# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

### ASHEVILLE DIVISION

| | | |
|---|---|---|
| JANE ROE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. __:20-cv-_____ |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| JUDICIAL CONFERENCE OF THE | ) | |
| UNITED STATES, | ) | |
| | ) | |
| THE HON. ROSLYNN R. MAUSKOPF, | ) | |
| in her official capacity as Chair of | ) | |
| the Judicial Conference Committee on | ) | |
| Judicial Resources, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ADMINISTRATIVE OFFICE OF THE | ) | |
| UNITED STATES COURTS, | ) | |
| | ) | |
| JAMES C. DUFF, in his official capacity as | ) | |
| Director of the Administrative Office of the | ) | |
| United States Courts, | ) | |
| | ) | |
| SHERYL L. WALTER, in her individual | ) | |
| capacity, | ) | |
| | ) | |
| JOHN DOE(S), | ) | |
| c/o Office of the General Counsel for the | ) | |
| Administrative Office of the | ) | |
| United States Courts, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| UNITED STATES COURT OF APPEALS | ) | |
| FOR THE FOURTH CIRCUIT, | ) | |

1

JUDICIAL COUNCIL OF THE
FOURTH CIRCUIT,

THE HON. ROGER L. GREGORY, in his
individual capacity and his official capacity as
Chief Judge of the Fourth Circuit and as Chair
of the Judicial Council of the Fourth Circuit,

JAMES N. ISHIDA, in his individual capacity
and his official capacity as Circuit Executive
of the Fourth Circuit and as Secretary of the
Judicial Council of the Fourth Circuit,

and

FEDERAL PUBLIC DEFENDER
FOR THE █████████████████
█████████████████,

█████████████████, in his individual
capacity and his official capacity as Federal
Public Defender of the Federal Public Defender
for the █████████████████████████,

*Defendants.*

## COMPLAINT
### JURY TRIAL DEMANDED

Plaintiff Jane Roe, by and through her attorney, alleges the following:

### INTRODUCTION

1.     This action seeks relief for the deprivation of constitutional rights suffered by

Plaintiff Jane Roe ("Roe") during her employment as a federal judiciary employee.  As detailed

herein, Roe alleges that Defendants violated her constitutional rights to due process and equal

protection under the law by subjecting her to unlawful sexual harassment, retaliation, and

2

discrimination, failing to take immediate and effective action on her complaints, and failing to provide meaningful review or remedies, resulting in her constructive discharge.

2. The Constitution guarantees judiciary employees, like all federal employees, the right to a workplace free of unlawful discrimination, harassment, and retaliation. These rights hold special force in light of the judiciary's core duty to provide equal justice under the law. To maintain the public's trust, the judiciary acknowledges that it "must hold itself to the highest standards of conduct and civility."

3. The federal judiciary has repeatedly assured the public and Congress that its existing procedures for redressing unlawful employment discrimination are adequate and effective, and that no external protections are necessary. The judiciary's procedures require its employees, the vast majority of whom do not work for Article III judges, to bring employment discrimination claims through internal complaint processes referred to as Employment Dispute Resolution ("EDR") Plans.

4. The federal judiciary claims that the complaint process is sufficient because, as one federal judge recently declared, the judiciary is "an independent branch of the government and we think we can police our own." Similarly, the Federal Judiciary Workplace Conduct Working Group ("Working Group") has concluded that the judiciary has a "good record for accountability" in this context. In fact, "[t]he most significant challenge for accountability," the Working Group asserts, "arises from the reluctance of victims to report misconduct."

5. During her employment as an assistant federal public defender in the federal judiciary, Roe suffered from unlawful sexual harassment, retaliation, and gender discrimination. Roe did everything possible, within the judiciary's existing mechanisms, to seek meaningful, prompt, and effective action on her complaints. She first confronted her harasser directly and

3

reported his misconduct to his supervisor, the Federal Public Defender. She next sought guidance from the Administrative Office of the U.S. Courts regarding her employment rights and then, when no other option was available, she filed a formal complaint under the EDR Plan for the United States Court of Appeals for the Fourth Circuit.

6.     At every turn, Roe was stonewalled. Defendants treated Roe as a liability rather than as a valued employee with a legitimate complaint. Defendants often blocked and intimidated Roe from exercising her protected rights. Over and over, Defendants minimized and trivialized Roe's complaints and, in turn, failed to respect her rights and dignity. Defendants also knowingly acquiesced in the violation of her rights and neglected their legal duties.

7.     When some conscientious judiciary officials did try to ensure prompt and effective action on Roe's complaints, their efforts were blocked. Instead, Defendants punished the victim while protecting the perpetrators. Over the next *six months*, Roe was placed on "telework," accompanied by diminished job duties and hostility from coworkers, with no meaningful action on her complaints. During this period, Roe was given no alternative to negotiating a resolution with the Federal Public Defender, against whom she had filed a formal complaint for retaliating against her and subjecting her to a hostile working environment. Then, following the termination of her employment, Roe was told she had no right to know the findings of the investigation into her complaints or the nature of any corrective actions taken.

8.     Defendants failed to provide Roe with meaningful review and remedies under the EDR Plan. The EDR process was structurally flawed, including by numerous conflicts of interest. Worse yet, judiciary officials acknowledged to Roe that presiding officers have no independent legal authority to order remedies against a federal defender office in an EDR proceeding. Roe was repeatedly told that ordering meaningful remedies would be unlikely and

4

perceived as meddling in the Federal Public Defender's business. Roe's rights under the EDR Plan existed on paper, but were fictional in practice.

9.      Without any meaningful review or remedies, Roe was constructively discharged. Because of Defendants' actions, Roe lost a career she cherished and her calling to serve federal indigent criminal defendants was largely foreclosed.

10.     Plaintiff seeks relief in this Court for Defendants' systemic and willful violations of her Fifth Amendment rights to due process and equal protection under the law.

## JURISDICTION AND VENUE

11.     This action is brought under the Fifth Amendment to the Constitution pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and 42 U.S.C. §§ 1985(3) and 1986.

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 2201.

13.     Venue is properly before this Court pursuant to 28 U.S.C. § 1391(e).

## JURY DEMAND

14.     Plaintiff Jane Roe demands trial by jury on each of her claims.

## PARTIES

15.     Plaintiff Jane Roe ("Roe") is a female attorney who was formerly employed as an assistant federal public defender in the federal judiciary.

16.     Roe graduated summa cum laude, Phi Beta Kappa from a "public ivy" undergraduate university.

17. Roe then graduated with high honors from a top-ten ranked law school, where she served on the law review and was elected to Order of the Coif.

18. After law school, Roe served as a judicial law clerk for a state supreme court chief justice with over fifteen years' experience in that position.

19. Roe then clerked for a federal district court judge who has served as chief judge, a member of the Judicial Conference, and a judge on the Foreign Intelligence Surveillance Court.

20. After her district court clerkship, Roe clerked for a federal court of appeals judge with fifteen years' experience on the bench, and who previously served as United States Attorney.

21. Roe was then selected for a prestigious fellowship in the judiciary. In this role, Roe worked on a number of projects to support the federal courts and the Judicial Conference of the United States. She wrote a law review article on a topic of interest to the federal courts, and presented her research at Judicial Conference committee meetings. As a fellowship alumna, Roe was invited to assist the Office of the Counselor to the Chief Justice with recruiting other judicial law clerks for the fellowship program.

22. Roe takes great pride in her professional accomplishments and exemplary work performance.

23. Defendant United States of America, by and through the federal judiciary and its statutorily authorized entities and agents, is legally bound as the guarantor of Roe's constitutional rights as a federal employee.

24. Defendant Judicial Conference of the United States ("Judicial Conference") is the principal policy-making body of the federal judiciary and promulgates the Model EDR Plan and related policy statements and mandates its adoption and implementation within the federal

6

judiciary.  The Judicial Conference derives the authority to promulgate and mandate the adoption of the Model EDR Plan from 28 U.S.C. § 331.

25.     Defendant Roslynn R. Mauskopf serves as Chair of the Judicial Conference Committee on Judicial Resources, which is responsible for making judicial policy on issues of human resource administration in the judiciary.  Chief Judge Mauskopf is being sued in her official capacity only.

26.     Defendant Administrative Office of the U.S. Courts ("AO") provides statutorily authorized administrative support to federal courts under the supervision and direction of the Judicial Conference, including support to circuit courts, judicial councils, and federal defender organizations.

27.     Defendant James C. Duff is the Director of the AO.  Director Duff is being sued in his official capacity only.

28.     Defendant Sheryl L. Walter ("General Counsel") is the General Counsel for the Office of the General Counsel ("OGC") of the AO.  The General Counsel is being sued in her individual capacity.

29.     Defendant John Doe(s) is/are attorney(s) employed in OGC under the General Counsel's supervision.  John Doe(s) is/are being sued in an individual capacity.  Because Plaintiff does not yet know the identity, or identities, of John Doe(s), this Complaint generally uses the term "OGC."

30.     Defendant United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") has the sole legal authority to appoint and remove Federal Public Defenders serving within the Fourth Circuit under 18 U.S.C. § 3006A(g)(2)(A).

7

31.     Defendant Fourth Circuit Judicial Council ("Judicial Council") oversees the administration of federal courts in the Fourth Circuit and adopted the EDR Plan used to process Roe's complaints of sexual harassment, retaliation, and gender discrimination.  The Judicial Council derives its authority to implement the Fourth Circuit EDR Plan from 28 U.S.C. § 332(d)(1).

32.     Defendant Roger L. Gregory ("Chief Judge") is the Chief Judge of the Fourth Circuit and Chair of the Judicial Council, and was responsible for various administrative duties under the EDR Plan used to process Roe's complaints of sexual harassment, retaliation, and gender discrimination.  Chief Judge Gregory is being sued in his individual and official capacities.

33.     Defendant James N. Ishida ("Circuit Executive" or "EDR Coordinator") is the Circuit Executive for the Fourth Circuit.  During the events alleged in this Complaint, he was the EDR Coordinator under the Fourth Circuit EDR Plan.  The Circuit Executive is being sued in his individual and official capacities.

34.     Defendant Federal Public Defender for the ██████████████████████ ("FDO") was Roe's "employing office" under the Fourth Circuit EDR Plan.

35.     Defendant ████████████████ ("Defender") is the Federal Public Defender for the ██████████████████████.  The Defender is being sued in his individual and official capacities.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]**

## FACTUAL ALLEGATIONS

### *Roe accepts a position with the FDO.*

36.     Since law school, Roe's dream job was to be a federal public defender, based on her interest in federal criminal law and her desire to help vulnerable clients navigate the criminal justice system.

37.     Roe was also inspired by the experiences of other judiciary fellows with similar credentials who have since gone on to illustrious careers in public service, using the fellowship as a springboard. Roe's mentors and supervisors at high levels of the judiciary during her fellowship year strongly supported and encouraged her ambitions to become a federal public defender.

38.     During her judiciary fellowship year, Roe was offered a position at the FDO.

39.     Roe hesitated to accept the employment offer because she was aware of the FDO's reputation as a troubled office—a history that was discussed in the public testimony of a resident district court judge.

40.     Roe was also told that some employees of the FDO had allegedly engaged in misconduct.

41.     It was Roe's understanding that, based on these concerns and others, the district court judges had recently converted the office to a Federal Defender Organization.

42.     Despite these concerns, Roe accepted the job offer.

43.     Based on information and advice from her colleagues, Roe believed that the incoming Defender would serve as a change agent to bring reforms to the office.

44.     In her offer letter, Roe was initially offered a position as a research and writing attorney, followed by a transition to an assistant federal public defender position shortly

9

thereafter. Roe's understanding was that she would transition to an assistant federal public defender position within a few months of her start date. The Defender repeatedly affirmed this understanding, and frequently discussed Roe's opportunity to select between a trial or appeals position.

45. It was Roe's understanding that, as an assistant federal public defender, she would have her own caseload and would undertake the representation of clients on parity with all other assistant federal public defenders in the FDO.

46. She would not have accepted a position with the FDO absent this understanding.

### *Roe works in a toxic culture of widespread discrimination, harassment, and retaliation, which the Defender encourages and condones.*

47. Roe had expected that the FDO would improve under the Defender's leadership. Instead, the Defender condoned, encouraged, and participated in a toxic workplace culture of discrimination, harassment, and retaliation. In this culture, bullying, sexism, homophobia, racism, and mockery of disabilities was normalized.

48. This toxic culture came straight from the top. The Defender promoted the individuals most responsible for misconduct and punished employees who complained. Examples were made of these employees with retaliatory acts ranging from disciplinary actions and firings to vicious and false rumors. These acts enforced an unwritten code of silence and fear.

49. Senior managers were emboldened by a lack of oversight. For instance, after Ninth Circuit Judge Alex Kozinski resigned, the FDO's First Assistant gloated to Roe that the process for filing sexual harassment claims in the federal judiciary is useless and nothing ever

10

happens to claims.  The First Assistant claimed to be personally aware of a complaint against a judge that, according to him, was appealed all the way to the "top" and went nowhere.

50.     The First Assistant also participated in spreading vindictive rumors about a former employee who had filed a lawsuit.  On information and belief, this employee had been fired after he took medical leave following his wife's death.  The First Assistant insinuated to Roe that this employee had actually killed his wife.  The First Assistant claimed to know this because an FDO investigator had, as he put it, "looked into it."  Roe heard the same rumor repeated by several other FDO employees.

51.     Despite the First Assistant's behavior, the Defender retained him as First Assistant.

52.     The First Assistant had control over the operations of the entire FDO and had supervisory authority over the trial units in the FDO's duty stations.  In Roe's experience, the Defender was highly deferential to the First Assistant's management decisions.

53.     The Defender also promoted four assistant federal public defenders, including one individual referred to as "Team Leader" in this Complaint.  In his role as Team Leader, he supervised several other employees, including Roe.

54.     The Team Leader routinely compared his clients, who were predominately African American, to "dogs."  He also mocked clients with disabilities.  During an all-staff meeting, he repeatedly referred to an intellectually-disabled client as a "retard."  In that same meeting, employees joked about a black federal prosecutor *rapping* to a jury.

