IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CASE NUMBER  1:20CV66

| | |
|---|---|
| JANE ROE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES OF AMERICA, et al., | ) |
| | ) |
| Defendants. | ) |

**DEFENDANT FEDERAL DEFENDER FOR THE WESTERN DISTRICT OF NORTH
CAROLINA'S MEMORANDUM  IN SUPPORT OF MOTION TO DISMISS
PLAI'TIFF'S INDIVIDUAL CAPACITY CLAIMS AGAINST HIM**

# TABLE OF CONTENTS

I.      INTRODUCTION..................................................................................... 1

II.     FACTUAL BACKGROUND ..................................................................... 2

III.    STATUTORY AND ADMINISTRATIVE FRAMEWORK ........................... 9

        A. Federal Employment…….…................................................................  9

        B. Fourth Circuit EDR Plan……................................................................11

IV.     ARGUMENT ........................................................................................... 5

        A. LEGAL STANDARD…….…..................................................................12

        B. JUDICIALLY IMPLIED *BIVENS* REMEDIES DO NOT APPLY.......................... 12

                1. Plaintiff's Novel Claims Present a "New *Bivens* Context"…………………...14

                2. Special Factors Counsel Against Implying a *Bivens* Cause of Action…………...16

                        a. Federal Employment Counsels Hesitation…………………………………16

                        b. Judicial Independence Counsels Hesitation…………………………....17

                        c. The Existence of the Comprehensive Plan Counsels Hesitation…………   19

                        d. The Plan Provides an Alternative, Existing Process ………………………20

        C. QUALIFIED IMMUNITY BARS PLAINTIFF'S LAWSUIT ……………………21

                A.      Step One: Plaintiff Fails to Allege Plausibly that the Defender personally violated the Constitution ......................................................... 22

                B.      Step Two: Plaintiff Alleges No Violation of Clearly Established Law..25

V.      CONCLUSION ....................................................................................... 25

ii

# TABLE OF AUTHORITIES

**Cases**

*Arar v. Ashcroft,*
  585 F.3d 559 (2d Cir. 2009) …………………………………………………………..16
*Ashcroft v. al-Kidd,*
   563 U.S. 731 (2011)…………………………………………………………………25
*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)........................................................................................ *passim*
*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007)........................................................................................ 12
*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,*
  403 U.S. 388 (1971)…………………………………………………………………*passim*
*Blankenship v. McDonald,*
  176 F.3d 1192, 1195 (9th Cir. 1999)………………………………………………… 17
*Buschi v. Kirven,*
  775 F.2d 1240 (4th Cir. 1985)…………………………………………………     24
*Bush v. Lucas,*
  462 U.S. 367 (1983)…………………………………………………………………*passim*
*Carlson v. Green,*
  446 U.S. 14 (1980)…………………………………………………………………13-14
*Chappell v. Wallace,*
   462 U.S.296, 304 (1983)………………………………………………………….. …..16
*Davis v. Passman,*
  442 U.S. 228……………………………………………………………………*passim*
*Dexter v. Huerta,*
   No. 12-1147, 2013 U.S. Dist. LEXIS 13632 (M.D.N.C. Sept. 24, 2013)……………………20
*Dotson v. Griesa,*
  398 F.3d 156 (2d Cir. 2005)……………………………………………………     *passim*
*Drone v. Duff,*
   No. 17-cv-332, 2017 U.S. Dist. LEXIS 206167 (E.D. Va. Dec. 14, 2017) ............................. 20
*FDIC v. Meyer,*
  510 U.S. 471 (1994)........................................................................................ 16
*Gleason v. Malcom,*
  718 F.2d 1044, 1048 (11th Cir. 1983)…………………………………………………...20
*Gooden v. Howard County,*
  954 F.2d 960 (4th Cir. 1992) ........................................................................... 24
*Grieveson v. Anderson,*
  538 F.3d 763 (7th Cir. 2008)…………………………………………………………...23
*Hall v. Clinton,*
  235 F.3d 202 (4th Cir. 2000) ........................................................................ *passim*
*Harlow v. Fitzgerald,*
  457 U.S. 800 (1982)………………………………………………………………… 21
*Hays v. Forsman,*
  458 F.Supp.2d 1177 (D.Nev. 2006)……………………………………………………...17

Case 1:20-cv-00066-WGY   Document 45   Filed 06/08/20   Page 3 of 31

*In re Golinski,*
 587 F.3d 956 (9th Cir. 2009)……………………………………………………..11, 18

*Jeffrey M. Brown Assoc., Inc. v. Rockville Center, Inc.,*
 7 Fed. App'x 197 (4th Cir. 2001)……………………………………………………..9

*Kentucky v Graham,*
 473 U.S. 159 (1985)……………………………………………………………… 22

*Kirby v. City of Elizabeth City,*
 388 F.3d 440  (4th Cir. 2006)……………………………………………………..1

*Lee v. Hughes,*
 145 F.3d 1272, 1276 (11th Cir. 1998)……………………………………………..17

*Lehman v. Morrissey,*
 779 F.3d 526 (9th Cir. 1985)……………………………………………………10

*Marcilis v. Township of Redford,*
 693 F.3d 589 (6th Cir. 2012)……………………………………………………..23

*Matthews v. Bergdorf,*
 889 F.3d 1136 (10th Cir. 2018)………………………………………………..24

*Migdal v. Rowe Price-Fleming Int'l,*
 248 F.3d 321 (4th Cir. 2001)     ……………………………………………   12

*Mirmehdi v. United States,*
 689 F.3d 975 (9th Cir. 2012)…………………………………………….……..21

*Pahls v. Thomas,*
 718 F.3d 1210 (10th Cir. 2013)…………………………………………………..24

*Pearson v. Callahan,*
 555 U.S. 223 (2009) …………………………………………………………..22

*Philips v. Pitt Cty Mem'l. Hosp.,*
 572 F.3d 176 (4th Cir. 2009) ......................................................... 4

*Pinar v. Dole,*
 747 F.2d 899 (4th Cir. 1984) ....................................................... 17

*Robbins v. Oklahoma,*
 519 F.3d 1242 (10th Cir. 2008)……………………………………………   23

*Ryan v. McAleenan,*
 No. ELH-19-1968, 2020 WL 1663172 (D. Md. Apr. 3, 2020)……………………… 9

*Semper v. Gomez,*
 747 F.3d 229 (3d Cir. 2014).........................................................10, 17-18

*Simmons v. Poe,*
 47 F.3d 1370 (4th Cir. 1995) ....................................................... 24

*Trerice v. Summons,*
 755 F.2d 1081 (4th Cir. 1985)………………………………………………24

*United States v. Fausto,*
 484 U.S. 439 (1988)...................................................................... 9, 10

*Vega v. United State*s,
 881 F.3d 1146 (9th Cir. 2018)…………………………………………………   20

*White v. Pauly,*
 137 S.Ct. 548 (2017)……………………………………..……………………..25

*Wilkie v. Robbins,*
 551 U.S. 537 (2007)……………………………………………………………2, 14, 20

iv

*Young v. City of Mount Ranier,*
    238 F.3d 567 (4th Cir. 2001) ........................................................................ 12

