# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

## ASHEVILLE DIVISION

| | | |
|---|---|---|
| JANE ROE, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Civil No. 1:20-cv-00066-WGY |
| | ) | |
| UNITED STATES OF AMERICA, *et al.,* | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |
| _____ | ) | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO THE INDIVIDUAL CAPACITY DEFENDANTS' MOTIONS TO DISMISS (ECF NOS. 36, 38, 40, 44)

## INTRODUCTION

Plaintiff Jane Roe ("Roe") suffered sexual harassment, retaliation, and discrimination during her employment as an assistant federal public defender. Roe sought relief under the Fourth Circuit's Employment Dispute Resolution ("EDR") Plan, but she was deprived of any meaningful review or remedies, resulting in her constructive discharge and the loss of her career.

Roe seeks relief in this Court for these constitutional violations. Defendants' motions to dismiss are just an attempt to avoid responsibility. Because no judicial precedent, constitutional principle, or rational basis supports this result, their motions should be denied.

## STANDARD OF REVIEW

When reviewing a motion to dismiss, a court must accept as true all facts in the complaint and construe them in the light most favorable to the plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When a dismissal motion involves a civil rights complaint, the court "must be especially solicitous of the wrongs alleged and must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory which might plausibly be suggested by the facts alleged." *Lamar v. Ebert*, 681 F. App'x 279, 284 (4th Cir. 2017) (per curiam) (quotation omitted).

## ARGUMENT

### I. Defendants Personally Violated Roe's Constitutional Rights.

Defendants assert that they are not liable because they were merely doing their jobs and following judiciary "policies." *See*, *e.g.*, ECF No. 45, at 2.[1] This is nonsense. Defendants are bound by the Constitution like every other government official, which they repeatedly violated.

---

[1] The individual capacity defendants' arguments are often identical. Unless otherwise stated, this brief cites to Federal Defender Anthony Martinez's individual capacity brief.

**A.  Defendants Violated Roe's Right to be Free from Sexual Harassment, Discrimination, and Retaliation.**

First, defendants violated Roe's constitutional right to be free from sex discrimination in her federal employment.  The Fifth Amendment forbids the federal government from denying equal protection of the laws.  *Davis v. Passman*, 442 U.S. 228, 234 (1979).  To withstand scrutiny under the Fifth Amendment, "classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." *Id.* at 234–35 (quotation omitted).  The Fifth Amendment confers a "federal constitutional right to be free from gender discrimination which cannot meet these requirements."  *Id.* at 235.

Sexual harassment has long been recognized as a form of unlawful sex discrimination. *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67 (1986).  It is well established that "intentional sexual harassment of employees by persons acting under color of state law violates the [Constitution]."  *Beardsley v. Webb*, 30 F.3d 524, 529 (4th Cir. 1994).  Moreover, a government official's "conscious failure" to stop or prevent unlawful harassment is itself a form of intentional sex discrimination.  *See*, *e.g.*, *Bohen v. City of East Chicago*, 799 F.2d 1180, 1187 (7th Cir. 1986).

In evaluating these claims, courts apply the well-established standards developed in similar litigation under Title VII of the Civil Rights Act of 1964.  *Davis*, 442 U.S. at 245; *Beardsley*, 30 F.3d at 529.  The judiciary also holds itself to these standards.  *See* Study of Judicial Branch Coverage Pursuant to the Congressional Accountability Act of 1995, at 2 (Dec. 1996) (CAA Report) (judiciary employees are provided protections "similar" to Title VII); Guide to Judiciary Policy § 220.10.10 (judiciary employees have a right to a workplace free of discrimination as defined by Title VII).  The Fourth Circuit EDR Plan instructs presiding officers to be "guided by judicial and administrative decisions" related to Title VII.  EDR Plan Ch. II

§ 10B(2)(e) (2013). And the judiciary's codes of conduct also reflect these standards. Code of Conduct for United States Judges, Canon 3B(4), 3B(6); Code of Conduct for Judicial Employees Canon 3(C)(1); Code of Conduct for Federal Public Defender Employees Canon 3(C).

Defendants do not dispute that Roe was subjected to quid pro quo sexual harassment by a supervisor. On the contrary, they acknowledge that disciplinary action was taken by Chief Judge Gregory. *E.g.*, ECF No. 41, at 5. Defendants recognized that the First Assistant's behavior was unacceptable. For example, the Defender conceded that Roe was being harassed but said he was being "blamed" and "attacked" for something that was not his fault.[2] Complaint ¶ 199. The EDR Coordinator stated to Roe that her complaints were very troubling in how she raised "one thing after another, even after her concerns were brought to light." *Id.* ¶ 292; *see also id.* ¶ 414 (mediator statements regarding quid pro quo email). And the Judicial Integrity Officer even described Roe's complaint as the first colorable sexual harassment she had seen. *Id.* ¶ 434.

Yet, despite being aware of sexual harassment by a supervisor, the Defender failed to take remedial steps. Under Title VII, an employer has a duty to exercise "reasonable care to prevent and correct promptly any harassing behavior." EEOC Enforcement Guidance: Vicarious Liability for Unlawful Harassment by Supervisors, 1999 WL 33305874 ("EEOC Guidance")[3];

---

[2] In his brief, the Defender repeats his defense that Roe only told him that she was "uncomfortable." Br. 6. His assertion is untrue. *See* Complaint ¶¶ 125, 134–47, 198. He also ignores his own admissions that he knew of Roe's complaints and failed to act. For example, after he placed Roe back under the supervisor who was harassing her, he called her to apologize. Complaint ¶ 163. Later, he admitted to the Chief of Defender Services that he had mishandled her complaints. *Id.* ¶ 191. But even if Roe *had* reported she was only "uncomfortable," an office head "cannot avoid Title VII liability . . . by adopting a 'see no evil, hear no evil' strategy." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 334 (4th Cir. 2003) (en banc).

[3] These guidelines "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Meritor*, 477 U.S. at 65 (internal citations omitted); *see also* EDR Plan Ch. X, § 10B(2)(e) (2013) (requiring presiding officer to apply "administrative decisions" related to Title VII).

