# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

## ASHEVILLE DIVISION

| | | |
|---|---|---|
| JANE ROE, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Civil No. 1:20-cv-00066-WGY |
| | ) | |
| UNITED STATES OF AMERICA, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |
| _____ | ) | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO THE OFFICIAL CAPACITY AND ENTITY DEFENDANTS' MOTION TO DISMISS (ECF NO. 42)

## INTRODUCTION

Plaintiff Jane Roe ("Roe") suffered sexual harassment, retaliation, and discrimination during her employment as an assistant federal public defender. Roe sought relief under the Fourth Circuit's Employment Dispute Resolution ("EDR") Plan,[1] but she was deprived of any meaningful review or remedies, resulting in her constructive discharge and the loss of her career.

Roe seeks relief in this Court for the violations of her constitutional rights. Defendants' motion to dismiss is merely an attempt to give a sexual harassment and discrimination victim the run-around and avoid responsibility. Their motion should be denied.

## STANDARD OF REVIEW

When reviewing a motion to dismiss for lack of jurisdiction, a court must determine whether there is a "persuasive reason to believe that such was the purpose of Congress." *Whitman v. Dep't of Transp.*, 547 U.S. 512, 514 (2006) (quoting parenthetical). Where Congress intends to preclude judicial review of constitutional claims, a "heightened showing" is required "to avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Webster v. Doe*, 486 U.S. 592, 603 (1988).

---

[1] Roe filed her complaint under the 2013 EDR Plan, not the 2018 EDR Plan, as defendants assert. Br. 1. The difference is important, in part, because the 2013 Plan only provided thirty (30) days to file a formal request for counseling, whereas the 2018 Plan provides 180 days. Indeed, the outcome may have been different if Roe could have awaited the outcome of the Chapter IX wrongful conduct report prior to filing a request for counseling under Chapter X. *See, e.g.*, Complaint ¶ 217. Instead, the adjudicative functions under Chapter X and the investigative functions under Chapter IX of the Plan were improperly combined in violation of her equal protection and due process rights. *See Hannah v. Larche*, 363 U.S. 420, 442 (1960) (noting that due process rights attach to adjudications but not to investigations); EEOC Mgmt. Directive 110, 1-7 (2015) (EEO complaint process must be kept separate from personnel actions "to maintain the integrity of the EEO investigative and decision-making processes").

When reviewing a motion to dismiss for failure to state a claim, a court must accept as true all facts in the complaint and construe them in the light most favorable to the plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When dismissal involves a civil rights complaint, the court "must be especially solicitous of the wrongs alleged and must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory which might plausibly be suggested by the facts alleged." *Lamar v. Ebert*, 681 F. App'x 279, 284 (4th Cir. 2017) (per curiam) (quotation omitted).

## ARGUMENT

### I. The Civil Service Reform Act Does Not Preclude Roe's Claims.

Defendants argue that the CSRA bars judiciary employees from any judicial remedy for or review of unconstitutional employment discrimination. Br. 7–11. The CSRA does no such thing, but if it does, the statute is unconstitutional in this context.

#### A. The CSRA Does Not Foreclose Remedies for Discrimination.

The CSRA does not foreclose judiciary employees' remedies for discrimination. Nor could it, because judiciary employees have a right to be free from discrimination under the Constitution. *See Koger v. Ball*, 497 F.2d 702, 704–05 & n.7 (4th Cir. 1974). When Congress has expanded statutory remedies for discrimination, like Title VII and the CSRA, it has only created new remedies to enforce existing rights. *See id.* In arguing the contrary, defendants misread the CSRA, ignore congressional intent, and distort legislative history.

##### 1. The CSRA preserves federal employees' right to file discrimination lawsuits in federal court.

Defendants misapprehend the CSRA, which preserves remedies for discrimination. The CSRA did overhaul a "patchwork" of statutes that previously governed the federal civil service. Br. 8. But more importantly, a major purpose of the CSRA was "[t]o promote equal employment

opportunity." H.R. Rep. No. 95-1403, at 99 (1978). The CSRA was meant to allow federal employees "to be hired and fired more easily, but for the right reasons." S. Rep. No. 95-969, at 4 (1978). To fulfill this purpose, the CSRA makes unlawful discrimination a "prohibited personnel practice" enforced by administrative remedies and disciplinary action. 5 U.S.C. § 2302(b). At the same time, the CSRA states that it "shall not be construed to extinguish or lessen any effort to achieve equal employment opportunity" under Title VII and other civil rights laws. *Id*. § 2302(d). It is thus well-established that the CSRA "does not extinguish any right or remedy available to federal employees under federal discrimination laws." *Planas v. Lamoutte*, No. CA 14-1468-MML, 2015 WL 5568015, at *8 (D.P.R. Sept. 22, 2015) (citations omitted).

Defendants argue, however, that the CSRA's review procedures are "exclusive," and so "what you get is what you get." Br. 8. But defendants overlook that the "CSRA provides different treatment for grievances depending on the nature of the claim." *Whitman*, 547 U.S. at 514. Specifically, discrimination claims are "expressly exempt[ed]" from the CSRA's regime. *Elgin v. Dep't of Treasury*, 567 U.S. 1, 13 (2012). Rather, the CSRA preserves the right of federal employees "to pursue claims of discrimination in violation of federal law in federal district court." *Perry v. MSPB*, 137 S. Ct. 1975, 1983 (2017). Defendants' reliance on cases interpreting the CSRA's "exclusive" procedures is misplaced, Br. 8–11, because those cases did not involve class-based discrimination claims. *See*, *e.g.*, *United States v. Fausto*, 484 U.S. 439, 443 (1988) (statutory claims under the Back Pay Act); *Fornaro v. James*, 416 F.3d 63, 64 (D.C. Cir. 2005) (calculation of disability benefits); *see also Hall v. Clinton*, 235 F.3d 202, 204 (4th Cir. 2000) (due process claim); *Pinar v. Dole*, 747 F.2d 899, 902 (4th Cir. 1984) (first amendment and due process claims).

Defendants also rely on the Second Circuit's decision in *Dotson v. Griesa*, but *Dotson* mistakenly conflates discrimination claims with other types of claims under the CSRA. *See* 398 F.3d 156, 166–68 (2d Cir. 2005). Only one case cited by defendants involves a potential claim of unconstitutional discrimination, and in that case, the Court held that the CSRA does not preempt a judiciary employee's equal protection claim.[2] *See Planas*, 2015 WL 5568015, at *8.

