IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CASE NUMBER 1:20CV66


JANE ROE,                                    )
                                             )
         Plaintiff,                          )
                                             )
v.                                           )
                                             )
UNITED STATES OF AMERICA, et al.,            )
                                             )
         Defendants.                         )


**DEFENDANT FEDERAL DEFENDER FOR THE WESTERN DISTRICT OF NORTH**

**CAROLINA'S REPLY IN SUPPORT OF HIS MOTION TO DISMISS INDIVIDUAL**

**CAPACITY CLAIMS AGAINST HIM**

In her Response, Plaintiff raises several new issues and fails to address many of the issues raised by Defendants in support of their motions to dismiss. None of Plaintiff's newly raised issues save her claims from dismissal. First, Plaintiff's efforts to misdirect the Court from the relevant issues in the case are transparent and futile. Second, Plaintiff fails to distinguish the large body of <u>controlling</u> case law precluding her *Bivens* claims. Third, Title VII of the Civil Rights Act of 1964 ("Title VII") and its progeny do not apply to this case. Fourth, Plaintiff's arguments fail to distinguish the <u>controlling</u> authority or address the <u>mandatory</u> procedures for evaluating qualified immunity. Finally, Plaintiff fails to distinguish the <u>controlling</u> authority calling for dismissal of her 42 U.S.C. §§1985 and 1986 claims. Accordingly, based on the applicable legal authorities and the briefing by the Defendants, Plaintiff's Complaint against the Defender should be dismissed.

**I.** **<u>Plaintiff's attempts to redirect this Court from the applicable legal issues should be disregarded.</u>**

    **A. Plaintiff's claim that Defendants "do not dispute" or "have admitted" allegations in her Complaint misstate the Defendants' arguments and contradict the Federal Rules of Civil Procedure.**

Without citing any controlling legal authority, Plaintiff makes several bald, conclusory statements in her Response, akin to those in her Complaint, including the following:

(a) because the Defender allegedly 'apologized' to her, <u>he admits that he engaged in illegal retaliation</u> against her. (Response, p. 3).

(b) "<u>Defendants do not dispute that Roe was subjected to quid pro quo sexual harassment by a supervisor</u>; to the contrary, <u>Defendants "acknowledge that disciplinary action was taken by Chief Judge Gregory.</u>[1]" *Id.*

---

[1] Disciplinary action taken in employment does not equate to an admission of any violation of the law giving rise to a federal lawsuit, nor should it. Defendants have <u>not</u> conceded that the Plaintiff was retaliated or discriminated against, nor that she was subjected sexual harassment, *quid pro quo* or otherwise, or that any employee was disciplined for retaliation, discrimination, or sexual harassment, *quid pro quo* or otherwise. That the Plaintiff would prefer the Defender to be removed from office, and that the First Assistant (and others) lose their jobs is inconsequential. Resp., pp. 10-11.

(c) the <u>Defender conceded that Roe was being harassed</u> but said he was being "blamed" and "attacked" for something that was not his fault." *Id.*

Here, Plaintiff reaches the unsupported conclusion that, if a defendant does not specifically deny an allegation in a motion to dismiss or supporting brief, he has admitted the allegation. Under Plaintiff's logic, this failure should result in the denial of motions to dismiss and foreclose the issue forever. Plaintiff's contention directly contradicts the plain language of the Federal Rules of Civil Procedure (the "Rules") and the applicable case law and should be disregarded.

First, Plaintiff's conclusions confuse an Answer or similar responsive pleading (pursuant to Rules 7(a)(2) and 8) with a Motion to Dismiss pursuant to Rule 12. Defendants are permitted by the Rules to file a Motion to Dismiss in lieu of filing an Answer, as they have done in this case. Rule 12. <u>Then</u>, if a motion to dismiss is denied,[2] defendants have additional time to file their responsive pleadings, as clearly stated in Rule 12(b)(4)(A)("if the court denies the motion … the responsive pleading must be served within 14 days after notice of the court's action.")

Second, a Motion to Dismiss pursuant to Rule 12(b)(6) generally calls upon the court and the parties to accept as true the allegations in the Complaint, except those constituting (1) legal conclusions, even those "couched as a factual allegation"; and, (2) "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements". *Ashcroft v. Iqbal*, 556 662, 678 (2009) (*citing Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In the initial briefing, that is exactly what Defendants have done. Their arguments do not make "admissions" nor do they "fail to dispute" Plaintiff's bald, threadbare allegations and legal conclusions.

---

[2] To avoid any confusion on the issue, the Defender and all the Defendants have moved to dismiss the Complaint in its entirety; consequently, Defendants unequivocally contend that an Answer will not be required, as the case should be dismissed.

2

Third, the Supreme Court has articulated that motions to dismiss raised under the qualified immunity doctrine are entitled to even higher scrutiny. As described in the initial briefing and in Section IV of this Brief, that defense requires analysis of the well-pled facts <u>as they relate to each individual defendant</u>, since the "basic thrust of the qualified-immunity doctrine is to free officials from the concerns of litigation, including 'avoidance of disruptive discovery." *Siegert v. Gilley*, 500 U.S. 226, 236 (1991). Accordingly, Plaintiff's arguments about "admissions" and "failure to dispute" are red herrings that should be disregarded.

**B. <u>Plaintiff's claim that the Defender's expectation of 'supervision' over Plaintiff is unreasonable and unsupported.</u>**

Similarly, Plaintiff disputes the concept that she would need 'supervision,' interpreting the word negatively. Resp., p. 5. She contends that the Defender's concerns about "supervision" should she be permitted her requested transfer to a much smaller office equate to a "*post hoc pretextual reason*" for Defender's resisting the transfer. *Id*. Plaintiff's conclusion that supervision was inapplicable her, amounting to a newly raised reason for the Defender's mindset, has no merit.

