# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

### ASHEVILLE DIVISION

|  |  |  |
|---|---|---|
| JANE ROE, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Civil No. 1:20-cv-00066-WGY |
| | ) | |
| UNITED STATES OF AMERICA, *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |
| | ) | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO SET DEADLINE TO RESPOND TO EARLY DISCOVERY REQUESTS

This case involving sexual harassment, retaliation, and discrimination in the federal judiciary is currently set for trial during the Court's January 2021 trial session. *See* Minute Entry Order, May 13, 2020. Though defendants agreed to this trial date, they seek a court order postponing discovery indefinitely pending a decision on their motions to dismiss. *See* ECF No. 51. For the reasons set forth below, their motion should be denied. If warranted, Roe anticipates filing a motion to compel after a final attempt to confer with defendants regarding this discovery dispute. LCvR 7.1(b).

## FACTS AND PROCEDURAL HISTORY

On March 3, 2020, Plaintiff Jane Roe ("Roe") filed a civil lawsuit asserting constitutional and civil rights claims against her prior Federal Defender Office ("FDO"), and government officials and entities within the Fourth Circuit and the federal judiciary. ECF No. 1.

On May 11, 2020, the Court held a telephonic hearing in which it set the case for trial in January 2021, a date to which counsel for all parties consented. *See* Minute Entry Order, May

1

13, 2020.  Based on this trial date, the Court ordered that any motions for summary judgment "shall be filed on or before October 1, 2020," that a "joint pretrial memorandum is due on or before December 1, 2020," and that a "final pretrial conference will be held in December 2020." *Id.*  The Court further ordered the parties to submit a "joint proposed case management schedule within two weeks" of the hearing date.  *Id.*

On May 20, 2020, the parties held an initial attorneys' conference to confer regarding the topics required in Federal Rule of Civil Procedure 26(f) and Local Rule 16.1.  On the same day, Roe served her initial disclosures on defendants pursuant to Fed. R. Civ. P. 26(a)(1).

On May 25, 2020, the parties filed a joint statement and proposed case management schedule, in which they agreed on proposed deadlines for the case.  ECF No. 34.  For example, the parties jointly proposed completion of <u>all</u> non-expert discovery by September 1, 2020, ECF No. 34, at 4, and to require Roe's expert disclosures under Fed. R. Civ. P. 26(a)(2) on the same date, *id*.  The parties also agreed to engage in "good faith efforts" to resolve the case through a mediated settlement conference, which "would be most useful if conducted no later than the close of non-expert discovery."  ECF No. 34, at 6.

Despite having agreed to these dates, defendants disagreed with engaging in any discovery prior to a ruling on their yet-to-filed motion to dismiss.  *Id.* at 1–3.  Roe opposed any delay in discovery.  *Id.* at 3.  She explained that defendants' arguments were premature absent a motion to stay, and that delaying discovery to some later undefined date "would inevitably require moving the trial date that was already ordered by the Court without any objection."  *Id*.  Further, Roe had already served her initial disclosures and would be prejudiced by any further delay.  *Id*.

To obtain written discovery prior to taking depositions, and to prepare for the court-ordered summary judgment motion and trial dates, Roe served initial written requests for production and interrogatories on June 5 and 12. ECF Nos. 51-1, 51-2. These requests were tailored to obtain discovery "relevant" to her "claim[s]" and "proportional to the needs of the case" as required under Fed. R. Civ. P. 26(b)(1). *See*, *e.g.*, ECF No. 48, at 1–13 (describing claims for due process and equal protection violations); ECF No. 49, at 22–25 (same). However, defendants informed Roe that they would not comply. On the due date for the requests for production, defendants filed the instant motion seeking to postpone discovery. ECF No. 51.

## ARGUMENT

For many reasons, defendants' motion to delay discovery should be denied.

**1.      Defendants have waived any objection to discovery.**

First, defendants have waived any objection to proceeding with discovery. Defendants agreed to a trial date of January 2021 and a summary motion deadline of October 1, 2020, dates which were subsequently ordered by the Court without any objection. Minute Entry Order, May 13, 2020. These court-ordered deadlines set a discovery end date of September 1, 2020 by default, because Fed. R. Civ. P. 56(b) requires that any motion for summary judgment must be filed, at the latest, "30 days after the close of all discovery." Moreover, defendants agreed to a non-expert discovery end date of September 1, 2020 in the parties' joint proposed case management schedule. ECF No. 34, at 4. By agreeing to these dates, defendants "intentional[ly] relinquish[ed] or abandon[ed]" any right they may have had to postpone discovery. *Brickwood Contractors, Inc. v. Datanet Eng'g, Inc.*, 369 F.3d 385, 395 n.7 (4th Cir. 2004) (en banc).

**2.      The Federal Rules of Civil Procedure require defendants to comply with discovery.**

Second, discovery is required under the Federal Rules of Civil Procedure. Following the parties' Rule 26(f) conference, engaging in discovery is permissible, *see*, *e.g.*, Fed. R. Civ. P.

3

26(d)(2)(B), and takes precedence over any local rules regarding joinder of issues, *see*, *e.g.*, Fed. R. Civ. P. 83(a)(1). In fact, Rule 26(d)(2) was amended in 2015 specifically to allow early requests for production "to facilitate focused discussion during the Rule 26(f) conference." Advisory Committee Notes, 2015 Amendment. Moreover, Rule 26(a) requires the parties to serve initial disclosures within two weeks of the initial attorneys' conference and "imposes a burden of disclosure that includes the functional equivalent of a standing Request for Production under Rule 34." *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006) (quoting advisory committee notes). Finally, as noted above, Fed. R. Civ. P. 56(b) requires summary judgment motions to be filed, at the latest, 30 days after the close of discovery.

