**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

**ASHEVILLE DIVISION**

| | |
|---|---|
| **JANE ROE,** ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | |
| **v.** ) | **Civil No. 1:20-cv-00066-WGY** |
| ) | |
| **UNITED STATES OF AMERICA,** *et al.*, ) | |
| ) | |
| *Defendants.* ) | |
| ) | |
| _____ ) | |

<u>**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HER MOTION
FOR PARTIAL SUMMARY JUDGMENT AGAINST THE OFFICIAL CAPACITY
AND ENTITY DEFENDANTS**</u>

Plaintiff Jane Roe ("Roe") was subjected to sexual harassment, retaliation, and discrimination during her employment as an assistant federal public defender. Roe sought relief under the Fourth Circuit's Employment Dispute Resolution ("EDR") Plan, but she was deprived of any meaningful review or remedies, resulting in her constructive discharge.

Because the material facts showing these constitutional violations are not subject to genuine dispute, Roe respectfully requests that the Court enter an order granting partial summary judgment on the issue of liability against the official capacity and entity defendants under Fed. R. Civ. P. 56. Roe further requests that the Court set an equitable hearing to determine appropriate remedies.

1

## STATEMENT OF UNDISPUTED FACTS[1]

**A.      Roe resigns after receiving no relief for unlawful discrimination.**

1.      On September 10, 2018, Roe filed a complaint of wrongful conduct and request for counseling under the Fourth Circuit EDR Plan.  Declaration of Jane Roe in Support of Partial Motion for Summary Judgment ("Roe Decl."), Ex. B, at 1–7.  Roe alleged that her protected rights against discrimination, sexual harassment, and retaliation were being continually violated.  Roe Decl., Ex. B, at 1, 7.  She named the First Assistant (J.P. Davis) and the Defender (Anthony Martinez) as alleged violators of the EDR Plan.  *Id.* at 3.  She alleged that, prior to filing an EDR complaint, she had reported her complaints to judiciary officials.  *Id.* at 5–6.

2.      Roe alleged that the First Assistant "abused his power and offered employment preferences for his unwanted advances."  *Id.* at 3.  She alleged that he sent her a quid pro quo "pay-for-stay" email, repeatedly asked her to meet outside of the office, interfered with her job duties and threatened disciplinary action as part of the harassment, and made her feel threatened by his advances.  *Id.* at 3–5.

3.      Roe further alleged that she had reported her complaints to the Defender, but he failed to take appropriate action.  *Id.* at 4–7.  The Defender failed to remove Roe from the First Assistant's supervision or protect her confidentiality, made hostile and discriminatory comments to her, and initiated a wrongful conduct investigation only after she followed up on his promises to take appropriate action.  *Id.*  He also retaliated against her by diminishing her job duties and not considering her for an opening as an appellate assistant federal public defender.  *Id.* at 6–7.  In fact, Roe was discouraged from applying for the position.  *Id.* at 7.  Instead, the Defender gave her a "phantom promotion," with Fourth Circuit approval, which was a reclassification of title

---

[1] Roe has verified the complaint's allegations as her sworn testimony.  Roe Decl., Ex. A.

that benefitted the office's work measurement formula with no consideration for a raise or progression of job responsibilities, and a loss of her locality adjustment. *Id.*; Roe Decl., Ex. D.

4.      Roe requested the following relief: "An environment free of harassment, retaliation, and discrimination, . . . the opportunity for merit-based advancement, and any other appropriate relief." Roe Decl., Ex. B, at 2.

5.      In a separate filing on the same date, Roe requested to disqualify the Defender from representing the employing office because he was a subject of her complaint. *Id.* at 8.

6.      On September 28, 2018, the EDR Coordinator (James Ishida) confirmed that "one, unified" investigation of Roe's allegations against the Defender and the First Assistant would be conducted under Chapters IX and X of the EDR Plan. Roe Decl., Ex. C, at 6; *see also id.* at 30 (confirming "joint investigation" for Chapters IX and X). The EDR Coordinator informed Roe that he, and not the Defender, would "receive" the investigation report. *Id.* at 6, 29. In addition, the EDR Coordinator confirmed that, if the allegations against the Defender were substantiated, then the Chief Judge (Roger Gregory) would "step in" as the Defender's "supervisor." Complaint ¶ 287.

7.      Roe fully and candidly participated in the joint investigation under Chapters IX and X of the EDR Plan. Complaint ¶ 299–301; *see also* Roe Decl., Ex. C, at 12–14. On October 8, 2018, Roe spent over four hours detailing the sexual harassment, retaliation, and discrimination she had suffered. *Id.* She provided copies of the First Assistant's inappropriate text messages and emails, her contemporaneous notes describing his harassing behavior, and documentation of the retaliation against her. *Id.* She also provided a list of witnesses. *Id.*

8.      After her October 8, 2018 interview, Roe did not hear from the Investigator (Heather Beam) for over three weeks. *Id.* ¶ 306.

9.     On November 9, 2018, Roe had a follow-up interview with the Investigator. *Id.*
¶ 308. In that meeting, the Investigator told Roe that if there is a "true feeling of retaliation,"
then that would have to be investigated "separately." *Id.* ¶ 318. She explained that she had been
focusing on how the Defender "handled" her claims, but that she did not understand her
allegations of retaliation to be within the scope of the investigation the EDR Coordinator
ordered. *Id.* She further stated that she would not be comfortable making, and did not think it
was appropriate for her to make, recommendations on the complaint because she is not an
"attorney" and not trained on the "legal" side. *Id.* ¶ 320.

