# EXHIBIT M

# North Carolina Office of Indigent Defense Services

# FY19 Private Appointed Counsel (PAC) Effective Pay Rate Study

## Public Defense Attorney Overhead Rates and Access to Benefits

Margaret A. Gressens
IDS Research Director

March 2019

North Carolina Office of Indigent Defense Services
123 West Main Street, Suite 400
Durham, NC 27701
919-354-7200
www.ncids.org



*Safeguarding individual liberty and the Constitution by equipping the North Carolina public defense community with the resources it needs to achieve fair and just outcomes for clients*



Copyright © 2019 NC Office of Indigent Defense Services

# FY19 Private Appointed Counsel (PAC) Effective Pay Rate Study

## Introduction

Over the years, the North Carolina Office of Indigent Defense Services (IDS) continuously hears from attorneys heart-rending stories about their efforts to serve clients under impossible conditions, their financial difficulties, and the lack of respect they are treated with by the system. Since the rate cuts imposed by the legislature in 2011, the frequency, frustration, and anguish in these stories continue to intensify every year. Good attorneys who have long felt an obligation to serve justice and protect the Constitution have been forced to walk away from public defense. They simply cannot afford to do this work any longer. Morale has eroded, faith in the system is failing, and many attorneys wonder when the system will simply collapse under the strain. All agree justice is suffering.

Yet diametrically opposed to the anguish is the equally deeply held belief by some that public defense attorneys milk the system with disregard to the fact that the public is paying, that $55 an hour is a considerable wage and still attorneys pad their bills, and that public defense attorneys make a very good living.

Amid the confusion and opposing opinions, what do we know? Yes, $55 an hour sounds like a very nice sum, but the fact is, unlike judges, clerks, prosecutors, magistrates, public defender office attorneys, and virtually every actor in the criminal justice system, private appointed public defense attorneys (PAC) are different. They are contractors. As contractors, their hourly pay rate represents gross pay, not net earnings. As contractors, before a dime goes in their pockets, they first have to pay office overhead and self-employment tax. The remainder of their payment has to pay for benefits, such as health insurance and retirement, without any contributions or help from an employer, as well as monthly earnings.



Gross Hourly Rate → Less Office Overhead → Less Employer FICA → Less Health Insurance → Less Retirement → Less Life Insurance → Effective Hourly Rate

We know the PAC hourly rate paid, but that is only half of the picture. What are their overhead costs? What benefits are they able to afford? At the end of the day, what is the effective hourly rate PAC receive for doing public defense work? IDS needed data to inform the debate on the appropriate hourly rate for public defense attorneys.

## Obtaining Data: The IDS Attorney Effective Hourly Rate Survey

In January 2019, IDS conducted a survey and collected data on attorney overhead costs, support staff, benefits, annual billable hours, and other financial information. The survey was sent to 2,380 attorneys in every county around the state, and 322 attorneys around the state responded (a 13.5% survey response rate).

---

### Gross Pay vs Earnings

Private appointed public defense attorneys are contractors; payment does not equal earnings.

### Their Voices

- *I put off purchase of personal items like groceries, because I am concerned the money will be needed elsewhere, like to pay the mortgage.*

- *I do not have room in my finances to handle any family emergency.*

- *It would be nice to have access to health insurance.*

- *The only way I could afford to do indigent defense work was because I am married. I am able to get health insurance through my husband and he pays the mortgage. I would not be able to afford my monthly expenses if I were not married.*

- *My overhead has been reduced to about $45/hour on a 2000 hour annual work year (which includes only a very modest monthly salary for me, less than what my assistant receptionist makes).*

- *I love indigent defense. I struggle running my practice and I am pretty good at the business aspects. It's a new practice and I spend the majority of my time on indigent defense. I just did the taxes and I made 5k. If it weren't for my husband we wouldn't make it and I would have to give up what I love.*

- *I have seen a number of individuals around the age of 30-35 take different jobs because they cannot make enough to support a solo law practice.*

- *I pay a higher fee rate for plumbers, electricians, and auto mechanics than $55 per hour. These are trade skills that don't require advanced levels of education.*

- *I include indigent defense cases because it's the right thing to do and as a service to those in need of help.*

## Public Defense Attorney Net Earnings and Access to Benefits

- 20% make an effective hourly rate of less than $10/hr.

