**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

**ASHEVILLE DIVISION**

| | |
|---|---|
| JANE ROE, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | )    **Civil No. 1:20-cv-00066-WGY** |
| | ) |
| UNITED STATES OF AMERICA, *et al.*, | ) |
| | ) |
| *Defendants*. | ) |
| | ) |
| _____ | ) |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HER MOTION**
**FOR PARTIAL SUMMARY JUDGMENT AGAINST THE**
**INDIVIDUAL-CAPACITY DEFENDANTS**

Plaintiff Jane Roe ("Roe") was subjected to sexual harassment, retaliation, and discrimination during her employment as an assistant federal public defender. Roe sought relief under the Fourth Circuit's Employment Dispute Resolution ("EDR") Plan, but she was deprived of any meaningful review or remedies, resulting in her constructive discharge.

Because the material facts showing these equal protection violations are not subject to genuine dispute, Roe respectfully requests that the Court enter an order granting partial summary judgment against the individual-capacity defendants on the issue of liability under the Fifth Amendment and 42 U.S.C. §§ 1985(3), 1986. *See* Fed. R. Civ. P. 56(a).

**ARGUMENT**

**I.     Defendants Are Individually Liable For Violating Roe's Equal Protection Rights.**

Defendants violated Roe's constitutional right to be free from sex discrimination in her federal employment. Specifically, defendants subjected Roe to sexual harassment, discrimination, and retaliation, failed to take immediate and effective remedial action on her

1

complaints, and deprived her of any meaningful remedies or review, resulting in her constructive discharge. These actions unlawfully burdened Roe because of her gender, in violation of the Fifth Amendment's Due Process Clause.

Stated simply, "[c]reating abusive conditions for female employees and not for male employees is discrimination." *Bohen v. City of E. Chicago, Ind.*, 799 F.2d 1180, 1185 (7th Cir. 1986) (citing *Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986)). "Forcing women and not men to work in an environment of sexual harassment is no different than forcing women to work in a dirtier or more hazardous environment than men simply because they are women. Such unjustified unequal treatment is exactly the type of behavior prohibited by the equal protection clause as interpreted in *Davis v. Passman*, 442 U.S. 228, 234–35 (1979)." *Id.* at 1185–86. This form of discrimination can never be "justified" by a "legitimate" policy purpose, because "there is virtually no scenario imaginable where sexual harassment . . . is substantially related to important governmental objectives." *Id.* at 1187. And by violating Roe's protected rights under the EDR Plan, defendants arbitrarily and unfairly denied her the benefit of the very procedures that were designed to protect her from workplace discrimination. *See Bolling v. Sharpe*, 347 U.S. 497, 499 (1954) (explaining that "the concepts of equal protection and due process, both stemming from our American ideal of fairness, are not mutually exclusive").

Each of the individual-capacity defendants is personally liable for his or her "affirmative conduct . . . that played a role in the discrimination." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990), *superseded on other grounds by statute* (citing *Rizzo v. Goode*, 423 U.S. 362, 377 (1976)). Under the Fifth Amendment, the EDR Plan, and the judiciary's codes of conduct, each defendant had a duty to ensure that Roe would be free from gender discrimination in her federal workplace. *See, e.g.*, *Davis v. Passman*, 442 U.S. 228, 235–36 (1979); *Beardsley*

*v. Webb*, 30 F.3d 524, 529 (4th Cir. 1994); Guide to Judiciary Policy § 220.10.10; EDR Plan Ch. II, § 1 (2013); Code of Conduct for United States Judges, Canon 3B(4), 3B(6); Code of Conduct for Judicial Employees Canon 3(C)(1); Code of Conduct for Federal Public Defender Employees Canon 3(C). However, defendants violated these duties, as set forth in detail in Roe's motion for partial summary judgment against the official capacity and entity defendants and accompanying declarations and exhibits, which she expressly adopts and incorporates here. *See* ECF No. 60; *see also* ECF No. 48, at 1–13 (describing equal protection violations by individual-capacity defendants).

To begin with, there is no dispute that Roe was subjected to unlawful discrimination at the FDO, including by the highest levels of management. In fact, the Chief Judge took "disciplinary action" "as a result of [her] report of wrongful conduct." Roe Decl., Ex. C, at 73; *see also* ECF No. 37, at 1, 5; ECF No. 39, at 1, 5; ECF No. 41, at 1, 5. The EDR Plan defines "wrongful conduct," in relevant part, as "[d]iscrimination against employees based on . . . sex (including pregnancy and sexual harassment)," and "retaliation for engaging in any protected activity." EDR Plan Ch. II, § 1. The Plan further provides that "[e]mployees <u>found</u> by the Chief Judge and/or unit executive <u>to have engaged in wrongful conduct</u>, as defined in this Plan, may be subject to disciplinary action." EDR Plan Ch. IX (emphases added). Under the EDR Plan's plain terms, a finding of wrongful conduct—that is, unlawful discrimination—is a prerequisite to taking disciplinary action.

Despite Roe's valid complaints of discrimination, defendants failed to take adequate remedial steps. Most importantly, as the head of Roe's employing office—and that office's representative in the EDR proceeding—the Defender was responsible for ensuring a workplace free of sexual harassment, retaliation, and discrimination. *See* 18 U.S.C. § 3006A(g)(2)(A);

EDR Plan Ch. II, § 1. However, after Roe reported her complaints to the Defender, he failed to

take appropriate action. *See* Declaration of Jane Roe in Support of Motion for Partial Summary

Judgment, ECF No. 60-2 ("Roe Decl."), Ex. B, at 4–7. The Defender failed to remove her from

the First Assistant's supervision or protect her confidentiality, made hostile and discriminatory

comments to her, and initiated a wrongful conduct investigation only after she followed up on his

promises to take appropriate action. *Id.* He also retaliated against her by diminishing her job

duties and not considering her for an opening as an appellate assistant federal public defender.

*Id.* at 6–7. Instead, the Defender gave her a "phantom promotion," with Fourth Circuit approval,

which was a reclassification of title that benefitted the office's work measurement formula with

no consideration for a raise or progression of job responsibilities, and a loss of her locality

adjustment. *Id.*; Roe Decl., Ex. D.

