**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CASE NUMBER 1:20CV66**

JANE ROE,                                     )
                                            )

        Plaintiff,                         )
                                            )

v.                                               )
                                            )

UNITED STATES OF AMERICA, et al.,     )
                                            )

        Defendants.                      )

**DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION .............................................................................................................1

FACTS .............................................................................................................................1

    I.      Plaintiff is hired as a Research & Writing Specialist .................................1

    II.     Plaintiff marries and threatens to quit unless she is transferred to
         Asheville to be near her husband ...........................................................3

    III.    Plaintiff pursues her own agenda, demonstrates a lack of candor, is caught
         in a lie, balks at following an order, and misses an assigned meeting ...................4

    IV.    Plaintiff complains of sexual harassment, the Defender notifies Circuit
         Executive Ishida, and an investigation is initiated ..................................7

    V.     The Federal Defender takes steps to protect Plaintiff during the pendency
         of the investigation ...............................................................................8

    VI.    Plaintiff files a request for counseling under Chapter X of the Plan and
         makes a report of wrongful conduct under Chapter IX of the Plan .......................9

    VII.   Plaintiff requests mediation, which results in Plaintiff obtaining a Fourth
         Circuit clerkship and she withdraws her Chapter X claim .....................9

    VIII.  The Investigation did not support any findings of gender discrimination, sexual
         harassment, or retaliation and Chief Judge Gregory takes appropriate action ......10

LEGAL STANDARD ......................................................................................................10

ARGUMENT .................................................................................................................10

    I.      The Court Should Decide Defendants' Motions to Dismiss Prior to
         Considering Plaintiff's Motion for Partial Summary Judgment ...........................10

    II.     In the Alternative, the Court Should Deny Plaintiff's Motion for Partial
         Summary Judgment for the Reasons Stated in Defendants'
         Motion to Dismiss ...............................................................................11

    III.    The Evidentiary Record Does Not Support Entry of Summary Judgment in
         Plaintiff's Favor ..................................................................................13

        A.     Plaintiff Fails to Argue For Summary Judgment as to Several
               Defendants ...............................................................................13

        B.     Plaintiff Suffered No Violation of Her Due Process or Equal
               Protection Rights .......................................................................14

            1.     The First Assistant Did Not Harass or Discriminate Against
                   Plaintiff ............................................................................14

            2.     Defendants Responded Promptly and Appropriately ...................16

             3.     Circuit Executive Ishida and Chief Judge Gregory properly
                   administered the EDR Plan, and Plaintiff was not denied any
                   "rights" under the EDR Plan ................................................17

4.     The EDR Plan provided Plaintiff meaningful remedies and review ........................................................................................... 20

5.     Plaintiff Cannot Establish a Claim for Retaliation ........................ 21

6.     Plaintiff has failed to Establish Constructive Discharge as a Matter of Law ............................................................................................ 23

IV.    Plaintiff is not entitled to Declaratory or Equitable Relief .................................... 24

CONCLUSION .................................................................................................................... 25

# TABLE OF AUTHORITIES

**CASES**

*Anderson v. Liberty Lobby Inc.*,
  477 U.S. 242 (1986) .................................................................................. 10
*Carter v. Ball*,
  33 F.3d 450 (4th Cir. 1994) ....................................................................... 24
*Doe v. Chao*,
  306 F.3d 170 (4th Cir. 2002) ..................................................................... 12
*Evans v. Int'l Paper Co.*,
  936 F.3d 183 (4th Cir. 2019) ..................................................................... 23
*FDIC v. Meyer*,
  510 U.S. 471 (1994) .................................................................................. 12
*Hall v. Clinton*,
  235 F.3d 202 (4th Cir. 2000) ..................................................................... 12
*Hewitt v. Helms*,
  482 U.S. 755 (1987) .................................................................................. 25
*Hill v. Cundiff*,
  797 F.3d 948 (11th Cir. 2015) ................................................................... 16
*Hylind v. Xerox Corp.*,
  481 F. App'x 819 (4th Cir. 2012) .............................................................. 12
*In re Papandreou*,
  139 F.3d 247 (D.C. Cir. 1998) ................................................................... 11
*Landis v. N. Am. Co.*,
  229 U.S. 248 (1936) .............................................................................. 1, 9
*Pennsylvania State Police v. Suders*,
  542 U.S. 129 (2004) ...................................................................... 23, 24, 25
*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998) .................................................................................... 11
*Sucampo Pharms., Inc. v. Astellas Pharma, Inc.*,
  471 F.3d 544 (4th Cir. 2006) ..................................................................... 11
*United States v. W. Elec. Co.*,
  46 F.3d 1198 (D.C. Cir. 1995) ............................................................. 10, 11
*United States v. W. Elec. Co.*,
  158 F.R.D. 211 (D.D.C. 1994) ................................................................... 11
*Vance v. Ball State Univ.*,
  570 U.S. 421 (2013) ............................................................................ 16, 17
*Wilcox v. Lyons*,
  970 F.3d 452 (4th Cir. 2020) ..................................................................... 13

**STATUTES**

18 U.S.C. § 3006A(g)(2)(A) ................................................................................................. 21

**RULES**

Fed. R. Civ. P. 56 ............................................................................................................... 14

Fed. R. Civ. P. 56(a) .......................................................................................................... 10

# INTRODUCTION

Plaintiff Jane Roe has moved for partial summary judgment in this case alleging employment discrimination and retaliation against various judicial branch defendants. Plaintiff filed her motion notwithstanding that Defendants' motions to dismiss are fully briefed and pending before the Court, and those motions, if granted, would dispose of all of Plaintiff's claims. The official-capacity and entity Defendants[1] respectfully request that the Court exercise its inherent power to "control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants," *Landis v. N. Am. Co.*, 229 U.S. 248, 254 (1936), and decide the pending Motions to Dismiss prior to deciding Plaintiff's Motion for Partial Summary Judgment. If, however, the Court reaches Plaintiff's summary judgment motion, the Court should deny it for the reasons stated herein and in Defendants' Memorandum of Law in Support of Motion to Dismiss the Complaint (ECF No. 43), which is hereby incorporated by reference.

## FACTS

## I.    Plaintiff is hired as a Research & Writing Specialist

On August 21, 2017, Plaintiff began work as a Research & Writing (R&W) Specialist, General Schedule (GS) 14, Step 1, in the Federal Defender's Office for the Western District of North Carolina (FDO-WDNC). Declaration of Administrative Officer William Moormann (GE A) ¶ 5; Declaration of First Assistant J. P. Davis (GE B) ¶16. The R&W Specialist position was a developmental and trial and appellate support position for attorneys who did not have substantial

---

[1] Those defendants are the United States, Judicial Conference of the United States, Administrative Office of the United States Courts, United States Court of Appeals for the Fourth Circuit, Judicial Council of the Fourth Circuit, the Federal Public Defender's Office, Chief Judge Roslynn R. Mauskopf in her official capacity, Director James C. Duff in his official capacity, Federal Public Defender Anthony Martinez in his official capacity, Chief Judge Roger L. Gregory in his official capacity, and Circuit Executive James N. Ishida in his official capacity.

career experience. GE A ¶ 6. As stated in the job description, "The Research and Writing Specialist does not ordinarily sign pleadings or make court appearances. The Research & Writing Specialist position is not intended to serve as a proxy, substitute, or replacement for an [Assistant Federal Defender] AFD position, nor in place of an additional AFD position," GE A ¶ 6; GE A-5. R&W Specialists are not permitted to handle their own caseloads but may be a second-chair if an AFD is assigned to the case. Declaration of Defender Anthony Martinez (GE C) ¶ 12.

