IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CASE NUMBER 1:20CV66

JANE ROE,                                    )
                                             )
        Plaintiff,                           )
                                             )
v.                                           )
                                             )
UNITED STATES OF AMERICA, et al.,            )
                                             )
        Defendants.                          )

## DECLARATION OF ANTHONY MARTINEZ

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the

United States of America that the foregoing is true and correct:

1.      I am the Federal Defender (Defender) in the Federal Defender's Office (FDO) for the Western District of North Carolina (FDO-WDNC).

2.      I began working in the FDO-WDNC as an Assistant Federal Defender (AFD) in June of 2017. My appointment was in the process of being cleared during that time. The Interim Public Defender at that time was Ms. Ross Richardson, who was undergoing cancer treatment at the time. I was appointed and sworn in as the Defender on August 21, 2017.

3.      Prior to my appointment as an AFD and ultimately as the Defender in the FDO-WDNC, I was the First Assistant in the FDO for the Eastern District of Tennessee in Chattanooga TN from December 2000 until June of 2017. Before moving to Chattanooga, I worked as and AFD in the FDO for the Middle District of Florida in Tampa for 13 years.

4.      I have worked in these various FDOs as an attorney representing indigent criminal defendants since March of 1987. I have worked my way "up the ranks" over the past 34 years, culminating in my current position as the Defender for the WDNC. The various positions, such as AFD and Research & Writing Specialist are consistent throughout the country. The same job descriptions, expectations, and pay structures (except for varied locality adjustments, where relevant) apply.

5. This declaration is based upon my personal knowledge, my experience in the FDO system for the past 34 years, and the procedures applicable to FDOs across the country, including the Defender Organization Classification System Manual ("DOCS Manual"), the Administrative Office of U.S. Courts procedures, and the Fourth Circuit's Employee Dispute Resolution ("EDR") Plan.

6. The DOCS Manual is created and distributed by the Defender Services Organization ("DSO"). The DSO is a national program established to ensure the right to counsel guaranteed by the Sixth Amendment, the Criminal Justice Act, and other congressional mandates relating to indigent criminal defendants. The DSO also ultimately determines the distribution of the annual budget in the FDO system. The FDO-WDNC's budget is, therefore, set at the national level, not locally.

7. The DOCS Manual and many other materials relating to employment in an FDO are and were during the Plaintiff's employment accessible via dWeb, the DSO's intranet system to all employees who have an email address ending in "fd.org."

8. At the time I joined the FDO-WDNC, Plaintiff had already accepted an offer as a Research & Writing Specialist made by Ms. Richardson in March of 2017. I had sat in on one of Plaintiff's interviews by Skype and agreed with Ms. Richardson and the others involved in the process—including the First Assistant-- that she was the best candidate for the position.

9. Plaintiff was to start work between July 15 and August 15, 2017. Plaintiff's salary as a Research & Writing Specialist was set at $101,929.00 per year according to the General Schedule ("GS") 14, Step 1, with the expectation that she would "transition to an Assistant Defender" ("AFD") at an unspecified time in the future.

10. Research & Writing Specialists are paid on the "GS" pay scale set by Congress for federal employees. The GS pay structure applies to all the employees of the FDO-WDNC except for me and the AFDs. We are in "unrated" positions in keeping with the rules set by Congress and the DSO.

11. The Research & Writing Specialist position is a developmental and trial and appellate support position for attorneys who are basically "entry level" litigators. Plaintiff did not have substantial directly relevant career experience but did have experience as a law clerk and Supreme Court Fellow, so the position was a good fit for her.

12. Research & Writing Specialists do not—and are not permitted to-- handle their own caseloads. While they may serve as "second chair" in a trial, they may not appear as lead counsel in any matter. As they progress with the FDO, they occasionally handle procedural motions hearings, with the direct supervision of AFDs. The AFDs must be counsel of record.

2

13.     Typically, the FDO-WDNC, and FDOs in general, hire attorneys with substantially more trial and career experience (at least 4-5 years of direct advocacy litigation experience) than Plaintiff had because of the importance of the defense function. FDO budgets are limited, resulting in fewer attorneys who can devote time to training of inexperienced lawyers like the Plaintiff. That said, when we do choose to hire inexperienced lawyers, we are committed to their training and development.

14.     Since Plaintiff's hire, the FDO-WDNC has, like most other FDOs throughout the country, transitioned away from employing Research & Writing Specialists. Instead, lawyers new to the FDO begin as AFDs. In our case, the transition officially occurred in August of 2018. We had been working on implementing the transition for months prior to then.

15.     In the FDO-WDNC, junior-level AFDs are given "hybrid" responsibilities between the trial and appellate divisions. Sometimes, there is a need for one or the other. Most of the time, there is a need for a junior-level AFD to remain in the "hybrid" category depending on the case load, type of work, and the make-up of the office at any given time.

16.     Unless they have significant experience as an advocate/trial lawyer when they join us, lawyers new to the FDO-WDNC start with significantly less direct responsibility than more senior lawyers. Even lawyers with significant directly relevant experience begin taking on issues and cases slowly until they can clearly handle the unique challenges of representing indigent criminal defendants. They frequently work in conjunction with more senior attorneys as well.

17.     Just like all legal organizations, we have ethical obligations to ensure our junior lawyers are "competent" in an individual issue or matter to handle it. This is not a reflection of the individual lawyer. It does not mean the lawyer is "incompetent" generally or that the lawyer is not good at what they do.

18.     This progression has been my experience over the last 34 years as well. As my career progressed, I took on more and more responsibility over the years. This is, put simply, how we are trained and developed. In my experience, the same general system applies to litigators in the U.S. Attorney's Office and to litigators in private practice.

19.     With time, experience, and training, lawyers are given more complex tasks the Defender or the Team Leaders feel the attorney is ready to handle. Eventually with sufficient first-hand trial and criminal litigation experience, successful AFDs will begin to handle their own cases and their careers progress accordingly. For example, even those with several years' experience as trial lawyers immediately take on matters involving lighter sentences and less complicated facts. They typically handle motions, witness interviews, contact with the clients, trials, and appeals.

Once they have proven their ability to handle those matters and as their trial experience in the FDO grows, they take on more complex and higher stake cases.

20.     This happens over the course of many years and is not an immediate process. Training and development by working directly with more senior lawyers is an integral part of the process. That reality applies to every lawyer newly starting as a criminal defense litigator (and, for that matter, any type of litigator).

21.     This progression is not unique to the Plaintiff and is not a punishment or a reflection on performance. First-hand court (including motions practice and direct trial experience) and client representation experience are mandatory elements of attorney progression. This is especially important when representing criminal defendants, whose very freedom is typically at stake.

22.     Research & Writing were integral parts of the AFD position; however, many other tasks must be juggled for a lawyer to become capable of managing an entire case from inception through trial and, often, appeals.

23.     There is guidance generally determining when a GS employee is eligible for grade and step changes. Since becoming the Defender, I have never "skipped" any employee on the GS pay scale up several steps of pay at a time.

24.     All the employees, whether in the GS system or the unrated system, of the FDO-WDNC are "at-will" employees. There are no guarantees of continued employment.

25.     On October 30, 2017, Plaintiff received a step increase from GS 14, Step 1 to GS 14, Step 2, which resulted in Plaintiff's salary increasing from $101,929 to $105,327. The advancement from Step 1 to Step 2 is automatic unless I affirmatively take action to block the Step increase. I did not take action to block Plaintiff's increase.

26.     On January 8, 2018, Plaintiff received a cost of living increase bringing her salary to $107,319. I did not take any action to block or modify this increase.

### Reclassification

27.     As noted above, we converted/reclassified our Research & Writing Specialists on or about August 20, 2018. Plaintiff had requested the change as well. The office's other remaining Research & Writing Specialist was also reclassified at the time.

28.     A move from a Research & Writing Specialist position to an AFD is a promotion on a long-term basis, even though it may not come with immediate compensation increases or

4

responsibilities. AFDs are the "face" of the FDO-WDNC. They are like an Assistant U.S. Attorney or an Associate in a private law firm.

29.     Unlike Research & Writing Specialists, AFDs have direct exposure to the U.S. Government and its many resources (i.e. our opposing party). They face the challenges of dealing directly with sophisticated government agencies involved in the criminal justice system like the FBI and the challenges of dealing with often difficult and, sometimes, hardened criminal clients. Research & Writing is often a key part of the job, but the advocacy and trial preparation and exposure on behalf of a client is the crux of the position.

30.     In August of 2018 at the time of the transition, Plaintiff as a Research & Writing Specialist was making a salary of $107,319.00 per year on the GS scale. As mentioned above, AFDs are paid under the "ungraded" AD System.

31.     Pay for AFDs is set based on a lawyer's number of years out of law school with direct legal experience. With Plaintiff's 1 year of service in the FDO-WDNC, plus her prior experience in clerkships and the Supreme Court fellowship, I normally would have set Plaintiff's salary between $66,254.00 and $101,036.00. In other words, the maximum I would normally have been permitted to pay Plaintiff under the "ungraded" AD System was $101,038.00 (which would have included locality pay) per year, resulting in an annual pay decrease of $6,319.00 for the Plaintiff.

32.     Plaintiff would normally have been paid under the generally applicable AD (Administratively Determined) salary, which was at that time between $66,254.00 and $101,038.00 (which, as noted, included 16.21% locality enhancement for the Charlotte, NC area). We were able to use a "Red Circle Rule" in the DOCS Manual to increase her pay. Under that Rule, we can compensate a reclassified employee like Plaintiff the same amount the employee previously earned under the GS scale if it is a higher amount than the employee would receive under the AD rules. A true and accurate copy of the applicable part of the DOCS manual is attached as GE C-1.

33.     Without the Red Circle Rule, Plaintiff would have had to take a pay cut to become an AFD. It was not within my discretion to pay Plaintiff a higher amount than what she was making in the GS scale. In fact, the rule clearly states that I am not permitted to increase Plaintiff's pay until the amount of her pay was "overtaken by the regularly prescribed pay for the current position."

34.     I instructed William Moormann to complete the paperwork ensuring Plaintiff's compensation remained at the highest possible rate of $107,319.00 (locality pay included).

5

35. I never reduced Plaintiff's compensation at any time during her employment.

36. I also never removed or adjusted Plaintiff's Charlotte locality supplement, even after she began teleworking from a location (Tryon, NC) approximately 90 miles from Charlotte outside the geographic area where the Charlotte locality supplement applies. Typically, this locality pay would have been adjusted down due to the relocation. However, since the telework was intended to be temporary, I did not adjust it.

## Substantive, Direct Interactions with Plaintiff

37. I had little direct interaction with the Plaintiff, other than exchanging pleasantries or brief discussions about cases during her employment at the FDO-WDNC, up until the Spring/Summer of 2018. This was not uncommon, as I had a busy office with 40 employees working in two different locations and we generally followed a "chain of command." Of course, my door was always open to employees to come to me directly with issues or concerns.

38. I had heard from my top team members, including the First Assistant, the Appellate Chief, and other senior attorneys, that Plaintiff's research & writing skills were quite good. I was also aware that she was eager to take on more challenges and was generally ambitious, which was very promising.

39. Plaintiff asked me directly in the late Spring of 2018 if she could serve as "second chair" on a trial that we had coming up that summer. I was aware that Plaintiff had been involved in the case and was doing a good job with the research, writing, and other specific tasks she had assisted with in the case.

