**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

**ASHEVILLE DIVISION**

| | |
|---|---|
| JANE ROE, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | )    **Civil No. 1:20-cv-00066-WGY** |
| | ) |
| UNITED STATES OF AMERICA, *et al.*, | ) |
| | ) |
| *Defendants*. | ) |
| | ) |
| | ) |

**PLAINTIFF'S REPLY IN SUPPORT OF HER MOTION FOR**
**PARTIAL SUMMARY JUDGMENT AGAINST THE**
**OFFICIAL CAPACITY AND ENTITY DEFENDANTS**

      Defendants' response to Roe's summary judgment motion shows not only that her equal protection and due process rights were violated, but also that these violations resulted from official judiciary policies and practices. Because defendants have failed to raise a genuine dispute of material fact, Roe is entitled to summary judgment on their liability.

**I.    Defendants Are Liable For Violating Roe's Fifth Amendment Rights to Due Process and Equal Protection.**

      **A.    Defendants Violated Roe's Right to be Free from Discrimination.**

      Defendants have not disputed the material facts showing that they violated Roe's right to be free from sex discrimination in her employment. For example, defendants do not dispute that Roe's complaint of sexual harassment, retaliation, and discrimination was pending with no action for *over six months* before she resigned. Br. 17. During this lengthy period, defendants failed to conduct a prompt and appropriate investigation. Indeed, Roe went for periods of three to six weeks without hearing any updates. Complaint ¶¶ 306, 322, 362, 384. After the initial report

1

was submitted almost two months after the investigation opened, Roe was told that the report was being sent back to be redone. *Id.* ¶ 362. At this point, Roe learned that the Investigator had been asked to make "recommendations," even though, by her own admission, she was not trained or qualified to do so. *Id.* ¶¶ 320, 364. Roe also learned that her retaliation complaints were not investigated, *id.* ¶¶ 318–19, 384; Roe Decl., Ex. C, at 45, because the Defender's misconduct was characterized as mishandling, not retaliation, *id.* ¶ 319. Defendants also cannot dispute that following these delays, they withheld the report and deliberately refused to act. *Id.* ¶¶ 398, 401; Roe Decl., Ex. C, at 60. Rather, disciplinary action *was* eventually taken, but not until almost *six months* later, after Roe had already resigned. Roe Decl., Ex. C, at 73.

Rather than dispute the facts, defendants contend that they simply do not matter. For example, defendants contend that it does not matter that the investigation dragged on for over four months, after which they deliberately refused to take disciplinary action, because Roe had no right to an investigation "on any particular timeframe." Br. 17. However, a prompt investigation with immediate corrective action is not Roe's "preferred timeline," *id.*, but is required under the EDR Plan, judiciary policies, and the Constitution.

Indeed, defendants' evidence establishes that in practice, the judiciary does not follow its own antidiscrimination policies requiring employers to follow Title VII principles and take appropriate action on complaints. Guide to Judiciary Policy § 220.10.10; EDR Plan Ch. II, § 1, Ch. IX; Code of Conduct for United States Judges, Canon 3B(4), 3B(6); Code of Conduct for Judicial Employees Canon 3(C)(1); Code of Conduct for Federal Public Defender Employees Canon 3(C). For example, the Judicial Integrity Officer, who describes herself as "a primary resource for the *entire judiciary* on the Model Employment Dispute Resolution Plan, its coverage, and processes," Declaration of Jill Langley ("Langley Decl."), ECF No. 78-5, ¶ 4

(emphasis added), confirms that, in practice, a report of wrongful conduct "has no formal procedures or timelines." *Id.* ¶ 5; *see also* Declaration of James Ishida ("Ishida Decl."), ECF No. 78-4, ¶ 6 (same). Nor is a sexual harassment complainant entitled to any "corrective action" by making a wrongful conduct report. *Id.*

Roe's only option for relief on her complaints was to participate in *mandatory* alternative dispute resolution beginning with "counseling" and "mediation." EDR Plan Ch. X §§ 8–9. By defendants' own admission, the initial stages are only capable of yielding a "voluntary" resolution. *See* Br. 20 ("In the request for counseling phase, the parties may *voluntarily agree* to a resolution but cannot be forced to take particular action."); Ishida Decl., ¶ 13 ("An investigation [of wrongful conduct] is not mandated at the counseling phase."). After mandatory counseling and mediation, Roe had the burden to "prove" her claims before a presiding judicial officer. *See* Complaint ¶ 432 (Judicial Integrity Officer insisting that it was not reasonable for Roe to want a "finding" on her claims before a final hearing and advising her to pursue "motions" and "discovery" to prove her claims). During the Chapter X process, no duty was imposed on the employing office to properly investigate or promptly remedy the harassment. *See* Complaint ¶ 400 (EDR Coordinator's comments to Roe that no decisions about disciplinary action would be made until after her Chapter X proceeding was over).

This process flips the judiciary's duty to remedy discrimination on its head. It alleviates the employer of any duty to "prevent and promptly correct any harassing behavior," EEOC Enforcement Guidance: Vicarious Liability for Unlawful Harassment by Supervisors, 1999 WL 33305874, at *1, and instead places the burden on the employee to remedy the harassment by proving her "demands." *See*, *e.g.*, Complaint ¶¶ 322–32 (Roe asking the Chief Judge and EDR Coordinator why "the burden is on her to initiate the solutions to her complaints"). This

3

inadequate process provides "[e]vidence of a pattern or practice of discrimination," and is "strong evidence supporting a plaintiff's claim that she herself has been the victim of discrimination."[1] *Bohen v. City of E. Chicago, Ind.*, 799 F.2d 1180, 1187 (7th Cir. 1986).

