**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
ASHEVILLE DIVISION
CASE NUMBER 1:20CV66

JANE ROE,                                          )
                                                   )
     Plaintiff,                              )
                                                   )
v.                                                 )
                                                   )
UNITED STATES OF AMERICA, et al.,                  )
                                                   )
     Defendants.                             )

**THE FEDERAL DEFENDER FOR THE WESTERN DISTRICT OF NORTH
CAROLINA'S OPPOSITION TO
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST HIM IN
HIS INDIVIDUAL CAPACITY**

# I.     INTRODUCTION

Plaintiff has moved for partial summary judgment (ECF No. 76) (hereinafter "PSJ") alleging constitutional torts and statutory violations arising out of her federal employment, against various government officials in their individual capacities, including Anthony Martinez, the Federal Defender ("Defender") for the Western District of North Carolina ("FDO").  Plaintiff filed the instant motion despite the Defender's pending Motion to Dismiss. ECF No. 44 (and briefing at ECF No. 45 and 52).  That motion, if granted, will dispose of all of Plaintiff's claims against the Defender, who respectfully requests that the Court exercise its inherent power to "control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants," *Landis v. N. Am. Co.*, 229 U.S. 248, 254 (1936), and decide his pending Motion to Dismiss prior to deciding Plaintiff's PSJ. The Defender incorporates his Motion to Dismiss and corresponding filings by reference here.

If, however, the Court does reach Plaintiff's PSJ, the Court should deny it for the reasons (a) stated herein; (b) stated in the Defender's Motion to Dismiss and supporting filings; (c) where applicable, in the entity and official capacity and other individual Defendants' responses in opposition to Plaintiff's PSJ against them, including the Declarations and other Exhibits thereto (ECF No. 78); (d) stated in other filings; and (e) set forth in oral arguments in this matter.

## II. FACTS

The Defender incorporates herein by reference the extensive background facts relating to him set forth in the entity and official capacity Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment (ECF No. 78), at 1-10. The Defender also incorporates herein by reference the arguments relating to due process and equal protection rights in Section III(B) of

ECF No. 78. Finally, the Defender also incorporates by reference the exhibits (GE) A-I submitted on October 26, 2020 to ECF No. 94, to which he refers throughout this brief.[1]

The facts and the thorough investigation into them under the Fourth Circuit's Employee Dispute Resolution ("EDR") Plan reveal that there was <u>no</u> sexual harassment, sex discrimination, or retaliation in the FDO against the Plaintiff, including by the Defender in his individual capacity. Plaintiff states no claim of any violation of any constitutional or statutory law by the Defender or anyone else. The facts also reveal that the Defender is entitled to qualified immunity. Plaintiff's PSJ should accordingly be denied.

**1. <u>Plaintiff removes from context various statements made in the Defender's prior submissions.</u>**

As an initial matter, Plaintiff relies on facts in her PSJ relating specifically to the Defender which she strips of essential context. For example, Plaintiff claims that the Defender "to this day" "described his employees' Constitutional rights are 'non-existent,'" concluding that the Defender's "continued hostility towards protected rights confirms that he is not entitled to qualified immunity." PSJ 18. Plaintiff's narrative distorts the argument in the Defender's prior briefing and removes it from necessary context. Review of the Defender's prior argument shows that the Defender clearly and appropriately refers to <u>Plaintiff's</u> specific claims <u>in this case</u>. ECF No. 52, p. 18. The binding legal precedent <u>in this case</u> reveals that <u>Plaintiff</u> has no Constitutional rights of equal protection or due process under the Fifth Amendment, the only pertinent "Constitutional" issues. *Id.* ("None of the allegations in the Complaint establish that the <u>Defender personally</u> violated any of **Plaintiff's** non-existent Constitutional rights but instead reflect **Plaintiff's** continued attempt to impose liability on all of the Defendants, collectively, for the inadequately

---

[1] The Exhibits applicable to Defender in this context are primarily: ECF No. 94-1 (Declaration of William Moormann) ("GE-A"); 94-2 (Declaration of James Parke Davis) ("GE-B"); 94-3 (Declaration of Anthony Martinez) ("GE-C"); and 94-4 (Declaration of James Ishida) ("GE-D").

pled actions of various individuals and government agencies.")(underlining in original; bold emphasis added). Plaintiff's attempt to expand the Defender's argument to include constitutional rights every employee in the FDO may or may not have in any context is hyperbolic and should not be permitted.

Similarly, Plaintiff claims, "the Defender describes the First Assistant's sexually harassing behavior as a 'unique opportunity for mentorship.'" PSJ 16. Plaintiff mischaracterizes the applicable statement, again taking it far from context. ECF No. 45, pp. 3-4 (the Defender "approved of a mentorship where she would work directly with his First Assistant, the Defender's highest-ranking employee. Plaintiff concedes she was provided this unique opportunity for mentorship, while no other attorneys in the office were.") The mentorship was "approved" by the Defender when Plaintiff started working, long before she had any issues with the First Assistant or-- at least-- long before she brought any issues to the Defender's attention. GE-C ¶45. The "unique" opportunity relates to the fact that she, as an attorney with no experience as a practicing criminal defense litigator, was mentored by the second highest ranking attorney in the office from the beginning of her employment. GE-B ¶¶1-3 and GE-C ¶45. As soon as Plaintiff told the Defender <u>nearly 11 months later</u> that she no longer wanted the First Assistant to be her mentor, the Defender immediately assigned her a new mentor—one who Plaintiff requested. GE-C at ¶57 and GE C-2 Plaintiff verified her agreement via email on July 9, 2018. *Id*. Plaintiff's manipulation of these facts and statements should not stand and do not show her entitlement to summary judgment.

Plaintiff further claims, as in her Response to the Defender's dismissal submissions, that there were "serious issues" in the FDO prior to her complaints which should result in individual liability against the Defender. PSJ 18, FN 7. In support of this bald assertion, she cites January 2016 testimony provided by a WDNC judge in the context of the WDNC's efforts to convert the

Community Defender Organization to an FDO. *Id*. Nothing in that testimony or elsewhere suggests that any "issues" that may have existed prior to the Defender's employment at the FDO bore any relation whatsoever to employment discrimination (including sexual harassment or sex discrimination), or to retaliation based on complaints thereof.

