**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

**ASHEVILLE DIVISION**

| | |
|---|---|
| JANE ROE, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | )   **Civil No. 1:20-cv-00066-WGY** |
| | ) |
| UNITED STATES OF AMERICA, *et al.*, | ) |
| | ) |
| *Defendants*. | ) |
| | ) |
| | ) |

**PLAINTIFF'S REPLY IN SUPPORT OF HER MOTION FOR PARTIAL SUMMARY**
**JUDGMENT AGAINST THE INDIVIDUAL CAPACITY DEFENDANTS**

Defendants' response to Roe's summary judgment motion shows that each defendant personally violated her equal protection rights. Because defendants have failed to raise a genuine dispute of material fact, Roe is entitled to summary judgment on their liability under the Fifth Amendment and 42 U.S.C. §§ 1985(3), 1986. *See* Fed. R. Civ. P. 56(a).

**I.     Defendants Are Individually Liable For Violating Roe's Equal Protection Rights.**

Defendants have not disputed the material facts showing that they violated Roe's right to be free from sex discrimination in her employment. Specifically, defendants subjected Roe to sexual harassment, discrimination, and retaliation, failed to take immediate and effective remedial action on her complaints, and deprived her of any meaningful remedies or review, resulting in her constructive discharge. These actions unlawfully burdened Roe because of her

1

gender, in violation of the Fifth Amendment's Due Process Clause.[1]  *See Davis v. Passman*, 442

U.S. 228, 235–36 (1979); *Beardsley v. Webb*, 30 F.3d 524, 529 (4th Cir. 1994).

### A.  The Defender Consciously Failed to Act on Roe's Complaints and Enforced a Hostile, Discriminatory, and Retaliatory Working Environment.

As the head of Roe's employing office—and that office's representative in the EDR

proceeding—the Defender was responsible for ensuring a workplace free of sexual harassment,

retaliation, and discrimination.  *See* 18 U.S.C. § 3006A(g)(2)(A); EDR Plan Ch. II, § 1.

However, the Defender does not dispute that after Roe reported her complaints, he failed to take

appropriate action.  The Defender failed to remove Roe from the First Assistant's supervision or

protect her confidentiality, made hostile and discriminatory comments to her, and initiated a

wrongful conduct investigation only after she followed up on his promises to take appropriate

action.  He also retaliated against her by diminishing her job duties and not considering her for

an opening as an appellate assistant federal public defender.  Roe Decl., Ex. B, at 6–7.  Instead,

the Defender gave her a "phantom promotion," with Fourth Circuit approval, which was a

reclassification of title that benefitted the office's work measurement formula with no

consideration for a raise or progression of job responsibilities, and a loss of her locality

adjustment.  *Id.*; Roe Decl., Ex. D.

Rather than dispute these facts, the Defender attempts to trivialize his misconduct and

avoid responsibility.  For example, he continues to argue that Roe's constitutional rights are

"non-existent" in this context because Title VII standards requiring appropriate action on

complaints only apply to employing offices, not individuals.  ECF No. 95, at 2, 13–14.  But it is

---

[1] Contrary to defendants' assertion that this case involves "different constitutional rights" from *Davis*, *e.g.*, ECF No. 95, at 16, the Fifth Amendment does not have an "Equal Protection Clause."  *Davis*, 442 U.S. at 244 ("[A] cause of action may be implied directly under the equal protection component of the Due Process Clause of the Fifth Amendment.").

2

well-established that "[c]ourts may apply the standards developed in Title VII litigation to similar litigation" against individuals under the Constitution. *Beardsley*, 30 F.3d at 529. The Supreme Court has held that *Bivens* claims for gender discrimination are appropriate precisely because "[l]itigation under Title VII of the Civil Rights Act of 1964 has given federal courts great experience evaluating claims [of] illegal sex discrimination." *Davis*, 442 U.S. at 245. And the Defender ignores that the judiciary imposes Title VII standards through its antidiscrimination policies, codes of conduct, and the EDR Plan. Guide to Judiciary Policy § 220.10.10; Code of Conduct for Federal Public Defender Employees Canon 3(C); EDR Plan Ch. II, § 10B(2)(e).

The Defender also contends that his employees' misconduct and discrimination, under his supervision and with his approval, are somehow not his fault. ECF No. 95, at 3–4. For example, he continues to portray the First Assistant's conduct as legitimate "mentorship" rather than a ruse to sexually harass her. ECF No. 95, at 3. But it is a matter of public record that the First Assistant was objectively "not qualified" to be in his job, much less to be Roe's mentor. Testimony of Hon. Max. O. Cogburn, Ad Hoc Committee to Review the Criminal Justice Act at 33 (Jan. 11–12, 2016), *available at* https://tinyurl.com/y3bjugxy. As a resident district court judge publicly stated, the First Assistant "could not be a panel attorney" because he had only "second chaired one criminal case." *Id.* In that same testimony, the judge called the First Assistant's lawyering "not strong," and said that his selection for a management position showed "bad judgement." *Id.* at 33–34. Worse yet, the First Assistant was the "second highest ranking attorney in the office," ECF No. 95, at 3, during much of the misconduct the district judge publicly described. *E.g.*, Judge Cogburn Testimony at 14 (administrative officer's embezzlement of money was "kept from the judges"); *id.* (employees were "afraid that they'll be fired" for coming forward); *id.* at 33 (the FDO's client representation was "unsatisfactory"); *id.*

3

at 34 (the office was a "mess" in "need [of] a change"). The Defender cannot dispute that he kept in management, or promoted, the same individuals whose misconduct prompted the office conversion, including the First Assistant. *See id.* (the district judges expected that "the change of the defender was going to bring about real change").

