```
                    UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF NORTH CAROLINA (Asheville)
_____
                                  )
JANE ROE,                         )
                                  )
                  Plaintiff,      )
                                  )
            v.                    )    CIVIL ACTION
                                  )    NO. 1:20-cv-00066-WGY
UNITED STATES OF AMERICA;         )
JUDICIAL CONFERENCE OF THE        )
UNITED STATES;                    )
UNITED STATES COURT OF APPEALS    )
FOR THE FOURTH CIRCUIT;           )
JUDICIAL COUNCIL OF THE           )
FOURTH CIRCUIT;                   )
THE HON. ROSLYNN R. MAUSKOPF,     )
Chair of the Judicial Conference  )
Committee on Judicial Resources;  )
ADMINISTRATIVE OFFICE OF THE      )
UNITED STATES COURTS;             )
JAMES C. DUFF,                    )
Director of the Administrative    )
Office of the United States Courts;)
SHERYL L. WALTER,                 )
in her individual capacity;       )
JOHN DOE(S),                      )
c/o Office of the General Counsel )
for the Administrative Office of  )
the United States Courts,         )
THE HON. ROGER L. GREGORY,        )
Chief Judge of the Fourth Circuit;)
JAMES N. ISHIDA,                  )
Circuit Executive of the          )
Fourth Circuit and as Secretary   )
of the Judicial Council of the    )
Fourth Circuit;                   )
ANTHONY MARTINEZ,                 )
Federal Public Defender for the   )
Western District of North Carolina,)
                                  )
                  Defendants.     )
                                  )
_____
```

YOUNG, D.J.[1]                                    December 30, 2020

**MEMORANDUM & ORDER**

## I.  INTRODUCTION

In 2018, Jane Roe ("Roe") filed two employment dispute claims alleging sexual harassment, discrimination, and retaliation under the Consolidated Equal Employment Opportunity and Employment Dispute Resolution Plan of the United States Court of Appeals for the Fourth Circuit ("EDR Plan").  Compl. ¶¶ 274-278, ECF No. 1.  Roe's present action alleges four counts against individuals and entities who participated in the resolution of her claims under the EDR Plan, violation of the Fifth Amendment Due Process Clause (Count I), violation of the Fifth Amendment Equal Protection Clause (Count II), conspiracy to violate civil rights under 42 U.S.C. § 1985 (Count III), and neglect to prevent conspiracy to violate civil rights under 42 U.S.C. § 1986 (Count IV).  Id. ¶¶ 494-505.

Roe sues Sheryl L. Walter, General Counsel for the Administrative Office of the United States Courts, the Honorable Roger L. Gregory, Chief Judge of the Fourth Circuit, James N. Ishida, Circuit Executive of the Fourth Circuit and Secretary of the Judicial Council of the Fourth Circuit, and Anthony

──────────────

[1] Of the District of Massachusetts, sitting by designation.

2

Martinez, Federal Public Defender for the Western District of North Carolina, in their individual capacities ("Individual Capacity Defendants").  Id. ¶¶ 23-35.  Roe also sues the following individuals and entities in their official capacities: the United States of America, the Judicial Conference of the United States, the Honorable Roslynn R. Mauskopf, Chair of the Judicial Conference Committee on Judicial Resources, the Administrative Office of the United States Courts, James C. Duff, Director of the Administrative Office of the United States Courts, John Doe(s) c/o Office of the General Counsel for the Administrative Office of the United States Courts, the United States Court of Appeals for the Fourth Circuit, the Judicial Council of the Fourth Circuit, and Anthony Martinez, Federal Public Defender for the Western District of North Carolina ("Official Capacity Defendants").[2]  Id.  Roe does not sue her alleged harasser in this action.  See id.

The Individual Capacity Defendants and Official Capacity Defendants move to dismiss all counts.  This Court GRANTS the Official Capacity Defendants' motion to dismiss, ECF No. 42, because sovereign immunity shields them from suit.  This Court GRANTS the Individual Capacity Defendants' motions to dismiss,

---

[2] Other than the United States, it is not at all clear that these entities are even capable of being sued as named.  The Court expresses no opinion thereon in view of the outcome.

ECF Nos. 36, 38, 40, 44, because Roe fails to allege cognizable claims against them.

## A.    Factual Background

Roe alleges that while working as a research and writing attorney for a federal public defender's office, the First Assistant to the Public Defender made her uncomfortable with unwelcomed interest in her personal and professional life, his insistence that he mentor Roe and drive her home, his leaving the office at the same time as her, and his alleged retaliation against her when she did not entertain his interest. Compl. ¶¶ 63-109. This proved particularly precarious because Roe sought trial experience, and the First Assistant managed the entire trial unit. Id. ¶ 52.

On July 2, 2018, Roe contacted the Public Defender to tell him that she would set boundaries with the First Assistant. Id. ¶ 124. The Public Defender asked Roe whether she was experiencing "'sexual harassment'" and Roe told the Public Defender that she was "not using those words yet." Id. ¶ 125. She emphasized that she was notifying the Public Defender of the First Assistant's behavior and that "she would not have involved [the Public Defender] if it was not absolutely necessary." Id.

Later that day, Roe met with the First Assistant to set boundaries. Id. ¶¶ 127, 129. This conversation did not go well; the First Assistant ended up "berating" Roe. Id. ¶¶ 127-

133. Roe notified the Public Defender that the First Assistant "might say something about her," and she asked the Public Defender to withhold judgment until he spoke to Roe again. Id. ¶ 133. Three days later, on July 5, 2018, the Public Defender called the First Assistant and Roe into his office to discuss what had happened. Id. ¶ 135. Roe stated that she was uncomfortable and would not participate without first speaking to the Public Defender alone. Id. ¶ 136. Roe then met with the Public Defender alone, whose comments, methods, and decisions she found dismissive and injurious. Id. ¶¶ 136-156. One such decision was to assign Roe to a different team that nevertheless reported directly to the First Assistant. Id. ¶ 150.

