## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

### ASHEVILLE DIVISION

| | | |
|---|---|---|
| JANE ROE, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Civil No. 1:20-cv-00066-WGY |
| | ) | |
| UNITED STATES OF AMERICA, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |
| _____ | ) | |

## PLAINTIFF'S MEMORANDUM OF LAW
## IN SUPPORT OF HER MOTION TO RECONSIDER

Plaintiff Jane Roe ("Roe"), by and through her attorney, respectfully requests that this

Court reconsider its decision of December 30, 2020, dismissing her claims. As described below,

the Court's ruling is based on clear legal and factual errors, which support a different outcome

when corrected. *See* Fed. R. Civ. P. 59(e). For these reasons, Roe respectfully respects that this

motion be granted and that the Court (1) vacate its order and judgment of December 30, 2020,

and (2) enter an order denying defendants' motions to dismiss.

### STANDARD FOR RELIEF

A motion to reconsider under Rule 59(e) should be granted to correct a clear error,

whether of law or of fact, and to prevent a manifest injustice. *See EEOC v. Lockheed Martin

Corp.*, 116 F.3d 110, 112 (4th Cir. 1997). This includes the power to vacate or set aside a

judgment, so long as the moving party demonstrates that the judgment rests on a substantive

error or mistake. *See Ortiz v. Gaston Cnty. Dyeing Mach. Co*., 277 F.3d 594, 597 n.1 (1st Cir.

2002)). So long as the Rule 59(e) motion is timely filed, the courts have considerable discretion.

*Lockheed Martin Corp.*, 116 F.3d at 112. By timely seeking correction of substantive errors, a party may be able to have the district court correct its mistake in the first instance, and avoid the burden, time, and expense of an unnecessary appeal. *See, e.g.*, *Howard v. United States*, 533 F.3d 472, 475 (6th Cir. 2008); *Russell v. Delco Remy Div. of Gen. Motors Corp.*, 51 F.3d 746, 749 (7th Cir. 1995).

The Fourth Circuit's decision in *Lockheed* illustrates the application of these standards. In that case, the district court reconsidered a decision where its prior order "was based on an erroneous understanding of the relevance" of certain record facts to an EEOC investigation. 116 F.3d at 112. Under the correct view of the facts, the EEOC was clearly entitled to enforcement of an administrative subpoena to investigate an employer's alleged discriminatory practices. *Id.* The Fourth Circuit affirmed, explaining that "the district court would likely have abused its discretion if it had *failed* to grant the Rule 59(e) motion." *Id.* (emphasis in original); *see Norman v. Arkansas*, 79 F.3d 748, 750 (8th Cir. 1996) (finding abuse of discretion where court refused to reconsider clear factual error); *see also Anyanwutaku v. Moore*, 151 F.3d 1053, 1058–59 (D.C. Cir. 1998) (finding abuse of discretion where court refused to reconsider erroneous dismissal based on failure to state a claim). Moreover, because the district court's erroneous order undermined the ability of a public agency to fulfill its mission, allowing the order to stand would have resulted in "manifest injustice." *Lockheed*, 116 F.3d at 112.

Here, the Court's analysis is based on clear legal and factual errors, and its decision should be reconsidered. But more fundamentally, the judiciary's approximately 30,000 employees, like Roe, have a strong constitutional interest in their right to be free from unlawful workplace sexual harassment, discrimination, and retaliation, and a failure to recognize this interest would be manifestly unjust.

2

**ARGUMENT**

**I.    The Court's Decision Is Based On Clear Factual And Legal Errors.**

**A.    Sovereign Immunity Does Not Bar Roe's Equitable Claims.**

The Court clearly erred in holding that sovereign immunity bars Roe's constitutional

claims, because it did not consider her request for equitable relief against the official capacity

defendants.[1] *See Flynn v. Dick Corp.*, 565 F. Supp. 2d 141, 145 (D.D.C. 2008) (reconsideration

is appropriate where court "misapprehended a party's position").

In her briefing, Roe argued that she is entitled to broad equitable relief, which is not

barred by sovereign immunity.  For example, at a minimum, she is presumptively entitled to

reinstatement and other incidental injunctive relief as a remedy for her unconstitutional

constructive discharge.  *See*, *e.g.*, ECF No. 49, at 16–17 (arguing that reinstatement and back pay

are not barred by sovereign immunity); ECF No. 55, at 8–9 ("Roe has broadly requested any

'relief as the Court deems just and proper,' Complaint p 85, which could include reinstatement

and other appropriate equitable remedies if the Court so orders based on a full evidentiary record,

considering the factual circumstances at the time of judgment."); ECF No. 100, at 10 (same);

Mot. to Dismiss Hr'g Tr. 17, Nov. 23, 2020, ECF No. 105 ("Nov. Tr.") (arguing that Roe is

entitled to "reinstatement" at a "minimum").

It is well-established that reinstatement is an equitable remedy that is not barred by

sovereign immunity.  *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988) (explaining that "an

order providing for the reinstatement of an employee with backpay" is "an equitable action for

---

[1] The Court incorrectly identified the official capacity defendants.  *Roe v. United States*,
No. 1:20-CV-00066-WGY, 2020 WL 7866317, at *1 (W.D.N.C. Dec. 30, 2020).  Most
importantly, the Court omitted two official capacity defendants, the Chief Judge and EDR
Coordinator, who would likely be at least partly responsible for implementing injunctive relief.

3

specific relief," not "an action at law for damages"); *Dotson v. Griesa*, 398 F.3d 156, 177–79 (2005) (recognizing that sovereign immunity does not bar judiciary employee's claim for reinstatement). In a recent decision, the Fourth Circuit underscored that "[e]very circuit, including this one," has held that claims for reinstatement are not barred by sovereign immunity.[2] *Biggs v. N. Carolina Dep't of Pub. Safety*, 953 F.3d 236, 243 (4th Cir. 2020). Because the Court did not consider this argument, it clearly erred by dismissing Roe's claims on sovereign immunity grounds.[3]

Moreover, Roe is entitled to specific relief requiring judiciary officials to comply with their legal duties under the EDR Plan and the Constitution to provide appropriate remedies for discrimination. *See*, *e.g.*, ECF No. 49, at 16–17 (citing *Bowen*, 487 U.S. at 893). It is well-established that "an equitable action for specific relief" to enforce a legal mandate is not an action for money damages, even if it involves the payment of money.[4] *Id.* Here, the premise of Roe's complaint is that she was forced to resign because of the failures of the EDR process, which deprived her of any meaningful review of or remedies for unlawful discrimination. *See* Complaint ¶¶ 1–10; *see Roe*, 2020 WL 7866317, at *12 (recognizing "constructive discharge"

---

[2] Although *Biggs* involved claims against a state official, "courts frequently draw parallels between principles of federal sovereign immunity and the Eleventh Amendment." *Dotson*, 398 F.3d at 179 n.18.

