**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 21-1346**

───────────────

CARYN DEVINS STRICKLAND,

        Plaintiff – Appellant,

v.

UNITED STATES OF AMERICA; JUDICIAL CONFERENCE OF THE UNITED STATES; BRIAN STACY MILLER, The Hon., in his official capacity as Chair of the Judicial Conference Committee on Judicial Resources; ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS; ROSLYNN R. MAUSKOPF, The Hon., in her official capacity as Director of the Administrative Office of the United States Courts; SHERYL L. WALTER, in her individual capacity as General Counsel for Administrative Office's Office of the General Counsel; JOHN DOE(S), c/o Office of the General Counsel for the Administrative Office of the United States Courts; UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT; JUDICIAL COUNCIL OF THE FOURTH CIRCUIT; ROGER L. GREGORY, The Hon., in his individual capacity and his official capacity as Chief Judge of the Fourth Circuit and as Chair of the Judicial Council of the Fourth Circuit; JAMES N. ISHIDA, in his individual capacity and his official capacity as Circuit Executive of the Fourth Circuit and as Secretary of the Judicial Council of the Fourth Circuit; JOHN G. BAKER, in his official capacity as Federal Public Defender of the Federal Public Defender for the Western District of North Carolina; FEDERAL PUBLIC DEFENDER FOR THE WESTERN DISTRICT OF NORTH CAROLINA; ANTHONY MARTINEZ, in his individual capacity,

        Defendants – Appellees.

------------------------------

MEMBERS OF CONGRESS,

        Amici Curiae.

LEGAL MOMENTUM; NATIONAL WOMEN'S LAW CENTER; THE PURPLE CAMPAIGN AND 42 ADDITIONAL ORGANIZATIONS; NAMED AND UNNAMED CURRENT AND FORMER EMPLOYEES OF THE FEDERAL JUDICIARY WHO WERE SUBJECT TO OR WITNESSED MISCONDUCT; AZIZ HUQ; ERWIN CHEMERINSKY,

Amici Supporting Appellant.

———————————————

Appeal from the United States District Court for the Western District of North Carolina, at Asheville.    William G. Young, United States District Judge for the District of Massachusetts, sitting by designation.  (1:20-cv-00066-WGY)

———————————————

Argued:  March 2, 2022                                    Decided:  April 26, 2022

———————————————

Before Mary Beck BRISCOE, Senior Circuit Judge of the United States Court of Appeals for the Tenth Circuit, Ronald Lee GILMAN, Senior Circuit Judge of the United States Court of Appeals for the Sixth Circuit, and Michael J. MELLOY, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.[1]

———————————————

Affirmed in part, reversed in part, and remanded for further disposition by published opinion.  Senior Circuit Judge Briscoe wrote the opinion, in which Senior Circuit Judge Gilman and Senior Circuit Judge Melloy joined.

———————————————

**ARGUED:**    Jeannie Suk Gersen, HARVARD LAW SCHOOL, Cambridge, Massachusetts, for Appellant.  H. Thomas Byron, III, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Shannon S. Spainhour, DAVIS HARTMAN WRIGHT PLLC, Arden, North Carolina, for Appellees.  **ON BRIEF:**  Cooper Strickland, LAW OFFICE OF COOPER STRICKLAND, Lynn, North Carolina, for Appellant.  Brian M. Boynton, Acting Assistant Attorney General, Amanda L. Mundell, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; William T. Stetzer, Acting United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellees.  Lynn Hecht Schafran, Jennifer M. Becker, LEGAL MOMENTUM, THE WOMEN'S LEGAL DEFENSE AND EDUCATION

———————————————

[1] Because all members of the United States Court of Appeals for the Fourth Circuit are recused in this case, a panel of judges from outside the Circuit was appointed for this appeal pursuant to 28 U.S.C. §§ 291, 294.

2

FUND, New York, New York; Sunu Chandy, Emily Martin, NATIONAL WOMEN'S LAW CENTER, Washington, D.C.; Ally Coll, Shea Holman, THE PURPLE CAMPAIGN, Washington, D.C.; Kristin E. Bender, WILLKIE FARR & GALLAGHER (UK) LLP, London, United Kingdom; Michael J. Gottlieb, Washington, D.C., Michaela Connolly, WILLKIE FARR & GALLAGHER LLP, New York, New York, for Amici Legal Momentum, National Women's Law Center, The Purple Campaign, and 42 Additional Organizations. Erin E. Meyer, Deeva Shah, KEKER, VAN NEST & PETERS, LLP, San Francisco, California, for Amici Named and Unnamed Current and Former Employees of the Federal Judiciary Who Were Subject to or Witnessed Misconduct. Ilann M. Maazel, Samuel Shapiro, EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP, New York, New York, for Amici Aziz Huq and Erwin Chemerinsky. Elizabeth B. Wydra, Brianne J. Gorod, Miriam Becker-Cohen, CONSTITUTIONAL ACCOUNTABILITY CENTER, Washington, D.C., for Amici Members of Congress.

———————————

3

MARY BECK BRISCOE, Senior Circuit Judge:

Plaintiff Caryn Devins Strickland is an attorney who was formerly employed by the Federal Public Defender's Office for the Western District of North Carolina (FPDO). During the course of her employment, Strickland was allegedly subjected to sexual harassment by the First Assistant Public Defender (First Assistant). When Strickland reported the harassment, Anthony Martinez, the Federal Public Defender (FPD), allegedly failed to take proper action and instead effectively retaliated against Strickland in various ways, including requiring her to meet with the First Assistant and to continue working under his supervision. Strickland made unsuccessful informal attempts to resolve the sexual harassment through the Administrative Office of the United States Courts (AO), and the FPD allegedly retaliated against Strickland for doing so by, in part, reclassifying her job and denying her a promotion. Strickland then utilized the first two steps outlined in the Fourth Circuit Court of Appeals' Employment Dispute Resolution Plan (EDR Plan), first filing a request for counseling and a report of wrongful conduct on the part of the First Assistant and the FPD, and then filing a request for mediation. After allegedly experiencing delays, procedural irregularities, and no resolution of the sexual harassment, Strickland asked the mediator to help her secure a term clerkship with a federal appellate judge. According to Strickland, she was constructively discharged. Strickland formally resigned from her position with the FPDO in March 2019.

Approximately a year later, in March 2020, Strickland initiated these proceedings by filing a complaint against: the United States of America; the Judicial Conference of the United States (Judicial Conference); Judge Roslynn Mauskopf, in her capacity as Chair of

4

the Judicial Conference Committee on Judicial Resources; the AO; James Duff, in his capacity as Director of the AO; Sheryl Walter, in her individual capacity as General Counsel for the AO's Office of the General Counsel; various John Does employed by the AO's Office of the General Counsel; the United States Court of Appeals for the Fourth Circuit (Fourth Circuit); the Judicial Council of the Fourth Circuit; Judge Roger Gregory, the Chief Judge for the Fourth Circuit, in both his individual and official capacities; James Ishida, the Circuit Executive of the Fourth Circuit, in both his individual and official capacities; and the FPD, in both his individual and official capacities.[2]  The complaint asserted claims for violations of Strickland's due process and equal protection rights under the Fifth Amendment, as well as claims pursuant to 42 U.S.C. §§ 1985(3) and 1986.

The district court, acting pursuant to the defendants' motions, dismissed all of Strickland's claims under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  More specifically, the district court concluded that Strickland's claims against the Official Capacity Defendants (encompassing all defendants sued in their official capacities) were precluded by sovereign immunity and that her complaint failed to state any cognizable claims for relief against the Individual Capacity Defendants (encompassing all defendants sued in their individual capacities).  Strickland now appeals from those rulings.  Strickland

_____

[2] After Strickland filed her complaint, Duff retired as Director of the AO and was replaced as Director of the AO by Defendant Mauskopf.  In turn, Brian Stacy Miller replaced Mauskopf as Chair of the Judicial Conference Committee on Judicial Resources. Defendant Martinez has also been replaced by John G. Baker as the Federal Public Defender for the Western District of North Carolina.  Consequently, Baker now appears in his official capacity only and Martinez now appears in his individual capacity only.

5

has also filed a motion to file a declaration in support of her reply brief, as well as a motion to vacate the district court's judgment and to disqualify/recuse the district judge and the panel in this appeal.

Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we grant Strickland's motion to file a declaration, but deny Strickland's motion to vacate the district court's judgment and to disqualify/recuse the district judge and the panel. As to the merits of Strickland's appeal, we conclude as follows: (a) Strickland's Fifth Amendment due process claim adequately alleges the deprivation of cognizable property rights, but fails to adequately allege the deprivation of a cognizable liberty interest; (b) Strickland's Fifth Amendment due process claim fails to adequately allege a facial challenge to the EDR Plan, but adequately alleges an as-applied challenge to the EDR Plan; (c) Strickland's Fifth Amendment equal protection claim adequately alleges that defendants violated her right to be free from sex discrimination; (d) Strickland's 42 U.S.C. §§ 1985(3) and 1986 claims fail to adequately allege claims upon which relief can be granted; (e) the Official Capacity Defendants are entitled to sovereign immunity from the Fifth Amendment due process and equal protection claims only to the extent those claims seek back pay; in other words, Strickland's potential recovery on those claims against the Official Capacity Defendants is limited to prospective equitable relief; (f) with respect to the Individual Capacity Defendants, Strickland's Fifth Amendment equal protection claim is subject to dismissal because Strickland cannot state a cause of action under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971); (g) neither the Administrative Procedure Act nor the Back Pay Act waive sovereign immunity for Strickland's claims for back pay against the Official

6

Capacity Defendants; and (h) the Civil Service Reform Act does not bar Strickland's claims.

The effect of our rulings is as follows. Strickland's Fifth Amendment due process claim, to the extent it alleges a deprivation of Strickland's property rights, and to the extent it is asserted against the Official Capacity Defendants, is sufficient to survive the motions to dismiss; to the extent the Fifth Amendment due process claim alleges the deprivation of a liberty interest, however, it was properly dismissed by the district court. Strickland's Fifth Amendment equal protection claim, to the extent it is asserted against the Official Capacity Defendants, is sufficient to survive the motions to dismiss. The Official Capacity Defendants are entitled to sovereign immunity from the Fifth Amendment due process and equal protection claims only to the extent those claims seek back pay; in other words, Strickland's potential recovery on those claims against the Official Capacity Defendants is limited to prospective equitable relief. With respect to the Individual Capacity Defendants, Strickland's Fifth Amendment equal protection claim is subject to dismissal because Strickland cannot state a cause of action under *Bivens*. Strickland's §§ 1985 and 1986 claims against the Individual Capacity Defendants are inadequately pled and were thus properly dismissed by the district court. We therefore affirm in part and reverse in part the district court's judgment and remand to the district court for further proceedings.

I

*A.   The Fourth Circuit's EDR Plan*

At the heart of this case is the EDR Plan that was adopted by the Fourth Circuit for addressing employee complaints of sexual discrimination.  We shall proceed to outline how the EDR Plan was adopted and, in turn, how the EDR Plan was designed to work.

In January 1995, Congress enacted the Congressional Accountability Act (CAA), 2 U.S.C. § 1301 et seq.  The CAA made applicable "to the legislative branch of the Federal Government" a number of federal employment statutes, including Title VII of the Civil Rights Act of 1964.  2 U.S.C. § 1302(a).  The CAA also included a section titled "Judicial Branch Coverage Study" that directed "[t]he Judicial Conference of the United States" to "prepare a report for submission by the Chief Justice of the United States to the Congress on the application to the judicial branch of the Federal Government" of various federal employment statutes, i.e., the same statutes that the CAA made applicable to the legislative branch of the federal government.[3]  2 U.S.C. § 1434.

In December 1996, the Judicial Conference submitted a report to Congress in response to the CAA.  The report essentially asserted that it was unnecessary for federal employment statutes to be applied to the federal judiciary because the federal judiciary already provided its employees with protections similar to those enumerated in the various

---

[3] "In enacting the CAA, Congress initially considered extending the statute's coverage to employees of the judicial branch but, mindful of the importance of judicial autonomy, ultimately decided against such action." *Dotson v. Griesa*, 398 F.3d 156, 173 (2d Cir. 2005).

8

federal employment statutes. The report did indicate, however, that the federal judiciary would develop and implement a new model employment dispute resolution plan.

In early 1997, the Judicial Resources Committee drafted a new model employment dispute resolution plan and circulated the plan for comments. After receiving comments and revising the plan in response to those comments, the Judicial Resources Committee recommended, and the Judicial Conference approved, a model employment dispute resolution plan (Model EDR Plan). Judicial Conference of the United States, *Report of the Proceedings of the Judicial Conference of the United States*, at 28 (Mar. 11, 1997) (saved as ECF opinion attachment).

The Fourth Circuit adopted its own EDR Plan, based on the Model EDR Plan. The Fourth Circuit's EDR Plan has been amended several times since its original adoption. At issue in this case is the 2013 version of that plan (2013 EDR Plan). The 2013 EDR Plan expressly applied to the "unit executive and staff" of the "Federal Public Defenders within the Fourth Circuit." JA, Vol. II at 661.

Chapter II, § 1 of the 2013 EDR Plan stated that

[d]iscrimination against employees based on race, color, religion, sex (including pregnancy and sexual harassment), national origin, age (at least 40 years of age at the time of the alleged discrimination), and disability is prohibited. Harassment against an employee based on any of these protected categories or retaliation for engaging in any protected activity is prohibited. All of the above constitute "wrongful conduct."

*Id*. at 662.

Chapter II, § 3.A of the 2013 EDR Plan stated, in pertinent part:

The . . . Federal Public Defenders . . . should make reasonable efforts to see that the skills, abilities, and potential of each employee are identified and

> developed and that all employees are given equal opportunities for promotion
> by being offered, when the work of the Court permits and within the limits
> of available resources, cross-training, reassignments, job restructuring,
> special assignments, and outside job-related training.

*Id*. Section 3.B of Chapter II in turn directs supervisors to "apply equal employment opportunity practices and policies in their work units." *Id*.

Chapter X of the 2013 EDR Plan sets forth detailed "DISPUTE RESOLUTION PROCEDURES" that are to govern when "[a]n employee . . . claims a denial of the rights granted under Chapters II through VII of th[e] Plan." *Id*. at 664. "Generally, the procedural process consists of" three components: (1) "[c]ounseling and mediation"; (2) a "[h]earing before the Chief Judge of the United States Court of Appeals for the Fourth Circuit (or a designated hearing officer)"; and (3) "[r]eview of the hearing decision under procedures established by the Judicial Council of the Circuit." *Id*.

Chapter X encourages employees to attempt to informally resolve their concerns before invoking the procedures of Chapter X. More specifically, § 2 of Chapter X provides as follows: "Before invoking a request for counseling, an employee (to the extent feasible) is encouraged to bring his or her concerns to his or her supervisor or unit executive, unless the supervisor or unit executive is the alleged violator." *Id*. at 664–65.

Section 8 of Chapter X requires "[a]n employee who believes that his or her rights under Chapters II through VIII of th[e] Plan have been violated [to] first request counseling." *Id*. at 666. Such requests "must be made within 30 days of the alleged violation or within 30 days of the time the employee becomes aware of the alleged violation." *Id*. Employee requests for counseling are submitted to the Circuit Executive,

10

who serves as the Circuit's Employment Dispute Resolution Coordinator (EDR Coordinator). *Id.*

This initial counseling requirement has four purposes: (1) "to discuss the employee's concerns and elicit information regarding the matter which the employee believes constitutes a violation"; (2) "to advise the employee of his or her rights and responsibilities and the procedures of the Court applicable to the employment dispute resolution process"; (3) "to evaluate the matter"; and (4) "to assist the employee in achieving an early resolution of the matter, if possible." *Id.* (§ 8.C.2). At the end of the 30-day counseling period, the EDR Coordinator is required to notify the employee in writing "of the end of the counseling period" and "inform the employee of the right and obligation, should the employee choose to pursue his or her claim, to file with the EDR Coordinator a request for mediation in accordance with § 9 of . . . Chapter" X. *Id.* at 667. The 30-day counseling period can be extended for an additional 30 days by mutual agreement of the employee and the counselor. *Id.*

An employee request for mediation must be filed "[w]ithin 15 days after receipt by the employee of the notice of the conclusion of the counseling period." *Id.* (§ 9.A). An employee's "[f]ailure to pursue mediation will preclude further processing of the employee's claim under any other provisions" of Chapter X. *Id.* "Any person with the skills to assist in resolving disputes, except the Court's EDR Coordinator, may serve as a mediator under this Plan." *Id.* (§ 9.B.1). The purpose of the mediation is to afford the mediator the opportunity to "consult separately and/or jointly with the employee and his or her representative, if any, and the employing office to discuss alternatives for resolving a

11

dispute, including any and all possibilities of reaching a voluntary, mutually satisfactory mediation." *Id.* (§ 9.B.3). If "the parties have not resolved the matter" by "the end of the [30-day] mediation period," the EDR Coordinator is required to "provide the employee, the employee's representative, if any, and the employing office with written notice that the mediation period has concluded" and "inform the employee of his or her right to file a complaint under § 10 of" Chapter X. *Id.* (§ 9.D).

"Not later than 15 days after receiving written notice of the end of the mediation period, an employee may file a complaint with the EDR Coordinator, who will transmit the complaint to the Chief Judge and to the respondent." *Id.* (§ 10.A). Provided that the complaint is on the court-approved form, names the employing office as the respondent, and does not name any individuals as respondents, the presiding judicial officer (either the Chief Judge of the Fourth Circuit or his/her designee) "shall hold a hearing on the merits of the complaint unless he or she determines that no material factual dispute exists." *Id.* at 668 (§ 10.B.1). "[T]he hearing shall be commenced no later than 60 days after the filing of the complaint." *Id.* (§ 10.B.2.a). No later than 60 days after the hearing, the presiding judicial officer must issue a final written decision. *Id.* (§§ 10.B.2.f and 10.B.2.g). In making that decision, the presiding judicial officer determines whether "the complainant has established by a preponderance of the evidence that a substantive right protected by th[e] Plan has been violated." *Id.* (§ 10.B.2.f). If the presiding judicial officer finds that the complainant has established one or more violations, "remedies may be provided in accordance with § 12 of" Chapter X. *Id.*

12

Available remedies include "placement of an employee in a position previously denied," "placement in a comparable alternative position," "reinstatement to a position from which previously removed," "prospective promotion to a position," "priority consideration for a future promotion or position," "back pay and associated benefits," "records modification and/or expungement," "'equitable' relief, such as temporary stays of adverse actions," "granting of family and medical leave," and "accommodation of disabilities through the purchase of specialized equipment or the restructuring of duties and work hours, or other appropriate means." *Id*. at 669–70 (§ 12.B).

## B.    Factual history[4]

Plaintiff Strickland is a female attorney. JA, Vol. I at 22. After graduating with honors from a highly ranked law school, Strickland completed three judicial clerkships: the first for a state supreme court chief justice, the second for a federal district court judge, and the third for a federal appellate judge. *Id*. at 23. Strickland then completed a federal judicial fellowship. *Id*. In August 2017, Strickland began working as a research and writing attorney for the FPDO. *Id*., Vol. II at 551. Defendant Martinez was the FPD at that time. Strickland's offer letter for the research and writing attorney position stated that it was expected that she "w[ould] transition to an Assistant Defender position." *Id*. According to Strickland, the FPD repeatedly indicated to her that she would transition to

---

[4] As discussed later, we must accept as true any well-pled facts in considering a motion to dismiss. The facts contained in this section are taken from Strickland's detailed complaint.

13

an assistant defender position within a few months of her start date and would be afforded the choice "between a trial or appeals position." *Id*., Vol. I at 27.

After she began working for the FPD, Strickland allegedly learned that the FPD "condoned, encouraged, and participated in a toxic workplace culture of discrimination, harassment, and retaliation." *Id*. "In this culture," Strickland alleges, "bullying, sexism, homophobia, racism, and mockery of disabilities was normalized." *Id*. Strickland further alleges that the FPD "promoted the individuals most responsible for misconduct and punished employees who complained . . . with retaliatory acts ranging from disciplinary actions and firings to vicious and false rumors." *Id*.

According to Strickland, "[s]enior managers" in the office, including the First Assistant, "were emboldened by the lack of oversight." *Id*. at 27. Strickland alleges, for example, that "after Ninth Circuit Judge Alex Kozinski resigned," the First Assistant "gloated to [her] that the process for filing sexual harassment claims in the federal judiciary is useless and nothing ever happens to claims." *Id*. at 27–28.

Strickland alleges that "[t]he First Assistant had control over the operations of the entire [FPDO] and had supervisory authority over the trial units in the [FPDO's] duty stations." *Id*. at 28. Under the management of the FPD and the First Assistant, Strickland alleges, a "toxic workplace culture" existed in which "[f]emale employees were treated in a sexist and discriminatory manner." *Id*. at 29. In particular, Strickland alleges that "female employees were belittled," "not taken seriously as professionals," and "targeted for bullying and abusive behavior." *Id*. "This toxic working culture," Strickland alleges,

14

"served as a foundation for the harassment and discrimination" that she ultimately suffered. *Id*.

Strickland alleges that, "[f]rom the time [she] started" at the FPDO, "the First Assistant used his supervisory role to single her out professionally and personally." *Id*. at 30. "[D]uring her first few months" at the FPDO, Strickland alleges, the First Assistant "lavished her with attention," "assigned her almost exclusively to his cases," "created a 'shadowing' activities list just for her . . . and adorned it with nicknames," "began asking her to go to lunch with him on a regular basis," and "always insisted on paying for her lunch, even when she offered." *Id*.

