# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

### ASHEVILLE DIVISION

| | | |
|---|---|---|
| **CARYN DEVINS STRICKLAND,** | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| **v.** | ) | **Civil No. 1:20-cv-00066-WGY** |
| | ) | |
| **UNITED STATES,** *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

### PLAINTIFF'S REPLY TO DEFENDANTS' RESPONSE TO HER SUPPLEMENTAL MEMORANDUM IN SUPPORT OF HER MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants are in denial about the significance of the Fourth Circuit's ruling in Strickland's favor. *Strickland v. United States*, 32 F.4th 311, 321 (4th Cir. 2022). In reversing this court's grant of dismissal of her due process and equal protection claims, the Fourth Circuit set out the legal framework that governs her claims and provided specific guidance on the showing needed to prove them. *Id.* at 355–56 (due process); *id.* at 358–60 (equal protection). That showing is plainly met based on the factual record in this case. Defendants' half-hearted "supplemental evidence," including two declarations that are each two pages long, utterly fails to refute her showing.

1

To defeat a motion for summary judgment, the responding party may not rest on "mere allegations or denials," but must present specific facts by affidavit or other admissible evidence showing that contradiction is possible. *Pine Ridge Coal Co. v. United Mine Workers of Am.*, 187 F.3d 415, 421 (4th Cir. 1999) (per curiam) (citation omitted). The court must treat Strickland's verified complaint as "the equivalent of an opposing affidavit for summary judgment purposes," and it must accept her undisputed allegations as true. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991). Moreover, "[a] mere scintilla of evidence presented by the nonmoving party is insufficient to circumvent summary judgment." *Austin v. Clark Equip. Co.*, 48 F.3d 833, 836 (4th Cir. 1995). "Rather, the nonmoving party must convince the court that upon the record taken as a whole a rational trier of fact could find for the nonmoving party." *Id.*

Defendants have been provided *three* separate opportunities to respond to Strickland's summary judgment motion, including their summary judgment opposition, filed on October 2, 2020; their response to Strickland's supplemental memorandum, filed on July 3, 2022; and their supplemental memorandum, filed on August 22, 2022. Despite having been provided multiple opportunities to respond, as well as lengthy extensions on their briefing, Defendants still have failed to produce any competent evidence to refute her claims. *Infra*, at 4–25.

Moreover, while Defendants state that they "intend to move for summary judgment at the close of discovery," ECF No. 134, at 1, they have not met the requirement under Fed. R. Civ. P. 56(d) to provide a reason why they need discovery to oppose Strickland's claims. *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996) (citing cases). As the Fourth Circuit has explained, "[w]e, like other reviewing courts, place great weight on the Rule 56[d] affidavit, believing that '[a] party may not simply assert in its brief that discovery was necessary and thereby overturn summary judgment when it failed to comply with the requirement of Rule 56[d] to set out reasons for the need for discovery in an affidavit.'" *Id.* (citation omitted). Accordingly, if a party was "genuinely concerned" that summary judgment was premature because it had inadequate opportunity for discovery, then it "should have sought relief" under Rule 56(d).[1] *Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 972 n. 3 (4th Cir. 1990). Because Defendants cannot show that there is a genuine issue for trial and because they have not provided any reason why they need discovery to oppose Strickland's claims, this court should grant summary judgment in her favor.

---

[1] Strickland has addressed elsewhere Defendants' frivolous and nonsensical arguments that they were not required to participate in discovery during the period authorized by the court's pretrial order. *See* ECF Nos. 87 (motion to strike), 116 (supplemental memorandum in support of summary judgment), 122 (motion for default judgment), 132 (parties' joint statement). But even if further discovery is authorized, Defendants have not shown any need for discovery under Rule 56(d).

3

# I. Defendants have failed to refute Strickland's showing that they violated her due process rights.

## A. The undisputed record shows that Strickland was led to believe that the Defender would be the decisionmaker.

The Fourth Circuit held that Strickland could pursue an as-applied due process challenge "because the refusal to disqualify the [Defender] from the investigation and the alleged coercing of Strickland to end the investigation stated a plausible violation of her due process rights." *Strickland*, 32 F.4th at 355. The undisputed evidence shows both that the Defender was not disqualified from exercising authority in the EDR investigation, and that Strickland was coerced to end the investigation and resign from the FDO.

