# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION


CARYN DEVINS STRICKLAND,

     Plaintiff,

v.                Civil No.: 1:20-cv-00066-WGY

UNITED STATES, et al.,

     Defendants.
                       /



| | |
|---|---|
| VIDEOTAPED DEPOSITION OF: | ANTHONY MARTINEZ |
| TAKEN: | By Counsel for Plaintiff |
| DATE: | April 28, 2023 |
| TIME: | 9:00 a.m. - 5:41 p.m. |
| PLACE: | Constangy, Brooks, Smith & Prophete<br>100 North Tampa Street<br>Suite 3350<br>Tampa, Florida 33602 |
| REPORTED BY: | Sarah Parker<br>Notary Public<br>State of Florida at Large |



RICHARD LEE REPORTING
rlr@richardleereporting.com

APPEARANCES:

    JEANNIE SUK GERSEN, ESQUIRE
    JACOB GERSEN, ESQUIRE
    Hauser Hall 510
    1563 Massachusetts Avenue
    Cambridge, Massachusetts 02138
        Appeared for Plaintiff

    RACHAEL WESTMORELAND, ESQUIRE
    MADELINE MCMAHON, ESQUIRE
    DANIELLE YOUNG, ESQUIRE
    JOSHUA KOLSKY
    US Department of Justice
    Civil Division, Federal Programs Branch
    1100 L Street NW
    Washington, D.C. 20005
        Appeared for Defendants

    SHANNON SUMERELL SPAINHOUR, ESQUIRE
    Constangy, Brooks, Smith & Prophete, LLP
    84 Peachtree Road
    Suite 230
    Asheville, North Carolina 28803
        Appeared for Defendants

ALSO PRESENT:

    Matt Casey, Videographer
    Claire Beutter, Research Assistant
    Edward Jung, Research Assistant
    Kristin Mannherz, Administrative Office of the US
    Courts

I N D E X

|  | PAGE |
|---|---|
| Examination by Ms. Gersen | 5 |
| Examination by Ms. Westmoreland | 282 |
| Examination by Ms. Gersen | 284 |
| Certificate of Oath | 286 |
| Certificate of Reporter | 287 |
| Signature page/errata sheet | 288 |

INDEX OF EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 56 | Offer Letter | 72 |
| 57 | Page from Martinez Declaration | 77 |
| 59 | 05.18.2018 E-mail from JP to Caryn | 113 |
| 60 | Text Messages | 127 |
| 58 | Meeting with Caryn Devins | 136 |
| 61 | E-mail Re: Watt tomorrow | 139 |
| 62 | 07.05.2018 Significant Event Log | 152 |
| 63 | 07.08.23 E-mail Caryn Mentoring JP Davis to: W Kelly Johnson | 160 |
| 64 | 07.20.2018 E-mail Research & Writing Support | 170 |
| 65 | Declaration of Anthony Martinez | 183 |
| 66 | 08.10.2018 E-mail Agreement from Yesterday's Meeting | 194 |
| 67 | 08.13.2018 E-mail Re: Personnel Manual | 202 |

1    the DOJ attorneys because they're here.  They're

2    working for a federal agency, and there is a

3    bureaucracy in their agency.

4              MS. YOUNG:  I don't know what you're

5         talking about.

6         A.   And so as a manager starting a federal

7    agency, you know, you're involved and you've got to

8    learn what that bureaucracy entails.  And then the

9    budget and numbers, that's important.  I mean, it's

10   massive; it's just very bureaucratic.  It's a lot to

11   learn.  So all of the stuff that I had to learn,

12   they're already doing, but I had to learn it.

13        Q.   I imagine.  Did you get any training for

14   that?

15        A.   No, not really.  There is some training,

16   there is minimal training, but a lot of it you have

17   to learn on the fly.

18        Q.   So how you said minimal training, what

19   training did exist for you?

20        A.   Federal defenders would have training for

21   like several days.

22        Q.   For you specifically?

23        A.   Yeah, for defenders.

24        Q.   For defenders, but what about for the

25   federal defender?

1          A.   For the defenders.

2          Q.   For all the defenders in the country?

3          A.   Correct.

4          Q.   Oh, so you attended training involving

5    other federal defenders nationally?

6          A.   Correct.  Correct.  Yes, ma'am.  And then

7    there was training for new defenders.

