# EXHIBIT J

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
Civil No. 1:20-cv-00066-WGY


CARYN DEVINS STRICKLAND,          )
                                  )
          Plaintiff,              )
                                  )
vs.                               )
                                  )
UNITED STATES, et al.,            )
                                  )
          Defendants.             )
_____   )




                                        Friday, April 14, 2023
                                        Charlotte, North Carolina




          Deposition of HEATHER BEAM, a witness herein,

called for examination by counsel for Plaintiff in the

above-entitled matter, pursuant to Notice, before

Dayna H. Lowe, Court Reporter and Notary Public in and

for the State of North Carolina, taken at Tin Fulton

Walker & Owen, PLLC, 301 East Park Avenue, Charlotte,

North Carolina, commencing at the hour of 9:06 a.m.

```
 1   APPEARANCES:

 2

 3        On behalf of the Plaintiff:

 4             OLIVIA WARREN, ESQUIRE
               JAY H. FERGUSON, ESQUIRE
 5             Thomas, Ferguson & Beskind, LLP
               119 East Main Street
 6             Durham, North Carolina 27701
               (919) 682-5648
 7             warren@tfblawyers.com
               ferguson@tfblawyers.com
 8
               JACOB GERSEN, ESQUIRE (Via Telephone)
 9             JEANNIE SUK GERSEN, ESQUIRE (Via Telephone)
               Hauser Hall 510
10             1563 Massachusetts Avenue
               Cambridge, Massachusetts 02138
11             (617) 496-5487
               jsuk73@gmail.com
12
               COOPER STRICKLAND, ESQUIRE (Via Telephone)
13             Post Office Box 92
               Lynn, North Carolina 28750
14             (828) 817-3703
               cooper.strickland@gmail.com
15
16        On behalf of the Defendants:

17             MADELINE McMAHON, ESQUIRE
               JOSHUA M. KOLSKY, ESQUIRE
18             United States Department of Justice
               Civil Division, Federal Programs Branch
19             1100 L Street NW
               Washington, DC 20005
20             (202)451-7722
               madeline.m.mcmahon@usdoj.gov
21             joshua.kolsky@usdoj.gov

22

23        Also Present:

               Ms. Kristin Mannherz, Office of General Counsel
24             Ms. Caryn Devins Strickland (Via Telephone)

25
```

1                        C O N T E N T S

2

3  Examination by Ms. Warren:                              5

4  Examination by Ms. McMahon:                            200

5

6                        E X H I B I T S

7                         (Plaintiff's)

8  Beam 13    Email(s), US 5361-5363                      14

9  Beam 14    Email(s), US 2839-2841                      15

10  Beam 15    EDR Plan January 2013                       20

11  Beam 16    EDR Plan November 2018                      20

12  Beam 17    Email(s), US 0462                           21

13  Beam 18    Email(s), US 2454-2456                      22

14  Beam 19    9/10/18 letter, US 5932-5938*               23

15  Beam 20    Email(s), US 0358-0360                      26

16  Beam 21    Email(s), US 1432-1433                      27

17  Beam 22    Email(s), US 1434-1435                      30

18  Beam 23    Handwritten notes, US 6213-6236*            54

19  Beam 24    Email(s) and Counselor's Report,            64
              US 2293; US1244-1311*
20
    Beam 25    Email(s), US 1357-1360*                     77
21
    Beam 26    Email(s), US 1353-1354*                     85
22
    Beam 27    Email(s), US 2822-2823*                     90
23
    Beam 28    Email(s), US 1343-1347*                     91
24

25                 (CONTINUED ON NEXT PAGE)

