# EXHIBIT Q

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

### ASHEVILLE DIVISION

| | |
|---|---|
| **CARYN DEVINS STRICKLAND,** ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | |
| v. ) | **Civil No. 1:20-cv-00066-WGY** |
| ) | |
| **UNITED STATES OF AMERICA,** *et al.*, ) | |
| ) | |
| *Defendants*. ) | |
| ) | |
| _____ ) | |

## DECLARATION OF VIDA THOMAS IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

I, Vida Thomas, declare as follows:

1.     I am over 21 years of age.

2.     I am the Managing Partner of Oppenheimer Investigations Group LLP.

3.     I have personal knowledge of the facts set forth in this Declaration.  I am competent to testify about those facts, and would do so if called to testify.

4.     I authored the report titled "Vida Thomas Expert Report – Strickland" dated June 1, 2023 ("Expert Report").  I understood at the time I was working on the Expert Report as well as when I finalized and signed it that, by signing my Expert Report, I was representing the truth and accuracy of the statements and tables I provided in that Expert Report.

5.     Attached hereto as Exhibit A is a true and correct copy of the Export Report.

1

6.     If called to testify under oath about my Expert Report and the matters it discusses, I would do so and would stand by the truth of the contents of my Expert Export.

I declare under penalty of perjury under the laws of the United States that the foregoing statements in this Declaration and the statements in the Expert Report are true and correct.

Executed this 1st day of June, 2023 at Sacramento, California.

_____

Vida Thomas



May 31, 2023

Olivia Warren
Thomas, Ferguson & Beskind, LLP
119 East Main Street
Durham, North Carolina 27701

Dear Ms. Warren:

The following is a report of my expert opinion in the matter of *Caryn Devins Strickland v. U.S., et al.,* Civil No.: 1:20-cv-00066-WGY in the U.S. District Court for the Western District of North Carolina, Asheville Division. I have been retained by Jeannie Suk Gersen, Esquire, on behalf of Plaintiff Caryn Strickland, to render opinions on the Defendants' actions in response to Plaintiff's internal complaints. Specifically, I have been asked to opine on: 1) what is considered typical and acceptable human resources practice in regard to responding to and investigating employee complaints of discrimination, harassment and retaliation; 2) what is considered typical and acceptable human resources practice in regard to protecting an employee from retaliation; 3) what is considered typical and acceptable practice for conducting workplace investigations of harassment, discrimination and retaliation; 4) the adequacy of the Defendants' response to Plaintiff's internal complaint; and 6) the adequacy of the Defendants' investigation of Plaintiff's internal complaint. I am prepared to testify regarding what practices are deemed acceptable standards and how the Defendants fell below these standards.

## I.    Professional Background

1.    I am the Managing Partner of the Oppenheimer Investigations Group, which is based in Berkeley, California. I have been an attorney since 1993. For 27 years, from 1993 to


2020, I specialized in employment law, defending employers in employment civil lawsuits brought pursuant to federal and state law, and counseling employers on all aspects of employment law compliance, including Title VII and the California Fair Employment Act's prohibitions on sexual harassment, discrimination, and retaliation in employment. As part of my practice, I advised employers and their human resources professionals on responding to complaints of sexual assault. I also advised colleges and universities on compliance with Title IX, including responding to student complaints of sexual assault.

2.　　　In January 2020, I stopped providing advice to employers, and since then I have engaged exclusively in conducting impartial investigations, including allegations of sexual assault.

3.　　　From 1994 to the present, as part of my law practice, I conducted impartial investigations of complaints of harassment, discrimination, retaliation, and other forms of alleged misconduct at work (including sexual assault and threats of violence), as well as whistleblower complaints.  I have provided this service for both public and private sector employers, as well as private and public colleges and universities. I have conducted hundreds of impartial investigations in the workplace and on college and university campuses.

4.　　　Since 2020, I have been a partner at a law office focused on conducting such investigations and supervise other attorneys who work for me and conduct workplace investigations.

5.　　　In 2000, I began training employers, human resource professionals and employees in preventing and responding to workplace harassment, discrimination, retaliation, sexual assault,

2


threats of violence and whistleblower complaints, and in conducting workplace investigations. I have provided such trainings continuously since that time.

