**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
ASHEVILLE DIVISION
CASE NUMBER 1:20CV66

CARYN DEVINS STRICKLAND,                    )
                                            )
      Plaintiff,                            )
                                            )
v.                                          )
                                            )
UNITED STATES OF AMERICA, et al.,           )
                                            )
      Defendants.                           )

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION..............................................................................................................1

FACTS..........................................................................................................................1

    I.    Plaintiff is hired as a Research & Writing Specialist.............................................1

    II.   Plaintiff threatens to quit unless she is transferred to Asheville to be near her husband......2

    III.  Plaintiff pursues her own agenda..........................................................................3

    IV.  Plaintiff complains of sexual harassment and the Defendants take prompt action..............5

    V.   Plaintiff files a request for counseling and makes a report of wrongful conduct. ..................6

    VI.  Plaintiff requests mediation, withdraws her Chapter X claim, and resigns.........................7

    VII.  The Investigation did not find any discrimination, sexual harassment, or retaliation...........7

LEGAL STANDARD ....................................................................................................7

ARGUMENT.................................................................................................................8

    I.    Plaintiff Has No Remedy. .....................................................................................8

       A.  There is no basis to award declaratory relief.......................................................8

       B.  Plaintiff lacks standing to seek a prospective injunction...................................8

       C.  Plaintiff cannot recover front pay.......................................................................9

          1.  Front pay is not an available remedy for Plaintiff's claims. ...........................9

          2.  Plaintiff's conduct is an additional bar to front pay.....................................12

    II.   Defendants Did Not Violate Plaintiff's Procedural Due Process Rights............................14

    III.  Defendants Did Not Violate the Equal Protection Clause. ..............................................18

       A.  Plaintiff did not suffer sexual harassment. .....................................................18

          1.  There was no hostile work environment. ..................................................18

          2.  There was no quid pro quo harassment.....................................................22

       B.  Plaintiff did not experience deliberate indifference.........................................23

CONCLUSION.............................................................................................................25

Case 1:20-cv-00066-WGY   Document 245   Filed 06/01/23   Page 2 of 33

## TABLE OF AUTHORITIES

**Cases**

*Akonji v. Unity Healthcare, Inc.*,
517 F. Supp. 2d 83 (D.D.C. 2007) ........................................................21

*Anderson v. Liberty Lobby Inc.*,
477 U.S. 242 (1986) ..............................................................................8

*Atkins v. Comp. Scis. Corp.*,
264 F. Supp. 2d 404 (E.D. Va. 2003) ...................................................23

*Baptiste v. Cushman & Wakefield*,
2007 U.S. Dist. LEXIS 19784 (S.D.N.Y. 2007) ............................... 11, 12

*Baynard v. Malone*,
268 F.3d 228 (4th Cir. 2001) ...............................................................24

*Bloch v. Exec. Off. of the President*,
164 F. Supp. 3d 841 (E.D. Va. 2016) ...................................................13

*Bostock v. Clayton County*,
140 S. Ct. 1731 (2020) .........................................................................21

*Burlington Indus., Inc. v. Ellerth*,
524 U.S. 742 (1998) ............................................................................22

*Carter v. Ball*,
33 F.3d 450 (4th Cir. 1994) .................................................................11

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) ................................................................................9

*Coker v. Trans World Airlines, Inc.*,
165 F.3d 579 (7th Cir. 1999) ...............................................................15

*Detweiler v. Va. Dep't of Rehabilitative Servs.*,
705 F.2d 557 (4th Cir. 1983) ...............................................................10

*EEOC v. Appalachian Power Co.*,
2019 U.S. Dist. LEXIS 163117 (W.D. Va. Sep. 24, 2019) ....................21

*Ellis v. Dir., CIA*,
1999 U.S. App. LEXIS 21638 (4th Cir. Sep. 10, 1999).........................22

*Evans v. Int'l Paper Co.*,
936 F.3d 183 (4th Cir. 2019) ...............................................................10

ii

*Farley v. Am. Cast Iron Pipe Co.*,
  115 F.3d 1548 (11th Cir. 1997) ........................................................................................23

*Feldman v. Phila. Hous. Auth.*,
  43 F.3d 823 (3d Cir. 1994) ................................................................................................9

*Frederick v. Simpson College*,
  149 F. Supp. 2d 826 (S.D. Iowa 2001) ............................................................................25

*Greene v. Friendship Pub. Charter Sch., Inc.*,
  2019 WL 918307 (D.D.C. Feb. 25, 2019) ................................................................. 24, 25

*Gregg v. N.Y. State Dep't of Tax'n & Fin.*,
  1999 U.S. Dist. LEXIS 5415 (S.D.N.Y. Apr. 19, 1999) ..................................................21

*Hewitt v. Helms*,
  482 U.S. 755 (1987) ...........................................................................................................8

*Highlander v. K.F.C. Nat'l Mgmt. Co.*,
  805 F.2d 644 (6th Cir. 1986) ...........................................................................................23

*Holmes v. Wal-Mart*,
  2011 U.S. Dist. LEXIS 46020 (E.D. Va. Apr. 27, 2011) ................................................10

*Hopkins v. Baltimore Gas & Electric Company*,
  77 F.3d 745 (4th Cir. 1996) .............................................................................................21

*Idusuyi v. Tenn. Dep't of Children's Servs.*,
  30 F. App'x 398 (6th Cir. 2002) ......................................................................................23

*Johnson v. Donohoe*,
  2013 U.S. Dist. LEXIS 185168 (D.S.C. Nov. 26, 2013) .................................................22

*Johnson v. Shalala*,
  991 F.2d 126 (4th Cir. 1993) ...........................................................................................10

*Jones-Davidson v. Prince George's Cty. Cmty. Coll.*,
  No. 13-cv-2284-AW, 2013 U.S. Dist. LEXIS 159422 (D. Md. Nov. 7, 2013) ...............23

*Jordan v. StoneMor Partners L.P.*,
  2018 WL 1074492 (W.D. Va. Feb. 27, 2018) .................................................................13

*Just. 360 v. Stirling*,
  42 F.4th 450 (4th Cir. 2022) ..............................................................................................8

*Landrau-Romero v. Banco Popular De P.R.*,
  212 F.3d 607 (1st Cir. 2000) ...........................................................................................11

iii

*Love-Lane v. Martin,*
    355 F.3d 766 (4th Cir. 2004) ................................................................................................25

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ...................................................................................................8, 9, 13

*Mathews v. Eldridge,*
    424 U.S. 319 (1976) ................................................................................................................18

*Matvia v. Bald Head Island Mgmt.,*
    259 F.3d 261 (4th Cir. 2001) ................................................................................................11

*McKennon v. Nashville Banner Publ'g Co.,*
    513 U.S. 352, (1995) ................................................................................................................13

*Meritor Sav. Bank, FSB v. Vinson,*
    477 U.S. 57 (1986) ..................................................................................................................19

*Montero v. AGCO Corp.,*
    192 F.3d 856 (9th Cir. 1999) ................................................................................................11

*Neal v. United States Penitentiary Lee,*
    2022 U.S. Dist. LEXIS 137076 (W.D. Va. Aug. 2, 2022) ..................................................10

*Okoli v. City of Balt.,*
    648 F.3d 216 (4th Cir. 2011) ......................................................................................... 18, 22

*Pennsylvania State Police v. Suders,*
    542 U.S. 129 (2004) ................................................................................................................10

*Pesso v. Montgomery Gen. Hosp.,*
    1999 U.S. App. LEXIS 10207 (4th Cir. May 24, 1999) ......................................................21

*Pollard v. E.I. du Pont,*
    532 U.S. 843 (2001) ..................................................................................................................9

*Ponticelli v. Zurich Am. Ins. Grp.,*
    16 F. Supp. 2d 414 (S.D.N.Y. 1998) ....................................................................................23

*Quinn v. Green Tree Credit Corp.,*
    159 F.3d 759 (2d Cir. 1998) ..................................................................................................21

*Riffle v. Sports Auth., Inc.,*
    1999 U.S. Dist. LEXIS 14588 (D. Md. July 30, 1999) ......................................................22

*Russell v. Cty. of Rockland,*
    2017 U.S. Dist. LEXIS 116771 (S.D.N.Y. July 26, 2017) ..................................................11

iv

*S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty.*,
    819 F.3d 69 (4th Cir. 2016) .................................................................................. 24, 25

*S.T. v. Yakima Sch. Dist. No.7*,
    Case No. 11-cv-1385, 2013 WL 807197 (E.D. Wash. Mar. 5, 2013) ....................................25

*Sellers v. Mineta*,
    358 F.3d 1058 (8th Cir. 2004) ..................................................................................13

*Shan Zhao v. Kaleida Health*,
    2007 U.S. Dist. LEXIS 103253 (W.D.N.Y. Aug. 8, 2007) ..................................................19

