# Exhibit 6

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CASE NUMBER 1:20CV66


CARYN DEVINS STRICKLAND,

            Plaintiff,

        v.

UNITED STATES OF AMERICA, et al.,

            Defendants.
_____


- - - - - - - - - - - - - - - - -
Videotaped Deposition

of

CARYN DEVINS STRICKLAND

- - - - - - - - - - - - - - - -


        The videotaped deposition of CARYN DEVINS STRICKLAND
was taken by the Defendants on Tuesday, the 25th day of April,
2023, commencing at 9:15 a.m., at the United States Attorney's
Office, located at 150 Fayetteville Street, Raleigh, North
Carolina.


PATRICIA C. ELLIOTT
Verbatim Reporter

1   defendants violated your -- your due process rights, the specific
2   things that the defendants did to violate your due process
3   rights.
4        A.   Well, I think, in a nutshell, they subjected me to a
5   fundamentally unfair process for redressing my claims.
6        Q.   Is there anything else that they did that you believe
7   violated your due process rights?
8        A.   I believe they deprived me of a remedy for the
9   discrimination I suffered.
10       Q.   And then is there anything else or any other ways that
11  you believe the defendants violated your due process rights?
12       A.   I don't know if I recall sitting here, but I think
13  that's the -- my overarching belief.
14       Q.   Okay.  Now, you said that the defendants subjected you
15  to a fundamentally unfair process.  What -- what process are you
16  referring to?
17       A.   The EDR process,
18       Q.   The EDR process for the Fourth Circuit?
19       A.   Yes.
20       Q.   And you've alleged in this case that judiciary
21  officials led you to believe that Tony Martinez would be the
22  final decision maker in the EDR process, correct?
23       A.   Yes.
24       Q.   Who told you that?
25       A.   Ed Smith and Jill Langley.

1          Q.    Let me mark our first exhibit, Exhibit 1.

2                 [GOVERNMENT EXHIBIT NO. 1 MARKED

3                     FOR IDENTIFICATION]

4          A.    Thank you.

5          Q.    Ms. Strickland, the court reporter has handed you

6     what's been marked as Exhibit 1.  Do you recognize this document?

7          A.    Yes.

8          Q.    This is the EDR plan for the Fourth Circuit dated

9     January 2013, correct?

10         A.    That's what it looks to be.

11         Q.    When did you first learn of the Fourth Circuit's EDR

12    plan?

13         A.    From what I recall, I believe it would have been in

14    about July of 2018.

15         Q.    And you've read the EDR plan previously, correct?

16         A.    Previously -- what do you mean by previously?

17         Q.    Well, when did you -- when -- when did you first read

18    the EDR plan?

19         A.    Probably around that time.  I don't specifically

20    remember.

21         Q.    But it was while you were employed by the Federal

22    Defender's Office?

23         A.    Yes.

24         Q.    Did you read it multiple times?

25         A.    I'm sure I probably did.

1          Q.   Did you read it carefully?

2          A.   Yes.

3          Q.   Would you agree that Page 14 -- Page 14 states, "The

4     presiding judicial officer shall hold a hearing on the merits of

5     the complaint unless he or she determines that no material

6     factual dispute exists"?

7          A.   Can you point me exactly what --

8          Q.   I'm sorry.  Yeah.  That's towards the -- the first

9     paragraph on Page 14, under Section 1, "Presiding Judicial

10    Officer."

11         A.   Okay.  Yeah, I'll just take a second to read it.

12         Q.   Sure.

13         A.   (Witness examines document.)  Okay.

14         Q.   And so would you agree that the EDR plan states, in

15    part, "The presiding judicial officer shall hold a hearing on the

16    merits of the complaint"?

17         A.   That is what it states, yes.

18         Q.   And then looking down at the bottom of that page,

19    Subparagraph f., it states, "Remedies may be provided in

20    accordance with Section 12 of this chapter where the presiding

21    judicial officer finds that the complainant has established by a

22    preponderance of the evidence that a substantive right protected

23    by this plan has been violated."

24              Do you see that?

25         A.   Yes.

1      Q.    What do you understand the term "presiding judicial

2    officer," as used in the EDR plan, to refer to?

3      A.    I'm not sure.

4      Q.    Do you know if the term "judicial officer" is defined

5    in the EDR plan?

6      A.    Sitting here, I don't.

7      Q.    Can you take a look at Page 2 of the EDR plan,

8    Paragraph D.?  Do you see where it says, "The term 'judicial

9    officer' means a circuit judge (including Senior Circuit Judge)

10   of the United States Court of Appeals for the Fourth Circuit

11   appointed pursuant to Article Three of the United States

12   Constitution"?

13     A.    Yes, I see that.

14     Q.    Does that appear to be a definition of the term

15   "judicial officer"?

16     A.    It appears to be a definition of the term "judicial

17   officer."

18     Q.    Is there anything about the term "presiding judicial

19   officer" used in the EDR plan that suggests a judge would serve

20   in that role?

21     A.    By the -- under the terms of the plan.

22     Q.    And even just the phrase itself, presiding judicial

23   officer, does the word "judicial" suggest that that would be a

24   judge?

25     A.    Not necessarily.

1       Q.    Why's that?

2       A.    Because I think, in theory, you could have an officer

3  who is not a judge serve as a judicial officer.

4       Q.    At the time you left the Federal Defender's Office in

5  March 2019, what was your understanding of the term "presiding

6  judicial officer" as used in the EDR plan?

7       A.    At that time, I believe I would have thought a

8  presiding judicial officer would be the officer at the final

9  hearing.

10       Q.    Did you have an understanding at that time as to who

11  could serve in the role of presiding judicial officer?

12       A.    I'm trying to think.  I'm sorry.

13       Q.    Sure.

14       A.    No, I'm not sure that I really knew who it would be.

15       Q.    Did you have any expectation -- if you were to proceed

16  to a formal hearing under Chapter X of the plan, did you have any

17  expectation as to who would serve as the presiding judicial

18  officer?

19       A.    Not specifically.

20       Q.    Did you understand -- when you left the Federal

21  Defender's Office in March 2019, did you understand that if you

22  proceeded to the complaint and hearing stage of Chapter X of the

23  plan, a presiding judicial officer would hold a hearing and

24  decide on any remedies?

25            **MS. WARREN:**  Objection, form.

 1              **BY MR. KOLSKY:**

 2       Q.    You can answer.

 3       A.    I believed there would be a presiding officer,

 4   presiding judicial officer, yes.

 5       Q.    And that that -- did you understand that that presiding

 6   judicial officer would hold a hearing and decide on any remedies?

 7              **MS. WARREN:**  Objection, form.

 8              **THE WITNESS:**  No, that was not my understanding.

 9              **BY MR. KOLSKY:**

10       Q.    Why not?

11       A.    Because what Ed and Jill led me to believe is that

12   whatever remedies existed on paper would not be available in

13   practice in a hearing.

14       Q.    Did you understand at that time that the terms of the

15   EDR plan itself provided that there would be a presiding judicial

16   officer who would conduct a hearing and decide on remedies?

17       A.    The terms of the plan, yes,

18       Q.    But -- but your understanding, based on what Ed Smith

19   and Jill Langley told you, was that that's not how it worked in

20   practice?

21       A.    Yes.

22       Q.    And we've been talking about Chapter X.  Switching to

23   Chapter IX, would you agree there is no right to a remedy under

24   Chapter IX of the EDR plan?

25       A.    I'm not sure what remedy is referring -- what you're

 1  discussing the question of who would be the hearing officer?

 2      A.   Vaguely, but I don't -- I don't remember the details.

 3      Q.   Didn't Mr. Smith say that the chief judge of the Fourth

 4  Circuit would be the hearing officer or he would designate

 5  someone else and specifically mention Judge Diaz?  Do you recall

 6  that?

