**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

**ASHEVILLE DIVISION**

| | | |
|---|---|---|
| **CARYN DEVINS STRICKLAND,** | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| **v.** | ) | **Civil No. 1:20-cv-00066-WGY** |
| | ) | |
| **UNITED STATES,** *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HER RENEWED MOTION**
**FOR SUMMARY JUDGMENT**

Plaintiff Caryn Devins Strickland hereby incorporates by reference her prior memoranda

in support of summary judgment, *see* ECF No. 60, 93, 116, 138, and supplements those

memoranda with the following evidence obtained through discovery and legal analysis.

**STATEMENT OF UNDISPUTED FACTS**

On September 10, 2018, Plaintiff, an assistant federal public defender in the Federal

Defender Office for the Western District of North Carolina ("FDO"), filed a report of wrongful

conduct and a request for counseling under the Fourth Circuit's Employment Dispute Resolution

Plan. *See* Ex. A. As an FDO employee, Plaintiff had a right to be free of wrongful conduct,

including sexual harassment, sex discrimination, and retaliation, under the Fourth Circuit's EDR

Plan. Ex. B; *see* EDR Plan Ch. II, § 1 (defining "wrongful conduct"). She also had a right to a

clear and specific set of procedures under the Plan to remedy violations of those workplace

protections, including investigation and discipline for the accused parties under Chapter IX of the

Plan, *see* EDR Plan Ch. IX, and dispute resolution and remedies for the complainant under

Chapter X of the Plan, *see* EDR Plan Ch. X, §§ 1–12.

1

## A. Sexual harassment

Plaintiff alleged that she was subjected to *quid pro quo* sexual harassment by the FDO's First Assistant, J.P. Davis, who served as the FDO's "principal deputy" and in a "supervisory role over Plaintiff." Ex. C, at 3; Ex. N, at 48. Since she started at the FDO, the First Assistant had singled Plaintiff out for attention, including "mentoring." Ex. A, at 15–16. Co-workers described him as "lustful," "fixated," "sexually attracted," and "smothering." *Id.*; Ex. P, at 70.

In May 2018, Plaintiff told the First Assistant that she planned to request a promotion to the next grade on the judiciary pay scale, and, eventually, a "duty station" transfer to the FDO's other office location. In response, he became visibly agitated and emotional. Ex. A, at 17. He then sent her an email in which he falsely asserted that she was not eligible for a promotion on her upcoming work anniversary date, but nonetheless had a "plan" to raise her pay:



**Mas Dinero**
**JP Davis**  to: Caryn Devins                    05/18/2018 03:56 PM

Dude, you're shooting high with a G15. Not least of all since you'll need 5 more years of fed service to qualify for it. But fret not, I have a plan... just remember I deal in pay-for-stay :)

J.P. Davis
First Assistant Federal Defender
Federal Public Defender
Western District of North Carolina

*Id.* at 36. The First Assistant's claim that Plaintiff needed five more years of service to qualify for a promotion was patently false (Plaintiff was at Grade 14 and would qualify for Grade 15 in three months), as was his improper assertion that he could help her skirt such a requirement. *See* Ex. C, at 9–10 (admission that Plaintiff was "eligible for a grade-level promotion to FD-15 on or about August 21, 2018"). As Defendants' own witnesses testified, and a subsequent wrongful conduct investigation found, the First Assistant's email "can clearly be inferred to be a quid pro quo request." Ex. D, at 22 (EDR Investigation Report); *see also* Ex. J, at 58 (Investigator's

2

testimony that "it was reasonable to be upset because of that email"); Ex. E, at 127 (Defender's testimony that the email could be "misinterpreted" as "sexual favors. . . . I can see that.").

Over the following weeks, the First Assistant repeatedly asked Plaintiff to meet outside the office alone, including for drinks, out-of-office meetings, and "mentoring" sessions, even after she declined and he acknowledged that his requests were making her uncomfortable. *See, e.g.*, Ex. A, at 37 (offering "a drink and an ear if you need one, though I get the feeling you are not comfortable talking to me about it"); *id.* at 38 (asking for a "celebratory drink"); *id.* at 40 (asking for a "mentoring session" and "some distance from work," while acknowledging that meeting in the office might make her more "comfortable"); *id.* at 41 ("I am free all day, including early morning, lunch, and evening. I am hoping this will be helpful for you, please don't be over-anxious about it."). He persisted in these requests even though he knew that she was intentionally avoiding him. Ex. M, at 2 (J.P. Davis notes to self, dated June 6, 2018, that Plaintiff "[h]as been avoiding me" and "[c]learly does not want to interact with me").

During this period, the First Assistant became increasingly angry with Plaintiff and even told another FDO supervisor that Plaintiff "may need to get smacked a bunch":

> Going to try and talk to her at some point. Hopefully give her a chance to turn around. She may just need to get smacked a bunch, tho.

Ex. N, at 10. The First Assistant began interfering aggressively with Plaintiff's job duties and threatening disciplinary action. One time, he became so angry at Plaintiff for not attending an optional shadowing activity that he was shaking. Ex. A, at 19; Ex. M, at 49 (he "[a]dmitted to being very upset, was controlling"); Ex. J, at 66, 100–01 (he was "visibly angry"). Another time,

3

he waited for her one evening after work when she was leaving the building alone and had already said no to a ride home. He texted her: "Last chance for a ride, tough girl." Ex. A, at 39. Plaintiff felt physically intimidated, pressured, and concerned about his intentions. After this incident, she curtailed her office hours and began bringing work home with her in the evenings to avoid being alone with him. *Id.* at 21; Ex. K, at 164–65 (she was "physically afraid of him").

