# EXHIBIT A

**Sent:** 6/12/2019 4:12:15 PM
**To:** James Ishida [█████ @ca4.uscourts.gov]
**Attachments:** Strickland Official Grievance.pdf; Strickland Request for Counseling.pdf

James N. Ishida
Circuit Executive
U.S. Court of Appeals for the Fourth Circuit
1100 East Main Street, Suite 617
Richmond, VA 23217-3517

█████ @ca4.uscourts.gov
— Forwarded by James Ishida/CA04/04/USCOURTS on 02/05/2019 10:28 AM —

From: Caryn Devins <caryn.devins@hotmail.com>
To: "█████ @ca4.uscourts.gov" <█████ @ca4.uscourts.gov>
Date: 09/10/2018 01:48 PM
Subject: Request for Counseling and Report of Wrongful Conduct

James,

I am requesting counseling and making a report of wrongful conduct under the Fourth Circuit EDR Plan. Please see the attached Request for Counseling form and official grievance.

Best regards,

Caryn

*(See attached file: Strickland Official Grievance.pdf) (See attached file: Strickland Request for Counseling.pdf)*

US00000500

September 10, 2018

Mr. James Ishida, Circuit Executive
Lewis F. Powell, Jr. United States Courthouse Annex
1100 East Main Street, Suite 617
Richmond, Virginia 23219-3517

SUBJECT: Official Grievance of Ms. Caryn Devins Strickland

Dear Mr. Ishida:

Please accept my grievance under the Employment Dispute Resolution Plan for the Fourth Circuit Court of Appeals ("EDR Plan"). For the reasons set forth below, I request counseling and a wrongful conduct investigation under the terms of the EDR Plan.

Anthony Martinez is the Federal Defender for the Western District of North Carolina. JP Davis is his First Assistant. The Federal Defender initiated a wrongful conduct investigation based on my allegations of sexual harassment by the First Assistant. My complaint, however, is against them both.

The First Assistant has abused his power and offered employment preferences for his unwanted advances. Soon after the start of my employment, he began treating with me with favoritism by, for example, requesting to be my mentor and asking me out to lunch with him regularly. After my marriage, he became visibly upset when I told him after a mentoring lunch that, although I wanted to continue working at the Federal Defender Office, I would eventually need to transfer to the Asheville division office. The topic of my annual review also came up, and I told him I planned to ask for a raise and a promotion to an Assistant Federal Defender ("AFD") position, as promised in my job offer letter. Later that day, he sent me an email with the subject line, "Mas Dinero":

> Dude, you're shooting high with a G15. Not least of all since you'll
> need 5 more years of fed service to qualify for it. But fret not, I have
> a plan . . . just remember I deal in pay-for-stay :)

The First Assistant repeatedly asked me to meet outside of the office. He also interfered with my participation as second chair on a case. A month before trial, he ordered me not to attend an FBI discovery review so that I could shadow him for a routine presentence interview ("PSI")— an activity I had already completed with him in another case. I met with him to talk about it, but he was so angry at me he was shaking. He also asked me more than once for a copy of my offer letter stating I would transition to an AFD role, claiming it was not saved in the file.

Later that day, I emailed him that the FBI meeting time was set, and that I believed his shadowing activities were optional and he had no problem when I cancelled similar activities with him in the past. In his response, copying the Federal Defender and my trial team leader, Peter Adolf, he directed me to attend the PSI. He said that if I disobeyed a direct order, that would be an action that he as a supervisor could not ignore.

1

US00000501

The next day, he berated me further as we were walking to the PSI. He said that I was being manipulative and that I had not been honest with him about my reasons for wanting to second chair. When I told him I had no idea what he was talking about, he said I was on this case just to get experience so I could demand to transfer.

Soon after, the first chair of the case was fired. Despite my excellent performance on the case, I was demoted to an informal research support role. The First Assistant again asked for a copy of my offer letter, and I complied even though I was uncomfortable.

Around the same time, I raised ethical questions regarding the duty of candor with the First Assistant. In light of my ethical concerns and his other recent behaviors, I felt extremely uncomfortable around him. One evening, we stayed after hours, alone in the office, to prepare for a hearing in that case. As we were getting ready to leave, he said it looked like it was going to rain and asked if I wanted a ride home. Although I had accepted rides home in the past, I was no longer comfortable. I told him I would be fine biking home, I am tough. I went to change into my bike clothes and I thought he left. When I got off the elevator at the lobby, he was standing there waiting. He said, are you sure you don't want a ride? I repeated yes, I am sure, I will be fine. When I got home I saw text messages he had sent me: "It is currently raining. Last chance for a ride, tough girl . . . .". After this, I modified my work schedule to avoid being alone with him.

Soon after this, the First Assistant asked me to meet for another mentoring session, suggesting that it might be good to have some distance from work. I was uncomfortable with his invitation but felt I could not say no, so I set a time to meet at the office. I then approached the Federal Defender. I told him that I would be meeting with the First Assistant, and that I needed to set boundaries with him. The Federal Defender asked me if this was sexual harassment. I said I did not want to use words like that yet because I was trying to self-manage the situation and I wanted to have a conversation with the First Assistant first. I explained, however, that the First Assistant had spoken to me inappropriately, berated me, and gotten extremely angry with me over the discovery review, and that I was leaving the office by 5 p.m. every day to avoid issues with him. I said that I was notifying him and I would not have involved him unless I thought it was absolutely necessary.

When I met with the First Assistant, he said that I was struggling and having a hard time balancing priorities, and that pushing me out of my comfort zone had not worked out. He asked me for my short and long term goals. I did not feel comfortable having this conversation. I told him I was setting boundaries and that he had crossed a line with me in the way he spoke to me about the PSI. He continued to berate me until I got up and left the room. Immediately afterwards, I called the Federal Defender to let him know that the First Assistant might say something to him, and that I would ask him to withhold judgment until he had spoken to me.

Later that week, the Federal Defender called me into his office to meet with the First Assistant directly to resolve, what he referred to as, a breakdown in communication. I repeated several times that I would not meet without speaking to the Federal Defender alone first. After the First Assistant left the room, the Federal Defender told me to put away my notepad and stop taking notes. I explained that the First Assistant had repeatedly told me that his shadowing activities were

US00000502

supposed to be for my benefit and that substantive work always took priority. I said I had emails documenting that these activities had been optional in the past. The Federal Defender responded that the emails were not relevant because he was only interested in moving forward.

I told the Federal Defender, once again, that the First Assistant was so angry with me over the discovery review that he was shaking and that the way he spoke to me was inappropriate and unprofessional. I also told him I understood the First Assistant to be attempting to restrict my job responsibilities in our meeting, and that I would rather have that type of conversation with the Federal Defender. He insisted, however, that the First Assistant was my supervisor and had the right to meet with me. He drew an analogy between our relationship and a marriage. He said that I had only been married recently, but marriage always involves compromise.

I began to tear up. The Federal Defender asked me why I was getting emotional. I told him that the First Assistant had made me uncomfortable and that he was interfering with my ability to do my job. I told him he had asked me numerous times to meet outside of the office, including for drinks, and that he had waited for me in the lobby one night after work when he knew was I alone and I had already said no to a ride home. I said I felt threatened by him. I told him that the First Assistant had said I was being manipulative by wanting to be on the trial case just so I could request a transfer. I said that the PSI issue was not really about the PSI, it was personal for him and my desire to transfer had seemed to set him off.

The Federal Defender responded that he did not want me to feel uncomfortable or unsafe. But he then brought the First Assistant back into the room, where the First Assistant continued to berate me regarding my second chair role and other matters. Even still, both confirmed that my performance was excellent, including as second chair. The First Assistant then changed topics. He said I needed a mentor I can trust and suggested that I choose someone else. In addition, he said he had created the shadowing activities list to help me get promoted, and he was frustrated that I was blowing off his checklist.

Following this meeting, I confirmed with the Federal Defender that I did not have a performance issue and that the First Assistant should no longer be my mentor. But within two weeks, the Federal Defender assigned me to the First Assistant's trial team. In that same meeting, I was told I would no longer be assigned my own trial cases. Within days after that, the First Assistant emailed me on a Sunday night to request to meet with me alone about his trial team.

At this point, I began taking leave and working from home. I also sought guidance regarding my civil rights as a judiciary employee from a Fair Employment Opportunity Officer within the Administrative Office of the U.S. Courts ("AO"). I did so on the advice of former AO Associate Director Laura Minor, my mentor and supervisor during my Supreme Court Fellowship. At that time, there was no FDO employee manual for the office and no notice of applicable procedures for reporting or addressing sexual harassment.

On the Tuesday after my reassignment, the Federal Defender called me to apologize and said that he should not have put me back under the First Assistant. He told me he would change the research and writing assignment procedure again. He promised to allow me to review the email announcing the change because I said I was concerned about being viewed as the reason. However,

US00000503

he then sent out the email without giving me a chance to review it. His email announced the posting of an Appellate AFD position and stated that another Research & Writing attorney would now be responsible for distributing assignments to me.

The next day, an FDO employee manual was distributed. The manual included an organizational chart requiring Research & Writing attorneys to report to the First Assistant.

I applied for the Appellate AFD position. Meanwhile, the Fair Employment Opportunity Officer discussed my situation with the head of the Defender Services Office. She, in turn, contacted the Federal Defender.

The Federal Defender then came to speak with me. He acknowledged that he knew of my concerns, and he claimed that he addressed them and took corrective action. During our conversation, he acknowledged that his solution failed to remove me from the First Assistant's supervisory authority and that he had no plan to prevent me from getting assignments from him in the future without violating my confidentiality.

He also tried to claim that he had asked me if I had been sexually harassed and that I said no, that I had told him I was uncomfortable. I told him this was not true and that the behavior I described to him put him on notice. As I told him at the time, I was not using those words yet because I was trying to self-manage the situation first and resolve it as informally as possible. He claimed, however, that I had not tried to resolve the situation with him, except for one conversation, and that I went to an outside party. I explained to him that in fact, I had spoken to him at least twice, and I repeated in detail the behaviors I had described to him in those meetings. When I mentioned, for example, that the First Assistant had cornered me in the lobby when he knew I was alone, the Federal Defender said, "OK, but there was no physical contact." I responded that the only reason he has not touched me is that I have not let him. The Federal Defender said he understood that and he was not disagreeing with me.

The Federal Defender pointedly asked me what I wanted. I had told him that all I wanted was to move on and do the job I was hired to do. I told him the steps I thought were necessary. We agreed on three points: (1) to be an Assistant Federal Defender; (2) to work exclusively in appeals; and (3) for the First Assistant to no longer be in my chain of command (he agreed to modify the organizational chart accordingly). When I asked him what happens next, he said he would implement these steps and that he would consult with the Appellate Chief as a courtesy.

The one term he would not immediately agree to was a transfer to the Asheville duty station, as he said there is no office space. He claimed it was enough that the First Assistant and I are on opposite ends of the building. I told him that it is necessary for my safety not to work in the Charlotte office anymore. I said that I would be fine with working remotely, especially considering that my current office space is in a converted utility closet, which until recently I had shared with a Research & Writing Attorney whose contract was not renewed. I reminded him that, as I had already told him, I had curtailed my office hours to never be in the building alone, and that this is not a tenable situation moving forward. I said I cannot come into work every day not knowing what will happen, and the First Assistant is likely to be very angry when he finds out about these changes. The Federal Defender said he was not able to commit to anything regarding duty station

US00000504

but said he would see what he could do and report back to me in a week. He said to me, if anything happens at all, it will not be tolerated and I should let him know immediately.

Only after I confirmed the terms of our agreement in an email and requested to work remotely pending his transfer decision, the Federal Defender initiated a wrongful conduct investigation into the First Assistant's behavior. Although he claimed in his response to my email that he already changed the organizational chart, he did not give me a copy. I believe that a new organizational chart document was not created until after I followed up and asked where it was.

Since then, the hiring committee has conducted interviews for the Appellate AFD position without asking me to interview. In fact, I was discouraged from applying for the position. My one-year anniversary date has come and gone without a review and no consideration for a raise based on my recognized excellent performance. I did receive a conversion of title from Research & Writing Specialist to Assistant Federal Defender. I view this title change as a phantom promotion, with no change in job responsibilities, no pay increase, and a loss of my locality adjustment. Rather, as the Federal Defender explained, it was to the office's advantage to reclassify all Research & Writing Specialists to AFD positions for purposes of case weight measurement.

My protected rights against discrimination, sexual harassment, and retaliation are being continually violated. I am not attempting to set forth all facts known, or unknown, at this time.

Respectfully submitted,

Caryn Devins Strickland

US00000505

**REQUEST FOR COUNSELING**
**UNDER THE CONSOLIDATED**
**EQUAL EMPLOYMENT OPPORTUNITY**
*and*
**EMPLOYMENT DISPUTE RESOLUTION PLAN OF THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

Prior to completing this form, please refer to the Consolidated Equal Employment Opportunity and Employment Dispute Resolution Plan (" Plan"). Please complete this form legibly. If there is insufficient space you may attach additional pages.

1.    Name of Person Requesting Counseling:    Caryn Devins Strickland

2.    Address: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3.    Home Phone: ▮▮▮▮▮▮▮▮▮               Work: _____

4.    If you are a Court employee, state the following:

      Court Unit in which employed:    Federal Defender Office

      Job Title:    Assistant Federal Defender

5.    Name and address of the Employing Office from which you seek resolution of your dispute:

      Federal Public Defender Office for the Western District of North Carolina

      129 West Trade St., Ste. 300

      Charlotte, NC 28202

6.    Date(s) of incident or decision giving rise to dispute:    Ongoing

7.    Please summarize the actions or occurrences giving rise to this dispute.

      Discrimination, harassment, and retaliation, as described in my attached grievance.

20

US00000506

_____

_____

_____

_____

_____

8.   What corrective action do you seek in this matter?

     I request to work in an environment free of harassment and retaliation. I request

     the opportunity for merit-based advancement, and any other appropriate relief.

_____

_____

_____

9.   Are you willing to waive confidentiality in order to permit the counselor to contact the
     Employing Office or to attempt a resolution of the disputed matter?

