# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

ASHEVILLE DIVISION

- - - - - - - - - - - - - - - - x
                                    :
CARYN DEVINS STRICKLAND,      :
                                    :
                Plaintiff,  :
vs.                           :     Case No. 2021-2071
                                    :
UNITED STATES, et al.,       :
                                    :
                Defendants.  :
                                    :
- - - - - - - - - - - - - - - - x

WASHINGTON, D.C.

THURSDAY, APRIL 27, 2023

=========================================
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
=========================================

DEPOSITION OF

JILL LANGLEY

called for examination by counsel for the Plaintiff,

pursuant to notice, at the offices of Caleb Andonian,

PLLC, 1100 H Street, NW, Suite 315, Washington, D.C.,

commencing at 9:29 a.m. and concluding at 2:45 p.m.,

before Kirk A. Sturges, a Notary Public for the

District of Columbia.

ICR/Rudiger & Green
office@icrdepos.com    www.icrdepos.com    (703) 331-0212
Case 1:20-cv-00066-WGY   Document 248-7   Filed 06/07/23   Page 2 of 26

```
 1   A P P E A R A N C E S:

 2   ON BEHALF OF THE PLAINTIFF:

 3   OLIVIA WARREN, ESQ.
     Thomas, Ferguson & Beskind, LLP
 4   119 Main Street, East
     Durham, NC  27701
 5   919-682-5648
     warren@tfblawyers.com
 6
     JEANNIE SUK GERSEN, ESQ.
 7   Hauser Hall 510
     1563 Massachusetts Avenue
 8   Cambridge, MA  02138
     617-496-5487
 9   jsuk73@gmail.com

10
     ON BEHALF OF THE DEFENDANTS:
11
     MADELINE McMAHON, ESQ.
12   DANIELLE WATSON YOUNG, ESQ.
     United States Department of Justice
13   Civil Division, Federal Programs Branch
     1100 L Street, NW
14   Washington, DC  20005
     danielle.young2@usdoj.gov
15   madeline.m.mcmahon@usdoj.gov

16

17   ALSO PRESENT (VIA REMOTE PLATFORM ZOOM)

18   Kristin Mannherz
     Caryn Devins Strickland
19

20

21

22
```

**ICR/Rudiger & Green**
office@icrdepos.com                     www.icrdepos.com                     **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 248-7   Filed 06/07/23   Page 3 of 26

1                    C O N T E N T S

2                 WITNESS:  JILL LANGLEY

3   EXAMINATION BY COUNSEL FOR                          PAGE

4   PLAINTIFF
    BY MS. WARREN. . . . . . . . . . . . . . . . . . 6
5
    DEFENDANTS
6   BY MS. McMAHON . . . . . . . . . . . . . . . . . 189

7   PLAINTIFF
    BY MS. WARREN  . . . . . . . . . . . . . . . . . 190
8

9                    E X H I B I T S

10  MEAD NUMBER            DESCRIPTION                 PAGE

11  15        January 2013 Consolidated EEO & EDR   69
              Plan of U.S. 4th Circuit Court of Appeals
12            US00003551-US00003579

13  16        November 2018 Consolidated EEO & EDR  69
              Plan of U.S. 4th Circuit Court of Appeals
14            US00003551-US00003579

15  24        Counselor's report & miscellaneous    103
              documents
16            US00002293-US00001311

17
    LANGLEY NUMBER         DESCRIPTION                 PAGE
18
    46        Combined Statements of Judges         37
19            McKeown & Robinson 3/17/2022

20  47        Press Release 12/3/2018               40

21

22            (EXHIBITS CONTINUE ON NEXT PAGE.)

**ICR/Rudiger & Green**
office@icrdepos.com          **www.icrdepos.com**          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 248-7   Filed 06/07/23   Page 4 of 26

1      A      I feel like I'm the Oscars people where

2  you don't name everybody.

3      Q      There also no music to drag you out.

4      A      It's going to kill me that I can't think

5  of Marc's last name right now, but I'm getting old.

6      Q      You became the judicial integrity officer

7  in 2018.

