# EXHIBIT H

```
1         IN THE UNITED STATES DISTRICT COURT
2     FOR THE WESTERN DISTRICT OF NORTH CAROLINA
3
4  CARYN DEVINS STRICKLAND,    : CIVIL NO.
5            Plaintiff          1:20-cv-00066-WGY
6        vs.                   :
7  UNITED STATES, et al.,
8            Defendants        :
9  _____
10 DEPONENT:  EDWARD G. SMITH, ESQ.
11 DATE:  APRIL 20, 2023
12 TIME:  10:00 a.m.
13 LOCATION:  CLARK BOLEN
14            671 JAMESTOWN DRIVE, SUITE 206D
15            MURRELLS INLET, SC
16 REPORTED BY:  CAROL T. LUCIC, RPR, RMR
17
18
19
20
21
22  CLARK BOLEN COURT REPORTING & VIDEO CONFERENCING
23              CHARLESTON, SC  29405
24                  843-762-6294
25             WWW.CLARK-ASSOCIATES.COM
```

```
 1              A P P E A R A N C E S
 2
 3  ON BEHALF OF THE PLAINTIFF:
 4        THOMAS, FERGUSON & BESKIND, LLP
 5        BY:  OLIVIA WARREN, ESQ.
 6             119 EAST MAIN STREET
 7             DURHAM, NC  27701
 8
 9  ON BEHALF OF THE DEFENDANT:
10        UNITED STATES DEPARTMENT OF JUSTICE
11        CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
12        BY:  RACHAEL WESTMORELAND, ESQ.
13             MADELINE McMAHON, ESQ.
14             DANIELLE YOUNG, ESQ. (via Zoom)
15             KRISTIN MANNHERZ, ESQ. (via Zoom)
16             1100 L STREET, N.W.
17             WASHINGTON, D.C.  20005
18
19  PRESENT (via Zoom) COOPER STRICKLAND, ESQ.
20                     CARYN STRICKLAND, ESQ.
21
22
23
24
25
```

```
1                        INDEX
2
3                EDWARD G. SMITH, ESQ.
4                    APRIL 20, 2023
5
6  EXAMINATION                                    PAGE
7  BY MS. WARREN                                   5
8  BY MS. WESTMORELAND                            124
9
10 CERTIFICATE OF REPORTER                        125
11
12                       EXHIBITS
13 NO.                                            PAGE
14 40     Email correspondence between
15        Mr. Ishida, Mr. Smith, and
16        Ms. Strickland, 1/31/19                  11
17 41     Email correspondence regarding
18        supplement to request for
19        mediation, 2/22/19 and 2/24/19           52
20 42     Email correspondence between
21        Mr. Strickland and Mr. Smith,
22        2/25/19                                  58
23 43     Email correspondence between
24        Mr. Smith and Mr. Ishida, 3/20/19       106
25
```

1  A.   No.

2  Q.   In January of 2019 when Mr. Ishida
3  contacted you, what was your understanding of how
4  mediation worked under Chapter 10 of the EDR plan?

5  A.   My understanding is a mediator is
6  designated, and I get that designation if it's
7  appointing me or if there is somebody else
8  involved, it would go to them.  I then review
9  whatever documentation I may have.  My typical
10 procedure has really been to talk to the parties
11 separately initially anyway.  Sometimes we do end
12 up getting together eventually.

13       It's my role to see if I can settle it
14 within the confines of the remedies within the EDR
15 plan or, as in this case, I really wasn't dealing
16 with those remedies because there really wasn't a
17 remedy that fit the situation.  I was trying to see
18 if I could work out a way to send Caryn back to
19 work that was acceptable to her.

20 Q.   Do you remember if this case was
21 proceeding under the 2013 EDR plan or the 2018 EDR?

22 A.   '13.

23 Q.   The 2013?

24 A.   Well, it was proceeding under a different
25 plan than we're under now.  I don't really know the

1  A. I was only dealing with trying to get her
2  back in the office.
3  Q. I know you said you didn't feel there was
4  a remedy that fit that situation, and I think you
5  just said you weren't dealing with these, so what
6  remedies were you dealing with?
7  A. There wasn't a remedy that I could utilize
8  to fit this situation. Maybe the internal
9  investigation would fit a remedy. That's separate
10 and apart from me. All my authority is what is
11 given to me by the Court. My job description is I
12 mediate civil disputes between counsel and parties.
13 I was asked to participate in the EDR as a mediator
14 because I'm a mediator. My charge is here are your
15 remedies, mediate this case, and see if you can
16 resolve it.
17      You can read these. None of these are
18 going to do anything in this particular case, so I
19 was trying to figure out how I was going to get
20 Caryn back in the office in such a way where she is
21 given some concessions where she's happy, and
22 that's what I did.
23 Q. Did you tell Caryn that you were operating
24 with remedies outside of the plan?
25 A. No. I said I was trying to work out a way

