# EXHIBIT I



# Transcript of Nancy Dunham

**Date:** April 17, 2023
**Case:** Strickland -v- United States of America, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

1    FOR THE WESTERN DISTRICT OF NORTH CAROLINA

2                ASHEVILLE DIVISION

3    -------------------------X

4    CARYN DEVINS STRICKLAND,  :

5                 Plaintiff, :

6       v.                    : Case No.

7    UNITED STATES OF AMERICA, : 1:20CV66

8    et al.,                  :

9                 Defendants.:

10   -------------------------X

11

12          Deposition of NANCY DUNHAM

13            Conducted Virtually

14          Monday, April 17, 2023

15              2:08 p.m. EST

16

17

18

19

20

21

22

23   Job No.: 488113

24   Pages: 1 - 202

25   Reported by: Marney Alena Mederos, RPR, CRR

1      Deposition of NANCY DUNHAM, conducted

2  virtually.

3

4

5

6      Pursuant to subpoena and notice, before

7  Marney Alena Mederos, Registered Professional

8  Reporter, Certified Realtime Reporter, and

9  Notary Public in and for the State of Maryland.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    A P P E A R A N C E S

 2      ON BEHALF OF THE PLAINTIFF:

 3            JACOB E. GERSEN, ESQUIRE

 4            10 Fayerweather Street

 5            Cambridge, Massachusetts 02138

 6            (857) 288-9151

 7

 8      ON BEHALF OF THE DEFENDANTS:

 9            MADELINE M. McMAHON, ESQUIRE

10            U.S. DEPARTMENT OF JUSTICE

11            CIVIL DIVISION, FEDERAL PROGRAMS BRANCH

12            1100 L Street, N.W.

13            Washington, D.C. 20005

14            (202) 451-7722

15

16    ALSO PRESENT:

17            SOPHIA GONZALES, AV TECHNICIAN

18            CARYN DEVINS STRICKLAND, PLAINTIFF

19            JEANNIE SUK GERSEN, ESQUIRE

20            COOPER STRICKLAND, ESQUIRE

21            OLIVIA WARREN, ESQUIRE

22            KRISTIN MANNHERZ, ESQUIRE

23            PHILIP HERTZ

24

25
```

```
1                    C O N T E N T S

2    EXAMINATION OF NANCY DUNHAM:              PAGE

3         By Ms. McMahon                         5

4         By Mr. Gersen                         115

5

6                    E X H I B I T S

7              (Attached to transcript)

8    GOVERNMENT DEPOSITION EXHIBIT             PAGE

9     Exhibit 1    Handwritten notes            39

10    Exhibit 2    E-mails                       52

11    Exhibit 3    Handwritten notes            60

12    Exhibit 4    E-mail                        73

13    Exhibit 5    Text messages                76

14    Exhibit 6    E-mails                       79

15    Exhibit 7    Handwritten notes            82

16    Exhibit 8    E-mail                        99

17    Exhibit 9    E-mails                      104

18    Exhibit 10   E-mails                      110

19
     PLAINTIFF'S DEPOSITION EXHIBIT            PAGE
20
      Exhibit 3    E-mails                      122
21
      Exhibit 39   E-mail with attachment      141
22

