# EXHIBIT J

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
Civil No. 1:20-cv-00066-WGY

CARYN DEVINS STRICKLAND,    )
                            )
            Plaintiff,      )
                            )
vs.                         )
                            )
UNITED STATES, et al.,      )
                            )
            Defendants.     )
_____)




                              Friday, April 14, 2023
                              Charlotte, North Carolina




        Deposition of HEATHER BEAM, a witness herein,

called for examination by counsel for Plaintiff in the

above-entitled matter, pursuant to Notice, before

Dayna H. Lowe, Court Reporter and Notary Public in and

for the State of North Carolina, taken at Tin Fulton

Walker & Owen, PLLC, 301 East Park Avenue, Charlotte,

North Carolina, commencing at the hour of 9:06 a.m.

```
 1   APPEARANCES:

 2

 3       On behalf of the Plaintiff:

 4           OLIVIA WARREN, ESQUIRE
             JAY H. FERGUSON, ESQUIRE
 5           Thomas, Ferguson & Beskind, LLP
             119 East Main Street
 6           Durham, North Carolina 27701
             (919) 682-5648
 7           warren@tfblawyers.com
             ferguson@tfblawyers.com
 8
             JACOB GERSEN, ESQUIRE (Via Telephone)
 9           JEANNIE SUK GERSEN, ESQUIRE (Via Telephone)
             Hauser Hall 510
10           1563 Massachusetts Avenue
             Cambridge, Massachusetts 02138
11           (617) 496-5487
             jsuk73@gmail.com
12
             COOPER STRICKLAND, ESQUIRE (Via Telephone)
13           Post Office Box 92
             Lynn, North Carolina 28750
14           (828) 817-3703
             cooper.strickland@gmail.com
15

16       On behalf of the Defendants:

17           MADELINE McMAHON, ESQUIRE
             JOSHUA M. KOLSKY, ESQUIRE
18           United States Department of Justice
             Civil Division, Federal Programs Branch
19           1100 L Street NW
             Washington, DC 20005
20           (202)451-7722
             madeline.m.mcmahon@usdoj.gov
21           joshua.kolsky@usdoj.gov

22       Also Present:

23
             Ms. Kristin Mannherz, Office of General Counsel
24           Ms. Caryn Devins Strickland (Via Telephone)

25
```

```
 1                    C O N T E N T S

 2

 3   Examination by Ms. Warren:                    5

 4   Examination by Ms. McMahon:                  200

 5

 6                    E X H I B I T S

 7                    (Plaintiff's)

 8   Beam 13    Email(s), US 5361-5363            14

 9   Beam 14    Email(s), US 2839-2841            15

10   Beam 15    EDR Plan January 2013             20

11   Beam 16    EDR Plan November 2018            20

12   Beam 17    Email(s), US 0462                 21

13   Beam 18    Email(s), US 2454-2456            22

14   Beam 19    9/10/18 letter, US 5932-5938*     23

15   Beam 20    Email(s), US 0358-0360            26

16   Beam 21    Email(s), US 1432-1433            27

17   Beam 22    Email(s), US 1434-1435            30

18   Beam 23    Handwritten notes, US 6213-6236*  54

19   Beam 24    Email(s) and Counselor's Report,  64
                US 2293; US1244-1311*
20
     Beam 25    Email(s), US 1357-1360*           77
21
     Beam 26    Email(s), US 1353-1354*           85
22
     Beam 27    Email(s), US 2822-2823*           90
23
     Beam 28    Email(s), US 1343-1347*           91
24

25                (CONTINUED ON NEXT PAGE)
```

1     Q.    No.   Okay.   I want to start by talking about

2     your investigation in this case.   When were you first

3     contacted about this case?

4     A.    I believe it was sometime in September of --

5     five years ago, 2008 -- 2018.

6     Q.    Who contacted you?

7     A.    There was an email from Tony Martinez, and

8     then James Ishida had emailed me regarding that he had

9     asked Lisa Morris if he could borrow me for this

10    assignment and she had said yes.

11    Q.    Who is Lisa?

12    A.    She -- Lisa Morris is the prior chief

13    probation officer.   She retired.

14    Q.    Okay.   And do you know why Mr. Ishida asked to

15    borrow you?

16    A.    No, I don't remember why.

17    Q.    Okay.   Had you ever done an investigation like

18    this before?

