# EXHIBIT K

```
 1              IN THE UNITED STATES DISTRICT COURT

 2         FOR THE WESTERN DISTRICT OF NORTH CAROLINA

 3                    ASHEVILLE DIVISION

 4    _____

 5    CARYN DEVINS STRICKLAND,   )

 6              Plaintiff,       )

 7                               )

 8    -vs-                       )  Case No. 1:20-cv-00066

 9                               )

10    UNITED STATES, et al.,     )

11              Defendants.      )

12    _____

13

14                 *** CONFIDENTIAL ***

15            SUBJECT TO PROTECTIVE ORDER

16                   ECF NO. 183

17

18         DEPOSITION OF JAMES N. ISHIDA

19           9:05 a.m. to 5:47 p.m.

20              April 13, 2023

21             Richmond, Virginia

22

23

24    Job No. 49661

25         REPORTED BY:  Julia A. Bammel, RPR, CSR
```

www.cavalier-reporting.com
(434) 293-3300

*Cavalier Reporting & Videography*
*Reported by Julia A Bammel*

info@cavalier-reporting.com
(800) 972-1993

1         Deposition of JAMES N. ISHIDA, taken and

2  transcribed on behalf of the Plaintiff, by and before

3  Julia A. Bammel, RPR, CSR, Notary Public in and for the

4  Commonwealth of Virginia at large, pursuant to the

5  Federal Rules of Civil Procedure and by Notice to Take

6  Deposition, commencing at 9:05 a.m., April 13, 2023, at

7  140 Virginia Street, Richmond, Virginia.

8

9

10

11  APPEARANCES OF COUNSEL:

12

13      HARVARD LAW SCHOOL

14      1563 Massachusetts Avenue

15      Hauser Hall 510

16      Cambridge, Massachusetts  02138

17      (617) 496-5487

18      jsuk73@gmail.com

19  BY:  JEANNIE SUK GERSEN, ESQUIRE

20      JACOB GERSEN, ESQUIRE

21      Counsel on behalf of the Plaintiff

22

23

24

25

www.cavalier-reporting.com       Cavalier Reporting & Videography       info@cavalier-reporting.com
(434) 293-3300             Reported by Julia A Bammel           (800) 972-1993

```
 1   APPEARANCES OF COUNSEL CONTINUED:

 2

 3

 4        THOMAS, FERGUSON & BESKIND, LLP

 5        119 East Main Street

 6        Durham, North Carolina  27701

 7        (919) 682-5648

 8        warren@tfblawyers.com

 9   BY:  OLIVIA WARREN, ESQUIRE

10        Counsel on behalf of the Plaintiff

11

12

13

14        LAW OFFICE OF COOPER STRICKLAND

15        P.O. Box 92

16        Lynn, North Carolina 28750

17        (828) 817-3703

18        cooper.strickland@gmail.com

19        COOPER J. STRICKLAND, ESQUIRE

20        (Appearing Via Remote Videoconference)

21        Counsel on behalf of the Plaintiff

22

23

24

25
```

www.cavalier-reporting.com
(434) 293-3300
Cavalier Reporting & Videography
Reported by Julia A Bammel
info@cavalier-reporting.com
(800) 972-1993

```
 1   APPEARANCES OF COUNSEL CONTINUED:

 2

 3        UNITED STATES DEPARTMENT OF JUSTICE

 4        Civil Division

 5        1100 L Street NW

 6        Washington, District of Columbia  20005

 7        (202) 305-7664

 8        joshua.kolsky@usdoj.gov

 9        rachael.westmoreland@usdoj.gov

10        madeline.m.mcmahon@usdoj.gov

11   BY: JOSHUA M. KOLSKY, ESQUIRE

12        RACHAEL LYNN WESTMORELAND, ESQUIRE

13        MADELINE MCMAHON, ESQUIRE

14        Counsel on behalf of the Defendants

15

16        ADMINISTRATIVE OFFICE OF THE U.S. COURTS

17        Office of General Counsel

18        1 Columbus Circle NE

19        Washington, District of Columbia 20002

20        (202) 502-1761

21        kristin-mannherz@ao.uscourts.gov

22   BY: KRISTIN P. MANNHERZ, ESQUIRE

23        Counsel on Behalf of the Federal Judiciary

24

25   ALSO PRESENT:  Caryn Strickland (via videoconference)
```

