## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CASE NUMBER 1:20CV66

CARYN DEVINS STRICKLAND,                )
                                        )
      Plaintiff,                       )
                                        )
v.                                      )
                                        )
UNITED STATES OF AMERICA, et al.,       )
                                        )
      Defendants.                      )


## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

ARGUMENT .............................................................................................................................2

    I.    Defendants Did Not Violate Plaintiff's Procedural Due Process Rights. ...................................2

        A.   Plaintiff did not reasonably believe that the Defender would be the final decisionmaker.....3

        B.   Defendants were justified in denying Plaintiff's request to disqualify the Defender. .............6

        C.   Plaintiff was not coerced to end the investigation or to resign. .................................................10

    II.   Defendants Did Not Violate Plaintiff's Equal Protection Rights...........................................11

        A.   Plaintiff was not subjected to sexual harassment. .....................................................................11

        B.   Plaintiff did not report the alleged sexual harassment until August 2018..............................14

            1.     Plaintiff did not alert the Defender about her allegations of sexual harassment until August 10, 2018. ....................................................................................................14

            2.     Reporting alleged harassment to the FEPO was insufficient to provide actual notice to Defendants with control over the EDR process...........................................16

        C.   Defendants were not deliberately indifferent to Plaintiff's allegations...................................16

        D.   Defendants had no intent to discriminate....................................................................................22

    III.  Plaintiff Has Failed to Establish that As a Matter of Law She Is Owed Front Pay.............22

CONCLUSION.........................................................................................................................25

i

# TABLE OF AUTHORITIES

**Cases**

*Arneson v. Callahan,*
   128 F.3d 1243 (8th Cir. 1997) ................................................................................................25

*Basta v. Novant Health Inc.,*
   56 F.4th 307 (4th Cir. 2022) ..................................................................................................21

*Baynard v. Malone,*
   268 F.3d 228 (4th Cir. 2001) .................................................................................................17

*Beardsley v. Webb,*
   30 F.3d 524 (4th Cir. 1994) ...................................................................................................12

*Burlington Indus. v. Ellerth,*
   524 U.S. 742 (1998) ...............................................................................................................12

*Collins v. Yellen,*
   141 S. Ct. 1761 (2021) ...........................................................................................................25

*Cox v. Bankcard Am.,*
   1998 U.S. Dist. LEXIS 17970 (N.D. Ga. Aug. 28, 1998) .....................................................13

*Cramer v. Bojangles' Rests., Inc.,*
   Civil Action No. 2:10-CV-0159-RWS-SSC, 2012 WL 716176 (N.D. Ga. Feb. 8, 2012) .................14

*DeCecco v. Univ. of S.C.,*
   918 F. Supp. 2d 471 (D.S.C. 2013) .......................................................................................14

*Detweiler v. Va. Dep't of Rehabilitative Servs.,*
   705 F.2d 557 (4th Cir. 1983) .................................................................................................23

*Ellis v. Dir., CIA,*
   1999 WL 704692 (4th Cir. Sep. 10, 1999) .......................................................................12, 13

*Farmer v. Brennan,*
   511 U.S. 825 (1994) ...............................................................................................................21

*Feldman v. Phila. Hous. Auth.,*
   43 F.3d 823 (3d Cir. 1994) ....................................................................................................23

*Feminist Majority Foundation v. Hurley,*
   911 F.3d 674 (4th Cir. 2018) ............................................................................................14, 16

Case 1:20-cv-00066-WGY   Document 249   Filed 06/15/23   Page 3 of 31

*Fogg v. Gonzales,*
    492 F.3d 447 (D.C. Cir. 2007) ........................................................................24

*Goldberg v. B. Green & Co.,*
    836 F.2d 845 (4th Cir. 1988) ..........................................................................13

*Harris v. Home Sales Co.,*
    499 F. App'x 285 (4th Cir. 2012) .....................................................................5

*Hill v. Cundiff,*
    797 F.3d 948 (11th Cir. 2015) ...................................................................14, 20

*Johnson v. Becerra,*
    No. 19-CV-1859, 2022 WL 2528430 (D. Md. July 7, 2022)...........................15

*Miller v. Baltimore City Bd. of Sch. Comm'rs,*
    565 F. App'x 262 (4th Cir. 2014) .....................................................................5

*Mt. Healthy City Bd. of Educ. v. Doyle,*
    429 U.S. 274 (1977) .......................................................................................25

*Okoli v. City of Baltimore,*
    648 F.3d 216 (4th Cir. 2011) ..........................................................................11

*Pennsylvania State Police v. Suders,*
    542 U.S. 129 (2004) .......................................................................................23

*Silva v. Baptist Health S. Fla., Inc.,*
    838 Fed. App'x 376 (11th Cir. 2020) .............................................................21

*Spreen v. Brey,*
    961 F.2d 109 (7th Cir. 1992) ...........................................................................5

*Stone v. Univ. of Md. Med. Sys. Corp.,*
    855 F.2d 167 (4th Cir. 1988) ...........................................................................5

*Strickland v. United States,*
    32 F.4th 311 (4th Cir. 2022)...................................................................*passim*

*Virgin Atlantic Airways, Ltd. v. British Airways PLC,*
    69 F. Supp. 2d 571.........................................................................................17

*Wilson v. Gaston Cnty.,*
    685 F. App'x 193 (4th Cir. 2017) ...................................................................15

**Rules**

Fed. R. Civ. P. 56(c)(1).........................................................................................12

iii

**Other Authorities**

2017 Report of the Ad Hoc Committee to Review the Criminal Justice Act (Apr. 2018),
    https://cjastudy.fd.org/sites/default/files/public-resources/Ad%20Hoc%20Report%20
    June%202018.pdf................................................................................................................................4

# INTRODUCTION

The summary judgment record puts certain overarching facts beyond dispute. As a means to "transition up, not down," Plaintiff Caryn Strickland voluntarily resigned from her position as an Assistant Federal Public Defender to accept a prestigious Fourth Circuit clerkship as a suitable resolution during EDR mediation, thus ending the EDR process before Plaintiff ever filed a formal complaint and well before she participated in a formal hearing with a presiding judicial officer. Despite this mediated agreement, Plaintiff filed this suit, claiming she was subject to procedural due process and equal protection clause violations. The undisputed evidentiary record shows she was not.

Although her complaint asserts Plaintiff was misled about who the final decisionmaker would be, Plaintiff testified in her deposition that she knew the final decisionmaker at any EDR hearing would be a judge, not the Federal Defender ("Defender"). For that reason alone, she is not entitled to summary judgment on her due process claim.

Her equal protection claims fare no better. Indeed, the evidence refutes Plaintiff's claim that she was subjected to a hostile work environment or quid pro quo harassment. To the contrary, the record demonstrates that the Defender responded reasonably and appropriately after Plaintiff reported her concerns, taking immediate steps to separate Plaintiff from the First Assistant by changing Plaintiff's reporting structure so that she would report directly to the Appellate Chief and by granting Plaintiff's request to telework. With respect to her quid pro quo theory of sexual harassment, Plaintiff has failed to identify an adverse employment action caused by the purported quid pro quo. Nor were Defendants deliberately indifferent to her allegations when she made them. Defendants took Plaintiff's allegations seriously and conducted a thorough investigation that ultimately found that Plaintiff did not experience any form of sexual harassment.

Finally, Plaintiff's claim that she is entitled to a $3.4 million award of front pay should be summarily dismissed as a matter of law. Plaintiff contends that her voluntary resignation was a constructive discharge on the grounds that she felt "not welcome" at the FDO, but this general feeling would not compel a reasonable person to resign under the circumstances. Plaintiff was teleworking

1

during the pendency of the investigation, an outcome that she herself was "completely fine" with and that allowed her to be near her husband in Tryon, nearly two hours from the FDO in Charlotte.

