# Exhibit 47

```
              IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF NORTH CAROLINA
                     ASHEVILLE DIVISION
                    CASE NUMBER 1:20CV66
```

CARYN DEVINS STRICKLAND,

      Plaintiff,

    v.

UNITED STATES OF AMERICA, et al.,

      Defendants.
_____

- - - - - - - - - - - - - - - - - -

Videotaped Deposition

of

CARYN DEVINS STRICKLAND

- - - - - - - - - - - - - - - - - -

        The videotaped deposition of CARYN DEVINS STRICKLAND was taken by the Defendants on Tuesday, the 25th day of April, 2023, commencing at 9:15 a.m., at the United States Attorney's Office, located at 150 Fayetteville Street, Raleigh, North Carolina.

                                        PATRICIA C. ELLIOTT
                                        Verbatim Reporter

1   Q.   Was it your understanding that a presiding judicial
2 officer wouldn't order any type of remedy whatsoever against a
3 federal defender's office?
4   A.   I think that if the federal defender agreed to it, they
5 might.
6   Q.   So you didn't have -- when you were going through the
7 EDR process, you didn't have specific remedies in mind that you
8 were expecting to ask for during the process?
9   A.   Well, I think that by the point I got to the formal
10 process, the remedies that I had requested had been rejected.  So
11 I -- the main remedy that I was asking for at that point was for
12 the harassment, discrimination and retaliation to be stopped.
13   Q.   Is it still your belief that a presiding judicial
14 officer in a Chapter X proceeding, as a practical matter, will
15 not order remedies against a federal defender's office?
16   A.   Yes.
17   Q.   So do you believe that the statements made to you by Ed
18 Smith and Jill Langley were accurate?
19   A.   I do.
20   Q.   So is it your contention that your due process rights
21 were violated by individuals making accurate statements to you?
22   A.   Yes.
23   Q.   In -- in your view, would the termination of J.P. Davis
24 from the Federal Defender's Office have been the only way to stop
25 the alleged harassment?

1     A.  At what point in time?  I'm not sure when you're
2  referring to.
3     Q.  Wile you were -- well, let's say in March of 2019.
4     A.  Yes, I think I believed that that would have been
5  necessary.  It would not have been sufficient.
6     Q.  Did you -- when you were going through the EDR process,
7  and specifically the mediation phase -- well, actually, let me
8  ask you a different question.
9         Do you think Ed Smith was an authority on the EDR
10 process?
11    A.  Yes.
12    Q.  And why do you think that?
13    A.  Because he worked for the Fourth Circuit.  He served at
14 the pleasure of the chief judge and he presented himself as such.
15    Q.  Did he tell you that he was an authority on the EDR
16 process?
17    A.  Not specifically.
18    Q.  What do you understand Mr. Smith's job at the Fourth
19 Circuit to be?  What is his -- what is his role at the Fourth
20 Circuit?
21    A.  He is the chief circuit mediator.
22    Q.  And so he mediates cases involving appeals that are
23 pending before the Fourth Circuit in -- in federal court,
24 correct?
25    A.  Yes.

1    A.    If that's what my mediation supplement says.
2    Q.    On the way back from the lunch, did you tell Mr. Davis
3  that you were not happy living in a different city than your
4  husband?
5    A.    Yes.
6    Q.    Where did your husband live at that time?
7    A.    South of Asheville.
8    Q.    And what -- was it Tryon?
9    A.    Yes.
10   Q.    And you lived in Charlotte?
11   A.    Yes.
12   Q.    About how long does it take to drive from Charlotte to
13 Tryon?
14   A.    About an hour and 45 minutes.
15   Q.    Did you want to live closer to your husband?
16   A.    Eventually, yes.
17   Q.    About how long does it take to drive from Asheville to
18 Tryon?
19   A.    About 40, 45 minutes
20   Q.    By the way, when you interviewed to work at the Federal
21 Defender's Office in 2017, did you express an interest during the
22 interview in working at the Asheville office?
23   A.    I don't remember.
24   Q.    Would it -- is it possible that you did?
25   A.    Anything's possible.

