# Exhibit 59

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

CARYN DEVINS STRICKLAND,

    Plaintiff,

v.                Civil No.: 1:20-cv-00066-WGY

UNITED STATES, et al.,

    Defendants.
_____/

| | |
|---|---|
| VIDEOTAPED DEPOSITION OF: | ANTHONY MARTINEZ |
| TAKEN: | By Counsel for Plaintiff |
| DATE: | April 28, 2023 |
| TIME: | 9:00 a.m. - 5:41 p.m. |
| PLACE: | Constangy, Brooks, Smith & Prophete<br>100 North Tampa Street<br>Suite 3350<br>Tampa, Florida 33602 |
| REPORTED BY: | Sarah Parker<br>Notary Public<br>State of Florida at Large |



RICHARD LEE REPORTING

rlr@richardleereporting.com

```
 1   and telling me that.  And she left, and I was
 2   puzzled.
 3        Q.   Did she tell you during the meeting that
 4   she was leaving work early to avoid being alone with
 5   him?
 6        A.   I don't recall that conversation either.
 7        Q.   And she didn't tell you that JP had
 8   cornered her in the lobby as she was trying to leave
 9   the building?
10        A.   No, she didn't mention that.
11        Q.   She did, or did not?
12        A.   She did not mention the lobby situation on
13   July 2nd, she mentioned that on July 5th.
14        Q.   So she didn't say she wanted to make a
15   formal complaint against JP; is that right?
16        A.   She didn't say --
17        Q.   That she wanted to make a formal complaint?
18        A.   No, she didn't say anything about formal
19   complaint, didn't say anything about sexual
20   harassment, nothing.
21        Q.   And would it surprise you to learn that she
22   said she wanted to resolve it informally and
23   self-manage the situation?
24        A.   Are you talking about July 2nd?
25        Q.   Uh-huh.
```

|   |   |
|---|---|
| 1 | wanted to give me a heads up and keep me in the |
| 2 | loop." |

1  wanted to give me a heads up and keep me in the
2  loop."
3          And that's referring to July 2nd.
4      Q.   In the fourth paragraph, can you read aloud
5  the fourth paragraph of the document?
6      A.   What paragraph do you want me to read?
7      Q.   Actually, why don't you do the third and
8  fourth paragraph, if that's okay, for the record.
9      A.   Yeah.  "I then specifically asked her about
10 any possible harassment by JP.  She advised me on
11 several occasions he made her feel uncomfortable by
12 wanting to meet after work hours.  On one specific
13 situation she said they both had stayed late working
14 on the case.  When the meeting was over, JP asked her
15 if she needed a ride.  Caryn advised him that she had
16 had her bike and she did not need a ride.  She went
17 and got her bike and on her way out to the first
18 floor, JP was waiting for her in the lobby and asked
19 her if she needed a ride.  Caryn said no and left."
20 She indicated she -- that's my language, "creeped
21 out."
22     Q.   Okay.
23     A.   I don't know if she used that specific
24 language, but she just felt creeped out by him being
25 in the lobby after she said no to his request.

1    Q.   Do you want to read the next paragraph?

2    A.   Right.  Then, "I specifically asked Caryn
if there was any inappropriate touching or attempting
to touch her.  She said no.  I told her that I wanted
to make sure she worked in a environment where she
felt comfortable.  She advised me she did not want to
submit a complaint against JP."

8    Q.   Does that accord with your recollection of
the event?

10   A.   Yes, ma'am.  Yes, ma'am.

11   Q.   Why did you ask about touching,
inappropriate touching or attempted touching?

13   A.   I understand that there is a physical
aspect to sexual harassment.  In this particular
scenario, when she's talking about she came down the
elevator and came to the lobby, I was really asking
about did JP do anything else than just stand there,
and, in essence, that's what I was saying.  When I
say, "touching or something physical," she said, "No,
he went his way and she went that way."  That's what
I was -- that's why I asked that question.

