# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

### ASHEVILLE DIVISION

| | |
|---|---|
| CARYN DEVINS STRICKLAND, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | )    **Civil No. 1:20-cv-00066-WGY** |
| | ) |
| UNITED STATES, *et al.*, | ) |
| | ) |
| *Defendants*. | ) |

### PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants misrepresent facts, ignore the standards set forth in the Fourth Circuit's prior decision, *Strickland v. United States*, 32 F.4th 311 (4th Cir. 2022), and fail to disclose controlling adverse authority. Defendants even fail to mention that the EDR Investigator found that both the Defender and the First Assistant engaged in conduct warranting disciplinary action, and they were disciplined for "wrongful conduct" under the EDR Plan, that is, "[d]iscrimination against employees based on . . . sex," including "sexual harassment," and "retaliation for engaging in any protected activity." ECF No. 248, Ex. D, at 83. In the Defender's letter of discipline, the Fourth Circuit vividly described the First Assistant's "unsavory quid pro quo proposal" and the Defender's deliberately indifferent response, including using an "inappropriate" and "ill-advised" metaphor comparing the First Assistant's relationship with Plaintiff to a "marriage"; "call[ing] out" Plaintiff for seeking "advice and guidance" on her legal rights; making "callous," "minimizing," and "insensitive" remarks, including that "at least you weren't touched"; and "shifting responsibility" by failing to accept blame. *See* ECF No. 248, at 17–19. These findings fatally undermine Defendants' argument and are conclusive in Plaintiff's favor.

Likewise, the Investigator found that the First Assistant's conduct "can clearly be inferred to be a quid pro quo request" that "supports [Plaintiff's] claim of harassment." *Id.* at 16. But due to the Investigator's lack of training and experience (she had never received any training in workplace investigations or conducted any other investigation besides Plaintiff's), she concluded that the harassment was "flimsy" and in Plaintiff's "mind" because she did not believe the First Assistant "intend[ed]" the harassment. *See id.* This misinformed conclusion is contrary to settled law that "[i]t is the perception of the individual who feels harassed that counts," not the intent of the harasser. *Id.* (FJC Guidance). The Investigator herself found that a reasonable person in Plaintiff's position would believe the email was a *quid pro quo* request, which undermines Defendants' characterization that it was a "joke." *See* ECF No. 245, at 20.

Defendants' trivializing of wrongdoing and omission of critical facts renders their motion for summary judgment baseless. Moreover, their eleventh-hour allegation of impropriety is meritless. *See infra*, at 5–9. Plaintiff's use of FDO materials is protected under the judiciary's Codes of Conduct and the FDO's EDR Plan, which Defendants failed to disclose to this Court.

I.     **Plaintiff Properly Seeks Prospective Equitable Relief that is Available Under the Fourth Circuit's Ruling and Other Longstanding Precedent.**

A.     **The Fourth Circuit rejected Defendants' jurisdictional arguments.**

Defendants begin with jurisdictional arguments that were considered, and rejected, by the Fourth Circuit. *Strickland*, 32 F.4th at 363–66. The Fourth Circuit held that except for back pay, each form of relief that Plaintiff requested, including "declaratory relief," "injunctive relief," and "front pay," were "viable forms of equitable relief." *Id.* at 365–66.

First, the Fourth Circuit rejected Defendants' argument that sovereign immunity barred Plaintiff's claims. *Id.* at 365. Plaintiff alleged that in violating her due process and equal protection rights, Defendants "exceeded the scope of their authority or acted unconstitutionally

2

and that those actions were therefore ultra vires." *Id.* "[T]hese allegations . . . fall 'squarely in the heartland of nonstatutory review over which federal courts have long exercised jurisdiction.'" *Id.* (quoting Huq & Chemerinsky Amicus Br. 11).

Second, the Fourth Circuit rejected Defendants' argument that Plaintiff "has not identified any prospective equitable relief or ongoing constitutional violations." *Id.* The Court explained that "[a]lthough it is true that Strickland's resignation and acceptance of another job means that she is not currently being impacted by the alleged constitutional violations, the fact remains that she is seeking other viable forms of equitable relief." *Id.* at 365–66. Such relief includes "a declaration" that the actions Defendants took "were unconstitutional," and an award of "front pay in lieu of reinstatement," which is "an equitable remedy." *Id.* at 366.

The Fourth Circuit's holding is binding under the mandate rule. *See S. Atl. Ltd. P'ship of Tennessee, LP v. Riese*, 356 F.3d 576, 584 (4th Cir. 2004) ("[T]he mandate rule 'forecloses relitigation of issues expressly or impliedly decided by the appellate court.'" (citation omitted)). Contrary to this principle, Defendants ask this Court to hold that "there is no basis to award declaratory relief," ECF No. 245, at 8, even though the Fourth Circuit expressly held that Plaintiff's request for declaratory relief was proper, *see Strickland*, 32 F.4th at 366. Defendants also recast their failed sovereign immunity argument as one of "standing." *See* ECF No. 245, at 8–9. Like their brief before this Court, Defendants' brief before the Fourth Circuit asserted that Plaintiff's complaint "identifies injuries based on defendants' alleged past violations during the EDR process, not any ongoing constitutional violations," and even cited the same precedent. *Compare* ECF No. 245, at 9 (citing *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983)), *with Strickland v. United States*, No. 21-1346, Doc. 80, at 20; *id.* at 21 n.8 (citing *City of Los Angeles*

*v. Lyons*, 461 U.S. 95 (1983)). Defendants' rehashing of arguments that were rejected by the Fourth Circuit is not a basis to grant summary judgment in their favor.

**B.    Plaintiff has standing.**

The Fourth Circuit's ruling that Plaintiff seeks viable equitable relief confirms that she has standing. Indeed, "a loss of employment and the resulting loss of wages and other benefits" are "'classic and paradigmatic' injuries for standing purposes." *DiCocco v. Garland*, 18 F.4th 406, 412 (4th Cir. 2021); *see also DiCocco v. Garland*, 47 F.4th 882 (4th Cir. 2022) (unpub. mem.). Plaintiff suffered a "loss of employment" due to her constructive discharge, and she continues to suffer a "resulting loss of wages and other benefits." *DiCocco*, 18 F.4th at 412.

