# EXHIBIT GG

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

CARYN DEVINS STRICKLAND,

Plaintiff,

v. Civil No.: 1:20-cv-00066-WGY

UNITED STATES, et al.,

Defendants.
____________________________/

VIDEOTAPED
DEPOSITION OF: ANTHONY MARTINEZ

TAKEN: By Counsel for Plaintiff

DATE: April 28, 2023

TIME: 9:00 a.m. - 5:41 p.m.

PLACE: Constangy, Brooks, Smith & Prophete
100 North Tampa Street
Suite 3350
Tampa, Florida 33602

REPORTED BY: Sarah Parker
Notary Public
State of Florida at Large

APPEARANCES:

JEANNIE SUK GERSEN, ESQUIRE
JACOB GERSEN, ESQUIRE
Hauser Hall 510
1563 Massachusetts Avenue
Cambridge, Massachusetts 02138
Appeared for Plaintiff

RACHAEL WESTMORELAND, ESQUIRE
MADELINE MCMAHON, ESQUIRE
DANIELLE YOUNG, ESQUIRE
JOSHUA KOLSKY
US Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
Appeared for Defendants

SHANNON SUMERELL SPAINHOUR, ESQUIRE
Constangy, Brooks, Smith & Prophete, LLP
84 Peachtree Road
Suite 230
Asheville, North Carolina 28803
Appeared for Defendants

ALSO PRESENT:

Matt Casey, Videographer
Claire Beutter, Research Assistant
Edward Jung, Research Assistant
Kristin Mannherz, Administrative Office of the US Courts

remained in that job, there was no other thing that needed to be done; is that right?

A. Correct.

Q. I see.

A. Correct.

Q. Did you interview people for the job or consider other candidates?

A. No. No, I didn't open it up. I considered everybody in private, but not like I interviewed. I conducted individual interviews with people just to see where they were at in terms of the office and stuff like that. So it's sort of like I'm checking them out, but --

Q. Right. So JP, as the first assistant, was -- had a role, had a role in the personnel manual?

A. Yes, in drafting it, yes.

Q. In drafting it?

A. Yes.

Q. Was he the primary?

A. No, there was no primary. It was -- I don't know how he was involved. He was involved; it might have been one or two other people. I think Bill might have been involved. I don't recall.

Q. Yeah. So just for me to understand the

first assistant's job duties as opposed to the defender's job duties --

A. Yes.

Q. -- did you delegate a lot of things to the first assistant?

A. I delegated some things, I wouldn't say a lot. I try to spread it out, but basically, so you understand, he supervises the whole office, also. Like he's technically a supervisor for the whole office.

Q. The whole office, meaning Charlotte and Asheville, or just Charlotte?

A. Yeah, yeah.

Q. So he supervises the entire FDO at both locations?

A. Yes, yes. Now, he can -- I'm the only one that can promote, demote, fire, terminate, things of that nature. But he's a supervisor, so you only get so many supervisors -- I don't mean you, I meant as a defender -- based on the number of AFPDs you have, so I believe.

Q. And please correct me if I'm not using the right lingo or terms --

A. No problem.

Q. -- because I just want to get it right.

You said you created trial teams?

A. Yes, ma'am.

Q. And are those same as trial units, or is that a different thing? I'm just trying to understand when I see language about the office, that I'm getting the structure of it right.

A. Okay. So I think when you heard trial unit, they're talking about, you know, the whole unit, which has teams in it.

Q. The whole unit?

A. Right.

Q. So would there be one unit then for trial?

A. Yeah, so you have one, but then you have divisions, right? So you have offices, so I had an Asheville division.

Q. Of the trial unit?

A. Correct.

Q. Okay. Got it.

A. Correct. But then I had appellate attorneys there of the appellate unit.

Q. And was it only trial and appellate units, or were there other units?

A. There is a trial unit, appellate unit, and admin.

Q. Admin. And admin was what it sounds like?

A. IT, yeah, IT, administrative officer.

Q. Got it. And did you say Bill Moorman was head of that admin unit?

A. Bill Moorman was, I would say, I would say probably head; you could probably say head. Yes, ma'am.

Q. Okay. So did JP oversee the trial unit?

A. He oversees the whole office, as I indicated.

Q. Oh. So does he oversee all of the units then?

A. Yes.

Q. He oversaw all of the units?

A. Right.

Q. Appellate as well?

A. Yes, ma'am.

Q. So -- and what specific duties did overseeing the trial unit entail?

A. General supervision. It could be referring a person to me for discipline action or it could be a multitude of general supervisory things.

Q. So referring someone to you for disciplinary action?

A. Yeah. If he observes or hears of something that requires my looking into it, then I would look

into it.

Q. Right.

A. Just general supervisory.

Q. Right. And when you say discipline action, what do you mean by that?

A. Any employee discipline actions. He's a supervisor, so he supervises also.

Q. Right.

A. Yeah. If someone is lacking for whatever reason, if someone -- just general supervisory.

Q. Okay. So is it fair to say JP, as first assistant, supervised all employees at the FDO except for you?

A. Yes, ma'am.

Q. And was he the only one who supervised all of those employees?

A. Other than me.

Q. Other than you?

A. Yes, ma'am.

Q. So it's you supervise everyone.

A. Yes, ma'am.

Q. And then he supervises everyone else, not you?

A. Correct.

Q. Okay. Got it. And so trial, appellate,

and administrative?

A. Yes, ma'am.

Q. So how often would you and JP communicate while you were at -- while you were the federal defender?

A. Often.

Q. Like daily?

A. Daily for sure.

Q. Several times a day?

A. Several times a day, for sure.

Q. And was it in person?

A. Yes.

Q. Also by e-mail?

A. Yes, ma'am.

Q. Texting?

A. Yes, ma'am.

Q. And did you consider him a friend?

A. I don't use -- I don't use -- I don't use that word in relation to my employees, necessarily. We had a friendly relationship, but I have friends and then I have my employees, so --

Q. Yeah. Did you socialize with him outside of work?

A. Occasionally.

Q. In what?

A. Very seldom. Usually -- like usually celebratory, where, you know, as defenders, we're always losing cases; so whenever we get a suppression motion and the judge grants a suppression motion, the evidence gets suppressed, let's have a few beers and let's celebrate type of scenario, but never other than that, really. It was always celebratory with other people, but him and I would not socialize other than in that scenario.

Q. Did you have confidence in JP Davis as your first assistant?

A. Yes.

Q. Did you trust his judgment?

A. Yes.

Q. Did you ever have reason to doubt that he behaved appropriately at work?

A. To doubt that he behaved -- I never doubted.

Q. You never doubted that he behaved appropriately at work. Okay. And to your knowledge has he ever been the subject of complaints about his conduct prior to Ms. Strickland's allegations?

A. No complaints. I mean, I'm just thinking about some people maybe didn't like his style sometimes, generally speaking, but nothing where it