# EXHIBIT HH



# Transcript of Nancy Dunham

**Date:** April 17, 2023
**Case:** Strickland -v- United States of America, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
www.planetdepos.com

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

```
 1     FOR THE WESTERN DISTRICT OF NORTH CAROLINA
 2              ASHEVILLE DIVISION
 3    --------------------------X
 4    CARYN DEVINS STRICKLAND,  :
 5              Plaintiff,  :
 6       v.                 : Case No.
 7    UNITED STATES OF AMERICA, : 1:20CV66
 8    et al.,                   :
 9              Defendants.:
10    --------------------------X
11
12          Deposition of NANCY DUNHAM
13             Conducted Virtually
14            Monday, April 17, 2023
15                2:08 p.m. EST
16
17
18
19
20
21
22
23    Job No.: 488113
24    Pages: 1 - 202
25    Reported by: Marney Alena Mederos, RPR, CRR
```

1  phone call was over, I had a very good sense of
2  what was going on.
3      Q    What did she say about her allegations?
4      A    Again, I'm -- I'm looking back, like,
5  five, six years, but she was uncomfortable -- made
6  uncomfortable by one of her senior managers who at
7  the time she was hired made some public statements
8  about how hot she was and -- and, again, this is
9  what she told me in detail -- and how he was
10 clearly interested in her either romantically or
11 sexually.
12          I don't believe -- I know that she was
13 in a relationship.  I don't think she was married
14 at that time.  I know that the individual at issue
15 was ten years older than she was and married, but
16 that immediately concerned me, and so she -- she
17 told me about the situation, she told me about his
18 desire to control her, which is very common in
19 this type of situation, and wanted to mentor her.
20          So when I heard her story for the first
21 time, her -- her -- her situation, it was
22 concerning.  I felt like I wanted to know more
23 about it, but it concerned me.
24     Q    You mentioned that she -- that Caryn
25 told you he was romantically interested in her.

1          Did she give you specific examples of
2    why she thought that?
3          A    Well, he wanted to spend a lot of time
4    with her.  He made comments, I believe, to other
5    employees about how hot she was, and he sort of
6    self-appointed himself as her mentor and would,
7    again, do a number of things that when we
8    discussed the case at the AO we were concerned
9    about because it -- it looked like he wanted to
10   control her, which is very common.
11         Q    What were those other number of things
12   besides for the comments to others saying that she
13   was hot?
14         A    I remember that she had a meeting that
15   she felt an obligation to attend, and he had
16   something that he wanted her to do, and so he sort
17   of blew up and was very angry, and -- and I
18   remember telling that to some of the people at the
19   AO, and -- and they -- their comment was, well,
20   that's a very bad sign because this is what we see
21   in a sexual harassment case, the desire to
22   control.
23         Q    So besides for him telling others that
24   she's hot and then blowing up at her at the
25   meeting, was there anything else that she

1  mentioned that would indicate he was interested in
2  her romantically?
3      A    Well, he -- he asked her, I think,
4  repeatedly -- I -- I think it goes beyond one
5  time -- to go out for drinks after work, he would
6  show up in the late evening in her workplace and
7  offer her rides home, things that were a little
8  atypical given the -- the parameters of their
9  relationship.
10     Q    And if I -- if I told you this -- that
11 the man was named J.P. Davis, would that ring a
12 bell?
13     A    That does ring a bell.  I couldn't have
14 told you his name, but yeah.
15     Q    Had you met J.P. Davis before?
16     A    Never.
17     Q    Had you contacted him or talked to him
18 throughout this process?
19     A    Never.
20     Q    So at that point, at the time of this
21 initial conversation, all you knew about the
22 allegations were what was based on what Caryn had
23 told you during that call?  It wasn't from Laura
24 Minor or anyone else?
25     A    It was primarily at that time of the

1      A     No, that -- I doubt that came from her.
2  That was my responsibility, having heard
3  allegations that concerned me, to address the
4  situation, and Cait Clarke and Lee Ann Bennett
5  would have been two individuals at a senior level
6  who might have been able to do something about it.
7            And so that -- and it was also my job
8  to inform senior managers of allegations so that
9  they could -- they would be on notice that they
10 needed to take action or to get more information
11 if they felt that was necessary.
12     Q     Why did you talk to Lee Ann Bennett
13 about it?
14     A     She was my immediate supervisor.  She
15 was second-in-command at the AO.  She had
16 responsibilities that related to that office and
17 actually all the offices in the courts, and she
18 was someone I had enormous amount of respect and
19 trust in, and when I told her about this case, her
20 responses were incredibly intuitive.
21           She was the one that mentioned, you
22 know, when there is a huge power imbalance and
23 somebody's trying to control the -- the employee
24 at issue, that -- I mean, she was not a lawyer,
25 but she recognized that was part of a classic

