**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
ASHEVILLE DIVISION
CASE NUMBER 1:20CV66

| | |
|---|---|
| CARYN DEVINS STRICKLAND, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES OF AMERICA, et al., | ) |
| | ) |
| Defendants. | ) |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY
JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................... 1

ARGUMENT ................................................................................................................................. 2

I.      Defendants Did Not Violate Plaintiff's Procedural Due Process Rights. .................................. 2

II.     Defendants Did Not Violate Plaintiff's Equal Protection Rights. .......................................... 6

        A.      Plaintiff was not subjected to sexual harassment. ............................................ 7

                1.      There was no quid pro quo harassment. ............................................ 7

                2.      The evidence establishes there was no hostile work environment. ................. 13

        B.      Defendants were not deliberately indifferent to Plaintiff's allegations. ....................... 17

III.     Plaintiff No Longer Has Any Viable Remedies. ............................................................. 18

        A.      Plaintiff is not entitled to front pay. ......................................................... 18

                1.      Front pay is not an available remedy for Plaintiff's claims. ............................. 18

                2.      Reinstatement would be inequitable under these circumstances. .................... 22

        B.      Other relief is not available. ................................................................. 24

CONCLUSION .............................................................................................................................. 25

i

# TABLE OF AUTHORITIES

**Cases**

*Afr. Communities Together v. Trump*,
2019 WL 5537231 (D. Mass. Oct. 25, 2019) .........................................................................................25

*Akonji v. Unity Healthcare, Inc.*,
517 F. Supp. 2d 83 (D.D.C. 2007) .....................................................................................................14

*Atkins v. Computer Scis. Corp.*,
264 F. Supp. 2d 404 (E.D. Va. 2003) ...............................................................................................8, 9

*Baqir v. Principi*,
434 F.3d 733 (4th Cir. 2006) .............................................................................................................15

*Bass v. E.I. DuPont de Nemours & Co.*,
324 F.3d 761 (4th Cir. 2003) .............................................................................................................15

*Bass v. Hill*,
2006 WL 3919620 (M.D.N.C. Oct. 16, 2006) ..................................................................................17

*Bloch v. Exec. Off. of the President*,
164 F. Supp. 3d 841 (E.D. Va. 2016) ...............................................................................................25

*Bonenberger v. Plymouth Twp.*,
132 F.3d 20 (3d Cir. 1997) ..................................................................................................................8

*Bostock v. Clayton County*,
140 S. Ct. 1731 (2020) .......................................................................................................................15

*Bryant v. Bell Atl. Md., Inc.*,
288 F.3d 124 (4th Cir. 2002) .............................................................................................................16

*Bryant v. Jones*,
575 F.3d 1281 (11th Cir. 2009) ....................................................................................................19, 20

*Burlington Indus., Inc. v. Ellerth*,
524 U.S. 742 (1998) .......................................................................................................................9, 12

*Butts v. Prince William Cnty. Sch. Bd.*,
844 F.3d 424 (4th Cir. 2016) .............................................................................................................25

*Carter v. Greenspan*,
304 F. Supp. 2d 13 (D.D.C. 2004) .....................................................................................................14

ii

*CTB, Inc. v. Hog Slat, Inc.,*
    954 F.3d 647 (4th Cir. 2020) ...................................................................................16

*Doe v. Rector & Visitors of George Mason Univ.,*
    149 F. Supp. 3d 602 (E.D. Va. 2016) ........................................................................3

*Ecklund v. Fuisz Tech., Ltd.,*
    905 F. Supp. 335 (E.D. Va. 1995) .............................................................................9

*EEOC v. Sunbelt Rentals, Inc.,*
    521 F.3d 306 (4th Cir. 2008) ...................................................................................15

*Evans v. Int'l Paper Co.,*
    936 F.3d 183 (4th Cir. 2019) ............................................................................ 19, 21

*Faragher v. City of Boca Raton,*
    524 U.S. 775 (1998) ................................................................................................16

*Farley v. Am. Cast Iron Pipe Co.,*
    115 F.3d 1548 (11th Cir. 1997) .................................................................................9

*Feliciano v. Alpha Sector,*
    2002 WL 1492139 (S.D.N.Y. July 11, 2002) ..........................................................14

*Felty v. Graves-Humphreys Co.,*
    818 F.2d 1126 (4th Cir. 1987) .................................................................................12

*Fiorito v. Metro. Aviation,*
    2018 WL 3730071 (E.D. Va. Aug. 3, 2018) ............................................................17

*Gonzalez v. Kahan,*
    1996 WL 705320 ....................................................................................................14

*Harris v. Forklift Sys., Inc.,*
    510 U.S. 17 (1993) ............................................................................................ 14, 15

*Hawkins v. PepsiCo, Inc.,*
    203 F.3d 274 (4th Cir. 2000) ............................................................................ 15, 16

*Hewitt v. Helms,*
    482 U.S. 755 (1987) ................................................................................................24

*Hopkins v. Baltimore Gas & Electric Company,*
    77 F.3d 745 (4th Cir. 1996) .............................................................................. 14, 15

*Huddleston v. Lumbermens Mut. Cas. Co.,*
    942 F. Supp. 504 (D. Kan. 1996) ..............................................................................9

iii

*Idusuyi v. State of Tenn. Dep't of Children's Servs.*,
    30 F. App'x 398 (6th Cir. 2002) ........................................................................................9

*Johnson v. Donohoe*,
    2013 WL 7216393 (D.S.C. Nov. 26, 2013) ....................................................................10

*Jones-Davidson v. Prince George's Cty. Cmty. Coll.*,
    2013 WL 5964463 (D. Md. Nov. 7, 2013) ......................................................................13

*Just. 360 v. Stirling*,
    42 F.4th 450 (4th Cir. 2022) ..........................................................................................24

*Kerns v. United States*,
    585 F.3d 187 (4th Cir. 2009) ..........................................................................................19

*Kouri v. Liberian Servs., Inc.*,
    1991 WL 50003 (E.D. Va. Feb. 6, 1991) ........................................................................14

*Lindemann-Moses v. Jackmon*,
    2023 WL 3000454 (M.D.N.C. Apr. 19, 2023) ................................................................18

*Mason v. S. Ill. Univ. at Carbondale*,
    233 F.3d 1036 (7th Cir. 2000) ........................................................................................15

*Matvia v. Bald Head Island Mgmt.*,
    259 F.3d 261 (4th Cir. 2001) ..........................................................................................20

*Meritor Sav. Bank, FSB v. Vinson*,
    477 U.S. 57 (1986) ..........................................................................................................13

*Morrison v. Garraghty*,
    239 F.3d 648 (4th Cir. 2001) ..........................................................................................12

*Okoli v. City Of Baltimore*,
    648 F.3d 216 (4th Cir. 2011) ....................................................................................*passim*

*Penn. State Police v. Suders*,
    542 U.S. 129 (2004) ........................................................................................................19

*Ponticelli v. Zurich Am. Ins. Grp.*,
    16 F. Supp. 2d 414 (S.D.N.Y. 1998) ............................................................................8, 9

*Potash v. Fla. Union Free Sch. Dist.*,
    972 F. Supp. 2d 557 (S.D.N.Y. 2013) ............................................................................13

*Prince v. Madison Square Garden*,
    427 F. Supp. 2d 372 (S.D.N.Y. 2006) ............................................................................10

iv

*Reed v. Hunt Corp.*,
  2003 WL 23104227 (S.D. Ind. Nov. 7, 2003) ...................................................................10

*Reinhold v. Virginia*,
  151 F.3d 172 (4th Cir. 1998) ...................................................................................12

*Rinaldi v. CCX, Inc.*,
  No. 3:05-cv-108-RJC, 2009 WL 412966 (W.D.N.C. Feb. 18, 2009),
  *aff'd in part and rev'd in part*, 388 F. App'x 290 (4th Cir. 2010) ............................23

*Russell v. Microdyne Corp.*,
  65 F.3d 1229 (4th Cir. 1995) ...................................................................................23

*Sasser v. Safe Home Sec., Inc.*,
  2019 WL 3858607 (M.D.N.C. Aug. 16, 2019) .............................................. 14, 22

*Strickland v. United States*,
  32 F.4th 311 (4th Cir. 2022) .............................................................................*passim*

*Tepperwien v. Entergy Nuclear Operations, Inc.*,
  663 F.3d 556 (2d Cir. 2011) ...................................................................................13

*Triplett v. N.C. Dep't of Pub. Safety*,
  2018 WL 4258512 (W.D.N.C. Sep. 5, 2018) ..........................................................20

