# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

### ASHEVILLE DIVISION

CARYN DEVINS STRICKLAND,     )
                              )
             *Plaintiff*,     )
                              )
v.                           )     **Civil No. 1:20-cv-00066-WGY**
                              )
UNITED STATES, *et al.*,       )
                              )
            *Defendants*.    )

### PLAINTIFF'S REPLY IN SUPPORT OF HER
### MOTION FOR SUMMARY JUDGMENT

The facts of this case are largely undisputed, as shown by the record developed during discovery and the parties' filings. Any remaining factual disputes are immaterial. Defendants have therefore failed to raise a genuine dispute of material fact sufficient to defeat Plaintiff's motion for summary judgment. *See* Fed. R. Civ. P. 56(a).

## I.    The Undisputed Facts Establish that Plaintiff is Entitled to Summary Judgment.

The undisputed record, including Defendants' own findings of wrongful conduct during the EDR proceeding and their judicial admissions in their Answer and filings during this litigation, establishes that Plaintiff is entitled to summary judgment on her equal protection and due process claims. Indeed, this Court may rule in Plaintiff's favor based on the administrative record created by Defendants themselves during Plaintiff's EDR proceeding. The other undisputed evidence in the record also overwhelmingly supports Plaintiff's claims.

### A.    The EDR administrative record confirms that Plaintiff's equal protection and due process rights were violated.

Defendants do not meaningfully address their own findings during Plaintiff's EDR proceeding that she was subjected to wrongful conduct in violation of the EDR Plan. In their

summary judgment brief, Defendants did not even mention the Fourth Circuit's counseling letter or the disciplinary action that was taken against both the First Assistant and Defender for wrongful conduct under the EDR Plan. ECF No. 245. In their response to Plaintiff's summary judgment motion, Defendants again failed to address these findings except to argue that they are (1) "irrelevant" to her sexual harassment claim and (2) "not controlling" at the summary judgment stage. ECF No. 249, at 13. Both assertions are incorrect.

Defendants' findings that disciplinary action was warranted for "wrongful conduct," that is, "[d]iscrimination against employees based on . . . sex," including "sexual harassment," and "retaliation for engaging in any protected activity," are judicial admissions by a party opponent. ECF No. 248, Ex. D, at 79, 83; *see* Answer ¶ 484 (admission that "disciplinary action was taken"). It is well-established that such admissions "are binding" and "may support summary judgment against the party making such admissions." *Bright v. QSP, Inc.*, 20 F.3d 1300, 1305 (4th Cir. 1994). Thus, Defendants' findings are both relevant and controlling.

In arguing the contrary, Defendants rely on precedents regarding the effect of probable cause findings in EEOC proceedings. *See* ECF No. 249, at 13. Specifically, Defendants reference a line of cases holding that the EEOC's findings may be considered by federal courts when they are more probative than prejudicial. *See, e.g.*, *Goldberg v. B. Green & Co.*, 836 F.2d 845, 848 n.4 (4th Cir. 1988) (noting that "the admission of such findings is within the discretion of the district court"). If the EDR administrative record in this case had been produced by an independent agency like the EEOC, this Court would certainly have discretion to consider its findings because they are supported by the evidence and thus more probative than prejudicial. *See id.* But this Court need not even reach this inquiry, because the EDR record was *not* produced by an independent agency. Rather, it was produced by Defendants themselves, based

2

on their own internal process under the EDR Plan. Defendants have made no persuasive argument as to why their own findings of wrongful conduct are not binding admissions at the summary judgment stage. *Bright*, 20 F.3d at 1305.

In addition to proving that wrongful conduct occurred, the EDR administrative record establishes that Plaintiff's equal protection and due process rights were violated. The EDR administrative record contains four core documents produced by Defendants that are dispositive in this regard: (1) the May 28, 2019 Letter of "Counseling re Caryn Devins Strickland's Report of Wrongful Conduct," which was provided by the Circuit Executive to Defender Martinez on behalf of the Chief Judge; (2) the March 25, 2019 Memorandum from the Circuit Executive to the Chief Judge entitled "Investigation Report – Caryn Devins Strickland"; (3) the "Counselor's Report with Addendum" provided by Investigator Heather Beam to the Circuit Executive and Chief Judge on January 11, 2019; and (4) the Investigator's January 13, 2019 email recommending that the Defender be disqualified because he was "biased" against Plaintiff and "could cause more damage if he were involved in the process at this point." ECF No. 248, Ex. D, at 9–77, 78–79, 80–83; *id.* Ex. M, at 76. Collectively, these documents establish that Defendants were deliberately indifferent to sexual harassment and subjected Plaintiff to a biased and fundamentally unfair EDR process.

Starting with the May 28, 2019 counseling letter, this document, alone, is sufficient to establish that Plaintiff's equal protection and due process rights were violated. The counseling letter makes detailed findings that Plaintiff was subjected to wrongful conduct by both the First Assistant and the Defender, in violation of her rights under the EDR Plan. ECF No. 248, Ex. D, at 83. The letter describes the wrongful conduct, including that the First Assistant "proposed an unsavory quid pro quo proposal on her request for a promotion and raise," and that the Defender

3

committed "numerous missteps which contributed to [her] perception of mistreatment and retaliation" and "exacerbated the underlying situation." *Id.* at 80, 82. Accepting the findings of the investigation, Defendants concluded that disciplinary action for wrongful conduct against both the Defender and the First Assistant was warranted. *Id.*

This counseling letter confirms that Plaintiff was subjected to sexual harassment and related sex discrimination and retaliation. It also establishes Defendants' deliberate indifference to the wrongful conduct. The counseling letter's description of the Defender's "numerous missteps" establishes his deliberate indifference to the First Assistant's sexual harassment, as explained in Plaintiff's summary judgment brief and her opposition to Defendants' summary judgment motion. *See* ECF Nos. 248, at 18–19; ECF No. 250, at 1, 16–17. These findings establish that the Defender "downplay[ed] the harassment and threats, and he made no effort to stop them." *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 703 (4th Cir. 2018). Instead, he "ratified the 'right' of [the First Assistant] to target" Plaintiff with harassment. *Id.* Moreover, the Defender "had the authority to address and curtail the harassment but failed to do so over a period of months." *Id.* Under Fourth Circuit precedent, this conduct is "sufficient" to prove the Defender's deliberate indifference to sexual harassment and his discriminatory intent. *Id.*

