# EXHIBIT LL

1           IN THE UNITED STATES DISTRICT COURT

2       FOR THE WESTERN DISTRICT OF NORTH CAROLINA

3                ASHEVILLE DIVISION

4    ——————————————————————————————

5    CARYN DEVINS STRICKLAND,   )

6               Plaintiff,     )

7                              )

8    -vs-                      )  Case No. 1:20-cv-00066

9                              )

10   UNITED STATES, et al.,    )

11              Defendants.    )

12   ——————————————————————————————

13

14               *** CONFIDENTIAL ***

15           SUBJECT TO PROTECTIVE ORDER

16                ECF NO. 183

17

18          DEPOSITION OF JAMES N. ISHIDA

19           9:05 a.m. to 5:47 p.m.

20               April 13, 2023

21             Richmond, Virginia

22

23

24   Job No. 49661

25        REPORTED BY:  Julia A. Bammel, RPR, CSR

www.cavalier-reporting.com                    Cavalier Reporting & Videography                    info@cavalier-reporting.com
(434) 293-3300                                  Reported by Julia A Bammel                          (800) 972-1993

1          Deposition of JAMES N. ISHIDA, taken and

2     transcribed on behalf of the Plaintiff, by and before

3     Julia A. Bammel, RPR, CSR, Notary Public in and for the

4     Commonwealth of Virginia at large, pursuant to the

5     Federal Rules of Civil Procedure and by Notice to Take

6     Deposition, commencing at 9:05 a.m., April 13, 2023, at

7     140 Virginia Street, Richmond, Virginia.

8

9

10

11    APPEARANCES OF COUNSEL:

12

13          HARVARD LAW SCHOOL

14          1563 Massachusetts Avenue

15          Hauser Hall 510

16          Cambridge, Massachusetts   02138

17          (617) 496-5487

18          jsuk73@gmail.com

19     BY:   JEANNIE SUK GERSEN, ESQUIRE

20          JACOB GERSEN, ESQUIRE

21          Counsel on behalf of the Plaintiff

22

23

24

25

Case 1:20-cv-00066-WGY   Document 255-3   Filed 06/29/23   Page 3 of 73

www.cavalier-reporting.com                    Cavalier Reporting & Videography                    info@cavalier-reporting.com
(434) 293-3300                                  Reported by Julia A Bammel                          (800) 972-1993

```
 1    APPEARANCES OF COUNSEL CONTINUED:

 2

 3

 4         THOMAS, FERGUSON & BESKIND, LLP

 5         119 East Main Street

 6         Durham, North Carolina  27701

 7         (919) 682-5648

 8         warren@tfblawyers.com

 9    BY:  OLIVIA WARREN, ESQUIRE

10         Counsel on behalf of the Plaintiff

11

12

13

14         LAW OFFICE OF COOPER STRICKLAND

15         P.O. Box 92

16         Lynn, North Carolina 28750

17         (828) 817-3703

18         cooper.strickland@gmail.com

19         COOPER J. STRICKLAND, ESQUIRE

20         (Appearing Via Remote Videoconference)

21         Counsel on behalf of the Plaintiff

22

23

24

25
```

Case 1:20-cv-00066-WGY   Document 255-3   Filed 06/29/23   Page 4 of 73

www.cavalier-reporting.com                Cavalier Reporting & Videography              Info@cavalier-reporting.com
(434) 293-3300                              Reported by Julia A Bammel                              (800) 972-1993

```
 1   APPEARANCES OF COUNSEL CONTINUED:

 2

 3        UNITED STATES DEPARTMENT OF JUSTICE

 4        Civil Division

 5        1100 L Street NW

 6        Washington, District of Columbia  20005

 7        (202) 305-7664

 8        joshua.kolsky@usdoj.gov

 9        rachael.westmoreland@usdoj.gov

10        madeline.m.mcmahon@usdoj.gov

11     BY: JOSHUA M. KOLSKY, ESQUIRE

12        RACHAEL LYNN WESTMORELAND, ESQUIRE

13        MADELINE MCMAHON, ESQUIRE

14        Counsel on behalf of the Defendants

15

16        ADMINISTRATIVE OFFICE OF THE U.S. COURTS

17        Office of General Counsel

18        1 Columbus Circle NE

19        Washington, District of Columbia 20002

20        (202) 502-1761

21        kristin-mannherz@ao.uscourts.gov

22     BY: KRISTIN P. MANNHERZ, ESQUIRE

23        Counsel on Behalf of the Federal Judiciary

24

25   ALSO PRESENT:  Caryn Strickland (via videoconference)
```

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

1          T A B L E   O F   C O N T E N T S

2

3   WITNESS:  JAMES N. ISHIDA

4     Examination by Ms. Suk Gersen.................  7

5     Examination by Mr. Kolsky......................233

6

7

8

9

10                   E X H I B I T S

11

12  Plaintiff's Exhibit 1
       Notice of Deposition.......................... 7
13

    Plaintiff's Exhibit 2
14     E-mail thread
       US00000615 – US00000618....................... 66
15

    Plaintiff's Exhibit 3
16     E-mail thread
       US00002558 – US00002561....................... 94
17

    Plaintiff's Exhibit 4
18     E-mail thread
       US00005359 – US00005360.......................102
19

    Plaintiff's Exhibit 5
20     E-mail thread
       US00000614....................................103
21

    Plaintiff's Exhibit 6
22     E-mail thread
       US00001390 – US00001391.......................128
23

    Plaintiff's Exhibit 7
24     E-mail thread
       US00001382 – US00001383.......................138
25

Case 1:20-cv-00066-WGY  Document 255-3  Filed 06/29/23  Page 6 of 73

www.cavalier-reporting.com                Cavalier Reporting & Videography              info@cavalier-reporting.com
(434) 293-3300                               Reported by Julia A Bammel                        (800) 972-1993

```
 1   EDR plan?

 2        A     In what context?

 3        Q     In the context that you were talking about.

 4   You said that you could see that people might think you

 5   had more authority than you did.  So whatever context

 6   you were talking about, I would like to know about.

 7        A     Okay.  Well, then let's say that -- if --

 8   say an employee came to me with a concern about they

 9   weren't -- they weren't promoted, say, and I would say,

10   "Okay.  Let's talk about why you feel that way," and

11   then we'll kind of get into the substance of why

12   they -- you know, why they feel that that is a concern.

13             But, ultimately, I have no authority to tell

14   the employing office that "You need to promote this

15   person," because that's not within -- I don't have that

16   authority.  The unit executive has that authority.

17        Q     Is the unit executive the only person who

18   has that authority, specifically with respect to the

19   matter that you just mentioned?

20        A     In terms of, say, a promotion of the

21   employee?  I would think that's the case.

22        Q     Does the Chief Judge have that authority?

23        A     To order the employing office to promote

24   somebody?

25        Q     (Nodding head.)
```

www.cavalier-reporting.com
(434) 293-3300
Cavalier Reporting & Videography
Reported by Julia A Bammel
info@cavalier-reporting.com
(800) 972-1993

```
 1        A     No, I don't believe so.

 2        Q     And just to clarify, you mean, with your

 3   previous answer, under the EDR plan?

 4              Would you like me to rephrase?

 5        A     Yeah, please.

 6              MS. SUK GERSEN:  Can you read back the

 7   last ...

 8              (Requested record read by the stenographer.)

 9   BY MS. SUK GERSEN:

10        Q     Under the EDR plan, does anyone have

11   authority to order a personnel action as a resolution

12   or a remedy?

13        A     Under the EDR plan, the EDR plan would give

14   the presiding judicial officer -- if the proceeding

15   went to a formal hearing, I believe that the EDR plan

16   gives the presiding judicial officer that authority.

17        Q     And who was the presiding judicial officer?

18        A     In --

19              MR. KOLSKY:  Objection.  Vague.

20   BY MS. SUK GERSEN:

21        Q     Who was the presiding judicial officer in

22   the Strickland matter?

23        A     There was no presiding judicial officer in

24   the Strickland matter because that never went to a

25   formal complaint stage.
```

www.cavalier-reporting.com                    Cavalier Reporting & Videography                    info@cavalier-reporting.com
(434) 293-3300                                Reported by Julia A Bammel                          (800) 972-1993

1    arrangement where Heather, you know, supports all the

2    offices in the district including the Clerk's Office.

3    And so when I had asked Frank Johns for a

4    recommendation, he recommended Heather.

5            I had also reached out to my HR manager, or

6    HR ACE, Kim Llewellyn, for a recommendation because

7    that's her -- you know, that's in her field.  And she

8    also agreed that Heather Beam would be terrific.

9            Now, I might have -- you know, I think -- I

10   think those were the two people that I reached out to

11   to make my decision on the selection of Heather Beam.

12       Q    The two people being Frank Johns and Kim

13   Llewellyn?

14       A    That's correct.

15       Q    What did you say to Frank Johns when you

16   reached out to him about this?

17       A    I said I needed somebody that, you know,

18   was, first, in HR, could handle a highly confidential,

19   highly sensitive matter, and if he had any

20   recommendations for me.

21       Q    Did you tell him who was involved in terms

22   of the parties?

23       A    No.

24       Q    Did you mention that it was something having

25   to do with the Public Defender's Office?

Case 1:20-cv-00066-WGY   Document 255-3   Filed 06/29/23   Page 9 of 73

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

1        A     I can't -- I can't remember, but I don't

2    believe I did because, obviously, the one thing I did

3    not want to do was breach any confidentialities.

4        Q     You would not, at the time, have had reason

5    to know whether Heather Beam was involved with the

6    facts of the matter that were alleged?

7        A     No.  I would not have reason to know that,

8    because, again, she -- I think, you know, she's

9    properly considered a probation office employee, so she

10   had no -- as far as I know, had no connection with the

11   Federal Public Defender's Office.

12            I mean, she would be familiar with it

13   because, again, they -- that district had a shared

14   services arrangement where, you know, the idea being

15   that each individual office in the district did not

16   need to have its own HR person but could borrow the

17   services of someone in another office, which is the

18   case here.

19            So Heather, you know, was, and I think still

20   is, a probation office employee but serves the entire

21   district, including the probation office -- I'm

22   sorry -- the Federal Public Defender's Office.

