# EXHIBIT MM

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION


CARYN DEVINS STRICKLAND,

     Plaintiff,

v.             Civil No.: 1:20-cv-00066-WGY

UNITED STATES, et al.,

     Defendants.
_____/




VIDEOTAPED
DEPOSITION OF:   ANTHONY MARTINEZ

TAKEN:         By Counsel for Plaintiff

DATE:          April 28, 2023

TIME:          9:00 a.m. - 5:41 p.m.

PLACE:         Constangy, Brooks, Smith &
                Prophete
                100 North Tampa Street
                Suite 3350
                Tampa, Florida 33602

REPORTED BY:    Sarah Parker
                Notary Public
                State of Florida at Large



rlr@richardleereporting.com

APPEARANCES:

    JEANNIE SUK GERSEN, ESQUIRE
    JACOB GERSEN, ESQUIRE
    Hauser Hall 510
    1563 Massachusetts Avenue
    Cambridge, Massachusetts 02138
        Appeared for Plaintiff

    RACHAEL WESTMORELAND, ESQUIRE
    MADELINE MCMAHON, ESQUIRE
    DANIELLE YOUNG, ESQUIRE
    JOSHUA KOLSKY
    US Department of Justice
    Civil Division, Federal Programs Branch
    1100 L Street NW
    Washington, D.C. 20005
        Appeared for Defendants

    SHANNON SUMERELL SPAINHOUR, ESQUIRE
    Constangy, Brooks, Smith & Prophete, LLP
    84 Peachtree Road
    Suite 230
    Asheville, North Carolina 28803
        Appeared for Defendants

ALSO PRESENT:

    Matt Casey, Videographer
    Claire Beutter, Research Assistant
    Edward Jung, Research Assistant
    Kristin Mannherz, Administrative Office of the US
    Courts

I N D E X

|  | PAGE |
|---|---|
| Examination by Ms. Gersen | 5 |
| Examination by Ms. Westmoreland | 282 |
| Examination by Ms. Gersen | 284 |
| Certificate of Oath | 286 |
| Certificate of Reporter | 287 |
| Signature page/errata sheet | 288 |

INDEX OF EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 56 | Offer Letter | 72 |
| 57 | Page from Martinez Declaration | 77 |
| 59 | 05.18.2018 E-mail from JP to Caryn | 113 |
| 60 | Text Messages | 127 |
| 58 | Meeting with Caryn Devins | 136 |
| 61 | E-mail Re: Watt tomorrow | 139 |
| 62 | 07.05.2018 Significant Event Log | 152 |
| 63 | 07.08.23 E-mail Caryn Mentoring JP Davis to: W Kelly Johnson | 160 |
| 64 | 07.20.2018 E-mail Research & Writing Support | 170 |
| 65 | Declaration of Anthony Martinez | 183 |
| 66 | 08.10.2018 E-mail Agreement from Yesterday's Meeting | 194 |
| 67 | 08.13.2018 E-mail Re: Personnel Manual | 202 |

INDEX OF EXHIBITS (Continued)

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 2 | 08.14.2018 E-mail Re: Fw: Confidential - Requesting Heather Beam | 204 |
| 3 | 08.15.2018 E-mail Fwd: Confidential - Personnel Matter | 217 |
| 68 | 08.17.2018 E-mail Re:  Agreement From Yesterday's Meeting | 229 |
| 69 | 12.04.2018 Significant Event Log | 246 |
| 70 | 02.12.2019 E-mail FW: Investigation Resolution/Procedure | 253 |
| 71 | 05.28.2019 E-mail Confidential | 263 |

1    with the EDR plan in the Fourth Circuit?

2         Q.   Yes, I am asking that.

3         A.   I was not familiar with it when I came on

4    board as the defender in 2017.

5         Q.   So was the first training you received on

6    EDR in 2018?

7         A.   The first training?  The one I attended,

8    2018.

9         Q.   2018, right.

10        A.   Yes, yes.

11        Q.   So I'm curious about the different

12   accomplishments during your tenure as a federal

13   public defender.  I know that creating a federal

14   agency was one that you testified to already.  Did

15   you create the capital habeas unit at the FDO?

16        A.   Yes, ma'am.

17        Q.   That's a big accomplishment; is that right?

18        A.   Yes, ma'am.  I considered it an

19   accomplishment.

20        Q.   Can you tell me about what the capital

21   habeas unit was?

22        A.   Is, it's still in existence.

23        Q.   Yes, is, yes.

24        A.   The capital habeas unit, we represent --

25   the capital habeas unit represents individuals that

1    of your role at the FDO?

2         A.   Guidance, I would seek guidance from him,

3    and directives --

4         Q.   Did you have -- did you have a supervisor?

5         A.   My supervisor is Chief Judge Gregory.

6         Q.   Your supervisor was Chief Judge Gregory?

7         A.   Yes, as far as I was concerned, my

8    supervisor was Chief Judge Gregory.

9              MS. GERSEN:  Okay.  So it's 10:30, so why

10        don't we take a break.

11             THE WITNESS:  Okay.

12             MS. GERSEN:  Thank you so much.

13             MS. WESTMORELAND:  Do you know how much

14        time we've been on the record?

15             THE COURT REPORTER:  It's been from 9:20

16        until 10:30.

17             THE VIDEOGRAPHER:  It's 10:33 and we're off

18        the record.

19             (Recess from 10:33 a.m. to 10:42 a.m.)

20             THE VIDEOGRAPHER:  10:42, Eastern Standard

21        Time.  We're back on the record.

22   BY MS. GERSEN:

23        Q.   Okay.  Thank you again for all your

24   explanations.  So I'm going to ask you some questions

25   now about Caryn Strickland and your first impressions

1    about her.  So you said that you were involved in her

2    hiring.

3        A.  I was involved from a distance in her

4    interview.

5        Q.  Okay.  Can you tell us about that

6    interview, as in who was there?

7        A.  I can only tell you that I was in my

8    Chattanooga office, because I was still working for

9    the Eastern District of Tennessee at the time of her

10   interview.  I Skyped into the interview.  I don't

11   recall, to be honest, who was at the interview other

12   than Ross Richardson.  That's all.

13       Q.  Was that the first time you met her?

14       A.  Yes.

15       Q.  As in the first time you met Caryn

16   Strickland?

17       A.  Yes.

18       Q.  And did you participate in the decision to

19   hire her?

20       A.  No, that was decided by Ross.  She did -- I

21   should qualify that.  So Ross did ask me, "Are you

22   good if we were to hire her?"

23            And I said, "Yes, I am good.  She appears

24   to be qualified, well-qualified for this position."

25       Q.  So what did you think of Caryn at the time?

1     A.   I mean, I didn't know her.  She was a

2     qualified individual.  That's all I knew.

3          (Phone rings.)

4     Q.   Did you think she was the best candidate

5     for the position?

6     A.   You know, I would imagine so; I don't

7     recall.  You know, reflecting back, I can't tell you

8     how she paired up with the other candidates, but I

9     know she came qualified and she came highly referred

10    from the AO, I believe Cait Clarke.  I just recall

11    some correspondence from Cait Clarke saying she would

12    be a good candidate for the office, is my

13    recollection.

14    Q.   So in your -- in the declaration that you

15    provided for this litigation, you said that you

16    agreed with others that she was the best candidate

17    for the position.  I'm quoting, "the best candidate

18    for the position."

19         Do you think that was a true statement of

20    what you thought?

21    A.   Yes.

22    Q.   And did you think that, even though she was

23    not coming in with any trial experience?

24    A.   Well, she was going to start as a research

25    and writing specialist.  So that -- you start -- you

1     know, you're limited in what you can do as a research

2     and writing specialist. You're not going to be going

3     to trial, so she would be -- and my understanding is

4     that, at that time, the research and writing

5     specialist would support the trial team and the

6     appellate team, so --

7         Q.   And to your knowledge, did other attorneys

8     at the FDO come in without trial experience into the

9     research and writing position?

10        A.   I'm sorry, can you repeat that question?

11        Q.   To your knowledge, did other attorneys at

12    the FDO come in without trial experience?

13        A.   No.

14        Q.   They generally had trial experience when

15    they were hired?

16        A.   Yes.

17        Q.   What about attorneys designated as research

18    and writing specialists?

19        A.   That wouldn't be technically a requirement

20    for that position.

21        Q.   So it was -- to your knowledge, there were

22    other attorneys who were coming in as research and

23    writing specialists without trial experience?

24        A.   I can't -- I don't recall any other

25    research and writing specialists that came in.

1      Q.   Right.  But in general, you don't consider

2   it a problem to hire someone without any trial

3   experience as a research and writing specialist?

4      A.   I mean, it's preferred that they have trial

5   experience; and generally, you know, it's been a

6   practice of federal defender offices to have people

7   come in with trial experience, but specifically for

8   an R&W position, it doesn't necessarily have to be

9   required.

10      Q.   Right.  Earlier you said that you had

11   started in a position before becoming an assistant

12   federal defender.  Did you say that it was a

13   paralegal position?

14      A.   Correct.

15      Q.   And would that have been similar to a

16   research and writing specialist?

17      A.   Somewhat similar.

18      Q.   Somewhat similar?

19      A.   Yes.

20      Q.   With the idea that you would transition to

21   an assistant federal --

22      A.   Correct.

23      Q.   Right.  So Caryn Strickland started working

24   at the FDO on the same day as you, August 21st, 2017?

25      A.   That's my recollection.

1        Q.    Okay.  Now that the -- do you call it R&W,

2   or do you call it "RW"?  How do you --

3        A.    R&W.

4        Q.    You say R&W?

5        A.    For short.

6        Q.    You just say R&W?

7        A.    R&W, or R&Ws.

8        Q.    So can you tell me the difference between

9   the responsibilities of an R&W and an AFPD?  Do they

10  have different job duties, first of all?

11       A.    Yes, basically.  An R&W cannot be the

12  attorney of record.  Only an AFPD can be the attorney

13  of record.  An R&W does not necessarily have their

14  own cases as a result, but they do function as

15  attorneys.  They're doing research and writing.

16  They're doing -- they're drafting motions for the

17  AFPDs, but they're not actually, you know, tasked

18  with actually arguing the motion in court.  That

19  would be up to the AFPD.

20            Now, an AFPD can allow a research and

21  writing specialist to argue the case at a motion, but

22  it would be -- it would have to be under the

23  supervision of an AFPD.  An AFPD doesn't have to seek

24  permission.  AFPD is tasked with the responsibility

25  of that's your case, you do the research and writing,

1   you file the motion, you do the argument, you do that

2   the trial, you take the plea, you do everything.

3   Research and writing specialists cannot do that.

4   Their tasks are limited.

5       Q.   So let me just make sure I understand.   So

6   R&Ws cannot have their own cases?

7       A.   Correct.

8       Q.   And can they represent clients in court?

9       A.   No.

10      Q.   Whereas AFPDs can represent clients in

11  court?

12      A.   Correct.

13      Q.   And they can have their own cases?

14      A.   Correct.

15      Q.   What was your expectation when Caryn was

16  hired about when she would be moved from an R&W to an

17  AFPD?

18      A.   I had no expectation.

19      Q.   You had no expectation at all?

20      A.   Correct.

21      Q.   So as far as you were concerned, she could

22  stay as an R&W indefinitely?

23      A.   Anybody could.

24      Q.   Anybody could.

25      A.   Yes, ma'am.

1          MS. GERSEN:  Okay.  Can I have Tab 3,

2      please.  Actually, no, I made a mistake.  It's

3      Tab 2.  We're going to mark this as Exhibit 56.

4          (Exhibit 56 was marked for identification.)

5      Q.   So I'm handing you what we've marked as

6  Exhibit 56, and this is the offer letter that

7  Caryn Strickland received when she received the offer

8  for her job.

9          Does this show that she was hired as an

10  R&W?

11     A.   Can I read this real quick?

12     Q.   Of course.

13     A.   Okay.

14     Q.   There is also an e-mail on the next page,

15  if you'd like to read that.

16     A.   Okay.

17     Q.   Okay.  Does this letter accord with your

18  understanding of the expectations for Caryn's

19  advancement from R&W to an AFPD?

20     A.   I had no expectations.  I was not involved

21  in this discussion, nor did I speak to Ross Richardson

22  about this.  I had no expectations.

23     Q.   Right.  So what do you think that

24  Ross Richardson was telling Caryn to expect?

25          MS. SPAINHOUR:  Object to the form.

BY MS. GERSEN:

    Q.  Go ahead.

    A.  I mean, I'm just going to read it with the expectation, "We would look to move you to a Assistant Federal Defender position pretty soon thereafter."

    Q.  So she was told that she'd move to an AFPD position "pretty soon thereafter."

        MS. SPAINHOUR:  Object to the form.

        MS. GERSEN:  I had no -- I did not ask my question.

        MS. SPAINHOUR:  Okay.

BY MS. GERSEN:

    Q.  So what do you think "pretty soon thereafter" means if a supervisor says that to a hiring -- someone they're hiring?

    A.  I have no idea.

    Q.  Have you ever hired someone on the expectation that they would be moved to an AFPD at some future time?

    A.  Never, no.

    Q.  You never have?

    A.  Not with the expectation, no.

    Q.  So is it fair to say that this is a letter that does not reflect something you would write to

1    someone you're hiring?

2       A.    Probably not, correct.

3       Q.    And why is that?

4       A.    There is an expectation that -- written in

5    there that the person would be an assistant federal

6    defender.

7       Q.    And that, you wouldn't want to say that,

8    why?

9       A.    I don't know how this person is going to

10    develop. If you hire them as a research and writing

11    specialist, one thing I want to know is, how do they

12    get along with other people in the office; what is

13    their writing ability; what is their research

14    ability; what is their advocacy ability; how do they

15    get along with clients; will they be able to get

16    along with judges; will they be able to get along

17    with AUSAs? So there's so many factors before

18    somebody -- before I would agree a research and

19    writing specialist would come to just say, Oh, yeah,

20    you know, no.

