# EXHIBIT PP

```
1          IN THE UNITED STATES DISTRICT COURT

2       FOR THE WESTERN DISTRICT OF NORTH CAROLINA

3

4  CARYN DEVINS STRICKLAND,    : CIVIL NO.

5              Plaintiff       1:20-cv-00066-WGY

6         vs.                  :

7  UNITED STATES, et al.,

8              Defendants      :

9  _____

10  DEPONENT:  EDWARD G. SMITH, ESQ.

11  DATE:  APRIL 20, 2023

12  TIME:  10:00 a.m.

13  LOCATION:  CLARK BOLEN

14            671 JAMESTOWN DRIVE, SUITE 206D

15            MURRELLS INLET, SC

16  REPORTED BY:  CAROL T. LUCIC, RPR, RMR

17

18

19

20

21

22   CLARK BOLEN COURT REPORTING & VIDEO CONFERENCING

23            CHARLESTON, SC  29405

24               843-762-6294

25            WWW.CLARK-ASSOCIATES.COM
```

1              A P P E A R A N C E S

2

3    ON BEHALF OF THE PLAINTIFF:

4              THOMAS, FERGUSON & BESKIND, LLP

5              BY:  OLIVIA WARREN, ESQ.

6                   119 EAST MAIN STREET

7                   DURHAM, NC  27701

8

9    ON BEHALF OF THE DEFENDANT:

10             UNITED STATES DEPARTMENT OF JUSTICE

11             CIVIL DIVISION, FEDERAL PROGRAMS BRANCH

12             BY:  RACHAEL WESTMORELAND, ESQ.

13                  MADELINE McMAHON, ESQ.

14                  DANIELLE YOUNG, ESQ. (via Zoom)

15                  KRISTIN MANNHERZ, ESQ. (via Zoom)

16                  1100 L STREET, N.W.

17                  WASHINGTON, D.C.  20005

18

19   PRESENT (via Zoom) COOPER STRICKLAND, ESQ.

20                      CARYN STRICKLAND, ESQ.

21

22

23

24

25

1                              INDEX

2

3                      EDWARD G. SMITH, ESQ.

4                        APRIL 20, 2023

5

6    EXAMINATION                                    PAGE

7    BY MS. WARREN                                   5

8    BY MS. WESTMORELAND                            124

9

10   CERTIFICATE OF REPORTER                        125

11

12                          EXHIBITS

13   NO.                                            PAGE

14   40      Email correspondence between

15           Mr. Ishida, Mr. Smith, and

16           Ms. Strickland, 1/31/19                 11

17   41      Email correspondence regarding

18           supplement to request for

19           mediation, 2/22/19 and 2/24/19         52

20   42      Email correspondence between

21           Mr. Strickland and Mr. Smith,

22           2/25/19                                 58

23   43      Email correspondence between

24           Mr. Smith and Mr. Ishida, 3/20/19    106

25

1    A.   No.

2    Q.   In January of 2019 when Mr. Ishida

3  contacted you, what was your understanding of how

4  mediation worked under Chapter 10 of the EDR plan?

5    A.   My understanding is a mediator is

6  designated, and I get that designation if it's

7  appointing me or if there is somebody else

8  involved, it would go to them.  I then review

9  whatever documentation I may have.  My typical

10  procedure has really been to talk to the parties

11  separately initially anyway.  Sometimes we do end

12  up getting together eventually.

13        It's my role to see if I can settle it

14  within the confines of the remedies within the EDR

15  plan or, as in this case, I really wasn't dealing

16  with those remedies because there really wasn't a

17  remedy that fit the situation.  I was trying to see

18  if I could work out a way to send Caryn back to

19  work that was acceptable to her.

20    Q.   Do you remember if this case was

21  proceeding under the 2013 EDR plan or the 2018 EDR?

22    A.   '13.

23    Q.   The 2013?

24    A.   Well, it was proceeding under a different

25  plan than we're under now.  I don't really know the

1    date, so let me just be clear.  We are under a

2    different plan now.

3        Q.    These have been marked as Exhibit 15.

4    This is the EDR plan from 2013 that was marked as

5    Exhibit 15 at Heather Beam's deposition.  I'll hand

6    to you Plaintiff's 16, which is the November 2018

7    plan that was marked at Heather Beam's deposition.

