# EXHIBIT UU

In the Matter of:

# Caryn Devins Strickland

*vs*

# United States, et al.

Deposition of:

# JILL LANGLEY

April 27, 2023



(703) 331-0212
www.icrdepos.com

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

ASHEVILLE DIVISION

- - - - - - - - - - - - - - - - - x
                                  :
CARYN DEVINS STRICKLAND,          :
                                  :
                    Plaintiff,    :
vs.                               :    Case No. 2021-2071
                                  :
UNITED STATES, et al.,            :
                                  :
                    Defendants.   :
                                  :
- - - - - - - - - - - - - - - - - x


WASHINGTON, D.C.

THURSDAY, APRIL 27, 2023

==========================================
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
==========================================

DEPOSITION OF

JILL LANGLEY

called for examination by counsel for the Plaintiff,

pursuant to notice, at the offices of Caleb Andonian,

PLLC, 1100 H Street, NW, Suite 315, Washington, D.C.,

commencing at 9:29 a.m. and concluding at 2:45 p.m.,

before Kirk A. Sturges, a Notary Public for the

District of Columbia.

**ICR/Rudiger & Green**
office@icrdepos.com          **www.icrdepos.com**          **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 3 of 196

1   A P P E A R A N C E S:

2   ON BEHALF OF THE PLAINTIFF:

3   OLIVIA WARREN, ESQ.
    Thomas, Ferguson & Beskind, LLP
4   119 Main Street, East
    Durham, NC  27701
5   919-682-5648
    warren@tfblawyers.com
6
    JEANNIE SUK GERSEN, ESQ.
7   Hauser Hall 510
    1563 Massachusetts Avenue
8   Cambridge, MA  02138
    617-496-5487
9   jsuk73@gmail.com

10

    ON BEHALF OF THE DEFENDANTS:
11
    MADELINE McMAHON, ESQ.
12  DANIELLE WATSON YOUNG, ESQ.
    United States Department of Justice
13  Civil Division, Federal Programs Branch
    1100 L Street, NW
14  Washington, DC  20005
    danielle.young2@usdoj.gov
15  madeline.m.mcmahon@usdoj.gov

16

17  ALSO PRESENT (VIA REMOTE PLATFORM ZOOM)

18  Kristin Mannherz
    Caryn Devins Strickland
19

20

21

22

**ICR/Rudiger & Green**
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 4 of 196

# C O N T E N T S

## WITNESS:  JILL LANGLEY

EXAMINATION BY COUNSEL FOR                              PAGE

PLAINTIFF
BY MS. WARREN. . . . . . . . . . . . . . . . . . 6

DEFENDANTS
BY MS. McMAHON . . . . . . . . . . . . . . . . . 189

PLAINTIFF
BY MS. WARREN  . . . . . . . . . . . . . . . . . 190

# E X H I B I T S

| MEAD NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 15 | January 2013 Consolidated EEO & EDR Plan of U.S. 4th Circuit Court of Appeals US00003551-US00003579 | 69 |
| 16 | November 2018 Consolidated EEO & EDR Plan of U.S. 4th Circuit Court of Appeals US00003551-US00003579 | 69 |
| 24 | Counselor's report & miscellaneous documents US00002293-US00001311 | 103 |

| LANGLEY NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 46 | Combined Statements of Judges McKeown & Robinson 3/17/2022 | 37 |
| 47 | Press Release 12/3/2018 | 40 |

(EXHIBITS CONTINUE ON NEXT PAGE.)

**ICR/Rudiger & Green**
office@icrdepos.com          **www.icrdepos.com**          **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 5 of 196

1              E X H I B I T S (CONT.)

2    LANGLEY NUMBER          DESCRIPTION                    PAGE

3    48          Director of Workplace Relations    44
                 Contacts by Circuit
4
     49          Emails re introduction 2/7/2019    65
5                US00002191-US00002194

6    50          Declaration of Jill B. Langley     75
                 9/23/2020
7
     51          Office of Judicial Integrity       90
8                Inquiries/Reports
                 US00006845-US00006846
9
     52          All Court Staff                    93
10               Preventing Workplace Harassment
                 US00007250-US00007290
11
     53          Respectful Workplace Scenarios     110
12               US00007291-US00007293

13   54          Langley Typewritten Notes          120
                 19-4 Caryn
14               US00005445-US00005447

15   55          Emails re checking in              171
                 2/17/2019-3/11/2019
16               US00005390-US00005392

17
        (THE EXHIBITS ARE INCLUDED WITH THE TRANSCRIPT.)
18

19

20

21

22

**ICR/Rudiger & Green**
office@icrdepos.com        **www.icrdepos.com**        **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 6 of 196



ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 7 of 196

1                    P R O C E E D I N G S

2        Thereupon,

3                          JILL LANGLEY

4    was called as a witness, and after having been first

5    duly sworn by the Notary, was examined and testified

6    as follows:

7            EXAMINATION BY COUNSEL FOR THE PLAINTIFF

8                    BY MS. WARREN:

9        Q       Good morning.

10       A       Good morning.

11               MS. McMAHON:  Before we begin, I just

12   want to reserve the right for the witness to sign and

13   read the transcript.

14                        (In the presence of counsel for the

15                         respective parties, it was requested

16                         the witness read and sign the

17                         deposition transcript.)

18               MS. McMAHON:  Thank you.

19               BY MS. WARREN:

20       Q       Ms. Langley, would you please state your

21   name for the record?

22       A       Jill Langley.

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 8 of 196

1      Q      Would you spell your last name?

2      A      L-A-N-G-L-E-Y.

3      Q      Have you ever been deposed?

4      A      Yes.

5      Q      How many times?

6      A      Once.

7      Q      And you understand the oath that you

8   took?

9      A      Yes.

10     Q      Are you feeling okay today?

11     A      Yes.

12     Q      Is there any reason that you wouldn't be

13  able to answer my questions?

14     A      No.

15     Q      If you don't understand a question, will

16  you let me know?

17     A      I will.

18     Q      Is it fair to assume that if you answer a

19  question, you understand it?

20     A      If I don't understand it, I will try to

21  let you know I don't understand it.

22     Q      I know we had just got settled, but we

**ICR/Rudiger & Green**
office@icrdepos.com          **www.icrdepos.com**          **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 9 of 196

1   will take breaks.  I'll try to take breaks every hour

2   or hour and a half.

3              If you need a break, just let me know.

4        A     Okay.

5        Q     All I ask is you wait until you have

6   answered a question.

7        A     Okay.

8        Q     How did you prepare for your deposition

9   today?

10       A     I met with Department of Justice

11  attorneys.  I reviewed the relevant documents that

12  related to me.

13       Q     When did you meet with them?

14       A     Last week.

15       Q     For about how long?

16       A     Part of the day.

17       Q     Did you do any other substantive

18  preparations for this deposition?

19       A     I don't think so, no.

20       Q     Have you -- when did you find out that

21  you were being deposed in this case?

22       A     I don't quite remember.  Six weeks ago,

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 10 of 196

1    something like that.  I don't quite remember.

2          Q      Other than preparing with DoJ attorneys,

3    have you talked with anyone substantively --

4          A      No.

5          Q      -- about the deposition?

6          A      No.

7          Q      You said you reviewed some documents that

8    were relevant.

9          A      Uh-huh (affirmative response).

10         Q      What documents did you review?

11         A      I reviewed the declarations that I

12   submitted; I reviewed the notes that you made of my

13   meeting with the plaintiff; I reviewed the fourth

14   circuit EDR plan; I skimmed the complaint; and I

15   skimmed the published Fourth Circuit decision.

16                Let me think about it.  Is there anything

17   else?

18                That's all I can think of.

19         Q      Did you take notes during this case as

20   these events were happening in 2019?  Did you take

21   any notes?

22         A      Probably I took written notes but didn't

ICR/Rudiger & Green
office@icrdepos.com                www.icrdepos.com                (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 11 of 196

1  save them.  The only thing I would have saved was the

2  notes that I've already produced.

3       Q      Do you generally not save your

4  handwritten notes?

5       A      Generally, I do not.  Right.

6       Q      Is there any time when you do save your

7  handwritten notes?

8       A      No.  I usually -- my practice is to take

9  handwritten notes, type them up, and destroy the

10  handwritten notes.

11       Q      I want to talk with you about your

12  service in the judiciary?

13       A      Okay.

14       Q      Where were you employed before you began

15  in the judiciary?

16       A      Before the judiciary, I was an attorney

17  with a law firm in Phoenix, Arizona.

18       Q      What kind of practice did you have?

19       A      Corporate transaction work; and then when

20  the stock market crashed in 1988 -- which will show

21  you how old I am -- I did -- I shifted over to

22  appellate work because the litigators and the

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 12 of 196

1    appellate people didn't understand securities law.

2         Q        How long were you doing appellate work?

3         A        I want to say two years.

4         Q        How long were you in private practice?

5         A        About a decade, maybe short of a decade,

6    like eight years.

7         Q        When did you begin with the judiciary?

8         A        1995.

9         Q        What was your first job?

10        A        Staff attorney for the 10th Circuit Court

11   of Appeals.

12        Q        What was your role in that job?

13        A        As staff attorneys, we work with the

14   judges to draft most of the non-orally argued cases.

15        Q        How long were you a staff attorney?

16        A        From 1995 until I became the judicial

17   integrity officer --

18        Q        And when was --

19        A        -- which was in two-thousand -- I was

20   hired in December of 2018.

21        Q        Did you have any other jobs for the

22   judiciary --

office@icrdepos.com                    **ICR/Rudiger & Green**
                                       www.icrdepos.com                    **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 13 of 196

1     A     No.

2     Q     -- as a staff attorney?

3     A     No.

4           I was an EDR coordinator, but that's not

5     a job.  It's a volunteer add-on thing you do, but it

6     isn't a job title.

7     Q     When did you become the EDR coordinator?

8     A     I think in 2007, about approximately in

9     that time zone, maybe 2006.

10    Q     So you said it was a volunteer role.

11    A     Right.  People in the court who are

12    designated to do it, it's not -- you do your day job,

13    and you do the EDR work as someone comes in and wants

14    guidance.

15    Q     And you began that role in 2007?

16    A     Yes.  This is going to be approximate.

17    Q     Approximate.

18    A     So it could be 2006.  It could be 2005.

19    But it's somewhere in that range.

20    Q     Were you compensated differently --

21    A     No.

22    Q     -- because you were doing that role?

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 14 of 196

 1        A        No.

 2        Q        So your official title remained staff

 3   attorney until 2019?

 4        A        2018.

 5        Q        2018.  I'm sorry.  When you became --

 6        A        Yes.

 7        Q        -- the judicial integrity officer?

 8        A        Yes.

 9        Q        How did you become the EDR coordinator in

10   2007?

11        A        There was another person in the office

12   -- the staff attorney who had been the EDR

13   coordinator -- and when she became the deputy circuit

14   executive, I said I was interested in taking over for

15   her, and they designated me.

16        Q        Why were you interested?

17        A        I guess I don't really remember now why

18   other than it seemed like a helpful thing to do.

19        Q        What kind of training did you get as an

20   EDR coordinator?

21        A        The A.O. had training that you could come

22   to Washington for and they put on a several-day

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 15 of 196

1    training course on the employment protections in the

2    EDR plan and what the employment protections and

3    processes were.

4          Q      So, how many days would you say that

5    training was?

6          A      We are going back a long time.

7          Q      Yes.

8          A      But I want to say it was three days.

9                 And then I was also asked to -- when they

10   put on additional training, they asked me to come in

11   and be one of the trainers; and I did two of those.

12         Q      I'm going to ask you about times you have

13   conducted trainings in just a couple minutes; so, I

14   want to try to focus on training that you received.

15         A      Okay.

16         Q      So this three-ish day training in D.C.,

17   would that have occurred for you in 2007?

18         A      To be precise, I don't remember the year;

19   but it would have been shortly after the became the

20   EDR coordinator so somewhere in that -- I can't limit

21   it to within even a year -- somewhere in that 2005,

22   2006, 2007 time frame.

**ICR/Rudiger & Green**
office@icrdepos.com          **www.icrdepos.com**          **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 16 of 196

1        Q        And did that -- I just want to understand

2    what that training included.

3                  I know it was a long time ago, and I also

4    don't remember those years of my life.  So

5    recognizing that, but just to the best of your

6    memory, I think, you said it included training on

7    sort of the policy and procedures.

8                  Did you learn about the kinds of matters

9    that might come up through the EDR process?

10       A        Without any specificity, I would be

11   guessing; but I think so.

12       Q        Do you know if the training included

13   anything about sexual harassment?

14       A        Yes.

15       Q        Workplace harassment generally?

16       A        We covered all of the employment

17   protections that are in the Employment Dispute

18   Resolution plan; so, yes.

19       Q        And in covering those protections, do you

20   know if it -- do you remember if the training

21   explained what sexual harassment is and what it looks

22   like?

Case 1:20-cv-00066-WGY  Document 255-12  Filed 06/29/23  Page 17 of 196

1              Sorry.  I'll ask what it is.  That was a

2   compound question.

3        A     I would -- not the way I would think I

4   understand sexual harassment today in terms of any

5   extended conversation.  We certainly discussed what

6   Title VII says.

7        Q     Tell me how you understand sexual

8   harassment today.

9        A     That's way too broad of a question.  I

10  mean, that could be an hour-long seminar.  You're

11  going to have to be much more specific than that.

12       Q     I mean, it sounds like your understanding

13  has evolved.

14       A     Well, let me be clearer.

15             What we did in the EDR training was a

16  brief discussion of each of the employment laws.  It

17  wasn't any more extended than what the statement in

18  the EDR plan said about distribution, about

19  harassment, about the Family and Medical Leave Act,

20  about the OSHA, about the Warren Act.

21             It wasn't -- the purpose of it was not to

22  educate us on the law.  The purpose of it was to

1    educate us on the EDR process.

2                Now, there is a lot more I understand

3    about it than what I learned in those days.  Most of

4    my knowledge about sexual harassment comes from being

5    an attorney and understanding employment law.

6         Q     So after that initial training, did you

7    have any other trainings as an EDR coordinator?

8         A     That I was the audience of?

9         Q     Yes.

10        A     No.

11        Q     Did you attend any other trainings on

12   workplace misconduct including sexual harassment,

13   discrimination, or retaliation?

14        A     I just can't remember at this point.

15   Maybe yes.  Maybe no.  I just don't remember.

16        Q     Do you remember ever attending any

17   trainings with outside organizations?

18        A     I don't remember ever doing that.

19        Q     So as the EDR coordinator from 2007 to

20   2018, what did you do?

21        A     When an employee who was covered by the

22   10th Circuit Court of Appeals EDR plan had questions,

**ICR/Rudiger & Green**
office@icrdepos.com          **www.icrdepos.com**          **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 19 of 196

1    I would provide that guidance.

2              And if they filed any of the EDR claim

3    documents, I would keep the records and do all the

4    tasks assigned to an EDR coordinator in the EDR plan.

5         Q     What else did you do as the EDR

6    coordinator?

7         A     Well, I don't know how to describe it.

8              I mean, I can go slow, or do you want it

9    detailed?

10             Do you want like every single thing an

11   EDR coordinator does, or do you --

12        Q     I want to understand what your roles are.

13        A     So if an employee comes to you either by

14   phone or by email, you answer their questions about

15   the EDR plan, whatever their questions might be.

16             Sometimes they want to file a request for

17   counseling; and you give them the guidance, the

18   forms, the EDR plan.  You answer whatever questions

19   they have in that process.  You make sure they know

20   whatever they want to know.

21             If they then file the request for

22   counseling, you make sure -- I keep a private,

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 20 of 196

1  confidential record of it; so I'm like a docketing

2  clerk or like a clerk of court for EDR.

3          If they file a request for mediation, you

4  keep that.  You give a copy to the appropriate

5  parties.

6          You just kind of are the record keeper

7  and you're also the person that answers the questions

8  about the EDR process to the employee and to all of

9  the other parties.

10      Q     About how many times between 2007 and

11  2018 would you say you answered questions from an

12  employee about the EDR plan?

13      A     I would say about once or twice a year.

14      Q     About how many actual claims did you

15  handle?

16      A     Slightly less than once a year.

17      Q     As the EDR coordinator, did you talk with

18  other EDR coordinators in other courts?

19      A     I can't say I didn't, but I don't have

20  any specific memories of that one way or the other.

21      Q     Did you play any other role in the

22  judiciary between 2007 and 2018 in developing

**ICR/Rudiger & Green**
office@icrdepos.com          **www.icrdepos.com**          **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 21 of 196

1    anything related to the EDR?

2        A       Yes.

3                So in 2008, the judiciary wanted to make

4    changes to the model EDR plan; and I was asked to be

5    a member of that EDR working group.

6                I was one of the few non-judges to be

7    part of that working group.  As the non-judge, I did

8    a lot of the writing as you can imagine.  When they

9    had concepts, I wrote them down.

10                And that started in late 2008, and the

11   new revised model EDR plan came out in 2010.

12                So I was part of that entire process of

13   discussing the modifications, writing the drafts,

14   et cetera, and then getting it approved.

15                In 2013 there was -- the judiciary wanted

16   to added whistleblower protection to the EDR plan;

17   and I was asked to draft that provision, and I did.

18                The provision that I drafted was adopted

19   in the 2013 amendments and then when the judiciary

20   wanted to amend the EDR plan again in 2018, I was

21   asked to be on that EDR working group and was part of

22   that.

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 22 of 196

1      Q      Okay.

2      A      I've had -- also, because I had been

3  involved in those amendments of the EDR plan, I began

4  getting calls from -- both I did training of the

5  courts in the 10th Circuit, but people in the

6  judiciary somehow would learn that I was familiar

7  with EDR and I would get calls from the Court

8  sometimes.

9      Q      When did that start happening?

10     A      2010 forward, after the new year -- after

11 the two-thousand -- that was a big amendment in 2010.

12 It was a pretty big -- it was the first amendment.

13             I would say like two, three times a year

14 I got a call from another court saying, "We think you

15 understand this.  What do you think"?

16     Q      Beginning in 2010, two to three calls a

17 year?

18     A      Yes.

19     Q      Okay.

20     A      From courts outside the Court of Appeals.

21     Q      As the EDR coordinator for the

22 10th Circuit Court of Appeals, did you handle any EDR

**ICR/Rudiger & Green**
office@icrdepos.com       **www.icrdepos.com**       **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 23 of 196

1    complaints from the district courts within the

2    circuit; or were those a separate coordinator?

3         A       Districts courts are separate.  If a

4    claim is against a district court judge, though, it

5    is transferred to the Circuit Court of Appeals.

6         Q       You said that the 2010 revision was

7    significant and that you began working as a member of

8    the working group in 2008.

9         A       Yes.

10        Q       Who else was on the working group in

11   2008?

12        A       I don't remember.

13               The only name I remember -- because he

14   and I both came from Colorado -- was Judge Wiley

15   Daniel of the District of Colorado.

16               I remember there was a judge from

17   Kentucky, but I don't remember the name.

18               I remember there was an attorney from

19   Philadelphia that came as an advisor.

20               I remember there was a clerk of court

21   from Texas.

22               There were other judges, and I just don't

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 24 of 196

1    remember the names anymore.

2         Q      What do you mean, an attorney who was an

3    advisor?

4         A      He was an employment lawyer who came in

5    and was an advisor.

6         Q      Do you remember what their experience was

7    in employment law?

8         A      Not at all.  He was an employment lawyer.

9    That's all I remember.

10        Q      You said -- do you know why the 2008

11   working group was formed?

12        A      I know what my memory of one of the

13   impetuses.  I don't know if it was the only impetus.

14               What my recollection of the impetus was

15   that it had come to someone's attention that

16   employees believed the only way -- or at least some

17   employee somewhere.  I don't know whether more than

18   one.

19               But somehow there was concern that at

20   least an employee or more believed the only way they

21   could report what I will call EDR wrongful conduct

22   -- which would include harassment -- was by filing

ICR/Rudiger & Green
office@icrdepos.com           www.icrdepos.com           (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 25 of 196

1  the request for counseling, request for mediation,

2  and complaint, the multistep process to get to a

3  complaint.

4           We wanted to make clear that you could

5  report wrongful conduct even if you didn't want to

6  file a complaint.

7           So one of the major reasons that we were

8  making changes was to put in a provision that would

9  say we encourage you to report wrongful conduct

10  whether or not you want to file a complaint, whether

11  or not you are even a victim of the alleged wrongful

12  conduct.

13      Q      Okay.  And those changes were implemented

14  in the 2010 plan?

15      A      That's correct.

16      Q      Were there any other changes in that

17  provision?

18      A      There were, yes; but I don't remember

19  specifically what anymore.

20      Q      I think you said you were involved in the

21  2013 plan.

22      A      That just added the whistleblower

1    protection, but yes.

2         Q      And again, was there a working group

3    around that plan?

4         A      There was not.

5         Q      Did anybody else assist in that revision?

6         A      I'm sure there were.

7                My chief circuit judge was, I think, the

8    chair of the judiciary sources committee; and that is

9    why he asked me if I would draft it.

