# EXHIBIT WW



# Transcript of Nancy Dunham

**Date:** April 17, 2023
**Case:** Strickland -v- United States of America, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

1    FOR THE WESTERN DISTRICT OF NORTH CAROLINA

2                 ASHEVILLE DIVISION

3    ------------------------X

4    CARYN DEVINS STRICKLAND,  :

5                   Plaintiff, :

6      v.                      : Case No.

7    UNITED STATES OF AMERICA, : 1:20CV66

8    et al.,                   :

9                   Defendants.:

10   ------------------------X

11

12         Deposition of NANCY DUNHAM

13            Conducted Virtually

14          Monday, April 17, 2023

15              2:08 p.m. EST

16

17

18

19

20

21

22

23   Job No.: 488113

24   Pages: 1 - 202

25   Reported by: Marney Alena Mederos, RPR, CRR

1          Deposition of NANCY DUNHAM, conducted

2     virtually.

3

4

5

6          Pursuant to subpoena and notice, before

7     Marney Alena Mederos, Registered Professional

8     Reporter, Certified Realtime Reporter, and

9     Notary Public in and for the State of Maryland.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              A P P E A R A N C E S

 2      ON BEHALF OF THE PLAINTIFF:

 3           JACOB E. GERSEN, ESQUIRE

 4           10 Fayerweather Street

 5           Cambridge, Massachusetts 02138

 6           (857) 288-9151

 7

 8      ON BEHALF OF THE DEFENDANTS:

 9           MADELINE M. McMAHON, ESQUIRE

10           U.S. DEPARTMENT OF JUSTICE

11           CIVIL DIVISION, FEDERAL PROGRAMS BRANCH

12           1100 L Street, N.W.

13           Washington, D.C. 20005

14           (202) 451-7722

15

16   ALSO PRESENT:

17           SOPHIA GONZALES, AV TECHNICIAN

18           CARYN DEVINS STRICKLAND, PLAINTIFF

19           JEANNIE SUK GERSEN, ESQUIRE

20           COOPER STRICKLAND, ESQUIRE

21           OLIVIA WARREN, ESQUIRE

22           KRISTIN MANNHERZ, ESQUIRE

23           PHILIP HERTZ

24

25
```

```
1                C O N T E N T S

2    EXAMINATION OF NANCY DUNHAM:              PAGE

3         By Ms. McMahon                         5

4         By Mr. Gersen                        115

5

6                 E X H I B I T S

7            (Attached to transcript)

8    GOVERNMENT DEPOSITION EXHIBIT             PAGE

9     Exhibit 1    Handwritten notes           39

10    Exhibit 2    E-mails                      52

11    Exhibit 3    Handwritten notes           60

12    Exhibit 4    E-mail                       73

13    Exhibit 5    Text messages               76

14    Exhibit 6    E-mails                      79

15    Exhibit 7    Handwritten notes           82

16    Exhibit 8    E-mail                       99

17    Exhibit 9    E-mails                     104

18    Exhibit 10   E-mails                     110

19
     PLAINTIFF'S DEPOSITION EXHIBIT            PAGE
20
      Exhibit 3    E-mails                     122
21
      Exhibit 39   E-mail with attachment      141
22

