# EXHIBIT XX

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
Civil No. 1:20-cv-00066-WGY


CARYN DEVINS STRICKLAND,    )
                            )
        Plaintiff,          )
                            )
vs.                         )
                            )
UNITED STATES, et al.,      )
                            )
        Defendants.         )
_____)




                              Friday, April 14, 2023
                              Charlotte, North Carolina




      Deposition of HEATHER BEAM, a witness herein,

called for examination by counsel for Plaintiff in the

above-entitled matter, pursuant to Notice, before

Dayna H. Lowe, Court Reporter and Notary Public in and

for the State of North Carolina, taken at Tin Fulton

Walker & Owen, PLLC, 301 East Park Avenue, Charlotte,

North Carolina, commencing at the hour of 9:06 a.m.

```
 1   APPEARANCES:
 2
 3       On behalf of the Plaintiff:
 4           OLIVIA WARREN, ESQUIRE
             JAY H. FERGUSON, ESQUIRE
 5           Thomas, Ferguson & Beskind, LLP
             119 East Main Street
 6           Durham, North Carolina 27701
             (919) 682-5648
 7           warren@tfblawyers.com
             ferguson@tfblawyers.com
 8
             JACOB GERSEN, ESQUIRE (Via Telephone)
 9           JEANNIE SUK GERSEN, ESQUIRE (Via Telephone)
             Hauser Hall 510
10           1563 Massachusetts Avenue
             Cambridge, Massachusetts 02138
11           (617) 496-5487
             jsuk73@gmail.com
12
             COOPER STRICKLAND, ESQUIRE (Via Telephone)
13           Post Office Box 92
             Lynn, North Carolina 28750
14           (828) 817-3703
             cooper.strickland@gmail.com
15
16       On behalf of the Defendants:
17           MADELINE McMAHON, ESQUIRE
             JOSHUA M. KOLSKY, ESQUIRE
18           United States Department of Justice
             Civil Division, Federal Programs Branch
19           1100 L Street NW
             Washington, DC 20005
20           (202)451-7722
             madeline.m.mcmahon@usdoj.gov
21           joshua.kolsky@usdoj.gov
22
23       Also Present:

24           Ms. Kristin Mannherz, Office of General Counsel
             Ms. Caryn Devins Strickland (Via Telephone)
25
```

```
 1                    C O N T E N T S

 2

 3   Examination by Ms. Warren:                        5

 4   Examination by Ms. McMahon:                     200

 5

 6                    E X H I B I T S

 7                    (Plaintiff's)
```

```
 8   Beam 13    Email(s), US 5361-5363               14

 9   Beam 14    Email(s), US 2839-2841               15

10   Beam 15    EDR Plan January 2013                20

11   Beam 16    EDR Plan November 2018               20

12   Beam 17    Email(s), US 0462                    21

13   Beam 18    Email(s), US 2454-2456               22

14   Beam 19    9/10/18 letter, US 5932-5938*        23

15   Beam 20    Email(s), US 0358-0360               26

16   Beam 21    Email(s), US 1432-1433               27

17   Beam 22    Email(s), US 1434-1435               30

18   Beam 23    Handwritten notes, US 6213-6236*     54

19   Beam 24    Email(s) and Counselor's Report,     64
                US 2293; US1244-1311*
20
     Beam 25    Email(s), US 1357-1360*              77
21
     Beam 26    Email(s), US 1353-1354*              85
22
     Beam 27    Email(s), US 2822-2823*              90
23
     Beam 28    Email(s), US 1343-1347*              91
24
```

```
25                 (CONTINUED ON NEXT PAGE)
```

1    Asheville, yes.

2       Q.    And why did that affect her relationship with

3    JP?

4       A.    I can't say why.

5       Q.    You have in your notes on 6214, it looks like

6    she described some drinking in the office and with JP.

7    Did she tell you that at a retreat he brought her into

8    the hall at 11 p.m. at night?

9       A.    Yes.

10      Q.    And he asked her to go to someone else's room?

11      A.    Yes.  Those are the notes I have.

12      Q.    And she said that I see other people noticed.

13      A.    Uh-huh.

14      Q.    Did you ask her who noticed?

15      A.    I don't recall.

16      Q.    Okay.  Do you know if she told you who

17   noticed?

18      A.    I don't remember.  I'm sorry.

19      Q.    And did she tell you about the email that JP

20   sent her that she understood to be a quid pro quo email?

21      A.    Yes, she did, and she gave me a copy of it.

22      Q.    And what did she say about that email?

23      A.    I don't recall what she said about it.

24      Q.    What did you think when you saw that email?

25      A.    I thought it was a very stupid email to send.

1    Q.    Did she seem upset by that email?

2    A.    Yes.

3    Q.    Did you believe her?

4    A.    That she was upset?

5    Q.    Yeah.

6    A.    Yes.

7    Q.    Did you think it was reasonable to be upset

8    because of that email?

9    A.    Yeah.

10   Q.    And how did she describe reacting after the

11   email?

12   A.    I do not remember.

13   Q.    Do you remember if she told you that she tried

14   to take some distance after receiving that email?

15   A.    I do recall her saying that she wanted to get

16   some distance from JP, but I don't recall the timeframe

17   in which she said that.

18          MS. WARREN:  Let's just take a short break.

19          MS. McMAHON:  That would be great.

20          (Recess from 10:40 a.m. to 10:57 a.m.)

21          BY MS. WARREN:

22   Q.    Ms. Beam, would you be all right if we go

23   through to lunch --

24   A.    Yeah, sure.

25   Q.    -- or try to?  Excellent.  I have a couple of

1  questions before we go back to the investigation.

2       A.    Sure.

3       Q.    You mentioned the Listserv for EDR

4  coordinators?

5       A.    Coordinators, uh-huh.

6       Q.    Did you ever use the Listserv to ask a

7  question about this case?

8       A.    No.

9       Q.    Okay.  And before you started this

10  investigation, had you heard anything about the culture

11  in the office, in the Federal Defender's Office in the

12  Western District?

13      A.    No, nothing specific.  All I knew was the

14  judges were not happy with that office, and I think

15  that's -- I mean, it's not their decision to make them a

16  federal agency, but I think them becoming a federal

17  agency, there was a reason behind that, but only from

18  the little like whispers in the hallway that I heard but

19  nothing specific, no.

20      Q.    Did you know why the judges were unhappy?

21      A.    No idea.  I don't get involved in cases or any

22  of that stuff.

23      Q.    You were in probation?

24      A.    Yeah.

25      Q.    And was there -- did you ever hear about any

1    complaints like this one?

2         A.    No.

3         Q.    Okay.  When you started your investigation in

4    August of 2018, I know that you talked about conducting

5    interviews and reviewing documents and using resources

6    to write a report.

7         A.    Yes.

8         Q.    And we'll talk through those things.  Did you

9    ever investigate whether there had been complaints

10   before against JP Davis?

11        A.    No.

12        Q.    Or against Tony Martinez?

13        A.    No.

14        Q.    Did you ask either of them if there had been

15   complaints before?

16        A.    No.

17        Q.    Did you ask either of them if they thought, in

18   their employment at that office, if there was anything

19   that could have made somebody complain about them?

20        A.    No.

21        Q.    Let's go back.  I think we're still in the --

22   we were talking about your interview with Caryn --

23        A.    Uh-huh.

24        Q.    -- your first interview with her.  Based on

25   your conversation with Caryn, what did you think her

1　considered it from the point of confidentiality.

2　　　Q.　So if someone who had confidential information

3　about Caryn's complaint shared it --

4　　　A.　Yes.

5　　　Q.　-- you wouldn't consider that an act of

6　retaliation?

7　　　　　MS. McMAHON:　Objection, calls for

8　speculation.

9　　　　　BY MS. WARREN:

10　　　Q.　Would you consider that retaliation?

11　　　A.　I'm not sure.

12　　　Q.　What did you understand retaliation to mean?

13　　　A.　Retaliation is when the person who feels

14　that's happened to has been denied something of value,

15　perhaps in their mind, you know, and to use it in a

16　work-related sense, retaliation could be they're no

17　longer invited to a meeting that they were routinely a

18　part of, they don't get a promotion, they're turned down

19　for a promotion, they have to move their office to a

20　less desirable location without a very good or logical

21　or reasonable explanation.

22　　　Q.　What if someone spreads rumors about someone?

23　　　　　MS. McMAHON:　Objection, calls for

24　speculation.

25　　　　　BY MS. WARREN:

```
 1        Q.   And how could it be interpreted?
 2        A.   It could be interpreted in any way that person
 3   decides to interpret it.
 4        Q.   Did you feel that it could be interpreted as a
 5   quid pro quo email?
 6        A.   No.
 7        Q.   And you didn't write that in your report, that
 8   it could be interpreted as a quid pro quo email?
 9        A.   It could be, yes.  For me, I wouldn't have, so
10   I answered that more from my perspective.  But, yes, it
11   could have been.
12        Q.   So you wouldn't have understood that email to
13   be a quid pro quo?
14        A.   Personally?
15        Q.   Yes.
16        A.   Like if that were sent to me?
17             MS. McMAHON:  Objection, calls for
18   speculation.
19             BY MS. WARREN:
20        Q.   You can answer.
21        A.   I don't know what I would think.
22        Q.   And what did Caryn say she thought?
23        A.   She thought it was a quid pro quo email.
24        Q.   I want to look at that email again, and that's
25   on 1260 of your report.  You said something about how
```

1    this could be a joke, or I think you brought up joke in

2    some way.  What would possibly be the joke in this

3    email?

4            MS. McMAHON:  Objection, mischaracterizes

5    prior testimony.

6        A.    JP characterized it as a joke.

7            BY MS. WARREN:

8        Q.    Okay.  And did you understand what he meant by

9    joke?

