# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### CASE NUMBER 1:20CV66

| | |
|---|---|
| CARYN DEVINS STRICKLAND, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES OF AMERICA, et al., | ) |
| | ) |
| Defendants. | ) |

## JOINT PRETRIAL FILING

Pursuant to the Court's instructions, the parties have jointly prepared and now file the following pretrial information.

(1) A concise summary of the evidence that will be offered by the Plaintiff, Defendants and other parties with respect to both liability and damages (including special damages, if any).

**Plaintiff intends to offer evidence concerning:** Plaintiff incorporates her prior summary judgment filings as a summary of the evidence and the issues of law and fact for purposes of this pre-trial memorandum and provides the following concise summary. *See* ECF Nos. 248, 250, 255; *see also Victim Rights Law Center et al. v. Devos*, No. 1:20-cv-11104-WGY (D. Mass), ECF Nos. 142 (ordering that "preliminary injunction briefs are deemed incorporated by reference into the parties' pre-trial briefing"). Plaintiff, a former assistant federal public defender, alleges that defendants subjected her to workplace sex discrimination, including deliberate indifference to her complaint of sexual harassment, in violation of her equal protection rights, and subjected her to a fundamentally unfair Employment Dispute Resolution ("EDR") process for resolving her

1

complaint of sexual harassment, sex discrimination, and retaliation, in violation of her due process rights. The Fourth Circuit previously held that Plaintiff's allegations were sufficient to state equal protection and due process claims against the official capacity defendants. *Strickland v. United States*, 32 F.4th 311, 319 (4th Cir. 2022). These allegations, and worse, are borne out by the evidence in this case.

Plaintiff's equal protection and due process claims are supported by Defendants' judicial admissions in response to her Complaint; the administrative record from Plaintiff's EDR proceeding, which resulted in disciplinary action based on wrongful conduct—defined under the EDR Plan as "[d]iscrimination against employees based on . . . sex," including "sexual harassment," and "retaliation for engaging in any protected activity," EDR Plan Ch. II, § 1; *id.* Ch. IX—against both the Federal Public Defender and the First Assistant; and the documentary evidence and deposition testimony provided by Defendants during discovery. Based on Defendants' own findings of wrongful conduct during the EDR proceeding, the record is undisputed that Plaintiff was subjected to unlawful sexual harassment as well as related sex discrimination and retaliation. In addition, the EDR administrative record and Defendants' judicial admissions demonstrate that Defendants failed to take appropriate action on Plaintiff's complaints, and instead downplayed the harassment and failed to stop it. *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 703 (4th Cir. 2018) (allegations that official "downplay[ed] the harassment and threats" and "made no effort to stop them" are "sufficient to state the intent element of the equal protection claim"). Defendants failed to conduct a prompt, fair, and thorough investigation. Defendants allowed the accused parties to influence the investigation and, ultimately, for the Defender to be a final decisionmaker as to discipline and remedies— despite the investigation's findings that he engaged in conduct warranting disciplinary action,

was "biased" against Plaintiff, and "could do more damage to the process at this point." As a result of these actions, the EDR process was discriminatory and fundamentally unfair.

The undisputed record also shows that Plaintiff was coerced to end the EDR investigation because Defendants purposefully held her wrongful conduct proceeding "in abeyance" and delayed taking disciplinary action, thus forcing Plaintiff to resign in order to avoid accountability for the individuals responsible for wrongful conduct. Indeed, the EDR record shows that Defendants did not even begin the process of considering whether to take disciplinary action until weeks after Plaintiff forcibly resigned, and they did not take disciplinary action until nearly a year after she first raised her complaints. Given the ongoing hostile working environment and adverse actions Plaintiff suffered, including being placed on telework for more than seven months with no meaningful action on her complaints—an ostracizing and career-ending adverse employment action in itself—together with Defendants' failure to act on her complaints, and their attempts to coerce her to end the investigation, including by telling her that no hearing officer would "micromanage" the Defender or tell him how to do his job, Plaintiff reasonably concluded that "the more suitable alternative was to drop her complaint and accept the Fourth Circuit clerkship." *Strickland*, 32 F.4th at 356. Based on these facts, Plaintiff has proven her equal protection and due process claims based on the showing required by the Fourth Circuit.

With respect to the remedy, the record is replete with evidence that Plaintiff viewed her position at the Federal Public Defender office as her dream job and intended to stay there for the remainder of her career. This conclusion is confirmed by the fact that Plaintiff is continuing to pursue indigent criminal defense five years after the events alleged in the Complaint and ten years after her law school graduation. Plaintiff has pursued her "next best employment" in indigent criminal defense, but there is no other position that would offer compensation

3

comparable to what she received at the FDO. *Avitia v. Metro. Club of Chicago, Inc.*, 49 F.3d 1219, 1231 (7th Cir. 1995). Plaintiff's lost earnings expert, Dr. Gary Albrecht, calculated the lifetime economic impact of her discontinued employment with the FDO based on the value of her lost wages and benefits, and his report is included with her summary judgment filings. *See* ECF No. 248-18 (Ex. R). Pursuant to Fed. R. Civ. P. 26(e), Plaintiff timely disclosed a corrected report from Dr. Albrecht and further disclosures following his deposition, and has included his corrected report in her list of trial exhibits.

Dr. Albrecht concluded that based on the lifetime economic impact of her discontinued employment with the FDO, the "amount required to make Ms. Strickland whole is $3,386,161." The substantial loss of wages and benefits is confirmed by Defendants' own evidence. Defendants' front pay expert, Dr. Paul F. White, concluded that even if Plaintiff were to obtain a private sector position by January 1, 2024 earning the salary she would have received at the FDO, she would still suffer $375,004 in lost earnings based on the loss of her federal pension alone. *See* ECF No. 250, Ex. T. In other words, Plaintiff has suffered hundreds of thousands of dollars in lost pension benefits before her lost wages are even considered. *See id.* Of course, it is exceedingly unlikely that Plaintiff will obtain another position in indigent criminal defense making the salary she would have earned at the FDO. Recognizing this possibility, Defendants' expert evaluates another scenario where it takes Plaintiff six years to fully mitigate her lost earnings, resulting in lost earnings of $692,881. *See id.* This scenario, which still underestimates her lost earnings, confirms her ongoing losses.

**Defendants intend to offer evidence concerning:** Plaintiff's knowledge that a judge would conduct any EDR hearing on her claim and would be the final decisionmaker; Defendants' application of the EDR process in response to Plaintiff's claim; Defendants' appropriate, diligent,

and timely response to Plaintiff's allegation of sexual harassment; the lack of unwelcome advances; the lack of quid pro quo sexual harassment; the lack of a hostile work environment; the lack of Defendants' conduct taken on the basis of Plaintiff's sex; the lack of an intent to discriminate or retaliate; and front pay damages.[1]

(2) A statement of facts established by the pleadings, by admissions or by stipulations. Counsel shall stipulate all facts not in genuine dispute.

**Plaintiff's position**: This Court granted partial summary judgment in favor of Plaintiff with respect to all judicial admissions provided by Defendants in this case. Accordingly, Defendants' admissions in their discovery responses and a statement of uncontested facts, based on Defendants' admissions in their First Amended Answer and the documents incorporated by reference or otherwise integral to the First Amended Answer, is provided below.

As requested by Defendants, Plaintiff provided a statement of uncontested facts based on the judicial admissions in their Answer on July 19, 2023. Plaintiff also provided her statement of exhibits, witness list, deposition designations, and trial duration proposal on that same date, so that Defendants would have adequate time to review her proposals prior to the parties' filing of the joint pretrial order. In response, Defendants stated that they would not "review the answer to identify the facts to which [they] are willing to stipulate at trial" unless Plaintiff "would agree to drop [her] objection to calling live witnesses at trial." Thereafter, Defendants did not provide a statement of facts, either disputed or undisputed, or any other elements of the pretrial order for Plaintiff's review until mid-day on July 24, 2023. Because undersigned counsel will be traveling

---

[1] Defendants understand that the damages portion of the case may occur during a separate phase of trial.

to Sacramento, California on July 25–26, 2023 for an in-person expert deposition scheduled by Defendants, it is unlikely that counsel will be able to adequately review any statement of facts or other elements of the pretrial order provided by Defendants, obtain feedback from Plaintiff, and incorporate any proposed changes or objections prior to the filing of this joint pretrial memorandum and the final pre-trial conference scheduled for July 27, 2023. While it appears on first review that Plaintiff may be able to stipulate to some facts stated by Defendants, she has not had adequate time to review their proposal. Thus, Plaintiff will attempt to stipulate to additional facts prior to trial, after a reasonable opportunity for review.

For purposes of this memorandum, instead of relying on a list of over 100 paragraphs of purportedly "undisputed" facts drafted by Defendants, many of which are in fact highly disputed, mischaracterize the nature of Plaintiff's claims, or omit material facts, Plaintiff believes it is more appropriate and reliable to rely on Defendants' actual stipulations made in discovery and their judicial admissions in their First Amended Answer, to which they were required to certify that their contentions had evidentiary support after a reasonable inquiry. *See* Fed. R. Civ. P. 11(b). Under these circumstances, Plaintiff does not stipulate to any facts Defendants may set forth, or any other elements of this pretrial memorandum, and reserves her right to object and to file motions in limine, motions to strike, or any other appropriate motion. Plaintiff's list of judicial admissions, together with citations to the record or US bates numbers for documents incorporated by reference, is provided below.

A. **Defendants' Responses to Requests for Admission: ECF No. 248, Ex. C.**

RFA No. 1: Defendants admit that Davis served as the FDO's "principal deputy" and that he had some supervisory responsibilities over the trial units in the FDO. Defendants admit that the First Assistant may assist in the management of all phases of the FDO and take actions that

affect the basic content and character of the FDO's administrative and legal operations. Defendants admit that, from August 2017 until December 2017 and from July 2018 to August 2018, J.P. Davis served in a supervisory role over Plaintiff.

RFA No. 6: Defendants admit that the Mediator stated that "I don't think a judge is going to micromanage this office and tell a federal defender how to do his job and run this office."

RFA No. 13: Defendants admit that Plaintiff's request for disqualification of the Federal Defender was denied.

RFA No. 14: Defendants admit that the Federal Defender sent the EDR Investigator an email on August 14, 2018 saying, "I have just been advised by Circuit Executive James Ishida that you are willing and able to assist us in investigating allegations of misconduct by an employee in my office. Pursuant to our office's EDR plan I am appointing you as my designee to conduct the investigation into the allegations."

RFA No. 20: Defendants admit that the EDR Coordinator delivered the Federal Defender a letter of counseling dated May 28, 2019, signed by Chief Judge Gregory, based on facts uncovered during the investigation.

RFA No. 21: Defendants admit that the Federal Defender counseled the First Assistant on May 8, 2019 based on facts uncovered during the investigation.

RFA No. 22: Defendants admit that Plaintiff would have been eligible for a grade-level promotion to FD-15 on or about August 21, 2018 and that all grade-level promotions are awarded at the discretion of the Federal Defender.

## B.    Defendants' First Amended Answer, ECF No. 210.

1.      Defendants admit that Plaintiff contacted the Administrative Office of the U.S.

7

Courts ("AO") and that she filed a request for counseling and a report of wrongful conduct. Answer ¶ 5; ECF No. 248-2 (Ex. A), at 1–8.

2.      Plaintiff is a female attorney who was formerly employed as an assistant federal public defender in the federal judiciary. Answer ¶ 15.

3.      Defendants admit that Plaintiff's resume indicates that she graduated summa cum laude and Phi Beta Kappa from the University of Vermont. Answer ¶ 16; ECF No. 248-5 (Ex. D), at 68–69.

4.      Defendants admit that Plaintiff's resume indicates that she graduated from Duke University Law School where she served on the law review and was elected to Order of the Coif. Answer ¶ 17; ECF No. 248-5 (Ex. D), at 68–69.

5.      Defendants admit that Plaintiff's resume indicates that she clerked for Chief Justice Paul Reiber of the Vermont Supreme Court. Answer ¶ 18; ECF No. 248-5 (Ex. D), at 68–69.

6.      Defendants admit that Plaintiff's resume indicates that she clerked for Judge James P. Jones of the U.S. District Court for the Western District of Virginia. Answer ¶ 19; ECF No. 248-5 (Ex. D), at 68–69.

7.      Defendants admit that Plaintiff's resume indicates that she clerked for Judge Peter W. Hall of the U.S. Court of Appeals for the Second Circuit. Answer ¶ 20; ECF No. 248-5 (Ex. D), at 68–69.

8.      Plaintiff was then selected for a prestigious fellowship in the judiciary. In this role, Plaintiff worked on a number of projects to support the federal courts and the Judicial Conference of the United States. She wrote a law review article on a topic of interest to the federal courts, and presented her research at Judicial Conference committee meetings. Answer

¶ 21.

9.       Defendant Judicial Conference of the United States ("Judicial Conference") is the principal policy-making body of the federal judiciary and promulgates the Model EDR Plan and related policy statements and mandates its adoption and implementation within the federal judiciary.  The Judicial Conference derives the authority to promulgate and mandate the adoption of the Model EDR Plan from 28 U.S.C. § 331.  Answer ¶ 24.

10.      Defendants admit that the Honorable Roslynn R. Mauskopf served as the Chair of the Judicial Conference Committee on Judicial Resources at the time the Complaint was filed. Defendants further admit that the Judicial Conference Committee on Judicial Resources is responsible for making judicial policy on issues of human resource administration in the judiciary.  Defendants admit that Plaintiff's Complaint purports to sue the Honorable Roslynn R. Mauskopf in her official capacity.  Answer ¶ 25.

11.      Defendant Administrative Office of the U.S. Courts ("AO") provides statutorily authorized administrative support to federal courts under the supervision and direction of the Judicial Conference, including support to circuit courts, judicial councils, and federal defender organizations.  Answer ¶ 26.

12.      Defendants admit that James C. Duff served as the Director of the AO at the time the Complaint was filed.  Defendants admit that Plaintiff's Complaint purports to sue James C. Duff in his official capacity.  Answer ¶ 27.

13.      Defendant United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") has the sole legal authority to appoint and remove Federal Public Defenders serving within the Fourth Circuit under 18 U.S.C. § 3006A(g)(2)(A).  Answer ¶ 30.

14.      Defendant Fourth Circuit Judicial Council ("Judicial Council") oversees the

administration of federal courts in the Fourth Circuit and adopted the EDR Plan used to process Plaintiff's complaints of sexual harassment, retaliation, and gender discrimination. The Judicial Council derives its authority to implement the Fourth Circuit EDR Plan from 28 U.S.C. § 332(d)(1). Answer ¶ 31.

15.     Defendant Roger L. Gregory ("Chief Judge") is the Chief Judge of the Fourth Circuit and Chair of the Judicial Council, and was responsible for various duties under the EDR Plan used to process Plaintiff's complaints of sexual harassment, retaliation, and gender discrimination. Defendants admit that Plaintiff's Complaint purports to sue the Chief Judge in his individual and official capacities. Answer ¶ 32.

16.     Defendant James N. Ishida ("Circuit Executive" or "EDR Coordinator") is the Circuit Executive for the Fourth Circuit. During the events alleged in this Complaint, he was the EDR Coordinator under the Fourth Circuit EDR Plan. Defendants admit that Plaintiff's Complaint purports to sue Mr. Ishida in his individual and official capacities. Answer ¶ 33.

17.     During her judiciary fellowship year, Plaintiff was offered a position at the FDO. Answer ¶ 38.

18.     Defendants admit that Plaintiff accepted a job offer with the Federal Defender's Office for the Western District of North Carolina. Answer ¶ 42.

19.     Defendants admit that Plaintiff's offer letter offered a position as a "Research and Writing Specialist Attorney with the expectation that you will transition to an Assistant Defender Position." Answer ¶ 44; ECF No. 248-5 (Ex. D), at 24.

20.     Defendants admit the First Assistant remained in his position during the relevant time period. Answer ¶ 51.

21.     Defendants admit that for part of the time that Plaintiff worked at the FDO, the First Assistant had some supervisory responsibilities over the trial units in the FDO.  Answer ¶ 52.

22.     Defendants admit that the FDO's management team was predominantly male at the time of relevant events in this case.  Answer ¶ 60.

23.     Defendants admit that the First Assistant created a document titled "New Attorney Shadowing Checklist" to be used to train Plaintiff, that the document listed nicknames, that the First Assistant and Plaintiff attended four mentoring lunches together, and that the First Assistant, as Plaintiff's mentor, paid for the lunches.  Answer ¶ 63.

24.     Defendants admit that Plaintiff sent an email to the Defender, copying the First Assistant, on December 5, 2017, asking to "meet sometime soon to discuss what the transition to an AFPD position will look like."  Complaint ¶ 64.  Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents.  Answer ¶ 64.

25.     Defendants admit that Plaintiff lived near the First Assistant and that, on multiple occasions, the First Assistant gave Plaintiff a ride home when she was unable to ride her bike in inclement weather or for other reasons.  Answer ¶ 69.

26.     Defendants further admit that Plaintiff recommended a music store to the First Assistant during a discussion about guitars, and that the First Assistant purchased a guitar from that store.  Answer ¶ 71.

27.     Admitted that Plaintiff and the First Assistant had their fourth and final mentoring lunch on May 18, 2018.  Answer ¶ 76.

28.     Later that afternoon, the First Assistant sent Plaintiff an email:

11



**Mas Dinero**
**JP Davis** to: Caryn Devins                                    05/18/2018 03:56 PM

Dude, you're shooting high with a G15. Not least of all since you'll need 5 more years of fed service to qualify for it. But fret not, I have a plan... just remember I deal in pay-for-stay :)

J.P. Davis
First Assistant Federal Defender
Federal Public Defender
Western District of North Carolina

Answer ¶ 82.

29.     In May 2018, Plaintiff volunteered, and was then assigned by the Defender, to serve as second chair on the trial case.  Answer ¶ 89.

30.     Defendants admit that, on June 5, 2018, Plaintiff emailed the First Assistant to cancel a shadowing activity.  Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents.  Answer ¶ 90; ECF No. 248-5 (Ex. D), at 36.

31.     Defendants admit that the First Assistant's response stated, "That's really not okay with me," that Plaintiff asked if the response was "sarcasm or for real," and that the First Assistant responded it was "real."  Answer ¶ 90; ECF No. 248-5 (Ex. D), at 37.

32.     Defendants admit that the First Assistant sent an email to Plaintiff at 6:03 am on June 6, 2018, regarding Plaintiff's claim to have an offer letter stating that she would transition to an Assistant Federal Public Defender position within "a few months" of starting at the FDO. Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents.  Defendants admit that Plaintiff responded at 10:25 a.m.  Answer ¶ 93.

33.     Defendants admit that Plaintiff and the First Assistant met on the morning of June 6, 2018 during business hours in the First Assistant's office.  Answer ¶ 94.

12

34.     Defendants admit that Plaintiff sent an email to the First Assistant on June 6, 2018, stating, among other things, that "the FBI meeting time is set and I cannot change it at this point" and that Plaintiff "will not be able to attend the PSI meeting tomorrow."  Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents. Answer ¶ 98; ECF No. 248-5 (Ex. D), at 41.

35.     Defendants admit that, on June 6, 2018, the First Assistant sent an email responding to Plaintiff, copying the Defender and Peter Adolf, directing Plaintiff to attend the presentence interview and stating in part, "If you choose to disobey a direct order, that is an action that I as a supervisor cannot ignore."  Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents.  Answer ¶ 98; ECF No. 248-5 (Ex. D), at 41.

36.     Defendants admit that Plaintiff attended the presentence interview on June 7, 2018.  Answer ¶ 99.

37.     Defendants admit that the First Assistant told Plaintiff that his understanding was that she was seeking to serve as second chair on the trial so Plaintiff could demonstrate her importance to the FDO.  Answer ¶ 101.

38.     Defendants admit that the First Assistant noted the inconsistency between the statements in Plaintiff's emails.  Answer ¶ 103.

39.     Defendants admit that in the late Spring of 2018, the Defender removed Plaintiff from the second chair trial role and reassured Plaintiff that the decision had nothing to do with her personally or her job performance.  Answer ¶ 109.

40.     Defendants admit that Plaintiff sent an email to the First Assistant on June 11, 2018, asking if there was an "issue" in a certain criminal case, and the First Assistant responded

13

explaining why there was no ethical issue. Defendants respectfully refer the Court to the emails for a complete and accurate statement of their contents. Answer ¶ 110.

41. Defendants admit that, on June 21, 2018, Plaintiff requested to meet the First Assistant at approximately 5:00 p.m. and that meeting continued until after business hours, in large part due to Plaintiff seeking the First Assistant's advice about a case on which she was working. Defendants admit that at the end of the meeting, the First Assistant noted that a storm was blowing in and offered to give Plaintiff a ride so she would not have to bike home in the rain. Defendants admit that Plaintiff stated she did not think it would actually rain and joked that if she was wrong, it would be okay, because she was "tough." Defendants admit that Plaintiff then went to her office while the First Assistant prepared to leave the office. Answer ¶ 111.

42. Defendants admit that the First Assistant was in the lobby of the FDO building when Plaintiff was leaving the building, that the First Assistant asked Plaintiff if she was sure she did not want a ride home, and that Plaintiff said she was sure. Answer ¶ 112.

43. Defendants admit that the First Assistant sent Plaintiff the text messages quoted in this paragraph:

> It is currently raining.
>
> Last chance for a ride, tough girl...

Answer ¶ 113.

44. Defendants admit that on June 27, 2018, the First Assistant sent an email to Plaintiff suggesting they have another mentoring session. Defendants respectfully refer the

14

Court to the email for a complete and accurate statement of its contents.  Answer ¶ 118; ECF No. 248-5 (Ex. D), at 55.

45.     Defendants admit that, on June 29, 2018, Plaintiff sent a text message to the First Assistant stating, "JP, I am feeling sick today. I will not be making it in but will try to finish my appeal brief from home." Defendants respectfully refer the Court to the text message for a complete and accurate statement of its contents.  Answer ¶ 120.

46.     Defendants admit that, on June 29, 2018, the First Assistant respond to Plaintiff's text message, stating, "OK. Can we reschedule our meeting for Monday?" and later stating, "I am free all day, including early morning, lunch and evening. I'm hoping this will be helpful for you, please don't be over-anxious about it."  Defendants respectfully refer the Court to the text message exchange for a complete and accurate statement of its contents.  Answer ¶ 121.

47.     On July 2, 2018, Plaintiff told the Defender that she would be drawing boundaries with the First Assistant. She asked him to support her and maintain her confidence.  Answer ¶ 124.

48.     The Defender asked Plaintiff if this was "sexual harassment."  Defendants admit that Plaintiff said the First Assistant had been angry at her.  Answer ¶ 125.

49.     Defendants admit that Plaintiff and the First Assistant met on July 2, 2018, in the FDO's primary conference room, which is interior and does not have windows, and that the First Assistant shut the conference room's doors during the meeting.  Defendants admit that the First Assistant used the words "struggling," "frustrated," and "comfort zone."  Answer ¶ 127.

50.     Defendants admit that the First Assistant had consistently praised the quality of Plaintiff's work product.  Answer ¶ 128.

15

51.    Defendants admit that Plaintiff told the First Assistant he had "crossed a boundary" when he directed her to attend the presentence interview, and that she was offended by his "tone."  Answer ¶ 129.

52.    Defendants admit that the First Assistant stated that he did not want the meeting to be an "airing of the grievances."  Answer ¶ 130.

