# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CASE NUMBER 1:20CV66

|  |  |
|---|---|
| CARYN DEVINS STRICKLAND, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) |
| | ) |
| United States of America, Judicial Conference of the | ) |
| United States, Roslynn R. Mauskopf in her official | ) |
| capacity as Chair of the Judicial Conference | ) |
| Committee on Judicial Resources, Administrative | ) |
| Office of the United States Courts, James C. Duff | ) |
| in his official capacity as Director of the | ) |
| Administrative Office of the United States Courts, | ) |
| United States Court of Appeals for the Fourth Circuit, | ) |
| Judicial Council of the Fourth Circuit, Albert Diaz,[1] | ) |
| The Hon., in his official capacity a Chief Judge of the | ) |
| Fourth Circuit and as Chair of the Judicial Council of | ) |
| the Fourth Circuit, James N. Ishida in his official | ) |
| capacity as Circuit Executive of the Fourth Circuit | ) |
| and as Secretary of the Judicial Council of the Fourth | ) |
| Circuit, Federal Public Defender for the Western | ) |
| District of North Carolina, John Baker[2] (official | ) |
| capacity) as Federal Public Defender of the Federal | ) |
| Public Defender for the Western District of North | ) |
| Carolina | ) |
| | ) |
| *Defendants.* | ) |

# DEFENDANTS' *MOTION IN LIMINE* TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S EXPERT DR. GARY ALBRECHT

---

[1] Albert Diaz is substituted as a defendant, in his official capacity, by operation of Federal Rule of Civil Procedure 25(d).

[2] John Baker is substituted as a defendant, in his official capacity, by operation of Federal Rule of Civil Procedure 25(d).

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

LEGAL STANDARDS ..............................................................................................................1

    I.    Federal Rule of Evidence 702 ....................................................................................1

    II.    Hearsay and Use of Depositions at Trial. ................................................................2

ARGUMENT .............................................................................................................................3

    I.    Dr. Albrecht's Opinion Is Unreliable Because It Is Based on Speculative Assumptions
           That Are Not Supported by the Record. ...................................................................3

         1.    Dr. Albrecht relied on speculative overhead costs. ............................................4

         2.    Dr. Albrecht used a speculative hours input. ......................................................8

         3.    Dr. Albrecht used a speculative rate of pay for Plaintiff's future earnings. ..........11

         4.    Dr. Albrecht wrongly assumed Plaintiff's future earnings are permanently diminished. ......12

         5.    Dr. Albrecht used a speculative retirement age. .................................................13

    II.    Dr. Albrecht's deposition testimony and accompanying exhibits should also be excluded
            as hearsay. ...............................................................................................................15

CONCLUSION .........................................................................................................................19

i

# TABLE OF AUTHORITIES

**CASES**

*Aubrey Rogers Agency, Inc. v. AIG Life Ins. Co.,*
  2000 WL 135129 (D. Del. Jan. 13, 2000) ................................................................. 16, 17, 18

*Boucher v. U.S. Suzuki Motor Corp.,*
  73 F.3d 18 (2d Cir. 1996) ................................................................................................. 12, 13

*Caron v. Gen. Motors Corp.,*
  37 Mass. App. Ct. 744 (1994) ................................................................................................ 17

*Carter-Wallace, Inc. v. Otte,*
  474 F.2d 529 (2d Cir. 1972) .................................................................................... 16, 17, 18

*Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.,*
  823 F. Supp. 2d 334 (D. Md. 2011) ........................................................................................ 2

*Cooper v. Smith & Nephew, Inc.,*
  259 F.3d 194 (4th Cir. 2001) ................................................................................................... 2

*CSAA Affinity Ins. Co. v. Scott Fetzer Co.,*
  2023 WL 2714026 (D. Md. Mar. 30, 2023) ......................................................................... 10

*Daubert v. Merrell Dow Pharm., Inc.,*
  509 U.S. 579 (1993) .................................................................................................................. 2

*E. Auto Distribs., Inc. v. Peugeot Motors of Am.,*
  795 F.2d 329 (4th Cir. 1986) ................................................................................................... 3

*Fiorentino v. Rio Mar Assocs., LP, SE,*
  2009 WL 10680817 (D.P.R. Apr. 21, 2009) ........................................................................ 18

*Free v. Bondo-Mar-Hyde Corp.,*
  25 F. App'x 170 (4th Cir. 2002) ............................................................................................... 2

*In re Air Crash Disaster at Stapleton Int'l Airport, Denver, Colo., on Nov. 15, 1987*
  720 F. Supp. 1493 (D. Colo. 1989) .................................................................................... 3, 17

*Kamara v. United States,*
  2005 WL 2298176 (S.D.N.Y. Sept. 20, 2005) ..................................................................... 18

*Kirk v. Raymark Indus., Inc.,*
  61 F.3d 147 (3d Cir. 1995) .................................................................................................... 18

*Masinter v. Tenneco Oil Co.,*
  929 F.2d 191 (5th Cir. 1991) .......................................................................................... 12, 13

ii

*Oglesby v. Gen. Motors Corp.,*
  190 F.3d 244 (4th Cir. 1999) ........................................................................11, 13, 14

*Salsman v. Witt,*
  466 F.2d 76 (10th Cir. 1972) ........................................................................16

*Truth Tellers, LLC v. Levine,*
  2023 WL 2576756 (N.D.W. Va. Mar. 20, 2023) ........................................................16

*Tyger Const. Co. Inc. v. Pensacola Const. Co.,*
  29 F.3d 137 (4th Cir. 1994) ...................................................................3, 8, 12, 14

*United States v. Shaw,*
  69 F.3d 1249 (4th Cir. 1995) ........................................................................2

## RULES

Fed. R. Civ. P. 32(a)(4) ....................................................................................3

Fed. R. Civ. P. 32(a)(4)(B) ..............................................................................15

Fed. R. Civ. P. 45(c)(1) ..................................................................................16

Fed. R. Evid. 403 ...........................................................................................2

