# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

### ASHEVILLE DIVISION

| | |
|---|---|
| **CARYN DEVINS STRICKLAND,** ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | |
| **v.** ) | **Civil No. 1:20-cv-00066-WGY** |
| ) | |
| **UNITED STATES,** *et al.*, ) | |
| ) | |
| *Defendants*. ) | |

## PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Caryn Devins Strickland, a former assistant federal public defender, alleges that officials of the federal judiciary subjected her to workplace sex discrimination, including deliberate indifference to sexual harassment, in violation of her equal protection rights, and subjected her to a fundamentally unfair Employment Dispute Resolution ("EDR") process for resolving her complaint of sexual harassment, sex discrimination, and retaliation, in violation of her due process rights. The Fourth Circuit previously held that Plaintiff's allegations were sufficient to state equal protection and due process claims against the official capacity defendants. *Strickland v. United States*, 32 F.4th 311, 319 (4th Cir. 2022).

Plaintiff's equal protection and due process claims are supported by Defendants' judicial admissions in response to her Complaint; the administrative record from Plaintiff's EDR proceeding, which resulted in disciplinary action against both the Federal Public Defender and the First Assistant for wrongful conduct—defined under the EDR Plan as "[d]iscrimination against employees based on . . . sex," including "sexual harassment," and "retaliation for engaging in any protected activity," Tr. Ex. 9, at US4540, US4545 (ECF No. 248-3, EDR Plan

1

Ch. II, § 1, *id.* Ch. IX); and the documentary evidence and deposition testimony provided by Defendants during discovery. In fact, while Plaintiff has provided nearly 450 pages of proposed findings and conclusions that overwhelmingly demonstrate the merits of her claims, it is unnecessary for the Court to review those findings to grant judgment in her favor on her equal protection and due process claims. That is because Plaintiff's claims are proven based on a small number of documents produced by Defendants that have no objection from either party, which this Court itself identified during the November 16, 2023 further pretrial conference.

First, following an investigation into Plaintiff's report of wrongful conduct, the Fourth Circuit's Chief Judge, Honorable Roger L. Gregory, issued a Letter of Reprimand to the Federal Defender based on Plaintiff's complaint of workplace sex discrimination and retaliation. This letter followed a memorandum from the Circuit Executive to the Chief Judge explaining that "[t]he investigation report recommends that disciplinary action be taken against the accused employee – Federal Public Defender First Assistant J.P. Davis – as well as the unit executive, Anthony Martinez." Tr. Ex. 13, at US7562 (ECF No. 248-5 at 80). This Court previously identified the "Letter of Reprimand" as an "unimpeached public record pursuant to Fed. R. Evid. 803(8)(A)(iii)." ECF No. 258, at 6. The Letter of Reprimand explained that the FDO's First Assistant, J.P. Davis, had subjected Plaintiff "to unwanted advances . . ., unreasonably interfered with her work assignments, and even proposed an unsavory quid pro quo proposal on her request for a promotion and raise." Tr. Ex. 15, at US4264 (ECF No. 254-4 at 2). The Letter of Reprimand also reads as a roadmap of the Defender's deliberate indifference to the sexual harassment as articulated by the Fourth Circuit, *see Strickland*, 32 F.4th at 359–60, by making the following factual findings:

- "<u>Marriage Metaphor</u>": "After attempting to resolve several disagreements between Ms. Strickland and Mr. Davis, you had used an ill-advised metaphor, comparing the relationship between Ms. Strickland and Mr. Davis as a 'marriage,' with the parties needing to 'compromise' and 'meet in the middle.' Ms. Strickland said that she was 'shocked' and 'offended' at the reference, believing that it was inappropriate to describe any professional relationship between a male supervisor and female subordinate as a 'marriage.' The metaphor was especially inappropriate given the context that Ms. Strickland had raised concerns with Mr. Davis's behavior towards her."

- "<u>No Physical Touching</u>": "Ms. Strickland denied that Mr. Davis had touched her inappropriately, but she repeated that Mr. Davis made her feel uncomfortable and threatened. Investigator Beam found that you had said, 'at least you weren't touched,' or words to that effect. The investigator concluded that your remarks were callous, minimizing, insensitive, and contributed to the distress that Ms. Strickland felt."

- "<u>Disapproval of Seeking Outside Advice</u>": "Ms. Strickland had also sought advice and guidance from the Fair Employment Opportunity Office at the Administrative Office of the U.S. Courts on her civil rights as a judiciary employee. The investigator found that you had 'called out' Ms. Strickland for seeking legal advice from that office, which further eroded trust between you and Ms. Strickland and exacerbated the deteriorating situation in your office."

- "<u>Shifting Responsibility</u>": "Finally, the investigator noted that you had said you were being blamed for matters that you had nothing to do with. Ms. Strickland reported that she felt 'offended' by your protest, which she perceived as disapproving her right to seek outside advice and counsel from the AO Fair Employment Opportunity Office. This, the investigator concluded, contributed to your mishandling of the matter."

Tr. Ex. 15, at US4265–66 (ECF No. 254-4, at 3–4). Further, the letter specifically stated that

disciplinary action was being taken against the Defender for "wrongful conduct" under the EDR

Plan:

### III. Chief Judge Gregory's Decision

Under Chapter IX of the Plan, "[e]mployees found by the Chief Judge and/or unit executive to have engaged in wrongful conduct, as defined in this Plan, may be subject to disciplinary action." After

3

> careful consideration of the investigator's report, supporting attachments, and documents filed in this case - and noting the mitigating circumstances – Chief Judge Gregory has decided to adopt the recommendations contained in the report.

Tr. Ex. 15, at US4267 (ECF No. 254-4, at 5). The Letter of Reprimand also includes a definition of "wrongful conduct" under the Plan:

> Under Chapter II, section 1 of the Plan, "wrongful conduct" is defined:
>
>> Discrimination against employees based on race, color, religion, sex (including pregnancy and sexual harassment), national origina, age (at least 40 years of age at the time of the alleged discrimination), and disability is prohibited. Harassment against an employee based upon any these protected categories or retaliation for engaging in any protected activity is prohibited. All of the above constitute "wrongful conduct."

Tr. Ex. 15, at US4267 n.4 (ECF No. 254-4, at 5 n.4) (quoting EDR Plan Ch. II, § 1). These statements conclusively establish that the Letter of Reprimand, as an unimpeached public record, made findings of unlawful workplace sex discrimination in violation of Plaintiff's rights under the EDR Plan. Defendants' own findings of wrongful conduct during the EDR proceeding amply support a finding that Plaintiff was subjected to *quid pro quo* sexual harassment as well as related sex discrimination and retaliation leading to her constructive discharge, in violation of her equal protection rights.

Second, Defendants violated Plaintiff's due process rights because they refused to disqualify the accused Defender, Anthony Martinez, from representing the employing office, even though he was a party accused of wrongful conduct. Indeed, the investigation subsequently found that the Defender had engaged in conduct warranting disciplinary action and was so biased against Plaintiff that he would do further damage to the process if allowed to participate. Tr. Ex. 39, at US1382 (ECF No. 248-14, at 77).

4

Consistent with commonsense notions of fundamental fairness, the EDR Plan provides for disqualification of an employee (including a unit executive) who is "involved in" a complaint. Tr. Ex. 9, at US4548, US4539–40 (ECF No. 248-3, EDR Plan Ch. X, § 7; *id.* Ch. I, §§ 2–3) (defining "employee" to include "unit executive[s]," including "Federal Public Defenders"). When Plaintiff filed a complaint under the EDR Plan, she moved for the Defender's disqualification because he was "involved in" her complaint as an accused party. Tr. Ex. 9, at US4548, US4539–40 (ECF No. 248-3, EDR Plan Ch. X, § 7; *id.* Ch. I, §§ 2–3) (defining "employee" to include "unit executive[s]," including "Federal Public Defenders"). Under the EDR Plan, Plaintiff had a right to "a clear and specific set of procedures that are to be followed in the event that an employee claims that his or her substantive rights afforded under the EDR Plan have been violated." *Strickland*, 32 F.4th at 349–50. Defendants violated these procedures, including the right to disqualification of an employee "involved in" a complaint, and thereby denied Plaintiff her due process right to a fundamentally fair process for resolving her workplace discrimination complaint. Indeed, more than four months after the investigation began, the Investigator concluded in her report that *both* the Defender *and* the First Assistant had engaged in conduct warranting disciplinary action. Tr. Ex. 12, at US1257 (ECF No. 248-5, at 24). Based on her recommendation that the Defender be disciplined, the EDR Coordinator asked the Investigator whether the Defender should be disqualified. Her answer was an emphatic yes:

> On Jan 13, 2019, at 5:53 PM, Heather Beam <Heather_Beam@ncwp.uscourts.gov> wrote:
>
> Hey James,
>
> I truly believe Tony is biased in this case involving JP and Caryn as far as the sexual harassment is concerned. From my conversations with him I know he feels Caryn is attempting to exploit this situation to get the transfer to Asheville, however it has created a bias in him to look at this case from a neutral perspective. I also believe he lacks the experience and understanding of exactly how this process works. I am concerned he could cause more damage if he were involved in the process at this point.
>
> Caryn had requested Tony be disqualified as she felt she was retaliated against after she submitted her claim of Wrongful Conduct. Although retaliation in my investigation was unfounded, I still think in a good faith effort to resolve this the circuit should consider disqualifying him based on the contentious nature of the current situation. I would strongly recommend mediation at this point with perhaps one of the individuals we discussed the other day.
~

Tr. Ex. 39, at US1382 (ECF No. 248-14, at 77). Even though the Investigator concluded that the Defender was "biased" against Plaintiff and "could cause more damage if he were involved in the process at this point," the Chief Judge denied Plaintiff's request for disqualification without explanation. As a result, the EDR process was both discriminatory and fundamentally unfair.

This Court need not look any further because the above documents are sufficient to prove Plaintiff's equal protection and due process claims. Nonetheless, the proposed findings and conclusions of law below also demonstrate that the allegations in Plaintiff's complaint are true. Pursuant to Federal Rule Civil Procedure 52, this Court should grant judgment in Plaintiff's favor based on the undisputed facts of this case.

Indeed, this Court previously recognized that "[t]he underlying facts" favoring Plaintiff's equal protection claim against the Defender "appear to be undisputed," including through a "letter of reprimand" issued by the Fourth Circuit's Chief Judge. ECF No. 258, at 6–7. If "an unimpeached public record" from the Fourth Circuit's Chief Judge containing "undisputed" findings of unlawful sex discrimination is not sufficient to demonstrate that Plaintiff should prevail on her equal protection claim, it is hard to imagine what would be sufficient. *Id.* at 6. The equal protection claim against the Defender, alone, is sufficient to entitle Plaintiff to a

prospective equitable remedy.  In this memorandum, Plaintiff expands on the overwhelming evidence of the Defender's deliberate indifference to her sexual harassment complaint. Similarly, the undisputed facts, including the EDR Investigator's email demonstrating that the Defender was not disqualified even though he was too biased to participate, demonstrate that Plaintiff is entitled to judgment in her favor on the due process claim.

## PROPOSED FINDINGS OF FACT

This Court granted partial summary judgment in favor of Plaintiff with respect to all judicial admissions provided by Defendants in this case.  ECF No. 258, at 1 ("[T]he government's listing of facts, where undisputed, were established for trial . . . .").  A statement of facts based on Defendants' judicial admissions in their First Amended Answer and the documents incorporated by reference or otherwise integral to the First Amended Answer, and based on the evidentiary admissions they provided in discovery, is provided below.  *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) ("[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."); *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 614 n.4 (4th Cir. 2015) considering document "incorporated into the complaint by reference").  Unless otherwise stated, judicial admissions from the First Amended Answer or documents incorporated therein by reference are provided in numbered paragraphs ("1").  Evidentiary admissions used to provide further support are provided in numbered and lettered subparagraphs to differentiate them from the judicial admissions ("1a").  The purpose of these proposed findings is to establish that Plaintiff's allegations, as pleaded in the complaint, are true, based on Defendants' own admissions in their Amended Answer and the evidence provided during discovery.

7

## I.    Facts Supporting Liability

### A.    Background facts

1.      Defendants admit that Plaintiff contacted the Administrative Office of the U.S. Courts ("AO") and that she filed a request for counseling and a report of wrongful conduct.  Tr. Ex. 4, at ¶ 5 (ECF No. 210, Am. Answer ¶ 5); Tr. Ex. 5, at US500–507 (ECF No. 248-2, at 2–9).

2.      Plaintiff is a female attorney who was formerly employed as an assistant federal public defender in the federal judiciary.  Tr. Ex. 4, at ¶ 15 (ECF No. 210, Am. Answer ¶ 15).

3.      Defendants admit that Plaintiff's resume indicates that she graduated summa cum laude and Phi Beta Kappa from the University of Vermont.  Tr. Ex. 4, at ¶ 16 (ECF No. 210, Am. Answer ¶ 16); Tr. Ex. 12, at US1302–03 (ECF No. 248-5, at 68–69).

4.      Defendants admit that Plaintiff's resume indicates that she graduated from Duke University Law School where she served on the law review and was elected to Order of the Coif.  Tr. Ex. 4, at ¶ 17 (ECF No. 210, Am. Answer ¶ 17); Tr. Ex. 12, at US1302–03 (ECF No. 248-5, at 69–70).

5.      Defendants admit that Plaintiff's resume indicates that she clerked for Chief Justice Paul Reiber of the Vermont Supreme Court.  Tr. Ex. 4, at ¶ 18 (ECF No. 210, Am. Answer ¶ 18); Tr. Ex. 12, at US1302–03 (ECF No. 248-5, at 69–70).

6.      Defendants admit that Plaintiff's resume indicates that she clerked for Judge James P. Jones of the U.S. District Court for the Western District of Virginia.  Tr. Ex. 4, at ¶ 19 (ECF No. 210, Am. Answer ¶ 19); Tr. Ex. 12, at US1302–03 (ECF No. 248-5, at 69–70).

7.      Defendants admit that Plaintiff's resume indicates that she clerked for Judge Peter

8

W. Hall of the U.S. Court of Appeals for the Second Circuit. Tr. Ex. 4, at ¶ 20 (ECF No. 210, Am. Answer ¶ 20); Tr. Ex. 12, at US1302–03 (ECF No. 248-5, at 69–70).

8.      Plaintiff was then selected for a prestigious fellowship in the judiciary. In this role, Plaintiff worked on a number of projects to support the federal courts and the Judicial Conference of the United States. She wrote a law review article on a topic of interest to the federal courts, and presented her research at Judicial Conference committee meetings. Tr. Ex. 4, at ¶ 21 (ECF No. 210, Am. Answer ¶ 21).

9.      Defendant Judicial Conference of the United States ("Judicial Conference") is the principal policy-making body of the federal judiciary and promulgates the Model EDR Plan and related policy statements and mandates its adoption and implementation within the federal judiciary. The Judicial Conference derives the authority to promulgate and mandate the adoption of the Model EDR Plan from 28 U.S.C. § 331. Tr. Ex. 4, at ¶ 24 (ECF No. 210, Am. Answer ¶ 24).

10.     Defendants admit that the Honorable Roslynn R. Mauskopf served as the Chair of the Judicial Conference Committee on Judicial Resources at the time the Complaint was filed. Defendants further admit that the Judicial Conference Committee on Judicial Resources is responsible for making judicial policy on issues of human resource administration in the judiciary. Defendants admit that Plaintiff's Complaint purports to sue the Honorable Roslynn R. Mauskopf in her official capacity. Tr. Ex. 4, at ¶ 25 (ECF No. 210, Am. Answer ¶ 25).

11.     Defendant Administrative Office of the U.S. Courts ("AO") provides statutorily authorized administrative support to federal courts under the supervision and direction of the

9

Judicial Conference, including support to circuit courts, judicial councils, and federal defender organizations.  Tr. Ex. 4, at ¶ 26 (ECF No. 210, Am. Answer ¶ 26).

12.     Defendants admit that James C. Duff served as the Director of the AO at the time the Complaint was filed.  Defendants admit that Plaintiff's Complaint purports to sue James C. Duff in his official capacity.  Tr. Ex. 4, at ¶ 27 (ECF No. 210, Am. Answer ¶ 27).

13.     Defendant United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") has the sole legal authority to appoint and remove Federal Public Defenders serving within the Fourth Circuit under 18 U.S.C. § 3006A(g)(2)(A).  Tr. Ex. 4, at ¶ 30 (ECF No. 210, Am. Answer ¶ 30).

14.     Defendant Fourth Circuit Judicial Council ("Judicial Council") oversees the administration of federal courts in the Fourth Circuit and adopted the EDR Plan used to process Plaintiff's complaints of sexual harassment, retaliation, and gender discrimination.  The Judicial Council derives its authority to implement the Fourth Circuit EDR Plan from 28 U.S.C. § 332(d)(1).  Tr. Ex. 4, at ¶ 31 (ECF No. 210, Am. Answer ¶ 31).

15.     Defendant Roger L. Gregory ("Chief Judge") is the Chief Judge of the Fourth Circuit and Chair of the Judicial Council, and was responsible for various duties under the EDR Plan used to process Plaintiff's complaints of sexual harassment, retaliation, and gender discrimination.  Defendants admit that Plaintiff's Complaint purports to sue the Chief Judge in his individual and official capacities.  Tr. Ex. 4, at ¶ 32 (ECF No. 210, Am. Answer ¶ 32).

16.     Defendant James N. Ishida ("Circuit Executive" or "EDR Coordinator") is the Circuit Executive for the Fourth Circuit. During the events alleged in this Complaint, he was the

EDR Coordinator under the Fourth Circuit EDR Plan.  Defendants admit that Plaintiff's

Complaint purports to sue Mr. Ishida in his individual and official capacities.  Tr. Ex. 4, at ¶ 33

(ECF No. 210, Am. Answer ¶ 33).

### B.    Plaintiff accepts a position with the FDO.

17.    During her judiciary fellowship year, Plaintiff was offered a position at the FDO.

Ex. 4, at ¶ 38 (ECF No. 210, Am. Answer ¶ 38).

17a.    The FDO had a reputation as a troubled office.  Indeed, Plaintiff's EDR

Coordinator, the Fourth Circuit's Circuit Executive, later stated that "it sounded like it was a

really kind of troubled office before, the judges had expressed a lot of concern.  There was a lot

of serious issues that were going on in that office. . . . And I do know from the stories I've heard

that the judges were very mindful of, okay, we need change and we need good change and we

need to change the culture first and foremost."  Ex. 4, at ¶ 264 (ECF No. 210, Am. Answer ¶

264); Tr. Ex. 57, at US7648–49 (ECF No. 255-11, at 6–7).

17b.    During public testimony, a sitting federal district judge in the Western

District of North Carolina, Honorable Max O. Cogburn, discussed the known problems in the

office, which had prompted the district judges to convert the office from a Community Defender

Organization to a Federal Public Defender Office.  *See* 18 U.S.C. § 3006A(g).  Judge Cogburn

explained that the office did not have "the quality of applicants" in other districts, "not only for

the directorship, but also for the assistant positions."  Testimony of Hon. Max. O. Cogburn, Ad

Hoc Committee to Review the Criminal Justice Act, at 13 (Jan. 11–12, 2016),

https://cjastudy.fd.org/sites/default/files/hearing-archives/miami-florida/pdf/final-cja-

11

miamipanel-2.pdf.[1]  In fact, the representation from the office was "unsatisfactory" and the

judges believed that "we need better representation in our district." *Id.* at 33–34.  Quite simply,

the office "is a mess.  We need a change.  We need somebody new." *Id.* at 34.  As support for

these statements, Judge Cogburn explained that the leader of the office had chosen unqualified

lawyers, including the First Assistant (J.P. Davis) and the Appellate Chief (Joshua Carpenter), to

run the office:

> But, there are lawyers on there that are still not strong. She has
> chosen, as her first assistant, a lawyer that could not be a panel
> attorney. He's not qualified. He's second chaired one criminal case.
> Her top gun in the Asheville office is her appellate chief who has
> never been in the  courtroom. The trial attorneys are chafing because
> they were not selected for these higher positions. She has shown a
> bad judgement in selecting people to run her office as well as other
> things. It is a mess. We need a change. We need somebody new.

*Id.* at 33–34.  Judge Cogburn also explained that there were instances of misconduct in the

office that were "kept from the judges" by the office's supervisors:

> We also were subjected to an embezzlement of money by the
> administrator of our CDO. The judges didn't find out about it for a
> long time. It was kept from the judges. In an FDO that would have
> been reported to the circuit chief but in the CDO that was kept from
> us for a long period of time until after the investigation was done.
> You cannot embezzle from an FDO. It's run just like any other
> federal. You put in a voucher and you get paid or you don't get paid
> but there's no cash money to take. A CDO is essentially a block
> grant to criminal defense attorneys.  Easy to embezzle from. Easily
> taken. We decided an FDO was better.

*Id.* at 14.  Judge Cogburn explained that employees were afraid to speak up because of fear of

retaliation:  "I cannot mention the names of some of the members of our CDO that talked to me

because they're afraid that they'll be fired. They're afraid they can't say anything because

---

[1] Judge Cogburn's testimony is subject to judicial notice.  *See* Fed. R. Evid. 201.

they're at will employees." *Id.*  Judge Cogburn testified that part of the motivation to convert the organization to an FDO was to provide greater protections to employees from retaliation.  *Id.*

18.     Defendants admit that Plaintiff accepted a job offer with the Federal Defender's Office for the Western District of North Carolina.  Tr. Ex. 4, at ¶ 42 (ECF No. 210, Am. Answer ¶ 42).

19.     Defendants admit that Plaintiff's offer letter offered a position as a "Research and Writing Specialist Attorney with the expectation that you will transition to an Assistant Defender Position." Tr. Ex. 4, at ¶ 44 (ECF No. 210, Am. Answer ¶ 44); Tr. Ex. 12, at US1258 (ECF No. 248-5, at 24).

19a.     When she was offered the position, Plaintiff was informed that "the idea would be for you to be in this role initially in order to get some experience.  We would look to move you to an Assistant Federal Defender position pretty soon thereafter."  Tr. Ex. 12, at US1252, US1259 (ECF No. 248-5, at 19, 26).

19b.     According to the job description, an Assistant Federal Defender "provides every aspect of legal representation to individuals charged with federal criminal offenses but who are unable to retain an attorney.  Duties include trials and court hearings, direct appeals to the circuit court, habeas, post-conviction and witness representation, and representation in other matters such as supervised release hearings and probation and parole hearings."  Tr. Ex. 54, at US4968 (ECF No. 248-15, at 52).

19c.     By contrast, "[t]he Research and Writing Specialist provides advanced research and writing services to assistant federal defender (AFD) staff on trial and appellate cases."  Tr. Ex. 54, at US4971 (ECF No. 248-15, at 55).  "General duties include examining,

13

analyzing and researching records and issues; performing legal research and preparing legal documents; assisting AFD staff with all aspects of case preparation, training and continuing legal education and supervision of other research staff as appropriate." Tr. Ex. 54, at US4971 (ECF No. 248-15, at 55). Notably the research and writing job description states, in bold emphasis: "*The Research and Writing Specialist does not ordinarily sign pleadings or make court appearances. The Research and Writing Specialist position is not intended to serve as a proxy, substitute, or replacement for an AFD position, nor in the place of an addition AFD position.*" Tr. Ex. 54, at US4971 (ECF No. 248-15, at 55 (emphasis in original)).

19d.    As the Defender testified during his deposition, Plaintiff was "on th[e] path" to becoming an AFD.   Tr. Ex. 16, at 103 (ECF No. 255-4, at 42).

20.    Defendants admit the First Assistant remained in his position during the relevant time period. Tr. Ex. 4, at ¶ 51 (ECF No. 210, Am. Answer ¶ 51).

21.    Defendants admit that for part of the time that Plaintiff worked at the FDO, the First Assistant had some supervisory responsibilities over the trial units in the FDO. Tr. Ex. 4, at ¶ 52 (ECF No. 210, Am. Answer ¶ 52).

21a.    During this litigation, Defendants admitted the following regarding the First Assistant: "[Defendants] admit that Davis served as the FDO's 'principal deputy' and that he had some supervisory responsibilities over the trial units in the FDO. Defendants admit that the First Assistant may assist in the management of all phases of the FDO and take actions that affect the basic content and character of the FDO's administrative and legal operations. Defendants admit that, from August 2017 until December 2017 and from July 2018 to August

14

2018, J.P. Davis served in a supervisory role over Plaintiff."  Tr. Ex. 10, at 3 (ECF No. 248-4, at 4).

21b.  The job description for First Assistant Defender (Mr. Davis's position) states: "The First Assistant Defender serves as the ***principal deputy*** to the Federal Public/Community Defender, assisting in the management of all phases of the defender organization.  The First Assistant assumes the authority to take actions that affect the basic content and character of the organization's administrative and legal operations.  ***The First Assistant Defender is a one-of-a-kind position within a defender organization and supervises a minimum of five (5) Assistant Federal Defenders (AFDs.).***"  Tr. Ex. 54, at US4956 (ECF No. 248-15, at 49 (emphasis in original)).  The list of "Primary Job Duties" for the First Assistant Defender includes the following: "Initiates personnel actions involving all staff members when required.  Actions may include: hiring, performance appraisals, mediation and negotiation, disciplinary actions, and employee job termination."  Tr. Ex. 54, at US4957 (ECF No. 248-15, at 50).  Thus, the job description for the First Assistant Defender position confirms that Mr. Davis had supervisory responsibility over Plaintiff.

21c.  During his deposition, the Defender testified that "JP was a supervisor at this time" and that Plaintiff was "working in JP's chain of command."  Tr. Ex. 16, at 170, 175 (ECF No. 255-4, at 72, 77).  He further testified that the First Assistant supervised "the entire FDO," including the trial appellate units," and that the Defender "trusted" his judgment on personnel matters."  Tr. Ex. 16, at 90–95 (ECF No. 255-4, at 29–34).  Specifically, the Defender explained the First Assistant's supervisory role as follows:

Q.    Okay. So did JP oversee the trial unit?

15

A.     He oversees the whole office, as I indicated.

Q.     Oh. So does he oversee all of the units then?

A.     Yes.

Q.     He oversaw all of the units?

A.     Right.

Q.     Appellate as well?

A.     Yes, ma'am.

Q.     So -- and what specific duties did overseeing the trial unit entail?

A.     General supervision. It could be referring a person to me for discipline action or it could be a multitude of general supervisory things.

Q.     So referring someone to you for disciplinary action?

A.     Yeah. If he observes or hears of something that requires my looking into it, then I would look into it.

Q.     Right.

A.     Just general supervisory.

Q.     Right. And when you say discipline action, what do you mean by that?

A.     Any employee discipline actions. He's a supervisor, so he supervises also.

Q.     Right.

A.     Yeah. If someone is lacking for whatever reason, if someone -- just general supervisory.

Q.     Okay. So is it fair to say JP, as first assistant, supervised all employees at the FDO except for you?

16

A.     Yes, ma'am.

Q.     And was he the only one who supervised all of those employees?

A.     Other than me.

Q.     Other than you?

A.     Yes, ma'am.

Q.     So it's you supervise everyone.

A.     Yes, ma'am.

Q.     And then he supervises everyone else, not you?

A.     Correct.

Q.     Okay. Got it. And so trial, appellate, and administrative?

A.     Yes, ma'am.

Q.     So how often would you and JP communicate while you were at -- while you were the federal defender?

A.     Often.

Q.     Like daily?

A.     Daily for sure.

Q.     Several times a day?

A.     Several times a day, for sure.

Tr. Ex. 16, at 92–94 (ECF No. 255-4, at 31–33).

C.     **Plaintiff works in a toxic culture of widespread discrimination, harassment, and retaliation, which the Defender encourages and condones.**

22.     Defendants admit that the FDO's management team was predominantly male at

the time of relevant events in this case.  Tr. Ex. 4, at ¶ 60 (ECF No. 210, Am. Answer ¶ 60).

17

22a.    Discovery in this case revealed MeToo evidence that corroborates

Plaintiff's allegations of a hostile working environment.  During the Defender's tenure, 

Tr. Ex. 58, at 3–4

Tr. Ex. 58, at US7438–39

Tr. Ex. 58, at US7430 (ECF No. 248-16, at 18).

22b.    In their sworn declarations filed in this proceeding, FDO supervisors made

false representations to this Court about other complaints of discrimination against the FDO.  *See*

ECF No. 78-3, ¶ 124; ECF No. 78-1, ¶ 54.  Defendants filed sworn declarations from Federal

Defender Anthony Martinez, Administrative Officer William Moormann, and First Assistant J.P.

Davis.  *See* ECF Nos. 78-1, 78-2, 78-3; ECF Nos. 245-2, 245-3, 245-4.  Defendants have stated

that all three individuals are "may call" witnesses at trial.  *See* ECF No. 259, at 107–08.

In their sworn declarations, these FDO supervisors made the following statements:

- "I have never witnessed or even heard of any gender-based discrimination, or sexual

  harassment involving the First Assistant, Plaintiff, or anyone else in my office at any

  time, other than what I describe above about Plaintiff's reports raised in mid-August,

  2018. . . .  Had I observed or even heard rumors or speculation about any such conduct, I

18

would have immediately followed all steps to ensure the issues were investigated and handled accordingly.  I have never made derogatory comments about Plaintiff or anyone else based on gender (or any other protected category).  I have never heard anyone in the FDO-WDNC make any such comments either."

Declaration of Anthony Martinez, ECF No. 245-4, ¶¶ 124–27.

- "I have never witnessed any sexual harassment or discrimination of any kind in our office, nor have I witnessed any retaliation.  No employee has ever reported to me, as the human resources contact for the FDO-WDNC or otherwise, any type of harassment, discrimination, or retaliation they have witnessed or experienced in the FDO-WDNC."

Declaration of William Moormann, ECF No. 245-2, ¶ 54.

- "I have never seen nor heard Defender Martinez nor anyone else in the organization speak about women using crude or derogatory language, belittle them, or otherwise treat any employee differently based on their sex.  I have not seen nor heard Team Leader Peter Adolf—or anyone else—refer to Black or other clients as "dogs" or use similar terms. While I have heard staff members struggle with understanding that the term "retarded" is no longer culturally appropriate, I have never heard anyone mock clients with disabilities or otherwise belittle disability. I have never experienced any homophobic commentary or attitude from any FDO-WDNC employees, whether in management or otherwise."

Declaration of John Parke Davis, ECF No. 245-3, ¶ 8.

22c.    As the MeToo evidence demonstrates, the statement by Defender Martinez that he has never "even heard of gender-based discrimination" aside from Plaintiff's complaint is

patently false in light of the other complaints against the FDO.  ECF No. 245-4, ¶¶ 124–27.

Indeed, ████████████████████████████████████████████████

████████████████████████████████████████ Tr. Ex. 58, at US5385–89 (ECF No. 248-

16, at 7–11); *see also* Tr. Ex. 58, at 1–5 (ECF No. 248-16, at 1–5) (████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ Moreover, ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ *See* Tr. Ex. 58, at

US7426–47 (ECF No. 248-16, at 14–35).  Defender Martinez ████████████████████

████████████████████████████████████████████████

████████ Tr. Ex. 58, at US7451 (ECF No. 248-16, at 36).  ████████████████████

████████████████████████████████ when he swore under penalty of perjury that

he had never "even heard rumors or speculation about any such conduct."  ECF No. 245-4, ¶¶

124–27.

      22d.    Similarly, ████████████████████████████████████

████████████████████████████████████████████████

20



Tr. Ex. 58, at US7542 (ECF No. 248-16, at 52); *see also* ECF No. 330, at 10 n.5 (omitting this material fact when stating that ████████████████████████████████████████ ████████████████████████████████████████ ████████████ (citations omitted)). During this litigation, on May 19, 2023, Defender Martinez filed an updated declaration correcting an error regarding an office chart. ECF No. 218. Yet, Defender Martinez apparently found it unnecessary to update his statement that he had never "even heard of any gender-based discrimination," No. 245-4, ¶ 124, which was unequivocally false ████████████████████████████████████ ████████ similar reasons, Administrative Officer Moormann's statement that "[n]o employee has ever reported" to him, in his capacity as human resources contact or otherwise, "any type of harassment, discrimination, or retaliation" is not even plausibly true. ECF No. 245-2, ¶ 54. In fact, Mr. Moormann was specifically identified in ████████████████████████████████ *See* Tr. Ex. 58, at 3 (ECF No. 248-16, at 3) (████████████████████████████ ████████████████████████████████████████ ███████████████████████████

      22e.    The Circuit Executive testified during his deposition that he was "concerned about a pattern of complaints against JP Davis or Mr. Martinez":

> Q   Were you, at any point during Ms. Strickland's complaint and proceeding, concerned about a pattern of complaints against JP Davis or Mr. Martinez?
>
> A   Well, I think -- I think I was concerned about that. There were multiple coming within a relatively short period of time, so I remember being somewhat concerned about that.

21

Tr. Ex. 22, at 227–28 (ECF No. 255-3, at 67–68).

Further, the Chief Judge was aware of "every" one of the complaints:

> Q   Did you speak with Chief Judge Gregory about the concern you just mentioned?
>
> A   Well, again, in my role as the EDR Coordinator, whenever I get, you know, like, say, a Chapter IX or Chapter X, I would always let him know that this is a – "Chief, by the way, this is what" – "I received this complaint or this request" – "this report of wrongful conduct." So I would let him know every time I received one what would happen.

Tr. Ex. 22, at 228 (ECF No. 255-3, at 68).

22f.    Defendants' interrogatory responses confirm the similarity of these complaints, demonstrating a pattern of conduct that is relevant to proving discriminatory intent:





Tr. Ex. 58, at 3–4 (ECF No. 248-16, at 3–4).

22g.　The following excerpts from Plaintiff's Exhibit P, which contains evidence provided by Defendants in discovery pertaining to the other complaints, strongly corroborate Plaintiff's allegations of a hostile working environment:



23



24



Case 1:20-cv-00066-WGY   Document 370   Filed 12/11/23   Page 25 of 450



Case 1:20-cv-00066-WGY   Document 370   Filed 12/11/23   Page 26 of 450



27



28



Tr. Ex. 58, at US5385–89, US7426–47, US7542, US7454–56, US7508–12 (ECF No. 248-16, at 7–11, 14–35, 52, 55–57, 58–62).

22h. Moreover, the MeToo evidence also corroborates the complaint's allegations of a hostile working environment including mocking clients based on their race, sex, and disability in FDO office meetings, as demonstrated by the following limited list of examples:

- In a single all-staff meeting at the FDO, employees made comments mocking an African American Assistant United States Attorney for *rapping* to the jury (*e.g.*, "[He's trying to reach out to black [inaudible], you know, he's – [inaudible] *Gucci Man*." (emphasis added)); a supervising Team Leader mocked his intellectually disabled death-penalty client for the "problem" caused by the fact that he "is so retarded"; and the Defender mocked "all our clients"—who are predominantly African American—for "want[ing] to smoke a blunt" and "call[ing] it a trend after the holidays." *See* Tr. Ex. 106, at US8146; Tr. Ex. 1, at ¶ 54 (ECF No. 1, Complaint ¶ 54). Corroborating these allegations, █████

29



. Ex. 58, at US7443 (ECF No. 248-16, at 31)

Tr. Ex. 58, at US7424–25 (ECF No. 248-16, at 42–43) (

- An employee described

Tr. Ex. 58, at US7429–30 (ECF No. 248-16, at 17–18).

- In addition,  Tr. Ex. 58, at US7430 (ECF No. 248-16, at 18).

- ██████████████████████████████████████████ Tr. Ex. 58, at US5553 (ECF No. 248-16, at 69).

31

- Additionally, ████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████ Tr. Ex. 58, at US5554 (ECF No. 248-16, at 70).

**D. The First Assistant singles out Plaintiff professionally and personally.**

23. Defendants admit that the First Assistant created a document titled "New Attorney Shadowing Checklist" to be used to train Plaintiff, that the document listed nicknames, that the First Assistant and Plaintiff attended four mentoring lunches together, and that the First Assistant, as Plaintiff's mentor, paid for the lunches. Tr. Ex. 4, at ¶ 63 (ECF No. 210, Am. Answer ¶ 63).

23a. Plaintiff was assigned almost exclusively to the First Assistant's cases during her first months at the FDO, including a large white collar case. *See* Tr. Ex. 31, at US6226 (ECF No. 248-14, at 45).

23b. The First Assistant specifically "requested to be an informal mentor" to Plaintiff, even though the FDO had no "mentoring program," after the Defender chose to assign Plaintiff to a different trial team instead of the First Assistant's trial team. Tr. Ex. 31 at US6226 (ECF No. 248-14 at 46). The Defender "initiated" and allowed the First Assistant to be Plaintiff's "mentor" even though the First Assistant had never "mentored" an attorney before. Tr. Ex. 31, at US5948 (ECF No. 248-14, at 41).

32

23c.    The First Assistant repeatedly told Plaintiff, and other supervisors, that he was Plaintiff's "supervisor" with authority to take "disciplinary action" against her, consistent with the job description for a First Assistant Federal Defender.  *See* Tr. Ex. 54, at US4957 (ECF No. 248-15, at 50) (First Assistant "initiates personnel actions involving all staff members . . . including "disciplinary actions, and employee job termination.").

23d.    The First Assistant was not a good candidate to mentor aspiring assistant federal public defenders, such as Plaintiff.  As ███████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████  Tr. Ex. 58, at US7431 (ECF No. 248-16, at 19).  This ███████ further explained, ████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████ ███████████████████████████████████████████████



Tr. Ex. 58, at US7430 (ECF No. 248-16, at 18). This employee also explained that ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████ Tr. Ex. 58, at US7446 (ECF No. 248-16, at 34 & n.21). This ██████ was █████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████ including the First Assistant. Tr. Ex. 58, at US7432 (ECF No. 248-16, at 20).

23e.     This AFPD's comments are similar to Judge Cogburn's stated concerns that the First Assistant "could not be a panel attorney" on the CJA panel because "[h]e's not qualified" and has only "second chaired one criminal case." Cogburn testimony, *supra*, ¶ 17b. Indeed, Judge Cogburn had testified that office leadership had shown "bad judgement" in selecting the First Assistant for that role. Despite these well-known concerns about the First Assistant, the Defender allowed the First Assistant to "mentor" Plaintiff.

24.     Defendants admit that Plaintiff sent an email to the Defender, copying the First Assistant, on December 5, 2017, asking to "meet sometime soon to discuss what the transition to an AFPD position will look like." Tr. Ex. 1, at ¶ 64 (ECF No. 1, Complaint ¶ 64). Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents. Tr. Ex. 4, at ¶ 64 (ECF No. 210, Am. Answer ¶ 64).

25.     Defendants admit that Plaintiff lived near the First Assistant and that, on multiple

34

occasions, the First Assistant gave Plaintiff a ride home when she was unable to ride her bike in inclement weather or for other reasons.  Tr. Ex. 4, at ¶ 69 (ECF No. 210, Am. Answer ¶ 69).

26.     Defendants further admit that Plaintiff recommended a music store to the First Assistant during a discussion about guitars, and that the First Assistant purchased a guitar from that store.  Tr. Ex. 4, at ¶ 71 (ECF No. 210, Am. Answer ¶ 71).

26a.     At least some of Plaintiff's coworkers noticed the First Assistant's interest in her as well.  They described him as "lustful," "fixated," "sexually attracted," and "smothering."  Tr. Ex. 7, at US69 (ECF No. 248-2, at 17).

26b.     Another employee described, ████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████  Tr. Ex. 58, at US5554 (ECF No. 248-16, at 70).  In fact, this employee was listed on Plaintiff's list of witnesses for the EDR Investigation, who the investigator never contacted, as described below.  *Infra*, ¶ 167.  Based on this employee's statements, it is reasonable to infer that if the investigator had contacted Plaintiff's witnesses in accordance with standard practices for investigating workplace harassment complaints, those witnesses would have corroborated the harassment she suffered.

26c.     As the AO's former Fair Employment Opportunity Officer ("FEOO"), Nancy Dunham, testified during her deposition, it is common in sexual harassment cases for

people to "have interpersonal relationships that are positive that later change after a boundary is crossed." Tr. Ex. 20, at 148 (ECF No. 255-14 at 148). Further, "warm, interpersonal relationships that are positive [can] be seen or understood as grooming in hindsight for further sexual advances." Tr. Ex. 20, at 148–49 (ECF No. 255-14 at 148–49). The FEOO explained that the First Assistant's conduct was about his "desire to control" Plaintiff, "which is very common" in sexual harassment cases, especially when there is a "huge power imbalance." Tr. Ex. 20, at 32–33, 62, 138, 167 (ECF No. 255-14 at 32–33, 62, 138, 167).

      26d.    The FEOO compared Plaintiff's case to sexual harassment allegations against Governor Andrew Cuomo by a woman "who alleged that he had made her uncomfortable by his obvious sexual and romantic interest in her." Tr. Ex. 20, at 138 (ECF No. 255-14 at 138). The FEOO explained: "There was never any groping or physical assault in that case, and I remember thinking that is exactly what happened with Caryn Devins. No physical touching, no groping, but nevertheless a – a desire to control her and – an obvious interest in her either sexually or romantically." Tr. Ex. 20, at 138–39 (ECF No. 255-14 at 138–39). Based on her 35 years of employment law experience, including working in employment defense firms and the federal judiciary, the FEOO described the First Assistant's conduct as "classic sexual harassment." Tr. Ex. 20, at 43, 138 (ECF No. 255-14 at 43, 138).

      **E.**    **The First Assistant sends Plaintiff a *quid pro quo* email.**

      27.    Admitted that Plaintiff and the First Assistant had their fourth and final mentoring lunch on May 18, 2018. Tr. Ex. 4, at ¶ 76 (ECF No. 210, Am. Answer ¶ 76).

      27a.    During the lunch, Plaintiff stated that at her upcoming performance evaluation, she planned to ask for a raise to the equivalent of the next grade on the GS pay scale

36

and her anticipated promotion to an assistant federal public defender position with her own caseload. Tr. Ex. 5, at US501 (ECF No. 248-2, at 3); Tr. Ex. 7, at US70 (ECF No. 248-2, at 18); ECF No. 245-3, ¶¶ 20–21 (Davis Decl.).

   27b. Defendants admit that Plaintiff would have been eligible for a grade-level promotion to FD-15 (*i.e.*, GS-15) on or about August 21, 2018, her work anniversary date. Tr. Ex. 10, at 9–10 (ECF No. 248-4, at 10–11).

   27c. Plaintiff was consistently praised for her excellent job performance, and the Defender thought she was "hardworking," "responsible," and her work was of "high quality." Tr. Ex. 16, at 106–07 (ECF No. 248-6, at 17–18); Tr. Ex. 16, at 100 (ECF No. 255-4, at 39) (Defender's testimony that "[s]he did a good job, so my impression was that she was doing good work, a good job, and hard working"). The Defender testified in his deposition that he "remember[ed] her being praised by attorneys in the office for her performance" and he thought "highly of her performance." Tr. Ex. 16, at 106 (ECF No. 248-6, at 17). Likewise, the First Assistant stated in his declaration filed in this proceeding that "I thought highly of her performance and considered her a valuable employee." ECF No. 245-3, ¶¶ 21.

   28. Later that afternoon, the First Assistant sent Plaintiff an email:



Mas Dinero
JP Davis to: Caryn Devins       05/18/2018 03:56 PM

Dude, you're shooting high with a G15. Not least of all since you'll need 5 more years of fed service to qualify for it. But fret not, I have a plan... just remember I deal in pay-for-stay :)

J.P. Davis
First Assistant Federal Defender
Federal Public Defender
Western District of North Carolina

Tr. Ex. 4, at ¶ 82 (ECF No. 210, Am. Answer ¶ 82).

28a.    The First Assistant's claim that Plaintiff needed five more years of service to qualify for a promotion was patently false (Plaintiff was at Grade 14 and would qualify for Grade 15 in three months), as was his improper assertion that he could help her skirt such a requirement.  As Defendants stated in response to Plaintiff's requests for admission: "Defendants admit that Plaintiff would have been eligible for a grade-level promotion to FD-15 on or about August 21, 2018 and that all grade-level promotions are awarded at the discretion of the Federal Defender." Tr. Ex. 10, at 9–10 (ECF No. 248-4, at 10–11).  It is thus a judicial admission from Defendants that Plaintiff was eligible for a grade-level promotion, contrary to the First Assistant's patently false statements to Plaintiff in his *quid pro quo* email and in his sworn declaration filed in this Court.  Decl. John Parke Davis, ECF No. 245-2, ¶ 21 (First Assistant's false statement that Plaintiff "did not meet the technical requirements for increase to the G15 level she had requested").

28b.    Defendants' own witnesses testified, and a subsequent wrongful conduct investigation found, that the First Assistant's email "can clearly be inferred to be a quid pro quo request" that "supports Caryn's claim of sexual harassment."  Tr. Ex. 12, at US1256 (ECF No. 248-5, at 23) (EDR Investigation Report).  The Investigator testified at her deposition that "it was reasonable" for Plaintiff "to be upset because of that email."  Tr. Ex. 21, at 58 (ECF No. 255-15 at 6).  The Defender testified at his deposition that the email could be "misinterpreted" as "sexual favors. . . . I can see that."  Tr. Ex. 16, at 127 (ECF No. 248-6 at 26).  The Mediator told Plaintiff: "I just can't believe anybody is going to say it wasn't an improper email."  Tr. Ex. 67, at US8528 (ECF No. 250-11, at 21).  In his Letter of Reprimand disciplining the Defender, the Fourth Circuit's Chief Judge referred to this email as an "unsavory quid pro quo proposal."  Tr.

Ex. 15, at US4264 (ECF No. 254-4, at 2). The Fair Employment Opportunity Officer later testified that it would have been a "reasonable interpretation" of the email "as a sexual quid pro quo e-mail." Tr. Ex. 20, at 144–45 (ECF No. 255-14 at 144–45). She explained that "the clear implication" of the email is that "if Caryn did what J.P. wanted, then he would – well, he would pay her more money." Tr. Ex. 20, at 144 (ECF No. 255-14 at 144). Further, even if the email was not explicitly sexual, it indicated that the First Assistant was requesting Plaintiff to "[s]ubmit to his control for a workplace benefit . . . for more salary," and that it "would definitely be a concern" that "she would be submitting to sexual advances at some further date." Tr. Ex. 20, at 145 (ECF No. 255-14 at 145). Plaintiff herself clearly subjectively understood the email as a *quid pro quo*, as she reported during the EDR process that "the First Assistant has abused his power and offered employment preferences for his unwanted advances," Tr. Ex. 5, at US501 (ECF No. 248-2, at 3), and that the First Assistant had "respond[ed] with a quid pro quo" to her request for "a raise and a promotion," Tr. Ex. 7, at US70 (ECF No. 248-2, at 18). Defendants' evidentiary admissions conclusively establish that the First Assistant's *quid pro quo* email would be perceived by a reasonable person as *quid pro quo* sexual harassment and was in fact subjectively perceived by Plaintiff as such.

F. **The First Assistant increasingly pressures Plaintiff to meet him outside of the office.**

28c. Over the following weeks, the First Assistant repeatedly asked Plaintiff to meet outside the office alone, including for drinks, out-of-office meetings, and "mentoring" sessions, even after she declined and he acknowledged that his requests were making her uncomfortable. *See, e.g.*, Ex. 7, at US90 (ECF No. 248-2, at 38) (offering "a drink and an ear if you need one, though I get the feeling you are not comfortable talking to me about it"); Ex. 7, at

39

US91 (ECF No. 248-2, at 38) (asking for a "celebratory drink"); Ex. 7, at US93 (ECF No. 248-2, at 41) (asking for a "mentoring session" and "some distance from work," while acknowledging that meeting in the office might make her more "comfortable"); Ex. 7, at US94 (ECF No. 248-2, at 41) ("I am free all day, including early morning, lunch, and evening. I am hoping this will be helpful for you, please don't be over-anxious about it.").  After sending his May 18, 2018 *quid pro quo* email, the First Assistant asked Plaintiff to meet outside of the office and outside of work hours at least five times over the course of less than one month.  *See id.*  Indeed, the First Assistant continued asking Plaintiff for "mentoring sessions" weeks after his own self-professed claim that his "mentorship" of her was over.  *Compare supra* ¶ 27 (statement that May 18 lunch was the "final" mentoring lunch), *with infra* ¶ 44 (First Assistant's June 27 request for "another mentoring session" with "some distance from work").

28d.    The First Assistant persisted in these requests even though he knew that Plaintiff was intentionally avoiding him.  Indeed, in his personal notes dated June 6, 2018, the First Assistant documented that Plaintiff "[h]as been avoiding me" and "[c]learly does not want to interact with me."  Tr. Ex. 24, at US5891 (ECF No. 248-14 at 3); *see also infra*, ¶ 71a (First Assistant's observation that Plaintiff calling in sick was "not coincidental" because she was avoiding him).  Yet, he continued asking Plaintiff for drinks and "mentoring sessions" out of the office.  *See supra*, ¶ 28c.

28e.    During this period, the First Assistant became increasingly angry with Plaintiff and even told another FDO supervisor, Erin Taylor, that Plaintiff "may just need to get smacked a bunch":

40

Going to try and talk to her at some point. Hopefully give her a chance to turn around. She may just need to get smacked a bunch, tho.

Tr. Ex. 25, at US6861 (ECF No. 248-15 at 11).  Later, he told this supervisor that Plaintiff "needs to get slapped":



Yeah. She needs to get slapped. I thought this morning would have at least been something. It's clearly made her worse.

Tr. Ex. 112, at US6388 (Def's Ex 126).  There is no evidence in the record that Ms. Taylor, as an FDO supervisor, condemned or discouraged the First Assistant's abusive behavior and threats of violence against Plaintiff.

G.     **The First Assistant becomes controlling of Plaintiff and punishes her when she does not comply.**

28f.     The First Assistant began interfering aggressively with Plaintiff's job duties and threatening disciplinary action.  As Plaintiff's workplace investigations expert, Vida G. Thomas, described, "When Strickland rebuffed these advances, Davis interfered with her job duties and threatened disciplinary action.  When Martinez assigned Strickland as second chair on

41

a trial, Davis exhibited professional jealousy towards Strickland." Tr. Ex. 59, at 7 (ECF No. 248-17 at 8); Tr. Ex. 108, at 173 (PLT4899).

29.    In May 2018, Plaintiff volunteered, and was then assigned by the Defender, to serve as second chair on the trial case. Tr. Ex. 4, at ¶ 89 (ECF No. 210, Am. Answer ¶ 89).

29a.    Plaintiff was doing a "bang up" job on the case. As the Defender described in his deposition, unprompted: "She did excellent work. We had high hopes for her. She was talented, she was energetic, and she was working on this very complicated – I'm going to refer to it, for client confidentiality, I'm going to refer to it as the life sentence trial. . . . There was a trial she was working on where the client was facing life without parole, and she did a bang-up job on that case. She did a good job, so my impression was she was doing good work, a good job, and hard working." Tr. Ex. 16, at 100 (ECF No. 255-4, at 39).

29b.    Although the case was serious, involving a potential life sentence, the Defender reassured Plaintiff that he would continue to be involved in supervising her and the lead trial attorney on the case. Specifically, in a text message dated May 29, 2018, the Defender recounted to the First Assistant that he had told Plaintiff that "didn't see a problem with" her second-chairing the trial "but I would still be involved in the case." Tr. Ex. H, at 6640. The Defender described Plaintiff's interest in working with the Defender and learning from him, stating: "I recall there was one time when we were together in the car on the trial, life [without] parole, and I was trying to show her one aspect of our defense work is client management, how to manage a very difficult client. You know, you could be a good lawyer, but if you don't know how to manage a client, and she was open eyes, open ears, listening to every aspect, and really

42

appreciated everything. . . .  So obviously that's just one aspect, but she was always open eyes and open ears."  Tr. Ex. 16, at 107 (ECF No. 248-6, at 18).

      29c.    At the Defender's direction, Plaintiff remained assigned to the case until he later removed her in June 2018.  On June 6, 2018, the Defender expressly instructed Plaintiff to ███████████████████████████████████████████████████████████ ████████  Tr. Ex. 70, at US7499–500 (ECF No. 250-16, at 3–4).

      29d.    The Defender was in charge of assigning attorneys to cases and there was no policy that would require Plaintiff to obtain the approval of other supervising attorneys before requesting assignment to a particular case.  In fact, the FDO did not even have written job descriptions for their team leaders or members of each team.  During a later July 2018 management meeting, an agenda item for the meeting was: "Job Descriptions for each role in the teams . . . Do we have these in writing?  Each team leader draft each team member's roles and send to Tony."  Tr. Ex. 29, at US7414 (ECF No. 248-14 at 35).  Accordingly, Plaintiff would not have had any notice that the preferences of her team leaders could possibly take precedence over the direct orders from the Defender, who was the head of the office.  Indeed, Plaintiff followed the Defender's orders and would have been insubordinate if she had *not* kept working on the case.  Moreover, the First Assistant acknowledged that he had no formally recognized role regarding Plaintiff's assignment to the case and even confided in another supervisor, "I probably need to butt out since I don't have a role here other than generic mentor/mgmt stuff."  Tr. Ex. 25, at US5886 (ECF No. 248-14 at 24).

      29e.    Defendants' narrative in this litigation that Plaintiff's "inexperience" somehow undermined the client's case is contradicted by the experienced AFPD ███████



Tr. Ex. 58 at US7438 (ECF No. 248-16 at 26).  This AFPD elaborated as follows:

Tr. Ex. 58, at US7438 (ECF No. 248-16, at 26 n.12).  This

Tr. Ex. 58, at US7438 (ECF No. 248-16, at 26 n.12).

30.     Defendants admit that, on June 5, 2018, Plaintiff emailed the First Assistant to cancel a shadowing activity.  Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents.  Tr. Ex. 4, at ¶ 90 (ECF No. 210, Am. Answer ¶ 90); Tr. Ex. 12, at US1270 (ECF No. 248-5 at 37).

30a.     The First Assistant had always told Plaintiff that his "shadowing" activities were optional.  In an email dated March 13, 2018, the First Assistant responded to Plaintiff when she similarly took a "rain check" on a shadowing activity scheduled for the next day: "No worries . . . We'll find another one.  Also, I'm sure you know this, but you don't have to do these shadowing things with me; just let me know if you do something with someone else so I can check if off your list."  Tr. Ex. 12 at US1276 (ECF No. 248-5, at 43).

30b.     A reasonable person, having received this email from the First Assistant, would believe that shadowing activities were optional and that taking a "rain check" the day before due to a conflict would be met with a response like "No worries . . . We'll find another one," as the First Assistant had previously stated Tr. Ex. 12 at US1276 (ECF No. 248-5, at 43).

31.     Defendants admit that the First Assistant's response stated, "That's really not okay with me," that Plaintiff asked if the response was "sarcasm or for real," and that the First Assistant responded it was "real."  Tr. Ex. 4, at ¶ 90 (ECF No. 210, Am. Answer ¶ 90); Tr. Ex. 12, at US1271 (ECF No. 248-5, at 38).

32.     Defendants admit that the First Assistant sent an email to Plaintiff at 6:03 am on June 6, 2018, regarding Plaintiff's claim to have an offer letter stating that she would transition to an Assistant Federal Public Defender position within "a few months" of starting at the FDO. Defendants respectfully refer the Court to the email for a complete and accurate statement of its

45

contents.  Defendants admit that Plaintiff responded at 10:25 a.m.  Tr. Ex. 4, at ¶ 93 (ECF No. 210, Am. Answer ¶ 93).

33.     Defendants admit that Plaintiff and the First Assistant met on the morning of June 6, 2018 during business hours in the First Assistant's office.  Tr. Ex. 4, at ¶ 94 (ECF No. 210, Am. Answer ¶ 94).

33a.     The First Assistant became so angry at Plaintiff for not attending his optional shadowing activity that he was shaking.  Tr. Ex., 7 at 19 (ECF No. 248-2, at 19).  The First Assistant later admitted to the EDR Investigator that he was "very upset" and "was controlling" of Plaintiff.  Tr. Ex. 31, at US6230 (ECF No. 248-14 at 50).  The First Assistant was "visibly angry."  Tr. Ex. 21, at 66, 100–01 (ECF No. 248-11, at 66, 100–01).

33b.     Plaintiff was "physically afraid" of the First Assistant because of his threatening behavior.  Tr. Ex. 22 at 164–65 (ECF No. 255-3 at 44–45) (EDR Coordinator's testimony confirming that she was "physically afraid of him").  Plaintiff's fear was objectively reasonable given that the First Assistant had become "visibly angry," "very upset," and "controlling" over a matter as trivial as an optional shadowing activity.  As the EDR Investigator later testified in her deposition, the First Assistant "was shaking he was so angry" and Plaintiff's perception of him was "reasonable."  Tr. Ex. 21, at 66, 100–01 (ECF No. 248-11, at 66, 100–01).  Corroborating this fear, the First Assistant had even made threats of physical violence, expressing his desire to another supervisor that Plaintiff "may just need to get smacked a bunch" and "needs to get slapped."  *Supra*, ¶ 28e.

33c.     ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████ Tr. Ex. 70, at US7497

(ECF No. 250-16, at 1). ██████████████████████████████████████

███████████████ Tr. Ex. 70, at US7499 (ECF No. 250-16, at 3). Accordingly, Plaintiff

was obligated to keep working on the trial case, as the Defender ordered, or else risk being

insubordinate.

34. Defendants admit that Plaintiff sent an email to the First Assistant on June 6,

2018, stating, among other things, that "the FBI meeting time is set and I cannot change it at this

point" and that Plaintiff "will not be able to attend the PSI meeting tomorrow." Defendants

respectfully refer the Court to the email for a complete and accurate statement of its contents.

Tr. Ex. 4, at ¶ 98 (ECF No. 210, Am. Answer ¶ 98); Tr. Ex. 12 at US1275 (ECF No. 248-5 at

42).

35. Defendants admit that, on June 6, 2018, the First Assistant sent an email

responding to Plaintiff, copying the Defender and Peter Adolf, directing Plaintiff to attend the

presentence interview and stating in part, "If you choose to disobey a direct order, that is an

action that I as a supervisor cannot ignore." Defendants respectfully refer the Court to the email

for a complete and accurate statement of its contents. Tr. Ex. 4, at ¶ 99 (ECF No. 210, Am.

Answer ¶ 99); Tr. Ex. 12 at US1275 (ECF No. 248-5 at 42).

36a. The First Assistant's emails repeatedly confirmed that he had conveyed

himself to Plaintiff as "supervisor" with authority to take disciplinary action against her, and that

he was threatening to do so if she "disobey[ed]" his orders. *See, e.g.*, Tr. Ex. 12 at US1275 (ECF

No. 248-5 at 42).

47

36b.    As Plaintiff's workplace investigations expert, Ms. Thomas explained, the First Assistant's threatening behavior supported Plaintiff's allegations that when she "rebuffed [Davis's] advances, Davis interfered with her job duties and threatened disciplinary action." Tr. Ex. 59, at 7 (ECF No. 248-17 at 8); Tr. Ex. 108, at 173 (PLT4899).

36.    Defendants admit that Plaintiff attended the presentence interview on June 7, 2018. Tr. Ex. 4, at ¶ 100 (ECF No. 210, Am. Answer ¶ 100).

37.    Defendants admit that the First Assistant told Plaintiff that his understanding was that she was seeking to serve as second chair on the trial so Plaintiff could demonstrate her importance to the FDO. Tr. Ex. 4, at ¶ 101 (ECF No. 210, Am. Answer ¶ 101).

38.    Defendants admit that the First Assistant noted the inconsistency between the statements in Plaintiff's emails. Tr. Ex. 4, at ¶ 103 (ECF No. 210, Am. Answer ¶ 103).

38a.    The First Assistant began spreading disparaging rumors about Plaintiff, some explicitly based on her gender, to her other supervisors. For example, the First Assistant's text messages show that he made the following disparaging comments about Plaintiff:

- The First Assistant agreed with supervisor Erin Taylor's statements that Plaintiff "played the gender card" and made a "gender play," calling it a "very good point." Tr. Ex. 25 at US5779–80 (ECF No. 248-14 at 6–7). The First Assistant added: "She def plays those tears for sympathy" and mocked Plaintiff for crying in response to his abusive behavior. Tr. Ex. 25 at US5780 (ECF No. 248-14 at 7).

- The First Assistant called Plaintiff a "lying manipulative underhanded jackass." Tr. Ex. 25 at US5782 (ECF No. 248-14 at 9).

48

- The First Assistant stated that Plaintiff is "acting like a spoiled brat." Tr. Ex. 25 at US6866 (ECF No. 248-15 at 16).

- The First Assistant stated, "I thought she could be in mgmt but I don't think so any more." Tr. Ex. 25 at US5814 (ECF No. 248-14 at 18).

- The First Assistant stated that Plaintiff is "way more manipulative than I expected" and that her "own self interest is the real problem." Tr. Ex. 25 at US5807–08 (ECF No. 248-14 at 11–12). The First Assistant stated: "She wants to use the case to prove that she's a star so she can threaten to quit if we don't move her to Asheville." Tr. Ex. 25 at US5808 (ECF No. 248-14 at 12). The First Assistant stated that Plaintiff will "show [the Defender] how valuable she is – because she legitimately IS very good." Tr. Ex. 25 at US5809 (ECF No. 248-14 at 13). He further stated "[t]he diff between her and the others is she has the actual goods to deliver and is very good at playing innocent." Ex. 25 at US5809 (ECF No. 248-14 at 13). The First Assistant's text messages, coupled with his personal notes claiming that Plaintiff had made "veiled threats" to move to an AFD, had "demanded more $," and "has clearly organized, marshalled her forces, and placed herself in position to be indispensable" reveals his apparent belief that Plaintiff's desire to get professional experience and "prove" her value in her employment is somehow a basis to be offended and even to conclude that Plaintiff is "self-interested" and "manipulative." Tr. Ex. 24 at US5890 (ECF No. 248-14 at 2). The First Assistant's beliefs reveal his clear reliance on derogatory gender stereotypes about professional women, including that Plaintiff should be "playing innocent," in his abusive and harassing treatment of Plaintiff. *See* Ex. 25 at US5809 (ECF No. 248-14 at 13).

49

- The First Assistant stated that Plaintiff "needs to get slapped" and "may need to get smacked a bunch," demonstrating his physical anger at and intimidation of Plaintiff. Tr. Ex. 112, at US6388 (Def's Ex 126); Tr. Ex. 25, at US6861 (ECF No. 248-15 at 11).

- The First Assistant even confessed to another supervisor, Erin Taylor, that his statements about Plaintiff "read like a break-up text": "No, you're right. I'm legit done. Just depressed at all the time and emotional energy I've spent trying to lift her up. But she isn't the person I was trying to lift. Jesus, that read like a break-up text." *See* Ex. 25 at US5778 (ECF No. 248-14 at 5). The First Assistant's texts are more similar to the statements of a spurned suitor than a supervisor of a subordinate in a professional relationship.

- The First Assistant did not stop there: he later told the Appellate Chief that Plaintiff had a "fuck off attitude" and had committed "fireable offenses." Tr. Ex. 44 at US2796–97 (ECF No. 248-15 at 21–22). He stated to another AFD, Plaintiff's new mentor, that Plaintiff "has made some egregious errors in attitude and judgment recently." Tr. Ex. 26 at US6088 (ECF No. 248-14 at 10). He told the Defender that, in his view, Plaintiff had engaged in conduct for which "I would have insisted they receive a formal reprimand after deception and insubordinate this severe," and for which the employee would be "on their way to a PIP [*i.e.*, performance improvement plan]." Tr. Ex. 27 at US3974–75 (ECF No. 248-14 at 28–29).

    38b.    The First Assistant described Plaintiff as "manipulative" and "self-centered" for seeking trial experience and professional advancement. *See supra*, ¶ 38a. In particular, he criticized Plaintiff for working on the life-sentence trial case, even though her

50

request to be assigned as second chair had been granted by the Federal Defender, Anthony

Martinez, and she was doing a "bang-up" job. Tr. Ex. 16 at 100 (ECF No. 255-4 at 39)

(Defender's testimony that "[s]he did a good job, so my impression was that she was doing good

work, a good job, and hard working"); *see also* Tr. Ex. 25 at US5886 (ECF No. 248-14 at 24)

(First Assistant's text message acknowledging, "I probably need to butt out since I don't really

have a role here"). He continued to do so even though he acknowledged that she was still being

asked to do work on the life-sentence case, consistent with her job duties. Tr. Ex. 25 at US6865–

66 (ECF No. 248-15 at 15–16) (criticizing Plaintiff for "independently digging into and

presenting ideas"). After Plaintiff rejected his advances, he repeatedly criticized and disparaged

Plaintiff, and interfered with her job duties, for working on a case to which she was assigned by

the Defender to work under his supervision.

    38c. The First Assistant's disparaging rumors undermined Plaintiff's ambitions

for a promotion from research-and-writing attorney to assistant federal public defender—the

position she was offered when she was hired to work at the FDO. Tr. Ex. 7 at US87 (ECF No.

248-2 at 35) (offer letter for research-and-writing attorney position "with the expectation that

you will transition to an Assistant Defender"). As the Defender testified during his deposition,

Plaintiff was "on th[e] path" to becoming an AFD. Tr. Ex. 16 at 103 (ECF No. 255-4 at 42).

The First Assistant, however, told the Defender that he should reconsider "whether [Plaintiff]

lives up to th[e] title [of AFD]." Tr. Ex. 27 at US3975 (ECF No. 248-14 at 29). He did so even

though Plaintiff was consistently praised for her excellent job performance, and the Defender

thought she was "hardworking," "responsible," and her work was of "high quality." Tr. Ex. 16

at 106–07 (ECF No. 248-6 at 17–18). Demeaning Plaintiff's efforts at professional

advancement, the First Assistant even made a "bet" with the Defender about whether he would "play[]" it "dirty" by encouraging Plaintiff to apply for an AFD position, stating that "I was sorely tempted to subtly encourage her, but I pretended like I didn't see where she was angling." Tr. Ex. 28 at US6036 (ECF No. 248-14 at 31). He noted that "her lip was practically quivering." Tr. Ex. 28 at US6035 (ECF No. 248-14 at 30).

38d. The First Assistant's obsessive, controlling, and aggressive behaviors were completely out of proportion to the issue of whether Plaintiff would attend an optional "shadowing" activity. His behaviors were part of a pattern of sexual harassment, discrimination, and retaliation. Moreover, his behaviors reflect derogatory gender-based views about women who are professionally focused. *See, e.g.*, Tr. Ex. 16 at 115 (ECF No. 255-4 at 46) (Defender's testimony recounting First Assistant's statements that she "was going to demand that she be promoted . . . she was going to wave that offer letter to me."); ECF No. 245-3, ¶ 20 (First Assistant's declaration stating that he was "taken aback by Plaintiff's demands" that she receive a promotion and her anticipated transition to an AFD position and claiming that Plaintiff "would 'wave [the offer letter] around' if the office didn't agree to promote her"). If Plaintiff were a man, it is reasonable to conclude that she would not have been disparaged, belittled, or put down as being too "demanding" for seeking professional experience from her employer.

39. Defendants admit that in the late Spring of 2018, the Defender removed Plaintiff from the second chair trial role and reassured Plaintiff that the decision had nothing to do with her personally or her job performance. Tr. Ex. 4, at ¶ 109 (ECF No. 210, Am. Answer ¶ 109).

52

39a.    The Defender later told the EDR Investigator that he did not "take[]" Plaintiff "off" of the case until June 12, 2018. The Defender "[a]sked [her] to stay on as support." Tr. Ex. 31 at US5949 (ECF No. 248-14 at 43).

39b.    The Investigator's notes also explained that the "normal procedure" is "not to remove atty's from cases." Tr. Ex. 31 at US6229 (ECF No. 248-14 at 49). The notes state: "*This is abnormal.*" Tr. Ex. 31 at US6229 (ECF No. 248-14 at 49).

**H.    Plaintiff cuts her in-office hours to avoid being alone with the First Assistant.**

40.    Defendants admit that Plaintiff sent an email to the First Assistant on June 11, 2018, asking if there was an "issue" in a certain criminal case, and the First Assistant responded explaining why there was no ethical issue. Defendants respectfully refer the Court to the emails for a complete and accurate statement of their contents. Tr. Ex. 4, at ¶ 110 (ECF No. 210, Am. Answer ¶ 110).

41.    Defendants admit that, on June 21, 2018, Plaintiff requested to meet the First Assistant at approximately 5:00 p.m. and that meeting continued until after business hours. Defendants admit that at the end of the meeting, the First Assistant noted that a storm was blowing in and offered to give Plaintiff a ride so she would not have to bike home in the rain. Defendants admit that Plaintiff stated she did not think it would actually rain and joked that if she was wrong, it would be okay, because she was "tough." Defendants admit that Plaintiff then went to her office while the First Assistant prepared to leave the office. Tr. Ex. 4, at ¶ 111 (ECF No. 210, Am. Answer ¶ 111).

42.    Defendants admit that the First Assistant was in the lobby of the FDO building

53

when Plaintiff was leaving the building, that the First Assistant asked Plaintiff if she was sure she did not want a ride home, and that Plaintiff said she was sure. Tr. Ex. 4, at ¶ 112 (ECF No. 210, Am. Answer ¶ 112).

43. Defendants admit that the First Assistant sent Plaintiff the text messages quoted in this paragraph:

It is currently raining.

Last chance for a ride, tough girl...

Tr. Ex. 4, at ¶ 113 (ECF No. 210, Am. Answer ¶ 113).

44a. Plaintiff felt physically intimidated, pressured, and concerned about the First Assistant's intentions. After this incident, she curtailed her office hours and began bringing work home with her in the evenings to avoid being alone with him. Tr. Ex. 7 at US74 (ECF No. 248-2 at 22). As the EDR Coordinator later testified in his deposition, there was "no reason to doubt" that Plaintiff was "physically afraid of him." Tr. Ex. 22 at 164–65 (ECF No. 255-3 at 44–45).

44b. As the AO's Fair Employment Opportunity Officer later explained, "[o]ccasionally, you know, people are actually in physical danger, and there were some very subtle signs of that in terms of late-night hanging around her when no one else was around." Tr. Ex. 20 at 43 (ECF No. 255-14 at 43). The FEOO explained that these facts showed "that there were aspects of her situation that were classic sexual harassment." Tr. Ex. 20 at 43 (ECF No.

54

255-14 at 43).  As she explained: "If you have been aware that someone has a romantic or sexual interest in you and they're pushing you to be alone in a car when you have said no and you're not comfortable with it, it would have struck me as a possible risk of something happening like a sexual assault.  And so I respected her discomfort with going in a car alone with him whether or not it was raining."  Tr. Ex. 20 at 78 (ECF No. 255-14 at 78).

44c.    In his sworn declaration filed in this proceeding, the First Assistant falsely claimed that it was "raining heavily" during this incident.  ECF No. 245-2, ¶ 30.  To the contrary, there was a "5 percent chance of rain" when Plaintiff left the building that evening.  Tr. Ex. 11, at US1278 (ECF No 248-5, at 45).  It did not rain until nearly an hour later, long after she arrived home, as confirmed by historical weather data.[2]  Charlotte NC Weather (June 21, 2018), *available at* https://tinyurl.com/2p8zu8cf (rain did not begin until 7:35 p.m.).  The First Assistant's false claims of rain contributed to her fear that he had created a contrived opportunity to be alone with her, with "a possible risk of something happening like a sexual assault."  Tr. Ex. 20 at 78 (ECF No. 255-14 at 78).

44d.    During her deposition, the EDR Investigator explained how the First Assistant's *quid pro quo* "Mas Dinero" email could have influenced Plaintiff's perception of the lobby incident:

> A.    If she perceived that email to be the quid pro quo and then she -- and then he's waiting for her downstairs to make sure she doesn't need a ride because it's storming, the perception could have been that he was making an advance even though perhaps his perception was it's kind of dangerous to ride home in a storm, and he had given her rides home in the past.

---

[2] This public website is subject to judicial notice.  *See* Fed. R. Evid. 201.

Tr. Ex. 21 at 123 (ECF No. 255-15 at 29). When asked, "[w]hose perception matters for sexual harassment?," the Investigator said she was "not sure" and had "never" received any training about that issue. Tr. Ex. 21 at 123–24 (ECF No. 255-15 at 29–30). Of course, judiciary guidance, consistent with governing precedent, states that "[i]t is the perception of the individual who feels harassed that counts," not the intent of the harasser. Tr. Ex. 55 at US7019 (ECF No. 248-15 at 61 (Federal Judicial Center Guidance)); Tr. Ex. 55 at US7019 (ECF No. 248-15 at 61) ("But the *intent* doesn't determine whether it's workplace harassment; what counts is the perception of the person who feels harassed.").

## I.     The First Assistant persists in asking Plaintiff to meet him outside of work.

44.     Defendants admit that on June 27, 2018, the First Assistant sent an email to Plaintiff suggesting they have "another mentoring session." Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents. Tr. Ex. 4, at ¶ 118 (ECF No. 210, Am. Answer ¶ 118); Tr. Ex. 12 at US1289 (ECF No. 248-5 at 56).

45.     Defendants admit that, on June 29, 2018, Plaintiff sent a text message to the First Assistant stating, "JP, I am feeling sick today. I will not be making it in but will try to finish my appeal brief from home." Defendants respectfully refer the Court to the text message for a complete and accurate statement of its contents. Tr. Ex. 4, at ¶ 120 (ECF No. 210, Am. Answer ¶ 120).

46.     Defendants admit that, on June 29, 2018, the First Assistant respond to Plaintiff's text message, stating, "OK. Can we reschedule our meeting for Monday?" and later stating, "I am free all day, including early morning, lunch and evening. I'm hoping this will be helpful for you, please don't be over-anxious about it." Defendants respectfully refer the Court to the text

56

message exchange for a complete and accurate statement of its contents. Tr. Ex. 4, at ¶ 121 (ECF No. 210, Am. Answer ¶ 121).

**J.  Plaintiff tells the Defender that she will be drawing boundaries with the First Assistant.**

47.  On July 2, 2018, Plaintiff told the Defender that she would be drawing "boundaries" with the First Assistant. She asked him to support her and maintain her confidence. Tr. Ex. 4, at ¶ 124 (ECF No. 210, Am. Answer ¶ 124).

48.  The Defender asked Plaintiff if this was "sexual harassment." Defendants admit that Plaintiff said the First Assistant had been angry at her. Tr. Ex. 4, at ¶ 125 (ECF No. 210, Am. Answer ¶ 125).

48a.  The Defender was aware based on Plaintiff's complaint of potential "harassment by JP," as stated in his contemporaneous notes. Tr. Ex. 45 at US3985 (ECF No. 248-15 at 23). The Defender testified during his deposition that he was "concerned" about whether Plaintiff was alleging sexual harassment and "wanted to check it out." Tr. Ex. 16 at 112, 149, 152–154, 158–59, 187–88 (ECF No. 255-4 at 43, 60, 63–65, 69–70, 86–87).

48b.  By attempting to resolve her complaint informally with the Defender, Plaintiff was following standard recommended practice to resolve the issue informally and at the lowest possible level. As the FEOO testified during her deposition, "I know that one of the first things I thought that the AO should do is look at whether the situation could be resolved informally." Tr. Ex. 20 at 48 (ECF No. 255-14 at 48). She explained: "I've been in many, many situations where a very bad employment situation could be resolved with everyone being better off due – due to a settlement, and so that – that was always – even when I was a defense counsel, that was always something I looked at, can we settle this favorably for both sides." Tr. Ex. 20 at

57

48–49 (ECF No. 255-14 at 48–49). By "settle informally," the FEOO explained that "I mean talking with those who have decision-making authority and seeing whether what the Plaintiff would find acceptable in a settlement would be something that the managers would also be in agreement." Tr. Ex. 20 at 48–49 (ECF No. 255-14 at 48–49). The FEOO also explained that resolving a complaint informally can help avoid retaliation: "[E]arly resolution of complaints is the preferred method so that things don't get worse and so it can be a resolution that is better . . . [t]han continuing to live and work in an unhappy work environment and possibly suffering retaliation to one's career." Tr. Ex. 20 at 174–75 (ECF No. 255-14 at 174–75) (cleaned up). The FEOO testified that "in every workplace I've advised and/or worked in, that is a reality, and I think even at the EEOC when – you know, there were instances where managers retaliated against people who brought complaints. That has – that has been a fact of life in the executive branch, in the judiciary, and in any other situations that I've become familiar with by reading. Retaliation is a fact of life, and I think that a person contemplating a formal process has to be aware of that." Tr. Ex. 20 at 175 (ECF No. 255-14 at 175).

48c. Likewise, the Judicial Integrity Officer ("JIO"), Jill Langley, testified at her deposition that "I definitely noticed that people who experience sexual harassment, discriminatory harassment, even verbal abuse tend to be – the phrase I use in my training is silent sufferers. They either diminish it. My experience is they tend to think – 'If I say nothing, it will – the problem will stop. I don't want to make a bigger deal of it,' I've heard people say. They haven't asked for this problem; so it's very – why do they have to have the burden of solving it, and so there is a reluctance to do that." Tr. Ex. 17 at 99 (ECF No. 255-12 at 101). When asked at her deposition, "Who do you think should solve the problem when there's harassment," the

58

JIO answered, "Whomever has the power to make personnel decisions in that organization – the supervisor, the unit executive, the judge – whomever in that particular work environment has the power and ability to control and, you, make decisions after staff."  Tr. Ex. 17 at 118 (ECF No. 255-12 at 120).  The JIO also explained, "[w]hen you look at harassment under the EDR plan it says that we will look to the laws that we are mirroring.  If you look at Title VII, an employer is liable in several situations but one where they are liable is if they know or should have known of harassment and don't take action reasonably calculated to stop the harassment from continuing.  So that's another responsibility of a manager or a unit executive."  Tr. Ex. 17 at 138 (ECF No. 255-12 at 140).

48d.    Similarly, the applicable EDR Plan instructs that "employees are encouraged to report wrongful conduct to . . . their supervisor as soon as possible, before it becomes a [sic] severe or pervasive."  Tr. Ex. 9 at US4545 (ECF No. 248-3 at 11).  The EDR Plan further states that the employee should report the conduct before initiating a formal complaint.  Specifically, "[b]efore invoking a request for counseling an employee (to the extent feasible) is encouraged to bring his or her concerns to his or her supervisor or unit executive, unless the supervisor or unit executive is the alleged violator."  Tr. Ex. 9 at US4545–46 (ECF No. 248-3 at 11–12).  By bringing her complaints to the Defender and attempting to resolve them informally, Plaintiff reasonably sought to resolve her complaints with the Defender's assistance, without needing to initiate a formal complaint process.

48e.    Plaintiff's workplace investigation's expert, Ms. Thomas, testified at her deposition that it is not "at all unusual for a Complainant to communicate something like that: I don't want to get the person in trouble, I just want to tell you; I'm not saying I want an

59

investigation, but I just want you to know. That's a very common entry point for Complainants for – you know, for many reasons. They feel [sic] retaliation." Tr. Ex. 108 at 85. Ms. Thomas further explained that "once someone comes forward, even if they say, 'Please do nothing,' you can't not do anything." Tr. Ex. 108 at 86.

48f.     Ms. Thomas further explained why Plaintiff's reports put the Defender on notice of a duty to take appropriate action on her complaints, as well as why it would be unreasonable to interpret Plaintiff's complaints as a "workplace conflict": "My point is that a well-trained supervisor wouldn't have stopped there; right? If an employee – he's the Federal Public Defender; so it's not for nothing that someone's coming to his office to talk about something, and so a well-trained manager knows right from the get-go: This must be serious. People don't come into my office every day to shoot the breeze. Second, that person's said, 'Someone's made my [sic] uncomfortable' and names the person, but then says, 'I don't want you to take any action.' In my experience, a well-trained supervisor wouldn't stop there. The question would be, to be fair to him: Okay, what action can you take, based on that? And you know, that's – that could be the subject of a conversation, but I – I don't think a well-trained manager or supervisor, hearing that, would have just confidently concluded, 'Oh, it must be a workplace conflict,' under those circumstances." Tr. Ex. 108 at 88–89.

**K.    The First Assistant berates and intimidates Plaintiff for drawing boundaries with him.**

49.    Defendants admit that Plaintiff and the First Assistant met on July 2, 2018, in the FDO's primary conference room, which is interior and does not have windows, and that the First

60

Assistant shut the conference room's doors during the meeting. Defendants admit that the First

Assistant used the words "struggling," "frustrated," and "comfort zone." Tr. Ex. 4, at ¶ 127

(ECF No. 210, Am. Answer ¶ 127).

50.     Defendants admit that the First Assistant had consistently praised the quality of

Plaintiff's work product. Tr. Ex. 4, at ¶ 128 (ECF No. 210, Am. Answer ¶ 128).

51.     Defendants admit that Plaintiff told the First Assistant he had "crossed a

boundary" when he directed her to attend the presentence interview, and that she was offended

by his "tone." Tr. Ex. 4, at ¶ 129 (ECF No. 210, Am. Answer ¶ 129).

52.     Defendants admit that the First Assistant stated that he did not want the meeting

to be an "airing of the grievances." Tr. Ex. 4, at ¶ 130 (ECF No. 210, Am. Answer ¶ 130).

53.     Defendants admit that in response to the First Assistant saying, "Caryn, you lied

to me repeatedly. That's not okay," Plaintiff stood up and walked out of the conference room.

Defendants admit that the First Assistant accompanied her out of the room to talk to the

Defender. Defendants admit that Plaintiff ultimately walked away to her office. Tr. Ex. 4, at ¶

132 (ECF No. 210, Am. Answer ¶ 132).

54.     Defendants admit that, on or about July 2, 2018, Plaintiff called the Defender and

let him know that the First Assistant might say something about her, and she asked him to

withhold judgment until he had spoken to her. Tr. Ex. 4, at ¶ 133 (ECF No. 210, Am. Answer ¶

133).

**L.     The Defender forces Plaintiff to meet directly with the person she reported
        for inappropriate behavior, and enforces a retaliatory, hostile, and
        discriminatory working environment.**

55.     Defendants admit that on July 5, 2018, the Defender called Plaintiff and the First

61

Assistant into his office to see if he could help them work through their issues. Tr. Ex. 4, at ¶ 135 (ECF No. 210, Am. Answer ¶ 135).

56.     Defendants admit that, at the July 5, 2018 meeting, the Defender asked both Plaintiff and the First Assistant to put their notepads away and just have a discussion with the Defender. Defendants admit that Plaintiff indicated that she first wanted to speak with the Defender without the First Assistant present, so the Defender asked the First Assistant to leave his office. Tr. Ex. 4, at ¶ 136 (ECF No. 210, Am. Answer ¶ 136).

56a.     According to the Defender's own notes, the Defender forced Plaintiff to meet with the First Assistant to "resolve a breakdown in communication" and "clarify with Caryn any issue about any harassment by JP." Tr. Ex. 45 at US3985 (ECF No. 248-15 at 23). Plaintiff repeatedly stated that she was not comfortable meeting with the First Assistant. As the Defender's Letter of Reprimand later stated, the Defender "had not abided by [her] wishes that she meet with [him] privately to discuss Mr. Davis's conduct." Tr. Ex. 15 at US4265 (ECF No. 254-4 at 3).

56b.     As Plaintiff's workplace investigation expert, Ms. Thomas, described, Defender Martinez "failed" in his "legal obligation to protect her from retaliation." As Ms. Thomas explained: "Strickland first went to Martinez in July 2018, telling him that Davis had subjected her to behavior that made her uncomfortable. In response, Martinez dismissed her concerns. He referred to her professional relationship with Davis as a "marriage" that required 'compromise.' Though Strickland said she was uncomfortable being in Davis' physical presence, Martinez insisted that Davis attend their meeting, and directed Strickland to stop taking notes. These actions in and of themselves were retaliatory, as Martinez punished Strickland for coming

62

forward by forcing her to engage one-on-one with the person she said was harassing her." Tr. Ex. 59, at 21 (ECF No. 248-17 at 22); Tr. Ex. 108, at 187 (PLT4913).

56c. Likewise, the FEOO explained that if someone reported to her that a manager had "not allow[ed] an employee to take notes during a meeting, at a meeting about harassment," she "would tell a manager that the employee has every right to take notes in a meeting about harassment or discrimination." Tr. Ex. 20 at 177–78 (ECF No. 255-14 at 177–78). The FEOO stated that this conduct "would actually be a deprivation of that employee's rights." Tr. Ex. 20 at 178 (ECF No. 255-14 at 178).

57. The Defender told Plaintiff that the First Assistant was upset with her for not keeping a commitment to him. The Defender called this issue a "breakdown in communication." Defendants admit that the Defender told Plaintiff that he understood where the First Assistant, as a supervisor, was coming from. Tr. Ex. 4, at ¶ 137 (ECF No. 210, Am. Answer ¶ 137).

58. Defendants admit that Plaintiff said the First Assistant had been angry. Tr. Ex. 4, at ¶ 138 (ECF No. 210, Am. Answer ¶ 138).

59. Defendants admit that the Defender told Plaintiff that, as her supervisor, the First Assistant had the right to meet with her. Tr. Ex. 4, at ¶ 139 (ECF No. 210, Am. Answer ¶ 139).

60. Defendants admit that the Defender used a marriage metaphor when discussing the relationship between Plaintiff and the First Assistant. Defendants admit that the Defender told Plaintiff that she and the First Assistant needed to "compromise" and "meet in the middle." Tr. Ex. 4, at ¶ 140 (ECF No. 210, Am. Answer ¶ 140).

63

60a.    The EDR Investigation report later found that Defender Martinez should be disciplined because "when [Plaintiff] initially brought her complaint to Mr. Martinez he compared her relationship with the First Assistant Defender as a marriage and asked her to compromise. . . .  It is evident this claim was mishandled from the beginning by Mr. Martinez and he would benefit greatly with additional training on workplace conduct as well as basic managerial/leadership skills."  Tr. Ex. 15 at US4265 (ECF No. 254-4 at 3).

60b.    The Chief Judge's Letter of Reprimand later made the following findings based on the Defender's discriminatory comments:

A.    <u>Marriage Metaphor</u>

On or around July 5, 2018, you met with Ms. Strickland and Mr. Davis to resolve a "breakdown in communications."  Though well-intended, you had not abided by Ms. Strickland's wishes that she meet with you privately to discuss Mr. Davis's conduct.  This made Ms. Strickland feel "uncomfortable" and "intimidated," having to confront the person she accused of sexually harassing her.  She was also troubled by your characterization that this was a simple misunderstanding, feeling that you had trivialized the incident.

After attempting to resolve several disagreements between Ms. Strickland and Mr. Davis, you had used an ill-advised metaphor, comparing the relationship between Ms. Strickland and Mr. Davis as a "marriage," with the parties needing to "compromise" and "meet in the middle." Ms. Strickland said that she was "shocked" and "offended" at the reference, believing that it was inappropriate to describe any professional relationship between a male supervisor and female subordinate as a "marriage." The metaphor was especially inappropriate given the context that Ms. Strickland had raised concerns with Mr. Davis's behavior towards her.

Tr. Ex. 15 at US4265 (ECF No. 254-4 at 3).

61.    The Defender asked her why she was "getting emotional."  Tr. Ex. 4, at ¶ 142 (ECF No. 210, Am. Answer ¶ 142).

61a.    As Plaintiff's workplace investigations expert, Ms. Thomas, explained: "To make matters worse, after Martinez finally asked Davis to leave this meeting, Martinez defended Davis' behavior, and when Strickland began to tear up, he mocked her for 'getting emotional.' Inexplicably, Martinez then invited Davis back into the meeting and permitted Davis to berate and criticize Strickland. Understandably, Strickland felt uncomfortable, intimidated and unsafe, which was further punishment for coming forward." Ex. 59, at 21–22 (ECF No. 248-17 at 22–23); Tr. Ex. 108, at 187–88 (PLT4913–14).

62.    Defendants admit that Plaintiff advised the Defender that Plaintiff and the First Assistant stayed late working one night, the First Assistant offered to give her a ride home, Plaintiff told the First Assistant that she had her bike and did not need a ride, and that on her way out the First Assistant was waiting for Plaintiff in the lobby and asked if she needed a ride. Tr. Ex. 4, at ¶ 143 (ECF No. 210, Am. Answer ¶ 143).

62a.    In his "significant event log" dated July 5, 2018, the Defender stated that "I then specifically asked her about any possible harassment by JP. She advised me that on several occasions he made her feel uncomfortable by wanting to meet after work hours. On one specific occasion she said they both had stayed late working on a case. When the meeting was over JP asked her if she needed a ride. Caryn advised him that she had her bike and did not need a ride. She went and got her bike and on her way out on the first floor JP was waiting for her in the lobby and asked if she needed a ride. Caryn said no and left. Caryn said she felt creeped out by this event." Tr. Ex. 45 at US3985 (ECF No. 248-15 at 23).

62b.    The Defender also stated that any comments from the First Assistant berating Plaintiff for her performance "must be a misunderstanding" and "proceeded to thank her

65

for all her hard work" on the FDO's cases, including the life-sentence trial case over which the First Assistant had interfered and threatened disciplinary action.  Tr. Ex. 45 at US3985 (ECF No. 248-15 at 23).

63.    Defendants admit that the Defender said he would bring the First Assistant back into the room.  Defendants admit that the First Assistant and Defender remarked on Plaintiff's excellent job performance.  Ex. 4, at ¶ 144 (ECF No. 210, Am. Answer ¶ 144).

64.    Defendants admit that the First Assistant explained to Plaintiff that the New Attorney Shadowing Checklist was intended to ensure that Plaintiff got the experience she needed to be qualified to be an Assistant Federal Public Defender.  Ex. 4, at ¶ 145 (ECF No. 210, Am. Answer ¶ 145).

64a.    The First Assistant admitted to Plaintiff's other supervisors that he hoped to cut off her prospects for a professional advancement based on his optional shadowing "checklist."  The First Assistant told another supervisor that when he berated Plaintiff during their July 5, 2018 meeting, "I made a point of working in that I had designed the shadowing stuff she blew off for the purpose of justifying promoting her and that seemed to have an impact."  Tr. Ex. 25, at US6782 (ECF No. 248-14, at 9).  The First Assistant also told this supervisor: "I thought she could be in mgmt. but I don't think so any more."  Tr. Ex. 25 at US6855 (ECF No. 248-15 at 5).

64b.    Following the July 5, 2018 meeting, the First Assistant emailed the Defender and told him that he should reconsider "whether [Plaintiff] lives up to th[e] title [of AFD]." Tr. Ex. 27 at US3975 (ECF No. 248-14 at 29).  The First Assistant also suggested that Plaintiff should have "receive[d] a formal reprimand" and be "well on [her] way to a PIP," *i.e.*, a

66

Performance Improvement Plan, even though Plaintiff had no issues with her work performance, which both the Defender and the First Assistant acknowledged was excellent. *See* Tr. Ex. 27 at US3974 (ECF No. 248-14 at 28); *see, e.g.,* Ex. 4, at ¶ 144 (ECF No. 210, Am. Answer ¶ 144) ("Defendants admit that the First Assistant and Defender remarked on Plaintiff's excellent job performance."). The First Assistant insisted that his perceived issues with Plaintiff "need to be addressed during her annual performance review." Tr. Ex. 27 at US3975 (ECF No. 248-14 at 29). The First Assistant's statements were part of a pattern of disparaging Plaintiff to her supervisors after she rejected his inappropriate advances and reported his harassing behavior.

## M.    The Defender assigns Plaintiff to work directly under her harasser.

65.    Defendants admit that on July 9, 2018, Plaintiff sent an email to the Defender stating in part, "my understanding is that there is no performance issue with my work, but that this is a matter of receiving the right mentoring. Based on this, I am planning to ask for a new mentor." Defendants admit that the Defender responded the same day confirming that Plaintiff's performance is not an issue and that Plaintiff would be assigned a new mentor. Defendants respectfully refer the Court to the emails for a complete and accurate statement of their contents. Ex. 4, at ¶ 148 (ECF No. 210, Am. Answer ¶ 148); Tr. Ex. 12 at US1298–99 (ECF No. 248-5 at 65–66).

65a.    That same day, the First Assistant emailed Plaintiff's new mentor, copying the Defender, without her knowledge. Unprompted, the First Assistant gratuitously disparaged Plaintiff to her new mentor, stating that although Plaintiff "is an amazingly gifted and talented young woman," she "has made some egregious errors in attitude and judgment recently." Tr. Ex. 26 at US6088 (ECF No. 248-14 at 10). The First Assistant did not explain what these purported

67

"egregious errors in attitude and judgment" could be, considering Plaintiff's unrefuted excellent work performance and work ethic, except for Plaintiff's rejection of the First Assistant's inappropriate advances and reporting of his sexually harassing behavior. *See* Tr. Ex. 26 at US6088 (ECF No. 248-14 at 10).

66.     Despite the First Assistant's disparagement of Plaintiff to her new mentor, Plaintiff began working with this highly experienced assistant federal public defender, who offered to help her with her goal of continuing to gain trial experience. *See* Ex. 4, at ¶ 149 (ECF No. 210, Am. Answer ¶ 149).

67.     Defendants admit that on July 20, 2018, the Defender sent an email to FDO staff in which he listed Plaintiff as assigned to Peter Adolf's team and the First Assistant's team. Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents. Ex. 4, at ¶ 150 (ECF No. 210, Am. Answer ¶ 150); Ex. 7 at US99 (ECF No. 248-2 at 47).

67a.     According to the Defender's own testimony at his deposition, the First Assistant was still Plaintiff's supervisor. Specifically, the Defender stated: "JP was a supervisor at this time and he was going to continue being a supervisor." Tr. Ex. 16 at 170 (ECF No. 255-4 at 72). The Defender reiterated that it was "fair to say that Caryn was still working in JP's chain of command." Tr. Ex. 16 at 175 (ECF No. 255-4 at 77). He further stated that the First Assistant supervised "the entire FDO," including the trial and appellate units, and that the Defender "trusted" his judgment on personnel matters." Tr. Ex. 16 at 90–95 (ECF No. 255-4 at 29–34).

67b.     During the July 20, 2018 meeting, Plaintiff's job duties were diminished, as she was taken off of new trial cases and demoted to "pure R&W," decisions on which the First

68

Assistant had direct input. Tr. Ex. 29 at US7413 (ECF No. 248-14 at 34). Specifically, the notes from the "Team Leader Meeting Agenda," in which the First Assistant participated, state: "Take Caryn off trial support cases. Also need to take her off duty days. The R&Ws will be more Jared's, essentially.[3] Pretrial motions, sentencing objections, trial research, appellate, etc." Tr. Ex. 29 at US7413 (ECF No. 248-14 at 34). The notes conclusively establish that Plaintiff, who had previously been "on th[e] path" to becoming an AFD, Tr. Ex. 16 at 103 (ECF No. 255-4 at 42), was taken off that path. As a "pure R&W," there was no prospect that Plaintiff would "provide[] every aspect of legal representation to individuals charged with federal criminal offenses but who are unable to retain an attorney" as required of the AFD job description, including "trials and court hearings, direct appeals to the circuit court, habeas, post-conviction and witness representation, and representation in other matters such as supervised release hearings and probation and parole hearings." Tr. Ex. 54 at US4968 (ECF No. 248-15 at 52).

      67c.    The meeting notes further state that the FDO had "enough money and approval for two FTE's [*i.e.*, full-time equivalents] at AFD salary range . . . and one FTE at a lower range." Tr. Ex. 29 at US7413 (ECF No. 248-14 at 34). Accordingly, an AFD position was open and available when Plaintiff was demoted to "pure R&W" and taken "off trial support cases." Tr. Ex. 29 at US7413 (ECF No. 248-14 at 34). The meeting notes also state that there was an open appellate position, as "Appeal FTE is 2.75 (but have been surviving with 1.75 FTE)." Tr. Ex. 29 at US7413 (ECF No. 248-14 at 34).

---

[3] By "more Jared's," the notes are referring to Jared Martin, a research and writing specialist at the FDO. *See* Tr. Ex. 29 at US7413 (ECF No. 248-14 at 34).

69

67d.    The meeting notes also address Plaintiff's supervisors moving forward: "Jared will work on assignments for Erin and Mary Ellen's teams and Caryn will work on assignments for JP and Peter's teams." Tr. Ex. 29 at US7411 (ECF No. 248-14 at 32). The meeting notes confirm that Plaintiff's placement under the First Assistant's supervision was a topic of the July 20, 2018 meeting: "Jared and Caryn will be assigned to two teams (each) and Jared and Caryn not on duty days (unless back-up and then will go to duty attorney) and will be pure R&W. Jared will be on Erin and Mary Ellen's team, and Caryn will be on JP and Peter's team." Tr. Ex. 29 at US7413 (ECF No. 248-14 at 34). Thus, in addition to being demoted to "pure R&W," Plaintiff was assigned even more directly under the First Assistant's supervision, to his "trial team," after she reported his sexually harassing behavior to the Defender.

67e.    In his sworn declaration filed with this Court, the Defender claimed that Plaintiff's reassignment even more closely under the First Assistant's supervision was a "mistake" and done "inadvertently." ECF No. 245-4, ¶¶ 60–61. But the "Team Leader Meeting Agenda" notes confirm otherwise, as does the First Assistant's sworn declaration: "As a result of [the July 20, 2018] meeting, the Management Team determined to hire a new attorney to cover research and writing duties, with a larger focus on appellate work than our current R&Ws (the 'Appellate AFD position'). To cover the short term, the Management Team decided that Plaintiff would be assigned to cover my trial team in addition to her own." ECF No. 245-3, ¶ 36. The First Assistant's declaration indicates that the reassignment of Plaintiff under his supervision by "the Management Team" was intentional, and the Defender was not being truthful in claiming it was done "inadvertently." ECF No. 245-4, ¶¶ 60–61.

68.    Defendants admit that, on or about July 20, 2018, the Appellate Chief spoke with

70

Plaintiff about a proposed restructuring regarding the FDO's research and writing attorneys, and that Plaintiff had expressed interest in gaining appellate experience. Ex. 4, at ¶ 152 (ECF No. 210, Am. Answer ¶ 152).

68a.    As discussed during the July 20, 2018 meeting, there was an open appellate position that the management team, including the First Assistant, was discussing how to fill. Tr. Ex. 29 at US7413 (ECF No. 248-14 at 34) ("Appeal FTE is 2.75 (but have been surviving with 1.75 FTE))"; Tr. Ex. 31 at US6234 (ECF No. 248-24 at 54) (office "needed more appellate support"); *see also* Tr. Ex. 113, at US2810 (Appellate Chief's email discussing open appellate position and stating "JP and Bill, please add in anything I missed or additional thoughts").

68b.    Management also discussed a full time research and writing position located in the Asheville division within the next year. *See* Tr. Ex. 29 at US7414 (ECF No. 248-14 at 35) (Appellate Chief's statement that he "is 'pretty sure' we have full-time need for AVL R&W" after being "CLT-based at least for the first year or so").

68c.    During this period, management also discussed providing a promotion to Assistant Federal Public Defender to Jared Martin, the FDO's other remaining research and writing attorney, "based on his excellent work performance." *See* Tr. Ex. 113, at US2810 ("[I]t may well make sense to reward Jared's excellent performance by converting him to an AFD position, given the higher top end salary range."); *see also* Tr. Ex. 29 at US7414 (ECF No. 248-14 at 35) (discussing "[c]onverting Jared to AFD"). Mr. Martin is male. There was no discussion among the management team about the possibility of a similar promotion for Plaintiff, even though she was consistently praised for her excellent work performance, was "on the path"

71

to an AFD position before complaining about the First Assistant, and was eligible for, and had specifically requested, a grade-level promotion on her upcoming work anniversary in August 2018. *See* Tr. Ex. 10 at 9–10 (ECF No. 248-4 at 10–11) ("Defendants admit that Plaintiff would have been eligible for a grade-level promotion to FD-15 on or about August 21, 2018, her work anniversary date.").

69.     Plaintiff also asked the Appellate Chief to help her put together a performance plan that would allow her to gain professional experiences, such as oral arguments and other courtroom appearances, to advance professionally. The Appellate Chief praised Plaintiff for working with an experienced attorney on the trial side, and offered to give her the same kind of professional support on the appeals side.  Tr. Ex. 4, at ¶ 153 (ECF No. 210, Am. Answer ¶ 153).

70.     Defendants admit that Plaintiff complained to the Appellate Chief about certain case-related staffing decisions by supervisors in the FDO and about what she perceived as micromanagement by the First Assistant, and that the Appellate Chief asked Plaintiff if her concerns were limited to a particular case or if she had experienced problems on other cases. Tr. Ex. 4, at ¶ 154 (ECF No. 210, Am. Answer ¶ 154).

70a.     That same day, on July 20, 2018, the First Assistant emailed the Appellate Chief and stated that Plaintiff had a "fuck off attitude" and had committed "fireable offenses." Tr. Ex. 44 at US2796–97 (ECF No. 248-15 at 21–22).  Specifically, the First Assistant stated: "My primary concern is that I am the only one who has communicated to Caryn that her actions – which were fireable offenses – were in fact problematic. . . . Caryn needs to get the message that she fucked up and she needs to make things better and apologize. . . .  If she chooses to continue the 'fuck off' attitude, then at least we know what we have."  Tr. Ex. 44 at US2796–97

72

(ECF No. 248-15 at 21–22).  The First Assistant also complained to the Appellate Chief that "I feel a bit out in the wind here" and "no one will back me up" on his perceived issues with, and criticisms of, Plaintiff.  Tr. Ex. 44 at US2796–97 (ECF No. 248-15 at 21–22).

70b.    The Appellate Chief responded to the First Assistant as follows: "I understand, and I want to get a bit more detail from you on some of what happened so I can tread carefully.  I have a game plan in mind for how to give her a chance – whether deserved or not – to redeem herself and return to being a productive employee.  If it works, great.  If not, we'll encourage Tony to respond appropriately."  Tr. Ex. 44 at US2796 (ECF No. 248-15 at 21).

70c.    This email correspondence confirms that the First Assistant was influencing tangible employment decisions regarding Plaintiff's job duties even after she reported his sexually harassing behavior.  Further, based on the First Assistant's statement that Plaintiff had supposedly committed "fireable offenses" and the Appellate Chief's response that he had a "game plan" for Plaintiff "to redeem herself" or else they would "encourage Tony to respond appropriately," it is reasonable to conclude that the First Assistant and Appellate Chief were planning to initiate Plaintiff's termination from the FDO.  Tr. Ex. 44 at US2796 (ECF No. 248-15 at 21).

71.     Defendants admit that on July 22, 2018, at 7:23 PM, the First Assistant sent an email to Plaintiff stating that the First Assistant would like to meet the next day "to discuss the R&W role on my team."  Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents.  Tr. Ex. 4, at ¶ 156 (ECF No. 210, Am. Answer ¶ 156).

71a.    When the First Assistant sent this email, he was aware that Plaintiff was avoiding him, having reported his sexually harassing behavior and having been reassured that the

73

First Assistant would no longer be her "mentor." The First Assistant himself stated in an email that Plaintiff's calling in sick to protect herself was not "coincidental" and recognized that she had a pattern of doing so in order to avoid him. Tr. Ex. 29, at US2795 (ECF No. 248-15, at 20). In fact, the First Assistant even told the Defender the next day that he believed that Plaintiff had called in sick because of his email asking to meet with her alone. Tr. Ex. 114, at US2848 ("7/23/18. Caryn calls in sick. JP tells Tony it is probably because of his email.").

**N.      Plaintiff is warned that the process is "stacked" in favor of management.**

72.      Defendants admit that Plaintiff took leave on July 23, 2018. Tr. Ex. 4, at ¶ 157 (ECF No. 210, Am. Answer ¶ 157).

72a.      On July 23, 2018, Plaintiff reported the harassment, and the Defender's failure to respond to it, to FEOO Nancy Dunham, in the Administrative Office of the U.S. Courts. The FEOO told Plaintiff that she was "the manager of the civil rights office for the federal courts and for AO employees." Tr. Ex. 20 at 168 (ECF No. 255-14 at 168).

72b.      In her deposition testimony, the FEOO explained how she first encountered Plaintiff: "I received a phone call . . . from a senior – a senior member of the AO staff who had, I believe, just retired. She was one of three department heads. I knew her very well, and . . . before I was hired, she had previously served in an EEO role and had advised the director and the deputy director. When I came on board, she relinquished those duties. . . . [H]er name was Laura Minor, and she called me and said will you talk to an employee – a judicial employee in one of our districts who has some questions about sexual harassment? I have talked to her, and I think she needs to talk to you, and I said of course. And she said, now, she may not want to give you her name, so she will call you and tell you that she is the employee that talked

74

to me, and if you could talk to her about her situation, I would really appreciate it." Tr. Ex. 20 at 25–26 (ECF No. 255-14 at 25–26). The FEOO explained, "[a]nd that's how I first talked to the Plaintiff on the phone. We had, I believe, a very long conversation, because she was very articulate and remembered facts very well, and so I think we talked the first time for maybe an hour and a half. And, again, I didn't know who she was, I didn't know where she was, and that was the first conversation." Tr. Ex. 20 at 26 (ECF No. 255-14 at 26). The FEOO explained that besides an "area code from a previous location" from Plaintiff's cell phone, she "did not have any personal information about her." Tr. Ex. 20 at 26 (ECF No. 255-14 at 26). Plaintiff told the FEOO about her background, including "that she had clerked at the District Court level, at the Circuit Court level, and that she had been a U.S. Supreme Court Fellow at the AO," but the FEOO "didn't know anything more than that in the beginning." Tr. Ex. 20 at 27 (ECF No. 255-14 at 27). The FEOO explained, "I think it took some time for her to build up trust talking to me." Tr. Ex. 20 at 27 (ECF No. 255-14 at 27).

72c.　　The FEOO described her impressions of Plaintiff's complaints, explaining that she was testifying "100 percent from my memory," was "looking back, like five, six years," and had had no contact with Plaintiff since leaving the AO five years earlier, including in preparing for her deposition by attorneys of the Department of Justice in this litigation. Tr. Ex. 20 at 8–9, 32 (ECF No. 255-14 at 8–9, 32 ) (FEOO's testimony that she had not had any contact with Plaintiff or her attorneys about this case); Tr. Ex. 20 at 119 (ECF No. 255-14 at 119) ("I have not talked to Caryn at all since I retired, and . . . I thought it better that I not discuss the substance of the case with any of the parties."). The FEOO remembered that Plaintiff was "made uncomfortable by one of her senior managers" who made "statements about how hot she was . . .

75

and how he was clearly interested in her either romantically or sexually." Tr. Ex. 20 at 32 (ECF No. 255-14 at 32). The FEOO explained that "I know that the individual at issue was ten years older than she was and married, but that immediately concerned me, and so she – she told me about the situation, she told me about his desire to control her, which is very common in this type of situation, and wanted to mentor her. So when I heard her story for the first time, . . . it was concerning." Tr. Ex. 20 at 32 (ECF No. 255-14 at 32). The FEOO further explained, "I remember that she had a meeting that she felt an obligation to attend, and he had something that he wanted her to do, and so he sort of blew up and was very angry, and – and I remember telling that to some of the people at the AO, and – and they – their comment was, well, that's a very bad sign because this is what we see in a sexual harassment case, the desire to control." Tr. Ex. 20 at 33 (ECF No. 255-14 at 33). The FEOO stated that "he asked her, I think, repeatedly . . . to go out for drinks after work, he would show up in the late evening in her workplace and offer her rides home, things that were a little atypical given – the parameters of their relationship." Tr. Ex. 20 at 34 (ECF No. 255-14 at 34).

72d.    Based on her experience of 35 years working in EEOC compliance, the FEOO "strongly believed" Plaintiff's allegations. Tr. Ex. 20 at 165 (ECF No. 255-14 at 165). When asked whether she "always believe[d]" sexual harassment complaints, the FEOO stated, "No, I do not. Just the opposite." Tr. Ex. 20 at 164 (ECF No. 255-14 at 164). In fact, the FEOO was "actually more likely to disbelieve the complaints than believe them." Tr. Ex. 20 at 165 (ECF No. 255-14 at 165). The FEOO explained that she had heard "thousands" of complaints of sexual harassment in her career and that "there are people who make complaints that are inherently unreliable." Tr. Ex. 20 at 164 (ECF No. 255-14 at 164). The FEOO had "seen many"

of these complaints, including "plaintiffs who were unreliable and I believed were creating false claims." Tr. Ex. 20 at 164 (ECF No. 255-14 at 164). Indeed, the FEOO herself had previously testified on behalf of the Environment Protection Agency against "an employee who was making a false claim about a sexual assault by one of the EPA managers." Tr. Ex. 20 at 164 (ECF No. 255-14 at 164). Based on her experience that "the vast majority of the claims are not true," the FEOO explained, "in the few times when I worked at the AO when I believed – strongly believed what a plaintiff was saying, those are the cases I really tried to intervene and assist with what the law tells us to do, which is to remedy and prevent future harassment and discrimination." Tr. Ex. 20 at 165 (ECF No. 255-14 at 165).

72e. The FEOO testified that she "believe[d] Caryn's allegations about J.P. Davis." Tr. Ex. 20 at 165 (ECF No. 255-14 at 165). The FEOO also "believe[d] her allegations about Tony Martinez." Tr. Ex. 20 at 165 (ECF No. 255-14 at 165). The FEOO believed that Plaintiff's "concerns about her workplace were reasonable," and that Plaintiff was being "sincere." Tr. Ex. 20 at 165–66 (ECF No. 255-14 at 165–66). The FEOO "told her candidly what my impressions were, that there were aspects of her situation that were classic sexual harassment and that, you know, I – I was concerned for her." Tr. Ex. 20 at 43 (ECF No. 255-14 at 43). "Occasionally, you know, people are actually in physical danger, and there were some very subtle signs of that in terms of late-night hanging around her when no one else was around. And so, yes, I was uncomfortable, and I felt I needed to do something as soon as possible." Tr. Ex. 20 at 43 (ECF No. 255-14 at 43).

72f. At the time of Plaintiff's report to the FEOO, there was no FDO office manual providing notice of the applicable EDR Plan. The Defender later told the EDR

Investigator, as documented in her interview notes: "No manual at time going off of CDO manual." Tr. Ex. 31 at US5950 (ECF No. 248-14 at 44). Similarly, the First Assistant told the EDR Investigator in an email: "[U]nfortunately, it really doesn't seem like much if anything was done between conversion and the release of our new manual to train FPDO employees on harassment or make them aware of EEO/EDR policies." Tr. Ex. 36 at US2822 (ECF No. 248-14 at 65). The FDO employees had also received no meaningful sexual harassment training. The EDR Investigator's notes with Defender state: "No training on EDR, sexual harassment" Tr. Ex. 31 at US5950 (ECF No. 248-14 at 44); *see also* Tr. Ex. 31 at US5947–51, US6226–30 (ECF No. 248-14 at 41–50); Tr. Ex. 16 at 40, 49 (ECF No. 248-6 at 5, 14) (Defender's training was "minimal" and he "could have received better training on so many" issues). In fact, most of the officials involved in Plaintiff's complaint process had received no meaningful training. *See* Tr. Ex. 21 at 42 (ECF No. 248-11 at 9) (Investigator did not "recall" ever receiving training on how to conduct a workplace investigation); Tr. Ex. 31 at US5947–51, US6226–30 (ECF No. 248-14 at 41–50); Tr. Ex. 16 at 40, 49 (ECF No. 248-6 at 5, 14) (Defender's training was "minimal" and he "could have received better training on so many" issues); Tr. Ex. 19 at 94 (ECF No. 248-9 at 16) (Mediator's testimony that "I have never worked on a sexual harassment case in my life to my knowledge and don't know the standards, don't know anything, so that's another reason I couldn't weigh into this because I know nothing about it"); Tr. Ex. 10 at 14 (ECF No. 248-4 at 15) (Defendants' interrogatory response admitting that FDO did not receive office-wide training until March 2019). According to Defendants' own witnesses, including the EDR Investigator and Judicial Integrity Officer, there was no mandatory judiciary-wide sexual harassment training before 2019. *See* Tr. Ex. 21 at 72 (ECF No. 248-11 at 15) (stating that video training has

78

"become available in the last year or two"); Tr. Ex. 17 at 60–64, 92–97 (ECF No. 255-12 at 60–64, 92–97) (JIO's discussion of "dated" FJC training video that "wasn't tailored to the judiciary" and "didn't describe any of our EDR options"). The JIO testified that currently, it is "mandatory" that training be "offered," but it still is not even "mandatory that people attend." Tr. Ex. 17 at 61 (ECF No. 255-12 at 61).

72g.    Following protocols that are required for employers to avoid liability when credible harassment allegations are made, the FEOO worked with other AO officials to resolve Plaintiff's complaint. Specifically, the FEOO "recall[ed] very early on having conversations with OGC, and, yes, they – they had concerns." Tr. Ex. 20 at 178 (ECF No. 255-14 at 178). Further, "the deputy director," Lee Ann Bennett, "invited me to meetings with OGC to discuss this case, and that was a normal way to handle discrimination and harassment complaints." Tr. Ex. 20 at 178 (ECF No. 255-14 at 178). These officials raised concerns that "any allegations of sexual harassment is of concern, and certainly someone who had Caryn's background and had been, for example, a U.S. Supreme Court Fellow, a law clerk to a U.S. District Judge and a Circuit Court of Appeals Judge, and was generally very highly thought of, that would be of concern to, I think, senior leadership at the AO, and in this case, it was." Tr. Ex. 20 at 179 (ECF No. 255-14 at 179). The FEOO explained that the AO's former Associate Director had described Plaintiff's "credentials" and "work ethics," including that she was a "rising star" in the federal judiciary, and so the FEOO know "that she was well-respected in the district where she worked [and] also by the AO people that she had come in contact with as a U.S. Supreme Court Fellow." Tr. Ex. 20 at 29–30 (ECF No. 255-14 at 29–30). The FEOO further explained, "I think [officials] were concerned that eventually this might lead to a public disclosure or litigation or a

79

judgment against the judiciary"—specifically, against "the federal public defender" office or the "AO." Tr. Ex. 20 at 179–80 (ECF No. 255-14 at 179–80). The deputy director "definitely supported my involvement in trying to settle the matter informally, and she was prepared to support that as well, and I believe her other concern was protection of the employee so that there was no future retaliation or discrimination or harassment." Tr. Ex. 20 at 181 (ECF No. 255-14 at 181). Thus, they agreed that the FEOO "would continue to attempt to informally resolve the matter and to give Caryn advice on the processes she had at her disposal" while "OGC would contact the managers and provide counsel to them." Tr. Ex. 20 at 183 (ECF No. 255-14 at 183). The FEOO testified that there was nothing "unusual" about proceeding in this way and that "[i]t happened more times than I can count." Tr. Ex. 20 at 184 (ECF No. 255-14 at 184). Indeed, not only was this process "the norm," it would have been "a breach of [the FEOO's] obligation or responsibilities" if she had not assisted Plaintiff. Tr. Ex. 20 at 184 (ECF No. 255-14 at 184). In short, "Caryn's case wasn't treated unusually or specifically or differently" by the FEOO. Tr. Ex. 20 at 185 (ECF No. 255-14 at 185).

72h. During their initial conversation, the FEOO also warned Plaintiff that the odds were "stacked against her." Tr. Ex. 20 at 45–46 (ECF No. 255-14 at 45–46). The FEOO explained that "when you have a power imbalance, you're always taking a risk in complaining about it." Tr. Ex. 20 at 45–46 (ECF No. 255-14 at 45–46). Specifically, when "you have, you know, two managers lining up against you as an employee, that I wanted her to be aware that – that this was not an easy case." Tr. Ex. 20 at 46 (ECF No. 255-14 at 46). That is because "there's a lot someone can do, you know, when they are in a position of power to either make life difficult for an employee or fail to take action and then have no consequences come from it."

Tr. Ex. 20 at 46 (ECF No. 255-14 at 46). The FEOO advised Plaintiff to resolve her claims informally rather than pursue a formal complaint process because "[r]etaliation is a fact of life, and I think that a person contemplating a formal process has to be aware of that." Tr. Ex. 20 at 175 (ECF No. 255-14 at 175). During her deposition, the FEOO elaborated on the forms of retaliation that a complainant could suffer, including that "I have seen people fired, people's workplace duties diminished, people – employees ostracized. Just every possible negative that you imagine happening in the workplace, I have seen examples of that." Tr. Ex. 20 at 177 (ECF No. 255-14 at 177). These forms of retaliation could include "diminished job responsibilities"; "negative comments about them formally or informally" and "[a]ll of a sudden, stellar performance reviews turn into either mediocre or actually negative reviews"; "negative comments about reaching out for help to an office like [the FEOO]; and "not allowing an employee to take notes during a meeting . . . about harassment," which is a "deprivation of that employee's rights." Tr. Ex. 20 at 177–78 (ECF No. 255-14 at 177–78).

**O. The Defender admits that he mishandled Plaintiff's complaints, but still fails to take effective remedial action.**

73. Defendants admit that the Defender called Plaintiff on or about July 24, 2018, that the Defender explained his mistake about the reporting hierarchy and the immediate action he would be taking to correct it, and that the Defender apologized to Plaintiff for the oversight. Tr. Ex. 4, at ¶ 163 (ECF No. 210, Am. Answer ¶ 163).

74. Defendants admit that Plaintiff sent a text message to the Defender requesting to review any email to the office before it was sent, and that the Defender responded in part, "I'll show it to you before I send it out." Defendants respectfully refer the Court to the text messages

81

for a complete and accurate statement of their contents. Tr. Ex. 4, at ¶ 164 (ECF No. 210, Am. Answer ¶ 164); Tr. Ex. 5, at US101 (ECF No. 248-2, at 49).

75.     Defendants admit that on July 26, 2018, the Defender sent an email to FDO staff and that the Defender did not provide a draft of the email to Plaintiff to review in advance. Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents. His email announced that he was hiring an appellate assistant federal public defender. Defendants admit that the email stated in part, "all requests for R&W support should be sent to Jared, who will then distribute the work amongst himself and Caryn based on their current workload capacity and any particular interest or expertise that an R&W may have on the relevant issue." Tr. Ex. 4, at ¶ 165 (ECF No. 210, Am. Answer ¶ 165); Tr. Ex. 5, at US102 (ECF No. 248-2, at 50).

76.     Defendants admit that the Defender distributed an employee manual in late July 2018. Defendants admit that the manual included an organizational chart showing the research and writing attorneys reporting to the First Assistant. Tr. Ex. 4, at ¶ 167 (ECF No. 210, Am. Answer ¶ 167); Tr. Ex. 12 at US1264 (ECF No. 248-5 at 31).

76a.     The FDO office chart placed Plaintiff directly under the First Assistant's supervision, which was a change from the previous organizational chart that listed the First Assistant only as a team leader of a limited number of employees, not including Plaintiff. *Compare* Tr. Ex. 56 at US1057 (ECF No. 248-15 at 72) (July 2018 organizational chart showing "research and writing attorneys" reporting directly to the First Assistant), *with* Tr. Ex. 56 at US1060 (ECF No. 248-15 at 74) (December 2017 organizational charge showing First Assistant's role as "Trial Team Leader/Administrative 1st Asst"); *see also* ECF No. 218-1, ¶¶ 2-

82

3 (Defender's "second declaration" stating that he had incorrectly represented in his prior declaration which organizational chart was in effect starting in late July 2018).

76b.    The FDO office chart also confirmed that Plaintiff had effectively been demoted to a subordinate of the FDO's other research and writing attorney, Jared Martin.  Tr. Ex. 56 at US1057 (ECF No. 248-15 at 72).  The management team intended to assign Mr. Martin as the "gatekeeper" in charge of distributing work assignments who would serve as "the supervisor" of the R&W unit. Tr. Ex. BF, at US4155.

76c.    As Plaintiff's workplace investigations expert, Ms. Thomas explained: "In the following months, when Strickland continued to make it clear to Martinez that Davis was still subjecting her to unwanted conduct that made her uncomfortable, Martinez initially removed her from Davis' supervision, then changed course and returned her to Davis' supervision, essentially forcing her to report to the person who had harassed her. Martinez then announced that Strickland would receive assignments from another Research and Writing attorney (Strickland's peer). This move reduced Strickland's job responsibilities, as she would no longer receive her own cases and would be subordinate to a peer. This had the practical effect of hindering Strickland's professional advancement."  Tr. Ex. 59, at 22 (ECF No. 248-17 at 23); Tr. Ex. 108, at 188 (PLT4914).

**P.    The Appellate Chief discourages Plaintiff from applying for a promotion.**

77.    Plaintiff decided to apply for the appellate assistant federal public defender position.  Tr. Ex. 4, at ¶ 169 (ECF No. 210, Am. Answer ¶ 169).

78.    Defendants admit that on or about July 27, 2018, Plaintiff spoke with the Appellate Chief about the new appellate attorney position.  Defendants admit that the Appellate

83

Chief told Plaintiff that she need not apply for the new appellate position and that it may be financially advantageous for Plaintiff to remain in her position. Tr. Ex. 4, at ¶ 170 (ECF No. 210, Am. Answer ¶ 170).

78a.    The Appellate Chief's statements that Plaintiff "need not apply" for the new appellate position contradict the statements of the FDO's Administrative Officer, Bill Moormann, to the Defender Services Office about the position: "We are currently advertising for an additional Appellate AFD. This means these Reclassifications [of the R&W positions] would not exclude anyone from the opportunity of being considered for an Appellate AFD Position." Tr. Ex. 1010, at US2706. Thus, according to Administrative Officer Moormann, Plaintiff should not have been "exclude[]d . . . from the opportunity of being considered for an Appellate AFD Position." Tr. Ex. 1010, at US2706.

78b.    There was also nothing "advantageous" about remaining in Plaintiff's position as a research and writing attorney, contrary to the Appellate Chief's statements to Plaintiff. Indeed, the FDO Manual states that an Assistant Federal Defender "provides every aspect of legal representation to individuals charged with federal criminal offenses but who are unable to retain an attorney. Duties include trials and court hearings, direct appeals to the circuit court, habeas, post-conviction and witness representation, and representation in other matters such as supervised release hearings and probation and parole hearings." Tr. Ex. 54, at US4968 (ECF No. 248-15 at 52). By contrast, "[t]he Research and Writing Specialist provides advanced research and writing services to assistant federal defender (AFD) staff." Tr. Ex. 54, at US4971 (ECF No. 248-15 at 55). ***The Research and Writing Specialist does not ordinarily sign pleadings or make court appearances. The Research and Writing Specialist position is not***

84

*intended to serve as a proxy, substitute, or replacement for an AFD position, nor in the place of an addition AFD position.*" Tr. Ex. 54, at US4971 (ECF No. 248-15 at 55) (emphasis in original). As the FDO Manual makes painstakingly clear, a research and writing attorney position is distinct from, and subordinate to, an AFD position. Tr. Ex. 54, at US4971 (ECF No. 248-15 at 55). Further, Defendants' own sworn declarations in this litigation confirm that "serving as an AFD is typically viewed as a more prestigious position," in part, because "[t]hose in the AFD position – as opposed to the Research & Writing position – can serve in a broader range of capacities, including eventually handling direct trial and appellate work." ECF No. 245-2, ¶ 19 (Decl. Bill Moormann).

78c. Staying a research and writing attorney also would not have been "financially advantageous" to Plaintiff. Defendants themselves repeatedly recognized, including in contemporaneous documentation and sworn declarations filed in this litigation, that AFDs have "greater maximum pay" and "accelerated movement to the maximum pay." ECF No. 245-2, ¶ 19 (Decl. Bill Moormann). In fact, the higher pay for AFDs was why the Appellate Chief stated in an email dated July 23, 2018 that "it may well make sense to reward Jared's excellent performance by converting him to an AFD position, given the higher top end salary range." Tr. Ex. 113, at US2810. The Appellate Chief's comments encouraging the promotion of Mr. Martin, a male research and writing attorney, to an AFD position are striking in their contrast to his statements to Plaintiff only four days later, on July 27, 2018, discouraging her from applying to an AFD position on the grounds that "she need not apply for the new appellate position and that it may be financially advantageous for Plaintiff to remain in her position." Tr. Ex. 4, at ¶ 170 (ECF No. 210, Am. Answer ¶ 170).

85

78d.     Moreover, Defendants admitted during this litigation that Plaintiff was eligible for the equivalent of a grade-level promotion to GS-15 on August 21, 2018.  Tr. Ex. 10 at 9–10 (ECF No. 248-4 at 10–11).  Plaintiff would have been eligible for a grade-level promotion regardless of whether she was converted to an AFD position.  Under the judiciary's "Highest Previous Rate" policy, an AFD's "starting salary may be set higher than the maximum of the applicable starting salary range if necessary to match the salary . . . the AFD previously earned as an employee of any federal government entity or any FDO."  Decl. Anthony Martinez, ECF No. 245-4, at 24, 26.  This policy allowed the Defender to promote Plaintiff to a Grade 15 and then maintain that salary after her reclassification, even if it exceeded the salary range for which she was eligible on the AD scale.  Decl. Anthony Martinez, ECF No. 245-4, at 24, 26. Indeed, if that were not the case, then a research and writing attorney could experience a *decrease* in salary upon being promoted to an AFD position, given the differences between the two pay scales.  *See* Moormann Decl., ECF No. 245-2, ¶ 19 (noting that at the beginning of an employee's career, the pay scale is "lower" for an AFPD employee than a JSP employee).  That result would make little sense, given that an AFD position is more prestigious and comes with greater job responsibilities.  Moormann Decl., ECF No. 245-2, ¶¶ 18–19.

78e.     In short, the Appellate Chief's stated reasons for discouraging Plaintiff from applying for the promotion to an Appellate AFD position on the grounds that she "did not need to apply" and that it would be "financially advantageous" for her to remain a research and writing attorney were false.  As Plaintiff's workplace investigations expert, Ms. Thomas, explained, "[w]hen Strickland tried to apply for the Appellate Assistant Federal Defender position, Appellate Chief Josh Carpenter, who previously had encouraged her to apply for the

86

position, now discouraged her from doing so. Carpenter was aware that Strickland had expressed concerns about Davis, and he had defended Davis to Strickland when she initially talked to Carpenter about the Appellate Assistant Federal Defender position. Thus, Carpenter's behavior was potentially retaliatory. Though Strickland ultimately did apply for the position, Carpenter's discouragement could have hindered her professionally. She was not invited to interview and, thus, was denied this opportunity for a promotion." Tr. Ex. 59, at 22 (ECF No. 248-17 at 23); Tr. Ex. 108, at 188 (PLT4914). The Appellate Chief's conduct was especially troubling given his prior endorsement of the First Assistant's comments that Plaintiff had committed "fireable offenses" and his response that he had a "game plan" for Plaintiff "to redeem herself" or else he and the First Assistant would "encourage Tony to respond appropriately." Tr. Ex. 44, at US2796 (ECF No. 248-15 at 21)

79. Defendants admit that Plaintiff submitted an application for the appellate position on or about August 7, 2018. Tr. Ex. 4, at ¶ 171 (ECF No. 210, Am. Answer ¶ 171).

**Q. The First Assistant continues his obsessive, demeaning, and sexually harassing behavior.**

80. Defendants admit that Plaintiff worked certain days in early August 2018. Tr. Ex. 4, at ¶ 173 (ECF No. 210, Am. Answer ¶ 173).

81. Defendants admit that another attorney worked in the office space utilized by Plaintiff and that that attorney's contract with the FDO was ending. Tr. Ex. 4, at ¶ 175 (ECF No. 210, Am. Answer ¶ 175).

81a. Plaintiff later reported to the Fourth Circuit the First Assistant's troubling conduct during this time:

In early August 2018, Ms. Strickland returned to work, having been absent for several weeks and believing she could not keep taking leave. Ms. Strickland's workspace was in a cubicle in a converted utility closet in an isolated back corner of the building. Ms. Strickland was afraid of being confronted by Mr. Davis in her workplace, and she began bringing pepper spray with her to work.

Ms. Strickland shared the utility closet space with Research and Writing Attorney Caleb Newman, who had recently given his notice. On August 3, 2018, Ms. Strickland confided in Mr. Newman that she was thinking about moving her workplace after he left the FDO, because she felt unsafe being in that space alone. Ms. Strickland told Mr. Newman that she had raised concerns with Mr. Martinez that Mr. Davis was sexually harassing her, and that Mr. Martinez had failed to address her concerns.

A few hours later, Mr. Newman told Ms. Strickland that, following their conversation, Mr. Davis had made an inappropriate joke at their team meeting. Mr. Newman had joked that he wished he could come back to attend the annual office retreat. Mr. Davis responded by stating, in front of the whole trial team, that Mr. Newman should come back to give the sexual harassment training. Mr. Newman and Ms. Strickland were both highly offended by Mr. Davis's comments. Given the timing of Mr. Davis's comments, they also wondered if he, or someone else, had eavesdropped on their conversations.

…

Mr. Davis continued engaging in harassing and obsessive behaviors even after he was aware of Ms. Strickland's complaints. For instance, another employee later told Ms. Strickland that, after Ms. Strickland had resumed coming into work in August 2018, Mr. Davis asked Lisa Ottens, a paralegal whose office was nearest the utility closet, to "keep tabs" on her. According to this employee, it was widely known within the office that Ms. Ottens had been spying on Ms. Strickland and reporting on her back to Mr. Davis.

Ms. Strickland was mortified that her privacy was violated in this manner. She was shocked that Mr. Davis made such an inappropriate request, that Ms. Ottens complied, and that other employees knew but did not report it. She also believed, in light of this information, that it likely was no coincidence that Mr. Davis made a joke about sexual harassment training just after Ms.

88

> Strickland had confided in Mr. Newman that Mr. Davis was sexually
> harassing her, which made her feel demeaned and humiliated. More
> than ever, she believed that Mr. Davis was obsessed with her and
> that she was not safe around him.

Tr. Ex. 7 at US81, US85–86 (ECF No. 248-2 at 29, 33–34).

      81b.    Plaintiff also contemporaneously reported her concerns about her

workplace to the FEOO. The FEOO advised Plaintiff to "[p]lease keep yourself safe—including

working in an open area closer to other people." Tr. Ex. 111, at US1075.

**R.**    **With the Deputy Director's backing, the Chief of Defender Services contacts the Defender directly to take immediate and effective action on Plaintiff's complaints.**

      82.    Defendants admit that the Fair Employment Opportunity Officer ("FEOO")

shared copies of some of the First Assistant's text messages and emails with the Chief of

Defender Services. Defendants further admit that the FEOO and the Chief of Defender Services

contacted the Deputy Director to discuss Plaintiff's complaints. Tr. Ex. 4, at ¶ 187 (ECF No.

210, Am. Answer ¶ 187).

      83.    The Deputy Director authorized the Chief of Defender Services to contact the

Defender directly. Tr. Ex. 4, at ¶ 188 (ECF No. 210, Am. Answer ¶ 188).

      84.    Defendants admit that the Chief of Defender Services called the Defender in

August 2018. Tr. Ex. 4, at ¶ 190 (ECF No. 210, Am. Answer ¶ 190).

      85.    Defendants admit that the Chief of Defender Services suggested that the Defender

consider transferring Plaintiff to another office, among other options. Tr. Ex. 4, at ¶ 193 (ECF

No. 210, Am. Answer ¶ 193).

      85a.    As the FEOO explained, the Chief of Defender Services, Cait Clarke,

"was the senior person that had responsibilities for and with the federal . . . defender's office."

89

Tr. Ex. 20 at 60 (ECF No. 255-14 at 60). The FEOO also spoke to Deputy Director Lee Ann Bennett about Plaintiff's allegations by telling her "the general situation here and what my impressions were. I also recall that I told her about a situation where – when Tony was made aware of these allegations of harassment and Caryn's discomfort with, you know, some of the late-night meetings and her – her feelings that she was not secure, I believe that Mr. Martinez sat Mr. Davis down in a room with Caryn and said something like, well, let's try to work this out, or, you, let's have you two work this out. And I believe that that was one of the things that I told Ms. Bennett that was concerning." Tr. Ex. 20 at 61 (ECF No. 255-14 at 61). The FEOO also clarified that Plaintiff did not ask the FEOO to speak to the Chief of Defender Services or the Deputy Director. "That was my responsibility, having heard allegations that concerned me, to address the situation, and Cait Clarke and Lee Ann Bennett would have been two individuals at a senior level who might have been able to do something about it. And so that -- and it was also my job to inform senior managers of allegations so that they could -- they would be on notice that they needed to take action or to get more information if they felt that was necessary." Tr. Ex. 20 at 62 (ECF No. 255-14 at 62). Specifically, the FEOO spoke with the Deputy Director because "[s]he was second-in-command at the AO" with "responsibilities that related to that office and actually all the offices in the courts." Tr. Ex. 20 at 62 (ECF No. 255-14 at 62). Further, the Deputy Director "was the one that mentioned, you know, when there is a huge power imbalance and somebody's trying to control the -- the employee at issue, that -- I mean, she was not a lawyer, but she recognized that was part of a classic sexual harassment claim." Tr. Ex. 20 at 62–63 (ECF No. 255-14 at 62–63). Specifically, Plaintiff's allegations, including "Mr.

90

Davis's attempt to control Caryn," were "of concern" to the Deputy Director "with respect to workplace discrimination and sexual harassment." Tr. Ex. 20 at 136 (ECF No. 255-14 at 136).

85b.    Regarding the Chief of Defender Services, the FEOO explained that she "was a senior official that had responsibilities for -- for the public defender's offices, and I believe that Caryn knew her from her time at the AO as a U.S. Supreme Court Fellow." Tr. Ex. 20 at 63 (ECF No. 255-14 at 63). In addition, the Chief of Defender Services "had a history with that office, so she knew the parties involved, she knew, you know, things that had happened in the past, and she gave me some good information, as I recall." Tr. Ex. 20 at 63 (ECF No. 255-14 at 63). Specifically, "she told me that there had been problems with that office in the past," Tr. Ex. 20 at 63 (ECF No. 255-14 at 63), and she "described to me some of the problems," Tr. Ex. 20 at 171 (ECF No. 255-14 at 171). The Chief of Defender Services "even warned me to be careful about the situation and to treat it delicately." Tr. Ex. 20 at 171 (ECF No. 255-14 at 171). As the FEOO testified:

> A     I think that Cait Clarke believed that she had been retaliated against or had some negative comments made to her bosses by that office, and I think she was warning me just to be careful. And now that I see the e-mail that I saw for the first time today from Mr. Ishida,[4] I understand why she had concerns.
>
> Q     Cait Clarke believed that she had been retaliated against by the Fourth Circuit?
>
> A     That -- that -- well, that -- that --that – I'll say that generally, yes, that she had been retaliated against by various people in the Fourth Circuit based on her handling of situations, and I do not remember the details.

---

[4] The retaliatory email from Mr. Ishida to which the FEOO is referring will be discussed further below. *See infra,* ¶ 99.

> Q      And by handle it delicately, do you have a sense of what she meant?
>
> A      I think she meant really talk to only the people who can do something about it. Don't – don't – don't say more than you absolutely need to say, and just watch your back.

Tr. Ex. 20 at 172 (ECF No. 255-14 at 172).  The FEOO also clarified that the Chief of Defender Service's warning was based "primarily [on] Cait's own interactions professionally over the years with that office," and that she did not believe that "Caryn ever talked to Cait directly" about these concerns.  Tr. Ex. 20 at 173 (ECF No. 255-14 at 173).  Indeed, the Chief of Defender Services' belief that she was retaliated against is corroborated by ████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████  Tr. Ex. 58 at US7443 (ECF No. 248-16 at 31).  This employee, ███

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████  Tr. Ex. 58 at US7443 (ECF No. 248-16 at 31).

85c.    Based on the FEOO's advice, the Chief of Defender Services suggested to the Defender that he transfer Plaintiff to the appeals unit, away from the First Assistant's supervision of the trial unit, and that he transfer her to the Asheville division office, away from the First Assistant's location in Charlotte.  *See* Tr. Ex. 20 at 66–67 (ECF No. 255-14 at 66–67). She suggested telework in the interim until a solution could be worked out because the Defender claimed "he has no space in Asheville," and Plaintiff found teleworking "more favorable than being in the Charlotte office" with the First Assistant.  Tr. Ex. 20 at 90, 95 (ECF No. 255-14 at

92

90, 95).  As the FEOO made clear in her testimony, the goal of the Chief of Defender Services'

conversation with the Defender was "to make a suggestion or to offer assistance in resolving the

situation."  Tr. Ex. 20 at 66 (ECF No. 255-14 at 66).  The Chief of Defender Services did not

have "any authority to order the public defender to do anything."  Tr. Ex. 20 at 66 (ECF No. 255-

14 at 66).  Rather, the objective of these suggestions was "a plan to move Caryn out of Charlotte

and into another appropriate position," in order "to resolve the situation."  Tr. Ex. 20 at 88 (ECF

No. 255-14 at 88).  The Chief of Defender Services thanked the FEOO for handling the situation

"discreetly" because "confidentiality is a huge part of handling these difficult employment

matters."  Tr. Ex. 20 at 88–89 (ECF No. 255-14 at 88–89).

       85d.    The FEOO further testified that there were multiple possible ways to settle

the matter so that Plaintiff would no longer have to work in proximity to the First Assistant.  She

explained: "Well, there are two ways that a transfer could occur, at least two ways.  One is if

there's an open position, and Caryn would have filled it.  There were other possibilities, too.  If

through an informal settlement agreement the managers created a position in Asheville or

allowed Caryn to perform the job that she had been performing in Charlotte from Asheville, that

could have been a solution as well."  Tr. Ex. 20 at 92 (ECF No. 255-14 at 92).  Thus, the FEOO

"didn't think that everything was foreclosed because there was no current position in Asheville."

Tr. Ex. 20 at 93 (ECF No. 255-14 at 93).  Further, regarding the Defender's claim of no office

space, the FEOO explained:

       A.     Looking back on this, I recall being a little skeptical that
       there was no office space in Asheville.

           Now, I don't know what the situation was, I had never been
       there, but I've seen that used as an excuse previously in -- in many

93

other cases, and I thought it was unlikely that office space was -- could not be found.

Often in federal buildings, there are multiple federal employees and multiple federal positions, and I just -- that made me skeptical, but –

Q    You had no –

A    -- I had no -- I had never been to Asheville and I had never seen the offices, but it seemed a little unlikely.

Tr. Ex. 20 at 95–96 (ECF No. 255-14 at 95–96).

85e.    The FEOO testified that Plaintiff's allegations were "of concern" to officials at the AO's highest levels.  The Deputy Director had "expressed concerns" about Plaintiff's allegations both "in meeting with her and me privately, as well as in meetings with her and the general counsel's office."  Tr. Ex. 20 at 136 (ECF No. 255-14 at 136).  The FEOO also mentioned "having conversations with OGC, and, yes, they – they had concerns."  Tr. Ex. 20 at 178 (ECF No. 255-14 at 178).  The FEOO explained, "I believe that the deputy director invited me to meetings with OGC to discuss this case," because "they were concerned that eventually this might lead to a public disclosure or litigation or a judgment against the judiciary."  Tr. Ex. 20 at 179 (ECF No. 255-14 at 179).  In addition, the FEOO spoke with the former AO Director, James Duff.  Tr. Ex. 20 at 134 (ECF No. 255-14 at 134).  The FEOO testified that the AO Director had "reached out to me" about the matter, and "I recall him asking me to send some of the communications that Caryn had sent to me so that he could look at them himself."  Tr. Ex. 20 at 134–35 (ECF No. 255-14 at 134–35).

**S.      The Defender retaliates against Plaintiff for reporting her complaints to the AO.**

86.     On August 9, 2018, the Defender came to speak with Plaintiff in her workspace. Tr. Ex. 4, at ¶ 195 (ECF No. 210, Am. Answer ¶ 195).

    86a.     The Defender became furious when he learned that Plaintiff had reported her allegations of wrongful conduct to the AO.  He "called her out on contacting the AO to receive guidance on her civil rights as a federal employee."  Tr. Ex. 15 at US4265 (ECF No. 254-4 at 3).  The Defender berated Plaintiff for going to "some other party" and stated that he was being "blamed" and "attacked" for something that was not his "fault."  Tr. Ex. 7 at US83 (ECF No. 248-2 at 31).  The Defender minimized the harassment, stating words to the effect that, "at least you weren't touched."  Tr. Ex. 15 at US4265 (ECF No. 254-4 at 3).

    86b.     The EDR Investigation Report found that the Defender "made comments bade [sic] on Caryn's report such as 'At least she was not touched' and called her out on contacting the AO to receive guidance on her civil rights as a federal employee."  Tr. Ex. 15 at US4265 (ECF No. 254-4 at 3).  Similarly, the Chief Judge's Letter of Reprimand later made the following findings:

> B.      No Physical Touching
>
> You had a subsequent discussion with Ms. Strickland in which you attempted to clarify whether Mr. Davis had touched Ms. Strickland or had engaged in other inappropriate behavior.  Ms. Strickland denied that Mr. Davis had touched her inappropriately, but she repeated that Mr. Davis made her feel uncomfortable and threatened. Investigator Beam found that you had said, 'at least you weren't touched,' or words to that effect. The investigator concluded that your remarks were callous, minimizing, insensitive and contributed to the distress that Ms. Strickland felt.
>
> C.      Disapproval of Seeking Outside Advice

95

Ms. Strickland had also sought advice and guidance from the Fair Employment Opportunity Office at the Administrative Office of the U.S. Courts on her civil rights as a judiciary employee. The investigator found that you had 'called out' Ms. Strickland for seeking legal advice from that office, which further eroded trust between you and Ms. Strickland and exacerbated the deteriorating situation in your office.

D.     Shifting Responsibility

Finally, the investigator noted that you had said you were being blamed for matters that you had nothing to do with. Ms. Strickland reported that she felt 'offended' by your protest, which she perceived as disapproving her right to seek outside advice and counsel from the AO Fair Employment Opportunity Office. This, the investigator concluded, contributed to your mishandling of the matter."

Tr. Ex. 15 at US4265–66 (ECF No. 254-4 at 3–4).

86c.    During his deposition, the Defender testified that he was "upset" that Plaintiff had "reported to the AO." Tr. Ex. 16 at 189 (ECF No. 255-4 at 88). The Defender testified that he criticized Plaintiff during their August 9, 2018 meeting: "I told her because I thought she was going behind my back and I would have liked for her to come to me first." Tr. Ex. 16 at 189 (ECF No. 255-4 at 88). He further explained: "I felt that she didn't go to me first, to speak to me, and she kind of went around me and is sharing with the AO, Administrative Office of the Courts, and I just felt like she went, you know, behind my back, sort of." Tr. Ex. 16 at 185 (ECF No. 255-4 at 84). "And so I asked her, 'Why did you do that? Why didn't you come to me and talk to me? I would have tried to resolve all these issues before you go into the AO." Tr. Ex. 16 at 186 (ECF No. 255-4 at 85). The Defender testified that while Plaintiff "was doing nothing wrong, . . . I just thought it was unfair to me that she didn't speak to me first and

articulate to me, you know, all of the concerns so that I could try to resolve them. You know, and I thought they were resolved on July 5th." Tr. Ex. 16 at 186 (ECF No. 255-4 at 85).

86d. The Defender also admitted that he told Plaintiff: "I feel like I'm being blamed for a situation that as soon as I was put on notice, I'm taking control over it." Tr. Ex. 16 at 189 (ECF No. 255-4 at 88). He testified at his deposition as follows:

A. Well, I felt that -- the tone of the meeting, you know, when you're not there, the tone of the meeting, I felt she was pointing the finger at me; so I started getting defensive. And I said, "Well, I feel like I'm getting blamed for this," and that was my response. That's what I was saying, that's the only thing I was saying.

Q. Why would she point the finger at you?

A. Well, I don't know. I felt that, though. I felt she was pointing the finger at me at that moment.

Q. At that moment, she felt that you were -- she felt that you were at fault, you thought that she thought you were at fault?

A. Correct.

Q. And did you think she had said that to the AO?

A. No, no, I just sensed by the way she was talking and making demands. Just the tenor of the conversation. She had never talked to me like that, she was very forceful, she was making demands, You are going to do this; We are going to do this; and I want this, and I want that. Just the tone. It appeared to me almost accusatory towards me. And, you know, I got defensive and said, "Well, I feel like I'm being blamed for this when I'm trying to resolve it. I'm trying to accommodate it."

Q. Yeah. And what could she -- what did you understand her to be blaming you for?

A. Everything. The way the whole thing was handled. I just felt like she was blaming me for how the whole thing was handled. How I handled it.

97

Tr. Ex. 16 at 190–91 (ECF No. 255-4 at 89–90).

87.     During their meeting, the Defender told Plaintiff that the Chief of Defender

Services had called him. He also claimed that he already "took care" of the situation.  Tr. Ex. 1,

at ¶ 196 (ECF No. 1, Complaint ¶ 196).  Defendants admit that Plaintiff and the Defender met on

August 9, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for

a record of the statements made.  Tr. Ex. 4, at ¶ 196 (ECF No. 210, Am. Answer ¶ 196); Tr. Ex.

80 at US7565–66.

88.     The Defender claimed that Plaintiff had told him she was not being sexually

harassed, but only that she was "uncomfortable."  Tr. Ex. 1, at ¶ 198 (ECF No. 1, Complaint ¶

198).  Plaintiff responded that this assertion was untrue.  Defendants admit that Plaintiff and the

Defender met on August 9, 2018 and respectfully refer the Court to Plaintiff's audio recording of

that meeting for a record of the statements made.  Tr. Ex. 4, at ¶ 198 (ECF No. 210, Am. Answer

¶ 198); Tr. Ex. 80 at US7573–74.

89.     The Defender criticized Plaintiff for going to "some other party" with her

concerns. He told her he was being "blamed" and "attacked" for something that was not his

"fault."  Tr. Ex. 1, at ¶ 199 (ECF No. 1, Complaint ¶ 199).  Defendants admit that Plaintiff and

the Defender met on August 9, 2018 and respectfully refer the Court to Plaintiff's audio

recording of that meeting for a record of the statements made.  Tr. Ex. 4, at ¶ 199 (ECF No. 210,

Am. Answer ¶ 199); Tr. Ex. 80 at US7573, 7580.

89a.    The Letter of Reprimand found that the Defender "called her out on

contacting the AO to receive guidance on her civil rights as a federal employee."  Tr. Ex. 15 at

US4265 (ECF No. 254-4, at 3).

98

89b.    The Letter of Reprimand found that the Defender stated that he was being "blamed" for something that was not his "fault" and that he "called out" Plaintiff for contacting the AO.  Tr. Ex. 15 at US4265–66 (ECF No. 254-4, at 3–4).

89c.    Similarly, the Defender testified at his deposition that he was "upset" that Plaintiff had "reported to the AO."  Tr. Ex. 16 at 189 (ECF No. 255-4 at 88).  He criticized Plaintiff because she "went . . . behind my back" and "I feel like I'm being blamed."  Tr. Ex. 16 at 185, 189 (ECF No. 255-4 at 84, 88).

90.    Plaintiff reminded the Defender that she had raised complaints about being harassed multiple times. She repeated in detail the behaviors she had described to him in those meetings.  Tr. Ex. 1, at ¶ 201 (ECF No. 1, Complaint ¶ 201).  Defendants admit that Plaintiff and the Defender met on August 9, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made.  Tr. Ex. 4, at ¶ 201 (ECF No. 210, Am. Answer ¶ 201); Tr. Ex. 80 at US7575–77.

91.    When she mentioned that the First Assistant had cornered her in the lobby when she was alone, the Defender interjected: "OK, but there was no physical contact."  Tr. Ex. 1, at ¶ 202 (ECF No. 1, Complaint ¶ 202).  Defendants admit that Plaintiff and the Defender met on August 9, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made.  Tr. Ex. 4, at ¶ 202 (ECF No. 210, Am. Answer ¶ 202; Tr. Ex. 80 at US7576.

91a.    The Letter of Reprimand found that the Defender minimized the harassment, stating words to the effect that, "at least you weren't touched." Tr. Ex. 15 at US4265 (ECF No. 254-4, at 3).  "The investigator concluded that [the Defender's] remarks were callous,

99

minimizing, insensitive, and contributed to the distress that Ms. Strickland felt." Tr. Ex. 15 at US4265 (ECF No. 254-4, at 3).

92.     Plaintiff told the Defender that the only reason the First Assistant had not touched her is that she had not let him. The Defender said he understood that and he was not disagreeing with her. He did not apologize for his offensive comments. Tr. Ex. 1, at ¶ 204 (ECF No. 1, Complaint ¶ 204). Defendants admit that Plaintiff and the Defender met on August 9, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made. Tr. Ex. 4, at ¶ 204 (ECF No. 210, Am. Answer ¶ 204); Tr. Ex. 80 at US7577–78.

93.     The Defender bluntly asked Plaintiff what she "want[ed]." Plaintiff had already repeatedly told him that all she wanted was to do her job without being harassed or threatened. The Defender agreed that it was necessary to move Plaintiff into appeals because the First Assistant was in charge of the entire trial unit. He also promised to remove the First Assistant from Plaintiff's chain of command. Tr. Ex. 1, at ¶ 205 (ECF No. 1, Complaint ¶ 205). Defendants admit that Plaintiff and the Defender met on August 9, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made. Tr. Ex. 4, at ¶ 205 (ECF No. 210, Am. Answer ¶ 205); Tr. Ex. 80 at US7580–7602).

94.     When Plaintiff asked what would happen next, the Defender said he would implement these steps, consulting with the Appellate Chief as a "courtesy." Tr. Ex. 1, at ¶ 206 (ECF No. 1, Complaint ¶ 206). Defendants admit that Plaintiff and the Defender met on August 9, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record

100

of the statements made.  Tr. Ex. 4, at ¶ 206 (ECF No. 210, Am. Answer ¶ 206); Tr. Ex. 80 at US7597–99.

94a.    The Defender's contemporaneous notes from the conversation reflect the following points about their agreement:

(1) modify organizational chart – direct supervisor to me by Monday.

(2) I will convert R&W's to AFPD.  ASAP.

(3) that she do exclusive appeals w/ appellate unit.  Speak to Josh

(4) space?? Telework??  Report back in one week.  I did indicate that I may not be able to accommodate this since I have no space in Asheville and do not want to grant telework will open gates.

Meeting I had w/ CD.  In reference to see how we can resolve issues raised by Cait and her feeling uncomfortable.

The above issues are issues I committed to resolve as soon as possible from this date.

Tr. Ex. 114, at US6839.

95.    The only term the Defender would not agree to was a transfer to another duty station, as he claimed there was no office space.  He claimed it was enough that Plaintiff and the First Assistant worked on opposite ends of the hallway.  Tr. Ex. 1, at ¶ 207 (ECF No. 1, Complaint ¶ 207).  Defendants admit that Plaintiff and the Defender met on August 9, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made.  Tr. Ex. 4, at ¶ 207 (ECF No. 210, Am. Answer ¶ 207); Tr. Ex. 80 at US7578, US7594–96.

96.    Plaintiff reminded him that she had cut her in-office hours to never be in the building alone with the First Assistant.  She stressed that this was not a tolerable situation.  She

101

said she could not come into work every day not knowing what might happen, and that the First Assistant was likely to be very angry when he found out about these changes. Tr. Ex. 1, at ¶ 208 (ECF No. 1, Complaint ¶ 208). Defendants admit that Plaintiff and the Defender met on August 9, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made. Tr. Ex. 4, at ¶ 208 (ECF No. 210, Am. Answer ¶ 208); Tr. Ex. 80 at US7578–7580, US7597.

97.     The Defender said he was not able to commit to anything regarding a transfer, but said he would see what he could do and report back to her. Tr. Ex. 1, at ¶ 209 (ECF No. 1, Complaint ¶ 209). Defendants admit that Plaintiff and the Defender met on August 9, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made. Tr. Ex. 4, at ¶ 209 (ECF No. 210, Am. Answer ¶ 209); Tr. Ex. 80 at US7595–96.

98.     Plaintiff resumed taking leave from work. Tr. Ex. 4, at ¶ 210 (ECF No. 210, Am. Answer ¶ 210).

**T.     With Defendants' backing, the Defender weaponizes the EDR process to intimidate Plaintiff and protect himself from liability.**

99.     Defendants admit that Plaintiff sent an email to the Defender on August 10, 2018, in which she purported to describe an agreement reached with the Defender. Defendants further admit that the email requested to work remotely "until the duty station issue is resolved" and referred to "sexually harassing and threatening behaviors." Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents. Tr. Ex. 4, at ¶ 211 (ECF No. 210, Am. Answer ¶ 211); Tr. Ex. 12 at US1263 (ECF No. 248-5 at 30).

1.      **The Defender appoints the EDR investigator despite the EDR Coordinator's suggestion that he recuse himself.**

99a.    Following the August 9, 2018 meeting, the Defender made his own report of "wrongful conduct" to the Fourth Circuit by forwarding Plaintiff's email to the Fourth Circuit's Circuit Executive, James Ishida.  Tr. Ex. 30 at US2559–60 (ECF No. 248-14 at 38–39). The Circuit Executive responded, in part, by stating: "I understand that arrangements are currently being made for you to appoint someone outside your office to investigate the allegations contained in the below email.  At the conclusion of the investigation, under the Plan, any employee found to have engaged in wrongful conduct may be subject to appropriate disciplinary action."  Tr. Ex. 30 at US2559 (ECF No. 248-14 at 38).

99b.    The Defender testified at his deposition that "the next step would be to appoint an investigator; I would need to appoint an investigator.  [The Circuit Executive] had talked to Frank Johns, the clerk of the court in Charlotte, and the clerk of the court recommended Heather Beam, who is the HR specialist in the Western District of North Carolina."  Tr. Ex. 16 at 179 (ECF No. 255-4 at 78).  The Circuit Executive then said, "you [*i.e.*, the Defender] should appoint Heather Beam as investigator; I appointed her."  Tr. Ex. 16 at 179 (ECF No. 255-4 at 78).

99c.    The EDR Investigator testified at her deposition that her understanding was that "James said to Tony, 'So you had designated Heather to investigate the allegations, and she now reports to you under the Fourth Circuit EDR Plan."  Tr. Ex. 21 at 19 (ECF No. 248-11 at 6).  The EDR investigator understood the Circuit Executive's instructions to mean "that I would investigate the allegations and bring my report to Tony Martinez."  Tr. Ex. 21 at 19 (ECF No. 248-11 at 6).

103

99d.    The Defender was allowed to "appoint" the investigator even though the Circuit Executive had recommended that the Defender "recus[e]" himself "because of [his] earlier involvement in the matter." Tr. Ex. 46 at US616 (ECF No. 248-15 at 25). Specifically, on August 14, 2018, the Circuit Executive told the Defender in an email: "So we now have Heather Beam. I'd suggest reaching out to her to set up a meeting to discuss the case. Heather will need to know that you're appointing her to investigate the allegations contained in Caryn's email. (I'd also suggest that you prepare something in writing to that effect. I might say that because of your earlier involvement in the matter that you are recusing and appointing Heather as your designee to investigate the allegations.)." Tr. Ex. 46 at US616 (ECF No. 248-15 at 25). During this litigation, Defendants made the following admission regarding the Defender's communication to the EDR Investigator: "Defendants admit that the Federal Defender sent the EDR Investigator an email on August 14, 2018 saying, 'I have just been advised by Circuit Executive James Ishida that you are willing and able to assist us in investigating allegations of misconduct by an employee in my office. Pursuant to our office's EDR plan I am appointing you as my designee to conduct the investigation into the allegations.'" Tr. Ex. 10 at 8 (ECF No. 248-4 at 9).

> ## 2.    The Defender falsely accuses the FEOO of "obstructing" an ongoing EDR investigation and claims that FEOO is a "friend" of Plaintiff.

99e.    On August 15, 2018, having appointed the EDR investigator despite his involvement in the matter, the Defender then informed the Circuit Executive that the FEOO had "tried to obstruct an ongoing Fourth Circuit EDR investigation" and ordered him to "give the complainant . . . whatever it is that she is asking for" before she "hires an attorney or goes to the press." Tr. Ex. 30 at US2558 (ECF No. 248-14 at 37). The Circuit Executive immediately

104

relayed these allegations to the Fourth Circuit's Chief Judge, Roger Gregory, stating the following in an August 15, 2018 email:

> Dear Chief,
>
> I wanted to alert you about a disturbing incident that happened today in this EDR matter.
>
> It's a long story, one that I'll fill you in on tomorrow, but the short version is it appears that the head of the AO's Fair Employment Practices Office, Nancy Dunham, tried to obstruct an ongoing Fourth Circuit EDR investigation. Ms. Dunham allegedly instructed one of her staff to tell Tony Martinez that he needed to give the complainant, Caryn Devins, whatever it is that she is asking for – telework, relocation, etc – before Ms. Devins hires an attorney or goes to the press. Ms. Dunham reportedly said that this is not a request but an order that comes from the highest levels of the AO.
>
> After some checking, Tony discovered that this "demand" did not come from the highest levels of the AO, but from Ms. Dunham, who coincidentally is a friend of the complainant, Caryn Devins.
>
> Needless to say, Tony felt threatened, coerced, intimidated, and mystified by the extraordinary demand. He's also very upset and intends to write Jim Duff a letter tomorrow.
>
> I suggested to Tony that we step back and think about this overnight before doing anything further. I also told him that I wanted to advise you of what had happened.
>
> I'll reach out to Thelma tomorrow to see if you have time to talk.
>
> Thanks,
>
> James

Tr. Ex. 30 at US2558 (ECF No. 248-14 at 37).

99f. The Defender's own contemporaneous notes confirm that the rumor that the FEOO was Plaintiff's "friend" came from the Defender himself: "Did not disclose she's friends w/ Caryn." Tr. Ex. 115, at US6841. During his deposition, the Defender admitted that

105

he had never spoken to the FEOO or anyone in her office about these allegations. Instead, the Defender claimed that the investigator, Heather Beam had told him that "I can't be involved in investigation of this case" and that she had been told "Do not contact any lawyers and this is a directive, this is an order." Tr. Ex. 16 at 180 (ECF No. 255-4 at 79). During her deposition, however, the EDR investigator did not corroborate the Defender's claim and instead testified that she did not recall ever being "threatened" by an official at the AO. Tr. Ex. 21 at 40–41 (ECF No. 248-11 at 7–8).

       99g.    During her deposition, the FEOO testified that she had never previously seen the allegations in the Circuit Executive's August 15, 2018 "disturbing incident" email and described those allegations as "patently false":

> Q      Did you, in fact, instruct your staff to tell Tony Martinez that he needed to give the complainant whatever she was asking for?
>
> A      This is patently false.
>
> Q      Did your staff say any of those things?
>
> A      To my knowledge, no, and nor would they ever.
>
> Q      Did you yourself say any of those things?
>
> A      I did not.
>
> Q      Do you know how Mr. Ishida could have gotten that impression?
>
> A      I do not.
>
> Q      The e-mail says that you reportedly said this was not a request but an order that comes from the highest levels of the AO. Do you see that passage?
>
> A      I do.

106

Q    Did you, in fact, say that?

A    I did not, nor would I ever have said something like that.

Q    And to the best of your knowledge, did any member of your staff or the AO say that?

A    No, they did not.

Q    So someone who reported that you or your staff said that -- those things would be misrepresenting the truth; is that right?

A    Yes.

Tr. Ex. 20 at 123–25 (ECF No. 255-14 at 123–25). The FEOO explained that she and the senior lawyer in her office, Amaal Scroggins, had had "very little interaction" with Ms. Beam except for a phone call early in the process. Tr. Ex. 20 at 190–91 (ECF No. 255-14 at 190–91). The FEOO believed that Ms. Beam was "an EEO counselor" involved in an "early informal part of how one handles an EDR complaint," but that there was no "formal" EDR process going on that she was "aware of" at that time. Tr. Ex. 20 at 192–93 (ECF No. 255-14 at 192–93). The FEOO explained that Ms. Scroggins had spoken with Ms. Beam about the matter without realizing that it was the same matter that had been brought to the FEOO's attention. Tr. Ex. 20 at 192 (ECF No. 255-14 at 192). In a subsequent phone call, "we informed Heather that the matter she had talked about with Amaal was also something that had been brought to my attention by the employee and that I was working with AO managers and others on how to assist in the case." Tr. Ex. 20 at 194 (ECF No. 255-14 at 194). However, there was nothing "threatening" about the call and the FEOO did not "give any directives to Heather Beam." Tr. Ex. 20 at 194 (ECF No. 255-14 at 194). To the contrary, "we had no authority to give directives to a judiciary employee." Tr. Ex. 20 at 194 (ECF No. 255-14 at 194).

107

99h.    The FEOO further explained as follows:

Q       Besides for saying that you thought it was a serious case and she should do a good job with the investigation, did you tell her anything else about her investigation?

A       I believe we told her that we were in the process of trying to informally settle the case -- I thought that that was important for her to know -- that the case may not continue to progress along the formal complaint lines, but that we -- we were trying to create a situation where the case would settle and was acceptable to both parties.

Q       Did you -- how -- how would that matter that it was -- like, why did you think it was important for her to know?

A       Well, I think that she might have at any point been told that the matter was investigated -- I mean, was settled, and then her investigation would need to stop, and I think probably what we were saying is do a good job -- you know, do the work as quickly as you can, and, you know, provide some information to all the parties that need it.

Q       So at that point, did you think an investigation was -- was somehow interfering with the informal settlement discussions that you had been having?

A       No, not at all.

Q       Okay. You thought it was, you know, proper to be conducting a fact-finding investigation into these claims?

A       Yes.

Tr. Ex. 20 at 97–98 (ECF No. 255-14 at 97–98).  In short, the FEOO wanted the Investigator to know that the parties were working towards settling the case in a manner "acceptable to both parties" without the need for a formal complaint process, investigation, and fact-finding.  Tr. Ex. 20 at 98–99 (ECF No. 255-14 at 98–99).  The FEOO was concerned that "sometimes when things get into a formal complaint mode, people's positions harden, and this was all very delicate

108

at the moment, because Caryn was uncomfortable, Caryn was having conversations of her own in terms of trying to settle the matter, and that we had OGC involved, my office involved, Cait Clarke involved, to try to resolve the matter, and it – you know – it was delicate." Tr. Ex. 20 at 101 (ECF No. 255-14 at 101). The FEOO's attempts to settle the matter informally are the exact opposite of "ordering" the Defender to give the complainant "whatever it is that she is asking for," as the Defender had falsely alleged. Tr. Ex. 30 at US2558 (ECF No. 248-14 at 37).

99i.     The FEOO explained that it appeared that "Tony Martinez is reporting this allegation . . . to Mr. Ishida . . . [w]ho then reported it to Chief Judge Gregory." Tr. Ex. 20 at 125 (ECF No. 255-14 at 125). These officials were "basically, the – the highest level of officials in the EDR process that Caryn was involved in," including Mr. Ishida as the EDR Coordinator and Chief Judge Gregory as "the supervisor." Tr. Ex. 20 at 126 (ECF No. 255-14 at 126). The FEOO stated that she was "shocked to read this. It's amazing what is happening behind the scenes." Tr. Ex. 20 at 126 (ECF No. 255-14 at 126). She explained, "one of the ways that someone can try to interfere with my office's function is to call one of my supervisors, and Jim Duff was definitely one of my supervisors. But I never knew any of this." Tr. Ex. 20 at 126–27 (ECF No. 255-14 at 126–27). When asked why she was "shocked," the FEOO elaborated as follows:

> A     It is really -- first of all, because it's not true, but second of all that – that there would be an attempt to interfere with the role that my office had and -- and the EDR process.
>
> Q     Mr. Ishida describes -- describes your work as an interference; is that right?
>
> A     He says, yes, "tried to obstruct an ongoing Fourth Circuit EDR investigation."

Q      How would either -- first of all, how would this be an interference with the EDR process?

A      Well, it looks like -- again, these allegations are false, but that I told someone on my staff to give -- to tell Tony Martinez to give Caryn Devins whatever she's asking for.

Q      More -- more straightforwardly, did you try to obstruct an EDR process in any way?

A      Absolutely not.

Q      Would you ever try to obstruct an EDR process in any way?

A      Never.

Q      Do you understand any of your activities throughout this matter as plausibly interfering or obstructing an EDR process?

A      Absolutely not.

Tr. Ex. 20 at 127–28 (ECF No. 255-14 at 127–28).  The FEOO also explained that she was not a

"friend" of Plaintiff as the Defender had falsely alleged:

A      "After some checking, Tony discovered that this 'demand' did not come from the highest levels of the AO, but from Ms. Dunham, who coincidentally is a friend of the complainant, Caryn Devins."

Q      Were you and Caryn Devins friends at this point?

A      We were never friends.

Q      Are you friends today?

A      I would not call her a friend. She was a person that was employed by the Federal Public Defender's Office with whom I interacted on her case.

I liked and respected her and wanted to try to resolve the matter as my job responsibilities called for, but, no, she was never a personal friend.

110

> Q     Did you know her before she came to you?
>
> A     I never met her. I never -- I don't believe I ever had any contact with her before she came to me.

Tr. Ex. 20 at 128–29 (ECF No. 255-14 at 128–29). The FEOO explained why she found the "disturbing incident" email "shocking" and believed it "might interfere with the EDR process":

> A     Well, Judge Gregory was going to be deciding this case eventually, and the fact that are falsehoods in here is somewhat concerning -- concerning.
>
> Q     And which falsehoods exactly?
>
> A     Well, that I tried to obstruct an ongoing Fourth Circuit EDR investigation, that this was a directive that came from the highest levels of the AO, that it was a demand, and that I am a friend or was a friend of the complainant.
>
> Q     And why would it be concerning that there was a falsehood introduced about those things?
>
> A     Well, I think the roles of Mr. Ishida and Judge Gregory were as neutral adjudicators, and I think having these falsehoods presented to them could interfere with decisions they made in the future.

Tr. Ex. 20 at 129–30 (ECF No. 255-14 at 129–30). The FEOO further described why the Defender's false allegation that the FEOO and Plaintiff were "friends" was "concerning": "I would speculate that such an allegation would diminish my observations about the case and possibly the -- the Plaintiff's observations on her own face." Tr. Ex. 20 at 131–32 (ECF No. 255-14 at 131–32). The FEOO explained that she interpreted this allegation "as undermining the legitimacy and credibility" of herself and Plaintiff. Tr. Ex. 20 at 132 (ECF No. 255-14 at 132). The FEOO explained that a reason for undermining the credibility of an interaction with her office with this type of false allegation would be "to protect an accused party in their office." Tr.

Ex. 20 at 133 (ECF No. 255-14 at 133). However, reaching out to her office for advice is "[a]bsolutely not" something that "could interfere in the EDR process." Tr. Ex. 20 at 133 (ECF No. 255-14 at 133). To the contrary, "my attorneys that interact regularly on a daily basis with the courts and court staff have conversations about cases, they provide guidance, and that is never considered interference." Tr. Ex. 20 at 133 (ECF No. 255-14 at 133). Moreover, there is nothing "wrong" with a federal public defender employee seeking advice from her office about sexual harassment or workplace discrimination, and "that, in fact," is what an employee "ought to do if they are concerned about workplace discrimination." Tr. Ex. 20 at 133 (ECF No. 255-14 at 133).

> 99j.    In his deposition, the Circuit Executive testified:
>
> I will confess, I was -- I think I was a little irritated by the fact that there were all these AO employees weighing in and calling Tony and telling him what he needed to do and what he needed to not do, and I just -- I just felt that that -- I don't think they knew there was an ongoing proceeding, so I think they felt, you know, free to do that, but I was a little -- I think I was -- I think it's fair to say I was a little irritated at what was going on and how it could impact the proceedings that we were handling at the time.

Tr. Ex. 22 at 103–04 (ECF No. 255-3 at 21–22). The Circuit Executive explained that when he sent the "disturbing incident" email to the Chief Judge, "I was just going off of what Mr. Martinez had relayed to me." Tr. Ex. 22 at 96 (ECF No. 255-3 at 14). The Circuit Executive "just was using what I heard from Mr. Martinez" and did not think he "had heard from anyone else" before he told the Chief Judge that the FEOO had "tried to obstruct an ongoing Fourth Circuit EDR investigation." Tr. Ex. 22 at 96 (ECF No. 255-3 at 14). The Circuit Executive "did not" talk to the FEOO before relaying these allegations to the Fourth Circuit's Chief Judge. Tr. Ex. 22 at 97 (ECF No. 255-3 at 15).

112

99k.     The Circuit Executive testified that based on what Mr. Martinez told him, the statements from the FEOO's office "came across as a directive, that you shall do this and you shall do that." Tr. Ex. 22 at 98 (ECF No. 255-3 at 16).  The Circuit Executive testified that even if the FEOO had only "advised" the Defender, he would still "be concerned because these are confidential matters," Tr. Ex. 22 at 98 (ECF No. 255-3 at 16), and he believed that "if the AO were involved, that would be prejudging the outcome before the investigation was complete," Tr. Ex. 22 at 106 (ECF No. 255-3 at 24).  The Circuit Executive believed that ordering a manager to take action on a harassment complaint before "the outcome of the investigation" as an "preemptive action" would be "inappropriate."  Tr. Ex. 22 at 105–06 (ECF No. 255-3 at 23–24). He stated that "what I was hoping the AO would agree to, which they did eventually, was they would realize that the actions of certain AO employees was [sic] not appropriate, and they needed to stop and let this investigation play out."  Tr. Ex. 22 at 107 (ECF No. 255-3 at 25).

99l.     Reiterating his view that assisting a complainant "while the investigation was still ongoing" would be equivalent to "prejudging the outcome," the Circuit Executive testified that it would be "inappropriate" to order action to help the complainant "without the benefit of knowing the outcome of what the investigation report said."  Tr. Ex. 22 at 109 (ECF No. 255-3 at 27).  The Circuit Executive acknowledged, however, that at the time of the AO's purported "interference," there had been no report of wrongful conduct filed by Plaintiff, and the AO was not "recommending discipline" against any accused managers.  Tr. Ex. 22 at 111 (ECF No. 255-3 at 29).  Rather, "what I recall Tony saying about what the AO was telling him, it was more about things that Mr. Martinez needed to do with respect to Caryn, you know, putting her on telework, giving her the promotion."  Tr. Ex. 22 at 111 (ECF No. 255-3 at 29).  When asked

113

why "it would have been interference with the Chapter IX [disciplinary] proceeding to have the AO talk to Tony about those kinds of resolutions," the Circuit Executive answered that doing so would be "prejudging" because if the investigation found no misconduct, "then any corrective or preventive action would – may not be necessary." Tr. Ex. 22 at 113–14 (ECF No. 255-3 at 31–32). Further, the Circuit Executive believed that because "only Tony Martinez had the authority to resolve this matter by ordering, say, separation of the parties or a transfer or a promotion," it was "interference from the AO" and "overstepping the AO's bounds" to tell the Defender, "as the unit executive, 'This is what you need to do for staff in your office.'" Tr. Ex. 22 at 114 (ECF No. 255-3 at 32).

        99m.    The Circuit Executive's stated disapproval of assisting a complainant informally is directly contrary to generally accepted practices for addressing workplace harassment complaints. As Plaintiff's workplace investigations expert, Ms. Thomas, explained: "Defendants did not meet their obligations to Strickland as provided by the well-accepted standards in the human resources industry. From the beginning, the Defendants treated this matter as an informal work dispute, between Strickland and Davis, one that could be 'resolved' through the EDR Plan process. Defendants apparently did not appreciate that Strickland had reported behavior that was potentially illegal under Title VII and that needed to be taken seriously, investigated promptly, and remedied appropriately. Because they viewed the situation as a workplace dispute, the Defendants took the position that Strickland was equally responsible for her poor relationship with Davis and, thus, bore responsibility for working with Martinez to identify an acceptable solution. This approach not only deprived Strickland of the protections to which she was entitled under Title VII, but it also placed her in the unfortunate position of

having to advocate for herself when it was the Defendants who should have been protecting her."
Tr. Ex. 59, at 23 (ECF No. 248-17 at 24); Tr. Ex. 108, at 189 (PLT4915). Ms. Thomas further

explained that Defendants "did not monitor Strickland's work environment, or Martinez's

management decisions about her, to ensure that Strickland did not suffer adverse job

consequences for bringing her complaints. As a consequence, Strickland's working conditions

were adversely affected." Tr. Ex. 59, at 23 (ECF No. 248-17 at 24); Tr. Ex. 108, at 189

(PLT4915).

                 99n.     Indeed, the Circuit Executive, in his role as EDR Coordinator, testified

that monitoring the Defender's management decisions and ensuring that Plaintiff did not suffer

adverse job consequences would be "inappropriate" outside "interference" that would amount to

"prejudging" the complaint. *Supra*, at 99l. The Circuit Executive's apparent belief that the

Defender was the "only" party with authority to resolve the matter, despite his involvement as an

accused party, is also contrary to well-accepted practices. Ms. Thomas explained that "the

investigation of Strickland's complaints lacked fundamental fairness" because the Defender was

allowed to "appoint" the investigator and "act[] as a 'decision maker' who had the authority to

approve or disapprove any proposed resolution." Tr. Ex. 59, at 16 (ECF No. 248-17 at 17); Tr.

Ex. 108, at 182 (PLT4908).

            100.     Defendants admit that Plaintiff took sick leave on August 10 and August 13-17,

and that the Defender later authorized the sick leave to be converted to administrative leave to

avoid depleting Plaintiff's sick leave balance. Tr. Ex. 4, at ¶ 212 (ECF No. 210, Am. Answer ¶

212).

### 3. The Defender emails Plaintiff, with the Circuit Executive and Investigator copied, and contradicts his representations about their August 9, 2018 agreement.

101.  A full week later, on August 17, 2018, the Defender emailed Plaintiff, copying the Circuit Executive and a Human Resources Specialist ("HR Specialist") employed by the district court. Tr. Ex. 4, at ¶ 213 (ECF No. 210, Am. Answer ¶ 213).

102.  Defendants admit that the Defender's August 17, 2018, email to Plaintiff stated in part: "I have instructed our Administrative Officer William Moorman to start the process to make you an Assistant Federal Defender. As I indicated to you at our meeting, Josh and Bill spoke with Todd Watson, who advised that it was to the office's advantage to reclassify Research & Writing Specialists to AFD positions for purposes of case weight measurement." Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents. Tr. Ex. 4, at ¶ 215 (ECF No. 210, Am. Answer ¶ 215); Tr. Ex. 12 at US1261–62 (ECF No. 248-5 at 28–29).

102a.  The Defender's email thus explicitly admitted that Plaintiff's "reclassification" to an assistant federal public defender was in title only, "for purposes of case weight measurement," and did not involve consideration for progression in pay or job duties. Tr. Ex. 7 at US105 (ECF No. 248-2 at 53); Tr. Ex. 12 at US1261–62 (ECF No. 248-5 at 28–29). Despite having the title of AFD "for purposes of case weight measurement," Plaintiff was no longer "on th[e] path" to an AFD position with her own caseload, as she had been before she raised complaints about the First Assistant. Tr. Ex. 16 at 103 (ECF No. 255-4 at 42). Indeed, the EDR Investigator later found in her report that "Caryn's duties remained the same, although with a different title." Tr. Ex. 12 at US1245 (ECF No. 248-5 at 12).

116

102b.   Plaintiff was not considered for any salary increase as part of the "reclassification," despite being eligible for a grade-level promotion.  *See* Tr. Ex. 10 at 9–10 (ECF No. 248-4 at 10–11) ("Defendants admit that Plaintiff would have been eligible for a grade-level promotion to FD-15 on or about August 21, 2018 and that all grade-level promotions are awarded at the discretion of the Federal Defender.").

102c.   In a sworn declaration filed in this proceeding, the Defender falsely stated that he had no "discretion" to raise Plaintiff's pay.  ECF No. 245-4, ¶ 33; *see* Tr. Ex. 10 at 10 (ECF No. 248-4 at 11) (stating that "all grade-level promotions are awarded at the discretion of the Federal Defender"). Defendants were forced to admit during this litigation that the Defender's assertions in his sworn declaration were false, as they admitted that Plaintiff not only "would have been eligible for a grade-level promotion," but also that "all grade-level promotions are awarded at the discretion of the Federal Defender."  Tr. Ex. 10 at 10 (ECF No. 248-4 at 11). Incredibly, the Defender even asserted in his sworn declaration, contrary to Defendants' admissions in this litigation, that he would have been required to *reduce* Plaintiff's pay upon reclassification to an AFD position if he had not invoked the "'Red Circle Rule in the DOCs Manual" to maintain her pay."  ECF No. 245-4, ¶ 31.  This assertion is patently false.  At the time of Plaintiff's "reclassification," her salary was $107,319.00.  She was reclassified to AD-28 on the pay scale for AFDs, which had a maximum starting salary of $134,659.  Tr. Ex. 12 at US1309 (ECF No. 248-5 at 76) ("Assistant Federal Public Defender is placed in AD Level 28"); Tr. Ex. 12 at US1311 (ECF No. 248-5 at 78) (maximum starting salary for AD-28 is $134,259); *see also* Decl. William Moormann, ECF No. 245-2, at 67 ("Should be Set at AD level 28 To be set at AD 28 Salery should remain $107,319" [sic]).  Thus, not only would it have been possible

117

to raise Plaintiff's pay, but the promotion she had requested to $122,163, the equivalent of Grade 15 on the JSP pay scale, would have been well within that range. *See* OPM GS Salary Table (2018), *available at* https://tinyurl.com/bdz7ec8a. Moreover, even if the AD-28 grade had been capped at a lower salary, the Defender had discretion to promote Plaintiff to a Grade 15 prior to reclassifying her under the judiciary's "Highest Previous Rate" policy, which allows a starting salary to be set "higher than the maximum of the applicable starting salary range if necessary to match the salary . . . the AFD previously earned as an employee of any federal government entity or any FDO." Decl. Anthony Martinez, ECF No. 245-4, at 24, 26. This policy exists to prevent precisely the nonsensical result the Defender claimed in his sworn declaration would be required here, *i.e.*, that Plaintiff's salary would have to be *reduced* in order to reclassify her to an AFD position. *See* ECF No. 245-4, ¶ 33 ("Without the Red Circle Rule, Plaintiff would have had to take a pay cut to become an AFD.").

102d. Likewise, the First Assistant and Administrative Officer made patently false assertions regarding Plaintiff's salary, including in their sworn declarations filed with this Court, that are easily disproven with a cursory glance at the relevant pay scales. In his *quid pro quo* "Mas Dinero" email, the First Assistant claimed that Plaintiff was "shooting high" with a promotion to GS15 because "you'll need 5 more years of fed service to qualify." *Supra* ¶ 82. This assertion was false. In fact, Plaintiff was at Grade 14 and would qualify for Grade 15 in less than three months, as Defendants admitted during this litigation. Tr. Ex. 10 at 9–10 (ECF No. 248-4 at 10–11) ("Defendants admit that Plaintiff would have been eligible for a grade-level promotion to FD-15 on or about August 21, 2018."). Plaintiff's eligibility for a promotion to Grade 15 after one year of service at Grade 14 would have been clear from a review of the pay

118

scale for research and writing attorneys in the DOCS Manual, which includes the following

chart:

**E. SALARY AND EXPERIENCE SCALE**

| DOCS Grade Level | Years of General Experience | Years of Specialized Experience | Total Years of Experience |
|---|---|---|---|
| 9 | 3 | 2 | 5 |
| 11 | 3 | 3 | 6 |
| 12 | 3 | 4 | 7 |
| 13 | 3 | 5 | 8 |
| 14 | 3 | 6 | 9 |
| 15 | 3 | 7 | 10 |

Tr. Ex. 54 at US4973 (ECF No. 248-15 at 57); *see* Tr. Ex. 54 at US4973 (ECF No. 248-15 at 57)

(stating that "[o]ne year of the required experience must have been at, or equivalent to, the next

lower grade in federal service"). Similarly, the Administrative Officer falsely stated in his sworn

declaration that "10 years of experience in the federal GS system is required to eligible for

promotion to GS-15" and that "Plaintiff had slightly less than 4 years" of relevant employment

experience. ECF No. 245-2, ¶ 16. Both of these statements are patently false, as confirmed by

Defendants' own admission during this litigation that Plaintiff *was* eligible for promotion to GS

15. In fact, as the DOCS Manual specifically explains, GS 15 requires ten years of "total"

experience, which includes experience working as a practicing attorney or judicial law clerk (*i.e.*,

specialized experience), and educational substitutions, which Plaintiff possessed due to her

advanced education and honors, including election to membership in Phi Beta Kappa. Tr. Ex. 54

at US4973–74 (ECF No. 248-15 at 57–58). The R&W pay scale is the same as the JSP pay scale

used to pay judicial law clerks who are serving federal judges, except that the pay scale is maxed

out at Grade 15 instead of Grade 14. *See* Tr. Ex. 54 at US4973–74 (ECF No. 248-15 at 57–58).

Moreover, in addition to possessing the years of relevant work experience, Plaintiff was eligible

for Grade 15 because she had served one year at the "next lower grade in federal service," *i.e.*, Grade 14. Tr. Ex. 54 at US4973 (ECF No. 248-15 at 57). These basic eligibility requirements are stated in explicit terms in the DOCs Manual. The patently false assertions of the Defender, First Assistant, and Administrative Officer, contrary to the basic terms of the FDO's own employment manual, demonstrates that their stated reasons for denying Plaintiff opportunities for advancement were blatantly false and pretextual. Moreover, based on these patently false statements, including in sworn declarations filed with this Court, the Defender, First Assistant, and Administrative Officer are lacking in credibility and should be disbelieved.

102e.   Confirming his discriminatory intent, the Defender even went to lengths to backdate the "reclassification" to *the day before* Plaintiff qualified for the promotion. Tr. Ex. 53 at US3411 (ECF No. 248-15 at 47) (request for personnel action dated August 28, 2018 but with an effective date of "August 20, 2018," that is, one day before Plaintiff became eligible for the promotion on August 21, 2018).

102f.   As part of the "reclassification," the Defender also attempted to remove Plaintiff's locality pay and reduce her salary by nearly 15 percent. Indeed, the request for personnel action submitted by the Defender requests that Plaintiff's salary be reduced from $107,319.00 to $92,349.00 by eliminating her locality pay. Tr. Ex. 53 at US3411 (ECF No. 248-15 at 47).

102g.   Contrary to the job description for an AFD position, which requires the attorney to carry her own caseload, the Defender required Plaintiff to continue serving in a research-and-writing support role. *See* Tr. Ex. 4, at ¶ 244 (ECF No. 210, Am. Answer ¶ 244) ("Defendants admit that Plaintiff provided support to attorneys in the office generally, which

included attorneys in the trial unit headed by the First Assistant."); *compare* Tr. Ex. 7 at US88 (ECF No. 248-2 at 36) (office chart placing Plaintiff in research and writing role), *with* Tr. Ex. 54 at US4968–73 (ECF No. 248-15 at 52–58 ) (stating that AFD "provides every aspect of legal representation," whereas "[t]he Research and Writing Specialist provides advanced research and writing services to assistant federal defender (AFD) staff").

102h.   The Defender's conduct in denying Plaintiff a promotion for which she was eligible is part of a pattern of discriminating and retaliating against female attorneys in the FDO.  For example, ███████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████. Ex. 58 at US5385–89 (ECF No. 248-16 at 7–11).  ████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

██████████   Tr. Ex. 58 at US5385–89 (ECF No. 248-16 at 7–11).  Similarly, ███████

████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████  Tr. Ex. 58 at US7449 (ECF No. 248-16 at 13).  ███████████████████████

███████████████████████████████████████████

█████████████████████████   Tr. Ex. 58 at US7443 (ECF No. 248-16 at 31).

121

Likewise,  Tr. Ex. 58 at US7542 (ECF No. 248-16 at 52).

Tr. Ex. 58 at US7542 (ECF No. 248-16 at 52).

Tr. Ex. 58 at US7542 (ECF No. 248-16 at 52).

Tr. Ex. 58 at US7542 (ECF No. 248-16 at 52).

102i.     As Plaintiff's workplace investigations expert, Ms. Thomas, explained, "Martinez also 'reclassified' Strickland's position to an Assistant Federal Public Defender, yet she did not receive a salary increase and would be providing research and writing support to other attorneys." Tr. Ex. 59, at 22 (ECF No. 248-17 at 23); Tr. Ex. 108, at 188 (PLT4914). This evidence contributed to Ms. Thomas's conclusion that "Defendants Failed to Protect Strickland from Retaliation." Tr. Ex. 59, at 21 (ECF No. 248-17 at 22); Tr. Ex. 108, at 188 (PLT4913).

103.     Defendants admit that the Defender's August 17, 2018 email to Plaintiff stated in part: "At our meeting I never agreed to allow you to work exclusively on appeals. I advised you I personally had no problem with it but had to clear it through Appellate Chief Josh Carpenter. If I were to allow you to only work on appeals, it would leave me with only one Research & Writing Specialist to support nine trial attorneys. After discussion with Josh about this request, we determined this is not doable and l will not agree to have you do appeals exclusively." Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents. Tr. Ex. 4, at ¶ 216 (ECF No. 210, Am. Answer ¶ 216); Tr. Ex. 12 at US1261–62 (ECF No. 248-5 at 28–29).

122

103a.   The Defender's email contradicts his prior statements to Plaintiff agreeing that it was "necessary" to transfer Plaintiff to appeals to remove her from the First Assistant's supervision, and that he would consult with the Appellate Chief as a "courtesy." *Supra*, ¶ 94.

103b.   In fact, the FDO had an open position in appeals.  Tr. Ex. 29 at US7413 (ECF No. 248-14 at 34) ("Appeal FTE is 2.75 (but have been surviving with 1.75 FTE))"; Tr. Ex. 31 at US6234 (ECF No. 248-14 at 54) (office "needed more appellate support").  The Defender had several options for accommodating Plaintiff's concerns while meeting the needs of the office, including (1) transferring Plaintiff to a full-time appeals position, (2) offering Plaintiff a position primarily in appeals that would involve separating her from the First Assistant, and (3) offering Plaintiff a transition to a full-time research and writing position in Asheville within the next year.[5]  All of these options had been discussed by the management team, including the Appellate Chief, in recent emails and meetings.  *See supra*, ¶ 68b.  The Appellate Chief confirmed that "we need basically one FTE of appeals/post-conviction work, so there are a lot of ways to get there."  Tr. Ex. BF, at US4155.  Offering these options would have allowed the Defender to potentially resolve the matter through an "informal settlement agreement" as recommended by the FEOO.  Yet, instead of offering Plaintiff any of these options, the Defender inaccurately made a blanket statement, with the EDR Coordinator and Investigator copied on the email, that accommodating Plaintiff's requests was not "doable."  Moreover, the Defender's statement that transferring Plaintiff to appeals "would leave me with only one Research &

---

[5] Indeed, there may have even been a fourth potential option: offer Plaintiff a part-time position working exclusively in appeals, similar to another Assistant Federal Public Defender in the FDO's appellate unit.  Tr. Ex. 10 at 17 (ECF No. 248-4 at 18) (Defendant's interrogatory response stating that during Plaintiff's employment, attorney Ann Hester was a "part time employee" and "classified as a .75 FTE employee").

Writing Specialist to support nine trial attorneys" was not true, as the FDO was in the process of hiring another attorney who could provide research and writing support to the trial unit. In fact, the Appellate Chief contemplated that the new attorney could provide a "30/70" split in favor of trial support. Tr. Ex. BF, at US4155.

103c. Thus, the Defender required Plaintiff to continue working for the trial unit supervised by the First Assistant, even though accommodations were possible so that she would not have to continue working for him. *See* Tr. Ex. 4, at ¶ 244 (ECF No. 210, Am. Answer ¶ 244) ("Defendants admit that Plaintiff provided support to attorneys in the office generally, which included attorneys in the trial unit headed by the First Assistant."); Tr. Ex. 7 at US105 (ECF No. 248-2 at 53); Tr. Ex. 10 at 3 (ECF No. 248-4 at 4) (Defendants' admission that the First Assistant had "supervisory responsibilities" over the FDO's trial unit). The FEOO testified that removing Plaintiff completely from the First Assistant's chain of command was essential to resolving her complaint, as "simply moving offices" would not "have solved if the problem . . . if J.P. was still in control and overseeing her." Tr. Ex. 20 at 167–68 (ECF No. 255-14 at 167–68). The FEOO explained: "In my mind, that employee/employer or manager relationship needed to be broken, and she needed to report to someone else." Tr. Ex. 20 at 168 (ECF No. 255-14 at 168). Likewise, Plaintiff's workplace investigations expert, Ms. Thomas, explained that because Defendants "did not grant Strickland's request to report to a different supervisor," "[c]learly, Defendants did not meet their obligation to protect Strickland from retaliation." Tr. Ex. 59 at 23 (ECF No. 248-17 at 24); Tr. Ex. 108, at 189 (PLT4915).

104. Finally, the Defender informed her that he had reported her sexual harassment allegation to the Circuit Executive, who had promptly informed the Chief Judge. The Defender

cited Plaintiff's August 10, 2018 email as the basis for making a report. Tr. Ex. 4, at ¶ 217 (ECF No. 210, Am. Answer ¶ 217).

104a.    The Defender's representation to Fourth Circuit officials that he became aware of Plaintiff's complaint on August 10, 2018 was false. As discussed above, the Defender was aware of potential "harassment by JP" by July 2, 2018. Tr. Ex. 45 at US3985 (ECF No. 248-15 at 23). The Defender testified at his deposition that he was "concerned" as of July 2, 2018 about whether Plaintiff was alleging sexual harassment and "wanted to check it out." Tr. Ex. 16 at 112, 149, 152–154, 158–59, 187–88 (ECF No. 255-14 at 43, 61, 63–65, 69–70, 86–87). The Chief Judge's Letter of Reprimand stated that the Defender had made Plaintiff "feel 'uncomfortable' and 'intimidated'" at the July 5, 2018 meeting because he made her "confront the person she accused of sexually harassing her." Tr. Ex. 15 at US4265 (ECF No. 254-4 at 3). Further, the Defender had been contacted by AO officials prior to August 10, 2018 because of his failure to take appropriate action on Plaintiff's complaints. *See, e.g.*, *supra*, ¶ 85a (AO officials had concerns "that Mr. Martinez sat Mr. Davis down in a room with Caryn and said something like, well, let's try to work this out, or, you, let's have you two work this out").

105.    The Defender stated that *both* he and the HR Specialist would meet with Plaintiff to "advise" her of her "rights" under the EDR Plan. Tr. Ex. 4, at ¶ 218 (ECF No. 210, Am. Answer ¶ 218).

106.    Defendants admit that the Defender's August 17, 2018, email to Plaintiff stated in part: "I will allow you to telework temporarily during the pendency of this investigation. This is not a permanent solution. I am reserving the right to request your return to your duty station in

125

Charlotte subject to and upon completion of this investigation." Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents. Tr. Ex. 4, at ¶ 219 (ECF No. 210, Am. Answer ¶ 219); Tr. Ex. 12 at US1261–62 (ECF No. 248-5 at 28–29).

106a. The Defender claimed there was no office space in Asheville, but a few months later, he began advertising positions for an intern and a paralegal to work in Asheville. *See* Tr. Ex. 12 at US1251 (ECF No. 248-5 at 18). Indeed, the EDR Investigator later explained that there is "a visiting managers office in Asheville" used by other Charlotte-based employees on occasional travel, and "[t]here has also been an advertisement for a summer intern in the Asheville office" that may require setting up a "cubicle." Tr. Ex. 12 at US1251 (ECF No. 248-5 at 18). While noting that accommodations had been made for other employees in the Asheville office, including a "cubicle" for a "summer intern," the EDR Investigator failed to explain why office space or a "cubicle" could not be offered to Plaintiff. Tr. Ex. 12 at US1251 (ECF No. 248-5 at 18). Indeed, the FEOO was "skeptical" of the Defender's claim that he had no office space, as she had seen that claim "used as an excuse previously in many other cases." Tr. Ex. 20 at 95–96 (ECF No. 255-14 at 95–96) ("Often in federal buildings, there are multiple federal employees and multiple federal positions, and I just -- that made me skeptical."). In fact, just a few weeks earlier, in July 2018, the FDO's management team had discussed the office's "full-time need for AVL [Asheville] R&W" within the next year "or so." Tr. Ex. 29 at US7414 (ECF No. 248-14 at 35). Presumably, a "full-time need for AVL R&W" in the near future would require office space to fill that need. Tr. Ex. 29 at US7414 (ECF No. 248-14 at 35).

106b. The Defender's comments confirmed that he had prejudged the outcome of the EDR investigation by refusing a transfer, a remedy that Plaintiff could have requested. As

126

Plaintiff's workplace investigations expert, Ms. Thomas, explained: "At no time did anyone in a position of authority in the FDO take steps to protect Strickland from retaliation. Defendants did not agree to the most straightforward way of protecting her: transferring her to the Asheville location as she had requested." Tr. Ex. 59 at 22–23 (ECF No. 248-17 at 23–24); Tr. Ex. 108, at 188–89 (PLT4914–15).

107. Defendants admit that the Defender contacted the Circuit Executive during the week following August 10, 2018. Tr. Ex. 4, at ¶ 224 (ECF No. 210, Am. Answer ¶ 224).

107a. The Defender was also receiving legal advice from the AO's Office of General Counsel at this time, even though OGC also advised the Fourth Circuit officials who responsible for investigating and adjudicating Plaintiff's complaint. As the FEOO explained: "The civil rights office is supposed to be completely independent from the defensive branch of the agency, the Office of General Counsel." Tr. Ex. 20 at 23 (ECF No. 255-14 at 23). That is because "[t]he AO and its managers are represented by the Office of General Counsel with the specific goal of avoiding future liability." Tr. Ex. 20 at 149 (ECF No. 255-14 at 149). By contrast, the FEOO's office was "in the position of giving—among other duties, giving neutral advice to both managers and employees about workplace discrimination, harassment, and the other civil rights laws." Tr. Ex. 20 at 149 (ECF No. 255-14 at 149). In short, the FEOO would be looking at a claim "from the perspective of a civil rights neutral," whereas "[t]he Office of General Counsel would be looking at it as a – as a defense counsel for a manager." Tr. Ex. 20 at 20 (ECF No. 255-14 at 20). In this case, the FEOO testified, "I believe that Tony and J.P. were having conversations with the Office of General Counsel," because "typically what would have happened is if the general counsel's office were concerned about an employment

127

situation, they would contact the managers involved." Tr. Ex. 20 at 64–65 (ECF No. 255-14 at 64–65). Likewise, General Counsel Sheryl Walter submitted a declaration in this litigation stating that OGC was "the sole AO office responsible for advising Plaintiff's **employer** of its legal rights and responsibilities." ECF No. 94-7, ¶ 3.

107b. The AO's General Counsel, the head of "the sole AO office responsible for advising Plaintiff's employer of its legal rights and responsibilities" in relation to Plaintiff's EDR proceeding, ECF No. 94-7, ¶ 3 (Walter Decl.), was also advising the EDR presiding officer and EDR Coordinator in relation to Plaintiff's EDR proceeding, even though the EDR presiding officer and EDR Coordinator must be neutral parties and their interests are not the same as the respondent-employing office. *See* ECF No. 245-16, ¶ 24 (EDR Coordinator's declaration stating: "Where the EDR Plan was vague, ambiguous, or silent, I exercised due diligence by relying on available resources, such as the Administrative Office of the United States Court's Office of the General Counsel, in assisting me interpret and administer the EDR Plan in a fair and consistent manner.").

107c. OGC's role in advising both the officials responsible for handling Plaintiff's complaint and the individuals accused of wrongful conduct presented potential and actual conflicts of interest. These conflicts of interest concretely undermined the fairness of Plaintiff's EDR proceeding, including by influencing the decisions not to disqualify the accused Defender from acting as a decisionmaker, not to release the EDR investigation report to the parties to coerce Strickland to "informally" resolve the complaint, and to deliberately delay taking disciplinary action. Compounding the conflict of interest, OGC also treated the interests of the accused Defender, in his individual capacity, as being one and the same as the interests of

128

the respondent-employing office, contrary to EDR guidance. *Compare* Walter Decl. ¶ 14

(claiming that disqualifying a unit executive accused of misconduct would be "unfair to the

Respondent-employing office"), *with* Tr. Ex. 69 at 67 (EDR Interpretive Guide & Handbook

(Jan. 2020), ECF No. 250-13) ("[I]f the Complainant alleges that the Unit Executive sexually

harassed her, the personal interests of the Unit Executive likely conflict with the Employing

Office's interests, and someone other than the Unit Executive should likely act on behalf of the

Respondent Employing Office.").

**U.** **The Defender facilitates and ratifies the First Assistant's quid pro quo harassment, "with the approval of the court."**

108.    In August 2018, the hiring committee conducted interviews for the appellate

attorney position. Plaintiff was not invited to interview. Tr. Ex. 4, at ¶ 236 (ECF No. 210, Am.

Answer ¶ 236).

109.    Defendants admit that Plaintiff's position was reclassified to an Assistant Federal

Public Defender. Tr. Ex. 4, at ¶ 239 (ECF No. 210, Am. Answer ¶ 239).

110.    Defendants admit that the Form AO 52 used in connection with the

reclassification of Plaintiff's position stated in part, "This request is submitted with the approval

of the court[.]" Defendants respectfully refer the Court to the document for a full and accurate

statement of its contents. Tr. Ex. 4, at ¶ 240 (ECF No. 210, Am. Answer ¶ 240); Tr. Ex. 53 at

US3411 (ECF No. 248-15 at 47).

111.    Defendants admit that Plaintiff was not considered for an increase in salary or job

responsibilities. Defendants admit that Plaintiff did not receive a formal performance evaluation

or a performance plan with benchmarks for advancement. In fact, Plaintiff was never given a

formal performance review the entire time she was employed at the FDO.  Tr. Ex. 4, at ¶ 242

(ECF No. 210, Am. Answer ¶ 242).

112.    Defendants admit that the Defender's August 17, 2018, email to Plaintiff stated in

part: "I have instructed our Administrative Officer William Moorman to start the process to

make you an Assistant Federal Defender.  As I indicated to you at our meeting, Josh and Bill

spoke with Todd Watson, who advised that it was to the office's advantage to reclassify

Research & Writing Specialists to AFD positions for purposes of case weight measurement."

Defendants respectfully refer the Court to the email for a complete and accurate statement of its

contents.  At the same time the Defender "reclassified" Plaintiff, he also "reclassified" the FDO's

other remaining research and writing attorney.  Tr. Ex. 4, at ¶ 243 (ECF No. 210, Am. Answer ¶

243); Tr. Ex. 12 at US1261–62 (ECF No. 248-5  at 28–29).

113.    Defendants admit that Plaintiff provided support to attorneys in the office

generally, which included attorneys in the trial unit headed by the First Assistant.  Tr. Ex. 4, at ¶

244 (ECF No. 210, Am. Answer ¶ 244).

113a.   The undisputed record confirms that the Defender acted with deliberate

indifference motivated by discriminatory intent, as summarized in the following passage of the

Court's summary judgment opinion:

> [T]he Defender facilitated and ratified the First Assistant's quid pro
> quo harassment by diminishing Plaintiff's job duties and refusing to
> consider her for the grade-level promotion that was the subject of
> the First Assistant's "Mas Dinero" email, for which she was eligible
> on her work anniversary date. *See* Ex. C, at 9 (admission that
> Plaintiff "was eligible for a grade-level promotion"). In a sworn
> declaration filed in this proceeding, the Defender falsely stated that
> he had no "discretion" to raise Plaintiff's pay. ECF No. 78-3, ¶ 33;
> *see* Ex. C, at 10 (stating that "all grade-level promotions are awarded
> at the discretion of the Federal Defender"). The Defender gave

130

Plaintiff a "reclassification" to AFD in title only, which he stated was "for purposes of case weight measurement." Ex. A, at 52. The Defender even backdated the reclassification to the day before Plaintiff qualified for the promotion. Ex. N, at 46. As part of the "reclassification," the Defender also attempted to remove Plaintiff's locality pay and reduce her salary by nearly 15 percent. Id. Contrary to the job description for an AFD position, which requires the attorney to carry her own caseload, the Defender required Plaintiff to continue serving in a research-and-writing support role. *Compare* Ex. A, at 52, *with* Ex. N, at 51–57.

The Defender told Plaintiff that he could not transfer her exclusively to appeals, even though he had an open position. Ex. M, at 33 ("Appeal FTE is 2.75 (but have been surviving with 1.75 FTE))"; id. at 53 (office "needed more appellate support"). Thus, the Defender required her to continue working for the trial unit supervised by the First Assistant. *See* Ex. A, at 52; Ex. C, at 3. The Defender also refused a transfer to the Asheville division office. See id. The Defender claimed there was no office space, but a few months later, he began advertising positions for an intern and a paralegal to work in Asheville. *See* Ex. D, at 17; *see also* Ex. I, at 95 (FEOO had seen lack of office space "used as an excuse previously in many other cases"). Because of the Defender's continued failure to address the harassment, Plaintiff did not feel safe in the office and requested to work remotely. Ex. A, at 51; see Ex. I, at 94–95. . . .  The Defender, however, became furious when he learned that Plaintiff had reported her allegations of wrongful conduct to the AO. He "called her out on contacting the AO to receive guidance on her civil rights as a federal employee." Ex. D, at 81. The Defender berated Plaintiff for going to "some other party" and stated that he was being "blamed" and "attacked" for something that was not his "fault." Ex. A, at 30. The Defender minimized the harassment, stating words to the effect that, "at least you weren't touched." Ex. D, at 81.

July 25, 2023 Memorandum and Order (ECF No. 258, at 6–7 (quoting ECF No. 248-1, at 7–8)).

131

## V.     The First Assistant continues harassing Plaintiff and interfering with her job duties even after the "investigation" is opened into his conduct.

114.     Defendants admit that on August 31, 2018, the First Assistant used the reply-all function and thereby copied Plaintiff on an email to a client.  Tr. Ex. 4, at ¶ 253 (ECF No. 210, Am. Answer ¶ 253); Tr. Ex. 7 at US108 (ECF No. 248-2 at 56).

114a.   Plaintiff later described the First Assistant's disturbing conduct to Fourth Circuit officials, and the effect that it had on her:

> In another instance, after Ms. Strickland had been placed on telework, Mr. Davis copied Ms. Strickland on an email to a client in which he referenced numerous words and phrases from her law review article "Against Design."  Exhibit Q (Email Dated August 31, 2018).  These references were entirely nonsensical and inappropriate in the context of a client email, and Ms. Strickland believed Mr. Davis included them because he knew she was the only one who would understand them.  Ms. Strickland found Mr. Davis's email disturbing and believed it showed his continued obsession with her.

 Tr. Ex. 7 at US86 (ECF No. 248-2 at 34).

114b.   Specifically, in response to a client's complaint about feeling "in the dark" because of the First Assistant's failure to keep in contact before an upcoming court date, the First Assistant sent the following email:

> Apologies for being out of pocket and unavailable; it was not by design.  One begins to feel like the Red Queen from Lewis Carroll, running eternally just to stay in the same place.  Not an excuse – just a sentiment I know you'll understand.
>
> Let's talk Tuesday at 10, you can call my cell.  I've also asked Jim to be available to you.  It's hard to prestate what the future will look like, so you should always feel free to reach out to Claudia – or Lisa, or anyone else on the team, for that matter.  Everyone is still on board to help if asked, and that might be a lot easier than trying to pin me down.

132

Tr. Ex. 7 at US108 (ECF No. 248-2 at 56).  Plaintiff's law review article "Against Design" is about constitutional theory and is completely unrelated to client representation in the FDO. Caryn Devins et al, *Against Design*, 47 Ariz. St. L.J. 609 (2015).  Her article invokes the Red Queen metaphor, stating, by way of example: "This behavior accords with the Red Queen phenomenon, 'an unceasing evolutionary process in which all species continue to change . . . faster and faster in order to maintain the same relative fitness.'"  *Id.* at 669.  Plaintiff's article also contends that "institutions are adaptive functional wholes that change in unpredictable and unprestateable ways," explaining, by way of example: "The law constrains, but in doing so it also enables. . . .  The unprestatability of future possibilities enables creative evolutionary change . . . .".  *Id.* at 623.  A reasonable person would conclude that the First Assistant sent this email nonsensically invoking Plaintiff's "Against Design" article solely to harass Plaintiff, despite its blatant inappropriateness and negative effect on the quality of client representation.

W.    **The EDR Coordinator tells Plaintiff that the General Counsel has provided special instructions for handling her complaint.**

115.    On September 5, 2018, Plaintiff spoke to the Circuit Executive by telephone in his capacity as EDR Coordinator.  Tr. Ex. 1, at ¶ 257 (ECF No. 1, Complaint ¶ 257).  Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made.  Tr. Ex. 4, at ¶ 257 (ECF No. 210, Am. Answer ¶ 257); *see generally* Tr. Ex. 57 (ECF No. 255-11); ECF No. 245-39 (Ex. 38).

116.    He explained that the HR Specialist would be investigating her complaints, and that although there were no hard or fast deadlines, the investigation would be done "promptly." Tr. Ex. 1, at ¶ 258 (ECF No. 1, Complaint ¶ 258).  Defendants admit that the EDR Coordinator

133

had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made. Tr. Ex. 4, at ¶ 258 (ECF No. 210, Am. Answer ¶ 258); Tr. Ex. 57 at US7671 (ECF No. 255-5 at 9); ECF No. 245-39 (Ex. 38) at US7671.

117.    Plaintiff asked the EDR Coordinator to clarify the scope of the investigation he had opened. He told Plaintiff that the investigation would cover her allegations of sexual harassment against the First Assistant.  Tr. Ex. 1, at ¶ 259 (ECF No. 1, Complaint ¶ 259). Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made.  Tr. Ex. 4, at ¶ 259 (ECF No. 210, Am. Answer ¶ 259); Tr. Ex. 117 (180905_1042 Audio File); ECF No. 245-39 (Ex. 38) at US7625–26 (Defendants' Transcript).

118.    Plaintiff informed him that her allegations were *not* just sexual harassment by one person, and included acts of retaliation as well.  She told him that she planned to name the Defender as a violator of the EDR Plan.  Tr. Ex. 1, at ¶ 260 (ECF No. 1, Complaint ¶ 260). Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made.  Tr. Ex. 4, at ¶ 260 (ECF No. 210, Am. Answer ¶ 260); Tr. Ex. 117 (180905_1042 Audio File); ECF No. 245-39 (Ex. 38) at US7625–27 (Defendants' Transcript).

119.     Plaintiff told the EDR Coordinator that the Defender was not being truthful when he said that he only learned of her sexual harassment allegations from her August 10, 2018 email.  She explained that, in fact, she had been trying to work with the Defender to resolve her complaints, but he had escalated the situation and failed to protect her.  Tr. Ex. 1, at ¶ 261 (ECF No. 1, Complaint ¶ 261).  Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made.  Tr. Ex. 4, at ¶ 261 (ECF No. 210, Am. Answer ¶ 261); Tr. Ex. 117 (180905_1042 Audio File); ECF No. 245-39 (Ex. 38) at US7625–29, US7640–42, US7650–52 (Defendants' Transcript).

120.     She emphasized that she *wanted* an investigation, but she was very concerned about the Defender's role in the process given that he had violated her rights.  Tr. Ex. 1, at ¶ 262 (ECF No. 1, Complaint ¶ 262).  Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made.  Tr. Ex. 4, at ¶ 262 (ECF No. 210, Am. Answer ¶ 262); Tr. Ex. 117 (180905_1042 Audio File); ECF No. 245-39 (Ex. 38) at US7628–29, US7641–42 (Defendants' Transcript).

121.     Plaintiff also discussed with the EDR Coordinator her perception that the FDO was a highly troubled office.  Plaintiff explained that she had wanted to be a federal public defender since law school and truly had a passion for the work, but she was disturbed by what she had seen at the FDO.  Tr. Ex. 1, at ¶ 263 (ECF No. 1, Complaint ¶ 263).  Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record

135

of the statements made.  Tr. Ex. 4, at ¶ 263 (ECF No. 210, Am. Answer ¶ 263); Tr. Ex. 57 at US7647 (ECF No. 255-11 at 5); ECF No. 245-39 (Ex. 38) at US7647.

122.    The EDR Coordinator acknowledged that, before the Defender's hiring, there were a lot of "serious issues" in the FDO and the judges were "mindful" of the need to change the office culture.  He said that Plaintiff's concerns were "well-founded."  Tr. Ex. 1, at ¶ 264 (ECF No. 1, Complaint ¶ 264).  Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made.  Tr. Ex. 4, at ¶ 264 (ECF No. 210, Am. Answer ¶ 264); Tr. Ex. 57 at US7648–49 (ECF No. 255-11 at 6-7); ECF No. 245-39 (Ex. 38) at US7649–50.

123.    The EDR Coordinator told Plaintiff that he had discussed her concerns about the Defender with the General Counsel.  The General Counsel had suggested that he, rather than the Defender, "receive" the final investigation report.  He said that, although that step is "not in the process or plan," the Defender had agreed to let him receive the report.  Tr. Ex. 1, at ¶ 265 (ECF No. 1, Complaint ¶ 265).  Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made.  Tr. Ex. 4, at ¶ 265 (ECF No. 210, Am. Answer ¶ 265); Tr. Ex. 57 at US7654–55 (ECF No. 255-11 at 8-9); ECF No. 245-39 (Ex. 38) at US7654–55.

124.    The EDR Coordinator also told Plaintiff that it was not "helpful" for her to have reported her complaints to the AO.  He said that when that happens, "barriers go up," walls go

136

up, and people are "on guard." Tr. Ex. 1, at ¶ 266 (ECF No. 1, Complaint ¶ 266). Defendants

admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer

the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a

record of the statements made. Tr. Ex. 4, at ¶ 266 (ECF No. 210, Am. Answer ¶ 266); Tr. Ex. 57

at US7655–56 (ECF No. 255-11 at 9-10); ECF No. 245-39 (Ex. 38) at US7655–56.

125.    The EDR Coordinator's comments confirmed to Plaintiff that multiple high-level

judiciary officials found it unacceptable that she had sought advice on her civil rights from the

FEOO. Even worse, the EDR Coordinator—the very person responsible for helping Plaintiff

preserve her protected rights—was openly criticizing her for exercising those rights. Tr. Ex. 1, at

¶ 267 (ECF No. 1, Complaint ¶ 267). Defendants admit that the EDR Coordinator had multiple

conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the

conversation referenced in this paragraph for a record of the statements made. Tr. Ex. 4, at ¶ 267

(ECF No. 210, Am. Answer ¶ 267); Tr. Ex. 57 at US7655–56 (ECF No. 255-11 at 9-10); ECF

No. 245-39 (Ex. 38) at US7655–56.

126.    Having been put on the defensive, Plaintiff explained that she reached out to the

FEOO because she was in a desperate situation where she was not being protected and she was

not being listened to. She noted that she had raised her complaints directly with the First

Assistant and the Defender, but these efforts had backfired. She was at a loss, though, trying to

understand why she needed to explain her actions at all. Tr. Ex. 1, at ¶ 268 (ECF No. 1,

Complaint ¶ 268). Defendants admit that the EDR Coordinator had multiple conversations with

Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation

referenced in this paragraph for a record of the statements made. Tr. Ex. 4, at ¶ 268 (ECF No.

137

210, Am. Answer ¶ 268); Tr. Ex. 117 (180905_1042 Audio File); ECF No. 245-39 (Ex. 38) at

US7657–61 (Defendants' Transcript).

127.     The EDR Coordinator repeatedly asked Plaintiff what she "want[ed]."  Tr. Ex. 1,

at ¶ 269 (ECF No. 1, Complaint ¶ 269).  Defendants admit that the EDR Coordinator had

multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio

recording of the conversation referenced in this paragraph for a record of the statements made.

Tr. Ex. 4, at ¶ 269 (ECF No. 210, Am. Answer ¶ 269); Tr. Ex. 117 (180905_1042 Audio File);

ECF No. 245-39 (Ex. 38) at US7663–65 (Defendants' Transcript).

128.     He explained that he had been involved in another EDR complaint against the

Defender's office.  Based on this experience, he said he believed that the Defender was "earnest"

and wanted the best for his employees.  These comments shocked Plaintiff, given what she had

just told him about the Defender's dishonesty and his failure to take her complaints seriously.

Tr. Ex. 1, at ¶ 270 (ECF No. 1, Complaint ¶ 270).  Defendants admit that the EDR Coordinator

had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio

recording of the conversation referenced in this paragraph for a record of the statements made.

Tr. Ex. 4, at ¶ 270 (ECF No. 210, Am. Answer ¶ 270); Tr. Ex. 117 (180905_1042 Audio File);

ECF No. 245-39 (Ex. 38) at US7662–64 (Defendants' Transcript).

129.     Plaintiff told the EDR Coordinator that she "wanted" two things: (1) a full and

fair investigation that included the full scope of her allegations, and (2) the opportunities for

professional advancement that she had before raising complaints about the First Assistant.  Tr.

Ex. 1, at ¶ 272 (ECF No. 1, Complaint ¶ 272).  Defendants admit that the EDR Coordinator had

multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio

recording of the conversation referenced in this paragraph for a record of the statements made. Tr. Ex. 4, at ¶ 272 (ECF No. 210, Am. Answer ¶ 272); Tr. Ex. 117 (180905_1042 Audio File); ECF No. 245-39 (Ex. 38) at US7665 (Defendants' Transcript).

X.    **Plaintiff files a report of wrongful conduct against the First Assistant and the Defender, and she requests to disqualify the Defender.**

130.    On September 10, 2018, Plaintiff filed a request for counseling and her own report of wrongful conduct, naming both the First Assistant and the Defender as alleged violators of the EDR Plan. Plaintiff alleged that she had been subjected to unlawful harassment, retaliation, and discrimination. She provided a separate five-page written narrative summarizing her complaints.  Tr. Ex. 4, at ¶ 274 (ECF No. 210, Am. Answer ¶ 274); Tr. Ex. 5 at US500–07 (ECF No. 248-2 at 2–9).

131.    Defendants admit that Plaintiff requested corrective action as follows: "[Plaintiff] request[s] to work in an environment free of harassment and retaliation. [Plaintiff] request[s] the opportunity for merit-based advancement, and any other appropriate relief."  Defendants respectfully refer the Court to the document for a complete and accurate statement of its contents.  Tr. Ex. 4, at ¶ 275 (ECF No. 210, Am. Answer ¶ 275); Tr. Ex. 5 at US500–07 (ECF No. 248-2 at 2–9).

132.    Defendants admit that Plaintiff requested to disqualify the Defender and respectfully refer the Court to Plaintiff's written request for a full and accurate statement of its contents.  Defendants further admit that Chapter X, Section 7 of the Plan provides that, "[a] party may seek disqualification of a judicial officer, employee or other person involved in a dispute by written request to the Chief Judge."  Defendants further admit that the definition of "employee" in Chapter I, Section 3 of the Plan includes the "unit executive and staff" of "Federal Public

139

Defenders within the Fourth Circuit." Tr. Ex. 4, at ¶ 276 (ECF No. 210, Am. Answer ¶ 276); Tr. Ex. 6 at US597–98 (ECF No. 248-2 at 10–11); Tr. Ex. 9 at US4540 (ECF No. 248-3 at 6).

132a. Plaintiff's request to disqualify the accused Defender from the EDR process was consistent with the judiciary's guidance, which states: "[I]f the Complainant alleges that the Unit Executive sexually harassed her, the personal interests of the Unit Executive likely conflict with the Employing Office's interests, and someone other than the Unit Executive should likely act on behalf of the Respondent Employing Office. Recall that the Model EDR Plan states that an alleged violator does not get a copy of the Complaint, only notice that a Complaint was filed and the nature of the allegations." Tr. Ex. 69 at 67 (EDR Interpretive Guide & Handbook (Jan. 2020), ECF No. 250-13) (quoting Plan § IV(C)(3)(e)(ii)). Further, "[a]n alleged violator, even a Unit Executive, is not a Party to the EDR matter." Tr. Ex. 69 at 91 (EDR Interpretive Guide & Handbook (Jan. 2020), ECF No. 250-13).

132b. As Plaintiff's workplace investigations expert, Ms. Thomas, explained, "Per the EEOC's Enforcement Guidance, the alleged wrongdoer should not have supervisory authority over the person conducting the investigation and should not have any direct or indirect control over the investigation." Tr. Ex. 59, at 16 (ECF No. 248-17 at 17); Tr. Ex. 108, at 182 (PLT4908).

133. Plaintiff argued that the Defender should be disqualified because he was an accused violator of her rights under the EDR Plan. Tr. Ex. 1, at ¶ 277 (ECF No. 1, Complaint ¶ 277). Defendants admit that Plaintiff requested to disqualify the Defender and respectfully refer the Court to Plaintiff's written request for a full and accurate statement of its contents. Tr. Ex. 4, at ¶ 277 (ECF No. 210, Am. Answer ¶ 277); Tr. Ex. 6, at US597–98 (ECF No. 248-2 at 10–11).

140

134.    Plaintiff also moved to stay the wrongful conduct investigation the Defender had initiated so that the scope of the investigation could be expanded to include her allegations of retaliation against the Defender.  Tr. Ex. 1, at ¶ 278 (ECF No. 1, Complaint ¶ 278).  Defendants admit that Plaintiff requested a stay of the wrongful conduct investigation and respectfully refer the Court to Plaintiff's written request for a full and accurate statement of its contents.  Tr. Ex. 4, at ¶ 278 (ECF No. 210, Am. Answer ¶ 278); Tr. Ex. 6, at US597–98 (ECF No. 248-2 at 10–11).

135.    Defendants admit that the Chief Judge was working to establish a Capital Habeas Unit that would be managed by the FDO.  Tr. Ex. 4, at ¶ 282 (ECF No. 210, Am. Answer ¶ 282).

135a.   As another AFPD explained, ███████████████████████████████ ████████████████████████████████████████ Tr. Ex. 58 at US7440 (ECF No. 248-16 at 28). ███████████████████████████████████ ████████████████████████████████████████████ ████████████████ Tr. Ex. 58 at US7446 (ECF No. 248-16 at 34).

135b.   These structural conflicts of interest would create an appearance of impropriety to a reasonable person regarding whether it would be possible for Fourth Circuit officials, who were actively working with Defender Martinez to establish a CHU in his office, to evaluate Plaintiff's complaints impartially.  Given the Defender's connections within the Fourth Circuit, Plaintiff faced not only losing her job, but also potentially more long-term career consequences, for having filed a complaint against him.

**Y.      The EDR Coordinator reiterates that the Defender should not be involved in making decisions on her complaint if he engaged in misconduct.**

136.    On September 18, 2018, Plaintiff met with the EDR Coordinator in person.  Tr. Ex. 4, at ¶ 284 (ECF No. 210, Am. Answer ¶ 284).

141

137.    The EDR Coordinator opened the meeting by emphasizing that the Chief Judge was "taken aback" by Plaintiff's request to disqualify the Defender because he wasn't "expecting it." Tr. Ex. 1, at ¶ 285 (ECF No. 1, Complaint ¶ 285).  Defendants admit that Plaintiff and the EDR Coordinator met on September 18, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made.  Tr. Ex. 4, at ¶ 285 (ECF No. 210, Am. Answer ¶ 285); Tr. Ex. 57 at US7695–96 (ECF No. 255-11 at 14–15).

138.    Plaintiff asked the EDR Coordinator about his appointment of the HR Specialist as the investigator.  Plaintiff asked if the Defender would be involved in administering the investigation, and whether he had already talked to the HR Specialist about her complaint.  Tr. Ex. 1, at ¶ 286 (ECF No. 1, Complaint ¶ 286).  Defendants admit that Plaintiff and the EDR Coordinator met on September 18, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made.  Tr. Ex. 4, at ¶ 286 (ECF No. 210, Am. Answer ¶ 286); Tr. Ex. 57 at US7696 (ECF No. 255-11 at 15).

139.    The EDR Coordinator admitted that the HR Specialist did not know about Plaintiff's allegations against the Defender, "because that was never part of the initial concern about sexual harassment" by the First Assistant. He reiterated that the HR Specialist would deliver the investigation report to him, instead of the Defender. Further, if the allegations against the Defender were substantiated, then the Chief Judge would need to "step in" as the Defender's "supervisor." Tr. Ex. 1, at ¶ 287 (ECF No. 1, Complaint ¶ 287).  Defendants admit that Plaintiff and the EDR Coordinator met on September 18, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made.  Tr. Ex. 4, at ¶ 287 (ECF No. 210, Am. Answer ¶ 287); Tr. Ex. 81 at US7696–98.

142

140. Plaintiff emphasized that this conflict of interest was exactly the issue she was getting at with her motion to disqualify the Defender. Tr. Ex. 1, at ¶ 288 (ECF No. 1, Complaint ¶ 288). Defendants admit that Plaintiff and the EDR Coordinator met on September 18, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made. Tr. Ex. 4, at ¶ 288 (ECF No. 210, Am. Answer ¶ 288); Tr. Ex. 81 at US7697.

141. The EDR Coordinator asked Plaintiff, again, what she wanted. He said that he believed the parties were "close" to agreeing, with the exception of a transfer because the Defender "physically doesn't have space." He claimed that the Defender had "physically" separated the First Assistant and Plaintiff by putting them "on opposite sides of the office." Tr. Ex. 1, at ¶ 289 (ECF No. 1, Complaint ¶ 289). Defendants admit that Plaintiff and the EDR Coordinator met on September 18, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made. Tr. Ex. 4, at ¶ 289 (ECF No. 210, Am. Answer ¶ 289); Tr. Ex. 81 at US7699–7700.

142. Plaintiff was shocked and angered by the EDR Coordinator's comments. She stressed that the Defender had never moved her office. Even if he had, Plaintiff was appalled by the suggestion that this was an adequate response to the complaints she had raised. Plaintiff told him that the Defender had acted in bad faith, and that his rejection of a transfer showed he had prejudged the investigation. Tr. Ex. 1, at ¶ 290 (ECF No. 1, Complaint ¶ 290). Defendants admit that Plaintiff and the EDR Coordinator met on September 18, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made. Tr. Ex. 4, at ¶ 290 (ECF No. 210, Am. Answer ¶ 290); Tr. Ex. 81 at US7699–7701.

143

143.    The EDR Coordinator acknowledged that it would be difficult for Plaintiff to return to the First Assistant's duty station.  Tr. Ex. 1, at ¶ 291 (ECF No. 1, Complaint ¶ 291). Defendants admit that Plaintiff and the EDR Coordinator met on September 18, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made.  Tr. Ex. 4, at ¶ 291 (ECF No. 210, Am. Answer ¶ 291); Tr. Ex. 81 at US7700.

144.    He added that Plaintiff's complaint was very troubling in terms of the sequence of events, "one thing after another," even after her concerns were brought to light.  Tr. Ex. 1, at ¶ 292 (ECF No. 1, Complaint  ¶ 292).  Defendants admit that Plaintiff and the EDR Coordinator met on September 18, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made.  Tr. Ex. 4, at ¶ 292 (ECF No. 210, Am. Answer ¶ 292); Tr. Ex. 81 at US7701.

145.    The EDR Coordinator asked Plaintiff, yet again, what she "want[ed]." She repeated what she had already requested: a working environment free of harassment and retaliation, the opportunity for merit-based advancement, and any other appropriate relief.  What she "wanted," in other words, was immediate and effective remedial action on her complaints. Tr. Ex. 1, at ¶ 293 (ECF No. 1, Complaint ¶ 293).  Defendants admit that Plaintiff and the EDR Coordinator met on September 18, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made.  Tr. Ex. 4, at ¶ 293 (ECF No. 210, Am. Answer ¶ 293); Tr. Ex. 81 at US7701–02.

146.    Plaintiff said she was "at a bit of a loss," stating words to the effect: "What I want is for it to be made right. I want to be safe. I want to be protected. I want the opportunity to stand on my own feet and advance on my own merit and to not be hindered or blocked from doing

144

that." Tr. Ex. 1, at ¶ 294 (ECF No. 1, Complaint ¶ 294). Defendants admit that Plaintiff and the EDR Coordinator met on September 18, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made. Tr. Ex. 4, at ¶ 294 (ECF No. 210, Am. Answer ¶ 294); Tr. Ex. 81 at US7702.

147. Plaintiff stressed that her limited caseload had been taken away after she reported the First Assistant's harassment. Tr. Ex. 1, at ¶ 295 (ECF No. 1, Complaint ¶ 295). Defendants admit that Plaintiff and the EDR Coordinator met on September 18, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made. Defendants admit that Plaintiff applied and was not interviewed for an appellate position. Tr. Ex. 4, at ¶ 295 (ECF No. 210, Am. Answer ¶ 295); Tr. Ex. 81 at US7702–03.

148. The EDR Coordinator expressed empathy for Plaintiff. He said that, based on Plaintiff not being invited to interview for the appellate position and being required to go back to the First Assistant's duty station, he could see how she would not feel valued or safe, and how she would not feel taken seriously career-wise and in her personal safety. He said words to the effect: "I'm sorry about that." Tr. Ex. 1, at ¶ 296 (ECF No. 1, Complaint ¶ 296). Defendants admit that Plaintiff and the EDR Coordinator met on September 18, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made. Tr. Ex. 4, at ¶ 296 (ECF No. 210, Am. Answer ¶ 296); Tr. Ex. 81 at US7704–06.

149. Moving forward, the EDR Coordinator said that he would send Plaintiff's report of wrongful conduct and request for counseling to the HR Specialist. She would conduct one, unified investigation for both proceedings. Tr. Ex. 1, at ¶ 297 (ECF No. 1, Complaint ¶ 297). Defendants admit that Plaintiff and the EDR Coordinator met on September 18, 2018 and

145

respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made. Tr. Ex. 4, at ¶ 297 (ECF No. 210, Am. Answer ¶ 297); Tr. Ex. 81 at US7706–09.

150. Plaintiff left the meeting concerned that the investigation would not be fair or impartial, but optimistic that the EDR Coordinator had at least *acknowledged* that it might not be appropriate for the Defender to be involved in resolving her complaint. Tr. Ex. 1, at ¶ 298 (ECF No. 1, Complaint ¶ 298). Defendants admit that Plaintiff and the EDR Coordinator met on September 18, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made. Tr. Ex. 4, at ¶ 298 (ECF No. 210, Am. Answer ¶ 298); Tr. Ex. 81 at US7696–98.

**Z. Despite the EDR Investigator's lack of training and grossly biased and unfair investigation, and interference by the Defender and the First Assistant, Plaintiff participates fully in the wrongful conduct investigation.**

151. On September 28, 2018, the EDR Coordinator confirmed in an email that the HR Specialist would "proceed with one, unified investigation into the Chapter IX report of wrongful conduct (allegation of sexual harassment by [the First Assistant]), and the alleged subsequent, related conduct by [the Defender]." Tr. Ex. 4, at ¶ 299 (ECF No. 210, Am. Answer ¶ 299); ECF No. 60-4 (Ex. C), at 6.[6]

151a. Despite the EDR Coordinator's suggestion that he "recus[e]" himself, the Defender was allowed to appoint the EDR Investigator. Tr. Ex. 46 at US616 (ECF No. 248-15 at 25). The Investigator, Heather Beam, testified that the Defender had "contacted" her because

---

[6] Cites to ECF No. 60 were incorporated by reference in the parties' joint pretrial memorandum. *See* ECF No. 259, at 109.

146

"[h]e had delegated me to be the EDR coordinator." Tr. Ex. 21 at 12 (ECF No. 248-11 at 5). As discussed above, the Investigator understood the EDR Coordinator's directions to mean that "I would investigate the allegations and bring my report to [the Defender]." Tr. Ex. 21 at 19 (ECF No. 248-11 at 6).

151b. The Investigator had never been trained in conducting workplace investigations and has never completed any other EDR investigation besides Plaintiff's. Tr. Ex. 21 at 12 (ECF No. 248-11 at 5) ("Q: Had you ever done an investigation like this before? A: No. This was my first one."). The Investigator testified that she was "given an overview of the EDR process," but she did not "recall" being given any guidance on how to investigate a complaint. Tr. Ex. 21 at 42 (ECF No. 248-11 at 9). Aside from a "template" investigation report from the judiciary's intranet site, the Investigator did not "recall" using any other resources to investigate Plaintiff's complaint. Tr. Ex. 21 at 43 (ECF No. 248-11 at 10).

151c. The Investigator was an HR Specialist in a "dual function . . . for the probation office and the District Court." Tr. Ex. 21 at 43 (ECF No. 248-11 at 10). The HR Investigator's first day in that dual function position was August 10, 2018. *Id.* The Investigator reported to the district court's Clerk of Court, Frank Johns, who was her "boss." Tr. Ex. 21 at 41 (ECF No. 248-11 at 8).

151d. Even though the Investigator testified that she did not "remember" any reason to include Mr. Johns on emails about Plaintiff's case, Tr. Ex. 21 at 41 (ECF No. 248-11 at 8), discovery revealed that the Investigator likely violated Plaintiff's confidentiality by communicating about her case with Mr. Johns. Following Plaintiff's EDR proceeding, Mr. Johns exchanged emails with the Investigator, mocking and disparaging Plaintiff after she

147

applied for other employment in the District Court for the Western District of North Carolina. Tr. Ex. 48 at US4025 (ECF No. 248-15 at 31) (email from Mr. Johns stating, "*YEA! That one is off the chess board!*" in reference to Plaintiff withdrawing her application to be a pro se law clerk, and response from Ms. Beam stating, "*Yep - I think she would have been a true pain in the you know what :)*" (emphasis added)).  These emails demonstrate that Mr. Johns and Ms. Beam engaged in the sort of hostile and retaliatory behavior in relation to job prospects that the judiciary has identified as a serious barrier to reporting workplace misconduct.  Mr. Johns and Ms. Beam also likely violated Plaintiff's confidentiality rights under the EDR Plan.  As Plaintiff's workplace investigations expert, Ms. Thomas, explained, the manner in which Ms. Beam conducted the investigation "raises questions about her impartiality," in part, because "after the investigation had concluded, Beam sent an email to Frank Johns, the Clerk Court, making fun of Strickland, a clear indication that Beam had a bias against her."  Tr. Ex. 59, at 18 (ECF No. 248-17 at 19); Tr. Ex. 108, at 184 (PLT4910).

151e.  Ms. Thomas concluded that "Defendants' Investigation of Plaintiff's Internal Complaint was not Consistent with Well-Accepted HR Practices."  Ms. Thomas explained that "there are well-developed standards in the human resource field relating to investigating workplace complaints of harassment and retaliation."  Tr. Ex. 59, at 17 (ECF No. 248-17 at 18); Tr. Ex. 108, at 183 (PLT4909).  "These standards include a timely, fair, and thorough investigation conducted by an unbiased investigator that comes to a reasoned and fair decision." Tr. Ex. 59, at 17–18 (ECF No. 248-17 at 18–19); Tr. Ex. 108, at 183–84 (PLT4909–10).  "The investigation must be conducted by a trained investigator gathering all relevant evidence by, among other things, interviewing the complainant(s), respondent and percipient

148

witnesses." Tr. Ex. 59, at 18 (ECF No. 248-17 at 19); Tr. Ex. 108, at 184 (PLT4910). As Ms. Thomas explained, "The EEOC's Enforcement Guidance provides that '[w]hoever conducts the investigation should be well-trained in the skills that are required for interviewing witnesses and evaluating credibility.' Yet Heather Beam had no experience conducting workplace investigations. In her deposition, she acknowledged that Strickland's complaint was the first she had investigated. Beam had no training in conducting workplace investigations, either." Tr. Ex. 59, at 18 (ECF No. 248-17 at 19); Tr. Ex. 108, at 184 (PLT4910). Ms. Thomas concluded that "[l]ikely because of her inexperience as an investigator, Beam made a number of mistakes that compromised the adequacy of her investigation," and "Beam's investigation fell below well-accepted standards in the HR industry for conducting workplace investigations." Tr. Ex. 59, at 21 (ECF No. 248-17 at 22); Tr. Ex. 108, at 187 (PLT4913).

151f. In addition, Ms. Thomas concluded that the investigation was "inadequate" because even "though he was named as a respondent in Strickland's complaint, Martinez was permitted to control aspects of the investigation. Per the EEOC's Enforcement Guidance, the alleged wrongdoer should not have supervisory authority over the person conducting the investigation and should not have any direct or indirect control over the investigation. Yet Martinez, whom Strickland had accused of wrongdoing, was permitted to appoint Beam as the investigator, even though in her 'report of wrongful conduct' brought under the EDR Plan, Strickland asked that Martinez be disqualified from this role. . . . At the investigation's conclusion, Martinez was also permitted to weigh in on the discipline Davis should receive. Because Martinez was allowed to participate to this degree, the investigation of

149

Strickland's complaints lacked fundamental fairness." Tr. Ex. 59, at 16 (ECF No. 248-17 at 17); Tr. Ex. 108, at 182 (PLT4908).

152. On October 5, 2018, Plaintiff met with the HR Specialist. At the outset, the HR Specialist told Plaintiff that her only role was to "collect" the facts. Tr. Ex. 1, at ¶ 300 (ECF No. 1, Complaint ¶ 300). Defendants admit that Plaintiff met with the HR Specialist on October 5, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made. Tr. Ex. 4, at ¶ 300 (ECF No. 210, Am. Answer ¶ 300); Tr. Ex. 82 at US7735.

153. Defendants admit that Plaintiff provided copies of text messages and emails from the First Assistant and notes about the First Assistant's behavior to the HR specialist at the October 5, 2018 meeting and that she provided a witness list to the HR Specialist by email on October 8, 2018. Tr. Ex. 4, at ¶ 301 (ECF No. 210, Am. Answer ¶ 301); Tr. Ex. 47 at PLT591 (ECF No. 248-15 at 29); ECF No. 60-4 (Ex. C), at 12.

154. During this meeting, the HR Specialist told Plaintiff that she believed there was "nothing wrong" with going to the AO for advice, even before speaking to anyone locally. Tr. Ex. 1, at ¶ 302 (ECF No. 1, Complaint ¶ 302). Defendants admit that Plaintiff met with the HR Specialist on October 5, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made. Tr. Ex. 4, at ¶ 302 (ECF No. 210, Am. Answer ¶ 302); Tr. Ex. 82 at US7887.

155. The HR Specialist noted that she had been involved with the office conversion to the FDO. She expressed surprise that no one from the AO gave training during the conversion

150

on policies and procedures for handling complaints. Tr. Ex. 1, at ¶ 303 (ECF No. 1, Complaint ¶ 303). Defendants admit that Plaintiff met with the HR Specialist on October 5, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made. Tr. Ex. 4, at ¶ 303 (ECF No. 210, Am. Answer ¶ 303); Tr. Ex. 82 at US7961–63.

156. The HR Specialist stated her opinion that training would have helped in Plaintiff's situation—and maybe even "avoided" it. Instead, in her view, the office was left on its own to learn. She said that she was not making excuses for the Defender, though, and that it was "evident" that he handled things "very poorly." Tr. Ex. 1, at ¶ 304 (ECF No. 1, Complaint ¶ 304). Defendants admit that Plaintiff met with the HR Specialist on October 5, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made. Tr. Ex. 4, at ¶ 304 (ECF No. 210, Am. Answer ¶ 304); Tr. Ex. 82 at US7963.

156a. In fact, the Investigator's notes state that the Defender had told her: "No training on EDR, sexual harassment." Tr. Ex. 31 at US5950 (ECF No. 248-14 at 44). During her deposition, the Investigator confirmed that the Defender told her that "he had no training on EDR" and "no training on sexual harassment." Tr. Ex. 21 at 177 (ECF No. 255-15 at 63). Likewise, the First Assistant told the EDR Investigator in an email: "[U]nfortunately, it really doesn't seem like much if anything was done between conversion and the release of our new manual to train FPDO employees on harassment or make them aware of EEO/EDR policies." Tr. Ex. 36 at US2822 (ECF No. 248-14 at 65).

156b. The FDO did not provide any office-wide training on sexual harassment until March 2019, the same month Plaintiff was constructively discharged from the FDO, as part

151

of a training that was provided to the entire district.  Tr. Ex. 10 at 13–14 (ECF No. 248-4 at 14–15).

157.    Plaintiff told the HR Specialist that she believed the EDR process was being set up to "wash me out" and "throw me away."  Tr. Ex. 1, at ¶ 305 (ECF No. 1, Complaint ¶ 305). Defendants admit that Plaintiff met with the HR Specialist on October 5, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made. Tr. Ex. 4, at ¶ 305 (ECF No. 210, Am. Answer ¶ 305); Tr. Ex. 82 at US7973–75.

**AA.    In a follow-up interview, the HR Specialist admits that she did not investigate the Defender for retaliation and that she is not qualified to make findings or recommendations.**

158.    Defendants admit that Plaintiff did not hear from the HR Specialist about the investigation for three weeks after the October 8 interview.  Tr. Ex. 4, at ¶ 306 (ECF No. 210, Am. Answer ¶ 306).

**1.    The HR Specialist is improperly influenced by the First Assistant, who speaks with other supervisors about Plaintiff's complaint and who is told the report's findings while the investigation is pending.**

158a.    During this time, the Investigator was extensively contacted by the First Assistant, including with requests that she complete the investigation before the office's fall "retreat."  Tr. Ex. 33 at US1354 (ECF No. 248-14 at 62).  In one of his emails, the First Assistant told her:

> As you are probably aware, the entire Appeal/Research and Writing Unit has been temporarily removed from my authority pending this investigation.  Most of the office is currently unaware of that, but I expect the retreat will make them aware—it is pretty obvious once you see it, as this is the only part of the office that goes around me, and there is no real reason why that should be the case.  Even trying to avoid conversations related to Caryn, I have heard enough to know that many of the employees have figured out there is some

152

> kind of existing HR matter. Once folks see that my authority has
> been reduced, I strongly expect that at least a few of them will
> connect the dots, and quite possibly reach the wrong conclusion
> regarding the status and merits of Caryn's claim. If that happens, I
> am afraid it will result in damage to my reputation and standing in
> the office that I may never be able to repair. It's my hope that the
> Chapter IX investigation can be completed in time for the
> restructuring to be addressed and decisions made before it is
> highlighted.

Tr. Ex. 33 at US1354 (ECF No. 248-14 at 62). The First Assistant's email thus communicated

his expectation that the investigation be completed before the upcoming fall retreat so that

Plaintiff, who he believed had been only "temporarily removed from my authority pending this

investigation," could be returned to his supervision. Tr. Ex. 33 at US1354 (ECF No. 248-14 at

62). The First Assistant's email also raised indications that Plaintiff's confidentiality had been

compromised, as "many of the employees have figured out there is some kind of existing HR

matter." Tr. Ex. 33 at US1354 (ECF No. 248-14 at 62). After initially telling the First Assistant

she could "accommodate" his requested timeline, the Investigator told him, "My timeline was a

little too optimistic unfortunately," in part, because "I also have to get ready to present at your

retreat on Thursday 😊." Tr. Ex. 35 at US1345 (ECF No. 248-14 at 69). The First Assistant

responded that "[t]he timeframe is a bit of a bummer" but "I also appreciate you coming out to

the retreat for us! See you in Blowing Rock!" Tr. Ex. 35 at US1345 (ECF No. 248-14 at 69).

By "Blowing Rock," the First Assistant was referring to the location of the office retreat, which

the First Assistant, Defender, and EDR Investigator attended, but Plaintiff did not attend due to

her discomfort with the ongoing situation.

158b. After following up with the Investigator on November 6, 2018, the First

Assistant followed up again on November 14 and told her: "Hey Heather, I hate to follow up so

soon, but wanted to let you know that James and Tony are together at a conference today and half of tomorrow. I am hoping that if they get the report while they're there they can discuss and we will have a chance of getting the whole thing wrapped up before Thanksgiving so it isn't hanging over our heads during the holidays." Tr. Ex. 35 at US1343 (ECF No. 248-14 at 67). The investigator responded: "Hey JP! Haha! Ya know, with every email you send me it takes me away from working on this report. 😊 Just Kidding . . . " Tr. Ex. 35 at US1343 (ECF No. 248-14 at 67). The First Assistant replied: "I guess the reality is that with Caryn's conspicuous absence, it feels less like a settling of past events and more like we're still being taking advantage of, every day. Of course, the fact that I could still lose my job for misconduct doesn't help either, so there's that 😊." Tr. Ex. 35 at US1343 (ECF No. 248-14 at 67).

158c.   During this time, the Investigator allowed the accused supervisors to speak with each during the investigation, contrary to the confidentiality obligations in the EDR Plan, thus heightening the risk that they would influence each other's testimony. In an email to the First Assistant, the Investigator told him that "if you need to talk keep it [Administrative Officer] Bill [Moormann] or [Defender] Tony [Martinez] and of course your wife only." Tr. Ex. 32 at US1359 (ECF No. 248-14 at 59). The Investigator admitted at her deposition that she did not "recall" ever instructing the accused supervisors to not discuss the facts of the allegations:

> Q.      You said, "If you need to talk keep it to Bill" -- is that Bill Moormann –
>
> A.      Uh-huh.
>
> Q.      -- "or Tony," Tony Martinez, "and of course your wife only."
>
> A.      Uh-huh.

Q.     The investigation was confidential, right?

A.     Yes. Uh-huh.

Q.     Did you tell witnesses it was confidential?

A.     Yes.

Q.     And that means that they should only share information in that need-to-know exception?

A.     Yes.

Q.     So would talking to Bill be confidential?

A.     He had already talked to Bill, so I wasn't giving him advice to talk to Bill to get any confidential information.

Q.     Did you ever make clear to JP that he should not talk to Bill about the facts of these allegations?

A.     I do not recall.

Q.     Did you ever make clear to JP that he should not talk to Tony about the facts of these allegations?

A.     I do not recall.

Q.     Were you concerned that JP and Tony might discuss the facts of these allegations?

A.     No, because I expected it to be kept confidential between all parties involved.

Q.     Even though you told JP, "if you need to talk keep it to Bill or Tony"?

A.     Yes. Tony in the capacity that she was JP's boss.

Q.     But your email doesn't say limit it to –

A.     No.

155

Q.     Okay. And his wife would not be confidential communications according to the plan either?

A.     Correct.

Q.     Did you ever advise JP and Tony because they were both accused that they shouldn't talk about the accusations together?

A.     Not that I recall.

Q.     Would it be important to advise them of that?

A.     I'm not sure.

Q.     Can witnesses influence each other's stories by talking about facts?

MS. McMAHON: Objection, calls for speculation.

BY MS. WARREN:

Q.     You may answer.

A.     I have not had experience with that.

Q.     In your years in HR, have you ever been told that when there is a claim like this, witnesses could come up with a story if they talk to one another?

MS. McMAHON: Same objection.

BY MS. WARREN:

Q.     You may answer.

A.     Not that I recall.

Q.     Have you ever considered that possibility?

A.     In this case?

Q.     Ever.

A.     Ever? No.

Q.     Did you ever consider it in this case?

A.     No.

Q.     And did you ever ask JP and Tony if they were talking to each other?

A.     No, I did not.

Q.     Neither JP?

A.     (Witness shook head.)

Q.     That's a no?

A.     No.

Q.     Nor Tony?

A.     Nor Tony, no.

Q.     Why?

A.     Why? It did not occur to me to ask.

Tr. Ex. 21 at 79–82 (ECF No. 248-11 at 17–20).

158d.   In fact, discovery revealed that the First Assistant and Defender did extensively discuss Plaintiff's allegations before their scheduled interviews with the Investigator. On August 20, 2018, per the Defender's request, the First Assistant emailed the Defender a "Timeline of Caryn Events for You." Tr. Ex. 114, at US2844–49; *see also* Tr. Ex. AQ, at US2834–2838. This five-page timeline prepared by the First Assistant informs the Defender of the First Assistant's narrative regarding Plaintiff's allegations beginning May 15, 2018 to August 10, 2018. Needless to say, the Defender did not make any similar "request" of Plaintiff that she provide her own timeline of events to him before his interview with the Investigator. The

157

Defender thus vindicated the concern articulated by Plaintiff's workplace investigations expert, Ms. Thomas, during her deposition testimony that the investigation was "not impartial" because of "[t]he fact that [the Investigator] permitted the two Respondents to communicate with each other, which would be unusual because it leaves open the possibility that those two would coordinate their interview testimony. It also leaves open the likelihood that information wouldn't be kept confidential." Tr. Ex. 108, at 149.

158e. During his deposition, the Defender testified that he "always believed" the First Assistant's account and that he viewed the First Assistant's conduct, including his *quid pro quo* "Mas Dinero" email, in the "context" of "JP's perspective." Tr. Ex. 16 at 115–19, 125, 127 (EECF No. 248-6 at 22–23, 24, 26). The Defender explained that "I recalled the conversation that he had with me" starting after the May 18, 2018 email "wherein he said Caryn said, 'If I don't get my demands, I'm going to quit.'" Tr. Ex. 16 at 119 (ECF No. 248-6 at 23). By contrast, the Defender "never" talked to Plaintiff about what the *quid pro quo* email meant to her. Tr. Ex. 16 at 119 (ECF No. 248-6 at 23). The Defender explained as follows:

> A. Caryn was alleging that she interpreted this as a sexual quid pro quo, okay, had I -- so I had that in my mind. But when I look at it for myself, knowing the context that this was made, from JP's perspective I understand what he intended, because he had already told me that she was demanding, making these demands, or she would quit.
>
> Q. And it was from JP's perspective that you were reading the e-mail?
>
> A. Yes, ma'am. Yes.
>
> Q. Did you think to look at it from Caryn's perspective?
>
> A. Yes, ma'am. And I looked at it in terms of maybe the appropriateness of it.

Q.     Okay.

A.     And maybe it could have been said in a different way. Yes, no doubt. But no way am I interpreting that, this e-mail, as a quid pro quo for sex, knowing what I know, and knowing what she said to him around this time.

Q.     Right. And knowing what you know, just to clarify, do you mean you know what you know because JP told you?

A.     Correct.

Tr. Ex. 16 at 125 (ECF No. 248-6 at 24). The Defender testified that in his "opinion," the conduct that Plaintiff reported "was not sexual harassment." Tr. Ex. 16 at 216 (ECF No. 255-4 at 91).

158f.   As Plaintiff's workplace investigations expert, Ms. Thomas, explained, "[w]ell-developed standards in the human resource field relating to conducting investigations also include a timely, fair, and thorough investigation conducted by an unbiased investigator that comes to a reasoned and fair decision. Yet Beam conducted the investigation in a manner that raises questions about her impartiality. She permitted Martinez and Davis, the two accused parties, to communicate with each other about the investigation. She responded to Davis' repeated emails and requests about the investigation, thereby allowing him to influence her. . . . In addition, although Beam was aware that the investigation possibly was not being kept confidential, she took no steps to verify whether this was the case; nor did she report the potential confidentiality breach to anyone. In her deposition, Beam said that Davis came to her and said that other employees were aware that the investigation was occurring. Beam said she did nothing with this information because she did not consider the possibility that a confidentiality breach might expose Strickland to retaliation by her peers." Tr. Ex. 59, at 18–19

159

(ECF No. 248-17 at 19–20); Tr. Ex. 108, at 184–85 (PLT4910–11). During her deposition, Ms. Thomas similarly testified that the Investigator did not "maintain the impartial role that she should have by allowing - - responding to one of the Respondents - - to Mr. Davis's repeated emails and requests, which did give him the opportunity to influence her. That's not standard, either." Tr. Ex. 108, at 149.

158g. Indeed, despite the clear breaches of confidentiality in allowing the accused parties to coordinate their testimony, the Investigator did not contemplate the possibility that Plaintiff could be subjected to retaliation. During her deposition, the Investigator testified that she was "not sure" whether sharing "confidential information about Caryn's complaint" would be considered "an act of retaliation." Tr. Ex. 21 at 88 (ECF No. 255-15 at 9). She testified to her belief that "[r]etaliation is when the person who feels that's happened to has been denied something of value, perhaps in their mind, you know, and to use it in a work-related sense, retaliation could be they're no longer invited to a meeting that they were routinely a part of, they don't get a promotion, they're turned down for a promotion, they have to move their office to a less desirable location without a very good or logical or reasonable explanation." Tr. Ex. 21 at 88 (ECF No. 255-15 at 9). The Investigator's limited understanding of retaliation does not account for other actions, besides being "denied something of value," that are intended to deter an employee from raising a complaint. Tr. Ex. 21 at 88 (ECF No. 255-15 at 9). As the FEOO testified, retaliation can include "[j]ust every possible negative that you could imagine happening in the workplace," including "diminished job responsibilities," "negative comments about them formally or informally," or "negative comments about reaching for help to an office like [the FEOO's]." Tr. Ex. 20 at 177 (ECF No. 255-14 at 177). Retaliation can range from

160

"people fired, people's workplace duties diminished, people – employees ostracized." Tr. Ex. 20 at 177 (ECF No. 255-14 at 177).

158h.    During this time, the First Assistant was also apparently either shown a copy of the investigation report or told of the investigation's findings. On February 1, 2019, the First Assistant sent an email to Administrative Officer Moormann stating: "As of this month, it will be six months since Caryn Devins falsely accused me of harassment" and "four months since I was informally told that the investigation had found that no harassment occurred." Tr. Ex. 73 at US2944 (ECF No. 255-6 at 2). The First Assistant's email indicates that four months earlier, in October 2018, he was "told that the investigation had found that no harassment occurred." Tr. Ex. 73 at US2944 (ECF No. 255-6 at 2). The First Assistant later repeated his claim to the EDR Coordinator, stating in an email that "Heather has produced a written recitation of facts sufficient, to my understanding, for a decision-maker to immediately conclude there was no sexual harassment (which, from what Heather told me, is the only allegations that fits into the Plan's definition of 'wrongful conduct')." Tr. Ex. 37 at US3020 (ECF No. 255-6 at 3). As will be discussed below, the First Assistant's repeated attempts to influence the investigation led the Defender to threaten to fire him on the spot if he did not stop.

> **2.    The Investigator fails to contact any of Plaintiff's witnesses and admits she did not investigate Plaintiff's claims against the Defender.**

159.    On November 1, 2018, Plaintiff asked the HR Specialist for a status update. The HR Specialist responded that she had a few follow-up questions for Plaintiff. Tr. Ex. 4, at ¶ 307 (ECF No. 210, Am. Answer ¶ 307).

160. Plaintiff met with the HR Specialist for a second time on November 9, 2018. Tr. Ex. 4, at ¶ 308 (ECF No. 210, Am. Answer ¶ 308).

161. The HR Specialist asked Plaintiff whether she had been "friendly" to the First Assistant. She asked whether Plaintiff's relationship with the First Assistant "broke down" over a case assignment. She questioned whether the First Assistant's behavior was "sexual." Tr. Ex. 1, at ¶ 309 (ECF No. 1, Complaint ¶ 309). Defendants admit that Plaintiff met with the HR Specialist on November 9, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made. Tr. Ex. 4, at ¶ 309 (ECF No. 210, Am. Answer ¶ 309); Tr. Ex. 83 at US8050–53, US8058–59, US8074–75.

162. Plaintiff emphatically responded to the HR Specialist that she had not welcomed the First Assistant's behavior, that it was obvious that his harassment was sexually motivated, and that her complaint was about the First Assistant's inappropriate behavior, not about a case assignment. Tr. Ex. 1, at ¶ 311 (ECF No. 1, Complaint ¶ 311). Defendants admit that Plaintiff met with the HR Specialist on November 9, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made. Tr. Ex. 4, at ¶ 311 (ECF No. 210, Am. Answer ¶ 311); Tr. Ex. 83 at US8051–53, US8074–75.

163. Plaintiff asked the HR Specialist whether she needed to start making "contingency plans" because her employing office had not shown any willingness to work with her and she did not know what her professional future would look like. The HR Specialist responded that it was "fair" for Plaintiff to feel that way. Tr. Ex. 1, at ¶ 312 (ECF No. 1, Complaint ¶ 312). Defendants admit that Plaintiff met with the HR Specialist on November 9, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of

162

the statements made.  Tr. Ex. 4, at ¶ 312 (ECF No. 210, Am. Answer ¶ 312); Tr. Ex. 83 at US8061–62.

164.    Plaintiff repeatedly asked when she would hear some kind of substantive update that would allow her to make an informed decision about her career. The HR Specialist said that there were no deadlines for the investigation.  Tr. Ex. 1, at ¶ 313 (ECF No. 1, Complaint ¶ 313). Defendants admit that Plaintiff met with the HR Specialist on November 9, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made.  Tr. Ex. 4, at ¶ 313 (ECF No. 210, Am. Answer ¶ 313); Tr. Ex. 83 at US8065– 66.

165.    Plaintiff said that it was "obvious" to her that "if they could, they would fire me tomorrow."  Tr. Ex. 1, at ¶ 314 (ECF No. 1, Complaint ¶ 314).  Defendants admit that Plaintiff met with the HR Specialist on November 9, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made.  Tr. Ex. 4, at ¶ 314 (ECF No. 210, Am. Answer ¶ 314); Tr. Ex. 83 at US8065.

166.    When Plaintiff expressed concerns about seeing the First Assistant at work, the HR Specialist responded dismissively by telling her that she would have to continue working with him after this.  Tr. Ex. 1, at ¶ 315 (ECF No. 1, Complaint ¶ 315).  Defendants admit that Plaintiff met with the HR Specialist on November 9, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made.  Tr. Ex. 4, at ¶ 315 (ECF No. 210, Am. Answer ¶ 315); Tr. Ex. 83 at US8061–63; Tr. Ex. 19 at 18 (ECF No. 255-7 at 10) (Mediator's testimony that Plaintiff had told him the Investigator "had made a comment to her that you're going to have to work with him").

163

167. The HR Specialist did not mention interviewing any other witnesses besides Plaintiff, the First Assistant, and the Defender. Tr. Ex. 1, at ¶ 317 (ECF No. 1, Complaint ¶ 317). Defendants admit that Plaintiff met with the HR Specialist on November 9, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made. Defendants admit that the HR Specialist did not contact the individuals listed on Plaintiff's witness list. Tr. Ex. 4, at ¶ 317 (ECF No. 210, Am. Answer ¶ 317).

167a. The Investigator did not contact any of the individuals on Plaintiff's witness list or any other witnesses who could have corroborated the sexual harassment. Tr. Ex. 4, at ¶ 317 (ECF No. 210, Am. Answer ¶ 317); Tr. Ex. 47 at PLT591 (ECF No. 248-15 at 29) (Plaintiff's witness list). During her deposition, the Investigator testified that she "did not" "reach out" to any of the individuals that Plaintiff listed as witnesses. Tr. Ex. 21 at 114 (ECF No. 255-15 at 20). The Investigator also did not "interview anyone else who could substantiate these claims." Tr. Ex. 21 at 114 (ECF No. 255-15 at 20). The Investigator testified that she "was only focused on the people that were involved directly in the situation," which apparently did not include the individuals listed on Plaintiff's witness list or anyone else who could substantiate her claims. Tr. Ex. 21 at 114 (ECF No. 255-15 at 20). Indeed, at this time, the only individuals with whom the Investigator had spoken were Plaintiff and the accused managers, the Defender and First Assistant. *See* Tr. Ex. 21 at 114 (ECF No. 255-15 at 20). Later, without notifying Plaintiff, the Investigator interviewed other members of the all-male upper management team to refute her claims, but she still did not contact anyone on Plaintiff's witness list. Tr. Ex. 12 at US1251–52 (ECF No. 248-5 at 18–21) (discussing interview with the Appellate Chief and correspondence with the Administrative Officer).

164

167b.  As Plaintiff's workplace investigations expert, Ms. Thomas, explained: "To conduct a timely, fair and thorough investigation, the investigator must gather all relevant evidence. Yet Beam did not interview anyone on the list of witnesses Strickland gave to her. One or more of those witnesses may have corroborated Davis' behavior that Strickland had described, which may have alerted Defendants to the gravity of Strickland's complaint and the need to remedy the situation expeditiously." Tr. Ex. 59, at 18 (ECF No. 248-17 at 19); Tr. Ex. 108, at 184 (PLT4910).  During her deposition, Ms. Thomas further testified that it is "not normal" for an investigator not to interview any witnesses provided by the complainant.  Tr. Ex. 108, at 148. Rather, "[t]he standard is that the investigator must make all reasonable efforts to gather relevant evidence and to do – and to preserve that evidence when necessary." Tr. Ex. 108, at 148.  In Ms. Thomas's expert opinion, Ms. Beam's investigation did not meet those accepted standards.  Tr. Ex. 108, at 148.

167c.  Further, in stark contrast to the Investigator's treatment of Plaintiff, the Investigator allowed the First Assistant to provide a list of "requests" regarding his preferred outcome of the investigation.  Tr. Ex. 31 at US6236 (ECF No. 248-14 at 56).  This list included the following, as stated in the Investigator's notes:

> Would like documented she was found to be making this up.
>
> All units should report to him; this should not be one unit that goes around me.
>
> No intention to have interaction.  Would be comfortable w/ a level of insulation.

165

Explicit provision to address the things she has done that do not

relate to the complaint (JP not involved in this)

1)    Finding of fact

2)    What can be considered and what should not be considered

3)    Clearly explain no retaliation

4)    One month cooling off once she returns to the office

5)    Any communication is work related

6)    No involvement during this time for JP to make any

decisions regarding her

7)    Eventual return to status quo + normal reporting process

8)    No issue w/ Caryn staying with agency

Tr. Ex. 31 at US6236 (ECF No. 248-14 at 56). The Investigator did not provide Plaintiff the

same treatment. Rather, the Investigator's "summary of informal resolution attempt" in her

report states the following:

> Employee Caryn Devins has been accommodated in each request
> she has made except for where she will sit for the foreseeable future
> as she is currently teleworking full-time. The Circuit Executive and
> EDR Counselor have both asked her to articulate what it will take
> for her to feel safe in the working environment. Employee has not
> been able to name anything specific outside of generalities. The
> counselor is awaiting her response to this request.

Tr. Ex. 12 at US1250 (ECF No. 248-5 at 17). When asked whether she gave "Caryn some

examples of specific requests that she could make," the Investigator answered, "No, because I

was just relaying the message from James Ishida." Tr. Ex. 21 at 155 (ECF No. 255-15 at 41).

The Investigator further testified as follows:

Q.      Did she tell you that she was having a hard time coming up with specific requests?

A.      Yes. Uh-huh.

Q.      And what did she say?

A.      I don't recall exactly what she said, but she was having a hard time coming up with specific things that would create an environment free from harassment.

Q.      And as an HR professional, could you think of some specific things?

A.      I could, sure.

Q.      Why didn't you propose some specific possibilities?

A.      Because at the time, and even when I was asked to provide recommendations, that was not my role in this matter. My role was to investigate. And I wrote down JP's list because I took notes on our conversation.

Q.      But it was your understanding that you were not allowed to propose or to even tell Caryn about specific possibilities?

A.      No, that's not what I said. I don't – I'm not familiar with her office, I don't know how it runs, so I didn't have -- you know, I wanted her to come up with what she thought would help her.

Q.      Is Caryn an HR professional?

A.      No.

Q.      And you said as an HR professional you're aware of some specific resolutions that could help –

A.      Sure.

Q.      -- in situations?

A.      Uh-huh.

Q.      Why didn't you provide them to her?

167

A. It did not occur to me to provide them to her. She didn't even ask that I recall.

Q. In your experience as an HR professional, when someone has experienced sexual harassment can it be hard for them to articulate -- sorry. When someone has experienced sexual harassment, are they responsible for coming up with a solution?

A. I am not sure if they are or not.

Q. Well, in human resources there's generally policies and procedures to deal with sexual harassment. Is that right?

A. Typically, yes.

Q. Were there policies and procedures here?

A. Not that I recall.

Q. There were no policies and procedures to deal with the harassment?

A. Other than the EDR under Chapter IX.

Tr. Ex. 21 at 155–57 (ECF No. 255-15 at 41–43).

167d.    As Plaintiff's workplace investigations expert, Ms. Thomas, explained, "[t]here was another way that Beam appeared to treat Davis more favorably than Strickland. After Beam issued her investigation report, Davis, who apparently was allowed to read the report, gave Beam a list of things he wanted to happen as a result of Beam's findings. For example, Davis wanted Beam's report to indicate that Strickland had made up her allegations against him. He also wanted the report to conclude that Strickland had not experienced retaliation. Davis even told Beam he 'didn't have an issue with [Strickland] staying' at the FDO. Yet at no time did Beam provide Strickland the opportunity to view the report and make equally concrete demands. Beam appeared to be influenced by the fact that when she had previously

168

asked Strickland to suggest remedies, Strickland had not offered anything specific. Beam did not appear to understand that someone who had potentially experienced the trauma of sexual harassment, Strickland may have had difficulty identifying specific remedies. It is not unusual for sexual harassment complainants to make one simple request: 'Just make the harassment stop.' In fact, repeatedly asking a sexual harassment victim to identify remedies can be retraumatizing. As Beam acknowledged in her deposition, she was aware of potential remedies that she could have suggested to Strickland but failed to offer them." Tr. Ex. 59, at 20 (ECF No. 248-17 at 21); Tr. Ex. 108, at 186 (PLT4912).

168.    Plaintiff also asked the HR Specialist about her investigation into the Defender's misconduct. The HR Specialist explained that she had been focusing on the sexual harassment claims regarding the First Assistant, as well as how the Defender "handled" them. She stated that if there is a "true feeling of retaliation," then that would have to be investigated "separately." She said that she did not understand Plaintiff's claims to be within the scope of the investigation the EDR Coordinator had ordered. Tr. Ex. 1, at ¶ 318 (ECF No. 1, Complaint ¶ 318). Defendants admit that Plaintiff met with the HR Specialist on November 9, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made. Tr. Ex. 4, at ¶ 318 (ECF No. 210, Am. Answer ¶ 318); Tr. Ex. 57 at US8068–69 (ECF No. 255-11 at 26).

168a.   Confirming that retaliation was not investigated, the Investigator testified that her investigation report's summary of allegations "did not speak to the retaliation claim." Tr. Ex. 21 at 117 (ECF No. 255-15 at 23). The initial report that the Investigator submitted to the EDR Coordinator does not even mention Plaintiff's claim of retaliation or her allegations

against the Defender.  *See* Tr. Ex. 12 at US1244–50 (ECF No. 248-5 at 11–17).  Rather, under

the "Claims Made" section, the report characterizes Plaintiff's claim as follows:

> Employee alleges sexual harassment based on the following:
>
> • Repeated meetings for lunch on the premise of 'mentoring'
>
> • Waiting for her in the lobby after working late into the evening on a case and offering a ride since she was on a bike and it had begun to rain after she had already declined the offer upstairs in the office (See Exhibit 1)
>
> • Attempts to restrict her job responsibilities and speaking to her in an unprofessional manner
>
> • Quid pro Quo relationship based on email dated May 18, 2018 (**Refer to Exhibit 2**)

Tr. Ex. 12 at US1244–45 (ECF No. 248-5 at 11–12).

168b.   Indeed, the Defender testified during this litigation that he was "never

told" he was a subject of Plaintiff's allegations under the Plan.  Tr. Ex. 16 at 271–72 (ECF No.

2255-4 at 103–04).  Similarly, the First Assistant stated that he was told by the Investigator that

Plaintiff's sexual harassment claim "is the only allegation that fits into the Plan's definition of

'wrongful conduct.'"  Tr. Ex. 37 at US3020 (ECF No. 255-6 at 3).

168c.   Confirming that the Defender was not a subject of the investigation, the

Office of General Counsel ultimately approved providing the investigation report to the Defender

but not the First Assistant, as the "accused" party.  Tr. Ex. 52 at US2739_0001 (ECF No. 248-15

at 45).

168d.   Plaintiff's workplace investigations expert, Ms. Thomas, concluded that

"Defendants failed to provide Strickland a prompt, fair and thorough investigation of her

complaints," in part, because "although Strickland informed Beam during their first meeting that

170

she believed Martinez had retaliated against her for expressing concerns about Davis' behavior, the Defendants apparently instructed Beam not to investigate this claim." Tr. Ex. 59, at 15, 17 (ECF No. 248-17 at 16, 18); Tr. Ex. 108, at 181, 183 (PLT4907, PLT4909).

169.    Despite Plaintiff's painstaking efforts to expand the scope of the investigation, the HR Specialist admitted that she never investigated her retaliation claim.  Even worse, she characterized the Defender's misconduct as a form of mishandling, or mismanagement, rather than actionable retaliation.  Tr. Ex. 1, at ¶ 319 (ECF No. 1, Complaint ¶ 319).  Defendants admit that Plaintiff met with the HR Specialist on November 9, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made.  Tr. Ex. 4, at ¶ 319 (ECF No. 210, Am. Answer ¶ 319); Tr. Ex. 57 at US8068–69 (ECF No. 255-11 at 26–27).

170.    The HR Specialist stated that she would not be comfortable making, and did not think it was appropriate for her to make, recommendations on the complaint because she is not an "attorney" and not trained on the "legal" side. Therefore, she told Plaintiff, her report would only contain "facts." She said she expected the EDR Coordinator to make the final decisions because he is "over" the Defender. She said she assumed that the EDR Coordinator would consult with the Chief Judge, as well.  Tr. Ex. 1, at ¶ 320 (ECF No. 1, Complaint ¶ 320). Defendants admit that Plaintiff met with the HR Specialist on November 9, 2018 and respectfully refer the Court to Plaintiff's audio recording of that meeting for a record of the statements made.  Tr. Ex. 4, at ¶ 320 (ECF No. 210, Am. Answer ¶ 320); Tr. Ex. 83 at US8071–73.

171.    Defendants admit that Plaintiff sent the HR specialist an email on November 12, 2018 detailing what Plaintiff alleged to be "quid pro quo harassment."  Defendants respectfully

refer the Court to the email for a complete and accurate statement of its contents. Tr. Ex. 4, at ¶ 321 (ECF No. 210, Am. Answer ¶ 321); ECF No. 60-4 (Ex. C), at 18.

**BB.    Plaintiff asks why the burden is on her to initiate the solutions to her complaints.**

172.    On November 12, 2018, Plaintiff emailed the EDR Coordinator, with the Chief Judge copied, to ask about the status of her EDR complaint. Defendants admit that Plaintiff's report of wrongful conduct under Chapter IX, and request for counseling under Chapter X of the Plan had been pending since September 10, 2018 as of November 12, 2018. Defendants further admit that no decision on Plaintiff's motion to disqualify Anthony Martinez had been made as of November 12, 2018. Tr. Ex. 4, at ¶ 322 (ECF No. 210, Am. Answer ¶ 322).

173.    Plaintiff asked the EDR Coordinator for a status update. Defendants admit that Plaintiff's email to James Ishida dated November 12, 2018 stated: "My concern is that it seems possible, if not likely, that the counseling period will expire before the wrongful conduct investigation and subsequent actions on Heather's factual report are concluded and shared with me?" Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents. Tr. Ex. 4, at ¶ 323 (ECF No. 210, Am. Answer ¶ 323); Tr. Ex. 40 at US1638–39 (ECF No. 248-14 at 82–83).

174.    Defendants admit that Plaintiff's email to James Ishida dated November 12, 2018 stated: "In my request for counseling, I identified the following remedies: (1) the ability to work in an environment free of harassment and retaliation and (2) professional advancement based on merit. I have put pen to paper too many times to count since our last meeting, but I am unable to come up with a proposed solution on my own that would achieve these goals. The problem I keep encountering is, how can these remedies be achieved without action by others, outside of

172

my control?  In other words, if I initiate the formulation of the ultimate remedy about how I can do my job, safely and effectively, as a precondition to counseling, then this dilemma seems inextricably linked to my request for disqualification.  Put simply, I do not see how I can negotiate a remedy with an individual who retaliated against me for raising concerns of sexual harassment?" Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents.  Tr. Ex. 4, at ¶ 324 (ECF No. 210, Am. Answer ¶ 324); Tr. Ex. 40 at US1639 (ECF No. 248-14 at 83).

175.    Defendants admit that Mr. Ishida's response to Plaintiff's email dated November 12, 2018 copied Chief Judge Gregory and stated that, while "the Complaint for Wrongful Conduct under Chapter IX and Request for Counseling under Chapter X" were "separate proceedings," Mr. Ishida "ordered a joint investigation for both" because "both proceedings share essentially the same set of facts."  Defendants further admit that Mr. Ishida's response stated that "the counseling period ends on November 29" and, "[s]ince [Mr. Ishida and Plaintiff] had agreed earlier to an extension of the counseling period, this is the last extension that can be granted."  Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents.  Tr. Ex. 4, at ¶ 325 (ECF No. 210, Am. Answer ¶ 325); Tr. Ex. 40 at US1637–38 (ECF No. 248-14 at 81–82).

176.    In addition, the EDR Coordinator claimed that the Defender had already "taken numerous steps" to protect Plaintiff's safety.  He did not specify what those steps were.  Tr. Ex. 4, at ¶ 326 (ECF No. 210, Am. Answer ¶ 326).

177.    Defendants admit that Plaintiff sent an email to Mr. Ishida dated November 13,

173

2018, which stated: "To help me better understand your positions, can you identify the steps taken by the Federal Defender to protect me from further harassment and to ensure my safety in the office as they have been described to you? I am only familiar with his rejection of a transfer from the First Assistant's duty station and his asserted authority to require me to return to that work environment at the impending conclusion of the Chapter IX process."  Tr. Ex. 4, at ¶ 327 (ECF No. 210, Am. Answer ¶ 327).  Defendants further admit that Plaintiff's email stated: "I am familiar with the administrative reclassification of my job title with no consideration for a raise in total salary or formal progression of duties, the elimination of my locality adjustment, and the failure to interview me for a newly created 'Appellate' AFD position that I was discouraged from applying for, among other events described in my official grievance."  Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents. Tr. Ex. 4, at ¶ 327 (ECF No. 210, Am. Answer ¶ 327); Tr. Ex. 40 at US1637 (ECF No. 248-14 at 81).

178.    Plaintiff asked the EDR Coordinator: "[C]an you understand why I do not view these measures as an attempt at resolution, but instead as evidence of actionable retaliation by the Federal Defender and support for my disqualification request?"  Tr. Ex. 4, at ¶ 328 (ECF No. 210, Am. Answer ¶ 328).

179.    Defendants admit that Plaintiff's email to Mr. Ishida dated November 13, 2018 stated: "Can you also inform me of which individuals will receive the Chapter IX investigator's factual report, including who will receive the report for the purpose of making recommendations based on its content? Similarly, who will make final decisions based on that individual's recommendations and how will I be informed of those decisions?"  Defendants respectfully refer

174

the Court to the email for a complete and accurate statement of its contents.  Tr. Ex. 4, at ¶ 329 (ECF No. 210, Am. Answer ¶ 329); Tr. Ex. 40 at US1637 (ECF No. 248-14 at 81).

180.     Defendants admit that Mr. Ishida responded to Plaintiff's November 13, 2018 email on November 14, 2018, copying the Chief Judge.  Defendants further admit that Mr. Ishida's response stated: "I am aware that Mr Martinez has allowed you to telework, removed you from the chain of command so that you have no reporting obligations with the person in question, and taken other steps to avoid contact with the accused."  Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents.  Tr. Ex. 4, at ¶ 330 (ECF No. 210, Am. Answer ¶ 330); Tr. Ex. 40 at US1636 (ECF No. 248-14 at 80).

181.     Defendants admit that Mr. Ishida's November 14, 2018 response to Plaintiff stated: "[W]e need to know . . . precisely what you would like to see to feel safe so that we can present that to Mr Martinez for consideration."  Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents.  Tr. Ex. 4, at ¶ 331 (ECF No. 210, Am. Answer ¶ 331); Tr. Ex. 40 at US1636 (ECF No. 248-14 at 80).

182.     Defendants admit that Ishida emailed Plaintiff on November 19, 2018 and that the email stated: "To make the call fruitful, I'll again suggest that you consider specifically what it is that you want. For example, reiterating that you want a safe workplace free from harassment isn't helpful because Mr. Martinez already believes that he's done and is doing all he can to provide such a workplace for you."  Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents.  Tr. Ex. 4, at ¶ 332 (ECF No. 210, Am. Answer ¶ 332); Tr. Ex. 40 at US1635 (ECF No. 248-14 at 79).

175

182a.   Plaintiff's workplace investigations expert, Ms. Thomas, concluded that "Defendants' Response to Strickland's Internal Complaint Fell Below Well-Accepted HR Practices," in part, because even "though Strickland was the alleged victim of sexual harassment, the EDR Plan process placed responsibility on *her* to negotiate with Martinez and come up with a resolution to her complaint."  Tr. Ex. 59, at 15, 17 (ECF No. 248-17 at 16, 18); Tr. Ex. 108, at 181, 183 (PLT4907, PLT4909).

182b.   Ms. Thomas explained that this approach runs counter to Defendants' obligation under Title VII, which "places the burden on the employer to remediate discrimination, harassment and retaliation."  Tr. Ex. 59, at 17 (ECF No. 248-17 at 18); Tr. Ex. 108, at 183 (PLT4909).  Therefore, "[i]t was Defendants, not Strickland, who had the power to address Davis' and Martinez's behavior and find a resolution that would permit Strickland to continue comparable employment with the FDO in a harassment-free environment."  Tr. Ex. 59, at 17 (ECF No. 248-17 at 18); Tr. Ex. 108, at 183 (PLT4909).   Moreover, "because Defendants treated this matter as an informal work dispute, between Strickland and Davis, one that could be 'resolved' through the EDR Plan process," "Defendants apparently did not appreciate that Strickland had reported behavior that was potentially illegal under Title VII and that needed to be taken seriously, investigated promptly, and remedied appropriately."  Tr. Ex. 59, at 23 (ECF No. 248-17 at 24); Tr. Ex. 108, at 189 (PLT4915).  "This approach not only deprived Strickland of the protections to which she was entitled under Title VII, but it also placed her in the unfortunate position of having to advocate for herself when it was the Defendants who should have been protecting her."  Tr. Ex. 59, at 23 (ECF No. 248-17 at 24); Tr. Ex. 108, at 189 (PLT4915).

176

**CC.    The HR Specialist asks Plaintiff for a "list of demands."**

183.    On November 19, 2018, the HR Specialist emailed Plaintiff, with the EDR Coordinator copied, asking for a "specific list of demands you feel would bring this situation to an agreeable resolution."  Tr. Ex. 4, at ¶ 333 (ECF No. 210, Am. Answer ¶ 333); Tr. Ex. 84 at US345 (ECF No. 60-4 at 38).

184.    The HR Specialist called Plaintiff's prior requests—an environment free of harassment and advancement based on merit—"general in nature."  The HR Specialist noted that some "steps" had already been taken based on Plaintiff's prior requests.  Among these "steps," Plaintiff was "reclassif[ied]" and "taken out of the chain of command" for the First Assistant. The HR Specialist asked Plaintiff to provide any other "specific, tangible requests."  Tr. Ex. 4, at ¶ 334 (ECF No. 210, Am. Answer ¶ 334); Tr. Ex. 84 at US345–46 (ECF No. 60-4 at 38–39).

185.    Defendants admit that the HR Specialist's November 19, 2018 email to Plaintiff stated: "I understand returning to the Charlotte office is a difficult issue for you and would appreciate any ideas you may have on facilitating this to ensure you feel safe and are in an environment free from harassment and intimidation and where advancement is based on merit. I will need concrete specific requests to bring forth in my report as a requirement in attempting to bring this Wrongful Conduct Claim to a resolution."  Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents.  Tr. Ex. 4, at ¶ 336 (ECF No. 210, Am. Answer ¶ 336); Tr. Ex. 84 at US346 (ECF No. 60-4 at 39).

186.    Defendants admit that Plaintiff did not immediately respond to the HR Specialist's email.  Tr. Ex. 4, at ¶ 337 (ECF No. 210, Am. Answer ¶ 337).

186a.  The HR Specialist's email confirmed that instead of taking Plaintiff's complaints seriously and taking prompt and appropriate action, Defendants "viewed the situation as a workplace dispute, [and] took the position that Strickland was equally responsible for her poor relationship with Davis and, thus, bore responsibility for working with Martinez to identify an acceptable solution."  Tr. Ex. 59, at 23 (ECF No. 248-17 at 24); Tr. Ex. 108, at 189 (PLT4915).

**DD.**  **Plaintiff continues to suffer a hostile working environment while her complaint is pending.**

187.  Defendants admit that the Defender's office advertised for a summer intern in the Asheville office in November 2018, as well as for a Charlotte paralegal position that would require occasional travel to Asheville and that the Defender stated there was no office space for a full-time attorney at the Asheville office.  Tr. Ex. 4, at ¶ 339 (ECF No. 210, Am. Answer ¶ 339).

187a.  The EDR investigation report acknowledged that the Defender had office space in Asheville that he was using for an unpaid summer intern.  Tr. Ex. 12 at US1251 (ECF No. 248-5 at 18).

187b.  During her deposition, the Investigator testified that, without notifying Plaintiff, she spoke with the Appellate Chief "about office space in Asheville."  Tr. Ex. 21 at 160 (ECF No. 255-15at 46).  The Investigator testified as follows:

> Q.    Why did you speak to him about office space in Asheville?
>
> A.    Because I wanted to confirm what Mr. Martinez was saying about the lack of office space in Asheville.
>
> Q.    So you were corroborating what Mr. Martinez said?
>
> A.    Yes. I also was in the Asheville office of the Federal Public Defender.

178

Q.      Oh, nice. And Mr. Carpenter told you – were you concerned at all that by speaking with Mr. Carpenter you were breaching any confidentiality?

A.      No. I was not concerned. I don't recall if I told Caryn or not that I was going to be speaking with him.

Q.      Did she give you permission to speak with him?

A.      I do not remember.

Q.      And when she and you discussed the confidentiality in her report, did she give you permission at that time to speak with Josh Carpenter?

A.      His name did not come up, and that's why she wrote down Tony and JP.

Q.      You wanted to talk to Mr. Carpenter to corroborate what Mr. Martinez was saying?

A.      Yes.

Q.      You told me this morning you didn't talk to anyone to corroborate what Caryn said, did you?

A.      I did not speak to anyone on her witness list is what I said this morning.

Q.      Did you speak to anyone else she mentioned who could corroborate what she said?

A.      No, not that I recall.

Q.      Did you ever talk to Caryn -- after learning from Josh about the limitations of the space, did you ever ask Caryn if she would be comfortable in a temporary cubicle?

A.      Not that I recall.

Tr. Ex. 21 at 160–61 (ECF No. 255-15 at 46–47). As this exchange demonstrates, "Defendants did not agree to," or even realistically explore, "the most straightforward way of protecting

179

[Plaintiff]: transferring her to the Asheville location as she had requested." Tr. Ex. 59, at 22–23 (ECF No. 248-17 at 23–24); Tr. Ex. 108, at 188–89 (PLT4914–15). Further, the Investigator's conduct in taking assertions made by the accused managers at face value, while discounting the credibility of Plaintiff's claims, demonstrates bias in her investigation. As Plaintiff's workplace investigations expert, Ms. Thomas, explained, "it does not appear from the Report that Beam attempted to corroborate statements made by Martinez and Davis. Beam also did not investigate the credibility of their statements. For example, Martinez claimed that after promising Strickland that he would move her to another supervisor, he accidentally assigned her to Davis again because he forgot the promise he had made 'earlier in the month.' However, Martinez had made that promise to Strickland only 11 days previously. In addition, the promise was an unusual one and, presumably, something Martinez would not easily forget. Yet there is no indication in the Report that Beam asked Martinez follow-up questions about the timing. As another example, Martinez said Strickland was not eligible for a promotion. Yet Beam did not investigate whether this was true." Tr. Ex. 59, at 19 (ECF No. 248-17 at 20); Tr. Ex. 108, at 185 (PLT4911). Likewise, the Investigator's acceptance of the management team's explanation that there was no "office space" in Asheville, even though they had provided cubicle space for an unpaid intern and had not even asked whether Plaintiff would accept a cubicle space in Asheville, is another example of the Investigator's failure to investigate the accused managers' credibility. Tr. Ex. 21 at 160–61 (ECF No. 255-15 at 46–47).

187c. The lengthy period of telework ostracized Plaintiff from her co-workers. As Plaintiff's workplace investigations expert, Ms. Thomas, explained, "[b]eing away from the office without direct access to her peers and superiors placed Strickland at a disadvantage

professionally." Tr. Ex. 59, at 21 (ECF No. 248-17 at 22); Tr. Ex. 108, at 182 (PLT4908)..

Indeed, during the summary judgment hearing in this case, this Court recognized that this

"remote work business . . . would sound like a career-ending step." ECF No. 268, at 18–19; *see*

*also* Tr. Ex. 19 at 47 (ECF No. 255-7 at 15 (Mediator's testimony that "it's hard to maintain

those connections when you're telecommuting").

       187d.   Another AFPD ███████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████



Tr. Ex. 58 at US7443 (ECF No. 248-16 at 31).

187e.   As this AFPD's account confirms, Defendants "did not monitor Strickland's work environment, or Martinez's management decisions about her, to ensure that Strickland did not suffer adverse job consequences for bringing her complaints. As a consequence, Strickland's working conditions were adversely affected. Clearly, Defendants did not meet their obligation to protect Strickland from retaliation."  Tr. Ex. 59, at 22 (ECF No. 248-17 at 24); Tr. Ex. 108, at 189 (PLT4915).

188.   Defendants admit that the First Assistant often participated in moots for the Appellate Division by request of the appellate attorneys, and that he served as counsel of record in one of his cases that was on appeal.  Tr. Ex. 4, at ¶ 341 (ECF No. 210, Am. Answer ¶ 341).

189.   Defendants admit that participation in appellate moots were a required part of Plaintiff's job duties.  Tr. Ex. 4, at ¶ 342 (ECF No. 210, Am. Answer ¶ 342).

189a.   The EDR investigation report found, based on the assertions of the Appellate Chief, that "Caryn is truly valuable and asked good questions in the moots when she has been physically able to be present."  Tr. Ex. 12 at US1252 (ECF No. 248-5 at 19).  The report states: "Mr. Carpenter has worked with the limitations Caryn has to the best of his ability. Mr. Carpenter also added Caryn did not provide any feedback or ask any questions during the

182

December moot. He felt disappointed by this as she was an excellent contributor when she participated in the spring of last year." Tr. Ex. 12 at US1252 (ECF No. 248-5 at 19).

189b. During her deposition, the Investigator was asked whether the Appellate Chief's statements raise concerns that "when high performers have a decline you're concerned that something has happened." Tr. Ex. 21 at 174 (ECF No. 255-15 at 60). The Investigator was dismissive, even flippant, about this concern, testifying as follows:

> Q. Does Josh's characterization regarding her decline in participation support -- earlier you described that sometimes when high performers have a decline you're concerned that something has happened.
>
> A. Sure.
>
> Q. Does this support that kind of concern?
>
> A. No, because her complaints about the moots was that she was not being invited to participate in moots that –
>
> Q. I'm not asking about the invitations.
>
> A. Yeah.
>
> Q. I'm just saying he says that she used to be very good at moots, and in December she didn't participate and he was disappointed. In the spring she was very helpful, was very good. He observed a decline. Is that something that you would be concerned about in the context of this case? Spring was before May 2018 and –
>
> A. Yeah, I know when spring is.
>
> MS. McMAHON: Objection, misleading.
>
> A. I didn't take it to show a decline in performance. I took it as she didn't provide any feedback.
>
> BY MS. WARREN:

Q.      Would you be concerned from an HR perspective in the change in her participation?

A.      No, because you're comparing one and one. I mean, I didn't see a pattern.

Q.      Well, he said that she participated in the fall and she asked good questions in the moots when she's been able to be present, so he described multiple times, moots, and that the telephone made it more difficult to participate but she still did, and eventually she stopped, so that seems like a pattern rather than one and one.

MS. McMAHON: Objection, misleading.

BY MS. WARREN:

Q.      Would you say that's more than one and one?

A.      No, I wouldn't because I didn't get the impression that she stopped. He said she just didn't provide any feedback at the December moot.

Tr. Ex. 21 at 174–75 (ECF No. 255-15 at 60–61).

190.    That fall, the Team Leader wore a Justice Kavanaugh costume—complete with a

184

Yale-themed beer guzzler helmet—for the office Halloween party, which she did not attend:



Tr. Ex. 4, at ¶ 346 (ECF No. 210, Am. Answer ¶ 346).

191.    On November 16, 2018, Plaintiff called into an all-staff meeting, even though she was not required to do so because she was on bereavement leave.  After the staff meeting ended, Plaintiff remained on the call after she realized that her trial "team" was meeting, and she had become a topic of conversation.  Complaint ¶ 348.  Defendants admit that the FDO held all-staff meetings and respectfully refer the Court to Plaintiff's audio recording of the meeting referenced in this paragraph for a record of the statements made.  Tr. Ex. 4, at ¶ 348 (ECF No. 210, Am. Answer ¶ 348).

192.    Plaintiff listened while her "team" members complained about her not being in the office, and mocked and belittled her.  Tr. Ex. 1, at ¶ 349 (ECF No. 1, Complaint ¶ 349).  Defendants admit that the FDO held all-staff meetings and respectfully refer the Court to

185

Plaintiff's audio recording of the meeting referenced in this paragraph for a record of the statements made. Tr. Ex. 4, at ¶ 349 (ECF No. 210, Am. Answer ¶ 349);

193. One attorney joked: "I mean, do I meet her at Starbucks?," resulting in rolling laughter. Tr. Ex. 1, at ¶ 350 (ECF No. 1, Complaint ¶ 350). Defendants admit that the FDO held all-staff meetings and respectfully refer the Court to Plaintiff's audio recording of the meeting referenced in this paragraph for a record of the statements made. Tr. Ex. 4, at ¶ 350 (ECF No. 210, Am. Answer ¶ 350).

194. The Team Leader chimed in: "Should we meet her at Waffle House?" Tr. Ex. 1, at ¶ 351 (ECF No. 1, Complaint ¶ 351). Defendants admit that the FDO held all-staff meetings and respectfully refer the Court to Plaintiff's audio recording of the meeting referenced in this paragraph for a record of the statements made. Tr. Ex. 4, at ¶ 351 (ECF No. 210, Am. Answer ¶ 351).

195. Others added: "Where's Waldo?," to more chuckles and laughter. Tr. Ex. 1, at ¶ 352 (ECF No. 1, Complaint ¶ 352). Defendants admit that the FDO held all-staff meetings and respectfully refer the Court to Plaintiff's audio recording of the meeting referenced in this paragraph for a record of the statements made. Tr. Ex. 4, at ¶ 352 (ECF No. 210, Am. Answer ¶ 352).

196. Plaintiff's "team" members sarcastically referred to her as a "liaison" "research and writing attorney." They said they had "no idea" what her job was. The Team Leader joked that Plaintiff was not "ideal to the task" if "communication is what we're looking for." Tr. Ex. 1, at ¶ 353 (ECF No. 1, Complaint ¶ 353). Defendants admit that the FDO held all-staff meetings and respectfully refer the Court to Plaintiff's audio recording of the meeting referenced in this

186

paragraph for a record of the statements made.  Tr. Ex. 4, at ¶ 353 (ECF No. 210, Am. Answer ¶ 353).

197.    Once the laughter died down, the Team Leader added: "I'll just say this as a caveat for the whole thing.  Not knowing anything about what's going on, which I don't, I was told that the fact that I do not know anything about what's going on is—I should feel lucky about the fact that I don't know. . . . I don't know what's going on, but I know enough to not ask questions.  My guess is it only gets worse the more you find out."  Tr. Ex. 1, at ¶ 354 (ECF No. 1, Complaint ¶ 354).  Defendants admit that the FDO held all-staff meetings and respectfully refer the Court to Plaintiff's audio recording of the meeting referenced in this paragraph for a record of the statements made.  Tr. Ex. 4, at ¶ 354 (ECF No. 210, Am. Answer ¶ 354).

**EE.    After months of enduring a hostile work environment with no action taken on her complaints, Plaintiff asks the Fourth Circuit for assistance with a transfer.**

198.    On November 21, 2018, Plaintiff sent the EDR Coordinator an email, with the Chief Judge copied.  Plaintiff stated: "I have been reflecting on this situation and discussing potential next steps with my family.  This situation has irreparably damaged my relationships with the Federal Defender and my colleagues, and I believe I am no longer welcome in that environment.  I would appreciate the Fourth Circuit's assistance in transitioning me out of [the Defender's] office."  Tr. Ex. 4, at ¶ 355 (ECF No. 210, Am. Answer ¶ 355); Tr. Ex. 40 at US1635 (ECF No. 248-14 at 79).

199.    Defendants admit that Plaintiff sent the HR Specialist an email on November 29, 2018.  Tr. Ex. 4, at ¶ 356 (ECF No. 210, Am. Answer ¶ 356); Tr. Ex. 84 at US344–46 (ECF No. 60-4  at 36–38).

187

200.     On November 25, 2018, the EDR Coordinator asked Plaintiff for a copy of her resume.  He said he would "make inquiries" in federal defender offices around the circuit.  Tr. Ex. 1, at ¶ 357 (ECF No. 1, Complaint ¶ 357).  Defendants admit that the EDR Coordinator emailed Plaintiff on November 25, 2018 and respectfully refer the Court to that email for a full and accurate statement of its contents.  Tr. Ex. 4, at ¶ 357 (ECF No. 210, Am. Answer ¶ 357); Tr. Ex. 89 at US2050 (ECF No. 60-4 at 25).

201.     Plaintiff thanked the EDR Coordinator for the offer, sent him her resume, and encouraged him to send it to federal defender offices and Article III judges within the Fourth Circuit.  Tr. Ex. 1, at ¶ 358 (ECF No. 1, Complaint ¶ 358).  Defendants admit that Plaintiff emailed the EDR Coordinator on November 25, 2018 and respectfully refer the Court to that email for a full and accurate statement of its contents.  Tr. Ex. 4, at ¶ 358 (ECF No. 210, Am. Answer ¶ 358); Tr. Ex. 89 at US2050 (ECF No. 60-4 at 25).

202.     The EDR Coordinator responded that he would be happy to circulate her resume with other federal defender offices, but that he would "leave" it to Plaintiff to reach out to judges, "as you see fit."  Tr. Ex. 1, at ¶ 359 (ECF No. 1, Complaint ¶ 359).  Defendants admit that the EDR Coordinator emailed a response to Plaintiff on November 26, 2018 and respectfully refer the Court to that email for a full and accurate statement of its contents.  Tr. Ex. 4, at ¶ 359 (ECF No. 210, Am. Answer ¶ 359); Tr. Ex. 89 at US2049 (ECF No. 60-4 at 24).

203.     The EDR Coordinator also said that, since Plaintiff was "now contemplating leaving" the FDO, he would like his Human Resources Administrator ("HR Administrator") to join an upcoming phone call they had scheduled in case any "HR questions or issues arise."  Tr. Ex. 1, at ¶ 360 (ECF No. 1, Complaint ¶ 360).  Defendants admit that the EDR Coordinator

188

emailed a response to Plaintiff on November 26, 2018 and respectfully refer the Court to that email for a full and accurate statement of its contents. Tr. Ex. 4, at ¶ 360 (ECF No. 210, Am. Answer ¶ 360); Tr. Ex. 89 at US2049 (ECF No. 60-4 at 24).

204. Plaintiff responded that she was not ready to have an HR conversation about leaving the FDO, and she would like to have a conversation with the EDR Coordinator in confidence. Tr. Ex. 1, at ¶ 361 (ECF No. 1, Complaint ¶ 361). Defendants admit that Plaintiff emailed a response to the EDR Coordinator on November 26, 2018 and respectfully refer the Court to that email for a full and accurate statement of its contents. Tr. Ex. 4, at ¶ 361 (ECF No. 210, Am. Answer ¶ 361); Tr. Ex. 89 at US2049 (ECF No. 60-4 at 24); ECF No. 60-4 (Ex. C), at 22.

**FF.** **The EDR Coordinator tells Plaintiff he is sending back the investigation report to be redone.**

205. On November 27, 2018, Plaintiff spoke with the EDR Coordinator by phone. He informed her that he had received the HR Specialist's report, but he was sending it back. Tr. Ex. 1, at ¶ 362 (ECF No. 1, Complaint ¶ 362). Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made. Tr. Ex. 4, at ¶ 362 (ECF No. 210, Am. Answer ¶ 362); Tr. Ex. 90 at US8092–97.

206. The EDR Coordinator explained that the report set out a "chronology" of the facts that "we all know." He said that he had told the HR Specialist that it would be "helpful" if the report had "findings and recommendations." According to him, the HR Specialist already had them written up, but she did not want to make the report "too long." He asked her to supplement

189

the report to include her findings, conclusions, and recommendations.  Tr. Ex. 1, at ¶ 363 (ECF No. 1, Complaint ¶ 363).  Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made.  Tr. Ex. 4, at ¶ 363 (ECF No. 210, Am. Answer ¶ 363); Tr. Ex. 90 at US8092–93.

207.    Plaintiff told the EDR Coordinator that, from her perspective, "the facts speak for themselves."  Plaintiff was extremely surprised that he would ask the HR Specialist to add "conclusions and recommendations" that she had *admitted* she was not qualified to make.  Tr. Ex. 1, at ¶ 364 (ECF No. 1, Complaint ¶ 364.  Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made. Tr. Ex. 4, at ¶ 364 (ECF No. 210, Am. Answer ¶ 364); Tr. Ex. 90 at US8094.

208.    Plaintiff asked when the amended investigation report would be finished. Plaintiff noted that the investigation had consumed the entire counseling period and could now stretch into the mediation period.  Plaintiff found this circumstance "challenging," describing it as "a limbo where basic procedural matters remain outstanding, but without them being resolved I can't move forward."  Tr. Ex. 1, at ¶ 365 (ECF No. 1, Complaint ¶ 365).  Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made.  Tr. Ex. 4, at ¶ 365 (ECF No. 210, Am. Answer ¶ 365); Tr. Ex. 90 at US8104–08.

209.    Plaintiff asked, again, who would be responsible for acting on the investigation report. The EDR Coordinator said that he would receive the report, and then a decision would be made about discipline.  He said that the disciplinary decision would be given to the Defender as supervisor, but if the report "raise[d] questions" about the Defender, then it may be referred to the Chief Judge.  Tr. Ex. 1, at ¶ 366 (ECF No. 1, Complaint ¶ 366).  Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made.  Tr. Ex. 4, at ¶ 366 (ECF No. 210, Am. Answer ¶ 366); Tr. Ex. 90 at US8097–99.

210.    Plaintiff also asked about the status of her retaliation claims.  Plaintiff relayed the HR Specialist's comments that she was investigating the Defender's "mishandling" of the situation, but not retaliation.  Plaintiff asked whether there was a difference between "mishandling" and retaliation.  Tr. Ex. 1, at ¶ 367 (ECF No. 1, Complaint ¶ 367).  Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made.  Tr. Ex. 4, at ¶ 367 (ECF No. 210, Am. Answer ¶ 367); Tr. Ex. 90 at US8099–8100.

211.    The EDR Coordinator said that he could "not remember exactly when" Plaintiff had raised an allegation of retaliation, and so he was not sure whether retaliation was part of the investigation.  Tr. Ex. 1, at ¶ 368 (ECF No. 1, Complaint ¶ 368).  Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the

statements made.  Tr. Ex. 4, at ¶ 368 (ECF No. 210, Am. Answer ¶ 368); Tr. Ex. 90 at US8100–01.

212.   Plaintiff expressed her total disbelief over the EDR Coordinator's comments.  She reminded him that she had filed a written claim of retaliation against the Defender on September 10, 2018.  Her retaliation claim was the reason why the investigation report was being submitted to him, not the Defender.  It was also a "critical element" of the disqualification issue.  Tr. Ex. 1, at ¶ 369 (ECF No. 1, Complaint ¶ 369).  Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made.  Tr. Ex. 4, at ¶ 369 (ECF No. 210, Am. Answer ¶ 369); Tr. Ex. 90 at US8101–04.

213.   Plaintiff asked whether her motion to disqualify was being held in abeyance, and why she had not received a ruling.  The EDR Coordinator explained that, early on, he and the Chief Judge had discussed the motion, and agreed that disqualification would be "premature" without a finding against the Defender.  Tr. Ex. 1, at ¶ 369 (ECF No. 1, Complaint ¶ 370).  Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made.  Tr. Ex. 4, at ¶ 370 (ECF No. 210, Am. Answer ¶ 370); Tr. Ex. 90 at US8103–04.

214.   The EDR Coordinator further explained that, if the Defender was disqualified, then "no one" could "represent" the employing office.  Tr. Ex. 1, at ¶ 371 (ECF No. 1, Complaint ¶ 371).  Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in

192

this paragraph for a record of the statements made.  Tr. Ex. 4, at ¶ 371 (ECF No. 210, Am. Answer ¶ 371); Tr. Ex. 90 at US8103–04.

215.    Plaintiff said that she would appreciate a written update on the status of her motion.  Tr. Ex. 1, at ¶ 372 (ECF No. 1, Complaint ¶ 372).  Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made.  Tr. Ex. 4, at ¶ 372 (ECF No. 210, Am. Answer ¶ 372); Tr. Ex. 90 at US8117–18.

216.    Plaintiff also challenged the EDR Coordinator's previous assertions that the Defender had "protect[ed]" her.  She provided specific examples of how the First Assistant was continuing to interfere with her job duties while her complaint was pending.  Tr. Ex. 1, at ¶ 373 (ECF No. 1, Complaint ¶ 373).  Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made.  Tr. Ex. 4, at ¶ 373 (ECF No. 210, Am. Answer ¶ 373); Tr. Ex. 90 at US8110–12.

217.    Plaintiff emphasized: "Nothing about my discomfort or my feelings about being threatened by this person have changed.  I don't see that anything has changed.  If anything, it sounds like everything is going to go back to exactly the way it was before, which is that I'm going to be forced to work with this person who made me feel threatened."  Tr. Ex. 1, at ¶ 374 (ECF No. 1, Complaint ¶ 374).  Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the

193

conversation referenced in this paragraph for a record of the statements made. Tr. Ex. 4, at ¶ 374 (ECF No. 210, Am. Answer ¶ 374); Tr. Ex. 90 at US8112.

218.    The EDR Coordinator expressed sympathy for Plaintiff, but said that he was "struggl[ing]" to understand what she "want[ed]," and that he did not know if the Defender was "aware" of her concerns. He again told Plaintiff "to specifically tell us what's the problem here so we can raise it and have it addressed and resolved." Tr. Ex. 1, at ¶ 375 (ECF No. 1, Complaint ¶ 375). Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made. Tr. Ex. 4, at ¶ 375 (ECF No. 210, Am. Answer ¶ 375); Tr. Ex. 90 at US8113–14.

219.    Exasperated, Plaintiff stated words to the effect: "The problem is that this person made me feel threatened at work." And given that Plaintiff had complained to the Defender, she did not "understand how he says he doesn't know." Tr. Ex. 1, at ¶ 376 (ECF No. 1, Complaint ¶ 376). Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made. Tr. Ex. 4, at ¶ 376 (ECF No. 210, Am. Answer ¶ 376); Tr. Ex. 90 at US8114–15.

220.    Plaintiff pointed out that she had been seeking a duty station transfer, at a bare minimum. However, the Defender was hiring for positions in that office—even as he claimed that he had no office space. Plaintiff further stated words to the effect: "It's difficult for me to understand how I've alleged a very serious situation that has made me feel uncomfortable and I can no longer do my job, and yet there appears to be room for an intern and not for me. There

194

are relatively simple things like that that weren't addressed as easy solutions to this earlier on. Now we're at a point where this process has so damaged my relationships with everyone and created so much hostility that I don't know if I can ever go back or if a transfer would even solve anything." Tr. Ex. 1, at ¶ 377 (ECF No. 1, Complaint ¶ 377). Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made. Tr. Ex. 4, at ¶ 377 (ECF No. 210, Am. Answer ¶ 377); Tr. Ex. 90 at US8114–15.

221. The EDR Coordinator suggested that maybe the Defender had "reasons" for what he did, and that the parties needed a "dialogue." Plaintiff suggested having a dialogue with someone who did not have a conflict of interest within the Fourth Circuit or from Defender Services. Tr. Ex. 1, at ¶ 378 (ECF No. 1, Complaint ¶ 378). Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made. Tr. Ex. 4, at ¶ 378 (ECF No. 210, Am. Answer ¶ 378); Tr. Ex. 90 at US8115–18.

222. The EDR Coordinator did not directly respond to Plaintiff's suggestion. He said that he was just trying to figure out where to go while the investigation was pending, but "if we need to wait, then we need to wait." Tr. Ex. 1, at ¶ 379 (ECF No. 1, Complaint ¶ 379). Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this

paragraph for a record of the statements made.  Tr. Ex. 4, at ¶ 379 (ECF No. 210, Am. Answer ¶ 379); Tr. Ex. 90 at US8119.

223.     The EDR Coordinator then referred to the "looming issue" of whether Plaintiff wanted to stay with the FDO at all. Plaintiff said that she "struggled" with this issue because she "didn't want to leave." Plaintiff said: "This is my dream job, I worked really hard to get here, this is where my husband's family is from, this is where we want to live, this office was a great fit for me."  Tr. Ex. 1, at ¶ 380 (ECF No. 1, Complaint ¶ 380).  Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made.  Tr. Ex. 4, at ¶ 380 (ECF No. 210, Am. Answer ¶ 380); Tr. Ex. 90 at US8119.

224.     Plaintiff noted that if the "highest levels of management feel that way about me despite my hard work and my excellent performance, then clearly I'm not a valued employee in this organization and I don't see how I can continue to work there."  She emphasized that she was not "welcome," and she was being "forced out."  Tr. Ex. 1, at ¶ 381 (ECF No. 1, Complaint ¶ 381).  Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made.  Tr. Ex. 4, at ¶ 381 (ECF No. 210, Am. Answer ¶ 381); Tr. Ex. 90 at US8119–8121.

225.     The EDR Coordinator responded that for Plaintiff to "even contemplate" leaving was "regrettable."  Tr. Ex. 1, at ¶ 382 (ECF No. 1, Complaint ¶ 382).  Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to

Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made.  Tr. Ex. 4, at ¶ 382 (ECF No. 210, Am. Answer ¶ 382); Tr. Ex. 90 at US8122.

226.    The EDR Coordinator ended the conversation by suggesting that Plaintiff consider mediation.  He also said he would ask the HR Specialist about Plaintiff's retaliation claim.  Tr. Ex. 1, at ¶ 383 (ECF No. 1, Complaint ¶ 383).  Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff and respectfully refer the Court to Plaintiff's audio recording of the conversation referenced in this paragraph for a record of the statements made.  Tr. Ex. 4, at ¶ 383 (ECF No. 210, Am. Answer ¶ 383); Tr. Ex. 90 at US8122–24.

226a.    During her deposition, the Investigator testified about her perception of the EDR Coordinator's instructions to her:

> Q.    Okay. Turn to page 8, please, of your report and tell me about your addendum. Why did you write an addendum?
>
> A.    I was asked to do that by James Ishida.
>
> Q.    And why were you asked to write an addendum?
>
> A.    He wanted me to provide my recommendations and more details.
>
> Q.    Did he also want you to include the retaliation?
>
> A.    He didn't -- I don't recall him specifically saying anything about that.
>
> Q.    Okay. So the details -- right at the top you have this bold headline, "Allegation of Retaliation by the Federal Defender for the Western District."
>
> A.    Yes.
>
> Q.    Have you included that claim in your first report?

197

A.     I investigated both claims when I did that report.

Q.     But did you include your findings about the retaliation claim in the first report?

A.     I didn't present any findings. I just presented what I -- the information that I got and then the summary of the informal resolution attempt.

Q.     And, again, just turning to page 1 and 2 on this report, it says "Counselor's Report," "Chronology of Counseling," on page 2 "Summary of Counseling Contacts," but that was not referring to counseling under Chapter X?

A.     No.

Q.     This was all under Chapter IX?

A.     Right.

Q.     Let's go back to page 8. I want to talk with you about Caryn's -- first, what did Mr. Ishida – you said he was asking you for detail. What did he discuss with you in terms of the detail he was looking for?

A.     He wasn't specific. He said can you do an addendum that provides recommendations and more details.

Q.     And did he ask you that by phone? Email?

A.     It was a phone call.

Q.     And did you take notes on that phone call?

A.     I don't recall if I did or not.

Q.     He asked you to provide information about next steps?

A.     Recommendations.

Q.     Recommendations. Did you previously understand that you were not supposed to provide recommendations about next steps?

198

A.      Yes.

Q.      So until he called you and asked you to do this after you submitted the November 19th report, before November 19th it was your understanding that you should not include recommendations?

A.      That's correct.

Q.      You were purely fact finding?

A.      Yes.

Q.      Okay. Is it normal for someone investigating to also make recommendations?

A.      I don't know.

Q.      Did you -- other than writing this report, did you take any additional steps to investigate after November 19th?

A.      Not that I recall.

Tr. Ex. 21 at 158–60 (ECF No. 255-15 at 44–46).  The Investigator's testimony confirms that the Investigator did not consider herself to be a "counselor" responsible for assisting the Plaintiff in finding remedies under Chapter X of the EDR Plan, but rather only a factfinder under Chapter IX—despite the EDR Coordinator's request that she make "recommendations" on the complaint. Indeed, besides repeatedly being asked for her "demands" so that they "could be presented to Mr. Martinez for his consideration," Tr. Ex. 4, at ¶ 331–32 (ECF No. 210, Am. Answer ¶¶ 331–32), Plaintiff never received the counseling she was entitled to under Chapter X of the EDR Plan. *See* Tr. Ex. 9 at US4549 (ECF No. 248-3 at 15) ("The purposes of the counseling shall be to discuss the employee's concerns and elicit information regarding the matter which the employee believes constitutes a violation; to advise the employee of his or her rights and responsibilities and the procedures of the Court applicable to the employment dispute resolution process; to

199

evaluate the matter; and to assist the employee in achieving an early resolution of the matter, if possible."). To the contrary, the EDR Coordinator apparently believed that providing remedies to a complainant before the conclusion of a formal investigation would be "prejudging" the matter and "inappropriate." *Supra*, at ¶¶ 99k, l.

**GG. Plaintiff is left in limbo for another six weeks with no investigation report.**

227. On November 28, 2018, the EDR Coordinator told Plaintiff that he had checked in with the HR Specialist about her retaliation claims. The HR Specialist had "assured" him that she would include the retaliation claims in her investigation report. Tr. Ex. 1, at ¶ 385 (ECF No. 1, Complaint ¶ 385). Defendants admit that the EDR Coordinator emailed Plaintiff on November 28, 2018 and respectfully refer the Court to that email for a full and accurate statement of its contents. Tr. Ex. 4, at ¶ 385 (ECF No. 210, Am. Answer ¶ 385); Tr. Ex. 87 at US1640 (ECF No. 60-4 at 27).

**1. The investigator fails to appropriately investigate Plaintiff's retaliation claim.**

228. Plaintiff emailed the HR Specialist to update her on the retaliation she had experienced since filing her complaint. Tr. Ex. 1, at ¶ 386 (ECF No. 1, Complaint ¶ 386). Defendants admit that Plaintiff sent the HR Specialist an email on November 29, 2018 purporting to detail what Plaintiff alleged as retaliation by the Federal Defender Office. Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents. Tr. Ex. 4, at ¶ 386 (ECF No. 210, Am. Answer ¶ 386); Tr. Ex. 84 at US344–46 (ECF No. 60-4 at 36–38).

228a. During her deposition, the Investigator testified that she did not "recall" ever speaking to Plaintiff about her retaliation claim. Tr. Ex. 21 at 160 (ECF No. 255-15 at 46).

200

The Investigator testified as to her "investigation" regarding retaliation. First, the Investigator spoke to the Appellate Chief to "corroborate" the Defender's claim of no office space in Asheville, even though the Investigator did not speak to any of Plaintiff's witnesses to "corroborate" her claims. *Supra* ¶ 167.

228b. Second, the Investigator testified that "Caryn said that her job duties were different from other people's." Tr. Ex. 21 at 161 (ECF No. 255-15 at 47). When asked about her investigation of this claim, the Investigator testified as follows:

Q. Did you talk to anyone about their job duties?

A. No.

Q. Did you look at any job duties?

A. Not that I recall.

Q. Written job duties of other postings?

A. No. There was one posting that came out that I recall during this investigation.

Q. And who was that?

A. I believe that was an Assistant Federal Defender in Charlotte.

Q. Wasn't there also an appellate position?

A. An appellate position, yes.

Q. And what do you recall about that appellate position?

A. What I do recall is that Caryn wanted to apply for it, and she was told by one of the three that she didn't need to because she already had an Assistant Federal Defender position.

Q. Did you investigate whether that was accurate?

201

A.     No. She had already been reclassified to the AFD.

Q.     And did you -- even though she had been reclassified on paper; I think the words she used in her complaints was a phantom promotion -- did you investigate whether her job duties were the same as that new hire's?

A.     I did not.

Q.     Okay. Was there a reason why not?

A.     No, not that I remember.

Q.     Did you ask JP or Tony if they were talking about Caryn's application for the appellate position with each other?

A.     No, I don't remember asking them.

MS. WARREN: If I could have Tab 32, please. . . .

Q.     This is a document, Bates 6035 to 6036, which I was told was in your paper file.

A.     Yes.

Q.     And I'm looking on 6036, and it's between Tony and, I believe, JP; and it's on June 21st, and it's talking about a bet. So it looks like JP says, "I would like you to know that I respect the sanctity of a bet: Caryn asked me out of the blue if we were just 'inundated with applications for the AFD slot.' She was clearly fishing for whether she should apply (if she hasn't already). I was sorely tempted to subtly encourage her but I pretended like I didn't see where she was angling."

Tony replied, "I appreciate you respecting the sanctity of a bet. You could of played dirty but you played it clean. Let's see if she files."

And then on the next page it looks like JP says, "She's right on the edge. I said something generic about transfers from other offices and her lip was practically quivering. She said "Is that what you're looking for, a transfer from another office?' It was like the thought was breaking her heart."

Then Tony replies, "Oh no. I'm gonna lose this bet."

202

Did you consider what this bet between them was about her employment?

A.      I considered it was a bet about whether or not she would apply for the position.

Q.      Did you ask either of them about this text message exchange?

A.      I don't recall.

Q.      And June 21st is after May 18th.

A.      Uh-huh.

Q.      And the quid pro quo email.

A.      Uh-huh. Yes.

Q.      Would you be concerned that someone who sent that email was making bets about an employee that they sent a quid pro quo email to?

MS. McMAHON: Objection, form.

BY MS. WARREN:

Q.      Are you concerned that an employee was making bets about another employee's application?

A.      I wouldn't necessarily be concerned. I'm not sure the right word to use. I would opine that it wouldn't be appropriate.

Q.      Okay. And it wouldn't be appropriate to make fun of her for crying?

A.      No, it would not be.

Q.      So "her lip was practically quivering," telling that to her supervisor in this context wouldn't necessarily be appropriate?

A.      I would agree with that.

203

Tr. Ex. 21 at 161–65 (ECF No. 255-15 at 47–51). The Investigator's testimony on this point was similar to her testimony that she did not "recall" seeing a text message exchange where the First Assistant stated about Plaintiff, "She may just need to get smacked a bunch." Tr. Ex. 21 at 115–16 (ECF No. 255-15 at 21–22); *see also* Tr. Ex. 112, at US6388 (Def's Ex 126) (First Assistant's statement that Plaintiff "needs to get slapped"). When asked "if someone said that their fellow employee may need to get smacked a bunch, you wouldn't be concerned?," the Investigator answered: "In today's environment, I would probably have a conversation with them if I were made aware of it, but that's not the right language to be using when talking about an employee." Tr. Ex. 21 at 116 (ECF No. 255-15 at 22). The Investigator did not "recall" whether she ever "ask[ed] JP if he had ever made statements about Caryn to other employees that might be inappropriate." Tr. Ex. 21 at 117 (ECF No. 255-15 at 23).

228c. Regarding Plaintiff's job duties, the Investigator also reiterated the Appellate Chief's assertion that he had offered Plaintiff an opportunity to provide arguments in an appellate case. The Investigator, however, did not conduct any independent investigation to corroborate this assertion. The Investigator testified as follows:

> Q. Okay. On page 10 [Appellate Chief] Josh Carpenter said he received notice about an appellate argument in November and immediately sent Caryn an email asking her if she would like to provide the arguments since she had stated an interest in doing so when she briefed this case over the summer.
>
> A. Yes.
>
> Q. Did you ask -- he said that she never responded.
>
> A. Uh-huh.
>
> Q. Did you ask her if she got that email?

204

A.      I did not.

Q.      Did you ask him to provide that email?

A.      I don't think I did.

Tr. Ex. 21 at 175–76 (ECF No. 255-15 at 61–62).  As of the date of this filing, the email that the

Appellate Chief supposedly sent in November 2018 asking Plaintiff to provide oral arguments

has never been produced by Defendants.  *See* Tr. Ex. 21 at 175–76 (ECF No. 255-15 at 61–62).

Rather, the record reflects that the Appellate Chief emailed Plaintiff about the oral argument on

January 11, 2019, *after* he was contacted by the Investigator about Plaintiff's retaliation claim.

*Compare* Tr. Ex. AO US2803–04 (January 9, 2019 and January 11, 2019 emails between Joshua

Carpenter and Heather Beam), *with* Tr. Ex. AD (January 11, 2019 emails between Joshua

Carpenter and Caryn Strickland).  The Investigator's failure to investigate the credibility of the

Appellate Chief's statements accords with Ms. Thomas's conclusion that the Investigator did not

"corroborate statements" by the accused managers or "investigate the credibility of their

statements," even as she "tested the credibility of Strickland's claims."  Tr. Ex. 59, at 19 (ECF

No. 248-17 at 20); Tr. Ex. 108, at 185 (PLT4911).

        228d.   Third, the Investigator testified as to her conclusion that "Ms. Strickland

was not denied locality pay."  Tr. Ex. 21 at 166 (ECF No. 255-15 at 52).  When asked how she

came to that conclusion, she stated: "I asked Bill [Moormann] to see her SF-50. I also confirmed

with -- I called somebody at the AO and asked about that, and locality pay is based off of the pay

table that the person is put on, which is based on their duty station, and that's not something we

have any control over at the local level."  Tr. Ex. 21 at 166 (ECF No. 255-15 at 52).  The

Investigator also noted, "Defender should always authorize both ECI and locality for all AFDs,"

205

as stated in the DOCS Manual. Tr. Ex. 21 at 166–67 (ECF No. 255-15 at 52–53). The Investigator testified, however, that besides talking to "Bill" and "somebody at the AO," she did not "look at any other actions in her personnel file." Tr. Ex. 21 at 166–67 (ECF No. 255-15 at 52–53). The Investigator was shown the Request for Personnel Action dated August 28, 2018, which backdates Plaintiff's reclassification and requests to remove her locality pay. *See supra* ¶ 102e. The Investigator testified as follows:

> Q. Looking at this, this is a request for personnel action, is that right?
>
> A. Yes.
>
> Q. Okay. Looking at the bottom, it looks like the requestor is [Administrative Officer] William Moormann?
>
> A. Yes.
>
> Q. That's Bill Moormann?
>
> A. Yes.
>
> Q. That's the person who you said JP could talk to?
>
> A. Yes.
>
> Q. And this is dated on August 28th of 2018?
>
> Q. If you'll look, it says that it was at least a proposal for Caryn to be reclassified. Is that right?
>
> A. A proposal?
>
> Q. It looks like it's a request for personnel action.
>
> A. Yes.
>
> Q. From a research and writing specialist?
>
> A. Yes.

206

Q.     At a grade 14, step 2?

A.     Yes.

Q.     With a $92,349 base pay?

A.     Yes.

Q.     And then adjusted base pay with the locality is up to 107,319?

A.     Yes.

Q.     This is a proposal to make her an Assistant Federal Defender with a base pay of $92,349 and no locality adjustment.

MS. McMAHON: Objection, lack of foundation.

BY MS. WARREN:

Q.     Did you ever look at this document?

A.     Yes, I did. And I looked at their pay tables as well.

Q.     Were you concerned that this appears to be removing her locality pay?

A.     I wasn't concerned about the removal of the locality pay because, as I understand it, it's not possible to do that at all; however, I wanted to understand where it was.

Q.     Okay. And what did you do to understand that?

A.     I talked to Bill about it by phone.

Q.     Uh-huh. And what did Bill say?

A.     I don't recall exactly what he said, but I did get the impression that he understood it about as well as I did.

Q.     And you said you didn't understand it.

207

A.     Right. So I looked at the pay tables and it -- there was a reason, but I don't recall what the reason was about why the locality was not on there.

Q.     And Bill couldn't explain that to you?

A.     Not that I recall to my satisfaction.

Q.     Okay. How, then, were you satisfied in your conclusion that her locality pay was not removed?

A.     Let me see. I think I had a pay table in here.

Q.     It's actually, I think, right at the end of your report.  I can help you out.  On page 1309 I think you have Exhibit 15. . . .  And it looks like there are sort of three pages to your Exhibit 15 that are all related. I see a notification of personnel action –

A.     Yes.

Q.      -- and it ends with a table. Is that right?

A.     Yes. This is where I saw it. So the AO-52, which is the request for personnel action – . . .  That is the request that is put into the HR management information system before it's actually processed on the back end.

Q.     Okay.

A.     All right? The SF-50 form, which is labeled Exhibit 15, page number 1309, this is the official document that goes into the employee's electronic official personnel file, and on it I saw there was no change in pay.

Q.     But there's no locality adjustment, is there?

A.     There is no locality adjustment, and I don't remember why that was.

Tr. Ex. 21 at 168–70 (ECF No. 255-15 at 54–56).

228e.   Fourth, the Investigator was asked whether she investigated Plaintiff's

claim "that she wasn't given a raise that she would have been entitled to if she had been moved

208

on the research and writing scale to the grade 15." Tr. Ex. 21 at 171 (ECF No. 255-15 at 57).

The Investigator answered as follows:

> A.    I don't recall. What I recall was that she did not get a promotion when she became an AFD.
>
> Q.    And she didn't receive any benefit in pay?
>
> A.    She would have a greater long-term earning potential by moving to this ungraded position, yes, but an immediate raise in pay did not happen.
>
> Q.    You also wrote on page 9 of your report that her salary puts her in the top of the range for an AFD classified as an AD25.
>
> A.    Yes.
>
> Q.    And that was important for your -- was that important that she was at the top of the range?
>
> A.    It did seem to be important to me because it didn't support any type of retaliation in regard to lessening her pay.
>
> Q.    Okay. Would you look back at 1309, and in the remarks she's actually placed in AD level 28, not 25.
>
> A.    Yes. I see that.
>
> Q.    Okay. So do you agree that this is correct, not what your report says, that she was an AD25?
>
> A.    Yes.
>
> Q.    And if you look at the table for an AD28, she would not be at the top of the range. Is that correct?
>
> A.    That is correct.
>
> Q.    Okay. Would that have changed your position about a pay reduction or retaliation?

209

A.      I'm not sure if it would, because there is a classification requirement of years of experience, years of professional attorney experience.

Q.      And did you investigate whether she met those requirements?

A.      No. I was told that there was no trial experience that she had coming into the AFD's office.

Q.      Does anything on this chart say it requires trial experience –

A.      No.

Q.      -- or does it just say professional attorney experience?

A.      Professional attorney experience.

Q.      And you didn't know at this time, in 2018, how many years of professional attorney experience she had?

A.      I do not recall if I knew that or not.

Q.      And that would have been relevant to your consideration?

A.      It could have been, yes.

Tr. Ex. 21 at 171–73 (ECF No. 255-15 at 57–59).

228f.   Similarly, the Investigator testified that she did not investigate the First Assistant's assertion in his *quid pro quo* "Mas Dinero" email that Plaintiff need "five more years of fed service to qualify" for a Grade 15.  Tr. Ex. 4, at ¶ 82 (ECF No. 210, Am. Answer ¶ 82). As Defendants admitted during this litigation, Plaintiff was actually eligible for a promotion to Grade 15 in three more months, not five years.  Tr. Ex. 10 at 9–10 (ECF No. 248-4 at 10–11 ("Defendants admit that Plaintiff would have been eligible for a grade-level promotion to FD-15 on or about August 21, 2018, [her work anniversary date].").  Regarding this issue, the Investigator testified as follows:

210

Q.     And did you confirm his assertion that Caryn would have needed five more years to qualify for a grade 15?

A.     I do not recall because the G15, or G as in a grade, I didn't find anywhere. AFDs have pay ranges.

. . .

Q.     I know you said that the AD plan, the ranges for the Federal Defenders themselves was confusing to you, but talking about the graded and stepped plan, did you research the qualification -- who would have been eligible -- did you research if Caryn was eligible for a G15?

A.     I do not recall what I researched because I know that they're compared to an Assistant U.S. Attorney, kind of like the U.S. Attorney staff is what they're compared to.

Q.     So you never looked into the truth of JP's assertion that it would take her five years to get there?

A.     I would not say that's an accurate statement.  I don't remember. I had conversations with Bill and I looked at their defender services organization handbook. That's what I remember looking at and talking with Bill.

Q.     Was it important to you to know if this was an accurate statement?

A.     Well, yeah, especially when he says it would take you five years to get there.

Q.     And why would it be important?

A.     Because in my experience it takes about a year, not on the JS schedule, but in the court personnel system you have to be at the grade for a year before you can go to the next grade.

Tr. Ex. 21 at 107, 110–11 (ECF No. 255-15 at 13, 16–17).  Confirming the importance of this

issue, the FEOO was asked during her deposition, "Do you know if Mr. Davis was correct that

she needed five more years of service to qualify for a G15?"  Tr. Ex. 20 at 143 (ECF No. 255-14

at 143). The FEOO testified, "I do not know, but . . . given her experience, that sounds unlikely." Tr. Ex. 20 at 143 (ECF No. 255-14 at 143). The FEOO explained that "it would be relevant" that Plaintiff was eligible for the promotion if the First Assistant's assertion "were false," and "then he is explaining that he has a plan," to Plaintiff's understanding of his email as *quid pro quo* sexual harassment. Tr. Ex. 20 at 143–45 (ECF No. 255-14 at 143–45). But the Investigator did not even investigate this issue, apparently because she did not understand the grade the First Assistant was referring to or "find" G15 "anywhere." Tr. Ex. 21 at 107 (ECF No. 255-15 at 13).

228g. In short, in belatedly purporting to "investigate" retaliation after her initial report failed even to mention this claim, the Investigator did not speak to Plaintiff. The Investigator took the FDO managers' statements that there was "no office space" in Asheville at face value without investigating facts that undermined the credibility of this assertion. The Investigator failed to investigate Plaintiff's claim that her job duties were different from other people's and admitted that the First Assistant's conduct in making a "bet" with the Defender about her employment, after sending a *quid pro quo* email, was inappropriate. The Investigator also failed to appropriately investigate Plaintiff's claim that her locality pay was removed. The Investigator was forced to admit that the Defender and Administrative Officer—both of whom were allowed to speak with the First Assistant about Plaintiff's allegations during the investigation—had requested to remove her locality pay and reduce her salary by nearly 15 percent. While Plaintiff's total salary ultimately remained the same due to subsequent actions of AO officials, Plaintiff's salary still "had no locality adjustment," and the Investigator did not know why. Finally, in investigating Plaintiff's claim that she was denied a salary increase, the

Investigator erroneously believed that Plaintiff was being paid near the top of AD Grade 25, even though Plaintiff had been reclassified to an AD Grade 28. The Investigator also admitted that she did not investigate Plaintiff's claim that she was denied consideration for promotion to a Grade 15 for which she was eligible on her work anniversary date. The issue of whether Plaintiff qualified for a grade-level promotion was relevant not only to her *quid pro quo* sexual harassment claim, in which the First Assistant falsely claimed that she would need "five more years of fed service" to qualify, but also her allegation that the Defender retaliated against her by failing to consider her for a promotion for which she qualified. In short, while the investigation report found that "I do not see a case for retaliation based on my investigation and the facts presented by both sides," the Investigator certainly did not investigate the facts as "presented by both sides." Tr. Ex. 12 at US1254 (ECF No. 248-5 at 21). To the contrary, this "investigation" was a sham.

229.   Defendants admit that Plaintiff requested a continuation of the counseling period on November 28, 2018. Defendants admit that Plaintiff's request stated: "My understanding is that the findings in the report will help determine the next steps in the wrongful conduct investigation under Chapter IX" and "[w]ithout more information regarding the report's findings and recommendations, it is difficult to assess the procedures or possible options for resolving the claims under Chapter X." Plaintiff requested extending counseling for 30 days from the date the investigation report was completed to allow time to address "outstanding procedural issues" and to resolve the matter "at the lowest level possible." Tr. Ex. 4, at ¶ 387 (ECF No. 210, Am. Answer ¶ 387).

230.   Defendants admit that, on November 30, 2018, the Chief Judge issued a written

order granting Plaintiff's request for a continuation of the counseling period in part and denying it in part. Defendants further admit that the Chief Judge extended the counseling period until January 14, 2019. Defendants respectfully refer the Court to the order for a complete and accurate statement of its contents. Tr. Ex. 4, at ¶ 388 (ECF No. 210, Am. Answer ¶ 388); Tr. Ex. 91 at US2047 (ECF No. 60-4 at 35).

### 2. Three months after the investigation is opened, the EDR Coordinator asks Plaintiff to consider "mediation" during the counseling period as an "unconventional" step.

231. On December 14, 2018, the EDR Coordinator asked Plaintiff to consider an "unconventional" step: involving a mediator during the counseling period. He stated, however, that "much depends on the findings and recommendations of the investigation report." Plaintiff agreed to discuss the possibility of using a mediator after the holidays. Tr. Ex. 1, at ¶ 389 (ECF No. 1, Complaint ¶ 389). Defendants admit that the EDR Coordinator emailed Plaintiff on December 14, 2018 and Defendants respectfully refer the Court to the email for a full and accurate statement of its contents. Tr. Ex. 4, at ¶ 389 (ECF No. 210, Am. Answer ¶ 389); Tr. Ex. 86 at US1612–14 (ECF No. 60-4 at 44–46).

232. On January 9, 2019, the EDR Coordinator and Plaintiff spoke by phone about a possible mediation. At that point, he still did not know when the amended investigation report would be finished. Tr. Ex. 1, at ¶ 390 (ECF No. 1, Complaint ¶ 390). Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff, and respectfully refer the Court to Plaintiff's recording of the conversation referenced in this paragraph for a record of the statements made. Tr. Ex. 4, at ¶ 390 (ECF No. 210, Am. Answer ¶ 390); Tr. Ex. 75 at US8151–52, US8154–58, US8164–74, US8187 (ECF No. 255-9 at 2–20).

214

233.    Plaintiff expressed discomfort proceeding to mediation if it meant waiving her

procedural rights—especially her right to a decision on her still-pending disqualification request.

Mediation would also be difficult without the investigation report, she noted, given that the

process had "dragged on so long without the problems being addressed."  And if mediation

failed, the only stage left would be a final hearing.  Tr. Ex. 1, at ¶ 391 (ECF No. 1, Complaint ¶

391).  Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff, and

respectfully refer the Court to Plaintiff's recording of the conversation referenced in this

paragraph for a record of the statements made.  Tr. Ex. 4, at ¶ 391 (ECF No. 210, Am. Answer ¶

391); Tr. Ex. 75 at US8171–72 (ECF No. 255-9 at 16–17).

234.    The EDR Coordinator responded that the process was designed to move

"expeditiously."  He noted that the Chief Judge was concerned that the process was taking too

long.  He told Plaintiff to be ready for the end of counseling on January 16, 2019.  Tr. Ex. 1, at ¶

392 (ECF No. 1, Complaint ¶ 392).  Defendants admit that the EDR Coordinator had multiple

conversations with Plaintiff, and respectfully refer the Court to Plaintiff's recording of the

conversation referenced in this paragraph for a record of the statements made.  Tr. Ex. 4, at ¶ 392

(ECF No. 210, Am. Answer ¶ 392); Tr. Ex. 75 at US8166–67 (ECF No. 255-9 at 11–12).

    **3.    The First Assistant repeatedly contacts the EDR Coordinator in an
           attempt to inappropriately influence the EDR investigation.**

234a.   During this period when Plaintiff was told to be ready for the end of

counseling and that the Chief Judge believed the process was "taking too long," *id.*,

unbeknownst to Plaintiff, the First Assistant was repeatedly contacting the EDR Coordinator

regarding what he described as "Caryn's false harassment claims."  Tr. Ex. 73 at US2944 (ECF

No. 255-6 at 2).  On December 3, 2018, the First Assistant emailed the EDR Coordinator the following:

> Hi James,
>
> Hope you're doing well.  Can we schedule a time to speak about the on-going investigation?  This would be mainly to help me get a better understanding of what the procedure is at this point.  It's been 4 months since Caryn made her false harassment claims, and with the facts now reported, I believe everyone now recognizes that no harassment or physical threats ever occurred.  I don't want to rush anything, but as the victim of Caryn's malicious conduct, the harm to me is serious and on-going every day, not just historical.  I am just hoping to get a better understanding of what to expect going forward, and what remedies I will have at the end of it.

Tr. Ex. 37 at US3023 (ECF No. 255-6 at 6).  In response, the EDR Coordinator stated, "I'd be happy to talk to you, but let me tell where things stand at the moment.  I've asked Heather to submit a supplemental report that contains her findings and recommendations. . . . [U]ntil then the proceedings are at a stand still.  So, as difficult as this must be for you and everyone involved, I'm counseling patience.  We need to let the process play out and allow the investigator to complete her work."  Tr. Ex. 37 at US3023 (ECF No. 255-6 at 6).  The EDR Coordinator concluded, "if you still wish to talk, pls let me know.  Otherwise, I will inform the appropriate parties at the appropriate time."  Tr. Ex. 37 at US3023 (ECF No. 255-6 at 6).  In response, the First Assistant asked questions including "will I hear anything once the supplement is completed," and "[a]m I one of the appropriate parties you mentioned who will be notifies [sic] . . . ?"  He also asked "[w]ho is making the final decision" and whether that decision could "sweep more broadly," including to what he characterized as "Caryn's conduct."  Tr. Ex. 37 at US3023 (ECF No. 255-6 at 6).  The EDR Coordinator responded to the First Assistant that "it's hard to say how things will proceed because it all depends on Heather's findings and recommendations."

216

Tr. Ex. 37 at US3022 (ECF No. 255-6 at 5). The EDR Coordinator provided different possible scenarios depending on the report's findings:

> For example, under the Chapter IX proceeding, let's say that Heather finds wrongful conduct and recommends some form of discipline. That recommendation would most likely be shared with the unit executive for his consideration.
>
> However, let's suppose that Heather's recommendation also includes a finding questioning the unit executive's impartiality. If that's the case, then I could envision a scenario where the recommendation would instead to submitted to the chief judge for his consideration.

Tr. Ex. 37 at US3022 (ECF No. 255-6 at 5). The EDR Coordinator explained, however, that "I would prefer not getting into a discussion about possible scenarios because that's just pure speculation, and it could open me and the process up to accusations of prejudging the case." Tr. Ex. 37 at US3022 (ECF No. 255-6 at 5). The First Assistant responded, "I would still like to speak." Tr. Ex. 37 at US3022 (ECF No. 255-6 at 5). The EDR Coordinator asked the First Assistant to "tell me what you plan to ask me" in order "to be helpful and safeguard the process." Tr. Ex. 37 at US3021 (ECF No. 255-6 at 4).

234b. On December 4, 2018, in response to the EDR Coordinator's request, the First Assistant responded, *inter alia*, with the following:

> I would simply request that you consider imposing a deadline for the Supplement. After all this time, I don't see how doing so could lead anyone to a conclude [sic] that the investigation was rushed or prejudged, particularly as I know you would grant any reasonable request for extension. I think you have shown as much sympathy for me—and for everyone involved, including Caryn—as someone in your position possibly could, and I am grateful for that. Nevertheless, it is difficult to express or understand how difficult a situation like this really is, the toll it takes on person and family, or deeply it impacts one day to day.

. . .

Finally, returning to the question I had for you: fundamentally, it is now obvious there are procedures in place that I cannot find or figure out, and I would like to know what they are. Currently, all I have to go on is Chapter IX itself, and as you know, its requirements are minimal: that "the allegations in the report are appropriately investigated" and no elaboration. ***Those facial requirements seem satisfied: the investigation is complete, and Heather has produced a written recitation of facts sufficient, to my understanding, for a decision-maker to immediately conclude there was no sexual harassment*** (which, from what Heather told me, is the only allegation that fits into the Plan's definition of "wrongful conduct").

Obviously, it's not that simple: as you told me, there needed to be Findings & Recommendations in the report, and Tony told me a couple weeks back that you would have two weeks after receiving the report to take some action on it. You've also given me some examples of different procedures in different scenarios. All of this shows me that there *are* established procedures—whether formal or informal—that go beyond what's written in the Plan. On the flipside, I know Caryn filed a Chapter X Request for Counseling some time back. Section 8.C.2 of Chapter X requires a copy of that to be "promptly" provided to the unit executive, but Tony does not have it, or at least did not as of last week. I fully recognize that Chapter X is not my concern except insofar as Tony deems me necessary as either witness or management team member, and I am not trying to interfere in that; I raise it only to point out that here, too, there is clearly an established procedure, and apparently it can *override* what is written in the Plan in certain circumstances. My question is simply what those established procedures are, at least in regard to Chapter IX, and where they come from.

Tr. Ex. 37 at US3020–21 (ECF No. 255-6 at 3–4) (emphasis added). In short, the First

Assistant's email confirmed that he had been told "that Heather has produced a written recitation

of facts sufficient, to my understanding, for a decision-maker to immediately conclude there was

no sexual harassment." Tr. Ex. 37 at US3020–21 (ECF No. 255-6 at 3–4). Thus, he strongly

implied that the investigation's findings were shared with him *ex parte* while the investigation

was ongoing. Further, the First Assistant had been told confidential information about Plaintiff's

218

complaint process, including details regarding her Chapter X Request for Counseling.  Tr. Ex. 37 at US3020–21 (ECF No. 255-6 at 3–4).

234c.  The record suggests that the First Assistant may, in fact, have been told about the investigation's findings in a "private conversation" with the Defender.  On December 4, 2018, the Defender counseled the First Assistant for "talk[ing] to James Ishida about something that Tony and JP talked about in a private conversation."  Tr. Ex. 38 at US4807 (ECF No. 248-14 at 76).  The Defender's notes state that the First Assistant's "legal conclusions" about the investigation did not have any basis because "that was an informal conversation between James and Tony."  Tr. Ex. 38 at US4807 (ECF No. 248-14 at 76).  The Defender's contemporaneous notes thus suggest that the investigation's findings were shared in an "informal conversation between James and Tony," and then shared with the First Assistant "in a private conversation" with the Defender.  Tr. Ex. 38 at US4807 (ECF No. 248-14 at 76).

234d.  The Defender's notes explain that he had "received an email from James Ishida regarding 'a troubling email exchange with one of your attorneys.'"  Tr. Ex. 38 at US4807 (ECF No. 248-14 at 76).  The Defender then gave the First Assistant an order "that if he contacts Heather Beam or James Ishida again, then Tony will walk him out of the office."  Tr. Ex. 38 at US4807 (ECF No. 248-14 at 76).  The Defender's notes further state as follows:

> Tony repeatedly cautioned JP that he (Tony) is trying to protect JP's rights. JP expressed that he felt like the victim. Tony expressed that JP is not the victim and we do not have a final report yet. Tony expressed extreme concern that his boss (James Ishida) is uncomfortable with JP's communication with him (James). From Tony's perspective, JP expressed something to the "judge" in this case. JP clearly asked what the procedures were and what the procedures are that the court is following as far as who makes the decision in the case and who will determine the outcome. Tony expressed frustration that he has been trying to protect JP from

219

making it worse for himself and JP is aggravating the key players in the process.

Tony made clear that he did not want to talk about the Sexual Harassment investigation with JP Davis any longer. JP also made clear that if he thought he would have breached Tony's trust by talking with James, he would have never done it. He did not realize that the communication he had earlier with Tony was to remain confidential.

JP asked for clarification on what he did wrong. Tony explained that he asked from the beginning for JP to let the process work itself out, let the process happen and just let go. He understands being accused is a bad spot to be in, but let the process work. Now, we are at the point where the Circuit Executive is uncomfortable with their conversation. Tony expressed several times that you cannot go to the trier of fact and speak about "legal conclusions" when there is no basis - that was an informal conversation between James and Tony. There is currently no legal conclusion to the ongoing investigation.

Tr. Ex. 38 at US4807 (ECF No. 248-14 at 76).

234e.   When asked about this incident during his deposition, the EDR Coordinator denied that he had disclosed the Investigator's findings, but he testified that it was possible that the First Assistant "had been told about Heather Beam's recitation of findings or facts." Tr. Ex. 22 at 185 (ECF No. 248-12 at 21). He stated that "[i]t could very well be that the investigator had drafted facts as she understood them and wanted to get confirmation," although he qualified that this was "speculation." Tr. Ex. 22 at 185 (ECF No. 248-12 at 21). The EDR Coordinator testified that he did not know because "I wanted, really, nothing to do with the investigation. I let Heather dictate how that would go." Tr. Ex. 22 at 186–87 (ECF No. 248-12 at 22–23). The EDR Coordinator stated: "So, again, I don't know what Heather did. I don't know if she showed Mr. Davis a copy of the report or what happened, but I don't know what JP means by 'the facts are now reported.'" Tr. Ex. 22 at 189 (ECF No. 248-12 at 25).

220

234f.　During his deposition, EDR Coordinator testified that he had "expressed concerns" to the Defender that the First Assistant's behavior was "inappropriate" and that he was "worried that the investigation be conducted with integrity."  Tr. Ex. 22 at 186 (ECF No. 248-12 at 22); Tr. Ex. 22 at 200–01 (ECF No. 255-3 at 57–58).  The EDR Coordinator did not remember, however, ever notifying the Chief Judge of his concerns about the First Assistant's behavior.  Tr. Ex. 22 at 201 (ECF No. 255-3 at 58).  His conduct is in stark contrast to his immediate notification to the Chief Judge about the Defender's earlier allegations that the FEOO was "interfering" with the EDR investigation as a "friend" of Plaintiff.  The EDR Coordinator also testified that he did not do anything to supervise the investigation because "once she was appointed, then, you know, it was her job to conduct the investigation as she saw fit, and I didn't want to know, and I didn't want to be involved in that process."  Tr. Ex. 22 at 200 (ECF No. 255-3 at 57)  The EDR Coordinator therefore did not know whether the "investigator showed the report's findings or discussed them with an accused party" because he "did not want to know how she conducted her investigation."  Tr. Ex. 22 at 201 (ECF No. 255-3 at 58).  The EDR Coordinator stated that he did not ask the Investigator whether the First Assistant had contacted her because he "trust[ed]" that she "would handle it appropriately."  Tr. Ex. 22 at 201 (ECF No. 255-3 at 58).  By "appropriately," the EDR Coordinator explained that he expected that if the First Assistant had asked "a procedural question" like when he was going to be interviewed, that would be OK, but "if it was an attempt to frame the issues or . . . something where Mr. Davis was trying to influence the outcome of the investigation, you know, I have full confidence that Heather would have said, 'That's improper' and 'Please don't do that.'"  Tr. Ex. 22 at 204 (ECF No. 255-3 at 61).  Of course, the EDR Coordinator's "full confidence" that the Investigator

221

would reject the First Assistant's attempts to influence the investigation was misplaced. Tr. Ex. 22 at 204 (ECF No. 255-3 at 61). Indeed, Plaintiff's workplace investigations expert, Ms. Thomas, concluded that the Investigator "allowed Martinez and Davis to potentially influence her," which, among other mistakes, "compromised the adequacy of her investigation." Tr. Ex. 59, at 21 (ECF No. 248-17 at 22); Tr. Ex. 108, at 187 (PLT4913).

234g. Further confirming these concerns about potential *ex parte* communications during the EDR proceeding, in February 2019 the First Assistant sent the following email to the Administrative Officer about Plaintiff's confidential complaint:

Bill,

I'm directing this to you because you are the only person I can raise it to without risking my job or worse. ***As of this month, it will be six months since Caryn Devins falsely accused me of harassment, four months since I was informally told that the investigation had found that no harassment occurred, and three months since I was told the investigator's report was sent back for "findings and recommendations" that were supposed to take only a few days to complete.***

As you'll recall, two months ago, Tony threatened to fire me on the spot if I had any future contact with Heather Beam or the Circuit's designated Employee Dispute Resolution Coordinator, and he insinuated that any further interest in my own HR matter might trigger retaliatory adverse findings against me on the merits.

. . .
Right now, as an employee and a person, I feel harassed, devalued, dismissed and intimidated. I am constantly on edge because I feel my job, position, and reputation are all being treated as pawns in a political game that only treats me this way because I am male and my accuser is female. Every day, I am frankly terrified that my job could to be [sic] yanked away at any minute if I say the wrong thing. Or worse, just because it's politically expedient to make me the scapegoat so no one has to formally acknowledge what everyone already agrees on: that Caryn brought these claims in bad faith, knowing full well that they were false.

222

Tr. Ex. 73 at US2944 (ECF No. 255-6 at 2) (emphasis added).  The First Assistant's email thus confirms that he was "informally told that the investigation had found no harassment occurred" on or about October 2018, while the investigation was still in its early stages.

234h.   Moreover, the First Assistant's interference with Plaintiff's EDR proceeding was not even the only attempt by FDO management officials to interfere with the EDR process while Plaintiff's complaint process was pending.  Indeed, ███████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
Tr. Ex. 58 at US7435 (ECF No. 248-16 at 23).
████████████████████████████████████████████





Tr. Ex. 58 at US7436–37 (ECF No. 248-16 at 24–25).



Tr. Ex. 58 at US7437–40 (ECF No. 248-16 at 25–28). Defender Martinez's conduct in



, Tr. Ex. 58 at US7439

(ECF No. 248-16 at 27), is similar to his conduct in openly coordinating with First Assistant

Davis to come up with a consistent narrative before their interviews with Investigator Heather

Beam in Plaintiff's EDR investigation—including by asking for a "timeline of events" drafted by

the First Assistant. *Supra*, ¶¶ 158d. This conduct shows that Defender Martinez's inappropriate

interference in the EDR process was not a one-off or inadvertent mistake, but rather part of a

pattern of discriminatory and retaliatory conduct.

> **HH. Despite the EDR Investigator's findings that both the Defender and First Assistant engaged in conduct warranting disciplinary action and her recommendation that the Defender be disqualified, the EDR Coordinator tells Plaintiff that he is withholding the investigation report and the Defender will not be disqualified.**

235. On January 11, 2019, the EDR Coordinator informed Plaintiff that he had

received the amended investigation report and would "be in touch." Tr. Ex. 1, at ¶ 393 (ECF No.

1, Complaint ¶ 393). Defendants admit that January 11, 2019 was just over four months after

September 10, 2018, when Plaintiff filed her request for counseling. Tr. Ex. 4, at ¶ 393 (ECF No. 210, Am. Answer ¶ 393); Tr. Ex. 42 at US1535 (ECF No. 248-15 at 38).

235a.  As Plaintiff's workplace investigations expert, Ms. Thomas, explained, "Defendants did not respond to or investigate Strickland's complaint promptly. Strickland first complained about Davis to Martinez in July 2018. She brought her EDR complaint on September 10, 2018. Beam did not conclude her investigation and issue her report until mid-January 2019, six months after Strickland's initial complaint. No action was taken by Defendants in response to Beam's report, and no resolution came as a result. . . . During this six-month period, Strickland worked from home in order to avoid contact with Davis. Being away from the office without direct access to her peers and superiors placed Strickland at a disadvantage professionally." Tr. Ex. 59, at 15–16 (ECF No. 248-17 at 16–17); Tr. Ex. 108, at 181–82 (PLT4907–08).

### 1. The Investigator's report concludes that both the Defender and the First Assistant should be disciplined.

235b.  In her report disclosed to the EDR Coordinator on January 11, 2019, the EDR Investigator concluded in her report that both the Defender and the First Assistant had engaged in conduct warranting disciplinary action. Tr. Ex. 12 at US1257 (ECF No. 248-5 at 24).

235c.  The EDR investigation report found that the First Assistant's May 18, 2018 "Mas Dinero" email "can clearly be inferred to be a quid pro quo request" that "supports Caryn's claim of sexual harassment." Tr. Ex. 12 at US1256 (ECF No. 248-5 at 23)  Specifically, the Investigator's findings regarding the *quid pro quo* email are as follows:

> JP sent Caryn one questionable email after their mentoring lunch on May 18, 2018 in which Caryn had expressed a desire to transfer to Asheville and also asked for a promotion. The email states, "Dude,

226

you're shooting high with a G15. Not least of all since you'll need 5 more years of fed service to qualify for it. But fret not, I have a plan . . . just remember I deal in pay for stay :)" (Exhibit #2). ***This email can clearly be inferred to be a quid pro quo request.*** When I interviewed JP Davis he did give me a copy of this email along with other documentation. I asked him about it and he openly admitted this was a stupid email to send. Based on his forthrightness with the email and his reaction when I brought it up, I do not believe there was an intention of sexual harassment when he sent the email. ***Regardless, this email supports Caryn's claim of sexual harassment.***

Tr. Ex. 12 at US1256 (ECF No. 248-5 at 23) (emphasis added).

235d.   Despite the Investigator's clear findings in support of the sexual harassment claim, her investigation report concluded that Plaintiff had experienced sexual harassment "in her mind" but the facts "find this claim to be very flimsy."  Tr. Ex. 12 at US1257 (ECF No. 248-5 at 24).  The Investigator had never received any training on whose perception matters in evaluating a sexual harassment claim.  *See* Tr. Ex. 21 at 123 (ECF No. 255-15 at 29).  Thus, the Investigator erroneously concluded that because the First Assistant "openly admitted this was a stupid email to send" and was "forthright" about it in her opinion, she did "not believe there was an intention of sexual harassment when he sent the email."  Tr. Ex. 12 at US1256 (ECF No. 248-5 at 23).  The Investigator's notes state: "Admitted this was dumb to do (pay for stay) it was a joke."  Tr. Ex. 31 at US6235 (ECF No. 248-14 at 55).  However, judiciary guidance, in accordance with applicable precedent, provides that "[i]t is the perception of the individual who feels harassed that counts," not the intent of the harasser.  Tr. Ex. 55 at US7019 (ECF No. 248-15 at 61) (Federal Judicial Center Guidance); Tr. Ex. 55 at US7019 (ECF No. 248-15 at 61) ("But the *intent* doesn't determine whether it's workplace harassment; what counts is the perception of the person who feels harassed.").  Indeed, it is settled law that sexual

harassment is determined from the perspective of "a reasonable person in the plaintiff's position." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333 (4th Cir. 2003).

       235e.   Had the Investigator applied these standards, she would have been compelled to conclude that the First Assistant engaged in *quid pro quo* sexual harassment based on her finding that his email "can clearly inferred to be a quid pro quo request." Tr. Ex. 12 at US1256 (ECF No. 248-5 at 23). Instead, she concluded that "JP Davis MUST be counseled and trained on workplace conduct issues and professional communications via email," a recommendation which gravely understated the seriousness of the harassment and the response that would be proportional to its severity. Tr. Ex. 12 at US1257 (ECF No. 248-5 at 24). As Ms. Thomas explained in her expert report, "it is not clear whether Beam asked Davis to explain a key piece of evidence: Davis' May 18, 2018, "pay for stay" email to Strickland. If Davis had intended this email as an implicit promise of a promotion if Strickland agreed to his sexual advances, sending the email would have constituted quid pro quo sexual harassment, something that would have called for Davis to be terminated. Yet it does not appear that Beam explored whether this was indeed Davis' intention. She appeared to take at face value his claim that sending the email had simply been a foolish error." Tr. Ex. 59, at 20–21 (ECF No. 248-17 at 21–22); Tr. Ex. 108, at 186–87 (PLT4912–13). At her deposition, Ms. Thomas testified that she found it "particularly concerning that, in [the investigator's] opinion, because the email was so – was a stupid thing to do, she found it very easy to believe, well, then he must have been joking, and did not seem to seriously pursue that defense on his part." Tr. Ex. 108, at 151–52. When asked why the *quid pro quo* email was a "key piece of evidence," Ms. Thomas explained as follows:

> Because it -- it was possibly quid-pro-quo sexual harassment, which, for most employers, is a particularly egregious form of sexual harassment that would demand serious discipline, up to and including termination.
>
> And so by treating -- accepting Davis' claim that this was just a joke and wasn't intended as an actual quid pro quo, Ms. Beam's conclusion insulated Davis from that potential discipline.

Tr. Ex. 108, at 153–54.

235f.    The Investigator's report also concluded, without any supporting explanation, that Plaintiff "has exploited poor judgement and decision-making skills of upper management to attain her goal of a transfer to Asheville."  Tr. Ex. 12 at US1257 (ECF No. 248-5 at 24).  This conclusion inexplicably blames Plaintiff for the "poor judgment and decision-making skills" of her supervisors, which led her to seek remedies that she was authorized— indeed encouraged—to seek under the EDR Plan.  Plaintiff was neither informed of this allegation, which unfairly damaged her reputation with officials of the court before which she practiced, nor provided an opportunity to respond.  Indeed, it appears likely that the Investigator introduced this "conclusion" to her report in response to the First Assistant's request that he "[w]ould like documented she was found to be making this up," Tr. Ex. 31 at US6236 (ECF No. 248-14 at 56), thereby confirming that she had allowed him to inappropriately influence her findings.  At her deposition, the Investigator conceded that there was no evidence in support of this conclusion except for the unsupported and self-serving allegations of the First Assistant himself:

> Q.    Is this your interview with Tony?
>
> A.    Yes.
>
> Q.    These are your notes?

229

A.      Yes.

Q.      Okay. And at the top of this it says interview with Caryn Devins. "No interest expressed in Asheville via Skype." Is that right?

A.      Yes.

Q.      And then the paragraph below it says, "Never asked about going to Asheville even up to today." Is that right?

A.      Yes.

Q.      And then it says, "Agreed to help with Asheville but never said anything about a long term move." Is that right?

A.      Yes.

Q.      So how did you reach that conclusion?

A.      Those are my notes. That wasn't my conclusion.

Q.      How did you reach the conclusion in your report that, "Tony advised in his interview with me that throughout the year she had stated an interest in moving to the Asheville office"?

A.      How did Tony know? Was that the question?

Q.      "Tony advised in his interview with me that throughout the year she had stated an interest in moving to the Asheville office."

A.      Yes.

Q.      But it looks like Tony told you that at least to him she didn't express interest in going to Asheville at her interview via Skype.

A.      Right.

Q.      Tony said that Caryn never asked Tony about going to Asheville, even up to today.

A.      Right.

230

Q.      And that she offered to help with Asheville but never said anything about a long-term move.

A.      Uh-huh. And he may -- JP had told Tony about Caryn wanting to move to Asheville.

Q.      And that was in May of 2018, right?

A.      Yes.

Q.      So it wasn't throughout the year, it started in May of 2018?

A.      I'm not sure if it started then, but that's what I have in my notes.

Q.      Did you come across anyone who said that Caryn wanted to move to Asheville before 2018, May of 2018?

A.      Not that I recall, no.

Q.      And did you find that she said that to anyone other than JP himself?

A.      I don't remember.

Q.      Well, she didn't say it to Tony. Do you agree?

A.      I am only writing down what he had told me.

Q.      So according to Tony she didn't say it to him?

A.      According to Tony that would be true.

Q.      Do you have any reason not to believe Tony?

A.      No.

Q.      And I just want to show you some more notes, because I think you only talked to one other person about Asheville. Is that right?

A.      I believe Josh Carpenter.

231

MS. WARREN: Yeah. Could I have 22, please?
(Exhibit 34 was marked for identification.)

BY MS. WARREN:

Q.      All right. I'm marking this as Exhibit 34, and this is, I
think, your interview with Josh, it looks like.

A.      Yes.

Q.      Okay. And if you'll look sort of right above the line, you
have "[at] interview – doesn't recall her wanting to come to
Asheville."

A.      Yes.

. . .

Q.      And sort of in the middle you said that Caryn wanting to
come to Asheville around the time of getting married, it looks like
Josh joked about taking Caryn and JP said no.  Is that how you
understand those notes?

A.      Yes.

Q.      Okay. So Caryn didn't bring it up to Josh?

A.      I'm not sure if she did or not.  I know he was aware that she
wanted to come to Asheville, but I don't recall how he said he was
made aware.

Q.      Okay. So from your notes it doesn't seem that she told
him?

A.      Does not seem to be.

Q.      It looks like he joked about it and JP said no?

A.      At some point he did.

Q.      Okay. Did you ask him if Caryn ever told him she wanted
to go to Asheville?

A.      I do not recall if I asked him or not.

232

Q.      Would that have been important to ask?

A.      I'm not sure, because Josh wouldn't be the decision-maker of whether or not she could come.

Q.      Well, your conclusion at the end of your report, and we'll get there, is that Caryn was sexually harassed in her mind but you seemed to think that the more likely thing is she was exploiting the poor judgment of her supervisors to move to Asheville.

A.      That's correct.

Q.      I'm trying to understand why you thought she was trying to move to Asheville, because according to your notes it seems that the only person who told you she was trying to move to Asheville is JP.

A.      Uh-huh.

Q.      Did anyone else tell you that she was trying to move to Asheville?

MS. McMAHON: Objection, misstating prior testimony.

MS. WARREN: I'm asking her the question.

BY MS. WARREN:

Q.      Did anyone else tell you that Caryn told them directly she was trying to move to Asheville?

A.      Not that I recall.

Q.      And do you recall anyone telling you, including JP, that Caryn wanted to move to Asheville earlier than May of 2018?

A.      I do not recall.

Tr. Ex. 21 at 147–151 (ECF No. 255-15 at 33–34).  The Investigator's admission that Plaintiff

had never requested a transfer to Asheville starkly undermines her conclusion that Plaintiff

"exploited poor judgment and decision-making skills of upper management to attain her goal of a

233

transfer to Asheville." Tr. Ex. 12 at US1257 (ECF No. 248-5 at 24). Indeed, after the Defender belatedly offered Plaintiff a transfer after stonewalling for six months, Plaintiff turned down the offer because a transfer would not remedy the harassment, discrimination, and retaliation she suffered. *See infra* ¶ 260.

235g. As for the Defender, the Investigator recommended that "Mr. Martinez MUST also be counseled and trained on how to handle workplace conduct complaints. He should also be counseled or train[ed] on judgement and decisiveness. From my interview with him and these decisions he made he had commented most of these were made at the end of a day where attended meetings all day and was tired." Tr. Ex. 12 at US1257 (ECF No. 248-5 at 24). In her report, the Investigator elaborated as follows:

> Executive Coaching/Training for Mr. Martinez for future employee issues he will be tasked to handle. For example, Caryn states that when she initially brought her complaint to Mr. Martinez he compared her relationship with the First Assistant Defender as a marriage and asked her to compromise. He also made comments bade [sic] on Caryn's report such as "At least she was not touched" and called her out on contacting the AO to receive guidance on her civil rights as a federal employee. He also stated he was being blamed for something that was not his fault. It is evident this claim was mishandled from the beginning by Mr. Martinez and he would benefit greatly with additional training on workplace conduct as well as basic managerial/leadership skills.

Tr. Ex. 12 at US1254 (ECF No. 248-5 at 21). In addition, the Investigator explained that Plaintiff had told her: "This situation has irreparably damaged my relationships with the Federal Defender and my colleagues, and I believe I am no longer welcome in that environment. At this time, I am hopeful the Fourth Circuit will assist me in transitioning out of Tony's office." Tr. Ex. 12 at US1254 (ECF No. 248-5 at 21). The investigator concluded that "[t]his may be the case for Caryn based on her own perception of how this case has been handled. She believes the

234

details of her case have not been handled in a confidential matter [sic]." Tr. Ex. 12 at US1254 (ECF No. 248-5 at 21). The Investigator inexplicably stated that "[t]his investigation has not revealed this perception to be true," Tr. Ex. 12 at US1254 (ECF No. 248-5 at 21), even though the First Assistant had specifically told her that "many of the employees have figured out there is some kind of existing HR matter," meaning that Plaintiff's confidentiality had been compromised, and the Investigator herself had allowed the First Assistant to discuss Plaintiff's complaint with the Defender and others. *Supra*, ¶¶ 158a–d.

> ### 2. Despite the Investigator's recommendation that the Defender be disqualified because he is "biased" against Plaintiff and "could cause more damage," Defendants deny Plaintiff's disqualification request.

235h. Based on her recommendation that the Defender be disciplined, on January 11, 2019, the EDR Coordinator emailed the Investigator and asked, "[g]iven your recommendation that Tony be counseled and trained on handling workplace conduct complaints and decision making, I'd like your thoughts on whether you think Tony should be disqualified from participating in the EDR case." Tr. Ex. 39 at US1382 (ECF No. 248-14 at 77). Her answer was an emphatic yes:

```
> On Jan 13, 2019, at 5:53 PM, Heather Beam <Heather_Beam@ncwp.uscourts.gov> wrote:
>
> Hey James,
>
> I truly believe Tony is biased in this case involving JP and Caryn as far as the sexual harassment is concerned. From
my conversations with him I know he feels Caryn is attempting to exploit this situation to get the transfer to Asheville,
however it has created a bias in him to look at this case from a neutral perspective. I also believe he lacks the experience
and understanding of exactly how this process works. I am concerned he could cause more damage if he were involved in
the process at this point.
>
> Caryn had requested Tony be disqualified as she felt she was retaliated against after she submitted her claim of
Wrongful Conduct. Although retaliation in my investigation was unfounded, I still think in a good faith effort to resolve this
circuit should consider disqualifying him based on the contentious nature of the current situation. I would strongly
recommend mediation at this point with perhaps one of the individuals we discussed the other day.
~
```

Tr. Ex. 39 at US1382 (ECF No. 248-14 at 77).

235i.    However, it appears that this email was never communicated to the Chief Judge, who did not consider it in ruling on disqualification.  During his deposition, the Chief Judge testified as follows when asked whether he was "familiar with this email":

A       I can't say that I am.

Q       Having read the e-mail now, was the substance of it ever communicated to you?

A       I don't recall that. I can't flat-out deny it, but I . . .

. . .

Q       All right.  So to confirm, you never received this e-mail?  It was never forwarded to you?

A       I said I don't recall it, but I do know this, that this was -- is dated two days after -- no. Scratch that.  No.  I don't recall it.  I don't recall it.

Q       And just to confirm, no one ever communicated the substance of this e-mail to you?

MR. KOLSKY: Objection. Asked and answered.

THE WITNESS: No, that I know of. Not that I know of.

BY MR. STRICKLAND:

Q       And just to confirm, did you consider Heather Beam's January 13, 2019, e-mail recommending that the Defender be disqualified in making your decision on Plaintiff's disqualification request?

A       Did I consider it, her opinion?

Q       Heather Beam's opinion.

A       No, I did not, because it wasn't her job to make the decision, nor was I counseling her -- or sought counsel from her to help in that decision, so, no, I didn't.

236

Tr. Ex. 18 at 32–34 (ECF No. 255-2 at 33–35).

236.   On January 16, 2019, the EDR Coordinator informed Plaintiff by email that her counseling period had expired.  Plaintiff did not receive a ruling on a second request for an extension of time she had made for the purpose of evaluating the investigation report.  Tr. Ex. 4, at ¶ 394 (ECF No. 210, Am. Answer ¶ 394); Tr. Ex. 42 at US1533 (ECF No. 248-15 at 36).

237.   In addition, he said that the Chief Judge "intend[ed]" to deny her request to disqualify the Defender."  Tr. Ex. 4, at ¶ 395 (ECF No. 210, Am. Answer ¶ 395); Tr. Ex. 42 at US1533 (ECF No. 248-15 at 36).

237a.   During his litigation, Defendants admitted that "Plaintiff's request for disqualification of the Federal Defender was denied."  Tr. Ex. 10 at 8 (ECF No. 248-4 at 9).

237b.   During his deposition, the Chief Judge testified as to the following regarding his reasons for denying Plaintiff's request to disqualify the Defender:

> So in making the decision to disqualify, I looked at a broader issue; that is, first, we start with what is the purpose of an EDR, and it's called dispute resolution. It's to resolve matters. That's the whole point of it.
>
> And so I looked at the whole context of resolving it with the person -- or with the appointing authority that needs to resolve it as best Ms. Strickland and the appointing authority can agree to. So then you have to have the right people there who can effect a settlement.
>
> And that is -- for example, all these things were grievance-type things, like pay, job duties, who you'll report to, where you would work, all of those things like that. That's the very essence of the idea of what a dispute is, and Mr. Martinez is the fulcrum there.
>
> I think the things that -- the 'bad acts' aspect of it was the alleged sexual harassment. Well, he was not that person. The other part is, of course, in terms of how -- questions of how he reacted, what he did, what my job things were, so all of that.

237

. . .

> And so I looked at the broader reach of it and went beyond her facts in terms of looking in terms of every sector where it would be appropriate to disqualify, take the appointing authority out. And you're trying to – if you're trying to legitimately resolve it, you need that person, and I saw nothing in there that said that he was resisting that. By her own statement, they were negotiating it.

> Q      And just to clarify, when you say the appointing authority, is another way to describe that the Unit Executive?

> A      Exactly. That's what -- yeah. The government appointing authority, yes.

Tr. Ex. 18 at 35–36 (ECF No. 255-2 at 36–37).  The Chief Judge's statements regarding disqualification are diametrically opposed to standard accepted practices for workplace investigations, as explained by Plaintiff's workplace investigations expert, Ms. Thomas.  Indeed, Ms. Thomas's report specifically concludes that Defendants erred because "[t]he EDR Plan process placed responsibility on *her* to negotiate with Martinez and come up with a resolution to her complaint."  Tr. Ex. 59, at 16–17 (ECF No. 248-17 at 17–18); Tr. Ex. 108, at 182–83 (PLT4908–09).  Moreover, "the investigation of Strickland's complaints lacked fundamental fairness," in part, because "Martinez acted as a 'decision maker' who had the authority to approve or disapprove any proposed resolution."  Tr. Ex. 59, at 16 (ECF No. 248-17 at 17); Tr. Ex. 108, at 182 (PLT4908).

> 237c.   In his deposition, the Chief Judge further testified:

> But the bottom line is, as a judge in making a judicial decision, I looked at all those factors, and I believe the decision I made was correct; not perfect, necessarily, but I think it's correct. And I think the problem with the standard is abuse of discretion since it doesn't lay out a standard at all. So the EDR doesn't even talk about what the standards are, what the guidelines are, so . . .

238

Tr. Ex. 18 at 37–38 (ECF No. 255-2 at 38–39).  Yet, as Ms. Thomas explained, there *are* standard accepted practices for conducting workplace investigations, which "include a timely, fair, and thorough investigation conducted by an unbiased investigator that comes to a reasoned and fair decision.  A fair investigation should provide due process (essential fairness) for both the complaining party and the party who the complaint is lodged against."  Tr. Ex. 59, at 14 (ECF No. 248-17 at 15); Tr. Ex. 108, at 180 (PLT4906).  As part of these standards, which are articulated in the EEOC's Enforcement Guidance, "the alleged wrongdoer should not have supervisory authority over the person conducting the investigation and should not have any direct or indirect control over the investigation."  Tr. Ex. 59, at 16 (ECF No. 248-17 at 17); Tr. Ex. 108, at 182 (PLT4908).  The failure to disqualify the Defender from the EDR process even though he was an alleged wrongdoer, and the investigation found that disciplinary action against him was warranted, does not comport with these accepted standards.

237d.   Contrary to these standards, the EDR Coordinator also testified that he believed it would depend on the "context" whether an accused unit executive would need to be disqualified from an EDR proceeding, even when the unit executive is accused of sexual harassment or sex discrimination.  Tr. Ex. 22 at 167 (ECF No. 255-3 at 47).  Specifically, the EDR Coordinator testified as follows:

> Well, I think it depends on the context and the allegations made against the unit executive.
>
> Q       Could you tell us more about how it depends on the context –
>
> A       Okay. So –
>
> Q       -- and the allegations?

239

A      Okay. So, for example, let's say – let's say an employee makes an allegation that "The unit executive is being unfair because," you know, "the unit executive did not promote me."

Okay. In that case, under that hypothetical, personally -- and if it's happening at the -- you know, the informal counseling, mediation stage, personally, under those set of facts, I would not see the need to disqualify the unit executive.

Q      What about in a circumstance where the unit executive were accused of sexual harassment or sex discrimination?

MR. KOLSKY: Objection. Calls for speculation.

BY MS. SUK GERSEN:

Q      You can answer.

A      Well, again, I think -- I think what I said before is, I think it depends on the context and what the allegations are.

Q      I understand, and that's -- and you provided an example to give us a sense of the context. So I'm providing you with another example and another context to get your view. And so let me reask the question.

A      Uh-huh.

Q      In the context where you have – let's just make it really specific -- quid pro quo sexual harassment allegations about a unit executive and hostile environment, sexual harassment, or sexual discrimination, or an allegation of deliberate indifference, would you say that the unit executive being alleged -- or being alleged to have committed those acts should not be disqualified –

MR. KOLSKY: Same objection.

BY MS. SUK GERSEN:

Q -- from the EDR process?

You can answer.

240

A    Yeah. You know, again, you know, it's difficult to answer, to provide an absolute, because, you know, it really does depend on the specific facts of the case and the context in which it's alleged.

Q.    Let me make it specific. Quid pro quo sexual harassment. A unit executive accused of quid pro quo sexual harassment should be disqualified from playing the normal role of a unit executive in a EDR proceeding. Yes or no?

A    In the early stages of the EDR proceeding?

Q    I'm talking about after an investigative report has been completed and in the counseling and mediation processes. You have testified that the unit executive is normally involved.

A    That's correct.

Q    If that unit executive were accused in the actual EDR matter of sex discrimination, or to be even more specific, quid pro quo sexual harassment, would you consider it appropriate to disqualify that person?

MR. KOLSKY: Objection. Calls for speculation. And object to form.

BY MS. SUK GERSEN:

Q    You may answer.

A    Well, again, I think it's – it's difficult to answer that because there's a lot of nuances.

Tr. Ex. 22 at 167–69 (ECF No. 255-3 at 47–49). Shockingly, the EDR Coordinator would not even confirm that a unit executive accused of *quid pro quo* sexual harassment should be disqualified from an EDR proceeding, because he believed the issue had "a lot of nuances." Tr. Ex. 22 at 167–69 (ECF No. 255-3 at 47–49).

237e.    As a result of the denial of disqualification, the Defender was the only person who could address Plaintiff's complaints during counseling and mediation, even though

241

the investigation found that he had engaged in conduct warranting disciplinary action and was too biased against Plaintiff to participate. As the EDR Coordinator testified:

> Q      So given that Tony was not disqualified, what role was he tasked with performing after the investigative report?
>
> A      Well, if I remember correctly, this was -- it was either at the close or close to the end of the counseling period or at the beginning of the mediation period, and so Tony's role would have been -- as the unit executive of the office, he would have been in the position to, you know, see what he could do to address Plaintiff's concerns about, you know, promotion, the work conditions, and so on and so forth.
>
> Q      And he had that role because he was the unit executive?
>
> A      Who had the authority to do that, yes.

Tr. Ex. 22 at 162 (ECF No. 255-3 at 42). Likewise, the Mediator testified that he did not believe that "anyone else could have represented that office during the mediation," besides the unit executive—even if the unit executive had engaged in wrongful conduct—"[b]ecause the only person in that office that had the authority or the power to agree to things that would have to be agreed to was [the Defender]." Tr. Ex. 19 at 70 (ECF No. 255-7 at 16).

> **3.      The EDR Coordinator informs Plaintiff that no disciplinary action against the accused parties will be considered because the wrongful conduct proceeding is being held "in abeyance" until Plaintiff's dispute resolution process is over.**

238.     The next day, Plaintiff spoke with the EDR Coordinator by phone. She asked him why her request to disqualify the Defender would be denied. He seemed unsure. At first, he said the Chief Judge had made a decision *before* the report came out, but then he said the decision was made *after* the report came out. Tr. Ex. 1, at ¶ 396 (ECF No. 1, Complaint ¶ 396). Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff, and

respectfully refer the Court to Plaintiff's recording of the conversation referenced in this paragraph for a record of the statements made. Tr. Ex. 4, at ¶ 396 (ECF No. 210, Am. Answer ¶ 396); Tr. Ex. 57 at US8206–07 (ECF No. 255-11 at 36–37).

239. The EDR Coordinator was asked if the reason for the impending denial is that a unit executive cannot be disqualified from an EDR proceeding. He did not answer. Instead, he said that the upcoming denial order, which he claimed he had started to draft, "will speak for itself." Tr. Ex. 1, at ¶ 397 (ECF No. 1, Complaint ¶ 397). Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff, and respectfully refer the Court to Plaintiff's recording of the conversation referenced in this paragraph for a record of the statements made. Tr. Ex. 4, at ¶ 397 (ECF No. 210, Am. Answer ¶ 397); Tr. Ex. 57 at US8206–07 (ECF No. 255-11 at 36–37).

240. The EDR Coordinator shared another update: neither Plaintiff, nor the employing office, would receive the investigation report or any summary of its findings and recommendations. He explained that OGC had "strongly recommended" not sharing the report during counseling or mediation. According to OGC, the parties were not legally entitled to receive the report because it is an "internal document only." OGC advised that distributing the report would make it difficult to resolve the matter informally, because the parties would "fight about the report" rather than focusing on the issues in the case. Tr. Ex. 1, at ¶ 398 (ECF No. 1, Complaint ¶ 398). Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff, and respectfully refer the Court to Plaintiff's recording of the conversation referenced in this paragraph for a record of the statements made. Tr. Ex. 4, at ¶ 398 (ECF No. 210, Am. Answer ¶ 398); Tr. Ex. 57, US8203–8216; *see* Tr. Ex. 71 (ECF No. 255-1).

243

241. The EDR Coordinator was asked to identify where the Fourth Circuit EDR Plan refers to "internal documents." He was told that the EDR Plan entitles the parties to receive "information and records," and it requires sharing of information on a "need to know basis," but it does not mention "internal documents." He had no answer to these questions. He admitted that the process is not "perfect," but said that he intended to follow OGC's advice. Tr. Ex. 1, at ¶ 399 (ECF No. 1, Complaint ¶ 399). Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff, and respectfully refer the Court to Plaintiff's recording of the conversation referenced in this paragraph for a record of the statements made. Tr. Ex. 4, at ¶ 399 (ECF No. 210, Am. Answer ¶ 399); Tr. Ex. 71 at US8217–20 (ECF No. 255-1 at 9–12).

242. The EDR Coordinator was asked how any disciplinary action could be taken without the investigation report. He explained that no decisions about disciplinary action would be made until after Plaintiff's EDR proceeding was over, perhaps after a final hearing. He assured her that the Chief Judge would hold people accountable, if appropriate. Tr. Ex. 1, at ¶ 400 (ECF No. 1, Complaint ¶ 400). Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff, and respectfully refer the Court to Plaintiff's recording of the conversation referenced in this paragraph for a record of the statements made. Tr. Ex. 4, at ¶ 400 (ECF No. 210, Am. Answer ¶ 400); Tr. Ex. 71 at US8214, US8220–21 (ECF No. 255-1 at 6, 12–13).

242a. The EDR Coordinator explained that Plaintiff's wrongful conduct proceeding was being held "in abeyance" until Plaintiff's dispute resolution process was over. Specifically, he explained: "So what we could –what we could do is hold the Chapter 9 proceeding in advance [sic] until the Chapter 10 proceeding has been finished." Tr. Ex. 71 at

244

US8214 (ECF No. 255-1 at 6); Tr. Ex. 57 at Audio Track 7 (ECF No. 248 (Ex. O) Audio Track 7; *see also* ECF Nos. 170, 173). Similarly, he stated: "And so what we've done in the past is we have done what we are contemplating doing here. And that is, you hold the judicial conduct piece of this in advance [sic], and you let the EDR piece just go forward." Tr. Ex. 71 at US8220–21 (ECF No. 255-1 at 12–13); Tr. 57 at Audio Track 7 (ECF No. 248 (Ex. O) Audio Track 7; *see also* ECF Nos. 170, 173).

      242b. The Judicial Integrity Officer ("JIO"), Jill Langley, who is considered a "national resource" on the EDR Plan, later stated that "the concept of saying something had been abated" in this way "is not something that I have ever heard of or understood as part of the EDR process." Tr. Ex. 17 at 27–28, 125–26 (ECF No. 255-12 at 29–30, 127–28); *see also* Tr Ex. 50 at 5445–47 (ECF No. 255-12 at 40–42). Specifically, at her deposition, the JIO testified regarding this issue as follows:

> Q     It looks like you discussed the wrongful conduct report that the federal defender filed. Is that right?
>
> MS. McMAHON: Objection. Misleading.
>
> BY MS. WARREN:
>
> Q     It's right there on the middle of the page?
>
> A     You called it a report that he filed. That's not how I think of chapter 9. That's just I'm telling someone that something has happened. It's not a filing.
>
> So the way you characterize it isn't – I don't think that -- I know that's not how I've characterized it.
>
> Q     It says, "The defender apparently filed a wrongful conduct report with the Fourth Circuit."

245

A        You're right.  I did use that word; but I think that's the way
Caryn described it, and it's why I have the thing that said people
seem to think of chapter 9 as a complaint process, which is not how
I think of chapter 9, nor do I think it's how chapter 9 is written.

Q        Can anything happen as a result of a chapter 9 wrongful
conduct report?

MS. McMAHON:  Objection.  Vague.

THE WITNESS:  Whatever the unit executive and/or chief judge
determines is the appropriate response can happen.

MS. WARREN:        Okay.

BY MS. WARREN:

Q        It says -- looking at that same paragraph –

A        Which paragraph?

Q        It is the fifth paragraph down.

A        Okay.

Q        "Caryn was told the EDR complaint process would need to
be abated during the wrongful conduct investigation."

So I read this to say that she told you the chapter 10 proceeding
needed to be abated during the chapter 9.

A        This information –

MS. YOUNG: Objection. Form.

THE WITNESS: This information is what Caryn related to me.
So, for example, when it says "filed," what I believe now is that was
the terminology she used which is why it's unfamiliar to me.  And
so I think the same thing is that I think Caryn told me that someone
told her, and so I am writing down her words to me.

MS. WARREN: Yes.

BY MS. WARREN:

246

Q        Were you concerned that the complaint process would need to be abated during the wrongful conduct investigation?

MS. YOUNG: Objection. Form.

THE WITNESS: I'm trying to think of the right word.

That's never how I have envisioned the process working.

BY MS. WARREN:

Q        And why not?

A        First, you have a limited amount of time under the EDR plan from when the alleged wrongful conduct happens to file to start the prerequisites.  Your request for counseling has to be filed within, under the model plan, 30 days.  I'm assuming that's – I'm going from memory, but I think that's what the Fourth Circuit was.  So you have a limited amount of time.  Now, granted, that can be extended; but that's reason one.

It to me should always be the employee's choice as to when they initiate that process as to being told.

I don't have a -- I see nothing in the EDR plan that says someone can tell you we are not letting you file something.

So, the concept of saying something had been abated as if she had not agreed to that is not something that I had ever heard of or understood as part of the EDR process.

Tr. Ex. 17 at 122–26 (ECF No. 255-12 at 124–28).

242c.   Similarly, the EDR Handbook and Interpretive Guide recommends the

opposite of what the EDR Coordinator did in this case, *i.e.*, holding the wrongful conduct

complaint, and any possible disciplinary action against the alleged wrongdoers, in abeyance.

Recognizing the importance of promptly addressing allegations of sexual harassment and

providing relief to the complainant, including the possibility of interim relief, the EDR

Handbook states the following:

> 4.  Holding the Formal Complaint in Abeyance
>
> When the EDR Complaint involves allegations of sexual or other harassment or abusive conduct, the PJO might hold the EDR matter in abeyance to give the Employing Office an opportunity to prevent and promptly correct the harassing or abusive behavior. Holding the EDR matter in abeyance may provide relief to the Complainant more efficiently and effectively than could be provided through the Formal Complaint process. Because compensatory damages or other monetary damages are not permitted under the Plan, the only available relief for discriminatory harassment and abusive conduct under the Plan may be to order the Employing Office to prevent or correct the abusive or harassing conduct. An Employing Office already has an interest in preventing and correcting the abusive or harassing behavior independent of the EDR Formal Complaint process and is often able promptly to implement practicable options for preventing and addressing the behavior.
>
> Also, when the EDR Complaint involves allegations of harassment or abusive conduct, the PJO may consider whether to grant interim relief to the Complainant. *See Interim Relief*, Handbook § V(D)(1).

Tr. Ex. 69 at 72 (EDR Interpretive Guide & Handbook (Jan. 2020), ECF No. 250-13).  In short,

the Handbook states that if any proceeding may be held in abeyance, it is the formal EDR

complaint process regarding remedies, not the wrongful conduct proceeding regarding

disciplinary action against the wrongdoers.  That is the process that Plaintiff requested when she

repeatedly requested that the EDR investigation report be released, and appropriate corrective

action be taken, before proceeding further with the formal EDR process.

243.    Plaintiff told the EDR Coordinator that she did not understand how disciplinary

action could be put off for so long, when the purpose of a wrongful conduct action is to make the

office safe.  And while nothing had changed for the First Assistant, Plaintiff was forced to work

from home and treated as the office joke. Plaintiff asked him why the First Assistant had not been put on administrative leave. Tr. Ex. 1, at ¶ 401 (ECF No. 1, Complaint ¶ 401). Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff, and respectfully refer the Court to Plaintiff's recording of the conversation referenced in this paragraph for a record of the statements made. Tr. Ex. 4, at ¶ 401 (ECF No. 210, Am. Answer ¶ 401); Tr. Ex. 71 at US8221–23 (ECF No. 255-1 at 13–15); Tr. Ex. 93 at US8222–27.

244. The EDR Coordinator expressed sympathy for the First Assistant, noting that this had been a "living hell" for him and he had been suffering "physical symptoms." He was asked how he knew these things about the First Assistant. Tr. Ex. 1, at ¶ 402 (ECF No. 1, Complaint ¶ 402). Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff, and respectfully refer the Court to Plaintiff's recording of the conversation referenced in this paragraph for a record of the statements made. Tr. Ex. 4, at ¶ 402 (ECF No. 210, Am. Answer ¶ 402); Tr. Ex. 93 at US8227–29.

245. The EDR Coordinator reluctantly admitted that the First Assistant had called him, that it was inappropriate for him to have done so, and that he had told him not to call again. Tr. Ex. 1, at ¶ 403 (ECF No. 1, Complaint ¶ 403). Defendants admit that the EDR Coordinator had multiple conversations with Plaintiff, and respectfully refer the Court to Plaintiff's recording of the conversation referenced in this paragraph for a record of the statements made. Tr. Ex. 4, at ¶ 403 (ECF No. 210, Am. Answer ¶ 403); Tr. Ex. 93 at US8228–29.

246. Plaintiff ended the conversation by telling the EDR Coordinator about several incidents of abusive behavior towards other employees and clients that she had personally

witnessed at the FDO.  The EDR Coordinator seemed deeply saddened by what Plaintiff told

him. He strongly implied that the Circuit would do the right thing and hold people accountable.

Tr. Ex. 1, at ¶ 404 (ECF No. 1, Complaint ¶ 404).  Defendants admit that the EDR Coordinator

had multiple conversations with Plaintiff, and respectfully refer the Court to Plaintiff's recording

of the conversation referenced in this paragraph for a record of the statements made.  Tr. Ex. 4, at

¶ 404 (ECF No. 210, Am. Answer ¶ 404); *see* Tr. Ex. 93 at US8235–37, US8250–8257.

## II.     Plaintiff requests a transfer for a second time.

247.     Defendants admit that Plaintiff sent an email to the Chief Judge and the EDR

Coordinator on January 22, 2019 stating: "A transfer to another federal defender office with

flexible working conditions, specifically in the Western District of Virginia, would resolve my

Chapter X claim."  Defendants respectfully refer the Court to the email for a complete and

accurate statement of its contents.  Tr. Ex. 4, at ¶ 405 (ECF No. 210, Am. Answer ¶ 405); Tr. Ex.

88 at US1958–60 (ECF No. 60-4  at 57–60).

248.     "Although it was my dream since law school to be a federal defender," Plaintiff

explained, "I do not believe it is possible to reach a resolution with my current office that will

protect me from further harassment and allow me to advance in my career."  Tr. Ex. 1, at ¶ 406

(ECF No. 1, Complaint ¶ 406).  Defendants respectfully refer the Court to the email for a

complete and accurate statement of its contents. Tr. Ex. 4, at ¶ 406 (ECF No. 210, Am. Answer ¶

406); Tr. Ex. 88 at US1959 (ECF No. 60-4  at 58).

249.     Defendants admit that Plaintiff's January 22, 2019 email stated: "OGC's guidance

would require me to negotiate directly with an alleged violator without knowing the report's

findings and recommendations."  Defendants respectfully refer the Court to the email for a

complete and accurate statement of its contents. Tr. Ex. 4, at ¶ 407 (ECF No. 210, Am. Answer ¶ 407); Tr. Ex. 88 at US1959 (ECF No. 60-4 at 59).

250. Defendants admit that Plaintiff's January 22, 2019 email stated: "I am concerned, however, that a successful negotiation is unlikely. For example, after the First Assistant made me feel so threatened that I stopped coming into the office, he joked to an attorney colleague who was leaving the office that he should attend the next office retreat to give sexual harassment training. Worse yet, the Federal Defender ignored my concerns, mishandled and escalated the situation, and only initiated a wrongful conduct report after I followed up on his promises to finally address the situation. Similarly, when I expressed interest in a recently-posted 'appellate' attorney position, Appellate Chief Josh Carpenter openly discouraged me from applying. When I applied anyway, I was not selected for an interview. I have been told it is no secret that the new appellate attorney was chosen to be my replacement. Under these circumstances, I do not see any path forward that would allow me to continue working in my office. But I am also concerned that I will be subjected to rumors and reputational damage. For example, years after attorney Robert Carlin took time off following his wife's suicide to care for his autistic son (and was subsequently fired), I personally heard the First Assistant and others insinuate that Mr. Carlin killed his wife, which they claimed to know because office investigator Jim Allard 'looked into it.' After attorney Jeffrey King, who is gay, was fired, office rumors began circulating that Mr. King was exchanging sexual favors with prison guards. Similar incivility extends to our clients, such as at a recent all-staff meeting when, in front of the entire office and the Federal Defender, Trial Team Leader Peter Adolf repeatedly referred to his intellectually-disabled client as a 'retard.' So far, I am aware of the First Assistant implying that I looked good

on paper but didn't work out; I am concerned it will not end there."  Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents.  Tr. Ex. 4, at ¶ 408 (ECF No. 210, Am. Answer ¶ 408); Tr. Ex. 88 at US1959 (ECF No. 60-4 at 59).

251.    Plaintiff said she hoped "to move on in a way that preserves my professional reputation and career options."  Tr. Ex. 4, at ¶ 409 (ECF No. 210, Am. Answer ¶ 409).

252.    Defendants admit that the EDR Coordinator emailed Plaintiff on January 24, 2019, stating, in part: "I'm sorry to hear about your experiences, and your decision to leave your office. I have spoken to Chief Judge Gregory, and he has directed me to lend appropriate assistance in finding you another position.  We can, of course, make no assurances, but we will do what we can to help."  Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents.  Tr. Ex. 4, at ¶ 410 (ECF No. 210, Am. Answer ¶ 410); Tr. Ex. 88 at US1958 (ECF No. 60-4 at 57).

**JJ.    Plaintiff's mediator candidly acknowledges that judiciary employees "give up a lot."**

253.    On January 30, 2019, Plaintiff filed a request for mediation under the EDR Plan. At this point, Plaintiff had not received any substantive update on her transfer request.  Tr. Ex. 4, at ¶ 411 (ECF No. 210, Am. Answer ¶ 411); Tr. Ex. 41 at US521 (ECF No. 248-15 at 35); Tr. Ex. 94 at US3138–39 (ECF No. 60-3 at 10–11).

254.    Before mediation, Plaintiff asked the EDR Coordinator to clarify whether her confidentiality would be protected during mediation, and whether any documents she submitted would be shared with the Defender without her consent. The EDR Coordinator confirmed that he had not shared any documents with the Defender except for her request for counseling and request for mediation, which were template forms. He had not shared her factual narrative or

252

any of her supporting documentation. Tr. Ex. 1, at ¶ 412 (ECF No. 1, Complaint ¶ 412).

Defendants admit that the EDR Coordinator and Plaintiff exchanged emails on January 31, 2019 and February 1, 2019 and respectfully refer the Court to those emails for a full and accurate statement of their contents. Tr. Ex. 4, at ¶ 412 (ECF No. 210, Am. Answer ¶ 412); Tr. Ex. 41 at US519–21 (ECF No. 248-15 at 33–35).

255.     On February 7, 2019, Plaintiff met with the appointed mediator ("Mediator") in the law library of a Fourth Circuit judge.  Plaintiff provided the Mediator with copies of some of the First Assistant's inappropriate text messages and emails.  Tr. Ex. 1, at ¶ 413 (ECF No. 1, Complaint ¶ 413).  Defendants admit that Plaintiff met with Circuit Mediator Edward Smith and respectfully refer the Court to Plaintiff's recording of that meeting for a record of the statements made.  Tr. Ex. 4, at ¶ 413 (ECF No. 210, Am. Answer ¶ 413); Tr. Ex. 95 at US8285.

256.     The Mediator acknowledged that it would be "really difficult" for Plaintiff to return to work, assuming that everybody is "still there."  He also stated that the First Assistant's quid pro quo email, in particular, was "inappropriate" and "improper."  Tr. Ex. 1, at ¶ 414 (ECF No. 1, Complaint ¶ 414).  Defendants admit that Plaintiff met with Circuit Mediator Edward Smith and respectfully refer the Court to Plaintiff's recording of that meeting for a record of the statements made.  Tr. Ex. 4, at ¶ 414 (ECF No. 210, Am. Answer ¶ 414); Tr. Ex. 95 at US8286, US8306, US8365; Tr. Ex. 67 at US8528 (ECF No. 250-11 at 21).

257.     The Mediator candidly stated his opinion that the Defender is from a "generation" that doesn't "get" sexual harassment.  He emphasized, however, that the Defender was the "decision maker" and that no hearing officer would "micromanage" him or tell him how to do

his job. Tr. Ex. 1, at ¶ 415 (ECF No. 1, Complaint ¶ 415). Defendants admit that Plaintiff met

with Circuit Mediator Edward Smith and respectfully refer the Court to Plaintiff's recording of

that meeting for a record of the statements made. Tr. Ex. 4, at ¶ 415 (ECF No. 210, Am. Answer

¶ 415); Tr. Ex. 67 at US8520–21 (ECF No. 250-11 at 17–18); Tr. Ex. 10, at 5 (ECF No. 24-5, at

5); Tr. Ex. 95 at US8321–32, US8336, US8317.

        257a. During his deposition, the Mediator was asked, "Did you tell Caryn that

Tony didn't react very well or handle other allegations very well because he was from a different

generation?" Tr. Ex. 19 at 67 (ECF No. 248-9 at 13). The Mediator responded as follows:

> A. I tried to offer Caryn neutral motivations for the way Tony
> responded. I didn't know Tony. I never talked to the man. I was just
> trying to say it may be something neutral and not some dismissing
> of what you're saying, dislike of you, favoritism for another. So I
> speculated just for the reason of trying to get her to give this a chance
> and let me go talk to Tony.
>
> Q. How would you view that as neutral?
>
> MS. WESTMORELAND: Object to the form.
>
> A. I don't understand your question.
>
> Q. You said that you felt being from a different generation is a
> neutral explanation.
>
> MS. WESTMORELAND: Objection; mischaracterizes his
> testimony.
>
> A. It's neutral as to her. It means it has nothing to do with her.
>
> Q. It's about his generation?
>
> A. Right. We all know there are generational differences and
> generations react differently to different problems. When I say
> "neutral," I mean it had nothing to do with you, Caryn. It didn't
> mean he was dismissing you or didn't like you or was trying to push
> you away. There was something else about his makeup maybe that

254

he didn't respond the way you thought he should because he's not from your generation.

Q.    I'm just trying to understand. He was neutral to her. Was he neutral towards these kind of allegations?

MS. WESTMORELAND: Object to the form.

A.    I was speculating, counselor. I was trying to get Caryn to move on from the emotion and saying maybe he'll talk to me, and when I keep getting hit over and over again, I have to throw out something to try to diffuse it, and that's all I was doing.

Q.    Why did you think saying that he was from a different generation would diffuse it?

A.    I just explained it to you. Certain generations react differently. Certain generations view things that happen differently. I have no idea how Tony views them because I never met the man. I simply wanted Caryn to just put it aside. Maybe it's something that has nothing to do with you and we can work it out because my memory is she said she wanted to try to work it out and go back to work.

Q.    I think you said she told you she wanted to be a federal public defender?

A.    Right; and so the best way to do that was get you back in the office. Let's see if we can put all this behind us.

Q.    Did you worry that she might view a comment about a different generation as an excuse for Tony's conduct?

A.    I didn't in the moment.

Q.    Do you think it could be seen as that as you look back now?

A.    Possibly, but I'm not a perfect mediator, and sometimes we say things inartfully.

Tr. Ex. 19 at 67–69 (ECF No. 248-9 at 13–15).

255

257b.    During his deposition, the Mediator was also asked, "Did you tell Caryn at your first meeting with her that you thought Tony felt Caryn was more likely to go away than JP?" Tr. Ex. 19 at 103 (ECF No. 255-7 at 20).  The Mediator responded as follows:

> A.     I told her that's a possible explanation for his behavior. Again, I'm offering speculation to try to get her from thinking I'm the one that's getting piled on. Maybe there is just some innocent other reason.
>
> Q.     Did you think that Tony thinking she would go away rather than JP was an innocent reason?
>
> A.     Well, it's not motivated for animus toward either party. That's what I mean.
>
> Q.     Why wouldn't you think it would be motivated for animus toward either party that one would go away more than the other?
>
> A.     It's the path of least resistance. I don't think people consider anything beyond the path of least resistance if that's the way they're acting. I had never met Tony. That was my rank speculation and opinion for what it's worth, which is probably not much.

Tr. Ex. 19 at 103 (ECF No. 255-7 at 20).

257c.    During this litigation, Defendants admitted that the Mediator stated: "I don't think a judge is going to micromanage this office and tell a federal defender how to do his job and run this office.  They'd be better off terminating him." Tr. Ex. 67 at US8517 (ECF No. 250-11 at 14); *see also* Tr. Ex. 10 at 4 (ECF No. 248-4 at 5).  The full context of this conversation is as follows:

> Mr. Smith:     Therefore I think in drafting a settlement agreement that binds Tony, you have the better ability to work these things in there, because I don't think the judge is going to micromanage this office and tell a federal defender how to do his job and run his office.
>
> They'd be better off terminating him.  They would – to me, terminate him first.

256

Ms. Strickland:          Mm-hmm.

Mr. Smith:      But that's not something, the way I read the EDR, and I'm not giving any legal advice, that would allow you to in a [inaudible] for relief that JP or Tony be terminated.

Ms. Strickland:          Right.

Mr. Smith:      I think you all read it the way I read it.

Mr. Strickland:          These seem like problems that would exist in any EDR situation.

Mr. Smith:      They do.

Mr. Strickland:          Where you have a unit executive.  So what's the point of having a hearing officer?

Ms. Strickland:          Part of – yeah, I mean, part of my feeling is that this all seems like a sham.  Like why am I even doing this?

Mr. Strickland:          It's a kangaroo court.

Ms. Strickland: When there's no – I mean, and there's no outside review of this.  There's no possibility that I can sue.  I mean, it's just – I just have to – and that's part of my feeling of like, you know, he's going to have to do a lot to show me.

It's not going to just be enough, well, I guess we can find you – we can give you the intern's desk.  It's an attitude.  I mean, it's – you.

Mr. Smith: Well, no, he's not giving you the intern's desk, but we don't need to talk about that right now, but --

Ms. Strickland:          But you get my point and it's like –

Mr. Smith:      No, you're expressing my frustration as a mediator who's told to come in here and mediate EDRs.

Mr. Strickland:          You're in an awful situation.

Mr. Smith:      I have talked to people in Washington about my frustration with this whole process.  Not in terms of what this

257

specific one is. I've had other issues, which we don't need to get in to, [inaudible] things and what not that I'm just totally frustrated.

That because I'm in here working for an employee and sometimes confidentially, in this room, I feel exactly what you just said. I can't do anything. You know? I think I can with you, but I can't give you what you want, which is comfort with Tony.

That's just the problem if he stays.

. . .

Mr. Strickland:    See, we believe that Tony is well aware of this dynamic, that he won't get micromanaged and this is the cynical part of me. He can throw out Ashville [sic], whatever he wants to, he knows that all he needs to kind of do is have the appearance of doing something.

But he will never get micromanaged. I mean, what do you – what happens if you get down the road just a little bit in time and they do the work measurement study and it's not lucky like your office, it requires a cut.

Well, why not cut Caryn?

Mr. Smith:    Well –

Ms. Strickland:    Especially if I'm doing research and writing work.

Mr. Smith:    There's only one reason not to cut and it could be viewed as retaliation.

Mr. Strickland:    Yeah, but [inaudible] back right in here and he'll be like, well, the hearing officer can't do anything because they're not going to micromanage the office.

Mr. Smith:    You're right. You're right, Cooper. Look, I'm not disagreeing with you. I'm just telling you if you go on with the hearing, your best opportunity, if you want to stay in that office and try to figure this thin out is to formulate a settlement agreement that you can hold his feet to the fire as opposed to – I mean, let's just play it out like you guys are saying, if it's a sham.

258

What are you going to get?  You're not going to get anything.

Mr. Strickland:        She may not, but she'll have to have the admission that they can't do anything.  You know, and –

Mr. Smith:        The admission that who can't do anything?

Mr. Strickland:        The – the –

Ms. Strickland:        [inaudible] court.

Mr. Strickland:        The hearing officer.  We can't do anything. You'll just have to do whatever Tony says.  He agrees with this, you do that.

Ms. Strickland:        See, here's the –

Mr. Smith:        They're not going to say it that way.

Mr. Strickland:        They won't say [inaudible] it'll be obvious.
Ms. Strickland:        [inaudible]

Mr. Smith:        Sure, but what does that give you?

Mr. Strickland:        But you know, you give up a lot to be a federal employee. I don't think you give up your Constitutional right to due process.  This is a process and it doesn't appear that very many things are being followed.

Tr. Ex. 67 at US8517–22 (ECF No. 250-11 at 14–19).

257d.   During this conversation, the parties also discussed how there was no "accountability" through this process.  Tr. Ex. 67 at US8513 (ECF No. 250-11 at 10).  During his deposition, the Mediator testified that "there really wasn't a remedy" under the EDR Plan that "fit the situation," because "[n]one of these are going to do anything in this particular case."  Tr. Ex. 19 at 13, 28 (ECF No. 255-7 at 5, 14).  The Mediator explained that "I always viewed this as what Caryn was after was some kind of discipline to JP, whether it be termination or something, and that could never be addressed in mediation."  Tr. Ex. 19 at 19 (ECF No. 255-7 at 11).

259

Specifically, the Mediator explained that his understanding of his role as mediator was as follows:

> It's my role to see if I can settle it within the confines of the remedies within the EDR plan or, as in this case, I really wasn't dealing with those remedies because there really wasn't a remedy that fit the situation. I was trying to see if I could work out a way to send Caryn back to work that was acceptable to her.

Tr. Ex. 19 at 13 (ECF No. 255-7 at 5). Later in his deposition, the Mediator elaborated as follows:

> Q.     I know you said you didn't feel there was a remedy that fit that situation, and I think you just said you weren't dealing with these, so what remedies were you dealing with?
>
> A.     There wasn't a remedy that I could utilize to fit this situation. Maybe the internal investigation would fit a remedy. That's separate and apart from me. All my authority is what is given to me by the Court. My job description is I mediate civil disputes between counsel and parties. I was asked to participate in the EDR as a mediator because I'm a mediator. My charge is here are your remedies, mediate this case, and see if you can resolve it.
>
> You can read these. None of these are going to do anything in this particular case, so I was trying to figure out how I was going to get Caryn back in the office in such a way where she is given some concessions where she's happy, and that's what I did.

Tr. Ex. 19 at 28 (ECF No. 255-7 at 14).

257e.   The Mediator was making these statements in his capacity as a highly experienced mediator, including with the EDR process. During their first phone conversation, the EDR Coordinator suggested that Plaintiff work with the Mediator: "So, I'm wondering, would it make sense to have someone else work with the two of you [*i.e.*, Plaintiff and the Defender] possibly? And what I'm thinking is, we have circuit mediators that are just outstanding. And the chief circuit mediator is outstanding, I've used him in other instances and

260

he's done a fantastic job." Tr. Ex. 72 at US7667 (ECF No. 255-5 at 7); *see also* Tr. Ex. 72 at US7670–71 (ECF No. 255-5 at 8–9) (identifying mediator as Ed Smith). Much later in the EDR process, when the investigation report had been delayed for nearly four months, the EDR Coordinator had a conversation with Plaintiff in which he proposed the "unusual step" of involving the Mediator during the counseling period. Specifically, on January 9, 2019, the EDR Coordinator stated: "So, Caryn, the reason – the reason why I wanted to kind of propose this unusual step is because it – it was – it was – I – I –I – was trying to think of a way to kind of get this going and get this moving along. Because frankly, at this point, I'm not quite sure where we're at – where the – where we're at, where the parties are at." Tr. Ex. 75 at US8154–55 (ECF No. 255-9 at 4–5). He further explained: "Now, the reason why I thought a mediator would be helpful is I think the mediator could help with, okay, you are making X demands. And then they could take that to the employing office and say, okay, Caryn has asked for this, what's your position on this? You, I think they could facilitate a discussion, and hopefully, fa---facilitate settlement negotiations in a way that I don't think has happened, or – or seems to have slowed down at this point." Tr. Ex. 75 at US8156–57 (ECF No. 255-9 at 6–7). Thus, "I think a mediator could help kind of bring into focus where the parties – where both parties stand." Tr. Ex. 75 at US8157 (ECF No. 255-9 at 7). In other words, having delayed the wrongful conduct investigation for months, the EDR Coordinator apparently now wished for Plaintiff to engage in the type of informal settlement discussions that the FEOO was encouraging—and the Defender and EDR Coordinator had opposed—beginning in July 2018, which was nearly seven months earlier. In response to the EDR Coordinator's proposal, Plaintiff explained her concern that that the investigation "was going to be what was used to determine whether Tony was disqualified or

261

not," and that if the "report's not done, no determination can be made on the disqualification." Tr. Ex. 75 at US8164–65 (ECF No. 255-9 at 9–10). But Plaintiff stated that if the EDR process were paused, and she would not "be waiving my right to have that request for disqualification decided in the future," she would agree to participate in mediation during the counseling period with the Chief Circuit Mediator. Tr. Ex. 75 at US8165–66 (ECF No. 255-9 at 10–11) 5. Despite Plaintiff's concerns about waiving her procedural rights, the EDR Coordinator stated the following:

> I guess, you know, one of the things that concerned Judge Gregory, and – and I – and I don't want to speak for him, and I can't speak for him. So this is just my – this is just my perception. But I think there was a concern on his party about why is this taking so long? And why is this – you know, why – why is this not moving? And . . . while he – he understood your request for an extension of the counseling period, he didn't grant in – in completely. I mean, I think you wanted an extension until the investigation report was completed. And I – and I'm guessing he felt that that was just – it would just prolong this whole process.

Tr. Ex. 75 at US8166–67 (ECF No. 255-9 at 11–12). Accordingly, because the investigation and subsequent disciplinary action were being delayed, and the Chief Judge believed the process was taking "too long," the Mediator's participation was presented as a crucial, even pivotal, means to resolve Plaintiff's EDR complaint.

257f. Moreover, like the Defender, the Chief Circuit Mediator was also a unit executive who "serve[s] at the chief judge's pleasure." Tr. Ex. 19 at 22 (ECF No. 255-7 at 12). The Mediator's personal experience led him to believe that the Defender "wouldn't be disqualified" because a "judge can't micromanage him in mediation." Tr. Ex. 19 at 88 (ECF No. 255-7 at 19). The Mediator further explained:

262

> He doesn't know the office. He doesn't know the effect of doing
> these things for Caryn that Caryn wanted, so it made sense to me. I
> guess that's why in every mediation I've done the unit head has been
> there, because they have to make those decisions. Nobody knows
> how my office operates but me.

Tr. Ex. 19 at 88 (ECF No. 255-7 at 19).

257g.   The Mediator conveyed his expertise and authority on the EDR process to Plaintiff. During mediation, the Mediator asked Plaintiff for feedback on his forthcoming "presentation at [the] Fourth Circuit EDR Conference" about "talking to EDR Coordinators and what to avoid." Tr. Ex. 68 at US8691 (ECF No. 250-12 at 4); *see* Tr. Ex. DC (190207_1056_Limited Confidentiality).[8]  The Mediator's presentation, "Lesson From a Circuit Mediator," is included as part of the trial record. Tr. Ex. 76 (ECF No. 255-10). The presentation includes topics such as "Counseling vs. Mediation," "Options for Resolution" of wrongful conduct, and discussion of "the actual remedies that are available under the EDR Plan." Tr. Ex. 76 at US3583, US3586, US3595 (ECF No. 255-10 at 5, 8, 17). The Mediator also shared his perspective on problems he saw with the EDR process based on his experience and told Plaintiff that he had shared his frustrations with "people in Washington." Tr. Ex. 67 at US8519 (ECF No. 250-11 at 16). And of course, the Mediator stated, "You're right," and "I'm not disagreeing with you," that a hearing officer would not "micromanage the office." Tr. Ex. 67 at US8517–22 (ECF No. 250-11 at 14–19).

257h.   A reasonable person would believe, based on the Mediator's statements to Plaintiff during the mediation, that the Defender would likely be the true decisionmaker in a final hearing, because a hearing officer would not "micromanage the office and tell a federal defender

---

[8] This transcript was prepared by Defendants and misidentifies the Mediator as "Judge."

263

how to do his job and run this office." Tr. Ex. 67 at US8517 (ECF No. 250-11 at 14). As the Chief Circuit Mediator for the Fourth Circuit, and a unit executive in his own right, the Mediator was the only individual who had personal knowledge of what a presiding officer within the Fourth Circuit likely would do in a final hearing. Based on this knowledge, the Mediator informed Plaintiff that a hearing officer would not "micromanage this office," and Plaintiff had no choice but to accept the situation because "you lose a few rights when you become a federal employee." Tr. Ex. 67 at US8511 (ECF No. 250-11 at 8). In fact, as stated above, the Mediator believed there was not even "a remedy" under the EDR Plan because "[n]one of these are going to do anything in this particular case." Tr. Ex. 19 at 13 (ECF No. 255-7 at 5). Specifically, delaying the investigation and disciplinary action foreclosed the one "remedy" that may "fit." Tr. Ex. 19 at 19, 28 (ECF No. 255-7 at 11, 14). And the record shows that subjectively, Plaintiff did reasonably believe that the Defender would be the decisionmaker based on what the Mediator told her: "[P]art of my feeling is that this all seems like a sham. Like why am I even doing this?" Tr. Ex. 67 at US8517–22 (ECF No. 250-11 at 14–19).

258. The Mediator admitted that he saw problems with the EDR process. He expressed frustrations with the settlement process and noted that, at times, promising settlements he had negotiated were vetoed by the AO because the judiciary lacked statutory authority to implement those remedies. He candidly acknowledged that you "give up a lot" as a judiciary employee. Tr. Ex. 1, at ¶ 416 (ECF No. 1, Complaint ¶ 416). Defendants admit that Plaintiff met with Circuit Mediator Edward Smith and respectfully refer the Court to Plaintiff's recording of that meeting for a record of the statements made. Tr. Ex. 4, at ¶ 416 (ECF No. 210, Am. Answer ¶ 416); Tr. Ex. 67 at US8511 (ECF No. 250-11 at 8); Tr. Ex. 95 at US8329–30, US8357–58.

259. The Mediator promised to press the Defender on a duty station transfer and other requested terms. Tr. Ex. 1, at ¶ 417 (ECF No. 1, Complaint ¶ 417). Defendants admit that Plaintiff met with Circuit Mediator Edward Smith and respectfully refer the Court to Plaintiff's recording of that meeting for a record of the statements made. Tr. Ex. 4, at ¶ 417 (ECF No. 210, Am. Answer ¶ 417); Tr. Ex. 95 at US8382.

260. On February 12, 2019, the Mediator updated Plaintiff by phone. He said that the Defender would permit Plaintiff to transfer to another duty station, where she would likely share an office with an intern. He mentioned that there was also a conference room and a library space to work. Tr. Ex. 1, at ¶ 418 (ECF No. 1, Complaint ¶ 418). Defendants admit that Plaintiff spoke with Circuit Mediator Edward Smith by phone and respectfully refer the Court to Plaintiff's recording of that telephone conversation for a record of the statements made. Tr. Ex. 4, at ¶ 418 (ECF No. 210, Am. Answer ¶ 418); Tr. Ex. 96 at US8418–8422.

261. Plaintiff asked the Mediator why a transfer was possible now, but not six months ago. The Mediator said that the Defender may have changed his mind after he got "involved." The Mediator seemed very frustrated with the Defender. Tr. Ex. 1, at ¶ 420 (ECF No. 1, Complaint ¶ 420). Defendants admit that Plaintiff spoke with Circuit Mediator Edward Smith by phone and respectfully refer the Court to Plaintiff's recording of that telephone conversation for a record of the statements made. Tr. Ex. 4, at ¶ 420 (ECF No. 210, Am. Answer ¶ 420); Tr. Ex. 96 at US8420–8421.

262. Plaintiff told the Mediator that a transfer under these circumstances would further humiliate and stigmatize her, since the whole office would know that the Defender had likely

265

prioritized an intern over her. The Mediator suggested that Plaintiff put these issues "aside" and work something out. Tr. Ex. 1, at ¶ 421 (ECF No. 1, Complaint ¶ 421). Defendants admit that Plaintiff spoke with Circuit Mediator Edward Smith by phone and respectfully refer the Court to Plaintiff's recording of that telephone conversation for a record of the statements made. Tr. Ex. 4, at ¶ 421 (ECF No. 210, Am. Answer ¶ 421); Tr. Ex. 96 at US8427–8428.

263.    According to the Mediator, the Defender was also in agreement that the First Assistant could no longer be "involved" with Plaintiff's work. The Mediator suggested taking the Defender at his "word" on his unsubstantiated promise. Tr. Ex. 1, at ¶ 422 (ECF No. 1, Complaint ¶ 422). Defendants admit that Plaintiff spoke with Circuit Mediator Edward Smith by phone and respectfully refer the Court to Plaintiff's recording of that telephone conversation for a record of the statements made. Tr. Ex. 4, at ¶ 422 (ECF No. 210, Am. Answer ¶ 422); Tr. Ex. 96 at US8423–8424.

264.    Plaintiff asked the Mediator what would happen if an EDR settlement was breached. In his experience, the only remedy for breach of an EDR settlement was another EDR claim. Tr. Ex. 1, at ¶ 423 (ECF No. 1, Complaint ¶ 423). Defendants admit that Plaintiff spoke with Circuit Mediator Edward Smith by phone and respectfully refer the Court to Plaintiff's recording of that telephone conversation for a record of the statements made. Tr. Ex. 4, at ¶ 423 (ECF No. 210, Am. Answer ¶ 423); Tr. Ex. 95 at US8294–8296.

265.    Plaintiff asked whether a settlement with the Defender would be binding on the next Federal Public Defender. The Mediator did not know the answer to this question. Tr. Ex. 1, at ¶ 424 (ECF No. 1, Complaint ¶ 424). Defendants admit that Plaintiff spoke with Circuit Mediator Edward Smith by phone and respectfully refer the Court to Plaintiff's recording of that

266

telephone conversation for a record of the statements made.  Tr. Ex. 4, at ¶ 424 (ECF No. 210, Am. Answer ¶ 424); Tr. Ex. 96 at US8445–8447.

266.     Plaintiff suggested that, under the circumstances, a duty station transfer would not accomplish anything without addressing the underlying harassment and retaliation.  Tr. Ex. 1, at ¶ 425 (ECF No. 1, Complaint ¶ 425).  Defendants admit that Plaintiff spoke with Circuit Mediator Edward Smith by phone and respectfully refer the Court to Plaintiff's recording of that telephone conversation for a record of the statements made.  Tr. Ex. 4, at ¶ 425 (ECF No. 210, Am. Answer ¶ 425); Tr. Ex. 96 at US8449–8454.

267.     The Mediator said he was still trying to get more information from the Defender, and he would be in touch.  Tr. Ex. 1, at ¶ 426 (ECF No. 1, Complaint ¶ 426.  Defendants admit that Plaintiff spoke with Circuit Mediator Edward Smith by phone and respectfully refer the Court to Plaintiff's recording of that telephone conversation for a record of the statements made. Tr. Ex. 4, at ¶ 426 (ECF No. 210, Am. Answer ¶ 426); U Tr. Ex. 96 at US8449–8454.

**KK.     The Judicial Integrity Officer tells Plaintiff that a court of appeals has no authority to enforce remedies against a federal defender office.**

268.     Defendants admit that Plaintiff met with the Judicial Integrity Officer during the week of February 13, 2019 in Washington, D.C.  Tr. Ex. 4, at ¶ 427 (ECF No. 210, Am. Answer ¶ 427).

269.     Plaintiff told the Judicial Integrity Officer about her experience with the EDR process. Plaintiff expressed concern that her due process rights were being violated.  Tr. Ex. 4, at ¶ 428 (ECF No. 210, Am. Answer ¶ 428).

269a.   The JIO's notes from the conversation state the following about what Plaintiff told her:

267

Stephen ? Special Assistant to Jeff Minear, Counselor to the Chief Justice, called me in his personal capacity – not his official capacity, to ask if a friend of his, Caryn Devins MLN, could meet with me on Friday, Feb. 15 about an EDR matter that seems not to be going as it should. I agreed. Caryn and her husband Cooper came to my office at 2 pm on 2/15/2019. My notes follow.

Caryn was a Supreme Court Fellow a few years ago, supervised by Stephen. Prior to that, Caryn clerked for a Vermont Supreme Court clerk [sic] and a Second Circuit federal judge. After her term as a Supreme Court Fellow, she became an Assist. (fix) Federal Public Defender in []. She alleges that shortly after beginning that job, the First Assistant who supervised her began making inappropriate sexual-type comments and remarks. She characterized his actions towards her as stalking. She reported the First Assistant's conduct to the Defender. She alleges he did not take her allegations seriously enough, telling her that at least the First Assistant never touched her. She also believes the Defender has been retaliating against her by not hiring for an AFPD position for which she was well qualified.

Caryn's allegations are set forth in the attached Request for Mediation.

Caryn's immediate concern is how her EDR claim is being processed. Caryn stated that Circuit Executive James Ishida is the EDR Coordinator. She says he seems very sincere and willing to help, but nonetheless, the EDR process seems to be bungled. And she believes it is being bungled to protect the Defender.

When she reported the harassment to the Defender, the Defender apparently filed a Wrongful Conduct Report with the Fourth Circuit. The Fourth Circuit treated that as if it were a separate complaint process, rather than simply a reporting mechanism for those who become aware of, but are not victims of, harassment. Caryn was told the EDR complaint process would need to be abated during the Wrongful Conduct investigation. She spent five hours with the HR Specialist assigned to investigate this. James apparently told the HR Specialist was told to redo her investigation because she did such a bare-bones investigation and failed to investigate Caryn's allegations that the Defender retaliated against her for reporting the harassment. Caryn has waited months for the investigation to be finished, and now is being told that the Circuit will not give her the results of its investigation.

268

In the EDR proceeding, Caryn moved to disqualify the Defender from acting on behalf of the FPD Office (the named Respondent.) She is very unhappy that she filed that motion many months ago with Chief Judge Roger Gregory and he still has not ruled on her motion. She is now at the EDR Mediation stage – she met with the Circuit Mediator for the first-time last week. Caryn has requested that the First Assistant be terminated, or that she either be transferred to a different location within the Defender's office or be allowed to permanently telework. She has been told that neither of these are available options.

Caryn is upset that her EDR matter was abated, and that she is not being given the results of the investigation. Further, when she sought help from OFEP last fall, James and the Defender were very angry at her for doing so, which she feels is a form of retaliation because she has every right to seek guidance from OFEP.

Tr. Ex. 50 at US5445 (ECF No. 248-15 at 40).

270.    The JIO stated, that just because every court handles the process differently, does not mean employees' rights are being violated. Tr. Ex. 4, at ¶ 430 (ECF No. 210, Am. Answer ¶ 430).

270a.   The JIO's notes from the conversation state the following:

I explained to Caryn that the purpose of the wrongful conduct provision in chapter IX is simply a reporting mechanism for those who become aware of the harassment and was not designed or intended as a separate complaint mechanism. But I said that courts are free to interpret EDR plans the way they see fit and the Fourth Circuit seemed to think that was the appropriate process, which they can do.

Tr. Ex. 50 at US5446 (ECF No. 248-15 at 41).

271.    Defendants admit that the JIO referenced the EDR Plan's provision stating that "[f]ailure to pursue mediation will preclude further processing of the employee's claim under any other provisions of this Chapter." Tr. Ex. 4, at ¶ 431 (ECF No. 210, Am. Answer ¶ 431).

271a.   The JIO's notes from the conversation state the following:

269

Caryn said that she had revealed all of her allegations and supporting evidence to the HR Specialist, but had never revealed all that information in her EDR Request for Counseling or Mediation. I said that surprised me and that I didn't understand why. Caryn said she was told that would upset the Defender and make him defensive, rather than being willing to mediate a resolution. I said this frankly made no sense to me at all. Its fine in normal litigation to provide a short plain statement of allegations in a complaint because there are clear discovery rules, but in EDR, it is fast and short and there are no clear discovery rules, so it seems to me critical for a complainant to reveal all the allegations and evidence as soon as possible. I said Caryn could still amend her Request for Mediation to include all of the allegations and evidence that she provided to the HR Specialist/Investigator. Caryn said she believed that none of her factual allegations, even those in her Request for Counseling and Mediation, had ever been given to the Defender. I said the EDR Plan obligates the EDR Coordinator to provide a copy of the complete Requests for Counseling and Mediation to the UE of the Responding party, so this would make no sense to me at all. Again, though, I suggested that she amend her Request for Mediation to include all of her allegations and supporting evidence and insist that the Defender be given a full copy of her amended Request for Mediation. If she was concerned that doing so would make the Defender unwilling to mediate with her on a reasonable basis, she could provide this information at the EDR Complaint stage but (1) that makes mediation even useless and (2) risks an argument that she is raising new allegations and claims for the first time her complaint, which is prohibited by the EDR Plan (which obligates all claims to be presented in the Request for Mediation). Caryn said the court is aware of all her allegations and evidence its investigation, so she doubted the court would say she had waived these allegations/claims. Nonetheless, I said I did not see any benefit in not including everything in the Request for Mediation, whether as a supplement or an amendment.

Tr. Ex. 50 at US5447 (ECF No. 248-15 at 42). During her deposition, the JIO further testified to

the following about the advice she provided to Plaintiff:

So when Caryn said to me, "The defender has never seen my request for mediation," that seemed to not -- I mean, that was not what the EDR plan said should happen.

Q      Did Caryn express concern that the defender would see her full allegations which included allegations against him?

A      I don't remember that. What my notes say -- which triggered a bit of a memory -- was that, I believe, she said someone had told her -- I don't remember now where she heard this -- that it would make the defender angry if he saw all the allegations, which made no sense to me.

Q      Why didn't it make sense?

A      Because what relevance is it whether someone would get angry or not. Like they are tasked with addressing the issue or responding to the issue, but you have to know what you are addressing or responding to.

Q      Do you think that someone could be concerned that their boss could be angry at them?

MS. McMAHON: Objection. It calls for speculation.

THE WITNESS: Yeah. I have no idea.

BY MS. WARREN:

Q Would you be concerned if your boss was angry at you?

MS. McMAHON: Objection. Lack of foundation.

THE WITNESS: It's like saying I'm going to file a complaint, but I'm not going to tell the defendant what my complaint is about. I don't understand the concept. If I'm choosing to file a complaint, then I'm choosing to disclose what my complaint allegations are.

So, in a big picture do I want my supervisor to be unhappy with me? No.

If I'm filing a complaint that alleges my employing office and/or the unit executive in charge of that office has done something, it wouldn't -- someone's emotional reaction to that doesn't seem relevant to me.

271

Tr. Ex. 17 at 148–50 (ECF No. 255-12 at 150–52). In short, the JIO testified that it made "no sense" to her that a complainant would be reluctant to disclose allegations of wrongful conduct to the supervisor against whom the complaint was raised because of her fear of retaliation. The JIO characterized that fear of retaliation as a potential "emotional reaction that doesn't seem relevant to me." Tr. Ex. 17 at 148–50 (ECF No. 255-12 at 150–52).

272. Defendants admit that the JIO told Plaintiff that she could pursue "motions" and "discovery" to prove her claims after filing a formal complaint following the close of counseling and mediation. Tr. Ex. 4, at ¶ 432 (ECF No. 210, Am. Answer ¶ 432).

273. Plaintiff asked the Judicial Integrity Officer how the EDR Coordinator could withhold the investigation report from the parties. Tr. Ex. 4, at ¶ 433 (ECF No. 210, Am. Answer ¶ 433).

273a. The JIO's notes from the conversation state the following:

I said it was very typical not to reveal the results of a wrongful conduct investigation to the parties, as it is an internal investigation. The Chief Judge is obligated to take appropriate action based on that investigation, but the EDR Plan does not obligate the court to reveal the actual investigation report. Nonetheless, I said Caryn could request that as part of her EDR discovery request. Caryn said the Mediator had mentioned it was difficult to mediate the matter without all of the facts. I suggested that Caryn request the Circuit to provide the full report to the Mediator, but if I were the Circuit, I would either disclose to everyone or no one.

Tr. Ex. 50 at US5446 (ECF No. 248-15 at 41).

273b. During her deposition, the JIO was asked whether she had "ever seen an EDR investigation substantiate a claim made?" The JIO answered as follows:

A    Boy, I'm sure; but I can't think of a specific [sic].

272

I mean, so I have to be real careful and be real precise. So in the
10th Circuit which is where I've seen the most, I can't remember.
I really can't remember. Sometimes they settled. Sometimes they
-- I just can't remember. I really can't remember.

Q      You said that during your time as judicial integrity officer, I
think, the first year you said there were about 100?

A      That's my guess right now today.

Q      Do you know how many of those went to a formal hearing?

A      Oh, I have no idea.

Q      Okay.

A      I would say the vast majority probably didn't. I mean, in my
experience generally, workplace conduct issues are resolved more
informally.

Tr. Ex. 17 at 181–82 (ECF No. 255-12 at 183–84). The JIO thus testified that although she was

"sure" a complaint had been substantiated, she could not "think of" or "remember" a single

example. Tr. Ex. 17 at 181–82 (ECF No. 255-12 at 183–84).

274.    Defendants admit that the JIO told Plaintiff that disqualifying the Defender at the

mediation stage was unusual because he was the head of the responding office. Tr. Ex. 4, at ¶

436 (ECF No. 210, Am. Answer ¶ 436).

274a.   The JIO's notes from the meeting state as follows:

I also said that it would not be expected that the EDR hearing officer
would disqualify the head of the Responding Employing Office to
act on behalf of the office, even when the UE is accused of
wrongdoing. I explained that almost all EDR complaints allege that
the EU violated their employment rights and that it was still entirely
contemplated that the UE would act as the head of the Responding
Office, just as any defendant to a civil action is the party responsible
for acting as the defendant. If the court concluded there was a
significant conflict of interest, it act – such as hiring an outside law
firm to represent the office – and her motion for disqualification

273

> could be a means to do that, but that it would not at all surprised me if her disqualification motion was denied. I explained disqualification motions were designed to ensure that the EDR Coordinator, Mediator and Hearing Officer were impartial, not that the defending party was impartial.

Tr. Ex. 50 at US5446 (ECF No. 248-15 at 41). Of course, when the JIO was providing this advice to Plaintiff, the Investigator had already found that the Defender had engaged in conduct warranting disciplinary action and that he was so "biased" against Plaintiff that he would do further "damage to the process" if allowed to participate. The JIO and Plaintiff had no reason to know these facts because they were not disclosed to Plaintiff, and her request to disqualify the Defender was denied without explanation. *Supra* ¶ 235h.

274b. During her deposition, the JIO testified that her understanding of the disqualification provision was based on her "opinion in my head, my understanding of how it worked." Tr. Ex. 17 at 84 (ECF No. 255-12 at 86). The JIO further testified as follows:

> Q. Looking at paragraph eight which is on page two of your declaration, the first paragraph is -- the first sentence or -- in eight the first sentence is: The disqualification provision under the model EDR plan in effect in 2018 was designed to ensure that the EDR coordinator, mediator, and presiding judicial officer were impartial, not that the defending party was impartial.
>
> Can you tell me where in the language of the disqualification provision in this plan you are drawing that conclusion from?
>
> A I'm drawing that from my opinion in my head, my understanding of how it worked.
>
> Q Let's look at this provision.
>
> A The disqualification provision in the Beam [sic] EDR plan is part of the complaint – part of the chapter 10 complaint process. And the way I always read this and understood this is that people who were either a factfinder or that neutral party needed to be neutral and they needed to not have a bias in it. And so that's my

274

understanding of that provision is what informs my declaration on paragraph 8.

. . .

Q    Does [the disqualification provision] specify, as your declaration does, that it's about the EDR coordinator, mediator, and presiding judicial officer?

A    It doesn't, but it never would have occurred to me.  I mean, it's impossible to – the defending party in any complaint process has a bias.  They are just like the complainant has a bias, the defending party has a bias.

So it just never occurred to me to apply it to anyone other than who I identified in A, which is the EDR coordinator, mediator, and presiding judicial officer.  That's Jill Langley's understanding of what that section means.

If somebody wants to interpret it differently, they are entirely free to; but what I wrote in my paragraph 8 is how I have always read and understood that disqualification provision.

Q    Do you think that someone could interpret it differently based on the language of the provision?

MS. McMAHON:  Objection.  It calls for speculation.

THE WITNESS:  I've been an attorney long enough to know that any two human beings could interpret anything different ways than I do.

BY MS. WARREN:

Q    So do you think that where it says "employee or other person involved in a dispute" that that in any way limits it the way that you're [sic] understanding does?

A    I do believe the way I interpret it is the way I interpreted it.

Tr. Ex. 17 at 84–87 (ECF No. 255-12 at 86–89).  In her testimony, however, the JIO

acknowledged that "hypothetically there could be situations in which an interest in denying the

conduct happened differs from the office's desire to admit the conduct happened.  Right?  There just could be times in which the interests are different."  Tr. Ex. 17 at 141–42 (ECF No. 255-12 at 143–44).  In such situations, "one option might be that the employing office hire a law firm to act on behalf of the office to be empowered to respond and decide how to respond to the complaint."  Ex. 17 at 142 (ECF No. 255-12 at 144).  The JIO further testified that the latest EDR Plan explicitly recognizes that "sometimes the respondent should not be represented by the unit executive, that there might be situations in which – and I think we just used the phrase 'cause to think,' there should – somebody else should represent the office in the complaint stage."  Ex. 17 at 179–80 (ECF No. 255-12 at 181–82); *compare* Tr. Ex. 69 at 67 (EDR Interpretive Guide & Handbook (Jan. 2020), ECF No. 250-13) ("[I]f the Complainant alleges that the Unit Executive sexually harassed her, the personal interests of the Unit Executive likely conflict with the Employing Office's interests, and someone other than the Unit Executive should likely act on behalf of the Respondent Employing Office.").

274c.   In addition to the above statements, the JIO also expressed uncertainty to Plaintiff during their conversation about how EDR remedies could be enforced against a federal defender office.  The JIO's testimony corroborates the civil complaint's allegations that the JIO stated that "most presiding officers would not want to 'meddle' in a federal defender office" and "Article III judges do not have authority to 'manage' a federal defender office."  Tr. Ex. 1, at ¶¶ 439–440 (ECF No. 1, Complaint ¶¶ 439–440).  Specifically, the JIO testified that she "didn't know what would happen" if "the defender refused" to comply with an order in an EDR proceeding.  Ex. 17 at 130–31 (ECF No. 255-12 at 132–33).  She testified as follows:

> Q     Did you talk with Caryn about remedies at the complaint stage?

A      I don't remember.

The only question -- the only topic that I remember coming up late in our meeting was her asking what would happen if the defender, like if the presiding judicial officer at the end of the complaint stage -- because that's when remedies happen, after there has been a decision on the merits -- what would happen if the defender refused to comply with the orders.

Q      And –

A      And I said I didn't remember what – I was not familiar with the -- how a defender could be unappointed.

In contrast, if I'm a court employee and the presiding judicial officer orders the clerk of court to provide some remedy, the clerk of court, I understand, is in a very direct employment relationship with the chief judge and the judges on the court.

And what I remember telling Caryn is I literally did not know enough about the relationship between a defender -- and I'm talking about the unit executive defender -- and the judges on the Court of Appeals.  And so I remember telling her that I didn't know what would happen.

I certainly told her that they are obligated -- a defender would be obligated under the plan to take those remedies and to comply with the order, but I didn't know what would happen if they refused to follow that.

Q      Do you know – I'm just trying to make sure I understand your answer.

Are you saying that you didn't know if the Court -- if a presiding judicial officer would have authority to enforce remedies ordered under the plan against the defender?

A      No.  I knew that they had the power to enforce it.

But the mechanics of what does that enforcement mean, what I didn't know was would they have the power to fire the defender for failing to comply with a presiding judicial officer decision.

277

And after our meeting, I did learn about a statute that describes how a defender can be removed from office for misconduct in office or neglect of duty; and as a lawyer I would make the argument that failing to comply with a presiding judicial officer's order would be neglect of duty.

So, I didn't know that.

Q    At the time.

A    So that was -- my answer to her was, "I don't know what would happen."

Q    Okay.

A    But I also want to be clear when you talk about remedies I am talking exclusively about a post-decision remedy ordered by a presiding judicial officer at the end of the complaint stage –

Q    I understand?

A    -- not settlement resolutions or other informal resolutions. I'm talking about remedies under the EDR plan.

Ex. 17 at 130–33 (ECF No. 255-12 at 132–35).  In short, the JIO testified that because the Defender was not in a "direct employment relationship" with the Court of Appeals like other court employees, the JIO did not know the "mechanics of what does th[e] enforcement" of remedies mean.  Ex. 17 at 130–33 (ECF No. 255-12 at 132–35).  Accordingly, even if remedies theoretically were to be ordered against a federal defender office during the formal complaint hearing stage of the EDR process, the JIO was uncertain how any such remedies could be enforced if the Defender were to decide not to comply with the presiding officer's order. Without a "direct employment relationship" and "mechanics" for the enforcement of remedies, a reasonable person would believe the EDR final hearing would be a sham, as Plaintiff did in this case.

278

275.    The Judicial Integrity Officer urged Plaintiff to use the EDR process as it exists and to be clear about the remedies she was seeking.  Tr. Ex. 4, at ¶ 437 (ECF No. 210, Am. Answer ¶ 437).

276.    A few days later, the Judicial Integrity Officer wrote in an email to Plaintiff that she hoped their meeting wasn't "completely overwhelming."  Tr. Ex. 4, at ¶ 442 (ECF No. 210, Am. Answer ¶ 442); Tr. Ex. 51 at US2208 (ECF No. 248-15 at 44).

> 276a.   The JIO's email to Plaintiff, dated February 17, 2019, stated as follows:
>
> Caryn,
>
> I hope Friday wasn't completely overwhelming.  I felt a little overwhelmed, so I suspect you did as well.  I want EDR to work; that is such a passion of mine.  I can't address the whys of what has transpired in your cast [sic] to date, and I know this has been an arduous path for you, but I think it would be helpful to remember that you are still at the start of the EDR process.  All of the due process rights in the EDR complaint process are still there for you to use.
>
> If you were to let me speak to James, I could at least offer myself to him as a guide for how I train and expect EDR to work.  I would not want to intervene, but just to offer him a sounding board for how I think the EDR process needs to work, so that everyone believes that the ultimate EDR result was fairly and transparently arrived at.  It would involve me letting him know you reached out to me, which is entirely within your rights to do, but if that concerns you, I will not ever reveal our conversation or my knowledge of your claim.
>
> I am also passionate that employees not fear retaliation for coming forward and for using EDR.  You can and should report any retaliatory actions that you experience, and that includes letting me know.
>
> With warmest regards,
>
> Jill

Tr. Ex. 51 at US2208 (ECF No. 248-15 at 44).

276b.   In response to the JIO's email, Plaintiff stated, "Thank you for your warm email and for taking so much of your time to meet with me in person."  Tr. Ex. 51 at US2208 (ECF No. 248-15 at 44).  Plaintiff stated that she was "supplement[ing] my original narrative with more detail in writing" based on the JIO's advice.  In addition, Plaintiff stated, "I appreciate your offer to speak to James, but I would like to let things play out more first and see if my filings move things in a different direction."  Tr. Ex. 51 at US2208 (ECF No. 248-15 at 44).  In her contemporaneous notes, the JIO stated that when she made the offer to speak to the EDR Coordinator, Plaintiff had stated that she "would have to consider this over the weekend, as [she] fear[ed] my [the JIO's] involvement might inflame matters."  Tr. Ex. 50 at US5447 (ECF No. 248-15 at 42).

277.   She said that Plaintiff's matter could be a "lesson learned."  Tr. Ex. 4, at ¶ 443 (ECF No. 210, Am. Answer ¶ 443); Tr. Ex. 51 at US2207 (ECF No. 248-15 at 43).

278.   She also said she would like "to better understand if FPDs are adequately protected by EDR remedies."  Tr. Ex. 4, at ¶ 444 (ECF No. 210, Am. Answer ¶ 444); Tr. Ex. 51 at US2207 (ECF No. 248-15 at 43).

278a.   In response to Plaintiff's email, the JIO stated as follows:

Don't hesitate to contact me again.  At least, do let me know how this is ultimately resolved.  Every matter can be a "lesson learned." For example, your experience has taught me that I/we need to provide EDR interpretive guidelines to courts, to flesh out what I/we think should happen in EDR proceedings.  I've trained EDR Coordinators in the Tenth Circuit, but I think that needs to be nationalized.  And I'd like to better understand if FPDs are adequately protected by EDR remedies.

Tr. Ex. 51 at US2207 (ECF No. 248-15 at 43).

280

278b.   During her deposition, the JIO was asked about this email exchange and, in particular, why she made these statements to Plaintiff.  The JIO testified as follows:

> Q     -- I think you wrote to Caryn on February 17th.  You said, "I hope Friday wasn't completely overwhelming.  I felt a little overwhelmed; so I suspect you did, as well."
>
> Do you remember why you felt overwhelmed?
>
> A     No, I don't.
>
> Q     Do you remember why you thought she might have been overwhelmed?
>
> A     I do remember that both she and her husband were very -- they had a strong passionate
> frustration.
>
> Q     And how did they communicate that to you?
>
> A     I don't know now.  I just don't remember.
>
> It's a sense of an emotion you're picking up from body language and tone of voice, and I don't
> remember the specifics now.
>
> Q     Is that why in the next sentence you said, "I know this has been an arduous path for you"?
>
> A     Yes.  Because you could tell that she had wanted things to be happening differently and was struggling to have those things happen.
>
> Q     When you said at the end of this paragraph, "All of the due process rights in the EDR complaint process are still there for you to use," was "due process rights" still colloquial in that?
>
> A     It was literally talking about the process.  The Constitution never entered my mind at all.
>
> Q     In the next paragraph you talk about possibly speaking to James; and then in your last paragraph you say, "I'm also passionate

281

that employees not fear retaliation for coming forward and for using EDR."

A     Right.

Q     Is that because you understood that she feared retaliation if you talked to James?

A     No.  I didn't have a sense of that.

The only retaliation I remember -- and I don't remember the specifics of what she felt had happened that was retaliatory -- but that that was one of her allegations.

Q     Looking at the page before it which is 5391, you said, "Every matter can be a lesson learned.  For example, your experience has taught me that I/we need to provide EDR interpretive guidelines to courts to flesh out what I/we think should happen in EDR proceedings."

What did you mean by that?

A     So, he [sic] EDR plans are adopted on a court-by-court basis, and each individual court unit does it's [sic] own reading of the EDR plan, it's [sic] own interpretation of the words.

Coming into a national role outside of my 10th Circuit universe where all of the courts have the same plan and where I was familiar, to some degree, of how different courts within the 10th Circuit interpreted things and had a sense of that, coming into a national role and seeing that people read the same language differently was like we should talk about these differences and become more aware and learn from each other where we have either agreements or disagreements about interpretation.

It seemed to me coming into a national role that that would -- I was hearing things as to how this was handled that was different than how I was used to seeing things.

And I thought, well, let's work on a more national understanding of how we're all interpreting these, how each court -- and we have like -- I don't know how many -- 400 courts, 400 different lawyer types.  Let's have a more nationalized interpretation of this.

282

Q      So, from your experience in talking to Caryn -- and I don't know if you had any other experience -- but did you feel that those 400-plus courts were sometimes interpreting things differently?

A      Yes.

Q      You then said, "I've trained EDR coordinators in the 10th Circuit, but I think that needs to be nationalized."

Why did you think that?

A      For the same reasons I just said.

Q      "And I'd like to better understand if FPDs are adequately protected by EDR remedies."

MS. McMAHON:  Objection.

MS. YOUNG:  Objection.  Form.

THE WITNESS:  What is your question?  I'm sorry.

BY MS. WARREN:

Q      What did you mean by that?

A      That was Caryn had asked me what would happen if the defender didn't comply with the presiding judicial officer's remedies at the end of the complaint stage; and I did not at that time know enough about the appointment, reappointment, and removal of defenders to know what would happen.  They are different than the unit executive in the court which is clearly governed by, supervised by, and works at the pleasure of the chief judge and the judges on that court.

And so I just didn't know the answer to that particular question, and I had said I wanted to find that out.

Q      Did you ever tell Caryn the answer to that question?

A      I don't think I did.  No.

283

Ex. 17 at 171–76 (ECF No. 255-12 at 173–78).  The JIO's testimony thus confirms that she had

raised concerns with Plaintiff about whether "FPDs are adequately protected by EDR remedies"

because federal defenders are "different from the unit executive in the court which is clearly

governed by, supervised by, and works at the pleasure of the chief judge and the judges on that

court."  Ex. 17 at 171–76 (ECF No. 255-12 at 173–78).  Further, the JIO never followed up with

Plaintiff to tell her whether FPDs would be adequately protected by EDR remedies.

278c.   Additionally, the JIO was asked about her comments about the need to provide

nationalized training regarding the EDR process.  Specifically, the JIO testified that prior to

2019, there was no "mandatory training for people who actually are participating in

administering the EDR process," such as investigators and mediators.  Ex. 17 at 64 (ECF No.

255-12 at 66).  Prior to 2019, there was also no requirement that "annual" training be provided to

judiciary employees.  Ex. 17 at 60–61 (ECF No. 255-12 at 62–63).  Currently, it is mandatory

that training be "offered," but "[i]t's not mandatory that people attend."  Ex. 17 at 61 (ECF No.

255-12 at 63).  The JIO testified as follows:

> Q       Was [training] a priority for you as the judicial integrity
> officer?
>
> A       Yes.
>
> Q       Did you work hard to accomplish that goal?
>
> A       Yes.
>
> Q       What did you do?
>
> A       Well, first, developing my training suggestions and then
> making it available.  I posted it on the JNET so that anyone could
> copy it and use it as a foundation to improve it or whatever, but at
> least you had something to work from.

I invited people to listen to my training to see if they could -- particularly new circuit directors -- to listen in on how I do training. We now all learn from each other and here each other's and improve that way.

The revised model plan that we changed in 2019 requires that the training be held annually, be offered annually, whereas the older EDR plan just said provide training but didn't have that annual requirement.

Q     Is the training mandatory?

A     It's not mandatory that people attend. It's mandatory that it be offered.

Many of the courts that I do provide the training in -- each Court makes it's [sic] own rules, but many of the courts do on their own require their mandatory attendance; but that's a court-by-court decision.

Q     Have you ever consulted with people in other kinds of workplaces about how they handle issues of workplace misconduct?

A     No.  I have read things, but I haven't ever had like a consultation with others. I pay attention to those kind of topics. I read those kind of topics in different forums but not that I have actually consulted.

Q     What have you read?

A     Oh, anything on the Internet, books – I don't know -- all kinds of thing.  I mean, everything that you come across, I couldn't possibly name what.

Q     Are there any specialized list serves that you read or follow?

A     I wouldn't even know what a list serve is; so, no.

Q     Have you ever spoken with employees or people involved with judiciary systems in other countries who are working on issues of workplace harassment?

A     No.

Q      Are you aware of any other countries working on issues of workplace harassment in the judiciary?

A      It's not something I've ever paid attention to; so, no.

Q      So, I think turning to your trainings that you've developed, do court decisions provide the definitions and standards that the judiciary applies through the EDR?

A      Oh, you are really going to have to start that one over again.

Q      Where did the definitions and standards that the judiciary applies through its EDR plan come from?

A      What definitions?

Q      Does the EDR plan have definitions of workplace harassment?

A      Yes.

Q      Discrimination?

A      Yes.

Q      Where do those definitions come from?

A      They are grounded in the employment laws that we mirror.

Q      Do you think that it's important that people be trained before they participate as an EDR investigator?

A      Yes.

Q      Are you aware if the EDR investigator in this case was trained?

A      I don't know anything about the investigator in this case.

Q      Do you think it's important that mediators be trained?

A      Yes.

Q      Are you aware that the mediator in this case was not trained?

A      I'm not aware of anything about the mediator in this case.

286

> Q   Is there mandatory training for people who actually are participating in administering the EDR process, or is that also court by court?
>
> A   The new model EDR plan adopted in 2019 has a training and certification program that I
> created and now its -- one of the statements in the model EDR plan is that to be designated as an EDR coordinator, you have to go through the training course.
>
> Q   Why did you think that was important?
>
> A   Because I think EDR coordinators need to understand what their role is and what their
> responsibilities are and understand, have some familiarity with what they're doing.
>
> Q   But prior to 2019, that did not exist?
>
> A   That's true.

Ex. 17 at 60–61 (ECF No. 255-12 at 62–63).  Additionally, the JIO explained that updated training was particularly necessary because the Federal Judicial Center's prior training program on harassment was "not contemporary," and though it "wasn't horrible," it was not "tailored to the judiciary."  Ex. 17 at 92 (ECF No. 255-12 at 94). The JIO described this training program as follows:

> Q   Did you participate in creating training for the Federal Judicial Center?
>
> A   They had a preventing workplace harassment program that I had heard given at several courts that I thought was not contemporary.  It was like it was a video.  It wasn't horrible.
>
> But it wasn't tailored to the judiciary.

It was focused on what an employee might do in a corporate setting in terms of going to H.R. So, it didn't describe any of our EDR options. It didn't describe EDR coordinators.

So I drafted and sent to -- but I don't know what they ever did with it. But I sent my suggestions for how they could change it, but I don't think I've ever seen it come out of the FJC as them having actually changed the programming.
. . .

What I'm remembering -- it did have a PowerPoint part of it and maybe this was part of it. So what I'm remembering more is that there was a video. So, there was a PowerPoint presentation; but what stands out more is the video that went with it.

I don't know if this is the PowerPoint that accompanied the video that I saw, although the title of what I saw was "Preventing Workplace Harassment" and it was put out by the Federal Judicial Center.

Q      What was the video?

A      So it was very '80s era, seriously; and it was employees in an open office setting.

The only scenario I remember -- but I think there were two or three -- but the one that for whatever reason stands out is that one of the actors playing an employee had like a Buddha statue on their desk and the co-worker makes fun of it.

I do think there was more than one example. Like someone else was made fun of for something.

And then I remember that the employee goes to head of H.R., talks to H.R. about it; and then H.R. talks to the manager about it, but I don't remember the specifics of what they said but something about we have to take this seriously or we have to do something. Then there was a PowerPoint presentation that went with it.

Q      Did you watch them give this training?

A      Yes. Three different times at three different courts, I saw someone give this presentation.

288

> I think mostly before I became the judicial integrity officer I had seen it either at courts in my circuit that had invited me to come be part of the training is what I think had happened.
>
> Q    As the judicial integrity officer, did you work with the FJC on their trainings?
>
> A    So when I became the judicial integrity officer -- yes -- I contacted different people at the FJC and said, "I really think we need to update this training. I think that it's visually dated. I think that it's not helpful to employees to not explain the EDR process. I think they need to know the judiciary system, and so I wanted them to do that.

Ex. 17 at 91–97 (ECF No. 255-12 at 93–99). In short, the JIO's testimony confirmed that at the time Plaintiff filed her EDR complaint, the primary workplace sexual harassment prevention training for the federal judiciary was an "80s era" FJC video that focused on what an employee would do in "corporate settings" and did not describe "any of our EDR options." Ex. 17 at 91–97 (ECF No. 255-12 at 93–99).

### LL.    With no meaningful review or remedies on her complaints, Plaintiff is constructively discharged.

278c.   Based on the JIO's statements, a reasonable person would reasonably feel deceived and misled by the EDR Plan's representations that an employee of a federal public defender office would have access to certain rights and remedies, when that was not actually the case. After all, the JIO stated that she is "considered a primary resource for the entire judiciary on the Model Employment Dispute Resolution Plan, its coverage, and processes," in a sworn declaration filed in this litigation. Decl. Jill Langley, ECF No. 243-18 ¶ 4. During her deposition, the JIO testified that she was a staff attorney for the Tenth Circuit Court of Appeals beginning in 1995 until she was appointed Judicial Integrity Officer in 2018. Ex. 17 at 11 (ECF No. 255-12 at 13). She began serving as the EDR Coordinator for the Tenth Circuit in

approximately 2007. Ex. 17 at 12 (ECF No. 255-12 at 14). In that role, the JIO participated in working groups regarding amendments to the Model EDR Plan in 2010 and 2013. Ex. 17 at 20 (ECF No. 255-12 at 22). Additionally, the JIO served as the first Circuit Director of Workplace Relations. Ex. 17 at 30–31 (ECF No. 255-12 at 32–33). The JIO testified regarding her role as Judicial Integrity Officer as follows:

> Q     And tell me what the role was as the judicial integrity officer?
>
> A     There was a federal judiciary workplace conduct working group that recommended -- issued a report in June of 2018 that had recommended the creation of a national office.
>
> I don't remember, specifically, what the report envisioned as the role.
>
> My best recollection is that the report envisioned the role as being a national resource that would be easy for any judiciary employees to locate and find and that it would be a resource outside of someone's court or employing office, if that's where they felt more comfortable.
>
> I believe it was also envisioned as an office that could provide training and education more nationally.
>
> Certainly, it was envisioned as an office that could provide advice and guidance about the employment protections in the EDR plan and the process for seeking remedies and resolutions under the EDR plan.

Ex. 17 at 27–28 (ECF No. 255-12 at 29–30). A reasonable person would believe that statements from a "national resource" on the "process for seeking remedies and resolutions under the EDR Plan" to the effect that she would like to better understand whether "FPDs are adequately protected by EDR remedies" because FPDs are not in a "direct employment relationship" with the courts would indicate that the process for seeking remedies and resolutions for federal defender employees is not adequate.

290

278d.   Indeed, the Defender himself testified in his deposition testimony that he did not know whether the Chief Judge could order remedies without his consent.  Specifically, the Defender testified as follows:

> Q. If there was a final hearing before Chief Judge Gregory and what he thought should happen is if Caryn could – Caryn should work, say, exclusively in the appellate unit, is that something that could have been accomplished without your approval?
>
> MS. WESTMORELAND: Objection to form.
>
> A. I don't know. And it's not a matter so much even because of my authority, necessarily, but it's an office, and, you know, I have to meet -- as a defender, meet the needs of the office for the Court and for the clients. And I don't think a Court -- a judge would order a defender that you've got to do this without considering whatever needs that defender has or lacks or budget lacks or space -- lacking of space. There is so many factors.
>
> For that reason, it's not a matter that the judge can't tell that defender what to do, there is too many factors for the Court to say I'm ordering you to do this.

Ex. 16 at 244–45 (ECF No. 248-6 at 31–32).  The Defender himself thus believed that, regardless of the remedies theoretically provided in the EDR Plan, if a presiding officer determined that there were "too many factors" to determine whether a remedy could be ordered, then the Court could not "say I'm ordering you to do this."  Ex. 16 at 244–45 (ECF No. 248-6 at 31–32). Regardless of the validity of an EDR claim, the complainant could end the EDR process with no remedies if the presiding officer determined there were "too many factors" in play to tell a federal defender what to do.  Ex. 16 at 244–45 (ECF No. 248-6 at 31–32).

279.    The Fourth Circuit EDR Plan, unlike the Model EDR Plan, gave accused

violators, such as the First Assistant, a right to cross-examine Plaintiff.  Likewise, the Defender would have the right to cross-examine Plaintiff in his capacity as the office's representative and as an accused violator of her rights.  Tr. Ex. 4, at ¶ 448 (ECF No. 210, Am. Answer ¶ 448).

280.    Defendants admit that Plaintiff's representative submitted a supplemental narrative to the EDR coordinator on February 22, 2019.  Tr. Ex. 4, at ¶ 449 (ECF No. 210, Am. Answer ¶ 449); Tr. Ex. 7 at US64–86 (ECF No. 248-2 at 12–34); Tr. Ex. 97 at US754–55 (ECF No. 60-4 at 66).

281.    Defendants admit that Ch. X, § 9(B)(4) provides: "Any person or party involved in the mediation process shall not disclose, in whole or in part, any information or records obtained through, or prepared specifically for, the mediation process, except as necessary to consult with the parties or their representatives, and then only with notice to all parties." Defendants further admit that Plaintiff's representative stated in his email transmitting the supplement: "If this document is shared with the Federal Defender Office, at any time, it should be subject to redaction to protect the identity of employees referenced in this document." Defendants respectfully refer the Court to the email for a complete and accurate statement of its contents.  Tr. Ex. 4, at ¶ 450 (ECF No. 210, Am. Answer ¶ 450); Tr. Ex. 97 at US754–55 (ECF No. 60-4 at 66).

282.    Defendants admit that the EDR Coordinator shared the supplement with the Chief Judge, the Defender, and the Mediator with simultaneous notice to Plaintiff and her representative.  He said that OGC had advised him that the supplement was "not subject to redaction."  Apparently, OGC had noted that the Defender "is prohibited from retaliating against

292

any employees for their participation in, or opposition to, EDR matters." Tr. Ex. 4, at ¶ 451 (ECF No. 210, Am. Answer ¶ 451); Tr. Ex. 97 at US754–55 (ECF No. 60-4 at 65–66).

282a.    The release of Plaintiff's mediation supplement to an accused party, in violation of her confidentiality rights, was part of a pattern of breaches of Plaintiff's confidentiality during the EDR process.  Indeed, as discussed above, the Defender and the First Assistant, as accused parties, openly discussed Plaintiff's complaint among themselves and with others, including by coordinating their testimony prior to their interview.  *Supra*, ¶ 158d. Additionally, the First Assistant directly told the Investigator that "many of the employees have figured out there is some kind of existing HR matter."  *Supra*, ¶¶ 158a–d.  Moreover, the EDR Investigator herself violated Plaintiff's confidentiality by making fun of Plaintiff to the District Court's Clerk of Court, Frank Johns, when Plaintiff applied for other judiciary employment in the district court.  *Supra*, ¶ 151d.

282b.    Moreover, Defendants' filings during this litigation revealed that Plaintiff's Chapter IX mediation supplement was shared not only with the accused Defender, who the investigation had already found should be disciplined based on Plaintiff's allegations, but also with the First Assistant, who the investigation had found should be disciplined, in part, for conduct that can "clearly be inferred to be a quid pro quo."  Tr. Ex. 12 at US1256 (ECF No. 248-5 at 23).  In his sworn declaration, the First Assistant stated the following:

> I did not learn what Plaintiff's specific allegations actually were until February, 2019, when Plaintiff filed her Mediation Supplement. At that point, Defender Martinez shared with me select portions of Plaintiff's Mediation Supplement for the limited purpose of providing him factual information necessary for him to properly understand and respond to Plaintiff's claims.

293

Declaration of John Parke Davis, ECF No. 245-3, ¶ 43. The First Assistant was not a party to Plaintiff's Chapter X EDR proceeding and had absolutely no "need to know" basis to receive Plaintiff's mediation supplement, in whole or in part, under the EDR Plan. The EDR Plan in effect at the time of Plaintiff's allegations specifically states that "the respondent shall be the employing office which would be responsible for redressing, correcting or abating the violation(s) alleged in the complaint. No individual shall be named as a respondent in the complaint." Tr. Ex. 9 at US4551–52 (ECF No. 248-3 at 17–18). The new EDR Interpretive Guide and Handbook is even more explicit on this point: "Recall that the Model EDR Plan states that an alleged violator does not get a copy of the Complaint, only notice that a Complaint was filed and the nature of the allegations." Tr. Ex. 69 at 67 (EDR Interpretive Guide & Handbook (Jan. 2020), ECF No. 250-13) (quoting Plan § IV(C)(3)(e)(ii)). "A Formal Complaint proceeding is between the Employee and the Employing Office, not an individual; and the matters adjudicated under this Plan are limited to whether the Employing Office is responsible to the Employee under employment law principles." Tr. Ex. 69 at 82 (EDR Interpretive Guide & Handbook (Jan. 2020), ECF No. 250-13). Thus, "[a]n alleged violator, even a Unit Executive, is not a Party to the EDR matter." Tr. Ex. 69 at 91 (EDR Interpretive Guide & Handbook (Jan. 2020), ECF No. 250-13). By sharing Plaintiff's Mediation Supplement with the individual accused of sexual harassment, against whom the investigation already found disciplinary action should be taken, and by openly coordinating with the harasser, once again, regarding Plaintiff's complaint process, the Defender violated Plaintiff's confidentiality rights under the EDR Plan and exposed her to further retaliation for having filed an EDR complaint. The Defender's continuing misconduct confirms the Investigator's concern that the Defender should be

294

disqualified because he was so biased against Plaintiff that he would do more damage if involved in the EDR process. It also confirms the concerns of Plaintiff's workplace investigations expert, Ms. Thomas, that Defendants "did not adequately protect the confidentiality of the process" and "did not consider the possibility that a confidentiality breach might expose Strickland to retaliation by her peers." Tr. Ex. 59, at 17, 19 (ECF No. 248-17 at 20, 22); Tr. Ex. 108, at 185, 187 (PLT4911, PLT4913).

283. Plaintiff's representative also submitted a renewed request to disqualify the Defender. Defendants admit that Plaintiff did not receive a written ruling on her request to disqualify the Defender. Tr. Ex. 4, at ¶ 453 (ECF No. 210, Am. Answer ¶ 453); Tr. Ex. 8 at US1498–1502 (ECF No. 248-2 at 58–62).

284. On February 26, 2019, Plaintiff met with the Mediator in a Fourth Circuit judge's law library. The Mediator told Plaintiff that she could not transfer to the federal defender office in the adjacent district she had requested because that office did not have an opening. Tr. Ex. 1, at ¶ 454 (ECF No. 1, Complaint ¶ 454). Defendants admit that Plaintiff met with Circuit Mediator Edward Smith and respectfully refer the Court to Plaintiff's recording of that meeting for a record of the statements made. Tr. Ex. 4, at ¶ 454 (ECF No. 210, Am. Answer ¶ 454); Tr. Ex. 98 at US8473–8475.

285. Plaintiff expressed concern and frustration that she would never be able to return to work normally at the FDO. The Mediator acknowledged that the Defender had been unresponsive since their first conversation. Tr. Ex. 1, at ¶ 455 (ECF No. 1, Complaint ¶ 455). Defendants admit that Plaintiff met with Circuit Mediator Edward Smith and respectfully refer

295

the Court to Plaintiff's recording of that meeting for a record of the statements made. Tr. Ex. 4, at ¶ 455 (ECF No. 210, Am. Answer ¶ 455); Tr. Ex. 98 at US8480–87, US8489–91.

286.    The Mediator offered to help Plaintiff get another job. He remarked that he was very impressed with Plaintiff's credentials. Plaintiff asked him to help her secure a Fourth Circuit clerkship. She said that having a clerkship would help prevent her employing office from destroying her reputation. She was disgusted, however, that she would have to lose her job while her perpetrators kept theirs. Tr. Ex. 1, at ¶ 456 (ECF No. 1, Complaint ¶ 456). Defendants admit that Plaintiff met with Circuit Mediator Edward Smith and respectfully refer the Court to Plaintiff's recording of that meeting for a record of the statements made. Tr. Ex. 4, at ¶ 456 (ECF No. 210, Am. Answer ¶ 456); Tr. Ex. 98 at US8532–8359, US8543, US8556–57, US8564–66).

287.    Defendants admit that after their meeting, Circuit Mediator Edward Smith went to Richmond, Virginia to discuss the possibility of a clerkship for Plaintiff. Tr. Ex. 4, at ¶ 457 (ECF No. 210, Am. Answer ¶ 457).

288.    Later that week, the Mediator called Plaintiff. A Fourth Circuit judge had a term clerkship vacancy, which had been open for at least several weeks. The Mediator said that this judge wanted to interview Plaintiff. Tr. Ex. 4, at ¶ 458 (ECF No. 210, Am. Answer ¶ 458).

289.    On March 8, 2019, Plaintiff interviewed with the Fourth Circuit judge. Plaintiff was highly qualified for the clerkship and she received an offer on the spot. Tr. Ex. 4, at ¶ 459 (ECF No. 210, Am. Answer ¶ 459).

290.    During Plaintiff's interview with the judge's other law clerks, and outside of Plaintiff's presence, the Mediator brought up in conversation a professional sports team owner

who had recently faced a nationally publicized sexual harassment scandal. The Mediator remarked that this person had been "good" to the school he had attended. The Mediator said he "hope[d]" that "nobody is making anything about what came out about him." He said he was "glad" it had been kept "quiet." He further elaborated: "He couldn't have handled it any better to keep it quiet" than by "walking away." Tr. Ex. 1, at ¶ 460 (ECF No. 1, Complaint ¶ 460). Defendants admit that Circuit Mediator Edward Smith had a discussion with Cooper Strickland during Plaintiff's interview and respectfully refer the Court to Plaintiff's recording of that conversation for a record of the statements made. Tr. Ex. 4, at ¶ 460 (ECF No. 210, Am. Answer ¶ 460); Tr. Ex. 99 at US8674–75.

291. As they were wrapping up mediation, Plaintiff told the Mediator that the clerkship was a "very nicely packaged constructive discharge." She said she was giving up her career because she was harassed and retaliated against without any accountability. Plaintiff called the situation the "collective fault of the institution." Tr. Ex. 1, at ¶ 462 (ECF No. 1, Complaint ¶ 462). Defendants admit that Plaintiff had a conversation with Circuit Mediator Edward Smith and respectfully refer the Court to Plaintiff's recording of that conversation for a record of the statements made. Tr. Ex. 4, at ¶ 462 (ECF No. 210, Am. Answer ¶ 462); Tr. Ex. 68 at US8692–93 (ECF No. 250-12 at 5–6).

291a. During this conversation, Plaintiff stated:

MS. STRICKLAND: I mean to get some rational, I mean, but it's clear it doesn't really resolve anything that happened. And it doesn't make me whole. You know, and it – it's very sadly, I feel what it show[s] me is how much the process doesn't work.

I mean, and I'm not trying to be – I don't mean that as a criticism of you or any [sic]. I – I very much appreciate it. But it – it's all just is very disturbing to me. This whole situation. And I think I need -

297

- I think I need to kind of process everything that happened and just -- just the fact that, you know, in a way if feels like a very nicely package constructed discharge.

You know, in that I have to give up a – a career that I wanted and over the fact that, you know, I was harassed and retaliated against and meanwhile I don't believe for a second that anything's going to happen to the people who did it. But there's going to be any accountability.

[MEDIATOR]: Yeah. I can't address that but from being with you, I don't even know if that was addressed with a clean house from what you wrote, it wouldn't do you any good anyway. I mean it was –

MS. STRICKLAND: Well and I -- I agree with you and that's why, you know, it's -- this makes the most sense for me because I just don't think there is any way that I could stay there but at the same time, you know, it's just not right.

It's just -- I don't know, there's just a real sense of injustice that comes. And I think it's very -it's very institutional. You know, it's not necessarily the fault of any one individual person. It's – it's a collective fault of the institution.

And it's – it's a weakness in the decentralized nature of the judiciary and the fact that you can -- you have these chambers and offices and union executives and their like little kings in their kingdoms.

Tr. Ex. 68 at US8692–93 (ECF No. 250-12 at 5–6). During the conversation, Plaintiff further stated her contemporaneous understanding that no remedies would be afforded through the EDR process, including during a final hearing:

MS. STRICKLAND: And I think those people just wouldn't – if their [sic] trying, if that's how a branch of government should operate. That there should be -- and especially if there was a huge difference between an article III judge and an agency like a Federal Defender's office.

To me, I feel like in some ways, Tony, as a [inaudible] has more rights in the process than someone like Judge Ford [sic] would have.

For example, I don't think he is even subject to this qualification [sic].

To me, you know, he -- he was involved in the dispute. Under the first [sic] circuit plan he should be disqualified. Yet, that's just not how the system is set up to operate. Yet, if you had an article III judge it goes into the system. They don't hear the claim when they're the person accused.

And to me, I just feel like how -- how is it that Federal Defender offices can just so completely [inaudible] and accountability for bad behavior. That the buck just stops at the unit infected [sic] and whatever they want.

That's all that there is. I just, you know, when we met in DC with the person at the IL [sic], I mean, you know the situation about remedy. What can even legally be ordered against a Federal Defender's office.

What authority does the fourth circuit even have other than -- because the CJ plan -- I don't think it gives them any statutory authority to actually order the [inaudible] be terminated or, you know, you don't.

[MEDIATOR]: That's why I pulled the remedies out when I first met with you. I hear you. I hear you.

MS. STRICKLAND: May I just say something.

[MEDIATOR]: The mediators hear you. We -- I deal with this. I understand exactly what you're saying. I would suggest to you -- I would hope that you would walk away from this not focused so much on what's wrong with the system but about what is right in this situation.

A lot of people went to work for you and found this. It's a testament to you and who you are and what you've accomplished. But it's also a testament to them too that everything you said is true. And they didn't have to do any of this. They wanted to do this.

And so, that's what I would offer out there to try to focus this on that. It might make you feel better. Because if you focus on the other, there's nothing you can do about it. I don't disagree with anything you say about the mediation process. I don't.

299

> MS. STRICKLAND: Yeah.
>
> [MEDIATOR]: I understand it's my frustration. They're looking at a new EDR plan right now at the DA [sic]. I don't think it's going to address what your all concern is. And even with me, the remedy part, which is a big problem here.

Tr. Ex. 68 at US8693–96 (ECF No. 250-12 at 6–9). The Mediator thus confirmed that "everything you said is true" about "the remedy part, which is a big problem here." Tr. Ex. 68 at US8693–96 (ECF No. 250-12 at 6–9). Indeed, because of the truth of Plaintiff's statements, the Mediator encouraged her to focus on "what is right in this situation," because officials involved in the EDR process "didn't have to do any of this" for her. Tr. Ex. 68 at US8693–96 (ECF No. 250-12 at 6–9). In other words, because the EDR process would afford no remedy, Plaintiff should be glad that she was able to get any remedy at all because judiciary officials "wanted to do this." Tr. Ex. 68 at US8693–96 (ECF No. 250-12 at 6–9).

292. The Mediator responded that Plaintiff should be thankful for what went right for her. He noted that a lot of people had worked to make this outcome possible, and they didn't have do anything for her. He advised Plaintiff not to focus on the problems with the system, adding words to the effect: "There's nothing you can do about it." Tr. Ex. 1, at ¶ 463 (ECF No. 1, Complaint ¶ 463). Defendants admit that Plaintiff had a conversation with Circuit Mediator Edward Smith and respectfully refer the Court to Plaintiff's recording of that conversation for a record of the statements made. Tr. Ex. 4, at ¶ 463 (ECF No. 210, Am. Answer ¶ 463); Tr. Ex. 68 at US8695 (ECF No. 250-12 at 8).

292a. During discovery, Defendants disclosed the communications of the Mediator and EDR Coordinator regarding Plaintiff's forced resignation. In response to the

300

Mediator's email confirming that he arranged a clerkship interview for Plaintiff, the EDR Coordinator responded: "Many thanks. There's a medal in this for you if this works." Tr. Ex. 74 at US1323 (ECF No. 255-8 at 3). Following the interview, the Mediator responded, in part, that "I have notified Tony Martinez that Caryn will be transferring effective March 18. I refused to tell him where she was transferring. He is thrilled and 'You must be able to walk on water.'" Tr. Ex. 74 at US1322 (ECF No. 255-8 at 2). The Mediator also stated: "I hope when this is all over you will have some much deserved and long lasting goodwill from the AO and Jim Duff." Tr. Ex. 74 at US1322 (ECF No. 255-8 at 2). The EDR Coordinator responded: "Having lived with this case for what seems like years, I can't tell you how relieved and delighted I am with the news. This has been an extraordinarily difficult case, compounded by the high-profile nature of it. Yet, you managed to achieve a result that everyone is thrilled with. This is a monumental accomplishment." Tr. Ex. 74 at US1322 (ECF No. 255-8 at 2). The EDR Coordinator further stated: "You've certainly earned the Circuit's thanks and appreciation for an outstanding job in settling this difficult case." Tr. Ex. 74 at US1322 (ECF No. 255-8 at 2). A few days later, when Plaintiff withdrew her EDR complaint, the EDR Coordinator sent the Mediator an email: "Congratulations!" Tr. Ex. 74 at US201 (ECF No. 255-8 at 5).

291b.    In his later memorandum to the Chief Judge, the EDR Coordinator stated that [e]ventually, Mr. Smith was able to persuade Circuit Judge Henry Floyd to offer Ms. Strickland a clerkship to the end of the term in June and convince Ms. Strickland to withdraw her EDR complaint in return for the clerkship." Tr. Ex. 13 at US7561–62 (ECF No. 248-5 at 79–80). The record confirms that the goal of the Mediator's statements was to "convince [Plaintiff] to withdraw her EDR complaint" instead of continuing to a final hearing. Tr. Ex. 13 at US7561

301

(ECF No. 248-5 at 79).  His statements were especially effective in "convinc[ing]" Plaintiff because they were made during mediation, the last phase of the EDR process before Plaintiff could proceed to a final hearing. *See* Tr. Ex. 13 at US7561 (ECF No. 248-5 at 79).

292c.   Judiciary officials' relief and delight that Plaintiff had withdrawn her complaint and resigned employment in the district extended to the EDR Investigator, who stated that Plaintiff "***would have been a true pain in you know what :)***" if she had accepted a *pro se* law clerk position for the district's judges.  Tr. Ex. 48 at US4025 (ECF No. 248-15 at 31). Similarly, the district's former Clerk of Court, Frank Johns, proclaimed, "***YEA! That one is off the chess board!***" Tr. Ex. 48 at US4025 (ECF No. 248-15 at 31); *see* Tr. Ex. 22 at 91 (ECF No. 255-3 at 9) (Mr. Johns had recommended the Investigator). This universally celebratory reaction confirms that judiciary officials convinced Plaintiff to resign and withdraw her EDR complaint, which they viewed as a "monumental accomplishment" worthy of "congratulations," instead of providing remedies that would allow her to work safely at the FDO.

### MM.   Plaintiff submits a comment on the revised Model EDR Plan highlighting the lack of meaningful remedies, which is ignored.

293.    On March 19, 2019, while Plaintiff was serving as a Fourth Circuit judicial law clerk, the AO Director circulated an Exposure Draft of the revised Model EDR Plan within the judiciary.  The Director requested that comments on the Exposure Draft be submitted to the Model EDR Plan Working Group.  Tr. Ex. 4, at ¶ 465 (ECF No. 210, Am. Answer ¶ 465).

294.    The Exposure Draft of the revised Model EDR Plan was never circulated for a public notice and comment period.  Tr. Ex. 4, at ¶ 466 (ECF No. 210, Am. Answer ¶ 466).

295.    On April 19, 2019, Plaintiff submitted a comment on the Exposure Draft to the Model EDR Working Group.  Tr. Ex. 4, at ¶ 467 (ECF No. 210, Am. Answer ¶ 467).

302

296.     Defendants admit that the quoted language appears in Plaintiff's comments:

> [E]ven the remedies listed in the Plan may not actually be legally or practically available to claimants. As an initial matter, the EDR Plan itself is a creature of Judicial Conference policy, rather than statute or other legally-binding authority. Judicial Conference policy states: "Judges' decisions in EDR matters must be in conformance with all statutes and regulations that apply to the judiciary, . . . [and] judges presiding in EDR matters may not compel the participation of or impose remedies upon agencies or entities other than the employing office which is the respondent in such matters." Proceedings of the Judicial Conference at 25 (Sept. 2010). This policy potentially undermines many of the remedies purportedly available under the Plan. For instance, if an employee requests a transfer as an interim measure or ultimate relief, the policy indicates that a court may not direct any other office to absorb that employee. Similarly, a court can only request, but not direct, another agency, such as GSA, to provide building modifications necessary to accommodate an employee with a disability.
>
> The problem is especially acute for employees of federal defender offices, who functionally have no remedies under the Plan at all. Although federal defender offices are "covered" by EDR Plans, the Criminal Justice Act does not explicitly confer statutory authority for the court of appeals to impose remedies or disciplinary action, short of removing the Federal Defender. *See* 18 U.S.C. § 3006A(g)(2)(A) (providing the court of appeals in the relevant circuit authority to appoint, set compensation for, and remove a Federal Defender for "incompetency, misconduct in office, or neglect of duty"). Even if the court has authority, institutionally speaking, the court is also unlikely to want to be perceived as interfering with the independence of a federal defender office.

Tr. Ex. 4, at ¶ 468 (ECF No. 210, Am. Answer ¶ 468).

297.     Defendants admit that the quoted language appears in Plaintiff's comments: that the Judicial Conference should "undertake a comprehensive review of its policies in this area and consider making recommendations to Congress in order to strengthen the remedies available to judicial employees." Tr. Ex. 4, at ¶ 469 (ECF No. 210, Am. Answer ¶ 469).

303

**NN.** **Months after Plaintiff is constructively discharged, the Fourth Circuit takes "disciplinary action."**

298.     Defendants admit that Plaintiff emailed the EDR Coordinator on May 1, 2019, stating, "I am requesting a status update on my Chapter 9 report of wrongful conduct. Specifically, is this proceeding still open or closed?" Defendants respectfully refer the Court to the email for a full and accurate statement of its contents. Tr. Ex. 4, at ¶ 471 (ECF No. 210, Am. Answer ¶ 471); Tr. Ex. 85 at US476 (ECF No. 60-4 at 72–73).

299.     The EDR Coordinator responded that the proceeding was still "open and ongoing." Tr. Ex. 4, at ¶ 472 (ECF No. 210, Am. Answer ¶ 472); Tr. Ex. 85 at US476 (ECF No. 60-4 at 72–73).

300.     Plaintiff asked the EDR Coordinator if he would meet with her in person. Tr. Ex. 4, at ¶ 473 (ECF No. 210, Am. Answer ¶ 473).

301.     On May 7, 2019, Plaintiff met with the EDR Coordinator and HR Administrator in Richmond, Virginia. Plaintiff asked for an update on the wrongful conduct proceeding. He said that, on the advice of OGC, he could not tell Plaintiff anything about the proceeding or its outcome. Tr. Ex. 1, at ¶ 474 (ECF No. 1, Complaint ¶ 474). Defendants admit that Plaintiff met with the EDR Coordinator and HR Administrator in Richmond, Virginia and respectfully refer the Court to Plaintiff's recording of that meeting for a record of the statements made. Tr. Ex. 4, at ¶ 474 (ECF No. 210, Am. Answer ¶ 474); Tr. Ex. 100 at US8754–8756.

302.     Plaintiff told the EDR Coordinator that she had lost her job because she filed a complaint. She said that there was no possible remedy through the EDR process. She said that OGC had skewed the process in favor of management and worked a "serious injustice," not just for her, but for anyone else who filed a complaint. She said that the failure to follow the EDR

304

Plan "as it appears on paper" made it impossible to stay in her office. Tr. Ex. 1, at ¶ 475 (ECF No. 1, Complaint ¶ 475). Defendants admit that Plaintiff met with the EDR Coordinator and HR Administrator in Richmond, Virginia and respectfully refer the Court to Plaintiff's recording of that meeting for a record of the statements made. Tr. Ex. 4, at ¶ 475 (ECF No. 210, Am. Answer ¶ 475); Tr. Ex. 100 at US8760–70.

303. Plaintiff further explained that she had had difficulty finding another job because, when asked, she did not feel comfortable providing references from the FDO. She also felt ostracized from applying for the Criminal Justice Act panel in her district, because the people who had engaged in misconduct would be reviewing her application. Tr. Ex. 1, at ¶ 476 (ECF No. 1, Complaint ¶ 476). Defendants admit that Plaintiff met with the EDR Coordinator and HR Administrator in Richmond, Virginia and respectfully refer the Court to Plaintiff's recording of that meeting for a record of the statements made. Tr. Ex. 4, at ¶ 476 (ECF No. 210, Am. Answer ¶ 476); Tr. Ex. 100 at US8756–58.

304. Plaintiff said that everyone in her office knew that she filed a complaint, and that the rumor was that she "lost." Tr. Ex. 1, at ¶ 477 (ECF No. 1, Complaint ¶ 477). Defendants admit that Plaintiff met with the EDR Coordinator and HR Administrator in Richmond, Virginia and respectfully refer the Court to Plaintiff's recording of that meeting for a record of the statements made. Tr. Ex. 4, at ¶ 477 (ECF No. 210, Am. Answer ¶ 477); Tr. Ex. 100 at US8767–68.

305. Plaintiff told the EDR Coordinator that this was not over for her. She told him that she lived with this burden every day and that it had tremendously affected her life and career. Tr. Ex. 1, at ¶ 478 (ECF No. 1, Complaint ¶ 478). Defendants admit that Plaintiff met

with the EDR Coordinator and HR Administrator in Richmond, Virginia and respectfully refer the Court to Plaintiff's recording of that meeting for a record of the statements made. Tr. Ex. 4, at ¶ 478 (ECF No. 210, Am. Answer ¶ 478; Tr. Ex. 100 at US8756–59.

306.    Defendants admit that on May 16, 2019 the EDR Coordinator, in his capacity as Circuit Executive, formally notified the Defender by letter that the judges of the Fourth Circuit approved the Defender's request to establish a Capital Habeas Unit ("CHU") in his office. Defendants further admit that the CHU would represent individuals in capital habeas cases throughout the Fourth Circuit. Tr. Ex. 4, at ¶ 479 (ECF No. 210, Am. Answer ¶ 479).

307.    The EDR Coordinator included a hand written note for the Defender: "Congratulations!" Tr. Ex. 4, at ¶ 480 (ECF No. 210, Am. Answer ¶ 480).

308.    Defendants admit that the Fourth Circuit was working with the Federal Defender's Office to establish a CHU. Tr. Ex. 4, at ¶ 481 (ECF No. 210, Am. Answer ¶ 481).

309.    Defendants admit that the EDR Coordinator's May 16, 2019 letter to the Defender said that the Defender had "stated that [he] plan[ned] to open the CHU in FY2021, pending appropriate funding from Defender Services." Defendants respectfully refer the Court to the letter for a complete and accurate statement of its contents. Tr. Ex. 4, at ¶ 482 (ECF No. 210, Am. Answer ¶ 482).

310.    On June 4, 2019, the EDR Coordinator sent Plaintiff an email, with the Chief Judge copied. Tr. Ex. 4, at ¶ 483 (ECF No. 210, Am. Answer ¶ 483); Tr. Ex. 43 at US4714 (ECF No. 248-15 at 46).

311.    The EDR Coordinator disclosed to Plaintiff: "I wanted to let you know that disciplinary action was taken last week as a result of your report of wrongful conduct. As we

306

discussed previously, I cannot reveal the nature of the action because it is a disciplinary matter. But I wanted to let you know that action was taken, and I wanted to re-emphasize that: (1) the Fourth Circuit took your report very seriously, (2) Chief Judge Gregory ordered a painstaking and exhaustive investigation into your allegations, and (3) actions were taken based on careful consideration of the investigation report." Tr. Ex. 4, at ¶ 484 (ECF No. 210, Am. Answer ¶ 484).

312. Defendants admit that Plaintiff was not informed about the content of the investigation report, or the disciplinary action taken under Chapter IX of the EDR Plan. Tr. Ex. 4, at ¶ 486 (ECF No. 210, Am. Answer ¶ 486).

312a. During this litigation, Defendants disclosed evidence after the close of discovery, and on the day before the Chief Judge's deposition, demonstrating the officials did not even begin the process of considering disciplinary action until March 25, 2019, weeks after Plaintiff forcibly resigned. Specifically, on March 25, 2019, the EDR Coordinator had written the Chief Judge a memorandum stating as follows:

> To: Chief Judge Gregory
>
> From: James N. Ishida
>
> RE: Investigation Report - Caryn Devins Strickland
>
> Attached is the investigation report that was prepared in the EDR/Report of Wrongful Conduct matters filed by Caryn Devins Strickland. You must decide what disciplinary action, if any, should be taken against Federal Public Defender Anthony Martinez (N.C. W.D.) under Chapter IX of the Fourth Circuit's EEO/EDRPlan (November 2018) ("the Plan").
>
> **I.    Summary**
>
> On September 10, 2018, Assistant Federal Public Defender Caryn Devins Strickland filed both an EDR Complaint under Chapter X and a Report of Wrongful Conduct under Chapter IX of the Plan,

307

alleging sexual harassment, retaliation, and other acts of wrongdoing. Because both matters arose under the same general facts, I had ordered a joint investigation and appointed HR Manager Heather Beam, from the North Carolina Western District Probation Office, to handle the investigation.

While the investigation was ongoing, I had attempted to find a resolution through the counseling phase of the Chapter X EDR proceeding. In spite of extending the counseling period, I was unsuccessful in settling the matter. The counseling period ended on January 14, 2019.

On January 31, 2019, Ms. Strickland filed a timely request for mediation under Chapter X of the Plan. I thereafter appointed Edward G. Smith, Fourth Circuit Chief Mediator, to conduct the mediation.

The mediation period was extended once by mutual consent of Mr. Smith and Ms. Strickland. Eventually, Mr. Smith was able to persuade Circuit Judge Henry Floyd to offer Ms. Strickland a clerkship to the end of the term in June and convince Ms. Strickland to withdraw her EDR complaint in return for the clerkship.

On March 11, 2019, Ms. Strickland submitted her request, asking that her EDR complaint be withdrawn.

## II.        Next Steps – Chapter IX Report of Wrong Conduct

The last remaining matter is Ms. Strickland's Report of Wrong Conduct under Chapter IX of the Plan.

Chapter IX describes the process for resolving a Report of Wrongful Conduct:

(a) A Report of Wrongful Conduct is not the same thing as an EDR Complaint, and the two must be handled according to the procedures as set forth in their respective chapters,

(b) An investigation must be conducted into the allegations,

(c) All parties involved in the investigation must protect the confidentiality of the allegations, and

> (d) "Employees found by the Chief Judge and/or unit executive to
> have engaged in wrongful conduct, as defined in this Plan, may be
> subject to disciplinary action."
>
> The investigation report recommends that disciplinary action be
> taken against the accused employee – Federal Public Defender First
> Assistant J.P. Davis – as well as the unit executive, Anthony
> Martinez. You cannot decide any disciplinary action against Mr.
> Davis – that is within the authority of the unit executive. But you
> can and are tasked with deciding if disciplinary action is appropriate
> for Mr. Martinez.
>
> **III.     Additional Information**
>
> I'll speak to you later about a conversation that I had with Cait
> Clarke, the chief of the AO's Defender Services Office, which may
> help with your decision regarding Mr. Martinez.

Tr. Ex. 13 at US7561–62 (ECF No. 248-5 at 79–80).  In a footnote, the memorandum defines

"wrongful conduct" as the following:

> "Wrongful conduct" is defined to include "[d]iscrimination against
> employees based on race, color, religion, sex (including pregnancy
> and sexual harassment), national origin, age (at least 40 years of age
> at the time of the alleged discrimination), and disability is
> prohibited.  Harassment against an employee based upon any of
> these protected categories or retaliation for engaging in any
> protected activity is prohibited."  *See* Chapter II, section 1 of the
> Plan.

Tr. Ex. 13 at US7562 n.1 (ECF No. 248-5 at 80 n.1).  In short, the EDR Coordinator's

memorandum confirmed that even though the investigation report "recommend[ed] that

disciplinary action be taken" against *both* the Defender *and* the First Assistant for wrongful

conduct, defined as "discrimination against employees based on . . . sex (including pregnancy

and sexual harassment)," judiciary officials did not promptly take corrective action based on the

investigation report.  Instead, they delayed taking disciplinary action in hopes of "convinc[ing]"

309

Plaintiff to resign and withdraw her EDR complaint.  Tr. Ex. 13 at US7561–62 (ECF No. 248-5 at 79–80).

312b.   During her deposition, the JIO testified that the definition of wrongful conduct in the EDR Plan is intended to "comply with the substance" of employment laws, including Title VII.  Tr. Ex. 17 at 35 (ECF No. 255-12 at 37).  Accordingly, the "definitions" of the workplace harassment and discrimination in the EDR Plan are "grounded in the employment laws that we mirror."  Tr. Ex. 17 at 63 (ECF No. 255-12 at 65).  The JIO further testified as follows:

> Q     What do you mean by the laws that are in the EDR plan?
>
> A      So, there's a lot of federal employment laws that don't, by their terms, apply to employees of the federal judiciary.
>
> Starting in 1985, it has become binding judicial conference policy to voluntarily comply with the substance of several federal employment laws.
>
> Then in 1997, Congress adopted the Congressional Accountability Act which applied numerous federal employment laws to congressional employees.  And there was some discussion, my understanding is, that should the judiciary – so some of those same laws apply to the judicial branch.
>
> And ultimately, what happened was the judiciary adopted a voluntary binding policy by the judicial conference -- the judges of the United States judicial conference to voluntarily comply with the substance of -- I think it was then -- I think it used to be referred to as nine laws.
>
> So, those nine laws we would, as a judiciary, comply with the substance of those laws; but we would have -- because we weren't governed by the EEOC, we weren't subject to the jurisdiction of the federal courts for remedies or violations of those protections -- have an internal claims process that's set forth in the Employment Dispute Resolution plan.

310

Tr. Ex. 17 at 34–36 (ECF No. 255-12 at 36–38). The EDR Plan similarly reflects the JIO's

understanding that "wrongful conduct" refers to conduct that is prohibited by analogous

employment laws, including Title VII. The EDR Plan that applied in Plaintiff's case states that

"in reaching a decision, the presiding judicial officer shall be guided by judicial and

administrative decisions under the laws related to Chapters II through VIII of this Plan." Tr. Ex.

9 at US4552 (ECF No. 248-3 at 18). The EDR Interpretive Guide and Handbook similarly states

that, although "[m]any federal employment laws do not apply to Employees of the federal

judicial branch," the Judicial Conference "has prohibited conduct in the Judiciary workplace that

would violate these and other federal employment laws." Tr. Ex. 69 at 5 (EDR Interpretive

Guide & Handbook (Jan. 2020), ECF No. 250-13). The Handbook further states, *inter alia*, the

following regarding the application of anti-discrimination laws:

> 1. Discrimination
>
> ▪ An Employing Office may not discriminate against an
> individual with regard to any term, condition, or privilege of
> employment (for example, hiring, firing, failing to promote,
> significant change in benefits) because of such individual's
> protected category, that is:
>
> o race,
> o color,
> o sex,
> o gender,
> o gender identity,
> o pregnancy,
> o sexual orientation,
> o religion,
> o national origin,
> o age (40 years and over), or
> o disability
>
> ▪ Discrimination is defined more specifically under one of the
> following statutes:

311

> o Title VII, Civil Rights Act of 1964, as amended and codified in 42
> U.S.C. §§ 2000e–2- 2000e-3, 2000e-16(a) (prohibits retaliation and
> discrimination based on race, color, religion, sex, and national
> origin), including failure to provide a reasonable accommodation for
> a religious observance or practice.

Tr. Ex. 69 at 110 (EDR Interpretive Guide & Handbook (Jan. 2020), ECF No. 250-13).  Finally, the EDR Interpretive Guide specifically states that "[w]rongful conduct includes violations of the following employment laws: Title VII of the Civil Rights Act of 1964: prohibits protected-class discrimination in personnel actions and protected-class harassment; . . ."  Tr. Ex. 69 at 7 (EDR Interpretive Guide & Handbook (Jan. 2020), ECF No. 250-13).  Based on the judiciary's written resources, it is indisputable that by taking "disciplinary action" for "wrongful conduct" against both the Defender and the First Assistant, the Fourth Circuit's Chief Judge made findings of unlawful sexual harassment, sex discrimination, and/or retaliation in violation of the EDR Plan.

      312c.   During his deposition, the EDR Coordinator testified that the decision regarding disciplinary action against the First Assistant for sexual harassment was not the "concern" of the Fourth Circuit.  Tr. Ex. 22 at 223–24 (ECF No. 255-5 at 63–64).  As his memorandum to the Chief Judge stated, the EDR Coordinator advised the Chief Judge that "You cannot decide any disciplinary action against Mr. Davis – that is within the authority of the unit executive. But you can and are tasked with deciding if disciplinary action is appropriate for Mr. Martinez."  Tr. Ex. 13 at US7561 (ECF No. 248-5 at 79).  The EDR Coordinator further testified as follows:

> Q      Was JP Davis demoted after the EDR matter concluded in
> Ms. Strickland's case?
>
> A      I don't know -- I didn't know what action Mr. Martinez took
> against Mr. Davis, and, frankly, that wasn't our concern.

312

Q       That wasn't your concern?

A       Well, it wasn't our concern in the sense that we had no authority to take any action against Mr. Davis. That is the purview of the unit executive.

Q       Could Chief Judge Gregory have disciplined JP Davis?

A       No. And we had discussion about that.

Q       What were those discussions about?

A       I can't -- I can't remember if we had reached out to General Counsel on this as well, but I do recall that it was Judge Gregory's sense that he did not have the authority to discipline a subordinate in Mr. Martinez's office.

Q       Did Chief Judge Gregory have authority to discipline Mr. Martinez?

A       I think -- I think we felt that the Court of Appeals, as the appointing entity, had that ability.

Q       And when you say "we felt," who do you mean by "we"?

A       So Judge Gregory and I discussed this. That was Judge Gregory's view, and I concurred with that.

Q       And just to be clear, you are saying it was Judge Gregory's view and you concurred that Chief Judge Gregory could discipline Mr. Martinez but did not have authority to discipline JP Davis; is that right?

A       I think that's fair to say.

Q       Does the Court of Appeals exercise any authority over the Federal Defenders Office?

A       Aside from the Defender, none that I'm aware of.

Q       So when you say "aside from the Defender," are you talking about his appointment?

313

A       Well, again, as -- the Court of Appeals, as the appointing body, has – there's a number of things that the court can do to the Defender but not anyone in the Defender's office.

Q       I see. So the court cannot discipline anyone in the Federal Defenders Office?

A       I'm not aware of any authority that would give the court that ability.

Q       And to be clear, the only person who could discipline an employee of the Federal Defenders Office is Mr. Martinez?

A       As the unit executive.

Q       As the unit executive.

A       That's correct. That's my understanding.

Tr. Ex. 22 at 223–25 (ECF No. 255-5 at 63–65). The EDR Coordinator's testimony confirms that, in addition to refusing to disqualify the Defender from acting a decisionmaker during the EDR process even though he was too biased against Plaintiff to participate without doing more damage to the process, the Defender was also allowed to exercise sole decisionmaking authority regarding discipline of the First Assistant—even though the Defender himself was also disciplined. Moreover, the EDR Coordinator confirmed that the Court of Appeals has "no authority" to order corrective action with respect to any employee except for, arguably, the unit executive.

312d.   During his deposition, the Defender testified he "always believed" the First Assistant's account; that in his "opinion," the conduct Plaintiff reported "was not sexual harassment"; and that he made his decision based on "the gravity of the conduct," which he believed was "just emails," and "wasn't as serious as any other action that [the First Assistant] might have taken." Tr. Ex. 16 at 117, 216, 273–276 (ECF No. 255-4 at 48, 91, 105–08). The

314

Defender "didn't do any other counseling on any other subject" besides "four emails" from the First Assistant. Tr. Ex. 16 at 275 (ECF No. 255-4 at 107). In fact, the Defender believed that the First Assistant's conduct "did not require any disciplinary action," despite the investigation's findings. Tr. Ex. 16 at 275 (ECF No. 255-4 at 107). Specifically, the Defender testified regarding his view of Plaintiff's allegations and subsequent disciplinary action as follows:

> Q.     So at the end of the EDR Chapter IX process, when it concluded, did you discipline JP Davis?
>
> A.     Yes. I'm sorry, I didn't discipline him, I did a counseling -- verbal counseling. I did not discipline him.
>
> Q.     Okay. Can you tell me the difference between counseling and discipline?
>
> A.     I don't believe counseling is discipline.
>
> Discipline is when you require, like, a performance plan or some type of disciplinary. I consider counseling as nondisciplinary. It's just a counseling.
>
> Q.     Right. And in what circumstance would JP have been disciplined, as opposed to counseled, in this matter?
>
> MS. WESTMORELAND: Objection to form.
>
> A.     In this matter? Well, you know, like the way he was handling -- it related to the way he was handling, to give you a scenario, the way he was handling contacting James Ishida. I thought that was inappropriate, and if he were to do it again, he was going to -- there was some disciplinary action I was going to take.
>
> Q.     So he wasn't disciplined for that conduct?
>
> A.     He never did it again.
>
> Q.     So he wasn't disciplined for the times that he did contact him?
>
> A.     Correct.

315

Q.     And your understanding was that JP was not disciplined for -- as a result of Caryn's EDR complaint -- or EDR report?

A.     I told you, I didn't discipline him, I counseled him.

Q.     Right. I'm asking you: Your understanding is he was not disciplined?

A.     He was not disciplined, correct.

Q.     And did you decide how to counsel him?

A.     Yes, we reviewed the e-mails in question that -- you know, what were considered inappropriate, and we went over them and as to why they might have been considered inappropriate and he could have done better, and I think there were four e-mails, I think there were.

Q.     Are these e-mails that he sent to Caryn?

A.     Correct.

Q.     And he was counseled on how he could have done better –

A.     Correct.

Q.     -- in writing those e-mails?

A.     Correct.

Q.     So did you decide whether to discipline or counsel JP?

A.     I decided.

Q.     You decided. And how did you decide?

A.     It was discretionary on my part.

Q.     It was discretionary on your part whether to choose discipline or counsel JP Davis?

A.     Correct.

316

Q.      And what informed your decision about that?

A.      The gravity of -- what I considered the gravity of the conduct. And in this case, they were just e-mails, and my review of the e-mails, for me, did not require any disciplinary action.

Q.      Right. And what do you mean in this case they were just e-mails?

A.      I'm saying the counseling was in reference to the four e-mails.

Q.      Right.

A.      I didn't do any other counseling on any other subject.

Q.      And why did you think those e-mails warranted counseling rather than discipline?

A.      Because of the gravity of it. It wasn't as serious as any other action that he might have taken or conduct.

Q.      Right. So when you -- when you first heard about the facts that gave rise to these complaints, you didn't think it was sexual harassment; is that right?

A.      Correct.

Q.      And did you think it was sexual harassment at the end of the process?

A.      No, because there was a finding of no sexual harassment by the investigator.

Q.      Okay. So based on the investigator's report, you made a decision about how to handle JP Davis' –

A.      Yes.

Q.      -- counseling?

A.      Yes.

317

Tr. Ex. 16 at 273–76 (ECF No. 255-4 at 105–08); *see also* Tr. Ex. 10 at 9 (ECF No. 248-4 at 10) ("Defendants admit that the Federal Defender counseled the First Assistant on May 8, 2019 based on facts uncovered during the investigation.").

312e.   On May 28, 2019, the Chief Judge issued a Letter of Reprimand against the Defender.  *See* Tr. Ex. 10 at 9 (ECF No. 248-4 at 10) ("Defendants admit that the EDR Coordinator delivered the Federal Defender a letter of counseling dated May 28, 2019, signed by Chief Judge Gregory, based on facts uncovered during the investigation.").  This Court recognized that "[t]he underlying facts" favoring Plaintiff's equal protection claim against the Defender "appear to be undisputed," including through the "letter of reprimand" issued by the Chief Judge.  ECF No. 258, at 6–7.  The Chief Judge's letter of reprimand reads as a roadmap of the Defender's deliberate indifference as articulated by this Court, *see* Strickland, 32 F.4th at 359–60:

- "Marriage Metaphor": "After attempting to resolve several disagreements between Ms. Strickland and Mr. Davis, you had used an ill-advised metaphor, comparing the relationship between Ms. Strickland and Mr. Davis as a 'marriage,' with the parties needing to 'compromise' and 'meet in the middle.' Ms. Strickland said that she was 'shocked' and 'offended' at the reference, believing that it was inappropriate to describe any professional relationship between a male supervisor and female subordinate as a 'marriage.' The metaphor was especially inappropriate given the context that Ms. Strickland had raised concerns with Mr. Davis's behavior towards her."

- "No Physical Touching": "Ms. Strickland denied that Mr. Davis had touched her inappropriately, but she repeated that Mr. Davis made her feel uncomfortable and threatened. Investigator Beam found that you had said, 'at least you weren't touched,' or words to that effect. The investigator concluded that your remarks were callous, minimizing, insensitive, and contributed to the distress that Ms. Strickland felt."

- "Disapproval of Seeking Outside Advice": "Ms. Strickland had also sought advice and guidance from the Fair Employment Opportunity Office

318

at the Administrative Office of the U.S. Courts on her civil rights as a judiciary employee. The investigator found that you had 'called out' Ms. Strickland for seeking legal advice from that office, which further eroded trust between you and Ms. Strickland and exacerbated the deteriorating situation in your office."

- "<u>Shifting Responsibility</u>": "Finally, the investigator noted that you had said you were being blamed for matters that you had nothing to do with. Ms. Strickland reported that she felt 'offended' by your protest, which she perceived as disapproving her right to seek outside advice and counsel from the AO Fair Employment Opportunity Office. This, the investigator concluded, contributed to your mishandling of the matter."

Tr. Ex. 15 at US4265–66 (ECF No. 254-4 at 3–4).  Based on these findings, the Chief Judge determined that disciplinary action should be taken against the Defender, as recommended by the Investigator:

> [T]he investigator did record the numerous missteps that you committed, which contributed to Ms. Strickland's perception of mistreatment and retaliation by you.  These missteps appeared to have exacerbated the underlying situation, and they broke trust between you and Ms. Strickland.  This was not helpful.  But the investigator observed that most of your "decisions . . . were made at the end of a day where [you had] attended meetings all day and was tired."  She found that your actions were not motivated by malice or ill-will, but rather were the result of poor judgment caused by fatigue.
>
> Taking all of this into account, the investigator concluded that harsher discipline was not appropriate; instead, she recommended that you should be "counseled or train[ed] on judgement and decisiveness," in addition to be[ing] "counseled and trained on how to handle workplace conduct complaints."
>
> Under Chapter IX of the Plan, "[e]mployees found by the Chief Judge and/or unit executive to have engaged in wrongful conduct, as defined in this Plan, may be subject to disciplinary action."  After careful consideration of the investigator's report, supporting attachments, and documents filed in this case – and noting the mitigating circumstances – Chief Judge Gregory has decided to adopt the recommendations contained in the report.

319

Tr. Ex. 15 at US4266–67 (ECF No. 254-4 at 4–5).  The letter of reprimand thus expressly confirms that "disciplinary action" was taken for "wrongful conduct" under Chapter IX of the EDR Plan.  The letter even quotes the definition of "wrongful conduct" provided in the Plan, which includes "[d]iscrimination against employees based on . . . sex (including pregnancy and sexual harassment)," as the basis for the letter of reprimand.  Tr. Ex. 15 at US4267 n.4 (ECF No. 254-4 at 5 n.4).  These statements confirm that the letter of reprimand, as an unimpeached public record, made findings of unlawful sex discrimination in violation of the EDR Plan.

312f.    Following Plaintiff's constructive discharge and the belated disciplinary action on her wrongful conduct report, ███████████████████████████████
███████████████████████████████████████████████████████ *See*
*supra*, ¶ 22. ███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
██████████████





Tr. Ex. 58 at US7443, US7446 (ECF No. 248-16 at 31, 34). ███████████

████████████████████████████████████ Tr. Ex.

58 at US7446 (ECF No. 248-16 at 34). ███████████████

████████████████████████████████

████████████████████████████████

████████████

312g.  Less than two weeks after Plaintiff's resignation, FDO supervisors requested "to perform a pay adjustment from $134,379.00 to 147,816.90" for Jared Martin, the other research and writing attorney "in less than the standard 52 weeks."  The request stated that due to the reclassification—*i.e.*, Plaintiff's request for a promotion to Grade 15—"the usual Grade and Step pay changes did not occur."  Tr. Ex. 101, at US2705–08.  In short, as soon as Plaintiff resigned from the FDO, after refusing her a promotion or progression of job duties based on her excellent performance, FDO supervisors rushed an approximately $15,000 raise to Plaintiff's male co-worker in "in less than the standard 52 weeks."

## II.    Facts Regarding Remedy

### A.    Plaintiff's employment in her chosen field in indigent criminal defense

The Fourth Circuit held that Plaintiff's request for front pay in lieu of reinstatement "constitute[s] an equitable remedy." *Strickland*, 32 F.4th at 366.  It is undisputed that after her constructive discharge, Plaintiff is continuing to pursue her chosen career in indigent criminal defense, as a solo practitioner taking court-appointed cases. *See* Tr. Ex. 79 at 1–10 (ECF No. 255-17 at 2–11); Tr. Ex. 109 at 162–218.  (Plaintiff's lost earnings tax and court-appointed payment information).  Indeed, Plaintiff continues to work in indigent criminal defense nearly five years after the events alleged in the Complaint, and ten years after her law school graduation. *See* Tr. Ex. 105, at 3; Tr. Ex. A, at 7 (ECF No. 250, Ex. T, at 7).  Specifically, she litigates appeals on behalf of criminal defendants in state court, including briefing and oral

argument.  *See* NC Appellate Courts, at https://tinyurl.com/mvnzpj3e (search results for "Caryn Strickland").[9]  Plaintiff's lost earnings information, including her tax records since 2014 and her payment vouchers for her court-appointed indigent criminal defense work, were introduced during Defendants' deposition of Plaintiff's expert, Dr. Gary Albrecht, and have been reproduced as a trial exhibit.  In addition to being produced in discovery, Plaintiff's court appointments and compensation are a matter of public record.  *See, e.g.*, N.C. Indigent Defense Services, Fee Transparency,[10] *available at* https://www.ncids.org/fee-transparency/.

Plaintiff's dream since law school was to be a federal public defender.  In fact, her desire to spend her career at the FDO was already stated in published articles, including an AOWeb article published by the federal judiciary, prior to the events of this case.  Before Plaintiff became a Supreme Court Fellow, she described to an alumni publication for the University of Vermont how she hoped the fellowship would be a springboard to a federal public defender career:

> As for the future beyond the fellowship, Devins says she would like to work in a more rural area, perhaps even her native Vermont. "Ideally, I would like to work as a federal public defender, which is my dream job, but those positions are hard to come by. I'm not sure what I will do next, but if you keep your eyes open for opportunities like this fellowship, they'll come to you and sometimes that's better than having things planned out far in advance."

Tr. Ex. 104 at 4; *see also* Jon Reidel, Young Grad Gains Insider's View of the U.S. Supreme Court, University of Vermont, *available at https://www.uvm.edu/news/story/young-grad-gains-insiders-view-us-supreme-court.*  Plaintiff continued to maintain this dream during her year as a Supreme Court Fellow.  As an AOWeb article published by the judiciary described, Plaintiff

---

[9] This public website is subject to judicial notice.  *See* Fed. R. Evid. 201.
[10] This public website is subject to judicial notice.  *See* Fed. R. Evid. 201.

spent her year as a Supreme Court Fellow "conduct[ing] research to analyze and make recommendations regarding the wide variety of administrative processes taken to address retroactive changes to sentencing law." Tr. Ex. 104 at 1. The article explains: "'The AO provided me with the necessary resources to easily connect with judges and visit judicial offices across the country,' said Devins. 'It's been interesting to learn how court units handled retroactive changes in sentencing law and how they addressed administrative challenges created from the influx of motions and individuals that would be coming out on supervised release." Tr. Ex. 104 at 2. Indeed, this research was valuable to the judiciary, as demonstrated by the fact that "Devins later presented her research to the Judicial Conference's committees on Criminal Law and Defender Services." Tr. Ex. 104 at 2. This research culminated in Plaintiff's publication, "Lessons Learned From Retroactive Resentencing After Johnson and Amendment 782" in the Federal Courts Law Review, demonstrating her passion for federal sentencing law and federal criminal law generally. *See* Caryn Devins, Lessons Learned from Retroactive Resentencing After *Johnson* and Amendment 782, 10 Fed. Cts. L. Rev. 39 (2018), *available at* https://www.fclr.org/article-list/lessons-learned-from-retroactive-resentencing-after-johnson-and-amendment-782/.

The AOWeb article concludes by explaining that "[a]t the conclusion of her fellowship this August, Devins looks forward to living out her dream as a federal defender at the Western District of North Carolina." Tr. Ex. 104 at 2. The article recounts Plaintiff's statement: "It's awesome that my dream is finally becoming a reality." Tr. Ex. 104 at 2.

Plaintiff continued to reiterate that being a federal defender was her dream job during her EDR process, particularly in describing how devastating it was for her to lose the career she had

worked so hard for because she was sexually harassed, retaliated against, and discriminated against. During her conversations with the EDR Coordinator, Plaintiff stated that she "struggled" with the issue of potentially resigning from the FDO because she "didn't want to leave." Plaintiff said: "This is my dream job, I worked really hard to get here, this is where my husband's family is from, this is where we want to live, this office was a great fit for me." *Supra*, ¶ 223. Later, in requesting a transfer from the FDO because of the intolerable working conditions, Plaintiff told Fourth Circuit officials: "Although it was my dream since law school to be a federal defender, I do not believe it is possible to reach a resolution with my current office that will protect me from further harassment and allow me to advance in my career." *Supra*, ¶ 248. Plaintiff similarly stated in her mediation supplement filed with the Fourth Circuit and shared with FDO officials: "Since law school, Ms. Strickland's dream job was to be a federal public defender, based on her interest in federal criminal law and her desire to assist vulnerable clients in navigating the criminal justice system." Tr. Ex. 7 at US65 (ECF No. 248-2 at 13). However, because of the sexual harassment, sex discrimination, and retaliation she suffered, "[t]his pattern of conduct has fundamentally altered [her] terms and conditions of employment and she is no longer able to do her job effectively." Tr. Ex. 7 at US86 (ECF No. 248-2 at 34). When Plaintiff forcibly resigned, she told the Mediator that this "feels like a very nicely packaged constructive discharge" because "I have to give up a – a career that I wanted and over the fact that, you know, I was harassed and retaliated against and meanwhile I don't believe for a second that anything's going to happen to the people who did it." Tr. Ex. 68 at US8692–93 (ECF No. 250-12 at 5–6).

Plaintiff's continued pursuit of her dream job through court-appointed work demonstrates that no there is no position that would offer compensation comparable to what she would have received at the Federal Public Defender office. Indigent criminal defense is a highly specialized workforce for individuals, like Plaintiff, who demonstrate a commitment to this type of work. Outside of the Federal Public Defender office, there are no comparably compensated opportunities in this field. State public defenders are not highly compensated, and North Carolina, like many states, relies heavily on court-appointed attorneys to represent indigent criminal defendants. *See* Off. of Indigent Def. Servs., N.C. Gen. Assembly, Ann. Rep. of the Comm. on Indigent Def. Servs., July 1, 2020 – June 30, 2021 (2022), https://webservices.ncleg.gov/ViewDocSiteFile/24319.[11]

As the Report of Commission on Indigent Defense Services explains, the role of private assigned counsel in North Carolina is particularly critical because public defender offices are underfunded throughout the state. Moreover, under-compensation of court-appointed counsel has led to an "alarming attrition in the ranks of qualified attorneys choosing to do this work." *Id.* Following a modest rate increase in 2021, the public defense system in North Carolina continues to "struggle" with "attorney deserts" throughout the state as it comes to this important area of work. The IDS report further states the following about these issues:

> The General Assembly's 2021 public defense appropriation allowed IDS to implement long overdue increases to the rates for Private Assigned Counsel (PAC) and to take a step forward in the expansion of public defender offices. We are grateful to the General Assembly for its recognition that North Carolina public defense system is struggling and hope that the increased PAC rates will slow the alarming attrition in the ranks of qualified attorneys choosing to do this work.

---

[11] This public website is subject to judicial notice pursuant to Fed. R. Evid. 201.

Failure to adequately fund public defense leads to this attrition in the PAC rosters. In the closing remarks of its 2021 report "Private Appointed Counsel Caseload and Compensation Study," the NC State Bar noted that experienced attorneys were choosing to leave the work and. The subcommittee conducting the study expressed concern that excessive caseloads were hindering the ability of lawyers to represent their clients effectively.

This attrition has resulted in "attorney deserts" throughout the state, particularly in rural areas. System stakeholders have increasingly requested that IDS create public defender offices in the underserved areas of the state. This attrition leads to significant costs to the system. From inefficient court rooms to wrongful convictions to increased appellate costs, the increased expenses associated with a shortage of qualified attorneys may be significant. Both research and anecdotal evidence overwhelmingly support one conclusion: North Carolina needs a statewide system of local public defender programs, supported by qualified and adequately compensated private counsel to handle conflict and overflow cases.

*Id.* at 5. As this report describes, despite the importance of this work in protecting the Sixth Amendment rights of indigent individuals charged with criminal offenses, there simply are not enough state resources to adequately compensate the attorneys, including Plaintiff, who dedicate themselves to this work. Further, the role of Private Appointed Counsel, like Plaintiff, is especially critical because there are simply not enough public defender offices in the state to meet the demand for indigent criminal defense work.

## B. Basis for Plaintiff's calculating lost earnings

Because of the nature of Plaintiff's work in public defense, the basis for calculating Plaintiff's future lost earnings is a matter of public record, supported by government publications, reports, and publicly available earnings information for federal defenders and state-appointed roster attorneys. Plaintiff has presented testimony from her lost earnings expert, Dr.

327

Gary Albrecht, below. However, even without expert testimony, Plaintiff's lost earnings may be calculated based on publicly available information.

First, Plaintiff's salary if she had remained at the FDO can be determined based on the pay chart for assistant federal public defenders, which is required by statute to be equivalent to the pay scale for Assistant United States Attorneys. *See* 18 U.S.C. § 3006A(g)(2)(A) ("Compensation paid to such attorneys and other personnel of the [federal defender] organization shall be fixed by the Federal Public Defender at a rate not to exceed that paid to attorneys and other personnel of similar qualifications and experience in the Office of the United States attorney in the district where representation is furnished . . . ."); *see* Administratively Determined Pay Plan Charts, United States Department of Justice, *available at* https://www.justice.gov/usao/career-center/salary-information/administratively-determined-pay-plan-charts.[12] Based on Plaintiff's years of professional experience as an attorney, which would be nearly 11 years since law school by January 1, 2024, Plaintiff would qualify for Grade AD-29 on the AFPD pay scale. *See* ECF No. 259, at 77 (Defendants' statement of facts); Tr. Ex. 12, at 1302 (resume) (ECF No. 248-5, at 69). Based on Plaintiff's unrefuted excellent performance, as well as the fact that she was reclassified to an AD-28 in 2018 (that is, five years ago), it is not unreasonably speculative to assume that she would be promoted to AD-29.

Second, Plaintiff's benefits and retirement information can be determined based on publicly available government data, as well as Plaintiff's pay stubs. Dr. Albrecht testified that to determine benefits, he (1) added the employer's contribution to retirement of 5.0 percent of wages, (2) added health benefits of $12,239 annually, which he derived from the health benefits

_____

[12] This public website is subject to judicial notice. *See* Fed. R. Evid. 201.

328

amount shown on Plaintiff's pay stub, and (3) subtracted Plaintiff's contribution to the defined

pension benefits of 4.4 percent of wages. In addition, Dr. Albrecht subtracted state and federal

income taxes and FICA taxes, which are based on publicly available rates. Dr. Albrecht also

added the value of annual payments from the Federal Employee Retirement System (FERS),

which would continue to the end of Plaintiff's life expectancy according to the North Carolina

Statutory Life Tables. Additionally, to determine the number of hours Plaintiff would have

worked per year if she were employed as a federal public defender, Dr. Albrecht relied on data

from the Office of Personnel Management regarding federal leave for federal employees.

Specifically, based on the annual leave that Plaintiff would have accrued based on her years of

service, Plaintiff would have worked 1,728 hours per year through 2028 and 1,680 beginning in

2029. *See* Tr. Ex. 105. Although Dr. Albrecht's expertise helps bolster the credibility of this

methodology, all of the inputs he used are based on publicly available data listed in his expert

report, as applied through basic calculations to determine after-tax earnings.

Third, Plaintiff's expected earnings as a private, court-appointed roster attorney are

based, again, on publicly available information. In fact, the North Carolina Commission on

Indigent Defense Services completed an Effective Pay Rate Study for Private Appointed

Counsel, which determined the effective pay rate for private appointed counsel (*i.e.*, court-

appointed counsel) in North Carolina after accounting for appropriate overhead costs. Tr. Ex. 79

at 11–18 (ECF No. 255-17 at 12–19) (North Carolina Office of Indigent Defense Services, FY19

Private Appointed Counsel (PAC) Effective Pay Rate Study (March 2019)); Tr. Ex. 109 at 222–

29 (North Carolina Office of Indigent Defense Services, FY19 Private Appointed Counsel (PAC)

Effective Pay Rate Study (March 2019)). Based, in part, on this study, the North Carolina State

Bar created a Subcommittee on Compensation of Court-Appointed Counsel with two purposes: "(1) to examine whether excessive caseloads and reduced compensation rates are preventing private appointed counsel ('PAC') from fulfilling their ethical and constitutional obligations to their clients; and (2) to study what actions, if any, the State Bar might undertake to support the fair compensation of lawyers who are appointed to represent indigent criminal defendants." *See* N.C. State Bar, Private Appointed Counsel Caseload and Compensation Study 1, *available at* https://www.ncbar.gov/media/730668/pac-caseload-and-compensation-report.pdf. The study's findings, along with the efforts of the Subcommittee, eventually led the General Assembly to modestly raise the rates for private appointed counsel beginning in 2022. *See* Office of Indigent Defense Services, Counsel Rates, *available at* https://www.ncids.org/counsel-rates/.

Because Plaintiff is only beginning in her career as an court-appointed roster attorney, her payment and overhead expenses have not yet stabilized. The IDS study, a government-commissioned study that was relied on by the General Assembly in setting court-appointed counsel payment rates, is a reliable source of information for calculating Plaintiff's likely effective pay rate. As the survey explains, its purpose was to determine what private appointed counsel, like Plaintiff, are actually making after overhead costs are accounted for:

> Yes, $55 an hour sounds like a very nice sum, but the fact is, unlike judges, clerks, prosecutors, magistrates, public defender office attorneys, and virtually every actor in the criminal justice system, private appointed public defense attorneys (PAC) are different. They are contractors. As contractors, their hourly pay rate represents gross pay, not net earnings. As contractors, before a dime goes in their pockets, they first have to pay office overhead and self-employment tax. The remainder of their payment has to pay for benefits, such as health insurance and retirement, without any contributions or help from an employer, as well as monthly earnings.

330

Tr. Ex. 79 at 13 (ECF No. 255-17 at 14); Tr. Ex. 109 at 224.  Accordingly, the study collected

data from private appointed counsel around the State regarding monthly overhead items, "such as

rent, parking, malpractice insurance, office equipment, telephones, internet, bar dues, required

CLE programs, non-attorney employee salaries, non-employee benefit programs, and data access

fees."  Tr. Ex. 79 at 14 (ECF No. 255-17 at 15); Tr. Ex. 109 at 225.  The study also collected the

attorneys "total billable hours, firm type, number of attorneys in the firm, and percent of their

hours handling public defense cases."  Tr. Ex. 79 at 14 (ECF No. 255-17 at 15); Tr. Ex. 109 at

225.

     The study reported that in 2018, "attorneys report their average per attorney per hour

overhead cost was $38.10 per hour and the median was $21.72 per hour."  Tr. Ex. 79 at 14 (ECF

No. 255-17 at 15); Tr. Ex. 109 at 225.  Thus, "[t]he average effective hourly rate before benefits

was $15.62 and the median was $30.75."  Tr. Ex. 79 at 14 (ECF No. 255-17 at 15); Tr. Ex. 109

at 225.  Crucially, "[h]owever, *these low overhead rates were achieved by eliminating critical*

*resources, such as legal research tools, that enable attorneys to provide competent*

*representation.*"  Tr. Ex. 79 at 14 (ECF No. 255-17 at 15); Tr. Ex. 109 at 225.  For example,

many public defense attorneys "took drastic steps to reduce overhead," including eliminating

support staff positions and malpractice insurance.  Tr. Ex. 79 at 14 (ECF No. 255-17 at 15); Tr.

Ex. 109 at 225.  The study explained that, "[p]erversely, this lack of access to support staff forces

attorneys to perform non-attorney duties, such as clerical and paralegal work, at attorney rates.  It

creates inefficiency in the system."  Tr. Ex. 79 at 15 (ECF No. 255-17 at 16); Tr. Ex. 109 at 226.

The study also found that "there is a strong expectation that public defense cases will be handled

with very few hours of work," and that as a result, almost half of attorneys "report they self-cut

331

the hours they submit for the judges approval on fee applications every month."  Tr. Ex. 79 at

15–16 (ECF No. 255-17 at 16–17); Tr. Ex. 109 at 226–27.

The study finds that "[c]urrent public defense rates are extraordinarily low, especially in

comparison to retained practice compensation rates."  Tr. Ex. 79 at 16 (ECF No. 255-17 at 17);

Tr. Ex. 109 at 227.  The study thus concludes that "[p]rivate public defense attorneys should be

compensated at levels that allow necessary overhead costs to be covered and to earn enough to

provide some appropriate level of health care and retirement like every other actor in the

criminal justice system, including judges, prosecutors, magistrates, clerks, and salaried public

defender office employees."  Tr. Ex. 79 at 17 (ECF No. 255-17 at 18); Tr. Ex. 109 at 228.  To

this end, the study identifies "13 non-optional overhead items that the hourly rate paid to public

defense attorneys should cover: rent, malpractice insurance, office equipment, office expenses,

telephone, internet, bar dues, required annual CLE programs, legal research tools such as Lexis

or Westlaw, access to one full-time support staff, and debt service or the interest on the firm's

line of credit."  Tr. Ex. 79 at 19 (ECF No. 255-17 at 20); Tr. Ex. 109 at 230.  Based on these non-

optional overhead items, the study concludes that "[t]he average overhead cost for non-optional

items averaged $46.72 an hour and the median was $38.20 an hour."  Tr. Ex. 79 at 19 (ECF No.

255-17 at 20); Tr. Ex. 109 at 230.  Based on the study, the Commission on Indigent Defense

Services concludes "that rates need to be raised immediately, and every year that passes only

intensifies this need."  Tr. Ex. 79 at 18 (ECF No. 255-17 at 19); Tr. Ex. 109 at 229.  IDS

advocates that "PAC hourly rates should be restored to their pre-2011 levels after being adjusted

for inflation, then periodically adjusted for cost of living increases as and when other court

system actors receive cost of living adjustments."  Tr. Ex. 79 at 18 (ECF No. 255-17 at 19); Tr.

Ex. 109 at 229. "In addition, IDS should support attorney compensation systems that do not pit the financial survival of the attorneys against their clients' interests. Compensation systems that pressure attorneys to spend few hours on cases, such as grossly low flat fee schedules and inadequate contract payments, compromise justice and erode faith in the criminal justice system." Tr. Ex. 79 at 18 (ECF No. 255-17 at 19); Tr. Ex. 109 at 229.

In short, the IDS study confirms that Plaintiff will incur lost earnings throughout her career as a private appointed counsel for the State of North Carolina and provides a non-speculative basis to calculate her projected effective pay rate based on government data.

### C.    Dr. Albrecht's testimony regarding Plaintiff's lost earnings

Plaintiff's lost earnings expert, Dr. Gary Albrecht, confirms the lost earnings calculation based on the above-described data sources. During his deposition, Dr. Albrecht testified regarding his expertise and the basis for his expert conclusions in this case as follows[13]:

> Q.    Okay. So let's just walk through [your CV].[14] What is your current position?
>
> A.    I'm the president of Albrecht Economics.
>
> Q.    Okay. How would you describe your specialty or area of expertise?
>
> A.    The application of economic analysis and means of methodology to the application of questions that arise in the course of litigation.

---

[13] Dr. Albrecht's Expert Reports are located at Tr. Ex. 60 (ECF 248-18) (March 2023 Albrecht Expert Report and Declaration); Tr. Ex. 109 at 129-61; Tr. Ex. 105 (July 2023 Albrecht Expert Report and Declaration); see also Tr. Ex. 109 at 103 ("Q. Do you think your report would help illustrate your testimony for a fact finder? A. Yes. Q. Do you believe this would include any revised report that you may prepare? A. Yes.").

[14] Dr. Albrecht's CV is located at Tr. Ex. 60 at 16–22 (ECF No. 248-18 at 17–23) and Tr. Ex. 109 at 142–48.

333

Q.      How long has this been your specialty or area of expertise?

A.      I started in 1987 as Albrecht Economics, and it has changed names once or twice and became incorporated.  But since basically about 1988, I guess.

Q.      All right.  Does your report in this case involve issues within your area of expertise?

A.      Yes.

Q.      Have you worked specifically on cases involving future lost earnings or benefits calculations like your report in this case?

A.      Yes.

Q.      Just to clarify, have you ever not qualified as an expert in litigation?

A.      No.

Q.      And you testified before that you've written academic articles, many of which have been peer reviewed?

A.      Yes.

Q.      What's the general subject matter of those articles?

A.      Various topics in forensic economics.  A lot of the articles I've written have to do with calculating the present value, what interest rates to use and how to do that.

Q.      And just to confirm, Defendants' Exhibit 1 is the report that you prepared in this case?

A.      Yes.

Q.      All right. I think that this has been covered, but you know, if you would turn to the first page of your report, it has a subsection entitled information you reviewed.  Does this look like an accurate list of what you reviewed in preparing this report?

A.      Yes.

334

Q.      All right.  Defendants' Exhibit 3 is the IDS study. If you'll look at that. Would you confirm, just looking at the front page of this, that this is a document that's prepared by the North Carolina Office of Indigent Defense Services?

A.      Yes.

Q.      Even down to a just simple thing, but do you see the seal of the State of North Carolina in the bottom right-hand corner?

A.      Yes.

Q.      Would you confirm that this is a government document or appears to be, at least, in your opinion?

A.      It appears to be -- to be a government document, yes.

Q.      All right. Did you rely on this document for your report?

A.      Yes.

Q.      All right. Do you commonly rely on government data when calculating lost earnings?

A.      Yes.

Q.      Is that a pretty standard practice for experts like you in this field?

A.      Yes, it is standard practice.

Q.      So if we could go back to exhibit – Defendants' Exhibit 1. If you'll turn to Bates number 4835. It's the questionnaire.

A.      Okay. All right.

Q.      Is this a standard form that you use?

A.      Yes.

Q.      Did you rely on this document that was prepared by Plaintiff in preparing your report?

335

A.     It was – there's much information in this document that I used, yes.

Q.     So it's safe to say that this provided some of the information that you used for the assumptions in your report?

A.     Yes.

Q.     Do you commonly rely on this type of information to calculate lost earnings?

A.     Yes.

Q.     For experts in your field, is it a professional practice to rely on assumptions regarding retirement age, hours worked subject to a specific individual?

A.     Yes.

Q.     So it's not your job to basically define the average person on the street; you're looking at a specific individual whenever you're preparing a report?

A.     When possible, yes.  It's not always – it's not always – it's not always possible to use information concerning the specific person, but when possible, yes.

Q.     So if we could look at -- continue with this questionnaire on page 5.

A.     Okay.

Q.     Let's look at number 6. When it says "I believe age 67 would be an appropriate retirement age for these purposes because I would qualify for both federal retirement and normal full Security—"

A.     Yes.

Q.     ---"Social Security," is that a reasonable assumption to use?

A.     Yes.

Q.     I'm going to ask you just some general questions before looking at some detailed sections of your report.

336

Were you able to come to a conclusion based on the information you reviewed in this case?

A.      Yes.

Q.      What was your conclusion?

A.      My conclusion is that the amount to make Ms. Strickland whole is $3,373,039.

Q.      All right. And just generally, what methods or principles did you rely on to reach that conclusion?

A.      I started with Ms. Strickland's – what Ms. Strickland's salary would have been beginning in 2024, which was after tax, of $147,013.  That includes the 401(k), subtracts out her contribution to the defined pension plan, and includes health benefits.  Take that to her age -- Ms. Strickland's age of 67, whereupon she would begin receiving the defined pension. And so we have then what Ms. Strickland would have earned annually had she remained in her position with the federal government.

Her after -- I then calculated her after-tax earnings, given her current situation, took the difference in those to get the difference in after-tax earnings, and then basically just calculated the present value of that amount that would be the present value of her diminished earnings.

And then calculated the additional taxes that would have been incurred as a result of receiving the lump sum award, which is taxable in employment cases, so that -- as opposed to receiving the amount annually when the tax rate would be lower.  The tax rate would be much higher on the lump sum.

Q.      And do you think these methods and principles are fully demonstrated in your report?

A.      Yes.

Q.      Are those methods and principles accepted in your field?

A.      Yes.

337

Q.     Do you think your report would help illustrate your testimony for a fact finder?

A.     Yes.

Q.     Do you believe this would include any revised report that you may prepare?

A.     Yes.

Q.     All right. So let's look at some of the specific components of your report.

MR. STRICKLAND: If we could have back Defendants Exhibit 1 for the witness.

THE WITNESS: Thank you.

Q.     And I know you've provided some updated numbers in the summary. Do you think this – with those updated numbers, do you think that this summary accurately summarizes the conclusions of your report?

A.     Yes.

Q.     All right. If we could go to the next section, and it's the "After-Tax Earnings" subheading.

A.     Table -- oh, I'm sorry.

Q.     It's page 2 of your report.

A.     All right. All right. Got it.

Q.     Okay. Did you calculate Ms. Strickland's after-tax salary if she had remained employed by the federal government?

A.     Yes.

Q.     Okay. According to your report, what – what after-tax salary would Ms. Strickland have earned if she had remained employed by the federal government?

338

A.      After tax, not including benefits, would be 149,044. After including benefits and subtracting out the 4.4 percent that Ms. Strickland contributed to the defined pension plan, 147,013.

Q.      Okay.

A.      That's after tax.

Q.      All right. Did you rely on a government pay scale to calculate Ms. Strickland's after-tax earnings?

A.      Yes.

Q.      What pay scale did you use?

A.      Administratively Determined Pay Plan Charts and I also used Schedule 9 -- Locality-Based Comparability Payments.

Q.      Okay. Did you apply the locality adjustment under that pay scale?

A.      Yes.

Q.      What locality adjustment did you use – the percentage?

A.      Asheville.

Q.      Okay. And what percentage is that?

A.      16.2.

Q.      All right. Did you add the value of any benefits?

A.      Yes. 401(k) and employment benefits.

Q.      All right. Can you describe how you calculated those?

A.      Yes. The 401(k) is 4.4 percent. It's one of the documents in front of me. I don't recall which one. The employer provided health benefits was from the pay stub. It has a portion where it says employer provided benefits or something like that on the pay -- pay stub.

Q.      Okay. Can you turn to Bates number 4844?

339

. . .

Q.      (By Mr. Strickland) So Bates number 4844, does that appear to be a pay stub to you?

A.      Yes.

Q.      Is that the pay stub you're referring to, to calculate the health benefit?

A.      Yes.

Q.      Did you account for state and federal income taxes and FICA taxes?

A.      Yes.

Q.      How did you do that?

A.      I looked up the percentage -- the average percentage that any individual pays with various levels of taxes.

Q.      So you referred to IRS tables and---

A.      Yes.

Q.      ---tax authority tables to calculate that number.

A.      Yes.

Q.      Okay. And I think you've already given this number again, but just to confirm, what was the resulting annual amount after completing these calculations?

A.      The after-tax earnings, if continued with the federal government, was $147,013.

Q.      Did you use a particular retirement age to calculate after-tax earnings?

A.      I took after-tax earnings to age 67.

340

Q.      I'm sorry. Let me clarify the question. Did you use a particular retirement age to calculate after-tax earnings?

A.      Not annually, but I did---

Q.      Let me just -- on page 2 of your report, the very final paragraph, would you just read that final paragraph into the record?

A.      Page 2, the final paragraph. "Ms. Strickland anticipated -- anticipated working to age 67. This retirement age is supported by 'The Markov Model of Years to Final Separation from the Labor Force 2012-2017; Extended Tables of Central Tendency, Shape Percentile Point, and Bootstrap Errors.'"

Q.      That's – that's the paragraph. Thank you.

You were asked earlier how the Markov Model incorporated into your report, and does this accurately reflect how you used it?

A.      I used age 67 because that's what Ms. Strickland indicated she anticipated working to.

The Markov Model simply confirms that that's a reasonable number.

Q.      So let me -- just to clarify that, the age 67 would be a Social Security retirement age; is that your understanding?

A.      Yes. Yes.

Q.      Okay. And then that would be consistent with the Markov Model -- at least the Markov Model would support using that number?

A.      Yes, the Markov Model supports using that number. The Markov Model would actually be a higher retirement age.

Q.      And if it resulted in a higher retirement, it would result in greater lost earnings?

A.      Yes.

Q.      Did you account for retirement or pension benefits?

341

A.      Yes.

Q.      How did you calculate that amount?

A.      I believe the formula is – I'm not certain about this, but I could find it. But I believe the formula is .018 times years of service times the average of the four years' last salary.

Q.      Are you referring to what's called the FERS retirement system for federal employees?

A.      Yes.

Q.      All right. And government available information is what you used to calculate retirement pension benefits?

A.      Yes, it -- yes, it would be listed in the information reviewed.

Q.      Okay. Does page 3 of your report reflect the total amount of after-tax earnings if Ms. Strickland had remained employed by the federal government?

A.      Yes. 5,189,611. That's in current dollars, by the way.

Q.      All right. So let's move to the next subsection of your report entitled, "After-Tax Earnings Given Current Situation."

Did you calculate Ms. Strickland's after-tax earnings given the current situation?

A.      Yes.

Q.      According to your report, what after-tax revenue will Ms. Strickland earn given the current situation?

A.      Did you say revenue?

Q.      Yes.

A.      135,360. That has been changed.

Q.      Okay. And can you provide that updated number?

A.      In the future, I certainly can. I can't right now.

342

Q.      Okay. Did you use a particular hourly rate to calculate Ms. Strickland's after-tax salary?

A.      Yes, I used an hourly rate of $80.

Q.      And you had indicated that that came from the IDS study, is that correct?

A.      Yes.

Q.      All right. And also the Plaintiff's questionnaire?

A.      Yes.

Q.      And just to be clear, that is -- that is an average of various rates that apply to the type of work she's doing?

A.      Yes. More toward the higher end than the low end of the average, but---

Q.      If you have still Exhibit 1, can you turn to Bates number 4842?

A.      4842. Okay.

Q.      All right. And this is section "C. Other," and if you go down a few lines, you'll see something that starts "After that study was conducted."

A.      Yes.

Q.      And then it goes on to state that there's a $75-per-hour rate for low felonies?

A.      Yeah. Yeah. So the average is 75 to 85, yes.

Q.      Okay. And that's how you obtained the $80-an-hour number?

A.      Yes.

Q.      And that's supported by the IDS study?

343

A.      Yes.

Q.      Did you use a particular number of annual hours to calculate Ms. Strickland's after-tax salary?

A.      You're talking about in her current situation?

Q.      Yes.

A.      Yes, I did.

Q.      Okay. What number of annual hours did you use?

A.      I used 1,728 hours per year through 2028.

After 2028, I used 1,680 hours per year.

Q.      And those are basically updating what is in your report that states 1,692 hours -- annual hours, is that correct?

A.      Yes.

Q.      Can you walk us through again how you made that calculation of annual hours?

A.      Yes. Prior to 15 years of service, there's 160 hours of vacation. 160 hours is – it's six hours every pay period plus -- for 25 periods, and at the 26 period -- 26 period, I think it's one and a half days.  I don't recall exactly, but it works out to be 160 hours of vacation time. Then there are 11 federal holidays, eight hours a day times 11. 88. Then the sick leave is 104 hours. So that's the total number of hours 352.  Then subtract 352 from 2,080 to arrive at 1,728 hours.

After 15 years, there's eight hours of vacation for every pay period. So that would be eight times 26, which was 208.  Federal holidays 88 – 88 hours, and then the sick leave is 104 hours. So that total is 400 hours.  Then we have -- so we have 2,080 hours in the year minus 400 hours, which is 1,680 hours.

Q.      And if you could just clarify how you came up with the 2,080 hours?

A.      That's 52 times 40.

344

Q.      Thank you. Did you rely on OPM data for the leave entitlements that you described so annual leave, sick leave, holidays?

A.      Did I rely on what?

Q.      OPM data.

A.      Yes.

Q.      Federal government data.

A.      Yes.

Q.      So I want to spend a little bit more time on a particular issue, and if you would turn to page 3 of your report. Again, we're in the section that's "After-Tax Earnings Given Current Situation."

A.      Okay.

Q.      Let's go to the second paragraph there. And could you just read the first sentence?

A.      "Annual overhead costs of 81,279 are subtracted from the revenue to obtain a before-tax profit of $54,081."

Q.      Okay. And so to calculate the annual overhead cost, I think you testified before that you relied on the IDS study, is that correct?

A.      That's correct.

Q.      So if you could get your copy of the IDS study, let's look at that for a minute.

A.      Okay.

Q.      Let's turn to page 5 of that report.

A.      Okay.

Q.      And it says at the top, "Appropriate Overhead Costs," is that correct?

345

A.     Yes.

Q.     Okay. Can you read the second paragraph into the record for me?

A.     "IDS reviewed all the itemized overhead costs and identified 13 nonoptional overhead items that the hourly rate paid to public defense attorneys should cover: rent, malpractice insurance, office equipment, office expenses, telephone, Internet, bar dues, required annual CLE programs, legal research tools such as Lexis or West law, access to one full-time support staff and debt service or the interest on the firm's line of credit. The average overhead cost for nonoptional items averaged $46.72 an hour and the median was $38.20 an hour. Note that because so few respondents had access to support staff, the analysis used the average and median salary of a paralegal in North Carolina instead of survey data."

Q.     Do you think the use of the word "nonoptional overhead items" has any significance?

A.     Yes.

Q.     Explain why.

A.     You have to have it. It's not optional. It's necessary.

Q.     Do you think it's a reasonable assumption for you to rely on this government survey stating that these are nonoptional overhead items?

A.     Yes.

Q.     And to confirm, this survey states the overhead rate in an hourly version.  Did you use the median number of 38.20?

A.     I did not use the hourly number. I used the annual number of overhead costs. I used the median of $5,729 and brought that into current dollars by using the Consumer Price Index.

Q.     Okay.  And when you use the CPI, is that -- can you confirm that that runs from the date of this survey, which is March 2019, to the date of your report, which I believe is January 2024?

346

A.      No, it doesn't run to January 2024 because I don't -- it would be current as of when I did report March of 2023.

Q.      All right. Thank you. Just one more question on this subject. Turn to page 2 of that report.

A.      Okay.

Q.      Can you read the sentence beginning "However, these low overhead rates"? It's in the second paragraph.

A.      "In 2018, attorneys reported their average per attorney per hour overhead cost was $38.10 per hour and the median was $21.72 per hour. The average effective hourly rate before benefits was $15.62 and the median was $30.75. However, these low overhead rates were achieved by eliminating critical resources, such as legal research tools that enable attorneys to provide competent representation. 30 percent of public defenders had overhead hourly rates under $15 and five percent had rates under $5."

Q.      What's your – what's your opinion about what that's saying when it references that "low overhead rates were achieved by eliminating critical resources"?

A.      What's my what?

Q.      What's your opinion about the median and average numbers stated in that paragraph in the context of "low overhead rates were achieved by eliminating critical resources"?

A.      I don't really have any opinion about it.

Q.      Let's do it this way, then. How would you compare that statement with what's on page 5 of the report that's describing appropriate overhead costs?

A.      Well, certainly, I think one would want appropriate resources as opposed to inappropriate resources.

Q.      Is it fair to say that those numbers on page 2 of the report are artificially low, then?

347

A.      I don't want to get into that really because I -- you know, I'm simply using an average of the nonoptional overhead items. That's about all I want to say about that.

Q.      Thank you. All right. If we could go back to Exhibit 1, and I'd like to look at the section That's titled, "Difference in After-Tax Earnings."  It's on page 3.

A.      "Difference in After-Tax Earnings." Okay.

Q.      Did you calculate the difference in after-tax earnings between the scenario where Ms. Strickland remains employed by the federal government and the current situation?

A.      Yes.

Q.      How did you calculate that difference?

A.      Simply the difference in Table -- if we look at Table 1, it's simply the difference between the -- between the two columns.

Q.      What is the difference?

A.      In the -- do you want the updated difference or the one in the report?

Q.      Sure.

A.      The updated difference?

Q.      So I'm looking at page 3 and you have a number that's 105,603?

A.      Yeah.

Q.      What is that?

A.      That is now $103,398 until the year – I don't remember what year it was -- through 2028. It then changes to $106,338.

Q.      All right. Let's look at the next section entitled, "Present Value of Difference in After-Tax Earnings." It's -- that begins on page 3 as well.

348

A.      Okay.

Q.      Did you calculate the present value of the difference in after-tax earnings?

A.      I did.

Q.      How did you calculate that amount?

A.      I used -- I used a real rate of 1.61 percent.  The real rate comes from -- is reported by the Federal Reserve. I calculated it using zero percent future inflation and a three percent future inflation. I calculated it with two rates of inflation to show -- to illustrate that the rate of -- future rate of inflation does not affect the present value calculation.

Q.      And to confirm, that amount is -- the updated amount is 2,906,243?

A.      Yes.

Q.      Can you explain the significance of present value in this context?

A.      Yes. Basically, it reflects the time value of money. If a person is owed $100 a year from now, what amount is required now in order to provide $100 a year from now? Well, maybe it's $98. So a person puts the $98 in the bank and receives interest on it, and the individual would have $100 a year from now.  So the $98 is the present value of the $100 a year from now. In this situation, the money that is – the difference in the after-tax earnings is annually for many years in the future. So to make up the difference in any particular year, you'd calculate how much is needed now in order to have a particular amount in the future, considering that the person can put it in the bank or somehow receive interest on it.

Q.      And is it your professional opinion this is an appropriate adjustment to make?

A.      Yes.

Q.      All right. Let's turn to page 4 of your report and the section titled, "Tax Implications."

349

A.      Okay.

Q.      If Ms. Strickland receives a lump sum award, will that have tax consequences?

A.      Yes.

Q.      Did you calculate the tax consequences as a part of your report?

A.      Yes.

Q.      How did you calculate the tax consequences?

A.      I used a website that shows the effective tax rate for various levels of income. So the -- if an award of approximately 290,000 – let's just round it off. If an award of 290,000 were made, the recipient in an employment termination case would have to pay taxes on that amount, and the tax rate would be quite high.

In this case, it's a tax rate of 39.41 percent. So the taxes would be approximately $1,160,000, but Ms. Strickland would have paid taxes on the earnings that she made at the federal government and that has to be taken into account also, so the difference between -- to arrive at the difference between the tax liabilities that Ms. Strickland would incur.

And that difference is approximately $470,000. So that has to be added into -- has to be added into Ms. Strickland's award in order for her to be in the same situation she would have been in had she remained at the federal government. She just can't get the pay difference to be -- to be in the same situation. She has to get the difference in pay plus the difference in the taxes that would have been incurred to get to the -- to be in the same situation.

Q.      And do you have the updated number for that amount?

A.      Which amount are we speaking of?

Q.      I believe you quoted it at 470,000 approximately.

A. $466,796.

. . .

350

Q.      (By Mr. Strickland) I just have one final question for you just to confirm. It's a standard practice and appropriate to rely on government resources in preparing expert reports on lost earnings?

A.      Certainly.

Tr. Ex. 109 at 97–124.

In addition to testifying regarding the basis for his expert conclusions, Dr. Albrecht also answered Defendants' questions regarding various aspects of his report, methodology, and background.[15]

Regarding his background, Dr. Albrecht testified that he has "[a] PhD in economics from Indiana University, a master's degree in economics from Indiana University, and an undergraduate degree in economics and philosophy from Tulane University." Tr. Ex. 109 at 17. Then, he was a professor at Wake Forest University where "I taught econometrics, economic forecasting, and intermediate microeconomics." Tr. Ex. 109 at 18. In addition, at the Institute for Public Policy and Business Research, Dr. Albrecht participated in "building economic forecasting models and monitoring the economic activity of the local, state, and federal economy." Tr. Ex. 109 at 19. Dr. Albrecht has also been a member of the National Association of Forensic Economics since 1987. Tr. Ex. 109 at 20.

---

[15] Dr. Albrecht testified that, in preparing for the deposition, he realized that he had made a minor error in documenting the basis for Plaintiff's annual leave; thus, he recalculated her annual hours based on other documentation from the Office of Personnel Management. Based on his revised calculation, the number of hours per year used to calculate Plaintiff's economic loss changed from 1,692 hours annually to 1,758 prior to 15 years and 1,680 after 15 years. As Dr. Albrecht explained, this change "doesn't make a great deal of difference," as it changed the economic loss prior to the tax calculation from 2,949,692 to 2,906,243. Tr. Ex. 109 at 11, 33, 61.

Dr. Albrecht testified that he offers opinions regarding economic loss in employment matters as appropriately 25 to 30 percent of his expert work. Tr. Ex. 109 at 22. He is retained by defendants about 25 percent of the time and plaintiffs about 75 percent of the time. Tr. Ex. 109 at 24. Dr. Albrecht was paid $3,500 for his expert report in Plaintiff's case. Tr. Ex. 109 at 25.

Dr. Albrecht has never been found "not qualified as an expert." Tr. Ex. 109 at 27. Appropriately three to five times, portions of his testimony were excluded, but not in any employment cases that he could recall. Tr. Ex. 109 at 27.

Dr. Albrecht testified that some of the information he relied on in his report came from Plaintiff, and some he obtained himself. Tr. Ex. 109 at 30. Dr. Albrecht explained that he relied on the following assumptions from Plaintiff: (1) that she would have maxed out at AD-29 on the federal government pay scale at the time of trial, and (2) that she had requested a transfer to RUS Asheville for locality purposes. Tr. Ex. 109 at 31–32. In addition, in determining her lost future earnings, Dr. Albrecht relied on a North Carolina State government study, entitled "FY19 Private Appointed Counsel Effective Pay Rate Study," which was used by the North Carolina legislature to set pay rates for court-appointed counsel. Tr. Ex. 109 at 32. The methodology for this study is described above in Section B. Dr. Albrecht testified that he used the study to create a blended rate between the $75 and $85 rates for low-level and high-level felonies, respectively.[16]

_____

[16] During this litigation, Defendants suggested that the $100 rate applicable to capital cases and first-degree murder should apply to Dr. Albrecht's calculations. Plaintiff does not take capital appellate work, as that would require application to a separate roster. Plaintiff's cases are a matter of public record and can be found on the N.C. Appellate Court's website. NC Appellate Courts, at https://tinyurl.com/mvnzpj3e (search results for "Caryn Strickland"). Since joining the appellate roster, Plaintiff has been assigned one first-degree murder appeal, for which she has not yet submitted any fee vouchers for payment. Accordingly, the documentation of Plaintiff's earnings provided to Dr. Albrecht did not include this first-degree murder case.

352

During his testimony, Dr. Albrecht was asked about the basis for his calculation of the number of hours that Plaintiff would have worked per year at the Federal Defender's Office. He testified as follows:

> Q.    Why did you use an estimate of how many hours Plaintiff would have worked if she had stayed at the Federal Defender's Office to estimate her income in her current position rather than how many hours she's actually working per year in her current role?
>
> A.    It is my economic opinion that an individual should not be forced to work more hours in the mitigating position than the individual worked in their prior position.
>
> Q.    Do you know how many hours Plaintiff is currently working per year?
>
> A.    No.
>
> Q.    Is it possible that she is working more than the -- the 1,680 hours you used in your calculation?
>
> A.    It's possible.
>
> Q.    Is it possible that she's working more than the 1,728 hours you used in your calculation?
>
> A.    It's possible.
>
> Q.    And did you account for those possibilities in your analysis?
>
> A. No, I did not.
>
> Q. And can you tell me a little bit more about your reasoning for why not?
>
> A. Okay. Well, as I stated, its my economic opinion that an individual should not be forced to work more hours than the individual had worked in order to mitigate their loss. There -- and we can go into it a little more, in that nonwork time has value.
>
> If nonwork time didn't have value, we would all work every hour except what was needed for body maintenance, sleeping and eating,

353

if nonwork time had no value. Obviously, nonwork time has value, and so in order for Ms. Strickland to work more in her current position, she has to give up nonwork time which has value.

Tr. Ex. 109 at 34–35.

Dr. Albrecht was questioned about whether he considered the facts that sick leave is capped at 240 hours per year and that Assistant Federal Defenders do not receive overtime, and whether those facts affected his calculations. He answered "no" to both and explained why:

Q. If Assistant Federal Defenders on average work more than 40 hours per week without getting overtime, how would that change your analysis?

A. If Ms. Strickland worked more than 40 hours a week when she wasn't on vacation or on sick leave or there were no federal holidays, then that would be -- that would affect--- It sort of depends, I guess, whether it was -- she was forced to or voluntarily did. If she was forced to work more than 40 hours per week, then that would need to be taken into account.

If she voluntarily did it, then I wouldn't take it into account.

Q. What would you consider being forced to work overtime in the context of an attorney working at the Federal Defender's Office?

A. The boss says, "Do this. I don't care how long it takes. I need it finished."

Q. What if you just have work to do to complete your case and it requires you to work more than 40 hours a week to get it done; is that voluntary or is that being forced?

A. Well, you are assigned a workload, expected to finish the workload. If you don't finish your workload, as you are expected, in the allotted time of 40 hours per week, then I would say it's mandatory that you work more than 40 hours a week.

Q. Do you know if Plaintiff regularly worked more than 40 hours per week while working at the Federal Defender's Office?

A. No.

Q. If she did, in fact, work more than 40 hours per week while working at the Federal Defender's Office and it was necessary to complete her workload, how would that change your analysis?

A. If it was -- if she were forced to do it, if it were mandatory, it would not affect my calculations.

Q. Wouldn't it change the input for the number of hours she had to work at the Federal Defender's Office in your economic calculations?

A. Yes, it would affect the number of hours that she worked there, but it would not affect the hours that I would use.

Q. Why not?

A. She was eating up her nonwork time which has value. If it were mandatory, it means that she didn't want to be there and that she valued her nonwork time greater than her work time.

Q. So let's say -- if Plaintiff had to work, let's say, 1,800 hours a year while at the Federal Defender's Office to complete her work, which it sounds like would count as forced work under your analysis, how would that affect your calculations?

A. If it is forced, it would not affect my calculation.

Q. Why not?

A. Because she's being forced to – she's being forced to give up her nonwork time which has value.

It's not voluntary. She -- she values -- if it were voluntary, it would mean that she valued – doesn't give much value to her nonwork time. But since it's forced, it means that she doesn't want to be there. It's mandatory.

Q. So it's your position, even if a plaintiff had to work more in their prior role because it was forced to work overtime -- you know, unpaid overtime, that shouldn't affect how much they have to work in the future? It doesn't count in terms of calculating their hours?

A. Yes.

355

Tr. Ex. 109 at 37–40.  Dr. Albrecht also explained why he did not use certain numbers that

Plaintiff had provided "[f]or purposes of making a conservative baseline assumption":

> A.      I have no doubt that Ms. Strickland is a good attorney, but I
> believe I am a better economist than Ms. Strickland, and I used what
> I believe is the economically correct way to make the calculation.

Tr. Ex. 109 at 41.  Similarly, Dr. Albrecht explained why his calculation of annual hours worked

was more appropriate for calculating lost earnings than the annual billable hours provided by the

IDS Study: "As I stated earlier, it is my economic opinion that an individual should not be forced

to work more hours than he or she had previously worked in order to mitigate their loss."  Tr. Ex.

109 at 43.

Next, Dr. Albrecht explained how he calculated the estimated annual overhead expenses

in his report:

> Q.      You calculated Ms. Strickland's overhead costs as
> approximately $81,000 per year, is that correct?
>
> A.      I don't recall. Annual overhead expenses $81,279.
>
> Q.      And is that an hourly overhead cost of about $48 per hour?
>
> A.      I don't know.
>
> Q.      How did you arrive at the $81,000-per-year number?
>
> A.      I started with the median for an attorney per month overhead
> of $5,739 and multiplied that by 12.
>
> Then multiplied that by the current CPI over the CPI of -- I think it
> was March 2019.
>
> Q.      What is CPI?
>
> A.      I'm sorry. Consumer Price Index.

356

> Q. Okay. Is it fair to say, in your front pay calculations, you based Plaintiff's overhead costs on this survey and not her actual overhead costs?
>
> A. Yes.
>
> Q. And why did you use this survey to calculate overhead costs for your front pay calculations instead of Plaintiff's actual overhead costs?
>
> A. Ms. Strickland indicated that she had not been doing this very long. It was just a short – she didn't have very much information concerning her overhead expenses.

Tr. Ex. 109 at 46–47. Additionally, Dr. Albrecht further testified as to why he selected the overhead rate he used:

> A. I used the median amount. I didn't consider whether it might be greater than that or less than that.
>
> Q. Did you account for the probability that Ms. Strickland's income, either now or in the future, might fall into one of these lower overhead cost categories?
>
> A. No.
>
> Q. And, again, why not?
>
> A. I used the median annual overhead amount. I didn't try to adjust it.

Tr. Ex. 109 at 50. In short, Dr. Albrecht's overhead calculation is based on the median "appropriate costs" portion of the state-conducted study on overhead expenses for court-appointed attorneys.

In addition, Dr. Albrecht answered Defendants' questions about the number of years that Plaintiff would have worked at the FDO if she had not been constructively discharged:

Q.      In your projection of the Plaintiff's front pay earnings had the alleged incidents not occurred, how many years into the future did you estimate?

A.      I estimated until the year 2066 -- no, I'm sorry -- 2055--- What was the question? How many years did I estimate or -- well, I estimated she would work until year 2055.26 or – I'm sorry -- .24 and that she would die in 2066.9.

Q.      Were the number of years updated in your new Excel sheets, or are those the same number of years you used in your original---

A.      No, same number of years.

Q.      Okay. In making your calculations, did you account for the possibility that the Plaintiff may not have remained employed with the Federal Defender's Office of the Western District of North Carolina for the next three plus decades?

A.      My assumption was that if she felt like leaving, she could have left voluntarily.

Q.      And how did you account for that possibility in your calculations?

A.      I didn't. It would have had to have been a better situation, and she no longer has that option.

Q.      Do your calculations account for the possibility that Plaintiff may have left this position at the Federal Defender's Office voluntarily to find another job at some point during the next, you know, about 30-plus years?

A.      She may have.

Q.      And did you account for that in your economic loss calculations?

A.      The assumption would be that if she left, it would be for a better job, and so this loss would be less than what she would prefer.

Q.      And did you take into account Ms. Strickland's qualifications, including her law degree from a top law school, when

358

evaluating whether she could find another higher paying position than the one she currently holds?

A.     No.

Q.     And why not?

A.     Ms. Strickland, it's my understanding, wants to be a public defender.

Q.     Do your calculations account for the possibility that Plaintiff might have been terminated involuntarily had she remained at the Federal Defender's Office at some point during the next, you know, approximately 30 years?

A.     It's possible, but I didn't think that that was very likely.

Q.     Did you consult the actual tenure experience of individuals in comparable roles at the Federal Defender's Office in making your calculations?

A.     No.

Q.     Would it surprise you to learn that it would have been very unusual for an employee to stay with the Federal Defender's Office for approximately 30-plus years?

A.     That it's unusual?

Q.     (Counsel nods head up and down.)

A.     I can't say I would be surprised, no.

Q.     If it's true that most employees stay less than 30 years, would that affect your calculations for Plaintiff's economic loss?

A.     No.

Tr. Ex. 109 at 62–64.

        In addition, Dr. Albrecht testified regarding his use of the "Markov Model of Years to

Final Separation" to calculate Plaintiff's expected retirement age:

359

Q.      Okay. Can you tell me what this document is, please.

A.      This is the "Markov Model of Years to Final separation from the Labor Force 2012-17; Authors: Gary R. Skoog, James E. Ciecka, and Kurt V. Krieger; Source: Journal of Forensic Economics, 2019, Volume 28, Number 1/2, 2019, pages 109 to 195; Published by: National Association of Forensic Economics."

Q.      And how are you familiar with this document?

A.      I use this document. I know the authors. I am familiar with this article.

Q.      Okay. And what does the model show that's used in this article?

A.      The model shows the number of years to final separation for various people, educational levels, and age.

Q.      And how did you---

A.      And gender.

Q.      Sorry. I didn't mean to cut you off.

A.      Oh, you didn't.

Q.      How did you use it in making your economic loss calculations for Plaintiff?

A.      Well, I looked at the years to final separation and--- Let's see. Okay. I used Table 20 or -- no, I'm sorry -- Table 30. Unfortunately, there don't seem to be page numbers on here, but it's Table 30. Oh, the page number up on the top left is 178.

I don't recall Ms. Strickland's age offhand. Oh, she's 35. So you go to 35, and then the mean years -- years to final separation, the mean is 35.04 and the median is 34.5 for an initially active woman 35 years old with a professional or doctoral degree.

Q.      Do you know what Plaintiff's age was when she left the FDO in 2019?

A.      When she left what?

360

Q.      The Federal Defender's Office in 2019.

A.      2019? No. Not offhand, no.

Q.      When you used the table, did you use the table based on her termination or her separation date in 2019 or January 1st, 2024, the start of any front pay damages for the period of the report?

A.      I didn't really use these numbers in particular, I mean, whatever age she was. Let's say she was 30 years old when she left the previous position. Her years to final separation would have been -- 39.9 would be the mean and 39.5 would be the median. So she would either be 69.9 or 69.5.
. . .
A.      Ms. Strickland indicated she planned -- intended to work to age 67. And I think what I said in the report -- I don't see it, but this age is -- whatever -- supported by this article. But I don't see where I said that. Oh, I think I'm missing--- I don't like pages printed on front and back. Well, I don't see it. Maybe I didn't put it in here. Okay.

Q.      So did you use Table 30 in calculating Plaintiff's expected -- work life expectancy?

A.      I did not use it directly. I just used that it supports the idea that Ms. Strickland would work to age 67. If we used the tables, she would actually work more years.

Q.      So did you kind of use it as like a gut check, would you say?

A.      We could call it a gut check, sure. A gut check.

Q.      And the Table 30 you mentioned, is it fair to say this table includes individuals for many different industries across the private and public sectors including like professors, doctors, dentists, academics?

A.      Yes.

Q.      Does this model indicate that there is a hundred percent chance that any given individual meet the mean work life expectancy?

361

A.      Not a hundred percent would, no. That's why it's a mean.

Q.      And does this model indicate that there is a hundred percent chance that any -- any given individual meet the median work life expectancy?

A.      I sincerely doubt that a hundred percent would work to that exact age.

Q.      Is it fair to say there is a statistical possibility that Plaintiff would not work until age 67?

A.      Yes.

Q.      What is the statistical possibility that she wouldn't work to that age?

A.      I don't know.

Q.      And did you account for that statistical possibility in your economic loss calculations?

A.      In a sense, I did, yes. In a sense, I did because she may have worked longer than that, right?

She may have worked to age 80. I don't know. So they offset each other, and so it is accounted for in that the mean is used.

Q.      But did you use the mean from this table in making your economic loss calculations?

A.      No. If I would have used the mean, the loss would be greater. I did not use the mean.

Q.      Does the fact that someone is eligible for full retirement and Social Security benefits mean that there is a hundred percent chance that they will work until that date?

A.      There's not a hundred percent probability that Ms. Strickland would have worked to age 67, not a hundred percent. She could have worked less. She could have worked more. I don't know.

362

Tr. Ex. 109 at 65–69.  In short, Dr. Albrecht confirmed that a retirement age of 67 would be reasonable based on the Markov Model; in fact, if he had used the mean retirement age in the Markov Model, the loss would be greater than his calculation of Plaintiff's economic loss.

Dr. Albrecht also testified that he used "Ms. Strickland's current situation to calculate the economic loss," because "[a]nything else would be speculative. This is what she's doing. This is her current situation." Tr. Ex. 109 at 78–79.  When asked whether it is "speculative to assume" that Plaintiff will stay in her current position for 30 or more years, Dr. Albrecht explained: "Well, everything is speculative. It's a matter of degree. If she were to switch jobs, I don't know what it would be. I know what she's doing now. It's speculative to say anything about the future." Tr. Ex. 109 at 79.  He further explained that he assumed Plaintiff's earnings would remain the same because "That's -- according to the North Carolina Office of Indigent Defense Services, this is what people earn -- attorneys. I shouldn't say people. That is what the attorneys earn, so that's what I used." Tr. Ex. 109 at 88.  In response to repeated, irrelevant questions about Plaintiff's earning capacity, which is not an issue in this case, *see* ECF No. 206 (denying Defendants' defense of failure to mitigate as untimely), Dr. Albrecht explained why earnings capacity was not relevant to his calculations given the facts of this case:

> Q.      Is it your opinion that an individual's actual earnings are the only relevant consideration here as opposed to their earnings capacity?
>
> A.      In some situations, earning capacity may be relevant.
>
> Q.      In what situations?
>
> A.      Well, if a person is looking for a job and hasn't found one yet, then I would say earning capacity may be relevant.  Here we are not in that situation. Ms. Strickland, it's my understanding, likes her work, wants to do this kind of work, and this is what the work pays.

363

Q.     Are there any other situations in which you believe an individual's earnings capacity would be relevant?

A.     Oh, there are, yeah. In personal injury cases, yeah.

Q.     What about in the employment discrimination context; are there any other situations, other than where a Plaintiff is actively looking for a job, in which you think their earnings capacity would be relevant in forming your economic loss calculations?

A.     Well, I suppose, if the person were employed -- even if the person was employed and they were actively -- they didn't like their employment, didn't like where they were, and were actively seeking some other employment, then earning capacity may be relevant in that situation.

Q.     So I just want to make sure I understand. Is it your view that earnings capacity is only relevant for economic loss calculations if the Plaintiff is actively looking for another job?

A.     I can't think of anything else offhand. I mean, in this situation, I don't -- I don't -- I don't think earnings incapacity is relevant because Ms. Strickland, it's my understanding, wants to do this kind of work and she has the position that allows her to do this kind of work.

Tr. Ex. 109 at 90–91.

## B.     Dr. Paul White's Report

The substantial loss of wages and benefits is also confirmed by Defendants' own evidence.  Defendants' front pay expert, Dr. Paul F. White, concluded that even if Plaintiff were to obtain a private sector position by January 1, 2024 earning the salary she would have received at the FDO, she would still suffer $375,004 in lost earnings based on the loss of her federal pension alone.  *See* Tr. Ex. A (ECF No. 250-1).  In other words, Dr. White's report confirms that Plaintiff has suffered hundreds of thousands of dollars in lost pension benefits before her lost wages are even considered.  *See* Tr. Ex. A (ECF No. 250-1).  Of course, it is exceedingly

364

unlikely that Plaintiff will obtain another position in indigent criminal defense making the salary she would have earned at the FDO. Recognizing this possibility, Dr. White evaluates another scenario where it takes Plaintiff six years to fully mitigate her lost earnings, resulting in lost earnings of $692,881. *See* Tr. Ex. A (ECF No. 250-1). This scenario, which still underestimates her lost earnings, confirms her ongoing losses.

Specifically, Dr. White's expert report provides an "[a]lternative estimate of potential economic losses" based on the expert reports in this case, including Dr. Albrecht's report. These alternative calculations are as follows:

### IV.    Alternative Estimate of Potential Economic Losses

My alternative calculations are based primarily on information available in Mr. Jackson's, and Drs. Albrecht and Marcum's reports. I have prepared calculations of potential economic losses under two scenarios.

Scenario I

In Scenario I, in accordance with the findings of vocational expert Robert W. Jackson, Plaintiff commences a job search of 20.9 weeks as of January 1, 2024 and is thus able to obtain replacement employment with the Federal Government and fully mitigate her losses as of May 26, 2024. Additionally, potential losses include the difference in pension attributable to the five months of Federal service that would have been credited during the job search period. Under this Scenario I-A, potential losses total $46,675 in present value.

Alternatively, if Plaintiff's replacement employment is not with the Federal Government and does not have earnings or benefits capable of mitigating her federal pension loss, then the potential loss in this scenario would include the present value of her entire projected FERS pension, which is $332,878. Total potential loss in this Scenario I-B would be $375,004. The details of these calculations are found in Appendix B.

Scenario II

365

> This scenario is also based on Mr. Jackson's determination that Plaintiff has not suffered a loss of earnings capacity and will eventually fully mitigate her losses. Plaintiff graduated from Duke Law School in 2013 and her employment with the FDO ended in 2019, a period of six years. In other words, with six years in the labor market, she was able to reach her prior level of FDO earnings. Under Scenario II, I have assumed that Plaintiff would again be able to reach an earnings level equal to her prior FDO earnings in an equivalent six-year period, beginning in 2024. For this scenario, I assume that the Plaintiff starts out in 2024 with the earnings calculated by Drs. Albrecht and Marcum - $41,410 after tax. At the end of the six year period, I assume she will have fully mitigated her projected losses. Scenario II-A assumes that Plaintiff's employment in 2030 and beyond includes either a federal pension or comparable retirement plan, or another form of compensation that mitigates the loss of the FERS pension. As a conservative measure, calculated losses in Scenario II-A assume that the six earning years from 2024 – 2030 are not credited to Plaintiff for pension purposes. Scenario II-B assumes that the would-be FERS pension is not mitigated at all through Plaintiff's subsequent employment. The present value of losses under Scenario II-A totals $425,916 and under Scenario II-B totals $692,881. The details of these calculations are found in Appendix C.

*See* Tr. Ex. A at 7–8 (ECF No. 250-1 at 9–10). In short, Dr. White report confirms that Plaintiff has suffered substantial lost earnings. Even if this Court were to decide not to award Plaintiff a lifetime front pay award as calculated by Dr. Albrecht, it should award at least six years of front pay based on the assumptions provided by Dr. White, Defendants' own expert. Tr. Ex. A at 7–8 (ECF No. 250-1 at 9–10).

Dr. White's report also contains some criticisms of Dr. Albrecht's reports. Some of these criticisms were addressed by Dr. Albrecht during his deposition testimony, while others are refuted by the underlying documentation provided in support of the front pay claim. Dr. White's criticisms as contained in the summary and conclusions section of his report, along with Plaintiff's response, are addressed below:

366

Dr. White's report: "Plaintiff's experts allow for no possibility that Plaintiff's employment with the FDO would have terminated for any other reason, voluntary or involuntary, in the approximately 36-year period from 2019-2055."  Tr. Ex. A at 8 (ECF No. 250-1 at 10).

Plaintiff's response: Dr. Albrecht testified that he made the assumption that Plaintiff would work at the FDO until retirement based on her "current situation," which is that Plaintiff "wants to be a public defender," and that she "likes her work, wants to do this kind of work, and this is what the work pays." *Supra*, at 363–65.  Dr. Albrecht's assumption is reasonable based on the fact that Plaintiff has consistently worked in public service since law school, she has consistently worked in public defense since her constructive discharge from the FDO nearly five years ago, and she has never worked in a private law firm.  Indeed, Plaintiff made statements in interviews to multiple publications that being a federal defender was her "dream job" prior to the events in this case.  Those contemporaneous statements are highly credible evidence that Plaintiff's dream job was to be a federal public defender and that she subjectively intended to remain at the FDO until retirement.  Indeed, as Dr. Albrecht explained, "everything is speculative" to a degree, and it would certainly be "speculative" to assume that Plaintiff would switch jobs when we "don't know what it would be." *Supra*, at 363.

Dr. White's report: "Plaintiff's experts disregard Plaintiff's mitigating earnings capacity and allowed for no possibility that the Plaintiff would have increased her post-Public Defender earnings level and fully mitigated her losses at any point in time through her remaining life expectancy in 2067."  Tr. Ex. A at 8 (ECF No. 250-1 at 10).

Plaintiff's response:  Failure to mitigate is an affirmative defense, which has not been asserted in this case. *See* Fed. R. Civ. P. 8(c) ("In responding to a pleading, a party *must*

affirmatively state any . . . affirmative defense . . . ." (emphasis added)).  In fact, the Court previously denied as untimely Defendants' motion to amend their Answer to assert a defense of failure to mitigate.  *See* Entry Order Dated September 21, 2022 (order striking Defendants' affirmative defenses); ECF No. 206 (order denying motion to assert affirmative defense of failure to mitigate losses); ECF No. 210 (Defendants' First Amended Answer with no affirmative defenses); ECF No. 259, at 99 (Parties' Joint Pretrial Statement) ("Any requested amendments to the pleadings. None.").  Defendants have also unequivocally stated to this Court that they have waived all affirmative defenses in this litigation.  *See*, *e.g.*, ECF No. 297, at 5 (acknowledging that "Defendants' answer does not include the affirmative defense of failure to mitigate").  Therefore, Plaintiff's mitigating earnings capacity is irrelevant to this case.

Dr. White's report: "Plaintiff's experts have added a tax neutralization amount onto potential economic losses, which defense counsel has informed me is not applicable in this matter."  Tr. Ex. A at 8 (ECF No. 250-1 at 10).

Plaintiff's response:  Whether a tax adjustment is available for a front pay award is a legal question.  In this case, the Fourth Circuit already held that Plaintiff's request for front pay is not barred by sovereign immunity.  *Strickland*, 32 F.4th at 359–60.  Courts within the Fourth Circuit allow a tax gross-up as an appropriate component of a front pay award.  *See*, *e.g.*, *Tinsley v. City of Charlotte*, No. 3:16-CV-00656-GCM, 2019 WL 1874044, at *7 (W.D.N.C. Apr. 26, 2019); *Saulsberry v. Savannah River Remediation, LLC*, No. 1:16-CV-02792-JMC, 2020 WL 264259, at *3 (D.S.C. Jan. 17, 2020); *see also Sonoma Apartment Associates v. United States*, 127 Fed.Cl. 721, 726–33 (2016) (permitting tax gross-up against the United States because "[t]he government should not be enriched" by its breach).

368

In addition, Dr. White's report contains other statements about the assumptions used to calculate Plaintiff's future lost earnings, which are addressed as follows:

| Dr. White's Report | Plaintiff's Response |
|---|---|
| "The Plaintiff's experts' calculations assume that Defendants are is [sic] found liable by a finder of fact." Tr. Ex. A at 3 (ECF No. 250-1 at 5). | Whether the finder of fact finds Defendants liable is a question for the finder of fact, not Dr. Albrecht. |
| "The Plaintiff's experts calculate earnings losses through 2055, approximately 36 years after Plaintiff's employment with the FDO ended." Tr. Ex. A at 3 (ECF No. 250-1 at 5). | As discussed above, this assumption is based on Plaintiff's well-documented intention to remain at the FDO until retirement, which was stated in public articles even before the events giving rise to this case. |
| "Plaintiff's experts describe the 1,692 hour figure as 'the number of hours per year Ms. Strickland would have worked had she remained employed with the Federal Government,' but "[t]he plaintiff's experts provide no documentation to provide foundation for this amount (which is 18.7% less than 'full time')". Tr. Ex. A at 4 (ECF No. 250-1 at 6). | The annual hours Plaintiff would have worked at the FDO is based on OPM data regarding annual leave for federal employees, as discussed above. |

| | |
|---|---|
| "Plaintiff's experts also provide no basis for their assumption of a 60% overhead rate, either by citing plaintiff's financial records or by identifying the specific costs they are including." Tr. Ex. A at 4 (ECF No. 250-1 at 6). | The overhead rate is based on the "non-optional costs" as calculated in the IDS study, as discussed above. |
| "[T]he $48 per hour figure they use in their calculation far exceeds the typical hourly overhead cost that is cited in their own references." Tr. Ex. A at 4 (ECF No. 250-1 at 6). | The overhead rate is based on the "non-optional costs" as calculated in the IDS study. Dr. White cites the $21.72 median rate in the study, but the IDS study explains that "these low overhead rates were achieved by eliminating critical resources, such as legal research tools, that enable attorneys to provide competent representation." Tr. Ex. 79 at 14 (ECF No. 255-17 at 15); Tr. Ex. 109 at 225. Accordingly, the median "appropriate overhead costs" rate is used. |
| "[Plaintiff's experts] do not address the fact that many common 'overhead' costs for attorneys in the plaintiff's position are reimbursable. Policies for North Carolina's Office of Indigent Defense Services state that | This criticism is misplaced for two reasons. First, the IDS study is based on overhead costs that are *not* reimbursed by the State. *See* Tr. Ex. 79 at 13 (ECF No. 255-17 at 14); Tr. Ex. 109 at 224. ("As contractors, their |

370

travel, copying and printing, computerized legal research, and paralegal or legal assistant time (among other things) are all reimbursable expenses." Tr. Ex. A at 4–5 (ECF No. 250-1 at 6–7).

hourly pay rate represents gross pay, not net earnings. As contractors, before a dime goes in their pockets, they first have to pay office overhead and self- employment tax.").  Thus, the limited expenses that are reimbursed by the State are not relevant to the overhead rate used in the IDS study.  Second, it is incorrect to state that expensive overhead items such as "computerized legal research" and "paralegal or legal assistant time" are categorically reimbursable.  While "[t]he actual case-related costs" of computerized legal research may be reimbursable, the State does not compensate attorneys for monthly or annual subscriptions to Lexis-Nexis, Westlaw, or other research services.  IDS Attorney Fee Application Policies, Non-Capital Criminal and Non-Criminal Cases at the Trial Level, at 7.  For this reason, the "non-optional overhead items" identified in the IDS study include "legal research tools such as Lexis or Westlaw."  Tr. Ex. 79 at 17 (ECF No. 255-17

| | at 18); Tr. Ex. 109 at 228.  Similarly, the study includes "access to one full-time support staff" as a "non-optional overhead item[] that the hourly rate paid to public defense attorneys should cover" because the State's modest reimbursement rates for paralegal time do not cover the cost of support staff.  Tr. Ex. 79 at 17 (ECF No. 255-17 at 18); Tr. Ex. 109 at 228. |
|---|---|

In short, the evidence before this Court, including Plaintiff's unrefuted statements that she intended to remain at the FDO for the rest of her career, the publicly available government data regarding her earnings as a federal public defender and as a court-appointed private appointed counsel, and the expert reports of Dr. Albrecht and Dr. White, demonstrate that Plaintiff is entitled to a substantial award of front pay.

**PROPOSED CONCLUSIONS OF LAW**

## I.   Plaintiff Is Entitled To Judgment In Her Favor On The Issue Of Liability.

### A.   The Federal Public Defender Violated Plaintiff's Equal Protection Rights.[17]

The Fourth Circuit held that "federal judiciary employees who occupy supervisory roles and/or who are charged with enforcing an EDR plan can . . . be held liable under the Fifth Amendment for their deliberate indifference to sexual harassment committed by a federal judiciary employee or supervisor against another federal judiciary employee." *Strickland*, 32 F.4th at 359 (citing *Feminist Majority Foundation v. Hurley*, 911 F.3d 674, 702–03 (4th Cir. 2018)). "This conclusion is based on the principle that the Fifth Amendment's Equal Protection Clause secures a federal judiciary employee's right to be free from sexual harassment in the workplace. It thus both guards against sexual harassment perpetrated by other federal judiciary employees and protects federal judiciary employees from deliberate indifference on the part of federal judicial employees charged with preventing sexual harassment and investigating complaints of sexual harassment." *Id.* The Fourth Circuit held that Plaintiff's complaint alleged each of the elements of a deliberate indifference claim, including that (1) she "was subjected to sexual harassment by the First Assistant"; (2) she "reported the sexual harassment to various judiciary employees, some of whom alerted the FPD to the harassment"; (3) Defendants "fail[ed] to take immediate and effective action on her complaints,' and also 'fail[ed] to provide her with meaningful review or remedies'" (quoting Complaint ¶ 498); and (4) Defendants' "failure to take

---

[17] This Court granted summary judgment in favor of the other official capacity Defendants on Plaintiff's equal protection claim. *See* ECF No. 258. Plaintiff preserves her objection to the Court's summary judgment ruling. In addition, if this Court excludes any of Plaintiff's exhibits or deposition designations, Plaintiff hereby provides notice that this document is intended to serve as a written offer of proof pursuant to Fed. R. Evid. 103.

373

proper corrective action was intentional and motivated by their intent to discriminate against her because of her gender." *Id.* at 360.

In holding that Plaintiff's complaint clearly alleged both sexual harassment and deliberate indifference, the Fourth Circuit described her allegations as follows:

> The [FPD] ratified the [First] Assistant's harassing conduct, most significantly by refusing to consider [Strickland] for the promotion for which she was qualified—a discriminatory follow-up to the Assistant's quid-pro quo sexual harassment. The meaning of the [First] Assistant's harassing email was that if [Strickland] didn't "pay" in the way he wanted, that is, sexually, she would not get the promotion. In refusing to consider the promotion—even going to lengths to backdate his reclassification of her title to the day before she became eligible for promotion, . . . the Defender made good on the [First] Assistant's threat. This response was clearly unreasonable and effectively caused further harassment. Second, after Fourth Circuit and AO officials were put on notice of the sexual harassment and of the [FPD's] disregard of AO advice on stopping it, they protected the [FPD] rather than taking steps to end the harassment. The officials prohibited [Strickland] from seeking guidance about her civil rights from the FEOO. The officials allowed the [FPD] to drive the process despite his conflict of interest: The [FPD] appointed the investigator to investigate the allegations, and decided how to discipline the Assistant. The Chief Judge refused to disqualify the [FPD] from acting on behalf of the employing office in the dispute resolution process. Officials failed to conduct an impartial investigation by a well-trained investigator. The Circuit Executive limited the investigation's scope to exclude the [FPD's] wrongful conduct. As a result, the Investigator did not fully investigate [Strickland]'s claims.

*Id.* at 337.  As the extensive discussion above shows, these allegations have been proven.

Plaintiff has overwhelmingly demonstrated that the Federal Defender was deliberately indifferent to sexual harassment and motivated by discriminatory intent.

374

### 1. The Chief Judge's Letter of Reprimand conclusively establishes that the Defender was deliberately indifferent to sexual harassment.

This Court's recognition that the Chief Judge's Letter of Reprimand is an "unimpeached" public record supports judgment in Plaintiff's favor on the equal protection claim against the Defender. If "an unimpeached public record" from the Fourth Circuit's Chief Judge containing "undisputed" findings of unlawful sex discrimination is not sufficient to prove Plaintiff's equal protection claim, it is hard to imagine what would be sufficient. ECF No. 258, at 6.

This Court's prior summary judgment opinion confirms that, based on the undisputed facts and Defendants' judicial admissions—including regarding the "disciplinary action" taken for "wrongful conduct" against the Defender and the First Assistant under the EDR Plan—the reasonable inferences that can be drawn from the facts strongly support judgment in Plaintiff's favor on the equal protection claim. This Court's ruling states that "[p]rominent among th[e] evidence" supporting Plaintiff's showing of discriminatory intent against Defender Martinez "is Chief Judge Gregory's letter of reprimand dated May 28, 2019." ECF No. 258, at 5–6. As the Court explained, "[t]he factual findings in this letter constitute an unimpeached public record pursuant to Fed. R. Evid. 803(8)(A)(iii)." *Id.* Based on this letter of reprimand, among other evidence, this Court recognized that the facts supporting Plaintiff's equal protection claim against Defender Martinez "appear to be undisputed" and Plaintiff's argument "well illustrates the plausible conclusions a court could draw." *Id.* at 7.

The findings in Chief Judge Gregory's Letter of Reprimand are admissible as an admission by a party opponent, Fed. R. Evid. 801(d)(2)(D), and as an investigative report of a public agency, Fed. R. Evid. 803(8)(A). *See Allen v. Chi. Transit Auth.*, 317 F.3d 696, 700 (7th Cir. 2003) (holding that the district court erred by "refus[ing] to give any weight to the finding

375

by the CTA's own investigator that Tapling's explanation for Reilly's promotion was not credible"). The Supreme Court has explained that "[p]rior administrative findings made with respect to an employment discrimination claim may, of course, be admitted as evidence at a federal-sector trial de novo." *Chandler v. Roudebush*, 425 U.S. 840, 863 n.39 (1976) (citing, in relevant part, former Fed. R. Evid. 803(8)(C)). "Moreover, it can be expected that, in the light of the prior administrative proceedings, many potential issues can be eliminated by stipulation or in the course of pretrial proceedings in the District Court." *Id.* Here, Defendants have stipulated in their responses to Plaintiff's requests for admission that "the EDR Coordinator delivered the Federal Defender a letter of counseling dated May 28, 2019, signed by Chief Judge Gregory, based on facts uncovered during the investigation." *Supra*, ¶ 312e.

In addition to the report's findings, the report's conclusions—including, here, that "disciplinary action" was warranted based on "wrongful conduct" under the EDR Plan—are also admissible under Supreme Court precedent. "As the Supreme Court recognized in *Beech Aircraft*, if an investigatory report is otherwise admissible under Rule 803(8)(C), portions of that report are not rendered inadmissible simply because they state a conclusion or opinion." *Kennedy v. Joy Techs., Inc.*, 269 F. App'x 302, 310 (4th Cir. 2008) (citing *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 175 (1988) ("[S]tatements in the form of opinions or conclusions are not by that fact excluded from the scope of Federal Rule of Evidence 803(8)(C).")); *see also Burns v. Johnson*, 829 F.3d 1, 8 n.5 (1st Cir. 2016) (recognizing that "EEO investigative materials" and agency "report" were admissible under *Beech Aircraft Corp.*). In fact, "[t]he admissibility of a public record specified in the rule is assumed as a matter of course, unless there are sufficient negative factors to indicate a lack of trustworthiness." *Kennedy*, 269 F.

App'x at 310 (quoting *Zeus Enterprises, Inc. v. Alphin Aircraft, Inc.*, 190 F.3d 238, 241 (4th Cir. 1999)).  "Furthermore, the party opposing the admission of such a report bears the burden of establishing its unreliability."  *Id.*  "Thus, Rule 803(8)(C) 'is not a rule of exclusion, but rather is a rule of admissibility,' so long as the proffered report satisfies the requirements of the rule."  *Id.* (citation omitted).  Here, Chief Judge Gregory's conclusions that the Defender engaged in wrongful conduct warranting disciplinary action, as defined in the EDR Plan, are reliable. Defendants have never even disputed that the facts found by Chief Judge Gregory in the Letter of Reprimand occurred.  As such, these findings are admissible and entitled to significant weight.

While a party may "present evidence tending to contradict or diminish the weight of those conclusions" in a public record, Defendants have not done so here.  *Parker v. Allentown*, Inc., 891 F. Supp. 2d 773, 783 (D. Md. 2012).  "Reports containing facts, opinions, and conclusions may be excluded in whole or in part if the source or circumstances of their making is untrustworthy."  *Id.*  On the other hand, the presumption of admissibility of public reports "is warranted 'because of the reliability of the public agencies usually conducting the investigation, and their lack of motive for conducting the studies other than to inform the public fairly and adequately.'"  *Kennedy*, 269 F. App'x at 309 (quoting *Ellis v. Int'l Playtex, Inc.*, 745 F.2d 292, 300 (4th Cir. 1984)).  In this case, the reliability of Chief Judge Gregory's Letter of Reprimand is established both by Defendants' judicial admissions and the undisputed facts of this case.

*First*, Defendants' judicial admissions confirm that they did, indeed, take "disciplinary action" pursuant to Chapter IX of the EDR Plan, which required a finding of violations of Plaintiff's rights under the EDR Plan.  *See* EDR Plan Ch. IX ("Employees found by the Chief Judge and/or unit executive to have engaged in wrongful conduct, as defined in this Plan, may be

377

subject to disciplinary action."). It is well-established that a party's "judicial admission[s]" are "*conclusively binding*." *Bright v. QSP, Inc.*, 20 F.3d 1300, 1305 (4th Cir. 1994) (emphasis in original). This Court granted partial summary judgment in favor of Plaintiff with respect to all judicial admissions provided by Defendants in this case, thus confirming that Defendants' judicial admissions are binding. *See* Entry Order Dated July 25, 2023 (confirming that Court had entered an order "granting in part/denying in part and taking under advisement" Plaintiff's motion for summary judgment"); ECF No. 258, at 2 (stating that Plaintiff's motion for summary judgment had been granted "in part, viz. the government's listing of facts, where undisputed, were established for trial"); ECF No. 268, at 25 (statement at summary judgment hearing that Plaintiff's motion was granted "insofar that we will say that those facts that the defense has actually admitted are taken as established," including the "facts established as to the documents and the meetings"). In Defendants' Answer, they admitted that "[t]he EDR Coordinator disclosed to Plaintiff: 'I wanted to let you know that *disciplinary action* was taken last week as a result of your report of wrongful conduct.'" Answer ¶ 311; *see* ECF No. 259, at 76 (emphasis added). Defendants further admitted "that Plaintiff was not informed about the content of the investigation report, or the *disciplinary action* taken under Chapter IX of the EDR Plan." Answer ¶ 312; ECF No. 259, at 76 (emphasis added). It is therefore a judicial admission by Defendants that "disciplinary action" was taken against the Defender and the First Assistant for wrongful conduct, which is confirmed by the contents of the Chief Judge's Letter of Reprimand.

*Second*, the findings and conclusions in the Letter of Reprimand are supported by the evidentiary record, as extensively set forth above in the proposed findings of fact. For example, the Defender himself testified during his deposition, long after he was disciplined and this

litigation had begun, that he was angry at Plaintiff for seeking guidance on her legal rights from the Fair Employment Opportunity Officer because he believed that Plaintiff had gone "behind his back." *Supra*, ¶ 86(c) (Defender's testimony that "I felt that she didn't go to me first, to speak to me, and she kind of went around me and is sharing with the AO, Administrative Office of the Courts, and I just felt like she went, you know, behind my back, sort of"); *id.* ¶ 86(d) (Defender's testimony that "I feel like I'm being blamed for a situation that as soon as I was put on notice, I'm taking control over it.").   Likewise, the Defender's comments comparing Plaintiff's relationship with her harasser to a "marriage" are undisputed, and in fact were admitted in Defendants' Answer.  *See supra*, ¶ 60 ("Defendants admit that the Defender used a marriage metaphor when discussing the relationship between Plaintiff and the First Assistant. Defendants admit that the Defender told Plaintiff that she and the First Assistant needed to 'compromise' and 'meet in the middle.'" (quoting Answer ¶ 140)).  The Defender's statements to the effect that "at least you weren't touched," likewise, were admitted in Defendants' Answer and found by the EDR Investigator.  *See supra*, ¶ 91.

In stating that the letter of reprimand is an "*unimpeached* public record," this Court recognized that Defendants have not introduced any evidence to undermine the reliability of the letter of reprimand.   ECF No. 258, at 6 (emphasis added).   That letter of reprimand made specific findings of wrongful conduct, that is, "[d]iscrimination against employees based on . . . sex," including "sexual harassment," and "retaliation for engaging in any protected activity":

- "Marriage Metaphor": "After attempting to resolve several disagreements between Ms. Strickland and Mr. Davis, you had used an ill-advised metaphor, comparing the relationship between Ms. Strickland and Mr. Davis as a 'marriage,' with the parties needing to 'compromise' and 'meet in the middle.' Ms. Strickland said that she was 'shocked' and 'offended' at the reference, believing that it was inappropriate to describe any

379

professional relationship between a male supervisor and female subordinate as a 'marriage.' The metaphor was especially inappropriate given the context that Ms. Strickland had raised concerns with Mr. Davis's behavior towards her."

- "No Physical Touching": "Ms. Strickland denied that Mr. Davis had touched her inappropriately, but she repeated that Mr. Davis made her feel uncomfortable and threatened. Investigator Beam found that you had said, 'at least you weren't touched,' or words to that effect. The investigator concluded that your remarks were callous, minimizing, insensitive, and contributed to the distress that Ms. Strickland felt."

- "Disapproval of Seeking Outside Advice": "Ms. Strickland had also sought advice and guidance from the Fair Employment Opportunity Office at the Administrative Office of the U.S. Courts on her civil rights as a judiciary employee. The investigator found that you had 'called out' Ms. Strickland for seeking legal advice from that office, which further eroded trust between you and Ms. Strickland and exacerbated the deteriorating situation in your office."

- "Shifting Responsibility": "Finally, the investigator noted that you had said you were being blamed for matters that you had nothing to do with. Ms. Strickland reported that she felt 'offended' by your protest, which she perceived as disapproving her right to seek outside advice and counsel from the AO Fair Employment Opportunity Office. This, the investigator concluded, contributed to your mishandling of the matter."

*Supra*, ¶ 312e.  Further, the letter specifically stated that disciplinary action was being taken

based on the wrongful conduct provision of the EDR Plan:

### III.    Chief Judge Gregory's Decision

Under Chapter IX of the Plan, "[e]mployees found by the Chief Judge and/or unit executive to have engaged in wrongful conduct, as defined in this Plan, may be subject to disciplinary action." After careful consideration of the investigator's report, supporting attachments, and documents filed in this case - and noting the mitigating circumstances – Chief Judge Gregory has decided to adopt the recommendations contained in the report.

*Id.*  As the Judicial Integrity Officer testified during her deposition, the term "wrongful conduct"

under the EDR Plan has a specific meaning that is intended to track the definition of unlawful

sex discrimination under Title VII. Specifically, the JIO testified that the definition of wrongful conduct in the EDR Plan is intended to "comply with the substance" of employment laws, including Title VII. *Supra*, ¶ 312b. Accordingly, the "definitions" of the workplace harassment and discrimination in the EDR Plan are "grounded in the employment laws that we mirror." *Id.* That is because the purpose of the EDR Plan is to reflect Judicial Conference policy "to voluntarily comply with the substance" of employment laws, including Title VII. *See id.* Accordingly, these unimpeached findings of unlawful sex discrimination by the Fourth Circuit's Chief Judge support judgment in Plaintiff's favor on the equal protection claim against the Defender. Indeed, if anything, these findings of wrongful conduct are not strong enough because they resulted from an investigation that was grossly inadequate and severely biased against Plaintiff by an Investigator who, *inter alia*, had no experience investigating EDR complaints, did not interview any of Plaintiff's witnesses, and referred to Plaintiff as a "true pain in the you know what." *Supra*, ¶ 151d. The fact that these findings in Plaintiff's favor resulted at all from such a flawed investigation makes them even more compelling and incontrovertible. *Cf. Beech Aircraft Corp.*, 488 U.S. at 167 (court may reject "portions" of report that it determines are untrustworthy).

>       2.      **The undisputed facts in the record further support Plaintiff's deliberate indifference equal protection claim.**

As demonstrated through the extensive discussion above, the record demonstrates that Plaintiff was subjected to unlawful *quid pro quo* sexual harassment and that the Defender was deliberately indifferent in response to her complaints. Indeed, the record contains clear evidence that Plaintiff was harassed based on her sex, including through *quid pro quo* advances by her supervisor, derogatory treatment based on pernicious gender stereotypes, and a hostile working

environment.  Despite the clear evidence supporting Plaintiff's sexual harassment claim, it appears that her complaints were not taken seriously because certain judiciary officials, including the Defender, wrongly believed that the conduct she reported was not sexual harassment because she was not sexually assaulted.  *See, e.g.*, *supra*, ¶ 312e (Investigator's conclusion that Defender had made comments to Plaintiff that "'at least you weren't touched,' or words to that effect," which "were callous, minimizing, insensitive, and contributed to the distress that Ms. Strickland felt").  The Defender's misconception of sexual harassment resulted in his "callous, minimizing, insensitive," and ultimately deliberately indifferent response.  *Id.*

As the FEOO, Nancy Dunham, testified during her deposition, based on her 35 years of employment experience in the federal judiciary and representing employers, sexual harassment can occur based on "warm, interpersonal relationships" that are "grooming in hindsight for further sexual relationships."  *Supra*, ¶ 26c.  Here, the First Assistant's conduct was about his "desire to control" Plaintiff, "which is very common" in sexual harassment cases, especially when there is a "huge power imbalance."  *Id.*  The FEOO explained that, as with allegations against Governor Andrew Cuomo by a woman "who alleged that he had made her uncomfortable by his obvious sexual and romantic interest in her," *id.* at 138, here, there was "[n]o physical touching, no groping, but nevertheless a – a desire to control her and – an obvious interest in her either sexually or romantically."  *Id.* ¶ 26d.  As the FEOO testified, and in accordance with employment laws prohibiting discrimination based on sex, the First Assistant's conduct was "classic sexual harassment."  *Id.*

### a.    Plaintiff was subjected to sexual harassment.

Plaintiff was subjected to sexual harassment and related sex discrimination and

retaliation. Indeed, *both* the First Assistant *and* the Defender were disciplined for "wrongful conduct" under Chapter IX of the EDR Plan. *Supra*, ¶ 312e. The EDR Plan defines "wrongful conduct" as "[d]iscrimination against employees based on . . . sex," including "sexual harassment," and "retaliation for engaging in any protected activity." *Id.* (quoting EDR Plan Ch. II, § 1). As discussed above, Defendants have failed to refute the findings in the Chief Judge's Letter of Reprimand substantiating Plaintiff's allegations of unlawful sex discrimination.

To prove a claim of sexual harassment, an employee must show that (1) she belongs to a protected group, (2) she was subjected to unwelcome sexual harassment, (3) the harassment was based on sex, (4) the employee's reaction affected tangible aspects of her employment, and (5) the employer is vicariously liable. *Okoli v. City Of Baltimore*, 648 F.3d 216, 222 (4th Cir. 2011). The last element is "automatically met" when the harassment is perpetrated by a supervisor. *Id.* Because Plaintiff is undisputedly a member of a protected group based on her gender, the below analysis focuses on elements (2)–(5) of her sexual harassment claim.

### i. Plaintiff was subjected to *quid pro quo* sexual harassment.

*Quid pro quo* harassment occurs when (1) "submission" to "unwelcome sexual advances . . . is made either explicitly or implicitly a term or condition of an individual's employment," or (2) "submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual." 29 C.F.R. § 1604.11(a). As the Federal Judicial Center's guidance states, "[q]uid pro quo harassment involves expressed or implied demands for sexual favors in exchange for some benefit—such as a promotion or pay increase— or to avoid some workplace detriment—such as termination or demotion." Tr. Ex. 55, at 7020 (ECF No. 248-15, at 62). "By definition, quid pro quo harassment can be perpetrated only by

383

someone in a position of power or authority over another—for example, a manager or supervisor over a subordinate." *Id.* For *quid pro quo* workplace harassment to occur, "it doesn't matter . . . whether the demand was made outright or simply implied," because "[e]ither way, the manager or supervisor making this demand is committing quid pro quo workplace harassment." *Id.* at 62. Moreover, in determining whether harassment is "unwelcome," the factfinder must determine whether it is "unwelcome to the person who perceives the alleged workplace harassment." *Id.* at 60. "This is an important point" because "[i]t is the perception of the individual who feels harassed that counts." *Id.* In other words, "the *intent* doesn't determine whether it's workplace harassment; what counts is the perception of the person who feels harassed." *Id.*

The FJC's Guidance is in accordance with standards applied by federal courts. Sexual harassment is determined from the perspective of "a reasonable person in the plaintiff's position." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333 (4th Cir. 2003) (en banc). The Supreme Court has held that "explicit *or* implicit proposals of sexual activity" will make it "easy to draw" an inference of discrimination. *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80 (1998) (emphasis added). "[A] victim need not provide evidence of a direct and express sexual demand," because "a supervisor may simply intimate that a subordinate's career prospects will suffer if she does not submit to his advances, with the hope of concealing his harassment if his statements are repeated to a third party." *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1312 (11th Cir. 2001). "[T]he underlying issue in a quid pro quo allegation is the same as in any claim of disparate treatment (*i.e.*, intentional discrimination): whether the claimant has satisfied the statutory requirement of establishing "discriminat[ion] . . . because of sex" affecting the "terms [or] conditions of employment." *Gregory v. Daly*, 243 F.3d 687, 698 (2d Cir. 2001).

384

Therefore, if a supervisor threatens to deny an employee a promotion or other job benefit for rejecting sexual advances and subsequently denies the job benefit, the denial of the job benefit itself is an explicit change to the terms and conditions of employment and thus constitutes unlawful sex discrimination. *See id.* Moreover, "when allegations of a sexual quid pro quo co-exist with allegations of other circumstances suggesting that the challenged employment actions were taken because of plaintiff's sex, [the court] look[s] to the totality of the circumstances to determine whether there is a sufficient basis to infer sex-based discrimination." *Id.* at 700. After all, "a jury might find it more plausible that a supervisor would be willing to fire a woman for refusing a sexual advance if it also had reason to think that he discounted women's abilities to be productive workers. Or it might conclude that his request for a quid pro quo reflected an insistence that women relate to men according to sexual stereotypes rather than as co-workers." *Id.* at 699. This approach "helps avoid distracting inquiries into whether a supervisor's statement *really* proposed a sexual quid pro quo, and focuses the analysis on the core question posed by Title VII: whether plaintiff's sex played a role in the actions at issue." *Id.* at 700.

Indeed, because a "supervisor's power and authority invests his or her harassing conduct with a particular threatening character," the status of the harasser is "a significant factor . . . [i]n measuring the severity of harassing conduct." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 278 (4th Cir. 2015) (en banc) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763 (1998)). Even if the threat is never carried out, the threat itself is a particularly severe form of harassment and would constitute unlawful sex discrimination if it establishes a hostile work environment, either alone or in concert with other harassing conduct. *Burlington Indus.*, 524 U.S. at 766; *cf. Gregory*, 243 F.3d at 698 (where supervisor made remark that Plaintiff needs to

"get on board or quit" in response to complaints about his behavior, the supervisor "might have been communicating that, in order to continue her employment, [plaintiff] would have to acquiesce in and affirmatively adopt a workplace role in which, because of her sex, she would be the butt of certain forms of ridicule, bullying, and diminished professional responsibilities" or "he might have been insinuating that her future at [the employer] depended on her response to sexual advances," but in either case, "the remark lends support to the notion that [plaintiff's] sex played a significant causal role in the chain of events leading to her termination").

Here, Plaintiff was subjected to *quid pro quo* sexual harassment. Indeed, the Investigator found that the First Assistant's "Mas Dinero" email "can clearly be inferred to be a quid pro quo request" that "supports Caryn's claim of sexual harassment." *Supra*, ¶ 235c. The Chief Judge's letter disciplining the Defender referred to this email as an "unsavory quid pro quo proposal." *Supra,* ¶ 28b. Quite simply, the First Assistant's false assertion that it would take five more years for Plaintiff to qualify for a promotion to Grade 15 (when she was actually eligible in three months), but to "fret not, I have a plan . . . just remember I deal in pay-for-stay :)" would be perceived by a reasonable person as *quid pro quo* harassment. Indeed, the Investigator testified that "it was reasonable to be upset because of that email," the Defender testified that he could "see" how it could be viewed as "sexual favors,"  and the Mediator stated that "I just can't believe anybody is going to say it wasn't an improper email." *Id.*

Plaintiff's rejection of the First Assistant's advances affected tangible aspects of her employment, including the denial of the promotion to Grade 15 and the diminishment of her job duties. In proving a "causal connection" between *quid pro quo* harassment and a tangible employment action, "[a] plaintiff may rely upon a broad array of evidence," including that "the

386

unwelcome sexual advances proximately preceded the tangible employment action and the alleged harasser made or substantially influenced the relevant decision." *Johnson v. Donohoe*, Civil Action No. 4:12-cv-0390-RBH-TER, 2013 U.S. Dist. LEXIS 185168, at \*19 (D.S.C. Nov. 26, 2013) (citations omitted). Moreover, "a court can consider circumstantial evidence and draw inferences in favor of the plaintiff in determining whether the causal link has been established." *Id.* If an "adverse action takes place 'on the heels of protected activity,' this generally suffices to establish a causal link." *Reed v. Hunt Corp.*, No. IP 01-1005-C-B/G, 2003 U.S. Dist. LEXIS 20774, at \*11 (S.D. Ind. Nov. 11, 2003).

Here, the First Assistant was in a "supervisory role over Plaintiff," with authority to "initiate[] personnel actions" and "refer[]" her "for disciplinary action." *Supra* ¶ 21. In fact, the First Assistant supervised "the entire FDO," including the trial and appellate units. *Id.* The Defender "trusted" his judgment on personnel matters. *Id.*

Following Plaintiff's rejection of his advances and reporting of his conduct to the Defender, on July 6, 2018, the First Assistant told the Defender that Plaintiff should be "well on [her] way to a PIP," *i.e.*, a performance improvement plan; that "we need to be serious about whether she actually lives up to th[e] AFD title"; and that his perceived issues with her "need to be addressed during her annual performance review." *Supra* ¶ 38a–d; *see also id.* ¶¶ 38c, 228b (First Assistant's statement about whether he would "play[]" it "dirty" by encouraging Plaintiff to apply for an AFD position, and noting that "her lip was practically quivering"); *id.* ¶ 38a (First Assistant's statement to another supervisor that "I thought she could be in mgmt. but I don't think so any more"). On July 20, 2018, the First Assistant told the Appellate Chief that Plaintiff had a "fuck off attitude" and had committed "fireable offenses," to which the Appellate Chief

387

responded: "I have a game plan in mind for how to give her a chance . . . to redeem herself and return to being a productive employee," or otherwise, "we'll encourage Tony to respond appropriately." *Id.* ¶; *id.* ¶¶ 70a–70c. Thus, the First Assistant and Appellate Chief openly discussed the possibility of advocating Plaintiff's termination from the FDO after Plaintiff rejected the First Assistant's unwelcome advances.

Unsurprisingly, during this period, Plaintiff's job duties were diminished, as she was taken off of new trial cases and demoted to "pure R&W," decisions on which the First Assistant had direct input. *Supra* ¶ 67a–e. In a humiliating office email, Plaintiff was demoted to a support role underneath a male research and writing attorney, who would serve as the "gatekeeper" of assignments and Plaintiff's "supervisor." *Id.* ¶ 67. Meanwhile, the FDO's all-male upper management team, including the First Assistant and the Appellate Chief, discussed the possibility of promoting this male research and writing attorney to an Assistant Federal Public Defender position "based on his excellent performance." *Id.* ¶ 67c. The all-male upper management team did not discuss any similar promotion for Plaintiff, even though she was "on th[e] path to an AFD position" before complaining about the First Assistant's sexual harassment. *Id.* A few weeks later, Plaintiff was not even considered for the promotion to Grade 15 that was referenced in the First Assistant's *quid pro quo* email, despite her excellent work performance. *Id.* (admission that Plaintiff was "eligible for a grade-level promotion to FD-15 on or about August 21, 2018"); *id.* ¶¶ 27c, 38c (Defender thought she was "hardworking," "responsible," and her work was of "high quality"). Plaintiff was given a "reclassification" of title to AFD but was required to work as "pure R&W," contrary to the job requirements for an AFD position. *Id.* ¶ 67b. Thereafter, because of the Defender's failure to address the harassment, Plaintiff was

forced to telework for nearly seven months while her complaint went unaddressed, while office space that was available in another division office was used for an intern. This Court previously described this "remote work business" implemented by the Defender as "a career-ending step." ECF No. 268, at 18–19; *see also supra* ¶ 187c (Mediator's testimony that "it's hard to maintain those connections when you're telecommuting").

It is difficult to imagine a tighter "causal connection" based on these facts, especially because the Defender's promotion denial came in *direct response* to Plaintiff's sexual harassment complaint. *See supra* ¶ 101 (Defender's email about steps taken "[a]s a result of our meeting" about the harassment). Defendants have never provided a "legitimate nondiscriminatory reason" for the denial of promotion. *Okoli*, 648 F.3d at 223. Defendants have asserted that Plaintiff's pay was "the maximum the Defender was authorized to approve," ECF No. 245, at 23, but that is simply false. Plaintiff was reclassified to AD-28 on the pay scale for AFDs, which had a maximum starting salary of $134,659. *Supra*, ¶ 102c. A promotion to $122,163, the equivalent of Grade 15 on the JSP pay scale, would have been well within that range. *See id.* Moreover, even if the AD-28 grade had been capped at a lower salary, the Defender had discretion to promote Plaintiff to a Grade 15 prior to reclassifying her. Under the judiciary's "Highest Previous Rate" policy, an AFD's "starting salary may be set higher than the maximum of the applicable starting salary range if necessary to match the salary . . . the AFD previously earned as an employee of any federal government entity or any FDO." *See id.* This policy allowed the Defender to promote Plaintiff to a Grade 15 and then maintain that salary after her reclassification, even if it exceeded the salary range for which she was eligible on the AD scale. *Id.* The fact that the Defender backdated the reclassification *to the day before*

Plaintiff qualified for the promotion, and sought to remove her locality pay, further demonstrates that his actions had no legitimate basis. *Id.* ¶ 102e.

Accordingly, Plaintiff was subjected to numerous adverse actions, including demotion of job duties, denial of promotion, and being ostracized on telework for seven months. These adverse actions affected tangible aspects of her employment and were directly causally linked to the First Assistant's hostile reaction to her rejection of his unwanted advances.

### ii. Plaintiff was subjected to a hostile working environment.

Even if the First Assistant's *quid pro quo* harassment did not result in a tangible employment action, it would still support a claim of hostile working environment. *Ellerth*, 524 U.S. at 766. A hostile working environment results when sexual harassment "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." 29 C.F.R. § 1604.11(a). The factfinder "may consider, among an open list of factors: whether the conduct was 'physically threatening or humiliating, or a mere offensive utterance; . . . whether it unreasonably interfere[d] with an employee's work performance'; and whether (and to what extent) the conduct affected the employee psychologically." *Flood v. Bank of Am. Corp.*, 780 F.3d 1, 11 (1st Cir. 2015) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). Whether harassment is sufficiently severe or pervasive "is not . . . a mathematically precise test" and "can be determined only by looking at all the circumstances," *id.*, keeping in mind that conduct "that may seem harmless in the abstract" or "innocuous" can have sexual connotations in context, *Okoli*, 648 F.3d at 222. The Court may consider whether the conduct involves "gender-based remarks that single out individuals for ridicule," and whether "there is a significant disparity in

390

power." *Id.* at 221 (citations omitted); *see, e.g.*, *Fiorito v. Metro. Aviation*, No. 1:17-cv-731, 2018 U.S. Dist. LEXIS 131876, at *16 (E.D. Va. Aug. 3, 2018) ("physical and verbal attacks," "stalking," and "threats of termination"); *Bass v. Hill*, No. 1:06CV543, 2006 U.S. Dist. LEXIS 94886, at *4 (M.D.N.C. Oct. 16, 2006) ("sexual comments," "use of profanity during work meetings," and "physically threatening posture"). The inquiry is from the perspective of "a reasonable person in the plaintiff's position." *Ocheltree*, 335 F.3d at 333.

To establish a hostile working environment, conduct need not be both severe and pervasive. "While 'the conduct may be both [severe and pervasive], only one of the qualities must be proved in order to prevail. The severity . . . may vary inversely with its pervasiveness." *Flood*, 780 F.3d at 11. The more severe the harassment, the less pervasive it must be, and vice versa, to establish a hostile work environment. *See id.* "Within the totality of circumstances, there is neither a threshold 'magic number' of harassing incidents that gives rise, without more, to liability as a matter of law nor a number of incidents below which a plaintiff fails as a matter of law to state a claim." *Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 668, 674 (7th Cir. 1993). In some instances, such as "a threat to deny job benefits for rejecting sexual advances," a single incident of harassment can result in a hostile work environment. *See Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 607 (2d Cir. 2006) ("Threats or insinuations that employment benefits will be denied based on sexual favors are, in most circumstances, quintessential grounds for sexual harassment claims, and their characterization as 'occasional' will not necessarily exempt them from the scope of Title VII."); *Jansen v. Packaging Corp. of Am.*, 123 F.3d 490, 500 (7th Cir. 1997) (en banc) (Flaum, J., concurring) (supervisor's communication that an adverse job

391

action will follow if sexual favors are denied may cause "real emotional strife," including "anxiety, distress, and loss of productivity regardless of whether the threat is carried out").

A hostile work environment also may include a variety of offensive acts and conduct, including physical or sexual assaults or threats; offensive jokes, slurs, epithets, or name calling; intimidation, bullying, ridicule, or mockery; insults or put-downs; ostracism; offensive objects or pictures; and interference with work performance. Moreover, sexual harassment "need not be overtly sexual in nature" if there is "circumstantial evidence" for a factfinder to infer that the harasser's behavior was triggered by the plaintiff's gender. *Rosario v. Dep't of the Army*, 607 F.3d 241, 248 (1st Cir. 2010); *see id.* ("[T]here is no legal requirement that hostile acts be overtly sex- or gender-specific in content, whether marked by language, by sex or gender stereotypes, or by sexual overtures." (citation omitted)). Courts have explicitly rejected the argument that a plaintiff is not subjected to harassment where she was not subjected to "physical conduct" because "non-sexual conduct may be illegally sex-based where it evinces anti-female animus, and therefore could be found to have contributed significantly to the hostile environment." *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 815 (6th Cir. 2013) (citation omitted)). Where there is evidence of both sexually oriented conduct and unequal treatment based on sex, "[c]ourts should avoid disaggregating a hostile work environment claim, dividing conduct into instances of sexually oriented conduct and instances of unequal treatment, then discounting the latter category of conduct." *Burns*, 829 F.3d at 17 (citation omitted). "[S]uch an approach not only ignores the reality that incidents of nonsexual conduct -- such as work sabotage, exclusion, denial of support, and humiliation -- can in context contribute to a hostile work environment, it also nullifies the harassing nature of that conduct." *Id.* Regardless of whether hostile behavior is

392

an expression of "sex-based animus," "misdirected sexual desire," or "power plays," it is actionable as gender-based discrimination. *Smith v. Sheahan*, 189 F.3d 529, 533 (7th Cir. 1999).

Here, in addition to the *quid pro quo* harassment, Plaintiff was subjected to such controlling behavior by the First Assistant that it was reasonable to feel threatened by him. *See, e.g.*, *supra* ¶ 28e; *see Strickland*, 32 F.4th at 326 (describing allegations that First Assistant's behaviors were "obsessive" and "controlling" and that he "was essentially stalking her"). Indeed, Plaintiff reported to the JIO that she perceived the First Assistant's actions towards her "as stalking." *Id.* ¶ 269a. After she distanced herself from him, he told another supervisor that Plaintiff "may just need to get smacked a bunch" and that Plaintiff "needs to get slapped." *See, e.g.*, *supra* ¶ 28e. The Investigator testified that he "was shaking he was so angry" and Plaintiff's perception of him was "reasonable." *Id.* ¶¶ 33a–b. The EDR Coordinator testified that there was "no reason to doubt" that she was "physically afraid of him." *Id.* ¶ 44a; *see id.* ¶ 44b (FEOO was concerned about "physical danger"). Further, his statements that Plaintiff "[h]as been avoiding me," "[c]learly does not want to interact with me," and her calling in sick was not "coincidental," show that he knew his conduct was unwelcome. *Id.* ¶¶ 28d, 71a. His statements that Plaintiff "played the gender card" and was a "spoiled brat," "manipulative," and "self-centered" for being professionally focused, show that he was motivated by sexual harassment and derogatory gender stereotypes. *Id.* ¶ 38a. His use of gratuitous profanity about Plaintiff (*e.g.*, "manipulative underhanded jackass" and "fuck off attitude"), further show his anger and aggression towards her. *Id.* ¶¶ 38a, 70a.

Indeed, the facts of this case are similar to *Burns v. Johnson*, in which the First Circuit held that a reasonable jury could find that the plaintiff had been subjected to sex-based

harassment based on "sex-stereotyping" by her supervisor. *Burns*, 829 F.3d at 13. The First Circuit explained that the circumstantial evidence supported an inference that the supervisor acted based on "the idea that men are better suited than women for positions of importance or leadership in the workplace." *Id.* Specifically, there was evidence of the supervisor's "general disregard for [the plaintiff's] professional abilities and status, despite the complete absence of any factual basis for that disregard"; "demeaning of [the plaintiff's] professional abilities" that was not aimed at similarly situated male colleagues; and disparate treatment despite the "positive evaluations and numerous accolades" she garnered for her work. *Id.* at 14–15 (citation omitted). Similarly, in *Burns*, the supervisor "was at times inappropriately upset or angry with [the plaintiff,] to the point of behaving unprofessionally," and even was physically intimidating towards the plaintiff by carrying around a baseball bat at work. *Id.* at 15–16.

As in *Burns*, the record reflects that in addition to his unwanted advances, the First Assistant exhibited an irrational disregard for Plaintiff's work despite her recognized excellent performance, engaged in obsessive and controlling behavior towards Plaintiff that he did not exhibit towards her colleagues, and was physically intimidating, lurking after work to wait for Plaintiff and even expressing a desire to physically hurt Plaintiff to another FDO supervisor. The First Assistant's own contemporaneous notes and statements show that his conduct towards Plaintiff was motivated by his romantic interest in her, but also by derogatory gender-based stereotypes. The First Assistant believed that it was "manipulative," "self-centered," and "underhanded" for Plaintiff to seek professional advancement, including trial experience, in her workplace. He characterized Plaintiff as making "veiled threats" by having "demanded more $," and stated that she "has clearly organized, marshalled her forces, and placed herself in position to

394

be indispensable." *Supra*, ¶ 38a. He believed that Plaintiff could possibly achieve her goals because "she is very good at playing innocent," as if a woman must "play innocent" and downplay her perceived threat level to the men with whom she works to advance professionally. *Id.* The First Assistant consistently belittled Plaintiff in gender-based terms, accusing her of playing the "gender" card, "playing those tears for sympathy," and calling her a "spoiled brat" and a "girl." *Id.* The First Assistant even filed a sworn declaration in this Court stating that he was "taken aback by Plaintiff's demands" that she receive a promotion and her anticipated transition to an AFD position and caricaturing her as supposedly stating that she "would 'wave [the offer letter] around' if the office didn't agree to promote her." Decl. of John Parke Davis, ECF No. 245-3, ¶ 20.

The First Assistant's hostile remarks play on longstanding, pernicious stereotypes "exhibit[ing] hostility toward the idea of women exercising power in the workplace," and "invoking a double standard for men's and women's leadership in the workplace." *Johnson v. J. Walter Thompson U.S.A., LLC*, 224 F. Supp. 3d 296, 309–11 (S.D.N.Y. 2016); *see id.* ("The view of female bosses as 'bossy' is a feature of the 'glass ceiling problem[],' namely, that given the close association of 'managers' and 'leaders' with masculinity, subjects tend to dislike women whom they rate highly as managers and leaders because of 'role incongruity'—the sense that it is incongruous for women to successfully perform masculine roles as opposed to feminine roles."); *cf. Parker v. Reema Consulting Servs., Inc.*, 915 F.3d 297, 303 (4th Cir. 2019) (concluding that the plaintiff stated a claim that she was discriminated against based on the "deeply rooted perception—one that unfortunately still persists—that generally women, not men, use sex to achieve success"). Indeed, "[t]he totality of" the First Assistant's conduct, "both

395

overtly sex-based or sexual and not, can be read as a campaign to assert power over [Plaintiff]—to sexualize her, to demean her, to professionally diminish her, and to deprive her of bodily security—because of her sex." *Johnson*, 224 F. Supp. 3d at 309–11.

Moreover, in addition to the hostile working environment directed at Plaintiff, the generalized hostile working environment at the FDO contributes to Plaintiff's equal protection claim against the Defender. "When examining all the circumstances of a plaintiff's workplace environment, evidence about how other employees were treated in that same workplace can be probative of whether the environment was indeed a sexually hostile one, even if the plaintiff did not witness the conduct herself. Hostile conduct directed toward a plaintiff that might of itself be interpreted as isolated or unrelated to gender might look different in light of evidence that a number of women experienced similar treatment." *Ziskie v. Mineta*, 547 F.3d 220, 225 (4th Cir. 2008); *Warf v. U.S. Dep't of Veterans Affairs*, 713 F.3d 874, 878 (6th Cir. 2013) ("We may also consider general sexual harassment in the workplace and find probative remarks or actions taken against women generally, which may not be demeaning to any one in particular. Evidence of other sexual harassment claims may help support a hostile work environment claim, but evidence of harassment to others does not weigh as heavily as evidence directed against the plaintiff.").

In this case, the record supports a reasonable inference that the FDO was rife with instances of discriminatory conduct based on gender and other protected bases. ██████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

396

████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

which was condoned by the Defender. *Id.* ████████████████████████

█████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

████████████████████████ *Id.*  This clear pattern of discriminatory

conduct obviates any defense that the harassing conduct towards Plaintiff was "isolated or

unrelated to gender." *Ziskie*, 547 F.3d at 225.

### iii. The remaining elements of a sexual harassment claim are met.

In addition to establishing *quid pro quo* and hostile working environment harassment,

Plaintiff has met the other elements of a sexual harassment claim.

First, the sexual harassment was "unwelcome," as well as subjectively and objectively

hostile. *Okoli*, 648 F.3d at 222. Courts have recognized that the complainant's own statement

that the complainant perceived conduct as hostile is sufficient to establish subjective hostility. A

subjectively hostile work environment also may be established if there is evidence that an

individual made a complaint about the conduct, as it follows logically that the individual found it

hostile. Similarly, if there is evidence that the individual complained to family, friends, or

397

coworkers about the conduct, it is likely that the individual found it subjectively hostile. *See,*
*e.g.*, *Wallace v. Performance Contractors, Inc.*, 57 F.4th 209, 223 (5th Cir. 2023) (concluding
that the plaintiff presented sufficient evidence that she subjectively viewed the alleged
harassment as hostile where she "complained about the harassment, reported it to her
supervisors, and suffered psychological harm"); *EEOC v. Mgmt. Hosp. of Racine, Inc.*, 666 F.3d
422, 433 (7th Cir. 2012) (concluding that there was sufficient evidence in the record showing
that a teenage server at a restaurant found her supervisor's comments and conduct subjectively
offensive because she repeatedly informed him that his conduct was unwelcome and complained
to two other restaurant managers about the conduct). Here, Plaintiff's repeated complaints about
the First Assistant's conduct, including to the First Assistant, the Defender, the FEOO, and
officials of the Fourth Circuit, demonstrated that it was unwelcome. Indeed, the First Assistant
himself recognized that his conduct was unwelcome, as he documented in his contemporaneous
notes that Plaintiff [h]as been avoiding me" and "[c]learly does not want to interact with me."
*Supra*, ¶ 28d. He even repeatedly observed that he believed Plaintiff was calling in sick to work
to avoid his requests to meet with him alone. *See id.* ¶ 71a (First Assistant's observation that
Plaintiff calling in sick was "not coincidental" because she was avoiding him).

Despite this clear evidence that the harassment was unwelcome, including from the First
Assistant himself, Defendants have argued that Plaintiff welcomed his conduct based on a
misunderstanding of the nature of sexual harassment and reliance on victim-blaming tropes. In
claiming the harassment was not "unwelcome," Defendants have pointed to prior text messages
between Plaintiff and the First Assistant and instances when FDO employees went for drinks

398

together as group.[18]  ECF No. 245, at 19.  But importantly, those instances took place *before* the First Assistant's May 18, 2018 *quid pro quo* "Mas Dinero" email, after which Plaintiff actively distanced herself from him, as he was well-aware.  As the FEOO testified, it is common in sexual harassment cases for supervisors to cultivate positive relationships with subordinates as "grooming" for "sexual advances."  *Supra*, ¶ 26c.  Nor does the fact that the First Assistant did not use explicitly sexual language mean he did not harass her or that his conduct was welcome.  His conduct was about his "desire to control" her, "which is very common" in sexual harassment cases, especially when there is a "huge power imbalance."  *Id.*

Second, the harassment was based on Plaintiff's sex.  The Supreme Court has addressed three non-exclusive evidentiary routes for establishing causation in a sexual harassment claim: (1) explicit or implicit proposals of sexual activity; (2) general hostility toward members of the complainant's sex; and (3) comparative evidence showing how the harasser treated persons who shared the complainant's sex compared to the harasser's treatment of those who did not.  *Oncale*, 523 U.S. at 80–81.  Plaintiff has established all three of these evidentiary routes.  As discussed above, Plaintiff's case involves *quid pro quo* sexual harassment, a hostile working environment, and unequal treatment based on sex and sex-based stereotypes.  These forms of sex-based harassment establish causation for a sexual harassment claim.

Third, Plaintiff's reaction to the harassment affected tangible aspects of her employment. A "tangible employment action" means a "significant change in employment status" that requires

_____

[18] As the Defender testified, drinking was commonplace in the FDO and not at all unique to Plaintiff.  ECF No. 250, Ex. GG, at 95 ("[A]s defenders, we're always losing cases," so when "the judge grants a suppression motion . . . let's have a few beers and let's celebrate type of scenario.").

399

an "official act" of the employer.  *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013).

Examples of tangible employment actions include hiring and firing, failure to promote,

demotion, reassignment with significantly different responsibilities, a compensation decision,

and a decision causing a significant change in benefits.  In some cases, a decision may constitute

a tangible employment action even though it does not have immediate direct economic

consequences, such as a change in job duties that limits the affected individual's eligibility for

promotion or a demotion with a substantial reduction in job responsibilities but without a loss in

pay.  *See id.*  In this case, the numerous adverse actions Plaintiff experienced because of her

reaction to the harassment—denial of promotion, demotion and reduction in job duties, and

extended telework—affected tangible aspects of her employment.  Moreover, these tangible

actions were directly causally linked to the harassment: the Defender ratified and facilitated the

First Assistant's *quid pro quo* advances.  And the record clearly shows that the First Assistant

had direct input on the Defender's adverse decisions, including his statements to the Defender

that Plaintiff should be "put on a PIP" and that he should rethink whether "Plaintiff lives up to

the AFD title," and his statements to the Appellate Chief that Plaintiff had a "fuck off attitude"

and had committed "fireable offenses."  After all, even if an individual is not the final decision

maker as to tangible employment actions affecting the complainant, the individual would still be

considered a supervisor if the individual has the "power to recommend or otherwise substantially

influence tangible employment actions."  *Vance*, 570 U.S. at 424.  Here, the First Assistant

abused his supervisory power to punish Plaintiff as a spurned suitor for rejecting his advances.

Fourth, the employer is liable for the harassment because the First Assistant was

Plaintiff's supervisor.  Indeed, Defendants' attempts to deny that the First Assistant was

Plaintiff's supervisor are specious. In *Boyer-Liberto v. Fontainebleau Corp.*, the Fourth Circuit explained that under *Vance*, "[t]o be considered a supervisor, the employee need not have the final say as to the tangible employment action; instead, the employee's decision may be 'subject to approval by higher management.'" 786 F.3d at 278. A harasser will be considered a supervisor based on facts including that "'No one [had been] hired without his recommendation'; he 'initiated firing and suspending personnel'; his performance evaluations 'translated into salary increases'; and he 'made recommendations regarding promotions.'" *Id.* (quoting *Vance*, 133 S. Ct. at 2446 n.8). Additionally, the Supreme Court in *Vance* observed that "even if an employer concentrates all decision-making authority in a few individuals," it cannot insulate itself from liability because "those individuals likely will have to rely on the recommendations of others, and 'the employer may be held to have effectively delegated the power to take tangible employment actions to the employees on whose recommendations it relies.'" *Id.* (quoting *Vance*, 133 S. Ct. at 2452).

Here, as in *Vance*, the First Assistant clearly had the "power to recommend or otherwise substantially influence tangible employment actions," which he exercised to punish Plaintiff. *Id.* Indeed, the First Assistant's job description states that he has the authority to "initiate personnel actions" involving all staff members, which is the definition of a supervisor. And the First Assistant's own sworn declaration discusses how he recommended personnel actions regarding Plaintiff, including her salary and disciplinary action. *See* Decl. of John Parke Davis, ECF No. 245-3, ¶ 6 (stating that he "raise[d] the potential for disciplinary action" against Plaintiff); *id.* ¶ 21 ("I was surprised and taken aback by Plaintiff's demands. Nevertheless, because I thought highly of her performance and considered her a valuable employee who I did not want to

leave the FDO-WDNC, I reviewed salary tables to see if we could meet her request for a raise (a duty station transfer being unavailable.)"; *compare Kramer v. Wasatch Cnty. Sheriff's Office*, 743 F.3d 726, 741 (10th Cir. 2014) ("Even if the [formal decision maker] undertook some independent analysis when considering employment decisions recommended by [the alleged harasser], [the alleged harasser] would qualify as a supervisor so long as his recommendations were among the proximate causes of the [formal decision maker's] decision-making." (emphasis in original)).

Moreover, even if the First Assistant did not have actual authority to initial personnel actions, an employee who does not have actual authority to take a tangible employment action with respect to the complainant is still a supervisor if, based on the employer's actions, the harassed employee reasonably believes that the harasser has such power. The complainant might have such a reasonable belief where, for example, the chain of command is unclear or the harasser has broad delegated powers. In these circumstances, the harasser is said to have "apparent authority." *See, e.g.*, *Ellerth*, 524 U.S. at 759 ("If, in the unusual case, it is alleged there is a false impression that the actor was a supervisor, when he in fact was not, the victim's mistaken conclusion must be a reasonable one."); *Llampallas v. Mini-Circuits Lab, Inc.*, 163 F.3d 1236, 1247 n.20 (11th Cir. 1998) ("Although the employer may argue that the employee had no actual authority to take the employment action against the plaintiff, apparent authority serves just as well to impute liability to the employer for the employee's action."). That apparent authority is clear from the repeated statements of both the First Assistant *and* the Defender that the First Assistant was Plaintiff's "supervisor" and that she must obey his "direct orders." *See supra* ¶ 35 (First Assistant's statement that "[i]f you choose to disobey a direct order, that is an

action that I as a supervisor cannot ignore."); *id.* ¶ 59 ("Defendants admit that the Defender told

Plaintiff that, as her supervisor, the First Assistant had the right to meet with her.").

### b. Plaintiff reported the harassment.

Plaintiff "reported the sexual harassment to various judiciary employees, some of whom

alerted the FPD to the harassment." *Strickland*, 32 F.4th at 360. These employees included (1)

the Defender, who was on notice of potential "harassment by JP" by July 2, 2018, *see supra* ¶

62a ; (2) the FEOO and AO officials, *see id.* ¶¶ 72a–h; and (3) the Fourth Circuit, *see id.* ¶ 130

During this litigation, Defendants argued that Plaintiff "did not report the alleged sexual

harassment until August 2018," but this is incorrect. ECF No. 249, at 14. The Defender's notes

from July 5, 2018 state that he sought to "clarify with Caryn any issue about any harassment by

JP." *Supra*, ¶ 56a. The Letter of Reprimand states that the Defender's reaction in this meeting

was "inappropriate" because he forced her "to confront the person she accused of sexually

harassing her." *Id.* ¶ 60b. The Defender testified during his deposition that he was "concerned"

before the July 5, 2018 meeting about whether Plaintiff was alleging sexual harassment and

"wanted to check it out." *Id.* ¶¶ 47a, 104a. The fact that Plaintiff stated, "I don't feel we are

there yet," and did not want to file a formal complaint during her July 2, 2018 meeting with the

Defender does not mean she was not reporting harassment, as the Defender well knew. *See* ECF

No. 249, at 15. Plaintiff was following standard recommended practice to resolve the issue

informally and at the lowest possible level, which is exactly what she was supposed to do. *See,

e.g.*, *supra* ¶¶ 47b–47f.

Additionally, Plaintiff "reported the sexual harassment to various judiciary employees,

some of whom alerted the FPD to the harassment." *Strickland*, 32 F.4th at 359. The employees

403

included the FEOO, who discussed the harassment with the Chief of Defender Services (Cait Clarke), the Director (Jim Duff), the Deputy Director (Lee Ann Bennett), and Office of General Counsel officials, who were concerned about "public disclosure, litigation, and judgment against the judiciary." *Supra* ¶ 72g, 85e.   The Chief of Defender Services, in turn, directly contacted the Defender.  *See id.*   These officials acted because they "supported the [FEOO's] involvement in trying to settle the matter informally" and wanted to "protect[]" Plaintiff against "future retaliation or discrimination or harassment."  *Id.* ¶ 72g.

### c.   The Defender was deliberately indifferent to the harassment.

In response to Plaintiff's complaint, the Defender failed "to take immediate and effective action" and failed to provide "meaningful review or remedies." *Strickland*, 32 F.4th at 360.  As the Fourth Circuit explained, the test for deliberate indifference is whether the official's response is "clearly unreasonable." *Id.* at 359.   The Letter of Reprimand reads as a roadmap of the Defender's deliberate indifference as articulated by the Fourth Circuit, *see id.* at 359–60:

- "Marriage Metaphor": "After attempting to resolve several disagreements between Ms. Strickland and Mr. Davis, you had used an ill-advised metaphor, comparing the relationship between Ms. Strickland and Mr. Davis as a 'marriage,' with the parties needing to 'compromise' and 'meet in the middle.' Ms. Strickland said that she was 'shocked' and 'offended' at the reference, believing that it was inappropriate to describe any professional relationship between a male supervisor and female subordinate as a 'marriage.' The metaphor was especially inappropriate given the context that Ms. Strickland had raised concerns with Mr. Davis's behavior towards her."

- "No Physical Touching": "Ms. Strickland denied that Mr. Davis had touched her inappropriately, but she repeated that Mr. Davis made her feel uncomfortable and threatened. Investigator Beam found that you had said, 'at least you weren't touched,' or words to that effect. The investigator concluded that your remarks were callous,

404

minimizing, insensitive, and contributed to the distress that Ms. Strickland felt."

- "Disapproval of Seeking Outside Advice": "Ms. Strickland had also sought advice and guidance from the Fair Employment Opportunity Office at the Administrative Office of the U.S. Courts on her civil rights as a judiciary employee. The investigator found that you had 'called out' Ms. Strickland for seeking legal advice from that office, which further eroded trust between you and Ms. Strickland and exacerbated the deteriorating situation in your office."

- "Shifting Responsibility": "Finally, the investigator noted that you had said you were being blamed for matters that you had nothing to do with. Ms. Strickland reported that she felt 'offended' by your protest, which she perceived as disapproving her right to seek outside advice and counsel from the AO Fair Employment Opportunity Office. This, the investigator concluded, contributed to your mishandling of the matter."

*Supra,* ¶ 312e.

Moreover, Plaintiff's investigations expert, Vida G. Thomas, described how the response to Plaintiff's complaint "fell below well-accepted HR practices" because Defendants "did not respond to or investigate Strickland's complaint promptly," the accused Defender "was permitted to control aspects of the investigation," and Defendants "took no action to remedy the harm Strickland suffered." *Id.* ¶¶ 151e, 235a, 151f. The investigation was not "timely, fair and thorough" and was conducted "in a manner that raises questions about [the Investigator's] impartiality." *Id.* ¶ 158f. Finally, "Defendants failed to protect Strickland from retaliation." *Id.* ¶ 102i. Ms. Thomas concluded that Defendants "failed in [their] obligation" to protect Plaintiff from retaliation because "[t]hey did not monitor Strickland's work environment, or Martinez's management decisions about her, to ensure that Strickland did not suffer adverse job consequences for bringing her complaints." *Supra,* ¶¶ 99m, 187e. Ms. Thomas concluded that "Defendants did not meet their obligations to Strickland" and "did not appreciate" that she had

405

reported "behavior . . . that needed to be taken seriously, investigated promptly, and remedied appropriately." *Id.* Specifically, Ms. Thomas concludes as follows:

> Defendants did not meet their obligations to Strickland as provided by the well-accepted standards in the human resources industry. From the beginning, the Defendants treated this matter as an informal work dispute, between Strickland and Davis, one that could be "resolved" through the EDR Plan process. Defendants apparently did not appreciate that Strickland had reported behavior that was potentially illegal under Title VII and that needed to be taken seriously, investigated promptly, and remedied appropriately. Because they viewed the situation as a workplace dispute, the Defendants took the position that Strickland was equally responsible for her poor relationship with Davis and, thus, bore responsibility for working with Martinez to identify an acceptable solution. This approach not only deprived Strickland of the protections to which she was entitled under Title VII, but it also placed her in the unfortunate position of having to advocate for herself when it was the Defendants who should have been protecting her.

Tr. Ex. 59, at 21 (ECF No. 248-17, at 21).

Ms. Thomas is the Managing Partner of the Oppenheimer Investigations Group. *See* Vida Thomas, Managing Partner, Oppenheimer Investigations Grp., *available at* https://www.oiglaw.com/attorney/vida-thomas/. Prior to serving as an expert witness, Ms. Thomas specialized in employment law for 27 years, "defending employers in employment civil lawsuits" and "advis[ing] employers and their human resources professionals on responding to complaints of sexual assault." Tr. Ex. 59, at 2 (ECF No. 248-17, at 2).

Since 1994, Ms. Thomas has also "conducted impartial investigations of complaints of harassment, discrimination, retaliation, and other forms of alleged misconduct at work" for both public and private sector employers. *Id.* She has provided relevant training on these issues to employers, human resources professionals and employees since 2000. *Id.* In addition, Ms. Thomas is a member of the Association of Workplace Investigations and, from 2016 through

406

2019, was on the AWI Board's Training Institute Committee. *Id.* at 3. In that role, Ms. Thomas was part of a committee that researched and wrote "Guiding Principles" for workplace investigators that have assisted in establishing acceptable practices for investigating workplace harassment. *Id.* At her deposition, Ms. Thomas testified that approximately "97 percent" of her legal practice was representing employers, and that she has also participated in "hundreds" of workplace investigations over the course of her career. Tr. Ex. 108, at 134–35. Ms. Thomas is well-qualified to testify as an expert on workplace investigations. Moreover, Ms. Thomas explained at her deposition that her expert opinions do not address the "legal conclusions about any underlying claims," and that she did not assume the truth of Plaintiff's allegations in coming to her opinions. Specifically, she explained:

> In -- in coming to the conclusions, I relied on facts as they were verified either by documents -- I saw the emails, so I saw what was said -- or Heather's deposition, particularly when I talked about her investigation, I wanted to rely on -- you know, as much as I could, on her deposition, and then -- as well as her report.
>
> So those -- I tried to rely as much on those -- you know, to be fair to her, to be fair to Defendants, I wanted to make sure that I was relying on information that came from more than just the Plaintiff.

Tr. Ex. 108, at 74. Ms. Thomas further explained that Plaintiff's allegations of sexual harassment, sex discrimination, and retaliation "don't necessarily go directly to the questions of: How did – how did the Defendants respond to her complaint? How did Heather investigate the complaint? What steps did they take?" *Id.* at 75. While Ms. Thomas was "not totally ignoring" what Plaintiff had alleged, because she was opining on "the sufficiency of what the Defendants did," she relied as much as possible "on what they would consider their evidence," including "Ms. Beam's deposition, her report and the documents that Defendants produced." *Id.* Ms.

407

Thomas's findings describing how the Defender was deliberately indifferent and failed to respond how a well-trained manager would to Plaintiff's complaints, after he was notice of the harassment, are useful to a factfinder, as extensively described above in Plaintiff's proposed findings of fact.

Defendants' failure to act on Plaintiff's complaint was part of a pattern of failing to take sexual harassment complaints seriously. *See Basta v. Novant Health Inc.*, 56 F.4th 307, 317 (4th Cir. 2022) ("[A] pattern of similar violations . . . is relevant evidence to proving deliberate indifference."). The FDO had provided no notice of applicable procedures for reporting harassment, and most of the officials involved in Plaintiff's complaint had received no meaningful training. *See Hill v. Cundiff*, 797 F.3d 948, 975 (11th Cir. 2015) (failure to provide training or notice of sexual harassment policy supported a finding that institution's response was "clearly unreasonable"); *see supra* ¶¶ 72f, 156a–b, 235d (describing lack of training for Investigator, Defender, and Mediator); *id.* ¶ 235g (Investigator's finding that the Defender "would benefit greatly with additional training on workplace conduct as well as basic managerial/leadership skills"); *id.* ¶ 72f(FDO did not receive office-wide training until March 2019). According to Defendants' own witnesses, there was no mandatory judiciary-wide sexual harassment training before 2019 and no "mandatory training for people who are actually participating in administering the EDR process," such as investigators and mediators. *See id.* ¶¶ 72f, 278c; *see also id.* (JIO's discussion of "dated" FJC training video that "wasn't tailored to the judiciary" and "didn't describe any of our EDR options"); *id.* ¶ 278c (JIO's discussion of lack of nationalized training). Currently, it is "mandatory" that training be "offered," but it still is not even "mandatory that people attend." *Id.*

408

There was also a pattern of other EDR complaints from the FDO office, as discussed in the hostile working environment section and extensively above in the proposed findings of fact. In fact, the Circuit Executive testified during his deposition that he was "concerned about a pattern of complaints against JP Davis or Mr. Martinez." *Supra*, ¶ 22e. The Chief Judge was aware "every time I received one" of the complaints, as was the Defender. *Id.*

As discussed in the proposed findings of fact, in their sworn declarations filed in this proceeding, the Defender and his Administrative Officer falsely represented to this Court that no other EDR complaints had been filed against the FDO. *Supra*, ¶ 22b–d. The Defender falsely asserted that he had "never even heard of any gender discrimination" in the FDO, even though ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆. *Id.* The Defender's false statements and his lack of credibility further support a finding of deliberate indifference motivated by discriminatory intent.

### d. The Defender was motivated by discriminatory intent.

Here, there are many bases for a finding that the Defender's deliberate indifference was motivated by a discriminatory intent. But most simply, the above proposed findings establish that the Defender "downplay[ed] the harassment and threats, and he made no effort to stop them." *Feminist Majority Found*, 911 F.3d 674, 703. Instead, he "ratified the 'right' of [the First Assistant] to target" Plaintiff with harassment. *Id.* Moreover, the Defender "had the authority to address and curtail the harassment but failed to do so over a period of months." *Id.* Under Fourth Circuit precedent, this conduct is "sufficient" to prove the Defender's deliberate indifference to sexual harassment and his discriminatory intent. *Id.*

Importantly, an intent to discriminate based on sex does not require the discrimination to be "maliciously motivated." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993). Rather, the test is whether the defendant acted "because of sex." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). In addition to the test for intentional discrimination provided in *Feminist Majority Foundation*—downplaying the harassment and failing to stop it— Fourth Circuit precedent also provides many other indicators that the Defender acted with discriminatory intent, as provided below:

### i. Actual notice and failure to act

The Fourth Circuit has recognized that "intentional discrimination can be proven via deliberate indifference," which "lies 'somewhere between the poles of negligence at one end and purpose or knowledge at the other.'" *Basta*, 56 F.4th at 317 (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)); *cf. Baynard v. Malone*, 268 F.3d 228, 236 (4th Cir. 2001) (applying *Farmer* to sexual harassment deliberate indifference claim). This standard, is "at bottom, an actual-notice standard." *Basta*, 56 F.4th at 317 (citation omitted).

Here, the evidence shows that the Defender had "actual notice" of Plaintiff's sexual harassment complaint as of July 5, 2018 and later, through several reports. The Defender consistently downplayed the harassment and failed to act, and also retaliated against Plaintiff through actions including discouraging her from reporting the harassment, denying her a promotion, and forcing her to telework for six months—a career-ending step—even though office space was available in another division office. This response was clearly unreasonable and effectively caused further harassment.

410

### ii. Direct evidence of discriminatory intent

Direct evidence is "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Taylor v. Virginia Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999) (en banc). "Derogatory comments" based on an employee's gender "may be direct evidence" of discrimination provided that the comments sufficiently demonstrate that the employer's animus "affected the employment decision at issue." *Cole v. Family Dollar Stores of Md., Inc.*, 811 F. App'x 168, 175 (4th Cir. 2020) (citation omitted).

In this case, the Defender "trivializ[ed]" the harassment by implying that "at least[] she had not been sexually assaulted," as the Chief Judge's Letter of Reprimand found. *See supra* ¶ 312e. He compared the relationship between Roe and her harassing supervisor to a "marriage" and ordered her to "compromise," relying on a sexist stereotype that a female employee relates to her male supervisor like a wife who must "compromise" with a husband's demands. *Id.* Confirming his sexist belief that sexual harassment does not exist unless there is a physical assault, the Defender testified at his deposition that in his view, the conduct that Plaintiff reported was not "sexual harassment" and did not even merit discipline because it was "just emails," despite the investigation's findings. *See id.* ¶ 312d. This attitude underscored the sex-discriminatory motivation for the Defender's unreasonable response to sexual harassment.

Indeed, the Chief Judge's Letter of Reprimand contains many examples of discriminatory statements evincing the Defender's discriminatory intent, including:

- That the Defender compared Plaintiff's relationship with her harassing supervisor to a "marriage" and told her to "compromise"

411

- That the Defender told Plaintiff words to the effect that "at least you weren't touched"

- That the Defender "called out" Plaintiff for seeking guidance on her civil rights as a judiciary employee

- That the Defender told Plaintiff that he was being blamed and attacked for something that he had nothing to do (*i.e.*, his response to the harassment)

Based on these explicit statements showing discriminatory intent, this Court could not reasonably find that the Defender lacked discriminatory intent unless it outright rejected the Chief Judge's own findings of unlawful discrimination, in an unimpeached public record.

### iii.      False statements showing pretext

"'In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.'" *Okoli*, 648 F.3d at 223 (quoting *Washington v. City of Charlotte*, 219 Fed. Appx. 273, 279 (4th Cir. 2007) (unpublished) (Gregory, J., dissenting) (quoting *Reeves v. Sanderson Plumbing Prods.*, Inc., 530 U.S. 133, 147(2000)). "'[O]nce the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.'" *Id.* at 279–80 (quoting *Reeves*, 530 U.S. at 147).

As discussed above, FDO officials, including the First Assistant, Defender, and Administrative Officer made patently false statements about Plaintiff's eligibility for a promotion to Grade 15, including statements in their sworn declarations that are contradicted by the DOCS Manual.  Similarly, these officials falsely claimed that accommodations to protect

412

Plaintiff from the harassment, including a transfer to another division office and transfer to the appeals unit were not possible, when their own contemporaneous discussions demonstrate that was not the case. And the Defender and Administrative Officer falsely claimed in their sworn declarations to be unaware of any other complaints of ██████ discrimination in the FDO, which is not even plausibly true. These false statements undermine the officials' credibility and demonstrate that their reasons for the adverse employment actions against Plaintiff, *i.e.*, diminishment of job duties, denial of promotion, prolonged telework, and forcing Plaintiff to work under the trial unit supervised by her harasser, were pretextual.

### iv. Pattern of other similar complaints

A pattern of violations is "relevant evidence" to proving deliberate indifference. *Basta*, 56 F.4th at 317. Moreover, the Fourth Circuit has held that "[a]s a general rule, the testimony of other employees about their treatment by the defendant is relevant to the issue of the employer's discriminatory intent." *Calobrisi v. Booz Allen Hamilton, Inc.*, 660 F. App'x 207, 210 (4th Cir. 2016) (citation omitted) (unpub. per curiam); *see also Mullen v. Princess Anne Volunteer Fire Co.*, 853 F.2d 1130, 1133 (4th Cir. 1988) ("Where a plaintiff seeks to prove discriminatory intent, the probative value of statements revealing the racial attitudes of the decisionmaker is great."). In determining whether this evidence is relevant, courts consider "whether the other discriminatory behavior described 'is close in time to the events at issue in the case, whether the same decisionmakers were involved, whether the witness and the plaintiff were treated in a similar manner, and whether the witness and the plaintiff were otherwise similarly situated.'" *Calobrisi*, 660 F. App'x at 210. When an employer "claim[s] that it maintained effective . . . policies prohibiting racial and sexual harassment," the employee is "entitled to present evidence

413

showing that [the employer] had consistently failed to prevent illegal conduct and to correct it promptly." *Madison v. IBP, Inc.*, 257 F.3d 780, 793–94 (8th Cir. 2001). The employer's duty to take reasonable steps to prevent harassment and stop it from recurring exists regardless of the truth of the matter asserted in the underlying complaints. *See id.* at 796 (explaining relevancy of evidence that the plaintiff "and other employees complained to management on many occasions that their civil rights were being violated, but management did not take reasonable care to investigate or stop such behavior").

More generally, an employer's notice of prior similar complaints is "highly relevant" to whether the employer should have anticipated further discriminatory conduct. *Bland v. Fairfax Cty.*, No. 1:10cv1030 (JCC/JFA), 2011 U.S. Dist. LEXIS 47164, at *44 (E.D. Va. May 3, 2011) (quoting *Paroline v. Unisys Corp.*, 879 F.2d 100, 107 (4th Cir. 1989), *vacated and remanded on other grounds*, 900 F.2d 27 (4th Cir. 1990) ("[A]n employer's knowledge that a male worker has previously harassed female employees other than the plaintiff will often prove highly relevant in deciding whether the employer should have anticipated that the plaintiff too would become a victim of the male employee's harassing conduct."). Andwhen other similar complaints are raised after the harassment of the plaintiff, that fact is "[a]lso significant" because a reasonable factfinder could conclude that the "Defendant knew or should have known about the harassment and failed to take effective action to stop it" based on the continued harassment. *Id.* at 44–45.

As these precedents indicate, "[a] history of violations is relevant evidence to proving deliberate indifference," though not required to succeed. *Basta*, 56 F.4th at 317. Thus, the evidence of other complaints of harassment, discrimination, and retaliation against the FDO is directly relevant to the Defender's discriminatory intent. The evidence is relevant because it is

414

close in time to the events in this case and involves the same decision makers, similar treatment, and similarly situated complainants. The complaints are thus relevant to establishing the discriminatory intent of Defender Martinez, who is alleged both to have engaged in discrimination and retaliation against other individuals, and to have been aware of the complaints and responded with deliberate indifference. *See Strickland*, 32 F.4th at 359 (holding that "federal judiciary employees who occupy supervisory roles and/or who are charged with enforcing an EDR plan can, under *Feminist Majority Foundation*, be held liable under the Fifth Amendment for their deliberate indifference to sexual harassment committed by a federal judiciary employee or supervisor against another federal judiciary employee").

### v. Sham investigation controlled by the Defender

Courts have recognized that a sham investigation into discriminatory conduct is itself evidence of discrimination. As one court explained in describing the relevancy of evidence of a sham investigation to the issue of discriminatory intent:

> If the jury were to conclude [the employer's] investigation fell below uniformly adopted minimum standard practices for such an investigation, the jury could conclude it was a "sham" investigation put on by Defendant to justify its decision not to recompensate Plaintiff and to conceal its previous discrimination. Defendant's CEO has submitted a declaration stating that he relied on the investigation in deciding not to correct her compensation, specifically alleging "[i]f [the investigator] had concluded at the end of his investigation that Plaintiff was being underpaid, I would have corrected Plaintiff's compensation regardless of whether her employment with Defendant was going to continue." (Dkt. 92-9 ¶ 4.) If the jury concludes the investigation was a sham, it could conclude the CEO's statement "is unworthy of credence," that is "one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) ("[T]he trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover

415

up a discriminatory purpose.") Put differently, if the jury concluded the investigation was a sham, it could conclude (1) the CEO knew the CFO had conducted a faulty investigation and knowingly used that as a basis for avoiding liability to Plaintiff for unequal pay or (2) the CFO deceived the CEO into relying on a faulty investigation to help the company avoid its liability to Plaintiff. In either event, evidence of a sham investigation could be considered by a jury as evidence Defendant's explanation for not compensating Plaintiff for a pay disparity was false, thus providing evidence of discriminatory purpose.

*Mueller v. Daugherty Sys.*, No. 1:18-cv-3358-MLB, 2021 U.S. Dist. LEXIS 163044, at *19-20

(N.D. Ga. June 14, 2021). Similarly, courts within this circuit have recognized that "[a]

departure from typical adjudicatory or procedural norms might be so perplexing that it supports

an inference of gender bias." *Doe v. Coastal Carolina Univ.*, No. 4:18-cv-268-SAL, 2021 U.S.

Dist. LEXIS 82292, at *7 (D.S.C. Mar. 8, 2021) (citing *Doe v. University of Purdue*, 928 F.3d

652, 669 (7th Cir. 2019); *Menaker v. Hofstra University*, 935 F.3d 20 (2d Cir. 2019)).

Here, the above facts demonstrate many ways in which the investigation was a "sham"

marred by "departure[s] from typical adjudicatory or procedural norms," which are the fault of

the Defender and thus serve as evidence of discriminatory purpose. The Defender's egregious

interference with an impartial investigation includes, but is not limited to, these examples:

- Interference with FEOO's duties based on false allegations about Plaintiff: As the "shocking" "Disturbing Incident" email demonstrates, the Defender fabricated an allegation about Plaintiff and thereby improperly influenced Fourth Circuit officials (that the FEOO was "interfering" on Plaintiff's behalf because she was Plaintiff's "friend"). *Supra,* ¶¶ 99e–99i.

- Defender's appointment of the Investigator: Despite his involvement in the allegations and the EDR Coordinator's suggestion that he "recuse" himself, the Defender appointed

416

the EDR Investigator. Unsurprisingly, the Investigator did not investigate Plaintiff's claims against the Defender, and her "follow-up" investigation of Plaintiff's retaliation claims was a sham. *Supra*, ¶¶ 99a–99d.

- Defender's coordination on testimony with the accused harasser: The Defender repeatedly violated Plaintiff's confidentiality rights under the EDR Plan by discussing her complaint with the accused harasser and coordinating their testimony. This coordination of testimony, which even included asking the First Assistant to provide his "timeline" of events, undermined the reliability and fundamental fairness of the investigation. *Supra*, ¶¶ 158d, 282a; *see also id.* ¶ 234h.

- Potential *ex parte* communications: The record reveals that the investigation report's findings were prematurely shared with the First Assistant, likely through a "private conversation" with the Defender or else by being shown the report by the Investigator. These *ex parte* communications further undermined the integrity of the investigation. *Supra*, ¶¶ 234b–g.

- Participation in decisions regarding disciplinary action: The Defender was the final decisionmaker regarding discipline against the First Assistant, even though the Defender himself was disciplined regarding the same allegations. The Defender's participation as the final decisionmaker in the investigation departs from basic standards of fairness in investigations, which hold that the accused party should not have any supervisory authority over the investigation. *See supra*, ¶ 312d. Indeed, the Defender stated that he provided only "verbal counseling" to the First Assistant because in his "opinion," the conduct Plaintiff reported "was not sexual harassment" and "did not require disciplinary

417

action." *Id.* The Defender's dismissive attitude towards Plaintiff's complaint, and the investigation's findings, starkly contrast with well-accepted practices for potential "quid-pro-quo sexual harassment, which, for most employers, is a particularly egregious form of sexual harassment that would demand serious discipline, up to and including termination." *Supra* ¶ 235e (testimony of Ms. Thomas).

      **3.**      **In addition to deliberate indifference to sexual harassment, Plaintiff was subjected to related sex discrimination and retaliation, which is also actionable as an equal protection violation.**

The Fourth Circuit has held that "continued sexual harassment and adverse treatment of a female employee unlike the treatment accorded male employees remains actionable as a violation of the Equal Protection Clause even when the sex discrimination and harassment continue after, and partially in response to, the female employee's report of prior discrimination and harassment." *Wilcox v. Lyons*, 970 F.3d 452, 461 (4th Cir. 2020). Such continued sex discrimination and retaliation "implicates the basic equal protection right to be free from sex discrimination that is not substantially related to important governmental objectives." *Id.* Thus, where a superior's "discriminatory conduct continued," and an employee is subjected to "a mixture of retaliation and continued sexual harassment," such conduct violates equal protection by "maintain[ing] and reinforc[ing] the hostile work environment that [the harassing supervisor] had created." *Beardsley v. Webb*, 30 F.3d 524, 530 (4th Cir. 1994). When there is a "mixture" of sexual harassment and continued sex discrimination and retaliation, the factfinder should consider the continued sex discrimination and retaliation in addition to the harassment. *Id.*

Here, the facts make clear that Plaintiff was subjected to continued sex discrimination and retaliation by her male supervisors at the FDO, including the Defender. In addition to the

numerous adverse actions already discussed—diminishment of job duties, demotion to "pure R&W" beneath another research and writing attorney, denial of promotion, and indefinite telework even though office space was available—the evidence further demonstrates that, within weeks after Plaintiff left the FDO, a male research and writing attorney, who was also converted to an assistant federal defender position, was given a promotion equivalent to a grade and a step on the JSP scale "in less than the standard 52 weeks." *Supra*, ¶ 312g (statement from Administrative Officer that "we wish to perform a pay adjustment from $134,379.00 to 147,816.90" for Mr. Martin "in less than the standard 52 weeks"). As a result, this male attorney was making approximately $40,000 more than Plaintiff despite having substantially the same job duties. *Id.* By contrast, Plaintiff was not considered for a grade-level promotion based on her years of service and excellent work performance even though she was eligible. Plaintiff and the male attorney were reclassified at the same time, and by Defendants' own admission, the "usual" grade level promotion should have occurred at that time. *See id.* ("Due to the reclassification the usual Grade and Step pay changes did not occur.").

This evidence conclusively rebuts Defendants' unsupported contentions that Plaintiff was treated no differently than the male research and writing attorney and that his treatment shows she was somehow "ineligible" for a grade and step level promotion. ECF No. 254, at 11–12. To the contrary, the male attorney was provided precisely the promotion that Plaintiff was denied, and in less than the standard 52 weeks ordinarily needed to establish eligibility for a grade-level promotion. Thus, Defendants' assertions are contradicted by their own documentary evidence. This evidence further demonstrates that Defendants' failure to promote Plaintiff was both discriminatory and retaliatory, that the First Assistant's *quid pro quo* harassment was ratified and

419

facilitated through denial of the grade-level promotion, and that Defendants' attempts to assert

non-discriminatory reasons for the promotion denial are false and blatantly pretextual.

Moreover, in addition to the denial of promotion, Plaintiff was subjected to a continuing series of

adverse actions, culminating in six months of telework with no meaningful action on her

complaints—a career-ending step—that forced her to resign.

**B.**     **Defendants violated Plaintiff's due process rights.**

The Fourth Circuit held that judiciary employees have a property interest in the

protections granted by the EDR Plan. *Strickland*, 32 F.4th at 348–52. The Plan affords judiciary

employees "substantive rights" to be free from discrimination, harassment, and retaliation, and it

"creates a clear and specific set of procedures that are to be followed in the event that an

employee claims that his or her substantive rights afforded under the EDR Plan have been

violated." *Id.* at 349–50.

The Fourth Circuit explained that the EDR Plan affords employees both "substantive"

and "procedural" rights, including the following analysis:

> A review of the EDR Plan clearly supports Strickland's arguments
> [that the Plan creates a property interest]. To begin with, the EDR
> Plan repeatedly refers to "rights enumerated under the Plan." Aplt.
> App., Vol. II at 661. For example, § 1 ("Preamble") of Chapter 1
> ("GENERAL PROVISIONS") states, in pertinent part: "This Plan .
> . . is intended to be the exclusive remedy of the employee relating to
> the rights enumerated under the Plan." Id. (emphasis added). In turn,
> Chapter II of the EDR Plan, titled "EQUAL EMPLOYMENT
> OPPORTUNITY AND ANTI-DISCRIMINATION RIGHTS,"
> purports to outline the rights that the EDR Plan affords to employees
> falling within the scope of the Plan's coverage (which includes, as
> relevant here, "[t]he unit executive and staff of the . . . Federal Public
> Defenders within the Fourth Circuit"). Id. at 661, 662. Section 1 of
> Chapter II, titled "General," states:

Discrimination against employees based on race, color, religion, sex (including pregnancy and sexual harassment), national origin, age (at least 40 years of age at the time of the alleged discrimination), and disability is prohibited. Harassment against an employee based upon any of these protected categories or retaliation for engaging in any protected activity is prohibited. All of the above constitute "wrongful conduct." The rights and protections of Sections I through VII of the Plan shall also apply to employees.

*Id.* at 662. Section 4 of Chapter II, titled "Personnel Practices," in turn provides:

A. Recruitment

Each Court unit will seek qualified applicants who reflect the make-up of all such persons in the relevant labor market. Each unit will publicize all vacancies.

B. Hiring

Each Court unit will make its hiring decisions strictly upon an evaluation of a person's qualifications and ability to perform the duties of the position satisfactorily. Hiring decisions shall be made without regard to race, color, religion, sex, national origin, age, or disability.

C. Promotion

Each Court unit will promote employees according to their experience, training, and demonstrated ability to perform duties of a higher level. Promotion decisions shall be made without regard to race, color, religion, sex, national origin, age, or disability.

D. Advancement

Each Court unit will seek insofar as reasonably practicable to improve the skills and abilities of its employees through cross-training, job restructuring, assignments, details, and outside training.

*Id.* at 662-63.

Chapter X of the EDR Plan is titled "DISPUTE RESOLUTION PROCEDURES." *Id.* at 664. Section 1 thereof outlines the "General

421

Procedure for Consideration of Alleged Violations," and begins by stating: "An employee who claims a denial of the rights granted under Chapters II through VIII of this Plan shall seek resolution of such claims through the procedures of this Chapter." *Id.* (emphasis added). Section 5 of Chapter X affords "[c]laimants under th[e] Plan . . . the right to be free from retaliation because of filing a claim pursuant to th[e] Plan." *Id.* at 665. Section 12 of Chapter X, titled "Remedies," states, in pertinent part, that "[w]here judicial officers acting pursuant to § 10 or § 11 of this Plan find that a substantive right protected by this Plan has been violated, they may order a necessary and appropriate remedy." *Id.* at 669.

The plain language of these provisions, in our view, indicates that the Fourth Circuit intended for the EDR Plan to afford its employees (including employees of each of the Fourth Circuit units listed in the Plan, which encompasses all of the federal defenders' offices) both substantive and procedural rights. As noted, the Plan (a) repeatedly and expressly refers to "rights" that are being afforded by the Plan to employees, (b) specifically outlines what those rights are, and (c) outlines a detailed set of procedures for employees to follow if they believe that any of the substantive rights afforded to them under the Plan have been violated. It is important to note that the Plan does not afford employees a substantive right to continued employment. Instead, the Plan effectively affords employees with the substantive right to work under conditions free from discrimination and harassment, as well as the substantive right to be free from retaliation in the event that they file a claim under the EDR Plan. The Plan also creates a clear and specific set of procedures that are to be followed in the event that an employee claims that his or her substantive rights afforded under the EDR Plan have been violated.

*Id.* at 348-50. The Fourth Circuit thus explained that the EDR Plan confers "substantive rights to be free from workplace discrimination and, in turn, to be protected by the procedures outlined in the EDR Plan, which is the right to a remedy for injuries from workplace discrimination." *Id.* at 350. "The EDR Plan provides Strickland, in part, a right to redress injuries caused by workplace discrimination, a right that is functionally equivalent to a cause of action and one that is vitally important considering the lack of alternative means of seeking relief for employees of the federal judiciary." *Id.* at 351. "A claimant has more than an abstract desire or interest in redressing his

422

grievance: his right to redress is guaranteed by the [judiciary]." *Id.* (*quoting Logan v.*

*Zimmerman Brush Co.*, 455 U.S. 422, 431 (1982)).

The Fourth Circuit held that Plaintiff could proceed with as an-applied challenge to the

Plan "because the refusal to disqualify the [Federal Public Defender] from the investigation and

the alleged coercing of Strickland to end the investigation stated a plausible violation of her due

process rights. The refusal to disqualify the FPD created a conflict of interest that infected the

entire investigation when Strickland was led to believe that the FPD would be the final

decisionmaker in the case." *Id.* at 355. Thus, "Strickland's due process rights were violated if

she can prove that the FPD, an accused party, was not disqualified from the EDR process, and if

Strickland was led to believe that the FPD would be the final decisionmaker in her case." *Id.* at

356. "Under these circumstances, a reasonable factfinder could conclude that continuing with

the EDR process would be futile and that Strickland had reason to believe that the more suitable

alternative was to drop her complaint and accept the Fourth Circuit clerkship. Such findings

would lead to the conclusion that Strickland was deprived, without due process, of her property

right to a remedy for the injuries that she allegedly suffered from harassment by the First

Assistant and from retaliation by the FPD." *Id.*

The undisputed facts establish that Plaintiff's due process rights were violated: Plaintiff

clearly was coerced to end the investigation and led to believe the Defender was a final

decisionmaker. Moreover, when the Fourth Circuit allowed Plaintiff's due process claim to

proceed, it had no way of knowing the severity of the Defender's conflicts of interest—including

that he had engaged in conduct warranting disciplinary action and the Investigator found he was

"biased" against Plaintiff and "could cause more damage if he were involved in the process at

this point"—which effectively sabotaged Plaintiff's rights under the EDR Plan. These egregious conflicts of interest, standing alone, are sufficient to conclude that Defendants deprived Plaintiff of a fundamentally fair process and thus violated her due process rights. *See Doe v. Rector & Visitors of George Mason Univ.*, 149 F. Supp. 3d 602, 621 (E.D. Va. 2016) (an "accumulation" of "failures to comply" with internal policies violates due process).

### 1. Defendants refused to disqualify the accused Defender.

Defendants refused to disqualify the Defender from the EDR process even though he was "involved in [the] dispute" as an accused party. *Strickland*, 32 F.4th at 355 (the EDR Plan "accounts for potential conflicts of interest by permitting a party . . . to 'seek disqualification of a judicial officer, employee or other person involved in a dispute'"). Defendants confirmed in their discovery responses, declarations, and deposition testimony that the Defender was not disqualified. *See supra,* ¶ 237a ("Defendants admit that Plaintiff's request for disqualification of the Federal Defender was denied."); Decl. James Ishida, ECF No. 78-4, ¶ 18 ("The Chief Judge denied Plaintiff's request to disqualify . . . . ."). In fact, the Chief Judge's testified that he denied the disqualification request because "the purpose of an EDR" is "to resolve matters" and in his view, "the 'bad acts' aspect of it was the alleged sexual harassment," and Defender Martinez "was not that person."[19] *Supra,* ¶ 237b. The Chief Judge further explained that "all these things were grievance-type things, like pay, job duties, who you'll report to, where you would work, all

_____

[19] In an interrogatory response dated May 8, 2023, Defendants asserted that the denial was "without prejudice to consider whether disqualification might be appropriate at a later date in the proceedings." Tr. Ex. 10, at 19–20 (ECF No. 248-4, at 19). Any such ruling, however, was never communicated to Plaintiff. *See supra* ¶ 237 ("[Chief Judge] informed me that he intends to deny your request to disqualify Tony Martinez. We are preparing an order to that effect."); *see also* Tr. Ex. 18, at 19 (ECF No. 255-2, at 19) (Chief Judge's testimony that the EDR Coordinator was "authorized to communicate this information" to Plaintiff on his behalf).

424

of those things like that. That's the very essence of the idea of what a dispute is, and Mr. Martinez is the fulcrum there." *Id.*

There was ample basis to disqualify the Defender, who was "involved in" the dispute as a party accused of wrongful conduct. EDR Plan, Ch. X, § 7; *Strickland*, 311 F.4th at 355 ("The refusal to disqualify the FPD created a conflict of interest . . . ."). An investigation into Plaintiff's allegations determined that the Defender had engaged in conduct warranting discipline, and the Defender was subsequently disciplined for wrongful conduct under Chapter IX of the EDR Plan by the Chief Judge. *Supra*, ¶ 312e. Moreover, the Investigator recommended that the Defender be disqualified because he was "biased" against Plaintiff and "could cause more damage if he were involved in the process at this point." *Id.* ¶ 235h.

The Defender's participation as an accused party concretely undermined the fairness of Plaintiff's EDR process. The Defender admitted that he never believed Plaintiff's allegations of sexual harassment, and he thus prejudged the EDR investigation. *Supra*, ¶¶ 157f, 312d. The Defender also relayed false allegations that impugned Plaintiff's integrity to the Fourth Circuit. These false allegations were "concerning" because "having these falsehoods presented to [the Chief Judge and EDR Coordinator] could interfere with decisions they made in the future," including by "undermining [Plaintiff's] legitimacy and credibility." *Supra*, ¶ 99i. Moreover, the Defender had sole decision-making authority over personnel actions affecting Plaintiff during mandatory counseling and mediation, which collectively lasted more than six months. *Supra*, ¶¶ 237–273e; *id.* ¶ 312c. The Defender exercised "discretionary" authority over discipline of the First Assistant, even though the Defender himself was also disciplined. *Id.* ¶ 312d.

### 2. Plaintiff was led to believe that the Defender was the final decisionmaker.

Plaintiff also was "led to believe that the FPD would be the final decisionmaker in her case." *Strickland*, 32 F.4th at 356. Specifically, the Mediator told Plaintiff that a hearing officer would not "micromanage" the Defender or "tell him how to do his job." *Supra*, ¶ 257c. The Judicial Integrity Officer testified that she was uncertain how EDR remedies could be enforced against the FDO, because defenders "are different than the unit executive in the court which is clearly governed by, supervised by, and works at the pleasure of the chief judge and the judges on that court." *Id.* ¶ 278b. This testimony corroborates Plaintiff's allegation that the JIO told her that "Article III judges do not have authority to 'manage' a federal defender office," an issue which she described as "jurisdictional." Complaint ¶ 439.

Indeed, the statement of the Fourth Circuit's Chief Circuit Mediator that "I don't think a judge is going to micromanage this office and tell a federal defender how to do his job and run this office" because "[t]hey'd be better off terminating him," by itself, is sufficient to reach the conclusion that Plaintiff was led to believe the Defender would be the final decisionmaker. *Supra*, ¶ 257c. As the Chief Circuit Mediator for the Fourth Circuit, the Mediator was the only individual who had personal knowledge of what a presiding officer within the Fourth Circuit likely would do in a final hearing. Like the Defender, the Mediator was also a unit executive, meaning that "[n]obody knows how my office operates but me." *Id.* ¶ 257f. Based on this knowledge, the Mediator informed Plaintiff that a hearing officer would not "micromanage this office," and Plaintiff had no choice but to accept the situation because "you lose a few rights when you become a federal employee." *Id.* ¶¶ 257h, 258. In fact, the Mediator believed there was not even "a remedy" under the EDR Plan because "[n]one of these are going to do anything

426

in this particular case." *Id.* ¶ 257d.  Specifically, delaying the investigation and disciplinary action foreclosed the one "remedy" that may "fit." *Id.* ¶ 257h.  Thus, the Mediator was forced to resort to a resolution outside "the confines" of the Plan.  *Id.* ¶ 257d.

The Mediator made these comments during a conversation with Plaintiff and her representative about "what's the point in having a hearing officer" when "this all seems like a sham" and "a kangaroo court." *Supra*, ¶ 257c.  The Mediator confirmed these concerns by stating, "I have talked to people in Washington about my frustration with this whole process" in that "I'm just totally frustrated" and "can't do anything." *Id.*; *see also id.* ¶ 257d (Mediator's testimony that "there really wasn't a remedy" under the EDR Plan because "[n]one of these are going to do anything in this particular case").  Plaintiff's representative then stated, "[Defender Martinez] is well aware of this dynamic, that he won't get micromanaged" and "the hearing officer can't do anything because they're not going to micromanage the office." *Id.* ¶ 257c.  The Mediator responded: "You're right . . . .  Look, I'm not disagreeing with you all." *Id.*  These comments culminated in a discussion about whether Plaintiff should proceed to the final hearing merely to obtain "the admission that [the hearing officer] can't do anything," with the Mediator responding, "[t]hey're not going to say it that way." *Id.*  Later, Plaintiff asked the Mediator: "[Y]ou know the situation about remedy.  What can even legally be ordered against a federal defender's office?"  He responded: "I understand exactly what you're saying" and "the remedy part . . . is a big problem here." *Id.* ¶ 291a.

The record confirms that the goal of the Mediator's statements was to "convince [Plaintiff] to withdraw her EDR complaint" instead of continuing to a final hearing.  *Supra*, ¶ 292b.  His statements were especially effective in "convinc[ing]" Plaintiff because they were

427

made during mediation, the last phase of the EDR process before Plaintiff could proceed to a final hearing. *See id.* Moreover, the record reveals that other judiciary officials broadly shared the goal of convincing Plaintiff to resign. After the Mediator managed to "convince" Plaintiff to accept the Fourth Circuit clerkship, *id.*, the Defender stated that he was "thrilled" that Plaintiff was transferring and the Mediator "must be able to walk on water." *Id.* ¶ 292a. The Mediator told the EDR Coordinator: "I hope when this is all over you will have some much deserved and long lasting goodwill from the AO and Jim Duff." *Id.* The EDR Coordinator responded: "Having lived with this case for what seems like years, I can't tell you how relieved and delighted I am with the news," which he described as "a result that everyone is thrilled with" and "a monumental accomplishment." *Id.* He told the Mediator, "You've certainly earned the Circuit's thanks and appreciation for an outstanding job in settling this difficult case." *Id.* A few days later, when Plaintiff withdrew her EDR complaint, the EDR Coordinator sent the Mediator an email: "Congratulations!" *Id.*

Judiciary officials' relief and delight that Plaintiff had withdrawn her complaint and resigned employment in the district extended to the EDR Investigator, who stated that Plaintiff "***would have been a true pain in you know what :)***" if she had accepted a *pro se* law clerk position for the district's judges. *Id.* ¶ 292c. Similarly, the district's former Clerk of Court, Frank Johns, proclaimed, "***YEA! That one is off the chess board!***" *Id.*; *see id.* (Mr. Johns had recommended the Investigator). This universally celebratory reaction confirms that judiciary officials convinced Plaintiff to resign and withdraw her EDR complaint, which they viewed as a "monumental accomplishment" worthy of "congratulations," instead of providing remedies that would allow her to work safely at the FDO.

428

During this litigation, Defendants attempted to diminish the significance of this coercive conduct by contending that the Mediator "is not an expert on [the] EDR process" and so Plaintiff should not have viewed his statements as "authoritative." ECF No. 249, at 4. But Defendants presented the Mediator as both an expert and authoritative during the EDR process. During their first phone conversation, the EDR Coordinator suggested that Plaintiff work with the Mediator because he "is outstanding, I've used him in other instances and he's done a fantastic job." *Id.* ¶ 257e. Later, the EDR Coordinator suggested the "unusual step" of involving the Mediator during the counseling period to "bring into focus where the parties . . . stand." *Id.* The EDR Coordinator stressed that it was unlikely that the investigation would be completed, or the disqualification issue decided, before the counseling period concluded. *Id.* Further, the Chief Judge had expressed concern "about why is this taking so long" and felt that waiting for the investigation report "would just prolong this whole process." *Id.* Thus, mediation was viewed as a way to "get this moving along."

The Mediator likewise communicated his expertise and authority to Plaintiff. The Mediator asked Plaintiff for feedback on his forthcoming "presentation at [the] Fourth Circuit EDR Conference" about "talking to EDR Coordinators and what to avoid." *Supra*, ¶ 257g; *see also id.* (Mediator's presentation, "Lessons from a Circuit Mediator"). The Mediator shared his perspective on problems he saw with the EDR process based on his experience. *See, e.g.*, *id.* ¶¶ 257c, 257g, 291a (discussing his "frustration" with "the remedy part" and his belief that counseling and mediation "should be merged to let a mediator come in here earlier"). The Mediator told Plaintiff that he had shared his frustrations with "people in Washington," as well as another chief circuit mediator, who "has the same frustrations I've always had." *See id.* In

response to Plaintiff's statements that the clerkship was a "very nicely package[d] construct[ive] discharge," and that "I have to give up a career that I wanted and over the fact that . . . I was harassed and retaliated against," the Mediator responded that Plaintiff should focus not "on what's wrong with the system but about what is right in this situation," because "they didn't have to do any of this" for her. *Id.* ¶ 291a. The Mediator thus reiterated his view that judiciary officials "didn't have to do" anything to remedy the discrimination Plaintiff suffered, despite the EDR Plan's language otherwise.

Similarly, the Judicial Integrity Officer, Jill Langley, testified that she told Plaintiff she was unsure how remedies could be enforced against the FDO. The JIO stated that Defenders "are different than the unit executive in the court which is clearly governed by, supervised by, and works at the pleasure of the chief judge and the judges on that court." *Supra*, ¶ 278b. Thus, "the mechanics of what does th[e] enforcement [of remedies] mean, what I didn't know was would they have the power to fire a defender for failing to comply with a presiding officer decision." *Id.* ¶ 274c. In a follow-up email, she emphasized: "I'd like to better understand if FPDs are adequately protected by EDR remedies." *Id.* ¶¶ 278a–278b; *see id.* (JIO's testimony that "I did not at that time know enough about the appointment, reappointment and removal of defenders to know what would happen . . . if the defender didn't comply with the presiding judicial officer's remedies at the end of the complaint stage"). The JIO's testimony confirms Plaintiff's allegation that the JIO told her that a hearing officer could not, or would not, "'manage' a federal defender office," an issue which she described as "jurisdictional." Complaint ¶ 439.

In short, multiple authorities, including the Mediator and the JIO, a "national resource" on the EDR Plan—told Plaintiff that remedies under the Plan could not, or would not, be ordered in practice. *Supra*, ¶ 242b, 278c. Based on the statements of the Mediator and JIO, Plaintiff reasonably believed that as a practical matter, an EDR presiding officer would not, or could not, order binding remedies against a federal defender office, regardless of what the EDR Plan stated. Plaintiff's understanding was especially reasonable in the context of contemporaneous debates about the importance of maintaining the independence of federal defender offices relative to the rest of the judicial branch. As Plaintiff testified at her deposition:



Tr. Ex. 23 at 32–33 (ECF No. 336, at 32–33, ECF No. 248-13, at 32–33) (citing 2017 Report of the Ad Hoc Committee to Review the Criminal Justice Act (Apr. 2018), *available at* https://tinyurl.com/mrkvs6ej). As Plaintiff described, at the time of the events alleged in the complaint, the Ad Hoc CJA Committee had recently recommended that the federal defender program be "an autonomous entity, not subject to judicial oversight and approval." *Id.* Soon after, the Judicial Conference approved a separate EDR plan for FDOs due to their "distinct employment relationship and mission." Report of the Proceedings of the JCUS, at 23–24 (Sept. 2021), *available at* https://tinyurl.com/mrymmju6.

431

Indeed, the Defender also confirmed the reasonableness of this understanding when he testified that he did not know whether the Chief Judge could order remedies without his consent, explaining: "I don't think a Court -- a judge would order a defender that you've got to do this without considering whatever needs that defender has." *Supra*, ¶ 278d.  Because Plaintiff reasonably believed that a final hearing officer would not, as a practical matter, order remedies, a reasonable person in Plaintiff's position would believe that "continuing with the EDR process would be futile" and the "more suitable alternative was to drop her complaint and accept the Fourth Circuit clerkship." *Strickland*, 311 F.4th at 356.

### 3.    Plaintiff was coerced to resign.

The Fourth Circuit also held that "the alleged coercing of Strickland to end the investigation stated a plausible violation of her due process rights," and the record establishes this claim. *Strickland*, 32 F.4th at 355.  Fourth Circuit officials deliberately held Plaintiff's wrongful conduct report "in abeyance" and delayed taking disciplinary action until her EDR process was over. *Supra*, ¶ 242a.  Officials did not even begin the process of considering disciplinary action until March 25, 2019, more than two months after the investigation report came out and weeks after Plaintiff resigned. *Id.* ¶ 312a.  By explicitly conditioning any disciplinary action on Plaintiff concluding her EDR process, Defendants pressured her to resign to avoid further delaying accountability for those responsible for sex discrimination. *See id.*

Indeed, the May 28, 2019 Letter of Reprimand supports Plaintiff's due process claim, because it confirms that she was "coerc[ed] . . . to end the investigation." *Strickland*, 32 F.4th at 355.  The date of the counseling letter, May 28, 2019, confirms that Defendants deliberately delayed taking disciplinary action for months after Plaintiff was forced to resign. *Id.* Plaintiff

filed a report of wrongful conduct alleging sexual harassment with the Fourth Circuit on September 10, 2018. *Supra,* ¶ 130. When the investigation concluded more than four months later, on January 11, 2019, Defendants were aware that Plaintiff's harassment allegations had support, as the investigation found that the First Assistant engaged in conduct that "can clearly be inferred to be a quid pro quo request" and that disciplinary action was warranted. *Id.* ¶ 235c. Defendants were also aware that the Defender engaged in wrongful conduct based on the investigation's findings. *See id.* Yet, Defendants did not take disciplinary action until May 2019, more than four months after the investigation concluded, eight months after Plaintiff filed her report of wrongful conduct, and nearly a year after she first raised her allegations. *Supra,* ¶ 312e. The March 25, 2019 Memorandum from the Circuit Executive to the Chief Judge confirms that Defendants did not even begin the process of considering disciplinary action until March 25, 2019, weeks after Plaintiff forcibly resigned on March 15, 2019. *Id.* ¶ 312a.

Moreover, the EDR Coordinator specifically informed Plaintiff that the wrongful conduct investigation would be held "in abeyance" until her EDR process concluded. *See* Complaint ¶ 400; Answer ¶ 400; *supra*, ¶ 242a ("[W]hat we could do is hold the Chapter 9 proceeding in advance [sic] until the Chapter 10 proceeding has been finished."); *id.* ("And so what we've done in the past is we have done what we are contemplating doing here. And that is, you hold the judicial conduct piece of this in advance [sic], and you let the EDR piece just go forward."). The EDR Coordinator's March 25, 2019 Memorandum makes clear that disciplinary action was conditioned on the withdrawal of Plaintiff's EDR complaint, as it characterizes discipline as "[t]he last remaining matter" following the complaint's withdrawal. *Id.* ¶ 312a. By explicitly

conditioning any disciplinary action on Plaintiff concluding her EDR process, Defendants "coerc[ed]" her "to end the investigation" and resign from the FDO. *Strickland*, 32 F.4th at 355.

### 4. The Defender's severe conflicts of interest are sufficient, standing alone, to conclude that Plaintiff's due process rights were violated.

When the Fourth Circuit allowed Plaintiff's due process claim to proceed, it had no way of knowing the severity of the Defender's conflicts of interest, which effectively sabotaged Plaintiff's rights under the EDR Plan. These egregious conflicts of interest, standing alone, are sufficient to conclude that Defendants deprived Plaintiff of a fundamentally fair process and thus violated her due process rights.

An "accumulation" of "failures to comply" with an agency's internal policies can result "in a violation of procedural due process." *Doe v. Rector & Visitors of George Mason Univ.*, 149 F. Supp. 3d 602, 621 (E.D. Va. 2016); *see also Furey v. Temple Univ.*, 884 F. Supp. 2d 223, 259 (E.D. Pa. 2012) ("[T]he accumulation of mistakes at each step of the process and failures to comply with the [internal code] resulted in a violation of procedural due process."). Courts examine the "totality of errors," including "deviations" from required procedure, and whether "the lack of process caused prejudice" to the plaintiff. *Doe*, 149 F. Supp. at 621. "At every stage of the process," due process "require[s] impartiality and a lack of bias by the decision makers and fairness in the conduct of the hearing and review." *Furey*, 884 F. Supp. 2d at 259.

In this case, Chapter X, § 7 of the EDR Plan required disqualification of the Defender because he was "involved" in the complaint as an accused party, as the Fourth Circuit held. *Strickland*, 311 F.4th at 355. Defendants do not dispute that they refused to disqualify the Defender. *Supra,* ¶ 237a. Defendants' refusal to disqualify the Defender not only created an impermissible conflict of interest, but it also led to an "accumulation" of errors that denied

434

Plaintiff her right to "impartiality and a lack of bias" "[a]t every stage." *Doe*, 149 F. Supp. at 621; *Furey*, 884 F. Supp. 2d at 259. Specifically, the Defender had engaged in conduct warranting disciplinary action, and the Investigator found he was "biased" against Plaintiff and "could cause more damage if he were involved in the process at this point." *Supra*, ¶ 235h.

The Defender's bias caused "damage" to Plaintiff and concretely prejudiced her in the EDR process. The Defender had sole decision-making authority over Plaintiff during the mandatory counseling and mediation stages, which he exercised to, *inter alia*, deny her a promotion to Grade 15, diminish her job duties, and refuse a transfer to the appellate unit or to another duty station to separate Plaintiff from her harasser. As Defendants themselves repeatedly emphasized, Plaintiff had no recourse to correct these biased actions because the Defender, the office's representative, was the only person with authority to make these decisions. *See supra*, ¶ 237b (Chief Judge's testimony that the unit executive is the person who "needs to resolve" "grievance-type things, like pay, job duties, who you'll report to, where you would work"); *id.* ¶ 237e (EDR Coordinator's testimony that "as the unit executive of the office, he would have been in the position to . . . see what he could do to address Plaintiff's concerns about, you know, promotion, the work conditions, and so on and so forth").

Moreover, the Defender spread false rumors about Plaintiff that impugned her integrity to the Fourth Circuit. He baselessly insinuated that Plaintiff had manipulated the FEOO to get "whatever it is that she is asking for" because the FEOO was a "friend" of hers. *Supra*, ¶ 99e. These false rumors prejudiced Plaintiff by potentially "interfer[ing] with decisions" the EDR Coordinator and Chief Judge would make in the future and "undermining [Plaintiff's] legitimacy and credibility." *Id.* ¶ 99i; *cf. Furey*, 884 F. Supp. 2d 223, 257 (noting that "*[e]x parte*

435

conversations are a due process violation if 'the integrity of the process and the fairness of the result' is tainted by the communication" (citation omitted)).  Indeed, these false rumors appear to have directly affected the EDR Coordinator's attitude toward Plaintiff.  The EDR Coordinator testified that he was "irritated by the fact that there were all these AO employees weighing in and calling Tony and telling him what he needed to do," which he felt was "inappropriate."  *Supra*, ¶¶ 99j–n.  The EDR Coordinator told Plaintiff that it was not "helpful" for her to have reported her complaints to the AO because "when that happens, . . . the barriers go up, the walls go up, the people are on guard."  *See id.* ¶ 124.  The EDR Coordinator promptly informed the Chief Judge about the FEOO's alleged interference with the EDR investigation, which he described as a "disturbing incident."  *Id.* ¶ 99e.  In contrast, it appears he *never* informed the Chief Judge about his concerns that the First Assistant was "potentially interfering with the investigation" by repeatedly contacting himself and the Investigator about "Caryn's false harassment claims," *id.* ¶¶ 234a–g.

The First Assistant's contacts were especially troubling because he claimed that "[the Investigator] has produced a written recitation of facts sufficient, to my understanding, for a decision-maker to immediately conclude there was no sexual harassment."  *See id.*  Thus, he strongly implied that the investigation's findings were shared with him *ex parte* while the investigation was ongoing.  The record suggests that the First Assistant may, in fact, have been told about the investigation's findings in a "private conversation" with the Defender.  *See supra*, ¶ 234c (Defender counseled First Assistant for "talk[ing] to James Ishida about something that Tony and JP talked about in a private conversation," which was supposed "to remain confidential"); *see also id.* ¶ 234g (First Assistant's February 1, 2019 email stating that "[a]s of

436

this month, it will be . . . four months since I was informally told the investigation had found that no harassment occurred"). The EDR Coordinator never investigated these potential *ex parte* communications, which obviously would have severely impaired the integrity of the investigation. *See id.* ¶ 234f. In fact, the EDR testified that he did not do anything to supervise the investigation because "once she was appointed, then, you know, it was her job to conduct the investigation as she saw fit, and I didn't want to know, and I didn't want to be involved in that process." *Id.* The EDR Coordinator therefore did not know whether the "investigator showed the report's findings or discussed them with an accused party" because he "did not want to know how she conducted her investigation." *Id.*

The Defender's role in the wrongful conduct investigation, despite his bias against Plaintiff and his involvement in her allegations, also prejudiced Plaintiff. Indeed, when the investigation concluded, the Defender made the "discretionary" decision of what discipline to impose on the First Assistant, even though the Defender himself was disciplined based on the same allegations. *Supra*, ¶ 312d. As the EDR Coordinator testified, the Defender's decision regarding discipline was not the "concern" of the Fourth Circuit because "it was Judge Gregory's sense that he did not have the authority to discipline a subordinate in [the Defender's] office." *Id.* ¶ 312c; *id.* ¶ 312a ("[The Chief Judge] cannot decide any disciplinary action against Mr. Davis – that is within the authority of the unit executive."). The record is clear that the Defender's bias against Plaintiff affected his decision-making. The Defender testified that he "always believed" the First Assistant's account; that in his "opinion," the conduct Plaintiff reported "was not sexual harassment"; and that he made his decision based on "the gravity of the conduct," which he believed was "just emails," and "wasn't as serious as any other action that

[the First Assistant] might have taken." *See supra*, ¶ 312d.  The Defender "didn't do any other counseling on any other subject" besides "four emails" from the First Assistant.  *Id.*  In fact, the Defender believed that the First Assistant's conduct "did not require any disciplinary action," despite the investigation's findings.  *Id.*

The Defender's involvement in the EDR process, despite his evident "bias" against Plaintiff, caused "damage" by effectively preventing her from receiving a meaningful remedy under the EDR Plan, regardless of the outcome of a final hearing.  The accumulation of errors caused by the Defender's involvement deprived Plaintiff of her right to "impartiality and a lack of bias" at "every stage of the process."  *Furey*, 884 F. Supp. 2d at 259.  The EDR administrative record thus confirms that the EDR process was both discriminatory and fundamentally unfair.

### C.    Plaintiff was constructively discharged because of the violations of her equal protection and due process rights.

The Fourth Circuit held that if Plaintiff proved the facts supporting her due process claim, "a reasonable factfinder could conclude that continuing with the EDR process would be futile and that Strickland had reason to believe that the more suitable alternative was to drop her complaint and accept the Fourth Circuit clerkship."  *Strickland*, 311 F.4th at 356.  Similarly, the Fourth Circuit held that her allegations that Defendants "fail[ed] to take immediate and effective action on her complaints" and "fail[ed] to provide her with meaningful review or remedies," both of which led directly to her resignation, supported her equal protection claim.  *Id.* at 360.  Plaintiff has proven both her due process and equal protection claims, and she has therefore proven she was constructively discharged.  *See id.* at 376 (Plaintiff "effectively alleges that defendants' actions knowingly deprived her of meaningful review of her claims of sexual harassment and that these actions ultimately led to her constructive discharge").

438

The inquiry in a constructive discharge claim is whether conditions are "so intolerable that a reasonable person" would feel "compelled to resign." *Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004). A constructive discharge "may be effected through co-worker conduct, unofficial supervisory conduct, or official company acts." *Id.* Here, this standard is amply met by the ongoing harassment and hostile working environment, the adverse employment actions she suffered, the grossly inadequate and biased EDR process, and the lack of meaningful remedies—including judiciary officials' efforts to "convince" her to resign by conveying that no remedies would be ordered in a final hearing. *Supra*, ¶ 292b; *id.* ¶ 292a (EDR Coordinator's statement to Mediator regarding clerkship interview: "There's a medal in this for you if this works."). These ongoing official and unofficial actions establish Plaintiff's constructive discharge and entitlement to front pay. *See Thorsen v. Cmty. Unit Sch. Dist. 300*, 2021 U.S. Dist. LEXIS 85530, *12–15 (N.D. Ill.) (post-*Spreen* case seeking recovery for "substantial loss of pay and future pension benefits" due to employee's "involuntary resignation" "based on coercion").

During this litigation, Defendants have raised several specious contentions to try to defeat the overwhelming evidence of Plaintiff's constructive discharge. First, Defendants oddly contended that Plaintiff's contemporaneous statements that she was "no longer welcome to work in an environment" were not evidence of a constructive discharge. ECF No. 245, at 10. But that is precisely what a constructive discharge means. *See Bryant v. Jones*, 575 F.3d 1281, 1299 (11th Cir. 2009) (employee "was not welcome to continue working" and "had no choice but to resign"). Here, the harassment Plaintiff suffered, the grossly unfair and inadequate EDR process, and the lack of meaningful remedies forced her to resign.

439

Second, Defendants have relied on cases where the discriminatory conduct ceased months before the plaintiff resigned, or the plaintiff voluntarily sought other employment, undermining the evidence of constructive discharge. ECF No. 245, at 11. Those cases are inapposite. The record here shows that the ongoing discriminatory and unfair EDR process, including "defendants' actions [that] knowingly deprived her of meaningful review of her claims of sexual harassment," forced her to resign. *Strickland*, 311 F.4th at 356. Moreover, Plaintiff did not voluntarily seek other employment, but was instead "persuad[ed]" to accept a short-term Fourth Circuit clerkship because she had no alternative. *Supra*, ¶ 312a. The violations of Plaintiff's rights continued, and even accelerated, until the day she resigned, such that "continuing with the EDR process would be futile" and the "more suitable alternative was to drop her complaint and accept the Fourth Circuit clerkship." *Strickland*, 311 F.4th at 356.

Third, Defendants have contended that it was acceptable to place Plaintiff on telework for seven months while her complaint was pending, contrary to standard accepted practices for handling a workplace sexual harassment complaint. Indeed, Defendants even inexplicably contend that the fact that, "[f]or the last seven months of her employment . . . , Plaintiff teleworked and did not see anyone from the office," somehow *undermines* her constructive discharge claim. ECF No. 245, at 10; *but see* ECF No. 268, at 18–19 (this Court's statement that "this remote work business" implemented by the Defender was a "career-ending step"). But Defendants ignore that Plaintiff only requested to telework because the Defender rejected her request to transfer duty station. *Supra*, ¶ 85c (explaining that Chief of Defender Services had suggested telework "in the interim until a solution could be worked out because the Defender claimed 'he has no space in Asheville,' and Plaintiff found teleworking 'more favorable than

440

being in the Charlotte office' with the First Assistant"); *see also id.* ¶ 85d (FEOO's testimony that "looking back on this, I recall being a little skeptical that there was no office space in Asheville"). Plaintiff was "fine" with telework "in the interim" insofar as it was only means to get away from her harasser, which the Defender otherwise would not allow. *See id.*

Fourth, Defendants have pointed to text messages from Plaintiff attempting to stay optimistic and expressing her frustration with the EDR process. Those statements—made after a year of inaction and stonewalling—in no way diminish her claims that she was harassed, discriminated against, and ultimately constructively discharged. Rather, Plaintiff's attempt to stay optimistic by "transition[ing] up," and her expression of frustration that "[i]t's a due process violation – how can I have a title vii protection with no remedies?" and "[t]he federal defenders are not accountable," establish that her feelings of anger and betrayal were genuine. *See* ECF No. 249-22 (Defendants' summary judgment filing). Those feelings were also justified. Before these events, Plaintiff was a "rising star" in the judiciary, having clerked for multiple federal judges and served as a Supreme Court Fellow. *Supra* ¶ 72g. As her "credentials" and "work ethic" show, Plaintiff is a person of integrity who was "well-respected" not only "in the district where she worked," "but also by the AO people that she had come in contact with as a U.S. Supreme Court Fellow." *Id.* But after Plaintiff reported a legitimate complaint of harassment, she was discriminated against and treated unfairly. Her reputation was tarnished, and she was unjustly coerced to resign and lose her chosen career as a federal public defender.

## II. Plaintiff is entitled to front pay as an equitable remedy.

The Fourth Circuit held that Plaintiff's request for front pay in lieu of reinstatement "constitute[s] an equitable remedy." *Strickland*, 32 F.4th at 366. This holding accords with

441

longstanding precedent recognizing that "[a]lthough reinstatement of a wrongfully discharged employee is preferable, 'in appropriate circumstances, a district court may award front pay in lieu of reinstatement.'" *Id.* (quoting *Hunter v. Town of Mocksville*, 897 F.3d 538, 562 (4th Cir. 2018)); *see also Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001) ("In cases in which reinstatement is not viable because of continuing hostility between the plaintiff and the employer or its workers, . . . courts have ordered front pay as a substitute for reinstatement.").

The record is replete with evidence that Plaintiff viewed her position at the Federal Public Defender office as her dream job and intended to stay there for the remainder of her career. This conclusion is confirmed by the fact that Plaintiff is continuing to pursue indigent criminal defense five years after the events alleged in the Complaint and ten years after her law school graduation. Plaintiff has pursued her "next best employment" in indigent criminal defense, but there is no other position that would offer compensation comparable to what she received at the FDO. *Avitia v. Metro. Club of Chicago, Inc.*, 49 F.3d 1219, 1231 (7th Cir. 1995). Plaintiff's lost earnings expert, Dr. Gary Albrecht, calculated the lifetime economic impact of her discontinued employment with the FDO based on the value of her lost wages and benefits. *Supra*, at 328–364.

Dr. Albrecht concluded that based on the lifetime economic impact of her discontinued employment with the FDO, the "amount required to make Ms. Strickland whole is $3,386,161." Tr. Ex. 105, at 1. The substantial loss of wages and benefits is confirmed by Defendants' own evidence. Defendants' front pay expert, Dr. Paul F. White, concluded that even if Plaintiff were to obtain a private sector position by January 1, 2024 earning the salary she would have received at the FDO, she would still suffer $375,004 in lost earnings *based on the loss of her federal pension alone*. *See* Tr. Ex. A (ECF No. 250-1). In other words, Plaintiff has suffered hundreds

442

of thousands of dollars in lost pension benefits before her lost wages are even considered. *See id.* Of course, it is exceedingly unlikely that Plaintiff will obtain another position in indigent criminal defense making the salary she would have earned at the FDO. Recognizing this possibility, Defendants' expert evaluates another scenario where it takes Plaintiff six years to fully mitigate her lost earnings, resulting in lost earnings of $692,881. *See id.* This scenario, which still underestimates her lost earnings, confirms her ongoing losses. Moreover, it also sets a floor of what is reasonable as a front pay award in this case. Because Defendants' own front pay expert agrees that a six-year award of lost earnings, with an additional award of lost pension benefits, is a reasonable "alternative scenario," this Court should rely on Defendants' expert and award at least six years of front pay, plus lost pension benefits.

Moreover, even if this Court does not accept Dr. Albrecht's deposition designation, "the absence of expert testimony does not prevent a jury from rendering an award for prospective earnings." *Cole v. Del. Tech. & Cmty. Coll.*, 459 F. Supp. 2d 296, 310 (D. Del. 2006). When a plaintiff's evidence in favor of a front pay award is not "speculative or unreasonable," a factfinder is capable of calculating a front pay award without the benefit of expert testimony. *Middlebrooks v. Teva Pharm. USA, Inc.*, No. 17-412, 2019 U.S. Dist. LEXIS 17609, at *55 (E.D. Pa. Feb. 4, 2019). "Due to the 'speculative nature of future damages,' a '[p]laintiff must merely prove his damages sufficiently to exclude unreasonable speculation.'" *Id.* (citation omitted). "[T]he risks associated with any remaining speculation in awarding front pay are upon the employer, because those risks 'must be borne by the wrongdoer, not the victim.'" *Id.* In fact, various circuits have explicitly "decline[d] to adopt an absolute rule mandating the presentation of expert testimony in every instance in determining future pay." *Halstead v. Res-Care, Inc.*,

No. 3:18-0586, 2019 U.S. Dist. LEXIS 126479, at *2 (S.D. W. Va. July 30, 2019); *see. e.g.*, *Maxfield v. Sinclair Int'l,* 766 F.2d 788, 797 (3d Cir. 1985) ("Nor do we believe that expert testimony was needed to reduce the damage award to present value."); *Bonura v. Sea Land Serv., Inc.*, 505 F.2d 665, 668-69 (5th Cir. 1974) (explaining that actuarial and mathematical evidence are not prerequisites for recovery of lost future wages); *Pa. R.R. Co. v. McKinley*, 288 F.2d 262, 265 (6th Cir. 1961); *Heater v. Chesapeake & Ohio Ry. Co.*, 497 F.2d 1243, 1250 (7th Cir. 1974); *Duncan v. St. Louis-San Francisco Ry. Co.*, 480 F.2d 79, 87 (8th Cir. 1973); *Cassino v. Reichhold Chem.*, 817 F.2d 1338, 1348 (9th Cir. 1987). As the First Circuit has explained, in relatively uncomplicated cases involving front pay for gender or age discrimination, expert testimony may be unnecessary because judges "are routinely called upon to make front pay calculations and are presumed to be more knowledgeable about necessary reductions to present day value and how to make them." *Franchina v. City of Providence*, 881 F.3d 32, 60 (1st Cir. 2018). Accordingly, while Dr. Albrecht's testimony is useful to the Court as factfinder, the "issue of front pay in this case is simply not so complicated that an expert is necessary." *Halstead,* 2019 U.S. Dist. LEXIS 126479, at *3. That is particularly true because Plaintiff's requested front pay award is based exclusively on publicly available government data, information, and reports that do not require any specialized knowledge of an expert. *Supra*, at 327–333 (basis for Plaintiff's lost earnings).

In their filings, Defendants have indicated that they intend to raise a defense of "failure to mitigate" even though the Court denied that defense as untimely. This Court granted Plaintiff's motion to strike all of Defendants' affirmative defenses and denied Defendants' motion for leave to amend their Answer to assert an affirmative defense of failure to mitigate. *See* Entry Order

Dated September 21, 2022 (order striking Defendants' affirmative defenses); ECF No. 206 (order denying motion to assert affirmative defense of failure to mitigate losses); ECF No. 210 (Defendants' First Amended Answer with no affirmative defenses); ECF No. 259, at 99 (Parties' Joint Pretrial Statement) ("Any requested amendments to the pleadings. None."). Defendants are therefore barred from presenting any evidence relating to an affirmative defense that they did not raise in their pleadings. *See Jones-El v. Godert*, No. 2:18 CV 65 JMB, 2021 WL 633760, at *2 (E.D. Mo. Feb. 18, 2021) ("[A]s with other affirmative defenses, failure to plead mitigation of damages as an affirmative defense results in a waiver of that defense and its exclusion from the case . . . ."). Plaintiff preserves her objection raised in her motions *in limine*.

In any event, Plaintiff plainly has mitigated her damages by continuing to pursue her chosen field of indigent criminal defense to the best of her ability. "[T]he defense of a wilful loss of earnings . . . is an affirmative defense and it is the employer's responsibility to carry that burden." *Lundy Packing Co. v. NLRB*, 856 F.2d 627, 629 (4th Cir. 1988); *see also Cavalier Hotel Corporation*, 48 F.3d 1343, 1358 (4th Cir. 1995) ("defendant [must] come[] forward with evidence that the plaintiff did not exert reasonable efforts to mitigate her damages"). In accordance with this principle, courts recognize that "'the defendants bear the burden of proof' in demonstrating [a] plaintiff's failure to mitigate." *Westmoreland v. TWC Admin. LLC*, No. 5:16-cv-24, 2018 U.S. Dist. LEXIS 68882, at *14 (W.D.N.C. Apr. 24, 2018) (quoting *Wagner v. Dillard Dept. Stores, Inc.*, 17 Fed. Appx. 141, 153 (4th Cir. 2001)). The inquiry regarding failure to mitigate is whether the plaintiff was "reasonably diligent in seeking and accepting new employment substantially equivalent to that from which [s]he was discharged." *Id.* (quoting *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1273 (4th Cir. 1985)). A plaintiff "need not

445

go into another line of work, accept a demotion, or take a demeaning position." *Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219, 231 (1982). Instead, "the burden regarding mitigation requires the defendant to prove that substantially equivalent work was available and that the employee did not use reasonable diligence to obtain it." *Crump v. United States Dept. Navy*, 205 F. Supp. 3d 730, 745 (E.D. Va. 2016). "[A]n employee is not required to go to heroic lengths in attempting to mitigate his damages, but only to take reasonable steps to do so." *Moore v. Univ. of Notre Dame*, 22 F. Supp. 2d 896, 906 (N.D. Ind. 1998). "Furthermore, a claimant has no obligation to accept lesser employment … or relocate to a new community." *Id.* at 906–07. The guiding question is whether the plaintiff has reasonably attempted to obtain "comparable employment," even if the plaintiff is unsuccessful in offsetting lost earnings. *Id.*

In a prior filing, Plaintiff has explained the unique hurdles she faces in pursuing comparable employment in her chosen field:

> Defendants have not articulated what employment they believe Plaintiff should have pursued in her chosen field that would offer compensation comparable to what she would have received at the Federal Public Defender office. Indigent criminal defense is a highly specialized workforce for individuals, like Plaintiff, who demonstrate a commitment to this type of work. Outside of the Federal Public Defender office, there are no comparably compensated opportunities in this field. State public defenders are not highly compensated, and North Carolina, like many states, relies heavily on court-appointed attorneys to represent indigent criminal defendants. *See* Off. of Indigent Def. Servs., N.C. Gen. Assembly, Ann. Rep. of the Comm. on Indigent Def. Servs., July 1, 2020 – June 30, 2021 (2022), https://webservices.ncleg.gov/ViewDocSiteFile/24319. Thus, it is not unusual for attorneys, like Plaintiff, to make a career consisting of court-appointed indigent criminal defense work.
>
> Defendants previously asserted that Plaintiff could pursue "certain private sector lawyer jobs," which they did not identify. ECF No. 176, at 5. But there is no "private sector" work in the indigent

446

criminal defense field, by definition, because such work requires an appointment by the court. Moreover, Plaintiff would have significant difficulty practicing in federal court in North Carolina. The ethics department of the North Carolina Bar has advised that because she brought a legal complaint against the Fourth Circuit as her former employer, she cannot appear before the Fourth Circuit unless "all the parties and the court" — including the U.S. Attorney's Office and Defendant the Fourth Circuit — consent. Ex. C. Defendants' assertion, that Plaintiff's continued efforts to pursue comparable work in her chosen field based on the opportunities available to her is a "failure to mitigate," is unreasonable and fails on its face.

ECF No. 204, at 5–6.

In short, Defendants have not even *attempted* to explain what comparable employment existed that Plaintiff allegedly should have pursued. Defendants cannot establish a failure to mitigate defense without meeting this threshold requirement. *See, e.g.*, *Fresquez v. BNSF Ry. Co.*, 421 F. Supp. 3d 1099, 1112 (D. Colo. 2019) (rejecting failure to mitigate defense because the defendant "failed to establish that there were suitable positions" comparable to the plaintiff's prior employment); *Warren v. Cty. Comm'n of Lawrence Cty.*, 826 F. Supp. 2d 1299, 1314 (N.D. Ala. 2011) (recognizing the "basic point that a longer period of front pay is merited in this case based on the unique and inherent difficulties [the plaintiff] faces in obtaining comparable alternate employment"); *Hunter v. Town of Mocksville*, 201 F. Supp. 3d 750, 760 (M.D.N.C. 2016) (rejecting failure to mitigate defense where employee was unable to obtain "a position comparable to the one he lost").

Defendants' failure to meet this requirement is unsurprising because no comparable employment exists. Defendants have never contested that all opportunities in indigent criminal defense outside of the FDO offer far less compensation than Plaintiff's prior position, and so there is no comparable employment to the job she once held. Instead of recognizing this fact,

447

Defendants apparently are asking this Court to require that Plaintiff abandon her chosen career in indigent criminal defense and become an associate in a big law firm because she was sexually harassed and discriminated against.  That is not a valid defense.  To the contrary, the Supreme Court has expressly recognized that a plaintiff "need not go into another line of work" to mitigate her damages.  *Ford Motor Co.*, 458 U.S at 231.  Nor is Plaintiff's location relevant: the rate for this type of work is identical no matter where she works in the state.  *See* N.C. Office of Indigent Servs., Currently Hourly Assigned Counsel Rates, *available at* https://tinyurl.com/25wdm3hy.

　　For all these reasons, Plaintiff has met the required showing that she is entitled to an equitable remedy in the form of front pay.  Under the circumstances, a substantial front pay award is supported by precedent from virtually every circuit on front pay awards against government entities.  *See, e.g.*, *Warren v. Cnty. Comm'n of Lawrence Cnty.*, Ala., 826 F. Supp. 2d 1299, 1313 (N.D. Ala. 2011) (32 years); *Feldman v. Philadelphia Housing Auth.*, 43 F.3d 823, 832–33, 841 (3d Cir. 1995) (27 years); *Lussier v. Runyon*, 50 F.3d 1103, 1106 (1st Cir. 1995) ("projected 25-year work expectancy"); *Padilla v. Metro-North Commuter RR*, 92 F.3d 117, 126 (2nd Cir. 1996) ("well over 20 years"); *Bates v. Bd. of Educ. of Capital Sch. Dist.*, No. 97-394-SLR, 2000 WL 376405, at *10 (D. Del. Mar. 31, 2000) (17 years); *Newton v. Pennsylvania State Police*, No. CV 18-1639, 2022 WL 874306, at *10 (W.D. Pa. Mar. 24, 2022) (11.8 years); *Gotthardt v. Nat'l Railroad Passenger Corp.*, 191 F.3d 1148, 1156–58 (9th Cir. 1999) (11 years); *Jackson v. City of Cookeville*, 31 F.3d 1354, 1360 (6th Cir. 1994) (11 years); *O'Kell v. Haaland*, 598 F. Supp. 3d 1032, 1051 (E.D. Wash. 2022) (11 years); *Tinsley v. City of Charlotte*, No. 3:16-CV-00656-GCM, 2019 WL 1874044, at *6 (W.D.N.C. Apr. 26, 2019) (9 years).  At a minimum, this Court should consider awarding the "alternative scenario" listed in

448

Defendant's front pay expert's report (Dr. White's report), which is six years front pay plus lost pension benefits. *Supra*, at 365–66. While that amount vastly underestimates Plaintiff's lost earnings, it is inherently reasonable because it was advocated by Defendants' own expert.

## CONCLUSION

This Court should grant judgment in Plaintiff's favor and order an equitable award of front pay.

This the 11th day of December, 2023.

Respectfully Submitted,

*/s/ Cooper Strickland*

Cooper Strickland
P.O. Box 92
Lynn, NC 28750
Tel. (828) 817-3703
cooper.strickland@gmail.com

*Counsel for Plaintiff*

449

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of December, 2023, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Joshua M. Kolsky at Joshua.Kolsky@usdoj.gov

Madeline M. McMahon at madeline.m.mcmahon@usdoj.gov

Danielle Young at Danielle.young2@usdoj.gov

Dorothy Canevari at Dorothy.m.canevari@usdoj.gov

*/s/ Cooper Strickland*
Cooper Strickland
N.C. Bar No. 43242
P.O. Box 92
Lynn, NC 28750
Tel. (828) 817-3703
cooper.strickland@gmail.com