**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
ASHEVILLE DIVISION
CASE NUMBER 1:20CV66

CARYN DEVINS STRICKLAND,      )
                        )
      Plaintiff,             )
                        )
v.                              )
                        )
UNITED STATES OF AMERICA, *et al.*,   )
                        )
      Defendants.            )

**DEFENDANTS' POST-TRIAL PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

Defendants United States of America, *et al.*, respectfully submit the following proposed findings of fact and conclusions of law.

**I.     [PROPOSED] FINDINGS OF FACT**

1.     Plaintiff, Caryn Strickland, graduated from Duke University School of Law in 2013, where she served on the law review and was elected to Order of the Coif. Tr. Ex. 5 at 60[1] (US1302).

2.     After law school, Plaintiff clerked for Chief Justice Paul Reiber of the Vermont Supreme Court from 2013 to 2014. Tr. Ex. 5 at 60 (US1302).

3.     Plaintiff then clerked for Judge James P. Jones of the U.S. District Court for the Western District of Virginia from 2014 to 2015. Tr. Ex. 5 at 60 (US1302).

4.     After that, Plaintiff clerked for Judge Peter W. Hall of the U.S. Court of Appeals for the Second Circuit from 2015 to 2016. Tr. Ex. 5 at 60 (US1302).

---

[1] The pin cites in Defendants' Post-Trial Proposed Findings of Fact and Conclusions of Law reflect the page number of the PDF of the document as opposed to the internal page number of the document.

Case 1:20-cv-00066-WGY   Document 385   Filed 01/02/24   Page 1 of 74

5.      Plaintiff next worked as a Supreme Court Fellow from 2016 to 2017 in the Administrative Office of the U.S. Courts ("AO"). Tr. Ex. 5 at 60 (US1302).

6.      After she completed her fellowship, on August 21, 2017, Plaintiff began her tenure at the Federal Defender's Office ("FDO") for the Western District of North Carolina, Charlotte office, as a Research & Writing ("R&W") Specialist with her pay set as FD14, Step 1, which is equivalent to the same grade and step on General Schedule. *See* Tr. Ex. 179 at 15 (US2885).

7.      Although she had clerked for several years, Plaintiff had no practical experience as a licensed attorney in arguing cases, examining witnesses, or trying cases. *See* Pl. Test., Tr. Day 1.[2]

8.      At the time Plaintiff joined the office, R&W Specialists were developmental trial and appellate support positions, designed for attorneys who did not have substantial litigation experience. Martinez Test., Trial Day 2.

9.      R&W Specialists did not handle their own caseloads but could be assigned as a second chair to an Assistant Federal Public Defender ("AFPD"). *See* Martinez Test., Tr. Day 3.

10.     When Plaintiff joined the FDO, Mr. Martinez asked Mr. Davis to serve as her mentor, so that she could learn the ropes of public defense work. Martinez Test., Trial Day 2.

11.     Plaintiff and Mr. Davis attended four mentoring lunches together, in December 2017, March 2018, April 2018, and on May 18, 2018. Pl. Test., Tr. Day 1; Davis Test., Tr. Day 4. During those lunches, Plaintiff and Mr. Davis discussed work, Plaintiff's caseload, and Plaintiff's career. Pl. Test., Tr. Day 1; Tr. Ex. 156 at 1 (688) (Plaintiff's notes about May 18, 2018 lunch stating that the "conversation was limited to work related topics"). Plaintiff never told Mr. Davis she was not comfortable getting lunch with him. Pl. Test., Tr. Day 1. At the time of the lunches, Plaintiff did not consider them to be sexual harassment. *Id.* While in private practice, Mr. Davis's mentor had taken

---

[2] Because Defendants do not have access to transcripts of the trial testimony, *see* Notice Regarding Tr. Transcripts ECF No. 380, these citations are to the best of Defendants' counsels' notes.

2

him on mentoring lunches, and Mr. Davis felt it was an effective way of showing him that the employer was invested in him. Davis Test., Tr. Day 4.

12.     Plaintiff married her husband in April 2018. Pl. Test., Tr. Day 1. Her husband lived in Tryon, North Carolina, and Plaintiff lived in Charlotte. *Id.* Tryon is closer to Asheville than to Charlotte. *Id.*

13.     Plaintiff had a friendly relationship with Mr. Davis, at least before May 18, 2018. Pl. Test., Tr. Day 1; Davis Test., Tr. Day 4. On March 15, 2018, Plaintiff sent a text message containing a picture of a cat and a bottle of gin to Mr. Davis and the following text: "Can't remember if I sent you a gin pic…" Pl. Test., Tr. Day 1; Tr. Ex. 142 at 12-14 (US2902-US2904). Plaintiff then sent a text message containing a picture of the gin bottle and the following text: "Better one of the bottle." Tr. Ex. 142 at 14 (US2904). Mr. Davis responded in part as follows: "Alright, now we have to throw down for real!" and Plaintiff responded: "Yeah but you need to get a full bottle first :)". *Id.* On April 30, 2018, Plaintiff texted pictures from her wedding to Mr. Davis and Mr. Martinez. Tr. Ex. 176.

14.     Plaintiff and Mr. Davis had drunk alcohol together on numerous occasions before June 2018, including during a work trip to Little Rock, Arkansas in October 2017; after a client reached a plea bargain in January 2018; during FDO happy hours; at a courthouse groundbreaking event; at the FDO retreat; and after Plaintiff examined a witness in court for the first time on May 15, 2018. Pl. Test., Tr. Day 1; Davis Test., Tr. Day 4. On May 15, 2018, Plaintiff, Mr. Davis, and FDO investigator Terra Parrish had lunch after Plaintiff's witness examination. *Id.* After the lunch, Plaintiff suggested getting drinks, and Plaintiff and Mr. Davis did get alcoholic drinks together at an establishment called Stoke. *Id.* It was not unusual for attorneys in the FDO to get drinks together. Pl. Test., Tr. Day 1. Plaintiff had felt comfortable drinking with Mr. Davis. Pl. Test., Tr. Day 1. Plaintiff never told Mr. Davis she was uncomfortable getting drinks with him. *Id.*; Davis Test., Tr. Day 4.

15.     During the mentoring lunch on May 18, 2018, Plaintiff told Mr. Davis about her desire to be on a trial that summer, and she was most focused on the *Dixon* case, a difficult child sexual abuse case in which the client was facing a potential life sentence. Davis Test., Tr. Day 4. Mr. Davis told Plaintiff it was not a good idea for her to become the second chair on *Dixon* because the case was very challenging, the client faced a life sentence if convicted, the first chair was inexperienced, and the office could not defend assigning the office's two most inexperienced attorneys to the case. *Id.*

16.     In the car after lunch on May 18, 2018, Plaintiff told Mr. Davis that she was not happy living in a different city than her husband, that she would probably need to be transferred to the Asheville office of the FDO at some point or else she would have to leave the FDO, and if she could not work in Asheville, she at least wanted a pay raise to Grade 15. Pl. Test., Tr. Day 1; Davis Test., Tr. Day 4; Tr. Ex. 156, at 1-3 (688-690). Mr. Davis told Plaintiff that there were no open positions in Asheville, the office could not guarantee when a position might become open, and that Asheville is a desirable location. Davis Test., Tr. Day 4.

17.     On the way back from lunch on May 18, 2018, Mr. Davis told Plaintiff that this would be the last mentoring lunch except for one around the time of Plaintiff's review. Davis Test., Tr. Day 4. Plaintiff responded by saying "anytime you want to buy me lunch or a drink, I'll take it," or words to that effect. Pl. Test., Tr. Day 1; Davis Test., Tr. Day 4.

18.     After Plaintiff returned to the office in the afternoon of May 18, 2018, Mr. Davis sent Plaintiff an email with the subject "Mas Dinero." Pl. Test., Tr. Day 1; Davis Test., Tr. Day 4. "Mas Dinero" is the Spanish language phrase for "more money." *Id.*

19.     On May 29, 2018, Mr. Davis ran into Plaintiff speaking with another FDO attorney on the street. Davis Test., Tr. Day 4. Plaintiff said she was going for a walk and invited Mr. Davis to go with her. *Id.* They walked together for about 45 minutes, and they discussed the *Dixon* case. *Id.* At

the end of the walk, Mr. Davis told Plaintiff that he believed Mr. Martinez was likely to take her off the *Dixon* case as second chair when Mr. Martinez returned to the office. *Id.*

20.     In the days following the May 29, 2018 conversation between Plaintiff and Mr. Davis, Plaintiff lost interest in a case she was working on with Mr. Davis, and that concerned Mr. Davis. Davis Test., Tr. Day 4. More specifically, on May 31, 2018, Mr. Davis emailed Plaintiff about meeting with a client to inform the client that the court had denied his suppression motion. Davis Test., Tr. Day 4; Tr. Ex. 177, at 3 (US7553); Tr. Ex. 156, at 4 (691). Plaintiff noted that she had a meeting in the *Dixon* case. Tr. Ex. 177, at 3 (US7553). Mr. Davis suggested that Plaintiff could meet with the client on her own, without Mr. Davis. *Id.* (US7552). Mr. Davis was annoyed by what he understood to be Plaintiff's lack of interest in the client. Davis Test., Tr. Day 4; Tr. Ex. 8 at 2 (US5891) (June 6, 2018 notes by Mr. Davis stating that Plaintiff "blew me off completely on seeing Mobley").

21.     On June 1, 2018, Plaintiff emailed Mr. Davis in part: "My apologies, I have been completely absorbed in the Dixon matter. I am doing some more research here and then I was planning on leaving a little early. I am completely mentally and emotionally exhausted." Tr. Ex. 177, at 2 (US7552). Mr. Davis responded in part: "I did notice that you looked pretty unhappy earlier. I hope you feel better. I'm happy to offer a drink and an ear if you need one, though I get the feeling you are not comfortable talking to me about it. Might I suggest Mary Ellen [Coleman]? She's completely separate from all aspects of this and would give you some good perspective." *Id.* Plaintiff replied: "I'm totally fine, we are figuring out a ton of useful information about this case and connecting some dots. It is just intense to read about child molestation all day." *Id.* at 1 (US7551). The reason Mr. Davis referred Plaintiff to Ms. Coleman is because his impression was that Plaintiff did not want to speak with him about the *Dixon* matter after Mr. Davis had told Plaintiff of his concerns about Plaintiff serving as second chair on that case and told her that Mr. Martinez was likely to remove her from the case. Davis Test., Tr. Day 4.

22.      On June 5, 2018, Plaintiff emailed Mr. Davis that she could not attend a Presentence Interview in the *Watt* case because she had to review evidence in the *Dixon* case, claiming it was the "only time everyone was available." Davis Test., Tr. Day 4; Tr. Ex. 5 at 29 (US1271). Mr. Davis was frustrated that Plaintiff had not attempted to meet her obligations in both cases, and it was the second time in a week that Plaintiff seemed to show a lack of interest in a client. Davis Test., Tr. Day 4; Tr. Ex. 8 at 2 (US5891) (June 6, 2018 notes by Mr. Davis stating that Plaintiff has "focused on Dixon to the exclusion of all else," has shown "complete disinterest in other matters [besides Dixon]" and a "[s]hocking lack of concern for Mobley case"); Tr. Ex. 9 at 13 (US5813) (Mr. Davis stating to a colleague that Plaintiff "doesn't FEEL the clients"); *id.* at 28 (US6856) (Mr. Davis noting to colleague that Plaintiff is "working in [her] self interest, not [the client's]"). Mr. Davis considered the presentence interview to be a very important part of the sentencing process because it is the only opportunity to humanize the client for the person creating the presentence report. Davis Test., Tr. Day 4. Mr. Davis soon learned that Plaintiff had not been truthful when she claimed that the time for the *Dixon* evidence review was "only time everyone was available." Davis Test., Tr. Day 4.

23.      On June 6, 2018, Mr. Davis met with Plaintiff and instructed her to attend the presentence interview. Davis Test., Tr. Day 4; Tr. Ex. 156 at 4-5 (691-692) (Plaintiff's notes from June 6 meeting stating that Mr. Davis told Plaintiff the client "is a human being facing the career offender guideline" and that Mr. Davis "was accusing [Plaintiff] of not caring about the clients," to which Plaintiff responded "I'm sorry and I understand"). Plaintiff stated that she would attend the presentence interview. *Id.* However, later that day, Plaintiff sent an email to Mr. Davis stating that she would not attend the presentence interview, in violation of Mr. Davis's instruction. Davis Test., Tr. Day 4; Tr. Ex. 5 at 33 (US1275). Mr. Davis responded and directed Plaintiff to attend. *Id.* Plaintiff did attend the presentence interview on June 7. Davis Test., Tr. Day 4.

6

24.     Because of the issue with the presentence interview, the working relationship between Mr. Davis and Plaintiff remained tense in early to mid-June. Davis Test., Tr. Day 4; Tr. Ex. 8 at 2 (US5891) (June 6 email by Mr. Davis noting that Plaintiff had displayed avoidant behaviors "but this only started after I questioned her place in Dixon"). In the following weeks, the working relationship improved and it moved back to being cordial. Davis Test., Tr. Day 4.

25.     On June 19, 2018, Mr. Davis and Plaintiff exchanged emails about work topics. In one email, Mr. Davis wrote in part: "I'm going to get this filed and get a celebratory drink. You're welcome to join me, but if I recall correctly, you have an appellate brief to write." Davis Test., Tr. Day 4; Tr. Ex. 5 at 35 (US1277).

26.     Prior to June 2018, Mr. Davis had given rides to Plaintiff on between five and ten occasions, typically at Plaintiff's request. Pl. Test., Tr. Day 1; Davis Test., Tr. Day 4.

27.     On June 21, 2018, Plaintiff asked to meet with Mr. Davis at 5:00 pm to discuss work topics. Davis Test., Tr. Day 4. Mr. Davis and Plaintiff met for about one and one-half hours. *Id.* A thunderstorm was blowing in, so Mr. Davis asked Plaintiff if she needed a ride home. *Id.* Plaintiff declined and said she was "tough," and then returned to her office. *Id.* Soon thereafter, as Mr. Davis was preparing to leave, it started to rain heavily. *Id.* Plaintiff's office was an interior office without windows, so Mr. Davis texted her to ask if she was sure she did not want a ride. *Id.* Mr. Davis went down to the lobby and waited for a couple minutes to give Plaintiff an opportunity to see his text message. *Id.* Plaintiff entered the lobby and was no closer than ten yards from Mr. Davis. *Id.* There were 20-30 people in a kickboxing class that looked into the lobby through a glass wall. *Id.* Plaintiff declined Mr. Davis's offer. *Id.*

28.     On June 26, 2018, Mr. Martinez forwarded Mr. Davis an email from Plaintiff declining to work on relatively simple cases (involving supervised release violations and illegal reentry) that had been assigned to her when another attorney left the FDO. Davis Test., Tr. Day 4; Tr. Ex. 165. Mr.

7

Martinez was concerned by Plaintiff's refusal to work on these cases, given that, because she was no longer assigned to be the second chair on the complicated *Dixon* case, he understood she had time to devote to work on new matters. Martinez Test., Tr. Day 3; Tr. Ex. 165 (Mr. Martinez noting that he would not let Plaintiff "pick and choose what cases she's going to work on").

29.     Mr. Davis planned to meet with Plaintiff to discuss stress coping skills. Davis Test., Tr. Day 4. On June 27, 2018, Mr. Davis emailed Plaintiff to schedule the stress coping skills meeting. Tr. Ex. 5 at 47 (US1289). His email stated: "Can we catch up for a little bit some time this week? I think it would be good for us to have another mentoring session. We can do it over lunch, or cut out early one day for a celebratory post-Davis drink, or we can just do it in the office—I think it might be good to have some distance from work, but whatever makes you most comfortable is fine with me. I am free all day tomorrow and Friday; could even do this afternoon after I get out of a debrief. Just let me know what your schedule is like." *Id.*

30.     There were occasions in June 2018 when Plaintiff asked to meet with Mr. Davis about work topics. Pl. Test., Tr. Day 1.

31.     On July 2, 2018, Plaintiff met with Mr. Davis. Davis Test., Tr. Day 4. Mr. Davis started going through the coping skills agenda he had created, but Plaintiff turned the conversation to how Mr. Davis had spoken to Plaintiff about the presentence interview in early June. *Id.* Plaintiff stated that the way Mr. Davis had spoken to her was "unacceptable." *Id.* Plaintiff told Mr. Davis they should have a conversation with Mr. Martinez. *Id.*

32.     On July 2, 2018, Plaintiff had a brief conversation with Mr. Martinez that lasted between five to ten minutes. Martinez Test., Tr. Day 2. Plaintiff told Mr. Martinez that she wanted to put up boundaries with Mr. Davis because she did not like the way he spoke to her when she canceled the presentence interview meeting in early June. Martinez Test., Tr. Day 2.

8

33.     Plaintiff told Mr. Martinez that she planned to talk to Mr. Davis again to inform him that he could not talk to her in the same manner that he used during their disagreement about the presentence interview meeting. Martinez Test., Tr. Day 2; Pl. Test., Tr. Day 1; Tr. Ex. 143 at 1 (744).

34.     Mr. Martinez believed that the issue between Plaintiff and Mr. Davis was a breakdown in workplace communication. Martinez Test., Tr. Day 2.

35.     Plaintiff did not tell Mr. Martinez at the July 2, 2018 meeting that she was alleging that Mr. Davis was sexually harassing her. Martinez Test., Tr. Day 2. Plaintiff did not tell Mr. Martinez about any of the conduct she later alleged was sexual harassment: specifically, the "mas dinero" email, Mr. Davis's June 1, June 19, or June 27 emails, or Mr. Davis's June 21 offer to give Plaintiff a ride home. *Id.*

36.     On July 5, 2018, Mr. Martinez decided to have a meeting with both Plaintiff and Mr. Davis to work out their communication problems. Martinez Test., Tr. Day 2. Both Plaintiff and Mr. Davis took out notepads, and Mr. Martinez asked them to just talk without taking notes so that they would not be defensive. *Id.* Plaintiff told Mr. Martinez that she did not want to have a discussion directly with Mr. Davis. *Id.* Mr. Martinez asked Mr. Davis to leave the room, and he did so. *Id.*

37.     After Mr. Davis left, Plaintiff first asked Mr. Martinez whether Mr. Davis was questioning her performance. Mr. Martinez Test., Tr. Day 2. Mr. Martinez said no, and that both he and Mr. Davis were appreciative of her hard work. *Id.*

38.     Plaintiff told Mr. Martinez that Mr. Davis had offered to give her a ride home one day after a meeting between the two that lasted until after 5 p.m. Martinez Test., Tr. Day 2. Plaintiff told Mr. Martinez that it was raining and she had biked, so Mr. Davis offered to give her a ride home, and she said no. *Id.* When she went down the elevator, Mr. Davis was in the lobby, and he asked her if she was sure she did not need a ride. *Id.* Plaintiff said she was sure, and the two left out of separate exits. *Id.* Plaintiff told Mr. Martinez that this made her feel uncomfortable. *Id.*

39.     Mr. Martinez asked Plaintiff if, by saying she was uncomfortable, did she mean that she believed she was being sexually harassed. Martinez Test., Tr. Day 2. Plaintiff responded that she was not alleging that Mr. Davis was sexually harassing her and asked Mr. Martinez not to raise her issues with Mr. Davis with anyone else. *Id.*; *see also* Pl. Test., Tr. Day 1; Tr. Ex. 143 at 1 (744).

