IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA (Asheville)


CARYN DEVINS STRICKLAND,                )
formerly known as Jane Roe,             )
                                        )
                Plaintiff               )
                                        )  CA No. 20-00066-WGY
            -VS-                         )  Pages 1 - 40
                                        )
UNITED STATES OF AMERICA, et al,        )
                                        )
                Defendants              )


**BENCH TRIAL – DAY SIX**

**CLOSING ARGUMENTS**

BEFORE THE HONORABLE WILLIAM G. YOUNG
UNITED STATES DISTRICT JUDGE




                        United States District Court
                        1 Courthouse Way, Courtroom 18
                        Boston, Massachusetts  02210
                        January 4, 2024,

LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
leemarz@aol.com

 1  A P P E A R A N C E S:

 2  FOR THE PLAINTIFF:

 3      CARYN STRICKLAND, P.O. Box 92, Lynn, North Carolina,
    28750, appearing Pro Se.

 4
        COOPER J. STRICKLAND, ESQ., Law Office of Cooper Strickland,
 5  P.O. Box 92, Lynn, North Carolina, 28750.

 6  FOR THE DEFENDANTS:

 7      JOSHUA MICHAEL KOLSKY, ESQ., US Department of Justice,
    1100 L Street NW, Washington, DC, 20005.

 8

 9                          I N D E X

10

11  CLOSING ARGUMENTS:                      PAGE

12  By Mr. Kolsky:                           3

13  By Ms. Strickland:                       20

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G

THE CLERK:  The United States District Court is in
session.  You may be seated.  Now hearing Civil Matter
20-00066, Strickland v. The United States, et al.

THE COURT:  Good morning, Counsel.  We've come to
final arguments in this case.  As I've already announced, the
order of argument will be the defense first and then the
plaintiff, as the plaintiff bears the burden of proof, and
one-half hour, no more than one-half hour, though that's not an
invitation to take that time, per side.

One thing I should say -- and counsel will understand
this -- in the course of the argument, I may suggest things or
say, "Well, assuming I found this" or "Isn't it true that the
following?"  No one should think that that's a forecast of the
findings of fact and conclusions of law.  It's just questions
that I have that you may have a chance to answer.

So with those things stated, we'll hear first from the
Judiciary defense here.

MR. KOLSKY:  Thank you, your Honor.  This is Josh
Kolsky on behalf of the defendants, and if I may, I'd like to
reserve five minutes for rebuttal.

THE COURT:  No.  We have no rebuttal.  I'll hear you.

MR. KOLSKY:  Thank you, your Honor.

The Federal Judiciary takes reports of sexual harassment
very seriously.  In this case, the evidence shows that

Ms. Strickland was not subjected to sexual harassment or
deliberate indifference, and there was no violation of her due
process rights.  Rather, the incidents that Ms. Strickland
points to as supposedly constituting sexual harassment were
ordinary workplace interactions that Ms. Strickland has
misinterpreted, just as she has misinterpreted many other
interactions.  Her subjective beliefs about the events at issue
simply do not comport with the objective evidence at trial.  As
the investigator who looked into Ms. Strickland's claims put
it, she experienced sexual harassment only in her mind.  The
evidence at trial has shown that that conclusion was exactly
right.

Under the Fourth Circuit's opinion in this case, if
Ms. Strickland does not prove that she was subject to sexual
harassment, her equal protection claim necessarily fails.
There are two ways a plaintiff can show sexual harassment, a
hostile work environment theory and a quid pro quo theory.
Here, Ms. Strickland's sexual harassment claim is based on
three emails in June, 2018, in which JP Davis offered to get a
drink with her; one occasion in June, 2018, when Mr. Davis
offered her a ride home; and one email in May, 2018, with the
subject "mas dinero."  So I want to talk about each of those.

As to the three drink emails, Ms. Strickland and
Mr. Davis both testified that they had gotten drinks together
on multiple prior occasions, including at least once at

Ms. Strickland's invitation.  Ms. Strickland never told
Mr. Davis that she was no longer comfortable getting a drink
with him.  On the contrary, she told him on May 18, 2018, words
to the effect of, "Anytime you want to buy me lunch or a drink,
I'll take it."  Given that statement, it couldn't possibly be
sexual harassment when Mr. Davis offered to get a drink with
her a couple weeks later.

Keep in mind that their drink emails were just casual
offers to get a drink while discussing work topics, and each
made clear Ms. Strickland was free to decline.

June 1st:  "I'm happy to offer a drink and an ear if
you need one, though I get the feeling you are not comfortable
talking to me about it.  Might I suggest Maryellen?"

June 19th:  "I'm going to get this filed and get a
celebratory drink.  You're welcome to join me, but if I recall
correctly, you have an appellate brief to write."

June 27th:  "Can we catch up for a little bit sometime
this week?  I think it would be good, another mentoring
session.  We can do it over lunch or cut out early one day for
a celebratory post-Davis drink, or we can just do it in the
office."

As to the occasion when Mr. Davis offered
Ms. Strickland a ride home when she was going to ride her bike
home in the rain, Ms. Strickland acknowledged in her testimony
that Mr. Davis had given her rides home at her request on

1  multiple occasions previously.

2       As to the "mas dinero" email, well, just hours before

3  Mr. Davis sent that email, Ms. Strickland told him she would

4  need a pay raise to remain working at the Federal Defender's

5  Office. So when Mr. Davis sent an email referring to "pay for

6  stay," he was referring to her request from earlier that day.

7       THE COURT: Well, excuse me. That's your conclusion,

8  and I understand why you would make that argument, but the

9  investigator here drew a contrary conclusion and thought that

10 that was inappropriate, quid pro quo, sexual harassment.

11      Now, it does seem, one, that there's an independent

12 investigator; that's the conclusion that she drew after what

13 appears to be a thorough investigation here. And it likewise

14 appears to be a basis for this letter from the Chief Judge of

15 the Circuit, which had specific reference to Chapter 9 of the

16 Plan. Aren't those admissions by the Judiciary that Mr. Davis

17 was way out of line here?

18      MR. KOLSKY: So the investigator did not find that

19 there was sexual harassment. In fact, she found that the

20 evidence did not show sexual harassment.