55.     The First Assistant and the Team Leader had a running joke about whether clients would file claims of ineffective assistance of counsel against them.

11

56. The Team Leader also bragged about being sued for malpractice by a former client who alleged that he was wrongfully convicted because of the Team Leader's concededly incompetent representation.

57. The toxic workplace culture also encouraged homophobia. On information and belief, the FDO's administrative officer made jokes that a gay male employee could stay in the women's hotel room at a work conference because he is "like a girl."

58. Another employee was subjected to horrific homophobic rumors and slurs. On information and belief, it was rumored that he (a) was a "faggot," (b) may have "come on" to a former client, and (c) was exchanging sexual favors with prison guards.

59. On information and belief, rumors deriding this employee based on homophobic stereotypes—including rumors about his "dildo" collection—were still circulating many months after he had left the FDO and moved out of state.

60. Female employees were treated in a sexist and discriminatory manner. The Defender's management team was predominately male; whereas, female employees were belittled and not taken seriously as professionals. The Defender spoke about women using crude and derogatory language.

61. Female employees were also targeted for bullying and abusive behavior. For example, an attorney told Roe that, when she was pregnant, a male attorney cornered her, screamed at her, and threatened to get her fired.

62. This toxic working culture served as a foundation for the harassment and discrimination Roe suffered at the FDO.

12

*The First Assistant singles out Roe professionally and personally.*

63.     From the time Roe started at the FDO, the First Assistant used his supervisory role to single her out professionally and personally.  He lavished her with attention and assigned her almost exclusively to his cases during her first few months.  He created a "shadowing" activities list just for her, and adorned it with nicknames.  He began asking her to go to lunch with him on a regular basis, saying that he wanted to "mentor" her.  He always insisted on paying for her lunch, even when she offered.

64.     A few months after her start date, Roe asked the Defender and the First Assistant to meet about her transition to an assistant federal public defender position.  Roe specifically wanted to know what steps she needed to take, and the expected timeline, for her advancement to an assistant federal public defender position.  Since her start date, she had repeatedly requested professional opportunities, such as jury trials and appellate oral arguments, that would allow her to advance professionally.

65.     At this meeting, the Defender told Roe that the First Assistant had requested to be her "mentor," and that he would approve of this mentorship.  Roe understood the Defender's comments to mean that the First Assistant's "mentorship" was linked to her career advancement.

66.     On information and belief, the FDO had no formal mentoring program, and she was the only attorney who was being "mentored" by the First Assistant.

67.     The First Assistant was also not a good candidate to mentor aspiring assistant federal public defenders, such as Roe.  On information and belief, based on his limited trial experience at the time, the First Assistant would not have qualified for appointment to the district's Criminal Justice Act panel absent an exemption.

13

68.     Though Roe believed, at first, that the First Assistant wanted to help her professionally, she also noticed that he took a keen personal interest in her.

69.     Roe lived near the First Assistant, and he often gave her rides home when she was unable to ride her bike in inclement weather.

70.     He read all of Roe's law review articles and often asked to discuss them with her.

71.     He also showed an interest in her hobbies. Whenever Roe told him that she liked a certain type of music, she noticed that he would play that music the next time she was in his car. After she told him she liked hiking, he began telling her about hikes he went on by himself. After she told him about a guitar she bought, he bought himself a guitar from the same music store.

72.     Roe avoided socializing with the First Assistant outside of work, but he asked her to drink alcohol with him in work settings.

73.     Roe gradually suspected that the First Assistant was asking her to lunch and "mentoring" her because he was attracted to her romantically. At least some of Roe's coworkers noticed the First Assistant's interest in her, as well. They described him as "lustful," "fixated," "sexually attracted," and "smothering."

74.     Another coworker described attorneys "wanting" Roe in "not such a professional way," stating: "Thank god the attorneys don't have the ability to really undress you with their eyes. Or you wouldn't be dressed at work."

75.     Though Roe was increasingly uncomfortable with the First Assistant's attention, she did not feel she could say no to her supervisor. She tried to give him the benefit of the doubt.

14

*The First Assistant sends Roe a quid pro quo email.*

76.     On May 18, 2018, the First Assistant asked Roe to another "mentoring" lunch.  At this lunch, Roe told the First Assistant that, although she wanted to keep working at the FDO, she would need to transfer, eventually, to another duty station for family reasons.

77.     The First Assistant was visibly upset and emotional in response to Roe's comments.  Roe believed that he was taking the idea of a transfer very personally and that his reaction was unprofessional and inappropriate.

78.     In the same conversation, Roe discussed her work performance with the First Assistant.  Roe was approaching her one-year anniversary at the FDO, and she anticipated having a performance evaluation.  Over the last year, Roe had worked extremely hard to prove herself.  She was widely praised and respected for her excellent written work product and courtroom demeanor by her colleagues and by the federal judges before whom she appeared.  She planned to highlight these professional successes at her performance evaluation.

79.     Roe told the First Assistant that, at her performance evaluation, she planned to ask for a raise to the equivalent of the next grade on the GS pay scale and her anticipated promotion to an assistant federal public defender position with her own caseload.

80.     When the First Assistant and Roe returned to the office, he told her, "don't worry, we're going to take care of you."  He added that he hoped Roe's husband would take her somewhere nice for dinner that night.

81.     Roe left the office feeling shaken about the conversation.  She expressed her discomfort with the First Assistant's comments to several friends and family members.

15

82.     Later that afternoon, the First Assistant sent Roe an email:



83.     In the context of the First Assistant's inappropriate interest in her, and his direct references to her request for a promotion, Roe reasonably interpreted his words as a form of quid pro quo sexual harassment.

### *The First Assistant increasingly pressures Roe to meet him outside of the office.*

84.     Over the following weeks, the First Assistant increasingly pressured Roe to leave the office with him.  He asked her (a) out for drinks, (b) for "mentoring" sessions, (c) to give her rides, and (d) for out-of-office meetings alone.  His invitations were repeated and persistent.

85.     Roe was not comfortable being around the First Assistant in light of his behaviors, including his persistent pressure after being rejected.

86.     Roe also noticed that the First Assistant was increasingly obsessive.  When Roe would leave work at the end of the day, the First Assistant would often appear from around the hallway corner at precisely the same time and walk her out of the building.  At first, Roe assumed it was a coincidence.  After it happened enough times, she suspected that the First Assistant was keeping track of when she left work and standing around the corner waiting to leave the building with her.  Roe found this behavior disturbing.

16

***The First Assistant becomes controlling of Roe and punishes her when she does not comply.***

87.     The First Assistant became even more controlling of Roe's work duties and schedule. He demanded that she spend time with him through contrived "shadowing" activities, and punished her if she did not comply. These demands prevented her from doing her other work. To Roe's knowledge, he did not demand that any other attorneys go on "shadowing" activities with him.

88.     In one particularly egregious instance, the First Assistant used his "shadowing" activities as an excuse to interfere with Roe's preparation for a trial in which the client was facing life in prison.

89.     In May 2018, Roe volunteered, and was then assigned by the Defender, to serve as second chair on the trial case. Roe had repeatedly requested courtroom experience opportunities from the Defender, and it was her understanding that he assigned her as second chair to continue advancing professionally.

90.     On June 5, 2018, Roe emailed the First Assistant to cancel a "shadowing" activity because she had a forensic discovery review scheduled in the life-sentence case.

91.     The First Assistant had always told Roe that his "shadowing" activities were optional, and she found it self-evident that a discovery review in a life-sentence case would take priority over "shadowing" a routine presentence interview.

92.     To Roe's surprise, he responded: "That's really not OK with me." She was so stunned by his unprofessional reaction that she asked him if he was being sarcastic. He told her he was not.

93.     At 6:00 a.m. the next morning, the First Assistant emailed Roe asking for a copy of her job offer letter, claiming it was not saved in her personnel file. Roe was uncomfortable

17

with the First Assistant's email because it served as a reminder of the control he had over her professionally. She did not immediately respond.

94.     That morning during business hours, Roe met with the First Assistant in his office about the "shadowing" activity. She believed that, perhaps, there was a misunderstanding that could be resolved.

95.     The First Assistant was so angry at Roe that he was pale and shaking. He berated her for not attending his "shadowing" activity. He accused her of breaking a "commitment" to him. He, again, demanded a copy of her job offer letter.

96.     Roe had never been treated this way in a professional setting, and she felt threatened by the First Assistant's aggression in confronting her. Roe was so shaken and upset she left the office crying.

97.     That afternoon, the Defender asked Roe to meet about the trial case. In this meeting, Roe raised concerns that the First Assistant had acted inappropriately towards her. The Defender was dismissive of her concerns. He told her to work things out with the First Assistant directly.

98.     Later that day, Roe reiterated to the First Assistant that the discovery review could not be rescheduled and she would not be able to go on his "shadowing" activity. Roe reasonably believed that her ethical duties to her client required her to review the discovery.

99.     In his response—copying the Defender and the Team Leader—the First Assistant ordered Roe to attend his "shadowing" activity. He threatened action against her if she disobeyed his "direct order."

100.    The next morning, Roe "shadowed" the presentence interview, fearing that the First Assistant would discipline or fire her otherwise. Roe dreaded seeing the First Assistant and feared further abusive behavior.

101.    The First Assistant continued to berate and demean Roe on the way to the presentence interview. He called her "manipulative" and "deceitful" for seeking trial experience. He accused her of seeking trial experience just so she could "demand" a transfer.

102.    Roe was highly offended by these comments. She reasonably believed that, if she were a man, she would not be disparaged or belittled for seeking professional experience from her employer.

103.    The First Assistant accused Roe of lying to him about her reasons for cancelling his "shadowing" activity. He challenged his perceived inconsistencies in her emails discussing the scheduling conflict.

104.    He made clear that he had questioned her coworkers, and he was especially angry that she had raised concerns about him to the Defender.

105.    He repeatedly warned her that this was a "communication" issue and that she needed to talk to him more.

106.    Roe reasonably perceived the First Assistant's aggressive behaviors as obsessive, controlling, and completely out of proportion to the issue of whether she would attend a "shadowing" activity.

107.    Roe felt extremely uncomfortable with the First Assistant and attempted to distance herself further. She felt threatened by his actions in confronting her. She felt humiliated and concerned that he had harmed her professional reputation. She believed he was

19

interfering with her job for inappropriate reasons, and she reasonably viewed his behaviors as a pattern of sexual harassment, discrimination, and retaliation.

108.　　Roe began taking contemporaneous notes to document the First Assistant's inappropriate and unprofessional behaviors.

109.　　Shortly thereafter, the Defender "removed" Roe as second chair from the trial case, despite acknowledging her excellent performance.

### *Roe cuts her in-office hours to avoid being alone with the First Assistant.*

110.　　In June 2018, Roe raised ethical questions with the First Assistant regarding his duty of candor in another case. In light of Roe's ethical concerns and his other recent behaviors, she felt extremely uncomfortable around him.

111.　　On June 21, 2018, Roe stayed after business hours with the First Assistant, alone in the office, to prepare for a court hearing in that case. When their work was finished, the First Assistant said that it looked like it might rain and asked Roe if she wanted a ride home. Roe was not comfortable around the First Assistant, and she told him no. She joked that she was tough, and could handle biking home. She went to change into her bike clothes and assumed that he had left for the evening.

112.　　As Roe was leaving the building, however, the First Assistant was waiting for her in the lobby. He asked her if she was *sure* she did not want a ride home. She repeated that she was sure. She felt physically intimidated, pressured, and concerned about his intentions, and she left the building as quickly as possible.

Case 1:20-cv-00066   Document 1   Filed 03/03/20   Page 20 of 85

113.    Roe later saw that the First Assistant had also sent her text messages:

> It is currently raining.
>
> Last chance for a
> ride, tough girl...

114.    Roe no longer felt safe being around the First Assistant after this incident.  She felt threatened by his behavior of waiting for her after work hours when she was leaving the building alone and had already said no to him.  She found his text messages offensive and inappropriate.  She was concerned that he had a pattern of pushing her to see him after hours.

115.    After discussing her concerns with her family, Roe decided to modify her work schedule to never leave the office after 5 p.m. to avoid being alone with the First Assistant.  She began bringing her work home with her in the evenings.

### The First Assistant persists in asking Roe to meet him outside of work.

116.    Roe began suffering from severe anxiety and stress.  She felt nauseous to the point of vomiting before work almost every morning.

117.    Roe reached out to colleagues for advice on how to address the situation.  For example, she confided in an attorney who worked at the FDO, describing some of the First Assistant's behaviors and explaining that she felt threatened by him.  This attorney understood the significance of Roe's concerns, and reached out to a friend who worked on workplace sexual harassment issues on her behalf.

118.    On June 27, 2018, the First Assistant emailed Roe to ask her to meet for another "mentoring" session, suggesting he would like "distance" from work.

119.    Roe was uncomfortable with his invitation, and she asked the attorney in whom she had confided for advice on how to respond. The attorney advised Roe to meet with the First Assistant at the office, tell him that she was uncomfortable with his behaviors, and ask him to stop. He agreed to walk by and check in on her during her meeting with the First Assistant.

120.    On Friday, June 29, 2018, Roe cancelled the meeting with the First Assistant because she was so nauseous, she could not go into work.

121.    The First Assistant insisted on rescheduling for the next Monday. He stressed that he was "free all day, including early morning, lunch, and evening."

122.    Roe was apprehensive about the meeting and uncomfortable with the First Assistant's continued insistence on meeting out of the office and outside of business hours.

### Roe tells the Defender that she will be drawing boundaries with the First Assistant.

123.    Roe sought advice from a mentor who had extensive experience handling Equal Employment Opportunity cases for the federal judiciary. Based on this advice, Roe asked to speak with the Defender in confidence.

124.    On July 2, 2018, Roe told the Defender that she would be drawing boundaries with the First Assistant. She asked him to support her and maintain her confidence.

125.    The Defender asked Roe if this was "sexual harassment." Roe said that she was not using those words *yet*, because she was trying to self-manage the situation first. She emphasized that the First Assistant had behaved inappropriately, noting by example that he had been so angry at her he was shaking, and that she was leaving the office early every day to avoid issues with him. She stressed that she was "notifying" the Defender, and she would not have involved him if it was not absolutely necessary.