*Zak v. Chelsea Therapeutics Int'l, Ltd.*
    780 F.3d 597 (4ᵗʰ Cir. 2015) ……………………………………………...…1

*Zibleman v. Savage*,
    228 F.3d 367 (4ᵗʰ Cir. 2000)…………………………………………………17

*Ziglar v. Abbasi*,
    137 S.Ct. 1843 (2017)……………………………………………….. *passim*

**Statutes**

2 U.S.C. § 1434…………………………………………………………………11
5 U.S.C. § 55……………………………………………………………….....  10
5 U.S.C. § 63………………………………………………………………..  10
5 U.S.C. § 1101…………………………………………………………...*passim*
5 U.S.C. § 2105…………………………………………………………………10
5 U.S.C. § 2302…………………………………………………………………10
5 U.S.C. § 4301…………………………………………………………………10
5 U.S.C. § 7511…………………………………………………………………10
5 U.S.C. § 8331…………………………………………………………………10
5 U.S.C. § 8901…………………………………………………………………10
28 U.S.C. § 331……………………………………………………………… 17
28 U.S.C. § 332……………………………………………………………… 19
28 U.S.C. § 610……………………………………………………………10
42 U.S.C. § 1985……————————————————————————— 1, 24, 25
42 U.S.C. § 1986………………………………………………………… 1, 24, 25

v

# I. INTRODUCTION

This case arises out of an employment discrimination claim filed by Plaintiff, Jane Roe ("Plaintiff"), an attorney formerly employed in the Federal Public Defender's Office for the Western District of NC ("FDO"), under the Consolidated Equal Employment Opportunity and Employment Dispute Resolution ("EDR") Plan of the US Court of Appeals for the Fourth Circuit (Nov. 2018)[1] ("Plan"). Under the Plan, Plaintiff participated in mediation, obtained a Fourth Circuit clerkship, withdrew her claims under the Plan, and resigned.

Plaintiff now sues her supervisor, the Federal Public Defender ("Defender"), as well as eleven other Defendants alleging under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), a due process violation under the Fifth Amendment (First Claim for Relief), an equal protection violation under the Fifth Amendment (Second Claim for Relief), a conspiracy between some or all of the multiple defendants, including the Defender, to violate her constitutional rights under 42 U.S.C. § 1985(3) (Third Claim for Relief), and an action for neglect to prevent a conspiracy to violate her constitutional rights under 42 U.S.C. § 1986 (Fourth Claim for Relief). Plaintiff has sued the Defender in both his official and individual capacities, seeking monetary compensation from the Defender's personal assets.[2]

---

[1] The Plan is referred to throughout the Complaint and is attached to the Defender's Motion as <u>Exhibit A</u>. It is a publicly available document at <u>https://www.ca4.uscourts.gov/docs/pdfs/equal-employment-opportunity-and-employment-dispute-resolution-plan.pdf?sfvrsn=0&sfvrsn=0</u>. The Court may take judicial notice of this document. *See Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015). The 2018 Plan superseded the 2013 Plan in place at the time the events occurred but did not change the pertinent provisions of the Plan.

[2] Equitable relief is not available from the Defender in his individual capacity. *Kirby v. City of Elizabeth City*, 388 F.3d 440, 452 n.10 (4th Cir. 2006) ("injunctive relief could only be awarded against the officers in their official capacities"), *cert. denied*, 547 U.S. 1187 (2006).

The Court should reject Plaintiff's claims in full. This personal-capacity *Bivens* lawsuit against the Defender is not a "proper vehicle" for challenging his actions as a federal employee/supervisor, nor is it the "proper vehicle" for challenging the policies underlying the Plan itself, which the Defender had no part in adopting. *See Bush v. Lucas*, 462 U.S. 367, 378-80 (1983)(federal employment constitutes a "special factor" warranting refusal to imply a *Bivens* claim); *see also Hall v. Clinton*, 235 F.3d 202, 203 (4th Cir. 2000)(the existence of an alternative means for resolution of federal employee's complaints "constitutes the exclusive remedy for claims arising out of federal employment"). To decide otherwise could easily result in a multitude of federal judiciary employees suing their supervisors and other federal judiciary officials personally in the federal courts. That result would be precisely the result Congress, the Supreme Court, and the judicial branch itself have repeatedly prohibited.

*First*, Plaintiff's *Bivens* claims present a "new context" never recognized by the Supreme Court. *See Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017). *Second*, special factors, including the federal employment relationship, judicial independence, and judicial policies (*i.e.,* the Plan), counsel hesitation in implying a *Bivens* cause of action. *Id.* at 1857-58. Indeed, because the Plan provided Plaintiff an alternative process for addressing her claims, "that alone may limit the power of the judiciary to infer a new *Bivens* cause of action" because "'any alternative, existing process for protecting the [injured party's] interest'… itself may 'amoun[t] to a convincing reason … to refrain from providing a new and freestanding remedy in damages.'" *Id.* at 1858 (quoting *Wilkie v. Robbins*, 551 U.S. 537 (2007)). *Finally*, qualified immunity bars this individual-capacity action.

## II. FACTUAL BACKGROUND

Plaintiff was hired as a Legal Research and Writing Assistant at an unstated time in her unverified Complaint; however, as of May 2018, Plaintiff "was approaching her one-year

2

anniversary at the FDO." Compl., ¶78.[3] Plaintiff claims the Defender "condoned, encouraged, and participated in a toxic workplace of discrimination, harassment, and retaliation" where "bullying, sexism, homophobia, racism, and mockery of disabilities was normalized." ¶¶47-48. In support of these bald, conclusory allegations, she relies on examples involving various members of the FDO staff, including the Defender's First Assistant, a Team Leader, an administrative employee, and several other unidentified employees. ¶¶49-62. These allegations of a "toxic workplace culture" are based almost exclusively "upon information and belief," upon rumors, office gossip, and speculation, and upon general conclusory statements of "harassment and discrimination" in the office. Id. Nowhere does Plaintiff allege that the Defender was involved in or even aware of any of the alleged issues creating her "toxic workplace culture." To the contrary, she attributes the culture to the fact that "Senior Managers were emboldened by a lack of oversight." ¶49. In support of her conclusions that "the Defender condoned, encouraged, and participated in" this "toxic workplace culture," Plaintiff makes following specific statements: (a) he was "highly deferential to his First Assistant's management decisions." ¶52; (b) he "promoted four assistant federal public defenders, including one individual referred to as 'Team Leader'" who was Plaintiff's supervisor. ¶53; (c) without any detail or examples, Plaintiff claims "The Defender spoke about women using crude and derogatory language." ¶60; (d) his "management team was predominately male"[4]; (e) he approved of a mentorship where she would work directly with his First Assistant, the Defender's highest-ranking employee. ¶65. Plaintiff concedes she was provided this unique opportunity for

---

[3] Plaintiff's Complaint says that she "hesitated to accept the employment offer [at the FDO's office] because she was aware of the FDO's office's reputation as a troubled office," and "was also told that some employees of the FDO had allegedly engaged in misconduct." ¶40. However, these issues did not involve the "incoming Defender," who was not even employed there when Plaintiff accepted her offer. ¶¶41-43.