*E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 319 (4th Cir. 2008).  This duty requires certain steps:[4]  the employer must (1) undertake a prompt, thorough, and impartial investigation using a well-trained investigator; (2) undertake intermediate measures to stop further harassment, such as transferring the alleged harasser or placing the alleged harasser on non-disciplinary leave; (3) take immediate and appropriate corrective action, including discipline, when the employer determines that harassment has occurred; (4) take remedial measures to correct the effects of the harassment and put the employee in the position she would have been in had the misconduct not occurred; and (5) not involuntarily transfer or burden the complainant—remedial measures that make the victim worse off may constitute unlawful retaliation and are not effective in correcting the harassment.  EEOC Guidance, 1999 WL 33305874, at *8–14.

These guidelines make clear what should have been done.  As soon as the Defender was put on notice that Roe was being sexually harassed, he should have immediately taken measures to protect her and allow her to continue doing her job.  Then, he should have required a thorough investigation and taken swift and effective disciplinary action proportionate to the seriousness of the misconduct—up to and including termination.  In fact, this was the approach advocated by the Fair Employment Opportunity Officer, the Chief of Defender Services, and the Deputy Director.  Complaint ¶¶ 184–94.

But the Defender did none of these things.  Instead, he retaliated against Roe.  He criticized and berated her for going to "some other party" with her complaints.  *Id.* ¶ 199.  He trivialized her complaints by saying there was no "physical contact."  *Id.* ¶ 202.  He prejudged

---

[4] In fact, the Defender failed to take the most basic step of "establish[ing], publiciz[ing], and enforc[ing] anti-harassment policies and complaint procedures."  EEOC Guidance, 1999 WL 33305874, at *9.  Though he notes that the Plan was posted on the Fourth Circuit's website (but not on the FDO's), Br. 5, an employer must "disseminate its policy" to its employees to fulfill its duty of reasonable care, *Faragher v. City of Boca Raton*, 524 U.S. 775, 872, 808 (1998).

the investigation by telling her that she would have to return to her harasser's duty station as soon as it was over.[5] *Id.* ¶¶ 219–20. He then worked with the Fourth Circuit and the Office of General Counsel (that is, Circuit Executive Ishida, Chief Judge Gregory, General Counsel Walter, and John Doe(s)),[6] to shut down the efforts to take immediate and effective action on her complaints.[7] *Id.* ¶¶ 213–35. They (1) prohibited Roe from communicating with the Fair Employment Opportunity Officer, *id.* ¶¶ 222–35; (2) criticized her for reporting her complaints to the AO, *id.* ¶¶ 199, 266; (3) ensured that she was denied any consideration for a promotion, *id.* ¶¶ 236–51; and (4) required her to continue working for the trial unit that was directly supervised by her harasser. *Id.* ¶¶ 216, 244. These intimidating and retaliatory acts would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Williams v. Prince William Cty., Va.*, 645 F. App'x 243, 245 (4th Cir. 2016) (quotation omitted).

Instead of taking prompt and effective action, defendants further punished Roe for making a complaint. For example, they forced Roe to "telework" while leaving the accused

---

[5] The Defender now claims for the first time that he denied Roe's transfer request because she needed "supervision." Br. 8. It is hard to understand, then, why he put her on telework. A post hoc pretextual reason like this one will not defeat a discrimination complaint and cannot excuse a personnel action that unlawfully burdens a sexual harassment complainant. *See* EEOC Guidance, 1999 WL 33305874, at *11.

[6] Defendants' attempt to recast Roe's claims as allegations of "vicarious" or "collective" liability, Br. 23–24, misconstrues her allegations. Roe is alleging that each of the defendants personally engaged in "affirmative conduct . . . that played a role in the discrimination," *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990) (citing *Rizzo v. Goode*, 423 U.S. 362, 377 (1976)), as described above.

[7] The General Counsel, who is being sued in her individual capacity only, attempts to elevate the status of her position, ECF No. 37, at 18–19, minimize her involvement, and ignore the John Doe(s) allegations involving her office. Complaint ¶¶ 227–28, 236–51, 398–99, 407, 451, 474. A general counsel is not "higher rank," ECF No. 37, at 12 (quotation omitted), than constitutional officers. *See Davis*, 442 U.S. at 246. And John Doe(s)' failure to accept service, *see* ECF No. 29, and defendants' failure to cooperate in discovery do not negate her involvement or that of her subordinates.

harasser in his duty station and supervisory role. *Id.* ¶¶ 219, 338–39, 401. Roe languished on "telework," which turned into de facto administrative leave, for more than *six months*. *Id.* ¶ 338, 393. Meanwhile, defendants' actions signaled that Roe was being ostracized while her accused harasser was being protected, fostering an open season of hostility and ridicule from her coworkers,[8] *see, e.g.*, ¶¶ 344–54, 492, and from future employers, *id.* ¶¶ 487, 490–91.

During this lengthy period, defendants failed to conduct an appropriate investigation. Roe went for periods of three to six weeks without hearing *any* updates. *Id.* ¶¶ 306, 322, 362, 384. After the initial report was submitted almost two months after the investigation opened, Roe was told that the report was being *sent back* to be redone. *Id.* ¶ 362. At this point, Roe learned that the investigator had been asked to make "recommendations," even though she was not trained or qualified to do so. *Id.* ¶¶ 320, 364. Roe also learned that her retaliation complaints were never investigated, *id.* ¶¶ 318–19, 384, because the Defender's misconduct was characterized as "mishandling," not retaliation, *id.* ¶ 319, 334 (retaliatory reclassification a remedial "step"). Worse yet, Roe's identified witnesses were never interviewed. *Id.* ¶ 317.

Following these delays, the situation was made even worse when defendants withheld the report and deliberately refused to act. *Id.* ¶¶ 398, 401. Defendants are not entitled to sit on their hands and refuse to act on sexual harassment. *See, e.g.*, EDR Plan Ch. IX (2013). They are required to take "immediate" corrective action. EEOC Guidance, 1999 WL 33305874, at *9, 11, 13, 9 n.57. It is even more inexplicable that disciplinary action was eventually taken, but not until almost *six months* later, after Roe had already been forced to resign. Complaint ¶ 484.

---

[8] Though the Defender attempts to trivialize a hostile working environment as "rumors, office gossip, and speculation," Br. 3, offensive rumors that are rooted in sex-based stereotypes are a form of actionable discrimination, *Parker v. Reema Consulting Servs., Inc.*, 915 F.3d 297, 303 (4th Cir.), *cert. denied*, 140 S. Ct. 115 (2019).