> **2. Congress has clearly expressed an intent to protect judiciary employees' remedies for discrimination.**

Defendants also argue that Congress intended to foreclose discrimination remedies for "excepted service" employees, Br. 9, but Congress intended to protect those employees.

The Supreme Court has rejected defendants' argument with respect to excepted service employees. In *Davis v. Passman*, the Court examined the remedies for discrimination available to excepted service employees not covered by Title VII's protections. *See* 442 U.S. 228, 246–48 (1979). The Supreme Court held that when Congress declined to extend Title VII to employees who are not in the competitive service, it did not intend to "foreclose alternative remedies available to those not covered by the statute." *Davis*, 442 U.S. at 247. Instead, Congress left "undisturbed whatever remedies" the employees "might otherwise possess." *Id.*

The Supreme Court's guidance applies equally to the CSRA, which was in effect when *Davis* was decided.[3] Like Title VII, the CSRA also prohibits discrimination in federal

---

[2] These cases are also distinguishable because these courts held that the employees had access to meaningful remedies and review under EDR plans. *See, e.g.*, *Dotson*, 398 F.3d at 181–82; *Semper v. Gomez*, 747 F.3d 229, 242 (3d Cir. 2014). By contrast, Roe was *not* afforded meaningful remedies or review, as will be further discussed below.

[3] The CSRA was signed into law on October 13, 1978 and went into effect on January 11, 1979. *See* Pub. L. No. 95-454, § 907, 92 Stat. 1227 (1978). Certiorari was granted in *Davis* on October 30, 1978. 439 U.S. 925 (1978) (mem.). At a minimum, if the CSRA had eliminated discrimination remedies for excepted service employees, the member of Congress who was being sued in *Davis* would have undoubtedly brought that fact to the Court's attention.

employment and preserves constitutional remedies. *See* 5 U.S.C. § 2302(d). Because the statutes cover the same subject matter, they must be read "in accord." *Perry*, 137 S. Ct. at 1984; *cf. Kloeckner v. Solis*, 568 U.S. 41, 49–50 (2012). Under this approach, "judicial branch employees not in the competitive service [who] are not yet covered by any antidiscrimination statute . . . presumably still can sue directly under the Constitution based on the *Davis v. Passman* theory." Lindemann & Grossman, Employment Discrimination Law Ch. 32.III.E (6th ed. 2020). By contrast, defendants' argument would violate this unified statutory scheme. Under their interpretation, excepted service employees would have constitutional remedies under Title VII, but not under the CSRA. This contradiction would render the statutes incoherent and eviscerate the rights that Congress intended to protect.[4]

Since *Davis*, Congress has made its intent to protect judiciary employees clear. In 1990, Congress amended the CSRA to remove employees of the Administrative Office of the U.S. Courts ("AO") from the competitive service. AO Personnel Act of 1990, Pub. L. No. 101-474, 104 Stat. 1097 (1990). Concerned that oversight of AO employees by the executive branch was contrary to "separation of powers," Congress authorized a personnel system "free from executive branch controls and more similar to that of the rest of the judicial branch." H.R. Rep. No. 101-770(I). Under the new system, Congress authorized the AO to exercise the same legal authority granted to the administrative agencies in the executive branch. Pub. L. No. 101-474, § 3(g). But in doing so, Congress did not foreclose employees from pursuing other remedies. Instead, Congress expressly *preserved* those remedies:

---

[4] This problem further shows that defendants' reliance on *Dotson* is misplaced. Br. 9–10. In that case, *Davis*'s holding with respect to excepted service employees was not raised by the parties or considered by the Court. *See* 398 F.3d at 163–65.

> Nothing in this Act shall be construed to abolish or diminish *any right or remedy* . . . by *any law* prohibiting discrimination in Federal employment on the basis of race, color, religion, age, sex, national origin, political affiliation, marital status, or handicapping condition . . . .

*Id.* (appearing in notes to 28 U.S.C. § 602) (emphases added).

The plain language confirms Congress's intent to preserve judiciary employees' remedies for unconstitutional discrimination. And this provision is not limited to AO employees, because the Act was intended to create a personnel system that is "more similar to the rest of the judicial branch." H.R. Rep. No. 101-770(I). The Act thus broadly reflects Congress's careful balancing of judicial independence against the constitutional guarantee of equal protection. To strike this balance, Congress exempted judiciary employees from review by the executive branch, while preserving the remedies that judiciary employees possess under the Constitution. Accepting defendants' argument would run contrary to Congress's chosen policy and the Constitution.

### 3. The CSRA's legislative history does not show that Congress barred judiciary employees from having any remedies for discrimination.

Defendants argue that Congress made a "conscious" choice to withhold remedies for discrimination because it was "aware" of the judiciary's EDR plans. Br. 9. But as already discussed, Congress did not make *any* choice to withhold judiciary employees' remedies. Thus, defendants' argument misses the point. The legislative history pertains to whether Congress intended to extend *additional* remedies, not whether it intended to foreclose *existing* ones.

But even on its own terms, defendants' argument fails. To begin with, Congress could not have been "aware" of the judiciary's EDR plans when it passed the CSRA, because no plan existed at that time. The judiciary did not adopt an equal opportunity plan until 1980. *See Dotson*, 398 F.3d at 172. And it did so not because of the CSRA, but because of evidence showing a "deliberate pattern of race and sex discrimination" in the judiciary. *Equal*

*Employment Opportunity Practices in the Federal Judiciary*, *Hearings Before the Subcomm. on Civil and Constitutional Rights of the H. Comm. on the Judiciary*, 96th Cong. 5 (1979) (EEO Hearing) (statement of Steve Suitts, Executive Director, the Southern Regional Council). For example, a 1978 study found that federal courts in the South had "virtual[ly] exclud[ed]" minorities and women "from all but clerical or secretarial positions." *Id.* at 1 (statement of Rep. Don Edwards). The findings were "so disturbing" that they prompted a series of congressional hearings in 1979 and 1980 regarding the judiciary's discriminatory hiring practices. *Id.* at 2.