Plaintiff's conclusions are implausible. All employees, including those who telework, are subject to 'supervision.' It is not some burden imposed unfairly upon the Plaintiff by the FDO. Moreover, Plaintiff was just beginning her career as a lawyer and as a criminal defense attorney. The N.C. Rules of Professional Conduct, and corresponding ethics rules of other states, as well as the Canons of Federal Defender Employees Plaintiff cites in her Response place a burden of appropriate supervision over the legal work performed by attorneys like the Plaintiff in this context, in addition to the Plaintiff's <u>individual</u> burden of ensuring competence. *See N.C. RPC, Rule 1* (competence)("a lawyer shall not handle a legal matter that the lawyer knows or should know he or she is not competent to handle without associating with a lawyer who is competent to

3

handle the matter.") and 5.1(b)("A lawyer having direct supervisory authority over another lawyer shall make reasonable efforts to ensure that the other lawyer conforms to the Rules of Professional Conduct."); *see also Canons of FD* 3(B)("A defender employee should be faithful to professional standards and maintain competence in the defender employee's profession.") Violations can lead to liability for the individual lawyer, the supervising lawyer, and the agency for claims such as malpractice and ineffective assistance of counsel and can put lawyers' law licenses in jeopardy.[2] The Defender's reasonable concerns about those issues were not created "after the fact."

## II. The Judicially implied *Bivens* remedy should not be extended to this case.

### A. This case differs in "constitutionally meaningful ways" from *Davis v. Passman* and presents a "new *Bivens* context."

Plaintiff argues that her case does not differ in a "constitutionally meaningful way" from *Davis v. Passman,* 442 U.S. 60 (1979). Relying on Title VII and various secondary materials, according to Plaintiff, "[i]t makes no difference that the facts of this case involve a constructive discharge based on sexual harassment rather than a termination based on sex." Resp., 13-15. Crucially, Plaintiff utterly fails to address her allegations of "retaliation" or to substantively address the Defender's arguments on that point. Retaliation claims require **yet another** separate showing from that at issue in *Davis*.[3] To determine whether a case presents a "new *Bivens* context,"

---

[2] Plaintiff's contention that the Defender "is liable for violating the legal duties associated with his position under the Criminal Justice Act (CJA), 18 U.S.C. § 3006A(g)(2)(A), including the duty to protect his employees from discrimination" (Resp., p. 10) is entirely baseless and is misleading, at best. The provision of the CJA Plaintiff cites relates to "Adequate Representation of [Criminal] Defendants." Section A(g)(2)(A) simply identifies when and where an FDO can be established, and sets forth the compensation structure, appointment terms, and other basic issues relating to an FDO Office. The alleged "duty" Plaintiff identifies is notably absent and, later in her Brief, Plaintiff contradicts this statement: "At most, the CJA offers only indirect authority." Resp., p. 12.

[3] This standard differs "meaningfully" from sex discrimination claim involving direct evidence, as in *Davis*, and it differs "meaningfully" from analysis for sexual harassment.

4

however, courts must determine "new context" solely by reference to the Supreme Court's own decisions implying private rights of action. *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1860 (2017); *Tun-Cos v. Perrotte*, 922 F.3d 514 (4th Cir. 2019), *cert. denied*, 2020 WL 1496627 (2020); *Doe v. Meron,* 929 F.3d 153 (4th Cir. 2019). Application of the *Abbasi* framework reveals that this case is "meaningfully different" from *Davis*, presents a "new *Bivens* context," and "special factors counsel hesitation in the absence of affirmative action by Congress." *See Abbasi*, 137 S.Ct. 1843; *Tun-Cos*, 922 F.3d at 522; *Meron*, 929 F.3d at 168.

Attempting to minimize the differences between her case and *Davis*, Plaintiff argues: (1) her constructive discharge and sexual harassment claims are indistinguishable from *Davis's* gender discrimination claim, (2) she has no alternative process or remedy, and, like the *Davis* Plaintiff, it is "damages or nothing," and (3) the Defender is indistinguishable from the Congressman in *Davis*. Resp., 13-15. As noted, she fails to make any substantive argument relating to the retaliation claim against the Defender at all in the context of *Davis* or *Bivens*, further undermining her argument that her case does not present a 'new context.' Plaintiff's arguments have no merit.

*Davis* dealt with a narrow and specific Fifth Amendment Due Process Clause gender discrimination claim in which a Congressman stated in a letter that "although Davis was 'able, energetic, and a very hard worker,' he had concluded 'that it was essential that the understudy to my Administrative Assistant be a man,'" *Davis*, 442 U.S. at 231. Here, by contrast, Plaintiff asserts Fifth Amendment Due Process and Equal Protection claims, as well as claims under 42 U.S.C. §§ 1985 and 1986, alleging a broad-based, unprecedented conspiracy within the Judiciary Branch to commit sexual harassment, retaliate, and discriminate based on gender. Unlike the discrete, specific discriminatory act of firing in *Davis*, Plaintiff attempts to import Title VII employment concepts of *quid pro quo* and amorphous claims of employer-imputed sexual harassment into her

5

overarching conspiracy theory involving the Defender, both in his individual and official capacities, and various Judiciary officials, some of whom she has also sued in their individual capacities as well as officially. The differences between the specificity of *Davis* and the generality of Plaintiff's claims could hardly be more profound and "constitutionally meaningful."

As the Supreme Court in *Abbasi* noted, "the generality or the specificity of the official action" is one of those "differences that are meaningful enough to make a given context a new one." *Abbasi*, 137 S.Ct. 1859-60. As addressed, *Davis* dealt with an extremely specific gender discrimination issue. *See Davis*, 442 U.S. at 231. In this case, however, Plaintiff raises several claims to allege a broad conspiracy within the Judiciary Branch to commit sexual harassment, retaliate, and discriminate against her based on her gender.

Second, while, for the *Davis* plaintiff, it was "damages or nothing," Plaintiff had an existing, alternative process under the Fourth Circuit's EDR Plan. Plan, Ch. X, §1(B)-(C). As *Abbasi* instructs, "an alternative remedial structure present … alone may limit the power of the Judiciary to infer a new *Bivens* cause of action. For, if Congress has created "any alternative, existing process for protecting the [Plaintiff's] interest," that itself may "amoun[t] to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Wilkie v. Robbins,* 551 U.S. 537, 550 (2007); see also *Bush v. Lucas*, 462 U.S. 367, at 385–388 (1983) (recognizing that civil-service regulations provided alternative means for relief) . The EDR Plan provided such a process, which creates a "constitutionally meaningful" difference from the *Davis* Plaintiff for whom it truly was 'damages or nothing'.