Defendants' reliance on the local rules is misplaced. The local rules provide "procedures that supplement the Federal Rules of Civil Procedure" and are "not intended to bind any judicial officer to any particular course of action or result." LCvR 1.1. Rather, "[e]ach judicial officer retains the discretion to apply the Local Civil Rules in a manner consistent with the demands of the case." *Id.* Though defendants rely on Local Rule 16.1, that local rule does not address, and is not applicable to, cases where the court has already ordered an Initial Attorney's Conference and set summary judgment motion and trial dates. Moreover, even that local rule recognizes that "early Rule 34 requests may be used pursuant to Fed. R. Civ. P. 26(d)(2)" *before* issues have joined. LCvR 16.1(f).

**3.      Roe is entitled to discovery on the defenses raised in the motions to dismiss.**

Third, Roe is entitled to discovery on the defenses raised in the motions to dismiss, which (1) are intertwined with the merits of her claims and (2) raise disputes of fact that cannot be resolved on a motion to dismiss. Defendants cannot contradict the complaint's factual allegations, which must be taken as true, and expect the case to be dismissed without any

discovery to test their assertions.  Further, if defendants contend that Roe is not credible, despite the corroborating evidence of her allegations in Judicial Conference policy, the EDR administrative record, and her sworn testimony under penalty of perjury, *see* Exhibit A (Sealed Affidavit), that is an issue for a fact finder to determine.

### i.    Subject Matter Jurisdiction and Sovereign Immunity.

Defendants' jurisdictional defenses under Fed. R. Civ. P. 12(b)(1) cannot be resolved in their favor without addressing Roe's claims on the merits.  It is well-established "that when the contested basis for jurisdiction is also an element of the plaintiff's federal claim, the claim should not be dismissed for lack of subject matter jurisdiction." *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc*., 840 F.2d 236, 239 (4th Cir. 1988) (citing *Bell v. Hood*, 327 U.S. 678, 682 (1946)).  Rather, "when the jurisdictional facts are inextricably intertwined with those central to the merits, the court should resolve the relevant factual disputes only after appropriate discovery." *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009).

Defendants' jurisdictional defenses raise disputes that cannot be resolved at this stage:

- Defendants assert that Roe's claims are jurisdictionally barred because the EDR process provided her with "meaningful review" by a "judicial officer" and an opportunity for "appellate review."  ECF No. 54, at 12–13; *see also* ECF No. 43, at 7–11.  However, these assertions contradict the complaint's allegations and merely create a dispute on a central element of Roe's constitutional claims.  For example, under Judicial Conference policy, EDR proceedings are "strictly administrative" and EDR presiding officers are acting in an "administrative rather than judicial capacity."[1]  *See* Exhibit B (Proceedings of the Judicial

---

[1] Though this policy is not discussed in defendants' briefs or any of the cases they cite, its importance cannot be overstated.  Because EDR proceedings are not judicial proceedings, a

Conference of the United States, at 25 (Sept. 2010)).  Moreover, the Judicial Integrity Officer

(among other agents of the judiciary) told Roe that an EDR presiding officer cannot order

remedies against an FDO, an issue which she described as jurisdictional, and on which she

followed up in an email.  *See* Exhibit C (Email from Jill Langley).  Though defendants contend

that Roe's complaints are meritless "regardless of what 'Roe was told,'" ECF No. 54, at 16, it

was objectively reasonable for Roe to rely on representations made about the EDR process by

the Judicial Integrity Officer, which would lead a reasonable person in her position to resign.

*Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004) (constructive discharge inquiry is

"objective" and focuses on whether "a reasonable person in the employee's position would have

felt compelled to resign"); *see also* ECF No. 51-1, at 7 (document request regarding the

enforceability of EDR remedies in federal defender offices).  If defendants believe that Roe's

reliance on her statements was unreasonable, they can make that argument to a fact finder.

- Relatedly, defendants contradict Roe's allegations that she was forced to resign

because of the failures of the EDR process.  They assert that Roe "voluntarily" resigned based on

one document from an EDR administrative record that they refuse to provide to Roe or the

Court.  *See* ECF No. 51-1, at 5–6 (document requests for EDR records).  Moreover, they accuse

her of using the EDR process to "extract" a "benefit" from them in the form of a "coveted"

clerkship.  ECF No. 43, at 4, 13; *see also* ECF No. 37, at 4 (Walter); ECF No. 39, at 4–5

(Ishida); ECF No. 41, at 4–5 (Gregory); ECF No. 45, at 8–9 (Martinez).  Their assertion is

hurtful[2] and unsupported, especially because it directly contradicts records in their possession

---

presiding officer is not engaged in "judicial review" any more than a supervisor making a hiring
or firing decision.

    [2] Defendants' assertions are especially hurtful given that Roe personally worked for
Director Duff, for the Fourth Circuit, and for the Federal Defender Office and was recognized as

and facts which they cannot refute. For example, defendants ignore Roe's statements, over the course of months, that she was "not welcome," Complaint ¶ 381, she was being "forced out," *id.*, her clerkship was a "very nicely packaged constructive discharge," *id.* ¶ 462, and that their failure to follow the EDR Plan "made it impossible to stay in her office," *id.* ¶ 475. They ignore Roe's emails requesting a transfer due to a hostile working environment.[3] *See* Exhibits D (Nov. 21, 2018 email), Exhibit E (Jan. 22, 2019 email). And they ignore their own admissions that Roe's forced resignation was not a good outcome. For example, after Roe first requested a transfer, Circuit Executive Ishida said it was "regrettable" for her to "even contemplate" leaving her office. *Id.* ¶ 382. After Roe's second transfer request, Chief Judge Gregory "directed" Ishida to assist her, and Circuit Executive Ishida told her that he was "sorry" to hear about her experiences. *Id.* ¶ 410. Though contrary to the facts, defendants' assertion that Roe "voluntarily" resigned is necessary to each of their arguments for dismissal, including (1) subject matter jurisdiction, ECF No. 54, at 13 ("Had Plaintiff not cut the process short, she could have obtained an adjudication of the merits of her claims."); (2) failure to exhaust, *id.* at 15 ("By failing to fully pursue the EDR process, Plaintiff prevented the judiciary from adjudicating the merits of her complaints and awarding relief if appropriate."); (3) failure to state a claim, *id.* at 19 (plaintiff "was not denied due process under the Plan because she withdrew from the process"), (4) new context for *Bivens*, ECF No. 53, at 4 (Roe "could have requested a hearing"

---

an exemplary employee. If defendants believed that Roe was not credible or that she had improper motives during the EDR process, it is hard to understand why they recommended her for a Fourth Circuit clerkship. It is also hard to understand why they acknowledged that there were a lot of "serious issues" in the FDO, that Roe's concerns were "well-founded," and that the judges were "mindful" of the need to change the office culture. Complaint ¶ 264.