10.    Roe was repeatedly asked for her "demands" to resolve her complaint. *See*, *e.g.*,
Roe Decl., Ex. C, at 5, 37–38. On November 12, 2018, Roe emailed the EDR Coordinator and
Chief Judge to ask why the burden was being placed on her to resolve her complaints. *Id.* at 31–
32. The EDR Coordinator responded, in part, that "[r]eiterating that you want a safe workplace
free of harassment isn't helpful because Mr. Martinez already believes that he's done and is
doing all he can to provide such a workplace for you." *Id.* at 27.

11.    Roe suffered great harm during the months when no action was taken on her
complaints. Because she did not feel safe returning to work at her harasser's duty station, *e.g.*,
Complaint ¶¶ 143, 157, 162, 174, and the Defender denied her a transfer, *e.g.*, *id.* ¶ 219; Roe
Decl., Ex. B, at 52 ("reserving the right" to require her to return to the First Assistant's duty
station), Roe was placed on telework during the investigation, Complaint ¶¶ 219, 338. The
situation made Roe's job duties, such as preparing for court appearances, difficult if not
impossible. *Id.* ¶ 338. During this period, Roe's workload and job responsibilities diminished,
while the First Assistant continued in his managerial role. *Id.* In addition, Roe was subjected to
hostile and demeaning treatment by the First Assistant, *e.g.*, *id.* ¶¶ 172–83, 252–256, and her

coworkers, *e.g.*, *id.* ¶¶ 338–54; *see also* Roe Decl., Ex. B, at 28, 32–33. For example, Roe's

Team Leader (Peter Adolf) led a "trial team" meeting in which her coworkers mocked and

belittled her with jokes about meeting her at "Waffle House" and compared her to "Where's

Waldo." *Id.* ¶ 349–54. The Team Leader also told her "trial team" that "it only gets worse the

more you find out." *Id.* ¶ 354. For the office Halloween party that year, the Team Leader wore a

Justice Kavanaugh costume, complete with a Yale-themed beer guzzler helmet. *Id.* ¶ 346.

12.     On November 21, 2018, Roe sent the EDR Coordinator an email, with the Chief

Judge copied, requesting the Fourth Circuit's assistance with a transfer. Roe explained that

"[t]his situation has irreparably damaged my relationships with the Federal Defender and my

colleagues, and I believe I am no longer welcome in that environment." Roe Decl., Ex. C, at 27.

13.     On November 27, 2018, the EDR Coordinator told Roe that the Investigator had

completed the report, but he was sending it back for her to supplement the report with findings,

conclusions, and recommendations. Complaint ¶ 362–63; *see also* Roe Decl., Ex. C, at 40–41.

14.     The EDR Coordinator further stated that, early on, he and the Chief Judge had

discussed Roe's motion to disqualify the Defender and agreed that disqualification would be

"premature" without a finding against the Defender. *Id.* ¶ 370. He explained that, if the

Defender was disqualified, then "no one" could "represent" the employing office. *Id.* ¶ 371; *see*

*also* Roe Decl., Ex. C, at 5.

15.     On November 28, 2018, the EDR Coordinator told Roe that the Investigator had

"assured" him that she would include the retaliation claims in her investigation report. Roe

Decl., Ex. C, at 26; *see also id.* at 53.

16.     Though the investigation was not reopened, *id.* at 45, Roe did not receive an

update on the investigation report for over six weeks. Complaint ¶ 384. On January 9, 2019, the

EDR Coordinator told Roe that the Chief Judge was concerned that the process was taking too long. *Id.* ¶ 392.

17.    On January 11, 2019, the EDR Coordinator informed Roe that he had received the final investigation report. Roe Decl., Ex. C, at 51.

18.    On January 16, 2019, the EDR Coordinator informed Roe that the Chief Judge "intend[ed]" to deny her request to disqualify the Defender and stated that he was preparing an order to that effect. *Id.* at 50–51. Roe was not provided any written ruling or statement of reasons, even after renewing her disqualification request on February 24, 2019. Complaint ¶ 453; *see* Roe Decl., Ex. B, at 57–60; Roe Decl., Ex. C, at 66.

19.    On January 17, 2019, the EDR Coordinator informed Roe that neither she, nor the employing office, would receive the investigation report or any summary of its findings and recommendations. *Id.* ¶ 398; *see also* Roe Dec., Ex. C, at 60. He also informed Roe that no decisions about disciplinary action would be made until after her Chapter X proceeding was over. Complaint ¶ 400.

20.    On January 22, 2019, Roe requested a transfer to a federal defender office in an adjacent district. Roe Decl., Ex. C, at 57–59. She stated that, "[a]lthough it was my dream since law school to be a federal defender, I do not believe it is possible to reach a resolution with my current office that will protect me from further harassment and allow me to advance in my career." *Id.* at 57. She noted that she was being required to negotiate with an alleged violator of her rights, without knowing any of the report's findings or recommendations. *Id.* at 58. She also expressed concern that she would be the target of rumors and reputational damage. *Id.* For instance, another employee who had recently complained was subjected to homophobic rumors

6

and slurs.  *Id.*  And another employee who had sued over unlawful discrimination was subjected to false rumors that he killed his wife.  *Id.*

22.     On January 24, 2019, Roe was informed that the Chief Judge had "directed" the EDR Coordinator "to lend appropriate assistance" with a transfer.  *Id.* at 56.  The EDR Coordinator said he was "sorry" to hear about Roe's experiences.  *Id.*

22.     On January 31, 2019, Roe filed a request for mediation under the EDR Plan.  Roe Decl., Ex. B, at 9–10.  Roe's January 14, 2019 request for an extension of counseling for the purpose of evaluating the investigation report was never ruled upon.  Roe Decl., Ex. C, at 48, 50.