- Four in 10 make an effective hourly rate of less than $22/hr.

- One in 10 loses money by handling public defense cases.

- One in 10 has no health insurance, and an additional 40% only have insurance due to a spouse or parent.

- 8 in 10 do not earn enough to invest in retirement.

- 7 in 10 PAC attorneys are solo practitioners, and 84% have no support staff whatsoever.

- Almost one in three report being constantly worried about finances, and two-thirds report they are often or constantly worried.

- Eighty-six percent report they experienced at least one of the these financial hardships in 2018:
  - Credit card debt
  - Taking on secondary employment
  - Late student loan payments
  - Late payments on other Loans
  - Being on income-based government assistance
  - Delay in starting a family

- One in two report that in the last three years, lowered rates have forced them to reduce the amount of public defense work they can take or to stop taking cases altogether, and a number report that the instigation of flat fee and contract compensation systems in some counties has made the situation worse.

### PAC Overhead Costs

The survey collected 2018 data on the monthly cost for a list of overhead items, such as rent, parking, malpractice insurance, office equipment, telephones, internet, bar dues, required CLE programs, non-attorney employee salaries, non-employee benefit programs, and data access fees, as well as their total billable hours, firm type, number of attorneys in the firm, and percent of their hours handling public defense cases.

In 2018, attorneys report their average per attorney per hour overhead cost was $38.10 per hour and the median was $21.72 per hour. The average effective hourly rate before benefits was $15.62 and the median was $30.75. However, these low overhead rates were achieved by eliminating critical resources, such as legal research tools, that enable attorneys to provide competent representation. Thirty percent of public defenders had overhead hourly rates under $15 and five percent had rates under $5.

| Average Overhead Costs per Attorney per Hour in 2018 | | | | |
|---|---|---|---|---|
| | | Effective District Court Hourly Rate Less Overhead | Employer Share of FICA* (7.6%) | Effective District Court Hourly Rate Before Benefits |
| N | 200 | | | |
| Average | $38.10 | $16.90 | $1.28 | $15.62 |
| Median | $21.72 | $33.28 | $2.53 | $30.75 |
| Minimum | $2 | $52.92 | $4.02 | $48.90 |
| Maximum | $553 | -$497.51 | $0.00 | -$497.51 |
| Percentiles 10 | $8.14 | $46.86 | $3.56 | $43.30 |
| 20 | $10.78 | $44.22 | $3.36 | $40.86 |
| 30 | $14.04 | $40.96 | $3.11 | $37.85 |
| 40 | $16.88 | $38.12 | $2.90 | $35.23 |
| 50 | $21.72 | $33.28 | $2.53 | $30.75 |
| 60 | $28.92 | $26.08 | $1.98 | $24.10 |
| 70 | $37.22 | $17.78 | $1.35 | $16.43 |
| 80 | $45.73 | $9.27 | $0.70 | $8.56 |
| 90 | $71.77 | -$16.77 | $0.00 | -$16.77 |

*\* Contractors pay both the employer and employee share of the Self-Employment Tax or FICA (contributions to Social Security and Medicare). Each contribute 7.6% of earnings (15.2% total). The analysis excludes survey responses that did not provide complete information on overhead costs, firm type, and annual billable hours.*

### PAC Attorneys Have Made Themselves As Lean As Possible:

Contrary to some public perception, public defense attorneys operate very leanly in order to survive and continue handling public defense cases.

After the rate reductions in 2011, one third of public defense attorneys took steps to reduce overhead, and another third took drastic steps to reduce overhead, including:

- ❖ Eliminated support staff positions
- ❖ Reduced staff benefits
- ❖ Moved practice from office to home
- ❖ Eliminated malpractice insurance

In fact, 84% of the attorneys who continue to handle public defense cases report that they have zero support staff. Only 12.7% of public defense attorneys report access to one full-time equivalent support staff.