Defendants ratified, enforced, and amplified the discrimination through their affirmative

acts at each stage of the EDR process. From the start, defendants worked together to shut down

the efforts by the Fair Employment Opportunity Officer, the Deputy Director, and the Chief of

Defender Services to take immediate and effective action on Roe's complaints. Complaint

¶¶ 213–35; Roe Decl., Ex. B, at 26, 29–32; Roe Decl., Ex. C, at 1–2. Specifically, they (1)

prohibited Roe from communicating with the Fair Employment Opportunity Officer, Complaint

¶¶ 222–35; Roe Decl., Ex. C, at 3; (2) criticized her for reporting her complaints to the AO,

Complaint ¶¶ 199, 266; Roe Decl., Ex. B, at 6, 30; (3) ensured that she was denied any

consideration for a promotion, *id*. ¶¶ 236–51; Roe Decl., Ex. B, at 7, 31–32; Roe Decl., Ex. D;

and (4) required her to continue working for the trial unit that was directly supervised by her

harasser, Complaint ¶¶ 216, 244; Roe Decl., Ex. B, at 6–7, 31, 52. Defendants personally

participated in these actions, which directly resulted in Roe being prohibited from speaking to the Fair Employment Opportunity Officer. Complaint, ¶ 231; Roe Decl., Ex. C, at 3.

Defendants then burdened Roe by placing her on telework for *over six months* with no action on her complaints, while leaving the accused harasser in his duty station and supervisory role. Complaint ¶ 338; *see also* Roe Decl., Ex. B, at 11, 33. This situation made Roe's job duties, such as preparing for court appearances, difficult if not impossible. Complaint ¶ 338; *see also* Roe Decl., Ex. B, at 32–33. In addition, Roe was subjected to hostile and demeaning treatment, such as her coworkers' belittling jokes about meeting her at "Waffle House" and comparing her to "Where's Waldo," *id.* ¶¶ 349–54, and her Team Leader's wearing of an offensive Justice Kavanaugh beer-guzzler helmet for the office Halloween party, *id.* ¶ 346; *see also* Roe Decl., Ex. B, at 28, 32–33.

During this lengthy period, defendants failed to conduct an appropriate investigation. Under Chapter IX of the EDR Plan, "[t]he Chief Judge and/or unit executive shall ensure that the allegations in the report are appropriately investigated." In addition, the EDR Coordinator, the General Counsel, and John Doe(s) personally involved themselves with overseeing the investigation. *Cf.* Fourth Circuit EDR Plan § VI(B) (Sept. 2020) (prohibiting unit executives from serving as EDR Coordinators).[1] For example, on the advice of the General Counsel, the

---

[1] The Fourth Circuit adopted a new EDR Plan on September 14, 2020. *See* Exhibit A. Among other changes from the 2013 and 2018 EDR Plans, the 2020 EDR Plan expressly disclaims any intent "to adjudicate employee discipline" and states that "[i]t is the responsibility of the appointing official to assess, in accordance with applicable policies and procedures, whether further action in a separate process is necessary to correct and prevent wrongful conduct." *Id.* § I; *compare* EDR Plan Ch. IX (2013) ("The Chief Judge and/or unit executive shall ensure that the allegations in the report are appropriately investigated," and "[e]mployees found by the Chief Judge and/or unit executive to have engaged in wrongful conduct . . . may be subject to disciplinary action.").

EDR Coordinator "received" the investigation report instead of the Defender. Complaint ¶ 265; Roe Decl., Ex C, at 6, 29, 51. The EDR Coordinator told Roe that if the allegations against the Defender were substantiated, then the Chief Judge would "step in" as the Defender's "supervisor." Complaint ¶ 287. And the EDR Coordinator and Chief Judge relied on the directives of John Doe(s) in the Office of General Counsel throughout the investigation. Complaint ¶¶ 227, 230, 398, 451, 474; Roe Decl., Ex. C, at 3, 58.

Despite defendants' personal involvement in the investigation, Roe went for periods of three to six weeks without hearing any updates. Complaint ¶¶ 306, 322, 362, 384. When the initial report was submitted approximately two months after the investigation opened, Roe was told that the report was being sent back to be redone. *Id.* ¶ 362. At this point, Roe learned that the Investigator had been asked to make "recommendations," even though, by her own admission, she was not trained or qualified to do so. *Id.* ¶¶ 320, 364. Roe also learned that her retaliation complaints were not investigated, *id.* ¶¶ 318–19, 384; Roe Decl., Ex. C, at 45, because the Defender's misconduct was characterized as mishandling, not retaliation, *id.* ¶ 319.

During this period, defendants gave Roe no alternative to negotiating a resolution with the Defender, against whom she had filed a formal complaint for retaliating against her and subjecting her to a hostile working environment. Roe Decl., Ex. B, at 3–7, 11; Ex. C, at 50–51. Defendants refused to recuse or disqualify the Defender from representing the employing office even though he was "involved in," and a subject of, the complaint. EDR Plan Ch. X, § 7; *see also* EEOC Mgmt. Directive 110, 1-7 (2015) (an accused agency head should recuse himself from the decision-making process on an EEO complaint). Defendants recognized that the Defender had a conflict of interest, which is why the EDR Coordinator "received" the

investigation report instead of the Defender. Roe Decl., Ex. C, at 6, 29, 51. But when it came to formally disqualifying him, defendants refused. *Id.* at 50–51.

Not only did defendants not disqualify the Defender, but they refused to rule on the matter. For *months*, defendants gave Roe the impression that her disqualification request was being stayed because they would need to make a finding of misconduct before disqualifying the Defender. *See* Complaint ¶¶ 287, 370; *see also* Roe Decl., Ex. C, at 5. After the investigation report finally came out, the EDR Coordinator told Roe that the Chief Judge "intend[ed]" to deny her request to disqualify the Defender, Roe Decl., Ex. C, at 50–51, but Roe was not provided any written ruling or statement of reasons, even after renewing her disqualification request, Complaint ¶ 453; *see* Roe Decl., Ex. B, at 57–60; Ex. C, at 66.