Following graduation from law school in 2013, Plaintiff had two federal clerkships, a state-level clerkship, and a Supreme Court fellowship, but did not have first-hand experience trying cases, representing clients, or defending criminal defendants in the federal system or otherwise, and she had never tried a case as either a first-chair or second-chair. GE A ¶ 7. Typically, the FDO-WDNC hires as AFDs attorneys with substantial trial experience because of the importance and challenge of representing defendants in federal criminal prosecutions. GE C ¶ 13.

As the FDO-WDNC's only first-level attorney supervisor at that time, First Assistant Davis took primary responsibility for Plaintiff's training, which included mentoring. GE B ¶ 16. Because the FDO-WDNC had never previously hired an attorney with so little experience, First Assistant Davis also designed a training program catered for Plaintiff's experience level. GE B ¶ 15.

During the period of August 21, 2017 until May 18, 2018, Plaintiff's training progressed, she appeared to be enjoying work, and she had a good working relationship with First Assistant Davis. GE B ¶ 18. Emails and text exchanges reflected this positive working relationship, including on April 30, 2018, when Plaintiff emailed her wedding photos to the Defender and First Assistant. GE B ¶¶ 18-19; GE B-1 - GE B-3. Plaintiff, who lived within a mile of First Assistant Davis's house for a period of time, and generally biked to work, would occasionally request rides home. GE B ¶ 18. First Assistant Davis and Plaintiff had four mentoring lunches. GE B ¶¶ 17-18.

## II.    **Plaintiff marries and threatens to quit unless she is transferred to Asheville to be near her husband**

On May 18, 2018, First Assistant Davis and Plaintiff had their fourth and final mentoring lunch. GE B ¶ 20. During lunch, Plaintiff told First Assistant Davis she wanted to second-chair a particularly difficult trial carrying a potential life sentence (the "Life Trial"), which was already staffed with one of the office's most junior AFDs. GE B ¶ 20. First Assistant Davis advised Plaintiff to focus on more suitable trial opportunities, since assigning FPD-WDNC's two least experienced attorneys as the trial team would risk ineffective assistance of counsel claims. GE B ¶ 20. Plaintiff acknowledged the validity of this issue, but stated she wanted to still "run it by Tony [Martinez]." GE B ¶ 20.

After lunch, on the drive back to the office, Plaintiff stated that she was not happy living in a separate city from her husband, and stated, "If I don't get moved to Asheville, I'm going to have to quit." GE B ¶ 20. First Assistant Davis told Plaintiff he was sorry to hear that because there were no spaces available in the Asheville office. GE B ¶ 20. Plaintiff then stated she would be open to "alternative arrangements" to moving to Asheville, and specifically raised the idea that she could telework from ████ doing only appeals. If she could not be guaranteed a move to Asheville, she at least wanted more money, specifically promotion to GS 15 or to become an AFD. GE B ¶ 20. Plaintiff claimed to have a signed original offer letter from FDO-WDNC stating that the anticipated transition to an AFD position would occur "within a few months," which First Assistant Davis believed to be inaccurate. GE B ¶ 20. According to Plaintiff, she had discussed with her husband how she would "wave [the offer letter] around" if the office did not promote her. GE B ¶ 20.

First Assistant Davis was taken aback by Plaintiff's demands, but because he considered her a valuable employee and wanted her to remain at the FDO-WDNC, he reviewed salary tables

to see if the FDO-WDNC could provide her with a raise since a duty station transfer to Asheville was not possible. GE B ¶ 21. The rules reflected in the tables required 10 years in the federal GS system to be eligible for promotion to GS-15. GE A ¶ 16. Plaintiff had slightly less than 4 years federal government employment at that time, about 9 months of which was with the FDO-WDNC, rendering her ineligible for promotion to GS-15 for at least another five to six years. GE A ¶ 16.

Based on this, Mr. Davis e-mailed Plaintiff that she was "shooting high" with her demand to be promoted to a GS-15, but said he had "a plan." GE B ¶ 22. Mr. Davis did not explain his plan because he needed to discuss with the Defender the plan to transition Plaintiff to an AFD. GE B ¶ 22. Because their earlier conversation had ended on a friendly tone, Mr. Davis ended the email with a pun, "pay-for-stay," as a joking reference to Plaintiff's own demand for an increase in *pay* in order to *stay* in the FDO-WDNC in the absence of a duty-station transfer. GE B ¶ 22.

### III. Plaintiff pursues her own agenda, demonstrates a lack of candor, is caught in a lie, balks at following an order, and misses an assigned meeting

First Assistant Davis was out of the office the following week, but learned from a colleague that Plaintiff had approached Defender Martinez and convinced him to add her to the Life Trial Team, without raising the issue that the two most inexperienced attorneys handling this challenge case could give rise to ineffective assistance of counsel claims. GE C ¶¶ 39-43; GE B ¶ 23. Subsequently, two Team Leaders objected directly to Defender Martinez about the assignment of Plaintiff to the Life Trial Team, and Defender Martinez removed her based on the first chair being an inexperienced attorney and the stakes were just too high to have two junior attorneys on this serious and challenging case. GE C ¶¶ 40-43. First Assistant Davis was concerned about Plaintiff's lack of candor, and believed she was pursuing her own agenda at the expense of the organization as a whole, and was doing so in a manner that was deceptive through omission. GE B ¶ 23.

On June 5, 2018, Plaintiff sent First Assistant Davis an email about the need to cancel a pre-existing client obligation to work on the Life Trial Case. GE B ¶ 27. Plaintiff had blamed the scheduling conflict on others when, in fact, she had created it for her personal convenience and to pursue her own agenda. GE B ¶ 25. Because of what he believed to be false statements, First Assistant Davis determined that corrective action was needed. GE B ¶ 26. After discussing his concerns with Defender Martinez, First Assistant Davis met with Plaintiff, explained to her that she needed to attend the client obligation, and directed her to attend. GE B ¶ 26. Plaintiff stated she understood and would comply, but later that day sent an email refusing to do so. GE B ¶ 27. First Assistant Davis responded that this was the wrong way to handle the situation, and again directed her to attend the client obligation. GE B ¶ 27.