40. As soon as two of my senior attorneys (Peter Adolf and Erin Taylor) learned of my agreement with Plaintiff's request to "second chair" the trial, they each came to me separately, and objected to that plan. Their objections were because the AFD serving as the "first chair" was inexperienced also, and the case was profoundly serious and challenging. They were also concerned that the "first chair" attorney was taking too "hands off" an approach and not giving the case the time and focus he needed to be giving it.

41. Around the same time, I also became aware that the First Assistant had already talked with Plaintiff about these reservations with her handling such an integral part of this particular matter, specifically with concerns he raised to her (before she talked with me) that her request would not be in the best interest of the client. She did not disclose this information to me when she sought my appointment to "second chair."

6

42.     In addition to Plaintiff's having no direct trial experience at the time, that case was one of the most complex, egregious, and upsetting cases I have ever dealt with in my career. We had an exceedingly difficult client, the charges involved sexual abuse of minors and child pornography, and the sentence was life in prison. The stakes were simply too high to put two junior lawyers on it.

43.     I approached Plaintiff to let her know I would be pulling her from second chair of the trial. I reassured her that it had nothing to do with her personally or her job performance. It was just too big a case to have two junior lawyers on it. She did not seem particularly upset by this decision and seemed to understand the issues. My decision also had nothing to do with Plaintiff's gender. In fact, I also took the male AFD who was "first chair" on the case off the case. I ended up handling the case personally and reached a plea agreement, which was the proper outcome all along. It was not a case that should have been tried.

## July 2018

44.     The next direct substantive interaction I recall with Plaintiff is a discussion I had with her shortly before the Fourth of July in 2018. At that time, she came to me to discuss an issue she had with the First Assistant.

45.     From the time the First Assistant became her mentor in or soon after August of 2017 up until this discussion in early July of 2018, Plaintiff had never come to me with any issues relating to the First Assistant or anyone else. I never personally witnessed or even heard from anyone else in the office that there may be any kind of issue between the two. They seemed to have a good rapport and appropriate working relationship.

46.     Plaintiff complained about the First Assistant raising his voice with her and becoming visibly angry with her in a recent meeting. I had no reason to believe that this was anything more than a more senior attorney becoming upset with an employee over some work-related issue, which can happen in a stressful work environment. That the two were of different genders was of no moment to me given the information Plaintiff provided at that time.

47.     As I reflected on this conversation over the next few days, I decided that the best way to handle it would be to give them a chance to "clear the air" with me present. I called both Plaintiff and the First Assistant into my office on July 5, 2018 to see if I could help them work through their issues. As the Unit Executive, part of my role is to manage employee disputes, especially those involving the attorneys.

48.     Both Plaintiff and the First Assistant had notepads out at the beginning of the meeting. I asked them both to put the notepads away and just have a discussion with me. Plaintiff

7

did not want to discuss anything with the First Assistant there, so I asked him to leave my office, which he promptly and willingly did.

49.     As soon as the First Assistant left my office, Plaintiff told me that the reason for the meeting was because she believed the First Assistant had made complaints to me about her performance. Since he had never told me (nor was I otherwise aware of) of any performance issues, I immediately corrected her mistaken impression. She seemed to be satisfied.

50.     She then advised me that she and the First Assistant stayed late one night working, and the First Assistant offered to give her a ride home. Plaintiff told the First Assistant that she had her bike and did not need a ride. On her way out, she said the First Assistant was waiting for her in the lobby and asked if she needed a ride. She stated that she was "creeped out" by this event. I advised Plaintiff that I wanted to make sure she was able to work in an environment where she felt comfortable. The mistaken belief about her performance was, to me, clearly her primary concern.

51.     At some point, Plaintiff used the word "uncomfortable" in relation to the First Assistant. I specifically asked Plaintiff what she meant by using the word ("uncomfortable") and asked her if she was suggesting or claiming there was sexual harassment. She responded by saying that she was not alleging or reporting sexual harassment by the First Assistant. .

52.     She also specifically asked me not to report or otherwise escalate her complaint. She said she did not want to submit a formal complaint, asked me to "keep her confidences," and make sure I "had her back."

53.     When I was able to get her to provide additional information, it seemed clear to me that the issues were purely related to communication problems between her and the First Assistant, who had been assigned as her mentor at the beginning of her employment.

54.     We talked through the issues she had raised thoroughly and Plaintiff seemed to be satisfied.

55.     I did what I thought was best at the time by respecting Plaintiff's requests not to escalate her complaint. I took her comments that there was not sexual harassment and that she was not reporting sexual harassment at face value. When I viewed the conversation as a whole, it did not at all seem to be a gender discrimination or harassment-based allegation.

56.     After my discussion with Plaintiff alone, the First Assistant rejoined the meeting and there was a group discussion about a seeming breakdown of their mentoring relationship,

8

including the Plaintiff failing to follow the First Assistant's instructions involving shadowing/training activities. To me, that is an entirely separate issue from job performance.

57.     After that meeting, and with the Plaintiff's and First Assistant's agreement, I reassigned Plaintiff to a new mentor. Plaintiff emailed me after this discussion to recap her concerns about whether her performance was satisfactory. She did not raise any of the other comments she made during the meeting. A true and accurate copy of that email and my response to Plaintiff regarding the new mentorship is attached as GE C-2.

58.     I did not hear from either Plaintiff about any kind of issues involving the First Assistant (or involving anyone else) after that meeting until late July, as described below. I believed the issues were resolved and had no reason to believe otherwise.

59.     Friday, July 20, 2018, I sent an email to the entire office explaining the restructuring of R&W support while we were preparing for a third attorney to depart. I had discussed the restructure with my management team in a meeting earlier that day. A true and accurate copy of that email is attached as GE C-3.

60.     In that email, I inadvertently listed Plaintiff as reporting to the First Assistant, in addition to one of the Team Leaders.

61.     Over the weekend, I reflected on the email and realized that I had made that mistake. It was not intentional.

62.     I reached out to Plaintiff early the next week, either Monday July 23 or Tuesday July 24, about the July 20 email. I explained my mistake about the reporting hierarchy and the immediate action I would be taking to correct it.

63.     I apologized to Plaintiff by phone (she was not in the office that day) for the mistake. In making that apology, I was not admitting that any kind of improper action had ever occurred. I just wanted her to know that I did not intend to have her to report to the First Assistant, and that it was an oversight I would correct.

64.     On July 26, 2018, I followed up with an email to the office stating that instead of assigning each of our two R&W's to two trial teams, incoming work would now be funneled through the senior R&W attorney. I drafted it in such a way that it neither singled Plaintiff out nor gave any information about any issues we had been working through relating to her mentorship shift and change of reporting structure. A true and accurate copy of my July 26, 2018 email is attached as GE C-4.

9

65.    Though Plaintiff had asked me to have her review any email before I sent it, I did not feel it was necessary. Having employees review my emails before sending them out is not something I usually do.

## "Appellate" Position

66.    On July 25, 2018, as a result of the determinations we made as a management team on July 20, we advertised an "Appellate" Position for an AFD. The following day, I sent out an email to all FDO-WDNC employees providing the job description and additional information about the position stating, in part, "This AFPD will be stationed in Charlotte. **Like Jared and [Plaintiff], the new position will divide time between providing support for the trial teams and assisting with our appellate and post-conviction practice.**" A true and accurate copy of the job posting is attached as GE C-5a, the email sent I sent within the FDO-WDNC is attached (see Paragraph 64) as GE C-4.

67.    Due to Sequestration and uncertain budgets, that "Appellate" AFD position was a "term" position. As a term position, the position was only for a period of one year and one day.

68.    As I clearly stated in my email, the position, while technically labeled as an "appellate" position, would be a typical AFD position requiring work and responsibilities on both the trial and appellate "sides" of the office.

69.    At that time Plaintiff was already in a permanently funded position, soon to be reclassified as an AFD position, which was also permanently funded. It would have adversely affected the terms, conditions, and privileges of Plaintiff's employment to move her from the permanently funded position to a term position with one year and one day term. For these reasons, there was no reason for her to apply for or interview for the term position. It is my understanding that my Appellate Chief, Josh Carpenter who works in the Asheville office, explained that to Plaintiff.

70.    Like all AFD positions, these had to be requested from, authorized by, and approved by the local Defender, the Circuit, and the DSO. GE A-2b § 3(B)(2). The position was authorized, as was the reclassification for our two Research & Writing Specialists to AFD positions.

71.    A true and accurate copy of the offer letter I sent to the candidate who ultimately accepted the position is attached as GE C-6. The letter identifies the position as a "Term (Year and one day)" position. That individual's pay was not subject to the "Red Circle Rule" and was accordingly in keeping with the pay structure applicable to AFDs. Even though the woman who filled that position had more experience than Plaintiff, she was paid less than Plaintiff because of

10

the application of the Red Circle Rule to Plaintiff and the different rule that was required to be applied to the new employee.

72. I never told Plaintiff I would allow her to work only on appellate matters at any point during her employment. The office always needed her and the other Research & Writing lawyer, even after they transitioned to AFDs, to handle research and writing for both "sides" of the organization. The Trial "side" has (and had) significantly more work. It has many more lawyers, needing much more support from junior level attorneys than the Appellate "side" of the FDO-WDNC.

73. I clarified that again with Plaintiff in an email to her on August 17, 2018. A true and accurate copy of that email is attached as GE C-7.

## August 2018

74. On August 9, 2018, I met with Plaintiff privately because of a phone call I received from the Director of Defender Services, Cait Clarke. Ms. Clarke advised me that Nancy Dunham, the Director of Fair Employment Practices, had reached out to her expressing concerns about interactions between the First Assistant and Plaintiff as alleged by Plaintiff. Ms. Clarke suggested that I should meet with Plaintiff, which I promptly did that day.

75. In our meeting, Plaintiff advised that she had been feeling uncomfortable with the First Assistant for quite some time now. She demanded that: 1) I modify the organizational chart to show I would be her direct supervisor instead of the Appellate Chief (I had already removed the First Assistant from her chain of command); 2) that I convert the Research & Writing positions to Assistant Federal Public Defender as soon as possible; 3) that she be allowed to do exclusive appeals within the Appellate Unit and not support the Trial Unit; and 4) that I change her duty station to the Asheville office or in the alternative that I allow her to telework.

76. I responded by stating I am committed to resolving these issues as soon as possible. I advised I will be able to modify the organizational chart and convert the R & W's to AFD's. I did indicate to Plaintiff I needed to speak to my Appellate Chief Josh Carpenter about her working exclusively on Appeals.

77. I also made it clear to her I would most likely be unable to accommodate her request for a change in duty station since there was no physical space in Asheville to accommodate that request.

78. I further advised her I do not grant telework requests as it would open the floodgates to other staff requesting transfer to Asheville or telework. (I did however permit her to telework

11

once she advised me in her subsequent email she believed was being sexually harassed by the First Assistant).

79.    I received Plaintiff's email on Friday, August 10, 2018, where she "recapped" our August 9 conversation. Several of the issues she raised did not accurately reflect our discussion. A true and accurate copy of Plaintiff's August 10, 2018 email is attached as GE C-8.

80.    In that email, Plaintiff alleged sexual harassment by the First Assistant. This email was the first time Plaintiff had made this claim to me. In my previous meeting with her back in early July, she specifically said she was not reporting sexual harassment, and she asked me not to report it or otherwise pursue it as such. In keeping with the Fourth Circuit's EDR Plan, I promptly contacted the EDR Coordinator, James Ishida by phone early the following week and forwarded Plaintiff's August 10 email to him. A true and accurate copy of my email to Mr. Ishida is attached as GE C-9.