Defendants further contend that it was acceptable to place Roe on telework for over six months while the investigation was pending because she "requested" to telework. Br. 16. But the undisputed facts refute their argument. To begin with, Roe requested to telework because the Defender denied her a transfer to another duty station. *See* Complaint ¶ 219; Roe Decl., Ex. B, at 52 ("reserving the right" to require her to return to the First Assistant's duty station). Though the Defender claimed that he did not have any office space in the other duty station, six months later, he offered her a transfer to that duty station during the EDR process. Complaint ¶ 418. Defendants also do not dispute that Roe was subjected to demeaning and hostile treatment because of her telework status, such as her coworkers' belittling jokes about meeting her at "Waffle House" and comparing her to "Where's Waldo." *Id.* ¶¶ 349–54; *see also* Roe Decl., Ex. B, at 28, 32–33. They do not dispute that while her complaint was pending, her Team Leader wore an offensive Justice Kavanaugh beer-guzzler helmet for the office Halloween party. Complaint ¶ 346. Indeed, defendants themselves state that Roe "did not see anyone from the office" for over seven months, Br. 23, which concedes that her telework status was an

---

[1] For this reason and others discussed below, defendants' argument that Roe has not argued for summary judgment against some of the official capacity and entity defendants fails. At a minimum, defendants are liable because they were involved in creating and implementing discriminatory policies and practices under the EDR plans. For example, the AO provides guidance to court units on the EDR process through the Office of General Counsel. The Judicial Conference imposes the Model EDR Plan on the circuits, which then adopt their own EDR plans through their circuit judicial councils.

4

ostracizing "tangible employment action," *Pennsylvania State Police v. Suders*, 542 U.S. 129, 143 (2004).

In addition, defendants contend that their actions were "appropriate" because the Defender eventually reported her complaints and the Chief Judge ordered an "investigation." Br. 17. But neither of those actions establish that their handling of Roe's complaint was appropriate. An employer "must respond" to a report of sexual harassment. *See Feminist Majority Found. v. Hurley*, 911 F.3d 674, 690 (4th Cir. 2018) (quoting parenthetical). "[T]he mere act of listening" to a complaint "is not a remedy in and of itself," *id.*, nor is a "half-hearted investigation or remedial action" sufficient, *id.* (quoting parenthetical). Here, it is undisputed that defendants deliberately refused to take prompt action on Roe's complaints. Complaint ¶¶ 398, 400; Roe Decl., Ex. C, at 60. They did not take disciplinary action for *almost a full year* after Roe raised her complaints, and several months after she resigned. Complaint ¶ 485; Declaration of Anthony Martinez ("Martinez Decl."), ECF No. 78-3, ¶¶ 99, 101.

To avoid these facts, defendants selectively quote disparaging conclusions reached in an investigation "report" that they did not produce in discovery or provide to the Court. Br. 15. Though defendants contend that the report is "confidential" and can only be filed under seal, Br. 15 n.3, they freely quote the report's denigrating statements about Roe in their public filings, *see, e.g.*, Br. 15. But the selective quotations they rely upon are inadmissible hearsay and "conclusory statements not based on specific factual knowledge," which must be disregarded for summary judgment purposes. *Reynolds v. Steward St. Elizabeth's Med. Ctr. of Bos., Inc.*, 364 F. Supp. 3d 37, 58 (D. Mass. 2019). Even if defendants had produced the report, it would be inadmissible because, among other evidentiary and foundational issues, defendants did not introduce any evidence showing that the report was reliable. *See* Fed. R. Civ. P. 56(c)(4) (facts

5

used on summary judgment must "be admissible in evidence"); *see also Angelone v. Xerox Corp.*, No. 09-6019, 2011 WL 4473534, at *2 (W.D.N.Y. Sept. 26, 2011); *Ambrose-Frazier v. Herzing Inc.*, No. CV 15-1324, 2016 WL 890406, at *5 n. 53 (E.D. La. Mar. 9, 2016).

On the contrary, defendants have not disputed any of the record facts showing that the "investigation" was a farce. For example, defendants assert that Roe's retaliation complaints were "investigated," Br. 17, but they rely exclusively on conclusory, inadmissible hearsay. *See Reynolds*, 364 F. Supp. 3d at 58. Defendants fail to dispute the factual record showing that the Investigator did not investigate the retaliation claim because she characterized the Defender's misconduct as mishandling, not retaliation. Complaint ¶ 318. Later, the Investigator stated she would "include" her retaliation claims in her report, Roe Decl., Ex. C, at 26, 53, but the investigation was never reopened, *id.* at 53. Worse yet, according to defendants' declarations, the Defender was the person who "appoint[ed]" the Investigator—a fact that defendants never previously disclosed to Roe. Martinez Decl., ¶ 81. This conflict of interest is further evidence that the Investigator did not appropriately investigate Roe's allegations.

If the report *were* admissible, it would provide further evidence of discrimination. The report's inflammatory, disparaging conclusions were unfairly obtained and facially implausible. *See*, *e.g.*, Complaint ¶ 434 (Judicial Integrity Officer's comments that "she had never seen an investigation report support an employee's sexual harassment allegations" and discussing a complainant in her circuit who was found to be a "liar"). For example, the report states that Roe experienced sexual harassment "in her mind." Br. 15; *cf.* Complaint ¶¶ 202–04 (Defender's statements implying that, at least there was no "physical contact"). This demeaning language contradicts the record evidence turned over to the Investigator, which included the First Assistant's inappropriate communications, her contemporaneous notes documenting the

6

harassment, and documentation of the retaliation against her. Complaint ¶ 301; Roe Decl., Ex.

C, at 12–14. It also contradicts the undisputed sequence of events demonstrating that Roe

contemporaneously reported the harassment to her coworkers, *e.g.*, Complaint ¶¶ 117, 175–76, to

a former judiciary mentor, *id.* ¶ 123, and to the Fair Employment Opportunity Officer, *id.* ¶ 158,

who involved the Deputy Director and Chief of Defender Services in the efforts to resolve her

complaints after they reviewed the First Assistant's inappropriate communications and the

Defender's inadequate response, *see* Roe Decl., Ex. C, at 1–2; Martinez Decl., ¶ 74.