Finally, Plaintiff's continued efforts to rely on a lawsuit filed against the FDO's predecessor entity years before the Defender began working there is also misdirected. PSJ 18, FN 7. Not only did the allegations there differ significantly from the facts and allegations here, the case was also voluntarily dismissed with prejudice prior to any substantive ruling. See ECF No. 52, p. 17, FN 10. Accordingly, that case does not provide any authority or evidence of any unlawful "issues" in the FDO's office or its predecessor entity, or of any other "issues" that could be applied to find personal liability against the Defender.

**2. The salient facts show that the Defender acted promptly, appropriately, and without discriminatory or retaliatory animus.**

On August 21, 2017, Plaintiff began work as a Research & Writing (R&W) Specialist in the FDO. GE-A ¶ 5; GE-B ¶16. The R&W Specialist position was a developmental and trial and appellate support position for attorneys who did not have substantial career experience. GE A ¶6. R&W Specialists are not permitted to handle their own caseloads but may be a second-chair if an AFD is assigned to the case. GE-C ¶12. Plaintiff's employment was uneventful and progressing nicely for the first several months. *Id*. ¶¶37-38. The Defender had little direct interaction with her during those months until the "Spring/Summer of 2018." *Id*. ¶37. There was an issue with a case Plaintiff wanted to take to trial (set for that summer). *Id*. ¶¶39-43. The issues were resolved, and the Defender decided to handle the complex, egregious case personally. *Id*.

Shortly before July 4, 2018, Plaintiff complained to the Defender about First Assistant Davis raising his voice and becoming visibly angry with her in a recent meeting. GE C ¶¶ 45-46.

This was the first time Plaintiff brought any type of issue with the First Assistant to the Defender's attention. *Id*. As he reflected on that information, the Defender determined the best way to handle it would be to give both Plaintiff and First Assistant Davis a chance to "clear the air" in his presence and accordingly called both to his office. *Id*. ¶47. On July 5, 2018, they met, and almost immediately Plaintiff said she did not want to discuss anything with First Assistant Davis there, so the Defender asked him to leave the meeting, which he did. GE C ¶48; GE B ¶34. Plaintiff's primary focus was concern regarding her performance, but she mentioned that the First Assistant had offered her a ride home and waited in the lobby, and at some point used the word "uncomfortable" in relation to the First Assistant. GE C ¶¶50-55.

The Defender asked Plaintiff what she meant by "uncomfortable," and if she was alleging sexual harassment, to which Plaintiff said she was not, and specifically asked the Defender not to report or otherwise escalate. *Id*. To the Defender, this reasonably seemed to be a communication issue between Plaintiff and the First Assistant, and Plaintiff appeared to be satisfied with the proposed resolution. *Id*. When the First Assistant re-joined the meeting, the discussion focused on the breakdown of the mentoring relationship and Plaintiff's failure to follow the First Assistant's instructions. *Id*. ¶56. After the meeting, with Plaintiff's and the First Assistant's agreement, the Defender promptly reassigned Plaintiff a new mentor. GE C ¶57. Plaintiff emailed the Defender to recap her concerns, and that email (GE C-2) only addressed the issue of her performance being satisfactory. GE C ¶57 & GE C-2. Based on these events, the Defender reasonably concluded that the issues between the two were typical work-related disagreements having nothing to do with Plaintiff's gender and that they had been resolved. *Id*.

On Friday, July 20, 2018, the Defender announced a new organizational structure inadvertently identifying Plaintiff as reporting, in part, to the First Assistant. *Id*. ¶¶ 59-60 GE C-3.

The Defender realized his mistake (based on the prior work-related mentorship issues), called Plaintiff on either Monday or Tuesday of the next week to apologize for it, and promptly corrected the mistake. *Id*. ¶¶61-66. In the following few weeks, the FDO finalized its preparations to convert the R&W Specialists to AFDs. Plaintiff and the other R&W Specialist (who was male) were officially converted to those positions on August 20, 2018. GE-C ¶27.

### 3. **Plaintiff complains of sexual harassment, and an investigation is initiated.**

On August 10, 2018, Plaintiff emailed the Defender claiming to recap an August 9 conversation they had; however, several of the issues did not accurately reflect the conversation, including her claim for the first time that the First Assistant had sexually harassed her. GE C ¶¶79-80. In the previous meeting in early July, Plaintiff specifically said she was <u>not</u> reporting sexual harassment, and asked the Defender not to report or escalate it. GE C ¶80; *see* ¶¶51-55. When Plaintiff raised the allegation, and pursuant to the EDR Plan, the Defender promptly reported the claim to Circuit Executive Ishida, and discussed initiating an investigation, which Chief Judge Gregory swiftly did. GE C ¶¶80-83; GE D ¶7. On August 17, 2018, the Defender responded (GE C-7) to Plaintiff's email addressing the points Plaintiff raised in her August 10 e-mail.

After August 17, 2020, the Defender was not involved in the EDR process except that he "was interviewed by the investigator … and worked with a mediator."[2] Id. ¶83. It was his understanding that Plaintiff continued to telework during the Fourth Circuit's investigation and that there were no issues, as none had been reported to him or to her supervisor. *Id*. ¶¶93-94. In or around March 2019, the Defender heard from the mediator, who explained that the Plaintiff had

---

[2] The Defender did not draft, advise about, or administer the EDR Plan. Any issues Plaintiff claims relating to the substance, procedure, or any other grievance she has about the EDR Plan itself, therefore, are irrelevant to and cannot be considered in relation to her allegations against the Defender. In this case, the Defender properly followed the EDR Plan, which was properly administered by the appropriate officials. Plaintiff was not denied any "rights" under the EDR Plan.

accepted a new position within the Fourth Circuit and was transitioning from her employment at the FDO. *Id.* ¶¶113-114. Therefore, any alleged (but denied) issues relating to the EDR process following August 17, 2018 are inapplicable to the Defender, who cannot be held individually liable for any of those allegations. Most of Plaintiff's arguments relate to that process and, in fact, the EDR process is the only one of the many "special factors counseling hesitation" addressed by Plaintiff in support of her *Bivens* claim in this case.