Next, the Defender asserts that he acted "promptly" and "appropriately" on Roe's complaint, because, he claims, she reported being harassed "for the first time" on August 10, 2018. ECF No. 95, at 4, 6. He also continues to trivialize her complaints as "typical work-related disagreements" and "communication issue[s]." *Id.* at 5. But his assertions are contradicted by his own declaration. As the Defender himself admits, he was on notice by July 5, 2018, if not earlier, that the First Assistant's behavior made Roe feel "uncomfortable" and "creeped out," at a minimum.[2] Martinez Decl., ¶¶ 50-55; *see also* ECF No. 95, at 5. He also admits that Roe's complaints were about the First Assistant's behavior outside of work, such as waiting for her in the lobby at night when she was leaving the building alone. *Id.*

Given the specificity of Roe's reports, it was unreasonable for the Defender to interpret her comments that she was not making a formal report "yet" as an assurance that she was not

---

[2] In his vague declaration, the Defender avoids discussing the facts but does not specifically deny many of Roe's allegations. For example, he does not deny that Roe "notif[ied]" him that she would be "drawing boundaries" with the First Assistant because he had behaved "inappropriately" towards her, and "she was leaving the office early every day to avoid issues with him." Complaint ¶¶ 124–25. After Roe's attempt to confront the First Assistant was unsuccessful, *id.* ¶¶ 127–33, Roe reported again to the Defender that the First Assistant "was interfering with her ability to do her job and that she felt threatened by him." Complaint ¶ 143. For example, "the First Assistant had asked her repeatedly to meet out of the office." *Id.* He had "waited for her in the lobby at night when he knew she was alone." *Id.* She repeated to the Defender "that she was leaving the office early every day to avoid being alone with him." *Id.* The Defender acknowledged the significance of her complaints by stating that he did not want her to feel "uncomfortable" or "unsafe." *Id.* ¶ 144.

4

being harassed.[3]  *See id.*  Even if the Defender believed that Roe had only reported she was "uncomfortable," *id.*, he "surely should have known" that her complaints put him on notice, *Okoli v. City Of Baltimore*, 648 F.3d 216, 224 (4th Cir. 2011); *see also Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 334 (4th Cir. 2003) (en banc) (an office head "cannot avoid Title VII liability . . . by adopting a 'see no evil, hear no evil' strategy").  The Defender fails to recognize that "[t]here is no magic word requirement.  That is, the employee need not label the events 'sexual harassment' in order to place an employer on notice of the offending behavior."  *Okoli*, 648 F.3d at 224 n.8 (quoting parenthetical).

Worse yet, the Defender does not deny that he compared Roe's relationship with the First Assistant to a marriage and told her to "compromise."[4]  Roe Decl., Ex. B, at 5.  He does not deny that he berated her for going to "some other party" with her complaints.  *Id.* at 30.  He does not deny that he minimized and trivialized her complaints by implying that, at least there was no "physical contact."  *Id.* at 6; *cf.* Fourth Circuit EDR Plan § III(A) (Sept. 2020) ("Wrongful conduct can be verbal, non-verbal, physical, or non-physical.").  Though he asserts that he "never made derogatory comments" about Roe based on her gender, Martinez Decl., ¶ 126, his

_____

[3] As Roe told the Defender, she was not making a formal complaint "yet," *not* because she was not being harassed, but because she was trying to self-manage the situation first by talking to the First Assistant directly.  Complaint ¶¶ 124–25.  In other words, Roe was doing exactly what employees in her situation are routinely advised to do (and what she was advised by both an attorney coworker, *id.* ¶ 119, and an experienced mentor, *id.* ¶ 123), which is to try to resolve complaints at the lowest level first before escalating them.  *See* EDR Plan Ch. IX (2013) (employees "are encouraged to report wrongful conduct . . . as soon as possible"); *id.* Ch. X § 2 (encouraging employees "to bring his or her concerns to his or her supervisor" before bringing a formal request for counseling).  Roe's efforts to resolve her complaints directly with the Defender obviously did not absolve him of his duty to act.  *See* EDR Plan Ch. IX.

[4] The Defender claims he reassigned Roe back under the First Assistant "inadvertently."  ECF No. 95, at 5.  But his self-serving assertion is contradicted by his own First Assistant, who stated that "the Management Team decided that [Roe] would be assigned to cover my trial team in addition to her own."  Davis Decl., ¶ 36.a.

5

vague and conclusory denial carries no weight on summary judgment, *Reynolds v. Steward St. Elizabeth's Med. Ctr. of Bos., Inc.*, 364 F. Supp. 3d 37, 58 (D. Mass. 2019).  And he does not deny that he rejected the Chief of Defender Services' efforts to ensure immediate and effective remedial action,[5] Roe Decl., Ex. B, at 5–7; Roe Decl., Ex. C, at 1–2, and instead retaliated against Roe without taking any meaningful action on her complaints, Roe Decl., Ex. B, at 4–7, 22–23, 24–27, 29–33.

Indeed, the Defender does not even attempt to dispute the facts showing that he took adverse action against Roe by denying her a promotion.  *See* ECF No. 95, at 6.  As Roe previously discussed, the Defender's own declaration and exhibits show that he falsely claimed that Roe was not eligible for a promotion by misrepresenting her years of professional experience.[6]  ECF No. 93, at 18–19.  In fact, Roe *was* eligible for a discretionary promotion to Grade Level 15 on her anniversary date of August 21, 2018, but the Defender avoided promoting her by retroactively "reclassifying" her to an AFD position on August 28, 2020 and making it effective August 20, 2018—*the day before* she would qualify for the promotion to Grade Level 15.  Roe Decl., Ex. D.  At the same time, the Defender requested to reduce Roe's total salary by eliminating her locality adjustment.  *Id.*  His declaration provides strong evidence that his efforts

---

[5] The Defender does not dispute that during the same period when he refused to transfer Roe into appeals work and away from the First Assistant's supervision, he was in the process of hiring for an open position with appellate responsibilities.  Martinez Decl., ECF No. 78-3, at 36–37.  Though the Defender asserts that the open position was "temporary," the position's "temporary" status was not disclosed in the job announcement.  *Id.*  In fact, the individual hired into that "temporary" position is still employed by the FDO.  *See* Roe Decl., Ex. C, at 58 (Roe's report to the Chief Judge and EDR Coordinator about office rumors that "the new appellate attorney was chosen to be my replacement").

[6] Because Roe's reply brief in support of her motion for partial summary judgment against the official capacity and entity defendants addresses many similar arguments, she adopts and incorporates that analysis by reference.  ECF No. 93.

6

to reduce Roe's salary were intentional, such as his false claims that she was not entitled to locality pay on telework. *See* ECF No. 93, at 20–21.

Because the Defender's only proffered reason for denying the promotion is false, no reasonable fact finder could infer that his actions were legitimate—especially in the context of his hostile and discriminatory comments. *See* Roe Decl., Ex. B, at 5 (comparing Roe's relationship with the First Assistant to a marriage and telling her to "compromise"); *id.* at 6 (implying that at least there was no "physical contact"). It is well established that when an employer's proffered reasons for taking an adverse action are shown to be false, "discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." *Okoli*, 648 F.3d at 223. Given that the Defender has not even attempted to offer a nondiscriminatory explanation, a reasonable fact finder must conclude "it is more likely than not" that he "based his decision on an impermissible consideration." *Id.* (quotation omitted).