On July 23, 2018, Roe took leave and sought guidance from an Administrative Office Fair Employment Opportunity Officer, who told Roe about the EDR Plan. Id. ¶¶ 157-162; Def. Chief Judge's Mem. Supp. Mot. Dismiss, Ex. A ("EDR Plan"), ECF No. 41. The Officer opined that the "cards were 'stacked' against Roe and in favor of management" and that it might "be less risky for her personally if she looked for another job." Id. ¶ 161.

The next day, the Public Defender called Roe, admitted that he should not have assigned her to a team under the First Assistant's supervision, and said that he had made the decision when he was "'tired.'" Id. ¶ 163. On July 26, 2018, the Public Defender changed the assignments so that Roe would receive

assignments from another research and writing attorney, but Roe was unhappy because she would not receive her own cases and would have to report to someone else. Id. ¶¶ 165-166. Roe also alleges that this is the first time the Public Defender distributed the employee manual, which included an updated organizational chart requiring research and writing attorneys to report directly to the First Assistant. Id. ¶ 167.

When Roe spoke with the Appellate Chief about a new appellate attorney position on July 27, 2018, the Appellate Chief discouraged her from applying. Id. ¶ 170. Roe was disappointed because the Appellate Chief previously had expressed interest in helping Roe gain appellate litigation experience. Id.

Eventually, the Public Defender moved Roe's office workspace away from the First Defendant, but still she did not feel safe. Id. ¶ 174. Roe alleges that people in the office were "'keep[ing] tabs'" on her for the First Assistant. Id. ¶ 179. Roe further asserts that the Administrative Office Fair Employment Opportunity Officer shared the First Assistant's allegedly harassing text messages and emails with the Chief of Defender Services, who contacted the Deputy Director, who in turn authorized the Chief of Defender Services to contact the Public Defender directly. Id. ¶¶ 184-188.

On August 9, 2018, the Public Defender told Roe that he
believed that he had already taken care of the situation, that
Roe had explicitly declined to use the words "sexual harassment"
when he asked her whether she was being sexually harassed, and
that he was frustrated with Roe for going to another party in
the judiciary with her complaints. Id. ¶¶ 195-199. The Public
Defender and Roe then had an exchange about the differences
between her allegations, sexual assault, and sexual harassment,
and this offended Roe because it seemed to trivialize her
allegations. Id. ¶¶ 201-204. The Public Defender asked Roe
what she wanted, and she said that she wanted "to do her job
without being harassed or threatened" and that she wanted to be
an assistant public defender working exclusively on appeals.
Id. ¶ 205. The Public Defender agreed that this made sense
because the First Assistant supervised the trial unit. Id. The
Public Defender did not agree, however, to transfer Roe to a new
duty station. Id. ¶ 209.

Via email on August 10, 2018, Roe contacted the Public
Defender "to confirm the terms of their agreement in writing"
and "requested to work remotely pending his transfer decision,
citing the First Assistant's sexually harassing and threatening
behaviors towards her." Id. ¶ 211.

The following week, the Public Defender emailed Roe with
the Circuit Executive and a human resources ("HR") specialist

copied on the email.  Id. ¶ 213.  The email informed Roe that she was to be reclassified as an assistant federal public defender and stated that the reassignment was "for purposes of case weight management."  Id. ¶ 215.  The email stated that Roe would continue to work in the trial unit but would report to the Appellate Chief instead of the First Assistant.  Id. ¶ 216.  The email further noted that the Public Defender had reported her sexual harassment allegation to the Circuit Executive, who had informed the Chief Judge of the Fourth Circuit.  Id. ¶ 217.  The Public Defender concluded the email by telling Roe that he and the HR specialist would advise her of her rights under the EDR Plan.  Id. ¶ 218.

Roe alleges that the Public Defender reported the harassment in order to funnel it through the EDR process, thereby preventing her from seeking guidance about her rights from the Administrative Office Fair Employment Opportunity Officer, to insulate himself from liability, and to conspire with the Office of the General Counsel and the Circuit Executive to "agree[] on actions and procedures for handling Roe's complaint . . . ."  Id. ¶¶ 221-227.

From this point forward, Roe had two recurring grievances: she wanted the Public Defender to be excluded from the EDR process because he initially had mishandled the situation, and

she felt that the EDR process was both stacked against her and mishandled at every turn.

Roe alleges that in August 2018 she was "denied a promotion" because she was not invited to interview for the appellate attorney position to which she had applied and that she was not permitted to request an increase in salary or job responsibility because of her prior reclassification. Id. ¶ 250. Roe contends that this constitutes retaliation because the reclassification also resulted in a pay cut of "nearly 15 percent." Id. ¶ 246.

Around the same time, the First Assistant copied Roe on an email to a client. Id. ¶ 253. Roe found this email harassing because the language in the email included "coded references" to language Roe had used in a law review article. Id. Roe also alleges that the First Assistant continued to stalk her by waiting for her in the county jail lobby when she went to meet clients. Id. ¶¶ 254-256.

On September 5, 2018, Roe spoke to the Circuit Executive, who explained the process under the EDR Plan. Id. ¶¶ 257-259. Roe was upset that the process was investigating only the sexual harassment allegations that she made in her August 10, 2018 email and not the Public Defender's mishandling of the situation as well. Id. ¶¶ 260-261. Roe later felt demoralized when the Circuit Executive asked Roe what she "really 'wanted,'" as Roe

felt that such questions were meant to "sweep her complaints under the rug."  Id. ¶¶ 262-273.

On September 10, 2018, Roe filed a request for counseling, a report of wrongful conduct in which she named the First Assistant and the Public Defender as violators of the EDR Plan, and a request for the following relief: "An environment free of harassment, retaliation, and discrimination, the opportunity for merit-based advancement, and any other appropriate relief."  Id. ¶¶ 274-275.  At that time, Roe also asserted that the Public Defender should not participate in the EDR process because of his prior mishandling of the situation.  Id. ¶¶ 277-278.

Subsequent conversations with the Circuit Executive further disheartened Roe.  On September 18, 2018, the Circuit Executive told Roe that the Chief Judge had been informed of the complaint, that he was "'taken aback'" by Roe's request to disqualify the Public Defender, and that the Chief Judge would have to "'step in'" if the investigation substantiated the allegations against the Public Defender.  Id. ¶¶ 284-287.  When the Circuit Executive asked Roe what she wanted, Roe was again insulted by the question, and she continued to lose faith in the EDR process.  Id. ¶¶ 288-298.