[3] Despite Roe's repeated efforts to initiate settlement discussions, *see generally* Mot. Hr'g 20, May 11, 2020, ECF No. 104 ("May Tr.") (Court's statement that it "devoutly" hopes that this case settles), defendants have not even attempted to initiate a resolution involving reinstatement within the judiciary. Their stance is especially unfortunate given Roe's exceptional qualifications and impeccable history of public service in the judiciary.

[4] *Bowen*'s holding was based on, and an application of, the *Larson* exception to sovereign immunity for constitutional violations. *See Bowen*, 487 U.S. at 893 (applying *Larson*).

4

allegation).[5]  Therefore, as Roe has consistently argued, on judicial review she is entitled to an order enforcing the remedies for discrimination that defendants unlawfully deprived her of under the EDR Plan.  *See*, *e.g.*, ECF No. 49, at 19 (arguing that Court has authority to order remedies available under EDR plans "in fashioning injunctions against officials who violate the judiciary's antidiscrimination policies"); ECF No. 60-1, at 22–24 (same); ECF No. 100, at 10 (arguing that relief on judicial review of EDR proceeding is "an equitable action for specific relief").

As the complaint alleges, and defendants do not dispute on summary judgment,[6] Roe was told that any meaningful action on her complaints would be viewed as "micromanag[ing]" or "meddl[ing]" in her office.  Complaint ¶¶ 415, 438.  The Judicial Integrity Officer also told Roe that an EDR presiding officer would have no authority to order remedies against a federal defender office in a final hearing, an issue which she described as "jurisdictional," and on which she followed up in an email.  *Id.* ¶ 439; *see also* Declaration of Jane Roe ("Roe Decl."), ECF No. 60-4, Ex C., at 69 (Judicial Integrity Officer's statement that she would like "to better understand if FPDs are adequately protected by EDR remedies").  It was objectively reasonable for Roe to rely on representations made about the EDR process by the Judicial Integrity Officer, who describes herself as "a primary resource for the entire judiciary on the Model Employment Dispute Resolution Plan, its coverage, and processes," Declaration of Jill Langley ("Langley

---

[5] At the motion-to-dismiss hearing, the Court suggested that Roe "left [her FDO] position to take another position within the judiciary as a result of the mediation process," Nov. Tr. 17, 24, but that assertion contradicts the complaint's allegations that she was constructively discharged.  *See*, *e.g.*, ECF No. 48, at 9, 12–13; ECF No. 49, at 20–22; ECF No. 100, at 11–12.

[6] At the Court's invitation, *see* Mot. Hr'g 6–7, May 11, 2020 ("May Tr."), Roe filed an affidavit verifying the complaint's allegations as her sworn testimony, *see* ECF No. 56, 61.  Roe also filed motions for summary judgment with further documentary evidence of her claims.  ECF Nos. 60, 76; *see* Minute Entry Order Dated May 13, 2020 (setting summary judgment deadline).

Decl."), ECF No. 78-5, ¶ 4, which would lead a "reasonable" person in her position to resign, *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004).

Contrary to their earlier representations to Roe during the EDR process, defendants now contend that EDR forums provide "broad equitable relief," including reinstatement and back pay. ECF No. 43, at 11; *see also* Nov. Tr. 28 ("[T]here is an EDR process where experienced Article III judges, albeit acting in their administrative capacities, who can order discovery, order *all the sorts* of relief that plaintiff is seeking here." (emphasis added)). Defendants have also never asserted that reinstatement *or* front pay in lieu of reinstatement are not allowed under the EDR Plan.[7] *See id.* (Roe has not "identified *any relief* that the judicial officers could not have given her through the EDR process" (emphasis added)); *cf. Confronting Sexual Harassment and Other Workplace Misconduct in the Federal Judiciary, Questions for the Record from Chairman Grassley*, *Sen. Comm. on the Judiciary*, 115th Cong. 16–17 (June 20, 2018) (Defendant Director Duff's testimony that sexual harassment EDR complainants have received "monetary relief"). At a minimum, an Article III court with authority to enjoin constitutional violations may order judiciary officers to provide the remedies they promised would be available under the EDR Plan. *See Bowen*, 487 U.S. at 893.

Finally, for purposes of a motion to dismiss, it is enough to conclude that *some* form of equitable relief may be made available. *See* ECF No. 100, at 10 (arguing that defendants'

---

[7] The Plan instructs EDR presiding officers to apply Title VII precedent and related laws. EDR Plan Ch. X, § 10(B)(2)(e) (2013). Under Title VII precedent, it is well-established that back pay and front pay in lieu of reinstatement are "equitable" remedies that are "not in the nature of a claim of damages," because they are "intended to restore the recipients to their rightful economic status." *Robinson v. Lorillard Corp.*, 444 F.2d 791, 802 (4th Cir. 1971). As the Supreme Court has held, there is "no logical difference between front pay awards made when there eventually is reinstatement and those made when there is not." *Pollard*, 532 U.S. at 853. Moreover, allowing front pay only when reinstatement is available would mean that "the most egregious offenders could be subject to the least sanctions." *Id.*

6

assertion of sovereign immunity is "intertwined" with factual disputes that cannot be resolved on dismissal). Ultimately, determining which equitable remedies are appropriate is a factual issue to be resolved through an equitable hearing, not at the dismissal stage. *See*, *e.g.*, *Davis v. Billington*, 51 F. Supp. 3d 97, 114 (D.D.C. 2014) (refusing to dismiss federal employee's equitable claims because the court had "not yet foreclosed the possibility of reinstatement" and there was a possibility that the circumstances "might change when a final judgment is ultimately issued in this case"). For example, Roe has argued that front pay in lieu of reinstatement would be appropriate because of her employing office's history of resistance to antidiscrimination efforts and continuing hostility.[8] ECF No. 49, at 19. But the Court cannot even consider alternative equitable remedies before it determines whether reinstatement is feasible. *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1424 (4th Cir. 1991) (court must resolve threshold factual question of whether reinstatement is feasible before considering front pay).