Strickland also alleges that the First Assistant began taking "a keen personal interest in her." *Id*. at 31. For example, Strickland alleges that "he often gave her rides home when she was unable to ride her bike in inclement weather," "read all of [her] law review articles and often asked to discuss them with her," and "showed an [unusual] interest in her hobbies." *Id*. Although Strickland "avoided socializing with the First Assistant outside of work, . . . he asked her to drink alcohol with him in work settings." *Id*. Strickland "gradually suspected that the First Assistant was asking her to lunch and 'mentoring' her because he was attracted to her romantically." *Id*. "[S]ome of [Strickland's] coworkers [also] noticed the First Assistant's interest in her" and "described him as 'lustful,' 'fixated,' 'sexually attracted,' and 'smothering.'" *Id*.

On May 18, 2018, the First Assistant asked Strickland to join him for a "mentoring" lunch together. *Id*. at 32. At this lunch, Strickland told the First Assistant that she would eventually need, for family reasons, to transfer to another of the FPDO's duty stations. *Id*.

15

According to Strickland, the First Assistant became "visibly upset and emotional in response to [her] comments." *Id.* Strickland also attempted to discuss her work performance with the First Assistant and told him that, at her upcoming performance evaluation, "she planned to ask for a raise to the equivalent of the next grade on the GS pay scale." *Id.* When the First Assistant and Strickland returned to the office, he allegedly said, "don't worry, we're going to take care of you," and "[h]e added that he hoped [Strickland's] husband would take her somewhere nice for dinner that night." *Id.* Later that afternoon, the First Assistant sent an email to Strickland referencing her comments about seeking a raise:

> Dude, you're shooting high with a G15, Not least of all since you'll need 5 more years of fed service to qualify for it. But fret not, I have a plan . . . just remember I deal in pay-for-stay :)

*Id.* at 33. Strickland alleges that, "[i]n the context of the First Assistant's inappropriate interest in her, and his direct references to her request for a promotion," she "interpreted his words as a form of quid pro quo sexual harassment." *Id.*

Strickland alleges that, "[o]ver the following weeks, the First Assistant increasingly pressured [her] to leave the office with him." *Id.* This included asking her "out for drinks," asking to join him "for 'mentoring' sessions," offering her rides, and scheduling "out–of– office meetings alone" with him. *Id.* Strickland also alleges that the First Assistant became "increasingly obsessive" during that time period. *Id.* For example, when she "would leave work at the end of the day, [he] would often appear from around the hallway corner at precisely the same time and walk her out of the building." *Id.* Although Strickland initially "assumed [this] was a coincidence," it "happened enough times" that she became

16

suspicious that he "was keeping track of her when she left work and standing around the corner waiting to leave the building with her." *Id*.

Strickland also alleges that, during this time period, the First Assistant "became even more controlling of [her] work duties and schedule" and "demanded that she spend time with him through contrived 'shadowing' activities, and punished her if she did not comply." *Id*. at 34. For example, on June 5, 2018, Strickland "emailed the First Assistant to cancel a 'shadowing' activity because she had a forensic discovery review scheduled in [a] life-sentence case." *Id*. Although the First Assistant had previously told Strickland "that his 'shadowing' activities were optional," he responded to her June 5, 2018 email and said "[t]hat's really not OK with me." *Id*. "At 6:00 a.m. the next morning, the First Assistant emailed [Strickland] asking for a copy of her job offer letter, claiming it was not saved in her personnel file." *Id*. Strickland met with the First Assistant in his office later that morning during business hours. *Id*. at 35. According to Strickland, "[t]he First Assistant was so angry at [her] that he was pale and shaking," and "[h]e berated her for not attending his 'shadowing' activity." *Id*. The First Assistant also "accused her of breaking a 'commitment' to him" and again "demanded a copy of her job offer letter." *Id*. Strickland alleges that she "was so shaken and upset that she left the office crying." *Id*.

"That afternoon, the [FPD] asked [Strickland] to meet about [a] trial case." *Id*. During the meeting, "Strickland raised concerns that the First Assistant had acted inappropriately towards her." *Id*. Strickland alleges that the FPD "was dismissive of her concerns" and "told her to work things out with the First Assistant directly." *Id*.

17

Following her meeting with the FPD, Strickland "reiterated to the First Assistant that the discovery review could not be rescheduled and she would not be able to go on his 'shadowing' activity." *Id*. According to Strickland, she "believed that her ethical duties to her client required her to review the discovery." *Id*. The First Assistant responded by "order[ing] [Strickland] to attend his 'shadowing' activity" and "threatened action against her if she disobeyed his 'direct order.'" *Id*.

Strickland attended the "shadowing" activity with the First Assistant the following morning. *Id*. at 36. During their time together, the First Assistant "continued to berate and demean [Strickland]." *Id*. For example, he "called her 'manipulative' and 'deceitful' for seeking trial experience" and "accused her of seeking trial experience just so she could 'demand' a transfer." *Id*. "The First Assistant also accused [Strickland] of lying to him about her reasons for cancelling his 'shadowing' activity," "made clear that he had questioned her coworkers," and expressed anger "that she had raised concerns about him to the [FPD]." *Id*. Strickland "perceived the First Assistant's aggressive behaviors as obsessive, controlling, and completely out of proportion to the issue of whether she would attend a 'shadowing' activity." *Id*.

Strickland alleges that she "began taking contemporaneous notes to document the First Assistant's inappropriate and unprofessional behaviors." *Id*. at 37. "Shortly thereafter," Strickland alleges, the FPD "'removed' [her] as second chair from [a] trial case, despite acknowledging her excellent performance." *Id*.

On June 21, 2018, Strickland and the First Assistant worked together alone in the office "after business hours . . . to prepare for a court hearing." *Id*. When they completed

18

their work, the First Assistant noted that it looked like it might rain and asked Strickland if she wanted a ride home. *Id*. Strickland did not feel comfortable around the First Assistant and told him no. *Id*. "She joked that she was tough, and could handle biking home." *Id*. After she changed clothes and was leaving the building, "the First Assistant was waiting for her in the lobby" and "asked her if she was *sure* she did not want a ride home." *Id*. (emphasis in original). Strickland "repeated that she was sure" and "left the building as quickly as possible." *Id*. Strickland "later saw that the First Assistant had . . . sent her text messages," saying "[i]t is currently raining. Last chance for a ride, tough girl . . . ." *Id*. at 38.

The First Assistant allegedly persisted in asking Strickland to meet him outside of work for "mentoring." *Id*. Strickland "sought advice from" an acquaintance "who had extensive experience handling Equal Employment Opportunity cases for the federal judiciary." *Id*. at 39. "Based on this advice, [Strickland] asked to speak with the [FPD] in confidence." *Id*. During a July 2, 2018 meeting with the FPD, Strickland told him "that she would be drawing boundaries with the First Assistant," and she asked the FPD "to support her and maintain her confidence." *Id*. The FPD "asked [Strickland] if this was 'sexual harassment.'" *Id*. Strickland "said that she was not using those words *yet*, because she was trying to self-manage the situation first." *Id*. (emphasis in original). But Strickland "stressed that she was 'notifying' the [FPD], and she would not have involved him if it was not absolutely necessary." *Id*. The FPD "said very little except to confirm[] that this was a 'head's up.'" *Id*. at 40. Strickland "left the meeting in tears, concerned that the [FPD] did not verbally support her or ask her to follow up with him on her concerns." *Id*.

19

"Later that afternoon, [Strickland] met with the First Assistant" in a conference room. *Id*. "Before starting the meeting, the First Assistant shut both doors to the windowless conference room." *Id*. "He then told her that she was 'struggling'" and "claimed she was having a hard time balancing priorities." *Id*. The First Assistant also told Strickland that "[h]e had 'frustrations' with her." *Id*. Strickland, believing "that his criticisms were not based on job performance, but rather his anger that she was resisting his advances," told him "that she was setting 'boundaries' with him." *Id*. She also "told him that he 'crossed a line' with her, and that his behavior was unacceptable." *Id*. The First Assistant responded "sarcastically," saying "he would 'try' not to speak to her that way again." *Id*. The First Assistant then "continued berating [Strickland] until she stood up, stated that she would rather discuss these issues with the [FPD], and left the room." *Id*. at 41. "The First Assistant followed [Strickland] out of the room, telling her to come with him to the [FPD's] office." *Id*. She "walked away from him." *Id*. "Immediately after this confrontation, [Strickland] called the [FPD]." *Id*. "She let him know that the First Assistant might say something about her, and she asked him to withhold judgment until he had spoken to her." *Id*. "She then left the office." *Id*.

On July 5, 2018, the FPD "unexpectedly called [Strickland] into his office to meet with the First Assistant directly." *Id*. Strickland "repeated several times that she was uncomfortable and that she would not meet without speaking to the [FPD] alone first." *Id*. "Eventually, the [FPD] asked the First Assistant to leave the room." *Id*. "The [FPD] told [Strickland] that the First Assistant was upset with her for not keeping a commitment to him." *Id*. "The [FPD] called this issue a 'breakdown in communication.'" *Id*. The FPD

20

explained "that he was an 'old school' person who believe[d] that when you make a commitment, you keep it, so he could understand where the First Assistant was coming from." *Id*. at 42.

Although Strickland again expressed her concerns about the First Assistant's behavior to the FPD, the FPD "dismissed [Strickland's] concerns" and "insisted that, as [Strickland's] supervisor, the First Assistant had the right to meet with her." *Id*. "The [FPD] then compared the First Assistant's supervisory role over [Strickland] to [Strickland's] marriage." *Id*. The FPD "said he knew [Strickland] had not been married for very long, but marriage always involves 'compromise,' and so Strickland would have to 'meet in the middle' with the First Assistant." *Id*. Strickland "began to cry" in response to the FPD's statements, and he "asked her why she was 'getting emotional.'" *Id*. Strickland again informed the FPD about what she perceived as "the First Assistant's harassing behaviors." *Id*. Although the FPD "acknowledged that he did not want [Strickland] to feel uncomfortable," he "brought the First Assistant back into the room," and the First Assistant proceeded to berate and criticize Strickland "in front of the [FPD]." *Id*. at 43. Strickland concluded that the FPD "wanted her to simply stop complaining rather than do anything to address the First Assistant's harassment." *Id*.

On July 9, 2018, Strickland confirmed in writing to the FPD their mutual understanding "that she did not have a performance issue and that the First Assistant would no longer be her 'mentor.'" *Id*. On July 20, 2018, however, the FPD "announced that he was re-assigning [Strickland] to work *directly* under the First Assistant on his trial 'team.'" *Id*. (emphasis in original). The FPD "also announced that [Strickland] would no longer be

21

assigned her own trial cases." *Id*. Strickland "felt betrayed and afraid of the idea that the First Assistant would have direct supervisory authority over her again." *Id*. at 44.

On the evening of July 20, 2018, the FPDO's Appellate Chief called Strickland and told her "that he thought she would be happy with a new appellate attorney position that management was looking into posting." *Id*. Strickland "asked the Appellate Chief to keep her updated on the new position." *Id*. When the Appellate Chief then "asked [Strickland] about her issues with the trial teams," Strickland informed "him that she had serious concerns about working on the First Assistant's team." *Id*. After further discussion, the Appellate Chief "remarked that he 'strongly disagreed' with some of the First Assistant's 'management' decisions, but he told [Strickland] that he 'adored' the First Assistant." *Id*. The Appellate Chief further stated that he perceived the First Assistant to be "a good guy who had made mistakes," and he told Strickland "that it was in her best interest to mend things and get along with him." *Id*. "These comments made [Strickland] deeply uncomfortable, as she believed he was pressuring her to drop her complaints." *Id*.

Two nights later, on the evening of Sunday, July 22, 2018, the First Assistant emailed Strickland and asked her to meet with him alone about his "team." *Id*. at 45. "This request made [Strickland] very uncomfortable because the trial teams always met as a group, and the First Assistant knew, or should have known, that [Strickland] was not comfortable being alone with him." *Id*.

The next day, Monday, July 23, 2018, Strickland took leave from work "because she felt she had no other choice." *Id*. She sought guidance that day from the AO's Fair Employment Opportunity Officer (FEOO). *Id*. Strickland described her experiences to the

FEOO. *Id.* The FEOO allegedly told Strickland that what she had described was "classic sexual harassment." *Id.* The FEOO in turn outlined for Strickland her possible options for resolving her complaints about the FPD and the First Assistant. *Id.* The FEOO also suggested to Strickland that a better option might be to look for another job because, in the FEOO's view, the EDR Plan meant that the cards were "stacked" against Strickland and in favor of management. *Id.*

The FEOO allegedly shared copies of the First Assistant's inappropriate text messages and emails with the Chief of Defender Services. *Id.* at 49. The FEOO and Chief of Defender Services then allegedly contacted the Deputy Director of the AO about the issue, and the Deputy Director allegedly authorized the Chief of Defender Services to contact the FPD directly. *Id.* at 49–50. The Chief of Defender Services then called the FPD and told him that he was on notice of sexual harassment by the First Assistant. *Id.* at 50. The FPD allegedly told the Chief of Defender Services that he had mishandled the situation and that the FPD did not have any performance issues with Strickland's work. *Id.* The Chief of Defender Services suggested to the FPD that he should transfer Strickland to another duty station immediately and should also consider Strickland for an open appellate-attorney position and allow her to work in the appeals unit away from the First Assistant's direct supervision. *Id.*

On August 9, 2018, the FPD visited Strickland in her office workspace and told her that the Chief of Defender Services had called him. *Id.* The FPD allegedly claimed that Strickland had previously told the FPD that she was not being sexually harassed and instead was just uncomfortable. *Id.* at 51. The FPD also allegedly criticized Strickland for going

23

to another person with her concerns, and he told her that he was being blamed and attacked for something that was not his fault. *Id*. The FPD allegedly asked Strickland what she "want[ed]." *Id*. Strickland responded that she was requesting to be an assistant federal public defender and to work exclusively on appeals. *Id*. at 51–52. The FPD allegedly agreed with Strickland that it was necessary to move her to an appellate position because the First Assistant was in charge of the entire trial unit. *Id*. at 52. The FPD, however, allegedly refused to transfer Strickland to another duty station, claiming that there was no available office space. *Id*. Although the FPD claimed that it was sufficient that Strickland and the First Assistant worked on opposite ends of a hallway, Strickland responded that she could not continue to work in the same office with the First Assistant, particularly since the First Assistant was likely to be angry when he found out about the changes that Strickland and the FPD had discussed. *Id*.

Approximately a week later, on August 17, 2018, the FPD sent an email to Strickland and copied the Circuit Executive and a human resources specialist. *Id*. at 53. In that email, the FPD informed Strickland that he was reclassifying her to the position of assistant federal public defender and that he was doing so because it was "to the office's advantage to reclassify Research & Writing Specialists to [assistant federal public defender] positions for purposes of case weight measurement." *Id*. The FPD further stated that he had never agreed to allow Strickland to work exclusively on appeals and instead would require her to continue to work for the trial unit in a research and writing support role. *Id*. The FPD stated that Strickland would report to the FPDO's Appellate Chief, but would still receive research and writing assignments from the First Assistant. *Id*. The FPD

24

stated that he had reported Strickland's sexual-harassment allegation to the Circuit Executive for the Fourth Circuit. *Id*. The FPD indicated that both he and the human resources specialist would meet with Strickland to advise her of her rights under the EDR Plan. *Id*. Lastly, the FPD stated that he would allow Strickland to telework temporarily, but was reserving the right to require her to return to her duty station as soon as the investigation into her allegations was over. *Id*.

The FPD subsequently contacted the Office of the General Counsel and the Circuit Executive for the Fourth Circuit and discussed the situation. *Id*. at 54. According to Strickland, her situation was subsequently discussed by various individuals, including the FPD, the Circuit Executive, the Deputy Director of the AO, and the Chief Judge of the Fourth Circuit. The decision was made that the Office of the General Counsel would take over the matter, remove the FEOO from any further involvement, and limit any investigation of wrongful conduct to the First Assistant. *Id*. at 55; Aplt. Br. at 11. Strickland in turn was told that she would be prohibited from speaking to the FEOO. JA, Vol. I at 55.

In August 2018, Strickland was not invited to interview for the appellate-attorney position that was open in the office. *Id*. at 56. According to Strickland, the First Assistant was either on the hiring committee or, at a minimum, provided input regarding the hiring decision for this position. *Id*.

Strickland was, however, formally reclassified by the FPD as an assistant federal public defender. *Id*. at 56–57. Strickland alleges that this reclassification was in name only, and that she was not treated like other assistant federal public defenders in the office.

*Id*. at 57. In particular, she alleges that her job duties were limited to providing research and writing support to other attorneys. *Id*. She also claims that she was required to continue providing research and writing support to the trial unit that was directly supervised by the First Assistant. *Id*. Strickland further alleges that she was denied a salary increase with this reclassification and had her locality adjustment stripped, which resulted in a pay cut of nearly 15 percent. *Id*.

Strickland alleges that, after her reclassification as an assistant federal public defender, the First Assistant continued to harass her and interfere with her job duties. *Id*. at 58. For example, she alleges that, in late August 2018, the First Assistant copied her on an email to a client and that, in the email, the First Assistant "used highly specific, unique words and phrases from a law review article" that she had written. *Id*. "As a result of including these references," she alleges, "the email was entirely nonsensical, inappropriate, and unprofessional." *Id*. Strickland believes that the First Assistant sent this email solely to harass her because he knew that she was the only one who would understand its coded references. *Id*. at 59. Strickland was allegedly scared to be around the First Assistant due to what she viewed as his erratic and obsessive behaviors. *Id*. She came to believe, based upon information conveyed to her by other employees, that the First Assistant was essentially stalking her. *Id*.

On September 5, 2018, Strickland spoke to the Circuit Executive by telephone in his capacity as the Fourth Circuit's EDR Coordinator. As previously noted, the EDR Plan provided that the Circuit Executive would serve as the EDR Coordinator. *Id*. The Circuit Executive informed Strickland that a human resources specialist would be promptly

investigating her complaints. *Id*. When Strickland asked about the scope of the investigation, the Circuit Executive stated that it would cover allegations of sexual harassment by the First Assistant. *Id*. Strickland allegedly informed the Circuit Executive that she was also alleging retaliation by the FPD. *Id*. at 60. The Circuit Executive allegedly told Strickland that it was not helpful for her to have reported her complaints to the AO. *Id*. He stated that her doing so meant that "barriers go up" and people are "on guard." *Id*.

On September 10, 2018, Strickland filed a request for counseling under the EDR Plan. *Id*. at 62. Strickland named both the First Assistant and the FPD as alleged violators of the EDR Plan. *Id*. She alleged that she had been subjected to unlawful harassment, retaliation, and discrimination. *Id*. Strickland requested the following relief: "An environment free of harassment, retaliation, and discrimination, the opportunity for merit-based advancement, and any other appropriate relief." *Id*. Strickland also filed a separate request, asking that the FPD be disqualified from serving as the employing office's representative under Chapter X, Section 7 of the EDR Plan. *Id*.

On September 18, 2018, Strickland met with the Circuit Executive in person. *Id*. at 63. After speaking with Strickland, the Circuit Executive stated that he would direct a human resources specialist to conduct a single unified investigation into Strickland's allegations of misconduct on the part of both the First Assistant and the FPD. *Id*. at 65.

On October 5, 2018, Strickland met with the human resources specialist that was assigned to conduct the investigation. *Id*. at 66. During the four-hour-plus meeting, Strickland explained in detail the nature of the harassing and retaliatory behavior on the part of the First Assistant and the FPD. *Id*. At the request of the human resources specialist,

the two met again a second time on November 9, 2018. *Id*. at 67. During that meeting, the human resources specialist asked Strickland if she had been "friendly" to the First Assistant, whether her relationship with the First Assistant "broke down" over a case assignment, and whether the First Assistant's behavior was "sexual" in nature. *Id*. The human resources specialist also informed Strickland that the specialist was focusing her investigation on the sexual-harassment claims regarding the First Assistant and in turn how the FPD "handled" those claims. *Id*. at 68. The human resources specialist stated that she did not understand Strickland's claims of retaliatory conduct on the part of the FPD to be part of the investigation that the Circuit Executive had ordered. *Id*. The human resources specialist also informed Strickland that the investigative report would contain only facts and that she expected the Circuit Executive to make the final decisions. *Id*. at 69.

On November 12, 2018, Strickland emailed the Circuit Executive, with a copy to the Chief Judge, to inquire about the status of her request for counseling. *Id*. Strickland noted in her email that the counseling period outlined in the EDR Plan would likely expire before the human resources specialist had completed her investigation. *Id*. The Circuit Executive responded by stating that the human resources specialist was conducting a "joint investigation" that would cover both Strickland's report of wrongful conduct and her request for counseling. *Id*. at 70. The Circuit Executive stated that Strickland's counseling period under the EDR Plan would end on November 29, 2018, and could not be renewed even if the joint investigation was not concluded by that date. *Id*. The Circuit Executive also stated that the FPD had "taken numerous steps" to protect Strickland's safety, but did not detail what those steps were. *Id*.

28

Strickland followed up by email and asked the Circuit Executive a series of questions. *Id.* at 70–71. The Circuit Executive responded by email, but did not directly answer any of Strickland's questions. *Id.* at 71. Instead, the Circuit Executive stated that the FPD had allowed Strickland to telework, had removed her from the First Assistant's chain of command, and had taken other unspecified steps to avoid contact with the First Assistant. *Id.* The Circuit Executive asked Strickland to "articulate precisely what it [wa]s" that she was "looking for" so that he could "present" her ideas to the FPD for "discussion." *Id.* In doing so, the Circuit Executive stated: "Reiterating that you want a safe workplace free of harassment isn't helpful because [the FPD] already believes that he's done and is doing all he can to provide such a workplace for you." *Id.*

On November 19, 2018, the human resources specialist emailed Strickland, with a copy emailed to the Circuit Executive, and asked for a "specific list of demands you feel would bring this situation to an agreeable resolution." *Id.* The human resources specialist asserted in the email that some "steps" had already been taken by the FPD, including reclassifying Strickland as an assistant federal public defender and taking her out of the chain of command of the First Assistant. *Id.* at 72. According to Strickland, the human resources specialist's email suggested that Strickland had accepted the legitimacy of these "steps," despite the fact that Strickland had asserted otherwise. *Id.* Lastly, the human resources specialist stated that she needed Strickland to make "concrete specific requests" regarding how she could "feel safe" in "an environment free from harassment and intimidation and where advancement is based on merit." *Id.*

29

On November 21, 2018, Strickland sent an email to the Circuit Executive, with a copy to the Chief Judge. *Id*. at 76. Strickland stated, in pertinent part, that "[t]his situation has irreparably damaged my relationships with the Federal Defender and my colleagues, and I believe I am no longer welcome in that environment. I would appreciate the Fourth Circuit's assistance in transitioning me out of [the FPDO]." *Id*. Strickland sent a similarly worded email in response to the human resources specialist's email of November 18, 2018. *Id*.