### 1. The Defender exercised decision-making authority throughout the EDR process.

Defendants' sworn declarations in this litigation confirm that the Defender, who was an accused party, was not disqualified from exercising authority in the EDR process. *See* Declaration of James Ishida ("Ishida Decl."), ¶ 18, ECF No. 78-4 ("The Chief Judge denied Plaintiff's request to disqualify, which was orally communicated to Plaintiff . . . ."). Indeed, the EDR Coordinator, the AO's General Counsel, and the Judicial Integrity Officer ("JIO") all asserted that Strickland had not provided any basis to disqualify the Defender because, in their view, a unit executive who is accused of wrongful conduct in an EDR proceeding is entitled to represent the employing office. *See id.* (stating that "[p]laintiff failed to come up

4

with a cognizable basis for disqualifying the Defender" because "[n]othing in the EDR Plan requires the respondent to be a neutral party"); *see also* Declaration of Jill Langley ("Langley Decl."), ¶ 8, ECF No. 78-5 ("[T]he defending Respondent employing office, acting through its unit executive, is the opposing or differing party to an EDR disputed matter."); Declaration of Sheryl Walter ("Walter Decl."), ¶ 14, ECF No. 94-7 (same). The JIO even claimed that the judiciary's latest Model EDR Plan "explicitly limit[s] disqualifications for a conflict of interest" to exclude unit executives. Langley Decl., ¶ 9; *but see* EDR Interpretive Guide & Handbook, at 67 (Jan. 2020) ("Handbook") ("[I]f the Complainant alleges that the Unit Executive sexually harassed her, the personal interests of the Unit Executive likely conflict with the Employing Office's interests, and someone other than the Unit Executive should likely act on behalf of the Respondent Employing Office."). The General Counsel further stated that disqualifying the accused unit executive "would be unfair to the Respondent-employing office." Walter Decl., ¶ 14.

The Fourth Circuit rejected Defendants' view that they were not required to disqualify the accused Defender from exercising authority in the EDR process regarding Strickland's claims against the Defender and the First Assistant. *See Strickland*, 32 F.4th at 355. As an alleged violator, the Defender was not a party to Strickland's EDR claim. Handbook, at 27 ("An alleged violator, even a Unit Executive, is not a Party to the EDR matter."). And contrary to Defendants'

reading of the EDR Plan, the Fourth Circuit held that the Plan "accounts for potential conflicts of interest by permitting a party, at any time during the Chapter X process, to 'seek disqualification of a judicial officer, employee or other person involved in a dispute by written request to the Chief Judge.'" *Id.* (quoting EDR Plan Ch. X, § 7). In this case, the Fourth Circuit held, "[t]he refusal to disqualify the [Defender] created a conflict of interest that infected the entire investigation when Strickland was led to believe that the [Defender] would be the final decisionmaker in the case." *Id.* It is undisputed that Defendants refused to disqualify the Defender even though he was an accused party.

Further, the Fourth Circuit concluded that "[l]eading Strickland to believe that her only way forward was to obtain a favorable decision from one of the key subjects of the investigation could be found to have deprived Strickland of her property interest in the right to a remedy from injuries incurred because of harassment and discrimination." *Id.* Defendants failed to refute Strickland's showing that she was "led to believe that the [Defender] would be the final decisionmaker" and that "her only way forward was to obtain a favorable decision" from him. *Id.* Defendants' declarations explicitly acknowledge that the Defender *was* the final decisionmaker during the counseling and mediation stages of the EDR process, with exclusive and unreviewable authority. Defendants stress that during counseling and mediation, "only the parties can mutually agree to a

6

resolution" and a "presiding judicial officer may not make a determination of liability or order a resolution."  Langley Decl., ¶ 10; Walter Decl., ¶ 11.  In their latest declarations, Defendants further emphasize that a hearing officer does "not have authority under the EDR Plan to order the Defender's office to do anything" during counseling and mediation.  Declaration of Jill Langley ("Langley Decl. II"), ¶ 6, ECF No. 134-2.  Both counseling and mediation were *mandatory* under the EDR Plan; Strickland was not allowed to bypass either stage before she could file a formal complaint to request a hearing before a presiding judicial officer.  *See* EDR Plan Ch. X, § 1, ECF No. 60-16 ("An employee who claims a denial of the rights granted [under the EDR Plan] shall seek resolution of such claims through the procedures of this Chapter."); *id.* § 8 (stating that employee "must first request counseling"); *id.* § 9 (stating that "[f]ailure to pursue mediation will preclude further processing of the employee's claim").  Hence, Defendants' own declarations and the plain terms of the EDR Plan establish that Strickland was led to "believe that the only way forward was to obtain a favorable decision from one of the key subjects of the investigation," the Defender.  *Strickland*, 32 F.4th at 355.