8          Q.   New defenders, uh-huh.

9          A.   But I wouldn't call it a substantial

10   training.

11         Q.   And were you in a unique position

12   because -- relative to the other federal defenders

13   because you were creating a new federal agency?

14         A.   Okay.  So yes, yes, if you look in relation

15   to the national, yes, yes.

16         Q.   And so there was -- was there any specific

17   training for you to reflect the unusual position that

18   you were in?

19         A.   No, not geared specifically towards me, no.

20         Q.   So what was the -- can you tell me about

21   trainings that you did attend for your job?

22         A.   I mean, I don't recall the specifics, you

23   know what I mean?  So we would have once a year a

24   national training with all the defenders, the

25   defenders.  We would have one national training with

1　all the defenders and assistant federal public

2　defenders.

3　　　　　And then there was one -- and in those

4　trainings, you run through everything.  You run

5　through budgeting, there might be a session on

6　workplace conduct, there might be one session on EDR,

7　there might be one session -- you know, so -- and you

8　pick and choose like that, it's once a year.

9　　　　Q.　You mean you pick and choose, like it's

10　not -- what do you mean by you pick and choose?

11　　　　A.　So you know how you have -- you may have

12　one or two plenary sessions, and then you have

13　breakouts.  That's the format.

14　　　　Q.　And for the breakouts it's your choice

15　which breakout to attend?

16　　　　A.　Yes, ma'am.  Yes, ma'am.

17　　　　Q.　So there's some mandatory trainings and

18　some at your choice; is that right?

19　　　　A.　Yes, ma'am.

20　　　　Q.　So the -- and then you said some were about

21　EDR, which of course --

22　　　　A.　Yes, ma'am.

23　　　　Q.　-- but did you attend any EDR trainings?

24　　　　A.　Yes, ma'am.  Yes, I did.  I just -- I

25　cannot recall.

1    Q.   What office provided that training?   Sorry,

2  let me clarify.

3         What office provided the overall training

4  that you attended with the other federal defenders?

5    A.   I believe it was the training branch from

6  Defender Services, from the Defender Services Office,

7  from DSO.

8    Q.   From DSO?

9    A.   Defender Services Office.

10   Q.   That is Defender Services Office --

11   A.   Office of Defender Services.   At one time

12  it was Office of Defender Services, but now it's DSO.

13   Q.   DSO.

14   A.   Defender Services Office.

15   Q.   And am I right that DSO is within the

16  administrative office --

17   A.   Of Courts, yes.

18   Q.   -- of the United States Courts?

19   A.   Yes, ma'am.

20   Q.   So it's within the courts system --

21   A.   Yes, ma'am.

22   Q.   -- DSO exists as a part of the

23  administrative office?

24   A.   Yes, ma'am.

25   Q.   And so did you receive training on being a

1    manager at those training sessions?

2         A.   Yeah, like I said, there might have been a

3    session, but it wouldn't be general, like how to be a

4    manager.  You know, there were more specifics.

5         Q.   Such as?

6         A.   Well, managing, like I said, EDRs, budget,

7    Hermes (phonetic), or you know what I mean; there

8    might have been specific sessions, but not general,

9    like how to be a manager.  There was just too many

10   things that involve being a manager in a federal

11   agency.

12        Q.   So when you were starting in this new role,

13   did you find the training that you were provided

14   adequate?

15        A.   There was a lot I had to learn.

16        Q.   You mean a lot that you had to learn on the

17   job --

18        A.   On the job.

19        Q.   -- as opposed to in the training?

20        A.   Correct.

21        Q.   So now looking back, now, you know, at the

22   time that you were -- you served in that role, would

23   you describe the training as adequate?

24        A.   No, I think I could have received more

25   training.  As a new defender?

1       Q.   Yeah.

2       A.   Yeah.

3       Q.   So you wish you would have received more or

4   better training?

5       A.   More or better, uh-huh.

6       Q.   What kind of things do you wish -- what

7   kind of things do you wish you had received better

8   training on?

9       A.   There's so many things, it's hard for me to

10  articulate.  You know, budget, different guidelines,

11  the financing.  There is so many things.  And they do

12  provide it, but it's like once a year.  It is

13  available, but it's once a year.  Maybe if there were

14  many more available throughout the year, but I think

15  I could have used and other defenders could have used

16  more training.