1    Q.   No.   Okay.   I want to start by talking about
2  your investigation in this case.   When were you first
3  contacted about this case?
4    A.   I believe it was sometime in September of --
5  five years ago, 2008 -- 2018.
6    Q.   Who contacted you?
7    A.   There was an email from Tony Martinez, and
8  then James Ishida had emailed me regarding that he had
9  asked Lisa Morris if he could borrow me for this
10 assignment and she had said yes.
11   Q.   Who is Lisa?
12   A.   She -- Lisa Morris is the prior chief
13 probation officer.   She retired.
14   Q.   Okay.   And do you know why Mr. Ishida asked to
15 borrow you?
16   A.   No, I don't remember why.
17   Q.   Okay.   Had you ever done an investigation like
18 this before?
19   A.   No.   This was my first one.
20   Q.   And you said Tony also contacted you?
21   A.   Yes.
22   Q.   What did Tony say?
23   A.   He had delegated me to be the EDR coordinator.
24   Q.   And what did you understand that to mean?
25   A.   That I was tasked with investigating the claim

```
 1        Q.   Oh, sorry.  Did you ever advise Caryn of her
 2   right to trigger the EDR process under Chapter X?
 3        A.   I do not recall if I did or not.  I know we
 4   did discuss her rights under the EDR plan, but I don't
 5   remember specifically what I said.
 6        Q.   Okay.  And now looking at number 3 in that
 7   bullet.
 8        A.   Okay.
 9        Q.   James said to Tony, "So you had designated
10   Heather to investigate the allegations, and she now
11   reports to you under the Fourth Circuit EDR Plan."
12        A.   Uh-huh.
13        Q.   What did that mean to you?
14        A.   Well, that means that I would investigate the
15   allegations and bring my report to Tony Martinez.
16        Q.   Okay.  And looking at the first page of this
17   document, towards the bottom there's an email that
18   begins, "Hi Tony," and the second line says, "I agree
19   that your office's EDR plan isn't applicable here
20   because Caryn did not file a grievance within five days
21   of the alleged harassment."
22             Do you think that that's talking about a
23   different policy than the Fourth Circuit's plan?
24        A.   Yes, because he references "your office's EDR
25   plan."
```

1    Q.   Uh-huh.  Do you know how you contacted him?
2  Was it phone or email?
3    A.   Phone.
4    Q.   Okay.  And did you take any notes on that
5  phone call?
6    A.   No.
7    Q.   How did you remember the tone of your call
8  with the AO about stopping your investigation?
9    A.   I don't recall that I said anything about the
10 tone of a phone call.
11   Q.   As you were on that phone call, how did you
12 understand the tone of the person who was talking to
13 you?  Do you remember?
14       MS. McMAHON:  Objection, form.
15       BY MS. WARREN:
16   Q.   Do you remember what the person you were
17 talking to sounded like?
18   A.   It was a female, and she told me to stop
19 investigating the claim.
20   Q.   Did she sound upset?
21   A.   I can't speculate on that.
22   Q.   Do you remember is what I'm asking.
23   A.   No, I don't.
24   Q.   Did she threaten you in any way?
25   A.   Not that I recall.

1     Q.   Do you think you would have remembered if she

2  threatened you?

3     A.   I probably would have remembered if she

4  threatened me, so I don't think she did.

5     Q.   If she threatened you, would you have probably

6  made some notes?

7          MS. McMAHON:  Objection, calls for

8  speculation.

9          BY MS. WARREN:

10    Q.   You may answer.

11    A.   I have no idea.

12    Q.   Okay.  Do you know who Frank Johns is?

13    A.   Yes.

14    Q.   Who is he?

15    A.   He's the clerk of court for the District

16  Court.

17    Q.   Was he involved in this matter in any way?

18    A.   Not that I recall.  He's my boss, so he knew

19  that I was investigating it because him and Lisa Morris

20  were both my bosses, but that was all he knew as far as

21  I'm aware.

22    Q.   And would there be any reason to include him

23  on emails about this case?

24    A.   I don't remember.

25    Q.   I want to talk about your, I know, several

1   months of investigation in this case.  You said that
2   this was your first time investigating.
3        A.   Yes.
4        Q.   Were you given any guidance about how to
5   investigate?
6        A.   We were given an overview of the EDR process.
7        Q.   Uh-huh.  Did that overview include how to
8   conduct an investigation?
9        A.   I do not recall.  It's been a long time.
10       Q.   Do you know when you got that overview?
11       A.   No.
12       Q.   Okay.  Did you have any other guidance for
13  your investigation?
14       A.   What timeframe are you talking about?  Before
15  I did it?
16       Q.   At any point before you began.
17       A.   I do not remember if I had made another call
18  to Fair Employment Practices.  I know that I did use the
19  JNet as a resource.
20       Q.   And what is on the JNet?
21       A.   It's the judiciary's intranet site, and there
22  are a ton of resources on there.  It's not just for
23  human resources stuff.  Pretty much all court related,
24  operational, administrative procedures and guidance and
25  policies.