6.     In 2009, I became a member of California Association of Workplace Investigators (CAOWI), now known as the Association of Workplace Investigators (AWI). From 2016 through 2019, I was on the AWI Board's Training Institute Committee. AWI now has over 1,000 members throughout the United States, Canada, Europe, New Zealand, and Australia.

7.     I was part of a committee at AWI that researched and wrote "Guiding Principles" for workplace investigators that have assisted in establishing acceptable practices for investigating workplace harassment. I attended and completed AWI's Workplace Investigation Training Institute, a rigorous week-long course for workplace investigators that has been offered multiple times per year since 2012. I have served as faculty at AWI's Training Institute since 2016.

8.     I have completed T9 Mastered Title IX investigation training, which included training on conduct trauma-informed interviews of victims of sexual assault.

9.     A copy of my CV and a list of all other cases in which, during the previous 4 years, I have testified as an expert at trial or by deposition are attached to this report as **Exhibits A** and **B**. My hourly rate is $600.

## II.     Materials Reviewed

10.     I have reviewed the following documents in forming my opinions:

     a.  Deposition Transcript of Heather Beam and attached exhibits.

     b.  <u>Workplace Protections for Federal Judiciary Employees: Flaws in the Current</u>



System and the Need for Statutory Change, Hearing before the U.S. House of Representative's

Subcommittee on Courts, Intellectual Property, and the Internet, Testimony of Caryn Devins

Strickland, Thursday, March 17, 2022.

        c. Defendants' Combined Discovery, Bates Nos 1 to 7401

        d. Plaintiff's Mediation Letter dated February 22, 2019

### III.    Summary of Background Facts

    11.    Plaintiff Caryn Strickland is a female attorney who was formerly employed as an

assistant federal public defender in the federal judiciary. She began working for an office of the

Federal Defender Organization ("FDO") in August 2017. The FDO was supervised by FDO First

Assistant JP Davis ("Davis"), who was appointed to that position by the Federal Public

Defender, Anthony Martinez ("Martinez"). Davis had control over the FDO's operations and

supervisory authority over trial units in the FDO's duty stations. Strickland was directly

supervised by a Team Leader who was also appointed by Martinez.

    12.    Strickland alleges that from the time she started working at the FDO, Davis,

Martinez, and the Team Leader encouraged and condoned a "toxic" workplace culture where,

among other things, the Team Leader and others routinely made racist and homophobic

comments about their clients, mocked clients with disabilities, subjected an employee to

homophobic rumors and slurs, treated female employees in a sexist and discriminatory manner,

and targeted female employees for bullying and abusive behavior.

    13.    From the beginning of her tenure at the FDO, Davis singled Strickland out to be

4


his mentee, assigned her almost exclusively to his cases, and targeted her for unwelcome attention. Coworkers noticed and commented on Davis's fixation with Strickland. After Judge Kozinski of the Ninth Circuit retired following allegations of sexual misconduct, Davis gloated to Strickland that the process for bringing sexual harassment complaints in the judiciary was useless.

14.     As Strickland approached one year at the FDO, she was widely praised by both her colleagues and the judges before whom she appeared for her excellent work performance, and she anticipated a highly positive performance review. Martinez told Strickland that Davis would be her "mentor" in charge of her advancement, even though the FDO had no formal mentoring program. In May 2018, Strickland told Davis that she planned to request a promotion for which she believed she qualified. In response, Davis became visibly agitated and emotional. He then said, "don't worry, we're going to take care of you." Later that day, he sent Strickland an email titled "Mas Dinero" (Spanish for "More Money"). The email stated: *"Dude, you're shooting high with a G15. Not least of all since you'll need 5 more years of fed service to qualify for it. But fret not, I have a plan...just remember I deal in pay-for stay ☺."*

15.     From there, Davis's unwelcome advances intensified. He repeatedly and persistently pressured Strickland to see him outside of the office alone, and asked her out for drinks, "mentoring" sessions, and out-of-office meetings. When Strickland rebuffed these advances, Davis interfered with her job duties and threatened disciplinary action. When Martinez assigned Strickland as second chair on a trial, Davis exhibited professional jealousy towards Strickland.