*Spencer v. Wal-Mart Stores, Inc.*,
    469 F.3d 311 (3d Cir. 2006) .................................................................................. 9, 10

*Spreen v. Brey*,
    961 F.2d 109 (7th Cir. 1992) ..................................................................................17

*Stiles ex rel. D.S. v. Grainger Cnty., Tenn.*,
    819 F.3d 834 (6th Cir. 2016) ..................................................................................24

*Stone v. Univ. of Md. Med. Sys. Corp.*,
    855 F.2d 167 (4th Cir. 1988) ..................................................................................18

*Strickland v. United States*,
    32 F.4th 311 (4th Cir. 2022) ...........................................................................*passim*

*Summers v. Earth Island Institute*,
    555 U.S. 488 (2009) .............................................................................................8

*Tepperwien v. Entergy Nuclear Operations, Inc.*,
    663 F.3d 556 (2d Cir. 2011) ...................................................................................23

*Triplett v. N.C. Dep't of Pub. Safety*,
    2018 U.S. Dist. LEXIS 150991 (W.D.N.C. Sep. 5, 2018) ..................................................11

**Statutes**

44 U.S.C. § 3106 ..............................................................................................................12

44 U.S.C. § 3301(a)(1)(A) ...............................................................................................12

**Rules**

Fed. R. Civ. P. 56(a) ..........................................................................................................7

**Other Authorities**

National Archives, Federal Records Management, *What Do Government Employees Need to Do When
    Leaving Federal Service?, available at* https://www.archives.gov/records-

mgmt/publications/documenting-your-public-service.html#:~:text=Federal%20records%
20must%20be%20maintained,by%20officials%20from%20your%20agency ...................................12

# INTRODUCTION

The Federal Judiciary takes reports of sexual harassment by Judiciary employees very seriously. That is why, when Plaintiff Caryn Strickland reported that she had been harassed, officials at the Federal Defender's Office for the Western District of North Carolina ("FDO") and the Fourth Circuit Court of Appeals took prompt and effective action consistent with the Fourth Circuit's Employment Dispute Resolution Plan ("EDR Plan"), including by separating Plaintiff from the person she accused of harassment and launching an investigation to determine the facts. The independent investigator concluded that Plaintiff had experienced sexual harassment only "in her mind" and that the claim was "very flimsy." After years of litigation, the evidentiary record confirms those conclusions, unequivocally demonstrating that Plaintiff's accusation that she was sexually harassed by the First Assistant is baseless and untrue. Defendants are therefore entitled to summary judgment on Plaintiff's equal protection claim. Similarly, the evidence refutes Plaintiff's due process claim because Plaintiff understood that a judicial officer—not the Federal Defender—would have decided her EDR claim had she proceeded to a formal hearing instead of voluntarily withdrawing her claim.

Plaintiff's claims also fail for another, independent reason—there is no remedy available to her. Although Plaintiff seeks front pay in lieu of reinstatement, she cannot prove that she was constructively terminated so she cannot recover lost wages. Moreover, Plaintiff's retention of federal records containing privileged information after the conclusion of her employment makes her ineligible for reinstatement or for front pay, given the high ethical standards expected of FDO attorneys. For these reasons, as discussed further below, the Court should enter summary judgment for Defendants.

# FACTS

## I. Plaintiff is hired as a Research & Writing Specialist.

On August 21, 2017, Plaintiff began work as a Research & Writing ("R&W") Specialist, GS14, Step 1, in the FDO. Ex. 1, Decl. of William Moormann ¶ 5; Ex. 2, Decl. of J.P. Davis ¶15. R&W Specialists are developmental trial and appellate support positions for attorneys who do not have substantial litigation experience. Ex. 1, ¶ 6. R&W Specialists are not permitted to handle their own

1

caseloads but may be a second-chair to an Assistant Federal Defender ("AFD"). Ex. 3, Decl. of Anthony Martinez ¶ 12.

Plaintiff did not have first-hand experience trying cases, representing clients, or defending criminal defendants. Ex. 1, ¶ 7. Because of her inexperience, the Defender assigned the First Assistant to be her mentor. Ex. 4, Dep. of Anthony Martinez at 98:3-25. The First Assistant and Plaintiff had four mentoring lunches during this period. Ex. 2 ¶ 16; Ex. 5, Email from J.P. Davis to Caryn Devins (Feb. 27, 2018). Plaintiff, who lived near the First Assistant's house for a period and generally biked to work, would also occasionally ask him for rides home. Ex. 6, Dep. of Caryn Strickland at 66:6-67:13; Ex. 7, Second. Decl. of J.P. Davis ¶ 3; Ex. 2, ¶ 17.

## II.    Plaintiff threatens to quit unless she is transferred to Asheville to be near her husband.

On May 18, 2018, the First Assistant and Plaintiff had their fourth and final mentoring lunch. Ex. 2, ¶ 20. During lunch, Plaintiff told the First Assistant she wanted to second-chair a difficult trial, which carried a potential life sentence ("Life Trial") and which was already staffed with one of the office's most junior AFDs. *Id.* The First Assistant advised Plaintiff to focus on more suitable trial opportunities, since assigning FDO's two least experienced attorneys as the trial team would risk ineffective assistance of counsel claims. *Id.*

After lunch, on the drive back to the office, Plaintiff stated that she was not happy living in a separate city from her husband, and stated, "If I don't get moved to Asheville, I'm going to have to quit." *Id.* The First Assistant told Plaintiff he was sorry to hear that because there were no office spaces available in Asheville. *Id.* Plaintiff then stated she would be open to "alternative arrangements," and raised the idea that she could telework from Tryon doing only appeals. *Id.* She told the First Assistant that if she could not be guaranteed a move to Asheville, she at least wanted more money, specifically promotion to GS-15 or to become an AFD. *Id.*

The First Assistant considered Plaintiff a valuable employee and wanted her to remain at the

2

FDO, so he reviewed salary tables to see if the FDO could provide her with a raise since a duty station transfer to Asheville was not possible. *Id.*, ¶ 21. Based on this review, the First Assistant sent Plaintiff an email with the subject line "mas dinero" saying that she was "shooting high" with her demand to be promoted to a GS-15, but said he had "a plan." *Id.*, ¶ 22; Ex. 9 at US89. The First Assistant did not explain his plan because he needed to discuss with the Defender how to transition Plaintiff to an AFD. *Id.* Because their earlier conversation had ended on a friendly note, the First Assistant ended the email with a pun, "pay-for-stay," as a joking reference to Plaintiff's own demand for an increase in *pay* in order to *stay* in the FDO in the absence of a duty-station transfer. Ex. 2, ¶ 22.

## III.    Plaintiff pursues her own agenda.

The First Assistant was out of the office the following week, but learned from a colleague that the Defender had approved Plaintiff's request to add her to the Life Trial team and that Plaintiff did not raise with the Defender the issue that assigning the two most inexperienced attorneys to this case could result in ineffective assistance of counsel claims. Ex. 3, ¶¶ 39-43; Ex. 2, ¶ 23. Subsequently, after two Team Leaders objected directly to the Defender on these grounds, the Defender removed Plaintiff from the team. Ex. 3, ¶¶ 40-43. However, on June 5, 2018, Plaintiff emailed the First Assistant to cancel a pre-existing client obligation to work on the Life Trial case. Ex. 2, ¶ 27. The First Assistant directed Plaintiff to attend the pre-existing meeting. *Id.*, ¶¶ 26-27.

On June 14, 2018, the First Assistant requested Plaintiff's help on a case, and she responded that she was "happy to help in any way [she could]." Ex. 8, Email from Caryn Devins to J.P. Davis (June 14, 2018). On June 19, after the First Assistant filed a brief that the two had been working on together, he told Plaintiff he was going to "get a celebratory drink" and that she was "welcome to join" him, but he believed she could not because she had "an appellate brief to write." Ex. 9 at US 91, Emails from J.P. Davis to Caryn Devins (June 2018).

On June 21, Plaintiff asked if the First Assistant would be in the office at 5 PM to meet. Ex.

3

2, ¶ 30. Their meeting addressed topics in their joint case and unrelated legal topics that Plaintiff wanted his opinion on. *Id.* At the end of the meeting, a thunderstorm was blowing in, so the First Assistant offered to give Plaintiff, who had biked to work, a ride home—as he had done, at her request, on prior occasions. *Id.*; *see also* Ex. 6 at 65:6-67:13. Plaintiff stated she did not think it would rain, and if it did, she was "tough." Ex. 2 ¶ 30. Minutes later, it began to pour. *Id.* Because Plaintiff was in an interior office, the First Assistant texted her "it is currently raining. Last chance for a ride tough girl[.]" *Id.* Shortly thereafter, he headed down to the lobby, and because Plaintiff had not responded to his text and it was still raining heavily, he briefly waited to give her a chance to see the text. *Id.* When Plaintiff came down the elevator, the First Assistant asked if she was sure she did not want a ride, and she said she was. *Id.* The First Assistant and Plaintiff then both left, using exits on opposite sides of the lobby. *Id.*

On June 27, 2018, the First Assistant emailed Plaintiff to "catch up" and schedule another mentoring session. Ex. 10, Email from J.P. Davis to Caryn Devins (June 27, 2018). He explained that they could have the session "over lunch, or cut out early one day for a celebratory . . . drink, or we can just do it in the office[.]" *Id.* Eventually the meeting was scheduled for July 2. Ex. 2, ¶ 33. The First Assistant had outlined his plan to discuss at the meeting how Plaintiff could develop better coping skills for the high-stress nature of their work. *Id.*, ¶¶ 32-33. Plaintiff, however, redirected the discussion to address her belief that he had spoken too harshly to her on June 5 about honoring the pre-existing client obligation. *Id.*, ¶ 33.