 7      A.   I don't specifically recall that.

 8      Q.   You understood at that February 7th, 2019, meeting that

 9  the hearing officer would be a judge, though, didn't you?

10      A.   I understood there would be a hearing officer, yes.  I

11  think I likely believed it would be a judge.

12      Q.   Did you tell Mr. Smith that you expected Tony Martinez

13  would be the hearing officer?

14      A.   No, I don't think I ever said that.

15      Q.   Now, you requested that Tony Martinez be disqualified

16  from the EDR process, correct?

17      A.   Yes.

18      Q.   And is it correct that you submitted two requests for

19  disqualification, one in September 2018 and another in February

20  2019?

21      A.   That sounds right.

22      Q.   Okay.  Why don't we take a look at the September 2018

23  request?  That's Exhibit 2.

24                  [GOVERNMENT EXHIBIT NO. 2 MARKED

25                      FOR IDENTIFICATION]

1          So it did not strike me as unreasonable at all that

2     they would suggest that -- regardless of what the plan said on

3     paper, that because of the unique role of the federal public

4     defender office, a presiding officer would not order anything

5     because it would be perceived as micromanaging or meddling in a

6     federal public defender's business.

7          Q.   So when you developed that understanding after speaking

8     with Mr. Smith and Ms. Langley, why didn't you go to James Ishida

9     or contact Chief Judge Gregory and just tell them, "Hey, I've

10    been told these things.  I've been told that a remedy won't be

11    ordered.  I'm confused.  Can you help clarify the -- the

12    process?"

13         A.   So the -- the question was why?

14         Q.   Why didn't you seek clarification from Mr. Ishida, Ms.

15    Scroggins, Chief Judge Gregory or anyone else?

16         A.   Because I thought it was very clear.

17         Q.   Even though the EDR plan itself states that remedies

18    could be ordered?

19         A.   Yes, I thought it was very clear what they were saying.

20         Q.   So it was unnecessary to seek clarification on that?

21         A.   Correct.

22         Q.   Did you -- did you expect that Tony Martinez would be

23    selected as the presiding judicial officer at the formal hearing?

24         A.   I did not expect that, no.

25              **MR. KOLSKY:**  Why don't we take a short break?

1    Q.    Was it your understanding that a presiding judicial

2    officer wouldn't order any type of remedy whatsoever against a

3    federal defender's office?

4    A.    I think that if the federal defender agreed to it, they

5    might.

6    Q.    So you didn't have -- when you were going through the

7    EDR process, you didn't have specific remedies in mind that you

8    were expecting to ask for during the process?

9    A.    Well, I think that by the point I got to the formal

10   process, the remedies that I had requested had been rejected.  So

11   I -- the main remedy that I was asking for at that point was for

12   the harassment, discrimination and retaliation to be stopped.

13   Q.    Is it still your belief that a presiding judicial

14   officer in a Chapter X proceeding, as a practical matter, will

15   not order remedies against a federal defender's office?

16   A.    Yes.

17   Q.    So do you believe that the statements made to you by Ed

18   Smith and Jill Langley were accurate?

19   A.    I do.

20   Q.    So is it your contention that your due process rights

21   were violated by individuals making accurate statements to you?

22   A.    Yes.

23   Q.    In -- in your view, would the termination of J.P. Davis

24   from the Federal Defender's Office have been the only way to stop

25   the alleged harassment?

 1       A.   At what point in time?  I'm not sure when you're

 2  referring to.

 3       Q.   Wile you were -- well, let's say in March of 2019.

 4       A.   Yes, I think I believed that that would have been

 5  necessary.  It would not have been sufficient.

 6       Q.   Did you -- when you were going through the EDR process,

 7  and specifically the mediation phase -- well, actually, let me

 8  ask you a different question.

 9            Do you think Ed Smith was an authority on the EDR

10  process?

11       A.   Yes.

12       Q.   And why do you think that?

13       A.   Because he worked for the Fourth Circuit.  He served at

14  the pleasure of the chief judge and he presented himself as such.

15       Q.   Did he tell you that he was an authority on the EDR

16  process?

17       A.   Not specifically.

18       Q.   What do you understand Mr. Smith's job at the Fourth

19  Circuit to be?  What is his -- what is his role at the Fourth

20  Circuit?

21       A.   He is the chief circuit mediator.

22       Q.   And so he mediates cases involving appeals that are

23  pending before the Fourth Circuit in -- in federal court,

24  correct?

25       A.   Yes.

1      A.    Yes.

2      Q.    And what are those things?

3      A.    He sent me a e-mail that contains language referring to

4  a quid pro quo.

5      Q.    And are you referring to the e-mail where he used the

6  term "pay for stay"?

7      A.    Yes.

8      Q.    Is there anything else that you can recall?

9      A.    Yes.

10      Q.    And what else can you recall?

11      A.    So after that, he repeatedly requested for me to meet

12  outside of the office for drinks or mentoring sessions and at the

13  same time became very controlling and angry at me.

14      Q.    Are there any other -- what -- what other acts of

15  sexual harassment can you recall?

16      A.    I mean, I think those facts are the core of my claim.

17  There are obviously other aspects to it.

18            I think that he retaliated against me as -- when I did

19  not submit to his advances, and that was part of the quid pro quo

20  harassment.

21      Q.    In -- in what ways did Mr. Davis retaliate against you?

22      A.    I think that he tried to ensure that I would not have

23  advancement in my position.

24      Q.    Anything else?

25      A.    I think that he disparaged me and tried to ruin my

1    reputation with others in the office.

2         Q.   Anything else?

3         A.   There may be, but sitting here, I -- I can't recall.

4         Q.   Now, you testified that Mr. Davis tried to ensure you

5    would not have advancement in her [sic] position.

6              What specifically are you referring to there?

7         A.   Well, there were two parts of it really, the first part

8    being progressing to the duties of -- of a assistant federal

9    public defender position with my own caseload.  And the other was

10   being considered for pay advancement, a promotion.

11        Q.   What was Mr. Davis's role with respect to those things

12   you just mentioned?

13        A.   Well, with respect to the progression to the AFD, he

14   was very discouraging of me for trying to get trial experience,

15   and he said that I was manipulative and deceitful for doing so.

16              And with respect to pay, the promotion that I was

17   discussing with him that was referred to in the quid pro quo

18   e-mail I was eligible for and was not even considered for it, or

19   any other salary increase for my excellent performance.

20        Q.   You also mentioned that Mr. Davis disparaged you as

21   part of the retaliation.  What specifically do you recall about

22   that?

23        A.   He criticized me.  He berated me.  He reported me

24   for -- to the defender himself.  He criticized me to other

25   members of the management team.

1      Q.   Okay.  Getting back to the May 18th lunch, did you tell

2   Mr. Davis that you wanted to move to the Asheville office or you

3   could not remain at the Federal Defender's Office?

4      A.   No.

5                 [GOVERNMENT EXHIBIT NO. 3 MARKED

6                    FOR IDENTIFICATION]

7      Q.   Ms. Strickland, the court reporter has handed you

8   what's been marked as Exhibit 3.  Do you recognize this document?

9      A.   Yes.

10     Q.   Are these your handwritten notes?

11     A.   Yes.

12     Q.   And it looks like they're dated June 6, 2018; is that

13   correct?

14     A.   Yes.

15     Q.   Are these notes referring to the May 18th, 2018, lunch

16   with Mr. Davis?

17     A.   It appears so, yes.

18     Q.   I want to direct your attention to the middle of the

19   page.  There's a sentence beginning with "I told him that it was

20   hard for me to be living long distance from my husband."  Do you

21   see that?

22     A.   Yeah.  Can I just take a second to look at this?

23     Q.   Sure.

24     A.   (Witness examines document.)  Okay.

25     Q.   So does -- do the notes say, "I told him that it was

1   hard for me to be living long distance from my husband and that,

2   if I was to be blunt, I would need to be transferred to Asheville

3   at some point or else I will probably need to leave the office."