Following Plaintiff's efforts to distance herself, the First Assistant began spreading disparaging rumors about Plaintiff, some explicitly based on her gender, to her other supervisors. *See, e.g.*, Ex. M, at 6 (agreeing with another supervisor that Plaintiff played the "gender card" and adding that she "plays those tears for sympathy"); *id.* at 8 (calling Plaintiff a "manipulative underhanded jackass"); Ex. N, at 20–21 (stating to Appellate Chief that Plaintiff had a "fuck off attitude" and had committed "fireable offenses"); Ex. M, at 9 (stating to another AFD, Plaintiff's new mentor, that she "has made some egregious errors in attitude and judgment recently"). The First Assistant described Plaintiff as "manipulative" and "self-centered" for seeking trial experience and professional advancement. Ex. N at 5–6. He criticized Plaintiff for working on a life-sentence trial case, even though Plaintiff's request to be assigned as second chair had been granted by the Federal Defender, Anthony Martinez, and she was doing a "bang-up" job. Ex. E, at 100 (Defender's testimony that "[s]he did a good job, so my impression was that she was doing good work, a good job, and hard working"); *see also* Ex. M, at 23 (First Assistant's text message acknowledging, "I probably need to butt out since I don't really have a role here").

The First Assistant's disparaging rumors undermined Plaintiff's ambitions for a promotion from research-and-writing attorney to assistant federal public defender—the position she was offered when she was hired to work at the FDO. Ex. A, at 34 (offer letter for research-and-writing attorney position "with the expectation that you will transition to an Assistant

4

Defender").  Plaintiff was "on th[e] path" to becoming an AFD.  Ex. E, at 103.  The First

Assistant, however, told the Defender that he should reconsider "whether [Plaintiff] lives up to

the title of AFD."  Ex. M, at 28; *see also id.* at 29–30 (First Assistant's text message joking with

the Defender about whether he would "play[]" it "dirty" by encouraging Plaintiff to apply for an

AFD position, and noting that "her lip was practically quivering").  He did so even though

Plaintiff was consistently praised for her excellent job performance, and the Defender thought

she was "hardworking," "responsible," and her work was of "high quality."  Ex. E, at 106–07.

### B.    Defender's sex discrimination and retaliation

On July 2, 2018, Plaintiff informed the Defender that she would be drawing "boundaries"

with the First Assistant and asked for the Defender's support and confidence.  *Id.* at 146; Ex. A,

at 22–23.  In response, the Defender forced Plaintiff to meet with the First Assistant to "resolve a

breakdown in communication" and "clarify with Caryn any issue about any harassment by JP."

Ex. N, at 22.  Plaintiff repeatedly stated that she was not comfortable meeting with the First

Assistant.  As the Defender's disciplinary letter later noted, he "had not abided by [her] wishes

that she meet with [him] privately to discuss Mr. Davis's conduct."  Ex. D, at 81.

During the meeting, the Defender compared Plaintiff's relationship with the First

Assistant to a "marriage," with the parties needing to "compromise" and "meet in the middle."

*Id.*  The Defender promised to remove Plaintiff from the First Assistant's supervision, but then

assigned her back under his supervision shortly thereafter.  Ex. A, at 25–27; *id.* at 26 (office

chart), *id.* at 44, 46; *see also* Ex. E, at 170 ("JP was a supervisor at this time and he was going to

continue being a supervisor."); *id.* at 175 (it was "fair to say that Caryn was still working in JP's

chain of command").  After the First Assistant again requested to meet with Plaintiff alone,

despite knowing she was avoiding him, she began calling in sick to protect herself. Ex. A, at 26; Ex. N, at 19 (recognizing that Plaintiff's calling in sick was not "coincidental").

On July 23, 2018, Plaintiff reported the harassment, and the Defender's failure to respond to it, to Fair Employment Opportunity Officer Nancy Dunham ("FEOO"), in the Administrative Office of the U.S. Courts, who managed the "civil rights office for the federal courts." *See* Ex. I, at 168. At the time, there was no FDO office manual providing notice of the applicable EDR Plan. Ex. M, at 43, 64. The FEOO told Plaintiff that her allegations were highly credible and constituted "classic sexual harassment." Ex. I, at 43, 138. The FEOO was "concerned for her," in part, because of signs of "physical danger." *Id.* at 43. Plaintiff had never previously met the FEOO and did not tell her who she was or where she was located. *Id.* at 26–27.

Based on her experience of 35 years working in EEOC compliance, the FEOO "strongly believed" Plaintiff's allegations. *Id.* at 165; *see id.* at 164 (FEOO had seen many "inherently unreliable" complaints and only intervened "in the few times" when a complaint was credible). The FEOO believed she "needed to do something as soon as possible." *Id.* at 43. Following protocols that are required for employers to avoid liability when credible harassment allegations are made, the FEOO worked with other AO officials to resolve Plaintiff's complaint. *Id.* at 183–84 (FEOO's involvement was not "unusual" and it would have been a "breach of [her] obligation or responsibilities" not to proceed). Based on the FEOO's advice, the AO's Chief of Defender Services suggested to the Defender that he transfer Plaintiff to the appeals unit, away from the First Assistant's supervision of the trial unit, and that he transfer her to the Asheville division office, away from the First Assistant's location in Charlotte. *Id.* at 66–67. She suggested telework in the interim until a solution could be worked out. *Id.* at 90.

The Defender, however, became furious when he learned that Plaintiff had reported her allegations of wrongful conduct to the AO. He "called her out on contacting the AO to receive guidance on her civil rights as a federal employee." Ex. D, at 81. The Defender berated Plaintiff for going to "some other party" and stated that he was being "blamed" and "attacked" for something that was not his "fault." Ex. A, at 30. The Defender minimized the harassment, stating words to the effect that, "at least you weren't touched." Ex. D, at 81.