     ☐ Yes     ☒ No

This request for counseling is submitted by:

_____     ___9/10/2018___
Signature                            Date

_____     _____
Recipient's Signature                Date of Receipt

21

US00000507

**Sent**: 6/12/2019 1:35:53 PM
**To**: Kim Llewellyn [kim_llewellyn@ca4.uscourts.gov]
**Attachments**: Strickland Request for Disqualification and Stay of Prior Investigation.pdf; Untitled attachment 10524.htm

James N. Ishida
Circuit Executive
U.S. Court of Appeals for the Fourth Circuit
1100 East Main Street, Suite 617
Richmond, VA 23217-3517

███████████ @ca4.uscourts.gov

Begin forwarded message:

**From:** "Caryn Devins" <caryn.devins@hotmail.com>
**Date:** September 10, 2018 at 1:49:07 PM EDT
**To:** ███ @ca4.uscourts.gov" ███ @ca4.uscourts.gov>
**Cc:** ███████ @ca4.uscourts.gov" ███████ @ca4.uscourts.gov>
**Subject: Requests in Relation to EDR Matter**

Dear Chief Judge Gregory,

I hope you are doing well. I have requested counseling and made a report of wrongful conduct under the Fourth Circuit EDR Plan. Please see my attached request for disqualification and a stay of the prior wrongful conduct investigation.

I look forward to hearing from you and I wish we could have been introduced under different circumstances.

Best regards,

Caryn Devins Strickland

US00000597

September 10, 2018

The Honorable Roger L. Gregory, Chief Judge
United States Court of Appeals for the Fourth Circuit
1100 E. Main Street, Suite 501
Richmond, VA 23219

SUBJECT: Request for Disqualification and a Stay of the Prior Investigation

Dear Chief Judge Gregory:

Please accept my request for disqualification of the Federal Defender under the EDR Plan. EDR Plan, Ch. X, § 7; *see also id.* Ch. IX ("The Chief Judge and/or unit executive shall ensure that the allegations in the report are appropriately investigated . . . ."). The basis for disqualifying the Federal Defender is that he is a subject of my wrongful conduct report, in addition to the First Assistant, and he is named in my request for counseling under the EDR Plan.

It may be necessary to request the disqualification of other employees as the investigation proceeds. In order to protect my procedural rights under the EDR Plan, I would request that the EDR Coordinator consult with me first and provide me an opportunity to request disqualification of other employees before sharing any information regarding the investigation with them or asking them to have any oversight role in the investigation.

In addition, I request a stay of the wrongful conduct investigation initiated by the Federal Defender. I will fully participate in a wrongful conduct investigation, but for the same reasons stated above, I request a stay so that an independent investigation into my allegations of wrongful conduct may be initiated.

Thank you for your consideration of my requests.

Respectfully submitted,

Caryn Devins Strickland

US00000598

**Cooper Strickland**
Attorney at Law
Post Office Box 92
Lynn, North Carolina 28750

February 22, 2019

[*Via Electronic Transmission*: ████████@ca4.uscourts.gov]

Mr. James N. Ishida
Circuit Executive
Lewis F. Powell, Jr. United States Courthouse Annex
1100 East Main Street, Suite 617
Richmond, Virginia 23219-3517

SUBJECT: Supplement to Mediation Request

Dear Mr. Ishida:

The following document is a supplement to Complainant Ms. Caryn Devins Strickland's ("Ms. Strickland") request for mediation under the Consolidated Equal Employment Opportunity and Employment Dispute Resolution Plan of the United States Court of Appeals for the Fourth Circuit ("EDR Plan").

On September 10, 2018, Ms. Strickland filed a request for counseling and a report of wrongful conduct based on the sexual harassment, retaliation, and discrimination she was subjected to during her employment at the Federal Defender Office for the Western District of North Carolina ("FDO"). At that time, Ms. Strickland also requested to disqualify Federal Defender Anthony Martinez under Chapter X, Section 7 of the EDR Plan, and to stay any proceedings on Mr. Martinez's earlier report of wrongful conduct by First Assistant J.P. Davis in order to ensure that the scope of the investigation was expanded to cover Ms. Strickland's report of wrongful conduct against Mr. Martinez.

Ms. Strickland cooperated extensively and candidly with a joint investigation into wrongful conduct under Chapter IX and a preliminary investigation under Chapter X of the EDR Plan. Once the investigation and subsequent report were completed, however, the EDR Coordinator informed Ms. Strickland that the report, and any information regarding the report's findings or recommendations, would not be distributed to her or to the employing office. In addition, the EDR Coordinator informed Ms. Strickland that the Chief Judge intended to deny her request to disqualify Mr. Martinez. As a result, Ms. Strickland is negotiating directly with an alleged wrongdoer without knowing any of the findings or recommendations resulting from the joint investigation.

Under these circumstances, Ms. Strickland supplements her request for mediation with the following factual summary in support of her sexual harassment, retaliation, and

US00000064

discrimination claims. Ms. Strickland believes that providing this information may assist in an early resolution of this matter.

### I.    *Ms. Strickland's Background and Start of Employment at the FDO.*

#### 1. Ms. Strickland's Professional Background.

Ms. Strickland graduated *magna cum laude*, Order of the Coif from Duke University School of Law, where she served as an editor of the Duke Law Journal. Prior to her current position, Ms. Strickland served as a Supreme Court Fellow at the Administrative Office of the U.S. Courts ("AO"). Previously, Ms. Strickland served as a judicial law clerk for Judge Peter W. Hall of the United States Court of Appeals for the Second Circuit, Judge James P. Jones of the U.S. District Court for the Western District of Virginia, and Chief Justice Paul Reiber of the Vermont Supreme Court.

Ms. Strickland has published several law review articles in the fields of constitutional law, complexity theory, and criminal law, including an article entitled *Against Design* with co-authors Stuart Kauffman, Roger Koppl, and Teppo Felin in the Arizona State Law Journal. As part of her Supreme Court Fellowship, Ms. Strickland conducted a field study of district courts implementing retroactive changes to sentencing law. Her article, *Lessons Learned from Retroactive Resentencing After* Johnson *and Amendment 782*, published in the Federal Courts Law Review, has since been cited in briefs filed in the Supreme Court of the United States and the United States Court of Appeals for the Federal Circuit.

Since completing the Supreme Court Fellowship, Ms. Strickland has assisted the Office of the Counselor to the Chief Justice of the United States in the recruitment of judicial law clerks for the Supreme Court Fellows Program. Ms. Strickland has presented to law clerks in the Fourth Circuit Court of Appeals and, most recently, she spoke on a panel for law clerks of the Second Circuit Court of Appeals with Chief Judge Robert Katzmann and Jeffrey Minear, Counselor to Chief Justice John Roberts.

Ms. Strickland has had consistently exemplary performance in her employment and she takes great pride in her career.

#### 2. Ms. Strickland accepts employment at the FDO, with the promise of an Assistant Federal Defender position.

Since law school, Ms. Strickland's dream job was to be a federal public defender, based on her interest in federal criminal law and her desire to assist vulnerable clients in navigating the criminal justice system.

In March 2017, during her Supreme Court Fellowship year, Ms. Strickland was offered a position at the FDO. Exhibit A (Offer Letter Dated March 24, 2017). Ms. Strickland hesitated to accept the employment offer because she was aware that the FDO had a troubled history and had recently undergone a conversion from a Community Defender Office ("CDO"). Based on

US00000065

information and advice from her colleagues, Ms. Strickland accepted the job, in part, because she believed that incoming Federal Defender Martinez would serve as a change agent to bring reforms to the office.

Mr. Martinez had been selected as the new Federal Defender in December 2016 and, although he had not yet been sworn in, he was present at Ms. Strickland's job interview. Although Interim Defender Ross Richardson signed Ms. Strickland's offer letter, the hiring panel had told Ms. Strickland that Mr. Martinez was the decision maker, and Ms. Strickland saw herself as "Tony's first hire." This history created a sense of loyalty to him, which was reinforced when Ms. Strickland began work the same week that Mr. Martinez was officially sworn in as Federal Defender in August 2017.

In her offer letter, Ms. Strickland was offered a position as a Research & Writing Attorney to get some initial experience, with a transition to an Assistant Federal Public Defender position shortly thereafter. Exhibit A; *see also* Email Dated March 21, 2017. In a phone conversation in March 2017, Ms. Richardson told Ms. Strickland that she would transition to an Assistant Federal Defender position within a few months of starting. Ms. Strickland's understanding was that, as an Assistant Federal Defender, she would have her own caseload and would undertake the representation of clients on parity with all other Assistant Federal Defenders in the office. She would not have accepted a position without this opportunity for advancement.

From the start of her employment, Mr. Martinez repeatedly affirmed Ms. Strickland's understanding that she would transition to an Assistant Federal Defender position. Mr. Martinez also promised Ms. Strickland that she would be able to choose between trial and appeals work based on how her interests developed. On several occasions, Mr. Martinez repeated to Ms. Strickland a story about a management meeting following Ms. Strickland's hiring, in which he asked everyone in the room to vote on whether they believed Ms. Strickland would choose trials or appeals and the room split half-and-half. Between August 2017 and the summer of 2018, Ms. Strickland and Mr. Martinez had several meetings about Ms. Strickland's professional advancement, her transition to an Assistant Federal Defender position, and her progress in choosing between trials or appeals. *See, e.g.*, Email Dated December 5, 2017; Email Dated February 27, 2018. Although Ms. Strickland initially expressed an interest in both trials and appeals, she ultimately informed Mr. Martinez that she would choose appeals.

During his initial months as Federal Defender, Mr. Martinez made changes to the organizational structure of the FDO. Mr. Martinez created "trial teams" and promoted an Assistant Federal Defender to a "Trial Team Leader" position on each team. Mr. Martinez selected J.P. Davis as a Trial Team Leader, and also chose to keep him on as First Assistant for the FDO. As First Assistant, Mr. Davis was responsible for overseeing the operations of the entire FDO and had supervisory authority over the trial divisions in both Charlotte and Asheville. *See, e.g.*, Exhibit B (Organizational Chart Dated July 2018); Email Dated August 17, 2018; Email Dated February 21, 2019. In Ms. Strickland's experience, Mr. Martinez was highly deferential to Mr. Davis's management decisions.

### 3. Ms. Strickland observes problems at the FDO.

In Ms. Strickland's experience, incivility and hostility to protected rights was severe and pervasive at the FDO. Ms. Strickland also observed ethically-questionable behaviors, including instances potentially implicating attorneys' duty of candor to the court, competency, and zealous representation. Mr. Martinez promoted, or kept in senior management, many of the individuals responsible for these problems.

Ms. Strickland believes that incivility and unethical behavior served as antecedents to the harassment and retaliation she has been subjected to in her employment. For example, after Judge Kozinski resigned, Mr. Davis made comments to Ms. Strickland that the process for filing sexual harassment claims in the federal judiciary is useless and that nothing ever happens with those claims. Mr. Davis said that when he was a law clerk, he knew of a complaint filed against another judge that was appealed all the way to the "top" and went nowhere.

Mr. Davis also insinuated to Ms. Strickland that an employee who took time off following his wife's suicide to care for his autistic son (and was subsequently fired) had killed his wife. Mr. Davis claimed to know this because an investigator employed by the office had, as he put it, "looked into it." Ms. Strickland also heard this rumor repeated by several other employees in the office.

After an attorney, who is gay, was fired, Ms. Strickland heard rumors spread about him. Ms. Strickland heard an employee openly speculate about whether the attorney's former client would accuse the attorney of coming onto him as a basis to assert a claim for ineffective assistance of counsel. Soon after, another employee confided in Ms. Strickland that the same employee had claimed that the attorney had been exchanging sexual favors with prison guards. Ms. Strickland has since heard that this attorney was referred to as a "faggot."

Ms. Strickland observed attorneys in the office scream at their clients, mock them and call them names. Mr. Davis and Trial Team Leader Peter Adolf had a running joke regarding whether clients would file claims of ineffective assistance. In an all-staff meeting with the entire office and the Federal Defender present, Mr. Adolf repeatedly referred to his intellectually-disabled client as a "retard." In the same staff meeting, employees made jokes about an African-American Assistant United States Attorney rapping to the jury.

Other employees also confided Ms. Strickland previous instances of troubling behavior. For example, a female employee confided in Ms. Strickland that, when she was nine months pregnant, a male Assistant Federal Defender ordered her to get on a plane and fly across the country for a last-minute witness interview. Another female employee told Ms. Strickland that, when she was pregnant, another male Assistant Federal Defender had screamed at her and threatened to get her fired. Employees also described comments by an administrative officer who joked during a work trip, with an insufficient number of reserved hotel rooms, that an attorney employed by the office, who is gay, could stay with the women because he is "like a girl."

US00000067

Ms. Strickland believes this pattern of conduct may be directly related to turnover at the FDO. For example, between June 2018 and October 2018, a total of five employees ended their employment at the FDO. Put another way, the FDO turned over almost one-eighth of its workforce over a period of less than six months. Some of these employees were terminated; others confided in Ms. Strickland that they felt placed in compromised positions and could no longer do their jobs effectively.

## II.  *Ms. Strickland is subjected to quid pro quo sexual harassment that is severe and pervasive and that fundamentally alters the terms and conditions of her employment.*

Mr. Davis abused his supervisory authority to sexually harass Ms. Strickland. From the start of Ms. Strickland's employment, Mr. Davis singled out Ms. Strickland professionally and personally. As time went on, Mr. Davis engaged in a pattern of obsessive, controlling, and threatening behavior towards Ms. Strickland. Mr. Davis sent Ms. Strickland a quid pro quo in writing, making her advancement contingent on complying; he made unwanted advances on her; he interfered with her job duties and threatened disciplinary action to force her to spend time with him; and he made her feel physically unsafe.

### 1.  From the beginning, the First Assistant acts as "mentor" to Ms. Strickland and singles her out professionally and personally.

Soon after the start of Ms. Strickland's employment, Mr. Davis began using his role as supervisor of Ms. Strickland to single her out, both professionally and personally. Mr. Davis began asking Ms. Strickland to go to lunch with him on a regular basis, stating that he wanted to be a "mentor" to her. Mr. Davis always insisted on paying for Ms. Strickland, even when she offered. Notes, Dated June 6, 2018.

During the fall of 2017, Mr. Davis created a two-page "attorney shadowing checklist" for Ms. Strickland. Mr. Davis tracked Ms. Strickland's activities and continually updated the checklist, at one point adorning it with nicknames for Ms. Strickland. *See, e.g.*, Email Dated January 11, 2018.