8      A      December of 2018.

9      Q      Okay.

10      A      Although I started working in January,

11  that's when I was hired.

12      Q      And tell me what the role was as the

13  judicial integrity officer?

14      A      There was a federal judiciary workplace

15  conduct working group that recommended -- issued a

16  report in June of 2018 that had recommended the

17  creation of a national office.

18            I don't remember, specifically, what the

19  report envisioned as the role.

20            My best recollection is that the report

21  envisioned the role as being a national resource that

22  would be easy for any judiciary employees to locate

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 248-7   Filed 06/07/23   Page 5 of 26

1  and find and that it would be a resource outside of

2  someone's court or employing office, if that's where

3  they felt more comfortable.

4        I believe it was also envisioned as an

5  office that could provide training and education more

6  nationally.

7        Certainly, it was envisioned as an office

8  that could provide advice and guidance about the

9  employment protections in the EDR plan and the

10 process for seeking remedies and resolutions under

11 the EDR plan.

12     Q     I think you just said that the report

13 that recommended this was in July of 2019.

14     A     June of 2018.

15     Q     June.  Okay.  I just wanted to make sure

16 I got the date.

17     A     Did I say that?  Huh.

18     Q     That's okay.  They had a supplement in

19 the summer of 2019?

20     A     Well, no.  But I'm surprised I said that

21 because I know it wasn't July of 2019.

22     Q     That's why I asked.

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 248-7   Filed 06/07/23   Page 6 of 26

 1  judiciary has received training on the EDR policy?

 2       A       I can't imagine anything is 100 percent,

 3  but I know that it's offered.

 4       Q       Was that a priority for you as the

 5  judicial integrity officer?

 6       A       Yes.

 7       Q       Did you work hard to accomplish that

 8  goal?

 9       A       Yes.

10       Q       What did you do?

11       A       Well, first, developing my training

12  suggestions and then making it available.  I posted

13  it on the JNET so that anyone could copy it and use

14  it as a foundation to improve it or whatever, but at

15  least you had something to work from.

16               I invited people to listen to my training

17  to see if they could -- particularly new circuit

18  directors -- to listen in on how I do training.  We

19  now all learn from each other and here each other's

20  and improve that way.

21               The revised model plan that we changed in

22  2019 requires that the training be held annually, be

**ICR/Rudiger & Green**
office@icrdepos.com          **www.icrdepos.com**          **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 248-7   Filed 06/07/23   Page 7 of 26

1    offered annually, whereas the older EDR plan just

2    said provide training but didn't have that annual

3    requirement.

4           Q      Is the training mandatory?

5           A      It's not mandatory that people attend.

6    It's mandatory that it be offered.

7                  Many of the courts that I do provide the

8    training in -- each Court makes it's own rules, but

9    many of the courts do on their own require their

10   mandatory attendance; but that's a court-by-court

11   decision.

12          Q      Have you ever consulted with people in

13   other kinds of workplaces about how they handle

14   issues of workplace misconduct?

15          A      No.  I have read things, but I haven't

16   ever had like a consultation with others.

17                 I pay attention to those kind of topics.

18   I read those kind of topics in different forums but

19   not that I have actually consulted.

20          Q      What have you read?

21          A      Oh, anything on the Internet, books -- I

22   don't know -- all kinds of thing.  I mean, everything

**ICR/Rudiger & Green**
office@icrdepos.com          **www.icrdepos.com**          **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 248-7   Filed 06/07/23   Page 8 of 26

1    that you come across, I couldn't possibly name what.

2         Q      Are there any specialized list serves

3    that you read or follow?

4         A      I wouldn't even know what a list serve

5    is; so, no.

6         Q      Have you ever spoken with employees or

7    people involved with judiciary systems in other

8    countries who are working on issues of workplace

9    harassment?

10        A      No.

11        Q      Are you aware of any other countries

12   working on issues of workplace harassment in the

13   judiciary?

14        A      It's not something I've ever paid

15   attention to; so, no.

16        Q      So, I think turning to your trainings

17   that you've developed, do court decisions provide the

18   definitions and standards that the judiciary applies

19   through the EDR?