1  Office works, so I can't answer that.  I know if
2  you're a mediator, wherever you're located you get
3  locality pay.
4      Q.   I want to talk about some of the details
5  in this case from your early meetings in January
6  before Caryn filed a supplemental request a little
7  bit later in February.
8           Did you think that it would be hard to get
9  Caryn back to the Charlotte office?
10     A.   When I first met with her, I thought it
11 would be hard because of what she had told me.
12     Q.   What did she tell you that made you think
13 that?
14     A.   Well, she told me her experience, one, but
15 more importantly she told me that Tony had not been
16 very receptive to her issues, and so I did think it
17 was going to be difficult.
18     Q.   What were those issues?
19     A.   Well, just her issues with -- I don't
20 remember what they all were now, but obviously she
21 had an issue with JP, his management style.  She
22 thought he was wanting more than a professional
23 relationship, I think, and she wasn't happy with
24 the way Tony had responded.  That's why when I came
25 back, I told her, well, Tony was very receptive,

1 and that's when I thought I think I can work
2 something out here because he seemed motivated and
3 wanted to do it.
4    Q.   Did she tell you the ways that she felt
5 Tony had not been receptive in the past?
6    A.   I'm sure she did.
7    Q.   Did she tell you how long she had been
8 trying to work it out?
9         MS. WESTMORELAND:  Objection; vague.
10    A.   I have no specific memory; it has been too
11 long, but I wouldn't dispute it if it occurred.
12    Q.   Were you aware that Caryn had asked for a
13 transfer to Asheville earlier?
14    A.   Yes, I believe I was.
15    Q.   Did you know how much earlier?
16    A.   I may have then, but I don't recall if I
17 did.
18    Q.   Did she tell you how Tony responded
19 previously?
20    A.   Again, I'm sure she did, but as I sit here
21 I don't remember what the response was.
22    Q.   What did you think about the Asheville
23 transfer as a possible resolution?
24    A.   I thought it was a good resolution
25 especially after I talked to Tony.  It gave the

1 opportunity to hit all the things we needed to hit,

2 especially getting her out from under JP.

3     Q. So what were those things that needed to

4 be hit?

5     A. Well, she needed to be away from JP. My

6 memory is she had a concern about the office

7 talking. That goes away if she's in Asheville. It

8 helped her out because I believe Cooper was either

9 from there or working there -- I can't remember

10 exactly -- and that's where the head of appeals was

11 if I remember right, and I thought she said she

12 wanted to move into the appellate arena.

13     Q. You said that concerns included being

14 supervised by JP, the office talking, and being in

15 appeals.

16     Do you remember any other concerns?

17     A. Telecommuting.

18     Q. What was the concern about telecommuting?

19     A. I think she wanted to be a full-time

20 telecommuter because my memory is from talking to

21 Tony that he was willing to talk about

22 telecommuting, but at some point she had to come

23 back because he liked people working in teams, and

24 it's hard to telecommute and work in teams.

25     Q. Did Caryn tell you why she would be

1  Q. Did she tell you she hadn't even gotten an
2  interview for that job?
3  A. She did. I do remember that.
4  Q. Did she tell you that someone else had
5  been hired into that position?
6  A. I believe so, yes.
7  Q. Were you surprised when Tony was willing
8  to facilitate a transfer to Asheville?
9  A. No.
10 Q. Why not?
11 A. I guess my question would be why would I
12 be surprised?
13 Q. I don't know.
14 A. I asked him, and he said he was willing to
15 do that. It didn't surprise me.
16 Q. Did you ask him about his prior refusal?
17 A. No.
18 Q. Did you ask him what had changed?
19 A. No. I'm dealing with where we are today,
20 and I'm trying to solve a problem and Tony was
21 trying to solve a problem. He was willing to work
22 with me to solve that problem. I don't go into
23 details like that. It doesn't help move the ball.
24 Q. How did Caryn react when you told her
25 about the possibility of a transfer to Asheville?