23

24

25
```

1    your recollection, let me know.

2        A     Okay.

3        Q     But if you can remember back -- I know

4    this is a couple years ago, do you remember when

5    you first encountered the Plaintiff?

6        A     I do.  I remember, because it was not

7    your usual situation.

8              I received a phone call -- and I

9    believe it was in late 2018, so that was six years

10   ago -- from a senior -- a senior member of the

11   AO staff who had, I believe, just retired.  She

12   was one of the three department heads.

13             I knew her very well, and she had

14   pre- -- before I was hired, she had previously

15   served in an EEO role and had advised the director

16   and the deputy director.  When I came on board,

17   she relinquished those duties.

18             So that was -- her name was Laura

19   Minor, and she called me and said will you talk to

20   an employee -- a judicial employee in one of our

21   districts who has some questions about sexual

22   harassment?  I have talked to her, and I think she

23   needs to talk to you, and I said of course.

24             And she said, now, she may not want to

25   give you her name, so she will call you and tell

1    you that she is the employee that talked to me,

2    and if you could talk to her about her situation,

3    I would really appreciate it.

4            And that's how I first talked to the

5    Plaintiff on the phone.  We had, I believe, a very

6    long conversation, because she was very articulate

7    and remembered facts very well, and so I think we

8    talked the first time for maybe an hour and a

9    half.  And, again, I didn't know who she was, I

10   didn't know where she was, and that was the first

11   conversation.

12       Q    Just so I understand, you didn't --

13   even the entire time you talked to her for an hour

14   and a half, you didn't know who she was?

15       A    I didn't know her name at that time.  I

16   knew -- I knew her general employment situation.

17   I knew that she worked for one of the public

18   defender offices, but I didn't know which one, and

19   I remember that I looked at the area code from her

20   cell, and it was not -- as it turned out, it was

21   an area code from a previous location.

22            Like, my cellphone reads 301.  Well, I

23   no longer live in Bethesda, Maryland.  So I

24   didn't -- I did not have any personal information

25   about her.  I didn't know who she was.  I didn't

1      A      I believe -- I believe it was late

2    2018, and I took -- I -- you know, I took notes,

3    so I -- I, you know, documented the conversation

4    without a lot of specifics, but I -- you know, I

5    know that there's a record that exists that would

6    say precisely when I talked to her for the first

7    time, but my memory tells me it was late 2018.

8           (Discussion off the record.)

9    BY MS. McMAHON:

10     Q      So if I -- if I told you that the

11   conversation was around July of 2018, would that

12   track with what you remember?

13     A      It would.

14     Q      Okay.  So you had this phone call with

15   Plaintiff -- or with Caryn on July -- in July of

16   2018.

17          And can you give us a little more

18   detail about what you discussed besides for her

19   personal characteristics?  Did she talk about --

20   did she tell you about what her perception of the

21   sexual harassment was?

22     A      She did.  She -- she provided me --

23   again, she had a very good recollection of facts.

24   When I asked her questions, she was able to fully

25   answer the questions, and by the time that first

1  phone call was over, I had a very good sense of

2  what was going on.

3      Q    What did she say about her allegations?

4      A    Again, I'm -- I'm looking back, like,

5  five, six years, but she was uncomfortable -- made

6  uncomfortable by one of her senior managers who at

7  the time she was hired made some public statements

8  about how hot she was and -- and, again, this is

9  what she told me in detail -- and how he was

10  clearly interested in her either romantically or

11  sexually.

12          I don't believe -- I know that she was

13  in a relationship.  I don't think she was married

14  at that time.  I know that the individual at issue

15  was ten years older than she was and married, but

16  that immediately concerned me, and so she -- she

17  told me about the situation, she told me about his

18  desire to control her, which is very common in

19  this type of situation, and wanted to mentor her.

20          So when I heard her story for the first

21  time, her -- her -- her situation, it was

22  concerning.  I felt like I wanted to know more

23  about it, but it concerned me.

24      Q    You mentioned that she -- that Caryn

25  told you he was romantically interested in her.

1          Did she give you specific examples of

2    why she thought that?

3      A    Well, he wanted to spend a lot of time

4    with her.  He made comments, I believe, to other

5    employees about how hot she was, and he sort of

6    self-appointed himself as her mentor and would,

7    again, do a number of things that when we

8    discussed the case at the AO we were concerned

9    about because it -- it looked like he wanted to

10   control her, which is very common.

11     Q    What were those other number of things

12   besides for the comments to others saying that she

13   was hot?

14     A    I remember that she had a meeting that

15   she felt an obligation to attend, and he had

16   something that he wanted her to do, and so he sort

17   of blew up and was very angry, and -- and I

18   remember telling that to some of the people at the

19   AO, and -- and they -- their comment was, well,

20   that's a very bad sign because this is what we see

21   in a sexual harassment case, the desire to