19    A.    No.   This was my first one.

20    Q.    And you said Tony also contacted you?

21    A.    Yes.

22    Q.    What did Tony say?

23    A.    He had delegated me to be the EDR coordinator.

24    Q.    And what did you understand that to mean?

25    A.    That I was tasked with investigating the claim

1     Q.   Oh, sorry.  Did you ever advise Caryn of her

2  right to trigger the EDR process under Chapter X?

3     A.   I do not recall if I did or not.  I know we

4  did discuss her rights under the EDR plan, but I don't

5  remember specifically what I said.

6     Q.   Okay.  And now looking at number 3 in that

7  bullet.

8     A.   Okay.

9     Q.   James said to Tony, "So you had designated

10  Heather to investigate the allegations, and she now

11  reports to you under the Fourth Circuit EDR Plan."

12     A.   Uh-huh.

13     Q.   What did that mean to you?

14     A.   Well, that means that I would investigate the

15  allegations and bring my report to Tony Martinez.

16     Q.   Okay.  And looking at the first page of this

17  document, towards the bottom there's an email that

18  begins, "Hi Tony," and the second line says, "I agree

19  that your office's EDR plan isn't applicable here

20  because Caryn did not file a grievance within five days

21  of the alleged harassment."

22          Do you think that that's talking about a

23  different policy than the Fourth Circuit's plan?

24     A.   Yes, because he references "your office's EDR

25  plan."

1      Q.   Uh-huh.  Do you know how you contacted him?

2  Was it phone or email?

3      A.   Phone.

4      Q.   Okay.  And did you take any notes on that

5  phone call?

6      A.   No.

7      Q.   How did you remember the tone of your call

8  with the AO about stopping your investigation?

9      A.   I don't recall that I said anything about the

10  tone of a phone call.

11      Q.   As you were on that phone call, how did you

12  understand the tone of the person who was talking to

13  you?  Do you remember?

14          MS. McMAHON:  Objection, form.

15          BY MS. WARREN:

16      Q.   Do you remember what the person you were

17  talking to sounded like?

18      A.   It was a female, and she told me to stop

19  investigating the claim.

20      Q.   Did she sound upset?

21      A.   I can't speculate on that.

22      Q.   Do you remember is what I'm asking.

23      A.   No, I don't.

24      Q.   Did she threaten you in any way?

25      A.   Not that I recall.

REED & ASSOCIATES
MATTHEWS, NORTH CAROLINA  980.339.3575
Case 1:20-cv-00066-WGY  Document 248-11  Filed 06/07/23  Page 7 of 34

 1     Q.    Do you think you would have remembered if she

 2  threatened you?

 3     A.    I probably would have remembered if she

 4  threatened me, so I don't think she did.

 5     Q.    If she threatened you, would you have probably

 6  made some notes?

 7         MS. McMAHON:  Objection, calls for

 8  speculation.

 9         BY MS. WARREN:

10     Q.    You may answer.

11     A.    I have no idea.

12     Q.    Okay.  Do you know who Frank Johns is?

13     A.    Yes.

14     Q.    Who is he?

15     A.    He's the clerk of court for the District

16  Court.

17     Q.    Was he involved in this matter in any way?

18     A.    Not that I recall.  He's my boss, so he knew

19  that I was investigating it because him and Lisa Morris

20  were both my bosses, but that was all he knew as far as

21  I'm aware.

22     Q.    And would there be any reason to include him

23  on emails about this case?