Case 1:20-cv-00066-WGY  Document 248-12  Filed 06/07/23  Page 5 of 28

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

1            T A B L E   O F   C O N T E N T S

2

3    WITNESS:  JAMES N. ISHIDA

4      Examination by Ms. Suk Gersen................. 7

5      Examination by Mr. Kolsky.....................233

6

7

8

9

10                   E X H I B I T S

11

12   Plaintiff's Exhibit 1
       Notice of Deposition........................... 7
13
     Plaintiff's Exhibit 2
14     E-mail thread
       US00000615 – US00000618........................ 66
15
     Plaintiff's Exhibit 3
16     E-mail thread
       US00002558 – US00002561........................ 94
17
     Plaintiff's Exhibit 4
18     E-mail thread
       US00005359 – US00005360.......................102
19
     Plaintiff's Exhibit 5
20     E-mail thread
       US00000614....................................103
21
     Plaintiff's Exhibit 6
22     E-mail thread
       US00001390 – US00001391.......................128
23
     Plaintiff's Exhibit 7
24     E-mail thread
       US00001382 – US00001383.......................138

25

www.cavalier-reporting.com              Cavalier Reporting & Videography              info@cavalier-reporting.com
(434) 293-3300                          Reported by Julia A Bammel                              (800) 972-1993

```
 1              Who is Cait Clarke?

 2       A     Oh, is Cait Clarke part of this e-mail?

 3  Maybe I'm looking at the wrong e-mail.

 4       Q     Later on in the page.  Sorry.  Sorry.  Let's

 5  move to -- we're going to get to that one later.

 6              (Plaintiff's Exhibit 5 marked.)

 7              THE WITNESS:  Okay so I'm looking at

 8  Exhibit 5?

 9  BY MS. SUK GERSEN:

10       Q     Yes.

11       A     Okay.  I'm sorry.  Can --

12       Q     US-614.  So can you walk us through what

13  this e-mail -- what is happening in this e-mail?

14       A     Okay.  You know, I don't recall this, and

15  even looking at it, it just doesn't ring a bell.  But

16  in just kind of reconstructing what I'm reading, it

17  looks like Cait Clarke, who was the chief of the

18  Defender's Services Office at the Administrative Office

19  is telling Nancy Dunham, you know, what you see in the

20  e-mail, and I'm commenting on that.

21              And I will confess, I was -- I think I was a

22  little irritated by the fact that there were all these

23  AO employees weighing in and calling Tony and telling

24  him what he needed to do and what he needed to not do,

25  and I just -- I just felt that that -- I don't think
```

Case 1:20-cv-00066-WGY   Document 248-12   Filed 06/07/23   Page 7 of 28

www.cavalier-reporting.com
(434) 293-3300
Cavalier Reporting & Videography
Reported by Julia A Bammel
info@cavalier-reporting.com
(800) 972-1993

1  they knew there was an ongoing proceeding, so I think

2  they felt, you know, free to do that, but I was a

3  little -- I think I was -- I think it's fair to say I

4  was a little irritated at what was going on and how it

5  could impact the proceedings that we were handling at

6  the time.

7       Q    So you say in this e-mail, "I wonder if

8  she's going to walk back her statement and say she only

9  insisted Caryn telework while this is being worked

10 out."

11           Who is "she"?

12      A    I think I was referring to Cait Clarke, and

13 if I recall correctly, I think Cait had essentially

14 ordered Tony to do certain things involving the

15 plaintiff, and, you know, I'm just thinking telework

16 might have been one of those.

17      Q    What -- why did you say, "I wonder if she's

18 going to walk back her statement"?

19      A    Well, instead of coming across as, "I'm

20 ordering you to do that," she might say, "Well, I was

21 just advising Tony to do that."