Regardless of whether she felt unwelcome, Plaintiff has only herself to blame for engaging in conduct rendering her ineligible for both reinstatement and front pay. Consistent with her vow to a friend that she was "going to burn the place down on the way out," upon her departure from the FDO, Plaintiff retained both secret recordings of her FDO colleagues and FDO e-mails, both of which contain privileged client information. For all these reasons, this Court should deny Plaintiff's motion for summary judgment, and grant Defendant's motion for summary judgment.

## **ARGUMENT**[1]

## **I.    Defendants Did Not Violate Plaintiff's Procedural Due Process Rights.**

The Fourth Circuit held that, to succeed on her procedural due process claim, Plaintiff must prove that she was "led to believe that the FPD would be the final decisionmaker in her case." *Strickland v. United States*, 32 F.4th 311, 356 (4th Cir. 2022). Plaintiff testified under oath that she understood that a presiding judicial officer, not the Defender, would decide the remedies for any formal complaint she filed under the EDR Plan. And given the numerous individuals who told her that the Defender would not be the final decisionmaker, it would be unreasonable for her to think otherwise. For this reason alone, Plaintiff's procedural due process claim fails.

In her motion, Plaintiff ignores the Fourth Circuit's prior decision in this case by arguing that Chief Judge Gregory was not justified in denying her motion to disqualify the Defender and that Plaintiff was "coerced to resign." As detailed below, these arguments are as irrelevant as they are wrong. Accordingly, the Court should deny Plaintiff's request for summary judgment on her procedural due process claim.

---

[1] Defendants hereby incorporate by reference the facts set forth in support of their motion for summary judgment. *See* Defs.' Mot. for Summ. J. 1-15, ECF No. 245 ("Defs.' Mot."). Defendants dispute the facts presented in Plaintiff's motion for summary judgment to the extent they conflict with the facts presented in Defendants' motion and as detailed further throughout the argument contained in this opposition.

## A. Plaintiff did not reasonably believe that the Defender would be the final decisionmaker.

Plaintiff testified under oath that, during her EDR process, she "thought a presiding judicial would be the officer at the final hearing" on her EDR claim. Ex. 6, Dep. of Caryn Devins Strickland, at 18:5-9; *see also* Defs.' Mot. at 14-15. Despite this testimony and other undisputed evidence, Plaintiff cherry-picks several statements to support her argument that she was "led to believe" that the Defender would be the final decisionmaker on her EDR claims. Those statements fail to establish a dispute of material fact.

Plaintiff claims that the Judicial Integrity Officer ("JIO") told her that "Article III judges do not have authority to 'manage' a federal defender office," an issue which she described as "jurisdictional." Pl.'s Renewed Mot. for Summ. J, ECF No. 248, at 23. Defendants dispute that the JIO said this. *See* Ex. 44, Second Decl. of Jill Langley ¶ 9. Although Plaintiff claims that the JIO's testimony "corroborate[s]" this statement," *see* Pl.'s Mot. at 23, it does not. The JIO testified that, when Plaintiff asked her "what would happen if the Defender didn't comply with the presiding judicial officer's remedies at the end of the complaint stage," she responded that she "did not at that time know enough about the appointment, reappointment, and removal of defenders to know what would happen." Ex. 45, Dep. of Jill Langley at 175:15-176:5. The JIO's acknowledgement that she "did not know" what would happen if the Defender *refused* to comply with a judicial officer's order hardly "corroborates" Plaintiff's belief that the Defender would be the final decisionmaker. In fact, during their February 19, 2014 conversation, the JIO told Plaintiff that the opposite was true, explaining that the presiding judicial officer could order remedies contemplated under the EDR Plan against any employing office, including a Federal Public Defender organization, Ex. 44 ¶ 8.

Plaintiff's reliance on the Mediator's statements is also unfounded. As Defendants explained in their motion for summary judgment, the context shows that the Mediator did not suggest that the Defender would be the final decisionmaker on Plaintiff's claims. *See* Defs.' Mot. at 16. When he stated that a judicial officer would not "micromanage" the Defender, the Mediator meant that the unit executive is better able to offer solutions tailored to a specific office during the mediation period.

Further, Plaintiff's attempt to use this statement to argue that she was "led to believe" the Defender would be the final decisionmaker is directly undermined by the Mediator's clear statements during the mediation that the decisionmaker would be a presiding judicial officer. *See id.* at 17. Regardless, the Mediator—who primarily mediates civil cases in federal court—is not an expert on EDR process, *see* Ex. 46, Dep. of Edward G. Smith at 20:4-6 ("I have a very limited understanding [of the EDR Plan]. . . EDRs were still fairly new to me in 2019"), a fact that Plaintiff acknowledged she knew when she testified that the Mediator's job was to mediate "appeals that are pending before the Fourth Circuit in federal court." *See* Ex. 47, Dep. of Caryn Strickland at 36:15-25. The undisputed evidence also shows that Plaintiff was told numerous times by others involved in her EDR process that the presiding judicial officer would be the final decisionmaker, *see* Defs.' Mot. at 15-16, thus rendering it particularly implausible that Plaintiff relied on the Mediator's purportedly contrary view as authoritative.

Plaintiff's post-hoc reliance on the "Cardone Committee Report" to justify her belief is similarly misplaced. *See* Pl.'s Mot. at 23. Plaintiff must show that *Defendants* led her to believe that the Defender would be the final decisionmaker on her EDR claims, so any conclusion Plaintiff drew from an outside report completely divorced from the facts of this case is wholly unrelated to her procedural due process claim.[2] Nowhere does the nearly 300-page report discuss the Fourth Circuit's EDR Plan or who would decide an FDO employee's EDR claim. *See generally* 2017 Report of the Ad Hoc Committee to Review the Criminal Justice Act (Apr. 2018), *available at* https://cjastudy.fd.org/sites/default/files/public-resources/Ad%20Hoc%20Report%20June%202018.pdf. In fact, the Report concludes that the "primary flaw" with Federal Defenders' offices is their "*lack* of independence" (emphasis added)—undercutting Plaintiff's purported belief that the Defender could defy an order from a presiding judicial officer under the Fourth Circuit's EDR Plan. *Id.* at 243.

---

[2] For similar reasons, Plaintiff's reliance on the Judicial Conference's adoption of a separate EDR plan for federal defenders offices in 2021 is perplexing, as this decision was not even made during the time period at issue in this case.

Further, Plaintiff testified that she believed that the statements made to her by the Mediator and the JIO were accurate. Ex. 47 at 35:17-19. Plaintiff admitted that she is claiming a due process violation based on truthful representations made by the JIO and the Mediator. *Id.* at 35:20-22. That distinguishes this case from *Spreen v. Brey*, 961 F.2d 109 (7th Cir. 1992), which held that, after an employee was given the choice to resign or be fired, her due process rights were violated when her supervisors made "material misrepresentations" about the consequences of her firing. *Id.* at 110-11. Plaintiff does not argue that any misrepresentations were made here. Rather, this case more closely resembles *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 172 (4th Cir. 1988), where the Fourth Circuit held that, because the plaintiff was "neither induced by misrepresentation nor coerced" to resign by his employers, he was not deprived of a "protected property interest by state action." *Id.* at 175. Plaintiff here likewise was not coerced to resign. *See infra* Part I.C. And the evidence in the record "make[s] it simply incredible that a person situated as was [Plaintiff] could reasonably have accepted the asserted misrepresentation and resigned on that basis." *Stone*, 855 F.2d at 176-77; *see also* Defs.' Mot. at 14-18. Because Plaintiff chose not to file a formal EDR complaint, request a hearing, or otherwise exhaust her administrative remedies, instead voluntarily leaving the FDO, she "was not 'deprived' of any protected interest . . . by the state" and that "effectively disposes of [her] due process claim." *Stone*, 855 F.2d at 178. *Cf. Miller v. Baltimore City Bd. of Sch. Comm'rs*, 565 F. App'x 262, 263 (4th Cir. 2014) (holding that because employee resigned "of [her] own free will," even though she was "prompted to do so by events set in motion by [her] employer," she "relinquished [her] property interest voluntarily and thus cannot establish that the state 'deprived' [her] of it within the meaning of the due process clause" (quoting *Stone*, 855 F.2d at 173)).