1  your mentor.  Is that your understanding?
2       A.   That is my understanding.
3       Q.   And what is the basis for that understanding?
4       A.   What I recall is that we had a meeting in December of
5  2017.  I had asked Tony about the transition to an Assistant
6  Federal Public Defender position.  And during that meeting, he
7  said that J.P. had asked to be my mentor and that he would allow
8  that request.
9       Q.   Mr. Martinez told you that?
10      A.   Yes.
11      Q.   Do you have any -- did you take any notes at that
12 meeting or after that meeting about that meeting?
13      A.   I don't specifically recall.
14      Q.   Now, you made a report of sexual harassment to Mr.
15 Martinez, correct?
16      A.   Yes.
17      Q.   When did you first report sexual harassment to Mr.
18 Martinez?
19      A.   July -- I believe it was July of 2018.
20      Q.   Do you recall the specific date?
21      A.   So there were two meetings that I had with him at the
22 beginning of the month.  I think the first one was on July 2nd,
23 but, I mean, I could -- I could be off.  I don't know.
24      Q.   Do you -- did you report sexual harassment in the July
25 2nd meeting?

1   A.   I don't think so.  I mean, this is a summary.  So there
2   may have been, but I -- I don't recall.
3   Q.   Sure.  At the meeting, Mr. Martinez asked if you'd --
4   if you were reporting harassment or sexual harassment, right?
5   A.   He asked if this was harassment or sexual harassment.
6   Q.   Okay.  And you responded "I don't feel we are there
7   yet.  I don't want to use words like that to trigger something,"
8   correct?
9   A.   Yeah.  So what I said was I did not want to trigger a
10  report of -- of sexual harassment at that time.
11  Q.   Are you saying -- did you say, "I said I don't" -- or
12  excuse me.
13       Did you tell Mr. Martinez, "I don't feel we are there
14  yet.  I don't want to use words like that to trigger something"?
15  A.   Yes, to make a formal report.
16  Q.   It doesn't say -- would -- would you agree with me that
17  your notes don't say "to make a formal report"?  Correct?
18  A.   No, but that's what I meant.
19  Q.   Okay.
20  A.   That's what I was advised to do.
21  Q.   Okay.  So to the best of your recollection, is this
22  the -- I'm just trying to understand the wording that you used on
23  this particular issue.
24       So to the best of your recollection, is it accurate to
25  say that you told Mr. Martinez, "I don't want to use" -- or,

1  certainly wouldn't involve him unless I thought it was absolutely
2  necessary."
3       Did I read that correctly?
4     A.  Yes, that's accurate.  That's what I said.
5     Q.  At this meeting, did you tell Mr. Martinez about the
6  pay for stay e-mail?
7     A.  I don't believe so.
8     Q.  Did you tell Mr. Martinez that Mr. Davis had invited
9  you to lunch?
10    A.  I think he already knew that J.P. had invited me to
11 lunch.
12    Q.  But you -- did you -- did you tell him -- did you tell
13 him that you were uncomfortable going to lunch with Mr. Davis?
14    A.  No.
15    Q.  Did you tell him that Mr. Davis had invited you to get
16 a drink?
17    A.  Not at that time.
18    Q.  At this meeting, did you report any specific conduct by
19 Mr. Davis that concerned you?
20    A.  I said that he had made me feel so uncomfortable that I
21 was leaving the office by 5:00 every night to avoid issues with
22 him.
23    Q.  But did you identify specific conduct that made you
24 feel that way?
25    A.  That he had gotten extremely angry at me and spoken to