22   Q.   Did you think that if she was touched, then
she would have experienced sexual harassment?

24   A.   Oh, obviously, if she was.  More, if he was
trying to do something, then, yes.

1         A.   Scroggins.  But she spoke to someone from
2    that office, and they instructed her.  I'm pretty
3    sure she said Nancy Dunham advised her, Heather Beam,
4    that there is nothing that they can do about this,
5    nothing Heather can do about this situation.
6    Mr. Martinez needs to resolve this.  Do not contact
7    any lawyers and this is a directive, this is an
8    order.
9              I then -- she then contacted -- you know,
10   this is Heather telling me this.
11             I then said, "What, Heather?  I mean, I'm
12   not understanding."
13             "That's what I was told, Tony, and I can't
14   be involved in investigation of this case.  I'm
15   done."
16             I called James, I said, "James, what's
17   going on here?"  Heather just advised me of what I
18   just told you, I thought this, this complaint is
19   going to the Fourth Circuit, the EDR plan under the
20   on the Fourth Circuit applies here.  How is the AO
21   saying this, or doing -- so it was clear to me that
22   Caryn had already contacted the AO, the FEPS office.
23   That's when I first found out that she had contacted
24   and filed or was communicating.  I didn't know, but
25   they were aware of the situation.

```
1       A.   Yes, ma'am.
2       Q.   And prior to that, you didn't know that
3   Caryn had gone to FEPS with her report?
4       A.   Correct.
5       Q.   So is it fair to say that you became aware
6   for the first time of Caryn's complaint to FEPS on
7   August 8th?
8       A.   Yes, yes.
9       Q.   First time?
10      A.   Yes.
11      Q.   Okay.  And it says here that you -- she
12  suggested you should meet with Plaintiff, and then
13  you did.  That's why you were meeting with her on
14  August 9th?
15      A.   Correct, correct.
16      Q.   So on August 9th, you met with her.  Did
17  you say in this meeting to her that -- did you tell
18  Caryn in this meeting that you were unhappy about her
19  having contacted FEPS?
20      A.   No, I told her -- excuse me.  I thought
21  that she -- I felt that she didn't go to me first, to
22  speak to me, and she kind of went around me and is
23  sharing with the AO, Administrative Office of the
24  Courts, and I just felt like she went, you know,
25  behind my back, sort of.
```

And so I asked her, "Why did you do that? Why didn't you come to me and talk to me? I would have tried to resolve all these issues before you go into the AO." That was the extent of my conversation.

Q. Did she tell you in that meeting that she had been trying to resolve the situation informally?

A. She might have, yes, yes, yes.

Q. Did you think she'd done something wrong by reporting the conduct to the AO's FEPS?

A. No, she was doing nothing wrong, and obviously, you know, she has a perfect right to call the AO and ask them questions. I just thought it was unfair to me that she didn't speak to me first and articulate to me, you know, all of the concerns so that I could try to resolve them. You know, and I thought they were resolved on July 5th.

So I was taken aback, that too. You know, we had the meeting July 5th. The way we left the meeting, she was happy.

I said, "Are you sure you're okay with this; are you comfortable going forward?"

She said, "I'm comfortable going forward."

And nothing, it was uneventful, up until I get a call from the AO saying, "Oh, Tony, I was just

1  Q.  Did you feel mad that she reported to the
2  AO?
3  A.  Yeah, I was upset, and I say it, I told her
4  because I thought she was going behind my back and I
5  would have liked for her to come to me first.
6  Q.  And you didn't think that she had come to
7  you first on July 2nd?
8  A.  Correct.  Because we were just talking
9  about, I thought it was a breakdown in communication.
10  I did have concerns, but my concerns were allayed
11  during that meeting, and after that meeting, she felt
12  comfortable going forward.  And it was just a
13  breakdown in communication, and I thought it was
14  resolved.
15  Q.  And at the July 5th meeting, you also
16  believed that the concern was resolved?
17  A.  Correct.
18  Q.  So did you say to her in that meeting, "I
19  feel like I'm being blamed for a situation that as
20  soon as I was put on notice, I'm taking control over
21  it"?
22  A.  At which meeting?  You're talking about
23  August 9th, yes.
24  Q.  Sorry, yes.  August 9th, yes.  What did you
25  mean by that?