This loss of wages and benefits is confirmed by Defendants' own evidence. Defendants' front pay expert, Dr. Paul F. White, concluded that even if Plaintiff were to obtain a private sector position by January 1, 2024 earning the salary she would have received at the FDO, she would still suffer $375,004 in lost earnings based on the loss of her federal pension alone. *See* Ex. T, at 9. In other words, Plaintiff has suffered hundreds of thousands of dollars in lost pension benefits before her lost wages are even considered. *See id.* Of course, it is exceedingly unlikely that Plaintiff will obtain another position in indigent criminal defense making the salary she would have earned at the FDO. Recognizing this possibility, Defendants' expert evaluates another scenario where it takes Plaintiff six years to fully mitigate her lost earnings, resulting in lost earnings of $692,881. *See id.* at 7–8. This scenario, which still underestimates her lost earnings, confirms her ongoing losses, "an injury in fact." *DiCocco*, 18 F.4th at 412.

Plaintiff also meets the other requirements for standing, including causation and redressability. "To satisfy standing's causation requirement, the alleged injury must be 'fairly traceable to the challenged action of the defendant . . . .'" *Id.* (quoting *Lujan v. Defs. of Wildlife*,

504 U.S. 555, 560 (1992)). "Standing does not turn on whether a plaintiff has definitively stated a valid cause of action," and so "a valid claim for relief is not a prerequisite for standing." *Id.*

In *DiCocco*, the plaintiff's allegation that she was forced to resign due to her federal employer's discriminatory policy met the causation element of standing. *Id.* The Fourth Circuit explained that "[w]ithout that policy . . . Dr. DiCocco would not have resigned." *Id.* Thus, "on the face of the complaint, Dr. DiCocco's alleged injuries are fairly traceable to the [agency's] actions." *Id.* Here, as in *DiCocco*, Plaintiff was forced to resign due to the fundamentally unfair and discriminatory EDR process. *See id.* Thus, "on the face of the complaint," her "alleged injuries are fairly traceable to [Defendants'] actions." *Id.*

Defendants argue that there is no "remedy" here because Plaintiff was "not constructively discharged," ECF No. 245, at 9–12, but this argument is properly addressed with the merits, not standing. *See DiCocco*, 18 F.4th at 412 (courts should not "improperly conflate[] the threshold standing question with the merits of [the] claims"). In any event, Plaintiff was constructively discharged. *Infra*, at 24–25. Defendants similarly err in contending that "front pay is not a remedy" for Plaintiff's due process claim. ECF No. 245, at 10. Plaintiff is not seeking front pay for due process violations standing alone, but rather for her constructive discharge resulting from those violations. *See Strickland*, 32 F.4th at 356 (discussing futility of EDR process).

Finally, Plaintiff has established redressability. Plaintiff's injuries will be "redressed by a favorable decision" and remedies, including a declaratory judgment and an award of front pay. *DiCocco*, 18 F.4th at 413; *Strickland*, 32 F.4th at 363–66.

### C.    Defendants' motion confirms that Plaintiff is suffering ongoing harm.

Defendants' summary judgment motion further confirms that Plaintiff is suffering ongoing harm, including retaliation. *Cf.* FDO EDR Plan § 1 (prohibiting "intimidation or

retaliation" for exercising any "legally protected right"). Defendants argue that Plaintiff is not eligible for reinstatement and therefore should not receive any remedy because of an alleged "specter of misconduct." ECF No. 245, at 12. Before alleging a "specter of misconduct," Defendants should have ensured that a good faith basis existed for these allegations. No such basis exists because the alleged conduct is protected by judiciary policy.

### 1. Plaintiff did not violate the confidentiality policy.

Defendants contend that Plaintiff "arguably violate[d] the confidentiality provision of the FDO Employee Handbook" by using copies of emails and recordings to support her report of wrongful conduct. ECF No. 245, at 12; ECF No. 245-25. Defendants are presumably referring to Plaintiff's use of FDO materials, similar to the case-related materials that FDO officials provided to the EDR Investigator and used in this litigation. *See, e.g.*, ECF No. 248, Ex. D, at 34–40, 47–56; ECF No. 78-2, at 20–26. Plaintiff disclosed these materials upon request by the Investigator and in response to discovery requests during this litigation. Unlike Defendants, Plaintiff took painstaking care to redact client information. *Compare* ECF No. 248, Ex. D, at 31–33, 41–43 (Plaintiff's redacted emails); *with id.* at 34–40, 47–53 (FDO's unredacted emails).

The Code of Conduct for Federal Public Defender Employees protects this activity by providing that the "general restriction on use or disclosure of confidential information does not prevent, nor should it discourage, an employee or former employee from reporting or disclosing misconduct, including sexual or other forms of harassment." Code of Conduct Canon 3(D)(3) (Ex. U). This policy was designed to "clarify" "that confidentiality obligations should never prevent any employee . . . from revealing abuse or reporting misconduct by any person." Report of the Federal Judiciary Workplace Conduct Working Group 25 (2018). It was enacted in response to reports that judiciary employees "mistakenly believe[d] that the obligation of

confidentiality extends to the reporting of misconduct," which was never the case. *Id.*; Report of

the Proceedings of the JCUS at 13 (Mar. 2019), *available at* https://tinyurl.com/rkt3ycmk

(amendments "clarify" that "duty of confidentiality" does not apply to reporting of misconduct).

The FDO's EDR Plan is even more specific, as it states the following:

> Confidentiality obligations in the Code of Conduct for Federal
> Public Defender Employees concerning use or disclosure of
> confidential information received in the course of official duties,
> ***including attorney-client and work-product privileged
> information***, do not prevent nor should they discourage Employees
> from reporting or disclosing wrongful conduct, including sexual,
> racial, or other forms of discriminatory harassment by the FPD, a
> Judge, a supervisor, or other person.