1  sexual harassment claim.
2      Q    And why did you talk to Cait Clarke?
3      A    Well, Cait Clarke also had -- had
4  responsibilities related to that office, and she
5  was also somebody I had respect for, and I knew --
6  these are both people that I -- I had confidence
7  would do the right thing.
8      Q    Can you be more specific about what
9  Cait Clarke's role was with respect to the office?
10     A    Cait Clarke -- I can't remember exactly
11 what her position was, but she was a senior
12 official that had responsibilities for -- for the
13 public defender's offices, and I believe that
14 Caryn knew her from her time at the AO as a
15 U.S. Supreme Court Fellow.
16          And Cait Clarke I trusted, I mean, and
17 Cait Clarke had a history with that office, so she
18 knew the parties involved, she knew, you know,
19 things that had happened in the past, and she gave
20 me some good information, as I recall.
21     Q    Do you recall what information she gave
22 you?
23     A    I -- all I recall is that she told me
24 that there had been problems with that office in
25 the past, and I -- I do not recall the details.

1  believe that this was an appropriate management
2  request.  I just -- the -- what concerned me was
3  the control issue and the desire to stay in
4  proximity with her.
5           MS. McMAHON:  Sophia, if you could pull
6  up Tab I, please.
7           (Government Exhibit 5 was marked for
8  identification and is attached to the transcript.)
9           MS. McMAHON:  This is Exhibit 5, and
10 this is another attachment to the August 6th, 2018
11 e-mail from Caryn to Ms. Dunham.
12 BY MS. McMAHON:
13      Q    Ms. Dunham, do you remember reading
14 this e-mail -- or, sorry, these texts?
15      A    These texts, yes, I do.
16      Q    Do you remember what this was in
17 reference to?
18      A    This is in reference to J.P. pushing
19 Caryn to take a ride home with him when she had
20 already told him that she preferred not to.
21      Q    Did you interpret this offer for a ride
22 home as sexual harassment?
23      A    It concerned me because of the nature
24 of her being very isolated in the office.  This
25 was late at night.  She had already told him, no,

1  she did not want a ride home, and he continued to
2  pursue it.
3          And -- and, again, what that told me
4  was not that that is just overall a wrong thing to
5  do, but when someone says no, that should be
6  respected.
7      Q    And the time stamp on this text is
8  6:44 p.m.; is that right?
9      A    Right, right.  Yes, that's what I see.
10     Q    Were you aware that J.P. had given
11 Plaintiff -- sorry, given Caryn ride homes in the
12 past?
13     A    I don't think I knew that.
14     Q    Caryn didn't tell you that?
15     A    I don't think so.
16     Q    Would that have changed how you viewed
17 J.P.'s offer to give her a ride home in the rain?
18     A    No, because at some point, she became
19 uncomfortable with his conduct in the workplace,
20 and being alone with him in his car was a concern
21 to her, and I understand that, and once she said
22 no, I was concerned about his continuing to pursue
23 it.
24     Q    Did Caryn show you any of the prior
25 communications that she had had with J.P.?

1      A      I cannot recall, but I know that she
2  sent -- she kept very good records and sent me
3  examples of things that we were talking about so
4  that I could see for myself what was happening.
5              I mean, she told me about this -- this
6  late-night push for a ride home when she had said
7  no, and then later she showed -- she actually sent
8  me a copy of the texts.
9      Q      And just so we're clear, you -- you
10 wouldn't consider this text to be the actual
11 sexual harassment, more indicative of control?
12     A      Well, here's what I -- here's what I
13 think now, and I would suspect I thought it at the
14 time:  If you have been aware that someone has a
15 romantic or sexual interest in you and they're
16 pushing you to be alone in a car when you have
17 said no and you're not comfortable with it, it
18 would have struck me as a possible risk of
19 something happening like a sexual assault.  And so
20 I respected her discomfort with going in a car
21 alone with him whether or not it was raining.
22     Q      And the expression of romantic interest
23 that we discussed earlier was -- would you explain
24 again what that's based on?
25     A      Well, as I said, he publicly made a

1         A    Yes.
2         Q    Could you say a little bit more about
3    that?
4              You said, I think, that that was part
5    of classic sexual harassment.  Could you explain a
6    bit about what you mean?
7         A    Yes, and I will tell you a personal
8    anecdote that I think does illustrate it.
9              Since I have retired, I have watched a
10   lot of the news stories on sexual harassment,
11   including the allegations against Governor Cuomo
12   in New York and what led to his resigning his
13   position, and there were a number of women that
14   made allegations against him.
15             And I recall thinking when I heard
16   about them, there was a woman who alleged that he
17   groped her, so there was a physical assault, but
18   there was also another woman who alleged that he
19   had made her uncomfortable by his obvious sexual
20   and romantic interest in her.
21             There was never any groping or physical
22   assault in that case, and I remember thinking that
23   is exactly what happened with Caryn Devins.  No
24   physical touching, no groping, but nevertheless
25   a -- a desire to control her and -- and an obvious