*Williams v. Cerberonics*, Inc.,
  871 F.2d 452 (4th Cir. 1989) ...................................................................................16

*Williams v. Verizon Wash., DC, Inc.*,
  266 F. Supp. 2d 107 (D.D.C. 2003) ................................................................. 8, 10

## Rules

Fed. R. Civ. P. 56(a) .....................................................................................................17

**INTRODUCTION**

Plaintiff Caryn Strickland has attempted to paint a picture of a work environment rife with sexual harassment and hostile overtones. But because she has done so in a vacuum, without relying on the undisputed material facts in the record and applicable case law, her efforts to avoid summary judgment in Defendants' favor must fail. Indeed, the overwhelming evidence in this case reveals a straightforward series of events. After Plaintiff informed the Federal Defender ("Defender") of her allegations of sexual harassment against the First Assistant at the Federal Defender's Office for the Western District of North Carolina ("FDO"), the Defender and other Fourth Circuit officials acted expeditiously to separate Plaintiff from the First Assistant, initiate an investigation into her accusations, and advise Plaintiff of her rights under the applicable Employment Dispute Resolution Plan ("EDR Plan"). Even after the investigation concluded in a finding that Plaintiff had not suffered any sexual harassment, these officials continued to work with Plaintiff to provide her the remedies she sought through the EDR process. And after they helped her secure a Fourth Circuit clerkship, Plaintiff voluntarily withdrew her EDR claims.

Defendants' actions do not come close to meeting the elements required to show a violation of either Plaintiff's procedural due process rights or her equal protection rights. Because neither case law nor material evidence supports her arguments to the contrary, Plaintiff falls back on immaterial evidence and out-of-context statements that ultimately have no bearing on the legal issues presented to the Court. Plaintiff's claims therefore fail as a matter of law.

For her due process claim, Plaintiff concedes that she knew the final decisionmaker at an EDR hearing would be a presiding judicial officer, thus foreclosing any factual basis for the conclusion that she "was led to believe that [the Defender] would be the final decisionmaker in her case." *Strickland v. United States*, 32 F.4th 311, 356 (4th Cir. 2022). Plaintiff now argues that, although she knew a judicial officer would be the decisionmaker, she believed that the judicial officer "would not, or could not" order any effective remedies against an FDO office. This attempted workaround of the Fourth Circuit's decision fails, because, among other things, it is nothing more than a recasting of the facial challenge to the EDR policy that both this Court and the Fourth Circuit have already rejected.

1

Plaintiff's equal protection claim likewise is deficient because Plaintiff has not demonstrated that she "was subjected to sexual harassment by another employee or supervisor" or that "supervisory officials and/or officials responsible for overseeing the court's EDR plan responded to" any allegations of such harassment to which they were alerted "with deliberate indifference[.]" *Id.* at 359. Plaintiff simply has not pointed to any evidence establishing that she was subjected to sexual harassment as a matter of law under either a quid pro quo or a hostile work environment theory. Plaintiff insists that the "mas dinero" email constituted a quid pro quo request, but she has not identified a tangible employment action she suffered as a result of rejecting this alleged sexual advance, as Supreme Court precedent requires. And the only conduct that Plaintiff identifies to support a hostile work environment claim—negative text messages that the First Assistant sent privately to a friend— falls woefully short of being "severe and pervasive" enough to have created an abusive workplace. This conduct also bears no resemblance to what the caselaw demands for a successful hostile work environment claim, and tellingly, Plaintiff does not even attempt to distinguish the numerous cases cited by Defendants on this topic. Plaintiff also has not addressed Defendants' arguments that they were not deliberately indifferent to her claims, and in fact the undisputed evidence shows that Defendants were responsive to Plaintiff's concerns at every turn.

Finally, Defendants are entitled to summary judgment because the record evidence demonstrates that Plaintiff has no viable form of relief. Although Plaintiff seeks front pay, that form of relief is not an available remedy for a procedural due process claim. Nor is it available for her equal protection clause claim. The undisputed facts demonstrate that she was not constructively discharged. In any event, her unauthorized retention of privileged information after the conclusion of her employment bars this remedy because it would be inequitable to compel Plaintiff's reinstatement. For these reasons, as discussed further below, the Court should enter summary judgment for Defendants.

## ARGUMENT

### I. Defendants Did Not Violate Plaintiff's Procedural Due Process Rights.

The Fourth Circuit held that Plaintiff's due process claim required her to prove two elements: (1) that the Defender "was not disqualified from the EDR process" and (2) that she "was led to believe

that [the Defender] would be the final decisionmaker in her case." *Strickland*, 32 F.4th at 356.[1] While the Defendants did not disqualify the Defender from the EDR process—justifiably so,[2] *see* Defs.' Opp. to Pl.'s Mot. for Summ. J. at 6-10, ECF No. 249 ("Defs.' Opp.")—Plaintiff has not shown that she was led to believe that the Defender would be the final decisionmaker on her EDR claims, as she concedes that she understood that a presiding judicial officer would oversee a final hearing on her claims, *see* Pl.'s Opp. to Defs.' Mot. for Summ. J. at 13, ECF No. 250 ("Pl.'s Opp."). Indeed, Plaintiff testified repeatedly that she believed "there would be a presiding . . . judicial officer" conducting a hearing and ordering remedies. Ex. 6, Dep. of Caryn Devins Strickland at 19:3-4; *see also* Defs.' Mot. for Summ. J. at 3, ECF No. 245 ("Defs.' Mot."). This delivers a fatal blow to her due process claim and should end the inquiry.

Plaintiff tries to resist this conclusion by arguing that she believed that a presiding judicial officer "would not, or could not order remedies in practice" because the judicial officer would not want to interfere with a Federal Defenders' office. *See* Pl.'s Opp. at 13-14. But this argument essentially takes issue with the application of the EDR Plan to Federal Defenders' offices *in general*, and the Fourth Circuit has already upheld the EDR Plan as facially valid. *See Strickland*, 32 F.4th at 354-55. Plaintiff has not provided any evidence to show that she was led to believe the presiding judicial officer "would" or "could" not order certain remedies for reasons unique to *her case* or that, once ordered, such remedies would not have been implemented. She cannot now re-litigate her failed facial challenge under the guise of an as-applied challenge.

---

[1] Plaintiff incorrectly states that the Fourth Circuit held that "[t]he refusal to disqualify the [Defender] created a conflict of interest[.]" *Strickland*, 32 F.4th at 355. The Fourth Circuit merely noted that Plaintiff had alleged this, and that this allegation stated a plausible claim. But the undisputed evidence shows that the Defender was not serving in neutral role—he was an interested party representing the respondent employing office—so there was no "conflict of interest" and thus no need to disqualify him. *See* Defs.' Opp. at 6-10.

[2] Plaintiff also seems to argue that the ruling on Plaintiff's motion to disqualify the Defender was a "failure to comply" with its own policies. Pl.'s Opp. at 13. However, Plaintiff does not identify any way in which Defendants failed to comply with the EDR Plan. Chapter X, § 7 of the EDR Plan gives the Chief Judge full discretion to either grant or deny a request to disqualify. *See* Ex. 12, Ch. X, § 7. Thus, Plaintiff's cited case, *Doe v. Rector & Visitors of George Mason Univ.*, 149 F. Supp. 3d 602 (E.D. Va. 2016), has no application here.

At any rate, Plaintiff's purported belief is patently unreasonable. The EDR Plan expressly gives the presiding judicial officer the authority to order certain remedies after a formal hearing. *See* Ex. 12, Employment Dispute Resolution Plan, Ch. X § 10(B)(2)(f) ("remedies may be provided in accordance with § 12 of this Chapter"); *id.*, Ch. X § 12 (listing available remedies). Plaintiff "carefully" read the plan "multiple times." Ex. 6 at 15:11-16:2. She was told repeatedly by multiple people that the Defender would not be the individual making decisions on her EDR claims. *See, e.g.*, Ex. 27, Conversation 180913_1633 Tr. at 9:15-22 (a staff member at the Administrative Office's Office of Fair Employment Practices telling Plaintiff that the Defender was "not going to have any authority in terms of how the matter is resolved in an EDR setting," because "he will not be the mediator, nor will he make the final decision before the court"); Ex. 28, Conversation 190117_1621 Tr. at 37:19-38:2 (Circuit Executive telling Plaintiff that if she filed a formal complaint, a "judicial officer" would make "findings on the merits"); Ex. 44, Second Decl. of Jill Langley, ¶ 8 (Judicial Integrity Office ("JIO") telling Plaintiff that the presiding judicial officer "could order remedies contemplated under the EDR Plan against any employing office, including a Federal Public Defender organization, designed to make her 'whole[.]'"); *see also* Defs.' Mot. at 14-18.