The timing and circumstances of the counseling letter also establish the deliberate indifference of the other Defendants. Deliberate indifference occurs when the defendant "knew about harassment of the plaintiff and acquiesced in that conduct by refusing to reasonably respond to it." *Strickland v. United States*, 32 F.4th 311, 359 (4th Cir. 2022) (quoting *Feminist Majority Found.*, 911 F.3d at 702–03). A plaintiff need not show that the defendant was "entirely unresponsive to allegations of harassment," but rather that the defendant "did not engage in efforts that were 'reasonably calculated to end [the] harassment.'" *Feminist Majority*

4

*Found.*, 911 F.3d at 689 (quoting *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 669 (2d Cir. 2012)). "[H]alf-hearted investigation or remedial action" does not suffice to shield a defendant from liability. *S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty.*, 819 F.3d 69, 77 (4th Cir. 2016). The fact that a defendant "dragged its feet" and delayed before implementing remedial action shows deliberate indifference. *Zeno*, 702 F.3d at 669 (involving "delay of a year or more"); *see also id.* at 669 n.13 (listing cases in which delays of up to six months constituted deliberate indifference).

The May 28, 2019 counseling letter confirms that Defendants "dragged [their] feet" in responding to Plaintiff's report of harassment. *Id.* The Defender was on notice of Plaintiff's harassment allegations by July 5, 2018, as the counseling letter states that his response was "inappropriate" because he forced her "to confront the person she accused of sexually harassing her." ECF No. 248, Ex. D, at 81. Thereafter, Plaintiff filed a report of wrongful conduct alleging sexual harassment with the Fourth Circuit on September 10, 2018. *Id.* at 80. When the investigation concluded more than four months later, on January 11, 2019, Defendants were aware that Plaintiff's harassment allegations had support, as the investigation found that the First Assistant engaged in conduct that "can clearly be inferred to be a quid pro quo request" and that disciplinary action was warranted. *Id.* at 22, 80. Defendants were also aware that the Defender engaged in wrongful conduct based on the investigation's findings. *See id.* Yet, Defendants did not take disciplinary action until May 2019, more than four months after the investigation concluded, eight months after Plaintiff filed her report of wrongful conduct, and nearly a year after she first raised her allegations. *Id.* at 80. Indeed, the March 25, 2019 Memorandum from the Circuit Executive to the Chief Judge confirms that Defendants did not even begin the process of considering disciplinary action until March 25, 2019, weeks after Plaintiff forcibly resigned

5

on March 15, 2019.  *See id.* at 78–79.  Defendants' response was "clearly unreasonable in light of known circumstances."  *Strickland*, 32 F.4th at 359 (citation omitted).

Likewise, the counseling letter supports Plaintiff's due process claim, because it confirms that she was "coerc[ed] . . . to end the investigation."  *Strickland*, 32 F.4th at 355.  The date of the counseling letter, May 28, 2019, confirms that Defendants deliberately delayed taking disciplinary action for months after Plaintiff was forced to resign.  *Id.*  Indeed, the EDR Coordinator specifically informed Plaintiff that the wrongful conduct investigation would be held "in abeyance" until her EDR process concluded.  *See* Complaint ¶ 400; Answer ¶ 400; Ex. JJ at 13 ("[W]hat we could do is hold the Chapter 9 proceeding in advance [sic] until the Chapter 10 proceeding has been finished."); *id.* at 19–20 ("And so what we've done in the past is we have done what we are contemplating doing here.  And that is, you hold the judicial conduct piece of this in advance [sic], and you let the EDR piece just go forward.").  The EDR Coordinator's March 25, 2019 Memorandum makes clear that disciplinary action was conditioned on the withdrawal of Plaintiff's EDR complaint, as it characterizes discipline as "[t]he last remaining matter" following the complaint's withdrawal.  ECF No. 248, Ex. D at 78.  By explicitly conditioning any disciplinary action on Plaintiff concluding her EDR process, Defendants "coerc[ed]" her "to end the investigation" and resign from the FDO.  *Strickland*, 32 F.4th at 355.

Finally, the EDR administrative record supports Plaintiff's claim that "[t]he refusal to disqualify the FPD created a conflict of interest that infected the entire investigation."  *Id.*  In fact, this Court need not even reach the issue of whether Plaintiff "was led to believe that the FPD would be the final decisionmaker," because the Defender's egregious conflicts of interest, which were undisclosed at the time of the Fourth Circuit's decision, are sufficient to conclude that she was denied her right to a fair and impartial process under the EDR Plan.  *See id.*  An

6

"accumulation" of "failures to comply" with an agency's internal policies can result "in a violation of procedural due process." *Doe v. Rector & Visitors of George Mason Univ.*, 149 F. Supp. 3d 602, 621 (E.D. Va. 2016); *see also Furey v. Temple Univ.*, 884 F. Supp. 2d 223, 259 (E.D. Pa. 2012) ("[T]he accumulation of mistakes at each step of the process and failures to comply with the [internal code] resulted in a violation of procedural due process."). Courts examine the "totality of errors," including "deviations" from required procedure, and whether "the lack of process caused prejudice" to the plaintiff. *Doe*, 149 F. Supp. at 621. "At every stage of the process," due process "require[s] impartiality and a lack of bias by the decision makers and fairness in the conduct of the hearing and review." *Furey*, 884 F. Supp. 2d at 259.

In this case, Chapter X, § 7 of the EDR Plan required disqualification of the Defender because he was "involved" in the complaint as an accused party, as the Fourth Circuit held. *Strickland*, 311 F.4th at 355. Defendants do not dispute that they refused to disqualify the Defender. ECF No. 249, at 6–10. Defendants' refusal to disqualify the Defender not only created an impermissible conflict of interest, but it also led to an "accumulation" of errors that denied Plaintiff her right to "impartiality and a lack of bias" "[a]t every stage." *Doe*, 149 F. Supp. at 621; *Furey*, 884 F. Supp. 2d at 259. Specifically, the Defender had engaged in conduct warranting disciplinary action, and the Investigator found he was "biased" against Plaintiff and "could cause more damage if he were involved in the process at this point." ECF No. 248, at 22.