23       Q     You wouldn't have known whether Heather Beam

24   was friends with the accused person in the case; is

25   that right?

www.cavalier-reporting.com          Cavalier Reporting & Videography          info@cavalier-reporting.com
(434) 293-3300                        Reported by Julia A Bammel                    (800) 972-1993

```
 1        A     Right.  I think that's -- I think that's

 2   right.

 3        Q     And to your knowledge, neither would Frank

 4   Johns?

 5        A     To my knowledge, that's correct.

 6        Q     So what was Heather's involvement --

 7              (Conferring with co-counsel.)

 8              THE WITNESS:  Professor, do you mind --

 9   before you ask the question, do you mind if we take,

10   like, five minutes?  It's getting a little warm.

11              MS. SUK GERSEN:  Of course.  Of course.

12              (Break in proceedings.)

13              MS. SUK GERSEN:  Okay.  Thank you for

14   suggesting the break.  And would it be all right if we

15   went until 12:30 before lunch?

16              MR. KOLSKY:  That's fine with me.

17              THE WITNESS:  Yeah, sure.

18   BY MS. SUK GERSEN:

19        Q     Okay.  So can you tell us who is Nancy

20   Dunham?

21        A     You know, I don't know.  I've heard the

22   name.  I think she's -- she was the Fair Employment

23   Practices Office.  I couldn't tell you exactly.

24        Q     At what stage did you alert Chief Judge

25   Gregory of the Chapter IX EDR matter?
```

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

```
 1        A     I think right away.  I couldn't tell you

 2   specifically, but the requirement is that the Chief

 3   Judge and the unit executive be notified promptly,

 4   so ...

 5        Q     And do you think that that meant before

 6   September 10th, 2018?

 7        A     Yes.

 8        Q     I'm going to hand you these -- hand you this

 9   document which I'm going to mark as Exhibit 3.

10             MR. KOLSKY:  Do you have an extra copy that

11   I could use?

12             MS. SUK GERSEN:  Yes.

13             (Plaintiff's Exhibit 3 marked.)

14   BY MS. SUK GERSEN:

15        Q     If you could look that over.

16             Does that look like an accurate e-mail that

17   you sent at the top of US-2558?

18        A     It does look accurate.

19        Q     The e-mail was from August 15, 2018.  Does

20   that seem right?

21        A     Generally, I guess -- I guess that seems

22   right.

23        Q     And as we -- as you discussed before, this

24   would have been weeks before Ms. Strickland filed her

25   EDR Chapter IX matter?
```

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

1    A    Uh-huh.  Yes.

2    Q    Okay.  So can you -- do you recall e-mailing

3  Chief Judge Gregory and saying, as here, that Nancy

4  Dunham was interfering with an EDR matter?

5    A    I'm sorry.  Can you say that again?

6    Q    Do you recall telling Chief Judge Gregory

7  that Nancy Dunham was interfering with an EDR matter?

8    A    Well, I do recall this e-mail where I

9  alerted him to that concern.  I don't recall

10  specifically an oral conversation.

11    Q    Uh-huh.  So can you tell me what you meant

12  in this e-mail to Chief Judge Gregory about a

13  disturbing incident?  What did you mean by "disturbing

14  incident"?

15    A    Well, I think, if I remember correctly, I

16  received a call from Mr. Martinez, who had told me

17  about contact that he had had with various, you know,

18  individuals at the AO, and he -- Mr. Martinez had said

19  that these individuals had basically told him, "Okay.

20  You need to do a number of things.  You need to do

21  this.  You need to do this.  You need to do this," all

22  involving the plaintiff.

23         And Mr. Martinez felt very uncomfortable

24  about that, about having the Administrative Office tell

25  him what he needed to do in this particular case.  And

Case 1:20-cv-00066-WGY    Document 255-3    Filed 06/29/23    Page 13 of 73

www.cavalier-reporting.com          Cavalier Reporting & Videography          info@cavalier-reporting.com
(434) 293-3300                          Reported by Julia A Bammel                          (800) 972-1993

```
 1   so Mr. Martinez raised that with me, and Mr. -- and he

 2   was -- he was very upset about that and very concerned

 3   about that, as was I, and that's why I had raised it

 4   with Chief Judge Gregory.  But I prefaced it by saying,

 5   it appears that there may be outside interference.  I

 6   mean, I was just going off of what Mr. Martinez had

 7   relayed to me.

 8        Q    Can you point me to where you said, "it

 9   appears"?

10        A    If you look at the second paragraph, that

11   first sentence, "It appears that the head of the" --

12             (Court reporter request for repeat.)

13             THE WITNESS:  I was mumbling.  I was

14   mumbling.  "It appears that the head of the AO's Fair

15   Employment Practices Office, Nancy Dunham, tried to

16   obstruct an ongoing Fourth Circuit EDR investigation."

17   BY MS. SUK GERSEN:

18        Q    So you alerted Chief Judge Gregory about

19   this appearance.  What basis did you have for believing

20   that there was this appearance?

21        A    Again, I just was using what I heard from

22   Mr. Martinez.

23        Q    Anyone else?  Just Mr. Martinez?

24        A    I believe -- I believe that's correct.  I

25   don't -- I don't know.  I mean, there were a number of
```

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

1   individuals at the Administrative Office that were --

2   had been -- had been involved.  I don't know -- I don't

3   know if I had heard from anyone else.  I don't think

4   so.  I think it was just when Mr. Martinez had called

5   me and was raising those concerns.

6       Q      And did you talk to Nancy Dunham before

7   writing this e-mail?

8       A      No, I did not.  I did not.

9       Q      Did you talk to anyone else at the AO about

10  Mr. Martinez's allegations?

11      A      I think at some point I reached out to Lee

12  Ann Bennett, who is the Deputy Director, and I might

13  have even spoke to the AO Director at the time, James

14  Duff.

15      Q      What did you believe at the time that you

16  wrote this e-mail that Nancy Dunham may have done to

17  obstruct an ongoing Fourth Circuit EDR investigation?

18      A      Well, again, going off of what Mr. Martinez

19  told me, and in describing kind of what had happened,

20  he had also added that he felt pressured to do certain

21  things that the Administrative Office wanted him to do.

22          They were -- I think the way it was coming

23  across is the AO was basically ordering Tony to, you

24  know, essentially give the plaintiff what she was

25  asking for.

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

1      Q      In this e-mail, you describe Nancy Dunham as

2  the AO's Fair Employment Practices Offices head.

3      A      Right.  In the e-mail, that's what I

4  referred her to -- refer to her as.

5      Q      So did you believe it was inappropriate for

6  the Fair Employment Office's -- Fair Employment

7  Practices Office head to advise Mr. Martinez about what

8  he ought to do with respect to Ms. Strickland?

9      A      Well, I don't think it came across as

10  advising Mr. Martinez.  I think it came across as a

11  directive, that you shall do this and you shall do

12  that.  And I think that -- I found that to be -- if it

13  was true, I found that to be inappropriate.

14      Q      So it wouldn't have been inappropriate if

15  she advised with respect to exactly the things you

16  described?

17      A      Well, I think I would be concerned because

18  these are confidential matters, and I would be

19  concerned about other people knowing what was going on.

20      Q      So what do you recall of the conversation

21  you had with Lee Ann Bennett?

22      A      I think it was raising -- well, I just

23  wanted to raise with her what had happened and how --

24  you know, what I had heard from Mr. Martinez.  Because,

25  again, I was just hearing Mr. Martinez's version of it,

www.cavalier-reporting.com
(434) 293-3300
Cavalier Reporting & Videography
Reported by Julia A Bammel
info@cavalier-reporting.com
(800) 972-1993

```
1    and I wanted to speak to somebody at the AO in

2    authority who could, you know, help me figure out what

3    exactly was going on.

4         Q     Uh-huh.  So what was Mr. Martinez's version

5    of what had been going on?

6         A     Well, again, I think from what I remember of

7    the conversation with Tony, was he felt pressured and

8    threatened to take certain action involving the

9    plaintiff, because what he was hearing from various,

10   you know, individuals at the Administrative Office was,

11   "You have to do this.  You have to take this action.

12   You have to" -- you know, it was basically they were

13   ordering him to do certain things.

14        Q     Did the AO have authority to do that, to

15   order him to do those things?

16        A     At the time, I thought not, because -- and

17   that's why I thought it was inappropriate for them to

18   be ordering him to do those things.  I can't remember

19   specifically what he was being asked to do, but I

20   remember thinking that was not appropriate, which is

21   why I raised it with the -- with Lee Ann Bennett and

22   others.

23        Q     So if they didn't have authority, why did

24   you think it was an order?

25        A     Well, again, because of the way Tony had
```

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

1    relayed it to me, it wasn't advice.  It wasn't

2    guidance.  It was a directive, like, "You shall do

3    this.  You shall do that."  And that's why Mr. Martinez

4    felt pressured, and he also felt that that was

5    inappropriate.

6         Q     When you spoke to Lee Ann Bennett about it,

7    did you hear anything different from her than what you

8    heard from Mr. Martinez?

9         A     Well, the -- I mean, it was -- these were

10   long conversations, and I don't remember everything

11   that we talked about, but the key takeaway was that

12   Ms. Bennett didn't realize that this was -- well, one,

13   they didn't realize -- I think -- I don't think she

14   realized what had happened.

15            And I think, two, the AO -- well, she didn't

16   understand that this was part of an ongoing Fourth

17   Circuit proceeding, and so she said, "Oh," you know,

18   "had we known that this" -- "there's an ongoing

19   proceeding in the Fourth Circuit, we would not have

20   interfered.  So we will let the Fourth Circuit handle

21   these ongoing matters, and we will" -- "we will," you

22   know, "pull back and allow the circuit to conduct

23   whatever it needs to do in handling the ongoing

24   matters."

25            So she told me that she didn't know that

Case 1:20-cv-00066-WGY   Document 255-3   Filed 06/29/23   Page 18 of 73

www.cavalier-reporting.com
(434) 293-3300
Cavalier Reporting & Videography
Reported by Julia A Bammel
info@cavalier-reporting.com
(800) 972-1993

1    that -- that those communications were made to

2    Mr. Martinez, and she didn't know that we had ongoing

3    EDR Chapter IX proceedings playing out in the Fourth

4    Circuit.

5          Q     Is there anything that could refresh your

6    recollection about the conversations you had with Lee

7    Ann Bennett about this problem?

8          A     Yeah.  I'm not -- I'm not sure if I wrote

9    follow-up e-mails, but if I did, that certainly would

10   be helpful.

11         Q     So it seems like here you thought that it

12   would have been inappropriate for Nancy Dunham to have

13   done the things that Tony Martinez alleged she did; is

14   that right?

15         A     I thought -- if true, I thought it was

16   inappropriate, if she ordered him to take certain

17   actions, yes.