21       Q.    So is it fair to say you disagree with that

22    expectation created in the words "pretty soon

23    thereafter"?

24         MS. SPAINHOUR: Object to the form.

25       A.    I don't understand the question about I

1    disagree.  This form is the first time I'm seeing

2    this e-mail.  I've never seen this before.

3         Q.   I understand that.

4         A.   This is an e-mail from Ross Richardson that

5    I have no idea what her thoughts were about this,

6    expectations, she never talked about it.  So I want

7    to be -- you're asking me if I disagree with it, I

8    can't answer that question because I don't know what

9    her expectation was.  I don't know what was

10   discussed.

11        Q.   Right.  So is it fair to say she --

12   whatever her expectation was in using the words

13   "pretty soon thereafter," which you don't know you

14   said, you would not have said -- you would not have

15   said the words -- if you were writing this letter to

16   Caryn when you hired her, you would not have said --

17   used the words that she used here.  Namely, "with the

18   expectation that you will transition to an Assistant

19   Federal -- Assistant Defender Position," you would

20   not have used those words?

21        A.   I'm not going to say never.  I'm not going

22   to say never.  I don't know the circumstances.

23        Q.   Yes.

24        A.   I don't know what Ross discussed with her.

25   I don't know what Ross saw in her.  I was not

1  involved with this; so I can't, I can't answer that

2  question.  I'm not going to say never.

3      Q.  Right.  Right.  What you knew about

4  Caryn's, you said qualifications and credentials, at

5  the time would not have caused you to write such a

6  letter --

7          MS. SPAINHOUR:  Object to the form.

8  BY MS. GERSEN:

9      Q.  -- about expectations?

10         MS. SPAINHOUR:  Object to the form.

11     A.  I don't know what else Ross saw in Caryn

12 or the discussion with Ross or the reasons why Ross,

13 I cannot; I would be speculating.

14     Q.  Uh-huh.  Yeah.  So you did not share the

15 expectation that she would move, she would transition

16 to an assistant federal defender position?

17     A.  I was not the one that hired her --

18     Q.  I understand.  Right.

19     A.  -- technically.  Yeah, this is Ross

20 Richardson's e-mail.

21     Q.  That's right.

22     A.  I had no objection.  I told Ms. Richardson

23 I had no objection to Ross hiring her, Ms. Strickland,

24 that's all I can say.  I'm not involved in

25 expectations, or did I have an expectation, I'm --

1    when this happened, I wasn't a defender.  I was still

2    awaiting my appointment.

3        Q.   So you had no expectations about that?

4        A.   Correct.  Correct.

5        Q.   Did Ms. Strickland ever show you this

6    letter or the e-mail on the next page about her --

7    about her expectations?

8        A.   I'm seeing this e-mail that you showed me

9    on exhibit, what is it, on this exhibit right now.

10   The e-mail on the back, I'm seeing that e-mail for

11   the first time.  I didn't even know this existed.

12       MS. GERSEN:  Can I have tab -- I'm looking

13       for the declaration, please.

14       MR. GERSEN:  I think it's Tab 1.

15       MS. GERSEN:  Tab 1, okay.  Actually, can I

16       have the full declaration, please.

17       A.   I'm sorry, ma'am, do you want this back, or

18   do you want me to hold on to this?

19   BY MS. GERSEN:

20       Q.   You can hold on to it in case we come back

21   to it later.  It's better if you just hold on.

22       A.   Okay.

23       THE COURT REPORTER:  Which exhibit is this?

24       MS. GERSEN:  This is Exhibit 57.

25       (Exhibit 57 was marked for identification.)

1    BY MS. GERSEN:

2        Q.   I'm handing you now Exhibit 57.  Which is a

3    page from your declaration that you filed in this

4    case.

5        A.   Uh-huh.

6        Q.   And I would like to point you to

7    paragraph 9 of your declaration.

8        A.   Uh-huh.

9        Q.   Could you, just for the record, read it out

10   loud.

11       A.   Paragraph 9 states, "Plaintiff was to start

12   work between July 15 and August 15, 2017.

13   Plaintiff's salary as a Research & Writing specialist

14   was set at $101,929.00 per year, according to the

15   General Schedule, ('GS') 14, Step 1, with the

16   expectation that she would 'transition to an

17   assistant federal defender' at an unspecified time in

18   the future."

19       Q.   Yeah.  So what did you mean in this

20   declaration when you said, "with the expectation that

21   she would 'transition to an assistant federal

22   defender' at an unspecified time in the future"?

23       A.   What was written in the letter, in the top

24   letter, on March 24th.

25       Q.   Can you explain what you meant?

1      A.   I'm not understanding.  I'm not

2   understanding the question.

3      Q.   Okay.  You're saying -- are you saying that

4   your declaration was consistent with what was

5   expressed in the letter that Caryn received upon

6   receiving her job offer?

7      A.   Yes, yes.

8      Q.   So is this an accurate representation of

9   what you believed at the time?

10      A.   What "this"?

11           MS. SPAINHOUR:   Object to form.

12   BY MS. GERSEN:

13      Q.   Did you -- is this an accurate, a

14   truthful -- is this truthful testimony about what

15   your expectation was at the time?

16      A.   When you say -- I'm not understanding when

17   you're saying "this."  What are you referring to?

18      Q.   This paragraph 9.

19      A.   Oh, in my declaration?

20      Q.   Yes.  Is this a truthful sentence from you?

21      A.   Yes, because I'm reflecting on what was, my

22   understanding of what was agreed between the

23   plaintiff and Ross Richardson.

24      Q.   Right.  So did you have the knowledge that

25   Ross Richardson created the expectation that she

1  would transition to an assistant federal defender?

2  A.  My knowledge comes from the letter, the

3  offer letter, saying that she would be hired with the

4  expectation she would transition to an assistant

5  federal -- assistant defender position.

6  Q.  Did you see this letter before today?

7  A.  I saw the letter before today; yes, ma'am.

8  Q.  So you didn't testify earlier that you

9  never saw this letter before?

10  A.  No, ma'am, I said the e-mail on the back

11  portion of this page, you asked me to look at this

12  e-mail that's attached to the letter.  I never saw

13  that e-mail.  I did see the letter.

14  Q.  You did see the letter?

15  A.  Yes, ma'am.

16  Q.  Okay.  So you saw the letter before writing

17  this declaration; is that right?

18  A.  Yes, ma'am.

19  Q.  So -- and when you said "Plaintiff was to

20  start work," with the expectation that she would

21  transition to any -- to an assistant federal defender

22  "at an unspecified time in the future," did you mean

23  that you expected that she would transition to an

24  assistant federal defender?

25  A.  That I expected her?

1    Q.   Yes.

2    A.   No, I'm just reflecting on what

3    Ross Richardson expected.

4    Q.   Yes.  Could that also mean that that's what

5    Ms. Strickland would have expected upon receiving the

6    letter?

7    A.   I don't understand your question.

8    Q.   Well, you're saying that Ross Richardson

9    would have expected that she would transition to an

10   AFPD.

11   A.   If Ms. Strickland relies on this, yes.  I

12   could see her having that same expectation, yes.

13   Q.   Right.  But you didn't have the expectation

14   that she would transition to an AFPD?

15   A.   Well, I was not involved in that

16   discussion.

17   Q.   You weren't involved in that discussion, so

18   what did you mean in paragraph 9 about the

19   expectations -- the expectation?  Whose expectation

20   were you talking about in this declaration?

21   A.   Ms. Strickland had the expectation that

22   she, Plaintiff, was to start work with the

23   expectation, that was her expectation, that she would

24   transition to assistant defender, not my expectation.

25   I had no expectation.  I'm not involved in that

1   discussion.

2        Q.   So this is your declaration; is that right?

3        A.   Yes, ma'am.

4        Q.   So were you declaring what Plaintiff was

5   expecting?

6        A.   What Plaintiff and/or Ross Richardson was

7   expecting --

8        Q.   Right.

9        A.   -- that wasn't -- go ahead, I'm sorry.

10       Q.   I'm sorry.  No, you go ahead, please.

11       A.   That was an agreement between both of them.

12  That's what I'm referring to.

13       Q.   And so you were testifying in this

14  declaration about Plaintiff's expectation, as well as

15  Ross Richardson's expectation?

16       A.   Correct.

17       Q.   But not testifying about your own

18  expectation?

19       A.   Correct.

20       Q.   Because you had no expectation that she

21  would transition to an AFPD?

22       A.   I was not involved in that discussion.

23       Q.   So does not being involved in that

24  discussion mean that you can't form an expectation

25  about whether she would transition?

1      A.   I had no expectation.

2      Q.   You had no expectation.  Okay.  I just

3  wanted to get clear on what you meant.

4      A.   Yeah.

5      Q.   And did you write this declaration to

6  reflect what was in the letter from Ross Richardson?

7      A.   Correct.

8      Q.   So -- and the expectation that you talked

9  about in paragraph 9 of the declaration, was that

10  something that you were aware of in the first year of

11  your tenure as the -- as the federal defender?

12      A.   I did not see this letter probably until

13  later in my first year.

14      Q.   Do you have any recollection of how you

15  might have seen the letter?

16      A.   It came up, I believe, in 2018.  It was

17  probably around April, May of 2018, either -- yes, it

18  came up around then.

19      Q.   Of -- I'm sorry, could you say it again.

20      A.   This letter was brought to my attention

21  back in May, April or May of 2018, around there, but

22  I had -- coming into my position, I had no idea that

23  this ever existed, this letter existed; but I did

24  know it existed prior to my drafting the declaration.

25      Q.   If you did know that this letter existed,

1    say at the time you came in as the federal defender

2    in August, is there anything you would have done

3    differently?

4        A.   No.

5        Q.   No.

6        A.   No.

7        Q.   So you would have thought the same way

8    about Caryn's potential transition to AFPD regardless

9    of what this letter said?

10       A.   What do you mean "thought the same way."  I

11   don't understand.

12       Q.   Earlier, you said you didn't have any

13   expectations that she would ever transition because

14   nobody -- you never had that expectation for anyone.

15           MS. WESTMORELAND:  Objection to form.

16   BY MS. GERSEN:

17       Q.   So my question is:  Did you -- would you

18   have had an expectation that she would transition to

19   an AFPD if you had seen this letter, say, in August?

20       A.   No, this is an agreement, again, between

21   her and Ross Richardson, not with me.

22       Q.   So you do not see the agreement with the

23   former defender as having any binding effect on you?

24       A.   Correct.

25       Q.   So it was just with another federal

1   defender, and so you could disregard agreements that

2   had existed prior to your taking the job?

3          MS. SPAINHOUR:  Objection to form.

4       A.   It was not binding on me.

5       Q.   Uh-huh.  It was not binding on you, and you

6   didn't think it was binding on the office?

7       A.   I didn't think it was binding on the

8   office.  It was not binding on me.

9          THE VIDEOGRAPHER:  Ms. Gersen, I'm getting

10          a little mic noise.

11          MS. GERSEN:  Yeah, it's my hair.  I'll do

12          something about it on the break.

13  BY MS. GERSEN:

14      Q.   Okay.  So would it be reasonable for

15  someone receiving this letter from Ross Richardson to

16  expect a transition pretty soon there -- pretty soon

17  after?

18      A.   Is it reasonable?  Probably, yeah.

19      Q.   So you were previously -- you said you were

20  previously a first assistant?

21      A.   Yes, ma'am.

22      Q.   So I wanted to know about the job, first

23  assistant.  What does the first assistant do?

24      A.   I had a full caseload and basically work

25  on any project that the defender would request,

1    remained in that job, there was no other thing that

2    needed to be done; is that right?

3         A.   Correct.

4         Q.   I see.

5         A.   Correct.

6         Q.   Did you interview people for the job or

7    consider other candidates?

8         A.   No.  No, I didn't open it up.  I considered

9    everybody in private, but not like I interviewed.  I

10   conducted individual interviews with people just to

11   see where they were at in terms of the office and

12   stuff like that.  So it's sort of like I'm checking

13   them out, but --

14        Q.   Right.  So JP, as the first assistant,

15   was -- had a role, had a role in the personnel

16   manual?

17        A.   Yes, in drafting it, yes.

18        Q.   In drafting it?

19        A.   Yes.

20        Q.   Was he the primary?

21        A.   No, there was no primary.  It was -- I

22   don't know how he was involved.  He was involved; it

23   might have been one or two other people.  I think

24   Bill might have been involved.  I don't recall.

25        Q.   Yeah.  So just for me to understand the

1    first assistant's job duties as opposed to the

2    defender's job duties --

3        A.    Yes.

4        Q.    -- did you delegate a lot of things to the

5    first assistant?

6        A.    I delegated some things, I wouldn't say a

7    lot.  I try to spread it out, but basically, so you

8    understand, he supervises the whole office, also.

9    Like he's technically a supervisor for the whole

10   office.

11       Q.    The whole office, meaning Charlotte and

12   Asheville, or just Charlotte?

13       A.    Yeah, yeah.

14       Q.    So he supervises the entire FDO at both

15   locations?

16       A.    Yes, yes.  Now, he can -- I'm the only one

17   that can promote, demote, fire, terminate, things of

18   that nature.  But he's a supervisor, so you only get

19   so many supervisors -- I don't mean you, I meant as a

20   defender -- based on the number of AFPDs you have, so

21   I believe.

22       Q.    And please correct me if I'm not using the

23   right lingo or terms --

24       A.    No problem.

25       Q.    -- because I just want to get it right.

1    You said you created trial teams?

2         A.   Yes, ma'am.

3         Q.   And are those same as trial units, or is

4    that a different thing?  I'm just trying to

5    understand when I see language about the office, that

6    I'm getting the structure of it right.

7         A.   Okay.  So I think when you heard trial

8    unit, they're talking about, you know, the whole

9    unit, which has teams in it.