8            MS. WESTMORELAND:  What was this marked

9    as?

10           MS. WARREN:  The 2018 was Plaintiff's 16

11   at Heather's.

12       Q.    Looking at the dates of these two

13   documents, if Ms. Strickland filed a claim under

14   the EDR plan in September of 2018, which plan would

15   she have been under?

16       A.    In September of '18?

17       Q.    Yes.

18       A.    I just assume it would have been the 2013

19   plan.

20       Q.    From your perspective as a mediator is

21   there a difference between these two plans in

22   Chapter 10 mediations?

23       A.    Going off memory, I think one difference

24   is under the 2013 mediation was mandatory.  It's

25   not mandatory under the 2018.  That's my memory.  I

1    haven't reviewed the 2018.

2        Q.    You're welcome to take a look.

3        A.    Yes, I'm assuming I'm right because it

4    says the employee may file.

5        Q.    So under the 2013 plan mediation was

6    mandatory?

7        A.    That's my memory that you had to go

8    through that step to get to filing a formal

9    complaint.

10       Q.    Was there another process under Chapter 10

11   other than mediation and a formal complaint?

12       A.    I wouldn't know without looking.  In every

13   case I ever dealt with my understanding was when it

14   got to me, I mediated it, and if I was unable to

15   resolve it, it went to a hearing in front of a

16   judge, and that is what I believe I told Caryn and

17   Cooper.

18            MS. WARREN:  We can pause for just a

19   second.  I don't think that my co-counsel can hear.

20            (Discussion off the record)

21       Q.    Now that we've got everyone on -- thank

22   you -- under Chapter 10 was there a step for

23   counseling?

24       A.    There was counseling under the old EDR

25   plan, yes.  I don't recall what section it was,

1   but, yes, you could go through counseling, but my

2   memory is whether you have been through counseling

3   or not you were required to do mediation to take it

4   to the last step as I understood it.

5       Q.   As you remember the old plan, did

6   counseling occur at the same time as mediation?

7       A.   Not in a case I had been involved in.

8       Q.   So were you aware that Mr. Ishida

9   described simultaneous counseling and mediation as

10  unconventional?

11      A.   I'm not aware of that or if I was, I

12  forgot.

13      Q.   But in your experience they were typically

14  two different steps?

15      A.   My experience is that they had been two

16  different steps.

17      Q.   Were you aware that there was also a

18  Chapter 9 proceeding, a wrongful conduct proceeding

19  regarding these claims?

20      A.   If you're talking about an investigation,

21  I was aware of that.  I wasn't aware what it was

22  proceeding under.  I knew there was an

23  investigation of the allegations of the claim.

24      Q.   Did you ever participate in investigations

25  of claims?

1      A.    This claim?

2      Q.    Of any claims under the EDR plan.

3      A.    I have done an investigation of a claim

4  before.  I don't know that it was under an EDR, but

5  I've done an investigation before.

6      Q.    When was that investigation?

7      A.    I want to say it was during COVID, and

8  that's about as close as I could get you.

9      Q.    Would it have been after this hearing?

10     A.    It would have been after, yes.

11     Q.    What was the nature of that investigation?

12     A.    It was an allegation of potential fraud

13  and abuse, financial.

14     Q.    Did you create a report?

15     A.    I did.

16     Q.    Do you know if there was ever a mediation

17  in the case that you investigated?

18     A.    I don't know if there was.  I don't know

19  what happened after I gave my report.  Again, I'm

20  not sure that was really an EDR.  It was maybe

21  something that just came to light and I was asked

22  to look into it.

23     Q.    Did you know when Mr. Ishida contacted you

24  or at any point after that that there was a report

25  regarding the investigation in this case?

1          A.    I knew there was an investigation ongoing.

2     I don't recall whether I knew an actual report had

3     been finished or not.  I mean I know nobody --

4     well, to my knowledge Tony hadn't seen it.  At

5     least that's my memory, but when that report was

6     completed I can't tell you.

7          Q.    Did you know if Caryn had seen the report?

8          A.    I'm assuming she hadn't just based upon

9     her conversations with me.

10         Q.    What about those conversations?

11         A.    Well, she had told me at one point that

12    whoever the investigator was had made a comment to

13    her that you're going to have to work with him, so

14    she was making an assumption that he wouldn't be

15    terminated at least.  So I just took that as an

16    assumption that she hadn't seen the report.