10               I know he was working with other judges

11   on that committee; but I don't who, specifically.

12        Q      What about the 2018 working group?

13        A      What about it?

14        Q      Who was on that?

15        A      Like 12 people.

16        Q      Do you remember who?

17        A      Some of the names, not everybody.  I

18   mean, that's a big list.

19               So, the director -- deputy director of

20   the -- so, mentally going around the room in my head,

21   the deputy director of the A.O. Lee Ann Bennett would

22   be there; now director Judge Roslyn Mauskopf -- do

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 27 of 196

1  you want me to spell these names?

2              THE COURT REPORTER:  Yes.

3              THE WITNESS:  Roslyn Mauskopf --

4  R-O-S-L-Y-N -- M-A-U-S-K-O-P-F -- District Court

5  Judge Bryan Jackson; Chief probation officer James

6  Corpening -- C-O-R-P-E-N-I-N-G; from the Fifth

7  Circuit Court of Appeals Mary G. Thompson --

8  T-H-O-M-P-S-O-N; from the First Circuit Deputy

9  Circuit Executive Florence Pagano -- P-A-G-A-N-O.

10             From the Ninth Circuit -- though now the

11 Sixth Circuit -- Marc -- and I cannot think of his

12 last name, and I should know it.  I'm going to feel

13 badly, but I can't think of his last name right now.

14             But Marc -- M-A-R-C -- he is now the

15 Sixth Circuit executive.

16             I'm trying to go around the room in my

17 head.

18             Oh, the Third Circuit executive Margaret

19 Weigand -- W -- probably -- E-I-G-A-N-D -- Weigand.

20             That's who I remember.  I'll feel badly

21 if I left somebody out.

22        Q     We won't tell them.

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 28 of 196

1          A          I feel like I'm the Oscars people where

2     you don't name everybody.

3          Q          There also no music to drag you out.

4          A          It's going to kill me that I can't think

5     of Marc's last name right now, but I'm getting old.

6          Q          You became the judicial integrity officer

7     in 2018.

8          A          December of 2018.

9          Q          Okay.

10          A          Although I started working in January,

11    that's when I was hired.

12          Q          And tell me what the role was as the

13    judicial integrity officer?

14          A          There was a federal judiciary workplace

15    conduct working group that recommended -- issued a

16    report in June of 2018 that had recommended the

17    creation of a national office.

18                    I don't remember, specifically, what the

19    report envisioned as the role.

20                    My best recollection is that the report

21    envisioned the role as being a national resource that

22    would be easy for any judiciary employees to locate

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 29 of 196

1  and find and that it would be a resource outside of

2  someone's court or employing office, if that's where

3  they felt more comfortable.

4          I believe it was also envisioned as an

5  office that could provide training and education more

6  nationally.

7          Certainly, it was envisioned as an office

8  that could provide advice and guidance about the

9  employment protections in the EDR plan and the

10 process for seeking remedies and resolutions under

11 the EDR plan.

12     Q    I think you just said that the report

13 that recommended this was in July of 2019.

14     A    June of 2018.

15     Q    June.  Okay.  I just wanted to make sure

16 I got the date.

17     A    Did I say that?  Huh.

18     Q    That's okay.  They had a supplement in

19 the summer of 2019?

20     A    Well, no.  But I'm surprised I said that

21 because I know it wasn't July of 2019.

22     Q    That's why I asked.

**ICR/Rudiger & Green**
office@icrdepos.com     www.icrdepos.com     **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 30 of 196

1       A       Thank you for asking.  That worries me.

2       Q       It's early in the morning.  It's okay.

3       A       Let me drink more caffeine.

4       Q       So, how did you first learn about the

5    role of the judicial integrity officer?

6       A       I read the June 2018 report.  I do

7    remember reading that and the executive summary and

8    noticing that idea.

9       Q       Did the judiciary post the position?

10      A       Yes.

11      Q       And how did you apply?

12      A       I was at the 10th Circuit Judicial

13   Conference in probably September of 2018, and Lee Ann

14   Bennett asked me to apply.

15      Q       What was -- do you remember what kind of

16   materials were required?

17      A       No.

18      Q       What was the interview process like?

19      A       There was an interview panel I don't

20   remember at all other than I can remember one person.

21   There was probably eight people.

22              The only person I remember being there

1   was Susan Goldberg, who was the First Circuit

2   executive; but there was a whole room full of people

3   who interviewed me.

4          Q      Was it just the one interview?

5          A      Yes.

6          Q      About how long was it?

7          A      Two hours.

8          Q      Do you know how many candidates they were

9   considering?

10         A      No idea.

11         Q      Do you know any other candidates that

12  they were considering?

13         A      No.

14         Q      Why were you interested in becoming the

15  judicial integrity officer?

16         A      I wasn't.

17                I was very happy in Colorado.  I was the

18  First Circuit Director of Workplace Relations, and I

19  enjoyed that.

20                But when Lee Ann Bennett talked to me

21  about it, I do have a lot of familiarity with the EDR

22  plan and wanted to be of assistance, wanted to be

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 32 of 196

1    helpful; and she seemed to think I could be helpful.

2        Q      You said you were the First Circuit

3    Director of Workplace Relations?

4        A      Yes.

5        Q      When did you assume that role?

6        A      August of 2018.

7        Q      What was that role?

8        A      That role was to help all of the judicial

9    employees within your circuit -- help employees, help

10   EDR coordinators, help supervisors, judges --

11   understand their rights, obligations in the EDR

12   process.

13       Q      When you say help, how would you help

14   them?

15       A      So, because EDR -- well, there is lot of

16   different ways; so let me go through it.

17              Let's start with EDR coordinators.  It is

18   an ancillary job and a Court can designate whomever

19   they want.

20              Some designate librarians or staff

21   attorneys or I.T. people; and they only are called

22   upon occasionally to provide EDR advice and guidance.

1  Not all are attorneys.  Not all are employment

2  attorneys.

3             And I believe there is a need to have

4  someone at the circuit level that could be a resource

5  to all of the EDR coordinators within the circuit who

6  could answer the questions that they would have,

7  promptly and efficiently, so they didn't always have

8  to either call the A.O. or not know.

9             Employees -- each -- under the existing

10  EDR plan, employees could always go to their court's

11  EDR coordinators to get information.

12             But I believe that there is times

13  employees don't want to go to someone at their court.

14  They might be concerned of a conflict of interest.

15  They may not want to share private information with

16  someone who they work with.  I thought it was

17  important to have someone outside of their court as

18  an additional option.

19             H.R. people sometimes don't understand

20  employment law and are often asked about employment

21  protections and they would also benefit from having

22  someone at the circuit who could help answer those

**ICR/Rudiger & Green**
office@icrdepos.com          **www.icrdepos.com**          **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 34 of 196

1    kinds of questions.

2              So that's how I envisioned the circuit

3    director job.

4         Q       When you became the circuit director, was

5    that a voluntary role?

6         A       Well, I wasn't forced.

7         Q       You said you were a staff attorney until

8    2018.  So this was another add-on --

9         A       Yes.

10        Q       -- role?

11        A       Yes.

12        Q       Other than EDR coordinator and Circuit

13   Director of Workplace Relations, did you have any

14   other additional titles or roles while you were a

15   staff attorney?

16        A       No.

17        Q       And the Circuit Director of Workplace

18   Relations, was this a role that you envisioned

19   yourself?

20        A       Yes.

21        Q       Was it included in the 2018 working group

22   report?

office@icrdepos.com                      ICR/Rudiger & Green                      (703) 331-0212
                                         www.icrdepos.com
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 35 of 196

1          A        They had also recommended this as a

2    concept.

3                   I actually think because I recommended it

4    to one of the judges who recommended it to the -- I

5    don't know that.  I just think that I had advocated

6    for this idea for a while.

7                   So when I saw it in the report, I made up

8    a story in my mind it was because someone heard me

9    suggest it.

10         Q        Where did you get the idea for this

11   centralized role?

12         A        I can't tell you when and where.

13                  I know that not all of the EDR

14   coordinators had the advantage to go to the training

15   that I had gotten to go to.  I knew that not all of

16   them were attorneys.  Not all of them understood the

17   laws that are in the EDR plan.  And I somehow became

18   aware that people could use extra help.

19         Q        What do you mean by the laws that are in

20   the EDR plan?

21         A        So, there's a lot of federal employment

22   laws that don't, by their terms, apply to employees

1 of the federal judiciary.

2 Starting in 1985, it has become binding

3 judicial conference policy to voluntarily comply with

4 the substance of several federal employment laws.

5 Then in 1997, Congress adopted the

6 Congressional Accountability Act which applied

7 numerous federal employment laws to congressional

8 employees.  And there was some discussion, my

9 understanding is, that should the judiciary -- so

10 some of those same laws apply to the judicial branch.

11 And ultimately, what happened was the

12 judiciary adopted a voluntary binding policy by the

13 judicial conference -- the judges of the United

14 States judicial conference to voluntarily comply with

15 the substance of -- I think it was then -- I think it

16 used to be referred to as nine laws.

17 So, those nine laws we would, as a

18 judiciary, comply with the substance of those laws;

19 but we would have -- because we weren't governed by

20 the EEOC, we weren't subject to the jurisdiction of

21 the federal courts for remedies or violations of

22 those protections -- have an internal claims process

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 37 of 196

 1    that's set forth in the Employment Dispute Resolution

 2    plan.

 3        Q     Do you think it's important that

 4    employees understand the difference between laws that

 5    -- statutes that apply to them and statutes that

 6    don't?

 7        A     Yes.

 8        Q     Do you tell employees that the statutes

 9    do not apply as written?  Do you explain how they are

10    incorporated?

11        A     So in my early training, I didn't.  It

12    seemed kind of in the weeds and technical, so I think

13    it was important for them to know that they had the

14    protections of the EDR plan; but people expressed

15    frustration that I wasn't clearer about that.

16              So now I do deliberately make sure people

17    know that the laws don't apply to us by statute but

18    that they do apply to us through the EDR plan.

19        Q     When did you start making that clear?

20        A     After my training at the D.C. Circuit.

21        Q     When was that?

22        A     December of 2018.

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 38 of 196

 1        Q      Okay.

 2        A      I think I used to say it quickly but not

 3   like a lot a detail, but I always said it quickly.

 4               But now I say it more deliberately.

 5        Q      Do you think that the judiciary

 6   understands that those laws don't apply?

 7        A      Yes -- well, how can I speak for the

 8   entire judiciary?

 9               I know that some people do, and some

10   people don't.

11               MS. WARREN:  Let's mark this as 46.

12                    (Langley Deposition Exhibit No. 46

13                    was marked for identification.)

14               BY MS. WARREN:

15        Q      I'm handing you what has been marked as

16   46.  This is the testimony of Judges Margaret McKeown

17   and Julie Robinson on March 17th of 2022.

18               Would you turn to page three, please?

19        A      (Witness complies.)

20        Q      You will see that it says judiciary

21   employees are protected by at least 10 employment

22   laws and policies.  Is that correct?

**ICR/Rudiger & Green**
office@icrdepos.com          **www.icrdepos.com**          **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 39 of 196

1        A        Is that what it says?

2        Q        Is that what it says?

3        A        Yes.

4        Q        Do you think that statement is correct?

5        A        I think it doesn't make clear that you're

6   not protected by the statutory material, as opposed

7   to being protected by binding judicial conference

8   policy; but you are protected by binding judicial

9   conference which adopts the substance of these laws.

10   So, I wouldn't say it's incorrect.

11        Q        Would you say it's incomplete?

12        A        No.  I wouldn't characterize it like

13   that.  Whatever I just said is what I would say.

14        Q        So it doesn't accurately explain --

15        A        I didn't --

16        Q        -- the --

17        A        -- say that.

18        Q        Would you say that this is accurate?

19        A        I wouldn't say it's inaccurate.

20        Q        I guess I'm wondering what you would say,

21   then, because the opposite of inaccurate is accurate?

22                MS. McMAHON:  Objection.  Form.

**ICR/Rudiger & Green**
office@icrdepos.com                 **www.icrdepos.com**                 **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 40 of 196

```
 1              MS. YOUNG:  Objection.

 2              THE WITNESS:  I feel like I've answered

 3   this question, and I don't have anything more to say

 4   about it.

 5              BY MS. WARREN:

 6        Q    Well, I'm asking you if this is accurate,

 7   and I don't think you have answered that question.

 8              You've said --

 9        A    I think I have.

10              MS. McMAHON:  Objection.  Asked and

11   answered.

12              BY MS. WARREN:

13        Q    How would you characterize this?

14        A    I don't have any other characterization

15   of it.

16        Q    Is this what you would tell people?

17        A    I don't know.  I'm not writing it.

18        Q    That's not my question.

19              Is this what you would tell people?

20        A    Sometimes, yes.  Sometimes, no.  It

21   depends on the audience.  It depends on the context.

22        Q    After your training in December of 2018,
```

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 41 of 196

1    is this what you would tell people?

2          A       Sometimes, yes.  Sometimes, no.  It

3    depends on the context.

4          Q       And what about the context would depend?

5          A       Are they attorneys who are really

6    listening, not attorneys who are listing?

7          Q       Why would that matter?

8          A       Non-attorneys tend to not need the legal

9    details.  They just need to know what the protections

10   are.

11         Q       What about attorneys?

12         A       They might be more interested.  They

13   might not be more interested.

14                 MS. WARREN:  Okay.  Exhibit 47.

15                       (Langley Deposition Exhibit No. 47

16                       was marked for identification.)

17                 BY MS. WARREN:

18         Q       I'm handing you what has been marked as

19   Exhibit 47.

20                 Do you recognize this?

21         A       I do.

22         Q       What is it?

ICR/Rudiger & Green
office@icrdepos.com           www.icrdepos.com           (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 42 of 196

1        A        It's the press release that they put out

2    when I was named.

3        Q        It says in the fourth paragraph that you

4    have developed a nationally recognized training

5    program on EDR laws.

6                I'm going to come back to the training

7    program, but I'm curious what "EDR laws" means?

8        A        Those are the laws that the federal

9    judicial conference said we will voluntarily comply

10   with the substance of in judicial conference policy.

11       Q        So that refers to the list that was in

12   Exhibit 46?

13       A        It does.  Yes.

14       Q        What is your role in the judiciary now?

15       A        I'm the Circuit Director of Workplace

16   Relations for the 10th Circuit and the Eighth Circuit.

17       Q        When you were the circuit director of the

18   10th Circuit of workplace relations for the

19   10th Circuit in 2018, you described that role as an

20   add-on, sort of a voluntary responsibility that you

21   assumed?

22       A        I don't know how well the -- it was my

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 43 of 196

1    job title.  I was still acting as -- I was still

2    doing staff attorney work.  So, again, it would be

3    doing the tasks, as needed.

4         Q     In 2018 in June when you became the

5    workplace --

6         A     August.

7         Q     August?

8         A     August to September.

9         Q     Prior to becoming judicial integrity

10   officer, was your compensation changed when you

11   assumed that role?

12        A     No.

13        Q     Now after your time as the judicial

14   integrity officer as Circuit Director of Workplace

15   Relations for the Eighth and 10th Circuits, is that

16   an independent job separate from a staff attorney?

17        A     Yes.

18        Q     And what is that job?

19        A     The Circuit Director of Workplace

20   Relations is given responsibility in the model EDR

21   plan to provide confidential, informal advice

22   whenever an employee wants to ask questions about

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 44 of 196

1    either the protections in the EDR plan or the EDR

2    processes or alternatives to resolving workplace

3    conduct issues outside of the EDR options; to assist

4    employees in knowing how to find the plan; how to --

5    what the forms are; what the informal options are;

6    what the formal options are to provide training to

7    all of the employees in the circuits but also to

8    provide that training to managers and unit executives

9    and to judges and to answer questions of all

10   judiciary employees -- managers, human resources,

11   judges -- about the protections in the Employment

12   Dispute Resolution plan and about the processes in

13   the EDR plan.

14       Q      So that is now an independent role that

15   is compensated separately.

16       A      Yes.  That is true.

17       Q      Do you know when that became an

18   independent role that was compensated separately?

19       A      I think it evolved throughout 2019.  It

20   was a very new concept, and so each circuit on its

21   own chose whether or not they thought -- it was a

22   very novel concept and so different circuits at

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 45 of 196

1  different times recognized the benefits of having

2  that position.

3           And we are now -- all of the circuits now

4  have a Circuit Director of Workplace Relations, but

5  that was about a two- or three-year evolutionary

6  process.

7           MS. WARREN:  Okay.

8               (Langley Deposition Exhibit No. 48

9               was marked for identification.)

10          BY MS. WARREN:

11     Q     I think you just testified that all the

12  circuits now have directors of workplace relations.

13          I've handed you a list of the directors

14  of workplace relations context by circuit.  Do all of

15  them have a director of workplace relations?

16     A     They do.

17     Q     Would you look at the list?

18     A     They do.

19          The Fourth Circuit has hired somebody.  I

20  don't know their name, but they do have someone.

21     Q     And who is the -- you don't know their

22  name?

```
 1        A       That's right.  I just know they have been

 2   hired and they are starting in May.

 3        Q       Do you know when they were hired?

 4        A       I don't.

 5        Q       So they don't currently have someone in

 6   place?

 7        A       That's true, other than she is starting

 8   in may, which is next month or next week.

 9                And they had someone that just --

10        Q       Do you who they had?

11        A       Yes.  Geetha -- G-E-E-T-H-A -- Ravindra

12   -- R-A-V-I-N-D-R-A.

13        Q       How long did Geetha serve?

14        A       I would be guessing.  I want to say two

15   years.

16        Q       When did their time end?

17        A       I don't remember the specifics because I

18   haven't paid attention.  I can't tell you specifically.

19        Q       So you don't know how long the position

20   has been vacant in the Fourth Circuit?

21        A       I think a few months --

22        Q       Okay.
```

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 47 of 196

1       A       -- three, four months.

2       Q       Is there anything else that your current

3   job as the Circuit Director of Workplace Relations

4   entails that you didn't tell me already?

5       A       I do training in all the courts.

6               I do advising.

7               I'm trying to think of what I didn't tell

8   you.

9               The circuit directors have a -- we're an

10  advisory group.  All the circuit groups are an A.O.

11  advisory group; so, I'm part of that.

12              I provide information to the 10th Circuit

13  workplace conduct working group about workplace

14  conduct matters.

15              That workplace conduct working group

16  authorized the formation of a law clerk advisory

17  group within the 10th Circuit.  So, I coordinated to

18  create that where we have a representative law clerk

19  from all of the district -- most of -- I shouldn't

20  say all of but most of the district courts and

21  bankruptcy courts and the Court of Appeals in the

22  10th Circuit.  And we meet monthly with just

**ICR/Rudiger & Green**
office@icrdepos.com          www.icrdepos.com          **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 48 of 196

1   primarily term law clerks and some career law clerks

2   to understand their perspectives on what it's like,

3   workplace conduct issues as a law clerk.

4           That's all I can think of.  I can't tell

5   if I'm leaving something out, but that's what I'm

6   thinking of right now.

7       Q      In your role as judicial integrity

8   officer, I think we talked about how it was created

9   and how you understood it applied.

10          What did you actually do from January

11  of 2019 to -- when did you leave the role?

12          MS. McMAHON:  Objection.

13          MS. YOUNG:  Objection.  Form.

14          MS. WARREN:  You may answer.

15          THE WITNESS:  I can't remember when I

16  stopped.  February of 2021.  That's right.  This has

17  been -- days kind of meld especially with COVID.

18          I'm sorry.  What was the question?  I'm

19  sorry.

20          BY MS. WARREN:

21      Q      What did you do as the judicial integrity

22  officer?

1          A        So, this could take like an hour.

2                    So I was on the EDR working group at the

3    time.  So, one of my functions was to remain on that

4    and help drafting and being part of that program.

5                    It was taking calls and emails from

6    -- throughout the judiciary on questions that people

7    had about the employment protections in the EDR plan

8    and the EDR process.

9                    It was working with the Federal Judicial

10   Center on improving some of their training on

11   workplace conduct and sexual harassment.

12                   It was attending judicial conferences,

13   H.R. conferences, other judiciary conferences to

14   educate them about the existence of this new job

15   title, to encourage circuits to create circuit

16   directors of workplace relations and why I thought it

17   was a beneficial position for the courts to have, to

18   try to develop -- not try to -- to develop training

19   that I could send EDR coordinators throughout the

20   country for them to provide training in their courts.

21                   That's all I can think of now.

22          Q        Did you have any staff?

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 50 of 196

1        A        No.

2        Q        Did you -- who were you supervised by?

3        A        By the director of the administrative

4   office James Duff -- D-U-F-F.

5        Q        So the judicial integrity office was just

6   you?

7        A        Yes.

8        Q        Why did you resign from the position?

9        A        So, I missed Colorado.  I never wanted to

10  stay in the District of Columbia.  In fact, I always

11  commuted.

12               They were going to now fill the

13  10th Circuit Director of Workplace Relations so that

14  they would have someone there full time, and I

15  realized that I really wanted to go home and do that

16  job.

17               The judicial integrity officer had become

18  a little bit of a political target which I did not

19  want to be part of.