23

24

25
```

```
 1                   P R O C E E D I N G S
 2   Whereupon,
 3                       NANCY DUNHAM
 4   being first duly sworn or affirmed to testify to
 5   the truth, the whole truth, and nothing but the
 6   truth, was examined and testified as follows:
 7             EXAMINATION BY COUNSEL FOR DEFENDANTS
 8   BY MS. McMAHON:
 9        Q     Good afternoon -- or good morning to
10   you, Ms. Dunham --
11        A     Good morning.
12        Q     -- from the East Coast.
13             I mentioned this earlier.  My name is
14   Madeline McMahon.  You can call me Maddie.  I'm an
15   attorney with the U.S. Department of Justice, and
16   I represent the Defendants in the Strickland vs.
17   U.S. matter that's currently pending in the
18   Western District of North Carolina.
19             Could you state and spell your name for
20   the record, please?
21        A     Nancy Dunham, N-A-N-C-Y, Dunham,
22   D-U-N-H-A-M.
23        Q     Are you represented by counsel?
24        A     I am not.
25        Q     Have you ever had your deposition
```

1  taken?

2       A      I don't believe I have.  I have

3  provided testimony through written declarations,

4  but I don't believe I've ever had my deposition

5  taken.

6       Q      But you have taken them, so you're

7  familiar with --

8       A      I -- I have taken many, and things have

9  changed a lot.  We used to be all in one room.

10       Q      Sometimes we still are, but sometimes

11  when -- when the deponent is in Hawaii, we don't

12  get so lucky.

13            So I'm going to try to take a break

14  every 45 minutes or so, but please let me know if

15  you need a break, and we will be happy to do that,

16  and I'll let you know from my end as well.

17       A      Okay.

18       Q      I will be asking you a series of

19  questions to which you are under oath to provide

20  full and complete answers.

21            If you do not understand any question

22  that I ask you, just please let me know before you

23  respond, and I will explain or rephrase the

24  question.

25            You also just took an oath.

1          Do you understand the nature of the

2    oath?

3         A    I do.

4         Q    It requires you to fully answer each

5    question to the extent you can, and if you're not

6    sure of an answer or don't have a complete answer,

7    you still must answer the question to the extent

8    you can.

9          Do you understand this?

10        A    I do.

11        Q    And as you can see, the court reporter

12   here is recording all that is said, but because

13   she can only record our words, please answer each

14   question with a verbal response.

15        A    I understand.

16        Q    It's also -- as we mentioned earlier,

17   it's very important that we don't talk over each

18   other, and I'll ask you to allow me to fully

19   answer -- to fully ask my question before you give

20   your answer, and I'll let you answer it before I

21   ask my next question.

22          Is that okay?

23        A    Yes.

24        Q    Have you taken or do you intend to take

25   any medication that may affect your ability to

1    testify accurately or honestly?

2         A    No.

3         Q    Is there any other reason why you

4    cannot provide your best and most accurate

5    testimony today?

6         A    No.

7              I would say that I am testifying

8    100 percent from my memory.  Since I'm not

9    employed any longer, I don't have access to those

10   records, and I have not, to my knowledge,

11   discussed the case with anyone, including the

12   Plaintiff or anyone involved in the case, other

13   than my e-mail correspondence with the DOJ lawyer

14   that contacted me about the deposition.

15             And I -- I did get one e-mail from

16   Charlene Hardy, from the AO's Office of General

17   Counsel, informing me about the case.  She sent

18   me, I think, the Fourth Circuit decision that

19   allowed the Plaintiff to move forward, and -- so

20   that is -- that is it.

21             I -- I have not reviewed any documents

22   as I normally would have done were I still

23   employed, and it is -- I think it has been almost

24   five years since I left the AO.

25        Q    Just so I understand, you mean in

1    preparation for this deposition today, you didn't

2    do anything to prepare?

3         A    I did not.

4         Q    So you didn't talk to any of

5    Plaintiff's attorneys to prepare for this

6    deposition?

7         A    I did not.

8         Q    Okay.  A couple more quick questions.

9              Do you plan to read and sign the

10   deposition after we're finished today?

11        A    I'm sorry, ask that again.

12        Q    Do you plan to read and sign the

13   deposition after we're finished?

14        A    Yes.

15        Q    Okay.  And as I'm sure you know from

16   your experience, from time to time, counsel may

17   object.

18             After his or her objection -- I think

19   it's Professor Gersen who's on -- who may object

20   today -- I'm going to ask you to go ahead and

21   answer the question until he instructs you not to.

22             Do you understand?

23        A    I do.

24        Q    So I'd like to start by getting a

25   little bit of background information about you.

1          What's your date of birth?

2     A     July 24th, 1955.

3     Q     Where do you currently live?

4     A     I live in Kamuela, Hawaii, on the big

5     island.

6     Q     And where did you go to college?

7     A     I went to college at the University of

8     Michigan in Ann Arbor.

9     Q     Did you go to law school?

10    A     I did.  I have a law degree from the

11    University of Connecticut.

12    Q     And what did you do after law school?

13    A     My first job after law school was I was

14    a teaching Fellow at Temple Law School, so I

15    taught first-year law students, and then as that

16    two-year fellowship progressed, I also taught a

17    number of other classes -- law school classes to

18    all -- all variety of law students, first-,

19    second-, and third-year law students.

20    Q     Got it.

21          And when -- what did you do after that?

22    A     My first job after teaching was I was a

23    law clerk to a federal judge in the Western

24    District of Michigan, Richard A. Enslen.

25    Q     And when did you join the AO?

1       A       I started working for the AO in 2014.

2       Q       And when did you leave the AO?

3       A       I left the AO at the end of May 2019.

4               Actually, I worked a full day on a

5       Wednesday, and then we flew to Hawaii on a

6       Thursday, and we've been here ever since.

7       Q       And you're retired now; is that right?

8       A       I am retired.

9       Q       What was your job at the AO?

10      A       I was the fair employment practices

11      officer, and that's kind of a wordy name.  It

12      comes from a Truman-level executive order for

13      employment practices.

14              Typically, in the executive branch, the

15      title would have been something like Director of

16      Equal Employment Opportunity or Civil Rights

17      Director.

18      Q       Had you worked in any -- any roles

19      prior that involved similar duties, like relating

20      to fair employment practices or equal opportunity?

21      A       Yes.  Quite a few of my jobs were

22      exactly that.

23              I -- I both represented plaintiffs in a

24      law firm in D.C. for about a year.  I worked for

25      the Equal Employment Opportunity Commission both

1   as advisor to an EEOC commissioner, and I worked

2   in the Office of Legal Counsel representing EEOC

3   employees, including administrative judges that

4   were sued by plaintiffs.

5           And then I worked mainly in defensive

6   positions for several executive agencies,

7   including EPA, the Department of Commerce.

8           At the Department of Transportation, I

9   was a civil rights advisor to the Secretary of

10  Transportation, and then I also practiced for

11  about two years at EPA as national security

12  lawyer.

13          So I had a top secret SEI clearance,

14  and I did very little employment law/civil rights

15  advising at that time, but the vast majority of my

16  35-year career has involved working for either the

17  federal courts or a federal executive agency, and

18  virtually all of it was related to the law on

19  employment discrimination and civil rights.

20      Q    When you say that you worked in a

21  defensive capacity before, what do you mean by

22  that?

23      A    I worked in the Offices of General

24  Counsel for the Department of Commerce, for the

25  Department of -- for the Environmental Protection

1   Agency, and for a short time at EEOC.  I worked in

2   their Office of Legal Counsel.

3          So I have -- I've been on both sides.

4   I've been a plaintiffs' lawyer, class-action

5   lawyer in the District of Columbia, and then I've

6   been a defensive lawyer as well working sometimes

7   with independent litigating authority when I was

8   with the EEOC, but I virtually always worked with

9   an AUSA when I -- when I represented EPA,

10  Department of Commerce.

11         Q    Did you work as the fair employment

12  practices officer the whole time you were at the

13  AO?

14         A    Yes.  That was my sole job.

15         Q    And that job -- that -- the job -- the

16  position had been around since you said

17  President Truman?  It was an old position?

18         A    No.  That's -- the -- the wording fair

19  employment practices came from a Truman-era

20  executive order.

21         The position was created in 2014, and I

22  was the first person to hold that position at an

23  executive level.  It had been split off in --

24  in -- in various -- held by various people, and

25  before I came, they consolidated the duties and

1    made it an executive-level position.

2         Q     What were the duties?

3         A     Well, first of all, the -- I served as

4    the advisor to the deputy director and the

5    director on civil rights matters.

6               We also -- my office provided advice to

7    the various courts across the country except for

8    the Supreme Court, and within the AO, we not only

9    provided advice, but we processed the complaints

10   of AO employees.

11              So we were like a -- in essence, a

12   civil rights processing office, as well as we did

13   the -- the celebration events for -- for, say,

14   Women's History Month and African-American History

15   Month, and so forth.

16        Q     When you say that you processed the

17   complaints of AO employees, what do you mean by

18   that?

19        A     Well, the office actually was the

20   neutral adjudicator of those complaints, so we

21   accepted the complaints.  My office did -- first

22   of all, did EEO counseling before the formal

23   complaint was filed, and then we arranged for

24   hearings for AO employees who brought

25   discrimination complaints, and then continued to

1    process them.

2            Certain AO employees had right to file

3    a civil action, most did not, and so to the extent

4    that someone had a right to go into federal court,

5    we sent that complaint -- we processed the

6    complaint until the point that there was a final

7    decision by the AO director, and then it went to

8    federal court and we lost jurisdiction.

9            But most of the cases stopped after

10   final decision by the AO director.  And, again,

11   that was a --

12       Q    You said that -- go ahead.

13       A    -- very different process than -- than

14   the judiciary employees.  The judiciary employees

15   had a separate process, and it was mainly carried

16   out within the Court that held jurisdiction.

17       Q    By "held jurisdiction," do you mean the

18   Court that was overseeing their -- the judiciary

19   employees?

20            For instance, like, if you're employed

21   by District of D.C., it would be overseen by

22   District of D.C. or D.C. Circuit?

23       A    Yes.

24       Q    Okay.  And with respect to those

25   judiciary employees, what was your role?

1       A       Well, I -- I -- I typically would not

2    get involved in your day-to-day judiciary employee

3    case.  I had a staff of lawyers that worked with

4    the judicial offices.  We collected discrimination

5    complaint information and published it yearly.

6              We -- we would occasionally -- I would

7    occasionally get a question from a senior

8    judiciary official or a judge, and that was not

9    the norm.  It was when something really was either

10   complicated or needed -- you know, needed someone

11   senior to look at it.

12             But my office -- the lawyers in my

13   office would take questions really on a daily

14   basis from court employees who were processing

15   their own complaints, and we worked on civil

16   rights initiatives.

17             We had a model intern program that --

18   that started in the Middle District of Alabama

19   with Judge Myron Thompson, and so we did both

20   civil rights initiatives, and we did -- we advised

21   the Courts on the processing of their own

22   complaints, and then we published that complaint

23   information on a yearly basis.

24      Q       And were you permitted to give legal

25   advice to either Court employees or employees

1    within the AO?

2        A      Well, I was a neutral, so I did not

3    represent the AO or the judiciary, and I also did

4    not represent plaintiffs or employees.

5              But in the course of my job, I did rely

6    on my -- my legal skills, and I did give legal

7    advice and discussed legal issues with the Office

8    of General Counsel, with my bosses who were the

9    deputy director and the director of the AO.

10       Q      So I know you mentioned that you had

11   worked in many different roles relating to

12   employment law in several different capacities,

13   and in 2014 you joined the AO as the fair

14   employment practices officer.

15             Did you receive any training when you

16   joined the AO to be the fair employment practices

17   officer?

18       A      I believe I did, because what I needed

19   to know as a new executive officer was how the

20   AO functioned, and, you know, what their role was

21   vis-à-vis AO employees versus judiciary employees.

22             So, yes, I recall going to training

23   when I started, and then periodically through my

24   tenure, I would attend training on substantive

25   matters that I was interested in.

1       Q      Can you be more specific about the

2    training you received when you started?

3       A      Yes.  The -- the AO had several offices

4    that did training for new employees, so I attended

5    those.  They tended to be more generic, you know,

6    about how the AO functioned and what the roles

7    were and how the various executive officers worked

8    together.

9              I remember that the former deputy

10   director took me around to every office, and I

11   talked with every office about, you know, what

12   their office did and how they functioned.

13             It's really a fairly comprehensive

14   body.  It -- you know, it -- there was a lot more

15   to the AO than I knew when I had applied for the

16   job.

17      Q      Definitely.

18             And in terms of the subsequent

19   training, was that -- you know, you mentioned that

20   it was in substantive areas.

21             Would one of those areas be employment

22   law, or what -- can you give us an example of

23   that?

24      A      You know, I can't actually remember,

25   and -- specifically getting training in employment

1    law, but I know that I was very -- I was very

2    interested in that general area, employment law,

3    employment litigation, civil rights, and so I know

4    that I -- if I didn't go to an outside conference,

5    I know that I went to some of the conferences that

6    were held in -- in the various judicial offices.

7                I also participated in training on a

8    regular basis.  I was a speaker at a number of

9    training for AO employees and for judicial

10   employees.

11      Q    So you also mention that you left the

12   AO in 2019.

13               Why did you leave?

14      A    My husband had practiced law for

15   40 years, and he's a couple years older than I am

16   and was in a position to retire, and he wanted --

17   we both wanted to move away from D.C. and to

18   move -- and we had been looking in Hawaii for

19   five years, and we sort of found our dream house,

20   and we decided to retire.

21      Q    Did you have any views on the way that

22   the AO was approaching how they were handling

23   misconduct claims or anything of that nature?

24      A    Yes.  Specifically, when I worked with

25   the Office of General Counsel, we would often get

1   involved with, say, a misconduct claim.  I would

2   be looking at it from the perspective of a civil

3   rights neutral.  The Office of General Counsel

4   would be looking at it as a -- as a defense

5   counsel for a manager.

6              So, yes, I -- I definitely worked on

7   individual misconduct matters where there were

8   legal issues that related to civil rights, and I

9   can give you one example as a hypothetical.

10             If, for example, you had an employee

11  who was being terminated for workplace -- the

12  inability to do the job at issue, that can raise a

13  civil rights issue in that -- let's say the

14  employee had early-onset Alzheimer -- Alzheimer's.

15             That -- the way that would have been

16  resolved would have been different, and that would

17  be my role, to advise on what to do with that --

18  that Alzheimer's aspect of the misconduct -- or

19  not misconduct, I'm sorry -- inability to do the

20  job.

21     Q     When you said that the way it was

22  handled is different, what do you mean by that?

23     A     Well, you wouldn't typically, or you'd

24  be in violation of the civil rights laws, fire

25  somebody for the inability to do the job, a

1    performance-based action, if you learned that it

2    was Alzheimer's that was causing the inability to

3    do the job.

4              Typically, what you would do is process

5    it as a disability retirement claim.

6         Q    I see.

7              And you generally agreed with the way

8    that the AO would handle a situation like that?

9         A    Can you be more specific?  Are you

10   talking about the AO managers, the Office of

11   General Counsel?

12        Q    Yeah.  I mean the approach that they

13   are taking in not necessarily adjudicating a claim

14   like that, because I realize it might not get to

15   that stage, but just the way that they approach

16   potential claims, like the example you gave.

17        A    I would say in the great -- the vast

18   majority of cases, I would be in agreement with

19   what the Office of General Counsel and managers

20   were doing.  That was not always the case, and

21   some of it depended on who the lawyer was.

22              I mean, I worked -- I had a very good

23   working relationship with Sheryl Walter, the

24   former general counsel, and Bill Meyers.  I would

25   say it was as good a relationship as I've ever had

1   when you're both serving different purposes.

2           But there were times when I disagreed

3   with either a lawyer on their staff or what a

4   manager was doing in a particular case, and

5   that -- that is when I was able often to work out

6   a solution, and, you know, that -- that was the

7   really wonderful part of the job, is there were

8   times when I thought that the civil rights laws

9   were -- were not being followed, and so I was

10  able, because of my relationship with the general

11  counsel's office and senior managers and the

12  deputy director and director of the AO, to make a

13  difference in how something was handled.

14      Q    Going back to what you mentioned

15  earlier about how your role was one as --

16          You said as neutral?

17      A    Right.

18      Q    -- maybe a neutral advisor, can you be

19  more specific what you mean by "neutral"?

20      A    Well, again, I represented the -- the

21  civil rights office, and our role was to provide

22  advice to AO managers and judiciary managers and

23  let them know what the civil rights implications

24  were.  My job was not to defend the agency or

25  defend the judiciary, it was purely advisory, and

1    so we -- we worked very hard at being neutral.

2            EEOC has management directives.  Now,

3    that doesn't apply precisely and technically to

4    the judiciary, but -- but Management Directive 110

5    talks about the different roles within an

6    executive agency.

7            The civil rights office is supposed to

8    be completely independent from the defensive

9    branch of the agency, the Office of General

10   Counsel.  And so we were careful to follow that

11   very good guidance on keeping -- keeping those

12   functions separate.

13       Q      Would you -- would you say that you

14   mostly advised management and members of OGC, or

15   would you also give advice regularly to employees

16   or employees who were bringing potential wrongful

17   conduct claims?

18       A      I would give advice to AO managers,

19   judiciary managers, judges, to -- to my superiors,

20   to other executive officers on what the civil

21   rights laws said about their particular situation,

22   but I -- my role was not to defend the AO or to

23   defend the judiciary.  It was to provide a

24   perspective of a neutral civil rights office.

25       Q      And you also would give advice to

1    employees of the judiciary and of the AO?

2         A    I often had -- we often as an office

3    had employees come in and tell us their story,

4    and, again, we would -- we would tell them what

5    the law was, we would explain the -- the judi- --

6    the processing of complaints, and give them

7    information that they could use to make decisions

8    about how to proceed.

9              Again, we didn't represent the

10   plaintiffs or the employees.  Our job was to give

11   them information to fully decide how they wanted

12   to proceed.

13        Q    Would you give employees legal advice?

14        A    No, not in that sense, not in the sense

15   of providing legal advice and representing that

16   employee.

17             What we did is give them the neutral

18   view with keeping in mind that we didn't represent

19   management and we didn't represent employees.  We

20   told them what the law said and what the processes

21   were.

22        Q    So I'd like to get into some of the

23   facts in the case, and I know, Ms. Dunham, you

24   mentioned that you didn't prepare anything in

25   advance, so if there's anything that would refresh

1    your recollection, let me know.

2         A      Okay.

3         Q      But if you can remember back -- I know

4    this is a couple years ago, do you remember when

5    you first encountered the Plaintiff?

6         A      I do.  I remember, because it was not

7    your usual situation.

8                I received a phone call -- and I

9    believe it was in late 2018, so that was six years

10   ago -- from a senior -- a senior member of the

11   AO staff who had, I believe, just retired.  She

12   was one of the three department heads.

13               I knew her very well, and she had

14   pre- -- before I was hired, she had previously

15   served in an EEO role and had advised the director

16   and the deputy director.  When I came on board,

17   she relinquished those duties.

18               So that was -- her name was Laura

19   Minor, and she called me and said will you talk to

20   an employee -- a judicial employee in one of our

21   districts who has some questions about sexual

22   harassment?  I have talked to her, and I think she

23   needs to talk to you, and I said of course.

24               And she said, now, she may not want to

25   give you her name, so she will call you and tell

1    you that she is the employee that talked to me,

2    and if you could talk to her about her situation,

3    I would really appreciate it.

4              And that's how I first talked to the

5    Plaintiff on the phone.  We had, I believe, a very

6    long conversation, because she was very articulate

7    and remembered facts very well, and so I think we

8    talked the first time for maybe an hour and a

9    half.  And, again, I didn't know who she was, I

10   didn't know where she was, and that was the first

11   conversation.

12       Q     Just so I understand, you didn't --

13   even the entire time you talked to her for an hour

14   and a half, you didn't know who she was?

15       A     I didn't know her name at that time.  I

16   knew -- I knew her general employment situation.

17   I knew that she worked for one of the public

18   defender offices, but I didn't know which one, and

19   I remember that I looked at the area code from her

20   cell, and it was not -- as it turned out, it was

21   an area code from a previous location.

22              Like, my cellphone reads 301.  Well, I

23   no longer live in Bethesda, Maryland.  So I

24   didn't -- I did not have any personal information

25   about her.  I didn't know who she was.  I didn't

1    know what her job was.

2                She told me about her background.  I

3    knew that she had clerked at the District Court

4    level, at the Circuit Court level, and that she

5    had been a U.S. Supreme Court Fellow at the AO.

6    Like, I didn't know anything more than that in the

7    beginning.

8                It -- it -- I think it took some time

9    for her to build up trust talking to me, and I

10   continued to talk with her about the matter on an

11   ongoing basis until I retired.

12       Q     You mentioned that you were introduced

13   to her by Laura Minor?

14       A     Yes.

15       Q     And how did you know Laura Minor?

16       A     Laura Minor was an AO senior manager

17   and also had done some -- some work that related

18   to my office before I got there.

19                So she was an EEO advisor as a

20   tangential job duty.  That was not what she did.

21   She was an AO manager, and so she and I would

22   often talk about civil rights matters, because she

23   had functioned in that role before my job was

24   created.

25       Q     Did you have a previous relationship

1    with her?

2         A     No, I did not know her.  She was one of

3    the people that I interviewed with.  The deputy

4    director wanted her to meet me and to give her

5    opinion on me, and so she was one of the people

6    that I interviewed with.

7              So I probably knew Laura for quite a

8    few months before I was actually hired, because

9    she was part of the interview and selection group.

10        Q     Had she ever introduced you to other

11   people or other judiciary or AO employees who had

12   similar situations to the Plaintiff?

13        A     I can't recall whether there was anyone

14   else that she sent specifically to me.  I do

15   believe that she was -- she was knowledgeable

16   about the various complaints that were --

17             I think we lost your video, Maddie.

18        Q     Oh, did you?

19        A     Oh, okay, you're back.

20        Q     Sorry.

21        A     Anyway, yeah, she -- I think that this

22   was the only situation where she specifically sent

23   someone to talk to me.

24             There was -- there was an AO case that

25   I know that she had followed and was interested

1    in, but by the time I was hired, we pretty much