10       A.    He was trying to be funny is what I understood

11   it to be.

12       Q.    And how was he trying to be funny?

13       A.    I am really not sure.

14       Q.    Well, looking at the subject line, it says Mas

15   Dinero.

16       A.    Yes.

17       Q.    Did he ever communicate with Caryn in Spanish

18   other than this email?

19       A.    I have no idea.

20       Q.    And when he said, "just remember I deal in

21   pay-for-stay," smiley face emoji, that was the joke?

22       A.    I don't know what part was the joke.  He said

23   it was a joke, and I inferred that he was trying to be

24   funny.

25       Q.    How did you think he was trying to be funny?

1    A.   Because he said it was a joke, and usually

2  jokes are meant to be funny.

3    Q.   Did you ask JP why he thought it might be a

4  joke?

5    A.   No.

6    Q.   Did you ask him if he thought it would be

7  funny?

8    A.   No.

9    Q.   What made you conclude that it was a joke?

10    A.   He said it was a joke.  And I didn't make that

11  conclusion.  I just wrote in my notes what he said it

12  was.

13    Q.   Okay.  In the email, in the first line he

14  says, "you're shooting high with a G15."  What do you

15  understand that to be referring to?

16    A.   Perhaps their grades when it comes to salary.

17    Q.   Do you know what grade Caryn was at the time

18  that JP sent this email on May 18th?

19    A.   I don't recall that I knew at the time.  I did

20  request that information from Bill Moormann.

21    Q.   And JP then said, "Not least of all since

22  you'll need 5 more years of fed service to qualify for

23  it."

24    A.   Yes.

25    Q.   Did you ask JP if that was accurate?

1  A.  I did not.  I was going to look up -- well, I
2  tried.  I did look up the Federal Defenders' pay and all
3  of that, the qualifications and stuff like that.
4  Q.  And did you confirm his assertion that Caryn
5  would have needed five more years to qualify for a
6  grade 15?
7  A.  I do not recall because the G15, or G as in a
8  grade, I didn't find anywhere.  AFDs have pay ranges.
9  Q.  Uh-huh.  And the AFDs have a pay range.  The
10 research and writing specialists, I believe it's the JSP
11 plan.
12 A.  Okay, yes.
13 Q.  Is that correct?
14 A.  That would be correct if -- I think I have her
15 SF-50 here.  Let me -- oh, right here.  Her pay plan is
16 ungraded.  Oh, but that was as a Assistant Federal
17 Defender.  So the pay plan said 14-2.  Pay plan is FD.
18 Q.  So she was at -- do you take 14 to be
19 referring to a grade on that plan?
20 A.  Yeah, because it's this in the grade or level
21 box, and the 2 is in the box titled step or rate, but
22 the pay plan says FD.  If it were JSP it would say JS.
23 Q.  Thank you.  And these plans, just so I'm
24 understanding, I believe that they have -- it's sort of
25 a table, is that right?

1    A.    Yes.

2    Q.    And on the left side, so the rows --

3    A.    Yes.

4    Q.    -- are grades?

5    A.    No.  The right side has all of the grades, and

6    then in the row are the steps.

7    Q.    Okay.  So each -- as you move down rows you

8    are going up steps.  Is that correct?

9    A.    You're going up in grades.

10   Q.    In grades.  And if you move over --

11   A.    Steps.

12   Q.    Steps.  Okay.  So moving from left to right on

13   the page you would go from a 14-1 to a 14-2 to a 14-3?

14   A.    Yes.

15   Q.    Okay.  Just so it's clear for the record.

16   A.    Yes.

17   Q.    And moving down we would see a 14-1, the next

18   row down a 15-1.

19   A.    Yes.  Yes.

20   Q.    So 15 is the grade after 14, is that correct?

21   A.    I would assume so, yes.  It would make the

22   most sense.

23   Q.    And did you investigate that?

24   A.    I looked at their -- I looked at how they're

25   paid, and I did not understand it because it's a range,

1   so, for example, a grade 14 -- maybe even not -- not as

2   a research and writing specialist, but these ungraded

3   pay plans for AFDs, it has a start -- like a minimum and

4   a maximum, and I did not understand where they picked

5   the dollar amount to pay.  It seemed different.  I'm not

6   going to say if it's good or bad, it's just different

7   than what I'm used to in the probation and District

8   Court.

9         Q.   Are you on more similar tables with grades and

10  steps?

11        A.   Everything's modeled after the general

12  schedule for the government, and we do have the JSP

13  schedule for chamber staff and -- yeah, chamber staff,

14  and then our circuit executive and the second in

15  command.  Everybody else is on the court personnel

16  system.  Similar.  They have grades and they have steps.

17        Q.   Did you understand how grades and steps worked

18  for research and writing attorneys?

19        A.   Based on their education, experience.

20        Q.   So the grades and steps had more objective

21  criteria?

22        A.   I don't recall.

23        Q.   Okay.  Generally are the grades and steps --

24  do they include years of experience to qualify for

25  certain ones?

1    A.   In my world, yes, it does, and the experience

2    is also separated out between general experience and

3    then specialized experience, and that is described like

4    what would be specialized experience.

5         Q.   Did you research how -- sorry.  Give me just a

6    moment.  I don't want to ask a confusing question.

7         A.   Take your time.

8         Q.   I know you said that the AD plan, the ranges

9    for the Federal Defenders themselves was confusing to

10   you, but talking about the graded and stepped plan, did

11   you research the qualification -- who would have been

12   eligible -- did you research if Caryn was eligible for a

13   G15?

14        A.   I do not recall what I researched because I

15   know that they're compared to an Assistant U.S.

16   Attorney, kind of like the U.S. Attorney staff is what

17   they're compared to.

18        Q.   So you never looked into the truth of JP's

19   assertion that it would take her five years to get

20   there?

21        A.   I would not say that's an accurate statement.

22   I don't remember.  I had conversations with Bill and I

23   looked at their defender services organization handbook.

24   That's what I remember looking at and talking with Bill.

25        Q.   Was it important to you to know if this was an

1  accurate statement?

2      A.   Well, yeah, especially when he says it would

3  take you five years to get there.

4      Q.   And why would it be important?

5      A.   Because in my experience it takes about a

6  year, not on the JS schedule, but in the court personnel

7  system you have to be at the grade for a year before you

8  can go to the next grade.

9      Q.   Uh-huh.  On the graded schedule, within those

10  yearly reviews are there automatic steps up?

11      A.   Yes, there are.

12      Q.   And is there automatic movement down from one

13  grade to the next level grade?

14      A.   No.  That would be an actual HR action that

15  had to be taken, otherwise known as a promotion.

16      Q.   Okay.  But those promotions are generally

17  guided by years of experience?

18      A.   Years of experience is the qualifier; however,

19  in our organization we also look at performance of the

20  position that they're in now.  I mean, if they can't do

21  their job now, they can't do their job in a more -- with

22  more responsibility.

23      Q.   And when you say in our organization, which

24  organization?

25      A.   I'm sorry.  District Court or probation.

1  Q.  And do you know how it was done for the
2  research and writing attorneys in the Federal Defender's
3  office?

4  A.  I don't know how they picked like their
5  starting salary.  I do know that the research and
6  writing position was done away with while Caryn was
7  there and she was reclassified.

8  Q.  Okay.  Did Caryn tell you that she was -- she
9  felt physically unsafe around JP?

10  A.  Yes, she did.  I made a note of it that she
11  was sitting in -- her office was placed into what she
12  referred to a remodeled utility closet, some closet, and
13  it was isolated and away from other people, therefore
14  making her feel unsafe.

15  Q.  And why did she feel unsafe in that
16  environment?

17  A.  Being in an isolated environment, there was no
18  one else around that might hear something, see
19  something, say something.

20  Q.  What kind of thing?

21  A.  Anything that Caryn was concerned about based
22  on her allegations against JP.

23  Q.  So something that JP might do or say to her?

24  A.  Sure.

25  Q.  Did Caryn tell you that JP -- that other

1    employees told her JP seemed to be watching her?

2         A.   Other employees made a comment to her about JP

3    that I recall, or comments, but I don't recall the

4    substance of what they said.

5         Q.   And did Caryn ever tell you that other

6    employees were concerned about JP's behavior towards

7    her?

8         A.   Not that I recall.

9         Q.   Did she give you a list of witnesses to talk

10   to?

11        A.   I have reviewed a list of witnesses.  I did

12   not remember getting that email from her.

13             (Exhibit 31 was marked for identification.)

14             MS. McMAHON:  What exhibit number is this?

15             MS. WARREN:  31.

16             BY MS. WARREN:

17        Q.   Looking at Exhibit 31, is that your email

18   address at the top?

19        A.   Yes.

20        Q.   And this is dated October 8th?

21        A.   Uh-huh.

22        Q.   And there's an attachment that says

23   "Strickland Witness List and Timeline"?

24        A.   Uh-huh.

25        Q.   And turning to the second page --

1    A.    Uh-huh.

2    Q.    -- do you see what appears to be the

3  attachment?

4    A.    Yes.

5    Q.    And on page 592 at the bottom, this is

6  Plaintiff's 592, do you see a witness list?

7    A.    Yes.

8    Q.    And did you reach out to any of those people?

9    A.    No, I did not.

10    Q.    Why didn't you reach out to them?

11    A.    I was only focused on the people that were

12  involved directly in the situation.

13    Q.    Did you interview anyone else who could

14  substantiate these claims?

15    A.    I did not.

16    Q.    Did Caryn tell you that these people had

17  information that was relevant to her claims?

18    A.    I do not remember.

19    Q.    Do you think she gave you witnesses who didn't

20  have information?

21         MS. McMAHON:  Objection, misleading.

22    A.    I am not sure.

23         BY MS. WARREN:

24    Q.    Why do you think she gave you this witness

25  list?