53.    Defendants admit that in response to the First Assistant saying, "Caryn, you lied to me repeatedly.  That's not okay," Plaintiff stood up and walked out of the conference room. Defendants admit that the First Assistant accompanied her out of the room to talk to the Defender.  Defendants admit that Plaintiff ultimately walked away to her office.  Answer ¶ 132.

54.    Defendants admit that, on or about July 2, 2018, Plaintiff called the Defender and let him know that the First Assistant might say something about her, and she asked him to withhold judgment until he had spoken to her.  Answer ¶ 133.

55.    Defendants admit that on July 5, 2018, the Defender called Plaintiff and the First Assistant into his office to see if he could help them work through their issues.  Answer ¶ 135.

56.    Defendants admit that, at the July 5, 2018 meeting, the Defender asked both Plaintiff and the First Assistant to put their notepads away and just have a discussion with the Defender. Defendants admit that Plaintiff indicated that she first wanted to speak with the Defender without the First Assistant present, so the Defender asked the First Assistant to leave his office.  Answer ¶ 136.

57.    The Defender told Plaintiff that the First Assistant was upset with her for not keeping a commitment to him. The Defender called this issue a "breakdown in communication." Defendants admit that the Defender told Plaintiff that he understood where the First Assistant, as a supervisor, was coming from.  Answer ¶ 137.

16

58.     Defendants admit that Plaintiff said the First Assistant had been angry.  Answer ¶ 138.

59.     Defendants admit that the Defender told Plaintiff that, as her supervisor, the First Assistant had the right to meet with her.  Answer ¶ 139.

60.     Defendants admit that the Defender used a marriage metaphor when discussing the relationship between Plaintiff and the First Assistant.  Defendants admit that the Defender told Plaintiff that she and the First Assistant needed to "compromise" and "meet in the middle." Answer ¶ 140.

61.     The Defender asked her why she was "getting emotional."  Answer ¶ 142.

62.     Defendants admit that Plaintiff advised the Defender that Plaintiff and the First Assistant stayed late working one night, the First Assistant offered to give her a ride home, Plaintiff told the First Assistant that she had her bike and did not need a ride, and that on her way out the First Assistant was waiting for Plaintiff in the lobby and asked if she needed a ride. Answer ¶ 143.

63.     Defendants admit that the Defender said he would bring the First Assistant back into the room.  Defendants admit that the First Assistant and Defender remarked on Plaintiff's excellent job performance.  Answer ¶ 144.

64.     Defendants admit that the First Assistant explained to Plaintiff that the New Attorney Shadowing Checklist was intended to ensure that Plaintiff got the experience she needed to be qualified to be an Assistant Federal Public Defender.  Answer ¶ 145.

65.     Defendants admit that on July 9, 2018, Plaintiff sent an email to the Defender

17

stating in part, "my understanding is that there is no performance issue with my work, but that this is a matter of receiving the right mentoring. Based on this, I am planning to ask for a new mentor." Defendants admit that the Defender responded the same day confirming that Plaintiff's performance is not an issue and that Plaintiff would be assigned a new mentor. Defendants respectfully refer the Court to the emails for a complete and accurate statement of their contents. Answer ¶ 148; ECF No. 248-5 (Ex. D), at 64–65.

66.     Plaintiff began working with another, highly-experienced assistant federal public defender, who offered to help her with her goal of continuing to gain trial experience. Answer ¶ 149.

67.     Defendants admit that on July 20, 2018, the Defender sent an email to FDO staff in which he listed Plaintiff as assigned to Peter Adolf's team and the First Assistant's team. Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents. Answer ¶ 150; ECF No. 248-2 (Ex. A), at 46.

68.     Defendants admit that, on or about July 20, 2018, the Appellate Chief spoke with Plaintiff about a proposed restructuring regarding the FDO's research and writing attorneys, and that Plaintiff had expressed interest in gaining appellate experience. Answer ¶ 152.

69.     Plaintiff also asked the Appellate Chief to help her put together a performance plan that would allow her to gain professional experiences, such as oral arguments and other courtroom appearances, to advance professionally. The Appellate Chief praised Plaintiff for working with an experienced attorney on the trial side, and offered to give her the same kind of professional support on the appeals side. Answer ¶ 153.

70.     Defendants admit that Plaintiff complained to the Appellate Chief about certain case-related staffing decisions by supervisors in the FDO and about what she perceived as

18

micromanagement by the First Assistant, and that the Appellate Chief asked Plaintiff if her concerns were limited to a particular case or if she had experienced problems on other cases. Answer ¶ 154.

71.     Defendants admit that on July 22, 2018, at 7:23 PM, the First Assistant sent an email to Plaintiff stating that the First Assistant would like to meet the next day "to discuss the R&W role on my team." Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents. Answer ¶ 156.

72.     Defendants admit that Plaintiff took leave on July 23, 2018. Answer ¶ 157.

73.     Defendants admit that the Defender called Plaintiff on or about July 24, 2018, that the Defender explained his mistake about the reporting hierarchy and the immediate action he would be taking to correct it, and that the Defender apologized to Plaintiff for the oversight. Answer ¶ 163.

74.     Defendants admit that Plaintiff sent a text message to the Defender requesting to review any email to the office before it was sent, and that the Defender responded in part, "I'll show it to you before I send it out." Defendants respectfully refer the Court to the text messages for a complete and accurate statement of their contents. Answer ¶ 164; ECF No. 248-15 (Ex. N), at 48.

75.     Defendants admit that on July 26, 2018, the Defender sent an email to FDO staff and that the Defender did not provide a draft of the email to Plaintiff to review in advance. Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents. His email announced that he was hiring an appellate assistant federal public defender. Defendants admit that the email stated in part, "all requests for R&W support should be sent to Jared, who will then distribute the work amongst himself and Caryn based on their current

19

workload capacity and any particular interest or expertise that an R&W may have on the relevant issue."  Answer ¶ 165; ECF No. 248-15 (Ex. N), at 49.

76.    Defendants admit that the Defender distributed an employee manual in late July 2018.  Defendants admit that the manual included an organizational chart showing the research and writing attorneys reporting to the First Assistant.  Answer ¶ 167; ECF No. 248-5 (Ex. D), at 30.

77.    Plaintiff decided to apply for the appellate assistant federal public defender position.  Answer ¶ 169.

78.    Defendants admit that on or about July 27, 2018, Plaintiff spoke with the Appellate Chief about the new appellate attorney position.  Defendants admit that the Appellate Chief told Plaintiff that she need not apply for the new appellate position and that it may be financially advantageous for Plaintiff to remain in her position.  Answer ¶ 170.

79.    Defendants admit that Plaintiff submitted an application for the appellate position on or about August 7, 2018.  Answer ¶ 171.

80.    Defendants admit that Plaintiff worked certain days in early August 2018.  Answer ¶ 175.

81.    Defendants admit that another attorney worked in the office space utilized by Plaintiff and that that attorney's contract with the FDO was ending.  Answer ¶ 175.

82.    Defendants admit that the Fair Employment Opportunity Officer ("FEOO") shared copies of some of the First Assistant's text messages and emails with the Chief of Defender Services.  Defendants further admit that the FEOO and the Chief of Defender Services contacted the Deputy Director to discuss Plaintiff's complaints.  Answer ¶ 187.

83.     The Deputy Director authorized the Chief of Defender Services to contact the Defender directly.  Answer ¶ 188.

84.     Defendants admit that the Chief of Defender Services called the Defender in August 2018.  Answer ¶ 190.

85.     Defendants admit that the Chief of Defender Services suggested that the Defender consider transferring Plaintiff to another office, among other options.  Answer ¶ 193.

86.     On August 9, 2018, the Defender came to speak with Plaintiff in her workspace. Answer ¶ 195.

87.     He told Plaintiff that the Chief of Defender Services had called him. He also claimed that he already "took care" of the situation.  Complaint ¶ 196.  Defendants admit that Plaintiff and the Defender met on August 9, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made.  Answer ¶ 196; US00007565–66.

88.     The Defender claimed that Plaintiff had told him she was not being sexually harassed, but only that she was "uncomfortable."  Complaint ¶ 198.  Plaintiff responded that this assertion was untrue.  Defendants admit that Plaintiff and the Defender met on August 9, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made.  Answer ¶ 198; US00007573–74.

89.     The Defender criticized Plaintiff for going to "some other party" with her concerns. He told her he was being "blamed" and "attacked" for something that was not his "fault."  Complaint ¶ 199.  Defendants admit that Plaintiff and the Defender met on August 9, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made.  Answer ¶ 199; US00007573, 7580.

90.     Plaintiff reminded the Defender that she had raised complaints about being harassed multiple times. She repeated in detail the behaviors she had described to him in those meetings.  Complaint ¶ 201.  Defendants admit that Plaintiff and the Defender met on August 9, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made.  Answer ¶ 201; US00007575–77.

91.     When she mentioned that the First Assistant had cornered her in the lobby when she was alone, the Defender interjected: "OK, but there was no physical contact."  Complaint ¶ 202.  Defendants admit that Plaintiff and the Defender met on August 9, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made.  Answer ¶ 202; US00007576.

92.     Plaintiff told the Defender that the only reason the First Assistant had not touched her is that she had not let him. The Defender said he understood that and he was not disagreeing with her.  He did not apologize for his offensive comments.  Complaint ¶ 204.  Defendants admit that Plaintiff and the Defender met on August 9, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made.  Answer ¶ 204; US00007577–78.

93.     The Defender bluntly asked Plaintiff what she "want[ed]." Plaintiff had already Repeatedly told him that all she wanted was to do her job without being harassed or threatened. The Defender agreed that it was necessary to move Plaintiff into appeals because the First Assistant was in charge of the entire trial unit.  He also promised to remove the First Assistant from Plaintiff's chain of command.  Complaint ¶ 205.  Defendants admit that Plaintiff and the Defender met on August 9, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made.  Answer ¶ 205; US00007580–7602.

22

94.     When Plaintiff asked what would happen next, the Defender said he would implement these steps, consulting with the Appellate Chief as a "courtesy." Complaint ¶ 206. Defendants admit that Plaintiff and the Defender met on August 9, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made. Answer ¶ 206; US00007597–98.

95.     The only term the Defender would not agree to was a transfer to another duty station, as he claimed there was no office space. He claimed it was enough that Plaintiff and the First Assistant worked on opposite ends of the hallway. Complaint ¶ 207. Defendants admit that Plaintiff and the Defender met on August 9, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made. Answer ¶ 207; US00007578, 7594–96.

96.     Plaintiff reminded him that she had cut her in-office hours to never be in the building alone with the First Assistant. She stressed that this was not a tolerable situation. She said she could not come into work every day not knowing what might happen, and that the First Assistant was likely to be very angry when he found out about these changes. Complaint ¶ 208. Defendants admit that Plaintiff and the Defender met on August 9, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made. Answer ¶ 208; US00007578–7580.

97.     The Defender said he was not able to commit to anything regarding a transfer, but said he would see what he could do and report back to her. Complaint ¶ 209. Defendants admit that Plaintiff and the Defender met on August 9, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made. Answer ¶ 209; US00007595–96.

98.     Plaintiff resumed taking leave from work.  Answer ¶ 210.

99.     Defendants admit that Plaintiff sent an email to the Defender on August 10, 2018, in which she purported to describe an agreement reached with the Defender.  Defendants further admit that the email requested to work remotely "until the duty station issue is resolved" and referred to "sexually harassing and threatening behaviors."  Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents.  Answer ¶ 211; ECF No. 248-5 (Ex. D), at 29.

100.    Defendants admit that Plaintiff took sick leave on August 10 and August 13-17, and that the Defender later authorized the sick leave to be converted to administrative leave to avoid depleting Plaintiff's sick leave balance.  Answer ¶ 212.

101.    A full week later, on August 17, 2018, the Defender emailed Plaintiff, copying the Circuit Executive and a Human Resources Specialist ("HR Specialist") employed by the district court.  Answer ¶ 213.

102.    Defendants admit that the Defender's August 17, 2018, email to Plaintiff stated in part: "I have instructed our Administrative Officer William Moorman to start the process to make you an Assistant Federal Defender. As I indicated to you at our meeting, Josh and Bill spoke with Todd Watson, who advised that it was to the office's advantage to reclassify Research & Writing Specialists to AFD positions for purposes of case weight measurement." Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents.  Answer ¶ 215; ECF No. 248-5 (Ex. D), at 27–28.

103.    Defendants admit that the Defender's August 17, 2018 email to Plaintiff stated in part: "At our meeting I never agreed to allow you to work exclusively on appeals. I advised you I personally had no problem with it but had to clear it through Appellate Chief Josh Carpenter. If I

were to allow you to only work on appeals, it would leave me with only one Research & Writing Specialist to support nine trial attorneys. After discussion with Josh about this request, we determined this is not doable and l will not agree to have you do appeals exclusively." Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents.  Answer ¶ 216; ECF No. 248-5 (Ex. D), at 27–28.

104.    Finally, the Defender informed her that he had reported her sexual harassment allegation to the Circuit Executive, who had promptly informed the Chief Judge. The Defender cited Plaintiff's August 10, 2018 email as the basis for making a report.  Answer ¶ 217.

105.    The Defender stated that *both* he and the HR Specialist would meet with Plaintiff to "advise" her of her "rights" under the EDR Plan.  Answer ¶ 218.

106.    Defendants admit that the Defender's August 17, 2018, email to Plaintiff stated in part: "I will allow you to telework temporarily during the pendency of this investigation.  This is not a permanent solution.  I am reserving the right to request your return to your duty station in Charlotte subject to and upon completion of this investigation." Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents.  Answer ¶ 219; ECF No. 248-5 (Ex. D), at 27–28.

107.    Defendants admit that the Defender contacted the Circuit Executive during the week following August 10, 2018.  Answer ¶ 224.

108.    In August 2018, the hiring committee conducted interviews for the appellate attorney position.  Plaintiff was not invited to interview.  Answer ¶ 236.

109.    Defendants admit that Plaintiff's position was reclassified to an Assistant Federal Public Defender.  Answer ¶ 239.

110.    Defendants admit that the Form AO 52 used in connection with the reclassification of Plaintiff's position stated in part, "This request is submitted with the approval of the court[.]"  Defendants respectfully refer the Court to the document for a full and accurate statement of its contents.  Answer ¶ 240; ECF No. 248-15 (Ex. N), at 46.

111.    Defendants admit that Plaintiff was not considered for an increase in salary or job responsibilities.  Defendants admit that Plaintiff did not receive a formal performance evaluation or a performance plan with benchmarks for advancement.  In fact, Plaintiff was never given a formal performance review the entire time she was employed at the FDO.  Answer ¶ 242.

112.    Defendants admit that the Defender's August 17, 2018, email to Plaintiff stated in part: "I have instructed our Administrative Officer William Moorman to start the process to make you an Assistant Federal Defender.  As I indicated to you at our meeting, Josh and Bill spoke with Todd Watson, who advised that it was to the office's advantage to reclassify Research & Writing Specialists to AFD positions for purposes of case weight measurement."  Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents."  At the same time the Defender "reclassified" Plaintiff, he also "reclassified" the FDO's other remaining research and writing attorney.  Answer ¶ 243; ECF No. 248-5 (Ex. D), at 27–28.

113.    Defendants admit that Plaintiff provided support to attorneys in the office generally, which included attorneys in the trial unit headed by the First Assistant.  Answer ¶ 244.

114.    Defendants admit that on August 31, 2018, the First Assistant used the reply-all function and thereby copied Plaintiff on an email to a client.  Answer ¶ 253; ECF No. 248-2 (Ex. A), at 55.

115.    On September 5, 2018, Plaintiff spoke to the Circuit Executive by telephone in his

capacity as EDR Coordinator. Complaint ¶ 257. Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made. Answer ¶ 257; ECF No. 255-5 (Ex. NN); ECF No. 245-39 (Ex. 38).

116.    He explained that the HR Specialist would be investigating her complaints, and that although there were no hard or fast deadlines, the investigation would be done "promptly." Complaint ¶ 258. Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made. Answer ¶ 258; ECF No. 245-39, at 8.

117.    Plaintiff asked the EDR Coordinator to clarify the scope of the investigation he had opened. He told Plaintiff that the investigation would cover her allegations of sexual harassment against the First Assistant. Complaint ¶ 259. Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made. Answer ¶ 259; ECF No. 245-39, at 10–11.

118.    Plaintiff informed him that her allegations were *not* just sexual harassment by one person, and included acts of retaliation as well. She told him that she planned to name the Defender as a violator of the EDR Plan. Complaint ¶ 260. Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made. Answer ¶ 260; ECF No. 245-39, at 10–12.

27

119.     Plaintiff told the EDR Coordinator that the Defender was not being truthful when he said that he only learned of her sexual harassment allegations from her August 10, 2018 email.  She explained that, in fact, she had been trying to work with the Defender to resolve her complaints, but he had escalated the situation and failed to protect her.  Complaint ¶ 261. Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made.  Answer ¶ 261; ECF No. 245-39, at 10–14, 25–27, 35–37.

120.     She emphasized that she *wanted* an investigation, but she was very concerned about the Defender's role in the process given that he had violated her rights.  Complaint ¶ 262. Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made.  Answer ¶ 262; ECF No. 245-39, at 13–14, 26–27.

121.     Plaintiff also discussed with the EDR Coordinator her perception that the FDO was a highly troubled office.  Plaintiff explained that she had wanted to be a federal public defender since law school and truly had a passion for the work, but she was disturbed by what she had seen at the FDO.  Complaint ¶ 263.  Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made. Answer ¶ 263; ECF No. 245-39, at 28–31.

122.     The EDR Coordinator acknowledged that, before the Defender's hiring, there were a lot of "serious issues" in the FDO and the judges were "mindful" of the need to change

the office culture. He said that Plaintiff's concerns were "well-founded." Complaint ¶ 264. Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made. Answer ¶ 264; ECF No. 245-39, at 33–34.

123. The EDR Coordinator told Plaintiff that he had discussed her concerns about the Defender with the General Counsel. The General Counsel had suggested that he, rather than the Defender, "receive" the final investigation report. He said that, although that step is "not in the process or plan," the Defender had agreed to let him receive the report. Complaint ¶ 265. Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made. Answer ¶ 265; ECF No. 245-39, at 39–40.

124. The EDR Coordinator also told Plaintiff that it was not "helpful" for her to have reported her complaints to the AO. He said that when that happens, "barriers go up," walls go up, and people are "on guard." Complaint ¶ 266. Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made. Answer ¶ 266; ECF No. 245-39, at 40–41.

125. The EDR Coordinator's comments confirmed to Plaintiff that multiple high-level judiciary officials found it unacceptable that she had sought advice on her civil rights from the FEOO. Even worse, the EDR Coordinator—the very person responsible for helping Plaintiff preserve her protected rights—was openly criticizing her for exercising those rights. Complaint ¶ 267. Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation

29

referenced in this paragraph for a record of the statements made. Answer ¶ 267; ECF No. 245-39, at 40–41.

126.    Having been put on the defensive, Plaintiff explained that she reached out to the FEOO because she was in a desperate situation where she was not being protected and she was not being listened to. She noted that she had raised her complaints directly with the First Assistant and the Defender, but these efforts had backfired. She was at a loss, though, trying to understand why she needed to explain her actions at all. Complaint ¶ 268. Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made. Answer ¶ 268; ECF No. 245-39, at 42–46.

127.    The EDR Coordinator repeatedly asked Plaintiff what she "want[ed]." Complaint ¶ 269. Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made. Answer ¶ 269. ECF No. 245-39, at 48–50.

128.    He explained that he had been involved in another EDR complaint against the Defender's office. Based on this experience, he said he believed that the Defender was "earnest" and wanted the best for his employees. These comments shocked Plaintiff, given what she had just told him about the Defender's dishonesty and his failure to take her complaints seriously. Complaint ¶ 270. Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made. Answer ¶ 270; ECF No. 245-39, at 47–49.

30

129. Plaintiff told the EDR Coordinator that she "wanted" two things: (1) a full and fair investigation that included the full scope of her allegations, and (2) the opportunities for professional advancement that she had before raising complaints about the First Assistant. Complaint ¶ 272. Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made. Answer ¶ 272; ECF No. 245-39, at 50.

130. On September 10, 2018, Plaintiff filed a request for counseling and her own report of wrongful conduct, naming both the First Assistant and the Defender as alleged violators of the EDR Plan. Plaintiff alleged that she had been subjected to unlawful harassment, retaliation, and discrimination. She provided a separate five-page written narrative summarizing her complaints. Answer ¶ 274; ECF No. 248-2 (Ex. A), at 1–8.

131. Defendants admit that Plaintiff requested corrective action as follows: "[Plaintiff] request[s] to work in an environment free of harassment and retaliation. [Plaintiff] request[s] the opportunity for merit-based advancement, and any other appropriate relief." Defendants respectfully refer the Court to the document for a complete and accurate statement of its contents. Answer ¶ 275; ECF No. 248-2 (Ex. A), at 1–8.

132. Defendants admit that Plaintiff requested to disqualify the Defender and respectfully refer the Court to Plaintiff's written request for a full and accurate statement of its contents. Defendants further admit that Chapter X, Section 7 of the Plan provides that, "[a] party may seek disqualification of a judicial officer, employee or other person involved in a dispute by written request to the Chief Judge." Defendants further admit that the definition of "employee" in Chapter I, Section 3 of the Plan includes the "unit executive and staff" of "Federal Public

31

Defenders within the Fourth Circuit."  Answer ¶ 276; ECF No. 248-2 (Ex. A), at 9–10; ECF No. 248-3 (Ex. B).

133.    Plaintiff argued that the Defender should be disqualified because he was an accused violator of her rights under the EDR Plan.  Complaint ¶ 277.  Defendants admit that Plaintiff requested to disqualify the Defender and respectfully refer the Court to Plaintiff's written request for a full and accurate statement of its contents.  Answer ¶ 277; ECF No. 248-2 (Ex. A), at 9–10.

134.    Plaintiff also moved to stay the wrongful conduct investigation the Defender had initiated so that the scope of the investigation could be expanded to include her allegations of retaliation against the Defender.  Complaint ¶ 278.  Defendants admit that Plaintiff requested a stay of the wrongful conduct investigation and respectfully refer the Court to Plaintiff's written request for a full and accurate statement of its contents.  Answer ¶ 278; ECF No. 248-2 (Ex. A), at 9–10.

135.    Defendants admit that the Chief Judge was working to establish a Capital Habeas Unit that would be managed by the FDO.  Answer ¶ 282.

136.    On September 18, 2018, Plaintiff met with the EDR Coordinator in person. Answer ¶ 284.

137.    The EDR Coordinator opened the meeting by emphasizing that the Chief Judge was "taken aback" by Plaintiff's request to disqualify the Defender because he wasn't "expecting it."  Complaint ¶ 285.  Defendants admit that Plaintiff and the EDR Coordinator met on September 18, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made.  Answer ¶ 285; ECF No. 255-11 (Ex. TT), at US00007695– 96.

138.    Plaintiff asked the EDR Coordinator about his appointment of the HR Specialist as the investigator.  Plaintiff asked if the Defender would be involved in administering the investigation, and whether he had already talked to the HR Specialist about her complaint. Complaint ¶ 286.  Defendants admit that Plaintiff and the EDR Coordinator met on September 18, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made.  Answer ¶ 286; ECF No. 255-11, at US00007696.