Fed. R. Evid. 702 ...........................................................................................2

Fed. R. Evid. 702(b) ..............................................................................4, 5, 6, 7

Fed. R. Evid. 801(c) ...............................................................................2, 15

Fed. R. Evid. 802 ...........................................................................................2

Fed. R. Evid. 803 ...........................................................................................2

Fed. R. Evid. 804 ...........................................................................................2

Fed. R. Evid. 804(a)(5)(A) ..............................................................................18

## OTHER AUTHORITIES

Annual Leave Fact Sheet: Annual Leave (General Information), OPM, *available at*
  https://www.opm.gov/policy-data-oversight/pay-leave/leave-administration/fact-sheets/annual-leave/ ...........................................................................................................5

BLS Calculator, *available at*
  https://data.bls.gov/cgibin/cpicalc.pl?cost1=39096&year1=201901&year2=202308 ....................5

Fact Sheet: Sick Leave (General Information), OPM, *available at* https://www.opm.gov/policy-data-oversight/pay-leave/leave-administration/fact-sheets/sick-leave-general-information/ .................9

iii

FY19 Private Appointed Counsel (PAC) Effective Pay Rate Study, *available at* https://www.ncids.org/wp-content/uploads/2021/05/FY19-Effective-Pay-Rate-Overhead-Report-1.pdf.............................................................................................................4, 5, 6, 8

Ncids.org, Current Hourly Assigned Counsel Rates, Appellate Division, Jan 1. 2022, *available at* https://www.ncids.org/wp-content/uploads/2022/10/PAC-Rate-Chart-2022.01.01.pdf ............11

iv

# INTRODUCTION

Plaintiff, who is 35 years old, seeks a front pay award equaling 32 years of work, until the age of 67 (a decade after her eligibility for federal retirement), plus an additional 12 years of pension benefits through the date of her predicted life expectancy. In support of this outsized request for over three million dollars as equitable relief, Plaintiff relies solely on the purported expert opinion of Dr. Gary Albrecht, who is not a vocational expert, but an economist. Dr. Albrecht assumed that Plaintiff, who is currently working as a solo practitioner in indigent criminal defense, will remain in her current role for the entirety of her working career and that her earnings capacity will be permanently diminished from what they would have been if she had remained an employee of the Federal Defender's Office (FDO).

At the outset, Dr. Albrecht's opinion should be excluded because his front pay calculations rely on baseless assumptions not only about Plaintiff's future earnings, but also about Plaintiff's overhead costs, the number of hours she will work, her rate of pay in her current position, and her retirement age. Dr. Albrecht's March 15, 2023 expert report must also be excluded because Dr. Albrecht admitted under oath that the report is inaccurate by a margin of several tens of thousands of dollars and is therefore unreliable. Finally, Dr. Albrecht's deposition testimony, accompanying exhibits, and prior declarations should also be excluded because they are inadmissible hearsay.

For these reasons, and as set forth in greater detail below, the Court should exclude Dr. Albrecht's opinion from trial under the Federal Rules of Evidence and Civil Procedure.

# LEGAL STANDARDS

## I.  Federal Rule of Evidence 702.

Under Federal Rule of Evidence 702, an expert witness may testify only if he satisfies all of the following conditions:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

1

       (b) the testimony is based on sufficient facts or data;
       (c) the testimony is the product of reliable principles and methods; and
       (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Thus, the court must determine at the outset whether the proffered testimony is relevant, *i.e.*, helpful to the trier of fact, and whether it is reliable. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993). The opinion therefore must be based on specialized knowledge—"not on belief or speculation"—and derived from sufficient facts or data "using scientific or other valid methods." *Free v. Bondo-Mar-Hyde Corp.*, 25 F. App'x 170, 172 (4th Cir. 2002); *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 200 (4th Cir. 2001) (trial courts must "act as gatekeepers to 'ensure that any and all [expert] testimony . . . is not only relevant, but reliable'" (quoting *Daubert*, 509 U.S. at 588)). This gatekeeping function is critical, given the potential of expert testimony to "be both powerful and quite misleading." *Cooper*, 259 F.3d at 199; *see also* Fed. R. Evid. 403. Finally, "[t]he party seeking admission of the expert testimony bears the burden of establishing admissibility by a preponderance of the evidence." *Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 340 (D. Md. 2011) (citation omitted).

## II.    Hearsay and Use of Depositions at Trial.

      The Federal Rules of Evidence define "hearsay" as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Hearsay is not admissible unless it falls within a prescribed exception. Fed. R. Evid. 802; *see also United States v. Shaw*, 69 F.3d 1249, 1253 (4th Cir. 1995) ("Federal Rule of Evidence 802 prohibits generally the admission of out-of-court statements offered to prove the truth of the matters asserted."). Rule 803 lists certain exceptions to the rule against hearsay, regardless of whether the declarant is available as a witness. *See generally* Fed. R. Evid. 803. And Rule 804 lists exceptions that apply when the declarant is unavailable as a witness. *See generally* Fed. R. Evid. 804.

      For purposes of admitting deposition testimony during trial, Federal Rule of Civil Procedure 32(a)(4) controls with respect to witnesses who are unavailable; that Rule further limits the circumstances under which a witness's prior deposition testimony may be used at trial. *See generally* Fed. R. Civ. Proc. 32(a)(4). "The party seeking to admit the deposition must prove that the requirements

2

of both Rule 32(a)(3) and Rule 804(b)(1) have been met[.]" *In re Air Crash Disaster at Stapleton Int'l Airport, Denver, Colo., on Nov. 15, 1987*, 720 F. Supp. 1493, 1502 (D. Colo. 1989). Finally, the decision to admit deposition testimony in lieu of live testimony "lies in the sound discretion of the trial court." *Id.*

## ARGUMENT

### I. Dr. Albrecht's Opinion Is Unreliable Because It Is Based on Speculative Assumptions That Are Not Supported by the Record.