40.     When Mr. Davis came back in the room, Mr. Martinez suggested assigning Plaintiff a new mentor. Martinez Test., Tr. Day 2. Plaintiff agreed, and Mr. Martinez suggested that her new mentor could be Kelly Johnson, another attorney at the FDO. *Id.*

41.     Mr. Martinez asked if Plaintiff was comfortable with being assigned a new mentor and if there was anything else she wanted. Martinez Test., Tr. Day 2. Plaintiff told him she was comfortable with that and indicated there was nothing further that she wanted. Martinez Test., Tr. Day 2.

42.     The July 5, 2018 meeting was the last time Plaintiff met with Mr. Davis. Pl. Test., Tr. Day 1; Davis Test., Tr. Day 4.

43.     On July 9, Plaintiff sent Mr. Martinez a follow-up email about the July 5 meeting. Tr. Ex. 167. Martinez Test., Tr. Day 2. In the email, Plaintiff thanked Mr. Martinez for meeting with her and Mr. Davis and stated that she "wanted to make sure that [she] underst[ood] the next steps moving forward." Tr. Ex. 167 at 1 (US3980). Specifically, Plaintiff stated that it was her "understanding that there [was] no performance issue with my work, but that this is a matter of receiving the right mentoring." *Id.* The email contained no allegations of sexual harassment. *Id.*

44.     Mr. Martinez believed that Plaintiff's primary concerns were her performance and the breakdown in communication between Mr. Davis and Plaintiff. Martinez Test., Tr. Day 2. In Mr. Martinez's experience, it was not unusual for there to be a disagreement between a manager and an employee at Federal Defenders' Offices because they often involve high-stress environments, heavy caseloads, and difficult cases and clients. *Id.* Mr. Martinez viewed his role on July 5 as helping to mediate the disagreement. *Id.*

45.     In July 2018, Plaintiff had a conversation with Appellate Chief Josh Carpenter about Mr. Davis. Carpenter Test., Tr. Day 3. During this conversation, Plaintiff complained about Mr. Davis's management style and said that he was "hard to work with" and would "micromanag[e]" her. *Id.* Plaintiff did not tell Mr. Carpenter that she believed Mr. Davis was sexually harassing her. *Id.* Mr. Carpenter was not surprised because other FDO employees had complained about Mr. Davis's tendency to micromanage. *Id.*

46.     On July 20, 2018, members of FDO management participated in an all-day meeting where many issues were discussed. Martinez Test., Tr. Day 2; Davis Test., Tr. Day 4. During the meeting, Mr. Martinez inadvertently assigned Plaintiff to work on Mr. Davis's trial team and that of Peter Adolph, another trial team leader. *Id.*; Tr. Ex. 173. Jared Martin, the other R&W attorney at the FDO, was assigned to the other two trial teams. Martinez Test., Tr. Day 2; Davis Test., Tr. Day 4.

47.     At the meeting, FDO management also discussed converting the R&Ws to AFPDs. Tr Ex. 173. Several managers—including Mr. Martinez and Mr. Carpenter—had been advised by Todd Watson, an official in the Defender Services Office ("DSO"), that it would advantage the FDO's case weight measurement to convert their R&Ws to AFPDs. *Id.*; *see also* Martinez Test., Tr. Day 3. Before 2016, FDOs were given a certain number of AFPD slots based on their case load, but they could increase their head count by classifying additional attorneys as R&Ws. Carpenter Test., Tr. Day 3. After 2016, AFPDs and R&Ws counted equally for budgetary purposes, so there no longer was any benefit to the individual office to classify attorneys as R&Ws. *Id.* The FDO determined that it was in its best interest to reclassify their R&Ws as AFPDs because the AD pay scale, used by all AFPDs, has a higher maximum earnings potential and faster acceleration through the pay scale than the pay scale R&Ws used. *Id.*

48.     Prior to the conversion of R&Ws to AFPDs, the duties of AFPDs included overseeing their own cases and filing their own motions. Martinez Test., Tr. Day 3. R&Ws were not permitted to sign their own motions or handle their own cases. *Id.*

49.     On July 22, 2018, Mr. Davis emailed Plaintiff to set up a meeting to discuss the research and writing role on his trial team. Tr. Ex. 178.

50.     A few days after the July 20, 2018 management meeting, Mr. Martinez realized he had inadvertently made a mistake in assigning Plaintiff to Mr. Davis's trial team. *See* Martinez Test., Tr. Day 2-3. Although he had not understood Plaintiff to be alleging sexual harassment at that time, he believed it made sense to separate Plaintiff and Mr. Davis until they resolved their breakdown in workplace communication. *Id.* Mr. Martinez promptly called Plaintiff to apologize and to tell her he did not intend to assign her to Mr. Davis's team. *Id.*

51.     After speaking with Plaintiff, Mr. Martinez wanted to ensure Plaintiff felt comfortable, Martinez Test., Tr. Day 3, so on July 24, 2018, Mr. Martinez instructed Mr. Davis "not to email, call or meet with Caryn at all until further notice from me." Tr. Ex. 170.

52.     Mr. Martinez spoke with Mr. Davis later that day and informed him that Plaintiff felt uncomfortable when he offered to give her a ride home on June 21. *See* Martinez Test., Tr. Day 3. Mr. Martinez felt it was necessary to give Mr. Davis context for his instruction that Mr. Davis should not contact Plaintiff. *Id.* Mr. Martinez also told Mr. Davis to ensure that Plaintiff would not work with him going forward. *Id.* Mr. Davis "completely agreed." *Id.*

53.     At the same time, Mr. Martinez temporarily made Mr. Martin, the R&W attorney who had many more years of attorney experience than Plaintiff, the gatekeeper for R&W assignments so that Plaintiff would not inadvertently be assigned to work with Mr. Davis again. *See* Martinez Test., Tr. Day 2-3; Tr. Ex. 168.

12

54. During the relevant time period, Mr. Davis had no involvement in any decisions regarding Plaintiff's pay. Davis Test., Tr. Day 4. Mr. Davis had no authority to change Plaintiff's pay or to promote her. Davis Test., Tr. Day 4; Martinez Test., Tr. Day 3.

55. On July 26, the FDO posted a job vacancy for a position that would have the same duties as Plaintiff and Mr. Martin. Tr. Ex. 168 at 1 (US2786). Even though the FDO advertised this position as an "appellate AFPD," the job duties included supporting both the trial and appellate teams, just like Plaintiff's. Carpenter Test., Tr. Day 3.

56. The job was posted as an AFPD position because the FDO had already decided to reclassify Plaintiff and Mr. Martin, the two existing R&Ws, as AFPDs. Carpenter Test., Tr. Day 3.

57. Plaintiff submitted an application for this position, but there was no need to interview her for the position, since it was identical to the one she already had. Carpenter Test., Tr. Day 3. Mr. Carpenter spoke with Plaintiff and told her that she did not need to apply for the position. *Id.* A female attorney was ultimately selected for the position. *Id.*

58. On August 8, 2018, Mr. Martinez had a brief, two-minute conversation with Cait Clarke, the former Director of Defender Services Operations at the AO. Martinez Test., Tr. Day 3. Ms. Clarke told Mr. Martinez that Plaintiff was still unhappy about the situation with Mr. Davis and suggested that Mr. Martinez meet with Plaintiff about it again. *Id.* Ms. Clarke did not give any specific details about why Plaintiff remained unhappy. *Id.* Ms. Clarke did not tell Mr. Martinez that Plaintiff was alleging sexual harassment. *Id.*

59. On August 9, 2018, Plaintiff met with Mr. Martinez. *See* Martinez Test., Tr. Day 3; Tr. Ex. 150. During the meeting, which Plaintiff secretly recorded, Plaintiff recharacterized her prior denials of any sexual harassment allegations. *See* Tr. Ex. 150 at 33:57-34:35:59. Mr. Martinez expressed confusion that Plaintiff had spoken to someone at the AO about her concerns—prompting the call from Ms. Clarke—because the AO was powerless to make any changes to help Plaintiff feel

13

comfortable. Martinez Test., Tr. Day 3. Mr. Martinez felt frustrated Plaintiff did not address the situation directly with him after July 5, when they last spoke about her issues with Mr. Davis. *Id.* Mr. Martinez never told Plaintiff she could not talk to employees at the AO. *See* Tr. Ex. 150.

60.     At one point during the meeting, Plaintiff discussed the occasion where Mr. Davis had offered her a ride home when it was raining, which she stated made her feel "threatened and uncomfortable." Tr. Ex. 150 at 36:28-36:44. Mr. Martinez attempted to clarify whether Mr. Davis had touched Plaintiff, stating: "But there was no physical contact or anything like that [inaudible]?" Tr. Ex. 150 at 36:44-36:50. Mr. Martinez did not say "at least you weren't touched." Tr. Ex. 150.

61.     During the meeting, Plaintiff made several demands. *See* Martinez Test., Tr. Day 3; Tr. Ex. 150. She demanded that Mr. Martinez remove her from Mr. Davis's chain of command; convert her to an AFPD; grant her teleworking privileges; allow her to work exclusively on appeals; and transfer her to the FDO's Asheville duty station. *See* Martinez Test., Tr. Day 3; Tr. Ex. 150 at 39:40-40:06 (work remotely); 56:21-1:00:50 (removed from chain of command).

62.     Mr. Martinez indicated that he wanted her to feel comfortable and would try to accommodate as many of Plaintiff's demands as possible. Tr. Ex. 150 at 1:02:58-1:04:5 (agreeing to implement changes and look into demands). Mr. Martinez told her that the FDO was already planning to convert both her and Mr. Martin from R&Ws to AFPDs, so she would become an AFPD "ASAP." Martinez Test., Tr. Day 3; Tr. Ex. 150 at 42:47-42:54; 1:02:50-1:04:14. Mr. Martinez told her that he had to check with the Appellate Chief, Josh Carpenter, about whether she could only work on appeals. Martinez Test., Tr. Day 3; Tr. Ex. 150 at 1:02:50-1:04:31. He told her that the Asheville office had no space. Martinez Test., Tr. Day 3; Tr. Ex. 150 at 57:21-58:00. And he told her that he did not think she could telework—the FDO did not have a policy allowing employees to routinely telework—but that he would look into it. Martinez Test., Tr. Day 3; Tr. Ex. 150 at 58:00-1:00:49.

14

63. On August 10, 2018, Plaintiff emailed Mr. Martinez purporting to memorialize their conversation. Tr. Ex. 171. In this email, she stated that they agreed that (1) she would be an AFPD; (2) she would work exclusively in appeals; and (3) she would not be in Mr. Davis's chain of command, nor would he have any supervisory authority over her. *Id.* Plaintiff's email also stated that Mr. Davis was engaging in "sexually harassing and threatening behaviors" and that these steps were "necessary to protect myself from further sexual harassment by the First Assistant." *Id.* She also requested to work remotely moving forward. *Id.*

64. On August 10, 2018, Mr. Martinez responded to Plaintiff's email. Tr. Ex. 172. He stated that he would modify the organizational chart so that she would report to Mr. Carpenter, who would report directly to him, removing her from Mr. Davis's chain of command. *Id.* Mr. Martinez stated that he would be converting Plaintiff to an AFPD once the FDO's Administrative Officer, William Moormann, returned to the office on Monday, August 13. *Id.* Mr. Martinez told Plaintiff that "the conversion will take place as soon as possible." *Id.* Mr. Martinez told Plaintiff that Mr. Carpenter advised him that she could not work exclusively on appeals because Mr. Carpenter envisioned Plaintiff, Mr. Martin, and a new AFPD would all be doing trial support in addition to appellate work. *Id.* And Mr. Martinez stated again that there was no office space in Asheville but he would report back about telework in one week. *Id.*

65. On the next business day, August 13, 2018, Mr. Martinez called James Ishida, the Circuit Executive of the Fourth Circuit and the Fourth Circuit's EDR Coordinator, to notify him about Plaintiff's claim of sexual harassment. Martinez Test., Tr. Day 3; Ishida Test., Tr. Day 2. On August 14, 2018, Mr. Martinez forwarded Plaintiff's August 10, 2018 email to Mr. Ishida. Martinez Test., Tr. Day 3; Tr. Ex. 158 at 2866-67. Mr. Ishida responded to Mr. Martinez, stating that under Chapter IX of the Fourth Circuit's Employment Dispute Resolution Plan ("EDR Plan"), he was required to inform Chief Judge Gregory of the allegations. Tr. Ex. 158 at 2866.

15

66.     Mr. Ishida began to make arrangements to select someone to investigate Plaintiff's claims. Ishida Test., Tr. Day 2. Under Chapter IX of the EDR Plan, Fourth Circuit officials "shall ensure that the allegations in the report are appropriately investigated, either by the human resources manager or other person." Tr. Ex. 136 at 10 (US4545). Mr. Ishida reached out to Frank Johns, the Clerk of Court in the Western District of North Carolina, for a recommendation for an employee in human resources who could serve as investigator. Ishida Test., Tr. Day 2. Mr. Johns recommended Human Resources Specialist Heather Beam. *Id.* Mr. Ishida also cross-referenced the recommendation of Ms. Beam with Kim Llewellyn, who oversaw human resources at the Fourth Circuit. *Id.*

67.     On August 14, Mr. Ishida emailed Lisa Morris, the Chief U.S. Probation Officer in the Western District of North Carolina and Ms. Beam's supervisor, asking if Ms. Beam was available to help gather facts for a "sensitive EDR matter." Tr. Ex. 18 at 3-4 (US617-18). Mr. Ishida stated that he was looking for someone "outside the particular office[.]" *Id.* at 3 (US617). Ms. Morris responded that Ms. Beam was available. *Id.*

68.     Mr. Martinez had no role in selecting Ms. Beam as the investigator. Ishida Test., Tr. Day 2. Mr. Martinez recused himself from any involvement in the investigation because he had already met with both Mr. Davis and Plaintiff and thought it was better that the investigation remained completely separate from the FDO. Martinez Test., Tr. Day 3.

69.     From the time Ms. Beam was appointed as investigator in August 2018, Ms. Beam was reporting to Mr. Ishida, not Mr. Martinez. Martinez Test., Tr. Day 3.

70.     On August 14, 2018, Mr. Ishida forwarded his exchange with Ms. Morris to Mr. Martinez, stating "[s]o now we have Heather Beam." Tr. Ex. 18 at 2 (US616). Mr. Ishida informed Mr. Martinez about the next steps he should take as the Unit Executive under the EDR Plan. *Id.*

71.     Mr. Martinez responded to Mr. Ishida, stating that, "in [his] attempt to insulate" Plaintiff, he created a Research & Writing Unit composed of Plaintiff and Mr. Martin that would

16

report directly to Mr. Carpenter. Tr. Ex. 18 at 1 (US615). Mr. Martinez explained that he had made Mr. Martin the "gatekeeper" for assignments but asked Mr. Ishida for advice as to how to instruct Mr. Martin "not to give [Plaintiff] any work from [Mr. Davis] without raising any eyebrows." *Id.* He also asked for advice about how to inform Mr. Martin and Mr. Carpenter that Plaintiff was working remotely while maintaining confidentiality. *Id.*

72.    Mr. Ishida responded and recommended that Mr. Martinez "advise [Mr. Carpenter] that [Plaintiff] will be teleworking temporarily for the time being" and to "simply ask [Mr. Martin] not to assign any work from [Mr. Davis] to [Plaintiff]." Tr. Ex. 18 at 1 (US615). Mr. Ishida reassured Mr. Martinez that he was "doing a great job" and that his "organizational changes were brilliant." *Id.*

73.    On August 15, 2018, at Mr. Martinez's direction, Mr. Moormann reached out to the Defender Services Office at the AO to request approval to reclassify Plaintiff and Mr. Martin from R&W attorneys to AFPDs. Moormann Test., Tr. Day 4. Tr. Ex. 180 at 1-2 (US3466-67); Tr. Ex. 181; Tr. Ex. 182. On August 16, Tim Lavan, an official at DSO, approved the reclassification requests for both Plaintiff and Mr. Martin. Tr. Ex. 180 at 1 (US3466).

74.    Mr. Martinez's only involvement in Plaintiff's conversion to an AFPD was to ask Mr. Moormann to initiate the process on or before August 15 and to instruct Mr. Moormann to make sure Plaintiff's pay did not decrease. Moormann Test., Tr. Day 4.

75.    Mr. Martinez never directed Mr. Moormann to reduce Plaintiff's pay. Martinez Test., Tr. Day 3.

76.    R&W attorneys are paid on a scale equivalent to the federal General Schedule ("GS"), which is a scale comprised of grades and steps. Under this scale, grade increases are discretionary, and step increases are non-discretionary. Moormann Test., Tr. Day 4. AFPDs, in contrast, are paid according to a pay band system that is calculated based on years of experience as a practicing attorney. Tr. Ex. 5 at 69 (US1311).

17

77.     The conversion to AFPD meant that both Plaintiff and Mr. Martin had a higher earnings potential over the long term, eligibility for faster pay increases, and that they could potentially handle their own cases in the future. Martinez Test., Tr. Day 3.

78.     Mr. Moormann's general practice was to advise Mr. Martinez when an employee was eligible for an increase in Grade or Step on the GS scale. Martinez Test., Tr. Day 3; Moormann Test., Tr. Day 4.

79.     At the time he initiated Plaintiff's conversion to an AFPD, Mr. Martinez had no knowledge about whether Plaintiff was eligible for a salary increase on the GS scale. Martinez Test., Tr. Day 3. Mr. Moormann never told Mr. Martinez about whether Plaintiff was eligible for a promotion to GS-15. Moormann Test., Tr. Day 4.

80.     Plaintiff was making $107,319.00 at the time of her conversion. Pl. Test, Tr. Day 1. Mr. Moormann calculated the pay for which Plaintiff was eligible at the time of her conversion. Martinez Test., Tr. Day 3.

81.     The conversions of Plaintiff and Mr. Martin to AFPD were intended to be "revenue neutral" for the FDO's budget, meaning they were converted at their exact pay rate—no higher, no lower. Moormann Test., Tr. Day 4; Tr. Ex. 180 at 1 (US3466) (Mr. Moormann explaining that the reclassification actions "would be revenue neutral").

82.     When Plaintiff was converted to an AFPD, Mr. Moormann calculated her AD level to be an AD-23 based upon her level of experience. Moormann Test., Tr. Day 4. The maximum salary for AD-23 was $101,038, less than the amount Plaintiff was making. Mr. Martinez asked Mr. Moormann to apply the Red Circle Rule. Martinez Test., Tr. Day 3. The Red Circle Rule allows the Defender to authorize reclassified employees to maintain the same salary, even if that salary is higher than the maximum amount prescribed for their AD level. *Id.* Years after Plaintiff left the FDO, Mr. Moormann realized that he inadvertently miscalculated Plaintiff's years of legal experience, and

Plaintiff may have been eligible to be AD-25. Moormann Test., Tr. Day 4. Because both Plaintiff and Mr. Martin's conversions were intended to be "revenue neutral," or maintained at the same level of pay, it would not have made a difference in her salary whether Plaintiff were classified as AD-23 or AD-25. *Id.*

83.     On August 16, 2018, after receiving approval from DSO, Mr. Moormann submitted "Requests for Personnel Action," or AO 52s, to initiate the reclassifications. Tr. Ex. 183; Moormann Test., Tr. Day 4. Even though Mr. Moormann submitted the "Requests for Personnel Action," on August 16, they had an effective date of August 20 because that was the first date of the next pay period after August 16. Tr. Ex. 183; Moormann Test., Tr. Day 4. It is very typical for an HR action to have an effective date that is after the request date, because HR actions go into effect at the start of the next pay period. Moormann Test., Tr. Day 4.