21      With regard to the quid pro quo email, I think what

22 the investigator said was that she felt that it supported the

23 plaintiff's claim of sexual harassment, but ultimately the

24 investigator could not find sexual harassment. And just

25 looking at the email itself, I mean, there's not a single word

in that email that has a sexual connotation.  Whatever Ms. Bean
thought about how that email could be interpreted, I mean, it's
up to the Court to read the email, to interpret it, to make the
Court's own finding.  And just on the face of it, there's
nothing about it that suggests any special advance, particularly
in light of the context where Ms. Strickland earlier that day
had had this conversation with Mr. Davis saying that she wanted
a pay raise in order to stay in the office, and that's clearly
what Mr. Davis was referring to.

10:09     THE COURT:  Well, it appears that Chief Judge Gregory
took it seriously, and that was the basis for his -- we'll call
it his "counseling letter."

MR. KOLSKY:  So the counseling letter that was issued
to Mr. Martinez was based on certain missteps that were
identified by the investigator with regard to Mr. Martinez.
That letter did not counsel Mr. Davis.  There was a separate
oral counseling by Mr. Martinez of Mr. Davis relating to his
unprofessional, certain unprofessional emails using profanity
in certain emails.  But the letter of counseling that was
10:10 issued and signed by Mr. Ishida, that was not based on conduct
by Mr. Davis.  That was a letter of counseling to Mr. Martinez.

The idea that the email was a sexual advance is also
inconsistent with the evidence that Ms. Strickland invited
Mr. Davis to go on a 45-minute walk with her just eleven days
later on May 29.  It's hard to see how she would have done that

if she thought Mr. Davis had just made a quid pro quo sexual

advance.  So the evidence does not show that Mr. Davis's

conduct was unwelcome, that it was based on Ms. Strickland's

gender, or that it was severe or pervasive.  None of the conduct

was sexual or romantic in nature.

And to illustrate just how far the evidence is from

meeting the legal standard for sexual harassment, consider the

Fourth Circuit's published opinion in *Hopkins v. Baltimore Gas*

*& Electric Company*.  There the First Circuit ruled that "A

supervisor's conduct towards a subordinate was not sufficiently

severe or pervasive to constitute actionable sexual harassment,

even though the supervisor allegedly made repeated sexual

innuendos, regularly commented on the plaintiff's appearance,

frequently entered the bathroom when the plaintiff was there

alone, asked the plaintiff about his sexual activity, held a

magnifying glass over the plaintiff's crotch and asked where is

it, and kissed the plaintiff."

The evidence that Ms. Strickland presented at trial in

this case does not even come close to the conduct at issue in

*Hopkins*, which, again, was not enough to constitute sexual

harassment.

The evidence is also insufficient under a quid pro quo

theory.  Not only was there no quid pro quo request for the

reasons I've already explained, but also there was no causal

connection with any tangible employment action, and that's a

1    requirement under the quid pro quo theory.  A plaintiff has to

2    show that when he or she rejected an unwelcome sexual advance,

3    the supervisor took a tangible employment action against the

4    plaintiff; but the evidence shows that Mr. Davis was not

5    involved in the actions that Ms. Strickland appears to be

6    challenging in this case, and that's based on testimony from

7    Mr. Martinez, Mr. Carpenter, Mr. Norman, and Mr. Davis.  So

8    Ms. Strickland has not come anywhere close to meeting her

9    burden to prove sexual harassment, and that alone is fatal to

10:12 10   her equal protection claim.

11          But she also has failed to prove that the government

12   responded to her report of sexual harassment with deliberate

13   indifference or that Tony Martinez acted with discriminatory

14   intent.  And the Fourth Circuit has said that deliberate

15   indifference is a very high standard; a showing of mere

16   negligence will not meet it.

17          Far from showing deliberate indifference, the evidence

18   shows that the government responded promptly and effectively to

19   Ms. Strickland's report of sexual harassment.  Ms. Strickland

10:13 20   sent an email to Mr. Martinez on August 10, 2018, in which she

21   claimed sexual harassment.  Mr. Martinez promptly notified the

22   Circuit Executive, who then notified the Chief Judge, and

23   selected an investigator to look into the allegations, all of

24   which was consistent with the EDR plan.

25          THE COURT:  Excuse me again.  It's pretty clear here

that Ms. Strickland has shown an animus, a bias, which Ms. Bean
also commented on, against her.  Now, how does that factor in
here?  And I may be anticipating your argument on due process,
but I will tell you, I have concern where the Chief Judge in
the Circuit says that it's not for him to take any action
against Davis because given the position of the Defenders and
their appropriate independence, that's for Martinez.  Now, if
Martinez is biased, doesn't that infect the whole process?

MR. KOLSKY:  So a few things in response to that.

THE COURT:  Yes.

MR. KOLSKY:  Number one, Ms. Strickland has no right
to secure discipline of another employee.  Discipline occurs
under Chapter 9 of the EDR plan.  So, you know, she doesn't
have any basis to say, you know, another employee needs to be
disciplined, and that's up to the judgment of the head of the
office, who was Tony Martinez.  But also I disagree that, you
know, Mr. Martinez had a bias or any sort of -- certainly
there's no evidence of discriminatory intent.  And on that
topic, I think Circuit Executive Ishida --

THE COURT:  It could be argued here, it could be
argued -- maybe Ms. Strickland will or Ms. Strickland's
lawyer -- that for whatever reason, he thought, "he," Martinez
thought that she was -- I'll phrase it like this -- "playing
the sexual harassment card in order to get the job advantages
that she wanted."

1          Now, that's far from an independent judgment about the

2     situation.  He appears, and I take the cross-examination here,

3     he appears to have been hostile to her.  I have some real doubt

4     whether that was based upon any gender bias, but as this went

5     along, he -- well, I've said it -- seems quite hostile to her.

6          MR. KOLSKY:  So both Mr. Ishida and Ms. Langley

7     testified, and Judge Gregory in his deposition designations did

8     as well, that the Unit Executive is not expected or required to

9     be neutral in an EDR proceeding.  That doesn't create any

10:16 10   violation of Ms. Strickland's rights.  Mr. Martinez was acting

11    consistent with his role as the Unit Executive.  So whatever

12    his views about Ms. Strickland's motivations, that did not

13    cause any deprivation of due process; and in fact the evidence

14    confirms that Mr. Martinez's limited participation in the EDR

15    process did not interfere with Ms. Strickland's rights.