22

126.     The Defender said very little except to confirm, that this was a "head's up." Roe left the meeting in tears, concerned that the Defender did not verbally support her or ask her to follow up with him on her concerns.

### *The First Assistant berates and intimidates Roe for drawing boundaries with him.*

127.     Later that afternoon, Roe met with the First Assistant in the FDO conference room. Before starting the meeting, the First Assistant shut both doors to the windowless conference room. He then told her that she was "struggling." He claimed she was having a hard time balancing priorities. He had "frustrations" with her. He said he had tried to push her out of her comfort zone, but it had not worked out.

128.     Roe reasonably believed that the First Assistant intended to punish her by restricting her job duties, imposing disciplinary action, or firing her. She reasonably believed that his criticisms were not based on her job performance, but rather his anger that she was resisting his advances. Roe had never had a performance issue, and the First Assistant, himself, had consistently praised her excellent job performance.

129.     Roe told the First Assistant that she was setting "boundaries" with him. She told him that he "crossed a line" with her, and that his behavior was unacceptable.

130.     The First Assistant responded derisively that he was not expecting an "airing of grievances."

131.     Roe declared that she was setting boundaries, not "airing grievances." When she insisted that he had crossed a line with her, he said, sarcastically, that he would "try" not to speak to her that way again. Roe was offended that the First Assistant would not agree to treat her in a respectful and professional manner. She felt intimidated by him.

132.    The First Assistant continued berating Roe until she stood up, stated that she would rather discuss these issues with the Defender, and left the room. The First Assistant followed Roe out of the room, telling her to come with him to the Defender's office. Roe walked away from him.

133.    Immediately after this confrontation, Roe called the Defender. She let him know that the First Assistant might say something about her, and she asked him to withhold judgment until he had spoken to her. She then left the office.

***The Defender forces Roe to meet directly with the person she reported for inappropriate behavior, and enforces a retaliatory, hostile, and discriminatory working environment.***

134.    Roe decided to approach the Defender again the following week, when she knew the First Assistant would be out of the office. She planned on bringing copies of some of his inappropriate emails and text messages for the Defender to review.

135.    But on July 5, 2018, the Defender unexpectedly called Roe into his office to meet with the First Assistant directly. The Defender did not respect Roe's request to discuss the matter in confidence with him first. Instead, he forced her to meet directly with the person she had reported for inappropriate behavior.

136.    Roe repeated several times that she was uncomfortable and that she would not meet without speaking to the Defender alone first. She continued to repeat that she was uncomfortable after the three of them sat down in the Defender's office. Eventually, the Defender asked the First Assistant to leave the room. He then told Roe to stop taking notes, which made her even more uncomfortable.

137.    The Defender told Roe that the First Assistant was upset with her for not keeping a commitment to him. The Defender called this issue a "breakdown in communication." He said

24

that he was an "old school" person who believes that when you make a commitment, you keep it, so he could understand where the First Assistant was coming from.

138.    Roe repeated, once again, that the First Assistant had been so angry at her that he was shaking. She stressed that his behavior was inappropriate and unprofessional. She also expressed her discomfort with his comments that she was "struggling," and his stated intent to further restrict her job responsibilities.

139.    The Defender dismissed Roe's concerns. He insisted that, as Roe's supervisor, the First Assistant had the right to meet with her.

140.    The Defender then compared the First Assistant's supervisory role over Roe to Roe's marriage. He said he knew Roe had not been married for very long, but marriage always involves "compromise," and so Roe would have to "meet in the middle" with the First Assistant.

141.    Roe was shocked, horrified, and disgusted by the Defender's comments. She believed it was unacceptable to compare *any* professional relationship to a marriage, and it was especially offensive in light of the concerns she had raised about the First Assistant's inappropriate behavior.

142.    Roe began to cry. The Defender asked her why she was "getting emotional."

143.    Though Roe did not feel comfortable confiding in the Defender, she further notified him of the First Assistant's harassing behaviors. She told him that the First Assistant was interfering with her ability to do her job and that she felt threatened by him. She explained that the First Assistant had asked her repeatedly to meet out of the office. She described how he had waited for her in the lobby at night when he knew she was alone. She repeated that she was leaving the office early every day to avoid being alone with him.

144.     The Defender acknowledged that he did not want Roe to feel uncomfortable or unsafe.  But almost immediately, he brought the First Assistant back into the room.  The First Assistant continued berating and criticizing Roe in front of the Defender.  Even still, both he and the Defender remarked on Roe's excellent job performance.

145.     The First Assistant told Roe that he had created the "shadowing" checklist to help get her promoted, and that he was frustrated that she had been blowing off his checklist.  He suggested that she choose another "mentor."

146.     The First Assistant's comments made Roe feel extremely uncomfortable and apprehensive.  She reasonably believed that the First Assistant was punishing her by cutting off her prospects for a promotion, and she feared she would soon be fired.

147.     Roe also reasonably believed that the Defender wanted her to simply stop complaining rather than do anything to address the First Assistant's harassment.

### *The Defender assigns Roe to work directly under her harasser.*

148.     On July 9, 2018, Roe confirmed with the Defender in writing that she did not have a performance issue and that the First Assistant would no longer be her "mentor."

149.     Roe began working with another, highly-experienced assistant federal public defender, who offered to help her with her goal of continuing to gain trial experience.  This attorney consistently praised Roe for her excellent work ethic and work performance.

150.     Less than two weeks later, however, Roe's efforts were stymied.  On July 20, 2018, the Defender announced that he was re-assigning Roe to work *directly* under the First Assistant on his trial "team."  He also announced that Roe would no longer be assigned her own trial cases.

26

151.     Despite being on notice that the First Assistant was sexually harassing Roe, the Defender put her more directly under her harasser's control.  Roe felt betrayed and afraid of the idea that the First Assistant would have direct supervisory authority over her again.

152.     After work that day, the FDO's Appellate Chief called Roe.  Roe previously had spoken with the Appellate Chief about her desire to gain appellate experience.  The Appellate Chief told Roe that he thought she would be happy with a new appellate attorney position that management was looking into posting.  Roe asked the Appellate Chief to keep her updated on the new position.

153.     Roe also asked the Appellate Chief to help her put together a performance plan that would allow her to gain professional experiences, such as oral arguments and other courtroom appearances, to advance professionally.  The Appellate Chief praised Roe for working with an experienced attorney on the trial side, and offered to give her the same kind of professional support on the appeals side.

154.     The Appellate Chief also asked Roe about her issues with the trial teams.  Roe told him that she had serious concerns about working on the First Assistant's team.  The Appellate Chief asked if Roe's issues with the First Assistant were limited to a specific trial case or were more "fundamental."  Roe said her concerns were related to the trial case, but also more.

155.     The Appellate Chief remarked that he "strongly disagreed" with some of the First Assistant's "management" decisions, but he told Roe that he "adored" the First Assistant, that he was a good guy who had made mistakes, and that it was in her best interest to mend things and get along with him.  These comments made Roe deeply uncomfortable, as she believed he was pressuring her to drop her complaints.  She ended the conversation by telling him she needed a way forward.

27

156.     That Sunday evening, the First Assistant emailed Roe to ask to meet with her alone about his "team." This request made Roe very uncomfortable because the trial teams always met as a group, and the First Assistant knew, or should have known, that Roe was not comfortable being alone with him. She was especially concerned that the First Assistant still had so much control over her after she had reported his inappropriate behavior.

### *Roe is warned that the process is "stacked" in favor of management.*

157.     Roe felt unsafe and unprotected. She took leave on Monday, July 23, 2018 because she felt she had no other choice.

158.     That day, Roe sought guidance about her rights as a judiciary employee from the AO's Fair Employment Opportunity Officer (FEOO). The FEOO told Roe that her role was to manage the civil rights office for the federal courts, and that she reported directly to the Director and the Deputy Director. At that time, the Judicial Integrity Office did not exist.

159.     Roe learned about the EDR Plan for the first time by talking to the FEOO. At that time, the FDO did not have an employee manual, and the FDO had not provided Roe with any sexual harassment training or notice of applicable procedures for reporting sexual harassment.

160.     Roe described her experiences to the FEOO. The FEOO said that the behavior Roe had described was "classic sexual harassment." She remarked that Roe was highly credible.

161.     The FEOO described to Roe her possible options for resolving her complaints. She also suggested to Roe that it might be less risky for her personally if she looked for another job. She candidly stated her perception that the cards were "stacked" against Roe and in favor of management.

162.     The FEOO expressed hope that, perhaps, things were changing due to the recently-formed Working Group.  In the meantime, she encouraged Roe to continue calling in sick as a way to protect herself.

### *The Defender admits that he mishandled Roe's complaints, but still fails to take effective remedial action.*

163.     The next day, on July 24, 2018, the Defender called Roe, who was still out of the office, to apologize.  He admitted that he should not have put her back under the First Assistant's supervision.  He claimed that he made the decision after a long staff meeting and that he was "tired."  He said he was changing the team assignments again, and that he was on his way to the Appellate Chief's duty station to "figure it out."

164.     Roe was concerned that her confidences were being betrayed.  She asked the Defender to allow her to review any email announcing the change.  He promised he would.

165.     On July 26, 2018, however, the Defender sent out an email without notifying Roe ahead of time.  His email announced that he was hiring an appellate assistant federal public defender.  It also explained that Roe would be receiving assignments from another research and writing attorney.

166.     Roe viewed this change as a further restriction of her job duties, because she was no longer receiving her own cases and she would now report to another research and writing attorney.

167.     The next day, the Defender distributed an FDO employee manual for the very first time.  The manual included an updated organizational chart that required research and writing attorneys to report directly to the First Assistant.

29

168.     The Defender *still* had not removed Roe from the First Assistant's control, despite his promises to finally take action on her complaints.

### The Appellate Chief discourages Roe from applying for a promotion.

169.     Roe decided to apply for the appellate assistant federal public defender position. Roe had previously sought both trial and appellate experience, but she decided to pursue an appellate position in hopes of getting away from the First Assistant's control. In addition, given that Roe was no longer receiving any of her own trial cases, she was seeking to finally transition to a position with her own caseload.

170.     On July 27, 2018, Roe spoke with the Appellate Chief about the new appellate attorney position. To Roe's shock and disappointment, the Appellate Chief discouraged her from applying. He claimed that she did not "need" to apply, and that she would be better off financially by staying in a research and writing support role. Roe was especially discouraged given that the Appellate Chief had previously expressed an interest in helping her gain appellate experience.

171.     Roe decided to apply, despite the Appellate Chief's comments. She submitted her application on August 7, 2018.

### The First Assistant continues his obsessive, demeaning, and sexually harassing behavior.

172.     During the months of July and August 2018, Roe was terrified that she would be fired at any moment for raising complaints about the First Assistant. Based on the hostile behaviors of the Defender, the First Assistant, and the Appellate Chief, Roe's belief was objectively reasonable.

173. Roe returned to work in early August 2018 because she could not continue taking leave.

174. Roe's workspace was in a converted utility closet in an isolated back corner of the building. Because she was afraid of being confronted, she began carrying pepper spray with her to work.

175. Roe shared her workspace with an attorney who was well-respected in the legal community but was leaving the FDO because his position was being eliminated.

176. She confided in this attorney that she was thinking about moving her workspace after he left because she felt unsafe there. She explained that the First Assistant was sexually harassing her, but the Defender had failed to address her concerns.

177. A few hours later, this attorney told Roe that the First Assistant had joked, in front of his entire trial team, that the attorney should come back to give the office "sexual harassment training."

178. Both the attorney and Roe were highly offended by the First Assistant's comments. Given the close timing, they also suspected that the First Assistant, or someone else, had eavesdropped on their conversation.

179. Months later, Roe learned from another attorney that the First Assistant had been asking employees to "keep tabs" on her. On information and belief, it was well-known in the office that employees were monitoring her and reporting back to the First Assistant.

180. This attorney notified Roe, despite her fear of retaliation, because she and other female employees were highly offended by the First Assistant's behavior and believed that Roe needed to know about it.

31

181.     Roe was shocked and mortified that the First Assistant would ask employees to monitor her, that these employees actually did so, and that others were too afraid to report him.

182.     She also reasonably believed that he intended to make a mockery of her, directly, with his sexual harassment training joke, which she found incredibly offensive and demeaning.

183.     Above all, she was convinced that he was obsessed with her and she was not safe around him.

***With the Deputy Director's backing, the Chief of Defender Services contacts the Defender directly to take immediate and effective action on Roe's complaints.***

184.     In early August 2018, Roe seriously considered reaching out to the Circuit Executive of the Fourth Circuit, who also served as EDR Coordinator.  Roe was too intimidated, however, to report a sexual harassment complaint directly to the Chief Judge of the Fourth Circuit.  She also worried that she would not be treated fairly if it was true, as the First Assistant had claimed, that prior harassment complaints were not taken seriously.

185.     Roe was also told that any EDR settlement agreement would likely include a nondisclosure clause.  She did not want to be forced into silence.

186.     Roe continued her efforts to address her complaints without resorting to the formal EDR process.

187.     On information and belief, the FEOO shared copies of the First Assistant's inappropriate text messages and emails with the Chief of Defender Services.  On information and belief, the FEOO and the Chief of Defender Services then sought clearance at the highest levels of the AO to take immediate and effective action on Roe's complaints, by contacting the Deputy Director.

32

188.    On information and belief, the Deputy Director authorized the Chief of Defender Services to contact the Defender directly.

189.    On information and belief, their objective in contacting the Defender was to get Roe out of the office immediately so she would be safe and could then decide whether she wanted to file a formal complaint.

190.    On information and belief, the Chief of Defender Services called the Defender, and told him that he was on notice of sexual harassment by the First Assistant.

191.    On information and belief, the Defender admitted to the Chief of Defender Services that he had mishandled the situation.

192.    On information and belief, the Defender told the Chief of Defender Services that Roe did not have any performance issue with her work.

193.    On information and belief, the Chief of Defender Services suggested to the Defender that he should transfer Roe to another duty station immediately.

194.    On information and belief, the Chief of Defender Services suggested to the Defender that he should consider Roe for the open appellate attorney position and allow her to work in the appeals unit away from the First Assistant's direct supervision.