[4] Paragraph 60 also conclusively states, without any examples involving the Defender personally, "female employees were belittled and not taken seriously as professionals."

3

mentorship, while no other attorneys in the office were. ¶¶63-66. In Plaintiff's opinion, the First Assistant was unqualified to be a mentor. ¶ 67.

Plaintiff claims the First Assistant sexually harassed her throughout her employment. *See Compl.* Comments from the First Assistant made her "uncomfortable" and "[s]he felt physically intimidated, pressured, and concerned about his intentions". Id. During the many months she worked in the FDO, she claims she experienced this conduct, but she did not address *any* issues, sexual harassment-based or otherwise, with the Defender until she vaguely "raised concerns that the First Assistant had acted inappropriately towards her." ¶97. The Defender "was dismissive of her concerns…and told her to work things out with the First Assistant directly." Id.

Plaintiff met with the Defender on July 2, 2018, upon the recommendation of an unnamed 'mentor who had extensive experience handling Equal Employment Opportunity cases for the federal judiciary.' ¶¶123-124. In that meeting, she "told the Defender that she would be drawing boundaries with the First Assistant and 'asked [the Defender] to maintain her confidence.'" Id. She also expressed her opinion that "the First Assistant had behaved inappropriately," noting that he "had been so angry at her that he was shaking, and that she was leaving the office early every day to avoid issues with him." Id. Notably, when the Defender specifically "asked [Plaintiff] if this was 'sexual harassment'" that day, Plaintiff responded that "she was not using those words *yet*, because she was trying to self-manage the situation first." Id.[5] She left the meeting "concerned that the Defender did not verbally support her or ask her to follow up with him on her concerns." ¶126. Plaintiff now claims she intended that July 2, 2018 meeting to provide notification of a sexual harassment complaint against the First Assistant, despite her assurances to the contrary.

---

[5] In June, she began "taking contemporaneous notes to document the First Assistant's inappropriate and unprofessional behaviors." ¶108. She does not allege that she provided any of this documentation, or the texts or emails identified in the Complaint to the Defender at any point.

4

Later that day, Plaintiff decided to meet one-on-one, without the Defender's knowledge, with the First Assistant. ¶¶127-132. The meeting resulted in Plaintiff "feeling intimidated by" the First Assistant, so she called the Defender to "let him know that the First Assistant might say something about her, and asked him to withhold judgment until he had spoken with her." Id. ¶133. Two workdays later, on Thursday, July 5, 2018, the Defender attempted to help resolve the issues between Plaintiff and the First Assistant when he, by Plaintiff's words, "forced her to meet directly with" both him and the First Assistant. ¶¶134-135. She expressed that she was "uncomfortable" meeting with the First Assistant and did not want him to be in the meeting. Id. The Defender asked the First Assistant to leave the meeting. ¶136. Plaintiff had been "taking notes" during the meeting, which she alleges the Defender told her to "stop taking." ¶¶136-137. During that conversation, the Defender told the Plaintiff he viewed her issue with the First Assistant as a 'breakdown in communication' between the Plaintiff and the First Assistant, and compared work relationships to marriage, in that both types of relationships required compromises. ¶140. The Defender's analogy "shocked, horrified, and disgusted" the Plaintiff because "she believed it to be unacceptable to compare any professional relationship to a marriage." ¶141. She became upset and reiterated the complaints she had made in the meeting a few days earlier. ¶138. This time, she included more detail but, again, did not identify any sexual harassment. ¶¶137-143.

On Friday, July 20, 2018, the Defender announced his intention to assign Plaintiff to the office's trial team headed by the First Assistant, ¶150, but reversed that decision four days later, ¶163, and allowed her to report instead to the Appellate Chief and to telework. ¶¶216, 219. On July 23, Plaintiff "contacted the AO's Fair Employment Opportunity Officer (FEOO)," where she claims she learned about the EDR Plan for the first time.[6] ¶158. Plaintiff "was concerned that her

---

[6] The Plan itself was "posted on the Court's internal and external websites" and a copy of the Plan was "filed with the Administrative Office." Plan, § 1.

confidences were being betrayed" by the Defender, evidently because he was working with others to make alternative arrangements to address Plaintiff's concerns. ¶¶163-169.

In early August, Plaintiff "seriously considered initiating a complaint under the Plan" but decided against it. ¶184. On August 9, 2018, Plaintiff met with the Defender, at his request.[7] ¶195. At that time, Plaintiff told the Defender he should have known that her use of the word "uncomfortable" on July 2 translated to a complaint of sexual harassment. ¶¶65-69, 72-76; 198. She and the Defender also discussed various options, including continued telework, for her so she could comfortably continue working while her complaints went through the investigative process. ¶¶205-207. The Defender agreed with each of her suggestions, except her request to be transferred to a different office in another part of the state. ¶207. On Friday, August 10, 2018, Plaintiff emailed the Defender about the August 9 meeting, formally submitting a written complaint that the First Assistant sexually harassed her, discriminated against her based on her gender, and retaliated against her. ¶¶65-66, 69, 72-76. The Defender, in accordance with the Plan, promptly referred the e-mail to the appropriate individuals, and then updated the Plaintiff on the status of her complaint a week after the August 10 e-mail. ¶¶213, 217, 224. Plaintiff concluded "on information and belief, [that] the real purpose of the Defender's email was not to update [her] on her complaint, but rather to further intimidate, bully, and retaliate against her." ¶214. Plaintiff was "intimidated and afraid" and was dissatisfied with the Defender's timing of his referral to the Plan, and she disagreed with the Plan's reporting procedures themselves. ¶¶220-221. An unidentified person at some point "told [Plaintiff] that the Defender was furious at her for reporting the harassment …." ¶223.

As to specific alleged improper actions taken by the Defender, Plaintiff claims "on information and belief" that "the Defender allowed the First Assistant to continue making, or

---

[7] *i.e.* Plaintiff did not initiate the meeting as 'encouraged' by the Plan. Plan, Chapter X, §2.

participating in, decisions affecting [her] job terms and conditions." "reclassified her" for "case weight management purposes" "along with the other research and writing attorney." ¶¶244-245. She also claims she "reasonably believed" the Defender "at best …denied [her] a raise, and at worst…planned to drastically, and illegally, reduce her salary," (¶248) and decreased her workload (¶295). She claims that he removed her as second chair on a trial in June, before her complaints, and did not ask her to interview for an open appellate position in August. ¶¶171; 236-237; 295. Ultimately, Plaintiff faults the Defender for "mishandl[ing] and escalat[ing] the situation." ¶408.

Plaintiff also generally alleges that "the Defendants," collectively, retaliated against her in other ways such as: they "directly sanctioned … a 'reclassification' of [Plaintiff's] title instead of [giving her] a promotion" (¶241), that she received a "retaliatory, phantom promotion," (¶242), that she was not considered for increased salary or job responsibilities and did not receive any performance reviews during the approximate year she had worked in the FDO, (¶242), and that she did not receive a promotion as quickly as she was told by the prior Defender. Plaintiff points to numerous other alleged acts committed by various Defendants, collectively, as well. ¶¶236-251.