## B.     Defendants Violated Roe's Protected Rights Under the EDR Plan.

Defendants also violated the rights and protections Roe had under the EDR Plan.  Roe had a liberty interest in being free from unlawful discrimination, *see Bolling v. Sharpe*, 347 U.S. 497, 500 (1954), and a property interest in the Plan's terms as a condition of her employment, *see*, *e.g.*, *Vitarelli v. Seaton*, 359 U.S. 535, 539, 545 (1959).  By violating these protections, defendants subjected Roe to discrimination.

Defendants refused to disqualify the Defender from representing the employing office even though he was "involved in," and a subject of, the complaint.  EDR Plan Ch. X, § 7 (2013); *see also* EEOC Mgmt. Directive 110, 1-7 (2015) (an accused agency head should recuse himself from the decision-making process on an EEO complaint).  Defendants even admitted that the Defender had a conflict of interest.  On the General Counsel's recommendation, the EDR Coordinator "received" the investigation report instead of the Defender.  Complaint ¶ 265.  Roe was also assured that if a finding were made against the Defender, the Chief Judge would "step in" as the Defender's supervisor.  *Id.* ¶¶ 265, 287, 320, 366.  But when it came to formally disqualifying him, defendants refused.  *Id.* ¶¶ 370–71, 393–404, 453.  His conflict of interest rendered the EDR process fundamentally unfair, thus violating Roe's due process right to an impartial decision maker, the ethical rules governing conflicts of interest, and the judiciary's codes of conduct.  *See*, *e.g.*, *Goldberg v. Kelly*, 397 U.S. 254, 271 (1970); ABA Model R. Prof. Conduct 1.7; Code of Conduct for Federal Defender Employees Canons 1 and 2.

There is no reason to believe that the Defender's conflict of interest would have been mitigated at a final hearing.  On the contrary, the Fourth Circuit EDR Plan, unlike the Model EDR Plan, gave accused violators a right to cross-examine Roe.  EDR Plan Ch. X, § 10(B)(2)(c) (2013).  Thus, the Defender would have had the right to cross-examine Roe in his capacity as the

office's representative *and* as an accused violator of her rights under the Fourth Circuit EDR Plan. Moreover, judiciary officials acknowledged to Roe that a final hearing officer would have no independent legal authority to order remedies against a federal defender office. Complaint ¶¶ 447–48. A hearing officer, even if willing, would not be able to order any remedies without the Defender's consent. *Id*.

Not only did defendants deny disqualification, but they refused to even rule on the matter. For *months*, defendants gave Roe the impression that her request was being stayed because they would need to make a finding of misconduct before disqualifying the Defender. *Id.* ¶¶ 287, 366, 370, 384. After the report finally came out, Circuit Executive Ishida told Roe that Chief Judge Gregory "intended" to deny her request, but they refused to give her a written ruling. *Id.* ¶¶ 395, 453. Even after Roe renewed her disqualification request, defendants still refused to provide a written basis for its alleged rejection. *Id.* ¶ 453. Their refusal to rule operated as a constructive denial of her disqualification request and her right to appeal to the Judicial Council. EDR Plan Ch. X, § 11 (2013).

In addition, defendants violated the Plan's provision requiring information and records to be shared on a "need-to-know basis." *Id.* Ch. X, § 4; *see also* EEOC Mgmt. Directive 110, 6-25. After telling Roe for *months* that the report would be the basis for acting in her Chapter X proceeding, defendants refused to disclose to Roe the results of the investigation or even a summary of its findings and recommendations. Complaint ¶ 398. Roe had a right to know the results of the investigation into her own complaint, which was being used as the basis to adjudicate her legal rights. *See Hannah v. Larche*, 363 U.S. 420, 442 (1960) (holding that due process protections attach to adjudicative proceedings).

Finally, defendants violated the EDR Plan's requirement of an "appropriate" remedy that is tailored to the violation. Under the Plan, appropriate remedies may include a comparative alternative position, promotion and back pay, or other equitable relief. EDR Plan, Ch. X § 12. They also include appropriate disciplinary action against the offender. *Id.* Ch. IX. Here, Roe was not even afforded the possibility of an appropriate remedy. She repeatedly asserted that she had been denied consideration for a promotion because of her harassment. Complaint ¶¶ 274, 295, 327, 335. She repeatedly requested action to stop the harassment and prevent it from recurring. *Id.* ¶¶ 205, 272, 275, 293, 324, 376. She repeatedly requested a transfer. *Id.* ¶¶ 355, 405–06. But she was told that any meaningful action would be viewed as micromanaging or meddling in her office. *Id.* ¶¶ 415, 438. She was told that an EDR presiding officer would have no authority to order remedies. *Id.* ¶ 439. And she was told she could not transfer.[9] *Id.* ¶ 454.

Defendants' assertion that Roe obtained a clerkship as a "negotiate[ed] . . . resolution" to her EDR complaint, Br. 8–9, is baseless. A four-and-a-half-month judicial clerkship is not comparable to the permanent assistant federal public defender position Roe held at the FDO. It is not an "appropriate" remedy under the EDR Plan. And even if the Chief Judge, the EDR Coordinator, and the Mediator facilitated that outcome, those parties are not Roe's "employing office" and do not have authority to settle an EDR complaint. EDR Plan Ch. X § 10(A) (2013). In fact, Roe *specifically* withdrew her complaint, rather than settling it, so that she would not have to negotiate her exit with the Defender.

---

[9] AO Director Duff has testified to Congress that sexual harassment complainants in the judiciary can transfer. *See, e.g.*, *Hearing on Judiciary Department Fiscal Year 2021 Budget Request, H. Subcomm. on Financial Servs. and Gen. Gov't*, 116th Cong. (Feb. 26, 2020) (questioning by Hon. Norma Torres). The new Model EDR Plan also states that complainants may transfer. *See* Model EDR Plan § IV(B)(4) (2019). These statements do not match Roe's experience.

**C.     Defendants Failed to Provide Roe Meaningful Remedies and Review.**

Finally, defendants discriminated against Roe because they knowingly perpetuated a sham process that deprived her of any meaningful review or remedies.  As judiciary officials acknowledged to Roe, an EDR presiding officer does not have legal authority to order remedies against a federal defender office.  *See*, *e.g.*, Complaint ¶¶ 371, 415, 439, 444.  In purporting to "cover" FDOs and misleading Roe into believing she had meaningful remedies, when she did not, defendants are liable for implementing discriminatory policies.  The Defender is also liable for violating the legal duties associated with his position under the Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A(g)(2)(A), including the duty to protect his employees from discrimination.