These findings prompted additional outside pressure on the judiciary. In June 1979, a group of minority and women's organizations served a petition on the Judicial Conference, which charged the judiciary with "manifest race and sex discrimination." *See In re Employment Discrimination in the Federal Judiciary*, Petition Seeking the Adoption of Equal Opportunity Plans by the Federal Judiciary at 1 (June 5, 1979). Noting that "[t]he equal protection standards of the United States Constitution require the Federal Judiciary to eliminate its own discriminatory employment practices," *id.* at 19, the petitioners demanded that the judiciary adopt equal employment opportunity plans, *id.* at 26–29.

On the same day, the Supreme Court ruled that the Fifth Amendment provides a damages remedy for sex discrimination in federal employment. *Davis*, 442 U.S. at 245–49. Although that case involved the legislative branch, the justices recognized that the ruling would apply to all excepted service employees, including those in the judicial branch. *See*, *e.g.*, Oral Arg. Tr. 21–22; Justice Powell, Dissent from the Bench at 2, *available in Davis v. Passman*, Supreme Court Case Files Collection, Box 63, Lewis F. Powell Jr. Archives, Washington & Lee University School of Law, Virginia. Based on the Supreme Court's ruling, judiciary employees publicly

threatened to sue over the unconstitutional discrimination they had suffered.  *See* Lawscope, *Momentum Grows to End Hiring Bias in U.S. Courts*, 65 ABA J. 1613, 1615 (Nov. 1979).

This outside pressure, not the CSRA, led the Judicial Conference to adopt its first EEO plan.  *See id.* at 1614; *see also* EEO Hearing at 22 (statement of Hon. Elmo B. Hunter) (adoption of EEO plan was "a direct response" to congressional inquiries).  Additionally, that EEO plan was voluntary and meant to be a "beginning."[5]  *Id.* at 24.  This history flatly contradicts the argument that Congress intentionally foreclosed all discrimination remedies for judiciary employees.  In passing a statute to promote equal employment opportunity, Congress would not have stripped remedies for a "deliberate pattern" of discrimination.  *Id.* at 5.

Defendants' assertion that Congress "maintained" such a choice over the years is equally unfounded.  On the contrary, Congress has repeatedly requested proposals for legislation, but the Judicial Conference has strongly opposed any expansion of antidiscrimination laws to the judicial branch.  For example, in 1990, Congress mandated that the Judicial Conference conduct a study to assess federal defender programs and to provide proposals for legislation, including in equal employment opportunity.  Judicial Improvements Act of 1990, Pub. L. No. 101-650, § 318(b)(2), 104 Stat. 5089 (1990) (appearing in notes to 18 U.S.C. § 3006A).  The study, known as the "Prado Report," found that "equal employment opportunity" is an "area which needs attention" in federal defender offices.  Rep. of the Comm. to Review the Criminal Justice Act, at 40 (1993).  For example, court of appeals judges were "dissatisfi[ed]" with the procedures for resolving employment disputes because they often lacked "jurisdiction" over complaints.  *Id.* at

---

[5] The EEO plan was criticized as "lacking teeth," *id.* at 24, and "devoid of any meaningful, specific procedures," *id.* at 53, or "enforcement mechanism," *id.* at 64.  As the petition's authors stressed, the EEO plan was not meant to "constitute a waiver of or prejudice any legal rights or remedies which an employee may want to seek through litigation."  *Id.* at 119.

40–41 (quotation omitted). In addition, federal defenders' inclusion in circuit EDR plans was a source of conflicts of interest and the potential for judicial interference, because "judges are . . . privy to such matters as employee grievances filed against FPDs." *Id.* at 45. The study recommended legislation to create an independent entity that could create "[e]nforceable regulations" over federal defender employment matters. *Id.* at 77 n.37. The Judicial Conference, however, did not act on these recommendations.

In 1995, Congress required the Judicial Conference to conduct a study and propose legislation to extend Title VII protections to the judicial branch. 2 U.S.C. § 1434. The study's purpose "was to allow the Judiciary to decide how it could best be covered" by Title VII. Charles Grassley and Jennifer Shaw Schmit, *Practicing What We Preach: A Legislative History of Congressional Accountability*, 35 HARV. J. ON LEGIS. 33, 49 (1998). Contrary to this purpose, *id.*, the Judicial Conference strongly opposed *any* extension of antidiscrimination laws to the judicial branch. *See* Study of Judicial Branch Coverage Pursuant to the Congressional Accountability Act of 1995 (Dec. 1996) (CAA Study). The Judicial Conference asserted that legislation would be "neither necessary nor advisable," in part, because the judiciary "currently provides its employees with protections similar to those enumerated" in Title VII. *Id.* at 2.

More recently, the judiciary has taken an even firmer stance against antidiscrimination legislation. After becoming public that Ninth Circuit Chief Judge Kozinski had sexually harassed his law clerks, Congress demanded that the judiciary reassess its procedures for handling complaints. As Senator Grassley stated, "The judicial branch has a problem. They have to deal with it or Congress will do it for the courts." *Confronting Sexual Harassment and Other Workplace Misconduct in the Federal Judiciary, Hearing Before the Sen. Judiciary Comm.*, 115th Cong. (Jun. 13, 2018). AO Director Duff testified to Congress, however, that

allowing an Inspector General to oversee sexual harassment complaints would be "unconstitutional." Nina Totenberg, *Sen. Grassley Says Report On Sexual Harassment In Judiciary Simply Kicks The Can*, NPR (Jun. 14, 2018) (noting that he would be unlikely to make this statement "without consulting the Chief Justice and possibly other members of the judiciary"). Congress has not relented in its criticism as sexual harassment scandals in the judiciary have publicly emerged.[6]

This is not a pattern of congressional acquiescence, but one of judicial resistance. But even if Congress were satisfied, its understanding would have been premised on the Judicial Conference's representation that its procedures adequately protect its employees from unlawful discrimination. *See* CAA Report at 2. If those procedures fail, congressional acquiescence cannot override the Constitution. *See Davis*, 442 U.S. at 247.

## B. Defendants' Reading of the CSRA Raises Serious Constitutional Questions.

Defendants' interpretation of the CSRA also fails to account for the serious constitutional question that would arise if a statute were to deny any judicial forum over a constitutional claim.