Third, while *Davis* dealt with a Congressman, this case deals with "a new category of defendants" – including a Federal Defender. The "*Abbasi* Court 'refused to extend *Bivens* to any . . . new category of defendants,' and pointed out categories that had been found to be meaningfully

6

distinct from the three *Bivens* cases, such as "federal employer[s]," "military officers," "Social Security officials," a "federal agency," a "private prison operator," "officials from the Bureau of Land Management," and "prison guards at a private prison." *Tun-Cos*, 922 F.3d at 525 (*citing Abbasi*, 137 S.Ct. at 1857). In *Tun-Cos*, the Fourth Circuit found a "meaningful difference" between the narcotics officers in *Bivens* and the ICE officers in *Tun-Cos*, even though both were Executive Branch law enforcement officers. *Id.* at 525. The "new category of defendants" here, including the Defender, is, under *Tun-Cos* and *Abbasi*, meaningfully distinct from the Legislative Branch's Congressman in *Davis*. *Id.* (citing *Abbasi*, 137 S.Ct. at 1857).

As the Supreme Court has also emphasized, "the new-context inquiry is easily satisfied," *Abbasi*, 137 S.Ct. at 1865, and "'even a modest extension is still an extension' for purposes of the new-context analysis." *Tun-Cos*, 922 F.3d at 519 (*quoting Abbasi*, at 1864). Each of the differences between *Davis* and this case such as (1) the generality of Plaintiff's far reaching conspiracy theories regarding eleven federal defendants and the specificity of *Davis's* gender discrimination, (2) this case's sexual harassment allegations; (3) the retaliation claims Plaintiff fails to address in her Response; (4) the existing alternative process under the Plan; and (5) the "new category of defendants" in this case would be fatal to her *Bivens* claim, provide "constitutionally meaningful" distinction from *Davis* and require the Court to consider "special factors." Taken together, the distinctions are substantial and, clearly, this case introduces a 'new *Bivens* context.'

**B.    Special factors counsel against implying a *Bivens* cause of action and contrary to Plaintiff's argument were not rejected in *Davis*.**

"In determining whether 'special factors' are present, [courts] focus on whether Congress **_might doubt_** the need for an implied damages remedy." *Tun-Cos*, 922 F.3d at 525 (quoting *Abbasi*, 137 S.Ct. at 1858)(emphasis added). Courts should not extend "the application of *Bivens* to [a]

7

new context [if doing so] causes [the court] to hesitate, as it raise[s] the substantial question of whether Congress would want plaintiffs to have a money damages remedy against [federal officials]." *Id.* at 528. Applying the "might doubt" and "cause hesitation" standards, Plaintiff's arguments fail, as there is strong reason to believe "Congress *might doubt*" the need for an implied damages remedy, and extending a *Bivens* remedy here "causes hesitation."

**Federal employment is a special factor.** Recognizing that three different Circuit Courts of Appeals support Defendants' position that federal employment constitutes a "special factor" precluding implication of a *Bivens* cause of action, Plaintiff attempts, but fails, to distinguish them. Contrary to Plaintiff's position, the Second Circuit's decision in *Dotson v. Griesa*, 398 F.3d 156, 176 (2nd Cir. 2005) directly addresses issues central to this case. In considering a probation officer's *Bivens* claim for racial discrimination and denial of due process, the Second Circuit carefully considered the CSRA's structure and history, determining that "Congress's exclusion of most judicial branch employees from the statutes review procedures was not inadvertent but deliberate." *Id.* at 160 & 163-171. The *Dotson* court based its opinion on (1) the CSRA's comprehensive nature, (2) the CSRA's amendment history, and (3) the judiciary's comprehensive review process under the Model EDR Plan. *Id.* at 169-176. Then the court held "we conclude that judicial branch employees such as *Dotson* no less than other federal employees covered by the CSRA are precluded from pursuing *Bivens* damages actions for adverse employment decisions." *Id.* at 176. The Second Circuit did not "mistakenly conflate discrimination claims with other typeof claims," but specifically denied both of the Fifth Amendment discrimination and due

Plaintiff's attempts (Resp., 18) to distinguish *Lee v. Hughes*, 145 F.3d 1272 (11th Cir. 1998) also fail. *Lee* provides a very careful examination of the interrelationship of *Davis* and the CSRA, with the Eleventh Circuit finding that "the *Davis* Court did not consider the effect of the CSRA on

process claims because the CSRA precludes *Bivens* claims from "adverse employment decisions." *Id.*[4] Davis's *Bivens* claim because the CSRA had been enacted immediately prior to the ruling on the preemptive effect of the Act was not an issue before the Court." *Id.* at 1275.[5]

Plaintiff also attempts to distinguish *Blankenship v. McDonald*, 176 F.3d 1192, 1195 (9th Cir. 1979) arguing that it only applies to non-discrimination claims; however, the Ninth Circuit, in denying a federal court reporter's *Bivens* claim, held:

> The CSRA contains an "elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations ..." *Bush,* 462 U.S. at 388 .... Because congressional action has not been inadvertent in providing certain remedies and denying others to judicial employees, we hold that the CSRA precludes a *Bivens* remedy in this case. *Accord Lee v. Hughes,* 145 F.3d 1272, 1275 (11th Cir.1998). Congress has given judicial employees certain employment benefits and remedies, such as back pay, severance pay, family and medical leave, and health and retirement benefits. Congress has withheld other benefits and remedies, such as review of adverse personnel decisions. This demonstrates that the lack of more complete remedies was not inadvertent ....

Although *Blankenship* did not involve employment discrimination or retaliation issues, its logic applies with equal force to *Bivens* claims making such allegations.

Plaintiff also ignores the seminal Supreme Court case, *Bush v. Lucas*, claiming that the Fourth Circuit has limited its CSRA preclusive effect to non-discrimination cases. Resp., p. 18.