[3] Though Roe is providing these documents as illustrative examples of why defendants' factual assertions cannot be taken as true on a motion to dismiss, she is not attempting to provide the entire universe of documents that may be relevant to refute their evolving defenses.

and "sought review of the hearing decision"), (5) and *Bivens* special factors, *id.* at 12 ("Plaintiff glosses over the fact that she withdrew her Chapter X claim."). Because their factual assertions are directly contrary to the complaint's allegations, their arguments cannot be resolved at the dismissal stage.

- Defendants' assertion of sovereign immunity is also intertwined with disputes that "are substantially related, if not identical, to the elements" of Roe's claims. *Al Shimari v. CACI Premier Tech., Inc.*, 775 F. App'x 758, 760 (4th Cir. 2019) (unpublished) (Exhibit F). Specifically, they contend that a federal court with jurisdiction under § 1331 cannot fashion injunctive relief against official capacity defendants by ordering declaratory relief and remedies available under EDR plans. But their logic assumes that these remedies were available to Roe during the EDR process, who in their view simply made a choice not to pursue them, making specific injunctive relief to enforce antidiscrimination remedies in an Article III court unnecessary. *See Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988) (equitable actions for specific relief to require government officials to comply with legal duties are not barred by sovereign immunity even if relief has "monetary aspects"). Of course, their assumptions about the efficacy of the EDR process are directly contradicted by Roe's complaint. If their logic were correct, then judiciary employees in Roe's position "would have no remedy at all" for discrimination. *In re Golinski*, 587 F.3d 956, 961 (9th Cir. 2009).

- Defendants' assertion of sovereign immunity is also subject to "continuing disputes of material fact." *Al Shimari*, 775 F. App'x at 760. For example, though defendants claim that Roe "expressly does not seek reinstatement," ECF No. 54, at 2, that assertion is oversimplified. Roe has broadly requested any "relief as the Court deems just and proper," Complaint p 85, which could include reinstatement and other appropriate equitable remedies if

the Court so orders based on a full evidentiary record, considering the factual circumstances at the time of judgment. Currently, however, the continuing hostility of her office makes alternative equitable remedies necessary in lieu of reinstatement, and defendants refuse to provide discovery regarding antidiscrimination training or the existence of other similar complaints. *See* ECF No. 51-1, at 12, 14. Regardless, defendants cannot seriously contest that reinstatement is a form of specific relief not barred by sovereign immunity,[4] and that alone is sufficient to defeat a motion to dismiss. *Bowen*, 487 U.S. at 893; *Dotson v. Griesa*, 398 F.3d 156, 177–79 (2005). The precise contours of appropriate equitable remedies incidental to reinstatement are premature and cannot be determined without a full factual record.

### ii. Failure to State a Claim

Dismissal on Rule 12(b)(6) grounds prior to discovery is improper where a motion to dismiss raises "questions of evidentiary sufficiency." *Crawford-El v. Britton*, 523 U.S. 574, 595 (1998); *see also Al Shimari v. CACI Int'l, Inc.*, 679 F.3d 205, 221 (4th Cir. 2012) (en banc) (noting that *Iqbal* distinguishes between "fact-based" or "abstract" issues of law at dismissal stage). However, defendants make numerous factual assertions that cannot be taken as true on dismissal:

<u>The Defender</u>

- The Defender claims that the First Assistant provided a "unique opportunity for mentorship" for Roe. ECF No. 45, at 3–4. Of course, he contradicts her allegations that the First Assistant abused his supervisory authority by using that "mentorship" as a ruse to sexually harass

---

[4] If defendants' sovereign immunity argument were correct, then no judiciary employee would ever be able to sue for injunctive relief over constitutional violations by judiciary officers. That is obviously not the case. *See Guffey v. Duff*, No. 18-CV-1271 (CRC), 2020 WL 2065274, at \*20 (D.D.C. Apr. 29, 2020) (enjoining enforcement of AO policy that violated First Amendment under § 1331).

her.  *See* Complaint ¶¶ 63–122.  These allegations were also the basis for her EDR complaint and, presumably, of disciplinary action taken by Chief Judge Gregory.

- The Defender reads into Roe's complaint a purported failure on her part to "provide[] any of th[e] documentation, or the texts or emails identified in the Complaint to the Defender."  ECF No. 45, at 4 n.5.  In fact, as the Defender knows (and the EDR administrative record shows), Roe asked to provide him documentation of the First Assistant's inappropriate behavior, but he said those documents were not "relevant" because he was only interested in moving forward.

- The Defender claims that Roe "would prefer the Defender to be removed from office, and that the First Assistant (and others) lose their jobs."  *Id.* at 2 n.1.  That allegation appears nowhere in Roe's complaint.  On the contrary, though Roe was repeatedly asked for her "demands," Complaint ¶ 337; *see also id.* ¶¶ 205, 273, she did not "demand" for anyone to be fired.  *See also id.* ¶ 439 (Judicial Integrity Officer's comments that "a presiding officer would not have authority to order the First Assistant's termination").  Instead, she repeatedly stated that "all she wanted was to do her job without being harassed or threatened."  *Id.* ¶ 205; *see also id.* ¶ 272 ("Roe told the EDR Coordinator that she 'wanted' two things: (1) a full and fair investigation that included the full scope of her allegations, and (2) the opportunities for professional advancement that she had before raising complaints about the First Assistant."); *id.* ¶ 275 ("Roe requested the following relief: 'An environment free of harassment, retaliation, and discrimination, the opportunity for merit-based advancement, and any other appropriate relief.'").  She also expressed her frustration to the EDR Coordinator and Chief Judge Gregory that they were placing the burden on her to initiate the solutions to her complaints rather than requiring appropriate action themselves.  Complaint ¶¶ 322–32, 401.