23.     In her first meeting with the Mediator (Ed Smith), the Mediator stated that the Defender is from a "generation" that doesn't "get" sexual harassment.  Complaint ¶ 415.  He emphasized, however, that the Defender was the "decision maker" and that no hearing officer would "micromanage" him or tell him how to do his job.  *Id.*

24.     On February 14, 2019, Roe met with the Judicial Integrity Officer (Jill Langley). The Judicial Integrity Officer told Roe that an EDR presiding officer would not have independent legal authority to order remedies against a federal defender office, because Article III judges do not have authority to "manage" a federal defender office.  Complaint ¶ 439.  She described this issue as "jurisdictional."  *Id.*  In a follow-up email, she called Roe's situation a "lesson learned" and stated that she would like "to better understand if FPDs are adequately protected by EDR remedies."  Roe Decl., Ex. C, at 69.

25.     On February 26, 2019, the Mediator told Roe that she could not transfer to the federal defender office in the adjacent district she had requested because that office did not have an opening.  Complaint ¶ 454.

26.     Without a meaningful remedy for the discrimination she had suffered, Roe believed that she would never be able to return to work normally at the FDO.  *Id.* ¶ 455.  Based on the Judicial Integrity Officer's comments, Roe believed that proceeding to a final hearing would be futile because an EDR presiding officer would not be able to order any remedies.  *Id.* ¶ 447.

27.     Roe asked the Mediator to help her secure a Fourth Circuit clerkship.  She said that having a clerkship would help prevent her employing office from destroying her reputation.  *Id.* ¶ 456.

26.     On March 8, 2019, Roe interviewed with a Fourth Circuit judge and received an offer for a term judicial clerkship.  *Id.* ¶ 459.

27.     On March 11, 2019, Roe sent the EDR Coordinator an email informing him that she had accepted a judicial clerkship.  Roe Decl., Ex. C, at 67.  She stated that, "[a]lthough I am saddened to no longer be a federal defender, I am honored for this opportunity and I very much appreciate the Fourth Circuit's assistance in helping me reach the best possible outcome under the circumstances."  *Id.*  She stated that, "[g]iven these circumstances, I no longer wish to pursue the Chapter X portion of my EDR claim."  *Id.*

28.     Roe formally resigned from the FDO effective March 15, 2019.  *Id.* ¶ 464.

29.     On May 1, 2019, in response to Roe's inquiry, the EDR Coordinator informed her that the proceeding on her Chapter IX report of wrongful conduct was "open and ongoing."  Roe Decl., Ex. C, at 71.

30.     On May 7, 2019, Roe met with the EDR Coordinator in person.  Complaint ¶ 474.  Roe told the EDR Coordinator that she had lost her job because she filed a complaint.  *Id.* ¶ 475.  She said that there was no possible remedy through the EDR process.  *Id.*  She said that the

8

process was skewed and worked a "serious injustice," not just for her, but for anyone else who filed a complaint. *Id.* She said that the failure to follow the EDR Plan "as it appears on paper" made it impossible to stay in her office. *Id.* She told the EDR Coordinator that she lived with this burden every day and that it had tremendously affected her life and career. *Id.* ¶ 478.

31. On June 4, 2019, the EDR Coordinator informed Roe:

> I wanted to let you know that disciplinary action was taken last week as a result of your report of wrongful conduct. As we discussed previously, I cannot reveal the nature of the action because it is a disciplinary matter. But I wanted to let you know that action was taken, and I wanted to re-emphasize that: (1) the Fourth Circuit took your report very seriously, (2) Chief Judge Gregory ordered a painstaking and exhaustive investigation into your allegations, and (3) actions were taken based on careful consideration of the investigation report.

Roe Decl., Ex. C, at 73.

32. This "disciplinary action" on Roe's report of wrongful conduct was taken *almost a full year* after she first raised her complaints. Complaint ¶ 485.

33. This "disciplinary action" on Roe's report of wrongful conduct was taken by the Chief Judge. ECF No. 37, at 1, 5; ECF No. 39, at 1, 5; ECF No. 41, at 1, 5.

34. Roe has never been informed of the findings on her complaint or what corrective actions were taken, except for the defendants' disclosure in their filings for this litigation that the Chief Judge was the one who took disciplinary action. *See id.* However, all the individuals responsible for the harassment, retaliation, and discrimination against Roe still hold their respective positions and titles. Roe Decl., ¶ 7.

**B. Roe suffers irreparable harm due to the defendants' conduct.**

35. Roe's dream since law school was to be a federal defender, and she anticipated working at the FDO until retirement. Roe Decl., ¶ 6. As a result of defendants' conduct, Roe

9

lost opportunities for training, experience, and professional growth in her calling to serve indigent clients. *Id.*

36.     To date, Roe has not been offered reinstatement. *Id.* ¶ 7.  Under existing circumstances, Roe does not believe that reinstatement would be feasible because (1) no position is available, (2) a subsequent working relationship between the parties would be antagonistic, (3) the FDO has a record of employee misconduct and discrimination, (4) the individuals responsible for the harassment, retaliation, and discrimination against Roe still hold their respective positions and titles at the FDO, and (5) reinstatement would require Roe to return to a hostile working environment with no meaningful remedies for discrimination. *Id.*  For example, the Defender has asserted that because Title VII "does not apply" to the judiciary, Title VII antidiscrimination principles are "irrelevant," and Roe's constitutional rights are "nonexistent."  ECF No. 52, at 14–18.  To this day, the FDO's public-facing website contains an outdated version of the district court EDR Plan, which does not even apply to federal defender employees.