Perversely, this lack of access to support staff forces attorneys to perform non-attorney duties, such as clerical and paralegal work, at attorney rates. It creates inefficiency in the system.

### Attorneys Cutting Back or Removing Themselves from Public Defense

A significant number of attorneys report that they make financial sacrifices to handle public defense cases, and they did so even when the hourly rate was $75 an hour but were willing to do so out of a strong sense of public service. However, many report that after the 2011 rate drops, although it pained them greatly, they simply could no longer afford to continue taking public defense cases at the $55 rate or had to severely limit the number of cases they took. In fact, 50%, or one in two attorneys, report that in the last three years they reduced their amount of public defense work or have withdrawn completely and they further report the primary reason for doing so is that they cannot afford public defense work at the current low rates.

The rate at which attorneys have left the public defense rosters across the state since the 2011 rate cut is a major concern for the criminal justice system, as it has led to court inefficiencies, delays, and increasing numbers of court continuances. As experienced attorneys remove themselves from public defense, fewer attorneys remain to handle cases. Those who remain are pressured to join multiple lists and even to join lists in multiple counties. The result is more continuances and more court delay as attorneys cannot be in two courts simultaneously and they struggle to handle larger caseloads.

For example, IDS recently was asked if an attorney could travel to another county to provide representation because the local list of attorneys willing to accept appointed cases was so small that one of the few attorneys willing to do the work would often handle 20 to 30 probation violation cases in one day. When so few attorneys are willing to do the work, the remaining attorneys handle more cases than they can reasonably cover, creating a risk clients will be represented by poorly prepared attorneys. The situation was sufficiently serious that the local judge and prosecutor were trying to recruit experienced attorneys to cover their county. Without an increase in the rates to allow attorneys to cover overhead and earn a living this situation will continue to worsen.

### Low Fees Exasperated by a Culture that Expects Indigent Cases to be Handled with Very Few Hours of Work

Attorneys report that there is a strong expectation that public defense cases will be handled with very few hours of work, which leads to two phenomona being present in public defense work: 1) some judges cut fees when that expectation is exceeded, and 2) attorneys self-cut their fees to meet that expectation and avoid the humiliation of having their hours cut in open court.

---

**Their Voices**

- *I'd like to see some way for private attorneys doing primarily appointed work to have affordable health insurance, long term disability insurance, and a retirement plan. Although I'm philosophically dedicated to indigent defense, these are the issues that I think about when I consider seeking other employment.*

- *I discontinued indigent defense to accept more profitable work although I have a passion and affinity for indigent clients and representation.*

- *As the fees have been reduced, I have taken fewer indigent cases and removed myself from appointment lists in favor of retained work. I have been appointed to some cases in two of the counties in our district where I am not on the list as favors to clerks, judges or other attorneys due to the lack of willing attorneys to take indigent cases.*

- *I know my practice is new but I'm constantly scared to ask for the actual amount of money I spent on a case. If we spend more than 5 hours our district Judge requires an affidavit which makes us spend time to do the affidavit so for most attorneys I know it's 4.9 if it's 5 or more hours.*

- *I maintain very low overhead, however, I feel the IDS rate grossly underpays attorneys. When factoring in the number of nonbillable hours that go into a case, the fees end up being less than paralegals, who tend to have much less student loan debt, much less stress, and much less malpractice exposure.*

### Their Voices

- *I do IDS work because the system is already so severely slanted in the favor of those with money. I use IDS work as an opportunity to help those who need it most. The money I make off of IDS work does not even cover overhead for the time I expend on the work.*

- *I have been doing indigent defense work for 25 years and I am being paid less than I was 10-15 years ago. I have watched the salary of other segments (judges, DA, ADA, clerks) of the criminal justice system increase while the attorneys who perform indigent defense pay decrease. It says that we are not an important component of the system. I understand how people feel about the people we represent, but they are entitled to qualified and competent representation.*