Following these delays, the situation was made even worse when defendants withheld the investigation report and deliberately refused to act. *See* Complaint ¶¶ 398, 401; Roe Decl., Ex. C, at 60. As the EDR Coordinator explained to Roe, he decided to withhold the report and delay action specifically after discussions with the Office of General Counsel and with approval of the Chief Judge. Complaint ¶ 398; *see* Roe Decl. Ex. C, at 58, 60. But defendants are not entitled to sit on their hands and refuse to act on sexual harassment. *See*, *e.g.*, EDR Plan Ch. IX. They are required to take "immediate" corrective action. EEOC Enforcement Guidance: Vicarious Liability for Unlawful Harassment by Supervisors, 1999 WL 33305874, at *2, 9, 11, 13, 9 n.57. Defendants' refusal to take immediate corrective action, after the investigation had already been pending for an unacceptably long period of over four months, was *per se* unreasonable and a "conscious failure" to act on sexual harassment. *Bohen*, 799 F.2d at 1187. Inexplicably, disciplinary action *was* eventually taken, but not until almost *six months* later, after Roe had already resigned. Roe Decl., Ex. C, at 73.

Defendants' refusal to disclose the investigation report also violated the Plan's provision requiring information and records to be shared on a "need-to-know basis." EDR Plan Ch. X, § 4. After telling Roe that the report would be the basis for acting in her Chapter X proceeding, Roe Decl., Ex. C, at 6, 30, defendants refused to disclose to Roe the results of the investigation or even a summary of its findings and recommendations, Complaint ¶ 398; Roe Dec., Ex. C, at 60. The EDR Coordinator explained that he did not want to "spark[] satellite litigation over the accuracy of the report" rather than "focus on the outstanding issues." Roe Decl., Ex. C, at 60. However, the "outstanding issue" at that time was taking "appropriate[]" action pursuant to Chapter IX of the EDR Plan. Moreover, at a minimum, Roe had a right to know the results of the investigation into her own complaint, which was being used to adjudicate her legal rights under Chapter X of the EDR Plan.

In addition, defendants violated the EDR Plan's requirement of an "appropriate" remedy. EDR Plan Ch. X, § 12. Specifically, Roe requested "[a]n environment free of harassment, retaliation, and discrimination, . . . the opportunity for merit-based advancement, and any other appropriate relief." Roe Decl., Ex. B, at 2. However, Roe was not even afforded the possibility of an appropriate remedy. She asserted that she had been denied consideration for a promotion because of her harassment. *Id.* at 6–7; *cf.* 2020 EDR Plan § III(B) (discrimination includes "failing to promote" and "significant change in benefits"). She requested action to stop the harassment and prevent it from recurring. Roe Decl., Ex. B, at 6–7. She repeatedly requested a transfer. Roe Decl., Ex. C, at 26–27, 57–59. But she was told that any meaningful action would be viewed as "micromanaging" or "meddl[ing]." Complaint ¶¶ 415, 438. She was told that an EDR presiding officer would have no authority to order remedies. *Id.* ¶ 439; Roe Decl., Ex. C, at

8

69.  And she was told she could not transfer.  *Id.* ¶ 454; *cf.* 2020 EDR Plan § V(B)(4) (interim relief includes transfer request).

Finally, defendants violated Roe's rights by depriving her of any meaningful review or remedies for unlawful discrimination.  As judiciary officials acknowledged to Roe, an EDR presiding officer does not have legal authority to order remedies against a federal defender office.  *See*, *e.g.*, Complaint ¶¶ 371, 415, 439, 444.  Moreover, Judicial Conference policy establishes the lack of meaningful remedies as a matter of law:

    a.  EDR proceedings are strictly administrative and are not "cases and controversies" under Article III of the Constitution;

    b.  Judges presiding in EDR matters are functioning in an administrative rather than judicial capacity;

    c.  Judges' decisions in EDR matters must be in conformance with all statutes and regulations that apply to the judiciary, and judges in the EDR context have no authority to declare such statutes or regulations unconstitutional or invalid; and

    d.  Judges presiding in EDR matters may not compel the participation of or impose remedies upon agencies or entities other than the employing office which is the respondent in such matters.

Proceedings of the Judicial Conference of the United States at 25 (Sept. 2010) (JCUS); *see also* 2020 EDR Plan § V(C)(3)(f)(iii) ("Presiding Judicial Officers serve in an administrative capacity with limited, non-Article III authority, even if they otherwise serve as Article III judges."). Thus, judges in the EDR context are not acting in a "judicial" capacity at all.  *Golinski v. U.S. Office of Pers. Mgmt.*, 781 F. Supp. 2d 967, 973 (N.D. Cal. 2011).  EDR presiding officers are not engaged in "judicial review" any more than a supervisor making a hiring or firing decision. And they can *only* order remedies that are already authorized by statute.  In purporting to "cover" FDOs and misleading Roe into believing she had meaningful remedies, when she did not, defendants are liable for implementing discriminatory policies and practices.  *Cf.* EDR Plan Ch.

9

X, § 6(A) (EDR Coordinator has a duty "[t]o provide information to . . . employees regarding the rights and protections afforded under this Plan").

As judiciary officials implicitly acknowledged, Complaint ¶¶ 439, 444; Roe Decl., Ex. C, at 69, no statute gives an EDR presiding officer authority to order remedies against a federal defender office.  In fact, the Criminal Justice Act ("CJA") limits the court of appeals' authority to appointing the federal defender, setting his compensation, and removing him for "incompetency, misconduct in office, or neglect of duty."  18 U.S.C. § 3006A(g)(2)(A).  The federal defender has authority over personnel decisions, including whether to appoint and remove assistant federal public defenders.  *Id.*  This separation was by design, to further the CJA's purpose of protecting the independence of the Sixth Amendment defense function.  As Congress recognized, "[i]t would be just as inappropriate to place direction of the defender arm in the judicial arm of the U.S. Government as it would be in the prosecutorial arm."  S. Rep. No. 91-790, at 18 (1970).