Over the course of the next few weeks, First Assistant Davis's relationship with Plaintiff remained tense, but appeared to be settling back toward friendly. GE B ¶ 30. Then, on June 21, 2018, Plaintiff failed to show up for a meeting regarding a legal issue on a jointly handled case that was scheduled for sentencing days later. GE B ¶ 30. Late in the afternoon of June 21, Plaintiff contacted First Assistant Davis to apologize, and asked if First Assistant Davis still needed research assistance. First Assistant Davis stated that he did and listed the topics. GE B ¶ 30. Plaintiff asked if First Assistant Davis would be in the office at 5:00 PM. GE B ¶ 30. The 5:00 meeting lasted for approximately an hour and a half and addressed topics in their joint case as well as unrelated legal topics that Plaintiff wanted First Assistant Davis's opinion on. GE B ¶ 30. Overall, this conversation was friendly and light-natured. At the end of the meeting, a thunderstorm was blowing in and First Assistant Davis, as he had done in the past, offered to give Plaintiff, who had biked to work, a ride home. GE B ¶ 30. Plaintiff stated she did not think it would rain, and if it did, she was "tough." GE B ¶ 30. Minutes later, as First Assistant Davis

prepared to leave, it began to rain heavily.  GE B ¶ 30.  Because Plaintiff was in an interior office at the time and may not have seen this, First Assistant Davis texted her "it is currently raining. Last chance for a ride tough girl[.]"  GE B ¶ 30.  Shortly thereafter, First Assistant Davis headed down to the lobby, and because Plaintiff had not responded to his text, and it was still raining heavily, he waited before leaving to give her a chance to see the text.  GE B ¶ 31.  When Plaintiff came down the elevator, First Assistant Davis asked if she was sure she did not want a ride, and she said she was.  GE B ¶ 30.  First Assistant Davis and Plaintiff then both left, using exits on opposite sides of the lobby from each other.  GE B ¶ 30.

Several days later, Plaintiff complained to Defender Martinez via email about several small cases that were assigned to her.  GE B ¶ 31.  First Assistant Davis understood that Defender Martinez viewed this as an effort by Plaintiff to "pick and choose" the cases she wanted to work on and planned to confront Plaintiff about her poor attitude.  GE B ¶ 32.  First Assistant Davis agreed but suggested that Plaintiff might have inexperience in dealing with high stress levels associated with defense work and proposed to meet with Plaintiff to help her develop better stress coping skills.  GE B ¶ 32.  Defender Martinez said to go forward with the meeting to address coping skills.  GE B ¶ 32.

On July 2, 2018, First Assistant Davis met with Plaintiff to have a Coping Skills Meeting. GE B ¶ 33.  Mr. Davis created an outline (GE B-6) for the meeting, but did not get far into it as Plaintiff redirected the discussion to her continued belief that First Assistant Davis had spoken too harshly to her about honoring the client obligation.  GE B ¶ 33 & GE B-7.

Shortly before the Fourth of July, Plaintiff complained to Defender Martinez about First Assistant Davis raising his voice and becoming visibly angry in a recent meeting.  GE C ¶¶ 45-46. As he reflected on that, Defender Martinez decided the best way to handle would be to give both

Plaintiff and First Assistant Davis a chance to "clear the air" in his presence and accordingly called both to his office. GE C ¶ 47. On July 5, they met, and almost immediately Plaintiff said she did not want to discuss anything with First Assistant Davis there, so Defender Martinez asked him to leave the meeting, which he did. GE C ¶ 48; GE B ¶ 34. Plaintiff's primary focus was concern regarding her performance, but she mentioned that the First Assistant had offered her a ride home and waited in the lobby, and at some point used the word "uncomfortable" in relation to the First Assistant. GE C ¶¶ 50-55. Defender Martinez asked Plaintiff what she meant by "uncomfortable," and if she was alleging sexual harassment, to which Plaintiff said she was not, and specifically asked Defender Martinez not to report or otherwise escalate. GE C ¶¶ 50-53. To Defender Martinez, this seemed to be a communication issue between Plaintiff and the First Assistant, and Plaintiff seemed to be satisfied. GE C ¶¶ 53-55. When the First Assistant re-joined the meeting, the discussion focused on the breakdown of the mentoring relationship and Plaintiff's failure to follow the First Assistant's instructions. GE C ¶ 56. After the meeting, with Plaintiff's and the First Assistant's agreement, Defender Martinez reassigned Plaintiff a new mentor. GE C ¶ 57. Plaintiff emailed Defender Martinez to recap her concerns, and that email (GE C-2) only addressed the issue of her performance being satisfactory. GE C ¶ 57.

Following the July 5 meeting, First Assistant Davis had very little contact with Plaintiff. GE B ¶ 35. On July 22, 2018, First Assistant Davis emailed Plaintiff asking to meet with her the next day to discuss case management. She did not respond. This was the last substantive interaction First Assistant Davis had with Plaintiff. GE B ¶ 37.

## IV. Plaintiff complains of sexual harassment, the Defender notifies Circuit Executive Ishida, and an investigation is initiated

On August 9, 2018, Defender Martinez received a call from the Chief of Defender Services regarding a call she received from the Fair Employment Practices Officer, who said that Plaintiff

had raised concerns about interactions with First Assistant Davis. GE C ¶ 74. Defender Martinez promptly met with Plaintiff, who made several demands, including that she be transitioned to an AFD, the organizational chart be changed, and she be transferred to Asheville or authorized telework. GE C ¶¶ 75-78. Defender Martinez explained that he planned to convert the R&W Specialists to AFDs, that he would change the organizational chart, that he did not have space in Asheville, and that he would not authorize telework because it would open the floodgates to other requests. GE C ¶¶ 75-78.

On August 10, Plaintiff emailed Defender Martinez claiming to recap the August 9 conversation; however, several of the issues did not accurately reflect the conversation, including her claim for the first time that Mr. Davis had sexually harassed her. GE C ¶¶ 79-80. In the previous meeting in early July, Plaintiff specifically said she was <u>not</u> reporting sexual harassment, and asked the Defender not to report it. GE C ¶ 80; *see* ¶¶ 51-55. The Defender promptly reported the August 10 allegation, pursuant to the Fourth Circuit's EDR Plan, to Circuit Executive Ishida, and discussed initiating an investigation. GE C ¶¶ 80-83. On August 17, Defender Martinez responded (GE C-7) to Plaintiff's email addressing the points Plaintiff raised in her August 10 e-mail. GE C ¶¶ 80-83.

## V. <u>The Federal Defender takes steps to protect Plaintiff during the pendency of the investigation</u>

On or about August 17, 2018, at Plaintiff's request, Defender Martinez authorized Plaintiff to telework from home during the pendency of the investigation, which she did until March 18, 2019, when she transitioned to a Fourth Circuit clerkship. GE C ¶ 93; GE A ¶ 37. Additionally, in late August 2018, Plaintiff was provided a private office, in the event she wanted to exercise her option under the telework agreement (GE A-16) to return to the Charlotte office. GE A ¶ 35.