81.    Mr. Ishida told me that he and the Fourth Circuit would follow the EDR Plan. Mr. Ishida reached back out the same day stating that I would be appointing Heather Beam to investigate the allegations.

82.    On August 17, 2018, I responded to Plaintiff's email, with the assistance of Mr. Ishida. In that email I responded specifically to each of Plaintiff's points in her August 10 email. See GE C-7, above.

83.    After that August 17 email, I was no longer involved in handling any part of any investigation into Plaintiff's claims, except I was interviewed by the investigator, Heather Beam and spoke with a mediator during the process.

## Work Space

84.    When I began working in the FDO-WDNC in June of 2017, there was not enough office space to accommodate all the staff in Charlotte since the Plaintiff and other new staff members were beginning imminently.

85.    As part of the ultimate plan to expand the office (we did have some convertible space, unlike in Asheville) and make as much use of the rentable space as possible, Ms. Richardson, with my input, decided to have a large File Room converted to an office that would hold two employees. One of those employees was Plaintiff, who was expected to start working in August of 2017.

86.    The FDO's Administrative Officer, Bill Moormann, was put in charge of ensuring this conversion occurred. Ms. Richardson and I both asked Mr. Moormann to ensure the office

12

space complied with local building code and other applicable rules. We also asked him to ensure the office space complied with the guidelines set forth by the General Services Administration's ("GSA") Space Planning Guide. It is my understanding that all those requirements were met.

87. Once the plans were made and the requirements were met, Ms. Richardson provided final authority, with my input and agreement, to complete the upfit. The upfit was completed before Plaintiff started working.

88. The space is like other space provided to our paralegals, investigators, Research & Writing Specialists (when we had them), and others allotted the same amount of square footage designated by the GSA. It is well lighted, had new furniture when Plaintiff started with us, was properly ventilated, and was generally a nice, if shared, workspace.

89. The space has never been a "utility," "storage," File Room, "closet", or anything other than a comfortable office since the conversion in July of 2017.

90. In late August of 2018, Plaintiff was provided a private office. Plaintiff never moved into that office. In my view, she could have chosen to move in at any time.

## Telework

91. In 2017 and up to the present (except during the coronavirus pandemic), I have never authorized telework for any employee for more than a few days, and then only in extreme situations.

92. I need my attorneys to be at the office and close to the courthouse and the local jail during working hours. I also feel strongly that FDO offices run more efficiently when everyone works together in the same space. In my experience, camaraderie among co-workers is essential, especially given that we handle stressful, challenging, and often disturbing cases.

93. However, at Plaintiff's request in August of 2018, I authorized Plaintiff to telework. I told her that I anticipated that she would come back to work once the investigation by the Fourth Circuit was completed. I did not tell her that she would be required to work for the First Assistant.

94. I also did not allow her to "languish" on telework. I instructed my Appellate Chief and Team Leaders to be sure to keep sending interesting, challenging work to her, as she remained an integral part of our Charlotte team. Plaintiff never complained to me or, to my knowledge anyone else with any supervisory authority in either office of the FDO-WDNC, about "languishing" on the telework she requested, or about not having an insufficient workload. Attached as GE C- 10 is a true and accurate copy of the organizational chart in effect from late July 2018 through Plaintiff's transfer in March of 2019.

13

95.    I have had several requests for transfers to the Asheville office. It is a sought-after location, and three AFDs have asked that we consider allowing them to move in the unlikely event a full-time AFD opening arises in Asheville. We do not and have not had physical space in that office to accommodate these requests. In fact, the interns who we accept in the summer share my personal office in Asheville.

96.    There is also significantly more work in Charlotte so most of our attorneys are needed in Charlotte. If a position were to open and physical space were available, I would select the AFD with the most tenure whose experience fit the position best. There has not been an open AFD position in Asheville during my tenure as the Defender.

Investigative Report and Subsequent Actions

97.    On April 3, 2019 (about 2 weeks after Plaintiff's transfer out of the FDO-WDNC), I received a copy of the investigative report prepared by Heather Beam. I had never seen the report before that date. It was provided to me by Kim Llewellyn, HR Administrator in the Office of the Circuit Executive for the United States Court of Appeals for the Fourth Circuit.

98.    The investigative report did not substantiate Plaintiff's claims of sexual discrimination, sexual harassment, or retaliation.

99.    On May 8, 2019, I personally counseled the First Assistant. His counseling was based on unprofessional communications via email in the workplace, and properly documenting context in emails.

100.    On May 22, 2019 and May 23, 2019, I attended the Fourth Circuit Workplace Conduct Conference near Richmond, Virginia. Also present, at my direction, were the First Assistant and the Administrative Officer. A true and accurate copy of the agenda for that conference is attached as GE C-11.

101.    On May 28, 2019, I received counseling under Chapter IX of the Fourth Circuit EDR Plan. The counseling decision came from Chief Judge Gregory, via James Ishida, as a result of the investigation. The substance of the counseling was to counsel me on "judgement and decisiveness" and "handling workplace conduct complaints."

102.    I was also instructed that training on these issues was recommended. Having completed an intensive two-day training course at the Fourth Circuit about a week before my counseling, it was my understanding that I had already met the training recommendation. I continue to take advantage of training opportunities in these areas.

14

103. I was specifically told that harsher discipline [than counseling] was not warranted under the circumstances.

104. There has been no finding that I ever engaged in of harassment, discrimination, or retaliation.

105. The investigation was thorough, and yielded the following salient conclusions, which appear to have been made prior to Plaintiff's transfer:

> a. "Employee has been accommodated in each request she has made except for where she will sit for the foreseeable future as she is currently teleworking full-time."
>
> b. "The mentor/mentee relationship seemed to have started out well enough. [Plaintiff] and Mr. Davis exchanged many text messages after hours that showed a friendly relationship that did not appear to be inappropriate in nature."
>
> c. "Throughout my investigation I could not find a time that [Plaintiff] had declined Mr. Davis' invitation to lunch until the end of their mentor/mentee relationship. I also did not find any indication [Plaintiff] had ever expressed her uneasiness about these lunch meetings."
>
> d. Regarding the May 18, 2018 e-mail: "I do not believe there was an intention of sexual harassment when [the First Assistant] sent the email."
>
> e. First Assistant Davis and Plaintiff had a heated exchange regarding a conflict in schedule with a presentence interview and a review of evidence in a case [Plaintiff] had been second chair on. He felt she was not honoring the commitment she made to attend the presentence interview by knowingly scheduling review of evidence at the same time. This upset [First Assistant Davis] . . . . [Plaintiff] took this exchange to be that [First Assistant Davis] had berated her. I believe this was over exaggerated [by Plaintiff]."
>
> f. Plaintiff has also stated she was promised the Assistant Federal Defender position in her offer letter dated March 24, 2017. This letter clearly states it was expected she would *transition* to an Assistant Federal Defender position. The letter did not outline a timeline or place an expected date of when this would occur. The offer letter also did not mention any promise of promotion."
>
> g. Plaintiff's "locality pay was never removed by the Federal Defender."

15

h. Plaintiff states she was "never granted an annual performance review. According to the DOCS manual, there are no formal policies governing performance evaluations of employees in federal defender organizations."

i. "I believe the Federal Defender has worked in good faith with Plaintiff on her request to telework until this complaint has been resolved. [Plaintiff] has been placed on full-time telework and has not been pressured to come into the office."

j. "I do not find any merit to [Plaintiff's] claim of regression of job duties or her intentionally not being invited to participate in moots."

k. "I do not see a case for retaliation based on my investigation and the facts presented by both sides."

l. "The investigation has also found [Plaintiff] has also exploited ... upper management to attain her goal of a transfer to Asheville."

m. Plaintiff "has experienced in her mind sexual harassment although the facts discovered in this case find this claim to be very flimsy."

## Adverse or Tangible Employment Actions Against Plaintiff

106. I never took any adverse employment action against Plaintiff at any time. I never instructed any other individual in the FDO-WDNC to take any adverse employment action against her.

107. No one in my office (other than me), including the First Assistant, has or had the authority to take any adverse employment action against Plaintiff or any of the other attorneys. This includes pay decreases, demotions, termination, or any other kind of adverse or tangible employment action.

108. Plaintiff never received a pay decrease, including her locality adjustment. Her salary remained at the maximum level permitted commensurate with her experience and years of service through the end of her employment.

109. Plaintiff was never demoted or written up at any time during her employment.

110. Plaintiff took several days of sick leave during the Summer of 2018. I ensured that those days be restored to her sick leave. Plaintiff was paid the entire period of her employment, including those days, which were categorized as paid "administrative leave" days. None of those days counted against any of her leave entitlements.

16

111. Plaintiff specifically requested being permitted to telework. I honored her request. I was never made aware by Plaintiff or anyone else that she had changed her mind about wanting to telework.

112. There is no requirement that I have "performance reviews," annually or otherwise, with my employees. Since I joined the FDO-WDNC, it has not been my practice to do performance reviews, unless the employee is being considered for a promotion or some other point of significance.

## Plaintiff's Transfer from FDO-WDNC

113. In or around March of 2019, I received a call from a mediator who had been working with the Plaintiff and the Fourth Circuit to resolve her dispute. He told me that Plaintiff had accepted another position in the Fourth Circuit and would be transferring out of the FDO-WDNC.

114. This was the first and only notice I received of Plaintiff's transfer to another position within the federal government. The transfer was never described to or understood by me as a "resignation" or "discharge." The "pre-employment information" requested from the new employing unit was completed and submitted by our office on March 14, 2019. A true and accurate copy of that document is attached as GE C-12. As noted in the document, there was no indication of "unfavorable data" from the FDO-WDNC.

115. Plaintiff was never "discharged" or terminated, constructively or otherwise, from her position. There was never any intent to discharge her or to make her working conditions intolerable.

116. To the contrary, I wanted to ensure Plaintiff's working conditions were satisfactory to her, which is why I permitted her to telework for over 6 months.

117. My understanding during that period was that her complaint was going through the EDR process. As I mentioned, my involvement in the process was limited to being interviewed by the investigator and speaking with a mediator.

118. Under the EDR Plan, as the appropriate Unit Executive, I was expected to receive a copy of any investigation report that was generated.

119. To my knowledge, Plaintiff never interacted with the First Assistant at any time after she began her telework. She never came to the office to work (and was not expected to while

17

the investigation was ongoing) after August 9, 2018, nor, to my knowledge, interacted in-person with anyone in the office.

## Office Diversity

120. The FDO-WDNC goes above and beyond seeking diversity by recruiting diverse candidates, advertising with both the Hispanic Bar (HNBA), and the National Bar Association (NBA), encouraging staff to promote job openings to diverse candidates, intentionally hosting diverse interns whenever possible, and employing other methods of attracting diverse employees as they arise. It is and has always been a very central and important part of my overall objectives for the office.

121. The FDO-WDNC currently has 40 employees. Of those employees we have: 29 female employees and 11 male employees; 21 diverse employees (as that term is defined by the AOC) and 19 non-diverse (Caucasian) employees; and 13 female attorney employees and 7 male attorney employees.

122. I am very committed to diversity, including gender equality. I have hired 10 total employees since my appointment in 2017. Nine of those 10 are female.