Similarly, the report's implication that Roe welcomed the First Assistant's behavior

because she did not "decline" his "mentor" lunches, Br. 15, contradicts the record evidence that

over time, Roe cut her working hours and eventually stopped coming into work to avoid being

alone with him. *E.g.*, Complaint ¶¶ 115, 157; *see also id.* ¶ 162 (Fair Employment Opportunity

Officer's statements "encourag[ing] Roe to continue calling in sick as a way to protect herself").

Finally, the report states that the First Assistant's "intention" was not sexual harassment when he

sent a quid pro quo email, Br. 15, but what matters is whether his behavior was objectively

offensive, not what he "inten[ded]." *See Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305,

1312 (11th Cir. 2001) (explaining that "a victim need not provide evidence of a direct and

express sexual demand," because "a supervisor may simply intimate that a subordinate's career

prospects will suffer if she does not submit to his advances, with the hope of concealing his

harassment if his statements are repeated to a third party").

Most disparagingly, defendants insinuate that Roe exploited her office to obtain a duty

station transfer. But in context of the undisputed facts, any such conclusion would be

implausible. To begin with, the record shows that Roe was not questioned during the

investigation about any accusation that she was manipulating her office. *Cf.*, *e.g.*, Complaint

¶¶ 304–05 (Investigator's statements that it was "evident" that the Defender had handled things "very poorly"); *id.* ¶¶ 306–21 (summarizing follow-up interview with Investigator). It was only many months later, when Roe's Team Leader was spreading office rumors that she "made up" her complaints to work in a different duty station, *id.* ¶ 492, that she became aware of any such allegation. These circumstances validate Roe's stated fears during the EDR process that she would be "subjected to rumors and reputational damage,"[2] Roe Decl., Ex. C, at 58, and are disturbing evidence that coming forward about workplace misconduct in the judiciary will "subject [victims] to retaliatory action," Report of the Federal Judiciary Workplace Conduct Working Group to the Judicial Conference of the United States 12 (2018).

Moreover, defendants' insinuation contradicts the undisputed record evidence. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (instructing courts to reject theories that are "blatantly contradicted by the record" for summary judgment purposes). As the record shows, Roe *was* offered a transfer to another duty station during her EDR process, *and she turned it down*. Complaint ¶ 418. She did so because "a duty station transfer would not accomplish anything without addressing the underlying harassment and retaliation." *Id.* ¶ 425. In addition, Roe requested to transfer to a federal defender office in an adjacent district. Roe Decl., Ex. C. at 57–59. As she explained to the EDR Coordinator and the Chief Judge, she did not believe it was "possible to reach a resolution with my current office that will protect me from further harassment and allow me to advance in my career." *Id.* at 57. And when she was unable to transfer, Complaint ¶ 454, she gave up her federal defender career rather than return to a working

---

[2] Notably, though the First Assistant attempts to downplay instances of a toxic working environment as taken out of context, he does not dispute many of Roe's allegations, including that he personally spread rumors insinuating that a former employee who sued the office had killed his wife. *See* Declaration of John Parke Davis ("Davis Decl."), ECF No. 78-2, at ¶¶ 7–10.

environment of harassment, retaliation, and discrimination.  *See id.* ¶ 462 (Roe "was giving up her career because she was harassed and retaliated against without any accountability"); *id.* ¶ 475 ("Roe told the EDR Coordinator that she had lost her job because she filed a complaint.").

If all this were not enough, it is undisputed that after receiving the investigation report, the Chief Judge and EDR Coordinator supported Roe in obtaining a judicial clerkship and recommended her for another judicial clerkship.  Ishida Decl., ¶¶ 21–22, Ex. D-1.  Judicial law clerk positions are sensitive positions requiring handling of confidential information, and law clerks must "personally observe high standards of conduct so that the integrity and independence of the Judiciary are preserved and the judicial employee's office reflects a devotion to serving the public."  Code of Conduct for Judicial Employees, Canon 1.  Having an alleged history of exploiting management would have disqualified Roe from a judicial law clerk position, which further shows that defendants' theory could not be believed by a reasonable fact finder.

What *is* undisputed is that "disciplinary action" against *both* the Defender *and* his First Assistant was taken "as a result of [Roe's] report of wrongful conduct."  Roe Decl., Ex. C, at 73; Martinez Decl., ¶¶ 99, 101, 103 (Defender's admission that he was "discipline[d]" and that he disciplined the First Assistant).  Under the EDR Plan's plain terms, a finding of wrongful conduct—that is, unlawful discrimination—is a prerequisite to taking disciplinary action.  EDR Plan Ch. IX ("Employees <u>found</u> by the Chief Judge and/or unit executive <u>to have engaged in wrongful conduct</u>, as defined in this Plan, may be subject to disciplinary action."  (emphases added)).  The finding of wrongful conduct in this case was informed not only by the investigation report, but also Roe's post-investigation narrative documenting her claims of harassment, discrimination, and retaliation.  *See* Roe Decl., Ex. B, at 11–33.  Though defendants attempt to downplay the significance of the disciplinary action, Br. 16, again relying solely on

9

inadmissible hearsay, the undisputed facts speak for themselves. The outcome of the EDR process was a judicial clerkship for Roe with repeated efforts to help her find other judiciary employment, Ishida Decl., ¶ 21, and disciplinary action for the Defender and his First Assistant, Roe Decl., Ex. C, at 73.

For this reason, defendants' attempt to relitigate Roe's underlying harassment, discrimination, and retaliation claims, based on self-serving FDO employee declarations, is meritless. Br. 14–16; 21–23. Defendants cannot dispute that "disciplinary action" was taken against the Defender and his First Assistant "as a result" of the wrongful conduct report. Roe Decl., Ex. C, at 73. In any event, Roe's equal protection and due process claims are premised on the failures of the EDR process, not relitigating her underlying EDR complaint.[3] Roe was entitled to be treated in a non-discriminatory manner, to have her rights enforced throughout the EDR process, and to have a fair and impartial adjudication of her right to be free from discrimination, independent of the alleged merits of her claims in the underlying proceeding.