### 4. Plaintiff's claims that she was subjected to sexual harassment, discrimination, and retaliation after she began telework are without merit.

In her PSJ, Plaintiff points to two specific instances occurring after she went on telework[3] she claims constitute conduct for which the Defender should be personally liable. PSJ, p. 5. First, she claims that an FDO employee [Peter Adolf, not the Defender or the First Assistant][4] dressed in a judicial robe as Justice Kavanaugh and wore a "beer-guzzler helmet" costume to a 2018 office Halloween party <u>she did not attend</u>. *Id.*; *see also* Compl., ¶346. She concludes that this costume constituted "hostile and demeaning treatment" against her.[5] There is simply no rational basis for Plaintiff's conclusion that this costume was directed towards her, was "offensive," was related to anything other than Justice Kavanaugh's "I like beer" testimony, specifically, or was "mocking and threatening women who complained," especially when the situation is placed in the appropriate context. Comp. ¶347; More importantly, she does not argue—nor can she—that the

---

[3] Plaintiff also takes issue with the length of time she teleworked, but it is indisputable that was not within the Defender's control. She also had a newly assigned private office in Charlotte where she could have returned to work at any time she wanted. GE A ¶¶ 35-36; 39-41; A-15a and 15b.

[4] Plaintiff claims the individual was "her Team Leader." *Id.* He was "a" Team Leader, but he was not "her" Team Leader at the time, which the applicable organizational chart for the relevant period clearly shows. GE-C ¶94; C-10.

[5] At the time, the beer funnel hat was the widespread subject of various "memes," cartoons, and a staple of comedians satirizing Justice Kavanaugh's "I like beer" testimony in his then-recent Senate confirmation hearings. *See* <u>Exhibit A</u>, October 6, 2018 New Yorker "Daily Cartoon"; *see also* https://twitter.com/TheDailyShow/status/1049733462683504641?s=20 October 9, 2018 "tweet" posted by "The Daily Show with Trevor Noah."

Defender was personally involved in the costume or its selection in any way. The Defender should not be personally liable to Plaintiff for another employee's objectively innocuous costume worn to an office party Plaintiff did not attend.

Plaintiff also claims that her co-workers made "belittling jokes about meeting her at Waffle House" and comparing her to "Where's Waldo" while she was on telework. PSJ 5. She then determines that the comments constitute unlawful sexual harassment, discrimination, or retaliation against her that should be imputed to the Defender individually. However, she does not (and cannot) allege that the Defender attended the meeting, much less that he condoned, solicited, encouraged, or was even made aware of the comments before or after the fact. Plaintiff never reported these comments to him or, to the Defender's knowledge, to any other supervisor at the FDO (GE-C ¶94), yet now contends that she is entitled to monetary damages from him for those employees' comments. The comments, while perhaps insensitive, also bear no relation to Plaintiff's (or anyone's) gender or to complaints she made to the Defender or anyone else, much less do they constitute violations of constitutional or statutory rights. Like Plaintiff's other allegations, these do not entitle Plaintiff to summary judgment in her favor.

5.     __Neither the investigation nor the "disciplinary action" taken in this case support any findings of gender discrimination, sexual harassment, or retaliation.__

The investigation unequivocally revealed no sexual harassment, discrimination, or retaliation, unlawful or otherwise, occurred at the FDO. GE-C ¶¶104-105. Plaintiff claims, however, that, since "disciplinary action" was taken following the investigation, there was necessarily a finding of unlawful sexual harassment, sex discrimination, and retaliation against the Defender. PSJ 3. The reality is that certain management and communication issues were found to be present in the workplace at the FDO. GE C ¶98. While disciplinary action "may" be taken in the context of an EDR wrongful conduct finding, there is nothing in the EDR Plan or elsewhere

prohibiting discipline or counseling of employees for other reasons, even if the reasons are identified during an investigation into "wrongful conduct." GE-D ¶9, ("[t]he investigative report was shared with Chief Judge Gregory . . . to determine whether Mr. Martinez had engaged in any misconduct and whether any action was necessary to address any findings of misconduct <u>or workplace concerns</u> against Mr. Martinez."). The nature of the disciplinary action here does not reveal <u>any</u> unlawful or "wrongful" conduct (as defined in the EDR Plan), including anything attributable to the Defender in his individual capacity or otherwise and there "has been no finding that [he] ever engaged in of [sic] harassment, discrimination, or retaliation." GE C ¶¶97-105.

## LEGAL STANDARD

A district court shall grant summary judgment in favor of a movant if the party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party[.]" *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247-48 (1986). The evidence must be viewed in favor of the nonmovant, and all "justifiable inferences" must be drawn in its favor. *Id*. at 255; *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015).

## LEGAL ARGUMENT

This case presents novel *Bivens* claims. The Plaintiff's claims differ in a constitutionally meaningful way from previous Supreme Court *Bivens* decisions, present a "new *Bivens* context," and special factors counsel hesitation in implying a *Bivens* remedy. *Ziglar v. Abbasi*, 137 S.Ct. 1843 (2017); *Tun-Cos v. Perrotte*, 922 F.3d 514 (4th Cir. 2019). Additionally, qualified immunity bars the individual claims against the Defender. Not only should the Plaintiff's PSJ be denied, all claims against the Defender should be dismissed.

**A. <u>Qualified Immunity requires dismissal of this case against the Defender.</u>**

The Defender raised and briefed the defense of qualified immunity in his MTD. ECF No. 44-45, 52. This immunity defense is "an entitlement not to stand trial *or face the other burdens of litigation*" prior to "the resolution of the essentially legal question whether the conduct of which the plaintiff complains violated clearly established law." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis added). "Litigation . . . exacts heavy costs in terms of efficiency and expenditure of valuable time and resources that might otherwise be directed to the proper execution of the work of the Government," and a defendant entitled to dismissal on the pleadings should "be free from the burdens of discovery" and the "concerns of litigation," including this MSJ. *Ashcroft v. Iqbal*, 556 U.S. 662, 685-86 (2009). Courts "are impelled to give real content to the concept of qualified immunity for high-level officials who must be neither deterred nor detracted from the vigorous performance of their duties." *Id.* at 686. Accordingly, the Motion to Dismiss should be decided prior to this Motion and should be granted.