The Defender's denial of promotion is especially strong evidence of discrimination given that Roe's promotion request was a specific triggering event for the First Assistant's quid pro quo email and escalating course of quid pro quo sexual harassment.[7] Indeed, in his quid pro quo "pay for stay" email, the First Assistant made the same misrepresentations about Roe's eligibility for a promotion that defendants made in their declarations. *Compare* Complaint ¶ 82 (First Assistant's false claim that Roe was "shooting high with a G15" because "you'll need 5 more years of fed service to qualify for it"), *with* Martinez Decl., ¶ 31 (falsely claiming that he had no

---

[7] Unlawful discrimination and retaliation are not mutually exclusive, and an adverse employment action can be both. *See Okoli*, 648 F.3d at 222 (plaintiff's firing was evidence of both quid pro quo discrimination and retaliation); *Beardsley*, 30 F.3d at 530–31 (same).

"discretion" to raise her salary), *and* Moormann Decl., ¶ 16 (falsely claiming that 10 years of "federal" experience were required to qualify for Grade Level 15 and Roe had "slightly less than 4 years").  The First Assistant's misrepresentations enabled him to control Roe's professional advancement as part of his quid pro quo sexual harassment.[8]  The Defender's subsequent denial of promotion for the same, illegitimate reasons is undisputed evidence that Roe's "reaction to the harassment affected tangible aspects of [her] compensation, terms, conditions, or privileges of employment." *Okoli*, 648 F.3d at 222 (quotation omitted).  Specifically, Roe "was deprived of a job benefit which she was otherwise qualified to receive because of the employer's use of a prohibited criterion in making the employment decision." *Id.*

Finally, the Defender asserts that he is not responsible for the failure to appropriately investigate Roe's complaints, take prompt and effective remedial action, or provide meaningful review and remedies because he did not create the EDR Plan.  ECF No. 95, at 6–7.  But as the head of Roe's office, the Defender had a duty to take appropriate action on her complaints.  *See* 18 U.S.C. § 3006A(g)(2)(A).  And as the undisputed evidence shows, the Defender "knew" of the harassment by his First Assistant and not only "took no effective remedial action," but instead punished Roe by denying her the very promotion that was at issue in the quid pro quo harassment.  *Okoli*, 648 F.3d at 222.  The Defender also "appoint[ed]" the Investigator, Martinez

―――――――――――――――

[8] Incredibly, defendants continue to assert that the First Assistant—"the second highest ranking attorney in the office," ECF No. 95, at 3,—was merely Roe's "co-worker," ECF No. 94, at 2.  But the Court may take judicial notice of the First Assistant job description, which states that the First Assistant "[i]nitiates personnel actions involving all staff members," including "hiring, performance appraisals, mediation and negotiation, disciplinary actions, and employee job termination."  Ex. A, at 2; *see* Fed. R. Evid. 201.  To be a supervisor, the employee need not have the "final say" on employment actions.  *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 278 (4th Cir. 2015).  It is enough to "initiat[e]" employment actions or "ma[ke] recommendations regarding promotions."  *Id.* (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 437 n.8 (2013)).

Decl., ¶ 81; ECF No. 78-3, at 43, and was responsible for taking disciplinary action against the First Assistant, Martinez Decl., ¶¶ 99, 101, 103. The Defender's argument that he "cannot be held individually liable," ECF No. 95, at 7, is wrong, because the other defendants were acting as his agents and he was responsible.

**B.  The Other Individual Capacity Defendants Ratified, Enforced, and Amplified the Discrimination Through the EDR Process.**

The other individual capacity defendants fail to dispute the material facts showing that they ratified, enforced, and amplified the discrimination against Roe through their affirmative acts at each stage of the EDR process. *See* ECF No. 76-1, at 4–5. From the start, defendants punished and intimidated Roe by ensuring that the Fair Employment Opportunity Officer ("FEOO")—the "civil rights office[r] for the federal courts," Complaint ¶ 158—would have no role in her complaint process. Complaint ¶¶ 213–35; Roe Decl., Ex. B, at 26, 29–32; Roe Decl., Ex. C, at 1–2. Defendants also criticized Roe for reporting her complaints to the AO, Complaint ¶¶ 199, 266; Roe Decl., Ex. B, at 6, 30; ensured that she was denied any consideration for a promotion, *id*. ¶¶ 236–51; Roe Decl., Ex. B, at 7, 31–32; Roe Decl., Ex. D; and required her to continue working for the trial unit that was directly supervised by her harasser, Complaint ¶¶ 216, 244; Roe Decl., Ex. B, at 6–7, 31, 52.

Rather than dispute these facts, defendants' evidence confirms that they "stacked" the EDR process in favor of the accused managers. *See* Complaint ¶ 161 (FEOO's comment that "the cards were 'stacked' against Roe and in favor of management"). The General Counsel, like the Judicial Integrity Officer, expressly disclaims *any* obligation for the employing office to "be fair and neutral to both parties." Declaration of Sheryl L. Walter ("Walter Decl."), ¶ 14; *see also* Langley Decl., ¶ 8. Instead, the General Counsel considers an accused unit executive to be an "opposing or differing party to an EDR disputed matter." *Id*.; *but see* ECF No. 78-5, at 86

9

(statement from EDR Bench Book that "only the employing office, not individuals, can be named as respondents"). She even asserts that disqualifying an accused unit executive would be "unfair" because it would require "disqualify[ing] the employing office from being able to respond to, and defend, an employment action filed under EDR." Walter Decl., ¶ 14; *see* ECF No. 93, at 12–14 (discussing conflicts of interests in complaints against unit executives).

Worse yet, the General Counsel states that OGC provided legal advice to Roe's "employer," acting through its accused unit executive, during the EDR process. Walter Decl., ¶ 3. Her actions run contrary to the principle that an organizational lawyer's client is the organization, not an individual unit executive accused of misconduct.[9] *See* ABA Model R. Prof. Conduct 1.13(b) (an organizational lawyer's duty to is protect "the best interest of the organization"); *Upjohn Co. v. United States*, 449 U.S. 383, 390–91 (1981). In fact, what is "unfair" to the employing office, Walter Decl., ¶ 14, is that the General Counsel allowed the Defender's individual interests to co-opt the best interests of the employing office.