On September 28, 2018, the Circuit Executive confirmed in an email that the HR specialist conducting the investigation would proceed with one unified investigation of the First

10

Assistant's conduct and the Public Defender's subsequent actions.  Id. ¶ 299.  Roe met with the HR specialist and fully participated in the investigation.  Id. ¶¶ 300-301.  Later interactions with the HR specialist, however, did not go as well.  The HR specialist insulted Roe when he asked whether she had been "friendly" with the First Assistant and whether the First Assistant's actions had been sexually motivated.  Id. ¶¶ 309, 311.  Roe soon concluded that the HR specialist was insensitive to her concerns and that he had not interviewed the list of people Roe had asked him to interview.  Id. ¶¶ 316-317.  The HR specialist also told Roe that he was investigating the Public Defender's mishandling of the situation but not his alleged retaliation.  Id. ¶ 318.

In November 2018, Roe emailed the Circuit Executive about the status of her investigation because her counseling period was about to expire and the investigation was not yet complete.  Id. ¶¶ 322-323.  Roe copied the Chief Judge on the email.  Id. ¶ 322.  The Circuit Executive confirmed that the investigation was a "'joint investigation'" of her "report of wrongful conduct and her request for counseling" and that the counseling period would expire on November 29, 2018 even if the investigation was not complete.  Id. ¶ 325.  The Circuit Executive also asked Roe to "'articulate precisely what it is'" that she was "'looking for'" so that he could relay her thoughts to the Public

Defender.  Id. ¶ 331.  He also stated, "Reiterating that you want a safe workplace free of harassment isn't helpful because [the Public Defender] already believes that he's done and is doing all he can to provide such a workplace for you."  Id. ¶ 332.  The following week, the HR specialist again asked Roe for a "specific list of demands" that would bring the EDR process to a close.  Id. ¶ 333.

Throughout the investigatory process, Roe's workplace allegedly became more hostile.  Specifically, she cites one incident on November 16, 2018 in which her team mocked and belittled her after she did not attend a team meeting.  Id. ¶¶ 348-354.

On November 21, 2018, Roe sent the Circuit Executive an email stating that she wanted to be transferred out of the Public Defender's Office and asking for help in securing a new position.  Id. ¶ 355.  On November 25, 2018, the Circuit Executive asked Roe for a copy of her resume and told her that he would "'make inquiries.'"  Id. ¶ 357.

Roe spoke to the Circuit Executive approximately one week later, who informed her that the investigation was finished but that he was sending it back to the HR specialist so that the HR specialist could add recommendations.  Id. ¶¶ 262-264.  The Circuit Executive explained that the report would be given to the Public Defender unless the investigation substantiated the

claims against the Public Defender.  Id. ¶ 366.  During this conversation, Roe asked about the exclusion of her retaliation claim from the investigation.  Id. ¶ 367.  The Circuit Executive stated that "he could 'not remember exactly when' Roe had raised an allegation of retaliation, and so he was not sure whether retaliation was part of the investigation."  Id. ¶ 368.  Roe reminded the Circuit Executive that she had filed a written claim of retaliation against the Public Defender.  Id. ¶ 369.

In a telephone call on November 28, 2018, the Circuit Executive told Roe that the HR specialist was including information about her retaliation claim in the investigation report.  Id. ¶ 385.  Roe then requested a thirty-day extension of her counseling period from the Chief Judge.  Id. ¶ 387.  On November 30, 2018, the Chief Judge granted an extension until January 16, 2019.  Id. ¶ 388.

On December 14, 2018, the Circuit Executive asked Roe to consider mediation during her counseling period.  Id. ¶ 389.  On January 11, 2019, the Circuit Executive told Roe that he had received the investigation report.  Id. ¶ 393.  Five days later, the Circuit Executive informed Roe that her counseling period had expired despite her second request for an extension and that the Chief Judge intended to deny her request to disqualify the Public Defender.  Id. ¶¶ 394-395.  Roe disputes whether this decision was made before or after the investigation had

13

finished.  Id. ¶ 396.  The Circuit Executive also told Roe that she would not receive a copy of the investigation report because the Office of the General Counsel advised against distributing such an "internal document."  Id. ¶ 398.

On January 22, 2019, Roe submitted a second transfer request.  Id. ¶ 405.  Roe filed a request for mediation under the EDR Plan on January 30, 2019, id. ¶ 411, and Roe met with the appointed mediator the following week, id. ¶ 413.  Several days later, the mediator said that the Public Defender would allow Roe to transfer to another duty station but that she would have to share an office with an intern.  Id. ¶ 418.  Roe did not find this satisfactory, and she said that a duty station transfer would not accomplish anything if the underlying harassment and retaliation went unchecked.  Id. ¶¶ 419-425.

On February 14, 2019, Roe met with the newly selected Judicial Integrity Officer who encouraged Roe to use the EDR process and to be clear about her desired remedies.  Id. ¶¶ 427, 437.  Roe details a conversation with the Judicial Integrity Officer during which the Officer questioned Roe's understanding of the EDR Plan, explained its deficiencies, confirmed the norm of withholding investigation reports from the individuals involved, and noted how, in that Officer's experience, she had never seen a colorable sexual harassment claim.  Id. ¶¶ 427-444.

Roe believed that "proceeding to a final hearing would be futile," id. ¶ 447, and she was unwilling to be cross-examined by the Public Defender and the First Assistant, a permissible option under the EDR Plan, id. ¶ 448. Roe later submitted more detailed factual allegations to the Circuit Executive, which "contained highly sensitive details, including information that could potentially expose other employees to retaliation . . . ." Id. ¶ 449. Roe anticipated that these detailed allegations would be kept confidential and requested that they be redacted. Id. ¶ 450. The Office of the General Counsel assured the Circuit Executive that the additional allegations were "'not subject to redaction'" because the Public Defender was prohibited from retaliating against employees for participating in an EDR process. Id. ¶ 451. The Circuit Executive then forwarded the detailed allegations to the Chief Judge, the mediator, and the Public Defender. Id. Roe later submitted a renewed request to disqualify the Public Defender because Roe had never received a written denial of her initial request. Id. ¶ 453.