### B. EDR Requires Due Process Because it is the "Exclusive" Remedy.

Next, the Court's due process holding should be reconsidered because it is based on a misunderstanding of the judiciary's EDR process. *See Flynn*, 565 F. Supp. 2d at 145 (reconsideration is appropriate when a decision is "based on [a] misunderstanding of a relevant regulatory scheme" (quoting parenthetical)). The Court did not consider the fact that the EDR process is the *exclusive* remedy for discrimination, which requires due process protections. *See*,

---

[8] As the EDR Coordinator acknowledged to Roe, there were a lot of "serious issues" in the FDO and the judges were "mindful" of the need to change the office culture. Complaint ¶ 264. Moreover, a sitting U.S. District Court judge publicly testified about employee misconduct, retaliation, and other problems. Testimony of Hon. Max. O. Cogburn, Ad Hoc Committee to Review the Criminal Justice Act at 13–15, 31–35 (Jan. 11–12, 2016), *available at* https://tinyurl.com/y3bjugxy. Even during this litigation, FDO employees disclosed Roe's true name and personally identifying information in public court filings. *See* ECF No. 90-1, at 7 (discussing pseudonym violations).

7

*e.g.*, ECF No. 49, at 1, 25 (arguing that due process rights attach to adjudications); ECF No. 60-1, at 16–18; ECF No. 93, at 11–16; ECF No. 100, at 13; Nov. Tr. 15–16.

The Supreme Court has long held that "when governmental agencies adjudicate or make binding determinations which directly affect the legal rights of individuals, it is imperative that those agencies use the procedures which have traditionally been associated with the judicial process." *Hannah v. Larche*, 363 U.S. 420, 442 (1960). The EDR process provides "binding determinations" that affect judiciary employees' rights to be free from sexual harassment, retaliation, and discrimination. *Id.* The EDR Plan even states that it is "the exclusive remedy of the employee relating to rights enumerated under the Plan." EDR Plan Ch. I, § 1 (2013).

The judiciary has long represented that the EDR process is intended to provide a meaningful adjudication of protected rights. For example, the Guide to Judiciary Policy states that "[j]udiciary employees have a *right* to a workplace free of discrimination, discriminatory harassment, abusive conduct, and retaliation" that "meets the definition of discrimination under . . . Title VII."[9] Guide to Judiciary Policy § 220.10.10 (emphasis added). The EDR Plan prohibits "discrimination" based on "sex" and "[h]arassment against an employee based upon any of these protected categories or retaliation for engaging in any protected activity." EDR Plan Ch. II, § 1. And the judiciary's EDR Handbook confirms that judiciary employees have "procedural rights" to confidentiality, impartiality, and other protections. EDR Interpretative Guide & Handbook (Jan 1. 2020) ("Handbook"), ECF No. 101-1, at 18–28.[10]

---

[9] Not only are these rights codified in the EDR Plan, but the Codes of Conduct also state that failing to take appropriate action on wrongful conduct, or retaliating against someone who reports wrongful conduct, are forms of actionable misconduct. Code of Conduct for United States Judges, Canon 3B(4), 3B(6); Code of Conduct for Judicial Employees Canon 3(C)(1); Code of Conduct for Federal Public Defender Employees Canon 3(C).

[10] Roe filed the Handbook, which was obtained after the motion-to-dismiss hearing, with a Notice of Supplemental Authority dated December 18, 2020. ECF No. 101.

8

Moreover, the Judicial Conference has represented to Congress that "the judiciary currently provides its employees with protections" similar to Title VII of the Civil Rights Act of 1964, a civil rights statute that provides a cause of action in federal court. *See* Study of Judicial Branch Coverage Pursuant to the Congressional Accountability Act of 1995, at 2 (Dec. 1996) (CAA Report); *see also id.* at 15 (EDR Plan provides "rights, protections, and remedies" similar to those provided congressional employees). According to the Judicial Conference's CAA Report, these rights are intended to be so comprehensive that any legislation in this area would be "neither necessary nor advisable." *Id.* at 2. The CAA Report even asserts that any judicial review in an Article III court "would be redundant and inappropriate" because EDR provides "for review of disputes by a judicial officer at both the hearing and appellate level." *Id.* at 16.

Courts have also consistently described the EDR process as a form of "judicial review." For example, the Second Circuit has stated that EDR provides "a measure of judicial review for claims of employment discrimination." *Dotson v. Griesa*, 398 F.3d 156, 161 (2d Cir. 2005). The *Dotson* Court even asserted that "the judiciary is unique among the branches of government in being able to provide for itself some review of its administrative employment decisions by a judicial officer," without the need for legislation. *Dotson*, 398 F.3d at 176 n.14. Likewise, the Third Circuit has held that EDR provides "meaningful redress for violations of [a judiciary employee's] constitutional rights through a process involving meaningful review by judicial officers." *Semper v. Gomez*, 747 F.3d 229, 242 (3d Cir. 2014).

Even defendants recognize that the EDR process is intended to adjudicate legal rights. For example, they argue that EDR forums provide "judicial review" that occurs "through a process separate from the traditional path of a suit filed in federal district court." ECF No. 54, at 12–13. They even assert that Chief Judge Gregory is entitled to absolute immunity because EDR

9

presiding officers perform "adjudicatory functions." ECF No. 41, at 21. And their own declarations confirm that EDR presiding officers "adjudicat[e]" discrimination complaints and "order" remedies. Langley Decl., ¶ 11; *see also* Declaration of Sheryl L. Walter ("Walter Decl."), ECF No. 94-7, ¶¶ 2–3 (sexual harassment complaint implicates employer's "legal responsibilities"); Declaration of James N. Ishida ("Ishida Decl."), ECF No. 78-4, ¶ 15 (EDR presiding officer "adjudicat[es]" a formal complaint).

The judiciary's use of terms like "rights," "remedies," and "judicial review" in this context is not surprising, given that the EDR process is the *exclusive* remedy for judiciary employees. EDR Plan Ch. I, § 1 (2013). After all, it is a basic principle that judiciary employees, like all federal employees, have a constitutional right to be free from illegal discrimination. *See Davis v. Passman*, 442 U.S. 228, 243–44 (1979). They also have a "cause of action" to vindicate that right.[11] *Id.*; *see Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428–30 (1982) (a "cause of action" is a property interest protected by the Due Process Clause). If the EDR process does not provide meaningful judicial safeguards, then judiciary employees functionally "have no remedy at all." *In re Golinski*, 587 F.3d 956, 961 (9th Cir. 2009).

The Court did not consider the basic right that all judiciary employees have to a meaningful adjudication of sexual harassment, retaliation, and discrimination. *See Roe*, 2020 WL 7866317, at *10 (Roe had no "legitimate claim of entitlement" to EDR protections

---

[11] As Roe has explained, *see* ECF No. 49, at 10–16, judiciary employees also have a right to judicial review in an Article III court over claims of unconstitutional discrimination, which the EDR Plan violates. *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1938 (2015) (quotation omitted) ("Congress may not withdraw from the Article III courts any matter which, from its nature, is the subject of a suit at the common law, or in equity, or in admiralty." (quotation omitted)); *cf. Webster v. Doe*, 486 U.S. 592, 603 (1988) (a "heightened showing" is required "to avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim").