On November 25, 2018, the Circuit Executive asked Strickland for a copy of her resume and stated that he would "make inquiries" to federal defenders' offices around the Fourth Circuit. *Id*. Strickland provided the Circuit Executive with a copy of her resume and asked if he would send it to federal defenders' offices and to Article III judges within the Fourth Circuit. *Id*. The Circuit Executive stated that he would circulate her resume to other federal defenders' offices, but would leave it to Strickland to contact judges in the Fourth Circuit. *Id*. at 77.

On November 27, 2018, Strickland and the Circuit Executive spoke by phone. *Id*. The Circuit Executive informed Strickland that he had received the human resources specialist's report but had sent it back. *Id*. According to the Circuit Executive, the report set forth a "chronology" of facts that "we all know." *Id*. The Circuit Executive stated that he told the human resources specialist that it would be "helpful" if the report included "findings and recommendations." *Id*. Strickland asked the Circuit Executive who would be responsible for acting on the human resources specialist's final report, and the Circuit Executive stated that he would receive the report and then a decision would be made about

30

discipline. *Id.* at 78. Strickland also asked the Circuit Executive about the status of her retaliation claims, and the Circuit Executive stated that he was not sure whether her allegation of retaliation was part of the human resources specialist's investigation. *Id.* In addition, Strickland asked about the status of her motion to disqualify the FPD, and the Circuit Executive stated that he and the Chief Judge had discussed the motion and agreed that disqualifying the FPD would be "premature" absent a finding against the FPD. *Id.* The Circuit Executive also stated that if the FPD was disqualified, then no one would represent the employing office. *Id.* at 79. Strickland and the Circuit Executive discussed whether Strickland wanted to remain with the FPDO at all, and Strickland expressed concern whether she could continue to work there because she felt unwelcome and like she was being "forced out." *Id.* at 81.

On November 28, 2018, the Circuit Executive told Strickland that he had checked with the human resources specialist regarding the retaliation claims and the human resources specialist had assured him that she would include those claims in her report. *Id.* Later that same day, Strickland emailed the human resources specialist to update her on the retaliation that she had experienced since filing her complaint. *Id.* She also contacted the Chief Judge and requested an extension of her counseling period for 30 days from the date the investigation report was completed in order to allow her time to assess the options for resolving her claims. *Id.*

On November 30, 2018, the Chief Judge issued a written order granting in part and denying in part Strickland's request to extend the counseling period. *Id.* at 82. The order

specifically extended the counseling period until January 16, 2019, but did not extend the counseling period to thirty days from the date that the investigation report was completed.

On January 11, 2019, the Circuit Executive contacted Strickland and informed her that he had received the amended investigation report from the human resources specialist and would "be in touch." *Id*. at 82. On January 16, 2019, the Circuit Executive emailed Strickland and informed her that her counseling period had expired. *Id*. at 83. The Circuit Executive also informed Strickland that the Chief Judge "intend[ed]" to deny her request to disqualify the FPD. *Id*.

On January 17, 2019, Strickland and the Circuit Executive spoke by phone. *Id*. Strickland asked the Circuit Executive to explain the reasons for the impending denial of her motion to disqualify the FPD. *Id*. The Circuit Executive declined to answer, and instead stated that he was drafting a denial order that would explain the reasons. *Id*. The Circuit Executive also informed Strickland that, per the advice of the Office of the General Counsel, neither she nor the employing office would receive a copy of the investigation report or any summary of its findings and recommendations. *Id*. According to the Circuit Executive, it was the Office of the General Counsel's opinion that the report was an "internal document only" and that distributing the report to the parties would make it more difficult to resolve the matter informally because both parties would likely fight about parts of the report rather than focusing on the issues in the case. *Id*. Strickland asked the Circuit Executive to identify what section of the EDR Plan referred to "internal documents." *Id*. The Circuit Executive could not identify any part of the EDR Plan that referred to "internal documents" and admitted that the EDR process was not "perfect." *Id*. at 84.

32

Strickland learned from the Circuit Executive that the First Assistant had called the Circuit Executive and stated that the ongoing EDR proceedings had been a "living hell" for him and that he had been suffering from physical symptoms. *Id*. The Circuit Executive admitted to Strickland that it was inappropriate for the First Assistant to have called the Circuit Executive and that the Circuit Executive told the First Assistant not to call again. *Id*.

On January 22, 2019, Strickland sent an email to the Chief Judge and the Circuit Executive asking to be transferred to a federal defender office in an adjacent district. *Id*. at 85. On January 24, 2019, Strickland was informed that the Chief Judge had directed the Circuit Executive "to lend appropriate assistance" with a transfer. *Id*.

On January 30, 2019, Strickland filed a request for mediation under the EDR Plan.[5] *Id*. On February 7, 2019, Strickland met with the appointed mediator (Mediator) in the law library of a Fourth Circuit judge. *Id*. at 86. The Mediator acknowledged that it would be difficult for Strickland to return to work. *Id*. The Mediator stated that the First Assistant's "quid pro quo email" was "inappropriate," and also stated his opinion that the Defender was from a "generation" that doesn't "get" sexual harassment. *Id*. The Mediator admitted that there were problems with the EDR Process, and he acknowledged that you "give up a

---

[5] This request was made by Strickland within fifteen days of what the Circuit Executive informed Strickland to be the end of the counseling period. Strickland's request effectively triggered the running of the thirty-day mediation period provided for in the EDR Plan.

33

lot" as a judiciary employee. *Id.* Ultimately, the Mediator promised that he would press the FPD on a duty station transfer and other requested terms. *Id.*

On February 12, 2019, the Mediator spoke to Strickland by phone and informed her that the FPD would permit her to transfer to another duty station where she would likely have to share an office with an intern. *Id.* at 87. Strickland told the Mediator that a transfer under these circumstances would further humiliate and stigmatize her because the whole office would know that the FPD had likely prioritized an intern over her. *Id.* The Mediator suggested that Strickland put these issues aside and attempt to "work something out." *Id.* The Mediator also informed Strickland that the FPD was in agreement that the First Assistant could no longer be "involved" with Strickland's work. *Id.* Strickland asked the Mediator what would happen if an EDR settlement was breached, and the Mediator stated that in his experience, the only remedy for the breach of an EDR settlement was the filing of another EDR claim. *Id.* Strickland suggested to the Mediator that, under the circumstances, a duty station transfer alone would not accomplish anything and that the underlying harassment and retaliation needed to be addressed. *Id.*

On February 14, 2019, Strickland met with the newly selected Judicial Integrity Officer (JIO) in Washington, D.C. *Id.* at 88. The JIO stated, in part, that a Circuit Executive should never serve as an EDR Coordinator due to inherent conflicts of interest. *Id.* But the JIO also stated that just because every court handles the EDR process differently does not mean that employees' rights are being violated. *Id.* The JIO warned Strickland that if she did not submit the entire factual basis for her claims in writing to her employing office, she risked waiving claims. The JIO also opined that the five-page

34

narrative that Strickland had submitted with her request for counseling was not sufficient to "preserve" her claims. *Id*. In addition, the JIO told Strickland that a presiding officer would not have authority to order the First Assistant's termination, and further noted that Article III judges do not have authority to manage a federal defenders' office. *Id*. at 90.

On February 22, 2019, Strickland's representative (it is unclear from the complaint who this representative was) submitted to the Circuit Executive a more detailed factual narrative. *Id*. at 91. This supplement included highly sensitive details, including information that Strickland believed could potentially expose other employees to retaliation, that Strickland would not have disclosed voluntarily to the FPD. *Id*. Strickland expected that the Circuit Executive would keep this supplement confidential. *Id*. Strickland's representative specifically requested that the supplement be redacted to protect other employees' identities if shared with the FPD. *Id*. at 92. The Circuit Executive, however, at the advice of the Office of the General Counsel, forwarded the supplement directly to the FPD, the Chief Judge, and the Mediator. *Id*.

On February 26, 2019, Strickland met with the Mediator in a Fourth Circuit judge's law library. *Id*. The Mediator told Strickland that she could not transfer to the federal defender's office in the adjacent district that she had requested because that office did not have an opening. *Id*. The Mediator also told Strickland that the FPD had been unresponsive since their first conversation. *Id*. at 93. The Mediator offered to help Strickland find another job. *Id*. Strickland responded by asking the Mediator to help her secure a Fourth Circuit clerkship; she believed that securing a clerkship would help prevent her existing employment situation from destroying her reputation. *Id*.

35

After the meeting, the Mediator traveled to Richmond, Virginia, to advocate on Strickland's behalf for a clerkship. *Id.* Shortly thereafter, the Mediator called Strickland and informed her that a Fourth Circuit judge had a term clerkship vacancy that had been open for at least several weeks. *Id.* The Mediator informed Strickland that this judge wanted to interview Strickland. *Id.* On March 8, 2019, Strickland interviewed with the Fourth Circuit judge and was offered the clerkship position. *Id.*

Strickland told the Mediator that the clerkship was a "very nicely packaged constructive discharge." *Id.* at 94. She explained that, in her view, she was giving up her career at the FPDO because she was harassed and retaliated against without any accountability. *Id.* Strickland called the situation the "collective fault of the institution." *Id.* The Mediator responded that Strickland should be thankful for what went right for her. *Id.* Further, the Mediator stated that a lot of people had worked to make this outcome possible, even though they did not have to do anything for her. *Id.*

Strickland formally resigned from the FPDO effective March 15, 2019. *Id.*

On May 1, 2019, while Strickland was serving as a Fourth Circuit judicial law clerk, she contacted the Circuit Executive and asked for a status update on her wrongful-conduct report. *Id.* at 96. The Circuit Executive responded and said that the wrongful-conduct proceeding was still ongoing *Id.* Strickland asked the Circuit Executive if she could meet with him in person. *Id.*

On May 7, 2019, Strickland met with the Circuit Executive and a human resources administrator in Richmond, Virginia. *Id.* Strickland asked for an update on her wrongful-conduct proceeding. *Id.* The Circuit Executive stated that, on the advice of the

36

Office of the General Counsel, he could not tell Strickland anything about the proceeding or its outcome. *Id*.

On June 4, 2019, the Circuit Executive sent Strickland an email, with a copy sent to the Chief Judge, stating:

> I wanted to let you know that disciplinary action was taken last week as a result of your report of wrongful conduct. As we discussed previously, I cannot reveal the nature of the action because it is a disciplinary matter. But I wanted to let you know that action was taken, and I wanted to re-emphasize that: (1) the Fourth Circuit took your report very seriously, (2) Chief Judge Gregory ordered a painstaking and exhaustive investigation into your allegations, and (3) actions were taken based on careful consideration of the investigation report.

*Id*. at 97.

To date, Strickland has never been informed of the findings on her complaint or what corrective actions were taken. *Id*. at 98. According to Strickland's complaint, however, all of the individuals responsible for the harassment, retaliation, and discrimination against her still hold their same positions and titles at the FPDO. *Id*. (We note that this allegation is no longer accurate as to the FPD himself, who was not reappointed. Aplt. Br. at 19 n.2)

### C. *Procedural history*

Strickland initiated these proceedings on March 3, 2020, by filing a complaint against the United States of America, the Judicial Conference, the AO, James Duff (then the Director of the AO), Roslynn Mauskopf (then the Chair of the Judicial Conference Committee on Judicial Resources), Sheryl Walter (General Counsel for the AO), John Does (attorneys employed in the Office of the General Counsel), the Fourth Circuit, the Judicial

Council of the Fourth Circuit, Roger Gregory (the Chief Judge of the Fourth Circuit), James Ishida (the Circuit Executive and EDR Coordinator), and the FPD.[6]  *Id.* at 19.  Three of the defendants—Gregory, Ishida, and the FPD—were named in both their official and individual capacities.  Walter and the John Does were named in their individual capacities only.

The first claim for relief asserted in the complaint, titled "Fifth Amendment: Due Process," alleged, in pertinent part, that defendants (the claim does not distinguish between the defendants and thus presumably includes all of the defendants) "knowingly deprived [Strickland] of her property interests without the due process of law in violation of the Fifth Amendment to the United States Constitution" by (a) "adopting, promulgating, and implementing policies and practices under which [Strickland] was deprived of immediate and effective action on, and meaningful review of and remedies for, the harassment, retaliation, and discrimination she suffered," (b) "by violating the limited procedural protections and rights [Strickland] was afforded under the EDR Plan," and (c) "by discriminating against [Strickland] based on her gender in violation of protected employment rights."  *Id.* at 99.  The first claim for relief does not identify precisely what each defendant did or failed to do.  Strickland's opening appellate brief, however, provides slightly more detail as to what she is claiming:

---

[6] As previously noted, defendant Duff has since retired as the Director of the AO. Defendant Mauskopf now serves as the Director of the AO.  Mauskopf was replaced by defendant Brian Stacy Miller as Chair of the Judicial Conference Committee on Judicial Resources.

38

> The Fourth Circuit's internal complaint process, known as the Employment Dispute Resolution Plan ("EDR Plan"), failed to provide a fair process, meaningful review of her claim or remedies to stop the harassment. The design of the EDR Plan and its implementation were deeply unfair and grossly inadequate. Through the EDR process, defendants ratified, facilitated, and aggravated the hostile work environment, which became so intolerable that [Strickland] was forced to resign and lose her career as a federal public defender.

Aplt. Br. at 2. According to Strickland, "[t]he due process violations here consisted of serious procedural defects in both 1) the EDR Plan's design (facial); and 2) officials' implementation of the EDR process (as applied)." *Id.* at 60. In short, Strickland alleges, defendants "violated her Fifth Amendment due process right by denying her fair procedures for resolving her discrimination complaint." *Id.* at 20–21. The first claim for relief alleged that "[a]s a result of Defendants' unlawful conduct, [Strickland] has suffered psychological harm, emotional distress, humiliation, embarrassment, and monetary damages." JA, Vol. 1 at 99.

The second claim for relief in Strickland's complaint, titled "Fifth Amendment: Equal Protection," alleged that defendants violated Strickland's Fifth Amendment equal protection rights by (a) "subjecting [her] to harassment, retaliation, and discrimination, (b) "failing to take immediate and effective action on her complaints," and (c) "failing to provide her with meaningful review or remedies." *Id.* at 100. The complaint does not identify precisely what each defendant is alleged to have done or failed to do. But again, Strickland's opening appellate brief provides more detail about this claim:

> The [FPD] ratified the [First] Assistant's harassing conduct, most significantly by refusing to consider [Strickland] for the promotion for which she was qualified—a discriminatory follow-up to the Assistant's quid-pro-quo sexual harassment. The meaning of the [First] Assistant's harassing

39

email was that if [Strickland] didn't "pay" in the way he wanted, that is, sexually, she would not get the promotion. In refusing to consider the promotion—even going to lengths to backdate his reclassification of her title to the day before she became eligible for promotion, . . . the Defender made good on the [First] Assistant's threat. This response was clearly unreasonable and effectively caused further harassment.

Second, after Fourth Circuit and AO officials were put on notice of the sexual harassment and of the [FPD's] disregard of AO advice on stopping it, they protected the [FPD] rather than taking steps to end the harassment. The officials prohibited [Strickland] from seeking guidance about her civil rights from the FEOO. The officials allowed the [FPD] to drive the process despite his conflict of interest: The [FPD] appointed the investigator to investigate the allegations, and decided how to discipline the Assistant. The Chief Judge refused to disqualify the [FPD] from acting on behalf of the employing office in the dispute resolution process. Officials failed to conduct an impartial investigation by a well-trained investigator. The Circuit Executive limited the investigation's scope to exclude the [FPD's] wrongful conduct. As a result, the Investigator did not fully investigate [Strickland]'s claims.

Aplt. Br. at 46–47. As with the first claim for relief, the second claim for relief alleged that, "[a]s a result of Defendants' unlawful conduct, [Strickland] has suffered psychological harm, emotional distress, humiliation, embarrassment, and monetary damages." JA, Vol. I at 100.

The third claim for relief alleged that defendants conspired to violate Strickland's civil rights, in violation of 42 U.S.C. § 1985, "[b]y agreeing to implement, and taking actions on, policies, procedures, and practices whereby [she] was subjected to sexual harassment, discrimination, and retaliation and deprived of immediate and effective action on her complaints, and meaningful review and remedies, all on account of her gender." *Id*. The fourth and final claim for relief alleged that defendants violated 42 U.S.C. § 1986 by neglecting to prevent the conspiracy to violate Strickland's civil rights. *Id*. Both the third

and fourth claims, like the first two claims, alleged that "[a]s a result of Defendants' unlawful conduct, [Strickland] has suffered psychological harm, emotional distress, humiliation, embarrassment, and monetary damages." *Id.* at 100, 101.

Under the heading "REQUESTED RELIEF," the complaint asked for declaratory relief, compensatory and punitive damages, front pay as equitable relief in lieu of reinstatement, back pay as equitable relief for the unlawful termination of her employment pursuant to the Back Pay Act, pre- and post-judgment interest on all amounts awarded, and reasonable attorney's fees and costs.

All of the Official Capacity Defendants moved to dismiss Strickland's complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). *Id.* at 256. The Individual Capacity Defendants also each filed motions to dismiss Strickland's claims against them pursuant to Fed. R. Civ. P. 12(b)(6). Strickland opposed those motions and also filed motions for partial summary judgment against all of the defendants.

On December 30, 2020, the district court issued a memorandum and order granting the Official Capacity Defendants' motion to dismiss on the grounds of sovereign immunity, and granting the Individual Capacity Defendants' motion to dismiss on the grounds that Strickland's complaint failed to allege cognizable claims against them. *Id.*, Vol. IV at 1492–93. Regarding the issue of sovereign immunity for the Official Capacity Defendants, the district court rejected Strickland's argument that both 28 U.S.C. § 1331 and the Back Pay Act waived those officials' sovereign immunity. *Id.* at 1507–08. The district court also rejected Strickland's argument "that section 702 of the Administrative Procedure Act [(APA)] waive[d] the Official Capacity Defendants' sovereign immunity." *Id.* at 1509. In

41

doing so, the district court noted that "[a]lthough section 702 waives sovereign immunity with respect to agencies, 5 U.S.C. § 702, 'the courts of the United States' are not agencies, *id*. § 701(b)(1)(B)." *Id.*  And the district court concluded, citing an unpublished Ninth Circuit opinion, that because "[t]he District Courts may make recommendations concerning nominees for the position of Federal Public Defender and the Courts of Appeals appoint, compensate, and remove Federal Public Defenders, . . . the Official Capacity Defendants [we]re part of the federal judiciary for purposes of the APA, and that the APA therefore d[id] not waive the Official Capacity Defendants' sovereign immunity." *Id*. at 1510–11.  As a result, the district court concluded that it lacked subject matter jurisdiction over the claims asserted by Strickland against the Official Capacity Defendants.  *Id*. at 1511.

The district court also concluded in its memorandum and order that Strickland "fail[ed] to allege cognizable constitutional claims" against the Individual Capacity Defendants.  *Id*. at 1512.  Addressing Strickland's first claim for relief, which alleged a violation of her Fifth Amendment procedural due process rights, the district court concluded that Strickland failed to adequately allege that "she . . . lost something that fits into one of the three protected categories: life, liberty, or property."  *Id*. at 1513 (internal quotation marks omitted).  Although the district court noted that Strickland purported "to have a liberty interest 'in being free from unlawful discrimination,' which she alternatively label[ed] 'a right to be free of sex discrimination in her workplace,'" the district court concluded that this claim found no support in either Supreme Court or lower federal court precedent.  *Id*. at 1515.  Consequently, the district court concluded "that [Strickland]

42

fail[ed] to allege that the Individual Capacity Defendants deprived her of a protected liberty interest."[7]  *Id*. at 1516.

The district court next addressed Strickland's allegation in her first claim for relief that she had "purported property interest[s] . . . 'in the [EDR] Plan's terms as a condition of her employment,' a 'right to prompt and effective remedial action on her complaints[,]' and [a] 'right to meaningful review and remedies.'"  *Id*. at 1517.  The district court concluded that "'[p]roperty' cannot be defined by the procedures for its deprivation."  *Id*. at 1519 (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985)).  And it in turn "conclude[d] that [Strickland] fail[ed] to allege that the Individual Capacity Defendants deprived her of a protected property interest."  *Id*.

Turning to Strickland's second claim for relief, which alleged a violation of her Fifth Amendment equal protection rights, the district court noted that Strickland did not allege either that defendants had made a classification on the basis of sex or took an action that resulted in a disparate impact that could be traced to a discriminatory purpose.  *Id*. at 1520.  Instead, the district court noted that Strickland was "attempt[ing] to graft precedent interpreting Title VII onto the Fifth Amendment."  *Id*.  Consequently, the district court concluded that the "case present[ed] a matter of first impression in th[e] [Fourth] [C]ircuit: *viz*, whether a Title VII theory of discrimination on the basis of sex states a claim for discrimination on the basis of sex under the Fifth Amendment Equal Protection Clause."

---

[7] Strickland states in her opening brief that, "[c]ontrary to the District Court's understanding," she "did not assert procedural due process claims against the Individual Capacity Defendants."  Aplt. Br. at 22 n.5.