Because Defendants refused to disqualify the Defender during mandatory counseling and mediation, Strickland was forced to negotiate with the Defender, the accused party, acting on behalf of the employing office.  *See* Declaration of Jane Roe ("Roe Decl."), Ex. C, at 5, ECF No. 60-2 (statement from EDR

7

Coordinator that if "Mr. Martinez is disqualified or is otherwise unavailable, then it will be very difficult, if not impossible, to resolve your concerns at this juncture"). During these EDR stages, which lasted more than six months, the Defender exercised sole decision-making authority on behalf of the employing office. The Defender stated that he would be "reserving the right" to require Strickland's return to the First Assistant's duty station no matter the outcome of the EDR investigation. *Id.* Ex. B, at 52. When Strickland repeatedly requested concrete steps to abate the continuing hostile work environment, the EDR Coordinator said: "Reiterating that you want a safe workplace free of harassment isn't helpful because [the Defender] already believes he's done and is doing all he can to provide such a workplace for you." *Id.* Ex. C, at 27. During mediation, Strickland was required to negotiate with the Defender even though, as the Mediator explained, "the Defender is from a 'generation' that doesn't 'get' sexual harassment." Complaint ¶ 415. In response to her request for the Defender's disqualification, the EDR Coordinator told Strickland that the Chief Judge believed that "no one" could "represent" the employing office if the Defender were disqualified, and that disqualification of the Defender would be "premature" without a finding against him. *Id.* ¶¶ 370–71.

Meanwhile, Defendants' declarations confirm that the Defender did exercise authority over the EDR investigation into Strickland's claims against him. The

8

Defender's declaration states that he "would be appointing Heather Beam to investigate the allegations." Declaration of Anthony Martinez ("Martinez Decl."), ¶ 81, ECF No. 78-3; *see also id.* at 43 (Gov't Ex. C-9) (statement from EDR Coordinator to Defender that "I understand that arrangements are currently being made for you to appoint someone outside your office to investigate the allegations contained in the below email"). The EDR Coordinator's declaration further states that the Defender was responsible for "determin[ing] whether the First Assistant had engaged in any misconduct and whether an employment personnel action was necessary to address any findings of misconduct or workplace concerns against the First Assistant." Ishida Decl., ¶ 8. Despite being an accused person whose actions in relation to the First Assistant's conduct were being investigated, the Defender acted as a decisionmaker in the investigation. *See* Martinez Decl., ¶¶ 99, 101–03 (stating that he "personally counseled" the First Assistant and that he "received counseling" under Chapter IX of the EDR Plan).

Defendants' refusal to disqualify the Defender from exercising authority over the investigation "created a conflict of interest that infected the entire investigation." *Strickland*, 32 F.4th at 355. Specifically, the Investigator told Strickland that her allegations of the Defender's violations of the EDR Plan were not being investigated because the EDR Coordinator excluded them from the investigation. Complaint ¶¶ 318–19. Defendants now claim that Strickland's

9

retaliation claim was investigated, but the Investigator never contacted Strickland about her retaliation claim, and emails from the EDR Coordinator confirm that she was led to believe the investigation was not reopened. Roe Decl., Ex. C, at 45–46 (quoting EDR Coordinator's statement that "[t]he investigation has not been or is expected to be reopened" in response to Strickland's request for a status update on her retaliation claim).

Moreover, the record confirms that Defendants intentionally withheld the investigation report and delayed taking disciplinary action in order to push Strickland to "settle the matter informally." Complaint ¶ 398. Defendants deliberately slow-walked the investigation and even imposed a *90-day extension* that she did not request, on the day she filed her EDR complaint, without notifying her. Roe Decl., Ex. C, at 37 (Investigator's statement that "a 90 day extension was granted" for the investigation "on September 10, 2018"). When the report was finally completed in January 2019, the EDR Coordinator refused to release the report to the parties because, as he put it, "that would have sparked satellite litigation over the accuracy of the report," which would not have been "helpful" in "resolv[ing]" the "outstanding issues." *Id.* at 60. By withholding the investigation's findings and then explicitly conditioning any corrective action on Strickland concluding her EDR process, defendants pressured her to resign to avoid further delaying accountability for those responsible for sex discrimination.