17      Q.   So on the EDR training that you said you

18  attended, how many hours do you think you spent

19  training on EDR?

20      A.   Total, maybe a day, maybe.  Maybe a day,

21  eight hours.

22      Q.   Eight hours on EDR alone?

23      A.   Eight hours.

24      Q.   And --

25      A.   I'm talking about the defender conferences

1    now.

2         Q.   Defender.  And would you have attended one

3    of those early on in your tenure as the defender?

4         A.   Yeah.

5         Q.   Like how early on do you think?

6         A.   Well, they're every year.

7         Q.   Yes.

8         A.   So as soon as it came up in my first year,

9    I would attend.  Now, what happened was now COVID

10   hit.

11        Q.   Yes.

12        A.   So COVID hit.  You know, I got appointed

13   2017, and by 2020, there were no longer any

14   trainings.

15        Q.   Right, but in 2017, do you think you

16   attended training in 2017?

17        A.   No, because I was just appointed August,

18   and I'm towards the end of the year now.  So there

19   might have been -- and the new defender conference

20   was maybe in 2018.  It was six months, eight months

21   after I was appointed.  I don't think I attended

22   training in 2017.

23        Q.   Okay.  So sounds like they gave you a lot

24   to deal with; is that right?

25        A.   Yes.

1    Q.   And so 2018 --

2    A.   I'm sorry, I didn't mean to laugh at your

3    question, but the gentleman behind you was making me

4    laugh.

5         MS. GERSEN:  What were you doing?

6         MR. GERSEN:  I smiled.

7    A.   Yeah, yeah, yeah.  I'm sorry, I'm sorry.  I

8    wasn't laughing at you, okay?

9    Q.   I understand.  So the training wasn't

10   until, would you say, spring of 2018?

11   A.   I can't recall, ma'am.  I really can't.

12   Q.   So sometime in 2018, it could have been --

13   A.   I'm sure there was a training in 2018.  I

14   cannot recall.  I cannot recall specifics of

15   training.  I can't tell you --

16   Q.   What date --

17   A.   -- when I attended.  I can't recall --

18   Q.   -- or like even what date, or like even

19   what season:  Winter, spring, or summer or fall?

20   A.   I cannot recall.

21   Q.   Okay.  But when you did attend the

22   training, I am assuming that the EDR training

23   included sexual harassment as a topic?

24   A.   Yes, ma'am.

25   Q.   And you received training at that time on

1    how to respond to claims of sexual harassment?

2         A.   Yes, ma'am.

3         Q.   Do you remember anything about that

4    training?

5         A.   You know, specifically, as something stands

6    out, no.

7         Q.   And that training was provided by?

8         A.   Again, the training branch --

9         Q.   The training branch --

10        A.   -- from DSO, and they had speakers come in.

11        Q.   Oh, they had speakers come in.

12        A.   Correct.

13        Q.   Do you remember any of the speakers?

14        A.   I don't remember the names of the speakers,

15   no.

16        Q.   Right.  And at the time do you remember

17   thinking that training was adequate?

18        A.   I thought it --

19             MS. WESTMORELAND:  Objection to form.

20   BY MS. GERSEN:

21        Q.   Did you find that training adequate at the

22   time?

23        A.   At the time, yes.

24        Q.   And in hindsight do you think that training

25   was adequate?

1          MS. WESTMORELAND:  Objection to form.

2          MS. SPAINHOUR:  Objection to form.

3    BY MS. GERSEN:

4          Q.   You can answer.

5          A.   I think, yes.

6          Q.   Earlier, you said that you wish you'd

7    received more, better training.  Do you wish you'd

8    received more, better training about sexual

9    harassment?

10         A.   I do.  I don't know if I said wish.  If I

11   did, what I meant -- I could have.  It's not like I'm

12   sitting here wishing, you know, but my philosophy is,

13   you know, I could have received better training on so

14   many other things when it comes to managing.

15         Q.   Yes.  When it comes to managing.

16         A.   There is so many aspects.

17         Q.   So many aspects.

18         A.   But it's not like I'm sitting here wishing

19   I could have received more training in EDR.

20         Q.   I understand.  I understand you to be

21   saying that, in general, on being a manager, you wish

22   you could have received more --

23         A.   I could have.

24         Q.   Could have.  What's your current work

25   position?