1    Q.   Did you find resources that were helpful for
2  your investigation?
3    A.   I did find some, yes.
4    Q.   What were those resources?
5    A.   One that I recall is the template that I used
6  to do the investigation report.
7    Q.   So there was a report template?
8    A.   That I found, yes.
9    Q.   Okay.  Do you remember any other resources?
10   A.   Not that I recall.
11   Q.   Did you save a copy of that report template?
12   A.   No.  I just typed up my report based on that
13 format.
14   Q.   Before we go into that, I just want to talk
15 for a moment about other resources that you had
16 available to you as HR staff.
17   A.   Sure.
18   Q.   In 2018 your role was in the probation office.
19 How long had you been there?
20   A.   My role was a dual function.  It was for the
21 probation office and the District Court.
22   Q.   The Western District.
23   A.   Yes.  And I'd been there since August --
24 officially August 10th of 2018.
25   Q.   That was your first date in that position?

1    Asheville, yes.

2         Q.   And why did that affect her relationship with

3    JP?

4         A.   I can't say why.

5         Q.   You have in your notes on 6214, it looks like

6    she described some drinking in the office and with JP.

7    Did she tell you that at a retreat he brought her into

8    the hall at 11 p.m. at night?

9         A.   Yes.

10        Q.   And he asked her to go to someone else's room?

11        A.   Yes.  Those are the notes I have.

12        Q.   And she said that I see other people noticed.

13        A.   Uh-huh.

14        Q.   Did you ask her who noticed?

15        A.   I don't recall.

16        Q.   Okay.  Do you know if she told you who

17   noticed?

18        A.   I don't remember.  I'm sorry.

19        Q.   And did she tell you about the email that JP

20   sent her that she understood to be a quid pro quo email?

21        A.   Yes, she did, and she gave me a copy of it.

22        Q.   And what did she say about that email?

23        A.   I don't recall what she said about it.

24        Q.   What did you think when you saw that email?

25        A.   I thought it was a very stupid email to send.

1    Q.    Did she seem upset by that email?

2    A.    Yes.

3    Q.    Did you believe her?

4    A.    That she was upset?

5    Q.    Yeah.

6    A.    Yes.

7    Q.    Did you think it was reasonable to be upset

8  because of that email?

9    A.    Yeah.

10    Q.    And how did she describe reacting after the

11  email?

12    A.    I do not remember.

13    Q.    Do you remember if she told you that she tried

14  to take some distance after receiving that email?

15    A.    I do recall her saying that she wanted to get

16  some distance from JP, but I don't recall the timeframe

17  in which she said that.

18          MS. WARREN:  Let's just take a short break.

19          MS. McMAHON:  That would be great.

20          (Recess from 10:40 a.m. to 10:57 a.m.)

21          BY MS. WARREN:

22    Q.    Ms. Beam, would you be all right if we go

23  through to lunch --

24    A.    Yeah, sure.

25    Q.    -- or try to?  Excellent.  I have a couple of

 1    was going to trial?

 2         A.    Yes.

 3         Q.    And the PSI that JP wanted her to go to was

 4    for shadowing?

 5         A.    Yes.

 6         Q.    And it seems like they had some heated

 7    conversations about this.  Would you --

 8         A.    As she described them to me, I would agree.

 9         Q.    And what did she describe?

10         A.    She used the word "berate," that he berated

11    her, that he was visibly angry.

12         Q.    Uh-huh.  Did she describe how she could tell

13    he was angry visibly?

14         A.    I remember her -- and I believe I took a note

15    on it, that JP was shaking he was so angry.

16         Q.    Did she tell you how that made her feel?

17         A.    Yes.

18         Q.    And what did she say?

19         A.    Uncomfortable.

20         Q.    Did she talk about how it made her feel a

21    couple weeks after receiving the quid pro quo email?