5


16.     When Strickland went to Martinez for help, but he told her to "work it out" with Davis, and then removed Strickland from the trial he assigned her, despite acknowledging her excellent performance and his understanding that Strickland wanted to gain more trial experience.

17.     In July 2018, Strickland notified Martinez that Davis was behaving inappropriately and that she was leaving work early every day to avoid being alone with him. Even though Strickland had asked to meet with Martinez alone and in confidence, Martinez responded by holding a meeting with Strickland and Davis to discuss the matter. After Strickland repeatedly informed Martinez that she was not comfortable with Davis being present in their meeting, Martinez asked Davis to leave. Once Davis left, Strickland described Davis's harassing behaviors in detail to Martinez. She told Martinez that she was routinely leaving the office early to avoid being alone with Davis.  During this meeting, Martinez told Strickland and Davis that their relationship was like a "marriage" that required "compromise." Days later, despite being on notice that Davis was sexually harassing Strickland, Martinez assigned Strickland to work even more closely under Davis's supervision.

18.     Strickland also sought guidance on both supervisors' conduct from the Administrative Office of the U.S. Courts ("AO's") Fair Employment Opportunity Officer ("FEOO"), the civil rights office for the courts.  She shared with the FEOO copies of Davis's inappropriate emails and texts. The FEOO said the behavior Strickland reported was "classic sexual harassment."  She also said that though Strickland was "highly credible," she recommended Strickland find another job rather than seek redress through the EDR Plan,

6


because the EDR process was "stacked" against a complainant and in favor of management. She encouraged Strickland to call in sick to protect herself.

19.    After speaking with Strickland, the FEOO also spoke with the AO's Chief of Defender Services, who advised Martinez to appropriately address the sexual harassment. Instead, Martinez angrily berated Strickland and downplayed the harassment. Martinez also reassigned Strickland to work with another research and writing attorney, a move that restricted Strickland's job duties because she was no longer receiving her own cases. However, Martinez did not remove Strickland from Davis's control.

20.    In August 2018, after the FEOO shared copies of Davis's inappropriate text messages and emails with the Chief of Defender Services, the Chief obtained clearance to contact Martinez directly. The Chief suggested to Martinez that he consider Strickland for an open appellate attorney position that would allow her to work away from Davis's direct supervision.

21.    On August 9, 2018, Martinez told Strickland that the Chief of Defender Services had called him. Martinez criticized Strickland for reporting her concerns about Davis to others. He told Strickland that he was being "blamed" and "attacked" for something that was not his "fault." When she mentioned that Davis had cornered her in the lobby when she was alone, Martinez interjected: "OK, but there was no physical contact." Martinez agreed it was necessary to move Strickland into appeals and promised to remove Davis from Strickland's chain of command. Martinez would not agree to transfer Strickland to another duty station, which meant that even after the transfer to appeals, Strickland and Davis would still work on the same floor,

7


on opposite ends of the hallway.

22.    On August 10, 2018, Strickland sent Martinez an email memorializing their conversation. On August 17, 2018 Martinez emailed Strickland, copying Circuit Executive Ishida and a Human Resources Specialist ("HR Specialist"), claiming that he had not agreed to transfer Strickland to appeals, informing Strickland that he was "reclassifying" her to an assistant federal public defender position that would still work under Davis, informing Strickland that Martinez had reported her sexual harassment complaint to Ishida and the Chief Judge, and telling her that Martinez and the HR Specialist would inform Strickland of her rights under the EDR Plan.

23.    In August 2018, candidates were interviewed for the appellate attorney position. Although Strickland applied for the position, she was not invited to interview. Instead of receiving this promotion, Strickland received a "reclassification" of her title. Davis continued to make or participate in decisions affecting Strickland's job terms and conditions. Strickland was not treated like other assistant federal public defenders. She did not receive her own caseload and clients. Her job duties were limited to providing research and writing support to the trial unit being supervised by Davis.

24.    Strickland was approaching her one-year anniversary with the FDO, which would have triggered an annual, nondiscretionary step increase on the GS pay scale; however, because her position was reclassified, she was not eligible for this salary increase.