A few days later, Plaintiff approached the Defender to complain about the First Assistant's conduct toward her during that June 5 interaction. Ex. 3, ¶¶ 44, 46. On July 5, the Defender called both Plaintiff and the First Assistant into his office to "clear the air." *Id.*, ¶ 47. Plaintiff refused to discuss anything with the First Assistant present, so he left the room, and Plaintiff's primary focus was concern about her performance. *Id.*, ¶¶ 48-50. Plaintiff also mentioned that the First Assistant had

offered her a ride home and waited in the lobby, and at some point used the word "uncomfortable" in relation to the First Assistant. *Id.*, ¶¶ 50-51. The Defender asked Plaintiff what she meant and if she was alleging sexual harassment. *Id.*, ¶ 51. Plaintiff said she was not, and specifically asked the Defender not to report or otherwise escalate. *Id.*, ¶¶ 51-53, 55; Ex. 6 at 78:3-80:4.

On July 22, the First Assistant emailed Plaintiff asking to discuss case management. She did not respond. This was their last substantive interaction. Ex. 2, ¶ 37. On July 24, Defender instructed the First Assistant not to email, text, or meet with Plaintiff until further notice. Ex. 11, Text Message from Anthony Martinez to J.P. Davis (July 24, 2018).

## IV. Plaintiff complains of sexual harassment and the Defendants take prompt action.

On August 9, 2018, the Defender again met with Plaintiff, who made several demands, including that she be transitioned to an AFD, the organizational chart be changed, and she be transferred to Asheville or authorized telework. Ex. 3, ¶¶ 74-78. The Defender explained that he planned to convert the R&W Specialists to AFDs, that he would remove her from the First Assistant's chain of command, that he did not have space in Asheville, and that he would not authorize telework because it would open the floodgates to requests from others. *Id.*, ¶¶ 75-78.

On August 10, Plaintiff emailed the Defender purporting to recap the August 9 conversation. *Id.*, ¶ 79. In the email, Plaintiff claimed that the First Assistant had sexually harassed her. *Id.*, ¶¶ 79-80. The Defender then promptly reported the alleged wrongful conduct, pursuant to Chapter IX of the EDR Plan, to the Circuit Executive of the Fourth Circuit, who also served as the EDR Coordinator. *Id.*, ¶¶ 80-83. Under Chapter IX, "[t]he person who receiv[es] [] a report [of wrongful conduct] has the responsibility to notify the EDR Coordinator as soon as possible." Ex. 12, Consolidated Equal Employment Opportunity & Employment Dispute Resolution Plan (Nov. 2018), Ch. IX. After wrongful conduct is reported, "[t]he Chief Judge and/or unit executive shall ensure that the allegations in the report are appropriately investigated, either by the human resources manager or other person." *Id.* Accordingly, after the Defender reported the alleged wrongful conduct, the Circuit Executive contacted an HR Specialist in the Western District of North Carolina and asked her to investigate

5

Plaintiff's claims of harassment to determine if additional action was warranted. Ex. 13 at US617, Email from James Ishida to Lisa Morris (Aug 14, 2018).

The Defender took several steps to protect Plaintiff during the investigation. On August 17, 2018, at Plaintiff's request, the Defender authorized Plaintiff to telework during the pendency of the investigation, which she did until March 15, 2019, when she transitioned to a Fourth Circuit clerkship. Ex. 3, ¶ 93; Ex. 1, ¶ 37; *see also* Ex. 13 at US615 (email from the Defender to Circuit Executive describing changes made to protect Plaintiff); Ex. 14 at US977, Emails between Caryn Devins and Nancy Dunham (August 2018) (email from Plaintiff saying that working remotely "is completely fine with me"). Additionally, in late August 2018, Plaintiff was provided a private office, in the event she wanted to exercise her option under the telework agreement to return to the Charlotte office. Ex. 1, ¶ 35. And as noted, the Defender instructed the First Assistant not to contact Plaintiff. Ex. 11.

On August 20, 2018, at Plaintiff's request, Plaintiff was reclassified from R&W Specialist to an AFD, with Plaintiff's salary remaining at the maximum authorized amount. Ex.1, ¶¶ 18-22.

## V.     Plaintiff files a request for counseling and makes a report of wrongful conduct.

On September 10, 2018, while the investigation was ongoing, Plaintiff again reported wrongful conduct (as encouraged under Chapter IX) and submitted a Request for Counseling under Chapter X of the Plan, naming both the First Assistant and the Defender. Ex. 15, Decl. of James Ishida, ¶ 4; Ex. 16, Email from Caryn Devins to James Ishida (Sept. 10, 2018). While Chapter IX of the Plan was "intended to be informal and has no formal procedures or time frames," Ex. 17, Decl. of Jill Langley, ¶ 5, Chapter X governs employees' formal complaints where they seek personal relief. Under Chapter X, an employee "who believes that his or her rights under . . . this Plan have been violated must first request counseling." Ex. 12, Ch. X § 8(A). After the counseling period concludes, the employee "may file a request for mediation with the EDR Coordinator." *Id.*, Ch. X § 9(A). If mediation is not successful, an employee may then "file a complaint with the EDR Coordinator, who will transmit the complaint to the Chief Judge and to the respondent." *Id.*, Ch. X § 10(A). The presiding judicial officer may either dismiss the complaint or hold a hearing on the merits, *id.*, Ch. X § 10(B)(1), after which the

judicial officer will issue a "final decision" and if warranted, order certain remedies outlined in the plan, *id.*, Ch. X § 10(B)(2)(f)-(g).

## VI. Plaintiff requests mediation, withdraws her Chapter X claim, and resigns.

Plaintiff's counseling period ended on January 14, 2019, Ex. 18, Letter from James Ishida to Caryn Devins (Jan. 16, 2019), and on January 31, she requested mediation. Ex. 15, ¶ 19. On February 14, 2019, Plaintiff also met with the AO's Judicial Integrity Officer, whose role was in part to advise members of the judiciary about the EDR process. Ex. 19, Dep. of Jill Langley at 47:21-48:21, 64:21-65:1; Ex. 44, Second Decl. of Jill Langley, ¶¶ 5,9. During Plaintiff's mediation, the Mediator offered to help Plaintiff secure a Fourth Circuit clerkship, and advocated on Plaintiff's behalf. Ex. 20, Conversation 190226_1153 Tr. at 33:13-22, 68:14-15; Ex. 21, Emails from James Ishida to Edward Smith (Mar. 2019). On March 8, Plaintiff interviewed with a Fourth Circuit Judge, who offered her a clerkship. Ex. 22, Conversation 190308_1019 Tr. at 60:20-61:15, 64:4-14. Plaintiff accepted the offer, and accordingly, informed the Circuit Executive that she "no longer wish[ed] to pursue the Chapter X portion of [her] EDR claim," meaning that she never filed a complaint under Chapter X. Ex. 23, Emails from James Ishida to Edward Smith (Mar. 2019); Ex. 16, ¶ 22. She "formally resigned" effective March 15, Compl. ¶ 464, and on March 18, Plaintiff began her Fourth Circuit clerkship, Ex. 1, ¶ 50.

## VII. The Investigation did not find any discrimination, sexual harassment, or retaliation.

The investigator concluded that there was no discrimination, sexual harassment, or retaliation and only identified management and communication issues. *See* Ex. 25, Counselor's Report. The Investigator did "not see a case for retaliation based on [her] investigation and the facts presented by both sides." *Id.* at 11. She also concluded that Plaintiff "experienced in her mind sexual harassment[,] although the facts discovered in this case find this claim to be very flimsy." *Id.* at 14.

## <u>LEGAL STANDARD</u>

A district court shall grant summary judgment if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247-48 (1986).