4           Is that -- did I read that correctly?

5       A.   Yes, that is what the notes say.

6       Q.   Are these notes accurate that that is what you told Mr.

7   Davis?

8       A.   That is what I told Mr. Davis.

9       Q.   Okay.  Did you mention to Mr. Davis the possibility

10  of -- of teleworking from Tryon doing appeals?

11      A.   I do not specifically recall that.

12      Q.   Okay.  Did you tell Mr. Davis that if you could not

13  work in Asheville, you at least wanted a pay raise?

14      A.   I'm sorry.  Can you repeat the question?

15      Q.   Yeah.  Did you tell Mr. Davis that if he couldn't work

16  in Asheville, you at least wanted a pay raise?

17      A.   Yes.

18      Q.   Did Mr. -- and Ms. -- I think you testified earlier

19  that Mr. Davis told you that that would be the last mentoring

20  lunch, right?

21      A.   I think he did say that.

22      Q.   Do you recall responding along the lines of "Anytime

23  you want to buy me lunch or a drink, I'll take it"?

24      A.   I don't recall.

25      Q.   Is it possible you did say that?

1      A.   It's possible.

2      Q.   Now, earlier, you testified about Mr. Davis inviting

3 you to drink with him.  Do you recall the specific dates?  Well,

4 let me -- let me ask you a different question.

5           Are you referring to e-mail invitations on June 1st,

6 June 19th and June 27th, 2018?

7      A.   I don't recall the specific dates, but that sounds

8 right.

9      Q.   Why don't -- why don't we just take a look at your

10 mediation supplement?

11               [GOVERNMENT EXHIBIT NO. 4 MARKED

12                    FOR IDENTIFICATION]

13      A.   Thank you.

14      Q.   Ms. Strickland, the court reporter has handed you

15 what's been marked as Exhibit 4.  Is this your supplement to

16 mediation request?

17      A.   That is what it appears to be,

18      Q.   Okay.  And so I want to direct your attention to

19 Exhibits D, E and G attached to this document.  So Exhibit D is

20 on Page US90, if you would turn to that page.

21           Are you -- are you at Page US90?

22      A.   Yes.

23      Q.   So this is an e-mail from Mr. Davis to you, correct?

24      A.   Yes.

25      Q.   And in the second paragraph of Mr. Davis's e-mail, he

1    says, "I did notice that you looked pretty unhappy earlier.  I

2    hope you feel better.  I'm happy to offer a drink and an ear if

3    you need one, though I get the feeling you are not comfortable

4    talking to me about It.  Might I suggest Mary Ellen?  She's

5    completely separate from all aspects of this and would give you

6    some good perspective."

7             Is that one of the drink invitations that you allege

8    was an act of sexual harassment?

9        A.   Yes.

10       Q.   And then turning to the next page, US91, and looking at

11   the e-mail midway down the page from Mr. Davis to you, he says,

12   "Yes, I did that for purposes of humanizing the client.  I'm

13   aware it may be offputting if you're used to a drier writing

14   style, but in my experience, that form of psychological

15   distance-closing can be effective.  Thanks.  I'm going to get

16   this filed and get a celebratory drink -- excuse me, drink.

17   You're welcome to join me, but if I recall correctly, you have an

18   appellate brief to write."

19            Is that one of the drink invitations that you allege

20   constitutes an act of sexual harassment?

21       A.   Yes.

22       Q.   And then turning to Exhibit G in this document, Page

23   US93, this is an e-mail from J.P. Davis to you.  He says, "Hey,

24   Caryn, can we catch up for a little bit sometime this week?  I

25   think it would be good for us to have another mentoring session.

1  We can do it over lunch or cut out early one day for a

2  celebratory post redacted drink, or we can just do it in the

3  office.

4          "I think it might be good to have some distance from

5  work, but whatever makes you comfortable -- whatever makes you

6  most comfortable is fine with me.  I am free all day tomorrow and

7  Friday.  Could even do this afternoon after I get out of debrief.

8  Just let me know what your schedule is like."

9          Is this one of the drink invitations that you allege

10  constitutes an act of sexual harassment?

11      A.   Yes.

12      Q.   Other than these three e-mails we just looked at, in

13  Exhibits D, E and G to your mediation supplement, are there other

14  drink invitations or meeting invitations that you are aware of

15  that constituted sexual harassment against you?

16      A.   Yes.

17      Q.   What are those other invitations?

18      A.   So on the next page, this was in a text message that he

19  had sent me.  He says, "I am free all day, including early

20  morning, lunch and evening.  I'm hoping this will be helpful for

21  you.  Please don't be over anxious about it."

22      Q.   And then in addition to -- well, are there -- are there

23  any others beyond the ones we've discussed?

24      A.   Exhibit F, 92, he texted me after I had said, "No, I do

25  not want a ride home," and says, "It is currently raining.  Last

1    chance for a ride, tough girl."

2        Q.   Are there any other meeting invites or drink invites

3    that you contend constituted sexual harassment?

4        A.   Not that I recall sitting here.

5        Q.   At the end of October 2017, did you travel to Little

6    Rock to interview witnesses for a case that you were working on?

7        A.   Yes.

8        Q.   And Mr. Davis was there as well, correct?

9        A.   Yes.

10       Q.   And Terra Parrish was also there; is that right?

11       A.   Yes.

12       Q.   Who was Ms. Parrish?

13       A.   She was an investigator.

14       Q.   At the Federal Defender's Office.

15       A.   Yes.

16       Q.   Did you get alcoholic drinks with Mr. Davis and Ms.

17   Parrish on that trip to Little Rock?

18       A.   I don't specifically recall.  It wouldn't surprise me.

19       Q.   In January 2018, do you recall a fraud case against

20   defendant Richard Davis resolving when the client accepted a plea

21   bargain?

22       A.   Can you repeat the first part of that?

23       Q.   Yeah.  In January of 2018, do you recall a fraud case

24   against Mr. Richard Davis resolving when Mr. Davis accepted a

25   plea bargain?

1    A.   I don't recall exactly when it was.  I do recall him

2    accepting a plea bargain.

3        Q.   Do you recall if the entire team for that case went out

4    and got drinks after that?

5        A.   Yes.

6        Q.   And J.P. Davis was there?

7        A.   Yes.

8        Q.   You were there?

9        A.   Yes.  Did you drink alcohol at that event?

10       A.   Probably.

11       Q.   About how many people from the team were there?

12       A.   I really don't recall.

13       Q.   Was it maybe about six people?

14       A.   That sounds about right.

15       Q.   Do you recall examining a witness at a suppression

16   hearing in the Mobley case on May 15th, 2018?

17       A.   Yes,

18       Q.   That was your first time examining a witness in court,

19   correct?

20       A.   Yes.

21       Q.   After that hearing, did you attend lunch with Mr. Davis

22   and Ms. Parrish?

23       A.   Yes, I vaguely recall that.

24       Q.   At the end of that lunch, did you suggest getting a

25   drink?

1      A.    I don't specifically recall.

2      Q.    Is it possible you did?

3      A.    Yes, it's possible.

4      Q.    And did you proceed to get a drink with Mr. Davis at an

5  establishment called Stoke?

6      A.    That sounds right.

7      Q.    Do you recall what type of drink you had?

8      A.    No.

9      Q.    But it was alcoholic?

10     A.    Yes.

11     Q.    During your time at the Federal Defender's Office, did

12  you attend any office happy hours?

13     A.    Probably.  I don't remember specifics.

14     Q.    Do you recall if Mr. Davis was also at those happy

15  hours?