Subsequently, the Defender made his own report of "wrongful conduct" to the Fourth Circuit. Ex. M, at 37–38. The Defender then informed the Circuit Executive, James Ishida, that the FEOO had "tried to obstruct an ongoing Fourth Circuit EDR investigation" and ordered him to "give the complainant . . . whatever it is that she is asking for" before she "hires an attorney or goes to the press." *Id.* at 36. The Defender added that "[a]fter some checking," he "discovered" that the FEOO is "coincidentally a friend of the complainant." *Id.* Without conducting any due diligence on these patently false allegations, the Circuit Executive relayed them directly to the Chief Judge, Honorable Roger L. Gregory. *Compare id.* (email describing "disturbing incident"), *with* Ex. I, at 124, 126 (FEOO's testimony that she was "shocked" by these "patently false" allegations; Ex. J, at 40–41 (Investigator's testimony that she was never "threatened" by the FEOO). The Circuit Executive, who served as the Fourth Circuit's EDR Coordinator, was "irritated by the fact that there were all these AO employees weighing in and calling Tony and telling him what he needed to do," which he felt was "inappropriate." Ex. K, at 103, 106.

Thereafter, the Defender facilitated and ratified the First Assistant's *quid pro quo* harassment by diminishing Plaintiff's job duties and refusing to consider her for the grade-level promotion that was the subject of the First Assistant's "Mas Dinero" email, for which she was eligible on her work anniversary date. *See* Ex. C, at 9 (admission that Plaintiff "was eligible for

a grade-level promotion"). In a sworn declaration filed in this proceeding, the Defender falsely stated that he had no "discretion" to raise Plaintiff's pay. ECF No. 78-3, ¶ 33; *see* Ex. C, at 10 (stating that "all grade-level promotions are awarded at the discretion of the Federal Defender"). The Defender gave Plaintiff a "reclassification" to AFD in title only, which he stated was "for purposes of case weight measurement." Ex. A, at 52. The Defender even backdated the reclassification to *the day before* Plaintiff qualified for the promotion. Ex. N, at 46. As part of the "reclassification," the Defender also attempted to remove Plaintiff's locality pay and reduce her salary by nearly 15 percent. *Id.* Contrary to the job description for an AFD position, which requires the attorney to carry her own caseload, the Defender required Plaintiff to continue serving in a research-and-writing support role. *Compare* Ex. A, at 52, *with* Ex. N, at 51–57.

The Defender told Plaintiff that he could not transfer her exclusively to appeals, even though he had an open position. Ex. M, at 33 ("Appeal FTE is 2.75 (but have been surviving with 1.75 FTE))"; *id.* at 53 (office "needed more appellate support"). Thus, the Defender required her to continue working for the trial unit supervised by the First Assistant. *See* Ex. A, at 52; Ex. C, at 3. The Defender also refused a transfer to the Asheville division office. *See id.* The Defender claimed there was no office space, but a few months later, he began advertising positions for an intern and a paralegal to work in Asheville. *See* Ex. D, at 17; *see also* Ex. I, at 95 (FEOO had seen lack of office space "used as an excuse previously in many other cases"). Because of the Defender's continued failure to address the harassment, Plaintiff did not feel safe in the office and requested to work remotely. Ex. A, at 51; *see* Ex. I, at 94–95.

## C.    Grossly inadequate and unfair EDR process

In her September 10, 2018 EDR complaint, Plaintiff reported wrongful conduct by both the First Assistant and the Defender and provided a five-page narrative summarizing her claims.

*See* Ex. A. Plaintiff requested a working environment free of sexual harassment, discrimination, and retaliation, and the opportunity to advance professionally based on merit. *Id.* Under Chapter X, Section 7 of the Plan, which provides for disqualification of an employee (including a unit executive) who is "involved in" a complaint, she requested to disqualify the accused Defender from the EDR process. *Id.* at 10; *see* EDR Plan, Ch. I, §§ 2–3 (defining "employee").

In their first phone call, the EDR Coordinator told Plaintiff that it was not "helpful" for her to have reported her complaints to the AO because "when that happens, the barriers go up, the walls go up, people are on guard." Ex. O. Thereafter, for more than six months, the Fourth Circuit took no meaningful action on Plaintiff's complaint. The lengthy period of telework ostracized Plaintiff from her co-workers, in part,



Ex. P, at 31. As a co-worker explained,

*Id.* at 30–31. A supervising Team Leader led Plaintiff's co-workers in spreading disparaging rumors and joking in a staff meeting that he would have to meet her at "Waffle House" because she was on telework. *See* Answer ¶ 351. As part of an



Ex. P, at 31. This conduct made Plaintiff's co-worker,



*Id.* at 30–31.

During this period, the Fourth Circuit failed to conduct an appropriate investigation. Despite the EDR Coordinator's suggestion that he "recus[e]" himself, the Defender was allowed

9

to appoint the EDR Investigator. Ex. N, at 24. The Investigator, Heather Beam, understood the EDR Coordinator's directions to mean that "I would investigate the allegations and bring my report to [the Defender]." Ex. J, at 19. The Investigator informed Plaintiff that she had not investigated her allegations against the Defender because the EDR Coordinator had excluded them from the scope of investigation. Ex. O (Investigator's statement that "if there's a true feeling of retaliation, then I think that might need to be investigated separately"); *see also* Ex. J, at 117 (investigation report's summary of allegations "did not speak to the retaliation claim"). Indeed, the Defender was "never told" he was a subject of Plaintiff's allegations under the Plan. Ex. E, at 271–72; *see also* Ex. N, at 44 (AO's Office of General Counsel approved providing the investigation report to Defender but not the First Assistant, the "accused" party).

The Investigator had never been trained in conducting workplace investigations and has never completed any other EDR investigation besides Plaintiff's. Ex. J, at 12; *id.* at 42 (Investigator did not "recall" being given any guidance about how to investigate complaints); *id.* at 43 (Investigator did not rely on any resources other than a "template" investigation report from the judiciary's intranet site). Contrary to the confidentiality obligations in the EDR Plan, the Investigator allowed the accused supervisors to speak with each other during the investigation, heightening the risk that they would influence each other's testimony. *Id.* at 79–81; Ex. M, at 58 (Investigator's email to First Assistant that "[i]f you need to talk keep it to [Administrative Officer] Bill [Moormann] or [Federal Defender] Tony [Martinez] and of course your wife only"). The Investigator did not contact any of the individuals on Plaintiff's witness list or any other witnesses who could have corroborated the sexual harassment. Answer ¶ 317; Ex. J, at 114 (investigator "didn't reach out to" any witnesses and did not "interview anyone else who could substantiate these claims"); Ex. N, at 28. Without notifying Plaintiff, the Investigator, instead,

interviewed members of the all-male upper management team.  Ex. D, at 17–20 (discussing interview with the Appellate Chief and correspondence with the Administrative Officer).  Later, the Investigator expressed her view that Plaintiff was "a true pain in the you know what" to the district's Clerk of Court after Plaintiff applied for other judiciary employment.  Ex. N, at 30.