On December 5, 2017, Ms. Strickland emailed Mr. Martinez and Mr. Davis, asking to meet about her progression to an Assistant Federal Defender position. Email Dated December 5, 2017. In the meeting, Mr. Martinez mentioned that Mr. Davis had requested to be her mentor, and that he would approve of this mentorship. Around the same time, Mr. Martinez created the trial teams, and Ms. Strickland was under the impression that Mr. Davis was very upset that she was not assigned to his team.

At first, Ms. Strickland believed that Mr. Davis was genuinely interested in providing her advancement opportunities. Ms. Strickland assisted Mr. Davis on many of his active cases, and she often asked him for assistance and advice. Mr. Davis invited Ms. Strickland to participate in management-level meetings, such as an initiative to review the office policy on discovery

US00000068

agreements. Mr. Davis also worked with Ms. Strickland to attempt to bring the AO's Detention Reduction Outreach Program to the Western District of North Carolina.

Mr. Davis often praised Ms. Strickland for her excellent work performance. For example, when Ms. Strickland told Mr. Davis that she and her mother had run into a federal judge in town, Mr. Davis asked whether the judge had told Ms. Strickland's mother that Ms. Strickland was "kicking ass." Text Message Dated April 27, 2018. Ms. Strickland responded that the judge had told her she was doing a great job and her mother should be proud. Mr. Davis responded, "He is correct. You can tell your mom we agree." Text Message Dated April 27, 2018.

Mr. Davis also took a personal interest in Ms. Strickland. Mr. Davis lived near Ms. Strickland, and she often accepted or asked for rides home from him when she was unable to ride her bike in inclement weather. Mr. Davis and Ms. Strickland would sometimes exchange text messages or emails after work about their cases or other topics. Mr. Davis read Ms. Strickland's academic articles and often wanted to discuss them with her. Mr. Davis also took an interest in Ms. Strickland's hobbies. When Ms. Strickland told Mr. Davis that she liked a certain musical artist, she noticed that he would play that artist the next time she was in his car. After Ms. Strickland said she liked hiking, Mr. Davis began telling her about hikes he went on by himself. After Ms. Strickland bought a guitar and recommended the music store to Mr. Davis, Mr. Davis bought a guitar for himself.

At the office annual retreat in December 2017, where employees and supervisors were drinking heavily, Mr. Davis asked Ms. Strickland into the hallway outside of the hotel's hospitality suite one night and asked her to come drink in someone else's hotel room. The retreat was an unprofessional experience and, regrettably, Ms. Strickland felt like she was being initiated into a troubled office culture. On several other occasions, Ms. Strickland went with Mr. Davis and other employees to have drinks during the work day. On one instance, Ms. Strickland had a drink with Mr. Davis during the work day to celebrate finishing a court hearing, after which they returned to work.

Ms. Strickland began to suspect that Mr. Davis might have personal feelings for her. However, Mr. Davis was Ms. Strickland's supervisor and she did not feel like she could do anything differently. Ms. Strickland continued to give Mr. Davis the benefit of the doubt that he had her best interests in mind.

Months after the retreat, other employees told Ms. Strickland that they observed Mr. Davis acting "lustful" towards her at the retreat and that they had never seen him act so "fixated" and sexually attracted to anyone. The employees said that Mr. Davis's behavior was noticeable enough that they had discussed it among themselves at the retreat. Another employee asked Ms. Strickland if Mr. Davis was still "smothering" her. Another employee later told Ms. Strickland, without specifically identifying Mr. Davis, "Thank god the attorneys don't have the ability to really undress you with their eyes. Or you wouldn't be dressed at work." Ms. Strickland came to believe it was common knowledge in the office that Mr. Davis had feelings for her.

US00000069

**2. Ms. Strickland requests a raise and promotion, and the First Assistant responds with a quid pro quo.**

On May 18, 2018, a few weeks after Ms. Strickland's wedding, Mr. Davis asked Ms. Strickland to another "mentoring" lunch. Email Dated May 18, 2018. At this lunch, Mr. Davis and Ms. Strickland mainly discussed work-related topics, until Mr. Davis asked Ms. Strickland what else was going on outside of work. Ms. Strickland told Mr. Davis that although she wanted to continue working at the Federal Defender Office, she would eventually need to transfer to the Asheville division office for family reasons. Mr. Davis was visibly upset and emotional in response to Ms. Strickland's comments about the transfer. She believed that Mr. Davis was taking her stated desire to transfer very personally and that his reaction was unprofessional and inappropriate. She was particularly surprised because she was under the impression that the management team recently met about potentially transferring her to Asheville. Notes Dated June 6, 2018.

In this same conversation, Ms. Strickland and Mr. Davis discussed Ms. Strickland's performance and an upcoming performance review. Ms. Strickland told Mr. Davis that she planned to ask for a raise to the equivalent of the next highest grade on the judiciary pay scale and the promotion he had been promised to an Assistant Federal Defender position.

When they got back to the office, Mr. Davis told Ms. Strickland, "don't worry, we're going to take care of you." He also commented that he hoped Ms. Strickland's husband would take her somewhere nice for dinner that night. Ms. Strickland left the office feeling shaken about the conversation, and she expressed her discomfort with Mr. Davis's comments to several friends and family members. Notes Dated June 6, 2018.

Later that afternoon, Mr. Davis sent Ms. Strickland an email with the subject line, "Mas Dinero":

> Dude, you're shooting high with a G15. Not least of all since
> you'll need 5 more years of fed service to qualify for it. But fret
> not, I have a plan . . . just remember I deal in pay-for-stay :)

Exhibit C (Email Dated May 18, 2018).

Ms. Strickland was extremely uncomfortable with this email. She understood it to mean that Mr. Davis did not believe she deserved, or could possibly receive, the raise she was asking for based on performance, but that he had a "plan" to raise her pay anyway if she complied with his requests. In other words, Ms. Strickland believed that future raises and professional opportunities would be contingent not on Ms. Strickland's performance, but on doing what Mr. Davis wanted personally.

US00000070

# 18

**3. Mr. Davis repeatedly asks Ms. Strickland to meet him out of the office.**

Mr. Davis began repeatedly asking Ms. Strickland to meet him outside of the office. Over less than a month period, Mr. Davis asked Ms. Strickland at least five times to meet him for drinks, "mentoring" sessions, rides home, or other meetings out of the office. *See* Exhibit D (Email Dated June 1, 2018); Exhibit E (Email Dated June 19, 2018); Exhibit F (Text Messages Dated June 21, 2018); Exhibit G (Email Dated June 27, 2018); Exhibit H (Text Messages Dated June 29, 2018). He persisted in these invitations even after she said no.

Ms. Strickland also noticed, that when she would leave work at the end of the day, Mr. Davis would often appear from around the hallway corner at precisely the same time and walk with her out of the building. At first, Ms. Strickland assumed it was a coincidence, but after it happened enough times, Ms. Strickland realized that Mr. Davis was keeping track of when she left work and standing around the corner of the hallway waiting for her. Notes, Dated June 6, 2018; Notes, Dated June 22, 2018. Ms. Strickland found this behavior disturbing.

**4. Mr. Davis interferes with Ms. Strickland's job duties and threatens disciplinary action to force her to spend time with him.**

Mr. Davis became more controlling of Ms. Strickland's work duties and schedule in order to spend time with her, and threatened disciplinary action if she did not comply. For example, Mr. Davis interfered with Ms. Strickland's participation as second chair on a trial case over a "shadowing" activity on his attorney checklist. In May 2018, Ms. Strickland volunteered, and was assigned by Mr. Martinez, to be second chair on short notice in a trial case in which the client was facing a life sentence if convicted. On June 5, 2018, Ms. Strickland emailed Mr. Davis that she would not be able to attend a "shadowing" activity with him, a presentence interview, because she had a forensic discovery review scheduled at the FBI the next day. Email Dated June 5, 2018.

Mr. Davis had consistently emphasized that his "shadowing" activities were optional and that substantive work should always take priority. *See, e.g.*, Email Dated November 22, 2017. Ms. Strickland had cancelled similar activities with him in the past when she needed to prepare for other cases with no issue from Mr. Davis. *See, e.g.*, Email Dated March 13, 2018. Ms. Strickland believed it was self-evident that a forensic discovery review to prepare for trial in a life-sentence case would take priority over a routine presentence interview, which Ms. Strickland had already attended previously in another case with Mr. Davis. Mr. Davis had also told Ms. Strickland that he knew the presentence interview would not be "exciting" and she had been to one at the probation office, but he wanted her to see one at the jail. Email Dated May 29, 2018.

This time, however, Mr. Davis responded to Ms. Strickland's email, stating "That's really not OK with me." Email Dated June 5, 2018. Ms. Strickland was so surprised by Mr. Davis's reaction that she asked him if he was being sarcastic. He told her he was not. Email Dated June 5, 2018; Notes Dated June 6, 2018.

US00000071

At 6:00 a.m. the next morning, on June 6, 2018, Mr. Davis emailed Ms. Strickland asking for a copy of her job offer letter, claiming it was not saved in her file. Email Dated June 6, 2018. Ms. Strickland was uncomfortable with the timing and content of Mr. Davis's email and she did not immediately respond.

That morning during business hours, Ms. Strickland met with Mr. Davis in his office about the discovery review, believing perhaps there was a misunderstanding that could be smoothed over. Mr. Davis, however, was so angry at Ms. Strickland that he was pale and shaking. Mr. Davis berated Ms. Strickland in an aggressive and demeaning manner, telling her that she did not care enough about the clients and that she had already made a commitment to him with the shadowing activity. Ms. Strickland had never been spoken to this way in a professional setting, and she felt intimidated and threatened by Mr. Davis's comments and tone of voice. During the meeting, Mr. Davis again brought up Ms. Strickland's offer letter and told her she needed to send him a copy. Notes Dated June 6, 2018.

That afternoon, Ms. Strickland was busy reviewing discovery for the trial case at the U.S. Attorney's office. Mr. Martinez also asked Ms. Strickland to meet about issues in the trial case regarding her first chair, Assistant Federal Defender Jeffrey King. In that meeting, Ms. Strickland raised concerns with Mr. Martinez about Mr. Davis's behavior regarding "shadowing" the presentence interview. Mr. Martinez dismissed Ms. Strickland's concerns and repeatedly told her to work things out directly with Mr. Davis. Notes Dated June 8, 2018.

Later that day, Ms. Strickland emailed Mr. Davis that the FBI meeting time was set and she would not be able to "shadow" the presentence interview with him. Email Dated June 6, 2018. Ms. Strickland continued to believe that she was ethically obligated to attend the discovery review in order to prepare the client's defense competently, considering the trial date was imminent and the FBI agents could not timely reschedule because they were leaving town. In her email to Mr. Davis, Ms. Strickland explained that she was under the impression that his "shadowing" activities were optional, and she forwarded previous email correspondence showing that Mr. Davis had no problem when Ms. Strickland cancelled similar activities with him in the past. Email Dated June 6, 2018.

In his response, copying Mr. Martinez and Ms. Strickland's trial team leader, Mr. Davis directed Ms. Strickland to attend the presentence interview with him. Mr. Davis told Ms. Strickland that if she disobeyed a direct order, that would be an action that he as a supervisor could not ignore. Exhibit I (Email Dated June 6, 2018).

On the morning of June 7, 2018, Ms. Strickland attended the presentence interview with Mr. Davis at the Mecklenburg County Jail. Ms. Strickland dreaded seeing Mr. Davis. She wore sunglasses during the 15-minute walk from the office to the jail, thinking she might cry. Mr. Davis continued to berate Ms. Strickland on the walk to the presentence interview. He accused her of being manipulative and deceitful, and he said she had not been honest with him about her reasons for wanting to second chair a trial case. Ms. Strickland replied that her intention was to help the client and she had no idea what Mr. Davis was talking about. Mr. Davis said that may

US00000072

have been "part" of her motivation, but he believed Ms. Strickland wanted to be on the case to get enough experience so she could demand to transfer.

Ms. Strickland was offended by Mr. Davis's comments, which she perceived as hostile to her right to seek professional experience and advancement in her office. She also believed that a man would not be considered "manipulative" for seeking an office transfer for family reasons.

Mr. Davis also accused Ms. Strickland of lying to him about her reasons for telling him she could not "shadow" the presentence interview. Mr. Davis challenged his perceived inconsistencies in Ms. Strickland's emails discussing the scheduling conflict. He made clear that he had questioned members of Ms. Strickland's trial team and the Federal Defender about how the discovery review was scheduled. In particular, Mr. Davis was angry that Ms. Strickland had raised concerns about his behavior with Mr. Martinez and that, in Mr. Davis's view, Ms. Strickland had tried to override his decisions. Mr. Davis also repeatedly warned Ms. Strickland that this was a "communication" issue and that she needed to talk to him more. Ms. Strickland perceived Mr. Davis's behaviors as obsessive, controlling, and completely out of proportion to the issue of whether she would "shadow" a presentence interview with him.

On the walk back to the office, Ms. Strickland tried to appease Mr. Davis by bringing up conversational topics unrelated to work. When they arrived back at the office, Mr. Davis told Ms. Strickland, again, that this was about communication and that it was in her best interest to come talk to him more often. Notes Dated June 8, 2018.

Ms. Strickland felt extremely uncomfortable with Mr. Davis after this incident and she attempted to distance herself from him further. She felt threatened by Mr. Davis's actions and his tone of voice in confronting her. She also felt humiliated by Mr. Davis and concerned that he had harmed her professional reputation. Ms. Strickland began taking contemporaneous notes to document Mr. Davis's inappropriate and unprofessional behaviors.

Soon after, ███████ employment at the FDO was terminated. Despite recognizing Ms. Strickland's excellent performance on the trial case, Mr. Martinez removed her as second chair. Mr. Martinez told Ms. Strickland that, although he wanted to take her off the case completely, she had already put in so much time and effort that he would keep her in an informal research role.

On June 12, 2018, Mr. Davis emailed Ms. Strickland, again asking for a copy of her job offer letter. Email Dated June 12, 2018. Ms. Strickland was uncomfortable, but she complied with her supervisor's request.

### 5. Mr. Davis makes Ms. Strickland feel unsafe, and she curtails her working hours to avoid being alone with him.

In June 2018, Ms. Strickland raised ethical questions with Mr. Davis regarding his duty of candor in another case. In light of Ms. Strickland's ethical concerns and Mr. Davis's other recent behaviors, Ms. Strickland felt extremely uncomfortable around him.