20        A      Oh, you are really going to have to start

21   that one over again.

22        Q      Where did the definitions and standards

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 248-7   Filed 06/07/23   Page 9 of 26

1    that the judiciary applies through its EDR plan come

2    from?

3        A       What definitions?

4        Q       Does the EDR plan have definitions of

5    workplace harassment?

6        A       Yes.

7        Q       Discrimination?

8        A       Yes.

9        Q       Where do those definitions come from?

10       A       They are grounded in the employment laws

11   that we mirror.

12       Q       Do you think that it's important that

13   people be trained before they participate as an EDR

14   investigator?

15       A       Yes.

16       Q       Are you aware if the EDR investigator in

17   this case was trained?

18       A       I don't know anything about the

19   investigator in this case.

20       Q       Do you think it's important that

21   mediators be trained?

22       A       Yes.

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 248-7   Filed 06/07/23   Page 10 of 26

1      Q      Are you aware that the mediator in this

2   case was not trained?

3      A      I'm not aware of anything about the

4   mediator in this case.

5      Q      Is there mandatory training for people

6   who actually are participating in administering the

7   EDR process, or is that also court by court?

8      A      The new model EDR plan adopted in 2019

9   has a training and certification program that I

10  created and now it's -- one of the statements in the

11  model EDR plan is that to be designated as an EDR

12  coordinator, you have to go through the training

13  course.

14     Q      Why did you think that was important?

15     A      Because I think EDR coordinators need to

16  understand what their role is and what their

17  responsibilities are and understand, have some

18  familiarity with what they're doing.

19     Q      But prior to 2019, that did not exist?

20     A      That's true.

21     Q      When did you first hear about

22  Ms. Strickland?

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 248-7   Filed 06/07/23   Page 11 of 26

1    have a dim memory at the end of the year of it being

2    about 100 but I'm going from -- I'm guessing.

3         Q        And what about 2020?

4         A        I'm guessing it was about the same.

5         Q        This would have been your fourth inquiry

6    as the judicial integrity officer?

7         A        Yes.  Because I started in the middle of

8    January and this was like four weeks later.

9         Q        As the judicial integrity officer, what

10   did you advise employees to do if they experienced

11   harassment?

12        A        To report it to the people who could stop

13   it.

14        Q        Did you participate in creating training

15   for the Federal Judicial Center?

16        A        They had a preventing workplace

17   harassment program that I had heard given at several

18   courts that I thought was not contemporary.  It was

19   like it was a video.  It wasn't horrible.

20               But it wasn't tailored to the judiciary.

21   It was focused on what an employee might do in a

22   corporate setting in terms of going to H.R.  So, it

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 248-7   Filed 06/07/23   Page 12 of 26

 1   didn't describe any of our EDR options.  It didn't

 2   describe EDR coordinators.

 3          So I drafted and sent to -- but I don't

 4   know what they ever did with it.  But I sent my

 5   suggestions for how they could change it, but I don't

 6   think I've ever seen it come out of the FJC as them

 7   having actually changed the programming.

 8                 (Langley Deposition Exhibit No. 52

 9                 was marked for identification.)

10          BY MS. WARREN:

11      Q     Ms. Langley, this seems to be one of the

12   trainings from the Federal Judicial Center; is that

13   right?

14      A     I don't recognize this, so I don't -- I

15   can't tell you what it is or isn't.

16      Q     Okay.

17      A     I don't know if it's what I drafted.  I

18   don't know if it's what I drafted.

19          I mean, as I'm looking at it, I remember

20   one of the things I disliked about it was I don't

21   like to make big distinctions between quid pro quo,

22   harassment, and harassment.

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 248-7   Filed 06/07/23   Page 13 of 26

1                So, I just don't remember.  I just don't

2    recognize this specifically.

3         Q      Why don't you like to make big

4    distinctions between quid pro quo harassment and

5    harassment?

6         A      I think legally it's not a distinction

7    that's often made in Title VII anymore.

8                I don't think any employees need to know

9    Latin to understand harassment.  They need to know

10   it's wrong however it happens.

11               So I don't think it's beneficial to try

12   to educate employees on legal topics.  I like to keep

13   it simple and straightforward.