1  A. I believe her response was why now? Why
2 that sticks in my head I don't know, but I believe
3 her response was why now, and I tried to impress
4 upon Caryn things change. I've learned that in my
5 job as a mediator. Things change, and this was
6 Caryn's last best opportunity to resolve this on
7 her terms if she could get Tony to agree. It was
8 also Tony's last best opportunity to resolve this
9 on terms he could live with when he wants her back
10 in the office. If I impasse the case, they both
11 lose all power. The power all goes to the judge.
12 They have the power to present their case, but they
13 don't have power to weigh in on the decision.
14  Q. You seem to remember that Caryn said why
15 now when you told her about the Asheville transfer.
16  A. Yes.
17  Q. Why does that stick out in your mind?
18  A. I don't know. It may just be because from
19 the transcript it's sticking out. I know Caryn was
20 frustrated that she had tried to do certain things
21 before coming into the EDR process, and I was
22 having more success once I met Tony getting those
23 things potentially in play. That's why I was just
24 trying to explain to her this is mediation. It's a
25 process. The process works, as you know as a

1  lawyer, and I have ways of trying to convince
2  people that, you know, you're better off doing it
3  this way than another way.
4      Q.   Did she explain to you why that offer at
5  this point in the process was surprising?  And by
6  "that offer" I mean the offer to move to Asheville.
7      A.   Yes, I understood.
8      The only thing I can remember possibly
9  with regard to that is that she may have been told
10 there was no room because I said that Tony had
11 agreed he would give her his office when he wasn't
12 in Asheville.  I think he's in Charlotte more than
13 Asheville, and I believe she raised the question of
14 what about when he is in Asheville, and I said
15 again we've got to get in a room together and
16 figure these things out.
17     Q.   Did Caryn tell you that she had been
18 asking for the duty station transfer for over six
19 months?
20     MS. WESTMORELAND:  Objection; counsel
21 testifying.
22     A.   I don't recall that.  I know she had
23 requested -- my memory is she had requested a
24 transfer.
25     Q.   Did Caryn tell you about the effect of

1  pointed to I need X, Y, or Z.
2      Q.   When you were following up about those
3  things, you weren't investigating?
4      A.   No.
5      Q.   You felt that Tony wanted Caryn back in
6  the office?
7      A.   He said so.  He said he didn't want to
8  lose her is my memory.  I didn't specifically
9  remember that, but it seems like I read it in a
10 transcript that I told Caryn that, and I wouldn't
11 have told Caryn that if he wouldn't have told me.
12     Q.   Did you tell Caryn that Tony didn't react
13 very well or handle other allegations very well
14 because he was from a different generation?
15     A.   I tried to offer Caryn neutral motivations
16 for the way Tony responded.  I didn't know Tony.  I
17 never talked to the man.  I was just trying to say
18 it may be something neutral and not some dismissing
19 of what you're saying, dislike of you, favoritism
20 for another.  So I speculated just for the reason
21 of trying to get her to give this a chance and let
22 me go talk to Tony.
23     Q.   How would you view that as neutral?
24          MS. WESTMORELAND:  Object to the form.
25     A.   I don't understand your question.

1  Q.  You said that you felt being from a
2  different generation is a neutral explanation.
3       MS. WESTMORELAND:  Objection;
4  mischaracterizes his testimony.
5  A.  It's neutral as to her.  It means it has
6  nothing to do with her.
7  Q.  It's about his generation?
8  A.  Right.  We all know there are generational
9  differences and generations react differently to
10 different problems.  When I say "neutral," I mean
11 it had nothing to do with you, Caryn.  It didn't
12 mean he was dismissing you or didn't like you or
13 was trying to push you away.  There was something
14 else about his makeup maybe that he didn't respond
15 the way you thought he should because he's not from
16 your generation.
17 Q.  I'm just trying to understand.  He was
18 neutral to her.  Was he neutral towards these kind
19 of allegations?
20      MS. WESTMORELAND:  Object to the form.
21 A.  I was speculating, counselor.  I was
22 trying to get Caryn to move on from the emotion and
23 saying maybe he'll talk to me, and when I keep
24 getting hit over and over again, I have to throw
25 out something to try to diffuse it, and that's all