22   control.

23     Q    So besides for him telling others that

24   she's hot and then blowing up at her at the

25   meeting, was there anything else that she

1   mentioned that would indicate he was interested in

2   her romantically?

3        A    Well, he -- he asked her, I think,

4   repeatedly -- I -- I think it goes beyond one

5   time -- to go out for drinks after work, he would

6   show up in the late evening in her workplace and

7   offer her rides home, things that were a little

8   atypical given the -- the parameters of their

9   relationship.

10       Q    And if I -- if I told you this -- that

11  the man was named J.P. Davis, would that ring a

12  bell?

13       A    That does ring a bell.  I couldn't have

14  told you his name, but yeah.

15       Q    Had you met J.P. Davis before?

16       A    Never.

17       Q    Had you contacted him or talked to him

18  throughout this process?

19       A    Never.

20       Q    So at that point, at the time of this

21  initial conversation, all you knew about the

22  allegations were what was based on what Caryn had

23  told you during that call?  It wasn't from Laura

24  Minor or anyone else?

25       A    It was primarily at that time of the

1   first call from what Caryn had said.

2           I also then talked to other officials

3   at the AO who were familiar with the situation,

4   and so I did get some additional facts, especially

5   as the months went on, from others who, I guess,

6   did talk to Mr. Davis or to others in that

7   district and learned a bit about how that office

8   functioned.

9       Q    Who else did you talk to in the AO?

10      A    I believe I talked to -- let's see,

11  what was her name?

12          All I can say conclusively is to other

13  senior managers who had official duties related to

14  the office where Caryn worked.

15      Q    You don't remember anyone specific?

16      A    I -- I can see their faces, but I -- I

17  could not tell you their names.  It's just been

18  too long.

19      Q    No problem.

20          And once -- after this initial phone

21  call, once Caryn told you this, did you

22  immediately go to the other AO officials to

23  discuss this with them?

24      A    I believe that I did.  I may have

25  waited for -- we -- we set up another call.  I may

1    have waited till I got more information, but I was

2    immediately concerned, and I thought it was

3    prudent for me to advise my managers about what

4    was going on.  Now, I'm talking about primarily

5    the deputy director at that point.

6                I later talked to the director about

7    the matter, but initially I talked to lawyers in

8    my office, I talked to managers who had duties

9    related to North Carolina, and I talked to -- I

10   felt a need to tell the deputy director what was

11   going on.

12               This was a time when, you know, sexual

13   harassment had hit the news, the Harvey Weinstein

14   case, there were a number of high-profile cases

15   that were hitting the news, and it was something

16   that the AO was very interested in.

17               So I was asked to do training on sexual

18   harassment, which I did, and we -- we started to

19   collect more information about allegations that

20   had occurred throughout the judiciary.  There was

21   a Ninth Circuit judge that was of some concern,

22   and there was a lawsuit that followed from that.

23               So it -- it was newsworthy at that

24   time, and so I realized there was, you know, some

25   potential risk for the judiciary because of all

1    that publicity about other cases.

2         Q      Can you describe what you told those

3    AO officials about the sexual harassment?  What --

4    what type of information were you passing on?

5         A      Well, I didn't tell them a lot because,

6    first of all, it was important for me to protect

7    her privacy, so I talked about it in generalities.

8    I said judicial employee.  I may have told the --

9    the region.

10                I probably did tell the deputy director

11   of the region, because she had worked in the field

12   before she was the deputy director, and she knew a

13   lot of people that were involved in the courts.

14   So -- and what I told them was a -- a more general

15   version of what I just told you I was concerned

16   about.

17        Q      Did you take any steps to verify what

18   Caryn had told you?

19        A      Well, as I said, I did talk to some

20   officials that were familiar with that particular

21   district.  I believe I called some of the

22   individuals who would have, for example, duties

23   related to processing her complaint when it was

24   eventually filed.  I think we talked to -- my --

25   my -- one of my senior lawyers and I talked to

1    impression was that if she moved to another office

2    that she would not have the physical contact and

3    the proximity with Mr. Davis and that she thought

4    that could resolve things.

5        Q    And --

6        A    I'm always looking for how might the

7    situation be better for everyone, which is the way

8    you typically settle a case that -- where there

9    are workplace disputes or problems, and so I

10   believe she talked to me about Asheville would be

11   a better fit and getting her away from him.

12       Q    Do you remember why Caryn would have

13   written that you are already uncomfortable with

14   the Asheville piece?

15       A    Probably because of the fact that I

16   told her candidly what my impressions were, that

17   there were aspects of her situation that were

18   classic sexual harassment and that, you know, I --

19   I was concerned for her.

20            Occasionally, you know, people are

21   actually in physical danger, and there were some

22   very subtle signs of that in terms of late-night