24     A.    I don't remember.

25     Q.    I want to talk about your, I know, several

1    months of investigation in this case.  You said that
2    this was your first time investigating.
3         A.   Yes.
4         Q.   Were you given any guidance about how to
5    investigate?
6         A.   We were given an overview of the EDR process.
7         Q.   Uh-huh.  Did that overview include how to
8    conduct an investigation?
9         A.   I do not recall.  It's been a long time.
10        Q.   Do you know when you got that overview?
11        A.   No.
12        Q.   Okay.  Did you have any other guidance for
13   your investigation?
14        A.   What timeframe are you talking about?  Before
15   I did it?
16        Q.   At any point before you began.
17        A.   I do not remember if I had made another call
18   to Fair Employment Practices.  I know that I did use the
19   JNet as a resource.
20        Q.   And what is on the JNet?
21        A.   It's the judiciary's intranet site, and there
22   are a ton of resources on there.  It's not just for
23   human resources stuff.  Pretty much all court related,
24   operational, administrative procedures and guidance and
25   policies.

```
 1         Q.    Did you find resources that were helpful for
 2    your investigation?
 3         A.    I did find some, yes.
 4         Q.    What were those resources?
 5         A.    One that I recall is the template that I used
 6    to do the investigation report.
 7         Q.    So there was a report template?
 8         A.    That I found, yes.
 9         Q.    Okay.  Do you remember any other resources?
10         A.    Not that I recall.
11         Q.    Did you save a copy of that report template?
12         A.    No.  I just typed up my report based on that
13    format.
14         Q.    Before we go into that, I just want to talk
15    for a moment about other resources that you had
16    available to you as HR staff.
17         A.    Sure.
18         Q.    In 2018 your role was in the probation office.
19    How long had you been there?
20         A.    My role was a dual function.  It was for the
21    probation office and the District Court.
22         Q.    The Western District.
23         A.    Yes.  And I'd been there since August --
24    officially August 10th of 2018.
25         Q.    That was your first date in that position?
```

1　Asheville, yes.

2　　　Q.　And why did that affect her relationship with

3　JP?

4　　　A.　I can't say why.

5　　　Q.　You have in your notes on 6214, it looks like

6　she described some drinking in the office and with JP.

7　Did she tell you that at a retreat he brought her into

8　the hall at 11 p.m. at night?

9　　　A.　Yes.

10　　　Q.　And he asked her to go to someone else's room?

11　　　A.　Yes.　Those are the notes I have.

12　　　Q.　And she said that I see other people noticed.

13　　　A.　Uh-huh.

14　　　Q.　Did you ask her who noticed?

15　　　A.　I don't recall.

16　　　Q.　Okay.　Do you know if she told you who

17　noticed?

18　　　A.　I don't remember.　I'm sorry.

19　　　Q.　And did she tell you about the email that JP

20　sent her that she understood to be a quid pro quo email?

21　　　A.　Yes, she did, and she gave me a copy of it.

22　　　Q.　And what did she say about that email?

23　　　A.　I don't recall what she said about it.

24　　　Q.　What did you think when you saw that email?

25　　　A.　I thought it was a very stupid email to send.

1      Q.    Did she seem upset by that email?

2      A.    Yes.

3      Q.    Did you believe her?

4      A.    That she was upset?

5      Q.    Yeah.

6      A.    Yes.

7      Q.    Did you think it was reasonable to be upset

8   because of that email?

9      A.    Yeah.

10      Q.    And how did she describe reacting after the

11   email?

12      A.    I do not remember.

13      Q.    Do you remember if she told you that she tried

14   to take some distance after receiving that email?

15      A.    I do recall her saying that she wanted to get

16   some distance from JP, but I don't recall the timeframe

17   in which she said that.

18           MS. WARREN:  Let's just take a short break.

19           MS. McMAHON:  That would be great.

20           (Recess from 10:40 a.m. to 10:57 a.m.)

21           BY MS. WARREN:

22      Q.    Ms. Beam, would you be all right if we go

23   through to lunch --

24      A.    Yeah, sure.

25      Q.    -- or try to?  Excellent.  I have a couple of

1    was going to trial?

2        A.    Yes.

3        Q.    And the PSI that JP wanted her to go to was

4    for shadowing?

5        A.    Yes.

6        Q.    And it seems like they had some heated

7    conversations about this.  Would you --

8        A.    As she described them to me, I would agree.

9        Q.    And what did she describe?

10       A.    She used the word "berate," that he berated

11   her, that he was visibly angry.

12       Q.    Uh-huh.  Did she describe how she could tell

13   he was angry visibly?

14       A.    I remember her -- and I believe I took a note

15   on it, that JP was shaking he was so angry.

16       Q.    Did she tell you how that made her feel?

17       A.    Yes.

18       Q.    And what did she say?

19       A.    Uncomfortable.

20       Q.    Did she talk about how it made her feel a

21   couple weeks after receiving the quid pro quo email?

22       A.    I do not recall.

23       Q.    Okay.  But she told you about the quid pro quo

24   email first?