22           But the way I understood it from

23 Mr. Martinez was he was getting directives from the AO

24 saying, "You have to do this" and "You have to do

25 that."

Case 1:20-cv-00066-WGY   Document 248-12   Filed 06/07/23   Page 8 of 28

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

1       Q      And at the time, you believed that

2   Mr. Martinez was accurately describing what happened?

3       A      Again, this was based on what he had told

4   me, and I don't know if this was before or after the

5   conversation I had with Lee Ann Bennett that really

6   clarified things for me.

7       Q      So how did Lee Ann Bennett -- how did

8   talking to her clarify things?

9       A      Well, again, she made those two takeaway

10  points that, "Oh, I didn't know that these

11  conversations were going on, and I didn't know that the

12  Fourth Circuit had ongoing matters involving this

13  case."

14      Q      Did you -- were you worried that the AO

15  employees were interfering with the EDR investigation?

16      A      In the sense that they were ordering Tony to

17  do certain things, which I thought was not appropriate

18  given that we've already got proceedings that were

19  designed to address the concerns that Plaintiff was

20  raising.

21      Q      What were the proceedings that were already

22  ongoing?

23      A      Well, we had the Chapter IX proceeding that

24  the investigation was going, and so we -- I mean, my

25  recollection was the AO was asking Tony to do certain

Case 1:20-cv-00066-WGY   Document 248-12   Filed 06/07/23   Page 9 of 28

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

1    things before even the outcome or what was known -- you

2    know, the outcome of the investigation of what had

3    actually happened.  They were just ordering him to take

4    preemptive action and really, you know, that -- I felt

5    that was inappropriate.

6        Q    And when you say that the proceeding was

7    already ongoing, do you mean that by then you had

8    already appointed Heather Beam?

9        A    Well, again, I can't remember at what point

10   that happened, but I'm looking at the date, and this is

11   August 15th.  I mean, by this time, we were -- we

12   were all -- you know, I had already heard about the

13   plaintiff's concerns and complaints, and so -- and

14   that -- and, again, I can't remember at what point I

15   got that, but that would have kicked off Chapter IX,

16   the report of wrongful conduct, which I think that had

17   already started when this was -- you know, when this

18   was -- the AO's involvement was coming to light.

19       Q    So was your worry that if the AO were

20   involved, that would be prejudging the outcome before

21   the investigation was complete?

22       A    I think that's fair to say.

23       Q    Once Tony informed you of the concern about

24   the AO and after you had informed the Chief Judge, why

25   were you continuing to communicate with Tony about

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

1　happened after this exchange.  Certainly I could see

2　raising that as part of his deliberations.

3　　　　Q　　So you said before that Chief Judge Gregory

4　denied the request for qualification.

5　　　　A　　That's correct.

6　　　　Q　　So given that Tony was not disqualified,

7　what role was he tasked with performing after the

8　investigative report?

9　　　　A　　Well, if I remember correctly, this was --

10　it was either at the close or close to the end of the

11　counseling period or at the beginning of the mediation

12　period, and so Tony's role would have been -- as the

13　unit executive of the office, he would have been in the

14　position to, you know, see what he could do to address

15　Plaintiff's concerns about, you know, promotion, the

16　work conditions, and so on and so forth.

17　　　　Q　　And he had that role because he was the unit

18　executive?

19　　　　A　　Who had the authority to do that, yes.

20　　　　Q　　Would you normally ask someone that the

21　investigator thought was biased to participate in those

22　roles?