To the extent that Plaintiff argues that she believed "as a practical matter, an EDR presiding officer would not . . . order binding remedies" against the FDO, Pl.'s Mot. at 23—ignoring the clear provisions of the EDR Plan and the unambiguous statements informing her that a presiding judicial officer would be the final decisionmaker on her claims—this belief is entirely speculative. *See Harris v. Home Sales Co.*, 499 F. App'x 285, 294 (4th Cir. 2012) (at summary judgment, courts "should also not find a genuine dispute of material fact based solely on [a party's] self-serving testimony"). The Plan

5

sets forth a list of specific remedies that a presiding judicial officer may order against an employing office, including "equitable" relief. Ex. 12, Consolidated Equal Employment Opportunity & Employment Dispute Resolution Plan (Nov. 2018), Ch. X, § 12(B). Plaintiff's assumption that a presiding judicial officer either could or would not order a binding remedy is baseless and unsupported.

In sum, Plaintiff has failed to establish that she had a reasonable basis to believe that the Defender would be the final decisionmaker—particularly in light of Plaintiff's sworn testimony that she believed a judge would fulfill that role. Accordingly, the Court should deny Plaintiff's request for summary judgement on her procedural due process claim.

### B. Defendants were justified in denying Plaintiff's request to disqualify the Defender.

Based on the Fourth Circuit's ruling in this case, since Plaintiff was not led to believe that the Defender would be the final decisionmaker on her EDR claims, her procedural due process claim is foreclosed. *See Strickland*, 32 F.4th at 356. Moreover, the Defender would not have been, in fact, the final decisionmaker on Plaintiff's claims. *See* Defs.' Mot. at 14-15. Therefore, Plaintiff's discussion about whether Chief Judge Gregory properly denied Plaintiff's motion to disqualify him—a decision committed to his sole discretion, *see* Ex. 12, Ch. X, § 7—is therefore irrelevant. *See* Pl.'s Mot. at 21-22. Regardless, the denial of Plaintiff's request to disqualify was entirely appropriate.

To begin, Plaintiff's September 10, 2018 motion to disqualify was unclear about the part of the EDR process from which she sought to disqualify the Defender.[3] *See* Ex. 48, Letter from Caryn Strickland to Chief Judge Gregory (Sept. 10, 2018). When Plaintiff filed this request, she also filed a request for counseling under Chapter X, Section 8(A), *see* Ex. 16, Email from Caryn Devins to James Ishida (Sept. 10, 2018), at US565, and the investigation initiated after the Defender notified the EDR coordinator of the alleged wrongful conduct was already ongoing. Plaintiff herself acknowledged that she was confused about what part of the EDR process she was requesting that the Defender be

---

[3] Plaintiff also filed a renewed motion to disqualify on February 24, 2019, and that request similarly did not state facts warranting disqualification of the Defender from the EDR proceeding. *See* Ex. 50 at 19. In any event, Plaintiff subsequently withdrew from the EDR proceeding on March 11, 2019, *see* Ex. 23.

6

disqualified from. *See* Ex. 49, Conversation 180913_1633 Tr. at 35:16-20 (Plaintiff asked the staff member from the AO's Office of Fair Employment Practices ("OFEP") on September 13, 2018, "what does disqualification mean then? . . . I'm just confused . . . what am I disqualifying him from?"). Despite this, Chief Judge Gregory evaluated Plaintiff's request with respect to each step of a proceeding under Chapter X and properly concluded that disqualification was not warranted. *See* Ex. 50, Defs.' Objs. & Resps. to Fourth Set of Interrogs. at 18-19; Ex. 66, Dep. of Chief Judge Roger L. Gregory at 20:23-24:2.

During the counseling stage, the Circuit Executive—the EDR Coordinator—conducted Plaintiff's counseling, not the Defender. Ex. 12, Ch. X, § 8(C)(1) ("The counseling shall be conducted by the Court's EDR Coordinator[.]"). During the mediation stage, the Mediator oversaw the negotiations, while the Defender represented the named respondent employing office, which is an interested, and not neutral, party. *See* Ex. 51, Conversation 190226_1153 Tr. at 22:16-21 (during the February 26, 2019 mediation, the Mediator explained to Plaintiff and her husband that the Defender "has no power" in mediation and was there just as "the unit head," so "if you removed [him], there's nobody I can talk to, to resolve this[]").

Plaintiff's stated grounds for disqualification were that the Defender was "a subject of [Ms. Strickland's] wrongful conduct report," and "named in [her] request for counseling." Ex. 48. But if the Defender were to be disqualified during the counseling and mediation processes, it was unclear who would have had the authority to take the actions that Plaintiff may have sought from her employing office to resolve her claims. Multiple people explained this to Plaintiff. *See* Ex. 45 at 130:4-11 (the JIO telling Plaintiff on February 14, 2019 that she "didn't understand the concept at all of disqualifying the party from representing itself," so it would have "suprise[d]" her if "disqualifying the defendant from being the defendant would be granted"); Ex. 49 at 37:1-17 (the OFEP staff member telling Plaintiff on September 13, 2019 that the Defender is "not going to have the authority to decide [her] case" or "to render a decision"; he "simply" has the "opportunity to give his position" and to "be at the table and negotiate").

7

According to the JIO, who helped draft the model EDR Plan in place during Plaintiff's EDR process, the disqualification provision "was designed to ensure that the EDR Coordinator, Mediator and presiding judicial officer were impartial, not that the defending party was impartial[.]" *See* Ex. 17, First Decl. of Jill Langley ¶ 8. This is because the "the defending Respondent employing office, acting through its unit executive, is the opposing or differing party to an EDR disputed matter, entitled to act and respond on behalf of the Respondent employing office." *Id.*; *see also* Ex. 45 at 86:5-8 (JIO testifying that it "just never occurred to [her] to apply [the disqualification provision] to anyone other than . . . the EDR coordinator, mediator, and presiding judicial officer."). The Mediator also testified that he had never heard of a unit executive being disqualified from an EDR mediation, Ex. 46 at 72:21-23, in part because the Defender "had no power in the mediation"—rather, Plaintiff "had all the power in the mediation to say 'this is the way I'll come back to work, and if you won't do it, I'm taking it to a judge, and the judge can decide this,'" *id.* at 74:20-25. And given the responsibility of a unit executive for approving personnel actions within his or her employing office, it is not unusual for the unit executive named in reports complaining about personnel actions to also participate in the EDR process. *See* Ex. 51 at 23:11-13 (the Mediator explaining to Plaintiff and her husband that he has "had many complaints where the unit head was the issue and they always handled the mediation"). Thus, the fact that the Defender was both a named party and the unit head was not a sufficient basis for disqualification from the mediation.

Moreover, there was no reason to evaluate whether the Defender should have been disqualified from any formal hearing stage under Chapter X because Plaintiff chose to voluntarily withdraw from the EDR process on March 11, 2019, Ex. 23, Email from Caryn Devins to James Ishida (Mar. 11, 2019), having never filed a formal complaint. *See* Ex. 50 at 19.

To the extent that Plaintiff contends that her due process rights were violated because the Defender was not disqualified from the investigation, this argument also fails. The Defender had no control over the investigation and only participated as a witness interviewed by the Investigator. *See* Ex. 52, Emails from Heather Beam to Tony Martinez (Oct. 12, 2018); *see also infra* at 18-19. The investigation was initiated at the direction of Chief Judge Gregory and performed by an independent

8

investigator selected by the Circuit Executive. Ex. 15, Decl. of James Ishida, ¶ 7; Ex. 53, Email from James Ishida to Lisa Morris (Aug. 14, 2018) at US617; Ex. 54, Dep. of James Ishida at 71:16-72:7 (Circuit Executive explaining why he selected Heather Beam as Investigator). And the investigation report was sent to the Circuit Executive, not the Defender. Ex. 55, Email from James Ishida to Caryn Devins (Sept. 28, 2018) (Circuit Executive explaining that the investigator "will be submitting her report to me, not" the Defender).