1  me inappropriately.
2       Q.   Anything else?
3       A.   That I needed to set boundaries with him.
4       Q.   Did you make a audio recording of this meeting on July
5  2nd?
6       A.   No.
7       Q.   You met with Mr. Martinez on -- well, let's get another
8  exhibit.
9              [GOVERNMENT EXHIBIT NO. 11 MARKED
10                  FOR IDENTIFICATION]
11      Q.   The court reporter has handed you what's been marked as
12 Exhibit 11.  Ms. Strickland, do you recall if you met with -- did
13 you meet with Mr. Martinez on July 5th?
14           And I know these dates -- well, let me ask a different
15 question.  Are these your handwritten notes?
16      A.   Yes, these are handwritten notes that I took.
17      Q.   And it looks like you wrote them on July 8th, 2018; is
18 that right?
19      A.   Yes, that's what it looks like.
20      Q.   And it says, "On Thursday, July 7th."  Do you know if
21 the meeting referred to here took place on July 7th, or is that a
22 mistake and it actually took place on July 5th?
23      A.   That could have been a mistake.  I don't remember
24 exactly when the meeting was.
25      Q.   Okay.  Do you know if your complaint refers to a -- a

1  meeting on July 5th?
2      A.   Off the top of my head, I -- I don't know.
3      Q.   Okay.
4      A.   I mean, this definitely -- it could have been a
5  mistake.
6      Q.   Okay.  I just want to make sure we're --
7      A.   Right.  I mean, there was --
8      Q.   -- we're speaking about the same --
9      A.   Yeah, it was that second meeting.
10     Q.   Okay.  What do you recall happening at that second
11 meeting?
12     A.   So I recall Tony coming to me and saying that he wanted
13 me to meet with J.P., the person who I had just told him I needed
14 to set boundaries with.  He said that there was a breakdown in
15 communication and he wanted me to meet with J.P.
16     Q.   And, initially, you met with Mr. Martinez and Mr.
17 Davis.  The three of you met; is that right?
18     A.   Initially, yes.
19     Q.   And Mr. Davis exited the room, and then you met with
20 just Mr. Martinez, correct?
21     A.   I asked him to leave, yes.
22     Q.   You asked Mr. Davis to leave?
23     A.   I said I wasn't comfortable meeting with Mr. Davis.
24     Q.   After Mr. Davis left, is it correct that the first
25 topic you discussed with Mr. Martinez was the issue of the

1  presentence interview?
2      A.   I don't recall specifically, but that sounds accurate.
3      Q.   At the meeting discussed here in your notes, did you
4  tell Mr. Martinez that you were being sexually harassed?
5      A.   I told him that I felt threatened by J.P., and I told
6  him that he had been asking me to meet repeatedly outside of the
7  office, that he waited for me when I was leaving the building
8  alone and no one else was there working.  I think I repeated that
9  I was leaving the office every day by 5:00 p.m. to avoid being in
10 the building alone with him.
11     Q.   Did you make an audio recording of this meeting?
12     A.   No.
13     Q.   Let's look back at the mediation supplement, which is
14 Exhibit 4.  If you could please turn to Page 98.
15          So on Page 98, there's an e-mail from you to Mr.
16 Martinez dated July 9th, 2018, saying, "Dear Tony, thanks for
17 meeting with me and J.P. last Thursday.  I wanted to make sure
18 that I understand the next steps moving forward.
19          "From the meeting, my understanding is that there is no
20 performance issue with my work, but that this is a matter of
21 receiving the right mentoring.  Based on this, I am planning to
22 ask for a new mentor.  Please let me know if you have any
23 questions or concerns."
24          And so this -- when you wrote "Thanks for meeting with
25 me and J.P. last Thursday," that's referring to the meeting that