1     Q. Did you agree with that?

2     A. Yes, ma'am.

3     Q. Why did you think you should recuse and appoint Heather?

5     A. Well, first of all, I wanted to get out of the scenario. I wanted somebody as fair and impartial. I wanted distance from the EDR process. I wanted to create distance, so I was in total agreement about recusing myself. And then Heather is the HR specialist for the district, and she had no idea. You know, she was distant; and so it's like, why not?

13     Q. Why not. Did you --

14     A. I mean, I'm not going to ask you a question, in my mind I'm saying, "Why not?"

16     Q. I understand. I wasn't about to answer for you. So did you think that you could be fair or impartial if you were the investigator?

19     A. I felt I could, but I didn't want to be the investigator. I didn't want anybody alleging that I was tipping the scale in favor of JP. He's my first assistant, and the allegations were against the first assistant, and one of my supervisors. And so I wanted to be recused, get out, and have somebody else who's completely independent to conduct the

208

1  investigation and be my designee.
2      Q.  Was there some risk in your mind that
3  people would think there was a little bias in favor
4  of JP on your part?
5      A.  Yes, ma'am.
6      Q.  Why was that?
7      A.  I felt that Caryn would feel that there
8  would be bias if I was investigating JP, yes.
9      Q.  Why do you think Caryn would have thought
10 that?
11     A.  I felt that, particularly in the August 9th
12 meeting, again, when I got defensive, I just felt she
13 was somewhat -- I felt like I was under attack
14 myself.  And so I just wanted to clean my hands of it
15 and have somebody else completely independent handle
16 it.
17     Q.  So in the August 9th meeting you felt
18 attacked by Caryn?
19     A.  No, I didn't feel attacked.
20     Q.  You felt that you were under attack?
21     A.  No, I felt that she was blaming me, which
22 is what I say in the meeting, that she's blaming me
23 for a lot of the circumstances surrounding, like in
24 her eyes, lack of whatever.  I just felt like I was
25 being blamed, that's all.

216

1    sexual harassment to you, correct?
2         A.   She reported some conduct to me that, in my
3    opinion, was not sexual harassment based on the facts
4    that she provided to me.
5         Q.   So she provided facts to you that you did
6    not consider sexual harassment; is that right?
7         A.   Correct.
8         Q.   And -- but you still felt that it was
9    obligatory for you to report it to Mr. Ishida?
10        A.   Because she alleges in black and white that
11   she was being sexually harassed.
12        Q.   In what way was Heather Beam your designee
13   in the investigation?
14        A.   I have no -- I really don't know.
15        Q.   Were you confused by what that meant?
16        A.   I was a little confused about some aspects
17   of this, because this was my first time going through
18   and under this EDR plan; so yeah.
19        Q.   Did you think that it was a conflict of
20   interest for you to be appointing the investigator?
21        A.   There might be an allegation.  I didn't
22   think so, because, in essence, I was not selecting
23   the investigator.  The investigator was being
24   selected by the circuit executive, and then, for me,
25   it was just a technicality that I would be appointing

1  her, but I still had a distance from her.
2      Q.   Did you think that Heather was acting as
3  your designee?
4      A.   Pursuant to this e-mail, yes.  You know,
5  what that means, I have no idea.
6      Q.   Was she doing the investigation under your
7  supervision?
8      A.   No.
9      Q.   Was she reporting to you?
10      A.   No.
11          MS. GERSEN:  All right.  Can we have
12      Tab 29, please.
13  BY MS. GERSEN:
14      Q.   Okay.  I'm handing you Exhibit 69, and could
15  you let me know if you recognize that.
16          MS. GERSEN:  I'm sorry, this is Exhibit 3
17      in a previous exhibit.  Can we fix this?
18          (Exhibit 3 was marked for identification.)
19      A.   Okay.
20      Q.   Do you have it?
21      A.   Yes, ma'am.
22      Q.   So this -- have you seen this e-mail
23  before?
24      A.   No, this is the first time I've ever seen
25  this.