Federal Public Defender – Western District of NC Employment Dispute Resolution Plan,

§ V(B)(1) (Ex. V) (emphasis added). The FDO's EDR Plan thus provides that restrictions on the

use of confidential information do not apply to reports of wrongful conduct. *Id.* These

protections apply to former employees, like Plaintiff, in addition to current employees. Code of

Conduct Canon 3(D)(3); FDO EDR Plan § II; App'x 1 (defining "employee"). These adverse

controlling authorities confirm that Plaintiff's conduct was protected activity.

Plaintiff also has taken care to avoid disclosure of client information. In her email

providing her documentation to the EDR Investigator, Plaintiff stated: "I have taken care to

redact all client or sensitive information so please let me know ASAP if you see any info that

needs to be redacted." ECF No. 248, Ex. N, at 27. These measures were particularly important

because the EDR Investigator appointed by Defender Martinez is an HR Specialist who works

for the Probation Department, which oversees FDO clients on pretrial and supervised release,

and the District Court, which hears FDO clients' cases. Ex. W, at 34–35 (discussing "shared

services agreement"). The Investigator praised Plaintiff for keeping meticulous records and

asked her to provide copies, including FDO emails. Ex. X, at 133. The Investigator, and by

extension, the FDO, were therefore well-aware of Plaintiff's use of FDO emails, which she properly redacted, because she disclosed them in response to the Investigator's request. Similarly, during this litigation, Plaintiff took painstaking care to avoid disclosing client information, as demonstrated by her privilege log. ECF No. 245-25, Ex. A.

By contrast, the First Assistant provided the Investigator a document containing "all emails from the Federal Defender's Office between Mr. Davis and Ms. Strickland dated on or before July 26, 2018." Ltr. from Joshua Kolsky Dated Jan. 27, 2023 (Ex. Y). According to Defendants, "[t]he document is 2,172 pages long and contains numerous case-related emails, and therefore would require extensive redactions of such information before it could be produced in this litigation." *Id.* Defendants themselves stated that the emails are "privileged" and not "relevant" to the claims in this proceeding. *Id.* This document containing unredacted client information was then provided to the Department of Justice—the authority responsible for prosecuting the FDO's clients—during this litigation. *Id.* Plaintiff's painstaking efforts to protect client information stand in stark contrast to these disclosures.

## 2. Plaintiff's recordings were lawfully protected and, in fact, were relied upon by Defendants during her EDR proceeding.

Defendants also contend that Plaintiff's use of recordings to document the discrimination she suffered "undermines the trust between colleagues" and "reflects . . . a disregard for the rules of this Office." ECF No. 245, at 12.

There is no FDO office rule that prohibits audio recording. *Cf.* FDO Employee Handbook § 5.21(B)(3) ("[n]o expectation of privacy exists" in the use of any office device and employees "may be subjected to monitoring"). Defendants' belief that such activity "undermines the trust between colleagues" demonstrates a selective enforcement of office norms, as it ignores that acts of sexual harassment, discrimination, and retaliation "undermine the trust

8

between colleagues." *Cf.* FDO EDR Plan § 1 ("[B]ullying, harassment, or inappropriate conduct does not align with treating colleagues with respect and will not be tolerated.").

Moreover, Defendants were well-aware of Plaintiff's recordings and relied on them in her EDR proceeding. Plaintiff told the Investigator that she was recording, and she provided a recording to the Investigator of a conversation with Defender Martinez in which he berated her for reporting her complaints to the AO, minimized the harassment, and stated that he was being blamed and attacked for something that was not his fault. ECF No. 248, Ex. N, at 27. In her mediation supplement, which was provided to the FDO and the Fourth Circuit, she stated: "Because Ms. Strickland no longer trusted Mr. Martinez, she tape-recorded the conversation." ECF No. 248, Ex. A, at 29; *see also* Ex. Z (Chief Judge "considered" Plaintiff's mediation supplement). At no point during Plaintiff's EDR process did anyone inform her that she had violated any office rule. Nor did the recordings disqualify her from placement in a subsequent Fourth Circuit judicial clerkship. To the contrary, her recording of Defender Martinez was the basis, in part, of disciplinary action taken against him. *See* ECF No. 248, at 18–19.

Defendants are also wrong to assert that recordings of office meetings were not "related to [Plaintiff's] EDR complaint." ECF No. 245, at 12. In fact, several instances of the hostile working environment Plaintiff experienced occurred during office meetings. *See, e.g.*, Complaint ¶ 54 (Team Leader "repeatedly referred to an intellectually-disabled client as a 'retard'" and "employees joked about a black federal prosecutor *rapping* to a jury"); *id.* ¶¶ 348– 54 (employees joked, "Should we meet her at Waffle House?" and "Where's Waldo?", in mockery of Plaintiff's telework status while her complaint was pending; Answer ¶¶ 348–54. Other employees confirmed that office meetings were a breeding ground for bullying and discriminatory treatment. *See, e.g.*, ECF No. 248, Ex. P, at 25, 70.

9

**D.      Defendants' belated attempt to assert an "after-acquired evidence" defense fails as a matter of law.**

In alleging a "specter of misconduct," Defendants fail to name the defense they are attempting to raise or discuss the applicable legal standard. ECF No. 245, at 12. A defense based on an employee's alleged misconduct is known as an "after-acquired evidence" defense. *Rinaldi v. CCX, Inc.*, No. 3:05-cv-108-RJC, 2009 U.S. Dist. LEXIS 16101, at *22 (W.D.N.C. Feb. 18, 2009). The employer bears the burden of proof by a preponderance of the evidence. *Id.* The employer "must establish not only that [the plaintiff] engaged in the alleged misconduct, but that 'the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge.'" *Id.* (quoting *McKennon v. Nashville Banner Publ. Co.*, 513 U.S. 352, 362–63 (1995)). The defense cannot apply "as a matter of law" on summary judgment unless the plaintiff admits "she 'would have been terminated' for her misconduct" or there is otherwise no dispute of fact. *Russell v. Microdyne Corp.*, 65 F.3d 1229, 1240 (4th Cir. 1995) (quoting *McKennon*, 9 F.3d at 541 n.3).