1  interest in her either sexually or romantically.
2         And I thought, boy, I -- I will say
3  this: I said to myself, I was right in this case,
4  because I did get some -- I did get some feedback
5  from one of the staff attorneys in OGC, who -- who
6  I often disagreed with, that this was not a
7  problem, that this case -- you know, I was not
8  assessing this case properly, and I remember
9  thinking, you know what, I was right.
10     Q    Understood. Thank you.
11          Did Caryn ever tell you that other
12 employees observed the kind of interest in her
13 that you just described?
14     A    No, never.
15     Q    Okay. Thank you.
16          I want to --
17          MR. GERSEN: Could we introduce one --
18 our next exhibit, please?
19          Just give me one moment. Sorry.
20          THE WITNESS: Sure.
21          MR. GERSEN: I'm sorry, I'm having a
22 technical glitch. Just bear with me for one
23 minute. Thank you so much.
24          THE WITNESS: Sure.
25          MR. GERSEN: Okay. Could we actually

1    A    Well, I don't believe I ever worked
2  past 7:00 p.m., but I do recall Caryn specifically
3  saying on this occasion the workplace was
4  virtually empty, and that made her additionally
5  concerned about being alone with him in the
6  building and, in addition, being alone in a car
7  with him.
8    Q    And does this text exchange make you
9  more or less concerned that the prior quid pro quo
10 e-mail might have been a precursor to further
11 sexual advances?
12   A    This text made me more concerned.
13   Q    Thank you.
14        You testified earlier that at some
15 point, Caryn got uncomfortable with the
16 communications with J.P. at work?
17   A    Yes.
18   Q    In your experience, can people have
19 interpersonal relationships that are positive that
20 later change after a boundary is crossed?
21   A    Oh, absolutely.
22   Q    And can warm, interpersonal
23 relationships that are positive sometimes be seen
24 or understood as grooming in hindsight for further
25 sexual advances?

1      A      Absolutely.
2      Q      Is this common in sexual harassment
3  cases?
4      A      In my experience, from what I have read
5  in published cases as well as seen in my workplace
6  interactions as a civil rights lawyer or defense
7  attorney, yes.
8      Q      Thank you.
9             Can you help me understand a little bit
10 about the relationship between your office and the
11 AO and OGC?
12     A      My office, fair employment practices
13 office?
14     Q      Yes, ma'am.
15     A      And OGC, yes.
16            As I mentioned before, within the AO,
17 they -- the AO and its managers are represented by
18 the Office of General Counsel with the specific
19 goal of avoiding future liability.
20            My office was, and my staff attorneys
21 were, in the position of giving -- among other
22 duties, giving neutral advice to both managers and
23 employees about workplace discrimination,
24 harassment, and the other civil rights laws.
25     Q      And who's entitled to ask for advice

1  J.P. became emotional when she told him that
2  eventually she wanted to work out of the Asheville
3  office?
4       A    Emotional in -- in what way?  Anger?
5  Surprise?  Tearful?  I need -- I need more
6  clarification.
7       Q    Anger.
8       A    Yes, I do remember that.
9       Q    Was -- did she describe him as tearful?
10      A    No.
11      Q    She described him as angry when she
12 told him that she eventually wanted to move to the
13 Asheville office to work somewhere away from
14 there?
15      A    Yes.  And I recall a couple of examples
16 when he became very angry at her and sort of
17 lashed out at her, and, again, I -- I took that as
18 some evidence of his desire to control her and the
19 situation.
20      Q    And would it have made you nervous at
21 all about Asheville as a solution to the control?
22           In other words, would simply moving
23 offices eliminate the problem if J.P. was still in
24 control and overseeing her?
25      A    No, that would not have solved the

1  problem.  In my mind, that employee/employer or
2  manager relationship needed to be broken, and she
3  needed to report to someone else.
4       Q    Understood.
5            And just to be clear, the Government's
6  asked you to speculate a lot, but these aren't
7  your notes, correct?
8       A    The notes in front of me?
9       Q    Correct.
10      A    They are not.  They are -- from what I
11 understand, they are Caryn's notes.
12      Q    So you don't actually know what Caryn
13 meant, of course?
14      A    I don't.  I don't.  I can only make a
15 reasoned determination of what she meant.
16           But, also, part of what I see refreshes
17 my memory about that initial conversation.
18      Q    Can you say a little more about that?
19      A    Well, I remember -- I mean, I remember
20 telling her I was the manager of the civil rights
21 office for the federal courts and for
22 AO employees.
23           I remember telling her that I had been
24 a law clerk and that I had a number of different
25 positions over the years in civil rights and