Plaintiff's efforts to dismiss the clear statements made to her by the AO staff member and the Circuit Executive fall short. Plaintiff claims that the conversation with the AO staff member took place before she filed her request for counseling, Pl.'s Opp. at 16, but according to the information Plaintiff gave Defendants about the conversations *she* recorded, that conversation took place on September 13, 2018. *See* Ex. 67, April 7, 2023 Letter, at 3. That is three days after Plaintiff filed her request for counseling on September 10, 2018. *See* Ex. 16, Email from Caryn Devins to James Ishida. Nevertheless, the timing of these statements does not undermine their import: Plaintiff was directly told that the Defender had no authority over her EDR claims and would not be the final decisionmaker. *See* Defs.' Mot. at 15. Plaintiff also baselessly accuses the Circuit Executive of having a conflict of interest, citing only to a provision of the 2019 EDR plan advising that a unit executive should not serve as an EDR coordinator. Pl.'s Opp. at 16. That plan did not exist during Plaintiff's EDR process, and more to the point, the Circuit Executive was not *Plaintiff's* unit executive. The Court

4

should thus disregard this misleading allegation.

As to her contention that a judicial officer "would not" order remedies in practice, Plaintiff stretches her interpretation of statements made by the Mediator and the JIO far beyond what would be credible or reasonable. The Mediator's remark that a judicial officer may not want to "micromanage" the FDO occurred amidst a broader discussion in which the Mediator was encouraging Plaintiff to settle her case instead of filing a formal complaint. *See generally* Ex. 31, Conversation 109226_1153 Tr. Though Plaintiff finds it "nonsensical" that the Mediator was referring only to settlement during the mediation stage, Pl.'s Opp. at 14, she conveniently omits the words preceding the Mediator's use of the word "micromanage": "Therefore I think *in drafting a settlement agreement that binds [the Defender]*, you have the better ability to work these things in there, because I don't think the judge is going to micromanage this office and tell a federal defender how to do his job and run his office." Ex. 31 at 47:8-13. As the Mediator clarified during his testimony, in this conversation he was explaining why Plaintiff would be better off negotiating a settlement through mediation, since "at a formal hearing the judge is in control" and the judge may not award her the specific remedy she initially sought given the judge's unfamiliarity with the day-to-day operations of her office. Ex. 30 at 87:15-88:22. Plaintiff also cites extensively to statements that her "representative" made to the Mediator, *see e.g.*, Pl.'s Opp. at 14-15, but these statements do not reflect what *Defendants* led Plaintiff to believe. Despite Plaintiff's efforts to parse various words and phrases uttered by the Mediator,[3] the bottom line is that the Mediator never told Plaintiff that the Defender would be the

---

[3] None of the Mediator's statements referenced by Plaintiff could be reasonably understood as saying that the Defender would be the final decisionmaker. The Mediator's "frustration" with mediating EDRs had nothing to do with who would be the final decisionmaker; rather, he was explaining that mediation could not provide Plaintiff with the intangible remedy "[she] want[ed], which is comfort with [the Defender]." Pl.'s Ex. DD at 49:7-17. The Mediator—whose goal was to convince Plaintiff to settle her claims—later tried to deescalate the situation by telling Plaintiff's representative that he was "not disagreeing with" him, and immediately clarified that he was "just telling [him] if you go on with the hearing, your best opportunity, if you want to stay in that office and try to figure this thing out is to formulate a settlement agreement." *Id.* at 51:1-6. This exchange only reflects the Mediator's attempts to convey that mediation was the best means to successfully resolve Plaintiff's claims. And on March 8, 2019, the Mediator reiterated that his "frustration" was that the limited remedies provided under Chapter X, § 12 of the EDR Plan made it challenging to resolve claims during mediation. Pl.'s

final decisionmaker on her EDR claims. Moreover, any frustration that the Mediator may have expressed with certain provisions of the EDR Plan in general would only be relevant to a facial challenge, which was already rejected. *Strickland*, 32 F.4th at 354. None of the Mediator's statements suggest that he believed the EDR Plan was being misapplied to Plaintiff's case.

Plaintiff again fails to point to a single statement that the JIO made during her EDR proceeding from which she could reasonably conclude the Defender would be the final decisionmaker. Plaintiff asserts that the JIO testified that she told Plaintiff she was "unsure how remedies could be enforced against the FDO," Pl.'s Opp. at 15, but that is an inaccurate description of the JIO's testimony. The JIO testified that she "certainly" told Plaintiff that "a defender would be obligated under the plan to take those remedies and comply with the [judicial officer's] order," but she "didn't know what would happen if they *refused* to follow that." *See* Ex. 68, Dep. of Jill Langley at 130:12-131:21 (emphasis added); *see also* Defs.' Opp. at 3. In fact, after researching the issue, the JIO concluded that a federal defender could be removed for failing to comply with a presiding judicial officer's order. *See* Ex. 68 at 132:12-18.

Finally, Plaintiff cites the Defender's statement that he did not think "a judge would order a defender that [he's] got to do this without considering whatever needs that defender has." Pl.'s Opp. at 16. Of course, since this statement was made in testimony during this litigation, it has no relevance to what Defendants may have led Plaintiff to believe during her EDR process. Besides, it is common sense that a judicial officer would consider the positions of both the employing office and the employee when fashioning a remedy. It would be unreasonable for Plaintiff to conclude from this sentiment that the Defender, and not a judicial officer, would be the final decisionmaker over her claims.

## II. Defendants Did Not Violate Plaintiff's Equal Protection Rights.

Ignoring binding caselaw and highlighting immaterial facts, Plaintiff's opposition falls short of demonstrating that Defendant's motion should be denied with respect to her equal protection claim.

---

Ex. EE at 77:22-79:14. Indeed, moments later, the Mediator reminded Plaintiff that she "forget[s]" that the Defender "does have a boss. It's a judge. He can be removed." *Id.* at 80:7-12.

Plaintiff has not and cannot establish that she was sexually harassed, either under a hostile work environment or quid pro quo theory. And she fails to meaningfully respond to the argument that Defendants were not deliberately indifferent—and has thus forfeited that element of her claim. The Court should thus enter summary judgment on Plaintiff's equal protection claim in Defendants' favor.

As a preliminary matter, Plaintiff seems to argue that this Court should find her equal protection rights were violated solely because, according to her, the Defender and First Assistant were "disciplined for 'wrongful conduct'"—a term of art under the EDR Plan. *See* Pl.'s Opp. at 16-17. This conclusion is wrong for numerous reasons. First, the Investigator made no finding of wrongful conduct—to the contrary, the Investigator concluded that there was "not . . . a case for retaliation" and that Plaintiff's sexual harassment claims were "very flimsy." Ex. 25, Counselor's Report at US1254-57. Second, neither the Defender nor the First Assistant were "disciplined" for wrongful conduct. The counseling letter issued to Defender expressly recognized that no retaliation had occurred and stated that "discipline was not appropriate." Ex. 69, Letter from James Ishida to Anthony Martinez, at US4267. With respect to the First Assistant, the Defender counseled him about only his use of email in the workplace, not any sexual harassment, discrimination, or retaliation. Ex. 2, Decl. of John Parke Davis, ¶ 6; Ex. 3, Decl. of Anthony Martinez, ¶ 99. Third, Defendants never admitted that disciplinary action was taken. Plaintiff merely quotes from an email in which the Circuit Executive mistakenly characterized the counseling as disciplinary action. *See* Defs.' First Am. Answer to Pl.'s Compl., ¶ 484, ECF No. 210. That mischaracterization certainly does not support any conclusion that a finding of wrongful conduct was made, let alone that Plaintiff has met the legal standard for an equal protection claim.

The Court should reject Plaintiff's attempt to distract from the conclusion that the material facts show Defendants did not violate Plaintiff's equal protection rights as a matter of law.

### A. Plaintiff was not subjected to sexual harassment.

#### 1. There was no quid pro quo harassment.

The undisputed evidence shows that Plaintiff has not met several elements necessary to prove quid pro quo harassment. *See Okoli v. City Of Baltimore*, 648 F.3d 216, 222 (4th Cir. 2011) (setting forth

elements of a quid pro quo claim).[4] Plaintiff hangs her entire claim of quid pro quo harassment on her argument that the "mas dinero" email constituted a quid pro quo request. For several reasons, this argument fails as a matter of law.