The Defender's bias caused "damage" to Plaintiff and concretely prejudiced her in the EDR process. The Defender had sole decision-making authority over Plaintiff during the mandatory counseling and mediation stages, which he exercised to, *inter alia*, deny her a promotion to Grade 15, diminish her job duties, and refuse a transfer to the appellate unit or to another duty station to separate Plaintiff from her harasser. *Id.* at 5–8, 22. As Defendants

themselves repeatedly emphasized, Plaintiff had no recourse to correct these biased actions because the Defender, the office's representative, was the only person with authority to make these decisions. *See* Ex. KK, at 35 (Chief Judge's testimony that the unit executive is the person who "needs to resolve" "grievance-type things, like pay, job duties, who you'll report to, where you would work"); Ex. LL, at 162 (EDR Coordinator's testimony that "as the unit executive of the office, he would have been in the position to . . . see what he could do to address Plaintiff's concerns about, you know, promotion, the work conditions, and so on and so forth").

Moreover, the Defender spread false rumors about Plaintiff that impugned her integrity to the Fourth Circuit. He baselessly insinuated that Plaintiff had manipulated the FEOO to get "whatever it is that she is asking for" because the FEOO was a "friend" of hers. ECF No. 248, at 7. These false rumors prejudiced Plaintiff by potentially "interfer[ing] with decisions" the EDR Coordinator and Chief Judge would make in the future and "undermining [Plaintiff's] legitimacy and credibility." *Id.* Ex. I, at 130–32; *cf. Furey*, 884 F. Supp. 2d at 257 (noting that "*[e]x parte* conversations are a due process violation if 'the integrity of the process and the fairness of the result' is tainted by the communication" (citation omitted)). Indeed, these false rumors appear to have directly affected the EDR Coordinator's attitude toward Plaintiff. The EDR Coordinator testified that he was "irritated by the fact that there were all these AO employees weighing in and calling Tony and telling him what he needed to do," which he felt was "inappropriate." ECF No. 248, Ex. K, at 103, 106; *see* Ex. LL, at 95, 106, 108, 113–14, 176; *see also* Ex. MM, at 179–180, 185, 189, 221–22, 225–26. The EDR Coordinator told Plaintiff that it was not "helpful" for her to have reported her complaints to the AO because "when that happens, . . . the barriers go up, the walls go up, the people are on guard." Ex. NN, at 40–41. The EDR Coordinator promptly informed the Chief Judge about the FEOO's alleged interference with the EDR investigation,

8

which he described as a "disturbing incident." ECF No. 248, at 7. In contrast, it appears he *never* informed the Chief Judge about his concerns that the First Assistant was "potentially interfering with the investigation" by repeatedly contacting himself and the Investigator about "Caryn's false harassment claims," *id.* Ex. K, at 180–81.

The First Assistant's contacts were especially troubling because he claimed that "[the Investigator] has produced a written recitation of facts sufficient, to my understanding, for a decision-maker to immediately conclude there was no sexual harassment." *Id.* at 185; *see* Ex. OO, at 2. Thus, he strongly implied that the investigation's findings were shared with him *ex parte* while the investigation was ongoing. The record suggests that the First Assistant may, in fact, have been told about the investigation's findings in a "private conversation" with the Defender. *See* ECF No. 248, Ex. M, at 75 (Defender counseled First Assistant for "talk[ing] to James Ishida about something that Tony and JP talked about in a private conversation," which was supposed "to remain confidential"); *see also* Ex. OO, at 1 (First Assistant's February 1, 2019 email stating that "[a]s of this month, it will be . . . four months since I was informally told the investigation had found that no harassment occurred"). The EDR Coordinator never investigated these potential *ex parte* communications, which obviously would have severely impaired the integrity of the investigation. ECF No. 248, Ex. K, at 184–85, 189; Ex. LL, at 200–05.

The Defender's role in the wrongful conduct investigation, despite his bias against Plaintiff and his involvement in her allegations, also prejudiced Plaintiff. Indeed, when the investigation concluded, the Defender made the "discretionary" decision of what discipline to impose on the First Assistant, even though the Defender himself was disciplined based on the same allegations. ECF No. 248, Ex. E, at 275. As the EDR Coordinator testified, the Defender's decision regarding discipline was not the "concern" of the Fourth Circuit because "it was Judge

9

Gregory's sense that he did not have the authority to discipline a subordinate in [the Defender's] office." Ex. LL, at 223–24; ECF No. 248, Ex. M, at 79 ("[The Chief Judge] cannot decide any disciplinary action against Mr. Davis – that is within the authority of the unit executive."); Ex. KK, at 6–38 (Chief Judge's review process). The record is clear that the Defender's bias against Plaintiff affected his decision-making. *See, e.g.*, Ex. LL, at 162–163; Ex. PP, at 103. The Defender testified that he "always believed" the First Assistant's account; that in his "opinion," the conduct Plaintiff reported "was not sexual harassment"; and that he made his decision based on "the gravity of the conduct," which he believed was "just emails," and "wasn't as serious as any other action that [the First Assistant] might have taken." Ex. MM at 117, 216, 273–276. The Defender "didn't do any other counseling on any other subject" besides "four emails" from the First Assistant. *Id.* at 275. In fact, the Defender believed that the First Assistant's conduct "did not require any disciplinary action," despite the investigation's findings. *Id.*

The Defender's involvement in the EDR process, despite his evident "bias" against Plaintiff, caused "damage" by effectively preventing her from receiving a meaningful remedy under the EDR Plan, regardless of the outcome of a final hearing. The accumulation of errors caused by the Defender's involvement deprived Plaintiff of her right to "impartiality and a lack of bias" at "every stage of the process." *Furey*, 884 F. Supp. 2d at 259. The EDR administrative record thus confirms that the EDR process was both discriminatory and fundamentally unfair.