18         Q     Do you think something differently now?

19         A     I haven't -- I haven't really thought about

20   it, because, again, as you said, I had not spoken to

21   Ms. Dunham, so I don't know what exactly she might have

22   said to Mr. Martinez.  All I know is what he had told

23   me.

24         Q     Why did you not speak with Ms. Dunham before

25   alerting the Chief Justice as to the appearance that

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

1    Tony Martinez told you about?

2         A      Judge Gregory.

3         Q      Sorry.

4         A      Well, again, I just wanted to alert him to

5    something so that he knew, roughly about the same time

6    that I did, that this had happened.  So I just wanted

7    him to know, you know, that I'd gotten this call from

8    Mr. Martinez and here's what, you know, appears to have

9    happened.

10              (Plaintiff's Exhibit 4 marked.)

11   BY MS. SUK GERSEN:

12        Q      Just so you know, at the top it says -- so

13   this is US-614 [sic], and at the top of this document

14   you'll see a date, sent 6/12/2019, but it is not the

15   correct date because, I guess, e-mails must have been

16   forwarded or produced at a certain time.  So the

17   correct date is later on.

18        A      Right.  Right.  We had -- I'm sure you know,

19   but it was around that time we were migrating e-mail

20   servers from Lotus to Outlook --

21        Q      Yes.

22        A      -- so I think there was -- I think that was

23   probably part of that.

24        Q      Can you tell us what is happening in this

25   e-mail?

Case 1:20-cv-00066-WGY   Document 255-3   Filed 06/29/23   Page 20 of 73

www.cavalier-reporting.com                Cavalier Reporting & Videography              info@cavalier-reporting.com
(434) 293-3300                                 Reported by Julia A Bammel                          (800) 972-1993

```
1               Who is Cait Clarke?

2     A     Oh, is Cait Clarke part of this e-mail?

3  Maybe I'm looking at the wrong e-mail.

4     Q     Later on in the page.  Sorry.  Sorry.  Let's

5  move to -- we're going to get to that one later.

6               (Plaintiff's Exhibit 5 marked.)

7               THE WITNESS:  Okay so I'm looking at

8  Exhibit 5?

9  BY MS. SUK GERSEN:

10    Q     Yes.

11    A     Okay.  I'm sorry.  Can --

12    Q     US-614.  So can you walk us through what

13 this e-mail -- what is happening in this e-mail?

14    A     Okay.  You know, I don't recall this, and

15 even looking at it, it just doesn't ring a bell.  But

16 in just kind of reconstructing what I'm reading, it

17 looks like Cait Clarke, who was the chief of the

18 Defender's Services Office at the Administrative Office

19 is telling Nancy Dunham, you know, what you see in the

20 e-mail, and I'm commenting on that.

21               And I will confess, I was -- I think I was a

22 little irritated by the fact that there were all these

23 AO employees weighing in and calling Tony and telling

24 him what he needed to do and what he needed to not do,

25 and I just -- I just felt that that -- I don't think
```

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

```
1    they knew there was an ongoing proceeding, so I think

2    they felt, you know, free to do that, but I was a

3    little -- I think I was -- I think it's fair to say I

4    was a little irritated at what was going on and how it

5    could impact the proceedings that we were handling at

6    the time.

7        Q    So you say in this e-mail, "I wonder if

8    she's going to walk back her statement and say she only

9    insisted Caryn telework while this is being worked

10   out."

11            Who is "she"?

12       A    I think I was referring to Cait Clarke, and

13   if I recall correctly, I think Cait had essentially

14   ordered Tony to do certain things involving the

15   plaintiff, and, you know, I'm just thinking telework

16   might have been one of those.

17       Q    What -- why did you say, "I wonder if she's

18   going to walk back her statement"?

19       A    Well, instead of coming across as, "I'm

20   ordering you to do that," she might say, "Well, I was

21   just advising Tony to do that."

22            But the way I understood it from

23   Mr. Martinez was he was getting directives from the AO

24   saying, "You have to do this" and "You have to do

25   that."
```

Case 1:20-cv-00066-WGY   Document 255-3   Filed 06/29/23   Page 22 of 73

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

1      Q     And at the time, you believed that

2  Mr. Martinez was accurately describing what happened?

3      A     Again, this was based on what he had told

4  me, and I don't know if this was before or after the

5  conversation I had with Lee Ann Bennett that really

6  clarified things for me.

7      Q     So how did Lee Ann Bennett -- how did

8  talking to her clarify things?

9      A     Well, again, she made those two takeaway

10  points that, "Oh, I didn't know that these

11  conversations were going on, and I didn't know that the

12  Fourth Circuit had ongoing matters involving this

13  case."

14      Q     Did you -- were you worried that the AO

15  employees were interfering with the EDR investigation?

16      A     In the sense that they were ordering Tony to

17  do certain things, which I thought was not appropriate

18  given that we've already got proceedings that were

19  designed to address the concerns that Plaintiff was

20  raising.

21      Q     What were the proceedings that were already

22  ongoing?

23      A     Well, we had the Chapter IX proceeding that

24  the investigation was going, and so we -- I mean, my

25  recollection was the AO was asking Tony to do certain

www.cavalier-reporting.com
(434) 293-3300
Cavalier Reporting & Videography
Reported by Julia A Bammel
info@cavalier-reporting.com
(800) 972-1993

1  things before even the outcome or what was known -- you

2  know, the outcome of the investigation of what had

3  actually happened.  They were just ordering him to take

4  preemptive action and really, you know, that -- I felt

5  that was inappropriate.

6      Q      And when you say that the proceeding was

7  already ongoing, do you mean that by then you had

8  already appointed Heather Beam?

9      A      Well, again, I can't remember at what point

10  that happened, but I'm looking at the date, and this is

11  August 15th.  I mean, by this time, we were -- we

12  were all -- you know, I had already heard about the

13  plaintiff's concerns and complaints, and so -- and

14  that -- and, again, I can't remember at what point I

15  got that, but that would have kicked off Chapter IX,

16  the report of wrongful conduct, which I think that had

17  already started when this was -- you know, when this

18  was -- the AO's involvement was coming to light.

19      Q      So was your worry that if the AO were

20  involved, that would be prejudging the outcome before

21  the investigation was complete?

22      A      I think that's fair to say.

23      Q      Once Tony informed you of the concern about

24  the AO and after you had informed the Chief Judge, why

25  were you continuing to communicate with Tony about

Case 1:20-cv-00066-WGY  Document 255-3  Filed 06/29/23  Page 24 of 73

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

```
 1   Nancy Dunham?

 2       A     Why was I communicating -- I mean, I'm not

 3   quite sure what you mean by that.

 4       Q     I'm looking at the exhibit in front of you.

 5       A     Five?

 6       Q     Yes.

 7       A     Well, I think -- I think what I wanted to

 8   tell Tony -- because he felt pressured to take certain

 9   action that the AO was demanding that he take, I wanted

10   to let him know that, hey, look.  I had a discussion

11   with the AO.

12           And what I was hoping the AO would agree to,

13   which they did eventually, was they would realize that

14   the actions of certain AO employees was not

15   appropriate, and they needed to stop and let this

16   investigation play out.

17           And so I wanted to let Tony know that, you

18   know, all of these directives that you're being told to

19   do by the AO is something you don't have to follow

20   because these directives -- well, one, I thought it

21   was -- I thought they misunderstood what was going on.

22   They didn't know that we had ongoing investigations.

23   But what I was hoping would happen, and did happen, was

24   once they knew there were ongoing things, that they

25   would immediately stop and pull back.
```

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

 1            So I wanted to keep Tony in the loop to let

 2    him know that "You don't have to follow these

 3    directives that are coming from the AO."

 4        Q     So any resolution that could come out of the

 5    EDR matter that was already ongoing, was it your view

 6    that it should have waited until the end of the

 7    investigation?

 8        A     So just so I'm clear --

 9        Q     Uh-huh.

10        A     -- so you're talking about Plaintiff's

11    request for Chapter IX and Chapter X?

12        Q     Just let me clarify, Mr. Ishida.

13        A     Okay.

14        Q     We're talking about a period of time before

15    the plaintiff put in any requests under Chapter IX or

16    Chapter X.

17        A     Okay.

18        Q     Nevertheless, is it your view, I think you

19    said earlier, that the EDR process had already begun?

20        A     Well, so that -- I'm clear that the

21    Chapter IX piece of it had already started.

22        Q     That's right.  That's what I understood you

23    to be saying.

24            So was your concern about the AO

25    interference that any resolution of the matter should

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

```
 1   wait until the end of the investigation under

 2   Chapter IX?

 3              MR. KOLSKY:   Objection.   Misstates prior

 4   testimony.

 5   BY MS. SUK GERSEN:

 6       Q     You can answer.

 7       A     So, again, I think you described it as the

 8   AO was almost prejudging the outcome and was directing

 9   Mr. Martinez to take certain action, all while the

10   investigation was still ongoing and had not finished.

11   So, yes, that's what I was concerned about.

12       Q     So if the investigation had been finished,

13   would you have been concerned about the AO's

14   involvement?

15       A     Well, if -- if the AO was continuing to give

16   directives to Mr. Martinez, and they would not have

17   been party -- they would not know what the

18   investigation report revealed, I would still consider

19   that inappropriate because they're making -- they're

20   making -- you know, they're ordering him to do certain

21   things without the benefit of knowing the outcome of

22   what the investigation report said.

23              So I would -- you know, if that had

24   happened, I would still consider that inappropriate.

25       Q     So this was prior to -- as we established,
```

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

1    and you also said, this was prior to a Chapter IX

2    report being filed by Ms. Strickland.  So prior to that

3    period, I understand you to be saying that the AO was

4    acting inappropriately by ordering Mr. Martinez to do

5    anything.

6        A    If that was true, I would think that that

7    was inappropriate to order him to do something.

8        Q    So who would have had authority to order any

9    kind of resolution of the matter prior to September

10   10th?

11       A    Well, again, so keep in mind where we were

12   at at the time.  So there was only a Chapter IX

13   proceeding, an investigation going on.

14       Q    That's right.

15       A    So a report of wrongful conduct tries to --

16   you know, it brings to light, you know, an incident

17   that someone feels, you know, violated certain rights.

18   And so once a report is made and the Chapter IX

19   proceeding, you know, proceeds, then at that -- you

20   know, so then an investigation is conducted.