10        Q.   The whole unit?

11        A.   Right.

12        Q.   So would there be one unit then for trial?

13        A.   Yeah, so you have one, but then you have

14   divisions, right?  So you have offices, so I had an

15   Asheville division.

16        Q.   Of the trial unit?

17        A.   Correct.

18        Q.   Okay.  Got it.

19        A.   Correct.  But then I had appellate

20   attorneys there of the appellate unit.

21        Q.   And was it only trial and appellate units,

22   or were there other units?

23        A.   There is a trial unit, appellate unit, and

24   admin.

25        Q.   Admin.  And admin was what it sounds like?

1      A.   IT, yeah, IT, administrative officer.

2      Q.   Got it.  And did you say Bill Moorman was

3  head of that admin unit?

4      A.   Bill Moorman was, I would say, I would say

5  probably head; you could probably say head.  Yes,

6  ma'am.

7      Q.   Okay.  So did JP oversee the trial unit?

8      A.   He oversees the whole office, as I

9  indicated.

10     Q.   Oh.  So does he oversee all of the units

11  then?

12     A.   Yes.

13     Q.   He oversaw all of the units?

14     A.   Right.

15     Q.   Appellate as well?

16     A.   Yes, ma'am.

17     Q.   So -- and what specific duties did

18  overseeing the trial unit entail?

19     A.   General supervision.  It could be referring

20  a person to me for discipline action or it could be a

21  multitude of general supervisory things.

22     Q.   So referring someone to you for

23  disciplinary action?

24     A.   Yeah.  If he observes or hears of something

25  that requires my looking into it, then I would look

1  into it.

2        Q.   Right.

3        A.   Just general supervisory.

4        Q.   Right.  And when you say discipline action,

5  what do you mean by that?

6        A.   Any employee discipline actions.  He's a

7  supervisor, so he supervises also.

8        Q.   Right.

9        A.   Yeah.  If someone is lacking for whatever

10  reason, if someone -- just general supervisory.

11        Q.   Okay.  So is it fair to say JP, as first

12  assistant, supervised all employees at the FDO except

13  for you?

14        A.   Yes, ma'am.

15        Q.   And was he the only one who supervised all

16  of those employees?

17        A.   Other than me.

18        Q.   Other than you?

19        A.   Yes, ma'am.

20        Q.   So it's you supervise everyone.

21        A.   Yes, ma'am.

22        Q.   And then he supervises everyone else, not

23  you?

24        A.   Correct.

25        Q.   Okay.  Got it.  And so trial, appellate,

1    and administrative?

2         A.   Yes, ma'am.

3         Q.   So how often would you and JP communicate

4    while you were at -- while you were the federal

5    defender?

6         A.   Often.

7         Q.   Like daily?

8         A.   Daily for sure.

9         Q.   Several times a day?

10        A.   Several times a day, for sure.

11        Q.   And was it in person?

12        A.   Yes.

13        Q.   Also by e-mail?

14        A.   Yes, ma'am.

15        Q.   Texting?

16        A.   Yes, ma'am.

17        Q.   And did you consider him a friend?

18        A.   I don't use -- I don't use -- I don't use

19   that word in relation to my employees, necessarily.

20   We had a friendly relationship, but I have friends

21   and then I have my employees, so --

22        Q.   Yeah.  Did you socialize with him outside

23   of work?

24        A.   Occasionally.

25        Q.   In what?

1    A.   Very seldom.  Usually -- like usually

2    celebratory, where, you know, as defenders, we're

3    always losing cases; so whenever we get a suppression

4    motion and the judge grants a suppression motion, the

5    evidence gets suppressed, let's have a few beers and

6    let's celebrate type of scenario, but never other

7    than that, really.  It was always celebratory with

8    other people, but him and I would not socialize other

9    than in that scenario.

10    Q.   Did you have confidence in JP Davis as your

11    first assistant?

12    A.   Yes.

13    Q.   Did you trust his judgment?

14    A.   Yes.

15    Q.   Did you ever have reason to doubt that he

16    behaved appropriately at work?

17    A.   To doubt that he behaved -- I never

18    doubted.

19    Q.   You never doubted that he behaved

20    appropriately at work.  Okay.  And to your knowledge

21    has he ever been the subject of complaints about his

22    conduct prior to Ms. Strickland's allegations?

23    A.   No complaints.  I mean, I'm just thinking

24    about some people maybe didn't like his style

25    sometimes, generally speaking, but nothing where it

1  was inappropriate.  Nothing where I had -- I had full

2  confidence in him.

3       Q.   You had full confidence in him.

4       A.   Yes, ma'am.

5       Q.   But he had not been the subject of

6  complaints?

7       A.   Formal complaints, no.

8       Q.   Informal complaints?

9       A.   No.

10      Q.   Okay.  What about after Ms. Strickland's

11 complaint against him, or allegation against him?

12      A.   No recollection.

13      Q.   No recollection.

14      A.   No.

15      Q.   So you don't know of other complaints

16 against JP Davis other than the one made by

17 Ms. Strickland?

18      A.   Correct.

19      Q.   Okay.  Had you -- so you had no concerns

20 about Mr. Davis' behavior toward coworkers before

21 Ms. Strickland's complaint?

22      A.   Correct.

23      Q.   Have you been in touch with JP Davis since

24 you left the FDO?

25      A.   I spoke to him soon after my retirement

1    once or twice.  I attended a wedding.  One of my

2    coworkers, former coworkers, got married in several

3    weeks, and we attended a wedding in North Carolina,

4    and that was it.  I haven't talked to him about it in

5    over a year.

6         Q.   Did you ever communicate with JP Davis

7    about this case?

8         A.   Before I left, we were talking about the

9    case, but since I left we haven't talked about the

10   case.

11        Q.   Before you left as the defender, you talked

12   about this litigation?

13        A.   Yes, ma'am.  Yes, ma'am.

14        Q.   Would you say you talked about it a handful

15   of times?

16        A.   I can't say how many times.  I can't

17   because his office was next to mine.

18        Q.   I see.

19        A.   We talked about a lot of things.  We talked

20   about cases, management, training.  There was so many

21   things we talked about, for me to put a number on how

22   many times we talked about it, I cannot.

23        Q.   And have you communicated with JP about

24   this deposition?

25        A.   No.

1       Q.   Was JP, Caryn's mentor?

2       A.   Yes.

3       Q.   Did you assign JP as Caryn's mentor?

4       A.   My recollection is when I came in, one of

5    the concerns I did have was that Caryn did not have

6    experience.  I mean, she had no idea, you know,

7    starting from A, she had no idea about what we did as

8    a defender office.  So I was concerned about that,

9    and I knew she needed somebody to at least show her

10   the ropes.

11          Basically, you know, review how motions are

12   drafted, you know, talk about the judges, procedures,

13   how we handle cases, what is the office about.  Just

14   someone, and I thought JP was the perfect person,

15   because first, I'm always talking to him, his office

16   was next to me.  We were always communicating, and I

17   could keep tabs on her and make sure she was okay and

18   growing through him, vicariously through him, without

19   having to directly do that, because that takes a lot

20   of time.

21      Q.   So whose idea was it to have Caryn assigned

22   to JP?

23      A.   My recollection is it was my idea for the

24   reasons I just articulated.

25      Q.   It was your idea.  And were other people

1    assigned mentors during your time as a defender?

2         A.    No.

3         Q.    Why is that?

4         A.    No one else in the office lacked the

5    experience that Caryn lacked.  Everyone else in the

6    office had at least several years of litigation;

7    trial work; defender work from, you know, a few years

8    up until 25.  Some people had 25 years of experience.

9    She was the one with the least amount when I came

10   into the office, so out of that concern to make sure

11   that she had someone that she could go to, to show

12   her the ropes, I assigned her to JP.

13        Q.    So she was the only one that you assigned a

14   mentor.  She was the only person in the office --

15        A.    Yes, ma'am.

16        Q.    -- that you assigned?

17        A.    Yes, ma'am.

18        Q.    Okay.  And other research and writing

19   specialists did not have a mentor?

20        A.    No.

21        Q.    So regarding JP Davis' level of experience

22   before you selected him as your first assistant, did

23   you know whether JP had ever first chaired a jury

24   trial?

25        A.    I don't think he had first chaired.  I

1    don't believe by around that time.  I don't recall,

2    but I don't believe he had.

3         Q.   So JP was Caryn's supervisor?

4         A.   Yes.

5         Q.   What was your impression of Caryn's work in

6    the first six months of her employment at the FDO?

7         A.   She did excellent work.  We had high hopes

8    for her.  She was talented, she was energetic, and

9    she was working on this very complicated -- I'm going

10   to refer to it, for client confidentiality, I'm going

11   to refer to it as the life sentence trial.

12        Q.   Yes.

13        A.   There was a trial she was working on where

14   the client was facing life without parole, and she

15   did a bang-up job on that case.  She did a good job,

16   so my impression was she was doing good work, a good

17   job, and hard working.

18        Q.   In prior depositions, I believe that we

19   refer to one case as the Dixon case, and I wonder if

20   that's the case you're referring to.

21        A.   Yeah.  I just didn't want to use the

22   client's name.

23        Q.   I understand.

24        A.   Yes, ma'am.

25        Q.   So that's what you were just referring to

1   right now --

2       A.   Yes, ma'am.

3       Q.   -- was the Dixon case?

4       A.   Yes, ma'am.

5       Q.   So do you recall meeting with Caryn in

6   December of 2017 to touch base about the timeline for

7   her transition to an AFPD position?

8       A.   I don't recall the date.  I did recall

9   meeting with her, I think, at least two times.

10      Q.   Right.  At least two times in December --

11  well, at least two times you remember?

12      A.   Correct, correct.  Yes, I do recall.

13      Q.   So what do you recall about those meetings?

14      A.   I guess she was just checking in about, you

15  know, how she was doing.  I was observing Caryn, not

16  knowing which avenue she was going to take, whether

17  she was going to go the trial route or the appellate

18  route, and I kept talking to her about that.  And she

19  didn't know, because she was kind of dabbling in

20  both, trying to see which avenue she was going to

21  take.

22          Because in our world, I mean, generally

23  speaking, you can divide the attorneys that way.  You

24  know, there's few that really like both.  You either

25  like trial work and you can't stand the appellate

1    work, or you like appeals and writing and you don't

2    like trials.  That's generally how it works.

3         So I was trying to see where she was at,

4    and I would ask her, I would say, "I'm trying to find

5    out where you're at."  And she never quite knew

6    because she was still trying to figure -- I mean,

7    we're talking about six months into it, she was still

8    trying to figure herself out.  So that, in essence,

9    was what those meetings were about.

10        Q.   So is it fair that you were providing her

11   mentoring on that question?

12        MS. WESTMORELAND:  Objection to form.

13   BY MS. GERSEN:

14        Q.   You were providing her mentoring on those

15   topics that you described?

16        A.   On what decision, what route she was going

17   to take.

18        Q.   Right.  Do you recall that the e-mail that

19   she sent you in December -- and it's fine if you

20   can't -- described that she wanted to discuss what the

21   transition to an AFPD would look like?

22        A.   I saw that e-mail, so I understand what

23   you're talking about.  I don't -- again, it would

24   fall into how I described the meetings that I would

25   sit down with her and try to find out which avenue

1    she was going.

2         Q.   So did you think that Caryn was on track at

3    that time to become an AFPD?

4         A.   Yeah.

5         Q.   You did?

6         A.   Yeah.

7         Q.   Did you have any view as to the time frame?

8         A.   No, that's the -- that's the issue, time

9    frame.

10        Q.   What do you mean by that's the issue?

11        A.   Well, because I can't -- as the defender, I

12   get so many -- prior to reclassifying Caryn a

13   defender, I was limited to the number of AFPDs I

14   would get.  To add another AFPD, I would have to seek

15   circuit approval and DSO approval.  And the circuits,

16   all circuits and DSO were not approving those unless

17   you had significant increase in workload.

18             So I couldn't tell somebody who's an R&W,

19   "Oh, yeah, you can be an AFPD in three months."  I

20   don't have the FTE for that, the approval, so I

21   couldn't promise that.  I couldn't put a time frame

22   on that.  Now, was she on that path, yeah.

23        Q.   So if the FTE availability had not been a

24   concern, would you have been able to tell her roughly

25   when you expected her to transition to AFPD?

1          A.   Yes, ma'am.

2               MS. GERSEN:  Okay.  I think we can take a

3          break.  Thank you so much.

4               THE WITNESS:  Yes, yes, yes.

5               MS. GERSEN:  Can we do another five

6          minutes?

7               THE VIDEOGRAPHER:  We're off the record at

8          11:45.

9               (Recess from 11:45 a.m. to 11:54 a.m.)

10              THE VIDEOGRAPHER:  We're back on the

11         record.

12    BY MS. GERSEN:

13         Q.   Do you recall when you first became aware

14    that Caryn was --

15              THE VIDEOGRAPHER:  Sorry.  I apologize.  I

16         think your microphone.

17    BY MS. GERSEN:

18         Q.   Do you recall when you first became aware

19    that Caryn was uncomfortable with JP's conduct toward

20    her?

21         A.   Yes.

22         Q.   And when was that?

23         A.   There was a meeting -- there was a meeting

24    on July 2nd that she came to my office.

25         Q.   Anything before then?

1        A.   I don't recall.  There might have been

2   something before then.  You would have to give me

3   something to refresh my recollection of the date.

4              MS. GERSEN:  Can I have Tab 6, please.

5   BY MS. GERSEN:

6        Q.   Just a brief refresh.

7        A.   Yes.

8              MR. SPAINHOUR:  Is that 58 or 59?

9              (Exhibit 59 was marked for the record.)