17         Q.    Did you ever tell Caryn that simultaneous

18    counseling and mediation didn't make sense to you?

19         A.    I don't recall it.

20         Q.    Did you think that mediation should have

21    begun earlier in this case?

22         A.    Well, I'm a proponent of in an EDR

23    situation mediation occurring as quickly as

24    possible if it's something that can be resolved, so

25    it wouldn't surprise me if said that to Caryn.  I

1   don't recall saying that to Caryn.  I don't recall

2   reading that in one of the transcripts.  Maybe it's

3   there, but, yes, I think you should get to that

4   point as quickly as possible if the parties are

5   agreeable to it and want to try to work things out.

6        Q.   I just want to make sure I have a clear

7   answer about this case.

8             Do you think that mediation should have

9   begun earlier in this case?

10       A.   I don't know about in this case because

11  one of the things that hampered this case was the

12  fact that there was a separate investigation, and I

13  always viewed this as what Caryn was after was some

14  kind of discipline to JP, whether it be termination

15  or something, and that could never be addressed in

16  mediation.  So if we had begun the process earlier,

17  I think we still would have ended up in the same

18  spot.

19       Q.   Did you think mediation was available

20  earlier in this case?

21       A.   There are certain steps you have to follow

22  through here, and whether it was available earlier

23  or not I don't know because I just don't know the

24  timeline.

25       Q.   What is your understanding of the role of

1  kind of structurally about the plan as far as you

2  understand it.

3          As a chief circuit mediator, are you

4  considered a unit executive under the EDR plan?

5      A.   Yes.  I'm a court unit executive.  There

6  are I think five of us.

7      Q.   As chief circuit mediator do you report to

8  the circuit executive?

9      A.   Pretty much.  Technically I guess the way

10 it's written is Chief Judge Gregory is my boss, but

11 I kind of go through James.

12     Q.   So you serve at the chief judge's

13 pleasure?

14     A.   Yes, ma'am.

15     Q.   Is the Fourth Circuit your appointing

16 authority?

17     A.   Well, they hired me.  All the circuits --

18 well, I take that back.  All the circuits but the

19 Eighth have a mediation program, and they're all

20 very similar to ours.

21     Q.   Did you ever have to feel like you had to

22 balance your role as a mediator under the EDR plan

23 with serving at the pleasure of the chief judge?

24     A.   No.

25     Q.   Did you ever feel that there was a

1      A.    There would be more than I have.  I want
2  to say at least four.
3      Q.    We'll come back to those in a little bit.
4            I want to talk about remedies under the
5  EDR plan in this case.  What did you tell Caryn
6  about the remedies that were available to her in
7  mediation?
8      A.    Well, I told her the remedies were set out
9  in Section 12, which they are, and that's why I
10  said none of these really fit what we were dealing
11  with here.  I told her what the remedies could not
12  entail, compensatory, punitive damages, attorney's
13  fees.  In a lot of these things as a mediator or
14  when somebody else in my office is mediating, we're
15  not necessarily looking at the remedies.  We're
16  trying to put the parties back together again, and
17  that's what I was trying to do here.
18            Caryn felt like she needed certain things
19  at least in that initial meeting to be able to go
20  back to work.  She said she wanted to work in the
21  Federal Defender's Office, so I took it as my
22  charge to try to figure that out for her.  Again, I
23  wasn't dealing with these.
24      Q.    So you were dealing with different
25  remedies?

1      A.    I was only dealing with trying to get her

2  back in the office.

3      Q.    I know you said you didn't feel there was

4  a remedy that fit that situation, and I think you

5  just said you weren't dealing with these, so what

6  remedies were you dealing with?

7      A.    There wasn't a remedy that I could utilize

8  to fit this situation.  Maybe the internal

9  investigation would fit a remedy.  That's separate

10  and apart from me.  All my authority is what is

11  given to me by the Court.  My job description is I

12  mediate civil disputes between counsel and parties.

13  I was asked to participate in the EDR as a mediator

14  because I'm a mediator.  My charge is here are your

15  remedies, mediate this case, and see if you can

16  resolve it.