20               I also thought circuit directors can be

21  more hands-on involved in actually addressing issues,

22  whereas the judicial integrity officer is a little

1    more of a top-level referral to the local courts; and

2    I like being actually in the weeds trying to help.

3         Q       Are there any other reasons?

4         A       That's all I can think of.

5         Q       What do you mean that the judicial

6    integrity officer became a political target?

7         A       People were commenting on things in a

8    more political way that is not -- I'm not a political

9    animal.

10        Q       You prefer Colorado.

11        A       And I prefer Colorado.

12        Q       What people were commenting?

13        A       You were.

14                That's all I can think of.

15                No.  There is something else, too.

16                I don't know.  My brain is not

17   remembering right now, but there was something else.

18   I just can't think of what.

19        Q       Are you saying that my testimony made

20   you --

21        A       Yes.

22        Q       -- was part of your resignation?

**ICR/Rudiger & Green**
office@icrdepos.com          www.icrdepos.com          **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 52 of 196

1          A        Oh, yeah.

2          Q        Was there anything else that was part of

3     a political target?

4          A        I literally right now have a brain fog,

5     and I can't think.

6                   It wasn't the primary.  It was just part

7     of the reasoning as that was part of it.

8          Q        Were you involved at all in the job

9     search for your replacement of the judicial integrity

10    officer?

11         A        Yes.

12         Q        What did that search entail?

13         A        I was given a list of -- the A.O. H.R.

14    people had whittled down the applicants to some

15    number of people, and I was part of an interview

16    panel that interviewed, I recall, three people we

17    interviewed and then make recommendations to the next

18    level.

19         Q        Who did you interview?

20         A        Well, I know we interviewed Michael

21    Henry, and I don't remember the names of the other

22    two people at all.

1    Q      Do you remember their qualifications?

2    A      I remember that one was an inspector

3  general for NASA.  That was his background.

4          I remember that the other person had

5  something to do with representing as an attorney, I

6  believe, unions in Ohio.

7    Q      Do you remember how big the applicant

8  pool was?

9    A      I have no idea.

10          I only know the people that were whittled

11  down for the interview panel.

12    Q      What qualifications did you think were

13  important for the job having served in it yourself?

14    A      Understanding employment law; I also

15  think because the job had become very political

16  facing, someone that had had experience interacting

17  with Congress; somebody who was articulate and able

18  to be a good communicator.

19    Q      Do you think that the current judicial

20  integrity officer has those qualifications?

21    A      Yes.

22    Q      Were you in favor of hiring the current

**ICR/Rudiger & Green**
office@icrdepos.com          **www.icrdepos.com**          **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 54 of 196

1    judicial integrity officer?

2         A     He was one of the three -- I don't

3    remember how many people we put forward, but he was

4    in the pool that was put forward.

5         Q     Did you recommend him?

6         A     I just remember he was part of the pool

7    that we put forward.

8         Q     Do you remember what about him made you

9    think he understood employment laws?

10        A     He had been involved with an Olympic

11   organization called Safe Sport where Olympic athletes

12   -- and that includes people all the way up from like

13   eighth grade on who are in like whatever you do for

14   the Olympics at a very young age -- as people that

15   they could report sexual harassment and other

16   potential conduct issues as an Olympic athlete.

17        Q     Did you know anything about his training?

18        A     No, I didn't.  No.  Or if I did, I don't

19   remember it now.

20        Q     Did you know if he had been an attorney

21   representing anyone?

22        A     So, his resumé said J.D., which I did

**ICR/Rudiger & Green**
office@icrdepos.com          www.icrdepos.com          **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 55 of 196

1  interpret to mean that he was an attorney; but I

2  later learned he had not ever taken a bar.

3          MS. WARREN:  Are you okay to go for a

4  little more, or how are you doing on a break.

5          THE WITNESS:  Okay.  I mean, would want a

6  break soon.

7          MS. WARREN:  This a good time for a

8  break.

9              (There was a break taken from

10             10:24 a.m. to 10:33 a.m.)

11         MS. WARREN:  All right.

12         BY MS. WARREN:

13     Q      Ms. Langley, other than the training that

14  you described early on at some point in the

15  mid-aughts as you were becoming the EDR coordinator,

16  I think you said you've attended conferences within

17  the circuit.

18         Have you gotten any other trainings that

19  you have received for your role as the circuit

20  director of workplace conduct?

21     A      It's the Circuit Director of Workplace

22  Relations.

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 56 of 196

1          Q        Sorry.

2          A        I attended a training for the Ninth

3    Circuit EDR coordinator, so I was an audience member

4    in that, although also a panelist.

5                   And it wasn't just conferences in the

6    circuit.  It was conferences throughout the country,

7    but I guess I can't think of anything offhand.

8          Q        So those conferences throughout the

9    country, are they judiciary conferences or outside

10   conferences?

11         A        Judiciary conferences.

12         Q        Tell me about the trainings that you have

13   conducted in the judiciary.

14         A        What do you want to know about it?

15         Q        What trainings have you conducted in the

16   judiciary?

17         A        So in the 10th Circuit and

18   Eighth Circuit, when a Court asks me to provide the

19   training -- they can provide it themselves, if they

20   want -- I work with them to discuss do we want to

21   just have employees; employees and managers;

22   employees, managers, and judges.  Sometimes they

**ICR/Rudiger & Green**
office@icrdepos.com          **www.icrdepos.com**          **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 57 of 196

1   combine them all in one.  Sometimes we do three

2   separate.

3           And I provide training on judiciary's

4   standards of workplace conduct, what are our

5   standards of how we should treat each other and be

6   treated and what are the EDR plan employment

7   protections and what are the processes, informal and

8   formal, in the EDR plan or outside the EDR if the

9   employee experiences or witnesses or becomes aware of

10   conduct that falls below our standards of conduct.

11     Q    When did you first provide a training on

12   behalf of the judiciary?

13     A    It was back when I was an EDR coordinator

14   at the 10th Circuit.  I would have annually provided

15   training in our Court of Appeals only.

16           When we adopted the 2010 new EDR plan --

17   and all of the courts in our circuit adopted it -- I

18   went around and provided a training in each of the

19   courts in the 10th Circuit on what the EDR plan was,

20   what the changes were to all of those courts.

21     Q    How did you develop that training?

22     A    By reading the EDR plan and understanding

Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 58 of 196

1    it and putting together PowerPoint slides.

2         Q      Did you consult with anyone on that?

3         A      Not that I remember.

4         Q      Did you develop any other trainings?

5         A      I don't know what you mean.

6         Q      Have you developed any other trainings

7    that you've provided within your role as the

8    judiciary --

9         A      I have not provided training outside of

10   EDR topics.

11        Q      I'm just trying to understand what all of

12   the trainings within the EDR topics are that you've

13   developed.

14        A      I can't think of any other than what I've

15   told you:  What are our standards of conduct, how do

16   we treat each other, how should we be treated in

17   terms of workplace conduct, what are the employment

18   protections that are in the EDR plan, what do we mean

19   by wrongful conduct.  I tend to give examples of some

20   of the most common types of wrongful conduct.

21               When I do manager training, I tend to

22   focus on what are best practices for dealing with

**ICR/Rudiger & Green**
office@icrdepos.com          **www.icrdepos.com**          **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 59 of 196

1    allegations of wrongful conduct.

2              But it's always -- all of the trainings

3    that I provide are related to those topics.

4        Q     How many times would you say you've given

5    a training?

6        A     A thousand.

7              For example -- and this is just an

8    example -- two weeks ago I did training in one of our

9    District Courts.  I did five trainings a day over

10   three days, so that's 15 right there in a week.

11       Q     How many different sets of training

12   materials have you developed, would you say?

13       A     Well, it would depend on how you define

14   it.  Every time I go, I have a standard set that I

15   every single time I do a training I look at and

16   tinker with.

17             So over the course of four years today's

18   might look different.  The way I prioritize things

19   might look different, the emphasis I give things.

20   Sometimes if I'm in person, I do scenarios.  So I do

21   a different -- some degree of difference almost every

22   time.

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 60 of 196

1             Now, they might look 99 percent the same

2   within a six-month period; but they always evolved

3   and are always tailored to that court.

4             So, for example, every court I go into

5   will have a slide identifying who that Court's EDR

6   coordinators are; so, that's tailored.

7             Every court I go into will have a picture

8   of their EDR plan.  Sometimes I put a slide that

9   shows them where on their web site they could find

10  the EDR plan.

11            So I try to tailor it both to the court.

12  I tailor it to the audience that I know is going to

13  be there.

14            So there is always -- I mean, I literally

15  have a different PowerPoint for every court and every

16  audience that I talk to.

17       Q     In those thousand-plus trainings, who

18  have you trained in terms of the categories of

19  people?

20       A     So, employees, managers and unit

21  executives, judges, H.R. people.

22       Q     Do you think that everyone in the

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 61 of 196

1    judiciary has received training on the EDR policy?

2          A      I can't imagine anything is 100 percent,

3    but I know that it's offered.

4          Q      Was that a priority for you as the

5    judicial integrity officer?

6          A      Yes.

7          Q      Did you work hard to accomplish that

8    goal?

9          A      Yes.

10         Q      What did you do?

11         A      Well, first, developing my training

12   suggestions and then making it available.  I posted

13   it on the JNET so that anyone could copy it and use

14   it as a foundation to improve it or whatever, but at

15   least you had something to work from.

16                I invited people to listen to my training

17   to see if they could -- particularly new circuit

18   directors -- to listen in on how I do training.  We

19   now all learn from each other and here each other's

20   and improve that way.

21                The revised model plan that we changed in

22   2019 requires that the training be held annually, be

**ICR/Rudiger & Green**
office@icrdepos.com          **www.icrdepos.com**          **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 62 of 196

1    offered annually, whereas the older EDR plan just

2    said provide training but didn't have that annual

3    requirement.

4          Q      Is the training mandatory?

5          A      It's not mandatory that people attend.

6    It's mandatory that it be offered.

7                 Many of the courts that I do provide the

8    training in -- each Court makes it's own rules, but

9    many of the courts do on their own require their

10   mandatory attendance; but that's a court-by-court

11   decision.

12         Q      Have you ever consulted with people in

13   other kinds of workplaces about how they handle

14   issues of workplace misconduct?

15         A      No.  I have read things, but I haven't

16   ever had like a consultation with others.

17                I pay attention to those kind of topics.

18   I read those kind of topics in different forums but

19   not that I have actually consulted.

20         Q      What have you read?

21         A      Oh, anything on the Internet, books -- I

22   don't know -- all kinds of thing.  I mean, everything

**ICR/Rudiger & Green**
office@icrdepos.com          **www.icrdepos.com**          **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 63 of 196

1  that you come across, I couldn't possibly name what.

2          Q      Are there any specialized list serves

3  that you read or follow?

4          A      I wouldn't even know what a list serve

5  is; so, no.

6          Q      Have you ever spoken with employees or

7  people involved with judiciary systems in other

8  countries who are working on issues of workplace

9  harassment?

10         A      No.

11         Q      Are you aware of any other countries

12  working on issues of workplace harassment in the

13  judiciary?

14         A      It's not something I've ever paid

15  attention to; so, no.

16         Q      So, I think turning to your trainings

17  that you've developed, do court decisions provide the

18  definitions and standards that the judiciary applies

19  through the EDR?

20         A      Oh, you are really going to have to start

21  that one over again.

22         Q      Where did the definitions and standards

1   that the judiciary applies through its EDR plan come

2   from?

3          A       What definitions?

4          Q       Does the EDR plan have definitions of

5   workplace harassment?

6          A       Yes.

7          Q       Discrimination?

8          A       Yes.

9          Q       Where do those definitions come from?

10         A       They are grounded in the employment laws

11  that we mirror.

12         Q       Do you think that it's important that

13  people be trained before they participate as an EDR

14  investigator?

15         A       Yes.

16         Q       Are you aware if the EDR investigator in

17  this case was trained?

18         A       I don't know anything about the

19  investigator in this case.

20         Q       Do you think it's important that

21  mediators be trained?

22         A       Yes.

1      Q      Are you aware that the mediator in this

2   case was not trained?

3      A      I'm not aware of anything about the

4   mediator in this case.

5      Q      Is there mandatory training for people

6   who actually are participating in administering the

7   EDR process, or is that also court by court?

8      A      The new model EDR plan adopted in 2019

9   has a training and certification program that I

10   created and now it's -- one of the statements in the

11   model EDR plan is that to be designated as an EDR

12   coordinator, you have to go through the training

13   course.

14      Q      Why did you think that was important?

15      A      Because I think EDR coordinators need to

16   understand what their role is and what their

17   responsibilities are and understand, have some

18   familiarity with what they're doing.

19      Q      But prior to 2019, that did not exist?

20      A      That's true.

21      Q      When did you first hear about

22   Ms. Strickland?

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 66 of 196

1      A      February of 2019.

2      Q      How did you hear about her?

3      A      So, I don't have a memory of whether it

4  was a phone call or an email, but I heard from

5  someone who had worked with her.  I only remember his

6  first name was Michael, but he had worked with her

7  when she was a Supreme Court fellow.

8            And as I say, I don't remember whether it

9  was a phone call, an email; but I just remember him

10  saying that he was -- he knew her.  She was involved

11  in some EDR matter and was concerned about how it was

12  being handled and could she talk to me to understand

13  my perspective on the EDR process.

14            MS. WARREN:  Okay.

15                (Langley Deposition Exhibit No. 49

16                was marked for identification.)

17            BY MS. WARREN:

18      Q      Do you recognize this email?

19      A      Just give me a second to take a look at

20  it.

21      Q      Go ahead.

22      A      I'm sorry.  What did you ask me about it

1  now?

2          Q       So I handed it to you.  I didn't ask you

3  a question yet.

4          A       Okay.  Thank you.  I couldn't remember

5  it; so, that's good.  That will explain why.

6          Q       It looks like -- turning to what's 2193

7  at the bottom, it looks like Michael Shenkman reached

8  out to you on February 7th of 2019; is that right?

9          A       That's what I read.

10          Q       And it seems from the email that you

11  spoke on the phone first.

12          A       It does.  It does indicate that.

13          Q       Would have you taken notes on that call?

14          A       I have no idea.

15          Q       Do you remember what he said on the

16  phone?

17          A       Not specifically, no.

18          Q       Turning to page 3922 at the top in an

19  email that you wrote to Ms. Strickland that day, you

20  say, "My role is neutral, but that means I will

21  always give my best assistance and advice to whomever

22  seeks it."

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 68 of 196

 1                     What did you mean by your role is

 2     neutral?

 3          A       So, EDR coordinators, circuit court

 4     directors of workplace relations, and the Office of

 5     Judicial Integrity always are -- we don't advocate

 6     for one party.

 7                     We are advocates to make sure whomever

 8     wants our information understands the process and

 9     understands the EDR plan.

10                     So, managers can call.  Employees can

11     call.  I always make that clear that I'm not like an

12     attorney advocate or a labor rep type kind of person.

13          Q       Are you sort of like an ethics hotline?

14          A       That's not a characterization I've ever

15     used before.  No.  We are literally there to make

16     sure people know the EDR plan.  Here is what it says.

17     Here is a copy of it.  Here is the forms.

18          Q       When you say you will always give my best

19     assistance and advice to whomever seeks it, did

20     anyone ever call in and say, "I think I've harassed

21     someone"?

22          A       No.

**ICR/Rudiger & Green**
office@icrdepos.com          **www.icrdepos.com**          **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 69 of 196

1    Q    Did you ever think about what you would
2  do if someone called in and said that?

3    A    No.  I never thought of that before you
4  just asked.

5    Q    Do you think you would have been neutral?

6    A    Neutral is helping people understand
7  their rights and obligations; so, it would be what
8  are they wanting to know.

9    Q    It looks like through these emails you
10  set up the meeting with Caryn.

11    A    It does look like that.

12    Q    Did she provide you with any materials in
13  advance?

14    A    It says so; so, she must have.

15    Q    Do you remember what she sent to you?

16    A    No.  I mean, I think it says I -- I know
17  -- I do remember she was in the mediation stage, my
18  guess is she sent me the request for mediation.  I
19  just don't have an independent memory today of what
20  she sent me.

21    Q    Do you know which plan applied to her
22  claim?

1      A      My belief it was certainly the -- it was

2 2018, so it has to have been the 2018 Fourth Circuit

3 Court of Appeals EDR plan.

4                    (Beam Deposition Exhibit No. 15, as

5                    previously designated, was identified

6                    for the record.)

7              BY MS. WARREN:

8      Q      This has been previously marked as

9 Exhibit 15 in Heather Mead's deposition.

10     A      Okay.

11                    (Beam Deposition Exhibit No. 16, as

12                    previously designated, was identified

13                    for the record.)

14             BY MS. WARREN:

15     Q      I have one more that has been previously

16 marked as Exhibit 16.

17             So these are just the 2013 and 2018

18 plans.  So looking at the dates on these two plans,

19 on what's marked as Exhibit 15 that's January of

20 2013; is that right?

21     A      Yes, it is.

22     Q      And 16 is marked as November of 2018?

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 71 of 196

1        A       Yes, it is.

2        Q       So if Caryn filed a claim -- filed a

3   request for counseling and mediation in September

4   of 2018, which plan would control?

5        A       In my opinion -- if she filed it in

6   September of 2018, in my opinion, the January of 2013

7   plan would control.

8        Q       How was the January of 2013 plan supposed

9   to work when someone filed a claim under chapter 10?

10              And you can review it, if you want.

11       A       An employee would -- under chapter 10, an

12   employee would start -- a claim would start by filing

13   a request for counseling, and they would file a

14   request for mediation.

15              Then when those two stages' prerequisites

16   were completed, they would have their right to file a

17   complaint.

18       Q       Under the 2013 plan, counseling and

19   mediation were required before a formal complaint?

20       A       Yes.

21       Q       And could you do counseling and mediation

22   at the same time?

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 72 of 196

1        A       The plan did not envision that.

2                The plan envisioned you would start with

3    a counseling period.  It would last for 30 days.

4                When that counseling period ended, the

5    employee had the right to then file a request for

6    mediation.  That was three days.

7                When that period concluded, the employee

8    that had the right to file an EDR complaint.

9        Q       Was the process different in the

10   November 2018 plan?

11       A       Not to my recollection, no.

12       Q       Is the process different now?

13       A       Yes.

14       Q       What is the process now?

15       A       We have eliminated almost all of the

16   prerequisites to filing a complaint.

17               So now with the exception of one type of

18   EDR protection called abusive conduct -- which was a

19   protection added in the 2019 model EDR plan -- anyone

20   can immediately file a complaint.

21               The other change that we made in the

22   model -- 2019 model EDR plan is an informal option.

**ICR/Rudiger & Green**
office@icrdepos.com          **www.icrdepos.com**          **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 73 of 196

1    If people -- let me back up.

2                  A formal complaint means you have the

3    right to have a federal judge hear and decide your

4    allegations that your rights under the EDR plan were

5    violated.

6                  People expressed a concern that that

7    sometimes was actually a barrier to reporting.  It

8    seemed too litigious.  It seemed too formal.

9                  Sometimes people wanted to resolve an

10   issue more informally and not necessarily involve the

11   judge, so we added assisted resolution as another new

12   option that people have.

13                 And of course, you never too need to use

14   EDR to solve a problem.  You can always solve it

15   however you want to solve it.  Those are additional

16   options.

17       Q     What is the difference between chapter 9

18   and chapter 10 under the 2019 EDR plan?

19       A     Chapter 9 is not a process.  Chapter 9

20   says we encourage you to report wrongful conduct.

21   Don't wait.  Don't.  You know, let us know whenever

22   you experience wrongful conduct or whenever you

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 74 of 196

1    become aware of it.

2              The other purpose of chapter 9 is to say

3    let's be sure that the people who can address that

4    concern are notified of that information.

5              So it obligates whomever hears this

6    information to be sure that the EDR coordinator knows

7    and to be sure the EDR coordinator let's the people

8    who have the power to make corrective action,

9    remedial action know about it.  That's all chapter 9

10   is, is essentially an encouraging of employees to

11   report any concerns that they have --

12        Q      And so does -- go ahead.

13        A      Whereas chapter 10 is now a claims

14   process, how do you seek in a procedural manner

15   remedies.

16        Q      So does chapter 9 not involve any

17   investigation?

18              MS. McMAHON:  Objection.  Unclear

19   question.

20              THE WITNESS:  Chapter 9 says that when

21   the information gets to the decision-makers -- the

22   people who are the heads of their offices, the unit

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 75 of 196

1   executives, or the judge -- it says they can take

2   appropriate action including an investigation.

3                   So, I don't know.  I don't remember

4   specifically what you asked.

5                   I think you said does it not include an

6   investigation, and I don't think that's accurate.

7                   I think it certainly anticipates the

8   possibility that there could be investigations.

9                   BY MS. WARREN:

10      Q       So chapter 9 anticipates the possibility

11  that there could be an investigation?

12      A       Well, to be clear, I will stop; and I'll

13  read it into the record.

14                  So I am reading from what is marked as

15  Beam 16, the November 2018 EDR Plan for the Fourth

16  Circuit Court of Appeals; and I am on the plan page 7

17  which is marked 3560 at the bottom with a bunch of

18  numbers at the beginning.