2    resolved the case to her satisfac- -- I think to

3    her satisfaction because I know she was worried

4    about the case, but she did -- she was not the

5    person who sent the plaintiff to my office.  It --

6    it was already there as a -- as a -- as a formal

7    complaint that had been a hearing -- it had been

8    counseled, there had been a hearing, and so forth.

9            So I think the -- I think, if my

10   recollection is correct, that this particular

11   situation was the only person that she sent to me

12   personally.

13      Q     What did Laura tell you?

14           I know that you didn't know the

15   Plaintiff's name or what district she worked in,

16   but what did Laura -- what did Laura tell you

17   about Plaintiff before you spoke to her on the

18   phone?

19      A     Well, she told me that -- and I hate to

20   keep calling her Plaintiff, because, you know, her

21   name is Caryn, and -- and I did get -- I got to

22   know her very well.  She -- I was told by Laura

23   that she was a rising star in the federal

24   judiciary, and I could see that just based on her

25   work history.

1          Laura had worked with her when she was

2    a U.S. Supreme Court Fellow at the AO, and so she

3    told me a little bit about, you know, her

4    credentials and, you know, her -- her work ethics,

5    and -- and other things that you would tell

6    someone about if -- if you were going to interview

7    them.

8          So I did -- I did know that she was

9    well-respected in the district where she worked

10   but also by the AO people that she had come in

11   contact with as a U.S. Supreme Court Fellow.

12       Q     Did Laura give you any specifics about

13   what the Plaintiff was alleging or anything

14   specific about the situation that she wanted to

15   call you for advice about?

16       A     She said only that she wanted to call

17   me and talk to me about sexual harassment.

18          She didn't tell me -- she didn't give

19   me any details that I can recall about her

20   situation, but just that she wanted to discuss

21   sexual harassment.

22       Q     And I know you mentioned that you

23   remember talking to Caryn for the first time in

24   2018.

25          Do you remember --

1      A      I believe -- I believe it was late

2  2018, and I took -- I -- you know, I took notes,

3  so I -- I, you know, documented the conversation

4  without a lot of specifics, but I -- you know, I

5  know that there's a record that exists that would

6  say precisely when I talked to her for the first

7  time, but my memory tells me it was late 2018.

8             (Discussion off the record.)

9  BY MS. McMAHON:

10     Q      So if I -- if I told you that the

11 conversation was around July of 2018, would that

12 track with what you remember?

13     A      It would.

14     Q      Okay.  So you had this phone call with

15 Plaintiff -- or with Caryn on July -- in July of

16 2018.

17            And can you give us a little more

18 detail about what you discussed besides for her

19 personal characteristics?  Did she talk about --

20 did she tell you about what her perception of the

21 sexual harassment was?

22     A      She did.  She -- she provided me --

23 again, she had a very good recollection of facts.

24 When I asked her questions, she was able to fully

25 answer the questions, and by the time that first

1   phone call was over, I had a very good sense of

2   what was going on.

3        Q     What did she say about her allegations?

4        A     Again, I'm -- I'm looking back, like,

5   five, six years, but she was uncomfortable -- made

6   uncomfortable by one of her senior managers who at

7   the time she was hired made some public statements

8   about how hot she was and -- and, again, this is

9   what she told me in detail -- and how he was

10  clearly interested in her either romantically or

11  sexually.

12            I don't believe -- I know that she was

13  in a relationship.  I don't think she was married

14  at that time.  I know that the individual at issue

15  was ten years older than she was and married, but

16  that immediately concerned me, and so she -- she

17  told me about the situation, she told me about his

18  desire to control her, which is very common in

19  this type of situation, and wanted to mentor her.

20            So when I heard her story for the first

21  time, her -- her -- her situation, it was

22  concerning.  I felt like I wanted to know more

23  about it, but it concerned me.

24       Q     You mentioned that she -- that Caryn

25  told you he was romantically interested in her.

1          Did she give you specific examples of

2     why she thought that?

3        A     Well, he wanted to spend a lot of time

4     with her.  He made comments, I believe, to other

5     employees about how hot she was, and he sort of

6     self-appointed himself as her mentor and would,

7     again, do a number of things that when we

8     discussed the case at the AO we were concerned

9     about because it -- it looked like he wanted to

10    control her, which is very common.

11       Q     What were those other number of things

12    besides for the comments to others saying that she

13    was hot?

14       A     I remember that she had a meeting that

15    she felt an obligation to attend, and he had

16    something that he wanted her to do, and so he sort

17    of blew up and was very angry, and -- and I

18    remember telling that to some of the people at the

19    AO, and -- and they -- their comment was, well,

20    that's a very bad sign because this is what we see

21    in a sexual harassment case, the desire to

22    control.

23       Q     So besides for him telling others that

24    she's hot and then blowing up at her at the

25    meeting, was there anything else that she

1    mentioned that would indicate he was interested in

2    her romantically?

3         A     Well, he -- he asked her, I think,

4    repeatedly -- I -- I think it goes beyond one

5    time -- to go out for drinks after work, he would

6    show up in the late evening in her workplace and

7    offer her rides home, things that were a little

8    atypical given the -- the parameters of their

9    relationship.

10        Q     And if I -- if I told you this -- that

11   the man was named J.P. Davis, would that ring a

12   bell?

13        A     That does ring a bell.  I couldn't have

14   told you his name, but yeah.

15        Q     Had you met J.P. Davis before?

16        A     Never.

17        Q     Had you contacted him or talked to him

18   throughout this process?

19        A     Never.

20        Q     So at that point, at the time of this

21   initial conversation, all you knew about the

22   allegations were what was based on what Caryn had

23   told you during that call?  It wasn't from Laura

24   Minor or anyone else?

25        A     It was primarily at that time of the

1    first call from what Caryn had said.

2            I also then talked to other officials

3    at the AO who were familiar with the situation,

4    and so I did get some additional facts, especially

5    as the months went on, from others who, I guess,

6    did talk to Mr. Davis or to others in that

7    district and learned a bit about how that office

8    functioned.

9        Q    Who else did you talk to in the AO?

10       A    I believe I talked to -- let's see,

11   what was her name?

12           All I can say conclusively is to other

13   senior managers who had official duties related to

14   the office where Caryn worked.

15       Q    You don't remember anyone specific?

16       A    I -- I can see their faces, but I -- I

17   could not tell you their names.  It's just been

18   too long.

19       Q    No problem.

20           And once -- after this initial phone

21   call, once Caryn told you this, did you

22   immediately go to the other AO officials to

23   discuss this with them?

24       A    I believe that I did.  I may have

25   waited for -- we -- we set up another call.  I may

1    have waited till I got more information, but I was

2    immediately concerned, and I thought it was

3    prudent for me to advise my managers about what

4    was going on.  Now, I'm talking about primarily

5    the deputy director at that point.

6            I later talked to the director about

7    the matter, but initially I talked to lawyers in

8    my office, I talked to managers who had duties

9    related to North Carolina, and I talked to -- I

10   felt a need to tell the deputy director what was

11   going on.

12           This was a time when, you know, sexual

13   harassment had hit the news, the Harvey Weinstein

14   case, there were a number of high-profile cases

15   that were hitting the news, and it was something

16   that the AO was very interested in.

17           So I was asked to do training on sexual

18   harassment, which I did, and we -- we started to

19   collect more information about allegations that

20   had occurred throughout the judiciary.  There was

21   a Ninth Circuit judge that was of some concern,

22   and there was a lawsuit that followed from that.

23           So it -- it was newsworthy at that

24   time, and so I realized there was, you know, some

25   potential risk for the judiciary because of all

1    that publicity about other cases.

2         Q     Can you describe what you told those

3    AO officials about the sexual harassment?  What --

4    what type of information were you passing on?

5         A     Well, I didn't tell them a lot because,

6    first of all, it was important for me to protect

7    her privacy, so I talked about it in generalities.

8    I said judicial employee.  I may have told the --

9    the region.

10              I probably did tell the deputy director

11   of the region, because she had worked in the field

12   before she was the deputy director, and she knew a

13   lot of people that were involved in the courts.

14   So -- and what I told them was a -- a more general

15   version of what I just told you I was concerned

16   about.

17        Q     Did you take any steps to verify what

18   Caryn had told you?

19        A     Well, as I said, I did talk to some

20   officials that were familiar with that particular

21   district.  I believe I called some of the

22   individuals who would have, for example, duties

23   related to processing her complaint when it was

24   eventually filed.  I think we talked to -- my --

25   my -- one of my senior lawyers and I talked to

1   the -- the person in that area who was doing an

2   initial investigation of the matter.

3            But, no, I -- I see what you're getting

4   at.  Primarily what I was getting information on

5   was from Caryn, from people who knew that specific

6   office, and from the other people at the AO who

7   had a role in this case.

8            So I did talk to the general counsel

9   about the case.  I remember she had been away for

10  a couple of days.  When she came back, we

11  discussed it, and, you know, she had concerns as

12  well.

13           And so, you know, it was -- it was a

14  topic of conversation because of the allegations,

15  and -- and, you know, the seriousness that sexual

16  harassment presented for many employers, Congress,

17  the executive branch agencies, but certainly the

18  judiciary as well.

19           MS. McMAHON:  Sophia, I think, if we

20  could, can you pull up Tab C?

21           AV TECHNICIAN:  Stand by.

22           And, Counsel, would you like this to be

23  marked as Exhibit 1?

24           MS. McMAHON:  I'm sorry, I'm having a

25  hard time hearing you.

1          AV TECHNICIAN:  Would you like this to

2    be marked as Exhibit 1?  I know we discussed it

3    earlier.

4          MS. McMAHON:  Yes, please.

5          AV TECHNICIAN:  Okay.

6          MS. McMAHON:  This is marked as

7    Exhibit 1.

8          AV TECHNICIAN:  All right.  Stand by.

9          (Government Exhibit 1 was marked for

10   identification and is attached to the transcript.)

11   BY MS. McMAHON:

12        Q    Ms. Dunham, this document, would it --

13   would it -- would it be fair to say that this

14   document says Nancy Dunham on the top and is dated

15   July 23rd?

16        A    Yes, that's what I see.

17        Q    Would it make sense if I told you that

18   this was Plaintiff's notes from a call you had

19   with her on July 23rd?

20        A    Yes, that looks very familiar.

21        Q    Okay.  And hopefully this will refresh

22   your recollection about that conversation, but

23   this aligns with what you were telling me about

24   your first conversation with her in July of 2018;

25   is that right?

1    A    Yes.  And I -- I note that she wrote --

2    and this is what typically I would say to

3    employees -- that I was not giving them legal

4    advice because they needed to get legal advice

5    from someone who could represent them, but I also

6    told her about confidentiality.  I knew that must

7    have been important to her.  And I can't see the

8    bottom of the page.  Oh, there we go.  Okay.

9          This -- this does refresh my

10   recollection.

11   Q    Let us know if you want to take your

12   time to read it.  I think Sophia can scroll

13   through it.

14   A    Okay.  And I -- I --

15        THE WITNESS:  Yeah, let's scroll a

16   little further.

17            AV TECHNICIAN:  (Technician complies.)

18            THE WITNESS:  Okay.  So...

19            AV TECHNICIAN:  And, Ms. Dunham, if you

20   need me to zoom in at all, I'm happy to do so.

21            THE WITNESS:  Okay.  I think I'm doing

22   fine.

23            Okay.  I -- I see that -- that she

24   wrote down that she -- that I said she was

25   credible, and that is consistent with my

1    recollection.

2                I see that she wrote down that classic

3    sexual harassment is an imbalance of power, a red

4    flag, yes.

5                I see that she wrote down there was no

6    physical assault, which I asked her about.

7                Okay.  And can you keep scrolling?

8                AV TECHNICIAN:  (Technician complies.)

9                THE WITNESS:  Okay.  And -- okay.  Keep

10   going.

11               AV TECHNICIAN:  (Technician complies.)

12               THE WITNESS:  I see that she talked

13   about what her career goals were.  I remember

14   that.

15               Okay.  Please keep going.

16               AV TECHNICIAN:  (Technician complies.)

17               THE WITNESS:  She wrote down, "She

18   believes me."  I -- and I did believe her.

19               Okay.  Keep going.

20               AV TECHNICIAN:  (Technician complies.)

21               THE WITNESS:  She did talk about fraud,

22   waste, and abuse, and I'm -- I am very

23   knowledgeable about that topic, having dealt with

24   it at other executive agencies, and I don't recall

25   the details, but I -- I -- that's why I said there

1  may have been a number of problems in that office,

2  but I remember her telling me some of those and

3  that it fell under waste, fraud, and abuse.

4          Okay.  Is that the end of it?

5  BY MS. McMAHON:

6      Q     Yes, I think so.

7      A     Okay.

8          MS. McMAHON:  Sophia, could you scroll

9  back to the first page?

10          AV TECHNICIAN:  (Technician complies.)

11          MS. McMAHON:  Yes, exactly.

12  BY MS. McMAHON:

13      Q     So, Ms. Dunham, I want to point you to

14  the bottom third of the page where Caryn writes,

15  "She is already uncomfortable with Asheville

16  piece."

17          Do you remember what that -- what she

18  was referring to there?

19      A     Well, I think I was referring to what

20  she was telling me about her office.

21      Q     Did she mention during this phone call

22  an interest in transferring to Asheville?

23      A     I, at some point, talked to her about

24  what she thought would resolve the situation,

25  which I typically would do, and I believe that her

1    impression was that if she moved to another office

2    that she would not have the physical contact and

3    the proximity with Mr. Davis and that she thought

4    that could resolve things.

5        Q    And --

6        A    I'm always looking for how might the

7    situation be better for everyone, which is the way

8    you typically settle a case that -- where there

9    are workplace disputes or problems, and so I

10   believe she talked to me about Asheville would be

11   a better fit and getting her away from him.

12       Q    Do you remember why Caryn would have

13   written that you are already uncomfortable with

14   the Asheville piece?

15       A    Probably because of the fact that I

16   told her candidly what my impressions were, that

17   there were aspects of her situation that were

18   classic sexual harassment and that, you know, I --

19   I was concerned for her.

20            Occasionally, you know, people are

21   actually in physical danger, and there were some

22   very subtle signs of that in terms of late-night

23   hanging around her when no one else was around.

24   And so, yes, I was uncomfortable, and I felt I

25   needed to do something as soon as possible.

1        Q        Okay.  I don't know, Ms. Dunham, if you

2   want to take a quick break.  Just let me know.  I

3   know we've been going for about an hour now.

4        A        Yeah, I think that would be good.  A

5   five-minute break would be wonderful.

6        Q        Okay.  We'll plan to come back at

7   3:15 --

8        A        Okay, thank you.

9        Q        -- our time --

10       A        Yes.

11       Q        -- or 9:15 your time.

12       A        Yes.

13                (A recess was taken.)

14                THE WITNESS:  So you asked me a

15  question earlier about whether or not I had ever

16  been deposed as a witness as opposed to as

17  counselor for someone else, and I -- I remembered

18  a situation where I was deposed.

19                So I -- it was when I was at EPA, and I

20  was an advisor to the Homeland Security office.  I

21  was a Homeland Security national security lawyer,

22  and I was a witness to a false allegation of

23  physical and sexual assault by an employee, and I

24  was asked to testify in that matter.

25                And so I basically testified against

1   the person who was falsely claiming that one of my

2   clients had physically assaulted her.  I was in --

3   I was actually in the office when the incident

4   happened, and so I -- I was deposed probably for

5   about half a day on that matter, and that was

6   not -- not in my role as a lawyer, but that was in

7   my role as a witness.

8              MS. McMAHON:  Understood.  That sounds

9   like an interesting case.

10             Sophia, could you pull up Exhibit 1

11  again?

12             AV TECHNICIAN:  (Technician complies.)

13             MS. McMAHON:  Could you scroll down to

14  the second page?

15             AV TECHNICIAN:  (Technician complies.)

16  BY MS. McMAHON:

17     Q    Ms. Dunham, on page 2, if you'll look

18  at the third bullet down, it says, "she thinks

19  that odds stacked against me with them 2 in

20  charge."

21             What did you tell Caryn about the odds

22  being stacked against her?

23     A    I probably -- and I don't want to

24  speculate, but I'm thinking what I said is that,

25  you know, when you have a power imbalance, you're

1    always taking a risk in complaining about it, and

2    that is what I think that language refers to.

3        Q      You're saying you just meant there was

4    a power imbalance, not that there was anything

5    about the system that would have meant that the

6    odds were stacked against her?

7        A      Yes.  I think -- I think I meant -- or

8    I think what that refers to is I probably said

9    that, you know, when you have a power imbalance,

10   you have, you know, two managers lining up against

11   you as an employee, that I wanted her to be aware

12   that -- that this was not an easy case.

13            But -- I don't recall much more than

14   that, actually, but this gives me a general

15   recollection of what we talked about.

16       Q      Why do you think that the -- when

17   there's a power imbalance, it's not easy for the

18   employee?

19       A      Well, there's a lot someone can do, you

20   know, when they are in a position of power to

21   either make life difficult for an employee or fail

22   to take action and then have no consequences come

23   from it.

24       Q      If you'll look farther down on that

25   page --

1      MS. McMAHON:  Sophia, if you wouldn't

2  mind scrolling a tiny bit down.

3      AV TECHNICIAN:  (Technician complies.)

4      MS. McMAHON:  That's perfect.

5  BY MS. McMAHON:

6      Q     -- there's another bullet that's third

7  from the bottom that says, "no adverse action."

8      Do you remember what that was referring

9  to?

10     A     I think I probably -- that to me says

11  they have not taken any performance-based or

12  adverse action related to conduct, and then she

13  said -- she writes, "may have diminished job

14  responsibilities."

15     I think that would be that there was no

16  obvious adverse action taken but that -- that job

17  responsibilities being diminished are one aspect

18  of the sexual harassment or other discrimination

19  complaint that can be actionable.

20     Q     And do you remember whether you were

21  talking about that in the general sense or whether

22  she gave you any specifics about her situation?

23     A     I cannot remember more than what I've

24  just said.

25     Q     No worries.

1          MS. McMAHON:  Sophia, if you could

2     scroll down -- and I know we've already been

3     through this, but --

4          AV TECHNICIAN:  (Technician complies.)

5     BY MS. McMAHON:

6          Q     -- to this page, page 3, and I think

7     this goes on to page 4 as well.  It looks like

8     it -- oh, maybe even, yeah, 5 too.

9          It looks like, Ms. Dunham, you were

10    telling Caryn about her various options that she

11    had in terms of what to do with her allegations.

12         Do you remember advising her as to a

13    specific course that she should take?

14         A     No.  That would not be something I

15    would do, and -- and I did talk about options with

16    her.  And I see she wrote, What feels better?

17    Informally?  Or enter into settlement agreement.

18         I know that one of the first things I

19    thought that the AO should do is look at whether

20    the situation could be resolved informally.  I've

21    been in many, many situations where a very bad

22    employment situation could be resolved with

23    everyone being better off due -- due to a

24    settlement, and so that -- that was always -- even

25    when I was a defense counsel, that was always

1    something I looked at, can we settle this

2    favorably for both sides.

3          Q      When you say settle informally, do you

4    mean without going through the official process?

5          A      I mean -- yes.  I mean talking with

6    those who have decision-making authority and

7    seeing whether what the Plaintiff would find

8    acceptable in a settlement would be something that

9    the managers would also be in agreement with.

10         Q      Would you still think that's the case,

11   even if there was not an official or unofficial --

12   any type of investigation?

13         A      Oh, absolutely, because, you know,

14   if -- if the managers had discussed the

15   situation -- the workplace situation informally

16   with AO managers, general counsel, my office, and

17   said we want to resolve this, we are -- you know,

18   one way to have handled this was if they had said

19   we didn't know that she was upset about this, and

20   we would like to resolve it favorably for

21   everyone, and we know that having an employee who

22   feels threatened, at risk, is unhappy, especially

23   someone who does really good work, one way that

24   this could have gone would have been to settle

25   early and to avoid everything that has happened

1    since.

2              And that's what I always look at,

3    especially in cases that I'm troubled by, and I

4    can see that that didn't happen.

5              MS. McMAHON:  Sophia, could you go to

6    page -- page 3 and scroll down to the bottom?

7              AV TECHNICIAN:  (Technician complies.)

8    BY MS. McMAHON:

9         Q    So it says right above the Bates

10   number, Bates number 18, "not a good idea - least

11   formal - work with her office - very informally

12   involved behind the scenes."

13        A    Yes.

14        Q    Did you think that was not a good idea

15   at the time?

16        A    I think what that's referring to -- I

17   think her notation, "not a good idea - least

18   formal" -- so I think maybe the -- the formal

19   complaint process may not have been a good idea.

20             I probably said, and I believe this

21   now, that the least formal method would have been

22   the best one, because you have so many more

23   options, and people that start into a complaint

24   process and begin to litigate get a little --

25   sometimes they get a little frozen in their

1  positions, either the managers or the employees.

2          So I thought this was something that --

3  especially with the senior people who were

4  involved at the AO -- may have been able to be

5  resolved early on informally.

6      Q    But do you know why she had written

7  down, "not a good idea - least formal"?

8      A    Well, I think it was probably that --

9  that the negatives about formal proceeding and

10  that the least-formal method, informal settlement

11  may have been a better idea.

12          But, again, I didn't make the decision.

13  I was giving her options and giving her my

14  experiences at the AO and at other institutions.

15      Q    And you thought -- what you're telling

16  me is you thought moving through the official

17  channels that may have involved more official

18  processes, in your experience, had been a worse

19  idea?

20      A    Yes.

21      Q    Understood.

22          MS. McMAHON:  You can take down

23  Exhibit 1, please.

24          AV TECHNICIAN:  (Technician complies.)

25          MS. McMAHON:  Great.

1    BY MS. McMAHON:

2         Q      So that was your initial phone call

3    with Caryn on July 23rd of 2018, and I know you

4    mentioned you started talking to her frequently.

5              Do you know when the next phone call

6    was that you had with Caryn?

7         A      I do not know.

8              MS. McMAHON:  Sophia, could you pull up

9    Tab D, please?

10             (Government Exhibit 2 was marked for

11   identification and is attached to the transcript.)

12   BY MS. McMAHON:

13        Q      I'll mark this as Government Exhibit 2.

14             This is an e-mail chain between Caryn

15   and Ms. Dunham, and it is very long, so there's a

16   couple things that I want to discuss in here, but

17   we can -- I'd like to start actually at the very

18   bottom, which is the earliest e-mail between you.

19             And, Ms. Dunham, I don't know if you

20   want to take a moment to read it.  You're welcome

21   to do that.

22        A      Yeah, I -- I will read, I guess,

23   backwards from Thursday, the 26th.

24             Yes, I remember this.

25             THE WITNESS:  Okay.  And then go back

1   to the next e-mail.

2            AV TECHNICIAN:  (Technician complies.)

3            THE WITNESS:  Okay.  Let's see.  Okay.

4            Okay.  I recognize this.

5   BY MS. McMAHON:

6        Q    Great.

7        A    Right, but I definitely -- I definitely

8   remember my concerns about her working in an

9   isolated part of the building.

10           Okay.  And --

11           MR. GERSEN:  I apologize for

12  interrupting.