1      A.    Because she wanted to provide a witness list.

2      Q.    So she just wanted to give you these names?

3      A.    Yeah.  Maybe she thought they were relevant to

4  the investigation, but she didn't say.  I don't recall

5  her saying so.

6      Q.    You don't recall that she told you you should

7  talk to these people?

8      A.    I do not remember.

9      Q.    Did you think you should talk to these people?

10     A.    I didn't even remember getting this email.

11     Q.    Okay.  But you agree that it appears you

12  received it?

13     A.    Yes.  Correct email address.

14     Q.    There's no reason that you wouldn't have

15  gotten it?

16     A.    No.

17           MS. WARREN:  We'll mark this as 32.

18           (Exhibit 32 was marked for identification.)

19           BY MS. WARREN:

20     Q.    Did you ever see this email -- or this

21  exchange of text messages?

22     A.    I do not recall.  And if I did receive it, it

23  was in my file.

24     Q.    Okay.  And this says, "She may just need to

25  get smacked a bunch, tho."  Is that right?

1      A.    Yes.   That is correct.

2      Q.    If JP had said that about Caryn, would you be

3  concerned?

4           MS. McMAHON:   Objection, calls for

5  speculation.   The witness can testify on her personal

6  knowledge.

7           BY MS. WARREN:

8      Q.    Would you be concerned?

9      A.    I was not involved in that conversation.

10     Q.    Would you be concerned if you saw an employee

11  say that another employee "may just need to get smacked

12  a bunch, tho"?

13          MS. McMAHON:   Objection, calls for

14  speculation.

15     A.    I'm not sure.

16          BY MS. WARREN:

17     Q.    You're not sure if you would be concerned?

18     A.    It depends on the situation.

19     Q.    Given your decades in HR, if someone said that

20  their fellow employee may need to get smacked a bunch,

21  you wouldn't be concerned?

22     A.    In today's environment, I would probably have

23  a conversation with them if I were made aware of it, but

24  that's not the right language to be using when talking

25  about an employee.

1    Q.   Did you ask JP if he had ever made statements
2    about Caryn to other employees that might be
3    inappropriate?
4    A.   I do not recall.
5    Q.   Let's look at your report.  Let's go ahead and
6    start on page 1244.  In Section III you say there that,
7    "Employee alleges sexual harassment based on the
8    following," and I see that there are four claims listed
9    between pages 1 and 2 of your report.
10   A.   Uh-huh.
11   Q.   How did you determine those four claims?
12   A.   That's what I summarized from my conversation
13   with Caryn.
14   Q.   And did you feel that that was an appropriate
15   summary of your conversation?
16   A.   Yes.
17   Q.   And based on the written grievance and request
18   that she submitted on September 10th and the other
19   documents that she submitted to you, did you feel that
20   this fairly captured all of her claims?
21   A.   It did not speak to the retaliation claim.
22   Q.   Did you feel that this captured all of the
23   instances of sexual harassment?
24   A.   Yes, I did.
25   Q.   You did not feel that there were other

1    instances of sexual harassment not described in these

2    four bullet points?

3        A.    No, I didn't.

4        Q.    So when she told you that JP tried to get her

5    to have a drink with him late at night, you didn't

6    consider that part of her concern about sexual

7    harassment?

8        A.    No.

9        Q.    When she said that he seemed to be watching

10   her, you didn't consider that part of her sexual

11   harassment claim?

12       A.    No.

13       Q.    How did you understand sexual harassment?

14       A.    Unwanted sexual advances, repeated asking for

15   dates or sexual favors, but just watching someone did

16   not register with me that that's sexual harassment.

17       Q.    Did she describe other things that she was

18   concerned about in terms of inappropriate personal

19   relationships?

20       A.    Of other people together?

21       Q.    Did she describe JP crossing personal

22   boundaries in other ways?

23       A.    Yes.  In the way that he spoke with her when

24   he was angry.

25       Q.    And what about some of his investment in her

1    personal interests?

2        A.   She felt it was weird from what I recall her

3    saying.  Or strange.

4        Q.   And you didn't understand any of that to be

5    connected to her concerns about sexual harassment?

6             MS. McMAHON:  Objection, misstates prior

7    testimony.

8             BY MS. WARREN:

9        Q.   You said that these were the only four things

10   that you believed were part of her sexual harassment

11   claim.

12       A.   I believed it was a good summary of the

13   conversation that I had with her because "Attempts to

14   restrict her job responsibilities and speaking to her in

15   an unprofessional manner" covers multiple events.

16       Q.   Okay.  So this was just a summary.

17       A.   That's what I said.

18       Q.   You listed the quid pro quo email as the

19   fourth bullet point.  Why did you put it fourth?

20       A.   No reason.

21       Q.   Did it occur before the other acts?

22       A.   It may have.  I'm not sure.

23       Q.   So we looked at that email together, and it

24   was sent on May 18th, right?

25       A.   Right.  Right.  Uh-huh.  And I have that noted

1  here as well in my report.

2      Q.   Uh-huh.  And attempts to restrict her job

3  responsibilities and speaking to her in an

4  unprofessional manner, that happened after May 18th,

5  right?  That began in the June disagreement?

6      A.   I can't recall if there was anything prior to

7  the May 18th, but the June 6th disagreement does stick

8  out in my mind.

9      Q.   And the waiting in the lobby, was that before

10  or after May 18th?

11      A.   I don't remember.

12      Q.   Would that be important?

13      A.   Important as far as if it happened before or

14  after the email?

15      Q.   Yes.

16      A.   I'm not sure if it would be.

17      Q.   Would the email have changed how she viewed

18  that kind of behavior?

19      A.   Yes.

20      Q.   I also wanted to ask.  You said, "Repeated

21  meetings for lunch on the premise of 'mentoring.'"

22      A.   Yes.

23      Q.   Did Ms. Strickland have a problem because the

24  meetings were at lunch?

25      A.   No.

```
 1       Q.    Did she tell you that JP requested to meet at
 2  other times that made her uncomfortable?
 3       A.    Yes.  He said in one email that I recall
 4  breakfast, lunch, dinner, drinks and an ear, something
 5  along those lines.
 6       Q.    Do you know if that email took place before or
 7  after the May 18th quid pro quo?
 8       A.    I don't recall the date of the email.
 9       Q.    Would it have been important?
10       A.    I'm not sure.
11       Q.    Might she have received that kind of request
12  differently after the May 18th email?
13             MS. McMAHON:  Objection, calls for
14  speculation.
15       A.    I don't know.
16             BY MS. WARREN:
17       Q.    Well, you said that she might have interpreted
18  a ride home differently after the email.
19       A.    No, that's not what I said.
20             MS. WARREN:  Could you read that back, please?
21             THE COURT REPORTER:  How far back and what am
22  I looking for?
23             MS. WARREN:  I asked her if the email would
24  change the way she viewed that kind of behavior, talking
25  about a ride.  I think it was about three or four
```

1   questions ago.

2         (The record was read as follows:

3         "Question:  Would the email have changed how

4         she viewed that kind of behavior?

5         Answer:  Yes.")

6         BY MS. WARREN:

7   Q.   Was that your answer?

8   A.   Yes.

9   Q.   Okay.  Would the email, the quid pro quo email

10  on September 18th, have changed how she might have

11  viewed a request for a drink after work?

12        MS. McMAHON:  Objection, misleading.

13        BY MS. WARREN:

14   Q.   On May 18th.  I'm sorry.

15   A.   Can you repeat the question?

16   Q.   Sure.  Would the quid pro quo email on

17  May 18th, just like the interaction in the lobby, have

18  changed how Caryn might have viewed a request for a

19  drink after work?

20        MS. McMAHON:  Same objection.

21        BY MS. WARREN:

22   Q.   You can answer.

23   A.   I'm not sure.

24   Q.   Why would it have changed her view of the

25  interaction in the lobby?

 1     A.   Well, it depends on the date when all that
 2  happened, and if it was, you know, the same day as the
 3  email, those two would go together I would imagine.
 4     Q.   In what way?
 5     A.   If she perceived that email to be the quid pro
 6  quo and then she -- and then he's waiting for her
 7  downstairs to make sure she doesn't need a ride because
 8  it's storming, the perception could have been that he
 9  was making an advance even though perhaps his perception
10  was it's kind of dangerous to ride home in a storm, and
11  he had given her rides home in the past.
12     Q.   People can have different perceptions of
13  events?
14     A.   Absolutely, yes.
15     Q.   And that's what you were investigating?
16     A.   Yes.
17     Q.   Whose perception matters for sexual
18  harassment?
19          MS. McMAHON:  Objection, vague.
20     A.   I'm not sure.  That's not up to me to judge.
21          BY MS. WARREN:
22     Q.   Did you ever get any training about that?
23     A.   Never talked about whose -- about perception.
24     Q.   Okay.  Did you ever get any training about
25  some behavior that -- there's some behavior that, would

1    you agree, can objectively be considered sexual

2    harassment, like asking someone to sleep with you?

3         A.   Yes.

4         Q.   There's other behavior that, as you've been

5    saying, I think, it depends on the context?

6         A.   And the situation, yes.

7         Q.   So it may not be as clear on its face?

8         A.   Right.

9         Q.   And in that kind of context, when it's not

10   clear on the face, have you ever been trained how you

11   assess whether that behavior is or is not sexual

12   harassment?

13        A.   Not that I recall.

14        Q.   I'm sorry.  I couldn't hear.

15        A.   Not that I recall.

16             MS. WARREN:  Thank you.

17             MS. McMAHON:  Liv, we've been going for over

18   an hour and a half at this point.  Do we want to break

19   for food?

20             MS. WARREN:  That's totally fine.  Sure.  It's

21   12:40.  We'll go off the record and come back.