139.    The EDR Coordinator admitted that the HR Specialist did not know about Plaintiff's allegations against the Defender, "because that was never part of the initial concern about sexual harassment" by the First Assistant. He reiterated that the HR Specialist would deliver the investigation report to him, instead of the Defender. Further, if the allegations against the Defender were substantiated, then the Chief Judge would need to "step in" as the Defender's "supervisor."  Complaint ¶ 287.  Defendants admit that Plaintiff and the EDR Coordinator met on September 18, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made.  Answer ¶ 287; US00007696–98.

140.    Plaintiff emphasized that this conflict of interest was exactly the issue she was getting at with her motion to disqualify the Defender.  Complaint ¶ 288.  Defendants admit that Plaintiff and the EDR Coordinator met on September 18, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made.  Answer ¶ 288; US00007697.

141.    The EDR Coordinator asked Plaintiff, again, what she wanted. He said that he believed the parties were "close" to agreeing, with the exception of a transfer because the Defender "physically doesn't have space." He claimed that the Defender had "physically"

separated the First Assistant and Plaintiff by putting them "on opposite sides of the office." Complaint ¶ 289. Defendants admit that Plaintiff and the EDR Coordinator met on September 18, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made. Answer ¶ 289; US00007699–7700.

142.    Plaintiff was shocked and angered by the EDR Coordinator's comments. She stressed that the Defender had never moved her office. Even if he had, Plaintiff was appalled by the suggestion that this was an adequate response to the complaints she had raised. Plaintiff told him that the Defender had acted in bad faith, and that his rejection of a transfer showed he had prejudged the investigation. Complaint ¶ 290. Defendants admit that Plaintiff and the EDR Coordinator met on September 18, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made. Answer ¶ 290; US00007699–7701.

143.    The EDR Coordinator acknowledged that it would be difficult for Plaintiff to return to the First Assistant's duty station. Complaint ¶ 291. Defendants admit that Plaintiff and the EDR Coordinator met on September 18, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made. Answer ¶ 291; US00007700.

144.    He added that Plaintiff's complaint was very troubling in terms of the sequence of events, "one thing after another," even after her concerns were brought to light. Complaint ¶ 292. Defendants admit that Plaintiff and the EDR Coordinator met on September 18, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made. Answer ¶ 292; US00007701.

145.     The EDR Coordinator asked Plaintiff, yet again, what she "want[ed]." She repeated what she had already requested: a working environment free of harassment and retaliation, the opportunity for merit-based advancement, and any other appropriate relief.  What she "wanted," in other words, was immediate and effective remedial action on her complaints. Complaint ¶ 293.  Defendants admit that Plaintiff and the EDR Coordinator met on September 18, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made.  Answer ¶ 293; US00007701–02.

146.     Plaintiff said she was "at a bit of a loss," stating words to the effect: "What I want is for it to be made right. I want to be safe. I want to be protected. I want the opportunity to stand on my own feet and advance on my own merit and to not be hindered or blocked from doing that."  Complaint ¶ 294.  Defendants admit that Plaintiff and the EDR Coordinator met on September 18, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made.  Answer ¶ 294; US00007702.

147.     Plaintiff stressed that her limited caseload had been taken away after she reported the First Assistant's harassment.  Complaint ¶ 295.  Defendants admit that Plaintiff and the EDR Coordinator met on September 18, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made.  Defendants admit that Plaintiff applied and was not interviewed for an appellate position.  Answer ¶ 295; US00007702–03.

148.     The EDR Coordinator expressed empathy for Plaintiff. He said that, based on Plaintiff not being invited to interview for the appellate position and being required to go back to the First Assistant's duty station, he could see how she would not feel valued or safe, and how she would not feel taken seriously career-wise and in her personal safety. He said words to the effect: "I'm sorry about that."  Complaint ¶ 296.  Defendants admit that Plaintiff and the EDR

35

Coordinator met on September 18, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made. Answer ¶ 296; US00007704–06.

149. Moving forward, the EDR Coordinator said that he would send Plaintiff's report of wrongful conduct and request for counseling to the HR Specialist. She would conduct one, unified investigation for both proceedings. Complaint ¶ 297. Defendants admit that Plaintiff and the EDR Coordinator met on September 18, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made. Answer ¶ 297; US00007706–09.

150. Plaintiff left the meeting concerned that the investigation would not be fair or impartial, but optimistic that the EDR Coordinator had at least *acknowledged* that it might not be appropriate for the Defender to be involved in resolving her complaint. Complaint ¶ 298. Defendants admit that Plaintiff and the EDR Coordinator met on September 18, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made. Answer ¶ 298; US00007696–98.

151. On September 28, 2018, the EDR Coordinator confirmed in an email that the HR Specialist would "proceed with one, unified investigation into the Chapter IX report of wrongful conduct (allegation of sexual harassment by [the First Assistant]), and the alleged subsequent, related conduct by [the Defender]." Answer ¶ 299; ECF No. 60-4 (Ex. C), at 6.

152. On October 5, 2018, Plaintiff met with the HR Specialist. At the outset, the HR Specialist told Plaintiff that her only role was to "collect" the facts. Complaint ¶ 300. Defendants admit that Plaintiff met with the HR Specialist on October 5, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made. Answer ¶ 300; US00007735.

36

153.     Defendants admit that Plaintiff provided copies of text messages and emails from the First Assistant and notes about the First Assistant's behavior to the HR specialist at the October 5, 2018 meeting and that she provided a witness list to the HR Specialist by email on October 8, 2018.  Answer ¶ 301; ECF No. 248-15 (Ex. N), at 28; ECF No. 60-4 (Ex. C), at 12.

154.     During this meeting, the HR Specialist told Plaintiff that she believed there was "nothing wrong" with going to the AO for advice, even before speaking to anyone locally.  Complaint ¶ 302.  Defendants admit that Plaintiff met with the HR Specialist on October 5, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made.  Answer ¶ 302; US00007887.

155.     The HR Specialist noted that she had been involved with the office conversion to the FDO.  She expressed surprise that no one from the AO gave training during the conversion on policies and procedures for handling complaints.  Complaint ¶ 303.  Defendants admit that Plaintiff met with the HR Specialist on October 5, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made.  Answer ¶ 303; US00007961–63.

156.     The HR Specialist stated her opinion that training would have helped in Plaintiff's situation—and maybe even "avoided" it. Instead, in her view, the office was left on its own to learn. She said that she was not making excuses for the Defender, though, and that it was "evident" that he handled things "very poorly."  Complaint ¶ 304.  Defendants admit that Plaintiff met with the HR Specialist on October 5, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made.  Answer ¶ 304; US00007963.

157. Plaintiff told the HR Specialist that she believed the EDR process was being set up to "wash me out" and "throw me away." Complaint ¶ 305. Defendants admit that Plaintiff met with the HR Specialist on October 5, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made. Answer ¶ 305; US00007973–75.

158. Defendants admit that Plaintiff did not hear from the HR Specialist about the investigation for three weeks after the October 8 interview. Answer ¶ 306.

159. On November 1, 2018, Plaintiff asked the HR Specialist for a status update. The HR Specialist responded that she had a few follow-up questions for Plaintiff. Answer ¶ 307.

160. Plaintiff met with the HR Specialist for a second time on November 9, 2018. Answer ¶ 308.

161. The HR Specialist asked Plaintiff whether she had been "friendly" to the First Assistant. She asked whether Plaintiff's relationship with the First Assistant "broke down" over a case assignment. She questioned whether the First Assistant's behavior was "sexual." Complaint ¶ 309. Defendants admit that Plaintiff met with the HR Specialist on November 9, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made. Answer ¶ 309; US00008050–53, US00008058–59.

162. Plaintiff emphatically responded to the HR Specialist that she had not welcomed the First Assistant's behavior, that it was obvious that his harassment was sexually motivated, and that her complaint was about the First Assistant's inappropriate behavior, not about a case assignment. Complaint ¶ 311. Defendants admit that Plaintiff met with the HR Specialist on November 9, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made. Answer ¶ 311; US00008051–53, 74–75.

163.    Plaintiff asked the HR Specialist whether she needed to start making "contingency plans" because her employing office had not shown any willingness to work with her and she did not know what her professional future would look like.  The HR Specialist responded that it was "fair" for Plaintiff to feel that way.  Complaint ¶ 312.  Defendants admit that Plaintiff met with the HR Specialist on November 9, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made.  Answer ¶ 312; US00008061–62.

164.    Plaintiff repeatedly asked when she would hear some kind of substantive update that would allow her to make an informed decision about her career. The HR Specialist said that there were no deadlines for the investigation.  Complaint ¶ 313.  Defendants admit that Plaintiff met with the HR Specialist on November 9, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made.  Answer ¶ 313; US00008065–66.

165.    Plaintiff said that it was "obvious" to her that "if they could, they would fire me tomorrow."  Complaint ¶ 314.  Defendants admit that Plaintiff met with the HR Specialist on November 9, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made.  Answer ¶ 314; US00008065.

166.    When Plaintiff expressed concerns about seeing the First Assistant at work, the HR Specialist responded dismissively by telling her that she would have to continue working with him after this.  Complaint ¶ 315.  Defendants admit that Plaintiff met with the HR Specialist on November 9, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made.  Answer ¶ 315; US00008061–63.

39

167.     The HR Specialist did not mention interviewing any other witnesses besides Plaintiff, the First Assistant, and the Defender.  Complaint ¶ 317.  Defendants admit that Plaintiff met with the HR Specialist on November 9, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made.  Defendants admit that the HR Specialist did not contact the individuals listed on Plaintiff's witness list.  Answer ¶ 317.

168.     Plaintiff also asked the HR Specialist about her investigation into the Defender's misconduct.  The HR Specialist explained that she had been focusing on the sexual harassment claims regarding the First Assistant, as well as how the Defender "handled" them. She stated that if there is a "true feeling of retaliation," then that would have to be investigated "separately." She said that she did not understand Plaintiff's claims to be within the scope of the investigation the EDR Coordinator had ordered.  Complaint ¶ 318.  Defendants admit that Plaintiff met with the HR Specialist on November 9, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made.  Answer ¶ 318; ECF No. 255-11 (Ex. TT), at US00008068–69.

169.     Despite Plaintiff's painstaking efforts to expand the scope of the investigation, the HR Specialist admitted that she never investigated her retaliation claim.  Even worse, she characterized the Defender's misconduct as a form of mishandling, or mismanagement, rather than actionable retaliation.  Complaint ¶ 319.  Defendants admit that Plaintiff met with the HR Specialist on November 9, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made.  Answer ¶ 319; ECF No. 255-11 (Ex. TT), at US00008068–69.

170.     The HR Specialist stated that she would not be comfortable making, and did not think it was appropriate for her to make, recommendations on the complaint because she is not

an "attorney" and not trained on the "legal" side. Therefore, she told Plaintiff, her report would only contain "facts." She said she expected the EDR Coordinator to make the final decisions because he is "over" the Defender. She said she assumed that the EDR Coordinator would consult with the Chief Judge, as well. Complaint ¶ 320. Defendants admit that Plaintiff met with the HR Specialist on November 9, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made. Answer ¶ 320; US00008071–73.

171. Defendants admit that Plaintiff sent the HR specialist an email on November 12, 2018 detailing what Plaintiff alleged to be "quid pro quo harassment." Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents. Answer ¶ 321; ECF No. 60-4 (Ex. C), at 18.

172. On November 12, 2018, Plaintiff emailed the EDR Coordinator, with the Chief Judge copied, to ask about the status of her EDR complaint. Defendants admit that Plaintiff's report of wrongful conduct under Chapter IX, and request for counseling under Chapter X of the Plan had been pending since September 10, 2018 as of November 12, 2018. Defendants further admit that no decision on Plaintiff's motion to disqualify Anthony Martinez had been made as of November 12, 2018. Answer ¶ 322.

173. Plaintiff asked the EDR Coordinator for a status update. Defendants admit that Plaintiff's email to James Ishida dated November 12, 2018 stated: "My concern is that it seems possible, if not likely, that the counseling period will expire before the wrongful conduct investigation and subsequent actions on Heather's factual report are concluded and shared with me?" Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents. Answer ¶ 323; ECF No. 248-14 (Ex. M), at 82.

174. Defendants admit that Plaintiff's email to James Ishida dated November 12, 2018

stated: "In my request for counseling, I identified the following remedies: (1) the ability to work in an environment free of harassment and retaliation and (2) professional advancement based on merit. I have put pen to paper too many times to count since our last meeting, but I am unable to come up with a proposed solution on my own that would achieve these goals. The problem I keep encountering is, how can these remedies be achieved without action by others, outside of my control? In other words, if I initiate the formulation of the ultimate remedy about how I can do my job, safely and effectively, as a precondition to counseling, then this dilemma seems inextricably linked to my request for disqualification. Put simply, I do not see how I can negotiate a remedy with an individual who retaliated against me for raising concerns of sexual harassment?" Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents. Answer ¶ 324; ECF No. 248-14 (Ex. M), at 82.

175.    Defendants admit that Mr. Ishida's response to Plaintiff's email dated November 12, 2018 copied Chief Judge Gregory and stated that, while "the Complaint for Wrongful Conduct under Chapter IX and Request for Counseling under Chapter X" were "separate proceedings," Mr. Ishida "ordered a joint investigation for both" because "both proceedings share essentially the same set of facts." Defendants further admit that Mr. Ishida's response stated that "the counseling period ends on November 29" and, "[s]ince [Mr. Ishida and Plaintiff] had agreed earlier to an extension of the counseling period, this is the last extension that can be granted." Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents. Answer ¶ 325; ECF No. 248-14 (Ex. M), at 80–81.

176.    In addition, the EDR Coordinator claimed that the Defender had already "taken numerous steps" to protect Plaintiff's safety. He did not specify what those steps were. Answer ¶ 326.

42

177. Defendants admit that Plaintiff sent an email to Mr. Ishida dated November 13, 2018, which stated: "To help me better understand your positions, can you identify the steps taken by the Federal Defender to protect me from further harassment and to ensure my safety in the office as they have been described to you? I am only familiar with his rejection of a transfer from the First Assistant's duty station and his asserted authority to require me to return to that work environment at the impending conclusion of the Chapter IX process." Defendants further admit that Plaintiff's email stated: "I am familiar with the administrative reclassification of my job title with no consideration for a raise in total salary or formal progression of duties, the elimination of my locality adjustment, and the failure to interview me for a newly created 'Appellate' AFD position that I was discouraged from applying for, among other events described in my official grievance." Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents. Answer ¶ 327; ECF No. 248-14 (Ex. M), at 80.

178. Plaintiff asked the EDR Coordinator: "[C]an you understand why I do not view these measures as an attempt at resolution, but instead as evidence of actionable retaliation by the Federal Defender and support for my disqualification request?" Answer ¶ 328.

179. Defendants admit that Plaintiff's email to Mr. Ishida dated November 13, 2018 stated: "Can you also inform me of which individuals will receive the Chapter IX investigator's factual report, including who will receive the report for the purpose of making recommendations based on its content? Similarly, who will make final decisions based on that individual's recommendations and how will I be informed of those decisions?" Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents. Answer ¶ 329; ECF No. 248-14 (Ex. M), at 80.

180.     Defendants admit that Mr. Ishida responded to Plaintiff's November 13, 2018 email on November 14, 2018, copying the Chief Judge.  Defendants further admit that Mr. Ishida's response stated: "I am aware that Mr Martinez has allowed you to telework, removed you from the chain of command so that you have no reporting obligations with the person in question, and taken other steps to avoid contact with the accused."  Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents.  Answer ¶ 330; ECF No. 248-14 (Ex. M), at 79.

181.     Defendants admit that Mr. Ishida's November 14, 2018 response to Plaintiff stated: "[W]e need to know . . . precisely what you would like to see to feel safe so that we can present that to Mr Martinez for consideration."  Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents.  Answer ¶ 331; ECF No. 248-14 (Ex. M), at 79.

182.     Defendants admit that Ishida emailed Plaintiff on November 19, 2018 and that the email stated: "To make the call fruitful, I'll again suggest that you consider specifically what it is that you want. For example, reiterating that you want a safe workplace free from harassment isn't helpful because Mr. Martinez already believes that he's done and is doing all he can to provide such a workplace for you."  Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents.  Answer ¶ 332; ECF No. 248-14 (Ex. M), at 78.

183.     On November 19, 2018, the HR Specialist emailed Plaintiff, with the EDR Coordinator copied, asking for a "specific list of demands you feel would bring this situation to an agreeable resolution."  Answer ¶ 333; ECF No. 60-4 (Ex. C), at 37.

184.     The HR Specialist called Plaintiff's prior requests—an environment free of harassment and advancement based on merit—"general in nature."  The HR Specialist noted that

44

some "steps" had already been taken based on Plaintiff's prior requests. Among these "steps," Plaintiff was "45eclassify[ied]" and "taken out of the chain of command" for the First Assistant. The HR Specialist asked Plaintiff to provide any other "specific, tangible requests." Answer ¶ 334; ECF No. 60-4 (Ex. C), at 37.

185. Defendants admit that the HR Specialist's November 19, 2018 email to Plaintiff stated: "I understand returning to the Charlotte office is a difficult issue for you and would appreciate any ideas you may have on facilitating this to ensure you feel safe and are in an environment free from harassment and intimidation and where advancement is based on merit. I will need concrete specific requests to bring forth in my report as a requirement in attempting to bring this Wrongful Conduct Claim to a resolution." Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents. Answer ¶ 336; ECF No. 60-4 (Ex. C), at 37.

186. Defendants admit that Plaintiff did not immediately respond to the HR Specialist's email. Answer ¶ 337.

187. Defendants admit that the Defender's office advertised for a summer intern in the Asheville office in November 2018, as well as for a Charlotte paralegal position that would require occasional travel to Asheville and that the Defender stated there was no office space for a full-time attorney at the Asheville office. Answer ¶ 339.

188. Defendants admit that the First Assistant often participated in moots for the Appellate Division by request of the appellate attorneys, and that he served as counsel of record in one of his cases that was on appeal. Answer ¶ 341.

189. Defendants admit that participation in appellate moots were a required part of Plaintiff's job duties. Answer ¶ 342.

190. That fall, the Team Leader wore a Justice Kavanaugh costume—complete with a Yale-themed beer guzzler helmet—for the office Halloween party, which she did not attend:



Answer ¶ 346.

191. On November 16, 2018, Plaintiff called into an all-staff meeting, even though she was not required to do so because she was on bereavement leave. After the staff meeting ended, Plaintiff remained on the call after she realized that her trial "team" was meeting, and she had become a topic of conversation. Complaint ¶ 348. Defendants admit that the FDO held all-staff meetings and respectfully refer the Court to Plaintiff's audio recording of the meeting referenced in this paragraph for a record of the statements made. Answer ¶ 348; (18116_1042_Redacted.mp3).

192. Plaintiff listened while her "team" members complained about her not being in the office, and mocked and belittled her. Complaint ¶ 349. Defendants admit that the FDO held all-staff meetings and respectfully refer the Court to Plaintiff's audio recording of the meeting

referenced in this paragraph for a record of the statements made. Answer ¶ 349; (18116_1042_Redacted.mp3).

193. One attorney joked: "I mean, do I meet her at Starbucks?," resulting in rolling laughter. Complaint ¶ 350. Defendants admit that the FDO held all-staff meetings and respectfully refer the Court to Plaintiff's audio recording of the meeting referenced in this paragraph for a record of the statements made. Answer ¶ 350; (18116_1042_Redacted.mp3).

194. The Team Leader chimed in: "Should we meet her at Waffle House?" Complaint ¶ 351. Defendants admit that the FDO held all-staff meetings and respectfully refer the Court to Plaintiff's audio recording of the meeting referenced in this paragraph for a record of the statements made. Answer ¶ 351; (18116_1042_Redacted.mp3).

195. Others added: "Where's Waldo?," to more chuckles and laughter. Complaint ¶ 352. Defendants admit that the FDO held all-staff meetings and respectfully refer the Court to Plaintiff's audio recording of the meeting referenced in this paragraph for a record of the statements made. Answer ¶ 352; (18116_1042_Redacted.mp3).

196. Plaintiff's "team" members sarcastically referred to her as a "liaison" "research and writing attorney." They said they had "no idea" what her job was. The Team Leader joked that Plaintiff was not "ideal to the task" if "communication is what we're looking for." Complaint ¶ 353. Defendants admit that the FDO held all-staff meetings and respectfully refer the Court to Plaintiff's audio recording of the meeting referenced in this paragraph for a record of the statements made. Answer ¶ 353; (18116_1042_Redacted.mp3).

197. Once the laughter died down, the Team Leader added: "I'll just say this as a caveat for the whole thing. Not knowing anything about what's going on, which I don't, I was told that the fact that I do not know anything about what's going on is—I should feel lucky about

the fact that I don't know. . . . I don't know what's going on, but I know enough to not ask questions. My guess is it only gets worse the more you find out." Complaint ¶ 354. Defendants admit that the FDO held all-staff meetings and respectfully refer the Court to Plaintiff's audio recording of the meeting referenced in this paragraph for a record of the statements made. Answer ¶ 354; (18116_1042_Redacted.mp3).

198.    On November 21, 2018, Plaintiff sent the EDR Coordinator an email, with the Chief Judge copied. Plaintiff stated: "I have been reflecting on this situation and discussing potential next steps with my family. This situation has irreparably damaged my relationships with the Federal Defender and my colleagues, and I believe I am no longer welcome in that environment. I would appreciate the Fourth Circuit's assistance in transitioning me out of [the Defender's] office." Answer ¶ 355; ECF No. 248-14 (Ex. M), at 78.

199.    Defendants admit that Plaintiff sent the HR Specialist an email on November 29, 2018. Answer ¶ 356; ECF No. 60-4 (Ex. C), at 35–37.

200.    On November 25, 2018, the EDR Coordinator asked Plaintiff for a copy of her resume. He said he would "make inquiries" in federal defender offices around the circuit. Complaint ¶ 357. Defendants admit that the EDR Coordinator emailed Plaintiff on November 25, 2018 and respectfully refer the Court to that email for a full and accurate statement of its contents. Answer ¶ 357; ECF No. 60-4 (Ex. C), at 24.

201.    Plaintiff thanked the EDR Coordinator for the offer, sent him her resume, and encouraged him to send it to federal defender offices and Article III judges within the Fourth Circuit. Complaint ¶ 358. Defendants admit that Plaintiff emailed the EDR Coordinator on November 25, 2018 and respectfully refer the Court to that email for a full and accurate statement of its contents. Answer ¶ 358; ECF No. 60-4 (Ex. C), at 24.

202.     The EDR Coordinator responded that he would be happy to circulate her resume with other federal defender offices, but that he would "leave" it to Plaintiff to reach out to judges, "as you see fit."  Complaint ¶ 359.  Defendants admit that the EDR Coordinator emailed a response to Plaintiff on November 26, 2018 and respectfully refer the Court to that email for a full and accurate statement of its contents.  Answer ¶ 359; ECF No. 60-4 (Ex. C), at 23.

203.     The EDR Coordinator also said that, since Plaintiff was "now contemplating leaving" the FDO, he would like his Human Resources Administrator ("HR Administrator") to join an upcoming phone call they had scheduled in case any "HR questions or issues arise."  Complaint ¶ 360.  Defendants admit that the EDR Coordinator emailed a response to Plaintiff on November 26, 2018 and respectfully refer the Court to that email for a full and accurate statement of its contents.  Answer ¶ 360; ECF No. 60-4 (Ex. C), at 23.