Dr. Albrecht's purported expert opinion, reflected in his March 15, 2023 report and his July 19, 2023 revised report, should be excluded because it is "based on assumptions which are speculative and are not supported by the record." *See Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137, 142 (4th Cir. 1994) (citing *E. Auto Distribs., Inc. v. Peugeot Motors of Am.*, 795 F.2d 329, 337 (4th Cir. 1986)). Dr. Albrecht's bottom-line conclusion is that Plaintiff will incur over three million dollars in lost front pay because she no longer works at the FDO and is instead working as a solo practitioner in indigent criminal defense, a role Dr. Albrecht assumed Plaintiff will remain in for her entire career. *See* Ex. B, July 19, 2023 Report at 3. In calculating Plaintiff's economic losses, Dr. Albrecht estimated the amount of hours Plaintiff would have worked at the FDO, and the pay she will receive if she works the same number of hours in her current position. *Id.* He then subtracted his estimate of Plaintiff's overhead costs—$81,279 per year—from her earnings in her current position, which reduces her future earnings estimate by 60%. *See id.* Finally, he subtracted her predicted earnings in her current position from her expected earnings had she stayed at the FDO to calculate Plaintiff's economic loss. *Id.* at 4. In making these calculations, Dr. Albrecht made speculative assumptions about five key numbers that he relied on for his front pay calculation: (1) Plaintiff's overhead costs, (2) the number of hours she will work, (3) her rate of pay in her current position, (4) her future earnings, and (5) her retirement age. These assumptions are not supported by the factual record in this case and greatly inflate Dr. Albrecht's

estimate of Plaintiff's front pay loss. Because Dr. Albrecht's opinion is not "testimony [] based on sufficient facts or data[,]" Fed. R. Evid. 702(b), it should be excluded.

**1. Dr. Albrecht relied on speculative overhead costs.**

Dr. Albrecht set Plaintiff's overhead costs at $81,279 per year—over 60% of her estimated yearly earnings in her current position as a solo practitioner in indigent criminal defense. *See* Ex. B, July 19, 2023 Report at 3. Assuming Plaintiff's overhead costs are so high greatly decreases the amount that Dr. Albrecht estimates to be her take-home pay in her current position, thus vastly overinflating Plaintiff's front pay losses.

Dr. Albrecht calculated Plaintiff's expected economic losses by using a number for overhead costs that has no factual support. Dr. Albrecht testified he neither reviewed Plaintiff's financial records nor solicited any information from Plaintiff about her current *or* expected overhead costs, even though she has held her current position for over three years. *See* Ex. A, Excerpts from Albrecht Depo. at 47:17-25. Dr. Albrecht further admitted that he does not know if in fact Plaintiff even has typical overhead costs such as malpractice insurance, support staff, office rent costs, legal research costs or what, if any, of her overhead expenses are reimbursable. *Id.* at 48:4-49:15.

Without any information about Plaintiff's actual overhead costs, Dr. Albrecht estimated Plaintiff's overhead costs by relying on a survey conducted by the North Carolina Office of Indigent Defense Services that asked attorneys to report their overhead costs and various categories to which these overhead costs belong, such as "rent" and "bar dues." *See generally*, ECF No. 243-18, Exhibit R. Only 13.5% of attorneys working in indigent defense services responded to the survey. *See* FY19 Private Appointed Counsel (PAC) Effective Pay Rate Study at 1, *available at* https://www.ncids.org/wp-content/uploads/2021/05/FY19-Effective-Pay-Rate-Overhead-Report-1.pdf ("PAC survey") at 1. Those who did respond reported median overhead costs in the amount of

$21.72 per hour, which totals about $47,805.90[3] when adjusted for inflation (and assuming 1800 hours worked per year)—an amount significantly less than Dr. Albrecht's calculation of $81,279 per year. *Id.* at 2. A significant portion of indigent criminal defense attorneys reported costs below the median: 30% reported overhead costs of less than $15 per hour and 5% had costs of less than $5 per hour. *Id.* Dr. Albrecht, however, testified that he "didn't consider" whether Plaintiff's current or expected expenses were in line with the numbers based on survey respondents' actual costs. Ex. A at 49:25-52:9.

Instead, Dr. Albrecht relied on the survey's *hypothetical* calculation of a sum of all "non-optional" median overhead costs identified on the first table on page 5 of the survey, which hypothesizes what costs would be if each attorney incurred every possible legitimate overhead expense at the median cost, including rent, malpractice insurance, equipment, phones, internet, office expenses, legal research tools, bar dues, required CLE programs, full-time support staff, staff benefits, data access fees, and debt service. *See, e.g., id.* at 124:24-125:12 (testifying that he relied on the $5,729 median monthly overhead cost identified in the first table on page 5 of the survey, which includes hypothetical, not actual, overhead costs, which are located on page 2 of the survey). This table is provided below:

---

[3] $21.72 per hour multiplied by 1800 hours per year (the same number of hours used in the table Dr. Albrecht relies on) would be $39,096. When adjusted for inflation using the Bureau of Labor Statistics ("BLS") calculator from January 2019, when the survey was conducted, to September 2023, the most recent month available, the result is: $47,805.90, which is approximately a 40% decrease in Plaintiff's overhead costs, thus significantly reducing her alleged economic loss calculations. *See* BLS Calculator, *available at* https://data.bls.gov/cgi-bin/cpicalc.pl?cost1=39096&year1=201901&year2=202308.