84.     The "Request for Personnel Action" for Plaintiff that Mr. Moormann submitted on August 16, 2018 showed that Plaintiff's pay would remain at $107,319, the same salary she had before the conversion to AFD. Tr. Ex. 183. The "Request for Personnel Action" showed that Plaintiff's salary had a $14,970 locality adjustment on top of her $92,349 base pay. *Id.*

85.     On August 28, Mr. Moormann was informed that, when he submitted Plaintiff's "Request for Personnel Action" on August 16, he accidentally used the incorrect nature of action code. Moormann Test., Tr. Day 4; Tr. Ex. 184. Accordingly, the reclassification had to be processed manually. Moormann Test., Tr. Day 4. Plaintiff's conversion to AFD was not backdated. *Id.* Rather, it is very common for an HR action, like the conversion, to be processed after the effective date because processing HR actions takes time and the process can be inefficient. *Id.*

86.     Plaintiff's conversion to an AFPD resulted in a "Notification of Personnel Action," or a Standard Form 50 ("SF-50"), with an effective date of August 20. Tr. Ex. 179 at 19 (US2889). This form showed that Plaintiff's pay remained at $107,319. *Id.*

87.    Mr. Martinez never directed Mr. Moormann to backdate Plaintiff's conversion to AFPD. Moormann Test., Tr. Day 4.

88.    Mr. Moormann mistakenly listed Plaintiff as AD Level 28 in the "Remarks" section of the SF-50. Moorman Test., Tr. Day 4; Tr. Ex. 179 at 19 (US2889). At the time, Mr. Moormann thought Plaintiff should have been listed as an AD-23. Moorman Test., Tr. Day 4. To qualify for AD Level 28, at least eight years of professional attorney experience were required. Tr. Ex. 5 at 69 (US1311). Plaintiff had approximately five years of such experience. *Id.* at 60 (US1302).

89.    On the AD pay scale at the time, locality pay was combined with base salary as one lump sum. Moormann Test., Tr. Day 4. Even though Plaintiff's SF-50 lists nothing in the "Locality Adj." box, since Plaintiff was now on the AD scale, her locality adjustment was included in the total amount of pay, as reflected in the "base pay" box on the SF-50. Tr. Ex. 179 at 19 (US2889); *see also* Tr. Ex. 5 at 69 (Bates 1311) (explaining in the notes under the salary chart that, once a location is selected, the chart updates to include the applicable locality pay with the base pay).

90.    On August 17, 2018, Mr. Martinez emailed Plaintiff, copying Mr. Ishida and Ms. Beam. Tr. Ex. 159 at 1-2 (US2546-47). He stated that he already instructed Mr. Moormann to begin the process to convert her to an AFPD. *Id.* at 1 (US2546). Mr. Martinez stated that while he had no problem with Plaintiff working exclusively on appeals, he spoke to Mr. Carpenter, who believed it was not doable because it would leave only one R&W attorney to support nine trial attorneys. *Id.*

91.    Mr. Martinez again told Plaintiff he had changed the organizational chart so that she was removed from Mr. Davis's chain of command and line of supervision. *Id.*; *see also* Tr. Ex. 5 at 22 (US1264) (modified organizational chart).

92.    Mr. Martinez also stated that, based on his obligations under Chapter IX of the EDR Plan, he had informed the EDR Coordinator (Mr. Ishida) of Plaintiff's sexual harassment allegations. Tr. Ex. 159 at 2 (US2547). Mr. Ishida in turn informed then-Chief Judge Gregory. *Id.* Mr. Martinez

told Plaintiff that Mr. Ishida approved Ms. Beam to conduct an investigation into her allegations. *Id.* Finally, Mr. Martinez told Plaintiff he would grant her request to telework during the pendency of the investigation. *Id.*

93. Plaintiff was "fine" with long-term telework and never told Mr. Martinez that she was not happy teleworking. Pl. Test., Tr. Day 1; Tr. Ex. 171 ("A long-term resolution that allows me to work remotely and report to the Appellate Chief in Asheville is fine with me."); Tr. Ex. 148 at 56:09-56:44 (Plaintiff stating in February 2019 that she prefers teleworking and works better on her own).

94. After Mr. Martinez authorized Plaintiff to telework on August 17, she began teleworking in Tryon, NC. Martinez Test., Tr. Day 3. Plaintiff teleworked until she left the FDO in March 2019. *See* Pl. Test., Tr. Day 1; Martinez Test., Tr. Day 3.

95. After she began teleworking, Plaintiff did not see Mr. Davis or Mr. Martinez again. *See* Pl. Test., Tr. Day 1 (admitting she teleworked exclusively beginning in August and had no contact with Mr. Davis of any kind when she resigned in March 2019).

96. When Plaintiff was converted to an AFPD in August 2018, she began working under Mr. Carpenter's supervision until she left the FDO in March 2019. Carpenter Test., Tr. Day 3. Mr. Martinez did not influence the work that Mr. Carpenter assigned to Plaintiff, and Mr. Davis had no role in Plaintiff's job duties. *Id.* Plaintiff's duties remained the same after she was converted to an AFPD, and she performed the same work as the other attorneys in the appellate group supervised by Mr. Carpenter. Carpenter Test., Tr. Day 3; Tr. Ex. 1 at 6 (US505) (there was "no change in job responsibilities"); *see also* Tr. Ex. 32 (emails showing Plaintiff's participation in appellate moots).

97. In January 2019, Mr. Carpenter encouraged Plaintiff to do an appellate argument in the Fourth Circuit. Tr. Ex. 144 at 1-3 (PLTF4356-58). Plaintiff declined that opportunity. *Id.* at 2 (PLTF4357).

21

98.     On August 22, 2018, Plaintiff stated in an email that she was "holding off the complaint" in the EDR process so that she could "make[] Tony and JP think they are still in control and give[] them the opportunity to make further mistakes[.]" Tr. Ex. 149.

99.     Under the Fourth Circuit's EDR Plan, Chapter IX was intended to encourage employees to report instances of misconduct. Tr. Ex. 136 at 10 (US4545); Langley Test., Tr. Day 5. Chapter IX does not provide any employee with any rights or remedies. Tr. Ex. 136 at 10 (US4545); Langley Test., Tr. Day 5.

100.    Chapter X of the EDR Plan is the formal dispute resolution provision and consists of three stages: counseling, mediation, and a formal complaint. Tr. Ex. 136 at 10 (US4545); Langley Test., Tr. Day 5; Ishida Text., Tr. Day 2.

101.    After a formal complaint and a hearing under Chapter X, the presiding judicial officer will order equitable remedies to successful complainants designed to make them whole. Tr. Ex. 136 at 20-21 (US4555-56); Langley Test., Tr. Day 5. Specifically, the Plan states that "remedies may be provided in accordance with § 12 of this Chapter where the presiding judicial officer finds that the complainant has established by a preponderance of the evidence that a substantive right protected by this Plan has been violated[.]" Tr. Ex. 136 at 17-18 (US4552-53). "Where judicial officers acting pursuant to § 10 or § 11 of this Plan find that a substantive right protected by this Plan has been violated, they may order a necessary and appropriate remedy." *Id.* at 20 (US4555); *see also id.* at 20-21 (US4555-56) (listing certain available remedies).

102.    Chapter X, § 4 directs the employing office to protect complaint "allegations filed under this Plan to the extent possible" but recognizes that allegations may need to "be shared on a need-to-know basis." Tr. Ex. 136 at 11 (US4546); Langley Test., Tr. Day 5.

103.     Chapter X, § 7 contains a general disqualification provision, providing that "[a] party may seek disqualification of a judicial officer, employee or other person involved in a dispute by written request to the Chief Judge." Tr. Ex. 136 at 13 (US4548)

104.     On September 10, 2018, Plaintiff emailed Mr. Ishida a Request for Counseling pursuant to Chapter X of the EDR Plan and an "Official Grievance" detailing her allegations. Tr. Ex. 1. Plaintiff accused Mr. Martinez of retaliation for the first time. *Id.* Plaintiff accused Mr. Davis of sexual harassment. *Id.*

105.     On September 10, 2018, Plaintiff emailed Chief Judge Gregory a request to disqualify Mr. Martinez pursuant to Chapter X, § 7 of the EDR Plan. Tr. Ex. 2.

106.     After Plaintiff submitted her request for counseling, Mr. Ishida set up a meeting with her on September 18, 2018 to inform her about the EDR process. Tr. Ex. 160 at 2-4 (US1403-05); Ishida Test., Tr. Day 2. Following that meeting, Plaintiff decided to delay her interview with Ms. Beam. Tr. Ex. 160 at 2 (US1403).

107.     On September 27, 2018, Plaintiff emailed Mr. Ishida, stating that she was comfortable sharing her official grievance with Ms. Beam and "expanding the scope of the investigation to include [her] allegations against" Mr. Martinez. Tr. Ex. 160 at 1-2 (US1402-03). On September 28, 2018, Mr. Ishida responded, copying Ms. Beam, stating that Ms. Beam should proceed with "one, unified investigation" into the "allegation of sexual harassment by JP Davis" and the "alleged, subsequent, related conduct by Anthony Martinez." *Id.* at 1 (US1402).

108.     Throughout her EDR process, Mr. Ishida spoke to Plaintiff too many times to count. Ishida Test., Tr. Day 2. Their conversations primarily involved Mr. Ishida responding to Plaintiff's questions. *Id.*

109.     During the counseling phase, Plaintiff also made at least three extension requests, which were mostly granted. Ishida Test., Tr. Day 2; *see also, e.g.*, Tr. Ex. 20; Tr. Ex. 140.

23

110. In October 2018, Ms. Beam interviewed Mr. Martinez. Martinez Test., Tr. Day 3.

111. Mr. Ishida gave Mr. Martinez updates on the status of the investigation periodically, but Mr. Martinez never discussed the contents of the investigation with Mr. Ishida. Martinez Test., Tr. Day 3. Mr. Ishida told Mr. Martinez when he received a draft of the investigation report, but that he was sending it back to Ms. Beam to provide additional information. *Id.* Mr. Martinez did not speak to anyone else about these status updates. *Id.*

112. Throughout the EDR process, Mr. Ishida thought Mr. Martinez was "conscientious," "diligent," and "acted in good faith." Ishida Test., Tr. Day 2. Mr. Ishida thought Mr. Martinez was "very concerned" about Plaintiff and "wanted to make sure he did the right thing." *Id.*

113. In November 2018, Plaintiff decided she no longer wanted to work in the FDO. Pl. Test., Tr. Day 1. Plaintiff believed she had been constructively discharged because she felt she was no longer welcome in the FDO. *Id.*; Tr. Ex. 145 at 1-2 (US2178-79).

114. Plaintiff also told Laura Minor, her former supervisor at the AO (*see* Pl. Test., Tr. Day 2) that, while she "d[id] not want to seem like an opportunist," she was "thinking about trying to get a fourth circuit clerkship to protect [her] reputation and open [her] career options further." Ex. 155. Plaintiff further elaborated that her "mantra right now is 'transition up, not down' haha." *Id.*

115. On November 21, 2018, Plaintiff informed Mr. Ishida that she "would appreciate the Fourth Circuit's assistance in transitioning [her] out" of the FDO. Tr. Ex. 161 at 2 (US3122).

116. At Plaintiff's request and with her permission, Mr. Ishida inquired about whether the Federal Defender's Office in the Western District of Virginia would be a potential option for Plaintiff and also whether there were any potential clerkship opportunities on the Fourth Circuit. Mr. Ishida Test., Tr. Day 2; Tr. Ex. 27 (email between Mr. Ishida and Plaintiff regarding job search); Tr. Ex. 28 (same).

117.    In January 2019, then-Chief Judge Roger Gregory denied Plaintiff's request to disqualify Mr. Martinez. Tr. Ex. 15 at 1 (US1533); Ex. O at 16:7.[3]

118.    At his deposition, Judge Gregory explained that he denied Plaintiff's request because "there were no facts submitted or proffered that would warrant disqualification of Tony Martinez." Ex. O at 21:4-6.

119.    Judge Gregory elaborated that "the only ground[] that was stated in [Plaintiff's] letter was the fact that" Plaintiff had made an accusation against Mr. Martinez but, Judge Gregory explained, that "party is never neutral because they're defending, obviously, the unit or the appointing authority in it, so that's not enough." Ex. O at 21:12-21.

120.    Judge Gregory noted that "there was no allegation that [Mr. Martinez] was stonewalling, would not meet with her, would not negotiate. There was nothing that he would be a mediator, nothing that he would have any fact-finding or be involved in the investigation or those things." Ex. O at 22:18-22.

121.    On February 7, 2019, Plaintiff discussed the EDR process with mediator Ed Smith. *See* Ex. 148 at 14:06-14:18. Mr. Smith reassured Plaintiff that if her EDR claim was not resolved through mediation, she would be entitled to a hearing in front of a judge. *See* Ex. 148 at 14:06-14:18; 35:01-17. Mr. Smith acknowledged that he did not know the structure of the FDO, or who "polices" the Federal Defender. *See* Ex. 148 at 27:39-28:26. But in that conversation, Plaintiff admitted that she knew the Federal Defender could be removed for cause or for neglect of duty. *See* Ex. 148 at 28:28-28:54.

---

[3]Although Defendants have made objections to specific portions of deposition testimony, Defendants have not otherwise opposed the admission of Plaintiff's deposition designations of fact witnesses. *See* ECF No. 382 at 1. Because the Court has not ruled on these objections and admitted the depositions into evidence, Defendants cite these depositions by their lettered exhibit number.

122.     During the mediation phase of Chapter X, Mr. Martinez offered Plaintiff his own office in Asheville, which he shared with IT support staff and interns. Martinez Test., Tr. Day 2-4. On February 12, 2019, Mr. Smith informed Plaintiff that Mr. Martinez was willing to give her his own office in Asheville because there was no other available office space and that he would use the library or conference room when he needed to come into the Asheville office. Tr. Ex. 152 at 3:09-3:20, 3:48-4:00. Mr. Martinez had not offered the office space sooner because it was not private and, as the Defender, he wanted an office when he traveled to the FDO's Asheville office. Martinez Test., Tr. Day 3.

123.     On February 15, 2019, Plaintiff met with Jill Langley, the Judicial Integrity Officer at the AO. Langley Test., Tr. Day 5.

124.     In that conversation, Ms. Langley informed Plaintiff that if Plaintiff proceeded to file a formal complaint under Chapter X, § 10(A) of the EDR Plan, a presiding judicial officer could order equitable remedies to make her whole. Langley Test., Tr. Day 5.

125.     Plaintiff asked Ms. Langley what would happen if the federal defender refused to comply with a presiding judicial officer's order, and Ms. Langley stated that she did not know what would happen in such a situation. Langley Test., Tr. Day 5.

126.     Ms. Langley neither informed Plaintiff that a presiding judicial officer would or could not order remedies against a Federal Defenders' Office, nor did she say that a presiding judicial officer would have no jurisdiction to enter remedies against a Federal Defenders' Office. Langley Test., Tr. Day 5.

127.     On February 26, 2019, Mr. Smith encouraged Plaintiff to utilize the mediation process because, "in drafting a settlement agreement that binds [Mr. Martinez], you have the better ability to work these things in there, because I don't think the judge is going to micromanage this office and tell a federal defender how to do his job and run his office." Ex. 153 at 42:09-23.

26

128. Also on February 26, 2019, Mr. Smith explained to Plaintiff that Mr. Martinez had "no power" during mediation because Mr. Martinez is "just the unit head and he's negotiating with me and if you removed [him], there's nobody I can talk to, to resolve this, because nobody has authority to" grant her requests. Ex. 153 at 19:58-20:15. When Plaintiff's counsel stated that Mr. Martinez could not be compelled to do anything, Mr. Smith noted Judge Gregory's removal authority and explained that, "if Judge Gregory wanted something done, he could fashion it in such a way." *Id.* at 1:11:10-1:12:00.

129. On March 8, 2019, Mr. Smith reminded Plaintiff in response to her concerns that "Tony does have a boss. It's the chief judge. He can be removed." Ex. 154 at 1:49:34-1:49:39.

130. Plaintiff never sought clarification regarding the difference between what the EDR Plan stated about remedies and what she believed she had been told by Mr. Smith and Ms. Langley. Pl. Test., Tr. Day 1; Langley Test., Tr. Day 5.

131. At Plaintiff's request, Mr. Ishida and Mr. Smith assisted Plaintiff in obtaining a transfer to the Fourth Circuit to serve as a judicial law clerk to Circuit Judge Henry Floyd. Ishida Test., Tr. Day 2; *see generally* Tr. Ex. 153-154.

132. In fact, Mr. Smith accompanied Plaintiff to her interview with Judge Floyd on March 8, 2019. Tr. Ex. 154.

133. While in Judge Floyd's chambers for her interview, Plaintiff or her husband made a secret recording of their meetings with Mr. Smith and Judge Floyd that day. *Id.*

134. Just three days later, on March 11, 2019, Plaintiff informed Mr. Ishida that she had accepted the clerkship with Judge Floyd, stating that she was "honored for this opportunity" and that she "very much appreciate[d] the Fourth Circuit's assistance in helping [her] reach the best possible outcome under the circumstances." Tr. Ex. 162.

27

135.    In that same email, Plaintiff informed Mr. Ishida that she "no longer wish[ed] to pursue the Chapter X portion of [her] EDR claim", which ended the EDR process before it ever reached the formal complaint stage. *Id.*

136.    Mr. Martinez signed off on the paperwork to effectuate Plaintiff's transfer from the FDO to the Fourth Circuit. Martinez Test., Tr. Day 3.

137.    When Plaintiff left the FDO in March, her total salary as an AFPD was $ 109,365.00, which was inclusive of the cost of living and locality pay increase for 2019. *See* Tr. Ex. 179 at 17 (US2887).

138.    Plaintiff's starting salary as a judicial law clerk with Judge Floyd was $108,316.00, which included the cost of living and locality pay increase for 2019. *See id.* at 2 (US2872).

139.    The clerkship with Judge Floyd was a wonderful and happy experience for Plaintiff. Pl. Test., Tr. Day 2.

140.    On May 27, 2019, Plaintiff received a step increase as a judicial law clerk bringing her total salary to $111,810.00, which is $2,445 more per year than she was making as an AFPD. Tr. Ex. 179 at 3 (US2873).

141.    Even though the investigation report contained no finding of retaliation or other wrongful conduct on the part of Mr. Martinez, on May 28, 2019, Mr. Ishida issued a "Letter of Counseling" to Mr. Martinez. Tr. Ex. 7. Mr. Ishida drafted and signed the letter of counseling. *Id.* This letter was not a letter of reprimand or disciplinary action. Ishida Test., Tr. Day 2. A letter of reprimand would be equivalent to a harsh rebuke or censure, while Mr. Martinez's letter of counseling was meant to be corrective rather than punitive. *Id.*

142.    The purpose of the letter of counseling was to advise Mr. Martinez about the findings of the investigation and to inform him about a few well-intended mistakes he made when communicating with Plaintiff during her EDR process. Ishida Test., Tr. Day 2. Mr. Ishida referenced

28

these missteps so that Mr. Martinez could learn from them and not make similar mistakes in the future. Ishida Test., Tr. Day 2.

143.     Mr. Ishida only included the standard for "wrongful conduct" under Chapter IX in the letter because the counseling was pursuant to Chapter IX of the EDR Plan. Ishida Test., Tr. Day 2. The letter contained no finding of wrongful conduct on the part of Mr. Martinez. *Id*.; Tr. Ex. 7.

144.     Mr. Martinez never took any action against Plaintiff because of her gender. Martinez Test., Tr. Day 3.

145.     Even though the investigation report contained no finding of sexual harassment or wrongful conduct on the part of Mr. Davis, Mr. Martinez, as the Unit Executive at the FDO, orally counseled Mr. Davis. Martinez Test., Tr. Day 3. Mr. Martinez counseled Mr. Davis about using professional word choice in email communications. *Id.* Mr. Martinez also counseled Mr. Davis on his inclusion of some profanity in emails, even though the profanity was not directed at any particular individual. *Id.*

146.     As a unit executive, Mr. Martinez understood that he must obey an order from a presiding judicial officer and would have complied with his obligation to do so. Martinez Test., Tr. Day 3.