16          During the mediation, Mr. Martinez offered

17    Ms. Strickland a duty station transfer to Asheville that she

18    had requested.  He even offered to give her his own office in

19    Asheville.  So whatever he felt about the situation with

10:17 20   Ms. Strickland, it sure didn't translate into any bad faith on

21    his part during the mediation.  And, you know, if anyone didn't

22    participate in good faith during the mediation, it was

23    Ms. Strickland, because how did she respond to Mr. Martinez's

24    offer to give her his office in Asheville?  Well, just three

25    days later she sent a text message to a friend vowing to burn

1  the place down on her way out.  That doesn't sound to me like

2  someone who was trying in good faith to reach a resolution.

3       But getting back to the actions that Mr. Martinez took

4  in response to the report of harassment on August 10, as I

5  noted, he notified the Circuit Executive, who then initiated an

6  investigation.  Mr. Martinez agreed to Ms. Strickland's request

7  to telework, agreed to allow her to report to the Appellate

8  Chief, Josh Carpenter, and he rearranged the office's reporting

9  structure so that Mr. Carpenter would report directly to

10:18 10  Mr. Martinez instead of to Ms. Davis.  And the evidence shows

11  that the measures put in place by Mr. Martinez were effective.

12  Ms. Strickland had virtually no further contact with Mr. Davis.

13       Now, Ms. Strickland has argued that Mr. Martinez was

14  put on notice of her claims of sexual harassment by July 5.  We

15  dispute that because Mr. Martinez specifically asked

16  Ms. Strickland if she was alleging sexual harassment, and she

17  said she was not.  But, in any event, Mr. Martinez did take

18  action at that time to make sure Ms. Strickland was comfortable.

19  Even though he understood the issue to be an ordinary workplace

10:19 20  conflict, not sexual harassment, he still wanted to make sure

21  she was comfortable.  So Mr. Martinez assigned a new mentor to

22  Ms. Strickland, he made sure she would not be assigned to work

23  with Mr. Davis, and he instructed Mr. Davis not to email, text,

24  or meet with Ms. Strickland; and as a result, there was no

25  further contact of any significance between Mr. Davis and

1    Ms. Strickland after the July 5 meeting.

2         Now, Ms. Strickland also claims that Mr. Martinez

3    retaliated against her for reporting sexual harassment, but the

4    evidence shows that that is incorrect.  She claims Mr. Martinez

5    denied her a promotion to Grade 15, but she was converted from

6    a research and writing attorney to an AFPD as she had

7    requested.  That conversion moved her to the ungraded AD pay

8    scale; she was not eligible for a promotion, although the

9    conversion did increase her long-term earnings potential.

10:20 10   Mr. Martinez had no knowledge of when Ms. Strickland would

11   become eligible to be considered for a discretionary promotion

12   to Grade 15.

13        Ms. Strickland claims that her locality pay was

14   removed when she was converted, but she testified that her

15   salary immediately before she was converted included locality

16   pay, and that her salary remained the same when she was

17   converted, so she didn't lose any locality pay.

18        She claims that she was forced to telework, but she

19   requested telework from Mr. Martinez.  She told him that

10:20 20   "A long-term resolution that allows me to work remotely and

21   report to the Appellate Chief in Asheville is fine with me."

22   She told Nancy Dunn at the Administrative Office that "If I

23   have to work remotely until there's space in Asheville, that is

24   completely fine with me."  She told Circuit Mediator Ed Smith

25   that she preferred teleworking and works better on her own.

1    And she never told Mr. Martinez that she was not happy

2    teleworking.

3          She claims her duties were diminished, but her

4    official grievance says otherwise.  It says there was no change

5    in job responsibilities when she was converted to an AFPD; and

6    Mr. Carpenter, who was her supervisor at the time, testified

7    that her duties remained the same and that she performed the

8    same work as the other attorneys in the Appellate group.

9          In fact, in January, 2019, Mr. Carpenter offered

10:21 10   Ms. Strickland an opportunity to argue a case in the Fourth

11   Circuit, but she declined that opportunity.  And her

12   interpretation of that email exchange with Mr. Carpenter is

13   very revealing:  She thought he didn't want her to do the

14   argument, even though in that email he is bending over backwards

15   to try to accommodate her, even offering to reassign her other

16   work obligations so that she could focus on the argument.

17          And that's indicative of a larger problem here, your

18   Honor, which is that Ms. Strickland has consistently

19   misinterpreted statements made to her and misinterpreted

10:21 20   people's intentions.  She finds nefarious explanations for

21   entirely ordinary interactions.  She misinterprets

22   Mr. Carpenter's very gracious offer to reassign her other work

23   so that she could do the Fourth Circuit argument.  She

24   misinterprets Mr. Davis's emails offering to get drinks as

25   sexual harassment, even though she had recently told him that

1  anytime he wanted to get a drink with her, that would be fine.

2  She misinterprets Mr. Davis's "mas dinero" email as a quid pro

3  quo request, even though the email is entirely consistent with

4  her request from earlier that day that she wanted to be paid

5  more money or she would quit.

6       She misinterprets Mr. Martinez's words when he

7  attempted to clarify whether she had been touched by Mr. Davis.

8  She falsely claimed that Mr. Davis had said "At least you

9  weren't touched."  Mr. Martinez never said that.  The recording

10:22 10  of the August 9 conversation is in evidence, and it confirmed

11  he never said that.

12       She misinterprets the letter of counseling that

13  Mr. Martinez received as a letter of reprimand.  In fact, even

14  yesterday she filed a document in this case repeatedly

15  referring to it incorrectly as a "letter of reprimand," despite

16  the clear evidence at trial to the contrary.

17       In short, Ms. Strickland has in her mind a view of the

18  events at issue in this case that is completely at odds with

19  the objective evidence.

10:23 20       THE COURT:  What do you say --

21       MR. KOLSKY:  Now, the evidence --

22       THE COURT:  Wait.  Two questions just to move this on.

23  What do you say she has to prove as a basis for her claim of

24  front pay here?  That is, what triggers the duty to pay front

25  pay from the Judiciary's point of view?