### *The Defender retaliates against Roe for reporting her complaints to the AO.*

195.    On August 9, 2018, the Defender came to speak with Roe in her workspace.

196.    He told Roe that the Chief of Defender Services had called him. He also claimed that he already "took care" of the situation.

197.    This comment surprised Roe, given her understanding that his failure to take appropriate action was the reason the Chief of Defender Services called him.

33

198.    The Defender claimed that Roe had told him she was *not* being sexually harassed, but *only* that she was "uncomfortable." Roe responded that this assertion was untrue. She was offended by his implication that, even if she *had* reported that she was only "uncomfortable," this would not be enough to notify him of a serious problem.

199.    The Defender criticized Roe for going to "some other party" with her concerns. He told her he was being "blamed" and "attacked" for something that was not his "fault."

200.    Roe was offended by these comments. Although the Defender had *conceded* she was being harassed, he was more focused on attacking her protected right to report the harassment.

201.    Roe reminded the Defender that she had raised complaints about being harassed multiple times. She repeated in detail the behaviors she had described to him in those meetings.

202.    When she mentioned that the First Assistant had cornered her in the lobby when she was alone, the Defender interjected: "OK, but there was no physical contact."

203.    Roe was outraged at the Defender's trivializing reaction, and his implication that at least, she had not been sexually assaulted. She was especially outraged because she had taken every possible measure, within her control, to protect herself from being alone with the First Assistant.

204.    Roe told the Defender that the only reason the First Assistant had not touched her is that she had not let him. The Defender said he understood that and he was not disagreeing with her. He did not apologize for his offensive comments.

205.    The Defender bluntly asked Roe what she "want[ed]." Roe had already repeatedly told him that all she wanted was to do her job without being harassed or threatened. She stated that, to address the situation, she was requesting to be an assistant federal public

34

defender and to work exclusively in appeals. The Defender agreed that it was necessary to move Roe into appeals because the First Assistant was in charge of the entire trial unit. He also promised to remove the First Assistant from Roe's chain of command.

206.    When Roe asked what would happen next, the Defender said he would implement these steps, consulting with the Appellate Chief as a "courtesy."

207.    The only term the Defender would not agree to was a transfer to another duty station, as he claimed there was no office space. He claimed it was enough that Roe and the First Assistant worked on opposite ends of the hallway.

208.    Roe was offended by his trivializing reaction. She reminded him that she had cut her in-office hours to never be in the building alone with the First Assistant. She stressed that this was not a tolerable situation. She said she could not come into work every day not knowing what might happen, and that the First Assistant was likely to be very angry when he found out about these changes.

209.    The Defender said he was not able to commit to anything regarding a transfer, but said he would see what he could do and report back to her.

210.    Roe believed it was unacceptable for the Defender to continue requiring her to work in an environment where she felt unsafe. She resumed taking leave from work.

211.    The next day, on August 10, 2018, Roe emailed the Defender to confirm the terms of their agreement in writing. Roe also requested to work remotely pending his transfer decision, citing the First Assistant's sexually harassing and threatening behaviors towards her.

212.    The Defender did not timely respond to Roe's email or act on her request to telework temporarily. She continued to take sick leave pending a response.

***With Defendants' backing, the Defender weaponizes the EDR process to intimidate Roe and
protect himself from liability.***

213.     A full week later, on August 17, 2018, the Defender emailed Roe, copying the

Circuit Executive and a Human Resources Specialist ("HR Specialist") employed by the district

court.

214.     On information and belief, the real purpose of the Defender's email was not to

update Roe on her complaint, but rather to further intimidate, bully, and retaliate against her.

215.     In the email, the Defender informed Roe that he was "reclassify[ing]" her to an

assistant federal public defender position.  The Defender said he was making this change because

it was "to the office's advantage to reclassify Research & Writing Specialists to AFD positions

for purposes of case weight measurement."

216.     In addition, after speaking with the Appellate Chief, the Defender would require

Roe to continue working for the trial unit in a research and writing support role.  The Defender

claimed that he had *never* agreed to allow her to work exclusively in appeals.  He said that she

would "report" to the Appellate Chief, even though she would still have research and writing

assignments under the First Assistant.

217.     Finally, the Defender informed her that he had reported her sexual harassment

allegation to the Circuit Executive, who had promptly informed the Chief Judge.  The Defender

cited Roe's August 10, 2018 email as the basis for making a report.

218.     The Defender stated that *both* he and the HR Specialist would meet with Roe to

"advise" her of her "rights" under the EDR Plan.

219.     He said he would "allow" Roe to telework temporarily, but he was "reserving the

right" to require her return to the First Assistant's duty station as soon as the investigation was

over.

220.     Roe was intimidated and afraid.  She was intimidated by the idea of meeting directly with the Defender about her rights under the EDR Plan, given that he had retaliated against her and subjected her to a hostile working environment.  She believed his statement about requiring her to return to the First Assistant's duty station showed that he had already prejudged the investigation.

221.     Given that the Defender had invoked the formal EDR process only *after* Roe followed up on his promise to take appropriate action, she reasonably believed that he was closing ranks to intimidate her and protect himself.

### *Defendants conspire to block Roe from exercising protected rights and shut down the efforts to take immediate and effective action on her complaints.*

222.     On August 20, 2018, Roe was informed she would be prohibited from seeking any further guidance about her rights from the FEOO.

223.     Roe was told that the Defender was furious at her for reporting the harassment to the AO.

224.     On information and belief, during the week that the Defender did not respond to Roe's August 10, 2018 email, he contacted OGC and the Circuit Executive directly.

225.     On information and belief, the Defender contacted OGC and the Circuit Executive with the objectives of insulating himself from liability and shutting down the FEOO's efforts to take immediate and effective action on Roe's complaints.

226.     During that week, no one from the Fourth Circuit contacted Roe about her complaints.

37

227. Instead, on information and belief, individual stakeholders acting on behalf of OGC and the Fourth Circuit agreed on actions and procedures for handling Roe's complaint, unbeknownst to her.

228. On information and belief, these stakeholders included, at a minimum, the Defender, Circuit Executive, and John Doe(s) defendant(s) from OGC.

229. On information and belief, the General Counsel and Chief Judge were made personally aware of these individuals' actions, at a minimum.

230. On information and belief, as part of the agreement, John Doe(s) recommended that OGC take over the investigation and strongly suggested that the FEOO be required to withdraw from any involvement. On information and belief, this recommendation was accepted and implemented.

231. As a direct result of this agreement, Roe was told that she would be prohibited from speaking to the FEOO.

232. Roe was outraged, intimidated, and offended by these actions, which she reasonably perceived as a form of institutionalized retaliation and an intimidation tactic. Defendants' actions illegally blocked Roe from engaging in protected activities: seeking guidance about, and asserting, her employment rights. She was especially shocked that OGC's directives contradicted the Working Group's public assurances encouraging judiciary employees to seek independent guidance and advice on workplace issues.

233. Roe made clear that the truth would be made known about OGC's tactics if things did not change. On information and belief, other high-level AO officials challenged OGC's directives, as well.

234. Roe was later told that the General Counsel personally overturned John Doe(s)' prior legally baseless, retaliatory directive barring her from speaking to the FEOO. Roe resumed speaking to the FEOO, but her involvement was restrained. A short time later, the FEOO left the judiciary.

235. Regardless, the damage had been done, as Roe understood how heavily the EDR process would be stacked against her. Roe had yet to even file a formal complaint, but she had already fought the highest levels of the judiciary in order to preserve her limited employment rights. Roe was disgusted, and terrified.

### Defendants conspire to deny Roe a promotion.

236. In August 2018, the hiring committee conducted interviews for the appellate attorney position. Roe was not invited to interview.

237. On information and belief, the First Assistant was on the hiring committee or, at a minimum, provided input regarding the hiring decision.

238. On information and belief, the Defender allowed the First Assistant to continue making, or participating in, decisions affecting Roe's job terms and conditions, despite being on notice of the First Assistant's quid pro quo sexual harassment.

239. Instead of being promoted, Roe received a "reclassification" of title.

240. The AO-52 Request for Personnel Action—the form used to request Roe's "reclassification"—was explicitly "submitted with the approval of the court."

241. On information and belief, Defendants directly sanctioned Roe's "reclassification" as part of their agreed-upon procedures for handling her complaint.

242. This "reclassification" was a retaliatory, phantom promotion. Roe was not considered for, or given an opportunity to request, an increase in salary or job responsibilities

39

based on her recognized excellent performance and hard work. She did not receive a performance evaluation or a performance plan with benchmarks for advancement that she had repeatedly requested. In fact, Roe was never given a formal performance review the entire time she was employed at the FDO.

243.    As the Defender himself confirmed, he "reclassified" Doe not to promote her, but rather to ensure that her attorney hours would count more favorably for office staffing and budget purposes. He explicitly confirmed his purpose of "reclassifying" Roe when he told her in his August 17, 2018 email, *with the EDR Coordinator and the HR Specialist copied*, that her reclassification was "to the office's advantage" for "case weight management purposes." At the same time the Defender "reclassified" Roe, he also "reclassified" the FDO's other remaining research and writing attorney.

244.    Roe was nominally an "Assistant Federal Public Defender," but she was not treated like other assistant federal public defenders at the FDO. Roe's prospects for receiving her own caseload and clients were cut off. Her job duties were limited to providing research and writing support to other attorneys. She was required to continue providing research and writing support to the trial unit directly supervised by the First Assistant.

245.    Roe was denied a salary increase, despite her recognized excellent work performance. On information and belief, Roe was approaching a work anniversary that would have triggered an annual, nondiscretionary step increase on the GS pay scale; however, the FDO was able to avoid paying her this salary increase as a result of her reclassification.

246.    In fact, along with "reclassifying" Roe, the AO-52 Request for Personnel Action requested to strip her of the locality adjustment to which she was legally entitled as a federal employee, resulting in a *pay cut of nearly 15 percent*—all with court "approval."

247.    Without explanation, an approving official made Roe's "base pay" equivalent to her total salary prior to the reclassification, while leaving her locality pay at zero.

248.    Roe reasonably believed that, at best, she was denied a raise, and at worst, the Defender planned to drastically, and illegally, reduce her salary.

249.    Roe repeatedly raised questions about her salary and locality pay, but her concerns were never addressed.  In total, Roe worked for approximately six months without designated locality pay.

250.    Roe was especially disturbed by the phantom promotion, given that her request for a promotion was a specific triggering event for the First Assistant's quid pro quo email and escalating course of quid pro quo sexual harassment.  Roe reasonably believed that she was being denied a promotion as part of a continuing course of harassment, retaliation, and discrimination, with Defendants' full knowledge and acquiescence.

251.    Most concerning, the Court's direct approval of the retaliatory "reclassification" contributed to Roe's concern that she would not receive a fair or impartial review of her complaint.

### The First Assistant continues harassing Roe and interfering with her job duties even after the "investigation" is opened into his conduct.

252.    The First Assistant did not stop harassing Roe or interfering with her job duties, even after an "investigation" was opened into his conduct.

253.    For example, in late August 2018, the First Assistant copied Roe on an email to a client.  In that email, the First Assistant used highly specific, unique words and phrases from a law review article written by Roe.  As a result of including these references, the email was entirely nonsensical, inappropriate, and unprofessional.  Roe reasonably believed that the First

Assistant sent this email solely to harass her because he knew she was the only one who would understand its coded references. She was disturbed that the First Assistant was so willing to sacrifice the quality of his representation to pursue his obsession with her.

254. Roe was scared to be around the First Assistant in light of his erratic and obsessive behaviors. She was concerned that, since she was no longer going into the office, he would confront her at places such as the county jail, where she visited clients, or the federal courthouse. Roe no longer went to these places alone; she always brought a family member, who would wait nearby during her client visits or court hearings.

255. Other employees later told Roe that, during this time period, they observed the First Assistant lurking around the county jail, and hanging out for long periods in the jail lobby, as if he was waiting for someone. On information and belief, his behavior was unusual enough that these employees discussed, and were disturbed by, his behavior.

256. These comments confirmed Roe's fears that the First Assistant was stalking her and that the "investigation" would not deter him.

### *The EDR Coordinator tells Roe that the General Counsel has provided special instructions for handling her complaint.*

257. On September 5, 2018, Roe spoke to the Circuit Executive by telephone in his capacity as EDR Coordinator.

258. He explained that the HR Specialist would be investigating her complaints, and that although there were no hard or fast deadlines, the investigation would be done "promptly."

259. Roe asked the EDR Coordinator to clarify the scope of the investigation he had opened. He told Roe that the investigation would cover her allegations of sexual harassment against the First Assistant.

260. Roe informed him that her allegations were *not* just sexual harassment by one person, and included acts of retaliation as well. She told him that she planned to name the Defender as a violator of the EDR Plan.

261. Roe told the EDR Coordinator that the Defender was not being truthful when he said that he only learned of her sexual harassment allegations from her August 10, 2018 email. She explained that, in fact, she had been trying to work with the Defender to resolve her complaints, but he had escalated the situation and failed to protect her.

262. She emphasized that she *wanted* an investigation, but she was very concerned about the Defender's role in the process given that he had violated her rights.

263. Roe also discussed with the EDR Coordinator her perception that the FDO was a highly troubled office. Roe explained that she had wanted to be a federal public defender since law school and truly had a passion for the work, but she was disturbed by what she had seen at the FDO.

264. The EDR Coordinator acknowledged that, before the Defender's hiring, there were a lot of "serious issues" in the FDO and the judges were "mindful" of the need to change the office culture. He said that Roe's concerns were "well-founded."

265. The EDR Coordinator told Roe that he had discussed her concerns about the Defender with the General Counsel. The General Counsel had suggested that he, rather than the Defender, "receive" the final investigation report. He said that, although that step is "not in the process or plan," the Defender had agreed to let him receive the report.

266. The EDR Coordinator also told Roe that it was not "helpful" for her to have reported her complaints to the AO. He said that when that happens, "barriers go up," walls go up, and people are "on guard."

43

267.     The EDR Coordinator's comments confirmed to Roe that multiple high-level judiciary officials found it unacceptable that she had sought advice on her civil rights from the FEOO.  Even worse, the *EDR Coordinator*—the very person responsible for helping Roe preserve her protected rights—was openly criticizing her for exercising those rights.