After the Defender referred her complaints to the appropriate individuals pursuant to the Plan, Plaintiff's complaint moved through the EDR process, during which, on September 5, 2018, she alleged retaliation by the Defender in addition to her complaints involving the First Assistant. ¶¶217, 257-60, 451, 484. Per Plaintiff's request, the Defender was not involved in the investigation process except to provide alternative working arrangement options for Plaintiff, with which Plaintiff was dissatisfied. ¶276. The EDR Coordinator assigned an HR Specialist to conduct the investigation and all agreed that the Defender would not receive the report on the investigation or be involved in conducting the investigation. ¶¶265, 297, 299, 398. Plaintiff was displeased that she

may not personally be provided a copy of the investigative report, which would include sensitive personnel information about other employees, among other confidential materials. ¶¶398-400.

Plaintiff eventually filed a request for counseling under the Plan and a report of wrongful conduct,[8] naming both the First Assistant and Defender as violators of the Plan. ¶274. In a separate filing, Plaintiff requested disqualification of the Defender. ¶276. On September 28, 2018, the Circuit Executive confirmed to Plaintiff that there would be a unified investigation covering Plaintiff's report of wrongful conduct and her request for counseling. ¶¶299, 325. On January 30, 2019, Plaintiff requested mediation under the Plan. ¶¶411-17. The following week, Plaintiff met with the Mediator and again requested a duty station transfer to another office than the one where she was hired to work. ¶411. On February 26, 2019, Plaintiff again met with the Mediator, who reported that Plaintiff could <u>not</u> transfer because that office had no openings. ¶454. Ultimately, during the mediation process, the Mediator persuaded the Defender to allow the Plaintiff's request to transfer, which made the Plaintiff "apoplectic". ¶¶417-421. The Defender had consistently resisted such a transfer to an office at least 2 hours away with no available office space, and with fewer attorneys and less supervision, particularly given Plaintiff's short tenure with the FDO. ¶¶78, 420. Regardless, the Mediator helped Plaintiff secure a Fourth Circuit clerkship. ¶¶456-57. On March 8, 2019, Plaintiff was offered the clerkship, which Plaintiff accepted as a "negotiate[ed] …

---

[8] Wrongful conduct complaints do not automatically trigger Chapter X procedures. Chapter IX, p. 7. An employee can only obtain relief under Chapter X. *See* Plan, Chapter X, § 1.

resolution of her claim. ¶¶7, 459. On March 11, 2019, Plaintiff withdrew her claims.[9]



On March 15, 2019, Plaintiff voluntarily resigned. ¶464. She now contends that her resignation was a "constructive discharge." She did not file another complaint under the Plan relating to her "constructive discharge" claim, instead initiating this federal lawsuit.

### III. STATUTORY AND ADMINISTRATIVE FRAMEWORK

#### A.  <u>Federal Employment</u>

Congress enacted the Civil Service Reform Act of 1978 (CSRA), 5 U.S.C. § 1101 *et seq.*, to replace a "patchwork system" of federal personnel law "with an integrated scheme of administrative and judicial review, designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration." *United States v. Fausto,* 484 U.S. 439, 445 (1988). The CSRA personnel system provides a

---

[9]  This email, while not cited in the Complaint, is appropriately considered on a motion to dismiss because it is integral to the Complaint. *Philips v. Pitt Cty Mem'l. Hosp.,* 572 F.3d 176, 180 (4th Cir. 2009); *Jeffrey M. Brown Assoc., Inc. v. Rockville Center, Inc.,* 7 Fed. App'x. 197, 203 (4th Cir. 2001)(considering documents referenced in a complaint to "further the policy of '[p]reventing plaintiffs from surviving a … motion [to dismiss] by deliberately omitting … documents upon which their claims are based.'"). This is especially appropriate here, where Plaintiff challenges the validity of the administrative process, yet omits mentioning that she <u>withdrew</u> her administrative claim.  *See, e.g., Ryan v. McAleenan*, No. CV ELH-19-1968, 2020 WL 1663172, at *10 (D. Md. Apr. 3, 2020)(considering emails and other documentation from administrative process attached to a motion to dismiss in a Title VII case).

9

Case 1:20-cv-00066-WGY   Document 45   Filed 06/08/20   Page 14 of 31

"comprehensive" scheme of protections and remedies for federal employment disputes, *Id.* at 448, and "prescribes in great detail the protections and remedies applicable … including the availability of … judicial review." *Id*. at 443. Because of its comprehensive nature, courts have held that "Congress meant to limit the remedies of federal employees bringing claims closely intertwined with their conditions of employment to those remedies provided in the [CSRA]." *Lehman v. Morrissey,* 779 F.2d 526, 527-28 (9th Cir. 1985).

Judicial Branch employees are federal "employees" under Title 5, Section 2105, of the U.S. Code. All Federal Public Defender Office employees are covered by many parts of Title 5 of the U.S. Code, conferring rights and benefits to them such as back pay, severance pay, family and medical leave, and health and retirement benefits.[10] However, Congress intentionally omitted Judicial Branch employees from the CSRA's specific procedures and remedies by expressly classifying such employees as "excepted service" personnel under various provisions of the CSRA. *See, generally,* 5 U.S.C. §§2302, 4301, 7511; *see also Semper v. Gomez*, 747 F.3d 229, 240 (3d Cir. 2014). Judicial Branch employees have long been covered by a distinct and comprehensive set of administrative procedures and remedies for personnel matters, including employee discrimination, harassment, and retaliation claims. Soon after Congress's enactment of the CSRA, the Judicial Conference developed a Model Equal Employment Opportunity Plan in 1980, revised in 1986 (Model Plan). Every federal court, including the Fourth Circuit, has adopted the Model Plan in its entirety or with some procedural modifications.

---

[10]  *See* 5 U.S.C. § 55 (providing severance pay, separation pay, and back pay for employees of the AOC and federal courts under 28 U.S.C. §610); 5 U.S.C. §63, Subchapter I (applying annual and sick leave provisions for all employees defined under 5 U.S.C. §2105, which includes most judiciary employees); 5 U.S.C. §63, Subchapter III (applying family and medical leave provisions to employees); 5 U.S.C. §8901(including employees defined under 5 U.S.C. § 2105 for health insurance coverage; 5 U.S.C. §8331 (including employees defined under 5 U.S.C. §2105 for civil service retirement benefits).