Contrary to their earlier representations to Roe, defendants now contend that EDR forums provide full remedies, including reinstatement, back pay, and other prospective relief.  *See*, *e.g.*, ECF No. 37, at 9, 21.  They rely on *In re Golinski*, but that opinion is an administrative order, not a decision by an Article III judge.  The Office of Personnel Management refused to comply with that order, explaining that it was not legally "binding" because Judge Kozinski "was sitting in his administrative capacity, and not as a federal judge in a court case."  *See* Statement from Elaine Kaplan, OPM General Counsel, *available at* https://tinyurl.com/ydxsg8vx.  When the complainant brought a mandamus action to enforce the order, the district court held that an EDR administrative order cannot "bind" an executive agency.  *Golinski v. U.S. Office of Pers. Mgmt.*, 781 F. Supp. 2d 967, 974 (N.D. Cal. 2011).  Ultimately, the complainant filed a civil lawsuit against OPM directly, *Golinski v. U.S. Office of Pers. Mgmt.*, 824 F. Supp. 2d 968, 1002 (N.D. Cal. 2012), and her case became associated with the proceedings that culminated in the Supreme Court's ruling striking down the Defense of Marriage Act, *Golinski v. U.S. Office of Pers. Mgmt.*, 724 F.3d 1048, 1050 (9th Cir. 2013).

As this history shows, Judge Kozinski's administrative "order" is not a judicial remedy.

Moreover, Judicial Conference policy explicitly repudiates his asserted authority:

a. EDR proceedings are strictly administrative and are not "cases and controversies" under Article III of the Constitution;

b. Judges presiding in EDR matters are functioning in an administrative rather than judicial capacity;

c. Judges' decisions in EDR matters must be in conformance with all statutes and regulations that apply to the judiciary, and judges in the EDR context have no authority to declare such statutes or regulations unconstitutional or invalid; and

d. Judges presiding in EDR matters may not compel the participation of or impose remedies upon agencies or entities other than the employing office which is the respondent in such matters.

Proceedings of the Judicial Conference of the United States at 25 (Sept. 2010) (JCUS). Thus, judges in the EDR context are not acting in a "judicial" capacity at all. They can *only* order remedies that are authorized by statute.

As judiciary officials recognize, Complaint ¶¶ 439, 444, no statute gives an EDR presiding officer authority to order remedies against a federal defender office. In fact, the CJA limits the court of appeals' authority to appointing the federal defender, setting his compensation, and removing him for "incompetence, misconduct in office, or neglect of duty." 18 U.S.C. § 3006A(g)(2)(A). The federal defender has authority over personnel decisions, including whether to appoint and remove assistant federal public defenders.[10] *Id.* This separation was by design, to further the CJA's purpose of protecting the independence of the Sixth Amendment defense function. As Congress recognized, "[i]t would be just as

---

[10] For more information on federal defender independence, *see generally* 2017 Report of the Ad Hoc Comm. to Review the CJA Program 6–15 (2018) (Cardone Committee Report); NADCL, Federal Indigent Defense 2015: The Independence Imperative 12–16 (2015); Rep. of the Comm. to Review the CJA 2 (1993) (Prado Committee Report).

inappropriate to place direction of the defender arm in the judicial arm of the U.S. Government as it would be in the prosecutorial arm." S. Rep. No. 91-790, at 18 (1970).

At most, the CJA offers only indirect authority. An EDR presiding officer could influence federal defenders to adopt recommendations, based on the court of appeals' authority to appoint and remove the federal defender. *See*, *e.g.*, Ninth Circuit EDR Plan for Federal Defenders at 3 (2019) (adopted based on court of appeals' authority to appoint and remove federal defenders). But this is not the same as having binding legal authority, JCUS at 25, and it is cold comfort to discrimination victims, who functionally have no meaningful review or remedies. And if defendants did have any legal authority, it is even more inexplicable why it was not used.

**D.    Defendants are Personally Liable for Roe's Constructive Discharge.**

Because defendants' actions resulted in Roe's forced resignation, they are liable for her constructive discharge. "[U]nder the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004). These intolerable working conditions "may be effected through co-worker conduct, unofficial supervisory conduct, or official company acts." *Id.* at 148.

By subjecting Roe to sexual harassment, retaliation, and discrimination, failing to take immediate and effective action on her complaints, and failing to provide meaningful review or remedies, defendants forced her to resign. Their assertions to the contrary—that Roe "voluntarily" resigned and "withdrew" her complaint—are baseless. Their argument is selectively premised on one email, in which Roe expressed her gratitude to Chief Judge Gregory and Circuit Executive Ishida for supporting her clerkship application. Br. 9. But on its face, the

email does not support their interpretation.  Rather, Roe said she was "saddened to no longer be a federal defender" and was resigning because it was the "best possible outcome under the circumstances."  *Id.*  The email merely confirms that she was seeking the best possible outcome when forced to resign.  *See*, *e.g.*, Complaint ¶¶ 355, 381, 406, 462, 475.

## II.     Defendants Are Liable For Damages Under *Davis v. Passman*.

In *Davis v. Passman*, the Supreme Court held that the Fifth Amendment provides a "cause of action" for sex discrimination that "may be redressed by a damages remedy."  442 U.S. at 249.  Defendants cannot distinguish *Davis* in any meaningful way.  This case is not a new context, and the "special factors" they raise have already been considered and rejected.

### A.     This Case is Not a New Context.

Defendants recognize that *Davis* is controlling, Br. 14–15, but they try to distinguish it. For example, they contend that the Supreme Court has never permitted a *Bivens* remedy to "vindicate a claim of constructive discharge."[11]  Br. 15.  But to create a new context, a case must be different in a way that is constitutionally "meaningful."  *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1864 (2017).  It makes no difference that the facts of this case involve a constructive discharge based on sexual harassment rather than a termination based on sex.[12]  Both forms of sex

---

[11] The Defender makes much of the fact that the sexual harassment started soon after Roe began employment and that she was forced to resign after only a year and a half.  Br. 7–8.  The length of her employment, of course, does not diminish her Fifth Amendment rights.  The plaintiff in *Davis* was only employed for six months.  442 U.S. at 243 n.21.