As then-Circuit Judge Alito recognized, "[t]he power of the federal courts to grant equitable relief for constitutional violations has long been established." *Mitchum v. Hurt*, 73 F.3d 30, 35 (3d Cir. 1995). Indeed, "[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803). These principles are codified in 28

---

[6] Both the House and Senate have raised significant concerns with the judiciary. *See*, *e.g.*, Letter from Reps. Jerrold Nadler, F. James Sensenbrenner, Jr., Henry C. 'Hank' Johnson, Jr., and Mary Gay Scanlon to James C. Duff, the Hon. Julie A. Robinson, and the Hon. Timothy M. Tymkovich (Feb. 6, 2020); Letter from Sens. Dianne Feinstein, Patrick Leahy, Richard J. Durbin, Sheldon Whitehouse, Amy Klobuchar, Christopher A. Coons, Richard Blumenthal, Mazie K. Hirono, Cory A. Booker, and Kamala D. Harris to James C. Duff (Jan. 3, 2019); Letter from Sens. Charles E. Grassley and Dianne Feinstein to James C. Duff (Feb. 9, 2018).

U.S.C. § 1331, which grants the federal courts "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

Given these important constitutional principles, "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." *Webster*, 486 U.S. at 603. A "heightened showing" is required to avoid the "serious constitutional question" that would arise if a federal statute were to deny a judicial forum over a constitutional claim. *Id*.; *see also McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 496 (1991); *Weinberger v. Salfi*, 422 U.S. 749, 762 (1975); *Johnson v. Robison*, 415 U.S. 361, 367 (1974).

Defendants do not acknowledge that this heightened showing is required or attempt to meet it here. Br. 9. Indeed, any such argument would fail. As discussed above, Congress has expressed a clear intent to protect judiciary employees from discrimination, not to foreclose judicial review. *See supra* pp. 2–10; *see also* Elizabeth A. Wells, *Injunctive Relief for Constitutional Violations: Does the Civil Service Reform Act Preclude Equitable Remedies?*, 90 MICH. L. REV. 2612, 2625 (1992). Moreover, the Supreme Court has held that the CSRA does not foreclose all judicial review of constitutional claims. *Elgin*, 567 U.S. at 9–10. The Court explained that although it had previously "interpreted the CSRA to entirely foreclose judicial review, the Court had no need to apply a heightened standard like that applied in [*Webster*]," because the plaintiff in that case "did not press any constitutional claims." *Id.* at 11 n.4.[7] Thus,

---

[7] *Elgin* is consistent with many decisions holding that the CSRA does not foreclose judicial review of constitutional claims. *See, e.g.*, *Am. Fed'n of Gov't Employees Local 1 v. Stone*, 502 F.3d 1027, 1035–39 (9th Cir. 2007); *Mitchum*, 73 F.3d at 35; *Spagnola v. Mathis*, 859 F.2d 223, 229–30 (D.C. Cir. 1988) (en banc per curiam). In holding the contrary, *Dotson* failed to consider the serious constitutional question that would arise from precluding all judicial review of a constitutional claim. *See* 398 F.3d at 179–82. The Court also relied on cases that have been questioned, *see, e.g.*, *Stone*, 502 F.3d at 1036; *Bryant v. Cheney*, 924 F.2d 525, 528 (4th Cir. 1991); *Hardison v. Cohen*, 375 F.3d 1262, 1267 (11th Cir. 2004), and that are no longer good law after *Elgin*, *see Semper*, 747 F.3d at 237–42.

as *Elgin* teaches, "a federal employee who could not pursue meaningful relief through a remedial plan that includes some measure of meaningful judicial review has the right to seek equitable and declaratory relief for alleged constitutional violations in a 'federal question' action filed pursuant to § 1331." *Semper*, 747 F.3d at 242.

Even the United States has recognized that "the CSRA does not contain a 'heightened showing' of congressional intent to foreclose review of constitutional claims altogether." Resp. Br. 18, *Elgin v. Dep't of Treasury*, No. 11-45. Accordingly, "there is no dispute that if judicial review were *not* available under the CSRA for a particular employment-related constitutional claim, a federal employee would be entitled to bring a freestanding action for equitable relief." *Id*. at 17. Regarding the EDR process specifically, the United States has even asserted that, if an employee is "dissatisfied with the result, and if he believe[s] a constitutional issue remain[s], he [may bring] suit at that time arguing that the court should give a further level of Judicial Branch scrutiny to his constitutional claims." Opp. Br. 17, *Dotson v. Griesa*, No. 04-1276.

Notwithstanding this consensus, defendants argue that the CSRA bars judiciary employees from bringing constitutional claims in federal court.[8] Br. 9. They argue that because Congress is aware of EDR plans, it has silently channeled constitutional claims into that forum

---

[8] Though defendants rely on *In re Golinski*, Br. 9, that case provides a model for the type of constitutional claim that Roe brings here. In that case, Judge Kozinski ruled in his capacity as EDR presiding officer that a judiciary employee was wrongfully denied spousal health benefits because of her sexual orientation. *In re Golinski*, 587 F.3d 956, 961 (9th Cir. 2009). However, the Office of Personnel Management refused to comply with Judge Kozinski's "administrative order" to enroll the employee in the federal health program. *Golinski v. U.S. Office of Pers. Mgmt.*, 824 F. Supp. 2d 968, 976 (N.D. Cal. 2012). Thus, the employee brought a civil lawsuit in federal district court to vindicate her constitutional rights. *Id.* Her case was associated with the proceedings that culminated in the Supreme Court's decision striking down the Defense of Marriage Act. *See Golinski v. U.S. Office of Pers. Mgmt.*, 724 F.3d 1048, 1050 (9th Cir. 2013).

and foreclosed all judicial review.[9]  *Id.* at 9, 13.  But there is no evidence to support their "extraordinary" interpretation of the CSRA.  *Salfi*, 422 U.S. at 762.  On the contrary, Congress knows "how to provide alternative forums for judicial review based on the nature of an employee's claim."  *Elgin*, 567 U.S. at 13.  For example, the CSRA provides judicial review of adverse employment actions in the Federal Circuit, and for discrimination claims via a *de novo* lawsuit in federal district court.  *Id.*  However, the CSRA does not mention EDR plans, which did not exist at the time, or channel constitutional claims into that forum.  *See supra* pp. 2–10.