---

[4] Attempting to undercut *Dotson*, Plaintiff relies upon *Whitman v. Dep't of Transp.,* 547 U.S. 512, 514 (2006), which is inapposite. *Whitman* involved the issue of whether an FAA employee in challenging drug testing could proceed under the CSRA even though he had not exhausted grievance procedures under a CSRA-modified statutory scheme for FAA employees. *Whitman* is not a *Bivens* claim, and in no way undercuts *Dotson*.

[5] The CSRA went into general effect on January 11, 1979, Pub.L.No. 95-454, 92 Stat. 1111 (October 13, 1978), with certain provisions having later effective dates. Although the Supreme Court issued its opinion in Davis on June 5, 1979, Davis was terminated on July 31, 1974, *Davis*, 442 U.S. at 230. Plaintiff's interpretation would have the CSRA apply retroactively; however, "[r]etroactivity is not favored in the law ... [and] congressional enactments . . . will not be construed to have retroactive effect unless their language requires this result." *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208 (1988). The CSRA does not indicate that it was intended to apply retroactively.

*Bush* and the Fourth Circuit's CSRA cases interpreting *Bush*, however, are not based on a discrimination versus non-discrimination distinction, but rather that the CSRA precludes all cases arising out of the federal employment relationship. *Hall v. Clinton*, 235 F.3d at 205 ("The salient fact is that [because] the wrongful acts … arose out of her federal employment, *Bush* and *Zimbelman* dictate that Hall's claim is precluded."); *Zimbelman v. Savage*, 228 F.3d 367, 369 (4th Cir. 2000)("special factor of … federal employment" precludes *Bivens* claim).

Plaintiff attempts to invoke Title VII, arguing that Congress left "undisturbed whatever remedies" the employee "might otherwise possess." Resp., 16 (quoting *Davis*, 442 U.S. at 246-48). This argument dealt with the Fifth Circuit's holding that Title VII foreclosed all judicial remedies, even constitutional claims for those employees like *Davis* who were excepted service employees not covered by Title VII. Defendants have never argued that Title VII precluded *Bivens* action, generally, though Title VII is wholly inapplicable in this case, as addressed in Section III.

Plaintiff also misreads the CSRA's exception, 5 U.S.C. §2302(d), which preserved specific enumerated actions under Title VII and other specific federal statutes. Plaintiff's claims here do not fit under any of the enumerated actions excepted under the CSRA. Instead of supporting Plaintiff's position, the specificity of 5 U.S.C. §2302(d) provides further support that Congress intended the CSRA to be the exclusive remedy.

**Judicial independence is a special factor.** Plaintiff argues that judicial independence is not a "special factor" because the doctrines of … qualified immunity are enough, the judiciary's personnel system is not "special," and "they have no reason to worry if they follow the law." Resp., 19-20. To the extent this applies to the Defender, personally, this special factor has been addressed.

**Judicial Council and Judicial Conference policies are special factors.** Plaintiff argues that the Judicial Council and Judicial Conferences policies are not "special factors" because she is

10

challenging the execution of the policies, Resp., 21, but in her First Claim for Relief, Plaintiff alleges that the <u>Defendants</u> "[b]y adopting, promulgating, and implementing policies and practices" she was deprived of meaningful review, Compl., ¶495 (emphasis added). Moreover, Plaintiff repeatedly alleges that the EDR Plan was structurally flawed (Comp., ¶¶ 8, 448, 468, 470), and in her Second Claim for Relief, Plaintiff complains of the EDR Plan by alleging "Defendants" subjected "Plaintiff to harassment, retaliation, and discrimination, failing to take immediate and effective action on her complaints, and failing to provide her with meaningful review or remedies," Comp., ¶497. Her complaints about the Defender's use of the EDR Plan generally relate to his alleged failure to provide her with a copy of the Plan (or with an employee handbook prior to July of 2018) and his subsequent following of the "flawed" Plan. This issue is a "special factor," as previously articulated.

**The Fourth Circuit's Plan is a special factor.** Plaintiff argues that the Plan is not a special factor because the "EDR policy provided no meaningful remedies or review and was not 'constitutionally adequate.'" Resp., 21-22. Plaintiff's criticism of the Plan is unrelated to the Defender, who Plaintiff has not alleged, and cannot allege, had any part in drafting, reviewing, or "adopting" it. Even if the Defender had such input, Plaintiff's withdrawal of her Chapter X claim and failure to exhaust her remedies under the Plan raise "special factor" issues and preclude her from now arguing that she would have had rights under Chapter X if she had continued. To the contrary, Plaintiff could have had numerous options for proceeding with her claims under the Plan. Plan, Ch. X, §1(B)-(C). Moreover, Plaintiff's subjective allegation that the Plan is "constitutionally inadequate" fails to establish a *Bivens* action against the Defender. Resp., pp. 21-22.

Plaintiff also argues the Plan did not provide the "appropriate remedies" she desired, Resp., 9; however, for purposes of constituting a "special factor," "alternative, existing process" and not

11

"remedies" is the appropriate focus. See *Abbasi*, 137 S.Ct. at 1858 ("[I]f there is an alternative remedial structure present … that alone may limit the power of the Judiciary to infer a *Bivens* cause of action.") *see also Dotson*, 398 F.3d at 176 (Congress's decision to exclude judicial branch employees from the administrative and judicial review procedures of the CSRA, and from subsequent legislation, such as the CAA, was not inadvertent, but a conscious and rational choice …. For all these reasons, we conclude that judicial branch employees such as Dotson … we are precluded from pursing *Bivens* damages action for adverse employment actions.")