10

- The Defender asserts without any factual basis that Roe "unilaterally decided to 'take leave' without first requesting it." ECF No. 52, at 18. In fact, Roe properly requested and took leave that was an earned benefit to which she was entitled as a federal employee, because she felt unsafe and unprotected in her workplace. Complaint ¶ 157. As the Defender knows (and the EDR administrative record shows), he returned some of the sick leave Roe had taken because of the harassment in the form of administrative leave. More disturbingly, the Defender ignores that Roe was acting on the advice of the AO's Fair Employment Opportunity Officer, who "encouraged Roe to continue calling in sick as a way to protect herself." *Id.* ¶ 162. By suggesting that Roe was being insubordinate merely for taking that advice, the Defender is confirming his continued hostility towards her exercise of protected rights.

- The Defender repeatedly asserts that Roe's reports of harassment were "vague" and "assurances" that she was *not* complaining about sexual harassment. ECF No. 45, at 4. He also trivializes her complaints as "mere dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions." ECF No. 52, at 15 (quotation omitted). His assertions directly contradict the complaint's allegations that on July 2, 2018, Roe reported to him that she would be "drawing boundaries" with the First Assistant because he had behaved "inappropriately" towards her, and "she was leaving the office early every day to avoid issues with him." Complaint ¶¶ 124–25. Roe said she was not making a formal complaint of sexual harassment "yet," *not* because she did not believe she was being harassed, but because she was trying to self-manage the situation first by talking to the First Assistant directly. *Id.* In other words, Roe was doing exactly what employees in her situation are routinely advised to do (and what she was advised by both an attorney coworker, *id.* ¶ 119, and an experienced mentor, *id.* ¶ 123), which is to try to resolve complaints at the lowest level first before escalating them. *See*

11

EDR Plan Ch. IX (2013) (employees "are encouraged to report wrongful conduct . . . as soon as possible"); *id.* Ch. X § 2 (encouraging employees "to bring his or her concerns to his or her supervisor" before bringing a formal request for counseling).[5]  And though the Defender claims that Roe met with the First Assistant "without [his] knowledge," ECF No. 45, at 5, the purpose of her July 2, 2018 meeting with him was to "notify" him of her plan to "draw boundaries" with the First Assistant, and to ask for his support and confidence.  Complaint ¶¶ 124–25.  However, after her attempt to confront the First Assistant was unsuccessful, *id.* ¶¶ 127–33, Roe reported again to the Defender on July 5, 2018 that the First Assistant "was interfering with her ability to do her job and that she felt threatened by him."  *Id.* ¶ 143.  For example, "the First Assistant had asked her repeatedly to meet out of the office."  *Id.*  He had "waited for her in the lobby at night when he knew she was alone."  *Id.*  She repeated to the Defender "that she was leaving the office early every day to avoid being alone with him."  *Id.*  The Defender acknowledged the significance of her complaints by stating that he did not want her to feel "uncomfortable" or "unsafe."  *Id.* ¶ 144.  But he then immediately required her to meet with her harasser, *id.*, assigned her to work directly under her harasser's supervision, *id.* ¶¶ 148–56, and enforced a hostile, discriminatory, and retaliatory working environment without taking any action on her complaints, *id.* ¶¶ 163–83, 195–256, 338–54.

- The Defender claims that he "consistently resisted" Roe's transfer to another duty station with "less supervision."  ECF No. 45, at 8.  On reply, he asserts that Roe cannot question or probe through discovery his newly stated reason for refusing the transfer, after his prior stated

---

[5] For similar reasons, the Defender's assertion that Roe did not "initiate" a meeting with him as encouraged by the Plan, ECF No. 45, at 6 n.7, contradicts her allegations that she did meet with him multiple times to raise her concerns, which he ignored.  *See, e.g.*, Complaint ¶¶ 124–25, 143–44.

reason about lack of office space was revealed as pretext, Complaint ¶¶ 339, 418, because he had "reasonable concerns" about potential claims of ineffective assistance of counsel, ECF No. 52, at 4. This assertion cannot be resolved in his favor at this stage for several reasons. First, no one has ever raised concerns about Roe's job performance or suggested that she provided ineffective assistance of counsel. On the contrary, Roe was consistently praised for her excellent job performance by the Defender and others. *See*, *e.g.*, Complaint ¶¶ 78, 109, 128, 144, 148, 149, 192. If defendants intend to raise a performance issue, then Roe needs notice of that defense as well as the opportunity to obtain discovery on performance issues and ineffective assistance of counsel by other attorneys in the FDO.[6] Second, if the Defender believed Roe was vulnerable to ineffective assistance of counsel claims, then presumably he would not have offered her a position as an assistant federal public defender with her own caseload and given her opportunities to advance prior to her raising complaints of sexual harassment.[7] Complaint

---

[6] Roe anticipates that discovery would be abundant in this area. For example, problems with attorney qualifications and performance, employee misconduct, and retaliation were discussed in a resident district judge's public testimony just before Roe's hiring. Testimony of Hon. Max. O. Cogburn, Ad Hoc Committee to Review the Criminal Justice Act (Jan. 11–12, 2016), *available at* https://tinyurl.com/y3bjugxy. *E.g.*, *id.* at 14 (administrative officer's embezzlement of money was "kept from the judges"); *id.* (employees were "afraid that they'll be fired" for coming forward); *id.* at 32 (the "most experienced person in the office" was fired by the person who engaged in embezzlement); *id.* at 33 (the FDO's client representation was "unsatisfactory"); *id.* (the First Assistant was not "qualified" to be a panel attorney and the Appellate Chief "has never been in the courtroom"); *id.* at 34 (the FDO is a "mess" in need of "change"); *id.* at 35 ("We think we need better representation in our district."). Defying the district judges' expectation that "the change of the defender was going to bring about real change," *id.* at 33, the Defender kept in management, or promoted, the same individuals whose incompetence and misconduct prompted the conversion. Complaint ¶¶ 51–53.