37.     Before and after her constructive discharge, Roe made diligent efforts to find employment with comparable pay and benefits within the Fourth Circuit and the judiciary but was unsuccessful.  Roe Decl., ¶ 8.  After her clerkship, Roe accepted another public service position. *Id.*  Though Roe received outstanding mentorship, training, and experience, the position was temporary, with substantially lower compensation, and did not involve criminal indigent defense work. *Id.*

38.     Given Roe's location in the Western District of North Carolina, it is extremely unlikely that she will ever find a position with comparable terms and compensation to the one she held at the FDO. *Id.* ¶ 9.

39.     Roe's next best employment is in court-appointed indigent defense work.  *Id.*

¶ 10.  After completing required training, Roe anticipates taking cases as soon as possible.[2]  *Id.*

This type of work offers substantially less compensation than Roe's job with the FDO and offers

no benefits.  *Id.* ¶¶ 12–20; Exs. F–M.

40.     Roe's lost future earnings can be calculated based on publicly available

government policies and studies that provide detailed information on the relative compensation

of federal government employees and court-appointed attorneys.  *See id.*

41.     Since the parties' initial attorneys' conference on May 20, 2020, Roe has not been

served with any discovery requests.  Roe's counsel has sent document requests, interrogatories,

and requests for admission that requested, among other information, defendants' defenses, their

position on whether reinstatement is feasible, and whether they dispute her mitigation efforts and

lost earnings calculation contained in her initial disclosures.  Declaration of Plaintiff's Counsel in

Support of Plaintiff's Motion for Partial Summary Judgment ("Pl. Counsel Decl."), ¶ 2.  On

August 11, 2020, Roe's counsel provided the official capacity and entity defendants' counsel an

opportunity to state whether their clients disputed the material facts contained in this motion.  *Id.*

¶ 3.  Defendants' counsel responded, in relevant part, that "[t]he Defendants believe it is

premature to stipulate to any facts prior to the ruling(s) on the Motions to Dismiss.  At the

appropriate time in the litigation, stipulations may be warranted, but not at this time."  *Id.*

---

[2] Roe was also accepted to the Fourth Circuit CJA panel.  *Id.* ¶ 11.  However, given her pending lawsuit against the Fourth Circuit, she does not believe it would be appropriate to take Fourth Circuit cases at this time.

11

# LEGAL STANDARD

A court must grant summary judgment when "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The responding party may not rest on "mere allegations or denials," but must present specific facts by affidavit or other admissible evidence showing that contradiction is possible. *Pine Ridge Coal Co. v. United Mine Workers of Am.*, 187 F.3d 415, 421 (4th Cir. 1999) (per curiam) (quoting Fed. R. Civ. P. 56(e)). Rather than a mere "scintilla" of support, the responding party bears the burden of showing that the trier of fact could reasonably find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

# ARGUMENT

## I.     Defendants Are Liable For Violating Roe's Fifth Amendment Rights to Due Process and Equal Protection.

### A.     Defendants Violated Roe's Right to be Free from Discrimination.

Defendants violated Roe's constitutional right to be free from sex discrimination in her federal employment. The Fifth Amendment forbids the federal government from denying equal protection of the laws. *Davis v. Passman*, 442 U.S. 228, 234 (1979). To withstand scrutiny under the Fifth Amendment, "classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." *Id*. at 234–35 (quotation omitted). The Fifth Amendment confers a "federal constitutional right to be free from gender discrimination which cannot meet these requirements." *Id*. at 235.

Sexual harassment has long been recognized as a form of unlawful sex discrimination. *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67 (1986). It is well established that "intentional

12

sexual harassment of employees by persons acting under color of state law violates the [Constitution]." *Beardsley v. Webb*, 30 F.3d 524, 529 (4th Cir. 1994). Moreover, a government official's "conscious failure" to stop or prevent unlawful harassment is itself a form of intentional sex discrimination. *See*, *e.g.*, *Bohen v. City of East Chicago*, 799 F.2d 1180, 1187 (7th Cir. 1986). Finally, it has long been clearly established that retaliation for making a sexual harassment complaint violates the Constitution. *Beardsley*, 30 F.3d at 530.

In evaluating these claims, courts apply the well-established standards developed in similar litigation under Title VII of the Civil Rights Act of 1964. *Davis*, 442 U.S. at 245; *Beardsley*, 30 F.3d at 529. The judiciary also holds itself to these standards. *See* Study of Judicial Branch Coverage Pursuant to the Congressional Accountability Act of 1995, at 2 (Dec. 1996) (CAA Report) (judiciary employees are provided protections "similar" to Title VII); Guide to Judiciary Policy § 220.10.10 (judiciary employees have a right to a workplace free of discrimination as defined by Title VII). The Fourth Circuit EDR Plan instructs presiding officers to be "guided by judicial and administrative decisions" related to Title VII. EDR Plan Ch. II, § 10B(2)(e) (2013) (Pl. Counsel Decl., Ex. A). And the judiciary's codes of conduct also reflect these standards. Code of Conduct for United States Judges, Canon 3B(4), 3B(6); Code of Conduct for Judicial Employees Canon 3(C)(1); Code of Conduct for Federal Public Defender Employees Canon 3(C).

Here, there is no dispute that Roe was subjected to unlawful discrimination at the FDO, including by the highest levels of management. In fact, "disciplinary action" was taken "as a result of [her] report of wrongful conduct." Roe Decl., Ex. C, at 73. The EDR Plan defines "wrongful conduct," in relevant part, as "[d]iscrimination against employees based on . . . sex (including pregnancy and sexual harassment)," and "retaliation for engaging in any protected

activity." EDR Plan Ch. II, § 1. The Plan further provides that "[e]mployees <u>found</u> by the Chief Judge and/or unit executive <u>to have engaged in wrongful conduct</u>, as defined in this Plan, may be subject to disciplinary action." EDR Plan Ch. IX (emphases added). Under the EDR Plan's plain terms, a finding of wrongful conduct—that is, unlawful discrimination—is a prerequisite to taking disciplinary action.