- *Cabarrus County is a flat rate county. We did have a judge that would routinely cut extraordinary fee apps claiming if he didn't cut them, IDS would. Our work is drastically undervalued by the state.*

- *If I didn't love helping the "little guy" and the underdogs who need help, and practicing mostly criminal defense, I would have gone into another line of work, or at least another area of the law that is more profitable. As a fellow attorney, also at the end of his career, told me, "All the good I've done hasn't done me any good."*

- *We do not accept indigent cases. We could not cover overhead and pay our staff (let alone our attorneys) on the rates that IDS is paying.*

Almost half (46.2%) of attorneys report they self-cut the hours they submit for the judges approval on fee applications every month. The average number of fee applications self-cut per month per attorney was eight and the median was five fee applications per month.

In addition, over one in 10 attorneys (15.4%) report judges cutting the fee of at least one fee application per month. Judges cut fees by reducing the number of hours the attorney will be compensated for in the case. When judges cut hours, the average number of hours cut per fee application was almost four hours (3.91) and the median was three hours.

The result of this pervasive expectation that few hours should be spent on public defense cases is two-fold. First, a significant percentage of an attorney's billable hours go uncompensated every year, further reducing the effective hourly rate earned by public defense attorneys. Second, over time, the impact of this culture cannot help but have a negative impact on quality as it pits the financial survival of the attorney against the interests of serving their clients, further exasperating a criminal justice system that provides one kind of justice to the wealthy and another to those without means.

The conflict between the attorneys' financial survival and their clients interest is even more pronounced under flat fee compensation systems, where the pressure to not spend time on a client's case is even stronger, as it is almost guaranteeed that those hours will not be compensated.

Inadequate compensation leads attorneys to cut corners. In one county, the prosecutor was so concerned about the lack of time being spent on cases that she contacted IDS and expressed that her prosecutors often had to look out to ensure defendants were being properly represented. She went on to recount a case in which an attorney appeared without knowing that the client was facing a probation violation rather than a criminal charge.

### Public Defense Attoneys Compensated Far Below the Fair Market Value

Current public defense rates are extraordinarily low, especially in comparison to retained practice compensation rates. The table belows show the average fees charged by attorneys with retained practices.

| | Retained Practice Charging Practices | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Flat Fee Charges | | | | | | Hourly Rate Charges | | | | |
| | Armed Robbery | Felony Drug | Felony H or I | DWI | Misd. Class 1 to 3 | Probation Violation | Bond Hearing | I Only Charge an Hourly Rate | Adult Criminal Hourly Rate | Juvenile Hourly Rate | Parent Rep. Hourly Rate | Other Hourly Rate |
| N | 124 | 130 | 139 | 154 | 162 | 137 | 111 | 14 | 45 | 37 | 53 | 42 |
| Average | $ 7,703 | $ 4,610 | $ 3,057 | $ 1,717 | $ 735 | $ 719 | $ 602 | $ 223 | $ 239 | $ 214 | $ 220 | $ 240 |
| Median | $ 6,000 | $ 4,000 | $ 2,500 | $ 1,500 | $ 650 | $ 625 | $ 500 | $ 250 | $ 250 | $ 200 | $ 225 | $ 250 |
| Minimum | $ 1,000 | $ 750 | $ 275 | $ 200 | $ 100 | $ 185 | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 55 |
| Maximum | $ 35,000 | $ 20,000 | $ 15,000 | $ 5,000 | $ 5,000 | $ 2,500 | $ 4,007 | $ 350 | $ 450 | $ 350 | $ 350 | $ 350 |

Public defense rates also are extremely low compared to the federal public defense rate, which was just raised. Effective February 15, 2019, the non-capital federal public defense rate increased from $140 to $148 an hour, and the capital rate increased from $188 to $190 an hour.

## Appropriate Overhead Costs

Private public defense attorneys should be compensated at levels that allow necessary overhead costs to be covered and to earn enough to provide some appropriate level of health care and retirement like every other actor in the criminal justice system, including judges, prosecutors, magistrates, clerks, and salaried public defender office employees.