At most, the CJA offers only indirect authority to impose remedies.  An EDR presiding officer could attempt to influence federal defenders to adopt recommendations, based on the court of appeals' authority to appoint and remove the federal defender.  *See*, *e.g.*, Ninth Circuit EDR Plan for Federal Defenders at 3 (2019) (adopted based on court of appeals' authority to appoint and remove federal defenders).  But this is not the same as having binding legal authority, JCUS at 25, and it is cold comfort to discrimination victims, who functionally have no meaningful review or remedies.  And if defendants did have any legal authority, it is even more inexplicable why it was not used.

Under these circumstances, there can be no genuine factual dispute that Roe resigned because she received no relief for unlawful discrimination in her employment.  *See*, *e.g.*,

Complaint ¶ 475 ("Roe told the EDR Coordinator that she had lost her job because she filed a complaint."); *see also* Roe Decl., Ex. C, at 26–27 ("This situation has irreparably damaged my relationships with the Federal Defender and my colleagues, and I believe I am no longer welcome in that environment."); *id.* at 57 ("I do not believe it is possible to reach a resolution with my current office that will protect me from further harassment and allow me to advance in my career."). Because Roe's involuntary resignation directly resulted from defendants' violations of her rights, and was "objective[ly]" reasonable, defendants are liable. *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004).

In arguing that Roe's resignation was "voluntar[y]," defendants point to an email in which she expressed her gratitude to the Chief Judge and EDR Coordinator for supporting her clerkship application. ECF No. 45, at 9. But on its face, the email does not create a genuine factual dispute. Rather, Roe said she was "saddened to no longer be a federal defender" and was resigning because it was the "best possible outcome under the circumstances." *Id*. The email merely confirms that she was seeking the best possible outcome when forced to resign.

Despite the foregoing facts, Roe expects that defendants may contend that they were acting pursuant to judiciary "policy." *See*, *e.g.*, ECF No. 45, at 2, 19; No. ECF 37, at 2, 16–18; ECF No. 39, at 2, 17–18; ECF No. 41, at 2, 16–17. For example, defendants have asserted that Roe's claims attack what they describe as the "policies underlying the Plan." ECF No. 45, at 19; *cf.* Complaint ¶ 8 ("Roe's rights under the EDR Plan existed on paper, but were fictional in practice."). But in fact, defendants' actions violated the judiciary's antidiscrimination policies and the EDR Plan, which prohibit sexual harassment, discrimination, and retaliation and require appropriate action on complaints. Guide to Judiciary Policy § 220.10.10; EDR Plan Ch. II, § 1, Ch. IX; Code of Conduct for United States Judges, Canon 3B(4), 3B(6); Code of Conduct for

Judicial Employees Canon 3(C)(1); Code of Conduct for Federal Public Defender Employees Canon 3(C). Defendants' actions also violated Title VII precedents and administrative guidance, which apply to EDR proceedings. *See* EDR Plan Ch. II, § 10B(2)(e) (instructing EDR presiding officers to be "guided by judicial and administrative decisions" related to Title VII). Rather than help defendants, their argument that they acted pursuant to policy provides "[e]vidence of a pattern or practice of discrimination," and is "strong evidence supporting a plaintiff's claim that she herself has been the victim of discrimination." *Bohen*, 799 F.3d at 1187.

Defendants may also argue that they did not act with specific intent to discriminate. *See*, *e.g.*, ECF No. 45, at 19 (asserting that Roe's claims against the Defender "boil down to a former judiciary employee's dissatisfaction with her supervisor's handling of her issues"). However, defendants' decisions not to take appropriate action on Roe's complaints were intentional, *supra* pp. 3–9, and any subjective beliefs used to rationalize their conduct are irrelevant. *See Feminist Majority Found. v. Hurley*, 911 F.3d 674, 703 (4th Cir. 2018) (official's failure to stop harassment and downplaying harassment are sufficient for intent element of equal protection claim). Sexual harassment, by definition, is a form of intentional gender discrimination. *Beardsley*, 30 F.3d at 530. Thus, "[a] supervisor who has been apprised of unlawful harassment . . . should know that her failure to investigate and stop the harassment is itself unlawful." *Bator v. Hawaii*, 39 F.3d 1021, 1029 (9th Cir. 1994). And as the Fourth Circuit has held, "[t]he test is objective; [a defendant's] subjective beliefs about the propriety of his conduct are irrelevant." *Beardsley*, 30 F.3d at 530. Because no officer "could reasonably have thought, in light of clearly established law," that defendants' actions were "consistent with [Roe's] rights to be free from discrimination," defendants are liable. *Id.*

12

Finally, defendants have argued that Roe "merely implies that things would have been different if [she] were a man." *See, e.g.*, ECF No. 37, at 12; ECF No. 39, at 12–13; ECF No. 41, at 12. But that is precisely the point—Roe would not have suffered these deprivations of her equal protection rights if she were a man. As the Supreme Court has held, an employer engages in discrimination when he or she intentionally fires an employee, forces her to resign, or otherwise treats her worse, *because of her sex. See Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1741 (2020) (Title VII).[2] Put simply, "if changing the employee's sex would have yielded a different choice by the employer," then discrimination has occurred. *Id.* If Roe were a man, she would not have been subjected to sexual harassment by her male supervisor that went unremedied by defendants, resulting in her constructive discharge. Defendants' conduct made Roe's workplace unbearable because she was a woman and was "unjustified unequal treatment" based on her sex. *Bohen*, 799 F.2d at 1185.

## II. Defendants Are Liable Under *Davis v. Passman*.

In *Davis v. Passman*, the Supreme Court held that the Fifth Amendment provides a "cause of action" for sex discrimination that "may be redressed by a damages remedy."[3] 442 U.S. at 249. As the Court held, "all individuals, whatever their position in government, are subject to federal law." 422 U.S. at 246 (quotation omitted). Further, when Congress excluded excepted service employees from having statutory remedies for discrimination under Title VII, it did not intend to "foreclose alternative remedies available to those not covered by the statute."

---

[2] Title VII prohibits discrimination against "any individual" because of sex, 42 U.S.C. § 2000e-2(a)(1), whereas the Fifth Amendment states that "[n]o person" shall "be deprived of life, liberty, or property, without due process of law," U.S. Const., amend. V. Because both clauses protect the rights of individuals, the discrimination analysis in this context is the same.