On August 20, 2018, at Plaintiff's request, and in accordance with her offer letter, Plaintiff was reclassified from Research & Writing Specialist to an AFD, with locality pay and without

taking a pay cut that would have occurred unless Defender Martinez had not exercised his discretion to apply the Red Circle Rule in Plaintiff's case, which resulted in Plaintiff continuing to receive $107,319.00 (locality pay included), and which was the maximum the Defender was authorized to pay Plaintiff. GE A ¶¶ 18-22.

In the late summer 2018, the FDO-WDNC advertised an Appellate Position. Plaintiff was not selected to interview for the position because she was already in a permanently-funded position and the advertised position was filled as a term position (one year plus one day), and to select Plaintiff, an employee in a permanently-funded position, to fill a term position would have adversely affected her government career. GE A ¶¶ 23-29. Defender Martinez ensured that First Assistant Davis had no contact with Plaintiff. GE B ¶ 42.

## VI.     Plaintiff files a request for counseling under Chapter X of the Plan and makes a report of wrongful conduct under Chapter IX of the Plan

On September 10, 2018, Plaintiff submitted both a request for counseling under Chapter X of the Plan and a report of wrongful conduct under Chapter IX of the Plan, naming both the First Assistant and Defender Martinez as violators of the Plan. Declaration of Circuit Executive James Ishida, (GE D) ¶ 4.

## VII.    Plaintiff requests mediation, which results in Plaintiff obtaining a Fourth Circuit clerkship and she withdraws her Chapter X claim

On January 31, 2019, Plaintiff requested mediation under the Plan. GE D ¶ 19. The Mediator offered to help Plaintiff secure a Fourth Circuit clerkship, and after the meeting the Mediator went to Richmond, Virginia to advocate on Plaintiff's behalf for a clerkship. Compl. ¶¶ 456-57. Later that week, the Mediator told Plaintiff that a Fourth Circuit judge had an available term clerkship position and wanted to interview Plaintiff. *Id*. ¶ 458. On March 8, 2019, Plaintiff interviewed with the Fourth Circuit Judge, who offered her a clerkship. Plaintiff accepted the offer as a "negotiate[ed] . . . resolution" of her Chapter X claim. *Id*. ¶¶ 7, 459. On March 11, 2019,

Plaintiff sent an email to the Circuit Executive withdrawing her Chapter X claim.  GE D ¶ 22.  On March 18, 2019, Plaintiff transitioned to her Fourth Circuit clerkship.  GE A ¶ 50.

## VIII. The Investigation did not support any findings of gender discrimination, sexual harassment, or retaliation and Chief Judge Gregory takes appropriate action

The facts uncovered during the investigation did not support a finding of discrimination, sexual harassment, or retaliation, GE C ¶ 98, but identified management and communication issues.  Accordingly, Chief Judge Gregory took appropriate action as to Defender Martinez.  GE C ¶ 101.  Defender Martinez took appropriate action as to First Assistant Davis.  *Id.* ¶ 99.

## LEGAL STANDARD

A district court shall grant summary judgment in favor of a movant if such party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party[.]" *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247-48 (1986).  The evidence must be viewed in favor of the nonmovant and all "justifiable inferences" must be drawn in its favor. *Id.* at 255.

## ARGUMENT

## I. The Court Should Decide Defendants' Motions to Dismiss Prior to Considering Plaintiff's Motion for Partial Summary Judgment

On June 8, 2020, Defendants filed a motion to dismiss all claims asserted against them in Plaintiff's complaint.  MTD, ECF No. 43.  The Court should resolve that motion before considering Plaintiff's summary judgment motion.  This Court's discretion includes the "inherent power to control the sequence in which it hears matters on its calendar." *United States v. W. Elec. Co.*, 46 F.3d 1198, 1207 n.7 (D.C. Cir. 1995).  In particular, when two parties present separate motions, the Court may first consider a motion that "addresses a specific and narrow issue" rather

than a motion that "encompass[es] issues far broader." *United States v. W. Elec. Co.*, 158 F.R.D. 211, 220 (D.D.C. 1994), *aff'd*, 46 F.3d at 1207 n.7. In this case, the existence of serious jurisdictional questions and the interests of judicial economy make it appropriate for the Court to resolve Defendants' motion to dismiss before the litigation proceeds to summary judgment.

Indeed, the "first and fundamental" question for any court is that of jurisdiction: "[t]he requirement that jurisdiction be established as a threshold matter springs from the nature and limits of the judicial power of the United States and is inflexible and without exception," and therefore "[w]ithout jurisdiction the court cannot proceed at all in any cause." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998) (internal quotation marks omitted). Courts therefore recognize that "resolving a merits issue while jurisdiction is in doubt carries the courts beyond the bounds of authorized judicial action and violates the principle that the first and fundamental question is that of jurisdiction." *In re Papandreou*, 139 F.3d 247, 254–55 (D.C. Cir. 1998).

## II. In the Alternative, the Court Should Deny Plaintiff's Motion for Partial Summary Judgment for the Reasons Stated in Defendants' Motion to Dismiss

If the Court proceeds to decide Plaintiff's motion for partial summary judgment before resolving Defendants' Motion to Dismiss, it still must resolve the threshold questions of law before assessing the facts. *See Sucampo Pharms., Inc. v. Astellas Pharma, Inc.*, 471 F.3d 544, 548 (4th Cir. 2006) (jurisdiction is a "threshold" issue that must be resolved prior to resolving "an issue relating to the merits of the dispute"). As discussed in detail in Defendants' Motion to Dismiss, Plaintiff's claims all fail as a matter of law. First, each of the claims is barred by the United States' sovereign immunity, as courts have repeatedly held in cases involving judicial branch defendants. *See* MTD at 5-7. Plaintiff has failed to identify any applicable waiver of Defendants' sovereign immunity and she has presented no credible argument for why her claims can proceed in the face of that jurisdictional bar. *See* Reply In. Supp. of Mot. to Dismiss the Compl. ("Reply"), ECF No.

54, at 1-5. Second, Plaintiff's claims are also jurisdictionally barred by the Civil Service Reform Act of 1978 ("CSRA") and the judiciary's own equal employment opportunity procedures – Employment Dispute Resolution ("EDR") policies and procedures. MTD at 7-11; Reply at 7-11. Third, judicial review of Plaintiff's claims in federal court is especially inappropriate here, where Plaintiff failed to exhaust her administrative remedies. MTD at 11-14.

In addition to these jurisdictional bars, there are further reasons why each of Plaintiff's claims fails as a matter of law. Her statutory civil rights claims are foreclosed by on-point Fourth Circuit authority in *Hall v. Clinton*, 235 F.3d 202, 206 (4th Cir. 2000). MTD at 22. Plaintiff has not even attempted to explain how her statutory claims are viable notwithstanding *Hall*.