123. As Defender, I reorganized the attorney structure to include "Team Leaders." I chose one male AFD, Peter Adolf, and one female AFD, Erin Taylor, for these roles. The Appellate Chief as well as the First Assistant, were already in those positions when I started, though my personal observations and evaluations of the Appellate Chief and the First Assistant were that they were the best AFDs for each of their positions. I also promoted a female, Mary Ellen Coleman, to be the Branch Supervisor for the Asheville office approximately 6 months after I became the Defender.

124. I have never witnessed or even heard of any gender-based discrimination, or sexual harassment involving the First Assistant, Plaintiff, or anyone else in my office at any time, other than what I describe above about Plaintiff's reports raised in mid-August, 2018. I responded to those complaints immediately as described in this Declaration.

125. Had I observed or even heard rumors or speculation about any such conduct, I would have immediately followed all steps to ensure the issues were investigated and handled accordingly.

126. I have never made derogatory comments about Plaintiff or anyone else based on gender (or any other protected category).

127. I have never heard anyone in the FDO-WDNC make any such comments either.

18

128.    I have never retaliated against Plaintiff or any other employee for complaints of gender discrimination or sexual harassment, or otherwise.

129.    I have never discriminated against Plaintiff or any other employee on the basis of sex/gender or on any other protected basis.

121.    I have never sexually harassed Plaintiff or any other employee, nor have I witnessed any sexual harassment in my office.

122.    The atmosphere at the office is very professional. We all work hard as a team and are very respectful to each other. I expect nothing less of my employees.

Anthony Martinez

Case 1:20-cv-00066-WGY   Document 78-3   Filed 10/02/20   Page 19 of 51

**II.    Appointment and Compensation of <u>Non</u>-Supervisory/<u>Non</u>-Senior Litigator AFDs (Line AFDs)**

CONTENTS

A.    Authority to Appoint Line AFDs ....................................... 6

B.    Compensation of Line AFDs ........................................... 6

      1.    Overview of Line AFD Compensation System .................... 6

      2.    Determining the "AD-level" of Each Line AFD ................... 7

      3.    AD-level Salary Minimums and Maximums ...................... 7
            a.    Generally ............................................... 7
            b.    "Red-circled" and "Green-circled" Rates .................. 7

      4.    Setting Starting Salaries of Line AFDs .......................... 9
            a.    Generally ............................................... 9
            b.    Determining the Number of Years of
                  Professional Attorney Experience ........................ 9
            c.    Selecting a Starting Salary Amount from within
                  the Salary Range ....................................... 10
            d.    "Highest Previous Rate" Policy .......................... 11
            e.    Changes to Established Starting Salaries .................. 11

      5.    Annual Pay Review (APR) Pay Adjustments for Line AFDs ......... 11
            a.    Generally .............................................. 11
            b.    Eligibility to Receive an APR Pay Increase ............... 12
            c.    Evaluation of AFDs' Performance as a Basis
                  for Determining APR Pay Increases ...................... 12
            d.    Determining the APR Pay Increase Amount ............... 12
            e.    APR Bonus Payments ................................... 13
            f.    Limitations on APR Pay Adjustments ..................... 14
            g.    Increases/Bonuses for "Red-Circled Rate" AFDs ........... 14
            h.    Increases/Bonuses for "Green-circled Rate" AFDs .......... 14

      6.    Other Compensation for Line AFDs ........................... 14
            a.    Salary Increase Via Elevation to a Supervisory
                  or Senior Litigator AFD Position ....................... 14
            b.    Salary Inequity Increases .............................. 15

      7.    Salary Caps for Line AFDs ................................... 15

GOVERNMENT EXHIBIT

Effective: May, 26, 2010

A.      Authority to Appoint Line AFDs

Federal defenders are authorized to fill AFD positions in such number as is authorized by the Defender Services Committee.   Committee approval is always subject to the availability of funds, and restrictions may be imposed on that basis.  In FPDOs, the number of AFD positions must also be approved by the court of appeals for the circuit in which the FPDO is located. CDOs do not need Circuit approval of their AFD positions.

Individuals may be appointed to fill AFD positions only if they meet the qualification standards set forth in the AFD position descriptions in the Defender Organization Classification System (DOCS) manual.  An AFD may be designated as a "supervisory" or "senior litigator" AFD only if the requirements under section III.A. below are met.

B.      Compensation of Line AFDs

1.      Overview of Line AFD Compensation System

The system of compensation for Line AFDs is separate and distinct from the compensation system for supervisory and senior litigator AFDs (S/SL AFDs).  (The S/SL AFD compensation system is discussed in section III.B. of these policies.)  The Line AFD compensation system is primarily a system for determining starting salaries for newly hired AFDs and annual pay review (APR) pay increases for currently employed Line AFDs.  Line AFD starting salary charts and APR increase charts, provided annually by ODS, are used in making these determinations.

Both of the Line AFD salary charts list 7 levels of salary ranges, each level being applicable to a different level of "professional attorney experience".  Each level is identified by its own numbered "AD-level."  (Note: "AD" is DOJ's abbreviation of "administratively determined").  The two digit AD-level code is formed by adding the number "2" to the first digit of the "years of experience" column for 4 or more years experience.  The AD-21 level is assigned to the first pay range and represents professional attorney experience of less than four years.  An AFD at the AD-27 level is paid from the "at least 7 but less than 8 years of experience" range. DOJ added the "2" to the first digit of the years of experience in order to distinguish further the AD plan attorneys from the graded employees, whose graded system covers grades 1 to 15.

To use these charts, the defender must determine the AFD's level of attorney experience, identify the corresponding "AD-level" and the applicable salary range, and then select an appropriate salary amount from within that range.  The starting salary chart provides one salary range for each AD-level.  The APR increase chart has two ranges for each AD-level (one range for Line AFDs rated as "Meets or Exceeds Expectations" and the other range for those rated as "Substantially Exceeds Expectations") and the defender chooses which of the two ranges is appropriate based on the AFD's performance during the last 12 months.

The Line AFD compensation system also addresses:  salaries that are set at amounts above the maximum or below the minimum of the applicable range ("red-circled" and "green-circled" rates, respectively), and salary caps.  Annual "cost of living" type of salary increases are described in section I.D. of these policies.

> 2.      Determining the "AD-level" of Each Line AFD

Each Line AFD must be assigned an "AD" level based on the number of years of professional attorney experience the AFD had as of his/her last anniversary date or entrance on duty date.  "Professional attorney experience" is defined in Section II.B.4.b. of these policies.  Either the starting salary chart or the APR increase chart can be used to determine the AFD's AD-level in this manner.  **An AFD's AD-level can be changed only on the basis of the number of years experience the AFD had as of his/her anniversary date.**

Each Line AFD's AD-level should be documented in his/her personnel records.  These records should note the future anniversary date on which the AFD's AD-level will change, and they should be kept updated with each change, so that this information may properly be used when determining Line AFD APR pay increases each year.

> 3.      AD-level Salary Minimums and Maximums

> a.      Generally

The **AD-level minimum** is the amount at the bottom of the "Meets or Exceeds Expectations" range for that AD-level on the APR increase chart (which is the same as the bottom of the range for that AD-level on the underlined starting salary chart).  The **AD-level maximum** is the amount at the top of that level's "Substantially Exceeds Expectations" range on the APR increase chart.  The amount at the top of the AD-29 level is the Line AFD "salary ceiling"      the highest salary level possible for a Line AFD.

> b.      "Red-circled" and Green-circled" Rates

**"Red-circled rate salaries"** are Line AFD salaries that exceed the AFD's AD-level maximum.[3]

Red-circled rate salaries should occur only if: (1) the AFD's salary exceeds the applicable AD-level maximum upon conversion to the new Line AFD compensation system (on October 1, 1998), or (2) an AFD's starting salary is set higher than the maximum pursuant to the "highest previous rate" policy      see section II.B.4.d. below).  In these instances, the AFD's salary will

---

[3] Note: No AD-29 level AFDs should ever have red-circled rates since the AD-29 level maximum is the Line AFD salary ceiling.

not be reduced, but will be held constant until the applicable AD-level cap amount overtakes the salary. Specifically, when an AFD's salary is red-circled, the basic pay portion of the salary will be held constant (i.e., the AFD will not be given any APR pay increase or the employment cost index (ECI) increase awarded each January) until the AD-level maximum applicable to the AFD overtakes (becomes higher than) the AFD's salary. The applicable AD-level maximum will eventually overtake such an AFD's salary because the AD-level maximum will be increased by annual ECI increases and because all red-circled AFDs will ultimately move into a higher AD-level (with a higher AD-level maximum).

While these red-circled AFDs may not receive ECI or APR pay increases, they will receive the full amount of any applicable locality adjustment (changed each January) even if it results in a salary higher than the AD-level maximum.[4]

If a Line AFD's salary exceeds the applicable AD-level maximum for any reason other than the two stated above, then immediate action may be necessary to reduce the salary and possibly recover overpayments pursuant to *Guide to Judiciary Policy*, Volume 20, Chapter 7.

Additional policies concerning red-circled rates are stated in sections II.B.4.d. and II.B.5.g. below.

**"Green-circled rates"** are Line AFD salaries that fall below the minimum of the "Meets or Exceeds Expectations" range applicable to the AFD's AD-level. Green-circled rates may occur in three instances, with varying ramifications, as follows:

(1)  upon conversion to the new Line AFD compensation system. In such instances, the AFD, if performing at least at the "Meets or Exceeds Expectations" level, may be given an immediate increase up to the applicable AD-level minimum.

(2)  when an AFD reaches an APR anniversary date that moves him/her to a higher AD-level (with a higher AD-level minimum) but is denied an APR pay increase due to poor performance (see section II.B.5.b. below), causing his/her salary to stay below the new AD-level minimum. Such an AFD's salary may be raised up to the AD-level minimum as soon as his/her performance reaches the "Meets or Exceeds Expectations" level;

(3)  upon hiring of the AFD. As stated in section II.B.4.c. below, defenders have the discretion to hire an AFD at a salary that is less than the minimum of the applicable starting salary range (although ODS does not encourage this practice). Such an AFD may

---

[4] All ECI, locality and non-foreign COLA adjustments will continue to be addressed in memoranda provided to all federal defender organizations prior to the implementation of these increases each January.

not receive any increase, other than the ECI and locality or non-foreign COLA adjustments, until his/her first APR anniversary date.

Additional policies concerning green-circled rate employees are stated in sections II.B.4.c. and II.B.5.h. below.

    4.  Setting Starting Salaries of Line AFDs

      a.  Generally

Starting salaries of Line AFDs must be determined using the AFD starting salary chart(s) provided to federal defender organizations (FDOs) annually by ODS, in conjunction with the policies for using these charts set forth below.

The starting salary for a newly hired Line AFD is determined by selecting a salary amount from within the applicable salary range on the Line AFD starting salary chart.  This is accomplished by: (1) determining the individual's number of years of prior "professional attorney experience" (as defined below), (2) using this number to determine the AFD's AD-level and applicable starting salary range on the starting salary chart, and (3) choosing an appropriate salary amount from within that range.  For example, when hiring an AFD with 4 years and 9 months of professional attorney experience, the starting salary chart indicates that the starting salary should be selected from within the AD-24 salary range.  The exact amount of the salary within that range is determined pursuant to the policies set forth in subsection II.B.4.c. below.