Finally, defendants misconstrue Roe's claims as "pure retaliation" claims that are barred by a recent Fourth Circuit decision.[4] Br. 13 (citing *Wilcox v. Lyons*, 970 F.3d 452, 455 (4th Cir.

_____

[3] For similar reasons, defendants' argument that the First Assistant was not Roe's supervisor, *see* Br. 16, is irrelevant, because Roe does not need to prove he was a supervisor to prevail on her equal protection and due process claims. But in any event, the First Assistant job description, which defendants did not include in their exhibits, states that the First Assistant "[i]nitiates personnel actions involving all staff members," including "hiring, performance appraisals, mediation and negotiation, disciplinary actions, and employee job termination." To be a supervisor, the employee need not have the "final say" on employment actions. *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 278 (4th Cir. 2015). It is enough to "initiat[e]" employment actions or "ma[ke] recommendations regarding promotions." *Id.* (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 437 n.8 (2013)).

[4] Though Roe's case was subject to an intercircuit transfer, defendants rely on a Fourth Circuit case that issued while her case was pending to support the Fourth Circuit's position as a party to litigation. *See* ECF No. 71, at 1–2.

10

2020)).  However, *Wilcox* does not apply because Roe's claims are not "pure retaliation" claims.

As the undisputed evidence shows, "the discriminatory conduct continued" after Roe made her

complaints, she was treated "adversely" based on her gender, and defendants' conduct

"maintained and reinforced the hostile work environment." *Beardsley v. Webb*, 30 F.3d 524, 530

(4th Cir. 1994).  Defendants also ignore that Roe raises due process claims based on violations of

the EDR Plan, which explicitly prohibits retaliation, whereas *Wilcox* only involved an equal

protection claim.  Even if *Wilcox* applied, the proper course would be leave to amend the

complaint to assert retaliation claims under the First Amendment.  *See Wilcox*, 970 F.3d at 458.

### B. Defendants Violated Roe's Protected Rights Under the EDR Plan.

Defendants also violated Roe's protected rights under the EDR Plan.  Their argument to

the contrary rests on the erroneous premise that Roe had no due process interest in adjudicating

her right to be free from unlawful discrimination.  Br. 12–13.  But defendants cannot argue both

that Roe had no protected interest in the EDR process *and* that the EDR process provided her

"the exclusive remedy."  EDR Plan Ch. I, § 1.  After all, judiciary employees, like all

government employees, have a constitutional right to be free from unlawful discrimination.

*Davis v. Passman*, 442 U.S. 228, 234–35 (1979).  In the adjudication of their legal rights, they

are entitled to due process protections "which have traditionally been associated with the judicial

process." *Hannah v. Larche*, 363 U.S. 420, 442 (1960).  And for their constitutional claims, they

have a "personal right" to "Article III's guarantee of an impartial and independent federal

adjudication." *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1943 (2015) (quotation

omitted).  However, the EDR process provides none of these constitutional safeguards.  EDR

forums are "strictly administrative and are not 'cases and controversies' under Article III of the

Constitution."  Proceedings of the Judicial Conference of the United States at 25 (Sept. 2010)

11

("JCUS").  The EDR Bench Book that defendants rely upon even states that an EDR final hearing "is not a formal judicial hearing or mini-trial."  ECF No. 78-5, at 75.  And defendants disavow any "right to employee dispute resolution procedures."  Br. 13; *but see* Roe Decl., Ex. C, at 70 (Judicial Integrity Officer's statement that Roe had "due process rights").

Defendants fail to dispute the material facts showing that they violated Roe's protected rights under the EDR Plan.  For example, defendants refused to disqualify the Defender from representing the employing office even though he was "involved in," and a subject of, the complaint.  EDR Plan Ch. X, § 7; *see also* EEOC Mgmt. Directive 110, 1-7 (2015) (an accused agency head should recuse himself from the decision-making process on an EEO complaint).  Defendants even recognized that the Defender had a conflict of interest, which is why the EDR Coordinator "received" the investigation report instead of the Defender.  Roe Decl., Ex. C, at 6, 29, 51.  But when it came to formally disqualifying him, defendants refused.  *Id.* at 50–51.

Not only did defendants not disqualify the Defender, but they refused to rule on the matter.  For *months*, defendants gave Roe the impression that her disqualification request was being stayed because they would need to make a finding of misconduct before disqualifying the Defender.  *See* Complaint ¶¶ 287, 370; *see also* Roe Decl., Ex. C, at 5.  After the investigation report finally came out, the EDR Coordinator told Roe that the Chief Judge "intend[ed]" to deny her request to disqualify the Defender, Roe Decl., Ex. C, at 50–51, but Roe was not provided any written ruling or statement of reasons, even after renewing her disqualification request, Complaint ¶ 453; *see* Roe Decl., Ex. B, at 57–60; Ex. C, at 66.

Rather than dispute these facts, defendants now contend that unit executives cannot be disqualified at all.  Br. 18.  According to the Judicial Integrity Officer, "[t]he disqualification provision . . . was designed to ensure that the EDR Coordinator, Mediator, and presiding judicial

officer were impartial, not that the defending party was impartial." Langley Decl., ¶ 8. However, defendants' interpretation contradicts the plain terms of the EDR Plan that applied to Roe, which defines unit executives, including federal defenders, as "employees" subject to disqualification if they are "involved in" a complaint. EDR Plan Ch. I, §§ 2–3 (defining "employee"); EDR Plan Ch. X, § 7 (disqualification). Though the Judicial Integrity Officer states that she "ensured that the 2019 Model EDR Plan explicitly limited disqualifications for conflicts of interest," Langley Decl., ¶ 9, that textual limitation was not present in the EDR Plan that applied to Roe. Moreover, defendants' post hoc explanation contradicts the record, which shows that defendants did not allow the Defender to receive the investigation report, Roe Decl., Ex. C, at 6, 29, 51, gave Roe the impression for months that they could disqualify the Defender after making a finding against him, Complaint ¶¶ 287, 370; *see also* Roe Decl., Ex. C, at 5, and then refused to explain why they did not disqualify him, Roe Decl., Ex. C, at 50–51.