**1. <u>Plaintiff fails to allege plausibly that the Defender personally violated her constitutional rights.</u>**

Because officials must have clear notice that their own specific actions are unconstitutional before they can be held liable in damages, *see Iqbal*, 556 U.S. at 676, step one of the qualified immunity test asks whether the plaintiff has plausibly alleged the violation of a right. *Id.* Specifically, in a *Bivens* action, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution," *id.*, because "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct," *id.* at 677, and a plaintiff must plausibly allege facts as to each defendant's particular actions. Plaintiff cannot overcome qualified immunity here because she fails to plausibly allege that the Defender has ***personally*** violated any constitutional rights.

Plaintiff's pleading insufficiency is not remedied by reference to Judiciary policy, codes of conduct, the Criminal Justice Act's provisions relating to Federal Defender Offices, law review articles, or other non-constitutional sources. Whether viewed as "an unadorned, the-defendant-unlawfully harmed-me accusation," *Iqbal*, 556 U.S. at 678, or an impermissible theory of "supervisory liability," *see id.* at 677, Plaintiff's allegations are insufficient to overcome qualified immunity and to establish a plausible claim that the Defender, "through [his] own individual actions, has violated the Constitution." *Id.* at 676.

Plaintiff attempts to implicate the "Defendants," generally, throughout her PSJ. However, where there are "only collective references to defendants," the allegations fail to "adequately state a *Bivens* claim . . . . " *Marcilis v. Township of Redford*, 693 F.3d 589, 596 (6th Cir. 2012) (citing *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008)); *see also Grieveson v. Anderson*, 538 F.3d 763, 778 (7th Cir. 2008). When a complaint like Plaintiff's "makes only categorical references to 'Defendants,'" it fails to "'allege, with particularity, facts that demonstrate what *each* defendant did to violate the asserted constitutional right.'" *Marcilis*, 693 F.3d at 596-97; *see also Pahls v. Thomas*, 718 F.3d 1210, 1226 (10th Cir. 2013) (complaint's "undifferentiated contention that 'defendants' infringed" plaintiff's rights failed to state a claim); *Matthews v. Bergdorf*, 889 F.3d 1136, 1144 (10th Cir. 2018) ("Before a court may undertake the proper analysis, the complaint must 'isolate the allegedly unconstitutional acts of each defendant'; otherwise the complaint does not 'provide adequate notice as to the nature of the claims against each' and fails for this reason."). Plaintiff's sweeping collective allegations against "Defendants" do not state plausible claims against the Defender in his individual capacity.

Similarly, *Bivens* liability cannot be established solely on a theory of *respondeat superior*. *Iqbal*, 556 U.S. at 676 ("Based on the rules our precedents establish, respondent correctly concedes

that Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*."). Because vicarious liability is inapplicable to *Bivens* suits, a plaintiff must plead that the Government-official defendant, <u>through the official's own individual actions</u>, violated the Constitution.[6] Here, Plaintiff offers no specific allegations against the Defender that plausibly state any Constitutional violation.

2. <u>**Plaintiff fails to define any Constitutional right with the appropriate level of specificity**</u>.

The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *Kisela v. Hughes*, -- U.S. --, 138 S.Ct. 1148 (2018) (per curiam). Similarly, the Fourth Circuit has instructed, "we must first define the right at the 'appropriate level of specificity,'" *Booker v. South Carolina Dept. of Corrections*, 855 F.3d 533, 539 (4th Cir. 2017) (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). Plaintiff's generalized proposition that the Defender "should know" what sexual harassment or discrimination is does not define the issue at the appropriate level of specificity. *Booker*, 855 F.3d at 539 (citing *Wilson*, 526 U.S. at 615).

Plaintiff has failed to allege with the appropriate specificity that the Defender violated her constitutional rights in promptly reporting her allegation of sexual harassment against the First Assistant pursuant to the EDR Plan or in any other way. She has also failed to allege with the appropriate specificity exactly what "affirmative conduct" the Defender engaged in that "played a role in" the alleged "discrimination." PSJ 2. To the contrary, Plaintiff's allegations against the Defender primarily focus on what she feels he and the other Defendants <u>failed</u> to do, not what was affirmatively done. PSJ 4. In any event, Plaintiff clearly seeks to merge all claims against all

---

[6] Even in the context of Title VII upon which Plaintiff relies, Plaintiff would be foreclosed from pursuing her claims against the Defender in his individual capacity, as individuals are not liable under Title VII. *See Lissau v. Southern Food Service, Inc.*, 159 F.3d 177, 178 (4th Cir. 1998)(holding: "employees are not liable in their individual capacities for Title VII violations.")

Defendants to overcome dismissal, but her strategy does not align with the precedent and her corresponding obligations to recognize and abide by that precedent.

Plaintiff claims "it has long been clearly established that government officials who "conscious[ly] fail[ed] to act on, "acquiesced" in, or "d[i]d nothing" in response to sexual harassment are not entitled to qualified immunity. PSJ 15-16. She relies upon several decisions inapplicable to the Defender in his individual capacity, some of which do not even address individual liability or qualified immunity. *Id., citing, e.g., Bohen v. City of East Chicago,* 799 F.2d 1180 (1986) (42 U.S.C. §1983 case against an <u>employer</u> with no claim of individual liability or qualified immunity issues)[7]; *Feminist Majority Found. v. Hurley,* 911 F.3d 674, 704 (4th Cir. 2018) (Title IX and §1983 case finding individual defendant/college President entitled to qualified immunity because, like here, there was no 'controlling authority nor a robust consensus of cases of persuasive authority [which] clearly established the pertinent right at the time of the wrongful conduct alleged in the Complaint.")