Defendants' attempts to distance themselves from the misconduct must be considered in context of these unfair and discriminatory practices. For example, defendants contend that OGC shut down the FEOO's involvement merely to lessen "confusion" about whether Roe's "employer was being informed of its legal rights and potential liabilities." Walter Decl., ¶ 3; Bennett Decl., ¶ 3. Defendants also deny that they *directly* criticized Roe[10] or prohibited her

---

[9] That principle is being applied in this litigation. The Defender in his official capacity is being represented by the Department of Justice, whereas the Defender in his individual capacity is being represented by separate, outside counsel. *See*, *e.g.*, ECF Nos. 94, 95.

[10] The EDR Coordinator vaguely asserts that he never "criticized or critiqued" Roe, Ishida Decl. ¶ 3, but he does not specifically deny saying that it was "not helpful" for Roe to have reported her complaint to the AO because "barriers go up" and "people are on guard." Complaint ¶ 266. Similarly, the Defender does not specifically deny that he berated Roe for

from speaking to the FEOO. Walter Decl., ¶ 4. But defendants' actions were not neutral as they suggest, because the General Counsel treated the interests of the Defender accused of discrimination and the interests of the employing office as being the same. *See id.* ¶ 14. Thus, when OGC took over the "sole" responsibility of advising Roe's employing office, Walter Decl. ¶ 3, it denied any opportunity for a neutral party to advise her office. Moreover, defendants imply that the FEOO acted unilaterally, *e.g.*, Walter Decl., ¶ 3, but the undisputed record shows that she worked with the Chief of Defender Services and obtained approval from the Deputy Director. *See* Roe Decl., Ex. C, at 1 (FEOO "let the Deputy Director know about what [the Chief of Defender Services] is going to do"); Martinez Decl., ¶ 74 (Defender "received a call from the Director of Defender Services," who had spoken with the FEOO).

Defendants also attempt to avoid responsibility by asserting that they were not Roe's "employer" and had no "duty" to her. ECF No. 94, at 21; *but see* ECF No. 78, at 18 n.4 (asserting that the Chief Judge was the "head of the agency"). Contrary to their assertions, what matters under the Fifth Amendment is not an official's job title or whether he was technically an "employer," but rather whether he violated a duty to act on sexual harassment complaints. *See*, *e.g.*, *Bohen v. City of E. Chicago, Ind.*, 799 F.2d 1180, 1189 (7th Cir. 1986) (city officials were liable because they were aware of harassment and tolerated it). The judiciary, and specifically the Fourth Circuit, assumed that duty by covering Roe's employing office under their EDR Plan. Under Chapter IX of the EDR Plan, "*[t]he Chief Judge* and/or unit executive shall ensure that the allegations in the report are appropriately investigated," and "[e]mployees found by *the Chief Judge* and/or unit executive to have engaged in wrongful conduct . . . may be subject to

---

going to "some other party" with her complaints and said that he was being "blamed" and "attacked" for something that was not his fault. Roe Ex. B, at 30.

disciplinary action."[11] (emphases added). And of course, the Defender unequivocally was Roe's employer and had a duty to act on her complaints. 18 U.S.C. § 3006A(g)(2)(A). Rather than help defendants, their argument that they do not have "the authority to engage in employment actions to correct and prevent future harassment in the workplace," ECF No. 94, at 22, confirms that the EDR process is a sham. *See* ECF No. 93, at 15–16. In purporting to "cover" FDOs and misleading Roe into believing she had meaningful remedies, when she did not, defendants are liable for implementing discriminatory policies and practices.

Defendants' argument that they were not Roe's "employer" also contradicts the undisputed record facts showing that they personally involved themselves with overseeing the response to her complaints. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (courts must reject theories that are "blatantly contradicted by the record" for summary judgment purposes). For example, each of the defendants was personally involved with the Defender's discriminatory denial of promotion. The General Counsel confirms that starting in August 2018, the period when the Defender denied the promotion, OGC was "advising" him of the employing office's "legal rights and responsibilities" regarding Roe's complaint. Walter Decl., ¶ 3. Moreover, the Defender's August 28, 2018 reclassification request was explicitly "submitted with the approval of the Court," that is, the Chief Judge and EDR Coordinator. Roe Decl., Ex. D.

Defendants then burdened Roe by placing her on telework for *over six months* with no action on her complaints, while leaving the accused harasser in his duty station and supervisory role. Complaint ¶ 338; *see also* Roe Decl., Ex. B, at 11, 33. Defendants do not dispute that Roe was subjected to demeaning and hostile treatment because of her telework status, such as her

---

[11] Notably, the Chief Judge has not submitted a declaration denying any of Roe's allegations that he failed to ensure her complaints were "appropriately investigated." *Id.* In addition, the Ishida and Martinez declarations are not dated as required under 28 U.S.C. § 1746.

12

coworkers' belittling jokes about meeting her at "Waffle House" and comparing her to "Where's Waldo." *Id.* ¶¶ 349–54; *see also* Roe Decl., Ex. B, at 28, 32–33. They also do not dispute that while her complaint was pending, her Team Leader wore an offensive Justice Kavanaugh beer-guzzler helmet for the office Halloween party.[12] Complaint ¶ 346.

Instead, the Defender asserts that the offensive telework jokes were merely "insensitive," and the Team Leader's costume was "innocuous" because it was related to Justice Kavanaugh's "I like beer" testimony. ECF No. 95, at 7–8. But Justice Kavanaugh's testimony was not about liking beer. Rather, his testimony was about allegations that he engaged in sexual assault while in a drunken state. *See* Christine Hauser, *The Women Who Have Accused Brett Kavanaugh*, N.Y. TIMES (Sept. 26, 2018) (Ex. B). When "placed in the appropriate context," ECF No. 95, at 7, the Team Leader's costume was offensive and, in fact, offended other employees besides Roe, Complaint ¶ 347. Worst of all, the Defender was present at the office party but did nothing to stop his Team Leader's offensive behavior.