On February 16, 2019, Roe met with the mediator, who agreed to help Roe secure a Fourth Circuit clerkship because the transfer order to another district seemed unlikely. Id. ¶¶ 454-458. On March 8, 2019, Roe interviewed and received an on-the-spot offer with a Fourth Circuit judge. Id. ¶ 459. In a

subsequent meeting with the mediator, Roe told him that "the clerkship was a 'very nicely packaged constructive discharge,'" and the two had a falling out.  Id. ¶¶ 462-463.  Roe formally resigned from the Public Defender's Office on March 15, 2019. Id. ¶ 464.

On June 4, 2019, the Circuit Executive emailed Roe with a copy to the Chief Judge.  Id. ¶ 483.  The email informed Roe that "'disciplinary action was taken last week as a result of [her] report of wrongful conduct,'" but that the Circuit Executive could not "'reveal the nature of the action because it is a disciplinary matter.'"  Id. ¶ 484.

## B.  Procedural History

Roe filed this action in the United States District Court for the Western District of North Carolina on March 3, 2020. See generally Compl.  The case was assigned to this Court on April 17, 2020.  Designation and Assignment Order, ECF No. 28. The Individual Capacity Defendants and Official Capacity Defendants filed motions to dismiss all counts with prejudice on June 5, 2020.  Def. General Counsel Mot. Dismiss, ECF No. 36; Def. General Counsel's Mem. Supp. Mot. Dismiss, ECF No. 37; Def. Circuit Executive Mot. Dismiss, ECF No. 38; Def. Circuit Executive's Mem. Supp. Mot. Dismiss, ECF No. 39; Def. Chief Judge Mot. Dismiss, ECF No. 40; Def. Chief Judge's Mem. Supp. Mot. Dismiss, ECF No. 41; Official Capacity Mot. Dismiss, ECF

No. 42; Mem. Supp. Official Capacity Mot. Dismiss, ECF No. 43;
Def. Federal Defender Mot. Dismiss, ECF No. 44; Def. Federal
Defender's Mem. Supp. Mot. Dismiss, ECF No. 45.

The parties have fully briefed these motions.  Pl.'s Opp'n
Individual Capacity Defs.' Mot. Dismiss, ECF No. 48; Pl.'s Opp'n
Official Capacity Defs.' Mot. Dismiss ("Pl.'s Opp'n Official
Capacity"), ECF No. 49; Def. Federal Defender's Reply Supp. Mot.
Dismiss, ECF No. 52; Individual Capacity Reply Supp. Mot.
Dismiss, ECF No. 53; Official Capacity Reply Supp. Mot. Dismiss,
ECF No. 54; Pl.'s Surreply Opp'n Mots. Dismiss ("Pl.'s
Surreply"), ECF No. 100; Pl.'s Notice Suppl. Authority, ECF No.
101.  This Court held a virtual motion hearing on November 23,
2020.  Minute Order (Nov. 23, 2020).

## II.  SOVEREIGN IMMUNITY

Absent a waiver, sovereign immunity shields from suit not
only the United States but also its "agencies," FDIC v. Meyer,
510 U.S. 471, 475 (1994), and "officials" acting in their
official capacities, Kentucky v. Graham, 473 U.S. 159, 165-66
(1985).  When the United States consents to be sued, "the terms
of its consent to be sued in any court define that court's
jurisdiction to entertain the suit."  United States v. Sherwood,
312 U.S. 584, 586 (1941).

A waiver of sovereign immunity "must be unequivocally
expressed in statutory text . . . and will not be implied."

_Lane_ v. _Pena_, 518 U.S. 187, 192 (1996); _Library of Cong._ v.

_Shaw_, 478 U.S. 310, 319 (1986) ("[C]ongressional silence does

not permit us to read the provision as the requisite waiver of

the Government's immunity . . . ."). Courts construe

ambiguities "strictly in favor of the sovereign." _Shaw_, 478

U.S. at 318. Because "[s]overeign immunity is jurisdictional in

nature," _Meyer_, 510 U.S. at 475, "a court finding that a party

is entitled to sovereign immunity must dismiss the action for

lack of subject-matter jurisdiction," _Cunningham_ v. _General

Dynamics Info. Tech._, 888 F.3d 640, 649 (4th Cir. 2018); _see_

Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time

that it lacks subject-matter jurisdiction, the court must

dismiss the action.").

Roe argues that three statutes waive the Official Capacity

Defendants' sovereign immunity.[3]  Pl.'s Opp'n Official Capacity

16-20. She points first to 28 U.S.C. § 1331. _Id._ 16-17.

Section 1331, however, "is not a general waiver of sovereign

immunity." _Randall_ v. _United States_, 95 F.3d 339, 345 (4th Cir.

1996) (quotations omitted) (quoting _Coggeshall Dev. Corp._ v.

_____

   [3] At the motion hearing, counsel directed this Court's
attention to _Drone_ v. _Duff_, Civil Case No. 3:17-cv-332, 2017 WL
6383607 (E.D. Va. Dec. 14, 2017). As applicable here, _Drone_
explains that "_Bivens_ did not waive the federal government's
sovereign immunity . . . ." _Id._ at *3 n.9 (citing _Randall_ v.
_United States_, 95 F.3d 339, 345 (4th Cir. 1996)).

Diamond, 884 F.2d 1, 4 (1st Cir. 1989)).  That statute "merely establishes a subject matter that is within the competence of federal courts to entertain."  Id.  "It does not," as Roe suggests, "expand the power of those courts in terms of the parties over whom it may exercise jurisdiction."  Diamond, 884 F.2d at 4.  Accordingly, section 1331 does not waive the Official Capacity Defendants' sovereign immunity.