(quotation omitted)).  Because of this threshold error, the Court did not consider the ways in which defendants violated Roe's rights to an "unbiased, fair, and impartial" process.  Handbook at 25; *see*, *e.g.*, ECF No. 48, at 7–12 (discussing defendants' violations of Roe's due process rights); ECF No. 49, at 22–25; ECF No. 60-1, at 16–20; ECF No. 93, at 11–16.

For example, defendants refused to disqualify the Defender from representing the employing office even though he was "involved in," and a subject of, the complaint.  EDR Plan Ch. X, § 7; *see also* Declaration of Anthony Martinez ("Martinez Decl."), ECF No. 78-3, ¶¶ 99, 101 (Defender's admission that he was "discipline[d]").  As the Handbook recognizes, when a unit executive is accused of misconduct, "the personal interests of the Unit Executive likely conflict with the Employing Office's interests, and someone other than the Unit Executive should likely act on behalf of the Respondent Employing Office."[12]  Handbook at 67; *see also* EEOC Mgmt. Directive 110, 1-7 (2015) (an accused "high-level official" with influence over the EEO process should recuse himself).  Defendants also recognized that the Defender had a conflict of interest, which is why the EDR Coordinator "receive[d]" the investigation report instead of the Defender.  Complaint ¶ 265; *see also* Roe Decl., Ex. C, at 6, 29, 51.  But when it came to formally disqualifying him, defendants refused.  Complaint ¶¶ 370–71, 393–404, 453; Roe Decl., Ex. C, at 50–51.

---

[12] Contrary to this guidance, defendants assert that a unit executive cannot be disqualified *at all*.  Defendants expressly disclaim *any* obligation for the employing office to "be fair and impartial to both parties."  Langley Decl., ¶ 8.  Instead, in their view, a unit executive accused of misconduct is considered an "opposing or differing party" that is "entitled to act and respond on behalf of the Respondent employing office."  *Id.*  The General Counsel even claims that disqualifying an accused unit executive would be "unfair" because it would require "disqualify[ing] the employing office from being able to respond to, and defend, an employment action filed under EDR."  Walter Decl., ¶ 14.  These statements are not only wrong, but as Roe has explained, they confirm the problems with conflicts of interest associated with complaints against unit executives in the judiciary.  *See* ECF No. 93, at 12–14.

11

The Defender's conflict of interest rendered the EDR process fundamentally unfair and discriminatory. For example, as defendants' own evidence shows, the Defender was the person who "appoint[ed]" the Investigator, Martinez Decl., ¶ 81, who, by her own admission, did not investigate Roe's claims against him, Complaint ¶¶ 318–19. That unfair investigation report, in turn, was used as the basis to adjudicate Roe's legal rights under Chapter X of the Plan. *See* Ishida Decl., ¶ 12 (investigation for Chapters IX and X "overlapped"). In addition, because the Defender was not disqualified, Roe was given no alternative to negotiating a resolution with the person against whom she had filed a formal discrimination complaint. *See* Complaint ¶¶ 7, 407. Worst of all, judiciary officials acknowledged to Roe that an EDR presiding officer does not have independent legal authority to order remedies against a federal defender office. *See*, *e.g.*, Complaint ¶¶ 371, 415, 439, 444. A hearing officer, even if willing, would not be able to order any remedies without the accused Defender's consent. *Id.* ¶¶ 447–48.

Most profoundly, the Court did not consider the fact that EDR, the exclusive remedy for sexual harassment victims in the judiciary, provided Roe *no remedy at all*. *See Hudson v. Palmer*, 468 U.S. 517, 539 (1984) (O'Connor, J., concurring) (due process means that the government "must provide . . . the remedies it promised would be available"). Contrary to the judiciary's representations that EDR is intended to provide a meaningful remedy, *supra* at 8–10, Roe's "rights" under the EDR Plan existed on paper but were fictional in practice. As Roe has discussed, Judicial Conference policy establishes that judges in the EDR context are not acting in a "judicial" capacity at all. Proceedings of the Judicial Conference of the United States at 25 (Sept. 2010) (JCUS); *Golinski v. U.S. Office of Pers. Mgmt.*, 781 F. Supp. 2d 967, 973 (N.D. Cal. 2011). EDR presiding officers are not engaged in "judicial review" any more than a supervisor

making a hiring or firing decision.  They can *only* order remedies that are already authorized by statute.  *See* ECF No. 48, at 10–12; ECF No. 49, at 24; ECF No. 93, at 15–16.

As judiciary officials implicitly acknowledged, Complaint ¶¶ 439, 444; Roe Decl., Ex. C, at 69, no statute authorizes EDR presiding officers to order remedies against a federal defender office.  On the contrary, the Criminal Justice Act insulates federal defenders, who serve a constitutionally independent defense function, from influence by Article III judges over personnel decisions.  *See* 18 U.S.C. § 3006A(g)(2)(A); Complaint ¶ 439 (Judicial Integrity Officer's statement that Article III judges do not have authority to "manage" a federal defender office).  In purporting to "cover" FDOs and misleading Roe into believing she had meaningful remedies, when she did not, defendants are liable for policies that are unfair *and* discriminatory.

### C.    Roe Has Alleged Gender Discrimination, Not "Pure" Retaliation.

Finally, the Court's equal protection holding should be reconsidered because it is based on a misunderstanding of Roe's complaint.  The Court apparently concluded that Roe alleged a "pure" retaliation claim, but its decision was based upon a clearly erroneous application of *Wilcox v. Lyons*, 970 F.3d 452 (4th Cir. 2020), to the factual allegations here.  *See Lockheed*, 116 F.3d at 112 (reconsideration is appropriate to correct clear factual error).