43

*Id*. at 1521. Addressing that question, the district court noted that "the Fourth Circuit has not held that courts must apply Title VII standards to free-standing Fifth Amendment claims," and in fact "rejected a similar attempt to graft Title VII standards onto a free-standing Fourteenth Amendment equal protection claim." *Id*. at 1522 (citing *Wilcox v. Lyons*, 970 F.3d 452, 460 (4th Cir. 2020)). The district court also noted that Strickland's "complaint [wa]s void of any allegation that women are treated differently than men under the EDR Plan" or "that the actions taken against her were on the basis of her sex." *Id*. at 1523. Instead, the district court noted, Strickland "theorizes that the Individual Capacity Defendants discriminated against her on the basis of sex when they mishandled her sexual harassment complaints, ultimately leading to retaliation and constructive discharge." *Id*. The district court concluded that "[t]o condone such a theory would be to graft Title VII standards onto the Fifth Amendment, when in *Wilcox* the Fourth Circuit rejected such a theory with respect to the Fourteenth Amendment." *Id*. at 1523–24. The district court also concluded that "Supreme Court precedent supports the conclusion that only theories of traditional class-based discrimination are cognizable under the Fifth Amendment Equal Protection Clause." *Id*. at 1524 (citing *Davis v. Passman*, 442 U.S. 228, 230 (1979)).

As for Strickland's claim for conspiracy to deny equal protection of the laws under 42 U.S.C. § 1985(3), the district court concluded that her complaint "fail[ed] to plead" that defendants were motivated by a specific class-based, invidiously discriminatory animus. *Id*. at 1526. Instead, the district court noted that Strickland's theory of liability was "the more sweeping Title VII standards regarding sexual harassment as discrimination on the basis of sex." *Id*. The district court therefore granted the Individual Capacity Defendants'

44

motion to dismiss Count III of Strickland's complaint.  And the district court in turn concluded that "[t]he dismissal of Count III require[d] the dismissal of Count IV because section 1986 applies only to actors who could have prevented the section 1985 injury but failed to do so."  *Id*.

Final judgment was entered in the case on December 30, 2020.  *Id*. at 1528–29.

On January 26, 2021, Strickland filed a motion to reconsider.  *Id*. at 1530.  Strickland argued in her motion that (1) the district court "did not consider [her] claims for equitable relief, which," she argued, "[we]re not barred by sovereign immunity," (2) the district court "did not consider the fact that the EDR process is the *exclusive* remedy for discrimination, which requires due process protections," and (3) the district court "construed [her] equal protection claims as 'pure' retaliation, but . . . did not consider her allegations of gender discrimination."  *Id*. (emphasis in original).  Strickland argued that she was "entitled to specific relief requiring judiciary officials to comply with their legal duties under the EDR Plan and the Constitution to provide appropriate remedies for discrimination."  *Id*. at 1535.

Strickland noted in support that "the premise of [her] complaint [wa]s that she was forced to resign because of the failures of the EDR process, which deprived her of any meaningful review of or remedies for unlawful discrimination."  *Id*.  Strickland also asserted that the district court "failed to consider her allegations that she was subjected to illegal discrimination because of her gender," including "sexual harassment, discrimination, retaliation, fail[ure] to take immediate and effective remedial action on her complaints, and depriv[ation] . . . of any meaningful remedies or review, resulting in her constructive discharge."  *Id*. at 1546.

45

The district court summarily denied Strickland's motion to reconsider.[8]

Strickland filed a notice of appeal on March 29, 2021.

## II

Before addressing the merits of Strickland's appeal, we must first address Strickland's motion to vacate or disqualify. For the reasons that follow, we decline to vacate the district court's judgment or disqualify this panel from this case.

### A.     *The designation and assignment process*

The Chief Justice of the United States is vested by statute with the authority to designate and assign visiting judges. 28 U.S.C. §§ 291(a), 292(d). It is undisputed that, in practice, the Chief Justice discharges that responsibility with assistance from the Judicial Conference's Intercircuit Assignment Committee and AO staff.

In this case, the Chief Justice was twice called upon to designate and assign visiting judges. The first occasion occurred after Strickland filed her complaint in the district court and all of the judges in the United States District Court for the Western District of North Carolina recused themselves. The second occasion occurred after Strickland filed her appeal and all of the judges in the Fourth Circuit recused themselves.

In both instances, the same procedures were employed. To begin with, the Fourth Circuit Clerk of Court contacted the AO's Judicial Services Office and asked for (a) a visiting judge to be designated and assigned to preside over the district court proceedings,

---

[8] The joint appendix does not appear to include a copy of the district court's order denying Strickland's motion to reconsider. It is undisputed, however, that the district court summarily denied the motion. Aplt. Br. at 24.

46

and (b) a panel of visiting judges to be designated and assigned to preside over Strickland's appeal.  In response, a senior attorney in the AO's Judicial Services Office "consulted [a] roster of judges who indicated a willingness to serve in recusal cases outside of their circuits."  ECF 124, Ex. A at 1.  In doing so, the senior attorney focused solely on the "availability and willingness to serve" of the judges listed on the roster.  *Id*. at 2.  After identifying potential judges from the roster, the senior attorney contacted those judges to obtain "their consent to serve."  *Id*.  The senior attorney then notified the Chair of the Committee on Intercircuit Assignments and the Fourth Circuit Clerk of Court of the identified judges' names "so that the Clerk's assistant could complete the certificates of necessity and obtain the circuit chief judge's signature for the certificates."  *Id*.  In executing these procedures, the senior attorney "had no discussions with any of the named defendants about this case."  *Id*.

In the district court proceedings, the parties were notified of the Chief Justice's designation and assignment of a visiting district court judge on April 17, 2020.  JA, Vol. I at 122.  None of the parties objected to that designation and assignment.

In these appellate proceedings, the Fourth Circuit Clerk of Court notified the parties on April 8, 2021, "that the judges of the court ha[d] recused themselves from consideration of this appeal," and that, consequently, "the appeal w[ould] be assigned to judges designated in accordance with 28 U.S.C. §§ 291(a), 292(d), and 294(d)."  ECF 8 at 1.  The designation and assignment orders were subsequently issued on May 7, 2021, but were not publicly disclosed at that time.

47

### B.    *Strickland's motion to vacate or disqualify*

On October 29, 2021, Strickland filed a motion to disclose all designation and assignment orders for this appeal.  ECF 78.  The court granted that motion on November 1, 2021, and disclosed to the parties the designation and assignment orders for each panel member.

On January 18, 2022, Strickland filed a motion to disclose public records from the intercircuit assignment process in this case, including both the district court and appellate assignments.  ECF 101.  In her motion, Strickland argued that "[t]he intercircuit assignment procedures that would be followed in the ordinary case raise serious fairness concerns in the context of this case" because the defendants in the case "include[d] parties who would typically participate in the intercircuit assignment process to select judges to sit on a particular case."  *Id*.  She in turn argued that "[t]he ordinary procedures for intercircuit assignment raise an unfortunate appearance that parties to this suit, who have a clear interest in its outcome, were able to participate in the selection of particular judges to decide their own case."  *Id*. at 1–2.  Strickland argued that, "[t]o dispel the appearance of unfairness," the court should disclose "all intercircuit-assignment records for this case, both in the district court and on appeal."  *Id*. at 2.  Strickland emphasized, however, that she was "not question[ing] the impartiality of the panel assigned to hear this appeal."  *Id*. at 15.

Defendants filed a response to Strickland's motion to disclose, asserting that "there are no public records concerning the intercircuit assignment process, and the underlying communications and forms, like all working papers of the Judicial Conference, are ordinarily not subject to disclosure."  ECF 108 at 2.  Nonetheless, defendants "ma[de] a

discretionary disclosure of several documents, including the recommendation memorandum to the Chief Justice, the certificates of necessity, and the cover letters accompanying the designations and assignment orders" for this appellate panel. *Id*. Defendants outlined how the intercircuit assignment process played out in this appeal, noting generally the steps taken by the AO staff attorney in making the selections and also noting that "[t]he Director of the AO—Judge Roslynn Mauskopf—recused herself from participating in the assignment process" and that "Lee Ann Bennett, the Deputy Director of the AO, . . . signed the memorandum recommending that the Chief Justice approve the proposed assignments in this case." *Id*. at 4–5. Defendants further noted that the AO staff attorney "was neither directed by nor influenced by any of the named defendants" in carrying out the selection process. *Id*. at 5. Defendants conceded that defendant "Gregory transmitted the certificates of necessity to the Judicial Conference after the Committee had made the selection, and [defendant] Ishida received notice of the assignments once they were approved by the Chief Justice," and "thereby learned the identity of the judges on the panel" prior to the other parties and counsel in this matter. *Id*. Defendants also noted that, "[w]hile some courts—including the district court in this case—enter [the designation and assignment] orders on the docket in a specific case, other courts—including the Fourth Circuit—maintain the orders in their internal records and ordinarily do not enter them on the docket of a case." *Id*. at 4. Ultimately, defendants argued that Strickland's "fairness concerns [we]re misplaced" and noted her "conce[ssion] that th[e] [assigned] panel w[ould] review her appeal fairly and impartially." *Id*. at 6. Relatedly, defendants argued that "the Constitution does not require that all support staff and every member of the entire Judicial

49

Conference should have recused themselves from the intercircuit assignment process," and they argued that the participation of the AO staff attorney and the Deputy Director of the AO "d[id] not create the appearance of impropriety or conflict of interest." *Id*. at 7 (quotation marks omitted).

Strickland filed a reply brief, arguing that defendants' "limited disclosures . . . reveal[ed] that [defendants] did participate in selecting judges to hear their own case" and that "[t]his [wa]s a blatant conflict of interest." ECF 111 at 1. Strickland in turn argued that this, combined with the fact that defendants "knew the identity of the panel while [she] did not," "undermine[d] the integrity of this proceeding and taint[ed] any judgment that was entered or could be entered in this case." *Id*. at 2. "At a minimum," Strickland argued, "the judgment below should be vacated, and the case assigned to a judge on remand, selected by officials who serve entities that are not defendants in this suit." *Id*. at 10.

On February 4, 2022, Strickland filed a motion to vacate the district court's judgment or to disqualify the appellate panel. Strickland argued "that the district court judgment must be vacated based on the fact that the district court judge was selected by Defendants—regardless of who the judge was or whether he was actually biased." ECF 117 at 1. Strickland further argued that, "[t]hrough no fault of this panel, the same conflict of interest that tainted the district court's judgment also affects this appellate panel" and that, consequently, "this Court could alternatively conclude that the panel should be disqualified and another panel be appointed to order vacatur of the district court's decision." *Id*. at 2.

50

The panel in this case ordered respondents to file a written response to Strickland's motion to vacate or disqualify and to attach thereto "a Declaration from the 'staffer' (or 'staffers') detailing how he/she went about selecting both the district court judge in this case, as well as the current appellate panel." ECF 119 at 2.

Defendants filed their response to Strickland's motion to vacate or disqualify on February 17, 2022. Attached to their response was a declaration from the AO senior attorney who was involved in the designation and assignment process for both the district court and appellate proceedings in this case. That attorney noted that her duties include assisting the Committee on Intercircuit Assignments "in maintaining a roster of judges who have indicated a willingness to serve in recusal cases outside of their circuits." ECF 124, Ex. A at 1. The attorney in turn noted that, "[i]n finding judges for this district court case and appeal," she "consulted the roster of judges who indicated a willingness to serve in recusal cases outside of their circuits, as [she] ha[s] previously done in every case in which one or more judges have recused themselves." *Id*. She further noted that her "identification of judges who could be designated . . . was in no way affected by the nature of the claims, the factual allegations, the legal issues likely to be presented in the case, or the impact the case may have on Judiciary policies." *Id*. at 1–2. Instead, she noted that she "identified the judges based on [her] understanding of their availability and willingness to serve for the duration of the district court and appellate proceedings." *Id*. at 2.

### C.    Analysis

Strickland makes two alternative requests in her motion to vacate or disqualify. First, Strickland seeks vacatur of the district court's judgment based upon what she alleges

51

was a violation of her due process rights. Second, and alternatively, Strickland seeks disqualification of the panel in this case pursuant to 28 U.S.C. § 455 based upon what she states is "the *appearance* of partiality and the harm to the public perception." ECF 117 at 20 (emphasis in original). For the reasons outlined below, we deny both requests.

### 1) Vacatur of the district court's judgment

In seeking vacatur of the district court's judgment, Strickland asserts that "the participation by officials in the AO and the Judicial Conference in selecting the" district judge and this appellate panel "violated [her] due process rights, regardless of whether those officials were actually biased in selecting judges, and regardless of whether the judges they selected are actually biased." ECF 117 at 18. Strickland has not, however, pointed to any authority suggesting that a party in a civil proceeding has a due process right to have a district judge or appellate panel assigned in a particular manner. And we are not, in any event, persuaded that the involvement of AO and Judicial Conference officials in the designation and assignment process resulted in the deprivation of Strickland's due process right to a fair tribunal, either in the district court or in this appeal.

It is well established that "[a] fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955). "Fairness," the Supreme Court has held, "requires [both] an absence of actual bias in the trial of cases" and an effort to "prevent even the probability of unfairness." *Id.* That said, the Supreme Court has also emphasized that "'most matters relating to judicial disqualification [do] not rise to a constitutional level.'" *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 876 (2009) (quoting *FTC v. Cement Inst.*, 333 U.S. 683, 702 (1948)).

52

In addressing whether a party has been deprived of their due process right to a fair tribunal, "the Court asks not whether the judge is actually, subjectively biased, but whether the average judge in his position is likely to be neutral, or whether there is an unconstitutional potential for bias." *Id.* at 881 (quotation marks omitted). In other words, are the circumstances such that "experience teaches that the probability of actual bias on the part of the judge . . . is too high to be constitutionally tolerable." *Id.* at 877 (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)).

The few cases that Strickland cites in support of her due process claim are inapposite. For example, at issue in *Murchison* was the propriety of a Michigan state contempt proceeding where the same judge who presided "at the contempt hearing had also served as the 'one-man grand jury' out of which the contempt charges arose." 349 U.S. at 134. And in *Caperton*, the question presented was whether a due process violation occurred when a justice on the Supreme Court of Appeals of West Virginia voted with the majority to "den[y] a recusal motion" and "[t]he basis for the motion was that the justice had received campaign contributions in an extraordinary amount from, and through the efforts of, the board chairman and principal officer of the corporation found liable for the damages." 556 U.S. at 872.

Thus, in the end, Strickland's motion presents the novel question of whether the involvement of AO and Judicial Conference officials in the designation and assignment process in this case—where the AO and Judicial Conference have, as entities, been named as defendants—gives rise to a probability of actual bias on the part of the designated and assigned judges that is too high to be constitutionally tolerable. Notably, Strickland does

53

not offer any explanation of precisely how these circumstances have "created a constitutionally intolerable probability of actual bias." *Id*. at 882. Indeed, she suggests in her motion that it is immaterial "whether the judges . . . selected are actually biased," and that, instead, the mere appearance of impropriety is sufficient to give rise to a due process violation. ECF 117 at 18. But those arguments are belied by Supreme Court precedent which, as we have discussed, requires an objective probability of actual bias.

In any event, we are not persuaded that the circumstances at issue here are so "extreme" or "extraordinary" as to give rise to an objective probability of actual bias. *Id*. at 887. Unlike in the handful of cases where the Supreme Court has found an objective probability of actual bias, there are no financial interests of any involved judge at issue here, nor have any of the designated and assigned judges had any prior involvement in, or connection with, this matter. We further note that, to the extent the AO staff attorney exercised any discretion in selecting the district judge or the panel members and submitting their names for designation and assignment, that discretion appears to have been confined solely to matters of availability and willingness to serve as visiting judges.

To be sure, Strickland speculates that the AO staff attorney might have exercised her discretion to select judges who were more favorable to the defendants' positions in this case. But Strickland does not identify any factors that would objectively support such a conclusion, such as, for example, the staff attorney selecting a judge who had a prior relationship with one or more of the defendants. And, even assuming for purposes of argument that the AO staff attorney had attempted to utilize such factors in the selection process, the only way that could have been successful would have been if the designated

54

and assigned visiting judges also acted improperly and ignored their own responsibilities under 28 U.S.C. § 455(b) and the Code of Conduct for United States Judges to recuse based on those same factors. *See* 28 U.S.C. § 455(b) (requiring a judge to "disqualify himself . . . [w]here he has a personal bias or prejudice concerning a party"). In other words, in addition to being designated and assigned by the Chief Justice, the district judge and the panel members in this case each had an independent duty and responsibility to satisfy themselves that they were not required to recuse before they agreed to serve in this case. As a result, we are simply not persuaded that the circumstances presented here, viewed objectively, give rise to a probability of actual bias.

For all of these reasons, we reject Strickland's due process arguments and decline to vacate the judgment of the district court.

### 2) *Disqualification of the panel*

Strickland's motion also seeks the disqualification of the panel in this case as an alternative to vacating the district court's judgment. In support of that alternative request, Strickland cites to 28 U.S.C. § 455.

Section 455 "sets forth the legal criteria for disqualification of federal magistrates, judges, and Supreme Court Justices." *Microsoft Corp. v. United States*, 530 U.S. 1301, 1301 (2000) (Rehnquist, Chief Justice, writing separately). "This statute is divided into two subsections." *Id.* "Section 455(b) lists specific instances in which disqualification is required," *id.*, including, for example, where a judge "has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding," 28 U.S.C. § 455(b). As we have noted, each of the designated and assigned

55

judges in this matter would have, before accepting the assignments, considered the specific instances outlined in § 455(b) and concluded that their disqualification was not required. And, we note, Strickland does not invoke § 455(b) in her motion.

"Section 455(a) contains the more general declaration that a [judge] 'shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.'" *Microsoft*, 530 U.S. at 1302 (quoting 28 U.S.C. § 455(a)). "[W]hat matters under § 455(a)," the Supreme Court has held, "'is not the reality of bias or prejudice but its appearance.'" *Id.* (quoting *Liteky v. United States*, 510 U.S. 540, 548 (1994)). "This inquiry is an objective one, made from the perspective of a reasonable observer who is informed of all the surrounding facts and circumstances." *Id.*

In arguing that the panel's impartiality might reasonably be questioned, Strickland again points generally to the involvement of AO and Judicial Conference officials in the selection process. ECF 117 at 20. She also points to what she calls an "information asymmetry" that resulted from the Fourth Circuit's Chief Judge and its Circuit Executive learning the panel's identity approximately six months before Strickland, the attorneys in this case, and the public. *Id.*

Although we agree with Strickland that, from a public perception standpoint, it would have been preferable had no AO or Judicial Conference officials participated in the designation and assignment process, and that none of the defendants received notice of the panel's identity prior to the remaining parties, the attorneys, and the public, we nevertheless are not persuaded that these circumstances require our disqualification under § 455(a). In our view, "a reasonable observer who is informed of all the surrounding facts and

56

circumstances" would not reasonably question our impartiality. *See Microsoft*, 530 U.S. at 1302. Key in that regard, we believe, is the fact that there is no evidence that the AO staff attorney considered anything other than availability and willingness to serve in selecting which judges to designate and assign to serve in this appeal, and the fact that each panel member in this case, upon receiving notification of and before agreeing to the designation and assignment, was obligated to and actually considered whether there were any factors that required his or her disqualification under § 455(b). As for the fact that the Chief Judge and the Circuit Executive received early notice of the panel's identity, we fail to see how that has any impact on our analysis under § 455(a). It is undisputed that neither the Chief Judge nor the Circuit Executive informed their counsel in this matter about the panel's identity, and there is no evidence that these two defendants' early notice had any impact whatsoever on the manner in which this appeal was litigated.

For these reasons, we deny Strickland's alternative request for disqualification of the panel.

III

We now turn to the substance of Strickland's appeal. Strickland essentially challenges the entirety of the district court's decision dismissing her complaint. We therefore proceed by analyzing each of the claims for relief asserted by Strickland in her complaint and determining whether Strickland has stated valid claims for relief against the defendants. We also, after analyzing the substance of each of the claims, consider the various defenses that the defendants have asserted to the claims, including whether Strickland can assert *Bivens* claims against the Individual Capacity Defendants, and

57

whether the Official Capacity Defendants are entitled to sovereign immunity from Strickland's Fifth Amendment claims.

As we shall explain in greater detail below, we conclude that: (a) Strickland's Fifth Amendment due process claim adequately alleges the deprivation of cognizable property rights, but fails to adequately allege the deprivation of a cognizable liberty interest; (b) Strickland's Fifth Amendment due process claim fails to adequately allege a facial challenge to the EDR Plan, but adequately alleges an as-applied challenge to the EDR Plan; (c) Strickland's Fifth Amendment equal protection claim adequately alleges that defendants violated her right to be free from sex discrimination; (d) Strickland's claims under 42 U.S.C. §§ 1985(3) and 1986 fail to adequately allege claims upon which relief can be granted; (e) the Official Capacity Defendants are entitled to sovereign immunity from the Fifth Amendment due process and equal protection claims only to the extent those claims seek back pay; in other words, Strickland's potential recovery on those claims against the Official Capacity Defendants is limited to prospective equitable relief; (f) with respect to the Individual Capacity Defendants, Strickland's Fifth Amendment equal protection claim is subject to dismissal because Strickland cannot state a cause of action under *Bivens*; (g) neither the Administrative Procedure Act nor the Back Pay Act waive sovereign immunity for Strickland's claims for back pay against the Official Capacity Defendants; and (h) the Civil Service Reform Act does not bar Strickland's claims.

### A. *Standards of review*

"This Court reviews a district court's dismissal under Federal Rule of Civil Procedure 12(b)(6) de novo." *Skyline Restoration, Inc. v. Church Mut. Ins. Co.*, 20 F.4th

825, 829 (4th Cir. 2021). "The Court must 'accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff.'" *Id*. (quoting *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id*. at 679. In other words, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id*.