*See Strickland*, 32 F.4th at 355 (holding that "the alleged coercing of Strickland to end the investigation stated a plausible violation of her due process rights").

### 2. Strickland was led to believe that the Defender would be the decisionmaker at a final hearing.

Defendants cannot dispute any of this. Instead, in an attempt to conjure up a dispute of fact, Defendants claim that "a reasonable person" would not have believed that the Defender would be the decisionmaker in a final EDR hearing. ECF No. 134, at 4. Defendants offer a second declaration from the JIO, in which she now claims that "[a]t no time" did she tell Strickland "that a designated EDR Presiding Judicial Officer had no jurisdiction to order a remedy against a Federal Public Defender organization." Langley Decl. II, ¶ 9, ECF No. 134-2. The JIO claims to recall telling Strickland instead that the Chief Judge lacked authority to order remedies "*in Mediation* because it was a pre-Complaint stage of the EDR process involving only the complaining employee and the employing office," but that he would have authority to do so in a final hearing. *Id.* ¶ 6.

The JIO's newly expressed certainly about these matters blatantly contradicts her contemporaneous emails to Strickland, in which she stated: "I'd like to better understand if FPDs are adequately protected by EDR remedies." Roe Decl., Ex. C., at 69 (Ex. A); *see Scott v. Harris*, 550 U.S. 372, 380 (2007) (theories that are "blatantly contradicted" by the record must be rejected on summary judgment). Moreover, the JIO is not alone in expressing concerns about the

11

authority of EDR to provide remedies for federal defender employees. For decades, federal judges have raised concerns that they lack "jurisdiction" over complaints against federal public defenders and "shouldn't be involved." *See* Report of the Judicial Conference Committee Report to Review the Criminal Justice Act, at 40 (Mar. 1993) (quoting Monroe G. McKay, C.J.). Recognizing their "distinct employment relationship and mission," the Judicial Conference recently adopted a separate EDR plan for federal public defender organizations. Report of the Proceedings of the Judicial Conference of the United States, at 23–24 (Sept. 2021). The JIO's statement that the issue was "jurisdictional" is in line with these concerns. Complaint ¶ 439. Regardless of whether the JIO's expressed concerns about the adequacy of EDR remedies for federal defender offices were valid, it was not "far-fetched" for Strickland to rely on the JIO's concerns to conclude that continuing the EDR process would be futile. ECF No. 134, at 6.

Moreover, while the JIO purported to tell Strickland how "the EDR Plan that applied to her matter" operated, Langley Decl. II, ¶ 6, the JIO lacked any personal knowledge as to how the EDR Plan was actually being implemented in her case. The JIO's testimony confirms, at best, that the EDR Plan facially provides remedies for federal defender employees, as the Fourth Circuit held. *Strickland*, 32 F.4th at 355. But under the Fourth Circuit's decision, Strickland stated a due process claim that the Plan was invalid *as applied to her*. *See id.* And the JIO's

12

emails strongly confirm that that was indeed the case. Explaining that "I can't address the whys of what has transpired in your cas[e] to date, and I know this has been an arduous path for you," the JIO offered to be a "guide" to Strickland's EDR Coordinator "for how I train and expect EDR to work." Roe Decl., Ex. C, at 70. The JIO further stated:

> Every matter can be a "lesson learned." For example, your experience has taught me that I/we need to provide interpretive guidelines to courts, to flesh out what I/we think should happen in EDR proceedings. I've trained EDR Coordinators in the Tenth Circuit, but I think that needs to be nationalized. And I'd like to better understand if FPDs are adequately protected by EDR remedies.

*Id.* at 69. After Strickland told the JIO that she would be resigning from the FDO and accepting a clerkship, the JIO said: "I'm sorry for the many months of difficulties that you had with EDR. Every EDR case I hear about helps me help courts do better next time, so what you went through will be useful in the long term." *Id.* at 68. The JIO's references to Strickland's "many months of difficulties" in EDR and the need to "do better next time" confirmed that her EDR process was grossly inadequate.