1    don't believe by around that time.  I don't recall,

2    but I don't believe he had.

3         Q.    So JP was Caryn's supervisor?

4         A.    Yes.

5         Q.    What was your impression of Caryn's work in

6    the first six months of her employment at the FDO?

7         A.    She did excellent work.  We had high hopes

8    for her.  She was talented, she was energetic, and

9    she was working on this very complicated -- I'm going

10   to refer to it, for client confidentiality, I'm going

11   to refer to it as the life sentence trial.

12        Q.    Yes.

13        A.    There was a trial she was working on where

14   the client was facing life without parole, and she

15   did a bang-up job on that case.  She did a good job,

16   so my impression was she was doing good work, a good

17   job, and hard working.

18        Q.    In prior depositions, I believe that we

19   refer to one case as the Dixon case, and I wonder if

20   that's the case you're referring to.

21        A.    Yeah.  I just didn't want to use the

22   client's name.

23        Q.    I understand.

24        A.    Yes, ma'am.

25        Q.    So that's what you were just referring to

1    she was going.

2         Q.   So did you think that Caryn was on track at

3    that time to become an AFPD?

4         A.   Yeah.

5         Q.   You did?

6         A.   Yeah.

7         Q.   Did you have any view as to the time frame?

8         A.   No, that's the -- that's the issue, time

9    frame.

10        Q.   What do you mean by that's the issue?

11        A.   Well, because I can't -- as the defender, I

12   get so many -- prior to reclassifying Caryn a

13   defender, I was limited to the number of AFPDs I

14   would get.  To add another AFPD, I would have to seek

15   circuit approval and DSO approval.  And the circuits,

16   all circuits and DSO were not approving those unless

17   you had significant increase in workload.

18             So I couldn't tell somebody who's an R&W,

19   "Oh, yeah, you can be an AFPD in three months."  I

20   don't have the FTE for that, the approval, so I

21   couldn't promise that.  I couldn't put a time frame

22   on that.  Now, was she on that path, yeah.

23        Q.   So if the FTE availability had not been a

24   concern, would you have been able to tell her roughly

25   when you expected her to transition to AFPD?

1      A.    Whoever she was writing for.  So AFPD,

2 John Smith, how did Caryn do when she did that motion

3 for you, were you -- and how was she involved when

4 you win that motion, the suppression motion.  Give me

5 some feedback.

6           Oh, yeah, she was great, team player, or

7 she was horrible, you know?

8      Q.    Yes.  And so as the year was going on, were

9 you getting that kind of feedback about Caryn?

10     A.    I was getting good feedback, but because

11 she wasn't up for an evaluation, I'm not requesting

12 hard core.

13     Q.    I understand.  I understand.  So in

14 general, do you remember her being praised by

15 attorneys in the office for her performance?

16     A.    Yes.

17     Q.    And did you think highly of her performance

18 from what you saw?

19     A.    Yes.

20     Q.    And to your knowledge, was her work of high

21 quality?

22     A.    Yes.

23     Q.    And to your knowledge, she was hardworking?

24     A.    Yes.

25     Q.    Responsible?

1          A.    Yes.

2          Q.    And did she seem committed to improving her

3     knowledge of how to do the work?

4          A.    Yes, yes, yes.

5                Bless you.

6          Q.    And is it fair to say Caryn had an interest

7     in working with you and learning from you in light of

8     your extensive experience?

9          A.    Yeah, I have no reason to believe

10    otherwise, because I recall there was one time when

11    we were together in the car on the trial, life

12    parole, and I was trying to show her one aspect of

13    our defense work is client management, how to manage

14    a very difficult client.  You know, you could be a

15    good lawyer, but if you don't know how to manage a

16    client, and she was open eyes, open ears, listening

17    to every aspect, and really appreciated everything.

18                And I was trying to do it in real time.  We

19    went together to the jail and spoke to this client,

20    and he was very, very difficult to talk to.  So

21    obviously that's just one aspect, but she was always

22    open eyes and open ears.

23         Q.    Was that work on the Dixon case or a

24    different case?

25         A.    Dixon case.

1    was going to demand that she get a promotion.  She

2    was going to wave that original offer letter to me.