22         A.    I do not recall.

23         Q.    Okay.  But she told you about the quid pro quo

24    email first?

25              MS. McMAHON:  Objection, misleading.

```
 1              BY MS. WARREN:
 2         Q.   You may answer.
 3         A.   I think she did.
 4         Q.   In your notes it comes first.
 5         A.   Yeah.  Uh-huh.
 6         Q.   Did she tell you that that quid pro quo email
 7    had changed how she felt about their work?
 8              MS. McMAHON:  Objection, misleading.
 9              BY MS. WARREN:
10         Q.   I'm just asking if she told you if the quid
11    pro quo email had changed anything for her.
12              MR. KOLSKY:  Same objection.
13              BY MS. WARREN:
14         Q.   You may answer.
15         A.   Can you clarify your question?  As in changed
16    what?
17         Q.   Anything at all.
18         A.   I do not recall if she said that that -- are
19    you asking me the question like was that the catalyst
20    that started all of this?
21         Q.   I'm asking how she described it as you
22    understood it.
23         A.   Okay.  She described it as a quid pro quo
24    email.  That's it.
25         Q.   Okay.  She didn't tell you how it made her
```

1    her answer was, but I do remember trying to get a copy

2    of it.

3          Q.   Is that something you would do as an HR

4    professional?

5          A.   First thing.  Yes.

6          Q.   And when people start in jobs, do you advise

7    employers to make sure they have a copy of the personnel

8    manual?

9          A.   Yes.  And we also give them a copy of the EDR

10   plan.  Our district does it a little differently.  We

11   also have -- we give them the video for the employee

12   training that's on the JNet.  If they're a manager, they

13   get the manager video training, and that was not

14   available at that time.

15         Q.   In 2018?

16         A.   No.

17         Q.   When did that become available?

18         A.   I would say it's become available in the last

19   year or two.

20         Q.   Okay.  So to your knowledge -- you -- sorry.

21         A.   It's okay.

22         Q.   Do you know if Caryn had a copy of the

23   personnel manual in, let's say, May of 2018?

24         A.   I don't recall.

25         Q.   And it seems, according to your notes, that

 1    she had not been informed of the process at the time?

 2         A.    Correct.

 3         Q.    Okay.  Did she say that -- did Caryn tell you

 4    that she reached out to Nancy Dunham?  I'm looking at

 5    the next page.

 6         A.    Yes.

 7         Q.    And do you remember what she said Nancy told

 8    her?

 9         A.    Not that I recall.

10         Q.    Okay.  It says on July 24th she called in

11    sick.

12         A.    Yes.

13         Q.    Do you remember why?

14         A.    Yeah.  This was when she had requested to be

15    taken out of JP's chain of command.  Tony had a meeting,

16    I believe, that Friday with staff going over the new

17    organizational chart, and when he sent it out, her

18    name -- her box was still under JP, which Caryn took

19    that as she's still reporting to JP.  This was upsetting

20    to her, so she did call in sick.

21         Q.    Did Tony also send an email saying that she

22    was going to report to JP?

23         A.    He sent an email out, and that email in

24    question, I recall Caryn was under the impression she

25    would be able to review it before he sent it out, but I

1    A.   To not make any outward appearance that
2  they're still trying to pursue what they're being
3  accused of pursuing.
4    Q.   And would you tell -- would you tell them not
5  to -- to stay away to protect, it sounds like, their own
6  rights?  Is that what you're --
7        MS. McMAHON:  Objection, calls for
8  speculation.
9        BY MS. WARREN:
10   Q.   You would advise them to stay away so that the
11  investigation could continue?
12   A.   Yes.
13   Q.   You said, "If you need to talk keep it to
14  Bill" -- is that Bill Moormann --
15   A.   Uh-huh.
16   Q.   -- "or Tony," Tony Martinez, "and of course
17  your wife only."
18   A.   Uh-huh.
19   Q.   The investigation was confidential, right?
20   A.   Yes.  Uh-huh.
21   Q.   Did you tell witnesses it was confidential?
22   A.   Yes.
23   Q.   And that means that they should only share
24  information in that need-to-know exception?
25   A.   Yes.