25.    In early September 2018, Strickland filed a "report of wrongful conduct" under the EDR Plan, against Martinez and Davis. She also filed a claim under the "Dispute Resolution

8


Procedures" of Chapter X of the Plan, initiating the proceeding with a formal "request for counseling." As she was permitted under the EDR Plan, Strickland made a written request that the Chief Judge disqualify Martinez from exercising authority in the EDR process, since he was one of the people she was accusing of wrongdoing. Despite his conflict of interest as a respondent, Martinez was allowed to appoint the investigator, Heather Beam, Human Resources Manager for the Western District of North Carolina.

26.     Over the next six months, Strickland worked from home. Beam met with and interviewed Strickland on October 5 and November 9, 2018. Beam also interviewed Strickland, Davis and Martinez. She interviewed no one else, even though Strickland had provided Beam a list of witnesses she believed had information relevant to her complaints. Strickland's allegations against Martinez were not investigated; Beam investigated only the allegations against Davis.

27.     Beam issued her final investigation report on January 11, 2019. Beam's report concluded ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ Though Strickland was informed that the final investigation report had been issued, she was not informed of the investigation's findings; nor was she informed of whether the FDO had taken any action against Davis or Martinez as a result of those findings. Exercising her rights under the EDR Plan, Strickland requested mediation, which concluded unsuccessfully on March 11, 2019. █████████████████████████████

████████████████████████████████████████████████████



█████████████████████████████ Martinez was not disqualified from representing the FDO in the mediation. He would not agree to transfer Strickland to an adjacent district as she had requested. So instead, the mediator helped Strickland secure a Fourth Circuit clerkship, which she received on March 8, 2019. Strickland formally resigned from the FDO effective March 15, 2019.

28.     On May 28, 2019, Ishida, in his capacity as Circuit Executive, issued Martinez a letter of counseling, ███████████████████████████████
███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████

29.     ███████████████████████████████████
████

30.     In June 2019, Ishida informed Strickland that "disciplinary action was taken last week as a result of [her] report of wrongful conduct." Ishida did not inform Strickland of the investigation's findings or what corrective action was taken.

## IV.     Applicable Standards

31.     After the passage of the 1964 Civil Rights Act (Title VII), enforcement agencies, such as the U.S. Equal Employment Opportunity Commission (EEOC) and the California Department of Fair Employment and Housing (DFEH), developed protocols for investigating different types of discrimination and for retaliation for complaining about discrimination. Employers facing complaints of discrimination then followed suit. In the 1980's, the Federal



Government conducted large-scale studies of sexual harassment, finding that such harassment was prevalent.[1] The studies also showed that most harassment was not reported, in large part due to fears of retaliation.

32.     This led to a focus on prevention of harassment and discrimination, with the employer being held responsible for enacting policies, training its workforce, investigating complaints, taking appropriate disciplinary action when it found there was discrimination or harassment and ensuring that those who complained about discrimination and harassment were not subject to retaliation. In fact, over time (and certainly before the facts that give rise to this case came about) statutes and regulations relating to discrimination and harassment came to include affirmative duties to prevent harassment, discrimination, and retaliation from occurring.

33.     Then, in 1998, the U.S. Supreme Court decided the twin cases of *Burlington Industries, Inc. v. Ellerth*[2] and *Faragher v. City of Boca Raton*[3] that established an affirmative defense for charges of discriminatory harassment when the employer had enacted reasonable polices and had responded appropriately to a complaint. These cases set forth some of the things employers could and should do to prevent and respond to harassment and provided a benefit (protection from liability) for employers who did so.

34.     In the same year, two California cases determined that an employer's good faith and fair investigation of a harassment complaint gave rise to a qualified immunity from liability for wrongful termination when the respondent was terminated as a result of findings in the investigation.[4] These cases also contributed to increased awareness in the employer community of what constituted a proper investigation of employee complaints.

---

[1] Sexual Harassment in the Federal Workplace: Is it a Problem" A report of the U.S. Merit Systems Protection Board, Office of Merit Systems Review and Studies, Washington D.D. 1981 (updated 1988 and 1995).
[2] 118 S. Ct. 2257 (1998)
[3] 118 S. Ct. 2275 (1998)
[4] *Cotran v. Rollins Hudig Hall Intl.,* Inc., 17 Cal. 4th 93 (1998*); Silva v. Lucky Stores, Inc.,* 65 Cal App. 4th 256 (1998).