## ARGUMENT

## I. Plaintiff Has No Remedy.

The only forms of relief sought by Plaintiff that potentially remain in this case are: (1) a declaratory judgment that Plaintiff's "constitutional rights were violated;" and that "the laws, regulations, and rules that operated to deprive Plaintiff of her rights [were] unconstitutional as applied to Plaintiff;" (2) an injunction "[e]njoin[ing] any further violation of Plaintiff's rights; and (3) an award of "front pay as equitable relief in lieu of reinstatement[.]" Compl. at 84, Requested Relief. However, there is no equitable remedy available to Plaintiff, in part due to her own conduct. Because her claims can no longer be redressed, Defendants are entitled to summary judgment.[1]

### A. There is no basis to award declaratory relief.

Plaintiff bears the burden of establishing standing for each form of relief sought. *Summers v. Earth Island Institute*, 555 U.S. 488, 493 (2009). For a declaratory order to be "a proper judicial resolution of a 'case or controversy' rather than an advisory opinion[,]" it must "settl[e] some dispute *which affects the behavior of the defendant towards the plaintiff.*" *Hewitt v. Helms*, 482 U.S. 755, 761 (1987). Yet there is no declaratory relief here that would "affect[] the behavior of the defendant[s] towards the plaintiff." *Id.*

Plaintiff seeks declarations that "[her] constitutional rights were violated" and that "the laws, regulations, and rules that operated to deprive Plaintiff of her rights [were] unconstitutional as applied to Plaintiff[.]" Compl. at 84, Requested Relief ¶¶ 1-2. Because Plaintiff has been separated from the FDO for over four years, any declaration that Plaintiff's rights were violated in the past would bring her no relief and would amount to nothing more than an advisory opinion. *Just. 360 v. Stirling*, 42 F.4th 450, 460 (4th Cir. 2022) (denying request for declaratory relief that "would amount to no more than an impermissible advisory opinion" that would not redress alleged harms).

### B. Plaintiff lacks standing to seek a prospective injunction.

---

[1] Courts must assure themselves of jurisdiction at each stage of litigation. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). To the extent this Court finds that the lack of available relief goes to this Court's jurisdiction, this Court may dismiss under Rule 12(h)(3).

8

Plaintiff also lacks standing to pursue prospective relief against any of the Defendants. Her "standing to seek the injunction requested depend[s] on whether [s]he [i]s likely to suffer future injury" from the allegedly unconstitutional practice. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983). "Absent a sufficient likelihood that [s]he will again be wronged in a similar way, [a plaintiff] is no more entitled to an injunction than any other citizen." *Id.* at 111.

Here, Plaintiff asks this Court to "[e]njoin any further violation of Plaintiff's rights." Compl. at 84, Requested Relief ¶ 3—but as the Fourth Circuit noted, under the facts alleged in the complaint, it would be, at best, "unclear," without "Strickland's reinstatement, what those 'further violation[s]' might be." *Strickland v. United States*, 32 F.4th 311, 366 n.16 (4th Cir. 2022). As it stands, Plaintiff is not seeking reinstatement, and on the summary judgment record, such relief is not available in any event. *See infra* Part I(C)(2) & n.2. Thus, there is no "actual or imminent" threat that Plaintiff's rights would be violated in the future by Defendants. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). She is not facing any ongoing retaliation, nor is her past injury likely to be redressed by such relief. A prospective injunction is accordingly unavailable as a matter of law.

## C. Plaintiff cannot recover front pay.[2]

### 1. Front pay is not an available remedy for Plaintiff's claims.

Front pay is "awarded for lost compensation." *Pollard v. E.I. du Pont*, 532 U.S. 843, 846 (2001). To be eligible for front pay, Plaintiff must prove that she lost compensation through a wrongful termination. *See Feldman v. Phila. Hous. Auth.*, 43 F.3d 823, 839 (3d Cir. 1994) (Garth, J., concurring in part and dissenting in part) ("The purpose of front pay is to make an injured employee whole by compensating h[er] for future lost earnings resulting from [her] wrongful termination.").

Without proof of an actual or constructive termination, a finding of an equal protection violation would not justify awarding front pay because there would be no connection to any lost compensation. *See, e.g., Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 317 (3d Cir. 2006) ("[I]f a hostile

---

[2] Plaintiff failed to plead a request for reinstatement. *See* Compl. at 84, Requested Relief ¶ 5 (requesting front pay in lieu of reinstatement). Any request for reinstatement would fail for the same reasons as set forth in this section regarding front pay.

9

work environment does not rise to the level where one is forced to abandon the job, loss of pay is not an issue."); *id.* n.6 (citing other circuit court decisions); *Johnson v. Shalala*, 991 F.2d 126, 130 (4th Cir. 1993); *Holmes v. Wal-Mart*, 2011 U.S. Dist. LEXIS 46020, at \*34 (E.D. Va. Apr. 27, 2011) (relying on *Johnson* to conclude that hostile work environment claims "do not entitle a plaintiff to recover back pay and reinstatement unless" they result in "a loss of pay or discharge"). Front pay is also not a remedy for a procedural due process violation. *See Detweiler v. Va. Dep't of Rehabilitative Servs.*, 705 F.2d 557, 562 (4th Cir. 1983) (if plaintiff could prove due process violation in the hearing afforded him, "he should be afforded a rehearing by the panel that comports with the due process clause"); *Neal v. United States Penitentiary Lee*, 2022 U.S. Dist. LEXIS 137076, at \*5 (W.D. Va. Aug. 2, 2022) ("[T]he typical remedy for a violation of due process . . . is more process").

As she was not actually terminated from the FDO, Plaintiff must prove, *inter alia*, that she was constructively discharged to recover front pay on her equal protection claim. "The [constructive termination] inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004). Plaintiff must show "that [s]he was discriminated against by h[er] employer to the point where a reasonable person in h[er] position would have felt compelled to resign" and that she actually did resign. *Evans v. Int'l Paper Co.*, 936 F.3d 183, 193 (4th Cir. 2019). Based on the undisputed facts, Plaintiff cannot demonstrate that she was constructively terminated.

Plaintiff's working conditions were not "intolerable" when she resigned in March 2019. Rather, she testified that she was constructively discharged because "it was clear to [her]" that her colleagues "did not want [her] there." Ex. 6 at 111:7-21. Plaintiff is mistaken in her "understanding of what a constructive discharge is," which to her means "you are no longer welcome to work in an environment." *Id.* at 112:14-18. But the crucial inquiry for this Court's "intolerability" review are frequency and severity. *Evans*, 936 F.3d at 193. The more continuous and egregious the conduct, the more likely it is "intolerable." *Id.* For the last seven months of her employment before her voluntary transfer, Plaintiff teleworked and did not see anyone from the office. Ex. 2, ¶¶ 39, 42; Ex. 3, ¶¶ 93-94. After mid-August, 2018, she did not communicate or meet with her alleged harasser, who was fully

removed from her chain of command. Ex. 2, ¶ 42.; Ex. 3, ¶ 94; Ex. 36, Second Decl. of Anthony Martinez; Ex. 6 at 93:3-9. Plaintiff's only contact with the First Assistant while on telework was being copied on one work email sent by him when he replied all on a client email. Ex. 6 at 92:5-20.

Plaintiff's subjective belief that she was harassed before she began teleworking is insufficient to establish any violation, much less to show that she was subjected to intolerable working conditions at the time she resigned several months later. *See Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994) ("dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions" are not "intolerable"); *Matvia v. Bald Head Island Mgmt.*, 259 F.3d 261, 273 (4th Cir. 2001) ("co-worker ostracism, denial of a management position, and the counseling received for turning in an inaccurate time card would not have compelled the reasonable person to resign"); *Triplett v. N.C. Dep't of Pub. Safety*, 2018 U.S. Dist. LEXIS 150991, at *6-8 (W.D.N.C. Sep. 5, 2018) (denying request for back pay and front pay where the plaintiff had been "removed from the environment that she deemed hostile" at the time of her resignation).

Moreover, "if a plaintiff does not resign within a reasonable time period after the alleged harassment, [s]he was not constructively discharged." *Landrau-Romero v. Banco Popular De P.R.*, 212 F.3d 607, 613 (1st Cir. 2000); *Montero v. AGCO Corp.*, 192 F.3d 856, 861 (9th Cir. 1999) (no constructive discharge where alleged "sexually harassing behavior had ceased three to four months before" plaintiff resigned). Here, although Plaintiff decided to leave the FDO in November 2018, she did not in fact resign until almost four months later. *See* Ex. 26, Email from Caryn Devins to Amaal Scroggins (Nov. 26, 2018) (Plaintiff stating on November 26, 2018 that she had been "constructively discharged" and was seeking to leave the FDO). Asked why she waited until March 2019 to resign, Plaintiff testified that she "didn't want to leave and not have a job" and that she "was trying to figure out if there was a way to get employment elsewhere." Ex. 6 at 112:19-25. But a "plaintiff who begins 'searching for another job while remaining employed with the defendant militates against a constructive discharge claim.'" *Russell v. Cty. of Rockland*, 2017 U.S. Dist. LEXIS 116771, at *15 (S.D.N.Y. July 26, 2017); *see also Baptiste v. Cushman & Wakefield*, 2007 U.S. Dist. LEXIS 19784, *35-36 (S.D.N.Y. 2007) (no constructive discharge where employee began looking for work months before resigning). Plaintiff

cannot establish that she was constructively discharged and is thus ineligible to recover front pay.