16     A.    Probably.

17     Q.    Do you recall attending an event at a courthouse around

18  March of 2018 for the groundbreaking of a new courthouse annex?

19     A.    I vaguely recall that.

20     Q.    Did you drink alcohol at that event?

21     A.    I really don't remember.

22     Q.    Do you recall if Mr. Davis was also at that event?

23     A.    I don't remember.

24     Q.    Do you recall attending the Federal Defender's Office's

25  retreat in December 2017?

1       A.   Yes,

2       Q.   And people were drinking alcohol at that retreat,

3  correct?

4       A.   Yes.

5       Q.   Did you drink alcohol at that retreat?

6       A.   Yes.

7       Q.   And Mr. Davis was there drinking alcohol at that

8  retreat, correct?

9       A.   Yes.

10       Q.   At that retreat, did Mr. Davis tell you that people

11  were having drinks in another room?

12       A.   Yes.

13       Q.   Do you know how many people were in that room?

14       A.   No.

15       Q.   Would it surprise you if it was about 15 to 20 people?

16       A.   I don't know.

17       Q.   Are there any other instances -- other than the ones

18  we've already discussed, are there other instances you can recall

19  in which you drank alcohol with Mr. Davis or at events where Mr.

20  Davis was in attendance?

21       A.   Sitting here, I don't recall.

22       Q.   Did you ever get drinks with other colleagues at the

23  Federal Defender's Office?

24       A.   Yes.

25       Q.   Did you get drinks with Caleb Newman?

1      A.   I don't specifically recall, but it wouldn't surprise

2    me.

3      Q.   And who -- who do you recall getting drink -- drinks

4    with from the Federal Defender's Office?

5      A.   I'm trying to remember.  I'm sorry.  I do recall there

6    being happy hours.  I just don't recall.  I'm sorry.

7      Q.   No.  That's okay.  Would you agree that it was not

8    unusual for attorneys in the Federal Defender's Office to get

9    drinks together?

10      A.   Yes.

11      Q.   How about at other jobs?  Have you gotten drinks with

12    colleagues at other jobs that you've had?

13      A.   Yes.

14                   [GOVERNMENT EXHIBIT NO. 5 MARKED

15                        FOR IDENTIFICATION]

16      Q.   Ms. Strickland, the court reporter has handed you

17    what's been marked as Exhibit 5.  Do you recognize this document

18    as a series of text messages between you and J.P. Davis?

19      A.   That is what it appears to be.

20      Q.   And I want to direct your attention to Page 2903.

21      **MS. WARREN:**  I'm sorry.  What's the number again?

22      **MR. KOLSKY:**  2903.

23      **MS. WARREN:**  Thank you.

24      **BY MR. KOLSKY:**

25      Q.   Actually, it's starting on the bottom of 2902.  And

1    this is a text -- or a picture sent through text messaging from

2    March 15th, and it appears to be a picture of a cat and a bottle

3    of gin.

4              Did you send that picture to J.P. Davis?

5        A.   Yes.

6        Q.   And there's -- below that, there's another picture of a

7    bottle of gin.  Did you send that one to J.P. Davis?

8        A.   Yes.

9        Q.   Why did you send those pictures to Mr. Davis?

10       A.   I really don't recall.

11       Q.   Turning to Page 2904, Mr. Davis writes "Tom Cat, how

12   appropriate.  Alright, now we have to throw down for real."

13             How did you interpret that statement by Mr. Davis,

14   "Alright, now we have to throw down for real"?

15       A.   I don't know.

16       Q.   You responded, "Yeah, but you need to get a full bottle

17   first," smiley face emoji.

18             What did you mean by that?

19       A.   I don't recall.

20       Q.   Is it possible you meant that you were interested in

21   getting a drink with Mr. Davis?

22       A.   Yes.

23       Q.   Is it fair to say you felt comfortable discussing

24   alcohol with Mr. Davis?

25       A.   Yes.

1      Q.    And you felt comfortable drinking with Mr. Davis,

2   correct?

3      A.    At that time, yes.

4      Q.    At any point, did you tell Mr. Davis you weren't

5   comfortable getting drinks with him?

6      A.    Yes.

7      Q.    When was that?

8      A.    Later in July, I told him that I would be drawing

9   boundaries with him.

10     Q.    Did you specifically tell him you didn't want to get a

11  drink with him?

12     A.    No.

13     Q.    And did you specifically tell him you weren't

14  comfortable getting drinks with him?

15     A.    No.

16     Q.    While we have this document out, did you thank Mr.

17  Davis for lunch on April 3rd, 2018?  And I'm referring to Page

18  2910.

19          If you look at the top of 2910, on April 3rd, did you

20  text Mr. Davis "I forgot to say thanks for lunch.  It was good"?

21     A.    That is what it appears to be.

22     Q.    And there's an exclamation point after "good," correct?

23     A.    Yes.

24     Q.    Okay.  If you could, take a look at Exhibit 4, Page

25  US89.

1          A.    I'm sorry.  Which one was 4?

2          Q.    That's the mediation supplement.

3          A.    Okay.  And what -- what page was it?

4          Q.    This is Page 89.  And this is an e-mail titled "Mas

5    Dinero."

6          A.    Yes.

7          Q.    And is this -- you referred to this e-mail earlier in

8    your testimony, correct?

9          A.    Yes.

10         Q.    So you received this on May 18th, 2018, correct?

11         A.    Yes.

12         Q.    So this was shortly after you returned back to the

13   office after having lunch with Mr. Davis, correct?

14         A.    Yes.

15         Q.    When you received this e-mail, how did you interpret

16   it?

17         A.    My immediate impression is that it was not a

18   work-related e-mail.  It was personal about him.

19         Q.    What do you mean by -- by that, personal about him?

20         A.    That he wanted me to do something personally for him

21   that was inappropriate.

22         Q.    And what specifically did you understand him to be

23   asking you to do?

24         A.    I understood it as an advance.

25         Q.    Did you understand it as a -- a sexual advance?

1      A.   Yes, and -- and I think just other personal things for

2    him.

3      Q.   What sorts of other personal things?

4      A.   I think that he had a romantic interest in me, and

5    he -- I understood it as him wanting me around him.

6      Q.   Did you interpret this e-mail as a quid pro quo e-mail?

7    I think you testified to that earlier.

8      A.   Yes.

9      Q.   So what is the quid and what is the quo here?

10     A.   I think that what I understood was that he would be

11   saying that I could get a raise if I went along with his plan.

12     Q.   So he says, "Just remember I deal in pay for stay."

13   How did you interpret the word "stay"?

14     A.   Think the literal words that he used was referring to

15   Charlotte.  I think using words like "I have a plan.  I deal

16   in" -- presenting language of a quid pro quo, I understood it to

17   mean more than that.

18     Q.   Are there any terms here that you believe have a sexual

19   connotation?

20     A.   Yes,

21     Q.   Which words are those?

22     A.   Well, I think the whole e-mail has a sexual

23   connotation, frankly

24     Q.   But I'm asking you if there are specific words that --

25   that have a sexual connotation.  Can you identify any here?

1          A.    Plan, I deal in pay for stay.

2          Q.    How did the -- how does the word "plan" have a sexual

3    connotation?

4          A.    Because I don't think that a supervisor would refer to

5    consideration for promotion as a plan, but just remember whatever

6    I deal in.

7          Q.    Did you -- would you agree that the word "plan" in

8    ordinary language typically doesn't have a sexual connotation?

9          A.    Yes.

10         Q.    Would you agree that the words "pay" and "for" and

11   "stay" and "deal" -- those words in ordinary conversation do not

12   usually have a sexual connotation?

13             MS. WARREN:  Objection, form.

14             BY MR. KOLSKY:

15         Q.    Would you agree with that?

16         A.    Can -- sorry.  Can you repeat the question?

17         Q.    Well, let's take it word by word.  You would agree that

18   the word "deal" in ordinary language doesn't usually have a

19   sexual connotation; is that right?