During the investigation, the First Assistant repeatedly contacted the Investigator and EDR Coordinator.  Ex. M, at 56–74.  His conduct led the EDR Coordinator to notify the Defender about the "troubling" perception that he was attempting to influence the investigation, and the Defender threatened to fire him if he did not stop.  *Id.* at 75; Ex. K, at 179–89.

After the investigation report was completed, the EDR Coordinator told Plaintiff that she would not receive the report or its findings.  Ex. N, at 32.  He further stated that no disciplinary action against the accused parties would be considered because the wrongful conduct proceeding was being held "in abeyance" until Plaintiff's dispute resolution process was over.  Ex. O.  The Judicial Integrity Officer ("JIO"), Jill Langley, who is considered a "national resource" on the EDR Plan, later stated that "the concept of saying something had been abated" in this way "is not something that I have ever heard of or understood as part of the EDR process."  Ex. F, at 27–28, 125–26; *see also* Ex. N, at 39–41.

Meanwhile, the Chief Judge refused to disqualify the accused Defender from representing the employing office.  Initially, Plaintiff did not receive a ruling for more than four months because, as the EDR Coordinator told her, the Chief Judge believed that "disqualification would be 'premature' without a finding against the Defender" and if he were disqualified, "there's really no one that represents the office."  Ex. O.  Because of the delay, Plaintiff was forced to negotiate a resolution with the Defender, an accused party, during "counseling" and "mediation," which were mandatory stages before Plaintiff could request a final hearing.  EDR Plan, Ch. X, §§

11

8–9.  As the office's representative, the accused Defender had sole decision-making authority over any personnel actions regarding Plaintiff.  *See* Ex. G, at 35 (Chief Judge's testimony that the unit executive is the person who "needs to resolve" "grievance-type things, like pay, job duties, who you'll report to, where you would work").

On January 11, 2019, more than four months after the investigation began, the Investigator concluded in her report that both the Defender and the First Assistant had engaged in conduct warranting disciplinary action.  Ex. D, at 23.  Based on her recommendation that the Defender be disciplined, the EDR Coordinator asked the Investigator whether the Defender should be disqualified.  Her answer was an emphatic yes:

> On Jan 13, 2019, at 5:53 PM, Heather Beam <Heather_Beam@ncwp.uscourts.gov> wrote:
>
> Hey James,
>
> I truly believe Tony is biased in this case involving JP and Caryn as far as the sexual harassment is concerned. From my conversations with him I know he feels Caryn is attempting to exploit this situation to get the transfer to Asheville, however it has created a bias in him to look at this case from a neutral perspective. I also believe he lacks the experience and understanding of exactly how this process works. I am concerned he could cause more damage if he were involved in the process at this point.
>
> Caryn had requested Tony be disqualified as she felt she was retaliated against after she submitted her claim of Wrongful Conduct. Although retaliation in my investigation was unfounded, I still think in a good faith effort to resolve this the circuit should consider disqualifying him based on the contentious nature of the current situation. I would strongly recommend mediation at this point with perhaps one of the individuals we discussed the other day.
>
`

Ex. M, at 76.  It appears, however, that this email was never communicated to the Chief Judge, who did not consider it in ruling on disqualification.  Ex. G, at 32 (Chief Judge did not "recall" receiving this email and no one ever communicated its substance to him "that I know of").

On January 16, 2019, the EDR Coordinator informed Plaintiff that the "Chief Judge intends to deny your request to disqualify the Defender."  Ex. N, at 35.  Plaintiff was not provided any basis for the decision.  Plaintiff later filed a renewed disqualification request along with a 23-page document further detailing her allegations of the Defender's wrongful conduct, but she never received a ruling.  *See* Ex. A, at 11, 58.

On January 30, 2019, nearly five months after Plaintiff filed her EDR complaint, she proceeded to the mandatory mediation stage. The Fourth Circuit's Chief Circuit Mediator, Ed Smith, informed Plaintiff that "the Defender is from a 'generation' that doesn't 'get' sexual harassment." *See* Answer ¶ 415; *see* Ex. H, at 67–69. He stated, however, that "I don't think a judge is going to micromanage this office and tell a federal defender how to do his job and run this office. They'd be better off terminating him." Ex. O; *see* Ex. C, at 4. The Mediator further observed that "there really wasn't a remedy" under the EDR Plan that "fit the situation," because "[n]one of these are going to do anything in this particular case." Ex. H, at 13, 28.

During mediation, the Mediator convinced the Defender to offer Plaintiff a duty station transfer. *Id.* at 38–40, 44–46. Plaintiff turned down the offer because of the Defender's evident bad faith in refusing the transfer six months earlier, even though it plainly was possible, and because a transfer would not resolve the underlying harassment, discrimination, and retaliation. *See id.*; *see also* Ex. I, at 167–68.

On February 14, 2019, Plaintiff met with the Judicial Integrity Officer, who had been newly appointed to that position. The JIO expressed uncertainty to Plaintiff about how EDR remedies could be enforced against a federal defender office. Specifically, the JIO "didn't know what would happen" if "the defender refused to comply" with an order in an EDR proceeding. Ex. F, at 130–31. The JIO explained, "[i]n contrast, if I'm a court employee and the presiding judicial officer orders the clerk of court to provide some remedy, the clerk of court, I understand, is in a very direct employment relationship with the chief judge and the judges on the court." *Id.* at 131. Thus, the JIO informed Plaintiff that in terms of the "mechanics of what does th[e] enforcement [of remedies] mean, what I didn't know was would they have the power to fire the defender for failing to comply with a presiding officer decision." *Id.* at 132.