US00000073

On June 21, 2018, Ms. Strickland stayed after business hours with Mr. Davis, alone in the office, to prepare for a hearing in that case. When their work was finished, Mr. Davis stated that it looked like it was going to rain and he asked if Ms. Strickland wanted a ride home. Ms. Strickland was no longer comfortable accepting rides home from Mr. Davis, and she told him no. Ms. Strickland joked that she was tough, and could handle it. Ms. Strickland went to change into her bike clothes, and she believed that Mr. Davis had left for the evening.

As Ms. Strickland was leaving the building, however, Mr. Davis was waiting for her in the lobby. Mr. Davis asked Ms. Strickland if she was sure she did not want a ride home. Ms. Strickland repeated that she was sure. Ms. Strickland felt physically intimidated and concerned about Mr. Davis's intentions, and she left the building as quickly as possible. Notes Dated June 22, 2018.

When Ms. Strickland got home, she saw that Mr. Davis had sent her text messages:

It is currently raining.

Last chance for a ride, tough girl . . .

Exhibit F (Text Messages Dated June 19, 2018).

After this, Ms. Strickland no longer felt safe around Mr. Davis. She felt threatened by his behavior of waiting for her after work hours when she was leaving the building alone and had already said no to him. She believed his text messages were inappropriate. She was concerned that Mr. Davis had a pattern of pushing for her to see him after hours.

After discussing her concerns with her family, Ms. Strickland decided to modify her work schedule to never leave the office after 5 p.m. in order to avoid being alone with Mr. Davis. Ms. Strickland began bringing her work home with her in the evenings.

### 6. Mr. Davis continues asking Ms. Strickland to meet outside of work.

Ms. Strickland began suffering from anxiety and stress, and she felt nauseous to the point of vomiting before work almost every morning. Ms. Strickland reached out to colleagues for advice on how to address the situation. On June 25, 2018, Ms. Strickland confided in Assistant Federal Defender W. Kelly Johnson, a former Federal Public Defender, about Mr. Davis, describing some of his behaviors and explaining that she felt threatened by him.

On June 27, 2018, Mr. Davis emailed Ms. Strickland to ask her to meet for another "mentoring" session, suggesting that it might be good to have some "distance" from work. Exhibit G (Email Dated June 27, 2018). Ms. Strickland was uncomfortable with his invitation, and she asked Mr. Johnson for advice on how to respond. Text Messages Dated June 27-28, 2018. Mr. Johnson advised Ms. Strickland to meet with Mr. Davis at the office and to tell him that she was uncomfortable with his behaviors and that she wanted him to stop. Ms. Strickland

US00000074

also asked Mr. Johnson if he would be willing to walk by and check in on her during the meeting.

On Friday, June 29, 2018, Ms. Strickland cancelled the meeting with Mr. Davis because she was so nauseous she could not go into work. Mr. Davis insisted on rescheduling their meeting the next Monday. He texted Ms. Strickland:

I am free all day, including early morning, lunch, and evening.

I'm hoping this will be helpful for you, please don't be over-anxious about it.

Exhibit H (Text Messages Dated June 29). Ms. Strickland was apprehensive about the meeting and uncomfortable with Mr. Davis's continued suggestions that their meeting take place out of the office and outside of business hours.

### III. *Ms. Strickland is subjected to a retaliatory, hostile, and discriminatory working environment after raising concerns about Mr. Davis.*

Ms. Strickland raised concerns with Mr. Martinez about Mr. Davis on multiple occasions. Mr. Martinez ignored Ms. Strickland's concerns, forced her to meet directly with Mr. Davis, made hostile comments that offended and intimidated Ms. Strickland, put Ms. Strickland back under Mr. Davis's supervision almost immediately after promising to separate her from him, and did not protect her safety even after she had told him she could no longer do her job effectively. Mr. Martinez also reduced Ms. Strickland's job responsibilities, and her professional advancement was stymied after she raised her complaints about Mr. Davis.

#### 1. Ms. Strickland tells Mr. Martinez in confidence that she will be drawing boundaries with Mr. Davis.

In June and July 2018, Ms. Strickland confided in former Associate Director of the AO, Laura Minor, about her experiences at the FDO and asked for her advice in addressing the situation with Mr. Davis. Based on Ms. Minor's advice, Ms. Strickland reached out to Mr. Martinez directly to speak with him in confidence.

On July 2, 2018, Ms. Strickland met with Mr. Martinez in his office and informed him that she would be meeting with Mr. Davis. She told Mr. Martinez that she needed to set boundaries with Mr. Davis and she asked for Mr. Martinez's support. Mr. Martinez asked Ms. Strickland if this was sexual harassment and what she meant by wanting his support. Ms. Strickland responded that she did not want to use words like that yet because she was trying to self-manage the situation and she wanted to give everyone the benefit of having a conversation with Mr. Davis first. Ms. Strickland told Mr. Martinez that she did not want him to do anything yet except keep her confidence, but she was giving him a "heads up" about the situation.

Ms. Strickland explained to Mr. Martinez, however, that Mr. Davis had spoken to her inappropriately, berated her, and gotten extremely angry with her over the presentence interview.

She told Mr. Martinez that she was leaving the office by 5 p.m. every day to avoid issues with Mr. Davis. Ms. Strickland emphasized that she was notifying Mr. Martinez and she would not have involved him unless she thought it was absolutely necessary. Notes Dated July 2, 2018.

Mr. Martinez said very little except to confirm, that this was a "head's up." Ms. Strickland left the meeting in tears, concerned that Mr. Martinez did not verbally encourage or support her or ask her to follow up with him on her concerns.

### 2. Ms. Strickland tells Mr. Davis she is drawing boundaries with him, and he intimidates and berates her.

Later in the afternoon of July 2, 2018, Ms. Strickland met with Mr. Davis in the FDO conference room. Before starting the meeting, Mr. Davis shut both doors to the windowless conference room. Mr. Davis then told Ms. Strickland that she was "struggling." He said that June had been a hard month for her and that she was having a hard time balancing priorities. He said he had frustrations with her. He told her that he had tried to push her out of her comfort zone, but it had not worked out. He wanted to discuss her short and long term goals. Notes Dated July 2, 2018.

Ms. Strickland felt intimidated by Mr. Davis, believing that he intended to restrict her job duties or impose disciplinary action on her. She also believed that Mr. Davis's criticisms of her were not actually based on her job performance, but rather his anger that she had not submitted to his advances. Ms. Strickland had never had a performance issue and Mr. Davis had consistently praised her excellent performance before that meeting, including very recently. *See, e.g.*, Text Messages Dated April 27, 2018; Email Dated May 15, 2018; Email Dated June 13, 2018.

At their meeting, Ms. Strickland did not respond to Mr. Davis's comments. She told Mr. Davis that she was setting boundaries with him and that he had crossed a line with her concerning "shadowing" the presentence interview. Ms. Strickland told Mr. Davis that she had never been spoken to that way in a professional setting and that it was unacceptable.

Mr. Davis responded to Ms. Strickland that he had not expected an "airing of grievances." Mr. Davis said he had never had to "order" an employee to do something, and there had to be consequences for Ms. Strickland's actions. Ms. Strickland responded that she was not airing grievances, she was setting boundaries. When she continued to insist that Mr. Davis had crossed a line with her, Mr. Davis said that he would "try" not to speak to her that way again. Ms. Strickland was offended that Mr. Davis would not agree to speak to her in a professional manner, and she felt intimidated by him. Mr. Davis continued to berate Ms. Strickland until Ms. Strickland stood up, stated that she would rather discuss these issues with Mr. Martinez, and left the room.

Mr. Davis followed Ms. Strickland out of the room, telling Ms. Strickland to go with him to Mr. Martinez's office right then. Ms. Strickland said she would speak to Mr. Martinez first, and walked away from Mr. Davis. Immediately after, Ms. Strickland called Mr. Martinez to let

him know that Mr. Davis might say something about her, and she asked him to withhold judgment until he had spoken to her. Notes Dated July 2, 2018. She then left the office early for the day.

### 3. Mr. Martinez forces Ms. Strickland to meet with Mr. Davis directly and makes retaliatory, hostile, and discriminatory comments to her.

Ms. Strickland decided to approach Mr. Martinez again the following week, when she knew Mr. Davis would be out of the office. She planned on bringing copies of some of Mr. Davis's troubling communications for Mr. Martinez to review.

Later that week, however, Mr. Martinez unexpectedly called Ms. Strickland into his office to meet with Mr. Davis directly to resolve, what he referred to as, a "breakdown" in communication. Notes Dated July 8, 2018. Ms. Strickland was dismayed that Mr. Martinez had not respected her stated request to discuss the matter with him first. She felt intimidated and uncomfortable with the idea of meeting directly with the very person she had raised concerns about to Mr. Martinez. She was also uncomfortable with Mr. Martinez's characterization of the situation as a miscommunication.

Ms. Strickland repeated several times that she was uncomfortable and would not meet without speaking to Mr. Martinez alone first, and she continued to repeat this after the three of them sat down in Mr. Martinez's office. Eventually, Mr. Martinez asked Mr. Davis to leave the room. Mr. Martinez directed Ms. Strickland to put away her notepad and stop taking notes, making Ms. Strickland feel even more uncomfortable.

Mr. Martinez stated that Mr. Davis was upset that Ms. Strickland had not kept a commitment to him, and that the two of them had a breakdown in communication that had been ongoing for a while. Ms. Strickland explained to Mr. Martinez that Mr. Davis had repeatedly told her that his shadowing activities were supposed to be for her benefit and that substantive work always took priority. Mr. Martinez responded that he was an "old school" person who believes that when you make a commitment, you keep it, and so he could see where Mr. Davis was coming from. Ms. Strickland said she had emails documenting that this was not a commitment because Mr. Davis's "shadowing" activities were supposed to be optional, but Mr. Martinez said the emails were not relevant because he was only interested in moving forward.

Ms. Strickland repeated, once again, that Mr. Davis had been so angry with her over the presentence interview "shadowing" that he was shaking, and that the way he had spoken to her was inappropriate and unprofessional. Ms. Strickland described Mr. Davis's comments during their meeting, including that she was "struggling" and that pushing her out of her comfort zone had not worked out. Ms. Strickland told Mr. Martinez that she believed Mr. Davis was attempting to restrict her job responsibilities, and that she would rather have that type of conversation with Mr. Martinez. Mr. Martinez acknowledged that he knew Mr. Davis was planning on meeting with Ms. Strickland, and he insisted that, as her supervisor, Mr. Davis had the right to meet with her.

US00000077

Mr. Martinez then drew an analogy between Ms. Strickland's relationship with Mr. Davis and a marriage. He said that Ms. Strickland had only been married recently, but marriage always involves "compromise" and she would have to "meet in the middle." Ms. Strickland was shocked and offended by Mr. Martinez's comments. She believed it would be inappropriate to compare any professional relationship between a male supervisor and a female subordinate to a marriage, and it made her especially uncomfortable in the context of the concerns she had already raised about Mr. Davis.

Ms. Strickland began to tear up, and Mr. Martinez asked her why she was "getting emotional." Even though Ms. Strickland felt uncomfortable, she told Mr. Martinez that Mr. Davis was interfering with her ability to do her job and that she felt threatened by him. Ms. Strickland explained that Mr. Davis had asked her numerous times to meet outside of the office, and she described how he had waited for her in the lobby one night after work when he knew she was alone and had already said no to a ride home. She repeated she was leaving the office by 5 p.m. every day to avoid being alone with him. She said that Mr. Davis had accused her of being manipulative by wanting to be on the trial case just to request a transfer. She explained that she believed that the presentence interview issue was personal for him and that her desire to transfer had seemed to set him off.

Mr. Martinez responded that he did not want Ms. Strickland to feel uncomfortable or unsafe. But he then brought Mr. Davis back into the room, making Ms. Strickland feel intimidated and subjected to a hostile environment. Mr. Davis continued to berate and criticize Ms. Strickland in front of Mr. Martinez. Even still, both Mr. Martinez and Mr. Davis confirmed Ms. Strickland's excellent performance in her job.

Mr. Davis abruptly changed topics. He said Ms. Strickland needed a mentor she could trust, and he suggested that she choose someone else. In addition, Mr. Davis said he had created the "shadowing" activities list to help promote Ms. Strickland to an Assistant Federal Defender position, although he admitted it was unfair because he had never told her the purpose of the checklist. Mr. Davis said he was frustrated that Ms. Strickland had been blowing off his checklist. Mr. Davis also said he had noticed that Ms. Strickland had been out of the office more and said he was sorry if it was because of him. These comments made Ms. Strickland feel very uncomfortable. She did not believe his apology was genuine.

After this conversation, Mr. Martinez told Ms. Strickland that he was glad it had worked out, and that Mr. Davis seemed "relieved" too. Notes Dated July 8, 2018. By contrast, Ms. Strickland felt intimidated and offended by Mr. Martinez's and Mr. Davis's hostile behaviors and comments.

### 4. After confirming that Mr. Davis will no longer be Ms. Strickland's mentor, Mr. Martinez puts her back under his supervision less than two weeks later.

Ms. Strickland decided to try and move on from the situation, and she confirmed with Mr. Martinez in writing that she did not have a performance issue and that Mr. Davis would no longer be her mentor. Exhibit J (Email Dated July 9, 2018).

US00000078

26

On July 20, 2018, Mr. Martinez announced he was assigning Ms. Strickland to work under Mr. Davis on his trial team. Exhibit K (Email Dated July 20, 2018). Ms. Strickland felt betrayed that Mr. Martinez had gone back on his word and intimidated by the idea that Mr. Davis would have more direct supervisory authority over her again. In the same meeting, Mr. Martinez also stated that Ms. Strickland would no longer be assigned her own trial cases. Notes Dated July 20, 2018.

After work that day, Appellate Chief Josh Carpenter called Ms. Strickland. Ms. Strickland previously had spoken with Mr. Carpenter about her thoughts on the research and writing assignment procedure and her desire to work in appeals. Mr. Carpenter told Ms. Strickland that he thought she would be happy with a new attorney position that management was looking into creating, that would involve primarily appeals work. Mr. Carpenter also asked Ms. Strickland about her issues with the trial team structure. Ms. Strickland told Mr. Carpenter that she had serious concerns about working on Mr. Davis's trial team.