14        Q      So, as you look at this document, you

15   don't know if they incorporated your drafts?

16        A      I don't.

17        Q      Do you want to take a second to look at

18   it and see if you recognize anything that you would

19   have provided?

20        A      So I don't know how to answer it because

21   I don't quite know what this is, and so I don't know.

22               What I'm remembering -- it did have a

ICR/Rudiger & Green
office@icrdepos.com         www.icrdepos.com         (703) 331-0212
Case 1:20-cv-00066-WGY   Document 248-7   Filed 06/07/23   Page 14 of 26

1    PowerPoint part of it and maybe this was part of it.

2    So what I'm remembering more is that there was a

3    video.  So, there was a PowerPoint presentation; but

4    what stands out more is the video that went with it.

5              I don't know if this is the PowerPoint

6    that accompanied the video that I saw, although the

7    title of what I saw was "Preventing Workplace

8    Harassment" and it was put out by the Federal

9    Judicial Center.

10        Q    What was the video?

11        A    So it was very '80s era, seriously; and

12    it was employees in an open office setting.

13             The only scenario I remember -- but I

14    think there were two or three -- but the one that for

15    whatever reason stands out is that one of the actors

16    playing an employee had like a Buddha statue on their

17    desk and the co-worker makes fun of it.

18             I do think there was more than one

19    example.  Like someone else was made fun of for

20    something.

21             And then I remember that the employee

22    goes to head of H.R., talks to H.R. about it; and

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 248-7   Filed 06/07/23   Page 15 of 26

1    then H.R. talks to the manager about it, but I don't

2    remember the specifics of what they said but

3    something about we have to take this seriously or we

4    have to do something.  Then there was a PowerPoint

5    presentation that went with it.

6          Q      Did you watch them give this training?

7          A      Yes.  Three different times at three

8    different courts, I saw someone give this

9    presentation.

10               I think mostly before I became the

11   judicial integrity officer I had seen it either at

12   courts in my circuit that had invited me to come be

13   part of the training is what I think had happened.

14         Q      As the judicial integrity officer, did

15   you work with the FJC on their trainings?

16         A      So when I became the judicial integrity

17   officer -- yes -- I contacted different people at the

18   FJC and said, "I really think we need to update this

19   training.  I think that it's visually dated.  I think

20   that it's not helpful to employees to not explain the

21   EDR process.  I think they need to know the judiciary

22   system, and so I wanted them to do that.

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 248-7   Filed 06/07/23   Page 16 of 26

1              The quid pro quo thing I remember just

2   being bothered by if I'm a non-lawyer and I'm seeing

3   a bunch of Latin words on the screen, that doesn't

4   seem welcoming to me.  It doesn't seem informative to

5   me.

6              So, those kind of tinkering-withs I know

7   I wanted to change; and I talked to different people

8   about it at different times to see if we could update

9   it.

10       Q     And many of the employees of the federal

11   judiciary are not lawyers, is that right?

12       A     Many of the --

13       Q     Federal judiciary employees are not

14   lawyers.

15       A     Right.  Of course, yes.  Right.

16       Q     Would you say the majority are not

17   lawyers?

18       A     I couldn't tell you.

19              I mean, I'm making it up, I think, yes;

20   but I don't know.  But yes, I think so.

21              I mean, obviously, we are dealing with

22   legal issues.  It's not like we're working at a bank

**ICR/Rudiger & Green**
office@icrdepos.com                **www.icrdepos.com**                **(703) 331-0212**
Case 1:20-cv-00066-WGY  Document 248-7  Filed 06/07/23  Page 17 of 26

1    used which is why it's unfamiliar to me.  And so I

2    think the same thing is that I think Caryn told me

3    that someone told her, and so I am writing down her

4    words to me.

5                    MS. WARREN:  Yes.

6                    BY MS. WARREN:

7        Q        Were you concerned that the complaint

8    process would need to be abated during the wrongful

9    conduct investigation?

10                   MS. YOUNG:  Objection.  Form.

11                   THE WITNESS:  I'm trying to think of the

12   right word.