1  I was doing.
2      Q.   Why did you think saying that he was from
3  a different generation would diffuse it?
4      A.   I just explained it to you.  Certain
5  generations react differently.  Certain generations
6  view things that happen differently.  I have no
7  idea how Tony views them because I never met the
8  man.  I simply wanted Caryn to just put it aside.
9  Maybe it's something that has nothing to do with
10 you and we can work it out because my memory is she
11 said she wanted to try to work it out and go back
12 to work.
13     Q.   I think you said she told you she wanted
14 to be a federal public defender?
15     A.   Right; and so the best way to do that was
16 get you back in the office.  Let's see if we can
17 put all this behind us.
18     Q.   Did you worry that she might view a
19 comment about a different generation as an excuse
20 for Tony's conduct?
21     A.   I didn't in the moment.
22     Q.   Do you think it could be seen as that as
23 you look back now?
24     A.   Possibly, but I'm not a perfect mediator,
25 and sometimes we say things inartfully.

1  A.   You have to understand I wasn't thinking
2  this through.  These are general things that
3  mediators use to try to say, hey, I don't know what
4  the motivation was.  You could be right, but it
5  could be all of these other things.  Let's figure
6  it out.  Then I go meet with Tony, and I'm hit with
7  what I'm hit with.  One reason I asked Caryn some
8  of these questions is I want her impression because
9  if I walk in and I get hit with the same thing,
10 okay, I'm not getting this resolved.  It's
11 invaluable information to me.
12      Q.   Before this mediation had you ever had any
13 training from the circuit in sexual harassment?
14      A.   No.  I have never worked on a sexual
15 harassment case in my life to my knowledge and
16 don't know the standards, don't know anything, so
17 that's another reason I couldn't weigh into this
18 because I know nothing about it.
19      Q.   Just to understand what you mean, was this
20 your first ever sexual harassment mediation?
21      A.   To my knowledge it's the only sexual
22 harassment case I have ever mediated.
23      Q.   Including the other EDR complaints?
24      A.   Correct.
25      Q.   Were you aware of whether Mr. Martinez was

1  of interest to Caryn.

2  Q. Did you think that Caryn was pleased with
3  the result?

4  A. She said she was. I can only base it on
5  that.

6  Q. On March 8 of 2019 did she tell you that
7  it felt like a very nicely packaged constructive
8  discharge?

9  A. I seem to remember reading that, but my
10 memory is it was before she had interviewed with
11 Judge Floyd and taken it. My memory is it was
12 brought up when we were talking about possible
13 options, but I do recall that being said, yes.

14 Q. So you recall that she communicated she
15 felt a clerkship would be a constructive discharge?

16 A. Right, something to that effect.

17 Q. Did she tell you that she had to give up a
18 career that she wanted because she was harassed and
19 retaliated against?

20 A. I have a memory that she said she felt
21 like that, but my understanding and my belief of
22 what was going to occur is that she was going to
23 take the clerkship. There was a possibility for
24 the Western District of Virginia to get her into a
25 Federal Defender's Office, so I didn't think that

1  CERTIFICATE OF REPORTER
   STATE OF SOUTH CAROLINA
2  COUNTY OF CHARLESTON

3

4          I, Carol T. Lucic, Registered Professional
   Reporter and Notary Public for the State of South
5  Carolina at Large, do hereby certify that the
   witness in the foregoing deposition was by me duly
6  sworn to testify to the truth, the whole truth, and
   nothing but the truth in the within-entitled cause;
7  that said deposition was taken at the time and
   location therein stated; that the testimony of the
8  witness and all objections made at the time of the
   examination were recorded stenographically by me
9  and were thereafter transcribed by computer-aided
   transcription; that the foregoing is a full,
10 complete, and true record of the testimony of the
   witness and of all objections made at the time of
11 the examination; and that the witness was given an
   opportunity to read and correct said deposition and
12 to subscribe the same.

13
           Should the signature of the witness not be
14 affixed to the deposition, the witness shall not
   have availed himself/herself of the opportunity to
15 sign or the signature has been waived.

16
           I further certify that I am neither
17 related to nor counsel for any party to the cause
   pending or interested in the events thereof.
18

19         Witness my hand, I have hereunto affixed
   my official seal on May 2, 2023, at Charleston,
20 Charleston County, South Carolina.

21
                     Carol T. Lucic
22                   NCRA MERIT REPORTER
                     REGISTERED PROFESSIONAL REPORTER
23

24
   My Commission expires:  November 27, 2027
25