23   hanging around her when no one else was around.

24   And so, yes, I was uncomfortable, and I felt I

25   needed to do something as soon as possible.

1    those two managers.

2        Q      So if we could look again at Exhibit

3    Number 3, and the -- the second -- so the first

4    bullet down says, "she talked to deputy director."

5        A      Uh-huh.

6        Q      And then the second bullet says,

7    "request immediate transfer to Asheville office;

8    make sure he considers it."

9        A      Uh-huh.  Yes.

10       Q      And then the third bullet says, she has

11   not talked to any other -- I think it says

12   manager, I'm not sure -- in FPD, but will tell

13   Cait Clarke; Clarke will make call to Tony -

14   should grant request.

15              Is that right?

16       A      Yes.

17       Q      So did you think that Cait Clarke would

18   order Tony to grant her request -- to grant

19   Caryn's request to transfer to Asheville?

20       A      No.  Cait Clarke I don't believe had

21   any authority to order the public defender to do

22   anything, but the -- I -- I took that conversation

23   to -- you know, to make a suggestion or to offer

24   assistance in resolving the situation.

25       Q      Did you and Caryn either in this call

1   or before discuss her move from be- -- from being

2   a research and writing attorney to being an

3   Assistant federal defender?

4        A    It sounds familiar, but I cannot -- I

5   cannot remember exactly a conversation like that.

6        Q    Do you remember in this conversation on

7   August 3rd discussing -- appointing some sort of

8   fact-finder to investigate her claims?

9        A    Well, I would not have had the

10  authority to appoint a fact-finder.  I think

11  the -- the judiciary process would have started

12  with counseling, and the counselor could have done

13  some informal fact-finding.  I do remember that

14  happening at some point.

15            MS. McMAHON:  Sophia, if you'll scroll

16  down to the bottom of page 1.

17            AV TECHNICIAN:  (Technician complies.)

18  BY MS. McMAHON:

19       Q    It says in the last bullet, she told

20  Lee Ann very credible - we can't do everything

21  without fact-finder.

22       A    True.

23       Q    What did you mean by that?

24       A    Well, I'm assuming what I meant, and it

25  would have made sense in this situation, is we

1          Q       So at the very top of that page --

2                  MS. McMAHON:  Sophia, if you could

3     scroll up a little bit more above the horizontal

4     line.

5                  AV TECHNICIAN:   (Technician complies.)

6                  MS. McMAHON:  There, that's perfect.

7     BY MS. McMAHON:

8          Q       -- there's an e-mail from August 9th,

9     2018, and that's an e-mail from you --

10         A       Yes.

11         Q       -- to Caryn, and you write, She did

12    called -- I think a typo -- and Tony was very

13    responsive.  He did say the AFD job was in

14    Charlotte and he has no space in Asheville.  I

15    proposed telework in the interim, and Cait is

16    talking to him about that.  Still working on it.

17    He may apologize to you or talk about a solution,

18    and if you are comfortable you can give him your

19    views.  My clear sense is that he is taking this

20    very seriously.

21                 Is that right?

22         A       Yes.

23         Q       So did you find this information out

24    because Cait -- Cait talked to Tony, and then Cait

25    called you; is that right?

1          THE WITNESS:  Oh, thank you.

2          I'm sorry, scroll down.  I apologize.

3          AV TECHNICIAN:  (Technician complies.)

4          THE WITNESS:  There, there.  That's

5    perfect.

6          Okay.  And continue down.

7          AV TECHNICIAN:  (Technician complies.)

8          THE WITNESS:  Okay.  I have finished

9    reading that, and I do recall the e-mail.

10   BY MS. McMAHON:

11       Q     So if you could go to the

12   second-to-last full paragraph on page 3 that

13   starts with "The sticking point for him."

14       A     Yes.

15       Q     "The sticking point for him is (4)

16   transfer to Asheville duty station, as he says

17   there is no office space in Asheville," and then

18   Caryn continues on.  She says that she would be

19   fine with working remotely - "especially since I

20   will be in appeals, which can be done from

21   literally anywhere."

22          So did you and Caryn discuss the

23   possibility of remote work as a solution?

24       A     Yes, I think we did, and I think there

25   was a time in which she actually was doing remote

1    work, that they permitted her to do that.

2         Q      And she communicated that she was fine

3    teleworking?

4         A      I think she found it more favorable

5    than being in the Charlotte office with him.

6         Q      Did you discuss with her teleworking as

7    a more permanent solution so that she didn't have

8    to work in Charlotte, but, again, there's no

9    office space in Asheville, so she didn't have a

10   desk there?

11        A      Looking back on this, I recall being a

12   little skeptical that there was no office space in

13   Asheville.

14             Now, I don't know what the situation

15   was, I had never been there, but I've seen that

16   used as an excuse previously in -- in many other

17   cases, and I thought it was unlikely that office

18   space was -- could not be found.

19             Often in federal buildings, there are

20   multiple federal employees and multiple federal

21   positions, and I just -- that made me skeptical,

22   but --

23        Q      You had no --

24        A      -- I had no -- I had never been to

25   Asheville and I had never seen the offices, but it

1    seemed a little unlikely.

2        Q      So if we could switch gears a little

3    bit.

4        A      Sure.