25            MS. McMAHON:  Objection, misleading.

```
 1              BY MS. WARREN:
 2         Q.   You may answer.
 3         A.   I think she did.
 4         Q.   In your notes it comes first.
 5         A.   Yeah.  Uh-huh.
 6         Q.   Did she tell you that that quid pro quo email
 7    had changed how she felt about their work?
 8              MS. McMAHON:  Objection, misleading.
 9              BY MS. WARREN:
10         Q.   I'm just asking if she told you if the quid
11    pro quo email had changed anything for her.
12              MR. KOLSKY:  Same objection.
13              BY MS. WARREN:
14         Q.   You may answer.
15         A.   Can you clarify your question?  As in changed
16    what?
17         Q.   Anything at all.
18         A.   I do not recall if she said that that -- are
19    you asking me the question like was that the catalyst
20    that started all of this?
21         Q.   I'm asking how she described it as you
22    understood it.
23         A.   Okay.  She described it as a quid pro quo
24    email.  That's it.
25         Q.   Okay.  She didn't tell you how it made her
```

1    her answer was, but I do remember trying to get a copy

2    of it.

3         Q.   Is that something you would do as an HR

4    professional?

5         A.   First thing.  Yes.

6         Q.   And when people start in jobs, do you advise

7    employers to make sure they have a copy of the personnel

8    manual?

9         A.   Yes.  And we also give them a copy of the EDR

10   plan.  Our district does it a little differently.  We

11   also have -- we give them the video for the employee

12   training that's on the JNet.  If they're a manager, they

13   get the manager video training, and that was not

14   available at that time.

15        Q.   In 2018?

16        A.   No.

17        Q.   When did that become available?

18        A.   I would say it's become available in the last

19   year or two.

20        Q.   Okay.  So to your knowledge -- you -- sorry.

21        A.   It's okay.

22        Q.   Do you know if Caryn had a copy of the

23   personnel manual in, let's say, May of 2018?

24        A.   I don't recall.

25        Q.   And it seems, according to your notes, that

1  she had not been informed of the process at the time?

2      A.    Correct.

3      Q.    Okay.  Did she say that -- did Caryn tell you

4  that she reached out to Nancy Dunham?  I'm looking at

5  the next page.

6      A.    Yes.

7      Q.    And do you remember what she said Nancy told

8  her?

9      A.    Not that I recall.

10     Q.    Okay.  It says on July 24th she called in

11 sick.

12     A.    Yes.

13     Q.    Do you remember why?

14     A.    Yeah.  This was when she had requested to be

15 taken out of JP's chain of command.  Tony had a meeting,

16 I believe, that Friday with staff going over the new

17 organizational chart, and when he sent it out, her

18 name -- her box was still under JP, which Caryn took

19 that as she's still reporting to JP.  This was upsetting

20 to her, so she did call in sick.

21     Q.    Did Tony also send an email saying that she

22 was going to report to JP?

23     A.    He sent an email out, and that email in

24 question, I recall Caryn was under the impression she

25 would be able to review it before he sent it out, but I

```
1        A.   To not make any outward appearance that
2   they're still trying to pursue what they're being
3   accused of pursuing.
4        Q.   And would you tell -- would you tell them not
5   to -- to stay away to protect, it sounds like, their own
6   rights?  Is that what you're --
7             MS. McMAHON:  Objection, calls for
8   speculation.
9             BY MS. WARREN:
10       Q.   You would advise them to stay away so that the
11  investigation could continue?
12       A.   Yes.
13       Q.   You said, "If you need to talk keep it to
14  Bill" -- is that Bill Moormann --
15       A.   Uh-huh.
16       Q.   -- "or Tony," Tony Martinez, "and of course
17  your wife only."
18       A.   Uh-huh.
19       Q.   The investigation was confidential, right?
20       A.   Yes.  Uh-huh.
21       Q.   Did you tell witnesses it was confidential?
22       A.   Yes.
23       Q.   And that means that they should only share
24  information in that need-to-know exception?
25       A.   Yes.
```

1    Q.   So would talking to Bill be confidential?

2    A.   He had already talked to Bill, so I wasn't

3  giving him advice to talk to Bill to get any

4  confidential information.

5    Q.   Did you ever make clear to JP that he should

6  not talk to Bill about the facts of these allegations?