23　　　　A　　Well, again, there -- you know, biased in

24　terms -- I mean, I'm struggling to answer that because

25　as the unit executive, he has to make decisions that he

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

```
 1   feels is in the best interest of not only the employee

 2   but the office and other colleagues, and so he may have

 3   to take -- he or she may have to take action that

 4   people disagree with, and, you know, he could be

 5   accused of being biased against the individual

 6   employee.

 7           MS. SUK GERSEN:  Would you please read out

 8   Mr. Ishida's previous answer.  Not this one but the one

 9   before.

10           (Requested record read by the stenographer.)

11           MS. SUK GERSEN:  Which exhibit is Tab 1?  Do

12   you remember?

13           MR. GERSEN:  What's the Bates number?

14           MS. SUK GERSEN:  Bates Number 615.

15           MR. KOLSKY:  That's Exhibit 2.

16   BY MS. SUK GERSEN:

17       Q    Do you have Exhibit 2 there, Mr. Ishida?

18       A    I think I do.  Yes, I do.

19       Q    At the top of the page in the first -- in

20   the paragraph that's an e-mail from you to

21   Mr. Martinez --

22       A    Okay.

23       Q    -- I'd like to point you to the sentence

24   starting with "You're doing."

25       A    Okay.
```

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

1      Q    "You're doing all you can to protect Caryn."

2          So what did you mean by that?  What did you

3  mean when you said, "You're doing all you can to

4  protect Caryn"?

5      A    Well, so I think -- I think part of

6  Mr. Martinez's concern was he had taken -- once he

7  received the concerns about sexual harassment the

8  plaintiff made against JP Davis, Mr. Martinez had

9  asked, "Okay" -- he did X, Y, and Z, and I think what

10  he asked me too was, "Can you think of anything else I

11  need to do?"

12          And my response is, "Well, I think, to me,

13  it appears like, you know, you've taken the appropriate

14  steps to protecting the plaintiff from JP Davis."

15      Q    What were the appropriate steps?

16      A    As I recall, it was physical separation.  He

17  had allowed Plaintiff to telework, and he had

18  removed -- or he said he had removed the plaintiff from

19  JP's chain of command.

20      Q    Why did you think that Ms. Strickland needed

21  protection?

22      A    Because she had told me on a number of

23  occasions she was afraid of Mr. Davis, and I think -- I

24  remember at least one time where she said, "I'm

25  physically afraid of him."

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

1      Q     Did you believe her?

2      A     I had no reason to doubt her, and she

3  seemed -- if I recall, she seemed very upset, so I took

4  her at her word.

5      Q     So taking her at her word, you felt that she

6  needed protection?

7            MR. KOLSKY:  Objection.  Misstates

8  testimony.

9  BY MS. SUK GERSEN:

10     Q     Did you believe she needed protection?

11     A     I believed that she had felt that she was

12  physically threatened by JP Davis.

13     Q     And you believed her?

14     A     Again, yes.  I had no reason to doubt her.

15     Q     Is there any special provision in the EDR

16  plan that applies if a unit executive is the person who

17  is alleged to be a violator of the EDR plan?

18     A     Say that again.  I'm sorry.

19     Q     Is there any provision in the EDR plan that

20  would apply in the circumstance where a unit executive

21  is themselves alleged to have violated the EDR plan?

22     A     So the EDR plan would apply to unit

23  executives equally.

24     Q     So does that mean that the unit executive

25  would be the person in charge of responding to an

Case 1:20-cv-00066-WGY  Document 248-12  Filed 06/07/23  Page 14 of 28

www.cavalier-reporting.com                Cavalier Reporting & Videography              info@cavalier-reporting.com
(434) 293-3300                             Reported by Julia A Bammel                    (800) 972-1993

```
 1        A     I wouldn't read it that way, because the
 2   examples in the report that I recall reading that the
 3   investigator was concerned about was -- were statements
 4   that the Defender had said that may have been
 5   inappropriate and assurances of things he would do that
 6   he apparently had not done.
 7             So to say that you can construe this to also
 8   include that, well, the investigator concluded that
 9   Mr. Martinez did not do everything in his power to
10   protect, I don't think I would read it that way at all.
11             MS. SUK GERSEN:  Okay.  Let's take a break.
12             THE WITNESS:  Okay.
13             MS. SUK GERSEN:  Thank you.
14             THE WITNESS:  Sure.
15             MS. SUK GERSEN:  Thank you so much for your
16   endurance.
17             (Break in proceedings.)
18   BY MS. SUK GERSEN:
19        Q     So switching topics a bit, can you tell me
20   about your communications with JP Davis during the EDR
21   investigation process?
22        A     Sure.  So I think -- I think I'd gotten a
23   couple of, I would say, outreaches from JP, Mr. Davis.
24   The first time he had contacted me, I was a little
25   concerned that he did that, so I had asked him, you
```

www.cavalier-reporting.com
(434) 293-3300
Cavalier Reporting & Videography
Reported by Julia A Bammel
info@cavalier-reporting.com
(800) 972-1993