Given the Defender's minimal role as a witness in the investigation, the Defender did not "prejudge" its outcome. Pl.'s Mot. at 22. The Defender attempted to work with Plaintiff at every step to help her resolve her claims so she could continue to work at the FDO. *See infra* Part II.C.; *see also* Ex. 46 at 32:20-23 (the Mediator testifying that Plaintiff gave the Mediator "three or four bullet points to take to" the Defender and even though "she thought [he] would not respond favorably," the Defender "responded favorably"); *id.* at 92:18-25 (the Mediator testifying that the Defender "appeared to be motivated" to "do something to make [Plaintiff] happy" because he told the Mediator that he "[didn't] want to lose her" and "want[ed] to make this right"); Ex. 56, Conversation 190212_1848 Tr. at 2:18-22 (the Mediator telling Plaintiff and her husband that he "[got] the clear sense that [the Defender] want[ed] to resolve this []"); *id.* at 10:5-13 (the Mediator telling Plaintiff and her husband that the Defender "takes this very seriously and, you know, I truly believe he wants to work this out and he wants to—to keep you"); Ex. 57, Email from Nancy Dunham to Caryn Devins (Aug. 9, 2018) (Fair Employment Practices Officer ("FEPO") telling Plaintiff that the Defender was "very responsive" and that her "clear sense is that he is taking this very seriously").[4] And while Plaintiff makes much of a purported "false allegation" made by the Defender, Plaintiff references a single email (that the Defender was not even copied on) that involved a misunderstanding between the Circuit

---

[4] Plaintiff refers to this individual as the FEOO, but the correct term is Fair Employment Practices Officer ("FEPO"), so Defendants refer to her as such.

Executive and employees in the OEFP.[5] This email has nothing to do with the fairness of Plaintiff's EDR proceeding, let alone any involvement (or lack thereof) by the Defender in the investigation.

### C. Plaintiff was not coerced to end the investigation or to resign.

While the Fourth Circuit acknowledged that Plaintiff's complaint alleged a "coercing of [Plaintiff] to end the investigation," *Strickland*, 32 F.4th at 355, the record shows that Defendants did nothing of the sort. The evidence demonstrates that the investigation ended because the Investigator had completed her inquiry into Plaintiff's allegations and submitted her final report to the Circuit Executive. Ex. 63, Email from Heather Beam to James Ishida (Jan. 11, 2019). Plaintiff apparently misreads the Fourth Circuit's opinion and argues that she was "coerced to *resign*," Pl.'s Mot. at 24, but this argument is irrelevant to the Fourth Circuit's holding and is therefore immaterial to her procedural due process claim.[6] As Defendants have explained, Plaintiff was not constructively discharged, Defs.' Mot. at 10-12, let alone "coerced" to resign. Therefore, this argument is unfounded.

In fact, contrary to Plaintiff's assertion, Defendants did not deliberately hold Plaintiff's "wrongful conduct report" in abeyance. Pl.'s Mot. at 24. It is unclear what Plaintiff could even mean by this, since Plaintiff reported the alleged wrongful conduct (after the Defender had already made the relevant individuals aware of her allegations) pursuant to Chapter IX, which simply encourages employees to report wrongful conduct and guarantees no remedies. *See* Ex. 12, Ch. IX. For support, Plaintiff cites merely to an exhibit comprised of all of her recordings during a nine-month period,

---

[5] In this email from August 15, 2018—shortly after the Defender notified the Circuit Executive of Plaintiff's claims of sexual harassment and the Circuit Executive reached out to the Investigator—the Circuit Executive explained that the Investigator was told by a member of the OFEP that she should instruct the Defender to give Plaintiff whatever she was asking for. Ex. 58, Email from James Ishida to Roger Gregory (Aug. 15, 2018). The Investigator informed the Defender, who promptly alerted the Circuit Executive. Ex. 59, Dep. of Tony Martinez at 180:10-20. The Circuit Executive followed up two days later, informing the Defender and the Investigator that there had been a "misunderstanding" and that the OFEP staff did not realize that Plaintiff "had filed, in effect, a report of sexual harassment." Ex. 60, Email from James Ishida to Heather Beam (Aug. 17, 2018).

[6] While also not relevant to her due process claim, it is worth noting that Plaintiff was also not coerced to end her EDR process either—it ended when she voluntarily accepted a Fourth Circuit clerkship during mediation and ended the process without filing a formal complaint. *See* Exs. 23, 61-62.

failing to identify any specific statement. Nothing in these recordings supports the conclusion that Defendants held any part of Plaintiff's EDR process in abeyance.

It is also patently untrue that Defendants "explicitly condition[ed] any disciplinary action on Plaintiff concluding her EDR process" or "pressured her to resign." Pl.'s Mot. at 24. The sole evidence on which Plaintiff relies—a letter of counseling recommending that the Defender participate in additional training—in no way stands for this proposition. *See id.* (citing Pl.'s Ex. D at 78). Indeed, the record contains ample evidence that Plaintiff *voluntarily* accepted a Fourth Circuit clerkship during mediation, resigned from the FDO, and withdrew her EDR claims. *See* Ex. 23; Ex. 61, Email from Caryn Devins to James Ishida (Nov. 21, 2018); Ex. 62, Text message from Caryn Devins to Laura Minor (text from Plaintiff to friend describing the Fourth Circuit clerkship as a "transition up" that would "open [her] career options further").

In sum, Plaintiff knew that the final decisionmaker would be a judicial officer, not the Defender, and she was not coerced to end the investigation, let alone to resign. Plaintiff is thus not entitled to summary judgment on her due process claim; rather, the undisputed evidence shows that this Court should enter summary judgment on this claim for Defendants.

## II. Defendants Did Not Violate Plaintiff's Equal Protection Rights.

### A. Plaintiff was not subjected to sexual harassment.

Plaintiff has not met the standard for either a hostile work environment claim or a quid pro quo harassment claim. Plaintiff does not even attempt to argue that she was subjected to a hostile work environment, and, as explained in Defendants' motion for summary judgment, such a claim would fail. *See* Defs.' Mot. at 18-21. Instead, Plaintiff contends erroneously that the First Assistant's May 18, 2018 "Mas Dinero" email constituted quid pro quo harassment. *See* Pl.'s Mot. at 16; Ex. 9, Email from JP Davis to Caryn Devins (May 18, 2018) at US89.

Under a quid pro quo theory, Plaintiff must prove four elements: (1) she "belongs to a protected group"; (2) she "was subject to unwelcome sexual harassment"; (3) the harassment "was based upon sex"; and (4) the employee's reaction to the harassment "affected tangible aspects of the employee's compensation, terms, conditions, or privileges of employment." *Okoli v. City of Baltimore,*

11

648 F.3d 216, 222 (4th Cir. 2011). Plaintiff was not subject to unwelcome conduct and this conduct was not based on her sex. *See* Defs.' Mot. at 19-20. Plaintiff has also not identified *any* tangible employment action that the First Assistant took against her when she refused the purported quid pro quo request. *See id.* at 22-23. Accordingly, Plaintiff's claim fails. *See Burlington Indus. v. Ellerth*, 524 U.S. 742, 753-54 (1998).