1  report what I said back to him.  But I don't recall if that was
2  before or after this e-mail.
3      Q.   Did you meet with Mr. Davis after August 10th --
4  August 10th, 2018?
5      A.   I don't believe so.  I think I -- that's when I started
6  on telework.
7      Q.   Did he invite you to meet with him after August 10th,
8  2018?
9      A.   I don't think so.
10     Q.   Did you ever speak with him on the phone after August
11 10th, 2018?
12     A.   He participated in the appellate moots that our office
13 was having on which I was also on the line.
14     Q.   How many people typically participated in those moots?
15     A.   It would depend.  Maybe four or five.
16     Q.   Do you recall how many moots you participated in after
17 August 10th in which Mr. Davis also participated in?
18     A.   I don't recall off the top of my head.
19     Q.   Do you have a -- a rough approximation?
20     A.   A few probably.
21     Q.   Now, you have alleged that Mr. Martinez was
22 deliberately indifferent to your reports of sexual harassment.
23 In what ways do you believe he was deliberately indifferent?
24     A.   Well, again, I mean, that's all set forth in detail in
25 the things that I filed.  But some of the things we've discussed

1              If you'd look at the second paragraph, the last
2     sentence, did you tell me Nancy Dunham, "If I have to work
3     remotely until there is space in Asheville, that is completely
4     fine with me"?
5         A.    I'm sorry.  I'm still just -- I'm familiarizing
6     myself --
7         Q.    Yeah.  Sure.
8         A.    It's a long e-mail chain.
9         Q.    Yeah.
10        A.    (Witness examines document.)  Okay.  Which page did you
11    want me to look at?
12        Q.    Page 977, the e-mail at the bottom of that page and the
13    second paragraph, beginning with "I just want to confirm."
14             If you look at the last sentence of that paragraph, did
15    you tell Ms. Dunham "If I have to work remotely until there is
16    space in Asheville, that is completely fine with me"?
17        A.    Yes, that's what it says.
18        Q.    And was that accurate?
19        A.    Yes.
20        Q.    At your February 7th, 2019, meeting with Circuit
21    Mediator Ed Smith, did you tell him that you prefer telework and
22    that you work better on your own?
23        A.    I don't recall specifically what I -- I remember
24    discussing telework with him.  I don't recall what specifically I
25    said.

1    Q.    Would that have been accurate, if you told him that you
2  prefer telework and -- and work better on your own?
3    A.    It wouldn't surprise me.
4    Q.    Were you able to work effectively at the Federal
5  Defender's Office while you were teleworking?
6    A.    No.
7    Q.    Why not?
8    A.    Well, under the circumstances while there was an
9  ongoing EDR process and nothing had been resolved about the
10  harassment, discrimination and retaliation, it was not a
11  situation that I preferred.
12         It was extremely ostracizing, and it made it difficult
13  even to do things like if I did need to have a court appearance.
14    Q.    Did you tell Mr. Martinez or Mr. Ishida that you
15  weren't happy teleworking?
16    A.    I think what I told Mr. Ishida is that I was not happy
17  with how the process was going.  I don't know if I specifically
18  mentioned telework.
19    Q.    Did you tell Mr. Martinez that you weren't happy
20  teleworking?
21    A.    I did not speak to Mr. Martinez once the -- that I call
22  after the EDR process started.
23    Q.    Is it correct that you primarily teleworked while
24  working for the North Carolina Solicitor General's Office?
25    A.    Yes.

1   Q. Why not?
2   A. Because I didn't want to leave that job.
3   Q. Would you agree a Court of Appeals clerkship is a
4   coveted experience for young attorneys?
5   A. It wasn't for me.
6   Q. In general, though, is that a coveted experience for
7   young attorneys?
8   A. Sure.
9   Q. And it's prestigious experience that helps open doors
10  for other jobs, correct?
11  A. Yeah, which is why I had clerked previously.
12  Q. Is it correct that you did not submit an EDR claim
13  alleging that you were constructively discharged?
14  A. I did not submit another EDR claim after this, no.
15  Q. Why is that?
16  A. I'm not sure what good it would have done.
17  Q. Ms. Strickland, do you recall when you vacated your
18  residence in Charlotte?
19  A. I don't remember the exact date. There were multiple
20  water leaks in my apartment, and so I decided it just wasn't
21  worth trying to -- I was going to have to leave anyway.
22  Q. Do you recall approximately when that was?
23  A. I think it was that fall sometime; fall of 2018.
24  Q. Do you know if it was August or September?
25  A. I really couldn't tell you.