Defendants cannot establish any of the elements of an after-acquired evidence defense. First, Plaintiff did not engage in "misconduct." *See id.* (defense does not apply unless plaintiff "actually engaged in 'misconduct'"). Indeed, Defendants' characterization of her conduct as "arguabl[e]" demonstrates that even they cannot represent that she engaged in misconduct. ECF No. 245, at 12. Second, Defendants were aware of Plaintiff's use of FDO materials and recordings during her EDR proceeding, and so the evidence was not "newly acquired in the course of discovery." *Id.* (defense does not apply when plaintiff "did not keep th[e] information secret"); *Rinaldi*, 2009 U.S. Dist. LEXIS 16101, at *23 (employer must demonstrate that it "was unaware" of the conduct). Third, Defendants cannot show that Plaintiff's conduct would have resulted in her termination, in part, because Defendants knew about it at the time and did not

10

terminate her. *Rinaldi*, 2009 U.S. Dist. LEXIS 16101, at *23 (employer knew of "officer wrongdoing" but did not address it). The fact that FDO officials disclosed thousands of pages of unredacted client information further demonstrates that she would not have been terminated. *See EEOC v. BOK Fin. Corp.*, No. CIV 11-1132 RB/LAM, 2014 U.S. Dist. LEXIS 188612, at *8–9 (D.N.M. Jan. 30, 2014) (policy was "selectively" enforced); *Rinaldi*, 2009 U.S. Dist. LEXIS 16101, at *23 ("self-serving statements" insufficient given contrary evidence).

Even if this defense did not fail as a matter of law, it is untimely and thus waived. A defendant's failure to raise an affirmative defense prior to summary judgment will result in "waiver" if the "failure to plead resulted in unfair surprise or prejudice." *S. Wallace Edwards & Sons, Inc. v. Cincinnati Ins. Co.*, 353 F.3d 367, 373 (4th Cir. 2003). The concern about unfair surprise is especially significant for an after-acquired evidence defense, because discovery is "necessary" "to test the defendants' after-acquired evidence." *Pennell v. Vacation Reservation Ctr.*, LLC, No. 4:11cv53, 2011 U.S. Dist. LEXIS 150763, at *7 (E.D. Va. Sep. 19, 2011). Because the defense depends on the employer's "actual employment practices and not merely the standards articulated in its employment manuals," *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 298 (4th Cir. 2009), the plaintiff must have discovery to determine "whether the defendants actually had terminated anyone" for similar conduct, *Pennell*, 2011 U.S. Dist. LEXIS 150763, at *7. Thus, asserting the defense after the close of discovery "would be clearly prejudicial" if allowed. *Id.*

Defendants failed to raise an after-acquired evidence defense in their Answer or provide any notice to Plaintiff during discovery, when she could have used discovery tools to explore and rebut this defense. Defendants were on notice of the relevant facts that they contend supported this defense many months, if not years, ago, and so there is "no justifiable explanation for their delay." *BOK Fin. Corp.*, 2014 U.S. Dist. LEXIS 188612, at *6. Aside from being aware of the

evidence during the EDR proceeding, Plaintiff disclosed its existence in her initial disclosures on May 20, 2020, *see* ECF No. 57-1, at 9, and discovery responses and public filings, *see* ECF No. 170, at 24–25 (recordings), and Ex. Y (FDO emails). Further, Plaintiff provided all recordings, with client information redacted, in discovery on January 20 and March 3, 2023. Ex. AA. Thereafter, on April 6, 2023, Defendants moved to amend their Answer to assert an affirmative defense of failure to mitigate, yet they did not assert an after-acquired evidence defense, despite being on notice of the facts. ECF No. 196. That is so even though their motion to amend *specifically* referenced Plaintiff's "audio recordings she made without the knowledge of others who participated in the various conversations alleged in the Complaint" as a basis to amend their Answer. *Id.* at 3. Indeed, Defendants previously denied many of the Complaint's allegations in their Answer, and were forced to withdraw their denials because the recordings plainly revealed them to be false and rendered them untenable. *See* Ex. BB (red-line Answer).

Moreover, Plaintiff diligently pursued discovery regarding this type of defense and was repeatedly informed by Defendants that it was irrelevant to her claims. Plaintiff served at least *seven* discovery requests relating to alleged misconduct and ethical concerns regarding FDO employees. *See* Ex. CC. Defendants objected to her requests as "overbroad" and not "relevant." *Id.* Plaintiff also served an interrogatory requesting that Defendants "[s]tate the basis . . . for the assertion of any defenses, including any affirmative or factual basis, that Defendants have raised or intend to raise in response to the complaint." *Id.* The only defenses that Defendants asserted were "failure to mitigate" and "judicial immunity," which were rejected as untimely or meritless. *See* ECF No. 206; Order Dated Sept. 21, 2022. Defendants' conduct in evading Plaintiff's timely served discovery requests and sandbagging her after discovery closed confirms that this defense is untimely and thus waived.

12

II.     **Defendants Have Failed to Refute Plaintiff's Constitutional Claims.**

A.      **Defendants violated Plaintiff's due process rights.**

Defendants have failed to refute Plaintiff's showing that they violated her due process rights.   Indeed, Defendants do not even address the fact that they refused to disqualify the Defender, an accused party, from the EDR process, except in a footnote on the last page of their brief.  ECF No. 245, at 25 n.10.  Defendants' argument runs contrary to the Fourth Circuit's holding that "[t]he refusal to disqualify the FPD created a conflict of interest" in violation of Chapter X, § 7 of the EDR Plan.  *Strickland*, 311 F.4th at 355.  There was ample basis to disqualify the Defender, including that he had engaged in conduct warranting disciplinary action and the Investigator found he was "biased" against Plaintiff and "could cause more damage if he were involved in the process at this point."  ECF No. 248, at 22.  When the Fourth Circuit allowed Plaintiff's due process claim to proceed, it had no way of knowing the severity of these conflicts of interest, which effectively sabotaged Plaintiff's rights under the EDR Plan.  These egregious conflicts of interest, standing alone, are sufficient to conclude that Defendants deprived Plaintiff of a fundamentally fair process and thus violated her due process rights.  *See Doe v. Rector & Visitors of George Mason Univ.*, 149 F. Supp. 3d 602, 621 (E.D. Va. 2016) (an "accumulation" of "failures to comply" with internal policies violates due process).