First, Plaintiff has not refuted the fact that this email did not constitute a quid pro quo request for a sexual favor, *see* Defs.' Mot. at 20-21, and so it cannot be considered "unwelcome" conduct for purposes of her harassment claim, *see Okoli*, 648 F.3d at 222. Plaintiff tries to discount the fact that the "mas dinero" email was plainly not a sexual "quid pro quo" request by arguing that harassment need not use explicitly sexual language. Pl.'s Opp. at 23. But Plaintiff still fails to articulate any coherent explanation of what sexual advance constituted the "quo" in the purported "quid pro quo." In this email, the First Assistant did not suggest that a sexual favor was required for Plaintiff to achieve a raise. *See Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 28 (3d Cir. 1997) (holding no quid pro quo existed when the employer "did not suggest, either by word or by action, that sexual favors were the price for keeping [plaintiff's] job"). Indeed, Plaintiff acknowledges that she had numerous friendly interactions with the First Assistant—including drinking with him and texting him photos of alcohol—before he sent the "mas dinero" email. *See* Pl.'s Opp. at 22-23. Given that Plaintiff concedes that the First Assistant had not made a sexual advance before the "mas dinero" email and that the email uses no explicitly sexual language, Ex. 6 at 58:18-60:1, it is entirely unclear what part of this email could be the "quo" on which she claims the First Assistant made her pay raise contingent. *See Atkins v. Computer Scis. Corp.*, 264 F. Supp. 2d 404, 412 (E.D. Va. 2003) (holding that the plaintiff made no showing that the alleged harasser's "request that [the] plaintiff stay and meet with her was in any way sexual in nature"); *Williams v. Verizon Wash., DC, Inc.*, 266 F. Supp. 2d 107, 119-20 (D.D.C. 2003) (granting summary judgment for defendants because alleged quid pro quo contained "no threat or hint of reprisal" if the plaintiff rejected offer); *Ponticelli v. Zurich Am. Ins. Grp.*, 16 F. Supp. 2d 414, 421-23, 428 (S.D.N.Y. 1998) (holding that no sexual advance was made when the plaintiff alleged her harasser had "asked her to go out to lunch a few times and told her she was welcome at his home" and called her

---

[4] Plaintiff incorrectly cites to a Title VII regulation that does not apply to her constitutional claims. Pl.'s Opp. at 17.

a "stupid idiot and a slut"); *Huddleston v. Lumbermens Mut. Cas. Co.*, 942 F. Supp. 504, 509 (D. Kan. 1996) (holding no quid pro quo harassment occurred when, "[o]ther than isolated incidents of inviting plaintiff to socialize outside the workplace and leaning on plaintiff in her office," there was no evidence that the plaintiff's supervisor "demanded that plaintiff accede to granting sexual favors").[5]

Second, Plaintiff has failed to put forth any evidence showing that "tangible aspects" of her employment were affected because of her alleged rejection of the First Assistant's quid pro quo request. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 751 (1998) (explaining that the key distinction between hostile environment and quid pro quo claims is whether the employee suffered some tangible employment action as a result of the harassment). She argues that two tangible employment actions support her claim: (1) the "denial of the promotion to Grade 15," and (2) the "diminishment of her job duties." Pl.'s Opp. at 18. Neither has merit.

*Denial of promotion to Grade 15.* No evidence cited by Plaintiff suggests that the First Assistant was involved in decisions over her pay or promotions, so there is no causal connection between the alleged quid pro quo and any pay decisions. *See* Ex. 2, ¶ 41 (First Assistant was not involved in such decisions). Indeed, the undisputed evidence shows the First Assistant had no authority to reclassify Plaintiff's position, to change her pay, or to promote her. *See* Defs.' Mot. at 22-23 & n.7. Because the First Assistant "was not in a position to grant or withhold job benefits to the plaintiff, a *quid pro quo* harassment claim cannot be sustained." *Ecklund v. Fuisz Tech., Ltd.*, 905 F. Supp. 335, 339 (E.D. Va. 1995); *see also Idusuyi v. State of Tenn. Dep't of Children's Servs.*, 30 F. App'x 398, 401 (6th Cir. 2002); *Farley v. Am. Cast Iron Pipe Co.*, 115 F.3d 1548, 1552-53 (11th Cir. 1997); *Atkins*, 264 F. Supp. 2d at 412; *Ponticelli*, 16 F. Supp. 2d at 428.

Plaintiff does not deny these facts, nor does she present any evidence that the First Assistant

---

[5] Plaintiff again mischaracterizes several statements. *See* Pl.'s Opp. at 18. The Defender later clarified that thought it would be unreasonable to interpret the "mas dinero" email as asking for sexual favors, and that he would consider this a misinterpretation of the email. Ex. 70, Dep. of Anthony Martinez, at 282:17-23. The Investigator and the Mediator's statements indicate that they believed the email unwise, but not that it rose to the level of quid pro quo harassment. And the Investigator ultimately found that Plaintiff was not sexually harassed. *See generally*, Ex. 25. Despite these statements, Plaintiff herself is still unable to explain what about the "mas dinero" email was a quid pro quo sexual advance.

took any action to deny her a promotion to GS 15. Instead, she cites to the generic Defender Organization Classification System Manual ("DOCS Manual"), which states that in defenders' offices throughout the country, first assistants may perform tasks "such as" initiating personnel actions "when required." Pl.'s Ex. N at 48-49. But in the FDO in the Western District of North Carolina, the Defender did not permit the First Assistant to perform these tasks. *See* Ex. 3, ¶ 107 (Defender explaining that "[n]o one in [his] office (other than [him]), including the First Assistant, has or had the authority to take any adverse employment action against plaintiff or any of the other attorneys," including "pay decreases, demotions, [and] terminations."); Pl.'s Ex. GG at 90:14-21 (the Defender testifying that even though the First Assistant served as a supervisor in the FDO, the Defender was "the only one that [could] promote, demote, fire, [or] terminate" employees). Nor does the DOCS manual does not permit first assistants to change an employee's pay grade. *See* Pl.'s Ex. N at 49. As is the case here, "[w]here there is no evidence to support a connection between the individual who decides on" the alleged adverse action and "the individual who engaged in alleged harassment, there is no actionable claim." *Williams*, 266 F. Supp. 2d at 122.

The cases Plaintiff cites fail to show otherwise. These cases are about whether causation exists when the adverse employment action occurred far in time after the alleged harassment, not about whether causation exists when the individual offering the quid pro quo had no involvement in the alleged adverse action. *See Johnson v. Donohoe*, 2013 WL 7216393, at *7 (D.S.C. Nov. 26, 2013); *Reed v. Hunt Corp.*, 2003 WL 23104227, at *1, *3 (S.D. Ind. Nov. 7, 2003). Plaintiff appears to conflate two separate concepts—(1) whether the First Assistant subjected her to a tangible employment action as a result of her rejection of his purported quid pro quo offer, and (2) whether the Defender took action against her as retaliation for *reporting* the harassment. *See, e.g.*, Pl.'s Opp. at 20 (arguing that "the Defender's promotion denial came in *direct response* to Plaintiff's sexual harassment complaint"). Whatever action the Defender allegedly took as a result of her report of sexual harassment is entirely distinct from whether, as a matter of law, she was subject to quid pro quo harassment in the first place. *Cf. Prince v. Madison Square Garden*, 427 F. Supp. 2d 372, 383 (S.D.N.Y. 2006) (holding that, because the plaintiff alleged her termination occurred as retaliation for reporting harassing conduct, it did not

10

constitute a tangible employment action taken for refusing a sexual advance). And because the First Assistant had no ability to change Plaintiff's grade or to reclassify her to the AD scale, he could not possibly have taken these actions because of her response to the purported quid pro quo offer.

Plaintiff's reliance on the alleged promotion denial as a tangible employment action also fails because the undisputed evidence shows that Plaintiff was never denied a promotion or pay raise.[6] *See* Defs.' Mot. at 23. After Plaintiff requested to move to an AFD position at her August 9, 2018 meeting with the Defender, the Defender told Plaintiff that he was already "taking steps to convert" *both* her and the other (male) R&W Specialist from a GS to an AFD position, doing "appellate work and trial support." Ex. 71, Conversation 180809_1344 Tr. at 18:6-19:5. Contrary to Plaintiff's unsupported assertion that the Defender "backdated" Plaintiff's conversion, Pl.'s Opp. at 21, this change had been in the works for weeks, *see* Pl.'s Ex. A at 53 (email dated August 17 from the Defender to Plaintiff stating that he has started the process to make Plaintiff an AFD); Ex. 1, Decl. of William Moormann, ¶ 17 (reclassification request was submitted on August 16, 2018). As of the day the conversion to AFD was accomplished, Plaintiff became ineligible for a promotion to GS 15, Ex. 1, ¶ 14, so she was not "deprived of a job benefit which she was otherwise qualified to receive." *Okoli*, 648 F.3d at 222. The Defender actually took affirmative steps to ensure that she did not receive a decrease in pay when she was converted to AFD by applying the "Red Circle Rule" to maintain her salary of $107,319, even though her years of experience would have placed her in the AD-23 bracket with a maximum total pay of $101,038. Ex. 1, ¶¶ 20-22; Ex. 3, ¶¶ 32-34.