### B. Plaintiff was led to believe the Defender would be the final decisionmaker.

There is also no dispute that Plaintiff was "led to believe that the FPD would be the final decisionmaker in her case." *Strickland*, 32 F.4th at 356. Indeed, the statement of the Fourth Circuit's Chief Circuit Mediator that "I don't think a judge is going to micromanage this office and tell a federal defender how to do his job and run this office" because "[t]hey'd be better off

10

terminating him," by itself, is sufficient to reach this conclusion.  ECF No. 250, Ex. DD, at 47.

As the Chief Circuit Mediator for the Fourth Circuit, the Mediator was the only individual who

had personal knowledge of what a presiding officer within the Fourth Circuit likely would do in

a final hearing.  Like the Defender, the Mediator was also a unit executive, meaning that

"[n]obody knows how my office operates but me."  Ex. PP, at 22, 88.  Based on this knowledge,

the Mediator informed Plaintiff that a hearing officer would not "micromanage this office," and

Plaintiff had no choice but to accept the situation because "you lose a few rights when you

become a federal employee."  ECF No. 250, Ex. DD, at 41.  In fact, the Mediator believed there

was not even "a remedy" under the EDR Plan because "[n]one of these are going to do anything

in this particular case."  ECF No. 248, Ex. H, at 13.  Specifically, delaying the investigation and

disciplinary action foreclosed the one "remedy" that may "fit."  Ex. PP, at 19, 28.  Thus, the

Mediator was forced to resort to a resolution outside "the confines" of the Plan.  *Id.* at 13.

The record confirms that the goal of the Mediator's statements was to "convince

[Plaintiff] to withdraw her EDR complaint" instead of continuing to a final hearing.  ECF No.

248, Ex. D, at 78.  His statements were especially effective in "convinc[ing]" Plaintiff because

they were made during mediation, the last phase of the EDR process before Plaintiff could

proceed to a final hearing.  *See id.*  Moreover, the record reveals that other judiciary officials

broadly shared the goal of convincing Plaintiff to resign.  After the Mediator managed to

"convince" Plaintiff to accept the Fourth Circuit clerkship, *id.*, the Defender stated that he was

"thrilled" that Plaintiff was transferring and the Mediator "must be able to walk on water."  Ex.

QQ, at 1.  The Mediator told the EDR Coordinator: "I hope when this is all over you will have

some much deserved and long lasting goodwill from the AO and Jim Duff."  *Id.*  The EDR

Coordinator responded: "Having lived with this case for what seems like years, I can't tell you

how relieved and delighted I am with the news," which he described as "a result that everyone is thrilled with" and "a monumental accomplishment." *Id.* He told the Mediator, "You've certainly earned the Circuit's thanks and appreciation for an outstanding job in settling this difficult case." *Id.* A few days later, when Plaintiff withdrew her EDR complaint, the EDR Coordinator sent the Mediator an email: "Congratulations!" *Id.* at 4.

Judiciary officials' relief and delight that Plaintiff had withdrawn her complaint and resigned employment in the district extended to the EDR Investigator, who stated that Plaintiff "***would have been a true pain in you know what :)***" if she had accepted a *pro se* law clerk position for the district's judges. ECF No. 248, Ex. N, at 30. Similarly, the district's former Clerk of Court, Frank Johns, proclaimed, "***YEA! That one is off the chess board!***" *Id.*; *see* Ex. LL, at 91 (Mr. Johns had recommended the Investigator). This universally celebratory reaction confirms that judiciary officials convinced Plaintiff to resign and withdraw her EDR complaint, which they viewed as a "monumental accomplishment" worthy of "congratulations," instead of providing remedies that would allow her to work safely at the FDO.

Defendants attempt to diminish the significance of this coercive conduct by contending that the Mediator "is not an expert on [the] EDR process" and so Plaintiff should not have viewed his statements as "authoritative." ECF No. 249, at 4. But Defendants presented the Mediator as both an expert and authoritative during the EDR process. During their first phone conversation, the EDR Coordinator suggested that Plaintiff work with the Mediator because he "is outstanding, I've used him in other instances and he's done a fantastic job." Ex. NN, at 52; *id.* at 55–56. Later, the EDR Coordinator suggested the "unusual step" of involving the Mediator during the counseling period to "bring into focus where the parties . . . stand." Ex. RR, at 3, 5–7. The EDR Coordinator stressed that it was unlikely that the investigation would be completed, or

the disqualification issue decided, before the counseling period concluded. *Id.* at 13–22. Further, the Chief Judge had expressed concern "about why is this taking so long" and felt that waiting for the investigation report "would just prolong this whole process." *Id.* at 15–16. Thus, mediation was viewed as a way to "get this moving along." *Id.* at 4; *but see supra*, at 11.

The Mediator likewise communicated his expertise and authority to Plaintiff. The Mediator asked Plaintiff for feedback on his forthcoming "presentation at [the] Fourth Circuit EDR Conference" about "talking to EDR Coordinators and what to avoid." ECF No. 250, Ex. EE, at 73; *see also* Ex. SS (Mediator's presentation, "Lessons from a Circuit Mediator"). The Mediator shared his perspective on problems he saw with the EDR process based on his experience. *See, e.g.*, ECF No. 250, Ex. EE, at 78 (discussing his "frustration" with "the remedy part" and his belief that counseling and mediation "should be merged to let a mediator come in here earlier"). The Mediator told Plaintiff that he had shared his frustrations with "people in Washington," as well as another chief circuit mediator, who "has the same frustrations I've always had." *Id.* at 79; *id.* Ex. DD, at 49. In response to Plaintiff's statements that the clerkship was a "very nicely package[d] construct[ive] discharge," and that "I have to give up a career that I wanted and over the fact that . . . I was harassed and retaliated against," the Mediator responded that Plaintiff should focus not "on what's wrong with the system but about what is right in this situation," because "they didn't have to do any of this" for her. *Id.* Ex. EE, at 74, 77. The Mediator thus reiterated his view that judiciary officials "didn't have to do" anything to remedy the discrimination Plaintiff suffered, despite the EDR Plan's language otherwise.