21            And Chapter IX also says that -- you know,

22   it contemplates potential disciplinary action should

23   the investigation reveal that someone was, you know,

24   culpable of, you know, some kind of misconduct.  And so

25   you're talking about at -- only Chapter IX was going on

Case 1:20-cv-00066-WGY   Document 255-3   Filed 06/29/23   Page 28 of 73

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

1  at this time, and so the resolution would have been --

2  we're not even talking -- I mean, we're talking -- the

3  only thing we're focused on is the allegation of

4  wrongdoing and whether or not there is any action

5  that's, you know, appropriate for that particular, you

6  know, report and the conduct of the employee involved.

7       Q    Yes.  Was the AO recommending discipline as

8  would have been appropriate after a Chapter IX

9  investigation?

10      A    To -- again, to my recollection, what I

11  recall Tony saying about what the AO was telling him,

12  it was more about things that Mr. Martinez needed to do

13  with respect no Caryn, you know, putting her on

14  telework, giving her the promotion.  I mean, it was --

15  it was things like that that, you know -- and so these

16  would not be natural outcomes of a Chapter IX

17  proceeding.

18           The Chapter IX proceeding is -- you know,

19  it's looking at the allegation of wrongdoing, and if

20  there are -- if the allegations are substantiated, then

21  what actions, you know, are justified with that

22  employee.  It doesn't have anything to do with, you

23  know, putting someone on telework or anything like

24  that.  It's looking at the conduct -- the alleged

25  wrongful conduct of an employee and what is -- what

www.cavalier-reporting.com                Cavalier Reporting & Videography             info@cavalier-reporting.com
(434) 293-3300                         Reported by Julia A Bammel                       (800) 972-1993

1    action would be appropriate to take in that instance.

2        Q    So let me make sure that I understand

3    correctly.  If you are saying that the Chapter IX

4    investigation is not something that can result in the

5    kinds of resolutions that the AO was ordering Tony to

6    undertake, for example, telework and promotion, things

7    of that nature, then why did you think it would have

8    been interference with the Chapter IX proceeding to

9    have the AO talk to Tony about those kinds of

10   resolutions?

11       A    Well --

12            MR. KOLSKY:  Objection.  Misstates prior

13   testimony.

14            But you can answer.

15            THE WITNESS:  Okay.

16            Well, again, I was worried that the AO was

17   ordering Tony to take certain action without -- without

18   understanding whether or not there was even merit or a

19   basis in that, and so, as you said, prejudging the case

20   by just, you know, assuming that what the plaintiff

21   was -- I'm assuming the plaintiff told various AO

22   officials this is what happened, and it seemed like the

23   AO officials accepted what Plaintiff was saying and

24   then, as a result, ordering Mr. Martinez to do certain

25   things.

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

1   BY MS. SUK GERSEN:

2       Q     Was that an interference by the AO with an

3   EDR Chapter IX investigation?

4       A     Well, let's -- let's -- so let's suppose

5   that the investigation --

6       Q     Please answer the question.

7       A     Well, I'm trying to by giving you an

8   example.  So let's suppose that the investigation

9   showed that there was no, you know, allegation -- or

10  there was no substance to the claim of sexual

11  harassment.  So then there would be no need to separate

12  them.  You know, I don't know.  We're just thinking

13  about a hypothetical.

14            So in that case, then, if there was no

15  basis -- if there was no misconduct, then any

16  corrective or preventative action taken would -- may

17  not be necessary.  So, again, I think you used the term

18  "prejudging."  I think I would agree with that, that

19  the AO seemed to have prejudged this case, and as a

20  result of that, was telling Plaintiff [sic] that he

21  needed to do certain things.

22      Q     So at that point, before the investigation

23  was complete, it wasn't the AO who could order any

24  remedies.  Who in the system could have made an order

25  to, say, separate the parties or to do a transfer to

www.cavalier-reporting.com
(434) 293-3300
Cavalier Reporting & Videography
Reported by Julia A Bammel
info@cavalier-reporting.com
(800) 972-1993

1    another location or get somebody out of somebody's

2    supervision, those kinds of things of that nature

3    having nothing to do with discipline?

4         A     Well, in the -- I guess the scenario you

5    described, I would think that would be the unit

6    executive who would have that control, to make

7    promotions, to, you know, require -- you know, order

8    different work arrangements and that kind of thing.

9         Q     Right.  So prior to the filing of the

10   Chapter IX complaint, or even while -- I think you're

11   saying that the Chapter IX process was already ongoing.

12   At that point, only Tony Martinez had the authority to

13   resolve this matter by ordering, say, separation of the

14   parties or a transfer or a promotion?

15        A     Uh-huh.  Right.  Which is why, again, the

16   interference from the AO was basically telling him, as

17   the unit executive, "This is what you need to do for

18   staff in your office.  These are practices that you

19   have to implement."  Which, again, I thought that was

20   overstepping the AO's bounds.

21        Q     Did you view it as important that the unit

22   executive maintain that kind of control free of

23   interference from others before and during the

24   investigation?

25             Would you like me to repeat the question?

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

1    what had you heard about that?

2        A    I think just that, that he had testified

3    that there were problems in that office.

4        Q    Okay.

5        A    But, again, I don't know the specifics.

6        Q    Did you know whether judges in the Western

7    District had the need -- saw the need to change the

8    office culture?

9        A    I can't speak to that directly.  Again, this

10   was before I became Circuit Executive.

11       Q    Okay.  So you became Circuit Executive in

12   2017?

13       A    October of 2017.  Yes, that's correct.

14       Q    October of 2017.  So since that time, I

15   wanted to ask about other EDR complaints that you might

16   have been aware of.  So how many other EDR complaints

17   were you aware of during that period since 2017?

18       A    Several, and I guess -- I guess I'm hesitant

19   because, again, these are confidential matters, and I

20   want to speak carefully about that because I don't want

21   to, you know, breach any obligation of confidentiality

22   I owe in those particular cases.

23       Q    So how many?

24       A    I think -- I think there were several.  I'm

25   not sure exactly.  You know, two or three maybe,

Case 1:20-cv-00066-WGY   Document 255-3   Filed 06/29/23   Page 33 of 73

www.cavalier-reporting.com
(434) 293-3300
Cavalier Reporting & Videography
Reported by Julia A Bammel
info@cavalier-reporting.com
(800) 972-1993

```
 1   something like that.

 2        Q     Two or three since 2017?

 3        A     Two or three since then.  While I was EDR

 4   Coordinator, I was aware of about two or three.

 5        Q     So were there others who alleged EDR

 6   violations against JP Davis?

 7        A     I think it -- I think it may include

 8   JP Davis.  I'm just -- I'm just trying to remember.  I

 9   think there might have been reference, yes.

10        Q     What about against Tony Martinez?

11        A     Yes.  I think -- I think that's fair to say

12   too.

13        Q     And that would have been prior to

14   Ms. Strickland's allegations against Tony Martinez?

15        A     I remember at least one that was before

16   Ms. -- the pending one, yes.

17        Q     At least one against Tony Martinez before

18   Ms. Strickland's?

19        A     I think -- I think that's right.  To the

20   best of my memory, I think that's right.

21        Q     And what about against JP Davis?  Prior to

22   Ms. Strickland's complaint, how many would you say were

23   allegations against him.

24        A     Yeah.  Now, this is -- I guess this is where

25   it gets a little fuzzy for me, because I'm trying to
```

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

```
 1   would usually receive the report?

 2        A     Well, again, that wasn't --

 3              MR. KOLSKY:  Objection.  Asked and answered.

 4              MS. SUK GERSEN:  I don't recall any answer

 5   to that.

 6   BY MS. SUK GERSEN:

 7        Q     Who?

 8        A     Again, the Chapter IX does not say who

 9   receives it, and so because, you know, that wasn't

10   addressed in Chapter IX, I just wanted to make sure

11   that I did -- that I did the right and appropriate

12   thing.

13        Q     On US-1390 --

14        A     Exhibit 6?

15              MS. SUK GERSEN:  This is the latest exhibit

16   that we have?

17              THE COURT REPORTER:  The latest exhibit,

18   yes.

19              THE WITNESS:  Okay.  Okay.

20   BY MS. SUK GERSEN:

21        Q     So this is an e-mail from you to Caryn.

22        A     Uh-huh.  Uh-huh.

23        Q     And in the middle of the e-mail you say,

24   "Practically speaking, if Mr. Martinez is disqualified

25   or is otherwise unavailable, then it will be very
```

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

 1    difficult, if not impossible, to resolve your concerns

 2    at this juncture."

 3              What did you mean by "difficult, if not

 4    impossible, to resolve your concerns"?

 5        A     Well, I think what I meant was, in the early

 6    stages of this process, the plaintiff was asking for

 7    certain things, you know, within the unit executive's

 8    authority, and if Mr. Martinez was not part of that

 9    process, it would be difficult to figure out who and

10    how that -- how the relief the plaintiff was seeking

11    could be done.

12              Again, going back to -- I certainly didn't

13    have the authority to, you know, mandate certain

14    practices that were happening in Mr. Martinez's office;

15    the unit executive has that.  And so if Mr. Martinez

16    was not part of the process, then it would be difficult

17    to find somebody with authority that could make those

18    changes that the plaintiff wanted.

19        Q     And -- okay.

20              MS. SUK GERSEN:  So can we go to Tab 21.

21              We are marking this Exhibit 7.

22              (Plaintiff's Exhibit 7 marked.)

23    BY MS. SUK GERSEN:

24        Q     I wanted to direct you to the date, which is

25    January 13th, 2019.

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

```
 1        A     Okay.

 2        Q     So you say to Heather, the investigator --

 3   or, sorry.  Heather says to you --

 4        A     Uh-huh.

 5        Q     Heather, the investigator, says to you, "I

 6   truly believe Tony is biased in this case concerning JP

 7   and Caryn as far as sexual harassment is concerned.

 8   From my conversations with him, I know he feels Caryn

 9   is attempting to exploit the situation to get the

10   transfer to Asheville.  However, it has created a bias

11   in him to look at this from a neutral perspective.  I

12   am concerned he could cause more damage if he were

13   involved in the process at this point."

14             And she also describes Caryn's request that

15   Tony be disqualified as she felt she was retaliated

16   against after she submitted her claim of wrongful

17   conduct.

18             What did you understand Heather to be

19   saying?

20             MR. KOLSKY:  Objection.  Overbroad.

21   BY MS. SUK GERSEN:

22        Q     You can answer the question.

23        A     Well, I mean, I would interpret this to mean

24   that she -- Ms. Beam is expressing the concern that

25   Mr. Martinez, you know, has a biased view about this in
```

Case 1:20-cv-00066-WGY   Document 255-3   Filed 06/29/23   Page 37 of 73

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

1   terms of not being able to see it from the plaintiff's

2   point of view in a fair and impartial manner.