10  BY MS. GERSEN:

11       Q.   I'm handing you Exhibit 59, and do you

12  recognize this e-mail?  Have you seen it -- do you

13  recognize this e-mail from JP to Caryn?

14       A.   Yes.

15       Q.   And so you recall reading this e-mail

16  before?

17       A.   Yes.  Before today, yes.

18       Q.   Before today.  In what context were you

19  previously shown this e-mail?

20             MS. SPAINHOUR:  Objection to form.

21       A.   After -- I received a copy of this after my

22  contacting the Fourth Circuit Court of Appeals and

23  advising them that there was an allegation by Caryn,

24  Ms. Strickland, about my first assistant's

25  misconduct.  It was after that.  Before that, I had

1    never seen this e-mail.

2        Q.   When you read this e-mail, do you recall

3    what you thought of it?

4        A.   Yes.  Yes, I do.

5        Q.   What do you think of this e-mail?

6        A.   Well, again, I'm going to read it.  "Dude,

7    you're shooting high with a G15, not least of all

8    since you'll need five more years of federal service

9    to qualify for it.  But fret not, I have a

10   plan...just remember I deal in pay-for-stay."

11           I interpreted that as him saying that

12   somehow he's going to have some say, utilize his say

13   or influence to make sure she gets more pay so she

14   could stay.

15       Q.   More pay so she could stay where?

16       A.   In the office.

17       Q.   Which office?

18       A.   The defender office.

19       Q.   Why -- what did you understand about the

20   context for his saying "pay-for-stay"?

21       A.   On this day, I was notified by Mr. Davis

22   that Caryn had indicated that she could not continue

23   commuting to Asheville.  She was about to be married

24   or she was married, I don't have the dates right.

25   Her husband was living in the Asheville area and she

1   was going to demand that she get a promotion.  She

2   was going to wave that original offer letter to me.

3   She was going to get a trial, have a trial to show

4   that she was, basically, indispensable, so that she

5   could get a promotion and she could get a change of

6   duties switched to Asheville.

7           So the thing is, I'm going to demand this

8   or I'm going to quit.  So the context I took this was

9   JP was saying, Don't worry, I'll deal in pay-for-stay

10  so you can stay and not quit.

11      Q.   Are you reporting to me now what JP told

12  you about this e-mail?

13      A.   You asked me in what context?

14      Q.   Yes.

15      A.   I -- JP did not reveal this e-mail.  I'm

16  saying JP had reported to me a comment that Caryn had

17  made to him, that she was going to demand that she be

18  promoted, she have a change of duty exchange, she was

19  going to wave that offer letter to me, and, if not,

20  she was going to quit.

21      Q.   So all of that is what JP told you about

22  that, what happened on that day?

23      A.   Correct.  He advised me of that, about what

24  happened on May 18th.

25      Q.   And did he advise you of that on May 18th?

1        A.    No, sometime later.

2        Q.    Approximately how much time?

3        A.    I can't recall.  I can only recall in

4    context.  I can't recall the dates, to be honest.

5        Q.    So do you think it was short -- sorry.

6        A.    Shortly after, but I can't recall the time.

7    I'm sorry.

8        Q.    But shortly after May 18th, you think?

9        A.    Yes, it could have been several weeks.

10   There's so many things happening around that time.

11       Q.    Right.

12       A.    But he made me aware that that's the

13   conversation he had with her.  So when I see this

14   after the EDR process started, I interpreted this

15   e-mail as referring to that conversation, and the

16   dates coincide.

17       Q.    Right.  So when you saw this e-mail

18   later --

19       A.    Yes, ma'am, yes, ma'am.

20       Q.    -- after JP had told you previously about

21   the conversation, that was --

22       A.    Yes, ma'am.

23       Q.    -- that provided the context?

24       A.    Yes, ma'am.

25       Q.    Did you think it confirmed JP's account?

1          A.    Yes, ma'am.

2          Q.    Okay.  So you believed JP's account about

3     the conversation he had with Caryn?

4          A.    I always believed it.

5          Q.    Okay.  Great.  And what did you think that

6     "mas dinero" meant in this?  In the heading of the

7     e-mail was "mas dinero."  What do you think he meant?

8          A.    I speak Spanish, so it means more money.

9          Q.    More money.  It was referring to salary

10    then?

11         A.    I have no idea what he's referring to.

12         Q.    You don't know, okay.  And "pay-for-stay,"

13    what did you think that that meant when you read this

14    e-mail?

15         A.    Well, that's what I was trying to tell you.

16         Q.    Yeah.

17         A.    So taking into context, he had told me

18    already about a conversation he had with Caryn on

19    May 18th whereby she said, "I'm going to demand that I

20    get a promotion and/or I get a change of duty station.

21    I'm going to take the offer letter, because they told

22    me," according to her, "that I would become an

23    assistant federal public defender.  If I don't get a

24    promotion, I am going to quit."

25              So when I see this months, months, later, I

1    Caryn was alleging that she interpreted this as a

2    sexual quid pro quo, okay, had I -- so I had that in

3    my mind.  But when I look at it for myself, knowing

4    the context that this was made, from JP's perspective

5    I understand what he intended, because he had already

6    told me that she was demanding, making these demands,

7    or she would quit.

8        Q.   And it was from JP's perspective that you

9    were reading the e-mail?

10        A.   Yes, ma'am.  Yes.

11        Q.   Did you think to look at it from Caryn's

12    perspective?

13        A.   Yes, ma'am.  And I looked at it in terms of

14    maybe the appropriateness of it.

15        Q.   Okay.

16        A.   And maybe it could have been said in a

17    different way.  Yes, no doubt.  But no way am I

18    interpreting that, this e-mail, as a quid pro quo for

19    sex, knowing what I know, and knowing what she said

20    to him around this time.

21        Q.   Right.  And knowing what you know, just to

22    clarify, do you mean you know what you know because

23    JP told you?

24        A.   Correct.

25        Q.   And when you said the appropriateness -- you

1   used the word "appropriateness," and I just wanted to

2   ask you what you meant.  Did you think it was

3   expressed inappropriately?

4        A.   He might have been able to use different

5   words.  When I say, you know, "inappropriate," he

6   might have used, he might have been able to use

7   another word than "pay-for-stay."  That's the only

8   reason why I say appropriateness.

9             But I don't see, taking this on its face, I

10   don't see a quid pro quo.  I don't see it, a sexual

11   force.

12        Q.   I understand.  What do you mean by he could

13   have used, he might have used other words than

14   "pay-for-stay"?

15        A.   I have no idea of what words he could have

16   used.  Don't worry, I will see to it that maybe you

17   can get a higher pay, you won't have to quit.

18             I can't -- I would be speculating, but he

19   might have been able to use different language.

20        Q.   Would he -- might he -- I'm sorry, go

21   ahead.

22        A.   But I don't know what language, I don't

23   know.

24        Q.   Please, I apologize for the interruptions,

25   it's just a sign of my wanting to engage with you.

1     A.    No, you're fine.

2     Q.    So I -- so in terms of the word, the

3  concept of appropriateness, I just wanted to see if

4  you thought you meant that it was inappropriate for

5  him to use the words "pay-for-stay."

6     A.    He could have used better language.

7     Q.    Because using the words "pay-for-stay" --

8     A.    Could be misinterpreted.

9     Q.    Could be misinterpreted?

10     A.    Yes, ma'am.

11     Q.    And what could it be misinterpreted as?

12     A.    Maybe sexual favors, disagreements -- I

13  could see that being misinterpreted, that language.

14  I can see that.

15     Q.    You can see it.  Okay.  So I'm just going

16  to now show you an exhibit.

17          MS. GERSEN:  Tab 7, please.

18     A.    Do you want me to keep this?

19     Q.    Yeah.  You can keep this it in front of

20  you.

21          THE COURT REPORTER:  This will be

22      Exhibit 60.

23          (Exhibit 60 was marked for identification.)

24     Q.    Okay.  I'm handing you Exhibit 60.  These

25  are text messages.  Do you recognize them?

1      Q.    They were justified in being upset?

2      A.    Yes, ma'am.

3      Q.    Because she had directly asked you to

4   second chair the Dixon trial; is that right?

5      A.    And not consulted with them, yes, ma'am.

6      Q.    So was there something wrong with Caryn

7   asking you to second chair a trial?

8      A.    I wouldn't say there is anything wrong, but

9   she should have gone through the channel of

10  communication and talked to the trial team leaders.

11     Q.    So when she asked you to second chair the

12  Dixon trial, you simply assumed she had already done

13  that?

14     A.    Correct.

15     Q.    Was there anything wrong with Caryn asking

16  to get trial experience?

17     A.    No.

18     Q.    Was there anything wrong with her seeking

19  to work with you?

20     A.    No.

21          MS. GERSEN:  Let's do lunch now.

22          (Recess from 12:27 p.m. to 1:24 p.m.)

23          THE VIDEOGRAPHER:  All right.  Stand by,

24       everyone.  We're back on the record.

25          MS. WESTMORELAND:  And as I just mentioned

1          before, in answer to your question, Counsel,

2          Defendants would like to reserve the right to

3          read and sign the deposition transcript.

4  BY MS. GERSEN:

5      Q.  Do you recall the meeting that you had with

6  Caryn Strickland several -- sorry, strike that.

7          Do you recall a meeting you had with

8  Caryn Strickland on June 6th, 2018; do you remember

9  that?

10      A.  I recall a number of meetings.

11      Q.  Uh-huh.  Do you remember a meeting around

12  that time when she told you she was concerned about

13  JP's conduct toward her?

14      A.  There was a meeting that -- could you put

15  it more into context?

16      Q.  Okay.  Why don't I show you something that

17  might refresh your recollection as to the specific

18  meeting.

19          MS. GERSEN:  Can I have Tab 13?

20          THE COURT REPORTER:  This is Plaintiff's

21      61.

22          MS. GERSEN:  Oh, I thought we were --

23          THE COURT REPORTER:  Oh, this one is going

24      to be 58.

25          MS. GERSEN:  Yeah, 58.

1        (Exhibit 58 was marked for identification.)

2   BY MS. GERSEN:

3        Q.   So I'm handing you what we've marked as

4   Exhibit 58.  Do you recognize this document?

5        A.   No.  Can I read it?

6        Q.   Yes, please read it.

7             So this is really just -- sorry, go ahead,

8   finish.

9        A.   Okay.

10       Q.   Okay.  So I really just want to ask you

11  about the first paragraph of the document.

12       A.   Oh, okay.  Okay.

13       Q.   So sorry I didn't make that clearer.

14            So does reading this refresh your

15  recollection at all about a meeting that occurred on

16  June 6th, 2018?

17       A.   This is the first time I've seen this

18  document, so --

19       Q.   Do you -- so you don't recognize this

20  document?

21       A.   No, I never saw this document, and I'm not

22  questioning it.  I'm just saying, I'm trying to

23  recollect, based on this document, some of that

24  meeting, is what I'm trying to say.

25       Q.   So what does the meeting indicate?  I mean,

1    what does the document indicate as to who was there?

2         A.   Well, it indicates that Caryn has stated

3    that she -- that being on this case, I'm assuming it

4    was the life sentence case, the trial, has created

5    tensions with other cases.  And then she advises me

6    about the cancellation of her meeting with JP on the

7    PSI or whatever, and he was very disturbed; so yes.

8         Q.   Are these Holly Dixon's notes from the

9    meeting that you had with Caryn?

10            MS. SPAINHOUR:  Objection.

11            MS. WESTMORELAND:  Objection, lack of

12        foundation.

13        A.   This is the first time I've seen this.

14    Honestly, I didn't even know this document existed.

15    So I'm not questioning whether it's Holly, I just

16    can't vouch for it.  I don't --

17        Q.   So you don't know who took -- who created

18    this document?

19        A.   Correct.

20        Q.   Right.  And this is a document that -- so

21    you've never seen it before?

22        A.   Correct.

23        Q.   Do you recall the meeting that is being

24    referred to in these notes?

25        A.   Yes.  Yes.

1      Q.    Yes.  So what did you understand Caryn to

2   be saying to you in this meeting?

3      A.    What she said.  I mean, it's in black and

4   white, that JP was disturbed about her wanting to go

5   to the discovery review rather than the other case,

6   that she understood -- her understanding was that

7   these interviews, or these meetings, were optional,

8   and that she was surprised by his reaction.

9      Q.    These aren't your notes, are they?

10      A.    No.

11          MS. WESTMORELAND:  Objection to form.

12      A.    No, no.  I've never seen this document

13   before.

14      Q.    So you -- but you don't have any reason to

15   doubt that this is what happened in the meeting?

16      A.    No.  No, I'm not questioning it.  I've

17   never seen this document, or if I did, it was years,

18   right when it was happening.  And this is five years

19   ago, close to five years ago, in 2018.

20      Q.    It says in the notes here, "Tony told Caryn

21   to work these issues out with JP."

22          Does that seem like an accurate

23   description?

24      A.    Yes, ma'am.  Yes, ma'am.

25      Q.    And what did you think you were telling her

1    to work out?

2         A.    I understood them both to have a

3    communication issue, that there was a breakdown of

4    communication, and that JP wanted her to attend the

5    PSI interview.  She wanted to continue with the

6    discovery on the Dixon case, or the trial.  She

7    thought that her going to the PSI was optional, and

8    to me, it was a breakdown in communication.  And

9    that's why I said, "Both of you need to work this

10    out."

11         Q.    So when you say, "to me, it was a breakdown

12    in communication," what do you mean by that?

13         A.    Caryn is under the impression it's

14    optional; JP is under the impression it is not

15    optional.  Obviously, they're not -- I don't know the

16    word -- in agreement, or there is a lack of

17    communication between them; they're not understanding

18    each other.  And so I then just kind of threw it back

19    at Caryn and said, you know, Both of you, please work

20    this out.