17          You can read these.  None of these are

18  going to do anything in this particular case, so I

19  was trying to figure out how I was going to get

20  Caryn back in the office in such a way where she is

21  given some concessions where she's happy, and

22  that's what I did.

23      Q.    Did you tell Caryn that you were operating

24  with remedies outside of the plan?

25      A.    No.  I said I was trying to work out a way

1    teleworking over the previous months had on her?

2        A.    I don't remember.

3        Q.    Do you remember if she told you about the

4    effect that it had on her relationships with her

5    colleagues?

6        A.    I don't remember specifically, but I would

7    assume being a telecommuter myself that it was

8    probably -- it's hard to maintain those connections

9    when you're telecommuting.

10       Q.    Did she tell you about the effect it had

11   on her ability to attend trainings?

12       A.    I don't specifically remember.  She may

13   have.

14       Q.    Did she tell you about the effect it had

15   on her caseload?

16       A.    I don't remember that, but she may have.

17       Q.    Is there anything else about her

18   experience that she described to you?

19       A.    I just don't recall, although it's my

20   memory she wanted to be a full-time telecommuter,

21   and maybe that's why I'm not -- I just don't

22   remember these other things.  That's my memory, if

23   she could work out an agreement to be a full-time

24   telecommuter.

25       Q.    Did Caryn tell you her concern that people

1     Q.   I certainly understand that.  I'm not

2   looking forward to reading my own transcript.

3          Who is the respondent party to an EDR

4   proceeding?  Is it the employing office or the unit

5   executive?

6          MS. WESTMORELAND:  Objection; vague.

7     A.   My understanding is that the claim is

8   against the employing office, who responds through

9   the court unit executive.

10    Q.   And Tony was the court unit executive?

11    A.   Of the Federal Defender's Office, correct.

12    Q.   Did you believe that anyone else could

13  have represented that office during the mediation?

14    A.   No.

15    Q.   You didn't think another employee could

16  have?

17    A.   No.

18    Q.   Why not?

19    A.   Because the only person in that office

20  that had the authority or the power to agree to the

21  things that would have to be agreed to was Tony.

22    Q.   Did you explain that to Caryn?

23    A.   I tried.

24    Q.   Did you think she understood?

25    A.   I don't know.

1          Q.   I'm sorry to circle back to the

2     disqualification.  I promise I'm not trying to

3     confuse us all.

4               I think I understand your testimony to be

5     that you had personally not handled a

6     disqualification request; is that right?

7          A.   That's not in my job description.  I'm a

8     mediator.  I talk to people and try to get them to

9     settle disputes.  I don't decide issues.

10         Q.   I'm just trying to make sure my memory is

11    correct that you had heard about a case where a

12    judge was accused, and he was not disqualified.

13              MS. WESTMORELAND:  Objection;

14    mischaracterizes his testimony.

15         A.   At some point I've heard, pure hearsay,

16    for what it's worth that there was a complaint

17    against a judge and that the judge was a

18    participant in the mediation.  I guess as I sit

19    here today if I've really got to think about it, he

20    could have been a participant in that he was one of

21    the parties.  I don't know.

22         Q.   You don't know?

23         A.   I had never thought about it in those

24    terms until right now.

25         Q.   Do you think that would be appropriate?

1    A.    I think if there is an alleged offending

2  party that's the head, and they're going to -- I

3  think they have to be a party to try to resolve it

4  and work it out because, look, most of these

5  employee disputes that I have been involved in --

6  and I haven't been involved in that many --

7  something has gone wrong.  There has been some

8  miscommunication, and it's put back together and

9  people go back to work.  That's the standpoint I

10 bring to it, and it's what I brought to this one.

11   Q.    The judge example that you heard about,

12 was that in your circuit?

13   A.    I've told you all I know about it.  It was

14 a passing comment, and I don't even remember where

15 I heard it.

16   Q.    So you don't know what circuit it was in?

17   A.    No, ma'am.

18   Q.    Or what judge?

19   A.    No.  We're not privy to judicial

20 complaints.

21   Q.    Are you aware of a unit executive ever

22 being disqualified from an EDR mediation?

23   A.    I can't recall one.

24   Q.    Did you tell Caryn that Tony could be

25 disqualified if she filed a formal complaint?