19                  Paragraph -- one, two -- three of chapter

20  nine says that the chief judge -- this is the second

21  sentence of that paragraph says:  The chief judge

22  and/or unit executive shall ensure that the

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 76 of 196

1  allegations in the report are appropriately

2  investigated, either by the human resources manager

3  or other person.

4      Q     Is chapter 9 meant to quickly bring a

5  stop to the harassment?

6      A     It's what it says it is.  It's meant to

7  encourage employees to report it and to make sure

8  that the information gets to the decision-makers.

9            Beyond that, I don't want to speculate as

10  to what its intent is because it's just it is what it

11  says it is.

12            MS. WARREN:  Let's mark this, please.

13               (Langley Deposition Exhibit No. 50

14                was marked for identification.)

15            BY MS. WARREN:

16      Q     Do you recognize this?

17      A     I recognize the first three pages.  I

18  have not remembered all of the attachments.

19      Q     What is this document?

20      A     This is a declaration that I submitted in

21  this case in September of 2020.

22      Q     I think that in this plan or -- so

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 77 of 196

1    sorry -- in this declaration, you are talking about

2    the 2018 EDR plan; is that correct?

3         A      Let me read through it, but I believe so.

4                Yes.  It says there in paragraph five

5    under the model EDR plan in effect in 2018; so, yes.

6         Q      And if Caryn filed her request in

7    September, that would not be the plan that applied.

8         A      There are only two differences that I'm

9    aware of between the January -- the 2013 plan and the

10   2018 plan, and so I can't quite say that's not -- yes.

11               She would have been governed by the plan

12   in effect in 2018.  Whether it was in effect from

13   January through November, it's still 2018.

14        Q      So if she --

15        A      And none of the changes were process

16   changes.  The changes in the two plans were to extend

17   the deadline to file a complaint and to add

18   protections to unpaid interns and externs.  Those are

19   the only two changes.

20               So, yes, she was governed by a 2018 plan.

21        Q      So, if she filed her complaint in

22   September, it would have shifted to the November 2018

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 78 of 196

1    plan?

2        A        So, I would call -- it says, "in effect

3    in 2018."

4                 So, Exhibit 15 was in effect from January

5    through November, and then this was in effect from

6    November through the end of the year; and either one

7    of them at whatever point in time is relevant would

8    have been in effect in 2018, as opposed to the 2019

9    model EDR plan that was adopted a year later.

10       Q        I'm just trying to understand.

11                Would both of them have applied to her

12   claim at different times, or would the 2013 plan have

13   been applied the whole time?

14       A        If there was a dispute about that

15   question, in my opinion, the presiding judicial

16   officer of the matter would make that determination.

17                If you're asking my opinion --

18       Q        Yes.

19       A        -- that it would not shift if she would

20   stay in -- the plan in effect when she filed would

21   remain in effect throughout the course of her

22   procedure, her process; but the process didn't

**ICR/Rudiger & Green**
office@icrdepos.com          **www.icrdepos.com**          **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 79 of 196

1   change.

2              The only thing I can think of that would

3   have impacted her or anyone would have been the

4   change in the deadline to file it.

5              But once she filed it, which is what

6   triggers what is in effect when you file it, that's

7   kind of now a moot question because you've filed it.

8        Q     Looking at page 2 of your declaration --

9   well, actually, it starts on page 1, in paragraph 5

10  -- you say in that last sentence that begins at the

11  bottom what you are talking about is the wrongful

12  conduct provisions, which I understand to mean

13  chapter 9; is that right?

14       A     Yes.  I agree.

15       Q     So chapter nine is simply filing a report

16  of misconduct which then prompts the appropriate unit

17  executive or chief judge to appropriately investigate

18  whether the alleged individuals engaged in misconduct

19  and determine whether a personnel or disciplinary

20  action is warranted.  Is that right?

21       A     Yes.

22       Q     So what you are saying is they may or may

**ICR/Rudiger & Green**
office@icrdepos.com                **www.icrdepos.com**                **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 80 of 196

1    not investigator under chapter nine?

2         A      It says appropriate.  Right?

3                So it's going to depend on the facts.  I

4    would think the vast majority of situations you're

5    going to need to educate yourself.

6                Whether you call that an investigation or

7    you call that educating yourself or you call it an

8    inquiry, you're going to want to know all the

9    information you need to know.

10        Q      Tell me about chapter 10.  What is

11   chapter -- how was chapter 10 supposed to work in

12   this plan?

13        A      I know I answered this a few minutes ago

14   where I said you first file a request for counseling;

15   and then when that 30 days is up and you have gotten

16   all the information you want from your EDR

17   coordinator, then you have the right as an employee

18   to file a request for mediation; and then when that

19   mediation stage is completed you have the right to

20   file an EDR complaint.

21        Q      In any of those phases, are you entitled

22   to an investigation?

office@icrdepos.com
ICR/Rudiger & Green
www.icrdepos.com
(703) 331-0212

Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 81 of 196

1          A          I have to take a look at the plan.

2          Q          Please do.

3          A          The short answer is you are entitled

4    to -- let me just read to you what it says.  That

5    would be easier.

6          Q          I think it's Beam 15.

7          A          I'm referring to Beam Exhibit 15.  I'm on

8    the plan page 14 but your page -- can I just read the

9    last four numbers -- 4552.

10         Q          Yes.

11         A          So I'm in chapter 10, section 10-B-2:

12   The presiding judicial officer may provide for such

13   discovery and investigation as is necessary.

14         Q          So, the officer has the right to

15   determine what's necessary?

16         A          That's correct.

17         Q          So an employee does not have a right to

18   an investigation under that provision.

19         A          I'm just going to read what it says, and

20   I'm not comfortable going beyond that.  That's what

21   it says.

22         Q          It doesn't say that the employee has a

**ICR/Rudiger & Green**

1  right to an investigation, does it?

2              MS. McMAHON:  Objection.  Form.

3              MS. YOUNG:  Objection.

4              THE WITNESS:  It says that they may

5   provide for such discovery and investigation as is

6   necessary; so, I would think they have the right to

7   that sentence.

8              BY MS. WARREN:

9       Q     I think you also said in your declaration

10  which is what we have marked as Exhibit 50, in

11  paragraph 7 that a complainant could request an

12  investigative report during the formal complaint

13  stage.  Is that right?

14      A     Yes.  It's my belief and experience that

15  in an EDR complaint stage employees tell the

16  presiding judicial officer what information they need

17  or they believe the presiding judicial officer needs

18  in order to rule on their EDR complaint.

19              And so they have -- in my experience --

20  and back somewhere it also says they have the right

21  to present evidence and to cross-examine witnesses,

22  and this is part of the right to say, "I think you

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 83 of 196

1    should know this information."

2             But ultimately, it's up to the presiding

3    judicial officer to decide what information they

4    believe is relevant and material.

5       Q    So, the presiding judicial officer gets

6    to determine the scope of discovery.

7       A    I think that's a fair characterization of

8    it.  Yes.

9       Q    And the presiding judicial officer gets

10   to determine the scope of the hearing --

11       A    Yes.

12       Q    -- and the ability to call witnesses?

13       A    Yes.  There is language that says you

14   have the right to tell what witnesses you want.

15             But yes, my opinion is that the presiding

16   judicial officer has the right/discretion to say that

17   is or isn't a relevant witness.

18       Q    So there is no right at any -- scratch

19   that.

20             Is there a right to call witnesses in

21   chapter 10?

22       A    Rather than try to he extrapolate, I'm

**ICR/Rudiger & Green**
office@icrdepos.com      **www.icrdepos.com**      **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 84 of 196

1   just going to try to find the right provision and

2   read it.

3              So, we're actually on the same page 14,

4   which is 4552.

5              And it says in B-2-C that the complainant

6   will have right to present evidence on his or her

7   behalf and to cross-examine adverse witnesses.

8       Q       But the presiding judicial officer gets

9   to determine the scope of the hearing.

10      A       Yes.

11      Q       So the presiding judicial officer could

12  say you cannot call this witness.

13              MS. McMAHON:  Objection.  It calls for

14  speculation.

15              THE WITNESS:  In my opinion, the

16  presiding judicial officer determines what

17  information is relevant and necessary to address the

18  issues raised in the complaint, whatever they think

19  is material.

20              So it's not that the employee has an

21  absolute right to bring, you know, all 200 employees

22  of a in.  The judge makes some judgment decision

**ICR/Rudiger & Green**
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 85 of 196

1    about what witnesses have relevant information.

2               BY MS. WARREN:

3        Q       I'm going to turn back to your

4    declaration.  I'm so sorry that we are flipping, but

5    I will be between these two documents.  So, we are

6    not going to jump around too much between documents

7    other than these two.

8               Looking at paragraph eight which is on

9    page two of your declaration, the first paragraph

10   is -- the first sentence or -- in eight the first

11   sentence is:  The disqualification provision under

12   the model EDR plan in effect in 2018 was designed to

13   ensure that the EDR coordinator, mediator, and

14   presiding judicial officer were impartial, not that

15   the defending party was impartial.

16              Can you tell me where in the language of

17   the disqualification provision in this plan you are

18   drawing that conclusion from?

19       A       I'm drawing that from my opinion in my

20   head, my understanding of how it worked.

21       Q       Let's look at this provision.

22       A       The disqualification provision in the

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 86 of 196

1    Beam EDR plan is part of the complaint -- part of the

2    chapter 10 complaint process.

3                  And the way I always read this and

4    understood this is that people who were either a

5    factfinder or that neutral party needed to be neutral

6    and they needed to not have a bias in it.  And so

7    that's my understanding of that provision is what

8    informs my declaration on paragraph 8.

9          Q      So we are looking at page 10 of Beam

10   15 -- which is Bates 4548 -- in the middle of the

11   page, it says, general disqualification provision.

12   Is that the provision that we're discussing?

13         A      It is.

14         Q      This says a party may seek

15   disqualification of a judicial officer, employee, or

16   other person involved in a dispute by written request

17   to the chief judge.  Is that right?

18         A      It does say that.

19         Q      Does it specify, as your declaration

20   does, that it's about the EDR coordinator, mediator,

21   and presiding judicial officer?

22         A      It doesn't, but it never would have

**ICR/Rudiger & Green**
office@icrdepos.com          www.icrdepos.com          **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 87 of 196

1    occurred to me.  I mean, it's impossible to -- the

2    defending party in any complaint process has a bias.

3    They are just like the complainant has a bias, the

4    defending party has a bias.

5                    So it just never occurred to me to apply

6    it to anyone other than who I identified in A, which

7    is the EDR coordinator, mediator, and presiding

8    judicial officer.  That's Jill Langley's

9    understanding of what that section means.

10                    If somebody wants to interpret it

11   differently, they are entirely free to; but what I

12   wrote in my paragraph 8 is how I have always read and

13   understood that disqualification provision.

14       Q     Do you think that someone could interpret

15   it differently based on the language of the

16   provision?

17                    MS. McMAHON:  Objection.  It calls for

18   speculation.

19                    THE WITNESS:  I've been an attorney long

20   enough to know that any two human beings could

21   interpret anything different ways than I do.

22                    BY MS. WARREN:

1      Q     So do you think that where it says

2  "employee or other person involved in a dispute" that

3  that in any way limits it the way that you're

4  understanding does?

5      A     I do believe the way I interpret it is

6  the way I interpreted it.

7      Q     Has this provision been changed since the

8  2013 plan?

9      A     Yes.  The language is different in the

10  2019 model EDR plan.

11      Q     And why is it different?

12      A     I don't remember now the specifics of

13  why.  I just know it's different.

14      Q     Do you think that that change was to

15  clarify this issue?

16      A     I don't remember now.

17      Q     Is there anything that would refresh your

18  recollection on that?

19      A     No.  I don't think so.

20      Q     And you were involved in drafting that in

21  2019?

22      A     I was part of the EDR working group so

**ICR/Rudiger & Green**
office@icrdepos.com     **www.icrdepos.com**     **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 89 of 196

1    everybody in that room was part of making those

2    changes.

3         Q       Were there meeting notes from the working

4    group?

5         A       Not that I'm aware of, no.

6         Q       Did you take any notes?

7         A       Not that I remember, no.

8         Q       So you don't have any recollection of why

9    this provision was changed?

10        A       I don't.

11        Q       Are you aware of any examples where a

12   judge in the Fourth Circuit in an EDR matter has

13   granted a complainant's request to remove someone as

14   a representative of a responding office and to

15   appoint a neutral representative?

16        A       I have no knowledge of anything in the

17   Fourth Circuit outside of this particular matter; so,

18   no.

19        Q       Are you aware that any other complainants

20   have ever asked for Tony Martinez, the appointed

21   Federal Defender for the Western District of North

22   Carolina, to be removed --

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 90 of 196

1          A       No.

2          Q       -- from their EDR proceeding?

3          A       I'm not aware.

4          Q       And you're not aware if that request has

5     ever been granted.

6          A       I don't have any knowledge of it being

7     asked or denied or anything.

8          Q       Are those -- does the judicial integrity

9     office keep records of EDR complaints?

10         A       No.

11         Q       It doesn't?

12         A       No.

13         Q       Is there some sort of a database --

14         A       No.

15         Q       -- with information about complaints?

16         A       No.  They are kept in each court under

17    each court's EDR plan.

18         Q       Does the judicial integrity office keep

19    records of reports that are made to the judicial

20    integrity office?

21         A       I kept my own records.  I can't speak for

22    what Michael Henry does.

 1       Q       What were your records?

 2       A       I created working with the tech people at

 3   the A.O. a private, to-me-only place where I could

 4   make my own personal notes about a call.

 5       Q       What else were in -- did you keep

 6   anything other than your notes?

 7       A       No.

 8                   (Langley Deposition Exhibit No. 51

 9                   was marked for identification.)

10               BY MS. WARREN:

11       Q       I'm handing you what has been marked as

12   Exhibit 51.  It's Bates stamped 6845.

13               What is this, Ms. Langley?

14       A       This is a printout of that -- whatever

15   you would call it I just described -- what they

16   created for me on my own private drive.  No one else

17   had access to it but me.

18               This is a form that I worked with to

19   create so that I could keep track of calls and

20   emails.

21       Q       And did you track -- it looks like at the

22   top there is -- inquiries and reports?

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 92 of 196

1    A    Hold on.  I can't read any of it.

2    Q    I'm sorry.

3    A    It's so small.

4    Q    I wish I had a magnifying glass for all

5    of us.

6    A    I see the word.

7          I'm sorry.  What was your question?

8    Q    Does it say inquiries and reports at the

9    top?

10   A    I don't see the word "report."  Oh, it

11   does.  I see it.

12   Q    Did you have a separate reporting system?

13   A    No.  It's just that's whatever got

14   written by somebody or me.  I don't know who.

15   Q    And I think inquiry name it says 19-04.

16   A    It does.

17   Q    Does that mean it's the fourth inquiry in

18   2019?

19   A    Yes, it does.

20   Q    About how many inquiries did you get in

21   2019?

22   A    Totally -- well, I take that back.  I

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 93 of 196

1    have a dim memory at the end of the year of it being

2    about 100 but I'm going from -- I'm guessing.

3         Q        And what about 2020?

4         A        I'm guessing it was about the same.

5         Q        This would have been your fourth inquiry

6    as the judicial integrity officer?

7         A        Yes.  Because I started in the middle of

8    January and this was like four weeks later.

9         Q        As the judicial integrity officer, what

10   did you advise employees to do if they experienced

11   harassment?

12        A        To report it to the people who could stop

13   it.

14        Q        Did you participate in creating training

15   for the Federal Judicial Center?

16        A        They had a preventing workplace

17   harassment program that I had heard given at several

18   courts that I thought was not contemporary.  It was

19   like it was a video.  It wasn't horrible.

20              But it wasn't tailored to the judiciary.

21   It was focused on what an employee might do in a

22   corporate setting in terms of going to H.R.  So, it

1  didn't describe any of our EDR options.  It didn't

2  describe EDR coordinators.

3  So I drafted and sent to -- but I don't

4  know what they ever did with it.  But I sent my

5  suggestions for how they could change it, but I don't

6  think I've ever seen it come out of the FJC as them

7  having actually changed the programming.

8  (Langley Deposition Exhibit No. 52

9  was marked for identification.)

10  BY MS. WARREN:

11  Q  Ms. Langley, this seems to be one of the

12  trainings from the Federal Judicial Center; is that

13  right?

14  A  I don't recognize this, so I don't -- I

15  can't tell you what it is or isn't.

16  Q  Okay.

17  A  I don't know if it's what I drafted.  I

18  don't know if it's what I drafted.

19  I mean, as I'm looking at it, I remember

20  one of the things I disliked about it was I don't

21  like to make big distinctions between quid pro quo,

22  harassment, and harassment.

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 95 of 196

1           So, I just don't remember.  I just don't

2    recognize this specifically.

3       Q     Why don't you like to make big

4    distinctions between quid pro quo harassment and

5    harassment?

6       A     I think legally it's not a distinction

7    that's often made in Title VII anymore.

8             I don't think any employees need to know

9    Latin to understand harassment.  They need to know

10   it's wrong however it happens.

11            So I don't think it's beneficial to try

12   to educate employees on legal topics.  I like to keep

13   it simple and straightforward.

14      Q     So, as you look at this document, you

15   don't know if they incorporated your drafts?

16      A     I don't.

17      Q     Do you want to take a second to look at

18   it and see if you recognize anything that you would

19   have provided?

20      A     So I don't know how to answer it because

21   I don't quite know what this is, and so I don't know.

22            What I'm remembering -- it did have a

**ICR/Rudiger & Green**
office@icrdepos.com        **www.icrdepos.com**        **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 96 of 196

1     PowerPoint part of it and maybe this was part of it.

2     So what I'm remembering more is that there was a

3     video.  So, there was a PowerPoint presentation; but

4     what stands out more is the video that went with it.

5              I don't know if this is the PowerPoint

6     that accompanied the video that I saw, although the

7     title of what I saw was "Preventing Workplace

8     Harassment" and it was put out by the Federal

9     Judicial Center.

10        Q     What was the video?

11        A     So it was very '80s era, seriously; and

12    it was employees in an open office setting.

13              The only scenario I remember -- but I

14    think there were two or three -- but the one that for

15    whatever reason stands out is that one of the actors

16    playing an employee had like a Buddha statue on their

17    desk and the co-worker makes fun of it.

18              I do think there was more than one

19    example.  Like someone else was made fun of for

20    something.

21              And then I remember that the employee

22    goes to head of H.R., talks to H.R. about it; and

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 97 of 196

1    then H.R. talks to the manager about it, but I don't

2    remember the specifics of what they said but

3    something about we have to take this seriously or we

4    have to do something.  Then there was a PowerPoint

5    presentation that went with it.

6          Q       Did you watch them give this training?

7          A       Yes.  Three different times at three

8    different courts, I saw someone give this

9    presentation.

10                 I think mostly before I became the

11   judicial integrity officer I had seen it either at

12   courts in my circuit that had invited me to come be

13   part of the training is what I think had happened.

14         Q       As the judicial integrity officer, did

15   you work with the FJC on their trainings?

16         A       So when I became the judicial integrity

17   officer -- yes -- I contacted different people at the

18   FJC and said, "I really think we need to update this

19   training.  I think that it's visually dated.  I think

20   that it's not helpful to employees to not explain the

21   EDR process.  I think they need to know the judiciary

22   system, and so I wanted them to do that.

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 98 of 196

1              The quid pro quo thing I remember just

2     being bothered by if I'm a non-lawyer and I'm seeing

3     a bunch of Latin words on the screen, that doesn't

4     seem welcoming to me.  It doesn't seem informative to

5     me.

6              So, those kind of tinkering-withs I know

7     I wanted to change; and I talked to different people

8     about it at different times to see if we could update

9     it.

10        Q     And many of the employees of the federal

11    judiciary are not lawyers, is that right?

12        A     Many of the --

13        Q     Federal judiciary employees are not

14    lawyers.

15        A     Right.  Of course, yes.  Right.

16        Q     Would you say the majority are not

17    lawyers?

18        A     I couldn't tell you.

19              I mean, I'm making it up, I think, yes;

20    but I don't know.  But yes, I think so.

21              I mean, obviously, we are dealing with

22    legal issues.  It's not like we're working at a bank

1   but --

2         Q       But there are many professional staff who

3   are not attorneys.

4         A       You're exactly right.  And lawyers who

5   don't know employment law.

6         Q       Yes.  The issue of specialty.

7                 I think you said you advised employees if

8   they experience harassment to report it, is that

9   right?

10        A       Yes, to whomever they feel most

11  comfortable reporting it.

12        Q       Do you ever tell them to try to

13  self-manage it?

14        A       S, there's not -- I haven't talked about

15  that in terms of sexual harassment, but in terms of

16  if someone says something maybe offensive to you or

17  maybe verbally abusive to you, I do remember that

18  that was one of the slides I remember seeing is if

19  you want to say, "When you said that, it made me

20  uncomfortable.  Please, don't say that going

21  forward."