13           Would it be possible to see the exhibit

14  in the chat or somewhere else so we could look at

15  it outside of this shared window?

16           AV TECHNICIAN:  Yes, I'm happy to share

17  it.  Please stand by.

18           MR. GERSEN:  Thank you so much.

19           AV TECHNICIAN:  I've uploaded it to the

20  chat.

21           And if you need Exhibit 1, just please

22  let me know.

23           THE WITNESS:  Okay.  Could you continue

24  to scroll forward in time?

25           AV TECHNICIAN:  (Technician complies.)

1              THE WITNESS:  Oh, there we go.  Okay.

2              Okay.

3    BY MS. McMAHON:

4        Q    Okay.  So I'd just like to start with

5    the bottom couple e-mails starting on page 3.

6              So page 3 and 4 -- 3 through 5 involve

7    e-mails from Caryn to you, Nancy, from Thursday,

8    July 26?

9        A    Yes.

10       Q    And she is e-mailing you, it appears,

11   about Tony Martinez.

12             Do you remember who Tony Martinez is?

13       A    Now I do.  I -- I recognize Tony.  I

14   couldn't have told you what his last name was.

15   Now I recall.  So I can see that she's reporting

16   what Tony said to her in a phone call.

17       Q    Uh-huh.  And -- so you write on

18   July 26, 2018 -- that's in the middle of page 3 --

19             MS. McMAHON:  If you could scroll up a

20   little bit, Sophia, that would be great.

21             AV TECHNICIAN:  (Technician complies.)

22             MS. McMAHON:  Perfect.

23   BY MS. McMAHON:

24       Q    You said, "Let's proceed as discussed

25   yesterday."

1        So did you have a phone call with

2   Plaintiff on July 25th, 2018?

3        A    I can't recall that.

4        Q    And just to summarize so that we

5   don't -- we don't need to read all of this.

6             Essentially, what Caryn has e-mailed

7   you, it seems as that Tony had put her temporarily

8   back on a team with J.P., and he called her

9   afterward to apologize and say that he had made a

10  mistake in doing so and took her back off that

11  team a couple days later.

12            So then if you scroll up to the bottom

13  of page 2, that's an e-mail from Friday, July 27th

14  from Caryn to you, and she writes, "Hi Nancy, I

15  just spoke with the appellate chief, (josh)."  And

16  she and Josh are having a discussion about whether

17  she should apply for the position of appellate

18  Assistant Federal Defender.

19            Do you remember that?

20       A    Vaguely.  I -- I can see the -- the

21  language, and I -- I have a -- a very weak

22  recollection of that part of it.

23       Q    Do you recall her talking about wanting

24  to work as an appellate lawyer?

25       A    Yes, I do recall that.

1      Q      What did she say about that?

2      A      Well, that was part of her career goal,

3   and that was very much related to her background,

4   so I -- I do recall that as being something that

5   she was interested in.

6      Q      And do you remember her raising that as

7   a possible resolution to her sexual harassment

8   claims?

9      A      Well, I think that was a solution to

10  her sit- -- her employment situation, so that if

11  she had taken that job, that she would no longer

12  be reporting to Mr. Davis and Mr. Martinez.

13           And so, yes, I think that that was

14  something that she thought could solve the

15  situation, and my recollection is that would have

16  been great.

17     Q      So in the earlier e-mails at the bottom

18  of this document that we're looking at, the

19  July 26th e-mails, she says, I think, on page --

20  on page 4, she says, "I have attached a PDF of

21  Tony's e-mail to the office and the appellate AFD

22  job posting."

23           Do you see that?

24     A      I do not.

25           MS. McMAHON:  I think if we could

1   scroll down a little -- sorry, Sophia -- just to

2   page 4.

3           AV TECHNICIAN:  (Technician complies.)

4   BY MS. McMAHON:

5       Q    And that's above her signature block,

6   the sentence, "I have attached..."

7       A    Okay.  I see that.

8       Q    Do you recall her talking about this

9   specific appellate AFD posting?

10      A    I vaguely recall that, yes.

11      Q    And do you recall reading the actual

12  appellate AFD posting that Caryn sent you?

13      A    I actually -- I can't -- I'm sure I

14  did, but I can't remember for sure.

15      Q    Understood.

16           So do you remember whether you

17  encouraged -- or if you encouraged Caryn to apply

18  to the appellate AFD job?

19      A    No.  That would not have been the sort

20  of thing I would have done.  I would have read

21  what her desire for a solution to her situation

22  was, and if I thought that that would have

23  resolved the employment dispute and the current

24  situation that she was uncomfortable with, I -- I

25  likely would have encouraged her.

1          But -- but I don't remember the details

2     of that, and I -- and I would not typically try to

3     push somebody into doing something unless they

4     wanted to do it.

5          MS. McMAHON:  Sophia, if you'll scroll

6     up again to the top of page 3.

7          AV TECHNICIAN:  (Technician complies.)

8     BY MS. McMAHON:

9     Q     That's back to this e-mail where Caryn

10    summarizes her conversation with the appellate

11    chief, Josh Carpenter.

12    A     Uh-huh.

13    Q     She writes to you that, He said I

14    basically "already" have the position they are

15    hiring for and that I don't "need" to apply.  He

16    said that because I am "lower" on the experience

17    scale being an R&W" -- a research and writing

18    attorney -- is financially better than being an

19    AFD and that only after 10-15 years' experience

20    does it make sense for me to move to an AFD.

21          Do you remember what your reaction was

22    to reading this?

23    A     Well, I can see that she says,

24    "Obviously, this hasn't gone as I hoped."  So I

25    think she was disappointed in Josh's response, but

1    I honestly -- this -- this part of it, I have

2    very, very little recollection of.

3        Q    Did you -- do you remember having any

4    reason to doubt Josh Carpenter's intentions or

5    that he wasn't telling the truth when he told her

6    she would -- she was in a more financially

7    advantageous position as a research and writing

8    attorney?

9        A    I did not have an opinion on that.

10            MS. McMAHON:  So if you'll scroll up to

11   page 1.

12            AV TECHNICIAN:  (Technician complies.)

13   BY MS. McMAHON:

14       Q    On August 3rd, 2018, you write to

15   Caryn, "Please give me a call today if you can."

16       A    Uh-huh.

17       Q    So it's fair to say you had another

18   phone call on August 3rd?

19       A    I assume that she called me when I told

20   her I -- I had availability, but I cannot remember

21   that for sure.

22       Q    Can we -- I'm going to show you a

23   document that might refresh your recollection

24   again.

25       A    Okay, uh-huh.

1          MS. McMAHON:  Sophia, if you could pull

2     up Tab F.

3          AV TECHNICIAN:  (Technician complies.)

4          MS. McMAHON:  And also put it in the

5     chat, please.

6          AV TECHNICIAN:  (Technician complies.)

7          (Government Exhibit 3 was marked for

8     identification and is attached to the transcript.)

9          MS. McMAHON:  Great.

10    BY MS. McMAHON:

11    Q      Is it fair to say that these notes --

12    it says Nancy at the top and dated 8/3 -- are

13    Caryn's notes from that phone call?

14    A      I think that must be true.  And I'm

15    looking at the content of what she has written,

16    and I also recollect that I did talk to the deputy

17    director, and -- yep, and I can see a number of

18    other substantive matters.  Oh, Cait Clarke is the

19    person I was trying to think of before.

20          Cait Clarke was the senior person that

21    had responsibilities for and with the federal

22    protector defender's office, and I think she said

23    she'd give Tony a call, and I -- I recall that.

24          MS. McMAHON:  I'd like to mark this,

25    for the record, as Dunham Exhibit 3.

1    BY MS. McMAHON:

2        Q       So up at the top, Ms. Dunham, it says

3    you talked to deputy director, correct?

4        A       Right.

5        Q       Would that -- is the deputy director

6    Lee Ann Bennett?

7        A       It is.

8        Q       Okay.  And do you recall what you

9    talked to Ms. Bennett about?

10       A       Well, I think I told her the general

11   situation here and what my impressions were.

12              I also recall that I told her about a

13   situation where -- when Tony was made aware of

14   these allegations of harassment and Caryn's

15   discomfort with, you know, some of the late-night

16   meetings and her -- her feelings that she was not

17   secure, I believe that Mr. Martinez sat Mr. Davis

18   down in a room with Caryn and said something like,

19   well, let's try to work this out, or, you know,

20   let's have you two work this out.  And I believe

21   that that was one of the things that I told

22   Ms. Bennett that was concerning.

23       Q       Did Caryn tell you -- did Caryn ask you

24   to talk to Ms. Bennett or Cait Clarke about her

25   situation?

1      A      No, that -- I doubt that came from her.

2    That was my responsibility, having heard

3    allegations that concerned me, to address the

4    situation, and Cait Clarke and Lee Ann Bennett

5    would have been two individuals at a senior level

6    who might have been able to do something about it.

7            And so that -- and it was also my job

8    to inform senior managers of allegations so that

9    they could -- they would be on notice that they

10   needed to take action or to get more information

11   if they felt that was necessary.

12     Q      Why did you talk to Lee Ann Bennett

13   about it?

14     A      She was my immediate supervisor.  She

15   was second-in-command at the AO.  She had

16   responsibilities that related to that office and

17   actually all the offices in the courts, and she

18   was someone I had enormous amount of respect and

19   trust in, and when I told her about this case, her

20   responses were incredibly intuitive.

21           She was the one that mentioned, you

22   know, when there is a huge power imbalance and

23   somebody's trying to control the -- the employee

24   at issue, that -- I mean, she was not a lawyer,

25   but she recognized that was part of a classic

1    sexual harassment claim.

2         Q    And why did you talk to Cait Clarke?

3         A    Well, Cait Clarke also had -- had

4    responsibilities related to that office, and she

5    was also somebody I had respect for, and I knew --

6    these are both people that I -- I had confidence

7    would do the right thing.

8         Q    Can you be more specific about what

9    Cait Clarke's role was with respect to the office?

10        A    Cait Clarke -- I can't remember exactly

11   what her position was, but she was a senior

12   official that had responsibilities for -- for the

13   public defender's offices, and I believe that

14   Caryn knew her from her time at the AO as a

15   U.S. Supreme Court Fellow.

16             And Cait Clarke I trusted, I mean, and

17   Cait Clarke had a history with that office, so she

18   knew the parties involved, she knew, you know,

19   things that had happened in the past, and she gave

20   me some good information, as I recall.

21        Q    Do you recall what information she gave

22   you?

23        A    I -- all I recall is that she told me

24   that there had been problems with that office in

25   the past, and I -- I do not recall the details.

1        Q      Did it occur to you at this point to

2    approach Tony, who was the federal defender at the

3    time?

4        A      That -- that was not my role, and I did

5    not think that was needed because I knew that -- I

6    believe that Tony and J.P. were having

7    conversations with the Office of General Counsel.

8    So I was very careful not to interfere with

9    that -- the role of the Office of General Counsel.

10              Now, if -- if the general counsel's

11   office or the lawyers would have said we would

12   like you to talk with us to J.P. or Tony, I -- I

13   would have considered doing that, but at that

14   point, I -- I thought that the conversations with

15   the managers about what to do in order to protect

16   the judiciary and the AO were already taking

17   place.

18       Q      What made you think that J.P. and Tony

19   were having conversations with the general

20   counsel's office?

21       A      I believe that I was probably in

22   meetings.  I don't recall this precisely, but I

23   believe that typically what would have happened is

24   if the general counsel's office were concerned

25   about an employment situation, they would contact

1     the managers involved.

2          Q     And just so I understand, why would

3     your role have been to contact someone like Cait

4     Clarke who oversaw the federal defenders and not

5     the federal defender himself, who was also a

6     manager?

7          A     Cait Clarke, I felt, could give me some

8     insight into the workings of that office, could

9     possibly have reached out to the people at issue,

10    and devised an informal settlement, and while I

11    could have, I -- it was certainly within my job

12    responsibilities to talk to Mr. Davis or

13    Mr. Martinez, I knew that they were talking to the

14    Office of General Counsel, so I thought it better

15    that I not get involved with that part of the

16    situation.

17         Q     Were you told directly that they were

18    talking to the Office of General Counsel?

19         A     I think I -- I think I interpreted what

20    the lawyers in OGC told me or that

21    Deputy Director Bennett told me that those

22    conversations were going on, but I -- I -- I did

23    not have any firsthand knowledge.

24               I was never in a meeting or phone

25    conference with the Office of General Counsel and

1    those two managers.

2         Q      So if we could look again at Exhibit

3    Number 3, and the -- the second -- so the first

4    bullet down says, "she talked to deputy director."

5         A      Uh-huh.

6         Q      And then the second bullet says,

7    "request immediate transfer to Asheville office;

8    make sure he considers it."

9         A      Uh-huh.  Yes.

10         Q      And then the third bullet says, she has

11    not talked to any other -- I think it says

12    manager, I'm not sure -- in FPD, but will tell

13    Cait Clarke; Clarke will make call to Tony -

14    should grant request.

15              Is that right?

16         A      Yes.

17         Q      So did you think that Cait Clarke would

18    order Tony to grant her request -- to grant

19    Caryn's request to transfer to Asheville?

20         A      No.  Cait Clarke I don't believe had

21    any authority to order the public defender to do

22    anything, but the -- I -- I took that conversation

23    to -- you know, to make a suggestion or to offer

24    assistance in resolving the situation.

25         Q      Did you and Caryn either in this call

1  or before discuss her move from be- -- from being

2  a research and writing attorney to being an

3  Assistant federal defender?

4       A      It sounds familiar, but I cannot -- I

5  cannot remember exactly a conversation like that.

6       Q      Do you remember in this conversation on

7  August 3rd discussing -- appointing some sort of

8  fact-finder to investigate her claims?

9       A      Well, I would not have had the

10  authority to appoint a fact-finder.  I think

11  the -- the judiciary process would have started

12  with counseling, and the counselor could have done

13  some informal fact-finding.  I do remember that

14  happening at some point.

15             MS. McMAHON:  Sophia, if you'll scroll

16  down to the bottom of page 1.

17             AV TECHNICIAN:  (Technician complies.)

18  BY MS. McMAHON:

19       Q      It says in the last bullet, she told

20  Lee Ann very credible - we can't do everything

21  without fact-finder.

22       A      True.

23       Q      What did you mean by that?

24       A      Well, I'm assuming what I meant, and it

25  would have made sense in this situation, is we

1    needed more facts.

2            As you pointed out early on, we were

3    hearing one side and then some general information

4    from AO employees about that particular Charlotte

5    office.  We -- we needed more facts.  And just

6    because I found someone credible, in order to do

7    the right thing, more facts needed to be had.

8        Q    What do you mean by "in order to do the

9    right thing"?

10       A    Well, in order to comply with the civil

11   rights laws, in order to make a good decision that

12   would avoid liability for the judiciary, but also

13   do the right thing in terms of our legal

14   obligations to the employee.

15       Q    To which employee?

16       A    To Caryn.  And -- and, in fairness, to

17   the managers as well.  I mean, fact-finding can

18   turn a case because you find out more information,

19   and it rounds out the entire picture.

20       Q    Would you typically recommend to

21   managers appointing some sort of fact-finder for

22   the reason that you just mentioned?

23       A    I don't think I recommended that to the

24   managers.  I think that -- I think the process --

25   the -- the judicial complaint process in -- in

1  that district would have started with EEO

2  counseling, and I think that counselor would have

3  done some interviews, and I remember actually

4  talking to that individual who had started

5  interviews and was doing fact-finding, not -- she

6  wasn't finding facts.  She was taking information

7  from all the parties involved.

8      Q      And at that point, like you said, at

9  this phone call on August 8th, all you knew about

10 Caryn's situation was what Caryn had told you?

11     A      What Caryn had told me, what Cait

12 Clarke, Laura Minor, and others, including the

13 Office of General Counsel and the deputy director,

14 told me about that particular office and their

15 knowledge of the parties.

16     Q      When you say "that particular office,"

17 that's -- just to clarify, that means, in general,

18 background about the office, not any specific

19 facts about what Caryn was alleging --

20     A      Yes.

21     Q      -- is that right?

22     A      Yes.

23     Q      And you hadn't seen any

24 documentation -- Caryn hadn't sent you any

25 documentation at that point, you know, to

1    corroborate her claims or to -- to give you more

2    specific context about her claims?

3        A    I don't recall.

4            MS. McMAHON:  So if we could scroll

5    down to page 2 of Exhibit 3.

6            AV TECHNICIAN:  (Technician complies.)

7    BY MS. McMAHON:

8        Q    The second bullet down on page 2 says,

9    "telework - a little bit beyond scope of remedy."

10            Do you recall why you would have said

11    that telework was beyond the scope of the remedy?

12        A    I do not recall.

13            I mean, I think what I might have meant

14    is what you do as a manager to resolve a claim of

15    harassment or discrimination if you want to settle

16    it according to the law is to put the person in

17    the position they would have been absent the

18    harassment or discrimination.

19            So I'm not sure that if this had been

20    adjudicated and if there had been a finding of

21    harassment or discrimination that what a judge or

22    someone else would have ordered would have been

23    telework.  It would have been, you know,

24    reinstatement to the position that the employee

25    would have been in absent discrimination, which

1    would have been a job.

2              Now, there are -- there are cases where

3    telework is at issue, someone wants to telework

4    because of a disability, and so the -- the remedy

5    would -- would include telework.  But I -- I'm --

6    I'm offering a reasoned explanation about those

7    notes.

8         Q     I understand.

9              It also says, in the fourth bullet

10   down, "send offer letter to her."

11             Do you remember discussing Caryn's

12   offer letter with her?

13        A     I -- I really do not.

14        Q     No problem.

15             MS. McMAHON:  So if we could go back to

16   Exhibit 2.

17             AV TECHNICIAN:  (Technician complies.)

18   BY MS. McMAHON:

19        Q     And just the top of the page, is it

20   fair to say this is an e-mail from Caryn to you

21   from August 6th, 2018?

22        A     Yes.

23        Q     So she writes, "Nancy, I had a good

24   phone call with Laura yesterday," and she writes

25   that she's attaching copies of her offer letter

1    and a related e-mail and some communications from

2    the first assistant, "including an email saying he

3    would raise my pay if I stayed in charlotte and a

4    text message he sent me when he waited for me in

5    the lobby one evening when I had already said no

6    to a ride."

7                    Do you recall receiving this e-mail?

8        A     I -- I do recall the substance of that

9    e-mail.

10       Q     Uh-huh.  Do you recall seeing the

11   attachments that she mentions?

12       A     I'm sure I did, but I can't remember

13   them enough to testify again about them.

14                   But, again, what raised red flags for

15   me was his saying that he'd raise her pay if she

16   stayed in Charlotte and that -- I mean, again, the

17   control issue, and then the text message she got

18   from him when he waited in the lobby and he had

19   been pestering her to give her a ride home.

20                   And so I do specifically remember those

21   situations, because, again, they were red flags

22   for me of concern.

23       Q     This was the first time that -- on

24   August 6th, 2018, that you were actually viewing

25   copies of that e-mail and that text message; is

1    that right?

2          A      I believe that's correct.

3                 MS. McMAHON:   Sophia, can you pull up

4    Tab H, please?

5                 (Government Exhibit 4 was marked for

6    identification and is attached to the transcript.)

7                 MS. McMAHON:   I'll mark this as

8    Government Exhibit 4, and this is the e-mail that

9    was attached to the August 6th e-mail to

10   Ms. Dunham from Caryn, and this attachment is the

11   e-mail that she was referencing from J.P. Davis to

12   Caryn that's from May 18th, 2018 that discusses

13   pay-for-stay.

14   BY MS. McMAHON:

15         Q      Ms. Dunham, I don't know if you want a

16   minute to read this.

17         A      No, I've already read it.

18         Q      So how did you interpret this e-mail

19   when you saw it?

20         A      Well, I remember it clearly, and I

21   expressly remember the last line which is, "I have

22   a plan...just remember I deal in pay-for-stay,"

23   and that to me, again, was indicative of

24   Mr. Davis' manipulating Caryn's conduct and urging

25   her to stay in the office that he worked in.

1       Q       Did Caryn tell you that she had told

2   J.P. earlier that she would quit -- she would have

3   to quit if she didn't make more money?

4       A       I don't recall that at all.

5       Q       Can you explain specifically what you

6   believe is sexual in nature about pay-for-stay?

7       A       Oh, I don't think pay-for-stay is

8   sexual.  I think it is indicative of manipulating

9   the employee's conduct and staying in -- in close

10  proximity to her.

11              So, no, nothing sexual about that.

12  There were -- the sexual aspects were scattered

13  through other aspects of the behavior, but this

14  is -- this is the control issue.

15      Q       So without knowing the -- without the

16  other examples that you -- that Caryn had told you

17  about her allegations against J.P., you don't

18  think that this e-mail alone would constitute

19  sexual harassment?

20      A       I'm not going to speculate on that.

21  Again, it is one e-mail out in a -- in a broad

22  context of behavior, and what I see here and what

23  I saw then was -- was the issue of control and

24  trying to control her, which is very common in

25  sexual harassment cases or in cases of harassment

1    in general.

2         Q      Is it possible that as her mentor, J.P.

3    interpreted this e-mail as wanting her to stay and

4    wanting to help raise her pay?

5         A      I can't speculate about that.

6         Q      Do you think that this e-mail is only

7    subject to one interpretation?

8         A      No, I'm positive that everything is

9    subject to multiple interpretations.

10        Q      If you had known that Caryn told J.P.

11   that she'd have to quit if she wasn't transferred

12   to Asheville or got a raise, would that have

13   changed your view on the context of this e-mail

14   and -- and whether it really was an effort to

15   control her?

16        A      I can't speculate about that.

17   That's -- that isn't what happened, so...

18        Q      And how do you know that's not what

19   happened?

20        A      I mean, I had no facts to -- to rely on

21   to believe that.

22        Q      That's not the account that Caryn told

23   you?

24        A      It may have been, but I just -- I

25   didn't have anything that would cause me to

1  believe that this was an appropriate management

2  request.  I just -- the -- what concerned me was

3  the control issue and the desire to stay in

4  proximity with her.

5          MS. McMAHON:  Sophia, if you could pull

6  up Tab I, please.

7          (Government Exhibit 5 was marked for

8  identification and is attached to the transcript.)

9          MS. McMAHON:  This is Exhibit 5, and

10  this is another attachment to the August 6th, 2018

11  e-mail from Caryn to Ms. Dunham.

12  BY MS. McMAHON:

13      Q     Ms. Dunham, do you remember reading

14  this e-mail -- or, sorry, these texts?

15      A     These texts, yes, I do.

16      Q     Do you remember what this was in

17  reference to?

18      A     This is in reference to J.P. pushing

19  Caryn to take a ride home with him when she had

20  already told him that she preferred not to.

21      Q     Did you interpret this offer for a ride

22  home as sexual harassment?

23      A     It concerned me because of the nature

24  of her being very isolated in the office.  This

25  was late at night.  She had already told him, no,

1    she did not want a ride home, and he continued to

2    pursue it.

3              And -- and, again, what that told me

4    was not that that is just overall a wrong thing to

5    do, but when someone says no, that should be

6    respected.

7         Q    And the time stamp on this text is

8    6:44 p.m.; is that right?

9         A    Right, right.  Yes, that's what I see.

10        Q    Were you aware that J.P. had given

11   Plaintiff -- sorry, given Caryn ride homes in the

12   past?

13        A    I don't think I knew that.

14        Q    Caryn didn't tell you that?

15        A    I don't think so.

16        Q    Would that have changed how you viewed

17   J.P.'s offer to give her a ride home in the rain?

18        A    No, because at some point, she became

19   uncomfortable with his conduct in the workplace,

20   and being alone with him in his car was a concern

21   to her, and I understand that, and once she said

22   no, I was concerned about his continuing to pursue

23   it.

24        Q    Did Caryn show you any of the prior

25   communications that she had had with J.P.?