22             (Luncheon recess from 12:38 p.m. to 1:45 p.m.)

23             BY MS. WARREN:

24        Q.   We're back on the record.  Good afternoon.

25        A.   Good afternoon.

1    General Counsel about this case?  Without telling me the
2    substances.  I'm just asking if it occurred.
3          A.    I don't recall if I did.
4          Q.    Do you think you would remember if you called
5    the Office of General Counsel?
6          A.    I'm not sure.  I mean, if they said something
7    that really stood out I probably would, but this was
8    five years ago and I just don't recall.
9          Q.    Did you frequently call them?
10         A.    No.  Huh-uh.
11         Q.    And do you think you might have taken notes if
12   you had called them?
13         A.    I would have, especially because that's the
14   Office of General Counsel and it would have had to be
15   like a more complicated issue.
16         Q.    And do you think if you had consulted with the
17   Office of General Counsel, would you have discussed that
18   with Mr. Ishida?
19         A.    It depends on what the question would have
20   been because if it was a question, for example, that
21   maybe Caryn brought to the interview and I didn't know,
22   then I would be following up with her.
23         Q.    Okay.  Going back to telework, what was your
24   understanding as to why Ms. Strickland couldn't be
25   temporarily relocated?

```
1        A.    Temporarily relocated to where?

2        Q.    To any other office.

3        A.    All I understood about the Asheville situation

4   was that there was not space for another employee to

5   work there.

6        Q.    In the middle of page 2, I see this highlight

7   here, which I think is in your original, about asking

8   for specific resolutions from Caryn, I think.  You noted

9   that Mr. Ishida had asked for a list of specific

10  articulable demands.

11       A.    Yes.

12       Q.    What did you mean?

13       A.    What did I mean --

14       Q.    By specific resolutions.

15       A.    I was asked by Mr. Ishida to ask Caryn for

16  more specific resolutions as her request for an

17  environment free from harassment and intimidation seemed

18  general to him.

19       Q.    Do you know if the -- do you know if the EDR

20  policy requires the party making a claim to come up with

21  a remedy?

22       A.    I don't recall if it does.

23       Q.    Do you know what remedies are available under

24  Chapter IX?

25       A.    Under Chapter IX?
```

1        BY MS. WARREN:

2        Q.   Is this your interview with Tony?

3        A.   Yes.

4        Q.   These are your notes?

5        A.   Yes.

6        Q.   Okay.  And at the top of this it says

7    interview with Caryn Devins.  "No interest expressed in

8    Asheville via Skype."  Is that right?

9        A.   Yes.

10       Q.   And then the paragraph below it says, "Never

11   asked about going to Asheville even up to today."  Is

12   that right?

13       A.   Yes.

14       Q.   And then it says, "Agreed to help with

15   Asheville but never said anything about a long term

16   move."  Is that right?

17       A.   Yes.

18       Q.   So how did you reach that conclusion?

19       A.   Those are my notes.  That wasn't my

20   conclusion.

21       Q.   How did you reach the conclusion in your

22   report that, "Tony advised in his interview with me that

23   throughout the year she had stated an interest in moving

24   to the Asheville office"?

25       A.   How did Tony know?  Was that the question?

 1       Q.    "Tony advised in his interview with me that
 2   throughout the year she had stated an interest in moving
 3   to the Asheville office."
 4       A.    Yes.
 5       Q.    But it looks like Tony told you that at least
 6   to him she didn't express interest in going to Asheville
 7   at her interview via Skype.
 8       A.    Right.
 9       Q.    Tony said that Caryn never asked Tony about
10   going to Asheville, even up to today.
11       A.    Right.
12       Q.    And that she offered to help with Asheville
13   but never said anything about a long-term move.
14       A.    Uh-huh.  And he may -- JP had told Tony about
15   Caryn wanting to move to Asheville.
16       Q.    And that was in May of 2018, right?
17       A.    Yes.
18       Q.    So it wasn't throughout the year, it started
19   in May of 2018?
20       A.    I'm not sure if it started then, but that's
21   what I have in my notes.
22       Q.    Did you come across anyone who said that Caryn
23   wanted to move to Asheville before 2018, May of 2018?
24       A.    Not that I recall, no.
25       Q.    And did you find that she said that to anyone

1    other than JP himself?

2         A.    I don't remember.

3         Q.    Well, she didn't say it to Tony.  Do you

4    agree?

5         A.    I am only writing down what he had told me.

6         Q.    So according to Tony she didn't say it to him?

7         A.    According to Tony that would be true.

8         Q.    Do you have any reason not to believe Tony?

9         A.    No.

10        Q.    And I just want to show you some more notes,

11   because I think you only talked to one other person

12   about Asheville.  Is that right?

13        A.    I believe Josh Carpenter.

14             MS. WARREN:  Yeah.  Could I have 22, please?

15             (Exhibit 34 was marked for identification.)

16             BY MS. WARREN:

17        Q.    All right.  I'm marking this as Exhibit 34,

18   and this is, I think, your interview with Josh, it looks

19   like.

20        A.    Yes.

21        Q.    Okay.  And if you'll look sort of right above

22   the line, you have "[at] interview - doesn't recall her

23   wanting to come to Asheville."

24        A.    Yes.

25        Q.    Okay.  And turning to the next page -- looking

1   at 5954, I'm sorry.  It's the last page.

2       A.   Okay.

3       Q.   And sort of in the middle you said that Caryn

4   wanting to come to Asheville around the time of getting

5   married, it looks like Josh joked about taking Caryn and

6   JP said no.  Is that how you understand those notes?

7       A.   Yes.

8       Q.   Okay.  So Caryn didn't bring it up to Josh?

9       A.   I'm not sure if she did or not.  I know he was

10  aware that she wanted to come to Asheville, but I don't

11  recall how he said he was made aware.

12      Q.   Okay.  So from your notes it doesn't seem that

13  she told him?

14      A.   Does not seem to be.

15      Q.   It looks like he joked about it and JP said

16  no?

17      A.   At some point he did.

18      Q.   Okay.  Did you ask him if Caryn ever told him

19  she wanted to go to Asheville?

20      A.   I do not recall if I asked him or not.

21      Q.   Would that have been important to ask?

22      A.   I'm not sure, because Josh wouldn't be the

23  decision-maker of whether or not she could come.

24      Q.   Well, your conclusion at the end of your

25  report, and we'll get there, is that Caryn was sexually

1    harassed in her mind but you seemed to think that the
2    more likely thing is she was exploiting the poor
3    judgment of her supervisors to move to Asheville.
4         A.   That's correct.
5         Q.   I'm trying to understand why you thought she
6    was trying to move to Asheville, because according to
7    your notes it seems that the only person who told you
8    she was trying to move to Asheville is JP.
9         A.   Uh-huh.
10        Q.   Did anyone else tell you that she was trying
11   to move to Asheville?
12             MS. McMAHON:  Objection, misstating prior
13   testimony.
14             MS. WARREN:  I'm asking her the question.
15             BY MS. WARREN:
16        Q.   Did anyone else tell you that Caryn told them
17   directly she was trying to move to Asheville?
18        A.   Not that I recall.
19        Q.   And do you recall anyone telling you,
20   including JP, that Caryn wanted to move to Asheville
21   earlier than May of 2018?
22        A.   I do not recall.
23        Q.   Okay.  Looking at page 5953, you said that
24   Josh started in June 2012 and JP started soon after.
25   They went to Baby Defender Training together -- which I

 1    hear is a week that's a lot of fun -- and in 2015 they
 2    started working together more closely.
 3         A.   Yes.
 4         Q.   Okay.  Were you concerned that Josh and JP
 5    might be friends?
 6         A.   No.
 7         Q.   You didn't think that Josh might try to give
 8    you answers that would help JP?
 9         A.   No.
10         Q.   Did you ask either of them about their
11    relationship, if it was friendly?
12         A.   I don't recall if I did or not.
13         Q.   And also Josh said that the micromanaging did
14    not surprise him of JP.
15         A.   Uh-huh.
16         Q.   Were you concerned about that?
17         A.   No, because it pretty much corroborated what
18    Caryn was telling me, you know, and some managers are
19    micromanagers.
20         Q.   Okay.  On page 6 of your report, going back,
21    what did you do when there were disputed facts that you
22    were including in your report?
23         A.   I just put the disputed facts in my report.
24         Q.   So Ms. Strickland said that Mr. Martinez
25    agreed to show her an email about reorganization before

1  sending it out to staff.  Did you ask Caryn for any

2  information to support that?

3      A.   Caryn and I did discuss it, but I don't recall

4  the details exactly of that.

5      Q.   And on page 7, you again said that, "Employee

6  Caryn Devins has been accommodated in each request she

7  has made except for where she will sit for the

8  foreseeable future."  You also said, "Employee has not

9  been able to name anything specific outside of

10 generalities."  Then you say, "The counselor is awaiting

11 her response to this request."

12     A.   Yes.

13     Q.   You're not referring to counseling under

14 Chapter X though?

15     A.   No.

16     Q.   Okay.  Did JP make any specific demands about

17 your investigation?

18     A.   Not that I recall.

19     Q.   Would you look at Exhibit 23, please?  You can

20 actually just go flip it over when you find it.  It's a

21 big chunk of your handwritten notes.

22     A.   Okay.  I have these all out of order.  Yeah.

23 Here we go.

24     Q.   If you'll flip it over to the very last page,

25 and I think this is your conversation with JP.  If you

1  look back on page -- I think it starts on page 6226.

2  These all seem to be your notes from JP, and you said

3  you reviewed these.

4      A.  Okay.

5      Q.  Great.  So looking at the last page of notes

6  from your meeting with JP, did he tell you he would like

7  it documented that Caryn was found to be making this up?

8      A.  Yes, he did say that.

9      Q.  And did he tell you he wanted a finding of

10  fact about that?