204.     Plaintiff responded that she was not ready to have an HR conversation about leaving the FDO, and she would like to have a conversation with the EDR Coordinator in confidence.  Complaint ¶ 361.  Defendants admit that Plaintiff emailed a response to the EDR Coordinator on November 26, 2018 and respectfully refer the Court to that email for a full and accurate statement of its contents.  Answer ¶ 361; ECF No. 60-4 (Ex. C), at 22.

205.     On November 27, 2018, Plaintiff spoke with the EDR Coordinator by phone. He informed her that he had received the HR Specialist's report, but he was sending it back. Complaint ¶ 362.  Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made.  Answer ¶ 362; ECF No. 255-11 (Ex. TT), at US0008090.

206.     The EDR Coordinator explained that the report set out a "chronology" of the facts

that "we all know."  He said that he had told the HR Specialist that it would be "helpful" if the report had "findings and recommendations."  According to him, the HR Specialist already had them written up, but she did not want to make the report "too long."  He asked her to supplement the report to include her findings, conclusions, and recommendations.  Complaint ¶ 363. Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made.  Answer ¶ 363; US00008092–93.

207.    Plaintiff told the EDR Coordinator that, from her perspective, "the facts speak for themselves."  Plaintiff was extremely surprised that he would ask the HR Specialist to add "conclusions and recommendations" that she had *admitted* she was not qualified to make. Complaint ¶ 364.  Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made.  Answer ¶ 364; US00008094.

208.    Plaintiff asked when the amended investigation report would be finished. Plaintiff noted that the investigation had consumed the entire counseling period and could now stretch into the mediation period.  Plaintiff found this circumstance "challenging," describing it as "a limbo where basic procedural matters remain outstanding, but without them being resolved I can't move forward."  Complaint ¶ 365.  Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made. Answer ¶ 365; US00008104–08.

209.    Plaintiff asked, again, who would be responsible for acting on the investigation report. The EDR Coordinator said that he would receive the report, and then a decision would be

made about discipline. He said that the disciplinary decision would be given to the Defender as supervisor, but if the report "raise[d] questions" about the Defender, then it may be referred to the Chief Judge. Complaint ¶ 366. Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made. Answer ¶ 366; US00008097–99.

210. Plaintiff also asked about the status of her retaliation claims. Plaintiff relayed the HR Specialist's comments that she was investigating the Defender's "mishandling" of the situation, but not retaliation. Plaintiff asked whether there was a difference between "mishandling" and retaliation. Complaint ¶ 367. Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made. Answer ¶ 367; US00008099–8100.

211. The EDR Coordinator said that he could "not remember exactly when" Plaintiff had raised an allegation of retaliation, and so he was not sure whether retaliation was part of the investigation. Complaint ¶ 368. Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made. Answer ¶ 368; US00008100–01.

212. Plaintiff expressed her total disbelief over the EDR Coordinator's comments. She reminded him that she had filed a written claim of retaliation against the Defender on September 10, 2018. Her retaliation claim was the reason why the investigation report was being submitted

to him, not the Defender. It was also a "critical element" of the disqualification issue. Complaint ¶ 369. Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made. Answer ¶ 369; US00008101–04.

213. Plaintiff asked whether her motion to disqualify was being held in abeyance, and why she had not received a ruling. The EDR Coordinator explained that, early on, he and the Chief Judge had discussed the motion, and agreed that disqualification would be "premature" without a finding against the Defender. Complaint ¶ 370. Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made. Answer ¶ 370; ECF No. 255-11, at US00008103–04.

214. The EDR Coordinator further explained that, if the Defender was disqualified, then "no one" could "represent" the employing office. Complaint ¶ 371. Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made. Answer ¶ 371; ECF No. 255-11, at US00008103–04.

215. Plaintiff said that she would appreciate a written update on the status of her motion. Complaint ¶ 372. Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made. Answer ¶ 372; US00008117–18.

216.     Plaintiff also challenged the EDR Coordinator's previous assertions that the Defender had "protect[ed]" her.  She provided specific examples of how the First Assistant was continuing to interfere with her job duties while her complaint was pending.  Complaint ¶ 373. Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made.  Answer ¶ 373; US00008110–12.

217.     Plaintiff emphasized: "Nothing about my discomfort or my feelings about being threatened by this person have changed.  I don't see that anything has changed.  If anything, it sounds like everything is going to go back to exactly the way it was before, which is that I'm going to be forced to work with this person who made me feel threatened."  Complaint ¶ 374. Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made.  Answer ¶ 374; US00008112.

218.     The EDR Coordinator expressed sympathy for Plaintiff, but said that he was "struggl[ing]" to understand what she "want[ed]," and that he did not know if the Defender was "aware" of her concerns.  He again told Plaintiff "to specifically tell us what's the problem here so we can raise it and have it addressed and resolved."  Complaint ¶ 375.  Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made.  Answer ¶ 375; US00008113–14.

219.     Exasperated, Plaintiff stated words to the effect: "The problem is that this person made me feel threatened at work." And given that Plaintiff had complained to the Defender, she did not "understand how he says he doesn't know."  Complaint ¶ 376.  Defendants admit that the

EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made. Answer ¶ 376; US00008114–15.

220. Plaintiff pointed out that she had been seeking a duty station transfer, at a bare minimum. However, the Defender was hiring for positions in that office—even as he claimed that he had no office space. Plaintiff further stated words to the effect: "It's difficult for me to understand how I've alleged a very serious situation that has made me feel uncomfortable and I can no longer do my job, and yet there appears to be room for an intern and not for me. There are relatively simple things like that that weren't addressed as easy solutions to this earlier on. Now we're at a point where this process has so damaged my relationships with everyone and created so much hostility that I don't know if I can ever go back or if a transfer would even solve anything." Complaint ¶ 377. Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made. Answer ¶ 377; US00008114–15.

221. The EDR Coordinator suggested that maybe the Defender had "reasons" for what he did, and that the parties needed a "dialogue." Plaintiff suggested having a dialogue with someone who did not have a conflict of interest within the Fourth Circuit or from Defender Services. Complaint ¶ 378. Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made. Answer ¶ 378; US00008115–18.

222.     The EDR Coordinator did not directly respond to Plaintiff's suggestion.  He said that he was just trying to figure out where to go while the investigation was pending, but "if we need to wait, then we need to wait."  Complaint ¶ 379.  Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made.  Answer ¶ 379; US00008119.

223.     The EDR Coordinator then referred to the "looming issue" of whether Plaintiff wanted to stay with the FDO at all. Plaintiff said that she "struggled" with this issue because she "didn't want to leave." Plaintiff said: "This is my dream job, I worked really hard to get here, this is where my husband's family is from, this is where we want to live, this office was a great fit for me."  Complaint ¶ 380.  Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made.  Answer ¶ 380; US00008119.

224.     Plaintiff noted that if the "highest levels of management feel that way about me despite my hard work and my excellent performance, then clearly I'm not a valued employee in this organization and I don't see how I can continue to work there."  She emphasized that she was not "welcome," and she was being "forced out."  Complaint ¶ 381.  Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made.  Answer ¶ 381; US00008119–8121.

225.     The EDR Coordinator responded that for Plaintiff to "even contemplate" leaving was "regrettable."  Complaint ¶ 382.  Defendants admit that the EDR Coordinator had multiple

conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made. Answer ¶ 382; US00008122.

226. The EDR Coordinator ended the conversation by suggesting that Plaintiff consider mediation. He also said he would ask the HR Specialist about Plaintiff's retaliation claim. Complaint ¶ 383. Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made. Answer ¶ 383; US00008122–24.

227. On November 28, 2018, the EDR Coordinator told Plaintiff that he had checked in with the HR Specialist about her retaliation claims. The HR Specialist had "assured" him that she would include the retaliation claims in her investigation report. Complaint ¶ 385. Defendants admit that the EDR Coordinator emailed Plaintiff on November 28, 2018 and respectfully refer the Court to that email for a full and accurate statement of its contents. Answer ¶ 385; ECF No. 60-4 (Ex. C), at 26.

228. Plaintiff emailed the HR Specialist to update her on the retaliation she had experienced since filing her complaint. Complaint ¶ 386. Defendants admit that Plaintiff sent the HR Specialist an email on November 29, 2018 purporting to detail what Plaintiff alleged as retaliation by the Federal Defender Office. Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents. Answer ¶ 386; ECF No. 60-4 (Ex. C), at 35–37.

229. Defendants admit that Plaintiff requested a continuation of the counseling period on November 28, 2018. Defendants admit that Plaintiff's request stated: "My understanding is

56

that the findings in the report will help determine the next steps in the wrongful conduct investigation under Chapter IX" and "[w]ithout more information regarding the report's findings and recommendations, it is difficult to assess the procedures or possible options for resolving the claims under Chapter X."  Plaintiff requested extending counseling for 30 days from the date the investigation report was completed to allow time to address "outstanding procedural issues" and to resolve the matter "at the lowest level possible."  Answer ¶ 387.

230.    Defendants admit that, on November 30, 2018, the Chief Judge issued a written order granting Plaintiff's request for a continuation of the counseling period in part and denying it in part.  Defendants further admit that the Chief Judge extended the counseling period until January 14, 2019.  Defendants respectfully refer the Court to the order for a complete and accurate statement of its contents.  Answer ¶ 388; ECF No. 60-4 (Ex. C), at 34.

231.    On December 14, 2018, the EDR Coordinator asked Plaintiff to consider an "unconventional" step: involving a mediator during the counseling period.  He stated, however, that "much depends on the findings and recommendations of the investigation report."  Plaintiff agreed to discuss the possibility of using a mediator after the holidays.  Complaint ¶ 389. Defendants admit that the EDR Coordinator emailed Plaintiff on December 14, 2018 and Defendants respectfully refer the Court to the email for a full and accurate statement of its contents.  Answer ¶ 389; ECF No. 60-4 (Ex. C), at 43–45.

232.    On January 9, 2019, the EDR Coordinator and Plaintiff spoke by phone about a possible mediation.  At that point, he still did not know when the amended investigation report would be finished.  Complaint ¶ 390.  Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff, and respectfully refer the Court to Plaintiff's recording of the

57

conversation referenced in this paragraph for a record of the statements made. Answer ¶ 390;
ECF No. 255-9 (Ex. RR).

233. Plaintiff expressed discomfort proceeding to mediation if it meant waiving her
procedural rights—especially her right to a decision on her still-pending disqualification request.
Mediation would also be difficult without the investigation report, she noted, given that the
process had "dragged on so long without the problems being addressed." And if mediation
failed, the only stage left would be a final hearing. Complaint ¶ 391. Defendants admit that the
EDR Coordinator had multiple conversations with Plaintiff, and respectfully refer the Court to
Plaintiff's recording of the conversation referenced in this paragraph for a record of the
statements made. Answer ¶ 391; ECF No. 255-9 (Ex. RR), at 20–21.

234. The EDR Coordinator responded that the process was designed to move
"expeditiously." He noted that the Chief Judge was concerned that the process was taking too
long. He told Plaintiff to be ready for the end of counseling on January 16, 2019. Complaint
¶ 392. Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff,
and respectfully refer the Court to Plaintiff's recording of the conversation referenced in this
paragraph for a record of the statements made. Answer ¶ 392; ECF No. 255-9 (Ex. RR), at 15–
16; US00008185.

235. On January 11, 2019, the EDR Coordinator informed Plaintiff that he had
received the amended investigation report and would "be in touch." Complaint ¶ 393.
Defendants admit that January 11, 2019 was just over four months after September 10, 2018,
when Plaintiff filed her request for counseling. Answer ¶ 393; ECF No. 248-15 (Ex. N), at 37.

236. On January 16, 2019, the EDR Coordinator informed Plaintiff by email that her

counseling period had expired. Plaintiff did not receive a ruling on a second request for an extension of time she had made for the purpose of evaluating the investigation report. Answer ¶ 394; ECF No. 248-15 (Ex. N), at 35.

237. In addition, he said that the Chief Judge "intend[ed]" to deny her request to disqualify the Defender." Answer ¶ 395; ECF No. 248-15 (Ex. N), at 35.

238. The next day, Plaintiff spoke with the EDR Coordinator by phone. She asked him why her request to disqualify the Defender would be denied. He seemed unsure. At first, he said the Chief Judge had made a decision before the report came out, but then he said the decision was made after the report came out. Complaint ¶ 396. Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff, and respectfully refer the Court to Plaintiff's recording of the conversation referenced in this paragraph for a record of the statements made. Answer ¶ 396; ECF No. 255-11 (Ex. TT), at US0008206–07.

239. The EDR Coordinator was asked if the reason for the impending denial is that a unit executive cannot be disqualified from an EDR proceeding. He did not answer. Instead, he said that the upcoming denial order, which he claimed he had started to draft, "will speak for itself." Complaint ¶ 397. Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff, and respectfully refer the Court to Plaintiff's recording of the conversation referenced in this paragraph for a record of the statements made. Answer ¶ 397; ECF No. 255-11 (Ex. TT), at US0008206–07.

240. The EDR Coordinator shared another update: neither Plaintiff, nor the employing office, would receive the investigation report or any summary of its findings and recommendations. He explained that OGC had "strongly recommended" not sharing the report during counseling or mediation. According to OGC, the parties were not legally entitled to

receive the report because it is an "internal document only." OGC advised that distributing the report would make it difficult to resolve the matter informally, because the parties would "fight about the report" rather than focusing on the issues in the case. Complaint ¶ 398. Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff, and respectfully refer the Court to Plaintiff's recording of the conversation referenced in this paragraph for a record of the statements made. Answer ¶ 398; ECF No. 255-1 (Ex. JJ), at 11–15; US00008203–8216.

241. The EDR Coordinator was asked to identify where the Fourth Circuit EDR Plan refers to "internal documents." He was told that the EDR Plan entitles the parties to receive "information and records," and it requires sharing of information on a "need to know basis," but it does not mention "internal documents." He had no answer to these questions. He admitted that the process is not "perfect," but said that he intended to follow OGC's advice. Complaint ¶ 399. Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff, and respectfully refer the Court to Plaintiff's recording of the conversation referenced in this paragraph for a record of the statements made. Answer ¶ 399; ECF No. 255-1 (Ex. JJ), at 16–19.

242. The EDR Coordinator was asked how any disciplinary action could be taken without the investigation report. He explained that no decisions about disciplinary action would be made until after Plaintiff's EDR proceeding was over, perhaps after a final hearing. He assured her that the Chief Judge would hold people accountable, if appropriate. Complaint ¶ 400. Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff, and respectfully refer the Court to Plaintiff's recording of the conversation referenced in this paragraph for a record of the statements made. Answer ¶ 400; ECF No. 255-1 (Ex. JJ), at 13, 19–20.

60

243.     Plaintiff told the EDR Coordinator that she did not understand how disciplinary action could be put off for so long, when the purpose of a wrongful conduct action is to make the office safe.  And while nothing had changed for the First Assistant, Plaintiff was forced to work from home and treated as the office joke.  Plaintiff asked him why the First Assistant had not been put on administrative leave.  Complaint ¶ 401.  Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff, and respectfully refer the Court to Plaintiff's recording of the conversation referenced in this paragraph for a record of the statements made.  Answer ¶ 400; ECF No. 255-1 (Ex. JJ), at 20–22; US00008222–27.

244.     The EDR Coordinator expressed sympathy for the First Assistant, noting that this had been a "living hell" for him and he had been suffering "physical symptoms." He was asked how he knew these things about the First Assistant.  Complaint ¶ 402.  Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff, and respectfully refer the Court to Plaintiff's recording of the conversation referenced in this paragraph for a record of the statements made.  Answer ¶ 402; US00008227–29.

245.     The EDR Coordinator reluctantly admitted that the First Assistant had called him, that it was inappropriate for him to have done so, and that he had told him not to call again.  Complaint ¶ 403.  Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff, and respectfully refer the Court to Plaintiff's recording of the conversation referenced in this paragraph for a record of the statements made.  Answer ¶ 403; US00008228–29.

246.     Plaintiff ended the conversation by telling the EDR Coordinator about several incidents of abusive behavior towards other employees and clients that she had personally

witnessed at the FDO.  The EDR Coordinator seemed deeply saddened by what Plaintiff told him. He strongly implied that the Circuit would do the right thing and hold people accountable. Complaint ¶ 404.  Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff, and respectfully refer the Court to Plaintiff's recording of the conversation referenced in this paragraph for a record of the statements made.  Answer ¶ 404; *see* US00008235–37, 8250–8257.

247.    Defendants admit that Plaintiff sent an email to the Chief Judge and the EDR Coordinator on January 22, 2019 stating: "A transfer to another federal defender office with flexible working conditions, specifically in the Western District of Virginia, would resolve my Chapter X claim."  Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents.  Answer ¶ 405; ECF No. 60-4 (Ex. C), at 57–59.

248.    "Although it was my dream since law school to be a federal defender," Plaintiff explained, "I do not believe it is possible to reach a resolution with my current office that will protect me from further harassment and allow me to advance in my career."  Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents. Answer ¶ 406; ECF No. 60-4 (Ex. C), at 57.

249.    Defendants admit that Plaintiff's January 22, 2019 email stated: "OGC's guidance would require me to negotiate directly with an alleged violator without knowing the report's findings and recommendations."  Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents.  Answer ¶ 407; ECF No. 60-4 (Ex. C), at 58.

250.    Defendants admit that Plaintiff's January 22, 2019 email stated: "I am concerned, however, that a successful negotiation is unlikely. For example, after the First Assistant made me

feel so threatened that I stopped coming into the office, he joked to an attorney colleague who was leaving the office that he should attend the next office retreat to give sexual harassment training. Worse yet, the Federal Defender ignored my concerns, mishandled and escalated the situation, and only initiated a wrongful conduct report after I followed up on his promises to finally address the situation. Similarly, when I expressed interest in a recently-posted 'appellate' attorney position, Appellate Chief Josh Carpenter openly discouraged me from applying. When I applied anyway, I was not selected for an interview. I have been told it is no secret that the new appellate attorney was chosen to be my replacement. Under these circumstances, I do not see any path forward that would allow me to continue working in my office. But I am also concerned that I will be subjected to rumors and reputational damage. For example, years after attorney Robert Carlin took time off following his wife's suicide to care for his autistic son (and was subsequently fired), I personally heard the First Assistant and others insinuate that Mr. Carlin killed his wife, which they claimed to know because office investigator Jim Allard 'looked into it.' After attorney Jeffrey King, who is gay, was fired, office rumors began circulating that Mr. King was exchanging sexual favors with prison guards. Similar incivility extends to our clients, such as at a recent all-staff meeting when, in front of the entire office and the Federal Defender, Trial Team Leader Peter Adolf repeatedly referred to his intellectually-disabled client as a 'retard.' So far, I am aware of the First Assistant implying that I looked good on paper but didn't work out; I am concerned it will not end there." Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents. Answer ¶ 408; ECF No. 60-4 (Ex. C), at 58.

251.   Plaintiff said she hoped "to move on in a way that preserves my professional reputation and career options." Answer ¶ 409.

252.    Defendants admit that the EDR Coordinator emailed Plaintiff on January 24, 2019, stating, in part: "I'm sorry to hear about your experiences, and your decision to leave your office. I have spoken to Chief Judge Gregory, and he has directed me to lend appropriate assistance in finding you another position.  We can, of course, make no assurances, but we will do what we can to help."  Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents.  Answer ¶ 410; ECF No. 60-4 (Ex. C), at 56.

253.    On January 30, 2019, Plaintiff filed a request for mediation under the EDR Plan. At this point, Plaintiff had not received any substantive update on her transfer request.  Answer ¶ 411; ECF No. 248-15 (Ex. N), at 34; ECF No. 60-3 (Ex. B), at 9–10.

254.    Before mediation, Plaintiff asked the EDR Coordinator to clarify whether her confidentiality would be protected during mediation, and whether any documents she submitted would be shared with the Defender without her consent. The EDR Coordinator confirmed that he had not shared any documents with the Defender except for her request for counseling and request for mediation, which were template forms. He had not shared her factual narrative or any of her supporting documentation.  Complaint ¶ 412.  Defendants admit that the EDR Coordinator and Plaintiff exchanged emails on January 31, 2019 and February 1, 2019 and respectfully refer the Court to those emails for a full and accurate statement of their contents. Answer ¶ 412; ECF No. 248-15 (Ex. N), at 32–34.

255.    On February 7, 2019, Plaintiff met with the appointed mediator ("Mediator") in the law library of a Fourth Circuit judge.  Plaintiff provided the Mediator with copies of some of the First Assistant's inappropriate text messages and emails.  Complaint ¶ 413.  Defendants admit that Plaintiff met with Circuit Mediator Edward Smith and respectfully refer the Court to

64

Plaintiff's recording of that meeting for a record of the statements made. Answer ¶ 413; US0008285.

256. The Mediator acknowledged that it would be "really difficult" for Plaintiff to return to work, assuming that everybody is "still there." He also stated that the First Assistant's quid pro quo email, in particular, was "inappropriate" and "improper." Complaint ¶ 414. Defendants admit that Plaintiff met with Circuit Mediator Edward Smith and respectfully refer the Court to Plaintiff's recording of that meeting for a record of the statements made. Answer ¶ 414; ECF No. 250-11 (Ex. DD), at 58; US00008286, 8306, 8365.

257. The Mediator candidly stated his opinion that the Defender is from a "generation" that doesn't "get" sexual harassment. He emphasized, however, that the Defender was the "decision maker" and that no hearing officer would "micromanage" him or tell him how to do his job. Complaint ¶ 415. Defendants admit that Plaintiff met with Circuit Mediator Edward Smith and respectfully refer the Court to Plaintiff's recording of that meeting for a record of the statements made. Answer ¶ 415; ECF No. 250-11 (Ex. DD), at 50–51; ECF No. 248, Ex. C; US00008321–32, 8336, 8317.

258. The Mediator admitted that he saw problems with the EDR process. He expressed frustrations with the settlement process and noted that, at times, promising settlements he had negotiated were vetoed by the AO because the judiciary lacked statutory authority to implement those remedies. He candidly acknowledged that you "give up a lot" as a judiciary employee. Complaint ¶ 416. Defendants admit that Plaintiff met with Circuit Mediator Edward Smith and respectfully refer the Court to Plaintiff's recording of that meeting for a record of the statements made. Answer ¶ 416; ECF No. 250, Ex. DD, at 41; US00008329–30, 8357–58.

259. The Mediator promised to press the Defender on a duty station transfer and other

requested terms.  Complaint ¶ 417.  Defendants admit that Plaintiff met with Circuit Mediator Edward Smith and respectfully refer the Court to Plaintiff's recording of that meeting for a record of the statements made.  Answer ¶ 417; US00008382.

260.     On February 12, 2019, the Mediator updated Plaintiff by phone.  He said that the Defender would permit Plaintiff to transfer to another duty station, where she would likely share an office with an intern.  He mentioned that there was also a conference room and a library space to work.  Complaint ¶ 418.  Defendants admit that Plaintiff spoke with Circuit Mediator Edward Smith by phone and respectfully refer the Court to Plaintiff's recording of that telephone conversation for a record of the statements made.  Answer ¶ 418; US00008418–8422.

261.     Plaintiff asked the Mediator why a transfer was possible now, but not six months ago.  The Mediator said that the Defender may have changed his mind after he got "involved." The Mediator seemed very frustrated with the Defender.  Complaint ¶ 420.  Defendants admit that Plaintiff spoke with Circuit Mediator Edward Smith by phone and respectfully refer the Court to Plaintiff's recording of that telephone conversation for a record of the statements made. Answer ¶ 420; US00008420–8421.