5

| | Non-Optional Overhead Items | | | | | | | | | | | | | Overhead Cost | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Rent | Malpractice Insur. | Equipment (Deprec. Value) | Phones | Internet | Office Expenses (supplies, postage, etc.) | Legal Research Tools (Lexis, etc.) | Bar Dues | Required CLE Programs | 1 FTE Support Staff | Staff Benefits | Data Access Fees (DMV, NC Crim., etc.) | Debt Service (interest on firm line of credit) | Per Atty per Mos. Ovrhd Cost | Per Atty Billable Hours | Per Atty per Hr Ovrhd Cost |
| N | 109 | 105 | 85 | 115 | 101 | 114 | 53 | 116 | 107 | 13 | 6 | 41 | 25 | | | |
| Average | $783 | $141 | $180 | $196 | $115 | $228 | $140 | $79 | $118 | $3,826 | $782 | $56 | $362 | $7,007 | 1,800 | $46.71 |
| Median | $700 | $100 | $100 | $150 | $80 | $150 | $100 | $40 | $50 | $3,479 | $600 | $30 | $150 | $5,729 | 1,800 | $38.20 |

*Note: 1 FTE support staff position based on average and median paralegal salaries in North Carolina. Billable hours based on typical billable hours per year by attorneys. Analysis includes survey responses of public defense solo practitioners with a minimum of 15% overhead ($8.25 per hour) for all items in the survey. Responses where the overhead was less than 15% were excluded.*

In his calculations, Dr. Albrecht took the sum of the median dollar amounts for each "non-optional overhead item"—$5,729 per month, reflected in the table—and multiplied that by 12 months, and then adjusted for inflation to get a total overhead cost number of $81,279 per year. Ex. A at 46:25-47:5. This table's hypothetical calculations inflates overhead costs in numerous ways, making Dr. Albrecht's reliance on it problematic. For one thing, the table purports to show the median overhead cost for each category of expense, but it excludes data from a significant number of respondents who had less than 15% or $8.25 per hour in overhead costs. PAC Survey at 5 ("Note: . . . Analysis includes survey responses of public defense solo practitioners with a minimum of 15% overhead ($8.25 per hour) for all items in the survey. Responses where the overhead was less than 15% were excluded."). Because respondents with low overhead costs are excluded entirely from the calculations in this table, the median data included therein is inflated and not based in reality. *See id.* Similarly, the hypothetical calculations in the table assume that each attorney will incur every category of expense at the median price, thus greatly inflating the median overhead to $38.20 per hour, a 75% increase above the median *actual* overhead costs reported by respondents (including support staff costs), which was only $21.72 per hour. *Compare* PAC Survey at 5 (hypothetical non-optional median costs), *with id.* at 2 (respondents'

actual median overhead costs). Yet despite the report's acknowledged inflations of the estimated overhead costs for indigent defense attorneys, Dr. Albrecht failed to even consider whether Plaintiff's actual costs might be greater or less than the median identified in this table. *See* Ex. A at 50:8-18 (admitting he used the median and "didn't consider whether [Plaintiff's costs] might be greater than that or less than that" or account for that "probability" at all). Instead, he just assumed her costs would be the same as the median in this table apparently without any analysis at all. *See id.*

Taking another example, the overhead cost number Dr. Albrecht relied on also includes the hypothetical cost of full-time paralegal support, based on the median paralegal salary in North Carolina across all legal sectors, rather than the median salary for paralegals employed by indigent defense attorneys. *See* PAC survey at 5. This is because less than 13% of respondents reported access to a full-time equivalent support staff, *id.* at 3, so there was not enough data to determine the actual median cost of full-time support staff for indigent defense attorneys. *See id.* at 5 (explaining that because "so few survey respondents had access to support staff, the analysis used the average and median salary of a paralegal in North Carolina instead of survey data"). Full time paralegal support is the largest cost included in the table at $3,479 *plus* $600 in staff benefits per month, which makes up the bulk (71%) of the $5,729 in median overhead costs per month that Dr. Albrecht used in his calculations. *See id.* Yet there is nothing in the record suggesting that Plaintiff even has or will have full time paralegal support, let alone at the average salary for a North Carolina paralegal. *See, e.g.,* Ex. A at 47:17-25 (admitting he did not review any financial statements about overhead costs or discuss with Plaintiff her actual overhead costs); *id.* at 48:4-49:15 (admitting he "doesn't know" if Plaintiff has support staff). If anything, the report Dr. Albrecht relied on shows that it is unlikely that Plaintiff will ever incur this cost, given that vast majority of respondents engaging in indigent defense work (84%) reported that they "have zero support staff". PAC Survey at 3. The median overhead cost number used by Dr. Albrecht therefore has no relation to Plaintiff's actual overhead costs. As Dr. Albrecht admitted in his

deposition, if Plaintiff does not or will not employ a full-time paralegal, then the hypothetical median overhead cost he relied on is likely to be significantly higher than Plaintiff's actual overhead costs. Ex. A at 54:6-12. In short, Dr. Albrecht's overhead calculations rely on speculative data that is not "comparable" to Plaintiff's current or expected overhead costs; instead, it is "without factual support . . . and should [] be[] excluded." *Tyger Const. Co. Inc.*, 29 F.3d at 142.

Dr. Albrecht's use of the hypothetical overhead cost table is problematic in other ways, too. For example, Dr. Albrecht testified that he used the hypothetical median *monthly* overhead costs identified in the first table on page 5 of the PAC Survey—$5,729—rather than the hourly costs identified in that table. *See* Ex. A at 124:24-125:12 (testifying that he relied on the median monthly overhead costs identified in the first table on page 5 of the PAC survey). The monthly median cost is based on the assumption that attorneys will work 1,800 hours per year, PAC Survey at 5, whereas Dr. Albrecht assumed that Plaintiff will only work between 1,680 and 1,728 hours per year, *see* Ex. A at 33:20-24. Because many of the expenses included in this overhead cost table, such as support staff costs, legal research costs, and office expenses, would likely increase the more hours an attorney works, the monthly overhead cost figure is higher than it would be for an attorney who worked only between 1,680 and 1,728 hours per year. Dr. Albrecht thus artificially inflated Plaintiff's overhead costs by using a higher number of hours worked in calculating overhead costs than he did in calculating her earnings. Once again, Dr. Albrecht's calculation of Plaintiff's overhead costs is based on speculative assumptions—namely, that Plaintiff's overhead costs will be the same as an attorney who works significantly more hours per year—"without factual support . . . and should [] be[] excluded." *Tyger Const. Co. Inc.*, 29 F.3d at 142.