## II.     [PROPOSED] CONCLUSIONS OF LAW

### A.  Due Process Claim

1.     The Fourth Circuit held that Plaintiff's "due process rights were violated if she can prove that the FPD, an accused party, was not disqualified from the EDR process, and if [Plaintiff] was led to believe that the FPD would be the final decisionmaker in her case." *Strickland v. United States*, 32 F.4th 311, 356 (4th Cir. 2022); *see also Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 172-78 (4th Cir. 1988) (holding that for an employee to establish a procedural due process violation, the employee must show that he "reasonably could have relied" on misrepresentation by Defendants).

29

2.      On December 11, 2023, this Court granted in part Defendants' Motion for Judgment on Partial Findings under Federal Rule of Civil Procedure 52(c), holding that there was no basis to conclude that Plaintiff reasonably believed the final decisionmaker on her EDR claims would be anyone other than an independent judicial officer. Tr. Day 1 (Dec. 11, 2023). As stated, the Fourth Circuit held that Plaintiff must prove that she was "led to believe that the FPD would be the final decisionmaker in the case" to succeed on her due process claim. *Strickland*, 32 F.4th at 355. The Court's holding thus forecloses Plaintiff's due process claim. Nevertheless, even if the Court considers Plaintiff's newly fashioned due process theories—all of which have no basis in the text of the Fourth Circuit's opinion—Plaintiff still cannot show that her due process rights were violated. Accordingly, the Court should enter judgment in favor of Defendants on Plaintiff's due process claim.

### i.   Plaintiff Was Not Reasonably Led to Believe that Mr. Martinez Would Not or Could Not Comply with an Order from a Presiding Judicial Officer.

3.      Plaintiff's first new due process theory is that she was led to believe that a presiding judicial officer would not or could not order remedies against the FDO. But the evidence shows that any belief Plaintiff may have held about whether Mr. Martinez either would not or could not comply with an order was unreasonable. *See Stone*, 855 F.2d at 172-78 (holding that for an employee to establish a deprivation of a protected property interest under a reliance theory, the "reliance must be reasonable under the circumstances").

4.      The EDR Plan itself provides that the presiding judicial officer may order "a necessary and appropriate remedy." Tr. Ex. 136 at 17 (US4555); *see also id.* at 14-15 (US4552-53) ("[R]emedies may be provided in accordance with § 12 of this Chapter"). And the Plan expressly covers staff of "Federal Public Defenders within the Fourth Circuit[.]" *Id.* at 1 (US4539). Plaintiff's argument that a presiding judicial officer "could not" order remedies against the FDO essentially takes issue with the application of the EDR Plan to Federal Defenders' offices in general, but the Fourth Circuit has already upheld the EDR Plan as facially valid. *See Strickland*, 32 F.4th at 354-55.

30

5. Plaintiff knew that a federal defender could be removed for cause or for neglect of duty, as she herself acknowledged to Mr. Smith on February 7, 2019. Tr. Ex. 148 at 28:28-28:54. Then, on February 26, 2019, when Plaintiff's counsel stated that he did not believe Mr. Martinez could not be compelled to do anything, Mr. Smith pointed out Judge Gregory's removal authority and explained Judge Gregory's ability to remediate. *See* Tr. Ex. 153 at 1:11:10-1:12:00 ("[I]f Judge Gregory wanted something done, he could fashion it in such a way."). And, on March 8, 2019, Mr. Smith reiterated to Plaintiff that Mr. Martinez could be removed from office by the Chief Judge. Tr. Ex. 154 at 1:49:34-1:49:39. Any belief held by Plaintiff that Mr. Martinez would not comply with an order from a presiding judicial officer is incongruous with her own knowledge that Mr. Martinez could be terminated for neglect of duty. And there is no evidence that Mr. Martinez would not have complied with an order from a judicial officer. *See* Martinez Test., Tr. Day 3 (Mr. Martinez's testimony that he understood that as a unit executive, he must comply with an order from a judicial officer). Therefore, any such belief by Plaintiff would be unreasonably held. *See Stone*, 855 F.2d at 172-78 (holding that an employee's reliance on the defendant's purported statement that the employee could be summarily discharged from a hospital was unreasonable because the employee was familiar with the employer's bylaws and was thus "certainly aware that members of the medical staff could be removed from their positions only in accordance with the procedures specified in those Bylaws").

6. Moreover, in contrast with Plaintiff's allegations, Ms. Langley never told Plaintiff that a presiding judicial officer would nor or could not order certain remedies. Langley Test., Tr. Day 5. In her conversation with Plaintiff, Ms. Langley told Plaintiff that she was unaware of what would happen if a federal defender failed to comply with an order from a presiding judicial officer. *Id.* Ms. Langley had not considered that question before because she did not have reason to think that someone might refuse to comply with an order of a presiding judicial officer. *Id.* Ms. Langley's professed lack of knowledge was not a representation about the EDR process on which Plaintiff could have relied. *Stone*,

855 F.2d at 172-78. Additionally, Ms. Langley informed Plaintiff that, under the EDR Plan, she could receive equitable relief after filing a formal complaint. Langley Test., Tr. Day 5. As such, Ms. Langley's conversation with Plaintiff could not have led Plaintiff to reasonably believe that a presiding judicial officer would not or could not order remedies against Mr. Martinez.

7.     Similarly, Mr. Smith did not lead Plaintiff to reasonably believe that Mr. Martinez could not or would not comply with a presiding judicial officer's order. During the February 26, 2019 mediation session, Mr. Smith told Plaintiff that she could negotiate more granular remedies in mediation than she might obtain from a judicial officer because Plaintiff had more control over the negotiation and a judge may not want to "micromanage" the office. Tr. Ex. 153 at 42:09-23 ("Therefore I think *in drafting a settlement agreement that binds [Mr. Martinez]*, you have the better ability to work these things in there, because I don't think the judge is going to micromanage this office and tell a federal defender how to do his job and run his office."). As the context for this statement reveals, in using the word "micromanage," Mr. Smith meant that the unit executive has a better ability to offer solutions tailored to the office or to a complainant's specific requests. *See id.*; *see also* Ex. P at 88 4-14. He did not suggest that a presiding judicial officer would not or could not order remedies against Mr. Martinez at a formal hearing. Tr. Ex. 153 at 42:09-23. Additionally, any belief to the contrary formed by Plaintiff from this statement would be unreasonable in light of Defendants' other reassurances. *See* Langley Test., Tr. Day 5 (Ms. Langley's testimony that she informed Plaintiff that a presiding judicial officer could order equitable remedies to make Plaintiff whole); Tr. Ex. 148 at 14:06-14:18; 35:01-17 (Mr. Smith reassuring Plaintiff that if her claim was not resolved through mediation, she would be entitled to a hearing in front of a judge); Tr. Ex. 153 at 19:58-20:15 (Mr. Smith explaining that Mr. Martinez had "no power").

8.     In any event, even if Plaintiff relied on her own misinterpretations of Defendants' statements to conclude that a presiding judicial officer would not or could not order remedies in her

32

case, such reliance would be inherently unreasonable because it is in contravention of the plain text of the plan. The Plan gives the judicial officer the authority to order certain remedies against the employing office—including the Federal Defenders' Office—if he or she concludes that such remedies are warranted. *See* Tr. Ex. 136, Ch. X §§ 10(B)(2)(f), 12(A). And the Plan defines "judicial officer" as "a Circuit Judge (including Senior Circuit Judge) of the United States Court of Appeals for the Fourth Circuit appointed pursuant to Article III of the United States Constitution." *Id.*, Ch. I § 3(D). Plaintiff, an attorney, testified that she "carefully" read the Plan during her EDR process. Pl. Test., Tr. Day 1. Under the Fourth Circuit's decision in *Stone,* it would thus have been unreasonable for Plaintiff, given her training and years of experience as an attorney, to disregard the plain text of the plan and rely instead on her own misinterpretations of Defendants' statements. *Stone*, 855 F.2d at 176 (rejecting surgeon's reliance on defendants' statements as unreasonable because surgeon had over 30 years of experience and should have known that he was entitled to process before termination, noting he admitted that he was familiar with bylaws and that those bylaws provided protections). Moreover, Plaintiff never sought clarification regarding the difference between what the EDR Plan stated and what she believed she had been told by Mr. Smith and Ms. Langley. Pl. Test., Tr. Day 1; Langley Test., Tr. Day 5. Accordingly, even if Plaintiff's due process theory were cognizable under the Fourth Circuit's opinion (it is not), it would nonetheless fail.

### ii. Judge Gregory's Decision Not to Disqualify Mr. Martinez Did Not Violate Plaintiff's Due Process Rights.

9.     Plaintiff next suggests a due process violation based on Judge Gregory's decision not to disqualify Mr. Martinez from the EDR process. That theory, too, is outside the scope of the Fourth Circuit's opinion, but it is meritless in any event. Judge Gregory's decision not to disqualify Mr. Martinez did not "infect[ ] the entire investigation" or deprive Plaintiff of her procedural due process rights. *See Strickland*, 32 F.4th at 355. Rather, Plaintiff's disqualification request failed to list any facts that warranted Mr. Martinez's disqualification and merely stated that Mr. Martinez should be

33

disqualified because she had made an accusation against him. Ex. O at 21:4-6; 21:12-21 (deposition testimony of Judge Gregory). But Mr. Martinez did not serve in a role that was required to be neutral, such as an EDR coordinator, investigator, counselor, mediator, or presiding judicial officer. *Id.* Instead, he served as the unit executive defending the employing office—a role which is "never neutral." *Id.*; *see also* Ishida Test., Tr. Day 2; Langley Test., Tr. Day 5; Tr. Ex. 153 at 19:58-20:15 (Plaintiff's taped conversation with Mr. Smith where Mr. Smith explains that Mr. Martinez is "just the unit head and he's negotiating with me and if you removed [him], there's nobody I can talk to, to resolve this, because nobody has authority to" grant Plaintiff's requests during mediation); *id.* at 20:50-20:56 (Mr. Smith noting that he has "had many complaints where the unit head was the issue and they always handled the mediation"); Tr. Ex. 21 (Ms. Langley's notes from her conversation with Plaintiff stating, "almost all EDR complaints allege that the [unit executive] violated their employment rights and that it was still entirely contemplated that the [unit executive] would act as the head of the Responding Office, just as any defendant to a civil action is the party responsible for acting as the defendant."). And Mr. Martinez participated in the investigation of Plaintiff's claims as only a witness. Martinez Test., Tr. Day 3. Plaintiff was represented by her husband during the EDR process, and yet no one has claimed that he should have been disqualified because he was biased in her favor. Likewise, Mr. Martinez's participation in mediation as the party defending the FDO did not deprive Plaintiff of her procedural rights under the EDR Plan, and thus, Plaintiff's theory fails.

10.     Moreover, the evidence reflects that Mr. Martinez had no bias against Plaintiff and carefully acted to resolve her concerns. Mr. Ishida testified that Mr. Martinez was "conscientious," "diligent," and "acted in good faith" in response to Plaintiff's allegations. Ishida Test., Tr. Day 2. Judge Gregory determined that there was no allegation that Mr. Martinez was "stonewalling, would not meet with [Plaintiff, or] would not negotiate." Ex. O at 22:18-22 (deposition testimony of Judge Gregory). Quite the opposite, Mr. Ishida testified that Mr. Martinez was "very concerned" about Plaintiff and

"wanted to make sure he did the right thing." *Id.* Mr. Martinez merely received periodic updates on the status of the investigation, Martinez Test., Tr. Day 3, and there is no evidence that Mr. Martinez shared any information about the investigation with others.

11.     And even assuming that Mr. Martinez was in some sense biased, the evidence shows that his participation did not "infect [ ] the entire investigation" or create a "futil[ity]" to the EDR process. *See Strickland*, 32 F.4th at 355-56. Any supposed "bias" on Mr. Martinez's part clearly did not translate into any refusal to mediate in good faith. Even before the mediation phase began, Mr. Martinez accommodated as many of Plaintiff's requests as he could, including changing the organizational structure of the FDO to remove Plaintiff from Mr. Davis's chain of command, converting her to an AFPD, and allowing her to work remotely. Martinez Test., Tr. Day 2-3. During the mediation phase of Chapter X, Mr. Martinez offered Plaintiff her requested duty station transfer to Asheville, and even offered her to work from his own office there. Martinez Test., Tr. Day 2-4. Mr. Martinez had a limited role in the EDR process and, as the Unit Executive, he consistently sought to resolve Plaintiff's concerns throughout the EDR proceedings. Therefore, any alleged "bias" did not deprive Plaintiff of any due process rights. *Accord Strickland*, 32 F.4th at 355-56.

### iii.     Plaintiff Was Neither Coerced to End the Investigation Nor to Resign.

12.     Plaintiff also suggests that her due process rights were violated because she allegedly was "coerced to resign." ECF No. 371 at 432. Again, this theory is outside of the bounds of the Fourth Circuit's opinion. But even still, Plaintiff's theory would fail because she was neither coerced to end the investigation nor coerced to resign.

13.     Plaintiff was not coerced to end the investigation into her claims. The investigation into Plaintiff's allegations ended on January 11, 2019 when Ms. Beam emailed her final report to Mr. Ishida. Tr. Ex. 5 at 1 (US2293); *see also* Ishida Test., Tr. Day 2. The investigation proceeded and

concluded in a normal course, and thus, Plaintiff did not decide when the investigation would conclude.

14.     Plaintiff was also not coerced to resign (a phrase that does not appear in the Fourth Circuit's opinion). Plaintiff voluntarily withdrew her EDR claims and left the FDO. Plaintiff requested that the Fourth Circuit transition her out of the FDO as early as November 21, 2018. Tr. Ex. 155; *see also* Ishida Test., Tr. Day 2. During that time, Plaintiff was actively seeking a Fourth Circuit clerkship so she could "transition up, not down." Tr. Ex. 155. Plaintiff then chose to accept a clerkship with Judge Floyd—instead of a reassignment to the FDO's Asheville office, which had been offered to her in mediation—and withdrew her EDR claims. *See* Tr. Ex. 162. She informed Mr. Ishida that she was "honored for this opportunity" and that she "very much appreciate[d] the Fourth Circuit's assistance in helping [her] reach the best possible outcome under the circumstances." Tr. Ex. 162. And that "[g]iven these circumstances, [she] no longer wish to pursue the Chapter X portion of [her] EDR claim." *Id.* She acknowledged that she was "grateful" and "very much appreciate[d]" Defendants' help, and she described her clerkship as the "best possible outcome" to multiple people, *see id.*; Tr. Ex. 187. She also communicated that the "Fourth Circuit was also very supportive of this outcome and is continuing to assist me with other possible opportunities." Tr. Ex. 187 at 1 (US5390). Plaintiff's own words reflect that she was not coerced to withdraw her claims or resign. Rather, she willingly and happily accepted a Fourth Circuit clerkship instead of pursuing her rights under the EDR Plan. Her due process argument is thus meritless.

15.     Plaintiff nevertheless suggests that she was coerced into resigning because she claims that any disciplinary action against Mr. Martinez and Mr. Davis was conditioned on the withdrawal of her claims. ECF No. 371 at 432-435. This argument rests on several faulty premises. At the outset, there is no evidence of any such condition. Mr. Ishida informed Plaintiff that the Chapter IX investigation *could* be held in abeyance while her Chapter X proceedings conclude, to address Plaintiff's

36

concerns about Mr. Martinez receiving the investigation report while the Chapter X proceeding was ongoing. Tr. Ex. 147 at 12:57-13:05, 22:31-22:50. But Mr. Ishida never conditioned disciplinary action on the withdrawal of Plaintiff's Chapter X claims. *See id.* Also, Mr. Martinez and Mr. Davis were neither found to have engaged in wrongful conduct nor subjected to any disciplinary action. *See* Ishida Test., Tr. Day 2. Thus, Defendants' decision to take any disciplinary action (which they decided not to do) could not have been conditioned upon Plaintiff's withdrawal of her claims. *See id.* Furthermore, Plaintiff had no rights under Chapter IX of the EDR Plan, which merely provides a mechanism for anyone to report wrongful conduct. Ishida Test., Tr. Day 2; Langley Test., Tr. Day 5; *see also* Tr. Ex. 136 at 10 (US4545) (Under Chapter IX, "[a] report of wrongful conduct is not the same as initiating or filing a claim under this Plan; thus, employees who wish to file an EDR claim relating to any alleged wrongful conduct . . . must follow the procedures set forth in Chapter X of this Plan"). Therefore, Plaintiff had no right to insist that disciplinary action under Chapter IX be taken at all, much less on any particular timeframe.

16.    At bottom, because there is no basis to conclude that Plaintiff reasonably believed the final decisionmaker on her EDR claims would be anyone other than an independent judicial officer, *see* Dec. 11, 2023 Tr., Plaintiff's due process claim is foreclosed. *See Strickland*, 32 F.4th at 355 (holding that, to prevail on her procedural due process claim, Plaintiff must show, *inter alia*, that she was "led to believe that the FPD would be the final decisionmaker in the case"). But even if considered, Plaintiff's latest due process theories each fail to show that she was deprived, without due process, of rights under the EDR Plan. Instead, the evidence reflects that Plaintiff received counseling and mediation under Chapter X of the EDR Plan and obtained the Fourth Circuit's help in acquiring a federal clerkship. *See* Tr. Ex. 136 at 10, 20 (US 4545, 4555). This process was sufficient to satisfy

constitutional procedural due process standards. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); *see also Strickland*, 32 F.4th at 354-55 (upholding the EDR Plan as facially valid).

**B. Equal Protection Claim**

17.     To prevail on her equal protection claim, the Fourth Circuit held that Plaintiff must meet each of four elements: (1) that she "was subjected to sexual harassment by another employee or supervisor"; (2) that Plaintiff "alerted supervisory officials and/or officials responsible for overseeing the court's EDR plan about the sexual harassment"; (3) that the "supervisory officials and/or officials responsible for overseeing the court's EDR plan responded to the allegations with deliberate indifference"; and (4) that any deliberate indifference "was motivated by a discriminatory intent." *Strickland*, 32 F.4th at 359. To demonstrate that Defendants were deliberately indifferent, Plaintiff must show that she was subjected to "continued sexual harassment and adverse treatment [as] a female employee unlike the treatment accorded male employees . . . after, and partially in response to, [her] report of prior discrimination and harassment[.]" *Id.* at 357.

18.     The Court granted summary judgment on Plaintiff's equal protection claim in favor of all Defendants except Mr. Martinez. July 25, 2023 Mem. & Order at 11, ECF No. 258. Therefore, to succeed on her equal protection claim, Plaintiff must demonstrate, *inter alia*, that *Mr. Martinez* "was motivated by a discriminatory intent." *Strickland*, 32 F.4th at 359.

19.     While Defendants acknowledge that Plaintiff reported the alleged sexual harassment on August 10, 2018, she cannot meet any of the remaining three elements. First, she has not proven that she was sexually harassed by Mr. Davis under either of the two available theories of sexual harassment. Second, she has not proven that the government responded to her allegations of sexual

38

harassment with deliberate indifference. And third, she has not proven that any deliberate indifference on the part of Mr. Martinez was motivated by discriminatory intent.

### i. Mr. Davis Did Not Sexually Harass Plaintiff.

20. There are two ways a plaintiff can prove sexual harassment: a hostile work environment theory and a quid pro quo theory. *See Okoli v. City of Baltimore*, 648 F.3d 216, 222 (4th Cir. 2011).