          MR. KOLSKY:  So front pay is awarded for lost

compensation.  So to be eligible for that, she has to show that

she lost compensation through a wrongful termination.  There's

no actual termination here, so she would have to show a

constructive termination, and that requires her to show that

working conditions became so intolerable that a reasonable

person in her position would have felt compelled to resign.

Her working conditions were not intolerable at any time, and

certainly not when she resigned in March, 2019.  At that point

she had been teleworking since August, 2018.  She had virtually

no contact with Mr. Davis since July.

          In fact, she doesn't even contend that her working

conditions were intolerable in March, 2019.  Rather, she

testified she believed she was constructively discharged

because she felt she was no longer welcome at the Federal

Defender's Office.  Well, that's not the standard.  And she

testified that she believes she was constructively discharged

in November of 2018, but she didn't leave the Federal Defender's

Office until nearly five months later because she wanted to

wait until she found a new job.  But the situation wasn't

intolerable if she could wait months and months until she found

acceptable replacement employment.

          THE COURT:  Let me ask you -- again, this is contrary

to your argument, and I fully understand that, but I do have a

question about this -- if I get to the issue of front pay, I

have two, not concerns but two aspects of it I'll ask you

about, two questions:  Do you agree that if the Judiciary is

liable on the issue of the failure, in a constitutional sense,

to afford her due process -- that's the first question -- if

she doesn't succeed on equal protection but she does succeed on

due process, is front pay available?  First question.

Second question:  If front pay is available on either

theory, I candidly don't get your argument that -- I don't

understand the evidence you put in of what Duke graduates would

get.  That seems to trench on some sort of duty to mitigate her

damages and earn as much as she was earning at the Federal

Defender's Office.

Now, what she's doing is important, socially

beneficent work.  It doesn't pay much, but I just don't see any

duty on her part to go out and earn as much as she can because

her pay was greater while she was a Defender.  I know you don't

think the Court's analysis should ever get that far, but if you

could answer those questions.

MR. KOLSKY:  Yes, your Honor.  The first question, if

there was a finding of liability on due process but not equal

protection, whether front pay would be available.  So front pay

is not a remedy for a due process violation.  The remedy for a

due process violation is more process.  She hasn't requested

to, you know, reinstate her EDR claim or anything like that, so

there would be no -- there's been no such remedy requested

1    here, but front pay is not a remedy for a due process violation.

2          And on the other question, I think the point we would

3    make is that Ms. Strickland has a higher earnings capacity than

4    her current work, so she could obtain another job making as

5    much as she was making at the Federal Defender's Office, if not

6    more, if she wanted to.  And her decision -- I mean, she can,

7    you know, she can take whatever job she wants, but her

8    decision --

9          THE COURT:  Suppose you're right on that, suppose

10:28 10   you're absolutely right, she has the capacity, the capacity to

11   earn more, but why is she required to do that if she is

12   genuinely devoting her time to this indigent appellate defense

13   work?

14         MR. KOLSKY:  She has a right to take a lower-paying

15   job, but she can't claim then that the government owes her the

16   difference if that's her personal decision to accept lower-

17   paying employment.  And --

18         THE COURT:  I'd like to see some authority on that

19   because I'm not so sure she has a duty to mitigate her damages.

10:28 20         All right, about five minutes more.  You go ahead.

21         MR. KOLSKY:  Yes, I would just say, you know, it is

22   her burden to prove her losses, and she was making more money

23   as a law clerk.  I think within a couple months after she left

24   the Federal Defender's Office, she was making more money than

25   she was at the Federal Defender's Office.

But just a few other points, your Honor.  One of the
things Ms. Strickland must prove is that Mr. Martinez acted
with discriminatory intent, and on that topic, Circuit
Executive Ishida's testimony was especially powerful.  He spoke
directly with Mr. Martinez in the days following Ms. Strickland's
report of sexual harassment, and he testified that Mr. Martinez
was well-intentioned, acted in good faith.  Mr. Ishida was in
perhaps the best position of anyone to observe Mr. Martinez's
state of mind at that time.  His testimony on that topic is
highly probative on the issue of discriminatory intent, and to
rule for Ms. Strickland on the equal protection claim would
require disbelieving Mr. Ishida's testimony.

Mr. Ishida also testified about his letter of
counseling which identified certain missteps or things
Mr. Martinez could have done better, but Mr. Ishida was clear
that the letter contained no finding of wrongful conduct.
Ms. Strickland has relied heavily on that letter, but it
doesn't show any discrimination or retaliation occurred.

And the Court should not hold against the Fourth
Circuit the fact that it tried to improve the Federal Defender
Office's response to harassment reports by counseling
Mr. Martinez on things he could have done better.  That
counseling is what any responsible employer would have done,
and it would be a concerning precedent for every employer in
this country.  If the mere fact that an employer identifies

1    areas of improvement be used as a basis to impose liability in

2    a discrimination case, that would have the perverse effect of

3    discouraging employers from taking appropriate steps to improve

4    their response to reports of harassment.

5              And getting back to your Honor's questions about front

6    pay, the factors that the Court should consider for an award of

7    front pay are Section 10 of our Findings of Fact and Proposed

8    Conclusions of Law that we filed earlier this week.

9              THE COURT:  Thank you.

10:31 10         MR. KOLSKY:  And for these reasons, the Court should

11    enter judgment for defendants on all claims remaining in the

12    case and deny Ms. Strickland's motion for a preliminary

13    injunction.

14             THE COURT:  Thank you.

15             Ms. Strickland, Mr. Strickland, who's going to argue?

16             MS. STRICKLAND:  I am, your Honor.  Thank you.

17             THE COURT:  And you may.  I'll hear you.

18             MS. STRICKLAND:  Thank you, your Honor.  The Court has

19    heard the evidence in this case and has had the chance to

10:31 20   observe the credibility of the witnesses' testimony.  At this

21    point the record confirms yet again that the allegations

22    contained in my complaint are true.