268.     Having been put on the defensive, Roe explained that she reached out to the FEOO because she was in a desperate situation where she was not being protected and she was not being listened to.  She noted that she had raised her complaints directly with the First Assistant and the Defender, but these efforts had backfired.  She was at a loss, though, trying to understand why she needed to explain her actions at all.

269.     The EDR Coordinator repeatedly asked Roe what she "want[ed]."

270.     He explained that he had been involved in another EDR complaint against the Defender's office.  Based on this experience, he said he believed that the Defender was "earnest" and wanted the best for his employees.  These comments shocked Roe, given what she had just told him about the Defender's dishonesty and his failure to take her complaints seriously.

271.     Based on the details the EDR Coordinator provided, Roe believed she could likely identify the other person who had filed a complaint.  Roe immediately lost all faith that he would protect her confidentiality.  She also did not understand why he would try to persuade her of the Defender's good intentions by telling her about yet *another* complaint against him.  To the contrary, she was alarmed and appalled that the Defender had been the subject of multiple complaints.

272.     Roe told the EDR Coordinator that she "wanted" two things: (1) a full and fair investigation that included the full scope of her allegations, and (2) the opportunities for professional advancement that she had before raising complaints about the First Assistant.

44

273.    She felt demoralized being repeatedly asked what she really "wanted."  She suspected that she was being asked what she "wanted" in an effort to sweep her complaints under the rug.

***Roe files a report of wrongful conduct against the First Assistant and the Defender, and she requests to disqualify the Defender.***

274.    On September 10, 2018, Roe filed a request for counseling and her own report of wrongful conduct, naming both the First Assistant and the Defender as alleged violators of the EDR Plan.  Roe alleged that she had been subjected to unlawful harassment, retaliation, and discrimination.  She provided a separate five-page written narrative summarizing her complaints.

275.    Roe requested the following relief: "An environment free of harassment, retaliation, and discrimination, the opportunity for merit-based advancement, and any other appropriate relief."

276.    In a separate filing, Roe requested to disqualify the Defender from serving as the employing office's representative under Chapter X, Section 7, of the EDR Plan.  Section 7 grants the Chief Judge the authority to disqualify any "employee" who is "involved" in a complaint. The EDR Plan's definition of "employee" includes unit executives, like Federal Public Defenders.

277.    Roe argued that the Defender should be disqualified because he was an accused violator of her rights under the EDR Plan.

278.    Roe also moved to stay the wrongful conduct investigation the Defender had initiated so that the scope of the investigation could be expanded to include her allegations of retaliation against the Defender.

279.    Though Roe filed her own complaint to try to ensure that her perspective and experiences were taken seriously, she did so because she believed she had no other choice but to resign.

280.    Roe was profoundly humiliated and demoralized by having to bring her complaint directly to the Chief Judge of the Court where she was a practicing attorney. Roe had never even met the Chief Judge. Now, instead of being known for a brief she wrote or an oral argument she gave, this complaint would be Roe's first impression on the Chief Judge—a devastating prospect for Roe professionally, and one that a male attorney would be far less likely to face.

281.    Roe also feared reprisal for filing a complaint against the very person whom the Fourth Circuit had only recently chosen as the FDO's first Federal Public Defender.

282.    Her fear was heightened given the Defender's recent announcement that the Chief Judge was working with him, personally, to establish a Capital Habeas Unit that would be managed by the FDO.

283.    Roe reasonably believed that these structural conflicts of interest would make it impossible to evaluate her complaints impartially. Given the Defender's connections within the Fourth Circuit, Roe was terrified that she faced not only losing her job, but also more long-term career consequences, for having filed a complaint against him.

### *The EDR Coordinator reiterates that the Defender should not be involved in making decisions on her complaint if he engaged in misconduct.*

284.    On September 18, 2018, Roe met with the EDR Coordinator in person.

285.    The EDR Coordinator opened the meeting by emphasizing that the Chief Judge was "taken aback" by Roe's request to disqualify the Defender because he wasn't "expecting it."

46

286.     Roe asked the EDR Coordinator about his appointment of the HR Specialist as the investigator.  Roe asked if the Defender would be involved in administering the investigation, and whether he had already talked to the HR Specialist about her complaint.

287.     The EDR Coordinator admitted that the HR Specialist did not know about Roe's allegations against the Defender, "because that was never part of the initial concern about sexual harassment" by the First Assistant.  He reiterated that the HR Specialist would deliver the investigation report to him, instead of the Defender.  Further, if the allegations against the Defender were substantiated, then the Chief Judge would need to "step in" as the Defender's "supervisor."

288.     Roe emphasized that this conflict of interest was exactly the issue she was getting at with her motion to disqualify the Defender.

289.     The EDR Coordinator asked Roe, again, what she wanted.  He said that he believed the parties were "close" to agreeing, with the exception of a transfer because the Defender "physically doesn't have space."  He claimed that the Defender had "physically" separated the First Assistant and Roe by putting them "on opposite sides of the office."

290.     Roe was shocked and angered by the EDR Coordinator's comments.  She stressed that the Defender had *never* moved her office.  Even if he had, Roe was appalled by the suggestion that this was an adequate response to the complaints she had raised.  Roe told him that the Defender had acted in bad faith, and that his rejection of a transfer showed he had prejudged the investigation.

291.     The EDR Coordinator acknowledged that it would be difficult for Roe to return to the First Assistant's duty station.

292.     He added that Roe's complaint was very troubling in terms of the sequence of events, "one thing after another," even after her concerns were brought to light.

293.     The EDR Coordinator asked Roe, yet again, what she "want[ed]." She repeated what she had already requested: a working environment free of harassment and retaliation, the opportunity for merit-based advancement, and any other appropriate relief. What she "wanted," in other words, was immediate and effective remedial action on her complaints.

294.     Roe said she was "at a bit of a loss," stating words to the effect:

"What I want is for it to be made right. I want to be safe. I want to be protected. I want the opportunity to stand on my own feet and advance on my own merit and to not be hindered or blocked from doing that."

295.     Roe stressed that her limited caseload had been taken away after she reported the First Assistant's harassment. She had applied for an appellate position and was *not even asked to interview*. These acts of retaliation not only blocked her from being considered for a promotion, it also foreclosed any opportunity for her to get away from the First Assistant's supervision.

296.     The EDR Coordinator expressed empathy for Roe. He said that, based on Roe not being invited to interview for the appellate position and being required to go back to the First Assistant's duty station, he could see how she would not feel valued or safe, and how she would not feel taken seriously career-wise and in her personal safety. He said words to the effect: "I'm sorry about that."

297.     Moving forward, the EDR Coordinator said that he would send Roe's report of wrongful conduct and request for counseling to the HR Specialist. She would conduct one, unified investigation for both proceedings.

298.     Roe left the meeting concerned that the investigation would not be fair or impartial, but optimistic that the EDR Coordinator had at least *acknowledged* that it might not be appropriate for the Defender to be involved in resolving her complaint.

### *Roe participates fully in the wrongful conduct investigation.*

299.     On September 28, 2018, the EDR Coordinator confirmed in an email that the HR Specialist would "proceed with one, unified investigation into the Chapter IX report of wrongful conduct (allegation of sexual harassment by [the First Assistant]), and the alleged subsequent, related conduct by [the Defender]."

300.     On October 5, 2018, Roe met with the HR Specialist.  At the outset, the HR Specialist told Roe that her only role was to "collect" the facts.

301.     Roe was under the impression that the primary purpose of their first meeting was to advise her of her rights, but she spent over four hours explaining in painstaking detail the sexual harassment, retaliation, and discrimination she had suffered, at times breaking down into tears.  She provided copies of the First Assistant's inappropriate text messages and emails, her contemporaneous notes describing his harassing behavior, and documentation of the retaliation against her.  She also provided a list of witnesses.

302.     During this meeting, the HR Specialist told Roe that she believed there was "nothing wrong" with going to the AO for advice, even before speaking to anyone locally.

303.     The HR Specialist noted that she had been involved with the office conversion to the FDO.  She expressed surprise that no one from the AO gave training during the conversion on policies and procedures for handling complaints.

304.     The HR Specialist stated her opinion that training would have helped in Roe's situation—and maybe even "avoided" it.  Instead, in her view, the office was left on its own to

49

learn. She said that she was not making excuses for the Defender, though, and that it was "evident" that he handled things "very poorly."

305. Roe told the HR Specialist that she believed the EDR process was being set up to "wash me out" and "throw me away."

***In a follow-up interview, the HR Specialist admits that she did not investigate the Defender for retaliation and that she is not qualified to make findings or recommendations.***

306. After her October 8 interview, Roe did not hear from the HR Specialist for over three weeks.

307. On November 1, 2018, Roe asked the HR Specialist for a status update. The HR Specialist responded that she had a few follow-up questions for Roe.

308. Roe met with the HR Specialist for a second time on November 9, 2018.

309. The HR Specialist asked Roe whether she had been "friendly" to the First Assistant. She asked whether Roe's relationship with the First Assistant "broke down" over a case assignment. She questioned whether the First Assistant's behavior was "sexual."

310. Roe reasonably inferred that the First Assistant had defended himself by asserting that Roe had welcomed his behavior.

311. Roe emphatically responded to the HR Specialist that she had *not* welcomed the First Assistant's behavior, that it was obvious that his harassment was sexually motivated, and that her complaint was about the First Assistant's inappropriate behavior, not about a case assignment.

312. Roe asked the HR Specialist whether she needed to start making "contingency plans" because her employing office had not shown any willingness to work with her and she did

50

not know what her professional future would look like. The HR Specialist responded that it was "fair" for Roe to feel that way.

313. Roe repeatedly asked when she would hear some kind of substantive update that would allow her to make an informed decision about her career. The HR Specialist said that there were no deadlines for the investigation.

314. Roe said that it was "obvious" to her that "if they could, they would fire me tomorrow."

315. When Roe expressed concerns about seeing the First Assistant at work, the HR Specialist responded dismissively by telling her that she would have to continue working with him after this.

316. Roe understood that she would need to answer questions about her complaints, but she reasonably perceived the HR Specialist's attitude as insensitive, especially after more than three weeks of not communicating with Roe at all.

317. The HR Specialist did not mention interviewing any other witnesses besides Roe, the First Assistant, and the Defender. On information and belief, the HR Specialist did not contact anyone on Roe's witness list.

318. Roe also asked the HR Specialist about her investigation into the Defender's misconduct. The HR Specialist explained that she had been focusing on the sexual harassment claims regarding the First Assistant, as well as how the Defender "handled" them. She stated that if there is a "true feeling of retaliation," then that would have to be investigated "separately." She said that she did not understand Roe's claims to be within the scope of the investigation the EDR Coordinator had ordered.

51

319.    These comments shocked and devastated Roe.  Despite Roe's painstaking efforts to expand the scope of the investigation, the HR Specialist admitted that she *never* investigated her retaliation claim.  Even worse, she characterized the Defender's misconduct as a form of mishandling, or mismanagement, rather than actionable retaliation.

320.    The HR Specialist stated that she would not be comfortable making, and did not think it was appropriate for her to make, recommendations on the complaint because she is not an "attorney" and not trained on the "legal" side.  Therefore, she told Roe, her report would only contain "facts."  She said she expected the EDR Coordinator to make the final decisions because he is "over" the Defender.  She said she assumed that the EDR Coordinator would consult with the Chief Judge, as well.

321.    After this meeting, Roe felt utterly demoralized and disbelieved.  She was convinced, more than ever, that her complaints would be whitewashed and buried.  Even still, in an effort to preserve a record, Roe sent the HR Specialist an email further detailing the First Assistant's quid pro quo harassment.

### Roe asks why the burden is on her to initiate the solutions to her complaints.

322.    On November 12, 2018, Roe emailed the EDR Coordinator, with the Chief Judge copied, to ask about the status of her EDR complaint.  At that point, Roe's formal complaint had been pending for over two months with no action taken and no decision on her motion to disqualify.

323.    Roe asked the EDR Coordinator for a status update.  She pointed out that her counseling period—the first stage of resolving her complaint—would likely expire before the investigation was completed.

324. Roe reiterated her requests to work in an environment free of harassment and retaliation and to advance professionally based on merit. Roe stated:

"I have put pen to paper too many times to count since our last meeting, but I am unable to come up with a proposed solution on my own that would achieve these goals. The problem I keep encountering is, how can these remedies be achieved without action by others, outside of my control? In other words, if I initiate the formulation of the ultimate remedy about how I can do my job, safely and effectively, as a precondition to counseling, then this dilemma seems inextricably linked to my request for disqualification. Put simply, I do not see how I can negotiate a remedy with an individual who retaliated against me for raising concerns of sexual harassment?"

325. In his response, also with the Chief Judge copied, the EDR Coordinator confirmed that the HR Specialist's investigation was serving as a "joint investigation" for Roe's report of wrongful conduct *and* her request for counseling. However, he stated that Roe's counseling period would end on November 29, 2018 and could not be renewed, regardless of whether the investigation had concluded by that date.

326. In addition, the EDR Coordinator claimed that the Defender had already "taken numerous steps" to protect Roe's safety. He did not specify what those steps were.

327. Roe followed up and pressed the EDR Coordinator to explain this assertion. Roe said that she was unaware of any actions that the Defender had taken to protect her, except that he had rejected a transfer and made clear he would require her to return to the First Assistant's duty station no matter the outcome of the investigation. Further, Roe reiterated that the Defender had retaliated against her by denying her a promotion and, instead, giving her an "administrative" reclassification of title.

53

328.     Roe asked the EDR Coordinator: "[C]an you understand why I do not view these measures as an attempt at resolution, but instead as evidence of actionable retaliation by the Federal Defender and support for my disqualification request?"

329.     Roe also asked the EDR Coordinator about the HR Specialist's investigation report. Specifically, who would receive a copy of the report? Who would make recommendations based on the facts in the report? Who would make final decisions based on those recommendations?

330.     In his response, again with the Chief Judge copied, the EDR Coordinator did not directly answer any of Roe's questions. Instead, he defended the Defender's actions by claiming that the Defender had "allowed" Roe to telework, removed her from the First Assistant's "chain of command," and taken "other" steps to "avoid contact with the accused," which he did not explain.