10

Congress has long been aware of the Model Plan, and unequivocally elected not to apply the CSRA to Judicial Branch employees. When Congress enacted the Congressional Accountability Act of 1995 (CAA), Pub. L. No. 104-1, 109 Stat. 3, "'Congress initially considered extending the [CAA's] coverage to employees of the judicial branch but mindful of judicial autonomy, ultimately decided against such action.'" *In re Golinski*, 587 F.3d 956, 962-63 (9th Cir. 2009) (quoting *Dotson v. Griesa,* 398 F.3d 156, 173 (2d. Cir. 2005)). Instead, in enacting the CAA, Congress required the Judicial Conference to submit a report to Congress regarding the application to the Judicial Branch of the federal labor laws extended to Congress by the CAA, and any need for legislation to afford Judicial Branch employees rights, protections, and procedures, "including administrative and judicial relief" comparable to those available to Legislative Branch employees. 2 U.S.C. § 1434. In response, the Judicial Conference emphasized that "[f]rom the beginning of the federal court system, the hallmarks of judicial branch governance have been local court management and individual judge autonomy, coupled with mechanisms for ensuring accountability and effective use of resources." *Dotson,* 398 F.3d at 175 (internal citation omitted). Accordingly, the "judiciary's internal governance system is a necessary corollary to judicial independence." *Id.* The Judicial Conference thereafter adopted a new Model Employment Dispute Resolution Plan in 1997 (1997 Model EDR Plan). The new Model EDR Plan established enhanced review procedures like the structure created in the CAA, and "Congress has determined that the Judiciary's EDR tribunals are the <u>only</u> forum where judicial employees may seek redress for unlawful personnel actions." *In re Golinski*, 587 F.3d at 961 (emphasis added).

**B.**   <u>**Fourth Circuit EDR Plan**</u>

Like the 1997 Model EDR Plan, the Fourth Circuit's Plan in place at the time of the events giving rise to this claim prohibited discrimination against employees based on race, color, religion,

sex, national origin, and disability, harassment, and retaliation. Plan, Ch. X, §1. The Plan established comprehensive review procedures like the structure Congress created in the CAA. The Plan "is intended to be the exclusive remedy of the employee relating to rights under the Plan." Ch. 1, §1. Moreover, like the CSRA, "[d]ecisions of the Judicial Council are final and conclusive and shall not be judicially reviewable on appeal or otherwise." Ch. 10, §12 (emphasis added).

## IV. ARGUMENT

### A. <u>LEGAL STANDARD</u>

A complaint attacked by a Rule 12(b)(6) motion to dismiss will survive if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 1949 (2009) quoting *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007). To assert a claim for relief, the complaint must allege facts that imply more than a "sheer possibility that a defendant has acted unlawfully" or "facts that are 'merely consistent with' a defendant's liability[.]" *Iqbal,* 556 U.S. at 678. (quoting *Twombly*, 550 U.S. at 557). Critically, "'[t]he presence … of a few conclusory legal terms does not insulate a complaint from dismissal … when the facts alleged in the complaint' cannot support the legal conclusion" alleged or the relief sought. *See Migdal v. Rowe Price-Fleming Int'l*, 248 F.3d 321, 326 (4th Cir. 2001) (quoting *Young v. City of Mount Ranier*, 238 F.3d 567, 577 (4th Cir. 2001)).

### B. <u>JUDICIALLY IMPLIED *BIVENS* REMEDIES DO NOT APPLY</u>

In *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017), the Supreme Court explained that jurisprudence regarding the implication of private rights of action has fundamentally changed since the Court first recognized a private cause of action for a 4th Amendment violation in the 1971 *Bivens* case, 403 U.S. 388. When *Bivens* was decided, the Court regularly found implied causes of action not explicit in statutory text; by contrast, its subsequent decisions have concluded that if a statute itself does not display an intent to create a private remedy, "a private cause of action will not be created

12

through judicial mandate." *Id.*, at 1855-56. This "caution as to implied causes of actions under congressional statutes led to similar caution with respect to actions in the *Bivens* context, where the action is implied to enforce the Constitution itself." *Id.* at 1856. Indeed, the Court has recognized an implied constitutional damages remedy only twice since *Bivens* itself, in *Davis v. Passman*, 442 U.S. 228 (1979)(gender discrimination by a Congressman in violation of 5th Amendment's Due Process Clause), and *Carlson v. Green*, 446 U.S. 14 (1980)(failure to provide medical treatment to a prisoner in violation of the 8th Amendment, resulting in his death).

The Supreme Court made clear in *Abbasi* "that expanding the *Bivens* remedy is now a 'disfavored' judicial activity," and emphasized that it has "consistently refused to extend *Bivens* to any new context or new category of defendants" for the past 30 years." 137 S. Ct. at 1857. The Court did not overrule *Bivens*, but it observed that "in light of the changes to the Court's general approach to recognizing implied damages remedies, it is possible that the analysis in the Court's three *Bivens* cases might have been different if they were decided today." *Id.* at 1856.

The Court's reluctance to extend *Bivens* is rooted in separation-of-powers principles. *Abbasi*, 137 S. Ct. at 1856-57. *Abbasi* explained that it is a "significant step under separation-of-powers principles for a court to determine that it has the authority … to create and enforce a cause of action for damages against federal officials in order to remedy a constitutional violation." *Id.* at 1856. When a party seeks to assert a *Bivens* remedy, "[t]he question is 'who should decide' whether to provide for a damages remedy, Congress or the courts?" *Id.* at 1857. The answer "most often will be Congress," because Congress is better suited to consider the costs and benefits of recognizing a damages remedy. *Id.* Accordingly, a *Bivens* remedy is not available in any "new context" when there are "special factors counselling hesitation in the absence of affirmative action by Congress." *Id.* Moreover, if there is an "'alternative, existing process for protecting the [injured

13

party's] interest,"' that process "may 'amoun[t] to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages."' *Id.* (alterations in original)(quoting *Wilkie*, 551 U.S. at 550). Plaintiff's *Bivens* claim thus fails.

1.    Plaintiff's novel claims present a "new *Bivens* context."

A case presents a "new context" if it "is different in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court" (*i.e.*, *Bivens*, *Davis*, and *Carlson*). *Id.* at 1859-60. Courts must decide whether a *Bivens* claim arises in a "new context" solely by reference to the Supreme Court's own decisions implying private rights of action. *Id. Abbasi* provides "some examples" of "differences that are meaningful enough to make a given context a new one," such as "the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to an emergency to be confronted; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider." *Id.* at 1864 ("even a modest extension is still an extension"). If the cause of action arises in a new context, courts must then consider whether "special factors counsel[] hesitation" before finding an implied cause of action for a government employee's personal liability "in the absence of affirmative action by Congress." *Id.* at 1857. Here, Plaintiff's case differs in several "meaningful ways" from previous *Bivens* cases decided by the Supreme Court. *Id.* at 1859-60.

*Davis v. Passman* is the only *Bivens* case relating to the employment context. This case differs from *Davis* in several ways. First, *Davis* dealt with a specific action: the firing by an elected Congressman of a staff member explicitly and unequivocally because of her gender. *See Davis*, 442 U.S. at 230 (the defendant fired the female assistant because "it was essential the understudy

14

to my Administrative Assistant be a man.") Plaintiff's allegations of retaliation and discrimination by the Defender are much more general and meandering. She identifies a handful of allegedly retaliatory actions taken by the Defender, but also boils it down, generally, to him "mishandl[ing] and escalat[ing] the situation." ¶408. *See Abbasi* at 1864 (observing that "meaningful differences" include the generality or specificity of the official action).