[12] In this case, like *Davis*, it is "damages or nothing," 228 U.S. at 245, especially if the equitable remedies of front pay and back pay are unavailable.  Reinstatement would be unavailing because of continuing hostility from Roe's employing office, *e.g.*, Br. 2–9, and that office's history of resistance to antidiscrimination efforts.  For constitutional violations like these, "damages have been regarded as the ordinary remedy," with equitable remedies "normally available only after legal remedies have been demonstrated inadequate."  Gene R. Nichol, *Bivens, Chilicky, and Constitutional Damages Claims*, 75 VA. L. REV. 1117, 1135 (1989) (quotation omitted).

discrimination violate the Fifth Amendment's guarantee of equal protection under the law. *Cf. id.* (a case can present a new context "if it implicates a different constitutional right"). For both types of claims, Title VII litigation provides a "meaningful guide for official conduct." *Id.*; *Davis*, 442 U.S. at 245.

Defendants also argue that the Supreme Court "has never applied" *Bivens* to a "judicial branch supervisor." Br. 15. But as *Davis* held, "all individuals, whatever their position in government, are subject to federal law." 422 U.S. at 246. Thus, a member of Congress—the highest constitutional officer in the legislative branch, who was duly elected—was liable for sex discrimination, the same as anyone else. *Id.* Just as those in Congress must live under the laws they make, "the Judiciary should live under the laws it interprets." Charles Grassley and Jennifer Shaw Schmit, *Practicing What we Preach: A Legislative History of Congressional Accountability*, 35 HARV. J. ON LEGIS. 33, 48 (1998).

It would be contrary to basic notions of due process for the judiciary—"the branch of government whose core purpose is equal justice under law"—to live by a different set of rules. Report of the Federal Judiciary Workplace Conduct Working Group to the Judicial Conference of the United States 2 (2018); *see also In re Employment Discrimination in the Federal Judiciary*, Petition Seeking the Adoption of Equal Opportunity Plans by the Federal Judiciary at 19 (June 5, 1979) ("Petition"). A contrary result would be "constitutionally and morally repugnant." Petition at 25. It "would create the appearance of injustice caused by the one branch of government whose sole responsibility is to provide justice." *Id.*

It would be especially irrational not to hold a federal defender to the standards that apply to every employer. The Defender is not an Article III judge, and he does not enjoy any "independent status in our constitutional scheme." *Carlson v. Green*, 446 U.S. 14, 19 (1980).

Rather, he leads an office that until recently was a non-profit community defender, which could be sued under Title VII. 18 U.S.C. § 3006A(g)(2)(B). In fact, the office was sued for employment discrimination just a few years before Roe's employment. *See Carlin v. Federal Defenders of Western North Carolina, Inc.*, No. 3:13-cv-00365-JFA-PJG (W.D.N.C). It would be arbitrary to deny Roe the same protections simply because her office was administratively converted by the judiciary. At a minimum, the Defender should be accountable to a jury of his peers like anyone else. *See* Anya Bernstein, *Congressional Will and the Role of the Executive in Bivens Actions: What is Special About Special Factors?*, 45 INDIANA L. REV. 719, 725–27 (2012) (*Bivens* recognizes a historical tradition of juries protecting against constitutional deprivations).

Finally, if all this were not enough, the record in *Davis* shows that the Court expected its holding to apply to the judicial branch. At oral argument, the justices recognized that a ruling in favor of the plaintiff could lead to lawsuits against themselves. *See*, *e.g.*, Oral Arg. Tr. 21–22. As Justice Powell stated in his dissent from the bench, the decision's rationale "cannot be limited to the legislative branch," and "extend[s] equally to the executive and judicial branches." Justice Powell, Dissent from the Bench, at 2, *available in Davis v. Passman*, Supreme Court Case Files Collection, Box 63, Lewis F. Powell Jr. Archives, Washington & Lee University School of Law, Virginia. Based on the Supreme Court's ruling, judiciary employees publicly threatened to sue over the unconstitutional discrimination they had suffered. *See* Lawscope, *Momentum Grows to End Hiring Bias in U.S. Courts*, 65 ABA J. 1613, 1615 (Nov. 1979). Defendants' attempt to distinguish this context from *Davis* is meritless.

**B.** **The "Special Factors" Raised by Defendants Were Rejected in *Davis*.**

Defendants also assert "special factors," but each argument was rejected in *Davis*.

## 1.  "Federal employment" is not a special factor.

Contrary to defendants' argument, Br. 16–17, "federal employment" has *never* been a reason to deny remedies for unlawful discrimination.  Their argument runs headlong into the "longstanding, important" congressional policy against employment discrimination.  *Morton v. Mancari*, 417 U.S. 535, 550 (1974).  It also disregards the judiciary's status as "the *only* remaining branch of the federal government that is not required to live with this country's labor laws."  Grassley, *supra*, at 49 (emphasis added).

Defendants also miss the basic point that the *Davis* plaintiff was an "excepted service" federal employee, just like Roe, but she still had a Fifth Amendment right to be free from discrimination.  *Davis*, 442 U.S. at 246–48.  The Court specifically held that when Congress declined to extend Title VII to employees who are not in the competitive service, it did not intend to "foreclose alternative remedies available to those not covered by the statute."  *Id.* at 247.  Instead, Congress left "undisturbed whatever remedies" the employees "might otherwise possess."  *Id*.  That holding confirms that being "excepted service" does not forfeit constitutional remedies for discrimination.  *See* Lindemann & Grossman, Employment Discrimination Law Ch. 32.III.E (6th ed. 2020).

By contrast, defendants' reliance on cases interpreting the Civil Service Reform Act is misplaced.  To begin with, they overlook the important detail that the CSRA went into effect before *Davis* was decided.[13]  If the CSRA had eliminated discrimination remedies for "excepted service" employees, which included the *Davis* plaintiff, that major intervening change in law

---

[13] The CSRA was signed into law on October 13, 1978 and went into effect on January 11, 1979.  *See* Pub. L. No. 95-454, § 907, 92 Stat. 1227 (1978).  Certiorari was granted in *Davis* on October 30, 1978, *see* 439 U.S. 925 (1978) (mem.), and the Court's opinion issued on June 5, 1979, 442 U.S. 228 (1979).

would have justified dismissing the writ.[14]  *Compare Cook v. Hudson*, 429 U.S. 165, 166 (1976)

(dismissing writ as improvidently granted due to intervening statute)*, with Jones v. Alfred H.*

*Mayer Co*., 392 U.S. 409, 417 n.21 (1968) (declining to dismiss writ as improvidently granted

because of "differen[ces]" in the statute's "coverage").  Instead, the Court held that excepted

service employees do have remedies, *Davis*, 442 U.S. at 246–47, and that ruling has never been

overturned,[15] *see*, *e.g.*, *Hernandez v. Mesa*, 140 S. Ct. 735, 743–44 (2020).