Aside from lacking any textual basis, defendants' argument also raises profound constitutional concerns.  To begin with, an EDR forum is not a "court" created by Congress.[10]  *See* U.S. CONST. ART. III, § 1.  Thus, to designate EDR forums the sole arbiter of employment-related constitutional claims, as defendants assert, would violate separation of powers because it would usurp power that Congress has not delegated.  *Cf. Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 496 (2010) (holding that statute that delegated President's core Article II powers violated separation of powers).  In doing so, it would impede the federal courts' constitutional and statutory jurisdiction over cases arising under the Constitution.  *See* U.S. CONST. ART. III, § 2; 28 U.S.C. § 1331.

---

[9] For a useful discussion of the principles regarding channeling of a constitutional claim to an Article III court, *see generally* Resp. Br, *Elgin v. Dep't of Treasury*, No. 11-45.

[10] Defendants are wrong to suggest that 28 U.S.C. §§ 331 and 332 provide valid statutory authority for EDR forums to decide constitutional claims.  Br. 17 n.7.  Under § 331, the Judicial Conference has authority to "submit suggestions and recommendations," but it cannot direct the actions of individual courts.  Under § 332, the Judicial Council has authority to issue administrative "orders," but it is not a "court and has no jurisdiction over civil actions." *Golinski*, 781 F. Supp. 2d at 974 (quoting parenthetical).  In any event, neither of these statutes establishes EDR forums as a type of Article III court.  *See id.*

Moreover, if Congress did channel constitutional claims into EDR forums, it would not be constitutionally authorized to do so. Courts have long held that, to protect the judiciary's integrity and independence, "Congress may not withdraw from the Article III courts any matter which, from its nature, is the subject of a suit at the common law, or in equity, or in admiralty." *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1938 (2015) (quotation omitted). Thus, for cases arising within Article III's judicial powers, "litigants are constitutionally entitled to an Article III adjudication," which they may only waive through knowing and voluntary consent. *Id*. at 1939. But as Judicial Conference policy states, EDR proceedings are "strictly administrative and are not 'cases and controversies' under Article III of the Constitution." Proceedings of the Judicial Conference of the United States at 25 (Sept. 2010) ("JCUS"). Thus, Congress cannot delegate employees' constitutional claims to EDR forums without violating their "personal right" to "Article III's guarantee of an impartial and independent federal adjudication."[11] *Sharif*, 135 S. Ct. at 1943.

Finally, any channeling of constitutional claims into EDR forums would be improper because they are not fully capable of providing meaningful review. *See Elgin*, 567 U.S. at 10. Under Judicial Conference policy, EDR presiding officers are acting in an "administrative rather than judicial capacity," and they have "no authority" to consider constitutional challenges or to impose remedies upon entities other than the employing office. JCUS at 25. Thus, presiding officers in the EDR context are not acting in a "judicial" capacity at all. *Golinski*, 781 F. Supp. 2d at 974. EDR presiding officers may be capable of making findings of fact and law regarding violations of the EDR plans, but they are not authorized to provide judicial review within the

---

[11] Contrary to defendants' suggestion, Br. 11, it makes no difference whether Roe could have "appealed" to the Judicial Council, because that is also not an Article III court.

meaning of Article III or to decide facial and as-applied constitutional challenges. *See id.* at 973 (EDR presiding officer's "interpretation" did not "bind" executive branch agency); *cf. Elgin*, 567 U.S. at 10, 16–21 (holding that Federal Circuit, as an Article III court, could provide meaningful judicial review). Indeed, even the question of what claims an EDR forum can adjudicate, or whether it can adjudicate claims at all,[12] can only be decided by an Article III court.

Defendants rely on *Dotson*, *Semper*, and their progeny, but those decisions do not address the weighty questions raised by their argument. Contrary to Judicial Conference policy, those decisions wrongly conflated administrative EDR forums with the type of judicial review conducted by a judicial officer in an Article III court. *See, e.g.*, *Dotson*, 398 F.3d at 161, 172–77; *Semper*, 747 F.3d at 242–244; *cf. Golinski*, 781 F. Supp. 2d at 974. Moreover, those cases are factually distinguishable because the courts found that the EDR forum was competent to provide meaningful review, at least in the first instance, over the specific claims at issue. For example, in *Dotson*, the Second Circuit held that a probation officer's race discrimination claims were barred, in part, because he did not use the EDR forum that was available to decide those claims. 398 F.3d at 181. Likewise, in *Semper*, the Third Circuit held that a probation officer could seek relief under the EDR Plan for his claim that he was fired in violation of his procedural due process rights. 747 F.3d at 242. By contrast here, Roe alleges that the EDR process itself deprived her of any meaningful remedies or review over her discrimination claims.

---

[12] The judiciary has described EDR as a voluntary policy, a recommendation that a unit executive may decline, and a form of alternative dispute resolution. These statements raise questions whether EDR forums can adjudicate legal rights at all. The latter raises the further question whether the judiciary can require its employees to engage in ADR without their consent. *See CellInfo, LLC v. Am. Tower Corp.*, 352 F. Supp. 3d 127, 133–34 (D. Mass. 2018) ("No party . . . should be required to submit to arbitration any dispute which it has not agreed so to submit."); EEOC Mgmt. Directive 110, 3-2 ("An EEO ADR resolution can never be viewed as fair if it is involuntary.").

In sum, defendants cannot avoid the serious constitutional questions that would result from their reading of the CSRA. If the CSRA does everything that defendants say it does, the statute is unconstitutional. For example, the statute would violate equal protection by foreclosing judicial remedies for discrimination with no legitimate basis. It would violate separation of powers because it would foreclose judicial review over constitutional challenges, including to the CSRA itself. And it would unlawfully delegate authority to strictly administrative forums that do not have the authority to meaningfully adjudicate claims. These serious constitutional questions can be avoided by rejecting defendants' argument that the CSRA forecloses Roe's constitutional claims.

## II. Roe's Claims Are Not Barred By Sovereign Immunity.

Defendants' argument that Roe's equitable claims[13] are barred by sovereign immunity should be rejected for several reasons.