The Fourth Circuit also addressed and rejected the remedy argument Plaintiff makes. In *Hall*, as the Fourth Circuit noted, "[t]hat the CSRA does not provide the remedy she would prefer is of no moment." Hall, 235 F.3d at 205; *see also Bush*, 462 U.S. at 388-90. (refusing to allow a *Bivens* action even though 'existing remedies [did] not provide complete relief); *Zimbelman*, 228 F.3d at 370-71 (4th Cir. 2000)(holding that plaintiffs were not released from the exclusive remedial framework of the CSRA when their claims arose from their federal employment even though the CSRA provided plaintiffs with no remedy). The question of preclusion under the CSRA does "not turn on 'the merits of the particular remedy' sought but on 'who should decide' what remedy, if any, should be provided." *Dotson*, 398 F.3d at 176 (quoting *Bush,* 462 U.S. at 380). Accordingly, Plaintiff's focus on the remedy she prefers is the wrong focus. The right focus is Congressional intent and whether its decision not to extend the CSRA to the judiciary was intentional or inadvertent. *Kostishak v. Mannes*, 145 F.3d 1325, 1999 WL 196607 *2 (4th Cir. 1998) (unpub., attached as <u>Exhibit A</u>)("[W]here Congress has established an adequate remedial scheme for the vindication of constitutional rights, the Court has refused to extend a *Bivens* remedy, even if the Congressional scheme is not as effective as a *Bivens* remedy would be.")

In support of her contention that the Plan was not a "special factor," Plaintiff baldly asserts that it was not "constitutionally adequate." Resp., 21-22. But again, Plaintiff glosses over the fact that she withdrew her Chapter X claim. Plaintiff had no legal right under the Plan or under the Constitution to know the inner workings of the investigation and timing of the various provisions of the Plan, including what disciplinary action was taken against whom, when, or for what specific reasons. Plaintiff also had no legal right to make demands about access to the investigation report, or about her disqualification request.[6] Plaintiff's criticism of the Plan that it would, had she followed it, have allowed the Defender to cross-examine her at a hearing also does not set forth a constitutional violation. Similarly, her belief that the investigator was unqualified to handle parts of the investigation does not create any constitutional violation. Plaintiff's argument that the final hearing officer "had no independent legal authority to order remedies against an FDO" Resp., 8, 10-12, ignores that, under the Plan, the presiding judicial officer "may order a necessary and appropriate remedy" and the employing office can then effectuate any employment action ordered. Plan, §12. Her speculation as to what the employing office may or may not have done is irrelevant. Finally, regarding Plaintiff's contention that information was improperly shared, she fails to establish a violation of the Plan or otherwise. *Cf. Kostishak*, 1999 WL 196607 *3 (4th Cir. 1998) (unpub.)(upholding 4th Circuit's EDR Plan against challenge that it was procedurally defective).

---

[6] Plaintiff's disqualification request did not present a conflict of interest under the Plan because the Defender represented the employing office. Plaintiff argues that the employing office had responsibilities under the Plan to act and then inexplicably argues that the Defender should have been "conflicted out" from representing its interest as an "employer" in an employment matter. Following Plaintiff's argument would have resulted in the First Assistant, who allegedly harassed her, taking responsibility for the FDO. In any event, Plaintiff withdrew her Chapter X complaint before Chief Judge Gregory acted on her request.

13

**III.** **Title VII does not apply to this case, does not create a Constitutional claim for Plaintiff, and does not create individual liability for the Defender.**

Plaintiff also improperly conflates Title VII with constitutional Fifth Amendment claims, concluding that "[i]n evaluating these claims, courts apply the well-established standards developed in similar litigation under Title VII …" Resp., p. 2. However, Congress has unequivocally chosen not to apply Title VII to the judicial branch. *See* initial briefing; *see also* Congressional Accountability Act of 1995, Pub.L.No 104-1 (1995), 2 U.S.C. §§1301, 1434. Plaintiff concedes that Title VII does not apply to the FDO since it is excepted from coverage under Title VII. 42 U.S.C. § 2000e-16(a); Resp., p. 15. Plaintiff's reliance on parts of the Title VII statute and case law interpreting it does not create a Constitutional *Bivens* claim for her. In fact, applying Title VII would require dismissal of Plaintiff's claims against the Defender, as Title VII does not apply to individual employees, since they are unambiguously not "employers" under the statute. *See Lissau v. Southern Food Service, Inc.*, 159 F.3d 177, 178 (4th Cir. 1998) (**holding**: "employees are not liable in their individual capacities for Title VII violations.")

In essence, Plaintiff seeks to have this Court apply parts of Title VII's extensive body of law that may be favorable to her case, such as certain affirmative defenses, while also asking this Court to reject the portions that would be disadvantageous to her. Most notably as to her case against the Defender, she seeks to hold him individually liable for alleged sexual harassment by another employee, which would be squarely impermissible under Title VII. She also seeks to hold him individually liable for her amorphous 'retaliation' and sex discrimination claims. Throughout her Response, she also seeks to have the Court impose EEOC Guidance as controlling authority. Concurrently, Plaintiff seeks to have this Court disregard the portions of Title VII that do not benefit her, such as the individual liability issue identified above, the damages caps (see 42 U.S.C.

14

§1981a(b)(3)), requirements that she exhaust administrative remedies through the EEOC (42 U.S.C. §2000e-4), among other requirements and limitations unique to Title VII claims, as well as certain rights and benefits Title VII provides to covered employers. Plaintiff cannot have it both ways. Either (a) the provisions of Title VII apply and individual employees, including the Defender, are shielded from liability since they are not "employers"; or (b) Title VII does not apply and the statute, the Title VII case law interpreting specific issues, the EEOC Guidance, and the other resources cited are irrelevant. Here, option (b) undoubtedly applies.

Still, Plaintiff attempts to have this Court apply directly to the Defender, individually, the complex affirmative defense unique to employers under Title VII. In fact, Plaintiff continually refers to "employer" liability and "government officials," while suggesting that <u>vicarious liability</u> should apply to the Defender. *See* EEOC Guidance cited throughout the Response, entitled "**<u>Vicarious Liability</u> for Unlawful Harassment by Supervisors**", 1999 WL 33305874. This Guidance was promulgated in the wake of the Supreme Court's decisions in two seminal Title VII cases decided on the same day in 1998. *See Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998); *see also* Guidance, Intro. Plaintiff manipulates the Guidance to identify what she believes the Defender "should have done" in response to her vague complaints to him in July of 2018. Resp., pp. 3-4. Incidentally, the issues she raised to the Defender prior to their August 9-10 exchanges clearly constituted "[m]ere dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions." *Melendez v. Bd. of Educ. for Montgomery Cty.*, 711 F. App'x 685, 688 (4th Cir. 2017). These are not protected <u>even by the inapplicable Title VII</u>, as they are not the type of objectively "severe or pervasive" <u>sexual or sex-based</u> harassment the Supreme Court has

long required.[7] *See*, *e.g. Clark County School Dist. v. Breede*n, 532 U.S. 268, 270 (2001) (*per curiam*), quoting, in part, *Faragher*, 524 U.S. at 786 ("sexual harassment is actionable under Title VII only if it is "so 'severe or pervasive' as to 'alter the conditions of the [Plaintiff's] employment and create an abusive working environment.")