[7] The Defender asserts that he did not work at the FDO when Roe was hired, ECF No. 45, at 3 n.3, but that statement is misleading. Though the Defender had not yet been sworn in, he had already been selected as the Defender, he participated in Roe's job interview, and he was called the decision maker by the hiring panel.

13

¶¶ 44–45, 64–65, 89.  At a minimum, he fails to explain why Roe could not be "supervised" by the attorneys in the other duty station.  Third, and most alarmingly, the Defender's new defense ignores that Roe's "supervisors" in her duty station were the First Assistant, who was sexually harassing her, *e.g. id.* ¶¶ 63–122, and her "Team Leader," who dressed as Brett Kavanaugh for the office Halloween party, *id.* ¶ 346, made jokes about meeting her at "Waffle House" because she was on telework, *id.* ¶ 351, and called his African American clients "dogs" and an intellectually disabled client a "retard," *id.* ¶ 54.  The First Assistant and Team Leader also openly joked about whether clients would file claims of ineffective assistance of counsel against them.[8]  *Id.* ¶ 55.  And during the very time period the Defender says Roe needed "supervision" to avoid *theoretical* concerns of ineffective assistance of counsel, her Team Leader was facing an *actual* malpractice lawsuit over his conceded ineffective assistance of counsel, which led his client to be wrongly imprisoned for twelve years.[9]  *Nieves v. Office of the Public Defender*, No. A-69-18, 2020 WL 1870253, at *3 (N.J. Apr. 15, 2020).  Whether the Defender's idea of "supervision" was reasonable cannot be decided in his favor on a motion to dismiss.

Other Defendants

- As noted above, *supra* pp 6–8, defendants argue that Roe has "failed" to state a claim, in large part, because she "voluntarily" resigned after "extract[ing]" a "coveted" clerkship as a "negotiated resolution" to her complaints.  ECF No. 43, at 4, 13.  Because these assertions directly contradict Roe's allegations that she was forced to resign, *e.g.*, Exhibits D, E, they raise

---

[8] Contrary to the Defender's assertion, ECF No. 45, at 4, it was not Roe's "opinion" that the First Assistant was unqualified.  *See* Cogburn Testimony, *supra*, at 33 (the First Assistant "could not be a panel attorney.  He's not qualified.  He's second chaired one criminal case").

[9] Much like defendants' hope to escape liability based on legal technicalities here, the "Team Leader" escaped liability for malpractice solely because of the technicalities of New Jersey's State Tort Claims Act.  *Nieves*, 2020 WL 1870253, at *3.

14

factual disputes that cannot be resolved in defendants' favor on a motion to dismiss.  *See Crawford-El*, 523 U.S. at 595.

- Defendants contend that Roe has not alleged that the First Assistant was her supervisor.  ECF No. 54, at 20.  This assertion contradicts her allegations that he abused his supervisory authority to sexually harass her, including through a quid pro quo "plan" to raise her pay.  Complaint ¶ 82.  It is also contrary to the Defender Services' classification manual, which states that the First Assistant (1) "***is a one-of-a-kind position within a defender organization and supervises a minimum of five (5) Assistant Federal Defenders (AFDs.)***"; (2) "serves as the ***principal deputy*** to the Federal Public/Community Defender, assisting in the management of all phases of the defender organization"; and (3) "[i]nitiates personnel actions involving all staff members," including "hiring, performance appraisals, mediation and negotiation, disciplinary actions, and employee job termination." (emphases in original)

- Defendants argue, contrary to the complaint's allegations, that no conflicts of interest existed in the EDR process.  Though they contend that the Defender did not have a conflict of interest because he "represented the employing office," *e.g.*, ECF No. 52, at 13 n.6, they admitted that the Defender had a conflict of interest as a subject of her complaint, but still required Roe to negotiate with him.  *See* ECF No. 48, at 7.  Defendants also wrongly assert that Chief Judge Gregory did not have a conflict of interest even though the Defender said he was working closely with Chief Judge Gregory to establish a Capital Habeas Unit while her complaint was pending.  Complaint ¶¶ 282, 479–81; *see also id.* ¶ 429 (EDR Coordinator's conflict of interest as Circuit Executive).[10]

---

[10] The new Model EDR Plan, which the Fourth Circuit has not adopted, does not allow unit executives, like Circuit Executives, to be EDR Coordinators, presumably because of inherent conflicts of interest.  Model EDR Plan § V(C) (Sept. 2019).

- Defendants assert that Roe had no protected interest in the EDR Plan's procedures. ECF No. 43, at 15; ECF No. 54, at 18. This assertion is contrary to judiciary guidance that Roe has requested in discovery, ECF No. 51-1, at 7, which states that the EDR Plan creates binding procedural rights based on the same cases Roe cites, ECF No. 49, at 23.

- Defendants claim that Roe "withdrew" her complaint prematurely before her disqualification request was decided. ECF No. 54 at 18–19. They contradict her allegations that Chief Judge Gregory "intended" to deny her request, but defendants refused to provide her a final, written ruling that she could appeal. ECF No. 48, at 8.

- Defendants contend (for the first time on reply) that Chief Judge Gregory, Circuit Executive Ishida, and General Counsel Walter were not Roe's "employer" or the "primary tortfeasors." ECF No. 53, at 4. They contradict the complaint's allegations that these defendants personally violated Roe's rights. ECF No. 48, at 1–13. For example, Chief Judge Gregory exercised "supervisory" authority over the Defender, *see* Complaint ¶¶ 287, 320, defendants personally oversaw the investigation, *id.* ¶ 265, and Chief Judge Gregory took belated disciplinary action, ECF No. 37, at 1, 5. Defendants would not have had authority to take these actions if they were not acting, at a minimum, as agents of Roe's employer. *See* JCUS at 25 (EDR presiding officers are acting in "administrative," not "judicial," capacity). Contrary to defendants' assertions, what matters under the Fifth Amendment is not an official's job title or whether he was a "primary tortfeasor," but whether he violated a duty to act on sexual harassment complaints. *See Bohen v. City of E. Chicago, Ind.*, 799 F.2d 1180, 1189 (7th Cir. 1986) (city officials were liable because they were aware of harassment and tolerated it). The judiciary assumed that duty by covering FDOs under their EDR Plan, *see* EDR Plan Ch. IX, and defendants violated that duty under the facts of this case.