Despite Roe's valid complaints of discrimination, defendants failed to take adequate remedial steps. Defendants had a duty to exercise "reasonable care to prevent and correct promptly any harassing behavior." EEOC Enforcement Guidance: Vicarious Liability for Unlawful Harassment by Supervisors, 1999 WL 33305874, at *1 ("EEOC Guidance"); *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 319 (4th Cir. 2008). This duty requires certain steps: the employer must (1) undertake a prompt, thorough, and impartial investigation using a well-trained investigator; (2) undertake intermediate measures to stop further harassment, such as transferring the alleged harasser or placing the alleged harasser on non-disciplinary leave; (3) take immediate and appropriate corrective action, including discipline, when the employer determines that harassment has occurred; (4) take remedial measures to correct the effects of the harassment and retaliation to put the employee in the position she would have been in had the misconduct not occurred; and (5) not involuntarily transfer or burden the complainant—remedial measures that make the victim worse off may constitute unlawful retaliation and are not effective in correcting the harassment. EEOC Guidance, 1999 WL 33305874, at *8–14.

Defendants failed to take these steps. For example, they burdened Roe by placing her on telework for *over six months* with no action on her complaints, while leaving the accused harasser in his duty station and supervisory role. Complaint ¶ 338. This situation made Roe's job duties, such as preparing for court appearances, difficult if not impossible. *Id.* In addition,

14

Roe was subjected to hostile and demeaning treatment, such as her coworkers' belittling jokes about meeting her at "Waffle House" and comparing her to "Where's Waldo," *id.* ¶ 349–54, and her Team Leader's wearing of an offensive Justice Kavanaugh costume for the office Halloween party, *id.* ¶ 346; *see also* Roe Decl., Ex. B, at 28, 32–33.

During this lengthy period, defendants failed to conduct an appropriate investigation. Roe went for periods of three to six weeks without hearing any updates. *Id.* ¶¶ 306, 322, 362, 384. After the initial report was submitted almost two months after the investigation opened, Roe was told that the report was being sent back to be redone. *Id.* ¶ 362. At this point, Roe learned that the Investigator had been asked to make "recommendations," even though, by her own admission, she was not trained or qualified to do so. *Id.* ¶¶ 320, 364. Roe also learned that her retaliation complaints were not investigated, *id.* ¶¶ 318–19, 384; Roe Decl., Ex. C, at 45, because the Defender's misconduct was characterized as mishandling, not retaliation, *id.* ¶ 319.

Following these delays, the situation was made even worse when defendants withheld the report and deliberately refused to act. *Id.* ¶¶ 398, 401; Roe Decl., Ex. C, at 60. Defendants are not entitled to sit on their hands and refuse to act on sexual harassment. *See*, *e.g.*, EDR Plan Ch. IX. They are required to take "immediate" corrective action. EEOC Guidance, 1999 WL 33305874, at *9, 11, 13, 9 n.57. Defendants' refusal to take immediate corrective action, after the investigation had already been pending for an unacceptably long period of over four months, was *per se* unreasonable and a "conscious failure" to act on sexual harassment. *Bohen*, 799 F.2d at 1187. Inexplicably, disciplinary action *was* eventually taken, but not until almost *six months* later, after Roe had already resigned. Roe Decl., Ex. C, at 73.

15

**B.     Defendants Violated Roe's Protected Rights Under the EDR Plan.**

Defendants also violated the rights and protections Roe had under the EDR Plan.  For

example, Roe had a liberty interest in being free from unlawful discrimination, *see Bolling v.*

*Sharpe*, 347 U.S. 497, 500 (1954), and a property interest in the Plan's terms as a condition of

her employment, *see*, *e.g.*, *Johnson v. Mishler*, 526 F.2d 364, 366 (2d Cir. 1975) (per curiam);

*Vitarelli v. Seaton*, 359 U.S. 535, 539, 545 (1959); *Paige v. Harris*, 584 F.2d 178, 181–82 (7th

Cir. 1978).  The bottom line is that Roe had a right to meaningful protections from

discrimination in her federal employment.  And in the adjudication of her legal rights, Roe was

entitled to due process protections "which have traditionally been associated with the judicial

process." *Hannah v. Larche*, 363 U.S. 420, 442 (1960).

Defendants violated these protections.  For example, defendants refused to disqualify the

Defender from representing the employing office even though he was "involved in," and a

subject of, the complaint.  EDR Plan Ch. X, § 7; *see also* EEOC Mgmt. Directive 110, 1-7

(2015) (an accused agency head should recuse himself from the decision-making process on an

EEO complaint).  Defendants recognized that the Defender had a conflict of interest, which is

why the EDR Coordinator received the investigation report instead of the Defender.  Roe Decl.,

Ex. C, at 6, 29.  But when it came to formally disqualifying him, defendants refused. *Id.* at 50–

51.  His conflict of interest rendered the EDR process fundamentally unfair, thus violating Roe's

due process right to an impartial decision maker, the ethical rules governing conflicts of interest,

and the judiciary's codes of conduct. *See*, *e.g.*, *Goldberg v. Kelly*, 397 U.S. 254, 271 (1970);

ABA Model R. Prof. Conduct 1.7; Code of Conduct for Federal Defender Employees Canons 1

and 2.