IDS reviewed all the itemized overhead costs and identified 13 non-optional overhead items that the hourly rate paid to public defense attorneys should cover: rent, malpractice insurance, office equipment, office expenses, telephone, internet, bar dues, required annual CLE programs, legal research tools such as Lexis or Westlaw, access to one full-time support staff, and debt service or the interest on the firm's line of credit. The average overhead cost for non-optional items averaged $46.72 an hour and the median was $38.20 an hour. Note that, because so few survey respondents had access to support staff, the analysis used the average and median salary of a paralegal in North Carolina instead of survey data.

**Average and Median Overhead Costs of Solo Practitioners for Non-Optional Overhead Items**

| | Non-Optional Overhead Items | | | | | | | | | | | | | Overhead Cost | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Rent | Malpractice Insur. | Equipment (Deprec. Value) | Phones | Internet | Office Expenses (supplies, postage, etc.) | Legal Research Tools (Lexis, etc.) | Bar Dues | Required CLE Programs | 1 FTE Support Staff | Staff Benefits | Data Access Fees (DMV, NC Crim., etc.) | Debt Service (interest on firm line of credit) | Per Atty per Mos. Ovrhd Cost | Per Atty Billable Hours | Per Atty per Hr Ovrhd Cost |
| N | 109 | 105 | 85 | 115 | 101 | 114 | 53 | 116 | 107 | 13 | 6 | 41 | 25 | | | |
| Average | $783 | $141 | $180 | $196 | $115 | $ 228 | $140 | $79 | $118 | $ 3,826 | $782 | $ 56 | $362 | $ 7,007 | 1,800 | $ 46.71 |
| Median | $700 | $100 | $100 | $150 | $ 80 | $ 150 | $100 | $40 | $ 50 | $ 3,479 | $600 | $ 30 | $150 | $ 5,729 | 1,800 | $ 38.20 |

*Note: 1 FTE support staff position based on average and median paralegal salaries in North Carolina. Billable hours based on typical billable hours per year by attorneys. Analysis includes survey responses of public defense solo practitioners with a minimum of 15% overhead ($8.25 per hour) for all items in the survey. Responses where the overhead was less than 15% were excluded.*

The table below shows the effective earnings of public defense attorneys with appropriate overhead levels at the current $55 hourly rate, as well as at $85 an hour, which is the pre-2011 rate adjusted for inflation.

**Average and Median Attorney Earnings with Appropriate Overhead Rates at Current and Restored Paid Hourly Rates**

| | | Overhead Cost | | | Effective Rate | | Benefits | | | Earnings | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Paid Hourly Rates | | Per Atty per Mos. Ovrhd Cost | Per Atty Billable Hours | Per Atty per Hr Ovrhd Cost | Eff. Hourly Rate | Eff. Hourly Rate Less FICA | Health Hourly Cost | Retirement Hourly Cost (6%) | Life Insur. Hourly Cost ($500,000) | Eff. Hourly Rate Less Ben. | Annual Earnings |
| $55 Rate | Average | $ 7,007 | 1,800 | $ 46.71 | $ 8.29 | $ 7.66 | $ 3.72 | $ 0.46 | $ 0.77 | $ 2.71 | $ 4,877 |
| | Median | $ 5,729 | 1,800 | $ 38.20 | $16.81 | $ 15.53 | $ 3.61 | $ 0.93 | $ 0.76 | $ 10.23 | $18,412 |
| $85 Rate | Average | $ 7,007 | 1,800 | $ 46.71 | $38.29 | $ 35.38 | $ 3.72 | $ 2.12 | $ 0.77 | $ 28.77 | $51,779 |
| | Median | $ 5,729 | 1,800 | $ 38.20 | $46.81 | $ 43.25 | $ 3.61 | $ 2.59 | $ 0.76 | $ 36.29 | $65,314 |

*Note: $85 paid hourly rate based on restored rate of $75 adjusted for inflation ($83.90). Billable hours based on typical billable hours per year by attorneys. Health insurance based on 79 survey responses with health benefits (average $724 and median $575 a month). Retirement based on 6% employer match. Life insurance based on average cost of $500,000 policy.*

Even at restored hourly rates adjusted for inflation, attorney earnings would be extremely modest.