[3] Roe previously rebutted defendants' arguments against her *Bivens* claims in detail, and she expressly incorporates and adopts those arguments here. ECF No. 48, at 13–24.

*Id.* at 247. Instead, Congress left "undisturbed whatever remedies" the employees "might otherwise possess." *Id*. That holding confirms that being "excepted service," including in the federal judiciary, does not forfeit constitutional remedies for discrimination. *See* Lindemann & Grossman, Employment Discrimination Law Ch. 32.III.E (6th ed. 2020) (explaining that "judicial branch employees not in the competitive service [who] are not yet covered by any antidiscrimination statute . . . presumably still can sue directly under the Constitution based on the *Davis v. Passman* theory").

However, defendants urge the Court to reject *Davis v. Passman* because in their view, that precedent no longer applies to any federal employees covered by the Civil Service Reform Act of 1978 ("CSRA").[4] ECF No. 37, at 14–15; ECF No. 39, at 14–15; ECF No. 41, at 14–15; ECF No. 45, at 16–17; ECF No. 52, at 8–10; ECF No. 53, at 6–8. Because all federal employees are covered by the CSRA in one form or another, defendants' argument is just another way of saying that *Davis* is no longer good law. But only the Supreme Court has authority to overrule its own precedents, and the Court has never overruled *Davis*. *See*, *e.g.*, *Hernandez v. Mesa*, 140 S. Ct. 735, 743–44 (2020).

---

[4] Defendants' reading of the CSRA creates an intractable and unnecessary conflict with Title VII, which even defendants concede does not preclude judiciary employees' constitutional remedies for discrimination. *See* ECF No. 53, at 8 n.4; ECF No. 54, at 7–8. Under defendants' reading, excepted service employees would have constitutional remedies under Title VII but would be barred from pursuing those remedies under the CSRA—a conflict which violates the Supreme Court's command to read the statutes "in accord." *Perry v. MSPB*, 137 S. Ct. 1975, 1984 (2017). Defendants are also wrong to suggest that excepted service employees are not "cover[ed]" by Title VII. ECF No. 54, at 7. Rather, Title VII protects those employees by negating any intent to "relieve *any* Government agency or official of its or his primary responsibility to assure nondiscrimination in employment as required by the Constitution and statutes." 42 U.S.C. § 2000e-16(e) (emphasis added); *see also Koger v. Ball*, 497 F.2d 702, 705 (4th Cir. 1974) (Title VII "did not create a new substantive right" but rather a "new remedy" for discrimination).

14

Moreover, if defendants were right that the CSRA eliminated a damages remedy for discrimination, the Court had the perfect opportunity to say so in *Bush v. Lucas*, which analyzed the constitutional remedies available to federal employees and specifically discussed the CSRA. *See*, *e.g.*, 462 U.S. 367, 385 n.25 (1983). Instead, the Court stressed that it was *not* disturbing *Davis*'s holding for equal protection violations that have "no alternative form of judicial relief." *Id.* at 377, 378 n.14. That holding directly applies to Roe, whose only option was an "administrative" process that provided no judicial review or any legally binding remedies. JCUS at 25; 2020 EDR Plan § V(C)(3)(f)(iii). Since *Bush*, the Court has confirmed that "alleged gender discrimination in employment" is an "appropriate" context for a *Bivens* claim. *FDIC v. Meyer*, 510 U.S. 471, 484 n.9 (1994). Defendants' arguments cannot overcome controlling Supreme Court precedent and should be rejected.

## III.    Defendants Are Not Entitled To Qualified Or Absolute Immunity.

Defendants are not entitled to qualified or absolute immunity for their conduct.[5]

Defendants are not entitled to qualified immunity because they had "fair warning, with sufficient specificity, that their actions would constitute a deprivation of an individual's constitutional rights." *Betton v. Belue*, 942 F.3d 184, 194 (4th Cir. 2019). "Even under novel factual circumstances, a government official can still be on notice that his conduct violates established law so long as the law provided 'fair warning' that his conduct was unconstitutional." *Feminist Majority Found.*, 911 F.3d at 704 (quotations and alterations omitted).

Specifically, it has long been clearly established that government officials who "conscious[ly] fail[ed]" to act on, "acquiesced" in, or "d[id] nothing" in response to sexual

---

[5] Roe expressly incorporates and adopts her previous arguments against qualified and absolute immunity. ECF No. 48, at 22–24.

harassment are not entitled to qualified immunity. *Bohen*, 799 F.2d at 1185; *Andrews*, 895 F.2d at 1478; *Cross v. State of Ala.*, 49 F.3d 1490, 1503 (11th Cir. 1995); *Beardsley*, 30 F.3d at 530 (citing *Bohen* with approval and noting that "sexual harassment has long been recognized to be a type of gender discrimination"); *accord Johnson v. Martin*, 195 F.3d 1208, 1219 (10th Cir. 1999) ("In instances in which a plaintiff demonstrates that a supervisor had actual knowledge of the harassment but failed to take any remedial action (e.g., by investigating the allegations and taking disciplinary action against the harassing subordinate employee), courts have concluded that the supervisor may be held liable."); *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1294 (3d Cir. 1997), *abrogated on other grounds by Burlington Northern v. White*, 548 U.S. 53 (2006) ("Where a supervisor with authority over a subordinate knows that the subordinate is violating someone's rights but fails to act to stop the subordinate from doing so, the factfinder may usually infer that the supervisor 'acquiesced' in (i.e., tacitly assented to or accepted) the subordinate's conduct."); *Bator*, 39 F.3d at 1029 ("A supervisor who has been apprised of unlawful harassment . . . should know that her failure to investigate and stop the harassment is itself unlawful.").