Given that Plaintiff's statutory claims are precluded by Fourth Circuit authority and that Plaintiff is not pursuing a *Bivens* remedy for her constitutional claims against the official capacity and entity defendants, *see* ECF No. 49 at 16 n.13,[2] her only remaining claims are equitable in nature and seek equitable relief. Notably, even if a trial were appropriate on those claims, they would be tried to the Court, not a jury. *See Hylind v. Xerox Corp.*, 481 F. App'x 819, 824 (4th Cir. 2012) ("the determination of back pay is an equitable matter for the judge, not the jury"). In any event, Plaintiff's equitable claims fail for the jurisdictional reasons stated above and for the additional reasons described in Defendants' Motion to Dismiss and discussed below.

Plaintiff's due process claim fails, as a matter of law, because Plaintiff lacked a property interest in her judicial branch employment and she fails to identify any other cognizable property interest that Defendants allegedly infringed. MTD at 14-15. Moreover, Plaintiff cannot bring a

---

[2] The law is settled that a plaintiff cannot bring a *Bivens* claim against the federal government. *See FDIC v. Meyer*, 510 U.S. 471, 475, 485-86 (1994) (sovereign immunity bars *Bivens* action against federal government); *Doe v. Chao*, 306 F.3d 170, 184 (4th Cir. 2002) ("*Bivens* action does not lie against either agencies or officials in their official capacity").

due process claim to challenge the terms of the judiciary's EDR Plan.  She lacked any substantive due process right to employee dispute resolution procedures, much less to procedures containing particular terms of her choosing.  *Id*. at *16-17.  And having voluntarily withdrawn from the EDR process, Plaintiff cannot complain about the adequacy of the EDR Plan procedures. *Id*. at 17-18.

Plaintiff's equal protection claim is foreclosed by the Fourth Circuit's recent decision in *Wilcox v. Lyons*, 970 F.3d 452 (4th Cir. 2020), which held that a "'pure or generic retaliation claim,' . . . even if premised on complaints of sex discrimination, is not cognizable under the Equal Protection Clause."  2020 U.S. App. LEXIS 25404, at *16.  In *Wilcox*, like here, "the subject matter" of the plaintiff's complaint was "sex discrimination and harassment[.]"  *Id*. at *11.  But "[r]etaliation for reporting alleged sex discrimination imposes negative consequences on an employee because of the employee's report, not because of the employee's sex."  *Id*. at *12.

As in *Wilcox*, Plaintiff attempts to assert an equal protection claim by alleging that various defendants subjected her to retaliation, failed to take "immediate and effective action on her complaints," and failed to "provide her with meaningful review and remedies[.]"  Compl. ¶ 498. Plaintiff's allegations do not implicate an impermissible classification or discrimination on the basis of her sex.  Though Plaintiff also claims she was harassed and subject to discrimination, those claims fail for the many reasons described in Defendant's motion to dismiss.  MTD 18-22.

## III.     The Evidentiary Record Does Not Support Entry of Summary Judgment in Plaintiff's Favor

### A.     Plaintiff Fails to Argue For Summary Judgment as to Several Defendants

As an initial matter, Plaintiff's Motion seeks judgment against all official capacity and entity defendants, which are the defendants identified on page one, footnote one above. Plaintiff's contentions set forth in her Motion boil down to her discontent with how: (1) Defendant FPD Martinez handled her complaint alleging that she had been harassed by another one of the FDO-

WDNC's employees; and (2) Defendant Ishida and Defendant Chief Judge Gregory handled Plaintiff's report of wrongful conduct and administered her EDR Complaint.

Plaintiff provides no explanation whatsoever for how or why the remaining defendants can be found to have violated any law. Plaintiff offers no evidence suggesting that those defendants committed any act of harassment, discrimination, or retaliation, or that they had an employment relationship with her or even had any responsibility for administering the EDR Plan. Accordingly, Plaintiff's Motion against the Judicial Conference of the United States of America, the Honorable Roslynn R. Mauskopf, the Administrative Office of the United States Courts, Director James C. Duff, the United States Court of Appeals for the Fourth Circuit, and the Judicial Council of the Fourth Circuit should be denied at the outset.

**B.      Plaintiff Suffered No Violation of Her Due Process or Equal Protection Rights**

**1.      The First Assistant Did Not Harass or Discriminate Against Plaintiff**

Plaintiff contends that Defendants violated her "constitutional right to be free from sex discrimination in her federal employment." Mot. 12. Aside from the numerous jurisdictional and other legal deficiencies discussed above, Plaintiff's claims fail because she has not established that she was subject to any harassment or discrimination. Indeed, despite having the burden of proof to show the absence of a genuine dispute of material fact, Fed. R. Civ. P. 56, Plaintiff has not identified the specific acts that she believes constituted harassment and/or discrimination, let alone cite any evidence of supposed harassment or discrimination. Instead, she merely asserts in conclusory fashion that "there is no dispute that Roe was subjected to unlawful discrimination at the FDO, including by the highest levels of management." Mot. 13.

Of course, Defendants vigorously dispute Plaintiff's claim that she was subjected to discrimination and the evidence overwhelmingly establishes that she was not. First Assistant Davis

denies Plaintiff's allegations that he harassed her. For instance, Mr. Davis did not repeatedly invite Plaintiff to meet after hours, GE B, ¶ 46, did not "appear" at the end of the workday and walk Plaintiff out of the building, *id.* ¶ 47, did not "lurk" at the county jail waiting for Plaintiff, *id.* ¶ 48, did not recruit employees to "spy" on Plaintiff, *id.* ¶ 50, and did not "harass" Plaintiff by copying her on a work-related email, *id.* ¶ 51. Likewise, Mr. Davis's offer to give Plaintiff a ride home when it was raining was not inappropriate, particularly given that Plaintiff had solicited rides from Mr. Davis previously. *Id.* ¶¶ 18, 31. Also, Mr. Davis's "pay-for-stay" email to Plaintiff was in response to her demand that she receive more money or she would quit, *id.* ¶ 23, and Plaintiff's interpretation of that email as having a sexual connotation is inexplicable.

The EDR Plan investigation into Plaintiff's allegations supports Mr. Davis's account and undermines Plaintiff's allegations. The investigation's findings include the following:

- Plaintiff "has experienced in her mind sexual harassment although the facts discovered in this case find this claim to be very flimsy." GE C ¶105(m).

- "Throughout my investigation I could not find a time that [Plaintiff] had declined Mr. Davis' invitation to lunch until the end of their mentor/mentee relationship. I also did not find any indication [Plaintiff] had ever expressed her uneasiness about these lunch meetings." GE C ¶ 105(c).