Exception: ("Highest Previous Rate Policy"): See section II.B.4.d. below regarding setting a Line AFD's starting salary higher than the AD-level maximum in order to match the AFD's salary in a previous federal service or FDO position.

      b.  Determining the AFD's Number of Years of Professional Attorney Experience

In determining the number of years of professional attorney experience, only activities that a practicing attorney would normally perform may be counted, and such experience may be counted only from the time that the AFD completed law school.  Investigative, quasi-legal, and other types of non-attorney law enforcement-related or defense-related experience (e.g., experience as an agent of the Federal Bureau of Investigation or as an investigator in an FDO are not creditable in determining years of professional attorney experience).  At the defender's discretion, legal research and writing experience obtained after graduation from law school may be counted as professional attorney experience.

Any calculation of years of professional attorney experience should include time the attorney was employed (in a position that provided professional attorney experience) but on leave

including, but not limited to, time spent on leave without pay, maternity leave, or while on sabbatical.

In determining the amount of experience to be credited, it is important to project an entrance-on-duty date. Applicants may acquire additional experience between the time their applications are submitted and the time they actually enter on duty.

c.       Selecting a Starting Salary Amount from within the Salary Range

Once the AFD's number of years of professional attorney experience has been determined, the starting salary amount must be selected from within the corresponding starting salary range.

Defenders are encouraged to set Line AFD starting salaries at the minimum amount in the applicable range. However, when the federal defender believes that a salary higher than the minimum is warranted, he/she may set the salary at any amount within the applicable starting salary range, as necessary: (1) to ensure consistency between the salary of the AFD being hired and the salaries of other AFDs in the organization, based on their relative experience and qualifications, or (2) to match the salary of an AUSA, having similar (or lesser) experience, qualifications, and responsibilities, in the same district(s) served by the FDO. ODS approval is not needed to award a starting salary higher than the minimum of the applicable range as long as the maximum of the range is not exceeded.

ODS approval of a Line AFD starting salary is needed only for salaries set higher than the maximum of the applicable starting salary range (except that ODS approval is not needed if a starting salary higher than the maximum is determined pursuant to the "highest previous rate" policy set forth in II.B.4.d. below.)

Note that some AD-21 Line AFDs will remain at the AD-21 level for anywhere from zero to four years before becoming an AD-24. Consequently, such AFDs will be subject to the same AD-21 range maximums (adjusted only for cost of living increases) year after year until the AFD reaches four years of attorney experience and becomes an AD-24. Accordingly, ODS recommends that when hiring a Line AFD at the AD-21 level, defenders set the starting salary low enough in the range to allow for appropriate APR pay increases each year until the AFD becomes an AD-24.

At the federal defender's discretion, Line AFD starting salaries may be set lower than the minimum amount of the applicable range, although defenders are reminded that such a practice will likely result in AFD salaries that are below those of comparably experienced and qualified AUSAs in the same district(s). Salaries that are below the minimum of the applicable starting salary range are "green-circled rates." A starting salary set at a green-circled rate may not be increased up to the AD-level minimum until the AFD's first APR anniversary date. (See section II.B.3.b. above.)

Effective: May, 26, 2010

ODS advises that the justification for setting any starting salary at an amount <u>other</u> than the minimum amount of the applicable range should be documented in the AFD's personnel file.

d.      "Highest Previous Rate" Policy

Under the "highest previous rate" policy, a Line AFD's starting salary may be set higher than the maximum of the applicable starting salary range if necessary to match the salary (adjusted for locality) the AFD previously earned as an employee of any federal government entity or any FDO (including any community defender organization). **Such salaries will be considered "red-circled rates," and subject to the provisions of section II.B.3.b. providing that such salaries must be held constant until they are eventually overtaken by a higher AD-level maximum.** Under no circumstances may a Line AFD's salary be set higher than the Line AFD "salary ceiling" (i.e., the highest allowable salary for Line AFDs, which is equal to the maximum of the AD-29 level.)

Setting an AFD's starting salary based on the AFD's "highest previous rate" does not require ODS approval, but such an action should be fully documented by the FDO. FDOs are encouraged to consult with ODS prior to setting any AFD's starting salary based on this policy.

e.      Changes to Established Starting Salaries

Once a starting salary amount has been established, it may not be later adjusted <u>retroactively</u> under any circumstances. It may be later adjusted <u>prospectively</u> only in instances of administrative error, a misunderstanding with respect to pertinent qualifications, or if the starting salary was <u>improperly</u> set at a red-circled rate and must therefore be immediately reduced (see section II.B.3.b. above.).

5.      Annual Pay Review (APR) Pay Adjustments for Line AFDs

a.      Generally

APR-related pay adjustments are discretionary performance based increases in salary and/or bonus payments that can be given annually to an "eligible" AFD on his/her "anniversary date" as defined in section b. below. Amounts, requirements, and limitations on APR-related pay adjustments is discussed in sections c. through h. below.

b.        Eligibility to Receive an APR Pay Increase

An AFD is eligible for an APR pay increase only if:  (1) the AFD's performance during the previous 12 months is determined to be at least "Meets or Exceeds Expectations" and (2) the AFD's salary, before the increase, is below the maximum of the APR salary range applicable to the AFD's AD-level and performance rating, as of this new APR anniversary date.

Eligible AFDs may receive an APR pay increase each year on their "anniversary date." For all FPDOs, and for CDOs on a bi-weekly payroll system, the AFD's anniversary date occurs on each 52 week anniversary of the AFD's entrance-on-duty date.  For CDOs on a semi-monthly payroll system, the anniversary date occurs on each one-year (exactly) anniversary of the AFD's entrance-on-duty date.[5]  (I.e., The anniversary date always falls on the first day of a pay period.)

c.        Evaluation of AFDs' Performance as a Basis for Determining APR Pay  Increases

Although the APR increase charts and policies assume that APR pay increase determinations are made based on a performance rating of each AFD, there are no formal policies governing performance evaluations of employees in federal defender organizations. Accordingly, federal defenders may use their own performance evaluation systems.  It is suggested that defenders use systems with at least three ratings categories, including at least two categories for which an APR pay increase can be given (consistent with the APR increase chart) and at least one lower rating for which an APR pay increase cannot be given.  (The rating categories listed on the APR increase chart are the same as those used for AUSAs.)  Any organization that does not have a performance evaluation system in place may wish to consider the system suggested by the Defender Services Advisory Group's ad hoc group that conducted a study of this issue.  That group suggested using four ratings categories.

Regardless of the performance evaluation system used by an organization (if any), the APR increase chart should always be applied in determining the amounts of all Line AFDs' salary increases.  If the rating categories in an organization's evaluation system differ from the rating categories on the APR increase chart, the defender should use his/her discretion in determining the appropriate rating on the APR pay increase chart for each eligible AFD.

d.        Determining the APR Pay Increase Amount

The APR increase chart is used to determine each Line AFD's APR pay increase by selecting a new (higher) salary amount from within the applicable salary range on the chart.  The applicable range is found at the intersection of: (1) the column representing the AFD's

---

[5] See section IV.C. below for different rules regarding anniversary dates for AFDs who transfer from one defender organization to another.

performance rating (for performance over the previous 12 months), and (2) the row representing the AFD's AD-level (based on his/her years of "professional attorney experience") as of the effective date of the salary increase.

The exact amount chosen from within the applicable range is determined totally at the defender's discretion subject to the limitations described in II.B.5.e-f below.

For example, consider an AFD whose performance falls into the "Meets or Exceeds Expectations" performance category and who has a total of 5 years and 7 months of professional attorney experience at the time of the APR pay increase.  This AFD's new (increased) salary amount would be selected from anywhere within the salary range found in the AD-25 row and under the "Meets or Exceeds Expectations" column, as long as the amount chosen is not more than 10% higher than the old salary.

As indicated above, if a Line AFD's salary prior to the APR pay increase is higher than the maximum of the range applicable to the AFD's performance rating, he/she is not eligible to receive an APR pay increase and will not become eligible until the next anniversary date at which his/her salary does not exceed the applicable range maximum.

> e.      APR Bonus Payments

Defenders are authorized to approve one APR-based bonus payment in addition to, or in lieu of, an APR pay increase for each AFD whose performance "Meets or Exceeds Expectations" at the time of the AFD's anniversary date.   These bonus payments  must be documented and based on a performance review conducted by the defender.

A bonus payment is a one-time lump sum payment that does not increase the salary of an AFD.  For FPDOs, bonuses are paid from BOC 1157 in the "Personnel" budget category. FPDOs should use Nature of Action (NOA) code 944 for attorney bonuses.

Tax and Benefit Ramifications of Performance Bonuses:  **Note that** bonus payments are considered to be "income," and therefore are subject to all applicable federal, state and local income taxes, as well as to Social Security and Medicare taxes. (There are standard tax rates specific to bonus payments.)   However, for federal employees (including **FPDOs**), bonus payments are not considered part of the employee's "salary" for any purpose, including for purposes of determining benefit contributions and payments that are calculated as a percentage of the employee's "salary" (e.g., calculations of:  an employee's maximum allowable contribution to the Thrift Savings Plan, contributions to CSRS or FERS, payout of CSRS or FERS benefits, life insurance premiums, workman's compensation benefits, severance pay, or annual leave payout upon separation from the government).  **CDOs** should consult their benefit providers and other appropriate sources to determine if/when bonus amounts are factored into calculations of benefits or other payments.

f.      Limitations on APR Pay Adjustments

Total APR-related pay adjustments, i.e. increases in salary and bonus payments, are limited to 10 percent of pay prior to the AFD's anniversary date. **Pay adjustments that exceed 10 percent require the approval of the Assistant Director, Office of Defender Services**.

g.      Increases/Bonuses for "Red-Circled Rate" AFDs

As stated in section II.B.5.b.above, in order to be eligible to receive an APR pay increase, an AFD's salary must be lower than the maximum of the APR salary range he/she qualifies for on his/her anniversary date. Note that, on their APR anniversary dates, **red-circled rate** AFDs with 4 to 9 years of professional attorney experience will advance to the **next higher AD-level**, and the maximum of the new AD-level will likely be higher than the AFD's salary. Thus, most of these AFDs' salaries will no longer be red-circled, and they will become eligible for an APR pay increase. **In all cases, however, an AFD may only be given an APR pay increase up to the maximum of the salary range for the performance rating and the AD-level applicable to that AFD.** Red-circled rate AFDs are eligible for an APR bonus payment, regardless of salary, as outlined in section II.B.5.e-f above.

h.      Increases/Bonuses for "Green-circled Rate" AFDs

As stated in section II.B.5.b. above, if the defender believes that a Line AFD's performance is not at least "Meets or Exceeds Expectations," the AFD is not eligible for an APR pay increase. If the AFD moves to a higher AD-level on his/her anniversary date (with a higher AD-level minimum), but is denied an APR salary increase, it may result in leaving the AFD's salary below the minimum of the "Meets or Exceeds Expectations" salary range for the AFD's new AD-level (i.e., it would be a **"green-circled rate"**). If, at any time, such an AFD's performance improves to the "Meets or Exceeds Expectations" level, the defender may give the AFD an <u>immediate</u> salary increase up to the minimum of the "Meets or Exceeds Expectations" range for the AD-level that the AFD qualified for <u>as of his/her last APR anniversary date</u>. Such increases are prospective only and the AFD's APR anniversary date would not change. Once at the "Meets or Exceeds Expectations" range, the AFD is eligible to receive an APR bonus payment as outlined in sections e. and f. above.

6.      Other Compensation for Line AFDs

a.      Salary Increase Via Elevation to a Supervisory or Senior Litigator AFD Position

When a Line AFD is designated as a supervisory or senior litigator (S/SL) AFD, his/her salary may be increased up to any amount that is equal to or less than the salary cap for the AFD's new S/SL AFD level. (These caps are discussed in section III.B. below.) Criteria for

determining whether or not an AFD is eligible to be appointed to a supervisory or senior litigator position is provided in section III.A. below.