More broadly, the Judicial Integrity Officer's statements confirm the problems with conflicts of interest in complaints against unit executives. *See* Jacqueline Thompson, *"Failures of the System": Law Students, Advocates Push for Protections at the Judiciary*, Nat'l L. J. (Mar. 25, 2020) (discussing "potential conflicts of interest when investigating misconduct"). The Judicial Integrity Officer expressly disclaims *any* obligation for the employing office to "be fair and neutral to both parties." *See* Langley Decl., ¶ 8. Instead, a unit executive accused of misconduct is considered an "opposing or differing party" that is "entitled to act and respond on behalf of the Respondent employing office." *Id.*; *but see* ECF No. 78-5, at 86 (statement from EDR Bench Book that "only the employing office, not individuals, can be named as respondents"). This situation presents precisely the type of conflict of interest that the EEOC recusal provision is designed to prevent, where the alleged discriminating official is a "high-level

13

official" with "influence" over the EEO complaint process. EEOC Mgmt. Directive 110, 1-7.
As defendants' evidence shows, the Defender had influence over the EDR process because he
"appoint[ed]" the Investigator, Martinez Decl., ¶ 81, and he imposed disciplinary action against
the First Assistant, *id.* ¶ 99. By contrast, defendants' assertion that the Chief Judge was the
"head of the agency," Br. at 18 n.4, is contradicted by their statement that the Defender is the
person "entitled to act and respond" on behalf of the FDO, Langley Decl., ¶ 8; *see also* Ishida
Decl., ¶ 8 (the Defender was the "appropriate unit executive" and "employer" responsible for
"determin[ing] whether the First Assistant had engaged in any misconduct and whether an
employment personnel action was necessary"). Their argument also contradicts their prior
assertion that the Chief Judge was not Roe's employer.[5] ECF No. 53, at 4.

In addition, defendants fail to dispute the facts showing that they violated the Plan's
provision requiring information and records to be shared on a "need-to-know basis." EDR Plan
Ch. X, § 4. Though defendants assert that, in practice, investigation reports are never released in
counseling or mediation, Br. 19, they do not dispute the EDR Coordinator's statements that the
report would be the basis for acting in Roe's Chapter X proceeding. Ishida Decl., ¶ 12
(investigation for Chapters IX and X "overlapped"); *see also id.* Roe Decl., Ex. C, at 29 (EDR
Coordinator was considering "distribution of the report" during counseling). Moreover,
defendants' explanation for not releasing investigation reports—that they contain "confidential
personnel information," Br. 18—contradicts their assertion that investigation reports are
"discover[able]" in the final hearing, Br. 19. Because the report may be relied upon in
determining a complainant's legal rights, the report is a "need-to-know" document under Chapter

---

[5] If the Chief Judge were Roe's employer, then presumably he could have acted as the
employing office's representative if the Defender were disqualified.

X. *See Hannah*, 363 U.S. at 442 (holding that due process protections attach to adjudicative proceedings).  The prejudice caused by not releasing the report is evident in Roe's case, where the report presented "conclusions" that contradicted the investigation materials.  *See* ECF No. 78-5, at 138–39 (EDR Bench Book's description of relevant investigation materials).

Finally, defendants fail to dispute the facts showing that they violated the EDR Plan's requirement of an "appropriate" remedy.  EDR Plan Ch. X, § 12.  Though they contend that Roe's belief that she would not have been provided a remedy is "entirely speculative," Br. 20, they do not dispute that Roe was told that any meaningful action would be viewed as "micromanaging" or "meddl[ing]."  Complaint ¶¶ 415, 438.  They do not dispute that the Judicial Integrity Officer, who is "considered a primary resource for the entire judiciary" on EDR matters, Langley Decl., ¶ 4, told Roe that an EDR presiding officer would have no authority to "manage" a federal defender office.  Complaint ¶ 439; *see also* Roe Decl., Ex. C, at 69.  And they do not dispute that Roe was told she could not transfer.  Complaint ¶ 454.

### C.  Defendants Failed to Provide Roe Meaningful Remedies and Review.

 Finally, defendants cannot dispute that they failed to provide Roe with meaningful review or remedies.  Indeed, Judicial Conference policy and the EDR Bench Book that defendants rely upon, Br. 20–21, establish the lack of meaningful remedies as a matter of law.  Under Judicial Conference policy, "[j]udges' decisions in EDR matters must be in conformance with all statutes and regulations that apply to the judiciary."  JCUS at 25.  Contrary to defendants' arguments, an EDR presiding officer cannot "order" any remedy, "make-whole" or otherwise, Br. 20, unless that remedy is independently authorized by statute.  JCUS at 25; *see also* ECF No. 78-5, at 102 (EDR Bench Book's statement that presiding officer cannot order remedies not authorized by law).  For example, according to the EDR Bench Book, an EDR

15

presiding officer has no authority to "direct" the General Services Administration to make accommodations for an employee with a disability. ECF No. 78-5, at 102; *see also Golinski v. U.S. Office of Pers. Mgmt*, 781 F. Supp. 2d 967, 973 (N.D. Cal. 2011) (EDR presiding officer has no authority to "bind" executive agencies).

The same principle applies to federal defender offices, which fulfill a statutorily independent constitutional function within the judiciary. *See* 18 U.S.C. § 3006A(g)(2)(A). Under the Criminal Justice Act, the Court of Appeals has statutorily limited appointment authority over the federal defender, and the federal defender has authority over personnel matters as the appointing official for his staff. *Id.* The fact that the Defender, not the Chief Judge, took disciplinary action against the First Assistant, confirms this principle. *See* Complaint ¶ 439 (Judicial Integrity Officer's statement that Article III judges do not have authority to "manage" a federal defender office). Defendants' arguments overlook that an EDR presiding officer does not have continuing "jurisdiction" or the authority to impose "sanctions," *see* Br. 21, to enforce an order the presiding officer had no authority to impose. *See* Complaint ¶ 439 (Judicial Integrity Officer's statement describing remedies issue as "jurisdictional").