Similarly, Plaintiff again relies upon portions of Title VII and EEOC Guidance in an effort to hold the Defender individually liable to her. The Defender incorporates his MTD Reply (ECF No. 52, §III) addressing the same Title VII issues previously raised by Plaintiff and why they cannot be used to justify imposition of individual liability on the Defender. The June 2020 *Bostock v. Clayton Cty., Georgia,* 140 S.Ct. 1731 (2020) decision cited by Plaintiff in her PSJ is a prime

---

[7] Incidentally, the underlying facts in these cases differ significantly from those raised by Plaintiff. *Bohen*, for example, involved claims against an employer relating to multiple instances for several years of: physical sexual assault, constant discussions of explicit sexual matters by co-workers and supervisors alike, continual obscene comments and "filthy talk," a requirement by Bohen's supervisor that she use the bathroom with the door open, suggestion by a Captain in the Department that Bohen should be raped, and implications that she was a lesbian because she failed to engage in the proposed acts. These are the types of "severe or pervasive" facts (unlike the amorphous facts Plaintiff alleges) that have been found to meet the definition of actionable sexual harassment by the Supreme Court, the Fourth Circuit, and courts across the country.

example of the challenge Plaintiff cannot overcome regarding her Title VII arguments. *Bostock* holds that Title VII's definition of "sex" encompasses discrimination based on sexual orientation and gender identity. *Id*. at 1754. ("In Title VII, Congress adopted broad language making it illegal **for an employer** to rely on an employee's sex when deciding to fire that employee. We do not hesitate to recognize today a necessary consequence of that legislative choice: An **employer** who fires an individual merely for being gay or transgender defies the law.") (emphasis added).The Court's decision nowhere discusses or suggests that an individual, like the Defender here, can be held personally financially responsible under Title VII.[8] Individual liability in *Bostock* like the type Plaintiff seeks would have violated well-settled law and, accordingly, was not an issue before the Court. Plaintiff should not be permitted to conflate these Title VII issues with *Bivens* claims, applying the parts of each theory that benefit her and discounting the ones that do not.

These cases and the majority of the other cases and other materials Plaintiff cites are irrelevant, as they: (a) are not *Bivens* cases; (b) do not apply the Supreme Court's required standards set forth in *Chappell v. Wallace,* 462 U.S. 296 (1983) and in *Abbasi* (and most predate *Abbasi*) and (c) involve statutory claims relating to state actors dissimilar to Plaintiff's claims here, which are pursued directly under the Fifth Amendment. In short, Plaintiff cites no controlling case or consensus of cases which have the requisite specificity required to overcome the Defender's qualified immunity; accordingly, Defendants are entitled to qualified immunity.

---

[8] For clarification, as the investigation in this case revealed, the Defender did not sexually harass, discriminate against, or retaliate against the Plaintiff in any capacity- official or individual. Complete arguments as to the official capacity claims are contained in ECF No. 78.

**3. The judicially-implied *Bivens* remedy should not be extended to this new context because special factors caution hesitation.**

As noted, and as alleged by Plaintiff (Compl.¶11), it is *Bivens* and its progeny that control the issues in this case, not the statutory 42 U.S.C. § 1983, Title VII, and Title IX issues examined in the majority of cases cited by Plaintiff. The *Bivens* claims alleged here differ in constitutionally meaningful ways from previous Supreme Court *Bivens* cases, and special factors counsel hesitation in implying a *Bivens* cause of action here. *See Abbasi*, 137 S.Ct. 1843. Plaintiff cannot overcome a motion to dismiss, nor can she be granted summary judgment.

a. **The Supreme Court has made clear that the *Abbasi* framework now controls.**

Plaintiff argues that Defendants are liable under *Davis v. Passman,* 442 U.S. 228 (1979) because the Fifth Amendment provides a cause of action for sex discrimination, PSJ 13, and the Supreme Court "has never overruled *Davis*," PSJ 14. The Supreme Court has, however, emphasized that *Davis* was "decided before the Court's cautionary instructions with respect to *Bivens* suits," and "the *Chappell* framework . . . now controls." *Abbasi*, 137 S.Ct. at 1859. Building on *Chappell v. Wallace,* and other post-*Davis* cases, the *Abbasi* Court established a "framework that now must be applied in determining whether a *Bivens* remedy is available against federal officials." *Tun-Cos*, 922 F.3d at 522. "Under the *Abbasi* framework, a court must determine (1) whether the case presents a "new *Bivens* context" and (2) if the context is new, whether there are "special factors *counseling hesitation* in the absence of affirmative action by Congress." *Id.* (emphasis in original).

b. **This case presents a "new *Bivens* context."**

Application of the precedential *Abbasi* framework reveals that Plaintiff's claims differ in constitutionally meaningful ways from *Davis*, and, therefore, present a "new *Bivens* context." While *Davis* dealt with an elected Congressman-employer, this case deals with "a new category

of defendants" – including an appointed Unit Executive Federal Defender. If a "new class of defendants" are at issue, as in this case, the "claim arises in a new context" and proceeds to consideration of special factors. *Hernandez v. Mesa*, 140 S.Ct. 735, 743 (2020).

Because "the new-context inquiry is easily satisfied," *Abbasi,* 137 S.Ct. at 1865, and "even a modest extension is still an extension," *id.* at 1864, each of the below constitutionally meaningful differences, in addition to the "new class of defendants," demonstrate that Plaintiff's claims present a "new *Bivens* context," *Id.* at 1865; *Tun-Cos,* 922 F.3d at 523. The Court, then, must determine whether special factors counsel hesitation before implying a *Bivens* remedy. Previously identified "special factors" include: (1) the rank of officers involved (in *Davis*, the case involved an elected Congressman-employer, whereas this case involves an appointed Unit Executive employee in his individual capacity); (2) different constitutional rights at issue (in *Davis*, the case involved a Fifth Amendment Due Process Clause claim, whereas this cases also involves claims under the Fifth Amendment Equal Protection Clause); (3) the statutory or legal mandate under which the officials operated (this case involves the Fourth Circuit's EDR Plan, whereas *Davis* had no such process); (4) the Civil Service Reform Act ("CSRA")(in *Davis*, the Court did not address the CSRA, whereas in this case the CSRA is directly at issue as supported by Second, Fourth, Ninth, and Eleventh Circuit decisions); (5) judicial independence (in *Davis,* the case involved an internal Congressional personnel decision with no risk to judicial independence, whereas in the present case the Plaintiff argues that the Court should invalidate the Fourth Circuit's EDR Plan (and by extension the Model EDR Plan upon which all Circuit EDR Plans are based) which manages internal judiciary matters); (6) policy challenges (in *Davis*, the case did not present policy issues, whereas in the present case Plaintiff challenges the Fourth Circuit's EDR Plan by seeking to hold Defender personally liable in damages for policies not created by him or by his office); and (7) the availability of remedies

under the EDR Plan (in *Davis*, it was "damages or nothing," whereas here Plaintiff had ample remedies under the EDR Plan that she chose not to pursue). Each of these differences is constitutionally meaningful. This Court should not imply a *Bivens* remedy because "the new-context inquiry is easily satisfied," *Tun-Cos*, 922 F.3d at 523, and "'even a modest extension is still an extension' for purposes of the new-context analysis." *Tun-Cos*, 922 F.3d at 525 (quoting *Abbasi*, 137 S.Ct. at 1864). Plaintiff is not entitled to summary judgment.