Defendants also cannot dispute that during the lengthy period of inaction, they failed to conduct a prompt and appropriate investigation. Under Chapter IX of the EDR Plan, "[t]he Chief Judge and/or unit executive shall ensure that the allegations in the report are appropriately investigated." In addition, the EDR Coordinator, the General Counsel, and John Doe(s) personally involved themselves with overseeing the investigation. For example, on the advice of the General Counsel, the EDR Coordinator "received" the investigation report instead of the Defender. Complaint ¶ 265; Roe Decl., Ex. C., at 6, 29, 51. The EDR Coordinator told Roe that

---

[12] Though the Defender claims that Team Leader Peter Adolf was not Roe's team leader, ECF No. 95, at 7 n.4., the record shows that the Appellate Chief reassigned her to Adolf's trial team in October 2018. Roe Decl., Ex. C, at 16. This reassignment led Roe to contact the FEOO with concerns about further possible retaliation because, at the time, she was cooperating in the investigation of another employee's EDR complaint against Adolf. *See id*.

if the allegations against the Defender were substantiated, then the Chief Judge would "step in" as the Defender's "supervisor." Complaint ¶ 287; *see also* Ishida Decl., ¶ 9 (the Chief Judge was the Defender's "appointing authority"). And the EDR Coordinator and Chief Judge relied on the directives of John Doe(s) in OGC throughout the investigation. *See* Walter Decl., ¶ 17 (OGC provided "advice and guidance" to the Fourth Circuit).

Despite defendants' personal involvement in the investigation, they do not dispute that Roe went for periods of three to six weeks without hearing any updates. Complaint ¶¶ 306, 322, 362, 384. After the initial report was submitted almost two months after the investigation opened, Roe was told that the report was being sent back to be redone. *Id.* ¶ 362. At this point, Roe learned that the Investigator had been asked to make "recommendations," even though, by her own admission, she was not trained or qualified to do so. *Id.* ¶¶ 320, 364. Roe also learned that her retaliation complaints were not investigated, *id.* ¶¶ 318–19, 384; Roe Decl., Ex. C, at 45, because the Defender's misconduct was characterized as mishandling, not retaliation, *id.* ¶ 319.

Following these delays, the situation was made even worse when defendants withheld the report and deliberately refused to act. *Id.* ¶¶ 398, 401; Roe Decl., Ex. C, at 60. Though defendants contend that investigation reports are not typically disclosed, ECF No. 94, at 23–24, that practice does not entitle them to sit on their hands and refuse to act on sexual harassment. *See*, *e.g.*, EDR Plan Ch. IX. Defendants' refusal to take immediate corrective action, after the investigation had already been pending for an unacceptably long period of over four months, was *per se* unreasonable and a "conscious failure" to act on sexual harassment. *Bohen*, 799 F.2d at 1187. Inexplicably, disciplinary action *was* eventually taken, but not until almost *six months* later, after Roe had already resigned. Roe Decl., Ex. C, at 73; Martinez Decl., ¶¶ 99, 101, 103.

14

Rather than dispute these facts, defendants contend they had no duty to follow Title VII principles or take appropriate action on complaints. *See* ECF No. 94, at 21–25. The General Counsel, like the Judicial Integrity Officer, confirms that in practice, a report of wrongful conduct "has no formal procedures or timelines." Walter Decl., ¶ 8; Langley Decl., ¶ 4. Nor is a sexual harassment complaint entitled to any "corrective action" by making a wrongful conduct report. *Id.* Rather, Roe's only option was to participate in *mandatory* alternative dispute resolution, which was only capable of yielding a voluntary resolution. *See* Walter Decl., ¶ 10– 12. Then, she had the burden to prove her claims to a presiding judicial officer following "discovery." *Id.* ¶ 13. During this process, no duty was imposed on the employing office to properly investigate or promptly remedy the harassment. *See* ECF No. 94, at 23 n. 7, 8.

This process flips the judiciary's duty to remedy discrimination on its head. It alleviates the employer of any duty to "prevent and promptly correct any harassing behavior," EEOC Enforcement Guidance: Vicarious Liability for Unlawful Harassment by Supervisors, 1999 WL 33305874, at *1, and instead places the burden on the employee to remedy the harassment by proving her "demands." *See*, *e.g.*, Complaint ¶¶ 322–32 (Roe asking the Chief Judge and EDR Coordinator why "the burden is on her to initiate the solutions to her complaints"). This inadequate process provides "[e]vidence of a pattern or practice of discrimination," and is "strong evidence supporting a plaintiff's claim that she herself has been the victim of discrimination." *Bohen*, 799 F.2d at 1187.

C.     **The Individual Capacity Defendants Cannot Rely on the Sham "Investigation" Report.**

To avoid the evidence of discrimination, the individual capacity defendants selectively quote conclusions reached in an investigation "report" that they did not produce in discovery or provide to the Court. ECF No. 94, at 3–4. Though defendants contend that the report is

15

"confidential" and can only be filed under seal,[13] *id.* at 4 n.2, they freely quote the report's statements about Roe in a denigrating and misleading way, *see*, *e.g.*, *id.* at 3–4. But the selective quotations defendants rely upon are inadmissible hearsay and "conclusory statements not based on specific factual knowledge," which must be disregarded for summary judgment purposes. *Reynolds*, 364 F. Supp. 3d at 58. Even if defendants had produced the report, it would be inadmissible because, among other evidentiary and foundational issues, defendants did not introduce any evidence showing that the report was reliable. *See* Fed. R. Civ. P. 56(c)(4) (facts used on summary judgment must "be admissible in evidence"); *see also Angelone v. Xerox Corp.*, No. 09-6019, 2011 WL 4473534, at *2 (W.D.N.Y. Sept. 26, 2011); *Ambrose-Frazier v. Herzing Inc.*, No. CV 15-1324, 2016 WL 890406, at *5 n. 53 (E.D. La. Mar. 9, 2016).

On the contrary, defendants have not disputed any of the record facts showing that the "investigation" was a farce. For example, defendants assert that Roe's retaliation complaints were investigated, ECF No. 94, at 3–4, but they rely exclusively on conclusory, inadmissible hearsay. *See Reynolds*, 364 F. Supp. 3d at 58. Defendants fail to dispute the factual record showing that the Investigator did not investigate the retaliation claim because she characterized the Defender's misconduct as mishandling, not retaliation. Complaint ¶ 318. Later, the Investigator stated she would "include" Roe's retaliation claims in her report, Roe Decl., Ex. C, at 26, 53, but the investigation was never reopened, *id.* at 53. Worse yet, according to defendants' declarations, the Defender was the person who "appoint[ed]" the Investigator—a

---

[13] Defendants cite no authority to justify sealing the report. On the contrary, "[i]t is well-settled that the public has a First Amendment right of access to documents filed in connection with a motion for summary judgment." *Johnson v. City of Fayetteville*, No. 5:12-CV-456-F, 2014 WL 7151147, at *9 (E.D.N.C. Dec. 11, 2014). Any privacy interest the First Assistant and Defender had in the report cannot overcome the public interest in disclosure because the report concerns their actions that "form the very basis of the lawsuit." *Id.* at *10.