Second, Roe asserts that the Back Pay Act waives the Official Capacity Defendants' sovereign immunity.  Pl.'s Opp'n Official Capacity 17.  But the Back Pay Act's waiver of sovereign immunity has a statutory prerequisite: only employees who are "found by appropriate authority under applicable law . . . to have been affected by an unjustified or unwarranted personnel action which has resulted in the withdrawal or reduction of all or part of the pay, allowances, or differentials of the employee" may recover back pay under the Back Pay Act.  5 U.S.C. § 5596(b)(1).  Appropriate authorities are entities which "have the authority to review the agency's determination," including the agency itself, the Merit Systems Protection Board, and the United States Court of Appeals for the Federal Circuit.  United States v. Fausto, 484 U.S. 439, 454 (1988).  Here no appropriate authority has found that Roe is entitled to back pay.  Thus the Back Pay Act does not waive the Official Capacity Defendants' sovereign immunity.  This renders

it unnecessary to address whether Congress intended to include entities such as the Official Capacity Defendants within the definition of "agency" under the Back Pay Act, see 5 U.S.C. § 5596(a), and this Court expresses no view on that question.

Finally, Roe avers that section 702 of the Administrative Procedure Act ("APA") waives the Official Capacity Defendants' sovereign immunity. Pl.'s Opp'n Official Capacity 17. Although section 702 waives sovereign immunity with respect to agencies, 5 U.S.C. § 702, "the courts of the United States" are not agencies, id. § 701(b)(1)(B).

Whether Congress intended to include entities such as the Official Capacity Defendants within the APA "courts of the United States" exemption is a matter of first impression in this circuit. In this regard, both parties direct this Court's attention to the opinion of the United States Court of Appeals for the District of Columbia Circuit in Washington Legal Foundation v. United States Sentencing Commission, though they disagree over what that court meant when it said:

> Over the years, virtually every case interpreting the APA exemption for "the courts of the United States" has held that the exemption applies to the entire judicial branch -- at least to entities within the judicial branch that perform functions that would otherwise be performed by courts.

17 F.3d 1446, 1449 (D.C. Cir. 1994). Roe argues that the second clause narrows the first, Pl.'s Opp'n Official Capacity 17; the

Official Capacity Defendants maintain that the first clause means what it says and says what it means, Mem. Supp. Official Capacity Mot. Dismiss 6. The Official Capacity Defendants further liken the Federal Public Defender's Office to the Judicial Conference of the United States and the Probation Service, both of which the D.C. Circuit has deemed to fall within "the courts of the United States" exemption.[4] Official Capacity Reply 3-4 (citing Washington Legal, 17 F.3d at 1449).

Although the question is unresolved in this circuit, in an unpublished opinion the Ninth Circuit held that "the APA does not apply to the Federal Public Defender's Office, which is a part of the federal judiciary." Demello v. Ney, 185 F.3d 866, *1 (9th Cir. 1999) (unpublished table decision). This Court is persuaded by the opinion of the Ninth Circuit. The District Courts may make recommendations concerning nominees for the position of Federal Public Defender, and the Courts of Appeals appoint, compensate, and remove Federal Public Defenders. 18 U.S.C. § 3006A(g)(2)(A). Against that backdrop, this Court rules that the Official Capacity Defendants are part of the

_____

[4] In Drone, a case which counsel raised at the motion hearing, the court similarly indicated that employees of the Probation Service and the United States District Court for the Eastern District of Virginia were federal judicial employees exempted from the APA's waiver of sovereign immunity. See Civil Case No. 3:17-cv-332, 2017 WL 6383607, at *3 & n.9.

federal judiciary for purposes of the APA, and that the APA
therefore does not waive the Official Capacity Defendants'
sovereign immunity.[5]  See Demello, 185 F.3d at *1.

Accordingly, the doctrine of sovereign immunity shields the
Official Capacity Defendants from suit.  This Court pauses at
this juncture to note that because it lacks subject-matter
jurisdiction over the Official Capacity Defendants, see
Cunningham, 888 F.3d at 649, and because Roe fails to allege a
cognizable constitutional claim against them, as discussed
below, Roe is left with no prospect of equitable relief against
the Official Capacity Defendants, see Bivens v. Six Unknown
Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 400
(Harlan, J., concurring) ("However broad a federal court's
discretion concerning equitable remedies, it is absolutely
clear . . . that in a nondiversity suit a federal court's power
to grant even equitable relief depends on the presence of a
substantive right derived from federal law.").  The Official
Capacity Defendants' Motion to Dismiss, ECF No. 42, is GRANTED.

_____

[5] This Court notes that even if the APA were to waive the
Official Capacity Defendants' sovereign immunity, Roe could not
recover damages from them because section 702 permits judicial
review of "agency action" only as to relief "other than money
damages."  5 U.S.C. § 702; Demello, 185 F.3d at *1 n.4.

## III. FAILURE TO STATE A CLAIM

Seeking to recover against the Individual Capacity Defendants for violation of her constitutional rights, Roe analogizes this case to Davis v. Passman, a Bivens action in which the Supreme Court allowed the plaintiff to recover for unconstitutional sex discrimination. See Pl.'s Surreply 15-23 (citing Davis v. Passman, 442 U.S. 228 (1979)). Unlike the plaintiff in Davis, however, Roe fails to allege cognizable constitutional claims. This Court therefore need not further distinguish this case from Davis, and it need not limn the many additional factors that caution against recognizing a new Bivens action. See Ziglar v. Abbasi, 137 S. Ct. 1843, 1857-58 (2017).

### A.    Pleading Standard

To survive a motion to dismiss, a complaint must include factual allegations sufficient "to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007); see Fed. R. Civ. P. 12(b)(6). Although courts must "accept as true all well-pleaded allegations" and "view the complaint in a light most favorable to the plaintiff," Mylan Laboratories, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993), courts "need not accept the [plaintiff's] legal conclusions drawn from the facts," nor need they "accept as true unwarranted inferences, unreasonable conclusions, or arguments,"

Eastern Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship, 213 F.3d 175, 180 (4th Cir. 2000).

**B.    Roe's Constitutional Claims Lack Merit**

As a threshold matter, "a plaintiff seeking a damages remedy under the Constitution must first demonstrate that his constitutional rights have been violated."  Davis, 442 U.S. at 248.  Because Roe fails to state a cognizable constitutional claim, this Court's analysis begins and ends with this threshold defect.