Reconsideration is especially appropriate because the Court's dismissal is based on an argument that defendants never raised in their briefing in support of their motions to dismiss.  Defendants only referenced the concept of "pure" retaliation for the first time in a one-page notice of supplemental authority, which prohibits any "further argument."  LCvR 7.1(j).  Other than their conclusory assertion that *Wilcox* "support[s]" their motions to dismiss, defendants did not explain why they contend Roe's sexual harassment claims bear any resemblance to the pure retaliation claims in *Wilcox*.  ECF No. 68, at 1; *see Belk, Inc. v. Meyer Corp.*, U.S., 679 F.3d 146,

152 n.4 (4th Cir. 2012) (issues that party "fails to develop" are waived). Without proper notice of defendants' argument, Roe did not have an adequate opportunity to respond.[13]

*Wilcox* is also distinguishable because it involved a claim of "pure" retaliation—*i.e.*, a claim that the plaintiff was fired because she brought a discrimination complaint. 970 F.3d at 454–55. In fact, the *Wilcox* plaintiff did not even raise a gender discrimination claim on appeal. *Id.* at 456 (plaintiff "dropped her allegation of sex discrimination" prior to the appeal); *see also Wilcox v. Lyons*, No. 7:17-CV-000530, 2018 WL 1955826, at *1 (W.D. Va. Apr. 25, 2018) (plaintiff's amended complaint "d[id] not include a claim for sex discrimination"). The *only* issue before the Court was whether the plaintiff's pure retaliation claim was cognizable under the Fourteenth Amendment's Equal Protection Clause. *Id.* at 455, 457. Faced with that narrow pleading issue, the Court held that the answer is no, because the right to be free from retaliation arises under Title VII, not the equal protection clause. *Id.* at 461.

But *Wilcox* does not hold that *any* "adverse consequences based on [a victim's] response to the harassing behavior," *Roe*, 2020 WL 7866317, at *12, are "pure" retaliation. On the contrary, *Wilcox* confirms that continued discrimination "after, or partially in response to," a sexual harassment report "remains actionable as a violation of the Equal Protection Clause." *Wilcox*, 970 F.3d at 461 (citing *Beardsley v. Webb*, 30 F.3d 524, 530 (4th Cir. 1994)). Even a "retaliatory action" that is "link[ed]" to an employee's gender "would constitute part of an equal protection discrimination claim, not a freestanding retaliation claim." *Id. Wilcox* does not, and cannot, overrule longstanding Fourth Circuit precedent that a "mixture" of retaliation and discrimination violates equal protection. *Beardsley*, 30 F.3d at 530; *see also Feminist Majority*

---

[13] Roe requested leave to file a more detailed response, in excess of the two-page limit imposed under Local Rule 7.1(j), which further underscores the lack of adequate briefing on this issue. ECF No. 71, at 1 n.1.

*Found. v. Hurley*, 911 F.3d 674, 696 (4th Cir. 2018) (recognizing that retaliation and discrimination claims can be pleaded based on "the same facts").

When the Court concluded that Roe had alleged "pure" retaliation, *see Roe*, 2020 WL 7866317, at *12, it failed to consider her allegations that she was subjected to illegal discrimination because of her gender. Specifically, defendants subjected Roe to sexual harassment, discrimination, retaliation, failed to take immediate and effective remedial action on her complaints, and deprived her of any meaningful remedies or review, resulting in her constructive discharge. *See, e.g.*, Complaint ¶¶ 1–10, 498. These actions unlawfully burdened Roe because of her gender, in violation of the Fifth Amendment's Due Process Clause.

Stated simply, "[c]reating abusive conditions for female employees and not for male employees is discrimination." *Bohen v. City of E. Chicago, Ind.*, 799 F.2d 1180, 1185 (7th Cir. 1986) (citing *Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986)). "Forcing women and not men to work in an environment of sexual harassment is no different than forcing women to work in a dirtier or more hazardous environment than men simply because they are women. Such unjustified unequal treatment is exactly the type of behavior prohibited by the equal protection clause as interpreted in *Davis v. Passman*, 442 U.S. 228, 234–35 (1979)." *Id.* at 1185–86. This form of discrimination can never be "justified" by a "legitimate" policy purpose, because "there is virtually no scenario imaginable where sexual harassment . . . is substantially related to important governmental objectives." *Id.* at 1187.

### 1.      Defendants discriminated against Roe because of her gender.

The Court did not consider Roe's allegations that defendants did not take corrective or disciplinary action until *almost a full year* after she raised complaints of sexual harassment that made her feel so threatened, she stopped coming into work on the advice of the AO's Fair

15

Employment Opportunity Officer ("FEOO"), and ultimately resigned.  *See*, *e.g.*, Complaint ¶¶ 63–122 (describing First Assistant's sexual harassment), *id.* ¶ 162 (describing FEOO's advice to call in sick "as a way to protect herself"); *id.* ¶ 462 (Roe "g[ave] up her career because she was harassed and retaliated against without any accountability"); *see also* ECF No. 48, at 1–13 (discussing defendants' failure to take appropriate action on sexual harassment); ECF No. 49, at 22–25; ECF No. 60-1, at 12–15; ECF No. 76-1, at 1–13, 15–22; ECF No. 100, at 15, 23–24.

Defendants do not even *attempt* to dispute that Roe has plausibly alleged she was sexually harassed.[14]  *See*, *e.g.*, ECF No. 43, at 18–19; ECF No. 45, at 4.  And it is undisputed that *both* the Defender *and* the First Assistant were disciplined "as a result of [Roe's] report of wrongful conduct."  Complaint ¶ 484; Roe Decl., Ex. C, at 73; Martinez Decl., ¶¶ 99, 101, 103 (Defender's admission that he was "discipline[d]" and that he disciplined the First Assistant).

The Court recognized that defendants allegedly "mishandled" Roe's complaints.  *Roe*, 2020 WL 7866317, at *12.  But the Court did not apply the principle, recognized in the Fourth Circuit and others, that government officials who "conscious[ly] fail[ed]" to act on, "acquiesced" in, or "d[id] nothing" in response to sexual harassment violate the Constitution.[15]  *Bohen*, 799

---

[14] Rather, defendants contend that the First Assistant was not a supervisor, *see* ECF No. 54, at 20, but their assertion contradicts Roe's allegations that he abused his supervisory authority to sexually harass her, *e.g.*, Complaint ¶ 82.  They also contradict the judiciary's own guidance, which states that the First Assistant "[i]nitiates personnel actions involving all staff members," including "hiring, performance appraisals, mediation and negotiation, disciplinary actions, and employee job termination."  ECF No. 97-1, at 2; *see Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 278–29 (4th Cir. 2015) (a supervisor "initiat[es]" employment actions).