## B.    *The Fifth Amendment due process claim*

Strickland argues on appeal that the district court erred in dismissing the first claim for relief in her complaint, which alleged a violation of her Fifth Amendment due process rights. As we have noted, the district court dismissed this claim on the grounds that Strickland failed to allege a protected property or liberty interest. Strickland argues in her appeal that she "stated a claim that federal officials deprived her of protected property and liberty interests without due process by subjecting her to a fundamentally unfair process for resolving workplace discrimination claims." Aplt. Br. at 1. Strickland further argues that her "property interest was created and defined by the EDR Plan." *Id*. at 53. More specifically, she alleges that "[t]he EDR Plan granted [her] the right to be free from workplace discrimination, harassment, and retaliation," the right "to equal opportunities for promotions," and the right "to promotion according to [her] experience, training, and demonstrated ability and without regard to sex." *Id*. (internal quotation marks omitted).

59

Strickland argues that she also "had a liberty interest in pursuing her chosen career." *Id*. at 57.

To adequately allege a Fifth Amendment procedural due process claim, Strickland must allege that she (1) lost "something that fits into one of the three protected categories: life, liberty, or property," and (2) did not "receive the minimum measure of procedural protection warranted under the circumstances." *Mallette v. Arlington Cnty. Emps. Supplemental Ret. Sys. II*, 91 F.3d 630, 634 (4th Cir. 1996). The district court, in granting defendants' motion to dismiss, focused exclusively on the first prong of this test and concluded that Strickland "fail[ed] to allege that the Individual Capacity Defendants deprived her of a constitutionally protected interest." JA, Vol. IV at 1514.

For the reasons discussed below, we conclude that the district court erred in failing to recognize that the Fourth Circuit's EDR Plan afforded Strickland protected property interests, but did not err in concluding that Strickland failed to adequately allege a protected liberty interest. We also proceed to consider the second prong of the test and, in doing so, conclude that Strickland's facial challenge to the EDR Plan fails, but that her as-applied challenge is sufficient to state a claim upon which relief can be granted.

*1) Did Strickland adequately allege a protected property interest?*

The Supreme Court has identified "[c]ertain attributes of 'property' interests protected by procedural due process." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it." *Id.* "He must have more than a unilateral expectation of it." *Id.* "He must, instead, have a legitimate claim of entitlement to it." *Id.* Importantly,

60

"[p]roperty interests . . . are not created by the Constitution," but rather "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* A "person's interest in a benefit is a 'property' interest for due process purposes if there are . . . rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing." *Perry v. Sindermann*, 408 U.S. 593, 601 (1972). "[T]he types of interests protected as 'property' are varied and, as often as not, intangible, relating to the whole domain of social and economic fact." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982) (internal quotation marks omitted).

Here, Strickland alleges that she has protected property interests that were created and defined by the EDR Plan. According to Strickland, the EDR Plan granted her "the right to be free from workplace discrimination, harassment, and retaliation," the right to "equal opportunities for promotions," and the right "to promotion 'according to [her] experience, training, and demonstrated ability' and 'without regard to' sex." Aplt. Br. at 53 (quoting EDR Plan provisions). Strickland also argues that, "[c]ontrary to the District Court's reasoning, an employee need not claim an interest in 'continued employment' to allege a protected property interest." *Id.* at 55 (citation omitted).

A review of the EDR Plan clearly supports Strickland's arguments. To begin with, the EDR Plan repeatedly refers to "rights enumerated under the Plan." Aplt. App., Vol. II at 661. For example, § 1 ("Preamble") of Chapter 1 ("GENERAL PROVISIONS") states, in pertinent part: "This Plan . . . is intended to be the exclusive remedy of the employee

61

relating to *the rights enumerated under the Plan*." *Id*. (emphasis added). In turn, Chapter II of the EDR Plan, titled "EQUAL EMPLOYMENT OPPORTUNITY AND ANTI-DISCRIMINATION RIGHTS," purports to outline the rights that the EDR Plan affords to employees falling within the scope of the Plan's coverage (which includes, as relevant here, "[t]he unit executive and staff of the . . . Federal Public Defenders within the Fourth Circuit"). *Id*. at 661, 662. Section 1 of Chapter II, titled "General," states:

> Discrimination against employees based on race, color, religion, sex (including pregnancy and sexual harassment), national origin, age (at least 40 years of age at the time of the alleged discrimination), and disability is prohibited. Harassment against an employee based upon any of these protected categories or retaliation for engaging in any protected activity is prohibited. All of the above constitute "wrongful conduct." The rights and protections of Sections I through VII of the Plan shall also apply to employees.

*Id*. at 662. Section 4 of Chapter II, titled "Personnel Practices," in turn provides:

> A. Recruitment
>
> Each Court unit will seek qualified applicants who reflect the make-up of all such persons in the relevant labor market. Each unit will publicize all vacancies.
>
> B. Hiring
>
> Each Court unit will make its hiring decisions strictly upon an evaluation of a person's qualifications and ability to perform the duties of the position satisfactorily. Hiring decisions shall be made without regard to race, color, religion, sex, national origin, age, or disability.
>
> C. Promotion
>
> Each Court unit will promote employees according to their experience, training, and demonstrated ability to perform duties of a higher level. Promotion decisions shall be made without regard to race, color, religion, sex, national origin, age, or disability.

62

D. Advancement

Each Court unit will seek insofar as reasonably practicable to improve the skills and abilities of its employees through cross-training, job restructuring, assignments, details, and outside training.

*Id*. at 662–63.

Chapter X of the EDR Plan is titled "DISPUTE RESOLUTION PROCEDURES." *Id*. at 664. Section 1 thereof outlines the "General Procedure for Consideration of Alleged Violations," and begins by stating: "An employee who claims a *denial of the rights granted under Chapters II through VIII of this Plan* shall seek resolution of such claims through the procedures of this Chapter." *Id*. (emphasis added). Section 5 of Chapter X affords "[c]laimants under th[e] Plan . . . the right to be free from retaliation because of filing a claim pursuant to th[e] Plan." *Id*. at 665. Section 12 of Chapter X, titled "Remedies," states, in pertinent part, that "[w]here judicial officers acting pursuant to § 10 or § 11 of this Plan find that a substantive right protected by this Plan has been violated, they may order a necessary and appropriate remedy." *Id*. at 669.

The plain language of these provisions, in our view, indicates that the Fourth Circuit intended for the EDR Plan to afford its employees (including employees of each of the Fourth Circuit units listed in the Plan, which encompasses all of the federal defenders' offices) both substantive and procedural rights. As noted, the Plan (a) repeatedly and expressly refers to "rights" that are being afforded by the Plan to employees, (b) specifically outlines what those rights are, and (c) outlines a detailed set of procedures for employees to follow if they believe that any of the substantive rights afforded to them under the Plan have been violated. It is important to note that the Plan does not afford

63

employees a substantive right to continued employment.  Instead, the Plan effectively affords employees with the substantive right to work under conditions free from discrimination and harassment, as well as the substantive right to be free from retaliation in the event that they file a claim under the EDR Plan.[9]  The Plan also creates a clear and specific set of procedures that are to be followed in the event that an employee claims that his or her substantive rights afforded under the EDR Plan have been violated.

Notably, the district court did not consider any of these provisions of the EDR Plan or the Fourth Circuit's purpose in implementing the EDR Plan in "conclud[ing] that Strickland fail[ed] to allege that the Individual Capacity Defendants deprived her of a protected property interest."  *Id*., Vol. IV at 1519.  Instead, the district court simply considered and distinguished a Supreme Court case (*Vitarelli v. Seaton*, 359 U.S. 535 (1959)), and two circuit cases (*Johnson v. Mishler*, 526 F.2d 364 (2d Cir. 1975), and *Paige v. Harris*, 584 F.2d 178 (7th Cir. 1978)), that Strickland cited in her opposition to the Official Capacity Defendants' motion to dismiss.  *Id.* at 1517–19.  Whether or not the cases that Strickland cited were on point, the fact remains that the district court overlooked the language of the EDR Plan in concluding that the EDR Plan did not afford Strickland with any substantive property rights.

The district court also stated, as part of its analysis, that " '[p]roperty cannot be defined by the procedures provided for its deprivation any more than can life or liberty.'"

---

[9] This conclusion is bolstered by the fact that the EDR Plan was implemented by the Fourth Circuit because federal judiciary employees have no remedies under the Civil Service Reform Act and are not covered by Title VII of the Civil Rights Act.

64

*Id*. at 1519 (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985)). Although this principle is of course true, it has no applicability here because, as we have discussed, the EDR Plan expressly afforded employees with both substantive and procedural rights. In other words, Strickland is not, as the district court's analysis suggests, asking the courts to find a substantive property right based simply on a set of procedural rules. Instead, Strickland is asserting substantive rights to be free from workplace discrimination and, in turn, to be protected by the procedures outlined in the EDR Plan, which is the right to a remedy for injuries from workplace discrimination.

In cases involving alternative judicial forums, the Supreme Court and other circuits have recognized similar substantive rights. In *Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982), for example, the plaintiff, Logan, was a participant in an administrative process established in Illinois that required litigants to bring their discrimination claims before the state Fair Employment Practices Commission. Although Logan filed a timely complaint with the Commission, the Illinois courts determined that the Commission's failure to hold an initial conference within the period mandated by statute deprived the Commission of jurisdiction over Logan's claims, causing the complaint to be dismissed. *Id*. at 424–27.

The Supreme Court held that the dismissal of Logan's complaint violated Logan's due process right to use the statutorily mandated procedures for adjudicating his discrimination claim. Logan had a protectable property interest in his handicap-discrimination claim, the Court held, and the dismissal of that claim as a result of the Commission's procedural error frustrated Logan's due process right "to have the

65

Commission consider the merits of his charge . . . before deciding whether to terminate his claim." *Id*. at 434.

> In a post-*Logan* case, the Seventh Circuit explained that

> the reason that there is a right of access to adjudicatory procedures is not because litigants have property interests in the procedures themselves. Rather, access to adjudicatory procedures is important because it serves to protect the litigants' underlying legal claims, which are the true property interests. . . . In short, the property interest in *Logan* was the underlying discrimination claim; the adjudicatory process constituted the process that was due in connection with the deprivation of that property interest.

*Shvartsman v. Apfel*, 138 F.3d 1196, 1199 (7th Cir. 1998); *see also Howard v. Defrates*, 811 F. App'x 376, 378 (7th Cir. 2020) (holding that "[t]he state-established right to pursue a discrimination claim through adjudicatory procedures can be a property interest, the deprivation of which implicates the Due Process Clause.").

Similarly, the Second Circuit has held that when "a state gives additional or alternative procedural forums for a cause of action, there is no constitutionally protected property interest in the forum itself," but rather "the cause of action itself constitutes a cognizable property interest." *Rosu v. City of New York*, 742 F.3d 523, 526 (2d Cir. 2014); *see also N.Y. State Nat. Org. for Women*, 261 F.3d 156, 164 (2d Cir. 2001) (concluding, in class action suit brought on behalf of all persons who had filed or would file complaints of discrimination with the New York State Division of Human Rights and whose complaints were not or would not be timely resolved, that "the only substantive expectation that warrants constitutional recognition is the entitlement under New York law to remedy injuries resulting from discrimination").

66

Such is the case here. The EDR Plan provides Strickland, in part, a right to redress injuries caused by workplace discrimination, a right that is functionally equivalent to a cause of action and one that is vitally important considering the lack of alternative means of seeking relief for employees of the federal judiciary. "A claimant has more than an abstract desire or interest in redressing his grievance: his right to redress is guaranteed by the [judiciary]." *Logan*, 455 U.S. at 431.

Seizing on language in the EDR Plan stating that the Plan itself is the exclusive remedy for enforcing the rights granted by the Plan, defendants summarily argue in their appellate response brief that "[t]he EDR Plan delineates the bounds of any rights it creates," and that "such rights do not exist independent of the Plan's procedures." Aple. Br. at 27. Defendants fail, however, to cite to a single case in support of this proposition.

In *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), the Supreme Court considered and rejected a similar argument. The plaintiffs, one a security guard for a school district and the other a bus mechanic for a different school district, were both considered "classified civil servants" under Ohio state law. Both plaintiffs were fired for alleged cause. After pursuing administrative remedies with Ohio's Civil Service Commission, both plaintiffs filed suit in federal court challenging the constitutionality of the dismissal procedures under Ohio state law. More specifically, both plaintiffs alleged that the Ohio statute that provided for administrative review of a dismissal was unconstitutional on its face because it failed to afford them an opportunity to respond to the charges against them prior to their removal.

In addressing these claims, the Supreme Court concluded that "[t]he Ohio statute plainly create[d]" a "property right" on the part of the plaintiffs. *Id*. at 538. Although one of the school district defendants argued "that th[is] property right [wa]s defined by, and conditioned on, the legislature's choice of procedures for its deprivation," the Supreme Court rejected that argument. *Id*. at 539. Characterizing the defendant's argument as "the 'bitter with the sweet' approach," the Court held that this "approach misconceives the constitutional guarantee." *Id*. at 541. The Court explained "that minimum procedural requirements are a matter of federal law" and "are not diminished by the fact that the State may have specified its own procedures that it may deem adequate for determining the preconditions to adverse official action." *Id*. (internal quotation marks and brackets omitted). "While the legislature may elect not to confer a property interest . . . , it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards." *Id*.

Applying that rule here, the defendants incorrectly suggest that they alone, by way of the procedures outlined in the EDR Plan, may decide what is required to vindicate the substantive rights that they conferred on Strickland under the express terms of the EDR Plan. Defendants could of course have chosen not to provide a right to combat the harassment of federal judiciary employees. But once they did so by adopting the EDR Plan, "the floor for the procedures due is set by the federal Constitution." *Stephany v. Wagner*, 835 F.2d 497, 500 (3d Cir. 1987). We therefore reject defendants' "bitter with the sweet" argument.

68

In sum, we conclude that the EDR Plan afforded Strickland with substantive rights that are protected property interests under the Fifth Amendment.

*2) Did Strickland have a protected liberty interest in pursuing her chosen career?*

Strickland also argues that she had a liberty interest in pursuing her chosen career. According to Strickland, "[d]ue process prohibits the government from discharging an employee in a manner that unfairly imposes a 'stigma' that 'foreclose[s] [an employee's] freedom to take advantage of other employment opportunities.'" Aplt. Br. at 57 (quoting *Roth*, 408 U.S. at 573)). She in turn alleges that "[d]efendants 'placed a stigma' on [her] reputation that they then 'made public.'" *Id.* at 58 (quoting *Sciolino v. City of Newport News*, 480 F.3d 642, 646 (4th Cir. 2007)). More specifically, Strickland alleges that "[d]efendants spread false rumors that [she] fabricated claims of sexual harassment," "bolstered the false rumors by visibly diminishing [her] job duties, announcing in a humiliating office email that she would report to a research and writing attorney, which looked like a demotion, and den[ied] her an earned promotion." *Id.* She argues that "[d]efendants' stigmatizing of [her] occurred in the course of her constructive discharge, and thus was accompanied by a change in her legal status as an employee." *Id.*

Defendants argue in response, in pertinent part, that Strickland did not assert these arguments in the district court. A review of the joint appendix confirms that defendants are correct. In responding to defendants' motions to dismiss for failure to state a claim, Strickland argued *only* that she "had a liberty interest in being free from unlawful discrimination." JA, Vol. I at 398; *see* JA, Vol. II at 499 (same); JA, Vol. IV at 1298 ("she had a liberty interest in being free from sex discrimination"). At no point did Strickland

69

argue in her district court pleadings that she had a liberty interest in pursuing her chosen career. Nor did Strickland cite to the Supreme Court's decision in *Roth*.

In her appellate reply brief, Strickland does not seriously dispute that she failed to raise the issue in the district court. Instead, she makes two alternative arguments. First, she asserts that the EDR investigation report contained a "damaging statement that [she] 'exploited' her supervisors to obtain a transfer," and that this statement "was not disclosed to her until Defendants' summary judgment filings." Aplt. Reply Br. at 10. She argues that "[t]he report's false charge matches the rumors about [her]" that were previously spread by her colleagues, and that this "strongly suggests that the report's findings were shared in violation of confidentiality." *Id*. This argument does not, however, explain why she failed to argue below (at least in her reply brief in support of her motion for summary judgment) that she had a liberty interest in pursuing her chosen career. Second, Strickland argues that "[t]here is no dispute that [she] brought a due process claim" and that, "[o]nce a federal claim is properly presented, a party can make any argument in support of that claim" and that "parties are not limited to the precise arguments they made below." *Id*. at 11 (quotation marks omitted). Strickland, however, fails to appreciate the fact that she never argued below that her Fifth Amendment procedural due process claim included a claim that defendants deprived her of a liberty interest in pursuing her chosen career. In other words, at no point during the district court proceedings did she properly present a claim that she had a liberty interest in pursuing her chosen career and that defendants deprived her of that right without due process.

70

This court "ha[s] repeatedly held that issues raised for the first time on appeal generally will not be considered," and that "[e]xceptions to this rule exist only in very limited circumstances, such as where refusal to consider the newly-raised issue would be plain error or would result in a fundamental miscarriage of justice." *Kadel v. N.C. State Health Plan for Teachers and State Emps.*, 12 F.4th 422, 430 (4th Cir. 2021) (internal quotation marks omitted). As we shall proceed to explain, Strickland has not established plain error or a fundamental miscarriage of justice.

"The Supreme Court has acknowledged a constitutional liberty interest in one's reputation." *Elhady v. Kable*, 993 F.3d 208, 225 (4th Cir. 2021) (citing *Kerry v. Din*, 576 U.S. 86, 91–92 (2015)). "But recognizing the potentially boundless nature of this right, the court has established doctrinal limits to narrow the category of cases claiming reputational injury." *Id*. A plaintiff claiming reputational injury "must show [(1)] a statement 'stigmatizing his good name' and damaging his standing in the community; (2) some type of dissemination or publication of the statement; and (3) some other government action that 'alter[s] or extinguishe[s] one of his legal rights." *Id*. (quoting *Paul v. Davis*, 424 U.S. 693, 706–711 (1976)). This court and other "[l]ower courts call this a 'stigma-plus' showing." *Id*. at 226.

Here, Strickland's allegations fail to satisfy even the publication requirement. She alleges in her complaint that "she had difficulty finding another job because, when asked, she did not feel comfortable providing references from the FDO" and "that everyone in her office knew that she filed a complaint, and that the rumor was that she 'lost.'" JA, Vol. I at 96. Strickland also alleges in her complaint that she "learned that her Team Leader was

71

spreading rumors that she 'made up' being sexually harassed so that she could work in a different duty station." *Id*. at 99.  In her appellate brief, Strickland now asserts that "[t]he malicious gossip spread beyond office walls, impugning [her] character and tainting her reputation."  Aplt. Br. at 58.  The only portion of Strickland's complaint that arguably supports this assertion is the allegation that Strickland "was asked about her EDR case by a former employee, who told her he found out about it because 'people talk.'"  JA, Vol. I at 74.

Strickland makes but one mention of any possible disclosure to prospective employers, alleging that when she spoke to the Federal Public Defender in the adjacent North Carolina district, "that Defender was openly hostile towards her and demanded to know why she left her former office."  *Id*. at 98.  Strickland speculates in her appellate brief that this other Federal Public Defender "heard false rumors about [her] integrity and departure from the Federal Defender's Office."  Aplt. Br. at 59.  None of this, however, sheds light on how this other Federal Public Defender actually received the information.  And, ultimately, we conclude that the allegations in Strickland's complaint are insufficient to "demonstrate a likelihood" that any of the defendants disseminated the information to the other Federal Public Defender.  *See Cannon v. Vill. of Bald Head Island,* 891 F.3d 489, 503 (4th Cir. 2018).  Thus, we conclude that the allegations in Strickland's complaint are insufficient to satisfy the dissemination/publication requirement imposed by the Supreme Court.

72

> 3) *Did Strickland adequately allege that she failed to receive the minimum measure of procedural protection warranted under the circumstances?*

Because the district court concluded that Strickland failed to allege either a protected property or liberty interest, it did not reach the second prong of the test that this court has outlined for determining the adequacy of a Fifth Amendment procedural due process claim. *See Mallette*, 91 F.3d at 634 (holding that a plaintiff must allege, in part, that she did not "receive the minimum measure of procedural protection warranted under the circumstances"). That said, the parties extensively briefed the issue, and the issue raises a purely legal question at this stage because it hinges solely on the allegations in Strickland's complaint. For those reasons, and for purposes of judicial economy, particularly in light of the unique circumstances at issue here with all of the judges in the case sitting by designation, we shall proceed to decide this issue in the first instance. *See United States v. Faulls*, 821 F.3d 502, 512 n.4 (4th Cir. 2016) ("Although we generally do not consider issues not passed upon below, the question before us is purely one of law, and we perceive no injustice or unfair surprise in doing so here.").

We begin with Strickland's facial challenge to the EDR Plan.[10] Strickland alleges that the EDR Plan was facially invalid for two reasons: (1) it denied her a neutral decisionmaker because it required the involvement of the Chief Judge and Circuit Executive, who were involved in the denial-of-promotion decision that she challenged; and (2) judiciary officials told Strickland that the presiding officer in an EDR hearing was

---

[10] We note at the outset of our analysis that the EDR Plan has been amended several times since the occurrence of the incidents that form the basis of Strickland's complaint.