In addition, Defendants have not disputed Strickland's verified allegations—which must be accepted as true—that the Mediator told her that the "Defender was the 'decision maker' and that no hearing officer would 'micromanage' him or tell

13

him how to do his job."[2]  Complaint ¶ 415.  Defendants contend that the Mediator

must have been referring to mediation, not a final hearing, but their interpretation

is implausible.  ECF No. 134, at 5.  As Defendants themselves emphasize, there is

no hearing officer at the mediation stage, and so the Mediator's comments about a

hearing officer could not have been referring to mediation or reasonably

understood as such.  *See* Langley Decl. II, ¶ 7 ("[T]here was no PJO designated

during mediation.").  The Mediator was performing a mediator's job, which is to

help a party understand what would happen if the matter was not resolved in

mediation.  In this instance, the Mediator was making it clear that if the mediation

ended without resolution and Strickland proceeded to a final hearing, the Defender,

the accused party, would be the decisionmaker.

    In a last-ditch effort, Defendants offer a second declaration from the EDR

Coordinator, who now claims to recall that on some unspecified date, he told

---

[2] Defendants assert that they have "not yet ascertained whether the mediator
in fact made the statement that Plaintiff claims he made" because they "are
working with the mediator to address his concerns about disclosing any
confidential information relating to the mediation."  ECF No. 134, at 5.
Defendants raised this same issue at the July 14, 2022 status conference, and this
court informed them that "there's plenty of time for you to make a motion" to
address the issue before filing their supplemental memorandum.  Transcript of
Status Conference at 17, ECF No. 129.  In addition, Strickland's counsel offered to
work with Defendants' counsel to provide a limited waiver of confidentiality.  The
fact that Defendants have still not spoken to the Mediator despite having these
opportunities to do so is no reason to delay deciding her motion.

Strickland that the Chief Judge or a presiding officer would handle the hearing phase of the EDR process and would be the decisionmaker. Declaration of James Ishida, ¶ 4, ECF No. 135-1. Even assuming that his newly conjured statement is true, it does not refute the Chief Circuit Mediator's statements that the Defender was the "decisionmaker" and a hearing officer would not "micromanage" him. Complaint ¶ 415. Moreover, because the EDR Coordinator had a blatant conflict of interest, *see* Handbook at 32 (unit executives have "an actual and perceived conflict of interest" in serving as EDR Coordinators); he allowed the Defender to exercise decision-making authority throughout the EDR process; and even the JIO acknowledged that he needed "guid[ance]" on "how I train and expect EDR to work," Roe Decl., Ex. C, at 70, any reliance on his statement would be "objectively unreasonable." *Baxter v. Comm'r of Internal Revenue Serv.*, 910 F.3d 150, 165 (4th Cir. 2018) (reliance on advice from a professional who "suffer[s] from a conflict of interest or lack[s] expertise" is "objectively unreasonable").

Defendants further assert that, regardless of what Strickland was told by high-level judiciary officials, her claim of reasonable reliance "is belied by the EDR Plan itself." ECF No. 135, at 5. This argument is foreclosed by the Fourth Circuit's decision. The Fourth Circuit recognized that the EDR Plan facially provides remedies for federal defender employees, but it held that Strickland could prove an as-applied challenge to the Plan if she was "led to believe that the

15

[Defender] would be the final decisionmaker" and that "her only way forward was to obtain a favorable decision" from him. *Strickland*, 32 F.4th at 355. Strickland has proven the facts to support her as-applied challenge, and she is entitled to summary judgment in her favor.

### B. Strickland has established that she had a viable EDR claim.

To prove her due process claim, Strickland is not required to prove the merits of her underlying EDR claims. Strickland's protected property interest is in her "right to redress injuries caused by workplace discrimination, a right that is functionally equivalent to a cause of action." *Strickland*, 32 F.4th at 351. Her right to be heard "does not depend upon an advance showing that [she] will surely prevail," and she "need not prove" the merits of her claims "to rightfully claim a modicum of procedural fairness." *Mallette v. Arlington Cnty. Employees' Supplemental Ret. Sys. II*, 91 F.3d 630, 637 (4th Cir. 1996) (citation omitted). The Fourth Circuit confirmed this when it held, without discussing the merits of her underlying EDR claims, that Strickland's due process rights were violated if she could prove "that continuing with the EDR process would be futile" and "the more suitable alternative was to drop her complaint and accept the Fourth Circuit clerkship." *Strickland*, 32 F.4th at 356.