3    She was going to get a trial, have a trial to show

4    that she was, basically, indispensable, so that she

5    could get a promotion and she could get a change of

6    duties switched to Asheville.

7            So the thing is, I'm going to demand this

8    or I'm going to quit.  So the context I took this was

9    JP was saying, Don't worry, I'll deal in pay-for-stay

10   so you can stay and not quit.

11       Q.   Are you reporting to me now what JP told

12   you about this e-mail?

13       A.   You asked me in what context?

14       Q.   Yes.

15       A.   I -- JP did not reveal this e-mail.  I'm

16   saying JP had reported to me a comment that Caryn had

17   made to him, that she was going to demand that she be

18   promoted, she have a change of duty exchange, she was

19   going to wave that offer letter to me, and, if not,

20   she was going to quit.

21       Q.   So all of that is what JP told you about

22   that, what happened on that day?

23       A.   Correct.  He advised me of that, about what

24   happened on May 18th.

25       Q.   And did he advise you of that on May 18th?

1      A.   No, sometime later.

2      Q.   Approximately how much time?

3      A.   I can't recall.  I can only recall in

4  context.  I can't recall the dates, to be honest.

5      Q.   So do you think it was short -- sorry.

6      A.   Shortly after, but I can't recall the time.

7  I'm sorry.

8      Q.   But shortly after May 18th, you think?

9      A.   Yes, it could have been several weeks.

10  There's so many things happening around that time.

11      Q.   Right.

12      A.   But he made me aware that that's the

13  conversation he had with her.  So when I see this

14  after the EDR process started, I interpreted this

15  e-mail as referring to that conversation, and the

16  dates coincide.

17      Q.   Right.  So when you saw this e-mail

18  later --

19      A.   Yes, ma'am, yes, ma'am.

20      Q.   -- after JP had told you previously about

21  the conversation, that was --

22      A.   Yes, ma'am.

23      Q.   -- that provided the context?

24      A.   Yes, ma'am.

25      Q.   Did you think it confirmed JP's account?

1            A.    Yes, ma'am.

2            Q.    Okay.  So you believed JP's account about

3      the conversation he had with Caryn?

4            A.    I always believed it.

5            Q.    Okay.  Great.  And what did you think that

6      "mas dinero" meant in this?  In the heading of the

7      e-mail was "mas dinero."  What do you think he meant?

8            A.    I speak Spanish, so it means more money.

9            Q.    More money.  It was referring to salary

10     then?

11           A.    I have no idea what he's referring to.

12           Q.    You don't know, okay.  And "pay-for-stay,"

13     what did you think that that meant when you read this

14     e-mail?

15           A.    Well, that's what I was trying to tell you.

16           Q.    Yeah.

17           A.    So taking into context, he had told me

18     already about a conversation he had with Caryn on

19     May 18th whereby she said, "I'm going to demand that I

20     get a promotion and/or I get a change of duty station.

21     I'm going to take the offer letter, because they told

22     me," according to her, "that I would become an

23     assistant federal public defender.  If I don't get a

24     promotion, I am going to quit."

25                 So when I see this months, months, later, I

1   looked at it in context, but just remember, I deal in

2   pay-for-stay; meaning, I would try to get you the pay

3   so you can stay in the office and you don't have to

4   quit.

5       Q.   So he -- okay.  I see.  I understand.

6           So what did you understand him to mean,

7   when you read this e-mail, by "deal in pay-for-stay"?

8   "I deal in"?

9       A.   That's -- it was of no significance to me.

10      Q.   Yeah.

11      A.   It's of no significance.  I interpreted it,

12  again, take into context, he had told me about the

13  conversation Caryn had had with him on May 18th, and

14  now I see this e-mail months later, and now it makes

15  sense.

16      Q.   It makes sense.  Okay.

17          So what -- I think you said that he would

18  do something to raise her pay?

19          MS. WESTMORELAND:  Objection to form.

20      A.   No, I didn't say that he would do

21  something.  "I deal" -- it doesn't say that he's

22  going to do something, but to me, it's indicating, I

23  will do whatever I need to do to for me -- what I'm

24  interpreting -- to increase your pay so you can stay.

25  So you don't quit.

1    Q.   Okay.  At the time that you first saw this

2    e-mail you testified that it made sense because you

3    already knew about the conversation from JP; is that

4    right?  It confirmed your understanding of what JP

5    told you?