1     Q.  So would talking to Bill be confidential?

2     A.  He had already talked to Bill, so I wasn't

3 giving him advice to talk to Bill to get any

4 confidential information.

5     Q.  Did you ever make clear to JP that he should

6 not talk to Bill about the facts of these allegations?

7     A.  I do not recall.

8     Q.  Did you ever make clear to JP that he should

9 not talk to Tony about the facts of these allegations?

10    A.  I do not recall.

11    Q.  Were you concerned that JP and Tony might

12 discuss the facts of these allegations?

13    A.  No, because I expected it to be kept

14 confidential between all parties involved.

15    Q.  Even though you told JP, "if you need to talk

16 keep it to Bill or Tony"?

17    A.  Yes.  Tony in the capacity that she was JP's

18 boss.

19    Q.  But your email doesn't say limit it to --

20    A.  No.

21    Q.  Okay.  And his wife would not be confidential

22 communications according to the plan either?

23    A.  Correct.

24    Q.  Did you ever advise JP and Tony because they

25 were both accused that they shouldn't talk about the

1    accusations together?

2        A.    Not that I recall.

3        Q.    Would it be important to advise them of that?

4        A.    I'm not sure.

5        Q.    Can witnesses influence each other's stories

6    by talking about facts?

7            MS. McMAHON:  Objection, calls for

8    speculation.

9            BY MS. WARREN:

10       Q.    You may answer.

11       A.    I have not had experience with that.

12       Q.    In your years in HR, have you ever been told

13   that when there is a claim like this, witnesses could

14   come up with a story if they talk to one another?

15           MS. McMAHON:  Same objection.

16           BY MS. WARREN:

17       Q.    You may answer.

18       A.    Not that I recall.

19       Q.    Have you ever considered that possibility?

20       A.    In this case?

21       Q.    Ever.

22       A.    Ever?  No.

23       Q.    Did you ever consider it in this case?

24       A.    No.

25       Q.    And did you ever ask JP and Tony if they were

1   talking to each other?

2       A.   No, I did not.

3       Q.   Neither JP?

4       A.   (Witness shook head.)

5       Q.   That's a no?

6       A.   No.

7       Q.   Nor Tony?

8       A.   Nor Tony, no.

9       Q.   Why?

10      A.   Why?  It did not occur to me to ask.

11      Q.   When you interview witnesses, do you do it

12 with other people present?

13      A.   I did not do it with other people present.

14      Q.   And why did you think it was important to

15 interview one witness at a time?

16      A.   Due to confidentiality.

17      Q.   Are there any other reasons why you would only

18 want to interview one witness at a time?

19      A.   No.

20      Q.   Looking at the front page of this, which is

21 1357 on the bottom, this is September 26th, 2018 in the

22 middle, and JP says, "Hey Heather, one more question did

23 occur to me after thinking about it for a bit -- you

24 referenced a Chapter X complaint, which to my

25 understanding would have required Caryn to actually



1   ██  ████████████████████████████

2       Q.    Uh-huh.  And June 6th was about three weeks

3   after the quid pro quo email on May 18th?

4             MS. McMAHON:  Objection, misleading.

5             BY MS. WARREN:

6       Q.    You may answer.  How long -- June 6th is a

7   couple of weeks after May 18th?

8       A.    Yes.  I would agree with that.

9       Q.    And May 18th was when JP sent the quid pro quo

10  email?

11            MS. McMAHON:  Objection, misleading.

12      A.    Can I double-check that email?

13            BY MS. WARREN:

14      Q.    You're welcome to.

15      A.    Did you give me a copy of that one already?

16  ██



9      Q.   Uh-huh.  And the AFDs have a pay range.  The

10   research and writing specialists, I believe it's the JSP

11   plan.

12      A.   Okay, yes.

13      Q.   Is that correct?

14      A.   That would be correct if -- I think I have her

15   SF-50 here.  Let me -- oh, right here.  Her pay plan is

16   ungraded.  Oh, but that was as a Assistant Federal

17   Defender.  So the pay plan said 14-2.  Pay plan is FD.

18      Q.   So she was at -- do you take 14 to be

19   referring to a grade on that plan?