11



35.     As a result of *Faragher* and *Ellerth,* the EEOC established guidance for employers on preventing and responding to unlawful harassment.[5] These guidelines covered how employers should go about conducting investigations. At the same time, employers, business organizations and attorneys advising employers became engaged in training human resource professionals on how to properly investigate a charge of discrimination and harassment.

36.     Liability for discrimination and harassment includes liability for retaliation for complaining about discrimination and harassment. Employees are to be protected from retaliation regardless of whether there was a finding of discrimination or harassment. That is, an employee should be able to bring a good faith complaint of harassment without fear of any reprisal.

37.     Thus, there are well-developed standards in the human resource field relating to practices in preventing and responding to workplace complaints of harassment, discrimination, and retaliation and, in particular, how to investigate a complaint. These standards include a timely, fair, and thorough investigation conducted by an unbiased investigator that comes to a reasoned and fair decision. A fair investigation should provide due process (essential fairness) for both the complaining party and the party who the complaint is lodged against. This includes a trained investigator gathering all relevant evidence by, among other things, interviewing the complainant(s), respondent and percipient witnesses. This should be followed by a careful weighing of the evidence along with findings (using a preponderance of the evidence standard) that logically flow from the evidence collected.

---

[5] EEOC Guidance on Vicarious Employer Liability for Unlawful Harassment by Supervisors ("EEOC Guidance"). EEOC Notice Number 915.002, 6/18/99.


38.     Based on my review of case materials, Defendants did not meet these well-established standards.

## V.    Summary of Opinions

39.     Based on my review of the evidence in this case, it is my opinion that:

   a.     Defendants' response to Strickland's sexual harassment and retaliation complaints fell below acceptable standards in the HR community;

   b.     HR Analyst Heather Beam's investigation of Strickland's complaint fell below acceptable standards in the HR community for conducting workplace investigations; and

   c.     Defendants failed to protect Strickland from further harassment and from retaliation for bringing her sexual harassment complaint.

## VI.    Opinions

### A. Defendants' Response to Strickland's Internal Complaint Fell Below Well-Accepted HR Practices

40.     The Defendants response to Strickland's complaint was inadequate in a number of ways. As a result, Defendants failed to provide Strickland a prompt, fair and thorough investigation of her complaints.

41.     First, Defendants did not respond to or investigate Strickland's complaint promptly. Strickland first complained about Davis to Martinez in July 2018. She brought her EDR complaint on September 10, 2018. Beam did not conclude her investigation and issue her report until mid-January 2019, six months after Strickland's initial complaint. No action was taken by Defendants in response to Beam's report, and no resolution came as a result. Instead, in

13


compliance with the EDR Plan, Strickland was required to mediate her complaint with Martinez. The mediation concluded unsuccessfully on March 11, 2019. During this six-month period, Strickland worked from home in order to avoid contact with Davis. Being away from the office without direct access to her peers and superiors placed Strickland at a disadvantage professionally. She resigned shortly after the mediation.

42.     Second, though he was named as a respondent in Strickland's complaint, Martinez was permitted to control aspects of the investigation. Per the EEOC's Enforcement Guidance, the alleged wrongdoer should not have supervisory authority over the person conducting the investigation and should not have any direct or indirect control over the investigation. Yet Martinez, whom Strickland had accused of wrongdoing, was permitted to appoint Beam as the investigator, even though in her "report of wrongful conduct" brought under the EDR Plan, Strickland asked that Martinez be disqualified from this role. Even though ███████████████████████████████████████████████████████████ ██████████████████████████████████████, Martinez was not disqualified from participating. As a consequence, during the mandatory mediation phase of the EDR dispute resolution process, Martinez acted as a "decision maker" who had the authority to approve or disapprove any proposed resolution. At the investigation's conclusion, Martinez was also permitted to weigh in on the discipline Davis should receive. Because Martinez was allowed to participate to this degree, the investigation of Strickland's complaints lacked fundamental fairness.