### 2. Plaintiff's conduct is an additional bar to front pay.

Front pay is also legally unavailable because of Plaintiff's own conduct. Plaintiff made over a dozen secret recordings of colleagues while at the FDO. *See* Ex. 24, Pl.'s Privilege Log; Ex. 6 at 131:18-133:6. These recordings began on August 3, 2018, and continued through the date she resigned, March 15, 2019. *See* Ex. 24, Pl.'s Privilege Log; Compl. ¶ 464. She recorded not just meetings related to her EDR complaint, but also "All Staff" and other "team meetings" within the FDO. *See* Ex. 24, Pl.'s Privilege Log at 2, 4. The recordings undisputedly contain privileged FDO client information, *id.*, as Plaintiff herself admitted during her deposition, Ex. 6, at 135:4-13. Further, after Plaintiff left the FDO, she retained both the recordings, *id.*, and work e-mails containing privileged client communications, *id.* at 151:18-152:1.

Plaintiff's retention of privileged information arguably violates the confidentiality provision of the FDO Employee Handbook, which states that: "Client information is confidential and can be used for very limited purposes only." Ex. 24, Employee Handbook, § 5.18. Further: "The removal of any document from the Defender's Office, except for official, authorized use, is also prohibited." *Id.* Here, Plaintiff not only had no official or authorized reason to record meetings containing privileged client information, but she also then removed those recordings and privileged client emails from the FDO for other than official government purposes—in contravention of FDO policy, *see id.*, and likely also the Federal Records Act.[3] Not only does this raise the specter of misconduct for violating the confidentiality policy, but the secret nature of the recordings "also undermines the trust between colleagues necessary to the [FDO's] team approach." Ex. 24, Dec. of John G. Baker, ¶¶ 11, 13-14.

---

[3] *See* 44 U.S.C. § 3106 (prohibiting the removal of federal records); 44 U.S.C. § 3301(a)(1)(A) (defining a "record" as "all recorded information . . . made or received by a Federal agency under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency"); *see also* National Archives, Federal Records Management, *What Do Government Employees Need to Do When Leaving Federal Service?*, *available at* https://www.archives.gov/records-mgmt/publications/documenting-your-public-service.html#:~:text=Federal%20records%20must%20be%20maintained,by%20officials%20from%20your%20agency (explaining that departing employees may only take copies of federal records that are already publicly available, subject to each agency's review and approval, and that do not contain Privacy Act information).

Moreover, her use of privileged client material for her own purposes reveals a "disregard for the sanctity of the attorney-client relationship." *Id.* ¶ 14.

Plaintiff's retention of confidential information is covered by several provisions in the Employee Handbook's "Disciplinary Actions" section, pursuant to any one of which she could have been subject to potential discipline, including removal, if she were still an FDO employee. *Id.* ¶ 15. For example, her personal use of privileged materials and removal of those materials from the Office, raises a question of whether she violated the confidentiality policy, "[m]isuse[d]" federal records, or "discredit[ed]" the office. *Id.* ¶ 15. Her secret recordings of FDO colleagues without their consent demonstrates, at the very least, "[d]iscourteous treatment . . . of other employees". *Id.* Accordingly, the current Federal Defender has determined that she is ineligible for reinstatement. *Id.* ¶¶ 13, 16. Because Plaintiff is ineligible for reinstatement due to her own conduct, it would be inequitable to award her front pay here. *See, e.g., McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 361–62, (1995) ("[N]either reinstatement nor front pay is an appropriate remedy" where "[i]t would be both inequitable and pointless to order the reinstatement of someone the employer would have terminated, and will terminate, in any event and upon lawful grounds"); *Sellers v. Mineta*, 358 F.3d 1058, 1060, 1064-65 (8th Cir. 2004) (recognizing that if the FAA could prove that the employee's termination at a subsequent employer for processing a false loan application "made her unsuitable for reinstatement as an air traffic controller" then reinstatement would be unavailable and front pay may not be appropriate); *Jordan v. StoneMor Partners L.P.*, 2018 WL 1074492, at *14 (W.D. Va. Feb. 27, 2018) (granting summary judgment to employer and denying reinstatement and front pay where the employer discovered after the employee's termination that she had been previously convicted of crime). For all these reasons, Plaintiff is precluded as a matter of law from receiving front pay.[4]

Because none of Plaintiff's requested relief is available to her, this Court cannot redress Plaintiff's claims. *Lujan*, 504 U.S. at 561; *see also Bloch v. Exec. Off. of the President*, 164 F. Supp. 3d 841,

---

[4] Defendants reserve the right to make the argument that Plaintiff is ineligible for reinstatement and front pay because of the recordings referenced in the Court's recent favorable ruling on Defendants' Motion to Strike, ECF No. 233, once Defendants have completed additional discovery on this topic.

849 (E.D. Va. 2016) (dismissing constitutional claim because "no relief [wa]s available" at the time of decision). This Court should accordingly enter summary judgment in favor of Defendants.

## II.    Defendants Did Not Violate Plaintiff's Procedural Due Process Rights.

The Fourth Circuit held that Plaintiff could succeed on her as-applied procedural due process challenge to the EDR Plan if she could show that she was "led to believe that the [Defender] would be the final decisionmaker" for her EDR claim. *Strickland*, 32 F.4th at 356. The undisputed evidence in the record shows that the Defender would not be the final decisionmaker, nor did Plaintiff reasonably believe that he would be. Thus, Defendants did not violate Plaintiff's due process rights.

The EDR Plan, which Plaintiff testified that she "carefully" read "multiple times" during her EDR process, Ex. 6 at 15:11-16:2, plainly states that the presiding judicial officer—not the Defender— is the "final decisionmaker" on EDR claims. The Plan provides that a presiding judicial officer oversees a hearing on a complaint, decides whether the Plan has been violated, and if so, orders an appropriate remedy. After a formal EDR complaint is filed under Chapter X, the "Chief Judge or designee ('judicial officer') shall hold a hearing on the merits" of that complaint, unless he dismisses the complaint or determines that no material or factual dispute exists. Ex. 12, Ch. X § 10(B)(1). "Judicial officer" is defined as "a Circuit Judge (including Senior Circuit Judge) of the United States Court of Appeals for the Fourth Circuit appointed pursuant to Article III of the United States Constitution." *Id.*, Ch. I § 3(D). The Plan also states that, "where the *presiding judicial officer* finds that the complainant has established by a preponderance of the evidence that a substantive right protected by this Plan has been violated," "remedies may be provided in accordance with § 12 of this Chapter[.]" *Id.*, Ch. X § 10(B)(2)(f) (emphasis added). And under § 12, "[w]here *judicial officers* acting pursuant to § 10 or § 11 of this Plan find that a substantive right protected by this Plan has been violated, *they* may order a necessary and appropriate remedy." *Id.*, Ch. X § 12(A) (emphasis added).

Plaintiff testified that, during her EDR process, she "thought a presiding judicial would be the officer at the final hearing." Ex. 6 at 18:5-9; *see also id.* 17:18-21 (testifying that, "under the terms of the plan," a judge would serve as the presiding judicial officer); *id.* 19:3-4 (testifying that she believed that if she proceeded to the complaint and hearing stage of Chapter X, "there would be a presiding .

14

. . judicial officer" conducting a hearing and deciding on remedies); *id.* 24:8-11 (testifying that, during her mediation, she understood a hearing officer on her claims would be a judge). Given Plaintiff's familiarity with the Plan and her sworn testimony that she believed a judicial officer would oversee her Chapter X EDR proceedings if she filed a formal complaint, she did not and could not have reasonably believed that the Defender would have been the final decisionmaker on her claims.

Further, Plaintiff was repeatedly told by a staff member in the AO's Office of Fair Employment Practices that the Defender had no authority to decide her EDR claims. On September 13, 2018, the staff member told Plaintiff that "the Federal Public Defender is not going to have any authority in terms of how the matter is resolved in an EDR setting," because "he will not be the mediator, nor will he make the final decision before the court." Ex. 27, Conversation 180813_1633 Tr. at 9:15-22. Later, Plaintiff asked her: "And the final decision will be made by who?" *Id.* 57:3-4. The staff member responded: "It will be whoever is the presiding judicial officer." *Id.* 57:5-8. The staff member further explained that the Defender was "not going to have the authority to decide your case" and "not going to have the authority to render a decision." *Id.* 37:1-7. The Circuit Executive also told Plaintiff that the Defender would not decide the merits of her EDR claims. *See, e.g.*, Ex. 28, Conversation 190117_1621 Tr. at 37:19-38:2 (if Plaintiff filed a formal complaint, "Judge Gregory will appoint a *judicial officer* and there will be findings on the merits"). Based on these unambiguous statements by both the EDR Coordinator and the AO staff member, Plaintiff could not reasonably conclude that the final decisionmaker would be the Defender and not the presiding judicial officer.