20         A.    In isolation, no.

21         Q.    And the word "pay" doesn't usually have a sexual

22   connotation?

23         A.    Correct.

24         Q.    And the word "stay" usually doesn't have a sexual

25   connotation?

1          A.    Right.

2          Q.    Would you agree that this e-mail -- it -- is

3    lighthearted or informal?

4          A.    No.

5          Q.    What about the subject, mas dinero?  Was the fact that

6    Mr. Davis was using a Spanish term -- does that suggest it was

7    sort of informal or lighthearted?

8          A.    No.

9          Q.    And he says "Dude."  Does the fact that he was using

10   the term "dude" suggest it was sort of informal and -- and

11   lighthearted?

12         A.    No.  I certainly didn't understand it that way.

13         Q.    And this -- by saying "pay for stay," is it possible

14   that Mr. Davis was saying that if you stayed employed at the

15   Federal Defender's Office, the office would pay you more money?

16         A.    That's not how I understood it.

17         Q.    But is it -- is it possible that that's what Mr. Davis

18   meant?

19         A.    I don't know what he meant.

20         Q.    You don't have -- you don't have any way of knowing

21   what Mr. Davis intended and what he meant by this e-mail; is that

22   right?

23         A.    I don't know what's in his mind.  I know how I

24   perceived it.

25         Q.    And in 2018, you interpreted this e-mail to mean that

1   Mr. Davis would raise your pay if you stayed in Charlotte; is

2   that right?

3          A.   That was part of it, yes.

4                    [GOVERNMENT EXHIBIT NO. 6 MARKED

5                     FOR IDENTIFICATION]

6          A.   Thank you

7          Q.   The court reporter has handed you what's been marked as

8   Exhibit 6.  And this is an e-mail that you sent to Nancy Dunham

9   on August 6th, 2018, correct?

10         A.   That is what it appears to be.

11         Q.   In the second paragraph of that top e-mail, it says,

12  "In the meantime, I have attached copies of my offer letter and a

13  related e-mail.  I have also attached some communications from

14  the First Assistant, including an e-mail saying he would raise my

15  pay if I stayed in Charlotte and a text message he sent me when

16  he waited for me in the lobby one evening when I had already said

17  no to a ride and he knew I was alone."

18              Did you tell Ms. Dunham in this e-mail that Mr. Davis's

19  pay for stay e-mail was a sexual advance?

20         A.   In this text here, I put the literal words that he

21  used.

22         Q.   But you didn't indicate that you considered it to be a

23  sexual advance?

24         A.   I'm not sure because -- I don't remember whether it was

25  this one or another one, but I sent it to her and said it was a

1    quid pro quo.

2        Q.   But in this e-mail, is it fair to say you didn't tell

3    Ms. Dunham that you considered the e-mail to be a sexual advance?

4        A.   Well, I think what he said did have a connotation of

5    being a sexual advance.

6        Q.   But my question is just what you told Ms. Dunham in

7    this e-mail, and you would agree that you didn't tell Ms. Dunham

8    that you considered it to be a sexual advance.

9        A.   I did not use the words "sexual advance," no.  I think

10   it's fairly obvious from the language.

11       Q.   Now, you received the pay for stay e-mail on May 18th,

12   2018, correct?

13       A.   Yes,

14       Q.   Did you report it to Tony Martinez?

15       A.   Not at that time.

16       Q.   Do you recall when you reported it to Mr. Martinez?

17       A.   I know I said something to him about it.  I don't

18   recall exactly when.

19       Q.   Why didn't you report it to Tony Martinez immediately

20   after receiving it?

21       A.   I'm trying to put myself in my shoes back then.  I

22   think because I was frankly mystified by this, and I could not

23   comprehend that -- at that time that my supervisor was sexually

24   harassing me.  That was very difficult for me to believe or

25   comprehend that he would do that.

1      Q.   Well, what I would do is I would check the weather

2  forecast before I left.  I don't recall specifically whether I

3  did that this time.

4      Q.   Okay.  You were planning to ride your bike home that

5  evening; is that right?

6      A.   Yes.

7      Q.   What do you recall about Mr. Davis's offer to give you

8  a ride?

9      A.   I think he said that it looked like it might rain.  And

10  I said, "No.  I'm tough.  I can handle it."

11     Q.   Where were you when you had that conversation?

12     A.   I really don't remember.  In the office, I think,

13  but -- or in the building, but I'm not sure where.

14     Q.   And then you went downstairs to leave the building, and

15  you saw Mr. Davis in the lobby, right?

16     A.   Yes.

17     Q.   And what do you recall about that interaction?

18     A.   I recall him asking if I was sure that I did not want a

19  ride home, and I recall feeling very pressured and intimidated.

20     Q.   How did you respond when Mr. Davis asked you if you

21  were sure you didn't want to ride home?

22     A.   I said, yes, I was sure.

23     Q.   What happened after that?

24     A.   I left as quickly as possible.

25     Q.   About how close were you to Mr. Davis when you had that

1    interaction in the lobby?

2          A.    I really don't remember.

3          Q.    Do you recall if there was a exercise class going on at

4    a -- through a glass window looking out into the lobby?

5          A.    I don't remember.  I just remember how I felt.

6          Q.    You've -- you had requested rides home from Mr. Davis

7    before that evening; is that right?

8          A.    Yes.

9          Q.    About how many times had you asked Mr. Davis for a

10   ride, either a ride home or a ride else -- anywhere else?

11         A.    I don't know off the top of my head.R-LINE

12         Q.    Do you think about ten times would be accurate?

13         A.    I really couldn't tell you.

14         Q.    Do you have any reason to doubt that it was about ten

15   times?

16         A.    No, not in particular.

17         Q.    Did Mr. Davis give you a ride to the courthouse in

18   Statesville, North Carolina?

19         A.    I vaguely recall that.

20         Q.    Did Mr. Davis give you a right to meet with a client

21   who lived outside of Charlotte?

22         A.    I don't remember.

23         Q.    Is it correct that you asked Mr. Davis to drive you

24   home from office happy hours?

25         A.    That wouldn't surprise me.

1      Q.    And he did drive you home?

2      A.    Yes.

3      Q.    Those were happy hours where you had been drinking?

4      A.    Yes.

5      Q.    Is it correct that you asked Mr. Davis to drive you

6    home from the courthouse annex groundbreaking event in March

7    2018?

8      A.    I don't specifically remember.

9      Q.    Did you have a car in Charlotte when you worked at the

10   Federal Defender's Office?

11     A.    Yes, I did.

12     Q.    But you typically commuted to work on your bike?

13     A.    Yes, I did.

14     Q.    You've alleged that you believe Mr. Davis spied on you

15   at the Federal Defender's Office; is that right?

16     A.    Yes.

17     Q.    Why do you believe that he spied on you?

18     A.    Well, there were a couple of things.  The first was

19   that -- and it was very bizarre, but I noticed that when I was

20   leaving the building, he would coincidentally pop around the

21   corner.

22          I would come from one side of the office.  He would

23   come from the other side of the office and walk me out of the

24   building.  And when that happened a few times, it just seemed

25   like it really wasn't a coincidence.  He was waiting for me to

1        A.    I don't recall other than they were the two people in

2    charge of the office.  I was asking them to pass them along.

3        Q.    Did you ever tell Mr. Davis about the time when your

4    now husband proposed to you?

5        A.    I don't remember.

6        Q.    Is it possible that you did?

7        A.    Yeah, it's possible.

8        Q.    Did you tell him that you had wanted something on a

9    mountaintop, but that the proposal occurred over the phone?

10       A.    He didn't propose to me over the phone.

11       Q.    Did you feel comfortable enough with Mr. Davis to share

12   personal information about your -- your personal life?

13       A.    At that time, yes.

14       Q.    So was there a point at which you had a friendly

15   relationship with Mr. Davis?