After this meeting, the JIO purportedly learned about a statute that "describes how a defender can be removed" for "misconduct" or "neglect of duty," which she speculated may provide the authority to enforce remedies. *Id.* at 132, 176. The JIO never communicated this information to Plaintiff. *Id.* Instead, the JIO reiterated to Plaintiff that "I'd like to better understand if FPDs are adequately protected by EDR remedies." Ex. N, at 42–43. She described Plaintiff's EDR process as a "lesson learned," explaining that "I can't address the whys of what has transpired in your cast [sic] to date, and I know this has been an arduous path for you." *Id.*

### D.     Constructive discharge

Having endured a hostile working environment for more than six months with no meaningful action on her complaints, having been subjected to an unfair and biased process for resolving her complaints, and having been told that a hearing officer would not, or could not, order remedies even if she prevailed, Plaintiff had no choice but to resign. Plaintiff informed the EDR Coordinator and Chief Circuit Mediator that she was no longer welcome in the FDO and was being forced to resign. Ex. H, at 105 (statement to Mediator that clerkship was a "very nicely packaged constructive discharge"); Ex. M, at 78. Plaintiff resigned on March 15, 2019. Complaint ¶ 464. Though Plaintiff had already clerked for multiple federal judges, including a judge on the Second Circuit, she accepted a temporary Fourth Circuit clerkship to prevent her supervisors in the FDO from harming her reputation. *See* Ex. H, at 105; Complaint ¶ 456.

On June 4, 2019, several months after Plaintiff resigned, the EDR Coordinator informed Plaintiff that "disciplinary action was taken" as "a result of your report of wrongful conduct." Ex. N, at 45. The Chief Judge decided what discipline to impose on the Defender, and the Defender decided what discipline to impose on the First Assistant. Ex. E, at 275 (Defender's testimony that discipline was "discretionary on my part"); *see* ECF No. 78-4, ¶ 8. Evidence

14

disclosed after the close of discovery, and on the day before the Chief Judge's deposition, reveals that officials did not begin the process of considering disciplinary action until March 25, 2019, weeks after Plaintiff forcibly resigned.  Ex. D, at 78–79.

## LEGAL STANDARD

Summary judgment is proper when "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To defeat summary judgment, "the nonmoving party must convince the court that upon the record taken as a whole a rational trier of fact could find for the nonmoving party."  *Austin v. Clark Equip. Co.*, 48 F.3d 833, 836 (4th Cir. 1995).

## ARGUMENT

### I.      Defendants Violated Plaintiff's Equal Protection Rights.

The Fourth Circuit held that "federal judiciary employees who occupy supervisory roles and/or who are charged with enforcing an EDR plan can . . . be held liable under the Fifth Amendment for their deliberate indifference to sexual harassment committed by a federal judiciary employee or supervisor against another federal judiciary employee."  *Strickland v. United States*, 32 F.4th 311, 321 (4th Cir. 2022).  Plaintiff's complaint alleged each of the elements of a deliberate indifference claim, including that (1) she "was subjected to sexual harassment by the First Assistant"; (2) she "reported the sexual harassment to various judiciary employees, some of whom alerted the FPD to the harassment"; (3) Defendants "fail[ed] to take immediate and effective action on her complaints,' and also 'fail[ed] to provide her with meaningful review or remedies'" (quoting Complaint ¶ 498); and (4) Defendants' "failure to take proper corrective action was intentional and motivated by their intent to discriminate against her because of her gender."  *Id.* at 360.  The undisputed facts establish each of these elements.

15

### A. Plaintiff was subjected to sexual harassment.

Plaintiff was subjected to sexual harassment and related sex discrimination and retaliation. Both the First Assistant and the Defender were disciplined for "wrongful conduct" under Chapter IX of the EDR Plan. Ex. D, at 79, 83. The EDR Plan defines "wrongful conduct" as "[d]iscrimination against employees based on . . . sex," including "sexual harassment," and "retaliation for engaging in any protected activity." *Id.* (quoting EDR Plan Ch. II, § 1).

The EDR investigation report found that the First Assistant's May 18, 2018 "Mas Dinero" email "can clearly be inferred to be a quid pro quo request" that "supports Caryn's claim of sexual harassment." Ex. D, at 22. Moreover, the First Assistant's conduct in undermining Plaintiff's professional advancement after she rejected his advances was "not consistent with the professional relationship of a superior officer and his subordinate," but was instead "more like the conduct of a spurned suitor." *Beardsley v. Webb*, 30 F.3d 524, 530 (4th Cir. 1994).

Despite the Investigator's clear findings in support of the sexual harassment claim, her investigation report concluded that Plaintiff had experienced sexual harassment "in her mind" but the facts "find this claim to be very flimsy." Ex. D, at 23. The Investigator had never received any training on whose perception matters in evaluating a sexual harassment claim. *See* Ex. J, at 123. Thus, the Investigator erroneously concluded that because the First Assistant "openly admitted this was a stupid email to send" and was "forthright" about it in her opinion, she did "not believe there was an intention of sexual harassment when he sent the email." Ex. D, at 22. The Investigator's conclusion runs contrary to judiciary guidance that "[i]t is the perception of the individual who feels harassed that counts," not the intent of the harasser. Ex. N, at 60 (Federal Judicial Center Guidance); *id.* ("But the *intent* doesn't determine whether it's workplace harassment; what counts is the perception of the person who feels harassed."). It is

settled law that sexual harassment is determined from the perspective of "a reasonable person in the plaintiff's position." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333 (4th Cir. 2003).