Mr. Carpenter asked Ms. Strickland if her issues with Mr. Davis were limited to the trial case or more fundamental. Mr. Carpenter said he knew about 75-80 percent of what happened on the trial case, did not care to know the rest, but that he "disagreed strongly" with some of Mr. Davis's management decisions. From Mr. Carpenter's comments, Ms. Strickland believed it was likely that Mr. Davis had criticized her over the "shadowing" activity at a senior management team meeting, which she found humiliating.

Ms. Strickland said that her issues were related to that case but also more than that. Mr. Carpenter told Ms. Strickland that he had started at the office around the same time as Mr. Davis and "adored" him, that he was a good guy who had made mistakes, and that it was in Ms. Strickland's best interest to mend things and get along with him. Ms. Strickland was uncomfortable with Mr. Carpenter's comments and considered them to be inappropriate. She ended the conversation by telling Mr. Carpenter that she needed a way forward. Notes Dated July 22, 2018.

That Sunday evening, Mr. Davis emailed Ms. Strickland to ask to meet with her alone about his trial team. Email Dated July 22, 2018. Ms. Strickland thought it was inappropriate for Mr. Davis to request to meet with her alone, considering that the trial team members always met together and that Mr. Davis knew that Ms. Strickland was uncomfortable with him.

Feeling unsafe again, Ms. Strickland took leave on Monday, July 23, 2018. Ms. Strickland sought guidance regarding her rights as a judiciary employee from the AO's Fair Employment Opportunity Officer, Nancy Dunham. At that time, there was no FDO employee manual for the office and no notice of applicable procedures for reporting or addressing sexual harassment, including the EDR Plan. Ms. Strickland learned about the EDR Plan for the first time by talking to Ms. Dunham.

On Tuesday, Mr. Martinez texted and called Ms. Strickland, who was still out of the office, to apologize, acknowledging he should not have put Ms. Strickland back under Mr.

US00000079

Davis's supervision. *See* Exhibit L (Text Message Dated July 24, 2018); Notes Dated July 24, 2018. Mr. Martinez claimed that he made the decision after a long staff meeting and that he was not thinking because he was tired. Mr. Martinez stated that he would change the research and writing assignment procedure again, and that he was on his way to Asheville to "figure it out." Because she was concerned about having her confidences betrayed and about being seen as the reason for the change, Ms. Strickland asked Mr. Martinez to allow her to review the email announcing the change. Mr. Martinez promised he would. Exhibit L (Text Messages Dated July 24, 2018).

On Thursday, July 26, however, Mr. Martinez sent out the email, without giving Ms. Strickland a chance to review it. Exhibit M (Email Dated July 26, 2018). His email announced the posting of an Appellate Assistant Federal Defender position and stated that another Research and Writing attorney would now be responsible for distributing assignments to Ms. Strickland. Ms. Strickland viewed this change as a demotion, because she was no longer receiving her own cases and she was now subordinate to another Research and Writing attorney.

The next day, an employee manual for the FDO was distributed for the first time. *See* Email Dated July 30, 2018. The employee manual included an organizational chart requiring Research and Writing attorneys to report to Mr. Davis, which was a change from the previous office organizational chart. *See* Exhibit B (Organizational Chart Dated July 2018). Ms. Strickland was frustrated that she had still not been removed from Mr. Davis's direct supervisory authority.

5.   **Appellate Chief Josh Carpenter discourages Ms. Strickland from applying for a promotion.**

Ms. Strickland decided to apply for the Appellate Assistant Federal Defender position. Although Ms. Strickland previously had been seeking some trial experience, she was interested in the position, in part, because she believed it was necessary to work exclusively in appeals to insulate herself from Mr. Davis's supervisory authority over the trial division. In addition, given that Ms. Strickland was no longer on the track to receive her own trial cases, she also believed the position would give her an opportunity to finally transition to an Assistant Federal Defender position with her own caseload.

On July 26, 2018, Mr. Johnson called Ms. Strickland. He told her that he had been speaking with Mr. Carpenter about her. He advised her to stick with Mr. Carpenter because, he believed, he had her best interests in mind. Notes Dated July 26, 2018.

On July 27, 2018, Ms. Strickland and Mr. Carpenter spoke by phone while Ms. Strickland was out of town for her wedding reception. Mr. Carpenter explained to Ms. Strickland the details of the new Appellate Assistant Federal Defender posting. Ms. Strickland asked Mr. Carpenter what he suggested for her. After a long pause, Mr. Carpenter asked Ms. Strickland what she meant. Ms. Strickland answered that she wanted to know what he suggested for her about the position.

US00000080

Mr. Carpenter told Ms. Strickland that she did not "need" to apply for the position. He told her that although the position was posted as an Assistant Federal Defender position, that title was being used simply to draw a better applicant pool, and the position would involve research and writing work similar to what she was already doing. Mr. Carpenter told Ms. Strickland that she was better off financially as a Research and Writing Attorney, and that it would only be better for her to be an Assistant Federal Defender after 10-15 years of employment. Notes Dated July 27, 2018.

Ms. Strickland was offended that Mr. Carpenter would discourage her from applying for a promotion. She was particularly discouraged considering that Mr. Carpenter previously had encouraged her interest in appeals and had implied that the new position was being created for her. Ms. Strickland took Mr. Carpenter's comments as another setback to her professional development.

Ms. Strickland decided to apply for the position anyway, and she submitted her application on August 7, 2018. Before submitting her application, she called Mr. Carpenter to let him know she was applying and to tell him she hoped he would support her.

### 6. Ms. Strickland returns to work, despite still feeling unsafe, and Mr. Davis jokes about sexual harassment to her colleagues.

In early August 2018, Ms. Strickland returned to work, having been absent for several weeks and believing she could not keep taking leave. Ms. Strickland's workspace was in a cubicle in a converted utility closet in an isolated back corner of the building. Ms. Strickland was afraid of being confronted by Mr. Davis in her workspace, and she began bringing pepper spray with her to work.

Ms. Strickland shared the utility closet space with Research and Writing Attorney Caleb Newman, who had recently given his notice. On August 3, 2018, Ms. Strickland confided in Mr. Newman that she was thinking about moving her workspace after he left the FDO, because she felt unsafe being in that space alone. Ms. Strickland told Mr. Newman that she had raised concerns with Mr. Martinez that Mr. Davis was sexually harassing her, and that Mr. Martinez had failed to address her concerns.

A few hours later, Mr. Newman told Ms. Strickland that, following their conversation, Mr. Davis had made an inappropriate joke at their team meeting. Mr. Newman had joked that he wished he could come back to attend the annual office retreat. Mr. Davis responded by stating, in front of the whole trial team, that Mr. Newman should come back to give the sexual harassment training. Mr. Newman and Ms. Strickland were both highly offended by Mr. Davis's comments. Given the timing of Mr. Davis's comments, they also wondered if he, or someone else, had eavesdropped on their conversation. Notes Dated August 3, 2018.

US00000081

**7. Ms. Strickland attempts to resolve the situation with Mr. Martinez, and he continues subjecting her to a hostile environment.**

Ms. Strickland seriously considered reaching out to the Circuit Executive of the Fourth Circuit Court of Appeals, who also had the role of EDR Coordinator. Ms. Strickland was intimidated, however, by the notion of reporting a sexual harassment complaint to the Chief Judge of the Fourth Circuit. Ms. Strickland was also unfamiliar with the EDR process, having only just learned of the EDR Plan and having never received any pertinent training. Ms. Strickland decided to continue attempting to resolve her complaints informally.

Meanwhile, the Fair Employment Opportunity Officer, Ms. Dunham, discussed Ms. Strickland's situation with the head of the AO's Defender Services Office, Cait Clarke. Ms. Strickland's understanding was that Ms. Clarke intended to suggest to Mr. Martinez an immediate transfer to the Asheville division to protect Ms. Strickland in the short term, and then Ms. Strickland could decide whether to make a formal complaint against Mr. Davis. With the approval of the AO's Deputy Director, Ms. Clarke contacted Mr. Martinez.

On August 9, 2018, Mr. Martinez came to speak with Ms. Strickland in her workspace about Ms. Clarke's phone call. Because Ms. Strickland no longer trusted Mr. Martinez, she tape-recorded the conversation.

Mr. Martinez said that Ms. Clarke had called him about Ms. Strickland's situation, and that he had told Ms. Clarke he "took care" of it. Mr. Martinez claimed that he had asked Ms. Strickland if she had been sexually harassed and that she had said no, that she had told him she was uncomfortable. Ms. Strickland told Mr. Martinez that this was not true. Ms. Strickland said that, as she had specifically told Mr. Martinez at the time, she was not using those words yet because she was trying to resolve the situation informally, but the behaviors she described to him put him on notice. Ms. Strickland was also offended by Mr. Martinez's implication that, even if she had reported she was only "uncomfortable," this would not be enough to put him on notice of a serious problem.

Mr. Martinez claimed that Ms. Strickland had not tried to resolve the situation with him, except for "one" conversation. Ms. Strickland explained to Mr. Martinez that in fact, she had raised concerns at least twice about Mr. Davis, and she repeated in detail the behaviors she had described to him in those meetings.

When Ms. Strickland mentioned that Mr. Davis had cornered her in the lobby when he knew she was alone, Mr. Martinez interjected, "OK, but there was no physical contact." Ms. Strickland was outraged by Mr. Martinez's trivializing reaction and his implication that, at least she wasn't touched. She responded that she believed the only reason Mr. Davis had not touched her is that she had not let him. Mr. Martinez said he understood that and he was not disagreeing with Ms. Strickland. Mr. Martinez, however, did not apologize for his comment.

Mr. Martinez also claimed that, as soon as he was on notice of Ms. Strickland's concerns, he took control of the situation and took corrective action, except he admitted he should not have

US00000082

put Ms. Strickland back under Mr. Davis, stating that he was simply tired that day. Ms. Strickland told Mr. Martinez that she did not believe he had done anything to correct the situation. Mr. Martinez acknowledged that he had failed to remove Ms. Strickland from Mr. Davis's supervisory authority. Ms. Strickland asked how Mr. Martinez was going to prevent assignments from Mr. Davis in the future to her without violating her confidentiality, and he admitted that he had not thought of or established any plan.

Mr. Martinez criticized Ms. Strickland for going to "some other party" with her concerns. Mr. Martinez also stated that he believed he was being "blamed" and "attacked" for something that was not his fault. Ms. Strickland was offended by these comments, which she perceived as hostile to her right to assert, and seek guidance regarding, her employment rights.

Mr. Martinez pointedly asked Ms. Strickland what she "want[ed]." Throughout the conversation, Ms. Strickland had repeatedly told Mr. Martinez that all she wanted was to move on and do the job she was hired to do without being harassed or threatened. Ms. Strickland stated that, to resolve the situation, she was requesting to be an Assistant Federal Defender and to work exclusively in appeals. Mr. Martinez agreed with Ms. Strickland that it was necessary to move her into appeals because Mr. Davis was in charge of the entire trial division. Mr. Martinez also stated that he would remove Mr. Davis from Ms. Strickland's chain of command and modify the organizational chart accordingly. When Ms. Strickland asked what would happen next, Mr. Martinez said he would implement these steps and that he would consult with Mr. Carpenter as a "courtesy."

The one term Mr. Martinez would not immediately agree to was a transfer to the Asheville duty station, as he said there was no office space. Mr. Martinez claimed it was enough that Mr. Davis and Ms. Strickland worked on opposite ends of the building. Ms. Strickland told Mr. Martinez that it was necessary for her safety not to work in the Charlotte office anymore. Ms. Strickland said that she did not require a full office space in Asheville, considering that she was working in a utility closet cubicle in Charlotte, and she also suggested working remotely. Mr. Martinez said he did not want Ms. Strickland to telework because, if he made an exception to his telework policy for her, other employees might ask to telework as well.

Ms. Strickland was offended by Mr. Martinez's reaction and believed he was trivializing her concerns. Ms. Strickland reminded Mr. Martinez that she had curtailed her office hours to never be in the building alone, and she asserted that this was not a tolerable situation for the long term. Ms. Strickland said she could not come into work every day not knowing what might happen, and that Mr. Davis was likely to be very angry when he found out about these changes. Mr. Martinez said he was not able to commit to anything regarding duty station, but said he would see what he could do and report back to Ms. Strickland in a week. Mr. Martinez told Ms. Strickland that if anything happened at all, it would not be tolerated and she should let him know immediately.

Ms. Strickland did not believe it was appropriate for Mr. Martinez to continue requiring her to work in an environment where she felt unsafe, and she resumed taking leave from work. The next day, on August 10, 2018, Ms. Strickland emailed Mr. Martinez to confirm the terms of

US00000083

their agreement in writing. Ms. Strickland also requested to work remotely pending his transfer decision, citing Mr. Davis's sexually harassing and threatening behaviors towards her. Exhibit N (Email Dated August 10, 2018). Mr. Martinez did not timely respond to her email or act on her request to telework temporarily.

### 8. Mr. Martinez does not implement his agreement with Ms. Strickland, and makes a wrongful conduct report for the first time.

On August 17, 2018, Mr. Martinez emailed Ms. Strickland, copying Fourth Circuit Executive James Ishida and Ms. Heather Beam, Human Resources Manager for the Western District of North Carolina. Exhibit O (Email Dated August 17, 2018). Mr. Martinez stated that, as a result of their August 9 meeting, he was "reclassify[ing]" her Research and Writing attorney position to an Assistant Federal Defender position. Mr. Martinez explained that it was "to the office's advantage to reclassify Research & Writing Specialists to AFD positions for purposes of case weight measurement."

Ms. Strickland was angry and disappointed with this characterization of her duties, which confirmed that she would be permanently relegated to a research and writing role not on parity with the other Assistant Federal Defenders in her office. Ms. Strickland felt that she had been subjected to a bait and switch from the terms on which she had been hired and which Mr. Martinez had promised her before she raised her complaints about Mr. Davis.

Next, Mr. Martinez stated that he never agreed to allow Ms. Strickland to work exclusively in appeals, and that after speaking with Mr. Carpenter, he would require her to continue doing trial work.

Mr. Martinez then stated that he had changed the organizational chart to reflect that Ms. Strickland would report to the Appellate Chief, who would report to the Federal Defender. Mr. Martinez did not provide Ms. Strickland with a copy of the new organizational chart.

Finally, Mr. Martinez informed Ms. Strickland that he had reported her allegation of sexual harassment to the Circuit Executive of the Fourth Circuit Court of Appeals, who had promptly informed Chief Judge Roger Gregory. Ms. Strickland was shocked that Mr. Martinez did not let her know ahead of time that he was making a wrongful conduct report based on her allegations. She was also offended that Mr. Martinez cited her August 9 email as the basis for her allegations when he already had been aware of her concerns since early July, if not earlier.