13                   That's never how I have envisioned the

14   process working.

15                   BY MS. WARREN:

16       Q        And why not?

17       A        First, you have a limited amount of time

18   under the EDR plan from when the alleged wrongful

19   conduct happens to file to start the prerequisites.

20   Your request for counseling has to be filed within,

21   under the model plan, 30 days.  I'm assuming

22   that's -- I'm going from memory, but I think that's

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 248-7   Filed 06/07/23   Page 18 of 26

1    what the Fourth Circuit was.  So you have a limited

2    amount of time.  Now, granted, that can be extended;

3    but that's reason one.

4                   It to me should always be the employee's

5    choice as to when they initiate that process as to

6    being told.

7                   I don't have a -- I see nothing in the

8    EDR plan that says someone can tell you we are not

9    letting you file something.

10                  So, the concept of saying something had

11   been abated as if she had not agreed to that is not

12   something that I had ever heard of or understood as

13   part of the EDR process.

14                  But I didn't know what she meant by that.

15   That's her words.

16        Q     Did you ask her to explain?

17        A     I could not tell you now what I said or

18   didn't say.  I don't remember, specifically.

19        Q     Do you think you would have?

20                  MS. McMAHON:  Objection.  Calls for

21   speculation.

22                  THE WITNESS:  I remember that one of the

ICR/Rudiger & Green
office@icrdepos.com                www.icrdepos.com                (703) 331-0212
Case 1:20-cv-00066-WGY   Document 248-7   Filed 06/07/23   Page 19 of 26

1    mediation stage and that she had waited months and

2    had not heard back.

3         Q       How did you respond to that?

4         A       What I remember telling her was that I

5    didn't understand the concept at all of disqualifying

6    the party from representing itself.

7                 And so I do -- I don't know what I said

8    to her about the delay in getting an answer back but

9    I remember -- and am seeing in my notes -- thinking

10   that it would surprise me if disqualifying the

11   defendant from being the defendant would be granted.

12        Q       Did you talk with Caryn about remedies at

13   the complaint stage?

14        A       I don't remember.

15                The only question -- the only topic that

16   I remember coming up late in our meeting was her

17   asking what would happen if the defender, like if the

18   presiding judicial officer at the end of the

19   complaint stage -- because that's when remedies

20   happen, after there has been a decision on the

21   merits -- what would happen if the defender refused

22   to comply with the orders.

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 248-7   Filed 06/07/23   Page 20 of 26

1      Q      And --

2      A      And I said I didn't remember what -- I

3   was not familiar with the -- how a defender could be

4   unappointed.

5            In contrast, if I'm a court employee and

6   the presiding judicial officer orders the clerk of

7   court to provide some remedy, the clerk of court, I

8   understand, is in a very direct employment

9   relationship with the chief judge and the judges on

10   the court.

11            And what I remember telling Caryn is I

12   literally did not know enough about the relationship

13   between a defender -- and I'm talking about the unit

14   executive defender -- and the judges on the Court of

15   Appeals.  And so I remember telling her that I didn't

16   know what would happen.

17            I certainly told her that they are

18   obligated -- a defender would be obligated under the

19   plan to take those remedies and to comply with the

20   order, but I didn't know what would happen if they

21   refused to follow that.

22      Q      Do you know -- I'm just trying to make

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 248-7   Filed 06/07/23   Page 21 of 26

1    sure I understand your answer.

2              Are you saying that you didn't know if

3    the Court -- if a presiding judicial officer would

4    have authority to enforce remedies ordered under the

5    plan against the defender?

6        A    No.  I knew that they had the power to

7    enforce it.

8              But the mechanics of what does that

9    enforcement mean, what I didn't know was would they

10   have the power to fire the defender for failing to

11   comply with a presiding judicial officer decision.

12             And after our meeting, I did learn about

13   a statute that describes how a defender can be

14   removed from office for misconduct in office or

15   neglect of duty; and as a lawyer I would make the

16   argument that failing to comply with a presiding

17   judicial officer's order would be neglect of duty.

18             So, I didn't know that.

19        Q    At the time.

20        A    So that was -- my answer to her was, "I

21   don't know what would happen."