5        Q      Do you know who Heather Beam is?

6        A      Is she in this --

7        Q      She is -- we're stepping away from the

8    exhibit.

9        A      Oh, okay.

10       Q      It's confusing when it's on the screen.

11   No problem.

12       A      Heather Beam sounds familiar, and if I

13   were -- well, I'm not going to guess.  My husband,

14   who's been listening, said don't speculate, but,

15   no, I -- I recognize the name, but I don't know

16   who she is.

17       Q      So she's -- would it -- would it sound

18   familiar if I told you that she was investigating

19   Plaintiff's claims -- Plaintiff's wrongful conduct

20   claim?

21       A      That sounds familiar, yes.

22       Q      And she was appointed as investigator

23   in August of 2018?

24       A      That sounds familiar.

25       Q      Do you remember contacting the

1       A       No.

2               (The Reporter clarified the record.)

3               THE WITNESS:  I have not.

4    BY MR. GERSEN:

5       Q       Could I ask that you take a moment to

6    read it?

7       A       Sure.

8               Okay.  I've finished.

9       Q       Okay.  I just want to reference a few

10   portions of it.  I'm going to ask you about them,

11   if that's okay.

12      A       Uh-huh.  Yes.

13      Q       The e-mail says that you allegedly

14   instructed one of your staff to tell Tony Martinez

15   that he needed to give the complainant, Caryn

16   Devins, whatever it is that she is asking for,

17   telework, relocation, et cetera, before Ms. Devins

18   hires an attorney or goes to the press.

19              Do you see that portion?

20      A       I do.

21      Q       Have I read it accurately?

22      A       You've read it accurately.

23      Q       Who do you believe alleged that?

24      A       I assume Tony Martinez alleged that.

25      Q       Did you, in fact, instruct your staff

1    to tell Tony Martinez that he needed to give the

2    complainant whatever she was asking for?

3         A     This is patently false.

4         Q     Did your staff say any of those things?

5         A     To my knowledge, no, and nor would they

6    ever.

7         Q     Did you yourself say any of those

8    things?

9         A     I did not.

10        Q     Do you know how Mr. Ishida could have

11   gotten that impression?

12        A     I do not.

13        Q     The e-mail says that you reportedly

14   said this was not a request but an order that

15   comes from the highest levels of the AO.

16              Do you see that passage?

17        A     I do.

18        Q     Did you, in fact, say that?

19        A     I did not, nor would I ever have said

20   something like that.

21        Q     And to the best of your knowledge, did

22   any member of your staff or the AO say that?

23        A     No, they did not.

24        Q     So someone who reported that you or

25   your staff said that -- those things would be

1    misrepresenting the truth; is that right?

2         A    Yes.

3         Q    With whom outside your office did you

4    or your staff communicate about the Caryn Devins

5    matter?

6         A    I want to make sure I understand.

7              With whom at the AO?

8         Q    Outside -- outside the AO.

9         A    Oh, outside the AO.

10             I believe that, as we mentioned

11   earlier, we talked to Heather Beam, and that was

12   Amaal Scroggins and myself.

13             I don't believe that I had any

14   conversations with the -- the Charlotte office or

15   anyone else in the courts.

16        Q    And your view is that it was likely

17   that Tony Martinez was the one who was alleged

18   making those allegations?

19        A    Well, reading this, yes, I -- it looks

20   like Tony Martinez is reporting this allegation.

21        Q    And reporting it to Mr. Ishida?

22        A    I'm assuming so, yes.

23        Q    Who then reported it to Chief

24   Judge Gregory?

25        A    Yes.

1          Q      And do you recall the roles of Chief

2    Judge Gregory and Mr. Ishida in the EDR process?

3          A      Yes.  They are -- they are the --

4    basically, the -- the highest level of officials

5    in the EDR process that Caryn was involved in.

6          Q      Mr. Ishida was the EDR coordinator, and

7    Chief Judge --

8          A      Yes.

9          Q      -- Gregory was the supervisor?

10         A      Yes.

11         Q      Yes.  Thank you very much.

12                Given your experience in helping to

13   enforce the civil rights laws and employee --

14   protect employees from discrimination, do you have

15   a view of why someone would misrepresent

16   communications from your office in this way?

17         A      Well, again, it's -- I'm speculating,

18   but I am assuming that they were not happy with my

19   position on Caryn Devins Strickland's case, and I

20   believe -- and I'm -- actually, I'm shocked to

21   read this.  It's amazing what is happening behind

22   the scenes.

23                But, yeah, I mentioned earlier that one

24   of the ways that someone can try to interfere with

25   my office's function is to call one of my

1  supervisors, and Jim Duff was definitely one of my

2  supervisors.  But I never knew any of this.

3      Q      And why are you shocked?

4      A      It is really -- first of all, because

5  it's not true, but second of all that -- that

6  there would be an attempt to interfere with the

7  role that my office had and -- and the

8  EDR process.

9      Q      Mr. Ishida describes -- describes your

10 work as an interference; is that right?

11     A      He says, yes, "tried to obstruct an

12 ongoing Fourth Circuit EDR investigation."

13     Q      How would either -- first of all, how

14 would this be an interference with the

15 EDR process?

16     A      Well, it looks like -- again, these