7    A.   I do not recall.

8    Q.   Did you ever make clear to JP that he should

9  not talk to Tony about the facts of these allegations?

10    A.   I do not recall.

11    Q.   Were you concerned that JP and Tony might

12  discuss the facts of these allegations?

13    A.   No, because I expected it to be kept

14  confidential between all parties involved.

15    Q.   Even though you told JP, "if you need to talk

16  keep it to Bill or Tony"?

17    A.   Yes.  Tony in the capacity that she was JP's

18  boss.

19    Q.   But your email doesn't say limit it to --

20    A.   No.

21    Q.   Okay.  And his wife would not be confidential

22  communications according to the plan either?

23    A.   Correct.

24    Q.   Did you ever advise JP and Tony because they

25  were both accused that they shouldn't talk about the

1    accusations together?

2         A.    Not that I recall.

3         Q.    Would it be important to advise them of that?

4         A.    I'm not sure.

5         Q.    Can witnesses influence each other's stories

6    by talking about facts?

7              MS. McMAHON:  Objection, calls for

8    speculation.

9              BY MS. WARREN:

10        Q.    You may answer.

11        A.    I have not had experience with that.

12        Q.    In your years in HR, have you ever been told

13   that when there is a claim like this, witnesses could

14   come up with a story if they talk to one another?

15             MS. McMAHON:  Same objection.

16             BY MS. WARREN:

17        Q.    You may answer.

18        A.    Not that I recall.

19        Q.    Have you ever considered that possibility?

20        A.    In this case?

21        Q.    Ever.

22        A.    Ever?  No.

23        Q.    Did you ever consider it in this case?

24        A.    No.

25        Q.    And did you ever ask JP and Tony if they were

 1    talking to each other?

 2         A.    No, I did not.

 3         Q.    Neither JP?

 4         A.    (Witness shook head.)

 5         Q.    That's a no?

 6         A.    No.

 7         Q.    Nor Tony?

 8         A.    Nor Tony, no.

 9         Q.    Why?

10         A.    Why?  It did not occur to me to ask.

11         Q.    When you interview witnesses, do you do it

12    with other people present?

13         A.    I did not do it with other people present.

14         Q.    And why did you think it was important to

15    interview one witness at a time?

16         A.    Due to confidentiality.

17         Q.    Are there any other reasons why you would only

18    want to interview one witness at a time?

19         A.    No.

20         Q.    Looking at the front page of this, which is

21    1357 on the bottom, this is September 26th, 2018 in the

22    middle, and JP says, "Hey Heather, one more question did

23    occur to me after thinking about it for a bit -- you

24    referenced a Chapter X complaint, which to my

25    understanding would have required Caryn to actually

1   the storm when Caryn rode her bike to work, and she had

2   described it as being cornered in the lobby, and I asked

3   JP how far away were you standing from Caryn, and he

4   said about 100 feet.

5        Q.   Can you look at your notes on page 6231?

6        A.   Yeah.

7        Q.   At the bottom he said he was standing about

8   10 yards away.

9        A.   I stand corrected.  10 yards.

10       Q.   Not 100 feet?

11       A.   Yeah.

12       Q.   I was just wondering.  The lobby --

13       A.   I knew there was a one-zero somewhere.  Sorry.

14   10 yards.  I would agree with that.

15       Q.   I'd like to be in a 100-foot lobby.

16           On 6230, you have an aside that in the

17   conversation on June 6th about the PSI that JP admitted

18   to being very upset and he was controlling?

19       A.   Yes.

20       Q.   And he does not recall if he raised his voice

21   or not?

22       A.   That is true.

23       Q.   Okay.  Given the different -- given that and

24   what Caryn told you, did you think it was likely that

25   Caryn -- that he seemed angry as Caryn described?

1      A.    Yes.   That would be reasonable.

2      Q.    Uh-huh.   And June 6th was about three weeks

3   after the quid pro quo email on May 18th?

4            MS. McMAHON:   Objection, misleading.

5            BY MS. WARREN:

6      Q.    You may answer.   How long -- June 6th is a

7   couple of weeks after May 18th?

8      A.    Yes.   I would agree with that.

9      Q.    And May 18th was when JP sent the quid pro quo

10  email?