1    know, "Please don't contact me."  I raised it with

2    Mr. Martinez and -- because I was just concerned about

3    that.

4             Now, I understand what Mr. Davis wanted to

5    know was he just wanted an idea of the process, but I

6    just told him that it was not something I was

7    comfortable with him doing, and I'd asked him not to do

8    that again.

9       Q    Why were you concerned?

10      A    About Mr. Davis reaching out to me?

11      Q    (Nodding head.)

12      A    Well, I didn't want anybody to have the

13   perception that Mr. Davis was trying to influence the

14   process or the investigation.  I can't remember at what

15   stage the investigation was proceeding at, but I was

16   concerned about how others would perceive his outreach.

17      Q    What about his outreach to you made you

18   concerned about the perception of potentially

19   interfering with the investigation?

20      A    Well, I think -- I think, again, it's --

21   you've got an ongoing investigation.  Somebody who

22   could be at the heart of that investigation reaches out

23   to me to have discussions.  And I think, you know, a

24   reasonable person might conclude that there was an

25   attempt to influence or guide the investigation in some

Case 1:20-cv-00066-WGY  Document 248-12  Filed 06/07/23  Page 16 of 28

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

```
 1    way, and that's why I was concerned about Mr. Davis's

 2    outreach.  So I mentioned it to him, but I also raised

 3    that with Mr. Martinez as well.

 4         Q    Was there anything in his outreach in terms

 5    of the content that made you concerned?

 6         A    Well, he just -- he wanted to know just

 7    really, where -- what the process was.  Because the way

 8    I remember the conversation, I mean, he was -- it was

 9    very anxiety-provoking for him.  I think he might have

10    mentioned it's been a living hell.

11              And so, you know, it's almost like the sword

12    of Damocles was hanging over him, and he just kind of

13    wanted an idea of where we are in the process because

14    it was just a lot of uncertainty that he was dealing

15    with.

16         Q    In the e-mails, in the reach-outs to you,

17    did he describe himself as a victim of Caryn

18    Strickland's malicious conduct?

19         A    I can't remember specifically what he said.

20              MS. SUK GERSEN:  This exhibit is being

21    marked as 9.

22              (Plaintiff's Exhibit 9 marked.)

23    BY MS. SUK GERSEN:

24         Q    So can we turn to US-3023 in Exhibit 9.

25         A    Okay.
```

Case 1:20-cv-00066-WGY   Document 248-12   Filed 06/07/23   Page 17 of 28

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

```
 1        Q      And the e-mail is on December 3rd, 2018, and
 2   it is addressed to you from JP Davis.
 3        A      Uh-huh.  Okay.
 4        Q      Is this one of the e-mails that made you
 5   concerned about Mr. Davis reaching out to you?
 6        A      Well, again, I think when Mr. Davis reached
 7   out to me, I wasn't sure why he was doing it, and then
 8   because of, you know, what I just said about the
 9   perception.  But he clarifies it by saying, again, all
10   he wants to know is where are we procedurally.
11              And so I felt comfortable telling him where
12   we were procedurally, but I didn't want to get into any
13   more detail than that because, again, his concern is,
14   you know, he's, you know, in this living hell and wants
15   some -- some clarification as to where we're at.
16        Q      Is this the first e-mail where JP Davis
17   reached out to you about the investigation, or was
18   there another chain that we're not aware of?
19        A      Yeah.  I don't -- I don't know, but if you
20   look at page 3020 where Mr. Davis is responding back to
21   me, if you look at the second paragraph where he says,
22   "First, it was never my intent to unduly intrude on
23   your schedule," what makes me think there was something
24   before that is I recall vaguely, when I had mentioned
25   to Mr. Martinez my concern about JP reaching out, I
```