Rather than citing to any record evidence demonstrating a tangible employment action, Plaintiff merely makes a passing reference to the "First Assistant's conduct in undermining Plaintiff's professional advancement." Pl.'s Mot. at 16. This general, unsupported assertion does not entitle her to summary judgment. *See* Fed. R. Civ. P. 56(c)(1) (explaining that a party "asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record"). As Defendants explained, *see* Defs.' Mot. at 22-23, the First Assistant was not involved in any employment-related decisions involving Plaintiff's pay, progression, or anything else that could have resulted in changes to the conditions of her employment. *See* Ex. 2, Decl. of John Park Davis, ¶ 41; *Ellerth*, 524 U.S. at 761 (tangible employment action usually "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits"); *see also Ellis v. Dir., CIA*, 1999 WL 704692, at *3 (4th Cir. Sep. 10, 1999) (finding no adverse action because the alleged offender "had no role in the decision" that "ultimately resulted in her displacement"). These decisions were solely within the discretion of the Defender. Plaintiff's only case cite, *Beardsley v. Webb*, is inapposite, as it involved a hostile work environment claim, not a quid pro quo claim. 30 F.3d 524, 528-30 (4th Cir. 1994).[7]

Plaintiff's argument rests almost exclusively on one sentence in the investigation report—which concluded that Plaintiff was *not* sexually harassed—saying that the "Mas Dinero" email could

---

[7] *Beardsley* also involved far more egregious conduct than any of the allegations in this case. 30 F.3d at 528-30 (defendant "stood behind [the plaintiff]" and "massaged her shoulders while staring at [her] husband," he "unjustifiably accused [the plaintiff] of having an affair with a deputy," he "asked [her] what kind of underwear she wore," he told her "it was his turn to have his way with her," and when the plaintiff complained, the defendant caused her reports "to become insubordinate," "refus[ed] to speak to her" and used others "to relay orders" to her).

"be inferred to be a quid pro quo request." *See* Pl.'s Mot. at 16; Ex. 25, Counselor's Report. Even assuming that the email could be inferred to be a quid pro quo *request*, without a tangible employment action, it is not sufficient to establish quid pro quo harassment as a matter of law. "[Q]uid pro quo harassment does not occur when an employer threatens, but does not carry out, a reprisal for an employee's refusal of sexual advances." *Cox v. Bankcard Am.*, 1998 U.S. Dist. LEXIS 17970, at *10-11 (N.D. Ga. Aug. 28, 1998); *see also Ellis*, 1999 WL 704692, at *6 ("Distinguished from quid pro quo sexual harassment, hostile work environment sexual harassment focuses on general improprieties such as 'unfulfilled threats.'"). Further, the Investigator's opinion on whether the email could "be inferred" to be a quid pro quo request is not relevant to whether the First Assistant's conduct actually meets the legal standard for quid pro quo sexual harassment, and does not control at the summary judgment stage. *See Goldberg v. B. Green & Co.*, 836 F.2d 845, 848 (4th Cir. 1988) (EEOC report finding probable cause that age discrimination had occurred did not render the granting of summary judgment to defendant improper). Even so, after weighing the "Mas Dinero" email in context with the other evidence before her, the Investigator concluded that Plaintiff's sexual harassment claims were "very flimsy" and had no merit, Ex. 25 at US1255-57. Plaintiff's various attempts to undermine the ways in which the Investigator reached this conclusion are similarly insufficient to support her claim.

Plaintiff also argues that the counseling the First Assistant and the Defender received as a result of the investigation report is evidence that Plaintiff was sexually harassed. Pl.'s Mot. at 16. On the contrary, the investigator's report clearly recommended that the First Assistant and Defender be counseled only for their missteps, not sexual harassment, of which the report found none. Ex. 25 at US1255-57. The First Assistant was counseled about his use of email in the workplace, including properly documenting context—not for any supposed sexual harassment. Ex. 3 ¶ 99. Similarly, the Defender was counseled on "judgement and decisiveness" and "handling workplace conduct complaints." *Id.* ¶ 101. And the issue of whether the First Assistant and the Defender were counseled or otherwise disciplined is irrelevant to whether Plaintiff has met her burden to satisfy the elements of a sexual harassment claim, which she has failed to do.

**B. Plaintiff did not report the alleged sexual harassment until August 2018.**

To prevail on a claim of deliberate indifference to sexual harassment, Plaintiff must prove that the accused individuals "'actually knew of . . . ' the discriminatory conduct." *Hill v. Cundiff*, 797 F.3d 948, 978 (11th Cir. 2015) (quotation omitted); *see also Feminist Majority Foundation v. Hurley*, 911 F.3d 674, 702-03 (4th Cir. 2018) (holding that Plaintiff must "allege that the school administrator *knew* about the harassment of the plaintiff" to state claim for deliberate indifference) (emphasis added). Here, the Fourth Circuit restated this condition as requiring Plaintiff to prove that she "alerted supervisory officials and/or officials responsible for overseeing the court's EDR plan about the sexual harassment." *Strickland*, 32 F.4th at 359.

**1. Plaintiff did not alert the Defender about her allegations of sexual harassment until August 10, 2018.**

On August 10, 2018, Plaintiff sent an email to the Defender alleging that the First Assistant engaged in "sexually harassing and threatening behaviors[.]" Ex. 37, Email from James Ishida to Anthony Martinez (June 12, 2019) at US622. It is undisputed that Plaintiff met with the Defender two times in early July before sending the August 10 email—on July 2, 2018 and July 5, 2018, Ex. 47 at 76:19-23; 81:11-82:9. Plaintiff claims that she first reported sexual harassment to the Defender by July 2, 2018. Pl.'s Mot. at 18. No finder of fact, however, could reasonably conclude that the Defender had knowledge of the First Assistant's purported sexual harassment in July 2018 because the undisputed statements made by Plaintiff during the two July meetings were too vague to provide actual notice of sexual harassment.

Plaintiff testified that, during the July 2, 2018 meeting, she told the Defender that the First Assistant "had gotten extremely angry at me and spoken to me inappropriately" and that she "needed to set boundaries with him." Ex. 47 at 80:25-81:3. Such vague statements regarding interpersonal conflict are insufficient to provide actual notice of sexual harassment. *See Cramer v. Bojangles' Rests., Inc.*, Civil Action No. 2:10-CV-0159-RWS-SSC, 2012 WL 716176, at *12 (N.D. Ga. Feb. 8, 2012) (holding that a reasonable jury could not find a complaint of "nasty comments to [plaintiff] sufficient to put Defendant on notice that Plaintiff was complaining about alleged sexual harassment"); *DeCecco v. Univ.*

14

*of S.C.*, 918 F. Supp. 2d 471, 493 (D.S.C. 2013) ("To the extent [plaintiff] gave notice of interpersonal relationship problems, that notice did not even hint at sexual harassment"). Plaintiff also admitted that she told the Defender, "I don't feel we are there yet," when asked directly whether she was reporting sexual harassment. Ex. 47 at 78:5-7; Ex. 59 at 148:18-20 (Plaintiff "didn't say anything about a formal complaint, didn't say anything about sexual harassment, nothing."). Plaintiff did not tell the Defender during the July 2 conversation about the "pay-for-stay" email, that she was uncomfortable going to lunch with the First Assistant, or that the First Assistant had invited her for a drink. Ex. 47 at 80:5-17. Courts routinely find that the actual notice requirement is not satisfied in similar circumstances where plaintiffs have not reported the alleged inappropriate conduct. *See Wilson v. Gaston Cnty.*, 685 F. App'x 193, 199 (4th Cir. 2017) (finding no actual notice when Plaintiff "generally refused to report what was happening," including disclosure of relevant messages); *Johnson v. Becerra*, No. 19-CV-1859, 2022 WL 2528430, at *11 (D. Md. July 7, 2022) (finding no actual notice after "failed romantic overture" when Plaintiff was "uninterested in pursuing a complaint").

In the July 5 meeting, Plaintiff similarly did not disclose pertinent details of the existence or scope of the alleged harassment. Plaintiff testified that she repeated her prior discussion with the Defender and told him about an incident where the First Assistant "waited for me when I was leaving the building alone and no one else there was working." Ex. 47 at 83:5-10. The Defender testified that he understood from this conversation with Plaintiff that she left the building without the First Assistant that evening, and that Plaintiff reiterated that she did not want to submit a complaint against the First Assistant. Ex. 59 at 154:9-155:7. The Defender also asked Plaintiff whether she was "comfortable going forward" and Plaintiff replied, "I'm comfortable going forward." *Id.* at 186:21-23. The addition of a one-off incident in the lobby of the building was still insufficient to provide the Defender with actual notice of Plaintiff's allegations of sexual harassment. *See Johnson*, 2022 WL 2528430 at *11 (finding disclosure of single failed romantic overture, in the form of an attempted kiss, insufficient to provide notice of sexual harassment).