Defendants also construct a strawman regarding Plaintiff's allegations about the final hearing.  Defendants misconstrue her allegation as whether she "understood" that "a presiding judicial officer would be the officer at the final hearing."  ECF No. 245, at 14.  That is not the basis for Plaintiff's due process claim.  Plaintiff understood that a presiding officer would be present at a final hearing.  Plaintiff's allegation is that, regardless of what the EDR Plan stated on

paper, a presiding officer would not, or could not, order remedies in practice, because it would be perceived as micromanaging or meddling. ECF No. 248, at 21–24.

Defendants fail to refute the Mediator's assertion that "I don't think a judge is going to micromanage this office and tell a federal defender how to do his job and run this office. They'd be better off terminating him." ECF No. 248, Ex. O; *see id.* Ex. C, at 4. Indeed, Defendants' attempted explanation confirms that the Mediator did, in fact, state that "a judge may not want to 'micromanage' this office." ECF No. 245, at 16. Defendants' contention that the Mediator was referring only to the mediation phase of the EDR process is nonsensical. As Defendants themselves have repeatedly emphasized, there is no hearing officer during mediation. *See* ECF No. 134-2 ¶ 6 (Decl. Jill Langley) (judicial officer does "not have authority under the EDR Plan to order the Defender's office to do anything" in mediation); ECF No. 248, at 11–12, 22.

The Mediator made these comments during a conversation with Plaintiff and her representative about "what's the point in having a hearing officer" when "this all seems like a sham" and "a kangaroo court." Ex. DD, at 48. The Mediator confirmed these concerns by stating, "I have talked to people in Washington about my frustration with this whole process" in that "I'm just totally frustrated" and "can't do anything." *Id.* at 49; *see also* ECF No. 248, at 13, 28 (Mediator's testimony that "there really wasn't a remedy" under the EDR Plan because "[n]one of these are going to do anything in this particular case"). Plaintiff's representative then stated, "[Defender Martinez] is well aware of this dynamic, that he won't get micromanaged" and "the hearing officer can't do anything because they're not going to micromanage the office." Ex. DD, at 50. The Mediator responded: "You're right . . . . Look, I'm not disagreeing with you all." *Id.* at 50–51. These comments culminated in a discussion about whether Plaintiff should proceed to the final hearing merely to obtain "the admission that [the hearing officer] can't do

anything," with the Mediator responding, "[t]hey're not going to say it that way."  *Id.* at 51.

Later, Plaintiff asked the Mediator: "[Y]ou know the situation about remedy.  What can even

legally be ordered against a federal defender's office?"  He responded: "I understand exactly

what you're saying" and "the remedy part . . . is a big problem here."  Ex. EE, at 76–78.[1]

Similarly, Defendants fail to address that the Judicial Integrity Officer, Jill Langley,

testified that she told Plaintiff she was unsure how remedies could be enforced against the FDO.

The JIO stated that Defenders "are different than the unit executive in the court which is clearly

governed by, supervised by, and works at the pleasure of the chief judge and the judges on that

court."  ECF No. 248, at 22–23.  Thus, "the mechanics of what does th[e] enforcement [of

remedies] mean, what I didn't know was would they have the power to fire a defender for failing

to comply with a presiding officer decision."  *Id.* at 13.  In a follow-up email, she emphasized:

"I'd like to better understand if FPDs are adequately protected by EDR remedies."  *Id.*

The JIO's testimony confirms Plaintiff's allegation that the JIO told her that a hearing

officer could not, or would not, "'manage' a federal defender office," an issue which she

described as "jurisdictional."  Complaint ¶ 439.  These concerns were reasonable in the context

of contemporaneous debates about the importance of maintaining the independence of federal

defender offices relative to the rest of the judicial branch.  Indeed, at the time of the events

alleged in the complaint, the Ad Hoc Committee to Review the Criminal Justice Act had recently

recommended that the federal defender program be "an autonomous entity, not subject to judicial

oversight and approval."  Report of the Ad Hoc CJA Committee (Apr. 2018), *available at*

https://tinyurl.com/mrkvs6ej.  Soon after, the Judicial Conference approved a separate EDR plan

---

[1] This transcript was prepared by Defendants and misidentifies the Mediator as "Judge."

for FDOs due to their "distinct employment relationship and mission." Report of the Proceedings of the JCUS, at 23–24 (Sept. 2021), *available at* https://tinyurl.com/mrymmju6.

Defendants assert that "[w]hether Article III judges can 'manage' a federal defender office does not bear on who adjudicates Plaintiff's EDR claims," ECF No. 245, at 17, but it certainly does bear on who decides the remedy. The Mediator, JIO, and the Defender himself acknowledged as much during this litigation. Indeed, the Defender testified that "I don't think a Court – a judge would order a defender that you've got to do this without considering whatever needs that defender has." ECF No. 248, at 24. By contrast, the general comments of an AO staff member about the role of a presiding officer, which were made during a preliminary phase of the EDR process before Plaintiff even filed a request for counseling, do not speak to this concern about the adequacy of remedies in practice, particularly with respect to federal defender offices. ECF No. 245, at 15. Nor does the general comment by the EDR Coordinator, who, in any event, could not be relied on for impartial advice due to his professional conflicts of interest. *See* Ex. FF, at 32 (prohibiting unit executives, including Circuit Executives, from serving as EDR Coordinators because they have "an actual and perceived conflict of interest in providing impartial advice and guidance to an Employee"); *Baxter v. Comm'r of Internal Revenue Serv.*, 910 F.3d 150, 165 (4th Cir. 2018) (it is "objectively unreasonable" to rely on advice from a professional who "suffer[s] from a conflict of interest"). Plaintiff did not need clarification when multiple authorities—including the Mediator and the JIO, a "national resource" on the EDR Plan—told her that remedies under the Plan could not, or would not, be ordered in practice.