Plaintiff's contention that Defendants have "never provided a 'legitimate nondiscriminatory reason'" for the reclassification to AFD is belied by Plaintiff's own testimony that she knew the reclassification occurred to help the FDO with case weight measurement. Ex. 6 at 97:5-21. Both Plaintiff and the FDO's other R&W Specialist were reclassified at the same time, undermining any suggestion that Plaintiff's reclassification served as a way to single her out for reporting allegations of

---

[6] While Plaintiff claims that the Defender "sought" to remove her locality pay, she does not appear to argue that her locality pay was actually removed, and so she cannot rely on it as an adverse employment action. Pl.'s Opp. at 21. Regardless, the Defender never removed her locality pay nor sought to remove it. *See* Ex. 1, ¶¶ 22, 43-44; Ex. 3, ¶ 36.

sexual harassment. *Cf. Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001) (explaining that an equal protection claim requires a plaintiff to "demonstrate that he has been treated differently from others with whom he is similarly situated"). To the contrary, reclassification was something Plaintiff demanded as a remedy for the alleged harassment. Pl.'s Ex. A at 53 (Plaintiff demanding that she be an AFD); Ex. 14, Emails between Caryn Devins and Nancy Dunham, at US977 (Plaintiff demanding that to "resolve" her case she become an AFD). Further, becoming an AFD is "a promotion on a long-term basis, even though it may not come with immediate compensation increases or responsibilities." Ex. 3, ¶ 28. Indeed, after her reclassification, Plaintiff was offered an appellate argument—that she declined—in the Fourth Circuit. Ex. 73, Emails between Joshua Carpenter and Caryn Strickland (January 11, 2019).

*Diminishment of duties.* Plaintiff also presents no evidence that the First Assistant "diminished" or removed her job duties after the "mas dinero" email. Without citing to any record evidence, Plaintiff claims she was "taken off of new trial cases," Pl.'s Opp. at 20, but it is unclear which "new cases" she is referencing or whether the First Assistant had any involvement in these decisions. *See Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) ("Unsupported speculation is not sufficient to defeat a summary judgment motion."). Plaintiff also argues that she was "demoted" to "pure R&W," Pl.'s Opp. at 20, citing only to notes from a management meeting with eight attendees explaining that she and her male counterpart would both "be assigned to two teams . . . and will be pure R&W," Pl.'s Ex. M at 33. These meeting notes do not show that the First Assistant had any role in assigning any of her duties. Plaintiff has therefore also failed to establish any causal connection between the alleged harassment and either of these occurrences.

Moreover, the meeting notes do not demonstrate that Plaintiff's duties were diminished or affected at all. The notes merely state that Plaintiff and the other, male R&W Specialist in the office would *both* continue to serve as "pure R&W[s]" for two teams, *id.*, a job that Plaintiff had been doing since she was hired as an R&W, *see* Ex. 1, ¶¶ 4-5. "As the Supreme Court made clear in *Ellerth*, a 'tangible employment action' requires '*a significant change in employment status.*'" *Reinhold v. Virginia*, 151 F.3d 172, 175 (4th Cir. 1998) (citing *Ellerth*, 524 U.S. at 761). Plaintiff has not alleged any change in

12

her job duties, let alone a significant one.[7] *See Potash v. Fla. Union Free Sch. Dist.*, 972 F. Supp. 2d 557, 584 (S.D.N.Y. 2013) ("Changes in assignments or responsibilities that do not 'radical[ly] change' the nature of work are not typically adverse employment actions.").

Plaintiff further references remarks the First Assistant made about problems with her performance and attitude. Pl.'s Opp. at 19-20. But "criticism of an employee . . . is not an adverse employment action." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 570 (2d Cir. 2011); *see also Jones-Davidson v. Prince George's Cty. Cmty. Coll.*, 2013 WL 5964463, at *4 (D. Md. Nov. 7, 2013) ("[C]ourts in this district have repeatedly held that mere criticism from supervisors does not constitute materially adverse employment action") (collecting cases). In sum, Plaintiff has failed, as a matter of law, to refute Defendant's position that she cannot meet the elements required for quid pro quo harassment.

### 2. The evidence establishes there was no hostile work environment.

Nor has Plaintiff established that Defendants are not entitled to summary judgment with respect to her hostile work environment claim. *See Okoli*, 648 F.3d at 220 (reciting elements of a hostile work environment claim).

First, Plaintiff has not identified any conduct that would reasonably be perceived as unwelcome. Plaintiff does not address Defendants' arguments that the June 29, 2018 meeting request or the June 21, 2018 offer for a ride home were not unwelcome. *See* Defs.' Mot. at 19-20. And for the reasons explained above, the "mas dinero" email does not constitute unwelcome harassment. *See supra* at 8-9. Plaintiff is thus left with her argument that the First Assistant's three offers to get a drink (with the option to decline) were unwelcome merely because they occurred after the "mas dinero" email. Pl.'s Opp. at 23. Irrespective of the timing, Plaintiff has not put forth any evidence that she "indicated" to the First Assistant that "the alleged sexual advances were unwelcome." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986). Nor could she—as Plaintiff admitted, she never told the First Assistant she was not comfortable drinking with him. Ex. 6 at 75:11-18; Ex. 7, Second Decl. of John Parke

---

[7] Plaintiff also contends that she was "forced to telework," even though the undisputed evidence shows that she requested to telework and repeatedly said she was "fine" with it. *See infra* at 20.

Davis, ¶ 4. Plaintiff acknowledged that "drinking was commonplace in the FDO," Pl.'s Opp. at 23 n.2, and her many experiences drinking alcohol with the First Assistant and texting him about alcohol suggest that his offers were a standard part of their relationship. *See Kouri v. Liberian Servs., Inc.*, 1991 WL 50003, at *6 (E.D. Va. Feb. 6, 1991), *aff'd sub nom. Kouri v. Todd*, 960 F.2d 146 (4th Cir. 1992) (holding that it was not "unwelcome" when the alleged harasser "paid extremely close attention to the plaintiff by, *inter alia*, peppering her with little notes, escorting her to the bathroom or to her car, and visiting her both at home and in the hospital" because "the plaintiff never made any realistic effort to cut it off" and "in essence, she was sending out mixed signals").

Second, Plaintiff did not respond to Defendants' argument that the First Assistant's conduct was not based on her sex. *See* Defs.' Mot. at 20. Plaintiff identifies no evidence showing that his conduct revealed a sexual interest in her. Accordingly, she has conceded these arguments. *See Sasser v. Safe Home Sec., Inc.*, 2019 WL 3858607, at *5 (M.D.N.C. Aug. 16, 2019) (failing to respond to an argument constitutes an abandonment of a claim) (collecting cases).

Third, Plaintiff has failed to show that the First Assistant's alleged conduct was so severe or pervasive that it created "an environment that a reasonable person would find hostile or abusive." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Plaintiff does not even attempt to distinguish the numerous cases demonstrating that the alleged conduct falls far short of this standard.[8] *See* Defs.' Mot. at 20-21 & n.6. In particular, she fails to explain why summary judgment for Defendants is not compelled by the Fourth Circuit's binding precedent in *Hopkins v. Baltimore Gas & Electric Company*, 77

---

[8] *See, e.g., Akonji v. Unity Healthcare, Inc.*, 517 F. Supp. 2d 83, 97-99 (D.D.C. 2007) (supervisor's acts of touching plaintiff's buttocks and thigh, trying to kiss her, calling her beautiful, and asking her to accompany him on weekend trip were "not 'sufficiently severe or pervasive to alter the conditions of [plaintiff's] employment'"); *Carter v. Greenspan*, 304 F. Supp. 2d 13, 25 (D.D.C. 2004) ("allegations that [co-worker] 'caressed [plaintiff] on his knee,' 'placed her breast on [his] arm,' and 'placed her fingers on [his] buttocks' . . . are not sufficiently severe in quantity or quality to unreasonably interfere with plaintiff's work performance or create a hostile work environment."); *Feliciano v. Alpha Sector*, 2002 WL 1492139, at *8 (S.D.N.Y. July 11, 2002) (granting summary judgment for the defendant on the basis that an attempt to hug, in addition to compliments, requests to date, a statement of desire to "lay with" the plaintiff, and a kiss, have been held not to comprise a hostile working environment); *Gonzalez v. Kahan*, 1996 WL 705320, at *3 (E.D.N.Y. Nov. 25, 1996) (obscene phone call, a hug, several requests for dates, and a marriage proposal did not establish a hostile work environment).