Defendants attempt to create a dispute of fact based on the statements of other judiciary officials. ECF No. 249, at 3–6. Even assuming any such disputes exist, they are immaterial. Unlike the Mediator, other judiciary officials lacked personal knowledge of what a Fourth

13

Circuit presiding officer would do in a final hearing, nor did they make statements seeking to "convince" Plaintiff to resign and withdraw her complaint rather than pursue a final hearing. Based on the Mediator's statements that a presiding officer would not "micromanage" the Defender, a reasonable person in Plaintiff's position would believe that "continuing with the EDR process would be futile" and the "more suitable alternative was to drop her complaint and accept the Fourth Circuit clerkship." *Strickland*, 311 F.4th at 356.

      **C.**      **Defendants' amended Answer confirms there is no material dispute of fact.**

Relying on Plaintiff's well-pleaded allegations, the Fourth Circuit held that her Complaint alleged equal protection and due process violations that were "sufficient to survive the motions to dismiss." *Strickland*, 32 F.4th at 321. Defendants initially denied many of the Complaint's allegations in their Answer, but they were forced to withdraw their denials after Plaintiff's audio recordings plainly revealed the denials to be false and rendered them untenable. *See* ECF No. 250, Ex. BB (red-line Answer); Ex. TT (transcripts of recordings from ECF No. 248, Ex. O). Indeed, Defendants were forced to amend *well over a hundred paragraphs* of their Answer. ECF No. 250, Ex. BB. Defendants' amended Answer confirms the veracity of Plaintiff's allegations on many issues that were crucial to the Fourth Circuit's decision, including her conversations with judiciary officials that coerced her to resign. *See, e.g.*, *id.* ¶¶ 257–273, 284–298, 300–305, 309–302, 362–383, 390–392, 396–404, 414–417, 454–464, 474–478. Together with the admissions contained in the EDR administrative record, as discussed above, these judicial admissions establish that Plaintiff is entitled to summary judgment.

**II.**      **Defendants Have Failed to Raise Any Genuine Dispute of Material Fact.**

Defendants have failed to raise a material dispute of fact sufficient to defeat Plaintiff's motion for summary judgment. As an initial matter, Defendants contend that it is

"inappropriate" to rely on certain evidence, such as Plaintiff's expert reports, before "they have been able to complete expert discovery." ECF No. 249, at 17. But Defendants did not file a declaration stating the "specified reasons" why they "cannot present facts essential to justify [their] opposition," as required under Fed. R. Civ. P. 56(d). *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996). For example, Defendants stated that they "reserve the right" to make further arguments once they "have completed additional discovery" based on the Court's June 1, 2023 order, *see* ECF No. 245, at 13 n.4, but they failed to explain how the privilege assertions referenced in that order are probative of any issue in this litigation.

Meeting Rule 56(d)'s requirement would have been especially important because Defendants agreed to extend the deadline for expert disclosures until June 1, 2023, and were therefore well-aware of the possibility that the parties could disclose expert reports on the same day that summary judgment motions were due. *See* ECF No. 187. Indeed, Defendants served two expert reports on Plaintiff on June 1, 2023. *See, e.g.*, ECF No. 250, at 4 (discussing Defendants' front pay expert report). By contrast, Plaintiff served her front pay expert's report on March 16, 2023, several months before the deadline. *See* ECF No. 248, Ex. R. As discussed below, Defendants' own front pay expert report reveals that there are no material disputes of fact regarding front pay, as the experts largely agree on the front pay calculation. As for Plaintiff's workplace investigations expert report, while it is useful in highlighting the ways in which Defendants fell below accepted standards, this Court need not rely on it for purposes of summary judgment to conclude that Defendants were deliberately indifferent. *See supra*, at 4–6.

### A. Due process

Defendants repeat their strawman argument misconstruing Plaintiff's due process claim as whether she "understood that a presiding judicial officer, not the Defender," would preside at

a final hearing.  ECF No. 249, at 2.  This argument misconstrues her due process claim for the reasons discussed above, *supra*, at 11–14, and in her opposition brief, ECF No. 250, at 13–14.  In short, Plaintiff's due process claim is not about whether the Defender would have been the presiding officer, but rather whether a presiding officer would, or could, order remedies against the Defender as a practical matter.  *See id.*  Similarly, Defendants' assertion that it is "irrelevant" whether Plaintiff was "coerced to resign," ignores her allegation "that defendants' actions knowingly deprived her of meaningful review of her claims of sexual harassment and that these actions ultimately led to her constructive discharge," *Strickland*, 311 F.4th at 356.

Defendants argue that there is a dispute of fact regarding the Judicial Integrity Officer's statements because the JIO purportedly told Plaintiff that a hearing officer "could order remedies contemplated under the EDR Plan."  ECF No. 249, at 3.  But as the JIO testified, she also told Plaintiff she was unsure of "the mechanics" of how any such remedies could be "enforce[d]."  ECF No. 248, at 13.  Specifically, the JIO told Plaintiff that Defenders "are different than the unit executive in the court which is clearly governed by, supervised by, and works at the pleasure of the chief judge and the judges on that court."  *Id.* at 22–23.  A reasonable person in Plaintiff's position would interpret the JIO's statements as raising a serious question of whether "FPDs are adequately protected by EDR remedies," as the JIO herself stated in a follow-up email.  *Id.* at 13.  This interpretation was reasonable because there are, in fact, serious questions about the propriety of including federal defenders under the supervision of the federal courts, as discussed in the contemporaneous Cardone Committee Report and recognized in the judiciary's adoption of a separate EDR Plan for federal defenders.  ECF No. 250, at 15–16; *see* Ex. LL, at 224–25.  These concerns have been raised by federal judges for decades.  For example, in the 1993 Prado Committee Report, the Tenth Circuit's Chief Judge raised concerns that federal judges lack

16

"jurisdiction" over complaints against federal public defenders and "shouldn't be involved." *See* Report of the Judicial Conference Committee Report to Review the Criminal Justice Act, at 40 (Mar. 1993) (quoting Monroe G. McKay, C.J.). Regardless, this Court need not even consider the JIO's statements to rule in Plaintiff's favor, given the other evidence. *See supra*, at 11–14.