3        Q     So did you agree with that characterization?

4        A     Well, that -- I'm not sure -- I'm trying to

5   think about how I responded at the time, or what I

6   thought about at the time.

7              Yeah.  I can't remember what my thoughts

8   were at the time, but, in -- you know, I don't address

9   it in my response back to her.

10             No.  Go ahead.

11       Q     You go ahead.

12       A     No.  I -- it's just that I just -- I can't

13  remember what my impressions were when I had read that.

14       Q     Did you think that she was saying that Tony

15  was not able to see it from Ms. Strickland's point of

16  view or not able to see it in a fair and impartial

17  manner?

18       A     Well, I guess when I -- reading this now, it

19  looks like that Mr. Martinez has, you know, an

20  impression about why this -- why Plaintiff brought

21  these, and so reading this, it looks like Heather Beam

22  is saying that Mr. Martinez may have already concluded

23  why Plaintiff brought this.

24       Q     And was that because he was a person who was

25  accused of violating the EDR plan?

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

```
 1              MR. KOLSKY:  Objection.  Lacks foundation.
 2  BY MS. SUK GERSEN:
 3       Q     So do you believe that she was saying he was
 4  not fair and impartial in this with respect to
 5  Ms. Strickland's matter?
 6       A     Again, reading this, it would seem like
 7  Mr. Martinez had formed views about why the plaintiff
 8  had brought these allegations.
 9       Q     Do you remember what you did in reaction to
10  this e-mail?
11       A     I mean, I don't -- I don't recall what I
12  did, but it looks like I had a follow-up conversation
13  with the investigator.  But I don't quite -- I don't
14  remember that conversation.
15       Q     This person was the person you selected to
16  be an independent and neutral investigator?
17       A     Uh-huh.
18       Q     And she was telling you that Mr. Martinez
19  was truly biased.  She truly believed Tony was biased
20  in this case?
21       A     That's what she said, yes.
22       Q     Did you talk to Chief Judge Gregory about
23  Heather Beam's conclusion about Tony's bias?
24       A     Again, I'm not quite sure what I did after
25  this e-mail.
```

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

1        Q     Ms. Strickland had -- Ms. Strickland had

2   requested that Tony be disqualified; is that correct?

3        A     Yes.  At different stages, yes.

4        Q     So you don't remember meeting or talking to

5   Chief Judge Gregory about Heather Beam's conclusion

6   about Tony's bias?

7        A     I don't remember what happened after this

8   exchange.

9        Q     At the -- can we look at the top of the

10  e-mail, please.

11       A     Uh-huh.

12       Q     It says, "Thanks, Heather.  Well said.  Kim

13  and I have a meeting tomorrow with Chief Judge Gregory

14  at 2 p.m."

15             Does that refresh your recollection about

16  whether you spoke with Chief Judge Gregory?

17       A     Well, I'm not even sure, reading my

18  response, that the meeting I had with Chief Judge

19  Gregory and Kim Llewellyn had anything to do with this

20  case.

21       Q     Is it possible you took no action in

22  response to receiving this e-mail from the

23  investigator?

24       A     Again, because I can't remember what

25  happened, I suppose it's possible.

www.cavalier-reporting.com              Cavalier Reporting & Videography              info@cavalier-reporting.com
(434) 293-3300                          Reported by Julia A Bammel                     (800) 972-1993

1     Q    Is there anything that could refresh your

2  recollection about what you did after receiving this

3  e-mail in response to it?

4     A    I guess if there were e-mails or notes, but

5  you know, I mean, there were just so many messages and

6  so many e-mails, it's -- it was just hard to keep

7  track.

8     Q    So I understand you to be saying it's

9  possible that you understood that the investigator

10  thought Tony was biased and that you did not do

11  anything about that.

12     A    Again, because I don't remember what

13  happened after that, I will concede it's possible.

14     Q    Do you remember taking any notes or sending

15  any e-mails in response to this e-mail from Heather

16  other than what we see here?

17     A    No.  Again, I don't -- I don't remember.

18     Q    Okay.  Was Tony Martinez disqualified in any

19  way?

20     A    He was -- he was not.

21     Q    And so if he -- given that you're saying he

22  was not disqualified, what did that mean in terms of

23  his authority to act on the investigative report?

24     A    So I'm not -- I'm not clear what you're

25  asking about, Tony's authority in light of the

Case 1:20-cv-00066-WGY  Document 255-3  Filed 06/29/23  Page 41 of 73

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

1    happened after this exchange.  Certainly I could see

2    raising that as part of his deliberations.

3        Q    So you said before that Chief Judge Gregory

4    denied the request for qualification.

5        A    That's correct.

6        Q    So given that Tony was not disqualified,

7    what role was he tasked with performing after the

8    investigative report?

9        A    Well, if I remember correctly, this was --

10   it was either at the close or close to the end of the

11   counseling period or at the beginning of the mediation

12   period, and so Tony's role would have been -- as the

13   unit executive of the office, he would have been in the

14   position to, you know, see what he could do to address

15   Plaintiff's concerns about, you know, promotion, the

16   work conditions, and so on and so forth.

17       Q    And he had that role because he was the unit

18   executive?

19       A    Who had the authority to do that, yes.

20       Q    Would you normally ask someone that the

21   investigator thought was biased to participate in those

22   roles?

23       A    Well, again, there -- you know, biased in

24   terms -- I mean, I'm struggling to answer that because

25   as the unit executive, he has to make decisions that he

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

1   feels is in the best interest of not only the employee

2   but the office and other colleagues, and so he may have

3   to take -- he or she may have to take action that

4   people disagree with, and, you know, he could be

5   accused of being biased against the individual

6   employee.

7            MS. SUK GERSEN:  Would you please read out

8   Mr. Ishida's previous answer.  Not this one but the one

9   before.

10           (Requested record read by the stenographer.)

11           MS. SUK GERSEN:  Which exhibit is Tab 1?  Do

12  you remember?

13           MR. GERSEN:  What's the Bates number?

14           MS. SUK GERSEN:  Bates Number 615.

15           MR. KOLSKY:  That's Exhibit 2.

16  BY MS. SUK GERSEN:

17       Q    Do you have Exhibit 2 there, Mr. Ishida?

18       A    I think I do.  Yes, I do.

19       Q    At the top of the page in the first -- in

20  the paragraph that's an e-mail from you to

21  Mr. Martinez --

22       A    Okay.

23       Q    -- I'd like to point you to the sentence

24  starting with "You're doing."

25       A    Okay.

www.cavalier-reporting.com                    Cavalier Reporting & Videography              info@cavalier-reporting.com
(434) 293-3300                                  Reported by Julia A Bammel                         (800) 972-1993

1      Q     "You're doing all you can to protect Caryn."

2      So what did you mean by that?  What did you

3 mean when you said, "You're doing all you can to

4 protect Caryn"?

5      A     Well, so I think -- I think part of

6 Mr. Martinez's concern was he had taken -- once he

7 received the concerns about sexual harassment the

8 plaintiff made against JP Davis, Mr. Martinez had

9 asked, "Okay" -- he did X, Y, and Z, and I think what

10 he asked me too was, "Can you think of anything else I

11 need to do?"

12      And my response is, "Well, I think, to me,

13 it appears like, you know, you've taken the appropriate

14 steps to protecting the plaintiff from JP Davis."

15      Q     What were the appropriate steps?

16      A     As I recall, it was physical separation.  He

17 had allowed Plaintiff to telework, and he had

18 removed -- or he said he had removed the plaintiff from

19 JP's chain of command.

20      Q     Why did you think that Ms. Strickland needed

21 protection?

22      A     Because she had told me on a number of

23 occasions she was afraid of Mr. Davis, and I think -- I

24 remember at least one time where she said, "I'm

25 physically afraid of him."

www.cavalier-reporting.com      Cavalier Reporting & Videography      info@cavalier-reporting.com
(434) 293-3300      Reported by Julia A Bammel      (800) 972-1993

1        Q      Did you believe her?

2        A      I had no reason to doubt her, and she

3    seemed -- if I recall, she seemed very upset, so I took

4    her at her word.

5        Q      So taking her at her word, you felt that she

6    needed protection?

7               MR. KOLSKY:   Objection.   Misstates

8    testimony.

9    BY MS. SUK GERSEN:

10       Q      Did you believe she needed protection?

11       A      I believed that she had felt that she was

12   physically threatened by JP Davis.

13       Q      And you believed her?

14       A      Again, yes.   I had no reason to doubt her.

15       Q      Is there any special provision in the EDR

16   plan that applies if a unit executive is the person who

17   is alleged to be a violator of the EDR plan?

18       A      Say that again.   I'm sorry.

19       Q      Is there any provision in the EDR plan that

20   would apply in the circumstance where a unit executive

21   is themselves alleged to have violated the EDR plan?

22       A      So the EDR plan would apply to unit

23   executives equally.

24       Q      So does that mean that the unit executive

25   would be the person in charge of responding to an

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

1    allegation of his or her own violation of the EDR plan?

2        A    Again, I'm -- you know, forgive me.  I'm not

3    sure what you're asking me and in what -- and in what

4    period, and what's the context?

5        Q    Is your position that the unit executive

6    cannot be removed from playing the role in the EDR

7    process that the EDR plan envisions because they alone

8    have power to act under the EDR plan for personal

9    actions -- personnel actions?

10            MR. KOLSKY:  Object to form.

11   BY MS. SUK GERSEN:

12       Q    You can answer.

13       A    Yeah.  I'm sorry.  You're going to have to

14   ask me that again.

15       Q    I guess what I'm trying to ask you is, if

16   the unit executive is the person who is accused of

17   violating the EDR plan --

18            Right?  You understand so far?

19       A    Uh-huh.  Uh-huh.

20       Q    -- is your view that that person should not

21   be disqualified?

22       A    Just because -- on the basis that he or she

23   is alleged to have ...

24       Q    Yes.  That is my question.

25            Shall I clarify?

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

1    A    No.  I'm actually -- I'm actually thinking

2  about that.

3              Well, I think it depends on the context and

4  the allegations made against the unit executive.

5    Q    Could you tell us more about how it depends

6  on the context --

7    A    Okay.  So --

8    Q    -- and the allegations?

9    A    Okay.  So, for example, let's say -- let's

10  say an employee makes an allegation that "The unit

11  executive is being unfair because," you know, "the unit

12  executive did not promote me."