21              MS. GERSEN:  Can we go to Tab 12.

22              THE COURT REPORTER:  This will be

23         Plaintiff's 61.

24              (Exhibit 61 was marked for identification.)

25    BY MS. GERSEN:

1    Q.   I'm handing you Exhibit 61.  You may not

2    have seen this before.  I would like you to turn to

3    Bates 6119.

4    A.   I'm sorry?

5    Q.   Actually, why don't you start -- why don't

6    you just read the whole thing, and let me know when

7    you're done.

8    A.   Okay.

9         Okay.

10    Q.   Okay.  So you've testified that you were

11    JP's supervisor; is that right?

12    A.   Correct.

13    Q.   Okay.  What do you understand JP to be

14    telling Caryn about whether the PSI is optional?

15    A.   I'm trying to understand your question.

16    Q.   Well, why don't we start -- why don't we

17    start with -- you read the whole thing.  So why don't

18    we start with the e-mail on the second page, 611 --

19    US6119, could you read in the middle of the page, the

20    e-mail there, from JP to Caryn on March 3rd, 2018?

21    A.   "No worries, though sucks not to have you

22    there.  We'll find another one.  Also, I'm sure you

23    know this, but you don't have to do these shadowing

24    things with me; just let me know if you do something

25    with someone else so I can check it off your list."

1           Is that what you're referring to?

2       Q.    Uh-huh.

3       A.    Okay.  What is your question?

4       Q.    Does it sound to you like he's saying the

5   PSIs are optional?

6       A.    It sounds like he is.  It sounds like -- I

7   mean, the thing speaks for itself.

8       Q.    Okay.  And then, if you look at the e-mail

9   on the first page, the e-mail exchange between Caryn

10  and JP on the first page, what is he saying about

11  whether the PSI is optional?

12      A.    Can I just backtrack?

13      Q.    Of course.

14      A.    I don't know what exactly he's referring

15  to.  I'm not sure I -- the e-mail I just read says,

16  "You don't have to do these shadowing things with

17  me," so I'm not sure about what he's referring to

18  when he says, "You don't have to do these shadowing

19  things with me."

20      Q.    Okay.  Thanks for clarifying.

21           So "these shadowing things."  What are the

22  kinds of things that involve shadowing?

23      A.    I have no idea.

24      Q.    You have no idea what shadowing means?

25      A.    I know what shadowing means, but I don't

1       A.   I don't recall having that conversation

2  with her.

3       Q.   Did you ask Caryn whether JP was sexually

4  harassing her?

5       A.   I asked her that on July 5th.

6       Q.   Okay.  So on July 2nd, did you have concern

7  that JP's behavior might be sexual harassment?

8       A.   I did have concern, because I wasn't

9  understanding -- it was almost cryptic.  She wasn't

10  really explaining everything to me, and so I got a

11  little concerned, which is why I brought them both in

12  on July 5th.

13       Q.   Okay.  Did she ask you for confidentiality?

14       A.   On July 2nd, no.  If you're talking about

15  July 2nd, no.

16       Q.   Okay.  So then July 5th, you mentioned --

17       A.   I'm sorry, she might have said, "I don't

18  want JP to know about this, this is between you and

19  I," when you say confidentiality.

20       Q.   Okay.

21       A.   That was on July 2nd.

22       Q.   On July 2nd?

23       A.   Yes, ma'am.

24       Q.   So you think she said, "I don't want JP to

25  know about this"?

1    A.   Yes, ma'am.  Yes.

2    Q.   Okay.

3    A.   "Because I'm creating some boundaries, and

4    I'm just keeping you in the loop."

5    Q.   Right.  So did you talk to JP about what

6    Caryn told you after July 2nd?

7    A.   No.

8    Q.   Before July 5th?

9    A.   No.  No.  No.

10   Q.   Did you tell anyone else what Caryn told

11   you?

12   A.   No.

13   Q.   So three days later, on July 5th --

14   A.   Correct.

15   Q.   -- you asked Caryn to meet with you about

16   the matter?

17   A.   Not her.  They were both in the office, I

18   was trying to find a good time to bring them both in

19   to settle this, what I considered -- the primary

20   thing I thought all along was a breakdown in

21   communication.  Because underlying this whole thing

22   was JP getting upset and getting angry about Caryn

23   not attending the Watt PSI, and her thinking that it

24   was a shadowing activity and her wanting to do the

25   discovery work on the Dixon trial.  So that was the

1    underlying thing.

2           So I thought this is a breakdown in

3    communication again, and so I brought them both

4    together so we can come together and see, okay, let

5    me try to fix this.

6        Q.   Before that July 5th meeting where you

7    brought them together, did you tell --

8        A.   No, I brought them on July 5th.

9        Q.   Yes.  The July 5th meeting.

10       A.   Yes.

11       Q.   You said you brought them together on

12   July 5th.

13       A.   Yes, ma'am.

14       Q.   Did you tell JP the reason for bringing

15   them together for the meeting?

16       A.   Yes.

17       Q.   What did you tell him?

18       A.   I think it was real quick, I caught them,

19   honestly, off guard.  I didn't want them to be

20   prepared, because they were both appearing to me to

21   be very defensive with one another.  So I said, "I

22   really want to fix this breakdown in communication.

23   Wait here.  I'm going to go get Caryn.  I know she's

24   here, and we're going to have a meeting right now in

25   my office."

1      Q.   Before July 5th, did you think there was a

2   possibility that Caryn was talking about sexual

3   harassment?

4      A.   It raised my concerns, it did raise my

5   concerns.

6      Q.   Okay.

7           MS. GERSEN:  So let's do Tab 18 now.  This

8        is Tab 18.

9           (Exhibit 62 was marked for identification.)

10  BY MS. GERSEN:

11     Q.   All right.  I'm handing you Exhibit 62.

12          Do you recognize this document?

13     A.   Yes.

14     Q.   What is it?

15     A.   It is my Significant Event Log.

16     Q.   Does it look like an accurate copy?

17     A.   Yes.

18     Q.   Okay.  And can you tell me what your

19  Significant Event Log is?

20     A.   What this is?

21     Q.   Yeah.  What is your Significant Event Log?

22  You said, "It's my Significant Event Log."  What does

23  that mean?

24     A.   If there is a meeting or something that

25  popped up, I usually make notes of the meeting and I

1    put it in a Significant Event Log.  I have a

2    Significant Event file --

3       Q.   Uh-huh.

4       A.   -- or folder, I should say.

5       Q.   Right.  So only for events that you

6    consider significant?

7       A.   Correct.

8       Q.   Right.  Not every event, not every meeting.

9       A.   Correct.

10       Q.   So what do these notes -- do you want to

11    take a second to read the notes?

12       A.   I'm pretty familiar with these notes.

13       Q.   What do these notes indicate to you about

14    why you wanted to have this meeting?

15       A.   Yeah.  So I mean, I can read it, "On this

16    date I met with Caryn and JP."  That was on July 5th,

17    I pulled them both together because I wanted to

18    resolve a breakdown in communication.  "I also wanted

19    to clarify with Caryn any issue about harassment by

20    JP."  Again, it wasn't clear to me on July 2nd, and I

21    did have a concern, so I wanted to clarify it.

22       "A few days ago, Caryn walked into my

23    office," meaning on July 2nd, "and told me she wanted

24    to know if she had my support," and "I asked her what

25    kind of support she wanted and she said that she just

1    wanted to give me a heads up and keep me in the

2    loop."

3            And that's referring to July 2nd.

4        Q.    In the fourth paragraph, can you read aloud

5    the fourth paragraph of the document?

6        A.    What paragraph do you want me to read?

7        Q.    Actually, why don't you do the third and

8    fourth paragraph, if that's okay, for the record.

9        A.    Yeah.  "I then specifically asked her about

10   any possible harassment by JP.  She advised me on

11   several occasions he made her feel uncomfortable by

12   wanting to meet after work hours.  On one specific

13   situation she said they both had stayed late working

14   on the case.  When the meeting was over, JP asked her

15   if she needed a ride.  Caryn advised him that she had

16   had her bike and she did not need a ride.  She went

17   and got her bike and on her way out to the first

18   floor, JP was waiting for her in the lobby and asked

19   her if she needed a ride.  Caryn said no and left."

20   She indicated she -- that's my language, "creeped

21   out."

22       Q.    Okay.

23       A.    I don't know if she used that specific

24   language, but she just felt creeped out by him being

25   in the lobby after she said no to his request.

1          Q.   Do you want to read the next paragraph?

2          A.   Right.  Then, "I specifically asked Caryn

3     if there was any inappropriate touching or attempting

4     to touch her.  She said no.  I told her that I wanted

5     to make sure she worked in a environment where she

6     felt comfortable.  She advised me she did not want to

7     submit a complaint against JP."

8          Q.   Does that accord with your recollection of

9     the event?

10         A.   Yes, ma'am.  Yes, ma'am.

11         Q.   Why did you ask about touching,

12    inappropriate touching or attempted touching?

13         A.   I understand that there is a physical

14    aspect to sexual harassment.  In this particular

15    scenario, when she's talking about she came down the

16    elevator and came to the lobby, I was really asking

17    about did JP do anything else than just stand there,

18    and, in essence, that's what I was saying.  When I

19    say, "touching or something physical," she said, "No,

20    he went his way and she went that way."  That's what

21    I was -- that's why I asked that question.

22         Q.   Did you think that if she was touched, then

23    she would have experienced sexual harassment?

24         A.   Oh, obviously, if she was.  More, if he was

25    trying to do something, then, yes.

1          Q.   And did you think that if she wasn't

2     touched, then it wasn't sexual harassment?

3          A.   Well, I would have to find out more

4     information about whether it was.

5          Q.   "Find out more information about whether it

6     was," what?

7          A.   Sexual harassment.

8          Q.   And so what was the concern about touching

9     in relation to?

10         A.   Well, when I found out the facts of this

11    sometime later; this is the first time I hear of

12    this, I find out from JP, he showed me the text,

13    where he asked her, Hey, it's raining -- and I

14    remember that night because I was in the office that

15    night -- it was raining and he asked her, "Do you

16    need a ride?"

17              She said, "No."

18              He was about to leave and there was a text

19    that he sent saying, "Hey, this is your last attempt,

20    do you" -- "this is your last opportunity, do you

21    want to"?

22              And she didn't respond to that.  So he was

23    waiting for her and she hadn't read the text, and

24    that explained to me the rationale behind him waiting

25    in the lobby, and it wasn't an attempt to do anything

1    forward or aggressive or anything like that.

2            His intent was actually, it says in the

3    text, "This is your last chance."

4            She never responded and he's waiting.  And

5    when she said, "No," she agreed, they both departed.

6    So --

7        Q.   You said JP showed you the text?

8        A.   Yes, ma'am.

9        Q.   When did he show that to you?

10       A.   After this, and I don't recall the timing,

11   to be honest, but once I got notice of this, it

12   wasn't, I didn't reveal this to him.  I kept it

13   confidence.  As you see, I never mentioned it.  He

14   comes back in the meeting, I never mentioned what she

15   said, but I found out about -- I asked him about the

16   texts.

17       Q.   Okay.  So in the last, in what you just

18   read aloud, it indicates that you told her, told

19   Caryn, "I wanted to make sure she was able to work in

20   an environment where she felt comfortable."

21           Did you do anything to make sure she felt

22   comfortable?

23       A.   Yeah.  So then I proposed that JP no longer

24   be the mentor.  I knew that Caryn had a good

25   relationship with another senior attorney,

1   Kelly Johnson, in the office.  I asked whether they

2   were both in agreement, I asked Caryn, "Would you

3   agree this is a good time to change mentors?"

4            She said yes.

5            "JP, are you in agreement?"  He was in

6   agreement.

7            Caryn thought it was a great idea to have

8   Kelly be the mentor, because she was already

9   having -- developing a good relationship with him in

10  mentoring, and so we agreed on that.

11       Q.   Did you understand at this meeting that

12  Caryn said she was being sexually harassed?

13       A.   No.  No.

14       Q.   You said that you were concerned before the

15  meeting, it raised a concern about sexual

16  harassment?

17       A.   Sure.  Sure.  It was very coy, the way she

18  was talking about it, and I wasn't understanding.

19       Q.   So at this meeting, did you feel that you

20  had a conclusion about whether she was alleging

21  sexual harassment?

22       A.   I'm not quite understanding the way the

23  question is being phrased.

24       Q.   So at this meeting, did you think that she

25  was alleging sexual harassment?

1        A.  I was concerned.  Honestly, I didn't know

2    what she was alleging, obviously, and that's why I

3    made the note.  I wanted to check it out.

4            And then I asked her, "Are you alleging?"

5            She didn't want to file -- she said, "I

6    don't want to file a complaint."  So it was very coy

7    in her language and, obviously, I was concerned, and

8    so I separated them.  I was trying to take action and

9    separate them.

10      Q.  What do you mean by coy?

11      A.  She wasn't being straightforward with me.

12    I felt she wasn't -- I felt there might be some more

13    information or something.  I just, you know, I just

14    didn't feel that I was getting all the information

15    from her.

16      Q.  But from what you heard at the meeting, you

17    felt that you should do something; is that right?

18      A.  Correct.  I mean, there are two things.  I

19    mean, there are two things.  This is all I know.  I

20    know she was -- JP was upset she didn't attend the

21    PSI, she said, you know, she was uncomfortable

22    because of the way he was angry, he was pale or

23    whatever.  You know, he was angry.  So that was an

24    issue.

25            And then, you know, the bike situation.

1     But in my eyes, I didn't see anything that had

2     occurred, based on the facts that were before me,

3     that rose to the level of sexual harassment.