1  mediation one of the reasons why I felt in my
2  opinion and my opinion only that he wouldn't be
3  disqualified is a judge can't micromanage him in
4  mediation.  He doesn't know the office.  He doesn't
5  know the effect of doing these things for Caryn
6  that Caryn wanted, so it made sense to me.  I guess
7  that's why in every mediation I've ever done the
8  unit head has been there, because they have to make
9  those decisions.  Nobody knows how my office
10 operates but me.
11      Q.  Did you tell Caryn that no one could
12 micromanage Tony at a formal hearing?
13      A.  I don't recall that, and if I said
14 anything like that, I don't know why I would have
15 said that because at a formal hearing the judge is
16 in control and the judge determines what happens.
17 How far he goes, that's up to him.  I don't know.
18 Again, I've never been to a formal hearing.
19      Q.  So as you sit here today is it your
20 position that at a hearing a judge could tell Tony
21 how to run his office?
22      A.  I don't know what a judge would do at a
23 hearing is what I've told you.
24      Q.  Could a judge do that?  Not would a judge.
25      A.  I think a judge can do whatever he or she

1    thought it would be hard to resolve at the start

2    and then in the middle, but Caryn seemed to be

3    happy with where she was going.

4        Q.   Did you tell Caryn at your first meeting

5    with her that you thought Tony felt Caryn was more

6    likely to go away than JP?

7        A.   I told her that's a possible explanation

8    for his behavior.  Again, I'm offering speculation

9    to try to get her from thinking I'm the one that's

10   getting piled on.  Maybe there is just some

11   innocent other reason.

12       Q.   Did you think that Tony thinking she would

13   go away rather than JP was an innocent reason?

14       A.   Well, it's not motivated for animus toward

15   either party.  That's what I mean.

16       Q.   Why wouldn't you think it would be

17   motivated for animus toward either party that one

18   would go away more than the other?

19       A.   It's the path of least resistance.  I

20   don't think people consider anything beyond the

21   path of least resistance if that's the way they're

22   acting.  I had never met Tony.  That was my rank

23   speculation and opinion for what it's worth, which

24   is probably not much.

25       Q.   Did you tell Caryn that you thought Tony

```
1    CERTIFICATE OF REPORTER
     STATE OF SOUTH CAROLINA
2    COUNTY OF CHARLESTON

3

4            I, Carol T. Lucic, Registered Professional
     Reporter and Notary Public for the State of South
5    Carolina at Large, do hereby certify that the
     witness in the foregoing deposition was by me duly
6    sworn to testify to the truth, the whole truth, and
     nothing but the truth in the within-entitled cause;
7    that said deposition was taken at the time and
     location therein stated; that the testimony of the
8    witness and all objections made at the time of the
     examination were recorded stenographically by me
9    and were thereafter transcribed by computer-aided
     transcription; that the foregoing is a full,
10   complete, and true record of the testimony of the
     witness and of all objections made at the time of
11   the examination; and that the witness was given an
     opportunity to read and correct said deposition and
12   to subscribe the same.

13

             Should the signature of the witness not be
14   affixed to the deposition, the witness shall not
     have availed himself/herself of the opportunity to
15   sign or the signature has been waived.

16

             I further certify that I am neither
17   related to nor counsel for any party to the cause
     pending or interested in the events thereof.

18

19           Witness my hand, I have hereunto affixed
     my official seal on May 2, 2023, at Charleston,
20   Charleston County, South Carolina.

21

                      Carol T. Lucic
22                    NCRA MERIT REPORTER
                      REGISTERED PROFESSIONAL REPORTER
23

24
     My Commission expires:  November 27, 2027
25
```

# WITNESS CORRECTION SHEET

Witness: Edward G. Smith, Esq.

Date of Deposition: 4/20/2023

Case: Caryn Devins Strickland v. United States, et al.
56076

I, the undersigned, _Edward G Smith_ do hereby certify that I have read the foregoing deposition and wish to make the following clarifications and/or corrections, if any.

| Page | Line # | Correction | Reason |
|------|--------|-----------|--------|
| 82 | 11 | I feel like it was not my place | |
| 82 | 11-12 | I had no Authority | |
| 91 | 17 | I don't want to do this | |

Signature: _Edward G Smith_        Date: _5/31/2023_

**Clark & Associates**
4130 Faber Place Drive Suite 200B
Charleston, SC 29405
production@clark-associates.com