22                But that -- so I always want to make

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 100 of 196

1    clear to people that EDR is an additional option.

2    You do what works for you.  If you are comfortable

3    saying something, of course you can should.  You are

4    not prohibited from doing that.  You do what's

5    comfortable for you.  But I tend to talk about that

6    not in sexual harassment as much as other types.

7         Q       In your experiences with sexual

8    harassment, do people often discount their own

9    experiences of sexual harassment?

10        A       I definitely noticed that people who

11   experience sexual harassment, discriminatory

12   harassment, even verbal abuse tend to be -- the

13   phrase I use in my training is silent sufferers.

14               They either diminish it.  My experience

15   is they tend to think -- "If I say nothing, it

16   will -- the problem will stop.  I don't want to make

17   a bigger deal of it," I've heard people say.

18               They haven't asked for this problem; so

19   it's very -- why do they have to have the burden of

20   solving it, and so there is a reluctance to do that.

21               I forget what your question was but --

22   yes -- I do think that's a fair characterization of

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 101 of 196

1   many victims of people who have experienced sexual

2   harassment, discriminatory harassment, and verbal

3   abuse.

4        Q      Do you think that other people sometimes

5   minimize sexual harassment that they witness?

6              MS. McMAHON:  Objection.  It calls for

7   speculation.

8              THE WITNESS:  I will have to honestly say

9   that's a hugely broad question.  I mean, some people

10  yes.  Some people no.  I can't speak for the universe

11  of humans.

12             BY MS. WARREN:

13       Q      Do you think that harassers minimize the

14  harassment?

15       A      Again, you are asking incredibly broad

16  questions so I don't mean to be not answering your

17  question.

18       Q      In your experience.

19       A      What I would say -- here is what feels

20  like a statement that I'm comfortable saying.

21             Some harassers -- not all but some in my

22  experience -- aren't aware that their behavior is

ICR/Rudiger & Green
office@icrdepos.com           www.icrdepos.com           (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 102 of 196

 1   unwelcome for whatever reason, as opposed to, "I'm

 2   intentionally -- I don't care.  I know this is

 3   offensive to you, and I don't care."

 4            What I have seen more often is people who

 5   don't appreciate for whatever reason that their words

 6   or their conduct is offensive or unwelcome.

 7        Q     Does intent matter in sexual harassment?

 8        A     In my opinion --

 9            MS. McMAHON:  Objection.  Vague.

10            THE WITNESS:  In my opinion, no.

11            My training is that part of the goal of

12   reporting it is that people may not know and that it

13   doesn't matter.

14            Now, whether it matters as a legal matter

15   I'm not getting into; but just as a reporting you

16   should report it regardless.  We should address it

17   regardless.

18            BY MS. WARREN:

19        Q     Do you think that it's the perception of

20   the individual who is experiencing the conduct that

21   matters?

22            MS. McMAHON:  Same objection.

**ICR/Rudiger & Green**
office@icrdepos.com          **www.icrdepos.com**          **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 103 of 196

1          MS. WARREN:  You can answer.

2          THE WITNESS:  I certainly think it

3    matters.  I'm not saying it's the only thing that

4    matters, but I think it's one of the things that

5    matter.

6          BY MS. WARREN:

7    Q       I know you said you don't like to

8    distinguish between quid pro quo harassment and

9    harassment because it's confusing.

10   A       In training -- right -- it's not a

11   helpful phrase -- you don't need to know law.

12   Q       In your mind, what is quid pro quo

13   harassment?

14   A       Quid pro quo harassment in my

15   understanding is when a supervisor conditions an

16   employment benefit -- or probably broader than a

17   benefit -- a personnel action on some kind of sexual

18   or romantic relationship.

19          "You have a relationship with me, and

20   you'll get this promotion," as an example.

21   Q       Does the request have to be explicitly

22   sexual or romantic?

ICR/Rudiger & Green
office@icrdepos.com            www.icrdepos.com            (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 104 of 196

1         A        I don't know the answer to that.

2                  I've always thought of it as yes.

3                  I can't -- I'm reluctant to say that's

4    the only categories, but I tend to think of it as

5    some kind of sexualized, romantic -- but, you know,

6    it could be that -- I will just leave it at that.  I

7    don't want to say it's the only thing, but that's the

8    only thing that comes to mind is sexual, romantic

9    relationships.

10        Q        Would requiring someone to stay under

11   their control be quid pro quo harassment?

12                 MS. McMAHON:  Objection.  It calls for

13   speculation.

14                 THE WITNESS:  Yes.  I don't even know

15   what you mean.

16                 MS. WARREN:  All right.   This is Beam 24.

17                 (Beam Deposition Exhibit No. 24, as

18                  previously designated, was identified

19                  for the record.)

20                 BY MS. WARREN:

21        Q        Ms. Langley, I'm handing you a long

22   document; but if you turn to the second page it is

ICR/Rudiger & Green
office@icrdepos.com              www.icrdepos.com              (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 105 of 196

1    the counselor's report in Ms. Strickland's case.

2              Have you ever seen this document?

3         A    No.

4         Q    Would you turn to -- at the bottom --

5    page 1260?

6         A    (Witness complies.)

7         Q    This is an email.  It says Exhibit 2 at

8    the top.

9         A    Okay.

10        Q    Have you ever seen this?

11        A    I have not.

12        Q    Would you read this email?

13        A    Okay.  Just this one page.

14        Q    Yes.

15        A    Okay.  I read it.

16        Q    This is an email from J.P. Davis to Caryn

17   Devins, is that right?

18        A    That's what it says.

19        Q    Did Caryn ever describe receiving a quid

20   pro quo email to you?

21        A    No, not that I recall.

22        Q    She didn't describe -- sorry.

**ICR/Rudiger & Green**
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 106 of 196

1              Did she describe the harassment that she

2   experienced to you?

3        A      I don't remember what she described to me

4   about it, and I don't have any strong memory today of

5   the specifics of it.

6        Q      You had not seen this email before?

7        A      I had not.  Correct.

8        Q      Do you think that this email could be

9   interpreted as a quid pro quo email?

10              MS. McMAHON:  Objection.  Lack of

11  foundation.

12              MS. YOUNG:  Objection.

13              MS. McMAHON:  Objection.  It calls for

14  opinion testimony.

15              MS. WARREN:  You can answer.

16              THE WITNESS:  I don't know even know what

17  this says.  IT has no context to me.

18              MS. WARREN:  Okay.

19              BY MS. WARREN:

20       Q      How do you explain in your training what

21  behaviors are workplace harassment?

22       A      So, remember.  I do five trainings a day.

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 107 of 196

1    I don't say the same things in every one.

2          Q      Yes, generally.

3          A      But I ou talk about it being unwelcome

4    conduct of a sexual or romantic nature that

5    interferes in some way with your ability to do your

6    job.

7          Q      And how do you describe workplace

8    harassment more broadly?

9          A      So, I do -- I start with employment

10   discrimination.

11         Q      How do you describe that?

12         A      So employment discrimination is when an

13   employer takes a personnel action that adversely

14   impacts you in some way that is motivated, in part,

15   on what the EDR plan mirroring Title VII calls a

16   protected class or protected category -- race, color,

17   national origin, gender or sex, pregnancy, your age

18   over 40 because we are mirroring the Age

19   Discrimination in Employment Act, your religion or

20   lack of a religion, and your disability.  I hope I'm

21   not forgetting any of them in there.

22                So that's when there's an actual

**ICR/Rudiger & Green**
office@icrdepos.com          **www.icrdepos.com**          **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 108 of 196

1    personnel action that has been taken that impacts

2    your pay or your status or something that has an

3    improper motive.

4              Then I describe discriminatory harassment

5    as an another form of discrimination which isn't

6    necessarily tied to a specific employment personnel

7    action, but it's a workplace that is unwelcoming or

8    offensive or somehow unpleasant for you, again,

9    motivated, in part, by those same protected

10   classes -- your race, the color of your skin, your

11   national origin, your gender, that you're pregnant,

12   that you're over 40, that you have a disability or

13   your religion or your lack of religion -- again.

14             And then I give some examples of what

15   that could be such as making fun of someone's accent,

16   making fun of someone's cultural practices, their

17   religious clothing that they wear, mocking someone

18   who has a disability, for example.

19             And then I have a specific set of

20   presentations on sexual harassment, and it starts

21   with unwelcome -- that someone can say to you, "Wow.

22   You look really nice," and maybe that's perfectly

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 109 of 196

1    welcome for that person and that relationship; but

2    someone could also say, "Wow.  You look really good,"

3    and it's not welcome.

4                    So, partly, like is this welcome or not?

5    Does the person know that what you're saying is

6    welcome or not?

7                    And then I give examples of how sexual

8    harassment can be a wide range.  I start with what

9    lawyers will call quid pro quo.

10                   My first example that I give is a very

11   obvious example.  An easily spotted example of sexual

12   harassment is when a supervisor, a manager, you know,

13   conditions some employment benefit, training

14   opportunity, or whatever on some kind of tolerating

15   participating in some kind of romantic, sexual

16   relationship -- I don't know even know if I used the

17   word relationship -- but behavior, conduct.

18                   But it can be broader than that.  It can

19   be lewd comments.  It can be showing pornography.  It

20   can be telling dirty jokes in the office or on social

21   media or on Teams messages.

22                   It can be commenting on how you look or

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 110 of 196

1   how you are dressed particularly if that's not

2   welcome.

3                   It can be unwelcome touching.  It can be

4   giving someone a neck rub or a back rub when they

5   don't want it or it's not welcome or even a hug.

6                   So part of my training is can I give you

7   a hug before we touch people, that we check to be

8   sure that's it's okay.

9                   It can be unwanted pressure for dates,

10  that you can be interested in somebody but you need

11  to pay very attention to if they are not returning

12  your flirting behavior because that's uncomfortable

13  for someone who wants to stay no.  They shouldn't

14  have to say no twice.

15                  So, I give a range of examples.  I also

16  always make sure people know it can be verbal.  It

17  can be in writing.  It can be inappropriate images.

18  It doesn't matter what the form of communication is.

19                  And then I encourage people to let

20  someone know, whoever they are the most comfortable

21  telling, when they experience any conduct that falls

22  into those ranges of behavior.

ICR/Rudiger & Green
office@icrdepos.com                     www.icrdepos.com                     (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 111 of 196

 1                    (Langley Deposition Exhibit No. 53

 2                    was marked for identification.)

 3          BY MS. WARREN:

 4          Q     I'm handing you Exhibit 53.  It is Bates

 5     7291.  Take a moment to look at it.

 6          A     Okay.  I've read it.

 7          Q     Have you ever seen this document before?

 8          A     No.

 9          Q     Do you have any idea what it is?

10          A     I'm guessing it looks like something like

11     a judge-type discussion scenario only because it

12     seems -- but I'm guessing.

13          Q     It gives some examples of harassment.  Is

14     that right?

15          A     It does.

16          Q     Do you agree that jokes about requiring

17     female clerk candidates to take a pregnancy test so

18     there is no risk of a pregnant clerk is a sexual or

19     discriminatory harassment grey area?

20                    MS. McMAHON:  Objection.  Lack of

21     foundation.  Calls for speculation.

22                    MS. YOUNG:  Objection.

**ICR/Rudiger & Green**
office@icrdepos.com          **www.icrdepos.com**          **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 112 of 196

1              MS. WARREN:  You can answer.

2              THE WITNESS:  I actually had the taught

3     when I read some of these that I did not think they

4     were grey areas.

5              BY MS. WARREN:

6         Q     Can you tell me which ones you don't

7     think are grey areas?

8              MS. McMAHON:  Objection.  Lack of

9     foundation.

10              THE WITNESS:  The one to describing

11     sexual positions, I wouldn't call that a grey area.

12     That's the thought that propped in my head when.

13              BY MS. WARREN:

14         Q     Asked female law clerk to describe sexual

15     positions mentioned in a case.

16         A     Right.  They all -- taking a pregnancy

17     test is just such an odd thing that I didn't even --

18     it was like, what?

19         Q     What about, "Tells newly married female

20     law clerk that she 'belongs to someone else now'"?

21         A     I didn't understand what that meant.  I

22     was just like what?  I don't understand that comment.

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 113 of 196

1    It just didn't -- I didn't understand it.

2         Q       What about comments about the physical

3    attributes?

4              MS. McMAHON:  Same objection.

5              BY MS. WARREN:

6         Q       About what comments about the physical

7    attributes of female attorneys who appear before him?

8         A       That didn't -- I mean, again, this is

9    just a Jill opinion.  This isn't anything other than

10   me reading it.

11             But it would depend on the comment.  Like

12   I could see something that might be, "Oh, what a nice

13   suit she has," that it might be fine, versus

14   something that would be grossly inappropriate.

15        Q       How about "Requires female law clerks to

16   wear skirts in chambers and in court"?

17             MS. McMAHON:  Same objection.

18             THE WITNESS:  That does strike me as a

19   grey area because a lot of judges do think that.  I

20   mean, they come from a generation where they had,

21   what I would consider, rigid rules about women versus

22   men appropriate office attire.

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY  Document 255-12  Filed 06/29/23  Page 114 of 196

1                  So that, to me, I do think is an example

2      of where educating anybody that people might think

3      that's inappropriate to make women dress differently

4      and show their legs.

5                  I think that that is, in my opinion, an

6      example of a grey area where someone of a certain

7      generation thought it was perfectly normal,

8      unquestionably normal just to say women should wear

9      skirts.

10                 I grew up in a time where I wasn't

11     allowed to wear anything but skirts in school until

12     ninth grade.

13                 So, educating that person that not

14     everyone thinks that women have to show their legs in

15     order to be good attorneys is an example of a grey

16     area that someone may not have any cognizant

17     awareness that it's making women dress differently

18     than men.

19                 BY MS. WARREN:

20         Q     What about the next one, "Only asks

21     female clerks to make copies, get coffee, pick up his

22     dry cleaning"?

1          MS. McMAHON:  Objection.  Lack of

2   foundation and calls for speculation.

3          THE WITNESS:  Again, to me that's a

4   potential grey area because it depends on the facts.

5          When Justice O'Connor became the first

6   Supreme Court female, because she was newest she got

7   the coffee.

8          If it's not that context, there are

9   situations in which that context could be making

10  women to be the go-to person but you're not doing it

11  to men.  So I think that's a good example of,

12  depending on the facts, how offensive or inappropriate

13  it might appear or feel to that person.

14          BY MS. WARREN:

15     Q     What about "Makes race-based comments

16  about someone's cultural food or accents"?

17          MS. McMAHON:  Same objection.

18          THE WITNESS:  Same comment really.  It

19  would depend on the facts.

20          I mean, in the vast majority of

21  situations I would think that would not be

22  appropriate; but maybe saying something like, "Wow,

**ICR/Rudiger & Green**
office@icrdepos.com                      **www.icrdepos.com**                      **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 116 of 196

1    I'm really interested in your Irish culture.  Tell me

2    more," might be fine.  It's going to depend on the

3    facts.

4                    BY MS. WARREN:

5         Q       So you think context is important?

6         A       I do.

7         Q       What about "Tells jokes about religion or

8    race expecting clerks to laugh and tell similar jokes

9    in return"?

10                   MS. McMAHON:  Objection.  Form.  And same

11   objections.

12                   THE WITNESS:  I have a hard time thinking

13   how that would ever be welcome.  Let's put it that

14   way.

15                   That would be an example of in a training

16   I would say avoid doing this.  This does not seem

17   like there is any reason to be joking.

18                   But again, maybe it's something that

19   -- you can certainly theorize examples of jokes that

20   aren't hurtful or offensive.

21                   BY MS. WARREN:

22        Q       Are you aware of anyone ever receiving

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 117 of 196

 1  this training?

 2       A     I don't know what --

 3             MS. McMAHON:  Objection.  Lack of

 4  foundation.

 5             THE WITNESS:  I don't know.  I don't know

 6  what this is; so, I have no idea what it is.  Until

 7  you handed it to me, I had never seen it before.

 8             MS. WARREN:  It's 11:50.  Do you want to

 9  take a break now and come back, or would you like

10  lunch now?

11                  (At 11:50 a.m., the luncheon recess

12                  was taken.)

13

14

15

16

17

18

19

20

21

22

office@icrdepos.com          ICR/Rudiger & Green          (703) 331-0212
                             www.icrdepos.com
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 118 of 196

1          A F T E R N O O N   P R O C E E D I N G S

2                    (At 1:00 p.m., the deposition

3                    proceedings resumed.)

4               MS. WARREN:  All right.

5               BY MS. WARREN:

6          Q      Earlier before lunch, Ms. Langley, I

7     think you said something along the lines of -- and

8     please, you are welcome to tell me I'm

9     mischaracterizing you.  I'm just trying to trigger

10    where we were type of thing.

11         A      Okay.

12         Q      But I think you said something along the

13    lines of you didn't think that people who have

14    experienced harassment should have the burden of

15    solving the problem.

16              MS. McMAHON:  Objection.  Form.

17              THE WITNESS:  I think what I said was

18    people haven't asked for this problem.

19              MS. WARREN:  Yes.

20              BY MS. WARREN:

21         Q      So I know you encourage people to report.

22         A      Yes.

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 119 of 196

1        Q       Who do you think should solve the problem

2    when there's harassment?

3        A       So, assuming we are talking about the

4    workplace, as opposed to the universe.

5        Q       Yes.  Right.

6        A       Right.  Whomever has the power to make

7    personnel decisions in that organization -- the

8    supervisor, the unit executive, the judge -- whomever

9    in that particular work environment has the power and

10   ability to control and, you know, make decisions

11   about staff.

12       Q       Do you think that people have the

13   -- people who report harassment need to propose

14   remedies themselves?

15               MS. McMAHON:  Objection.

16               THE WITNESS:  No.  I think they are free

17   to.  You said supposed to.

18               BY MS. WARREN:

19       Q       Do you think they need to propose

20   remedies?

21               MS. McMAHON:  Objection.  Form.

22               THE WITNESS:  No, I don't think they need

**ICR/Rudiger & Green**
office@icrdepos.com              **www.icrdepos.com**              **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 120 of 196

1  to.

2                 BY MS. WARREN:

3        Q      If someone said that they would like a

4  workplace free of harassment, do you feel like that

5  is a clear statement of the remedy that they would

6  like?

7                 MS. McMAHON:  Objection.  Form.

8                 MS. YOUNG:  Objection.  Calls for

9  speculation.

10                THE WITNESS:  You can't wave a magic

11  wand.  It's like saying I would like world peace.

12                You can only report something that

13  happens and respond to something that happens.

14                So you could say I want a workplace free

15  of harassment, but you don't have bewitched-like powers

16  to prevent people from acting however they act.  All

17  you can do is react when an incident happens.

18       Q      What if someone says they would like

19  advancement based on merits in the workplace?

20                MS. McMAHON:  Objection.  It calls for

21  speculation.

22                THE WITNESS:  When you say, "What about,"

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 121 of 196

1    what do you mean, "What about"?

2              BY MS. WARREN:

3        Q     Is that a remedy, or would you ask them

4    to be more specific?

5        A     So I wouldn't characterize that as a

6    remedy.  I would characterize that as one of our

7    equal opportunity obligations that we have in the

8    judiciary.

9              It's not really a remedy.  It's something

10   that everyone that's part of our commitment is that

11   promotion is based on merit.

12       Q     Do you think -- what are your other equal

13   opportunity obligations?

14             MS. McMAHON:  Objection.  Form.

15             THE WITNESS:  We talked earlier about

16   that personnel decisions should be based on merit and

17   qualifications and shouldn't be based on your

18   membership in a protected class such as race, color,

19   national origin, gender, disability, religion.

20                  (Langley Deposition Exhibit No. 54

21                   was marked for identification.)

22             BY MS. WARREN:

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 122 of 196

1        Q       I want to talk about your meeting with

2   Caryn in February of 2019, and I will give you your

3   notes right away.

4        A       Thank you.  I'm going to take a second to

5   reread it.

6        Q       Go ahead.

7        A       Okay.

8        Q       Are these your notes?

9        A       Yes.

10       Q       Does 19-4 at the top refer to that number

11  that you were using in your initial -- in your

12  internal reporting service?

13       A       It does.

14       Q       Tell me.  How long was this meeting?

15       A       Well, I think it says two hours but

16  that's -- about two or three hours is what I

17  remember, two or three hours.

18       Q       What did you talk about when Caryn first

19  sat down?

20       A       She described to me where it was in the

21  process.  It was more focused on the EDR process than

22  what had actually transpired to cause her to want to

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 123 of 196

 1    initiate the EDR process.  It was focused on where

 2    they were and wanting to understand the EDR mediation

 3    and complaint stage.

 4                So we talked about the different things

 5    that she wanted to understand about where she was in

 6    that process.

 7        Q        Have you ever learned about the

 8    underlying harassment that she experienced?

 9        A        The only knowledge I have of it is from

10    when I read the Fourth Circuit's published opinion

11    that came out last summer before that, and that's the

12    only source of information that I've ever had about

13    the underlying -- I mean, Caryn likely told me

14    something about what had happened; but today I don't

15    remember what she told me, and I don't have any

16    specific memories of it that I can recall.