```
 1        A     I cannot recall, but I know that she

 2   sent -- she kept very good records and sent me

 3   examples of things that we were talking about so

 4   that I could see for myself what was happening.

 5              I mean, she told me about this -- this

 6   late-night push for a ride home when she had said

 7   no, and then later she showed -- she actually sent

 8   me a copy of the texts.

 9        Q     And just so we're clear, you -- you

10   wouldn't consider this text to be the actual

11   sexual harassment, more indicative of control?

12        A     Well, here's what I -- here's what I

13   think now, and I would suspect I thought it at the

14   time:  If you have been aware that someone has a

15   romantic or sexual interest in you and they're

16   pushing you to be alone in a car when you have

17   said no and you're not comfortable with it, it

18   would have struck me as a possible risk of

19   something happening like a sexual assault.  And so

20   I respected her discomfort with going in a car

21   alone with him whether or not it was raining.

22        Q     And the expression of romantic interest

23   that we discussed earlier was -- would you explain

24   again what that's based on?

25        A     Well, as I said, he publicly made a
```

1    statement that Caryn was hot and then took other

2    opportunities to be alone with her, including this

3    evening, asked her out for drinks, and

4    consistently tried to take control of her work by

5    self-appointing himself as her mentor.

6             MS. McMAHON:  So could we pull up

7    Tab J, please?

8             (Government Exhibit 6 was marked for

9    identification and is attached to the transcript.)

10   BY MS. McMAHON:

11       Q    And this is Exhibit 6, so this is

12   another long e-mail chain.  My apologies.  If we

13   could maybe read it from the bottom again, that

14   might make the most sense, because that's

15   chronological.

16            So this starts with an e-mail -- this

17   is an e-mail chain between Caryn and Ms. Dunham,

18   and it starts, again, right after -- on August 6th

19   after she had -- Caryn had e-mailed the documents

20   that we've been discussing.

21       A    Yes.

22            Okay.  I've finished reading.

23            MS. McMAHON:  So, again, Sophia, if you

24   could scroll all the way to the bottom.

25            AV TECHNICIAN:  (Technician complies.)

1    BY MS. McMAHON:

2         Q       The second e-mail from the bottom on

3    August 6th, 2018 that's at 3:38 p.m., you e-mailed

4    Caryn to say, "I am meeting with Cait Clarke today

5    to generally make her aware of the situation.  No

6    decisions, just discussing possibilities."  I will

7    report back to you.

8               It's fair to say that you met with Cait

9    Clarke on August 6th, 2018?

10        A       Yes.

11        Q       So you said, "No decisions, just

12   discussing possibilities."

13        A       Right.

14        Q       What did --

15        A       What I meant by that was that, again,

16   Cait Clarke was not in a position to make a

17   decision about this case, but she could talk to

18   the people in that office who were in a position

19   to either give Caryn another position or otherwise

20   resolve it.

21        Q       And when you said "no decisions, just

22   discussing possibilities," what did you mean by

23   saying "no decisions"?

24        A       Well, I -- I expect that I meant Cait

25   and I talked about possibilities for resolving the

1    matter.

2         Q       Do you recall what those possibilities

3    were?

4         A       Well, what I recall is that we were

5    looking for a work placement that was -- did not

6    put her in close proximity to Mr. Davis and

7    allowed her to do the work that she wanted to do.

8         Q       When you say allowed her to do the work

9    she wanted to do, what do you mean by that?

10        A       Well, for example, it would not have

11   been reasonable to transfer her to Asheville to a

12   position as a legal secretary.

13               What was important was that she was

14   doing comparable work, and so there was no

15   diminution of responsibilities in a place where

16   she was not directly supervised by Mr. Davis.

17        Q       So you mean comparable work, not --

18        A       Yes.

19        Q       -- not more, not less?  Comparable?

20        A       Yes, exactly.

21        Q       So if you'll scroll up a bit, you

22   say -- this is on August 6th, 2018 at 5:11 p.m.

23   You say, "Hi Caryn, Please call me when you have a

24   few minutes," and you give your number.

25               Is it fair to say, then, that you had a

1    conversation -- a phone conversation with Caryn on

2    August 6th?

3         A    Yes.

4         Q    Okay.  And do you recall what you

5    discussed on that phone call?

6         A    I do not without looking at documents

7    that Caryn may have created based on our

8    conversation.

9              MS. McMAHON:  Sophia, can you pull up

10   Tab K, please, and put it in the chat too.

11             (Government Exhibit 7 was marked for

12   identification and is attached to the transcript.)

13   BY MS. McMAHON:

14        Q    This is Exhibit 7, and at the top Caryn

15   writes, "Nancy - she met with Cait."  This is

16   dated 8/6.

17        A    Uh-huh.

18        Q    It's fair to say these are notes from

19   the phone call that you had with Caryn on

20   August 6th?

21        A    Yes, it looks like it.

22        Q    Okay.  I'll give you a moment to read

23   through it.

24        A    Okay.  I remember this.

25             This second -- or third paragraph is

1    what I had mentioned about Mr. Martinez sitting an

2    employee who had complained of sexual harassment

3    down with the person she said was the perpetrator

4    and sort of forced them to discuss the situation

5    in a meeting.

6              THE WITNESS:  And you can keep

7    scrolling down.

8              AV TECHNICIAN:  (Technician complies.)

9              THE WITNESS:  Okay.

10             Okay.  Keep going.

11             AV TECHNICIAN:  (Technician complies.)

12             THE WITNESS:  Okay.  Next page.

13             AV TECHNICIAN:  (Technician complies.)

14             THE WITNESS:  Okay.  I'm having trouble

15   reading some of the writing.

16   BY MS. McMAHON:

17        Q     That's okay.  Me too.

18             MS. McMAHON:  Sophia, if you could just

19   scroll back up to the very top on page 1, that

20   would be great.

21             AV TECHNICIAN:  (Technician complies.)

22   BY MS. McMAHON:

23        Q     Okay.  So it says on that first page,

24   this is the -- one, two, three, four, five, six --

25   sixth bullet down, "she thinks she can handle

1    this - she crafted with me a potential solution."

2             Do you see that?

3        A     Yes, I do see it.

4        Q     What did you -- what do you think Caryn

5    meant by saying that you can handle it and she and

6    you -- she and you came up with a potential

7    solution?

8        A     Well, I assume that what I was saying

9    was if she were to be reassigned to Asheville,

10   that that would meet her needs, that would resolve

11   the situation with Mr. Martinez, and I thought

12   that that could definitely be an informal

13   resolution to a settlement agreement to this

14   problem.

15       Q     And then if you'll go to page 3, that

16   second bullet down says, "she's on my side - she

17   said she'll deal with what she needs after that."

18       A     I can see that.

19       Q     Did you tell Caryn that you were on her

20   side?

21       A     I don't recall saying that.  I don't

22   recall saying that.

23       Q     You mentioned earlier that your role

24   was as a neutral advisor.

25             Would you think it's appropriate to

1  tell one of the parties that you're on their side?

2      A     I -- to answer that, I would have to

3  know the context.

4           One of the ways that you settle a

5  difficult employment situation is to look at what

6  is best for all sides.  And so if I were trying to

7  settle this, I would have been looking to what was

8  good for the judiciary and the AO, as well as what

9  was good for the employee.

10          Typically, I would not say to someone

11  I'm on your side, but that may -- I don't remember

12  the conversation, so that might have been her

13  impression of what I was saying.

14          I think at some point, she began to

15  trust me, and so -- I can't explain the language.

16  My best -- my best explanation is that, as I said,

17  I -- to try to settle a case, I would have been

18  looking to what was good for the employee, what

19  was good for the managers, what was good for the

20  judiciary, and what was good for the AO.

21      Q     And when Caryn writes, "she said she'll

22  deal with what she needs after that," what were

23  you dealing with?

24      A     Well, if -- occasionally when I would

25  get involved with cases that were contentious,

1   the man- -- a manager or managers might complain

2   to my boss or somehow communicate to me

3   displeasure, and that happened.

4          I don't recall any of that happening in

5   this case, but I think what I probably meant was I

6   was anticipating if there was negative reaction

7   from the public defender's Office in Charlotte

8   that I would deal with it.

9      Q     Why would there be a negative reaction

10  in this case?

11     A     Well, just based on what I knew of how

12  Mr. Martinez and Mr. Davis had handled the

13  allegations thus far.  I thought, well, we may get

14  some negative feedback, and I -- and as I said,

15  Cait Clarke had told me some history on the

16  office, and I did not think that these were

17  managers that were particularly open to being

18  criticized.

19     Q     That wasn't based on any of your own

20  personal knowledge, right?  That was what Caryn

21  told you or Cait?

22     A     That's what other people told me, yes.

23         MS. McMAHON:  I know we've been going

24  for a while, so I'm happy to take a break again

25  for a couple minutes or whatever makes you most

1    comfortable, Ms. Dunham.

2              THE WITNESS:  Okay.  That sounds good.

3    Five minutes is great.

4              MS. McMAHON:  Great.  Let's do a

5    bathroom break.

6              (A recess was taken.)

7              MS. McMAHON:  So if we could go back to

8    Exhibit 6, please.

9              AV TECHNICIAN:  (Technician complies.)

10             MS. McMAHON:  And if you could scroll

11   down to page 5.

12             AV TECHNICIAN:  (Technician complies.)

13   BY MS. McMAHON:

14       Q    Ms. Dunham, you'll see that right below

15   that horizontal line, it's an e-mail from Caryn

16   from Thursday, August 9th, and then below that is

17   an e-mail from you on August 7th, 2018 at

18   5:44 p.m.; is that right?

19       A    Yes.

20       Q    And it appears that you're forwarding a

21   couple e-mails between you and Cait Clarke from

22   that same day; is that right?

23       A    Yes.

24       Q    So it looks like you and Cait set up a

25   call for August 7th, where you write, "Cait, Ready

1   for your call."

2        A      Yes.

3        Q      And when Cait e-mails you back, she

4   says, "Will make the call soon.  Thank you for

5   handling this so discreetly.  I hope our plan

6   works."

7        A      Correct.

8        Q      What plan was she referring to?

9        A      I'm -- based on that information is I

10  think a plan to move Caryn out of Charlotte and

11  into another appropriate position.

12       Q      Why --

13       A      To put --

14       Q      Go ahead.

15       A      To put it more broadly, to resolve the

16  situation.

17       Q      And why did Cait say, "Thank you for

18  handling this so discreetly"?

19       A      Well, because confidentiality is a huge

20  part of handling these difficult employment

21  matters, and I believe that she took notice of the

22  fact that I was not, you know, talking to

23  The Washington Post or -- or -- or broadcasting

24  this through the agency.

25              I mean, these are very delicate

1    matters, and I think part of my job was knowing

2    who I needed to talk to who was in a position of

3    power and could do something when I saw a problem.

4    So I assume that's what she meant.

5          Q      Did you or Cait discuss the plan that

6    she's referring to with anyone else in the AO?

7          A      I don't know.

8          Q      Did you discuss it with anyone else in

9    the Fourth Circuit or the FDO?

10         A      No.

11         Q      Then at 5:44 p.m. on August 7, it looks

12   like you forwarded that chain to Caryn; is that

13   right?

14         A      Yes.  I say, for your information.

15   Yes.

16         Q      Did you tell Cait that you were

17   forwarding her e-mails to Caryn?

18         A      I'm sure I told her that I would be

19   sharing communications between us with Caryn so

20   that Caryn could make decisions about what she

21   should do, and you can see that Caryn says, "Do

22   you think it's likely she will call this week?"

23                I mean, Caryn was preparing herself for

24   discussions she would be having with her

25   supervisors once they had talked to Cait.

1     Q      So at the very top of that page --

2            MS. McMAHON:  Sophia, if you could

3     scroll up a little bit more above the horizontal

4     line.

5            AV TECHNICIAN:  (Technician complies.)

6            MS. McMAHON:  There, that's perfect.

7     BY MS. McMAHON:

8     Q      -- there's an e-mail from August 9th,

9     2018, and that's an e-mail from you --

10    A      Yes.

11    Q      -- to Caryn, and you write, She did

12    called -- I think a typo -- and Tony was very

13    responsive.  He did say the AFD job was in

14    Charlotte and he has no space in Asheville.  I

15    proposed telework in the interim, and Cait is

16    talking to him about that.  Still working on it.

17    He may apologize to you or talk about a solution,

18    and if you are comfortable you can give him your

19    views.  My clear sense is that he is taking this

20    very seriously.

21           Is that right?

22    A      Yes.

23    Q      So did you find this information out

24    because Cait -- Cait talked to Tony, and then Cait

25    called you; is that right?

1        A        I believe that's correct.

2        Q        And she said that Tony was very

3   responsive?

4        A        Yes.

5        Q        Was it your general impression at that

6   point that Tony was responsive in taking this

7   seriously?

8        A        Well, I took Caryn at her word, and she

9   was the one that had direct contact with him, so

10   yes.

11        Q        Or do you mean Cait?

12                 Sorry, Ms. Dunham, you said --

13        A        Yes, yes.  I'm sorry, Cait, not Caryn.

14        Q        It's confusing with the -- the

15   alliteration.

16        A        Yeah.

17        Q        Was it your impression that Tony was

18   working in good faith to help Caryn find a

19   solution and resolve her claims?

20        A        At or -- at or around this time, yes, I

21   believed that.

22        Q        And were you encouraging Caryn to work

23   with him simultaneously to work out a solution?

24        A        I can't recall that, but that would be

25   typical.

1      Q      And you also told Caryn in this e-mail

2  that Tony said he has no space in Asheville; is

3  that right?

4      A      Yes.

5      Q      Did you have any reason to believe that

6  that wasn't true and that there was space in

7  Asheville?

8      A      I had no information on that at all,

9  but I was disappointed that there was no space in

10  Asheville because I thought that would have been

11  a -- a great solution, but, no, I had no -- I had

12  no independent means to verify that.

13      Q      Did it make you reconsider the

14  possibility of a transfer to Asheville as a

15  potential solution for Caryn?

16      A      Well, there are two ways that a

17  transfer could occur, at least two ways.  One is

18  if there's an open position, and Caryn would have

19  filled it.

20             There were other possibilities too.  If

21  through an informal settlement agreement the

22  managers created a position in Asheville or

23  allowed Caryn to perform the job that she had been

24  performing in Charlotte from Asheville, that could

25  have been a solution as well.

1          So I didn't think that everything was

2    foreclosed because there was no current position

3    in Asheville.

4        Q    To be clear, the e-mail reads, "he has

5    no space in Asheville."

6        A    Right.  Now, I -- I can't recall what

7    that meant.  I assume either there's no position,

8    there's no desk and workspace.  I -- I just can't

9    remember, but it was a clear no in terms of going

10   to Asheville.

11          MS. McMAHON:  So we'll scroll up to

12   page 1 -- sorry, page -- I'm sorry, not page 1,

13   page 3.

14          AV TECHNICIAN:  (Technician complies.)

15   BY MS. McMAHON:

16       Q    This is an e-mail from Caryn to you,

17   Nancy --

18       A    Yes.

19       Q    -- from Friday, August 10th, at 9:44,

20   and --

21       A    Yes.  I'm reading it now.

22       Q    Okay.

23          THE WITNESS:  Okay.  I'm continuing to

24   read.  Can you scroll up a little bit?

25          AV TECHNICIAN:  (Technician complies.)

1          THE WITNESS:  Oh, thank you.

2          I'm sorry, scroll down.  I apologize.

3          AV TECHNICIAN:  (Technician complies.)

4          THE WITNESS:  There, there.  That's

5  perfect.

6          Okay.  And continue down.

7          AV TECHNICIAN:  (Technician complies.)

8          THE WITNESS:  Okay.  I have finished

9  reading that, and I do recall the e-mail.

10  BY MS. McMAHON:

11     Q     So if you could go to the

12  second-to-last full paragraph on page 3 that

13  starts with "The sticking point for him."

14     A     Yes.

15     Q     "The sticking point for him is (4)

16  transfer to Asheville duty station, as he says

17  there is no office space in Asheville," and then

18  Caryn continues on.  She says that she would be

19  fine with working remotely - "especially since I

20  will be in appeals, which can be done from

21  literally anywhere."

22          So did you and Caryn discuss the

23  possibility of remote work as a solution?

24     A     Yes, I think we did, and I think there

25  was a time in which she actually was doing remote

1    work, that they permitted her to do that.

2         Q      And she communicated that she was fine

3    teleworking?

4         A      I think she found it more favorable

5    than being in the Charlotte office with him.

6         Q      Did you discuss with her teleworking as

7    a more permanent solution so that she didn't have

8    to work in Charlotte, but, again, there's no

9    office space in Asheville, so she didn't have a

10   desk there?

11        A      Looking back on this, I recall being a

12   little skeptical that there was no office space in

13   Asheville.

14             Now, I don't know what the situation

15   was, I had never been there, but I've seen that

16   used as an excuse previously in -- in many other

17   cases, and I thought it was unlikely that office

18   space was -- could not be found.

19             Often in federal buildings, there are

20   multiple federal employees and multiple federal

21   positions, and I just -- that made me skeptical,

22   but --

23        Q      You had no --

24        A      -- I had no -- I had never been to

25   Asheville and I had never seen the offices, but it

1    seemed a little unlikely.

2        Q     So if we could switch gears a little

3    bit.

4        A     Sure.

5        Q     Do you know who Heather Beam is?

6        A     Is she in this --

7        Q     She is -- we're stepping away from the

8    exhibit.

9        A     Oh, okay.

10        Q     It's confusing when it's on the screen.

11    No problem.

12        A     Heather Beam sounds familiar, and if I

13    were -- well, I'm not going to guess.  My husband,

14    who's been listening, said don't speculate, but,

15    no, I -- I recognize the name, but I don't know

16    who she is.

17        Q     So she's -- would it -- would it sound

18    familiar if I told you that she was investigating

19    Plaintiff's claims -- Plaintiff's wrongful conduct

20    claim?

21        A     That sounds familiar, yes.

22        Q     And she was appointed as investigator

23    in August of 2018?

24        A     That sounds familiar.

25        Q     Do you remember contacting the

1   investigator at any point?

2        A    I recall a phone conversation with

3   Heather, the investigator; and Amaal Scroggins,

4   one of my senior lawyers; and me, yes.

5        Q    What happened on that phone call?

6        A    I do not recall that, but I -- what I

7   do recall is I think Amaal and I both let her know

8   that we thought this was a serious case and that

9   we needed to have her do a really good job in --

10  in her investigation.

11       Q    Do you -- did you call her?

12       A    I don't recall.

13       Q    Did Amaal call her?

14       A    I don't recall.  I know that we had the

15  phone conversation.  I'm not sure -- sure who

16  initiated the call.

17       Q    Did you know Heather before that phone

18  call?

19       A    No, I did not.  I think Amaal did,

20  though.

21       Q    So that was the first time you talked

22  to her?

23       A    I believe so, yes.

24       Q    Besides for saying that you thought it

25  was a serious case and she should do a good job

1    with the investigation, did you tell her anything

2    else about her investigation?

3         A     I believe we told her that we were in

4    the process of trying to informally settle the

5    case -- I thought that that was important for her

6    to know -- that the case may not continue to

7    progress along the formal complaint lines, but

8    that we -- we were trying to create a situation

9    where the case would settle and was acceptable to

10   both parties.

11        Q     Did you -- how -- how would that matter

12   that it was -- like, why did you think it was

13   important for her to know?

14        A     Well, I think that she might have at

15   any point been told that the matter was

16   investigated -- I mean, was settled, and then her

17   investigation would need to stop, and I think

18   probably what we were saying is do a good job --

19   you know, do the work as quickly as you can, and,

20   you know, provide some information to all the

21   parties that need it.

22        Q     So at that point, did you think an

23   investigation was -- was somehow interfering with

24   the informal settlement discussions that you had

25   been having?

1          A      No, not at all.

2          Q      Okay.  You thought it was, you know,

3     proper to be conducting a fact-finding

4     investigation into these claims?

5          A      Yes.

6          Q      Did you think the investigation could

7     help inform the settlement conversations?

8          A      I thought it was possible, yes.

9               MS. McMAHON:  Can we pull up Tab L,

10    please?

11              (Government Exhibit 8 was marked for

12    identification and is attached to the transcript.)

13    BY MS. McMAHON:

14         Q      This is Exhibit 8, and this is an

15    e-mail from you, Ms. Dunham, to Lee Ann Bennett

16    from August 17th, 2018; is that right?

17         A      Yes.

18         Q      Do you want to take a moment to read

19    it?

20         A      Yes.

21                Okay.

22         Q      So in this e-mail, you describe the

23    interaction you had with Heather Beam; is that

24    right?

25         A      Yes, and -- and -- and the one earlier

1    that Amaal had with her before she knew it was the

2    Charlotte matter.

3        Q      Does this help fresh your recollection

4    about what happened?

5        A      It does.

6        Q      So is it fair to say that Amaal and

7    Heather talked, and then you, Amaal, and Heather

8    called her; is that right?

9        A      At that -- at that --

10       Q      Sorry, you and Amaal called her.

11       A      Called her, yes.

12       Q      And do you know -- do you remember what

13   this e-mail was responding to from Lee Ann?

14       A      Yes.

15              Lee Ann had a conversation with me and

16   said that Heather had told her or communicated to

17   her that -- some language like Heather was told to

18   stand down, give her anything she wants, this is

19   coming from the highest level of the agency, and I

20   was clarifying and explaining to Lee Ann that that

21   had not happened, that -- that Amaal made clear to

22   me that she had never said anything like that, and

23   I told her what exactly we talked about with

24   Heather separately.

25       Q      You say in this e-mail that Tony and

1    Caryn had had formal -- informal resolution

2    discussions which could be negatively impacted by

3    a formal investigation.

4            Why do you think that?

5        A    I don't remember exactly why.  As I

6    mentioned, sometimes when things get into a formal

7    complaint mode, people's positions harden, and

8    this was all very delicate at the moment, because

9    Caryn was uncomfortable, Caryn was having

10   conversations of her own in terms of trying to

11   settle the matter, and that we had OGC involved,

12   my office involved, Cait Clarke involved, to try

13   to resolve the matter, and it -- you know, it --

14   it was delicate.

15       Q    And you write here, "I asked (did not

16   direct) her to hold off investigating until I got

17   more information."

18       A    Right.  And I -- I honestly cannot

19   remember saying that, but that -- but if I did, I

20   think all I would have been saying -- I never

21   would have directed a judiciary employee about

22   anything, because I would not have had the

23   authority to do that.

24           I assume from this language that we

25   might have been close to resolving this so that,

1    you know, getting back into a formal investigation

2    may have been deleterious, but I cannot remember

3    for sure.  I'm just, in part, trying to recall

4    based on this language.

5         Q      And you just mentioned earlier it would

6    be -- typically, these types of fact-finding

7    investigations help -- you would encourage them,

8    and they would help resolve claims rather --

9         A      Yeah.

10        Q      -- than harm that?

11        A      Yes.

12        Q      And at this point, you -- you hadn't

13   talked to Tony directly yet about any of Caryn's

14   claims; is that right?

15        A      I don't believe I ever talked with Tony

16   directly.

17        Q      Uh-huh.  Did you talk to anyone else in

18   the -- besides Lee Ann in the AO about your

19   involvement in Caryn's situation?

20        A      Yes.  I would have talked with Lee Ann,