11      A.  Yes.

12      Q.  Okay.  That was one of the things he wanted.

13  Number 2 was he wanted something about what can be

14  considered and what should not be considered.  What did

15  you understand that request to be?

16      A.  I am not sure.

17      Q.  Number 3, it sounds like he wanted you to

18  clearly explain there was no retaliation?

19      A.  Yes.

20      Q.  Number 4, he wanted a one-month cooling off

21  period once Caryn returned to the office?

22      A.  Yes.

23      Q.  Number 5, he wanted any communication between

24  them to be work related?

25      A.  Yes.

1    Q.    Number 6, he wanted no involvement during this
2  time for JP to make any decisions regarding Caryn?
3    A.    Yes.
4    Q.    Number 7, an eventual return to the status quo
5  and normal reporting process?
6    A.    Yes.
7    Q.    And number 8, he didn't have an issue with
8  Caryn staying?
9    A.    Yeah.
10   Q.    Those were specific requests would you say?
11   A.    Yeah.
12   Q.    Did you give Caryn some examples of specific
13 requests that she could make?
14   A.    No, because I was just relaying the message
15 from James Ishida.
16   Q.    Did she tell you that she was having a hard
17 time coming up with specific requests?
18   A.    Yes.  Uh-huh.
19   Q.    And what did she say?
20   A.    I don't recall exactly what she said, but she
21 was having a hard time coming up with specific things
22 that would create an environment free from harassment.
23   Q.    And as an HR professional, could you think of
24 some specific things?
25   A.    I could, sure.

1    Q.   Why didn't you propose some specific

2  possibilities?

3    A.   Because at the time, and even when I was asked

4  to provide recommendations, that was not my role in this

5  matter.  My role was to investigate.  And I wrote down

6  JP's list because I took notes on our conversation.

7    Q.   But it was your understanding that you were

8  not allowed to propose or to even tell Caryn about

9  specific possibilities?

10    A.   No, that's not what I said.  I don't -- I'm

11  not familiar with her office, I don't know how it runs,

12  so I didn't have -- you know, I wanted her to come up

13  with what she thought would help her.

14    Q.   Is Caryn an HR professional?

15    A.   No.

16    Q.   And you said as an HR professional you're

17  aware of some specific resolutions that could help --

18    A.   Sure.

19    Q.   -- in situations?

20    A.   Uh-huh.

21    Q.   Why didn't you provide them to her?

22    A.   It did not occur to me to provide them to her.

23  She didn't even ask that I recall.

24    Q.   In your experience as an HR professional, when

25  someone has experienced sexual harassment can it be hard

 1    for them to articulate -- sorry.  When someone has

 2    experienced sexual harassment, are they responsible for

 3    coming up with a solution?

 4        A.    I am not sure if they are or not.

 5        Q.    Well, in human resources there's generally

 6    policies and procedures to deal with sexual harassment.

 7    Is that right?

 8        A.    Typically, yes.

 9        Q.    Were there policies and procedures here?

10        A.    Not that I recall.

11        Q.    There were no policies and procedures to deal

12    with the harassment?

13        A.    Other than the EDR under Chapter IX.

14        Q.    Okay.  Turn to page 8, please, of your report

15    and tell me about your addendum.  Why did you write an

16    addendum?

17        A.    I was asked to do that by James Ishida.

18        Q.    And why were you asked to write an addendum?

19        A.    He wanted me to provide my recommendations and

20    more details.

21        Q.    Did he also want you to include the

22    retaliation?

23        A.    He didn't -- I don't recall him specifically

24    saying anything about that.

25        Q.    Okay.  So the details -- right at the top you

1   have this bold headline, "Allegation of Retaliation by

2   the Federal Defender for the Western District."

3       A.   Yes.

4       Q.   Have you included that claim in your first

5   report?

6       A.   I investigated both claims when I did that

7   report.

8       Q.   But did you include your findings about the

9   retaliation claim in the first report?

10      A.   I didn't present any findings.  I just

11  presented what I -- the information that I got and then

12  the summary of the informal resolution attempt.

13      Q.   And, again, just turning to page 1 and 2 on

14  this report, it says "Counselor's Report," "Chronology

15  of Counseling," on page 2 "Summary of Counseling

16  Contacts," but that was not referring to counseling

17  under Chapter X?

18      A.   No.

19      Q.   This was all under Chapter IX?

20      A.   Right.

21      Q.   Let's go back to page 8.  I want to talk with

22  you about Caryn's -- first, what did Mr. Ishida -- you

23  said he was asking you for detail.  What did he discuss

24  with you in terms of the detail he was looking for?

25      A.   He wasn't specific.  He said can you do an

```
 1   addendum that provides recommendations and more details.

 2        Q.    And did he ask you that by phone?  Email?

 3        A.    It was a phone call.

 4        Q.    And did you take notes on that phone call?

 5        A.    I don't recall if I did or not.

 6        Q.    He asked you to provide information about next

 7   steps?

 8        A.    Recommendations.

 9        Q.    Recommendations.  Did you previously

10   understand that you were not supposed to provide

11   recommendations about next steps?

12        A.    Yes.

13        Q.    So until he called you and asked you to do

14   this after you submitted the November 19th report,

15   before November 19th it was your understanding that you

16   should not include recommendations?

17        A.    That's correct.

18        Q.    You were purely fact finding?

19        A.    Yes.

20        Q.    Okay.  Is it normal for someone investigating

21   to also make recommendations?

22        A.    I don't know.

23        Q.    Did you -- other than writing this report, did

24   you take any additional steps to investigate after

25   November 19th?
```

1      A.   Not that I recall.

2      Q.   Okay.  Is there anything that could help your

3  recollection with that?

4      A.   I may have notes.  I know I met with Caryn a

5  second time, but I don't recall the date of that

6  interview.

7      Q.   Okay.  In the middle of this page it says that

8  you talked with Josh Carpenter, which I think are the

9  notes we looked at.

10     A.   Yes.

11     Q.   Why did you speak to him about office space in

12 Asheville?

13     A.   Because I wanted to confirm what Mr. Martinez

14 was saying about the lack of office space in Asheville.

15     Q.   So you were corroborating what Mr. Martinez

16 said?

17     A.   Yes.  I also was in the Asheville office of

18 the Federal Public Defender.

19     Q.   Oh, nice.  And Mr. Carpenter told you -- were

20 you concerned at all that by speaking with Mr. Carpenter

21 you were breaching any confidentiality?

22     A.   No.  I was not concerned.  I don't recall if I

23 told Caryn or not that I was going to be speaking with

24 him.

25     Q.   Did she give you permission to speak with him?

1     A.    I do not remember.

2     Q.    And when she and you discussed the

3  confidentiality in her report, did she give you

4  permission at that time to speak with Josh Carpenter?

5     A.    His name did not come up, and that's why she

6  wrote down Tony and JP.

7     Q.    You wanted to talk to Mr. Carpenter to

8  corroborate what Mr. Martinez was saying?

9     A.    Yes.

10    Q.    You told me this morning you didn't talk to

11 anyone to corroborate what Caryn said, did you?

12    A.    I did not speak to anyone on her witness list

13 is what I said this morning.

14    Q.    Did you speak to anyone else she mentioned who

15 could corroborate what she said?

16    A.    No, not that I recall.

17    Q.    Did you ever talk to Caryn -- after learning

18 from Josh about the limitations of the space, did you

19 ever ask Caryn if she would be comfortable in a

20 temporary cubicle?

21    A.    Not that I recall.

22    Q.    Caryn said that her job duties were different

23 from other people's.

24    A.    Yes.

25    Q.    Did you talk to anyone about their job duties?

1    A.    No.

2    Q.    Did you look at any job duties?

3    A.    Not that I recall.

4    Q.    Written job duties of other postings?

5    A.    No.  There was one posting that came out that

6  I recall during this investigation.

7    Q.    And who was that?

8    A.    I believe that was an Assistant Federal

9  Defender in Charlotte.

10    Q.    Wasn't there also an appellate position?

11    A.    An appellate position, yes.

12    Q.    And what do you recall about that appellate

13  position?

14    A.    What I do recall is that Caryn wanted to apply

15  for it, and she was told by one of the three that she

16  didn't need to because she already had an Assistant

17  Federal Defender position.

18    Q.    Did you investigate whether that was accurate?

19    A.    No.  She had already been reclassified to the

20  AFD.

21    Q.    And did you -- even though she had been

22  reclassified on paper; I think the words she used in her

23  complaints was a phantom promotion -- did you investigate

24  whether her job duties were the same as that new hire's?

25    A.    I did not.

1     Q.    Okay.  Was there a reason why not?

2     A.    No, not that I remember.

3     Q.    Did you ask JP or Tony if they were talking

4  about Caryn's application for the appellate position

5  with each other?

6     A.    No, I don't remember asking them.

7          MS. WARREN:  If I could have Tab 32, please.

8  So these are just -- this one is mine, sorry.  I'm a

9  little bit tired.  It's been a long day and a lot of

10  paper.  I think that this one is -- this is Exhibit 35.

11  Great.

12          (Exhibit 35 was marked for identification.)

13          MS. McMAHON:  Oh, it's 35.

14          BY MS. WARREN:

15     Q.    This is a document, Bates 6035 to 6036, which

16  I was told was in your paper file.

17     A.    Yes.

18     Q.    And I'm looking on 6036, and it's between Tony

19  and, I believe, JP; and it's on June 21st, and it's

20  talking about a bet.  So it looks like JP says, "I would

21  like you to know that I respect the sanctity of a bet:

22  Caryn asked me out of the blue if we were just

23  'inundated with applications for the AFD slot.'  She was

24  clearly fishing for whether she should apply (if she

25  hasn't already).  I was sorely tempted to subtly

1  encourage her but I pretended like I didn't see where

2  she was angling."