262.     Plaintiff told the Mediator that a transfer under these circumstances would further humiliate and stigmatize her, since the whole office would know that the Defender had likely prioritized an intern over her.  The Mediator suggested that Plaintiff put these issues "aside" and work something out.  Complaint ¶ 421.  Defendants admit that Plaintiff spoke with Circuit Mediator Edward Smith by phone and respectfully refer the Court to Plaintiff's recording of that telephone conversation for a record of the statements made.  Answer ¶ 421; US00008427–8428.

263.     According to the Mediator, the Defender was also in agreement that the First

Assistant could no longer be "involved" with Plaintiff's work. The Mediator suggested taking the Defender at his "word" on his unsubstantiated promise. Complaint ¶ 422. Defendants admit that Plaintiff spoke with Circuit Mediator Edward Smith by phone and respectfully refer the Court to Plaintiff's recording of that telephone conversation for a record of the statements made. Answer ¶ 422; US00008423–8424.

264. Plaintiff asked the Mediator what would happen if an EDR settlement was breached. In his experience, the only remedy for breach of an EDR settlement was another EDR claim. Complaint ¶ 423. Defendants admit that Plaintiff spoke with Circuit Mediator Edward Smith by phone and respectfully refer the Court to Plaintiff's recording of that telephone conversation for a record of the statements made. Answer ¶ 423; Ex. BB, at US00008294–8296.

265. Plaintiff asked whether a settlement with the Defender would be binding on the next Federal Public Defender. The Mediator did not know the answer to this question. Complaint ¶ 424. Defendants admit that Plaintiff spoke with Circuit Mediator Edward Smith by phone and respectfully refer the Court to Plaintiff's recording of that telephone conversation for a record of the statements made. Answer ¶ 424; US00008445–8447.

266. Plaintiff suggested that, under the circumstances, a duty station transfer would not accomplish anything without addressing the underlying harassment and retaliation. Complaint ¶ 425. Defendants admit that Plaintiff spoke with Circuit Mediator Edward Smith by phone and respectfully refer the Court to Plaintiff's recording of that telephone conversation for a record of the statements made. Answer ¶ 425; US00008449–8454.

267. The Mediator said he was still trying to get more information from the Defender,

67

and he would be in touch. Complaint ¶ 426. Defendants admit that Plaintiff spoke with Circuit Mediator Edward Smith by phone and respectfully refer the Court to Plaintiff's recording of that telephone conversation for a record of the statements made. Answer ¶ 426; US00008449–8454.

268.    Defendants admit that Plaintiff met with the Judicial Integrity Officer during the week of February 13, 2019 in Washington, D.C. Answer ¶ 427.

269.    Plaintiff told the Judicial Integrity Officer about her experience with the EDR process. Plaintiff expressed concern that her due process rights were being violated. Answer ¶ 428.

270.    The JIO stated, that just because every court handles the process differently, does not mean employees' rights are being violated. Answer ¶ 430.

271.    Defendants admit that the JIO referenced the EDR Plan's provision stating that "[f]ailure to pursue mediation will preclude further processing of the employee's claim under any other provisions of this Chapter." Answer ¶ 431.

272.    Defendants admit that the JIO told Plaintiff that she could pursue "motions" and "discovery" to prove her claims after filing a formal complaint following the close of counseling and mediation. Answer ¶ 432.

273.    Plaintiff asked the Judicial Integrity Officer how the EDR Coordinator could withhold the investigation report from the parties. Answer ¶ 433.

274.    Defendants admit that the JIO told Plaintiff that disqualifying the Defender at the mediation stage was unusual because he was the head of the responding office. Answer ¶ 436.

275.    The Judicial Integrity Officer urged Plaintiff to use the EDR process as it exists and to be clear about the remedies she was seeking. Answer ¶ 437.

68

276.    A few days later, the Judicial Integrity Officer wrote in an email to Plaintiff that she hoped their meeting wasn't "completely overwhelming."  Answer ¶ 442; ECF No. 248-15 (Ex. N), at 42.

277.    She said that Plaintiff's matter could be a "lesson learned."  Answer ¶ 443; ECF No. 248-15 (Ex. N), at 42.

278.    She also said she would like "to better understand if FPDs are adequately protected by EDR remedies."  Answer ¶ 444; ECF No. 248-15 (Ex. N), at 42.

279.    The Fourth Circuit EDR Plan, unlike the Model EDR Plan, gave accused violators, such as the First Assistant, a right to cross-examine Plaintiff.  Likewise, the Defender would have the right to cross-examine Plaintiff in his capacity as the office's representative and as an accused violator of her rights.  Answer ¶ 448.

280.    Defendants admit that Plaintiff's representative submitted a supplemental narrative to the EDR coordinator on February 22, 2019.  Answer ¶ 449; ECF No. 248-2 (Ex. A), at 11–33; ECF No. 60-4 (Ex. C), at 65.

281.    Defendants admit that Ch. X, § 9(B)(4) provides: "Any person or party involved in the mediation process shall not disclose, in whole or in part, any information or records obtained through, or prepared specifically for, the mediation process, except as necessary to consult with the parties or their representatives, and then only with notice to all parties."  Defendants further admit that Plaintiff's representative stated in his email transmitting the supplement: "If this document is shared with the Federal Defender Office, at any time, it should be subject to redaction to protect the identity of employees referenced in this document."  Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents.  Answer ¶ 450; ECF No. 60-4 (Ex. C), at 65.

282.    Defendants admit that the EDR Coordinator shared the supplement with the Chief Judge, the Defender, and the Mediator with simultaneous notice to Plaintiff and her representative.  He said that OGC had advised him that the supplement was "not subject to redaction."  Apparently, OGC had noted that the Defender "is prohibited from retaliating against any employees for their participation in, or opposition to, EDR matters."  Answer ¶ 451; ECF No. 60-4 (Ex. C), at 64.

283.    Plaintiff's representative also submitted a renewed request to disqualify the Defender.  Defendants admit that Plaintiff did not receive a written ruling on her request to disqualify the Defender.  Answer ¶ 453; ECF No. 248-2 (Ex. A), at 57–61.

284.    On February 26, 2019, Plaintiff met with the Mediator in a Fourth Circuit judge's law library.  The Mediator told Plaintiff that she could not transfer to the federal defender office in the adjacent district she had requested because that office did not have an opening.  Complaint ¶ 454.  Defendants admit that Plaintiff met with Circuit Mediator Edward Smith and respectfully refer the Court to Plaintiff's recording of that meeting for a record of the statements made. Answer ¶ 454; US00008473–8475.

285.    Plaintiff expressed concern and frustration that she would never be able to return to work normally at the FDO.  The Mediator acknowledged that the Defender had been unresponsive since their first conversation.  Complaint ¶ 455.  Defendants admit that Plaintiff met with Circuit Mediator Edward Smith and respectfully refer the Court to Plaintiff's recording of that meeting for a record of the statements made.  Answer ¶ 455; US00008480–87, 8489–91.

286.    The Mediator offered to help Plaintiff get another job.  He remarked that he was very impressed with Plaintiff's credentials.  Plaintiff asked him to help her secure a Fourth Circuit clerkship.  She said that having a clerkship would help prevent her employing office from

70

destroying her reputation.  She was disgusted, however, that she would have to lose her job while her perpetrators kept theirs.  Complaint ¶ 456.  Defendants admit that Plaintiff met with Circuit Mediator Edward Smith and respectfully refer the Court to Plaintiff's recording of that meeting for a record of the statements made.  Answer ¶ 456; US00008532–8359, 8543, 8556–57, 8564–66.

287.    Defendants admit that after their meeting, Circuit Mediator Edward Smith went to Richmond, Virginia to discuss the possibility of a clerkship for Plaintiff.  Answer ¶ 457.

288.    Later that week, the Mediator called Plaintiff.  A Fourth Circuit judge had a term clerkship vacancy, which had been open for at least several weeks.  The Mediator said that this judge wanted to interview Plaintiff.  Answer ¶ 458.

289.    On March 8, 2019, Plaintiff interviewed with the Fourth Circuit judge.  Plaintiff was highly qualified for the clerkship and she received an offer on the spot.  Answer ¶ 459.

290.    During Plaintiff's interview with the judge's other law clerks, and outside of Plaintiff's presence, the Mediator brought up in conversation a professional sports team owner who had recently faced a nationally publicized sexual harassment scandal.  The Mediator remarked that this person had been "good" to the school he had attended.  The Mediator said he "hope[d]" that "nobody is making anything about what came out about him."  He said he was "glad" it had been kept "quiet."  He further elaborated: "He couldn't have handled it any better to keep it quiet" than by "walking away."  Complaint ¶ 460.  Defendants admit that Circuit Mediator Edward Smith had a discussion with Cooper Strickland during Plaintiff's interview and respectfully refer the Court to Plaintiff's recording of that conversation for a record of the statements made.  Answer ¶ 460; US00008674–75.

291.    As they were wrapping up mediation, Plaintiff told the Mediator that the clerkship

was a "very nicely packaged constructive discharge." She said she was giving up her career because she was harassed and retaliated against without any accountability. Plaintiff called the situation the "collective fault of the institution." Complaint ¶ 462. Defendants admit that Plaintiff had a conversation with Circuit Mediator Edward Smith and respectfully refer the Court to Plaintiff's recording of that conversation for a record of the statements made. Answer ¶ 462; ECF No. 250-12 (Ex. EE), at 74–75.

292. The Mediator responded that Plaintiff should be thankful for what went right for her. He noted that a lot of people had worked to make this outcome possible, and they didn't have do anything for her. He advised Plaintiff not to focus on the problems with the system, adding words to the effect: "There's nothing you can do about it." Complaint ¶ 463. Defendants admit that Plaintiff had a conversation with Circuit Mediator Edward Smith and respectfully refer the Court to Plaintiff's recording of that conversation for a record of the statements made. Answer ¶ 463; ECF No. 250-12 (Ex. EE), at 77.

293. On March 19, 2019, while Plaintiff was serving as a Fourth Circuit judicial law clerk, the AO Director circulated an Exposure Draft of the revised Model EDR Plan within the judiciary. The Director requested that comments on the Exposure Draft be submitted to the Model EDR Plan Working Group. Answer ¶ 465.

294. The Exposure Draft of the revised Model EDR Plan was never circulated for a public notice and comment period. Answer ¶ 466.

295. On April 19, 2019, Plaintiff submitted a comment on the Exposure Draft to the Model EDR Working Group. Answer ¶ 467.

296. Defendants admit that the quoted language appears in Plaintiff's comments:

> [E]ven the remedies listed in the Plan may not actually be legally or
> practically available to claimants. As an initial matter, the EDR Plan

72

itself is a creature of Judicial Conference policy, rather than statute or other legally-binding authority. Judicial Conference policy states: "Judges' decisions in EDR matters must be in conformance with all statutes and regulations that apply to the judiciary, . . . [and] judges presiding in EDR matters may not compel the participation of or impose remedies upon agencies or entities other than the employing office which is the respondent in such matters." Proceedings of the Judicial Conference at 25 (Sept. 2010). This policy potentially undermines many of the remedies purportedly available under the Plan. For instance, if an employee requests a transfer as an interim measure or ultimate relief, the policy indicates that a court may not direct any other office to absorb that employee. Similarly, a court can only request, but not direct, another agency, such as GSA, to provide building modifications necessary to accommodate an employee with a disability.

The problem is especially acute for employees of federal defender offices, who functionally have no remedies under the Plan at all. Although federal defender offices are "covered" by EDR Plans, the Criminal Justice Act does not explicitly confer statutory authority for the court of appeals to impose remedies or disciplinary action, short of removing the Federal Defender. *See* 18 U.S.C. § 3006A(g)(2)(A) (providing the court of appeals in the relevant circuit authority to appoint, set compensation for, and remove a Federal Defender for "incompetency, misconduct in office, or neglect of duty"). Even if the court has authority, institutionally speaking, the court is also unlikely to want to be perceived as interfering with the independence of a federal defender office.

Answer ¶ 468.

297. Defendants admit that the quoted language appears in Plaintiff's comments: that the Judicial Conference should "undertake a comprehensive review of its policies in this area and consider making recommendations to Congress in order to strengthen the remedies available to judicial employees." Answer ¶ 469.

298. Defendants admit that Plaintiff emailed the EDR Coordinator on May 1, 2019, stating, "I am requesting a status update on my Chapter 9 report of wrongful conduct. Specifically, is this proceeding still open or closed?" Defendants respectfully refer the Court to

the email for a full and accurate statement of its contents. Answer ¶ 471; ECF No. 60-4 (Ex. C), at 71–72.

299. The EDR Coordinator responded that the proceeding was still "open and ongoing." Answer ¶ 472; ECF No. 60-4 (Ex. C), at 71–72.

300. Plaintiff asked the EDR Coordinator if he would meet with her in person. Answer ¶ 473.

301. On May 7, 2019, Plaintiff met with the EDR Coordinator and HR Administrator in Richmond, Virginia. Plaintiff asked for an update on the wrongful conduct proceeding. He said that, on the advice of OGC, he could not tell Plaintiff anything about the proceeding or its outcome. Complaint ¶ 474. Defendants admit that Plaintiff met with the EDR Coordinator and HR Administrator in Richmond, Virginia and respectfully refer the Court to Plaintiff's recording of that meeting for a record of the statements made. Answer ¶ 474; US00008754–8756.

302. Plaintiff told the EDR Coordinator that she had lost her job because she filed a complaint. She said that there was no possible remedy through the EDR process. She said that OGC had skewed the process in favor of management and worked a "serious injustice," not just for her, but for anyone else who filed a complaint. She said that the failure to follow the EDR Plan "as it appears on paper" made it impossible to stay in her office. Complaint ¶ 475. Defendants admit that Plaintiff met with the EDR Coordinator and HR Administrator in Richmond, Virginia and respectfully refer the Court to Plaintiff's recording of that meeting for a record of the statements made. Answer ¶ 475; US00008760–70.

303. Plaintiff further explained that she had had difficulty finding another job because, when asked, she did not feel comfortable providing references from the FDO. She also felt ostracized from applying for the Criminal Justice Act panel in her district, because the people

74

who had engaged in misconduct would be reviewing her application. Complaint ¶ 476. Defendants admit that Plaintiff met with the EDR Coordinator and HR Administrator in Richmond, Virginia and respectfully refer the Court to Plaintiff's recording of that meeting for a record of the statements made. Answer ¶ 476; US00008756–58.

304. Plaintiff said that everyone in her office knew that she filed a complaint, and that the rumor was that she "lost." Complaint ¶ 477. Defendants admit that Plaintiff met with the EDR Coordinator and HR Administrator in Richmond, Virginia and respectfully refer the Court to Plaintiff's recording of that meeting for a record of the statements made. Answer ¶ 477; US00008767–68.

305. Plaintiff told the EDR Coordinator that this was not over for her. She told him that she lived with this burden every day and that it had tremendously affected her life and career. Complaint ¶ 478. Defendants admit that Plaintiff met with the EDR Coordinator and HR Administrator in Richmond, Virginia and respectfully refer the Court to Plaintiff's recording of that meeting for a record of the statements made. Answer ¶ 478; US00008756–59.

306. Defendants admit that on May 16, 2019 the EDR Coordinator, in his capacity as Circuit Executive, formally notified the Defender by letter that the judges of the Fourth Circuit approved the Defender's request to establish a Capital Habeas Unit ("CHU") in his office. Defendants further admit that the CHU would represent individuals in capital habeas cases throughout the Fourth Circuit. Answer ¶ 479.

307. The EDR Coordinator included a hand written note for the Defender: "Congratulations!" Answer ¶ 480.

308. Defendants admit that the Fourth Circuit was working with the Federal Defender's Office to establish a CHU. Answer ¶ 481.

75

309.    Defendants admit that the EDR Coordinator's May 16, 2019 letter to the Defender said that the Defender had "stated that [he] plan[ned] to open the CHU in FY2021, pending appropriate funding from Defender Services."  Defendants respectfully refer the Court to the letter for a complete and accurate statement of its contents.  Answer ¶ 482.

310.    On June 4, 2019, the EDR Coordinator sent Plaintiff an email, with the Chief Judge copied.  Answer ¶ 483; ECF No. 248-15 (Ex. N), at 45.

311.    The EDR Coordinator disclosed to Plaintiff: "I wanted to let you know that disciplinary action was taken last week as a result of your report of wrongful conduct.  As we discussed previously, I cannot reveal the nature of the action because it is a disciplinary matter.  But I wanted to let you know that action was taken, and I wanted to re-emphasize that: (1) the Fourth Circuit took your report very seriously, (2) Chief Judge Gregory ordered a painstaking and exhaustive investigation into your allegations, and (3) actions were taken based on careful consideration of the investigation report."  Answer ¶ 484.

312.    Defendants admit that Plaintiff was not informed about the content of the investigation report, or the disciplinary action taken under Chapter IX of the EDR Plan.  Answer ¶ 486.

**Defendants' position on uncontested facts:** Defendants have made a good faith effort to identify facts to which the parties can stipulate by extrapolating from their Amended Answer and responses to Requests for Admission the facts probative of the issues to be decided at trial.  After business hours on July 19, 2023, Plaintiff, who had agreed to prepare a list of proposed stipulations, sent Defendants a 71-page document containing a copy-and-pasted version of most of Defendants' Amended Answer and a handful of their responses to Plaintiff's Requests for Admission.  A number of these proposed "stipulations" merely set forth the allegations in Plaintiff's Amended

complaint, many of which Defendants dispute. Defendants acknowledge and stand by the admissions made in their Amended Answer and in their responses to Requests for Admission (including Defendants' objections to these Requests for Admission). Nevertheless, Defendants' position is that the format and content of Plaintiff's proposed "stipulations" fail to reflect that many of the responses contained in the Amended Answer constitute partial admissions and most require additional context. In response, based on their understanding of the trial practices of this and other Courts, Defendants proposed more than 100 undisputed facts that should help to streamline the trial. Defendants sent this cohesive set of re-formulated stipulated facts to Plaintiff just four days after receiving Plaintiff's proposed "admissions," but Plaintiff has chosen not to respond to Defendants' proposal.

Because the parties have not yet engaged in an interactive process to assess the extent to which they can agree to stipulated facts, both Plaintiff and Defendants have included their proposals in this Statement. Defendants nevertheless request that the Court accept the following facts as uncontested:

1.　　Plaintiff graduated summa cum laude and Phi Beta Kappa from the University of Vermont for her undergraduate studies.

2.　　Plaintiff graduated from Duke University School of Law in 2013, where she served on the law review and was elected to Order of the Coif.

3.　　Plaintiff clerked for Chief Justice Paul Reiber of the Vermont Supreme Court from 2013 to 2014.

4.　　Plaintiff clerked for Judge James P. Jones of the U.S. District Court for the Western District of Virginia from 2014 to 2015.

5.　　Plaintiff clerked for Judge Peter W. Hall of the U.S. Court of Appeals for the Second Circuit from 2015 to 2016.

6.    Plaintiff worked as a Supreme Court Fellow from 2016 to 2017 in the Administrative Office in the U.S. Courts ("AO").

7.    On August 21, 2017, Plaintiff began work as a Research & Writing ("R&W") Specialist in the Federal Defender's Office for the Western District of North Carolina ("FDO").

8.    As of August 21, 2017, Plaintiff was an FD14, Step 1, equivalent to GS.

9.    R&W Specialists are developmental trial and appellate support positions for attorneys who do not have substantial litigation experience.

10.    R&W Specialists do not handle their own caseloads but may be assigned as a second chair to an Assistant Federal Defender ("AFD").

11.    Before joining the FDO, Plaintiff did not have experience in handling cases, trying cases, and representing clients, including clients who are criminal defendants.

12.    For a period of time, including during Plaintiff's FDO employment, J.P. Davis ("Davis") served as the FDO's "principal deputy" and had some supervisory responsibilities over the trial units in the FDO.

13.    From August 2017 to August 2018, Davis served in a supervisory role over Plaintiff at various times as well as other employees in the FDO.

14.    The Federal Defender, Anthony Martinez ("Martinez"), assigned Davis to be Plaintiff's mentor in 2017.

15.    Plaintiff, who lived near Davis's house until she moved to Tryon, North Carolina in the fall of 2018 and generally biked to work, occasionally would ask Davis for rides home.

16.    Beginning in December 2017, Davis and Plaintiff had mentoring lunches roughly every six weeks.

17.    They had four mentoring lunches in total.

18.    On May 18, 2018, Plaintiff and Davis had their final mentoring lunch.

19.    On May 18, 2018, during the drive back to the office, Plaintiff told Davis that she was not happy living in a separate city from her husband, and stated, "If I don't get moved to Asheville, I'm going to have to quit."

20.     Plaintiff's husband lived in Tryon, North Carolina, in 2018 and 2019.

21.     AFDs are ungraded positions that use the AD pay scale whereas R&W Specialists are on the FD pay scale (equivalent to GS).

22.     On or about June 4, 2018, Plaintiff invited Davis to go for walk, which he accepted.

23.     On the walk, they discussed case-related matters, primarily the Dixon case.

24.     On June 5, 2018, Plaintiff emailed Davis to cancel a pre-existing meeting with a client to work on the Dixon case.

25.     On June 6, 2018, Plaintiff and Davis met to discuss, among other things, Plaintiff's June 5 email.

26.     On June 21, 2018, Plaintiff requested a meeting at 5:00 PM for advice about a case, Davis and Plaintiff met at the requested time, and the meeting extended past business hours.

27.     On June 26, 2018, Plaintiff emailed Martinez stating that she had too much work to take on new cases that were assigned to her.

28.     On June 26, 2018, Martinez, Davis, and the Appellate Chief exchanged emails about Plaintiff's workload.

29.     On July 2, 2018, Plaintiff and Davis met in the office.

30.     On July 2, 2018, Plaintiff met with Martinez.

31.     On July 5, 2018, Martinez met with Plaintiff and Davis in his office.

32.     On July 8, 2018, Davis emailed another attorney at the FDO indicating that he would no longer be Plaintiff's mentor and that the attorney would be Plaintiff's mentor from that point forward.

33.     On July 20, 2018, Martinez, Davis, Administrative Officer for the FDO Bill Moormann ("Moormann"), and the Team Leaders in the FDO, Erin Taylor, Peter Adolf, and Mary Ellen Coleman, had a meeting and discussed a new R&W position and the conversion of R&Ws to AFDs.

34.     On July 22, 2018, Davis emailed Plaintiff asking to discuss case management.

35.     Davis's July 22, 2018 email to Plaintiff was their last communication.

36.     Plaintiff and Davis never had any other one-on-one interaction in any form after July 22, 2018.

37.     On July 24, 2018, Martinez instructed Davis not to email, text, or meet with Plaintiff until further notice.

38.     On July 24, 2018, the FDO Appellate Chief Josh Carpenter ("Carpenter") emailed the FDO about a new AFD position, saying it is "Like Jared and Caryn."

39.     On July 26, 2018, the managers in the FDO discussed how they envisioned the new AFD position.

40.     On July 26, 2018, Martinez emailed the office announcing a new AFD position.

41.     The job posting emailed by Martinez on July 26, 2018 stated that duties included both trial and appellate work.

42.     On August 3, 2018, Plaintiff signed a document acknowledging that she received the FDO manual, including its EDR polices. The FDO is governed by the Fourth Circuit's EDR Plan.