### 2. Dr. Albrecht used a speculative hours input.

In calculating Plaintiff's future earnings, Dr. Albrecht multiplied the number of hours Plaintiff would have worked had she remained at the FDO by the pay rate she allegedly earns in her current

8

position as an indigent criminal defense attorney. Ex. B at 3. He used 1,728 hours per year from January 2024 to the date that Plaintiff would have reached 15 years of federal service had she remained at the FDO, and 1,680 hours for the remaining years to account for the increased annual leave that employees receive after 15 years of federal service. Ex. A at 33:20-24; *id.* at 60:7-19. Dr. Albrecht's use of these numbers in his future earnings calculations is significantly flawed.

To begin, instead of the number of hours Plaintiff would have allegedly worked at the FDO, Dr. Albrecht should have used the number of hours that Plaintiff is currently working per year, or the number of hours that Plaintiff estimates is "realistic" (1,800 hours), which would more accurately estimate Plaintiff's future earnings, and thus her expected economic loss. *See id.* at 43:8-19 (admitting he did not use Plaintiff's own "realistic" estimate of 1,800 hours); *see also id.* at Bates 004842 (Plaintiff's suggestion that 1,800 hours would be "realistic"). In Dr. Albrecht's view, this was appropriate because "an individual should not be forced to work more hours than he or she had previously worked in order to mitigate their loss." *Id.* at 43:17-19.

But even under Dr. Albrecht's own future earnings methodology, the hours input he used is plainly inaccurate. In calculating how many hours Plaintiff would have worked if she had remained at the FDO, Dr. Albrecht assumed that Plaintiff would have used every hour of annual and sick leave available to her and never worked a single hour of overtime. *Id.* at 34:4-14. One problem with this assumption is that sick leave can only be used for qualifying reasons and annual leave is capped at a certain amount in terms of the year-to-year carryover amount permitted. Therefore, if Plaintiff had not actually used all of her annual leave in a given year, she may have forfeited that leave time.[4] More

---

[4] *See* Fact Sheet: Sick Leave (General Information), OPM, *available at* https://www.opm.gov/policy-data-oversight/pay-leave/leave-administration/fact-sheets/sick-leave-general-information/ (providing that sick leave may only be used for specified purposes and in specified amounts depending on the reason); *see also* Annual Leave Fact Sheet: Annual Leave (General Information), OPM, *available at* https://www.opm.gov/policy-data-oversight/pay-leave/leave-administration/fact-sheets/annual-

significantly, Dr. Albrecht failed to take into account that Plaintiff's own time reports show that she routinely worked more than 40 hours per week while at the FDO, *see* Ex. E, and, like all FDO attorneys, did not receive overtime pay.[5] If Dr. Albrecht's estimate of her future earnings incorporated the more accurate measure of hours that Plaintiff actually had worked at the FDO, her economic loss would be lower. *See* Ex. A at 61:5-62:3 (admitting that if Plaintiff voluntarily worked overtime the economic loss calculations "would be less"); *id.* at 37:16-23 (admitting he does not know if FDO attorneys receive overtime or the average number of hours worked). In fact, Dr. Albrecht repeatedly testified that he did not know how many hours Plaintiff worked while at the FDO. *Id.* at 38:25-39:5 (admitting he does not know whether Plaintiff regularly worked overtime); *see also id.* at 61:25-62:3 (the same). He further admitted that if Plaintiff worked additional unpaid hours, that fact might affect his economic calculations depending on whether that overtime was "forced" or "voluntary" in his view, *id.* at 38:2-40:18, which is a "person-specific" analysis that he is unable to answer with respect to Plaintiff, *id.* at 61:5-24. Put differently, Dr. Albrecht does not know if the hours he used for Plaintiff's future earnings are accurate, even under his own methodology, because he failed to ask her or solicit any relevant documentation regarding the actual number of hours Plaintiff worked per year at the FDO. Indeed, he failed altogether to account in his analysis for the fact that Plaintiff routinely worked unpaid overtime.

Courts have routinely excluded expert opinions where the expert fails to ask pertinent questions to obtain the relevant underlying facts, and instead bases his opinion on unreliable assumptions as Dr. Albrecht has done here. *See, e.g., CSAA Affinity Ins. Co. v. Scott Fetzer Co.,* 2023 WL

---

leave/ (explaining annual leave accrual rates and caps on the amount of annual leave that may be carried over year-to-year).

[5] *See* ECF No. 245-25, FDO Employee Manual, § 3.10 (explaining that "the Defender may ask employees to work in excess of 40 hours in a week without any additional obligation to pay overtime or allow compensatory time off").

2714026, at *6 (D. Md. Mar. 30, 2023) (rejecting expert opinion as unreliable where expert failed to ask pertinent questions to obtain the relevant facts before forming his opinion and instead based his opinion on an unreliable assumption) (citing *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 251 (4th Cir. 1999)). Dr. Albrecht's opinion should be excluded for the same reason: his calculation of Plaintiff's future earnings is unreliable because it is based on a speculative and faulty assumption about the number of hours Plaintiff *may* have worked at the FDO, rather than the number of actual hours the record shows she worked. *See id.*

### 3. Dr. Albrecht used a speculative rate of pay for Plaintiff's future earnings.

Dr. Albrecht also made speculative assumptions and relied on outdated data in calculating Plaintiff's rate of pay for her future earnings in her current position. Pay rates for privately appointed indigent defense counsel vary by the type of criminal case at issue. Dr. Albrecht appears to have relied on Plaintiff's own assertion that she is paid at hourly rates of $85 for high-level felonies and $75 for low-level felonies. Ex. A at Bates 004840. But in 2022, North Carolina updated the hourly rate chart so that many capital cases and cases involving life without parole, including the types of cases Plaintiff testified she handles,[6] now pay at the higher rate of $100 per hour. *See* Ncids.org, Current Hourly Assigned Counsel Rates, Appellate Division, Jan 1. 2022, *available at* https://www.ncids.org/wp-content/uploads/2022/10/PAC-Rate-Chart-2022.01.01.pdf. Dr. Albrecht testified that he used a "blended rate" of $80 per hour—which is the average of $85 and $75 per hour—to calculate Plaintiff's future earnings without reviewing any documentation from Plaintiff or elsewhere about the hourly rate she is actually paid. Ex. A at 33:9-17. In fact, when asked why he didn't review documentation to determine what hourly rate would be appropriate based on the types of cases Plaintiff handles, he