21. Under the hostile work environment theory, the plaintiff must show four elements: "(1) unwelcome conduct; (2) that is based on the plaintiff's sex[;] (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Id.* at 220 (citation omitted).

22. The conduct that Plaintiff challenges as sexual harassment is the following: a May 18 email regarding Plaintiff's request for an increase in pay; emails offering to get a drink with Plaintiff on June 1, June 19, and June 27; and a ride home offer on June 21. Pl. Test., Tr. Day 1.

23. None of the Mr. Davis's conduct that Plaintiff now claims is sexual harassment was unwelcome at that time. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986) ("inquiry is whether [plaintiff] by her conduct indicated that the alleged sexual advances were unwelcome[]"); *Shan Zhao v. Kaleida Health*, 2007 U.S. Dist. LEXIS 103253, at *8 (W.D.N.Y. Aug. 8, 2007) ("When welcomeness is at issue . . . . [t]riers of fact rely on objective evidence, rather than subjective, uncommunicated feelings") (quotation omitted). As to Mr. Davis's three emails in June 2018 referencing drinks, Plaintiff and Mr. Davis drank alcohol together on several prior occasions, including at least one time at Plaintiff's invitation. Pl. Test., Tr. Day 1; Davis Test., Tr. Day 4. In March 2018, Plaintiff sent Mr. Davis pictures of bottles of gin. Pl. Test., Tr. Day 1; Tr. Ex. 142 at 12-14 (US2902-US2904). Plaintiff never told Mr. Davis that she was not comfortable getting a drink with him. Pl. Test., Tr. Day 1; Davis Test., Tr. Day 4. On the contrary, she told him on May 18, 2018, "anytime you want to buy me lunch

39

or a drink, I'll take it," or words to that effect. *Id.* As to Mr. Davis's offer to give Plaintiff a ride home on June 21, 2018, Mr. Davis had given Plaintiff rides on several prior occasions, typically at Plaintiff's request. Pl. Test., Tr. Day 1; Davis Test., Tr. Day 4. Likewise, Mr. Davis's "Mas Dinero" email was a response to Plaintiff's own statements from hours earlier that she wanted to make more money if she did not quit the FDO. Pl. Test., Tr. Day 1; Davis Test., Tr. Day 4; Tr. Ex. 156, at 1-3 (688-690). Thus, the evidence does not support a finding that Mr. Davis's conduct was unwelcome. *See Kouri v. Liberian Servs., Inc.*, 1991 WL 50003, at *6 (E.D. Va. Feb. 6, 1991), *aff'd sub nom.*, *Kouri v. Todd*, 960 F.2d 146 (4th Cir. 1992) (table) (holding that it was not "unwelcome" when the alleged harasser "paid extremely close attention to the plaintiff by, *inter alia*, peppering her with little notes, escorting her to the bathroom or to her car, and visiting her both at home and in the hospital" because "the plaintiff never made any realistic effort to cut it off" and "in essence, she was sending out mixed signals").

24.     Mr. Davis's conduct was not based on Plaintiff's sex. As Plaintiff testified, it was not unusual for attorneys in the FDO to get drinks together. Pl. Test., Tr. Day 1. Moreover, Mr. Davis's interactions with Plaintiff—offers to get drinks, an offer to provide a ride home, and an email about Plaintiff's request for higher pay—are consistent with his role as Plaintiff's mentor. Moreover, Plaintiff failed to present evidence showing that Mr. Davis treated Plaintiff differently because she is female.

25.     Mr. Davis's conduct was not severe or pervasive. The challenged conduct consists of a small number of incidents over the course of about six weeks: three drink emails, a ride home offer, and an email regarding Plaintiff's request for an increase in pay. All of the incidents fall within the context of the work relationship between Plaintiff and Mr. Davis. None of the conduct was sexual in nature.[4] The conduct involved ordinary workplace interactions and falls far short of the actually

---

[4] Indeed, the three emails in which Mr. Davis offered to get drinks with Plaintiff—each time giving her the option to decline—cannot reasonably be interpreted as sexual advances. On June 1, after Plaintiff told Mr. Davis that she was "completely mentally and emotionally exhausted" from working

offensive conduct that courts routinely find to be *not* severe or pervasive. For example, in *Hopkins v. Baltimore Gas & Electric Co.*, 77 F.3d 745, 753-54 (4th Cir. 1996), abrogated on other grounds by *Bostock v. Clayton Cnty*, 140 S. Ct. 1731 (2020), the Fourth Circuit found a supervisor's conduct towards a subordinate not sufficiently severe or pervasive to constitute actionable sexual harassment even though the supervisor allegedly made repeated sexual innuendos, regularly commented on the plaintiff's appearance, frequently entered the bathroom when the plaintiff was there alone, asked the plaintiff about his sexual activity, held a magnifying glass over the plaintiff's crotch and asked "where is it," and kissed the plaintiff, among other conduct. *Id.* at 747-48. In another case, the Fourth Circuit ruled that a supervisor asking a subordinate if he wanted to get a hotel room at a medical conference and wondering aloud what the subordinate would "taste like" were neither severe nor pervasive. *Pesso v. Montgomery Gen. Hosp.*, 1999 U.S. App. LEXIS 10207, at *5-6 (4th Cir. May 24, 1999).[5]

_____

on a child pornography case, Mr. Davis responded that he was "happy to offer a drink and an ear if you need one," but also suggested that she talk to another female AFPD instead. Tr. Ex. 177, at 2 (US7552). On June 19, Mr. Davis emailed Plaintiff stating that he was going to file a brief and "get a celebratory drink. You're welcome to join me, but if I recall correctly, you have an appellate brief to write." Tr. Ex. 5 at 35 (US1277). Mr. Davis did not think Plaintiff was actually available for a drink. Davis Test., Tr. Day 4. And on June 27, Mr. Davis emailed Plaintiff to schedule a work-related meeting about stress coping skills, stating that they could have the meeting "over lunch, or cut out early one day for a celebratory post-Davis drink, or we can just do it in the office—I think it might be good to have some distance from work, but whatever makes you most comfortable is fine with me." Tr. Ex. 5 at 47 (US1289).

[5] *See also Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998) (harassment claim failed despite allegations that co-worker commented that plaintiff had been voted the "sleekest ass" in the office and had deliberately brushed plaintiff's breasts with papers); *EEOC v. Appalachian Power Co.*, 2019 U.S. Dist. LEXIS 163117, at *16 (W.D. Va. Sep. 24, 2019) (evidence that supervisor gave plaintiff gifts; told her he had a crush on her, loved her, and wanted to leave his wife for her; texted her that he wanted to take her out and treat her like a queen; and fired her was not severe or pervasive because "expressing romantic interest in a coworker or subordinate or asking them out is not enough on its own to establish a Title VII hostile environment claim"); *Akonji v. Unity Healthcare, Inc.*, 517 F. Supp. 2d 83, 97-99 (D.D.C. 2007) (supervisor's acts of touching plaintiff's buttocks and thigh, trying to kiss her, calling her beautiful, and asking her to accompany him on weekend trip were "not 'sufficiently severe or pervasive to alter the conditions of [plaintiff's] employment" (quoting *Harris v. Forklift Sys., Inc.* 510 U.S. 17, 21 (1993))); *Carter v. Greenspan*, 304 F. Supp. 2d 13, 25 (D.D.C. 2004) ("allegations that [co-worker] 'caressed [plaintiff] on his knee,' 'placed her breast on [his] arm,' and 'placed her

26.     Mr. Davis's text messages expressing criticism of Plaintiff also do not constitute harassment that could support a hostile work environment claim. "Mean-spirited or derogatory behavior of which a plaintiff is unaware, and thus never experiences, is not 'harassment' of the plaintiff (severe, pervasive, or other)." *Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1046 (7th Cir. 2000). Similarly, "complaints premised on nothing more than rude treatment by [coworkers], callous behavior by [one's] superiors, or a routine difference of opinion and personality conflict with [one's] supervisor are not actionable under Title VII." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) (alterations in original; internal citations omitted); *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 276 (4th Cir. 2000) (explaining that "[e]ven if [the supervisor] harbored some personal dislike of [the employee] that made [the employee's] job more difficult or stressful, '[a]n employer is not required to like his employees'").

27.     The evidence also fails to show any quid-pro-quo sexual harassment. The key distinction between hostile environment and quid pro quo claims is whether the employee suffered some tangible employment action as a result of the harassment. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 751 (1998). "Cases based on threats which are carried out are referred to often as quid pro quo cases, as distinct from bothersome attentions or sexual remarks that are sufficiently severe or pervasive to create a hostile work environment." *Id.*; *see also Okoli*, 648 F.3d at 222 (listing elements of quid pro quo claim). A plaintiff must prove a causal connection between his or her rejection of unwelcome

---

fingers on [his] buttocks' . . . are not sufficiently severe in quantity or quality to unreasonably interfere with plaintiff's work performance or create a hostile work environment."); *Feliciano v. Alpha Sector, Inc.*, 2002 WL 1492139, at *8 (S.D.N.Y. July 12, 2002) (attempt to hug, in addition to compliments, requests to date, a statement of desire to "lay with" the plaintiff, and a kiss, did not create a hostile working environment); *Gregg v. N.Y. State Dep't of Tax'n & Fin.*, 1999 U.S. Dist. LEXIS 5415, at *35-36 (S.D.N.Y. Apr. 19, 1999) (finding ten to fifteen allegedly inappropriate conversations, four instances of allegedly offensive touching, and repeated invitations to meals and drinks over three to four months not sufficiently severe or pervasive); *Gonzalez v. Kahan*, 1996 WL 705320, at *3 (E.D.N.Y. Nov. 25, 1996) (obscene phone call, a hug, several requests for dates, and a marriage proposal did not establish a hostile work environment).

sexual advances and a tangible employment action. *See Johnson v. Donohoe*, 2013 U.S. Dist. LEXIS 185168, at *18-19 (D.S.C. Nov. 26, 2013).

28. Here, there was no quid-pro-quo offer made to Plaintiff. In particular, Mr. Davis's May 18, 2018 email to Plaintiff with the subject line "mas dinero" did not constitute a quid-pro-quo offer. That email was in response to Plaintiff's statement during their lunch conversation that day that she wanted to receive more money or she would have to quit the FDO. Davis Test., Tr. Day 4. Specifically, earlier that day, Plaintiff told Mr. Davis that she was not happy living in a different city than her husband, that she would probably need to be transferred to the Asheville office of the FDO at some point or else she would have to quit, and if she could not work in Asheville, she at least wanted a pay raise to Grade 15 if she was going to remain an R&W. Pl. Test., Tr. Day 1; Davis Test., Tr. Day 4; Tr. Ex. 156 at 1-3 (US688-690). Mr. Davis's use of the phrase "pay-for-stay" in his "mas dinero" email was a reference to Plaintiff's own request for an increase in pay in order to stay at the FDO. Plaintiff's interpretation of that email as constituting a sexual quid-pro-quo offer is inexplicable and unreasonable. *See Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 28 (3d Cir. 1997) (statement to plaintiff that "if you really like this job and you want to stay here, you better start straightening out and conforming to the rules" did not support a quid-pro-quo claim where the employer "did not suggest, either by word or by action, that sexual favors were the price for keeping [plaintiff's] job"); *Atkins v. Computer Scis. Corp.*, 264 F. Supp. 2d 404, 412 (E.D. Va. 2003) (plaintiff made no showing that the alleged harasser's "request that [the] plaintiff stay and meet with her was in any way sexual in nature"); *Huddleston v. Lumbermens Mut. Cas. Co.*, 942 F. Supp. 504, 509 (D. Kan. 1996) (holding no quid pro quo harassment occurred when, "[o]ther than isolated incidents of inviting plaintiff to socialize outside the workplace and leaning on plaintiff in her office," there was no evidence that the plaintiff's supervisor "demanded that plaintiff accede to granting sexual favors").

43

29.     The quid-pro-quo theory also fails because there is no causal connection between the "Mas Dinero" email and any tangible employment action. Mr. Davis never took, nor did he have authority to take, any tangible employment action against Plaintiff, let alone as retribution for her purported rejection of his supposed sexual advances. *See Reinhold v. Virginia*, 151 F.3d 172, 175 (4th Cir. 1998) (quid-pro-quo harassment requires a "tangible employment action," which is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.") (quoting *Burlington Indus.*, 524 U.S. at 761). "Absent proof of a tangible employment action being taken against her, [Plaintiff] cannot establish the 'quid' in her claim of quid pro quo sexual harassment." *Riffle v. Sports Auth., Inc.*, 1999 U.S. Dist. LEXIS 14588, at *16 (D. Md. July 30, 1999); *see also Williams v. Verizon Wash., DC, Inc.*, 266 F. Supp. 2d 107, 122 (D.D.C. 2003) ("Where there is no evidence to support a connection between the individual who decides on [the alleged adverse action] and the individual who engaged in alleged harassment, there is no actionable claim[.]"); *see also Prince v. Madison Square Garden*, 427 F. Supp. 2d 372, 383 (S.D.N.Y. 2006) (where the plaintiff alleged her termination occurred as retaliation for reporting harassing conduct, it did not constitute a tangible employment action taken for refusing a sexual advance).

30.     Mr. Davis was not involved in the various actions that Plaintiff claims were tangible employment actions. *See Ellis v. Dir., CIA*, 1999 U.S. App. LEXIS 21638, at *8-10 (4th Cir. Sept. 10, 1999) (employment action was not related to plaintiff's denial of sexual advances because the alleged harasser "had no role" in the employment decision). Specifically, Mr. Davis was not involved in decisions regarding Plaintiff's pay. Davis Test., Tr. Day 4; Martinez Test., Tr. Day 3; Moormann Test., Tr. Day 4. Mr. Davis was not involved in decisions regarding Plaintiff's work assignments while she was working in the appellate unit, which was supervised by Appellate Chief Josh Carpenter. Carpenter Test., Tr. Day 3. Mr. Davis was not involved in the selection process for the August 2018 Appellate

AFPD position. *Id.* Also, Mr. Davis had no authority to change Plaintiff's pay or to promote her. Davis Test., Tr. Day 4; Martinez Test., Tr. Day 3; *see Farley v. Am. Cast Iron Pipe Co.*, 115 F.3d 1548, 1552-53 (11th Cir. 1997) (alleged harasser's lack of authority to terminate the plaintiff's employment precluded a quid pro quo claim based on termination); *Atkins*, 264 F. Supp. 2d at 412 (same); *Ecklund v. Fuisz Tech., Ltd.*, 905 F. Supp. 335, 339 (E.D. Va. 1995) (where alleged harasser "was not in a position to grant or withhold job benefits to the plaintiff, a quid pro quo harassment claim cannot be sustained"). Further, any criticism of Plaintiff by Mr. Davis is not a tangible employment action. *See Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 570 (2d Cir. 2011) ("[C]riticism of an employee . . . is not an adverse employment action."); *Jones-Davidson v. Prince George's Cty. Cmty. Coll.*, 2013 U.S. Dist. LEXIS 159422, at *14 (D. Md. Nov. 7, 2013) ("[D]isparaging remarks made by a supervisor do not state an adverse employment action.").

### ii. Plaintiff Reported Her Claim of Sexual Harassment on August 10, 2018.

31.     In Plaintiff's email to Mr. Martinez on August 10, 2018, she alleged, for the first time, that she was being sexually harassed. Tr. Ex. 171. In this email, Plaintiff stated that Mr. Davis was engaging in "sexually harassing and threatening behaviors[.]" *Id.* Before August 10, Plaintiff never told Mr. Martinez that she believed she was being sexually harassed. Pl. Test., Tr. Day 1; Martinez Test., Tr. Day 3.

32.     Plaintiff did not report her allegations of sexual harassment to Mr. Martinez during their brief July 2, 2018 meeting. At that meeting, Plaintiff told Mr. Martinez only that she wanted to set boundaries with Mr. Davis because she did not like the way he spoke to her about the *Dixon* issue. Martinez Test., Tr. Day 2. This does not constitute a report of sexual harassment. In *Cramer v. Bojangles' Restaurants, Inc.*, the court held that a reasonable jury could not find a complaint of "'nasty' comments to [plaintiff] sufficient to put Defendant on notice that Plaintiff was complaining about alleged sexual harassment." 2012 WL 716176, at *12 (N.D. Ga. Feb. 8, 2012), *report and recommendation adopted*, 2012

WL 716028 (N.D. Ga. Mar. 6, 2012). Like the plaintiff in *Cramer*, Plaintiff "never gave any details or specifics" about the conduct she now contends she believed was sexual harassment. *Id.*; *see also Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1300 (11th Cir. 2000) (holding the plaintiff's complaint that harasser's behavior "made [her] sick" without disclosing "the extent or precise nature of [harasser's] behavior" was not sufficient for putting employer on notice of harassment); *DeCecco v. Univ. of S.C.*, 918 F. Supp. 2d 471, 493 (D.S.C. 2013) ("To the extent [plaintiff] gave notice of interpersonal relationship problems, that notice did not even hint at sexual harassment"). The July 2 meeting lasted under ten minutes, and Plaintiff did not inform Mr. Martinez about any of the conduct that she now claims was sexual harassment. Mr. Martinez Test., Tr. Day 2. Mr. Martinez reasonably believed that the issue between Plaintiff and Mr. Davis amounted to a breakdown in communication. Martinez Test., Tr. Day 2.

33.     Plaintiff also did not report her allegations of sexual harassment to Mr. Martinez on July 5, 2018. When Mr. Martinez met with Plaintiff that day, Plaintiff was focused on confirming that Mr. Davis had not questioned her job performance. *Id.*; Tr. Ex. 17 (contemporaneous notes of meeting). In fact, Plaintiff expressly told Mr. Martinez that she was *not* alleging sexual harassment. *Id.*; *see also DeCecco*, 918 F. Supp. 2d at 493 (holding the plaintiff had not put the defendant on notice when the plaintiff "never indicated any concern relating to sexual discrimination, harassment, or a sexually hostile environment"). Plaintiff also did not tell Mr. Martinez about the majority of the conduct she now alleges was sexual harassment—the "mas dinero" email or Mr. Davis's June 1, June 19, or June 27 emails. Mr. Martinez Test., Tr. Day 2. Plaintiff told Mr. Martinez only that it made her uncomfortable when Mr. Davis offered to give her a ride home one day in June and mentioned generally that Mr. Davis asked to meet her after work hours. *Id.* In short, Plaintiff only relayed "a particular incident" and "did not indicate that this incident was part of an on-going pattern of sexually harassing behavior or that she wanted [Mr. Martinez] to take action," so Mr. Martinez "could not have

been expected to take action to address the singular incident" of the June 21 ride offer. *Madray*, 208 F.3d at 1300-01. Indeed, courts routinely hold that when a plaintiff has not reported specifics about alleged inappropriate conduct, the actual notice requirement is not satisfied. *See Wilson v. Gaston Cnty.*, 685 F. App'x 193, 199 (4th Cir. 2017) (finding no actual notice when Plaintiff "generally refused to report what was happening," including disclosure of relevant messages); *Johnson v. Becerra*, 2022 WL 2528430, at *11 (D. Md. July 7, 2022) (finding no actual notice after "failed romantic overture" when Plaintiff was "uninterested in pursuing a complaint"); *see also DeCecco*, 918 F. Supp. 2d at 493 (holding "vague comments" that "suggested *possible* sexual discrimination or harassment" did not provide notice when the plaintiff chose not "to follow up with a formal complaint").

34.     Further, after the July 5 meeting, Plaintiff sent Mr. Martinez an email thanking him for meeting with her and Mr. Davis and stating her understanding that her performance was not at issue and "this [was] a matter of receiving the right mentoring." Tr. Ex. 167 at 1 (US3980). In this email, Plaintiff did not allege or indicate in any way that she was being sexually harassed. *Id.* Plaintiff's own contemporaneous statements thus confirm Mr. Martinez's understanding that the conflict between her and Mr. Davis was a workplace personality conflict and that she was not alleging sexual harassment.