23             Defendants' defense to these allegations is specious.

24    Let's start with the Chief Judge's letter of reprimand.  Coming

25    into the trial, this Court stated that the letter was an

1   unimpeached public record.  Following the trial, it remains so.
2   Mr. Martinez testified that he did not deny any of the findings
3   in this letter.  He testified that he did not deny using a
4   marriage metaphor to describe my relationship with the accused
5   harasser.  He testified that he did not deny that he had called
6   me out for seeking advice and guidance from the Fair Employment
7   Opportunity Office at the AO on my civil rights as a Judiciary
8   employee.  Indeed, he confirmed and doubled down on his
9   statements that he was frustrated and angry that I went to the
10:32 10  AO for guidance on my civil rights.  That is protected activity.

11          Mr. Martinez also testified --

12          THE COURT:  But wait, wait, wait.  What came of that?
13  You know, you're, like, advancing a retaliation claim, and, you
14  know, there is much to what the Judiciary, through Mr. Kolsky,
15  has said.  This was termed a "letter of counseling."  You
16  persist in calling it a "letter of reprimand."  What do you say
17  to his argument that I shouldn't hold the Judiciary liable
18  based upon good-faith efforts to improve a process here?

19          MS. STRICKLAND:  Well, your Honor, I think there's a
10:33 20  couple of responses.  First, the "letter of reprimand"
21  terminology was from the summary judgment ruling, not from us.
22  But, really, it doesn't matter whether it's a letter of
23  reprimand or a letter of counseling; it was disciplinary action
24  under Chapter 9, a finding of wrongful conduct.  And to say
25  that somehow it would create a perverse incentive to impose

 1    liability on this would simply disregard the duty of an

 2    employer to take action, timely action, prompt and effective

 3    remedial action on findings of wrongful conduct.

 4          Defendants have repeatedly stated that Chapter 9 of

 5    the Plan doesn't impose remedies, but it does impose a duty on

 6    the employer to take action on wrongful conduct.  That duty

 7    exists for every employer in the country, and it does not

 8    create a perverse incentive or do anything except do what the

 9    law requires, to impose liability for findings of sex

10:34 10    discrimination.

11          THE COURT:  Having made your claim here, and I guess

12    I'm focusing on your due process claim, what process here do

13    you think you were due?

14          MS. STRICKLAND:  What process do I believe I was due?

15    Is that the question?

16          THE COURT:  It is, yes, ma'am.

17          MS. STRICKLAND:  So the Fourth Circuit articulated all

18    of this very well in its opinion when it stated that the EDR

19    Plan creates both substantive rights -- the right to be free

10:35 20    from discrimination, harassment, and retaliation in

21    employment -- but it also creates a procedure and procedural

22    rights.  And one of the things that the Fourth Circuit said was

23    that the failure to disqualify Anthony Martinez, the Federal

24    Defender, even though he was an accused party, created a

25    conflict of interest.

1        Now, the Fourth Circuit at the time of its decision

2  did not know -- none of us knew outside of the defendant -- how

3  severe and pervasive this conflict of interest really was.  And

4  the evidence on this claim, and I believe your Honor mentioned

5  it, remains unrefuted that Heather Bean, the EDR investigator,

6  recommended that he be disqualified, not only because he was an

7  accused party but because he was too biased, and he could do

8  more damage if allowed to participate.

9        Mr. Ishida testified that he did discuss Ms. Bean's

10:36 10  recommendation with Chief Judge Gregory.  In contrast, Chief

11  Judge Gregory testified during his deposition that he had not

12  been made aware of this email; but either way, this failure to

13  disqualify Mr. Martinez when he had engaged in conduct

14  warranting --

15        THE COURT:  I guess I don't understand.  Again, the

16  Fourth Circuit in its most important opinion, the opinion that

17  both guides and controls this Court, and whose mandate I must

18  strive entirely to fulfill, was operating on the basis, as we

19  all were operating then, on the basis of your complaint.  And

10:36 20  the evidence as it has been developed here shows that he was

21  not any decision-maker in the furtherance of the resolution of

22  your complaint, or at least that's how it appears to me.

23        So the fact -- and I do think your cross-examination

24  of him was effective -- he was hostile to your performance,

25  that's true, and you brought that out, but that's not -- they

           did not convey to you, it seems to me on this record, that he

           was a decision-maker here.  So that's why I'm asking, what due

           process -- to disqualify him, what role, what pernicious role

           did he play here on the evidence as we actually see it?

                     MS. STRICKLAND:  Yes, your Honor.  Well, first of all,

           we understand the ruling about the decision-maker from earlier

           in the trial, and we would preserve our objection to that

           ruling.  And we believe that our proposed findings have

           numerous and numerous pages of what was actually said

10:38      contemporaneously at the time that was communicated that the

           Defender, in his position as Unit Executive, would have been,

           as a practical matter, the decision-maker in a final hearing.

           But I would also contend that that doesn't matter --

                     THE COURT:  I have to interrupt you because I've read

           this Plan carefully, and I don't see -- cite to the Plan where

           he would be the decision-maker in a final hearing.  We never

           got to the final hearing.  That's one of the concerns I have on

           the due process ground.  It appears that this, from the

           Judiciary's point of view, this thing was resolved at the

10:39      mediation stage.  Isn't that so?

                     MS. STRICKLAND:  No, your Honor.  In fact, that was

           exactly the argument that the defendants raised on dismissal

           that was rejected by the Fourth Circuit.  And I would note that

           the defendants never contended here any sort of exhaustion

           argument at the appeals stage, and the Fourth Circuit said that

even if exhaustion had been raised as a claim, they understood

I didn't exhaust my claims.  That's because I was constructively

discharged and forced to end the EDR process before it concluded.

And I would like to say --

THE COURT:  Detail for me in your argument the

elements of your constructive discharge before the EDR process

completed.  Could you please do that.

MS. STRICKLAND:  Yes, your Honor.  I will start on

that with two things about Mr. Ishida's testimony in particular

as it relates to the claim of constructive discharge.  First,

Mr. Ishida confirmed, as stated in his March 25, 2019

memorandum, that the Fourth Circuit did not even begin the

process of taking disciplinary action on these allegations

until after I resigned from the FDO.  The memorandum even

states, and I quote, "The last remaining matter" which

conveniently followed my resignation, "is Ms. Strickland's

report of wrongful conduct under Chapter 9 of the Plan."