331.     The EDR Coordinator pressed Roe to "articulate precisely what it is" that she was "looking for," so that he could "present" her ideas to the Defender for "discussion."

332.     The EDR Coordinator further told Roe:

"Reiterating that you want a safe workplace free of harassment isn't helpful because [the Defender] already believes that he's done and is doing all he can to provide such a workplace for you."

### The HR Specialist asks Roe for a "list of demands."

333.     On November 19, 2018, the HR Specialist emailed Roe, with the EDR Coordinator copied, asking for a "specific list of demands you feel would bring this situation to an agreeable resolution."

54

334. The HR Specialist called Roe's prior requests—an environment free of harassment and advancement based on merit—"general in nature." The HR Specialist noted that some "steps" had already been taken based on Roe's prior requests. Among these "steps," Roe was "reclassif[ied]" and "taken out of the chain of command" for the First Assistant. The HR Specialist asked Roe to provide any other "specific, tangible requests."

335. For Roe, the HR Specialist's characterization of her "reclassification" as a remedial "step" confirmed that her retaliation claims were never taken seriously. Roe had specifically alleged that her "reclassification" was a phantom promotion with no progression of salary or job duties. Roe had also alleged that she was still required to do research and writing work for the trial unit under the First Assistant's supervision. The HR Specialist did not mention these facts, however. Instead, she seemed to have accepted the legitimacy of these actions at face value.

336. In addition, the HR Specialist said she understood that returning to the First Assistant's duty station would be "difficult" for Roe. The HR Specialist said she "would appreciate any ideas" for Roe to "feel safe" in "an environment free from harassment and intimidation and where advancement is based on merit." The HR Specialist emphasized that she would need "concrete specific requests" from Roe.

337. Roe did not understand why she was being asked, yet again, to make "specific" "demands," or what demands would be considered "specific" enough. She did not understand how her request to be free of harassment, retaliation, and discrimination was not enough. She strongly believed she was being asked for her "demands" to avoid institutional responsibility for taking meaningful action on her complaints. She also did not understand why the HR Specialist

was asking for a "list of demands" when she was not qualified to make recommendations. For these reasons, Roe did not immediately respond to her email.

### *Roe continues to suffer a hostile working environment while her complaint is pending.*

338.    Roe's work was severely affected by the lack of prompt and effective action on her complaints. Roe originally expected to be on telework only briefly during the investigation, but she languished for months on what had become de facto administrative leave. This situation made Roe's job duties, such as preparing for court appearances, difficult if not impossible. During this period, Roe's workload and job responsibilities diminished, while the First Assistant continued in his normal managerial role.

339.    In November 2018, the Defender announced that he planned to hire an unpaid intern in another division office, despite previously stating that he had no office space at that location. The FDO publicly advertised at least two positions requiring work in that division office, while Roe was essentially banished on de facto administrative leave.

340.    The First Assistant did not stop interfering with Roe's work even while her complaint was pending against him. Roe had taken extreme measures, including giving up on her trial experience ambitions, to avoid working with a supervisor who was harassing her. She reasonably expected, as a baseline, that the First Assistant would not be allowed to be involved with her work while her complaint against him was pending. On information and belief, the First Assistant was a trial lawyer only, with no job duties pertaining to appeals.

341.    After Roe raised complaints about the First Assistant, however, he suddenly began volunteering to take on appeals work. He decided that he wanted to serve as counsel of record in a Fourth Circuit appeal, and he participated in all the moot court sessions held by the

appellate unit. He even volunteered to serve in back-to-back moot court sessions for the same case, behavior which was highly unusual and irrational.

342.    Although appellate moots were a required part of her job duties, Roe eventually stopped participating because she did not feel comfortable being forced to work directly with her harasser while her complaint was pending. She reasonably interpreted his sudden interest in appellate work as a way to continue pursuing his obsession with, and control over, her. Given his undeterred intrusive and obsessive behavior towards her while the investigation was pending, she reasonably feared what he would do when it was over.

343.    Roe reported the First Assistant's continued involvement with her work, including her discomfort with his participation in her appellate job duties, to the HR Specialist and the EDR Coordinator. However, no action was taken on her complaints.

344.    Roe was also ostracized and ridiculed by her colleagues, who treated her as an office joke and spread rumors about her. For example, Roe was asked about her EDR case by a former employee, who told her he found out about it because "people talk." Roe also heard office rumors that the new appellate attorney was hired to be her replacement.

345.    Roe's Team Leader openly ridiculed and disparaged her, even while he claimed, tongue-in-cheek, to deny knowing about her complaint.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]**

57

346.     That fall, the Team Leader wore a Justice Kavanaugh costume—complete with a Yale-themed beer guzzler helmet—for the office Halloween party, which she did not attend:



347.     Other employees were highly offended by the Team Leader's behavior. They reasonably perceived him to be mocking—and threatening—women who complained.

348.     The Team Leader also goaded and encouraged team members' mockery and smears of Roe. For example, on November 16, 2018, Roe called into an all-staff meeting, even though she was not required to do so because she was on bereavement leave. After the staff meeting ended, Roe remained on the call after she realized that her trial "team" was meeting, and she had become a topic of conversation.

349.     Roe listened while her "team" members complained about her not being in the office, and mocked and belittled her.

350.     One attorney joked: "I mean, do I meet her at Starbucks?," resulting in rolling laughter.

351.     The Team Leader chimed in: "Should we meet her at Waffle House?"

352.     Others added: "Where's Waldo?," to more chuckles and laughter.

58

353.    Roe's "team" members sarcastically referred to her as a "liaison" "research and writing attorney."  They said they had "no idea" what her job was.  The Team Leader joked that Roe was not "ideal to the task" if "communication is what we're looking for."

354.    Once the laughter died down, the Team Leader added:

"I'll just say this as a caveat for the whole thing.  Not knowing anything about what's going on, which I don't, I was told that the fact that I do not know anything about what's going on is—I should feel *lucky* about the fact that I don't know. . . .  I don't know what's going on, but I know enough to not ask questions.  My guess is it only gets worse the more you find out."

***After months of enduring a hostile work environment with no action taken on her complaints, Roe asks the Fourth Circuit for assistance with a transfer.***

355.    On November 21, 2018, Roe sent the EDR Coordinator an email, with the Chief Judge copied.  Roe stated:

"I have been reflecting on this situation and discussing potential next steps with my family.  This situation has irreparably damaged my relationships with the Federal Defender and my colleagues, and I believe I am no longer welcome in that environment.  I would appreciate the Fourth Circuit's assistance in transitioning me out of [the Defender's] office."

356.    Roe provided a similar response to the HR Specialist's email asking for a "list of demands."

357.    On November 25, 2018, the EDR Coordinator asked Roe for a copy of her resume.  He said he would "make inquiries" in federal defender offices around the circuit.

358.    Roe thanked the EDR Coordinator for the offer, sent him her resume, and encouraged him to send it to federal defender offices and Article III judges within the Fourth Circuit.

359. The EDR Coordinator responded that he would be happy to circulate her resume with other federal defender offices, but that he would "leave" it to Roe to reach out to judges, "as you see fit."

360. The EDR Coordinator also said that, since Roe was "now contemplating leaving" the FDO, he would like his Human Resources Administrator ("HR Administrator") to join an upcoming phone call they had scheduled in case any "HR questions or issues arise."

361. Roe responded that she was not ready to have an HR conversation about leaving the FDO, and she would like to have a conversation with the EDR Coordinator in confidence. Roe could not help but notice that he seemed very relieved that she was contemplating leaving her job.

### The EDR Coordinator tells Roe he is sending back the investigation report to be redone.

362. On November 27, 2018, Roe spoke with the EDR Coordinator by phone. He informed her that he had received the HR Specialist's report, but he was sending it back.

363. The EDR Coordinator explained that the report set out a "chronology" of the facts that "we all know." He said that he had told the HR Specialist that it would be "helpful" if the report had "findings and recommendations." According to him, the HR Specialist already had them written up, but she did not want to make the report "too long." He asked her to supplement the report to include her findings, conclusions, and recommendations.

364. Roe told the EDR Coordinator that, from her perspective, "the facts speak for themselves." Roe was extremely surprised that he would ask the HR Specialist to add "conclusions and recommendations" that she had *admitted* she was not qualified to make.

365. Roe asked when the amended investigation report would be finished. Roe noted that the investigation had consumed the entire counseling period and could now stretch into the

60

mediation period. Roe found this circumstance "challenging," describing it as "a limbo where basic procedural matters remain outstanding, but without them being resolved I can't move forward."

366. Roe asked, again, who would be responsible for acting on the investigation report. The EDR Coordinator said that he would receive the report, and then a decision would be made about discipline. He said that the disciplinary decision would be given to the Defender as supervisor, but if the report "raise[d] questions" about the Defender, then it may be referred to the Chief Judge.

367. Roe also asked about the status of her retaliation claims. Roe relayed the HR Specialist's comments that she was investigating the Defender's "mishandling" of the situation, but not retaliation. Roe asked whether there was a difference between "mishandling" and retaliation.

368. The EDR Coordinator said that he could "not remember exactly when" Roe had raised an allegation of retaliation, and so he was not sure whether retaliation was part of the investigation.

369. Roe expressed her total disbelief over the EDR Coordinator's comments. She reminded him that she had filed a written claim of retaliation against the Defender on September 10, 2018. Her retaliation claim was the reason why the investigation report was being submitted to him, not the Defender. It was also a "critical element" of the disqualification issue.

370. Roe asked whether her motion to disqualify was being held in abeyance, and why she had not received a ruling. The EDR Coordinator explained that, early on, he and the Chief Judge had discussed the motion, and agreed that disqualification would be "premature" without a finding against the Defender.

61

371. The EDR Coordinator further explained that, if the Defender was disqualified, then "no one" could "represent" the employing office.

372. Roe said that she would appreciate a written update on the status of her motion.

373. Roe also challenged the EDR Coordinator's previous assertions that the Defender had "protect[ed]" her. She provided specific examples of how the First Assistant was continuing to interfere with her job duties while her complaint was pending.

374. Roe emphasized:

"Nothing about my discomfort or my feelings about being threatened by this person have changed. I don't see that anything has changed. If anything, it sounds like everything is going to go back to exactly the way it was before, which is that I'm going to be forced to work with this person who made me feel threatened."

375. The EDR Coordinator expressed sympathy for Roe, but said that he was "struggl[ing]" to understand what she "want[ed]," and that he did not know if the Defender was "aware" of her concerns. He again told Roe "to specifically tell us what's the problem here so we can raise it and have it addressed and resolved."

376. Exasperated, Roe stated words to the effect: "The problem is that this person made me feel threatened at work." And given that Roe had complained to the Defender, she did not "understand how he says he doesn't know."

377. Roe pointed out that she had been seeking a duty station transfer, at a bare minimum. However, the Defender was hiring for positions in that office—even as he claimed that he had no office space.

Roe further stated words to the effect:

62

"It's difficult for me to understand how I've alleged a very serious situation that has made me feel uncomfortable and I can no longer do my job, and yet there appears to be room for an intern and not for me. There are relatively simple things like that that weren't addressed as easy solutions to this earlier on. Now we're at a point where this process has so damaged my relationships with everyone and created so much hostility that I don't know if I can ever go back or if a transfer would even solve anything."

378. The EDR Coordinator suggested that maybe the Defender had "reasons" for what he did, and that the parties needed a "dialogue." Roe suggested having a dialogue with someone who did not have a conflict of interest within the Fourth Circuit or from Defender Services.

379. The EDR Coordinator did not directly respond to Roe's suggestion. He said that he was just trying to figure out where to go while the investigation was pending, but "if we need to wait, then we need to wait."

380. The EDR Coordinator then referred to the "looming issue" of whether Roe wanted to stay with the FDO at all. Roe said that she "struggled" with this issue because she "didn't want to leave." Roe said: "This is my dream job, I worked really hard to get here, this is where my husband's family is from, this is where we want to live, this office was a great fit for me."

381. Roe was deeply hurt, however, that it appeared that the First Assistant and Defender had questioned her integrity and character as a defense to her complaints. She also did not see how she could report to the Appellate Chief, given that he actively participated in the retaliation against her. Roe noted that if the "highest levels of management feel that way about me despite my hard work and my excellent performance, then clearly I'm not a valued employee

63

in this organization and I don't see how I can continue to work there." She emphasized that she was not "welcome," and she was being "forced out."

382. The EDR Coordinator responded that for Roe to "even contemplate" leaving was "regrettable."

383. The EDR Coordinator ended the conversation by suggesting that Roe consider mediation. He also said he would ask the HR Specialist about Roe's retaliation claim.

### *Roe is left in limbo for another six weeks with no investigation report.*

384. Roe's conversation with the EDR Coordinator made clear that any progress on resolving her complaint, including the disqualification issue, would depend on receiving the amended investigation report. Though the investigation had not been reopened and the HR Specialist only needed to add recommendations that she had supposedly already written, Roe did not receive an update on the investigation report for over six weeks.

385. On November 28, 2018, the EDR Coordinator told Roe that he had checked in with the HR Specialist about her retaliation claims. The HR Specialist had "assured" him that she would include the retaliation claims in her investigation report.

386. Roe did not understand how the HR Specialist could possibly make findings on a retaliation claim she never investigated. Roe emailed the HR Specialist to update her on the retaliation she had experienced since filing her complaint.

387. That same day, Roe requested an extension of her counseling period from the Chief Judge. Roe explained that, without the report's findings and recommendations, it would be difficult to assess the options for resolving her claims. Roe requested extending counseling for 30 days from the date the investigation report was completed to allow time to address "outstanding procedural issues" and to resolve the matter "at the lowest level possible."

64

388.     On November 30, 2018, the Chief Judge issued a written order granting Roe's request in part and denying it in part by extending the counseling period until January 16, 2019.

389.     On December 14, 2018, the EDR Coordinator asked Roe to consider an "unconventional" step: involving a mediator during the counseling period. He stated, however, that "much depends on the findings and recommendations of the investigation report." Roe agreed to discuss the possibility of using a mediator after the holidays.