Second, *Davis* dealt with congressional employment practices, whereas Plaintiff's allegations deal with federal judiciary policies underlying the Plan that implicate special considerations which could disrupt judicial operations and undercut judicial autonomy. *Id*. at 1864 (observing that "meaningful differences" include the risk of disruptive effects). Third, in *Davis*, an alternative process did not exist[11], whereas, in this case, the Plan provided Plaintiff an existing process for protecting her interests and affording her numerous possible remedies. Unlike *Davis,* this is a case in which "an alternative remedial structure … alone may limit the power of the Judiciary to infer a new *Bivens* cause of action." *Id.* at 1858. Thus, Plaintiff's proposed constitutional claims "bear little resemblance" to those previously recognized by the Supreme Court. *Id.* at 1865 (even where "[t]he differences between a claim… are perhaps small…" "the new-context inquiry is easily satisfied.").

Plaintiff's theories of vicarious and collective liability also have no equivalent in the Supreme Court's *Bivens* jurisprudence. The Supreme Court has never permitted a *Bivens* remedy for a standalone "conspiracy" claim, or to vindicate a claim of constructive discharge. Additionally, the Supreme Court has never applied a *Bivens* claim to a judicial branch supervisor

---

[11] The Supreme Court emphasized, in the *Davis* ruling over 40 years ago, "[f]or Davis, as for Bivens, 'it is damages or nothing.'" *Davis*, 442 U.S. at 245 (quoting *Bivens* 403 U.S. at 410 (Harlan, J. concurring in judgment)). *Davis* was decided in 1979, while the CSRA was adopted in 1978 (after the events giving rise to the *Davis* action occurred), and the CAA in 1995. In this case, the Plan provides—and has long provided-multiple remedies to Plaintiff and is decidedly <u>not</u> "damages or nothing." *See Plan*, generally.

handling a personnel matter. Undoubtedly, this case constitutes a new *Bivens* context.

    2.    <u>Special factors counsel against implying a *Bivens* cause of action.</u>

The special-factors inquiry "concentrate[s] on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Abbasi*, 137 S. Ct. at 1857-58. "The only relevant threshold — that a factor 'counsels hesitation'-- is remarkably low… 'Hesitation' is 'counseled' whenever thoughtful discretion would pause even to consider." *Arar v. Ashcroft*, 585 F.3d 559, 573-74 (2d Cir. 2009). "[I]f there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting a wrong, the courts must refrain from creating the remedy[.]" *Abbasi*, 137 S. Ct. at 1858. The special factors here, "[t]aken together," "dictate that it would be inappropriate" to imply the remedies Plaintiff seeks. *Chappell v. Wallace*, 462 U.S.296, 304 (1983).

    a.    <u>*Federal employment counsels hesitation.*</u>

*Bush* determined that "federal employment constituted a 'special factor' warranting refusal to recognize a First Amendment *Bivens* claim asserted by a federal employee." *Hall*, 235 F.3d at 202. Neither the Supreme Court nor the Fourth Circuit has recognized a Due Process or Equal Protection Claim under similar circumstances. *See id*. Where the Court has considered extending *Bivens* to federal employment claims at all, it has expressly decided *against* doing so. *See Bush*, 462 U.S. at 367, 390 (denying *Bivens* claim for allegedly retaliatory personnel action against federal worker); *Chappell*, 462 U.S. at 304 (denying sailors' *Bivens* claim alleging racial discrimination by military officers); *FDIC v. Meyer*, 510 U.S. 471, 473 (1994)(rejecting *Bivens* claim in a procedural due process suit against a federal agency for wrongful termination); *see also Hall v. Clinton, supra,* and *Zimbelman v. Savage*, 228 F.3d 367, 369 (4th Cir. 2000)(dismissing *Bivens* claims because they "indisputably ar[o]se from a federal employment relationship").

"Congress intended that the CSRA would operate to the exclusion of all other statutory remedies for claims arising out of federal employment." *Hall*, 235 F.3d at 202; *Pinar v. Dole*, 747 F.2d 899, 910-12 (4th Cir.1984)(Congress intended the CSRA to be exclusive; rejecting federal employee's *Bivens* challenge to personnel actions taken against him). "Congress's omission of review rights [under the CSRA] for judicial branch employees was not inadvertent and, therefore, preclude[s] pursuit of a *Bivens* claim." *Dotson*, 398 F.3d at 169 (rejecting probation officer's *Bivens* claim for racial discrimination).

Several Circuits "have concluded that current or former employees of the Judicial Branch, specifically, could not bring damages claims pursuant to the *Bivens* doctrine." *Semper v. Gomez*, 747 F.3d 229, 237 (3d Cir. 2014)(in rejecting probation officer's *Bivens* claim, "it is undisputed that the CSRA precludes current or former federal employees from bringing a *Bivens* damages action for alleged constitutional violations arising out of the employment context"); *Blankenship v. McDonald*, 176 F.3d 1192, 1195 (9th Cir. 1999)(denying federal employee's *Bivens* action because "the CSRA precludes a *Bivens* remedy in this case"); *Lee v. Hughes*, 145 F.3d 1272, 1276 (11th Cir. 1998)(CSRA precludes probation officer's *Bivens* claim). At least one district court has even held that a *Bivens* claim asserted <u>by a former employee of an FDO directly against a Federal Defender</u> must be dismissed. *See Hays v. Forsman*, 458 F.Supp.2d 1177 (D.Nev. 2006). This Court, like the many others, should decline to imply *Bivens* remedies for novel claims in the federal employment context.

b. <u>Judicial independence counsels hesitation.</u>

The Federal Judiciary has long taken the position that the judicial branch must have control over its employee and workplace management in order to ensure both the independence, and the appearance of independence, of its decisions. *Dotson*, 388 F.3d at 175. The "judiciary's internal

governance system is a necessary corollary to judicial independence." *Id.* (internal citations omitted). "Congress has indicated on a number of occasions that employment disputes with the Judicial Branch implicate a special set of circumstances, including the doctrine of separation of powers and the protection of the independent judiciary." *Semper,* 747 F.3d at 240. Congressional action in withholding CSRA review rights from judicial branch employees was not inadvertent, *Dotson*, 398 F.3d at 169, and, in fact, the CSRA's history reveals Congress' deliberate decision to exclude judicial branch employees from the CSRA's review process, *Dotson*, F.3d at 170; *In Re Golinski*, 587 F.3d at 962 ("History reveals that Congress intended the Judiciary to have … the ability to manage its own personnel and adjudicate workplace complaints.").