As this history confirms, the CSRA did not foreclose the remedies for discrimination that

existed prior to its passage.  *See* 5 U.S.C. § 2302(d).  It is well-established that the CSRA "does

not extinguish any right or remedy available to federal employees under federal discrimination

laws."  *Planas v. Lamoutte*, No. CA 14-1468-MML, 2015 WL 5568015, at *8 (D.P.R. Sept. 22,

2015) (citations omitted).  The CSRA "expressly exempts" discrimination claims from its

exclusive review procedures, *Elgin v. Dep't of Treasury*, 567 U.S. 1, 13 (2012), and preserves

the right of federal employees "to pursue claims of discrimination in violation of federal law in

federal district court," *Perry v. MSPB*, 137 S. Ct. 1975, 1983 (2017).  Regarding judiciary

employees specifically, Congress has even provided that their exclusion from the competitive

---

[14] At a minimum, if the CSRA had eliminated discrimination remedies for excepted
service employees, the member of Congress who was being sued in *Davis* would have
undoubtedly brought that fact to the Court's attention.  However, he did not raise the CSRA at
all.  By contrast, other members of Congress filed an amicus brief stating that Congress did not
intend to foreclose discrimination remedies for excepted service employees.  Amicus Br. of the
Hon. Morris Udall, et al in Support of Reversal, No. 78-5072, 1978 WL 223687, at *9–14
("Amicus Br.").

[15] By contrast, courts have held that the Congressional Accountability Act "legislatively
abrogated *Davis* with respect to congressional employees, who now have a comprehensive
remedy for unlawful discrimination."  Lindemann, *supra*, at Ch. 32.III.E; *see also Hamilton-
Hayyim v. Jackson*, No. 12-CV-06392, 2013 WL 3944288, at *10–11 (N.D. Ill. July 31, 2013);
*Packer v. U.S. Comm'n on Sec. & Cooperation in Europe*, 843 F. Supp. 2d 44, 48 (D.D.C.
2012).  There would be no need to so hold if *Davis* had already been legislatively abrogated by
the CSRA.

service "shall [not] be construed to abolish or diminish any right or remedy . . . by any law prohibiting discrimination in Federal employment." AO Personnel Act, Pub L. No. 101-474, § 3(g), 104 Stat. 1097 (1990) (appearing in notes to 28 U.S.C. § 602) (AO employees).

Rather than acknowledge these controlling authorities, defendants rely on *Bush v. Lucas* and its progeny. Br. 16–17. Those cases are inapposite because they did not involve class-based discrimination claims, which are exempted from the CSRA's exclusive review procedures. *See*, *e.g.*, *Hall v. Clinton*, 235 F.3d 202, 204 (4th Cir. 2000) (due process claim); *Zimbelman v. Savage*, 228 F.3d 367, 370–71 (4th Cir. 2000) (due process claim); *Pinar v. Dole*, 747 F.2d 899, 902 (4th Cir. 1984) (first amendment and procedural due process claims); *see also Blankenship v. McDonald*, 176 F.3d 1192, 1195 (9th Cir. 1999) (first and fifth amendment claims); *Semper v. Gomez*, 747 F.3d 229, 235 (3d Cir. 2014) (procedural due process claim); *Hays v. Forsman*, 458 F. Supp. 2d 1177, 1179 (D. Nev. 2006) (retaliation claim). Defendants also rely on the Second Circuit's decision in *Dotson v. Griesa*, but *Dotson* mistakenly conflates discrimination claims with other types of claims under the CSRA. *See* 398 F.3d at 166–68. *Dotson* overlooked the principle that the CSRA "provides different treatment for grievances depending on the nature of the claim." *Whitman v. Dep't of Transp.*, 547 U.S. 512, 514 (2006). *Dotson* is especially unhelpful because the issue of whether *Davis* afforded a remedy was not raised by the parties or considered by the Court. 398 F.3d at 163–65.

Finally, in *Lee v. Hughes*, the Eleventh Circuit recognized that *Davis* was on point, but it refused to follow that precedent and instead barred a probation officer's race discrimination claim. 145 F.3d 1272, 1275 (11th Cir. 1998). *Lee* reasoned that *Davis* "did not consider" the CSRA, and that more recent cases did "not reflect the *Davis* Court's willingness" to recognize a damages remedy. *Id.* That reasoning improperly attempts to overrule *Davis sub silentio*. For

example, *Lee* relied on *Bush v. Lucas*, but that ruling stressed that it was *not* disturbing *Davis*'s holding.[16]  462 U.S. 367, 377 n.13, 378 n.14 (1983).  *Lee* also relied on the denial of a procedural due process claim in *Schweiker v. Chilicky*, but the Supreme Court has specifically distinguished that type of claim from "alleged gender discrimination in employment," which is an "appropriate" context for a *Bivens* claim.  *FDIC v. Meyer*, 510 U.S. 471, 484 n.9 (1994).  Finally, *Lee* relied on *United States v. Fausto*, but that case did not involve a constitutional claim.  *See Elgin*, 567 U.S. at 11 n.4 (distinguishing statutory claim in *Fausto* from constitutional claims).  What *Lee* did not want to recognize is that the *only* possible way to distinguish *Davis* is that it involved the legislative rather than judicial branch.  As discussed above, there is no legitimate basis to hold the judicial branch to different standards than those that apply to the rest of society.  Because *Lee* disregards higher court precedents and applies a double standard, it is unpersuasive.[17]

### 2. "Judicial independence" is not a special factor.

Defendants also contend that holding them liable for sex discrimination would infringe on "judicial independence," Br. 17–19, but the Supreme Court has rejected this line of reasoning.  The Court has held that "special concerns" do arise in a lawsuit against a member of Congress in

---

[16] As *Bush* explained, the dispositive factor in *Davis* was "the fact that no other alternative form of judicial relief was available" for the unlawful discrimination.  *Id.* at 377.  By contrast, the First Amendment claims in *Bush* were "fully cognizable" within a "comprehensive scheme" of administrative and judicial review, which provided "meaningful remedies."  *Id.* at 386.  Here, Roe's only option was an "administrative" process that provided no judicial review or any legally binding relief.  *See* JCUS at 25.  Unlike the plaintiff in *Bush*, Roe has "no effective means other than the judiciary" to "vindicate" her rights.  *Davis*, 442 U.S. at 243.