First, under 28 U.S.C. § 1331, it is "established practice" for the "federal courts to issue injunctions to protect rights safeguarded by the Constitution."[14] *Bell v. Hood*, 327 U.S. 678, 684 (1946). Under this authority, the court may issue declaratory and injunctive relief against officials responsible for creating unconstitutional laws and policies, like Defendant Judge Mauskopf, chair of the Judicial Conference committee responsible for the Model EDR Plan. *See Golinski*, 824 F. Supp. 2d at 1002. Moreover, the Supreme Court has "long recognized the

---

[13] Roe is not seeking compensatory or punitive damages against the official capacity and entity defendants. She is seeking declaratory relief and appropriate equitable remedies, including front pay and back pay in lieu of reinstatement.

[14] In addition, 42 U.S.C. §§ 1985(3) and 1986 provide relief for conspiracies to violate equal protection under the law. Official capacity claims for injunctive relief under Sections 1985(3) and 1986 satisfy the requirement that the action be against a "person." *Cf. Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989) (section 1983 context).

distinction between an action at law for damages—which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation—and an equitable action for specific relief—which may include an order providing for the reinstatement of an employee with backpay." *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988); *see also Dotson*, 398 F.3d at 177–79 (recognizing that sovereign immunity does not bar reinstatement). Thus, "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen*, 487 U.S. at 893.

Second, statutory waivers of sovereign immunity apply in this context. For example, the Back Pay Act expressly waives sovereign immunity. *See* 5 U.S.C. § 5596(b)(2); *In re Levenson*, 587 F.3d 925, 935–38 (9th Cir. 2009). And contrary to defendants' argument, Br. 6, the Administrative Procedure Act ("APA") exemption for "the courts' of the United States" does not apply to the entire judicial branch, but only to "entities within the judicial branch that perform functions that would otherwise be performed by courts." *Wash. Legal Found. v. U.S. Sentencing Comm'n*, 17 F.3d 1446, 1449 (D.C. Cir. 1994). Defendants' citation to an unpublished Ninth Circuit decision stating that federal defender offices are exempt as "courts," Br. 6, ignores the independence of the defense function. *See generally* 18 U.S.C. § 3006A. Put simply, federal defender offices, like panel attorneys or community defenders, are not "courts," nor do they perform court functions, rather they are advocates in an adversarial system. *See* 28 U.S.C. § 610; *see also* Code of Conduct for Federal Public Defender Employees Canon 1.

Third, defendants' argument directly contradicts their own position that the judiciary has statutory authority to eradicate employment discrimination under EDR plans. *See* Br. 17 n.7 (citing 28 U.S.C. §§ 331, 332). As defendants emphasize, "EDR tribunals must have . . . the authority to grant full relief, including reinstatement (or other prospective relief) and back pay."

*Golinski*, 587 F.3d at 961. If this is "not true, judicial employees who are victims of discrimination would have no remedy at all." *Id.*

Defendants argue that EDR presiding officers have authority to grant "broad equitable relief," including reinstatement and back pay. Br. 11. Defendant Director Duff has also testified that sexual harassment EDR complainants have received "monetary relief." *Confronting Sexual Harassment and Other Workplace Misconduct in the Federal Judiciary, Questions for the Record from Chairman Grassley, Sen. Comm. on the Judiciary*, 115th Cong. 16–17 (June 20, 2018). Similarly, the Fourth Circuit EDR Plan states that presiding officers may "order a necessary and appropriate remedy" that can be "directed at correcting a past violation, prospectively ensuring compliance with the rights protected by th[e] Plan, or both." EDR Plan Ch. X, § 12(A) (2013). The Plan provides an open-ended list of available remedies that are both monetary and non-monetary in nature. *Id.* § 12(B). The only types of relief that are *not* available are attorney's fees (except as allowed under the Back Pay Act), compensatory and punitive damages. *Id.* § 12(C).

The Judicial Conference has also represented to Congress that it provides its employees with protections similar to Title VII.[15] CAA Report at 2. Consistent with this representation, the EDR Plan draws on Title VII concepts by distinguishing between "equitable relief" and "compensatory damages."[16] *See Pollard v. E.I. du Pont de Nemours*, 532 U.S. 843, 852 (2001). Under Title VII precedent, it is well-established that back pay and front pay in lieu of

---

[15] Title VII waives sovereign immunity for the government agencies to which it applies. *See Brown v. GSA*, 425 U.S. 820, 826–28 (1976). Thus, when the Judicial Conference stated that the judiciary provides protections similar to Title VII, CAA Report at 2, it was implicitly stating that sovereign immunity has been waived.

[16] The Plan instructs EDR presiding officers to apply Title VII precedent and related laws. EDR Plan Ch. X, § 10(B)(2)(e) (2013).

reinstatement[17] are "equitable" remedies that are "not in the nature of a claim of damages," because they are "intended to restore the recipients to their rightful economic status." *Robinson v. Lorillard Corp.*, 444 F.2d 791, 802 (4th Cir. 1971); *see also* Nora J. Pasman-Green & Alexis Derrossett, *Twenty Years After Bowen v. Massachusetts: When Does It Still Matter? When Should It?*, 69 LA. L. REV. 749, 774 (2009) (front pay "is generally described as an equitable remedy").

These forms of relief would not be available absent a waiver of, or exception to, sovereign immunity. After all, an EDR complaint is against an employing office, not an individual. *See* EDR Plan Ch. X, § 10(A) (2013). This structure tracks Title VII, which imposes liability for supervisor misconduct on the employer. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 342 (2013). EDR Plan relief inherently requires the use of government funds.

A court with jurisdiction under § 1331 has authority to order these remedies in fashioning injunctions against officials who violate the judiciary's antidiscrimination policies. *See Bowen*, 487 U.S. at 893; *see also* Pasman-Green, *supra*, at 768 ("incidental" monetary relief may be awarded where equitable relief "would not be complete" or "is no longer possible"). Thus, defendants cannot assert both that sovereign immunity is waived for EDR remedies and that it bars those remedies on judicial review. Otherwise, judiciary officials could assert sovereign immunity selectively "to follow their litigation interests," thus "generat[ing] seriously unfair

---

[17] Front pay is available as a remedy when reinstatement is not appropriate or feasible. *Pollard*, 532 U.S. at 846. Here, reinstatement would not be appropriate because of continuing hostility from Roe's former employing office, *see, e.g.*, ECF No. 45, and that office's history of resistance to antidiscrimination efforts. As the Supreme Court has held, there is "no logical difference between front pay awards made when there eventually is reinstatement and those made when there is not." *Pollard*, 532 U.S. at 853. Moreover, allowing front pay only when reinstatement is available would mean that "the most egregious offenders could be subject to the least sanctions." *Id.*

results." *Lapides v. Bd. of Regents of Univ. System of Ga.*, 535 U.S. 613, 619 (2002); *see, e.g.*, *New Hampshire v. Maine*, 532 U.S. 742, 748–49 (2001) (discussing judicial estoppel when inconsistent positions result in unfair advantage).