In any event, the *Faragher/Ellerth* decisions, which have generated a substantial body of often conflicting and confusing case law[8], set forth the framework for an <u>affirmative defense</u> an **<u>employer</u>** <u>may use</u> under Title VII in certain circumstances relating to sexual harassment claims[9]. Briefly, the defense allows <u>employers</u> to avoid liability by raising an affirmative defense for the imputation of sexual harassment of a supervisor to an employer. *See id.* at 807. This affirmative "defense comprises two necessary elements: [1] that the <u>employer</u> exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and [2] that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* (emphasis added). In response to these decisions, the EEOC then stepped in and <u>recommended</u> the 'best practices' measures **<u>a covered employer</u>** may take to avail itself of the affirmative defense, which are the numerous procedures Plaintiff cites in her Response as controlling authority. Contrary to Plaintiff's arguments, however, the Supreme Court has concluded that EEOC Guidance "lacks the persuasive force that is a necessary precondition to deference under *Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944)," meaning it

---

[7] Plaintiff admits that she never provided the alleged "*quid pro quo*" e-mail or any other documentation to the Defender. Compl. ¶ 134
[8] *Faragher* alone is cited in over 10,000 court opinions.
[9] Plaintiff also conflates her sexual harassment claims with her allegations of retaliation. As noted, these are two entirely separate issues requiring entirely separate analyses.

does not constitute precedent even in Title VII cases. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 340 (2013). This Court should refuse Plaintiff's demands to apply it as binding authority.

Regardless, the EEOC Guidelines do not establish any affirmative <u>duty</u> to employers, much less on individual employees like the Defender, to implement the EEOC's suggestions. This fact is especially true in cases like this one <u>where Title VII is inapplicable</u>. Accordingly, Plaintiff's reliance on the EEOC Guidelines, much like her reliance on an Americans with Disabilities Act case filed against the FDO's predecessor entity years before the Defender was appointed[10], is misplaced and inapplicable to her claims against the Defender, in any "capacity."

After setting forth what she believes the Defender "should have done," she then claims, again without citing any binding authority, that the Defender individually and collectively with the other ten Defendants "retaliated against her." Resp., pp. 5-12. In support of her claim of alleged retaliation[11] by the Defender, specifically, she points to three alleged actions: (1) "[h]e criticized and berated her for going to some other party with her complaints"; (2) "[h]e trivialized her complaints by saying there was no 'physical contact'"; and (3) "[h]e prejudged the investigation by telling her she would have to return to her harasser's duty station as soon as [the investigation] was over.[12]" Resp., p. 4. She also claims that he <u>forced</u> her to "telework", even though she

---

[10]  Plaintiff relies upon a case filed in the WDNC in <u>2013</u> against a predecessor federal defender's office. *Carlin*, WDNC Case No. 3:13-cv-00365. The case involved another former employee's claims for alleged violations of the ADA based on events arising <u>in 2011</u>. The Defender was appointed <u>at least six years</u> after the underlying facts occurred. The case was settled and dismissed accordingly, so *Carlin* has no precedential value. The mere <u>filing</u> of another lawsuit under entirely different facts, circumstances, and legal theories, involving a completely different set of individual employees does not equate to evidence of ongoing unlawful discrimination.

[11]  **<u>Like all other Title VII claims, 'retaliation' claims are also only applicable to employers, not to individuals like the Defender.</u>**

[12]  This allegation (#3) differs from the allegations in her Complaint that the Defender "said he would 'allow' [her] to telework temporarily, <u>but he was 'reserving the right' to require her to return</u>

17

unilaterally decided to "take leave" without first requesting it. Compl. ¶157. When the issue was addressed with the Defender, he "said he would 'allow' her to telework temporarily." ¶219. The Defender also discussed options with her so she could comfortably continue working while her complaints went through the investigative process, a process over which the Defender had no control. ¶¶205-207. He agreed to all of them except her duty transfer request. ¶207.

Plaintiff then vaguely lists, without supplying any factual context as it relates to the Defender or anyone else, actions allegedly taken together "with the Fourth Circuit and the [OGC]…to shut down the efforts to take immediate and effective action on her complaints." Resp., p. 5. None of the allegations in the Complaint establish that the Defender personally violated any of Plaintiff's non-existent Constitutional rights but instead reflect Plaintiff's continued attempt to impose liability on all of the Defendants, collectively, for the inadequately pled actions of various individuals and government agencies.

## IV. The Defender is entitled to qualified immunity and dismissal of Plaintiff's 42 U.S.C. §§1985(3) and 1986 claims.

What is applicable to the Defender in this case is his clear entitlement to qualified immunity, even assuming Plaintiff has a *Bivens* claim, which she does not.[13] She fails to distinguish the prolific binding authority on qualified immunity. *See* Defendants' initial briefing generally, *citing*

───────────────

to the First Assistant's duty station as soon as the investigation was over". Compl. ¶219. At first glance, this alternate language may seem like a distinction without a difference. However, there is a significant difference. Under the Complaint, the Defender simply said he might, depending on the results of the investigation, require her to return. Plaintiff's new version of the statement is much more threatening, though it still does not allege actionable retaliation. Courts rely on the well-pled allegations of the Complaint in ruling upon motions to dismiss.

[13] Plaintiff refers to qualified immunity, generally, but does not substantively address the dispositive issue as it relates specifically to the Defender. Resp., pp. 23-24.