16

- Defendants contend that Chapters IX and X were separate proceedings under the EDR Plan. ECF No. 53, at 12. This assertion contradicts the record, which shows that there was "one, unified investigation" for both proceedings. Complaint ¶¶ 297, 299, 325; Exhibit G. Thus, defendants are wrong to assert that Roe had no "right" to receive the investigation report that was being used to adjudicate her legal rights under Chapter X. *See Hannah v. Larche*, 363 U.S. 420, 442 (1960) (due process rights attach to adjudicative proceedings).

- Defendants claim that an "appropriate" investigation was conducted, ECF No. 54, at 19, but they contradict Roe's allegations that the "investigation" dragged on for more than four months, over which Chief Judge Gregory expressed concern, Complaint ¶ 392; was conducted by an investigator who admitted she was not qualified to make recommendations, *id.* ¶ 320, and who did not interview any of Roe's witnesses, *id.* ¶ 317; and did not include Roe's claims of retaliation against the Defender within the scope of her investigation, *id.* ¶ 318. Defendants' assertion that the investigation was "appropriate" cannot be substantiated without discovery. *See Ambrose-Frazier v. Herzing Inc.*, No. CV 15-1324, 2016 WL 890406, at *4 (E.D. La. Mar. 9, 2016) (where employer relies on appropriate investigation as a defense, investigation report is not protected by work product or attorney-client privilege); *Robinson v. Vineyard Vines, LLC*, No. 15CIV4972VBJCM, 2016 WL 845283, at *4 (S.D.N.Y. Mar. 4, 2016) (same).

- Defendants claim that Roe has not alleged any failure to take prompt and effective action.[11] They contradict her allegations that even when they received the long-delayed

---

[11] The Defender's sweeping assertion that the EEOC's guidance "lacks persuasive force," ECF No. 52, at 16–17, is based on a case rejecting a single provision of a different EEOC manual dealing with causation in the retaliation context. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 361 (2013) (analyzing 2 EEOC Compliance Manual (2003)). However, the EEOC's guidance on the duty to take prompt and effective action comports with precedent from the Supreme Court, *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998), and the Fourth Circuit, *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 319 (4th Cir. 2008); *Paroline v. Unisys*

investigation report, they deliberately refused to take corrective action. Complaint ¶ 398; Exhibit E. Indeed, they did not take any corrective action until several months after Roe resigned and almost a year after she raised her complaints. *See* Exhibit H. That kind of extreme and intentional delay is the definition of a "conscious failure" to address sexual harassment. *Bohen*, 799 F.2d at 1187 (upholding district court's finding of intentional discrimination against city officials where employee "suffered many instances of sexual harassment and often complained of them through official channels, but . . . nothing was done").

- Defendants state that Chief Judge Gregory took disciplinary action, *see*, *e.g.*, ECF No. 37, at 1, 5; ECF No. 39, at 1, 5; ECF No. 41, at 1, 5, but that fact is found nowhere in the complaint. Rather, all Roe was told was that "disciplinary action was taken . . . as a result of your report of wrongful conduct." Exhibit H. Prior to defendants' filings, Roe did not know who took disciplinary action. However, this new fact raises many questions relevant to Roe's equal protection and due process claims, including whether and how Chief Judge Gregory had the legal authority to take disciplinary action and, if so, why he did not do so when the investigation report came out. It also raises questions about the Defender's conflicts of interest. For example, if the Defender was not the one who took disciplinary action, then was he disciplined? And if he was disciplined, why was he not disqualified from Roe's Chapter X proceeding? Conversely, if he was not disciplined, then what was the reason for not disciplining him? Was he ever investigated as a subject of Roe's complaint? Defendants cannot expect to sidestep discovery and obtain judgment in their favor without having to answer these questions.

_____

*Corp.*, 879 F.2d 100, 106 (4th Cir. 1989), *opinion vacated in part on other grounds*, 900 F.2d 27 (4th Cir. 1990). It also comports with the "conscious failure" standard, *Bohen*, 799 F.2d at 1187, and the EDR Plan, *see* EDR Plan Ch. IX. The Defender provides no reason why these standards do not apply to him.

18

- Defendants trivialize Roe's points about a lack of meaningful remedies as contrary to her "personal preference," ECF No. 54, at 21, a "grievance," ECF No. 39, at 23, and worse yet, as "absurd," ECF No. 54, at 21, and a "conspiracy theory," ECF No. 52, at 6; ECF No. 53, at 2. But Roe's arguments are based on Judicial Conference policy, Exhibit B, which they have not even attempted to refute, the caselaw they cited in their motions to dismiss (but ignored in their replies), *e.g.*, ECF No. 37, at 9 n.6 (citing *In re Golinski* for the proposition that "[o]ur EDR tribunals . . . have the authority to grant full relief"); ECF No. 43, at 9 (same), and the statements of the Judicial Integrity Officer and other judiciary officers, *supra* p 6.

. . .

As these examples show, the Court lacks sufficient information to rule on "a claim that a plaintiff has not presented enough evidence to prove that the plaintiff's version of the events actually occurred" at the motion to dismiss stage. *Al Shimari*, 679 F.3d at 221 (quoting *Winfield v. Bass*, 106 F.3d 525, 530 (4th Cir. 1997) (en banc)). Because defendants' arguments for failure to state a claim raise factual assertions regarding the sufficiency of the evidence, judgment cannot be granted in their favor without engaging in discovery.