There is no reason to believe that the Defender's conflict of interest would have been mitigated at a final hearing. On the contrary, the Fourth Circuit EDR Plan, unlike the Model EDR Plan, gave accused violators a right to representation and a right to cross-examine Roe. EDR Plan Ch. X, § 10(B)(2)(c). Thus, the Defender would have had the right to cross-examine Roe in his capacity as the office's representative and as an accused violator of her rights under the Fourth Circuit EDR Plan. Moreover, high-level judiciary officials acknowledged to Roe that a final hearing officer would have no independent legal authority to order remedies against a federal defender office. *See*, *e.g.*, Complaint ¶¶ 415, 439; *see also* Roe Decl., Ex. C, at 69.

Not only did defendants not disqualify the Defender, but they refused to rule on the matter. For *months*, defendants gave Roe the impression that her disqualification request was being stayed because they would need to make a finding of misconduct before disqualifying the Defender. *See* Complaint ¶¶ 287, 370; *see also* Roe Decl., Ex. C, at 5. After the investigation report finally came out, the EDR Coordinator told Roe that the Chief Judge "intend[ed]" to deny her request to disqualify the Defender, Roe Decl., Ex. C, at 50–51, but Roe was not provided any written ruling or statement of reasons, even after renewing her disqualification request, Complaint ¶ 453; *see* Roe Decl., Ex. B, at 57–60; Ex. C, at 66. The failure to provide a ruling violated the decisionmaker's duty to "state the reasons for his determination and indicate the evidence he relied on." *Goldberg*, 397 U.S. at 271. It also acted as a constructive denial of her request and her right to appeal to the Judicial Council. EDR Plan Ch. X, § 11.

In addition, defendants violated the Plan's provision requiring information and records to be shared on a "need-to-know basis." EDR Plan Ch. X, § 4. After telling Roe that the report would be the basis for acting in her Chapter X proceeding, Roe Decl., Ex. C, at 6, 30, defendants refused to disclose to Roe the results of the investigation or even a summary of its findings and

17

recommendations, Complaint ¶ 398; Roe Dec., Ex. C, at 60.  At a minimum, Roe had a right to know the results of the investigation into her own complaint, which was being used to adjudicate her legal rights under Chapter X of the EDR Plan.  *See Hannah*, 363 U.S. at 442 (holding that due process protections attach to adjudicative proceedings).

Finally, defendants violated the EDR Plan's requirement of an "appropriate" remedy.  EDR Plan Ch. X, § 12.  Specifically, Roe requested "[a]n environment free of harassment, retaliation, and discrimination, . . . the opportunity for merit-based advancement, and any other appropriate relief."  Roe Decl., Ex. B, at 2.  However, Roe was not even afforded the possibility of an appropriate remedy.  She asserted that she had been denied consideration for a promotion because of her harassment.  *Id.* at 6–7.  She requested action to stop the harassment and prevent it from recurring.  *Id.*  She repeatedly requested a transfer.  Roe Decl., Ex. C, at 26–27, 57–59.  But she was told that any meaningful action would be viewed as "micromanaging" or "meddl[ing]."  Complaint ¶¶ 415, 438.  She was told that an EDR presiding officer would have no authority to order remedies.  *Id*. ¶ 439; Roe Decl., Ex. C, at 69.  And she was told she could not transfer.  *Id*. ¶ 454.

### C.     Defendants Failed to Provide Roe Meaningful Remedies and Review.

Finally, defendants violated Roe's rights by depriving her of any meaningful review or remedies for unlawful discrimination.  As judiciary officials acknowledged to Roe, an EDR presiding officer does not have legal authority to order remedies against a federal defender office.  *See*, *e.g.*, Complaint ¶¶ 415, 439; Roe Decl., Ex. C, at 69.  Moreover, Judicial Conference policy establishes the lack of meaningful remedies as a matter of law:

   a.  EDR proceedings are strictly administrative and are not "cases and controversies" under Article III of the Constitution;

b. Judges presiding in EDR matters are functioning in an administrative rather than judicial capacity;

c. Judges' decisions in EDR matters must be in conformance with all statutes and regulations that apply to the judiciary, and judges in the EDR context have no authority to declare such statutes or regulations unconstitutional or invalid; and

d. Judges presiding in EDR matters may not compel the participation of or impose remedies upon agencies or entities other than the employing office which is the respondent in such matters.

Proceedings of the Judicial Conference of the United States at 25 (Sept. 2010) (JCUS). Though this policy is not discussed in defendants' briefs or any of the cases they cite in support of their motions to dismiss, its importance cannot be overstated. Judges in the EDR context are not acting in a "judicial" capacity at all. *Golinski v. U.S. Office of Pers. Mgmt.*, 781 F. Supp. 2d 967, 973 (N.D. Cal. 2011). EDR presiding officers are not engaged in "judicial review" any more than a supervisor making a hiring or firing decision. And they can *only* order remedies that are already authorized by statute.

As judiciary officials implicitly acknowledged, Complaint ¶¶ 439, 444; Roe Decl., Ex. C, at 69, no statute gives an EDR presiding officer authority to order remedies against a federal defender office. In fact, the Criminal Justice Act ("CJA") limits the court of appeals' authority to appointing the federal defender, setting his compensation, and removing him for "incompetency, misconduct in office, or neglect of duty." 18 U.S.C. § 3006A(g)(2)(A). The federal defender has authority over personnel decisions, including whether to appoint and remove assistant federal public defenders. *Id.* This separation was by design, to further the CJA's purpose of protecting the independence of the Sixth Amendment defense function. As Congress recognized, "[i]t would be just as inappropriate to place direction of the defender arm in the judicial arm of the U.S. Government as it would be in the prosecutorial arm." S. Rep. No. 91-790, at 18 (1970).