### Their Voices

- *. . . I have to do a lot of other stuff to make ends meet and make a little money for myself. In turn, I end up spending less time on my court-appointed cases than I should. I am surprised the State has not yet been hit with a class-action lawsuit for violation of due process rights by defendants with court-appointed attorneys on a theory that the State is giving them less than adequate representation. It's not that these attorneys are bad attorneys. They are simply overworked and trying to make ends meet.*
- *When I went into solo practice, I took very intentional steps to keep overhead as low as possible (e.g. working from home rather than having a dedicated office, getting on my spouse's insurance rather than trying to pay for it on my own), knowing that IDS rates would not enable me to do otherwise. If something were to happen to my spouse, I would be unable to meet my financial obligations (mortgage, child care, etc.) on IDS income.*
- *While I find it rewarding, it can be disheartening, especially when you encounter ingratitude when trying to serve the underserved. Financial necessity has forced me to leave indigent defense (which I did for several years, but at $75/hr I determined it was a break-even, so I limited my hours; when it was lowered to $55/hr, I simply had to stop, as I was losing money).*
- *The firm stopped paying my malpractice insurance, my bar dues, my CLE, and my health insurance. I had to pay for these items out of pocket.*
- *I have no savings and retirement. I live paycheck to paycheck.*
- *It's a constant battle to stay in budget with my firm and my household. I worry more about long term financial goals like retirement.*

Case 1:20-cv-00066-WGY Document 60-14 Filed 08/17/20 Page 8 of 9

## Their Voices

- *It is nearly financially illogical to stay on the court appointed list based upon my overhead and the hourly rate. I wouldn't do it if I didn't believe in the right for people to have legal representation and could not afford it financially.*

- *I have filed bankruptcy. I have defaulted on student loans (currently rehabilitating). I have had to recover my mortgage from foreclosure twice, most recently with assistance from the North Carolina Housing Authority bridge loan.*

- *I've had to set up payment arrangements for back taxes, and I have not been able to purchase health insurance.*

- *I have not taken a salary in many months due to financial strains in the office.*

- *I have no retirement plan. My health insurance is like a second mortgage and that is through the bar plan. And I am healthy . . . I operate on a shoestring budget.*

- *I have strongly considered leaving the legal profession.*

## Conclusion

It is IDS's long-held position that rates need to be raised immediately, and every year that passes only intensifies this need. The 2011 rate cuts were intended to be a temporary measure that was necessary when the state was in extreme financial difficulty. Now that state finances have recovered, PAC hourly rates should be restored to their pre-2011 levels after being adjusted for inflation, then periodically adjusted for cost of living increases as and when other court system actors receive cost of living adjustments. Today, restored rates adjusted for inflation would be $85, $95, and $105.

In addition, IDS should support attorney compensation systems that do not pit the financial survival of the attorneys against their clients' interests. Compensation systems that pressure attorneys to spend few hours on cases, such as grossly low flat fee schedules and inadequate contract payments, compromise justice and erode faith in the criminal justice system.

## Note

A copy of the survey in its entirety is available on the IDS website along with the companion worksheet IDS provided to assist attorneys in completing the overhead cost section of the survey at www.ncids.org.

*It is not possible to provide competent and thorough representation to a criminal defendant for what amounts to less than $200 for the entire case, and the attorney has to handle dozens of cases at a time. Witnesses are not interviewed, evidence is not reviewed, trials are virtually out of the question, so it's a plea-factory.*

*If this is a shocking suggestion, it should be. That is actually the reality of the current situation, with the malpractice insulation being that although these clients know they are getting treated like cattle, they don't have the means to hold anyone accountable.*