Even an official who is not "entirely unresponsive" will be liable for not "engag[ing] in efforts that were reasonably calculated to end the harassment."[6] *Feminist Majority Found.*, 911 F.3d at 689. The test is whether the official's conduct was "clearly unreasonable" or "deliberately indifferent," *id.* at 701–02, which describes defendants' conduct here. For example, the Defender describes the First Assistant's sexually harassing behavior as a "unique

---

[6] The Court granted the defendants qualified immunity in *Feminist Majority Foundation* because that case involved student-on-student sexual harassment in the university setting, which presented a novel context. 911 F.3d at 704–05. In doing so, the Court distinguished sexual harassment "in the context of a supervisory liability equal protection claim," which violates established law. *Id.* at 705; *see also id.* at 701 n. 16 (relying on *Beardsley*).

16

opportunity for mentorship." ECF No. 45, at 3–4. He also describes Roe's complaints as "vague" and "mere dissatisfaction with work assignments." ECF No. 52, at 15. However, Roe "notif[ied]" the Defender that she would be "drawing boundaries" with the First Assistant because he had behaved "inappropriately" towards her, and "she was leaving the office early every day to avoid issues with him." Complaint ¶¶ 124–25. After Roe's attempt to confront the First Assistant was unsuccessful, *id.* ¶¶ 127–33, Roe reported again to the Defender that the First Assistant "was interfering with her ability to do her job and that she felt threatened by him," *id.* ¶ 143. For example, "the First Assistant had asked her repeatedly to meet out of the office." *Id.* He had "waited for her in the lobby at night when he knew she was alone." *Id.* She repeated to the Defender "that she was leaving the office early every day to avoid being alone with him." *Id.* The Defender acknowledged the significance of her complaints by stating that he did not want her to feel "uncomfortable" or "unsafe." *Id.* ¶ 144.

Given the specificity of Roe's reports, it was unreasonable for the Defender to interpret her comments that she was not making a formal report "yet" because she was trying to self-manage the situation, *id.* at ¶¶ 124–25, as "assurances" that she was not being harassed, ECF No. 45, at 4. Even if the Defender believed that Roe had only reported she was "uncomfortable," Complaint ¶ 198, he "surely should have known" that her complaints put him on notice, *Okoli v. City Of Baltimore*, 648 F.3d 216, 224 (4th Cir. 2011). The Defender fails to recognize that "[t]here is no magic word requirement. That is, the employee need not label the events 'sexual harassment' in order to place an employer on notice of the offending behavior." *Id.* at 224 n.8 (quoting parenthetical). Worse yet, the Defender compared Roe's relationship with her harassing supervisor to a marriage and told her to "compromise." Roe Decl., Ex. B, at 5. The Defender berated her for going to "some other party" with her complaints. *Id.* at 30; *cf.* 2020 EDR Plan

17

§ V (encouraging employees to speak with individuals outside of the employing office). He minimalized and trivialized her complaints by implying that, at least there was no "physical contact." Roe Decl., Ex. B, at 6; *cf.* 2020 EDR Plan § III(A) ("Wrongful conduct can be verbal, non-verbal, physical, or non-physical."). He rejected the Chief of Defender Services' efforts to ensure immediate and effective remedial action, Roe Decl., Ex. B, at 5–7; Roe Decl., Ex. C, at 1–2, and instead retaliated against her and subjected her to a hostile working environment without taking any meaningful action on her complaints, Roe Decl., Ex. B, at 4–7, 22–23, 24–27, 29–33.

To this day, the Defender asserts that he has no legal duty to protect his employees from discrimination. ECF No. 52, at 4 n.2. He claims that Title VII principles are "irrelevant" because Title VII does not apply to the judiciary. *Id.* at 15; *cf.* 2020 EDR Plan § III(A) ("Wrongful conduct also includes conduct that would violate . . . Title VII."). He has even described his employees' constitutional rights as "non-existent." ECF No. 52, at 18. His continued hostility towards protected rights confirms that he is not entitled to qualified immunity.

The other defendants' response was also "clearly unreasonable" and "deliberately indifferent." *Feminist Majority Found.*, 911 F.3d at 701–02. For example, defendants did not take disciplinary action until *almost a full year* after Roe raised complaints of harassment that made her feel so threatened, she stopped coming into work and ultimately resigned.[7] *See id.* at 691–92 (discussing deliberate indifference where defendants "downplayed" harassment and told

---

[7] Defendants' conduct is especially unjustifiable because they were already aware of "serious issues" in the FDO prior to Roe's complaints. Complaint ¶ 264; *see also* Testimony of Hon. Max. O. Cogburn, Ad Hoc Committee to Review the Criminal Justice Act (Jan. 11–12, 2016), *available at* https://tinyurl.com/y3bjugxy (describing employee misconduct and retaliation); *Carlin v. Federal Defenders of Western North Carolina, Inc.*, No. 3:13-cv-00365-JFA-PJG (W.D.N.C) (prior employee discrimination lawsuit).

18

complainants they were "powerless" to address it). An employer "must respond" to a report of sexual harassment. *See Feminist Majority Found.*, 911 F.3d at 690 (quoting parenthetical). "[T]he mere act of listening" to a complaint "is not a remedy in and of itself," *id.*, nor is a "half-hearted investigation or remedial action" sufficient, *id.* (quoting parenthetical). Finally, defendants' assertion that Roe's resignation was "voluntar[y]," ECF No. 45, at 9, further confirms their deliberate indifference. A reasonable official would know that making Roe feel not "welcome" and "forced out" of her employing office, Complaint ¶ 381, was a constructive discharge, not a voluntary resignation. *Suders*, 542 U.S. at 141.

Defendants have cited no cases contrary to the overwhelming consensus of authority that clearly establishes their violations of legal duties, including controlling cases from the Fourth Circuit. *Beardsley*, 30 F.3d at 530; *see also Feminist Majority Found.*, 911 F.3d at 702–04. And defendants should know these standards better than anyone, given that it is the judiciary itself that creates and applies these standards. *Cf.* Melissa Heelan Stanzione, *Fourth Circuit Latest in Judiciary to Review Harassment Policy*, BLOOMBERG LAW (Oct. 25, 2019) (noting that the Chief Judge and Circuit Executive serve on the Fourth Circuit "workplace relations committee").