- Regarding the May 18, 2018 "pay-for-stay" e-mail: "I do not believe there was an intention of sexual harassment when he sent the email." GE C ¶ 105(d).[3]

Aside from the fact that Mr. Davis's conduct was not harassing under any standard, Plaintiff offers no basis for concluding that Mr. Davis *intended* to harass or discriminate. *Cf.* GE B ¶ 53 (Mr. Davis explaining that he never intended to harass or discriminate against Plaintiff). But even if Mr. Davis's actions could be construed as harassment or discrimination – and they

---

[3] The Investigative Report contains confidential information pertaining to the Chapter IX Report of Conduct, and, accordingly, the complete Investigative Report is not provided to the Court at this time. Should the Court want a copy provided, Defendants request that the Court order the Investigative Report to be filed under seal.

plainly cannot – that still would not establish liability for the FDO-WDNC. Plaintiff fails to present

any evidence of "an official government policy" resulting in harassment or evidence that Mr. Davis

is "an official fairly deemed to represent government policy[.]" *Hill v. Cundiff*, 797 F.3d 948, 977

(11th Cir. 2015). On the contrary, the evidence shows that Mr. Davis did not have authority to take

personnel actions against Plaintiff and therefore his actions are not attributable to the Office. *See*

GE C ¶ 98; GE B ¶ 2; *cf. Vance v. Ball State Univ.*, 570 U.S. 421, 431 (2013) (in Title VII context,

employer may be liable for employee's harassment "only when the employer has empowered that

employee to take tangible employment actions against the victim").

Contrary to Plaintiff's argument, the fact that Mr. Davis faced action following Plaintiff's

complaints does not establish that any discrimination occurred. Mot. 13-14. Plaintiff does not

identify any reason for the action much less any basis to conclude that it was in response to a

finding of discrimination. On the contrary, as discussed, the investigation did *not* support a finding

of discrimination, and Mr. Davis was counseled about his use of email in the workplace, including

properly documenting context. GE C ¶ 99. Similarly, Mr. Martinez was counseled on "judgement

and decisiveness" and "handling workplace conduct complaints." *Id*. ¶ 101. For these reasons, the

trier of fact could certainly find that Defendants did not engage in discrimination or harassment.

### 2. Defendants Responded Promptly and Appropriately

Plaintiff insists that "defendants failed to take adequate remedial steps" in response to her

complaints. Mot. at 14. But, the evidence refutes that assertion and precludes summary judgment.

First, Plaintiff's claim that she was "plac[ed]" on telework is disingenuous. *Id*. It was

*Plaintiff* who *requested* to telework after she moved to ██████ which was 90 miles from the

Charlotte office. GE A ¶¶ 37-45. Moreover, Plaintiff could discontinue the telework arrangements

at any time, and report to her new, private office. GE A 40 & GE A-16a ¶ 12.

There also is no support for Plaintiff's assertion that "defendants failed to conduct an appropriate investigation" because Plaintiff would go "for periods of three to six weeks without hearing any updates." Mot. 15. The EDR Plan did not entitle Plaintiff to "updates" on her preferred schedule. Plaintiff also argues that her "retaliation complaints were not investigated," *id.*, but that is incorrect. GE C ¶ 105(k) (quoting investigator's conclusion that "I do not see a case for retaliation based on my investigation").

Lastly, the evidence also refutes Plaintiff's argument that Defendants did not take prompt action in response to her complaints. Mot. 15. On August 10, 2018, upon learning of Plaintiff's allegations of sexual harassment regarding First Assistant Davis, Defender Martinez exercised reasonable care and took prompt action in informing Circuit Executive Ishida. GE C ¶ 80. That same day, Chief Judge Gregory ordered an investigation and an investigating officer was appointed. GE C ¶ 81. On or about August 17, 2018, at Plaintiff's request, Defender Martinez authorized Plaintiff to telework from home during the pendency of the investigation. GE A ¶ 37. Plaintiff teleworked for over six months, until she transferred from the FDO-WDNC on March 18, 2019, GE A ¶ 49, and had no contact with First Assistant Davis. Although Plaintiff believes that the investigation took too long to complete, Mot. 15, she had no right to have it completed on any particular timeframe, especially given that she had been separated from her alleged harasser.

### 3. Circuit Executive Ishida and Chief Judge Gregory properly administered the EDR Plan, and Plaintiff was not denied any "rights" under the EDR Plan

Plaintiff claims that Defendants violated her "rights and protections" under the EDR Plan by not (1) disqualifying the Defender from representing his office in the EDR process, (2) providing a copy of the investigation report to Plaintiff, and (3) providing Plaintiff with an "appropriate remedy." Mot. 16-18. Again, the record refutes Plaintiff's arguments. Notably, at the time Plaintiff voluntarily dismissed her Chapter X claim, she was in the request for counseling

phase of Chapter X. *See* EDR Plan ¶ 8. Plaintiff chose not to file a formal EDR complaint, request a hearing, or otherwise exhaust her administrative remedies. Thus, Plaintiff decided not to avail herself of the procedural rights and remedies afforded to a complainant who files a formal complaint, requests a hearing, and meets his or her burden of proving a violation by the employer.

As to the disqualification request, Plaintiff withdrew from the EDR process before her request was decided. Compl. ¶ 453. Moreover, Plaintiff fails to establish a reasonable basis for disqualification. The disqualification provision was designed to ensure that the EDR coordinator, mediator, and judicial officer, who are involved in the processing of the EDR complaint, were fair and impartial, not that the official defending against the claim of discrimination was impartial. GE E ¶ 7. The defending respondent or employing office, acting through its unit executive, is the opposing party to an EDR disputed matter, and thus acts and responds on behalf of the respondent or employing office. GE E ¶ 7. Plaintiff has failed to point to a single provision of the Plan that required disqualification of the Defender from representing the interests of the FDO.[4]

Circuit Executive Ishida's decision not to provide Plaintiff with a copy of the investigative report also is well-founded. GE D ¶¶ 10, 14-15. As he explained, the EDR Plan did not provide that such a report must be produced to a complainant at the counseling phase, the report contained confidential personnel information, and Mr. Ishida was concerned that providing Plaintiff with a copy of the report would subvert the purpose of the counseling phase, which is to encourage the employee and the employing office to engage in open dialogue and assess the potential for early resolution. GE D ¶ 14.

_____

[4] Plaintiff cites EEOC Management Directive 110, 1-7 (2015), but that addresses the situation where, in Title VII cases, the alleged discriminating official "is the Head of the Agency," who may have influence over the EEO director. Even if applicable, this case does not present the same concerns addressed by MD 110 because Chief Judge Gregory filled the role of the "head of the agency," not Defender Martinez.

EDR Coordinators and/or the chief judges do not reveal the results of a wrongful conduct investigation to the parties under Chapter IX because it is considered an internal investigation into confidential personnel matters. GE E ¶ 5. The Chief Judge is obligated determine whether it is necessary to take appropriate action based on that investigation, but the EDR Plan does not obligate disclosure of the investigation report, or even the results of the investigation. GE E ¶ 5. As the EDR Plan states, "All individuals involved in the investigation shall protect the confidentiality of the allegations of wrongful conduct to the extent possible. Information and records about allegations shall be shared on a need-to-know basis." EDR Plan, Ch. IX.