Upon designation to a S/SL AFD classification, the AFD's APR anniversary date is changed to the anniversary of the effective date of the action.

b.      Salary Inequity Increases

AFD salary inequity increases, which may be available to both Line AFDs and S/SL AFDs, are discussed in section IV.A. below.

7.      Salary Caps for Line AFDs

Under no circumstances may any **Line AFD** be paid a salary that exceeds the Line AFD "salary ceiling" for his/her locality area, as listed on the Line AFD salary charts.  The salary ceiling is the maximum amount of the "Substantially Exceeds Expectations" range of the AD-29 level.

In addition, each Line AFD is "capped" at the maximum salary for his/her AD-level, and if a Line AFD's salary exceeds the applicable AD-level maximum (i.e., red-circled rate AFDs), steps must be taken to bring the salary within that AD-level maximum, as explained in section II.B.3.b.

Section IV.B. below sets forth policies regarding corrective actions that must be taken when an AFD's salary exceeds any applicable salary cap (either the Line AFD salary ceiling or the applicable AD-level maximum).  Salary caps for supervisory and senior litigator AFDs are addressed in section III.B. below.

**From:** Anthony Martinez
**Sent:** Monday, July 9, 2018 10:37 AM
**To:**
**Subject:** Re: next steps after meeting last week

You are correct. As I indicated to you at our meeting, your performance is not at issue. We agreed that we should have someone else other than JP mentor you. I asked you who you'd prefer. You advised me you would like for Kelly to be your mentor. I've already discussed the matter with Kelly and he's advised he'd be more than willing to be your mentor. I've talked with Peter (your team leader) and advised him that Kelly would be acting in that capacity with you. Is this ok with you?

Thanks,
Tony

**Anthony Martinez**
**Federal Public Defender**



Western District of North Carolina
129 West Trade Street, Suite 300
Charlotte, NC 28202
Tel: (704) 374-0720
Fax: (704) 374-0722
E-mail: Anthony_Martinez@fd.org

*This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify us by reply e-mail.

---07/09/2018 09:20:43 AM---Dear Tony,

NCWF/04/FDO
To Anthony Martinez/NCWF/04/FDO@FDO
Date: 07/09/2018 09:20 AM
Subject: next steps after meeting last week

Dear Tony,

Thanks for meeting with me and JP last Thursday. I wanted to make sure that I understand the next steps moving forward. From the meeting, my understanding is that there is no performance issue with my work, but that this is a matter of receiving the right mentoring. Based on this, I am planning to ask for a new mentor.

Please let me know if you have any questions or concerns.

GOVERNMENT
EXHIBIT
C-2

1

Best regards,



Research & Writing Attorney
Federal Public Defender for the Western District of North Carolina
129 West Trade Street, Suite 300
Charlotte, North Carolina 28202
Main - 704-374-0720
Fax - 704-374-0722

CONFIDENTIALITY NOTE

This e-mail, and any attachments accompanying this e-mail, contain information from the Federal Public Defender's Office which is confidential or privileged. The information is intended only for the use of the individual(s) or entity(s) named in this e-mail. If you are not the intended recipient, be aware that any disclosure, copying, distribution, or use of the contents of this information is prohibited. If you have received this e-mail in error, please notify us immediately by reply e-mail.

## Anthony Martinez

| | |
|---|---|
| **From:** | Anthony Martinez |
| **Sent:** | Friday, July 20, 2018 4:15 PM |
| **To:** | zzNCWml_AllStaff |
| **Subject:** | Research & Writing Support |

All,

In light of Caleb's imminent departure, we will be adding a new assistant paralegal position for JP's team. Meanwhile, we will be making some adjustments to ensure all teams have full R&W support. Going forward, each of our two remaining Research and Writing attorneys will be assigned to cover two teams. Jared will be assigned to Erin and Mary Ellen's teams.' will be assigned to Peter and JP's teams. We are still exploring the possibility of adding an additional position with research and writing responsibilities at some point in the future, so please keep your team leaders informed about how your R&W needs are being met.

Thanks,
Tony

**Anthony Martinez**
**Federal Public Defender**



Western District of North Carolina
129 West Trade Street, Suite 300
Charlotte, NC 28202
Tel: (704) 374-0720
Fax: (704) 374-0722
E-mail: Anthony_Martinez@fd.org

*This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify us by reply e-mail.

1

GOVERNMENT
EXHIBIT
C-3

## Anthony Martinez

| | |
|---|---|
| **From:** | Anthony Martinez |
| **Sent:** | Thursday, July 26, 2018 9:03 AM |
| **To:** | zzNCWml_AllStaff |
| **Subject:** | Fw: Research & Writing Support Follow-Up |
| **Attachments:** | App AFD posting.pdf |

All,

Following up on my email from last Friday, I'm happy to report that we are going forward with the hiring of a new Appellate Assistant Federal Public Defender. This AFPD will be stationed in Charlotte. Like Jared and ▊▊▊ the new position will divide time between providing support for the trial teams and assisting with our appellate and post-conviction practice.

In light of this development and in order to facilitate the flow of work to the R&W's I am adjusting how work is assigned from the trial teams to the R&W's. We will no longer assign each team a designated R&W attorney. Instead, all requests for R&W support should be sent to Jared, who will then distribute the work amongst himself and ▊▊▊ based on their current workload capacity and any particular interest or expertise that an R&W may have on the relevant issue. This is the system that Jared has used to handle requests from Asheville since we implemented the team structure, and he reports that it has worked well.

This is a temporary fix. Once we get the new AFPD on board we will revisit the issue on how to distribute the R&W trial/appellate workload going forward.

In the meantime, if you know any attorneys who might be a good fit for the attached position, please reach out to them.

Thank you for your patience.

*(See attached file: App AFD posting.pdf)*

Thanks!
Tony

---- Forwarded by Anthony Martinez/NCWF/04/FDO on 07/26/2018 09:02 AM ----

From: Anthony Martinez/NCWF/04/FDO
To: zzNCWml_AllStaff@FDO
Date: 07/20/2018 04:15 PM
Subject: Research & Writing Support



All,

In light of Caleb's imminent departure, we will be adding a new assistant paralegal position for JP's team. Meanwhile, we will be making some adjustments to ensure all teams have full R&W support.

1

Going forward, each of our two remaining Research and Writing attorneys will be assigned to cover two teams. Jared will be assigned to Erin and Mary Ellen's teams. ▮▮▮▮ will be assigned to Peter and JP's teams. We are still exploring the possibility of adding an additional position with research and writing responsibilities at some point in the future, so please keep your team leaders informed about how your R&W needs are being met.

Thanks,
Tony


**Anthony Martinez**
Federal Public Defender



Western District of North Carolina
129 West Trade Street, Suite 300
Charlotte, NC 28202
Tel: (704) 374-0720
Fax: (704) 374-0722
E-mail: Anthony_Martinez@fd.org

*This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) ▮▮▮▮▮ ▮▮▮▮▮ If you are not the intended recipient of this e-mail or an employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited If you have received this e-mail in error, please notify us by reply e-mail

## Position Announcement
## ASSISTANT FEDERAL PUBLIC DEFENDER (APPELLATE)
Office of the Federal Public Defender
Western District of North Carolina (Charlotte Office)

The Office of the Federal Public Defender for the Western District of North Carolina is accepting applications for an Assistant Federal Public Defender to join our appellate team in the Charlotte Office. The Federal Public Defender operates under authority of the Criminal Justice Act, 18 U.S.C. 3006A, to provide defense services in federal criminal cases and related matters by appointment from the court to individuals unable to afford counsel.

**Duties.** In addition to handling traditional appeals, our appellate team provides extensive legal-issue support to the office's trial teams while also aggressively pursuing post-conviction relief in appropriate cases. Accordingly, the duties of this position may include: (1) researching, briefing, and arguing cases in the Fourth Circuit and the Supreme Court; (2) assisting the office's trial attorneys in identifying legal issues in pending cases, and researching and drafting motions, objections, and memoranda in those cases; (3) litigating post-conviction motions arising from retroactive judicial decisions or Sentencing Guidelines amendments; and (4) monitoring relevant legal developments and helping to train the office's lawyers, and other criminal defense practitioners, on the impact of those developments. The balance of responsibilities among these duties will vary depending on the office's needs at any particular time.

**Requirements.** Candidates must be law school graduates and members in good standing of the bar of any state or federal district court. Attorneys applying for this position should have sufficient experience to undertake the defense of serious criminal cases before the United States District Court and the Fourth Circuit Court of Appeals. Appointment is subject to a satisfactory background investigation, including but not limited to an FBI name and fingerprint check and an IRS tax check. The private practice of law is prohibited.

**Selection Criteria.** The successful applicant will have a strong academic background and excellent research, writing, and oral advocacy skills. Appellate experience in federal court is preferred. Prior judicial clerkship experience is preferred.

**Salary and Benefits.** The salary of an assistant federal public defender is commensurate with that of an assistant U.S. attorney with similar qualifications and experience. The position is in the excepted service and does not carry the tenure rights of the competitive Civil Service. The position offers federal government employment benefits, including



GOVERNMENT EXHIBIT
C-5

participation in health and life insurance program, retirement, and the Thrift Savings Plan. Salary is payable only by Electronic Funds Transfer (direct deposit).

**How to Apply.** You may apply by submitting a letter of interest, résumé, and representative writing sample, along with 3 references, to WDNCapplication@fd.org. Please describe in detail your experience with appellate work and motions practice.

For applicants with disabilities, this organization provides reasonable accommodations which are decided on a case-by-case basis. To request a reasonable accommodation for any part of the application or interview process, please submit the request in writing to WDNCapplication@fd.org.

Position announced July 25, 2018; open until filled. Applications received by August 17, 2018, will be given priority consideration.

**Federal Public Defender is an equal-opportunity employer.**

129 West Trade Street
Suite 300
Charlotte, NC 28202
(704) 374-0720
Fax (704) 374-0722



1 Page Avenue
Suite 210
Asheville, NC 28801
(828) 232-9992
Fax (828) 232-5575

September 12, 2018



**Offer letter**

This offer letter confirms our conversation regarding your employment as a Term (Year and one day) Assistant Federal Public Defender, Appellate working at the Charlotte Headquarters Office. Your salary has been set in accordance with Defender Services Office policy at AD 25, earning ████ per annum, including locality pay. Your start date has been determined to October 1 2018.

You will be eligible for the federal benefits package including health insurance, dental insurance, life insurance, and retirement benefits effective 2 weeks after your start date. You will earn annual leave at 4 hours per pay period and sick leave at 4 hours per pay period. Employment terms are subject to final approval by the Defender Services Office and the Administrative Office of the Courts.

We are very excited about the opportunity to work with you and the talents and skills you bring to this position.

If you have any questions, please contact William Moormann, Administrative Officer.

Sincerely,

Anthony Martinez
Federal Public Defender

Signed: _____

**GOVERNMENT EXHIBIT**
C-6

From:          Anthony Martinez
Sent:          Friday, August 17, 2018 1:52 PM
To:            ▮▮▮▮▮▮
Cc:            James Ishida; Heather Beam
Subject:       Re: Agreement from yesterday's meeting



As a result of our meeting on Thursday, 8/9/18 I have done the following:

1. I have instructed our Administrative Officer William Moorman to start the process to make you an Assistant Federal Defender. As I indicated to you at our meeting, Josh and Bill spoke with Todd Watson, who advised that it was to the office's advantage to reclassify Research & Writing Specialists to AFD positions for purposes of case weight measurement. Bill has already started the paperwork.