### D. Defendants are Liable for Roe's Resignation.

Based on the undisputed facts, defendants are liable for Roe's involuntary resignation. Though defendants contend that it was not "objectively" intolerable that Roe "teleworked and did not see anyone from the office" for over seven months, Br. 23 (*but see supra*, at 4), they describe the events leading to her involuntary resignation too narrowly. As the undisputed facts show, the totality of the discriminatory "co-worker conduct, unofficial supervisory conduct, [and] official company acts" that Roe experienced made it objectively reasonable for her to resign. *Suders*, 542 U.S. at 148.

16

Even the Judicial Integrity Officer recognized the harm caused to Roe by the failures of the EDR process. She told Roe, "I can't address the whys of what has transpired in your cas[e] to date, and I know this has been an arduous path for you." Roe Decl., Ex. C, at 70; *see also* Complaint ¶ 429 (acknowledging that the handling of Roe's claim was "unusual" and that a Circuit Executive should never be an EDR Coordinator because of inherent conflicts of interest). She further stated that "[e]very matter can be a 'lesson learned,'" and provided examples of what Roe's experience had "taught" her. *Id.* Specifically, "I/we need to provide EDR interpretative guidelines to courts," EDR training "needs to be nationalized," and she would "like to better understand if FPDs are adequately protected by EDR remedies." *Id.* Defendants cannot dispute that the Judicial Integrity Officer's comments regarding the failures of the EDR process and the lack of any meaningful review or remedies were a critical factor in Roe's decision to resign.

## II.     The FDO Employees' Declarations Do Not Preclude Summary Judgment.

As discussed above, the FDO employees' self-serving declarations do not preclude summary judgment in Roe's favor on her equal protection and due process claims. *Supra*, at 10. But if anything, their declarations and exhibits provide further evidence that Roe was subjected to unlawful discrimination and her complaints were not appropriately investigated:

Eligibility for Grade 15

Defendants contend that Roe was not eligible for a promotion to Grade 15, because ten years of "federal service" were required for eligibility and she had "slightly less than 4 years." Br. at 4; Declaration of William Moormann (Moormann Decl.), ECF No. 78-1, ¶ 16. Both assertions are contradicted by their declarations and the judiciary policy materials included in their exhibits. Based on the Research and Writing ("R&W") attorney job description, to qualify for Grade Level 15, an R&W attorney must have 3 years of "General Experience" and 7 years of

"Specialized Experience" for 10 years of "Total . . . Experience." ECF No. 78-1, at 58.

According to the R&W attorney job description, Roe's undergraduate degree satisfied the

general experience requirement as an "educational substitution." *Id*. at 59. Similarly, Roe's Phi

Beta Kappa membership and law degree satisfied at least 2 years (and likely 3 years) of

specialized experience as an "educational substitution." *Id*. In addition, Roe possessed 4 years

of specialized legal experience *prior* to starting at the FDO in August 2017. *See* Moormann

Decl., ¶ 7 (describing Roe's prior experience); *see also* Complaint ¶¶ 18–21. Accordingly, she

had *at least* five years' specialized experience in August 2018—not "slightly less than 4 years,"

as defendants assert.[6] Br. 9. Roe satisfied the 10 years' experience requirement for Grade 15.

In addition, defendants cannot dispute that Roe began her employment with the FDO on

August 21, 2017 at Grade 14.[7] Moormann Decl., ¶ 5, Exs. A-4, A-6. Following "[o]ne year of .

. . required experience . . . at, or equivalent to, the next lower grade in federal service [i.e., Grade

Level 14]," ECF No. 78-1, at 58, on August 21, 2018, Roe was eligible for a discretionary

promotion to Grade Level 15. *See also id.* at 46 (discussing employee eligibility for

promotions); *id.* at 61 (form stating that Roe's "[c]urrent promotion potential" was "1 grade").

This rate of progression in promotion eligibility is consistent with judiciary policy and is

common in federal government. *See*, *e.g.*, Office of Pers. Mgmt., General Schedule

Classification and Pay ("GS employees may advance to higher grades by promotion at certain

intervals (generally after at least a year.)").

---

[6] Defendants' misrepresentation of Roe's years of experience appears to assume that only federal experience can be creditable experience, which is not the case. *See* ECF No. 78-1, at 58 (defining specialized experience as "[p]rogressively responsible legal experience"); *see also id.* at 64 (required experience for AFDs is "[p]rogressively responsible experience as a lawyer").

[7] In fact, based on her prior experience, Roe likely qualified for Grade 15 when she began employment at the FDO, as discussed above.

18

<u>"Red-Circling"</u>

Defendants contend that when Roe was reclassified to an Assistant Federal Defender ("AFD") position, "[t]he absolute maximum the Defender was authorized to pay Plaintiff under the AD system was $101,038.00," which would have resulted in a pay reduction if the Defender had not exercised "his discretion and applied the 'Red Circle Rule.'" Br. 22. Their assertion is contradicted by defendants' declarations and the judiciary materials included in their exhibits. The "AFD Appointment and Compensation Policies" instruct that, "[i]n determining the number of years of professional attorney experience," the "activities that a practicing attorney would normally perform may be counted, and such experience may be counted only from the time that the AFD completed law school." ECF No. 78-3 at 24. As previously discussed, as of August 2018, Roe had "at least" 5 years of post-law school "professional attorney" experience, which qualified her for AD Level 25. ECF No. 78-1 at 65. According to the AFD "Starting Salary Chart," the maximum salary for AD Level 25 was $108,560, *see* ECF No. 78-1, at 65, which was higher than Roe's total salary prior to the reclassification, *see* Br. 22.