### c.  **Special factors counsel hesitation.**

Because Plaintiff's constitutional claims "meaningfully differ" from the claims in *Davis*, the Court must proceed to determine whether special factors counsel hesitation before implying a *Bivens* remedy.  "In determining whether 'special factors' are present, [courts] focus on whether Congress *might doubt* the need for an implied damages remedy."  *Tun-Cos*, 922 F.3d at 525 (quoting *Abbasi*, 137 S.Ct. at 1858) (emphasis added). Courts should not extend "the application of *Bivens* to [a] new context [if doing so] *causes [the court] to hesitate*." *Tun-Cos*, 922 F.3d at 528 (emphasis added).

Extending this novel *Bivens* remedy "causes hesitation" as it raises substantial questions regarding separation of powers. *Tun-Cos* "raised the substantial question of whether Congress would want plaintiffs to have a money damages remedy against [federal officials]." *Id*. Applying these standards, Plaintiff's arguments fail because there is strong reason to believe not only that "Congress *might doubt*" the need for an implied damages remedy, but Congress has stated its doubt and has declined to create any legislation on the topic, as recently as June of 2018.

The only special factor that Plaintiff addresses in her PSJ is whether the EDR Plan provides an alternative, existing process precluding the implication of a *Bivens* remedy. Plaintiff argues that it does not because, according to Plaintiff, she had "no alternative form of judicial relief." PSJ 15.

**(1) The EDR Plan provides an alternative, existing process that precluding a *Bivens* remedy**.

Although "an alternative remedial structure . . . alone may limit the power of the Judiciary to infer a new *Bivens* cause of action," *Abbasi*, 137 S.Ct. at 1858, the absence of a damages remedy standing alone is insufficient to extend *Bivens* liability. *Schweiker v. Chilicky*, 487 U.S. 412, 421–22 (1988)("The absence of statutory relief for a constitutional violation ... does not by any means necessarily imply that courts should award money damages against the officers responsible for the violation."); *United States v. Stanley*, 483 U.S. 669, 683 (1987)("[I]t is irrelevant to a 'special factors' analysis whether the laws currently on the books afford [plaintiff] an 'adequate' federal remedy for his injuries"). As the Fourth Circuit explained last year:

> The plaintiffs are correct that the protections provided by the INA do not include a money damages remedy . . . . But this misses the point, for the relevant question "is not what remedy the court should provide for a wrong that would otherwise go unredressed" but instead "whether an elaborate remedial system . . . should be augmented by the creation of a new judicial remedy." *Bush*, 462 U.S. at 388, 103 S.Ct. 2404 . . . .

*Tun-Cos*, 922 F.3d 527.

Plaintiff's argument that a "judicial remedy" must be provided has been expressly rejected as a basis for implying a *Bivens* cause of action because a judicially-created cause of action "is not an automatic entitlement," *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007), and "even in the absence of an alternative [remedial scheme]," courts must "pay[] particular heed . . . to any special factors counseling hesitation." *Id.* As the Court stated in *Hernandez*:

> Congress's decision not to provide a judicial remedy does not compel us to step into its shoes. "The absence of statutory relief for a constitutional violation . . . does not by any means necessarily imply that courts should award money damages against the officers responsible for the violation." *Schweiker*, 487 U.S. at 421–422 . . . .

*Hernandez,* 140 S.Ct. at 750.

Moreover, the Supreme Court has not limited "alternative, existing process" to a "judicial remedy" but rather "the question [is] whether *any* alternative, existing process for protecting the

interests amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Wilkie*, 551 U.S. at 550 (emphasis added). "Alternative, existing process" includes "administrative, statutory, equitable, and state law remedies." *Vega v. United States*, 881 F.3d 1146, 1154 (9th Cir. 2018). The Fourth Circuit's EDR Plan undoubtedly provides an existing, alternative process. *See* Plan, § 12.

Plaintiff's belief that she would not have been provided meaningful remedies is entirely speculative because she withdrew[9] her claim before the remedial phase. Her belief is predicated on a misunderstanding of rights and available options for resolution in the counseling phase under the EDR Plan, compared to rights, remedies, and review available during the formal complaint phase of the EDR Plan, *Id*. In the request for counseling phase, the parties may *voluntarily agree* to a resolution but cannot be forced to take particular action. In contrast, during the formal complaint phase, after adjudication of a formal complaint, a chief judge or designated judicial officer could *order any "make-whole" remedies* contemplated under the EDR Plan against any employing office, including a Federal Public Defender organization, *see* EDR Plan, ¶¶ 10.B.e. & 12. Specifically, the Chief Judge or designated judicial officer "acting pursuant to ¶ 10 or ¶ 11 of this Plan," finding a "substantive right protected by this Plan has been violated," may "[o]rder a necessary and appropriate remedy." EDR Plan, ¶ 10. Remedies "include, but are not limited to"

---

[9] The failure to exhaust remedies under the EDR Plan is a standalone basis for prohibiting this *Bivens* action, since Plaintiff "failed to avail [her]self of the very administrative procedures [s]he attacks as inadequate"); *cf. Mirmehdi v. United States*, 689 F.3d 975, 982 (9th Cir. 2012) (declining to imply a *Bivens* remedy when plaintiffs have sought alternative relief "through not one but two different remedial systems"). "The purpose of denying a [*Bivens*] private cause of action to federal employees is to ensure that they do not bypass comprehensive and carefully-balanced statutory and administrative remedies in order to seek direct judicial relief." *Hall v. Clinton*, 235 F.3d 202, 205 (4th Cir. 2000) (citation omitted). This is especially true in this case where Plaintiff withdrew her Chapter X claim after obtaining a Fourth Circuit clerkship and did not file a formal complaint under the EDR Plan.

placement, promotion, back pay and associated benefits, records modification and/or expungement, equitable relief, and other remedies. EDR Plan, ¶ 12.