16

fact that defendants never previously disclosed to Roe. Martinez Decl., ¶ 81; ECF No. 78-3, at 43; *see also* Walter Decl., ¶ 14 (General Counsel treated the interests of the Defender and his employing office as being the same). This conflict of interest is further evidence that the Investigator did not appropriately investigate Roe's allegations.

If the report *were* admissible, it would provide further evidence of discrimination. The report's inflammatory, disparaging conclusions were unfairly obtained and facially implausible. *See*, *e.g.*, Complaint ¶ 434 (Judicial Integrity Officer's comments that "she had never seen an investigation report support an employee's sexual harassment allegations" and discussing a complainant in her circuit who was found to be a "liar"). For example, the report states that Roe experienced sexual harassment "in her mind." ECF No. 94, at 4; *cf.* Complaint ¶¶ 202–04 (Defender's statements implying that, at least there was no "physical contact"). This demeaning language contradicts the record evidence turned over to the Investigator, which included the First Assistant's inappropriate communications, Roe's contemporaneous notes documenting the harassment, and documentation of the retaliation against her. Complaint ¶ 301; Roe Decl., Ex. C, at 12–14. It also contradicts the undisputed sequence of events demonstrating that Roe contemporaneously reported the harassment to her coworkers, *e.g.*, Complaint ¶¶ 117, 175–76, to a former judiciary mentor, *id.* ¶ 123, and to the FEOO, *id.* ¶ 158, who involved the Deputy Director and Chief of Defender Services in the efforts to resolve her complaints after they reviewed the First Assistant's inappropriate communications and the Defender's inadequate response, *see* Roe Decl., Ex. C, at 1–2; Martinez Decl., ¶ 74.

Similarly, the report's implication that Roe welcomed the First Assistant's behavior because she did not "decline" his "mentor" lunches, ECF No. 94, at 3, contradicts the record evidence that over time, Roe cut her working hours and eventually stopped coming into work to

avoid being alone with him. *E.g.*, Complaint ¶¶ 115, 157; *see also id.* ¶ 162 (FEOO "encouraged Roe to continue calling in sick as a way to protect herself"). Finally, the report states that the First Assistant's "intention" was not sexual harassment when he sent a quid pro quo email, ECF No. 94, at 3, but what matters is whether his behavior was objectively offensive, not what he "inten[ded]." *See Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1312 (11th Cir. 2001) (explaining that "a victim need not provide evidence of a direct and express sexual demand," because "a supervisor may simply intimate that a subordinate's career prospects will suffer if she does not submit to his advances, with the hope of concealing his harassment if his statements are repeated to a third party").

If anything, defendants' selective quotations of the report further show that Roe's complaints were found valid but misconstrued as poor management or "mishandling." *See* Complaint ¶ 318. For example, the Defender misleadingly asserts that the report found that Roe "exploited . . . upper management to attain her goal of a transfer." ECF No. 78-3, at 16. But defendants' brief adds critical context to that sentence, which states that Roe allegedly "exploited poor judgment and decision-making skills," ECF No. 94, at 4, of "upper management," ECF No. 78-3, at 16. The report's statement is evidence that the report, in fact, found misconduct but trivialized it as "poor judgment and decision-making skills." Of course, the attempts to trivialize by an Investigator who admitted she was unqualified and untrained, Complaint ¶¶ 320, 364, and who was appointed by the Defender she was investigating, Martinez Decl., ¶ 81, are entitled to no deference. Even worse, it appears the report blamed Roe, the victim, for somehow "exploit[ing]" a transfer, rather than blame the perpetrators of misconduct.[14] *See* ECF No. 84, at

---

[14] This inflammatory language exemplifies how the judiciary uses hostile language to delegitimize harassment victims. For example, defendants use the word "demands" to describe legitimate requests for relief under the EDR Plan. *See, e.g.*, Complaint ¶¶ 205, 269, 273, 289,

8–9 (discussing implausibility of allegation that Roe "exploited" her office). Roe had every right to request a transfer under the EDR Plan—especially after the Defender, in his "poor judgment," made clear that he would do nothing to stop the harassment or prevent it from recurring. *See* EDR Plan Ch. X, § 12.

Likewise, the "investigation" report minimizes the denial of promotion because (1) Roe's offer letter stated she would "transition" to an AFD position, but did not "promise" a promotion, and (2) there are no "formal policies" requiring performance reviews in FDOs. ECF No. 94, at 4. But as discussed above, Roe was eligible for a salary increase on her anniversary date, at a minimum, which the Defender denied her with no justification. *Supra*, at 6–8. The report's minimizing of this misconduct is especially egregious because the denial of promotion was relevant to Roe's discrimination claims against both the First Assistant and the Defender.

What *is* undisputed is that "disciplinary action" against *both* the Defender *and* his First Assistant was taken "as a result of [Roe's] report of wrongful conduct." Roe Decl., Ex. C, at 73; Martinez Decl., ¶¶ 99, 101, 103 (Defender's admission that he was "discipline[d]" and that he disciplined the First Assistant). Under the EDR Plan's plain terms, a finding of wrongful conduct—that is, unlawful discrimination—is a prerequisite to taking disciplinary action. EDR Plan Ch. IX ("Employees <u>found</u> by the Chief Judge and/or unit executive <u>to have engaged in wrongful conduct</u>, as defined in this Plan, may be subject to disciplinary action." (emphases added)). The finding of wrongful conduct in this case was informed not only by the

---

293, 333, 337; Walter Decl., ¶ 3; Ishida Decl., ¶ 16. Likewise, Roe was told that any meaningful action on her complaint would be viewed as "micromanaging" or "meddl[ing]." Complaint ¶¶ 415, 438; *see also id.* ¶ 460 (Mediator was "glad" a professional sports team owner kept his sexual harassment scandal "quiet" and "walked away"). Defendants even assert that Roe "extract[ed]" a clerkship from them. ECF No. 43, at 4. Their frequent use of derogatory language is strong evidence that they acted "'because of,' not merely 'in spite of,'" Roe's gender. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 272 (1993).