**1.    Count I – Fifth Amendment Procedural Due Process**

A plaintiff pursuing a Fifth Amendment Procedural Due Process claim must allege that she (1) lost "something that fits into one of the three protected categories: life, liberty, or property" and (2) did not "receive the minimum measure of procedural protection warranted under the circumstances." Mallette v. Arlington Cty. Employees' Supplemental Ret. Sys. II, 91 F.3d 630, 634 (4th Cir. 1996).  Where, as here, the plaintiff fails to plead the first element, this Court need not reach the second.  See American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 59 (1999) ("The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty . . . .'  Only after finding the deprivation of a protected interest do we look to see if the [government's] procedures comport with due process." (citations

omitted)).  Because Roe fails to allege that the Individual
Capacity Defendants deprived her of a constitutionally protected
interest, this Court GRANTS the Individual Capacity Defendants'
motions to dismiss Count I.[6]

### a)    Purported Liberty Interest

Although the Supreme Court has not defined "'liberty' with
any great precision, that term is not confined to mere freedom
from bodily restraint."  Bolling v. Sharpe, 347 U.S. 497, 499,
(1954).  "Liberty" also denotes the right "to contract, to
engage in any of the common occupations of life, to acquire
useful knowledge, to marry, establish a home and bring up
children, to worship God according to the dictates of his own
conscience, and . . . to enjoy those privileges long
recognized . . . as essential to the orderly pursuit of
happiness by free men."  Board of Regents of State Colls. v.
Roth, 408 U.S. 564, 572 (1972) (quotation omitted) (quoting
Meyer v. Nebraska, 262 U.S. 390, 399 (1923)).

In determining whether the interest that a plaintiff
alleges is a protected liberty interest under the Fifth
Amendment, courts also consider the Supreme Court's Fourteenth
Amendment jurisprudence.  See Paul v. Davis, 424 U.S. 693, 702

---

[6] This Court has reviewed each of the cases on which Roe
predicates her purported liberty and property interests, and it
dismisses out of hand those not analyzed here.

n.3 (1976) ("Surely the Fourteenth Amendment imposes no more stringent requirements upon state officials than does the Fifth upon their federal counterparts. We thus consider this Court's decisions interpreting either Clause as relevant to our examination of respondent's claim.").

Here, Roe purports to have a liberty interest "in being free from unlawful discrimination," which she alternatively labels "a right to be free of sex discrimination in her workplace." Pl.'s Opp'n Official Capacity 22-23.[7] In advancing this purported intertest, Roe primarily relies on Bolling v. Sharpe, 347 U.S. 497 (1954) and Beardsley v. Webb, 30 F.3d 524 (4th Cir. 1994). Id. Bolling held that "[s]egregation in public education is not reasonably related to any proper governmental objective, and thus it imposes on Negro children of the District of Columbia a burden that constitutes an arbitrary deprivation of their liberty in violation of the Due Process Clause." 347 U.S. at 500. Roe fails to explain how Bolling evinces such a sweeping protected "liberty interest in being free from unlawful discrimination." Pl.'s Opp'n Official Capacity 23. Moreover, Roe makes no attempt to fashion this

---

[7] Although this Court has granted the Official Capacity Defendants' motion to dismiss, this Court continues to cite Roe's opposition to their motion to dismiss because that opposition best develops Roe's arguments on the merits of Count I.

purported interest as any type of protected interest identified in Roth, see 408 U.S. at 572, nor does she find reprieve in Fourteenth Amendment jurisprudence, see Paul, 424 U.S. at 702. Roe's bald reliance on Bolling, without more, does not suffice to plead the existence of a protected liberty interest. Beardsley, the other case on which Roe relies, did not involve a due process claim at all. See generally 30 F.3d at 524. This Court therefore holds that Roe fails to allege that the Individual Capacity Defendants deprived her of a protected liberty interest.

### b) Purported Property Interest

Under the Fifth Amendment Due Process Clause, protected property interests "are not created by the Constitution" but rather are "created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Roth, 408 U.S. at 577. Thus, the "hallmark" of protected property interests is "individual entitlement grounded in state law . . . ." Logan v. Zimmerman Brush Co., 455 U.S. 422, 430 (1982); see Roth, 408 U.S. at 577 ("To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a

unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it.").

Here, Roe's only purported property interest is "in the [EDR] Plan's terms as a condition of her employment," though she separately alludes to other procedural safeguards, such as her "right to prompt and effective remedial action on her complaints" and "right to meaningful review and remedies." Pl.'s Opp'n Official Capacity 22; see Pl.'s Notice Suppl. Authority 1-2 (citing rights afforded under EDR Plan).  In support of this asserted interest, Roe primarily relies on the Supreme Court's decision in Vitarelli v. Seaton, 359 U.S. 535 (1959), and on two out-of-circuit cases, Johnson v. Mishler, 526 F.2d 364 (2d Cir. 1975) (per curiam) and Paige v. Harris, 584 F.2d 178 (7th Cir. 1978).  Pl.'s Opp'n Official Capacity 23.

In Vitarelli v. Seaton, the Supreme Court held that the Department of the Interior violated its own regulations when it suspended without pay an educator who allegedly sympathized with members of the Communist Party.  359 U.S. at 539.  For present purposes, Vitarelli falls flat.  Since the Department of Interior violated its own regulations in Vitarelli, the Supreme Court declined to reach the constitutional due process issue. Id. at 540.  Accordingly, Roe's reliance on Vitarelli to support her assertion of a constitutionally protected property right is misplaced.

Similarly, in Johnson v. Mishler, the Second Circuit refused to reach the constitutional due process issue because the plaintiff had been denied the "built-in due process procedures" of the Regulations of the Probation Department. 526 F.2d at 366. Insofar as Roe relies on Johnson to identify a constitutionally protected "property interest in the [EDR] Plan's terms as a condition of her employment," Pl.'s Opp'n Official Capacity 22, the case simply does not support her attempt.

Finally, in Paige v. Harris, the Seventh Circuit held that because the plaintiff "possessed a property interest in his continued employment with HUD," there were "sufficient grounds to require a hearing on his discharge." 584 F.2d at 181. But here, Roe explicitly does not assert that she had a "constitutionally protected interest in continued employment . . . ." Pl.'s Opp'n Official Capacity 22 n.22. Paige, then, is inapposite.