[15] Likewise, the Court erred when it concluded that discrimination based on sexual harassment only violates Title VII, not the Constitution.  *See*, *e.g.*, *Roe*, 2020 WL 7866317, at *11, 13.  The fact that courts apply Title VII guidance in this context does not mean that gender discrimination claims based on sexual harassment arise only under Title VII.  Rather, Title VII precedent is relevant because "Title VII and equal protection cases address the same wrong: discrimination" and Title VII caselaw "reflects our collective understanding of what conduct violates a person's rights."  *Bator*, 39 F.3d at 1028 n.7; *see also Beardsley*, 30 F.3d at 529 ("Courts may apply the standards developed in Title VII litigation to similar litigation under

F.2d at 1185; *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990), *superseded on other grounds by statute*; *Cross v. State of Ala.*, 49 F.3d 1490, 1503 (11th Cir. 1995); *see also Beardsley*, 30 F.3d at 530 (citing *Bohen* with approval and noting that "sexual harassment has long been recognized to be a type of gender discrimination"); *Johnson v. Martin*, 195 F.3d 1208, 1219 (10th Cir. 1999); *Bator v. Hawaii*, 39 F.3d 1021, 1029 (9th Cir. 1994). Even an official who is not "entirely unresponsive" will be liable for not "engag[ing] in efforts that were reasonably calculated to end the harassment."[16] *Feminist Majority Found.*, 911 F.3d at 689. The test is whether the official's conduct was "clearly unreasonable" or "deliberate[ly] indifferent[]," *id.* at 701–02, which describes defendants' conduct here.

For example, the Court did not discuss Roe's allegation that she was denied a promotion as "part of a continuing course of harassment, retaliation, and discrimination, with Defendants' full knowledge and acquiescence." Complaint ¶ 250. In fact, defendants' own evidence shows that the Defender, with Fourth Circuit approval, personally participated in the discrimination by denying Roe the *very* promotion that was at issue in the First Assistant's quid pro quo sexual harassment. *See* Complaint ¶ 82 (First Assistant's "pay for stay" email); ECF No. 60-1, at 2 (First Assistant "abused his power and offered employment preferences for his unwanted advances"). The Defender's declaration and exhibits even show that the defendants had no legitimate justification to deny Roe a promotion. *See* ECF No. 93, at 17–22 (discussing illegitimate denial of promotion). In fact, Roe *was* eligible for a promotion on her anniversary

---

§ 1983."). Indeed, the Court even implicitly recognized the relevancy of Title VII standards when it compared Roe's claims to other similar employment discrimination cases. *See*, *e.g.*, May Tr. 11; Nov. Tr. 12.

[16] Although *Feminist Majority Foundation* involved discrimination claims in a university setting, the Court relied on principles that generally apply "in the context of a supervisory liability equal protection claim." *Id.* at 705; *see also id.* at 701 n.16 (relying on *Beardsley*).

date, but the Defender falsely claimed that she was not eligible by misrepresenting her years of professional experience. *Id.* Even worse, the request for personnel action that resulted in the promotion denial was backdated and then explicitly "submitted with the approval of the court." Complaint ¶ 240; Roe Decl., Ex. D.

Defendants' denial of promotion is especially strong evidence of discrimination given that Roe's promotion request was a specific triggering event for the First Assistant's quid pro quo email and escalating course of quid pro quo sexual harassment.[17] Indeed, in his quid pro quo "pay for stay" email—which the Court's opinion does not mention—the First Assistant made the same misrepresentations about Roe's eligibility for a promotion that defendants made in their declarations. *Compare* Complaint ¶ 82 (First Assistant's false claim that Roe was "shooting high with a G15" because "you'll need 5 more years of fed service to qualify for it"), *with* Martinez Decl., ¶ 33 (falsely claiming that he had no "discretion" to raise her salary), *and* Declaration of William Moormann, ECF No. 78-1, ¶ 16 (falsely claiming that 10 years of "federal" experience were required to qualify for the next grade and Roe had "slightly less than 4 years"). The First Assistant's misrepresentations enabled him to control Roe's professional advancement as part of his quid pro quo sexual harassment. The Defender's subsequent denial of promotion for the

---

[17] Roe also alleged that she was "disparaged [and] belittled for seeking professional experience" because she was a woman, Complaint ¶ 102, and defendants' evidence supports her claim. In their summary judgment filings, defendants argued that Roe was being "demand[ing]" and "deceptive" because she requested a promotion. *See e.g.*, ECF No. 78, at 3–4 (describing Roe's alleged plan to "wave [the offer letter] around" if the office did not promote her). As Roe explained, these assertions reflect pernicious gender stereotypes of successful professional women and are further evidence of discrimination. ECF No. 93, at 21–22 (citing Susan Adams, *How Women Should Ask For A Raise*, FORBES (Oct. 16, 2014) (discussing "lingering sexism toward women who appear too assertive" when asking for raises); Jenna Goudreau, *The 10 Worst Stereotypes About Powerful Women*, FORBES (Oct. 24, 2011) (discussing stereotype that "a woman can only be successful because she somehow connived or engineered her rise").

same, illegitimate reasons is undisputed evidence that Roe's "reaction to the harassment affected tangible aspects of [her] compensation, terms, conditions, or privileges of employment." *Okoli v. City Of Baltimore*, 648 F.3d 216, 222 (4th Cir. 2011) (quotation omitted). Specifically, Roe "was deprived of a job benefit which she was otherwise qualified to receive because of the employer's use of a prohibited criterion in making the employment decision." *Id.*

The Court also did not discuss Roe's allegations that defendants burdened her by placing her on telework for *over six months* without taking any meaningful action on her complaints, while leaving the accused harasser in his duty station and supervisory role.[18] *See Feminist Majority Found.*, 911 F.3d at 701–02 ("clearly unreasonable" or "deliberate[ly] indifferent[]" response to harassment violates the Constitution). This situation made Roe's job duties, such as preparing for court appearances, difficult if not impossible. Complaint ¶ 338; *see also* Roe Decl., Ex. B, at 32–33. In addition, Roe was subjected to hostile and demeaning treatment, including her coworkers' belittling jokes about meeting her at "Waffle House" and comparing her to "Where's Waldo," Complaint ¶¶ 349–54, and her Team Leader's wearing of an offensive Justice Kavanaugh beer-guzzler helmet for the office Halloween party,[19] *id.* ¶ 346; *see also* Roe Decl., Ex. B, at 28, 32–33.

---

[18] Roe also alleged that defendants downplayed the harassment and criticized her for reporting it. *Feminist Majority Found.*, 911 F.3d at 703 (allegation that an official "downplay[ed]" the harassment establishes the intent element of an equal protection claim). For example, the Defender compared Roe's relationship with her harassing supervisor to a marriage and told her to "compromise." Complaint ¶ 140. He berated her for going to "some other party" with her complaints." *Id.* ¶ 199. He minimized and trivialized her complaints by implying that, at least there was no "physical contact." *Id.* ¶ 202. Likewise, the EDR Coordinator told Roe that it was not "helpful" for her to have reported her complaints to the AO because "barriers go up" and "people are on guard." *Id.* ¶ 266. And Roe was told that any meaningful action on her complaints would be viewed as micromanaging or meddling. *Id.* ¶¶ 415, 438.