73

powerless to order the EDR Plan's promised remedies, which made the availability of the EDR process a "meaningless sham." Aplt. Br. at 62–65. Strickland fails, however, to explain why these are innate defects of the EDR Plan itself that would apply in all circumstances. "When considering a facial challenge such as this one, . . . programs can withstand such facial attacks whenever they are capable of constitutional applications." *Elhady*, 993 F.3d at 217 (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

Although the Chief Judge and Circuit Executive are involved in employment decisions, that would not necessarily raise any conflict of interest under circumstances different from those in the present case. In Strickland's case, for example, had the FPD not allegedly retaliated against her for raising allegations of harassment by the First Assistant, there would have been nothing improper about the Chief Judge and Circuit Executive being involved in investigating the underlying allegations against the First Assistant. And the EDR Plan accounts for potential conflicts of interest by permitting a party, at any time during the Chapter X process, to "seek disqualification of a judicial officer, employee or other person involved in a dispute by written request to the Chief Judge." JA, Vol. I at 301.

The EDR Plan even accounts for potential conflicts involving the Chief Judge specifically. *Id*. (Chapter X § 7 of the EDR Plan provides that "[i]f the Chief Judge is named as being involved in a dispute, the Chief Judge will ask the next most senior judge of the Court of Appeals in regular active service who is available and qualified to serve to decide the disqualification request."). There is nothing in the record indicating that Strickland ever made use of this procedure to seek the disqualification of the Chief Judge,

which prevents her from now asserting that his involvement automatically violated her due process rights. *See Dotson v. Griesa*, 398 F.3d 156, 161 n.2 (2d Cir. 2005) (holding that because the plaintiff failed to request a hearing pursuant to his employer's Equal Employment Opportunity Plan, he could not complain that his termination was in violation of due process).

The EDR Plan is also not facially invalid because judiciary officials allegedly told Strickland that the Plan did not allow for the ordering of actual remedies. Remedies are specifically provided for by the EDR Plan, including but not limited to "placement of an employee in a position previously denied," "placement in a comparable alternative position," "reinstatement," "prospective promotion," and "back pay . . . where the statutory criteria of the Back Pay Act are satisfied." JA, Vol. I at 308 (EDR Plan, Ch. X, § 7). Because the terms of the EDR Plan clearly allow for remedies, whatever Strickland was told about the ability to order remedies is relevant only to her as-applied challenge.

Turning to Strickland's as-applied challenge, we conclude that it may proceed because the refusal to disqualify the FPD from the investigation and the alleged coercing of Strickland to end the investigation stated a plausible violation of her due process rights. The refusal to disqualify the FPD created a conflict of interest that infected the entire investigation when Strickland was led to believe that the FPD would be the final decisionmaker in the case. Leading Strickland to believe that her only way forward was to obtain a favorable decision from one of the key subjects of the investigation could be found to have deprived Strickland of her property interest in the right to a remedy from injuries incurred because of harassment and discrimination.

75

In *Spreen v. Brey*, 961 F.2d 109 (7th Cir. 1992), the plaintiff testified that she was told by her supervisor that she could resign her employment or be terminated for cause, and the supervisor erroneously said that the plaintiff would lose all of her employment benefits if she were terminated. The Seventh Circuit held that, if true, her resignation was involuntary and the "misrepresentation to [the] Plaintiff as to the consequences of termination deprived her of procedural due process." *Id*. at 113. Because the defendants in *Spreen* had not shown that "knowledge of who is responsible for administering pension benefits, and whether those benefits would be lost upon involuntary termination, [was] a matter of common knowledge," the plaintiff "was entitled to reasonably rely upon Defendants' statements regarding the loss of pension benefits." *Id*.

The same principles compel the conclusion here that Strickland's due process rights were violated if she can prove that the FPD, an accused party, was not disqualified from the EDR process, and if Strickland was led to believe that the FPD would be the final decisionmaker in her case. Under these circumstances, a reasonable factfinder could conclude that continuing with the EDR process would be futile and that Strickland had reason to believe that the more suitable alternative was to drop her complaint and accept the Fourth Circuit clerkship. Such findings would lead to the conclusion that Strickland was deprived, without due process, of her property right to a remedy for the injuries that she allegedly suffered from harassment by the First Assistant and from retaliation by the FPD.

76

*4)  Conclusion*

We conclude, in sum, that the district court erred in failing to recognize that the Fourth Circuit's EDR Plan afforded Strickland with protected property interests, but did not err in concluding that Strickland failed to allege a protected liberty interest.  We further conclude that Strickland's facial challenge to the EDR Plan fails to state a claim upon which relief can be granted and must therefore be dismissed, but that her as-applied challenge to the EDR Plan adequately alleges a claim upon which relief can be granted.

## C.  Strickland's equal protection claim

We next turn to the second claim for relief asserted in Strickland's complaint, which alleges that defendants "violated the equal protection component of the Fifth Amendment's Due Process Clause, which confers a right to be free from sex discrimination in federal employment."  Aplt. Br. at 40.  Strickland argues in her appeal that "[t]he District Court erred in two respects" in dismissing this claim.  *Id*. at 41.  "First," she argues, "the District Court mischaracterized [her] complaint as alleging 'pure' retaliation, when in fact she explicitly alleged a mixture of retaliation and ongoing sex discrimination and sexual harassment."  *Id*.  "Second," Strickland argues that "by ignoring [her] allegations of defendants' deliberate indifference to sexual harassment, the District Court erroneously concluded that 'Strickland does not allege that the actions taken against her were on the basis of her sex.'"  *Id*. at 41 (quoting JA at 1271).  For the reasons outlined below, we agree with both of Strickland's arguments.

The Fifth Amendment to the United States Constitution provides, in pertinent part, that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of

77

law." U.S. Const. Amend. V. "In numerous decisions," the Supreme "Court has held that the Due Process Clause of the Fifth Amendment forbids the Federal Government to deny equal protection of the laws." *Davis*, 442 U.S. at 234 (internal quotation marks omitted). "To withstand scrutiny under the equal protection component of the Fifth Amendment's Due Process Clause, classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." *Id.* at 234–35 (internal quotation marks omitted). "The equal protection component of the Due Process Clause thus confers . . . a federal right to be free from gender discrimination which cannot meet these requirements." *Id.* at 235.

In analyzing Strickland's Fifth Amendment equal protection claim, the district court began by concluding that Strickland was "attempt[ing] to graft precedent interpreting Title VII onto the Fifth Amendment." JA, Vol. IV at 1520. The district court in turn concluded that the Fourth Circuit would not recognize such a claim. *Id.* at 1521. In support, the district court stated that "the Fourth Circuit has **not** held that courts must apply Title VII standards to free-standing Fifth Amendment claims" and, "[t]o the contrary," has "rejected a similar attempt to graft Title VII standards onto a free-standing Fourteenth Amendment equal protection claim." *Id.* at 1522 (emphasis in original) (citing *Wilcox v. Lyons*, 970 F.3d 452, 460 (4th Cir. 2020)). The district court concluded that "Strickland's complaint is devoid of any allegation that women are treated differently than men under the EDR Plan," and that "Strickland does not allege that the actions taken against her were on the basis of her sex." *Id.* at 1523. "Instead," the district court concluded, Strickland "theorizes that the [defendants] discriminated against her on the basis of sex when they mishandled

78

her sexual harassment complaints, ultimately leading to retaliation and constructive discharge." *Id*.

We conclude that the district court misconstrued both the Fourth Circuit's decision in *Wilcox* and, more importantly, Strickland's equal protection claim. In *Wilcox*, the Fourth Circuit "conclude[d] that a pure retaliation claim is not cognizable under the Equal Protection Clause" of the Fourteenth Amendment. In doing so, the Fourth Circuit noted that neither it nor the Supreme Court "has recognized an equal protection right to be free from retaliation." 970 F.3d at 458. Instead, the court noted that it "has consistently considered retaliation claims brought under Section 1983 to be more properly characterized as claims asserting a violation of the First Amendment." *Id*.

The court explained that "[r]etaliation for reporting alleged sex discrimination imposes negative consequences on an employee because of the employee's report, not because of the employee's sex." *Id*. at 460. "The very premise of a retaliation claim," the court noted, "is that the employer has subjected an employee to adverse consequences in response to her complaint of discrimination." *Id*. Thus, the court noted, "[t]he necessary causal link is between the employee's complaint and the adverse action, not between her sex and the adverse action." *Id*. The court emphasized that "*continued sexual harassment and adverse treatment of a female employee unlike the treatment accorded male employees remains actionable as a violation of the Equal Protection Clause even when the sex discrimination and harassment continue after, and partially in response to, the female employee's report of prior discrimination and harassment*." *Id*. at 461 (emphasis added). But, the court noted, "[t]he employee's claim in such a case is *not a claim of pure*

79

*retaliation, but instead implicates the basic equal protection right to be free from sex discrimination that is not substantially related to important governmental objectives.*" *Id.* (internal quotation marks omitted; emphasis added). Although the court's holdings were limited to the Equal Protection Clause of the Fourteenth Amendment, we have no doubt, given the Supreme Court's equivalent treatment of equal protection claims under the Fifth and Fourteenth Amendments, that they should be extended to retaliation claims brought under the equal protection component of the Fifth Amendment's Due Process Clause. *See Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975) (noting that the Supreme Court's "approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment.").

Turning to Strickland's complaint, she alleges that defendants violated her Fifth Amendment equal protection rights by (a) "subjecting [her] to harassment, retaliation, and discrimination," (b) "failing to take immediate and effective action on her complaints," and (c) "failing to provide her with meaningful review or remedies." JA, Vol I at 100. According to the complaint, defendants "singled [her] out . . . based on her gender and intentionally violated her right to equal protection under the Fifth Amendment." *Id.* Strickland's opening appellate brief fleshes out the claim in more detail:

> The [FPD] ratified the Assistant's harassing conduct, most significantly by refusing to consider [Strickland] for the promotion for which she was qualified—a discriminatory follow-up to the Assistant's quid-pro-quo sexual harassment. The meaning of the Assistant's harassing email was that if [Strickland] didn't "pay" in the way he wanted, that is, sexually, she would not get the promotion. In refusing to consider the promotion—even going to lengths to backdate his reclassification of her title to the day before she became eligible for promotion, . . . the Defender made good on the

80

Assistant's threat.  This response was clearly unreasonable and effectively caused further harassment.

> Second, after Fourth Circuit and AO officials were put on notice of the sexual harassment and of the [FPD's] disregard of AO advice on stopping it, they protected the [FPD] rather than taking steps to end the harassment. The officials prohibited [Strickland] from seeking guidance about her civil rights from the FEOO.  The officials allowed the [FPD] to drive the process despite his conflict of interest: The [FPD] appointed the investigator to investigate the allegations, and decided how to discipline the Assistant.  The Chief Judge refused to disqualify the Defender from acting on behalf of the employing office in the dispute resolution process.  Officials failed to conduct an impartial investigation by a well-trained investigator.  The Circuit Executive limited the investigation's scope to exclude the Defender's wrongful conduct.  As a result, the Investigator did not fully investigate [Strickland]'s claims.

Aplt. Br. at 46–47.  Thus, Strickland has not alleged a pure retaliation claim, but rather has alleged a violation of her right under the Equal Protection Clause of the Fifth Amendment to be free from sex discrimination.

We also agree with Strickland that, under Fourth Circuit law, her complaint adequately alleged that defendants were deliberately indifferent to her complaints of sexual harassment.  The Fourth Circuit has held in the context of a § 1983 action that a school official can be liable under the Equal Protection Clause of the Fourteenth Amendment for his or her deliberate indifference to student-on-student sexual harassment.  *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 701–02 (4th Cir. 2018).  In reaching this conclusion, the Fourth Circuit noted that "the Equal Protection Clause of the Fourteenth Amendment secures a student's right to be free from sexual harassment in an educational setting," and that this both "guards against sexual harassment perpetrated by a school administrator against students" and "protects students from a school administrator's

81

deliberate indifference that allows such harassment to occur and persist." *Id*. at 702 (internal quotation marks omitted). The Fourth Circuit further noted that a "school administrator has the power and opportunity to both address and rectify" "known student-on-student sexual harassment," and that an "administrator's failure to exercise that power can result in the harassment victim suffering further injury." *Id*.

The Fourth Circuit also held that, "[t]o state an equal protection claim for deliberate indifference to known student-on-student sexual harassment, a plaintiff must first allege that she was subjected to discriminatory peer harassment." *Id*. (internal quotation marks omitted). "Secondly, the plaintiff must allege that the school administrator responded to the discriminatory peer harassment with deliberate indifference, i.e., in a manner clearly unreasonable in light of known circumstances." *Id*. "In other words, the plaintiff must allege that the school administrator knew about harassment of the plaintiff and acquiesced in that conduct by refusing to reasonably respond to it." *Id*. at 702–03 (internal quotation marks omitted). "Third, the plaintiff must allege that the school administrator's deliberate indifference was motivated by a discriminatory intent." *Id*. at 703.

Because the Supreme Court's "approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment," *Weinberger*, 420 U.S. at 638 n.2, we conclude that the principles outlined by the Fourth Circuit in *Feminist Majority Foundation* apply equally to the circumstances alleged by Strickland in this case. More specifically, federal judiciary employees who occupy supervisory roles and/or who are charged with enforcing an EDR plan can, under *Feminist Majority Foundation*, be held liable under the Fifth Amendment

82

for their deliberate indifference to sexual harassment committed by a federal judiciary employee or supervisor against another federal judiciary employee. This conclusion is based on the principle that the Fifth Amendment's Equal Protection Clause secures a federal judiciary employee's right to be free from sexual harassment in the workplace. It thus both guards against sexual harassment perpetrated by other federal judiciary employees and protects federal judiciary employees from deliberate indifference on the part of federal judicial employees charged with preventing sexual harassment and investigating complaints of sexual harassment.

The elements of such a claim, we conclude, are essentially identical to those outlined by the Fourth Circuit in *Feminist Majority Foundation*: (1) the plaintiff was subjected to sexual harassment by another employee or supervisor; (2) the plaintiff alerted supervisory officials and/or officials responsible for overseeing the court's EDR plan about the sexual harassment; (3) the supervisory officials and/or officials responsible for overseeing the court's EDR plan responded to the allegations with deliberate indifference; and (4) the deliberate indifference was motivated by a discriminatory intent.

The question then becomes whether Strickland's complaint adequately alleged each of these elements. The complaint clearly alleged the first element, i.e., that Strickland was subjected to sexual harassment by the First Assistant. The complaint also clearly alleged the second element, i.e., that Strickland reported the sexual harassment to various judiciary employees, some of whom alerted the FPD to the harassment, and also initiated an investigation and mediation under the EDR Plan. As for the third element, the complaint alleged in substantial detail how officials responded to her report of sexual harassment and

83

to her initiating an investigation and mediation under the EDR Plan, and it in turn alleged that defendants "fail[ed] to take immediate and effective action on her complaints" and also "fail[ed] to provide her with meaningful review or remedies."  JA, Vol. I at 100.

The complaint does not specifically allege deliberate indifference on the part of the defendants.  But the complaint does allege that "[d]efendants, acting under color of law and their authority as federal officers, singled out [Strickland] based on her gender and intentionally violated her right to equal protection under the Fifth Amendment to the United States Constitution."  *Id.*  In our view, this allegation is substantially similar to, if not more egregious than, deliberate indifference, and is sufficient to satisfy the fourth element, which requires Strickland to prove that defendants' deliberate indifference was motivated by a discriminatory intent.  More specifically, the complaint effectively alleges that defendants' failure to take proper corrective action was intentional and motivated by their intent to discriminate against her because of her gender.

Thus, in sum, we conclude that Strickland's complaint adequately alleged that defendants violated her equal protection rights under the Fifth Amendment and that the district court erred in concluding otherwise.

### D.  *Strickland's §§ 1985(3) and 1986 claims*

The third and fourth claims for relief in Strickland's complaint allege, respectively, violations of 42 U.S.C. §§ 1985(3) and 1986.  To state a claim for conspiracy to deny equal protection of the laws under section 1985(3), a plaintiff must plausibly allege:

> (1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4)

84

and which results in injury to the plaintiff as (5) a consequence of an overt
act committed by the defendants in connection with the conspiracy.

*Simmons v. Poe*, 47 F.3d 1370, 1376 (4th Cir. 1995) (internal citations omitted).  Section
1986, in turn, provides a cause of action against anyone who has knowledge of a § 1985
conspiracy and who, "having the power to prevent or aid in preventing the commission of"
acts pursuant to that conspiracy, "neglects or refuses so to do."  42 U.S.C. § 1986.  "Section
1986 claims are therefore derivative of § 1985 violations."  *Park v. City of Atlanta*, 120
F.3d 1157, 1159–60 (11th Cir. 1997).

The district court in this case dismissed Strickland's § 1985(3) claim for essentially
the same reasons that it dismissed Strickland's Fifth Amendment equal protection claim.
More specifically, the district court concluded that the complaint "fail[ed] to plead" that
defendants were motivated by a specific class-based, invidiously discriminatory animus,
and instead "plead . . . the more sweeping Title VII standards regarding sexual harassment
as discrimination on the basis of sex."  JA, Vol. IV at 1526.

We reject the district court's reasoning for dismissing Strickland's § 1985(3) claim.
As discussed above, Strickland's complaint effectively alleges that defendants' failure to
take proper corrective action was intentional and motivated by their intent to discriminate
against her because of her gender.  That allegation is sufficient under Fourth Circuit law to
satisfy the second element of a § 1985(3) claim.  *See Simmons*, 47 F.3d at 1376.

Nevertheless, we conclude that the allegations in Strickland's complaint are
otherwise insufficient to state a claim for relief under § 1985(3).  "[T]he law is well settled
that to prove a section 1985 'conspiracy,' a claimant must show an agreement or a 'meeting

85

of the minds' by defendants to violate the claimant's constitutional rights." *Id*. at 1377 (citing cases). More specifically, the plaintiff must show "that there was a single plan, the essential nature and general scope of which was known to each person who is to be held responsible for its consequences." *Id*. at 1378 (internal quotation marks and brackets omitted). "This Court, under that standard, has rarely, if ever, found that a plaintiff has set forth sufficient facts to establish a section 1985 conspiracy." *Id*. at 1377. "Indeed, we have specifically rejected section 1985 claims whenever the purported conspiracy is alleged in a merely conclusory manner, in the absence of concrete supporting facts." *Id*.

Here, Strickland's § 1985(3) claim, as set forth in her complaint, broadly alleges as follows:

> By agreeing to implement, and taking actions on, policies, procedures, and practices whereby Plaintiff was subjected to sexual harassment, discrimination, and retaliation and deprived of immediate and effective action on her complaints, and meaningful review and remedies, all on account of her gender, Defendants conspired to deprive Plaintiff of equal protection under the law and of equal privileges and immunities of the laws of the United States, resulting in injury to her person and property in violation of 42 U.S.C. § 1985(3).

JA, Vol. I at 100.

The complaint, in a section entitled "FACTUAL ALLEGATIONS," more specifically alleges that defendants conspired against Strickland on two occasions. First, in a subsection titled "Defendants conspire to block [Strickland] from exercising protected rights and shut down the efforts to take immediate and effective action on her complaints," the complaint alleges that the FPD met with the Circuit Executive and John Doe(s) from the Office of the General Counsel "with the objectives of insulating himself from liability

86

and shutting down . . . efforts to take immediate and effective action on [Strickland's] complaints." *Id*. at 54. This portion of the complaint further alleges that "individual stakeholders acting on behalf of [the Office of the General Counsel] and the Fourth Circuit agreed on actions and procedures for handling [Strickland's] complaint, unbeknownst to her." *Id*. at 55. In particular, it alleges that "John Doe(s) recommended that [Office of the General Counsel] take over the investigation and strongly suggested that the [Federal Equal Opportunity Officer] be required to withdraw from any involvement." *Id*. It also alleges that "the General Counsel and Chief Judge were made personally aware of these individuals' actions, at a minimum." *Id*.

Second, in a subsection titled "Defendants conspire to deny [Strickland] a promotion," the complaint alleges that "the hiring committee conducted interviews for [an] appellate attorney position" that Strickland had expressed interest in obtaining. *Id*. at 56. The complaint further states that "the First Assistant was on the hiring committee" and "the [FPD] allowed the First Assistant to continue making, or participating in, decisions affecting [Strickland's] job terms and conditions, despite being on notice of the First Assistant's quid pro quo sexual harassment." *Id*. Finally, the complaint alleges that "[i]nstead of being promoted, [Strickland] received a 'reclassification' of title." *Id*.

What is missing from these allegations is the pleading of any specific facts to show that the Individual Capacity Defendants had any sort of "single plan, the essential nature and scope of which was known to each person who is to be held responsible for its consequences." *Simmons*, 47 F.3d at 1378. The essence of Strickland's complaint is instead based on these defendants' alleged deliberate indifference to her claims of sexual

87

harassment rather than their affirmative adherence to a single plan of discriminatory animus based on her protected-class status. *Id*. at 1376. This is hardly the stuff of a conspiracy, and leads us to conclude that Strickland's § 1985(3) claim is "essentially an afterthought." *Id*. at 1377.

Based on the failure of Strickland's complaint to plausibly allege any conspiratorial plan of class-based discriminatory animus, we conclude that Strickland's § 1985(3) claim was properly dismissed for failure to state a claim upon which relief could be granted. And because Strickland's § 1986 claim depends on the existence of a viable § 1985(3) claim, the § 1986 claim was properly dismissed as well.[11]

### E.     *Sovereign Immunity for the Official Capacity Defendants*

Having analyzed each of the claims alleged in Strickland's complaint, we now turn to the various defenses asserted by defendants, beginning with their argument that the Official Capacity Defendants are entitled to sovereign immunity from the claims asserted against them. Strickland argues in her appeal that the district court "erred in holding that all of [her] constitutional claims against the Official Capacity Defendants were barred by sovereign immunity." Aplt. Br. at 27. She argues in support that her "equitable claims against the Official Capacity Defendants are not barred by sovereign immunity because they fall squarely within the *Larson-Dugan* exception to sovereign immunity" that applies to nonstatutory review claims seeking equitable forms of relief. *Id*. Strickland also argues

---

[11] Because we conclude that Strickland's §§ 1985(3) and 1986 claims were properly dismissed, it is unnecessary for us to address the absolute and qualified immunity defenses that were asserted by the Individual Capacity Defendants.