Even so, the record clearly establishes that Strickland had a viable EDR claim. Consider the Defender's August 28, 2018 "reclassification" of Strickland,

which he inexplicably backdated to August 20, 2018—the day before her one-year anniversary at the FDO. Roe Decl., Ex. D. In "reclassifying" Strickland without considering her for a salary increase, the Defender effectively denied her any consideration for the grade-level promotion she qualified for on her anniversary date. *See* Declaration of William Moormann ("Moormann Decl."), Ex. A-1, ECF No. 78-1 (exhibit from FDO stating that Strickland's "[c]urrent promotion potential" as of August 16, 2018 was "1 grade"). And in backdating the reclassification to the *day before* her work anniversary, the Defender demonstrated that he was aware of her eligibility for a promotion and that his actions were intentional. Roe Decl., Ex. D. Moreover, as part of her "reclassification," the Defender proposed to eliminate Strickland's locality pay without any legitimate basis to do so, which would have resulted in a pay cut of nearly 15 percent. *Id.* The fact that the Defender's promotion denial came as part of a purported resolution of Strickland's sexual harassment allegations, and was approved by the Fourth Circuit, definitively proves that Strickland was subjected to an adverse action in direct response to her report of wrongful conduct. *See* Roe Decl., Ex. B, at 52 (Defender's statement that he was "reclassify[ing]" her as a "result" of their meeting about her allegations); *Id.* Ex. C, at 37 (Investigator's statement that the reclassification was a "step" taken in response to her "requests"). This, alone, is enough to prove her EDR claim.

17

In their summary judgment filings, Defendants claimed that Strickland was not eligible for a promotion—contrary to their own documentation showing that she was, *see* Moormann Decl., Ex. A-1—by misrepresenting her years of relevant professional experience. Defendants asserted that Strickland was not eligible for a promotion to JSP Grade Level 15 because ten years of "federal service" were required for eligibility and she had "slightly less than 4 years." ECF No. 78, at 4; Moormann Decl., ¶ 16. Defendants further asserted that the maximum Strickland could be paid after the reclassification would have been *less* than she was making as a research-and-writing attorney if the Defender had not exercised his "discretion and applied the 'Red Circle Rule.'" ECF No. 78, at 22. Both assertions are false. First, Strickland had five years of federal service on her work anniversary date, not "slightly less than 4 years," which could be discerned from a cursory review of her resume. Strickland was eligible for JSP Grade Level 15 based on her qualifications and professional experience, including her service as a federal employee for one full year at the next lower grade. *See* ECF No. 93, at 17–18 (describing how Strickland's qualifications met the eligibility requirements for a grade-level promotion). Second, the Defender was not prohibited from raising Strickland's salary upon "reclassifying" her to an assistant federal public defender, because he could have maintained her salary under the Highest Previous Rate policy. *See* DOCS Manual, Sec. 2-1, at 11. Defendants' blatant misrepresentation

of the facts confirms that they had no legitimate basis to deny Strickland the promotion, and that their stated reasons were merely pretextual.

In attempting to refute Strickland's arguments, Defendants also offered a version of the reclassification action that is not signed or dated, and which Strickland had never seen prior to their summary judgment filings. Moormann Decl., Ex. A-10 (Ex. B). Conveniently for Defendants, this version of the reclassification action purports to have a request date of August 16, 2018 and to maintain Strickland's salary without proposing to eliminate her locality pay. *Id.* Whether this exhibit is merely an inaccurate version or whether it was fabricated, it is not the final personnel action that appears in Strickland's personnel file. Roe Decl., Ex. D. Strickland has attached the official OPM-certified version of the document, which this court may consider under the business records exception to the hearsay rule. Ex. C; *see also* Fed. R. Evid. 902(4)(A) (providing that certified copies of official records are "self-authenticating"). In fact, this document shows that beyond refusing to consider Strickland for a promotion, Defendants *never even reclassified* her to an assistant federal public defender position as they claimed. Ex. C. Instead, Defendants merely requested a "pay adjustment," *i.e.*, to cut her salary. *Id.*; *see* DOCS Manual, Sec. 1-10 (stating that a reclassification requires prior written approval and use of the proper "Nature of Action" Code).