6    A.   Well, I want to clarify.

7    Q.   I just want to get the accurate account; so

8    if my answer -- if my question is not --

9    A.   My first thoughts when I saw this.

10   Q.   Yeah.

11   A.   And now I'm seeing the date of this, and

12   I'm trying to figure out what does this mean.  I

13   recalled the conversation that he had with me.  He

14   let me know.  I don't recall -- soon after May 18th,

15   sometime after May 18th, wherein he said Caryn said,

16   "If I don't get my demands, I'm going to quit."

17         The way I interpret this language, "I have

18   a plan...just remember, I deal in pay-for-stay."

19         She said, "I'm going to quit if I don't get

20   a promotion, an increase in pay."

21         I will deal in pay.  I'll find a way for

22   you to get more pay so you can stay.

23   Q.   Right.  So did you ever talk to Caryn about

24   what this e-mail meant to her?

25   A.   Never.  I never saw this until after.

1    Caryn was alleging that she interpreted this as a

2    sexual quid pro quo, okay, had I -- so I had that in

3    my mind.  But when I look at it for myself, knowing

4    the context that this was made, from JP's perspective

5    I understand what he intended, because he had already

6    told me that she was demanding, making these demands,

7    or she would quit.

8        Q.   And it was from JP's perspective that you

9    were reading the e-mail?

10       A.   Yes, ma'am.  Yes.

11       Q.   Did you think to look at it from Caryn's

12   perspective?

13       A.   Yes, ma'am.  And I looked at it in terms of

14   maybe the appropriateness of it.

15       Q.   Okay.

16       A.   And maybe it could have been said in a

17   different way.  Yes, no doubt.  But no way am I

18   interpreting that, this e-mail, as a quid pro quo for

19   sex, knowing what I know, and knowing what she said

20   to him around this time.

21       Q.   Right.  And knowing what you know, just to

22   clarify, do you mean you know what you know because

23   JP told you?

24       A.   Correct.

25       Q.   And when you said the appropriateness -- you

1   used the word "appropriateness," and I just wanted to

2   ask you what you meant.  Did you think it was

3   expressed inappropriately?

4       A.   He might have been able to use different

5   words.  When I say, you know, "inappropriate," he

6   might have used, he might have been able to use

7   another word than "pay-for-stay."  That's the only

8   reason why I say appropriateness.

9       But I don't see, taking this on its face, I

10   don't see a quid pro quo.  I don't see it, a sexual

11   force.

12       Q.   I understand.  What do you mean by he could

13   have used, he might have used other words than

14   "pay-for-stay"?

15       A.   I have no idea of what words he could have

16   used.  Don't worry, I will see to it that maybe you

17   can get a higher pay, you won't have to quit.

18       I can't -- I would be speculating, but he

19   might have been able to use different language.

20       Q.   Would he -- might he -- I'm sorry, go

21   ahead.

22       A.   But I don't know what language, I don't

23   know.

24       Q.   Please, I apologize for the interruptions,

25   it's just a sign of my wanting to engage with you.

1        A.    No, you're fine.

2        Q.    So I -- so in terms of the word, the

3    concept of appropriateness, I just wanted to see if

4    you thought you meant that it was inappropriate for

5    him to use the words "pay-for-stay."

6        A.    He could have used better language.

7        Q.    Because using the words "pay-for-stay" --

8        A.    Could be misinterpreted.

9        Q.    Could be misinterpreted?

10       A.    Yes, ma'am.

11       Q.    And what could it be misinterpreted as?

12       A.    Maybe sexual favors, disagreements -- I

13   could see that being misinterpreted, that language.

14   I can see that.

15       Q.    You can see it.  Okay.  So I'm just going

16   to now show you an exhibit.

17            MS. GERSEN:  Tab 7, please.

18       A.    Do you want me to keep this?

19       Q.    Yeah.  You can keep this it in front of

20   you.

21            THE COURT REPORTER:  This will be

22       Exhibit 60.

23            (Exhibit 60 was marked for identification.)

24       Q.    Okay.  I'm handing you Exhibit 60.  These

25   are text messages.  Do you recognize them?

1   you.  Earlier, you mentioned July 2nd, 2018.