20      A.   Yeah, because it's this in the grade or level

21   box, and the 2 is in the box titled step or rate, but

22   the pay plan says FD.  If it were JSP it would say JS.

23      Q.   Thank you.  And these plans, just so I'm

24   understanding, I believe that they have -- it's sort of

25   a table, is that right?

         9    Q.   Are you on more similar tables with grades and

        10  steps?

        11    A.   Everything's modeled after the general

        12  schedule for the government, and we do have the JSP

        13  schedule for chamber staff and -- yeah, chamber staff,

        14  and then our circuit executive and the second in

        15  command.  Everybody else is on the court personnel

        16  system.  Similar.  They have grades and they have steps.

        17    Q.   Did you understand how grades and steps worked

        18  for research and writing attorneys?

        19    A.   Based on their education, experience.

        20    Q.   So the grades and steps had more objective

        21  criteria?

        22    A.   I don't recall.

        23    Q.   Okay.  Generally are the grades and steps --

        24  do they include years of experience to qualify for

        25  certain ones?

1       A.    In my world, yes, it does, and the experience

2    is also separated out between general experience and

3    then specialized experience, and that is described like

4    what would be specialized experience.

5       Q.    Did you research how -- sorry.  Give me just a

6    moment.  I don't want to ask a confusing question.

7       A.    Take your time.

8       Q.    I know you said that the AD plan, the ranges

9    for the Federal Defenders themselves was confusing to

10



1 ██████████████████████████████████████

[redacted]

9      Q.   Uh-huh.  On the graded schedule, within those

10 yearly reviews are there automatic steps up?

11      A.   Yes, there are.

12      Q.   And is there automatic movement down from one

13 grade to the next level grade?

14      A.   No.  That would be an actual HR action that

15 had to be taken, otherwise known as a promotion.

16      Q.   Okay.  But those promotions are generally

17 guided by years of experience?

18      A.   Years of experience is the qualifier; however,

19 in our organization we also look at performance of the

20 position that they're in now.  I mean, if they can't do

21 their job now, they can't do their job in a more -- with

22 more responsibility.

23      Q.   And when you say in our organization, which

24 organization?

25      A.   I'm sorry.  District Court or probation.

1      A.   Uh-huh.

2      Q.   -- do you see what appears to be the

3  attachment?

4      A.   Yes.

5      Q.   And on page 592 at the bottom, this is

6  Plaintiff's 592, do you see a witness list?

7      A.   Yes.

8      Q.   And did you reach out to any of those people?

9      A.   No, I did not.

10     Q.   Why didn't you reach out to them?

11     A.   I was only focused on the people that were

12  involved directly in the situation.

13     Q.   Did you interview anyone else who could

14  substantiate these claims?

15     A.   I did not.

16     Q.   Did Caryn tell you that these people had

17  information that was relevant to her claims?

18     A.   I do not remember.

19     Q.   Do you think she gave you witnesses who didn't

20  have information?

21          MS. McMAHON:  Objection, misleading.

22     A.   I am not sure.

23          BY MS. WARREN:

24     Q.   Why do you think she gave you this witness

25  list?

1    A.    Because she wanted to provide a witness list.

2    Q.    So she just wanted to give you these names?

3    A.    Yeah.  Maybe she thought they were relevant to

4    the investigation, but she didn't say.  I don't recall

5    her saying so.

6    Q.    You don't recall that she told you you should

7    talk to these people?

8    A.    I do not remember.

9    Q.    Did you think you should talk to these people?

10   A.    I didn't even remember getting this email.

11   Q.    Okay.  But you agree that it appears you

12   received it?

13   A.    Yes.  Correct email address.

14   Q.    There's no reason that you wouldn't have

15   gotten it?

16   A.    No.

17         MS. WARREN:  We'll mark this as 32.

18         (Exhibit 32 was marked for identification.)

19         BY MS. WARREN:

20   Q.    Did you ever see this email -- or this

21   exchange of text messages?

22   A.    I do not recall.  And if I did receive it, it

23   was in my file.