43.     Third, though Strickland was the alleged victim of sexual harassment, the EDR

14



INVESTIGATIONS | TRAININGS | MEDIATIONS

Plan process placed responsibility on *her* to negotiate with Martinez and come up with a resolution to her complaint. Yet, Title VII places the burden on the *employer* to remediate discrimination, harassment and retaliation. It was Defendants, not Strickland, who had the power to address Davis' and Martinez's behavior and find a resolution that would permit Strickland to continue comparable employment with the FDO in a harassment-free environment.

44.     Fourth, although Strickland informed Beam during their first meeting that she believed Martinez had retaliated against her for expressing concerns about Davis' behavior, the Defendants apparently instructed Beam not to investigate this claim.

45.     Fifth, although Beam's investigation concluded in January 2019 that ▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ the Defendants took no action to remedy the harm Strickland suffered as a consequence. Instead, they insisted that she engage in mediation with Martinez to help find a remedy, then permitted her to resign when the mediation was not successful because Martinez was willing to approve Strickland's transfer to another location.

46.     Based on the above, I am of the opinion that the Defendants' response to Strickland's complaints fell below the well-accepted standards for handling a complaint of harassment and retaliation.

### B. Defendants' Investigation of Plaintiff's Internal Complaint was not Consistent with Well-Accepted HR Practices.

47.     There are well-developed standards in the human resource field relating to investigating workplace complaints of harassment and retaliation. These standards include a timely, fair, and thorough investigation conducted by an unbiased investigator that comes to a

15


reasoned and fair decision. The investigation must be conducted by a trained investigator gathering all relevant evidence by, among other things, interviewing the complainant(s), respondent and percipient witnesses.

48.     The EEOC's Enforcement Guidance provides that "[w]hoever conducts the investigation should be well-trained in the skills that are required for interviewing witnesses and evaluating credibility." Yet Heather Beam had no experience conducting workplace investigations. In her deposition, she acknowledged that Strickland's complaint was the first she had investigated. Beam had no training in conducting workplace investigations, either.

49.     To conduct a timely, fair and thorough investigation, the investigator must gather all relevant evidence. Yet Beam did not interview anyone on the list of witnesses Strickland gave to her. One or more of those witnesses may have corroborated Davis' behavior that Strickland had described, which may have alerted Defendants to the gravity of Strickland's complaint and the need to remedy the situation expeditiously.

50.     Well-developed standards in the human resource field relating to conducting investigations also include a timely, fair, and thorough investigation conducted by an unbiased investigator that comes to a reasoned and fair decision. Yet Beam conducted the investigation in a manner that raises questions about her impartiality. She permitted Martinez and Davis, the two accused parties, to communicate with each other about the investigation. ███████████

███████████████████████████████████████████████

███  In March 2019, after the investigation had concluded, Beam sent an email to Frank Johns, the Clerk Court, making fun of Strickland, a clear indication that Beam had a bias against her.

16



51.     In addition, although Beam was aware that the investigation possibly was not being kept confidential, she took no steps to verify whether this was the case; nor did she report the potential confidentiality breach to anyone. ██████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

52.     As another example, it does not appear from the Report ███████████

███████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

█████████

53.     ██████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

17


███ There was another way that Beam appeared to treat Davis more favorably than Strickland. ████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████ Beam did not appear to understand that someone who had potentially experienced the trauma of sexual harassment, Strickland may have had difficulty identifying specific remedies. It is not unusual for sexual harassment complainants to make one simple request: "Just make the harassment stop." In fact, repeatedly asking a sexual harassment victim to identify remedies can be re-traumatizing. █████████████████████████████████

████████████████████████

55.     Finally, it is not clear whether Beam asked Davis to explain a key piece of evidence: Davis' May 18, 2018, "pay for stay" email to Strickland. If Davis had intended this email as an implicit promise of a promotion if Strickland agreed to his sexual advances, sending the email would have constituted *quid pro quo* sexual harassment, something that would have called for Davis to be terminated. Yet it does not appear that Beam explored whether this was indeed Davis' intention. █████████████████████████

18


56.     Likely because of her inexperience as an investigator, Beam made a number of mistakes that compromised the adequacy of her investigation. She did not adequately protect the confidentiality of the process. She did not follow up regarding relevant evidence. She did not interview witnesses who may have possessed relevant information. She allowed Martinez and Davis to potentially influence her. For these reasons, Beam's investigation fell below well-accepted standards in the HR industry for conducting workplace investigations.