Plaintiff nevertheless claims her belief came from a handful of comments made by the Mediator and the Judicial Integrity Officer. *See* Ex. 6 at 13:21-25. The undisputed evidence shows that neither person told Plaintiff that the Defender would be the final decisionmaker on her EDR claims. It would have been unreasonable for Plaintiff to form such a belief based only on several out-of-context remarks. *See Coker v. Trans World Airlines, Inc.*, 165 F.3d 579, 586 (7th Cir. 1999) (plaintiff could not have relied on statements "in light of her easy access to . . . ways of ascertaining the true facts").

As to the Mediator, Plaintiff relies on his statements that the Defender "was the 'decision maker' and that no hearing officer would 'micromanage' him or tell him how to do his job." Compl.

¶ 415. These statements, which occurred weeks apart, reflect only the Mediator's view that any resolution reached during *mediation* would have to be agreed to by the Defender, as the counterparty to the negotiation. On February 7, 2019, the Mediator said that the Defender was the "decision maker" during a broader discussion about the specific relief Plaintiff sought during the mediation phase of Chapter X. *See* Ex. 29, Conversation 190207_1056 Tr. at 44:14-52:4. As the Mediator told Plaintiff, since the Defender was the other party in the negotiation, he had to decide whether to accept Plaintiff's requests affecting the FDO at the mediation stage. *See id.* at 34:5-7 (explaining that, for "any resolution with you continuing to work in the Western District, he's the head and so he's got to sign off on it"); *see also* Ex. 30, Dep. of Edward G. Smith, Esq. Tr. at 70:12-23 (testifying that he "tried" to explain to Plaintiff that "the only person in that office that had the authority or the power to agree to the things that would have to be agreed to was [the Defender]").

During the February 26, 2019 mediation, the Mediator told Plaintiff that she could negotiate more granular remedies in mediation than she might obtain from a judicial officer because Plaintiff had more control over the negotiation and a judge may not want to "micromanage" the office. Ex. 31, Conversation 109226_1153 Tr. at 47:8-13 ("Therefore I think *in drafting a settlement agreement that binds [the Defender]*, you have the better ability to work these things in there, because I don't think the judge is going to micromanage this office and tell a federal defender how to do his job and run his office."). As the context reveals, in using the word "micromanage," the Mediator meant that the unit executive has a better ability to offer solutions tailored to the office, because anyone else "doesn't know the office" and "doesn't know the effect of doing these things for Plaintiff." Ex. 30 at 87:25-88:10. It is particularly implausible that Plaintiff relied on this offhand remark to mean that the Defender was the decisionmaker because the Mediator specifically told Plaintiff that the Defender "has no power" during mediation and that he is acting as a negotiating party. Ex. 31, at 22:16-:17; *see also id.* 22:17-21 (explaining that the Defender is "just the unit head and he's negotiating with me and if you removed [the Defender], there's nobody I can talk to, to resolve this, because nobody has authority to" grant her requests); *id.* 23:11-24:2 ("I've had many complaints where the unit head was the issue and they always handled the mediation" because "you can't have somebody come in and

16

defend [the Defender] in his office. [The Defender is] the only one who can do that."). The Mediator also correctly informed Plaintiff, consistent with the EDR Plan, that a presiding judicial officer would be the final decisionmaker over her EDR claims. Ex. 29 at 35:16-:20 (stating that if Plaintiff's claims weren't resolved during mediation, "you get a hearing in front of a judge"); *contra Spreen v. Brey*, 961 F.2d 109, 111-12 (7th Cir. 1992) (denying summary judgment because Defendants misled Plaintiff into resigning her employment by making "material misrepresentations to her").

As to the Judicial Integrity Officer ("JIO"), Plaintiff relies on two alleged remarks made on February 14, 2019: (1) that a presiding judicial officer "would not have the authority to order the First Assistant's termination" and (2) that it was "jurisdictional" that "Article III judges do not have the authority to 'manage' a federal defender office." Compl. ¶ 439. Assuming the JIO made these statements (which Defendants dispute), it would not be reasonable for Plaintiff to infer from them that the Defender would be the final decisionmaker on her EDR claims. Whether the presiding judicial officer has the authority to order the First Assistant's termination is wholly distinct from whether the presiding judicial officer or the Defender decides whether Plaintiff's EDR claims have merit and can be appropriately redressed. During the same conversation, the JIO told Plaintiff that "under the EDR Plan that applied to her," the presiding judicial officer could order remedies contemplated under the EDR Plan against any employing office, including a Federal Public Defender organization, designed to make her 'whole[.]'" Ex. 44, Second Decl. of Jill Langley, ¶ 8. Whether Article III judges can "manage" a federal defender office does not bear on who adjudicates Plaintiff's EDR claims. To the extent Plaintiff subjectively believed these statements established that the Defender would be the final decisionmaker if she filed a formal complaint under Chapter X—in conflict with the terms of the EDR Plan and what Plaintiff had been told by the EDR Coordinator or the staff member—she could have sought clarification, which she inexplicably thought was "unnecessary." *See* Ex. 6 at 33:20-21.

Plaintiff takes the statements from the Mediator and the JIO out of context and ignores that both individuals otherwise told Plaintiff that a judicial officer would be the final decisionmaker on her claims. These remarks in no way suggest that "continuing with the EDR process would be futile," *Strickland*, 32 F.4th at 356. Plaintiff thus made a voluntary choice not to file a formal complaint under

17

Chapter X and avail herself of that aspect of the EDR Plan's extensive process. Accordingly, Defendants did not deprive her of any process at all. *See Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 172-78 (4th Cir. 1988) (holding that an employee who resigned "was not 'deprived' of any protected interest in his employment by the state" and that "effectively disposes of his due process claim"). And the process that Plaintiff did receive under Chapter X of the EDR Plan—such as the counseling and mediation undertaken to resolve her claims—satisfy constitutional procedural due process standards. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); *see also Strickland*, 32 F.4th at 354 (upholding the EDR Plan as facially valid). The Court should therefore enter summary judgment for Defendants on Plaintiff's procedural due process claim.

## III. Defendants Did Not Violate the Equal Protection Clause.

The Fourth Circuit identified the four elements of Plaintiff's equal protection claim. *Strickland*, 32 F.4th at 359. Plaintiff must show, among other things, that she "was subjected to sexual harassment by another employee or supervisor;" and that "supervisory officials and/or officials responsible for overseeing the court's EDR plan responded to" any allegations of such harassment to which they were alerted "with deliberate indifference[.]" *Id.* Plaintiff cannot establish either of these two necessary elements as a matter of law.[5]

### A. Plaintiff did not suffer sexual harassment.

Actionable sexual harassment can be based on a hostile work environment or quid pro quo theory. *See Okoli v. City of Balt.*, 648 F.3d 216, 220, 222 (4th Cir. 2011). Neither was present here.

#### 1. There was no hostile work environment.

Under the hostile work environment theory, the plaintiff must show: "'(1) unwelcome conduct; (2) that is based on the plaintiff's sex[;] (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer.'" *Id.* at 220. Here, Plaintiff's claim fails.

---

[5] Defendants also dispute that Plaintiff has met any of the other elements of a deliberate indifference claim, and they reserve the right to raise further arguments on these elements in opposition to Plaintiff's summary judgment motion or at trial.

18

First, Plaintiff lacks evidence to support a finding that the First Assistant's conduct was unwanted. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986) ("inquiry is whether [plaintiff] by her conduct indicated that the alleged sexual advances were unwelcome[]"); *Shan Zhao v. Kaleida Health*, 2007 U.S. Dist. LEXIS 103253, at *8 (W.D.N.Y. Aug. 8, 2007) ("When welcomeness is at issue . . . . [t]riers of fact rely on objective evidence, rather than subjective, uncommunicated feelings") (quotation omitted). Plaintiff points to a small number of interactions between her and the First Assistant to support her sexual harassment allegations. She first references three occasions in June 2018, when, in the course of email communications about work topics, the First Assistant offered to get a drink with Plaintiff, each time giving her the option to decline. Ex. 6 at 38:10-13, 47:2-49:11; Ex. 9 at US90 ("I'm happy to offer a drink and an ear if you need one, though I get the feeling you are not comfortable talking to me about it. Might I suggest Mary Ellen?"); *id.* at US91 ("I'm going to get this filed and get a celebratory drink. You're welcome to join me, but if I recall correctly, you have an appellate brief to write"); *Id.* at US93 ("We can do it over lunch, or cut out early one day for a celebratory post-Davis drink, or we can just do it in the office").