16       A.    Yes.

17       Q.    When was that?

18       A.    Well, I think I would say prior to May 18th, 2018.

19       Q.    And so what changed on May 18th, 2018?

20       A.    Well, I think that's when I understood that whatever

21   interest he had in me was not merely work-related and was not

22   appropriate.

23       Q.    And was that because of the pay for stay e-mail?

24       A.    Yes.

25       Q.    I believe you've alleged that Mr. Davis requested to be

1          A.    I don't think so.  I mean, this is a summary.  So there
2     may have been, but I -- I don't recall.
3          Q.    Sure.  At the meeting, Mr. Martinez asked if you'd --
4     if you were reporting harassment or sexual harassment, right?
5          A.    He asked if this was harassment or sexual harassment.
6          Q.    Okay.  And you responded "I don't feel we are there
7     yet.  I don't want to use words like that to trigger something,"
8     correct?
9          A.    Yeah.  So what I said was I did not want to trigger a
10    report of -- of sexual harassment at that time.
11         Q.    Are you saying -- did you say, "I said I don't" -- or
12    excuse me.
13               Did you tell Mr. Martinez, "I don't feel we are there
14    yet.  I don't want to use words like that to trigger something"?
15         A.    Yes, to make a formal report.
16         Q.    It doesn't say -- would -- would you agree with me that
17    your notes don't say "to make a formal report"?  Correct?
18         A.    No, but that's what I meant.
19         Q.    Okay.
20         A.    That's what I was advised to do.
21         Q.    Okay.  So to the best of your recollection, is this
22    the -- I'm just trying to understand the wording that you used on
23    this particular issue.
24               So to the best of your recollection, is it accurate to
25    say that you told Mr. Martinez, "I don't want to use" -- or,

1    excuse me -- "I don't feel we are there yet.  I don't want to use

2    words like that to trigger something"?

3          A.   Yes, I think that's fair.

4          Q.   Okay.  And moving down the page -- okay.  Well,

5    following that paragraph, it says, "I said I am self-managing and

6    that everyone deserves the benefit of me having a conversation

7    with him first to try to resolve the issue."

8               Did I read that accurately?

9          A.   Yes, that's accurate.

10         Q.   And does -- him, does that refer to Mr. Davis?

11         A.   Yes.

12         Q.   So is it correct that you wanted to have a conversation

13   with Mr. Davis to try to resolve the issue?

14         A.   Yes.

15         Q.   And then moving to the next paragraph, you -- you

16   wrote, "He said, 'I understand.  So this is a heads up'"

17              Is that what Mr. Martinez told you, "I understand.  So

18   this is a heads up"?

19         A.   Yes.

20         Q.   And you responded, "Yes.  I don't want you to do

21   anything except keep my confidence and so you'll know if

22   something happens.  I said I am trying to do this all by the

23   book, and this is the advice that I got, was to give you a heads

24   up.

25              "I said I wouldn't want to do any of this and I

1   certainly wouldn't involve him unless I thought it was absolutely

2   necessary."

3              Did I read that correctly?

4       A.   Yes, that's accurate.  That's what I said.

5       Q.   At this meeting, did you tell Mr. Martinez about the

6   pay for stay e-mail?

7       A.   I don't believe so.

8       Q.   Did you tell Mr. Martinez that Mr. Davis had invited

9   you to lunch?

10      A.   I think he already knew that J.P. had invited me to

11  lunch.

12      Q.   But you -- did you -- did you tell him -- did you tell

13  him that you were uncomfortable going to lunch with Mr. Davis?

14      A.   No.

15      Q.   Did you tell him that Mr. Davis had invited you to get

16  a drink?

17      A.   Not at that time.

18      Q.   At this meeting, did you report any specific conduct by

19  Mr. Davis that concerned you?

20      A.   I said that he had made me feel so uncomfortable that I

21  was leaving the office by 5:00 every night to avoid issues with

22  him.

23      Q.   But did you identify specific conduct that made you

24  feel that way?

25      A.   That he had gotten extremely angry at me and spoken to

1    but I do recall a couple of strange things.

2         Q.   What do you recall?  What strange things do you recall?

3         A.   So -- I'm sorry.  Did you -- what date did you say that

4    you were --

5         Q.   Yeah.  So I'm just -- I'm referring to the August 10th,

6    2018, e-mail on Page 971 of Exhibit 12 --

7         A.   Okay.

8         Q.   -- that we were looking at a moment ago.

9              Do you -- did you have any contact with Mr. Davis after

10   you sent that e-mail to Mr. Martinez?

11        A.   I don't recall if it was before or after, but I think

12   it was around this time he sent a very strange e-mail that I was

13   copied on to a client where he was repeatedly quoting a Law

14   Review article that I had written and quoting, like, very

15   specific phrases from it that wouldn't have any place in a client

16   e-mail.  And it struck me as bizarre and obsessive.

17        Q.   When he copied you, he was replying all to an e-mail

18   that he had received, correct?

19        A.   That sounds right.  I -- I don't recall the -- I just

20   remember the e-mail.

21        Q.   Are there any other -- I think you said strange things.

22   Are there any other strange things that you can recall that

23   happened after the August 10th, 2018, e-mail that you sent?

24        A.   Well, I knew that it was around that time that another

25   employee had told me that he was sending people to spy on me and

1    than the ones you -- you just mentioned, are there additional

2    actions that would qualify as -- as retaliation?

3         A.   Yes.

4         Q.   And what are those?

5         A.   Well, with respect to the transition to the Assistant

6    Federal Defender, I mean, he says it right here.

7              "As I indicated to you at our meeting, Josh and Bill

8    spoke with Todd Watson, who advised that it was to the office's

9    advantage to reclassify research and writing specialists to AFT

10   positions for purposes of case weight measurement."

11             He -- contrary to what had been my understanding for

12   that entire time up until that point that I would transition to

13   an AFD position, according to the job description for that

14   position, which means an attorney with their own caseload, he

15   told me that I would be working as a research and writing

16   specialist under an AFD title because that was to the office's

17   benefit for purposes of case measurement.

18        Q.   So your understanding is that Mr. Martinez was only

19   reclassifying you as Assistant Federal Defender because it was to

20   the office's advantage for purposes of case weight measurement?

21        A.   That's what he said, yes.

22        Q.   Are there any other acts of retaliation other than what

23   you've mentioned?

24        A.   Well, related to that, I was taken off the track of

25   having my own cases, and from this point on, I was assigned to do

1     Q.    Were you able to do your work effectively at that job

2   teleworking?

3     A.    Yes.

4     Q.    In what ways do you believe James Ishida violated your

5   constitutional rights?

6     A.    Again, I think I would refer you to the written

7   materials that I have submitted that extensively document all of

8   these things.  If I don't recall anything specifically today,

9   that's where I think you should go.

10     Q.    I understand.  Do you recall -- you know, sitting here

11   today, do you recall anything that Mr. Ishida did that you

12   believe violated your constitutional rights?

13     A.    Yes.

14     Q.    What did he do?

15     A.    Well -- excuse me.  From the very start -- sorry.  It's

16   just kind of an overwhelming question.  So I'm trying to put

17   myself back at the beginning.

18          From the very start, he criticized me for going to the

19   AO to report my complaints.  He said that when that happens,

20   barriers go up and people go on guard, which I understood him to

21   be telling me that there was a very adverse reaction to the fact

22   that I had reported my complaints to the EO, which I believed I

23   had every right to do.

24     Q.    Is there anything else you can call sitting here today

25   that Mr. Ishida did to violate your constitutional rights?

1          A.    Yes.

2          Q.    And what's that?

3          A.    Well, he -- the next thing that I remember is him

4    telling me that Cheryl Walter from the AO had told him that he

5    should receive the report, the investigation report -- by he, I

6    mean James -- instead of Tony because of concerns that Tony was

7    involved in the conduct that I was alleging.