Had the Investigator applied these standards, she would have been compelled to conclude that the First Assistant engaged in *quid pro quo* sexual harassment based on her finding that his email "can clearly inferred to be a quid pro quo request." Ex. D, at 22. Indeed, the Chief Judge's letter disciplining the Defender even referred to this email as "an unsavory quid pro quo proposal." *Id.* at 80. Likewise, the Defender, who also had received no meaningful training in sexual harassment, was dismissive of Plaintiff's allegations because he understood them in the "context" of "JP's perspective," even as he recognized that the email could be interpreted as a request for "sexual favors." Ex. E, at 115–19, 125, 127; *see also* Ex. M, at 43 (Investigator's notes with Defender: "No training on EDR, sexual harassment"); Ex. E, at 40–49 (Defender's training was "minimal" and he "could have received better training on so many" issues).

Similarly, the Investigator did not understand the *quid pro quo* email's reference to "G15" as referring to Grade 15 on the judiciary pay scale. Ex. J, at 107. Thus, she did not investigate whether the First Assistant's assertion that Plaintiff needed "five more years to qualify" for Grade 15 was accurate. *Id.* at 110–11 (Investigator did not "recall" investigating this issue); *cf.* Ex. C, at 9 (admission that Plaintiff was "eligible for a grade-level promotion to FD-15"). This issue would have been "important" to the investigation because in the Investigator's "experience, it takes about a year . . . before you can go to the next grade." Ex. J, at 111. The issue of whether Plaintiff qualified for a grade-level promotion was relevant not only to her sexual harassment claim, but also her allegation that the Defender retaliated against her by failing to consider her for a promotion for which she qualified. *See* Ex. D, at 20 ("I do not see a case for retaliation based on my investigation and the facts presented by both sides.").

17

### B.     Plaintiff reported the harassment.

Plaintiff "reported the sexual harassment to various judiciary employees, some of whom alerted the FPD to the harassment." *Strickland*, 32 F.4th at 360. These employees included (1) the Defender, who was on notice of potential "harassment by JP" by July 2, 2018, *see* Ex. N, at 22; (2) the FEOO and AO officials, *see* Ex. I, at 31–35; and (3) the Fourth Circuit, *see* Ex. A.

### C.     Defendants were deliberately indifferent to the harassment.

In response to Plaintiff's complaint, Defendants failed "to take immediate and effective action" and failed to provide "meaningful review or remedies." *Strickland*, 32 F.4th at 360. Indeed, the counseling letter for the Defender reads as a roadmap of the Defender's deliberate indifference as articulated by the Fourth Circuit, *see id.* at 359–60:

- "Marriage Metaphor": "After attempting to resolve several disagreements between Ms. Strickland and Mr. Davis, you had used an ill-advised metaphor, comparing the relationship between Ms. Strickland and Mr. Davis as a 'marriage,' with the parties needing to 'compromise' and 'meet in the middle.' Ms. Strickland said that she was 'shocked' and 'offended' at the reference, believing that it was inappropriate to describe any professional relationship between a male supervisor and female subordinate as a 'marriage.' The metaphor was especially inappropriate given the context that Ms. Strickland had raised concerns with Mr. Davis's behavior towards her."

- "No Physical Touching": "Ms. Strickland denied that Mr. Davis had touched her inappropriately, but she repeated that Mr. Davis made her feel uncomfortable and threatened. Investigator Beam found that you had said, 'at least you weren't touched,' or words to that effect. The investigator concluded that your remarks were callous, minimizing, insensitive, and contributed to the distress that Ms. Strickland felt."

- "Disapproval of Seeking Outside Advice": "Ms. Strickland had also sought advice and guidance from the Fair Employment Opportunity Office at the Administrative Office of the U.S. Courts on her civil rights as a judiciary employee. The investigator found that you had 'called out' Ms. Strickland for seeking legal advice from that office, which further eroded trust between you and Ms. Strickland and exacerbated the deteriorating situation in your office."

- "Shifting Responsibility": "Finally, the investigator noted that you had said you were being blamed for matters that you had nothing to do with. Ms. Strickland

reported that she felt 'offended' by your protest, which she perceived as disapproving her right to seek outside advice and counsel from the AO Fair Employment Opportunity Office. This, the investigator concluded, contributed to your mishandling of the matter."

Ex. D, at 81–82.

The other Defendants were also deliberately indifferent. Indeed, Plaintiff's workplace investigations expert, Vida G. Thomas, concluded that Defendants' response to Plaintiff's complaint "fell below well-accepted HR practices" because Defendants "did not respond to or investigate Strickland's complaint promptly," the accused Defender "was permitted to control aspects of the investigation," and Defendants "took no action to remedy the harm Strickland suffered." Ex. Q. The investigation was not "timely, fair and thorough" and was conducted "in a manner that raises questions about [the Investigator's] impartiality." *Id.* Finally, "Defendants failed to protect Strickland from retaliation." *Id.* Ms. Thomas concluded that "Defendants did not meet their obligations to Strickland" and "did not appreciate" that she had reported "behavior . . . that needed to be taken seriously, investigated promptly, and remedied appropriately." *Id.*

Defendants' failure to act on Plaintiff's complaint was part of a pattern of failing to take sexual harassment complaints seriously. *See Basta v. Novant Health Inc.*, 56 F.4th 307, 317 (4th Cir. 2022) ("[A] pattern of similar violations . . . is relevant evidence to proving deliberate indifference."). The FDO had provided no notice of applicable procedures for reporting harassment, and most of the officials involved in Plaintiff's complaint had received no meaningful training. *See Hill v. Cundiff*, 797 F.3d 948, 975 (11th Cir. 2015) (failure to provide training or notice of sexual harassment policy was "clearly unreasonable"); *see* Ex. J, at 42 (Investigator); Ex. E, at 40–49 (Defender); Ex. H, at 94 (Mediator); Ex. C, at 14 (FDO did not receive office-wide training until March 2019). According to Defendants' own witnesses, there was no mandatory judiciary-wide sexual harassment training before 2019. *See* Ex. J, at 72; Ex.

F, at 60–64, 92–97 (JIO's discussion of "dated" FJC training video that "wasn't tailored to the judiciary" and "didn't describe any of our EDR options").  Currently, it is "mandatory" that training be "offered," but it still is not even "mandatory that people attend."  Ex. F, at 61.