Mr. Martinez stated that both he and Ms. Beam would need to meet with Ms. Strickland in order to advise her of her rights under the EDR Plan. He stated that he would allow Ms. Strickland to telework temporarily during the pendency of the investigation, but this was not a permanent solution and he was "reserving the right" to request her return to her duty station in Charlotte after the investigation was completed.

Ms. Strickland was intimidated and offended by Mr. Martinez's statements. She was extremely uncomfortable with the idea of meeting with Mr. Martinez about her rights under the

EDR Plan, considering that she believed he had retaliated against her and subjected her to a hostile working environment. She believed his statement about requiring her to return to Charlotte was inappropriate and demonstrated that he had already prejudged the outcome of the investigation by siding against her. Considering that Mr. Martinez had only made a wrongful conduct report after she followed up on his promises to finally address the situation, Ms. Strickland also believed Mr. Martinez was invoking the formal EDR process, in part, to intimidate her and to protect himself.

On September 10, 2018, Ms. Strickland filed a request for counseling and her own report of wrongful conduct, naming both Mr. Davis and Mr. Martinez as alleged violators of the EDR Plan. At the same time, Ms. Strickland requested to disqualify Mr. Martinez from serving as the employing office representative, and to stay the wrongful conduct investigation Mr. Martinez had initiated in order to ensure that the scope of the investigation was expanded to include her allegations against him.

### 9. Ms. Strickland receives a conversion to Assistant Federal Defender with no progression of duties or pay.

In August 2018, the hiring committee conducted interviews for the Appellate Assistant Federal Defender position without asking Ms. Strickland to interview. Another individual was hired into that position.

Ms. Strickland received a conversion of title to an Assistant Federal Defender effective August 20, 2018. *See* Exhibit P (Notification of Personnel Action). Ms. Strickland viewed the conversion as a phantom promotion, with no formal progression of job duties, the loss of an anticipated pay increase to the next equivalent grade, or step, following an additional year of service, and the loss of her locality adjustment. This perception has since been confirmed. As of the time of this writing, Ms. Strickland currently does not have her own caseload, and her role is still to provide research and writing support for other attorneys, including appeal and trial assignments.

### 10. Mr. Martinez still does not protect Ms. Strickland from harassment and retaliation, even after her complaints.

Mr. Davis continued engaging in harassing and obsessive behaviors even after he was aware of Ms. Strickland's complaints. For instance, another employee later told Ms. Strickland that, after Ms. Strickland had resumed coming into work in August 2018, Mr. Davis asked Lisa Ottens, a paralegal whose office was nearest to the utility closet, to "keep tabs" on her. According to this employee, it was widely known within the office that Ms. Ottens had been spying on Ms. Strickland and reporting on her back to Mr. Davis.

Ms. Strickland was mortified that her privacy was violated in this manner. She was shocked that Mr. Davis made such an inappropriate request, that Ms. Ottens complied, and that other employees knew but did not report it. She also believed, in light of this information, that it likely was no coincidence that Mr. Davis made a joke about sexual harassment training just after

Mr. Strickland had confided in Mr. Newman that Mr. Davis was sexually harassing her, which made her feel demeaned and humiliated. More than ever, she believed that Mr. Davis was obsessed with her and that she was not safe around him.

In another instance, after Ms. Strickland had been placed on telework, Mr. Davis copied Ms. Strickland on an email to a client in which he referenced numerous words and phrases from her law review article "Against Design." Exhibit Q (Email Dated August 31, 2018). These references were entirely nonsensical and inappropriate in the context of a client email, and Ms. Strickland believed Mr. Davis included them because he knew she was the only one who would understand them. Ms. Strickland found Mr. Davis's email disturbing and believed it showed his continued obsession with her.

Since Ms. Strickland joined the appellate unit, Mr. Davis has begun regularly volunteering to participate in appellate moots, including multiple sessions in the same case. *See, e.g.*, Exhibit R (Email Dated November 26, 2018). Although appellate moots are a required activity for the appellate unit, Ms. Strickland no longer feels comfortable participating. Ms. Strickland is particularly disturbed that, as of the time of this writing, Mr. Martinez still has not prevented Mr. Davis from interfering with her job duties even after she filed a formal complaint.

Nor has Mr. Martinez ensured that other employees treat Ms. Strickland with respect or maintain her confidentiality. For example, Ms. Strickland heard attorneys make jokes that they would have to meet Ms. Strickland at "Waffle House" because she was not in the office. Ms. Strickland also was asked about her EDR case by a former employee, who told her he found out about it because "people talk." The same former employee told Ms. Strickland it was widely believed in the office that the Appellate Assistant Federal Defender was hired to be her replacement.

Ms. Strickland believes that she is still unsafe and that nothing has changed since she raised complaints against Mr. Davis. This pattern of conduct has fundamentally altered Ms. Strickland's terms and conditions of employment and she is no longer able to do her job effectively. Ms. Strickland believes that her protected rights against sexual harassment, retaliation, and discrimination are being continually violated.

Respectfully,

Cooper Strickland

Cooper Strickland

cc:    Hon. Roger L. Gregory, Chief Judge, Fourth Circuit Court of Appeals via electronic transmission ▮▮▮@ca4.uscourts.gov)

Ms. Caryn Devins Strickland via electronic transmission (caryn.devins@hotmail.com)

US00000086



# FEDERAL PUBLIC DEFENDER
## WESTERN DISTRICT NORTH CAROLINA

Ross Richardson
Interim Federal Public Defender

129 West Trade Street
Suite 300
Charlotte, NC 28202
(704) 374-0720
Fax (704) 374-0722



1 Page Avenue
Suite 210
Asheville, NC 28801
(828) 232-9992
Fax (828) 232-5575

March 24, 2017

Ms. Caryn Devins
18 Oak Beach Drive
Burlington, Vermont 05401

Re: Offer letter for attorney position

Dear Caryn,

This offer letter confirms our conversation regarding your employment as a Research and Writing Specialist Attorney with the expectation that you will transition to an Assistant Defender position. You will be working at the Charlotte Headquarters Office. Your salary has been set in accordance with Defender Services Office policy at Grade 14, Step 1, earning $101,929 per annum, including locality pay. At this time, we expect your start date to be between July 15 and August 15, 2017, but that may change depending upon circumstances.

You will be eligible for the federal benefits package including health insurance, dental insurance, life insurance, and retirement benefits. You will accrue sick leave at the rate of 4 hours per pay period and accrue annual leave at the rate of 4 hours per pay period. Employment terms are subject to final approval by the Defender Services Office and the Administrative Office of the Courts.

We are excited about the talents and skills you bring to this position and are looking forward to working with you.

If you have any questions, please contact William Moormann, our Administrative Officer.

Sincerely,

Ross Richardson
Federal Public Defender, Interim

Signed:

Caryn Devins

US00000087



Federal Public Defender - Western District of North Carolina
Organization Chart

US00000088



 **Mas Dinero**
JP Davis  to: Caryn Devins                                    05/18/2018 03:56 PM

Dude, you're shooting high with a G15. Not least of all since you'll need 5 more years of fed service to
qualify for it. But fret not, I have a plan... just remember I deal in pay-for-stay :)

J.P. Davis
First Assistant Federal Defender
Federal Public Defender
Western District of North Carolina
129 W. Trade Street, Suite 300
Charlotte, NC 28202
Phone: 704-374-0720
Fax: 704-374-0722

US00000089



▼ JP Davis---06/01/2018 03:24:52 PM---My apologies, I have been completely absorbed in the ▮▮▮ matter, I am doing some more research here and then I was planning o

> From: JP Davis/NCWF/04/FDO
> To: Caryn Devins/NCWF/04/FDO@FDO
> Date: 06/01/2018 03:24 PM
> Subject: Re: ▮▮▮

The meeting was primarily to inform Mr. ▮▮▮ of the ruling and discuss the case. I don't need you to go with me; I just asked if you wanted to go and took your response as a yes. It's fine for you to not.

I did notice that you looked pretty unhappy earlier. I hope you feel better. I'm happy to offer a drink and an ear if you need one, though I get the feeling you are not comfortable talking to me about it. Might I suggest Mary Ellen? She's completely separate from all aspects of this and would give you some good perspective.

Sent from IBM Verse

Caryn Devins --- Re: ▮▮▮ ---

| | |
|---|---|
| From: | "Caryn Devins" <Caryn_Devins@fd.org> |
| To: | "JP Davis" <JP_Davis@fd.org> |
| Date: | Fri, Jun 1, 2018 2:43 PM |
| Subject: | Re: ▮▮▮ |

My apologies, I have been completely absorbed in the ▮▮▮ matter. I am doing some more research here and then I was planning on leaving a little early. I am completely mentally and emotionally exhausetd.

This is to discuss with him the plea options? Not sure if you really need me to go with you but if so then Monday would probably work better for me. Thanks, Caryn

Caryn Devins
Research & Writing Attorney
Federal Public Defender for the Western District of North Carolina
129 West Trade Street, Suite 300
Charlotte, North Carolina 28202
Main - 704-374-0720
Fax - 704-374-0722

CONFIDENTIALITY NOTE

This e-mail, and any attachments accompanying this e-mail, contain

US00000090





**Re: Brief** 🗋
Caryn Devins   to: JP Davis                                      06/19/2018 05:22 PM

Good, glad to see it done. Yes I have a bunch of things going on but I hope you enjoy. Caryn

Caryn Devins
Research & Writing Attorney
Federal Public Defender for the Western District of North Carolina
129 West Trade Street, Suite 300
Charlotte, North Carolina 28202
Main - 704-374-0720
Fax - 704-374-0722

CONFIDENTIALITY NOTE

This e-mail, and any attachments accompanying this e-mail, contain information from the Federal Public
Defender's Office which is confidential or privileged. The information is intended only for the use of the
individual(s) or entity(s) named in this e-mail. If you are not the intended recipient, be aware that any
disclosure, copying, distribution, or use of the contents of this information is prohibited. If you have
received this e-mail in error, please notify us immediately by reply e-mail.


      JP Davis            Yes, I did that for purposes of humanizing the cli ..      06/19/2018 05:00:34 PM

| | |
|---|---|
| From: | JP Davis/NCWF/04/FDO |
| To: | Caryn Devins/NCWF/04/FDO@FDO |
| Date: | 06/19/2018 05:00 PM |
| Subject: | Re: Brief |

Yes, I did that for purposes of humanizing the client. I'm aware it may be off-putting if you're used to a drier
writing style, but in my experience that form of psychological distance-closing can be effective.

Thanks. I'm going to get this filed and get a celebratory drink. You're welcome to join me, but if I recall
correctly, you have an appellate brief to write.

J.P. Davis
First Assistant Federal Defender
Federal Public Defender
Western District of North Carolina
129 W. Trade Street, Suite 300
Charlotte, NC 28202
Phone: 704-374-0720
Fax: 704-374-0722

      Caryn Devins            Sorry for not getting to this earlier, busy afternoo,..      06/19/2018 04:33:48 PM

| | |
|---|---|
| From: | Caryn Devins/NCWF/04/FDO |
| To: | JP Davis/NCWF/04/FDO@FDO |
| Date: | 06/19/2018 04:33 PM |
| Subject: | Re: Brief |

Sorry for not getting to this earlier, busy afternoon. I agree it's close and I mostly just fixed a few minor
typos in track changes. the only thing I wanted to double check is that you want to refer to him as ▮▮▮

US00000091



EXHIBIT
F

●●○○○ Verizon 📶   2:15 PM   🌙 ⏰ ⚇ 75% 🔋

 **Jp** ⓘ

Fri, Jun 15, 5:44 PM

**Hey, just tried to call and missed you. Feel free to give me a call back whenever.**

Thu, Jun 21, 6:44 PM

**It is currently raining.**

**Last chance for a ride, tough girl...**

Fri, Jun 22, 5:02 PM

**How would you feel about handling a sentencing hearing**

Case 1:20-cv-00066-WGY   Document 248-2   Filed 06/07/23   Page 40 of 62

US00000092



**From:** JP Davis
**To:** Caryn Devins
**Subject:** Catching up
**Date:** 06/27/2018 11:52 AM

Hey Caryn,

Can we catch up for a little bit some time this week? I think it would be good for us to have another mentoring session. We can do It over lunch, or cut out early one day for a celebratory post-████drink, or we can just do it in the office-- I think it might be good to have some distance from work, but whatever makes you most comfortable is fine with me. I am free all day tomorrow and Friday; could even do this afternoon after I get out of a debrief. Just let me know what your schedule is like.

JP

Sent from IBM Verse

US00000093



EXHIBIT

**H**



> with Jen's clients on Monday. Is there a particular time you were thinking?

> I am free all day, including early morning, lunch and evening. I'm hoping this will be helpful for you, please don't be over-anxious about it.

> Ok how about 3pm?

**Delivered**

> Monday at 3 is fine, not it down.



From: JP Davis
To: Caryn Devins
Cc: Peter Adolf; Anthony Martinez
Subject: Re: ▮ tomorrow
Date: 06/06/2018 05:27 PM

Caryn,

This is not the right way to handle this situation. You made the knowing and deliberate decision to disregard your commitment and schedule the FBI review without even raising the preexisting PSI or clearing it with me ahead of time. The fact that it is now scheduled is your own doing.

I did not give you an option this morning. I am directing you to attend the PSI. If you choose to disobey a direct order, that is an action that I as a supervisor cannot ignore.

I will have my phone if you would like to discuss this further. Otherwise, I expect you to be ready to go at 8:15.

JP

Sent from IBM Verse

Caryn Devins --- ▮ tomorrow ---

From: "Caryn Devins" <Caryn_Devins@fd.org>
To: "JP Davis" <JP_Davis@fd.org>
Date: Wed, Jun 6, 2018 5:11 PM
Subject: ▮ tomorrow

JP,

I am sorry, but the FBI meeting time is set and I cannot change it at this point. I will not be able to attend the PSI meeting tomorrow.

I was under the impression that this was a shadowing activity that is optional and that we could find other similar activities if schedules could not be accommodated, as explained in the email below. I very much appreciate the opportunity for mentorship and hopefully there is another one we can go to soon.