22        Q    Okay.

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 248-7   Filed 06/07/23   Page 22 of 26

1      A      But I also want to be clear when you talk

2  about remedies I am talking exclusively about a

3  post-decision remedy ordered by a presiding judicial

4  officer at the end of the complaint stage --

5      Q      I understand?

6      A      -- not settlement resolutions or other

7  informal resolutions.  I'm talking about remedies

8  under the EDR plan.

9      Q      Does the EDR plan contemplate any

10  distinction between someone's interests as, say, a

11  unit executive and their interests if they are also

12  an accused party?

13      A      Say it again.

14              (The following was read back by the

15              court reporter:

16              QUESTION:  Does the EDR plan

17              contemplate any distinction between

18              someone's interests as, say, a unit

19              executive and their interests if

20              they are also an accused party?

21              THE WITNESS:  So you are going to have to

22  excuse me, but I'm going to stop and reread this to

ICR/Rudiger & Green
office@icrdepos.com            www.icrdepos.com            (703) 331-0212
Case 1:20-cv-00066-WGY   Document 248-7   Filed 06/07/23   Page 23 of 26

1      A      Yes.

2      Q      You then said, "I've trained EDR

3  coordinators in the 10th Circuit, but I think that

4  needs to be nationalized."

5              Why did you think that?

6      A      For the same reasons I just said.

7      Q      "And I'd like to better understand if

8  FPDs are adequately protected by EDR remedies."

9              MS. McMAHON:  Objection.

10             MS. YOUNG:  Objection.  Form.

11             THE WITNESS:  What is your question?  I'm

12 sorry.

13             BY MS. WARREN:

14     Q      What did you mean by that?

15     A      That was Caryn had asked me what would

16 happen if the defender didn't comply with the

17 presiding judicial officer's remedies at the end of

18 the complaint stage; and I did not at that time know

19 enough about the appointment, reappointment, and

20 removal of defenders to know what would happen.  They

21 are different than the unit executive in the court

22 which is clearly governed by, supervised by, and

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 248-7   Filed 06/07/23   Page 24 of 26

1    works at the pleasure of the chief judge and the

2    judges on that court.

3              And so I just didn't know the answer to

4    that particular question, and I had said I wanted to

5    find that out.

6         Q    Did you ever tell Caryn the answer to

7    that question?

8         A    I don't think I did.  No.

9         Q    Has your office -- did the Office of

10   Judicial Integrity provide EDR interpretive

11   guidelines to courts?

12        A    Yes.

13        Q    Did they provide national training to EDR

14   coordinators?

15        A    Yes.

16        Q    You were part of a 2018 working group.

17        A    I was.

18        Q    Why was that working group convened?

19        A    It was in response to the recommendations

20   in the June 2018 workplace conduct working group.

21        Q    Sorry.  The working --

22        A    The workplace conduct working group

**ICR/Rudiger & Green**
office@icrdepos.com              **www.icrdepos.com**              **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 248-7   Filed 06/07/23   Page 25 of 26

1        CERTIFICATE OF NOTARY PUBLIC

2

3        I, Kirk A. Sturges, the officer before whom

4   the foregoing deposition was taken, do hereby certify

5   that the witness whose testimony appears in the

6   foregoing deposition was duly sworn by me; that the

7   testimony of said witness was taken by me by machine

8   shorthand and thereafter reduced to typewriting, by

9   myself; that said deposition is a true record of the

10  testimony given by said witness; that I am neither

11  counsel for, related to, nor employed by any of the

12  parties to the action in which this deposition was

13  taken; and further, that I am not a relative or

14  employee of any attorney or counsel employed by the

15  parties hereto, nor financially or otherwise

16  interested in the outcome of the action.

17

18                        Kirk A. Sturges, Notary Public for

19                             the District of Columbia

20

21  My Commission Expires:

22  August 14, 2027

ICR/Rudiger & Green
office@icrdepos.com            www.icrdepos.com            (703) 331-0212
Case 1:20-cv-00066-WGY   Document 248-7   Filed 06/07/23   Page 26 of 26