17 allegations are false, but that I told someone on

18 my staff to give -- to tell Tony Martinez to give

19 Caryn Devins whatever she's asking for.

20     Q      More -- more straightforwardly, did you

21 try to obstruct an EDR process in any way?

22     A      Absolutely not.

23     Q      Would you ever try to obstruct an

24 EDR process in any way?

25     A      Never.

1       Q     Do you understand any of your

2  activities throughout this matter as plausibly

3  interfering or obstructing an EDR process?

4       A     Absolutely not.

5       Q     Okay.  Could you please read the

6  sentence in the middle of the page aloud starting,

7  "After some checking"?

8       A     Yes.  I am reading that sentence.

9           I'm done.

10      Q     Could you please read it aloud, just

11  for the record?

12      A     "After some checking, Tony discovered

13  that this 'demand' did not come from the highest

14  levels of the AO, but from Ms. Dunham, who

15  coincidentally is a friend of the complainant,

16  Caryn Devins."

17      Q     Were you and Caryn Devins friends at

18  this point?

19      A     We were never friends.

20      Q     Are you friends today?

21      A     I would not call her a friend.  She was

22  a person that was employed by the Federal Public

23  federal defender's Office with whom I interacted

24  on her case.

25           I liked and respected her and wanted to

1    try to resolve the matter as my job

2    responsibilities called for, but, no, she was

3    never a personal friend.

4         Q    Did you know her before she came to

5    you?

6         A    I never met her.  I never -- I don't

7    believe I ever had any contact with her before she

8    came to me.

9              She and I were probably -- we may have

10   overlapped when she was a U.S. Supreme Court

11   Fellow, but without looking at the dates, I can't

12   say.  But I never met her in that role.

13        Q    Did you ever tell Tony Martinez that

14   you were friends?

15        A    No, never.

16        Q    Did you ever tell anyone that you were

17   friends?

18        A    Never.

19        Q    You said before that you were shocked

20   or found it shocking that this -- and that this

21   e-mail might interfere with the EDR process.

22              How did you mean?

23        A    Well, Judge Gregory was going to be

24   deciding this case eventually, and the fact that

25   are falsehoods in here is somewhat concerning --

1    concerning.

2         Q     And which falsehoods exactly?

3         A     Well, that I tried to obstruct an

4    ongoing Fourth Circuit EDR investigation, that

5    this was a directive that came from the highest

6    levels of the AO, that it was a demand, and that I

7    am a friend or was a friend of the complainant.

8         Q     And why would it be concerning that

9    there was a falsehood introduced about those

10   things?

11        A     Well, I think the roles of Mr. Ishida

12   and Judge Gregory were as neutral adjudicators,

13   and I think having these falsehoods presented to

14   them could interfere with decisions they made in

15   the future.

16        Q     You'd -- you'd be concerned that an

17   e-mail like this with clear falsehoods could

18   affect the neutrality of either Mr. Ishida or

19   Judge Gregory, both key players in the

20   EDR process; is that correct?

21        A     I would be concerned retrospectively

22   and having seen this for the first time today that

23   that could have happened.

24        Q     And is it reasonable to think that

25   Chief Judge Gregory receiving this communication

1    might be influenced by it in his adjudication or

2    judgments?

3         A     I would be speculating if I answered

4    that question.

5              I do not know Judge Gregory personally,

6    and -- and I cannot say for sure, but even reading

7    it today, it's concerning.

8         Q     Understood.

9              Given your experience with workplace

10   discrimination claims which you testified about

11   earlier, do you have a view of why someone would

12   inaccurately report that you or someone from your

13   office complaining -- and the complainant, someone

14   who was complaining about discrimination, were

15   friends?

16             I could rephrase it.  That would be

17   useful.

18             Given your experience -- extensive

19   experience with workplace discrimination claims,

20   do you have a view of why someone would

21   inaccurately report that a complainant complaining

22   of workplace discrimination and you or your office

23   were friends?

24        A     I would speculate that such an

25   allegation would diminish my observations about

1    the case and possibly the -- the Plaintiff's

2    observations on her own face.

3        Q      So you interpret the -- that sentence

4    as undermining your own credibility and

5    legitimacy?

6        A      Yes, I do.

7        Q      And do you interpret that sentence as

8    undermining the legitimacy and credibility of the

9    complainant, Caryn?

10       A      Yes.

11       Q      And would or does this letter make you

12   concerned that someone misrepresented facts to

13   undermine the advice given by the Office of Fair

14   Employment Practices?

15       A      Yes.

16       Q      In your experience with workplace

17   discrimination claims, why would someone want to

18   undermine legitimacy of an interaction with the

19   Office of Fair Employment Practices?

20       A      There are so many possibilities, it's

21   hard for me to answer that.

22       Q      Understood.  Thank you.

23              Is one reason that someone would want

24   to undermine the credibility or legitimacy of an

25   interaction with your Office of Fair Employment

1    Practices to protect an accused party in their

2    office?

3         A    Yes, definitely.