11           MS. McMAHON:   Objection, misleading.

12     A.    Can I double-check that email?

13           BY MS. WARREN:

14     Q.    You're welcome to.

15     A.    Did you give me a copy of that one already?

16     Q.    It's in your report.

17     A.    In my report.   Okay.

18     Q.    And I can tell you the page number for it.   I

19  think that's 1260.

20     A.    May 18th, yes.   That is correct.

21     Q.    It seems like -- turning back to your notes

22  that we were looking at.

23     A.    Yeah.

24     Q.    And I think we were -- just for your

25  reference, we had been on page 6231.

1    A.   I did not.  I was going to look up -- well, I
2  tried.  I did look up the Federal Defenders' pay and all
3  of that, the qualifications and stuff like that.

4    Q.   And did you confirm his assertion that Caryn
5  would have needed five more years to qualify for a
6  grade 15?

7    A.   I do not recall because the G15, or G as in a
8  grade, I didn't find anywhere.  AFDs have pay ranges.

9    Q.   Uh-huh.  And the AFDs have a pay range.  The
10  research and writing specialists, I believe it's the JSP
11  plan.

12    A.   Okay, yes.

13    Q.   Is that correct?

14    A.   That would be correct if -- I think I have her
15  SF-50 here.  Let me -- oh, right here.  Her pay plan is
16  ungraded.  Oh, but that was as a Assistant Federal
17  Defender.  So the pay plan said 14-2.  Pay plan is FD.

18    Q.   So she was at -- do you take 14 to be
19  referring to a grade on that plan?

20    A.   Yeah, because it's this in the grade or level
21  box, and the 2 is in the box titled step or rate, but
22  the pay plan says FD.  If it were JSP it would say JS.

23    Q.   Thank you.  And these plans, just so I'm
24  understanding, I believe that they have -- it's sort of
25  a table, is that right?

1    so, for example, a grade 14 -- maybe even not -- not as

2    a research and writing specialist, but these ungraded

3    pay plans for AFDs, it has a start -- like a minimum and

4    a maximum, and I did not understand where they picked

5    the dollar amount to pay.  It seemed different.  I'm not

6    going to say if it's good or bad, it's just different

7    than what I'm used to in the probation and District

8    Court.

9         Q.   Are you on more similar tables with grades and

10   steps?

11        A.   Everything's modeled after the general

12   schedule for the government, and we do have the JSP

13   schedule for chamber staff and -- yeah, chamber staff,

14   and then our circuit executive and the second in

15   command.  Everybody else is on the court personnel

16   system.  Similar.  They have grades and they have steps.

17        Q.   Did you understand how grades and steps worked

18   for research and writing attorneys?

19        A.   Based on their education, experience.

20        Q.   So the grades and steps had more objective

21   criteria?

22        A.   I don't recall.

23        Q.   Okay.  Generally are the grades and steps --

24   do they include years of experience to qualify for

25   certain ones?

1    A.    In my world, yes, it does, and the experience

2  is also separated out between general experience and

3  then specialized experience, and that is described like

4  what would be specialized experience.

5    Q.    Did you research how -- sorry.  Give me just a

6  moment.  I don't want to ask a confusing question.

7    A.    Take your time.

8    Q.    I know you said that the AD plan, the ranges

9  for the Federal Defenders themselves was confusing to

10  you, but talking about the graded and stepped plan, did

11  you research the qualification -- who would have been

12  eligible -- did you research if Caryn was eligible for a

13  G15?

14    A.    I do not recall what I researched because I

15  know that they're compared to an Assistant U.S.

16  Attorney, kind of like the U.S. Attorney staff is what

17  they're compared to.

18    Q.    So you never looked into the truth of JP's

19  assertion that it would take her five years to get

20  there?

21    A.    I would not say that's an accurate statement.

22  I don't remember.  I had conversations with Bill and I

23  looked at their defender services organization handbook.

24  That's what I remember looking at and talking with Bill.

25    Q.    Was it important to you to know if this was an

1   accurate statement?

2       A.   Well, yeah, especially when he says it would

3   take you five years to get there.

4       Q.   And why would it be important?

5       A.   Because in my experience it takes about a

6   year, not on the JS schedule, but in the court personnel

7   system you have to be at the grade for a year before you

8   can go to the next grade.

9       Q.   Uh-huh.  On the graded schedule, within those

10  yearly reviews are there automatic steps up?