www.cavalier-reporting.com                Cavalier Reporting & Videography                info@cavalier-reporting.com
(434) 293-3300                              Reported by Julia A Bammel                              (800) 972-1993

```
 1   think -- I think there was -- I can't remember how this

 2   came up, but I think Mr. Martinez was concerned,

 3   certainly about the appropriateness of reaching out.

 4          But I think he was also concerned about

 5   Mr. Davis taking up my time.  So in reading this

 6   response, it makes me think that this happened later,

 7   after another -- this -- I guess all I can say is it

 8   looks like from the way this e-mail string is going, is

 9   this wasn't the first exchange.

10      Q    This is in December of 2018 --

11      A    Uh-huh.

12      Q    -- while both Chapter IX and Chapter X are

13   already ongoing?

14      A    Yes.

15      Q    When did you mention your concerns about

16   JP Davis reaching out to Mr. Martinez?

17      A    I don't remember the specific date, but it

18   was soon after I had gotten that first inquiry from

19   Mr. Davis.

20      Q    So are you aware that Tony counseled JP on

21   December 4th, 2018, based on JP's interactions with

22   you?

23      A    I'm not aware of that.

24      Q    Do you believe it was proper for JP to

25   contact you about what he said were Caryn's false
```

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

```
 1   claims?

 2        A     I don't -- I don't remember what Mr. Davis

 3   had expressed to me about the plaintiff's claims.

 4        Q     If you look on the bottom of 3023, that --

 5        A     Okay.

 6        Q     The first e-mail of the chain that we have

 7   in front of us, on December 3rd, 2018, "It's been four

 8   months since Caryn made her false harassment claims,

 9   and with the facts now reported, I believe everyone now

10   recognizes that no harassment or physical threats ever

11   occurred."

12              Do you know -- oh, go ahead.

13        A     No.  No.  No.  I'm just -- I was waiting for

14   your question.

15        Q     Do you know why he's saying the facts are

16   now reported?

17        A     I'm not sure what he meant by that.

18        Q     Do you know why he says there is a finding

19   in the investigation?

20        A     I'm sorry.  Where is that?

21        Q     "With the facts now reported."

22        A     Okay.  Yeah.  Again, I don't know what he

23   means by that.

24        Q     Can you turn to US-3020, please.

25        A     Okay.
```

www.cavalier-reporting.com
(434) 293-3300
Cavalier Reporting & Videography
Reported by Julia A Bammel
info@cavalier-reporting.com
(800) 972-1993

```
1          Q     This is the first page of the exhibit.

2          A     Okay.

3          Q     At the bottom of the page, JP Davis writes

4    to you on December 4th, 2018, "Heather has produced a

5    written recitation of facts sufficient, to my

6    understanding, for a decision-maker to immediately

7    conclude there was no sexual harassment."

8                Did you understand what he was referring to?

9          A     No.

10         Q     Did it make you think that he might have

11   been told about Heather Beam's recitation of findings

12   or facts?

13         A     Yeah.  I don't know, so it's hard to answer,

14   but -- and, again, this is just -- you asked me the

15   question of, you know, what I think this means.  It

16   could very well be that the investigator had drafted

17   facts as she understood them and wanted to get

18   confirmation, but I don't know that that's -- that's

19   pure speculation.

20         Q     Well, if it -- if it is -- if it were true

21   that Heather Beam had drafted her written recitation of

22   facts, how would JP Davis know that that's the case?

23         A     Well, again, I don't --

24               MR. KOLSKY:  Objection.  Calls for

25   speculation.
```