Because Plaintiff did not provide actual notice of her allegations until August 10, 2018, the Defender could not have been deliberately indifferent to her allegations before that date.

15

### 2. Reporting alleged harassment to the FEPO was insufficient to provide actual notice to Defendants with control over the EDR process.

Plaintiff also argues that she reported her allegations to "the FEOO and AO officials." Pl.'s Mot. at 18. The FEPO, however, is not a "supervisory official[] and/or official[] responsible for overseeing the [Fourth Circuit's] EDR plan," *Strickland*, 32 F.4th at 359, and Plaintiff does not identify any other AO official with sufficient specificity to allow the Court to even consider whether a report to them could have satisfied the notice requirement. The FEPO reiterated multiple times during her testimony that she had no authority over the Plaintiff or the Fourth Circuit's EDR Process. Ex. 64, Dep. of Nancy Dunham, at 194:15-16 ("[W]e had no authority to give directives to a judiciary employee."); *id.* 101:18-23 ("I never would have directed a judiciary employee about anything, because I would not have had the authority to do that.); *id.* 67:9-14 ("I would not have had the authority to appoint a fact-finder."). Where, as here, the FEPO had no "control over the context" in which the alleged harassment occurred and no "disciplinary authority," reporting allegations to her is not sufficient to provide notice to Defendants such that they could have responded with deliberate indifference. *See Hurley*, 911 F.3d at 687-88. The only evidence Plaintiff points to in support of notifying "other AO officials" about her alleged harassment is a portion of the FEPO's testimony where the FEPO recalls talking "to other officials at the AO who were familiar with the situation," but then testified that she could not recall who they were. Pl.'s Ex. I at 35:1-18. While it is doubtful that anyone at the AO could have exerted control over the Fourth Circuit or the FDO, Plaintiff failed to even provide the bare minimum of information that would be required to consider whether any other AO official may have satisfied this requirement.

### C. Defendants were not deliberately indifferent to Plaintiff's allegations.

Plaintiff argues that the Defender responded to her allegations of harassment with deliberate indifference based exclusively on four conclusions in the Investigator's report on which the Defender subsequently received counseling. Pl.'s Mot. at 18-19. At the threshold, Plaintiff's argument fails because the instances referenced in the Investigator's conclusions occurred before Plaintiff reported sexual harassment to the Defender on August 10, 2018, *see supra* II.B. It is undisputed that the

conversation in which the Defender used a marriage metaphor occurred on July 5, 2018, Pl.'s Ex. D at 81, that the Defender inquired about whether the First Assistant had physically touched Plaintiff on July 5, 2018, Pl.'s Ex. N at 22, and that, to the extent the Defender criticized Plaintiff for seeking outside advice or complained of being blamed for Plaintiff's concerns, that conversation occurred on August 9, 2018, Ex. 59 at 185:16-186:5; 189:18-25. Accordingly, the Defender did not have actual notice of Plaintiff's allegations of harassment such that he could have responded with deliberate indifference during these conversations.

Plaintiff's argument regarding the Defender's deliberate indifference also fails for the independent reason that none of the Investigator's conclusions are relevant to the purported "roadmap" provided by the Fourth Circuit in its decision. The panel merely noted that Plaintiff alleged Defendants "failed to take immediate and effective action on her complaints and also failed to provide her with meaningful review or remedies." *Strickland*, 32 F.4th at 359-60 (cleaned up). Even if one could consider this statement a "roadmap," none of the Defender's actions that Plaintiff identifies relate to the timing or effectiveness of action on her allegations of harassment or the type of review or remedies available under the EDR Plan. "Actions that are in hindsight unfortunate or even imprudent will not suffice" to support a finding of deliberate indifference. *Baynard v. Malone*, 268 F.3d 228, 236 (4th Cir. 2001) (citation omitted). Plaintiff has failed to identify any undisputed facts sufficient to find that the Defender responded to her with deliberate indifference.

With respect to the other Defendants, Plaintiff fails to specifically identify who she accuses of deliberate indifference. She provides no evidence that Defendants such as the Judicial Conference of the United States were involved in her EDR process at all, let alone had actual notice of her allegations and could have possibly responded with deliberate indifference. Pl.'s Mot. at 19. Instead, Plaintiff relies solely on the conclusions from an expert report that Defendants received on June 1, 2023, the same day Plaintiff's motion was filed. *Id.* Reliance on this expert report is inappropriate before Defendants have been able to complete expert discovery under this Court's scheduling order, including deposing the expert in question, *see* ECF No. 187. In any event, the report merely reflects an expert's opinion about the facts and, thus, is not a substitute for them. *See Virgin Atlantic Airways,*

17

*Ltd. v. British Airways PLC*, 69 F. Supp. 2d 571, 579 (S.D.N.Y. 1999 ("[A]n expert's opinion is not a substitute for a plaintiff's obligation to provide evidence of facts that support the applicability of the expert's opinion to the case."). As Defendants have explained, the facts in the record show that Plaintiff cannot, as a matter of law, succeed on her deliberate indifference claim. Also, Defendant reserves the right move to exclude this expert's testimony after her deposition has been taken.

All of Plaintiff's arguments that unspecified "Defendants" were deliberately indifferent fail. First, Plaintiff argues that Defendants "did not respond to or investigate [her] complaint promptly." Pl.'s Mot. at 19. An investigator was appointed, however, on August 15, 2018, the day after the Defender alerted the Circuit Executive to Plaintiff's allegations, Ex. 37 at US621-622; Ex. 42, Email from Heather Beam to James Ishida (Aug. 15, 2018), and nearly a month before Plaintiff submitted a report of wrongful conduct and request for counseling under the EDR Plan, Ex. 16 at US565. The Investigator worked on her investigation for a period of approximately three months, before submitting a completed report on November 19, 2018, Ex. 25; the report was later updated with specific recommendations at the Circuit Executive's request, Ex. 54 at 187-188.

Next, Plaintiff argues, without any record support, that the "Defender was permitted to control aspects of the investigation." Pl.'s Mot. at 19. The Defender testified, however, that he had no substantive role in the investigation after appointing the Investigator at the Circuit Executive's suggestion. Ex. 59 at 207:23-208:1 ("I wanted to be recused . . . and have somebody else who's completely independent to conduct the investigation . . . ."); *id.* 217:6-10 (testifying that the Investigator was not "doing the investigation under [his] supervision" and was not "reporting to [him]"); *id.* 216:19-217:1 ("I was not selecting the investigator. The investigator was being selected by the circuit executive and . . . it was just a technicality that I would be appointing her . . . ."). Plaintiff also concludes, again without any elaboration or support, that the investigation into her complaints was not "timely, fair and thorough and was conducted in a manner that raises questions about the

18

investigator's impartiality." Pl.'s Mot. at 19. She points to no evidence to support this conclusion and, as the report reflects, the Investigator thoroughly considered all of Plaintiff's allegations. *See* Ex. 25.[8]

Plaintiff further argues that Defendants took "no action to remedy the harm [she] suffered." Pl.'s Mot. at 19. However, even if Plaintiff suffered any "harm," a broad statement that Defendants dispute, it is undisputed that Defendants took several actions to accommodate Plaintiff's concerns by modifying her work environment. Ex. 3, Decl. of Anthony Martinez ¶ 94; Ex. 36, Second Decl. of Anthony Martinez. The Defender reclassified Plaintiff to an Assistant Federal Public Defender at her request, Ex. 37 at US622; Ex. 6 at 123:25-124:3, instructed the First Assistant to cease contact with Plaintiff, Ex. 11, Text message from Anthony Martinez to J.P. Davis (July 24, 2018), allowed Plaintiff to telework, Ex. 4, Dep. of Anthony Martinez at 236:20-22, and participated in mediation, even offering to give Plaintiff his own office in Asheville, Ex. 30, Dep. of Edward G. Smith at 46:4-16.