### B. Defendants violated Plaintiff's equal protection rights.

Defendants' attempt to refute Plaintiff's equal protection claim relies on misrepresentations of the record and outright falsehoods. As discussed above, Defendants fail to

mention that *both* the Defender *and* the First Assistant were disciplined for "wrongful conduct" under the EDR Plan, which is defined as "[d]iscrimination against employees based on . . . sex," including "sexual harassment," and "retaliation for engaging in any protected activity." ECF No. 248, Ex. D, at 79, 83 (quoting EDR Plan Ch. II, § 1). Defendants' own findings of wrongful conduct fatally undermine their argument for summary judgment and are case-dispositive in Plaintiff's favor. *See* Answer ¶ 484 (admission that "disciplinary action was taken"); *Bright v. QSP, Inc.*, 20 F.3d 1300, 1305 (4th Cir. 1994) ("[A]dmissions in the pleadings are binding . . . and may support summary judgment against the party making such admissions.").

Further, the Fourth Circuit held that Plaintiff "clearly alleged" that she "was subjected to sexual harassment by the First Assistant." *Strickland*, 32 F.4th at 359. Plaintiff's allegations, and worse, are borne out by discovery. *See, e.g.*, ECF No. 248, at 3 (First Assistant's text message that Plaintiff "***may just need to get smacked a bunch***," which he never disclosed during the EDR investigation); *id.* at 18–19 (Defender's counseling letter). Defendants' attempt to trivialize the misconduct effectively asks this Court to rule that it is insufficient to constitute sexual harassment, contrary to the Fourth Circuit's decision.

### 1. Plaintiff was subjected to *quid quo pro* harassment.

*Quid pro quo* harassment occurs when (1) "submission" to "unwelcome sexual advances . . . is made either explicitly or implicitly a term or condition of an individual's employment," or (2) "submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual." 29 C.F.R. § 1604.11(a). To prove *quid pro quo* harassment, an employee must show that (1) she belongs to a protected group, (2) she was subjected to unwelcome sexual harassment, (3) the harassment was based on sex, (4) the employee's reaction affected tangible aspects of her employment, and (5) the employer is

17

vicariously liable. *Okoli v. City Of Baltimore*, 648 F.3d 216, 222 (4th Cir. 2011). The last element is "automatically met" when the harassment is perpetrated by a supervisor. *Id.* It does not matter whether the "demand was made outright or simply implied." ECF No. 248, Ex. N, at 62. "[A] victim need not provide evidence of a direct and express sexual demand," because "a supervisor may simply intimate that a subordinate's career prospects will suffer if she does not submit to his advances, with the hope of concealing his harassment if his statements are repeated to a third party." *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1312 (11th Cir. 2001).

Here, Plaintiff is a member of a protected group and was subjected to unwelcome sexual harassment based on her sex. Indeed, the Investigator found that the First Assistant's "Mas Dinero" email "can clearly be inferred to be a quid pro quo request" that "supports Caryn's claim of sexual harassment." ECF No. 248, at 16. The Chief Judge's letter disciplining the Defender referred to this email as an "unsavory quid pro quo proposal." *Id.* at 17. Quite simply, the First Assistant's false assertion that it would take five more years for Plaintiff to qualify for a promotion to Grade 15 (when she was actually eligible in three months), but to "fret not, I have a plan . . . just remember I deal in pay-for-stay :)" would be perceived by a reasonable person as *quid pro quo* harassment. Indeed, the Investigator testified that "it was reasonable to be upset because of that email," ECF No. 248, Ex. J, at 58; the Defender testified that he could "see" how it could be viewed as "sexual favors," *id.* Ex. E, at 127; and the Mediator stated that "I just can't believe anybody is going to say it wasn't an improper email," Ex. DD, at 58.

Plaintiff's rejection of the First Assistant's advances affected tangible aspects of her employment, including the denial of the promotion to Grade 15 and the diminishment of her job duties. *See* ECF No. 248, at 7–8. In proving a "causal connection" between *quid pro quo* harassment and a tangible employment action, "[a] plaintiff may rely upon a broad array of

evidence," including that "the unwelcome sexual advances proximately preceded the tangible employment action and the alleged harasser made or substantially influenced the relevant decision." *Johnson v. Donohoe*, Civil Action No. 4:12-cv-0390-RBH-TER, 2013 U.S. Dist. LEXIS 185168, at *19 (D.S.C. Nov. 26, 2013) (citations omitted). Moreover, "a court can consider circumstantial evidence and draw inferences in favor of the plaintiff in determining whether the causal link has been established." *Id.* If an "adverse action takes place 'on the heels of protected activity,' this generally suffices to establish a causal link." *Reed v. Hunt Corp.*, No. IP 01-1005-C-B/G, 2003 U.S. Dist. LEXIS 20774, at *11 (S.D. Ind. Nov. 11, 2003).

Here, the First Assistant was in a "supervisory role over Plaintiff," ECF No. 248, at 2, with authority to "initiate[] personnel actions" and "refer[]" her "for disciplinary action," *id.* Ex. N, at 49; Ex. GG, at 90–95. In fact, the First Assistant supervised "the entire FDO," including the trial and appellate units. *Id.* The Defender "trusted" his judgment on personnel matters. *Id.*

Following Plaintiff's rejection of his advances and reporting of his conduct to the Defender, on July 6, 2018, the First Assistant told the Defender that Plaintiff should be "well on [her] way to a PIP," *i.e.*, a performance improvement plan; that "we need to be serious about whether she actually lives up to th[e] AFD title"; and that his perceived issues with her "need to be addressed during her annual performance review." ECF No. 248, Ex. M, at 27–28; *see also id.* at 29–30 (First Assistant's statement about whether he would "play[]" it "dirty" by encouraging Plaintiff to apply for an AFD position, and noting that "her lip was practically quivering"); *id.* Ex. N, at 4 (First Assistant's statement to another supervisor that "I thought she could be in mgmt. but I don't think so any more"). On July 20, 2018, the First Assistant told the Appellate Chief that Plaintiff had a "fuck off attitude" and had committed "fireable offenses," to which the Appellate Chief responded: "I have a game plan in mind for how to give her a chance

19

. . . to redeem herself and return to being a productive employee," or otherwise, "we'll encourage Tony to respond appropriately." *Id.* Ex. N at 20–21.