F.3d 745 (4th Cir. 1996), *abrogated on other grounds by Bostock v. Clayton County*, 140 S. Ct. 1731 (2020). *See id.* at 747, 753-54 (explaining that the Fourth Circuit has "consistently affirmed summary judgment dismissing claims" involving the "conduct of the type alleged by" the plaintiff, which included allegations that harasser followed the plaintiff into bathroom and pretended to lock the door, asked about his intimate life, attempted to kiss him, tried to force himself into a revolving door with the plaintiff, and placed a "magnifying lens over [the plaintiff's] crotch," asking "where is it?"). Plaintiff also again relies on the incorrect legal standard—she cites to a Title VII regulation, Pl.'s Opp. at 21, which is inapplicable to an equal protection claim.

The only specific conduct that Plaintiff identifies are a handful of text messages the First Assistant sent voicing his concerns about Plaintiff's refusal to stop working on a case from which she had been removed. Pl.'s Opp. at 22-23. The First Assistant sent these text messages privately to a friend, and Plaintiff was not aware of them until discovery in this case. "Mean-spirited or derogatory behavior of which a plaintiff is unaware, and thus never experiences, is not 'harassment' of the plaintiff (severe, pervasive, or other)" for a hostile work environment claim. *Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1046 (7th Cir. 2000). And even if they were poorly worded, these statements—which are not sexual in nature—do not come close to clearing the "high bar" necessary to show conduct is severe or pervasive enough to create an abusive environment. *See EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 316 (4th Cir. 2008). It is well-established in the Fourth Circuit that "complaints premised on nothing more than rude treatment by [coworkers], callous behavior by [one's] superiors, or a routine difference of opinion and personality conflict with [one's] supervisor are not actionable." *Sunbelt Rentals*, 521 F.3d at 315 (citing *Baqir v. Principi,* 434 F.3d 733, 747 (4th Cir. 2006); *Bass v. E.I. DuPont de Nemours & Co.,* 324 F.3d 761, 765 (4th Cir. 2003); *Hawkins v. PepsiCo, Inc.,* 203 F.3d 274, 276 (4th Cir. 2000)). "[E]ven incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard." *Sunbelt Rentals*, 521 F.3d at 315; *see also Harris*, 510 U.S. 17, 21 (1993) (the "mere utterance of an . . . epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to" establish a hostile work environment claim). These texts were also sent during one conversation on one day, and "isolated

15

incidents" and "sporadic use of abusive language" do not amount to "changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

Otherwise, Plaintiff cites to her *own* allegations that the First Assistant was "obsessive" and "essentially stalking her," Pl.'s Opp. at 22, but points to no evidence to support these unspecific, self-serving beliefs. *CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658-59 (4th Cir. 2020) (the plaintiff's "self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment") (citation omitted). She also references the First Assistant's notes to himself, including that Plaintiff was "avoiding him" and that it seemed like she did "not want to interact" with him. Pl.'s Opp. at 22. It is unclear how the First Assistant's observations about *Plaintiff's* behavior toward him, about which she was unaware, could constitute a hostile work environment, and indeed Plaintiff cites to no caselaw to support her argument. If anything, the notes demonstrate a "personality conflict" between Plaintiff and the First Assistant and that is not enough to support a hostile work environment claim. *Hawkins*, 203 F.3d at 276 (explaining that "[e]ven if [the supervisor] harbored some personal dislike of [the employee] that made [the employee's] job more difficult or stressful, '[a]n employer is not required to like his employees'") (citing *Williams v. Cerberonics*, Inc., 871 F.2d 452, 457 (4th Cir. 1989)).

Plaintiff also relies on testimony of the Investigator and the Circuit Executive, Pl.'s Opp. at 22, reflecting what *Plaintiff* had told them rather than their own opinions. The Investigator testified about how Plaintiff described the First Assistant during her interview. Pl.'s Ex. J at 66. And the Circuit Executive testified that, prior to the investigation or any inquiry into the specific facts had been initiated, he believed Plaintiff's claim that she felt upset by the First Assistant's actions. Pl.'s Ex. K at 164-65. The testimony from these two individuals recount only Plaintiff's subjective beliefs and fail to establish a material factual dispute. *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 134-35 (4th Cir. 2002) (evidence of subjective beliefs "without more, is insufficient to create a genuine issue of material fact as to any discriminatory conduct.").

The facts in the sparse caselaw cited by Plaintiff do not in any way resemble this case. In *Okoli*, the plaintiff alleged, among other things, that her supervisor "proposition[ed]" the plaintiff "to have sex with him in a Jacuzzi as part of his sexual fantasy," asked the plaintiff "whether she was wearing

16

any underwear, what color it was, and whether she would come to work the next day without underwear," told the plaintiff "about a sexual experience he had with an African–American woman and her daughter," touched the plaintiff's "legs under the conference table 'two or three times' during their morning meetings," and that he "forcibly grabbed and kissed her." 648 F.3d at 217-18. Plaintiff does not allege that the First Assistant did anything of this sort. *Fiorito v. Metro. Aviation* involved allegations that the accused harasser physically attacked the plaintiff's husband, made physical advances toward the plaintiff, and told the plaintiff he would kill her, and the defendants did not challenge Plaintiff's hostile work environment claim on summary judgment. 2018 WL 3730071, at *3-5 (E.D. Va. Aug. 3, 2018). And *Bass v. Hill* is not a hostile work environment case—it is a tort case in which the plaintiff was terminated after an investigation found that he had engaged in improper conduct. 2006 WL 3919620, at *1-3 (M.D.N.C. Oct. 16, 2006). None of these cases have any applicability here.

Finally, the two facts Plaintiff appears to dispute are not material to whether the Court should enter summary judgment in Defendants' favor. *See* Pl.'s Opp. at 23; *see also* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact . . ."). First, even assuming the Defender did not remove Plaintiff from the Life Trial case prior to June 5, 2018, whether Plaintiff was properly continuing to work on that case does not make the First Assistant's private text messages rise to the level of "severe and pervasive" conduct sufficient for a hostile work environment claim. Second, whether it was "raining heavily" or whether there was merely a "five percent chance of rain" when the First Assistant offered Plaintiff a ride home—after she had requested many rides in the past—similarly does not help her hostile work environment claim survive summary judgment.

**B. Defendants were not deliberately indifferent to Plaintiff's allegations.**

Plaintiff does not address the numerous acts that demonstrate Defendants were not deliberately indifferent to her allegations of sexual harassment. Pl.'s Opp. at 24. As Defendants explained, the undisputed evidence shows that the Defender immediately reported Plaintiff's allegations to the Circuit Executive, triggering an investigation into these allegations by an independent

17

investigator; removed Plaintiff entirely from the First Assistant's chain of command; told the First Assistant to cease all contact with Plaintiff; reclassified Plaintiff to an AFD (consistent with her request); allowed Plaintiff to telework (consistent with her request); and participated in mediation to resolve Plaintiff's claims. *See* Defs.' Mot. at 24-25; *see also* Defs.' Opp. at 16-22. Likewise, the Circuit Executive facilitated the investigation of Plaintiff's allegations; advised Plaintiff about the EDR process; appointed a mediator; and helped Plaintiff seek employment outside of the FDO. *See* Defs.' Mot. at 24-25. Plaintiff's conclusory assertion that the evidence supports her allegations of deliberate indifference, without any specificity or citation to material evidence, does not suffice to defeat summary judgment. *See Lindemann-Moses v. Jackmon*, 2023 WL 3000454, at *4 (M.D.N.C. Apr. 19, 2023) ("It is well established . . . that conclusory statements unaccompanied by supporting facts in the record are insufficient to defeat a motion for summary judgment.") (citation omitted).