Defendants further argue that Plaintiff is not entitled to summary judgment because she testified that she believed that the statements of the Mediator and JIO were "accurate." ECF No. 249, at 5. Plaintiff believed that their statements were "accurate" because they were candidly sharing a genuine belief, based on their knowledge and experience, that remedies would not, or could not, be ordered in a final hearing, regardless of what the EDR Plan stated on paper. But whether Plaintiff's perception was correct, or whether they instead made intentional misrepresentations, is immaterial. *See Spreen v. Brey*, 961 F.2d 109, 113 (7th Cir. 1992) ("[T]he employee need not show an *intent* to deceive for his or her resignation to be involuntary."). Their statements led Plaintiff to reasonably believe that the EDR Plan's remedies would not be applied to her in practice, thus leading to her constructive discharge. *See Strickland*, 32 F.4th at 356 (recognizing due process claim because "continuing with the EDR process would be futile").

Defendants also contend that Plaintiff did not "exhaust her administrative remedies." ECF No. 249, at 5. This argument is foreclosed by the Fourth Circuit's ruling that Plaintiff's claims could proceed even though it "appears to be undisputed that, as defendants assert in their appellate response brief, Strickland failed to exhaust her remedies under the EDR Plan." *Strickland*, 32 F.4th at 370. It is also foreclosed by this Court's grant of Plaintiff's motion to strike Defendants' affirmative defenses, including that she "failed to exhaust her administrative remedies." *See* Entry Order Dated September 21, 2022. These rulings sensibly recognize that exhaustion would be "futile" under the circumstances of this case. *Strickland*, 32 F.4th at 356.

Defendants' arguments regarding disqualification are equally unavailing. The Fourth Circuit held that the failure to disqualify the Defender violated Chapter X, § 7 of the EDR Plan, which "accounts for potential conflicts of interest by permitting a party" "to seek disqualification of" an employee, including a unit executive, who is "involved in a dispute." *Id.* at 355. Plaintiff requested "disqualification of the Federal Defender" pursuant to this section. ECF No. 248, Ex. A, at 10. She explained that "[t]he basis for disqualifying the Federal Defender is that he is a subject of my wrongful conduct report, in addition to the First Assistant, and he is named in my request for counseling under the EDR Plan." *Id.*; *cf.* Ex. KK, at 22. These facts warranted the Defender's disqualification because he was "involved" in the dispute, as the Fourth Circuit held. *Strickland*, 32 F.4th at 356. Similarly, the new EDR Plan recognizes that "if the Complainant alleges that the Unit Executive sexually harassed her, the personal interests of the Unit Executive likely conflict with the Employing Office's interests, and someone other than the Unit Executive should likely act on behalf of the Respondent Employing Office." ECF No. 250, Ex. FF, at 67.

Not only was the Defender "involved" in the dispute as the subject of Plaintiff's allegations, but the investigation also found that he had engaged in conduct warranting disciplinary action and was so "biased" against Plaintiff that he "could cause more damage if he were involved in the process." ECF No. 248, at 22; *cf.* Ex. KK, at 22–23, 36–37; Ex. LL, at 143. Nevertheless, the Defender was allowed to exercise sole decision-making authority over Plaintiff during counseling and mediation, and to determine what discipline to impose on the First Assistant, even though the Defender himself was also disciplined. *Supra*, at 8–10; Ex. LL, at 47–48, 137–38, 173–74, 223–24, 234–35 (describing supervisory authority); Ex. MM, at 216–17, 240–42; Ex. PP, at 70–72. As these facts confirm, Defendants' assertion that the Defender "had

18

no control over the investigation and only participated as a witness interviewed by the Investigator" is demonstrably incorrect. ECF No. 249, at 8.

Defendants point to various statements from judiciary officials to the effect that it would be unusual to disqualify an accused unit executive. ECF No. 249, at 7–8. If anything, those statements only confirm that the misapplication of the disqualification provision may have been more widespread than just this case. *See id.* The JIO made clear in her testimony that while it had "never occurred" to her to apply the disqualification provision to a unit executive, that was only "[her] understanding of what that section means." Ex. UU, at 85–86. Further, the provision has since been changed to recognize explicitly that "sometimes the respondent should not be represented by the unit executive." *Id.* at 179–80, 186. Similarly, the AO staff member's confusing (and incorrect) statements that the Defender could not be disqualified from representing the office—not any confusion on Plaintiff's part over her disqualification request— led Plaintiff to ask, "[s]o I guess then what does disqualification mean? Because that's what I would've thought that disqualifying somebody would do." Ex. VV, at 35.[1]

**B.    Equal protection**

Defendants' argument that Plaintiff was not sexually harassed contradicts the investigation's findings, their counseling letter, the documents they produced in discovery, and the deposition testimony of their own witnesses. *See, e.g.*, Ex. MM, at 125, 127, 134, 141; Ex. LL, at 164–65; Ex. WW, at 143–45; Ex. XX, at 104, 178–81, 187–88; Ex. UU, at 101, 109.

---

[1] The AO staff member also told Plaintiff, "I'm going on my limited understanding of the way offices are normally stacked [sic] and organized," and "I don't really know in the case of the Federal Public Defender, if there is someone else there who has the ability to speak for the office." *Id.* at 33–34. These statements confirm that she was not speaking about the issues involved in the due process claim. *Supra*, at 10–14.

Further, admissions and documents from FDO officials amply demonstrate that Plaintiff was subjected to adverse employment actions as a direct result of the harassment. ECF No. 250, at 16–23; *see* Ex. MM, at 66–85 (job duties), 90–93, 96, 100, 103, 175 (supervision); Ex. XX, at 88 (retaliation). Defendants contend that "the issue of whether the First Assistant and the Defender were counseled or otherwise disciplined is irrelevant" to whether Plaintiff has proven her harassment claim, but they ignore that both individuals were disciplined for wrongful conduct, that is, "[d]iscrimination against employees based on . . . sex," including "sexual harassment," and "retaliation for engaging in any protected activity." ECF No. 248, Ex. D, at 79, 83.