13              Okay.  In that case, under that

14  hypothetical, personally -- and if it's happening at

15  the -- you know, the informal counseling, mediation

16  stage, personally, under those set of facts, I would

17  not see the need to disqualify the unit executive.

18    Q    What about in a circumstance where the unit

19  executive were accused of sexual harassment or sex

20  discrimination?

21              MR. KOLSKY:  Objection.  Calls for

22  speculation.

23  BY MS. SUK GERSEN:

24    Q    You can answer.

25    A    Well, again, I think -- I think what I said

www.cavalier-reporting.com
(434) 293-3300
Cavalier Reporting & Videography
Reported by Julia A Bammel
info@cavalier-reporting.com
(800) 972-1993

```
1    before is, I think it depends on the context and what

2    the allegations are.

3         Q     I understand, and that's -- and you provided

4    an example to give us a sense of the context.  So I'm

5    providing you with another example and another context

6    to get your view.  And so let me reask the question.

7         A     Uh-huh.

8         Q     In the context where you have -- let's just

9    make it really specific -- quid pro quo sexual

10   harassment allegations about a unit executive and

11   hostile environment, sexual harassment, or sexual

12   discrimination, or an allegation of deliberate

13   indifference, would you say that the unit executive

14   being alleged -- or being alleged to have committed

15   those acts should not be disqualified --

16              MR. KOLSKY:  Same objection.

17   BY MS. SUK GERSEN:

18        Q     -- from the EDR process?

19              You can answer.

20        A     Yeah.  You know, again, you know, it's

21   difficult to answer, to provide an absolute, because,

22   you know, it really does depend on the specific facts

23   of the case and the context in which it's alleged.

24        Q     Let me make it specific.  Quid pro quo

25   sexual harassment.  A unit executive accused of
```

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

1    quid pro quo sexual harassment should be disqualified

2    from playing the normal role of a unit executive in a

3    EDR proceeding.  Yes or no?

4         A     In the early stages of the EDR proceeding?

5         Q     I'm talking about after an investigative

6    report has been completed and in the counseling and

7    mediation processes.  You have testified that the unit

8    executive is normally involved.

9         A     That's correct.

10         Q     If that unit executive were accused in the

11   actual EDR matter of sex discrimination, or to be even

12   more specific, quid pro quo sexual harassment, would

13   you consider it appropriate to disqualify that person?

14              MR. KOLSKY:  Objection.  Calls for

15   speculation.  And object to form.

16   BY MS. SUK GERSEN:

17         Q     You may answer.

18         A     Well, again, I think it's -- it's difficult

19   to answer that because there's a lot of nuances.  And,

20   again, I will just say that one of the reasons why we

21   waited to decide -- or to have Chief Judge Gregory

22   decide the motion for disqualification is we wanted to

23   see the investigation report to see, you know, what the

24   investigator's findings and conclusions were.

25              I mean, let's just take -- let's -- you

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

1    know, let's take a hypothetical. Suppose, you know,

2    she did sustain -- let's, you know, just say -- suppose

3    she -- there were allegations like what you described,

4    and suppose the investigator did say, "Oh, yes.

5    Absolutely. I found evidence of that." Well, that

6    could -- I could see that swaying the decision to

7    disqualify the unit executive.

8          On the flip side, if the investigation

9    report said, "Well, I don't" -- "I could find no

10    evidence to substantiate that," then it would swing the

11    other way.

12          So it's really difficult to answer your

13    question. I don't mean to be difficult, but it's a

14    really nuanced question.

15    Q    I do understand it's a nuanced question, and

16    that is why I'm asking you, because you are the -- you

17    were the EDR Coordinator with the experience and the

18    expertise.

19          Would it be proper for a person who was

20    alleged to have violated the EDR plan, for example,

21    sexual harassment, to be the judicial officer at the

22    end of the final -- in the final complaint stage of a

23    Chapter X proceeding?

24    A    I'm sorry. I wasn't tracking. You're

25    asking me about the qualifications of the judicial --

www.cavalier-reporting.com
(434) 293-3300
Cavalier Reporting & Videography
Reported by Julia A Bammel
info@cavalier-reporting.com
(800) 972-1993

1       Q       Yeah.  The presiding judicial officer at the

2   end of the Title X proceedings --

3       A       Uh-huh.

4       Q       -- would it be proper for that person who is

5   playing that role to be the same person who is accused

6   of violating the EDR plan in that very case?

7       A       In that very case?

8       Q       Yes.

9       A       No, I would not think that would be

10  appropriate.

11      Q       The report that Ms. Beam prepared found that

12  Mr. Martinez had mishandled Ms. Strickland's EDR

13  complaint.

14      A       Uh-huh.  Uh-huh.

15      Q       And then Heather Beam further alleged that

16  Tony was biased or found -- she concluded that Tony was

17  biased in the e-mail that she sent you.

18      A       Right.  But I don't -- I don't think that

19  she said that in her report.

20      Q       She recommended disqualification to you; is

21  that right?

22      A       That's the way I would read her e-mail, yes.

23      Q       If, in that circumstance, there is no

24  disqualification of the unit executive, what is a

25  situation where you might think a disqualification is

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

```
 1   important?  Is there any situation where a
 2   disqualification would be appropriate?
 3        A    Well, again, I would -- I would go back to
 4   what I had said before.
 5        Q    I appreciate that, but I'm not asking for
 6   what you said before.  I'm asking you a different
 7   question.
 8        A    Because it sounds like the same question, so
 9   I apologize if I'm mishearing you.
10        Q    In a situation where the investigator found
11   that Tony was biased and she recommended
12   disqualification of the person who was accused of an
13   EDR violation, you found -- or you did not feel that
14   disqualification was appropriate; is that right?
15             MR. KOLSKY:  Objection.  Misleading.
16   BY MS. SUK GERSEN:
17        Q    Based on the investigative report, did you
18   think that disqualification was merited?
19        A    You're asking my opinion?
20        Q    I'm asking your opinion.
21        A    Based on the report itself, no, I did not
22   think disqualification was merited.
23        Q    Can you think of any situation at all where
24   disqualification would be merited with an allegation of
25   sexual harassment against a unit executive?
```

www.cavalier-reporting.com          Cavalier Reporting & Videography          info@cavalier-reporting.com
(434) 293-3300                        Reported by Julia A Bammel                        (800) 972-1993

 1          MR. KOLSKY:   Objection.   Calls for

 2   speculation.

 3   BY MS. SUK GERSEN:

 4       Q     You can answer.

 5       A     Well, again, I mean, I'm just -- like I said

 6   before, had the investigation report concluded that the

 7   unit executive -- there was evidence to substantiate

 8   the allegations of sexual harassment, substantiate

 9   allegations of retaliation, I could see in that

10   particular circumstance that there would be stronger

11   reasons to support disqualification.

12       Q     Why did Tony Martinez take action against

13   JP Davis in response to this report?

14          MR. KOLSKY:   Objection.   Lacks foundation.

15   BY MS. SUK GERSEN:

16       Q     We know from the discovery in this case that

17   Tony was in charge of taking action against JP Davis,

18   namely, disciplining him.   Why was Tony the one who had

19   that role?

20       A     Well, he would have that role as the unit

21   executive of this office.

22       Q     And your view is that it was appropriate for

23   him to have that role in this case?

24       A     Yes.

25       Q     And your view is that it was appropriate for

www.cavalier-reporting.com
(434) 293-3300
Cavalier Reporting & Videography
Reported by Julia A Bammel
info@cavalier-reporting.com
(800) 972-1993

```
 1   him to have that role even though he was alleged to

 2   have violated the EDR plan in connection with JP?

 3            MR. KOLSKY:  Objection.  Misleading.

 4   BY MS. SUK GERSEN:

 5       Q    You can answer.

 6       A    Well, again, as the unit executive, that is

 7   within his or her purview to take such action

 8   against -- against one of his or her employees.

 9       Q    Did Tony take action against himself?

10       A    I'm not sure I know what you mean.

11       Q    The investigative report found wrongdoing on

12   the part of Tony Martinez.

13       A    Well, I wouldn't call it wrongdoing.

14            MR. KOLSKY:  Object to counsel's testimony.

15   Object to form.

16            MS. SUK GERSEN:  We can look at the report.

17   BY MS. SUK GERSEN:

18       Q    Do you have the report in front of you,

19   Mr. Ishida?

20       A    Yes.  Exhibit 8?

21       Q    Yes.

22       A    Yes.

23       Q    Exhibit 8.  This is page 11 of the report.

24       A    Okay.

25       Q    US-1254.
```

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

1      A      Okay.

2      Q      What do you understand Ms. Beam to be

3   finding here with respect to Mr. Martinez?

4           MR. KOLSKY:  Objection.  Vague.

5   BY MS. SUK GERSEN:

6      Q      Is your view that Ms. Beam found no

7   wrongdoing on the part of Mr. Martinez?

8      A      So from my reading of the report, what

9   Heather Beam said was she found no evidence of

10  retaliation, and she found no evidence to support

11  Plaintiff's allegation of sexual harassment.

12     Q      What was your understanding of why Ms. Beam

13  said on page 14 of that report, "Mr. Martinez," in all

14  caps, "must also be counseled and trained"?

15     A      Well, if I remember the passages of the

16  report, while she found that there was nothing to

17  substantiate the claims of retaliation or sexual

18  harassment, she did point out certain, you know -- and

19  I'll use her term -- mishandling of Plaintiff's

20  complaint and concerns.

21           And so Ms. Beam said that, you know, these

22  mishandlings contributed or exacerbated the situation.

23  And so my reading of the report is that she wanted that

24  to be addressed with Mr. Martinez so that he understood

25  what the consequences of this mishandling was.  But she

www.cavalier-reporting.com                    Cavalier Reporting & Videography            info@cavalier-reporting.com
(434) 293-3300                                    Reported by Julia A Bammel                         (800) 972-1993

1   also wanted to make sure going forward that these types

2   of things wouldn't happen again.  That's the way I read

3   her conclusions there.

4        Q     Her conclusion that Tony mishandled

5   Ms. Caryn Strickland's case, did you consider that to

6   be a finding of wrongdoing?

7        A     No.  I considered them mistakes, missteps,

8   because the plaintiff's more serious allegations of

9   retaliation and sexual harassment, she did not find any

10  evidence to support that.

11       Q     What is the difference between mistakes and

12  missteps versus wrongdoing?