4          Q.   You thought it didn't rise to the level of

5     sexual harassment, but you still felt something

6     needed to be done?

7          A.   Correct.  To make her feel comfortable,

8     because she was uncomfortable.  It was obvious to me

9     she was uncomfortable with JP.  So I said I've got to

10    sever this relationship and have her go with another

11    mentor.

12         Q.   Did you do -- apart from the things that

13    you already told me, did you do anything else to make

14    sure Caryn would feel comfortable?

15         A.   No, I'm trying to think about this time.

16    That was the immediate reaction, or action that I

17    took.  I cannot, at this time, recall.

18         Q.   Right.  And the immediate action that you

19    took, just to make sure I understand, was reassigning

20    her mentor?

21         A.   Correct.

22              MS. GERSEN:  Can we do Tab 19?

23              (Exhibit 63 was marked for the record.)

24         Q.   This is Exhibit 63.  Please take a moment

25    to read it.

1    about his conduct.

2         Q.   Okay.  So on this day, did you tell --

3    sorry, on July 5th, at the meeting, did you tell

4    Caryn that she wouldn't have to work under JP's

5    supervision?

6         A.   No.

7         Q.   What did you tell her about who would

8    supervise her going forward?

9         A.   JP was a supervisor at this time and he was

10   going to continue being a supervisor.

11             MS. GERSEN:  So can we look at Tab 21.

12             (Exhibit 64 was marked for identification.)

13   BY MS. GERSEN:

14        Q.   I'm handing you Exhibit 64.

15        A.   Can I read this?

16        Q.   Yes, please.

17        A.   Okay.  Got it.

18        Q.   This is an e-mail from July 20th --

19        A.   Correct.

20        Q.   -- from you to your entire staff; is that

21   right?

22        A.   Yes, ma'am.

23        Q.   And I want to focus just on the part where

24   you say Caryn will be assigned to Peter and JP's

25   teams?

1     A.   Yes, ma'am.

2     Q.   Can you explain what you meant there?

3     A.   Yes.  What I meant was, at that time, that

4    Caryn would be supporting Peter and JP's teams as an

5    R&W, meaning she would be doing that work for those

6    teams, supporting them in terms of drafting motions,

7    doing legal research, and things of that nature.

8     Q.   Okay.  Had you previously told her that she

9    would not have to be assigned to JP's team?

10     A.   I don't recall really saying that.  I

11    honestly don't recall, but the issue on July 5th was

12    mentoring.

13     Q.   So the fact that she was being reassigned a

14    mentor didn't mean that she wouldn't have to work

15    under JP's supervision on his team; is that right?

16     A.   No, my intent was not to have her work on

17    JP's team.  This was a mistake.

18     Q.   Oh, what do you mean?  Can you explain what

19    you mean by mistake?

20     A.   Yes, ma'am.  I mistakenly assigned her to

21    Peter and JP's team and I called her.  This was on

22    a -- I forget the date, it might have been a Thursday

23    or Friday, and when I got back in the office, over

24    the weekend I thought about what I did.  It was a

25    long meeting; we had a long team leaders meeting, and

1    it was hours.  And we were shifting FTE's around to

2    have R&Ws support the trial teams.

3           And I was so focused on the shifting and

4    how to spread the work, I mistakenly assigned Caryn

5    as supporting Peter and JP's team.  I then called

6    Caryn.  I told her, "I am sorry, I apologize.  I

7    should have never done this."

8           She said, "Okay, I understand."

9           And I sent another e-mail correcting that

10    and taking her off working for JP's team.

11        Q.   Why was it a mistake to assign her to JP's

12    team?

13        A.   I didn't want her working and doing work

14    for him.

15        Q.   Why didn't you want her working for him?

16        A.   Because of the situation that just happened

17    on July 5th.  I was trying to separate them.  I mean,

18    this is another thing that I did, besides separate,

19    taking JP off as a mentor, this is another thing to

20    try to help her feel comfortable.

21        Q.   So are you saying that this was a mistaken

22    assignment to JP's team because you had previously

23    told her that you would not assign her to JP's team?

24           MS. WESTMORELAND:  Objection to form.

25        A.   No, I'm not saying that.

1    Q.   Then what are you saying about why it was a

2    mistake?  Is it because you had decided for yourself

3    that you wouldn't assign her to JP's team?

4    A.   Correct.  I wanted to separate both of them

5    as much as I could and still have them both working

6    in the office.  So one thing I did was take him off

7    as mentor, and the other thing I did was I didn't

8    want her doing any work on behalf of JP.

9         So when I did this, it was an accident.

10   Not because I had previously said anything to her.  I

11   just, it was not my intent for her to do work for JP,

12   and as soon as I realized it, I called her.  I

13   apologized, she said, "Okay," and I issued another --

14   there is another e-mail days later where I shift the

15   work around.

16   Q.   Right.  Why did she need an apology?

17   A.   That was at my courtesy.  I felt -- I

18   didn't want her to feel like here I'm taking JP off

19   as a mentor, now I'm putting her back to work with

20   JP.  So as a courtesy, I said, "Caryn, I'm sorry, I

21   didn't mean to put you back to work with JP.  I want

22   to accommodate you, make sure you're comfortable.

23   That was my bad, I apologize."

24   Q.   Did you -- were you concerned that Caryn

25   would feel uncomfortable working on JP's team?

1       A.   Yes, ma'am, yes.  That's why I did it.

2       Q.   And so how did you correct the error after

3  the apology?

4       A.   So what I did was, I had all the R&Ws

5  submit -- I had -- I assigned Jared Martin, who had

6  prior -- a lot of experience in the office.  He had

7  eight years prior experience, he was an R&W then,

8  great writer.  And I had him -- I had the attorneys

9  send the assignments to Jared, their writing

10  assignments; Jared would be the gatekeeper, and then

11  send the work out and avoid having Caryn working

12  directly with JP's team.

13       Q.   So Jared was going to assign Caryn the

14  work?

15       A.   Jared, not only Caryn, all work.  He was

16  going to be the gatekeeper for all work for R&Ws.

17       Q.   For R&Ws.

18       A.   For legal research and writing work.

19       Q.   And how many R&Ws --

20       A.   There were three back then.

21       Q.   Is the three back then meaning including

22  Caryn?

23       A.   Correct.  Around that time.

24       Q.   So Caryn, Jared, and --

25       A.   And it was Caleb.

1    Q.   And Caleb?

2    A.   But then Caleb left and there was a

3    position there that opened up.

4    Q.   And so Jared -- do you mean that Jared

5    would assign the work to Caryn and Caleb?

6    A.   Correct.

7    Q.   Because you've told me all of the R&Ws?

8    A.   Correct, correct.

9    Q.   And who did Jared report to?

10    A.   Josh, the appellate chief.

11    Q.   So Jared did not report to JP?

12    A.   Well, if I can answer to your question

13    before, JP was first assistant; so he supervised

14    everybody, technically.

15    Q.   Okay.  So is it fair to say that Caryn was

16    still working in JP's chain of command?

17    A.   Yes, ma'am, yes, ma'am, but not directly.

18    So Josh was her chief.

19    Q.   And did you think that this restructuring

20    was sufficient to protect Caryn?

21    A.   When you say this restructuring, so this

22    was not a restructuring.  There is another e-mail I

23    sent out days later restructuring this e-mail.

24    Q.   Got it.  That's the -- thank you for

25    clarifying.  That's the one where you take her off of

1          And there was several days there that

2    between James Ishida and I, we were trying to figure

3    out what would happen next.  He then advised me that

4    the next step would be to appoint an investigator; I

5    would need to appoint an investigator.  He had talked

6    to Frank Johns, the clerk of the court in Charlotte,

7    and the clerk of the court recommended Heather Beam,

8    who is the HR specialist in the Western District of

9    North Carolina.

10          I then advised James, he said you should

11   appoint Heather Beam as investigator; I appointed

12   her.  Heather Beam then commented to me, "Oh, great.

13   I have connections and know some people at the FEDS,"

14   we said?

15       Q.   FEPS, I think.

16       A.   FEPS, "And I dealt with them before, I'll

17   just call them to get some direction from them, and

18   I'll go from there, thank you."

19          She hung up.  I want to say maybe within

20   that day, she calls me back and advises me, I was

21   advised by FEPS advisory -- advisor, counsel, I think

22   it was Jamal Scroggins or something.

23       Q.   Oh, it's Amaal.

24       A.   Amaal, sorry.

25       Q.   Amaal Scroggins.

1      A.    Scroggins.  But she spoke to someone from

2    that office, and they instructed her.  I'm pretty

3    sure she said Nancy Dunham advised her, Heather Beam,

4    that there is nothing that they can do about this,

5    nothing Heather can do about this situation.

6    Mr. Martinez needs to resolve this.  Do not contact

7    any lawyers and this is a directive, this is an

8    order.

9              I then -- she then contacted -- you know,

10    this is Heather telling me this.

11              I then said, "What, Heather?  I mean, I'm

12    not understanding."

13              "That's what I was told, Tony, and I can't

14    be involved in investigation of this case.  I'm

15    done."

16              I called James, I said, "James, what's

17    going on here?"  Heather just advised me of what I

18    just told you, I thought this, this complaint is

19    going to the Fourth Circuit, the EDR plan under the

20    on the Fourth Circuit applies here.  How is the AO

21    saying this, or doing -- so it was clear to me that

22    Caryn had already contacted the AO, the FEPS office.

23    That's when I first found out that she had contacted

24    and filed or was communicating.  I didn't know, but

25    they were aware of the situation.

1          Q.   Do you recall meeting with Caryn on

2     August 9th --

3          A.   Yes, ma'am.

4          Q.   -- about her concerns about JP?

5          A.   Yes, ma'am.

6          Q.   So what do you recall about this, what was

7     discussed at this meeting?

8          A.   It was maybe a 40-minute meeting, you know,

9     we talked about a lot; but in summary, I agreed to do

10    several things.  She had certain demands that she

11    wanted taken care of because of the -- of how she

12    felt uncomfortable.  And so she wanted to be an AFPD,

13    which I committed to doing, and I eventually did.

14         She wanted a change in the organizational

15    structure, which I did; so I changed the

16    organizational structure so she would not be under

17    JP but she would be under Josh and Josh would be

18    under me, so I tried to separate her that way.  And

19    she wanted either a change in duty station or --

20    and/or remote working telework.

21         I advised her that in terms of change of

22    duty station, the only other duty station was

23    Asheville, and I had no space, at all, in Asheville.

24    I couldn't accommodate her there.  I said, "Well,

25    I'll see maybe," but there was nothing I could do.

1   And telework, I was reluctant.  Again, this was 2018,

2   this is pre-COVID, and I had a policy of no telework,

3   the AO even had a policy of no telework.  General

4   policy, I don't know if it's -- but they were

5   frowning upon people working remotely because they

6   couldn't supervise them.  That was an issue.

7          And I told her, and again, I'm trying to --

8   I'm walking a thin line here because I'm trying to

9   accommodate her but I don't want to raise any

10  eyebrows in the office, because if I have her

11  telework, then I'm raising eyebrows of, Well,

12  Mr. Martinez, why do you have her telework?  I want

13  to telework, too.

14         And I was trying to explain that to her,

15  you know, "I'm trying to avoid raising eyebrows but

16  I'm trying to meet your demands at the same time and

17  accommodate you, and I can't do telework."  So that,

18  in a nutshell, is August 9th.

19         MS. GERSEN:  Okay.  Can we have -- did we

20     introduce the entire declaration; did we do

21     that?

22         MR. GERSEN:  I don't think we did.

23         MS. GERSEN:  Can we do that now?

24         MR. GERSEN:  I have a copy there.  I think

25     you have one.  That's yours.

1        MS. GERSEN:  Yeah.  Oh, that's not Tab 1.

2        MS. WESTMORELAND:  We can share.  We can

3    share this.

4        MS. GERSEN:  This is the declaration.

5        (Exhibit 65 was marked for identification.)

6    BY MS. GERSEN:

7        Q.   Okay.  I'm handing you Exhibit 65.

8        A.   Okay.

9        Q.   Do you recognize --

10       A.   Yes, ma'am.

11       Q.   -- what that is?  Tell us what it is for

12   the record.

13       A.   It appears to be my declaration.

14       Q.   And it's -- does it appear to be an

15   accurate --

16       A.   Yes.  Yes, ma'am.

17       Q.   So I'm wondering if we could turn to

18   page 11 of your declaration.

19       A.   Uh-huh.

20       Q.   And could you, for the record, read out

21   paragraph 74?

22       A.   "On August 9, 2018, I met with Plaintiff

23   privately because of a phone call I received from the

24   Director of Defender Services, Cait Clarke.

25   Ms. Cait Clarke advised me that Nancy Dunham, the

1    Director of Fair Employment Practices, had reached

2    out to her expressing concerns about interactions

3    with the first assistant and Plaintiff as alleged by

4    Plaintiff.  Ms. Clarke suggested that I should meet

5    with Plaintiff, which I promptly did that day."

6        Q.   Okay.  Does that suggest that you heard

7    from Cait Clarke before the August 9th meeting with

8    the plaintiff?

9        A.   I'm sorry, could you repeat that question

10   again.

11       Q.   Did you hear from Cait Clarke before the

12   August 9th meeting with Caryn?

13       A.   Yes.

14       Q.   The phone call that you received from the

15   Director of Defender Services, Cait Clarke, what do

16   you recall about that phone call?

17       A.   Exactly what I say in this paragraph.  And

18   just to clarify, I don't mention it here, the phone

19   call occurred the day before.

20       Q.   The day before.

21       A.   On August 8th.

22       Q.   On August 8th.

23       A.   Yes, ma'am.  Yes, ma'am.

24       Q.   So Ms. Clark just reached out to you

25   unexpectedly?