17        Q        And you wouldn't have anything other than

18    your notes that would refresh your recollection.

19        A        That's true.

20        Q        It looks like you discussed the wrongful

21    conduct report that the federal defender filed.  Is

22    that right?

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 124 of 196

 1            MS. McMAHON:  Objection.  Misleading.

 2            BY MS. WARREN:

 3       Q     It's right there on the middle of the

 4  page?

 5       A     You called it a report that he filed.

 6  That's not how I think of chapter 9.  That's just I'm

 7  telling someone that something has happened.  It's

 8  not a filing.

 9            So the way you characterize it isn't -- I

10  don't think that -- I know that's not how I've

11  characterized it.

12       Q     It says, "The defender apparently filed a

13  wrongful conduct report with the Fourth Circuit.  "

14       A     You're right.  I did use that word; but I

15  think that's the way Caryn described it, and it's why

16  I have the thing that said people seem to think of

17  chapter 9 as a complaint process, which is not how I

18  think of chapter 9, nor do I think it's how chapter 9

19  is written.

20       Q     Can anything happen as a result of a

21  chapter 9 wrongful conduct report?

22            MS. McMAHON:  Objection.  Vague.

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 125 of 196

 1              THE WITNESS:  Whatever the unit executive

 2    and/or chief judge determines is the appropriate

 3    response can happen.

 4              MS. WARREN:  Okay.

 5              BY MS. WARREN:

 6       Q      It says -- looking at that same

 7    paragraph --

 8       A      Which paragraph?

 9       Q      It is the fifth paragraph down.

10       A      Okay.

11       Q      "Caryn was told the EDR complaint process

12    would need to be abated during the wrongful conduct

13    investigation."

14              So I read this to say that she told you

15    the chapter 10 proceeding needed to be abated during

16    the chapter 9.

17       A      This information --

18              MS. YOUNG:  Objection.  Form.

19              THE WITNESS:  This information is what

20    Caryn related to me.

21              So, for example, when it says "filed,"

22    what I believe now is that was the terminology she

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 126 of 196

1    used which is why it's unfamiliar to me.  And so I

2    think the same thing is that I think Caryn told me

3    that someone told her, and so I am writing down her

4    words to me.

5                    MS. WARREN:  Yes.

6                    BY MS. WARREN:

7         Q       Were you concerned that the complaint

8    process would need to be abated during the wrongful

9    conduct investigation?

10                   MS. YOUNG:  Objection.  Form.

11                   THE WITNESS:  I'm trying to think of the

12   right word.

13                   That's never how I have envisioned the

14   process working.

15                   BY MS. WARREN:

16        Q       And why not?

17        A       First, you have a limited amount of time

18   under the EDR plan from when the alleged wrongful

19   conduct happens to file to start the prerequisites.

20   Your request for counseling has to be filed within,

21   under the model plan, 30 days.  I'm assuming

22   that's -- I'm going from memory, but I think that's

ICR/Rudiger & Green
office@icrdepos.com            www.icrdepos.com            (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 127 of 196

1    what the Fourth Circuit was.  So you have a limited

2    amount of time.  Now, granted, that can be extended;

3    but that's reason one.

4                    It to me should always be the employee's

5    choice as to when they initiate that process as to

6    being told.

7                    I don't have a -- I see nothing in the

8    EDR plan that says someone can tell you we are not

9    letting you file something.

10                   So, the concept of saying something had

11   been abated as if she had not agreed to that is not

12   something that I had ever heard of or understood as

13   part of the EDR process.

14                   But I didn't know what she meant by that.

15   That's her words.

16       Q      Did you ask her to explain?

17       A      I could not tell you now what I said or

18   didn't say.  I don't remember, specifically.

19       Q      Do you think you would have?

20                   MS. McMAHON:  Objection.  Calls for

21   speculation.

22                   THE WITNESS:  I remember that one of the

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 128 of 196

1   things that stands out to me even all these years

2   later and what I remember of wanting to volunteer to

3   call James on her behalf was this needs to get to the

4   complaint stage.  Right?

5              It seemed to me that much of what Caryn's

6   frustration was is wanting other people involved to

7   be overseeing this or to be making decisions, getting

8   a presiding judge appointed.

9              BY MS. WARREN:

10      Q      Did she tell you the timeline of any of

11  this?

12             MS. McMAHON:  Objection to form.

13             THE WITNESS:  I don't remember today.

14             MS. WARREN:  Okay.  If she told you

15  -- well, strike that.

16             BY MS. WARREN:

17      Q      How long does the counseling period

18  usually take?

19      A      So I'm going to tell you what the EDR

20  plan says --

21      Q      Yes.

22      A      -- which is 30 days.

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY  Document 255-12  Filed 06/29/23  Page 129 of 196

1          Q       Can that be extended for good cause?

2          A       Going from memory now, I believe that

3   there is a provision in the 2018 plan that says that

4   can be extended for good cause.

5          Q       Can it be extended repeatedly?

6                  And you're welcome to look at the plan.

7          A       I'm not going to speculate beyond what

8   the words of it say.  I don't see anything that says

9   it can't be; so, I guess the answer is yes.

10                 But I want to be clear we are talking

11  about the counseling stage because I have a slightly

12  different answer for the mediation stage.

13         Q       What is the answer for the mediation

14  stage?

15         A       So the mediation stage, it does also

16  -- that says it can be extended with the agreement of

17  the employee and, I believe -- rather than guessing

18  --

19         Q       No.  Go ahead.

20         A       Let's see.  I believe the mediator, but

21  let me check.

22                 "Mediation period may be extended by the

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 130 of 196

1    mutual agreement of the mediator and the employee,"

2    which means I would read that as if the employee does

3    not want to extend mediation.

4                    Now, I do believe there is a general

5    provision elsewhere right on page 9.

6                    And by the way, for court reporter we are

7    referring to Beam Exhibit 15.  On page 9, there is a

8    general provision that says, "The chief judge or

9    presiding judicial officer may extend any of the

10   deadlines set forth in this chapter for good cause."

11                   And then if says, also, the counseling

12   and mediation stage.

13        Q      So that was your earlier answer --

14        A      Yes.

15        Q      -- confirmed.

16        A      (Witness nods head.)

17        Q      Okay.  Do you remember discussing with

18   Caryn her request to disqualify the defender?

19        A      I have some memory of that conversation.

20        Q      What did she say?

21        A      That she had filed a motion to disqualify

22   him from acting on behalf of the office during the

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 131 of 196

1    mediation stage and that she had waited months and

2    had not heard back.

3        Q       How did you respond to that?

4        A       What I remember telling her was that I

5    didn't understand the concept at all of disqualifying

6    the party from representing itself.

7                And so I do -- I don't know what I said

8    to her about the delay in getting an answer back but

9    I remember -- and am seeing in my notes -- thinking

10   that it would surprise me if disqualifying the

11   defendant from being the defendant would be granted.

12       Q       Did you talk with Caryn about remedies at

13   the complaint stage?

14       A       I don't remember.

15               The only question -- the only topic that

16   I remember coming up late in our meeting was her

17   asking what would happen if the defender, like if the

18   presiding judicial officer at the end of the

19   complaint stage -- because that's when remedies

20   happen, after there has been a decision on the

21   merits -- what would happen if the defender refused

22   to comply with the orders.

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 132 of 196

1      Q      And --

2      A      And I said I didn't remember what -- I

3  was not familiar with the -- how a defender could be

4  unappointed.

5              In contrast, if I'm a court employee and

6  the presiding judicial officer orders the clerk of

7  court to provide some remedy, the clerk of court, I

8  understand, is in a very direct employment

9  relationship with the chief judge and the judges on

10  the court.

11              And what I remember telling Caryn is I

12  literally did not know enough about the relationship

13  between a defender -- and I'm talking about the unit

14  executive defender -- and the judges on the Court of

15  Appeals.  And so I remember telling her that I didn't

16  know what would happen.

17              I certainly told her that they are

18  obligated -- a defender would be obligated under the

19  plan to take those remedies and to comply with the

20  order, but I didn't know what would happen if they

21  refused to follow that.

22      Q      Do you know -- I'm just trying to make

ICR/Rudiger & Green
office@icrdepos.com              www.icrdepos.com              (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 133 of 196

1   sure I understand your answer.

2              Are you saying that you didn't know if

3   the Court -- if a presiding judicial officer would

4   have authority to enforce remedies ordered under the

5   plan against the defender?

6       A     No.  I knew that they had the power to

7   enforce it.

8              But the mechanics of what does that

9   enforcement mean, what I didn't know was would they

10  have the power to fire the defender for failing to

11  comply with a presiding judicial officer decision.

12             And after our meeting, I did learn about

13  a statute that describes how a defender can be

14  removed from office for misconduct in office or

15  neglect of duty; and as a lawyer I would make the

16  argument that failing to comply with a presiding

17  judicial officer's order would be neglect of duty.

18             So, I didn't know that.

19      Q     At the time.

20      A     So that was -- my answer to her was, "I

21  don't know what would happen."

22      Q     Okay.

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 134 of 196

1  A  But I also want to be clear when you talk

2 about remedies I am talking exclusively about a

3 post-decision remedy ordered by a presiding judicial

4 officer at the end of the complaint stage --

5  Q  I understand?

6  A  -- not settlement resolutions or other

7 informal resolutions.  I'm talking about remedies

8 under the EDR plan.

9  Q  Does the EDR plan contemplate any

10 distinction between someone's interests as, say, a

11 unit executive and their interests if they are also

12 an accused party?

13  A  Say it again.

14      (The following was read back by the

15      court reporter:

16      QUESTION:  Does the EDR plan

17      contemplate any distinction between

18      someone's interests as, say, a unit

19      executive and their interests if

20      they are also an accused party?

21     THE WITNESS:  So you are going to have to

22 excuse me, but I'm going to stop and reread this to

ICR/Rudiger & Green
office@icrdepos.com  www.icrdepos.com  (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 135 of 196

 1   see off the top of my head.  Without reading it -- I

 2   have to take a look to see if anything pops out as

 3   responsive to your question.

 4                 Just kind of commenting as I go,

 5   certainly a unit executive is covered by the EDR

 6   plan.  Their conduct is governed by it.

 7                 On page three, there are specific

 8   obligation of a unit executive to ensure that

 9   vacancies are publicly announced to attract

10   candidates of a wide range of the qualified labor

11   market to ensure that skills and abilities of

12   employees are identified.  These are section 3-A.

13                 Chapter two, section 3-A, talks about

14   some specific unit executive obligations and

15   responsibilities.

16                 It doesn't quite connect the dots, but an

17   employing office is run by unit executives so when

18   there are obligations at an employee office in the

19   EDR plan to not discriminate and to comply with these

20   protections, it would be the unit executive

21   implicitly to follow the dictates and the obligations

22   of the EDR plan.  So, that's a different role that it

**ICR/Rudiger & Green**
office@icrdepos.com                    **www.icrdepos.com**                    **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 136 of 196

1    contemplates.

2                    In chapter nine, the unit executive is

3    designated as someone who should be informed of a

4    report of wrongful conduct who is tasked with the

5    obligation to make sure that you look into

6    allegations of wrongful conduct.  So, that's a

7    distinction between a unit executive and an employee.

8                    Those are the provisions of the 2018 EDR

9    plan that I see that are unique or reference to

10   distinguish between unit executives and employees.

11        Q     Does the plan contemplate what should

12   happen if a unit executive is an accused employee in

13   the EDR plan?

14        A     Okay.  Now, I'm going to have to read it

15   again.

16        Q     Sorry.  They would have objected if I

17   asked both at once.  I promise.

18                    MS. YOUNG:  Can you read that back one

19   more time?

20                    (The following was read back by the

21                    court reporter:

22                    QUESTION:  Does the plan contemplate

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 137 of 196

1              what should happen if a unit

2              executive is an accused employee in

3              the EDR plan?)

4          THE WITNESS:  I can read it faster now

5    that I've read it again.

6              (Witness reviews document.)

7          I don't see any language that expressly

8    or explicitly says anything about when the unit

9    executive is the person alleged to have violated the

10   rights under the EDR plan.

11          I have more thoughts on that; but to

12   answer your specific question, no.

13          MS. WARREN:  Okay.  I would love to hear

14   your thoughts.

15          THE WITNESS:  I thought so.

16          MS. McMAHON:  Objection.  Form.

17          THE WITNESS:  I walked into that one.

18   She's going to be mad at me later.

19          EDR is very frequently challenging

20   personnel decisions.  Unit executives typically are

21   people who make personnel decisions.

22              So, implicitly in the structure of

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 138 of 196

1   challenging personnel decisions made by a unit

2   executive in EDR, unit executives are not infrequently

3   the person alleged to have taken a personnel action

4   that was discriminatory or failed to prohibit

5   discrimination or failed to prohibit discriminatory

6   harassment, et cetera, under the EDR plan.

7               So I don't -- I want to be honest and be

8   careful with your question.

9               No.  There isn't anything that says what

10  you do when the unit executive is the alleged

11  violator except to comment that's most typically what

12  the fact patterns are.

13              BY MS. WARREN:

14      Q     I guess I just want to understand what

15  those ordinary fact patterns -- the typical fact

16  patterns are.

17              Is it a denial of a promotion?

18              MS. McMAHON:  Objection.  Form.

19              THE WITNESS:  Yes.  That one, yes.

20  That's just -- I mean, it is a violation of the

21  protections in the EDR plan from soup to nuts, the

22  panoply of fact patterns that could arise or that

**ICR/Rudiger & Green**
office@icrdepos.com          **www.icrdepos.com**          **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 139 of 196

1    could be alleged to have arised under the protections

2    in the EDR plan.

3             BY MS. WARREN:

4        Q     But you said it's usually challenging

5    personnel decisions.

6        A     So the named respondent in an EDR plan is

7    the employing office.  It's not a person, and so it's

8    typically challenging.

9             I mean, if you went through each of the

10   laws, employment discrimination is taking an adverse

11   employment action.  The people who take employment

12   actions are unit executives and managers.

13            When you look at harassment under the EDR

14   plan it says that we will look to the laws that we

15   are mirroring.

16            If you look at Title VII, an employer is

17   liable in several situations but one where they are

18   liable is if they know or should have known of

19   harassment and don't take action reasonably

20   calculated to stop the harassment from continuing.

21   So that's another responsibility of a manager or a

22   unit executive.

**ICR/Rudiger & Green**
office@icrdepos.com          **www.icrdepos.com**          **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 140 of 196

1              If you look at the OSHA protections in

2    the EDR plan, making sure we have a workplace free of

3    known hazards, that's typically a unit executive's

4    obligation to make sure we have a workplace free of

5    known hazards.

6              The USERRA protection in the EDR plan is

7    making sure that people returning from military

8    service get their job back.  That's typically a

9    personnel decision to make sure they have their job.

10             So the protections in the EDR plan are

11   employment protections that a unit executive is

12   responsible for complying with.

13        Q    Do you think that there is any conflict

14   of interest in someone representing what is best for

15   their office in terms of liability as you used the

16   term and what is best if they are themselves accused?

17             MS. McMAHON:  Objection.

18             THE WITNESS:  Can you do me a favor and

19   re-read her question?

20                  (The following was read back by the

21                  court reporter:

22                  QUESTION:  Do you think that there

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 141 of 196

1              is any conflict of interest in

2              someone representing what is best

3              for their office in terms of

4              liability as you used the term and

5              what is best if they are themselves

6              accused?)

7          MS. McMAHON:  And I can note for the

8    record an objection.  It calls for speculation.

9          THE WITNESS:  And in response to that I

10   could only answer speculatively.  Sometimes, there

11   is.  Sometimes, there is not.  It will depend

12   entirely on the facts.

13         BY MS. WARREN:

14      Q     Looking at your conversation with Caryn

15   and looking back at your notes on page two which is

16   5446 of Exhibit 54, in the second-to-the-last

17   paragraph towards the bottom it looks like this

18   reflects some of your conversations around the

19   disqualification issue.

20      A     Okay.

21      Q     So, it looks like at least the first

22   couple of sentences confirm what you were just

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 142 of 196

1    explaining to me.

2        A       Right.  Right.

3        Q       Then it says, "If the Court concluded

4    there was a significant conflict of interest, it

5    could act."

6        A       Right.

7        Q       What would that conflict of interest be?

8        A       Okay.  That's like such a general

9    question it's going to depend on what the conflict

10   is.

11       Q       Do you have any idea what kind of

12   conflict of interest you would be referring to?

13       A       Well, I'll use a phrase that we use in

14   the revised model EDR plan.

15       Q       Is that the 2020?

16       A       And actually, I don't even think it says

17   that.  I don't even think there is language in there.

18   So, I'm trying to think of how I described it.

19               Speaking entirely generally -- I'm not

20   going to hypotheticalize about possible fact patterns

21   that fit this general description -- but

22   hypothetically there could be situations in which an

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 143 of 196

1    interest in denying the conduct happened differs from

2    the office's desire to admit the conduct happened.

3    Right?  There just could be times in which the

4    interests are different.

5         Q    You also in that same sentence there is a

6    dash-dash "After it could act," and the sentence

7    continues to read, "such as hiring an outside law

8    firm to represent the office."

9              MS. YOUNG:  Objection.  Form.

10             THE WITNESS:  I guess there isn't a

11   question.  What is the question?

12             BY MS. WARREN:

13        Q    What did you mean by that?

14        A    Because the unit executive runs the

15   office, that's their statutory role when they are

16   not -- if they are not acting on behalf of the

17   office, who does?

18             And so my thinking there was one option

19   might be that the employing office hire a law firm to

20   act on behalf of the office to be empowered to

21   respond and decide how to respond to the complaint.

22        Q    Is the idea because an outside law firm

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 144 of 196

1  would be able to best represent the office's

2  interests?

3       A      It's literally just the thought that I

4  had at that moment, like what would happen if they

5  weren't in charge of the office, which had not ever

6  occurred to me or ever happened in my EDR experience;

7  but that's what I remember thinking, maybe you would

8  hire a law firm to represent the office.  I mean, who

9  else is going to once you've taken out the unit

10  executive?

11      Q      Have you ever heard of anyone within the

12  judiciary of any hiring of a law firm within the EDR

13  process to represent a responding office?

14      A      I have not.

15      Q      Have you heard of an approach like that

16  in other sectors outside of the judiciary?

17      A      I'm not familiar enough without outside

18  the judiciary.  I've been a judiciary employee too

19  many years.

20      Q      Do you get pins?  I hope you do.

21      A      I guess, but I never saved them.  When I

22  die, my children will find them buried in drawers

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 145 of 196

1    around the house.

2          Q       Have you heard, again, in the private

3    sector about outside investigations into --

4          A       Yes.

5          Q       -- allegations --

6          A       Yes.

7          Q       -- of misconduct?

8          A       Yes.

9          Q       Has the judiciary -- strike that.

10               Have you ever considered incorporating

11    that into the EDR plan?

12          A       So, I'm not in charge of the EDR plan.

13          Q       But have you ever considered it?

14          A       I have not, but that's a -- every Court

15    has its own EDR plan and can do whatever it wants to

16    do.

17          Q       Have you ever heard any discussions about

18    the possibility of outside investigations?

19          A       I can't say ever.  I don't know.

20          Q       Looking up at this page in this big

21    paragraph in the middle, a couple of lines down --

22    let's see.  I think, five, six lines down I believe

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 146 of 196

1   you're describing what you told Caryn.

2                   And you said, "It's fine in normal

3   litigation to provide a short plain statement of

4   allegations in a complaint because there are clear

5   discovery rules; but in EDR it is fast and short and

6   there are no clear discovery rules."

7                   Is that how you would characterize EDR?

8       A       If you look at the EDR plan, hearings are

9   expected to be within 60 days.  That's very quick.

10                  If you look at the EDR plan, it doesn't

11  have Rule 16.  It doesn't have all the discovery

12  rules.  It says that the judge will decide how to

13  conduct discovery or investigation to gather the

14  information.

15                  And so -- yes -- based on what I just

16  described to you about the EDR plan, it's fast and

17  there is not established discovery rules that were

18  used to in the rules of civil procedure.

19      Q       Looking a little bit further down this

20  paragraph, it looks like you and Caryn discussed her

21  concerns about her request for counseling and

22  mediation being given to the defender.

ICR/Rudiger & Green
office@icrdepos.com        www.icrdepos.com        (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 147 of 196

1              What do you remember about that?

2      A       I remember her saying that -- well, let

3    me back up.

4              I remember noting that the request for

5    mediation was much shorter than what she was

6    describing to me.

7              And she had said to me that she met with

8    the H.R. investigator for five hours, and yet my

9    recollection was the request for mediation was very

10   short, like it was on a five-hour worth of facts.  So

11   there was a disconnect between factual concerns

12   versus what was in the request for mediation.

13             What I recall my immediate concern was is

14   there is a provision in the EDR plan that says,

15   "Claims not presented in mediation are waived."

16             Now, we can, as attorneys, quibble over

17   what a claim is.  I want to give the employee like,

18   "Don't risk it.  Tell them everything -- whether it's

19   a factual allegation or a legal claim -- so that

20   there is never a risk of an argument that, 'Sorry.