21   with Sheryl Walter, the general counsel.  I would

22   have talked -- I did talk with Cait.  As I said, I

23   talked originally with Laura Minor, who by that

24   time, I think, had retired.

25               So, yes, I had talked with a number of

1    people, including Amaal --

2         Q      And --

3         A      -- including Amaal in my office.

4         Q      -- what was Amaal's role?

5         A      Amaal is a -- was a senior civil rights

6    advisor at the time I was there.  She was my --

7    basically my most-senior lawyer.  She worked on a

8    daily basis with court personnel and took

9    questions and problems from them and discussed how

10   to handle them, and so that was what happened in

11   this case.

12              She got a call and did not realize it

13   was the Charlotte matter that I had been working

14   on, and then we had the conversation with Heather.

15        Q      And the people who you had just named

16   who you spoke to about this matter in the AO, did

17   they communicate to you that you shouldn't have

18   been involved in it?

19        A      No.  Never.

20        Q      So everyone was comfortable with you

21   advising Plaintiff -- or Caryn in having a role?

22        A      I do not recall anyone saying that I

23   should not be involved.  In fact, you know,

24   Lee Ann definitely wanted me to be involved,

25   because she was concerned about the case.

1      Q      Uh-huh.  And you did continue to talk

2   to Caryn after August 17th and -- and throughout

3   the next couple months, as you mentioned earlier?

4      A      I believe so, yes.

5      Q      Okay.  And what was your impression at

6   this point about how the investigation was going?

7      A      I really cannot recall that, other than

8   what I see in writing in -- you know, in messages

9   from me.

10      Q      Uh-huh.  Do you remember what the

11   status was of the informal negotiation discussions

12   with Tony Martinez and Caryn in August -- in

13   mid-August of -- of 2018?

14      A      Only based on what I have read this

15   morning.

16      Q      Okay.

17           MS. McMAHON:  Can you pull up Tab T,

18   please?

19           (Government Exhibit 9 was marked for

20   identification and is attached to the transcript.)

21   BY MS. McMAHON:

22      Q      So I believe this is Exhibit 9.

23      A      I can't see the very bottom of the

24   document.

25           AV TECHNICIAN:  (Technician complies.)

1          THE WITNESS:  Oh, okay.  There is

2    nothing there.  Okay.

3    BY MS. McMAHON:

4          Q     Yeah.  This is just one page, and this

5    is an e-mail chain between you and Caryn from --

6    starting on August 24th, 2018.

7          A     Yes.

8          Q     So you e-mailed Caryn saying, "What

9    would be a good time for a call, so we can address

10   your questions about the various processes?"

11         A     Right.

12         Q     And you set up a phone call with Caryn,

13   right?

14         A     Yes.

15         Q     Do you remember what you discussed in

16   that phone call with Caryn?

17         A     Well, only that I can read -- we were

18   discussing various processes, so I assume what we

19   were talking to her about were her options if she

20   wanted to bring a claim through the judiciary's

21   process.

22         Q     Had she told you that she was not

23   interested in the informal settlement anymore?

24         A     I don't think that she told me that.  I

25   think that the circumstances involving everyone,

1    we had not reached a solution.

2          Q      What was her sticking point?

3          A      I don't recall, and I don't know if it

4    was her -- if it was her sticking point or her

5    manager's sticking point.  I just don't recall.

6          Q      Okay.  At this point, were you still in

7    favor of trying to work out an informal

8    settlement?

9          A      Yes.

10          Q      And just to be clear on this, the

11    benefits of the informal settlement is that

12    it's -- it helps both sides; is that right?

13          A      It can, if it's properly crafted, help

14    both sides.

15          Q      In Caryn's --

16          A      And it is appropriate -- when an

17    employer gets allegations that are credible about

18    sexual harassment, what the law requires is that

19    they -- that the employer ceases the conduct that

20    is of concern and keeps the plaintiff or the --

21    the employee in the position they would have been

22    absent harassment.

23          Q      Were you considering how -- so you

24    would consider how that would be beneficial to the

25    employee who's alleging sexual harassment, right?

1          A       Yes, certainly.

2          Q       And were you considering at the time

3    how a settlement would be beneficial to the

4    federal defender's Office?

5          A       Yes.  And to the AO and to the

6    judiciary, in general.

7          Q       And how would a settlement have

8    benefited them?

9          A       Well, as I said, sexual harassment at

10   that time was in the news.  It was a hot topic in

11   Congress, in -- for example, our director had to

12   go and testify before Congressional committees on

13   the issue of harassment in the judiciary, and here

14   was someone I believed with her background as a

15   District Court clerk, a U.S. Court of Appeals

16   clerk, a former U.S. Supreme Court Fellow, those

17   allegations, had they become public, would have

18   been -- could have been very damaging to the -- to

19   the judiciary.

20               And so I was concerned about that, and

21   I thought that informally settling the matter

22   would have solved Caryn's problem and also been

23   beneficial for the judiciary.

24         Q       How does Caryn's background as a clerk

25   and as a Supreme Court Fellow make her allegations

1   more credible?

2       A       I didn't say more credible.  I think

3   that it would have attracted attention from the

4   media and others if they had become public.

5              The worst-possible situation, I think,

6   for an employer to be in is to have allegations

7   made against it that are credible by a person

8   who -- whom the news would consider to be

9   newsworthy, and her former positions would have

10  given her that credibility had she gone public,

11  and I think every- --

12      Q       Did you ever talk --

13      A       I think everybody realized that.

14  Certainly, senior management realized that.

15      Q       Did you ever talk to Caryn about going

16  public with her allegations?

17      A       I believe that we talked about that as

18  one possibility.  I mean, there are -- a plaintiff

19  or an employee who is -- experiences workplace

20  discord has a lot of different options, and that

21  is one of them.

22              I don't necessarily think that's a

23  great option in most cases, but, yeah, we probably

24  talked about that as one option.

25      Q       Back to -- back to the exhibit.

1          So you discussed the processes with

2     Plaintiff -- or with Caryn on this call, and were

3     you aware at the time that she had an interview

4     with Heather Beam set up for August 30th, roughly

5     six days after this e-mail?

6          A     I don't remember.

7          Q     You don't remember discussing the

8     interview with her?

9          A     I don't remember, no.

10         Q     Do you remember if she had any

11    hesitations about proceeding with that interview?

12         A     I can't say for certain under oath.

13    I'm just -- I would be speculating.

14         Q     No problem.

15         And do you remember any -- well, would

16    you generally advise an employee to participate in

17    a formal fact-finding process when they are

18    alleging conduct such as sexual harassment?

19         A     It would depend on the circumstances,

20    so I can't definitively answer that, but the

21    processes are in place to inform and resolve

22    workplace disagreements.  And so, in general, I

23    would think that -- I believe that there was a

24    process in place that might have helped resolve

25    this.

1          Q      Were you aware when Plaintiff filed a

2     report -- Plaintiff her- -- sorry, Caryn herself

3     filed a report of wrongful conduct under

4     Chapter IX and a request for counseling under

5     Chapter X of the EDR Plan on September 10th?

6          A      I recall that she initiated the

7     process.  I couldn't have told you, though, when

8     it was.

9          Q      Did you recommend that she initiate the

10    process at any point?

11         A      I don't remember doing so.

12         Q      Do you remember talking to her about

13    initiating an EDR claim before Caryn filed --

14    officially filed her EDR claim?

15         A      I don't recall doing that, but that

16    would have probably been one of the things we

17    would have discussed in this conversation with

18    Amaal, because that was one of the processes she

19    had at her desire to initiate.

20              MS. McMAHON:  Can we pull up Tab U,

21    please?

22              (Government Exhibit 10 was marked for

23    identification and is attached to the transcript.)

24    BY MS. McMAHON:

25         Q      This is Exhibit 10, and this is -- it's

1    really just one page.

2          A      Okay.

3          Q      An e-mail -- another e-mail chain

4    between you and Caryn starting on October 15th,

5    2018.  I'll give you a moment to read.

6          A      Okay.  Thank you.

7                 Okay.

8          Q      So it appears from this e-mail that

9    Caryn e-mailed you letting you know the

10   investigation was proceeding and that she met with

11   Heather Beam; is that fair?

12         A      Yes.

13         Q      Do you remember hearing anything else

14   from Caryn about the investigation or any issues

15   that she was having with the investigation?

16         A      No.

17         Q      Did you have any reason -- any reason

18   to doubt that those overseeing the investigation,

19   such as James Ishida or Chief Judge Gregory, were

20   not operating in good faith and proceeding as

21   contemplated by the EDR Plan?

22         A      No.  Not that I recall.

23         Q      So it seems on -- if you scroll to the

24   top, on October 15th, 2018, you write to Caryn,

25   "Amaal and I will call you tomorrow to discuss

1    your questions."

2              Do you remember what these questions

3    were?

4        A    Well, I assume they're questions that

5    are contained in what she forwarded to me about

6    her concerns with other EDR claims that were being

7    filed and her involvement as a witness.

8        Q    Do you remember if you discussed --

9    discussed her going back into the office to move

10   her things?

11       A    This e-mail sounds familiar, yes,

12   and...

13             THE WITNESS:  Can you scroll up a

14   little, please?

15             AV TECHNICIAN:  I believe that's it.

16             THE WITNESS:  I'm trying to look at the

17   second paragraph, "Second, I received an email" --

18             MS. McMAHON:  Yeah, scroll down just a

19   little bit.

20             AV TECHNICIAN:  (Technician complies.)

21             THE WITNESS:  Ah, there you go.  Okay.

22   Perfect.  Thank you.  Yes.

23             So she had concerns, and I'm assuming

24   we discussed them with her.

25   BY MS. McMAHON:

1      Q      Did she say anything about whether she

2    ever planned to go back into the federal

3    defender's office in Charlotte?

4      A      I don't recall that.

5      Q      Did she say anything about whether she

6    planned to continue working at the federal

7    defender's office?

8      A      I don't recall that either.

9      Q      Did you have any reason to doubt that

10   the investigation and the EDR process was being

11   conducted in an appropriate way?

12     A      No, I don't believe so.  Not at that

13   time.

14            MS. McMAHON:  You can take down the

15   exhibit, please.

16            AV TECHNICIAN:  (Technician complies.)

17   BY MS. McMAHON:

18     Q      So when was the last time that you

19   talked to Caryn?

20     A      I don't recall, but it must have been

21   in early to mid 2019, and I'm recalling that I had

22   a lot of responsibilities to take care of when I

23   knew that I was going to be retiring at the end of

24   May, so I was very focused on handling those

25   responsibilities.

1          I had appointed Amaal Scroggins as my

2   acting fair employment practices officer, and so

3   she was beginning to pick up some of those

4   responsibilities, and I was filling out retirement

5   forms and a lot of other things that needed to be

6   done.  So I probably would have talked to Caryn,

7   again, early to mid-2019, but I can't specifically

8   recall.

9          Q     What date did you retire on?

10         A     My last day physically in the office

11   was May 28th, I believe, a Wednesday, of 2019.

12         Q     Did Caryn tell you how her claims were

13   resolved?

14         A     No, I don't believe so.

15         Q     Did she tell you -- did Caryn tell you

16   that she was going to mediation?

17         A     I don't recall that.

18         Q     Did Caryn ever tell you that she

19   accepted a Fourth Circuit clerkship as a result of

20   the mediation?

21         A     No, I don't -- I don't recall that at

22   all.

23         Q     Did Caryn ever follow up with you about

24   not pursuing a complaint under Chapter X of the

25   EDR Plan?

1         A      No.

2         Q      Ms. Dunham, is there anything else that

3    you wanted to add or say in this deposition?

4         A      No, not that I can think of right now.

5                MS. McMAHON:  Well, thank you so much

6    for your time.  That's all from the Government.

7                THE WITNESS:  Okay.

8                Oh, my husband just reminded me that my

9    last day was actually May 29th, 2019.  We took a

10   couple of vacation days, and we were in Hawaii by

11   the following day, on the 30th.

12               MR. GERSEN:  Great.  Thanks so much.

13               I'm going to suggest that we take a

14   15-minute break, if that's okay.  We've covered a

15   lot of ground that we were going to cover, and so

16   if we can cull that out, I think we can save some

17   time if we can take a little bit of extra right

18   now.

19               Is that okay with everyone?

20               MS. McMAHON:  Yeah, that's great.

21               (A recess was taken.)

22         EXAMINATION BY COUNSEL FOR PLAINTIFF

23   BY MR. GERSEN:

24         Q      Good afternoon, Ms. Dunham.  My name's

25   Jacob Gersen.  I'm one of the attorneys

1   representing the Plaintiff in this case, as you

2   know.

3           I know you've been answering questions

4   for a long time, so I'll try not to take more of

5   your time than is necessary.

6       A     Thank you.

7       Q     I may pause occasionally to go back

8   over something, and if -- just to make sure that

9   we've covered it, but I'll try not to do too much

10  of that.

11      A     Okay.

12      Q     And just like was true as when the

13  Government was asking you questions, if there's

14  anything you're not sure about or I've asked a

15  confusing question, please just ask me to clarify.

16      A     I will do that.

17      Q     Great.  And, similarly, if you need to

18  take a break at any time, just ask.  Otherwise,

19  we'll probably try to go for about the same

20  duration.

21      A     Okay.

22      Q     Okay.  Great.

23          Can I ask when you were first contacted

24  by the Department of Justice attorneys about the

25  deposition?

1      A      It was within the last two months, I

2  believe.  I was aware of the --

3      Q      Uh-huh.

4      A      I was aware of the case, because the

5  AO's Office of General Counsel contacted me and

6  let me know that the case was proceeding in the

7  Western District of North Carolina, and then about

8  two months ago, I think, I was contacted by

9  Ms. McMahon's office.

10     Q      And how did they contact you?  Do you

11 recall?

12     A      By e-mail.

13     Q      By e-mail.

14            And you don't happen to have that

15 e-mail with you, by chance?

16     A      I do.

17     Q      Would you mind pulling it up?

18     A      Yep.  Okay.  Let's see.

19            Okay.  That first e-mail was March 31st

20 of this year.

21     Q      March 31st of this year.  Thank you.

22            Could I trouble you to read it?

23     A      Yes.

24            The e-mail to me said, I hope this --

25 Ms. Dunham, I hope this e-mail finds you well.  I

1   am one of the Department of Justice attorneys

2   representing the AO in the Strickland v. U.S. case

3   brought by Caryn Devins Strickland.

4           Ms. Strickland's attorneys have

5   indicated they would like to take your deposition

6   and have asked us to reach out to you to see if

7   you're willing to appear.  If so, we are happy to

8   take care of scheduling logistics and could assist

9   with your preparation.

10          We would also appreciate it if you

11  would be willing to talk with us about the events

12  that gave rise to this litigation and could

13  schedule a quick call at your convenience.

14          Thank you for your time.  All the best,

15  Rachael.

16      Q     Thank you.

17          And did you, in fact, talk with the DOJ

18  attorneys?

19      A     Only by e-mail.

20      Q     And what was the content of those

21  subsequent e-mails?

22      A     I wrote back to Rachael Westmoreland.

23  I said, I'm sorry, but I don't think I can be of

24  any help to the Government in this particular

25  case.  I will contact Ms. Strickland's attorney

1    directly and offer to testify for her, although

2    given my retirement in Hawaii, that would not be

3    my preference.

4              And then I said, I respectfully

5    recommend that you settle this matter and make

6    Ms. Strickland whole.

7         Q     Thank you.

8              And I believe you testified -- you can

9    correct me if I'm wrong -- that you and the

10   Plaintiff or Caryn are otherwise not in contact?

11        A     No.  I have not talked to Caryn at all

12   since I retired, and given the fact I was pretty

13   sure that I would be subpoenaed to testify today,

14   I thought it better that I not discuss the

15   substance of the case with any of the parties.

16        Q     I understand.

17             How did the Government respond when you

18   said that you thought they should settle the

19   matter?

20        A     They did not say anything about that.

21   They let me know that they would be subpoenaing me

22   if I did not agree to testify, so I let her know

23   if -- if you and the Plaintiff's attorney agree on

24   the terms, I'll voluntarily testify.

25        Q     Okay.  Thank you.

1          And did you, in fact, ever contact any

2     of Ms. Strickland's attorneys?

3          A    I did not.  I changed my mind, because

4     I just thought it was more prudent to have

5     everyone ask me the questions that they wanted to

6     ask and have me truthfully answer those questions.

7          Q    I understand.

8               Did the Department of Justice ever say

9     that we reached an agreement?

10         A    They said that -- let's see -- we have

11    agreed with Plaintiff's counsel to conduct your

12    deposition via Zoom on April 17, 2023, and then

13    they served the subpoena and the deposition

14    notice.

15         Q    Would you be willing to share that

16    e-mail with us?

17         A    Yes.

18              What -- what the Department of Justice

19    said?

20         Q    Yes, ma'am.

21         A    Okay.  So on April 10th, Rachael

22    Westmoreland said, Ms. Dunham, Thank you for your

23    cooperation.  We have agreed with Plaintiff's

24    counsel to conduct your deposition via Zoom on

25    April 17, 2023.  Attached are a copy of the

1    subpoena and a deposition notice with additional

2    details.

3              Please confirm that you accept service

4    of the subpoena versus e-mail.  If we do not

5    receive that confirmation, we will have a copy of

6    the subpoena served on you personally.

7              All the best --

8        Q    Thank you.

9        A    -- Rachael.

10       Q    Sorry to interrupt.

11            Thank you.

12            And would you be willing to e-mail or

13   forward it to us?

14       A    Sure.

15       Q    Great.  Thank you so much.

16       A    Uh-huh.

17       Q    The Government asked about your

18   availability for a deposition on April 25th to

19   28th?

20       A    Right.

21            Well, I --

22       Q    Did they?

23       A    Yes.  They gave me a number of options.

24   The 17th, today, is the only day that I was

25   available, and I will be out of the country

1    beginning on April 24th and continuing for about

2    two weeks.

3        Q    Understood.  Thank you.

4            And did you discuss the subject of your

5    testimony for the deposition with the Government?

6        A    I did not.

7        Q    Thank you very much.

8            MR. GERSEN:  Could we please try to put

9    up Exhibit 3, which should be U.S. page 5359 --

10           This was Exhibit 3 from the initial

11   deposition from Plaintiff's side.  We can

12   reintroduce it, or just reference it as needed.

13           (Discussion off the record.)

14           MS. McMAHON:  We have no objection to

15   that.

16           AV TECHNICIAN:  Okay.  So I will go

17   ahead and mark it as Plaintiff's Exhibit 3 for

18   this deposition.  Stand by.

19           (Plaintiff's Exhibit 3 was marked for

20   identification and is attached to the transcript.)

21   BY MR. GERSEN:

22       Q    Are you able to see that, Ms. Dunham?

23       A    I am.

24       Q    Okay.  Have you seen this e-mail

25   before?

1          A      No.

2                 (The Reporter clarified the record.)

3                 THE WITNESS:  I have not.

4     BY MR. GERSEN:

5          Q      Could I ask that you take a moment to

6     read it?

7          A      Sure.

8                 Okay.  I've finished.

9          Q      Okay.  I just want to reference a few

10    portions of it.  I'm going to ask you about them,

11    if that's okay.

12         A      Uh-huh.  Yes.

13         Q      The e-mail says that you allegedly

14    instructed one of your staff to tell Tony Martinez

15    that he needed to give the complainant, Caryn

16    Devins, whatever it is that she is asking for,

17    telework, relocation, et cetera, before Ms. Devins

18    hires an attorney or goes to the press.

19                Do you see that portion?

20         A      I do.

21         Q      Have I read it accurately?

22         A      You've read it accurately.

23         Q      Who do you believe alleged that?

24         A      I assume Tony Martinez alleged that.

25         Q      Did you, in fact, instruct your staff

1   to tell Tony Martinez that he needed to give the

2   complainant whatever she was asking for?

3        A    This is patently false.

4        Q    Did your staff say any of those things?

5        A    To my knowledge, no, and nor would they

6   ever.

7        Q    Did you yourself say any of those

8   things?

9        A    I did not.

10       Q    Do you know how Mr. Ishida could have

11  gotten that impression?

12       A    I do not.

13       Q    The e-mail says that you reportedly

14  said this was not a request but an order that

15  comes from the highest levels of the AO.

16            Do you see that passage?

17       A    I do.

18       Q    Did you, in fact, say that?

19       A    I did not, nor would I ever have said

20  something like that.

21       Q    And to the best of your knowledge, did

22  any member of your staff or the AO say that?

23       A    No, they did not.

24       Q    So someone who reported that you or

25  your staff said that -- those things would be

1    misrepresenting the truth; is that right?

2         A    Yes.

3         Q    With whom outside your office did you

4    or your staff communicate about the Caryn Devins

5    matter?

6         A    I want to make sure I understand.

7              With whom at the AO?

8         Q    Outside -- outside the AO.

9         A    Oh, outside the AO.

10             I believe that, as we mentioned

11   earlier, we talked to Heather Beam, and that was

12   Amaal Scroggins and myself.

13             I don't believe that I had any

14   conversations with the -- the Charlotte office or

15   anyone else in the courts.

16        Q    And your view is that it was likely

17   that Tony Martinez was the one who was alleged

18   making those allegations?

19        A    Well, reading this, yes, I -- it looks

20   like Tony Martinez is reporting this allegation.

21        Q    And reporting it to Mr. Ishida?

22        A    I'm assuming so, yes.

23        Q    Who then reported it to Chief

24   Judge Gregory?

25        A    Yes.

1          Q       And do you recall the roles of Chief

2     Judge Gregory and Mr. Ishida in the EDR process?

3          A       Yes.  They are -- they are the --

4     basically, the -- the highest level of officials

5     in the EDR process that Caryn was involved in.

6          Q       Mr. Ishida was the EDR coordinator, and

7     Chief Judge --

8          A       Yes.

9          Q       -- Gregory was the supervisor?

10         A       Yes.

11         Q       Yes.  Thank you very much.

12                 Given your experience in helping to

13    enforce the civil rights laws and employee --

14    protect employees from discrimination, do you have

15    a view of why someone would misrepresent

16    communications from your office in this way?

17         A       Well, again, it's -- I'm speculating,

18    but I am assuming that they were not happy with my

19    position on Caryn Devins Strickland's case, and I

20    believe -- and I'm -- actually, I'm shocked to

21    read this.  It's amazing what is happening behind

22    the scenes.

23                 But, yeah, I mentioned earlier that one

24    of the ways that someone can try to interfere with

25    my office's function is to call one of my

1   supervisors, and Jim Duff was definitely one of my

2   supervisors.  But I never knew any of this.

3        Q     And why are you shocked?

4        A     It is really -- first of all, because

5   it's not true, but second of all that -- that

6   there would be an attempt to interfere with the

7   role that my office had and -- and the

8   EDR process.

9        Q     Mr. Ishida describes -- describes your

10  work as an interference; is that right?

11       A     He says, yes, "tried to obstruct an

12  ongoing Fourth Circuit EDR investigation."

13       Q     How would either -- first of all, how

14  would this be an interference with the

15  EDR process?

16       A     Well, it looks like -- again, these

17  allegations are false, but that I told someone on

18  my staff to give -- to tell Tony Martinez to give

19  Caryn Devins whatever she's asking for.