3          Tony replied, "I appreciate you respecting the

4  sanctity of a bet.  You could of played dirty but you

5  played it clean.  Let's see if she files."

6          And then on the next page it looks like JP

7  says, "She's right on the edge.  I said something

8  generic about transfers from other offices and her lip

9  was practically quivering.  She said 'Is that what

10  you're looking for, a transfer from another office?'  It

11  was like the thought was breaking her heart."

12          Then Tony replies, "Oh no.  I'm gonna lose

13  this bet."

14          Did you consider what this bet between them

15  was about her employment?

16      A.   I considered it was a bet about whether or not

17  she would apply for the position.

18      Q.   Did you ask either of them about this text

19  message exchange?

20      A.   I don't recall.

21      Q.   And June 21st is after May 18th.

22      A.   Uh-huh.

23      Q.   And the quid pro quo email.

24      A.   Uh-huh.  Yes.

25      Q.   Would you be concerned that someone who sent

1   that email was making bets about an employee that they

2   sent a quid pro quo email to?

3           MS. McMAHON:  Objection, form.

4           BY MS. WARREN:

5       Q.  Are you concerned that an employee was making

6   bets about another employee's application?

7       A.  I wouldn't necessarily be concerned.  I'm not

8   sure the right word to use.  I would opine that it

9   wouldn't be appropriate.

10      Q.  Okay.  And it wouldn't be appropriate to make

11  fun of her for crying?

12      A.  No, it would not be.

13      Q.  So "her lip was practically quivering,"

14  telling that to her supervisor in this context wouldn't

15  necessarily be appropriate?

16      A.  I would agree with that.

17      Q.  And this was in your file?

18      A.  Yes.

19      Q.  You remember reviewing this?

20      A.  I remember that this text message was in the

21  file after I just read it, yes.

22      Q.  And why did it stand out in your memory?

23          MS. McMAHON:  Objection, mischaracterizes

24  prior testimony.

25          BY MS. WARREN:

1    Q.   You just said when you read it you remembered

2    it.

3    A.   Yeah, because I've seen it before.

4    Q.   We've looked at some other documents today

5    that you've seen before that haven't triggered that

6    reaction.

7    A.   Yeah.

8    Q.   Was there something different about this?

9    A.   Probably because it's got big blocks with dark

10   colors and it looks a little different than an email

11   where they all look the same.

12   Q.   Okay.  On page 1251 and 1252, your report says

13   that Ms. Strickland was not denied locality pay.

14   A.   Right.

15   Q.   How did you make that conclusion?

16   A.   I asked Bill to see her SF-50.  I also

17   confirmed with -- I called somebody at the AO and asked

18   about that, and locality pay is based off of the pay

19   table that the person is put on, which is based on their

20   duty station, and that's not something we have any

21   control over at the local level.

22   Q.   And I think your report notes on page 8

23   towards the bottom, "Defender should always authorize

24   both ECI and locality for all AFDs."

25   A.   Yes.  And that is in their Defender

1    Organization Classification System Manual.

2         Q.   And did you look at any other actions in her

3    personnel file?

4         A.   No, because the action that we were talking

5    about that was brought as an issue was her

6    reclassification to the AFD.

7              MS. WARREN:  Could I have Tab 15, please?

8    This is going to be 36.  Tab 15.

9              MR. FERGUSON:  Tab 15?

10             MS. WARREN:  Yeah.  Hold on just a moment.

11   That is not what I want.  I wanted 33.  I'm sorry, Jay.

12             (Exhibit 36 was marked for identification.)

13             BY MS. WARREN:

14        Q.   Looking at this, this is a request for

15   personnel action, is that right?

16        A.   Yes.

17        Q.   Okay.  Looking at the bottom, it looks like

18   the requestor is William Moormann?

19        A.   Yes.

20        Q.   That's Bill Moormann?

21        A.   Yes.

22        Q.   That's the person who you said JP could talk

23   to?

24        A.   Yes.

25        Q.   And this is dated on August 28th of 2018?

1      A.   Correct.

2      Q.   If you'll look, it says that it was at least a

3   proposal for Caryn to be reclassified.  Is that right?

4      A.   A proposal?

5      Q.   It looks like it's a request for personnel

6   action.

7      A.   Yes.

8      Q.   From a research and writing specialist?

9      A.   Yes.

10     Q.   At a grade 14, step 2?

11     A.   Yes.

12     Q.   With a $92,349 base pay?

13     A.   Yes.

14     Q.   And then adjusted base pay with the locality

15  is up to 107,319?

16     A.   Yes.

17     Q.   This is a proposal to make her an Assistant

18  Federal Defender with a base pay of $92,349 and no

19  locality adjustment.

20          MS. McMAHON:  Objection, lack of foundation.

21          BY MS. WARREN:

22     Q.   Did you ever look at this document?

23     A.   Yes, I did.  And I looked at their pay tables

24  as well.

25     Q.   Were you concerned that this appears to be

1  removing her locality pay?

2       A.   I wasn't concerned about the removal of the

3  locality pay because, as I understand it, it's not

4  possible to do that at all; however, I wanted to

5  understand where it was.

6       Q.   Okay.  And what did you do to understand that?

7       A.   I talked to Bill about it by phone.

8       Q.   Uh-huh.  And what did Bill say?

9       A.   I don't recall exactly what he said, but I did

10 get the impression that he understood it about as well

11 as I did.

12      Q.   And you said you didn't understand it.

13      A.   Right.  So I looked at the pay tables and

14 it -- there was a reason, but I don't recall what the

15 reason was about why the locality was not on there.

16      Q.   And Bill couldn't explain that to you?

17      A.   Not that I recall to my satisfaction.

18      Q.   Okay.  How, then, were you satisfied in your

19 conclusion that her locality pay was not removed?

20      A.   Let me see.  I think I had a pay table in

21 here.

22      Q.   It's actually, I think, right at the end of

23 your report.  I can help you out.  On page 1309 I think

24 you have Exhibit 15.

25      A.   Oh, the staple came undone.  That's why I

1    don't see it.  Sorry.

2         Q.   Maybe Counsel can hand you --

3         A.   I see Exhibit 15.  Yeah.

4         Q.   And it looks like there are sort of three

5    pages to your Exhibit 15 that are all related.  I see a

6    notification of personnel action --

7         A.   Yes.

8         Q.   -- and it ends with a table.  Is that right?

9         A.   Yes.  This is where I saw it.  So the AO-52,

10   which is the request for personnel action --

11        Q.   Page 1309?

12        A.   3411.

13        Q.   Oh, sorry.  That's the one I just showed you.

14        A.   Yeah.  Uh-huh.  That is the request that is

15   put into the HR management information system before

16   it's actually processed on the back end.

17        Q.   Okay.

18        A.   All right?  The SF-50 form, which is labeled

19   Exhibit 15, page number 1309, this is the official

20   document that goes into the employee's electronic

21   official personnel file, and on it I saw there was no

22   change in pay.

23        Q.   But there's no locality adjustment, is there?

24        A.   There is no locality adjustment, and I don't

25   remember why that was.

1    Q.   So in the exhibit on page 1309, in her
2    previous job it shows the locality adjustment, and in
3    the new position there is no locality adjustment.  Is
4    that right?
5    A.   Yes.  And she also went to a different pay
6    plan, and I don't recall if that had anything to do with
7    it or not.
8    Q.   Would it have been important to understand
9    that to investigate her claim about her payment?
10   A.   Oh, I do recall investigating this a lot.  I
11   just don't remember what the ultimate answer was, if
12   locality was already included in that pay on an ungraded
13   position or not.  I just don't remember.
14   Q.   Would that have been important to include in
15   your report?
16   A.   It would have, sure, but I also did not see
17   any change in pay.
18   Q.   She also claimed that she wasn't given a raise
19   that she would have been entitled to if she had been
20   moved on the research and writing scale to the grade 15.
21   Isn't that right?
22   A.   I don't recall.  What I recall was that she
23   did not get a promotion when she became an AFD.
24   Q.   And she didn't receive any benefit in pay?
25   A.   She would have a greater long-term earning

 1  potential by moving to this ungraded position, yes, but
 2  an immediate raise in pay did not happen.
 3      Q.   You also wrote on page 9 of your report that
 4  her salary puts her in the top of the range for an AFD
 5  classified as an AD25.
 6      A.   Yes.
 7      Q.   And that was important for your -- was that
 8  important that she was at the top of the range?
 9      A.   It did seem to be important to me because it
10  didn't support any type of retaliation in regard to
11  lessening her pay.
12      Q.   Okay.  Would you look back at 1309, and in the
13  remarks she's actually placed in AD level 28, not 25.
14      A.   Yes.  I see that.
15      Q.   Okay.  So do you agree that this is correct,
16  not what your report says, that she was an AD25?
17      A.   Yes.
18      Q.   And if you look at the table for an AD28, she
19  would not be at the top of the range.  Is that correct?
20      A.   That is correct.
21      Q.   Okay.  Would that have changed your position
22  about a pay reduction or retaliation?
23      A.   I'm not sure if it would, because there is a
24  classification requirement of years of experience, years
25  of professional attorney experience.

1      Q.   And did you investigate whether she met those

2   requirements?

3      A.   No.  I was told that there was no trial

4   experience that she had coming into the AFD's office.

5      Q.   Does anything on this chart say it requires

6   trial experience --

7      A.   No.

8      Q.   -- or does it just say professional attorney

9   experience?

10     A.   Professional attorney experience.

11     Q.   And you didn't know at this time, in 2018, how

12  many years of professional attorney experience she had?

13     A.   I do not recall if I knew that or not.

14     Q.   And that would have been relevant to your

15  consideration?