43.     On August 9, 2018, Martinez met with Plaintiff.

44.     On August 14, 2018, Martinez forwarded Plaintiff's August 10, 2018 allegation of sexual harassment to the Circuit Executive for the Fourth Circuit and Fourth Circuit EDR Coordinator, James Ishida ("Ishida").

45.     On August 14, 2018, Ishida emailed Martinez explaining the next steps under the EDR Plan.

46.     On August 14, 2018, Ishida sent an email to Lisa Morris, Chief U.S. Probation Officer for W.D.N.C., asking if Heather Beam was available to conduct an investigation into Plaintiff's sexual harassment allegation.

47.     On August 15, 2018, Beam began her investigation.

48.     On August 16, 2018, Moormann submitted the request to reclassify both Plaintiff and Jared Martin ("Martin"), the other, male R&W Specialist, to AFDs, with an effective date of August 20, 2018.

49.     On August 17, 2018, at Plaintiff's request, Martinez authorized Plaintiff to telework during the pendency of the investigation.

50.     Plaintiff teleworked from August 17, 2018 until March 15, 2019, when she transitioned to a Fourth Circuit clerkship.

51.     After the EDR process began, Plaintiff did not meet with or see Martinez again.

52.     On August 20, 2018, Plaintiff emailed Martinez a list of the cases she was working on.

53.     In late August 2018, the FDO informed Plaintiff a private office was available in the event she wanted to exercise her option under the telework agreement to return to the Charlotte office.

54.     On August 28, 2018, the paperwork to convert Plaintiff and Martin from R&W Specialists to AFDs was processed manually due to an error in the original submission.

55.     The AO maintained the original effective date of the conversion: August 20, 2018.

56.     On August 21, 2018, Nancy Dunham, the AO's Fair Employment Practices Officer, emailed Plaintiff to confirm she would continue to have a role in advising her.

57.     On August 22, 2018, Beam contacted Plaintiff to schedule an interview for the investigation.

58.     On August 29, 2018, Plaintiff emailed Beam requesting to delay their interview.

59.     On September 10, 2018, Plaintiff emailed Ishida a Request for Counseling under Chapter X of the EDR Plan and an "official grievance" letter.

60.     On September 10, 2018, Plaintiff emailed Chief Judge Gregory a request to disqualify Martinez.

61.     On September 19, 2018, Ishida emailed Beam asking her to hold the investigation in abeyance because Plaintiff did not want to proceed with the investigation.

62.     On September 28, 2018, Ishida emailed Plaintiff saying that he and Plaintiff had already achieved many objectives of counseling and were working on an attempted resolution.

63.     Ishida emailed Plaintiff and Beam on September 28, 2018 to inform them that Beam was proceeding with "one, unified investigation" and "submitting her report to me, not Mr. Martinez."

64.     On October 5, 2018, Beam interviewed Plaintiff.

65. On October 10, 2018, Plaintiff requested a 30-day extension of time for her counseling period, which was granted.

66. On October 11, 2018, Beam interviewed Davis.

67. On October 15, 2018, Martinez approved Plaintiff's request to travel to a Supreme Court Fellows event.

68. On October 18, 2018, Beam interviewed Martinez.

69. On November 1, 2018, Ishida emailed Plaintiff to confirm that the investigation would include her claims of retaliation by Martinez.

70. On November 1, 2018, Plaintiff asked Beam for a status update and Beam responded that she had a few follow-up questions for Plaintiff.

71. Plaintiff met with Beam for a second time on November 9, 2018.

72. On November 16, 2018, there was an all-staff meeting for the FDO.

73. On November 19, 2018, Beam emailed Plaintiff, with Ishida copied, asking for a "specific list of demands you feel would bring this situation to an agreeable resolution."

74. Beam further noted that four steps "have been taken based on [Plaintiff's] previous requests:

    1. Reclassification to Assistant Public Defender

    2. Taken out of the chain of command for JP Davis and reporting to Josh Carpenter (Chief Appellate division)

    3. Temporary Full-Time telework pending the resolution of this investigation

    4. The return of any sick leave used between August 10 through August 17."

75. On November 21, 2018, Plaintiff emailed Ishida and said that the situation has irreparably damaged her relationship with the FDO and that she wanted assistance in transitioning out of the FDO.

76. On November 21, 2018, Plaintiff emailed Beam and said that the situation has irreparably damaged her relationship with the FDO and that she wanted assistance in transitioning out of the FDO.

82

77. Ishida emailed Plaintiff on November 25, 2018 asking for her resume and telling her he would inquire around the Circuit and in other FPD offices to help her secure a new job. Plaintiff responded the following day, permitting him to distribute her resume to other FPD offices as well as Article III judges.

78. On November 28, 2018, Ishida emailed Plaintiff saying that Beam assured him that retaliation claims against Martinez would be included in her report.

79. Plaintiff responded to Ishida's November 28, 2018 email saying that she appreciated the clarification that her retaliation claims were being considered as part of the investigation.

80. On November 29, 2018, Plaintiff sent Beam an email about her claims.

81. On January 11, 2019, Beam concluded her investigation and sent Ishida her report.

82. Plaintiff's EDR counseling period ended on January 14, 2019.

83. On January 17, 2019, Plaintiff and Ishida spoke by phone about the EDR process.

84. On January 22, 2019, Plaintiff again emailed Ishida saying she wanted to leave the FDO, and Ishida offered to help her obtain new employment.

85. On January 31, Plaintiff emailed Ishida and Chief Judge Gregory her Request for Mediation.

86. On February 2, 2019, Ishida initiated the mediation phase.

87. On February 7, 2019, Chief Fourth Circuit Mediator Ed Smith ("Smith") and Plaintiff held a mediation session.

88. On February 12, 2019, Smith and Plaintiff held a mediation session.

89. On February 12, 2019, Smith and Ishida talked by telephone and discussed the status of the mediation.

90. On February 14, 2019, Smith and Ishida talked by telephone and discussed the status of the mediation.

91. On February 14, 2019, Plaintiff met with the AO's Judicial Integrity Officer, Jill Langley ("Langley"), whose role was in part to advise members of the judiciary about the EDR process.

92. On February 22, 2019, Plaintiff filed a supplement to her mediation request.

83

93.     On February 24, 2019, Plaintiff renewed her request for disqualification of Martinez.

94.     On February 26, 2019, Smith met with Plaintiff for a mediation session.

95.     On March 4, 2019, Ishida contacted newly appointed Fourth Circuit Judge Rushing about hiring Plaintiff as a law clerk.

96.     On March 8, 2019, Smith and Plaintiff held a mediation session.

97.     On March 8, 2019, Plaintiff interviewed with Fourth Circuit Judge Floyd, who offered her a clerkship.

98.     On March 11, 2019, Ishida contacted the Federal Defender in the Western District of Virginia about securing Plaintiff a job.

99.     On March 11, 2019, Plaintiff accepted the clerkship offer with Judge Floyd and withdrew her EDR claims.

100.    On March 11, 2019, Plaintiff emailed Smith thanking him for his support.

101.    On March 11, 2019, Plaintiff emailed Langley indicating she was pleased with the outcome of the clerkship offer and that she was "very excited and honored" to clerk on the Fourth Circuit.

102.    Plaintiff formally resigned from the FDO, effective March 15.

103.    On March 18, 2019, Plaintiff began her Fourth Circuit clerkship with Judge Floyd.

104.    On May 8, 2019, Martinez held a counseling session with Davis.

105.    On May 28, 2019, Judge Gregory issued Martinez a letter of counseling.


(3) Contested issues of fact.

**Plaintiff identifies the following contested issues of fact:** This Court previously stated that this case may be appropriately decided on a case stated basis because the facts are largely undisputed. *See TLT Constr. Corp. v. RI, Inc.*, 484 F.3d 130, 135 n.6 (1st Cir. 2007) (case stated basis occurs when the parties "present the case to the court on the undisputed facts in the pre-trial record" and "[t]he court is then entitled to 'engage in a certain amount of factfinding, including

84

the drawing of inferences'" (citation omitted)); Minute Entry Dated June 21, 2023 ("The Court explains and offers to proceed case stated on the pending motions for summary judgment."). Consistent with the Court's recognition, Plaintiff maintains that the facts of this case are largely undisputed, as evidenced by Defendants' judicial and evidentiary admissions, and any remaining factual disputes are immaterial.

Plaintiff objects to Defendants' attempt to relitigate their own findings of wrongful conduct during the EDR proceeding and their admissions during this litigation through their proposed "35 hours" of witness testimony, which would require at least two weeks of trial. As discussed further below, four of Plaintiff's counsel, including her only counsel with trial experience, have withdrawn from this case. *See* Entry Order Dated May 23, 2023. Due to the loss of four of Plaintiff's counsel, it would be not only contrary to the undisputed evidence, but also severely prejudicial to Plaintiff, to allow Defendants to relitigate "disputes" that already resulted in adverse findings during the prior EDR proceeding and admissions in their First Amended Answer and document disclosures. *See, e.g.*, ECF No. 248-5, at 79 (March 25, 2019 Memorandum from James Ishida to Chief Judge Gregory) (stating that "[t]he investigation report recommends that disciplinary action be taken against the accused employee—Federal Public Defender First Assistant J.P. Davis—as well as the unit executive, Anthony Martinez," and noting that under Chapter IX of the EDR Plan, "[e]mployees found by the Chief Judge and/or unit executive to have engaged in wrongful conduct, as defined in this Plan, may be subject to disciplinary action" and that "'wrongful conduct' is defined to include '[d]iscrimination against employees based on color, religion, sex (including pregnancy and sexual harassment), . . . or retaliation for engaging in any protected activity'"); ECF No. 254-4, at 5 (Counseling Letter Dated May 28, 2019 from James Ishida to Anthony Martinez) (describing wrongful conduct by

the First Assistant and Defender and stating that "Chief Judge Gregory has decided to adopt the recommendations contained in the report" by imposing "disciplinary action" "[u]nder Chapter IX of the Plan"); *see also* ECF No. 210 (Defendants' First Amended Answer, ¶¶ 484, 486) (admitting that "disciplinary action was taken" and that "Plaintiff was not informed about the content of the . . . disciplinary action taken under Chapter IX of the EDR Plan"). Further, as stated above, while it appears on first review that Plaintiff may be able to stipulate to some facts stated by Defendants, she has not had adequate time to review their proposals. Thus, Plaintiff will attempt to stipulate to additional facts after a reasonable opportunity for review.

### Defendants identify the following contested issues of fact:

1.     Before May 18, 2018, Plaintiff and Davis had a friendly, informal relationship and would text each other regularly, including about drinking alcohol together.

2.     The interactions between Plaintiff and Davis were not sexual or romantic in nature.

3.     On May 18, 2018, Davis advised Plaintiff to focus on trial opportunities other than the Dixon life sentence trial, because assigning the FDO's two least experienced attorneys as the trial team would increase the risk of ineffective assistance of counsel claims.

4.     On May 18, 2018, Davis told Plaintiff he was sorry to hear that Plaintiff was going to have to quit if she was not transferred to Asheville and mentioned there were no office spaces available in Asheville.

5.     On May 18, 2018, Plaintiff stated she would be open to "alternative arrangements," and raised the possibility that she could telework from Tryon doing only appeals.

6.     Plaintiff told Davis that if she could not be guaranteed a move to Asheville, she at least wanted more money—specifically a promotion to GS-15 or to become an AFD, which was on the AD pay scale.

7.     Davis considered Plaintiff a valuable employee who was an asset to the FDO, so he reviewed salary tables to see if the FDO could provide her with a raise since a duty station transfer to Asheville was not possible.

8.     Davis ended his May 18, 2018 "mas dinero" email with a joking rhyme, "pay-for-stay," as a reference to Plaintiff's own demand for an increase in *pay* in order to *stay* in the FDO in the absence of a duty-station transfer.

9.     The email was not sexual or romantic in nature, and at the time, Plaintiff did not perceive the email as a quid pro quo request.

10.     At the end of the June 21 meeting between Plaintiff and Davis, a thunderstorm was blowing in and Davis waited for Plaintiff in the lobby to see if she wanted a ride home because it was raining.

11.     Davis's offer of a ride home was not sexual or romantic in nature.

12.     After Plaintiff declined a ride, Davis and Plaintiff both left, using exits on opposite sides of the lobby.

13.     There were no other communications or interactions between Plaintiff and Davis before they left the lobby.

14.     On July 2, 2018, Davis initiated a meeting with Plaintiff to help her develop stress coping skills given her indication that she was overwhelmed with her workload, but Plaintiff redirected the meeting to discuss her belief that Davis had spoken too harshly toward her in early June regarding her commitment to attend a client meeting for the Dixon case.

15.     On July 2, 2018, Plaintiff approached Martinez to discuss an issue she was having with Davis and told Martinez that Davis had gotten angry at her, she believed that Davis spoke to her inappropriately, and that she wanted to set boundaries. Plaintiff did not tell Martinez that she believed she was being sexually harassed.

16.     On July 5, 2018, Martinez called a meeting with both Plaintiff and Davis in his office to clear the air.

17.     Plaintiff refused to discuss anything with Davis present, so he left the room.

18.     After Davis left the room, Plaintiff's primary focus was concern about whether Davis had complained about her performance.

19.     Plaintiff told Martinez that one day, she and Davis had stayed late working, and he offered to give her a ride home. Plaintiff said that on her way out, Davis was waiting for her in the lobby and asked if she needed a ride home.

20.     At some point during the meeting, Plaintiff used the word "uncomfortable" in relation to Davis. Martinez asked Plaintiff what she meant by that and if she was alleging sexual harassment.

21.     Plaintiff said she was not alleging sexual harassment and asked Martinez not to report or otherwise escalate her statements.

22.     Davis rejoined Plaintiff and Martinez toward the end of the July 5 meeting, and both Davis and Plaintiff agreed Davis would no longer serve as Plaintiff's mentor.

23.     On July 20, Martinez emailed the office explaining that Martin would be giving out R&W assignments, and Martin would be assigned to Team Leads Erin Taylor and Mary Ellen Coleman's teams, while Plaintiff was assigned to Davis and Team Lead Peter Adolf's teams.

24.     On July 24, Martinez called Plaintiff to apologize for saying she was on Davis's team, told her it was an inadvertent mistake, and that he would move her off immediately.

25.     On August 9, 2018, Martinez again met with Plaintiff, who made several demands, including that she be transitioned to an AFD, that the organizational chart be changed so that she was no longer supervised by Davis, that she only work on appeals, and that she be transferred to Asheville or authorized telework.

26.     During this meeting, Plaintiff did not allege that Davis was sexually harassing her.

27.     Martinez explained that he had already been considering a conversion of all the R&W Specialists to AFDs and that he would remove her from Davis's chain of command.  Martinez further told her that he did not have space in the Asheville office and that he had concerns about authorizing telework because it would open the floodgates to requests from others.

28.     Martinez took Plaintiff out of Davis's chain of command after their August 9, 2018 meeting.

29.    The FDO did not have an open position that involved only appellate work.

30.    Because Plaintiff was not eligible to move up a grade to GS-15, Martinez had no occasion to consider whether he should consider her for this grade increase.

31.    Davis was not involved in the decision to reclassify the R&W Specialists to AFDs.

32.    Davis did not have authority over Plaintiff's classification or her pay (nor that of any other employee).

33.    Only Martinez had the authority to reclassify employees or adjust their pay.

34.    On August 10, 2018, Plaintiff emailed Martinez purporting to recap the August 9 conversation and claimed, for the first time, that Davis had sexually harassed her.

35.    On August 10, 2018, Martinez responded to Plaintiff and informed her that her recap of their meeting was inaccurate.

36.    Martinez promptly reported Plaintiff's allegations of sexual harassment, pursuant to Chapter IX of the EDR Plan, to Ishida and Chief Judge Gregory.

37.    On August 14, 2018, Martinez forwarded to Ishida Plaintiff's report of sexual harassment from August 10, and Ishida responded with details about what should be done under the EDR Plan.

38.    On August 14, 2018, Martinez emailed Ishida asking about how to ensure he was insulating Plaintiff from Davis, letting her work remotely, and keeping Plaintiff's allegations confidential.

39.    On August 15, 2018, Moormann emailed the Defender Services Office at the Administrative Office of the U.S. Courts about reclassifying both Plaintiff and Martin from R&W Specialists to AFDs.

40.    On August 15, 2018, Martinez recused himself from any involvement in the investigation of Plaintiff's claim beyond potentially being interviewed as a witness.

41.    On August 17, 2018, Martinez emailed Plaintiff, copying Ishida and Beam. In the email, Martinez summarized the changes made to protect Plaintiff and stated that he had reported her allegations to Ishida, consistent with Chapter IX of the EDR Plan.

42.    Ishida emailed Martinez saying that he thought Martinez had done all he could to protect Plaintiff. Neither Plaintiff nor Beam were copied on Ishida's response.

89

43.     Plaintiff repeatedly told Defendants, including Davis on May 18, Dunham and Martinez on August 9, and Martinez on August 10, that she was fine with teleworking or working remotely, especially if it helped her get her duty station transfer to Asheville, so she could be near her husband in Tryon.

44.     On August 20, 2018, as Plaintiff had requested, Plaintiff was reclassified from R&W Specialist to an AFD, with Plaintiff's salary remaining at the amount it was previously, which was above what was normally authorized for an AFD with her level of experience. Martin's salary also remained at the amount it was previously when he was reclassified from R&W Specialist to an AFD on the same date.

45.     At no point did the Defender backdate the reclassification of Plaintiff and Martin to AFDs, including to avoid increasing her grade to GS-15.

46.     On August 20, 2018, Martinez emailed Martin telling him to ensure that Plaintiff did not work on any cases with Davis.

47.     On September 27, 2018, Plaintiff emailed Ishida saying she wanted to expand the scope of the investigation to include allegations against Martinez.

48.     On November 19, 2018, Plaintiff communicated by text message with Laura Minor, a former employee of the AO, that she "love[d] clerking" and that, while she "[did]n't want to seem like an opportunist," she was hoping to clerk again to "open [her] career options further" and "transition up, not down."

49.     On January 11, 2019, Carpenter spoke with Plaintiff on the phone about her doing a Fourth Circuit argument for a case that she had previously worked on.

50.     Plaintiff stated that she did not think it was "feasible" for her to do the argument.

51.     Although Carpenter offered to move other assignments off of Plaintiff's plate so she would have the time to prepare for such an opportunity, Plaintiff declined the opportunity.

52.     Carpenter then emailed Martinez the same day to recap his conversation with Plaintiff.

53.     On January 28, 2019, Plaintiff and Ishida exchanged emails about a job search for Plaintiff and Ishida indicated his willingness to help.

90

54.    On February 12, 2019, Smith told Ishida that Plaintiff would not accept any result from mediation other than the firing of Davis.

55.    On February 14, 2019, Smith indicated to Ishida that Martinez was willing to allow Plaintiff to use his office in Asheville.

56.    During Plaintiff's February 14, 2019 meeting with Langley, Plaintiff asked Langley if Chief Judge Gregory could order Martinez to move her to a different duty station or terminate the employee who allegedly harassed her in order to resolve the mediation.

57.    Langley told Plaintiff that Chief Judge Gregory did not have the authority to order Martinez's office to do anything as a result of *mediation* because it was a pre-Complaint stage of the EDR process involving only the complaining employee and the employing office.

58.    Langley explained to Plaintiff that under the then-current Model EDR Plan that applied to her matter, there were two pre-Complaint stages: a 30-day Counseling stage between the employee and the EDR Coordinator, intended to educate the employee about the EDR process; and a 30-day Mediation stage between the employee and the employing office, designed to see if the employee and employing office could reach a mutually agreeable settlement of the matter.

59.    Langley explained to Plaintiff that, under the applicable EDR Plan, if mediation is not successful, and the employee files an EDR Complaint, the Chief Circuit Judge would then appoint a Judge (a Presiding Judicial Officer, or "PJO") to oversee the Complaint, and the PJO would have authority to order remedies.

60.    Langley explained to Plaintiff that she was currently in the mediation stage, and because no EDR Complaint had yet been filed, a PJO with authority to order any EDR remedy had not yet been designated.

61.    Langley explained that during the mediation stage, only the parties, with the assistance of the mediator, can agree to a mutual resolution. Langley advised Plaintiff she could request that her duty station be moved, or make any other request, in an attempt to settle the matter, but that request would be to the employing office – there was no PJO designated during the mediation stage who could order a mediation resolution or make a determination of liability.

91

62.     Langley did not tell Plaintiff that a designated EDR PJO had no jurisdiction to order a remedy against a Federal Public Defender organization.

63.     Defendants did not inform Plaintiff that Martinez would be final decisionmaker at the EDR hearing stage.

64.     During Plaintiff's mediation, Smith offered to help Plaintiff secure a Fourth Circuit clerkship and advocate on Plaintiff's behalf.

65.     Defendants took appropriate actions in response to Plaintiff's concerns about working or otherwise interacting with Davis.

66.     In March 2019, Martinez conducted his first set of attorney reviews for all employees.

67.     On March 25, 2019, Martin, the other AFD who had previously served as an R&W Specialist, was given a pay raise because he had the years of experience to qualify for a higher salary, was under paid in relation to other AFDs with his experience level (9 years) and was performing at an exceptional level. Martin was already an AD29, so he did not receive a promotion.

68.     At the time she departed the FDO, Plaintiff did not have the years of experience necessary to convert to a higher level on the AD scale.


(4) Any jurisdictional questions. None.


(5) Any question raised by pending motions.


**Plaintiff:** Plaintiff reserves her right to file motions in limine, motions to strike, or any other appropriate motion within 21 days of trial or deadline set by the Court.  *See* WDNC LCvR 7.1(e) (time frames for filing of motions, responses, and replies).

Defendants did not identify any witnesses for trial until mid-day on July 24, 2023, and they still have not proposed any exhibits or designated any depositions, contrary to this Court's instructions during the summary judgment hearing on July 10, 2023.  By contrast, Plaintiff has

provided a complete list of witnesses, exhibits, and deposition designations below. Plaintiff

reserves the right to object and file motions in limine, motions to strike, or any other appropriate

motion regarding any exhibits, deposition designations, or witness designations identified by

Defendants within 21 days of trial or subject to other deadline provided by the Court, after a

reasonable opportunity for review. *See* WDNC LCvR 7.1(e) (time frames for filing of motions,

responses, and replies).

Plaintiff will move in limine to preclude Defendants from presenting any witness

testimony at trial because Defendants did not disclose any witnesses in discovery or in response

to Plaintiff's interrogatories. *See* ECF No. 211 (Defendants' May 5, 2023 motion to Exclude

Belatedly Disclose Witnesses); ECF No. 220, at 2 (Plaintiff's discussion of Defendants' failure

to disclose witnesses); ECF No. 233 (order denying in part and granting in part Defendants'

motion). Moreover, Defendants' proposed witness testimony is cumulative and duplicative

given that all of their witnesses have either been deposed or submitted written declarations (and

in at least four instances, multiple declarations) in this case. *See* Fed. R. Civ. P. 403 (evidence

should be excluded if it will result in "unfair prejudice, . . . undue delay, waste of time, or

needless[] present[ation of] cumulative evidence"). The only exception is Erin Taylor, who was

not disclosed on any witness list or even as an individual with relevant information until April

17, 2023, less than two weeks before the close of discovery. Defendants have provided no

justification for their delay in disclosing Ms. Taylor, and she, along with all of the other

witnesses who Defendants failed to disclose, should be excluded from trial. Because Plaintiff

was only provided with a list of trial witnesses for the first time on July 24, 2023, she reserves

the right to object and further develop her arguments in a motion in limine or motion to strike.