---

[6] *See* Ex. D, Depo. of Caryn Strickland at 11:22-12:2 (testifying that she has her "own appellate caseload of all types of criminal appeals, ranging from probation violations to first degree murder"). First degree murder cases would qualify at the $100 per hour rate.

replied, "I don't have an answer for that." *Id.* at 33:15-19. Again, Dr. Albrecht's expert opinion is flawed because it relies on assumptions that have little connection to the underlying facts of this case. *See Tyger Const. Co. Inc.*, 29 F.3d at 142 (requiring that expert opinion be supported by the record, not speculative assumptions).

### 4. Dr. Albrecht wrongly assumed Plaintiff's future earnings are permanently diminished.

Dr. Albrecht's assumption that Plaintiff's future earnings will be permanently lower than what she would have earned at the FDO is likewise speculative and unsupported by the record. Although admitting that he is "Absolutely not" an expert in vocational rehabilitation, Ex. A at 80:15-23, Dr. Albrecht opined that he assumed Plaintiff would remain in her current situation for the rest of her career. Ex. A at 62:16-64:7; 79:14-84:19. This assumption is particularly unreliable because the longest Plaintiff has held *any* position since she graduated Duke University School of Law in 2013 is only three years, so to assume she would remain in the same role for over three decades is speculative at best. *See, e.g.*, *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 22 (2d Cir. 1996) (excluding expert's projection that plaintiff "was on the verge of a twenty-four year career of clock-punching" because the expert's opinion relied on assumptions that demonstrated a "complete break" with the plaintiff's "work history of seasonal and intermittent employment"); *Masinter v. Tenneco Oil Co.*, 929 F.2d 191, 193 (5th Cir. 1991) (affirming district court's determination that expert's front pay calculations were speculative because the expert "assumed that [the plaintiff] would remain employed with [his current employer] despite the fact that it underwent massive layoffs," and because he "presumed that [the plaintiff] would continue to incur future wage loss through the age of 70"). Dr. Albrecht fails to account for the possibility that Plaintiff could have left the FDO at any point before she turns 67, instead only including in his analysis a comparison between what Plaintiff would earn at the FDO and her "current position" based on the PAC survey. Ex. A, Albrecht Depo. at 14:14-21; *see also id.* at 80:7-25 (admitting

he "basically" assumed Plaintiff would remain in the same position her entire career and that his calculations were based on the PAC survey, *not* Plaintiff's financial statements).

Dr. Albrecht also did not account of the fact that, after her departure from the FDO, Plaintiff worked as a judicial law clerk for Fourth Circuit Judge Floyd, where she maintained nearly the same salary as at the FDO,[7] and then as a Solicitor General Fellow in a term position for the Solicitor General's Office of North Carolina. *See* Ex. C at Bates 004002-03 (Plaintiff's resume). Indeed, Dr. Albrecht inexplicably was unaware that Plaintiff had even worked as a federal judicial law clerk after her departure from the FDO. Ex. A at 14:1-13. In short, even though the record in this case shows that Plaintiff not only had the ability to, but did, in fact, obtain employment after her departure from the FDO that was more lucrative than her current situation, Dr. Albrecht ignored that possibility altogether, instead relying on speculative assumptions about her future employment prospects that render his analysis unreliable. *See, e.g.*, *Boucher*, 73 F.3d at 22; *Masinter*, 929 F.2d at 193; *Oglesby*, 190 F.3d at 251 (affirming exclusion of expert testimony that "speculate[d] as to a possibility which was no more likely than other available possibilities").

### 5. Dr. Albrecht used a speculative retirement age.

Finally, Dr. Albrecht also used an unrealistic retirement age, based on Plaintiff's own statement to him that she would work to age 67 because that's when she would qualify for "both federal retirement and normal/full social security." Ex. A, Bates 004839. However, Plaintiff herself recognized that the "average age of voluntary retirement for federal service (as of 2019) is 62.6", and that she would have been eligible for full federal retirement at age 57. *Id.* When asked if he considered the average age of voluntary retirement for federal service, Dr. Albrecht admitted he did not do so, and instead based his calculations on his "understanding that Ms. Strickland . . . wanted to work—

---

[7] *See* Ex. F, Notification of Personnel Action (SF-50) at US00006834 (showing Plaintiff's conversion from Assistant Federal Public Defender to Law Clerk, including minimal salary changes).

intended to work till age 67." *Id.* at 75:12-18; *see also id.* at 71:4-8 (admitting he only review[ed] the Markov Model, which calculates average retirement ages based on educational level, to "check[] to see if that [age 67] was reasonable"); *id.* at 107:25-108:6 (admitting that he "used age 67 because that's what Ms. Strickland indicated she anticipated working to. The Markov Model simply confirms that that's a reasonable number."). He then conceded that considering retirement eligibility in a specific employer's retirement plan, like the federal government's, is "relevant" in making front pay calculations because the retirement plan itself contains "more specific data" than using a model like the Markov Model. *Id.* at 77:15-78:4. Yet Dr. Albrecht inexplicably failed to utilize or in any way account for this "more specific data", *id.*, in his own analysis, and chose instead to rely on Plaintiff's own self-serving statement, *id.* at 75:12-18. Because Dr. Albrecht failed to account for the fact that Plaintiff would have been eligible to retire at age 57, or that the average age of voluntary retirement for federal employees is 62.6, his economic loss calculations are based on mere "belief or speculation" about Plaintiff's retirement age, which should be disregarded as unreliable. *Oglesby*, 190 F.3d at 250.