35.     Plaintiff's claim that she reported sexual harassment when, in late July, she told Nancy Dunham, the Fair Employment Practices Officer at the AO, of her allegations is similarly unsupported. Ms. Dunham did not work at the FDO and had no supervisory authority over Plaintiff or the office. *See* Dep. of Nancy Dunham 67:9-14 ("I would not have had the authority to appoint a fact-finder."); Martinez Test., Day 2-3. Ms. Dunham was neither a "supervisory official[] and/or official[] responsible for overseeing the court's EDR plan." *Strickland*, 32 F.4th at 359. Ms. Clarke similarly had no supervisory authority over the FDO. *Cf. DeCecco*, 918 F. Supp. 2d at 492 (holding that the plaintiff had not satisfied the notice requirement when she reported the conduct to a coach who

47

had "at most, limited supervisory responsibility"). And when Ms. Clarke called Mr. Martinez about Plaintiff in early August, Ms. Clarke did not tell him that Plaintiff was alleging sexual harassment, and she did not detail any specific conduct that Plaintiff believed was sexually harassing behavior. Mr. Martinez Test., Tr. Day 3.

### iii. The Evidence Does Not Support a Finding that Mr. Martinez was Deliberately Indifferent.

36. Deliberate indifference is "a very high standard—a showing of mere negligence will not meet it." *Baynard v. Malone*, 268 F.3d 228, 236 (4th Cir. 2001) (citations omitted). "Actions that [are] in hindsight 'unfortunate' or even 'imprudent' will not suffice." *Id.* Similarly, the mere fact that a plaintiff "advocated for stronger remedial measures" does not render official actions "clearly unreasonable"—the required standard for a finding of deliberate indifference. *S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty.*, 819 F.3d 69, 77 (4th Cir. 2016).

37. Even before Plaintiff reported sexual harassment to Mr. Martinez on August 10, he had taken steps to separate her from Mr. Davis based on her having informed him that Mr. Davis made her uncomfortable. Mr. Martinez had already instructed Mr. Davis on July 24 not to contact Plaintiff until further notice. Tr. Ex. 170 (US6636); Martinez Test., Tr. Day 2-3. Mr. Martinez had also already assigned Plaintiff a new mentor and removed Plaintiff from supporting Mr. Davis's trial team in July. Martinez Test., Tr. Day 3; Ex. 167 at 1 (US3980). Mr. Martinez also temporarily made Mr. Martin the "gatekeeper" for research and writing assignments to ensure that Plaintiff would not be assigned any work from Mr. Davis. Martinez Test., Tr. Day 2-3; Tr. Ex. 18 at 1 (US615); Tr. Ex. 168 at 1 (US2786).

38. Then, in August, after Plaintiff reported sexual harassment, Mr. Martinez took Plaintiff out of Mr. Davis's chain of command and placed her under the supervision of Mr. Carpenter, who then would report directly to Mr. Martinez. Martinez Test., Tr. Day 3; Carpenter Test., Tr. Day 3; Tr. Ex. 172; Tr. Ex. Tr. Ex. 159 at 1-2 (US2546-47); Tr. Ex. 5 at 22 (US1264) (modified organizational

48

chart). And Mr. Martinez granted Plaintiff's request to telework during the pendency of the investigation, which established a physical separation between Plaintiff and Mr. Davis while her allegations were investigated. Martinez Test., Tr. Day 3; Tr. Ex. 172; Tr. Ex. 159 at 1-2 (US2546-47).

39.     Mr. Martinez's actions were not only prompt; they were also effective—Plaintiff and Mr. Davis had no further meaningful contact. Pl. Test., Tr. Day 1; Davis Test., Tr. Day 4. After she began teleworking in August, Plaintiff did not see Mr. Davis again. Pl. Test., Tr. Day 1; Davis Test., Tr. Day 4. Plaintiff also did not work on any cases with Mr. Davis after that point. Davis Test., Tr. Day 4. And while Plaintiff and Mr. Davis both participated in two appellate moots in Fall 2018, these moots had at least four other participants, and Plaintiff participated by phone. Davis Test., Tr. Day 4. Plaintiff has never alleged that any harassing conduct occurred during these moots.

40.     Mr. Martinez also acted consistently with the EDR Plan. After Plaintiff informed Mr. Martinez that she was alleging sexual harassment on August 10, 2018, Mr. Martinez promptly reported the conduct to Mr. Ishida by phone the very next business day, on August 13, 2018, and then forwarded Plaintiff's August 10 email to Mr. Ishida on August 14, 2018. Ishida Test., Tr. Day 2; Martinez Test., Tr. Day 3; Tr. Ex. 158 at 1-2 (US2866-67). Under Chapter IX, employees "are encouraged to report wrongful conduct to the Court's EDR Coordinator, the Chief Judge, unit executive, human resources manager, or their supervisor as soon as possible[.]" Tr. Ex. 136 at 10 (US4545). Pursuant to Chapter IX, Mr. Ishida then immediately reported the conduct to then-Chief Judge Gregory and began the process to select an investigator. Ishida Test., Tr. Day 2; Tr. Ex. 18 at 3-4 (US617-18). Chapter IX states that the "EDR Coordinator shall promptly inform the Chief Judge and unit executive of any report" and that "[t]he Chief Judge and/or unit executive shall ensure that the allegations in the report are appropriately investigated, either by the human resources manager or other person." Tr. Ex. 136 at 10 (US4545). On August 14, 2018, Mr. Ishida identified an investigator based on a recommendation from the Clerk of Court. Ishida Test., Tr. Day 2; Tr. Ex. 18.

41.     Where, as here, supervisory officials promptly investigate allegations and separate the alleged harasser from the plaintiff, courts routinely find no deliberate indifference. *See, e.g. Stiles ex rel. D.S. v. Grainger Cnty.*, 819 F.3d 834, 849 (6th Cir. 2016) (holding there was no "triable issue as to whether Defendants exhibited deliberate indifference" when the school "investigated promptly," "disciplined students found guilty of wrongdoing," and separated the alleged harasser from the purported victim); *Greene v. Friendship Pub. Charter Sch., Inc.*, 2019 WL 918307 at *9–12 (D.D.C. Feb. 25, 2019) (similar). Indeed, the Fourth Circuit has explained that a defendant is not deliberately indifferent even when the defendant "failed to eliminate [the] harassment, or to impose the disciplinary sanctions sought by a victim." *S.B. ex rel. A.L.*, 819 F.3d at 77.

42.     Mr. Martinez also complied with as many of Plaintiff's other demands as he could—even though those demands were not necessary to protect Plaintiff from alleged harassment. In particular, he granted her request to be converted to an AFPD and contacted Mr. Moormann to initiate the conversion as soon as Mr. Moormann came back into the office. Martinez Test., Tr. Day 3.

43.     Plaintiff's claim that Mr. Martinez was deliberately indifferent fails for an additional reason: after she reported her allegations of sexual harassment to Mr. Martinez, Plaintiff had virtually no contact with Mr. Davis. Indeed, Plaintiff does not allege a single instance of supposed sexual harassment that occurred after June 27. Courts have declined to find deliberate indifference when the allegedly harassing conduct stops after the sexual harassment is reported. *See Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1295-96 (11th Cir. 2007) (a plaintiff must allege that the "deliberate indifference to the initial discrimination subjected the plaintiff to further discrimination" to state a deliberate indifference claim) (citing *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 645 (1999)). In *DeCecco*, the court held that the defendant was not deliberately indifferent because there was "no evidence that [the plaintiff] was subjected to sexual harassment, a sexually abusive environment, or

50

any other form of adverse treatment after" informing the defendant of her allegations. 918 F. Supp. 2d at 494-95. Likewise, in *Borkowski v. Baltimore Cnty.*, the court held that the school had not been deliberately indifferent after a student reported a sexual assault because "there [was] no allegation that harassment continued, let alone that [the school's] alleged failure to respond properly to her complaint caused further discrimination." 492 F. Supp. 3d 454, 491 (D. Md. 2020). Even if the Court were to conclude that Plaintiff reported the sexual harassment to Mr. Martinez as early as July 5, Plaintiff does not even allege, much less demonstrate, that the alleged sexual harassment continued after that date. Because Mr. Martinez's actions did not "cause [Plaintiff] to suffer injury" after July 5, *DeCecco*, 918 F. Supp. 2d at 495, the Court should conclude he was not deliberately indifferent.

44. When courts make a finding of deliberate indifference in the sexual harassment context or allow a claim to survive past the summary judgment phase, it is typically only when the sexually harassing conduct has continued after it was reported.[6] *See Jennings v. Univ. of N. Carolina*, 482 F.3d 686, 700 (4th Cir. 2007) (denying summary judgment because the university official "took no action on the complaint, and [the plaintiff's] harassment continued"); *Baynard*, 268 F.3d at 235-36 (denying judgment as a matter of law because sexual abuse continued after the defendant was aware of the abuse). For example, in *Feminist Majority Foundation v. Hurley*, the Court held that the plaintiffs stated a claim for deliberate indifference because the university "did not engage in efforts that were reasonably calculated to end [the] harassment," which continued after the plaintiffs alerted administrators. 911 F.3d 674, 689-90 (4th Cir. 2018) (quotation omitted). This case involves a far different situation, as Plaintiff did

---

[6] In the Title IX context, liability can sometimes be found when there is only "a single incident of pre-notice harassment," but this harassment must be "vile enough and the institution's response, after learning of it, unreasonable enough to have the combined systemic effect of denying access to a scholastic program or activity." *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 273-74 (4th Cir. 2021). That standard is based on the "plain language" of Title IX, which is not at issue here. *Id.* In any event, the standard is not met here, where there was no sexual harassment at all, much less any "vile" conduct. *See id.*

not have any meaningful contact with Mr. Davis after July 5 (the date Plaintiff claims she reported the alleged harassment), and Mr. Martinez took critical steps to separate Mr. Davis from Plaintiff. *See* Martinez Test., Day 2 (testifying that in July 2018, he removed Mr. Davis as Plaintiff's mentor, removed Plaintiff from Mr. Davis's trial team, and instructed Mr. Davis not to contact Plaintiff).

45.     Plaintiff misleadingly references *Hill v. Cundiff* for her argument that Mr. Martinez was deliberately indifferent because he and other officials had not received adequate training. 797 F.3d 948 (11th Cir. 2015). But *Hill* states that a plaintiff "must present evidence" that it was "clearly unreasonable . . . not to improve [] sexual harassment training" after receiving notice of the "initial discrimination" such that she was subjected to "further discrimination." *Id.* at 973-75. Plaintiff has presented no such evidence, and as stated, Plaintiff does not even allege that any incidents of sexual harassment occurred after the date she alleges Mr. Martinez should have been on notice that she was reporting harassment (July 5, 2018).[7]

46.     Plaintiff's arguments that Mr. Martinez was deliberately indifferent because he retaliated against her when she reported sexual harassment are also meritless.

47.     The record contains no evidence that Mr. Martinez retaliated against Plaintiff for reporting sexual harassment by not considering her for the open AFPD position. The open position was posted on July 26, before Plaintiff reported her allegations of sexual harassment to Mr. Martinez on August 10. Tr. Ex. 168 at 1 (US2786). But even so, the evidence is undisputed that Plaintiff was not considered for the open AFPD position because it was identical to the one she already had.

---

[7] Furthermore, the court in *Hill* court noted the "stringent standard of fault" required to show deliberate indifference and concluded that school board "could not have foreseen" subsequent harassment to the plaintiff as a "known or obvious consequence" of its "training policies." *Id.* at 977-78 (citations omitted. The court went on to explain that even if the training policies made a violation of the plaintiff's rights more likely (an argument that the Plaintiff in this case does raise), the training policies "alone do[] not give rise to an inference that the policies produced a specific constitutional allegation." *Id.* at 978 (citation omitted).

52

Carpenter Test., Tr. Day 3. The open AFPD position involved both trial and appellate support as well post-conviction work, just like Plaintiff's position—in fact, Mr. Martinez's email announcing the job posting to the office stated, "[l]ike Jared and Caryn, the new position will divide time between providing support for the trial teams and assisting with our appellate and post-conviction practice," Tr. Ex. 168 at 1 (US2786), which shows Mr. Martinez's understanding that the new position would be the same as Plaintiff's position. The fact that Plaintiff was not selected for this position had nothing to do with her subsequent allegations of sexual harassment.

48.     Next, Plaintiff's locality pay was not removed. Tr. Ex. 179 at 19 (US2889) (Plaintiff's SF-50 reflecting that her salary as a R&W attorney was the same as her salary as an AFPD). Before she was converted to an AFPD, Plaintiff made $107,319, including a $14,970 locality adjustment. *Id.* After her conversion, Plaintiff's pay remained at the same amount, $107,319. *Id.*; Pl. Test., Tr. Day 1. Her locality adjustment stayed at $14,970, but because Plaintiff was moved to the AD scale, her SF-50 reflected one lump sum payment without the locality adjustment separately notated. Moormann Test., Tr. Day 4; *see also* Tr. Ex. 5 at 69 (Bates 1311) (explaining in the notes under the salary chart that, once a location is selected, the chart updates to include the applicable locality pay with the base pay). Mr. Martinez never took any steps to try to remove Plaintiff's locality pay upon her conversion to AFPD. *Id.*; *see also* Martinez Test., Tr. Day 3.

49.     Mr. Martinez did not backdate Plaintiff's conversion to AFPD to deprive her of a promotion. After Plaintiff demanded to be converted to an AFPD on August 9, 2018 as soon as possible, *see generally* Tr. Ex. 150, Mr. Martinez spoke with Mr. Moormann immediately to initiate the conversion process. Moormann Test., Tr. Day 4. On August 15, 2018, Mr. Moormann reached out to the DSO to request that the DSO approve the conversion of Plaintiff (and Mr. Martin) to AFPD. Moormann Test., Tr. Day 4; Tr. Ex. 180 at 1-2 (US3466-67); Tr. Ex. 181; Tr. Ex. 182. The following day, after he received the DSO's approval, Mr. Moormann submitted a "Request for Personnel

53

Action," or AO 52, to initiate the reclassification. Tr. Ex. 183 at 1-2 (US3454-55); Moormann Test., Tr. Day 4. This document had an effective date of August 20 because that was the first date of the next pay period after August 16. Tr. Ex. 183 at 1 (US3454); Moormann Test., Tr. Day 4. On August 28, 2018, Mr. Moormann was informed that, when he submitted Plaintiff's "Request for Personnel Action" on August 16, he had used the incorrect nature of action code. Moormann Test., Tr. Day 4; Tr. Ex. 184. Accordingly, the reclassification had to be processed manually. *Id.* However, the effective date on Plaintiff's SF-50 did not change from August 20. Tr. Ex. 179 at 19 (US2889).

50.     After he reached out to Mr. Moormann on August 15 to initiate the conversion to AFPD—shortly after Plaintiff specifically requested him to do so—Mr. Martinez had no involvement in her conversion other than instructing Mr. Moormann to ensure Plaintiff's pay did not decrease. Moormann Test., Tr. Day 4. And as of August 15, Plaintiff was not eligible for a grade increase to GS-15. *Id.* Even though Plaintiff may have become eligible to be considered for a discretionary promotion to GS-15 on August 21, 2018 (her one-year anniversary date, *see* Tr. Ex. 179 at 15 (US2885)), Mr. Martinez was not aware of her eligibility because Mr. Moormann, who was responsible for notifying Mr. Martinez of such events, never told him about it. Martinez Test., Tr. Day 3; Moormann Test., Tr. Day 4; *see also S.B. ex rel. A.L.*, 819 F.3d 69 at 79 (holding that, after the pleading stage, "timing alone generally cannot defeat summary judgment once an employer has offered a convincing, nonretaliatory explanation"). Moreover, it would have been extraordinary to promote Plaintiff directly to GS-15 at that point, without her first proceeding through the steps on the GS-14 scale. Moormann Test., Tr. Day 4.

51.     Mr. Martinez also did not retaliate against Plaintiff when he granted her request to telework. Plaintiff asked Mr. Martinez for permission to telework on August 9, *see* Tr. Ex. 150 at 39:40-40:06 (work remotely), and August 10, *see* Tr. Ex. 171. After Plaintiff alleged sexual harassment on August 10, Mr. Martinez promptly approved Plaintiff's telework request. Tr. Ex. 159 at 2 (US2547).

54

Plaintiff repeatedly affirmed that she was fine teleworking and even subsequently sought approval to do so on a permanent basis. *See* Pl. Test., Tr. Day 1; Tr. Ex. 171 at 1 (US4246) ("A long-term resolution that allows me to work remotely and report to the Appellate Chief in Asheville is fine with me."); Tr. Ex. 148 at 56:00-56:50 (Plaintiff stating in February 2019 that she prefers teleworking and works better on her own and seeking through mediation to get approval to continue to do so permanently). And Plaintiff never told Mr. Martinez that she was not happy teleworking. Pl. Test., Tr. Day 1. Mr. Martinez certainly was not deliberately indifferent when he approved Plaintiff's own request to telework—quite the opposite, it was yet another step Mr. Martinez took to separate Plaintiff from Mr. Davis and to accede to Plaintiff's demands.

52.     Finally, Mr. Martinez did not diminish Plaintiff's duties after she reported her allegations of sexual harassment. The record contains no evidence that Plaintiff's job duties changed after she reported the alleged sexual harassment on August 10. Shortly thereafter, Plaintiff was converted to an AFPD—consistent with her own demand—and she worked under Mr. Carpenter's supervision until she left the FDO in March 2019. Carpenter Test., Tr. Day 3. Mr. Martinez did not influence the work that Mr. Carpenter assigned to Plaintiff. *Id.* Plaintiff herself said there was "no change in job responsibilities" when she was converted to an AFPD. Tr. Ex. 1 at 6 (US505). Mr. Carpenter similarly testified that Plaintiff's duties remained the same after she was converted to an AFPD, and she performed the same work as the other attorneys in the appellate group supervised by Mr. Carpenter. Carpenter Test., Tr. Day 3. In fact, Mr. Carpenter encouraged Plaintiff to do an appellate argument in the Fourth Circuit in January 2019. Tr. Ex. 144 at 1-3 (PLTF4356-58). Plaintiff turned down this opportunity. *Id.* at 2 (PLTF4357). Further, although Plaintiff was taken off of "duty days" as a result of the July 20 team meeting, so was the other remaining R&W attorney, Jared Martin. In addition, this was a temporary change implemented to relieve some of their workload because the FDO had recently lost an R&W. Tr. Ex. 173 at 1 (US7411) (stating that the R&Ws would both be

55

"'unlocked' from the teams and will no longer take duty days (unless needed as back-up) nor take new criminal cases"); *id.* at 3 (US7413) (discussing the other R&W's departure and effects on R&W staffing and further explaining that this change in duties for the R&Ws would only last "for a month"). In any event, "[c]hanges in assignments or responsibilities that do not 'radical[ly] change' the nature of work are not typically adverse employment actions." *Potash v. Fla. Union Free Sch. Dist.*, 972 F. Supp. 2d 557, 584 (S.D.N.Y. 2013).

53.     To sum up, Defendants took immediate, effective actions in response to Plaintiff's allegations of sexual harassment. Mr. Martinez separated Mr. Davis and Plaintiff, removed Plaintiff from Mr. Davis's chain of command, and ensured that they would not work together. Consistent with the EDR Plan, Mr. Martinez reported Plaintiff's sexual harassment allegations to Mr. Ishida and Judge Gregory, and within days, Mr. Ishida selected Ms. Beam to investigate the allegations. Nothing about Mr. Martinez's response was "clearly unreasonable in light of the known circumstances." *S.B. ex rel. A.L.*, 819 F.3d at 77 (citing *Davis*, 526 U.S. at 648).