Even though the investigation itself took an

unacceptably long time, the amended investigation report with

these recommendations had come out in January, 2019, months

earlier.  There was simply no justification not to take prompt

and effective action based on the investigation findings.  Any

reasonable person in my position who was told that no

disciplinary action would even be considered after the report

came out would feel compelled to resign on that basis alone.

1         And, second, the failure to disqualify Mr. Martinez,

2    despite his hostility and bias, and the fact that he had

3    engaged in wrongful conduct also contributed to the constructive

4    discharge.

5         THE COURT:  The hostility --

6         MS. STRICKLAND:  The purpose of --

7         THE COURT:  Wait, wait.  The hostility of Mr. Martinez,

8    at least as you developed it at trial, was with your work

9    performance, not based on gender.  Now --

10:41 10        MS. STRICKLAND:  Well, your Honor, I would direct you

11   back to what the findings are in whether we call it a letter of

12   reprimand or a letter of counseling.  Using a marriage metaphor

13   to describe my relationship with the accused harasser is sex

14   discrimination.  Calling me out for seeking advice and guidance

15   from the AO on my legal rights is sex discrimination.  Making

16   statements that there was no physical contact, which the

17   investigator found were words to the effect that "At least you

18   were not touched" and "were callous, minimizing, and sensitive

19   and contributed to the distress that Ms. Strickland felt as

10:42 20   stated in the report," that is sex discrimination.

21        THE COURT:  On the last --

22        MS. STRICKLAND:  Without a --

23        THE COURT:  Wait a minute.  Wait, wait a minute.  On

24   the last point, there's a factual dispute there which I have to

25   resolve and I will, but I asked a question, and now you've

answered it. You've answered it directly, and I appreciate that, but what's the authority under which I act here? The Fourth Circuit law that the failure to discipline the marriage metaphor -- ill-advised, you're absolutely right -- but you've drawn the conclusion that that's sexual harassment on the part of Mr. Martinez. I don't see the authority for that, respectfully.

MS. STRICKLAND: Well, yes, your Honor, it is not just me saying that. It is what is in this letter itself. It is the fact that disciplinary action was taken for wrongful conduct under the EDR plan, which requires a finding of sex discrimination, sexual harassment. Here we had deliberate indifference to quid pro quo sexual harassment, which your Honor correctly recognized the investigation found.

And I would also point out that our conclusions of law cite numerous, numerous cases about the use of derogatory gender stereotypes, which his marriage metaphor was, about sexual harassment that is based not only on sexual advances but also on the use of derogatory gender stereotypes and the expectations of how supervisors expect their subordinates to relate to them in the office. The record is rife with examples of that conduct here, and your Honor saw it in Martinez's testimony.

You have to ask yourself, if he's so hostile towards me, where is this coming from? And why, why is there such a

double standard, when the Court heard this inappropriate anger
from Defendant Martinez?  When he was challenged on his
narrative that I was not a team player, which is yet another
gender-based euphemism, he got angry about that, and even had
the audacity to state that it reflected poorly on my character,
but, shockingly, he did not even believe that JP Davis's quid
pro quo "mas dinero" email and other profanity-laced work
communications warranted disciplinary action.  That is sex
discrimination.  That is a sexist double standard in the
working environment that is based on gender, and that creates a
hostile working environment and constitutes deliberate
indifference based on sex, based on gender.

            THE COURT:  One --

            MS. STRICKLAND:  I would also point out as well --

            THE COURT:  Let me go back to one particular aspect of
your cross-examination, which, as I say, I think is effective,
but I'm not sure that it demonstrates sex discrimination, but
I've got to reflect on that.  That's what you're arguing.  But
with this interchange, you asked him about the imposter syndrome
when you were inquiring of him about -- when you had spoken to
him about cross-examining that police officer, and he said he
didn't know what that was.  And you followed up, but I sustained
the next question because the witness said he didn't know what
the imposter syndrome was.

            Well, I know what it is, and I'm familiar with it, but

1   I had not thought -- you draw the conclusion it's gender-

2   specific, that the imposter syndrome falls especially on female

3   employees.  That, one, has not been my understanding, but if

4   there's authority for that, I would like to be provided it.

5   I'm not sure that that's so.

6           Go ahead with your argument.  I simply raise that as a

7   concern.

8           MS. STRICKLAND:  Yes, your Honor, I'm happy to provide

9   authority on that.  It's my understanding that studies have

10:47 10  found that that is a gender-based phenomenon, or that it's

11  excused more in favor of one gender towards another.  Of course

12  it's not saying that it can't happen to men, just like we don't

13  intend to say that sexual harassment cannot happen to men.  Of

14  course it can happen to men, but that doesn't mean that sexual

15  harassment is not a form of discrimination based on gender,

16  which it clearly is.

17          Let me go back and figure out exactly where I was in

18  my script.  I do want to say one thing about the due process

19  claim and their argument that the only remedy for a due process

10:48 20  violation is more process.  That is simply not true.  The

21  question here that is relevant is whether there was a

22  constructive discharge and involuntary resignation; and if an

23  involuntary resignation is caused by a due process violation,

24  then the remedy for that is front pay or equitable relief.

25  It's not exclusively limited to more process.  I'm not aware of

         1    any precedent that supports that contention.

         2          THE COURT:  What's your best case on that?

         3          MS. STRICKLAND:  I couldn't give you a name sitting

         4    here right now.  It is cited in our conclusions of law, but we

         5    do have case law.  I believe it's from the Seventh Circuit.  I

         6    don't know that there's case law from the Fourth Circuit,

         7    besides the opinion in this case, of course, at the dismissal

         8    stage; but there is very detailed precedent from the Seventh

         9    Circuit describing the different forms of involuntary

10:49   10    resignation as a result of a due process violation, and I'd be

        11    happy to give you those cites in supplemental briefing.

        12          THE COURT:  Thank you.

        13          MS. STRICKLAND:  Thank you.  But I do want to say that

        14    the failure to disqualify did contribute to the constructive

        15    discharge here.  And I want to reiterate that the purpose of

        16    the EDR process is to provide a safe working environment and to

        17    discharge the Judiciary's obligations to its employees.  And

        18    it's important to stress again that while defendants continue

        19    to assert that Chapter 9 provides complainants no rights, it

10:49   20    does compel a duty on the employer to take appropriate action.