390.     On January 9, 2019, the EDR Coordinator and Roe spoke by phone about a possible mediation. At that point, he still did not know when the amended investigation report would be finished.

391.     Roe expressed discomfort proceeding to mediation if it meant waiving her procedural rights—especially her right to a decision on her still-pending disqualification request. Mediation would also be difficult without the investigation report, she noted, given that the process had "dragged on so long without the problems being addressed." And if mediation failed, the only stage left would be a final hearing.

392.     The EDR Coordinator responded that the process was designed to move "expeditiously." He noted that the Chief Judge was concerned that the process was taking too long. He told Roe to be ready for the end of counseling on January 16, 2019.

### The EDR Coordinator tells Roe that he is withholding the investigation report and the Defender will not be disqualified.

393.     On January 11, 2019, the EDR Coordinator informed Roe that he had received the amended investigation report and would "be in touch." By this point, Roe had been waiting for more than six months since she first complained about the First Assistant, and more than four months since she filed a formal complaint.

65

394. On January 16, 2019, the EDR Coordinator informed Roe by email that her counseling period had expired. Roe did not receive a ruling on a second request for an extension of time she had made for the purpose of evaluating the investigation report.

395. In addition, he said that the Chief Judge "intend[ed]" to deny her request to disqualify the Defender.

396. The next day, Roe spoke with the EDR Coordinator by phone. She asked him why her request to disqualify the Defender would be denied. He seemed unsure. At first, he said the Chief Judge had made a decision *before* the report came out, but then he said the decision was made *after* the report came out.

397. The EDR Coordinator was asked if the reason for the impending denial is that a unit executive cannot be disqualified from an EDR proceeding. He did not answer. Instead, he said that the upcoming denial order, which he claimed he had started to draft, "will speak for itself."

398. The EDR Coordinator shared another update: neither Roe, nor the employing office, would receive the investigation report or any summary of its findings and recommendations. He explained that OGC had "strongly recommended" not sharing the report during counseling or mediation. According to OGC, the parties were not legally entitled to receive the report because it is an "internal document only." OGC advised that distributing the report would make it difficult to resolve the matter informally, because the parties would "fight about the report" rather than focusing on the issues in the case.

399. The EDR Coordinator was asked to identify where the Fourth Circuit EDR Plan refers to "internal documents." He was told that the EDR Plan entitles the parties to receive "information and records," and it requires sharing of information on a "need to know basis," but

it does not mention "internal documents." He had no answer to these questions. He admitted that the process is not "perfect," but said that he intended to follow OGC's advice.

400.    The EDR Coordinator was asked how any disciplinary action could be taken without the investigation report. He explained that no decisions about disciplinary action would be made until *after* Roe's EDR proceeding was over, perhaps after a final hearing. He assured her that the Chief Judge would hold people accountable, if appropriate.

401.    Roe told the EDR Coordinator that she did not understand how disciplinary action could be put off for so long, when the purpose of a wrongful conduct action is to make the office safe. And while nothing had changed for the First Assistant, Roe was forced to work from home and treated as the office joke. Roe asked him why the First Assistant had not been put on administrative leave.

402.    The EDR Coordinator expressed sympathy for the First Assistant, noting that this had been a "living hell" for him and he had been suffering "physical symptoms." He was asked how he knew these things about the First Assistant.

403.    The EDR Coordinator reluctantly admitted that the First Assistant had called him, that it was inappropriate for him to have done so, and that he had told him not to call again. Roe reasonably perceived the First Assistant's actions as an attempt to improperly influence the EDR process.

404.    Roe ended the conversation by telling the EDR Coordinator about several incidents of abusive behavior towards other employees and clients that she had personally witnessed at the FDO. The EDR Coordinator seemed deeply saddened by what Roe told him. He strongly implied that the Circuit would do the right thing and hold people accountable.

67

*Roe requests a transfer for a second time.*

405.    On January 22, 2019, Roe sent the Chief Judge and the EDR Coordinator an email. She requested a transfer to a federal defender office in an adjacent district.

406.    "Although it was my dream since law school to be a federal defender," Roe explained, "I do not believe it is possible to reach a resolution with my current office that will protect me from further harassment and allow me to advance in my career."

407.    Roe noted that OGC's guidance would require her to negotiate with an alleged violator of her rights, without knowing any of the report's findings or recommendations. Under these circumstances, a successful negotiation would be unlikely.

408.    Roe described how the First Assistant had treated her complaint as a joke, how the Defender had mishandled and escalated the situation, and how the Appellate Chief had discouraged her from applying for the appellate position. She expressed concern that she would be the target of rumors and reputational damage. She noted, by example, that another employee who had recently complained was smeared with homophobic rumors.

409.    Roe said she hoped "to move on in a way that preserves my professional reputation and career options."

410.    On January 24, 2019, Roe was informed that the Chief Judge had "directed" the EDR Coordinator "to lend appropriate assistance" with a transfer. The EDR Coordinator said he was "sorry" to hear about Roe's experiences.

*Roe's mediator candidly acknowledges that judiciary employees "give up a lot."*

411.    On January 30, 2019, Roe filed a request for mediation under the EDR Plan. At this point, Roe had not received any substantive update on her transfer request.

68

412.     Before mediation, Roe asked the EDR Coordinator to clarify whether her
confidentiality would be protected during mediation, and whether any documents she submitted
would be shared with the Defender without her consent.  The EDR Coordinator confirmed that
he had not shared any documents with the Defender except for her request for counseling and
request for mediation, which were template forms.  He had not shared her factual narrative or
any of her supporting documentation.

413.     On February 7, 2019, Roe met with the appointed mediator ("Mediator") in the
law library of a Fourth Circuit judge.  Roe provided the Mediator with copies of some of the
First Assistant's inappropriate text messages and emails.

414.     The Mediator acknowledged that it would be "really difficult" for Roe to return to
work, assuming that everybody is "still there."  He also stated that the First Assistant's quid pro
quo email, in particular, was "inappropriate" and "improper."

415.     The Mediator candidly stated his opinion that the Defender is from a "generation"
that doesn't "get" sexual harassment.  He emphasized, however, that the Defender was the
"decision maker" and that no hearing officer would "micromanage" him or tell him how to do
his job.

416.     The Mediator admitted that he saw problems with the EDR process.  He
expressed frustrations with the settlement process and noted that, at times, promising settlements
he had negotiated were vetoed by the AO because the judiciary lacked statutory authority to
implement those remedies.  He candidly acknowledged that you "give up a lot" as a judiciary
employee.

417.     The Mediator promised to press the Defender on a duty station transfer and other
requested terms.

418.   On February 12, 2019, the Mediator updated Roe by phone.  He said that the Defender would permit Roe to transfer to another duty station, where she would likely share an office with an intern.  He mentioned that there was also a conference room and a library space to work.

419.   Roe was apoplectic at this news.  This eleventh-hour concession proved that the Defender could have transferred her *all along*, further showing his dishonesty and bad faith.

420.   Roe asked the Mediator why a transfer was possible now, but not six months ago.  The Mediator said that the Defender may have changed his mind after he got "involved."  The Mediator seemed very frustrated with the Defender.

421.   Roe told the Mediator that a transfer under these circumstances would further humiliate and stigmatize her, since the whole office would know that the Defender had likely prioritized an intern over her.  The Mediator suggested that Roe put these issues "aside" and work something out.

422.   According to the Mediator, the Defender was also in agreement that the First Assistant could no longer be "involved" with Roe's work.  The Mediator suggested taking the Defender at his "word" on his unsubstantiated promise.

423.   Roe asked the Mediator what would happen if an EDR settlement was breached.  In his experience, the only remedy for breach of an EDR settlement was another EDR claim.

424.   Roe asked whether a settlement with the Defender would be binding on the next Federal Public Defender.  The Mediator did not know the answer to this question.

425.   Roe suggested that, under the circumstances, a duty station transfer would not accomplish anything without addressing the underlying harassment and retaliation.

426. The Mediator said he was still trying to get more information from the Defender, and he would be in touch.

### The Judicial Integrity Officer tells Roe that a court of appeals has no authority to order remedies against a federal defender office.

427. On February 14, 2019, Roe met with the newly-selected Judicial Integrity Officer in Washington, D.C.

428. Roe told the Judicial Integrity Officer about her experience with the EDR process. Roe expressed concern that her due process rights were being violated.

429. The Judicial Integrity Officer acknowledged that the way Roe's claim was being handled was unusual. She commented, in particular, that a Circuit Executive should never be an EDR Coordinator because of inherent conflicts of interest.

430. She stated, however, that just because every court handles the process differently, does not mean employees' rights are being violated. She noted that the EDR process is "barebones" and has "no rules." Because the courts are decentralized, the judge assigned to run the hearing process "makes" the rules. She responded dismissively to Roe's questions with words to the effect that Roe just didn't understand the process.

431. The Judicial Integrity Officer also warned Roe that if she did not submit the *entire* factual basis for her claims in writing to her employing office, she risked waiving her claims. She strongly suggested that Roe's five-page narrative, submitted with her request for counseling, was not good enough to "preserve" her claims. She stressed that the Defender needed full knowledge of her allegations.

432. Roe explained that she had fully disclosed the facts supporting her claims in a four-hour investigation interview. The Judicial Integrity Officer advised Roe to forget about the

71

investigation because her claims were only "allegations" until she proved them at a final hearing. She insisted that it was not reasonable for Roe to want a "finding" on her claims before a final hearing, even though Roe had already produced all the evidence supporting her claims. She advised Roe to pursue "motions" and "discovery" to prove her claims.

433. Roe asked the Judicial Integrity Officer how the EDR Coordinator could withhold the investigation report from the parties. She responded that the report was an internal document, and that she never released the investigation reports when she was the Tenth Circuit's EDR Coordinator.

434. The Judicial Integrity Officer further explained that, in her role as EDR Coordinator, she had never seen an investigation report support an employee's sexual harassment allegations. She said that Roe's complaint was the first colorable sexual harassment claim she had seen—though some of Roe's allegations, in her view, were open to interpretation, including the quid pro quo email that she reviewed. She told a story about a sexual harassment complainant in her circuit who was found to be a liar after an outside investigation.

435. Roe was shocked and horrified by her comments. Her comments were especially prescient in light of revelations a short time later that U.S. District Court Judge Carlos Murguia, who served within her circuit, had been sexually harassing court staff with impunity.

436. The Judicial Integrity Officer also remarked that Roe's request to disqualify the Defender was highly unusual, because EDR complainants are usually "fired" employees who are bringing their claims against a unit executive. She stressed that EDR documents "have" to go to the unit executive, even if that person is the subject of a complaint.

437.    The Judicial Integrity Officer urged Roe to use the EDR process as it exists and to be clear about the remedies she was seeking.  She claimed, for example, that if Roe wanted the First Assistant fired, she should simply request that remedy in her EDR proceeding.

438.    She then qualified this suggestion by noting that most presiding officers would not want to "meddle" in a federal defender office.

439.    She further elaborated that a presiding officer would not have authority to order the First Assistant's termination.  She noted that Article III judges do not have authority to "manage" a federal defender office.  She called this issue "jurisdictional."

440.    The Judicial Integrity Officer immediately realized the legal significance of these statements.  She asked Roe not to repeat them to anyone.

441.    Roe was astounded by the Judicial Integrity Officer's admissions, as well as what Roe reasonably perceived as her disrespectful and condescending attitude towards complainants, including herself.  Their nearly three-hour meeting grew very tense and uncomfortable at times.  Near the end of the meeting, the Judicial Integrity Officer became visibly emotional.

442.    A few days later, the Judicial Integrity Officer wrote in an email to Roe that she hoped their meeting wasn't "completely overwhelming."

443.    She said that Roe's matter could be a "lesson learned."

444.    She also said she would like "to better understand if FPDs are adequately protected by EDR remedies."

### With no meaningful review or remedies on her complaints, Roe is constructively discharged.

445.    The Judicial Integrity Officer's comments confirmed what Roe was already experiencing—a lack of any meaningful review of, or remedies on, her complaint.  Roe reasonably felt deceived and misled by the EDR Plan's representations that, as an employee of a

73

federal public defender office, she would have access to certain rights and remedies, when that was not actually the case.

446. On information and belief, the EDR Plan's lack of meaningful remedies, especially for federal public defender offices, was, and is, widely known and understood within the judiciary.

447. Given the Judicial Integrity Officer's comments, and under the totality of the circumstances, Roe reasonably believed that proceeding to a final hearing would be futile. As the Judicial Integrity Officer had confirmed, a hearing officer, even if willing, would not be able to order any remedies without the Defender's consent.

448. The Fourth Circuit EDR Plan, unlike the Model EDR Plan, also gave accused violators, such as the First Assistant, a right to cross-examine Roe—even though the EDR Coordinator had told her that disciplinary action against him would not be at issue in a final hearing. Likewise, the Defender would have the right to cross-examine Roe in his capacity as the office's representative *and* as an accused violator of her rights. Without any prospect of a meaningful remedy, Roe reasonably believed that the final hearing would only serve to humiliate and retraumatize her.

449. On February 22, 2019, Roe's representative submitted a more detailed factual narrative to the EDR Coordinator because she was concerned about waiving her claims after the Judicial Integrity Officer's warnings. The supplement contained highly sensitive details, including information that could potentially expose other employees to retaliation, which Roe would not have disclosed to the Defender voluntarily.

450. Roe expected that the EDR Coordinator would keep the narrative confidential, based on his prior conduct and assurances. In addition, the EDR Plan protected the

74

confidentiality of documents prepared for mediation. EDR Plan Ch. X, § 9(B)(4). Roe's

representative also specifically requested that the supplement be redacted to protect other

employees' identities if shared with the Defender's office at any time.

451. Without prior notice, the EDR Coordinator forwarded the narrative directly to the

Defender, the Chief Judge, and the Mediator. He said that OGC had advised him that the

supplement was "not subject to redaction." Apparently, OGC had noted that the Defender "is

prohibited from retaliating against any employees for their participation in, or opposition to,

EDR matters."