Moreover, "Congress initially considered extending the [CAA's] coverage to employees of the judicial branch but, mindful of the importance of judicial autonomy, ultimately decided against such action." *Dotson*, 398 F.3d at 173. "The Judicial Conference of the United States submitted [a] report in 1996, telling Congress: 'The judicial branch is committed to providing the general protections of the CAA laws in a manner that preserves judicial independence and the decentralized administration of the federal courts.'" *In Re Golinski*, 587 F.3d at 962 (quoting Judicial Conference of the United States, Study of Judicial Branch Coverage). Pursuant to the Congressional Accountability Act of 1995 (Study) 2-3 (1996)("CAA"), "the Judicial Conference reported that it was developing 'a plan to provide the rights, protections, and remedies similar to the CAA.'" *Id.* at 963 (quoting Study at 15). That plan became the Model EDR Plan, which the Fourth Circuit adopted. Congress, cognizant of the Judiciary's use of EDR Plans, has not taken further action to bring judiciary employees within a statutory scheme, but instead has allowed the judiciary to implement EDR plans. Congressional action and inaction in this area acknowledge the importance of separation of powers in ensuring the independence of the federal judiciary, counsel

hesitation, and constitute a "special factor" precluding this action. *Dotson,* 398 F.3d at 171.

c.    <u>*The existence of the comprehensive Plan counsels hesitation.*</u>

Plaintiff's claims attack the Judicial Council for the Fourth Circuit's EDR policies as embodied in the Plan. Plaintiff asks this Court to recognize an alternative process (by pursuing this Federal lawsuit), even though the Plan already provides a comprehensive process. Plaintiff's claims against the Defender boil down to a former judiciary employee's dissatisfaction with her supervisor's handling of her issues, as well as with the Plan's administrative process for addressing her alleged personnel claims. However, as noted in *Abbasi,* a *Bivens* action is not the proper vehicle for altering an entity's policy. *Abbasi,* 137 S. Ct. at 1860. Plaintiff's *Bivens* cause of action amounts to an attempt to attack the Fourth Circuit's EDR policies and reporting procedures, *see* Compl. ¶¶ 465-70.  Notably, Plaintiff's claim is predicated on her contention that the 2019 Model EDR Plan, adopted months after her employment ended, "did not address the problems" with the Plan in place at the time of her employment. *See* Compl. at ¶¶ 465-470. But Plaintiff's subjective views of what would be the Circuit's best policy do not give rise to a *Bivens* cause of action.

Congress has granted the circuit councils broad authority to develop policies and procedures to administer the circuit's personnel system through the circuit executive "subject to the general supervision of the chief judge of the circuit." 28 U.S.C. §332(e). Plaintiff seeks through this *Bivens* action to encourage this Court to override the policy-making roles of the Judicial Conference of the United States and the Judicial Council for the Fourth Circuit. Allowing Plaintiff's *Bivens* cause of action would require the Court to assess the quality and propriety of the policies underlying the Plan – policies not promulgated in any way by the Defender. Consequently, Plaintiff's *Bivens* action "would call into question the formulation and implementation of a high-level policy," *Abbasi,* at 1860, and counsels hesitation against recognizing a *Bivens* claim.

19

*The Plan provides an alternative, existing process precluding a Bivens cause of action.*

Plaintiff's decision not to pursue the full alternative process under the Plan provides an additional basis for dismissal since a plaintiff who fails to pursue relief under available administrative remedies cannot also pursue *Bivens* claims. *Dotson*, 398 F.3d at 161, n.2 (refusing to imply *Bivens* cause of action for probation officer who alleged he was terminated based on racial discrimination and denial of due process); *See also Dexter v. Huerta*, No. 12-1147, 2013 U.S. Dist. LEXIS 136362, at *4 (M.D.N.C. Sep. 24, 2013)("parties who seek to challenge agency action to exhaust available administrative remedies before bringing their case to court").

*Any* sort of "alternative, existing process" may "limit the power of the Judiciary to infer a new *Bivens* cause of action." *Abbasi*, 137 S. Ct. at 1858, 1876 (quoting *Wilkie*, 551 U.S. at 550). This includes "administrative, statutory, equitable, and state law remedies." *Vega v. United States*, 881 F.3d 1146, 1154 (9th Cir. 2018). The Plan provides a comprehensive alternative process for Plaintiff's claims, both during and following her employment. *See* Plan, generally. The Plan is precisely the type of alternative administrative process that precludes a *Bivens* claim, as "'[t]he purpose of denying a [Bivens] private cause of action to federal employees is to ensure that they do not bypass comprehensive and carefully-balanced statutory and administrative remedies in order to seek direct judicial relief.'" *Hall*, 235 F.3d at 205 (quoting *Gleason v. Malcom*, 718 F.2d 1044, 1048 (11th Cir. 1983)). This is especially true where Plaintiff did not exhaust her remedies under the Plan, instead voluntarily withdrawing her claim after obtaining an appellate clerkship. *See Drone v. Duff*, 2017 WL 6383607 (E.D. Va. 2017)(federal district court's EDR Plan provided meaningful review by judicial officers.

Plaintiff's own actions demonstrate the availability (and her knowledge of the availability) of an alternative, existing remedial process, which resulted in Plaintiff obtaining a Fourth Circuit

clerkship and withdrawing her claims. Those claims expressly included her allegations against the Defender. Under the Plan, there are several more steps Plaintiff could have taken to address her complaints, including those relating to the Defender. After mediation, had Plaintiff elected to file a formal complaint under §10 of the Plan, she would have been afforded numerous rights. See Plan, Chapter X, §12. Instead, Plaintiff chose to withdraw her claim and cannot now complain about the inadequacy of the administrative process. Plan, Ch. X, §1(B)-(C). She also could have filed a separate post-employment claim under the Plan to address her "constructive discharge" allegation. Id., §3(B).

*Bivens* was never intended to be a "vehicle" where plaintiffs could pick and choose which parts of the alternative process would benefit them and complain, in a *Bivens* lawsuit, of other parts being inadequate. *See Mirmehdi v. United States*, 689 F.3d 975, 982 (9th Cir. 2012)(declining to imply a *Bivens* remedy when plaintiffs had sought alternative relief "through not one but two different remedial systems").

**B.**    **QUALIFIED IMMUNITY BARS PLAINTIFF'S LAWSUIT AGAINST THE DEFENDER**

The Defender is also entitled to qualified immunity from Plaintiff's claims and, accordingly, this case against him in his individual capacity should be dismissed. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity thus protects officials from suit and not simply protection from the ultimate assessment of damages, as "[l]itigation … exacts heavy

costs in terms of efficiency and expenditure of valuable time and resources that might otherwise be directed to the proper execution of the work of the Government." *Iqbal*, 556 U.S. at 685-86.[12]

Qualified immunity serves the public interest by allowing government officials to perform their duties diligently, without being chilled or distracted by the risk of personal damages suits and the burdens of the litigation process. Accordingly, government officials like the Defender are entitled to qualified immunity unless: "(1) the allegations underlying the claim, if true, substantiate the violation of a federal statutory or constitutional right; and (2) this violation was of a 'clearly established' right 'of which a reasonable person would have known." *Kentucky v. Graham*, 473 U.S. 159, 165-67 (1985). Plaintiff is unable to meet either of these requirements.

1. Step One: Plaintiff fails to allege plausibly that the Defender personally violated the law.

Because officials must have clear notice that their own specific actions are unconstitutional before they can be held liable in damages, *see Iqbal*, 556 U.S. at 676, step one of the qualified immunity test asks whether the plaintiff has plausibly alleged the violation of a right. *Id.* Specifically, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution," *Iqbal*, because "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct," *Id.* at 677. Plaintiff must include factual material about the defendant's own actions.