[17] *Lee*'s refusal to apply Supreme Court precedent in this context is especially troubling given that the result is "to exempt the judiciary from any judicial review of its own employment actions, even with respect to charges of discrimination."  *Dotson*, 398 F.3d at 160.

his official duties, but these concerns are "coextensive with the protections afforded by the Speech or Debate Clause." *Davis*, 442 U.S. at 246.

That holding applies to the judicial branch. If applicable, the doctrines of absolute and qualified immunity can protect defendants in their official duties. *Butz v. Economou*, 438 U.S. 478, 512 (1978). But otherwise, members of the judiciary are not "special" or "different" when it comes to employment discrimination.[18] Grassley, *supra*, at 49. Although the courts have "structural independence in their core judicial function of adjudicating cases or controversies, there is no similar authority for the proposition that the independence of the judiciary applies to the administration of the courts' personnel system." *Golinski*, 781 F. Supp. 2d at 974. And a federal defender is not subject to *any* "judicial independence" concerns.

If "judicial independence" were relevant, that factor would *support* a judicial remedy. After all, the question in any *Bivens* case is "'who should decide' whether to provide for a damages remedy, Congress or the courts?"[19] *Ziglar*, 137 S. Ct. at 1857 (quotation omitted). For obvious reasons, an Article III court is uniquely well-suited to administer a damages remedy for the judicial branch. Conversely, failure to provide a remedy would "would encourage the legislative and executive branches to intrude upon the Judiciary's independence in order to provide a remedy for discrimination which the courts have refused to provide." Petition, at 25.

---

[18] Defendants assert that holding them liable would "expose [them] to individual liability every time an EDR complainant is dissatisfied with their EDR outcome." *E.g.*, ECF No. 39 at 23. But they have no reason to worry if they are following the law. *Davis*, 442 U.S. at 248. And as *Davis* held, "budgetary inadequacies should not be permitted to stand in the way of the recognition of otherwise sound constitutional principles." *Id.* (quotation omitted).

[19] As discussed in Roe's response to the entity and official capacity defendants, Congress has repeatedly sought to extend antidiscrimination laws to the judicial branch, but members of the judiciary have strongly opposed such efforts and even stated that any legislation would be "unconstitutional." *See, e.g.*, Nina Totenberg, *Sen. Grassley Says Report On Sexual Harassment In Judiciary Simply Kicks The Can*, NPR (Jun. 14, 2018).

### 3. Judicial Conference "policies" are not a special factor.

Defendants further contend that the "policies" of the Judicial Council and Judicial Conference counsel hesitation. But a *Bivens* claim "is brought against the individual official for his or her own acts." *Ziglar*, 137 S. Ct. at 1860. That is exactly what Roe has done. She has alleged that each of the individual defendants personally violated her constitutional rights.

Moreover, there is nothing sensitive about policies governing sexual harassment in the federal judiciary. This case does not involve national security, *id.* at 1861, foreign relations, *Hernandez*, 140 S. Ct. at 744, or military discipline, *Chappell v. Wallace*, 462 U.S. 296, 300 (1983), which are policy matters appropriately left to other branches. Rather, this case involves a common type of workplace misconduct that is litigated daily in federal courts across the nation. *Davis*, 442 U.S. at 245. This misconduct can never be "justified" by a "legitimate" policy purpose, because "there is virtually no scenario imaginable where sexual harassment . . . is substantially related to important governmental objectives." *Bohen*, 799 F.2d at 1187.

Finally, even if the Fourth Circuit's "policies" could shield the defendants who were involved in executing those policies, it is axiomatic that "a federal agency's formal, internal EEO complaint process does not, by itself, fulfill [the agency's] obligation to exercise reasonable care." EEOC Guidance, 1999 WL 33305874, at *18 n.57. Thus, defendants cannot hide behind a judiciary "policy."

### 4. The Fourth Circuit EDR Plan is not a special factor.

Finally, defendants argue that the Fourth Circuit EDR Plan is a special factor because it provides an "alternative, existing process." Br. 20. But they are wrong to assert that "*any*" process, no matter how inadequate, can defeat a judicial remedy. The EDR policy provided no

meaningful remedies or review and was not "constitutionally adequate." *Bush*, 462 U.S. at 378 n.14.

The lack of a meaningful policy is yet another reason why this case is no different than *Davis*. In *Davis*, the congressional employer argued that judicial relief would be inappropriate because Congress "is solving whatever employee relations problems may exist within its halls." Amicus Br., 1978 WL 207325, at *4 n.1 (quoting Supp. Resp. Br. 2). But as an amicus brief filed by members of Congress explained, those internal congressional policies were "inadequate and unsuccessful." *Id.* at *5. Likewise, here, the Fourth Circuit's ineffective policy poses no bar to the relief Roe is seeking.

## III.     Defendants Are Not Entitled To Absolute Or Qualified Immunity.

Defendants' arguments for immunity fail. First, defendants assert that they are entitled to qualified immunity because there is no case where "an employee of the judicial branch" has been held liable for constitutional violations in an employment context. Br. 25. Apparently, they believe that without a specific case telling them so, they could not have reasonably known that sex discrimination violates the law. But it is beyond question that the Fifth Amendment applies to the judiciary. *Hurd v. Hodge*, 334 U.S. 24, 35–36 (1948); *Murray's Lessee v. Hoboken Land & Imp. Co.*, 59 U.S. 272, 276 (18 How. 272) (1855). And defendants do not need a case to tell them what they should already know about sex discrimination based on Judicial Conference policy, EDR plans, and judiciary codes of conduct.