Finally, if sovereign immunity applies here, then the proper course is not dismissal, but leave to amend the complaint to assert individual capacity claims for *ultra vires* conduct. It is well established that suits against officers acting "beyond statutory authority or unconstitutionally" are not barred by sovereign immunity. *Pollack v. Hogan*, 703 F.3d 117, 120 (D.C. Cir. 2012).

## III.  Roe Was Not Required To Exhaust The EDR Plan's Procedures.

Defendants argue that Roe's claims are barred because she did not "exhaust" the EDR Plan's procedures. Br. 11–14. But defendants cannot argue both that Roe has failed to exhaust the EDR Plan's procedures *and* that the court has no authority to review whether those procedures were constitutionally meaningful. When a defendant raises an exhaustion defense to a complaint, the issue of its mishandling of that complaint will "come to life." *Nielsen v. Hagel*, 666 F. App'x 225, 232 (4th Cir. 2016) (quotation omitted). Even assuming exhaustion is required, *see Carthy v. Madigan*, 503 U.S. 140, 144 (1992), it is not a hard-and-fast requirement, because "[a]dministrative remedies need not be pursued if the litigant's interests in immediate judicial review outweigh the government's interests in the efficiency or administrative autonomy that the exhaustion doctrine is designed to further," *id.* at 146.

Exhaustion is not required if it results in "prejudice," such as an unreasonable or indefinite timeframe for administrative action. *Id.* at 146–47. The premise of Roe's complaint is that she was constructively discharged because of defendants' failure to take prompt and effective action on her complaints. *See*, *e.g.*, Complaint ¶¶ 5–9. Roe was not required to exhaust

a process that had already caused her "irreparable harm." *Carthy*, 503 U.S. at 147. Nor is she required to bring a new complaint through the process that violated her constitutional rights. *Id.*

In addition, exhaustion is not required if there is "doubt as to whether the agency was empowered to grant effective relief." *Id.* at 147. This factor is present in Roe's case, as well. At every stage of the process, judiciary officials admitted that the situation was unacceptable, but that nothing would be done. For example, Roe was told that a presiding officer would have no authority to order remedies against a federal defender office. Complaint ¶¶ 439, 444; *see also*, *e.g.*, ¶¶ 157–62, 415, 438–39. These facts establish "doubt" as to whether the EDR process could grant Roe effective relief. *Carthy*, 503 U.S. at 147.

Exhaustion is also not required where an administrative body is "shown to be biased or has otherwise determined the issue before it." *Id.* at 148. Here, the EDR process was structurally flawed by numerous conflicts of interest, including the Defender's role as both the employing office's representative and an accused violator of Roe's rights. Complaint ¶¶ 220, 281–83, 288, 378, 429; *see* Jacqueline Thompson, *"Failures of the System": Law Students, Advocates Push for Protections at the Judiciary*, NAT'L L. J. (Mar. 25, 2020) (discussing "potential conflicts of interest when investigating misconduct").[18] These conflicts of interest rendered the process fundamentally unfair to Roe.

Defendants' assertions to the contrary—that Roe "voluntarily" resigned and "withdrew" her complaint—are baseless.[19] Their argument is selectively premised on one email, in which

---

[18] The fact that this lawsuit was transferred out of circuit demonstrates the validity of Roe's concerns regarding conflicts of interest.

[19] Defendants selectively quote the complaint. For example, the quote "negotiate[ed] . . . resolution," Br. 11, comes from a sentence stating that "Roe was given no alternative to *negotiating* a *resolution* with the Federal Public Defender, against whom she had filed a formal complaint for retaliating against her and subjecting her to a hostile working environment."

Roe expressed her gratitude to Chief Judge Gregory and Circuit Executive Ishida for supporting her clerkship application.[20]  Br. 4.  But on its face, the email does not support their interpretation.  Rather, Roe said she was "saddened to no longer be a federal defender" and was resigning because it was the "best possible outcome under the circumstances."  *Id*.  The email merely confirms she was seeking the best possible outcome when forced to resign.  *See*, *e.g.*, Complaint ¶¶ 355, 381, 406, 462, 475.

## IV. Roe Has Stated Claims For Violations Of Due Process And Equal Protection.

Finally, defendants are wrong to argue that Roe has "failed" to state a claim.[21]  Br. 14–22.

Defendants' assertion that Roe had no constitutionally protected interest in having her discrimination complaint taken seriously and handled fairly is meritless.[22]  Under the Fifth Amendment, Roe had a right to be free of sex discrimination in her workplace.  *See Beardsley v. Webb*, 30 F.3d 524, 529 (4th Cir. 1994).  She had a right to prompt and effective remedial action on her complaints.  *See Bohen v. City of East Chicago*, 799 F.2d 1180, 1185 (7th Cir. 1986); *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990).  And she had a right to meaningful review and remedies.  *See Elgin*, 567 U.S. at 16–19; *Bush v. Lucas*, 462 U.S. 367, 378 n.14 (1983); *Semper*, 747 F.3d at 242.

---

Complaint ¶ 7.  Defendants also combine facts that appear more than 450 paragraphs apart in the complaint.  *See* Br. 4.

[20]  If defendants' filings are interpreted as presenting matters outside of the pleadings— inviting conversion—then Roe requests an opportunity to provide further documentation and affidavits.  Fed. R. Civ. P. 12(d).

[21]  Defendants' argument that Roe has failed to state a claim under 42 U.S.C. §§ 1985(3) and 1986 is addressed in her response to the individual capacity defendants' motions to dismiss.