*Abassi et al.* Plaintiff's failure to address the legal standards and controlling authority underscores the weakness of her arguments, and qualified immunity bars her claims against the Defender.

### 1. Step One: Plaintiff fails to allege plausibly that the Defender personally violated her Constitutional rights.

Courts must apply qualified immunity's two-step inquiry to identify whether each defendant <u>personally</u> (1) violated a constitutional right <u>and</u> (2) "whether the right violated was clearly established" at the time of the official's conduct. *D.C. v. Wesby*, 138 S.Ct. 577, 587 (2018)(quoting *Reichle v. Howard*, 566 U.S. 658, 664 (2012)); *Booker v. South Carolina Dept. of Corrections*, 855 F.3d 533 (4th Cir. 2017). "Courts have discretion to take these steps in either order," *Booker*, 855 F.3 at 538, but they do not have discretion to ignore the two-step inquiry and assume that because 'Defendants' "should already know about sex discrimination.". Resp. at 22.

The type of sweeping generality Plaintiff employs has been rejected by courts across the country again and again. The Supreme Court has "repeatedly told [lower] courts … not to define clearly established law at a high level of generality." *Kisela v. Hughes*, 138 S.Ct. 1148 (2018)(*per curiam*). As the Fourth Circuit also instructs, courts "must first define the right at the 'appropriate level of specificity,'" *Wilson v. Layne*, 526 U.S. 603, 615 (1999). Plaintiff's generalized proposition that Defendants "should know what sexual discrimination is" does not define any right at all, much less at the appropriate level of specificity. In fact, Plaintiff does not identify a single case with the authority and specificity required to overcome the Defender's qualified immunity. Plaintiff's failure to cite controlling authority or a consensus of persuasive authority precludes her from overcoming the Defender's qualified immunity because:

> In conducting the clearly established analysis, we first examine "cases of controlling authority in [this] jurisdiction," *Amaechi v. West*, 237 F.3d 356, 363 (4th Cir. 2001) (quoting *Wilson v. Layne*, 526 U.S. 603, 617, (1999))—that is, "decisions of the Supreme Court, this court of appeals, and the highest court of the

state in which the case arose," *Owens ex rel. Owens v. Lott*, 372 F.3d 267, 279 (4th Cir. 2004) (internal quotations omitted). We "ordinarily" need not look any further than decisions from these courts. *Booker*, 855 F.3d at 538.

Controlling authority or a consensus of persuasive authority must not only exist, it must be sufficient to send a clear signal to a reasonable official that certain conduct falls short of the constitutional norm. Plaintiff cites two cases, *Hurd v. Hodge*, 334 U.S. 24, 35-36 (1948) and *Murray's Lessee v. Holboken Land & Imp. Co.*, 59 U.S. 272 (1855) for the general principle that the Fifth Amendment applies to the judiciary. In the 1948 *Hurd* case, the Supreme Court held that judicial enforcement of restrictive covenants that would prohibit a person from owning or occupying property based on race or color violated the Civil Rights Act of 1866. In *Murray's Lessee*, the 1855 Court held that a distress warrant issued by the solicitor of the treasury was constitutional. Neither of these cases address whether a Federal Defender (or any other federal employee) violated any constitutional duty owed to a plaintiff based on the employment law concepts of sex discrimination, sexual harassment, constructive discharge, or retaliation.

Moreover, to defeat qualified immunity "[a] plaintiff must plead that each Government-official defendant, through the official's individual actions has violated the Constitution." *Iqbal*, 556 U.S. at 676. Otherwise, "[q]ualified immunity attaches [to the Defender's] conduct, [which did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *City of Escondido, Cal. v. Emmons*, 139 S.Ct. 500, 503 (2019) (*quoting Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018)(per curiam). The Fourth Circuit has instructed: "For an official to lose the protections of qualified immunity, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). There is no such precedent for Plaintiff's claims and the Defender is immune from this lawsuit.

20

**2. Fourth Circuit precedent forecloses Plaintiff's claims under 42 U.S.C. §§ 1985(3) and 1986.**

Rather than address the controlling decisions in *Hall v. Clinton* and *Trerice v. Summons*, 755 F.2d 1081 (4th Cir. 1985), Plaintiff makes a flawed statutory argument under 42 U.S.C. §§1985(3) and 1986. Plaintiff's argument fails for many reasons.

First, the Fourth Circuit foreclosed Plaintiff's argument that statutory repeal by implication is disfavored, deciding: "Because 'Congress clearly intended the CSRA to be the exclusive remedy for federal employees,' the comprehensive grievance procedures of **the CSRA implicitly repealed all other then-existing statutory rights of federal employees regarding personnel decisions**." *Hall*, 235 F.3d at 206 (emphasis added). Hall then recognized a broad bar applying her to both of Plaintiff's statutory claims: "[W]e hold that Congress intended the CSRA to exclude ***all*** other statutory remedies for claims arising out of the federal employment relationship." *Hall*, 235 F.3d at 206 (emphasis added). While *Hall* dealt with a § 1985(1) claim, the holding applies to "***all*** other statutory remedies for claims arising out of the federal employment relationship," including Plaintiff's §§1985(3) and 1986 claims here. *Id..; see also* Compl. ¶1. ("This action seeks relief for the deprivation of constitutional rights suffered by [Plaintiff] during her employment as a federal judiciary employee.").

Second, Plaintiff's argument regarding her §1986 claim is foreclosed by *Trerice v. Summons* because "[a] cause of action based upon a §1986 is dependent upon the existence of a claim under §1985," so the dismissal of plaintiff's §1985 claim requires the dismissal of a §1986 claim. *Trerice*, 755 F.2d at 1085. Plaintiff attempts to avoid *Trerice* by citing *A Soc'y Without a Name v. Commonwealth of Va.*, 655 F.3d 342 (4th Cir. 2011)("ASWAN"); however, ASWAN does not address *Trerice*, much less overrule it. In *ASWAN*, the Fourth Circuit dealt with a

homeless advocacy group that argued that the relocation of a homeless shelter from Richmond's downtown community to a remote location was motivated by discriminatory animus, in violation of 42 U.S.C. §§1983 and 1985(3). The Fourth Circuit affirmed the dismissal of the case, and, as to the §1985(3) claim, held that allegations of parallel conduct and a bare assertion of conspiracy failed to state a claim under §1985(3). *Id.* at 347.