### iii.    Absolute and Qualified Immunity

For similar reasons, defendants are not entitled to a ruling on their immunity defenses prior to discovery. Though "[d]iscovery involving public officials is indeed one of the evils that *Harlow* aimed to address . . . neither that opinion nor subsequent decisions create an immunity from all discovery." *Crawford-El*, 523 U.S. at 593 n.14 (quotation omitted). Rather, "limited discovery may sometimes be necessary before the district court can resolve a motion for summary judgment based on qualified immunity." *Id.* As these principles recognize, "[f]undamentally, a court is entitled to have before it a proper record, sufficiently developed

19

through discovery proceedings, to accurately assess any claim, including one of immunity." *Al Shimari*, 679 F.3d at 220.

Here, if qualified immunity is not outright denied, defendants' factual assertions are intertwined with the question of whether they violated clearly established constitutional rights. Though defendants argue (for the first time on reply) that they need a case specifically holding that sex discrimination by a Chief Judge, an EDR Coordinator, a General Counsel (and John Doe(s)), and a Federal Defender violates the Constitution, it is has long been clearly established that a federal official's (1) "conscious failure" to act on sexual harassment complaints, *Bohen*, 799 F.2d at 1187; and (2) retaliation for making a sexual harassment complaint, *Beardsley v. Webb*, 30 F.3d 524, 530 (4th Cir. 1994), violate the Constitution no matter what an official's title or job description. And both the Supreme Court and the Fourth Circuit have long applied Title VII standards in this context. *Davis v. Passman*, 442 U.S. 228, 245 (1979); *Beardsley*, 30 F.3d at 529. If Title VII standards do not apply, then it is unclear what standards, if any, defendants believe govern their conduct.[12] Regardless, whether defendants retaliated or consciously failed to act on harassment are questions of fact that cannot be resolved on a motion to dismiss.

Likewise, any claim of absolute immunity depends on whether EDR is a type of judicial proceeding, and if so, whether it contained sufficient procedural safeguards to support absolute immunity on the facts of this case. Though defendants assert that the EDR Plan provided "robust procedural protections" and that Roe simply did not "avail herself" of them, ECF No. 53, at 14,

---

[12] As defendants recognize, the judiciary follows Title VII standards. ECF No. 54, at 10 ("Since 1966, it has been the avowed policy of the federal judiciary . . . to follow the equal employment opportunity principles applicable to private sector and government employers." (quoting *Dotson*, 398 F.3d at 172)).

20

these assertions contradict the complaint and cannot be resolved without "a proper record, sufficiently developed through discovery proceedings." *Al Shimari*, 679 F.3d at 220.

### 4. Defendants have invited conversion to summary judgment.

Fourth, and related to the above issues, defendants have invited conversion of the motion to dismiss to one for summary judgment. *See Ryan v. McAleenan*, No. CV ELH-19-1968, 2020 WL 1663172, at *5 (D. Md. Apr. 3, 2020) (parties who raise matters outside of the pleadings invite conversion to summary judgment). As shown by Roe's exhibits, defendants selectively rely on facts outside of the complaint and portions of the EDR administrative record for dismissal. Though defendants contend that Roe's "voluntary resignation" email may be considered on a motion to dismiss because it is "integral" to the complaint, ECF No. 43, at 4 n.3, the purpose of that rule is to prevent a plaintiff from "evad[ing] a properly argued motion to dismiss simply because plaintiff has chosen not to attach [a document] to the complaint or to incorporate it by reference." *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir. 1991). That same principle applies to defendants. They cannot use discovery as both a sword and a shield by selectively including portions of the administrative record and refusing to disclose other portions that are equally "integral" to the complaint.

Alternatively, the Court may disregard defendants' untested factual assertions and deny their motions to dismiss. "A district judge has 'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.'" *Ryan*, 2020 WL 1663172, at *5 (quoting 5 C Wright & Miller, Federal Practice & Procedure § 1366 (3d ed. 2018)).

21

**5.      Defendants have not shown good cause for a stay.**

Fifth, defendants have not shown good cause for a stay.  Though they style their motion as one opposing "early" discovery, ECF No. 51, discovery has already been triggered for the reasons discussed above.  Once discovery has begun, the Federal Rules of Civil Procedure allow a protective order from discovery only where there is "good cause . . . to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."  *Mendia v. Garcia*, No. 10-CV-03910-MEJ, 2016 WL 3249485, at *2 (N.D. Cal. June 14, 2016) (quoting Fed. R. Civ. P. 26(c)).

Defendants have not made this required showing.  For example, they call Roe's requests "broad" and "voluminous," but do not provide any reason why those requests are oppressive or unduly burdensome.  ECF No. 51, at 2, 3.  They rely on qualified immunity, *id.* at 2–3, but that defense is unavailing and, even if applicable, would turn on fact questions, *supra*, p 20. Moreover, regardless of the individual capacity defendants' assertions of qualified immunity, they "are still subject to discovery as witnesses related to the claims against the United States" and other official capacity and entity defendants.  *Mendia*, 2016 WL 3249485, at *3; *see also Morse v. Frederick*, 551 U.S. 393, 400 n.1 (2007) (qualified immunity is not a defense to claims for equitable relief).

**6.      Roe is prejudiced by defendants' failure to comply with discovery.**

Sixth, and perhaps most importantly, defendants' motion should be denied because Roe is being prejudiced by their ongoing delay tactics.  Defendants' refusal to cooperate in discovery is akin to forcing Roe "into a fencing match without a sword or mask."  *McCray v. Maryland Dep't of Transp., Maryland Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2014).  Indeed, while

defendants have not cooperated in discovery, they have continually evolved their factual defenses as a moving target in response to Roe's filings.