19

At most, the CJA offers only indirect authority. An EDR presiding officer could attempt to influence federal defenders to adopt recommendations, based on the court of appeals' authority to appoint and remove the federal defender. *See*, *e.g.*, Ninth Circuit EDR Plan for Federal Defenders at 3 (2019) (adopted based on court of appeals' authority to appoint and remove federal defenders). But this is not the same as having binding legal authority, JCUS at 25, and it is cold comfort to discrimination victims, who functionally have no meaningful review or remedies. And if defendants did have any legal authority, it is even more inexplicable why it was not used.

### D. Defendants Are Liable for Roe's Resignation.

Based on the foregoing circumstances, there can be no genuine factual dispute that Roe resigned because she received no relief for unlawful discrimination in her employment. *See*, *e.g.*, Complaint ¶ 475 ("Roe told the EDR Coordinator that she had lost her job because she filed a complaint."); *see also* Roe Decl., Ex. C, at 26–27 ("This situation has irreparably damaged my relationships with the Federal Defender and my colleagues, and I believe I am no longer welcome in that environment."); *id.* at 57 ("I do not believe it is possible to reach a resolution with my current office that will protect me from further harassment and allow me to advance in my career."). Because Roe's involuntary resignation directly resulted from defendants' violations of her rights, and was "objective[ly] reasonable," defendants are liable. *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004).

In arguing that Roe's resignation was "voluntar[y]," defendants point to an email in which she expressed her gratitude to the Chief Judge and EDR Coordinator for supporting her clerkship application. Def's Br., ECF No. 43, at 4. But on its face, the email does not create a genuine factual dispute. Rather, Roe said she was "saddened to no longer be a federal defender"

and was resigning because it was the "best possible outcome under the circumstances." *Id*. The email merely confirms that she was seeking the best possible outcome when forced to resign.

## II.    The Undisputed Evidence Shows That Roe Satisfies The Requirements For Declaratory and Injunctive Relief.

The undisputed evidence establishes that Roe satisfies the requirements for declaratory and injunctive relief. Specifically, Roe is entitled to (1) a declaratory judgment that her constitutional rights were violated, and (2) appropriate equitable remedies.

First, "[i]n a case of actual controversy within its jurisdiction," this Court "may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). The Court has jurisdiction over this action, and the ongoing harm Roe suffers as a result of the defendants' discriminatory treatment poses a justiciable controversy. Indeed, Roe cannot even contemplate returning to employment in the federal judiciary without having meaningful remedies or review if she is subjected to discrimination.

Second, under 28 U.S.C. § 1331, it is "established practice" for the "federal courts to issue injunctions to protect rights safeguarded by the Constitution." *Bell v. Hood*, 327 U.S. 678, 684 (1946). For example, a federal court with jurisdiction under § 1331 may order specific relief requiring judiciary officials to comply with their duty under the EDR Plan to provide appropriate remedies for workplace discrimination. Under the EDR Plan, presiding officers may "order a necessary and appropriate remedy" that can be "directed at correcting a past violation, prospectively ensuring compliance with the rights protected by th[e] Plan, or both." EDR Plan Ch. X, § 12(A). The Plan provides an open-ended list of available remedies that are both monetary and non-monetary in nature, including reinstatement. *Id.* § 12(B). The only types of relief that are *not* available are attorney's fees (except as allowed under the Back Pay Act), compensatory and punitive damages. *Id.* § 12(C); *see also Confronting Sexual Harassment and*

21

*Other Workplace Misconduct in the Federal Judiciary, Questions for the Record from Chairman Grassley*, *Sen. Comm. on the Judiciary*, 115th Cong. 16–17 (June 20, 2018) (Director Duff's testimony that sexual harassment EDR complainants have received "monetary relief").

The Judicial Conference has also represented to Congress that it provides its employees with protections similar to Title VII.  CAA Report at 2.  Consistent with this representation, the EDR Plan draws on Title VII concepts by distinguishing between "equitable relief" and "compensatory damages."[3]  *See Pollard v. E.I. du Pont de Nemours*, 532 U.S. 843, 852 (2001). Under Title VII precedent, it is well-established that back pay and front pay in lieu of reinstatement are "equitable" remedies that are "not in the nature of a claim of damages," because they are "intended to restore the recipients to their rightful economic status."  *Robinson v. Lorillard Corp.*, 444 F.2d 791, 802 (4th Cir. 1971) (quotation omitted).

Though reinstatement is presumptively the appropriate remedy for a discriminatory discharge, *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1423 (4th Cir. 1991), front pay is available as a remedy when reinstatement is not appropriate or feasible, *Pollard*, 532 U.S. at 846.  To date, Roe has not been offered reinstatement, and, under existing circumstances, she believes that reinstatement would not be feasible.  *Supra*, at 9–10; *see Hunter v. Town of Mocksville*, 897 F.3d 538, 562 (4th Cir. 2018) ("[C]ourts have reasonably declined to award reinstatement when the employer has demonstrated such extreme hostility that, as a practical matter, a productive and amicable working relationship would be impossible." (quotation omitted)).  As the Supreme Court has held, there is "no logical difference between front pay awards made when there eventually is reinstatement and those made when there is not."  *Pollard*, 532 U.S. at 853.

---

[3] The Plan instructs EDR presiding officers to apply Title VII precedent and related laws. EDR Plan Ch. X, § 10(B)(2)(e).