Defendants have contended, however, that no court has specifically held that a member of the federal judiciary can be liable for employment discrimination. ECF No. 37, at 25; ECF No. 39, at 25; ECF No. 41, at 25; ECF No. 45, at 25. But as *Davis* held, even constitutional officers "ought generally to be bound by the law as are ordinary persons." 422 U.S. at 246 (quotation and alterations omitted). Moreover, to defeat qualified immunity, "[i]t is not necessary . . . that the very action in question has previously been held unlawful." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866–67 (2017) (quotation omitted). "That is, an officer might lose

19

qualified immunity even if there is no reported case directly on point," so long as the unlawfulness of the officer's conduct is "apparent."  *Id.* at 1867 (quotations omitted).

In the context of sexual harassment specifically, courts have long emphasized that officials may be liable "[e]ven under novel factual circumstances," *Feminist Majority Found.*, 911 F.3d at 704, so long as "a reasonable government official in the defendants' shoes would have understood that the prohibition against sexual harassment extended to their [conduct]," *Markham v. White*, 172 F.3d 486, 492 (7th Cir. 1999); *see also Johnson*, 195 F.3d at 1216 ("We have never said that there must be a case presenting the exact fact situation at hand in order to give parties notice of what constitutes actionable conduct. . . .  Instead, we merely require the parties to make a reasonable application of existing law to their own circumstances."); *Andrews*, 895 F.2d at 1479–80 ("Although there may not have been any precedents with preciously analogous facts it is sufficiently clear that by allowing the harassment of [the plaintiffs] to continue, and possibly even participating directly in that harassment, a 'reasonable official would understand that what he is doing violates their rights.'").

Defendants' arguments are especially unavailing given that they were on notice of the standards governing their conduct through the judiciary's codes of conduct and the EDR Plan, which expressly incorporate well-established standards from Title VII precedents and administrative guidance.  *See*, *e.g.*, Guide to Judiciary Policy § 220.10.10 ("Judiciary employees have a right to a workplace free of discrimination, discriminatory harassment, abusive conduct, and retaliation . . . ."); EDR Plan Ch. II, § 1 (prohibiting "discrimination" based on "sex" and "[h]arassment against an employee based upon any of these protected categories or retaliation for engaging in any protected activity").  No reasonable officer would believe it was acceptable to engage in "serious violations" of the judiciary's antidiscrimination policies.  *Ziglar*, 137 S. Ct. at

1864. After all, the purpose of qualified immunity is to "protect public officials from liability in situations involving extraordinary circumstances and where they neither knew nor objectively should have known the appropriate legal standard." *Andrews*, 895 F.2d at 1480. That purpose is not served where officials "should have known the applicable legal standard" against "treating, or allowing their subordinates to treat, female employees differently on the basis of gender in their work environment." *Id.*

Defendants further contend that the Chief Judge, EDR Coordinator, and General Counsel were not Roe's employer or the "primary tortfeasors." ECF No. 53, at 4. Contrary to their assertions, what matters under the Fifth Amendment is not an official's job title or whether he was a "primary tortfeasor," but whether he violated a duty to act on sexual harassment complaints. *See*, *e.g.*, *Bohen*, 799 F.2d at 1189 (city officials were liable because they were aware of harassment and tolerated it). The judiciary, and specifically the Fourth Circuit, assumed that duty by covering Roe's employing office under their EDR Plan. *See* EDR Plan Ch. IX ("*The Chief Judge* and/or unit executive shall ensure that the allegations in the report are appropriately investigated," and "[e]mployees found by *the Chief Judge* and/or unit executive to have engaged in wrongful conduct . . . may be subject to disciplinary action.") (emphases added). As discussed above, each of the defendants personally violated that duty under the facts of this case. *Supra* pp. 1–13. And of course, the Defender was unequivocally both Roe's employer and a "primary tortfeasor" as a subject of her EDR complaint; therefore, even if the other defendants are entitled to qualified immunity on this basis, he is not.

Finally, neither the Chief Judge nor any other defendant is entitled to absolute immunity. Under Judicial Conference policy, the EDR process is "strictly administrative" and is not a judicial proceeding protected by absolute immunity. JCUS at 25; *see also* 2020 EDR Plan

§ V(C)(3)(f)(iii) (EDR presiding officers serve in an "administrative capacity with limited, non-Article III authority"). Judiciary officials, like other government officials, are not entitled to absolute immunity for discriminatory personnel decisions, whether made during the EDR process or otherwise. *Forrester v. White*, 484 U.S. 219, 224, 227 (1988).

## IV. Defendants Are Liable Under 42 U.S.C. §§ 1985(3) And 1986.

Congress has imposed damages liability on government officials who conspire to violate equal protection rights, which defendants only briefly addressed in their dismissal motions. *See* ECF No. 37, at 24–25; ECF No. 39, at 24–25; ECF No. 41, at 24–25; ECF No. 45, at 24–25. The Reconstruction Civil Rights Act holds liable officials who "conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws." *Griffin v. Breckenridge*, 403 U.S. 88, 102–03 (1971) (quoting 42 U.S.C. § 1985(3)). The Act also holds liable officials who have the power to prevent or aid in preventing the commission of conspiracies to violate equal protection rights, and who neglect or refuse to do so. 42 U.S.C. § 1986.

These Reconstruction-era statutes do not create any new substantive rights, but rather remedies to enforce the constitutional right to equal protection.[8] *Great Am. Fed. Savings & Loan*

---

[8] Defendants have argued that the CSRA implicitly repealed Sections 1985(3) and 1986, but their analysis is oversimplified. *See, e.g.*, ECF No. 52, at 21–22; ECF No. 53, at 18. Absent "a clearly expressed congressional intention," *Morton v. Mancari*, 417 U.S. 535, 551 (1974), repeals by implication are strongly disfavored, *United States v. Fausto*, 484 U.S. 439, 453 (1988). An implied repeal will only be found where provisions in two statutes are in "irreconcilable conflict," or where the latter Act covers the whole subject of the earlier one and "is clearly intended as a substitute." *Posadas v. Nat'l City Bank*, 296 U. S. 497, 503 (1936). Defendants disregard these canons of construction by relying on cases involving competitive service employees who did not bring equal protection claims. By contrast, the CSRA does not show any intent to repeal longstanding equal protection remedies for excepted service employees. Instead, Congress left "undisturbed" the "alternative remedies" those employees possess. *Davis*, 442 U.S. at 247. Thus, the "statutes are capable of co-existence," and "it is the duty of courts . . . to regard each as effective." *Mancari*, 417 U.S. at 551.