In contrast, if Plaintiff had exhausted her administrative remedies by filing a formal complaint under ¶ 8 of Chapter X of the EDR Plan, she could have requested the investigative report, and Chief Judge Gregory, who had authority to "provide for such discovery and investigation as is necessary," could have provided it to her under ¶10.B.2. *See also* GE E ¶ 6. The Chapter X proceeding was terminated at Plaintiff's request before Chief Judge Gregory could enter an order based on the report of investigation.[5]

Finally, Plaintiff's assertion that she was not afforded an "appropriate remedy," Mot. 18, is puzzling given that she withdrew her EDR claim before the issue of remedy was ripe. GE D ¶ 23. Plaintiff cannot short-circuit the administrative process by failing to follow it through and then

---

[5] Chapter IX of the Plan and Chapter X of the Plan are independent and separate processes. Chapter IX's wrongful conduct provisions were intended to encourage employees to report discrimination, harassment, or retaliation in the workplace. GE E ¶ 4. As the Plan states, "[a] report of wrongful conduct is not the same as initiating or filing a claim under this Plan; thus, employees who wish to file an EDR claim relating to any alleged wrongful conduct . . . must follow the procedures set forth in Chapter X of the Plan." Plan, Chapter IX, p. 7. A report of wrongful conduct does not entitle the employee to corrective action. GE E ¶ 4. It is simply filing a report of misconduct, which then prompts the appropriate unit executive or chief judge to appropriately investigate whether the alleged individual(s) engaged in misconduct and determine whether a personnel or disciplinary action is warranted. GE E ¶ 4. An employee can only obtain relief under Chapter X. *See* Plan, Chapter X, § 1.

blame Defendants for not delivering a particular remedy from that process. Plaintiff alleges that she "was told" by certain individuals that meaningful action would not be taken on her complaint, Mot. 18, but even if true, those assertions do not undermine the express provision of the EDR Plan that permits a judicial officer to order broad relief to remedy a violation, as discussed below, or the fact that Plaintiff withdrew from the process before the provision could be applied to her claim.

**4.      The EDR Plan provided Plaintiff meaningful remedies and review**

Plaintiff also argues that "[D]efendants" generally violated her constitutional rights "by depriving her of any meaningful review or remedies for unlawful discrimination." Mot. 18. It is unclear which Defendants Plaintiff believes deprived her of her rights but she is presumably referring to the formulation of the EDR Plan. As discussed above in Section II, this claim fails because Plaintiff lacks a constitutional right to particular EDR procedures and because she has not presented evidence that any defendant designed the EDR Plan with an intent to discriminate.

Moreover, Plaintiff's belief that she would not have been provided meaningful remedies is entirely speculative because, as discussed, she withdrew her claim before the remedial phase. Her belief is also predicated on a misunderstanding of rights and available options for resolution in the counseling phase under Chapter X, *see* EDR Plan, ¶ 8, compared to rights, remedies, and review available during the formal complaint phase of the EDR Plan, *see* EDR Plan, ¶¶ 10-13. In the request for counseling phase, the parties may *voluntarily agree* to a resolution but cannot be forced to take particular action. In contrast, during the formal complaint phase, after adjudication of a formal complaint, a chief judge or designated judicial officer could *order any "make-whole" remedies* contemplated under the EDR Plan against any employing office, including a Federal Public Defender organization, *see* EDR Plan, ¶¶ 10.B.e. & 12. Specifically, the Chief Judge or designated judicial officer "acting pursuant to ¶ 10 or ¶ 11 of this Plan," who found a "substantive

right protected by this Plan has been violated," may "[o]rder a necessary and appropriate remedy." EDR Plan, ¶ 10.  Remedies "include, but are not limited to" placement, promotion, back pay and associated benefits, records modification and/or expungement, equitable relief, and a variety of other remedies.  EDR Plan, ¶ 12.

Plaintiff insists that a judicial officer may not order remedies against a FDO. Mot. 19. But the Proceedings of the Judicial Conference of the United States at 25 (Sept. 2010 (JCUS), which she cites, says otherwise. It states that "Judges presiding in EDR matters may not compel the participation of or impose remedies upon agencies or entities *other than the employing office*," (emphasis added), indicating that the EDR Judicial Officer has the power to impose remedies on the employing office, which in this case is the FDO-WDNC.  Similarly, the Employment Dispute Resolution Guide – Bench Book for Judges, which served as an interpretive guide for the relevant Model EDR Plan, provides that a judicial officer "[r]etain[s] jurisdiction over the complaint until court officials fully implement the resolution and any relief ordered."  Employment Dispute Resolution Guide – Bench Book for Judges, Sections 12.24(A)(2)(c), and "[i]mpose sanctions for failure to do so," 14.04(B)(2).  If a Defender failed to follow an EDR Order, the Defender can be removed from office for neglect of duty.  18 U.S.C. § 3006A(g)(2)(A); *see also* GE E ¶ 16.

## 5.    Plaintiff Cannot Establish a Claim for Retaliation

Plaintiff claims that Defender Martinez "retaliated against her by diminishing her job duties and not considering her for an opening as an appellate assistant federal public defender." Mot. 2. But as discussed above in Section II, the Fourth Circuit recently clarified in *Wilcox* that a plaintiff cannot bring a retaliation claim under the Fifth Amendment. Nevertheless, Plaintiff fails to establish that Defender Martinez took any adverse personnel action against her or that he was driven by any retaliatory motive.

On August 20, 2018, *at Plaintiff's request*, and in accordance with her offer letter, Plaintiff

was reclassified from Research & Writing Specialist to an AFD. GE A ¶ 23; GE A-7. The compensation for the Research & Writing Specialist position was governed by the GS scale for federal employees, whereas the pay for AFD is under the AD system. GE A ¶ 19. At the time of the transition, Plaintiff was making $107,319.00, which included locality pay. GE A, ¶ 19. The absolute maximum the Defender was authorized to pay Plaintiff under the AD system was $101,038.00, which included locality pay. GE A ¶ 19. Instead of reducing her pay, the Defender exercised his discretion and applied the "Red Circle Rule," which allowed him to maintain Plaintiff's pay at $107,319.00. GE A ¶ 21. Defender Martinez's actions were pursuant to Plaintiff's request, benefitted Plaintiff, and plainly do not constitute retaliation.

Plaintiff also asserts that she should have been selected for an AFD Appellate Position; however, Plaintiff was already an AFD, and it would make no sense to select her for another AFD position, especially where the AFD position at issue was a term position lasting only a year and a day. GE A ¶¶ 23-29. To transfer Plaintiff from a permanently-funded position to a term position would have resulted in an adverse impact on the terms, conditions, privileges, and benefits of her employment.