2. At our meeting I never agreed to allow you to work exclusively on appeals. I advised you I personally had no problem with it but had to clear it through Appellate Chief Josh Carpenter. If I were to allow you to only work on appeals, it would leave me with only one Research & Writing Specialist to support nine trial attorneys. After discussion with Josh about this request, we determined this is not doable and I will not agree to have you do appeals exclusively.

3. We have already changed the organizational chart to reflect that you will report to the Appellate Chief, who will report to the Federal Defender. As Appellate Chief, Josh Carpenter is aware of this change.

In your email you state, "these steps are necessary to protect myself from further sexual harassment by the First Assistant". You further state, "The First Assistant has already crossed many lines with me by engaging in sexually harassing and threatening behaviors..." I take allegations of wrongful conduct on the part of my employees very seriously. Based on your allegation of sexual harassment and my obligation pursuant to the Employment Dispute Resolution Plan of the United States Court of Appeals for the Fourth Circuit Chapter IX, I have contacted the Circuit Executive for the 4th Circuit and advised him of this allegation. The Circuit Executive has promptly informed Chief Judge Gregory. Our office also has an EDR plan but it doesn't appear to apply in this case.

Under the 4th Circuit Court of Appeals EDR plan, you have certain rights. The investigation into these allegations will be conducted by Heather Beam who is the HR professional for the US District Court in the Western District of NC. Ms. Beam has been approved to conduct this investigation by the Circuit Executive. Both Ms. Beam and I will need to meet with you in order to advise you of your rights under the 4th Circuit Court of Appeals EDR plan. We will be in contact with you some time next week since Ms. Beam will be out of the office for training from Monday through Thursday. In the meantime, I will allow you to telework temporarily during the pendency of this investigation. This is not a permanent solution. I am reserving the right to request your return to your duty station in Charlotte subject to and upon completion of this investigation. I am also going to count the time from Friday, 8/10/18 (the date of your email) through today as Administrative leave so you do not have to use your sick leave. If you have any additional questions, please feel free to ask.

I will also be in touch with you to ask you the status of some of the cases you have been handling.

**GOVERNMENT EXHIBIT**

Thank you,

**Anthony Martinez**
Federal Public Defender

 Western District of North Carolina
129 West Trade Street, Suite 300
Charlotte, NC 28202
Tel: (704) 374-0720
Fax: (704) 374-0722
E-mail: Anthony_Martinez@fd.org

*This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify us by reply e-mail.

█████████████-08/10/2018 11:12:42 AM---Tony, I am confirming what we discussed yesterday. We agreed to the following:

From ███████████
To: Anthony Martinez/NCWF/04/FDO@FDO
Date: 08/10/2018 11:12 AM
Subject: Agreement from yesterday's meeting

Tony,

I am confirming what we discussed yesterday. We agreed to the following:

    1. I will be an Assistant Federal Defender;
    2. I will work exclusively in appeals;
    3. The First Assistant will not be in my chain of command or have any supervisory authority over me. I will report to the Appellate Chief, who will report to the Federal Defender. The organizational chart will be modified to reflect this.

As we discussed, these steps are necessary to protect myself from further sexual harassment by the First Assistant, and to allow me to do my job effectively going forward.

In addition, as I told you, I am not safe working in the Charlotte office. The First Assistant has already crossed many lines with me by engaging in sexually harassing and threatening behaviors, such as cornering me in the lobby after hours when he knew I was alone. I have already curtailed my working hours to avoid being alone in the building and this situation is not tenable moving forward. The First Assistant is likely to be very angry when he finds out about these changes, which puts me at further risk.

You indicated that there was an issue with office space in Asheville and that it might take up to two weeks to resolve the issue, but that you would report back to me in a week. In order to prevent further threats to my safety, I am requesting to work remotely until the duty station issue is resolved. A long-term resolution that allows me to work remotely and report to the Appellate Chief in Asheville is fine with me. An exception to the telework policy can be justified by the lack of office space in Asheville.

████

Sent from Mail for Windows 10

## Anthony Martinez

From:
Sent:                    Friday, August 10, 2018 11:12 AM
To:                      Anthony Martinez
Subject:                 Agreement from yesterday's meeting

Tony,

I am confirming what we discussed yesterday. We agreed to the following:

(1) I will be an Assistant Federal Defender;
(2) I will work exclusively in appeals;
(3) The First Assistant will not be in my chain of command or have any supervisory authority over me. I will report to the Appellate Chief, who will report to the Federal Defender. The organizational chart will be modified to reflect this.

As we discussed, these steps are necessary to protect myself from further sexual harassment by the First Assistant, and to allow me to do my job effectively going forward.

In addition, as I told you, I am not safe working in the Charlotte office. The First Assistant has already crossed many lines with me by engaging in sexually harassing and threatening behaviors, such as cornering me in the lobby after hours when he knew I was alone. I have already curtailed my working hours to avoid being alone in the building and this situation is not tenable moving forward. The First Assistant is likely to be very angry when he finds out about these changes, which puts me at further risk.

You indicated that there was an issue with office space in Asheville and that it might take up to two weeks to resolve the issue, but that you would report back to me in a week. In order to prevent further threats to my safety, I am requesting to work remotely until the duty station issue is resolved. A long-term resolution that allows me to work remotely and report to the Appellate Chief in Asheville is fine with me. An exception to the telework policy can be justified by the lack of office space in Asheville.



Sent from Mail for Windows 10

GOVERNMENT
EXHIBIT
6-8

## Anthony Martinez

| | |
|---|---|
| **From:** | James Ishida <james_ishida@ca4.uscourts.gov> |
| **Sent:** | Tuesday, August 14, 2018 12:17 PM |
| **To:** | Anthony Martinez |
| **Cc:** | Judge Roger L Gregory |
| **Subject:** | CONFIDENTIAL - Personnel Matter |

Dear Tony,

Thank you very much for forwarding the below email from ▮▮▮▮▮▮, your Research and Writing Attorney, who has accused your First Assistant of sexual harassment.

Under Chapter IX of the *Consolidated Equal Employment Opportunity and Employment Dispute Resolution Plan of the United States Court of Appeals for the Fourth Circuit* (January 2013) ("the Plan"), I as the EDR Coordinator am required to inform Chief Judge Gregory of any report of wrongful conduct, which includes allegations of sexual harassment. Chapter IX also directs "[t]he Chief Judge and/or unit executive [to] ensure that the allegations in the report are appropriately investigated either by the human resources manager or other person."

I understand that arrangements are currently being made for you to appoint someone outside your office to investigate the allegations contained in the below email. At the conclusion of the investigation, under the Plan, any employee found to have engaged in wrongful conduct may be subject to appropriate disciplinary action.

As a reminder, Chapter IX imposes an obligation on everyone involved in the investigation to "protect the confidentiality of the allegations of wrongful conduct to the extent possible," which includes limiting the dissemination of information and records on a need-to-know basis.

Please let me know if you have any questions. I'll be in touch with additional information.

James

James N. Ishida
Circuit Executive
U.S. Court of Appeals for the Fourth Circuit
1100 East Main Street, Suite 617
Richmond, VA 23217-3517
804-916-2184
james_ishida@ca4.uscourts.gov

Anthony Martinez---08/14/2018 10:56:10 AM---James, Here it is.

From: Anthony Martinez/NCWF/04/FDO@FDO
To: James Ishida/CE04/04/USCOURTS@USCOURTS
Date: 08/14/2018 10:56 AM
Subject: Fw: Agreement from yesterday's meeting

James,

Here it is.

Thanks

1





Federal Public Defender - Western District of North Carolina
Organization Chart

GOVERNMENT EXHIBIT C-10

OFFICE OF THE CIRCUIT EXECUTIVE
## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JAMES N. ISHIDA
CIRCUIT EXECUTIVE

1100 EAST MAIN STREET, SUITE 617
RICHMOND, VIRGINIA 23219-3517

| To: | All Participants |
|---|---|
| From: | James Ishida, Circuit Executive for the Fourth Circuit |
| cc: | Hon. Roger L. Gregory, Chief Judge for the Fourth Circuit<br>Conference Presenters |
| Subject: | Workplace Conduct Conference, May 22-23, 2019<br>Richmond, Virginia |

You are cordially invited to attend the Fourth Circuit Workplace Conduct Conference scheduled for May 22-23, 2019 at the Virginia Crossings Resort and Conference Center in Glen Allen, VA. This memorandum provides information regarding planned sessions, accommodations, registration, and travel. Additional information is posted on the conference website and will be available on the conference app *(coming soon)*.

We are excited about hosting our inaugural workplace conduct conference, and we look forward to seeing you in Richmond.

### Purpose
The purpose of our conference is simple. We want every participant to walk away feeling better equipped to handle workplace issues. As you will see from the attached agenda, we have presenters who will inform you on the EDR process and national developments in workplace conduct. We will offer interactive activities that reinforce skills and lessons learned. We will provide you with resources and information that you can take back to your court or office so that you can build a culture founded on respect, civility, and professionalism.

### Agenda
The conference will begin on Wednesday, May 22 at 9:00AM and end around 12:30PM on Thursday, May, 23. Tuesday, May 21 is a travel day.

### Conference Website and App
To reduce our impact on the environment, printed handouts will not be provided at the conference. All conference materials, registration, and links for lodging and the conference app *(coming soon!)* will be posted soon on the conference website at:
http://training.sdso.ao.dcn/WCC2019/

GOVERNMENT
EXHIBIT
C-11

## Registration

Space is limited, so please register as soon as possible to hold your place. Simply log on to the conference website with your JENIE name and password to register for the conference and for up-to-date conference information.
**http://training.sdso.ao.dcn/WCC2019/**


## Accommodations

A block of rooms has been reserved at Virginia Crossings Hotel and Conference Center at the GSA per diem rate (CONUS) of $94 per night, single or double occupancy + applicable taxes.

Virginia Crossings Hotel and Conference Center
1000 Virginia Center Parkway
Glen Allen, VA 23059
Phone: 804-727-1400

Please make your reservation as soon as possible, but no later than April 30, 2019:
By Phone: 888-444-6553 or 804-727-1400
Group Code: WPC
Cancellations: Permitted without penalty before 3pm on May 19, 2019 (48 hours)
Online: **https://tapestrycollection3.hilton.com/tc/virginia-crossings-hotel/**
Enter dates of stay at the top of the landing page and click on Advanced Search to enter the Group Code. If you get an error message, please call the hotel directly to make your reservation. An online reservation link is also posted on the conference website.


## Daily Meeting Package

We have negotiated a daily meeting package that includes continuous light refreshments throughout the meeting and a hot buffet lunch on Wednesday. Meals at the GSA per diem rate are available on-site in The Glen Restaurant (buffet style service) upon request.


## Travel and Transportation

It is the traveler's responsibility to secure the requisite travel authorization. All travel expenses will be locally funded. Glen Allen is a CONUS location. Please contact National Travel Service (1-800-445-0668) to make your travel arrangements.

By POV:
Virginia Crossings is located 15 minutes from downtown Richmond with easy access to highway routes I-95 and I-64. Parking is complimentary at Virginia Crossings.

By Air:
The closest airport is Richmond International Airport (RIC).

By Rail:
The closest Amtrak station is Richmond-Staples Mill Road Station (RVR).