Defendants' assertion that the Defender had to apply the "Red Circle Rule" appears to be based, again, on their misrepresentation of Roe's years of creditable experience. *See* ECF No. 78-1, at 65 (AD-Level 23, with a maximum starting salary of $101,038, requires "less than" 5 years' professional attorney experience). Moreover, defendants' argument is self-contradictory because they did not apply AD Level 23, which they asserted was the "absolute maximum" level, *see* Br. 22, but rather AD Level 28, which has a maximum starting salary of $134,659. *See* ECF No. 78-1, at 67 ("To be set at AD 28 Salery [sic] should remain $107,319").

Denial of Promotion

As the above analysis shows, at a minimum, Roe was eligible for a salary increase on her anniversary date of August 21, 2018. *Supra*, at 17–18. However, defendants avoided promoting Roe by retroactively "reclassifying" her to an AFD position on August 28, 2020 and making it effective August 20, 2018—*the day before* she would qualify for promotion to Grade Level 15. *See* Roe Decl., Ex. D (ECF No. 60-5).

Prior to defendants' summary judgment filings, Roe had never seen the unexecuted "Request for Personnel Action" included in defendants' exhibits, ECF No. 78-1, at 66–67, nor was she ever told that the Defender had "red-circled" her pay. However, Roe included the two executed forms relevant to the August 20, 2018 reclassification as exhibits to her partial summary judgment motion. Roe Decl., Ex. D (ECF No. 60-5) ("Request for Personnel Action"); Roe Decl., Ex. B (ECF Nos. 60-3), at 54 ("Notification of Personnel Action"). According to these forms, the Defender (1) signed the Personnel Action form on August 28, 2020, but with an effective date of August 20, 2018, Roe Decl., Ex. D; (2) requested to eliminate her locality pay, *id.*; and (3) placed her in AD Level 28, Roe Decl., Ex. B, at 54.

Locality Pay

Defendants contend that when Roe was reclassified to an AFD position, she continued to receive locality pay, Br. 9, even though she was not "technically" entitled to the adjustment while on telework, Moormann Decl. ¶¶ 43–44; Martinez Decl., ¶ 36. However, the undisputed record establishes that defendants requested to reduce Roe's total salary by eliminating her locality adjustment. Specifically, Roe's "Request for Personnel Action" form dated August 28, 2020 shows that the FDO approved a total salary reduction in the amount of her prior locality adjustment. Roe Decl., Ex. D. This requested personnel action was adjusted by the AO's Chief

of the Court Personnel Management Division to increase Roe's basic pay to the level of her prior

total salary, but her locality adjustment remained at "$0." Roe Decl., Ex. B, at 54.

Defendants' declarations provide further evidence that their efforts to reduce Roe's salary

by eliminating her locality pay were intentional. For example, defendants assert that Roe was

not entitled to locality pay while she was on telework, and that the Defender only maintained her

locality adjustment because he "chose not to remove" it. Moormann Decl., ¶ 43; *see also*

Martinez Decl., ¶ 36. However, Roe's "Telework Agreement" clearly states that telework was

authorized on an "Ad hoc" basis. ECF No. 78-1, at 89. Under the Guide to Judiciary Policy,

"the location of the . . . FPDO is the official duty station" for telework on an "Ad hoc" basis, *not*

the location of the telework site. Guide to Judiciary Policy, Vol. 12, Ch. 10, § 1010.40. In

addition, defendants assert that Asheville, NC does not "have" a locality adjustment, Moormann

Decl., ¶ 44, but FDO employees assigned to the Asheville duty station are entitled to the locality

adjustment for the "Rest of the United States," *see* ECF 78-1, at 47. Indeed, the DOCS manual

on which defendants rely states that locality pay may not be denied under any circumstances.

<u>Promotion "Agenda"</u>

Because Roe was eligible for a discretionary promotion, defendants' argument that she

was pursuing her own "agenda" for a promotion to which she was not entitled is incorrect. Br. 4.

Defendants' argument also reflects pernicious gender stereotypes regarding Roe's "demand[]"

for a promotion. *Compare*, *e.g.*, Br. 3 (describing Roe's alleged plan to "wave [the offer letter]

around" if the office did not promote her); *with* Susan Adams, *How Women Should Ask For A

Raise*, FORBES (Oct. 16, 2014) (discussing "lingering sexism toward women who appear too

assertive" when asking for raises). There is nothing wrong with requesting, or even demanding,

a raise, training, experience, a transfer, or other preferred conditions of employment; in fact, men

are disproportionately rewarded for this behavior, which contributes to the pay gap between men and women. *See* Benjamin Artz et al, *Research: Women Ask for Raises as Often as Men, but Are Less Likely to Get Them*, HARV. BUS. REV. (Jun. 25, 2018) (noting that fewer promotions for women "adds up" over a lifetime). The First Assistant's reaction of being "taken aback" and perceiving Roe's requests as "deceptive" is rooted in negative stereotypes of successful professional women and is further evidence of discrimination. Jenna Goudreau, *The 10 Worst Stereotypes About Powerful Women*, FORBES (Oct. 24, 2011) (discussing stereotype that "a woman can only be successful because she somehow connived or engineered her rise"). Even worse, these sexist stereotypes appear to have tainted the investigation into Roe's complaints.

<u>"Inexperience" and "Attitude"</u>

Finally, it is undisputed that Roe's job performance at the FDO was exemplary, and defendants do not even attempt to contend otherwise. *See*, *e.g.*, Martinez Decl., ¶ 49; Davis Decl., ¶ 21. Instead, defendants criticize her as "inexperience[d]," Br. 2, though the Defender agreed she was the "best candidate for the position," Martinez Decl., ¶ 8. Of course, it is a matter of public record that the First Assistant—the person responsible for "training" and "mentoring" Roe, Br. 2—was objectively "not qualified" for his position. Testimony of Hon. Max. O. Cogburn, Ad Hoc Committee to Review the Criminal Justice Act (Jan. 11–12, 2016), *available at* https://tinyurl.com/y3bjugxy. As a resident district court judge publicly stated, the First Assistant "could not be a panel attorney" because he had only "second chaired one criminal case." *Id.*

Defendants also raise subjective complaints of a "poor attitude," the main examples being (1) Roe's alleged lying about the scheduling of a shadowing activity, Br. 6, and (2) Roe's "whining" about requesting training before handling a new type of hearing, ECF No. 78-2, at 25.