Plaintiff does not distinguish the Second, Third, and Fourth Circuit decisions which have found that circuit EDR Plans do, in fact, provide meaningful relief and preclude a *Bivens* action. *Semper v. Gomez*, 747 F.3d 229, 243 (3d Cir. 2014); *Dotson v. Griesa*, 398 F.3d 156, 171 (2d Cir. 2005); *Kostishak v. Mannes*, 145 F.3d 1325, *2-7 (4th Cir. 1998) (unpub.); *see also Drone v. Duff*, 2017 WL 6383607 *2 (E.D. Va. Dec. 14, 2017) (USDC-EDVA's EDR Plan provided meaningful review by judicial officers).[10]

**(2) Judicial employment counsels hesitation.**

The Second, Third, Ninth, and Eleventh Circuits have determined that Judiciary Branch employment is a special factor that counsels hesitation because "Congress's omission of review rights [under the CSRA] for judicial branch employees was not inadvertent and, therefore, preclude[s] pursuit of a *Bivens* claim." *Dotson*, 398 F.3d at 169 (rejecting probation officer's *Bivens* claim for racial discrimination); *Semper*, 747 F.3d at 237 (in rejecting probation officer's *Bivens* claim, "it is undisputed that the CSRA precludes current or former federal employees from bringing a *Bivens* damages action for alleged constitutional violations arising out of the employment context"); *Blankenship*, 176 F.3d at 1195 (denying federal court reporter's *Bivens* action holding "that the CSRA precludes a *Bivens* remedy in this case"); *Lee*, 145 F.3d at 1276 (CSRA precludes probation officer's *Bivens* claim). Additionally, although not dealing with a Judiciary employee, the Supreme Court has rejected a damages remedy for federal employees

---

[10]The Ninth and Eleventh Circuits have found it unnecessary to reach the issue of the adequacy of the EDR Plan because the Civil Service Reform Act (CSRA) is a remedial scheme, and Congress' omission of Judiciary employees was not inadvertent. *Blankenship v. McDonald*, 176 F.3d 1192, 1194-96 (9th Cir. 1999) (finding CSRA as adequate remedial scheme); *Lee v. Hughes*, 145 F.3d 1272, 1273-77 (11th Cir. 1998) (same).

whose claims arise out of a federal employment relationship. *Bush v. Lucas*, 462 U.S. 367, 368 (1983). This Court should follow those courts.

**(3) Judicial independence counsels hesitation.**

The Federal Judiciary has long taken the position that the Judicial Branch must have control over its employees and workplace management to ensure both the independence, and the appearance of independence, of its decisions. *Dotson,* 398 F.3d at 175. The "judiciary's internal governance system is a necessary corollary to judicial independence." *Id. (internal citations omitted). "*Congress has indicated on a number of occasions that employment disputes within the Judicial Branch implicate a special set of circumstances, including the doctrine of separation of powers and the protection of the independent judiciary." *Semper,* 747 F.3d at 240. Congressional action in withholding CSRA review rights from judicial branch employees was not inadvertent, *Dotson*, 398 F.3d at 169, and, in fact, the CSRA's history evidences Congress's deliberate decision to exclude judicial branch employees from the CSRA's review process. *Id.* at 170; *In Re Golinski*, 587 F.3d at 962 ("History reveals that Congress intended the Judiciary to have . . . the ability to manage its own personnel and adjudicate workplace complaints.").

Congress has also considered and rejected the extension of the Congressional Accountability Act's (CAA's) "coverage to employees of the judicial branch." *Dotson*, 398 F.3d at 173. "The Judicial Conference of the United States submitted [a] report in 1996, telling Congress: 'The judicial branch is committed to providing the general protections of the CAA laws in a manner that preserves judicial independence and the decentralized administration of the federal courts.'" *In Re Golinski*, 587 F.3d at 962 (quoting Judicial Conference of the United States, Study of Judicial Branch Coverage Pursuant to the Congressional Accountability Act of 1995 (Study) 2-3 (1996)). "As part of that commitment, the Judicial Conference reported that it was

developing 'a plan to provide the rights, protections, and remedies similar to the CAA.'" *In re Golinski*, 587 F.3d at 963 (quoting Study at 15). That Plan became the Model EDR Plan, which the Fourth Circuit adopted.

On June 20, 2018, a Senate Judiciary Committee hearing addressed Judiciary workplace misconduct, sexual harassment, and EDR Plans (including remedies). Senate Judiciary Committee Hearing Confronting Sexual Harassment and Other Workplace Misconduct in the Federal Judiciary, 115 Cong. (June 20, 2018), https://www.judiciary.senate.gov/meetings/confronting-sexual-harassment-and-other-workplace-misconduct-in-the-federal-judiciary. As part of that hearing, Senator Grassley stated that Congress may have to take action to address sexual harassment in the Judiciary, *id*. at 1, considering the CAA, *id*. at 4, to provide "meaningful remedies," *id*. at 2. Administrator Duff responded, describing the EDR process and Judiciary improvements to it, and the handling of misconduct within the Judiciary, *id*. at 18-28. When Senator Tillis raised the possibility of congressional action, Director Duff responded that such action was "unnecessary," and "with regard to misconduct, we have a very healthy review system," and for Congress to interfere with the independence of the Judiciary would be "unconstitutional," *id.* at 25-26. This hearing brings into sharp focus the separation of powers issue and highlights why Congress has consistently chosen not to dictate internal Judiciary personnel practices.

In the aftermath of the hearing, and in the aftermath of *Abbasi*, Congressional silence is relevant and telling, *see Abbasi*, 137 S.Ct. at 1862, and demonstrates that the failure to enact legislation to provide for a damages remedy was "not inadvertent." *See Dotson*, 398 F.3d at 169 ("Congress's omission of review rights [under the CSRA] for judicial branch employees was not inadvertent and, therefore, preclude[s] pursuit of a *Bivens* action."). Congress, fully aware of the Judiciary's use of EDR Plans, has not taken further action to bring judiciary employees within a

statutory scheme, but instead has allowed the Judiciary to implement EDR Plans, further underscoring the separation of powers concerns regarding the independence of the federal judiciary. It is clear that "Congress might doubt" the need for a *Bivens* remedy here, *Tun-Cos*, 922 F.3d at 525. "Congress' 'failure to provide a damages remedy' is 'more than inadvertent' and "strongly counsels hesitation before creating" a *Bivens* remedy in this context. *Attkinson v. Holder*, 925 F.3d 606, 621 (4th Cir. 2019); *Dotson*, 398 F.3d at 171.