19

investigation report, but also Roe's post-investigation narrative documenting her claims of harassment, discrimination, and retaliation. *See* Roe Decl., Ex. B, at 11–33. Though the Defender attempts to downplay the significance of the disciplinary action, ECF No. 95, at 8–9, again relying solely on inadmissible hearsay, the undisputed facts speak for themselves. The outcome of the EDR process was a judicial clerkship for Roe with repeated efforts to help her find other judiciary employment, Ishida Decl., ¶ 21, and disciplinary action for the Defender and his First Assistant, Roe Decl., Ex. C, at 73; Ishida Decl., ¶¶ 8–9.

## D. The Individual Capacity Defendants are Liable for Roe's Resignation.

Finally, the individual capacity defendants fail to dispute the facts showing that Roe resigned because she received no relief for unlawful discrimination. Indeed, their deliberate delay in taking disciplinary action until *almost a full year* after Roe raised her complaints, several months after she resigned, establishes that their response was "clearly unreasonable" and "deliberately indifferent." *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 701–02 (4th Cir. 2018). An employer "must respond" to a report of sexual harassment. *See id.* at 690 (quoting parenthetical). "[T]he mere act of listening" to a complaint "is not a remedy in and of itself," *id.*, nor is a "half-hearted investigation or remedial action" sufficient, *id.* (quoting parenthetical).

Though helping Roe obtain a clerkship was better than nothing, defendants' actions confirm that they swept the misconduct under the rug. It was clearly unreasonable for defendants to make Roe feel not "welcome" and "forced out" of her employing office, Complaint ¶ 381, rather than take meaningful action on her complaints. *See Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004). And defendants' continued attempts to blame Roe for not "exhausting" the EDR process, ECF No. 94, at 22, confirm their deliberate indifference. Defendants ignore the undisputed evidence of discriminatory "co-worker conduct, unofficial

20

supervisory conduct, [and] official company acts" that made it objectively reasonable for Roe to resign.  *Suders*, 542 U.S. at 148.

## II.    The Individual Capacity Defendants Are Not Entitled To Absolute or Qualified Immunity.

The individual capacity defendants are not entitled to absolute or qualified immunity. Primarily, they attempt to recast Roe's claims as allegations of "vicarious" or "collective" liability.  ECF No. 94, at 7–8.  But Roe has "identif[ied] the specific policies over which particular defendants possessed responsibility and that led to the alleged constitutional violation."  *Pahls v. Thomas*, 718 F.3d 1210, 1226 (10th Cir. 2013).  Specifically, the Defender was the head of Roe's employing office and responsible for ensuring a working environment free of discrimination.  18 U.S.C. § 3006A(g)(2)(A).  The Chief Judge was responsible for ensuring "that the allegations in the report [were] appropriately investigated."  EDR Plan Ch. IX.  The EDR Coordinator had a duty "[t]o provide information" to Roe "regarding the rights and protections afforded under th[e] Plan."  EDR Plan Ch. X, § 6(A).  And the General Counsel "advised" the Defender on his "legal rights and potential liabilities" and the Fourth Circuit regarding Roe's complaint.  Walter Decl., ¶ 3.  As discussed above, defendants violated their "duties," and the undisputed facts "establish personal involvement by [each] Defendant in the alleged constitutional violation."  *Pahls*, 718 F.3d at 1226 (quoting parenthetical).

Next, defendants argue that they were not warned with sufficient "specificity" that failing to act on Roe's sexual harassment complaint would violate clearly established law.  ECF No. 94, at 8–9.  However, it has long been clearly established that government officials who "conscious[ly] fail[ed]" to act on, "acquiesced" in, or "d[id] nothing" in response to sexual harassment are not entitled to qualified immunity.  *Bohen*, 799 F.2d at 1185; *Andrews*, 895 F.2d at 1478; *Cross v. State of Ala.*, 49 F.3d 1490, 1503 (11th Cir. 1995); *Beardsley*, 30 F.3d at 530

(citing *Bohen* with approval and noting that "sexual harassment has long been recognized to be a type of gender discrimination"); *Johnson v. Martin*, 195 F.3d 1208, 1219 (10th Cir. 1999); *Bator v. Hawaii*, 39 F.3d 1021, 1029 (9th Cir. 1994). Even an official who is not "entirely unresponsive" will be liable for not "engag[ing] in efforts that were reasonably calculated to end the harassment." *Feminist Majority Found.*, 911 F.3d at 689. The test is whether the official's conduct was "clearly unreasonable" or "deliberately indifferent," *id.* at 701–02, which describes defendants' conduct here.

Finally, the Chief Judge is not entitled to absolute immunity. He even concedes that the investigation was not part of an adjudication, *see* ECF No. 94, at 6 n.3, which confirms he may be held liable for his failure to ensure that Roe's complaints were "appropriately investigated." EDR Plan Ch. IX. In addition, he is wrong to assert that his refusal to disqualify the Defender[15] was an adjudicative action protected by absolute immunity. ECF No. 94, at 6. As the Supreme Court has held, absolute immunity does not apply to adjudications that lack "procedural safeguards."[16] *Cleavinger v. Saxner*, 474 U.S. 193, 202, 204 (1985). The EDR process lacked procedural safeguards, and was fundamentally unfair, precisely because the Chief Judge did not disqualify the Defender. *See* EEOC Mgmt. Directive 110, 1-7 (2015) (an accused "high-level official" with "influence" over the EEO process should recuse himself).

---

[15] Defendants' assertion that Roe "withdrew" her complaint before her disqualification request was decided, ECF No. 94, at 23, is contrary to the undisputed record. *See* Ishida Decl., ¶ 18 ("The Chief Judge denied Plaintiff's request to disqualify, which was orally communicated to Plaintiff on January 16, 2019.").

[16] Indeed, if Roe had filed a formal complaint and requested the investigation report in "discovery," *see* ECF No. 94, at 24, then the unfairness of the investigation likely would have tainted the final hearing. *See supra*, at 15–20 (discussing flawed investigation report).