To clinch the matter, as the Supreme Court explained,

Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement . . . . The State may choose to require procedures for reasons other than protection against deprivation of substantive rights, of course, but in making that choice the State does not create an independent substantive right.

Olim v. Wakinekona, 461 U.S. 238, 250 (1983) (citations and quotations omitted). "The categories of substance and procedure

are distinct.  Were the rule otherwise, the Clause would be reduced to a mere tautology.  'Property' cannot be defined by the procedures provided for its deprivation any more than can life or liberty."  Cleveland Bd. of Educ. v. Loudermill 470 U.S. 532, 541 (1985).  Relying on these Supreme Court precedents, the Fourth Circuit deemed "meritless" the argument that a former government employee had a constitutionally protected property interest in his employer's grievance procedures.  Garraghty v. Commonwealth of Va., Dep't of Corr., 52 F.3d 1274, 1284 (4th Cir. 1995); accord United of Omaha Life Ins. Co. v. Solomon, 960 F.2d 31, 34 (6th Cir. 1992); Curtis Ambulance of Fla., Inc. v. Board of Cty. Comm'rs of Shawnee Cty., 811 F.2d 1371, 1377 (10th Cir. 1987); Clemente v. United States, 766 F.2d 1358, 1364 (9th Cir. 1985).

Here, because Roe fashions her purported property interest as an "interest in the [EDR] Plan's terms as a condition of her employment," and more specifically as rights to "prompt and effective remedial action on her complaints" and "meaningful review and remedies," Pl.'s Opp'n Official Capacity 22-23, this Court concludes that Roe fails to allege that the Individual Capacity Defendants deprived her of a protected property interest.

## 2. Count II – Fifth Amendment Equal Protection

The Supreme Court has held that the "Due Process Clause of the Fifth Amendment forbids the Federal Government to deny equal protection of the laws." Davis, 442 U.S. at 234. The Supreme Court has recognized these equal protection claims in two distinct situations: (1) when a classification is made on the basis of sex and (2) when the state action results in a disparate impact that can be traced to a discriminatory purpose. See generally, e.g., United States v. Virginia, 518 U.S. 515 (1996); Personnel Adm'r of Massachusetts v. Feeney, 442 U.S. 256 (1979) ("'Discriminatory purpose,' however, implies more than intent as volition or intent as awareness of consequences . . . . It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."); Reed v. Reed, 404 U.S. 71 (1971). To survive heightened scrutiny in such situations, the classification "must serve important governmental objectives and must be substantially related to achievement of those objectives." Davis, 442 U.S. at 234-35 (quotation omitted).

Roe does not plead or argue such a case. Rather, Roe attempts to graft precedent interpreting Title VII onto the Fifth Amendment. Pl.'s Opp'n Individual Capacity Defs.' Mot. Dismiss 2 ("In evaluating these claims, courts apply the well-

established standards developed in similar litigation under Title VII of the Civil Rights Act of 1964.").  But see Yatvin v. Madison Metro. Sch. Dist., 840 F.2d 412, 418 (7th Cir. 1988) ("Although sex discrimination by state agencies has been held to violate the equal protection clause, retaliating against a person for filing charges of sex discrimination is not the same as discriminating against a person on grounds of sex -- unless, perhaps, those are the only complainants against whom the employer retaliates, and even in that case the retaliation would only be evidence of discrimination, not discrimination per se." (citations omitted)).  Consequently, this case presents a matter of first impression in this circuit: viz, whether a Title VII theory of discrimination on the basis of sex states a claim for discrimination on the basis of sex under the Fifth Amendment Equal Protection Clause.  This Court holds that it does not.

The Fourth Circuit has held that courts may apply Title VII standards to section 1983 claims.  Beardsley, 30 F.3d at 529; see Feminist Majority Found. v. Hurley, 911 F.3d 674, 703 (4th Cir. 2018) (applying Title VII standards to section 1983 claim).  See also Bohen v. City of East Chicago, 799 F.2d 1180, 1187 (7th Cir. 1986) (applying Title VII standards to section 1983 claim but noting the distinction between "the ultimate inquiry" in an equal protection case, "whether the sexual harassment constitutes intentional discrimination," and the inquiry "under

Title VII as to whether or not the sexual harassment altered the conditions of the victim's employment").  Extrapolating from Beardsley and other section 1983 cases, Roe asserts that courts must also apply Title VII standards to free-standing Fifth Amendment claims.  See Pl.'s Opp'n Official Capacity 24-25; Pl.'s Surreply 15.

Contrary to Roe's assertion, the Fourth Circuit has **not** held that courts must apply Title VII standards to free-standing Fifth Amendment claims.  To the contrary, in Wilcox v. Lyons,[8] the Fourth Circuit rejected a similar attempt to graft Title VII standards onto a free-standing Fourteenth Amendment equal protection claim.  970 F.3d 452, 460 (4th Cir. 2020).  In Wilcox, the court considered whether a former public employee's

_____

[8] During oral argument, plaintiff's counsel suggested Wilcox is questionable authority as it came down after the filing of the present complaint and its author was a judge whom Roe had designated as a source of evidence in this case.
    This offhand ad hominem comment is unworthy of a skilled attorney and this Court is deaf as an adder to such suggestion, utterly disregarding it.  The Court treats it as a slip of the tongue, uttered before his brain got into gear.
    There is simply no place in our courts for groundless speculation, fantastical conspiracy theories, or faux facts.  Our Cannons of Ethics and Fed. R. Civ. P. 11 forbid it.
    Hon. Richard Arnold of the Eighth Circuit, perhaps the finest judge of the twentieth century, said to a group of lawyers and judges, "There has to be a safe place.  And we have to be it."  In the present context, that means advocacy consists of straight talk, based on facts.  After all, "facts are like flint" as the judge for whom I clerked now over half a century ago (Hon. Raymond S. Wilkins, Chief Justice, Supreme Judicial Court of Massachusetts) was fond of saying.  Remember it.

allegation that a state employer fired her in retaliation for

her complaint of sexual harassment and discrimination was

sufficient to state a claim for sexual discrimination under the

Fourteenth Amendment Equal Protection Clause.  970 F.3d at 454-

55.  There, as here, the plaintiff did not allege that she was

fired because of her sex, but rather that she suffered adverse

consequences based on her response to the harassing behavior.