[19] Rather than dispute these facts, the Defender asserts that the offensive telework jokes were merely "insensitive," and the Team Leader's costume was "innocuous" because it was related to Justice Kavanaugh's "I like beer" testimony. *See* ECF No. 97, at 12–13. But Justice

During this lengthy period of inaction, defendants failed to conduct an appropriate investigation. *See Feminist Majority Found.*, 911 F.3d at 690 (a "half-hearted investigation or remedial action" is not sufficient (quoting parenthetical)). Roe went for periods of three to six weeks without hearing any updates. Complaint ¶¶ 306, 322, 362, 384. After the initial report was submitted almost two months after the investigation opened, Roe was told that the report was being sent back to be redone. *Id.* ¶ 362. At this point, Roe learned that the Investigator had been asked to make "recommendations," even though, by her own admission, she was not trained or qualified to do so. *Id.* ¶¶ 320, 364. Roe also learned that her retaliation complaints were not investigated, *id.* ¶¶ 318–19, 384; Roe Decl., Ex. C, at 45, because the Defender's misconduct was characterized as mishandling, not retaliation, *id.* ¶ 319. Worse yet, according to defendants' declarations, the Defender was the person who "appointe[d]" the Investigator—a fact that defendants never previously disclosed to Roe. Martinez Decl., ¶ 81; ECF No. 78-3, at 43. This conflict of interest is further evidence that the Investigator did not appropriately investigate Roe's allegations.

Following these delays, the situation was made even worse when defendants withheld the investigation report and deliberately refused to act. *Id.* ¶¶ 398, 401; Roe Decl., Ex. C, at 60. Defendants are not entitled to sit on their hands and refuse to act on sexual harassment. *See, e.g.,* EDR Plan Ch. IX. They are required to take immediate and effective corrective action. *See Feminist Majority Found.*, 911 F.3d at 690 (an employer "must respond" to sexual harassment (quoting parenthetical)). Defendants' refusal to take immediate corrective action, after the

---

Kavanaugh's testimony was not about liking beer. Rather, his testimony was about allegations that he engaged in sexual assault while in a drunken state. *See* Christine Hauser, *The Women Who Have Accused Brett Kavanaugh*, N.Y. TIMES (Sept. 26, 2018). The Team Leader's costume was offensive and, in fact, offended other employees besides Roe. Complaint ¶ 347. Worst of all, the Defender was present but apparently did nothing to stop this offensive behavior.

investigation had already been pending for an unacceptably long period of over four months, was *per se* unreasonable and a "conscious failure" to act on sexual harassment. *Bohen*, 799 F.2d at 1187. Inexplicably, disciplinary action *was* eventually taken, but not until almost *six months* later, after Roe had already resigned. Complaint ¶ 484; Roe Decl., Ex. C, at 73.

### 2. Defendants violated Roe's equal protection rights pursuant to official policies and practices.

The Court also stated that "Roe's complaint is devoid of any allegation that women are treated differently than men under the EDR Plan." *Roe*, 2020 WL 7866317, at *12. But the Court did not consider Roe's allegations that the EDR process deprived her of any meaningful remedies for or review of the sexual harassment, retaliation, and discrimination she suffered. *See Bohen*, 799 F.2d at 1185–86; *see also* ECF No. 48, at 10–12; ECF No. 49, at 22–25; ECF No. 60-1, at 18–20; ECF No. 76-1, at 9–10; ECF No. 93, at 1–17; ECF No. 97, at 2–20.

Defendants' own evidence shows that they violated Roe's equal protection rights pursuant to official policies and practices. *See* ECF No. 93, at 1–17. For example, defendants' evidence establishes that in practice, the judiciary does not follow its own antidiscrimination policies requiring employers to follow Title VII principles and take appropriate action on complaints. *Id.* at 2–4. In practice, a report of wrongful conduct "has no formal procedures or timelines." Walter Decl., ¶ 8; Langley Decl., ¶ 4. Nor is a sexual harassment complainant entitled to any "corrective action" by making a wrongful conduct report. *Id.* Rather, Roe's only option was to participate in *mandatory* alternative dispute resolution with the Defender against whom she filed a complaint for discriminating against her and subjecting her to a hostile working environment. *See* Walter Decl., ¶ 10–12 (counseling and mediation can only produce voluntary resolution). Then, she had the burden to prove her claims to a presiding officer following

"discovery." *Id.* ¶ 13. During this process, no duty was imposed on the employing office to properly investigate or promptly remedy the harassment. *See* ECF No. 94, at 23 n. 7, 8.

This process flips the judiciary's duty to remedy discrimination on its head. It alleviates the employer of any duty to prevent and promptly correct any harassing behavior, and instead places a perverse burden on the employee to remedy the harassment by proving her "demands." *See* Complaint ¶¶ 322–32 (Roe asking the Chief Judge and EDR Coordinator why "the burden is on her to initiate the solutions to her complaints"). This inadequate process provides "[e]vidence of a pattern or practice of discrimination," and is "strong evidence supporting a plaintiff's claim that she herself has been the victim of discrimination." *Bohen*, 799 F.2d at 1187.

In addition, as Roe has discussed, *see* ECF No. 76-1, at 4–5; ECF No. 97, at 9–11, defendants' evidence confirms that they intentionally "stacked" the EDR process against Roe and in favor of the managers accused of discrimination. *See* Complaint ¶ 161 (FEOO's comment that "the cards were 'stacked' against Roe and in favor of management"). The General Counsel's declaration even states that her office treated the interests of the accused unit executive and his employing office as being the same. *See* Walter Decl., ¶¶ 3, 14; *but see* Handbook at 67. Defendants also prohibited the FEOO—the "civil rights office[r] for the federal courts," Complaint ¶ 158—from providing neutral advice to Roe's employing office on its civil rights obligations and from having any role in her complaint process, *id.* ¶¶ 213–35. And they shut down the efforts of the Deputy Director, the Chief of Defender Services, and the FEOO to ensure immediate and effective action on Roe's complaints. *See id.*; *see also* Roe Decl., Ex. B, at 26, 29–32; Roe Decl., Ex. C, at 1–2.

Finally, Roe has alleged that the EDR process deprived her of any meaningful review or remedies for unlawful discrimination. As discussed above, judiciary officials acknowledged to

Roe that an EDR presiding officer would have no independent legal authority to order remedies for discrimination against a federal defender office, which is confirmed by judiciary policy. *Supra*, at 12–13. Defendants cannot dispute that the Judicial Integrity Officer's comments regarding the failures of the EDR process and the lack of any meaningful review or remedies were a critical factor in Roe's decision to resign.

These policies and practices are discriminatory because having "a policy of nonresponse to complaints of harassment" is as discriminatory as engaging in harassment is to begin with. *Bohen*, 799 F.2d at 1190 (Posner, J., concurring). Defendants' actions reflect policies and practices "in the judiciary where sex harassment victims fe[el] they ha[ve] to remain silent or face retaliation." Melissa Heelan Stanzione, *Fourth Circuit Latest in Judiciary to Review Harassment Policy*, BLOOMBERG LAW (Oct. 25, 2019). They are especially troubling in context of the judiciary's policy that EDR is the exclusive remedy, even if it provides *no remedy at all*.

## II. In Raising Objectively Apparent Conflicts Of Interest, Roe's Counsel Made A Legitimate And Good Faith Effort To Advocate On Behalf Of His Client.

Roe also respectfully submits that in footnote 8 of its opinion, the Court misapprehended her counsel's argument regarding apparent conflicts of interest. *See Roe*, 2020 WL 7866317, at *12 n.8 (alleging that Roe's counsel made an "off hand ad hominem comment" and engaged in "groundless speculation, fantastical conspiracy theories, or faux facts").

Reconsideration is especially appropriate because the Court never indicated during the motion-to-dismiss hearing, or at any other time, that it believed Roe's counsel's position is legally or ethically inappropriate. *See, e.g.*, ECF No. 93, at 10 n.4 (raising conflict-of-interest issue); ECF No. 97, at 23 (same).

The entirety of counsel's relevant hearing comments, verbatim, is as follows:

23

> The *Wilcox* decision, it troubles me on a variety of levels because I understand that it's pretty hard on retaliation, this is a purely retaliatory claim, but I would point out it bothers me that that decision came out after this case was filed and after this case was subject to intercircuit transfer, and I would just point out too it was authored by a judge who was in our initial disclosures as having discoverable information. That bothers me. And the fact that the Fourth Circuit as a defendant can come up with case law that supports their argument for dismissal or any other kind of relief in this action is problematic.

Nov. Tr. 8–9. The Court responded to counsel's argument by stating, in relevant part, "[w]ell you know that raises an interesting point, you don't suggest that somehow I'm not bound by the Fourth Circuit?" *Id.* at 9. No further discussion occurred during the hearing about the conflict-of-interest issue and, at the end of the hearing, the Court praised "all four counsel" for being "extraordinarily helpful" and "devot[ed] as advocates." *Id.* at 29–30.

If Roe's counsel had been aware that the Court was troubled by his comments, the hearing would have been an opportunity to explain that federal law regarding conflicts of interest does not require speculation as to anyone's motives, and he did not engage in any speculation. *See*, *e.g.*, 28 U.S.C. § 455(a); *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 879 (2009) (court does not "decide whether in fact [the judge] was influenced" (quotation omitted)). Roe's counsel has no reason to believe that any member of the *Wilcox* panel had an improper motive, especially because he has consistently argued that *Wilcox* does not bar Roe's claims. *See*, *e.g.*, Tr. 8–9.

Rather, in raising *apparent* conflicts of interest, Roe's counsel made a legitimate and good faith effort to advocate on behalf of his client and preserve a material issue based on the undisputed record facts, the disqualification statute's plain text, and Supreme Court precedent. Under federal law, a judge "shall disqualify himself in any proceeding in which his impartiality might be reasonably questioned," 28 U.S.C. § 455(a), or in any proceeding where "[h]e knows" he has an "interest that could be substantially affected by the outcome of the proceeding," *id.* § 455(b)(4). The Supreme Court has also held that as a matter of fundamental fairness, a judge

24

cannot create "binding" precedent that will directly favor the judge's interests as a party in other pending litigation. *See Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 822 (1986).

Defendants' reliance on *Wilcox*, ECF No. 68, is troubling because it creates an appearance that the Fourth Circuit issued "binding" precedent that directly favored the interests of the Fourth Circuit and its officials, in a proceeding in which all members of the Fourth Circuit were already disqualified. *Aetna*, 475 U.S. at 822; *cf.* Nov. Tr. 9 (Court is "bound by the Fourth Circuit"). After all, it is undisputed that this case *was* transferred to a different circuit, ECF No. 28, because all members of the Fourth Circuit were disqualified, *see*, *e.g.*, May Tr. at 4 ("Given the nature of this suit and the various defendants, judicial officers, under the Committee for Intercircuit Assignments the Chief Justice has designated me a visiting judge . . . ."). Defendants' filings also show that the *Wilcox* author was factually involved in this case, which is an independent basis to disqualify. *See*, *e.g.*, ECF No. 43-1, ECF No. 45, at 9; *cf.* 28 U.S.C. § 455(b) (a judge with "personal knowledge of disputed evidentiary facts" "shall disqualify himself"). Defendants even argued that proceeding with discovery would be "burdensome," in part, because Fourth Circuit judges, including the *Wilcox* author, were listed in Roe's disclosures as having discoverable information. *See* ECF No. 57 at 7.

As *Aetna* confirms, judges with a conflict of interest are not permitted to create precedent that accomplishes indirectly what they could not do directly. *See* 475 U.S. at 822. That principle applies here. And the circumstances here are especially concerning because *Wilcox* involved an issue of first impression in the Fourth Circuit and is the subject of a circuit split. *See id.* at 813 (noting that conflict of interest was heightened where judge ruled in an "unsettled" area of law).

## CONCLUSION

For these reasons, Roe respectfully requests that the Court reconsider its dismissal order.

25

This the 26th day of January, 2021.

Respectfully Submitted,

*/s/ Cooper Strickland*
Cooper Strickland
N.C. Bar No. 43242
P.O. Box 92
Lynn, NC 28750
Tel. (828) 817-3703
cooper.strickland@gmail.com

Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of January, 2021, I will electronically file the foregoing with

the Clerk of Court using the CM/ECF system, which will then send a notification of such filing

(NEF) to the following:

Gill P. Beck at Gill.Beck@usdoj.gov

Joshua M. Kolsky at Joshua.kolsky@usdoj.gov

Rachael Westmoreland at rachael.westmoreland@usdoj.gov

Shannon Sumerall Spainhour at mss@dhwlegal.com

*/s/ Cooper Strickland*
Cooper Strickland
N.C. Bar No. 43242
P.O. Box 92
Lynn, NC 28750
Tel. (828) 817-3703
cooper.strickland@gmail.com