88

that "even if a waiver of sovereign immunity is needed, the [Administrative Procedure Act (APA)] provides that waiver for [her] claims against the United States and judicial branch defendants who are not 'courts.'" *Id.* Finally, she argues that the Back Pay Act "waives sovereign immunity for [her] back pay claims against the defendants who were her employer." *Id.*

For the reasons discussed below, we agree with Strickland that the nonstatutory review claims she asserts against the Official Capacity Defendants are not barred by sovereign immunity.[12] We disagree, however, with Strickland's arguments that the Back Pay Act and the APA waive sovereign immunity for her claims for back pay and other requested relief against the Official Capacity Defendants.

    1) *The district court's ruling*

The district court concluded that "the doctrine of sovereign immunity shields the Official Capacity Defendants from suit." JA, Vol. IV at 1511. In reaching this conclusion, the district court considered only whether "three statutes waive[d] the Official Capacity Defendants' sovereign immunity": (1) 28 U.S.C. § 1331; (2) the Back Pay Act; and (3) the APA. The district court concluded that none of these statutes waived the Official Capacity

---

[12] Strickland's Fifth Amendment due process and equal protection claims against the Official Capacity Defendants encompass both (a) nonstatutory review claims seeking prospective equitable relief, and (b) *Bivens*-like claims seeking back pay. *See* Clark Byse & Joseph V. Fiocca, *Section 1361 of the Mandamus and Venue Act of 1962 and "Nonstatutory" Judicial Review of Federal Administrative Action*, 81 Harv. L. Rev. 308, 322 (1967). Nonstatutory review claims allege that federal officials have (a) purported to exercise powers they do not have, (b) refused to perform required duties, and/or (c) acted unconstitutionally.

Defendants' sovereign immunity for the claims asserted against them by Strickland. The district court therefore concluded that "it lack[ed] subject-matter jurisdiction over the Official Capacity Defendants." *Id*.

### 2) *Sovereign immunity and waivers of sovereign immunity*

The general rule is that the sovereign, i.e., the United States, may not be sued without its consent. *See United States v. Mitchell*, 463 U.S. 206, 212 (1983). The Supreme Court has held that, generally speaking, a suit is against the sovereign "if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act." *Dugan v. Rank*, 372 U.S. 609, 620 (1963).

Sovereign immunity can, however, be waived. To begin with, Congress has enacted certain statutes that both create a cause of action against the federal government and expressly waive the government's immunity from suit for those actions. Strickland alleges that two of those acts—the APA and the Back Pay Act—are applicable here and operate to waive the sovereign immunity of the Official Capacity Defendants. In addition to these statutory waivers of sovereign immunity, the Supreme Court has also held that sovereign immunity does not apply when a plaintiff files suit seeking equitable relief against federal officials in their official capacities and alleging that those officials exceeded the scope of their authority and/or acted unconstitutionally. *E.g.*, *Leedom v. Kyne*, 358 U.S. 184, 188–89 (1958) (holding that federal courts have jurisdiction to strike down agency orders made in excess of the agency's delegated powers); *Noble v. Union River Logging R.R. Co*., 147 U.S. 165, 171–72 (1893) (holding that a federal official may be enjoined where he has

90

acted "ultra vires, and beyond the scope of his authority"). These types of claims are generally referred to as nonstatutory review claims. Strickland also invokes this type of waiver of sovereign immunity. We proceed to discuss both of these categories of waiver in more detail below.

### 3) The Larson-Dugan exception for nonstatutory review claims

The Supreme Court has recognized, in what is sometimes referred to as the *Larson-Dugan* exception to sovereign immunity, that a plaintiff can obtain injunctive relief against an individual officer or agent of the United States in his official capacity for acts beyond his statutory or constitutional authority because such actions "are considered individual and not sovereign actions."[13] *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 89 (1949). In other words, "under the so-called *Larson-Dugan* exception[,] . . . 'suits for specific relief against officers of the sovereign' allegedly acting 'beyond statutory authority or unconstitutionally' are not barred by sovereign immunity." *Pollack v. Hogan*, 703 F.3d 117, 120 (D.C. Cir. 2012) (quoting *Larson*, 337 U.S. at 689); *see, e.g.*, *Vitarelli v. Seaton*, 359 U.S. 535 (1959) (nonstatutory review case filed by former government employee seeking reinstatement and a declaration that his dismissal was illegal).

In *Pollack*, for example, the D.C. Circuit held that the plaintiff's claim fell within the *Larson-Dugan* exception because "[h]er sole allegation [wa]s that the named officers

---

[13] More specifically, the Supreme Court noted in *Larson* that "[t]here may be, of course, suits for specific relief against officers of the sovereign which are not suits against the sovereign . . . . [W]here the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions. The officer is not doing the business which the sovereign has empowered him to do or he is doing it in a way (Continued)

91

acted unconstitutionally, and she request[ed] only injunctive and declaratory relief." 703 F.3d at 120. In doing so, the D.C. Circuit rejected the argument "that the *Larson-Dugan* exception is limited to cases alleging that defendants have acted beyond statutory authority." *Id*. The court stated that "there is no basis for such a limitation in the logic of the '*ultra vires*' rationale for the exception." *Id*. The court also noted that the argument was "contrary to the Supreme Court's subsequent decision in *Dugan*, which noted 'recognized exceptions' to the general rule of federal sovereign immunity, for suits alleging that: '(1) action[s] by officers [are] beyond their statutory powers *and* (2) even though within the scope of their authority, the powers themselves or the manner in which they are exercised are constitutionally void.'" *Id*. (quoting *Dugan*, 372 U.S. at 621–22) (emphasis in *Pollack*).

Strickland argues on appeal that the *Larson-Dugan* exception applies to her Fifth Amendment claims against the Official Capacity Defendants because those claims alleged violations of her constitutional rights and sought prospective equitable relief from the defendants, specifically reinstatement to a position of assistant federal public defender or front pay in lieu of reinstatement (if reinstatement is deemed infeasible), as well as declaratory and injunctive relief to stop ongoing constitutional violations. Aplt. Br. at 28–33.

---

which the sovereign has forbidden. His actions are ultra vires his authority and therefore may be made the object of specific relief." 337 U.S. at 689.

Defendants argue in response that Strickland "alleged that the official-capacity federal defendants violated her right to due process and equal protection," but that she "has not identified any prospective equitable relief or ongoing constitutional violations."  Aple. Br. at 15.  Defendants assert in particular that Strickland's complaint "explicitly disclaimed any interest in reinstatement" and requested only front pay in lieu of reinstatement.  *Id*. at 20.  As for the request for front pay, defendants argue that Strickland's "complaint identifies injuries based on defendants' alleged past violations during the EDR process, not any ongoing constitutional violations."  *Id*.  Thus, defendants argue, "front pay would be a damages remedy, not an equitable one."  *Id*.  In other words, defendants appear to be arguing that Strickland's request for front pay is not actually prospective in nature because it targets defendants' past conduct.  Defendants concede that Strickland's "complaint includes a generic request for injunctive and declaratory relief," *id*., but they argue that she "has never identified any equitable remedy that would redress her alleged injuries."  *Id*. at 20–21.  Instead, defendants argue, Strickland "has disclaimed any request for reinstatement, and her remaining claims seek damages for her past alleged injuries."  *Id*. at 21.

In addressing these arguments, it should be noted as a threshold matter that Strickland did not expressly mention the *Larson-Dugan* exception in her response to the Official Capacity Defendants' motion to dismiss, nor did she cite to either of the Supreme Court cases on which that exception is based.  But she did argue in her response that a federal district court exercising federal-question jurisdiction pursuant to 28 U.S.C. § 1331 "may issue declaratory and injunctive relief against officials responsible for creating

93

unconstitutional laws and policies," and also "has authority to order [equitable] remedies in fashioning injunctions against officials who violate the judiciary's antidiscrimination policies."[14] JA, Vol. I at 391, 394. In other words, Strickland quite clearly indicated that she was asserting, in part, nonstatutory review claims against the Official Capacity Defendants. Thus, Strickland has effectively argued the substance of the *Larson-Dugan* exception, notwithstanding her failure to mention it by name.

As to the question of whether the *Larson-Dugan* exception applies in this case, we agree with Strickland and one of the amicus briefs that the district court "mistakenly overlooked th[e] long-established line of precedent" establishing that parties can "seek to enjoin federal officials in their official capacities from exceeding the scope of their authority or acting unconstitutionally." Huq & Chemerinsky Amicus Br. at 2. In Claims One and Two of her complaint, Strickland alleged, in pertinent part, that "Defendants, acting under color of law and their authority as federal officers," adopted and applied the EDR Plan to hear, adjudicate, and decide her claims of harassment and discrimination and, in doing so, "willfully and knowingly deprived [her] of her property interests without due process of law in violation of the Fifth Amendment to the United States Constitution," and "singled [her] out . . . based on her gender and intentionally violated her right to equal protection under the Fifth Amendment to the United States Constitution." JA, Vol I at 99, 100. In other words, Strickland alleged in Claims One and Two that the Official Capacity

---

[14] Strickland did not, as the district court suggested in its memorandum and order granting the Official Capacity Defendants' motion to dismiss, argue that 28 U.S.C. § 1331 itself waived these defendants' sovereign immunity. JA, Vol. I at 1507.

Defendants exceeded the scope of their authority or acted unconstitutionally and that those actions were therefore ultra vires.  Strickland in turn asked, in pertinent part, for declaratory relief ("Declare that Plaintiff's constitutional rights were violated"), injunctive relief ("Enjoin any further violation of Plaintiff's rights"), front pay ("Award Plaintiff appropriate front pay as equitable relief in lieu of reinstatement"), and back pay ("Award Plaintiff back pay as equitable relief from the unlawful termination of her employment pursuant to the Back Pay Act").[15]  *Id*. at 101.  These allegations, with the exception of the request for back pay, fall "squarely in the heartland of nonstatutory review over which federal courts have long exercised jurisdiction," and we therefore conclude that the Official Capacity Defendants are not entitled to sovereign immunity from these nonstatutory claims.  Huq & Chemerinsky Amicus Br. at 11.

Relatedly, we reject the Official Capacity Defendants' argument that Strickland "has not identified any prospective equitable relief or ongoing constitutional violations." Aple. Br. at 15.  Although it is true that Strickland's resignation and acceptance of another job means that she is not currently being impacted by the alleged constitutional violations,

---

[15] As noted, the parties dispute on appeal whether Strickland requested reinstatement in the district court.  We need not resolve this dispute because we conclude that Strickland's complaint requests other viable forms of equitable relief against the Official Capacity Defendants.  We therefore leave it to the district court on remand to determine whether Strickland actually requested reinstatement in her complaint and, if not, whether Strickland can amend her complaint to add that as a form of requested relief.

95

the fact remains that she is seeking other viable forms of equitable relief.[16]  To begin with, she seeks a declaration that the actions that the Official Capacity Defendants took were unconstitutional (defendants effectively concede in their appellate response brief that Strickland is seeking declaratory relief).  In addition, she expressly requests in her complaint that she be awarded front pay in lieu of reinstatement.  This remedy has been deemed by federal courts to constitute an equitable remedy.  *E.g., Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843 (2001) (holding, in a Title VII case, that front pay constituted equitable relief and not an element of compensatory damages); *Monohon v. BNSF Rwy. Co.*, 17 F.4th 773, 784 (8th Cir. 2021); *Hunter v. Town of Mocksville,* 897 F.3d 538, 562 (4th Cir. 2018) (holding that, although reinstatement of a wrongfully discharged employee is preferable, "in appropriate circumstances a district court may award front pay in lieu of reinstatement").

Thus, in sum, if Strickland can prove the allegations in her complaint, she will establish that the Official Capacity Defendants acted beyond the scope of their powers and/or in an unconstitutional manner, and in turn would be entitled to equitable relief.  The Official Capacity Defendants are not shielded by sovereign immunity from those nonstatutory review claims.

---

[16] Strickland's complaint asks the district court to "[e]njoin any further violation of [her] rights."  JA, Vol. I at 101.  It is unclear to us, however, barring Strickland's reinstatement, what those "further violation[s]" might be.

*4)  Waiver of sovereign immunity by statute*

Strickland also argues in her appeal that "Congress waived sovereign immunity for [her] claims against the United States and non-courts defendants" by way of the APA, and "for her back pay claim against her employer" by way of the Back Pay Act.  Aplt. Br. at 33.  We disagree.

*a)  The APA*

The APA provides both a cause of action and a waiver of sovereign immunity in suits against federal agencies seeking equitable relief.  More specifically, the APA provides, in pertinent part:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided*, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

5 U.S.C. § 702.

The APA defines the term "agency" to mean, in pertinent part, "each authority of the Government of the United States, whether or not it is within or subject to review by another agency, *but does not include . . . the courts of the United States*."  5 U.S.C.

97

§ 701(b)(1)(B) (emphasis added).  The question at issue in this appeal is whether the Official Capacity Defendants should all be considered part of "the courts of the United States," a phrase that the APA does not expressly define.

The district court concluded that this was "a matter of first impression in this circuit."  JA, Vol. I at 1509.  The district court in turn relied on an unpublished Ninth Circuit opinion holding that "APA does not apply to the Federal Public Defender's Office, which is a part of the federal judiciary."  *Id*. at 1510 (quoting *Demello v. Ney*, 185 F.3d 866, *1 (9th Cir. 1999)).  In doing so, the district court stated:

> The District Courts may make recommendations concerning nominees for the position of Federal Public Defender, and the Courts of Appeals appoint, compensate, and remove Federal Public Defenders.  18 U.S.C. § 3006A(g)(2)(A).  Against that backdrop, this Court rules that the Official Capacity Defendants are part of the federal judiciary for purposes of the APA, and that the APA therefore does not waive the Official Capacity Defendants' sovereign immunity.  *See Demello*, 185 F.3d at *1.

*Id*. at 1510–11.

Strickland challenges the district court's ruling on appeal.  She argues that "[i]n determining whether an entity falls within the APA's 'courts' exemption, courts have looked to whether the functions performed by the entity are 'functions that would otherwise be performed by courts.'"  Aplt. Br. at 34 (quoting *Wash. Legal Found. v. U.S. Sent'g Comm'n*, 17 F.3d 1446, 1449 (D.C. Cir. 1994)).  She in turn argues that "[t]he judicial branch is not synonymous with 'courts,' and offices or officials do not become 'courts' simply by being placed in the judicial branch."  *Id*.  She argues that "[t]he 'courts' exemption would likely cover the Fourth Circuit, and the Chief Judge and Judicial Conference when they perform judicial functions," but that the "[o]ther defendants—the

98

FDO, Defender, AO, AO Director, Circuit Executive, and Fourth Circuit Judicial Council—are organizationally in the judicial branch but are not 'courts.'" *Id*. "Federal defenders," Strickland argues, "serve an independent Sixth Amendment criminal defense function." *Id*. at 35. She in turn argues that "it would denigrate FDOs' integrity and independence to deem the FDO a court or to blur its functions with those of courts." *Id*. "And," she argues, "at a minimum, the APA undoubtedly waives the sovereign immunity of 'the United States.'" *Id*. at 34.

Defendants argue in opposition that "[e]ach of the defendants named in their official capacities—the Fourth Circuit, the Judicial Conference, the Fourth Circuit Judicial Council, the AO, the Circuit Executive, the Federal Defender's Office, the Federal Defender, the Chair of the Judicial Conference Committee on Judicial Resources, and Chief Judge Gregory—is part of the Judicial Branch and therefore outside the scope of the APA's waiver of sovereign immunity." Aple. Br. at 16. Defendants further argue that, contrary to Strickland's arguments, "the exemption of a particular office from the APA's waiver 'is warranted not by the functions it performs . . . but by its status as an auxiliary of the courts.'" *Id*. at 17 (quoting *Washington Legal Found*., 17 F.3d at 1449)). Defendants in turn argue that "[t]he AO, Fourth Circuit Judicial Council, and Circuit Executives are all auxiliaries of the courts" because "[t]hey manage the courts' operations and ensure the 'effective and expeditious administration of justice,'" *id*. (quoting 28 U.S.C. § 332(d)(1)), and that "Federal Defender Offices are also auxiliaries of the courts" because "[t]he Courts of Appeals appoint, compensate, and remove Federal Defenders." *Id*. at 18 (citing 18 U.S.C. § 3006A).

99

We conclude that defendants have the better of the argument here. Although there is little case law on this issue, the central question as we see it is whether Congress intended to include within or exclude from the statutory phrase "courts of the United States" entities such as the AO, federal judicial councils, circuit executives, and federal public defenders. Presumably, the reason that Congress excluded "courts of the United States" from the definition of "agency" was that it had no intention of subjecting federal courts' decisions to "judicial review" under the APA. Indeed, the notion of that occurring is nonsensical.

"Congress passed the [APA] to ensure that agencies follow constraints even as they exercise their powers," and "[o]ne of those constraints is the duty of agencies to find and formulate policies that can be justified by neutral principles and a reasoned explanation." *F.C.C. v. Fox Tel. Stations, Inc.*, 556 U.S. 502, 537 (2009). To achieve this goal, "[t]he APA 'sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (quoting *Franklin v. Mass.*, 505 U.S. 788, 796 (1992)). Further, "[t]he APA establishes a basic presumption of judicial review for one suffering legal wrong because of agency action." *Id.* (quotation marks and brackets omitted).

Unlike federal executive agencies that are subject to the APA, federal courts do not take what could reasonably be described as "executive agency action[s]," i.e., they do not adopt rules or policies that impact the public at large and in turn could cause members of the public to suffer legal wrong. *Fox Tel. Stations,* 556 U.S. at 513. The same holds true for entities that are related to the federal courts, including the AO, federal judicial councils,

100

circuit executives, and federal public defenders. All of these entities, except for federal public defenders, perform administrative and auxiliary functions for the federal courts. The AO, for example, "provides a range of administrative, financial, legal, legislative, management, technology, and program support services to Federal courts." Administrative Office of the United States Courts, The United States Government Manual (saved as ECF opinion attachment). Not surprisingly, the Ninth Circuit has held that "[t]he AO's role was intended to be administrative 'in the narrowest sense of that term.'" *Tashima v. Admin. Office of U.S. Courts*, 967 F.2d 1264, 1271 (9th Cir. 1992) (quoting *Chandler v. Jud. Council*, 398 U.S. 74, 97 (1970) (Harlan, J., concurring)).

As for federal public defenders, they do not serve an administrative function for the federal courts. But they are, nevertheless, intricately associated with the federal courts and the AO. By statute, Congress has authorized the federal appellate courts to appoint federal public defenders for any district that meets the requirements for establishment of a defender organization. 18 U.S.C. § 3006A(g)(1) and (2). Per statute, the federal appellate courts also determine the compensation of federal public defenders, exercise supervisory authority over them, and may remove them "for incompetency, misconduct in office, or neglect of duty." *Id*. § 3006A(g)(2)(A). Each federal defender office is required by statute to submit to the AO "reports of its activities and financial position and its proposed budget." *Id*. The AO in turn submits a budget for each such office for each fiscal year and makes payments to and on behalf of such office. *Id*.

Further, like the federal courts, and unlike executive agencies that are subject to the APA, the federal public defenders do not establish rules or policies that are applicable to the

101

public at large. Thus, like federal courts, they do not appear to us to be the type of governmental entities that Congress intended to subject to judicial review under the APA. Indeed, it is unclear how any actions taken by federal public defenders would be subject to review under the APA.

For these reasons, we agree with the district court that the APA does not waive the Official Capacity Defendants' sovereign immunity.

### b) *The Back Pay Act*

The Back Pay Act waives sovereign immunity when

> [a]n employee of an agency who, on the basis of a timely appeal or an administrative determination (including a decision relating to an unfair labor practice or grievance) is found by appropriate authority under applicable law, rule, regulation, or collective bargaining agreement, to have been affected by an unjustified or unwarranted personnel action which has resulted in the withdrawal or reduction of all or part of the pay, allowances, or differentials of the employee.

5 U.S.C. § 5596(b)(1). The Back Pay Act authorizes an employee under these circumstances to receive back pay "for the period for which the personnel action was in effect." *Id.* § 5596(b)(1)(A)(i).

The question of whether the Back Pay Act applies in this case received scant attention in the parties' district court pleadings. Aside from a brief mention in her complaint, Strickland first raised the issue in her response to the Official Capacity Defendants' motion to dismiss. JA, Vol. I at 392. Strickland argued that "statutory waivers of sovereign immunity apply in this context," and cited, "[f]or example, the Back Pay Act." *Id.* She otherwise provided no discussion or argument regarding the applicability of the Back Pay Act. The Official Capacity Defendants filed a reply brief in support of their

102

motion to dismiss and argued therein that Strickland was "wrong in claiming that the Back Pay Act [wa]s an applicable waiver of sovereign immunity." *Id*., Vol. II at 462. In support, the Official Capacity Defendants noted that the Back Pay Act requires a determination by an "appropriate authority," and they in turn argued that Strickland had "not allege[d] that there ha[d] been any determination by an appropriate authority that would entitle her to back pay." *Id*.

The district court, in its written decision granting the Official Capacity Defendants' motion to dismiss, concluded that the Back Pay Act "d[id] not waive the Official Capacity Defendants' sovereign immunity" because no "appropriate authority" had determined that Strickland was "affected by an unjustified or unwarranted personnel action." *Id*., Vol. IV at 1508. In reaching this conclusion, the district court stated that "[a]ppropriate authorities are entities which 'have the authority to review the agency's determination,' including the agency itself, the Merit Systems Protection Board, and the United States Court of Appeals for the Federal Circuit."[17] *Id*. (citing *United States v. Fausto*, 484 U.S. 439, 454 (1988)).

In her opening appellate brief, Strickland challenges the district court's decision and argues that "the District Court itself is an 'appropriate authority' to determine whether [she] was 'affected by unjustified or unwarranted personnel action,' since a district court can

---

[17] The district court therefore found it "unnecessary to address whether Congress intended to include entities such as the Official Capacity Defendants within the definition of 'agency' under the Back Pay Act." JA, Vol. IV at 1509. We likewise do not reach this issue.

103

rule that officials' unconstitutional conduct resulted in her constructive discharge and order her reinstated." Aplt. Br. at 39–40 (quoting 5 U.S.C. § 5596(b)(1)).

Defendants argue in response that the "appropriate authority" in Strickland's case, i.e., "the one with the power 'under applicable law' to determine whether [she] was subject to 'an unwarranted personnel action'" was "Chief Judge Gregory (or the Judicial Council), through the EDR process." Aple. Br. at 18. Defendants in turn argue that "[b]ecause [Strickland] terminated the EDR process before asking for or obtaining a determination of whether she was entitled to back pay, no one—let alone any 'appropriate authority' under the Back Pay Act—has found that [Strickland] is entitled to back pay." *Id*. As for Strickland's contention that a district court could be an "appropriate authority," defendants argue that "she has not identified an 'applicable law' that authorizes the district court to decide in the first instance whether she was subject to an unwarranted personnel action," and that, instead, "applicable law gives the Chief Judge and Judicial Council the authority to do that pursuant to the EDR Plan." *Id*. at 18–19.

It appears to be undisputed that, under the terms of the EDR Plan, an "appropriate authority" for purposes of the Back Pay Act would have included "the Chief Judge of the . . . Fourth Circuit" and/or "the Judicial Council of the Circuit." Aplt. App., Vol. II at 664 (quoting Chapter X, § 1 of EDR Plan). It also appears to be undisputed that, as defendants assert in their appellate response brief, Strickland failed to exhaust her remedies under the EDR Plan. More specifically, Strickland never filed a complaint and sought a hearing under the EDR Plan. Consequently, neither the Chief Judge nor the Judicial Council rendered a decision regarding her allegations of discrimination and retaliation.

That leaves Strickland's argument that the district court in this case should be deemed an "appropriate authority" for purposes of the Back Pay Act. The Back Pay Act itself does not define the phrase "appropriate authority." To be sure, Congress directed the Office of Personnel Management (OPM) to "prescribe regulations to carry out" the Back Pay Act, 5 U.S.C. § 5596(c), and the OPM's implementing regulations define key terms and phrases in the Back Pay Act, including "appropriate authority." 5 C.F.R. § 550.803. But Congress also made clear that the OPM's implementing "regulations are not applicable to" the AO, the Federal Judicial Center, and the federal courts. 5 U.S.C. §§ 5596(a)(2), (c). Thus, we must ignore the OPM's implementing regulations and determine for ourselves the meaning of the statutory phrase "appropriate authority."

The plain text of the Back Pay Act requires an employee/plaintiff to establish, in part, that an "appropriate authority" found, in the context "of a timely appeal or an administrative determination," and "under applicable law, rule, regulation, or collective bargaining agreement," that the employee/plaintiff was "affected by an unjustified or unwarranted personnel action." 5 U.S.C. § 5596(b)(1). These requirements make clear, in our view, that an "appropriate authority" exists only when the statute's context requirement is met, i.e., when a decision is rendered in the context "of a timely appeal or an administrative determination."

We fail to see how the statute's context requirement could be satisfied in this case, and Strickland makes no attempt to address that issue. To begin with, a decision by the district court in this case on the merits of Strickland's claims would not be rendered in the

105

context "of a timely appeal." That is because Strickland's claims were filed originally in the district court and do not stem from any decision by a lower body or agency.

As for whether a decision by the district court could constitute an "administrative determination," the Back Pay Act does not define the phrase "administrative determination." Black's Law Dictionary defines the term "administrative" to mean "[o]f, relating to, or involving the work of managing a company or organization; executive." Black's Law Dictionary (11th ed. 2019). The Oxford English Dictionary defines the term in a similar manner. OED Third Ed., December 2011 (defining "administration" to mean "[o]f, relating to, or concerned with administration (in various senses); (in later use esp.) relating to or required for the running of a business, organization, etc."). Applying those definitions to the case at hand, we conclude that a decision by the district court could not reasonably be deemed an administrative determination for purposes of the statute's context requirement. Rather, such decisions are, under the normal meaning of the word "administrative," confined to determinations made by agencies themselves. This in turn supports the notion that only a decision by the Chief Judge and/or the Judicial Council pursuant to the EDR Plan would constitute an administrative determination by an appropriate authority. *Cf. United States v. Fausto*, 484 U.S. 439, 454 (1988) (holding that "the Claims Court (and any other court relying on Tucker Act jurisdiction) is not an 'appropriate authority' to review an agency's personnel determination" under the Back Pay Act); *Bell v. United States*, 23 Cl. Ct. 73, 76 (Cl. Ct. 1991) (same).

106

For these reasons, we conclude that Strickland has failed to establish that the district court could reasonably be classified as an "appropriate authority" under the Back Pay Act because there was no "timely appeal" or an "administrative determination" in this case.

### 5) Conclusion

We agree with the district court that the Back Pay Act and the APA do not waive sovereign immunity for Strickland's claims for back pay and other requested relief against the Official Capacity Defendants. But we conclude, contrary to the district court's decision, that Strickland's nonstatutory review claims for prospective equitable relief against the Official Capacity Defendants, i.e., her Fifth Amendment due process and equal protection claims, are not barred by sovereign immunity.

### F.  Bivens

The Individual Capacity Defendants argue that Strickland lacks a cause of action against them under *Bivens* for the alleged Fifth Amendment equal protection violations. Aple. Br. at 40; *see Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1976). The district court did not reach this issue because it concluded that Strickland's complaint failed to allege a viable claim for relief under the Fifth Amendment's Equal Protection Clause. Because we conclude that Strickland's complaint does in fact allege a viable claim for relief under the Fifth Amendment's Equal Protection

Clause, we proceed to address whether *Bivens* permits Strickland to seek money damages for that claim against the Individual Capacity Defendants.[18]

"If [Strickland] were bringing" her Fifth Amendment "claim[] against *state* officials [in their individual capacities], then there would be no question that [s]he could seek money damages under 42 U.S.C. § 1983." *Annappareddy v. Pascale*, 996 F.3d 120, 132 (4th Cir. 2021) (emphasis in original). Because, however, "no statute provides an analogous cause of action against *federal* officials," any remedy for her alleged constitutional violations against the Individual Capacity Defendants "must come in the form of the implied cause of action first recognized in *Bivens*." *Id.* (quotation marks omitted) (emphasis in original).

In *Bivens*, the Supreme Court "recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Ashcroft*, 556 U.S. at 675 (quoting *Corr. Serv. Corp. v. Malesko*, 534 U.S. 61, 66 (2001)). "In that case and then in two subsequent cases, the Supreme Court allowed plaintiffs alleging certain Fourth, Fifth, and Eighth Amendment violations to proceed under this implied cause of action." *Annappareddy*, 996 F.3d at 133; *see Bivens*, 403 U.S. at 396–97 (recognizing Fourth Amendment violation resulting from use of unreasonable force during a warrantless search and seizure); *Davis*, 442 U.S. at 248–49 (recognizing a

---

[18] Strickland argues that we "should remand the *Bivens* issue to the District Court to consider in the first instance." Aplt. Br. at 49–50. We could, of course, remand the *Bivens* question to the district court for a determination in the first instance. But, for purposes of expedience and efficiency, and because the parties briefed the *Bivens* issue in detail in their district court pleadings, we proceed to address the question in the first instance.

remedy for the violation of the equal protection component of the Fifth Amendment's Due Process Clause resulting from a congressman's termination of plaintiff's employment because of her gender); *Carlson v. Green*, 446 U.S. 14, 17–19 (1980) (recognizing a remedy for a violation of the Eighth Amendment's Cruel and Unusual Punishments Clause arising out of a federal prison officials' failure to provide proper medical care to a prisoner).

"In the years since those [three] cases were decided, however, the Supreme Court's approach to implied damage remedies has changed dramatically, to the point that expanding the *Bivens* remedy is now a disfavored judicial activity." *Annappareddy*, 996 F.3d at 133 (quotation marks omitted). "Indeed, the Court has gone so far as to observe that if the Court's three *Bivens* cases [had] been . . . decided today, it is doubtful that [it] would have reached the same result." *Id*. (quotation marks omitted) (citing *Hernandez v. Mesa*, 140 S. Ct. 735, 742–43 (2020)). "And for almost 40 years, [the Court has] consistently rebuffed requests to add to the claims allowed under *Bivens*." *Hernandez*, 140 S. Ct. at 743.

Consistent with its current view of *Bivens* actions, the Supreme Court has outlined a two-step framework for determining whether a claim asserted under *Bivens* can proceed. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017). First, a court must determine whether the claims at issue present a new *Bivens* context, i.e., a context different from the contexts at issue in *Bivens*, *Davis*, and *Carlson*. "To present a new context, a radical difference is not required." *Annappareddy*, 996 F.3d at 133 (quotation marks omitted). The Supreme Court in *Abbasi* outlined a non-exhaustive list of potentially meaningful differences:

109

the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Abbasi*, 137 S. Ct. at 1860. "If the context is *not* new . . . then a *Bivens* remedy continues to be available." *Annappareddy*, 996 F.3d at 133 (quotation marks omitted) (emphasis in original). "But if the context is new, courts must move on to the second step of the *Bivens* analysis: evaluat[ing] whether there are special factors *counselling hesitation* in the absence of affirmative action by Congress." *Id*. (quotation marks omitted) (emphasis in original). "If such special factors are present, a *Bivens* action is not available." *Id*. (quotation marks omitted).

Applying the *Abbasi* framework to Strickland's Fifth Amendment Equal Protection claim, the first step is to determine whether that claim presents a new *Bivens* context. On the one hand, the Supreme Court has already extended *Bivens* to a Fifth Amendment Equal Protection claim arising in the context of sex discrimination in federal employment. *See Davis*, 442 U.S. at 248–49 (1979) (recognizing a remedy for the violation of the equal protection component of the Fifth Amendment's Due Process Clause resulting from a congressman's termination of plaintiff's employment because of her gender). In addition, there is relatively clear judicial guidance, albeit in the context of federal discrimination statutes rather than *Bivens* actions, as to how a supervisory official should respond to a complaint that an employee is being sexually harassed by another employee.

110

But those two factors aside, Strickland's claim clearly appears to us to present a new context. To begin with, the defendants against whom the claim is asserted—a federal circuit judge, a federal public defender, and other federal judiciary employees—are strikingly different from the sole defendant in *Davis*, "who was a United States Congressman at the time th[e] case commenced." 442 U.S. at 228. Further, the actions that Strickland seeks to challenge in her Fifth Amendment Equal Protection claim are more far-reaching than the one specific action that was challenged by the plaintiff in *Davis*, i.e., the defendant congressman's issuance of a letter terminating her employment because he believed that a man was needed in the position that she occupied. 442 U.S. at 230 (the letter concluded "that it was essential that the understudy to my Administrative Assistant be a man"). More specifically, Strickland is challenging defendants' response to her initial allegations of sexual harassment, as well as the manner in which the EDR Plan was executed by defendants in response to her request for an investigation and mediation. Further, unlike the situation in *Davis*, where the defendant congressman was not operating under any specific statutory or legal mandate when he issued the termination letter to the plaintiff, the defendants in this action were operating under the framework of the EDR Plan when they responded, or attempted to respond, to Strickland's allegations of sexual harassment. Finally, the fact that Congress has, to date, intentionally exempted the federal judiciary from the reach of anti-discrimination employment statutes appears to be a potential special factor that was not at issue in the previous *Bivens* cases. Thus, in sum, we conclude that Strickland's Fifth Amendment equal protection claim presents a new *Bivens* context.

111

Because Strickland's Fifth Amendment equal protection claim presents a new *Bivens* context, the next question is whether there are special factors that counsel hesitation in the absence of affirmative action by Congress. As previously noted, Congress has, to date, intentionally exempted the federal judiciary from the reach of federal employment statutes (including, as discussed in greater detail below, the Civil Service Reform Act), and has instead effectively allowed the federal judiciary to police itself in terms of addressing claims of employment discrimination by federal judiciary employees. In light of that backdrop, it seems clear to us that the question of whether a damages action should be allowed against federal judicial officials in their individual capacities "is a decision for the Congress to make, not the courts." *Abbasi*, 137 S. Ct. at 1860. Thus, we conclude that *Bivens* should not be extended to the Fifth Amendment equal protection claim asserted by Strickland in her complaint.

## G.   The Civil Service Reform Act

Defendants also argue that Strickland's claims are all barred by the Civil Service Reform Act, 5 U.S.C. § 1101 et seq. (CSRA). We reject that argument.

"The CSRA, enacted in 1978, 'comprehensively overhauled the civil service system,' replacing a patchwork of rules and regulations with a 'new framework for evaluating adverse personnel actions against [federal employees].'" *Dotson*, 398 F.3d at 163 (quoting *Lindahl v. Office of Pers. Mgmt.*, 470 U.S. 768, 773–74 (1985)). "'[T]o balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration,' the CSRA creates 'an integrated scheme of

112

administrative and judicial review' for adverse employment actions." *Id.* (quoting *United States v. Fausto*, 484 U.S. 439, 445 (1988)).

The CSRA does not, however, "afford . . . administrative or judicial review to judicial branch employees such as [Strickland]." *Id.* "The CSRA divides civil service personnel into three main classifications: the senior executive service, the competitive service, and the excepted service." *Id.* "[E]mployees of the judicial branch . . . qualify as excepted service personnel because they are neither in the executive branch nor included in the competitive service by statute." *Id.* Although "[t]hree sections of the CSRA, Chapters 23, 43, and 75, afford detailed procedural protections to civil service employees who experience adverse employment actions," none of them apply to excepted service judicial branch employees such as Strickland. *Id.*

The Supreme Court and federal circuit courts have all noted the comprehensive nature of the CSRA and concluded that the lack of remedy provided therein to certain classes of federal employees is not due to inadvertence on the part of Congress. *See Schweiker v. Chilicky*, 487 U.S. 412, 423 (1988); *Dotson*, 398 F.3d at 167–68 (collecting cases). As a result, the Supreme Court and federal circuit courts have generally refused to create additional *Bivens* remedies for those classes of federal employees. *See Schweiker*, 487 U.S. at 423 ("When the design of a Government program [such as the CSRA] suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration," the Court "ha[s] not created additional *Bivens* remedies"); *Dotson*, 398 F.3d at 167–68 (collecting cases). More specifically, the Supreme Court and federal circuit courts have generally

113

treated the comprehensiveness of the CSRA as a special factor that weighs against creating *Bivens* remedies for federal employees who lack remedies under the CSRA. Thus, and for the reasons we have previously discussed, we agree with defendants that the CSRA effectively operates to preclude Strickland from asserting *Bivens* claims for money damages against the Individual Capacity Defendants in this case.

But that still leaves open the question of whether the CSRA also operates to preclude Strickland from asserting her nonstatutory review claims seeking equitable relief against the Official Capacity Defendants. Those claims, as we have discussed, seek to enjoin the Official Capacity Defendants from exceeding the scope of their authority or acting unconstitutionally in their design of the Fourth Circuit's EDR Plan, as well as in their administration of the EDR Plan and its procedures in her particular case.

"The circuits are divided as to whether equitable relief such as reinstatement is available to federal employees notwithstanding their general agreement that the CSRA precludes *Bivens* claims for damages." *Dotson*, 398 F.3d at 179. The Third and D.C. Circuits have concluded the CSRA does not preclude federal employees' claims for equitable relief, reasoning, in part, "that the CSRA does not" express Congress' intent to bar such actions "with sufficient strength and clarity to bar courts' traditional power to do equity." *Id*. at 180 (citing cases). "The First, Fourth, Ninth, Tenth, and Eleventh Circuits," on the other hand, "have concluded from the comprehensive nature of the CSRA that Congress did not intend for federal employees to pursue supplemental judicial relief, even in equity, for classic employment disputes." *Id*. at 179 (citing cases).

114

The Fourth Circuit addressed this general issue nearly forty years ago in *Pinar v. Dole*, 747 F.2d 899 (4th Cir. 1984). The plaintiff in that case was a Federal Aviation Administration (FAA) police officer who filed suit against the Secretary of the Department of Transportation and various FAA officials "contesting three personnel actions taken against him: (1) the issuance of a letter of reprimand for making false and unfounded statements about another employee; (2) a two-day suspension without pay and benefits for mishandling his firearm; and (3) the termination of his temporary promotion to GS-6 for being unresponsive to authority." *Id*. at 902. The plaintiff claimed violations of his First Amendment rights and "his [F]ifth [A]mendment right to due process." *Id*. He "sought injunctive relief against the agency and money damages against the individual" defendants. *Id*. The district court dismissed the claims and the plaintiff appealed to the Fourth Circuit. The Fourth Circuit began its analysis by rejecting the plaintiff's "claim under the [F]irst [A]mendment for damages against the individual defendants." *Id*. at 904. The court noted, in pertinent part, that the CSRA afforded the plaintiff "constitutionally adequate procedures to protect his [F]irst [A]mendment rights" and that "[t]o afford [him] a full hearing with the right to direct judicial review of the relatively minor personnel actions he received would unduly frustrate the government's interest in efficiently administering the federal workforce." *Id*. at 908. As for the plaintiff's claim for equitable relief, the Fourth Circuit concluded that "[a] review of the remedial provisions of the CSRA support[ed] the finding that Congress clearly intended the comprehensive remedies available to [him] to be exclusive." *Id*. at 910. More specifically, the Fourth Circuit held that "in this case where the personnel actions are so minor in nature and where the available statutory remedies are

115

constitutionally adequate to provide relief, we conclude that Congress intended that judicially-created remedies in district court not be made available." *Id*. at 912.

Strickland's case, however, is distinguishable from *Pinar* and thus requires us to decide an issue that was not decided in *Pinar*. Unlike the plaintiff in *Pinar*, Strickland is not simply challenging one or more personnel decisions. To be sure, she is alleging that she was subjected to sexual harassment in the workplace and that she was constructively discharged. But the substance of her claims focuses on the defendants' actions in both designing the EDR Plan, and in turn in executing the EDR Plan in response to her allegations of workplace sexual harassment. Strickland also effectively alleges that defendants' actions knowingly deprived her of meaningful review of her claims of sexual harassment and that these actions ultimately led to her constructive discharge.

In resolving this issue, we find persuasive the Third Circuit's decision in *Semper v. Gomez*, 747 F.3d 229 (3d Cir. 2014). That case was filed by a federal probation officer challenging his termination. The Third Circuit "concluded that the CSRA precluded [his] constitutional claims for equitable and declaratory relief because he was a judicial employee who could pursue meaningful relief under a remedial plan adopted by the District Court of the Virgin Islands that provide[d] for meaningful review of his claims by judicial officers." *Id*. at 235. In reaching this result, the Third Circuit "conclude[d] that the CSRA precludes a federal employee from litigating constitutional claims for equitable and declaratory relief in a [28 U.S.C.] § 1331 action where the employee could pursue meaningful relief under a remedial plan that provides for meaningful review of his or her claims by judicial officers," but that "a federal employee who could not pursue meaningful

116

relief through a remedial plan that includes some measure of meaningful judicial review *has the right to seek equitable and declaratory relief for alleged constitutional violations in a 'federal question' action filed pursuant to § 1331*." *Id*. at 242 (emphasis added). In so concluding, the Third Circuit noted "that it would be unnecessary and even inappropriate to allow a judicial employee to file a lawsuit against a judicial officer where the judiciary has already provided a means for this person to obtain meaningful relief together with a measure of judicial review." *Id*. at 243.

Generally speaking, an EDR Plan like the one in place in the Fourth Circuit is designed to "provide[] for both a measure of judicial review and the means to obtain meaningful relief to an employee covered under th[e] . . . Plan who claims a denial of the rights granted [t]hereunder." *Semper*, 747 F.3d at 244 (quotation marks and brackets omitted). But Strickland's allegations that the Official Capacity Defendants exceeded their authority and/or acted unconstitutionally in the manner in which they implemented the EDR plan and considered her claims of sexual harassment place Strickland's case within the exception identified by the Third Circuit in *Semper*. These allegations present a situation where Strickland contends that she has been deprived of a forum for meaningful review of her claims by judicial officers. As a result, we conclude that the CSRA should not be interpreted as precluding Strickland's claims for equitable relief against the Official Capacity Defendants.

117

IV

The effect of our rulings is as follows: Strickland's Fifth Amendment due process claim, to the extent that it alleges a deprivation of Strickland's property rights, and to the extent that it is asserted against the Official Capacity Defendants, is sufficient to survive the motions to dismiss; to the extent the Fifth Amendment due process claim alleges the deprivation of a liberty interest, however, it was properly dismissed by the district court. Strickland's Fifth Amendment equal protection claim, to the extent that it is asserted against the Official Capacity Defendants, is sufficient to survive the motions to dismiss. The Official Capacity Defendants are entitled to sovereign immunity from the Fifth Amendment due process and equal protection claims only to the extent those claims seek back pay; in other words, Strickland's potential recovery on those claims against the Official Capacity Defendants is limited to prospective equitable relief.

With respect to the Individual Capacity Defendants, Strickland's Fifth Amendment equal protection claim is subject to dismissal because Strickland cannot state a cause of action under *Bivens*. Strickland's §§ 1985 and 1986 claims against the Individual Capacity Defendants are inadequately pled and were thus properly dismissed by the district court.

Strickland's motion to vacate the district court's judgment and to disqualify/recuse both the district court judge and this panel is DENIED. Strickland's motion to file an addendum/attachment to her reply brief is GRANTED. The district court's judgment is AFFIRMED in part and REVERSED in part and the case is REMANDED to the district court for further proceedings consistent with this opinion.