19

Further, Defendants' actions regarding the "reclassification" provide strong, undisputed evidence that they facilitated and ratified the First Assistant's sexual harassment. In his quid-pro-quo "Mas Dinero" email, the First Assistant made the same misrepresentations about Strickland's eligibility for a promotion that Defendants made in their declarations:



Roe Decl., Ex. B, at 36. The First Assistant's claim that Strickland needed more years of service to qualify for a promotion was plainly false, as was his improper assertion that he could help her skirt such a requirement. A reasonable factfinder would not view his email as anything but quid-pro-quo sexual harassment in which he proposed a "deal" to "pay" for his inappropriate advances. The fact that the First Assistant was clever enough not to make an explicit sexual demand is not enough to overcome the clear inference of quid-pro-quo sexual harassment to a reasonable factfinder. *See Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1312 (11th Cir. 2001) ("a victim need not provide evidence of a direct and express sexual demand," because "a supervisor may simply intimate that a subordinate's career prospects will suffer if she does not submit to his advances, with the hope of

concealing his harassment if his statements are repeated to a third party"). The fact that Defendants denied her the promotion after she rebuffed his advances shows that Defendants "maintained and reinforced the hostile work environment that [the First Assistant] had created." *Beardsley v. Webb*, 30 F.3d 524, 530 (4th Cir. 1994).

## II. Defendants have failed to refute Strickland's showing that they violated her equal protection rights.

Defendants have also failed to refute Strickland's showing that they were deliberately indifferent to the sexual harassment. While the First Assistant unsurprisingly claims that he did not sexually harass Strickland, he cannot deny that he sent her a quid-pro-quo email in which, as her direct supervisor, he falsely claimed that she was not eligible for a promotion and proposed a "plan" to raise her pay if she dealt in "pay-for-stay." Roe Decl., Ex. B, at 36. A reasonable factfinder would not believe the First Assistant's assertions that he was "joking" and that he did not mean for his comments "to be interpreted in a sexual manner." Declaration of John Parke Davis ("Davis Decl."), ¶ 22, ECF No. 78-2; *see Frederick*, 246 F.3d at 1312 (discussing the "long line of cases showing that sexual asides and insinuations are the well-worn tools of a sexual harasser"). That is especially true in the context of his repeated invitations for drinks and "mentoring sessions" out of the office, even after she declined and he acknowledged that his requests were making her uncomfortable. *See, e.g.*, Roe Decl. Ex. B, at 37 (offering Strickland "a drink and an ear if you need one, though I get the feeling

you are not comfortable talking to me about it"); *id.* at 40 (asking for a "mentoring session" and "some distance from work," while acknowledging that meeting in the office might make her more "comfortable"); *id.* at 41 ("I am free all day, including early morning, lunch, and evening. I am hoping this will be helpful for you, please don't be over-anxious about it."). Further, his assertion that she somehow invited his behavior because he perceived her as "demand[ing] that either she receive more money or she would quit," ECF No. 134, at 8, merely confirms that he tied his own behavior to a requested promotion and was engaged in crude sexist stereotyping of her based on his belief that she was too assertive in requesting a promotion. Because Defendants also took disciplinary action against the First Assistant, they have failed to present "evidence which shows more than some 'metaphysical doubt' that genuine and material factual issues exist" as to whether he engaged in wrongful conduct under the EDR Plan. *Austin*, 48 F.3d at 836.

Defendants have also failed to refute Strickland's showing that their response to the harassment was "clearly unreasonable." *Strickland*, 32 F.4th at 359 (quoting *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 702 (4th Cir. 2018)). In addition to facilitating and ratifying the quid-pro-quo harassment through their "reclassification" gambit, Defendants "dragged [their] feet" in investigating and taking disciplinary action. *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 669 (2d Cir. 2012). Defendants deliberately slow-walked the investigation and even

imposed a *90-day extension* on the day Strickland filed her EDR complaint without notifying her. Roe Decl., Ex. C, at 37. Defendants also failed to conduct an appropriate investigation, as they failed to disqualify the Defender from exercising authority over the investigation and excluded Strickland's claims against him from its scope. *Supra*, at 8–11. Moreover, Defendants did not take disciplinary action until *almost a full year* after Strickland first raised her complaints, and several months after she had already been forced to resign. Roe Decl., Ex. C, at 73; *see Feminist Majority Found.*, 911 F.3d at 703 (official was deliberately indifferent who failed "to address and curtail the harassment . . . over a period of months").

Defendants' answer to the complaint provides further admissions of their deliberate indifference. *Bright v. QSP, Inc.*, 20 F.3d 1300, 1305 (4th Cir. 1994) ("[A]dmissions in the pleadings are binding on the parties and may support summary judgment against the party making such admissions."). Defendants admit that the Investigator did not interview *any* witnesses besides Strickland, the First Assistant, and the Defender. Answer ¶ 317, ECF No. 127. For this glaring failure on their part, Defendants inexplicably blame *Strickland* for failing to provide a witness list, even though her email sending the Investigator her witness list is already part of the summary judgment record. Roe Decl., Ex. C, at 14 ("I have attached a copy of the personnel manual and appendices, as well as a witness list/timeline."). Defendants further admit that the Investigator told Strickland that

23

"training would have helped" and "maybe even 'avoided'" her situation, but the office was "left on its own to learn." Answer ¶ 304. The lack of "adequate training or guidance that is obviously necessary" is further evidence of Defendants' deliberate indifference. *Hill v. Cundiff*, 797 F.3d 948, 975 (11th Cir. 2015); *see also* Roe Decl., Ex. C, at 70 (JIO's comments confirming a lack of training).

Despite all this undisputed evidence, Defendants contend that this court should deny Strickland's summary judgment motion because the investigation report—which they still have not provided to her or the court—did not "find her claims to have merit." ECF No. 134, at 9. Defendants ask the court and the parties to essentially take their word for it that the investigation did not substantiate her claims. The rules of evidence and civil procedure do not allow that approach. *See Hodgin v. UTC Fire & Sec. Americas Corp., Inc.*, 885 F.3d 243, 252 (4th Cir. 2018) (nonmoving party "must produce evidence that goes beyond '[c]onclusory or speculative allegations'" to defeat summary judgment). Moreover, it is well-established that when a defense "is premised, in whole in or part, on the results of an internal investigation, the defendant waives the attorney-client privilege and work product protections for not only the report itself, but for all documents, witness interviews, notes and memoranda created as part of and in furtherance of the investigation." *Angelone v. Xerox Corp.*, No. 09-CV-6019, 2011 WL 4473534, at *2 (W.D.N.Y. Sept. 26, 2011) (citing cases).

24

Defendants further contend that this court should consider their selective quotations from the investigation report under the public records exception to the hearsay rule. ECF No. 34, at 10. While the investigation report *itself* might be admissible under that exception, the Defender's selective hearsay quotations from the report clearly are not. That testimony is "impermissible double hearsay," and Defendants have failed to identify any exception that could apply. *United States v. Melia*, 691 F.2d 672, 677 (4th Cir. 1982).

Moreover, Defendants face another fundamental problem in claiming that Strickland's allegations were not substantiated, which is that they have not offered any witness who can testify to that assertion based on personal knowledge. It is undisputed that the Investigator was not qualified to make findings or recommendations on the complaint. Answer ¶ 120. Instead, the Chief Judge was responsible for "determin[ing] whether [the Defender] had engaged in any misconduct and whether any action was necessary to address any findings of misconduct or workplace concerns against [the Defender]." Ishida Decl., ¶ 9. Without testimony from the Chief Judge or the disciplinary record itself, Defendants have failed to refute Strickland's showing that disciplinary action was taken for wrongful conduct under the EDR Plan. Roe Decl. Ex. C, at 73.

This the 2nd day of September, 2022.

Respectfully Submitted,

*/s/ Cooper Strickland*

Cooper Strickland
N.C. Bar No. 43242
P.O. Box 92
Lynn, NC 28750
Tel. (828) 817-3703
cooper.strickland@gmail.com

Jeannie Suk Gersen
Hauser Hall 510
1563 Massachusetts Ave.
Cambridge, MA 02138
617-496-5487
jsuk73@gmail.com

Philip Andonian
D.C. Bar No. 490792
CALEB ANDONIAN PLLC
1156 Fifteenth Street, N.W.,
Ste. 510
Washington, D.C. 20005
Tel: (202) 787-5792
phil@calebandonian.com

*Counsel for Plaintiff*

26

## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of September, 2022, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Gill P. Beck at Gill.Beck@usdoj.gov

Joshua M. Kolsky at Joshua.Kolsky@usdoj.gov

Rachael Westmoreland at Rachael.Westmoreland@usdoj.gov

*/s/ Cooper Strickland*
Cooper Strickland
N.C. Bar No. 43242
P.O. Box 92
Lynn, NC 28750
Tel. (828) 817-3703
cooper.strickland@gmail.com