2        A.   Yes, ma'am.

3        Q.   Do you recall that on 2018 Caryn met with

4   you about JP?

5        A.   Yes, ma'am.

6        Q.   Did she tell you her concerns about JP's

7   behavior toward her?

8        A.   She mentioned some concerns.

9        Q.   What do you recall about what she said to

10  you?

11       A.   "I'm giving you a heads-up."

12            I said, "What do you mean by heads-up?  I'm

13  not understanding."

14            "I just want to know if I have your

15  support.  I'm keeping you in the loop."

16            And I believe there was some discussion

17  about her creating some boundaries with JP.  And that

18  was the extent of my recollection of that July 2nd

19  meeting.

20       Q.   Do you recollect what she said about what

21  she was giving you a heads-up about?

22       A.   She didn't give me any -- I don't recall

23  her saying anything about what that was.  What she

24  said.

25       Q.   Uh-huh.  Just the phrase, "I'm giving you a

1    about his conduct.

2         Q.    Okay.  So on this day, did you tell --

3    sorry, on July 5th, at the meeting, did you tell

4    Caryn that she wouldn't have to work under JP's

5    supervision?

6         A.    No.

7         Q.    What did you tell her about who would

8    supervise her going forward?

9         A.    JP was a supervisor at this time and he was

10   going to continue being a supervisor.

11              MS. GERSEN:  So can we look at Tab 21.

12              (Exhibit 64 was marked for identification.)

13   BY MS. GERSEN:

14        Q.    I'm handing you Exhibit 64.

15        A.    Can I read this?

16        Q.    Yes, please.

17        A.    Okay.  Got it.

18        Q.    This is an e-mail from July 20th --

19        A.    Correct.

20        Q.    -- from you to your entire staff; is that

21   right?

22        A.    Yes, ma'am.

23        Q.    And I want to focus just on the part where

24   you say Caryn will be assigned to Peter and JP's

25   teams?

1      Q.   And Caleb?

2      A.   But then Caleb left and there was a

3 position there that opened up.

4      Q.   And so Jared -- do you mean that Jared

5 would assign the work to Caryn and Caleb?

6      A.   Correct.

7      Q.   Because you've told me all of the R&Ws?

8      A.   Correct, correct.

9      Q.   And who did Jared report to?

10      A.   Josh, the appellate chief.

11      Q.   So Jared did not report to JP?

12      A.   Well, if I can answer to your question

13 before, JP was first assistant; so he supervised

14 everybody, technically.

15      Q.   Okay. So is it fair to say that Caryn was

16 still working in JP's chain of command?

17      A.   Yes, ma'am, yes, ma'am, but not directly.

18 So Josh was her chief.

19      Q.   And did you think that this restructuring

20 was sufficient to protect Caryn?

21      A.   When you say this restructuring, so this

22 was not a restructuring. There is another e-mail I

23 sent out days later restructuring this e-mail.

24      Q.   Got it. That's the -- thank you for

25 clarifying. That's the one where you take her off of

1   sexual harassment to you, correct?

2       A.   She reported some conduct to me that, in my

3   opinion, was not sexual harassment based on the facts

4   that she provided to me.

5       Q.   So she provided facts to you that you did

6   not consider sexual harassment; is that right?

7       A.   Correct.

8       Q.   And -- but you still felt that it was

9   obligatory for you to report it to Mr. Ishida?

10      A.   Because she alleges in black and white that

11  she was being sexually harassed.

12      Q.   In what way was Heather Beam your designee

13  in the investigation?

14      A.   I have no -- I really don't know.

15      Q.   Were you confused by what that meant?

16      A.   I was a little confused about some aspects

17  of this, because this was my first time going through

18  and under this EDR plan; so yeah.

19      Q.   Did you think that it was a conflict of

20  interest for you to be appointing the investigator?

21      A.   There might be an allegation.  I didn't

22  think so, because, in essence, I was not selecting

23  the investigator.  The investigator was being

24  selected by the circuit executive, and then, for me,

25  it was just a technicality that I would be appointing

1        A.   Uh-huh, or a designee.

2        Q.   -- or a designee, was your understanding

3    that that designee could have been you?

4        A.   I don't -- I don't know who the designee

5    could be, to be honest.  I understand it wouldn't be

6    me, and I don't know if it's clear.  It's up to the

7    chief judge to determine who the designee would be.

8        Q.   Uh-huh.  So it wasn't clear to you whether

9    you could be the designee?

10       A.   For me, yes.  And, again, since I didn't

11   have personal experience with Chapter X, I couldn't

12   tell you.  I'm aware of what it basically says.

13       Q.   Right.  Right.  If there was a final

14   hearing before Chief Judge Gregory and what he

15   thought should happen is if Caryn could -- Caryn

16   should work, say, exclusively in the appellate unit,

17   is that something that could have been accomplished

18   without your approval?

19            MS. WESTMORELAND:  Objection to form.

20       A.   I don't know.  And it's not a matter so

21   much even because of my authority, necessarily, but

22   it's an office, and, you know, I have to meet -- as a

23   defender, meet the needs of the office for the Court

24   and for the clients.  And I don't think a Court -- a

25   judge would order a defender that you've got to do

1    this without considering whatever needs that defender

2    has or lacks or budget lacks or space -- lacking of

3    space.  There is so many factors.

4           For that reason, it's not a matter that the

5    judge can't tell that defender what to do, there is

6    too many factors for the Court to say I'm ordering

7    you to do this.

8    Q.  So you felt confident that the chief judge

9    wouldn't order you to do something after a final

10   hearing?

11          MS. SPAINHOUR:  Objection to the form.

12          MS. WESTMORELAND:  Object to the form.

13   A.  Yeah, I had no experience with Chapter X.

14   I know what Chapter X basically says.  I don't know

15   what Judge Gregory would do after a final hearing.

16   Q.  Right.  Do you think he would have done

17   something in a Chapter X final hearing about -- in

18   order to resolve this case without consulting with

19   you?

20          MS. SPAINHOUR:  Object to the form.

21          MS. WESTMORELAND:  Object to the form.

22   A.  I have no idea.

23   Q.  But if he did want to, say, resolve the

24   case by having Caryn work exclusively in appeals, is

25   that something that could have happened if you

1

18

me just scratch that.

1 ██  ██ ███ ███ ████ ███ ██ ██ ████ ███

███ ███ ██ ██

██ █ █████

██ ███ ████ ██ ████ ███ ███ ███ ████

██ ███ ██ ████ █████ ███ ██ ███

██ ███ ██ ██ █████ ████ ██ ███ ████

███ ██ ███ ████ ████ ███ ██ ████

██ ██ ████

██ ███ ███ ████ ████ ██ ███ ████ ████

██ ███ ██ ████ ██ ██ ██ █ ████ ████ ██

████ ██ ██ ████ ████ ██ ██ ██ ███ ████

████ ████ ██ ██ ████ ██ ██ ██ ████ ████

████ ██ ██ ████ ████ ████ ████

██ ████ ████ ██ ███ ██ ███ ██ ██ ████

████ ██ ██ ████ ████

██ ████ ████ ██ ████ ██ ███ ██ ███

██ ██ ██ ████

██ ██ ███

██ ██ █ ████ ████ ███ ████ ███ ████

20 ████ █████

██ ███ ███ ████ ███ ████ ███ ███

████ ██ ████ ████ ████ ██ ███ ████ ████

██ ████ ████ ██ ██ ██ ███ ████ ████ ████

████ ██ ████ ████ ████ ██ ████ ████ ████

██ ████

1          CERTIFICATE OF OATH

2          I, the undersigned authority, certify that

3   Anthony Martinez personally appeared before me

4   on April 28, 2023, and was duly sworn.

5          Witness my hand and seal May 11, 2023.

6

7

8                          *Sarah Parker*

9

10

11                  Sarah Parker

12                  Notary Public - State of Florida

13                  My Commission No. 1747421

14                  Expires 1/25/27

15

16

17                  SARAH PARKER
                    MY COMMISSION #HH354230
18                  EXPIRES: JAN 25, 2027
                    Bonded through 1st State Insurance

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE

STATE OF FLORIDA:

COUNTY OF HILLSBOROUGH:

      I, Sarah Parker, certify that I was authorized to and did stenographically report the deposition of Anthony Martinez; that a review of the transcript was requested; and that the transcript is a true and complete record of my stenographic notes.

      I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

      DATED May 11, 2023.

Sarah Parker