24   Q.    Okay.  And this says, "She may just need to

25   get smacked a bunch, tho."  Is that right?

1      A.   Yes.  That is correct.

2      Q.   If JP had said that about Caryn, would you be

3   concerned?

4           MS. McMAHON:  Objection, calls for

5   speculation.  The witness can testify on her personal

6   knowledge.

7           BY MS. WARREN:

8      Q.   Would you be concerned?

9      A.   I was not involved in that conversation.

10     Q.   Would you be concerned if you saw an employee

11  say that another employee "may just need to get smacked

12  a bunch, tho"?

13          MS. McMAHON:  Objection, calls for

14  speculation.

15     A.   I'm not sure.

16          BY MS. WARREN:

17     Q.   You're not sure if you would be concerned?

18     A.   It depends on the situation.

19     Q.   Given your decades in HR, if someone said that

20  their fellow employee may need to get smacked a bunch,

21  you wouldn't be concerned?

22     A.   In today's environment, I would probably have

23  a conversation with them if I were made aware of it, but

24  that's not the right language to be using when talking

25  about an employee.





1    A.   Well, it depends on the date when all that

2    happened, and if it was, you know, the same day as the

3    email, those two would go together I would imagine.

4    Q.   In what way?

5    A.   If she perceived that email to be the quid pro

6    quo and then she -- and then he's waiting for her

7    downstairs to make sure she doesn't need a ride because

8    it's storming, the perception could have been that he

9    was making an advance even though perhaps his perception

10   was it's kind of dangerous to ride home in a storm, and

11   he had given her rides home in the past.

12   Q.   People can have different perceptions of

13   events?

14   A.   Absolutely, yes.

15   Q.   And that's what you were investigating?

16   A.   Yes.

17   Q.   Whose perception matters for sexual

18   harassment?

19        MS. McMAHON:  Objection, vague.

20   A.   I'm not sure.  That's not up to me to judge.

21        BY MS. WARREN:

22   Q.   Did you ever get any training about that?

23   A.   Never talked about whose -- about perception.

24   Q.   Okay.  Did you ever get any training about

25   some behavior that -- there's some behavior that, would

 1    you agree, can objectively be considered sexual

 2    harassment, like asking someone to sleep with you?

 3         A.   Yes.

 4         Q.   There's other behavior that, as you've been

 5    saying, I think, it depends on the context?

 6         A.   And the situation, yes.

 7         Q.   So it may not be as clear on its face?

 8         A.   Right.

 9         Q.   And in that kind of context, when it's not

10    clear on the face, have you ever been trained how you

11    assess whether that behavior is or is not sexual

12    harassment?

13         A.   Not that I recall.

14         Q.   I'm sorry.  I couldn't hear.

15         A.   Not that I recall.

16              MS. WARREN:  Thank you.

17              MS. McMAHON:  Liv, we've been going for over

18    an hour and a half at this point.  Do we want to break

19    for food?

20              MS. WARREN:  That's totally fine.  Sure.  It's

21    12:40.  We'll go off the record and come back.

22              (Luncheon recess from 12:38 p.m. to 1:45 p.m.)

23              BY MS. WARREN:

24         Q.   We're back on the record.  Good afternoon.

25         A.   Good afternoon.

```
 1              CERTIFICATE OF NOTARY PUBLIC & REPORTER

 2

 3   STATE OF NORTH CAROLINA        )

 4   COUNTY OF UNION                )

 5

 6           I, Dayna H. Lowe, the officer before whom the

 7   foregoing deposition was taken, do hereby certify that the

 8   HEATHER BEAM was duly sworn by me; that the testimony of

 9   said witness was taken in stenotype and thereafter reduced

10   to typewriting by me or under my direction; that said

11   deposition is a true record of the testimony given by said

12   witness; that I am neither counsel for, related to, nor

13   employed by any of the parties to the action in which this

14   deposition was taken; and, further, that I am not a

15   relative or employee of any attorney or counsel employed

16   by the parties thereto, nor financially or otherwise

17   interested in the outcome of the action.

18           This the 20th day of April, 2023.

19

20

21                               DAYNA H. LOWE

22                               Notary Public #19971830009

23

24

25
```