## C. Defendants Failed to Protect Strickland from Retaliation

57.     From the moment she first reported to Martinez about Davis' unwanted conduct, the Defendants had a legal obligation to protect her from retaliation. The Defendants failed this obligation.  Strickland first went to Martinez in July 2018, telling him that Davis had subjected her to behavior that made her uncomfortable. In response, Martinez dismissed her concerns. He referred to her professional relationship with Davis as a "marriage" that required "compromise." Though Strickland said she was uncomfortable being in Davis' physical presence, Martinez insisted that Davis attend their meeting, and directed Strickland to stop taking notes. These actions in and of themselves were retaliatory, as Martinez punished Strickland for coming forward by forcing her to engage one-on-one with the person she said was harassing her.

58.     To make matters worse, after Martinez finally asked Davis to leave this meeting, Martinez defended Davis' behavior, and when Strickland began to tear up, he mocked her for "getting emotional."  Inexplicably, Martinez then invited Davis back into the meeting and permitted Davis to berate and criticize Strickland. Understandably, Strickland felt

19


uncomfortable, intimidated and unsafe, which was further punishment for coming forward.

59.     In the following months, when Strickland continued to make it clear to Martinez that Davis was still subjecting her to unwanted conduct that made her uncomfortable, Martinez initially removed her from Davis' supervision, then changed course and returned her to Davis' supervision, essentially forcing her to report to the person who had harassed her. Martinez then announced that Strickland would receive assignments from another Research and Writing attorney (Strickland's peer). This move reduced Strickland's job responsibilities, as she would no longer receive her own cases and would be subordinate to a peer. This had the practical effect of hindering Strickland's professional advancement. Martinez also "reclassified" Strickland's position to an Assistant Federal Public Defender, yet she did not receive a salary increase and would be providing research and writing support to other attorneys.

60.     When Strickland tried to apply for the Appellate Assistant Federal Defender position, Appellate Chief Josh Carpenter, who previously had encouraged her to apply for the position, now discouraged her from doing so.  Carpenter was aware that Strickland had expressed concerns about Davis, and he had defended Davis to Strickland when she initially talked to Carpenter about the Appellate Assistant Federal Defender position. Thus, Carpenter's behavior was potentially retaliatory. Though Strickland ultimately did apply for the position, Carpenter's discouragement could have hindered her professionally. She was not invited to interview and, thus, was denied this opportunity for a promotion.

61.     At no time did anyone in a position of authority in the FDO take steps to protect Strickland from retaliation. Defendants did not agree to the most straightforward way of

20


protecting her: transferring her to the Asheville location as she had requested. Defendants also did not grant Strickland's request to report to a different supervisor. They did not monitor Strickland's work environment, or Martinez's management decisions about her, to ensure that Strickland did not suffer adverse job consequences for bringing her complaints. As a consequence, Strickland's working conditions were adversely affected. Clearly, Defendants did not meet their obligation to protect Strickland from retaliation.

62.     In sum, Defendants did not meet their obligations to Strickland as provided by the well-accepted standards in the human resources industry. From the beginning, the Defendants treated this matter as an informal work dispute, between Strickland and Davis, one that could be "resolved" through the EDR Plan process. Defendants apparently did not appreciate that Strickland had reported behavior that was potentially illegal under Title VII and that needed to be taken seriously, investigated promptly, and remedied appropriately. Because they viewed the situation as a workplace dispute, the Defendants took the position that Strickland was equally responsible for her poor relationship with Davis and, thus, bore responsibility for working with Martinez to identify an acceptable solution. This approach not only deprived Strickland of the protections to which she was entitled under Title VII, but it also placed her in the unfortunate position of having to advocate for herself when it was the Defendants who should have been protecting her.

63.     I reserve the right to supplement this report and to expand or modify my opinions based on review of material as it becomes available through ongoing discovery and through any additional work.  If you have any questions about this report, please do not hesitate to contact

21



me.


Sincerely,

Vida Thomas
Managing Partner

22