The evidence does not suggest those emails were unwelcome. As Plaintiff conceded, it was not unusual for attorneys in the FDO to get drinks together. Ex. 6 at 54:7-10. Plaintiff and the First Assistant drank alcohol together on several prior occasions, including at least one time at Plaintiff's invitation. Ex. 6 at 50:5-53:16; Ex. 7, ¶¶ 3-4. Also, in March 2018, Plaintiff sent the First Assistant multiple photos of a bottle of gin. Ex. 32 at US2902-04 (Text messages exchanged between J.P. Davis and Caryn Devins). When the First Assistant responded, "now we have to throw down for real," Plaintiff replied, "Yeah but you have to get a full bottle first :)" *Id.*; Ex. 6 at 54:16-55:25 (Plaintiff testifying it was possible that statement meant she was interested in getting a drink with the First Assistant). In May 2018, Plaintiff said to the First Assistant, "anytime you want to buy me lunch or a drink, I'll take it," or words to that effect. Ex. 6 at 46:22-47:1; Ex. 2 ¶ 20(f). Plaintiff testified that she had felt comfortable drinking with the First Assistant, had a friendly relationship with him, and never told him she was no longer comfortable drinking with him. Ex. 6 at 56:1-15; 75:11-18; Ex. 7, ¶ 4.

Plaintiff also complains that the First Assistant requested to meet with her on June 29, 2018.

19

Ex. 6 at 49:12-21. The meeting was to discuss work topics, Ex. 7, ¶ 5, and Plaintiff had not told the First Assistant that she was uncomfortable meeting with him, *id.* ¶ 6. Around the same time (June 2018) Plaintiff herself requested to meet with the First Assistant to discuss work topics, on multiple occasions. Exs. 33, 34, Emails exchanged between J.P. Davis and Caryn Devins (June 2018).

Next, Plaintiff complains that the First Assistant offered her a ride home on June 21, 2018. It was raining at the time, and Plaintiff was planning to ride her bike home. Ex. 2 ¶ 30. The First Assistant texted Plaintiff an offer to drive her home, and then briefly waited in the lobby because Plaintiff had not responded to his text, and it was still raining heavily. *Id.* ¶30. Notably, Plaintiff had requested the First Assistant give her rides on numerous previous occasions, and the First Assistant had no reason to suspect this ride offer would be unwanted. Ex. 6 at 66:6-67:13; Ex. 7 ¶ 3.

Plaintiff also contends that an email with the subject line "mas dinero" from the First Assistant constituted a sexual advance. Ex. 9 at US89; Ex. 6 at 56:24-58:11. The email was in response to Plaintiff's demand that she receive more money or she would quit. *Id.* at 45:15-46:17; Ex. 2 ¶¶ 20-22. The email's use of the phrase "pay-for-stay" was a joking reference to Plaintiff's own demand for an increase in *pay* in order to *stay* at the FDO. *Id.* ¶ 22. Plaintiff's interpretation of that email as having a sexual connotation is inexplicable and unreasonable. *See* Ex. 6 at 58:18-60:1 (conceding that words used in the email on their own do not have a sexual connotation); *id.* at 60:20-24. Plaintiff's current interpretation of the email is also inconsistent with her interpretation when she received it. Then, she believed it meant that the First Assistant "would raise [her] pay if [she] stayed in Charlotte." *Id.* at 61:7-62:10; Ex. 35, Email from Caryn Devins to Nancy Dunham (Aug. 6, 2018) at US1074.

Second, Plaintiff lacks evidence to support a finding that the First Assistant's conduct was based on Plaintiff's sex. No evidence suggests that the alleged conduct connoted a romantic or sexual interest. Moreover, the First Assistant was Plaintiff's mentor, Ex. 2, ¶ 3, so it is reasonable that he would offer to spend time with her and discuss her concerns about work, including pay.

Third, as a matter of law, the First Assistant's alleged conduct was neither severe nor pervasive. As discussed, the alleged harassing conduct is that the First Assistant (1) offered to get a drink with Plaintiff on three occasions; (2) requested to meet with her to discuss a work-related issue; (3) offered

her a ride home when it was raining; and (4) informed her that the FDO could potentially increase her pay to retain her as an employee. Ex. 6 at 38:3-17. There is no evidence to support a conclusion that this conduct was sexual in nature or otherwise inappropriate. Rather, the conduct involved ordinary workplace interactions and falls far short of the actually offensive conduct that courts routinely find to be not severe or pervasive as a matter of law. For example, in *Hopkins v. Baltimore Gas & Electric Company*, 77 F.3d 745, 753-54 (4th Cir. 1996), *abrogated on other grounds by Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), the Fourth Circuit found a supervisor's conduct towards a subordinate not sufficiently severe or pervasive to constitute actionable sexual harassment even though the supervisor allegedly made repeated sexual innuendos, regularly commented on the plaintiff's appearance, frequently entered the bathroom when the plaintiff was there alone, asked the plaintiff about his sexual activity, held a magnifying glass over the plaintiff's crotch and asked "where is it," and kissed the plaintiff, among other conduct. *Id.* at 747-48. In another case, the Fourth Circuit ruled that a supervisor asking a subordinate if he wanted to get a hotel room at a medical conference and wondering aloud what the subordinate would "taste like" were neither severe nor pervasive. *Pesso v. Montgomery Gen. Hosp.*, 1999 U.S. App. LEXIS 10207, at *5-6 (4th Cir. May 24, 1999). Numerous decisions of other courts likewise show that objectively offensive conduct (in contrast to the inoffensive conduct alleged here) has been held neither severe nor pervasive.[6]

---

[6] *E.g., Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998) (harassment claim failed despite allegations that co-worker commented that plaintiff had been voted the "sleekest ass" in the office and had deliberately brushed plaintiff's breasts with papers); *EEOC v. Appalachian Power Co.*, 2019 U.S. Dist. LEXIS 163117, at *16 (W.D. Va. Sep. 24, 2019) (evidence that supervisor gave plaintiff gifts; told her he had a crush on her, loved her, and wanted to leave his wife for her; texted her that he wanted to take her out and treat her like a queen; and fired her was not severe or pervasive because "expressing romantic interest in a coworker or subordinate or asking them out is not enough on its own to establish a Title VII hostile environment claim"); *Gregg v. N.Y. State Dep't of Tax'n & Fin.*, 1999 U.S. Dist. LEXIS 5415, at *35-36 (S.D.N.Y. Apr. 19, 1999) (finding ten to fifteen allegedly inappropriate conversations, four instances of allegedly offensive touching, and repeated invitations to meals and drinks over three to four months not sufficiently severe or pervasive); *Akonji v. Unity Healthcare, Inc.*, 517 F. Supp. 2d 83, 97-99 (D.D.C. 2007) (supervisor's acts of touching plaintiff's buttocks and thigh, trying to kiss her, calling her beautiful, and asking her to accompany him on weekend trip were "not 'sufficiently severe or pervasive to alter the conditions of [plaintiff's] employment'").

## 2. There was no quid pro quo harassment.

The key distinction between hostile environment and quid pro quo claims is whether the employee suffered some tangible employment action as a result of the harassment. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 751 (1998). "Cases based on threats which are carried out are referred to often as quid pro quo cases, as distinct from bothersome attentions or sexual remarks that are sufficiently severe or pervasive to create a hostile work environment." *Id.*; *see also Okoli*, 648 F.3d at 222 (listing elements of quid pro quo claim). A plaintiff must prove a causal connection between his or her rejection of unwelcome sexual advances and a tangible employment action. *See Johnson v. Donohoe*, 2013 U.S. Dist. LEXIS 185168, at *18-19 (D.S.C. Nov. 26, 2013).

Here, Plaintiff's quid pro quo claim fails, first, because Plaintiff was not subject to unwelcome sexual harassment and because the First Assistant's conduct was not based on Plaintiff's sex, as discussed above. In addition, Plaintiff's response to the conduct did not result in any tangible employment action. "Absent proof of a tangible employment action being taken against her, [Plaintiff] cannot establish the 'quid' in her claim of quid pro quo sexual harassment." *Riffle v. Sports Auth., Inc.*, 1999 U.S. Dist. LEXIS 14588, at *16 (D. Md. July 30, 1999). Plaintiff contends that the First Assistant retaliated against her for not submitting to his alleged advances in three ways. First, she claims he interfered with her progression to an AFD position by being "discouraging of [her] for trying to get trial experience[.]" *Id.* at 38:16-39:15. Defendants dispute that the First Assistant discouraged her from seeking trial experience, but even if true, discouraging comments do not amount to a tangible employment action. *Ellerth*, 524 U.S. at 761 (tangible employment action usually "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits").

Second, Plaintiff claims that she was not considered for a promotion to GS-15 "or any other salary increases for [her] excellent performance." Ex. 6 at 39:4-19. But the First Assistant was not involved in any decisions about Plaintiff's pay, Ex. 2, ¶ 41, so there is no causal connection between any alleged harassment and any pay decisions. *See Ellis v. Dir., CIA*, 1999 U.S. App. LEXIS 21638, at *8-9 (4th Cir. Sep. 10, 1999) (employment action was not related to plaintiff's denial of sexual advances

because the alleged harasser "had no role" in the employment decision).[7] Indeed, the First Assistant did not have the authority to make pay decisions, which were exclusively the responsibility of the Defender. Ex. 2, ¶ 2; Ex. 3 ¶ 23. That too undermines Plaintiff's claim. *See Farley v. Am. Cast Iron Pipe Co.*, 115 F.3d 1548, 1552-53 (11th Cir. 1997) (alleged harasser's lack of authority to terminate the plaintiff's employment precluded a quid pro quo claim based on termination); *Atkins v. Comp. Scis. Corp.*, 264 F. Supp. 2d 404, 412 (E.D. Va. 2003) (same).

In any event, there is no evidence suggesting Plaintiff was improperly denied a promotion or pay raise. In August 2018, Plaintiff was reclassified—at her request—from a R&W Specialist to an AFD. Ex. 37, Email from James Ishida to Anthony Martinez (June 12, 2019) at US622; Ex. 3, ¶¶ 27-34; Ex. 1, ¶¶ 17-22. That reclassification moved Plaintiff from the GS scale to the AD system, so Plaintiff was not eligible for a promotion to GS 15 as an AFD. Ex. 1, ¶ 19. Plaintiff's pay as an AFD was the maximum the Defender was authorized to approve. *Id.* ¶ 22. Plaintiff has acknowledged that her reclassification to an AFD was done for a non-discriminatory and non-retaliatory reason—that it benefitted the FDO for purposes of case weight measurement. Ex. 6 at 97:5-21.

Third, Plaintiff claims that the First Assistant "disparaged" and "criticized" her to members of the management team because Plaintiff attempted to cancel her attendance at a client interview. Ex. 6 at 39:20-40:5. To be sure, the First Assistant felt Plaintiff had acted inappropriately when Plaintiff cancelled the commitment. Ex. 2, ¶ 25. But it is well-settled that criticism does not constitute an adverse employment action. *See Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 570 (2d Cir. 2011) ("[C]riticism of an employee . . . is not an adverse employment action."); *Jones-Davidson v. Prince George's Cty. Cmty. Coll.*, No. 13-cv-2284-AW, 2013 U.S. Dist. LEXIS 159422, at *14 (D. Md. Nov. 7, 2013) ("[D]isparaging remarks made by a supervisor do not state an adverse employment action.").

**B. Plaintiff did not experience deliberate indifference.**

No reasonable factfinder could conclude that Defendants' undisputed actions in response to

---

[7] *See also Idusuyi v. Tenn. Dep't of Children's Servs.*, 30 F. App'x 398, 401 (6th Cir. 2002) (no causal relationship between refusal of sexual advances and adverse employment action when alleged harasser had no role in making the adverse decision); *Highlander v. K.F.C. Nat'l Mgmt. Co.*, 805 F.2d 644, 649 (6th Cir. 1986) (same); *Ponticelli v. Zurich Am. Ins. Grp.*, 16 F. Supp. 2d 414, 434 (S.D.N.Y. 1998) (same).

Plaintiff's complaints of sexual harassment meet the high standard required for a showing of deliberate indifference. *See Strickland*, 32 F.4th at 359. For that reason alone, Defendants are entitled to summary judgment on Plaintiff's equal protection claim. "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Baynard v. Malone*, 268 F.3d 228, 236 (4th Cir. 2001) (citations omitted). "Actions that are in hindsight unfortunate or even imprudent will not suffice." *Id.* Importantly, as relevant here, the fact that a plaintiff "advocated for stronger remedial measures" does not render official actions "clearly unreasonable" sufficient to support a finding of deliberate indifference. *S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty.*, 819 F.3d 69, 77 (4th Cir. 2016).

After Plaintiff informed the Federal Defender of her allegations of sexual harassment in August 2018, Ex. 37 at US622, the Federal Defender took prompt action to investigate her allegations. He expeditiously reported Plaintiff's allegations to the EDR Coordinator, triggering an investigation under Chapter IX, *id.*, appointed an independent investigator, Ex. 42, Email from Heather Beam to James Ishida (Aug. 15, 2018), took Plaintiff entirely out of the First Assistant's chain of command, Ex. 3, ¶ 94; Ex. 36, reclassified Plaintiff to an Assistant Federal Public Defender at her request,[8] Ex. 37 at US622; Ex. 6 at 123:25-124:3, instructed the First Assistant to cease contact with Plaintiff, Ex. 11, allowed Plaintiff to telework, Ex. 4 at 236:20-22, and participated in mediation, even offering to give Plaintiff his own office in Asheville, Ex. 30 at 46:4-16. When, as here, supervisory officials thoroughly investigated allegations and separated the alleged harasser from the plaintiff, courts routinely find that summary judgment is appropriate. *See, e.g. Stiles ex rel. D.S. v. Grainger Cnty., Tenn.*, 819 F.3d 834, 849 (6th Cir. 2016) (holding there was no "triable issue as to whether Defendants exhibited deliberate indifference" when the school "investigated promptly," "disciplined students found guilty of wrongdoing," and separated the alleged harasser from the purported victim); *Greene v. Friendship Pub. Charter Sch., Inc.*, 2019 WL 918307 at *9–12 (D.D.C. Feb. 25, 2019) (similar).

The Circuit Executive also acted promptly to address Plaintiff's complaints. At a minimum, he facilitated the investigation of Plaintiff's allegations, Ex. 42, appointed a mediator, Ex. 43, Email

---

[8] Plaintiff claims that, despite her affirmative request, this conversion amounted to retaliation. For the reasons explained in III.A.2, *supra*, no reasonable factfinder could agree.

from James Ishida to Ed Smith (Jan. 31, 2019), spoke with Plaintiff repeatedly and at length about the EDR process, Ex. 38, Conversation 180905_1042 Tr., Ex. 15, ¶ 16, discussed proposed solutions with the Federal Defender, *id.*, and attempted to help Plaintiff seek employment outside of the FDO, Ex. 39, Emails from Caryn Devins to James Ishida (Jan. 2019). Courts have rejected claims of deliberate indifference when administrators have done less than the Circuit Executive did here. *See, e.g. Frederick v. Simpson College*, 149 F. Supp. 2d 826, 840 (S.D. Iowa 2001) (finding no deliberate indifference when College conducted a "prompt" but "subpar" investigation by investigator who was not "adequately trained to handle" the complaint); *S.T. v. Yakima Sch. Dist. No.7*, Case No. 11-cv-1385, 2013 WL 807197 at *8 (E.D. Wash. Mar. 5, 2013) (finding no issue of fact as to deliberate indifference when Defendants "took prompt steps to investigate" and followed the "set of policies and procedures" in place for sexual harassment investigations," while the plaintiffs "chose not to avail" themselves of a formal hearing and appeal after the investigation."). Indeed, Plaintiff at her deposition could not present a coherent basis for her belief that the Circuit Executive and Chief Judge Gregory violated her constitutional rights. Ex. 6 at 105:4-109:15.[9]

Plaintiff would have accepted nothing less than the First Assistant's termination and the Federal Defender's disqualification from the EDR process in response to her sexual harassment allegations. Ex. 6 at 35:23-36:5, 109:2-12.[10] But her preferences are irrelevant in determining whether Defendants' conduct was "clearly unreasonable." *S.B. ex rel. A.L.*, 819 F.3d at 77.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' Motion.

---

[9] The claims against Chief Judge Gregory and the Circuit Executive, along with the claims against the other non-entity defendants, should be dismissed as duplicative of claims against the entities. *See Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004).

[10] The Chief Judge's denial of Plaintiff's motion to disqualify the Federal Defender was reasonable because at no point during the EDR process was the Defender serving in a neutral role, such as EDR coordinator, investigator, counselor, mediator, or presiding judicial officer. During the mediation, the Defender represented the named respondent employing office, which is an interested party to an EDR matter. *See* Ex. 40, Defs.' Obj. & Resp. to Pl.'s Fourth Set of Interrogs. at 18. The Defender participated in the investigation only as a witness and the EDR Coordinator received the investigation report, not the Defender. *See, e.g.*, Ex. 41, Emails from James Ishida and Caryn Devins (Sept. 2018). And Plaintiff never filed a formal complaint under Chapter X.

Dated: June 1, 2023

Respectfully submitted,

BRIAN BOYNTON
Principal Deputy Assistant Attorney General

CARLOTTA P. WELLS
Assistant Branch Director

JOSHUA KOLSKY
Senior Trial Counsel

*/s/ Rachael L. Westmoreland*
MADELINE MCMAHON
DANIELLE YOUNG
RACHAEL WESTMORELAND (GA Bar No. 539498)
Trial Attorneys, Federal Programs Branch
U.S. Department of Justice, Civil Division
1100 L Street, NW
Washington, DC 20005
Tel.: (202) 514-1280
Email: rachael.westmoreland@usdoj.gov

*Counsel for Defendants*