8                But when I filed a motion to disqualify Tony from the

9    EDR process based on those same concerns, James Ishida told me

10   that -- well, several things, but that deciding that request

11   would require waiting for the investigation report to come out.

12   So, functionally, because of that, there was really nothing that

13   I could do to try to resolve my complaints for many months

14   because the only person -- and he told me this over and over

15   again.

16               The only person who I could have resolved my complaints

17   with was Tony, even though we were waiting for a decision on the

18   disqualification request.  And then -- after many months of

19   waiting for the investigation report, which he had told me we

20   were waiting for to determine what the next steps in the process

21   would be and whether Tony would be involved, then he told me that

22   neither I nor the employing office would receive the report, that

23   Tony would not be disqualified and that no disciplinary action

24   would even be considered on my complaints until after my EDR --

25   my Chapter X process was over.

1          So that would mean that if I continued to pursue EDR,

2     there would be no prospect of accountability for people who

3     engaged in harassment, discrimination and retaliation at any

4     point so long as I continued to assert my rights in the Chapter X

5     process.

6          And so because of all of those things and the fact that

7     I had been on telework for nearly seven months, and nothing had

8     been done about any of my complaints, I did not feel that there

9     was any way that I could stay in that office and that I had to

10    resign.

11    Q.   Would you agree that Mr. Ishida spent several hours

12    meeting with you and speaking with you on the phone during your

13    EDR process?

14    A.   Yes.

15    Q.   And he answered questions that you asked about the EDR

16    process?

17    A.   Not every question I asked had an answer.

18    Q.   But he answered at least some of the questions that you

19    asked?

20    A.   He answered some of the questions that I asked.

21    Q.   Do you recall -- excuse me.  Do you recall telling Mr.

22    Ishida at your September 18th, 2018, meeting with him, "I think

23    this was very informative, and I appreciate you taking the time"?

24    A.   I'm sorry.  When was that?

25    Q.   September 18th, 2018.

1      A.    I don't recall specifically, but it would not surprise

2  me if I said that.

3      Q.    And would that have been accurate if you had said that?

4      A.    I think that I was trying to politely express

5  gratitude, but, no, I don't know that the content of that would

6  have been accurate.

7      Q.    Would you agree that Mr. Ishida was trying to be

8  helpful to you during the process?

9      A.    No, I don't agree with that.

10     Q.    He was not trying to be helpful to you?

11     A.    No.

12     Q.    Did you tell Jill Langley that Mr. Ishida seemed very

13 sincere and willing to help?

14     A.    I don't recall specifically whether I said that or not.

15     Q.    Is it possible you did say that?

16     A.    Sure.  It's possible.

17     Q.    And if you had said that, was -- would that have been

18 accurate?

19     A.    I think that James was not necessarily a bad person,

20 and I think that's what I meant by saying that he was sincere.

21 But I do not believe that he was helpful.

22           There's actually one other thing that I forgot to

23 mention.  He excluded my -- or at least did not tell Heather

24 Beam -- you know, did not communicate to her.  Somehow she

25 believed that he had excluded my claims against Tony from the

1   investigation and she did not investigate those claims.

2       Q.   Okay.  What about Chief Judge Gregory?  In what ways do

3   you believe Chief Judge Gregory violated your constitutional

4   rights?

5       A.   Well, under Chapter IX of the plan, he was the official

6   responsible for overseeing the investigation.  And so the flaws

7   in the investigation and the conflicts of interest were, to my

8   understanding, his responsibility.

9            In addition, he allowed Tony to continue participating

10  in the EDR process as a decision maker and, in fact, the final

11  decision maker as to disciplinary action regarding a complaint

12  that he, himself -- Tony, himself, was part of.

13      Q.   Do you think that Chief Judge Gregory acted in good

14  faith during the EDR process?

15      A.   I have no way of knowing that.

16      Q.   One of the other defendants in this case is the chair

17  of the Judicial Conference Committee on Judicial Resources,

18  correct?

19      A.   Yes.

20      Q.   Do you believe that defendant should remain a defendant

21  in this case?

22      A.   I don't know.

23      Q.   Do you know why that defendant is currently a defendant

24  in this case?

25      A.   Because the Fourth Circuit allowed the claim to proceed

1          Q.    Okay.  And I'm going to read part of the -- the

2    paragraph on the bottom of Page 2178 that continues on to the

3    next page.

4          A.    Can I have a moment to familiarize myself?

5          Q.    Yeah.  Sure.

6          A.    (Witness examines document.)  Okay.

7          Q.    I'm going to read part of that last paragraph on 2178

8    that continues on to the next page.  It says, "In the meantime, I

9    have informed James, Chief Judge Gregory and Heather that I would

10   like the Fourth Circuit to assist me in finding a placement

11   elsewhere in the Fourth Circuit because my relationships with the

12   Federal Defender and my colleagues have been irreparably damaged

13   and I no longer feel welcome in that environment.

14          "I did not want to leave my position with the Federal

15   Defender Office, which I considered my dream job, but at this

16   point, I have been constructively discharged."

17          What did you mean when you said, "My relationships with

18   the Federal Defender and my colleagues have been irreparably

19   damaged and I no longer feel welcome in that environment"?

20          A.    Well, I think it was clear to me at that point that

21   they did not want me there.

22          Q.    How -- how was that clear to you?

23          A.    Well, I think Tony not taking some basic and obvious

24   steps from July, you know, until then.  I'm trying to remember

25   exactly when this was, but there were other events around this

1    time.

2          This may have been when they began advertising for an

3    intern position in the Asheville office at the time that Tony was

4    saying that there was no office space, and it made me feel like

5    having an intern in that space was more important than resolving

6    my complaint.  There was also around this time a

7    conference-called meeting for work where my team members were

8    mocking me and making fun of me and expressing frustration that I

9    was on telework because they would have to meet me at Waffle

10   House and saying that -- joking around "Where's Waldo?"

11         And they also made comments that led me to believe that

12   it was not confidential the claim that I had filed.  So, no, I

13   did not believe that I was welcome in that environment.

14   Q.   Why did you feel that you had been constructively

15   discharged?

16   A.   Well, that's my understanding of what a constructive

17   discharge is, is when you are no longer welcome to work in an

18   environment.

19   Q.   So this e-mail, Exhibit 14, is dated November 26, 2018,

20   correct?

21   A.   Yes.

22   Q.   Why did you not leave the office until March of 2019?

23   A.   Because I didn't want to leave and not have a job.  I

24   was trying to figure out if there was a way to get employment

25   elsewhere.

1              [RECESS - 2:58 P.M. TO 3:10 P.M.]

2          **THE VIDEOGRAPHER:**  Going back on the record.  The time

3      is 3:10 p.m.

4          **BY MR. KOLSKY:**

5      Q.    Ms. Strickland, I want to ask you one more question

6  about Exhibit 17 and the -- the statement we were talking about

7  earlier, holding off the complaint and cooperating with the

8  investigation into wrongful conduct.

9          Were you saying there that holding off on the Chapter X

10  complaint would potentially make the Chapter IX wrongful conduct

11  claim stronger?

12     A.    I'm sorry.  Can you say that one more time?

13     Q.    Yeah.  So I'm referring to the statement "holding off

14  the complaint and cooperating with the investigation into

15  wrongful conduct as long as Tony is kept completely out of it.

16  The strategy for doing this is as follows."

17          And you list four points.  Number two, "It makes Tony

18  and J.P. think they are still in control and gives me the

19  opportunity to make further mistakes."

20          So were you saying there that holding off on the

21  Chapter X complaint would make the Chapter IX claim stronger?

22     A.    I don't recall exactly what I was thinking.  But I do

23  believe that in my mind at the time, I thought that wrongful

24  conduct would come before Chapter X, that that made sense.

25     Q.    Okay.  Now, in August 2018, you were reclassified from

1    a research and writing attorney to an Assistant Federal Defender,

2    correct?

3         A.   Yes.

4         Q.   Do you know if another research and writing attorney

5    was reclassified at that same time to assist the Federal

6    Defender?

7         A.   That's what I recall, yes.

8         Q.   And who was that?

9         A.   Jared Martin.

10        Q.   To your knowledge, was any research and writing

11   attorney at the FDO not reclassified at that time?

12        A.   We were the only two research and writing at that time.

13        Q.   Okay.  Did you have your own caseload when you were a

14   researching and writing attorney?

15        A.   No.

16        Q.   And when you were reclassified, did you think you had

17   the experience necessary to carry your own caseload?

18        A.   In appeals, I think, yes.

19        Q.   What about in trial court work?

20        A.   Trial court, I think that I could have second-chaired

21   cases.  I think it would have been more time.  And that's what I

22   was trying to do, frankly,

23        Q.   At that point, when you were reclassified, had you

24   served as first chair for any felony cases from start to finish?

25        A.   No.

1       A.    Yeah.  He said during the August meeting that they just
2  hadn't thought of me for the position.
3       Q.    When did he tell you that?
4       A.    It was during the -- I think it was August 9th, that
5  meeting.
6       Q.    And when he said they hadn't thought of you, do you
7  know who he was referring to or -- well, what -- what is your
8  understanding of who he was referring to?
9            **MS. WARREN:**  Objection, form.
10           **BY MR. KOLSKY:**
11      Q.    Do -- do you have an understanding of who Mr. Martinez
12 was referring to when he said they hadn't thought of you?
13      A.    My understanding would be the management team.
14      Q.    Can you identify specifically who was in the management
15 team?
16      A.    The management team at that time was Tony, Josh, J.P.
17 and I believe the team leaders.
18      Q.    Ms. Strickland, you audio-recorded some of your
19 conversations at the Federal Defender's Office, correct?
20      A.    Yes.
21      Q.    And you audio-recorded some conversations with James
22 Ishida?
23      A.    Yes.
24      Q.    And you audio-recorded some conversations with Ed
25 Smith?

1      A.    Yes.

2      Q.    You audio-recorded conversations with Heather Beam?

3      A.    Yes.

4      Q.    Did you ever tell the person who you recorded that you

5      were recording the conversations?

6      A.    I told Heather that I recorded Tony and gave her the

7      recording.  Other than that, no.

8      Q.    Why did you record those conversations?

9      A.    I recorded those conversations because it became clear

10     to me that people were saying things and going back on their

11     word.  And to create a record and for my own self-protection, I

12     decided to start recording people.

13                   [GOVERNMENT EXHIBIT NO. 19 MARKED

14                          FOR IDENTIFICATION]

15     A.    Thank you.

16     Q.    The court reporter has handed you what's been marked as

17     Exhibit 19.  Do you recognize this document?

18     A.    Yes.

19     Q.    And this is plaintiff's recordings privilege log from

20     this litigation, correct?

21     A.    Yes.  That's what it appears to be.

22     Q.    Other than the recordings identified in this document,

23     did you make any other recordings of anyone who was employed by

24     the Federal Defender's Office or any other part of the judiciary

25     at the time the recording was made?

1          A.    I'm sorry.  Can you ask that again, please?

2          Q.    Yeah.  Other than the recordings identified in this

3    document, did you make any other recordings of anyone who was

4    employed by the Federal Defender's Office or any other part of

5    the judiciary at the time the recording was made?

6          A.    No, I don't believe so.

7          Q.    Did you ever delete any recordings that you'd made?

8          A.    No.

9          Q.    Did you record any of your conversations with Jill

10   Langley?

11         A.    No, I did not.

12         Q.    And why not?

13         A.    I did not record Jill because she came referred to me

14   by Michael Shenkman from the Counselor's Office, and I believed

15   that she was there to help me.  And I had no idea that she was

16   going to say what she was going to say, so I didn't think there

17   was any reason to record.

18         Q.    You mentioned Michael Shenkman in Counselor's Office.

19   Is that the -- at the Supreme Court of the United States?

20         A.    Yes.

21         Q.    What did he say about Ms. Langley when he referred you

22   to her?

23         A.    I don't recall exactly.  I think that he said that she

24   was the new judicial integrity officer and that he offered to

25   connect me with her.

1  retain copies of any privileged client materials?

2      A.   I'm trying to think.  I'm sorry.  I don't believe so,

3  but I'm really not sure.

4      Q.   Did you retain copies of your work e-mails?

5      A.   I did retain copies of some work e-mails.

6      Q.   Did you retain copies of -- well, you did retain copies

7  of recordings discussing client matters, correct?

8      A.   I'm sorry.  Say that again, please.

9      Q.   You retained copies of recordings of conversations

10  discussing privileged matters, correct?

11      A.   Yes.

12      Q.   Do you know if that was permitted by office policy?

13      A.   I don't know.

14      Q.   Ms. Strickland, do you claim that you are currently

15  experiencing any constitutional violations by any of the

16  defendants in this case?

17      A.   Yes.

18      Q.   In what way are you currently experiencing

19  constitutional violations?

20      A.   Well, the harm that I experienced as a result of the

21  constructive discharge is ongoing.

22      Q.   What jobs have you applied to since you left the

23  Federal Defender's Office?

24      A.   I don't recall every job that I applied for.  The job

25  that I ended up with was the appellate roster.

1    Q.    Could you read the -- the part that you -- the part

2    that you can read?

3    A.    "Not feasible.  Josh already submitted travel voucher

4    last week as reported in staff meeting 1/4 and travel voucher" --

5    I'm not sure what the rest of it says.

6    Q.    Okay.  If you had responded to Mr. Carpenter that you

7    did want to do the argument, do you think you would -- do you

8    think he would have let you?

9    A.    I don't know.  I mean, probably.

10   **MR. KOLSKY:**  Let's take a break.

11   **MS. WARREN:**  Sure.

12   **THE VIDEOGRAPHER:**  Going off the record.  The time is

13        4:07 p.m.

14             [RECESS - 4:07 P.M. TO 4:23 P.M.]

15   **THE VIDEOGRAPHER:**  Going back on the record.  The time

16        is 4:23 p.m.

17   **BY MR. KOLSKY:**

18   Q.    Ms. Strickland, before the break, I believe you

19   testified that you had retained some e-mails when you left the

20   Federal Defender's Office, some work e-mails; is that right?

21   A.    Yes.

22   Q.    What -- what types of e-mails did you retain?

23   A.    I don't recall.  I think they would have been e-mails

24   related to the claims.

25   Q.    Do they include privileged client communications?

1        A.    Yes, they would have.

2        Q.    Any other e-mails that you can recall retaining?

3        A.    I don't recall.

4        Q.    Your complaint alleges that Mr. Ishida disclosed

5   information to you about another EDR complaint from which you

6   could identify the person who had filed the complaint; is that

7   right?

8        A.    Yes.

9        Q.    Do you recall specifically what Mr. Ishida said that

10  allowed you to identify the claimant?

11       A.    He said that there had been another EDR complaint that

12  had been resolved in the counseling stage.

13       Q.    Did he say, "Now I can say that -- well, I can -- I can

14  tell you this in general terms.  I was involved in another matter

15  involving Tony's office and then -- and that's about as much as I

16  can tell you.  But we were able to work that out successfully and

17  we did get resolution, and that was actually my first EDR matter

18  that really had a good ending.  And that told me a lot about Tony

19  and how he was earnest and willing and wanted the best for his

20  staff and his employees"?

21             Is that the -- the statement you recall Mr. Ishida

22  making?

23       A.    That sounds like it.

24       Q.    So what part of that statement revealed the identity of

25  the person filing the complaint?