There was also a pattern of other EDR complaints from the FDO office.  *See* Ex. K, at 227 (EDR Coordinator was "concerned" about a "pattern" of complaints).  During the Defender's tenure,



Ex. P, at 3–4.

*Id.* at 26, 27.

*Id.* at 18.

In their sworn declarations filed in this proceeding, the Defender and his Administrative Officer falsely represented to this Court that no other EDR complaints had been filed against the FDO.  *See* ECF No. 78-3, ¶ 124; ECF No. 78-1, ¶ 54.  The Defender falsely asserted that he had "never even heard of any gender discrimination" in the FDO,

Ex. P, at 36.

### D.     Defendants acted with intent to discriminate.

The Fourth Circuit has held that "intentional discrimination can be proven via deliberate indifference."  *Basta*, 56 F.4th at 316.  Because Plaintiff has proven that Defendants acted with deliberate indifference, she has also proven that Defendants acted with "intent to discriminate against her because of her gender."  *Strickland*, 32 F.4th at 360.

## II.    Defendants Violated Plaintiff's Due Process Rights.

The Fourth Circuit held that the "refusal to disqualify the FPD from the [EDR] investigation and the alleged coercing of Strickland to end the investigation stated a plausible violation of her due process rights." *Id.* at 355. "The refusal to disqualify the FPD created a conflict of interest that infected the entire investigation when Strickland was led to believe that the FPD would be the final decisionmaker in the case." *Id.* Thus, "Strickland's due process rights were violated if she can prove that the FPD, an accused party, was not disqualified from the EDR process, and if Strickland was led to believe that the FPD would be the final decisionmaker in her case." *Id.* at 356. The undisputed facts establish this due process claim.

### A.    Defendants refused to disqualify the accused Defender.

Defendants refused to disqualify the Defender from the EDR process even though he was "involved in [the] dispute" as an accused party. *Id.* at 355 (the EDR Plan "accounts for potential conflicts of interest by permitting a party . . . to 'seek disqualification of a judicial officer, employee or other person involved in a dispute'"). Defendants confirmed in their discovery responses, declarations, and deposition testimony that the Defender was not disqualified. *See* Ex. C, at 8 ("Defendants admit that Plaintiff's request for disqualification of the Federal Defender was denied."); ECF No. 78-4, ¶ 18 (Ishida Decl.) ("The Chief Judge denied Plaintiff's request to disqualify . . . . ."); Ex. G, at 16 (Chief Judge's testimony that Plaintiff's disqualification request was "[d]enied, at that time. Yes. Denied.").[1]

---

[1] In an interrogatory response dated May 8, 2023, Defendants asserted that the denial was "without prejudice to consider whether disqualification might be appropriate at a later date in the proceedings." Ex. C, at 19. Any such ruling, however, was never communicated to Plaintiff. *See* Ex. N, at 35 ("[Chief Judge] informed me that he intends to deny your request to disqualify Tony Martinez. We are preparing an order to that effect."); *see also* Ex. G, at 19 (Chief Judge's testimony that the EDR Coordinator was "authorized to communicate this information" to Plaintiff on his behalf).

21

There was ample basis to disqualify the Defender, who was "involved in" the dispute as a party accused of wrongful conduct.  EDR Plan, Ch. X, § 7; *Strickland*, 311 F.4th at 355 ("The refusal to disqualify the FPD created a conflict of interest . . . .").  An investigation into Plaintiff's allegations determined that the Defender had engaged in conduct warranting discipline, and the Defender was subsequently disciplined for wrongful conduct under Chapter IX of the EDR Plan.  Ex. D, at 80–83.  Moreover, the Investigator recommended that the Defender be disqualified because he was "biased" against Plaintiff and "could cause more damage if he were involved in the process at this point."  Ex. M, at 76.

The Defender's participation as an accused party concretely undermined the fairness of Plaintiff's EDR process.  The Defender admitted that he never believed Plaintiff's allegations of sexual harassment, and he thus prejudged the EDR investigation.  Ex. E, at 216.  The Defender also relayed false allegations that impugned Plaintiff's integrity to the Fourth Circuit.  These false allegations were "concerning" because "having these falsehoods presented to [the Chief Judge and EDR Coordinator] could interfere with decisions they made in the future," including by "undermining [Plaintiff's] legitimacy and credibility."  Ex. I, at 130–32.  Moreover, the Defender had sole decision-making authority over personnel actions affecting Plaintiff during *mandatory* counseling and mediation, which collectively lasted more than six months.  Ex. G, at 35; *see also* Ex. K, at 162.  The Defender exercised "discretionary" authority over discipline of the First Assistant, even though the Defender himself was also disciplined.  Ex. E, at 275.

**B.    Plaintiff was led to believe that the Defender was the final decisionmaker.**

Plaintiff also was "led to believe that the FPD would be the final decisionmaker in her case."  *Strickland*, 32 F.4th at 356.  Specifically, the Mediator told Plaintiff that a hearing officer would not "micromanage" the Defender or "tell him how to do his job."  Ex. O; *see* Ex. C, at 4.

22

The Judicial Integrity Officer testified that she was uncertain how EDR remedies could be enforced against the FDO, because defenders "are different than the unit executive in the court which is clearly governed by, supervised by, and works at the pleasure of the chief judge and the judges on that court." Ex. F, at 175–76. This testimony corroborates Plaintiff's allegation that the JIO told her that "Article III judges do not have authority to 'manage' a federal defender office," an issue which she described as "jurisdictional." Complaint ¶ 439.

Based on the statements of the Mediator and JIO, Plaintiff reasonably believed that as a practical matter, an EDR presiding officer would not, or could not, order binding remedies against a federal defender office, regardless of what the EDR Plan stated. Plaintiff's understanding was especially reasonable in the context of contemporaneous debates about the importance of maintaining the independence of federal defender offices relative to the rest of the judicial branch. As Plaintiff testified at her deposition:

> At this time, there was a big report called the Cardone Committee Report that had just come out and was discussing the recommendation that federal defender offices be taken out of the judiciary entirely. And there were a lot of concerns about judges and the judiciary in general infringing on the independence of federal defender offices.
>
> So it did not strike me as unreasonable at all that they would suggest that -- regardless of what the plan said on paper, that because of the unique role of the federal public defender office, a presiding officer would not order anything because it would be perceived as micromanaging or meddling in a federal public defender's business.

Ex. L, at 32–33 (citing 2017 Report of the Ad Hoc Committee to Review the Criminal Justice Act (Apr. 2018), *available at* https://tinyurl.com/mrkvs6ej)); *see also* Report of the Proceedings of the Judicial Conference of the United States, at 23–24 (Sept. 2021) (adopting separate EDR plan for federal public defender organizations in light of their "distinct employment relationship and mission"). Indeed, the Defender confirmed the reasonableness of this understanding when

23

he testified that he did not know whether the Chief Judge could order remedies without his consent, explaining: "I don't think a Court -- a judge would order a defender that you've got to do this without considering whatever needs that defender has." Ex. E, at 244–45.

### C. Plaintiff was coerced to resign.

The Fourth Circuit also held that "the alleged coercing of Strickland to end the investigation stated a plausible violation of her due process rights," and the record establishes this claim. *Strickland*, 32 F.4th at 355. Fourth Circuit officials deliberately held Plaintiff's wrongful conduct report "in abeyance" and delayed taking disciplinary action until her EDR process was over. Ex. O. Officials did not even begin the process of considering disciplinary action until March 25, 2019, more than two months after the investigation report came out and weeks after Plaintiff resigned. Ex. D, at 78. By explicitly conditioning any disciplinary action on Plaintiff concluding her EDR process, Defendants pressured her to resign to avoid further delaying accountability for those responsible for sex discrimination. *See id.*

### III. Plaintiff is Entitled to Front Pay as an Equitable Remedy.

The Fourth Circuit held that Plaintiff's request for front pay in lieu of reinstatement "constitute[s] an equitable remedy." *Strickland*, 32 F.4th at 366. This holding accords with longstanding precedent recognizing that "[a]lthough reinstatement of a wrongfully discharged employee is preferable, 'in appropriate circumstances, a district court may award front pay in lieu of reinstatement.'" *Id.* (quoting *Hunter v. Town of Mocksville*, 897 F.3d 538, 562 (4th Cir. 2018)); *see also Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001) ("In cases in which reinstatement is not viable because of continuing hostility between the plaintiff and the employer or its workers, . . . courts have ordered front pay as a substitute for reinstatement.").

24

Plaintiff has pursued her "next best employment" in indigent criminal defense, but there is no other position that would offer compensation comparable to what she received at the FDO. *Avitia v. Metro. Club of Chicago, Inc.*, 49 F.3d 1219, 1231 (7th Cir. 1995). Plaintiff's lost earnings expert, Dr. Gary Albrecht, concluded that based on the lifetime economic impact of her discontinued employment with the FDO, the "amount required to make Ms. Strickland whole is $3,420,610." Ex. R. Under the circumstances, a substantial front pay award is supported by precedent from virtually every circuit on front pay awards against government entities. *See, e.g.*, *Warren v. Cnty. Comm'n of Lawrence Cnty.*, Ala., 826 F. Supp. 2d 1299, 1313 (N.D. Ala. 2011) (32 years); *Feldman v. Philadelphia Housing Auth.*, 43 F.3d 823, 832–33, 841 (3d Cir. 1995) (27 years); *Lussier v. Runyon*, 50 F.3d 1103, 1106 (1st Cir. 1995) ("projected 25-year work expectancy"); *Padilla v. Metro-North Commuter RR*, 92 F.3d 117, 126 (2nd Cir. 1996) ("well over 20 years"); *Bates v. Bd. of Educ. of Capital Sch. Dist.*, No. 97-394-SLR, 2000 WL 376405, at *10 (D. Del. Mar. 31, 2000) (17 years); *Newton v. Pennsylvania State Police*, No. CV 18-1639, 2022 WL 874306, at *10 (W.D. Pa. Mar. 24, 2022) (11.8 years); *Gotthardt v. Nat'l Railroad Passenger Corp.*, 191 F.3d 1148, 1156–58 (9th Cir. 1999) (11 years); *Jackson v. City of Cookeville*, 31 F.3d 1354, 1360 (6th Cir. 1994) (11 years); *O'Kell v. Haaland*, 598 F. Supp. 3d 1032, 1051 (E.D. Wash. 2022) (11 years); *Tinsley v. City of Charlotte*, No. 3:16-CV-00656-GCM, 2019 WL 1874044, at *6 (W.D.N.C. Apr. 26, 2019) (9 years). Plaintiff thus requests that this Court order an appropriate award of front pay or, alternatively, conduct an "equitable hearing" on the front pay remedy. *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1424 (4th Cir. 1991).

## CONCLUSION

This Court should grant summary judgment in Plaintiff's favor.

This the 1st day of June, 2023.

Respectfully Submitted,

*/s/ Cooper Strickland*

Cooper Strickland
P.O. Box 92
Lynn, NC 28750
Tel. (828) 817-3703
cooper.strickland@gmail.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of June, 2023, I will electronically file the foregoing with the

Clerk of Court using the CM/ECF system, which will then send a notification of such filing

(NEF) to the following:

Joshua M. Kolsky at Joshua.Kolsky@usdoj.gov

Rachael Westmoreland at Rachael.Westmoreland@usdoj.gov

Madeline M. McMahon at madeline.m.mcmahon@usdoj.gov

Danielle Young at Danielle.young2@usdoj.gov

/s/ Cooper Strickland
Cooper Strickland
N.C. Bar No. 43242
P.O. Box 92
Lynn, NC 28750
Tel. (828) 817-3703
cooper.strickland@gmail.com

27