Thank you,

Caryn

Caryn Devins
Research & Writing Attorney
Federal Public Defender for the Western District of North Carolina
129 West Trade Street, Suite 300
Charlotte, North Carolina 28202
Main - 704-374-0720
Fax - 704-374-0722

CONFIDENTIALITY NOTE

US00000095

This e-mail, and any attachments accompanying this e-mail, contain information from the Federal Public Defender's Office which is confidential or privileged. The information is intended only for the use of the individual(s) or entity(s) named in this e-mail. If you are not the intended recipient, be aware that any disclosure, copying, distribution, or use of the contents of this information is prohibited. If you have received this e-mail in error, please notify us immediately by reply e-mail.

----- Forwarded by Caryn Devins/NCWF/04/FDO on 06/06/2018 05:06 PM -----

From: JP Davis/NCWF/04/FDO
To: Caryn Devins/NCWF/04/FDO@FDO
Date: 03/13/2018 09:53 AM
Subject: Re: ▓▓ raincheck

_____

No worries, though sucks not to have you there. We'll find another one. Also, I'm sure you know this, but you don't have to do these shadowing things with me; just let me know if you do something with someone else so I can check it off your list.

PS - after yesterday, I'm going to add "Evidence Review" to the checklist. That really is something every new attorney should do, glad you suggested it.

J.P. Davis
First Assistant Federal Defender
Federal Public Defender
Western District of North Carolina
129 W. Trade Street, Suite 300
Charlotte, NC 28202
Phone: 704-374-0720
Fax: 704-374-0722
Caryn Devins---03/13/2018 08:54:57 AM---JP, I am so sorry but I am going to have to take a rain check on ▓▓ ▓▓ tomorrow. I have to prep

From: Caryn Devins/NCWF/04/FDO
To: JP Davis/NCWF/04/FDO@FDO
Date: 03/13/2018 08:54 AM
Subject: ▓▓ raincheck

_____

JP,

I am so sorry but I am going to have to take a rain check on ▓▓ ▓▓ tomorrow. I have to prepare for two SRV hearings next week and that is the only day I can visit the clients. Hopefully I'll be able to visit a debrief with you another time.

Caryn

Caryn Devins
Research & Writing Attorney
Federal Public Defender for the Western District of North Carolina
129 West Trade Street, Suite 300
Charlotte, North Carolina 28202
Main - 704-374-0720
Fax - 704-374-0722

US00000096

EXHIBIT
5

## Caryn Strickland

**From:** Caryn Devins
**Sent:** Monday, July 9, 2018 11:42 AM
**To:** Anthony Martinez
**Subject:** Re: next steps after meeting last week

Yes, this works for me. Thank you very much. Caryn

Caryn Devins
Research & Writing Attorney
Federal Public Defender for the Western District of North Carolina
129 West Trade Street, Suite 300
Charlotte, North Carolina 28202
Main - 704-374-0720
Fax - 704-374-0722

CONFIDENTIALITY NOTE

This e-mail, and any attachments accompanying this e-mail, contain information from the Federal Public Defender's Office which is confidential or privileged. The information is intended only for the use of the individual(s) or entity(s) named in this e-mail. If you are not the intended recipient, be aware that any disclosure, copying, distribution, or use of the contents of this information is prohibited. If you have received this e-mail in error, please notify us immediately by reply e-mail.

Anthony Martinez—07/09/2018 10:37:34 AM---Caryn, You are correct. As I indicated to you at our meeting, your performance is not at issue. We a

From: Anthony Martinez/NCWF/04/FDO
To: Caryn Devins/NCWF/04/FDO@FDO
Date: 07/09/2018 10:37 AM
Subject: Re: next steps after meeting last week

Caryn,

You are correct. As I indicated to you at our meeting, your performance is not at issue. We agreed that we should have someone else other than JP mentor you. I asked you who you'd prefer. You advised me you would like for Kelly to be your mentor. I've already discussed the matter with Kelly and he's advised he'd be more than willing to be your mentor. I've talked with Peter (your team leader) and advised him that Kelly would be acting in that capacity with you. Is this ok with you?

Thanks,
Tony

US00000097

**Anthony Martinez**
**Federal Public Defender**



Western District of North Carolina
129 West Trade Street, Suite 300
Charlotte, NC 28202
Tel: (704) 374-0720
Fax: (704) 374-0722
E-mail: Anthony_Martinez@fd.org

*This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify us by reply e-mail.

Caryn Devins---07/09/2018 09:20:43 AM---Dear Tony,

From: Caryn Devins/NCWF/04/FDO
To: Anthony Martinez/NCWF/04/FDO@FDO
Date: 07/09/2018 09:20 AM
Subject: next steps after meeting last week

Dear Tony,

Thanks for meeting with me and JP last Thursday. I wanted to make sure that I understand the next steps moving forward. From the meeting, my understanding is that there is no performance issue with my work, but that this is a matter of receiving the right mentoring. Based on this, I am planning to ask for a new mentor.

Please let me know if you have any questions or concerns.

Best regards,

Caryn

Caryn Devins
Research & Writing Attorney
Federal Public Defender for the Western District of North Carolina
129 West Trade Street, Suite 300
Charlotte, North Carolina 28202
Main - 704-374-0720
Fax - 704-374-0722

CONFIDENTIALITY NOTE

This e-mail, and any attachments accompanying this e-mail, contain information from the Federal Public Defender's Office which is confidential or privileged. The information is intended only for the use of the individual(s) or entity(s) named in this e-mail. If you are not the intended recipient, be aware that any disclosure, copying, distribution, or use of the contents of this information is prohibited. If you have received this e-mail in error, please notify us immediately by reply e-mail.



 **Research & Writing Support**
Anthony Martinez    to: zzNCWml_AllStaff

07/20/2018 04:15 PM

All,

In light of Caleb's imminent departure, we will be adding a new assistant paralegal position for JP's team. Meanwhile, we will be making some adjustments to ensure all teams have full R&W support. Going forward, each of our two remaining Research and Writing attorneys will be assigned to cover two teams. Jared will be assigned to Erin and Mary Ellen's teams. Caryn will be assigned to Peter and JP's teams. We are still exploring the possibility of adding an additional position with research and writing responsibilities at some point in the future, so please keep your team leaders informed about how your R&W needs are being met.

Thanks,
Tony

**Anthony Martinez**
**Federal Public Defender**

 **Western District of North Carolina**
**129 West Trade Street, Suite 300**
**Charlotte, NC 28202**
**Tel: (704) 374-0720**
**Fax: (704) 374-0722**
**E-mail:** Anthony_Martinez@fd.org

*This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify us by reply e-mail.

US00000099



EXHIBIT

L

 **Verizon** 2:04 PM 44%

 **Tony** ›

Talk later

Tue, Jul 24, 9:17 AM

This is Tony. I'm at the Caldwell Jail getting ready to speak with Mr. Dixon. I really need to talk with you. What would be a good time for me to call you. I should be out by the latest 11. Thanks.

Tue, Jul 24, 11:10 AM

https://outlook.live.com/mail/AQMkADAwATZiZmYA7C1kZW...

  ●●○○○ Verizon 📶    **9:32 AM**    🌙 📷 ✳ 97% 🔋

**◁ ●**      **Tony**      ⓘ 

Tuesday 11:10 AM

> Tony, before you send out any email to the office, I would like to review it first. Honestly I am concerned about being viewed as the reason for the change

**Delivered**

> Yes, I thought of that. I think I can couch it so it doesn't come back to you. I'll show it to you before I send it out. Thx

L0/4/2018, 2:03 PM





**Fw: Research & Writing Support Follow-Up**
Anthony Martinez   to: zzNCWml_AllStaff                                    07/26/2018 09:03 AM

All,

Following up on my email from last Friday, I'm happy to report that we are going forward with the hiring of a new Appellate Assistant Federal Public Defender. This AFPD will be stationed in Charlotte. Like Jared and Caryn, the new position will divide time between providing support for the trial teams and assisting with our appellate and post-conviction practice.

In light of this development and in order to facilitate the flow of work to the R&W's I am adjusting how work is assigned from the trial teams to the R&W's. We will no longer assign each team a designated R&W attorney. Instead, all requests for R&W support should be sent to Jared, who will then distribute the work amongst himself and Caryn based on their current workload capacity and any particular interest or expertise that an R&W may have on the relevant issue. This is the system that Jared has used to handle requests from Asheville since we implemented the team structure, and he reports that it has worked well.

This is a temporary fix. Once we get the new AFPD on board we will revisit the issue on how to distribute the R&W trial/appellate workload going forward.

In the meantime, if you know any attorneys who might be a good fit for the attached position, please reach out to them.

Thank you for your patience.

📄
App AFD posting.pdf

Thanks!
Tony

---- Forwarded by Anthony Martinez/NCWF/04/FDO on 07/26/2018 09:02 AM ----

| | |
|---|---|
| From: | Anthony Martinez/NCWF/04/FDO |
| To: | zzNCWml_AllStaff@FDO |
| Date: | 07/20/2018 04:15 PM |
| Subject: | Research & Writing Support |

All,

In light of Caleb's imminent departure, we will be adding a new assistant paralegal position for JP's team. Meanwhile, we will be making some adjustments to ensure all teams have full R&W support. Going forward, each of our two remaining Research and

US00000102

Writing attorneys will be assigned to cover two teams. Jared will be assigned to Erin and Mary Ellen's teams. Caryn will be assigned to Peter and JP's teams. We are still exploring the possibility of adding an additional position with research and writing responsibilities at some point in the future, so please keep your team leaders informed about how your R&W needs are being met.

Thanks,
Tony


**Anthony Martinez**
Federal Public Defender



Western District of North Carolina
129 West Trade Street, Suite 300
Charlotte, NC 28202
Tel: (704) 374-0720
Fax: (704) 374-0722
E-mail: Anthony_Martinez@fd.org

*This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify us by reply e-mail.

US00000103



Agreement from yesterday's meeting
Caryn Devins
to:
Anthony Martinez
08/10/2018 11:12 AM
Hide Details
From: Caryn Devins/NCWF/04/FDO
To: Anthony Martinez/NCWF/04/FDO@FDO
Tony,

I am confirming what we discussed yesterday. We agreed to the following:

1. I will be an Assistant Federal Defender;
2. I will work exclusively in appeals;
3. The First Assistant will not be in my chain of command or have any supervisory authority over me.
   report to the Appellate Chief, who will report to the Federal Defender. The organizational chart wi
   modified to reflect this.

As we discussed, these steps are necessary to protect myself from further sexual harassment by the First
Assistant, and to allow me to do my job effectively going forward.

In addition, as I told you, I am not safe working in the Charlotte office. The First Assistant has already cros
many lines with me by engaging in sexually harassing and threatening behaviors, such as cornering me in
lobby after hours when he knew I was alone. I have already curtailed my working hours to avoid being al
the building and this situation is not tenable moving forward. The First Assistant is likely to be very angry
he finds out about these changes, which puts me at further risk.

You indicated that there was an issue with office space in Asheville and that it might take up to two week
resolve the issue, but that you would report back to me in a week. In order to prevent further threats to
safety, I am requesting to work remotely until the duty station issue is resolved. A long-term resolution tl
allows me to work remotely and report to the Appellate Chief in Asheville is fine with me. An exception t
telework policy can be justified by the lack of office space in Asheville.

Caryn

Sent from Mail for Windows 10

US00000104





Re: Agreement from yesterday's meeting
Anthony Martinez    to:  Caryn Devins
Cc:  James Ishida, Heather Beam

08/17/2018 01:52 PM

Caryn,

As a result of our meeting on Thursday, 8/9/18 I have done the following:

1. I have instructed our Administrative Officer William Moorman to start the process to make you an Assistant Federal Defender. As I indicated to you at our meeting, Josh and Bill spoke with Todd Watson, who advised that it was to the office's advantage to reclassify Research & Writing Specialists to AFD positions for purposes of case weight measurement. Bill has already started the paperwork.

2. At our meeting I never agreed to allow you to work exclusively on appeals. I advised you I personally had no problem with it but had to clear it through Appellate Chief Josh Carpenter. If I were to allow you to only work on appeals, it would leave me with only one Research & Writing Specialist to support nine trial attorneys. After discussion with Josh about this request, we determined this is not doable and I will not agree to have you do appeals exclusively.

3. We have already changed the organizational chart to reflect that you will report to the Appellate Chief, who will report to the Federal Defender. As Appellate Chief, Josh Carpenter is aware of this change.

In your email you state, "these steps are necessary to protect myself from further sexual harassment by the First Assistant". You further state, "The First Assistant has already crossed many lines with me by engaging in sexually harassing and threatening behaviors..." I take allegations of wrongful conduct on the part of my employees very seriously. Based on your allegation of sexual harassment and my obligation pursuant to the Employment Dispute Resolution Plan of the United States Court of Appeals for the Fourth Circuit Chapter IX, I have contacted the Circuit Executive for the 4th Circuit and advised him of this allegation. The Circuit Executive has promptly informed Chief Judge Gregory. Our office also has an EDR plan but it doesn't appear to apply in this case.

Under the 4th Circuit Court of Appeals EDR plan, you have certain rights. The investigation into these allegations will be conducted by Heather Beam who is the HR professional for the US District Court in the Western District of NC. Ms. Beam has been approved to conduct this investigation by the Circuit Executive. Both Ms. Beam and I will need to meet with you in order to advise you of your rights under the 4th Circuit Court of Appeals EDR plan. We will be in contact with you some time next week since Ms. Beam will be out of the office for training from Monday through Thursday. In the meantime, I will allow you to telework temporarily during the pendency of this investigation. This is not a permanent solution. I am reserving the right to request your return to your duty station in Charlotte subject to and upon completion of this investigation. I am also going to count the time from Friday, 8/10/18 (the date of your email) through today as Administrative leave so you do not have to use your sick leave.

US00000105

If you have any additional questions, please feel free to ask.

I will also be in touch with you to ask you the status of some of the cases you have been handling.

Thank you,

**Anthony Martinez**
Federal Public Defender



Western District of North Carolina
129 West Trade Street, Suite 300
Charlotte, NC 28202
Tel: (704) 374-0720
Fax: (704) 374-0722
E-mail: Anthony_Martinez@fd.org

*This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify us by reply e-mail

| Caryn Devins | Tony, I am confirming what we discussed yesterd... | 08/10/2018 11:12:42 AM |
|---|---|---|

| | |
|---|---|
| From: | Caryn Devins/NCWF/04/FDO |
| To: | Anthony Martinez/NCWF/04/FDO@FDO |
| Date: | 08/10/2018 11:12 AM |
| Subject: | Agreement from yesterday's meeting |

Tony,

I am confirming what we discussed yesterday. We agreed to the following:

1. I will be an Assistant Federal Defender;
2. I will work exclusively in appeals;
3. The First Assistant will not be in my chain of command or have any supervisory authority over me. I will report to the Appellate Chief, who will report to the Federal Defender. The organizational chart will be modified to reflect this.

As we discussed, these steps are necessary to protect myself from further sexual harassment by the First Assistant, and to allow me to do my job effectively going forward.

In addition, as I told you, I am not safe working in the Charlotte office. The First Assistant has already crossed many lines with me by engaging in sexually harassing and threatening behaviors, such as cornering me in the lobby after hours when he knew I was alone. I have already curtailed my working

US00000106



Standard Form 90
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| Strickland, Caryn Ann Devins | | | 08/20/2018 |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
| 894 | Pay Adjustment | | |
| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
| 852 | AO 52 dated 08-17-2018 | | |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |

**7. FROM: Position Title and Number**
Research & Writing Specialist
PD: 541011
Position: P1700619

**15. TO: Position Title and Number**
Assistant Federal Public Defender
PD: 548400
Position: P1700619

| 8. Pay Plan | 9. Occ. Code | 10. Grade or Level | 11. Step or Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19. Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| FD | FD44 | 14 | 2 | $107,319.00 | PA | UC | FD82 | 00 | 0 | $107,319.00 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| $92,349.00 | $14,970.00 | $107,319.00 | $0 | $107,319.00 | $0 | $107,319.00 | $0 |

**14. Name and Location of Position's Organization**

Federal Public Defender Office
129 West Trade Street
Room 300

Charlotte NC USA

**22. Name and Location of Position's Organization**

Federal Public Defender Office
129 West Trade Street
Room 300

Charlotte NC USA

## EMPLOYEE DATA

| 23. Veterans Preference | | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF | |
|---|---|---|---|---|---|
| 1 - None   3 - 10-Point/Disability   5 - 10-Point/Other | | 3 | | YES | NO |
| 2 - 5-Point   4 - 10-Point/Compensable   6 - 10-Point/Compensable/30% | | 0 - None   2 - Conditional   1 - Permanent   3 - Indefinite | | | |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| X0   Basic + Option B (2x) | 9   Not Applicable | |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| KF   FERS FRAE and FICA | 09/19/2014 | F   Full Time | |

## POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 2   1 - Competitive Service   3 - SES General   2 - Excepted Service   4 - SES Career Reserved | E - Exempt   N - Nonexempt | | |

| 38. Duty Station Code | 39. Duty Station (City – County – State or Overseas Location) |
|---|---|
| FNCWXCHNCW | Charlotte NC |

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| LEI: 10/30/2017 | | | | |

**45. Remarks**
Assistant Federal Public Defender is placed in AD Level 28

| Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| United States Federal Courts | Electronically Signed by: |
| 47. Agency Code   48. Personnel Office ID   49. Approval Date | Janice Chiverton |
| JC01   6807   08/28/2018 | Chief,Court Personnel Mgmt Div |

5-Part SF-116

2 - OPF Copy - Long-Term Record - DO NOT DESTROY

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540-01-333-6238

Case 1:20-cv-00066-WGY   Document 248-2   Filed 06/07/23   Page 55 of 62

US00000107



**From:** JP Davis
**Sent:** Friday, August 31, 2018 4:38 PM
**To:** ▮▮▮▮
**Cc:** Caryn Devins; Claudia M Garcia
**Subject:** Re: Fw: ▮▮▮ - motion to extend report date

▮▮▮▮

Apologies for being out of pocket and unavailable; it was not by design. One begins to feel like the Red Queen from Lewis Carroll, running eternally just to stay in the same place. Not an excuse -- just a sentiment I know you'll understand.

Let's talk Tuesday at 10, you can call my cell. I've also asked Jim to be available to you. It's hard to prestate what the future will look like, so you should always feel free to reach out to Claudia-- or Lisa, or anyone else on the team, for that matter. Everyone is still on board to help if asked, and that might be a lot easier than trying to pin me down.

J.P. Davis
First Assistant Federal Defender
Federal Public Defender
Western District of North Carolina
129 W. Trade Street, Suite 300
Charlotte, NC 28202
Phone: 704-374-0720
Fax: 704-374-0722
▮▮▮▮ —08/31/2018 12:12:45 PM---Hi, are you out for the holiday? I can't get a reply. It's been 16 days. There were lists that I was

**From:** ▮▮▮▮
**To:** JP Davis ▮▮▮▮, Caryn Devins <Caryn_Devins@fd.org>
**Date:** 08/31/2018 12:12 PM
**Subject:** Re: Fw: ▮▮▮ - motion to extend report date

Hi, are you out for the holiday? I can't get a reply. It's been 16 days.

There were lists that I was going to be able to review after our last in person meeting that I haven't been able to review yet.

I was supposed to meet with Jim before our court date in September as well.

I am in the dark right now.

When is good to talk on the phone?

US00000108



**Caryn Strickland**

| | |
|---|---|
| **From:** | Ann Hester |
| **Sent:** | Monday, November 26, 2018 1:11 PM |
| **To:** | JP Davis; W Kelly Johnson; Melissa Baldwin; Joshua B Carpenter; Caryn Strickland; Jared P Martin |
| **Subject:** | FW: Briefs for Moot |
| **Attachments:** | 2018-07-11 Samuels Appellant Brief.pdf; 2018-08-15 Samuels US Brief.pdf |

Everyone, here are Taylor's briefs for the moots on 12/6 at 11 am and 12/11 at 11:30 am.

Here's the signup list for the two moots. We have three lawyers from Robinson Bradshaw participating:

12/6 11 a.m.
Ann
→ JP
Kelly
Cheyenne Chambers
Melissa
Erik Zimmeran
Mark Hiller

12/11 11:30 a.m
→ JP
Josh
Caryn
Jared
Melissa
Travis Hinman
Chris Fialko

Ann L. Hester
Assistant Federal Public Defender
Appellate Division
Federal Public Defender
Western District of North Carolina
129 West Trade Street Suite 300
Charlotte, NC 28202
Ann_Hester@fd.org
Main - 704-374-0720
Fax - 704-374-0722

*This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify us by reply e-mail.

**From:** Taylor.goodnight_fialko-law.com <Taylor.goodnight@fialko-law.com>
**Sent:** Monday, November 26, 2018 11:21 AM

Case 1:20-cv-00066-WGY   Document 248-2   Filed 06/07/23   Page 57 of 62

US00000109

**Sent**: 6/12/2019 8:09:17 AM
**To**: ████ca4.uscourts.gov
**CC**: ████@ca4.uscourts.gov; Caryn Devins [caryn.devins@hotmail.com]
**Attachments**: Renewed Request for Disqualification (EDR Claim Strickland).pdf

Dear Chief Judge Gregory:

The following document is a renewed request by Complainant Ms. Caryn Devins Strickland to disqualify Mr. Anthony Martinez under the Consolidated Equal Employment Opportunity and Employment Dispute Resolution Plan of the United States Court of Appeals for the Fourth Circuit.

If you have any questions, please feel free to contact me. I may be reached by email or by phone at (828) 817-3703.

Respectfully,

Cooper Strickland
Representative for Claimant

US00001498

**In The**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

| | | |
|---|---|---|
| In the Matter of a Request Filed | ) | |
| | ) | |
| Under Employment Dispute Resolution | ) | |
| | ) | |
| Plan of the United States Courts | ) | **RENEWED REQUEST FOR** |
| | ) | **DISQUALIFICATION** |
| of the Fourth Circuit | ) | |
| | ) | |
| | ) | |
| | ) | |

For the reasons set forth in the attached letter to the Honorable Roger L. Gregory, dated February 24, 2019, the Claimant, Ms. Caryn Devins Strickland, requests that the Federal Public Defender for the Western District of North Carolina, Mr. Anthony Martinez, be disqualified from performing, in an official capacity (e.g., unit executive), any of the claim procedures on behalf of the employing office as set forth in Chapter X of the Consolidated Equal Employment Opportunity and Employment Dispute Resolution Plan of the United States Court of Appeals for the Fourth Circuit (Nov. 2018) and that the Fourth Circuit Judicial Council be appointed to represent Ms. Strickland's employing office in this matter.

This the 24th day of February, 2019.


Cooper Strickland
N.C. State Bar No. 43242 (Active)
S.C. State Bar No. 101645 (Inactive)
Representative for Claimant
P.O. Box 92
Lynn, NC 28750

US00001499

# Cooper Strickland

Attorney at Law
Post Office Box 92
Lynn, North Carolina 28750

February 24, 2019

[*Via Electronic Transmission*: ████ @ca4.uscourts.gov]

The Honorable Roger L. Gregory
Chief Judge
U.S. Court of Appeals for the Fourth Circuit
1100 E. Main Street
Richmond, VA 23219

### RE: Renewed Request for Disqualification

Dear Chief Judge Gregory:

As an alleged violator of protected employment rights, the individual interests of the Federal Public Defender for the Western District of North Carolina, Mr. Anthony Martinez ("Mr. Martinez"), are fundamentally divergent from the interests of the employing office. His personal conflict of interest results in prejudice to the Claimant, Ms. Caryn Devins Strickland ("Ms. Strickland"), through his official role in fulfilling the claim procedures set forth in Chapter X of the Consolidated Equal Employment Opportunity and Employment Dispute Resolution Plan of the United States Court of Appeals for the Fourth Circuit (Nov. 2018) (the "EDR Plan"). For the following reasons, Ms. Strickland respectfully requests that the Court disqualify Mr. Martinez and that the Fourth Circuit Judicial Council represent Ms. Strickland's employing office in this matter. See, e.g., EDR Plan, Ch. X, § 3.

Pursuant to Chapters IX and X of the EDR Plan, Ms. Strickland has alleged that Mr. Martinez personally denied her employment rights provided by the EDR Plan. Her allegations against Mr. Martinez and other employees under his supervision are documented in her request for counseling and mediation and in interviews with and evidence submitted to the Court's investigator. At each stage of this process, Ms. Strickland has repeatedly alleged that Mr. Martinez subjected her to legally actionable retaliation for reporting sexual harassment by First Assistant JP Davis.

Ms. Strickland's allegations were jointly investigated for purposes of Chapters IX *and* X, including her claim of retaliation by Mr. Martinez. The joint investigation process concluded after the investigator submitted a revised report containing findings and recommendations.[1] Ms.

---

[1] The joint report was submitted shortly before the conclusion of an extended counseling period. Prior to the end of counseling, Ms. Strickland requested an additional extension to allow time for the Court to consider the results of the joint investigation prior to the conclusion of counseling.

US00001500

Strickland believed that the joint investigation would be considered by the Court in deciding her September 10, 2018 written request to disqualify Mr. Martinez pursuant to Chapter X, Section 7 of the EDR Plan. Ms. Strickland has been informed that the Court intends to deny her disqualification request and that a written decision is forthcoming. To date, however, the Court has not communicated a decision to her in writing.

Disqualification of Mr. Martinez remains appropriate and is an available remedy under the terms of the EDR Plan. Under the "General Disqualification Provision" of Chapter X, "[a] party may seek disqualification of a judicial officer, *employee* or other person *involved in* a dispute by written request to the Chief Judge." Id., Ch. X, § 7 (emphasis added). For purposes of the EDR Plan, "employee" is defined as "all individuals listed in § 2 of this Chapter," including "[t]he *unit executive* and staff of the . . . Federal Public Defenders within the Fourth Circuit." Id., Ch. I, §§ 2–3 (emphasis added). Mr. Martinez is the "unit executive" of the employing office, see id., Ch. II, § 3.A, and he is "involved in" this dispute as an alleged violator of Ms. Strickland's employment rights. As an "employee" that is "involved in" this dispute, Mr. Martinez is subject to disqualification under the express terms of the EDR Plan.

Disqualification is also consistent with analogous provisions in the EDR Plan. For example, if Mr. Martinez had initially violated Ms. Strickland's rights, she would have been "encouraged to discuss the matter with the EDR Coordinator," not with Mr. Martinez. Id., Ch. X, § 2. Presumably, the EDR Plan recommends this reporting alternative to avoid the risk of abuse of process by an alleged violator and the high probability of distress that an aggrieved employee would experience from reporting a violation to the alleged violator. Similarly, if a judge is accused of violating the rights of an employee, "all the *claims procedures* of [Chapter X] shall be performed by the Fourth Circuit Judicial Council." Id., Ch. X, § 3 (emphasis added). This provision prohibits an accused judge from participating in an official capacity in counseling, mediation, or the final hearing. The EDR Plan also prohibits the Chief Judge from considering a disqualification request if the Chief Judge is "*named* as being involved in a dispute." Id., Ch. X, § 7 (emphasis added). Without these conflict of interest provisions, an aggrieved employee could be compelled to seek relief from the alleged violator, potentially risking institutional and procedural "retaliation" for "filing a claim pursuant to [the EDR Plan]." See id., Ch. X, § 5.

Ms. Strickland is also concerned that if Mr. Martinez is not disqualified before the hearing stage, then Mr. Martinez will be entitled to legal representation both as the representative of the employing office and as an accused individual. Id., Ch. X, § 10.B.2.c. Similarly, Mr. Martinez will have the right to present evidence and cross-examine witnesses at the hearing in both his official and individual capacities. Id. These hearing rights create a conflict of interest under the Fourth Circuit EDR Plan that is fundamentally unfair to Ms. Strickland and that do not exist under the Model Employment Dispute Resolution (EDR) Plan (Sept. 2018) (the "Model Plan"). See Model Plan, Ch. X, § 10.B.2.c.

Based on the language and principles of the EDR Plan, disqualification of Mr. Martinez is warranted based on Ms. Strickland's documented allegations against him and his conflict of interest. For these reasons, Ms. Strickland respectfully requests that Mr. Martinez be disqualified prior to the end of mediation so that she may continue her attempts to reach a

US00001501

resolution of this matter at the lowest procedural level possible and with a party that did not personally violate her protected employment rights.

Respectfully,

Cooper Strickland

cc:    Mr. James N. Ishida, Circuit Executive, Fourth Circuit Court of Appeals via electronic transmission ██████████)ca4.uscourts.gov)

Ms. Caryn Devins Strickland via electronic transmission (caryn.devins@hotmail.com)

US00001502