4         Q    Is reaching out to your office for

5    advice generally considered something that could

6    interfere in the EDR process?

7         A    Absolutely not.  Again, my attorneys

8    that interact regularly on a daily basis with the

9    courts and court staff have conversations about

10   cases, they provide guidance, and that is never

11   considered interference.

12        Q    Is there anything wrong with a federal

13   public defender employee coming to your office for

14   advice about what to do about sexual harassment or

15   workplace discrimination?

16        A    No.

17        Q    Is that, in fact, what an employee of

18   the federal public defender or the judiciary ought

19   to do if they are concerned about workplace

20   discrimination?

21        A    Yes.

22        Q    You told Ms. McMahon that nobody told

23   you that you shouldn't be involved in this matter.

24             Seeing this e-mail, does it refresh

25   your memory on whether you were told at any point

1          A      Yes.

2          Q      Could you say a little bit more about

3    that?

4                 You said, I think, that that was part

5    of classic sexual harassment.  Could you explain a

6    bit about what you mean?

7          A      Yes, and I will tell you a personal

8    anecdote that I think does illustrate it.

9                 Since I have retired, I have watched a

10   lot of the news stories on sexual harassment,

11   including the allegations against Governor Cuomo

12   in New York and what led to his resigning his

13   position, and there were a number of women that

14   made allegations against him.

15                And I recall thinking when I heard

16   about them, there was a woman who alleged that he

17   groped her, so there was a physical assault, but

18   there was also another woman who alleged that he

19   had made her uncomfortable by his obvious sexual

20   and romantic interest in her.

21                There was never any groping or physical

22   assault in that case, and I remember thinking that

23   is exactly what happened with Caryn Devins.  No

24   physical touching, no groping, but nevertheless

25   a -- a desire to control her and -- and an obvious

1    interest in her either sexually or romantically.

2              And I thought, boy, I -- I will say

3    this:  I said to myself, I was right in this case,

4    because I did get some -- I did get some feedback

5    from one of the staff attorneys in OGC, who -- who

6    I often disagreed with, that this was not a

7    problem, that this case -- you know, I was not

8    assessing this case properly, and I remember

9    thinking, you know what, I was right.

10       Q    Understood.  Thank you.

11            Did Caryn ever tell you that other

12   employees observed the kind of interest in her

13   that you just described?

14       A    No, never.

15       Q    Okay.  Thank you.

16            I want to --

17            MR. GERSEN:  Could we introduce one --

18   our next exhibit, please?

19            Just give me one moment.  Sorry.

20            THE WITNESS:  Sure.

21            MR. GERSEN:  I'm sorry, I'm having a

22   technical glitch.  Just bear with me for one

23   minute.  Thank you so much.

24            THE WITNESS:  Sure.

25            MR. GERSEN:  Okay.  Could we actually

1    Q      So in your --

2    A      So that was my impression.

3    Q      My apologies.  Thank you.

4           So in your experience both in the

5    executive branch and the judicial branch, you, I

6    take it, heard a lot of these complaints of sexual

7    harassment or sex discrimination?

8    A      Thousands.

9    Q      Thousands?

10          And do you always believe the people

11   who come to you with these complaints?

12   A      No, I do not.  Just the opposite.

13   Q      And say a little bit more.

14   A      Well, there are people who make

15   complaints that are inherently unreliable, and --

16   and I have seen many of them.

17          When I was a judicial clerk and was

18   adjudicating -- working on adjudicating the cases,

19   I saw plaintiffs who were unreliable and I

20   believed were creating false claims.

21          I mentioned that in a deposition I

22   testified in at EPA, there was an employee who was

23   making a false claim about a sexual assault by one

24   of the EPA managers, and I testified on behalf of

25   the agency.

1          So when you -- when you -- when you

2     look at a lot of these cases over 35 years, I

3     would say the vast majority of the claims are not

4     true.  So in -- in the few times when I worked at

5     the AO when I believed -- strongly believed what a

6     plaintiff was saying, those are the cases I really

7     tried to intervene and assist with what the law

8     tells us to do, which is to remedy and prevent

9     future harassment and discrimination.

10         Q      And so having seen thousands of these

11    cases, you're actually more likely to disbelieve

12    the complaints than believe them?

13         A      Yes, just based on numbers.

14         Q      And did you believe Caryn's allegations

15    about J.P. Davis?

16         A      I did.  I did.

17         Q      And did you believe her allegations

18    about Tony Martinez?

19         A      I did.

20         Q      Do you believe she was telling you the

21    truth?

22         A      I do.

23         Q      Do you think her concerns about her

24    workplace were reasonable?

25         A      I do.

1          Q       And did you feel in those conversations

2     like she was sincere?

3          A       Yes.

4          Q       Did you suspect that she was being

5     manipulative or deceptive?

6          A       No, I did not.

7          Q       Did you think Caryn was telling a false

8     story to try to get a transfer to another work

9     location?

10         A       No, I did not.

11         Q       Did you think she might be fabricating

12    or exaggerating things that had happened so she

13    could get to work exclusively in appeals?

14         A       No, I did not.

15         Q       Thank you.

16               MR. GERSEN:  Can we put up Government

17    Exhibit 1, please, page 1?

18               AV TECHNICIAN:   (Technician complies.)

19               MR. GERSEN:  Thank you.

20    BY MR. GERSEN:

21         Q       I think you said that Caryn told you

22    about ways that J.P. was asserting control; is

23    that right?

24         A       Yes.

25         Q       Do you remember her telling you that

1  J.P. became emotional when she told him that

2  eventually she wanted to work out of the Asheville

3  office?

4         A      Emotional in -- in what way?  Anger?

5  Surprise?  Tearful?  I need -- I need more

6  clarification.

7         Q      Anger.

8         A      Yes, I do remember that.

9         Q      Was -- did she describe him as tearful?

10        A      No.

11        Q      She described him as angry when she

12  told him that she eventually wanted to move to the

13  Asheville office to work somewhere away from

14  there?

15        A      Yes.  And I recall a couple of examples

16  when he became very angry at her and sort of

17  lashed out at her, and, again, I -- I took that as

18  some evidence of his desire to control her and the

19  situation.

20        Q      And would it have made you nervous at

21  all about Asheville as a solution to the control?

22               In other words, would simply moving

23  offices eliminate the problem if J.P. was still in

24  control and overseeing her?

25        A      No, that would not have solved the

1    problem.  In my mind, that employee/employer or

2    manager relationship needed to be broken, and she

3    needed to report to someone else.

4         Q    Understood.

5              And just to be clear, the Government's

6    asked you to speculate a lot, but these aren't

7    your notes, correct?

8         A    The notes in front of me?

9         Q    Correct.

10        A    They are not.  They are -- from what I

11   understand, they are Caryn's notes.

12        Q    So you don't actually know what Caryn

13   meant, of course?

14        A    I don't.  I don't.  I can only make a

15   reasoned determination of what she meant.

16             But, also, part of what I see refreshes

17   my memory about that initial conversation.

18        Q    Can you say a little more about that?

19        A    Well, I remember -- I mean, I remember

20   telling her I was the manager of the civil rights

21   office for the federal courts and for

22   AO employees.

23             I remember telling her that I had been

24   a law clerk and that I had a number of different

25   positions over the years in civil rights and

1    the witness doesn't answer about specific advice

2    that's given.

3              Does that work?

4              MR. GERSEN:  Yeah, why don't we note

5    that, and we can come back to the issue if we need

6    to at a later -- at another time.

7    BY MR. GERSEN:

8        Q      So can you -- to the extent that you

9    could answer the question without revealing

10   specific advice that was -- specific legal advice

11   that was given?

12       A      And what was the question again?

13       Q      I think the question was:  Was there

14   disagreement about how to proceed?

15       A      In -- in my initial meetings, no, there

16   was not disagreement.

17       Q      And what was the decision about how to

18   proceed from those initial meetings?

19       A      Well, that -- that OGC would contact

20   the managers and provide counsel to them, that I

21   would continue to attempt to informally resolve

22   the matter and to give Caryn advice on the

23   processes she had at her disposal -- disposal, and

24   that we would continue to discuss.

25       Q      And was there anything especially

1    unusual about that decision to proceed in that

2    way?

3         A      No.  It happened more times than I can

4    count.

5         Q      It was very much the norm or a normal

6    way to proceed in a case like this?

7         A      Exactly.  And when I say countless

8    times, the managers were different.  I mean, it

9    wasn't always the deputy director.  It might have

10   been an office head or another manager, but that

11   was perfectly usual proceedings where OGC, my

12   office, and a manager of an office would sit down

13   and discuss next steps.

14        Q      And would it be a breach of your

15   obligation or responsibilities if you hadn't done

16   so, do you think?

17        A      I think it would have been.

18        Q      Thank you.

19               You mentioned that you had a very

20   positive relationship with Cait Clarke, I think,

21   professionally?

22        A      Yes.

23        Q      And you had confidence that she would

24   do the right thing?

25        A      Yes.

```
1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2            I, Marney Alena Mederos, the officer

3    before whom the foregoing deposition was taken, do

4    hereby certify that the foregoing transcript is a

5    true and correct record of the testimony given;

6    that said testimony was taken by me

7    stenographically and thereafter reduced to

8    typewriting under my direction; that reading and

9    signing was requested; and that I am neither

10   counsel for, related to, nor employed by any of

11   the parties to this case and have no interest,

12   financial or otherwise, in its outcome.

13           IN WITNESS WHEREOF, I have hereunto set

14   my hand and affixed my notarial seal this 23rd day

15   of April 2023.

16   My commission expires November 23, 2024

17

18

19   _____

20   NOTARY PUBLIC IN AND FOR

21   THE STATE OF MARYLAND

22

23

24

25
```