11      A.   Yes, there are.

12      Q.   And is there automatic movement down from one

13  grade to the next level grade?

14      A.   No.  That would be an actual HR action that

15  had to be taken, otherwise known as a promotion.

16      Q.   Okay.  But those promotions are generally

17  guided by years of experience?

18      A.   Years of experience is the qualifier; however,

19  in our organization we also look at performance of the

20  position that they're in now.  I mean, if they can't do

21  their job now, they can't do their job in a more -- with

22  more responsibility.

23      Q.   And when you say in our organization, which

24  organization?

25      A.   I'm sorry.  District Court or probation.

1    A.    Uh-huh.

2    Q.    -- do you see what appears to be the

3    attachment?

4    A.    Yes.

5    Q.    And on page 592 at the bottom, this is

6    Plaintiff's 592, do you see a witness list?

7    A.    Yes.

8    Q.    And did you reach out to any of those people?

9    A.    No, I did not.

10   Q.    Why didn't you reach out to them?

11   A.    I was only focused on the people that were

12   involved directly in the situation.

13   Q.    Did you interview anyone else who could

14   substantiate these claims?

15   A.    I did not.

16   Q.    Did Caryn tell you that these people had

17   information that was relevant to her claims?

18   A.    I do not remember.

19   Q.    Do you think she gave you witnesses who didn't

20   have information?

21        MS. McMAHON:  Objection, misleading.

22   A.    I am not sure.

23        BY MS. WARREN:

24   Q.    Why do you think she gave you this witness

25   list?

1    A.    Because she wanted to provide a witness list.

2    Q.    So she just wanted to give you these names?

3    A.    Yeah.  Maybe she thought they were relevant to

4    the investigation, but she didn't say.  I don't recall

5    her saying so.

6    Q.    You don't recall that she told you you should

7    talk to these people?

8    A.    I do not remember.

9    Q.    Did you think you should talk to these people?

10   A.    I didn't even remember getting this email.

11   Q.    Okay.  But you agree that it appears you

12   received it?

13   A.    Yes.  Correct email address.

14   Q.    There's no reason that you wouldn't have

15   gotten it?

16   A.    No.

17         MS. WARREN:  We'll mark this as 32.

18         (Exhibit 32 was marked for identification.)

19         BY MS. WARREN:

20   Q.    Did you ever see this email -- or this

21   exchange of text messages?

22   A.    I do not recall.  And if I did receive it, it

23   was in my file.

24   Q.    Okay.  And this says, "She may just need to

25   get smacked a bunch, tho."  Is that right?

```
 1        A.   Yes.   That is correct.

 2        Q.   If JP had said that about Caryn, would you be

 3   concerned?

 4             MS. McMAHON:   Objection, calls for

 5   speculation.   The witness can testify on her personal

 6   knowledge.

 7             BY MS. WARREN:

 8        Q.   Would you be concerned?

 9        A.   I was not involved in that conversation.

10        Q.   Would you be concerned if you saw an employee

11   say that another employee "may just need to get smacked

12   a bunch, tho"?

13             MS. McMAHON:   Objection, calls for

14   speculation.

15        A.   I'm not sure.

16             BY MS. WARREN:

17        Q.   You're not sure if you would be concerned?

18        A.   It depends on the situation.

19        Q.   Given your decades in HR, if someone said that

20   their fellow employee may need to get smacked a bunch,

21   you wouldn't be concerned?

22        A.   In today's environment, I would probably have

23   a conversation with them if I were made aware of it, but

24   that's not the right language to be using when talking

25   about an employee.
```

1      Q.   Did you ask JP if he had ever made statements

2 about Caryn to other employees that might be

3 inappropriate?

4      A.   I do not recall.

5      Q.   Let's look at your report. Let's go ahead and

6 start on page 1244. In Section III you say there that,

7 "Employee alleges sexual harassment based on the

8 following," and I see that there are four claims listed

9 between pages 1 and 2 of your report.

10      A.   Uh-huh.

11      Q.   How did you determine those four claims?

12      A.   That's what I summarized from my conversation

13 with Caryn.

14      Q.   And did you feel that that was an appropriate

15 summary of your conversation?

16      A.   Yes.

17      Q.   And based on the written grievance and request

18 that she submitted on September 10th and the other

19 documents that she submitted to you, did you feel that

20 this fairly captured all of her claims?

21      A.   It did not speak to the retaliation claim.

22      Q.   Did you feel that this captured all of the

23 instances of sexual harassment?

24      A.   Yes, I did.

25      Q.   You did not feel that there were other

 1    instances of sexual harassment not described in these

 2    four bullet points?

 3         A.   No, I didn't.

 4         Q.   So when she told you that JP tried to get her

 5    to have a drink with him late at night, you didn't

 6    consider that part of her concern about sexual

 7    harassment?

 8         A.   No.

 9         Q.   When she said that he seemed to be watching

10    her, you didn't consider that part of her sexual

11    harassment claim?

12         A.   No.

13         Q.   How did you understand sexual harassment?

14         A.   Unwanted sexual advances, repeated asking for

15    dates or sexual favors, but just watching someone did

16    not register with me that that's sexual harassment.

17         Q.   Did she describe other things that she was

18    concerned about in terms of inappropriate personal

19    relationships?

20         A.   Of other people together?

21         Q.   Did she describe JP crossing personal

22    boundaries in other ways?

23         A.   Yes.  In the way that he spoke with her when

24    he was angry.

25         Q.   And what about some of his investment in her

1      A.   Well, it depends on the date when all that

2  happened, and if it was, you know, the same day as the

3  email, those two would go together I would imagine.

4      Q.   In what way?

5      A.   If she perceived that email to be the quid pro

6  quo and then she -- and then he's waiting for her

7  downstairs to make sure she doesn't need a ride because

8  it's storming, the perception could have been that he

9  was making an advance even though perhaps his perception

10  was it's kind of dangerous to ride home in a storm, and

11  he had given her rides home in the past.

12      Q.   People can have different perceptions of

13  events?

14      A.   Absolutely, yes.

15      Q.   And that's what you were investigating?

16      A.   Yes.

17      Q.   Whose perception matters for sexual

18  harassment?

19          MS. McMAHON:  Objection, vague.

20      A.   I'm not sure.  That's not up to me to judge.

21          BY MS. WARREN:

22      Q.   Did you ever get any training about that?

23      A.   Never talked about whose -- about perception.

24      Q.   Okay.  Did you ever get any training about

25  some behavior that -- there's some behavior that, would

1    you agree, can objectively be considered sexual

2    harassment, like asking someone to sleep with you?

3         A.    Yes.

4         Q.    There's other behavior that, as you've been

5    saying, I think, it depends on the context?

6         A.    And the situation, yes.

7         Q.    So it may not be as clear on its face?

8         A.    Right.

9         Q.    And in that kind of context, when it's not

10   clear on the face, have you ever been trained how you

11   assess whether that behavior is or is not sexual

12   harassment?

13        A.    Not that I recall.

14        Q.    I'm sorry.  I couldn't hear.

15        A.    Not that I recall.

16             MS. WARREN:  Thank you.

17             MS. McMAHON:  Liv, we've been going for over

18   an hour and a half at this point.  Do we want to break

19   for food?

20             MS. WARREN:  That's totally fine.  Sure.  It's

21   12:40.  We'll go off the record and come back.

22             (Luncheon recess from 12:38 p.m. to 1:45 p.m.)

23             BY MS. WARREN:

24        Q.    We're back on the record.  Good afternoon.

25        A.    Good afternoon.

```
1              CERTIFICATE OF NOTARY PUBLIC & REPORTER

2

3    STATE OF NORTH CAROLINA        )

4    COUNTY OF UNION                )

5

6           I, Dayna H. Lowe, the officer before whom the

7    foregoing deposition was taken, do hereby certify that the

8    HEATHER BEAM was duly sworn by me; that the testimony of

9    said witness was taken in stenotype and thereafter reduced

10   to typewriting by me or under my direction; that said

11   deposition is a true record of the testimony given by said

12   witness; that I am neither counsel for, related to, nor

13   employed by any of the parties to the action in which this

14   deposition was taken; and, further, that I am not a

15   relative or employee of any attorney or counsel employed

16   by the parties thereto, nor financially or otherwise

17   interested in the outcome of the action.

18           This the 20th day of April, 2023.

19

20                              _____

21                              DAYNA H. LOWE

22                              Notary Public #19971830009

23

24

25
```