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

```
 1              You can answer.

 2              THE WITNESS:  Again, I don't know.

 3  BY MS. SUK GERSEN:

 4      Q     When did you mention your concerns about

 5  JP Davis to Mr. Martinez?

 6      A     I'm sorry.  Say that again.

 7      Q     When did you mention your concerns about

 8  JP Davis's e-mails to you to Mr. Martinez?

 9      A     Well, again, as soon as Mr. Davis had

10  reached out to me that first time, I raised it with

11  Mr. Martinez.

12      Q     What did you say to Mr. Martinez about that?

13      A     So the best of my recollection, as I was --

14  I reached out to Mr. Martinez, told him what happened.

15  I expressed concerns about this, and I thought that

16  this was inappropriate for Mr. Davis to do.  Again --

17  and I think I remember saying something about the

18  concerns about how this would be perceived.

19      Q     So did you ever disclose the findings of the

20  draft report that Heather produced to anyone?

21      A     No.  I, you know, did not receive any drafts

22  or anything preliminary.

23              So my view on this was Heather was appointed

24  to investigate Plaintiff's allegations, and so at that

25  point, you know, it was -- I wanted, really, nothing to
```

Case 1:20-cv-00066-WGY   Document 248-12   Filed 06/07/23   Page 22 of 28

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

1    do with the investigation.  I let Heather dictate how

2    that would go.  So she didn't give me any draft.  She

3    didn't, you know, show me anything.

4         Q    We have in the record that you received an

5    earlier report from Heather Beam --

6         A    Uh-huh.

7         Q    -- earlier than the one that we reviewed

8    here --

9         A    Uh-huh.

10        Q    -- on November 19th.

11        A    Uh-huh.

12        Q    Was that a draft of Heather Beam's

13   investigative report?

14        A    I think she had submitted to me with the

15   intent that this was her final report.

16        Q    Can you clarify?

17        A    So she had given me a copy of the

18   investigation report that she had completed, and so I

19   looked at it, and it had a recitation of the events --

20   a chronology of the events that happened along with a

21   sizeable set of attachments, and -- but the one thing

22   that I didn't see in there was her impressions.

23             And we had -- we had a conversation, I

24   think -- I can't remember when, but Heather mentioned

25   that in the process of conducting her investigation,

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

1 she had formed, you know, some views, some opinions,

2 she had some suggestions, but they weren't included in

3 the report.

4         So I said, "Well, I think it would be

5 helpful to have all of your impressions in the report

6 because you obviously had interviewed people

7 face-to-face, and so you would have information that we

8 would not have." So I -- in essence, what I did was I

9 asked her to include those impressions and her thoughts

10 in the report. So she went back and then revised the

11 report to include those observations and her

12 recommendations as well.

13     Q    What do you mean by impressions and

14 observations?

15     A    Well, so -- and I'm trying to remember --

16 the conversation I had with Heather was -- I don't know

17 if she used those words, but the sense I -- what I was

18 hearing her to say was she had other thoughts about the

19 case that were not included in the report, and so I had

20 asked her, you know, to create a full, complete, and

21 accurate account of what she found during the course of

22 her investigation. I had asked her to include those in

23 the report.

24     Q    So when you received these e-mails from

25 JP Davis that we just reviewed, including the one

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

1    talking about the reports, factual findings, did you

2    take him at the time to mean that he was told about the

3    investigation's findings before Ms. Beam's report was

4    final?

5         A    No, I didn't.  I didn't read it that way.

6         Q    You didn't read it that way meaning?

7         A    That -- I mean -- well, again, I don't know

8    what Heather did, so I can't speak conclusively to

9    that, but you had asked me what a passage means

10   about -- where was it? -- "with the facts now

11   reported."  So, again, I don't know what Heather did.

12   I don't know if she showed Mr. Davis a copy of the

13   report or what happened, but I don't know what JP means

14   by "the facts are now reported."

15        Q    But you didn't take those words to mean,

16   when you read the e-mail, that he had been told about

17   the November report findings?

18        A    Well, I guess because I didn't know what he

19   was talking about, I hadn't even considered that as a

20   possibility.

21        Q    When were the findings disclosed to anyone

22   other than yourself and Heather Beam?

23        A    Well, I think -- I think Chief Judge Gregory

24   had a copy of it as soon as I received it because I

25   responded back to Heather thanking her for the job she

www.cavalier-reporting.com
(434) 293-3300
Cavalier Reporting & Videography
Reported by Julia A Bammel
info@cavalier-reporting.com
(800) 972-1993

1    A    Yes.

2    Q    -- regarding JP Davis or Tony Martinez.

3    A    I'm aware of two or three -- I think what I

4  said was I'm aware of two or three involving the office

5  of Mr. Martinez.  I don't think I said that there were

6  any involving Mr. Davis.

7    Q    Were you, at any point during

8  Ms. Strickland's complaint and proceeding, concerned

9  about a pattern of complaints against JP Davis or

10  Mr. Martinez?

11    A    Well, I think -- I think I was concerned

12  about that.  There were multiple coming within a

13  relatively short period of time, so I remember being

14  somewhat concerned about that.

15    Q    What were your concerns?

16    A    Well, mainly, you know, if -- you know, why

17  are there multiple complaints coming in such a short

18  period of time?  I mean, what does this mean?

19    Q    Did you do anything about that concern?

20    A    Well, we wanted to, you know, certainly look

21  at why these -- you know, why these individuals were

22  bringing these, you know, complaints, and we

23  certainly -- we didn't want to prejudge anyone or, you

24  know, the office, but we wanted to make sure that we

25  looked at, you know, each of the complaints as they

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

Info@cavalier-reporting.com
(800) 972-1993

```
 1   were brought to us.
 2        Q     Did you speak with Chief Judge Gregory about
 3   the concern you just mentioned?
 4        A     Well, again, in my role as the EDR
 5   Coordinator, whenever I get, you know, like, say, a
 6   Chapter IX or Chapter X, I would always let him know
 7   that this is a -- "Chief, by the way, this is what" --
 8   "I received this complaint or this request" -- "this
 9   report of wrongful conduct."  So I would let him know
10   every time I received one what would happen.
11        Q     So you testified just now that you were
12   concerned about a potential pattern with respect to
13   Chief Judge -- sorry -- let me start again.
14             You testified that you were concerned about
15   a potential pattern regarding JP Davis or Mr. Martinez.
16        A     No.  I don't think that's accurate to say
17   what I meant.  What I said was, I was concerned that
18   there were a number of these complaints filed in such a
19   short period of time.  I don't -- I never mentioned
20   pattern.
21        Q     So given the short [sic] number of
22   complaints filed in a short period of time and your
23   concern about it, did it worry you that Mr. Martinez
24   would remain in charge of any complaints brought
25   against him?
```

www.cavalier-reporting.com
(434) 293-3300
Cavalier Reporting & Videography
Reported by Julia A Bammel
info@cavalier-reporting.com
(800) 972-1993

1    COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

2              I, Julia A. Bammel, RPR, CSR, Notary Public

3    in and for the Commonwealth of Virginia at large, and

4    whose commission expires May 31, 2024, do certify that

5    the aforementioned appeared before me, was sworn by me,

6    and was thereupon examined by counsel, and that the

7    foregoing is a true, correct, and full transcript of

8    the testimony adduced.

9              I further certify that I am neither related

10   to nor associated with any counsel or party to this

11   proceeding nor otherwise interested in the event

12   thereof.

13             I further certify that the deponent's right

14   to review the transcript was reserved.

15             Given under my hand and notarial seal at

16   Charlottesville, Virginia, this 24th day of April,

17   2023.

18

19        *Julia A. Bammel*
         _____

20             Julia A. Bammel, RPR, CSR

21        Notary Public Registration No. 7205414

22        Commonwealth of Virginia at Large

23

24   Job No. 49661

25

Case 1:20-cv-00066-WGY   Document 248-12   Filed 06/07/23   Page 28 of 28

www.cavalier-reporting.com                Cavalier Reporting & Videography                Info@cavalier-reporting.com
(434) 293-3300                              Reported by Julia A Bammel                      (800) 972-1993