Finally, Plaintiff concludes, again without any specificity or reliance on evidence in the record, that Defendants "failed to protect Strickland from retaliation." Pl.'s Mot. at 19. But, as explained more thoroughly in Defendants' motion, there is no evidence suggesting Plaintiff was improperly denied a promotion or pay raise or suffered any other form of retaliation. Defs.' Mot. at 21-22. Plaintiff has acknowledged that she was reclassified from a R&W Specialist to an AFD at her request, Ex. 37 at US622; Ex. 3, ¶¶ 27-34; Ex. 1, Decl. of William Moormann, ¶¶ 17-22, and that this personnel action was taken for a non-discriminatory and non-retaliatory reason. Ex. 6 at 97:5-21. As a result, Plaintiff moved from the GS scale to the AD system, and thus was not eligible for a GS Promotion. Ex. 1, ¶ 19. Plaintiff's pay as an AFD was the maximum the Defender was authorized to approve, *id.* ¶ 22.

Plaintiff's emphasis on the sexual harassment training Defendants received is a red herring. Pl.'s Mot. at 19-20. Plaintiff has not established that a lack of or inadequate training resulted in a "clearly unreasonable" response to her alleged harassment such that she was "subjected . . . to further

---

[8] To the extent that Plaintiff relies on her conclusion that the Investigator "did not contact any [] witnesses who could have corroborated the sexual harassment," Pl.'s Mot. at 10, Defendants dispute this statement. The Investigator interviewed witnesses, who could have, but did not, corroborate Plaintiff's story, including the Appellate Chief. *See* Pl.'s Mot. at 10. Ultimately, the Investigator focused "on the people that were involved directly in the situation." Pl.'s Ex. J at 114:11-12.

discrimination." *See Hill*, 797 F.3d at 973-75. In any event, Plaintiff's own cited evidence reveals a genuine dispute of material fact as to whether "officials involved in Plaintiff's complaint had received [] meaningful training." Pl.'s Mot. 19.

For a factfinder to determine that inadequate training on sexual harassment contributed to deliberate indifference, Plaintiff "must present evidence" that it was "clearly unreasonable . . . not to improve [] sexual harassment training" after receiving notice of the "initial discrimination" such that Plaintiff was subjected to "further discrimination." *Hill*, 797 F.3d at 973. Plaintiff makes no attempt to do so here. She skips the causal analysis entirely and states only her conclusion that Defendants were deliberately indifferent because they "received no meaningful training." Pl.'s Mot. at 19. The single case Plaintiff cites in support of her argument directly contradicts her conclusion. Misleadingly, Plaintiff says that the court in *Hill* concluded that "failure to provide training or notice of sexual harassment policy was 'clearly unreasonable.'" *Id.* (citing *Hill*, 797 F.3d at 975). While it is true that the *Hill* court reached that conclusion with respect to the deliberate indifference analysis under Title IX, the court actually reached the opposite conclusion with respect to the *Hill* plaintiff's equal protection claim. Addressing the equal protection claim, the Court noted the "stringent standard of fault" required to show deliberate indifference and concluded that school board "could not have foreseen" subsequent harassment to the plaintiff as a "known or obvious consequence" of its "training policies." *Hill*, 797 F.3d at 977-78. The Court went on to explain that even if the training policies made a violation of the plaintiff's rights more likely, an argument that the Plaintiff in this case does raise, the training policies "alone do[] not give rise to an inference that the policies produced a specific constitutional allegation." *Id.* at 978 (citation omitted).

Moreover, Plaintiff's conclusion that "the officials involved" in her EDR process "had received no meaningful training" is contradicted by the very evidence she cites. Pl.'s Mot. at 19. For example, the Investigator recalled that she was "given an overview of the EDR process" and had access to a "ton of resources" on the "judiciary's intranet site.[]" Pl.'s Ex. J, 42:4-6, 17-25. The Defender testified that he received training on EDR that he found to be "adequate" and that he was not "sitting here wishing [he] could have received more training in EDR." Pl.'s Ex. E, 45:17-23, 47:21-

20

24, 48:21-49:19. Defendants further listed the numerous relevant trainings provided to the Chief Judge, Circuit Executive, JIO, Defender, First Assistant, and Investigator in their response to Plaintiff's Interrogatory No. 11, which Plaintiff cites here for the unsupported and inexplicable proposition that Defendants received inadequate training. Pl.'s Mot. 19 (citing Pl.'s Ex. C). Given the overwhelming evidence to the contrary, whether the training Defendants received was "meaningful" is, at best for Plaintiff, a disputed fact such that she cannot rely on it to support her deliberate indifference claim, regardless of whether the Court agrees with Defendants that training materials are not relevant here as a matter of law.

Plaintiff's attempt to make out a "pattern of failing to take sexual harassment complaints seriously" is similarly both unsupported by caselaw and a gross misstatement of the evidence she relies upon for her conclusion. Pl.'s Mot. at 19-20. Applying the deliberate indifference standard in a Rehabilitation Act case, the Fourth Circuit recently concluded that, while a "pattern" or "history of violations" can be "relevant evidence to proving deliberate indifference, it cannot be equated with the standard itself." *Basta v. Novant Health Inc.*, 56 F.4th 307, 317 (4th Cir. 2022). As indicated by the parentheticals the court used to support this proposition, one-off allegations of similar harassment are insufficient to provide relevant evidence. *See id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)) ("*longstanding, pervasive, [and] well-documented" rights violations* can be circumstantial evidence that defendants "had been exposed to information concerning the risk and thus must have known about it") (emphasis added); *Silva v. Baptist Health S. Fla., Inc.*, 838 Fed. App'x 376, 382 (11th Cir. 2020) (finding evidence that several plaintiffs *"routinely"* experiencing malfunctioning VRI was enough of a showing of deliberate indifference to survive summary judgment) (emphasis added). Even if the Court were inclined to consider Plaintiff's purported evidence in support of a "pattern" of EDR complaints against the FDO, Plaintiff has not identified another grievance based on sexual harassment. Pl.'s Ex. P. at 3-4. Of the two grievances listed that pre-date Plaintiff's report in August 2018, one claimed "[w]histleblower retaliation," and the other claimed "[d]iscrimination on the basis of age, race/national origin, and gender." *Id.* These complaints fail to provide probative evidence of deliberate indifference to Plaintiff's allegations, as they do not indicate a pattern of similar complaints.

21

In any event, Plaintiff's reliance on the Defender's alleged use of crude language regarding women and members of the LGBTQIA+ community and the First Assistant's alleged use of sexual hand gestures is inapposite here. The evidence Plaintiff relies upon for these statements and hand gestures comes from the unrelated EDR grievance of another individual and Defendants vigorously dispute the veracity of these unproven allegations.[9] *See* Ex. 3 ¶ 124; Ex. 2 ¶¶ 8-9, Ex. 1 ¶ 54. Additionally, this report of wrongful conduct was submitted nearly a year after Plaintiff voluntarily left the FDO, and thus has no bearing on Defendants' purportedly indifferent response to Plaintiff's allegations of harassment. Pl.'s Ex. P at 13.

### D. Defendants had no intent to discriminate.

Plaintiff does not provide any independent evidence outside of her deliberate indifference arguments to support a finding of "intent to discriminate." Moreover, Defendants have submitted evidence showing that they did not act with any intent to harass, discriminate, or retaliate. *See* Ex. 2 ¶ 51; Ex. 3 ¶¶ 128-130; Ex. 15 ¶ 16. For all the reasons explained above, Plaintiff has not shown that Defendants were deliberately indifferent toward her allegations of sexual harassment. Accordingly, Plaintiff has not shown that Defendants acted with "intent to discriminate" based on her gender.

## III. Plaintiff Has Failed to Establish that As a Matter of Law She Is Owed Front Pay.

Plaintiff argues that she is entitled to $3.4 million in front pay. *See* Pl.'s Mot at 24-25. Yet she cannot establish entitlement to front pay at all, let alone in the amount she seeks to recover. Her request that this Court award her $3.4 million as a matter of law fails for four reasons.

First, although front pay can be an equitable remedy in lieu of reinstatement, it is Plaintiff's burden to establish entitlement to it for each claim by showing that she lost compensation through a

---

[9] Plaintiff accuses the Defender and Administrative Officer of "falsely represent[ing] to this Court that no other EDR complaints had been filed against the FDO." Pl.'s Mot. at 20. But it is Plaintiff who falsely represents the content of the Defender and Administrative Officer's declarations to this Court. Both declarations state that the declarant had not "witnessed" sexual harassment and made no statement regarding whether other EDR complaints had been filed. Ex. 3 ¶ 124; Ex. 1 ¶ 54. The very fact that other EDR complaints existed, without any actual findings of harassment against anyone at the FDO, has no bearing on the declarants' truthful statements regarding their lack of experience witnessing harassment.

wrongful termination. *See Feldman v. Phila. Hous. Auth.*, 43 F.3d 823, 839 (3d Cir. 1994) (Garth, J., concurring in part and dissenting in part) ("The purpose of front pay is to make an injured employee whole by compensating h[er] for future lost earnings resulting from [her] wrongful termination."). She cannot do so here. As Defendants explained, Plaintiff is not entitled to front pay on her due process claim because the remedy for a prevailing plaintiff on such a claim is "more process." *See Detweiler v. Va. Dep't of Rehabilitative Servs.*, 705 F.2d 557, 562 (4th Cir. 1983) (if plaintiff could prove due process violation in the hearing, "he should be afforded a rehearing by the panel that comports with the due process clause"). Notably absent from Plaintiff's discussion is a citation to a case where a court awarded front pay as equitable relief against the federal government on a due process claim—let alone for the staggering amount of time she seeks to recover. *See* Pl.'s Mot. at 25 (listing cases against non-federal, local and state government employers or not involving due process claims).

With respect to her equal protection claims, to be eligible for front pay, Plaintiff must show that she was constructively discharged, meaning that her "working conditions bec[a]me so intolerable that a reasonable person in [her] position would have felt compelled to resign[.]" Defs.' Mot. at 10 (quoting *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004)). Plaintiff has failed to meet her burden. The only evidence Plaintiff cites in support of her constructive discharge argument is her feeling that she was "no longer welcome in the FDO," noting that she informed the Mediator that her Fourth Circuit clerkship offer was a "nicely packaged constructive discharge." *See* Pl.'s Mot at 14. Even if Plaintiff felt unwelcome, she misapprehends both the legal standard and her burden at summary judgment. Plaintiff must show that there is no dispute of material fact as to whether her working conditions were so intolerable and severe that a reasonable person in her position would have felt forced to resign. *Pennsylvania State Police*, 542 U.S. at 141. The record, however, contains numerous undisputed facts that not only undercut Plaintiff's argument and prevent a grant of summary judgment in her favor, but warrant summary judgment in Defendants' favor.

During her last seven months of employment, Plaintiff admits she teleworked and did not see anyone from the office. Ex. 47 at 93:3-20. She also conceded that she was "completely fine" with telework, *id.* at 103:1-104:3, which allowed her to live with her husband in Tryon, which is nearly a

23

two-hour drive away from the FDO, *id.* at 44:2-16; 114:17-25. And she further acknowledges that after mid-August 2018, she did not meet with her alleged harasser and they had no further one-on-one interactions. *Id.* at 93:3-20 (admitting their only interaction after that date was on "a few" occasions during office-wide moot calls, in which Plaintiff participated by phone). In short, Plaintiff's circumstances in the months leading up to her resignation were not so intolerable that a reasonable person would feel compelled to resign.

In fact, Plaintiff's failure to promptly resign only further underscores that her working conditions were not intolerable as a matter of law. Defs.' Mot. at 11 (citing cases). Plaintiff waited to resign until, with help from the Mediator, she found a clerkship that would—as she explained to her friend months earlier—enable her to "open [her] career options further" and "transition up". *See* Ex. 62. Because Plaintiff's own words conclusively establish that she was not constructively discharged, Plaintiff is not entitled to front pay in any amount.

Second, there is an additional, independent reason to reject Plaintiff's request for front pay on this record: Plaintiff's own conduct renders such relief unavailable as a matter of law. Plaintiff's decision to secretly record her FDO colleagues and to retain those secret recordings as well as FDO emails, both of which contained privileged client information, without authorization, renders her ineligible for reinstatement. *See* Defs.' Mot. at 12-13. As she put it herself, she sought to "burn the place down on the way out." Ex. 65, Text message from Caryn Devins to Valerie Nannery. Because Plaintiff's conduct makes her ineligible for reinstatement, it would be inequitable to award her front pay in any amount. Defs.' Mot. at 13 (citing cases).

Third, even if Plaintiff could show entitlement to a front pay award, she would not be entitled to the staggering amount she seeks. For one thing, her expert applied an inappropriate tax gross-up of Plaintiff's alleged damages in the amount of nearly half a million dollars, *see* Pl.'s Ex. R at 1, 4, despite the fact that there is no waiver of sovereign immunity for a tax gross-up. In fact, at least two circuits have found that grossing up a plaintiff's damages for the tax consequences of a lump-sum payment is not appropriate against the federal government, even where there is a waiver of sovereign immunity for "equitable" relief. *See, e.g., Fogg v. Gonzales*, 492 F.3d 447, 456 (D.C. Cir. 2007) (holding

24

that no gross-up of plaintiff's damages for tax consequences of a lump sum payment was available under Title VII in a case against the federal government); *Arneson v. Callahan*, 128 F.3d 1243, 1247 (8th Cir. 1997) (recognizing that a waiver of sovereign immunity is required for tax enhancements and finding no such waiver in either Title VII or the Rehabilitation Act, even though both statutes expressly waive sovereign immunity for "equitable" relief). Indeed, a tax gross-up here "would, contrary to usual remedial principles, put [Plaintiff] 'in a better position' than if no constitutional violation had occurred" because she would be receiving a lump-sum up front for more than she would have received if she had remained at the FDO, including all the benefits that the time value of money affords. *Collins v. Yellen*, 141 S. Ct. 1761, 1801 (2021) (Kagan, J., concurring in part and dissenting in part) (quoting *Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 285 (1977)).

Plaintiff's request for a $3.4 million front pay award should be denied for a fourth and final reason: addressing the amount of front pay Plaintiff might be owed is premature because, at this stage of the litigation, the only issue is whether Plaintiff is entitled to this form of relief. Based on the undisputed evidence in the record, she is not. Further, Plaintiff's request for $3.4 million is also premature because it is based on an expert witness report and evidence that Defendants have had no opportunity to test or rebut at this stage in the proceedings. In fact, it is apparent there are serious flaws in the expert report that Plaintiff asks this Court to rely on. For example, Plaintiff's front pay expert relies on untested assumptions about Plaintiff's current earnings, including that Plaintiff will only work part-time (1,692 hours/year) and that she has annual "overhead costs" in the amount of $81,279, which is a 60% subtraction from her total earnings of $135,360, without providing any basis for that assumption or identifying what those "overhead costs" may be. Defendants are entitled to test these assumptions and reserve the right to contest the amount of front pay once expert discovery is completed.

For all these reasons, her request for a front pay award should be denied as a matter of law.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's Motion and enter summary judgment in favor of Defendants.

Dated: June 15, 2023

Respectfully submitted,

BRIAN BOYNTON
Principal Deputy Assistant Attorney General

CARLOTTA P. WELLS
Assistant Branch Director

*/s/ Madeline M. McMahon*
MADELINE MCMAHON (DC Bar 1720813)
DANIELLE YOUNG
RACHAEL WESTMORELAND
Trial Attorneys, Federal Programs Branch
U.S. Department of Justice, Civil Division
1100 L Street, NW
Washington, DC 20001
Tel.: (202) 451-7722
Email: madeline.m.mcmahon@usdoj.gov

*Counsel for Defendants*

26