Unsurprisingly, during this period, Plaintiff's job duties were diminished, as she was taken off of new trial cases and demoted to "pure R&W," decisions on which the First Assistant had direct input. *Id.* Ex. M, at 33–34. A few weeks later, Plaintiff was not even considered for the promotion to Grade 15 that was referenced in the First Assistant's *quid pro quo* email, despite her excellent work performance. *Id.* Ex. C, at 3 at 9–10 (admission that Plaintiff was "eligible for a grade-level promotion to FD-15 on or about August 21, 2018"); ECF No. 248, at 5 (Defender thought she was "hardworking," "responsible," and her work was of "high quality"). Plaintiff was given a "reclassification" of title to AFD but was required to work as "pure R&W," contrary to the job requirements for an AFD position. *See* ECF No. 248, at 8. Thereafter, because of the Defender's failure to address the harassment, Plaintiff was forced to telework for nearly seven months while her complaint went unaddressed. *See id.* at 9.

It is difficult to imagine a tighter "causal connection" based on these facts, especially because the Defender's promotion denial came in *direct response* to Plaintiff's sexual harassment complaint. *Id.* Ex. A., at 52 (Defender's email about steps taken "[a]s a result of our meeting" about the harassment). Defendants have never provided a "legitimate nondiscriminatory reason" for the denial of promotion. *Okoli*, 648 F.3d at 223. Defendants assert that Plaintiff's pay was "the maximum the Defender was authorized to approve," ECF No. 248, at 23, but that is simply false. Plaintiff was reclassified to AD-28 on the pay scale for AFDs, which had a maximum starting salary of $134,659. ECF No. 248, Ex. D, at 75, 77; *see* ECF No. 78-1, at 67. A promotion to $122,163, the equivalent of Grade 15 on the JSP pay scale, would have been well within that range. *See* OPM GS Salary Table (2018), *available at*

https://tinyurl.com/bdz7ec8a.  Moreover, even if the AD-28 grade had been capped at a lower salary, the Defender had discretion to promote Plaintiff to a Grade 15 prior to reclassifying her. Under the judiciary's "Highest Previous Rate" policy, an AFD's "starting salary may be set higher than the maximum of the applicable starting salary range if necessary to match the salary . . . the AFD previously earned as an employee of any federal government entity or any FDO." ECF No. 78-3, at 24, 26.  This policy allowed the Defender to promote Plaintiff to a Grade 15 and then maintain that salary after her reclassification, even if it exceeded the salary range for which she was eligible on the AD scale.  *Id.*  The fact that the Defender backdated the reclassification *to the day before* Plaintiff qualified for the promotion, and sought to remove her locality pay, further demonstrates that his actions had no legitimate basis.  ECF No. 248, at 8.

### 2.    Plaintiff was subjected to a hostile working environment.

Even if the First Assistant's *quid pro quo* harassment did not result in a tangible employment action, it would still support a claim of hostile working environment.  *Burlington Indus. v. Ellerth*, 524 U.S. 742, 766 (1998).  A hostile working environment results when sexual harassment "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment."  29 C.F.R. § 1604.11(a).  The Court "will look at the record as a whole and at the totality of the circumstances," *id.* § 1604.11(b), keeping in mind that conduct "that may seem harmless in the abstract" or "innocuous" can have sexual connotations in context, *Okoli*, 648 F.3d at 222.  The Court considers factors including whether the conduct involves "gender-based remarks that single out individuals for ridicule," and whether "there is a significant disparity in power."  *Id.* at 221 (citations omitted); *see, e.g.*, *Fiorito v. Metro. Aviation*, No. 1:17-cv-731, 2018 U.S. Dist. LEXIS 131876, at *16 (E.D. Va. Aug. 3, 2018) ("physical and verbal attacks," "stalking," and

21

"threats of termination"); *Bass v. Hill*, No. 1:06CV543, 2006 U.S. Dist. LEXIS 94886, at *4 (M.D.N.C. Oct. 16, 2006) ("sexual comments," "use of profanity during work meetings," and "physically threatening posture"). The inquiry is from the perspective of "a reasonable person in the plaintiff's position." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333 (4th Cir. 2003).

Here, in addition to the *quid pro quo* harassment, Plaintiff was subjected to such controlling behavior by the First Assistant that it was reasonable to feel threatened by him. ECF No. 248, at 2–5; *see Strickland*, 32 F.4th at 326 (describing allegations that First Assistant's behaviors were "obsessive" and "controlling" and that he "was essentially stalking her"). After she distanced herself from him, he told another supervisor that Plaintiff "may just need to get smacked a bunch." ECF No. 248, at 3. The Investigator testified that he "was shaking he was so angry" and Plaintiff's perception of him was "reasonable." *Id.* Ex. J., at 66, 100–01. The EDR Coordinator testified that there was "no reason to doubt" that she was "physically afraid of him." *Id.* Ex. K, at 164–65; *see id.* Ex. I, at 43 (FEOO was concerned about "physical danger"). Further, his statements that Plaintiff "[h]as been avoiding me," "[c]learly does not want to interact with me," and her calling in sick was not "coincidental," show that he knew his conduct was unwelcome. ECF No. 248, at 3, 6. His statements that Plaintiff "played the gender card" and was a "spoiled brat," "manipulative," and "self-centered" for being professionally focused, show that he was motivated by sexual harassment and derogatory gender stereotypes. *Id.* Ex. N, at 15. His use of gratuitous profanity about Plaintiff (*e.g.*, "manipulative underhanded jackass" and "fuck off attitude"), further show his anger and aggression towards her. ECF No. 248, at 4.

Defendants' argument misunderstands the nature of sexual harassment and relies on victim-blaming tropes. In claiming the harassment was not "unwelcome," Defendants rely on

22

prior text messages and instances when FDO employees went for drinks together.[2]  But those instances took place *before* the First Assistant's May 18, 2018 "Mas Dinero" email, after which Plaintiff actively distanced herself from him, as he was well-aware.  As the FEOO testified, it is common in sexual harassment cases for supervisors to cultivate positive relationships with subordinates as "grooming" for "sexual advances."  Ex. HH, at 148–49.  Nor does the fact that the First Assistant did not use explicitly sexual language mean he did not harass her.  His conduct was about his "desire to control" her, "which is very common" in sexual harassment cases, especially when there is a "huge power imbalance."  *Id.* at 32–33, 62, 138, 167.

Many of Defendants' factual assertions are also outright false.  For example, Defendants contend that the Defender "removed" Plaintiff from the trial case prior to the First Assistant's optional shadowing activity on June 5, 2018, but after that date, the Defender had instructed Plaintiff to ███████████████████████  Ex. II.  Contrary to "pursu[ing] her own agenda," Plaintiff was following orders and would have been insubordinate if she had *not* kept working on the case.  ECF No. 245, at 3.  Similarly, Defendants' assertion that it was "raining heavily" during the June 21, 2018 lobby incident is untrue.  *Id.* at 4.  There was a "5 percent chance of rain" when Plaintiff left the building that evening.  ECF No. 248, Ex. D, at 44.  It did not rain until nearly an hour later, long after she arrived home, as confirmed by historical weather data.  Charlotte NC Weather (June 21, 2018), *available at* https://tinyurl.com/2p8zu8cf (rain did not begin until 7:35 p.m.).  The First Assistant's false claims of rain contributed to her fear that he had created a contrived opportunity to be alone with her, with "a possible risk of something happening like a sexual assault."  Ex. HH, at 78.

---

[2] As the Defender testified, drinking was commonplace in the FDO and not at all unique to Plaintiff.  Ex. GG, at 95 ("[A]s defenders, we're always losing cases," so when "the judge grants a suppression motion . . . let's have a few beers and let's celebrate type of scenario.").

23

### 3. Defendants were deliberately indifferent to the harassment.

An employer will be liable for a response to sexual harassment that is "clearly unreasonable" and "deliberately indifferent." *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 701–02 (4th Cir. 2018). An employer "must respond" to a report of sexual harassment. *See id.* at 690 (quoting parenthetical). "[T]he mere act of listening" to a complaint "is not a remedy in and of itself," *id.*, nor is a "half-hearted investigation or remedial action" sufficient, *id.* (quoting parenthetical). The Fourth Circuit held that the conduct alleged in Plaintiff's complaint stated a claim of deliberate indifference, and the evidence abundantly proves this claim, as discussed above, *supra*, at 1, and in Plaintiff's summary judgment brief, *see* ECF No. 248, at 5–15, 18–20.

### C. Plaintiff was constructively discharged.

The Fourth Circuit held that if Plaintiff proved the facts supporting her due process claim, "a reasonable factfinder could conclude that continuing with the EDR process would be futile and that Strickland had reason to believe that the more suitable alternative was to drop her complaint and accept the Fourth Circuit clerkship." *Strickland*, 311 F.4th at 356. Similarly, the Fourth Circuit held that her allegations that Defendants "fail[ed] to take immediate and effective action on her complaints" and "fail[ed] to provide her with meaningful review or remedies," both of which led directly to her resignation, supported her equal protection claim. *Id.* at 360. Plaintiff has proven both her due process and equal protection claims, and she has therefore proven she was constructively discharged. *See id.* at 376 (Plaintiff "effectively alleges that defendants' actions knowingly deprived her of meaningful review of her claims of sexual harassment and that these actions ultimately led to her constructive discharge").

Defendants oddly contend that a constructive discharge does not mean that an employee is "no longer welcome to work in an environment," ECF No. 245, at 10, but that is precisely

24

what it means.  *See Bryant v. Jones*, 575 F.3d 1281, 1299 (11th Cir. 2009) (employee "was not welcome to continue working" and "had no choice but to resign").  The inquiry is whether conditions are "so intolerable that a reasonable person" would feel "compelled to resign."  *Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004).  A constructive discharge "may be effected through co-worker conduct, unofficial supervisory conduct, or official company acts."  *Id.*

Here, the harassment Plaintiff suffered, the grossly unfair and inadequate EDR process, and the lack of meaningful remedies forced her to resign.  *See* ECF No. 248, at 14–15.  In contending otherwise, Defendants ignore the ongoing adverse actions Plaintiff suffered due to the First Assistant's harassment.  *See id.*  Defendants point to the fact that Plaintiff was forced to telework for seven months, but this merely confirms that she was subjected to ostracizing employment actions.  *See id.* at 9.  Finally, Defendants reference cases where the discriminatory conduct ceased months before the plaintiff resigned, or the plaintiff voluntarily sought other employment.  ECF No. 245, at 11.  Those cases are inapposite.  The record here shows that the ongoing discriminatory and unfair EDR process, including "defendants' actions [that] knowingly deprived her of meaningful review of her claims of sexual harassment," forced her to resign.  *Strickland*, 311 F.4th at 356.  Moreover, Plaintiff did not voluntarily seek other employment, but was instead "persuad[ed]" to accept a short-term Fourth Circuit clerkship because she had no alternative.  ECF No. 248, Ex. D, at 78.  The violations of Plaintiff's rights continued, and even accelerated, until the day she resigned, such that "continuing with the EDR process would be futile" and the "more suitable alternative was to drop her complaint and accept the Fourth Circuit clerkship."  *Strickland*, 311 F.4th at 356.

**CONCLUSION**

Defendants' motion for summary judgment should be denied.

25

This the 15th day of June, 2023.

Respectfully Submitted,

*/s/ Cooper Strickland*

Cooper Strickland
P.O. Box 92
Lynn, NC 28750
Tel. (828) 817-3703
cooper.strickland@gmail.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of June, 2023, I will electronically file the foregoing with

the Clerk of Court using the CM/ECF system, which will then send a notification of such filing

(NEF) to the following:

Joshua M. Kolsky at Joshua.Kolsky@usdoj.gov

Rachael Westmoreland at Rachael.Westmoreland@usdoj.gov

Madeline M. McMahon at madeline.m.mcmahon@usdoj.gov

Danielle Young at Danielle.young2@usdoj.gov

*/s/ Cooper Strickland*
Cooper Strickland
N.C. Bar No. 43242
P.O. Box 92
Lynn, NC 28750
Tel. (828) 817-3703
cooper.strickland@gmail.com