### III. Plaintiff No Longer Has Any Viable Remedies.

Turning to the remedies, Plaintiff spends much of her opposition arguing that the Court has jurisdiction. Defendants have not contended otherwise. Defendants instead seek summary judgment on three discrete remedies issues: (1) that Plaintiff is not entitled to front pay because she cannot show she suffered lost wages from a constructive discharge and, in any event, her own pattern of conduct renders such relief inequitable; (2) that a prospective injunction is not available because Plaintiff is not seeking reinstatement; and (3) that without another viable form of equitable relief, Plaintiff's request for a declaratory order would amount to nothing more than an advisory opinion.

#### A. Plaintiff is not entitled to front pay.

##### 1. Front pay is not an available remedy for Plaintiff's claims.

In her opposition, Plaintiff makes no persuasive argument that she is entitled to front pay for either of her constitutional claims. The undisputed facts establish that Plaintiff voluntarily resigned and was not constructively discharged, and so she cannot recover front pay for her equal protection claim. What is more, Plaintiff effectively concedes that front pay is not a remedy for a due process claim. In short, front pay is not an available remedy under these facts.

At the outset, Plaintiff contends that Defendants' argument that Plaintiff was not

constructively discharged and thus cannot recover front pay "is properly addressed with the merits, not standing." Pl.'s Opp. at 5. Plaintiff misunderstands Defendants' argument. Defendants have not argued that Plaintiff lacks standing to seek front pay. Defendants are arguing that front pay is not an available remedy because the undisputed facts demonstrate that Plaintiff was not constructively discharged. *See* Defs.' Mot. at 9-10 (explaining that Plaintiff must prove she lost compensation through a wrongful termination to be eligible for front pay). In any event, this case is now well past the motion to dismiss phase. The parties have completed all non-expert discovery, and this Court has a summary judgment record to enable it to rule on the merits, even if it determines that any potential jurisdictional issues are intertwined with the merits. *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009) (recognizing that "when the jurisdictional facts are inextricably intertwined with those central to the merits, the court should resolve the relevant factual disputes only after appropriate discovery").

Plaintiff next argues that because she has "proven both her due process and equal protection claims, [] she has therefore proven she was constructively discharged." Pl.'s Opp. at 24. Not so. This argument is nothing more than an attempt to conflate the separate legal standards required for her due process and equal protection claims with the discrete issue of whether Plaintiff was constructively discharged. This attempt should be rejected because the well-established legal standard for constructive discharge is clear: "Did [the plaintiff's] working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" *Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004); *see also Evans v. Int'l Paper Co.*, 936 F.3d 183, 193 (4th Cir. 2019) (applying the same standard). Based on the undisputed facts, Plaintiff cannot demonstrate that she was constructively discharged. *See* Defs.' Mot. at 9-11; Defs.' Opp. at 23-24.

Seeking to bend the legal standard in her favor, Plaintiff contends that subjectively feeling "not welcome" is enough to show constructive discharge and selectively quotes an out-of-circuit case, *Bryant v. Jones*, 575 F.3d 1281, 1299 (11th Cir. 2009). *See* Pl.'s Opp. at 24-25. Yet the comparison falls short. In *Bryant*, the plaintiff was subject to "abusive" conduct on "numerous occasions, including an interaction where [the defendant] appeared ready to assault [the plaintiff] physically" and a pattern of conduct indicating that the plaintiff "was not welcome to continue working for [her employer] on

19

account of her being white." 575 F.3d at 1299. The court explained that "establishing a constructive discharge claim is a more onerous task than establishing a hostile work environment claim," but found that standard met because the conduct the plaintiff was subject to was so "abusive" that "a reasonable person in [the plaintiff's] position would have had no choice but to resign." *Id.* at 1298-99. In contrast to the situation in *Bryant*, Plaintiff here merely contends that her teleworking privileges were actually "ostracizing employment actions[.]" Pl.'s Opp. at 25 (citing Pl.'s Mot. at 9).

Plaintiff's claim that her teleworking privileges amounted to a constructive discharge is further undercut by her own statements. Plaintiff herself admitted that she was "completely fine" with teleworking. Ex. 14 at US977 (email from Plaintiff saying that working remotely "is completely fine with me"); Ex. 47, Dep. of Caryn Devins Strickland, at 103:1-104:3 (Plaintiff testifying that the email was accurate). This is unsurprising given that teleworking allowed her to move in with her husband, who lived nearly two hours from the FDO. Ex. 47 at 44:2-16; 114:17-25. And more importantly, teleworking removed Plaintiff—at her own request—from the office environment she deemed unwelcome. Ex. 14 (email from Plaintiff requesting telework). In fact, after Plaintiff began teleworking in August 2018, she did not have any further contact with either the First Assistant or the Federal Defender. Ex. 47 at 93:3-20 (admitting her only interaction with the First Assistant after that date was on "a few" occasions during office-wide moot calls, in which Plaintiff participated by phone); *id.* at 104:19-22 (admitting she did not speak to the Federal Defender after the EDR process started); Ex. 3 at 40 (email from the Defender to Plaintiff explaining that he took Plaintiff out of the First Assistant's chain of command). And while Plaintiff may not have liked her co-workers' comments expressing concern about where to meet her for an upcoming hearing, Pl.'s Opp. at 9, given that Plaintiff would not come into the office, those offhand remarks made at a single meeting are insufficient to create conditions so intolerable that a reasonable person would feel compelled to resign. *Matvia v. Bald Head Island Mgmt.*, 259 F.3d 261, 273 (4th Cir. 2001) ("co-worker ostracism, denial of a management position, and the counseling received for turning in an inaccurate time card would not have compelled the reasonable person to resign"); *Triplett v. N.C. Dep't of Pub. Safety*, 2018 WL 4258512, at *3 (W.D.N.C. Sep. 5, 2018) (denying request for back pay and front pay where the plaintiff had been

"removed from the environment that she deemed hostile" at the time of her resignation).

Without means to show that her own working conditions were intolerable, Plaintiff instead relies on two aspects of *another* employee's EDR proceedings. First, she cites that employee's EDR report to show that an FDO employee (who is not a defendant or witness in this case) dressed up as Justice Kavanaugh for Halloween at an out-of-office party that Plaintiff did not attend. Pl.'s Ex. P at 31; *see also* Compl. ¶ 346 (admitting she did not attend the party). Plaintiff further cites to the employee's statement in the same EDR report that there was a rumor floating around the office about that employee's sexual harassment allegations, not Plaintiff's. Pl.'s Ex. P at 30-31. Neither of these references, which involve another employee's purported personal experiences at the FDO, establish that Plaintiff herself was subject to an intolerable working environment. *Evans*, 936 F.3d at 193 (recognizing that the crucial inquiry for "intolerability" review is frequency and severity of the discriminatory conduct). At most, Plaintiff has shown merely that she was subject to a few offhand remarks from co-workers about her teleworking status. *See id.*

Plaintiff's final argument is that she was "persuaded" to accept the clerkship because she had no alternatives, but the undisputed factual record shows the decision was a voluntary one. Plaintiff waited many months before she left the FDO, and only left once she accepted a prestigious Fourth Circuit clerkship. Ex. 6 at 112:19-25. As Plaintiff told a friend months before she resigned, she sought a clerkship was a way to "transition up, not down" and "open [her] career options further[.]" Ex. 62. Plaintiff went even further: explaining that while she "didn't want to seem like an opportunist" she "love[d] clerking[.]" *Id.* Simply put, the contemporaneous evidence shows Plaintiff ended the EDR process and left the FDO because she felt that clerking would be a great opportunity for her, not because she was subject to intolerable working conditions. Her delay in leaving the office while she looked for better employment further undermines her constructive discharge claim. *See* Defs.' Mot. at 11-12 (citing cases). And while she seeks to distinguish the case law Defendants cited by contending that she was subject to an ongoing "unfair EDR process[,]" even if that were true, Plaintiff cites no authority suggesting that an unfair EDR process creates intolerable working conditions. Plaintiff has also failed to meaningfully counter Defendants' argument that front pay is not a remedy for a

procedural due process violation, and has thus, conceded the point. *See Sasser*, 2019 WL 3858607, at *5.[9] For all these reasons, this Court should reject her post-hoc characterization of her voluntary decision to leave the FDO, which is contradicted by the undisputed material facts.

### 2. Reinstatement would be inequitable under these circumstances.

Plaintiff expends significant effort trying to explain that, although she admittedly made numerous[10] secret recordings of her co-workers and took those recordings along with privileged e-mails from the FDO, doing so was not a violation of FDO policy because she sought to use these materials for her EDR process. To begin, some of those recordings, by Plaintiff's own admission, have no relevance to this litigation. *See* Ex. 67 at 3 (asserting that "Although Plaintiff is not required to create a privilege log for information that is not relevant to any claim or defense, she has added information regarding those recordings in the spirit of cooperation and transparency"). What is more, Plaintiff cites only to the FDO's 2022 plan, even though that plan was not in effect during the relevant time. *See* Pl.'s Opp. at 6-12 & Ex. V at 16 (effective date April 13, 2022). But even if that plan had been in effect in 2019, it would still not excuse Plaintiff's pattern of conduct here, which went well beyond the scope of the 2022 policy Plaintiff now seeks to use as a shield. Ex. 24, Decl. of John G. Baker, ¶ 11.

Plaintiff retained secret recordings and work e-mails containing privileged client communications without authorization even after she resigned from the FDO and ended her EDR process in March 2019. Ex. 6 at 135:4-13, 151:18-152:1. Nowhere in her opposition does Plaintiff argue that the taking of those materials *after* the EDR process had ended was authorized or otherwise permitted under FDO policy. *See* Pl.'s Opp. at 6-9 (arguing only that the use of the materials during

---

[9] Plaintiff relies heavily on the Fourth Circuit opinion in this matter. But the Fourth Circuit merely noted, in the context of a motion to dismiss, that for the case to proceed there had to be some form of equitable relief that was capable of redressing Plaintiff's injuries if she "prove[d] the allegations in her complaint." *Strickland*, 32 F.4th at 366 (explaining that front pay can constitute an equitable form of relief). The question before the Court now—whether the undisputed facts now show that Plaintiff was not subject to a constructive discharge—is markedly different from the theoretical remedy question addressed by the Fourth Circuit in its opinion.

[10] Ex. 24 at 8 n.3 (admitting to withholding 23 additional recordings that she claims are not relevant); Ex. 67 (listing over 40 recordings in total).

ongoing EDR proceedings was permissible). She likewise fails to contest that the unauthorized taking of these materials was a probable violation of the Federal Records Act. *See id.* The undisputed facts make clear that Plaintiff took privileged client information without authorization, and that this was, at a minimum, inconsistent with her obligations as an FDO employee. Ex. 24 ¶¶ 10-16. Such conduct bars reinstatement, and thus the remedy of front pay. *Id.* ¶¶ 13, 16.

Plaintiff further argues that even if she had engaged in misconduct, Defendants could not satisfy the elements of the after-acquired evidence defense and that the argument was waived. *See* Pl.'s Opp. at 10-12. Plaintiff misapprehends Defendants' argument. Defendants are merely pointing out the obvious fact that because Plaintiff brings only constitutional claims, any remedy must be "equitable" in nature. *Strickland*, 32 F.4th at 366. And while front pay, as the Fourth Circuit held, can sometimes constitute equitable relief under the *Larson Dugan* exception, *id.*, it would not be equitable to award such relief here because Plaintiff's own course of conduct was inconsistent with the obligations of an FDO employee. *See* Defs.' Mot. at 13 (citing cases). Indeed, the cases Plaintiff cites involving the after-acquired evidence doctrine all involve the use of the defense in cases involving statutory claims, where monetary relief, like front pay and back pay, are often available as a matter of course. *See, e.g., Rinaldi v. CCX, Inc.*, No. 3:05-cv-108-RJC, 2009 WL 412966, at *8 (W.D.N.C. Feb. 18, 2009) (ERISA case), *aff'd in part and rev'd in part*, 388 F. App'x 290, 295 (4th Cir. 2010) (collecting cases applying the doctrine, all of which involved different statutory claims where monetary relief is an available remedy as a matter of course); *Russell v. Microdyne Corp.*, 65 F.3d 1229, 1232 (4th Cir. 1995) (Title VII case). That stands in contrast to the issue before the Court here, where the Plaintiff seeks millions of dollars as an "equitable" remedy for alleged constitutional violations, despite the fact she is ineligible for reinstatement to the FDO due to her own conduct—a fact Plaintiff apparently does not contest. *See* Pl.'s Opp. at 10-11 (arguing only that she might not have been terminated). Because the undisputed facts, including Plaintiff's own testimony, conclusively establish that she engaged in conduct that renders her ineligible for reinstatement, Defendants are entitled to summary judgment barring any front pay remedy here.

23

**B. Other relief is not available.**

The other forms of equitable relief Plaintiff seeks, a declaratory order and a prospective injunction, are both unavailable here as a matter of law.

Beginning with the declaratory order Plaintiff seeks, it is well-established that to be "a proper judicial resolution of a 'case or controversy' rather than an advisory opinion[,]" a declaratory order must "settl[e] some dispute *which affects the behavior of the defendant towards the plaintiff.*" *Hewitt v. Helms*, 482 U.S. 755, 761 (1987). Yet there is no declaratory relief here that would "affect[] the behavior of the defendant[s] towards the plaintiff." *Id.* Even though the Fourth Circuit recognized that a declaratory order is a form of equitable relief, it did not address at the motion to dismiss stage whether such an order would by itself redress Plaintiff's alleged harms in the absence of reinstatement. *Strickland*, 32 F.4th at 366 (recognizing that a declaratory order is a viable form of relief under the *Larson-Dugan* exception). It would not. Plaintiff seeks declarations that "[her] constitutional rights were violated" and that "the laws, regulations, and rules that operated to deprive Plaintiff of her rights [were] unconstitutional as applied to Plaintiff[.]" Compl. at 84, Requested Relief ¶¶ 1-2. Because Plaintiff has been separated from the FDO for over four years, and is not seeking reinstatement,[11] any declaration that Plaintiff's rights were violated in the past would bring her no relief by itself and would amount to nothing more than an advisory opinion. *Just. 360 v. Stirling*, 42 F.4th 450, 460 (4th Cir. 2022) (denying request for declaratory relief that "would amount to no more than an impermissible advisory opinion" that would not redress alleged harms).

Turning to Plaintiff's request for a prospective injunction, Plaintiff fails to meaningfully address Defendants' argument that, based on the Fourth Circuit's opinion, such relief is unavailable here. *See* Defs.' Mot. at 9. Instead, Plaintiff merely cites the Fourth Circuit's black letter law statement that injunctive relief *can* be an equitable remedy, *see* Pl.'s Opp. at 2, while entirely ignoring the part of the opinion that recognizes that such relief would likely be unavailable here unless Plaintiff were to be

---

[11] Although on appeal Plaintiff disputed whether she was seeking reinstatement, it is now clear from her failure to amend her complaint and her summary judgment briefing that she is not seeking such relief.

24

reinstated to the FDO (a form of relief that she is not seeking). *Strickland*, 32 F.4th at 366 n.16 (recognizing that under the facts alleged in the complaint, it would be "unclear" without "Strickland's reinstatement, what those 'further violation[s]' might be."). Consequently, Plaintiff has effectively conceded that a prospective injunction is not an available remedy here.

Because none of Plaintiff's requested relief is available to her at this time, Defendants are entitled to summary judgment. *See, e.g.*, *Butts v. Prince William Cnty. Sch. Bd.*, 844 F.3d 424, 433 (4th Cir. 2016) (affirming summary judgment where there was "no remedy available" to plaintiff); *Bloch v. Exec. Off. of the President*, 164 F. Supp. 3d 841, 849 (E.D. Va. 2016) (dismissing constitutional claim because "no relief [wa]s available" at the time of decision); Ex. 72, Mem. Op., *Chmielewski v. EPA*, 1:20-cv-03025-CJN, ECF No. 43, at 11-16 (D.D.C. Jul. 28, 2022) (dismissing First Amendment claims against Department of Energy because none of the former employee's requested relief was available against that defendant and granting partial summary judgment to the Environmental Protection Agency narrowing the available remedies); *Afr. Communities Together v. Trump*, 2019 WL 5537231, at *3-4 (D. Mass. Oct. 25, 2019) (dismissing case where court found no available remedy it could award). This Court should accordingly enter summary judgment in favor of Defendants.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's Motion and enter summary judgment in favor of Defendants.

Dated: June 29, 2023

Respectfully submitted,

BRIAN BOYNTON
Principal Deputy Assistant Attorney General

CARLOTTA P. WELLS
Assistant Branch Director

*/s/ Madeline M. McMahon*
MADELINE MCMAHON (DC Bar 1720813)
DANIELLE YOUNG
Trial Attorneys, Federal Programs Branch

U.S. Department of Justice, Civil Division
1100 L Street, NW
Washington, DC 20001
Tel.: (202) 451-7722
Email: madeline.m.mcmahon@usdoj.gov

*Counsel for Defendants*