Defendants' contention that Plaintiff "did not report the alleged sexual harassment until August 2018," is similarly incorrect. ECF No. 249, at 14. The Defender's notes from July 5, 2018 state that he sought to "clarify with Caryn any issue about any harassment by JP." ECF No. 248, at 5. Defendants' counseling letter states that the Defender's reaction in this meeting was "inappropriate" because he forced her "to confront the person she accused of sexually harassing her." ECF No. 248, Ex. D, at 81. The Defender testified during his deposition that he was "concerned" before the July 5, 2018 meeting about whether Plaintiff was alleging sexual harassment and "wanted to check it out." Ex. MM, at 112, 149, 152–154, 158–59, 187–88.

While not necessary to decide Plaintiff's motion for summary judgment, it is worth noting that Defendants' emphasis on the fact that Plaintiff stated, "I don't feel we are there yet," and did not want to file a formal complaint does *not* mean she was not reporting harassment, as the Defender well knew. ECF No. 249, at 15. Plaintiff was following standard recommended practice to resolve the issue informally and at the lowest possible level, which is exactly what she was supposed to do. *See, e.g.*, Ex. WW, at 48–49, 174, 187; Ex. UU, at 99, 118, 138 (manager's duties to act on harassment).

Additionally, Plaintiff "reported the sexual harassment to various judiciary employees, some of whom alerted the FPD to the harassment." *Strickland*, 32 F.4th at 359. The employees included the FEOO, who discussed the harassment with the Chief of Defender Services (Cait Clarke), the Director (Jim Duff), the Deputy Director (Lee Ann Bennett), and Office of General Counsel officials, who were concerned about "public disclosure, litigation, and judgment against the judiciary." Ex. WW, at 134–35, 177–85. The Chief of Defender Services, in turn, directly contacted the Defender. *Id.* at 60, 184–85. These officials acted because they "supported the [FEOO's] involvement in trying to settle the matter informally" and wanted to "protect[]" Plaintiff against "future retaliation or discrimination or harassment." *Id.* at 181. Defendants' contention that the AO officials did not have "control over" the FDO is inapposite, because both Plaintiff and those officials notified the Defender, who plainly did. ECF No. 249, at 16.

Plaintiff has already extensively rebutted Defendants' arguments regarding their deliberate indifference to the harassment. But she further notes that Defendants' argument that the Investigator "thoroughly" investigated her allegations is unsupported. The Investigator did not interview any witnesses who could have corroborated Plaintiff's allegations, nor did she investigate Plaintiff's allegation that she was erroneously denied a promotion, among other issues. ECF No. 248, at 10–11, 16–17; *see, e.g.*, Ex. XX, at 172 (Investigator's report erroneously stated that Plaintiff was "classified as an AD25," even though she had been placed in "AD level 28, not 25"); Ex. YY, at 24–25 ("there may have to be a separate investigation done then under Tony's conduct" and "if there's a true feeling of retaliation, then I think that might [need to] be investigated separately"); *see also* Ex. XX, at 57, 60, 108–111, 114, 118, 123–24, 134–35, 161–62, 166–171; Ex. MM, at 270. Moreover, the Investigator displayed a clear bias against Plaintiff, as evidenced by her statement that Plaintiff was a "true pain in the you know

what :).'" ECF No. 248, at 11; *see also* Ex. XX, at 134–35, 147–50, 150–51, 153–55. Nevertheless, this Court need not decide whether the investigation was appropriate to rule in Plaintiff's favor. Despite the investigation's flaws, it still found support for Plaintiff's harassment allegations, on which Defendants failed to take appropriate action.

Finally, Defendants attempt to refute Plaintiff's arguments regarding a lack of training and a pattern of other complaints against the FDO. ECF No. 249, at 22. The Court need not reach these arguments because they are cumulative. But Plaintiff notes, first, that the relevancy of the other complaints, as well as FDO officials' false denials, speak for themselves. *See* ECF No. 248, at 9, 20; *see* Ex. LL, at 125–26, 227–28. Second, Defendants cannot dispute that the EDR Investigator had received *no* prior training in workplace investigations, nor had she investigated any other complaints besides Plaintiff's.[2] ECF No. 248, at 10. Similarly, Defendants cannot dispute that the FDO did not provide any notice of applicable procedures for reporting harassment, including the EDR Plan, until July 2018, nor did it provide office-wide sexual harassment training until March 2019. *Id.* at 19–20; Ex. MM, at 52; Ex. XX, at 177.

## C. Constructive discharge

Defendants' argument that Plaintiff was not constructively discharged ignores the ongoing harassment and hostile working environment, the adverse employment actions she suffered, the grossly inadequate and biased EDR process, and the lack of meaningful remedies—

---

[2] Defendants attempt to distinguish this case from *Hill v. Cundiff*. ECF No. 249, at 20. But notably, the equal protection claim in *Hill* was based on the improbable theory that a failure to train would have led a teacher to engage in a "rape-bait sting operation." 797 F.3d 948, 977–78 (11th Cir. 2015). Those "highly unique and extreme facts" are not instructive here. *Id.* at 973. By contrast, the Title IX claim in *Hill* survived summary judgment because it was based on the theory that a failure to train "cause[d] students to undergo harassment or ma[de] them more vulnerable to it." *Id.*; *cf. Feminist Majority Found.*, 911 F.3d at 703 (applying "similar[]" standards to Title IX and equal protection claims). Similarly, that is the case here.

22

including judiciary officials' efforts to "convince" her to resign by conveying that no remedies would be ordered in a final hearing. *Supra*, at 11–14; Ex. QQ, at 2 (EDR Coordinator's statement to Mediator regarding clerkship interview: "There's a medal in this for you if this works."). These ongoing official and unofficial actions establish Plaintiff's constructive discharge and entitlement to front pay. *See Thorsen v. Cmty. Unit Sch. Dist. 300*, 2021 U.S. Dist. LEXIS 85530, *12–15 (N.D. Ill.) (post-*Spreen* case seeking recovery for "substantial loss of pay and future pension benefits" due to employee's "involuntary resignation" "based on coercion").

Defendants contend that it was acceptable to place Plaintiff on telework for seven months while her complaint was pending, but they ignore that Plaintiff only requested to telework because the Defender rejected her request to transfer duty station. ECF No. 248, at 8. Plaintiff was "fine" with telework "in the interim" insofar as it was the only means to get away from her harasser, which the Defender otherwise would not allow. *Id.* Ex. I at 90, 94–95; Ex. PP, at 47.

Plaintiff's statements that she hoped to "transition up, not down" and "burn the place down on the way out"—made after a year of inaction and stonewalling—in no way diminish her claims that she was harassed, discriminated against, and ultimately constructively discharged. Rather, Plaintiff's attempt to stay optimistic by "transition[ing] up," and her expression of frustration that "[i]t's a due process violation – how can I have a title vii protection with no remedies?" and "[t]he federal defenders are not accountable," establish that her feelings of anger and betrayal were genuine. *See ECF No. 249-22. Those feelings were also justified. Before these events, Plaintiff was a "rising star" in the judiciary, having clerked for multiple federal judges and served as a Supreme Court Fellow. Ex. WW, at 29. As her "credentials" and "work ethic" show, Plaintiff is a person of integrity who was "well-respected" not only "in the district where she worked," "but also by the AO people that she had come in contact with as a U.S.

23

Supreme Court Fellow."  *Id.* at 29–30.  But after Plaintiff reported a legitimate complaint of harassment, she was discriminated against and treated unfairly.  Her reputation was tarnished, and she was unjustly coerced to resign and lose her chosen career as a federal public defender.

## III.  Defendants Have Failed to Raise a Genuine Dispute of Fact Regarding Front Pay.

Plaintiff moved for summary judgment on the front pay remedy based on an expert report that provided detailed calculations of her lost future earnings.[3]  ECF No. 248, at 24–25.  Front pay is "a lump sum . . . representing the discounted present value of the difference between the earnings (an employee) would have received in his old employment and the earnings he can be expected to receive in his present and future, and by hypothesis, inferior, employment."  *Moore v. University of Notre Dame*, 22 F. Supp. 2d 896, 904 (N.D. Ind. 1998) (citation omitted).  "Such a remedy may especially be indicated when the plaintiff has no reasonable prospect of obtaining comparable employment . . . ."  *Id.* (citations omitted).  Moreover, "[f]uture wages may be determined with "reasonable certainty" when "the earning capacity of a plaintiff is . . . damaged" due to the employer's conduct.  *Duke v. Uniroyal, Inc.*, 928 F.2d 1413, 1423 (4th Cir. 1991).

In this case, Plaintiff continues to work in indigent criminal defense nearly five years after the events alleged in the Complaint, and ten years after her law school graduation.  *See* ECF No. 248, Ex. R, at 3; ECF No. 250, Ex. T, at 7.  Specifically, she litigates appeals on behalf of criminal defendants in state court, including briefing and oral argument.  *See* NC Appellate Courts, at https://tinyurl.com/mvnzpj3e (search results for "Caryn Strickland").  Defendants have made no plausible argument that Plaintiff has not mitigated her damages, and in any event, the Court rejected any such defense as untimely.  *See* ECF No. 206.  Nor have Defendants made any

---

[3] Plaintiff has already addressed Defendants' erroneous assertion that her "conduct" makes her ineligible for front pay.  ECF No. 250, at 5–12.  Plaintiff's conduct was protected by judiciary policy, and she properly protected client information.  *See id.* Ex. V, at 4–5.

attempt to show that there is employment in the indigent criminal defense field with comparable terms and compensation to Plaintiff's former position at the FDO, because there is none. ECF No. 250, Ex. T, at 5–6; *Moore*, 22 F. Supp. 2d at 906–07 ("an employee is not required to go to heroic lengths in attempting to mitigate his damages, but only to take reasonable steps to do so," and "has no obligation to accept lesser employment . . . or relocate to a new community").

The only purported flaws that Defendants identify in Plaintiff's expert report involve questions of law that can easily be resolved by this Court on summary judgment. First, Defendants argue that a tax gross-up is barred by sovereign immunity. ECF No. 245, at 24. But the Fourth Circuit already held that Plaintiff's request for front pay is not barred by sovereign immunity. And, contrary to the minority of courts cited by Defendants, courts within the Fourth Circuit allow a tax gross-up as an appropriate component of a front pay award. *See, e.g.*, *Tinsley v. City of Charlotte*, No. 3:16-CV-00656-GCM, 2019 WL 1874044, at *7 (W.D.N.C. Apr. 26, 2019); *Saulsberry v. Savannah River Remediation*, LLC, No. 1:16-CV-02792-JMC, 2020 WL 264259, at *3 (D.S.C. Jan. 17, 2020); *see also Sonoma Apartment Associates v. United States*, 127 Fed.Cl. 721, 726–33 (2016) (permitting tax gross-up against the United States because "[t]he government should not be enriched" by its breach). Second, Defendants argue that the hours per year used by the expert is flawed, but that amount properly reflects hours of leave and holidays comparable to what Plaintiff received as a federal employee. Ex. ZZ, at 5; *see* 5 U.S.C. § 5504. Finally, the expert's overhead rate comes from a 2019 study by N.C. Indigent Defense Services regarding the median "Appropriate Overhead Costs" for attorneys practicing in indigent criminal defense, with an adjustment for inflation since the study was conducted. *See* Ex. ZZ, at 17.

## CONCLUSION

Defendants have failed to refute Plaintiff's case for summary judgment.

This the 29th day of June, 2023.

Respectfully Submitted,

*/s/ Cooper Strickland*

Cooper Strickland
P.O. Box 92
Lynn, NC 28750
Tel. (828) 817-3703
cooper.strickland@gmail.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of June, 2023, I will electronically file the foregoing with

the Clerk of Court using the CM/ECF system, which will then send a notification of such filing

(NEF) to the following:

Joshua M. Kolsky at Joshua.Kolsky@usdoj.gov

Rachael Westmoreland at Rachael.Westmoreland@usdoj.gov

Madeline M. McMahon at madeline.m.mcmahon@usdoj.gov

Danielle Young at Danielle.young2@usdoj.gov

*/s/ Cooper Strickland*
Cooper Strickland
N.C. Bar No. 43242
P.O. Box 92
Lynn, NC 28750
Tel. (828) 817-3703
cooper.strickland@gmail.com