13       A     You're asking me --

14       Q     Yes, I am.

15       A     -- for my thoughts?

16       Q     Yes, because you -- because of the way you

17  answered the previous question.

18       A     Well, in this case, the missteps were that

19  Tony had done these things well intended, but, you

20  know, he -- you know, he had done it inadvertently,

21  without intention.  He had done it -- he had done it,

22  you know, in good faith in trying to address

23  Plaintiff's concerns.  Whereas wrongdoing, I would just

24  say that there's a certain element of intention there.

25       Q     According to this report by Ms. Beam, had

Case 1:20-cv-00066-WGY   Document 255-3   Filed 06/29/23   Page 56 of 73

www.cavalier-reporting.com
(434) 293-3300
Cavalier Reporting & Videography
Reported by Julia A Bammel
info@cavalier-reporting.com
(800) 972-1993

1    individual?

2        A    Well, Heather -- so I wanted Heather to

3    investigate, you know, the circumstances in these

4    proceedings.  I did not want to be seen directing it in

5    any way or influencing it or anything like that.  I

6    mean, it was -- once she was appointed, then, you know,

7    it was her job to conduct the investigation as she saw

8    fit, and I didn't want to know, and I didn't want to be

9    involved in that process.

10       Q    Wasn't it your job to ensure that the

11   investigations are fair and thorough?

12       A    Yes, which is why I did not want to, you

13   know, be seen as influencing it or -- you know, I

14   wanted to let it take its course, and I wanted the

15   investigator to conduct the investigation as she saw

16   fit.

17       Q    So if what she saw fit was to show the

18   report to the accused party, you didn't want to know?

19       A    Again, I did not want to know how she

20   conducted her investigation.

21       Q    It seems from your answers previously that

22   as EDR Coordinator you were concerned about preserving

23   the integrity of the investigation.  Am I right?

24       A    Yes.

25       Q    Wouldn't the question of whether the

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

```
 1   investigator showed the report's findings or discussed

 2   them with an accused party be concerning when it comes

 3   to preserving the integrity of the investigation?

 4        A     Well, again, I don't know if that happened,

 5   and if it did, I don't know the reason why Heather

 6   would have done that.  So I'm hardly qualified to pass

 7   judgment on that.

 8        Q     And is it your testimony that you didn't

 9   want to know?

10        A     Yes.  I wanted Heather to conduct her

11   investigation without any direction from me, and I

12   wanted to allow her to develop the investigation as she

13   saw fit.

14        Q     So you had several contacts from JP, and you

15   said today that you were worried that the investigation

16   be conducted with integrity; is that right?

17        A     Yes.

18        Q     So would you not be concerned if JP or Tony

19   Martinez repeatedly contacted Heather Beam with queries

20   similar to the ones that JP made to you?

21        A     Well --

22             MR. KOLSKY:  Objection.  Vague and calls for

23   speculation.

24   BY MS. SUK GERSEN:

25        Q     Did you ask Heather if Tony or JP contacted
```

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

1    her?

2        A    No.  And, again, I did not ask her questions

3    about how she was conducting the investigation or what

4    was happening during the course of that investigation.

5        Q    You were deeply worried about preserving the

6    integrity of the investigation --

7        A    Right.  Which would --

8        Q    -- is that right?

9        A    Which would include not, you know -- or

10   being perceived as steering the investigation or

11   dictating its course.

12       Q    Would that concern not be important if

13   Heather had been contacted by JP during the

14   investigation?

15           MR. KOLSKY:  Object to form.

16   BY MS. SUK GERSEN:

17       Q    If the investigator were behaving

18   improperly, would you want to know?

19       A    If the investigator was behaving improperly?

20       Q    During the investigation.

21       A    Improperly how?

22       Q    If the investigator were behaving improperly

23   with respect to not preserving the integrity of the

24   investigation, is that something you'd want to know?

25       A    Well, again, maybe give me an example of

Case 1:20-cv-00066-WGY  Document 255-3  Filed 06/29/23  Page 59 of 73

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

1    what you mean by behaving improperly.

2        Q    Did you tell Heather that JP contacted you?

3        A    I can't remember if I told that to Heather

4    or not.

5        Q    Did you tell the Chief Judge that JP was

6    contacting you outside of the EDR proceedings?

7            MR. KOLSKY:  Objection.  Misstates

8    testimony.

9    BY MS. SUK GERSEN:

10       Q    I'm asking the question.  Did you tell the

11   Chief Judge that JP was contacting you about the EDR

12   proceedings?

13       A    I can't remember if -- if I let Judge

14   Gregory know.  Again, I had had a conversation with JP,

15   and I had a -- I alerted Mr. Martinez.  Beyond that, I

16   don't recall.

17       Q    So if JP repeatedly contacted Heather about

18   the investigation while it was ongoing, is that

19   something that would worry you?

20           MR. KOLSKY:  Objection.  Calls for

21   speculation.

22           THE WITNESS:  I would trust that Heather

23   would handle that appropriately.

24   BY MS. SUK GERSEN:

25       Q    Am I right that you had a conversation with

Case 1:20-cv-00066-WGY   Document 255-3   Filed 06/29/23   Page 60 of 73

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

```
 1   JP about his contacting you?

 2        A     Yes.   That's -- yes.

 3        Q     So he -- it wasn't just conversation over

 4   e-mail; is that right?

 5        A     Well, again, I can't remember if I called

 6   him or if I sent him an e-mail.

 7        Q     What was your conversation with JP?

 8        A     Well, again, it was -- I was concerned about

 9   him reaching out to me.  I told him my concern, and I

10   asked him not to contact me again.

11        Q     Okay.  Just before, you said that you would

12   trust that Heather, the investigator, would handle it

13   appropriately.

14        A     Uh-huh.

15        Q     What does that mean, to handle it

16   appropriately?

17        A     Just that, that, you know -- suppose --

18   suppose Mr. Davis had asked a question about -- you

19   know, a procedural question.  "Am I" -- you know, "Are

20   you going to interview me again?" or, you know, "When

21   is the next time" -- you know, things like that.  I

22   could see where Heather would feel comfortable in

23   talking to Mr. Davis and answering his question.

24             But if it was an attempt to frame the issues

25   or -- I don't know.  I mean, you know, something where
```

Case 1:20-cv-00066-WGY  Document 255-3  Filed 06/29/23  Page 61 of 73

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

1    Mr. Davis was trying to influence the outcome of the

2    investigation, you know, I have full confidence that

3    Heather would have said, "That's improper" and "Please

4    don't do that."

5         Q    So the -- who would be the appropriate

6    response of Heather to that kind of behavior?

7              MR. KOLSKY:  Objection; calls for

8    speculation.

9              THE WITNESS:  Yeah.  I mean, it depends on

10   the context.

11   BY MS. SUK GERSEN:

12        Q    Okay.  One question I had about the Title --

13   the Chapter IX versus Chapter X that you described

14   before, there are two separate procedures; is that

15   right?

16        A    Yes.  They're -- they can come from the same

17   set of facts, but they're very different processes and

18   procedures.

19        Q    Does Chapter IX have to come in any order?

20   Does it have to come before Chapter X or after

21   Chapter X?

22        A    No.  The plan doesn't prescribe kind of an

23   order of what comes first.  I think the plan gives a

24   lot of flexibility.

25        Q    So the plan -- according to the plan, they

Case 1:20-cv-00066-WGY  Document 255-3  Filed 06/29/23  Page 62 of 73

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

1    about why they think that's the case.

2            And so in Mr. Martinez's case, we got a

3    range of comments on his request for reappointment.

4        Q     Would you say that the comments were largely

5    positive or negative?

6        A     Again, I don't remember all of them.  I

7    would say -- but I think it's fair to say there was a

8    mix of positive and adverse comments.

9        Q     Did some of those comments involve comments

10   about Mr. Martinez's handling of discrimination

11   complaints?

12       A     I recall that we had received a number of

13   comments that discussed EDR matters involving the

14   particular commentator.

15       Q     Was JP Davis demoted after the EDR matter

16   concluded in Ms. Strickland's case?

17       A     I don't know -- I didn't know what action

18   Mr. Martinez took against Mr. Davis, and, frankly, that

19   wasn't our concern.

20       Q     That wasn't your concern?

21       A     Well, it wasn't our concern in the sense

22   that we had no authority to take any action against

23   Mr. Davis.  That is the purview of the unit executive.

24       Q     Could Chief Judge Gregory have disciplined

25   JP Davis?

Case 1:20-cv-00066-WGY   Document 255-3   Filed 06/29/23   Page 63 of 73

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

 1      A      No.  And we had discussion about that.

 2      Q      What were those discussions about?

 3      A      I can't -- I can't remember if we had

 4   reached out to General Counsel on this as well, but I

 5   do recall that it was Judge Gregory's sense that he did

 6   not have the authority to discipline a subordinate in

 7   Mr. Martinez's office.

 8      Q      Did Chief Judge Gregory have authority to

 9   discipline Mr. Martinez?

10      A      I think -- I think we felt that the Court of

11   Appeals, as the appointing entity, had that ability.

12      Q      And when you say "we felt," who do you mean

13   by "we"?

14      A      So Judge Gregory and I discussed this.  That

15   was Judge Gregory's view, and I concurred with that.

16      Q      And just to be clear, you are saying it was

17   Judge Gregory's view and you concurred that Chief Judge

18   Gregory could discipline Mr. Martinez but did not have

19   authority to discipline JP Davis; is that right?

20      A      I think that's fair to say.

21      Q      Does the Court of Appeals exercise any

22   authority over the Federal Defenders Office?

23      A      Aside from the Defender, none that I'm aware

24   of.

25      Q      So when you say "aside from the Defender,"

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

1    are you talking about his appointment?

2         A    Well, again, as -- the Court of Appeals, as

3    the appointing body, has -- there's a number of things

4    that the court can do to the Defender but not anyone in

5    the Defender's office.

6         Q    I see.  So the court cannot discipline

7    anyone in the Federal Defenders Office?

8         A    I'm not aware of any authority that would

9    give the court that ability.

10        Q    And to be clear, the only person who could

11   discipline an employee of the Federal Defenders Office

12   is Mr. Martinez?

13        A    As the unit executive.

14        Q    As the unit executive.

15        A    That's correct.  That's my understanding.

16        Q    To be clear, is the FDO part of the federal

17   judiciary and not the executive branch?

18        A    Yes.  They're -- they are considered

19   a judiciary -- federal judiciary entity.

20        Q    Are you aware that JP Davis is no longer the

21   First Assistant at the FDO?

22        A    I think I had heard that.

23        Q    You heard that he was no longer the First

24   Assistant?

25        A    Yes.

www.cavalier-reporting.com
(434) 293-3300
Cavalier Reporting & Videography
Reported by Julia A Bammel
info@cavalier-reporting.com
(800) 972-1993

 1        Q      Do you know why?

 2        A      I don't know why.

 3        Q      Subsequent to the Strickland matter being

 4   resolved, have there been subsequent complaints about

 5   Tony Martinez?

 6        A      I'm aware generally that there were other

 7   complaints after Caryn Strickland's case.

 8        Q      Are you aware of those complaints happening

 9   while you were the EDR Coordinator?

10        A      No.  I think by this time, I was not the EDR

11   Coordinator, and we had a Director of Workplace

12   Relations that was working with a number of these

13   individuals.

14        Q      What about against JP Davis?  Subsequent to

15   Ms. Strickland's EDR matter, were there any complaints

16   against JP Davis?

17        A      I don't -- I don't recall anything, but,

18   again, not -- it wasn't too much longer after that that

19   I was not the EDR Coordinator.  And, again, we had a

20   Director of Workplace Relations who handled these types

21   of things.

22        Q      At the beginning of today, at the beginning

23   of the testimony, you mentioned two to three matters --

24        A      That I am familiar with, yes.

25        Q      -- that you're familiar with --

www.cavalier-reporting.com                    Cavalier Reporting & Videography                    info@cavalier-reporting.com
(434) 293-3300                                Reported by Julia A Bammel                           (800) 972-1993

1      A      Yes.

2      Q      -- regarding JP Davis or Tony Martinez.

3      A      I'm aware of two or three -- I think what I

4  said was I'm aware of two or three involving the office

5  of Mr. Martinez.  I don't think I said that there were

6  any involving Mr. Davis.

7      Q      Were you, at any point during

8  Ms. Strickland's complaint and proceeding, concerned

9  about a pattern of complaints against JP Davis or

10  Mr. Martinez?

11      A      Well, I think -- I think I was concerned

12  about that.  There were multiple coming within a

13  relatively short period of time, so I remember being

14  somewhat concerned about that.

15      Q      What were your concerns?

16      A      Well, mainly, you know, if -- you know, why

17  are there multiple complaints coming in such a short

18  period of time?  I mean, what does this mean?

19      Q      Did you do anything about that concern?

20      A      Well, we wanted to, you know, certainly look

21  at why these -- you know, why these individuals were

22  bringing these, you know, complaints, and we

23  certainly -- we didn't want to prejudge anyone or, you

24  know, the office, but we wanted to make sure that we

25  looked at, you know, each of the complaints as they

Case 1:20-cv-00066-WGY  Document 255-3  Filed 06/29/23  Page 67 of 73

www.cavalier-reporting.com
(434) 293-3300
Cavalier Reporting & Videography
Reported by Julia A Bammel
info@cavalier-reporting.com
(800) 972-1993

1    were brought to us.

2        Q    Did you speak with Chief Judge Gregory about

3    the concern you just mentioned?

4        A    Well, again, in my role as the EDR

5    Coordinator, whenever I get, you know, like, say, a

6    Chapter IX or Chapter X, I would always let him know

7    that this is a -- "Chief, by the way, this is what" --

8    "I received this complaint or this request" -- "this

9    report of wrongful conduct." So I would let him know

10    every time I received one what would happen.

11        Q    So you testified just now that you were

12    concerned about a potential pattern with respect to

13    Chief Judge -- sorry -- let me start again.

14        You testified that you were concerned about

15    a potential pattern regarding JP Davis or Mr. Martinez.

16        A    No. I don't think that's accurate to say

17    what I meant. What I said was, I was concerned that

18    there were a number of these complaints filed in such a

19    short period of time. I don't -- I never mentioned

20    pattern.

21        Q    So given the short [sic] number of

22    complaints filed in a short period of time and your

23    concern about it, did it worry you that Mr. Martinez

24    would remain in charge of any complaints brought

25    against him?

www.cavalier-reporting.com     Cavalier Reporting & Videography     info@cavalier-reporting.com
(434) 293-3300     Reported by Julia A Bammel     (800) 972-1993

1    practical effect of what that would mean to the

2    proceeding if Mr. Martinez was no longer part of the

3    process and no longer was representing the office.

4        Q    And what practical effect are you referring

5    to?

6        A    Who would be negotiating for the office, you

7    know, to address the plaintiff's concerns.

8        Q    Was there an understanding of who would be

9    negotiating for the office if Mr. Martinez was

10   disqualified?

11       A    I'm sorry.  The first part, Josh?

12       Q    Did Chief Judge Gregory express an opinion

13   about who, in fact, would negotiate on behalf of the

14   office if Mr. Martinez was disqualified, or did he not

15   have an understanding of who that would be?

16       A    Well, I don't think he had an understanding,

17   because if he had granted the request to disqualify

18   Mr. Martinez, you would obviously look to the next in

19   command, and JP Davis was the First Assistant, who he

20   would not have appointed Mr. Davis.

21            So then that left -- well, then who else in

22   the office would have the authority to participate in

23   the informal resolution process?  So the short answer

24   is, we couldn't -- I mean, we talked about that, and we

25   couldn't come up with anybody suitable to represent the

www.cavalier-reporting.com
(434) 293-3300

*Cavalier Reporting & Videography*
*Reported by Julia A Bammel*

info@cavalier-reporting.com
(800) 972-1993

1   office.

2       Q     You testified earlier that Chief Judge

3   Gregory didn't have authority to discipline a

4   subordinate in the Federal Defenders Office.  Do you

5   recall that testimony?

6       A     Yes.

7       Q     Does a presiding judicial officer have the

8   authority to order remedies against a Federal Defenders

9   Office after a formal hearing under Chapter X of the

10  EDR process?

11      A     Yes.

12      Q     Did Tony Martinez ever suggest to you that

13  you should select Heather Beam as the investigator for

14  Ms. Strickland's EDR matter?

15      A     No.  That was a decision that was made by

16  me, again, after I consulted with Frank Johns and Kim

17  Llewellyn.

18          MR. KOLSKY:  Thank you.  No further

19  questions.

20          MS. SUK GERSEN:  Thank you.  I think we're

21  all done.

22          (Deposition concluded at 5:47 p.m.)

23          (Signature reserved.)

24

25                    * * * * *

www.cavalier-reporting.com
(434) 293-3300
Cavalier Reporting & Videography
Reported by Julia A Bammel
info@cavalier-reporting.com
(800) 972-1993

1    COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

2         I, Julia A. Bammel, RPR, CSR, Notary Public

3    in and for the Commonwealth of Virginia at large, and

4    whose commission expires May 31, 2024, do certify that

5    the aforementioned appeared before me, was sworn by me,

6    and was thereupon examined by counsel, and that the

7    foregoing is a true, correct, and full transcript of

8    the testimony adduced.

9         I further certify that I am neither related

10   to nor associated with any counsel or party to this

11   proceeding nor otherwise interested in the event

12   thereof.

13        I further certify that the deponent's right

14   to review the transcript was reserved.

15        Given under my hand and notarial seal at

16   Charlottesville, Virginia, this 24th day of April,

17   2023.

18

19        _____

20             Julia A. Bammel, RPR, CSR

21        Notary Public Registration No. 7205414

22        Commonwealth of Virginia at Large

23

24   Job No. 49661

25

Case 1:20-cv-00066-WGY   Document 255-3   Filed 06/29/23   Page 71 of 73

www.cavalier-reporting.com
(434) 293-3300
Cavalier Reporting & Videography
Reported by Julia A Bammel
info@cavalier-reporting.com
(800) 972-1993

```
1                    DEPOSITION ERRATA SHEET

2    Job No. 49661
     Case:  Strickland v. United States of America, et al.
3    Deposition Date:  April 13, 2023

4

5            DECLARATION UNDER PENALTY OF PERJURY

6         I declare under penalty of perjury that I have

7    read the entire transcript of my deposition taken in

8    the captioned matter, or the same has been read to me,

9    and the same is true and accurate, save and except for

10   changes and/or corrections, if any, as indicated by me

11   on the DEPOSITION ERRATA SHEET hereof, with the

12   understanding that I offer these changes as if still

13   under oath.

14

15   Signed on the _22nd_ day of ___May___, 20_23_.

16   _____

17                 JAMES N. ISHIDA

18

19   Signed to and sworn before me this _22nd_ day of _May_,

20   20_23_, in _Roanoke, VA_____.

21

22   _Cyntha Newby Hamilton_____

23   Notary Public

24   My commission expires: _8-31-2026_, 20___

25   Notary Public Registration No. _226996_
```

*Notary Seal:* Cynthia Newby Hamilton · NOTARY PUBLIC · REG # 226996 · COMMONWEALTH OF VIRGINIA

www.cavalier-reporting.com
(434) 293-3300

7:22-cv-00066-WGY   Document 257-3   Filed 06/29/23   Page 72 of 73

Cavalier Reporting & Videography
Reported by Julia A Bammel

info@cavalier-reporting.com
(800) 972-1993

## DEPOSITION ERRATA SHEET

Page No. __22__ Line No. __25__ Change to: _____

"personnel issues, disciplinary issues that had come"

Reason for change: __Transcription error__

Page No. __72__ Line No. __22__ Change to: _____

"Chief Judge and the unit executive must be notified."

Reason for change: __Transcription error__

Page No. __76__ Line No. __7__ Change to: _____

"so I think there is an encouragement to"

Reason for change: __Transcription error__

Page No. __77__ Line No. __11__ Change to: _____

"of a verb. A report of wrongful conduct is --"

Reason for change: __Transcription error__

Page No. __93__ Line No. __23__ Change to: _____

"Practices Officer. I couldn't tell you exactly.

Reason for change: __Transcription error__

Page No. __96__ Line No. __13-14__ Change to: _____

"It appears that the head of the AO's Fair"

Reason for change: __Transcription error__

Page No. _____ Line No. _____ Change to: _____

_____

Reason for change: _____

SIGNATURE: _____ DATE: May 22, 2023

JAMES N. ISHIDA

www.cavalier-reporting.com
(434) 293-3300

Cavalier Reporting & Videography
Reproduction Prohibited

info@cavalier-reporting.com
(800) 972-1993

Case 1:20-cv-00066-WGY   Document 250-1   Filed 06/29/23   Page 73 of 73