1          A.   Yes, ma'am.

2          Q.   And prior to that, you didn't know that

3     Caryn had gone to FEPS with her report?

4          A.   Correct.

5          Q.   So is it fair to say that you became aware

6     for the first time of Caryn's complaint to FEPS on

7     August 8th?

8          A.   Yes, yes.

9          Q.   First time?

10         A.   Yes.

11         Q.   Okay.  And it says here that you -- she

12    suggested you should meet with Plaintiff, and then

13    you did.  That's why you were meeting with her on

14    August 9th?

15         A.   Correct, correct.

16         Q.   So on August 9th, you met with her.  Did

17    you say in this meeting to her that -- did you tell

18    Caryn in this meeting that you were unhappy about her

19    having contacted FEPS?

20         A.   No, I told her -- excuse me.  I thought

21    that she -- I felt that she didn't go to me first, to

22    speak to me, and she kind of went around me and is

23    sharing with the AO, Administrative Office of the

24    Courts, and I just felt like she went, you know,

25    behind my back, sort of.

1          And so I asked her, "Why did you do that?

2     Why didn't you come to me and talk to me?  I would

3     have tried to resolve all these issues before you go

4     into the AO."  That was the extent of my

5     conversation.

6          Q.   Did she tell you in that meeting that she

7     had been trying to resolve the situation informally?

8          A.   She might have, yes, yes, yes.

9          Q.   Did you think she'd done something wrong by

10    reporting the conduct to the AO's FEPS?

11         A.   No, she was doing nothing wrong, and

12    obviously, you know, she has a perfect right to call

13    the AO and ask them questions.  I just thought it was

14    unfair to me that she didn't speak to me first and

15    articulate to me, you know, all of the concerns so

16    that I could try to resolve them.  You know, and I

17    thought they were resolved on July 5th.

18         So I was taken aback, that too.  You know,

19    we had the meeting July 5th.  The way we left the

20    meeting, she was happy.

21         I said, "Are you sure you're okay with

22    this; are you comfortable going forward?"

23         She said, "I'm comfortable going forward."

24         And nothing, it was uneventful, up until I

25    get a call from the AO saying, "Oh, Tony, I was just

1    contacted by Nancy Dunham telling me about this issue

2    between JP and Caryn."

3        Q.   So what else do you recall about that

4    meeting with Caryn on August 9th?

5        A.   You know, there was so much that was said,

6    to be honest, but I just, you know, I want to

7    summarize what the demands were and what I was

8    willing to do, and I do that in this paragraph.

9        Q.   You do that in paragraph 75; is that right?

10       A.   Yes, ma'am.

11       Q.   Okay.  So at this point, when you met with

12   her, was your understanding that she had not filed an

13   EDR report of wrongful conduct?

14       A.   Correct.  Correct, yeah, yeah.

15       Q.   And at that point, you had not filed an EDR

16   report of wrongful conduct?

17       A.   Correct.

18       Q.   Yes.  So between the time that you met with

19   her on July 5th and August 9th, was your

20   understanding that her issues had been resolved?

21       A.   Yes.

22       Q.   Because of the things you'd already done?

23       A.   Yes, ma'am.  And there was no -- again, it

24   was quiet.

25       Q.   So at any point prior to August 9th, did

1   you understand that she believed she was being

2   sexually harassed?

3       A.   No, I had concerns.  Other than that, no,

4   no.

5       Q.   Right, but you had concerns about --

6       A.   Which is why I had the meeting and brought

7   them together.

8       Q.   Uh-huh, right.  But after that you thought

9   it had stopped and was -- you thought it had stopped?

10          MS. SPAINHOUR:  Objection to form.

11          MS. WESTMORELAND:  Objection to form.

12  BY MS. GERSEN:

13      Q.   You thought the conduct had stopped?

14      A.   I thought it was resolved.

15      Q.   Meaning?

16      A.   I thought it was over.  I mean, it was,

17  from that meeting to this call, it was uneventful.  I

18  heard nothing.  She had a new mentor.  You know, I

19  changed the support, the trial support in who she

20  reported to in that nature.  And it was -- there was

21  nothing happening, so I'm assuming we were okay.

22      Q.   So in the meeting, were you telling her

23  that she should not have gone to the AO to report

24  sexual harassment?

25      A.   No, I never saw said that.

1      Q.   Did you feel mad that she reported to the

2   AO?

3      A.   Yeah, I was upset, and I say it, I told her

4   because I thought she was going behind my back and I

5   would have liked for her to come to me first.

6      Q.   And you didn't think that she had come to

7   you first on July 2nd?

8      A.   Correct.  Because we were just talking

9   about, I thought it was a breakdown in communication.

10   I did have concerns, but my concerns were allayed

11   during that meeting, and after that meeting, she felt

12   comfortable going forward.  And it was just a

13   breakdown in communication, and I thought it was

14   resolved.

15      Q.   And at the July 5th meeting, you also

16   believed that the concern was resolved?

17      A.   Correct.

18      Q.   So did you say to her in that meeting, "I

19   feel like I'm being blamed for a situation that as

20   soon as I was put on notice, I'm taking control over

21   it"?

22      A.   At which meeting?  You're talking about

23   August 9th, yes.

24      Q.   Sorry, yes.  August 9th, yes.  What did you

25   mean by that?

1          A.   Well, I felt that -- the tone of the

2     meeting, you know, when you're not there, the tone of

3     the meeting, I felt she was pointing the finger at

4     me; so I started getting defensive.

5               And I said, "Well, I feel like I'm getting

6     blamed for this," and that was my response.  That's

7     what I was saying, that's the only thing I was

8     saying.

9          Q.   Why would she point the finger at you?

10          A.   Well, I don't know.  I felt that, though.

11     I felt she was pointing the finger at me at that

12     moment.

13          Q.   At that moment, she felt that you were --

14     she felt that you were at fault, you thought that she

15     thought you were at fault?

16          A.   Correct.

17          Q.   And did you think she had said that to the

18     AO?

19          A.   No, no, I just sensed by the way she was

20     talking and making demands.  Just the tenor of the

21     conversation.  She had never talked to me like that,

22     she was very forceful, she was making demands, You

23     are going to do this; We are going to do this; and I

24     want this, and I want that.  Just the tone.  It

25     appeared to me almost accusatory towards me.

1              And, you know, I got defensive and said,

2    "Well, I feel like I'm being blamed for this when I'm

3    trying to resolve it.  I'm trying to accommodate it."

4         Q.   Yeah.  And what could she -- what did you

5    understand her to be blaming you for?

6         A.   Everything.  The way the whole thing was

7    handled.  I just felt like she was blaming me for how

8    the whole thing was handled.  How I handled it.

9         Q.   And what do you mean by the whole thing?

10        A.   Well, the July 5th, the July 1st -- the

11   July 2nd meeting, yeah.

12        Q.   The July 2nd meeting?

13        A.   Yeah, yeah.

14        Q.   And so the quote is, "I feel like I am

15   being blamed for a situation that as soon as I'm

16   being put on notice, I'm taking control over it."  So

17   in the August 8th meeting, you indicated that you had

18   previously been put on notice; is that right?

19             MS. SPAINHOUR:  Objection to the form.

20   BY MS. GERSEN:

21        Q.   When you used the words, "I was put on

22   notice," is that fair to say?

23        A.    I was put on notice that she told me that

24   JP got angry at her and that JP was waiting for her

25   in the lobby and she felt uncomfortable, creeped out

1   sexual harassment to you, correct?

2      A.   She reported some conduct to me that, in my

3   opinion, was not sexual harassment based on the facts

4   that she provided to me.

5      Q.   So she provided facts to you that you did

6   not consider sexual harassment; is that right?

7      A.   Correct.

8      Q.   And -- but you still felt that it was

9   obligatory for you to report it to Mr. Ishida?

10     A.   Because she alleges in black and white that

11  she was being sexually harassed.

12     Q.   In what way was Heather Beam your designee

13  in the investigation?

14     A.   I have no -- I really don't know.

15     Q.   Were you confused by what that meant?

16     A.   I was a little confused about some aspects

17  of this, because this was my first time going through

18  and under this EDR plan; so yeah.

19     Q.   Did you think that it was a conflict of

20  interest for you to be appointing the investigator?

21     A.   There might be an allegation.  I didn't

22  think so, because, in essence, I was not selecting

23  the investigator.  The investigator was being

24  selected by the circuit executive, and then, for me,

25  it was just a technicality that I would be appointing

1    her, but I still had a distance from her.

2        Q.   Did you think that Heather was acting as

3    your designee?

4        A.   Pursuant to this e-mail, yes.  You know,

5    what that means, I have no idea.

6        Q.   Was she doing the investigation under your

7    supervision?

8        A.   No.

9        Q.   Was she reporting to you?

10       A.   No.

11           MS. GERSEN:  All right.  Can we have

12           Tab 29, please.

13   BY MS. GERSEN:

14       Q.   Okay.  I'm handing you Exhibit 69, and could

15   you let me know if you recognize that.

16           MS. GERSEN:  I'm sorry, this is Exhibit 3

17           in a previous exhibit.  Can we fix this?

18           (Exhibit 3 was marked for identification.)

19       A.   Okay.

20       Q.   Do you have it?

21       A.   Yes, ma'am.

22       Q.   So this -- have you seen this e-mail

23   before?

24       A.   No, this is the first time I've ever seen

25   this.

1          That, in fact, happened.  That, in fact,

2    Heather Beam told me.

3          Q.   Okay.  So when it says, "Ms. Dunham

4    allegedly instructed one of her staff to tell Tony

5    Martinez," is that literally correct, that one of her

6    staff told you?

7          A.   Not me, I'm telling you it was Heather Beam.

8          Q.   Okay.  So this is not quite correct.  One

9    of her -- get one of her staff -- instructed one of

10   her staff to tell Tony Martinez, that's not literally

11   correct?

12         A.   It was Ms. Dunham -- I don't know, it might

13   have been Ms. Dunham allegedly instructed one of her

14   staff to tell Heather Beam to tell Tony Martinez, but

15   they never called me.  This information came to me

16   through Heather Beam, that Heather Beam was told us.

17         Q.   So you had spoken to Cait Clarke on the

18   8th?

19         A.   The 8th of August.

20         Q.   On the 8th.  But you did not, in fact,

21   speak with one of Nancy Dunham's staff --

22         A.   Correct.

23         Q.   -- on August 15th?

24         A.   Correct.

25         Q.   Okay.  So you -- is James Ishida recounting

1    to the chief judge a conversation he had with you in

2    which you informed him of these events?

3         A.   Correct.  From Heather Beam, yeah.

4         Q.   Got it.  So Heather Beam told you, and then

5    you told Mr. Ishida?

6         A.   Correct.  Because, like I indicated before,

7    I called James Ishida and said, "What's going on

8    here?  I filed an EDR under the EDR for the Fourth

9    Circuit Court of Appeals under the circuit.  Now the

10   AO is ordering me that I have to do all these demands

11   before Caryn goes to the press."

12        Q.   Right.  So what day did you file the EDR?

13        A.   If you look at the e-mail, I think it's

14   right here.

15        Q.   Okay.

16        A.   There it is.  Yeah, it's the back of the

17   next page.  "Thank you very much for forwarding the

18   below e-mail from Caryn Devins."

19        Q.   Yes.

20        A.   And what's the date on that?  I'm sorry.

21   The 14th, so it was the 14th.  All that happened

22   really close to one another.

23        Q.   Right.  So on -- does it look to you like

24   on August 14th, at 10:56 a.m., you wrote, "James,

25   here it is.  Thanks"?

1          A.    Yes, ma'am.

2          Q.    And did you mean by "here it is,"

3    Caryn Strickland's report of sexual harassment?

4          A.    Yes, ma'am, the e-mail.

5          Q.    The e-mail.

6          A.    I literally forwarded the e-mail, the

7    entire e-mail.

8          Q.    So then, later that day, after James got

9    that e-mail, he wrote back to you thanking you; is

10   that right?

11         A.    Yes.  Yes, ma'am.

12         Q.    And then the next day, August 15th, is when

13   he's writing to the chief judge about a conversation

14   that you and he had; is that right?

15         A.    Correct.  As a result of Heather Beam.

16   After Heather Beam was appointed, yes.

17         Q.    Do you remember when you spoke with

18   Heather Beam about the events that are referenced

19   here?

20         A.    It had to be either late August 14th or

21   during the day August 15th.

22         Q.    Okay.  It had to be one of those two?

23         A.    One of those two.

24         Q.    One of those two.  Because is it fair to

25   say that the EDR process had not started before

1     August 14th?

2          A.   Before, correct, it started when I

3     forwarded the e-mail.

4          Q.   Right.  Which would have been 10:56 a.m. on

5     August 14th?

6          A.   Yes, ma'am.

7          Q.   So somewhere in that day and a half, are

8     you recalling that you must have had the

9     conversation?

10         A.   Yes, ma'am.  Yes, ma'am.

11         Q.   And then you called Mr. Ishida; is that

12    right?

13         A.   Yes, ma'am.

14         Q.   Okay.

15              MS. WESTMORELAND:  Should we take a quick

16         break?

17              THE VIDEOGRAPHER:  We're off the video

18         record.

19              (Recess from 3:45 p.m. to 3:53 p.m.)

20              THE VIDEOGRAPHER:  We're back on the

21         record.

22    BY MS. GERSEN:

23         Q.   So continuing with just a few more

24    questions about this e-mail, this Exhibit 3.  I

25    wanted to -- so when he says, when James Ishida says,

1    "I wanted to alert you to a disturbing incident," did

2    you agree with -- I know you didn't see this e-mail

3    before, but when you read this, do you agree that

4    there was a disturbing incident that he's describing?

5         A.   Yes, ma'am.

6         Q.   And what was disturbing about it?

7         A.   So we had started, I had started an EDR

8    process, and now the AO, or representatives from the

9    AO, are indicating to Heather Beam that she cannot

10   investigate the case, that Tony needs to -- whatever

11   she's asking for, give her whatever she's asking for;

12   telework, relocation, before Ms. Devins hires an

13   attorney and goes to the press.  I mean, that's

14   disturbing, after here, I'm seeking to resolve these

15   matters and have it investigated through the process

16   that was given to me.

17             And the other thing that's disturbing, and

18   you wouldn't know this, but as I indicated before, as

19   a defender, I am appointed by the chief judge for the

20   Fourth Circuit Court of Appeals.  My boss is the

21   chief judge for the Fourth Circuit Court of Appeals.

22   My boss is not the AO, my boss is not the director of

23   the AO, my boss is technically not the district

24   judges, my boss is the chief judge of the Fourth

25   Circuit Court of Appeals.

1          So for the AO to be directing me to hear

2    whatever demands of an employee, not necessarily is

3    Caryn's fault, I'm saying any employee, whatever they

4    ask, telework, and this is an order?  Who are you to

5    give me this order?  You don't have any authority over

6    a defender.  So that -- it was very disturbing.

7          Q.   You hadn't talked with Nancy Dunham or her

8    staff directly yourself?

9          A.   Never, never.

10         Q.   So what you knew about the disturbing

11   incident was from Heather?

12         A.   Heather Beam, correct.

13         Q.   And not anyone else?

14         A.   Correct.

15         Q.   And would you expect Nancy and Heather to

16   corroborate this story?

17         A.    Well, Heather would have to; I mean, I took

18   notes.  This is exactly what she told me.  My

19   understanding was that after this, there was a

20   meeting.  There's some e-mails to that effect.  James

21   met with the deputy director of the AO, I believe

22   Nancy Dunham was there present, and someone else.

23   And they had a meeting, a powwow, and when it was all

24   said and done, the AO apologized.

25              They said Heather Beam misinterpreted or

1  had agreed to take the position with the Fourth

2  Circuit, with a judge.  I wasn't involved.

3      Q.  You weren't involved.

4      A.  I had no idea.  I was not involved in that.

5  That's something I don't -- I don't have even the

6  authority to approve anything in mediation when it

7  comes to that.  Now, if it has to do with the office,

8  like duty station, that's different.  In fact, that's

9  a different animal.

10     Q.  So if the resolution involved something

11 with your office --

12     A.  Correct.

13     Q.  -- then would you have been the person who

14 would have to look at that?

15     A.  Yes, ma'am.

16     Q.  And would you have had the final authority

17 to approve such a resolution involving your office?

18     A.  Yes, ma'am.  Yes, ma'am.

19     Q.  So anything, like any personnel action

20 involving promotion or pay, or I'm trying to think

21 of other examples that you deal with in terms of

22 decision-making as a manager, all of those decisions

23 really were in your control as the defender?

24     A.  That's my understanding.  Yes, ma'am.

25     Q.  So in terms of mediation, it couldn't

1   really have happened without your approval; is that

2   right?

3        A.   Mediation could not happen --

4        Q.   Mediation resolution.

5        A.   If the resolution involves my office.

6        Q.   If it involves your office.

7        A.   Correct.

8        Q.   So the Fourth Circuit is a totally

9   different thing because that does not involve your

10  office?

11       A.   Correct.

12       Q.   Okay.  So Caryn left for the Fourth Circuit

13  as a result of whatever was happening in mediation.

14  Is that your understanding?

15       A.   I have no idea.

16       Q.   And if she were to have wanted to stay in

17  her job rather than leave and, say, wanted to be an

18  AFPD with a certain level of pay, would that have had

19  to be your decision?

20            MS. SPAINHOUR:  Objection to form.

21            MS. WESTMORELAND:  Objection to form.

22  BY MS. GERSEN:

23       Q.   Go ahead.

24       A.   Can you rephrase that question, I'm trying

25  to --

1      Q.   Yeah.  If she wanted to just stay at the

2  FDO, in, say, the appellate unit, would that have

3  been ultimately your decision?

4      A.   Yes.

5      Q.   So could anything happen in mediation

6  involving your office without -- you know what, this

7  is asked and answered.  I don't need to ask about it

8  again.  Sorry.

9           And did you have an understanding of what

10  would happen if Caryn filed the Chapter X complaint,

11  a formal complaint under Chapter X, that went to a

12  final hearing?

13      A.   I don't know.

14      Q.   You don't know?

15      A.   I don't know.

16      Q.   So are you familiar with Chapter X?

17      A.   I've read Chapter X.

18      Q.   Uh-huh?

19      A.   I know there is certain rights and certain

20  stages, like counseling, mediation, and a final

21  hearing.

22      Q.   Right.  Right.  Right.

23      A.   Since I've never gone myself, I don't have

24  personal experience with Chapter X.

25      Q.   Right.  So in -- after mediation comes

1          A.   You know, maybe when I was working, to

2     receive more workplace training, which was a

3     recommendation.

4          Q.   And you had said earlier that you had

5     received very little training?

6          A.   Right.  Some training, correct.

7          Q.   So did you testify earlier that you were

8     not told that you yourself were being investigated?

9          A.   Repeat that question again.

10         Q.   Did you testify earlier that you, yourself,

11    were not told that you were being investigated?

12         A.   No one told me, no.

13         Q.   Do you think it would be part of a fair

14    process that a person who is being investigated

15    should be told?

16         A.   Yes.

17         Q.   And did you have any concept -- did you

18    have any idea during the EDR process that the

19    investigator was looking into your conduct?

20         A.   Not really.

21         Q.   Should the EDR investigation have given you

22    notice?

23         A.   I think, you know, I knew I was aware of

24    allegations being made by Ms. Strickland.

25         Q.   Yeah.

1          A.    I knew that we had filed under Chapter 19.

2          Q.    Chapter IX.

3          A.    Nine.  And that she was making allegations

4     also.  To me, it was all part and parcel of the whole

5     process.  I'm not -- it wasn't like I had not filed,

6     or nothing was filed originally, and then, all of a

7     sudden, now she's alleging something of misconduct

8     done about me.  It wasn't -- to me, it was all part

9     and parcel of the whole process.

10         Q.    So you -- I just want to be really -- just

11    make sure I'm clear.  You were never told that there

12    were allegations against you by Ms. Strickland?

13         A.    By who?

14         Q.    By Caryn Strickland?

15         A.    No.  Officially, under the plan, no.

16         Q.    So did you feel confused when you received

17    this counseling letter as to why you were receiving

18    it?

19         A.    I -- the letter specifies that, "On behalf

20    of Chief Circuit Judge Gregory, I write to inform you

21    that you are being counseled for your actions arising

22    from the Report of Wrongful Conduct submitted by

23    Caryn Strickland on September 10th, 2018."

24              So that was clear to me.

25         Q.    It was clear what that sentence you read

1    meant; is that right?

2         A.   Right.  And I understood it was arising

3    from the allegations that she made, so --

4         Q.   So when you read that, did you -- did you

5    read that to mean that she had made allegations

6    against you?

7         A.   Correct.  Yeah.

8         Q.   So when was the first time you realized

9    that Caryn had made allegations against you under the

10   Chapter IX provisions of the EDR plan?

11        A.   Probably when I received this letter.  Now,

12   that is not to say that, you know, there were copies

13   of things I received during the EDR process, and I

14   might have received a copy of the allegations, but I

15   really became aware when this letter came out.

16        Q.   You said there might be copies of things

17   you received?

18        A.   Yeah, they might have sent me a copy of

19   something, or I was CC'd, or --

20        Q.   But whatever you received didn't cause you

21   to think that you were being investigated under the

22   EDR plan?

23        A.   Correct.

24        Q.   Was EDR -- was the EDR investigator -- let

25   me just scratch that.

1          So at the end of the EDR Chapter IX process,

2    when it concluded, did you discipline JP Davis?

3        A.    Yes.   I'm sorry, I didn't discipline him, I

4    did a counseling -- verbal counseling.   I did not

5    discipline him.

6        Q.    Okay.   Can you tell me the difference

7    between counseling and discipline?

8        A.    I don't believe counseling is discipline.

9    Discipline is when you require, like, a performance

10   plan or some type of disciplinary.   I consider

11   counseling as nondisciplinary.   It's just a

12   counseling.

13       Q.    Right.   And in what circumstance would JP

14   have been disciplined, as opposed to counseled, in

15   this matter?

16           MS. WESTMORELAND:   Objection to form.

17       A.    In this matter?   Well, you know, like the

18   way he was handling -- it related to the way he was

19   handling, to give you a scenario, the way he was

20   handling contacting James Ishida.   I thought that was

21   inappropriate, and if he were to do it again, he was

22   going to -- there was some disciplinary action I was

23   going to take.

24       Q.    So he wasn't disciplined for that conduct?

25       A.    He never did it again.

1        Q.   So he wasn't disciplined for the times that

2   he did contact him?

3        A.   Correct.

4        Q.   And your understanding was that JP was not

5   disciplined for -- as a result of Caryn's EDR

6   complaint -- or EDR report?

7        A.   I told you, I didn't discipline him, I

8   counseled him.

9        Q.   Right.  I'm asking you:  Your understanding

10  is he was not disciplined?

11        A.   He was not disciplined, correct.

12        Q.   And did you decide how to counsel him?

13        A.   Yes, we reviewed the e-mails in question

14  that -- you know, what were considered inappropriate,

15  and we went over them and as to why they might have

16  been considered inappropriate and he could have done

17  better, and I think there were four e-mails, I think

18  there were.

19        Q.   Are these e-mails that he sent to Caryn?

20        A.   Correct.

21        Q.   And he was counseled on how he could have

22  done better --

23        A.   Correct.

24        Q.   -- in writing those e-mails?

25        A.   Correct.

1      Q.   So did you decide whether to discipline or

2  counsel JP?

3      A.   I decided.

4      Q.   You decided.  And how did you decide?

5      A.   It was discretionary on my part.

6      Q.   It was discretionary on your part whether

7  to choose discipline or counsel JP Davis?

8      A.   Correct.

9      Q.   And what informed your decision about that?

10      A.   The gravity of -- what I considered the

11  gravity of the conduct.  And in this case, they were

12  just e-mails, and my review of the e-mails, for me,

13  did not require any disciplinary action.

14      Q.   Right.  And what do you mean in this case

15  they were just e-mails?

16      A.   I'm saying the counseling was in reference

17  to the four e-mails.

18      Q.   Right.

19      A.   I didn't do any other counseling on any

20  other subject.

21      Q.   And why did you think those e-mails

22  warranted counseling rather than discipline?

23      A.   Because of the gravity of it.  It wasn't as

24  serious as any other action that he might have taken

25  or conduct.

1          Q.   Right.  So when you -- when you first heard

2     about the facts that gave rise to these complaints,

3     you didn't think it was sexual harassment; is that

4     right?

5          A.   Correct.

6          Q.   And did you think it was sexual harassment

7     at the end of the process?

8          A.   No, because there was a finding of no

9     sexual harassment by the investigator.

10         Q.   Okay.  So based on the investigator's

11    report, you made a decision about how to handle

12    JP Davis' --

13         A.   Yes.

14         Q.   -- counseling?

15         A.   Yes.

16         Q.   So you were the subject of a counseling

17    letter; is that right?

18         A.   Yes, ma'am.

19         Q.   And does being the subject of this

20    counseling letter from Mr. Ishida in the matter of

21    Caryn Devins affect your views of the merits of her

22    claims?

23         A.   The mere receiving of the counseling that I

24    received, yes.

25         Q.   How so?

1          CERTIFICATE OF OATH

2          I, the undersigned authority, certify that

3      Anthony Martinez personally appeared before me

4      on April 28, 2023, and was duly sworn.

5          Witness my hand and seal May 11, 2023.

6

7

8

9

10

11              Sarah Parker

12              Notary Public - State of Florida

13              My Commission No. 1747421

14              Expires 1/25/27

15

16

17              SARAH PARKER
                MY COMMISSION #HH354230
                EXPIRES: JAN 25, 2027
18              Bonded through 1st State Insurance

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE

STATE OF FLORIDA:

COUNTY OF HILLSBOROUGH:

       I, Sarah Parker, certify that I was authorized to and did stenographically report the deposition of Anthony Martinez; that a review of the transcript was requested; and that the transcript is a true and complete record of my stenographic notes.

       I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

       DATED May 11, 2023.

Sarah Parker

SIGNATURE PAGE/ERRATA SHEET

WITNESS:  ANTHONY MARTINEZ (4/28/23)
RE:  STRICKLAND VS. UNITED STATES

INSTRUCTIONS TO WITNESS

Please note any errors or amendments on this page, indicating the reason for any change you wish to make. Do not mark on the transcript itself.  Please sign and date this sheet as indicated below.  If additional lines are required for corrections, attach additional sheets.

| PAGE | LINE | ERROR OR AMENDMENT/REASON FOR CHANGE |
|------|------|--------------------------------------|
| 98 | 18 | should read, "going" through him "Not "growing" |
| 211 | 19 | should read "mistateting the question" Not "mistaking" |
| 231 | 5 | should read "determine them" Not "determine then" |
| ----- | ----- | ------------------------------------------- |
| ----- | ----- | ------------------------------------------- |
| ----- | ----- | ------------------------------------------- |
| ----- | ----- | ------------------------------------------- |
| ----- | ----- | ------------------------------------------- |
| ----- | ----- | ------------------------------------------- |
| ----- | ----- | ------------------------------------------- |
| ----- | ----- | ------------------------------------------- |
| ----- | ----- | ------------------------------------------- |

I have read my transcript and subscribe to its accuracy, to include the corrections or amendments noted above, or hereto attached.

_____        ___6/5/23_____
Signature of Witness                Date