21   You can't bring that in your complaint because you

22   didn't raise it in mediation.'"

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 148 of 196

1          And so that's where the topic came up of

2    why is this so short, because I think you need to

3    have everything in here to protect yourself.

4          And somehow in the course of that -- and

5    I would not have remembered this had I not read it in

6    my notes -- she said that she did not believe the

7    defender had ever seen it.

8          Well, I'm going too fast.  I should slow

9    down.

10          The EDR plan states that the request for

11   mediation should be given -- in fact, let me just

12   read it so I don't say it wrong.

13   Q     That's why we brought it.

14   A     Requests for counseling don't go to

15   anyone.  Requests for counseling go to the EDR

16   coordinator because that's their quiet, confidential

17   time to ask all the questions.

18          And sometimes at the end of counseling

19   nobody wants to go any further, and no one knows

20   there has been a request for counseling.

21          Mediation is an obligation for the

22   employing office and the employee to meet to see if

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 149 of 196

1    they can resolve it; and thus, it says at page 12,

2    chapter 10, section 9, that, "The EDR coordinator

3    shall promptly provide a copy of the request for

4    mediation to the unit executive and the chief judge

5    of the court."

6            So when Caryn said to me, "The defender

7    has never seen my request for mediation," that seemed

8    to not -- I mean, that was not what the EDR plan said

9    should happen.

10        Q     Did Caryn express concern that the

11    defender would see her full allegations which

12    included allegations against him?

13        A     I don't remember that.  What my notes

14    say -- which triggered a bit of a memory -- was that,

15    I believe, she said someone had told her -- I don't

16    remember now where she heard this -- that it would

17    make the defender angry if he saw all the

18    allegations, which made no sense to me.

19        Q     Why didn't it make sense?

20        A     Because what relevance is it whether

21    someone would get angry or not.  Like they are tasked

22    with addressing the issue or responding to the issue,

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 150 of 196

1    but you have to know what you are addressing or

2    responding to.

3         Q     Do you think that someone could be

4    concerned that their boss could be angry at them?

5                MS. McMAHON:  Objection.  It calls for

6    speculation.

7                THE WITNESS:  Yeah.  I have no idea.

8                BY MS. WARREN:

9         Q     Would you be concerned if your boss was

10   angry at you?

11               MS. McMAHON:  Objection.  Lack of

12   foundation.

13               THE WITNESS:  It's like saying I'm going

14   to file a complaint, but I'm not going to tell the

15   defendant what my complaint is about.  I don't

16   understand the concept.

17               If I'm choosing to file a complaint, then

18   I'm choosing to disclose what my complaint

19   allegations are.

20               So, in a big picture do I want my

21   supervisor to be unhappy with me?  No.

22               If I'm filing a complaint that alleges my

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 151 of 196

1   my employing office and/or the unit executive in

2   charge of that office has done something, it wouldn't

3   -- someone's emotional reaction to that doesn't seem

4   relevant to me.

5          BY MS. WARREN:

6       Q       Did Caryn tell you at all about the ways

7   that the defender had retaliated against her?

8          MS. McMAHON:  Objection.  Misleading.

9          THE WITNESS:  I don't have any memory of

10  her telling my anything about the underlying factual

11  obligations.

12         The only thing I remember her telling me

13  about retaliation was that when the H.R. person did

14  the investigation, they had not investigated her

15  retaliation claims.

16         Caryn may have told me, but I don't have

17  any memory today at all of what those were.

18         BY MS. WARREN:

19      Q       Looking at the first page of your notes,

20  the last full paragraph on the page in the second

21  sentence, it says, "Further, when she sought help

22  from OFEP last fall, James and the defender were very

ICR/Rudiger & Green
office@icrdepos.com              www.icrdepos.com              (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 152 of 196

1    angry at her for doing so which she feels is a form

2    of retaliation because she has every right to seek

3    guidance from OFEP."  Do you remember her telling you

4    that?

5         A     No.  Had I not read this in the notes, I

6    wouldn't have had that memory.

7         Q     Was Caryn entitled to seek guidance from

8    OFEP?

9         A     The Office of Fair Employment

10   Practices -- which is what those initials stand for

11   -- is available to judiciary employees to call and

12   ask about their rights and protections under the EDR

13   plan.

14        Q     Would it be appropriate to be upset with

15   an employee for calling OFEP?

16             MS. McMAHON:  Objection.

17             MS. YOUNG:  Objection.  It calls for

18   speculation.

19             THE WITNESS:  That's a question I don't

20   know how to answer.

21             BY MS. WARREN:

22        Q     If someone says that -- if the defender

ICR/Rudiger & Green
office@icrdepos.com                 www.icrdepos.com                 (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 153 of 196

1   had said, "You should not have reached out to OFEP,"

2   would that be an appropriate statement; or would that

3   be a form of retaliation?

4                   MS. McMAHON:  Objection.  Form.

5                   Objection.  It calls --

6                   THE WITNESS:  Yes.  I'm certainly not

7   going to opine --

8                   MS. McMAHON:  -- for speculation.

9                   THE WITNESS:  -- on whether it's a form

10  of retaliation.

11                  MS. McMAHON:  Objection.  It calls for

12  speculation.

13                  THE WITNESS:  I have absolutely no

14  ability on how to answer that question.

15                  BY MS. WARREN:

16      Q      Is it protected conduct to reach out to

17  OFEP?

18      A      You would have to define "protected

19  conduct" in terms of what the EDR plans calls as

20  protected conduct.

21      Q      Is it a right under the EDR plan to reach

22  out for more information?

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 154 of 196

1                    MS. McMAHON:  Objection.  Vague.

2                    THE WITNESS:  So the EDR plan doesn't say

3      anything about the Office of Fair Employment

4      Practices; so, I think the narrow answer to your

5      question is it doesn't address it at all.

6                    BY MS. WARREN:

7           Q      Is there some other right that employees

8      have to reach out to the Office of Fair Employment

9      Practices?

10          A      When you use the word "right," I don't

11     know what that means.

12                   There is an Office of Fair Employment

13     Practices.  People can call it.

14                   I don't know what you mean by "right."

15     So, I don't know.  Like that sounds like a legal term

16     of art that I'm just to the comfortable defining.  I

17     don't know what it means by a "right."

18                   It's not something in the EDR plan; and

19     to me in this context, the only thing that provides

20     guidance or responsibilities would be this document.

21     This document doesn't say anything about the Office

22     of Fair Employment Practices.

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 155 of 196

1      Q      Do you think that employees can be

2   punished for contacting OFEP?

3              MS. McMAHON:  Objection.

4              MS. YOUNG:  Objection.

5              MS. McMAHON:  It callings for speculation.

6              THE WITNESS:  I don't have an opinion on

7   that.

8              BY MS. WARREN:

9      Q      You don't have any opinion at all?

10     A      I don't have any opinion on that at all.

11             I just don't.  I mean, I just don't.  I

12   don't know what -- it's entirely theoretical.

13     Q      So Caryn reached out to the Office of

14   Fair Employment Practices in this case.

15     A      Okay.

16             MS. McMAHON:  Objection.  Can you ask a

17   question?

18             MS. WARREN:  I'm not done.  Thanks.

19             BY MS. WARREN:

20     Q      So when Caryn reached out to the Office

21   of Fair Employment Practices in this case, she told

22   you that James and the defender were upset for doing

**ICR/Rudiger & Green**
office@icrdepos.com            **www.icrdepos.com**            **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 156 of 196

1  so.  Is that appropriate?

2               MS. McMAHON:  Objection.  It calls for

3  speculation.

4               MS. YOUNG:  Objection.

5               MS. McMAHON:  Lack of foundation.

6               THE WITNESS:  There are a million things

7  that could make a different answer.

8               What did she say?  What did she not say?

9               I don't know the answer to that question.

10  It's just not something that any of my -- I don't

11  have any opinion on this, and it depends on what was

12  said.

13               Literally, this is just me writing down

14  what she said; and I can't give an opinion on

15  something where I don't know anything more about it.

16               BY MS. WARREN:

17      Q      You said earlier that you encourage

18  employees to report to someone --

19      A      Yes.

20      Q      -- to whoever they feel most comfortable

21  with.

22      A      By that, I mean, the people in the EDR

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY  Document 255-12  Filed 06/29/23  Page 157 of 196

 1   plan because the Office of Fair Employment Practices

 2   doesn't have a defined role in the EDR plan.

 3        Q        Can employees ask OFEP about the EDR

 4   plan?

 5        A        Yes.  They could, at that time.

 6        Q        Can they do so now?

 7        A        They can, but they would likely be

 8   referred to the Office of Judicial Integrity because

 9   the Office of Judicial Integrity now provides

10   information about EDR plans.

11        Q        When you say the Office of Judicial

12   Integrity, is there anyone in the Office of Judicial

13   Integrity other than the judicial integrity officer?

14        A        There is now a deputy and an

15   administrative assistant.

16        Q        Do you know when they began?

17        A        The deputy began probably a year ago; but

18   whether it's nine months or 18 months, I couldn't be

19   more specific than that.

20                 And the administrative assistant, I

21   believe, began about seven or eight months ago.

22                 BY MS. WARREN:

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 158 of 196

1      Q      You said earlier that EDR is not the only

2  option for employees.

3      A      Right.

4      Q      What are their other options?

5      A      Well, you can always walk into your

6  supervisor's office; your unit executive's office; if

7  you are in a court, the judge's office and say, "I

8  would like help with this workplace conduct problem."

9      Q      Could you go to the Office of Fair

10  Employment Practices?

11      A      You could go to them to get information

12  about what the plan says, but the EDR plan doesn't

13  contemplate them being anything more than providing

14  process advice.  They're not part of the court.

15  They're not part of the EDR plan of that court.  So,

16  it would be informational.

17          If they don't have any power to take

18  action, a unit executive would be; or if you were a

19  court employee, a judge would have.

20      Q      Turning to the end of your note, on this

21  last page do you remember if Caryn explained why she

22  did not want you to reach out to James Ishida --

**ICR/Rudiger & Green**
office@icrdepos.com          **www.icrdepos.com**          **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 159 of 196

1    I-S-H-I-D-A.

2          A      I would not have remembered but for

3    reading what I wrote; so, my memory is literally just

4    the words on this page.

5          Q      Do you remember asking why they thought

6    it might inflame matters?

7          A      I don't have -- I have no recollection of

8    anything about this conversation.

9          Q      And there is nothing that could refresh

10   your recollection other than these notes.

11         A      That's true.

12         Q      You wrote that you don't share their

13   cynicism about why things have proceeded as this

14   have.  What did you mean?

15         A      That.  What I said.  That I thought based

16   on what they were telling me that even though the

17   mediation was taking long, it seemed like it might be

18   taking long because of Caryn's disqualification

19   motion -- it might be taking long for other reasons

20   -- and that a lot of what she wanted to have happen

21   such as getting a copy of the report were things that

22   she had all the power to request in the complaint

ICR/Rudiger & Green
office@icrdepos.com              www.icrdepos.com              (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 160 of 196

1   stage.

2                   And so I had a belief -- and I think I

3   expressed the opinion -- that as the -- if you

4   proceed to the actual complaint process, things that

5   you're frustrated about in terms of wanting a remedy,

6   wanting a copy of the investigation report, can and

7   will happen or can happen and I thought would happen.

8       Q      You said that -- strike that.

9                   The unit executive has the power to take

10  action, is that right?

11                  MS. McMAHON:  Objection.  Vague.

12                  THE WITNESS:  Yeah.  I agree.  That's a

13  vague question.  Like what kind of -- like can --

14                  MS. WARREN:  In the EDR plan?

15                  THE WITNESS:  -- you be more specific

16  about what you mean by EDR action?

17                  MS. WARREN:  Yes.

18                  BY MS. WARREN:

19      Q      In chapter 10, who has the power to

20  actually take action?

21      A      Yeah.  I'm sorry.  I still can't answer

22  it because there's too many contexts.

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 161 of 196

1              It's not a false statement.  It's just

2      that there is a lot of -- like what kind of action?

3              They can make hiring decisions.  They can

4      make promotion decisions.  They could make personnel

5      decisions.  They can -- I mean, there is an infinite

6      number of things that unit executives have the power

7      to do.

8              So, I'm not sure what you mean by what

9      kind of action.  So like if you want to be more

10     specific about an action, that's helpful.

11         Q      So in chapter 10 --

12         A      Right.

13         Q      -- what power does the unit executive

14     have?

15         A      To represent the office as the employing

16     office in defending or responding -- whatever they

17     want to do in their response -- to the allegations

18     -- admit them, deny them, respond, provide evidence

19     -- but they don't have any other power than being a

20     party.

21             They are essentially the person who

22     represents the respondent, which is the equivalent in

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 162 of 196

1   sort of a sense to a defendant.

2       Q       So, did you tell Caryn that the unit

3   executive has no power other than a party?

4       A       I don't have any specific memory of that

5   statement, but I certainly was differentiating

6   between a unit executive's responsibility empowered

7   to act on behalf of the office during mediation.

8               But in the complaint stage really the

9   only person that makes decisions is the designated

10  presiding judicial officer.  Everybody else are

11  parties or witnesses.

12      Q       At the end of this paragraph you said

13  that you reassured them that they are at the start of

14  the EDR process with all of the due process that it

15  offers.

16              What did you mean by "all of the due

17  process"?

18      A       So the EDR plan has -- and we can read

19  through them.  There are all kinds of protections,

20  procedural provisions that are in chapter 10.

21      Q       Do you believe that those all comport

22  with due process in a Constitutional sense?

1          MS. YOUNG:  Objection.

2          THE WITNESS:  I could not begin to opine

3   on Constitutional judicial process.  I graduated from

4   law school in '85, and I'm not a common law expert

5   anymore.

6          BY MS. WARREN:

7      Q      So when you used due process in this,

8   that was not the concept of due process you were

9   referring to?

10          MS. McMAHON:  Objection.  Form.

11          THE WITNESS:  I think that's a fair

12   statement.  I think I was referring to the process

13   that is described in the EDR plan.  I was not

14   remotely thinking Constitutional concepts.

15          BY MS. WARREN:

16      Q      Do you think that there are processes in

17   the EDR plan that comport with due process?

18          MS. McMAHON:  Objection.  It calls for a

19   legal conclusion.

20          THE WITNESS:  Yeah.  That does call for a

21   legal conclusion.

22          BY MS. WARREN:

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY  Document 255-12  Filed 06/29/23  Page 164 of 196

```
1        Q       And you said you haven't been in
2   constitutional law in a while.
3        A       No.  I was number one in my class but
4   that was --
5        Q       Congratulations.
6        A       And I still have my little book, but
7   that's been almost 40 years.
8                MS. WARREN:  I was not at the top of my
9   common law class.  I can tell you that.
10               Let's take a break.
11                    (There was a break taken from
12                    1:58 p.m. to 2:07 p.m.)
13               MS. WARREN:  Back on the record.
14               BY MS. WARREN:
15        Q      I want to go back to Exhibit 51.  I'm
16   sorry to make you dig through the pile.
17        A       That's the one that's really tiny.
18        Q       I think you might need Jenny's glasses
19   for it.
20        A       Okay.  I'm ready.
21        Q       So you said -- and this is in the initial
22   inquiry narrative.  I'm sorry it's in, it looks like,
```

1     six font.

2                          That last sentence reads -- and this is

3     Exhibit 51, Bates 6845 -- "I met with Caryn and her

4     husband for several hours and discussed my

5     recommendations to persuade the Fourth Circuit EDR

6     coordinator to bring this matter to some prompt

7     resolution."

8                          Did you feel like the Fourth Circuit EDR

9     coordinator needed persuading in this case?

10         A     Say that again.

11         Q     Did you feel like the Fourth Circuit EDR

12    coordinator needed persuading in this case?

13                         MS. YOUNG:  Objection.  Vague.

14                         THE WITNESS:  Well, that's the words I

15    wrote down.  Let's put it that way.

16                         BY MS. WARREN:

17         Q     Turning the page to 6846, for the

18    resolution narrative it says, "Caryn was offered a

19    job as a career law clerk to a Fourth Circuit judge

20    and dismissed her EDR request for mediation.

21                         "Eventually, the FPD took corrective

22    action against the supervisor, and the Fourth Circuit

ICR/Rudiger & Green
office@icrdepos.com                    www.icrdepos.com                    (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 166 of 196

1  chief judge counseled the defender for his response."

2           Was Caryn offered a job as a career law

3  clerk?

4      A     That's what I was told.  I don't have

5  personal knowledge of that.

6      Q     Were you concerned at all about that

7  resolution?

8      A     I have no memory of being concerned about

9  the resolution.

10      Q     "Eventually, the FPD took corrective

11  action against the supervisor; and the Fourth Circuit

12  chief judge counseled the defender for his response."

13           Are you aware of the details of that

14  counseling or the corrective action?

15           MS. YOUNG:  Objection.  Misleading.

16           THE WITNESS:  I am not.  I'm not aware of

17  any of those.

18           BY MS. WARREN:

19      Q     I'm sorry to make you go back to the

20  plan, but I want to look at the confidentiality

21  provision.

22      A     Okay.

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 167 of 196

1    Q    Let me just find the section.  I believe

2  that's on page 8.

3    A    Thank you.

4    Q    So this is Beam 15, Bates 4546, and this

5  is under chapter 10.  Is that right?

6    A    That's correct.

7    Q    It says, "The Court or employing office

8  shall protect the confidentiality of allegations

9  filed under this plan to the extent possible;

10  however, information about allegations filed under

11  this plan shall be shared on a need-to-know basis."

12        Have you trained EDR coordinators about

13  the definition of confidentiality under this plan?

14    A    I don't because I train them under the

15  new plan.

16    Q    Does the new plan have a different

17  definition of confidentiality?

18    A    I believe it does, but I would have to

19  take a look at it.  But I don't have it.

20    Q    And you are talking about the 2020 plan?

21    A    The 2019.

22    Q    2019.  Okay.  I do not have a copy of

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 168 of 196

1    that one with me.

2              Have you ever trained anyone on this

3    definition of confidentiality?

4         A    I don't know.

5         Q    Do you have any understanding of what a

6    "need-to-know basis" means?

7         A    So, what I do know is that without

8    remembering the specifics, the need-to-know language

9    was one of the amendments from the 1997 plan to the

10   2010 plan.

11             Whatever it used to say, it didn't even

12   provide any guidance; and I remember the discussion

13   of, well, people need to know it.  Either they need

14   to know it because they are a witness, or they might

15   need to know it because they are the person who has

16   information or the person who can make the remedy

17   happen.

18             And so that was the language that was

19   added in the 2010 plan saying it's permissible to

20   disclose to people who need to know.

21             I think -- 100 percent memory -- the

22   current version says who need to know in order to

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 169 of 196

1    help address or resolve, like we gave a little more

2    definition of what we mean by need to know.

3                    Like why would you need to know?  You

4    need it because you have knowledge or you're going to

5    implement.

6          Q      Why would a witness need to know about

7    the confidentiality of a proceeding?

8                    I think you said it would be important to

9    tell witnesses.

10         A      What you are telling them is that there

11   is an EDR complaint, as opposed to not telling them

12   that there is an EDR complaint.

13                   Like no one who doesn't need to know

14   about the EDR complaint would know about the EDR

15   complaint.  That would be a confidential process that

16   was happening.

17         Q      So, would you need to tell a witness this

18   is confidential or something along those lines

19   about --

20         A      They would be told this same language,

21   that this is a confidential process.

22                   "You have information that we need."

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 170 of 196

1              You can't have a witness without knowing

2    why they are being a witness to something.  So, that

3    might require you to tell them, "This is part of an

4    EDR complaint process."

5         Q     Is it important to tell someone who is

6    accused that the EDR complaint is confidential?

7         A     This provision applies, and so everyone

8    who needs to know this needs to know this.  That

9    would be everyone.

10        Q     Is one purpose of confidentiality to

11   prohibit rumors or retaliation by sharing private

12   things?

13             MS. YOUNG:  Objection.  It calls for

14   speculation.

15             THE WITNESS:  I was really going to say

16   that I can't speak to the provision.

17             I only know that this is the words on the

18   page.  There is no all-powerful being that has an

19   intent in their head that I can refer to; so, it just

20   is what it is.

21             MS. WARREN:  Okay.

22             BY MS. WARREN:

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 171 of 196

1        Q       So you have no idea why -- other than

2   what this says -- why confidentiality would be

3   important?

4        A       That's true.

5        Q       Have you ever spoken with anyone about

6   the confidentiality provision?

7        A       Yes.

8        Q       Have they expressed a view on why it's

9   important?

10               MS. McMAHON:  Objection.  Lack of

11  personal knowledge.

12               MS. WARREN:  She said she has spoken to

13  them.

14               THE WITNESS:  But I don't remember other

15  people's conversations about it.

16               BY MS. WARREN:

17       Q       But you've had conversations with other

18  people about the confidentiality?

19       A       Sure.  I'm the Circuit Director of

20  Workplace Relations.  We talk about all provisions in

21  the EDR plan.

22       Q       And because it's a provision in the EDR

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 172 of 196

```
 1   plan, it's important to follow.

 2        A      Yes.

 3                    (Langley Deposition Exhibit No. 55

 4                    was marked for identification.)

 5               BY MS. WARREN:

 6        Q      This is Exhibit 55.  You are welcome to

 7   take a look at it.

 8        A      Okay.

 9        Q      So, looking at the email on the last page

10   which has Bates 5392 --

11        A      Okay.

12        Q      -- I think you wrote to Caryn on

13   February 17th.  You said, "I hope Friday wasn't

14   completely overwhelming.  I felt a little overwhelmed;

15   so I suspect you did, as well."

16               Do you remember why you felt overwhelmed?

17        A      No, I don't.

18        Q      Do you remember why you thought she might

19   have been overwhelmed?

20        A      I do remember that both she and her

21   husband were very -- they had a strong passionate

22   frustration.
```

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 173 of 196

1         Q        And how did they communicate that to you?

2         A        I don't know now.  I just don't remember.

3                  It's a sense of an emotion you're picking

4    up from body language and tone of voice, and I don't

5    remember the specifics now.

6         Q        Is that why in the next sentence you

7    said, "I know this has been an arduous path for you"?

8         A        Yes.  Because you could tell that she had

9    wanted things to be happening differently and was

10   struggling to have those things happen.

11        Q        When you said at the end of this

12   paragraph, "All of the due process rights in the EDR

13   complaint process are still there for you to use,"

14   was "due process rights" still colloquial in that?

15        A        It was literally talking about the

16   process.  The Constitution never entered my mind at

17   all.

18        Q        In the next paragraph you talk about

19   possibly speaking to James; and then in your last

20   paragraph you say, "I'm also passionate that

21   employees not fear retaliation for coming forward and

22   for using EDR."

ICR/Rudiger & Green
office@icrdepos.com              www.icrdepos.com              (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 174 of 196

1          A       Right.

2          Q       Is that because you understood that she

3     feared retaliation if you talked to James?

4          A       No.  I didn't have a sense of that.

5                  The only retaliation I remember -- and I

6     don't remember the specifics of what she felt had

7     happened that was retaliatory -- but that that was

8     one of her allegations.

9          Q       Looking at the page before it which is

10    5391, you said, "Every matter can be a lesson

11    learned.  For example, your experience has taught me

12    that I/we need to provide EDR interpretive guidelines

13    to courts to flesh out what I/we think should happen

14    in EDR proceedings."

15                 What did you mean by that?

16         A       So, he EDR plans are adopted on a

17    court-by-court basis, and each individual court unit

18    does it's own reading of the EDR plan, it's own

19    interpretation of the words.

20                 Coming into a national role outside of my

21    10th Circuit universe where all of the courts have

22    the same plan and where I was familiar, to some

ICR/Rudiger & Green
office@icrdepos.com              www.icrdepos.com              (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 175 of 196

1    degree, of how different courts within the

2    10th Circuit interpreted things and had a sense of

3    that, coming into a national role and seeing that

4    people read the same language differently was like we

5    should talk about these differences and become more

6    aware and learn from each other where we have either

7    agreements or disagreements about interpretation.

8                    It seemed to me coming into a national

9    role that that would -- I was hearing things as to

10   how this was handled that was different than how I

11   was used to seeing things.

12                   And I thought, well, let's work on a more

13   national understanding of how we're all interpreting

14   these, how each court -- and we have like -- I don't

15   know how many -- 400 courts, 400 different lawyer

16   types.  Let's have a more nationalized interpretation

17   of this.

18        Q    So, from your experience in talking to

19   Caryn -- and I don't know if you had any other

20   experience -- but did you feel that those 400-plus

21   courts were sometimes interpreting things

22   differently?

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 176 of 196

1          A       Yes.

2          Q       You then said, "I've trained EDR

3     coordinators in the 10th Circuit, but I think that

4     needs to be nationalized."

5                  Why did you think that?

6          A       For the same reasons I just said.

7          Q       "And I'd like to better understand if

8     FPDs are adequately protected by EDR remedies."

9                  MS. McMAHON:  Objection.

10                  MS. YOUNG:  Objection.  Form.

11                  THE WITNESS:  What is your question?  I'm

12     sorry.

13                  BY MS. WARREN:

14          Q       What did you mean by that?

15          A       That was Caryn had asked me what would

16     happen if the defender didn't comply with the

17     presiding judicial officer's remedies at the end of

18     the complaint stage; and I did not at that time know

19     enough about the appointment, reappointment, and

20     removal of defenders to know what would happen.  They

21     are different than the unit executive in the court

22     which is clearly governed by, supervised by, and

ICR/Rudiger & Green
office@icrdepos.com                www.icrdepos.com                (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 177 of 196

 1   works at the pleasure of the chief judge and the

 2   judges on that court.

 3                   And so I just didn't know the answer to

 4   that particular question, and I had said I wanted to

 5   find that out.

 6         Q       Did you ever tell Caryn the answer to

 7   that question?

 8         A       I don't think I did.  No.

 9         Q       Has your office -- did the Office of

10   Judicial Integrity provide EDR interpretive

11   guidelines to courts?

12         A       Yes.

13         Q       Did they provide national training to EDR

14   coordinators?

15         A       Yes.

16         Q       You were part of a 2018 working group.

17         A       I was.

18         Q       Why was that working group convened?

19         A       It was in response to the recommendations

20   in the June 2018 workplace conduct working group.

21         Q       Sorry.  The working --

22         A       The workplace conduct working group

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY  Document 255-12  Filed 06/29/23  Page 178 of 196

1    report that came out in June of 2018 had made

2    recommendations for modifications to the EDR plan.

3          Q      Sorry.  I'm asking why the working group

4    was convened.

5          A      Oh, not the EDR working group?

6          Q      The EDR --

7          A      The national one?

8          Q      Yes.

9          A      I wasn't part of that.  I don't know.

10         Q      How --

11         A      I mean, anecdotally, I believe it was a

12   response to the law clerk allegations about

13   Judge Kozinski; but it's kind of a tethered

14   understanding.  And that's what I think precipitated

15   that.

16         Q      How is EDR different now, if at all?

17         A      We extended the deadline to file to give

18   people more times.  We added coverage for unpaid

19   interns and externs.  We eliminated the prerequisites

20   that -- the 1990s -- let me finish the sentence.

21                We eliminated the prerequisites to filing

22   a formal complaint with the exception of abusive

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 179 of 196

1    conduct.  The 1997 model EDR plan was based very

2    largely on the Congressional Accountability Act.  If

3    you compare the EDR plan with the 1997 Congressional

4    Accountability Act, you'll see substantial

5    similarities.  So that's where those prerequisites

6    came from.

7                    So in the 2019, we wanted to simplify

8    that so that people could go right to the complaint

9    stage, if that's what they wanted to do, with the

10   exception of abusive conduct.  We added abusive

11   conduct.

12                   Instead of having these multiple pages at

13   the beginning which are kind of odd law bits, law

14   sections, we instead tried to describe the

15   protections in plain English but with a link to

16   the -- there's a -- in the judiciary, there is

17   something called the guide to judiciary policy, and

18   that is all of the policies that are binding on the

19   courts and adopted by the judicial conferences, and

20   so what we did is to link the full legal descriptions

21   to the guide but in the EDR plan put more plain

22   English descriptions of what those rights were.

ICR/Rudiger & Green
office@icrdepos.com            www.icrdepos.com            (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 180 of 196

1           We -- there is a lot of things we did.

2           We recognized the existence now of the

3    Office of Judicial Integrity.

4           At the time, there was only two or three

5    Circuit Directors of Workplace Relations, but we

6    recognized the possibility of that so we could now

7    say to an employee, "You can go to your EDR

8    coordinator; you can go to the circuit; or you can go

9    to someone nationally for that informal advice."

10          We added the concept of abusive conduct.

11          We added -- in addition to the EDR formal

12   complaint process, we added an informal process where

13   could you request assisted resolution.

14          I want help with my problem.  I'm not

15   looking for litigation.  I'm not looking for

16   complaints and responses and hearings.  I just want

17   help.  So we articulated that informal process.

18          We tinkered with language throughout in

19   any number of sections, confidentiality sections.

20          We added a concept that sometimes the

21   respondent should not be represented by the unit

22   executive, that there might be situations in which

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 181 of 196

1    -- and I think we just used the phrase "cause to

2    think," there should -- somebody else should

3    represent the office in the complaint stage.

4              We did away with any mandatory mediation

5    stage.  It doesn't preclude it.  You're certainly

6    still able to, but you don't have to go through a

7    structured mediation stage if you don't want to.

8              Let me think what else we did.

9              There possibly are more things, but those

10   are what is coming to my mind right now.  There could

11   be more big changes that I'm not thinking of right

12   now, but that's what's coming to my mind.

13        Q    Is there still a working group convened?

14        A    The national -- the federal judiciary

15   workplace conduct working group is still in existence

16   and still meets.  Yes.

17        Q    And that is the group that was initially

18   convened in 2018?

19        A    Yes.

20        Q    Do you know if anyone with experience in

21   workplace discrimination outside of the judiciary was

22   involved in that working group?

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY  Document 255-12  Filed 06/29/23  Page 182 of 196

1       A       Oh, I have no -- my knowledge of that at

2  the time would be what was written in their June 2018

3  report.  When I was judicial integrity officer, I

4  would attend those meetings; and it was just the

5  members of that committee.  We didn't have outside

6  people that attended when I was a judicial integrity

7  officer, and I don't have knowledge since I left as

8  to who meets with them or doesn't meet with them.

9       Q       Have you ever seen an EDR investigation

10  substantiate a claim made?

11       A       Boy, I'm sure; but I can't think of a

12  specific.

13              I mean, so I have to be real careful and

14  be real precise.  So in the 10th Circuit which is

15  where I've seen the most, I can't remember.

16              I really can't remember.  Sometimes they

17  settled.  Sometimes they -- I just can't remember.  I

18  really can't remember.

19       Q       You said that during your time as

20  judicial integrity officer, I think, the first year

21  you said there were about 100?

22       A       That's my guess right now today.

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 183 of 196

1        Q      Do you know how many of those went to a

2   formal hearing?

3        A      Oh, I have no idea.

4        Q      Okay.

5        A      I would say the vast majority probably

6   didn't.  I mean, in my experience generally,

7   workplace conduct issues are resolved more

8   informally.

9        Q      And in your time as judicial integrity

10  officer --

11       A      Sorry.  Sorry to interrupt.

12              But those calls are from judges,

13  managers.  They're not just from employees.

14       Q      Because you're advising people.

15       A      Yes.

16       Q      Yes.

17       A      In other words, I don't want to give the

18  impression that it's 100 different people with 100

19  different workplace conduct allegations.  It could be

20  anything.

21       Q      Yes.  I understand you to mean that

22  someone who would like to make a claim might call in

**ICR/Rudiger & Green**
office@icrdepos.com          **www.icrdepos.com**          **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 184 of 196

1    and people who are trained to respond to that claim

2    also might call in.

3         A       Exactly right.

4         Q       Okay.

5         A       Exactly right.

6         Q       So --

7         A       Or they might be calling to ask me is

8    this covered by EDR.

9         Q       There might be no claim involved at all?

10        A       There might be no claim.  Right.

11        Q       You said toward the start of your

12   deposition this morning that your understanding of

13   sexual harassment has been informed primarily by your

14   experience as a lawyer?

15               MS. McMAHON:  Objection.  It

16   mischaracterizes prior testimony.

17               BY MS. WARREN:

18        Q       How has your understanding of sexual

19   harassment been informed?

20        A       By my role as an EDR coordinator, by my

21   role as a circuit director, by my roles in the Office

22   of Judicial Integrity, judicial integrity officer, by

**ICR/Rudiger & Green**
office@icrdepos.com          **www.icrdepos.com**          **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 185 of 196

1      my role as a human in the world.

2             Q       And what do you mean by your role as a

3      human in the world?

4             A       Well, as anyone, you read about things in

5      the paper.  You read about things on the Internet.

6      You read about examples of it, so --

7             Q       Have you read any academic books about

8      sexual harassment?

9             A       In law school, I did.

10             Boy, it's hard when you say academic.

11             I believe I've read law review articles

12      over the course of the years, and that's -- I have

13      read magazine articles.  I have read any number of

14      things.

15             Q       About how many times since 2007 in your

16      involvement with EDR has someone come to you with a

17      complaint of sexual harassment?

18             A       I really would be guessing.  I'd just -- I

19      would really be guessing.

20             Q       Would it be more than 50?

21             A       No, not even close.

22             Q       More than 10?

ICR/Rudiger & Green
office@icrdepos.com           www.icrdepos.com           (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 186 of 196

1          A       It could be in the 10 range.

2          Q       And outside of your experience with

3    sexual harassment in the EDR context, do you have any

4    experience with sexual harassment as a lawyer?

5          A       Do you mean like --

6                  MS. YOUNG:  Objection.

7                  THE WITNESS:  -- representing clients?

8                  MS. WARREN:  Yes.

9                  THE WITNESS:  No.

10                 BY MS. WARREN:

11         Q       As a staff attorney, did you ever deal

12   with sexual harassment cases?

13         A       I helped judges draft whatever employment

14   law provisions cases came up, and I don't remember

15   now whether any of them involved allegations of

16   sexual harassment.

17         Q       Was it a significant portion of your

18   docket?

19         A       I don't know how you define "significant."

20                 I mean, I had the full range of

21   non-orally argued cases that come before a Court of

22   Appeals on appeal.

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 187 of 196

1                     So, employment law would be one of those.

2     Social Security laws would be another one of those,

3     criminal habeas -- I mean, there is a whole range of

4     things, and it would be one of those.

5          Q      In the new EDR plan, is there a provision

6     that the respondent should not always be represented

7     -- the responding party should not always be

8     represented by the unit executive?

9          A      There is a provision.  Again, I'm going

10    from memory, so -- none of us apparently have it with

11    us.

12                    There is a provision that says that the

13    presiding judicial officer or the chief judge can

14    determine that there is -- I think it says good cause

15    or cause that the unit executive should not

16    represent -- should not be the person who acts on

17    behalf of the respondent.

18         Q      Do you know anything about the origin of

19    that provision?

20         A      It was part of our discussions during the

21    EDR working group.

22         Q      Did those discussions at all including

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 188 of 196

1    anything about this case?

2         A       Nothing specifically would ever come up

3    about any particular fact pattern.  That's all

4    confidential.

5         Q       Do you know why the working group felt

6    that provision was needed?

7         A       I can't speak on behalf of the whole EDR

8    working group.  I mean, there was 12 of us.  There

9    was some huge number of us.

10        Q       Were there specific arguments made in

11   support of that provision?

12        A       Obviously, or it wouldn't be in it.

13        Q       Do you remember any of those arguments?

14        A       No, I don't.

15        Q       Is there anything that would refresh your

16   recollection on those arguments?

17        A       Not that I can think of.

18                I mean, the language of the plan has that

19   in it now.

20        Q       But don't know specifically why it was

21   added to the plan?

22        A       I just can't remember now.

**ICR/Rudiger & Green**
office@icrdepos.com          **www.icrdepos.com**          **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 189 of 196

1              MS. YOUNG:  Objection.  Asked and

2     answered.

3              THE WITNESS:  I just can't remember now.

4     It's been too long.  If it was contemporary, I might

5     have a memory of it; but it's just been too long.

6              BY MS. WARREN:

7        Q    Did you think that the provision was

8     needed?

9        A    Yes.

10       Q    Why?

11       A    Because there would be times where there

12    might be some conflict of interest and so that seemed

13    to be a good thing to contemplate in the EDR plan.

14             MS. WARREN:  Okay.  That's it for us.

15    I'll pass the witness.

16             Thank you so much, Ms. Langley.

17             THE WITNESS:  Thank you.

18             MS. McMAHON:  I have a few questions.

19             MS. YOUNG:  Do you want to take a break

20    first?

21             MS. McMAHON:  Actually, can we take a

22    five-minute break?

1               (There was a break taken from

2               2:38 p.m. to 2:42 p.m.)

3          MS. McMAHON:  Back on the record.

4       EXAMINATION BY COUNSEL FOR DEFENDANTS

5          BY MS. McMAHON:

6     Q     Ms. Langley, can you please pull up

7  Plaintiff's Exhibit 54.

8     A     Okay.

9     Q     The first two pages of this exhibit are

10  your notes from your meeting on February 15th with

11  Ms. Strickland, is that right?

12    A     Yes.

13    Q     And these notes are based only on what

14  Ms. Strickland told you during that meeting.

15    A     Yes.

16    Q     And Ms. Strickland -- when Ms. Strickland

17  told you that the unit executive didn't see her

18  request for mediation, that was based on her account

19  only.

20    A     True.

21    Q     And if you will, go to page 5446

22  -- which is the second page of Exhibit 54 -- the

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 191 of 196

1    third paragraph down starting with, "I also said that

2    it would not be expected," there is a sentence here

3    that reads, "If the Court concluded there was a

4    significant conflict of interest, it could act such

5    as hiring an outside law firm to represent the

6    office."

7              When you were -- when you wrote this in

8    your notes, what stage of the EDR process were you

9    referring to?

10        A    The complaint stage.

11             MS. McMAHON:  That's all.

12             MS. WARREN:  Just one question after

13   that.

14      FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF

15             BY MS. WARREN:

16        Q    You were asked if these notes are purely

17   based on what Caryn told you.

18        A    Yes.

19        Q    The sentence, "If the Court concluded

20   there was a significant conflict of interest, it

21   could act," that is your own --

22        A    That's a qualification.  There are times

ICR/Rudiger & Green
office@icrdepos.com        www.icrdepos.com        (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 192 of 196

1    where I'm describing what I said to her.  That's

2    true.

3         Q       So these include factual statements that

4    Caryn made to you.

5         A       Statements that --

6                 MS. McMAHON:  Objection.

7                 THE WITNESS: -- she made to me.

8                 MS. McMAHON:  Misleading.

9                 THE WITNESS:  Statements that she made to

10   me.

11                BY MS. WARREN:

12        Q       As well as some of the things that you

13   said to her in response?

14        A       Right.  Right.

15                MS. WARREN:  Thank you.

16                All right.  That's it.  We are done.

17                     (At 2:45 p.m., the taking of the

18                     deposition was concluded.)

19

20

21

22

ICR/Rudiger & Green
office@icrdepos.com                www.icrdepos.com                (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 193 of 196

1              CERTIFICATE OF NOTARY PUBLIC

2

3          I, Kirk A. Sturges, the officer before whom

4    the foregoing deposition was taken, do hereby certify

5    that the witness whose testimony appears in the

6    foregoing deposition was duly sworn by me; that the

7    testimony of said witness was taken by me by machine

8    shorthand and thereafter reduced to typewriting, by

9    myself; that said deposition is a true record of the

10   testimony given by said witness; that I am neither

11   counsel for, related to, nor employed by any of the

12   parties to the action in which this deposition was

13   taken; and further, that I am not a relative or

14   employee of any attorney or counsel employed by the

15   parties hereto, nor financially or otherwise

16   interested in the outcome of the action.

17

18

19                     Kirk A. Sturges, Notary Public for

20                         the District of Columbia

21   My Commission Expires:

22   August 14, 2027

ICR/Rudiger & Green
office@icrdepos.com          www.icrdepos.com          (703) 331-0212
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 194 of 196

1              CERTIFICATE OF READING AND SIGNING

2    RE: CARYN DEVINS STRICKLAND v. UNITED STATES, et al.

3    DEPONENT:  JILL LANGLEY

4    BEFORE:  US DISTRICT COURT FOR WESTERN DISTRICT OF NC

5

6              I, JILL LANGLEY, the deponent herein, do

7    hereby certify that I have read the foregoing

8    deposition and certify that it is a true and accurate

9    transcription of my testimony given in the

10   above-captioned matter except for any corrections as

11   noted on the enclosed errata sheet.

12

13

14                              *Jill Langley*

15        _____

16                              Jill Langley

17

18

19

20

21

22

**ICR/Rudiger & Green**
office@icrdepos.com          **www.icrdepos.com**          **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 195 of 196

# E R R A T A   S H E E T

RE: CARYN DEVINS STRICKLAND v. UNITED STATES, et al.
DEPONENT:  JILL LANGLEY
BEFORE:  US DISTRICT COURT FOR WESTERN DISTRICT OF NC

Enclosed is the transcript of your

deposition testimony.  Please review the transcript,

complete, and distribute the signed errata sheet and

acknowledgement page to all parties, including this

office, within 30 days.  Any changes and/or

corrections should be listed below and not made upon

the transcript itself:

| PAGE | LINE | CHANGE OR CORRECTION | REASON THEREFORE |
|------|------|----------------------|------------------|
| 162  | 4    | Change "common" to "con" | Typographical error |
| 163  | 9    | Change "common" to "con" | Typographical error |

DATE  June 9, 2023          SIGNATURE  s/Jill Langley

                                           Jill Langley

**ICR/Rudiger & Green**
office@icrdepos.com          **www.icrdepos.com**          **(703) 331-0212**
Case 1:20-cv-00066-WGY   Document 255-12   Filed 06/29/23   Page 196 of 196