20       Q     More -- more straightforwardly, did you

21  try to obstruct an EDR process in any way?

22       A     Absolutely not.

23       Q     Would you ever try to obstruct an

24  EDR process in any way?

25       A     Never.

1      Q      Do you understand any of your

2  activities throughout this matter as plausibly

3  interfering or obstructing an EDR process?

4      A      Absolutely not.

5      Q      Okay.  Could you please read the

6  sentence in the middle of the page aloud starting,

7  "After some checking"?

8      A      Yes.  I am reading that sentence.

9             I'm done.

10     Q      Could you please read it aloud, just

11 for the record?

12     A      "After some checking, Tony discovered

13 that this 'demand' did not come from the highest

14 levels of the AO, but from Ms. Dunham, who

15 coincidentally is a friend of the complainant,

16 Caryn Devins."

17     Q      Were you and Caryn Devins friends at

18 this point?

19     A      We were never friends.

20     Q      Are you friends today?

21     A      I would not call her a friend.  She was

22 a person that was employed by the Federal Public

23 federal defender's Office with whom I interacted

24 on her case.

25             I liked and respected her and wanted to

1    try to resolve the matter as my job

2    responsibilities called for, but, no, she was

3    never a personal friend.

4          Q     Did you know her before she came to

5    you?

6          A     I never met her.  I never -- I don't

7    believe I ever had any contact with her before she

8    came to me.

9                She and I were probably -- we may have

10   overlapped when she was a U.S. Supreme Court

11   Fellow, but without looking at the dates, I can't

12   say.  But I never met her in that role.

13         Q     Did you ever tell Tony Martinez that

14   you were friends?

15         A     No, never.

16         Q     Did you ever tell anyone that you were

17   friends?

18         A     Never.

19         Q     You said before that you were shocked

20   or found it shocking that this -- and that this

21   e-mail might interfere with the EDR process.

22               How did you mean?

23         A     Well, Judge Gregory was going to be

24   deciding this case eventually, and the fact that

25   are falsehoods in here is somewhat concerning --

1    concerning.

2         Q      And which falsehoods exactly?

3         A      Well, that I tried to obstruct an

4    ongoing Fourth Circuit EDR investigation, that

5    this was a directive that came from the highest

6    levels of the AO, that it was a demand, and that I

7    am a friend or was a friend of the complainant.

8         Q      And why would it be concerning that

9    there was a falsehood introduced about those

10   things?

11        A      Well, I think the roles of Mr. Ishida

12   and Judge Gregory were as neutral adjudicators,

13   and I think having these falsehoods presented to

14   them could interfere with decisions they made in

15   the future.

16        Q      You'd -- you'd be concerned that an

17   e-mail like this with clear falsehoods could

18   affect the neutrality of either Mr. Ishida or

19   Judge Gregory, both key players in the

20   EDR process; is that correct?

21        A      I would be concerned retrospectively

22   and having seen this for the first time today that

23   that could have happened.

24        Q      And is it reasonable to think that

25   Chief Judge Gregory receiving this communication

1    might be influenced by it in his adjudication or

2    judgments?

3         A     I would be speculating if I answered

4    that question.

5              I do not know Judge Gregory personally,

6    and -- and I cannot say for sure, but even reading

7    it today, it's concerning.

8         Q     Understood.

9              Given your experience with workplace

10   discrimination claims which you testified about

11   earlier, do you have a view of why someone would

12   inaccurately report that you or someone from your

13   office complaining -- and the complainant, someone

14   who was complaining about discrimination, were

15   friends?

16             I could rephrase it.  That would be

17   useful.

18             Given your experience -- extensive

19   experience with workplace discrimination claims,

20   do you have a view of why someone would

21   inaccurately report that a complainant complaining

22   of workplace discrimination and you or your office

23   were friends?

24        A     I would speculate that such an

25   allegation would diminish my observations about

1    the case and possibly the -- the Plaintiff's

2    observations on her own face.

3         Q     So you interpret the -- that sentence

4    as undermining your own credibility and

5    legitimacy?

6         A     Yes, I do.

7         Q     And do you interpret that sentence as

8    undermining the legitimacy and credibility of the

9    complainant, Caryn?

10        A     Yes.

11        Q     And would or does this letter make you

12   concerned that someone misrepresented facts to

13   undermine the advice given by the Office of Fair

14   Employment Practices?

15        A     Yes.

16        Q     In your experience with workplace

17   discrimination claims, why would someone want to

18   undermine legitimacy of an interaction with the

19   Office of Fair Employment Practices?

20        A     There are so many possibilities, it's

21   hard for me to answer that.

22        Q     Understood.  Thank you.

23              Is one reason that someone would want

24   to undermine the credibility or legitimacy of an

25   interaction with your Office of Fair Employment

1    Practices to protect an accused party in their

2    office?

3         A    Yes, definitely.

4         Q    Is reaching out to your office for

5    advice generally considered something that could

6    interfere in the EDR process?

7         A    Absolutely not.  Again, my attorneys

8    that interact regularly on a daily basis with the

9    courts and court staff have conversations about

10   cases, they provide guidance, and that is never

11   considered interference.

12        Q    Is there anything wrong with a federal

13   public defender employee coming to your office for

14   advice about what to do about sexual harassment or

15   workplace discrimination?

16        A    No.

17        Q    Is that, in fact, what an employee of

18   the federal public defender or the judiciary ought

19   to do if they are concerned about workplace

20   discrimination?

21        A    Yes.

22        Q    You told Ms. McMahon that nobody told

23   you that you shouldn't be involved in this matter.

24             Seeing this e-mail, does it refresh

25   your memory on whether you were told at any point

1    to stop being involved?

2         A      No.  I was -- I absolutely was never

3    told by Ms. Bennett or Mr. Duff to stop being

4    involved in this case.  I'm sure I would have

5    remembered that, and that would have been very out

6    of character for either of them.

7         Q      Can you tell me about the conversation

8    with James Duff and tell me who James Duff is

9    again, please?

10        A      James Duff is the former director of

11   the AO.  He was my second-level supervisor, and I

12   probably had one conversation with him, maybe two,

13   about this case.

14               I recall him asking me to send some of

15   the communications that Caryn had sent to me so

16   that he could look at them himself, and I did

17   that, but other than that, I never discussed the

18   case with him.

19        Q      And do you recall when that was?

20        A      Oh, it had -- I think it must have been

21   in -- in the spring of -- or early 2019, but I

22   can't tell you exactly when.

23        Q      And what did you have -- what did he

24   think about those communications?

25        A      Would -- I'm sorry, would you re- --

1    re-question -- restate the question?

2         Q     Yes.

3               You sent him -- you said, I believe,

4    that you sent him what Caryn sent you; is that

5    correct?

6         A     Yes.

7         Q     And my question is:  What was his

8    reaction to those -- to that material?

9         A     He did not react to that.

10              I believe he asked me at an AO party if

11   I could send him certain documents that Caryn had

12   provided to me because he -- I'm assuming he

13   wanted to familiarize himself with the case, and

14   so I did so.  He did not say anything more to me

15   about the case.

16        Q     And did you reach out to him, or did he

17   reach out to you?

18        A     He reached out to me.

19        Q     He reached out to you about the matter.

20              And do you happen to know how he

21   learned about the case?

22        A     I'm assuming, again, based on the

23   overlying context, that it was from either Lee Ann

24   Bennett, his deputy, or the general counsel, or

25   both.

1      Q      From Lee Ann Bennett or the general

2  counsel or both; is that correct?

3      A      Yes.

4      Q      And did Lee Ann -- can you remind me

5  who Lee Ann Bennett is once more?

6      A      She was Jim Duff's deputy director.

7      Q      Got it.

8             And she never expressed a concern to

9  you?

10     A      Oh, she did express a concern to me.

11            When we first discussed these

12  allegations in -- in meetings with her and me

13  privately, as well in meetings with her and the

14  general counsel's office and me, yes, she

15  expressed concerns.

16            And I recall specifically her noting --

17  and, again, she's not a lawyer, but I thought it

18  was incredibly intuitive that she understood the

19  power differential and how Mr. Mar- -- Mr. Davis'

20  attempt to control Caryn was of concern.

21     Q      And when you say "of concern," do you

22  mean of concern with respect to workplace

23  discrimination and sexual harassment?

24     A      Yeah.  Yes.

25     Q      Thank you.

1          And did she ever express concern to you

2     about the propriety of your communication with

3     Caryn?

4          A     No.

5          Q     And did Sheryl Walter ever express

6     concern to you about your involvement or conduct

7     in this matter or case?

8          A     Not that I recall, and that would be

9     very unlike Sheryl Walter.  We worked --

10         Q     How so?

11         A     We worked very cooperatively, and we

12    recognized that we had different roles.

13              It was -- Sheryl Walter's position was

14    to protect and defend the AO and the judiciary.

15    It was my role to provide guidance to senior

16    officials on the civil rights laws, and generally

17    we agreed, I mean, and I worked very cooperatively

18    with both Sheryl Walter and Bill Meyers, and

19    considered both of them trusted and valued former

20    colleagues.

21         Q     Understood.  Thank you.

22              You mentioned that control relates to

23    sexual harassment, and that both you and I think

24    Lee Ann Bennett were concerned about that; is that

25    correct?

1          A       Yes.

2          Q       Could you say a little bit more about

3     that?

4                  You said, I think, that that was part

5     of classic sexual harassment.  Could you explain a

6     bit about what you mean?

7          A       Yes, and I will tell you a personal

8     anecdote that I think does illustrate it.

9                  Since I have retired, I have watched a

10    lot of the news stories on sexual harassment,

11    including the allegations against Governor Cuomo

12    in New York and what led to his resigning his

13    position, and there were a number of women that

14    made allegations against him.

15                 And I recall thinking when I heard

16    about them, there was a woman who alleged that he

17    groped her, so there was a physical assault, but

18    there was also another woman who alleged that he

19    had made her uncomfortable by his obvious sexual

20    and romantic interest in her.

21                 There was never any groping or physical

22    assault in that case, and I remember thinking that

23    is exactly what happened with Caryn Devins.  No

24    physical touching, no groping, but nevertheless

25    a -- a desire to control her and -- and an obvious

1    interest in her either sexually or romantically.

2              And I thought, boy, I -- I will say

3    this:  I said to myself, I was right in this case,

4    because I did get some -- I did get some feedback

5    from one of the staff attorneys in OGC, who -- who

6    I often disagreed with, that this was not a

7    problem, that this case -- you know, I was not

8    assessing this case properly, and I remember

9    thinking, you know what, I was right.

10       Q    Understood.  Thank you.

11            Did Caryn ever tell you that other

12   employees observed the kind of interest in her

13   that you just described?

14       A    No, never.

15       Q    Okay.  Thank you.

16            I want to --

17            MR. GERSEN:  Could we introduce one --

18   our next exhibit, please?

19            Just give me one moment.  Sorry.

20            THE WITNESS:  Sure.

21            MR. GERSEN:  I'm sorry, I'm having a

22   technical glitch.  Just bear with me for one

23   minute.  Thank you so much.

24            THE WITNESS:  Sure.

25            MR. GERSEN:  Okay.  Could we actually

1  put up Government's Exhibit 4?

2              AV TECHNICIAN:  So, Counsel, to

3  confirm, was that the Exhibit 4 we marked earlier

4  today, or the one you uploaded just now?

5              MR. GERSEN:  It was the one marked

6  earlier today by the Government.

7              AV TECHNICIAN:  I understand.  Thank

8  you.  Stand by.

9  BY MR. GERSEN:

10     Q     Okay.  Do you remember this exhibit

11 from earlier today?

12     A     I do.

13     Q     Great.

14              MR. GERSEN:  Now, apologies, but could

15 we switch to our exhibit that we just uploaded?

16              (Discussion off the record.)

17              MR. GERSEN:  We are struggling with our

18 exhibits.

19              Could we please take a five-minute

20 break so we don't waste anyone's time?

21              THE WITNESS:  Sure.

22              MR. GERSEN:  Thank you so much.

23              (A recess was taken.)

24              MR. GERSEN:  That last exhibit need not

25 be withdrawn.  That's the correct exhibit and

1    correct destination.

2                  (Plaintiff's Exhibit 39 was marked for

3    identification and is attached to the transcript.)

4                  MR. GERSEN:  So please display what is

5    designated as Exhibit 39.

6                  AV TECHNICIAN:  Yes.  Stand by,

7    Counsel.  I need to re-mark it.

8                  MR. GERSEN:  We apologize for the

9    confusion.  Thank you for bearing with us.

10                 THE WITNESS:  No worries.

11                 MR. GERSEN:  We can start at the top on

12   the first page.  Thank you.

13                 AV TECHNICIAN:  (Technician complies.)

14   BY MR. GERSEN:

15        Q     Are you able to see that -- that

16   e-mail, Ms. Dunham?

17        A     Yes, I am.

18        Q     Would you mind just reading the

19   information on the page?

20        A     It needs to go down, back to the

21   exhibit that was a text, I believe.

22        Q     Actually, I'm just interested in that

23   first part, the subject.

24        A     Oh, the subject.  Yes, I see that.

25   Quid pro quo e-mail, and then there are two

1    attachments.

2          Q      Great.

3                 The rest of the e-mail is blank?

4          A      Yes.

5          Q      And do you recall what those

6    attachments were?

7          A      Yes.  I believe that was the text about

8    I pay for stay or I pay to stay, something like

9    that.

10                MR. GERSEN:  And if we could scroll

11   down to the next page, which is the attachment.

12                AV TECHNICIAN:  (Technician complies.)

13                MR. GERSEN:  Great.  Thank you.

14   BY MR. GERSEN:

15         Q      Do you recognize this text?

16         A      I do.

17         Q      And this is an e-mail that Caryn sent

18   to you?

19         A      Yes.

20         Q      How do you understand that Caryn

21   interpreted this e-mail?

22         A      I think she interpreted it as -- from

23   J.P. Davis, if you do what I want you to do, you

24   will be appropriately compensated for the better.

25         Q      Is that what she meant by "quid pro

1  quo" in the subject line?

2       A     Yes, I believe it is.

3       Q     And would you mind reading the text?

4  It's relatively brief.

5       A     It says, Dude, you're shooting high

6  with a GS-15 [sic].  Not least of all since you'll

7  need 5 more years of federal service to qualify

8  for it.  But fret not, I have a plan...just

9  remember I deal in pay-for-stay, and then an emoji

10  smile.

11       Q     Thank you.

12             Do you know if Mr. Davis was correct

13  that she needed five more years of service to

14  qualify for a G15?

15       A     I -- I do not know, but that -- given

16  her experience, that sounds unlikely.

17       Q     And would that be relevant to how she

18  read or understood the e-mail?

19       A     Well, it would be relevant if it were

20  false --

21       Q     How is that?

22       A     -- and then -- and then he is

23  explaining that he has a plan.

24             In other words, he has a way of solving

25  that problem if she stays with him in that office.

1        Q        And what do you mean by saying J.P. was

2    saying "if you do what I want"?

3        A        I deal in pay-for-stay, so I want you

4    to stay, and if you stay, you will get the

5    GS level and pay that you want.

6        Q        So if -- if Caryn did what J.P. wanted,

7    then he would -- well, he would pay her more

8    money?

9        A        That's the clear implication of this,

10   yes.

11       Q        I deal in pay-for-stay, pay-for-stay?

12       A        (No verbal response.)

13       Q        And did you interpret this e-mail to be

14   a quid pro quo e-mail?

15       A        It could be construed as that.

16                Typically, "quid pro quo" refers to sex

17   for a workplace benefit, but since physical

18   interactions were not part of this case, I would

19   take it that the quid pro quo was having Caryn

20   remain under his supervision and control for a

21   workplace benefit.  So, yes, I think that's a fair

22   reading of quid pro quo.

23       Q        Submit to his control for a workplace

24   benefit?

25       A        Yes.

1      Q      And if she had submitted to his control

2    for a workplace benefit for more -- for more

3    salary, would you be concerned that she would be

4    submitting to sexual advances at some further

5    date?

6      A      That would -- that would definitely be

7    a concern.

8      Q      Would it be a reasonable concern for

9    Caryn to have after receiving that e-mail, in your

10   view?

11     A      I believe so.

12     Q      Do you -- given the subject line of

13   Caryn's e-mail, do you think that she interpreted

14   J.P.'s communications as a sexual quid pro quo

15   e-mail?

16     A      I believe that would have been a

17   reasonable interpretation.  I can't speak to

18   exactly what was on her mind at the time.

19     Q      Understood.

20            Do you recall the text messages that

21   were shown as Government Exhibit 5 today?

22            We can put up the exhibit, if you'd

23   like to see them again.

24     A      If you just refer to the language, I

25   bet I can recall it.

1        Q      Yeah, it was the text where she was

2   referred to as "tough girl" by J.P. Davis?

3        A      Oh, yes, right, the ride home in the

4   rain.

5        Q      Yeah.

6               What, if anything, did you make of

7   language like "tough girl"?

8        A      I think it was not the kind of language

9   one would expect from a senior official to a more

10  junior lawyer in the office -- in other words,

11  overly familiar -- and I also think that I'll

12  restate what I originally said, which was she had

13  concerns about being alone with him in the office

14  or in the car, and it was clear that he was trying

15  to have her take a ride home with him alone.

16       Q      Those messages were after the e-mail,

17  is that right, or -- about the raise?

18       A      Oh, I don't know.  I'd have to check.

19       Q      Okay.  We could --

20       A      Let's see.  5/18, and then I don't

21  recall what the other one was.

22              MR. GERSEN:  Could we put up Government

23  Exhibit --

24              Sorry, I'm just looking for it now.

25              THE WITNESS:  Sure.

1          MR. GERSEN:  -- Government Exhibit 5?

2          AV TECHNICIAN:  (Technician complies.)

3          THE WITNESS:  Oh, yes.  The -- the

4    tough girl, last chance for a ride text is on

5    June 21st, so that would be after the -- the

6    compensation e-mail.

7    BY MR. GERSEN:

8          Q     And you mentioned that it would be

9    inappropriate or concerning if it was from a

10   senior supervisor to a junior employee.

11         Does the fact that it was a male

12   supervisor to a female supervisee affect your

13   view?

14         A     Yes.  That would be -- and was -- even

15   more of a concern, especially when he had openly

16   expressed his interest in her by saying she was

17   hot to a number of other employees.

18         Q     In your experience, do a lot of male

19   supervisors call female supervisees "girl"?

20         A     Also inappropriate.

21         Q     This e-mail was sent, it looks like, at

22   6:44 p.m.?

23         A     Yes.

24         Q     In your experience, when do federal

25   offices close?

1          A      Well, I don't believe I ever worked

2    past 7:00 p.m., but I do recall Caryn specifically

3    saying on this occasion the workplace was

4    virtually empty, and that made her additionally

5    concerned about being alone with him in the

6    building and, in addition, being alone in a car

7    with him.

8          Q      And does this text exchange make you

9    more or less concerned that the prior quid pro quo

10   e-mail might have been a precursor to further

11   sexual advances?

12         A      This text made me more concerned.

13         Q      Thank you.

14                You testified earlier that at some

15   point, Caryn got uncomfortable with the

16   communications with J.P. at work?

17         A      Yes.

18         Q      In your experience, can people have

19   interpersonal relationships that are positive that

20   later change after a boundary is crossed?

21         A      Oh, absolutely.

22         Q      And can warm, interpersonal

23   relationships that are positive sometimes be seen

24   or understood as grooming in hindsight for further

25   sexual advances?

1     A     Absolutely.

2     Q     Is this common in sexual harassment

3  cases?

4     A     In my experience, from what I have read

5  in published cases as well as seen in my workplace

6  interactions as a civil rights lawyer or defense

7  attorney, yes.

8     Q     Thank you.

9           Can you help me understand a little bit

10  about the relationship between your office and the

11  AO and OGC?

12     A     My office, fair employment practices

13  office?

14     Q     Yes, ma'am.

15     A     And OGC, yes.

16           As I mentioned before, within the AO,

17  they -- the AO and its managers are represented by

18  the Office of General Counsel with the specific

19  goal of avoiding future liability.

20           My office was, and my staff attorneys

21  were, in the position of giving -- among other

22  duties, giving neutral advice to both managers and

23  employees about workplace discrimination,

24  harassment, and the other civil rights laws.

25     Q     And who's entitled to ask for advice

1    from OGC?

2              MR. GERSEN:  And, I'm sorry, you can

3    take the exhibit down.  Thank you.

4              AV TECHNICIAN:  (Technician complies.)

5              THE WITNESS:  OGC is likely to be

6    contacted by agency managers and other officials.

7              I -- I would say they probably have

8    been approached from time to time by employees,

9    but that's not the ordinary case.

10   BY MR. GERSEN:

11       Q    Thank you.  These are really actually

12   clarifying questions.

13            So OGC, in general, although they might

14   be approached by an employee, that would be

15   unusual?

16       A    Right.  And we have -- we, as a civil

17   rights office, have much more, to my knowledge,

18   contact with employees.

19       Q    Much more contact with employees?

20       A    Much more, yes.

21       Q    Okay.  Understood.

22            And OGC does, though, sometimes give

23   advice -- legal advice to super- -- like

24   supervisors and unit heads?

25       A    Oh, absolutely.

1        Q       And their concern, I think you said

2   earlier, was primarily defensive or protective?

3        A       Yes.

4        Q       In the sense that they would be

5   guarding the -- either the agency's or the

6   judiciary's interest?

7        A       Yes.

8        Q       Understanding, in some ways, the

9   employee's claims as risk to the institution; is

10  that fair?

11       A       Yes.

12       Q       And that was not true of your office,

13  correct?

14       A       That was not true of my office, no.

15       Q       So who -- whose office is in charge of

16  giving guidance to judicial branch employees who

17  have experienced sexual harassment or sex

18  discrimination?

19               Is that your office, or is it a

20  different office?

21       A       It's primarily my office.

22               There is a new position that was

23  created that reported directly to the AO director

24  to take claims and concerns from employees who

25  were experiencing discrimination and harassment.

1          So that occurred probably, I think, in

2     2019 before I retired, so there were actually two

3     places that an employee could go.  One was this --

4     and I don't even remember what the title was, but

5     the individual provided guidance to employees and

6     discussed concerns with them, and that person

7     reported directly to Director Duff.

8          Q     So --

9          A     Two possible avenues for employees to

10    use, in addition to their own EDR programs in the

11    courts.

12         Q     And the -- the second office you

13    mentioned did not exist at the time of Caryn's

14    complaint or allegations, or it did?

15         A     No, I think it did, and I just can't

16    remember if Caryn actually made contact with that

17    office, and she may not have told me, so I -- I

18    just don't know, but it was an available resource

19    as well.

20         Q     Understood.

21               What is the -- is that the judicial

22    integrity office?

23         A     Yes, it is.

24         Q     So there's fair employment, and then

25    judicial integrity --

```
 1          A      Yes.

 2          Q      -- correct?

 3          A      Yes.

 4          Q      So employees could go to either

 5   office --

 6          A      Yes.

 7          Q      -- if they wanted to?

 8          A      And sometimes both.

 9          Q      And sometimes both.

10                 And forgive me for going over it once

11   more.  I'm just trying to understand the lay of

12   the land.

13                 That office had different authority

14   or -- a different authority or role than your

15   office?

16          A      Yes, because we actually processed

17   discrimination complaints, and that office, I

18   believe, was 100 percent advisory.

19                 So employees could report concerns to

20   the Office of Judicial Integrity, and the head of

21   that office would give -- give advice to the

22   employee and then to the extent possible would

23   bring in the managers to -- to prevent

24   discrimination and harassment.

25          Q      And I think you said --
```

1       A       But they had -- they had no complaint

2   processing authority the way my office did.

3       Q       And I thought you said earlier that

4   that second office, the judicial integrity office,

5   was created in 2019?

6       A       Yes, on or about that time.  It was

7   created as a result of Congressional inquiries to

8   the harassment -- to harassment and discrimination

9   in the judicial branch, and so I believe as a

10  means of providing employees more options, the

11  AO management decided that that would be a good

12  move.

13      Q       Are you -- you're familiar with those

14  Congressional investigations?

15      A       Yes.

16      Q       And what was their concern?

17      A       Well, I mean, again, at the time, this

18  issue of sexual discrimination and harassment was

19  all over the news.  It was -- it was a concern for

20  the judiciary, the Congress, the executive

21  branches, and we had Congressional inquiries about

22  how our branch of government dealt with these

23  allegations.

24              And so Director Duff testified before

25  Congress on that issue, and, you know, it was --

1  it was on everyone's minds, even more than -- in

2  my experience in 35 years of legal practice, even

3  more than previously.

4       Q      And is it fair to say that

5  Director Duff was concerned that the existing ways

6  of addressing and responding to complaints of

7  sexual harassment were inadequate at the time?

8       A      No.  I think that's going too far.  I

9  think Director Duff -- and I have the utmost

10  respect for him and Lee Ann Bennett.  I believe

11  they were always people who always wanted to do

12  the right thing.

13            Regardless of, you know, what their

14  lawyers told them or otherwise, they wanted to do

15  the right thing, and this office was a means of

16  achieving that.

17       Q      And that office, the new office, the

18  judicial integrity office, trying to do the right

19  thing and give employees a better means of

20  preventing and responding to sexual harassment in

21  the judiciary?

22       A      Yes.

23       Q      And how did it do that, or how is it --

24       A      Well, I believe -- and, again, this

25  office was only in existence for about four to

1   five months before I retired, but the head of that

2   office would discuss allegations that she found

3   concerning with the director, because she reported

4   directly to him.

5          Director Duff was my second-level

6   supervisor, so this office, I believe almost

7   exclusively informally, dealt with those

8   allegations, and if she gathered information --

9   that office had gathered information and would

10  look at repeating claims of discrimination or

11  harassment in a particular office, and if patterns

12  made themselves clear, she would inform the

13  director of those concerns.

14      Q     Were you aware at the time or

15  subsequently of any patterns of sexual harassment

16  or discrimination in this federal defender's

17  office?

18      A     Well, I knew through Caryn that there

19  were a number of complaints that were filed,

20  including in the case that we looked at earlier.

21         So that -- that -- that is the only

22  pattern I knew of, that there were other

23  complaints of, I would say, discrimination in that

24  office.

25      Q     Thank you.

1          Was there at the time, then, any other

2     office that someone who experienced sexual

3     harassment or sex discrimination could report or

4     get advice from?

5          A     No, I don't believe so.  I think the --

6     I think that -- in terms of reporting and --

7     and -- and having the -- having the AO address

8     what is going on either at the AO or in the

9     courts, I believe my office and the Office of

10    Judicial Integrity were the exclusive means of

11    raising those issues.

12         Q     And you described, again, your office

13    as a neutral --

14         A     Yes.

15         Q     -- and I think you explained that as

16    not being defensive protecting the institution or

17    acting on behalf of the complainant; is that fair?

18         A     Yes, yes.

19         Q     And you described OGC as being

20    defensive in posture --

21         A     Yes.

22              (The Reporter clarified the record.)

23    BY MR. GERSEN:

24         Q     You described OGC as defensive in

25    posture?

1         A      Yes.

2         Q      OGC as defensive in posture protecting

3    the interest of the judicial branch or the

4    supervisors or unit managers; is that fair?

5         A      Yes.

6         Q      Okay.  Was there any party or

7    institution within the judiciary that was

8    dedicated to protecting the interest of the

9    employees in these matters?

10        A      I would say that the EDR process was

11   designed to protect judicial employees, and then

12   again, my office and the Office of Judicial

13   Integrity were there to prevent -- I mean, to --

14   to present claims of discrimination and harassment

15   so they could be dealt with at the

16   soon-as-possible point.

17               But certainly the judiciary's

18   EDR process was designed to do the -- the same,

19   and that, I would say, is primarily an

20   employee-based process.

21        Q      And a process designed to protect the

22   interest of the employees?

23        A      Yes.

24        Q      Who have experienced sex discrimination

25   or harassment?

1       A       Yes.

2       Q       Thank you.

3               So in your experience with handling sex

4       discrimination complaints, is it typical for OGC

5       to give legal advice to the accused party or

6       person?

7       A       Yes.

8       Q       And why is that?

9       A       Well, because when someone is accused

10      of discrimination or harassment, OGC's role is to

11      advise the manager on what their legal

12      requirements are and hopefully to change the

13      behavior, and, again, in -- in protection of the

14      integrity of the judiciary and to eliminate or

15      prevent any future discrimination or harassment.

16      Q       And in your experience, what did OGC do

17      when there was a conflict between a legitimate

18      claim of sex discrimination or harassment and the

19      interest of the accused or the judiciary?

20      A       You mean when -- when those interests

21      diverge?

22      Q       Yes.

23              MS. McMAHON:  I'm going to --

24              THE WITNESS:  Their role --

25              MS. McMAHON:  I'm going to object on

1   attorney-client privilege grounds here and direct

2   the witness not to answer about any specific

3   advice that OGC would have given to one party or

4   another.

5   BY MR. GERSEN:

6       Q      Were you or your office clients of OGC?

7       A      No, although -- although -- I'll expand

8   on that a little bit.

9              No, we were not, but if I had a

10  question as a senior manager about how to proceed

11  in my own managerial decisions, I often talked to

12  OGC about it, because I was, in addition, a

13  manager of a number of attorneys, a number of

14  interns, and, as I said, I had very good relations

15  with the general counsel and the deputy general

16  counsel, and we had discussions regularly about

17  how to proceed in a given matter.

18      Q      Without disclosing any specific advice,

19  in your experience, how did OGC resolve conflicts

20  between the different parties' interests in

21  complaints of sex discrimination or harassment?

22      A      Sheryl Walter and Bill Meyers, in my

23  view, were some of the most ethical lawyers I have

24  worked with in the past, and that's part of the

25  reason that we worked so well together and I think

1    were able to stop discrimination and harassment in

2    many, many cases, because of that compatible

3    relationship and our understanding of the law.

4         Q    It sounds like you have a lot of

5    respect for OGC in general?

6         A    In general, I do.

7         Q    And a lot of respect for Jim Duff as

8    well?

9         A    I do.

10         Q    And you worked well in your office?

11         A    Yes.

12         Q    You were on good terms with the people

13    in your office?

14         A    Yes, I was on excellent terms with my

15    two supervisors, Jim Duff and Lee Ann Bennett.

16         Q    And you retired on good terms, I take

17    it?

18         A    I did.  I -- I have nothing but fond

19    memories.

20              You know, obviously, there were cases

21    that I felt like I wish I could have done more at

22    an early point, and the Plaintiff's case is one of

23    those.  I felt like there was a real means to make

24    the workplace situation better for everyone and

25    not to have the Plaintiff's career sabotaged as

1    ultimately I believe it was.

2              She's no longer employed by the

3    judiciary, but it -- it is a case I regret I could

4    not have done more about.

5        Q      What do you wish you could have done

6    more or done earlier?

7        A      I wish that we could have settled the

8    matter ear- -- I mean, every civil rights

9    commentator suggests and recommends early dispute

10   resolution.  It's better for everyone.  And I

11   think this was the perfect case of we had -- we

12   had an opportunity, but somehow it -- it was

13   sidetracked.

14       Q      And do you have a sense or a theory of

15   how it got sidetracked?

16       A      Well, that e-mail from Mr. Ishida is

17   some evidence of that, yes.

18       Q      The e-mail from Mr. Ishida is some

19   evidence that that process got sidetracked by?

20       A      By him.

21       Q      By Mr. Ishida and Mr. Martinez?

22       A      Yes.

23       Q      I want to go back, if I could, to your

24   initial conversations with Caryn for a few

25   minutes.

1       A       Sure.

2       Q       I think you've talked about them quite

3    extensively, so I won't belabor the point, but can

4    you give me a sense of your impression of Caryn in

5    your first few conversations?

6       A       Oh, I thought she was honest and

7    articulate, and the reason I say honest was she

8    said things about herself that were both positive

9    and negative.

10              She was not, as often when you distrust

11   what somebody is telling you, you know, giving me

12   a description of the workplace as totally

13   favorable to her and she could do no wrong, and

14   she gave me a very, I thought, reasoned and fair

15   description of what was going on, and, again, I

16   was aware of her history as a judiciary employee,

17   and she was an impressive person, an impressive

18   employee.

19      Q       What negative things did she say about

20   herself?  You mentioned some.

21      A       I can't remember exactly, but I do

22   remember thinking here is somebody who is

23   accurately reporting to me and is not giving me

24   all negative statements about her supervisors and

25   all positive things about herself.

1       Q       So in your --

2       A       So that was my impression.

3       Q       My apologies.  Thank you.

4               So in your experience both in the

5    executive branch and the judicial branch, you, I

6    take it, heard a lot of these complaints of sexual

7    harassment or sex discrimination?

8       A       Thousands.

9       Q       Thousands?

10              And do you always believe the people

11   who come to you with these complaints?

12      A       No, I do not.  Just the opposite.

13      Q       And say a little bit more.

14      A       Well, there are people who make

15   complaints that are inherently unreliable, and --

16   and I have seen many of them.

17              When I was a judicial clerk and was

18   adjudicating -- working on adjudicating the cases,

19   I saw plaintiffs who were unreliable and I

20   believed were creating false claims.

21              I mentioned that in a deposition I

22   testified in at EPA, there was an employee who was

23   making a false claim about a sexual assault by one

24   of the EPA managers, and I testified on behalf of

25   the agency.

1              So when you -- when you -- when you

2      look at a lot of these cases over 35 years, I

3      would say the vast majority of the claims are not

4      true.  So in -- in the few times when I worked at

5      the AO when I believed -- strongly believed what a

6      plaintiff was saying, those are the cases I really

7      tried to intervene and assist with what the law

8      tells us to do, which is to remedy and prevent

9      future harassment and discrimination.

10          Q      And so having seen thousands of these

11     cases, you're actually more likely to disbelieve

12     the complaints than believe them?

13          A      Yes, just based on numbers.

14          Q      And did you believe Caryn's allegations

15     about J.P. Davis?

16          A      I did.  I did.

17          Q      And did you believe her allegations

18     about Tony Martinez?

19          A      I did.

20          Q      Do you believe she was telling you the

21     truth?

22          A      I do.

23          Q      Do you think her concerns about her

24     workplace were reasonable?

25          A      I do.

1          Q      And did you feel in those conversations

2     like she was sincere?

3          A      Yes.

4          Q      Did you suspect that she was being

5     manipulative or deceptive?

6          A      No, I did not.

7          Q      Did you think Caryn was telling a false

8     story to try to get a transfer to another work

9     location?

10         A      No, I did not.

11         Q      Did you think she might be fabricating

12    or exaggerating things that had happened so she

13    could get to work exclusively in appeals?

14         A      No, I did not.

15         Q      Thank you.

16                MR. GERSEN:  Can we put up Government

17    Exhibit 1, please, page 1?

18                AV TECHNICIAN:   (Technician complies.)

19                MR. GERSEN:  Thank you.

20    BY MR. GERSEN:

21         Q      I think you said that Caryn told you

22    about ways that J.P. was asserting control; is

23    that right?

24         A      Yes.

25         Q      Do you remember her telling you that

1    J.P. became emotional when she told him that

2    eventually she wanted to work out of the Asheville

3    office?

4          A     Emotional in -- in what way?  Anger?

5    Surprise?  Tearful?  I need -- I need more

6    clarification.

7          Q     Anger.

8          A     Yes, I do remember that.

9          Q     Was -- did she describe him as tearful?

10         A     No.

11         Q     She described him as angry when she

12   told him that she eventually wanted to move to the

13   Asheville office to work somewhere away from

14   there?

15         A     Yes.  And I recall a couple of examples

16   when he became very angry at her and sort of

17   lashed out at her, and, again, I -- I took that as

18   some evidence of his desire to control her and the

19   situation.

20         Q     And would it have made you nervous at

21   all about Asheville as a solution to the control?

22               In other words, would simply moving

23   offices eliminate the problem if J.P. was still in

24   control and overseeing her?

25         A     No, that would not have solved the

1  problem.  In my mind, that employee/employer or

2  manager relationship needed to be broken, and she

3  needed to report to someone else.

4      Q      Understood.

5             And just to be clear, the Government's

6  asked you to speculate a lot, but these aren't

7  your notes, correct?

8      A      The notes in front of me?

9      Q      Correct.

10     A      They are not.  They are -- from what I

11 understand, they are Caryn's notes.

12     Q      So you don't actually know what Caryn

13 meant, of course?

14     A      I don't.  I don't.  I can only make a

15 reasoned determination of what she meant.

16            But, also, part of what I see refreshes

17 my memory about that initial conversation.

18     Q      Can you say a little more about that?

19     A      Well, I remember -- I mean, I remember

20 telling her I was the manager of the civil rights

21 office for the federal courts and for

22 AO employees.

23            I remember telling her that I had been

24 a law clerk and that I had a number of different

25 positions over the years in civil rights and

1    EEO compliance.

2            And I remember telling her, as I often

3    did with employees, that my office was neutral.

4    It was not my job to represent either management

5    or the complainant -- complainant or to give legal

6    advice to managers.

7        Q    Understood.

8            Did Caryn contemplate other solutions

9    besides moving locations?

10       A    I honestly can't remember that.

11           I know that she was very uncomfortable

12   with being in the physical -- in the physical

13   office with Mr. Davis, and so I -- I believe that

14   any acceptable solution so that her job duties

15   remained the same or equivalent and yet she was

16   not subject to that supervision would have been

17   appropriate, and that's what we looked for.

18       Q    Under- -- understood.

19           MR. GERSEN:  Could we see Government

20   Exhibit 3 again, please, page 3?

21           AV TECHNICIAN:  (Technician complies.)

22   BY MR. GERSEN:

23       Q    Does this refresh your memory at all

24   about other alternatives that Caryn considered?

25       A    Yes.

1          Q        How so?

2          A        Well, she says here that I was going to

3     talk to my boss and look at solutions such as a

4     lateral transfer as a research and writing

5     attorney or the appellate AFD offer, and...

6          Q        And the line, the lateral transfer as a

7     research and writing position, would that be an

8     advanced -- a career-advancing position, or the

9     same?

10         A        I think that would be the same.  That

11    was what the office that -- or the position that

12    she held at the time.

13              MR. GERSEN:  Okay.  You can take down

14    the exhibit.  Thank you.

15              AV TECHNICIAN:  (Technician complies.)

16    BY MR. GERSEN:

17         Q        Did Caryn ask you to talk to other

18    people in the AO on her behalf?

19         A        She never suggested, I do not believe,

20    that I talk to anyone at the AO, other than she

21    knew that I had talked to Laura Minor, and I

22    assume asked Laura Minor to contact me.

23              My conversations with AO employees were

24    entirely my decisions, but who I thought could

25    help in this situation or had responsibilities in

1    this situation.

2          Q       And so you did that at your own

3    directive or initiative; is that correct?

4          A       Yes.

5          Q       Did you talk to Cait Clarke about her?

6          A       I did.

7          Q       And you said, I think, that Cait Clarke

8    gave you information about the office and some of

9    the parties; is that correct?

10         A       She did.  She had -- she had a lot of

11   background with that particular office and the

12   parties involved, and she told me what she knew.

13         Q       And what was that?

14         A       Well, all I can remember is generally

15   that there had been problems in that office

16   previously, and she had described to me some of

17   the problems.

18                 I can't even tell you exactly what they

19   were, but they -- they involved her in her

20   position as one of the senior officials at the AO,

21   and so I think she may have even warned me to be

22   careful about the situation and to treat it

23   delicately.

24         Q       And how did you interpret what she

25   meant by be careful with the situation?

1        A       I think that Cait Clarke believed that

2   she had been retaliated against or had some

3   negative comments made to her bosses by that

4   office, and I think she was warning me just to be

5   careful.

6               And now that I see the e-mail that I

7   saw for the first time today from Mr. Ishida, I

8   understand why she had concerns.

9        Q      Cait Clarke believed that she had been

10  retaliated against by the Fourth Circuit?

11       A       That -- that -- well, that -- that --

12  that -- I'll say that generally, yes, that she had

13  been retaliated against by various people in the

14  Fourth Circuit based on her handling of

15  situations, and I do not remember the details.

16       Q      And by handle it delicately, do you

17  have a sense of what she meant?

18       A       I think she meant really talk to only

19  the people who can do something about it.

20  Don't -- don't -- don't say more than you

21  absolutely need to say, and just watch your back.

22       Q      Watch your back?

23       A      (No verbal response.)

24       Q      To your knowledge, did Cait Clarke get

25  information about the Western District of

1    North Carolina Public -- federal public defender's

2    office from Caryn, or was it her -- Cait's prior

3    knowledge?

4         A    No.  This was -- I mean, in part, it

5    must have been from Caryn -- well, I don't know.

6    Caryn never -- I don't think Caryn ever talked to

7    Cait directly.

8              But, no, this was primarily Cait's own

9    interactions professionally over the years with

10   that office.

11        Q    And what about Lee Ann Bennett?

12        A    Lee Ann Bennett, before she was the

13   deputy director, worked in one of the southern

14   EDR offices or one of the southern -- she was a

15   circuit executive.  She was a circuit -- a senior

16   person in one of the southern courts, and so she

17   knew the parties that were involved too because

18   the [indecipherable] of the courts tend to know

19   each other, and -- and staff tends to know each

20   other.

21        Q    And did she give you any warning about

22   the parties?

23        A    She did not.

24        Q    Okay.  I think counsel asked you about

25   how you knew about the various allegations, these

1   allegations, and you said through Caryn and Cait

2   and other sources.

3           Is that fair or correct?

4       A   Yes, yes.

5       Q   I don't want to misstate it.

6       A   No, that's correct.

7       Q   And did you ever independently

8   investigate those claims or claims like these?

9       A   No.  That would not have --

10      Q   Was that your role?

11      A   That would not have been my role.

12      Q   In the summer of 2018 while this was

13  unfolding, did you advise Caryn to try to resolve

14  her claims informally?

15      A   Yes, I believe I did.

16      Q   And why did you advise that?

17      A   Well, because the principle that -- you

18  know, early resolution of complaints is the

19  preferred method so that things don't get worse

20  and so the -- and so it can be a resolution that

21  is better for everyone, including the employee.

22      Q   Better for everyone than?

23      A   Than continuing to live and work in an

24  unhappy work environment and possibly suffering

25  retaliation to one's career.

1        Q       So you would be worried, given your

2    experience, that there might be retaliation and

3    harm to one's career for pursuing --

4        A       No, I --

5               (The Reporter clarified the record.)

6    BY MR. GERSEN:

7        Q       -- for pursuing an employment

8    discrimination claim within the judiciary?

9        A       Yes, that -- in every workplace I've

10   advised and/or worked in, that is a reality, and I

11   think even at the EEOC when -- you know, there

12   were instances where managers retaliated against

13   people who brought complaints.  That has -- that

14   has been a fact of life in the executive branch,

15   in the judiciary, and in any other situations that

16   I've become familiar with by reading.

17              Retaliation is a fact of life, and I

18   think that a person contemplating a formal process

19   has to be aware of that.

20       Q       Are you aware that Caryn alleged that

21   she was retaliated against by her supervisor, by

22   Tony Martinez?

23       A       I would not be surprised to hear that.

24       Q       You would -- would you not be surprised

25   if, in fact, there were retaliation?

1      A      I would not be surprised.

2      Q      You testified repeatedly that employees

3 regularly contact your office --

4      A      Yes.

5      Q      -- with concerns about sexual

6 harassment; is that correct?

7      A      Yes.

8      Q      Do they sometimes, those employees,

9 contact your office about harassment or

10 discrimination before bringing their concerns to a

11 supervisor in their own office?

12      A      Yes.

13      Q      And why might they do that, or what are

14 some reasons that employees contact your office

15 rather than going to their immediate supervisor or

16 unit executive?

17      A      Well, because they want -- they want

18 somebody to hear their concerns.  They want to

19 know what the law says about their concerns.

20 They -- they get comfort by talking to somebody

21 who is experienced in dealing with complaints of

22 discrimination and harassment.

23      Q      And is one reason they might contact

24 your office before their immediate supervisor a

25 worry or concern about retaliation?

1        A        Yeah, I would think so.

2        Q        And what might that retaliation look

3   like?  What are some forms of retaliation that

4   you've seen?

5        A        Oh, my goodness.  I think I've seen

6   everything, and this is, again, not -- not the

7   judiciary in particular, but I have seen people

8   fired, people's workplace duties diminished,

9   people -- employees ostracized.

10               Just every possible negative that you

11  could imagine happening in the workplace, I have

12  seen examples of that.

13       Q        So diminished job responsibilities, for

14  example?

15       A        Yes.

16       Q        And negative comments about them

17  formally or informally?

18       A        Yes.  All of a sudden, stellar

19  performance reviews turn into either mediocre or

20  actually negative reviews.

21       Q        Could retaliation or a form of

22  retaliation be negative comments about reaching

23  out for help to an office like yours?

24       A        I would think so, yes.

25       Q        What about not allowing an employee to

1    take notes during a meeting, at a meeting about

2    harassment, for example?

3        A    Well, if I were told about that, I

4    would tell a manager that the employee has every

5    right to takes notes in a meeting about harassment

6    or discrimination.

7        Q    So in your view, it would actually be a

8    deprivation of that employee's rights?

9        A    I think that is true.

10       Q    Thank you.

11            You mentioned that in talking to -- to

12   OGC or the General Counsel about the case that

13   they had concerns as well; is that correct?

14       A    Yes.  I recall very early on having

15   conversations with OGC, and, yes, they -- they had

16   concerns.

17       Q    And were you at all worried about

18   bringing the case to OGC given that they are

19   defensive, as you put it?

20       A    Well, I didn't bring it to OGC

21   specifically.  I believe that the deputy director

22   invited me to meetings with OGC to discuss this

23   case, and that was a normal way to handle

24   discrimination and harassment complaints.

25       Q    And who was the deputy director again?

1      A      Lee Ann Bennett.

2      Q      Lee Ann Bennett.

3             So Lee Ann Bennett invited you to a

4      meeting to discuss the Caryn Devins matter?

5      A      Yes.

6      Q      Yes?  Okay.

7             And what were the concerns that they

8      raised?

9      A      Well, again, any -- any allegation of

10     sexual harassment is of concern, and certainly

11     someone who had Caryn's background and had been,

12     for example, a U.S. Supreme Court Fellow, a law

13     clerk to a U.S. District Judge and a Circuit Court

14     of Appeals Judge, and was generally very highly

15     thought of, that would be of concern to, I think,

16     senior leadership at the AO, and in this case, it

17     was.

18     Q      And -- okay.  And how would you

19     describe their -- let's just say, why were they

20     concerned?

21     A      Well, I think they were concerned that

22     eventually this might lead to a public disclosure

23     or litigation or a judgment against the judiciary.

24     Q      They were worried about public

25     disclosure, litigation, and judgment against the

1   judiciary?

2        A       Yes.  And also, again, Lee Ann Bennett

3   and the director, as I've testified, were

4   individuals who were always concerned about doing

5   the right thing, and so that played into their

6   concerns as well.

7        Q       And by "judgment against the

8   judiciary," do you mean a judgment at the end

9   of -- do you mean a judgment against J.P. or Tony

10  Martinez?

11       A       No.  I mean against that office or, you

12  know, to the extent the AO was involved, against

13  the AO.

14       Q       And by "that office," you mean the

15  federal public defender?

16       A       Yes.

17       Q       And -- or the AO.

18               And by judgment, did you mean public

19  condemnation, or an award at the end of

20  litigation?

21       A       Either.

22       Q       Who else do you remember was at the

23  meeting that Lee Ann invited you to attend?

24       A       I think it was OGC, the deputy

25  director, and me.  I think that was -- that was

1    it.

2         Q      And could you give me their names just

3    for the record?

4         A      Sure.  Sheryl Walter, the former

5    general counsel of the AO; and me; and Lee Ann

6    Bennett, the deputy director.

7         Q      Thank you.

8              And you've talked about that meeting

9    and their concerns in somewhat general terms.

10             Do you recall the deputy director's

11   response or what they wanted to do, what they felt

12   should be done?

13        A      Well, the deputy director definitely

14   supported my involvement in trying to settle the

15   matter informally, and she was prepared to support

16   that as well, and I believe her other concern was

17   protection of the employee so that there was no

18   future retaliation or discrimination or

19   harassment.

20        Q      And was there disagreement about how to

21   proceed?

22             MS. McMAHON:  And I'll just object

23   quickly.

24             To the extent that you would be

25   speaking about any sort of advice that came from

1    OGC to either you or Lee Ann, please do not

2    answer.

3              THE WITNESS:  I understand.

4    BY MR. GERSEN:

5         Q     I'll just ask one more time.

6              Were you a client of OGC?

7         A     No, although as I -- as I said, there

8    were times in my role as a manager that I would

9    consult with OGC, because it was their job to

10   defend me in my capacity making employment

11   decisions as a manager.

12        Q     In this meeting or this matter, were

13   you a client of OGC?

14        A     No, I don't believe so.  There's no way

15   to reasonably suggest that.

16             MS. McMAHON:  To be -- to be clear,

17   Lee Ann Bennett was also in the meeting, who is a

18   client of OGC.

19             MR. GERSEN:  Understood.

20             THE WITNESS:  Correct.

21             MR. GERSEN:  A third-party presence I

22   think would probably breach the privilege, no?

23             MS. McMAHON:  We would have to consult

24   with the individuals involved to be specific about

25   that, but I -- the witness -- to be safe, maybe

1    the witness doesn't answer about specific advice

2    that's given.

3            Does that work?

4            MR. GERSEN:  Yeah, why don't we note

5    that, and we can come back to the issue if we need

6    to at a later -- at another time.

7    BY MR. GERSEN:

8        Q    So can you -- to the extent that you

9    could answer the question without revealing

10   specific advice that was -- specific legal advice

11   that was given?

12       A    And what was the question again?

13       Q    I think the question was:  Was there

14   disagreement about how to proceed?

15       A    In -- in my initial meetings, no, there

16   was not disagreement.

17       Q    And what was the decision about how to

18   proceed from those initial meetings?

19       A    Well, that -- that OGC would contact

20   the managers and provide counsel to them, that I

21   would continue to attempt to informally resolve

22   the matter and to give Caryn advice on the

23   processes she had at her disposal -- disposal, and

24   that we would continue to discuss.

25       Q    And was there anything especially

1    unusual about that decision to proceed in that

2    way?

3         A     No.  It happened more times than I can

4    count.

5         Q     It was very much the norm or a normal

6    way to proceed in a case like this?

7         A     Exactly.  And when I say countless

8    times, the managers were different.  I mean, it

9    wasn't always the deputy director.  It might have

10   been an office head or another manager, but that

11   was perfectly usual proceedings where OGC, my

12   office, and a manager of an office would sit down

13   and discuss next steps.

14        Q     And would it be a breach of your

15   obligation or responsibilities if you hadn't done

16   so, do you think?

17        A     I think it would have been.

18        Q     Thank you.

19              You mentioned that you had a very

20   positive relationship with Cait Clarke, I think,

21   professionally?

22        A     Yes.

23        Q     And you had confidence that she would

24   do the right thing?

25        A     Yes.

1    Q    And what did you mean by "do the right

2    thing"?

3    A    Well, she was about to contact the

4    managers that were involved, and I had every

5    confidence that she would communicate to them that

6    they needed to be aware of the laws that protect

7    employees and to do the appropriate thing and not

8    to retaliate.  I assume that's part of the

9    discussion she had with them.

10    Q    So Caryn's case wasn't treated

11    unusually or specially or differently?

12    A    No.

13    Q    And after -- after this meeting, can

14    you describe what you or your office did in the

15    next -- next steps?

16    A    Right.  Well, it wasn't one meeting.

17    It was probably multiple meetings with OGC, the

18    deputy director, and me, and I continued to try to

19    resolve the case informally, and I believe that

20    Amaal Scroggins was also advising the EDR program

21    on how to proceed in terms of doing -- doing --

22    giving the employee access to the process that she

23    was entitled to.

24    Q    And you have, I take it, quite a lot of

25    experience with the EDR process?

1          A     Well, yes.  I mean, I -- that was

2     probably something I worked on every day of the

3     five years I was at the AO.  We just -- we were

4     there as a resource for judiciary employees,

5     managers, and those who were involved in the

6     EDR process.

7          Q     Great.  Thank you.

8                MR. GERSEN:  I think it's a good time

9     for us to take a quick break.

10                THE WITNESS:  Okay.

11                (A recess was taken.)

12     BY MR. GERSEN:

13          Q     Okay.  When Caryn first reached out to

14     you, she had not started an EDR process; is that

15     correct?

16          A     Yes, that's my recollection.

17          Q     She had started that process in

18     approximately September; is that your

19     recollection?

20          A     Somewhere around that time, yes.

21          Q     And counsel asked you about an

22     interview Caryn had with Heather Beam at the end

23     of August earlier.

24                Do you recall that?

25          A     Yes.  I do remember Caryn telling me

1    about it and Heather reporting it, yes.

2         Q      And when Caryn reached out to you -- do

3    you know what that interview was about?

4         A      You mean with Heather Beam?

5         Q      Yes.

6         A      I think she was -- she had

7    responsibilities in the early part of the

8    EDR process.

9         Q      And if Caryn hadn't started an

10   EDR process, do you know who had started an

11   EDR process?

12        A      I don't understand that question.

13        Q      Sure.

14               At the time Caryn reached out to you, I

15   believe you said that she had not started an

16   EDR process.

17        A      Correct.

18        Q      And, indeed, you had advised her to try

19   to resolve the -- her concerns informally --

20        A      Right.

21        Q      -- before going down that formal

22   process; is that correct?

23        A      Right.  Yeah, that's what I recall.

24        Q      And at that time, she had no awareness

25   of any ongoing EDR investigation?

1        A       About -- you mean in her case?

2        Q       In her case.

3        A       No, I don't believe she did.

4        Q       Because she had not initiated that

5   process; is that correct?

6        A       Right.  That's my recollection.

7        Q       And you weren't aware of any ongoing

8   EDR process at that time either; is that correct?

9        A       That's correct.

10       Q       And did you know that Tony Martinez had

11  initiated a Chapter IX proceeding under the

12  EDR Plan involving these allegations?

13       A       No, I don't think I did.

14       Q       And did you have any sense or knowledge

15  that Caryn knew that?

16       A       If I didn't know it, I -- I don't think

17  she would have known it, because she told me

18  virtually everything that she thought was relevant

19  to her case.

20       Q       Thank you.

21               And so none of the activities or

22  conduct or steps that your office took or you took

23  could possibly have been interfering with or

24  intended to interfere with an EDR process?

25       A       No, absolutely not.

1       Q       Thank you.

2               And I believe you said earlier that you

3       did not have any contact with Tony Martinez after

4       Caryn contacted you; is that correct?

5       A       That's correct.  I have no recollection

6       about either talking to or otherwise interacting

7       with Tony Martinez.

8       Q       Great.  Thank you.

9               I want to talk for a moment about

10      Heather Beam.

11      A       Yes.

12      Q       Okay.  My understanding from your

13      testimony is that there were at least two calls

14      between you or Amaal and Heather Beam?

15      A       Yes.

16      Q       In one of those calls, it sounds

17      like -- as though Heather reached out to your

18      office or to Amaal; is that correct?

19      A       Correct.

20      Q       And can you tell me why she reached

21      out?

22      A       I think she was asking Amaal, you know,

23      some process questions, and -- and I believe, to

24      be -- to be clear, I believe that Heather was, in

25      essence, the EEO counselor in the EDR process,

1  similar to what takes place in the executive

2  branch and in the AO.

3          So she -- I believe she was taking

4  information and creating a report that would --

5  would basically start the process.

6      Q    For those of us who aren't quite as

7  steeped in this, can you explain exactly -- or a

8  bit more about what that office -- or her role

9  would be?

10     A    Well, an EEO counselor in the federal

11 executive branch and in -- in cases with the

12 AO would be the very first step in initiating a

13 complaint.

14         You cannot file a complaint without

15 going to an EEO counselor first, and I believe

16 that was Heather's role in the early part of this

17 process.

18     Q    So Heather's role was similar to the

19 EEO counselor in the executive branch -- in the --

20     A    I believe that is correct.

21     Q    And in that capacity -- and then she

22 also became the Chapter IX investigator in the

23 investigation; is that correct?

24     A    I think that's correct, but, again, I

25 had very little interactions with her other than

1    those two phone calls early on in the process.

2         Q      Would -- in the executive branch --

3         A      And, in fact, I was not a part of the

4    first phone call, that was Amaal, and then I had

5    very little interaction with her other than that

6    one call that Amaal and I were on together with

7    Heather.

8         Q      And is it normal for the EEO counselor

9    or person in that initial role to subsequently

10   serve as the investigator of the complaint?

11        A      Typically, I don't think that happened.

12               I mean, in -- in -- at EEOC, in the

13   federal executive branch, in our AO process for

14   AO employees, typically the EEO counselor begins

15   the process, but you -- the process of

16   investigation is done by a trained

17   EEO investigator, and I don't know that I've ever

18   seen a situation where the EEO counselor served as

19   the investigator.

20        Q      So that would be very unusual?

21        A      I think that it -- I've never seen it.

22        Q      And would it be concerning if it

23   occurred?

24        A      No, I can't say it would, but I just --

25   it's very unusual.

1          Q       Understood.

2                  Okay.  In that first call with Amaal

3     and Heather Beam, do you know what Amaal told her,

4     told Heather?

5          A       I only recall slightly that Amaal came

6     to me and said I received a phone call from this

7     person, and I believe this person may be involved

8     in the Charlotte case, meaning Caryn Devins

9     Strickland's case.

10                 And so Amaal thought that, you know, we

11    should discuss that with Heather since I had been

12    involved with talking to Caryn.

13         Q       So Amaal did not disclose that during

14    the conversation?

15         A       I don't think she did in the beginning,

16    because she didn't know that that's what the

17    situation was.  I think when she and I talked

18    about it, then she realized, oh, yes, that's --

19    that's the Charlotte case Nancy's been working on.

20         Q       So at this point, did you know that

21    Heather was the investigator?

22         A       I think at that point, I knew Heather

23    was the EDR counselor --

24         Q       The EDR counselor in that she --

25         A       -- which -- which has some informal

1    investigatory role.

2         Q      Got it.

3                And is that a -- is that EEO counselor

4    with respect to Chapter X of the EDR, or is it

5    just general?

6         A      I'm not sure.

7         Q      Okay.  Thank you.

8         A      I'm not sure.  I don't recall any

9    longer the chapters in the EDR process, but I do

10   know that early on in the process, an EDR --

11   EDR counseling is done, and I believe that Heather

12   was that person.

13        Q      And there was no -- in your impression

14   or understanding, there was no EDR process going

15   on at that point that you were aware of?

16        A      Not formal, because the -- the

17   complaint process sort of triggers the formal

18   complaint.

19        Q      Understood.

20        A      The -- the counseling aspect is an

21   early informal part of how one handles an

22   EDR complaint.

23        Q      And in that second conversation you

24   described --

25        A      Yes.

1        Q       -- where I think you said you discussed

2   all of these issues, what was said during that

3   conversation?

4        A       Well, again, I believe that we informed

5   Heather that the matter she had talked about with

6   Amaal was also something that had been brought to

7   my attention by the employee and that I was

8   working with AO managers and others on how to

9   assist in the case.

10       Q       And was there anything threatening

11   about the call?

12       A       I didn't think there was.

13       Q       Did you or Amaal give any directives to

14   Heather Beam?

15       A       Never, and we had no authority to give

16   directives to a judiciary employee.

17       Q       Did you give any ultimatums to Heather

18   Beam?

19       A       I did not, nor did I hear Amaal do any

20   such thing.

21       Q       Was there anything out of the ordinary

22   about that call?

23       A       I don't believe so.

24       Q       Thank you.

25               And did you ever talk to Tony Martinez

1   about that call?

2        A     No.

3        Q     Did you ever talk to J.P. Davis about

4   that call?

5        A     No.

6        Q     Okay.  Thank you.

7              Did you ever have any contact or

8   communication with James Ishida about this case?

9        A     I cannot recall.  He could have been

10  involved with a call between the Office of General

11  Counsel and Lee Ann Bennett and me, but I have no

12  specific recollection of that.  It's something

13  that could have happened.

14             I mean, typically, we would often get

15  on the phone with -- with people who were in a

16  position of authority when there was a case of

17  discrimination or harassment being alleged, and I

18  knew James Ishida, but I -- I -- it could have

19  happened.  I don't recall it.

20       Q     So you knew James Ishida some?

21       A     Yes.

22       Q     Did he ever ask you if you were Caryn's

23  friend?

24       A     No.

25       Q     Did he ever ask you if you tried to

1    obstruct this investigation?

2        A      No.  As I mentioned, the e-mail that

3    the Department of Justice showed me -- I think you

4    showed me maybe -- was the first time I had ever

5    seen those concerns by James Ishida.

6        Q      And how did you know James Ishida?

7        A      Well, I regularly interacted with

8    circuit executives in all the circuits.  We went

9    to training with them, we -- when there was an

10   issue they needed advice on, they would often call

11   me directly, and so I knew of him.

12             James Ishida also at one point sued the

13   Department of General Counsel at the AO, so I was

14   made aware of that situation.  So he was sort of a

15   notable individual.

16       Q      Why did he sue?

17       A      I can't remember, but there was a case

18   that he was involved with where he sued general

19   counsel based on how they had handled that case,

20   which I didn't think he was entitled to do, but

21   that was the reason it was sort of notable because

22   it was out of ordinary to sue -- sue your own

23   general counsel's office.

24       Q      Okay.  Why do you think he would not

25   have reached out to you to verify this allegation

1   about you?

2       A     Well, I -- I suspect he would have

3   known what I would say.

4       Q     And what is that?

5       A     Well, they were very damaging

6   accusations, and I would expect that I would have

7   been upset had I heard about it.

8       Q     And did you know Chief Judge Gregory?

9       A     No, I did not.  I don't think I've ever

10   had any direct contact with him.

11           He could have been at a conference that

12   I was at, but I -- I don't recall ever speaking to

13   him.

14       Q     So he didn't ever reach out to verify

15   or check on these allegations?

16       A     No, not with -- not with me.

17       Q     And you don't know if Ishida ever

18   corrected these allegations to Chief

19   Judge Gregory?

20       A     I do not.

21       Q     You said at the end of your testimony

22   this afternoon with Ms. McMahon that you didn't

23   have any reason to doubt that the investigation

24   and EDR process was being done in an appropriate

25   way at the time.

1             Do you recall saying that?

2        A      Yes.

3        Q      Was there a time where you did have --

4    did come to have concerns?

5        A      No, I can't say that I ever reached

6    that conclusion.  Again, I -- I left the agency at

7    a time period that this would have been still very

8    early on in the process, and so I -- I can't say

9    any more than what I've said.

10        Q      Thank you.

11             MR. GERSEN:  I want to thank you very

12    much for your time and your candor and being with

13    us this afternoon, and it was very nice to meet

14    you.

15             THE WITNESS:  You too.

16             I do need to -- you asked me to forward

17    the e-mails from the DOJ lawyers to me asking me

18    to be a part of this deposition, and I want to

19    make sure, first of all, that Maddie does not have

20    any objections to my doing so, and then I -- if

21    not, then I need your e-mail address.

22             THE REPORTER:  Am I still on the

23    record?

24             MR. GERSEN:  I think we can --

25             THE WITNESS:  Yes.

1              MR. GERSEN:  Yes, this is still on the

2      record.

3              MS. McMAHON:  We have no objection.

4              THE WITNESS:  Okay.  Thank you, Maddie.

5              MR. GERSEN:  Thank you.

6              THE WITNESS:  Okay.  So your e-mail

7      address, Professor Gersen?

8              MR. GERSEN:  Is jacob.gersen,

9      G-E-R-S-E-N --

10              THE WITNESS:  Uh-huh.

11              MR. GERSEN:  -- @gersen.com.

12              (The Reporter clarified the record.)

13              THE WITNESS:  Okay.  I'll send those

14      later.

15              THE REPORTER:  Ms. McMahon, do you have

16      any other questions?

17              MS. McMAHON:  We don't, no.

18              (Discussion off the record.)

19              THE REPORTER:  So, Ms. McMahon, do you

20      need regular delivery or expedite?

21              MS. McMAHON:  I think expedited

22      delivery, please.

23              THE REPORTER:  When would you like it?

24              MS. McMAHON:  What are the options?

25              THE REPORTER:  You can get it in five

1   business days, four business days, three business

2   days, two business days.

3           MS. McMAHON:  Five business days would

4   be great.

5           THE REPORTER:  And, Mr. Gersen, do you

6   need a copy of the transcript?

7           MR. GERSEN:  Yes, please.

8           THE REPORTER:  Do you need regular

9   delivery or expedite?

10          MR. GERSEN:  Do we need regular?  I

11  think we need -- I don't think we need expedited.

12  I think regular should be fine.

13          (Discussion off the record.)

14          AV TECHNICIAN:  Would you like the

15  exhibits attached to the transcript?

16          MS. McMAHON:  That's not necessary for

17  us.

18          AV TECHNICIAN:  Okay.

19          MR. GERSEN:  Or for us.

20          AV TECHNICIAN:  Okay.  Thank you.

21  That's all I need.

22          (Off the record at 8:09 p.m.)

23

24

25

1                ACKNOWLEDGMENT OF DEPONENT

2         I, NANCY DUNHAM, do hereby acknowledge

3     that I have read and examined the foregoing

4     testimony, and the same is a true, correct

5     and complete transcription of the testimony

6     given by me and any corrections that appear

7     on the attached Errata Sheet signed by me.

8

9

10    _____  _____

11        (DATE)                  (SIGNATURE)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1      CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2              I, Marney Alena Mederos, the officer

3   before whom the foregoing deposition was taken, do

4   hereby certify that the foregoing transcript is a

5   true and correct record of the testimony given;

6   that said testimony was taken by me

7   stenographically and thereafter reduced to

8   typewriting under my direction; that reading and

9   signing was requested; and that I am neither

10  counsel for, related to, nor employed by any of

11  the parties to this case and have no interest,

12  financial or otherwise, in its outcome.

13             IN WITNESS WHEREOF, I have hereunto set

14  my hand and affixed my notarial seal this 23rd day

15  of April 2023.

16  My commission expires November 23, 2024

17

18

19  _____

20  NOTARY PUBLIC IN AND FOR

21  THE STATE OF MARYLAND

22

23

24

25
```