16     A.   It could have been, yes.

17     Q.   On the bottom of page 1252, Mr. Carpenter said

18  that Caryn had been invited to moots previously.

19     A.   Yes.

20     Q.   "He stated Caryn is truly valuable and asked

21  good questions in the moots when she has been physically

22  able to be present."  Is that right?

23     A.   That is correct.

24     Q.   And he also said that as the fall progressed

25  and she had to participate remotely, he noticed a

1  decline in participation and that he was disappointed

2  during a December moot.  I'm on page 9 of your report.

3       A.   Thank you.

4       Q.   At the bottom paragraph.  He was disappointed

5  that she didn't participate in the December moot because

6  she was an excellent contributor when she participated

7  in the spring of 2018.  Is that what you remember?

8       A.   Yes.

9       Q.   Does Josh's characterization regarding her

10  decline in participation support -- earlier you

11  described that sometimes when high performers have a

12  decline you're concerned that something has happened.

13       A.   Sure.

14       Q.   Does this support that kind of concern?

15       A.   No, because her complaints about the moots was

16  that she was not being invited to participate in moots

17  that --

18       Q.   I'm not asking about the invitations.

19       A.   Yeah.

20       Q.   I'm just saying he says that she used to be

21  very good at moots, and in December she didn't

22  participate and he was disappointed.  In the spring she

23  was very helpful, was very good.  He observed a decline.

24  Is that something that you would be concerned about in

25  the context of this case?  Spring was before May 2018

1  and --

2       A.   Yeah, I know when spring is.

3            MS. McMAHON:  Objection, misleading.

4       A.   I didn't take it to show a decline in

5  performance.  I took it as she didn't provide any

6  feedback.

7            BY MS. WARREN:

8       Q.   Would you be concerned from an HR perspective

9  in the change in her participation?

10      A.   No, because you're comparing one and one.  I

11  mean, I didn't see a pattern.

12      Q.   Well, he said that she participated in the

13  fall and she asked good questions in the moots when

14  she's been able to be present, so he described multiple

15  times, moots, and that the telephone made it more

16  difficult to participate but she still did, and

17  eventually she stopped, so that seems like a pattern

18  rather than one and one.

19           MS. McMAHON:  Objection, misleading.

20           BY MS. WARREN:

21      Q.   Would you say that's more than one and one?

22      A.   No, I wouldn't because I didn't get the

23  impression that she stopped.  He said she just didn't

24  provide any feedback at the December moot.

25      Q.   Okay.  On page 10 Josh Carpenter said he

1   received notice about an appellate argument in November

2   and immediately sent Caryn an email asking her if she

3   would like to provide the arguments since she had stated

4   an interest in doing so when she briefed this case over

5   the summer.

6       A.   Yes.

7       Q.   Did you ask -- he said that she never

8   responded.

9       A.   Uh-huh.

10      Q.   Did you ask her if she got that email?

11      A.   I did not.

12      Q.   Did you ask him to provide that email?

13      A.   I don't think I did.

14      Q.   Let's go to -- on page 10 to 11 you describe

15  that Caryn cleaned out her personal effects in October.

16      A.   Yes.

17      Q.   You said, "During my interview with JP Davis,

18  he stated this action taken by Caryn seemed to be

19  presumptuous on her part as it seemed she did not expect

20  to be returning to the Charlotte office at all."

21      A.   Yes.  That's correct.

22      Q.   Did you ask Caryn why she removed her things?

23      A.   I do not recall if I asked her or not.

24      Q.   Would that be relevant to considering its

25  significance?

1      A.   It would be.

2      Q.   On page 11 you recommend training for

3  Mr. Martinez, and you note, "It is evident this claim

4  was mishandled from the beginning by Mr. Martinez."  Did

5  Mr. Martinez tell you he had no training on sexual

6  harassment?

7      A.   He did not.  I don't remember if he did or

8  not.

9      Q.   Okay.  Give me just a moment to find this.

10  Okay.  Would you please look at Exhibit 33?  It's

11  handwritten notes.

12      A.   Okay.

13      Q.   And at the bottom of page 5950, did

14  Mr. Martinez tell you he had no training on EDR?

15      A.   Yes.

16      Q.   And no training on sexual harassment?

17      A.   Yes.

18      Q.   How many employees were in Mr. Martinez's

19  office?

20      A.   I have no idea.

21      Q.   And he was the unit executive --

22      A.   Yes.

23      Q.   -- of that office?  So you don't know how many

24  people were under his leadership?

25      A.   No, I do not.

1       Q.    And this was in 2018.

2       A.    Yes.

3       Q.    He had received no training.  Do you know if

4    after the allegations about Judge Kozinski came out in

5    2017, did the judiciary express any commitment to the

6    issue of sexual harassment?

7            MS. McMAHON:  Objection, lack of personal

8    knowledge.

9            MS. WARREN:  I asked did she know.

10      A.    I did not know anything about Judge Kozinski.

11           BY MS. WARREN:

12      Q.    Did you know about any of the news stories

13    regarding the allegations against Judge Kozinski?

14      A.    No.

15      Q.    And you didn't get any emails from the

16    judiciary about concerns regarding sexual harassment?

17      A.    Not that I recall.

18      Q.    Okay.  Going back to your statement that the

19    claim was mishandled --

20      A.    Yes.

21      Q.    -- what did you mean?

22      A.    What did I mean?  Well, for example, one thing

23    that stands out at the moment is when Caryn requested to

24    be removed from the chain of command of JP and then Tony

25    sent out the org chart still showing her under JP, which

1    caused Caryn a lot of feelings and emotions about that,

2    he admitted that was his mistake.  I believe it was a

3    mistake.  I don't think he intended to go back on his

4    word to Caryn that she was being removed from his --

5    from JP's chain of command, and those sick days that she

6    took were also given back to her.

7         Q.   How else do you think Mr. Martinez mishandled

8    this?

9         A.   I believe in some of the wording that he used

10   in conversations with Caryn.  I believe also having her

11   and JP in the same room together to have a meeting when

12   she clearly stated she was uncomfortable.

13        Q.   What was some of the wording?

14        A.   Well, specifically when he compared the

15   working relationship between her and JP kind of like a

16   marriage where it needs compromise, and I wasn't in that

17   meeting so I can't guess or even say what he meant by

18   that, but when there's already an issue, I don't think

19   using marriage as an example is a very good idea.

20        Q.   And I see you're smiling a little bit.  Is

21   that because you were very concerned by the use of

22   marriage given the context you just explained?

23        A.   I wasn't concerned.  I just thought it was

24   extremely inappropriate.

25        Q.   He also, I think, said at least she was not

1    touched.

2         A.   Also shows that there's not a clear

3    understanding on Mr. Martinez's part of what sexual

4    harassment can be.

5         Q.   And just for the record, you sort of inhaled

6    and rolled your eyes a little.  Is that just because you

7    were concerned as an HR professional by a statement like

8    that?

9         A.   Once again, not concerned.  I had higher

10   expectations of someone in a position such as that.

11        Q.   Okay.  And that's because sexual harassment

12   does not just include touching?

13        A.   That is true.

14        Q.   You also noted that Mr. Martinez called her

15   out on contacting the AO to receive guidance on her

16   civil rights as a federal employee.

17        A.   Yes.

18        Q.   Why were you concerned about him doing that?

19        A.   Once again, I was not concerned but I wanted

20   to point out certain instances in which I believe that

21   Tony did not really follow or understand the policies

22   and procedures that are in place because, as I explained

23   to Caryn, she did nothing wrong by contacting the AO.

24   If she felt that was the safest place for her to go to

25   get counseling, advice, informal conversations, that is

1    fine.

2         Q.   So her contacting the AO was not

3    inappropriate?

4         A.   I did not believe it was.

5              MS. WARREN:  Okay.  I think I'll take just a

6    couple more minutes on something and then we'll take a

7    break.

8              THE WITNESS:  Sure.

9              MS. WARREN:  And I'm hoping that after the

10   break I'll be close to wrapping up.  I might have

11   another half hour or so, but just letting you know.  And

12   I do think we have to be out by 5:30.

13             MS. McMAHON:  Understood.  That's good for our

14   travel plans.

15             MS. WARREN:  Excellent.

16             BY MS. WARREN:

17        Q.   Okay.  So what I hear and I see in your report

18   in pretty strong language are concerns about Tony's

19   handling of this.

20        A.   Yes.

21        Q.   And also you have some strong language about

22   his understanding of what the issue was.

23        A.   Yes.

24        Q.   And I just want to turn to the last page, 14.

25   For suggested actions you have, "Mr. Martinez MUST," in

 1    all caps, "also be counseled and trained on how to

 2    handle workplace conduct complaints.  He should also be

 3    counseled or training on judgment and decisiveness.

 4    From my interview with him and these decisions he made

 5    he had commented most of these were made at the end of a

 6    day where he attended meetings all day and was tired."

 7        A.   Yes.

 8        Q.   After Mr. Ishida received this report --

 9             MS. WARREN:  Jay, could I have 51, please?

10             MR. FERGUSON:  Which number?

11             MS. WARREN:  Actually, hold on just a second.

12    Let me see if I have it here.  Yes, I do.  Sorry.

13             This was marked as Exhibit 2 yesterday, and

14    this is -- sorry, no, this was Exhibit 7 yesterday, and

15    it is at Bates 1382 to 83.  I'm going to hand that.

16    I've got copies for both of you but -- and again my

17    printer did not capture the Bates, but I believe if

18    Counsel looks you will recognize it from yesterday.

19             MS. McMAHON:  Are we going to remark it today?

20             MS. WARREN:  I don't see a need to.  I think

21    it's fine to refer to it as Exhibit 7 unless you have

22    any objection.

23             MS. McMAHON:  No objection.

24             BY MS. WARREN:

25        Q.   Okay.  So looking at this, this is on

1    January 13th.  I think you sent the report on

2    January 11th, and James thanks you for your excellent

3    investigation report, and then he says that he has a

4    question about Caryn's disqualification request

5    regarding Tony.  He says, "Given your recommendation

6    that Tony be counseled and trained on handling workplace

7    conduct complaints and decision making, I'd like your

8    thoughts on whether you think Tony should be

9    disqualified from participating."

10           And you wrote back and said -- this is

11   January 13th of 2019 -- "Hey James, I truly believe Tony

12   is biased in this case involving JP and Caryn as far as

13   the sexual harassment is concerned.  From my

14   conversations with him I know he feels Caryn is

15   attempting to exploit this situation to get the transfer

16   to Asheville, however it has created a bias in him to

17   look at this case from a neutral perspective.  I also

18   believe he lacks the experience and understanding of

19   exactly how this process works.  I am concerned he could

20   cause more damage if he were involved in the process at

21   this point."

22           Does that reflect how you felt about his bias?

23   A.    Yes.  Yes.

24   Q.    And you noted that Tony feels like Caryn is

25   attempting to exploit this situation to get the transfer

1   to Asheville.  Did you ask him why he felt that way

2   given that he said -- he told you she had never asked

3   him for the transfer?

4           MS. McMAHON:  Objection, misstating prior

5   testimony.

6           BY MS. WARREN:

7       Q.   Did Tony ever tell you that Caryn asked him

8   directly for a transfer to Asheville?

9       A.   Not that I recall.

10      Q.   And not that your notes reflected.  Is that

11  right?

12      A.   That is correct.

13      Q.   And we looked at your notes from Josh

14  Carpenter, and they also reflect that Josh might have

15  brought up Asheville once, but it didn't say that Caryn

16  had brought it up to Josh.

17      A.   That's correct.

18      Q.   Okay.  So JP told Tony, as reflected in your

19  notes with your conversation with Tony, that Caryn was

20  trying to get a transfer to Asheville.

21      A.   Yes.

22      Q.   And based on who you talked to, Caryn only

23  tried to do that -- Caryn only told JP that she wanted

24  the transfer to Asheville?

25      A.   At the time, yes.  She did eventually talk to

1    Tony about the transfer to Asheville.

2         Q.   After this process --

3         A.   Yes.

4         Q.   -- had begun?

5         A.   As part of the remedies that she would like,

6    yeah.

7         Q.   And JP could not have given Caryn a transfer

8    to Asheville?

9         A.   No.  That would have been the court unit

10   executive's decision.

11        Q.   So only Tony could have allowed that?

12        A.   Correct.

13        Q.   You said in this email, "Caryn had requested

14   Tony be disqualified as she felt she was retaliated

15   against after she submitted her claim of Wrongful

16   Conduct.  Although retaliation in my investigation was

17   unfounded, I still think in a good faith effort to

18   resolve this the circuit should consider disqualifying

19   him based on the contentious nature of the current

20   situation.  I would strongly recommend mediation at this

21   point with perhaps one of the individuals we discussed

22   the other day."

23             Now, who did you discuss mediation with?

24        A.   I believe we talked about mediators that could

25   come in, and I believe there were two, but it was a

```
 1   mention of names and I don't recall what names they
 2   were.  There was no substantive conversation about it.
 3   That's all I can really remember about it.
 4         Q.   Okay.  And did you come up with the names of
 5   mediators?
 6         A.   No.
 7         Q.   And this conversation was with James Ishida?
 8         A.   Yes.
 9         Q.   Was anyone else in the conversation?
10         A.   Not that I was aware of at that time.
11         Q.   So James proposed names?
12         A.   I think so, and we were just discussing it,
13   but I don't recall being familiar with any of the names.
14   I can't even remember what names he had brought up.
15         Q.   And is it your understanding -- Chapter X
16   we've talked about allows for counseling.  Is that
17   right?
18         A.   Yes.
19         Q.   Does it also allow for mediation?
20         A.   Yes, it does.
21         Q.   And does mediation come after counseling?
22         A.   Yes.
23         Q.   But you have not done any counseling?
24         A.   No.
25         Q.   At the top of this you talk with -- James says
```

1    that he has a meeting with Chief Judge Gregory the next
2    day, can we talk on the phone.  Did you talk on the
3    phone with James?
4         A.    I do not recall if we did or not.
5         Q.    Okay.  Did you take notes with your calls with
6    James?
7         A.    No.
8              MS. WARREN:  I think we will take a break
9    because I know we've been going for quite some time.
10   It's 3:26.  Should we do 15 minutes, come back at 3:40,
11   and I hope to wrap up in a reasonable amount of time.  I
12   know it's been a long day.
13             (Recess from 3:26 p.m. to 3:42 p.m.)
14             BY MS. WARREN:
15        Q.    I am getting close to the end of my questions
16   about your report, but looking at page 14 which we were
17   on, in your second paragraph you talk about some of the
18   ways that Mr. Martinez mishandled Caryn's complaint,
19   trying to mediate between them after she said she was
20   uncomfortable, and you said, "however the initial
21   handling of this incident also elevated the severity of
22   Caryn's feelings about this allegation of sexual
23   harassment and retaliation."  What did you mean by that?
24        A.    I believe she did not think that Mr. Martinez
25   was taking her seriously.  It was handled poorly, which

 1    made those feelings about her situation even worse.

 2        Q.   Do you think that some of the ways that

 3    Mr. Martinez mishandled it could have made her feel

 4    retaliated against?  Like, for example, I'll ask, like

 5    scolding her for reaching out to the AO's office?

 6        A.   Yes.  That would be a good example.

 7        Q.   What about telling her not to take notes at a

 8    meeting?

 9        A.   I wouldn't view that as retaliation so much as

10    bad form.  Like if you want to take notes, take notes.

11    I mean, I want to take notes.  I don't have a very good

12    memory, as you can tell.  I have a lot going on in my

13    life.  So yeah.

14        Q.   It's also been five years.

15        A.   Yes, it has.

16        Q.   And all of our memories have limits.  Looking

17    at this, you said, "JP Davis MUST be counseled and

18    trained," again all caps for must, "on workplace conduct

19    issues and professional communications via email.  I

20    have seen copies of other emails where he has used

21    profanity and this is simply unprofessional in a court

22    environment.  I must clarify the profanity was not at

23    anyone as it was simply used in a sentence."

24        A.   Yes.

25        Q.   What kinds of profanity do you remember?

```
 1            CERTIFICATE OF NOTARY PUBLIC & REPORTER

 2

 3   STATE OF NORTH CAROLINA      )

 4   COUNTY OF UNION              )

 5

 6          I, Dayna H. Lowe, the officer before whom the

 7   foregoing deposition was taken, do hereby certify that the

 8   HEATHER BEAM was duly sworn by me; that the testimony of

 9   said witness was taken in stenotype and thereafter reduced

10   to typewriting by me or under my direction; that said

11   deposition is a true record of the testimony given by said

12   witness; that I am neither counsel for, related to, nor

13   employed by any of the parties to the action in which this

14   deposition was taken; and, further, that I am not a

15   relative or employee of any attorney or counsel employed

16   by the parties thereto, nor financially or otherwise

17   interested in the outcome of the action.

18          This the 20th day of April, 2023.

19

20                          _____

21                          DAYNA H. LOWE

22                          Notary Public #19971830009

23

24

25
```

```
 1              E R R A T A   S H E E T          (1 of 3)

 2

 3    DEPOSITION OF:  HEATHER BEAM, 4/14/23

 4    Re: Strickland v. United States, et al., 1:20-cv-00066-WGY

 5

 6    Please read the foregoing transcript with care, and if you
      find any corrections or changes you wish to be made, list
 7    them by page and line number below.

 8    PLEASE DO NOT WRITE IN THE TRANSCRIPT ITSELF!

 9    You may return these ORIGINAL errata sheet pages within
      the 30-day REQUIRED timeframe to:
10
                       Reed & Associates
11                   2401 Whirlaway Court
                  Matthews, North Carolina 28105
12         (980) 339-3575   VReed@carolina.rr.com

13    To assist in making any such corrections, please use the
      forms provided below.  If additional pages are necessary,
14    please furnish same and attach hereto.

15    Page _____ Line _____ Change _____

16    _____

17    Reason for change _____

18

19    Page _____ Line _____ Change _____

20    _____

21    Reason for change _____

22    Page _____ Line _____ Change _____

23    _____

24    Reason for change _____

25
```

```
1           E R R A T A   S H E E T        (2 of 3)
2
3   Page _____ Line _____ Change _____
4   _____
5   Reason for change _____
6
7   Page _____ Line _____ Change _____
8
9   Reason for change _____
10  Page _____ Line _____ Change _____
11
12  Reason for change _____
13
14  Page _____ Line _____ Change _____
15
16  Reason for change _____
17  Page _____ Line _____ Change _____
18
19  Reason for change _____
20
21  Page _____ Line _____ Change _____
22
23  Reason for change _____
24                    Thank You!
25
```

```
1                    WITNESS CERTIFICATE              (3 of 3)

2

3          I, HEATHER BEAM, do hereby certify that I have read

4     and understand the foregoing transcript and believe it to

5     be a true, accurate, and complete transcript of my

6     testimony, subject to the attached list of changes, if

7     any.

8

9

10                              _Heather Beam_____

11                              HEATHER BEAM

12

13

14

15     *  This deposition was signed in my presence by HEATHER

16     BEAM on (day) _Friday_____, this (date) 26TH day of

17     (month) _May_____, 2023.

18

19                              _Karen A. Burton_____

20                              Notary Public

21

22     My Commission Expires:  June 12, 2028
```

KAREN A BURTON
NOTARY PUBLIC
Mecklenburg County
North Carolina
My Commission Expires June 12, 2028

```
23

24

25
```