Additionally, Plaintiff opposes Defendants' below proposal "to move the trial date to September 27 or later." This case has been pending for more than three years, since March 2020, and for more than a year since the case was remanded from the Fourth Circuit on June 21, 2022. Plaintiff's motion for a preliminary injunction has pending for a full year, since July 27, 2022. ECF No. 125. In October 2022, the Fourth Circuit ordered that this Court must rule "promptly" on Plaintiff's motion for a preliminary injunction. ECF No. 156. Waiting until the end of the trial month in a case that has already been pending for more than a full year since the preliminary injunction motion was filed is not in compliance with the Fourth Circuit's order or the standards governing preliminary injunction motions. *See* 28 U.S.C. § 1657(a) ("[T]he Court shall expedite the consideration of . . . any action for temporary or preliminary injunctive relief."). Plaintiff thus requests the earliest possible trial date on the Court's calendar.

Defendants will not be prejudiced by an earlier trial date given that Plaintiff is not calling any witnesses or presenting any additional evidence beyond what is cited in this pretrial memorandum, and her evidentiary showing relies nearly exclusively on admissions, documents, and testimony produced by Defendants. Moreover, Defendants cannot complain about the September trial date given that they have been on notice of that date for more than a year and repeatedly consented to it in their filings. *See* Minute Entry Order Dated July 14, 2022 ("The case is placed on the running trial list for September 2023."); ECF No. 160 ("[T]he parties agree that the trial date of September 2023 that was ordered by the Court during the July 2022 status conference should be maintained."). This Court reiterated during the July 10, 2023 summary judgment hearing that the trial would be in September. Further, given Defendants' estimate of 35 hours of witness testimony, it would not be possible to hold a September trial starting on "September 27 or later," as the trial would inevitably need to take place at least partly in

94

October. Defendants' proposal is thus in defiance of this Court's orders and the Fourth Circuit's order that the trial be held promptly, and it undermines Plaintiff's statutory right to a prompt decision on her preliminary injunction motion.

**Defendants:** The only pending motion of which Defendants are aware is ECF No. 252, which is their motion to move the trial date to September 27 or later due to conflicts for the attorneys earlier in the month, including religious holidays. Defendants have since learned that many of the witnesses in this matter also have conflicts the first three weeks of September, including witnesses Plaintiff has indicated she may call at trial.

(6) Issues of law, including evidentiary questions, together with supporting authority.

**Plaintiff:**

**Equal protection:**

The Fourth Circuit held that "federal judiciary employees who occupy supervisory roles and/or who are charged with enforcing an EDR plan can . . . be held liable under the Fifth Amendment for their deliberate indifference to sexual harassment committed by a federal judiciary employee or supervisor against another federal judiciary employee." *Strickland v. United States*, 32 F.4th 311, 321 (4th Cir. 2022). Plaintiff's complaint alleged each of the elements of a deliberate indifference claim, including that (1) she "was subjected to sexual harassment by the First Assistant"; (2) she "reported the sexual harassment to various judiciary employees, some of whom alerted the FPD to the harassment"; (3) Defendants "fail[ed] to take immediate and effective action on her complaints,' and also 'fail[ed] to provide her with meaningful review or remedies'" (quoting Complaint ¶ 498); and (4) Defendants' "failure to take

proper corrective action was intentional and motivated by their intent to discriminate against her because of her gender." *Id.* at 360.

The Fourth Circuit held that Plaintiff's Complaint clearly alleged both sexual harassment and deliberate indifference and described these allegations as follows:

> The [FPD] ratified the [First] Assistant's harassing conduct, most significantly by refusing to consider [Strickland] for the promotion for which she was qualified—a discriminatory follow-up to the Assistant's quid-pro quo sexual harassment. The meaning of the [First] Assistant's harassing email was that if [Strickland] didn't "pay" in the way he wanted, that is, sexually, she would not get the promotion. In refusing to consider the promotion—even going to lengths to backdate his reclassification of her title to the day before she became eligible for promotion, . . . the Defender made good on the [First] Assistant's threat. This response was clearly unreasonable and effectively caused further harassment.
>
> Second, after Fourth Circuit and AO officials were put on notice of the sexual harassment and of the [FPD's] disregard of AO advice on stopping it, they protected the [FPD] rather than taking steps to end the harassment. The officials prohibited [Strickland] from seeking guidance about her civil rights from the FEOO. The officials allowed the [FPD] to drive the process despite his conflict of interest: The [FPD] appointed the investigator to investigate the allegations, and decided how to discipline the Assistant. The Chief Judge refused to disqualify the [FPD] from acting on behalf of the employing office in the dispute resolution process. Officials failed to conduct an impartial investigation by a well-trained investigator. The Circuit Executive limited the investigation's scope to exclude the [FPD's] wrongful conduct. As a result, the Investigator did not fully investigate [Strickland]'s claims.

*Id.* at 337. Thus, if Plaintiff proves these allegations as set forth by the Fourth Circuit, she will have prevailed on her equal protection claim.

**Due process**:

The Fourth Circuit held that the "refusal to disqualify the FPD from the [EDR] investigation and the alleged coercing of Strickland to end the investigation stated a plausible violation of her due process rights." *Id.* at 355. "The refusal to disqualify the FPD created a

conflict of interest that infected the entire investigation when Strickland was led to believe that the FPD would be the final decisionmaker in the case." *Id.* Thus, "Strickland's due process rights were violated if she can prove that the FPD, an accused party, was not disqualified from the EDR process, and if Strickland was led to believe that the FPD would be the final decisionmaker in her case." *Id.* at 356. In short, under the Fourth Circuit's decision, if Plaintiff can prove that (1) she was coerced to end the EDR investigation, or (2) the FPD was not disqualified and Plaintiff was led to believe that he would be the decisionmaker in her case, then she will have prevailed on her due process claim.

Additionally, the evidence disclosed in discovery reveals another basis for Plaintiff's due process claim that was not disclosed at the time of the Fourth Circuit's decision: namely, the Defender's egregious conflicts of interest, including that the investigation found that he had engaged in conduct warranting disciplinary action and was "biased" against Plaintiff and "could cause more damage if he were involved in the process at this point." ECF No. 255, at 6–10; *see also* ECF No. 250, at 13. The Defender's continued participation in the EDR process, notwithstanding his egregious and actual conflicts of interest, concretely prejudiced Plaintiff and deprived her of her right to impartiality and a lack of bias at every stage of the EDR process. *Id.*

### **Front pay**:

The Fourth Circuit held that Plaintiff's request for front pay in lieu of reinstatement "constitute[s] an equitable remedy." *Strickland*, 32 F.4th at 366. This holding accords with longstanding precedent recognizing that "[a]lthough reinstatement of a wrongfully discharged employee is preferable, 'in appropriate circumstances, a district court may award front pay in lieu of reinstatement.'" *Id.* (quoting *Hunter v. Town of Mocksville*, 897 F.3d 538, 562 (4th Cir. 2018)); *see also Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001) ("In cases

in which reinstatement is not viable because of continuing hostility between the plaintiff and the employer or its workers, . . . courts have ordered front pay as a substitute for reinstatement.").
Under the circumstances, a substantial front pay award is supported by precedent from virtually every circuit on front pay awards against government entities. *See, e.g., Warren v. Cnty. Comm'n of Lawrence Cnty., Ala.*, 826 F. Supp. 2d 1299, 1313 (N.D. Ala. 2011) (32 years); *Feldman v. Philadelphia Housing Auth.*, 43 F.3d 823, 832–33, 841 (3d Cir. 1995) (27 years); *Lussier v. Runyon*, 50 F.3d 1103, 1106 (1st Cir. 1995) ("projected 25-year work expectancy"); *Padilla v. Metro-North Commuter RR*, 92 F.3d 117, 126 (2nd Cir. 1996) ("well over 20 years"); *Bates v. Bd. of Educ. of Capital Sch. Dist.*, No. 97-394-SLR, 2000 WL 376405, at *10 (D. Del. Mar. 31, 2000) (17 years); *Newton v. Pennsylvania State Police*, No. CV 18-1639, 2022 WL 874306, at *10 (W.D. Pa. Mar. 24, 2022) (11.8 years); *Gotthardt v. Nat'l Railroad Passenger Corp.*, 191 F.3d 1148, 1156–58 (9th Cir. 1999) (11 years); *Jackson v. City of Cookeville*, 31 F.3d 1354, 1360 (6th Cir. 1994) (11 years); *O'Kell v. Haaland*, 598 F. Supp. 3d 1032, 1051 (E.D. Wash. 2022) (11 years); *Tinsley v. City of Charlotte*, No. 3:16-CV-00656-GCM, 2019 WL 1874044, at *6 (W.D.N.C. Apr. 26, 2019) (9 years).

**Defendants:**

1. Whether Ms. Strickland was led by the Defendants to reasonably "believe that the FPD would be the final decisionmaker in the case." *Strickland v. United States*, 32 F.4th 311, 355 (4th Cir. 2022); *see also See Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 172-78 (4th Cir. 1988) (holding that for an employee to establish a procedural due process violation, the employee must show that he "reasonably could have relied" on misrepresentation by Defendants).

98

2. Whether Plaintiff "was subjected to sexual harassment by another employee or supervisor"; whether Plaintiff "alerted supervisory officials and/or officials responsible for overseeing the court's EDR plan about the sexual harassment" before August 2018; whether the "supervisory officials and/or officials responsible for overseeing the court's EDR plan responded to the allegations with deliberate indifference"; whether any deliberate indifference "was motivated by a discriminatory intent"; and whether Plaintiff was subjected to "continued sexual harassment and adverse treatment [as] a female employee unlike the treatment accorded male employees . . . after, and partially in response to, [her] report of prior discrimination and harassment." *Strickland*, 32 F.4th at 357, 359.

3. Whether front pay is an appropriate remedy for Plaintiff's procedural due process claim. *Detweiler v. Va. Dep't of Rehabilitative Servs.*, 705 F.2d 557, 562 (4th Cir. 1983). Whether Ms. Strickland's "working conditions bec[a]me so intolerable that a reasonable person in [her] position would have felt compelled to resign[.]" *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004); *see also Matvia v. Bald Head Island Mgmt.*, 259 F.3d 261, 273 (4th Cir. 2001). Whether Ms. Strickland's conduct renders an award of reinstatement or front pay in lieu of reinstatement inequitable. *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 361–62, (1995). Whether Ms. Strickland has met her "burden of proving actual damages, if any." *See* Order dated Apr. 25, 2023, ECF No. 206.

(7) Any requested amendments to the pleadings. None.

(8) Any additional matters to aid in the disposition of the action.

**Plaintiff**: ***Trial Proposal:*** In a similar case subject to a Rule 65(a) consolidated bench trial and involving constitutional claims based on an administrative record provided by the defendants, this Court allowed the parties to incorporate prior briefing by reference into the trial record and decided the matter based on the parties' briefing and exhibits. *See Victim Rights Law Center et al. v. Devos*, No. 1:20-cv-11104-WGY (D. Mass), ECF Nos. 140, 142 (joint motion and order governing proceedings). Based on the largely undisputed factual record, as confirmed above by the extensive judicial admissions in this case, this streamlined procedure would reduce the burden on the Court and serve the interests of judicial efficiency as well as Plaintiff's interest in a prompt decision on the merits of her claims, given her pending motion for preliminary injunction. *See id.* (involving consolidated trial associated with pending preliminary injunction motion); *see also* Fed. R. Civ. P. 1 ("[Rules of Civil Procedure] should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding."). In particular, Plaintiff is mystified by Defendants' below statement that there is "no administrative record" in this case. The entire basis for Plaintiff's claims occurred within the context of an administrative proceeding under Chapters IX and X of the EDR Plan. Defendants' contention thus ignores the administrative record for the EDR investigation that Defendants themselves conducted, which resulted in disciplinary action for wrongful conduct that Defendants themselves took—including for sexual harassment by the First Assistant, supported by the Investigator's findings that he engaged in conduct that "can clearly be inferred to be a quid pro quo request." ECF No. 248-5, at 22. As shown by Plaintiff's exhibit list below, the evidence she is relying on was produced by Defendants in discovery as part of the administrative record in this case or are otherwise

incorporated by reference as admissions in their First Amended Answer. Moreover, the loss of

four of Plaintiff's counsel, *see* Entry Order Dated May 23, 2023, including her only counsel with

trial experience, further supports this approach because Plaintiff and her remaining counsel are

unable to provide a plenary presentation of evidence at trial under the circumstances. Plaintiff

would be severely prejudiced by allowing Defendants to relitigate this case with 35 hours of

cumulative and duplicative witness testimony when, due to her legal team's *en masse*

withdrawal, she lacks comparable resources to Defendants and their counsel. Therefore, Plaintiff

requests a procedure similar to *Victims Rights Law Center*:

- Trial for this case is set for September 2023. *See* Entry Order Dated July 14, 2022.

  Plaintiff's motion for a preliminary injunction has been pending since July 27, 2022 and

  was consolidated with a trial on the merits on September 8, 2022. *See* Entry Order Dated

  September 8, 2022. This Court has stated that it "fully recognizes the Plaintiff's interest

  in prompt relief should she prevail on the merits." ECF No. 185, at 3–4. Consistent with

  that interest, Plaintiff respectfully requests the earliest possible trial date on the Court's

  calendar. Plaintiff requests that the parties each be provided a half an hour for argument.

  *Victim Rights Law Center et al.*, No. 1:20-cv-11104-WGY, ECF No. 136, at 16.

- Plaintiff respectfully incorporates by reference her prior summary judgment filings into

  her pre-trial briefing. *See* ECF Nos. 248, 250, 255; *see also Victim Rights Law Center et*

  *al.*, No. 1:20-cv-11104-WGY, ECF No. 142 (ordering that "preliminary injunction briefs

  are deemed incorporated by reference into the parties' pre-trial briefing").

- Plaintiff proposes that each party file a pretrial brief of fifteen pages or less, to be due

  seven days before trial. *See Victim Rights Law Center et al.*, No. 1:20-cv-11104-WGY,

  ECF No. 142 (ordering pretrial brief of fifteen pages or less).

- Subject to this proposal, Plaintiff will not call any witnesses at trial and proposes that the parties agree to a stipulation that would negate the need to call witnesses solely for the purpose of establishing the foundational requirements for the admission of exhibits.

- Plaintiff will move *in limine* to preclude Defendants from presenting any witness testimony at trial because Defendants did not disclose any trial witnesses in discovery or response to Plaintiff's interrogatories. *See* ECF No. 211 (Defendants' May 5, 2023 motion to Exclude Belatedly Disclose Witnesses); ECF No. 220, at 2 (Plaintiff's discussion of Defendants' failure to disclose witnesses); ECF No. 233 (order denying in part and granting in part Defendants' motion). If the Court denies Plaintiff's motion, then Plaintiff conditionally consents to submission of the declarations filed with Defendants' summary judgment filings in lieu of live testimony and waives cross examination of their declarants, subject to the objections in her motion *in limine*. If Defendants are permitted to call live witnesses at trial, Plaintiff does not waive cross examination of Defendants' witnesses.

- Plaintiff requests that the parties appear remotely at the trial if the Court accepts her trial proposal; otherwise, if live witnesses must be called at trial, Plaintiff requests a courtroom in Asheville for counsel and witnesses.

- Plaintiff does not anticipate the need for post-trial briefs; however, Plaintiff reserves the right to request post-trial briefing.

**<u>Defendants</u>:** Defendants oppose Plaintiff's proposal for trial to have no live witness testimony. The case cited by Plaintiff, *Victim Rights Law Center et al. v. Devos*, No. 1:20-cv-11104-WGY (D. Mass), ECF Nos. 140, 142 (joint motion and order governing proceedings), was a challenge to a government regulation. Accordingly, in that case, both parties mutually agreed

that the court could decide the matter on the basis of the administrative record without live witness testimony, as is the norm in such administrative cases. This case has no administrative record—rather, the parties both participated in months of discovery and fact-gathering. The Court's factfinding role would greatly benefit from a presentation of evidence that includes live witness testimony, including on disputed issues of fact. Further, the Court will need to make credibility determinations about the witnesses' testimony to decide this case. As one of many examples, Plaintiff did not depose Davis at all, despite the fact he is the main target of her accusations of sexual harassment. The Court will need to hear Davis's testimony to decide Plaintiff's sexual harassment claims because there is no deposition transcript to designate in lieu of live testimony. Accordingly, this Court should hold a trial to allow the parties to present a full and complete record. Plaintiff provides no support for her request that the witnesses appear via videoconference and Defendants are aware of no basis for the request. Defendants' witnesses and counsel are fully prepared to appear in person in the Asheville Division of the Western District of North Carolina, which has courtrooms equipped with the technology for the Court to appear virtually, if it prefers.

Plaintiff's claim that Defendants did not disclose their witnesses to her during discovery is unwarranted and lacks any support in either fact or law. All witnesses named in the table below in Section 10 were disclosed to Plaintiff in compliance with the Federal Rules of Civil Procedure and this Court's scheduling order. On August 19, 2022, in their initial disclosures under Rule 26(a), Defendants disclosed Heather Beam, J.P. Davis, Josh Carpenter, James Ishida, Jill Langley, Anthony Martinez, and William Moormann as witnesses. Then, on December 21, 2022, Defendants responded to Plaintiff's First Interrogatory naming all the individuals listed in Defendants' initial disclosures as well as additional witnesses with "material knowledge or

information," including Ed Smith and Judge Gregory. Defendants then further supplemented that interrogatory response on April 17, 2023, with additional witnesses, including Erin Taylor.

Before the close of discovery, Plaintiff did not file a motion to compel or otherwise object to the adequacy of Defendants' response to the above-noted interrogatories (nor any other interrogatory), and it is too late for her to do so now, nearly three months *after* the close of fact discovery in this matter. *See, e.g.*, *Rudolph v. Buncombe Cnty. Gov't*, 2011 WL 5326187, at *2 (W.D.N.C. Nov. 4, 2011) (holding that "[b]ecause Plaintiff filed her Motion to Compel after the close of discovery, it is untimely"); *Days Inn Worldwide, Inc. v. Sonia Invs.*, 237 F.R.D. 395, 397–98 (N.D.Tex.2006) (collecting cases); *Lane. v. Lucent Techs., Inc.,* 2007 WL 2079879 (M.D.N.C. Jul. 13, 2007) (denying motion to compel filed "well after the close of discovery" as untimely). Indeed, at least one district court in the Fourth Circuit has expressly held that parties may not raise a discovery dispute after the close of discovery by means of a trial motion. *Steele v. Goodman*, 2020 WL 3620427, at *8 (E.D. Va. July 2, 2020) (denying motion *in limine* filed after the close of discovery because it was an "improperly raised [] discovery dispute," not a genuine trial motion).

Further, Plaintiff has offered no legitimate basis for this Court to exclude the testimony of any of Defendants' witnesses. Plaintiff would not be prejudiced by their testimony since she has not only had notice of the majority of the named witnesses in the initial disclosures Defendants served nearly a year ago, but also cannot claim to have been surprised by the subsequent identification of Ed Smith, who mediated her claim under the EDR process, Judge Gregory, who she claims wrongfully denied her request to disqualify Tony Martinez, and Erin Taylor, a Team Lead in the FDO. In any event, Plaintiff has deposed nearly all of the witnesses Defendants identified and cannot demonstrate that she will be prejudiced by their testimony at trial. *See Southern States Rack & Fixture v. Sherwin-Williams Co.*, 318 F.3d 592, 595-97 (4th Cir. 2003)

(holding that when considering exclusion "a district court should be guided by the following factors: (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence."). Here, all of the factors in *Sherwin-Williams* weigh in Defendants' favor.

Defendants additionally propose that the parties finalize their joint deposition designations after the witness list for trial is set. Defendants propose that in their joint deposition designations, each party will highlight the portions of the deposition they wish to designate for non-testifying witnesses and make any objections in the same document, for the Court's and the parties' convenience. Defendants propose that this task be completed by a future date as set by the Court after the witness list is finalized.

## (9) The probable length of trial and whether jury or nonjury.

**Plaintiff:** If the Court accepts Plaintiff's trial proposal, no witnesses need to be called and no trial time is needed to present evidence. Alternatively, total trial length should not exceed one week, assuming the Court sits from 9:00 a.m. to 1:00 p.m. *See* ECF No. 171, at 33–34 (referencing week-long trial as appropriate for this case).

**Defendants:** Defendants believe this nonjury trial is expected to last approximately 5 days and that 35 hours will be needed.

## (10) A list of the names and addresses of witnesses who will testify at trial and the purpose of the testimony, i.e., whether factual, medical, expert, etc.

**Plaintiff:** Plaintiff will not call any witnesses unless needed for purposes of admitting exhibits into the trial record, as discussed above. *But see* Cmt. Fed. R. Civ. P. 26(a)(3) (purpose of pretrial disclosures is, in part, to "eliminate the need to have available witnesses to provide 'foundation' testimony for most items of documentary evidence"). The following witnesses are "may call" witnesses for this purpose:

James Ishida, 1100 E. Main St., Ste. 501, Richmond, VA 23219

J.P. Davis, 129 West Trade St., Suite 300, Charlotte, NC 28202

Bill Moormann, 129 West Trade St., Suite 300, Charlotte, NC 28202

Heather Beam, 401 West Trade St. Charlotte, NC 28202

Hon. Roger Gregory, 1100 E. Main St., Ste. 501, Richmond, VA 23219

Ed Smith, current address unknown

If Plaintiff's deposition designations are challenged, Plaintiff also hereby designates each of the individuals in her deposition designations as "may call" witnesses. If the Court accepts Plaintiff's trial proposal, no witnesses need to be called and no trial time is needed to present evidence. As stated above, Plaintiff reiterates her objection to allowing Defendants to present witness testimony that is cumulative and duplicative of deposition testimony and declarations and that was not timely disclosed to Plaintiff in discovery or prior to trial. Moreover, Plaintiff objects to Defendants' failure to provide exhibit lists and deposition designations as ordered by the Court during the July 10, 2023 summary judgment hearing, and as required by the Court's standard pretrial order. Plaintiff has provided a complete list of exhibits and deposition designations below, in compliance with the Court's instructions, and she will be prejudiced by Defendants' failure to do so as required by the Court. Defendants' failure to timely disclose exhibits and deposition designations provides yet another basis to exclude them from presenting

any witness testimony or exhibits at trial. Finally, Plaintiff does not understand the basis for Defendants' below statement that she has "proposed to delay naming her witnesses," as her witnesses are named above. Because Defendants have not proposed any exhibits or designated any depositions, and did not identify any witnesses for trial until July 24, 2023, Plaintiff reserves the right to update her witness list after (1) a reasonable opportunity for review and (2) any future rulings by the Court that may affect the presentation of evidence at trial. *See* Fed. R. Civ. P. 26(a)(3).

**Defendants:** Contrary to Plaintiff's assertions, Defendants have completed their witness designations in compliance with the Court's instructions at the July 10, 2023, hearing and oppose Plaintiff's request to call any witnesses that are not expressly named in this filing. Defendants further respectfully request that the Court set the witness list for trial, so that, if appropriate, the parties need not expend unnecessary resources to depose the witnesses that Plaintiff identified on the date discovery closed, none of whom Plaintiff has listed in this filing as a possible witness at trial.

Defendants may call the following witnesses identified in the table below, without conceding the propriety of such witnesses testifying. Defendants also reserve the right to call any witness identified by Plaintiff and the right to call witnesses who are not listed to rebut Plaintiff's evidence.

| Witness | Address | Purpose |
|---|---|---|
| Anthony ("Tony") Martinez | c/o Missy Spainhour<br>Constangy, Brooks, Smith & Prophete LLP<br>84 Peachtree Road<br>Suite 230<br>Asheville, NC 28803<br>(828) 333-4218 | Factual |

| | | |
|---|---|---|
| John Parke ("JP") Davis | c/o Trial Attorneys Danielle Young and Madeline McMahon<br>1100 L St, NW<br>Washington, DC 20005 | Factual |
| Joshua ("Josh") Carpenter | c/o Trial Attorneys Danielle Young and Madeline McMahon<br>1100 L St, NW<br>Washington, DC 20005 | Factual |
| Heather Beam | c/o Trial Attorneys Danielle Young and Madeline McMahon<br>1100 L St, NW<br>Washington, DC 20005 | Factual |
| Edward ("Ed") Smith | c/o Trial Attorneys Danielle Young and Madeline McMahon<br>1100 L St, NW<br>Washington, DC 20005 | Factual |
| James Ishida | c/o Trial Attorneys Danielle Young and Madeline McMahon<br>1100 L St, NW<br>Washington, DC 20005 | Factual |
| Judge Roger Gregory | c/o Trial Attorneys Danielle Young and Madeline McMahon<br>1100 L St, NW<br>Washington, DC 20005 | Factual |
| Jill Langley | c/o Trial Attorneys Danielle Young and Madeline McMahon<br>1100 L St, NW<br>Washington, DC 20005 | Factual |
| William ("Bill") Moormann | c/o Trial Attorneys Danielle Young and Madeline McMahon<br>1100 L St, NW<br>Washington, DC 20005 | Factual |
| Erin Taylor | c/o Trial Attorneys Danielle Young and Madeline McMahon<br>1100 L St, NW<br>Washington, DC 20005 | Factual |
| Caryn Strickland | PO Box 92<br>Lynn, NC 28750 | Factual |
| Robert Jackson | c/o Trial Attorneys Danielle Young and Madeline McMahon<br>1100 L St, NW<br>Washington, DC 20005 | Expert |
| Paul White | c/o Trial Attorneys Danielle Young and Madeline McMahon<br>1100 L St, NW<br>Washington, DC 20005 | Expert |

(11) <u>A list of the proposed exhibits (photographs, documents, instruments, and all other objects)</u> <u>in numerical order. Those exhibits to be introduced without objection shall be identified by a single</u> <u>sequence of numbers and those items to which a party reserves the right to object shall be identified</u> <u>by a single sequence of capital letters in the following form: A-Z, AA-AZ, BA-BZ, etc., regardless</u> <u>of which party is offering the exhibit</u>.

**Plaintiff:** Pursuant to the Court's standard "Procedural Order Re: Final Pretrial Conference/Trial," Plaintiff provides notice that "the trial materials required by this Order have been previously filed with the Court" and sets forth "supplement trial documents" as described herein below.

Plaintiff hereby incorporates by reference the exhibits cited in her summary judgment filings, as well as the documents incorporated by reference in, or otherwise integral to, Defendants' First Amended Answer. *See* ECF Nos. 248, 250, 255. Plaintiff requests that the Court grant Plaintiff's pending and unopposed motion to file Exhibit P to ECF No. 243 (Plaintiff's Renewed Motion for Summary Judgment) under seal. *See* ECF Nos. 244, 247. In addition to these exhibits, Plaintiff hereby incorporates by reference the following exhibits that are not yet part of the trial record:

- **Emails between William Moormann (Administrative Officer) and AO HR Officials (Bates No. US2705–08)**: This Exhibit is provided in response to an argument that Defendants raised for the first time in their reply brief in support of summary judgment. *See* ECF No. 254, at 11–12. The Exhibit is a document from the FDO demonstrating that within weeks after Plaintiff left the FDO, a male research and writing attorney, who was also converted to an assistant federal defender position, was given a promotion equivalent to a grade and a step

on the JSP scale "in less than the standard 52 weeks." Exhibit AAA (statement from Administrative Officer that "we wish to perform a pay adjustment from $134,379.00 to 147,816.90" for Mr. Martin "in less than the standard 52 weeks"). As a result, this male attorney was making approximately $40,000 more than Plaintiff despite having substantially the same job duties. *Id.* By contrast, Plaintiff was not considered for a grade-level promotion based on her years of service and excellent work performance even though she was eligible. Plaintiff and the male attorney were reclassified at the same time, and by Defendants' own admission, the "usual" grade level promotion should have occurred at that time. *See id.* ("Due to the reclassification the usual Grade and Step pay changes did not occur.").

Plaintiff thus offers this Exhibit to rebut Defendants' unsupported contentions, made for the first time in their summary judgment reply brief, that Plaintiff was treated no differently than the male research and writing attorney and that his treatment shows she was somehow "ineligible" for a grade and step level promotion. ECF No. 254, at 11–12. To the contrary, the male attorney was provided precisely the promotion that Plaintiff was denied, and in less than the standard 52 weeks ordinarily needed to establish eligibility for a grade-level promotion. Thus, Defendants' assertions are contradicted by their own documentary evidence. This evidence further demonstrates that Defendants' failure to promote Plaintiff was both discriminatory and retaliatory, that the First Assistant's *quid pro quo* harassment was ratified and facilitated through denial of the grade-level promotion, and that Defendants' attempts to assert non-discriminatory reasons for the promotion denial are false and blatantly pretextual.

- **Transcript of Conversation 181221_0937 Redacted**: This Exhibit is a transcript prepared by Defendants of an all-staff meeting at the FDO involving comments mocking an African American Assistant United States Attorney for rapping to the jury; a supervising Team

Leader's comments about "the problems" caused by the fact that his intellectually disabled client "is so retarded"; and comments mocking "all our clients" who "want to smoke a blunt" during the holidays, resulting in more supervised release violations. Because the transcript did not accurately reflect all of the statements made during the all-staff meeting, likely due to poor audio quality, the original recording will also be provided as an exhibit.

- Additional "miscellaneous" exhibits that Plaintiff may use to support her claims at trial are listed below.

The following is a complete list of Plaintiff's exhibits:

## PLEADINGS

1. Plaintiff's Complaint (ECF No. 1)

2. Defendants' Answer (ECF No. 127)

3. Defendants' Redline Proposed First Amended Answer (ECF No. 250-9, Ex. BB, ECF No. 196-2)

4. Defendants' First Amended Answer (ECF No. 210)

## SUMMARY JUDGMENT FILINGS

1. Strickland Official EDR Grievance and Cover Email (ECF No. 248-2; Bates No. US500–07[2]);
2. Strickland EDR Disqualification Request and Cover Email (ECF No. 248-2; Bates No. US597–98);
3. Strickland EDR Mediation Supplement and Exhibits (ECF No. 248-2; Bates No. US64–109);
4. Strickland EDR Renewed Disqualification Request and Cover Email (ECF No. 248-2; Bates No. US1498–1502);
5. 2013 EDR Plan (ECF No. 248-3; Bates No. US4536–64);
6. Defendants' Objections and Responses to Plaintiff's Second Set of Requests for Admission (ECF No. 248-4);
7. Draft EDR Report of Investigator/Counselor and Cover Email (ECF No. 248-5; Bates No. US1654–61);

[2] "Bates No. USXXX" references document produced by Defendants during discovery.

111

8.      Final EDR Report and Exhibits of Investigator/Counselor and Cover Email (ECF No. 248-5; Bates No. US2293, 1244–1311);

9.      EDR Coordinator Disciplinary Action Letter (ECF No. 248-5; Bates No. US7561–62);

10.     Draft EDR Counseling Letter (ECF No. 248-5; Bates No. US1312–15);

11.     Final EDR Counseling Letter (ECF No. 254-4; Bates No. US4264–67);

12.     Anthony Martinez (Federal Defender) Deposition (ECF No. 248-6; ECF No. 250-14; ECF No. 255-4);

13.     Jill Langley (Judicial Integrity Officer) Deposition (ECF No. 255-12);

14.     Hon. Roger Gregory (Chief Judge/ EDR Presiding Officer) Deposition (ECF No. 255-2);

15.     Ed Smith (Circuit Mediator) Deposition (ECF No. 248-9; ECF No. 255-7);

16.     Nancy Dunham (AO FEOO) Deposition (ECF No. 255-15);

17.     Heather Beam (EDR Investigator/Counselor) Deposition (ECF No. 248-11; ECF No. 250-4; ECF No. 255-15);

18.     James Ishida (Circuit Executive/ EDR Coordinator) Deposition (ECF No. 248-12; ECF No. 255-3);

19.     Caryn Strickland (Plaintiff) Deposition (ECF No. 248-13);

20.     June 2018 J.P. Davis (First Assistant) Email Notes (ECF No. 248-14; Bates No. US5890–91);

21.     Text Messages between J.P. Davis (First Assistant) and Erin Taylor (Trial Unit Chief) (ECF No. 248-14; Bates No. US5777–82, 5807–14, 5881–89; ECF No. 248-15, US6852–68);

22.     July 2018 J.P. Davis (First Assistant) Mentoring Email (ECF No. 248-14; Bates No. US6088);

23.     July 2018 J.P. Davis (First Assistant) PIP Email (ECF No. 248-14; Bates No. US3974–75);

24.     Text Messages between J.P. Davis (First Assistant) and Anthony Martinez (Federal Defender) (ECF No. 248-14; Bates No. US6035–36);

25.     July 2018 Holly Dixon (Administrative Assistant to the Defender) Team Leader Notes with Cover Email (ECF No. 248-14; Bates No. US7411–15);

26.     August 2018 James Ishida (Circuit Executive/ EDR Coordinator) AO Interference Email (ECF No. 248-14; Bates No. US2558–61);

27.     Heather Beam (EDR Investigator/Counselor) Investigation Notes (ECF No. 248-14; Bates No. US5947–51, 6226–36);

28.     Emails between Heather Beam (EDR Investigator/Counselor) and J.P. Davis (First Assistant) (ECF No. 248-14; Bates No. US1357–60, 1353–54, 4014–15, 1343–47);

29.     Emails between Heather Beam (EDR Investigator/Counselor), J.P. Davis (First Assistant), and Anthony Martinez (ECF No. 248-14; Bates No. US2822–23, 2820);

30.     Emails between J.P. Davis (First Assistant) and James Ishida (Circuit Executive/ EDR Coordinator) (ECF 255-6; Bates No. US3020–24);

31.     December 2018 Significant Event Log (ECF No. 248-14; Bates No. US4807);

32.     January 2019 Heather Beam (EDR Investigator/Counselor) Disqualification Email (ECF No. 248-14; Bates No. US1382–83);

33.     Emails between Caryn Strickland (Plaintiff) and James Ishida (Circuit Executive/ EDR Coordinator) (ECF No. 248-14; Bates No. US1635–39; ECF No. 248-15; Bates No. US519–21, 1533–35, 4714);

112

34. Emails between J.P. Davis (First Assistant) and Josh Carpenter (Appellate Chief) (ECF No. 248-15; Bates No. US6852–68);

35. July 2018 Significant Event Log (ECF No. 248-15; Bates No. US3985);

36. Emails between James Ishida (Circuit Executive/ EDR Coordinator) and Anthony Martinez (Federal Defender) (ECF No. 248-15; Bates No. US615–18);

37. EDR Witness List (ECF No. 248-15; Bates No. US590–92);

38. March 2019 Heather Beam (EDR Investigator/Counselor) "True Pain" Email (ECF No. 248-14; Bates No. US4025–26);

39. Email between Caryn Strickland (Plaintiff) and Hon. Roger Gregory (Chief Judge/ EDR Presiding Officer) (ECF No. 248-15; Bates No. US1536);

40. Jill Langley (Judicial Integrity Officer) Notes (ECF No. 248-15; Bates No. US5445–47);

41. Emails between Caryn Strickland (Plaintiff) and Jill Langley (Judicial Integrity Officer) (ECF No. 248-15; Bates No. US2207–08);

42. Emails between James Ishida (Circuit Executive/ EDR Coordinator) and AO OGC Attorney (ECF No. 248-15; Bates No. US2739_0001);

43. August 2018 Backdated AO Form 51 (ECF No. 248-15; Bates No. US3411–12);

44. AO DOCS Manual Federal Defender Organization Job Descriptions (ECF No. 248-15; Bates No. US4956–58, 4968–74);

45. Federal Judicial Center "Preventing Workplace Harassment for Court Staff" Resource (ECF No. 248-15; Bates No. US4956–58, 4968–74);

46. Emails between Caryn Strickland (Plaintiff) and Nancy Dunham (AO FEOO) (ECF No. 248-15; Bates No. US1056–59);

47. Excerpts of Audio Recordings of Heather Beam (EDR Investigator/Counselor), James Ishida (Circuit Executive/ EDR Coordinator), and Ed Smith (Circuit Mediator) (ECF No. 248 Exh. O [Conventional Filing, ECF No. 173]; ECF 255-11; Bates No. US7615–16, 7647–49, 7654–56, 7675, 7693–96, 7709, 7730–31, 7733–34, 7989–90, 7992, 8044–45, 8068–69, 8077, 8089–90, 8103–04, 8129, 8201–02, 8206–08, 8219–21, 8263, 8283–84, 8336, 8386, 8470–71, 8516–17, 8588 [Defendants' Transcripts]);

48. FDO EDR Complaints (ECF 248-16; Defendants' Objections and Responses to Plaintiff's Third Set of Interrogatories, Bates No. US5384–89, 7448–49, 7426–47, 7451–53, 7421–25, 7513–16, 7544–47, 7542, 7529–30, 7454–56, 7508–12, 7504–07, 5551–58, 4008–10);

49. Thomas Expert Report and Declaration (ECF 248-17);

50. March 2023 Albrecht Expert Report and Declaration (ECF 248-18);

51. White Expert Report (ECF 250-1);

52. Guide to Judiciary Policy Chapter 4 (ECF 250-2);

53. WDNC FDO EDR Plan (ECF 250-3);

54. 181005_1434 Heather Beam (EDR Investigator/Counselor) Audio Transcript (ECF No. 250-5; Bates No. US7731, 7863);

55. January 2023 Kolsky Discovery Letter (ECF No. 250-6);

56. January 2023 and March 2023 Strickland Discovery Emails (ECF No. 250-8);

57. Defendants' First Amended Answer (ECF No. 250-9);

58. Defendants' Objections and Responses to Plaintiff's Requests for Production (ECF No. 250-10);

59. 190226_1153 Ed Smith (Circuit Mediator) Audio Transcript (ECF No. 250-11; Bates No. US8470–71, 8507–22, 8527–28);

113

60. 190308_1019 Ed Smith (Circuit Mediator) Audio Transcript (ECF No. 250-12; Bates No. US8618–19, 8691–98);

61. 2019 Employment Dispute Resolution Interpretative Guide & Handbook (ECF No. 250-13);

62. Other EDR Complaint Investigation Report Attachment (ECF No. 250-16);

63. 190117_1621 James Ishida (Circuit Executive/ EDR Coordinator) Audio Transcript (ECF No. 255-1; Bates No. US8201–02, 8212–23, 8263);

64. 180905_1042 James Ishida (Circuit Executive/ EDR Coordinator) Audio Transcript (ECF No. 255-5; Bates No. US7615–16, 7654–56, 7667, 7670–71, 7675);

65. Emails between J.P. Davis (First Assistant) and William Moormann (Administrative Officer) (ECF No. 255-6; Bates No. US2944);

66. Emails between James Ishida (Circuit Executive/ EDR Coordinator) and Ed Smith (Circuit Mediator) (ECF No. 255-8; Bates No. US1322–24, 201);

67. 190109_1116 James Ishida (Circuit Executive/ EDR Coordinator) Audio Transcript (ECF No. 255-9; Bates No. US8151–52, 8154–58, 8164–74, 8187);

68. Lessons From a Circuit Mediator Slideshow ) (ECF No. 255-10; Bates No. US3580–602, 201);

69. 180913_1633 AO FEOO Staff Attorney Audio Transcript (ECF No. 255-13; Bates No. US8782–83, 8813–23, 8848);

70. 181109_1540 Heather Beam (EDR Investigator/Counselor) Audio Transcript (ECF No. 255-16; Bates No. US8044–45, 8066–69, 8077);

71. Albrecht Expert Report Supporting Documentation (ECF 255-17);

### AMENDED ANSWER INCORPORATIONS BY REFERENCE

72. 180809_1344 Anthony Martinez (Federal Defender) Audio Transcript (Bates No. US7563–64, 7565–66, 7573–603);

73. 180918_0845 James Ishida (Circuit Executive/ EDR Coordinator) Audio Transcript (Bates No. US7693–94, 7696–709, 7709);

74. 181005_1434 Heather Beam (EDR Investigator/Counselor) Audio Transcript (Bates No. US7730–31, 7735, 7887, 7961–63, 7973–75, 7992);

75. 181109_1540 Heather Beam (EDR Investigator/Counselor) Audio Transcript (Bates No. US8044–45, 8050–53, 8058–59, 8061–63, 8065–66, 8068–69, 8071–73, 8074–75, 8077);

76. Emails between Heather Beam (EDR Investigator/Counselor) and Caryn Strickland (Plaintiff) (ECF No. 60-4; Bates No. US344–46, 431–32, 1428);

77. 18116_1042 Audio Recording;

78. Emails between James Ishida (Circuit Executive/ EDR Coordinator) and Caryn Strickland (Plaintiff) (ECF No. 60-4; Bates No. US476, 1611–14, 1640, 1958–60, 2049–50);

79. 181127_1711 James Ishida (Circuit Executive/ EDR Coordinator) Audio Transcript (Bates No. US8089–90, 8092–94, 8097–104, 8104–08, 8110–24, 8129);

80. Counseling Extension Order (ECF No. 60-4; Bates No. US2047);

81. 190109_1116 James Ishida (Circuit Executive/ EDR Coordinator) Audio Transcript (Bates No. US8151–52, 8185, 8187);

114

82. 190117_1621 James Ishida (Circuit Executive/ EDR Coordinator) Audio Transcript (Bates No. US8201–16, 8222–29, 8235–37, 8250–57, 8263);

83. Plaintiff's Request for Mediation (ECF No. 60-3; Bates No. US3138–39);

84. 190207_1056 Ed Smith (Circuit Mediator) Audio Transcript (Bates No. US8283–86, 8294–96, 8306, 8317, 8321–32, 8336, 8357–58, 8365, 8382, 8386);

85. 190212_1848 Ed Smith (Circuit Mediator) Audio Transcript (Bates No. US8417–42, 8427–28, 8445–47, 8449–54, 8456);

86. Emails between James Ishida (Circuit Executive/ EDR Coordinator) and Cooper Strickland (Plaintiff) (ECF No. 60-4; Bates No. US754–55);

87. 190226_1153 Ed Smith (Circuit Mediator) Audio Transcript (Bates No. US8470–71, 8473–75,8480–87, 8489–91, 8532–59, 8564–66, 8588);

88. 190308_1019 Ed Smith (Circuit Mediator) Audio Transcript (Bates No. US8618–19, 8674–75, 8700);

89. 190504_1621 James Ishida (Circuit Executive/ EDR Coordinator) Audio Transcript (Bates No. US8745–46, 8754–59, 8760–71);

## MISCELLANEOUS

90. Emails between William Moormann (Administrative Officer) and AO HR Officials (Bates No. US2705–08);

91. Defendants' March 2023 and April 2023 Privilege Log for Defendants' Production;

92. WDNC FDO 2024 AFD Job Postings;

93. AOWeb and UVM Articles regarding Caryn Devins Strickland's "dream job" as a federal public defender

94. July 2023 Albrecht Expert Report and Declaration;

95. 181221_0937 FDO all-staff meeting Audio Transcript (Bates No. US8144–8150)

96. Ethics advice provided by NC Bar restricting Plaintiff's ability to practice in federal court within the Fourth Circuit

Plaintiff reserves the right to update her exhibit list if needed prior to trial, subject to any deadline set by the Court. *See* Fed. R. Civ. P. 26(a)(3).

Plaintiff hereby incorporates by reference the deposition designations provided in her summary judgment briefs. *See* ECF Nos. 248, 250, 255. Additionally, Defendants are continuing to depose witnesses in this matter. *See* ECF Nos. 187, 208, 233 (regarding continued depositions after the close of discovery). Pursuant to Court order, these depositions must be completed by August 31, 2023. *See* ECF No. 233, at 3. Plaintiff reserves the right to add additional deposition designations once the transcripts are made available and subject to any deadline set by the Court.

The following is a complete list of Plaintiff's deposition designations, which are also included in her summary judgment filings:

1.    Anthony Martinez (Federal Defender) Deposition (ECF No. 248-6; ECF No. 250-14;
      ECF No. 255-4);

2.    Jill Langley (Judicial Integrity Officer) Deposition (ECF No. 255-12);

3.    Hon. Roger Gregory (Chief Judge/ EDR Presiding Officer) Deposition (ECF No. 255-2);

4.    Ed Smith (Circuit Mediator) Deposition (ECF No. 248-9; ECF No. 255-7);

5.    Nancy Dunham (AO FEOO) Deposition (ECF No. 255-15);

6.    Heather Beam (EDR Investigator/Counselor) Deposition (ECF No. 248-11; ECF No.
      250-4; ECF No. 255-15);

7.    James Ishida (Circuit Executive/ EDR Coordinator) Deposition (ECF No. 248-12; ECF
      No. 255-3);

In addition, Plaintiff will designate testimony from the following individuals once the transcripts are available:

1.    Dr. Gary Albrecht

2.    Vida Thomas

If Plaintiff's deposition designations are challenged, Plaintiff hereby designates each of the above individuals as "may call" witnesses. Plaintiff reserves the right to update her deposition designations based on ongoing developments if needed prior to trial. *See* Fed. R. Civ. P. 26(a)(3).

**Defendants**: Defendants have attached their proposed list of exhibits to this filing as Exhibit 1. Defendants suggest that the parties be given additional time to compile a list of mutually agreed upon exhibits that are labeled in compliance with the Court's standard order, which has not yet been entered in this case. Defendants also request that Plaintiff provide her exhibit list in a

116

table format so Defendants can indicate whether they would either agree to or object to each exhibit, and provide the basis for any objection. Defendants reserve the right to object to any and all of Plaintiff's exhibits and to update their exhibit list at a later date, if the Court permits.

Defendants request up to and including August 16, 2023, for the parties to exchange exhibits in trial admissible format and up to and including August 31, 2023 for the parties to compile a list of mutually-agreed upon exhibits. This additional time is necessary because Plaintiff's original draft pretrial statement, did not include a list of exhibits, but merely referenced the summary judgment exhibits, many of which are not in admissible form for trial.

Respectfully submitted,

*/s/ Cooper Strickland*
Cooper Strickland
N.C. Bar No. 43242
P.O. Box 92
Lynn, NC 28750
Tel. (828) 817-3703
Cooper.strickland@gmail.com
Counsel for Plaintiff


*/s/ Madeline M. McMahon*
MADELINE MCMAHON (DC Bar 1720813)
DANIELLE YOUNG
Trial Attorneys, Federal Programs Branch
U.S. Department of Justice, Civil Division
1100 L Street, NW
Washington, DC 20001
Tel.: (202) 451-7722
Email: madeline.m.mcmahon@usdoj.gov

*Counsel for Defendants*