***

In sum, Dr. Albrecht's economic loss opinions rely on assumptions about Plaintiff's overhead costs, number of hours worked, pay rate, future career trajectory, and retirement age that "are speculative and are not supported by the record." *See Tyger Const. Co. Inc.*, 29 F.3d at 142. His purported expert opinions should therefore be excluded as unreliable. For the same reasons Dr. Albrecht's purported expert opinions should not be admitted, his March 15, 2023 and July 19, 2023 reports should not be admitted either. Finally, Dr. Albrecht's March 15, 2023 report should be excluded for an additional reason: he testified under oath that the March 15, 2023 report is inaccurate. *See* Ex. A at 94:24-95:18 (testifying that all the calculations and tables in the original March report are incorrect).

14

## II. Dr. Albrecht's deposition testimony and accompanying exhibits should also be excluded as hearsay.

Plaintiff's designation of Dr. Albrecht's deposition testimony, accompanying exhibits,[8] and prior declarations are all inadmissible hearsay and should be excluded as such. Plaintiff seeks to use Dr. Albrecht's statements made during his deposition and in prior declarations to show the truth of the matter asserted, which clearly meets the definition of hearsay. *See* Fed. R. Evid. 801(c). Indeed, Plaintiff herself seems to recognize that these materials are hearsay. *See* ECF No. 269-2 at 4, Row 54 (conditionally asserting hearsay objections to Defendants' potential use of Plaintiff's exhibit "March 2023 Albrecht Expert Report and Declaration"); *id.* at 6, Row 98 (asserting hearsay objections to Defendants' potential use of Plaintiff's exhibit "July 2023 Albrecht Expert Report and Declaration"). But there is no hearsay exception under Rule 804(b)(1) that would apply here, nor is Dr. Albrecht's deposition testimony admissible at trial under Federal Rule of Civil Procedure 32. Plaintiff cannot circumvent the oral testimony of her own expert witness—and avoid live cross-examination—by simply designating Dr. Albrecht's deposition testimony, accompanying exhibits, and prior declarations as exhibits to support her case at trial.

With respect to Dr. Albrecht's deposition testimony, Plaintiff cannot satisfy the requirement of either Federal Rule of Civil Procedure 32 or Federal Rule of Evidence 804(b)(1). Beginning with Federal Rule of Civil Procedure 32, Dr. Albrecht is not located "more than 100 miles from the place of hearing or trial" nor has Plaintiff been unable to "procure [his] attendance by subpoena[.]" Fed. R. Civ. P. 32(a)(4)(B), (D). Dr. Albrecht's office is at 1817 Georgia Ave in Winston-Salem, North Carolina. Trial in this matter was set to take place in the Charlotte Division. With only 80 miles between the

---

[8] Plaintiff's request to use these exhibits to the deposition testimony should be excluded for additional reasons as well. First, Exhibit 1 to Dr. Albrecht's deposition testimony includes not just Dr. Albrecht's March report, but a number of other documents, including a questionnaire that Plaintiff filled out for Dr. Albrecht, that are undeniably hearsay. Further, Exhibit 3, which is the PAC survey, has no relevance to this litigation for the reasons set forth above. *See supra* Part I.

two, Dr. Albrecht is well within the radius of the Court's trial subpoena power. *See* Fed. R. Civ. P. 45(c)(1). Plaintiff has also not made any effort to secure Dr. Albrecht's attendance at trial through a subpoena. To the contrary, she has represented that she does not intend to call Dr. Albrecht as a witness at trial. *See* Joint Pretrial Filing at 106, ECF No. 259 (Plaintiff's witness list does not specifically include Dr. Albrecht, and merely lists all of her deposition designations as "'may call' witnesses" if those designations are challenged). "[T]he general preference of the federal rules, as expressed in F. R. Civ. P. 43(a), is for oral testimony so that there will be an opportunity for live cross-examination and observation of the demeanor of the witness." *Carter-Wallace, Inc. v. Otte*, 474 F.2d 529, 536 (2d Cir. 1972). Although Plaintiff seeks for Dr. Albrecht to avoid the rigors of live testimony, Dr. Albrecht is not an unavailable witness, and his deposition testimony, including any accompanying exhibits, is thus inadmissible.

Even assuming Dr. Albrecht was located more than 100 miles from the trial location (such as if trial is to be held in Asheville), he would still not qualify as an unavailable witness under Rule 32. *See Salsman v. Witt*, 466 F.2d 76, 79 (10th Cir. 1972) ("The various restrictions imposed by Rule 32(a)(3) upon the use of depositions at trial make it clear that there has been no change in the long-established principle that testimony by deposition is less desirable than oral testimony and should ordinarily be used as a substitute only if the witness be unavailable to testify in person."). Courts "are not automatically required to admit deposition testimonies" under this Rule "just because the witness is more than one hundred miles away." *Truth Tellers, LLC v. Levine*, 2023 WL 2576756, at *10 (N.D.W. Va. Mar. 20, 2023) (citation omitted). Indeed, this rule does not apply to expert witnesses, because "[u]nlike fact witnesses, who are determined by their personal knowledge of relevant facts, regardless of where they live or work, a party normally has broad latitude in selecting his expert witnesses." *See Aubrey Rogers Agency, Inc. v. AIG Life Ins. Co.*, 2000 WL 135129, at *4 (D. Del. Jan. 13, 2000) (citation omitted). The reason behind this interpretation of the Rule is self-evident: if the Rule were construed

16

otherwise, parties could intentionally procure the unavailability of their own expert witnesses for trial by choosing expert witnesses who are located out of state. As the Second Circuit put it:

> [U]nlike the typical witness whose involvement with the case may depend on the fortuity of his observing a particular event and whose presence at trial is often involuntary, a party ordinarily has the opportunity to choose the expert witness whose testimony he desires and invariably arranges for his presence privately, by mutual agreement, and for a fee. Although a requirement of an attempt to secure the voluntary attendance of a witness who lives beyond the subpoena power of the court is not ordinarily imposed before prior testimony can be used in civil litigation, we think that such a requirement is particularly appropriate when dealing with the testimony of expert witnesses whose earlier attendance is almost invariably secured by such voluntary arrangements.

*Carter-Wallace*, 474 F.2d at 536 (internal citations omitted). In fact, the Second Circuit went further requiring that the proponent of the expert deposition testimony to "show[] not only that the witness is unavailable, but that no other expert of similar qualifications is available or that the unavailable expert has some unique testimony to contribute." *Id.* at 536-37.

By selecting an expert from Winston-Salem, Plaintiff "'procured' that expert's absence" from this Court because she "voluntarily created a situation in which" Dr. Albrecht would be outside the subpoena power of this Court unless she "should make arrangements for the expert's appearance at trial." *Aubrey Rogers Agency*, 2000 WL 135129, at *4 (quoting *Caron v. Gen. Motors Corp.*, 37 Mass. App. Ct. 744, 747 (1994))). "Mere inconvenience to the witness does not outweigh the substantial need to evaluate the demeanor of a witness presenting controversial testimony of questionable relevance. Nor does inconvenience outweigh the unfairness of limiting an opponent's right to demonstrate varying interpretations of the facts on which the witness bases his testimony." *In re Air Crash Disaster at Stapleton Int'l Airport, Denver, Colo., on Nov. 15, 1987*, 720 F. Supp. at 1502 (refusing to admit deposition testimony of expert who the plaintiffs claimed was unavailable solely because he lived outside 100-mile radius). Plaintiff made the decision to select Dr. Albrecht as an expert witness in this case, and she has already relied on his testimony in summary judgment briefing. Pl.'s Mem. in Supp. of Her Renewed Mot. for Summ. J. at 25, ECF No. 248-1. Plaintiff cannot reap the benefit of Dr. Albrecht's

out-of-court testimony and accompanying exhibits and simultaneously evade cross-examination of the expert by insisting that Dr. Albrecht is unavailable.

For similar reasons, Dr. Albrecht is also not an "unavailable" witness under the hearsay exception in Rule 804(b)(1). Under Rule 804(a)(5), a witness is only unavailable if "the statement's proponent has not been able, by process or other reasonable means, to procure the declarant's attendance[.]" Fed. R. Evid. 804(a)(5)(A). There is no indication that Plaintiff cannot procure Dr. Albrecht by "reasonable means," including by requesting his presence at trial and offering to pay his expert fee. *See Aubrey Rogers Agency*, 2000 WL 135129, at *3 (holding that expert witness was not unavailable when the proponent "proffered no explanation for [his] unavailability other than that he lives in Texas" and had "not indicated that it ha[d] even asked this chosen expert to appear at trial, nor that [it] ha[d] offered to pay for the expert's fee and expenses"). Moreover, even if Dr. Albrecht works or resides outside of the 100-mile radius of the Court's subpoena power, this does not suffice to render an expert witness unavailable. *Id.* at *2-3; *see also Carter-Wallace*, 474 F.2d at 536 ("[U]nlike the typical witness whose involvement with the case may depend on the fortuity of his observing a particular event and whose presence at trial is often involuntary, a party ordinarily has the opportunity to choose the expert witness whose testimony he desires and invariably arranges for his presence privately, by mutual agreement, and for a fee."); *Kirk v. Raymark Indus., Inc.*, 61 F.3d 147, 163 (3d Cir. 1995) (holding that an expert witness's being beyond the court's subpoena power was insufficient to prove unavailability); *Kamara v. United States*, 2005 WL 2298176, at *6 (S.D.N.Y. Sept. 20, 2005) (noting that "because [the witness] has been retained as Plaintiffs' expert, an even greater showing than mere unavailability is required to excuse his attendance at trial"). Parties are "responsible for selecting their own expert witnesses and presumably have control over them." *Fiorentino v. Rio Mar Assocs., LP, SE*, 2009 WL 10680817, at *2 (D.P.R. Apr. 21, 2009) (excluding expert witnesses' deposition testimony because proponent failed to show they were unavailable). Plaintiff's failure to satisfy the requirements

18

of Rule 804 provides a further independent basis for this Court to reject her request to use Dr. Albrecht's deposition testimony, accompanying exhibits, and prior declarations.

In sum, Dr. Albrecht is not an unavailable witness because he likely is within the Court's trial subpoena power. Even if he were not, the only reason he is unavailable is that Plaintiff has made no effort to secure his presence at trial, despite that fact that she hired him. Accordingly, he is not "unavailable" under Rule 32 or 804(b)(1), and his deposition testimony, accompanying exhibits, and prior declarations should thus be excluded.

## CONCLUSION

For the reasons set forth above, Dr. Albrecht's expert opinion, including his testimony, accompanying deposition exhibits, prior declarations, and reports, should all be excluded as inadmissible.[9]

Dated: November 15, 2023                     Respectfully submitted,

                                             BRIAN BOYNTON
                                             Principal Deputy Assistant Attorney General

                                             CARLOTTA P. WELLS
                                             Assistant Branch Director

                                             JOSHUA KOLSKY
                                             Senior Trial Counsel

                                             */s/ Danielle Young*
                                             DANIELLE YOUNG (TX Bar 24098649)
                                             MADELINE MCMAHON
                                             DOROTHY CANEVARI
                                             Trial Attorneys, Federal Programs Branch
                                             U.S. Department of Justice, Civil Division
                                             1100 L Street, NW
                                             Washington, DC 20001

---

[9] Pursuant to Local Civil Rule 7.1(b), Defendants conferred with Plaintiff about her position on this motion. Plaintiff requested that Defendants represent her position as follows: "Plaintiff opposes Defendants' motion and intends to file a response pursuant to W.D.N.C. LCvR 7.1(e)."

19

Tel.: (202) 616-2035
Email: Danielle.young2@usdoj.gov

*Counsel for Defendants*