### iv. The Evidence Does Not Support a Finding That Mr. Martinez Had Discriminatory Intent.

54.     Finally, Mr. Martinez was not motivated by gender-based discriminatory intent. Plaintiff's equal protection claim fails for this reason alone. *See Strickland*, 32 F.4th at 357 (setting forth the four independent elements, all of which Plaintiff must meet in order to prevail on her equal protection claim).

55.     "[D]iscriminatory intent implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 819 n.2 (4th Cir. 1995) (quoting *Personnel Admin'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (internal citations omitted)). Therefore, "[t]o succeed on an equal protection claim, a plaintiff must demonstrate that [she] has been treated differently from others with

56

whom [she] is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001).

56. The record contains no evidence that Mr. Martinez treated Plaintiff differently than any similarly situated employees, male or female. Mr. Martinez testified that he never took any action against Plaintiff because of her gender. Martinez Test., Tr. Day 3. The evidence shows that, when Mr. Martinez initiated the conversion process to reclassify Plaintiff to an AFPD—consistent with her own demand that he do so—she was treated exactly the same as Mr. Martin, a male R&W. *See* Moormann Test., Tr. Day 4. As explained, Mr. Moormann submitted the requests to convert both Plaintiff and Mr. Martin on August 16. Tr. Ex. 180; Tr. Ex. 181; Tr. Ex. 182. Both conversions were "revenue neutral," meaning both of their pay levels remained the same. Moormann Test., Tr. Day 4; Tr. Ex. 180 at 1 (US3466). And the reclassification itself occurred for additional non-discriminatory, non-retaliatory reasons. First, Plaintiff herself requested to be converted to an AFPD on August 9 and again on August 10. Martinez Test., Tr. Day 3; Tr. Ex. 171. Second, the FDO had been planning to reclassify both her and Mr. Martin from R&W attorneys to AFPDs for weeks for case weight measurement purposes. Carpenter Test., Tr. Day 4; Martinez Test., Tr. Day 2-3. As Mr. Carpenter explained, the office no longer benefitted from classifying attorneys as R&Ws, so they wanted to reclassify both R&Ws for their benefit to increase their earnings potential over the long term. Carpenter Test., Tr. Day 4; *see also* Moormann Test., Tr. Days 4-5. There is no evidence that Mr. Martinez had any gender-based discriminatory intent when he converted *both* Plaintiff and her male counterpart in an identical manner.

57. To the extent Plaintiff contends that Mr. Martin's pay raise after Plaintiff left the FDO in March 2019 evinces Mr. Martinez's discriminatory intent, this argument fails. Mr. Martin and Plaintiff were not "similarly situated," *Morrison*, 239 F.3d at 654. Mr. Martin had many years of attorney experience, and after his employee review occurred, it became clear he had been severely underpaid

57

for his level of experience compared to other AFPDs. Moormann Test., Tr. Day 5; *see also* Tr. Ex. 186 at 1 (US2705) (asking DSO for permission to adjust Mr. Martin's pay in light of his employee review). There is no evidence that Plaintiff was similarly underpaid based on her level of experience.

58.     The letter of counseling also does not provide evidence that Mr. Martinez was motivated by gender-based discrimination at any point. Contrary to Plaintiff's assertion, the letter of counseling makes no finding of wrongful conduct. Tr. Ex. 7; Ishida Test., Tr. Day 2. Indeed, the letter specifically notes that the investigator found that Mr. Martinez "acted expeditiously to accommodate [Plaintiff's] requests, except her request to be transferred" to Asheville, and that Mr. Martinez noted that "there was no physical space" to accommodate Plaintiff in Asheville. Tr. Ex. 7 at 3 (US4266). The letter explains that the investigator found Mr. Martinez "had acted in good faith in accommodating [Plaintiff's] request to telework" and that he was "flexible in other work assignments." *Id.* The letter states that investigator found that Plaintiff's claims that Mr. Martinez denied her a promotion and removed her locality pay were "without support." *Id.* Finally, the letter states that the investigator did "not see a case for retaliation based on [the] investigation and the facts presented by both sides," and that Mr. Martinez's "actions were not motivated by malice or ill-will." *Id.* The letter of counseling "adopt[s]" the recommendation in the report that "discipline was not appropriate[]" for Mr. Martinez, and that he should only be "counseled or trained on judgment and decisiveness." *Id.* at 4 (US4267).

59.     This letter of counseling was not a letter of reprimand. Ishida Test., Tr. Day 2. While it references several missteps that Mr. Martinez made to help show him how his communication could improve in the future, none of these events, either individually or collectively, merit a finding of discriminatory intent. The actions taken by the Fourth Circuit to improve the FDO's response to reports of sexual harassment by counseling Mr. Martinez on things he could have done better are what any responsible employer should have done and is not a basis to impose liability.

58

60.     First, the letter mentions a "marriage metaphor" that Mr. Martinez used in reference to Plaintiff's relationship with Mr. Davis. Tr. Ex. 7 at 2 (US4265). Mr. Martinez made this reference during the conversation on July 5, before Plaintiff alleged she was being sexually harassed (and shortly after Plaintiff had expressly told him she was *not* being sexually harassed). Martinez Test., Tr. Day 3. Second, the letter references a statement Mr. Martinez made about "physical touching" during his August 9 conversation with Plaintiff. Tr. Ex. 7 at 2 (US4265). As the recording of that conversation reveals, Mr. Martinez was attempting to clarify what happened in the lobby and whether Plaintiff was touched by Mr. Davis, stating: "But there was no physical contact or anything like that [inaudible]?" Tr. Ex. 150 at 36:44-36:50. Finally, the letter notes that the investigator found that Mr. Martinez "called out" Plaintiff for seeking advice from the AO's Fair Employment Opportunity Office ("FEOO") and that he said he was being blamed for matters that did not have to do with him. Tr. Ex. 7 at 3 (US4266). While Mr. Martinez felt frustrated and confused that Plaintiff went to the FEOO, which had no ability to accommodate her requests, instead of bringing her claims to him directly so he could resolve them, he never instructed her not to seek advice from the FEOO. Martinez Test., Tr. Day 3; Tr. Ex. 150 at 33:30-34:13. None of these incidents demonstrate that Mr. Martinez intended to discriminate against Plaintiff based on her gender. As the letter of counseling describes, these are the handful of "missteps" that Mr. Martinez made during the EDR process. Tr. Ex. 7 at 3 (US4266). "[T]he Constitution is designed to deal with deprivations of rights, not errors in judgment." *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999), *abrogated on other grounds*. These mistakes do not come close to meeting the standard for intentional gender-based discrimination that is required under the equal protection clause.[8] *See Sylvia Dev. Corp.*, 48 F.3d at 819 n.2 (discriminatory intent requires the decisionmaker to

---

[8] To the extent that Plaintiff contends that Mr. Martinez had discriminatory intent based on any gender stereotypes, this argument should be discarded. *See Willey v. Bd. of Educ. of St. Mary's Cnty.*, 2023 WL 3819294, at *9 (D. Md. June 5, 2023) (dismissing equal protection claim in which the plaintiffs alleged

select an action "because of, not merely in spite of, its adverse effects upon an identifiable group" (citations omitted)); *see also Roe v. Charlotte-Mecklenburg Bd. of Educ.*, 2020 WL 5646105, at *6 (W.D.N.C. Sept. 22, 2020) ("[N]egligence is simply 'insufficient to support a claim of'" a violation of equal protection rights) (quoting *Young v. City of Mount Ranier*, 238 F.3d 567, 577 (4th Cir. 2001).

61.     Ms. Beam's email stating that she believed that Mr. Martinez was "biased" likewise does not demonstrate that he had gender-based discriminatory intent in his actions toward Plaintiff. In the email, Ms. Beam states that Mr. Martinez felt Plaintiff was "attempting to exploit the situation to get a transfer to Asheville," and that this has prevented him from looking "at this case from a neutral perspective." Tr. Ex. 163. at 1 (US1382). Even if Mr. Martinez did feel this way, there is no evidence that his belief that Plaintiff was "attempting to exploit the situation to get a transfer to Asheville" was motivated by a discriminatory animus. Moreover, at this stage in the EDR process, Mr. Martinez was not serving in a "neutral" role, but as the opposing party representing the employing office during mediation. Ishida Test., Tr. Day 2 (explaining that unit executive is not expected to be a neutral party). Regardless, Ms. Beam's personal opinion about whether Mr. Martinez was "neutral" does not support the conclusion that he had discriminatory intent. As Mr. Ishida testified, throughout the EDR process, Mr. Martinez consistently acted in good faith, was responsive to Plaintiff's concerns, and worked toward addressing her issues. Ishida Test., Tr. Day 2. And during mediation, Mr. Martinez did everything he could to keep Plaintiff working at the FDO. He even offered to give her his own office in Asheville so she could transfer her duty station. Martinez Test., Tr. Day 2-4; Tr. Ex. 152 at 3:09-3:20, 3:48-4:00.

---

discriminatory intent based on "harmful gender stereotypes" because "generic allegations do not give rise to a reasonable inference that the defendants acted with discriminatory animus toward" the plaintiff).

62.     Finally, Plaintiff's claim that Mr. Martinez had gender-based discriminatory intent because he controlled Ms. Beam's investigation is meritless. The evidence shows that Mr. Martinez had no substantive role in the investigation other than being interviewed. Mr. Ishida was the one who identified and selected Ms. Beam as the investigator, and received Ms. Beam's report. Tr. Exs. 5, 18 at 2 (US616). Mr. Martinez only formally "appointed" her pursuant to Chapter IX of the EDR Plan, *see* Tr. Ex. 136 at 10 (US4545) (the "unit executive shall ensure that the allegations in the report are appropriately investigated"), and then promptly recused himself. Martinez Test., Tr. Day 3. Mr. Martinez's ministerial role in this process does not demonstrate that he had any substantive involvement in selecting Ms. Beam. Even so, Ms. Beam was appointed on August 17, *see* Tr. Ex. 18, before Plaintiff raised her retaliation claims against him for the first time on September 10, *see* Tr. Ex. 1, undermining any suggestion that Mr. Martinez acted improperly as an accused party.

63.     Moreover, contrary to Plaintiff's repeated assertions, the evidence demonstrates that Ms. Beam did investigate both her sexual harassment claims against Mr. Davis and her retaliation claims against Mr. Martinez. *See* Tr. Ex. 160 at 1 (US1402) (September 28, 2018 email from Mr. Ishida telling Plaintiff that Ms. Beam will proceed with "one unified investigation" into the sexual harassment and retaliation allegations); Tr. Ex. 5 at 9-12 (US1251-54) (portions of the investigation report that discusses the claims of retaliation). And from the time Ms. Beam was appointed as investigator in August 2018, Ms. Beam was reporting to Mr. Ishida, not Mr. Martinez. Martinez Test., Tr. Day 3. The record also contains no evidence that Mr. Martinez coordinated his testimony with Mr. Davis or that Mr. Martinez had any knowledge about the findings of the investigation while it was ongoing. *See* Martinez Test., Tr. Day 3. Finally, the fact that Mr. Martinez decided, as the unit executive, whether to take disciplinary action against Mr. Davis does not have anything to do with the adequacy of Ms. Beam's investigation, let alone suggest that Mr. Martinez had discriminatory intent.

61

64.     In any event, given Mr. Martinez's minimal role in the investigation, whether the investigation was adequate is wholly irrelevant to Mr. Martinez's discriminatory intent. Plaintiff relies on *Mueller v. Daugherty Systems, Inc.*, but in that case, the defendant expressly relied on the results of its investigation when it took the adverse action central to the case—firing the plaintiff without correcting her compensation. 2021 WL 3754582, at *7 (N.D. Ga. June 14, 2021). Here, in contrast, Plaintiff does not allege, much less prove, any instances of sexual harassment after the investigation began nor does she show that the results of the investigation led to Mr. Martinez taking some action against *her*. Even if the investigation was inadequate (and it was not), any possible shortcomings did not lead to Plaintiff "suffering further injury" in the form of additional alleged sexual harassment. *Feminist Majority Found.*, 911 F.3d at 702.

## C. Plaintiff's Requested Remedies Are Not Available.

65.     The only forms of relief sought by Plaintiff that remain in this case are: (1) a declaratory judgment that Plaintiff's "constitutional rights were violated" and that "the laws, regulations, and rules that operated to deprive Plaintiff of her rights [were] unconstitutional as applied to Plaintiff"; (2) an injunction "[e]njoin[ing] any further violation of Plaintiff's rights"; and (3) an award of "front pay as equitable relief in lieu of reinstatement[.]" Compl. at 84, Requested Relief, ECF No.1 ("Compl."). However, there is no equitable remedy available to Plaintiff on the facts of this case.

### i.     There is No Basis to Award Declaratory Relief.

66.     For a declaratory order to be "a proper judicial resolution of a 'case or controversy' rather than an advisory opinion[,]" it must "settl[e] some dispute *which affects the behavior of the defendant towards the plaintiff.*" *Hewitt v. Helms*, 482 U.S. 755, 761 (1987).

67.     There is no declaratory relief here that would "affect[] the behavior of the defendant[s] towards the plaintiff." *Id.* Plaintiff seeks declarations that "[her] constitutional rights were violated" and that "the laws, regulations, and rules that operated to deprive Plaintiff of her rights [were]

62

unconstitutional as applied to Plaintiff[.]" Compl. at 84, Requested Relief ¶¶ 1-2. Even though the Fourth Circuit recognized on appeal that a declaratory order is a form of equitable relief, it did not address at the motion to dismiss stage whether such an order would, by itself, redress Plaintiff's alleged harms in the absence of reinstatement. *Strickland*, 32 F.4th at 366 (recognizing that a declaratory order is a viable form of relief under the *Larson-Dugan* exception). It would not.

68. Plaintiff seeks a declaration that her constitutional rights were violated in the past, but such a declaration would not change the legal relationship between the parties because Plaintiff has been separated from the FDO for nearly five years and is not seeking reinstatement. *See* Tr. Ex. 179 at 2 (US2872); *see generally* Compl. at 84, Requested Relief. Thus, such a declaration would bring Plaintiff no relief and would amount to nothing more than an advisory opinion. *See Just. 360 v. Stirling*, 42 F.4th 450, 460 (4th Cir. 2022) (denying request for declaratory relief that "would amount to no more than an impermissible advisory opinion" that would not redress alleged harms); *see also Zanze v. Snelling Servs., LLC*, 412 F. App'x 994, 997 (9th Cir. 2011) (affirming dismissal of former employee's request for declaratory order on the grounds that there was no continuing relationship with the former employer).

### ii. There is No Basis to Award Injunctive Relief.

69. For similar reasons, there is also no basis to award prospective injunctive relief against any of the Defendants. Plaintiff's "standing to seek the injunction requested depend[s] on whether [s]he [i]s likely to suffer future injury" from the allegedly unconstitutional practice. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983). "Absent a sufficient likelihood that [s]he will again be wronged in a similar way, [a plaintiff] is no more entitled to an injunction than any other citizen." *Id.* at 111.

70. Here, Plaintiff asks this Court to "[e]njoin any further violation of Plaintiff's rights." Compl. at 84, Requested Relief ¶ 3. But as the Fourth Circuit noted, it would be "unclear," without "Strickland's reinstatement, what those 'further violation[s]' might be." *Strickland*, 32 F.4th at 366 n.16.

As it stands, Plaintiff is not seeking reinstatement. Thus, there is no "actual or imminent" threat that Plaintiff's rights would be violated in the future by Defendants. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

71. Because Plaintiff has been separated from the FDO for several years, she is not facing any ongoing retaliation, nor would her past alleged injury be redressed by prospective injunctive relief. *See Lyons*, 461 U.S. at 105. A prospective injunction is unavailable as a matter of law.

### iii. There is No Basis to Award Front Pay.

72. Turning to Plaintiff's request for front pay, before the Court can award front pay as equitable relief, the Court must determine whether front pay is an appropriate remedy for the claim at issue, *see Detweiler v. Va. Dep't of Rehabilitative Servs.*, 705 F.2d 557, 562 (4th Cir. 1983), and whether Plaintiff has met her "burden of proving actual damages, if any," *see* Order dated Apr. 25, 2023, ECF No. 206.

73. Beginning with Plaintiff's procedural due process claim, front pay is not a remedy for such a claim. "[T]he typical remedy for a violation of due process . . . is more process." *Neal v. U.S. Penitentiary Lee*, 2022 U.S. Dist. LEXIS 137076, at *5 (W.D. Va. Aug. 2, 2022); *see also Detweiler*, 705 F.2d at 562 (if plaintiff could prove due process violation in the hearing afforded him, "he should be afforded a rehearing by the panel that comports with the due process clause"). The Court should not deviate from this well-established standard here. No additional process is warranted, given that Plaintiff is not seeking to return to her employment at the FDO and has not requested any additional process in her prayer for relief. *See* Pl. Test., Tr. Day 1 (expressing no desire to return to any office, including the FDO); Compl. at 84, Requested Relief. In any event, Plaintiff did not suffer any sexual harassment or retaliation, so her EDR claims based on those allegations lack merit. Because no underlying violation occurred, Plaintiff would have no right to further pursue her EDR claims even if she could establish a due process violation (which she cannot do).

64

74.     Turning next to Plaintiff's equal protection claim, this Court's "authority to award and fashion equitable relief is 'necessarily broad.'" *Porter v. Clarke*, 923 F.3d 348, 364 (4th Cir. 2019), *as amended* (May 6, 2019) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)); *see also Smith v. Bounds*, 813 F.2d 1299, 1301 (4th Cir. 1987), *on reh'g*, 841 F.2d 77 (4th Cir. 1988) ("A district court enjoys wide discretionary authority in formulating remedies for constitutional violations."). This broad authority includes discretion to consider whether Plaintiff's conduct in removing confidential client information from the FDO renders front pay in lieu of reinstatement inequitable. *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 361–62 (1995).

75.     Before granting any award of front pay for Plaintiff's equal protection claim, this Court must also determine that Plaintiff's "working conditions bec[a]me so intolerable that a reasonable person in [her] position would have felt compelled to resign[.]" *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004); *see also Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 273 (4th Cir. 2001). Without proof of an actual or constructive termination, a finding of an equal protection violation would not warrant a front pay award because the violation would have no connection to any lost compensation. *See, e.g.*, *Johnson v. Shalala*, 991 F.2d 126, 130 (4th Cir. 1993); *Holmes v. Wal-Mart Stores East, L.P.*, 2011 U.S. Dist. LEXIS 46020, at *34 (E.D. Va. Apr. 27, 2011) (relying on *Johnson* to conclude that hostile work environment claims "do not entitle a plaintiff to recover back pay and reinstatement unless" they result in "a loss of pay or discharge"); *Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 317 (3d Cir. 2006) ("[I]f a hostile work environment does not rise to the level where one is forced to abandon the job, loss of pay is not an issue."); *id.* n.6 (citing other circuit court decisions).

76.     Simply put, because Plaintiff was not terminated from the FDO, Plaintiff must show, among other things, "that [s]he was discriminated against by h[er] employer to the point where a reasonable person in h[er] position would have felt compelled to resign," and that she actually did resign. *Evans v. Int'l Paper Co.*, 936 F.3d 183, 193 (4th Cir. 2019) (citation omitted). This heavy burden

65

requires her to show "something more" than ordinary workplace harassment. *Id.* As discussed above, Plaintiff cannot meet her burden to show *any* harassment occurred, much less harassment that reaches this heightened standard. The evidence shows that Plaintiff voluntarily accepted a transfer for what she considered a better job opportunity as a Fourth Circuit law clerk. Plaintiff has thus failed to meet her burden at trial to show that she was constructively terminated from the FDO.

77.     Specifically, Plaintiff's working conditions were not "intolerable" when she resigned in March 2019; rather, she testified that she chose to leave the FDO because no longer felt welcome there. *See* Pl. Test., Tr. Day 1. But the crucial inquiry for this Court's "intolerability" review is not whether the plaintiff felt "unwelcome," but the frequency and severity of the harassment. *Evans*, 936 F.3d at 193. The more continuous and egregious the conduct, the more likely it is "intolerable." *Id.*

78.     For the last seven months of her employment before her voluntary transfer, Plaintiff teleworked and did not see anyone from the office. *See* Pl. Test., Tr. Day 1. In fact, after Mr. Martinez issued his no-contact order to Mr. Davis on July 24, 2018, *see* Tr. Ex. 170; Martinez Test., Tr. Day 3, Plaintiff and Mr. Davis had no meaningful interactions. Davis Test., Day 4. After Mr. Martinez granted Plaintiff's request to telework in mid-August, Plaintiff and Mr. Davis did not see each other in person. Davis Test., Tr. Day 4; *see also* Pl. Test., Tr. Day 1 (admitting she teleworked exclusively beginning in August and had no contact with Mr. Davis of any kind when she resigned in March 2019). After August 2018, Plaintiff was completely removed from Mr. Davis's supervision and chain of command. *See* Martinez Test., Tr. Day 3; Carpenter Test., Day 3; *see also* Tr. Ex. 5 at 22 (US1264) (modified organizational chart).

79.     Indeed, this case is similar to others in the Fourth Circuit where courts have rejected front pay awards when the employee is offered suitable reassignment away from the alleged harasser. For example, in *Von Gunten v. Maryland Department of Environment*, the employee alleged that her supervisor had repeatedly touched her inappropriately, made sexual comments, talked about his

66

genitalia, and would "groan and engage in actual or suggestive self stimulation" while working alone on a boat with her. 68 F. Supp. 2d 654, 659-61 (D. Md. 1999), *aff'd sub nom. Von Gunten v. Maryland*, 243 F.3d 858 (4th Cir. 2001). The employee further alleged that "the sexual harassment to which she was subjected caused her constant stress and that this stress ultimately forced her to resign from her job." *Id.* at 661. Nevertheless, the court rejected the employee's request for front pay, noting that the defendant had tried to find her a suitable position away from her harasser that she had rejected, and that, by the time plaintiff resigned, the sexual harassment "had long since ceased" because she had no contact with her alleged harasser "after she was removed from the boat[.]" *Id.* at 661. Accordingly, given that months had lapsed without any further sexual harassment, the Court held that the plaintiff failed to establish that the defendant had engaged in "a deliberate effort to induce her to quit." *Id.* at 661-62.

80.     Like the employee in *Von Guten*, Plaintiff was not only granted teleworking privileges to separate her from her alleged harasser during the pendency of the Chapter IX investigation, but, during mediation, she was also offered a duty-station transfer to Asheville, which she rejected. Martinez Test., Tr. Day 2-4; *see also* Tr. Ex. 152 at 3:09-3:20, 3:48-4:00. Instead, Plaintiff transferred out of the FDO only after Mr. Ishida and Mr. Smith, at Plaintiff's own request, helped her secure a prestigious Fourth Circuit clerkship with Judge Floyd, something she had been seeking since November 2018. *See* Tr. Exs. 155 (US4450) (Plaintiff privately texting on November 19, 2018 that she wanted a clerkship), 161 at 2 (US3300) (Plaintiff emailing James Ishida on November 21, 2018 that she wants help transitioning out of the FDO), 162 (US3300) (Plaintiff notifying James Ishida on March 11, 2019 that she had accepted clerkship and thanking the Fourth Circuit officials for their help). Plaintiff made a voluntary choice to accept this clerkship opportunity and leave the FDO instead of accepting reassignment to the Asheville office. And she repeatedly thanked the Defendants, saying she was "grateful" and "very much appreciate[d]" their help, Tr. Ex. 162 at 1 (US3300), that she was

67

"honored" to have the clerkship opportunity, *id.*, which she herself described as the "best possible outcome[,]" Tr. Ex. 187 at 1 (US5390). Thus, like the employee in *Von Guten*, she has failed to establish entitlement to front pay because she voluntarily accepted a transfer to another office in the Fourth Circuit many months after the alleged harassment had ceased.[9] *See id.* <u>Put differently, Plaintiff's working conditions were not intolerable at the time she voluntarily accepted the clerkship transfer, nor was there any effort by Defendants to make her working conditions intolerable so that she would quit.</u>

---

[9] In the alternative, Plaintiff has failed to meet her burden of proving actual damages. For one thing, soon after Plaintiff left the FDO to serve as a judicial law clerk—by May 27, 2019—she began earning a *higher* salary than she had at the FDO. *See* Tr. Ex 59 at 3 (US2873) (clerk salary of $111,810). Further, Plaintiff's only evidence of her damages—the deposition testimony of her lost earnings expert, Dr. Albrecht—must be discredited. Dr. Albrecht himself testified at his deposition that the calculations in his March report are completely inaccurate. Albrecht Depo. Tr. at 94:24-95:18 (testifying that all the calculations and tables in the original March report are incorrect). Dr. Albrecht admitted that his calculations about Plaintiff's future earnings in her current position were not based on Plaintiff's actual income or overhead expenses. *Id.* at 47:17-49:15 (admitting he relied on the hypothetical table in the PAC survey and lacks knowledge about Plaintiff's actual overhead costs). Dr. Albrecht's assumption that Plaintiff would have stayed at the FDO for the remainder of her career also contradicts Plaintiff's own testimony that she likely would have quit the FDO within a couple of years to move near her husband in Tryon. Pl. Test., Tr. Day 1. This alone suggests a front pay award would not be appropriate here. *See, e.g., Hunter v. Town of Mocksville*, 201 F. Supp. 3d 750, 758 (M.D.N.C. 2016) (citing cases establishing that "[i]f the record evidence suggests the plaintiff would have been unlikely to remain in the position even absent the unlawful discharge, this weighs against a front pay award"). Moreover, Defendants' expert, Dr. Paul White, testified that Dr. Albrecht's assumptions were invalid because they do not comport with either the facts of this case or relevant labor market data. As Dr. White explained, because Plaintiff is likely to find a position with earnings comparable to or even exceeding her earnings at the FDO, a more realistic measure of her front pay would be $46,675. White Test., Tr. Day 3. Her front pay award therefore must be limited "because of the potential for windfall", given the inherently speculative nature of such awards. *Duke v. Uniroyal, Inc.*, 928 F.2d 1413, 1424 (4th Cir. 1991). Indeed, courts in this jurisdiction have cautioned that the "longer a proposed front pay period, the more speculative the damages become[,]" especially where the employee is young, has not been working with the defendant-employer for long, and could secure comparable employment using reasonable effort. *E.g., Hunter*, 201 F. Supp. 3d at 758; *Tinsley v. City of Charlotte*, 2019 WL 1874044, at *5 (W.D.N.C. Apr. 26, 2019); *Taylor*, No. 1:12-CV-00523-GBL, Mem & Op. 53, ECF No. 288 (rejecting employee's request for an additional three years of front pay finding it highly speculative that the employee would have remained in the same job for that long).

68

81.     Seeking to distinguish this case law, Plaintiff insists that merely feeling unwelcome and being subject to an EDR process that "lack[ed] meaningful remedies" is sufficient for a constructive discharge. Pl.'s Tr. Br. at 439-441. Not so.

82.     To begin with, the out-of-circuit case Plaintiff relies on, *Bryant v. Jones*, 575 F.3d 1281, 1299 (11th Cir. 2009), involved a very different scenario than the facts of this case. Pl.'s Tr. Br. at 439. In *Bryant*, the plaintiff was subject to "abusive" conduct on "numerous occasions, including an interaction where [the defendant] appeared ready to assault [the plaintiff] physically" and a pattern of conduct indicating that the plaintiff "was not welcome to continue working for [her employer] on account of her being white[.]" 575 F.3d at 1299. The court explained that "[e]stablishing a constructive discharge claim is a more onerous task than establishing a hostile work environment claim," but found that standard met because the conduct the plaintiff was subject to was so "abusive" that "a reasonable person in [the plaintiff's] position would have had no choice but to resign." *Id.* at 1298-99.

83.     In contrast to the repeated abusive conduct and threats of physical violence in *Bryant*, Plaintiff here bases her claim of constructive discharge only on the fact that she was "forced to telework for nearly seven months." Pl.'s Tr. Br. at 439-441. Further, the evidence shows that this assertion is not even accurate. At the outset, it was Plaintiff who requested telework, which Mr. Martinez promptly granted. *See* Pl. Test., Tr. Day 1; Martinez Test., Tr. Day 3. In fact, although she now claims otherwise, Plaintiff repeatedly stated that she was fine with remote work beginning on August 9, 2019, Tr. Ex. 150 at 56:21-1:00:50, and continued to indicate interest in permanent remote work all the way through the mediation phase in February 2019, *see* Tr. Ex. 148 at 56:09-56:44; Tr. Ex. 153 at 1:25:24-1:29:33. And although Plaintiff now complains that the various EDR processes took too long, it was Plaintiff, not Defendants, who repeatedly delayed both the investigation under Chapter IX as well as the counseling and mediation phases under Chapter X. Ishida Test., Tr. Day 2 (explaining that Plaintiff made at least three requests for extensions of time); Tr. Ex. 140 (granting in part

69

Plaintiff's request for extension of EDR counseling period); Tr. Ex. 160 at 2 (US1403) (Plaintiff's email from Sept. 18, 2018, stating that she was delaying her interview with Ms. Beam). Ultimately, it was Plaintiff who rejected Mr. Martinez's offer of a duty-station transfer to Asheville—which required him to give Plaintiff his own office in Asheville. Martinez Test., Tr. Day 2-4. And while Plaintiff was teleworking, Defendants continued to offer her substantial job responsibilities, including a Fourth Circuit oral argument, which she rejected. Pl. Test., Tr. Day 1; *see also* Tr. Ex. 144. Even if it were true that Plaintiff became dissatisfied with telework at some point, she never communicated that to Mr. Martinez. Pl. Test., Tr. Day 1. Suffice it to say, Plaintiff was not "forced" to telework.

84. Turning next to Plaintiff's claim that she was constructively discharged because the EDR Plan fails to offer meaningful remedies, that argument is nothing more than a recasting of her facial challenge, something the Fourth Circuit has already rejected. *Strickland*, 32 F.4th at 354. And even though she had not reached the stage of the EDR process in which she *could have been* awarded remedies, she nonetheless received most of what she had requested during the EDR process, beginning with her demands that the Defender authorize her to telework (a privilege rarely granted in the FDO), her demand that the Defender change the organizational chart and her chain of command, and ending with a transfer to a prestigious Fourth Circuit clerkship, which she herself requested as a negotiated settlement during mediation. *See* Pl. Test., Tr. Day 1; Martinez Test., Tr. Day 1-3.

85. Finally, Plaintiff also claims that she was constructively discharged because she was "convince[d]" to resign by unspecified judiciary officials, Pl.'s Tr. Br. at 439-441, but the trial record shows the decision was a voluntary one. In fact, Plaintiff waited many months after she made clear she wished to leave the FDO before actually leaving, and then only after she accepted a prestigious Fourth Circuit clerkship. Pl. Test., Tr. Day 1. As Plaintiff told a friend months before she resigned, she sought a clerkship as a way to "transition up, not down" and "open [her] career options further[.]" Tr. Ex. 155 at 1 (US4450). Plaintiff went even further: explaining that, while she "didn't want to seem

like an opportunist," she "love[d] clerking[.]" *Id.* Simply put, the contemporaneous evidence shows Plaintiff ended the EDR process and left the FDO because she felt that clerking would be a great opportunity for her, not because she was subject to intolerable working conditions. Moreover, Plaintiff's decision to delay leaving the FDO for several months so she could "search[] for another job while remaining employed with the defendant militates against [her] constructive discharge claim." *Russell v. Cty. of Rockland*, 2017 U.S. Dist. LEXIS 116771, at *15 (S.D.N.Y. July 26, 2017); *see also Baptiste v. Cushman & Wakefield*, 2007 U.S. Dist. LEXIS 19784, *35-36 (S.D.N.Y. 2007) (no constructive discharge where employee began looking for work months before resigning). Specifically, Plaintiff testified that she felt she had been constructively discharged by November 2018, and yet she waited until March 2019 to leave the FDO because she wanted to find another job. Pl. Test., Tr. Day 1.

86.     More to the point, because Plaintiff experienced no allegedly harassing conduct in the many months leading up to her resignation—let alone the "something more" than ordinary workplace harassment required under the case law—Plaintiff cannot establish that she was constructively discharged. *Evans*, 936 F.3d at 193.

87.     Even if Plaintiff could establish that she was constructively discharged (she cannot), it would be inequitable to award front pay here because Plaintiff testified that she removed privileged client information from the FDO after she left the office and her representation of those clients ceased. *See* Pl. Test., Tr. Day 1. The Court should take judicial notice of the *Guide to Judiciary Policy* for Federal Defenders, which states:

> A defender employee should never disclose any confidential communications from a client, or any other confidential information received in the course of official duties, except as authorized by law. A former defender employee should observe the same restrictions on disclosure of confidential information that apply to a current defender employee. This general restriction on use or disclosure of confidential information does not prevent, nor should it discourage, an employee or former employee from reporting or disclosing misconduct, including sexual or other forms of harassment, by a judge, supervisor, or other person.

*Guide to Judiciary Policy*, Vol. 2, Pt. A, Ch. 4, Cannon 3(D)(3), *available at* https://www.uscourts.gov/sites/default/files/guide-vol02a-ch04_0.pdf.[10]

88.     Under this policy, even if it were permissible for Plaintiff to secretly record meetings discussing privileged client matters and to disclose some of those recordings when she first reported and disclosed alleged misconduct during the EDR process, *see id.*, it was plainly not "authorized by law" for Plaintiff to continue to retain that information nearly five years after she voluntarily ended the EDR process and long after she first reported her allegations of sexual harassment. *See id.* Tr. Ex. 162 at 1 (US3300) (email from Plaintiff voluntarily ending Chapter X EDR process on March 11, 2019). In fact, it is impossible to reconcile Plaintiff's continued retention of this privileged client information with this policy given her continued insistence that some of the recordings do not contain information relevant to this litigation. *See* Pl. Test., Tr. Day 1.

89.     Because Plaintiff's removal of privileged client information, even if intertwined with information related to her EDR claim, was inconsistent with her obligations as a federal defender, reinstatement and front pay in lieu of reinstatement are unavailable here. *See, e.g.*, *McKennon*, 513 U.S. at 361-62 ("[N]either reinstatement nor front pay is an appropriate remedy" where "[i]t would be both inequitable and pointless to order the reinstatement of someone the employer would have terminated, and will terminate, in any event and upon lawful grounds"); *Sellers v. Mineta*, 358 F.3d 1058, 1060, 1064-65 (8th Cir. 2004) (recognizing that if the FAA could prove that the employee's termination at a subsequent employer for processing a false loan application "made her unsuitable for reinstatement as an air traffic controller" then reinstatement would be unavailable and front pay may not be appropriate); *Jordan v. StoneMor Partners L.P.*, 2018 WL 1074492, at *14 (W.D. Va. Feb. 27, 2018)

---

[10] Plaintiff herself cited extensively from this policy during briefing in this case. *See, e.g.*, ECF No. 250-2 at 5. Because this policy is a matter of public record, the Court may take judicial notice of it. *See, e.g.*, *Megaro v. McCollum*, 66 F.4th 151, 157 (4th Cir. 2023) (explaining that "a court may properly take judicial notice of matters of public record").

(granting summary judgment to employer and denying reinstatement and front pay where the employer discovered after the employee's termination that she had been previously convicted of crime). Accordingly, even if Plaintiff were constructively discharged, it would nevertheless be inequitable to award front pay in lieu of reinstatement, given Plaintiff's lack of suitability for reinstatement.

90.     Finally, Plaintiff is also ineligible for reinstatement or front pay in lieu of reinstatement because she testified that she would not have stayed at the FDO for more than a couple of years after May 2018 because she wanted to move to Tryon to be near her husband. Pl. Test., Tr. Day 1. This testimony is consistent with her statements at the time that she intended to quit if she did not obtain a duty-station transfer to Asheville. *See id.*; *see also* Davis Test., Tr. Day 4. Because it has been well over "a couple of years" since May 2018, no front pay award would be appropriate here given Plaintiff's subjective intention to quit the FDO. *See, e.g., Taylor v. Republic Servs., Inc.*, No. 1:12-CV-00523-GBL, Mem & Op. 53, ECF No. 288 (E.D. Va. Sept. 16, 2013) (rejecting employee's request for an additional three years of front pay finding it highly speculative that the employee would have remained in the same job for that long); *Hunter*, 201 F. Supp. 3d at 759 (recognizing "[t]he plaintiff's subjective intention to remain in the position" as an important factor in weighing front pay); *Tinsley*, 2019 WL 1874044, at *5 (the same).

91.     For all these reasons, no front pay award would be appropriate here.[11]

_____

[11] Even if the Court were to award front pay here, not only should such award be limited because Plaintiff has failed to prove her requested damages, *see supra* note 10, but the Court should also decline to gross up any such award for adverse tax consequences. *See, e.g., Fogg v. Gonzales*, 492 F.3d 447, 456 (D.C. Cir. 2007) (holding that no gross-up of plaintiff's damages for tax consequences of a lump sum payment was available under Title VII in a case against the federal government); *Arneson v. Callahan*, 128 F.3d 1243, 1247 (8th Cir. 1997) (recognizing that a waiver of sovereign immunity is required for tax enhancements and finding no such waiver in either Title VII or the Rehabilitation Act, even though both statutes expressly waive sovereign immunity for "equitable" relief). Indeed, a tax gross-up here "would, contrary to usual remedial principles, put [Plaintiff] 'in a better position' than if no

## III.    [PROPOSED] ORDER

It is hereby ordered and adjudged as follows:

1.   The Court finds that Plaintiff has failed to meet her burden of proof as to her claims remaining in the case.

2.   Accordingly, the Court enters judgment for Defendants on Plaintiff's First and Second Claims for relief and denies Plaintiff's motion for preliminary injunction.

3.   Alternatively, if the Court were to find in favor of Plaintiff on either claim, it declines to issue any declaratory or injunctive relief and declines to award any front pay.


Dated: January 2, 2023                          Respectfully submitted,

                                                 BRIAN M. BOYNTON
                                                 Principal Deputy Assistant Attorney General

                                                 CARLOTTA P. WELLS
                                                 Assistant Branch Director

                                                 /s/ Joshua Kolsky
                                                 JOSHUA KOLSKY
                                                 Senior Trial Counsel
                                                 DOROTHY CANEVARI
                                                 MADELINE MCMAHON
                                                 DANIELLE YOUNG
                                                 Trial Attorneys, Federal Programs Branch
                                                 U.S. Department of Justice, Civil Division
                                                 1100 L Street, NW, Room 11526
                                                 Washington, DC 20001
                                                 Tel.: (202) 305-7664
                                                 Email: joshua.kolsky@usdoj.gov

                                                 *Counsel for Defendants*

---

constitutional violation had occurred" because she would be receiving a lump-sum up front for more than she would have received if she had remained at the FDO, including all the benefits that the time value of money affords. *Collins v. Yellen*, 141 S. Ct. 1761, 1801 (2021) (Kagan, J., concurring in part and dissenting in part) (quoting *Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 285 (1977)).