        21    By failing to take prompt and effective remedial action and by

        22    failing to provide a fundamentally fair process, the defendants

        23    gave me no choice but to resign and forgo my chosen career as a

        24    Federal Public Defender.

        25          I'm happy to talk about the individual witnesses in

this case.  I think I've already spoken about Defender Martinez.

With respect to First Assistant JP Davis, the Court heard his

overly rehearsed and utterly incredible testimony about

so-called coping skills and shadowing allegations.  Mr. Davis

could not explain his inappropriate, obsessive, and even

threatening communications at the time when he became furious

at me for not attending an optional sharing activity.  He even

stated to another supervisor contemporaneously that I should be

slapped and smacked.  You saw his email rant to himself about

me, which showed his obsession with controlling me and his

anger based on longstanding derogatory gender stereotypes that

he held about professional women, particularly those in the

legal profession.

Mr. Davis admitted on the stand that he knew I was

avoiding him, even going to lengths to call in sick based in

part on the advice of AO officials, but he still did not stop

requesting that I meet with him alone and outside of the office.

Mr. Davis admitted that his quid pro quo "mas dinero"

email was stupid, and it has been characterized as a joke, but

let me be clear:  It was threatening and traumatizing,

particularly coming from a male supervisor with so much power

and authority, both physically and over my career.

It's amazing that the defendants will continue to

suggest that the sexual harassment existed only in my quote/

unquote "mind," which is a gender-based trope about sexual

1  harassment victims, when their own investigation found that

2  quid pro quo sexual harassment had occurred.

3      Despite defendants' assertions that my job duties were

4  not reduced and that Mr. Davis did not participate in decisions

5  about my job duties, those assertions are disproven by their

6  own contemporaneous communications.  Appellate Chief Josh

7  Carpenter was forced to acknowledge this fact when he testified

8  that Mr. Davis directly participated in the conversations about

9  the conversion from R&W to AFD positions.  Unsurprisingly,

10 those conversations led to me being taken off the track to an

11 AFD position with my own case load, not being considered for a

12 promotion to Grade 15, and being required to do research and

13 writing work under Mr. Davis's supervision in the Trial Unit.

14      Mr. Martinez also required me to continue doing

15 research and writing work under Mr. Davis's Trial Unit, even

16 though there was an open position in the Appellate Unit at the

17 time.

18      Defendants also point to a January, 2019 email, months

19 after Mr. Carpenter signed himself up for an oral argument,

20 supposedly to show that he acted in good faith to accommodate

21 me.  It's important to note that Mr. Carpenter only sent this

22 email the day after the investigator contacted him to

23 investigate his conduct for the EDR investigation.  That is not

24 a misinterpretation on my part, and it does not show good

25 faith.

All of these facts were undisputed at the summary judgment stage. They remain undisputed now, and they clearly establish that Mr. Martinez ratified and facilitated Mr. Davis's quid pro quo sexual harassment.

Both Mr. Carpenter and Mr. Davis also testified regarding Mr. Davis's emails about my fuck-off attitude and my supposed fireable offenses, which appear to be nothing more than not acquiescing to his sexually harassing behaviors. Defendants' flimsy arguments are addressed in detail in our proposed findings of fact and conclusions of law, and I won't repeat everything here, but I do want to point out that if I schemed the EDR process just to get a transfer to the Asheville office, then I may be the worst manipulator alive.

You heard Mr. Martinez testify that I had never even remotely requested a transfer to Asheville before these allegations were raised, and when he eventually offered a transfer to Asheville six months into the EDR process, I did not take it. Defendants sadly continue to ask this Court to believe that I fabricated a sexual harassment claim for a transfer that I did not even take.

Defendants' story does not make any sense. According to them, I made this up to get a transfer, but then I apparently changed my mind and decided to manipulate the EDR process instead for a five-month term clerkship, even though I had already served in three prior judicial clerkships and a

1   fellowship.  It doesn't make any sense.  What does make sense

2   is that I was desperate to get out of that office, I was

3   desperate to get out of a hostile working environment, and I

4   was desperate to get away from my sexual harasser; and then,

5   after months of intentional delay, when others would do nothing,

6   I did whatever I could to get out.  In this context --

7        THE COURT:  I'm challenging you only on when you said

8   "intentional delay."  Who is responsible -- whose intent are

9   you talking about there?  This did take overly long.  The

10:55 10  Federal Courts not infrequently take overly long.  It's

11  something we are criticized for frequently and appropriately.

12  But you're talking about intentional delay.  Whose intent?

13        MS. STRICKLAND:  Yes, your Honor, I think there are

14  really two answers to that question.  The first is what I spoke

15  about earlier when Mr. Ishida said that the investigation would

16  be held in abeyance after the investigation report came out.

17  It's hard to read that as anything but intentional because the

18  investigation had concluded.  But I would submit here that the

19  person who is really at fault for all of this, the person who

10:56 20  is really in charge is Tony Martinez.  He knew about these

21  allegations since July, 2018, if not earlier.  His testimony

22  was simply not credible that he was not aware of this.  He

23  created a significant event log, and he admitted that he does

24  not create significant event logs for ordinary work

25  disagreements.  So he knew, but he simply did not address the

1   conduct for months, so he is ultimately responsible.  And he --

2           THE COURT:  I want to be clear what you're arguing.

3   You're saying knowing and understanding that you are claiming

4   sexual harassment, he deliberately delayed taking action?

5   That's what you're saying?

6           MS. STRICKLAND:  For Mr. Martinez?

7           THE COURT:  Yes.

8           MS. STRICKLAND:  Yes, absolutely.

9           THE COURT:  All right.  All right, about five more

10:57 10  minutes.

11          MS. STRICKLAND:  Thank you.  I do want to address the

12  arguments about teleworking and a couple other points in the

13  remedy.

14          So about teleworking, you heard the Defender testify

15  that the office in Asheville is only his office in the sense he

16  had a computer there.  It was not really his office because it

17  was a shared space.  You heard the Defender testify that he

18  advertised for an intern to work in that space while these

19  allegations were pending, although he said that I could not

10:57 20  work in Asheville because he had no office space.  That was

21  false, making clear to me that the only option was to go on

22  telework while hiring an intern for that duty station was

23  punitive, humiliating, and retaliatory.  It was a career-ending

24  step.  It communicated that I was less valued than a summer

25  intern.  It communicated that an employee who complains about

sexual harassment and sex discrimination will be ostracized
from the office. It resulted in a constructive discharge.

I also want to point out who you did not hear from at
trial Fair Employment Opportunity Officer Nancy Dunham, and her
deposition is part of the record, and she testified that
Mr. Davis's conduct was, quote, "classic sexual harassment."
She explained that it is common in sexual harassment cases for
people to have interpersonal relationships that are positive
that later change after a battery is caused. Further, warm
interpersonal relationships that are positive can be seen or
understood as grooming, in hindsight, for further sexual
advances.

Ms. Dunham explains that Mr. Davis's conduct was about
his desire for control, which is very common in sexual harassment
cases, especially when there is a huge power imbalance. To
further explain this concept, she compared my case to allegations
against Governor Andrew Cuomo by a woman who alleged that he
had made her uncomfortable by his obvious sexual and romantic
interest. She explained, "There was never any groping or
physical assault in my case, and I remember thinking that is
exactly what happened with Caryn Devins: no physical touching,
no groping, but nevertheless a desire to control her and an
obvious interest in her either sexually or romantically."

Ms. Dunham also explained that in her 35 years of
employment law experience, she is more likely to disbelieve

than to believe allegations of sexual harassment, but she

strongly believed me.  Likewise, this Court should compare the

credibility and consistency in my allegations, as confirmed by

the investigation's findings, with the lack of credibility of

defendants' witnesses.

I do want to talk about one other thing with Ms. Bean

and Frank Johns, which is that you didn't hear from Ms. Bean as

a witness in this case.  That appears to be because they cannot

stand behind the quality of her investigation.  But even so,

Ms. Bean still could not ignore the obvious evidence of quid

pro quo sexual harassment and sex discrimination which led to

the discipline of both the First Assistant and the Federal

Defender.  Ms. Bean and Mr. Frank Johns, the Clerk of Court for

this entire district, also mocked me for applying for a law

clerk position in the District Court.  After I withdrew my

application, Mr. Johns --

THE COURT:  Wait, wait, wait, wait.  Forgive me.  You

have about a minute left, but I want to know where -- you're

now taking on after Mr. Johns.  Where is this in the record?

MS. STRICKLAND:  We've moved for it to be admitted as

an exhibit, but it's also subject to judicial notice because

it's in prior filings.  The reason why we're using this email

is to show that the career damage for this was long term, the

damage to my reputation was long term, and it continued even

though they were aware that I had accepted a Fourth Circuit

1   clerkship, and that is relevant to the remedy component of this.

2       I do think that the issues about front pay have been

3   extensively briefed, so I won't say too much about that, except

4   I don't believe there is a lot of difference between the two

5   front pay experts, and even their expert seems to acknowledge

6   that a substantial front pay award is warranted in this case.

7   And we would submit that the award of six years of front pay

8   plus lost pension benefits amounting to $692,881, plus an

9   appropriate tax (Unclear), is the absolute floor of what the

11:02 10   record supports in this case because that number comes from

11   defendants' own expert. But really Dr. Albert's testimony

12   establishes that the amount should be much higher, but whatever

13   the Court awards, it should award an amount that appropriately

14   accounts for the long-term career damage here.

15       So in closing, I would like to renew our prior motions

16   to admit exhibits and deposition designations. I renew the

17   motion for preliminary injunction relief. I also object to

18   defendants' reliance in their conclusions of law on the alleged

19   after-acquired-evidence defense that was not pleaded or

11:02 20   disclosed in discovery. And I would note that if this was a

21   proper part of the trial, we would have put on evidence that JP

22   Davis disclosed thousands of pages of unredacted client

23   information to an employee at the Probation Office, but those

24   documents are in the record and they are subject to judicial

25   notice. And I also renew my objection to defendants' untimely

exhibit and deposition designations. Thank you.

THE COURT: Thank you. Well, I thank you all, and my thanks is sincere. The matter is now before the Court, the responsibility to rule on these matters.

One correction, Ms. Strickland. You're not now seeking a preliminary injunction. You're seeking an injunction, and I will take that under advisement.

I said I would ask this at the close of the arguments and I do. It's this, and I do this routinely in jury-waived cases: If there is any hope of you people getting together and resolving the case, now that we are at an end, save only for the decision at the trial level, I will respect that and stay my hand until some date that you agree to. On the other hand, there has been discussion throughout this about delay, and I'm prepared to begin working on this matter at once. But I do want to ask if you would like me to stay my hand so you can talk among yourselves for a brief period. You both have to agree.

We'll start with the plaintiff. Do you want me to start or stay my hand for some reasonable period, Ms. Strickland?

MS. STRICKLAND: Thank you, your Honor. Thank you for making that offer. We don't believe that further settlement discussions would be productive at this point.

THE COURT: Very well. You both have to agree and one does not. I will get to work with all reasonable speed, given

1    my other obligations.

2            My thanks to counsel is genuine.  At least in the

3    trial of this case, all counsel -- and I speak to both Mr. and

4    Mrs. Strickland and I speak to counsel for the Judiciary --

5    conducted themselves both appropriately and forcefully.  This

6    is how a case ought to be tried, and I have been privileged to

7    be the judge who's had the obligation and chance to preside

8    over it.  Thank you.  We'll stand in recess.

9            THE CLERK:  All rise.

11:05 10        (Adjourned, 11:05 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3
UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6

7          I, Lee A. Marzilli, Official Federal Court Reporter,

8  do hereby certify that the foregoing transcript, Pages 1

9  through 40 inclusive, was recorded by me stenographically at

10 the time and place aforesaid in CA No. 20-00066-WGY, Caryn

11 Devins Strickland v. United States of America, et al, and

12 thereafter by me reduced to typewriting and is a true and

13 accurate record of the proceedings.

14          Dated this 28th day of February, 2024.

15

16

17

18

19          /s/ Lee A. Marzilli
           _____
20          LEE A. MARZILLI, CRR
            OFFICIAL COURT REPORTER
21

22

23

24

25