452. Roe was appalled by the EDR Coordinator's release of her narrative, without

giving her prior notice or seeking her permission. She did not understand how it was acceptable

to release such a highly sensitive document directly to the Defender when he had not even been

trusted to receive the investigation report. This unsanctioned release of Roe's narrative was a

major factor in her conclusion that she would never be able to return to work normally at the

FDO and that she would be compelled to resign.

453. Roe's representative also submitted a renewed request to disqualify the Defender.

Roe had never received the written denial order she had been told was forthcoming from the

Chief Judge. Indeed, Roe *never* received a written ruling on any of her requests to disqualify,

which, under the circumstances, operated as a constructive denial of her requests and her right to

appeal to the Judicial Council.

454. On February 26, 2019, Roe met with the Mediator in a Fourth Circuit judge's law

library. The Mediator told Roe that she could not transfer to the federal defender office in the

adjacent district she had requested because that office did not have an opening.

455.     Roe expressed concern and frustration that she would never be able to return to work normally at the FDO.  The Mediator acknowledged that the Defender had been unresponsive since their first conversation.

456.     The Mediator offered to help Roe get another job.  He remarked that he was very impressed with Roe's credentials.  Roe asked him to help her secure a Fourth Circuit clerkship. She said that having a clerkship would help prevent her employing office from destroying her reputation.  She was disgusted, however, that she would have to lose her job while her perpetrators kept theirs.

457.     After their meeting, the Mediator went to Richmond, Virginia to advocate in person for a clerkship on Roe's behalf.

458.     Later that week, the Mediator called Roe.  A Fourth Circuit judge had a term clerkship vacancy, which had been open for at least several weeks.  The Mediator said that this judge wanted to interview Roe.

459.     On March 8, 2019, Roe interviewed with the Fourth Circuit judge.  Roe was highly qualified for the clerkship and she received an offer on the spot.

460.     During Roe's interview with the judge's other law clerks, and outside of Roe's presence, the Mediator brought up in conversation a professional sports team owner who had recently faced a nationally publicized sexual harassment scandal.  The Mediator remarked that this person had been "good" to the school he had attended.  The Mediator said he "hope[d]" that "nobody is making anything about what came out about *him*."  He said he was "glad" it had been kept "quiet."  He further elaborated: "He couldn't have handled it any better to keep it quiet" than by "walking away."

461.    When Roe later found out what had transpired, she was outraged by these shocking statements, uttered just outside the presence of a sexual harassment victim *during her complaint process*.  To her, these comments exemplified a mentality of keeping victims "quiet."

462.    As they were wrapping up mediation, Roe told the Mediator that the clerkship was a "very nicely packaged constructive discharge."  She said she was giving up her career because she was harassed and retaliated against without any accountability.  Roe called the situation the "collective fault of the institution."

463.    The Mediator responded that Roe should be thankful for what went right for *her*.  He noted that a lot of people had worked to make this outcome possible, and they didn't *have* do anything for her.  He advised Roe not to focus on the problems with the system, adding words to the effect: "There's nothing you can do about it."

464.    Roe was constructively discharged and formally resigned from the FDO effective March 15, 2019.

### Roe submits a comment on the revised Model EDR Plan highlighting the lack of meaningful remedies, which is ignored.

465.    On March 19, 2019, while Roe was serving as a Fourth Circuit judicial law clerk, the AO Director circulated an Exposure Draft of the revised Model EDR Plan within the judiciary.  The Director requested that comments on the Exposure Draft be submitted to the Model EDR Plan Working Group.

466.    On information and belief, the Exposure Draft of the revised Model EDR Plan was never circulated for a public notice and comment period.

467.    On April 19, 2019, Roe submitted a comment on the Exposure Draft to the Model EDR Working Group.  She did so anonymously because she feared retaliation.

77

468.     In her comment, Roe highlighted the lack of meaningful remedies in the Model

EDR Plan—especially for employees of federal defender offices:

> [E]ven the remedies listed in the Plan may not actually be legally or
> practically available to claimants. As an initial matter, the EDR Plan
> itself is a creature of Judicial Conference policy, rather than statute
> or other legally-binding authority.  Judicial Conference policy
> states: "Judges' decisions in EDR matters must be in conformance
> with all statutes and regulations that apply to the judiciary, . . . [and]
> judges presiding in EDR matters may not compel the participation
> of or impose remedies upon agencies or entities other than the
> employing office which is the respondent in such matters."
> Proceedings of the Judicial Conference at 25 (Sept. 2010). This
> policy potentially undermines many of the remedies purportedly
> available under the Plan.  For instance, if an employee requests a
> transfer as an interim measure or ultimate relief, the policy indicates
> that a court may not direct any other office to absorb that employee.
> Similarly, a court can only request, but not direct, another agency,
> such as GSA, to provide building modifications necessary to
> accommodate an employee with a disability.
>
> The problem is especially acute for employees of federal defender
> offices, who functionally have no remedies under the Plan at all.
> Although federal defender offices are "covered" by EDR Plans, the
> Criminal Justice Act does not explicitly confer statutory authority
> for the court of appeals to impose remedies or disciplinary action,
> short of removing the Federal Defender. *See* 18 U.S.C. §
> 3006A(g)(2)(A) (providing the court of appeals in the relevant
> circuit authority to appoint, set compensation for, and remove a
> Federal Defender for "incompetency, misconduct in office, or
> neglect of duty"). Even if the court has authority, institutionally
> speaking, the court is also unlikely to want to be perceived as
> interfering with the independence of a federal defender office.

469.     Roe urged the Judicial Conference to "undertake a comprehensive review of its

policies in this area and consider making recommendations to Congress in order to strengthen the

remedies available to judicial employees."

470.     Although the new Model EDR Plan ultimately adopted by the Judicial Conference

differed in certain respects from the Exposure Draft, it did not address the problems with EDR

remedies that Roe had raised.

***Months after Roe is constructively discharged, the Fourth Circuit takes "disciplinary action."***

471.    On May 1, 2019, while Roe was still serving as a Fourth Circuit judicial law clerk, she asked the EDR Coordinator for a status update on her wrongful conduct report. Specifically, Roe wanted to know if the wrongful conduct proceeding was still open.

472.    The EDR Coordinator responded that the proceeding was still "open and ongoing."

473.    Roe asked the EDR Coordinator if he would meet with her in person.

474.    On May 7, 2019, Roe met with the EDR Coordinator and HR Administrator in Richmond, Virginia. Roe asked for an update on the wrongful conduct proceeding. He said that, on the advice of OGC, he could not tell Roe anything about the proceeding or its outcome.

475.    Roe told the EDR Coordinator that she had lost her job because she filed a complaint. She said that there was no possible remedy through the EDR process. She said that OGC had skewed the process in favor of management and worked a "serious injustice," not just for her, but for anyone else who filed a complaint. She said that the failure to follow the EDR Plan "as it appears on paper" made it impossible to stay in her office.

476.    Roe further explained that she had had difficulty finding another job because, when asked, she did not feel comfortable providing references from the FDO. She also felt ostracized from applying for the Criminal Justice Act panel in her district, because the people who had engaged in misconduct would be reviewing her application.

477.    Roe said that everyone in her office knew that she filed a complaint, and that the rumor was that she "lost."

478.    Roe told the EDR Coordinator that this was not over for her. She told him that she lived with this burden every day and that it had tremendously affected her life and career.

79

479.    Less than a week after this conversation with Roe, the EDR Coordinator, in his capacity as Circuit Executive, formally notified the Defender by letter that the judges of the Fourth Circuit had approved his request to establish a Capital Habeas Unit (CHU) in his office. The CHU would represent individuals "in capital habeas cases throughout the Fourth Circuit."

480.    The EDR Coordinator included a hand written note for the Defender: "Congratulations!"

481.    On information and belief, the Fourth Circuit was working with the Defender, personally, to establish a CHU in his office while Roe's complaint against him was pending.

482.    On information and belief, the CHU is anticipated to open in fiscal year 2021, the same year that the Defender's four-year term as Federal Public Defender will be subject to renewal.

483.    On June 4, 2019, the EDR Coordinator sent Roe an email, with the Chief Judge copied.

484.    The EDR Coordinator disclosed to Roe:

"I wanted to let you know that disciplinary action was taken last week as a result of your report of wrongful conduct.  As we discussed previously, I cannot reveal the nature of the action because it is a disciplinary matter.  But I wanted to let you know that action was taken, and I wanted to re-emphasize that: (1) the Fourth Circuit took your report very seriously, (2) Chief Judge Gregory ordered a painstaking and exhaustive investigation into your allegations, and (3) actions were taken based on careful consideration of the investigation report."

485.    This "disciplinary action" was taken *almost a full year* after Roe first raised her complaints about the First Assistant.

486. As of filing this action, Roe has never been informed of the findings on her complaint or what corrective actions were taken. However, all of the individuals responsible for the harassment, retaliation, and discrimination against Roe still hold their respective positions and titles at the FDO.

### *Roe suffers irreparable harm due to the defendants' conduct.*

487. Roe's chosen career was stolen from her as a result of the defendants' conduct. As a result, she lost opportunities for training, experience, and professional growth in her calling to serve indigent clients. Roe anticipated working at the FDO until her retirement. She also tried, but failed, to secure other comparable employment within the Fourth Circuit after her term clerkship ended.

488. Roe is now working in a temporary and substantially lower-paying position. Given Roe's geographic location, it is extremely unlikely that she will ever find a position with comparable terms and compensation to the one she held at the FDO.

489. As a result of the defendant's conduct, Roe suffers from ongoing anxiety, depression, emotional distress, and a loss of self-worth. She has been forced to delay major life goals, including obtaining her own home and having children.

490. Roe has also endured other humiliation and career damage. Roe's complaint was flagged as an area of concern on her North Carolina Bar Application, and she was questioned about it at her Character and Fitness interview.

491. When Roe spoke to the Federal Public Defender in the adjacent district, who posted at least three attorney openings within a short time after rejecting Roe's transfer request, that Defender was openly hostile towards Roe and demanded to know why she left her former office.

81

492.     Roe also learned that her Team Leader was spreading rumors that she "made up" being sexually harassed so that she could work in a different duty station.

493.     In sum, Defendants' systemic and willful violations of Roe's constitutional rights caused irreparable harm.

## FIRST CLAIM FOR RELIEF
### Fifth Amendment: Due Process

494.     Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

495.     By adopting, promulgating, and implementing policies and practices under which Plaintiff was deprived of immediate and effective action on, and meaningful review of and remedies for, the harassment, retaliation, and discrimination she suffered; by violating the limited procedural protections and rights Plaintiff was afforded under the EDR Plan; and by discriminating against Plaintiff based on her gender in violation of protected employment rights, Defendants, acting under color of law and their authority as federal officers, willfully and knowingly deprived Plaintiff of her property interests without due process of law in violation of the Fifth Amendment to the United States Constitution.

496.     As a result of Defendants' unlawful conduct, Plaintiff has suffered psychological harm, emotional distress, humiliation, embarrassment, and monetary damages.

## SECOND CLAIM FOR RELIEF
### Fifth Amendment: Equal Protection

497.     Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

498.    In subjecting Plaintiff to harassment, retaliation, and discrimination, failing to take immediate and effective action on her complaints, and failing to provide her with meaningful review or remedies, Defendants, acting under color of law and their authority as federal officers, singled out Plaintiff based on her gender and intentionally violated her right to equal protection under the Fifth Amendment to the United States Constitution.

499.    As a result of Defendants' unlawful conduct, Plaintiff has suffered psychological harm, emotional distress, humiliation, embarrassment, and monetary damages.

**THIRD CLAIM FOR RELIEF**
**(42 U.S.C. § 1985: Conspiracy to Violate Civil Rights)**

500.    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

501.    By agreeing to implement, and taking actions on, policies, procedures, and practices whereby Plaintiff was subjected to sexual harassment, discrimination, and retaliation and deprived of immediate and effective action on her complaints, and meaningful review and remedies, all on account of her gender, Defendants conspired to deprive Plaintiff of equal protection under the law and of equal privileges and immunities of the laws of the United States, resulting in injury to her person and property, in violation of 42 U.S.C. § 1985(3).

502.    As a result of Defendants' unlawful conduct, Plaintiff has suffered psychological harm, emotional distress, humiliation, embarrassment, and monetary damages.

**FOURTH CLAIM FOR RELIEF**
**(42 U.S.C. § 1986: Action for Neglect to Prevent Conspiracy to Violate Civil Rights)**

503.    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

83

504. By having knowledge of policies, procedures, practices, and actions whereby Plaintiff was subjected to sexual harassment, discrimination, and retaliation and deprived of immediate and effective action on her complaints and meaningful review and remedies, all on account of her gender, by having power to prevent or aid in preventing the commission of these wrongs, and by neglecting or refusing to do so, Defendants are liable to Plaintiff for the violations of her rights to equal protection under the law and of equal privileges and immunities under the laws of the United States.

505. As a result of Defendants' unlawful conduct, Plaintiff has suffered psychological harm, emotional distress, humiliation, embarrassment, and monetary damages.

## REQUESTED RELIEF

WHEREFORE, Plaintiff requests that this Court:

1. Declare that Plaintiff's constitutional rights were violated;

2. Declare the laws, regulations, and rules that operated to deprive Plaintiff of her rights unconstitutional as applied to Plaintiff;

3. Enjoin any further violation of Plaintiff's rights;

4. Award compensatory and punitive damages for the constitutional violations Plaintiff suffered in an amount that is fair, just, reasonable, and in conformity with the evidence;

5. Award Plaintiff appropriate front pay as equitable relief in lieu of reinstatement;

6. Award Plaintiff back pay as equitable relief from the unlawful termination of her employment pursuant to the Back Pay Act;

7. Award pre-judgment and post-judgment interest on all amounts awarded herein;

8. Award Plaintiff reasonable attorney's fees and costs incurred in this action and any administrative proceedings that necessarily preceded this action pursuant to 28 U.S.C.

§ 2412, 42 U.S.C. § 1988, or any other basis;

9.    Award such other relief as the Court deems just and proper.

This the 3rd Day of March, 2020.

Respectfully Submitted,

*/s/ Cooper Strickland*
Cooper Strickland
N.C. Bar No. 43242
P.O. Box 92
Lynn, NC 28750
Tel. (828) 817-3703

Counsel for Plaintiff