Here, Plaintiff's Complaint does not adequately allege an individual-capacity constitutional claim against the Defender. A large portion of her Complaint as it relates to the Defender is based "on information and belief," on rumors, gossip, and suppositions. *See* Compl., The actual wrongs she alleges exclusively against the Defender boil down to claims that he, as her

---

The Supreme Court has held that a defendant's entitlement to qualified immunity is so paramount that denials of qualified immunity, even at the motion to dismiss stage, are among the rare matters subject to immediate interlocutory appeal as a matter of right. *See Behrens v. Pelletier*, 516 U.S. 299, 308 (1996).

Case 1:20-cv-00066-WGY   Document 45   Filed 06/08/20   Page 27 of 31

supervisor's supervisor, hindered her employment opportunities. Other wrongs she alleges occurred at the hands of other people, such as the First Assistant and the various other Defendants.

Whether viewed as an impermissible theory of "supervisory liability," *see Iqbal*, 556 U.S. at 677, or as "an unadorned, the-defendant-unlawfully harmed-me accusation," *Id.* at 678, Plaintiff's allegations are insufficient to show a plausible claim that the Defender should be held individually liable to the Plaintiff. The numerous other remedies afforded her under the Plan adequately address her alleged wrongs. Attempting to hold the Defender personally liable to her contradicts both the *Bivens* jurisprudence and the general employment law principle holding employers accountable for a supervisor's personnel actions, and not the supervisor him or herself.

Moreover, a plaintiff must "plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 676. In much of her Complaint, Plaintiff attempts to impute the allegations against other defendants to the Defender, or to combine all the actions of multiple defendants. However, a complaint that contains "only collective references to defendants does not adequately state a *Bivens* claim…." *Marcilis v. Township of Redford*, 693 F.3d 589, 596 (6th Cir. 2012)(citing *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008)); *see also Grieveson v. Anderson*, 538 F.3d 763, 778 (7th Cir. 2008). When a complaint, like Plaintiff's, "makes only categorical references to 'Defendants,'" it fails to "'allege, with particularity, facts that demonstrate what *each* defendant did to violate the asserted constitutional right.'" *Marcilis*, 693 F.3d at 596-97; *see also Pahls v. Thomas*, 718 F.3d 1210, 1226 (10th Cir. 2013)(complaint's "undifferentiated contention that 'defendants' infringed" plaintiff's rights failed to state a claim); *Matthews v. Bergdorf*, 889 F.3d 1136, 1144 (10th Cir. 2018)("the complaint must 'isolate the allegedly unconstitutional acts of each defendant'; otherwise the

complaint does not 'provide adequate notice as to the nature of the claims against each' and fails ...”). Plaintiff's allegations as to "defendants" do not state a plausible claim against the Defender.

Similarly, *Bivens* liability cannot be established solely on a theory of *respondeat superior*. *Iqbal*, 556 U.S. at 676 ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*."). Because vicarious liability is inapplicable to *Bivens* suits, a plaintiff must plead that the Government-official defendant, through the official's own individual actions, violated the Constitution. Here, Plaintiff seeks, in large part, to hold the Defender personally responsible for the alleged actions of the First Assistant, as well as trying to hold him responsible for her subjective beliefs that he retaliated against her. Under *Iqbal* these are the types of allegations shielding the Defender from personal liability.

Plaintiff also fails to state any plausible claim that the Defender personally violated 42 U.S.C. §§ 1985(3) and 1986. Plaintiff's claims under these statutes (a) fail to allege all elements of the causes of action, *Simmons v. Poe*, 47 F.3d 1370, 1376 (4th Cir. 1995), (b) are impermissibly conclusory, *Gooden v. Howard County*, 954 F.2d 960, 969-70 (4th Cir. 1992) (*en banc*), (c) are barred by the intracorporate-conspiracy doctrine, *Buschi v. Kirven*, 775 F.2d 1240 (4th Cir. 1985), and (d) are precluded by the administrative process under the Plan, *Hall*, 235 F.3d at 206. The Fourth Circuit has held "that Congress intended the CSRA would operate to the exclusion of ***all*** other statutory remedies for claims arising out of the federal employment relationship." *Hall*, 235 F.3d at 206 (emphasis added). Similarly, the Plan is intended to operate to the exclusion of **all** remedies for claims arising out of the employment context. Because "[a] cause of action based upon §1986 is contingent upon the existence of a claim under §1985," the dismissal of plaintiff's §1985 claims necessarily result in the dismissal of the §1986 claims. *Trerice v. Summons*, 755 F.2d

1081, 1085 (4th Cir. 1985). Accordingly, Plaintiff fails to allege a plausible claim for relief, and the Defender is entitled to qualified immunity. *See Abbasi*, 137 S. Ct. at 1869.

      2.<u>Step Two: Plaintiff Alleges No Violation of Clearly Established Law.</u>

Plaintiff must also allege a clearly established right. For an official to lose the protections of qualified immunity, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Plaintiff must "identify a case where an [official] acting under similar circumstances … was held to have violated [the Constitution]." *White v. Pauly,* 137 S. Ct. 548, 552 (2017)(per curiam). As noted, there is no case where an employee of the judicial branch has been held to violate another employee's constitutional rights in an employment context. Because Plaintiff sets forth no constitutional or statutory violation at all in her Complaint, much less a clearly established one, qualified immunity bars Plaintiff's lawsuit against the Defender.

## VI. CONCLUSION

For the foregoing reasons, the Federal Defender for the Western District of North Carolina respectfully requests dismissal with prejudice of the individual capacity claims against him. This the 8th day of June, 2020.

      Respectfully submitted,

      **s/Shannon Sumerell Spainhour**

      SHANNON SUMERELL SPAINHOUR
      N.C. State Bar No. 28108
      DAVIS HARTMAN WRIGHT PLLC
      28 Schenck Parkway, Suite 200
      Asheville, NC 28803
      Phone: 828-771-0833
      Fax: 252-514-9878
      Email: mss@dhwlegal.com

      Counsel for the Defender in his individual capacity

25

## CERTIFICATE OF SERVICE

The undersigned certifies that on June 8, 2020, she electronically filed the foregoing **DEFENDANT FEDERAL DEFENDER FOR THE WESTERN DISTRICT OF NORTH CAROLINA'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PLAI'TIFF'S INDIVIDUAL CAPACITY CLAIMS AGAINST HIM** using the Court's CM/ECF system, which will send notification of such filing to all counsel of record, including:

Cooper J. Strickland at cooper.strickland@gmail.com

Gill P. Beck at Gill.Beck@usdoj.gov

Joshua M. Kolsky at Joshua.kolsky@usdoj.gov

                         **s/Shannon Sumerell Spainhour**

                         SHANNON SUMERELL SPAINHOUR
                         N.C. State Bar No. 28108
                         DAVIS HARTMAN WRIGHT PLLC
                         28 Schenck Parkway, Suite 200
                         Asheville, NC 28803
                         Phone:  828-771-0833
                         Fax:  252-514-9878
                         Email:  mss@dhwlegal.com

26