Second, Chief Judge Gregory's arguments for absolute immunity fail. Absolute immunity is granted "sparing[ly]," and attaches only to "truly judicial acts," not "acts that simply happen to have been done by judges." *Forrester v. White*, 484 U.S. 219, 224, 227 (1988). It is therefore well-established that a judge's actions taken "in an administrative capacity," such as

"personnel decisions," are not "themselves judicial or adjudicative." *Id.* at 229. Justice Sotomayor recently underscored this point, when she stated that "[w]e only give judicial officers and congressional officers immunity for acts within their official capacity." Oral Arg. Tr. 20, *Trump v. Vance*, No. 19-635. Thus, "if judges sexually harass someone, we've said that's not within judicial functions, they can be sued." *Id.*

Chief Judge Gregory argues that he was performing "adjudicatory functions" under the EDR Plan that were "functionally comparable" to his "Article III role." ECF No. 41, at 21. But EDR matters "are strictly administrative proceedings and are not 'cases and controversies' under Article III of the Constitution." JCUS at 25. Thus, "[j]udges presiding in EDR matters are functioning in an administrative rather than judicial capacity." *Id.*

Even if Chief Judge Gregory's actions were adjudicative, absolute immunity does not apply to adjudications that lack "procedural safeguards." *Cleavinger v. Saxner*, 474 U.S. 193, 202 (1985). The rationale behind judicial immunity is that "the safeguards built into the judicial process tend to reduce the need for private damages actions as a means of controlling unconstitutional conduct." *Butz*, 438 U.S. at 512. That rationale does not apply to a process like EDR, where among other structural flaws and conflicts of interest, the ultimate decision-maker was a subject of Roe's complaint. *Cleavinger*, 474 U.S. at 204.

Finally, though the other defendants have not asserted absolute immunity, they speak in terms of its equivalent. They contend that because they have discretion to promulgate judicial policies, the lawfulness of their actions cannot be questioned. *E.g.*, ECF No. 37, at 17. The Supreme Court has rejected this reasoning. *Butz*, 438 U.S. at 505–06. As the Court explained, if "all officials exercising discretion were exempt from personal liability, a suit under the Constitution could provide no redress to the injured citizen, nor would it in any degree deter

federal officials from committing constitutional wrongs." *Id.* at 505. If anything, the power

those officials hold "affords a greater potential for a regime of lawless conduct" and

"opportunities for unconstitutional action on a massive scale." *Id.* at 506. Actions for damages

are necessary to deter situations of policy "abuse." *Id.*

## IV. Roe Has Properly Pled Claims Under 42 U.S.C. §§ 1985(3) And 1986.

Defendants' arguments against Roe's Section 1985(3) and 1986 claims are conclusory,

Br. 24–25, and therefore waived. *Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 152 n.4 (4th Cir.

2012) (issues that party "fails to develop" are waived). But regardless, they are meritless.

First, defendants' argument that the CSRA bars Roe's claims is wrong. As already

discussed, the CSRA does not foreclose other remedies for discrimination.[20] *See supra* p. 17.

Defendants' argument also violates the "cardinal rule . . . that repeals by implication are not

favored." *Morton*, 417 U.S. at 549. The strong presumption against implied repeal can only be

overcome "if there is an irreconcilable conflict between the two provisions or if the later Act was

clearly intended to cover the whole subject of the earlier one." *Branch v. Smith*, 538 U.S. 254,

256–57 (2003) (quotation omitted). Defendants point to no evidence that the CSRA implicitly

repealed Reconstruction-era statutes that do not create any new substantive rights, but rather

remedies to enforce the constitutional right to equal protection. *Great Am. Fed. Savings & Loan*

*Ass'n v. Novotny*, 442 U.S. 366, 372 (1979). As the Supreme Court has instructed, courts must

accord these statutes "a sweep as broad as (their) language." *Griffin v. Breckenridge*, 403 U.S.

88, 97 (1971). This is a "prototypical case" where an implied repeal would not be appropriate,

---

[20] Although Title VII provides the exclusive remedy for federal employees who are covered by the statute, *Brown v. GSA*, 425 U.S. 820, 829 (1976), Congress did not foreclose other remedies for employees not covered by the statute, *Davis*, 442 U.S. at 246–47. Moreover, if the CSRA bars "all" other remedies, Br. 24, then the statute would have preempted the judiciary's adoption of EDR plans under 28 U.S.C. §§ 331, 332.

because it would undermine the "longstanding, important" congressional policy against unconstitutional discrimination. *Morton*, 417 U.S. at 550.

Defendants also assert that Roe has not pleaded sufficient allegations. They do not explain what elements they believe she has not alleged, but regardless, the complaint fully sets out a conspiracy to violate Roe's equal protection rights. By their nature, defendants' actions were a conspiracy to discriminate because they involved a "an agreement or a meeting of the minds." *A Soc'y Without a Name v. Commonwealth of Va.*, 655 F.3d 342, 273 (4th Cir. 2011) (quotation omitted). Moreover, Section 1986 "inculpat[es] bystander defendants who are not themselves conspirators under § 1985." Linda E. Fisher, *Anatomy of a Duty to Protect*: *42 U.S.C. Section 1986*, 56 WASH. & LEE L. REV. 461, 464 (1999). The statute creates liability for a "negligent failure to protect by an actor with knowledge of a § 1985 conspiracy and power to protect its victims," even if that person did not "personally" act with "discriminatory intent." *Id.*

Finally, defendants imply that Roe's claims are barred by the "intercorporate conspiracy" doctrine. Assuming that doctrine is even applicable, *see Ziglar*, 137 S. Ct. at 1868 (discussing circuit split), it does not apply to the federal judiciary, which is inherently decentralized. Indeed, the judiciary's stated reason for opposing antidiscrimination laws is that "the hallmarks of judicial branch governance have been local court management and individual judge autonomy." CAA Report, at 4. And as discussed above, federal defender offices are statutorily independent from the rest of the judiciary. 18 U.S.C. § 3006A(g)(2)(A).

## CONCLUSION

For these reasons, the defendants' motions to dismiss should be denied.

This the 3rd day of July, 2020.

Respectfully Submitted,

*/s/ Cooper Strickland*
Cooper Strickland
N.C. Bar No. 43242
P.O. Box 92
Lynn, NC 28750
Tel. (828) 817-3703
cooper.strickland@gmail.com

Counsel for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on the 3rd day of July, 2020, I will electronically file the foregoing with the

Clerk of Court using the CM/ECF system, which will then send a notification of such filing

(NEF) to the following:

Gill P. Beck at Gill.Beck@usdoj.gov

Joshua M. Kolsky at Joshua.kolsky@usdoj.gov

Shannon Sumerall Spainhour at mss@dhwlegal.com

*/s/ Cooper Strickland*
Cooper Strickland
N.C. Bar No. 43242
P.O. Box 92
Lynn, NC 28750
Tel. (828) 817-3703
cooper.strickland@gmail.com