[22] Defendants presumably believe that Roe is claiming she had a constitutionally protected interest in continued employment.  Br. 14–15.  Rather, she is asserting she had a constitutional right to be free from unlawful discrimination, to have prompt and effective action taken on her complaints, and to have meaningful review and remedies.  Complaint ¶¶ 494–99.

Defendants violated these rights in multiple ways. For example, defendants do not dispute that Roe was subjected to quid pro quo sexual harassment by a supervisor. On the contrary, they acknowledge that disciplinary action was taken by Chief Judge Gregory on Roe's complaints. Br. 21. Harassment by a high-level supervisor is especially serious because it reflects an abuse of power on behalf of an organization. As second-in-charge, the First Assistant falls "within that class . . . who may be treated as the organization's proxy," meaning the FDO is strictly liable for his behavior. *Faragher v. City of Boca Raton*, 524 U.S. 775, 789 (1998). Even if the First Assistant is not the FDO's alter ego, an employer will be held strictly liable if the harassment culminated in a tangible employment action. *Id*. at 790. Here, the harassment resulted in an unbroken chain of tangible employment actions, culminating in Roe's constructive discharge. *See, e.g.*, Complaint ¶¶ 107, 115, 150, 166–68, 170, 236–51, 338–54, 445–64.

In arguing that the sexual harassment "ceased" after Roe made a complaint, Br. 20, defendants ignore that they are responsible for the fact that it even occurred. Moreover, in attempting to trivialize her allegations, they fail to apply the cardinal rule that acts constituting a pattern of sexual harassment must be considered "in combination." *Beardsley*, 30 F.3d at 529. They also ignore her allegations of retaliation and a hostile work environment. *See, e.g.*, Complaint ¶¶ 107–09, 137–56, 163–71, 195–231, 266–67, 338–54.

Defendants also violated the protections that Roe had under the EDR Plan. Roe had a liberty interest in being free from unlawful discrimination, *see Bolling v. Sharpe*, 347 U.S. 497, 500 (1954), and a property interest in the Plan's terms as a condition of her employment, *see, e.g.*, *Johnson v. Mishler*, 526 F.2d 364, 366 (2d Cir. 1975) (per curiam); *Vitarelli v. Seaton*, 359 U.S. 535, 539, 545 (1959); *Paige v. Harris*, 584 F.2d 178, 181–82 (7th Cir. 1978). The bottom

line is that Roe had a right to expect that she would not be subjected to discrimination in her employment.

Though defendants claim that they "followed" the EDR Plan, their handling of Roe's complaint violated many provisions of the Plan and would be unlawful for any other employer. *See Davis*, 442 U.S. at 245 (noting that Title VII standards apply to government employer); *Beardsley*, 30 F.3d at 529 (same); *see generally* EEOC Enforcement Guidance: Vicarious Liability for Unlawful Harassment by Supervisors, 1999 WL 33305874. For example, they refused to disqualify the Defender from serving as the employing office's representative, even though he was involved in, and a subject of, her complaint. EDR Plan Ch. X, § 7 (2013). They forced Roe to telework, while leaving the accused harasser in his duty station and supervisory role. Complaint ¶ 338. They failed to conduct an appropriate investigation by an impartial and well-trained investigator that included the full scope of her allegations. *E.g.*, *id.* ¶¶ 306–21, 362–86. They refused to provide her with the investigation's findings as required by the Plan. EDR Plan Ch. X, § 4 (2013). And they refused to take immediate and effective remedial action, and instead deliberately withheld the investigation report. Complaint ¶¶ 393–94.

Finally, defendants violated Roe's rights by adopting policies, regulations, and practices that deprived her of any meaningful review or remedies. As judiciary officials acknowledged to Roe, an EDR presiding officer does not have legal authority to order remedies against a federal defender office. *See, e.g.*, Complaint ¶¶ 434, 444; *see also* Resp. to Indiv. Defs.' Br. at 11–12. In purporting to "cover" FDOs and misleading Roe into believing she had meaningful remedies for discrimination, when she did not, defendants are liable for adopting discriminatory policies.

Defendants' assertion that these allegations do not show intentional discrimination is meritless. On the contrary, their actions reflect policies and practices "in the judiciary where sex

harassment victims fe[el] they ha[ve] to remain silent or face retaliation."  Melissa Heelan Stanzione, *Fourth Circuit Latest in Judiciary to Review Harassment Policy*, Bloomberg Law (Oct. 25, 2019).  Their arguments are especially troubling in context of their claim that EDR is the exclusive remedy for sexual harassment victims, even if that process provides *no remedy at all*.[23]

Defendants ignore the rule that "when governmental agencies adjudicate or make binding determinations which directly affect the legal rights of individuals, it is imperative that those agencies use the procedures which have traditionally been associated with the judicial process." *Hannah*, 363 U.S. at 442.  Instead, they contend that when it comes to judiciary policies on sexual harassment, "you get . . . what you get."  Br. 8.  This assertion runs contrary to the basic principle that "[a]ll officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it."  *Davis*, 442 U.S. at 246.  Like all federal officials, judiciary officials are required to comply with the Fifth Amendment.

## CONCLUSION

For all these reasons, defendants' motion to dismiss, ECF No. 42, should be denied.

This the 3rd day of July, 2020.

Respectfully Submitted,

*/s/ Cooper Strickland*
Cooper Strickland
N.C. Bar No. 43242
P.O. Box 92
Lynn, NC 28750
Tel. (828) 817-3703

---

[23] By even asserting that the EDR Plan is "the exclusive remedy of the employee relating to rights enumerated under the Plan," EDR Plan Ch. I, § 1 (2013), defendants violated Roe's "personal right" to "Article III's guarantee of an impartial and independent federal adjudication," *Sharif*, 135 S. Ct. at 1943.

cooper.strickland@gmail.com

Counsel for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on the 3rd day of July, 2020, I will electronically file the foregoing with the

Clerk of Court using the CM/ECF system, which will then send a notification of such filing

(NEF) to the following:

Gill P. Beck at Gill.Beck@usdoj.gov

Joshua M. Kolsky at Joshua.kolsky@usdoj.gov

Shannon Sumerall Spainhour at mss@dhwlegal.com

*/s/ Cooper Strickland*
Cooper Strickland
N.C. Bar No. 43242
P.O. Box 92
Lynn, NC 28750
Tel. (828) 817-3703
cooper.strickland@gmail.com