Next, although her Complaint is prolix, covering 85 pages and 505 allegations, she fails to allege "concrete supporting facts," but instead conclusively claims a conspiracy, which is insufficient as a matter of law. *Simmons v. Poe*, 47 F.3d 1370, 1376 (4th Cir. 1995)("We have specifically rejected §1985 claims whenever the purported conspiracy is alleged in a merely conclusory manner, in the absence of concrete supporting facts."). Plaintiff's conclusory allegations of conspiracy also fail to allege with any specificity (a) the persons who agreed to the alleged conspiracy; (b) the specific communications amongst the conspirators; or (c) the manner in which any such communications were made. *Id.* Allegations like Plaintiff's are "insufficient to support a meeting of the minds by" the Defender and any other defendant(s) and, at most, amount to allegations of parallel conduct and a bare assertion of a conspiracy insufficient to survive Defendants' motions to dismiss.

Plaintiff also fails to allege the necessary unlawful intent required to proceed with her §§1985 and 1986 claims. *See Gooden v. Howard County*, 954 F.2d 960, 969-70 (4th Cir. 1992) (*en banc*)("To avoid evisceration of qualified immunity, courts have thus required that plaintiffs alleging unlawful intent in conspiracy claims under § 1985(3) . . . plead specific facts in a nonconclusory manner <u>to survive a motion to dismiss</u>.") *Id.* Plaintiff fails to plead facts plausibly supporting an inference of unlawful intent in her conspiracy claims. Her bare allegations of malice are insufficient. *See id.*

Plaintiff's argument that this court should disregard *Buschi v. Kirven*, 775 F.3d 1240 (4th Cir. 1985), in which the Fourth Circuit adopted the intra-corporate conspiracy doctrine, also fails. Pursuant to that doctrine, a plaintiff cannot bring a civil conspiracy claim based on an agreement between "agents of the same legal entity, when the agents act in their official capacities," *Abassi*, 137 S.Ct. at 1867, and "the immunity granted under the doctrine to the agents and corporation" is not destroyed because the agents are sued individually." *Buschi*, 775 F.2d at 1252. This doctrine "has been applied in the civil rights area, involving 'officials of a public body who act within the scope of their employment.'" *Id.* In this case, Plaintiff's allegations fail to state a claim of conspiracy considering the intra-corporate conspiracy doctrine. Her argument that the doctrine does not apply to the judiciary, "which is inherently decentralized" is wholly unsupported, and Plaintiff cites no Fourth Circuit authority contrary to *Buschi*.

Finally, Plaintiff's citation to *Abbasi* and the circuit split provides further support that Defendants are entitled to qualified immunity. As the Supreme Court observed: "[T]he fact that the courts are divided as to whether or not a §1985(3) conspiracy can arise from official discussions between and among agents of the same entity demonstrate that the law on the point is not well established." *Id.* at 1868. Because of that circuit split, the Supreme Court held that the officers were entitled to qualified immunity as to claims under §1985(3). *Id.* at 1869. The Supreme Court's logic in applying qualified immunity applies with even more force in the Fourth Circuit, which <u>has</u> adopted the intra-corporate conspiracy doctrine. Plaintiff is seeking to establish an unprecedented exception to that doctrine. Therefore, the Defendants are entitled to qualified immunity.

23

### 3. Step Two: Plaintiff alleges no violation of clearly established law personally violated by the Defender or any defendant.

Under step two of the qualified immunity test, Plaintiff has also failed to allege, with the appropriate level of specificity, a clearly established right that the Defender personally violated and which "a reasonable official in his shoes would have known." She fails to produce necessary "cases of controlling authority in [this] jurisdiction" or a "consensus of cases of persuasive authority," *Booker*, 855 F.3d at 538, establishing that "each Defendant under similar circumstances . . . was held to have violated [the Constitution]." *White v. Pauly,* 137 S. Ct. 548, 552 (2017) (per curiam). Because Plaintiff sets forth no constitutional violation at all, much less a clearly established one, qualified immunity bars Plaintiff's lawsuit against the Defender. *See Abbasi*, 137 S.Ct. at 1869. A reasonable official in the Defender's shoes could not have known of a clearly established right since one does not exist here.

### CONCLUSION

For the foregoing reasons, the Federal Defender for the Western District of North Carolina respectfully requests dismissal with prejudice of the individual capacity claims against him.

This the 16th day of July, 2020.

Respectfully submitted,

**s/Shannon Sumerell Spainhour**

SHANNON SUMERELL SPAINHOUR
N.C. State Bar No. 28108
DAVIS HARTMAN WRIGHT PLLC
28 Schenck Parkway, Suite 200
Asheville, NC 28803
Phone: 828-771-0833
Fax: 252-514-9878
Email: mss@dhwlegal.com

Counsel for the Defender in his Individual Capacity

24

**CERTIFICATE OF SERVICE**

The undersigned certifies that on July 16, 2020, she electronically filed the foregoing **DEFENDANT FEDERAL PUBLIC DEFENDER FOR THE WESTERN DISTRICT OF NORTH CAROLINA'S REPLY IN SUPPORT OF HIS MOTION TO DISMISS PLAINTIFF'S INDIVIDUAL CAPACITY CLAIMS AGAINST HIM** using the Court's CM/ECF system, which will send notification of such filing to all counsel of record, including:

Cooper J. Strickland at cooper.strickland@gmail.com

Gill P. Beck at Gill.Beck@usdoj.gov

Joshua M. Kolsky at Joshua.kolsky@usdoj.gov

s/Shannon Sumerell Spainhour

SHANNON SUMERELL SPAINHOUR
N.C. State Bar No. 28108
DAVIS HARTMAN WRIGHT PLLC
28 Schenck Parkway, Suite 200
Asheville, NC 28803
Phone: 828-771-0833
Fax: 252-514-9878
Email: mss@dhwlegal.com

25