For example, though Roe served her initial disclosures more than seven weeks ago, she has not received defendants' initial disclosures. Thus, Roe has specifically tailored the timing and content of her initial discovery requests to overcome the informational disadvantages caused by defendants' failure to cooperate. She has served requests for production and more than half of her interrogatories to obtain information regarding defendants' positions on basic issues such as their defenses and damages. *See* ECF Nos. 51-1, 51-2. Roe needs this information to make informed decisions regarding which officials to depose (the number which defendants propose should be only half what their side receives, *see* ECF No. 34, at 5), and regarding the expeditious use of expert funds. Moreover, this information is necessary to engage in settlement discussions in "good faith," as the parties have agreed, and to conduct a mediated settlement conference before non-expert discovery closes on September 1. ECF No. 34, at 6. And as discussed above, this information is necessary to rebut the defenses already raised by defendants and to prepare for any further summary judgment motions by October 1. In sum, defendants' failure to cooperate is complicating Roe's good faith efforts to comply with court-ordered deadlines and to narrow the contested issues before the Court.

More fundamentally, a speedy resolution of this case is important to Roe's mitigation of damages. Roe's ongoing effort to vindicate her rights against judiciary officials, including officers of the courts where she practices, has complicated her mitigation efforts. Though Roe intends to continue practicing indigent criminal defense, the same area of practice as her position

at the FDO,[13] her efforts are complicated by defendants' unique position as both defendants to this litigation and the authorities who supervise the federal district and appellate Criminal Justice Act panels. *See*, *e.g.*, Complaint ¶ 476 (explaining that Roe "felt ostracized from applying for the Criminal Justice Act panel in her district, because the people who had engaged in misconduct would be reviewing her application"). For example, the Defender who retaliated against her is also in charge of the district's CJA panel and holds great influence over Roe's career, which he continues to abuse.[14] *See supra* pp 10–14. Moreover, Roe has endured other career damage. For example, she tried, but failed, to secure other comparable employment within the Fourth Circuit, including with another Federal Defender who "was openly hostile" and "demanded to know why she left her former office." Complaint ¶ 491. Her complaint was also "flagged as an

---

[13] Roe's dream since law school has been to practice indigent defense work, *see* Complaint ¶ 36; Exhibit E, and she has never practiced law outside of government or public interest work. She is not required to switch career paths or practice areas to mitigate damages simply because defendants discriminated against her. *See EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 148 (4th Cir. 2017) (duty to mitigate requires plaintiff to be diligent in seeking "new employment substantially equivalent to that from which he was discharged" (quotation omitted)); *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1423 (4th Cir. 1991) (front pay award focuses on whether a "comparable position" is available); *Avitia v. Metro. Club of Chicago, Inc.*, 49 F.3d 1219, 1231 (7th Cir. 1995) (front pay is the difference between what plaintiff would earn absent discrimination and what she will earn in her "next best employment"). Nor is she required to move out of state, acquire a new bar license, or otherwise take on burdens that acquiring a new federal defender position in a different district (assuming one was available) would require. *See Consol Energy*, 869 F.3d at 149 (court must account for plaintiff's "economic and personal circumstances" in determining front pay award). In any event, any argument against Roe's mitigation efforts "is an affirmative defense and it is the employer's responsibility to carry that burden." *Lundy Packing Co. v. N.L.R.B.*, 856 F.2d 627, 629 (4th Cir. 1988).

[14] Most disturbingly, the Defender asserts that as the head of a federal office, he has no legal duty to protect his employees from discrimination, ECF No. 52, at 4 n.2, or to follow the Title VII principles required by Supreme Court precedent, Judicial Conference policy, the Fourth Circuit's EDR Plan, and the Codes of Conduct. *Id.* at 14–17 (arguing that because Title VII "does not apply" to the judiciary, Title VII antidiscrimination principles are "irrelevant"). He even describes his employees' constitutional rights as "non-existent." *Id.* at 18.

24

area of concern on her North Carolina Bar Application, and she was questioned about it at her Character and Fitness interview." *Id.* ¶ 490.

In addition, though Roe has attempted to mitigate damages by proceeding under a pseudonym, ECF No. 2-1, she cannot control "retaliation and reprisal" by others, *id.* at 2–3. In their filings, defendants engage in ad hominem attacks and make unprofessional and disparaging remarks that are inappropriate for officers of the court. *See*, *e.g.*, ECF No. 43, at 13 (accusing Roe of using the EDR process to "extract[]" a "benefit" from them); ECF No. 39, at 23 (calling Roe an employee with a "grievance[]"); ECF No. 54, at 21 (calling Roe's arguments "absurd"); ECF No. 52, at 6 (calling Roe's arguments a "conspiracy theory"); ECF No. 53, at 2 (same). The Defender makes many unsupported, disparaging statements about Roe. *See supra* pp. 10–14; *cf.* Code of Conduct for Federal Defenders Canon 3(C) ("A defender employee should be patient, dignified, respectful, and courteous to all persons with whom the defender employee deals in an official capacity."). Though these antagonistic statements hold no persuasive value in this proceeding, they raise reasonable "concerns that [her] complaint will subject [her] to retaliatory action or affect future job prospects." Report of the Federal Judiciary Workplace Conduct Working Group to the Judicial Conference of the United States 12 (2018).

## CONCLUSION

For all these reasons, Defendants' Joint Motion To Set Deadline To Respond To Early Discovery Requests, ECF No. 51, should be denied.

This the 20th day of July, 2020.

Respectfully Submitted,

*/s/ Cooper Strickland*
Cooper Strickland
N.C. Bar No. 43242
P.O. Box 92

25

Lynn, NC 28750
Tel. (828) 817-3703
cooper.strickland@gmail.com

Counsel for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on the 20th day of July, 2020, I will electronically file the foregoing with the

Clerk of Court using the CM/ECF system, which will then send a notification of such filing

(NEF) to the following:

      Gill P. Beck at Gill.Beck@usdoj.gov

      Joshua M. Kolsky at Joshua.kolsky@usdoj.gov

      Shannon Sumerall Spainhour at mss@dhwlegal.com


                                */s/ Cooper Strickland*
                                Cooper Strickland
                                N.C. Bar No. 43242
                                P.O. Box 92
                                Lynn, NC 28750
                                Tel. (828) 817-3703
                                cooper.strickland@gmail.com