22

Moreover, allowing front pay only when reinstatement is available would mean that "the most egregious offenders could be subject to the least sanctions." *Id.*

Defendants have asserted that any award of front pay would be barred by sovereign immunity. ECF No. 54, at 2. But the cases they rely upon are distinguishable, in part, because the plaintiffs were not asking for specific relief to enforce a preexisting legal duty—that is, the duty to provide appropriate remedies for discrimination under the EDR Plan. *See id.* (citing *Ahmed v. Bd. of Trustees of Alabama Agric. & Mech. Univ.*, No. 5:14-CV-01683-JHE, 2017 WL 4532039, at *5 (N.D. Ala. Oct. 10, 2017); *Weihua Huang v. Rector & Visitors of Univ. of Virginia*, No. 3:11-CV-00050, 2013 WL 865845, at *13–14 (W.D. Va. Mar. 7, 2013)). It has long been established that "an equitable action for specific relief" to enforce a legal "mandate" is not one for money damages, even if it involves the payment of money. *Bowen v. Massachusetts*, 487 U.S. 879, 893, 900 (1988). Moreover, in the cases defendants cite in support of their motions to dismiss, the plaintiffs had alternative remedies. *See Ahmed v. Bd. of Trustees of Alabama Agric. & Mech. Univ.*, No. 5:14-CV-01683-JHE, 2020 WL 733180, at *9 (N.D. Ala. Feb. 13, 2020) (Title VII claims); *Weihua Huang*, 2013 WL 865845, at *1 (lost wages and compensatory damages). By contrast here, Roe "would have no remedy at all" for discrimination by her employing office if the appropriate equitable remedies were barred by sovereign immunity. *In re Golinski*, 587 F.3d 956, 961 (9th Cir. 2009). Worse yet, defendants' approach would create a situation where the "most egregious offenders," *Pollard*, 532 U.S. at 853, would escape *all* liability, contrary to the Constitution and the EDR Plan.

Because Roe has established an entitlement to relief, the Court has authority to order an equitable remedy for the harm she has suffered by losing her career at the FDO. *See* Roe Decl.,

¶ 20 ("[U]nder any reasonable scenario, my compensation as a court-appointed attorney will be far less than I would have received over the course of my career at the FDO.").

## III.    Defendants' Anticipated Attack On This Motion As Premature Is Unwarranted.

Roe anticipates that defendants will claim that her motion for partial summary judgment is premature. *See* Pl. Counsel Decl., ¶ 3. Rule 56 expressly authorizes a summary judgment motion at any time prior to the close of discovery. Fed. R. Civ. P. 56(b). If a party opposes summary judgment as premature, it bears the burden of demonstrating via declaration the "specified reasons" why it "cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d).

Here, many of the essential facts about Roe's situation—that she resigned because she did not receive remedies for unlawful discrimination—are not subject to any genuine dispute, as set forth in her declaration and accompanying exhibits. Absent a genuine dispute of material fact, there is no reason why the Court cannot decide defendants' liability as a matter of law. In fact, that is precisely what happened in another judiciary employee's lawsuit to enforce her equal protection rights after she failed to receive remedies under the EDR Plan. *See Golinski v. U.S. Office of Pers. Mgmt.*, 824 F. Supp. 2d 968, 974 (N.D. Cal. 2012) (granting plaintiff's motion for summary judgment and denying motion to dismiss in the same ruling).

Moreover, despite having the opportunity, defendants have not participated in discovery. Pl. Counsel Decl., ¶ 2. Defendants therefore have no basis to demand a Rule 56(d) stay to conduct discovery while at the same time refusing to move forward with discovery. Though defendants have argued that discovery is premature prior to a ruling on qualified immunity, *see* ECF No. 51, that defense is not relevant to Roe's equitable claims against the official capacity

24

and entity defendants.  More to the point, discovery is not necessary to verify facts and evidence, such as the EDR administrative record, that are already in defendants' possession.

Though Roe's case likely will be even stronger with discovery, the evidence submitted with this motion shows that her constitutional rights were violated and entitles her to summary judgment on defendants' liability.  But if defendants contend that genuine material disputes of fact exist, and the Court finds that the current record is insufficient, then, at a minimum, defendants should be compelled to respond to Roe's discovery requests.

Finally, any factual disputes about appropriate remedies can be resolved by the Court after an "equitable hearing" on that issue.  *Duke*, 928 F.2d at 1424.  For example, in awarding front pay, the Court may examine factors such as the length of time Roe likely would have been employed absent the discrimination and the availability of comparable employment opportunities.  *Hunter*, 897 F.3d at 563 (citing *Ogden v. Wax Works, Inc*., 29 F. Supp. 2d 1003, 1013–15 (N.D. Iowa 1998)).

## CONCLUSION

For these reasons, Roe respectfully requests that the Court enter an order granting partial summary judgment on the issue of liability against the official capacity and entity defendants under Fed. R. Civ. P. 56.  Roe further requests that the Court set an equitable hearing to determine appropriate remedies.

This the 17th day of August, 2020.

Respectfully Submitted,

*/s/ Cooper Strickland*
Cooper Strickland
N.C. Bar No. 43242
P.O. Box 92
Lynn, NC 28750
Tel. (828) 817-3703

25

cooper.strickland@gmail.com

Counsel for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on the 17th day of August, 2020, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

  Gill P. Beck at Gill.Beck@usdoj.gov

  Joshua M. Kolsky at Joshua.kolsky@usdoj.gov

  Shannon Sumerall Spainhour at mss@dhwlegal.com

*/s/ Cooper Strickland*
Cooper Strickland
N.C. Bar No. 43242
P.O. Box 92
Lynn, NC 28750
Tel. (828) 817-3703
cooper.strickland@gmail.com