22

*Ass'n v. Novotny*, 442 U.S. 366, 372 (1979). Moreover, the statutes must be accorded "a sweep as broad as (their) language." *Griffin*, 403 U.S. at 97 (quotation omitted); *see also Novotny*, 442 U.S. at 389 n. 6 (White, J., dissenting) ("It is clear that sex discrimination may be sufficiently invidious to come within the prohibition of § 1985(3)."); *Nat'l Org. for Women v. Operation Rescue*, 914 F.2d 582, 585 (4th Cir. 1990), *judgment rev'd in part on other grounds*, *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993) (holding that "gender-based animus satisfies the 'purpose' element of § 1985(3)").

To prevail under Section 1985(3), a plaintiff must prove "(1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy." *A Soc'y Without a Name v. Commonwealth of Va.*, 655 F.3d 342, 273 (4th Cir. 2011) (quotation omitted). "Moreover, the plaintiff must show an agreement or a meeting of the minds by the defendants to violate the plaintiff's constitutional rights." *Id.* (quotation omitted).

Here, the record fully sets out a conspiracy to violate Roe's equal protection rights. By their nature, defendants' actions were part of a conspiracy because they involved "an agreement or a meeting of the minds."[9] *Id.* As the record shows, defendants agreed and coordinated on

---

[9] As Roe has explained, the intracorporate-conspiracy doctrine does not apply because the judiciary is inherently decentralized and no one office is in any other office's chain of command, especially with respect to federal defenders. *Cf. Ziglar*, 137 S. Ct. at 1867 (noting that officers being sued were within the Department of Justice). Moreover, the doctrine does not apply because defendants' acts were "unauthorized" and violated the judiciary's antidiscrimination policies. *Buschi v. Kirven*, 775 F.2d 1240, 1253 (4th Cir. 1985). Their actions also "involved a series of acts over time going well beyond simple ratification of a managerial decision." *Stathos v. Bowden*, 728 F.2d 15, 21 (1st Cir. 1984).

23

their actions throughout the investigation, including the decisions to withhold the report, deny disqualification, and delay any remedial action. Specifically, the Chief Judge and the Defender were responsible for "appropriately investigat[ing]" Roe's complaints under Ch. IX of the EDR Plan, and "the EDR Coordinator, the General Counsel, and John Doe(s) personally involved themselves with overseeing the investigation." *Supra*, p. 5.

Roe has also presented direct evidence that at least some of the defendants acted with a "specific class-based, invidiously discriminatory animus." *A Soc'y Without a Name*, 655 F.3d at 273. Notably, the "animus" requirement does not require proof of "maliciously motivated" discrimination; rather "[i]t implies that the decisionmaker selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Bray*, 506 U.S. at 270, 272 (quotation omitted). That requirement is met here. As discussed above, sexual harassment is, by definition, intentional discrimination, and defendants' failure to take appropriate action is "unjustified unequal treatment" because of sex. *Bohen*, 799 F.2d at 1185. Moreover, many of defendants' overt acts confirm their discriminatory purpose, such as the Defender's hostile comments to Roe. Roe Decl., Ex. B, at 5–6, 30; *see also* Complaint ¶ 266 (EDR Coordinator's comments that it was not "helpful" for Roe to have reported her complaint to the AO because "barriers go up" and "people are on guard"). As another example, John Doe(s) recommended prohibiting the Fair Employment Opportunity Officer from having any role in Roe's complaint process or even speaking to Roe about her rights—a recommendation that, at least initially, was accepted and implemented by the other defendants. *See* Roe Decl., Ex. C, at 3. And on John Doe(s)' recommendation, defendants withheld the investigation report and deliberately delayed taking remedial action. *See* Roe Decl., Ex. C, at 45.

Even if some of the defendants did not personally act with class-based, discriminatory animus—a topic which Roe has been unable to probe any further without discovery—they are still liable for violating her equal protection rights. Section 1986 "inculpat[es] bystander defendants who are not themselves conspirators under § 1985." Linda E. Fisher, *Anatomy of a Duty to Protect*: *42 U.S.C. Section 1986*, 56 WASH. & LEE L. REV. 461, 464 (1999). The statute creates liability for a "negligent failure to protect by an actor with knowledge of a § 1985 conspiracy and power to protect its victims," even if that person did not "personally" act with "discriminatory intent." *Id.*; *see also Clark v. Clabaugh*, 20 F.3d 1290, 1298 (3d Cir. 1994) (holding that negligence is sufficient to maintain a § 1986 claim). At a minimum, defendants had "actual knowledge" of the violations of Roe's rights and "neglected or refused to prevent" those wrongful acts. *Clark*, 30 F.3d at 1295.

## CONCLUSION

For these reasons, Roe respectfully requests that the Court enter an order granting partial summary judgment against the individual-capacity defendants on the issue of liability under the Fifth Amendment and 42 U.S.C. §§ 1985(3), 1986.

This the 1st day of October, 2020.

Respectfully Submitted,

*/s/ Cooper Strickland*
Cooper Strickland
N.C. Bar No. 43242
P.O. Box 92
Lynn, NC 28750
Tel. (828) 817-3703
cooper.strickland@gmail.com

Counsel for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on the 1st day of October, 2020, I will electronically file the foregoing with

the Clerk of Court using the CM/ECF system, which will then send a notification of such filing

(NEF) to the following:

      Gill P. Beck at Gill.Beck@usdoj.gov

      Joshua M. Kolsky at Joshua.kolsky@usdoj.gov

      Shannon Sumerall Spainhour at mss@dhwlegal.com


                                   */s/ Cooper Strickland*
                                   Cooper Strickland
                                   N.C. Bar No. 43242
                                   P.O. Box 92
                                   Lynn, NC 28750
                                   Tel. (828) 817-3703
                                   cooper.strickland@gmail.com