Plaintiff has also complained about her workspace, inaccurately describing it as a "converted utility closet." Compl. ¶ 174. Under GSA standards, Research & Writing Specialists are designated 150 square feet of rentable space. GE A ¶ 32. Plaintiff was allocated more than that, and, specifically in anticipation of Plaintiff's arrival, the office invested $10,000 in making the space well lighted, fully furnished, and in compliance with NC building codes and GSA specifications. *Id.* ¶¶ 30-36. Photographs of the Plaintiff's work space are attached as GE A-14a &14b and demonstrate that the workspace was suitable. Additionally, when space became

available and in conjunction with her transition to AFD, Plaintiff was provided a private office. GE A 15b.

### 6. Plaintiff has failed to Establish Constructive Discharge as a Matter of Law

Plaintiff claims she was "constructively discharged" from her position as an AFD. "The [constructive discharge] inquiry is *objective*: Did working conditions become so *intolerable* that a *reasonable* person in the employee's position would have felt *compelled* to resign?" *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004) (emphasis added). In other words, Plaintiff must show "that [s]he was discriminated against by h[er] employer to the point where a reasonable person in h[er] position would have felt compelled to resign" and that she actually did resign. *Evans v. Int'l Paper Co.,* 936 F.3d 183 (4th Cir. 2019) (internal citations omitted). A reasonable person in Plaintiff's shoes would not have felt compelled to resign, as the working conditions—at the time of her resignation and throughout her employment—were objectively *not* "intolerable."

The crucial inquiry for this Court's "intolerability" review are frequency and severity. *Id*. The more continuous and egregious the conduct, the more likely it is "intolerable." *Id.* Here, as discussed above, the evidence establishes that Plaintiff was *not* subjected to harassment, discrimination, or retaliation. Indeed, for the last seven months of her employment before her voluntary transfer, she teleworked and did not see anyone from the office. She did not communicate with her alleged harasser, who was fully removed from her chain of command, nor did she have any direct interaction with the Defender. The fact that Plaintiff might *subjectively* believe she was harassed, discriminated against, or retaliated against does not establish a violation. Objectively, the actions about which she complains were justified and did not create an intolerable work environment – *e.g.*, receiving a "phantom promotion" (which a male coworker also received), not receiving the pay she wanted (which is governed by strict standards set at national levels), and

not being given a caseload to handle herself (which was objectively not appropriate given her inexperience as a trial lawyer and as an advocate generally). *See Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994) ("dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions" are not "intolerable").[6]

The circumstances surrounding Plaintiff's departure from the FDO-WDNC further confirm that there was no constructive discharge. She accepted a transfer while pursuing the process afforded her by the Fourth Circuit. The transfer was part of a mediated resolution, to which she voluntarily agreed, with the advice of her lawyer. On these facts, a reasonable person would not have felt "compelled" to resign. In all events, Plaintiff plainly has not established a right to summary judgment on this claim.

## IV.    Plaintiff is not entitled to Declaratory or Equitable Relief

Plaintiff asks the Court to award her declaratory relief and unspecified "appropriate equitable remedies," which apparently includes front pay in the amount of up to $7,868,307.88. *See* Plaintiff's Calculation of Damages, GE F. Plaintiff is not entitled to this relief, or any relief. First and foremost, Plaintiff has failed to establish any violation of law by Defendants.

Second, Plaintiff's requested relief is barred by sovereign immunity. MTD 5-7; Reply 1-5. Plaintiff tries, but fails, to distinguish the numerous cases cited by Defendants holding that front pay is functionally equivalent to a damages award and is therefore barred by sovereign immunity. Mot. 23.[7] She claims that, in those cases, the "plaintiffs were not asking for specific relief to

---

[6] Notably, "'[u]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress.'" *Suders,* 542 U.S. at 147. Plaintiff did not "have to remain on the job while seeking redress" and was permitted to telework *at her request*.

[7] The distinction between monetary and non-monetary relief is only relevant if the *Larson* exception to sovereign immunity for *ultra vires* conduct applies to a particular claim. Mot. 6-7; Reply 2. If that exception applies, then a plaintiff may pursue certain forms of non-monetary relief.

enforce a preexisting legal duty[.]" *Id*. But the plaintiffs in those cases were asking for the same relief as Plaintiff here – front pay as a remedy for alleged employment discrimination or retaliation. *Ahmed v. Bd. of Trs. of Ala. Agric. & Mech. Univ.*, No. 14-cv-01683, 2017 U.S. Dist. LEXIS 166782, at *12-16 (N.D. Ala. Oct. 10, 2017); *Weihua Huang v. Rector & Visitors of the Univ. of Va.*, No. 11-00050, 2013 U.S. Dist. LEXIS 34186, at *5, 38-42 (W.D. Va. Mar. 7, 2013). Also, the application of sovereign immunity does not turn on whether the plaintiff has "alternative remedies," and Plaintiff cites nothing suggesting otherwise. Mot. 23. Indeed, Plaintiff cites no decision awarding front pay against the judiciary or finding front pay to be an appropriate remedy against any governmental defendant instead of being barred by sovereign immunity.

Third, for a declaratory judgment to be "a proper judicial resolution of a 'case or controversy' rather than an advisory opinion," it must "settl[e] some dispute which affects the behavior of the defendant towards the plaintiff." *Hewitt v. Helms*, 482 U.S. 755, 761 (1987). Here, Plaintiff is no longer employed at the FDO-WDNC and there is no declaratory relief that this Court could award Plaintiff that would "affect[] the behavior of the defendant[s] towards the plaintiff."

Finally, even if Plaintiff had established a violation and even if the Court could order relief, it would still be appropriate to decline the requested relief here. Plaintiff is apparently requesting this Court award her nearly eight million dollars in front pay based on her false belief that Defendants somehow damaged her career prospects over the next 35 years. Plaintiff's outrageous demand cannot be deemed "equitable" under any circumstances.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's Motion.

---

But Plaintiff has conceded that she has not pled an *ultra vires* claim. ECF No. 49 at 20. Therefore, even if front pay were considered non-monetary relief – which it is not – that still would not allow Plaintiff to avoid the sovereign immunity bar.

This the 2nd day of October, 2020.

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

CARLOTTA P. WELLS
Assistant Branch Director

s/*Joshua Kolsky*
JOSHUA M. KOLSKY
Trial Attorney
D.C. Bar No. 993430
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW Washington, DC 20005
Tel.: (202) 305-7664
Fax: (202) 616-8470
E-mail: joshua.kolsky@usdoj.gov


R. ANDREW MURRAY
UNITED STATES ATTORNEY

s/Gill P. Beck
GILL P. BECK
Assistant United States Attorney
N.C. State Bar No. 13175
Room 233, U.S. Courthouse
100 Otis Street
Asheville, North Carolina 28801
Phone:  (828) 271-4661
Fax:  (828) 271-4327
Email:  Gill.Beck@usdoj.gov