**Travel Voucher Instructions**

Lunch is included on Wednesday. If you are claiming per diem, please reduce your per diem by $14 on Wednesday. If you are claiming actual expenses, please claim no reimbursement for lunch that day on your travel voucher.

Please refer to the ***Guide to Judiciary Policy*** for detailed information regarding reimbursement for actual expenses and/or per diem in lieu of actual expenses of subsistence, and specific guidance on reimbursable expenses.

**Additional Information and Assistance**

Should you have any questions about the program, please contact:
James Ishida at 804-916-2184 or james_ishida@ca4.uscourts.gov

For travel-related questions or questions about the venue, please contact:
Caron Paniccia at 804-916-2183 or caron_paniccia@ca4.uscourts.gov

Thank you, and we look forward to seeing you at the conference!

# Agenda

# Fourth Circuit Workplace Conduct Conference
Richmond, VA
May 22-23, 2019

<u>Wednesday, May 22</u>

| | | |
|---|---|---|
| 7:30 AM – 4:30 PM | Continuous Break Service | Henrico Ballroom Foyer |

*Includes Continental breakfast, all-day beverage and snack service*

| | | |
|---|---|---|
| 8:30 AM – 5:00 PM | Registration and Conference Services | Henrico Ballroom Foyer |
| 9:00 AM – 5:00 PM | GENERAL SESSION | Henrico Ballroom |

9:00 AM
Welcome by the Chief Judge
The Honorable Roger L. Gregory, Chief Circuit Judge, Fourth Circuit

Conference Overview
James N. Ishida, Circuit Executive, Fourth Circuit

Conference Logistics
Caron B. Paniccia, Assistant Circuit Executive for Administration, Fourth Circuit

9:30 AM
Panel Discussion with Margaret A. Wiegand and Jill B. Langley

Perspectives from the National Workplace Conduct Working Group and Contemplated Changes to the Model EDR Plan
Margaret A. Wiegand, Circuit Executive, Third Circuit

Overview of the EDR Process
Jill B. Langley, Judicial Integrity Officer of the US Courts
*Identifying inappropriate behavior; reporting inappropriate behavior; serving as an EDR resource to provide information or guidance.*

| | |
|---|---|
| 10:45 AM | Q&A |
| ***11:00 AM*** | ***BREAK*** |

11:15 AM
Results of the Fourth Circuit Workplace Conduct Survey
Kim S. Llewellyn, ACE for Human Resources, Circuit Executive's Office, Fourth Circuit
*Results of the survey and how we can apply lessons learned; identifying training opportunities.*

| | | |
|---|---|---|
| 11:45 AM | Q&A | |
| 12:00 PM | LUNCH | The Glen Restaurant |
| 12:30 PM – 2:30 PM | EAP Representative Available | Henrico Ballroom Foyer |
| 1:30 PM | RECONVENE IN GENERAL SESSION | Henrico Ballroom |

Town Hall Discussion
Felicia Cannon, Clerk of Court, US District Court, District of Maryland

2:00 PM
Building a Culture of Civility
Honorable Robin L. Rosenberg, US District Judge, Southern District of Florida
Honorable Beth Bloom, US District Judge, Southern District of Florida
*How to build a workplace culture founded on professionalism, civility, and collegiality.*

3:00 PM                          Q&A

*3:15 PM*                        *BREAK*

3:30 PM                          BREAKOUT SESSIONS
Breakout 1: Jill Langley, moderated by Catherine Stavlas                     Henrico Ballroom
Breakout 2: Topic TBD, moderated by Tim Averill                             Spotsylvania Room

4:00 PM                          RECONVENE IN GENERAL SESSION              Henrico Ballroom
                                 Breakout Reporting and Discussion

4:15 PM
Lessons from a Circuit Mediator
Edward G. Smith, Chief Circuit Mediator, Fourth Circuit
Cynthia Mabry-King, Circuit Mediator, Fourth Circuit
*How to avoid and resolve conflict: negotiate with success: observations from a mediator.*

5:00 PM                          ADJOURN


Thursday, May 23

7:30 AM – 12:30 PM               Continuous Break Service                  Henrico Ballroom Foyer
*Includes Continental breakfast, all-day beverage and snack service*

9:00 AM – 12:30 PM               GENERAL SESSION                          Henrico Ballroom

9:00 AM
Judiciary Code of Conduct
Robert P. Deyling, AO Assistant General Counsel & Staff to JCUS Codes of Conduct Committee
*New obligations under the recently revised Judiciary Code of Conduct that apply to all court employees.*

9:45 AM
Legal Considerations and Common Pitfalls
Charlene Hardy, AO Assistant General Counsel
*Legal considerations and common pitfalls in handling EDR complaints: best practices: how to avoid accusations of retaliation: preserving confidentiality.*

*10:30 AM*                       *BREAK*

10:45 AM
How to Have Difficult Conversations While Building Civility
Garbo Cheung-Jasik and Michael E. Siegel, Federal Judicial Center
*How to have difficult conversations with judges, supervisors, co-workers, and subordinates, while preserving and strengthening relationships.*

12:15 PM
Wrap-Up Discussions
James N. Ishida, Circuit Executive, Fourth Circuit

12:20 PM
Closing Remarks
Honorable Mark S. Davis, Chief District Judge, Eastern District of Virginia

12:30 PM                         ADJOURN

**Pre-Employment Information**

## SECTION A:

1. Name (Last, First, Middle):
   Previously Used Name(s):
2. Social Security Number:      3. Date of Birth:
4. Requesting Agency Name and Address:      Format m/d/yyyy

5. Name of Person Requesting Information: _____ Phone Number: _____

                                                                                               Format (999) 999-9999

## SECTION B:

1. Currently employed ☑    Separated ☐    (Specify Date) _____
2. Agency Name and Location of Official Personnel Folder (complete address):   Format m/d/yyyy
   Federal Public Defender Western District NC
   129 West Trade St, Sutie 300
   Charlotte, NC 28202

3. Grade/Level _____ Step/Rate _____ Salary _____ Pay Basis _____
4. If Salary Includes Cost of Living Adjustment (COLA), Indicate Base Salary and COLA
   Base: _____ COLA: _____
5. Service Computation Date (SCD) 08/29/2016
6. Retirement Plan KF _____       Format m/d/yyyy

   If retirement code is C, E, 1, or 6: Date First Covered _____

   If retirement code is K or M: Elected FERS _____ Format m/d/yyyy covered _____ Date First Covered _____

                                                                 Format m/d/yyyy

## SECTION C—RETIREMENT DATA

1. MILITARY:
   A. Branch of Service _____ B. Retired Rank _____
   C. Check One and *Specify Date*: Retired ☐   Transferred to Fleet Reserve ☐    (Date) _____
2. FEDERAL CIVILIAN:                                              Format m/d/yyyy
   A. Civilian Retirement Date _____ B. Retirement System Paying Annuity _____
                                Format m/d/yyyy

## SECTION D—GRADE AND PAY DATA

1. Date Entered Current Grade and Step/Rate 08/20/2018
2A. Date of Last Within-Grade Increase (WGI) _____ 2B. If WGI Was Denied, Date of Denial _____
3A. Highest Previous Grade/Step Held _____ Format m/d/yyyy held: From: _____ To: _____ Salary: 107319
4. Was Salary Based on Special Rate or Locality? ☐ Yes ☑    No ☐   Format m/d/yyyy
5A. Is Applicant on Grade Retention? ☐ Yes ☐   No ☐
5B. Retained Grade/Step: _____ 5C. Date Grade Retention Began _____
6. Is Applicant on Pay Retention?   Yes ☐   No ☐                            Format m/d/yyyy
7. If Not Listed Above, Highest Salary Held on a Federal Appointment _____
   Dates Held: From: _____ To: _____

## SECTION E—APPOINTMENT DATA           Format m/d/yyyy

1. Is there an INS Form I-9 on file?   Yes ☐   No ☑    (Date Certified) _____
2. Is the applicant a U.S. citizen?   Yes ☑   No ☐    If No, list country citizen of _____

                                            (SEE PAGE TWO)

GOVERNMENT EXHIBIT C-12

**SECTION F—UNFAVORABLE DATA**

1. Does OPF Contain Removal, Suspension, Within-Grade Denial, Discharge or Change to Lower Grade Actions?
   Yes ☐   No ☑   (Type of Action) _____

2. Is There Unfavorable Information in Other Files, e.g. Letters of Warning, Admonishment, Reprimand, Suitability or Letter of Decision on an Adverse Action?   Yes ☐   No ☐   Don't Know ☐

3. If "Yes" to Question 1 or 2, Name and Phone Number of Person to Contact for More Information:

   _____   _____
                                              Format (999) 999-9999

**SECTION G—BENEFITS DATA  (HEALTH INSURANCE, LIFE INSURANCE)**

1. FEHB (Health)          Waived ☐      Canceled—Show Date: _____
   Ineligible ☐     Enrolled—Show Code: ▇▇▇      _____ Format m/d/yyyy

2. FEGLI (Life)   Enrollment Code ▇▇▇      If "B" Waived—effective date _____
                                                                          Format m/d/yyyy

**SECTION H—SERVICE OBLIGATION**

1. Does OPF Show Employee Has an Obligation to Remain in Government Service for a Specific Period Because of Training Received?

   ☑ No        ☐ Yes—Date Obligation Expires: _____
                                                             Format m/d/yyyy

2. Does Employee Have an Obligation Because of a Government Purchase? ☐ No      ☐ Yes—Date Obligation Expires: _____
                                                                                                          Format m/d/yyyy

**SECTION I—PAYROLL & THRIFT SAVINGS PLAN DATA**

1. A. Employees Payroll Office Address:
      AOUSC, 1 Columbus Cir NE Washington DC 20054

   B. Leave Balances:   Annual _____   Sick _____
      Is Employee Currently on LWOP? ☐ No   ☐ Yes—Beginning Date: _____   NTE Date: _____
      C. Person to Contact for Leave and Pay Information: _____
                                                                              (Name)                              (Phone Number)
                                                                                                                  Format (999) 999-9999

2. Year-To-Date FICA Deductions          $ _____   As Of: _____
                                                                                            (Date)
                                                                                            Format m/d/yyyy

3. Does Employee Have Severance Pay Entitlement? ☐ No   ☐ Yes—Beginning Date: _____
                                                                                                          Format m/d/yyyy

4. Thrift Savings Plan   A. TSP SCD _____        B. TSP Vesting Code _____ Format m/d/yyyy
                         C. TSP Status Code _____   D. TSP Status Date _____
                                                                                                        Format m/d/yyyy
5. TSP Allocation   A. Percent of Base Pay— _____ .00%
                    B. Whole $ Amount— _____ .00

6. Year-To-Date TSP Contributions        $ _____

7. TSP Loan Account Number: _____   Payroll Deduction Account: _____

8. Name and Title of Official Certifying TSP Information _____
                                                                     (Name)                                        (Title)

**SECTION J—LOSING AGENCY RELEASE DATE**

1. A. Requested Release Date: 3/14/2019
                                        Format m/d/yyyy
   B. Name and Phone Number of Person Giving Release Date   William Moormann      7046886903
                                                                            (Name)                          Format (999) 999-9999

2. Name, Title, and Phone Number of Person Giving Information
   William Moormann                  Administrative Officer              7046886903
        (Name)                                (Title)                           Format (999) 999-9999

Case 1:20-cv-00066-WGY   Document 78-3   Filed 10/02/20   Page 51 of 51