22

At a minimum, these allegations must be considered in context of the FDO's recent transition from a CDO. *See*, *e.g.*, Complaint ¶ 264 (EDR Coordinator's comments acknowledging that there were a lot of "serious issues" and the judges were "mindful" of the need to change the office culture). For example, a prior administrative officer's embezzlement of money was "kept from the judges," Cogburn Testimony at 14, and the "most experienced person in the office" was fired by the person who engaged in embezzlement, *id.* at 32. The office's client representation was "unsatisfactory," and the district judges wanted "better representation in our district." *Id.* at 33, 35. Employees were "afraid that they'll be fired" for coming forward. *Id.* Overall, the office was a "mess" in "need [of] a change." *Id.* at 34.

III.     **Roe's Motion For Partial Summary Judgment Is Ripe For Decision.**

For all the reasons discussed above, Roe's claims are ripe for decision, and she is entitled to summary judgment on the issue of defendants' liability. Though defendants ask the Court to decide their motions to dismiss prior to her motion for partial summary judgment, Br. 10–11, their request is undermined by their decision to attach five declarations and nearly 400 pages of exhibits to their opposition brief. By even presenting witness declarations and exhibits, defendants are conceding that Roe's complaint is not subject to dismissal based on the pleadings. *See* Fed. R. Civ. P. 12(b)(1), (b)(6). If their dismissal arguments had merit, then there would be no need for them to offer evidence, because Roe's complaint would fail as a matter of law. *See In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017).

At most, defendants' jurisdictional arguments raise issues that "are inextricably intertwined with those central to the merits," and can only be resolved based on the factual record. *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009). For example, their arguments that Roe did not "exhaust" her claims, or that she "voluntarily" resigned, are not a procedural

bar, but rather factual assertions necessary to each of their arguments for dismissal. *See*, *e.g.*, Br. 12–13, 18–19, 20. Notably, defendants did not file a declaration demonstrating any "specified reasons" why they "cannot present facts essential to justify [their] opposition" pursuant to Fed. R. Civ. P. 56(d).[8] Thus, the factual record is fully developed and ripe for decision.

Finally, defendants again contend that Roe's claims are barred by sovereign immunity. But at a minimum, reinstatement is a form of specific relief not barred by sovereign immunity. *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988); *Dotson v. Griesa*, 398 F.3d 156, 177–79 (2d Cir. 2005). Defendants' argument that Roe has not cited cases awarding front pay "against any governmental defendant," Br. 25, fails to recognize that the judiciary is "the *only* remaining branch of the federal government that is not required to live with this country's labor laws." Charles Grassley and Jennifer Shaw Schmit, *Practicing What we Preach: A Legislative History of Congressional Accountability*, 35 HARV. J. ON LEGIS. 33, 49 (1998). Instead, the judiciary adjudicates discrimination complaints through the EDR process, which defendants recognize is statutorily authorized under 28 U.S.C. §§ 331, 332. ECF No. 43, at 17 n.7. Defendants cannot assert both that EDR remedies are statutorily authorized and that sovereign immunity bars those remedies on judicial review. Rather, relief on judicial review is "an equitable action for specific relief" to enforce a legal "mandate," not an action for money damages.[9] *Bowen*, 487 U.S. at 893.

---

[8] Defendants' opposition brief should also be disregarded in its entirety because (1) their brief was untimely and does not satisfy the requirements of Fed. R. Civ. P. 6(b)(1), LCvR 7.1(e), and (2) defendants did not produce the names of their witnesses or documents relied upon in their initial disclosures, which requires exclusion of the evidence under Fed. R. Civ. P. 37(c)(1).

[9] Defendants contend that Roe has not asserted the *Larson* exception to sovereign immunity, Br. 24 at n.7, but she plainly has asserted that defendants acted unconstitutionally and relied on *Bowen*, which is based on, and an application of, the *Larson* exception. *See Bowen*, 487 U.S. at 893 (applying *Larson*). Defendants' argument misconstrues her position, which is that if sovereign immunity somehow bars her official capacity claims, she requests leave to assert claims against the same defendants in their individual capacity. *See* ECF No. 49, at 20.

24

Moreover, defendants have never asserted that reinstatement *or* front pay are not allowed under the EDR Plan; on the contrary, the EDR Bench Book states that "equitable" relief is authorized, and the only relief that is *not* available are "compensatory" damages, "punitive" damages, and "attorneys' fees" except as allowed under the Back Pay Act. ECF No. 78-5, at 102–03.

Defendants also assert that Roe's lost earnings calculation is "outrageous," Br. 25, but they have not provided any reason why it is inaccurate, nor have they offered her any viable pathway to reinstatement that would mitigate her lost earnings. In any event, equitable remedies incidental to reinstatement are not an issue currently before the Court and would be decided as part of an equitable hearing. *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1424 (4th Cir. 1991).

## CONCLUSION

For these reasons, defendants have not raised any genuine dispute of material fact, and Roe respectfully requests that the Court enter an order granting partial summary judgment on the issue of liability against the official capacity and entity defendants under Fed. R. Civ. P. 56.

This the 9th day of October, 2020.

Respectfully Submitted,

*/s/ Cooper Strickland*
Cooper Strickland
N.C. Bar No. 43242
P.O. Box 92
Lynn, NC 28750
Tel. (828) 817-3703
cooper.strickland@gmail.com

Counsel for Plaintiff

25

# CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of October, 2020, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Gill P. Beck at Gill.Beck@usdoj.gov

Joshua M. Kolsky at Joshua.kolsky@usdoj.gov

Shannon Sumerall Spainhour at mss@dhwlegal.com

*/s/ Cooper Strickland*
Cooper Strickland
N.C. Bar No. 43242
P.O. Box 92
Lynn, NC 28750
Tel. (828) 817-3703
cooper.strickland@gmail.com