Each of these special factors, among others previously addressed in this case, individually "counsel hesitation" because Congress "might doubt" the wisdom of providing an unprecedented money damages remedy against a Unit Executive like the Defender. Accordingly, in addition to the arguments set forth in the Defender's MTD filings (ECF No. 44, 45, and 52), Congressional silence and inaction and separation of powers concerns "counsel hesitation" because Congress "might doubt" the efficacy of a money damages remedy here.

### d. *Wilcox v. Lyons* forecloses Plaintiff's retaliation claim.

Plaintiff's retaliation claim is foreclosed by *Wilcox v. Lyons*, 970 F.3d 452 (4th Cir. 2020), which held that a "'pure or generic retaliation claim' . . . even if premised on complaints of sex discrimination, is not cognizable under the Equal Protection Clause." *Id*. at 461. In *Wilcox*, like here, "the subject matter" of the plaintiff's complaint was "sex discrimination and harassment[.]" *Id*. at 459. But "[r]etaliation for reporting alleged sex discrimination imposes negative consequences on an employee because of the employee's report, not because of the employee's sex." *Id*. at 460; *see also* ECF No. 52, pp. 4-5, 17 (Defender's MTD Reply, noting that retaliation and discrimination claims are two separate claims requiring two separate analyses).

As in *Wilcox*, Plaintiff attempts to assert an equal protection claim by alleging that various defendants subjected her to retaliation, failed to take "immediate and effective action on her

complaints," and failed to "provide her with meaningful review and remedies[.]" Compl. ¶498. Plaintiff's allegations do not implicate an impermissible classification or discrimination on the basis of her sex and fail to state a claim of retaliation under *Wilcox*.

Even if *Wilcox* did not foreclose the retaliation claim, the facts as they relate to the Defender show that no retaliation occurred so no retaliation claim could proceed, even if such a claim did exist. Those facts as they relate to the Defender are set forth in detail in §3(B)(5) of ECF No. 78 and are incorporated herein by reference. They address each allegation of "retaliation" made by Plaintiff specifically against the Defender, as supported by the testimony of the Defender and others. The overwhelming evidence shows that the Plaintiff was not subjected to any retaliation in her employment with the FDO at any time by the Defender or anyone else. GE A-GE C. Though Plaintiff also claims she was sexually harassed by the First Assistant and subjected to discrimination, those claims fail for the reasons described herein and in the Defender's Motion to Dismiss.

**E. Fourth Circuit precedent forecloses Plaintiff's statutory argument regarding 42 U.S.C. § 1985(3) and § 1986.**

The Fourth Circuit in *Hall* considered and rejected Plaintiff's statutory argument that repeal by implication is disfavored. "Because 'Congress clearly intended the CSRA to be the exclusive remedy for federal employees,' the comprehensive grievance procedures of **the CSRA implicitly repealed all other then-existing statutory rights of federal employees regarding personnel decisions**." *Hall*, 235 F.3d at 206 (emphasis added). After rejecting the very argument Plaintiff is making, the *Hall* Court announced a broad rule that bars both of Plaintiff's statutory claims: "[W]e hold that Congress intended the CSRA would operate to the exclusion of **all** other statutory remedies for claims arising out of the federal employment relationship." *Hall*, 235 F.3d at 206 (emphasis added). While *Hall* dealt with a 42 U.S.C. § 1985(1) claim, the Fourth Circuit's

holding applies to **_all_** other statutory remedies for claims arising out of the federal employment relationship, *Id.*, 235 F.3d at 206 (emphasis added), including Plaintiff's 42 U.S.C. § 1985(3) and § 1986 claims, since they arose out of Plaintiff's federal employment relationship. *See* Compl. ¶1 ("This action seeks relief for the deprivation of constitutional rights suffered by Jane Roe ("Roe") during her employment as a federal judiciary employee."). Similarly, Plaintiff's argument regarding her § 1986 claim is foreclosed by *Trerice v. Summons*, 755 F.2d 1081, 1085 (4th Cir. 1985), which holds that a cause of action under § 1986 is dependent upon the existence of a claim under § 1985; accordingly, the dismissal of Plaintiff's § 1985 claim requires the dismissal of her § 1986 claim. *Trerice*, 755 F.2d at 1085.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's Motions for Partial Summary Judgment against the Defender.

Respectfully submitted this the 26th day of October, 2020.

**s/Shannon Sumerell Spainhour**
SHANNON SUMERELL SPAINHOUR
N.C. State Bar No. 28108
DAVIS HARTMAN WRIGHT PLLC
28 Schenck Parkway, Suite 200
Asheville, NC 28803
Phone: 828-771-0833
Mobile: 704-904-0506
Fax: 252-514-9878
Email: mss@dhwlegal.com

Counsel for Federal Public Defender Anthony Martinez in his individual capacity

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned certifies that on October 26, 2020, I electronically filed the foregoing

***FEDERAL DEFENDER FOR THE WESTERN DISTRICT OF NORTH CAROLINA'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST HIM IN HIS INDIVIDUAL CAPACITY***

using the Court's CM/ECF system, which will send notification of such filing to all counsel of

record, including:

Cooper J. Strickland at cooper.strickland@gmail.com

Gill P. Beck at Gill.Beck@usdoj.gov

Joshua M. Kolsky at Joshua.kolsky@usdoj.gov

**s/Shannon Sumerell Spainhour**

SHANNON SUMERELL SPAINHOUR
N.C. State Bar No. 28108
DAVIS HARTMAN WRIGHT PLLC
28 Schenck Parkway, Suite 200
Asheville, NC 28803
Phone: 828-771-0833
Mobile: 704-904-0506
Fax: 252-514-9878
Email: mss@dhwlegal.com