22

## III.     The Individual Capacity Defendants' Arguments For Dismissal Are Meritless.

Finally, the individual capacity defendants' attempts to dispose of this case on procedural grounds fail.[17]   First, defendants' continued reliance on *Wilcox v. Lyons* is troubling.  ECF No. 94, at 19–20 (citing 970 F.3d 452 (4th Cir. 2020)); ECF No. 95, at 23–24 (same).  As Roe has explained, *see* ECF No. 71, *Wilcox* issued after the Fourth Circuit, its Judicial Council, and its Chief Judge were made defendants to this proceeding and, even more definitively, after this case was transferred out of circuit.[18]   *Cf.* 28 U.S.C. § 455(b)(2) (requiring disqualification of judge with an "interest that could be substantially affected by the outcome of the proceeding").

But even so, *Wilcox* does not help defendants because this case does not involve a "pure retaliation" claim.  970 F.3d at 455.  As *Wilcox* explained, "adverse treatment" of a female employee is an equal protection violation even when it "continue[s] after, and partially in response to, the female employee's report of prior discrimination and harassment."  970 F.3d at 461 (applying *Beardsley*, 30 F.3d at 530).  Here, the undisputed evidence shows that "the discriminatory conduct continued" after Roe made her complaints, she was treated "adversely" based on her gender, and defendants' conduct "maintained and reinforced the hostile work environment."  *Beardsley*, 30 F.3d at 530.  For example, the Defender, with the other defendants'

---

[17] In a recent filing, defendants alleged that Roe is "attempt[ing] to win this case on a procedural basis, instead of on the merits," ECF No. 96, at 5, because she pointed out that defendants had not engaged in discovery and their summary judgment oppositions were untimely.  *See* ECF No. 90 (Motion to Strike).  But as the above analysis shows, *see also* ECF No. 93, Roe is entitled to prevail on the merits of her constitutional claims.  Rather, it is defendants who spend most of their summary judgment opposition briefs arguing for dismissal based on legal technicalities.  *See* ECF No. 94, at 5–20; *see also* ECF No. 95, at 9–25.

[18] Moreover, under Fourth Circuit procedures, the Chief Judge assigns opinion authors, and opinion drafts are circulated to the entire Court.  *See* Loc. R. 36(a).

23

backing, denied Roe the very promotion that was at issue in the quid pro quo sexual harassment. *Supra*, at 6–8, 12. Moreover, defendants "conscious[ly] fail[ed]" to act on the harassment in violation of clearly established law. *Bohen*, 799 F.2d at 1185; *see also Feminist Majority Found.*, 911 F.3d at 703 (official's failure to stop harassment and downplaying harassment are sufficient for intent element of equal protection claim).

Second, defendants do not even attempt to address Roe's allegations under Sections 1985(3) and 1986. *See* ECF No. 94, at 20. Instead, they contend that Roe's claims are foreclosed by *Hall v. Clinton*, 235 F.3d 202 (4th Cir. 2002). But as Roe has explained, *Hall* did not involve equal protection claims brought by excepted service employees, but rather other types of claims barred by the Civil Service Reform Act. ECF No. 76-1, at 22 n.8. With respect to equal protection claims, the Supreme Court has held that Congress did not intend to "foreclose alternative remedies" to excepted service employees, but instead left "undisturbed whatever remedies" the employees "possess." *Davis*, 442 U.S. at 247; *see also* Lindemann & Grossman, Employment Discrimination Law Ch. 32.III.E (6th ed. 2020).

Finally, defendants' attempts to avoid Roe's *Bivens* claims fail,[19] *see* ECF No. 94, at 11–19, because this case does not present a new *Bivens* context. Rather this case is controlled by *Davis*, which held that the Fifth Amendment provides a "cause of action" for sex discrimination that "may be redressed by a damages remedy." 442 U.S. at 249. As the Court held, "all individuals, whatever their position in government, are subject to federal law." *Id.* at 246.

The "special factors" raised by defendants were also rejected in *Davis*. For example, defendants' argument that the EDR Plan is a "special factor," ignores that the Plan did not

---

[19] Roe has previously rebutted defendants' *Bivens* arguments in detail, ECF No. 48, at 13–22, and she will further address their arguments in a forthcoming surreply.

provide meaningful remedies and was not "constitutionally adequate." *Bush v. Lucas*, 462 U.S. 367, 378 n.14 (1983). In fact, defendants deny that the EDR Plan conferred *any* "authority to engage in employment actions to correct and prevent future harassment in the workplace." ECF No. 94, at 22. Thus, the EDR Plan is indistinguishable from the inadequate congressional policies that did not preclude judicial relief in *Davis*. *See* ECF No. 48, at 21–22.

Likewise, defendants contend that providing remedies for discrimination would be "dictat[ing] internal Judiciary personnel practices" and "unconstitutional." ECF No. 94, at 17. But that line of reasoning was rejected in *Davis*, which held that any "special concerns" about an official's duties are "coextensive" with existing immunity doctrines. *See* 442 U.S. at 246. In fact, defendants' position was vigorously advocated by the *Davis* dissenters, who argued that the majority's decision "presents very grave questions of separation of powers." *Id.* at 249 (Burger, J., dissenting); *see also id.* at 251 (Powell, J., dissenting) (criticizing majority's "intrusion upon the legitimate powers of Members of Congress"). Defendants' outdated notion of a coequal branch of government's "independence" was rejected by the Supreme Court more than 40 years ago and cannot prevail today.

## CONCLUSION

For these reasons, defendants have not raised any genuine dispute of material fact, and Roe respectfully requests that the Court enter an order granting partial summary judgment on the issue of liability against the individual-capacity defendants under Fed. R. Civ. P. 56.

This the 2nd day of November, 2020.

Respectfully Submitted,

*/s/ Cooper Strickland*
Cooper Strickland
N.C. Bar No. 43242
P.O. Box 92

25

Lynn, NC 28750
Tel. (828) 817-3703
cooper.strickland@gmail.com

Counsel for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on the 2nd day of November, 2020, I will electronically file the foregoing

with the Clerk of Court using the CM/ECF system, which will then send a notification of such

filing (NEF) to the following:

      Gill P. Beck at Gill.Beck@usdoj.gov

      Joshua M. Kolsky at Joshua.kolsky@usdoj.gov

      Shannon Sumerall Spainhour at mss@dhwlegal.com


                                     */s/ Cooper Strickland*
                                       Cooper Strickland
                                       N.C. Bar No. 43242
                                       P.O. Box 92
                                       Lynn, NC 28750
                                       Tel. (828) 817-3703
                                       cooper.strickland@gmail.com