Id. at 460-61.  The Fourth Circuit held:

> The "right to be free from retaliation for protesting
> sexual harassment and sex discrimination" upon which Wilcox
> solely relies "is a right created by Title VII, not the
> equal protection clause."  Gray v. Lacke, 885 F.2d 399, 414
> (7th Cir. 1989); see also Boyd v. Ill. State Police, 384
> F.3d 888, 898 (7th Cir. 2004) ("[T]he right to be free from
> retaliation may be vindicated under the First Amendment or
> Title VII, but not the equal protection clause.").  To be
> clear: these existing legal avenues for challenging public
> employer retaliation remain open to employees; we simply
> decline to create a new one under the auspices of the
> Fourteenth Amendment [Equal Protection Clause].

Id. at 461.  Here, Roe's complaint is devoid of any allegation

that women are treated differently than men under the EDR Plan,

and Roe does not allege that the actions taken against her were

on the basis of her sex.  Instead, Roe theorizes that the

Individual Capacity Defendants discriminated against her on the

basis of sex when they mishandled her sexual harassment

complaints, ultimately leading to retaliation and constructive

discharge.  Compl. ¶ 498.  To condone such a theory would be to

graft Title VII standards onto the Fifth Amendment, when in

_Wilcox_ the Fourth Circuit rejected such a theory with respect to the Fourteenth Amendment.  Viewed in this light, Roe's theory is incompatible with _Wilcox_, which explained that "[r]etaliation for reporting alleged sex discrimination imposes negative consequences on an employee because of the employee's report, not because of the employee's sex."  _See_ 970 F.3d at 460.

Supreme Court precedent supports the conclusion that only theories of traditional class-based discrimination are cognizable under the Fifth Amendment Equal Protection Clause. In _Davis_, a congressman discharged the plaintiff based on the plaintiff's sex.  442 U.S. at 230.  Although the plaintiff "was 'able, energetic and a very hard worker . . . it was essential that the understudy to [the congressman's] Administrative Assistant be a man.'"  _Id._  The Supreme Court held that the plaintiff could bring a _Bivens_ action for the congressman's violation of the Fifth Amendment Equal Protection Clause.  _Id._ at 234.  Since the congressman's classification was so clearly on the basis of gender, the _Davis_ Court applied the traditional class-based equal protection framework.  _See id._ at 234-25. Although Roe reads _Davis_ as allowing constitutional claims to proceed under Title VII standards, such circumstances were not before the Supreme Court in _Davis_, and _Wilcox_ suggests that such an extension of _Davis_ would be improper.  _Cf. id.; Wilcox_, 970 F.3d at 460-61.

This Court rejects Roe's attempt to extend Davis,
particularly in light of the Fourth Circuit's decision in
Wilcox. This Court therefore GRANTS the Individual Capacity
Defendants' motions to dismiss Count II.[9]

### C. Roe's Statutory Claims Lack Merit

To survive a motion to dismiss, a plaintiff pursuing a
claim for conspiracy to deny equal protection of the laws under
42 U.S.C. § 1985(3) must "plead specific facts in a
nonconclusory fashion" as to:

> (1) a conspiracy of two or more persons, (2) who are
> motivated by a specific class-based, invidiously
> discriminatory animus to (3) deprive the plaintiff of the
> equal enjoyment of rights secured by the law to all, (4)
> and which results in injury to the plaintiff as (5) a
> consequence of an overt act committed by the defendants in
> connection with the conspiracy.

---

[9] This Court dismisses Roe's action with prejudice -- rather
than without prejudice and leave to amend -- because such leave
would be futile. If Roe properly has pled any claim, it is a
First Amendment retaliation claim. See Wilcox, 970 F.3d at 461
(quoting Boyd, 384 F.3d at 898 ("[T]he right to be free from
retaliation may be vindicated under the First Amendment or Title
VII, but not the equal protection clause.")). The Supreme
Court, however, has never recognized a Bivens action for First
Amendment claims, see Reichle v. Howards, 566 U.S. 658, 663
(2012); Bush v. Lucas, 462 U.S. 367, 368 (1983) (declining to
recognize a Bivens action for a First Amendment speech claim
involving federal employment), and courts within the Fourth
Circuit have not held otherwise, see Kirtman v. Helbig, Civil
Action No.: 4:16-cv-2839-AMQ, 2018 WL 3611344, at *3-4 (D.S.C.
July 27, 2018) (declining to recognize a Bivens action for First
Amendment claim).

Simmons v. Poe, 47 F.3d 1370, 1376 (4th Cir. 1995); Gooden v. Howard Cty., 954 F.2d 960, 969-70 (4th Cir. 1992) (en banc). Roe fails to plead the second element because her theory of liability is not "class-based, invidiously discriminatory animus," but rather the more sweeping Title VII standards regarding sexual harassment as discrimination on the basis of sex. See United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott, 463 U.S. 825, 829 (1983) ("[N]ot only must [the conspiracy] have as its purpose the deprivation of 'equal protection of the laws, or of equal privileges and immunities under the laws,' but also must be motivated by 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.'"). This Court therefore GRANTS the Individual Capacity Defendants' motions to dismiss Count III.

The dismissal of Count III requires the dismissal of Count IV because section 1986 applies only to actors who could have prevented the section 1985 injury but failed to do so. See 42 U.S.C. § 1986; Adickes v. S. H. Kress & Co., 398 U.S. 144, 222 n.28 (1970) (Brennan, J., concurring). This Court therefore GRANTS the Individual Capacity Defendants' motions to dismiss Count IV.

## IV.    CONCLUSION

This Court GRANTS the Official Capacity Defendants' motion to dismiss, ECF No. 42, and GRANTS the Individual Capacity Defendants' motions to dismiss, ECF Nos. 36, 38, 40, 44. Judgment will enter for the defendants.

**SO ORDERED.**

/s/ William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE