1          UNITED STATES DISTRICT COURT

2        WESTERN DISTRICT OF NORTH CAROLINA (Asheville)

3                        No. 1:20-cv-00066-WGY

4

5    CARYN DEVINS STRICKLAND, formerly known as Jane Roe,
              Plaintiff

6

7    vs.

8

9    UNITED STATES OF AMERICA, et al,
              Defendants

10

11                      * * * * * * * * *

12

13

          For Bench Trial via Courtroom Zoom Before:
14                Judge William G. Young

15

16

                      United States District Court
17                    District of Massachusetts (Boston)
                      One Courthouse Way
18                    Boston, Massachusetts 02210
                      Monday, December 11, 2023

19

20                      * * * * * * * *

21

22          REPORTER: RICHARD H. ROMANOW, RPR
                   Official Court Reporter
23              United States District Court
          One Courthouse Way, Room 5510, Boston, MA 02210
24                    rhrbulldog@aol.com

25

```
1                    A P P E A R A N C E S

2

3    CARYN STRICKLAND, ESQ.
     COOPER J. STRICKLAND, ESQ.
4        P.O. Box 92
         Lynn, NC 28750
5        (802) 318-0926
         Email: Caryn.devins@hotmail.com
6        Pro Se Plaintiff

7

8    JOSHUA MICHAEL KOLSKY, ESQ.
     DANIELLE YOUNG, ESQ.
9    MADELINE McMAHON, ESQ.
         U.S. Department of Justice
10       1100 L Street NW
         Washington, DC 20005
11       (202) 305-7664
         Email: Joshua.kolsky@usdoj.gov
12       For Defendants

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    I N D E X

2

3    PRELIMINARIES......................................   5

4    OPENING STATEMENT BY MR. STRICKLAND................  15

5    OPENING STATEMENT BY MS. McMAHON..................  23

6

7    WITNESS                DIRECT  CROSS  REDIRECT  RECROSS

8    CARYN DEVINS STRICKLAND

9       By Mr. Kolsky:         37

10      By Mr. Strickland:

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        E X H I B I T S

2

3
        EXHIBIT 142 ......................   60
4
        EXHIBIT 143 ......................   68
5
        EXHIBIT 144 ......................   83
6
        EXHIBIT 145 ......................   89
7
        EXHIBIT 146 ......................   97
8
        EXHIBIT 147 ......................   98
9
        EXHIBIT 148 ......................   99
10
        EXHIBIT 149 ......................  114
11
        EXHIBIT 150 ......................  115
12
        EXHIBIT 151 ......................  116
13
        EXHIBIT 152 ......................  117
14
        EXHIBIT 153 ......................  118
15
        EXHIBIT 154 ......................  118
16
        EXHIBIT 155 ......................  119
17
        EXHIBIT 156 ......................  120
18
        EXHIBIT 157 ......................  127
19

20

21

22

23

24

25

```
 1        P R O C E E D I N G S
 2        (Begins, 9:00 a.m.)
 3        THE COURT:  The United States District Court is
 4   now in session.  You may be seated.
 5        THE CLERK:  Now hearing Civil Matter 20-00066,
 6   Strickland versus the United States.
 7        THE COURT:  Good morning counsel.  Could I ask you
 8   to introduce yourselves starting -- yourselves, starting
 9   with the plaintiff's counsel.
10        MR. STRICKLAND:  Good morning, your Honor, Cooper
11   Strickland for the plaintiff.
12        MS. STRICKLAND:  And Caryn Strickland.  Thank you.
13        THE COURT:  Good morning to you both.
14        And for the defense?
15        MR. KOLSKY:  Good morning, your Honor, Joshua
16   Kolsky on behalf of the defendants, and with me seated
17   at counsel table are Madeline McMahon, Danielle Young,
18   from the Department of Justice, James Ishida, the
19   Circuit Executive for the Fourth Circuit and one of the
20   defendants in this case, Christian Namhurtz from the
21   Administrative Office of U.S. Courts, the Federal
22   Council's Office, Erol Spears, who will be assisting
23   with our trial presentation technology, and also present
24   in the courtroom are DOJ Attorneys Delotta Wells and
25   Dorothy Canevari as well as William Meyers, the General
```

1    Counsel of the Administrative Office of U.S Courts, and

2    finally Kimberly Knight and Tracey Urban, who are both

3    paralegals at the Department of Justice.

4        THE COURT:  Well good morning to you all.  You are

5    welcome.

6        On the Court's end, we are assisted in the Western

7    District of North Carolina with Courtroom Deputy Clerk

8    Hayley Shade, and, um, Ms. Shade will administer the

9    oath to witnesses during the course of the trial.

10   She'll be with us throughout the trial.

11       Here in Boston I'm assisted by Courtroom Deputy

12   Clerk, Jennifer Gaudet.  The official transcript of

13   these proceedings is taken down by our Official Court

14   Reporter, Rich Romanow.

15       A few things need be stated at the outset.  One,

16   and I'm talking to the gallery here, um, given the fact

17   that I am sitting in Boston after designation as a

18   visiting judge to the Western District of North

19   Carolina, the local rules for the Western District of

20   North Carolina apply and they apply here in Courtroom 18

21   in the John J. Moakley Courthouse here in Boston.  And

22   the specific aspect of those rules that is important to

23   the public is that under the local rules of the Western

24   District of North Carolina, there are no -- to be no

25   electronic devices of any sort in the courtroom during

these proceedings.  And I speak to the Western District,
um, you know your local rules and we are following your
local rules throughout.

       The, um -- various motions have been filed, only a
few need be ruled on.  I do need the help of counsel,
there has recently been filed a -- as I have requested,
a single exhibit list going up to Exhibit Number 134 in
evidence.

       And do I understand that this encompasses those
exhibits to which the plaintiff raised an objection, but
I see a document here, um, filing Number 35, where those
objections are withdrawn.

       Is that right, Mr. Strickland?

       MR. STRICKLAND:  Just give me one moment, if you
will, your Honor.  Yes.  Up to 134, um, the objections
were withdrawn.

       THE COURT:  All right.  So, um -- but it does not
include the 7 exhibits that, um -- of the documents
proffered by the defense, to which the plaintiff raised
no objection.  So what we'll do is --

       Is that right, Mr. Strickland?

       MR. STRICKLAND:  Um, I'm not sure I can comment on
their --

       THE COURT:  Well I'll ask the defense.

       I've got Exhibits 1 through 7 which -- to which no

1  objection was raised?

2      MS. YOUNG:  Yes, your Honor, 1 through 7 on our

3  list are the ones which no objection was raised.

4      THE COURT:  Okay.

5      MS. YOUNG:  The exhibit list was like --

6      THE COURT:  All right, look, we're only going to

7  have one list of exhibits in evidence, so your 1 through

8  7 will start at 135, and you renumber them.  Um, let's

9  see, um, 7 and 34 takes us up to, um, 141.  And so

10  they'll be renumbered.  And now I've got 141 exhibits

11  which are part of the record and I am responsible for

12  them.

13      I notice, as I go over this list of exhibits,

14  various depositions are mentioned.  Are all the

15  depositions -- does that mean that I am to read the

16  entire deposition or are portions of the depositions

17  spelled out here?

18      MR. STRICKLAND:  Your Honor, we mailed courtesy

19  copies of those deposition designations with the

20  exhibits, which is, my understanding, the way the

21  practice works in this district, that they are exhibits.

22      THE COURT:  Well that's so -- excuse me.  So

23  what's of record are the deposition designations, and I

24  will be sure to have read them all.  And if objections

25  are raised in the deposition, I will endorse them so

1    we're clear what we're doing.

2         All right.

3         MS. YOUNG:  Your Honor, can I have permission to

4    speak?

5         THE COURT:  Yes.

6         MS. YOUNG:  Your Honor, the exhibit list that was

7    filed this morning by plaintiff, I just want to be clear

8    it's not a joint exhibit list, and defendants have a

9    number of objections to the exhibit list that plaintiff

10   filed.

11        THE COURT:  Well, look, I issued an order here and

12   the order was that you were to get together and exhibits

13   that to which objections were raised, they would get

14   letters, and exhibits to which no objections were

15   raised, they would get numbers.  Now that's an order,

16   that wasn't some negotiating position.  So you people

17   now are going to have to sit down, after today's

18   session, and work that out.  But I've been given

19   something that I thought there was no objection to.

20        And I'll say this further about exhibits.  I will

21   assume -- even as to exhibits for identification, I will

22   assume the authenticity of the document, or whatever it

23   may be, unless you particularly, in your objection, call

24   out what you suggest to me that it's not authentic.

25        Now let me deal with some other matters.  The

1  motion for sequestration is allowed.  And you know the

2  requirements as to sequestered witnesses, so they will

3  not be in the courtroom, nor will they discuss in any

4  way the testimony of any other witness.

5       The motion to close the courtroom for the

6  testimony of the plaintiff is denied.  It is imperative

7  that a court proceeding such as this be public and on

8  the record.  There are a few rare exceptions to that and

9  you may raise those at the time.  But everyone's going

10  to testify in public.  This entire proceeding is going

11  to be public.

12       References made on -- I'm looking at these

13  recently-filed documents quickly.  But reference was

14  made to things that you have denominated "confidential"

15  in the course of discovery.  I'm not honoring any of

16  that during this trial.  If something is going to be

17  proffered to the Court as a basis for making findings

18  and rulings, it's going to be public, unless it fits any

19  one of those narrow exceptions.

20       I think with that done, we're ready to go.  We

21  agreed on 15 minutes a side for opening.  So,

22  Mr. Strickland, I take it, though, as -- Ms. Strickland,

23  you're an attorney, and you may divide this up as you

24  see fit, except when you testify, Mr. Strickland will be

25  asking questions and you will be answering.  So if I

1  call on one of you and the other one is going to

2  present, simply correct me.  I'm fine with that.

3      All right.  15 minutes for openings.

4      MR. KOLSKY:  Sorry, your Honor, may I first

5  interrupt with one clarifying question about one of your

6  rulings?

7      THE COURT:  You may.

8      MR. KOLSKY:  With regard to the motion for

9  sequestration, um, as I mentioned, Mr. Ishida is present

10  in the courtroom --

11      THE COURT:  He's a party.  He's a party and he may

12  be present in the courtroom throughout.

13      MR. KOLSKY:  Thank you, your Honor.  We are

14  planning to call him as a witness.

15      THE COURT:  I understand.

16      MS. YOUNG:  And may I ask the Court a clarifying

17  question, your Honor, on one of your --

18      THE COURT:  You may.

19      MS. YOUNG:  Just for the record, defendants

20  understand that the Court does not want to hear argument

21  on defendants' objection to plaintiff's exhibits, but to

22  preserve this issue on the record, defendants

23  respectfully incorporate all their objections to

24  plaintiff's exhibits by reference as recorded in ECF

25  document number 354.  Thank you, your Honor.

 1          THE COURT:  To tell you the truth, I don't

 2    understand what that means, because now is the trial

 3    and, um, if someone offers a document, if it's got a

 4    number on it, unless you people sort this out this

 5    afternoon, I'm going to assume it's admitted.  If it has

 6    a letter on it, I'm going to assume there is an

 7    objection to it.  And if I ask for you to argue, I will

 8    entertain the argument.  If I can figure it out by

 9    looking at the document, I will, and I'll make my

10    ruling.  So that's why it's important that I have a

11    single exhibit list of what's in evidence.

12          All right, let's do the openings.

13          MS. YOUNG:  I understand, your Honor, but the

14    issue is that plaintiff believes defendants have waived

15    their objections to her to submit because she believes

16    they're untimely, and this issue has been raised since

17    at least September, your Honor, defendants don't believe

18    they've waived their objections, and certainly our

19    objections are more relevant now if they're not waived.

20    And so I think that's where the confusion is coming

21    from.

22          THE COURT:  I don't think there's any confusion.

23    Fine, you state that there are objections, we're going

24    to handle them the way I have stated.  There's going to

25    be -- there's been no waiver on the part of any party.

1        Now is the trial.  I'll hear an opening if you

2   wish to make an opening.  No more than 15 minutes.

3        MR. STRICKLAND:  Your Honor, if I can get a point

4   of clarification on that as well?  We have briefed this

5   issue for -- she's correct, since September.  Pursuant

6   to Rule 26, the defendants did not file their objections

7   --

8        THE COURT:  Mr. Strickland.  Look, Mr. Strickland,

9   I've made my ruling.  I'm content with my ruling.  I'm

10  aware of what's been filed, and I'm ruling there is no

11  waiver, and I will take it step by step in the trial.

12  Now that's the ruling of the Court.

13       Now do you wish to make an opening?

14       MR. STRICKLAND:  Yes, your Honor.

15       THE COURT:  I will hear you.

16       (Pause.)

17       MS. STRICKLAND:  Okay, your Honor, I apologize,

18  just one more clarification question about your ruling.

19       In terms of the courtroom being sealed for certain

20  testimony regarding sealed exhibits, we understand that

21  ruling, and we don't necessarily have to address this

22  now, we can address this at the time of the testimony,

23  but we would appreciate guidance and clarification about

24  the procedure for referring to exhibits that have been

25  sealed, that there is a right of interlocutory appeal

```
 1   over the sealing.
 2         THE COURT:  Let's be very clear.  Let's be very
 3   clear.  I have sealed nothing that is going to be used
 4   as a trial exhibit.  The burden is on the party to seek
 5   to have an exhibit treated other than as a public
 6   document.  Now let's hear the opening.
 7         MR. STRICKLAND:  Yes, um, but just to clarify
 8   that, um, the deposition testimony of the plaintiff,
 9   both depositions, is currently sealed, um, in its
10   entirety.
11         THE COURT:  And you're proffering it and it's an
12   agreed-upon exhibit?
13         MR. STRICKLAND:  Um, the defendants did not
14   designate the depositions, they have made repeated
15   statements that they are going to use the depositions --
16         THE COURT:  Look, Mr. Strickland, try my question.
17   Is the plaintiff's deposition an agreed-upon exhibit,
18   and if so, what is its number?
19         MR. STRICKLAND:  It's not, the defendants have not
20   designated --
21         THE COURT:  We'll you can raise it at the time.
22   If you think you can somehow get her deposition in, you
23   can raise that at the time.  I don't really see how her
24   deposition gets in if you're proffering it.
25         I really would like to get to the, um, openings if
```

1    you wish to make an opening.  Go ahead.

2         MR. STRICKLAND:  I want to make one last comment

3    on that.  We anticipate that the substance of the

4    depositions will be, um, a pretty big chunk of what the

5    questions are about.  But anyway, we can deal with that

6    whenever we get to it.

7

8    OPENING STATEMENT BY MR. STRICKLAND:

9         Again, my name is Cooper Strickland and I

10   represent the plaintiff -- um, the plaintiff, Caryn

11   Devins Strickland, a former Assistant Federal Public

12   Defender, alleges that officials of the Federal

13   judiciary subjected her to workplace sex discrimination

14   including deliberate indifference to sexual harassment

15   in violation of her equal protection rights, and

16   subjected her to a fundamentally unfair employment

17   dispute resolution process for resolving her complaint

18   of sexual harassment, sex discrimination, and

19   retaliation, in violation of her due process rights.

20        As this Court previously stated in June 2023, "For

21   the first time in my administration of this case we've

22   moved beyond allegations to actual evidence.  There

23   isn't too much dispute as to what went on here.  The

24   issues, the major issues are legal issues."  The Court

25   reaffirmed this position in July 2023 stating that, "As

I said at an earlier hearing, it doesn't seem genuinely that too much of this is disputed." And in its summary judgment order, this Court recognized that the underlying facts favoring plaintiff's equal protection claim against the Defender appear to be undisputed, including through a letter of reprimand issued by the Fourth Circuit's Chief Judge. These statements are as true now as they were then.

Plaintiff's equal protection and due process claims are supported by defendants' judicial admissions. In response to her complaint, the administrative record from plaintiff's EDR proceeding, which resulted in disciplinary action against both the Federal Public Defender and the First Assistant for wrongful conduct, defined under the EDR plan as "Discrimination against employees based on sex, including sexual harassment and retaliation for engaging in any protected activity," and the documentary evidence and deposition testimony provided by defendants during discovery.

In fact, while plaintiff has provided over 450 pages of proposed findings and conclusions that overwhelmingly demonstrate the merits of her claims, it is unnecessary for the Court to review those findings to grant judgment in her favor on her equal protection and due process claims, that is because plaintiff's claims

are proven based on a small number of documents produced
by defendants that have no objection from either party,
which this Court itself highlighted during the further
pretrial conference.

First, following an investigation in plaintiff's
report of wrongful conduct, the Fourth Circuit's Chief
Judge issued a letter of reprimand to the Federal
Defender based on plaintiff's complaint of workplace sex
discrimination and retaliation.  This letter followed a
memorandum from the Circuit Executive to the Chief Judge
explaining "The investigation report recommends
disciplinary action be taken against the accused
employee, First Assistant JP Davis, as well as the Unit
Executive, Anthony Martinez."  This Court previously
identified the letter of reprimand as an unimpeached
public record pursuant to Federal Rule of Evidence 803.

The letter of reprimand explained that the FDO's
First Assistant, JP Davis, had subjected plaintiff to
unwanted advances, unreasonably interfered with her work
assignments, and even proposed an unsavory quid pro quo
proposal on her request for promotion.  The letter of
reprimand also reads as a road map of the Defender's
deliberate indifference to sexual harassment, as
articulated by the Fourth Circuit, by making the
following factual findings.

1    Quote, "After attempting to resolve several

2    disagreements between Ms. Strickland and Mr. Davis,

3    Mr. Martinez used an ill-advised metaphor comparing the

4    relationship between Ms. Strickland and Mr. Davis as a

5    'marriage' with the parties needing to compromise and

6    meet in the middle."  This letter also states that

7    Ms. Strickland denied that Mr. Davis had touched her

8    inappropriately, but Mr. Martinez said, "At least you

9    weren't touched," or words to that effect.  The

10   investigator concluded that his remarks were callous,

11   minimizing, insensitive, and contributed to the distress

12   that Ms. Strickland felt.

13    The investigator found that Mr. Martinez had

14   called out Ms. Strickland for seeking legal advice from

15   the Fair Employment Opportunity Office of the

16   Administrative Office of the U.S. Courts, which further

17   eroded trust between Mr. Martinez and Ms. Strickland and

18   exacerbated the deteriorating situation in his office.

19   Finally, the investigator noted that Mr. Martinez had

20   said he was being blamed for matters he had nothing to

21   do with.  "This," the investigator concluded,

22   "contributed to your mishandling of the matter."

23    Further, the lawyer specifically stated the

24   disciplinary action was being taken against the Defender

25   for wrongful conduct under the EDR plan.  Chief Judge

Gregory's decision stated as follows: "Under Chapter 9
of the plan, employees found by the Chief Judge and/or
Unit Executive judge to have engaged in wrongful
conduct, as defined in this plan, may be subject to
disciplinary action."

After careful consideration of the investigator's
report, supporting attachments and documents filed in
this case, and the mitigating circumstances, Chief Judge
Gregory has decided to adopt the recommendations
contained in the report. These statements conclusively
establish that the letter of reprimand, as an
unimpeached public record, made findings of unlawful
workplace sex discrimination in violation of plaintiff's
rights under the EDR plan. Defendants own findings of
wrongful conduct during the EDR proceeding amply support
a finding that plaintiff was subjected to quid pro quo
sexual harassment as well as related sex discrimination
and retaliation leading to her constructive discharge in
violation of her equal protection rights.

Second, defendants violated plaintiff's due
process rights because they refused to disqualify the
accused Defender from representing the employing office
even though he was a party accused of wrongful conduct.
Indeed the investigation subsequently found that the
Defender had engaged in conduct warranting disciplinary

action and was so biased against the plaintiff that he would do further damage to the process if allowed to participate.  Nonetheless, the Defender was permitted to discipline the First Assistant following the Defender's own reprimand by the Chief Judge of the Fourth Circuit. Consistent with common sense notions of fundamental fairness, the EDR plan provides for disqualification of an employee, including a Unit Executive, who is involved in a complaint.

In plaintiff's review of the EDR plan, she moved for the Defender's disqualification because he was involved in her complaint as an accused party.  Under the EDR plan, and as identified by the Fourth Circuit, the plaintiff had a right to a clear and specific set of procedures that are to be followed in the event that an employee claims that his or her substantive rights afforded under the EDR plan had been violated. Defendants violated these procedures including the right to disqualification of an employee involved in a complaint and thereby denied plaintiff her due process right to a fundamentally fair process for resolving her workplace discrimination complaint.

Indeed for more than four months after the investigation began, the investigator -- I'm sorry, indeed more than four months after the investigation

began, the investigator concluded, in her report, that
both the Defender and the First Assistant had engaged in
conduct warranting disciplinary action.  Based on her
recommendation that the Defender be disciplined, the EDR
coordinator asked the investigator whether the Defender
should be disqualified?  Her answer was an emphatic
"Yes."  Specifically she stated that "I truly believe
Mr. Martinez is biased in this case.  I also believe he
lacks experience and understanding of exactly how this
process works.  I'm concerned he could cause more damage
if he were involved in the process at this point."

Even though the investigator concluded that the
Defender was biased against plaintiff and can cause more
damage if he were involved in the process at this point,
the Chief Judge denied plaintiff's request for
disqualification without explanation.  As a result, the
EDR process was both discriminatory and fundamentally
unfair.  This Court need not look any further because
the above documents are sufficient proof of plaintiff's
equal protection and process claims.

In closing, plaintiff renews her prior motion to
admit exhibits and deposition designations.  She also
renews both of her motion for summary judgment and her
motion for preliminary injunctive relief.  She requests
that the Court recognize a standing objection regarding

1    the subject matter of her previously-filed motions in
2    limine which have not been subject to rulings.
3    Plaintiff also renews her objection to defendants'
4    untimely exhibit and deposition objections and their
5    deposition counterdesignations.  Plaintiff requests that
6    any transcripts of this proceeding produced by
7    defendants' private Court Reporter be made available and
8    if and when completed.  And lastly she reserves the
9    balance of her time for cross-examination of the
10   opposing statement.
11        THE COURT:  Well you've asked for a lot of things
12   in your opening, but you've got a few minutes left.
13   Suppose you are right and the Court finds liability, how
14   are you going to prove damages here?
15        (Pause.)
16        MS. STRICKLAND:  Yes, your Honor, I --
17        THE COURT:  Wait.  Wait.  Wait.  Wait.  I'm used
18   to one person making the opening.  So we'll --
19        Mr. Strickland, how are you going to prove
20   damages?
21        MR. STRICKLAND:  I think the plaintiff has also
22   entered an appearance here and would be best able to
23   speak to that.
24        THE COURT:  Well -- in other words, you're not
25   going to -- you don't have to address it in the opening,

that's fine, we'll get to it downstream.  But it is a
question that I have.

      MR. STRICKLAND:  We have the deposition testimony
and report of an expert on lost earnings --

      THE COURT:  Well do you --

      MR. STRICKLAND:  But --

      THE COURT:  Here's why I ask.  Is that deposition
an agreed-upon exhibit?  What's its number?

      (Pause.)

      MR. STRICKLAND:  I believe it is 109 on our
exhibit list.

      THE COURT:  Thank you.  All right.  That's the
answer.

      Well let's turn to the --

      (Interruption.)

      THE COURT:  Let's turn then to the judiciary and
see if they wish to make an opening.  You were about to
say something about 109.  But I'll hear your opening
now.  No more than 15 minutes.

      MS. McMAHON:  Good morning, your Honor, Madeline
McMahon for the government.

      THE COURT:  Thank you.


OPENING STATEMENT BY MS. McMAHON:

      On May 18th, 2018, Caryn Strickland had a

mentoring lunch with JP Davis who was the First
Assistant at the Federal Defender's Office where
Ms. Strickland worked.  At that lunch Ms. Strickland
told Mr. Davis that she was unhappy living in Charlotte
away from her husband who lived outside of Asheville.
She told Mr. Davis that she planned to demand a transfer
to the Asheville office or else she would have to quit.
And she said that if she did not get a transfer, she
would need to make more money.

    Shortly after the lunch, Mr. Davis sent
Ms. Strickland an e-mail with the joking subject line
"Mas Dinero."  He told her that he had a plan to help
her ask for a raise so that she wouldn't have to quit
the FDO.

    This is plainly not a sexual advance.
Ms. Strickland only began to call this a "sexual
advance" three months later when she simultaneously
demanded that the Federal Defender, Tony Martinez,
transfer her to the FDO's actual office.  But as the
evidence in this case show, Ms. Strickland has only
experienced sexual harassment in her mind.

    Throughout this trial you will hear about many
instances when Ms. Strickland has, in her mind, turned
perfectly innocuous events into nefarious ones.  Indeed,
Ms. Strickland and her counsel would have you believe

that almost everyone involved in her EDR claims, from
her colleagues at the FDO to the then Chief Judge of the
Fourth Circuit, have participated in a conspiracy
against her.  But as you will learn through the evidence
in this case, the reality is far more mundane.  Behind
plaintiff and her counsel's inflammatory language are
facts that simply reveal an ordinary workplace conflict,
false accusations, and officials who tried their best to
resolve Ms. Strickland's issues.

The main events in this case take place from June
2018 to March 2019, but there are three key stages to
understand about this timeline, the conflict, the
accusations, and the response.

First, the conflict.  The evidence will show that
before June, Mr. Davis and Ms. Strickland had a friendly
cordial relationship, the two got drinks on several
occasions, including at Ms. Strickland's request.
Ms. Strickland even sent Mr. Davis texts joking about
drinking a bottle of gin.  Mr. Davis will also testify
that he gave Ms. Strickland rides home on several
occasions, often at her request, since they only lived a
mile away.

Mr. Davis will explain that things began to change
in June 2018.  Ms. Strickland had recently told
Mr. Davis that she wanted to serve as second chair on

the Dixon case, a complicated child pornography case that could be headed to trial and that involved a potential life sentence.  Mr. Davis will testify that Ms. Strickland made it clear that she wanted to work on this case to make herself indispensable to the FDO so that she could secure a transfer to the Asheville office.  Then, in early June, Mr. Davis became frustrated that Ms. Strickland began to prioritize Dixon at the expense of all of her clients.  On June 6th, after she cancelled on another client obligation to work on the Dixon case, Mr. Davis ordered her to attend her prior commitment.  Mr. Davis will testify that Ms. Strickland became angry and the two had a tense exchange.

Now you will hear about some text messages that Mr. Davis sent to his friend, Aaron Taylor, in which he vents about his frustrations with Ms. Strickland.  But during this trial it's important to keep in mind that these texts, while sometimes rash, were sent privately to a close friend.  Mr. Davis will testify that they were never intended to be shared with anyone.

Mr. Davis will also testify that by mid June he believed that the tension between him and Ms. Strickland had mostly faded, but it seemed that Ms. Strickland could not let go of her belief that Mr. Davis had been

too critical of her about the **Dixon** issue.  In early

July, Ms. Strickland twice met with Mr. Davis and

Mr. Martinez, first separately and then together, to

voice her complaints with how Mr. Davis handled the

**Dixon** issue.  Mr. Martinez will testify that he believed

the conflict between the two boiled down to a workplace

communication problem, but he was optimistic that the

two could work it out.

Mr. Martinez will explain that after their meeting

on July 5th, he thought that the conflict had been

mostly resolved.  Even still, in July, Mr. Martinez took

additional steps to make sure that Ms. Strickland felt

comfortable, he assigned her a new mentor, ensured that

Mr. Strickland and Mr. Davis would no longer be working

together, and even told Mr. Davis not to contact

Ms. Strickland.  So that was the conflict.  Next came

the accusations.

The evidence will establish that throughout July

Ms. Strickland remained angry at Mr. Davis and she still

wanted that transfer to Asheville.  Mr. Martinez will

testify that on August 10th, 2018, Ms. Strickland sent

him an e-mail accusing Mr. Davis of sexual harassment

for the first time and making a list of demands.

Prominent among those demands was a transfer to the

Asheville office.

1     But the evidence will show that Mr. Davis never
2   made any sexual advances towards Ms. Strickland.
3   Mr. Davis will explain that when he sent the "Mas
4   Dinero" e-mail on May 18th, he was merely echoing
5   Ms. Strickland's comments from just hours earlier that
6   she would quit unless she received a pay increase.
7   Mr. Davis will also testify that when he offered to get
8   drinks with her and to give her a ride home in June, he
9   was acting the exact same way towards Ms. Strickland as
10  she had towards him in the past.  The evidence will show
11  that Ms. Strickland never told Mr. Davis that she no
12  longer wanted to get drinks with him or that she no
13  longer wanted him to give her rides home.  Only after
14  the workplace conflicts between them arose did
15  Ms. Strickland claim that there was anything untoward
16  about these offers.
17     In mid August the last stage of this timeline
18  began, the response.  The evidence will show that
19  Mr. Martinez acted quickly and diligently as soon as
20  Ms. Strickland reported her claim of sexual harassment.
21  Because Mr. Martinez had already told Mr. Davis to stop
22  communicating with Ms. Strickland, the two had no
23  further contact after July.  Mr. Martinez took her out
24  of Mr. Davis's line of supervision.  And pursuant to
25  Chapter 9 of the Fourth Circuit's EDR plan, Mr. Martinez

promptly reported the alleged conduct to the EDR

Coordinator, James Ishida.  Mr. Ishida will testify that

he alerted Chief Judge Roger Gregory and selected an HR

Specialist, Heather Beam, to investigate the

allegations.

Mr. Martinez will also testify that he tried to

agree to as many of Ms. Strickland's demands as he

could.  He agreed to let her telework and Ms. Strickland

promptly left Charlotte and began teleworking and living

near Asheville.  He converted her from a research and

writing attorney to an Assistant Federal Defender as she

had requested.  The one demand that Mr. Martinez

couldn't agree to was her request to be transferred to

the Asheville office because there was simply no open

office space for her to work in.

THE COURT:  About 5 more minutes, Ms. McMahon.

And don't think that I have formed any opinion, but I

want to ask you the same question that I asked

plaintiff's counsel.

How do you counter -- if you lose on liability,

how do you counter the claim for damages?

MS. McMAHON:  May I, um, may I just add that to

the end of the statement, your Honor?

THE COURT:  You may in 5 minutes.  Go ahead.

MS. McMAHON:  Yes.

1          So what did Ms. Strickland do next after

2     Mr. Martinez couldn't agree to her demand to transfer to

3     Asheville?  She accused Mr. Martinez of retaliating

4     against her.

5          On September 10th, she filed a formal request for

6     counseling under Chapter 10 of the EDR plan naming

7     Mr. Martinez for the first time along with Mr. Davis.

8     But the evidence will show that Mr. Martinez acted

9     appropriately in response to Ms. Strickland's

10    allegations.  While Ms. Strickland accuses Mr. Martinez

11    of backdating her conversion to an AFD to deprive her of

12    a promotion, the evidence simply does not bear this out.

13    Mr. Martinez will testify that the FDO had been planning

14    to convert both Ms. Strickland and a male research and

15    writing attorney in the office for weeks.  And the FDO's

16    HR rep, Bill Moormann, will testify that he submitted

17    the paperwork to initiate that conversion on August 16th

18    before Ms. Strickland was eligible for a promotion to GS

19    15.  While Ms. Strickland believes she was unfairly

20    passed over for a vacant AFD position, the Appellate

21    Chief, Josh Carpenter, will testify that Ms. Strickland

22    was not interviewed for the open position because it was

23    identical to the one she already had.

24         The evidence will also show that in November,

25    before the investigation into her claims had even

1  concluded, Ms. Strickland had already determined she was

2  done with the FDO.  The evidence will establish that

3  Ms. Strickland e-mailed multiple people, including

4  Mr. Ishida and two officials at the Administrative

5  Office, to tell them that she wanted to leave the FDO

6  and to ask them for help to find another job.

7  Meanwhile in January, Ms. Strickland began the

8  mediation phase of Chapter 10.  Mr. Martinez will

9  testify that he entered the mediation in good faith

10  wanting to find a way to allow Ms. Strickland to

11  continue to work at the FDO.  But the evidence will show

12  that Ms. Strickland was determined to secure a Fourth

13  Circuit clerkship and in her own words, "Transition up,

14  not down."  Mr. Ishida will testify that he and the

15  mediator, Ed Smith, helped Ms. Strickland get a

16  clerkship with Fourth Circuit Judge Henry Floyd.

17  The evidence will show that Ms. Strickland

18  voluntarily left the FDO.  Indeed at the time she said

19  that she very much appreciated the Fourth Circuit's

20  assistance in helping her reach the best possible

21  outcome, she then voluntarily withdrew her EDR claims

22  and chose not to file a formal EDR complaint.

23  Ms. Strickland now contends that she believes that

24  if she did file a formal EDR complaint, the final

25  decision-maker on her claims would not be a judicial

officer, as the EDR plan expressly states, but rather it
would be Mr. Martinez.  The evidence will show that just
the opposite is true, that in fact Ms. Strickland knew
that if she filed a formal EDR complaint, a judicial
officer would oversee the hearing and determine any
remedies.  The evidence will also show that there is no
merit to Ms. Strickland's convoluted theory that
Mr. Smith jokingly, the Judicial Integrity Officer at
the AO, led her to believe that Mr. Martinez would
decide her EDR claims.

    THE COURT:  Your time's about up, Ms. McMahon.

    (Pause.)

    THE COURT:  All right.

    MS. McMAHON:  Excuse me, your Honor?

    THE COURT:  Your time's about up.  Sum up.

    MS. McMAHON:  So to sum up, um -- and I'll address
damages briefly, you will also hear from two of
defendants' experts --

    THE COURT:  No, your time's about up.  You have a
couple of experts, that's fine.  Let's get to evidence
now.  You've had your 15 minutes.

    All right, call your first witness.

    MR. STRICKLAND:  Your Honor, um, we have -- to
state it simply, we said this in the most recent
hearing, it was a document's case and we, um, the

plaintiff intends to rely on that, and their extensive
record now, and we will rely on those as well.

THE COURT:  I just want to be clear what you're
doing.  Are you resting?

MR. STRICKLAND:  Um, again, we have fact witnesses
who testified by deposition and we have expert witnesses
that testified by deposition.

THE COURT:  Well be very clear, I'm not going to
accept the -- whether they object to it or not, I'm not
going to accept expert testimony by deposition, you call
a live expert.  He need not be called today.  But to be
clear, any expert for the plaintiff or the defense is
going to testify live.  The fact that they have been
deposed is -- I just don't see the basis for admitting
expert testimony by deposition.  So have that in mind.

So let me put it to you.  Do you rest?

MR. STRICKLAND:  Your Honor, we have filed
numerous motions on these issues and we move for the
deposition testimony to be admitted.  We provided
numerous bases for that including under the Rules of
Civil Procedure, which the Court had previously told us
it would follow on these issues.

THE COURT:  Well I have to follow the Rules of
Civil Procedure, I have no choice about it, they are the
force of law.  But if you're confident -- if you're

1    confident that I have to receive the depositions and

2    you're otherwise satisfied with the exhibits that are

3    before the Court, then, um, I understand that your

4    answer to my question is "Yes, you rest," is that

5    correct?

6        MR. STRICKLAND:  Again we rely on the exhibit list

7    that we filed this morning, um, and our proposed

8    findings of fact and conclusions of law which fully set

9    forth the documentary record in this case and the legal

10   conclusions that this Court could draw.  I would also

11   add though that this is a pretty standard principle in

12   the First Circuit, it's my understanding, that you don't

13   need an expert for --

14       THE COURT:  I didn't say you did.  Be very clear

15   though that the law that I must follow here is the

16   Fourth Circuit, I'm a visiting judge in the Fourth

17   Circuit and I must follow the Fourth Circuit's law.  So

18   I'm taking it that you're resting.  The defense has said

19   something about objecting to some of these exhibits and

20   if I were to sustain any of those objections, I'll give

21   you a chance to call witnesses live.  But otherwise

22   you'll rest on your 134 exhibits.

23       Is that right?

24       MR. STRICKLAND:  May I have one moment, your

25   Honor?

```
 1          THE COURT:  Of course.

 2          (Pause.)

 3          MR. KOLSKY:  Your Honor, this is Josh Kolsky for

 4     the defendants.  I just want to be clear on the record

 5     that we do object to the wholesale admission of

 6     plaintiff's exhibits without foundational testimony from

 7     a witness, and we have made objections to several of

 8     plaintiff's exhibits and --

 9          THE COURT:  You have, but both of you --

10          MS. STRICKLAND:  The is no foundation for --

11          THE COURT:  Wait a minute.  Wait a minute.  Only

12     one person is going to talk at a time.  And when I

13     speak, please allow me to speak, so I can preside.

14          Let me say to the defense, I am not satisfied with

15     how the exhibits have come before me.  Exhibits which

16     have a number, I was very clear, those exhibits are

17     admitted in evidence.

18          Now I am hearing for the first time that there's

19     some objection to these exhibits.  I'll let you folks

20     work this out this afternoon.  And as I said to

21     Mr. Strickland, if I were to strike any of these

22     numbers, then I will allow him to lay a foundation for a

23     live witness.

24          So I understand that you do object.  Well we can

25     discuss the matter this afternoon.
```

1          Now, Mr. Strickland, I'm hearing that your 134
2     exhibits, if they remain in evidence, is your case.  Is
3     that right?
4          MR. STRICKLAND:  Again, if I may have one moment
5     to confer?
6          THE COURT:  Of course you may.
7          MR. STRICKLAND:  Sir, just to comment on the, um
8     --
9          THE COURT:  No.  No.  No.  Wait.  Wait.  You have
10    to, Mr. Strickland, you have to allow me to preside.  I
11    threw a question to you.  You may answer the question.
12    But I don't want comments.  Are you going to rest or
13    not?  If you tell me no, I will allow you to put on
14    evidence, any competent evidence.
15         Now, is it "yes" or "no," are you resting on these
16    134 exhibits?
17         (Pause.)
18         MR. STRICKLAND:  Yes, your Honor, subject to the
19    objections we filed and stated on the record.
20         THE COURT:  That's fine, I'll take it that way.
21         And I'll turn then to the government.  You may
22    call your first witness.
23         MR. KOLSKY:  Your Honor, defendants move for
24    judgment on the merits pursuant to Rule 52(c), and I'd
25    like to make a brief argument about that, if I may?

```
 1          THE COURT:  Not now, but I'll take it under
 2    advisement though.
 3          All right, call your first witness.
 4          MR. KOLSKY:  Thank you, your Honor.
 5          Defendants call Caryn Strickland.
 6          THE COURT:  She may be called.
 7          And the Clerk, Ms. Shay will administer the oath.
 8          (CAROLYN STRICKLAND, sworn.)
 9
10          * * * * * * * * * * * * * * * *
11          CARYN STRICKLAND
12          * * * * * * * * * * * * * * * *
13
14    DIRECT EXAMINATION BY MR. KOLSKY:
15    Q.   Ms. Strickland, you started working at the Federal
16    Defender's Office for the Western District of North
17    Carolina in August 2017, correct?
18          MR. STRICKLAND:  Objection, your Honor.
19          THE COURT:  Overruled.
20          MS. STRICKLAND:  I'm going to object on the
21    grounds of --
22          THE COURT:  Wait.  Wait.  Wait.  Ms. Strickland,
23    you are an attorney, but you were represented by counsel
24    here.  Counsel makes the objections.  He made one.  I
25    overruled it.  That's a appropriate question.  You will
```

```
1   answer the question.

2           Is that when you started work there?

3           MR. STRICKLAND:  Your Honor, if I may be heard on

4   that for just a moment?

5           THE COURT:  No, you may not.

6           THE COURT:  When did you start work there, ma'am?

7           THE WITNESS:  Yes, your Honor.  I am going to --

8   in addition to the objection raised by counsel, I am

9   going to -- based on the advice that I have received

10  from counsel, I am going to assert my Fifth Amendment

11  constitutionally-protected right to silence.

12          THE COURT:  On the question "When you started to

13  work there?"

14          THE WITNESS:  Yes, your Honor.

15          THE COURT:  If you do that -- if you do that, how

16  can I accept anything that you said that is before me.

17  You cannot use the Fifth Amendment as both a shield and

18  a sword.  So if that data appears -- and I believe it

19  does appear, if that data appears of record -- in the

20  record of this case as it now stands, I see no reason to

21  -- you've waived it because it's a matter that's clear.

22  All right?

23          Mr. Kolsky, if you so represent that that's a

24  matter of dispute before that she was --

25          (Interference.)
```

1      MR. STRICKLAND:  I'm sorry, your Honor, would you

2  repeat that.  I didn't hear that question.

3      THE COURT:  Do you represent, as an officer of the

4  court, that you've spoken about that issue before and it

5  is a matter of record in this case as it now stands?

6      MR. KOLSKY:  I don't know if she was specifically

7  asked that question at her deposition.  I don't think

8  there's any real dispute about that fact.  I don't know

9  if there's a document in evidence currently that speaks

10  to it, which is what I wanted to establish it through

11  Ms. Strickland.  I also don't think that there's any

12  basis for her to invoke the Fifth Amendment on this

13  issue, there's no reasonable fear of prosecution.

14      THE COURT:  Yes, I can't see any.  Overruled.

15      You will answer the question, Ms. Strickland.  Is

16  that when you started working?

17      MR. STRICKLAND:  Your Honor, we would request to

18  be able to submit in camera documents to support the

19  Fifth Amendment assertion.

20      THE COURT:  Well by "in camera" do you mean just

21  to me that the government doesn't see?

22      MR. STRICKLAND:  Yes.

23      THE COURT:  I won't allow that.  They get to see

24  it.  I might take it in camera and review it, but, um --

25      MR. STRICKLAND:  It involves an attorney-client

```
 1    privilege that cannot be waived with respect to this
 2    issue.
 3         THE COURT:  I just don't see any privilege here.
 4    She was just asked when she started to work there.
 5    She'll answer the question.
 6         MR. STRICKLAND:  The argument --
 7         THE COURT:  Ms. Strickland, answer that question.
 8    When did you start work there?
 9         THE WITNESS:  Your Honor, may we take a quick
10    recess because this --
11         THE COURT:  We may not.  We may not.  Answer that
12    question.
13         MR. STRICKLAND:  What's going to happen though is
14    we're going to be accused of waiver if she answers any
15    of those questions.
16         THE COURT:  Well I think she's -- no, I don't see
17    it's waiver, my ruling rests that I cannot see how that
18    exposes her to any possibility of criminal prosecution
19    -- reasonable possibility of criminal prosecution either
20    in the state courts or the federal court.  Now if I had
21    some basis for thinking that there was, even remote, a
22    basis for possible criminal prosecution, I would rethink
23    it.  I am a very strong defender of the Fifth Amendment.
24    But I don't see it.  I just don't see it.  So she'll
25    answer the question.
```

1    When did you start working there in that
2    Defender's office, ma'am?
3        (Pause.)
4        THE WITNESS:  August 2017.
5    Q.    You graduated law school in 2013, correct?
6    A.    Yes.
7    Q.    Before working at the Federal Defender's office,
8    you have done three judicial clerkships and you had been
9    a fellow at the Supreme Court, correct?
10   A.    Yes.
11   Q.    Before starting at the Federal Defender's Office,
12   did you have any experience trying cases?
13   A.    Not as first chair.
14   Q.    Did you have any experience as a practicing
15   attorney trying cases before starting at the Federal
16   Defender's Office?
17   A.    Through internships and --
18   Q.    Were you a practicing attorney when you were an
19   intern?
20   A.    I don't understand your question.
21   Q.    You said through internships.  Were you a
22   practicing licensed attorney when you were an intern?
23   A.    No.
24   Q.    Before starting at the Federal Defender's Office,
25   had you -- excuse me, had you ever argued in court?

```
1    A.     I don't believe so.
2    Q.     Had you ever examined a witness in court before
3    starting at the Federal Defender's Office?
4    A.     I don't believe so.
5    Q.     Did you have experience with civil or criminal
6    litigation as a practicing attorney before starting at
7    the Federal Defender's Office?
8    A.     I would answer the same as I did before.
9    Q.     Is that experience, was that as an intern?
10   A.     Through law school and -- yes.
11   Q.     And is it fair to say you weren't a practicing
12   attorney when you were still in law school?
13   A.     I was not licensed, no.
14   Q.     You were hired as a research and writing attorney
15   for the Charlotte office, correct?
16   A.     Correct.
17   Q.     And JP Davis was assigned as your mentor, correct?
18   A.     My understanding is that he requested to be my
19   mentor.
20   Q.     Did you personally witness him requesting to be
21   your mentor?
22   A.     I believe from what I recall there was a meeting
23   that we had with, um, Mr. Davis and Attorney Martinez
24   and I believe it was discussed in that meeting.
25   Q.     Did you personally request -- excuse me, let me
```

1    rephrase that.

2         Did you personally observe Mr. Davis request to be

3    your mentor?

4    A.    From what I recall of that meeting, Mr. Martinez

5    said that that's what he had requested.

6    Q.    Okay, so you didn't personally observe Mr. Davis

7    request to be your mentor, isn't that right?  That was

8    my question.

9    A.    Um, no, was I in that meeting?  No, I didn't see

10   that.

11   Q.    You went to lunch with Mr. Davis on four

12   occasions, correct?

13   A.    I don't recall exactly how many.

14   Q.    Does it sound right that it's approximately four?

15   A.    Um, sure, yes.

16   Q.    And those lunches were on December 19th, 2017,

17   March 1st, 2018, April 3rd, 2018, and May 18th, 2018,

18   correct?

19   A.    I don't recall when they were.

20   Q.    Does it sound like this could be relatively

21   accurate?  Well let me -- strike that.  Let me ask a

22   different question.

23         Do you have any reason to, um, dispute that those

24   are the correct dates of your lunches with Mr. Davis?

25   A.    No.

```
1    Q.    You talked about work during those lunches with
2    Mr. Davis, correct?
3    A.    Yes.
4    Q.    You talked about your caseload?
5    A.    Probably.
6    Q.    You talked about your career?
7    A.    Probably.
8    Q.    Did you ever decline any of Mr. Davis's
9    invitations to lunch?
10   A.    I don't recall it being a choice, he was my
11   supervisor.
12   Q.    But did you ever decline any of the invitations?
13   Did you ever tell him, "No, you didn't want to go," when
14   he asked you to lunch?
15   A.    Not that I recall.
16   Q.    Did you ever tell Mr. Davis that you weren't
17   comfortable getting lunch with him?
18   A.    At that time, no.
19   Q.    Well did you ever, at any time, tell him that you
20   weren't comfortable getting lunch with him?
21   A.    (Pause.)  Not that I recall, using those specific
22   words.
23   Q.    Do you recall ever using any words that would have
24   conveyed that you were not comfortable getting lunch
25   with him?
```

A.    (Pause.)  Well that's a bit of a complicated

question because I do recall conveying to him that I was

uncomfortable.  But, um -- and in fact, yes, I think he

did text me at one point and he did ask for lunch and I

was very uncomfortable at that time and I tried to

convey to him that I did not want to meet outside of the

office.

        THE COURT:  When was that text, ma'am?

        THE WITNESS:  Um, I believe my -- my dates are not

perfect, I apologize, but I believe it was in June of

2018.  It was after he --

        THE COURT:  All right.  Thank you.

        THE WITNESS:  It was after he said --

        THE COURT:  All right.

        THE WITNESS:  Yes, it was after --

        THE COURT:  We'll let Mr. Kolsky ask the

questions, but I just wanted to --

        And that's the first time you had expressed some

reservations?

        THE WITNESS:  Um, no, your Honor, I don't think

that that's accurate.  I think it was very clear to him

that I was distancing myself from him after he sent the

quid-pro-quo e-mail and he was aware of that.  He --

throughout the month of June he was repeatedly asking me

to meet outside of the office to have drinks, to have

mentoring sessions, and that was after he had told me

that supposedly mentoring was over.  So there wasn't any

basis professionally for him to do that.  And I told him

no every time.  But he continued asking I think like at

least 5 times over the course of a few weeks, um, in the

month of June 2020.

THE COURT:  Thank you.  Go ahead, Mr. Kolsky.

THE WITNESS:  But I --

THE COURT:  Let Mr. Kolsky ask the question.

Q.    Ms. Strickland, you testified in response to the

Court's question about, um, expressing some sort of

reservation to Mr. Davis in June of 2018.  Do you recall

specifically what you told Mr. Davis?

A.    What I recall is I think as I just said, that, um,

he began --

Q.    I'm asking you specifically what you told

Mr. Davis about getting lunch with him?

A.    I said no to his invitations.

Q.    This was in June of 2018?

A.    From what I recall, yes.

Q.    Do you recall being asked if you ever told

Mr. Davis you weren't comfortable getting lunch with him

at your deposition?

A.    I don't know.  I mean I would object, but that's

under seal.  But, um --

 1          THE COURT:  Again, your objections -- only your

 2     counsel may object.

 3          MR. STRICKLAND:  Objection, that's under seal.  I

 4     think we're getting well into what's covered in the

 5     deposition testimony.

 6          THE COURT:  Well, I --

 7          MR. STRICKLAND:  It's under seal.  I mean this

 8     Court ordered the depositions to be sealed, and

 9     defendants filed --

10          THE COURT:  Well I -- I'm not taking sealed

11     documents.  It's an appropriate question.  I don't see

12     any reason not to try the case on the public record.

13     Overruled.  She may answer.

14          MR. STRICKLAND:  Your Honor, may I just be heard

15     on that point?  Just one second.

16          THE COURT:  One second, yes, go ahead.

17          MR. STRICKLAND:  Mr. Kolsky has communicated to us

18     that the substance of sealed documents cannot be

19     communicated about in open court and I would agree with

20     that.

21          MR. KOLSKY:  Your Honor, we have submitted the

22     depositions --

23          THE COURT:  We're now having the trial.  It's

24     overruled.

25          Go ahead, Mr. Kolsky.

```
 1          MR. KOLSKY:  Your Honor, may I approach the
 2     witness to provide her her deposition transcript?
 3          THE COURT:  You may.
 4          MR. STRICKLAND:  Objection, your Honor, they did
 5     not designate the depositions as an exhibit.
 6          THE COURT:  He's not using it as an exhibit, he's
 7     using it impeach her.
 8          (Hands to witness.)
 9  Q.   Ms. Strickland, would you please turn to Page 43
10     of the deposition transcript that I have handed you.
11  A.     (Turns.)
12          MR. STRICKLAND:  Again, your Honor, this is under
13     seal.
14          THE COURT:  Well then to this extent I lift the
15     seal.  It's an appropriate question.
16          MR. STRICKLAND:  On November 16th we said that if
17     you're going to unseal anything, we'd put an objection
18     on the record that we wanted to pursue an interlocutory
19     appeal for anything unsealed.  We have not been given
20     that opportunity.  You granted that request.
21          THE COURT:  All right.  He may ask the question.
22     He's just having her --
23  Q.   Ms. Strickland, would you please look at Page 43,
24     Lines 1 to 3, and tell me if I read it correctly.
25          Question, "Did you ever tell Mr. Davis that you
```

1    weren't comfortable getting lunch with him?  Answer,
2    "No."  Did I read that correctly?
3    A.    You did read that correctly, but I think this
4    answer might not be accurate.  I think there's a
5    document that could actually -- there's several
6    documents that could potentially refresh my recollection
7    on that.
8    Q.    Ms. Strickland, did you testify truthfully at your
9    deposition?
10   A.    Of course I did to the best of any ability, yeah.
11   Q.    Thank you.
12         At the time of these lunches, you didn't consider
13   Mr. Davis's invitations to be acts of sexual harassment,
14   did you?
15   A.    I'm sorry, I didn't hear the last part of your
16   question.
17   Q.    At the time of these lunches, you didn't consider
18   Mr. Davis's invitations to have been acts of sexual
19   harassment, did you?
20   A.    That question doesn't have an easy "yes" or "no"
21   answer.  Did I become -- do I think that a supervisor
22   asking somebody to lunch is sexual harassment as a
23   general matter?  No, I don't.  Of course not.  But in
24   this case I did begin to become concerned at a certain
25   point that it was getting a little too personal, and

1  then when he sent a quid-pro-quo e-mail, then, um, my
2  understanding of what was happening really changed at
3  that point.
4  Q.    And I'm going to direct you to your deposition
5  transcript on Page 40, Line 24.
6       Question, "Do you believe those -- those lunches
7  were his invitation to have lunch with him, do you
8  believe that those were acts of sexual harassment?"
9  Answer, "Looking back I see them as red flags, but at
10 the time, no, I didn't think that."
11      Did I read that correctly?
12 A.    Yes, and I believe that's accurate.
13 Q.    Would you agree that before May 18th, 2018, you
14 had a friendly relationship with JP Davis?
15 A.    Yeah, I mean you always want to be friendly and on
16 good terms with your supervisors, so, yes.
17 Q.    And you had lunch with Mr. Davis on May 18th,
18 2018, correct?
19 A.    Yes.
20 Q.    In the car after that lunch, did you tell
21 Mr. Davis that you were not happy living in a different
22 city than your husband?
23 A.    That is not exactly how I recall that
24 conversation.
25 Q.    I'm directing you to Page 44, Line 2 of your

1    deposition transcript.

2         Question, "On the way back from the lunch, did you

3    tell Mr. Davis that you were not happy living in a

4    different city than your husband?"  Answer, "Yes."

5         Did I read that correctly?

6    A.    Yes, that's true.

7    Q.    That was your testimony at your deposition?

8    A.    Yes.

9    Q.    Where did your husband live at the time?

10   A.    South of Asheville.

11   Q.    In Tryon?

12   A.    Yes.

13   Q.    And you lived in Charlotte?

14   A.    Yes.

15   Q.    And Tryon is closer to Asheville than to

16   Charlotte, correct?

17   A.    Yes, it is.

18   Q.    Did you -- in the car ride after that lunch, did

19   you tell Mr. Davis that you would need to be transferred

20   to Asheville at some point or else you would probably

21   need to leave the Federal Defender's Office?

22   A.    At some point, yes.  Not immediately.  But at some

23   point eventually that's what I said.  I mean

24   potentially, you know, even a couple of years down to

25   the line, I mean I wanted to keep working there, so.

1   Q.   Your notes from -- your notes of that conversation

2   with Mr. Davis don't indicate anything about "a couple

3   years down the line," do they?

4   A.   I think I used the word "eventually," which has

5   always been the case, yeah.

6   Q.   Did you tell Mr. Davis that if you couldn't work

7   in Asheville, you at least wanted a pay raise?

8   A.   I don't recall that being what I said.  I don't

9   recall it being an either/or situation like that.  What

10  I recall is that I was coming up on an annual review and

11  I was very excited about the possibility of requesting a

12  promotion.  I don't specifically recall it being an

13  either/or, Asheville or promotion, thing because that's

14  just really not something I would have asked for.  I

15  mean I believed that I should get the promotion anyway.

16  Q.   Would you please take a look at Page 46, Line 12

17  of your deposition transcript.

18  A.   (Looks.)

19  Q.   Actually Line 15.

20       Question, "Yeah, did you tell Mr. Davis that if

21  you couldn't work in Asheville you at least wanted a pay

22  raise?"  Answer, "Yes."

23       Did I read that correctly?

24  A.   Yes, you read that correctly.

25  Q.   Is it fair to say that we can at least agree that

1    during that car ride you discussed the idea that you

2    wanted a pay raise with Mr. Davis?

3    A.    Oh, yes.

4    Q.    And on your way back from lunch that day, did you

5    say to Mr. Davis words to the effect of "Any time you

6    want to buy me lunch or a drink, I'll take it"?

7    A.    I'm sorry, could you repeat that question please?

8    Q.    Yes.

9          On your way back from lunch that day, did you say

10   to Mr. Davis words to the effect of "Any time you want

11   to buy me lunch or a drink, I'll take it"?

12   A.    I don't specifically recall saying that.

13   Q.    Is it possible that you did?

14   A.    Anything is possible.

15   Q.    And after you returned to the office on May 18th,

16   that afternoon Mr. Davis sent you an e-mail with the

17   subject "Mas dinero," correct?

18   A.    Yes, he did.

19   Q.    What does "Mas dinero" mean in Spanish?

20   A.    "More money."

21   Q.    And in the e-mail Mr. Davis uses the phrase "pay

22   for stay," correct?

23   A.    Yes, he did.

24   Q.    Given your conversation with Mr. Davis at lunch

25   that day, is it possible that by saying "pay for stay"

1    --

2        MR. STRICKLAND:  Objection, your Honor.

3        THE COURT:  Sustained.

4        MR. STRICKLAND:  This is --

5        THE COURT:  Sustained.

6        MR. STRICKLAND:  Mr. Cooper -- Mr. Strickland, you

7    just won that one.  Sustained.

8        Mr. Kolsky, I -- what possible -- that does not

9    help the Court.  Go ahead.

10        MR. KOLSKY:  Understood, thank you, your Honor.

11   Q.    You're alleging in this case that JP Davis

12   sexually harassed you in part by offering to get a drink

13   with you on three occasions in June of 2018, correct?

14   A.    Yes.

15   Q.    You'd gotten alcoholic drinks with Mr. Davis

16   before June 2018, right?

17   A.    In the past, yes.

18   Q.    In October of 2017, you traveled to Little Rock

19   Arkansas to conduct witness interviews for a case,

20   correct?

21   A.    I remember going on that trip.  I couldn't tell

22   you exactly when it was.

23   Q.    Approximately October of 2017, is that fair?

24   A.    Um, sure, that's fair.

25   Q.    And Mr. Davis was there on that trip, right?

A.    Yes.

Q.    And another Federal Defender's Office employee,
Tara Parish, was there too, correct?

A.    Yes, we were both staff assigned to the case.

Q.    And you got alcoholic drinks with Mr. Davis and
Ms. Parish on that trip, correct?

A.    It wouldn't surprise me.  I mean it's hard for me
to recall the specifics.

Q.    In January of 2018, do you recall a criminal case
against Mr. Richard Davis resulting with a plea bargain?

A.    Again I don't know exactly when it was, but I mean
I do remember that case, um, that it resulted in a plea.

Q.    And it would have been roughly around January of
2018?

A.    I can't dispute that.

Q.    Did the entire team go out and get drinks after
that?

A.    I do remember the entire team getting drinks to
celebrate that case, that seemed to be kind of something
everybody did in the office.

Q.    And JP Davis was there?

A.    Yeah, I don't specifically recall, but he was on
the case, so that would not surprise me.

Q.    And did you get alcoholic drinks there with the
team?

1       MR. STRICKLAND:  Objection, your Honor, relevance.
2   What does this have to do with the --
3       THE COURT:  Please, if I want any argument, I will
4   call for it.
5       You may have it, though there are limits to it.
6   She's testified that it's a social matter.  She had
7   drinks with them on various occasions.
8       MR. STRICKLAND:  And 403 as well.  This seems
9   prejudicial then.  If you're describing --
10      THE COURT:  As a judge once told me, one of the
11  tests whether something is relevant is in fact if it is
12  prejudicial.  Under 403 it has to substantially outweigh
13  the probative value.  Here it does not.  But I think
14  we're approaching the limits of what Mr. Kolsky can
15  inquire of.
16      Go ahead, Mr. Kolsky.
17  Q.   Ms. Strickland, did you have alcoholic drinks
18  there with the team?
19  A.   I don't recall the specifics of that, but it
20  wouldn't surprise me because that's what everyone did.
21  Q.   And you examined a witness at a suppression
22  hearing on or about May 15th, 2018, right?
23  A.   I couldn't tell you the exact date, but that
24  sounds plausible.
25  Q.   And after that lunch -- or after that hearing, you

 1   got lunch with Mr. Davis and Ms. Parish, correct?

 2   A.    Um, probably.

 3   Q.    And at the end of that lunch, did you suggest

 4   getting a drink with Mr. Davis?

 5   A.    Um, it wouldn't surprise me.

 6   Q.    And you did get an alcoholic drink with Mr. Davis

 7   at an establishment called "Stoke," correct?

 8   A.    I really don't remember any of the specifics of

 9   that, but -- if that's what you're saying, I don't have

10   a reason to deny it, so.

11   Q.    Wouldn't you agree that it was not unusual for

12   attorneys in the Federal Defender's Office to gets

13   drinks together?

14   A.    It was not -- it was definitely a culture in the

15   office, I would agree with that.

16         (Pause.)

17         MR. KOLSKY:  Your Honor, may I approach the

18   witness?

19         THE COURT:  You may.

20         MR. STRICKLAND:  Is it possible that the exhibit

21   could be identified for me?

22         THE COURT:  You'll get to see every exhibit that

23   he -- every document that she has on the stand at the

24   beginning of your cross.  He needn't -- I'm not

25   requiring him to do it.

1          Go ahead, Mr. Kolsky.

2          MR. KOLSKY:  I can provide counsel with that, your

3     Honor.

4          THE COURT:  Fine.

5     Q.    Ms. Strickland, I've handed you what's currently

6     marked as Exhibit DN, Defendant's Exhibit DN.

7     A.    (Looks.)

8     Q.    Is this a series of text messages between you and

9     JP Davis dated between October 31st, 2017 and June 29th,

10    2018?

11    A.    May I have an opportunity to review the document?

12    Q.    Yes.

13    A.    Thank you.  (Looks.)

14         MR. STRICKLAND:  I'm sorry, which exhibit number

15    again?

16         THE COURT:  DN.  For identification.

17         (Pause.)

18         MR. KOLSKY:  Your Honor, we appear to have lost

19    the video connection with the Court.

20         THE COURT:  Everything appears the same to me.  I

21    can see you all.  Can you see me?

22         MR. KOLSKY:  No, your Honor.

23         THE CLERK:  No, your Honor, we cannot.  If you

24    don't mind giving me just one moment.

25         (Pause.)

 1          THE COURT:  Shall we take the morning recess at

 2     this time so as not to waste time and she can look over

 3     the document, is that satisfactory?  All right.

 4          MR. KOLSKY:  Yes, your Honor.

 5          THE COURT:  We started late, so we'll take only a

 6     20-minute recess.  We'll recess until 5 minutes after

 7     11:00.  We'll stand in recess.

 8          THE CLERK:  All rise.

 9          (Recess, 10:45 a.m.)

10          (Continuing, 11:05 a.m.)

11          THE COURT:  Mr. Kolsky, you may continue.

12          MR. STRICKLAND:  Your Honor, this exhibit contains

13     my communications about FDO clients, I think this

14     thing's privileged.  I mean at one point it says

15     "Prosecutor is offering low-end guideline plus 3 months

16     home confinement and further supervision."  And then it

17     says --

18          THE COURT:  Well I don't know that you have --

19     Mr. Strickland, I don't know that you have standing, I

20     think we'll let the judiciary make that determination.

21     I think there is something to what you say and if I need

22     to redact any portions of it, I will do so.

23          Go ahead, Mr. Kolsky.

24          MR. KOLSKY:  Thank you, your Honor.

25     Q.    Ms. Strickland, where we left off, the question I

1    had asked you was as to Defendant's Exhibit DN.

2          Is this a series of text messages between you and

3    JP Davis dated between October 31st, 2017 and June 29th,

4    2018?

5    A.    Yes, and in fact his lunch invitation that I was

6    referring to earlier is on the last page.

7    Q.    Okay, thank you, Ms. Strickland.

8          MR. KOLSKY:  Your Honor, I move to admit Exhibit

9    DN into evidence.

10         THE COURT:  Any objection?

11         MR. STRICKLAND:  I would reiterate that I think

12   these criminal defendants have a basis to assert their

13   attorney-client privilege.  I just don't understand why

14   --

15         THE COURT: Wait.  Wait.  Wait.  Yes.  I will

16   receive it subject to redacting anything that, um,

17   discusses a particular case.  But otherwise it's

18   admitted with that redaction, Exhibit 141 -- 142 in

19   evidence.

20         Proceed.

21         (Exhibit 142, marked.)

22         MR. STRICKLAND:  Your Honor, just to clarify

23   further, the defendant's already filed this on the

24   docket unredacted, it's been out there since this

25   summer.  Those are the summary judgment filings.

1          THE COURT:  Well I will redact it.

2          Go ahead, Mr. Kolsky.

3          MR. KOLSKY:  And just to state our position, your

4    Honor, we have reviewed the exhibits and, um, do not --

5    we have redacted from the exhibits any information that

6    we consider to be privileged.

7          THE COURT:  Well that you consider.  If I feel I

8    need to redact it, I will.

9          Have in mind we're going to try this case for 5

10   days, no longer.  Let's move on.

11         MR. KOLSKY:  Mr. Spears, please display Exhibit

12   DN, which is now Exhibit 142.

13         (Pause.)

14         MR. KOLSKY:  Your Honor, we're having some

15   technical issues.

16         THE COURT:  Well I have the exhibits, so I can

17   find it.  Go ahead.

18         MR. KOLSKY:  Okay, we'll just proceed with the

19   paper copies.

20   Q.    Ms. Strickland, please turn to Page 12.

21   A.    (Turns.)

22   Q.    Which is Bates-stamped US 2902.  And there's a

23   picture on the bottom of that page, continuing on to the

24   next page.  Did you send that picture to Mr. Davis on

25   March 15th, 2018?

1   A.     Yes, that's my cat.

2   Q.     And it's a picture of a cat and a bottle of gin,

3   correct?

4         MR. STRICKLAND:  I renew my objection to the

5   relevance and prejudicial effect of this.  I thought --

6   we've already covered the social drinking and the --

7         THE COURT:  You're riding two horses.  If it's so

8   prejudicial, then almost by definition it's relevant.

9   It's not too prejudicial.

10        But I do think there is a limit to this,

11  Mr. Kolsky.  But go ahead.  The document's in evidence.

12        MR. KOLSKY:  I'd like to ask the plaintiff a few

13  questions on this document, your Honor.

14  Q.     Ms. Strickland, underneath that picture you wrote,

15  "Can't remember if I sent you a gin pic," correct?

16  A.     That's what it appears to be, yeah.

17  Q.     And then you sent another picture of the gin

18  bottle, right?

19  A.     That is what it appears to be.

20  Q.     And then turning to the next page, Page 14, or US

21  2904, Mr. Davis -- Mr. Davis wrote, "All right, now we

22  have to throw down for real."  And you responded, "Yeah,

23  but you need to get a full bottle first," smiley face,

24  is that right?

25        THE COURT:  Now have in mind -- I think we have

1    reached the limit, Mr. Kolsky.  Move on.  You've got it

2    in evidence and it's my duty to read it and I will.

3    Q.    Is it fair to say you felt comfortable drinking

4    with Mr. Davis?

5    A.    At this time, no, it's not clear to me what the

6    dates are.  But, I mean, yeah.

7    Q.    And did you ever tell Mr. Davis that you were not

8    comfortable getting a drink with him?

9    A.    I believe I did.  Later I declined his invitations

10   and distanced myself after he sent me a quid-pro-quo

11   e-mail.

12   Q.    But did you ever tell him that you were not

13   comfortable getting a drink with him?

14   A.    I don't know if I used the word "uncomfortable,"

15   what I recall is that I repeatedly declined his

16   invitation in the most polite way that I could.

17   Q.    You're referring to June of 2018?

18   A.    If that was the time range, um, yeah, I mean I

19   don't specifically recall the date.  But it was after he

20   sent the quid-pro-quo e-mail.

21   Q.    Ms. Strickland, you were asked about this at your

22   deposition, correct?

23   A.    I -- I don't specifically recall.  I'm sorry.  It

24   wouldn't surprise me.

25   Q.    Would you please turn to Page 56 of your

1    deposition transcript.

2    A.     (Turns.)

3    Q.     Line 10 on Page 56.

4           Question, "Did you specifically tell him you

5    didn't want to get a drink with him?"  Answer, "No."

6    Question, "And did you specifically tell him you weren't

7    comfortable getting drinks with him?"  Answer.  "No."

8           MR. STRICKLAND:  Objection, your Honor.  I thought

9    you already ordered -- ordered that this wasn't -- I

10   don't understand why we just keep asking the alcoholic

11   questions.

12          THE COURT:  We haven't -- we haven't heard the

13   question, alcoholic or otherwise.  Let's hear the

14   question.

15   Q.     Ms. Strickland, was that your testimony at

16   deposition?

17          THE COURT:  Well if that's it, then sustained.

18   Sustained.  I think we've gone far enough with this.

19   It's sustained.

20          Go ahead, Mr. Kolsky.

21   Q.     Ms. Strickland, um, you're claiming that part of

22   the sexual harassment that you're alleging in this case

23   was when Mr. Davis offered you a ride home from the

24   office on June 21st, 2018, correct?

25   A.     Um, that was the lobby incident?  I just -- I

1   don't recall the specific dates of things, so I don't

2   want to testify inaccurately.

3   Q.    Is it correct that you're alleging that part of

4   what you're describing as sexual harassment in this case

5   was when Mr. Davis offered you a ride home and

6   subsequently was in the lobby on your way out, um, which

7   occurred on June 21st, 2018.  Does that sound right?

8   A.    Yes, when he waited for me in the lobby after

9   work, um, in the evening, when everyone else had left

10  and I had already said no to him.  Yes, that was, um,

11  definitely intimidating.

12  Q.    And you had requested rides from Mr. Davis before

13  that evening, correct?

14  A.    Yes.

15  Q.    About how many times had you asked Mr. Davis for a

16  ride?

17  A.    I really couldn't tell you.

18  Q.    Do you have any reason to doubt it was about 10

19  times?

20  A.    That wouldn't surprise me.

21  Q.    And, for example, you asked him to drive you home

22  from office happy hours?

23  A.    I don't recall specifics, but it wouldn't surprise

24  me.

25  Q.    Okay.  Mr. Davis texted you on June 29th, 2018 to

```
 1   meet with you, correct?
 2   A.    Um, may I look at this exhibit to --
 3   Q.    Yes.
 4   A.    I just don't remember, um, like specific dates so
 5   it's hard for me to, um --
 6   Q.    That's fine.
 7   A.    I'm sorry, the question -- can you please repeat
 8   the question?
 9   Q.    Mr. Davis texted you on June 29th of 2018 to meet
10   with you?
11   A.    That is what it appears to be, yeah.
12   Q.    Okay.  And you contend that that was part of the
13   sexual harassment you're alleging in this case, correct?
14   A.    Yes, from what I recall about this incident, um,
15   even though there's so-called --
16   Q.    I'm not asking that, I'm just asking if that's
17   part of the sexual harassment that you're alleging?
18   A.    Yes.
19   Q.    And Mr. Davis was asking to meet with you to
20   discuss a work-related topic, correct?
21   A.    From what I recall he said he wanted to have a
22   mentoring session a distance from work.  And when I
23   called in sick, in part because I was trying to avoid
24   him, he said, um, "Can we reschedule?  And I'm free all
25   day, including early morning, lunch, and evening.  I'm
```

1  hoping this will be helpful for you.  Please don't be
2  overanxious about it."
3  Q.   Isn't it true there were occasions when you asked
4  to meet with Mr. Davis in June of 2018?
5  A.   I'm sure I asked to meet with him about like a
6  case we were assigned to.  I don't recall asking to meet
7  him like socially or outside of the office about
8  anything.
9  Q.   Did you request to meet with him about a
10 "work-related topic," is that fair to say?
11 A.   I don't recall requesting to meet with him, I
12 recall that we were assigned to cases that needed work
13 to be done.  So I mean if that's a "request," then, you
14 know, okay.
15 Q.   Did you write to him, on June 18th, 2018, "At some
16 point we should talk about this too, to be honest I'm
17 confused about it"?
18 A.   I don't recall the specifics, but if I e-mailed
19 him about a case, yeah, I'm not going to deny that.
20 Q.   And you met Tony Martinez on July 2nd, 2018,
21 correct?
22 A.   Um, that sounds right.
23      MR. KOLSKY:  Your Honor, may I approach the
24 witness?
25      THE COURT:  You may.

```
 1    Q.    Ms. Strickland, I've handed you what's currently
 2    marked as Defendant's Exhibit DP -- excuse me, I'm
 3    sorry, Exhibit GV.
 4          THE COURT:  Gv for identification.
 5          MR. KOLSKY:  Yes, GV.
 6    Q.    Are these your handwritten notes of the meeting
 7    between you and Mr. Martinez on July 2nd, 2018?
 8    A.    Could I just have a moment please to review it?
 9    Q.    Yes.
10    A.    Thank you.  (Reads.)  Um, yes, these are my notes.
11          MR. KOLSKY:  Your Honor, I move to admit Exhibit
12    GV into evidence.
13          THE COURT:  Any objection?
14          (Pause.)
15          MR. STRICKLAND:  Not from me, but plaintiff is
16    also co-counsel in this case and I think she ought to
17    have an opportunity to assert an objection.
18          THE COURT:  Well, I --
19          THE WITNESS:  I don't have any objection.
20          THE COURT:  Be that as it may, you're making the
21    objections to her interrogation.  There's no objection.
22    It's admitted Exhibit 143 in evidence.
23          (Exhibit 143, marked.)
24          MR. STRICKLAND:  Can I just ask a point of
25    clarification?
```

```
 1          THE COURT:  Always.  Yes.

 2          MR. STRICKLAND:  So whenever you granted the

 3     reopened deposition, it was because the plaintiff did

 4     not assert objections on her behalf, I think you

 5     referred to it as "a licensed attorney answered the

 6     question."  I think she ought to have an opportunity to

 7     assert objections, particularly whenever all four of her

 8     counsel --

 9          THE COURT:  Mr. Strickland, 1, that's not a

10     question for clarification, you're arguing with respect

11     to the Court's ruling.  The normal procedure, and a

12     procedure that I will follow here, is that she is now on

13     the witness stand, you'll make the objections.  When

14     another witness is on the witness stand, one or the

15     other of you will make the objections.  It's not a

16     tag-team operation.

17          The government has a number of attorneys, the same

18     rule applies to them.  Whoever has taken the witness for

19     interrogation, for instance Mr. Kolsky, when we get to

20     your examination of this witness, only Mr. Kolsky is

21     going to make the objections.  That's the rule that is

22     followed uniformly in my practice and that's the rule I

23     follow here.

24          Go ahead, Mr. Kolsky.

25          MR. KOLSKY:  Mr. Spears, please display Exhibit
```

1    GV, which is now Exhibit 143.

2         (On screen.)

3    Q.    Ms. Strickland, according to these notes,

4    Mr. Merchant had asked you if you were reporting

5    harassment or sexual harassment, correct?

6    A.    Yes, they say he asked, "Is this harassment/sexual

7    harassment?"

8    Q.    And you said -- and you responded to him, "I don't

9    feel we are there yet, I don't want to use words like

10   that to trigger something," correct?

11   A.    Yes, I said I am self-managing and that everyone

12   deserves the benefit of me trying to resolve the issue

13   informally and at the lowest level.

14   Q.    Well don't you say, "I am self-managing and that

15   everyone deserves the benefit of me having a

16   conversation"?

17   A.    Yes, exactly.

18   Q.    A conversation with him first to try to resolve

19   the issue, is that correct?

20   A.    Yes, exactly.

21   Q.    And "him" refers to Mr. Davis, correct?

22   A.    Um, yes.

23   Q.    So you wanted to have a conversation with

24   Mr. Davis to try to resolve the issue, right?

25   A.    Yes, I did.

Q.    And you also told Mr. Martinez, "I don't want you

to do anything except keep my confidence and so you'll

know if something happens," correct?

A.    That is correct.  I went to him because that was

the advice that I was given from Laura Miner, was to try

to resolve it informally and at the lowest level

possible, to try to have a conversation with him.  And

she said, "Go to Tony first, but don't make a formal

report."  So that's what I did.

Q.    At this July 2nd meeting, did you tell

Mr. Martinez about the "Mas Dinero" e-mail from

Mr. Davis?

A.    I don't recall that specifically coming up, no.

Q.    And you met with Mr. Martinez and Mr. Davis a few

days later on July 5th, 2018, correct?

A.    That sounds right.  I don't recall the exact date.

Q.    Okay.  Did you ever meet again with Mr. Davis

after July 5th?

A.    I'm not sure.  You mean like in a work meeting or

-- um, I'm not sure I understand the question.

Q.    Did you meet in person with Mr. Davis after July

5th, um, one on one, a one-on-one meeting between you

and Mr. Davis?

A.    No, I recall that he asked me to meet with him one

on one and, um, that's when I decided I need to try to

1    get advice from the Fair Employment Opportunity Office

2    of the AO.

3    Q.    And when did he ask you to meet one on one, wasn't

4    that in June of 2018?

5    A.    No, um, it was in July after -- it was a week and

6    a half, two weeks I think after this when Tony had told

7    me that he was going to separate us and then he assigns

8    me back, um, under JP's team, and then JP immediately

9    began requesting to meet with me alone again about his

10   team.  And so that's when I felt like my attempts to try

11   to distance myself and resolve the issue informally were

12   not working, that Tony was not addressing my complaints

13   appropriately.  And so, um, that's when I reached out to

14   the AO for advice.

15   Q.    Understood.  So with regard to that e-mail in late

16   July, you didn't end up meeting with Mr. Davis in

17   response to that, correct?

18   A.    No, because I called in sick to avoid meeting with

19   him, which I think was pretty clear to him as well that

20   I was avoiding him.

21   Q.    Did you ever speak with Mr. Davis by phone after

22   July 5th, 2018?

23   A.    By phone?  Not that I recall.

24   Q.    You would agree that Mr. Martinez reclassified you

25   to an Assistant Federal Public Defender because it was

1   "to the Office's benefit for purposes of case-weight

2   measurement," correct?

3   A.    I believe that's what he said in his e-mail, yeah,

4   that it was not a promotion, it was just to maintain the

5   Office's work measurement.

6   Q.    And would you agree that immediately before you

7   were reclassified to Assistant Federal Defender, your

8   salary as a Research and Writing Attorney was $107,319

9   per year, is that right?

10  A.    I'm sorry, I couldn't tell you the specifics.  But

11  I don't have any reason to deny that.

12  Q.    Okay.  And you would agree that the amount that

13  you were paid at that time included locality pay,

14  correct?

15  A.    Um, yeah, at that time, yes, there was a locality

16  adjustment.  What I recall is they tried to take it away

17  later, but --

18  Q.    And then when you became an Assistant Federal

19  Defender after you were reclassified, your salary was

20  still $107,319 per year, correct?

21  A.    Yeah, what I recall was that the form said that

22  that was --

23  Q.    Well that's not my question, Ms. Strickland, I'm

24  just asking what your salary was after you were

25  reclassified?  Do you agree that it was --

1          MR. STRICKLAND:  Objection, your Honor, can she
2     answer the question?  Arguably the --
3          THE COURT:  Just a moment.  Just a moment.  You
4     object.  The objection's overruled.  You'll have a
5     chance to interrogate this witness.
6          You may go over it.  Go ahead, Mr. Kolsky.
7     Q.    Ms. Strickland, when you became an Assistant
8     Federal Defender, your salary was still $107,319 per
9     year, correct?
10    A.    My salary did not -- my total salary did not
11    change, that is correct.  The locality adjustment was
12    not part of that.
13         MR. KOLSKY:  Your Honor, I move to strike the last
14    part of the witness's testimony about --
15         THE COURT:  All right.  In the exercise of
16    discretion, that may stand.
17    Q.    Ms. Strickland, you sent Tony Martinez an e-mail
18    on August 10th, 2018, correct?
19    A.    I mean again I -- if you're saying it was that
20    date, that sounds right to me.
21    Q.    Do you recall sending Mr. Martinez an e-mail
22    around August 10th, 2018 in which you made certain
23    requests?
24    A.    I remember sending him an e-mail, um, based on the
25    advice of Nancy Dunham, that I needed to really tell him

what I was asking for and why.  So I said that based on
these harassing behaviors that I had reported and the
lack of meaningful action up to that point, that I was
making certain requests based on a conversation that we
had that I thought we had in agreement.

Q.    And in that e-mail you requested to work remotely,
right?

A.    I requested to work remotely until he could figure
out an office-space issue in Asheville.

Q.    Do you recall if your e-mail said -- didn't your
e-mail say "A long-term resolution that allows me to
work remotely and report to the Appellate Chief in
Asheville is fine with me"?

A.    If he could not find space in Asheville, then,
yeah, because I didn't want to work in -- not I didn't
want to, I couldn't work in Charlotte anymore with JP
the way he was behaving.

Q.    But just to be clear, your e-mail did say "A
long-term resolution that allows me to work remotely and
report to the Appellate Chief in Asheville is fine with
me," is that correct?

A.    Based on his statement that he does not believe he
had office space, yeah.

Q.    And Mr. Martinez did allow you to telework
temporarily during the pendency of the EDR

 1   investigation, correct?

 2   A.    Um, yes.

 3   Q.    Okay.  And that was in his response to you on

 4   August 17th, 2018, does that sound correct?

 5   A.    Um, without having it in front of me, that sounds

 6   right.

 7   Q.    Did you e-mail Nancy Dunham on August 9th, 2018?

 8   A.    I'm sorry, I don't recall the specifics of it.

 9   I'm sure I e-mailed her.  I don't know exactly when.

10   Q.    Ms. Strickland, I've handed you a document.  And I

11   direct your attention to Page US 977.

12   A.    (Looks.)  May I have a moment to review it?

13   Q.    Yes.

14   A.    Thank you.

15   A.    (Looks.)  Okay.

16         MR. STRICKLAND:  Does this exhibit have a number

17   or a letter?

18         THE COURT:  That's an appropriate --

19         MR. STRICKLAND:  I would want to know if I'm to

20   make an objection.

21         THE COURT:  -- yes, that's an appropriate

22   objection.

23         MR. KOLSKY:  Your Honor, this is just to refresh

24   her recollection.

25         THE COURT:  All right, you've identified it.

1       MR. STRICKLAND:  If it's to refresh her

2   recollection, may I see it as well?

3       THE COURT:  You may prior to your, um, cross-

4   examination you may certainly see it.  Anything that she

5   is shown you may see.

6       MR. STRICKLAND:  But I need to be able to make

7   objections to the document itself.

8       THE COURT:  She isn't testifying from the

9   document, he represented he showed her a document to

10  refresh her recollection.  So we'll see whether that

11  document refreshes her recollection.  Then we'll get a

12  question as to what her testimony is with her

13  recollection refreshed.  Maybe the document doesn't

14  refresh her recollection, in which case that's it for

15  this document.  But she's looking it over.  Let's see.

16      Does that refresh your recollection, ma'am?

17      THE WITNESS:  (Looks.)  What is -- what is my

18  memory that is being --

19  Q.   Ms. Strickland, the question I asked is whether

20  you e-mailed Nancy Dunham on August 9th, 2018, and I'm

21  directing you to Page US 977.  Does that refresh your

22  recollection as to whether you e-mailed Ms. Dunham on

23  August 9th, 2018?

24  A.   Yes, if I could just have one moment please, it's

25  a long document.

```
 1    Q.    Well I'm only asking you about the e-mail on Page
 2    977.
 3    A.    (Looks.)  Yes, it does appear that there is, um --
 4    I'm sorry, did you say August 7th or August 9th?
 5    Q.    August 9th.
 6    A.    Okay, yes, it does appear there's an e-mail, um,
 7    dated August 9th in this chain.
 8    Q.    And you had reached out to Ms. Dunham for advice
 9    on the situation with Mr. Davis, correct?
10    A.    Yes.
11    Q.    And in your e-mail to Ms. Dunham, did you write,
12    "If I have to work remotely until there is space in
13    Asheville, that is completely fine with me"?
14          MR. STRICKLAND:  That doesn't seem like refreshing
15    recollection, it seems like it's reading from the
16    document.
17          THE COURT:  Well she may not read from the
18    document, but he may ask the question.
19          Is that what you said to her?
20    A.    It appears what I said is if I have to work
21    remotely until there is space in Asheville, that is fine
22    with me.
23          THE COURT:  Is that what you remember?  Is that
24    your memory?
25          THE WITNESS:  I mean I have no reason to deny that
```

1   that's what I said, so, yeah.

2          THE COURT:  All right, that may stand.

3   Q.    You said "That is completely fine with me,"

4   correct?

5   A.    Well compared to Charlotte, yeah, it was

6   completely fine with me.

7   Q.    Okay.  You met with Circuit Mediator Ed Smith on

8   February 7th, 2019, correct?

9   A.    Um, that sounds right.  I couldn't tell you the

10  specific date.

11  Q.    And at that meeting did you tell Mr. Smith that

12  you prefer teleworking and you work better on your own?

13  A.    Yeah, I mean what I recall is I think I said that

14  in the context of the conversation where it was very

15  clear to me that I was going to have to leave, resign

16  from that office, because they weren't going to do

17  anything about my complaints.  So I was trying to figure

18  out some sort of solution where I could just stay on

19  telework until I could have some sort of transition.

20  Q.    Did you ever tell Mr. Martinez that you were not

21  happy teleworking?

22  A.    I'm sorry, can you repeat that please?

23  Q.    Did you ever tell Mr. Martinez that you were not

24  happy teleworking?

25  A.    Well I asked for a transfer to Asheville, so I

```
 1    mean I think, whenever I brought it up, I said, "If
 2    there was no office space and that was the only
 3    alternative."
 4    Q.    Do you recall being asked that question at your
 5    deposition, Ms. Strickland?
 6    A.    Um, not specifically, but I won't deny it if you
 7    say I was.  Oops.  I'm sorry.
 8    Q.    Please turn to Page 104 of your deposition
 9    transcript.
10    A.    Sorry, I'm trying to find a place for all of these
11    exhibits.  Okay, what is the page number again please?
12    Q.    Page 104, Line 19.
13    A.    (Turns.)
14    Q.    I'm going to read from the transcript, I want you
15    to tell me if I read it correctly.
16          Question, "Did you tell Mr. Martinez that you
17    weren't happy teleworking?"  Answer, "I did not speak to
18    Mr. Martinez once the -- that I call after the EDR
19    process started."
20          Did I read that correctly?
21    A.    Right.  Yeah, that's true.
22    Q.    Okay.  At the Federal Defender's Office, would it
23    be accurate to say you "Assisted in all aspects of trial
24    and appellate litigation, including motions practice and
25    trial preparation, appellate briefing, and court
```

1   hearings?"

2   A.    Um, I believe that's a line from my resume, so,

3   yes.

4   Q.    And your resume's accurate, correct?

5   A.    Um, to the best of my knowledge, yes.

6   Q.    Okay.  In January 2019, did you decline an

7   opportunity to argue a case in the Fourth Circuit?

8   A.    Well what I recall is that after the argument

9   notice came out, I had briefed the case, um, Josh had

10  signed himself up for the argument, and then by the time

11  he reached out to me and said, "Oh, do you want to do

12  the argument?" um, it just, um -- it made me feel

13  uncomfortable.  I was afraid that I was being set up for

14  failure and I didn't want to do that to the client.  So

15  I declined.

16       THE COURT:  Who is "Josh," ma'am?  Who is "Josh"?

17       THE WITNESS:  He is the Appellate Chief.

18       THE COURT:  And his full name?

19       MR. KOLSKY:  Is that Josh --

20       THE COURT:  I'm asking the witness.

21       THE WITNESS:  Yes, Joshua Carpenter.

22       THE COURT:  Thank you.

23       Go ahead, Mr. Kolsky.

24       MR. KOLSKY:  Your Honor, may I approach the

25  witness?

1          THE COURT:  You may.

2     Q.    Ms. Strickland, I've handed you what's currently

3     marked as Exhibit EB.

4     A.    (Looks.)

5     Q.    Is this an e-mail exchange between you and Josh

6     Carpenter on January 11th, 2019?

7     A.    Now if I could just take a moment to review it?

8     Q.    Yes.

9     A.    Thank you.  (Reads.)  Okay.

10    Q.    And is that an e-mail chain between you and Josh

11    Carpenter on January 11th, 2019?

12    A.    Um, yes, that's what it appears to be.

13         MR. KOLSKY:  Your Honor, I move to admit Exhibit

14    EB into evidence.

15         THE COURT:  No objection?

16         MR. STRICKLAND:  Give me one moment, your Honor.

17         THE COURT:  Of course.

18         MR. STRICKLAND:  "EV"?

19         MR. KOLSKY:  "EB," as in "boy."

20         MR. STRICKLAND:  Oh, okay.

21         (Pause.)

22         MR. STRICKLAND:  I'm a little concerned about

23    hearsay issues given there's statements by Josh.

24         THE COURT:  Oh, well so much of his -- so much of

25    the document as reflects what Mr. Carpenter said is

hearsay, I'm only going to admit it for the fact that it
was said.  The rest of it is her admission, so it's not
a hearsay issue.

    With that limitation, no objection?

    MR. STRICKLAND:  No objection, your Honor.

    THE COURT:  It is admitted with that limitation.
Give it Exhibit 144.

    (Exhibit 144, marked.)

Q.    Ms. Strickland, this e-mail chain is in reference
to an appellate argument in a case that you had worked
on, correct?

A.    Um, yeah.

Q.    Did you interpret Mr. Carpenter's statements in
this e-mail chain as indicating that he did not want you
to do the appellate argument?

A.    Well I think the fact that it had been months
since he signed himself up for it, it -- I mean he said
he wanted to double-check to make sure I didn't want to
argue it.

Q.    And so did you interpret that as meaning that he
didn't want you to do the argument?

A.    I don't know what he wanted.  I don't know what is
in his mind.  So I can't speak to that.

Q.    Did you testify at your deposition that you did
interpret this e-mail chain as indicating that he didn't

1    want you to do the appellate argument?

2    A.    That he did not want me to do it?

3    Q.    Correct.

4    A.    That wouldn't surprise me, because that is how I

5    felt.  Yes.

6    Q.    At the time you were an Assistant Federal

7    Defender, had you served as first chair for any felony

8    cases from start to finish?

9    A.    No.

10   Q.    In June of 2018, did you express concerns to Tony

11   Martinez about whether you had enough training to handle

12   cases involving supervised release violations and

13   illegal reentries?

14   A.    I'm not sure.  Can you remind me of just the

15   timeframe of when that was -- would have been?  It might

16   help me remember.

17   Q.    So I'm asking you about June of 2018.

18   A.    Right.  So after I was removed from the, um, the

19   case that we've all been discussing, I was very

20   concerned because it seemed like I was getting

21   conflicting messages about whether I wasn't even able to

22   do research and writing on a case versus, you know, a

23   couple of weeks later I was assigned like 6 cases.  And

24   so, yeah, I was concerned about training.

25   Q.    But you were specifically concerned -- the cases

 1    that you're referring to that you were assigned, did

 2    those involve supervised release violations and illegal

 3    reentries?

 4    A.    I don't recall the specifics.  I'm sorry.

 5    Q.    Ms. Strickland, would you please turn to Page 125

 6    of your deposition transcript.

 7    A.    (Turns.)  Sorry, what page again?

 8    Q.    125.

 9    A.    125.  Okay.  (Turns.)

10    Q.    Line 5, Question, "In June 2018, did you express

11    concerns to Tony Martinez about cases you were handling

12    involving supervised release violations and illegal

13    reentries?"  Answer, "I did."

14          Did I read that correctly?

15    A.    Right.  Yeah, and what it says here is I think

16    with what had just happened with me being taken off of

17    another case, um, even in a research and writing

18    capacity, I was concerned about feeling like whether

19    they have given me sufficient training.  Yeah.

20    Q.    Would you agree that cases involving supervised

21    release violations and illegal reentries are among the

22    most basic cases handled by the Federal Defender's

23    Office?

24    A.    I mean I don't -- I really couldn't tell you.  I

25    mean I also think research and writing work is pretty

1    basic, but I was also taken off of that case.  So it's
2    hard for me to compare.
3    Q.    Did you call Tony Martinez the night before your
4    first witness examination in May of 2018?
5    A.    That may very well be, yeah.
6    Q.    And did you tell him that you didn't feel prepared
7    to do the examination?
8    A.    (Pause.)  I'm trying to remember the details of
9    what we discussed.  I do remember feeling like I didn't
10   trust the way that JP was trying to help me prepare, so
11   I reached out to another attorney, um, Jeff King, for
12   advice, and he did a mock examination with me and, um,
13   he -- when we actually went into the courtroom, you know
14   everyone said it was fantastic and basically the witness
15   was discredited on the stand.  So, yeah, I mean I'm sure
16   I wanted to do really well for, you know, cross-
17   examination in court, so it wouldn't surprise me if I
18   reached out to him about that.
19   Q.    And you believe that you were prepared to have
20   your own caseload in August of 2018, correct?
21   A.    I'm sorry, can you repeat that?
22   Q.    You believed that you were prepared to have your
23   own caseload in August of 2018, correct?
24   A.    Yeah, I mean certainly in appeals, I think.  I
25   think on the trial side I definitely wanted more

training.  But, you know, because of the situation and

the harassment and everything, I didn't really feel like

I had a future, like I could keep pursuing that, so I

decided to, um, turn my attention to appeals, which I

think I was well-qualified to handle my own caseload on

that.  I mean having served as a law clerk and seeing

probably hundreds of oral arguments and drafted

opinions.

Q.    You left the Federal Defender's Office in March of

2019, right?

A.    Um, yes.

Q.    And you were not in contact with JP Davis in March

of 2019, correct?

A.    Um, no.

Q.    No, you were not in contact with him or, no,

that's not correct?  My question was --

A.    Oh, I'm sorry.  No, I was not in contact with him

in March of 2019.

Q.    Thank you.  You had been teleworking since August

of 2018, correct?

A.    Yeah, I mean actually kind of even before that,

so.  What I recall is I felt like it really kind of

started in June, because he just wanted to stop, like he

kept wanting to have these meetings and reaching out to

me.  And so it really started in June.  And then I think

1    more into July.  But then, from what I recall, the more

2    -- like a telework arrangement with Tony began in

3    August.

4           MR. KOLSKY:  Your Honor, may I approach the

5    witness?

6           THE COURT:  You may.

7    Q.    Ms. Strickland, I've handed you what's currently

8    marked as Defendants' Exhibit DM.

9    A.    (Looks.)

10   Q.    Is this an e-mail from you to Amal Scoggins and

11   Nancy Dunham dated November 26, 2018?

12   A.    If I could just have a moment?

13   Q.    Yes.

14   A.    Thank you.  (Reads.)  Okay.

15   Q.    Is that an e-mail from you to Amal Scoggins and

16   Nancy Dunham dated November 26, 2018?

17   A.    That's what it appears to be.

18          MR. KOLSKY:  Your Honor, I move to admit Exhibit

19   DM into evidence.

20          THE COURT:  Any objection?

21          MR. STRICKLAND:  I object, this has a plaintiff's

22   Bates number and presumably this went to Amal Scoggins's

23   and Nancy Dunham's work account, I don't recall it being

24   produced by defendants in discovery.

25          THE COURT:  Well haven't you been -- haven't you

```
 1   been over the documents that they proposed?  It has a
 2   letter on it.
 3        MR. STRICKLAND:  Yes, but I noted -- we noted an
 4   untimeliness objection.
 5        THE COURT:  Oh, that it was untimely produced as
 6   of the time that the exhibit lists were prepared, you're
 7   saying?
 8        MR. STRICKLAND:  I'm saying I don't believe that
 9   they produced this in discovery.  We didn't get anything
10   from --
11        THE COURT:  Well what is the -- is there -- what
12   is the discovery request that -- I'll take it
13   provisionally, but if you can show me a discovery
14   request that should have called to this document and
15   they did not produce it, I will strike it.
16        It's admitted, Exhibit 145 in evidence.
17        (Exhibit 145, marked.)
18        THE COURT:  Proceed.
19        MR. KOLSKY:  Mr. Spears, please display Exhibit DM
20   -- now Exhibit 145.
21        (On screen.)
22   Q.   Amal Scoggins is an attorney at the Administrative
23   Office of the US Courts, correct?
24   A.   Yes.
25        MR. KOLSKY:  Mr. Spears, can you please magnify
```

 1     the paragraph at the bottom of Page 1 and continuing
 2     onto Page 2, beginning with "In the meantime"?
 3         (Enlarged.)
 4     Q.    Ms. Strickland, could you please read that
 5     paragraph.
 6     A.    Um, yes, it says "In the meantime I have informed
 7     James, Chief Judge Gregory, and Heather, that I would
 8     like the Fourth Circuit to assist me in finding a
 9     replacement elsewhere in the Fourth circuit because my
10     relationships with the Federal Defender and my
11     colleagues have been irreparably damaged and I no longer
12     feel welcome in that environment."
13         THE COURT:  In that --
14     A.    "I did not want to leave my" --
15         THE COURT:  Excuse me.  Go ahead.  I interrupted
16     and I shouldn't have.  Finish.
17     A.    "I did not want to leave my position at the
18     Federal Defender Office, which I considered my dream
19     job, but at this point I have been constructively
20     discharged.  I consider James's lack of engagement as
21     EDR coordinator to be a major contributing factor in
22     this decision.  Although he has now offered to send my
23     resume to other Federal Defender offices in the Fourth
24     Circuit to ask their hiring availability, it is
25     exceedingly unlikely that anything will be resolved

1  before Thursday when counseling expires."
2  Q.    Ms. Strickland --
3         THE COURT:  Excuse me.  I just want a
4  clarification.
5         When you say "James" there, to whom are you
6  referring, ma'am?
7         THE WITNESS:  James Ishida, the Circuit Executive.
8         THE COURT:  Thank you.
9         Go ahead, Mr. Kolsky.
10 Q.    Ms. Strickland, is it true that by November 2018
11 you believed you had been constructively discharged?
12 A.    Yeah, I mean it definitely was an ongoing, um, I
13 think "irreparably damaged" was very apt, the right
14 thing to use.
15 Q.    And you believed that you had been constructively
16 discharged because you felt you were no longer welcome
17 at the Federal Defender's Office, correct?
18 A.    Yeah, I mean from what I understood from the
19 investigator it sounded like, um, you know my character
20 and integrity were being questioned as a defense to the
21 complaints, and, um, nothing was being -- I mean at this
22 point the investigation has been pending for months with
23 no progress.  Um, this e-mail, from what I recall -- and
24 it's possible this is actually a draft because it looks
25 like there are some typos in here.  I don't know.  It's

1    possible that I produced a draft e-mail that I didn't
2    actually send --
3    Q.    I think you're getting a little beyond the scope
4    of my question, Ms. Strickland, but your counsel will
5    have an opportunity to question you.
6          You stayed at the Federal Defender's Office until
7    March of 2019 because you wanted to wait until you found
8    another job, right?
9    A.    I think that was part of it, yes.  I mean I never
10   really gave up hope that maybe the thing could be
11   resolved through the EDR process.  I mean being a
12   Federal Defender was my dream job and I wanted to stay
13   with the FDO for my entire career until retirement, so
14   it was very difficult for me to accept the possibility
15   that I might have to be forced to leave because of this
16   hostile working environment.  So I did -- even though I
17   felt that way, I did try to work through the process the
18   best that I could to see if there would be some sort of
19   solution, but there wasn't.
20   Q.    During the mediation phase of your EDR process,
21   did Circuit Mediator, Ed Smith, tell you that Tony
22   Martinez would allow you to change your duty station to
23   Asheville?
24   A.    After 6 months of stonewalling, yeah, I think he
25   said, yeah, there's an, um, an office that I would share

with an intern or a library space to work.  It makes you
wonder why all of a sudden office space was available
after 6 months of no office space.
Q.    Well didn't Mr. Smith tell you that Tony Martinez
had offered you his own office space in Asheville?
A.    I don't recall the exact words that he said.
Q.    Would it refresh your recollection to listen to a
recording of that portion of the conversation with
Mr. Smith?
A.    No, I'm not denying it.  If that's what he said,
I'm not going to deny that.
Q.    Is it -- so is your testimony that Mr. Smith told
you that Tony Martinez had offered you his own office in
Asheville?
A.    It would not surprise me at all if that's what he
said, yeah.
Q.    Do you have a recollection of that?
A.    I'm sorry, I'm not trying to be difficult, um, but
that's sound right, yeah.
Q.    You read the Fourth Circuit's EDR plan while you
were employed by the Federal Defender's Office, correct?
A.    Yeah, of course at some time I did, I mean I
hadn't heard of it or received any training until after
these events occurred.  But, yes, I did.  When I did
find out what the plan was, I read it.

```
1    Q.    And you read it multiple times?

2    A.    I'm sure I did, yeah.

3    Q.    You read it carefully, right?

4    A.    Um, yes, of course.

5    Q.    And did you have a conversation with Amal

6    Scoggins, from the Administrative Office of US Courts,

7    on September 13th, 2018?

8    A.    I know I talked to her.  I mean I couldn't say

9    it's the exact date, but that sounds right.

10   Q.    During that conversation, did Ms. Scoggins tell

11   you that the Federal Public Defender is not going to

12   have any authority in terms of how the matter is

13   resolved in an EDR setting and that he will not be the

14   mediator nor will he make the final decision before the

15   court?

16   A.    I recall I think that was one statement that she

17   made.

18   Q.    Did Ms. Scoggins also say the following to you,

19   "What will happen is you will be entitled to file a

20   formal complaint, if it's not resolved in counseling, if

21   it's not resolved in mediation, and you will, in that

22   formal complaint, have the opportunity to have a hearing

23   before a judicial officer.  And so the judicial officer

24   will make the final decision based on the allegations

25   that you raised in the formal complaint.  And so it's
```

1    typically a couple of things.  First, they're

2    determining whether or not you're discriminated against

3    or you were subjected to a workplace violation, and then

4    from that they're deciding that if you were, what are

5    the remedies that you're entitled to."

6        Did Ms. Scoggins make that statement to you?

7        MR. STRICKLAND:  Objection, hearsay.

8        THE COURT:  You're not offering that for the

9    truth, you're offering it for the fact that the

10    statements were made, is that correct, Mr. Kolsky?

11        (Silence.)

12    A.   I think that was one thing that she said.  I mean

13    it was a larger conversation where she was also saying

14    that an accused Federal Defender can't be disqualified

15    from an EDR proceeding and that she didn't know

16    specifically how all of that worked in Federal Defender

17    Offices.

18    Q.   And did Ms. Scoggins also -- well did you ask

19    Ms. Scoggins who the final decision would be made by and

20    did she respond, "So it would be whoever is the

21    presiding judicial officer, and so Chief Judge Gregory

22    will decide who the judicial officer will be.  But it

23    will definitely be made by a judicial officer"?

24    A.   I mean -- I'm sure that's one statement that she

25    made.

Q.    And did you make an audio recording of your
conversation with Ms. Scoggins?

A.    I'm sure I did.

Q.    And you produced that during discovery in this
case?

A.    Yeah.

MR. KOLSKY:  Your Honor, I move to admit
Defendant's Exhibit HO, which is that recording that the
plaintiff produced during discovery.

THE COURT:  Any objection?

MR. STRICKLAND:  So this recording is not going to
be used for the substance of what Amal Scoggins said,
it's just that statements were made to the plaintiff?

THE COURT:  Well that's how I understand it.  Yes,
it proves that the -- it tends to prove that the
statements were made.

MR. STRICKLAND:  (Pause.)  Again I think this is
one of those situations where the plaintiff, its
counsel, should have an opportunity to object if she'd
like to.

THE COURT:  You know my practice, you're the
attorney here.  Well you're not the only attorney, but
she's on the stand.

You have no objection?

MR. STRICKLAND:  Objection.

1          THE COURT:  Well what's the ground?

2          MR. STRICKLAND:  I have no objection.

3          THE COURT:  Oh, I misheard, forgive me.

4          MR. STRICKLAND:  What I just said --

5          THE COURT:  It's admitted, Exhibit 146, in

6     evidence.

7          (Exhibit 146, marked.)

8     Q.    Ms. Strickland, did you have a call with Circuit

9     Executive James Ishida on January 17th, 2019?

10    A.    I don't recall the specific dates, but that

11    wouldn't surprise me.

12    Q.    And during that call did Mr. Ishida say the

13    following to you, "If Caryn wants to proceed and

14    requests a hearing and at that time you're going to --

15    Judge Gregory will appoint a judicial officer and there

16    will be -- there will be findings on the merits between

17    that point and the end of the proceeding."

18    A.    I'm sure that's one of many things that he said.

19    Q.    And did you make an audio recording of your call

20    with Mr. Ishida?

21    A.    Yes.

22    Q.    And you produced that recording during discovery

23    in this case?

24    A.    Yes.

25         MR. KOLSKY:  Your Honor, I move to admit Exhibit

1    HP, which is that recording that plaintiff produced in

2    discovery.

3         THE COURT:  No objection, Mr. Cooper --

4    Mr. Strickland, excuse me?

5         MR. STRICKLAND:  I would assert the hearsay

6    objection for the recording, but it's --

7         THE COURT:  And you are right, the hearsay

8    objection is sustained.  I will admit it limited to the

9    fact that those things were said.  Admitted as Exhibit

10   147.

11        (Exhibit 147, marked.)

12   Q.   I believe you testified earlier today,

13   Ms. Strickland, that you met with Ed Smith on or about

14   February 7th, 2019, is that right?

15   A.   Yeah, that sounds right.

16   Q.   During that meeting did Mr. Smith say the

17   following to you, "We're at that stage, we don't get

18   resolved here, it's going to be a fun complaint, and I

19   don't think the Chief Judge will hear it, but he'll have

20   to appoint a judge to hear it"?

21   A.   Right, and he said that the judge would not

22   micromanage or tell the attorneys what to do in the

23   final hearing.

24   Q.   But just to be clear, the statement that I read to

25   you is a statement that he made to you, correct?

A.    Sure, among many other statements.

Q.    And did you make an audio recording of your
meeting with Mr. Smith?

A.    Yes.

Q.    And you produced that during discovery in this
case?

A.    Yes.

        MR. KOLSKY:  Your Honor, I move to admit Exhibit
HE, which is that recording that the plaintiff produced
during discovery.

        THE COURT:  HE.  All right.

        No objection if I limit it as I have heretofore,
Mr. Strickland?

        MR. STRICKLAND:  (Silence.)

        THE COURT:  Is that right?

        MR. STRICKLAND:  Yes.

        THE COURT:  It's admitted as limited, Exhibit 148
in evidence.

        (Exhibit 148, marked.)

Q.    Ms. Strickland, while you were still employed at
the Federal Defender's Office, you understood that if
you proceeded to a formal hearing on your EDR claim, a
judge would decide your EDR claim and make a
determination about remedies, correct?

A.    No, that was not my understanding.

1   Q.    Please turn to Page 24 of your deposition
2   transcript.
3   A.    (Turns.)  I'm sorry, could you say the page again,
4   please?
5   Q.    Yes, it's Page 24.
6   A.    (Turns.)
7   Q.    I'm going to ask you a different question,
8   Ms. Strickland.
9         In February of 2019, you understood that the
10  hearing officer -- if you proceeded to the formal
11  complaint, the hearing officer would be a judge,
12  correct?
13  A.    I think I likely believed that the hearing officer
14  would be a judge, yeah.  I did not believe -- to clear
15  up a misconception, I never believed that the hearing
16  officer was going to be Tony Martinez.  So we can just
17  get that out of way.
18  Q.    Thank you.  (Pause.)  Your position in this case
19  is that you believed, as a practical matter, that the
20  presiding judicial officer wouldn't order any remedies
21  that Mr. Martinez didn't agree to, is that correct?
22  A.    Yeah, I think that's a fair statement.
23  Q.    And you believed that based on what you claimed
24  were statements made to you by Ed Smith and Jill
25  Langley, right?

A.    Um, yes.

Q.    The EDR plan itself provides that remedies can be ordered by the presiding judicial officer, right?

A.    I'm sorry, could you repeat that question please?

Q.    The EDR plan itself provides that remedies can be ordered by the presiding judicial officer, right?

A.    Yes, I mean in theory I think that's what the EDR plan states, it's just not what occurred in this specific case.

Q.    Did you ever seek a clarification based on the difference between what the EDR plan stated and what you claim you were told by Mr. Smith and Ms. Langley?

A.    They were both very clear about it from what I recall of the conversation.  So I don't know what there would be to clarify.

Q.    So you didn't seek clarification from James Ishida, the EDR coordinator?

A.    No, I mean he works directly for the Fourth Circuit and the Chief Judge, so I knew that he wouldn't necessarily be a good person to ask.

Q.    He was the EDR coordinator, correct?

A.    He was, but he had an inherent conflict of interest in that position.

Q.    Ms. Strickland, what are your current sources of income?

A.    I do -- I work as, um, a private appointed counsel
for the State of North Carolina.  I receive
court-appointed appellate cases representing indigent
criminal defendants.

Q.    What, if any, overhead expenses do you have for
your legal practice?

      MR. STRICKLAND:  Objection, your Honor, the
mitigation defense was stricken in this case.

      THE COURT:  She's got to prove her damages, this
goes to that point, and I'm allowing it.

      You may answer the question.

A.    Can you please repeat the question?  I'm sorry.

Q.    What, if any, overhead expenses do you have for
your legal practice?

A.    Yeah, you know sitting here right now I couldn't
give you like numbers or a specific thing, but, um --
and part of that is just because I've recently started
this practice that's evolving -- and I mean this
litigation has, um, affected it as well.  But, um, I
mean all of the things that I think are listed in the
IDS report are things that are either necessary overhead
expenses or that I intend to, um, you know, have as soon
as I'm able to.

      THE COURT:  Ms. Strickland --

Q.    Do you mean --

1          Wait a minute, Mr. Kolsky, I'll allow to you

2    examine, but I just want to be clear here.

3          As I understand it, you now specialize in -- you

4    are private counsel appointed under the appropriate

5    provisions in North Carolina to represent indigent

6    defendants, but your practice, the way I get it, is

7    limited to appeals, is that correct?

8          THE WITNESS:  Yes, your Honor.  So, um, the way

9    that this works in North Carolina is that while there's

10   some Public Defender Offices in the state, there are not

11   very many, and so the state relies very heavily on

12   private-appointed counsel who basically act as public

13   defenders, except that they are appointed by the state

14   in particular cases.  So it's technically a contract

15   position.  But it's something that for the -- something,

16   for example, that if somebody wants to make their

17   practice full-time, that they're basically treated like

18   a, um, public defender.

19         THE COURT:  I'm familiar with the -- with the

20   approach.  My question was primarily, if not entirely,

21   you're called in as an appellate counsel, is that

22   correct?

23         THE WITNESS:  Oh, um, yes, your Honor, I serve as

24   appellate counsel.

25         THE COURT:  How many appellate, um, appointments

1    have you handled over let's say 2022?

2         THE WITNESS:  Gosh, it would be hard to estimate

3    exactly.

4         THE COURT:  But an estimate is satisfactory.

5         THE WITNESS:  Okay.  Okay.  Um, gosh, between 10

6    and 20, at least.

7         THE COURT:  Thank you.

8         Is that typical per year?

9         THE WITNESS:  Um, that's a hard question to answer

10   just because again I'm kind of at the beginning of this

11   practice.

12        THE COURT:  You're hoping to grow this practice?

13        THE WITNESS:  Yes, I'm hoping to grow and

14   basically kind of, you know, maximize the appointments

15   that I can take.

16        THE COURT:  Thank you.

17        Mr. Kolsky, go ahead.  I interrupted.

18        MR. KOLSKY:  Thank you, your Honor.

19   Q.   Ms. Strickland, do you pay for a paralegal or

20   other staff?

21   A.   Currently I do not have a paralegal, but that is

22   something that I would like to have.

23   Q.   Have you taken any steps to hire a paralegal or

24   other staff?

25   A.   I'm really not in any position to do that at this

1    time.

2    Q.    What is the range of your hourly rate of pay for

3    the cases you handle?

4    A.    I'm sorry, can you repeat that please?

5    Q.    What is the range of your hourly rate of pay for

6    the cases you handle?

7    A.    Um, so it depends on the type of case.

8    Lower-level felonies are $75 an hour.  Higher-level

9    felonies are, um, $85 an hour.  And in response to one

10   of the filings, um, that came from you all, I realize

11   that I have had one first-degree murder appeal assigned

12   to me.  I have not submitted any vouchers for that yet.

13   But that is technically $100 per hour.

14   Q.    Could you --

15         THE COURT:  Excuse me.

16         Just now to break it down, could you break down

17   the 10 to 20 appointments in 2022 as an exemplar, how

18   many were lower felonies and how many were higher?

19         THE WITNESS:  Um, so if I had to just take a wild

20   -- not a wild guess, but if I had to take an educated

21   guess, um, I would think it would be 50/50.  It might

22   trend a little bit more towards the lower-level felonies

23   just because, you know, there are more of those to get

24   assigned.  But again I would have to -- I would be happy

25   to provide a further submission to the Court, if that

would be helpful.  But my cases are all listed on the
North Carolina appellate court's website.

            THE COURT:  Thank you.

            Mr. Kolsky, go right ahead.

Q.    Ms. Strickland, you sometimes worked more than 40
hours per week while you were employed at the Federal
Defender's Office, correct?

A.    I'm sure I did to get the work done.  I mean we
had a lot of work to do, so.

Q.    And you didn't get paid more or get credited hours
for those additional hours, right?

A.    Um, I don't recall having overtime or anything
like that.

Q.    Approximately how many hours do you work currently
in your current job?

A.    Well again that's kind of hard for me to estimate
because it's been so disrupted by this litigation.  But
I think what I've tried to do is basically maintain a
comparable work/life balance as the, um, the Federal
Defender's Office.  So full-time but with appropriate
time off and things like that.

Q.    Well you've spent considerable time on this case
as well, right?

A.    Yeah, I mean I've been forced to.

Q.    Would you say you've spent less than 1600 hours on

```
1    your, um -- on your legal practice per year?
2    A.    (Pause.)  I really don't know the answer to that
3    question.
4    Q.    Have you applied to any other jobs in the past
5    three years?
6    A.    Um, since joining the roster, um, which I couldn't
7    tell you exactly when that was, but, no, I haven't
8    because I really like the roster work and I think it
9    very closely approximates what I was doing at the
10   Federal Public Defender's office, um, the best that I
11   can, um, outside of that employment situation.
12   Q.    You're currently living in Tryon, North Carolina,
13   is that right?
14   A.    Yes.
15   Q.    Are you willing to relocate for a job?
16   A.    Um, at this time, um, no, and that's part of the
17   reason why I'm doing the work that I'm doing, because no
18   matter where you work in the state, the rates are the
19   same and the work is same.  I get assigned cases from
20   all over the state.
21   Q.    Are you willing to relocate to Charlotte for a
22   job?
23         MR. STRICKLAND:  Objection, your Honor.  Are we
24   sure this isn't somehow related to mitigation and it's
25   just a backdoor way to get in it?
```

```
1          THE COURT:  It's proof of her damages and it's
2     relevant.  He may have it.
3          You may answer.
4          Would you go back to Charlotte if there was a job
5     opportunity there?
6     A.   Sitting here right now, well I mean it's very
7     speculative, it would depend what it was and everything.
8     But I mean sitting here right now, if it was like a
9     similar job to what I was doing, then, um, no, I
10    probably wouldn't.
11    Q.   Ms. Strickland, you made some audio recordings of
12    conversations with other judiciary employees while you
13    were employed at the Federal Defender's Office, correct?
14         MR. STRICKLAND:  Objection.
15         THE COURT:  Sustained.
16         MR. STRICKLAND:  I don't think any --
17         THE COURT:  Wait.  Wait a minute.  Wait a minute.
18         I've been reflecting on this and, Mr. Kolsky, I
19    don't see why this is relevant unless any such call, um,
20    is violative of the law of some state, and I don't think
21    it is violative of the law in North Carolina, but I
22    could be wrong.  And if it is not, then I don't see the
23    relevance.  So I'm disposed to sustain it, unless you
24    represent that this is violative of the law.
25         MR. KOLSKY:  Well it's relevant to
```

1    Ms. Strickland's ability to be reinstated or to receive

2    front pay in lieu of reinstatement.  We don't know

3    whether the --

4          THE COURT:  Wait a minute.  I have to say I don't

5    think so.  Sustained.

6          MR. KOLSKY:  May I --

7          (Pause.)

8          THE COURT:  Anything else for this witness?

9          MR. KOLSKY:  Your Honor, I'm not sure if that

10   ruling covers, um, a separate issue and so I'm going to

11   ask the question.  But I don't want to run afoul of --

12         THE COURT:  You're not running afoul if you think

13   it's some separate issue.  Go ahead.

14   Q.    Ms. Strickland, did you retain privileged

15   attorney-client information when you left the Federal

16   Defender's Office?

17         MR. STRICKLAND:  Objection, it's the same issue.

18         THE COURT:  I don't think it is.

19         MR. STRICKLAND:  It is.

20         THE COURT:  I don't think it is.  He can ask it in

21   that form and we'll see what she says.

22         MR. STRICKLAND:  Your Honor, I'm representing that

23   that would be against the ethical rules in North

24   Carolina --

25         THE COURT:  Wait.  Wait a minute.  He's simply

```
1    asking the question.  And I'm going to allow him to ask
2    the question.
3           What do say to that, Ms. Strickland?
4    A.     Could you please repeat the question?
5    Q.     Okay.
6           Did you retain any privileged attorney-client
7    information when you left the Federal Defender's Office?
8    A.     Well it's really hard for me to answer that
9    question because I tried to be very protective of any
10   kind of case-related information, but the types of
11   things that, for example are on my privilege log, are
12   things that defendants have filed unredacted in the
13   litigation.  So whether it meets the technical
14   definition of privilege?  You know I couldn't tell you
15   that.  But I could tell you that I just tried to be very
16   protective of all client-related information.
17          THE COURT:  But when you say "protective" of it, I
18   understand that in one sense, but I guess he's asking,
19   the way I understand his question, did you take any of
20   that with you?
21          THE WITNESS:  I'm sorry, of what?
22          THE COURT:  Any client-privileged,
23   attorney-client-privileged material.  Did you take any
24   of that with you when you left the employ of the Federal
25   Defender's Office?
```

```
1          THE WITNESS:  Well the materials that were
2     intermingled and interlinked with materials for my EDR
3     claims and this litigation, um, were not possible to
4     separate.
5          THE COURT:  All right, that's your answer.
6          THE WITNESS:  So my understanding is that that was
7     protected activity.
8     Q.    So, Ms. Strickland, is that --
9          THE COURT:  Go ahead, Mr. Kolsky.
10    Q.    So is it your testimony that you did retain
11    attorney-client privileged materials when you left the
12    Federal Defender's Office?
13         MR. STRICKLAND:  Objection.  North Carolina
14    follows the end-product rule.  I'm not sure what this is
15    relevant to?
16         THE COURT:  Just a moment.  That misstates the
17    witness's answer and so I'm going to sustain it.
18         It's not necessary to argue every question,
19    Mr. Strickland, you can object.  Sustained.  She's given
20    us her view.
21    Q.    Ms. Strickland, isn't it true that some of the
22    materials that you've retained, you indicated on your
23    privilege log in this case that they were not relevant
24    to the litigation?
25    A.    Um, ultimately, yeah, we did not produce, um,
```

1    certain things that did not seem to be relevant, but

2    that doesn't mean they weren't relevant at the time.

3    Q.    But ultimately you determined that they were not

4    relevant to this litigation?

5    A.    Um, ultimately, yes, if we did not turn them over

6    on relevance grounds, then that's what we did in

7    discovery, so I stand by that.

8         MR. KOLSKY:  Your Honor, may I approach the

9    witness?

10        THE COURT:  You may.

11   Q.    Ms. Strickland, I've handed you what's been marked

12   as Defendants's Exhibit GU.

13   A.    (Looks.)

14   Q.    Is this an e-mail from Laura Miner to you on

15   August 22nd, 2018?

16   A.    If I could just have a moment to review it?

17   Q.    Yes.

18   A.    (Reads.)  Okay.

19   Q.    Ms. Strickland, is this an e-mail from Laura Miner

20   to you on August 22nd, 2018?

21   A.    That's what it appears to be.

22        MR. KOLSKY:  Your Honor, I move to admit Exhibit

23   GU into evidence.

24        THE COURT:  Any objection?

25        MR. STRICKLAND:  The hearsay objection as before.

1        THE COURT:  Why is this relevant?  Mr. Kolsky.

2    Why is the fact that the e-mail was sent, why is that

3    relevant to any issue in this case?

4        MR. KOLSKY:  The most relevant part of this

5    document is in the paragraph, um, beginning with

6    "Holding off the complaint."  It says, "Holding off the

7    complaint and cooperating with the investigation into

8    wrongful conduct, as long as Tony is kept completely out

9    of it, the strategy for doing this is as follows."  And

10   then go down to the second point.  "It makes Tony and JP

11   think they're still in control and gives them the

12   opportunity to make further mistakes."

13       So we think this exhibit shows that Ms. Strickland

14   was delaying the, um, the EDR process so that she could

15   allow, as she put it, "Tony and JP to make further

16   mistakes."

17       THE COURT:  And who do you suggest the sender of

18   this e-mail is?

19       MR. KOLSKY:  Um, this is from the plaintiff.  If

20   you go onto the next page it's signed "Caryn" and her

21   e-mail address is above the top of the e-mail that I was

22   referring to, that I was reading from.

23       THE COURT:  I understand.

24       Well, Mr. Strickland, then it's an admission by

25   her, isn't it?  And at least it has some relevance.

```
 1          MR. STRICKLAND:  I understand that, but there's
 2    also communications from Laura Miner, Nancy Dunham --
 3          THE COURT:  Well we'll limit those, but -- as I
 4    have before, but we'll admit it as Exhibit 148 in
 5    evidence.  149.  The Clerk properly corrects me.
 6          (Exhibit 149, marked.)
 7          THE COURT:  Go ahead, Mr. Kolsky.
 8    Q.    Ms. Strickland, you met with Tony Martinez on
 9    August 9th, 2018, correct?
10    A.    That sounds right.
11    Q.    And you made an audio recording of that meeting?
12    A.    Um, yes, I did, um, because I -- I no longer
13    trusted him.  That's why I put it in my mediation
14    supplement.
15    Q.    And you produced that recording during discovery
16    in this case?
17    A.    Yes, and during the EDR process.
18          MR. KOLSKY:  Your Honor, I move to admit Exhibit
19    HN, which is that recording the plaintiff produced
20    during discovery.
21          THE COURT:  Any objection?
22          MR. STRICKLAND:  May I have just one moment, your
23    Honor?
24          THE COURT:  You may.
25          (Pause.)
```

1    MR. STRICKLAND:  No objection.  Thank you.

2    THE COURT:  HN is admitted, Exhibit 150 in

3  evidence.

4    (Exhibit 150, marked.)

5  Q.    Ms. Strickland, you had a call with James Ishida

6  on September 5th, 2018, is that right?

7  A.    I'm sorry, can you repeat that?

8  Q.    You had a call with James Ishida on September 5th,

9  2018, correct?

10  A.    Um, yes, that sounds right.

11  Q.    You made an audio recording of that call, correct?

12  A.    Yes.

13  Q.    And you produced that during discovery?

14  A.    Um, yes.

15    MR. KOLSKY:  Your Honor, I move to admit Exhibit

16  HH, which is that recording that the plaintiff produced

17  during discovery.

18    THE COURT:  No objection?

19    MR. STRICKLAND:  One more moment so I can consult

20  my notes?

21    THE COURT:  Of course.

22    (Pause.)

23    MR. STRICKLAND:  No, this particular audio

24  recording, I would say, um, is hearsay, not for the

25  substance.  It's similar to 146, 147, and 148.

```
 1          THE COURT:  Well, um --
 2          What's your answer to that, Mr. Kolsky?
 3          MR. KOLSKY:  These recordings are not being
 4     offered for the truth of the matter asserted, but rather
 5     just for the facts that the statements were made.
 6          THE COURT:  I accept that.  As Mr. Strickland has
 7     pointed out, it is hearsay, but I will admit it for the
 8     fact that statements were made, as limited.
 9     Q.   Ms. Strickland --
10          MR. KOLSKY:  I'm sorry, your Honor, that's Exhibit
11     151?
12          THE COURT:  151, correct.
13          (Exhibit 151, marked.)
14     Q.   Ms. Strickland, you had a call with Ed Smith on
15     February 12th, 2019, right?
16     A.   Well I mean I don't remember the precise date, but
17     that sounds right.
18     Q.   And you made an audio recording of that call?
19     A.   Um, yes.
20     Q.   And you produced that during discovery?
21     A.   Yes.
22          MR. KOLSKY:  Your Honor, I move to admit Exhibit
23     HI, which is that recording that the plaintiff produced
24     during discovery.
25          THE COURT:  With the same limitation?
```

1          MR. KOLSKY:  Yes, your Honor.

2          THE COURT:  No objection with the limitation,

3    Mr. Strickland?

4          MR. STRICKLAND:  Yes, your Honor.

5          THE COURT:  It's admitted with that limitation,

6    152 in evidence.

7          (Exhibit 152, marked.)

8    Q.    Ms. Strickland, you had another meeting with

9    Mr. Smith on February 26th, 2019, correct?

10   A.    Again, you know without seeing it, I don't know

11   the exact date, but that sounds right.

12   Q.    And you made an audio recording of that meeting,

13   right?

14   A.    Yes.

15   Q.    And you produced that recording during discovery?

16   A.    That's right.

17         MR. KOLSKY:  Your Honor, I move to admit Exhibit

18   HF, which is the recording that the plaintiff produced

19   during discovery.

20         THE COURT:  With the same limitation.

21         And with that limitation you have no objection,

22   Mr. Strickland?

23         MR. STRICKLAND:  Yes, your Honor.

24         THE COURT:  It is admitted with the limitation for

25   the fact of the statements made.  That's all.  153 in

1  evidence.

2      (Exhibit 153, marked.)

3  Q.    Ms. Strickland, you had another meeting with

4  Mr. Smith on March 8th, 2019, correct?

5  A.    Again, I mean that sounds right.

6  Q.    And you made an audio recording of that meeting

7  and produced it during discovery?

8  A.    Um, yes.

9      MR. KOLSKY:  Your Honor, I move to admit Exhibit

10  HG, which is that recording the plaintiff produced

11  during discovery, and we move to admit it with the same

12  limitation.

13      THE COURT:  No objection with the limitation,

14  Mr. Strickland?

15      MR. STRICKLAND:  And, yes, your Honor.  I'm sorry.

16      THE COURT:  That's all right.  Exhibit 154 in

17  evidence as limited.

18      (Exhibit 154, marked.)

19      MR. KOLSKY:  Your Honor, may I approach the

20  witness?

21      THE COURT:  You may.

22  Q.    Ms. Strickland, I've handed you what's currently

23  marked as Defendants's Exhibit DX.

24  A.    (Looks.)

25  Q.    Do you recognize this as a series of text messages

1    between you and Laura Miner in November of 2018?

2    A.    If you could give me just a moment please?

3    Q.    Yes.

4    A.    (Reads.)  Okay.

5    Q.    Is this a series of text messages between you and

6    Laura Miner in November of 2018?

7    A.    That's what it appears to be.

8         MR. KOLSKY:  Your Honor, I move to admit Exhibit

9    DX into evidence.

10        THE COURT:  No objection?

11        MR. STRICKLAND:  I have some degree of concerns on

12   a 106 basis, if we'd be able to supplement this, because

13   it's just part of the chain?

14        THE COURT:  You may, um, assuming that there is

15   more to the chain.  I will consider supplementing it.

16   But, um, having made that remark, you have no objection

17   to admitting this portion if I follow the rule of

18   completeness, correct?

19        MR. STRICKLAND:  Yes, your Honor.

20        THE COURT:  All right, DX is admitted.  If there

21   is more that the rule of completeness would, um, permit

22   to be admitted, I will so admit it.

23        That's 155 in evidence.

24        (Exhibit 155, marked.)

25        MR. KOLSKY:  Your Honor, may I approach the

```
1   witness?
2         THE COURT:  You may.
3   Q.    Ms. Strickland, I've handed you what's currently
4   marked as Defendants's Exhibit GE.
5   A.    (Looks.)
6   Q.    Are these your handwritten notes dated June 6th,
7   2018?
8   A.    If I could just have a moment please?
9         (Pause.)
10  Q.    Ms. Strickland, I'm not going to ask you any
11  questions about the content, I'm just asking you are
12  these your handwritten notes from June 26th, 2018?
13  A.    Oh, hold on.  That is what they appear to be.
14        MR. KOLSKY:  Your Honor, I move to admit Exhibit
15  GE into evidence.
16        THE COURT:  No objection to GE?
17        MR. STRICKLAND:  No, your Honor.
18        THE COURT:  GE is admitted, Exhibit 156.
19        (Exhibit 156, marked.)
20  Q.    Ms. Strickland, you believe that many different
21  people knowingly and intentionally violated your
22  constitutional rights, correct?
23  A.    I don't know what you mean by "many"?  I mean I
24  think the named defendants in this case and certain
25  employees, like the First Assistant, I think violated my
```

1    rights.

2    Q.    So the First Assistant, JP Davis, violated your

3    rights, correct?

4    A.    Yes.

5    Q.    And Tony Martinez?

6    A.    Yes.

7    Q.    And Josh Carpenter?

8    A.    I think potentially, yes.

9    Q.    And James Ishida?

10   A.    James Ishida is named in the due process claim,

11   yes.

12   Q.    And Judge Gregory?

13   A.    Yes, Judge Gregory is named in the due process

14   claim.

15   Q.    And Ed Smith?

16   A.    Um, I mean Ed Smith is not named as a defendant,

17   but I don't know -- I mean saying someone violated your

18   rights is a legal conclusion.  I mean did he say certain

19   statements that contributed to my decision to end the

20   EDR process?  Yes, he did.

21   Q.    And Jill Langley?

22   A.    Um, yes, I would say the same thing.  I mean for

23   whatever it's worth, I think -- I don't know that they

24   were, um -- I think that they were trying to explain to

25   me how they thought it was, um, with the EDR process,

1    but -- in terms of there not being any remedies at a
2    final hearing.  But that was the effect that it had on
3    me.
4    Q.    And Heather Beam, did Heather Beam violate your
5    rights as well?
6    A.    Heather Beam did not conduct an adequate
7    investigation into these claims.  She's not a named
8    defendant, but I mean she didn't even contact anyone on
9    my witness list, so.
10   Q.    How about Bill Moormann, did he violate your
11   rights too?
12   A.    Um, I really don't know the answer to that because
13   I don't -- I don't -- I wasn't there personally, so I
14   don't know what his level of involvement was in this
15   case.
16   Q.    What about Cheryl Walter, the former General
17   Counsel of the Administrative Office of US Courts, did
18   she violate your rights too?
19   A.    So my understanding was that she was originally
20   named as an individual-capacity defendant, and she filed
21   a declaration in this case stating that an accused unit
22   executive cannot be disqualified because doing that
23   would be unfair to the employing office.  So, um --
24   among other statements.  I mean I don't know to the
25   extent that that advice was relied on, I mean that seems

1    clearly wrong to me.

2    Q.    And so because she gave advice that you believe

3    was wrong, you sued her in her individual capacity,

4    meaning you thought she should be personally liable to

5    you violating your constitutional rights, is that right?

6        MR. STRICKLAND:  Objection, your Honor.  Are these

7    defendants still in the case?

8        THE COURT:  Sustained.  Wait.  Wait.  Wait a

9    minute.  One, they're not.  Two, she would not be

10   personally liable in any event, this case at this

11   posture is only against various named defendants in

12   their official capacities.  I'll sustain the objection.

13   Q.    Ms. Strickland, do you believe Frank Johns, the

14   Clerk of Court, violated your rights?

15   A.    Well what I recall is that he, um, unbeknownst to

16   me, was joking with Heather behind my back about what a

17   pain in the ass I was and how they were just so glad I

18   didn't apply for a position working in the court.  I

19   think he used the phrase, "That's one off the chess

20   board."

21   Q.    Didn't you say in a recent filing that you thought

22   he violated your rights?

23   A.    I guess that's in the eye of the beholder.

24   Q.    And even during this litigation you believe your

25   rights have been violated, correct?

A.    (Pause.)  Yes, I do.

Q.    And you believe that a Fourth Circuit judge wrote
an opinion in the **Wilcox** case in order to influence the
outcome of your lawsuit and violate your rights,
correct?

        MR. STRICKLAND:  Objection.

        THE COURT:  Well there's some basis for --

        MR. STRICKLAND:  May I be heard on that?

        THE COURT:  I don't think it's necessary, I
remember the argument, and she can be asked whether
that's what she thinks.

        Is that what you think, ma'am?

        THE WITNESS:  Um, that was not the basis of our
argument, the argument was based on whether there was a
reasonable appearance of a conflict of interest under
the statute 455(a).  I don't remember us ever making any
sort of accusation to that effect.  And from what I
recall, that's in the filings and the transcripts, so.
I know that that keeps getting repeatedly brought up,
but that's just a complete mischaracterization.

Q.    It's a complete mischaracterization, is that what
you said?

A.    (Silence.)

Q.    Could you please turn to Page 155 of your
deposition transcript.

A.    (Turns.)  I'm sorry, you said which page?

Q.    Page 155, Line 9.

A.    Oh, sorry.  (Turns.)

Q.    I'm going to read it and I want you to tell me if I read it correctly.

Question, "Do you think that the panel, the **Wilcox** panel, conspired to decide the case as it did in order to help the defendants in this case?"  Answer, "I think it's possible."

Did I read that correctly?

A.    Right, because it's an apparent conflict of interest on its face.  The question is what a reasonable person would believe, not whether they -- I don't know whether they did that, I don't know what -- that's not the question.

Q.    And, Ms. Strickland, you moved for sanctions against me and my colleagues accusing us of violating your rights too, correct?

A.    Yes, I did.

Q.    Ms. Strickland, it sounds like almost every person who has had any connection to your EDR process and to this lawsuit has violated your rights, does that seem plausible to you?

A.    I think --

      MR. STRICKLAND:  Objection, this seems

1    prejudicial, I would like to be heard on this.

2         THE COURT:  No, it's intended to be prejudicial,

3    but now I think it's irrelevant.  Sustained.  I mean

4    it's argumentative.  I'm sustaining it on that basis.

5    It may be argued.

6         MR. KOLSKY:  Yes, your Honor.

7         We just have one more exhibit.  May I approach the

8    witness?

9         THE COURT:  You may.

10   Q.    Ms. Strickland, I've handed you what's currently

11   been marked as Defendants's Exhibit DZ.

12   A.    (Looks.)

13   Q.    Is this a series of text messages between you and

14   Valerie Maneri dated between February 15th and February

15   27th, 2019?

16   A.    Um, may I just have a moment to review it?

17         (Pause.)

18   A.    Yes, that is what it appears to be.

19         MR. KOLSKY:  Your Honor, I move to admit Exhibit

20   DZ into evidence.

21         MR. STRICKLAND:  Objection.

22         THE COURT:  Yes, the same objection as to what --

23   Ms. Maneri will be limited to what the -- the fact that

24   it was said.

25         No objection to so limiting it, Mr. Kolsky?

```
 1          MR. KOLSKY:  No objection to limiting it in that
 2     way.
 3          THE COURT:  All right.
 4          MR. STRICKLAND:  I also wanted to raise the --
 5          THE COURT:  Go ahead.
 6          MR. STRICKLAND:  This is the same as the Laura
 7     Miner text, Number 106.  It's possible to supplement, if
 8     necessary.
 9          THE COURT:  I will allow to you supplement, if
10     necessary.
11          It's admitted, with those limitations, as Exhibit
12     157.
13          Is that it for this witness?
14          (Exhibit 157, marked.)
15          MR. KOLSKY:  I'm sorry, I didn't hear the last
16     part, your Honor?
17          THE COURT:  Is that it for this witness?
18          MR. KOLSKY:  Um, two -- I think two more questions
19     for this witness, your Honor.
20          THE COURT:  Go right ahead.
21          MR. KOLSKY:  Mr. Spears, please display Exhibit
22     DZ, which is now Exhibit 157, and would you please
23     magnify the first blue message from the top.
24          (Enlarged.)
25     Q.    Ms. Strickland, would you please read that text
```

message dated February 5th, 2019.

A.    "My reputation has already been ruined with the Fourth Circuit, things will never be the same again. I'm going to burn the place down on the way out."

Q.    Did you send that text message?

A.    Yes, along with another one saying, "It's a due process violation, how can I have Title VII protection with no remedies?  And Federal Defenders are not accountable to anyone.  No one has oversight.  I literally asked the judicial integrity officer, 'Who has oversight?'  And we kept going round and round and there was no answer."

        MR. KOLSKY:  No further questions, your Honor.

        THE COURT:  And, Mr. Strickland, do you wish to examine this witness or no?

        MR. STRICKLAND:  Well we're approaching the 1:00 hour, so.

        THE COURT:  Well we have 10 more minutes and I'm keeping time.  I mean if you don't -- if you want to just eat the time, I'll put the 10 minutes on you.

        MR. STRICKLAND:  We'll eat the time and make that decision, um, after the conclusion of this hearing, or trial.

        THE COURT:  Well, not at the -- no, you won't, you'll make that decision by 9:00 tomorrow -- not

1    tomorrow, Wednesday, since I can't sit tomorrow.  We'll

2    start on Wednesday morning.  If you want to ask her

3    questions, now is the time.

4         Actually I think what -- wait a minute, I

5    misspoke, Mr. Strickland, and I apologize.  She was

6    called as an adverse witness.  You don't have to examine

7    her now.  And you do have the right to call her at any

8    time during your case.

9         So you tell me, are you going to examine her now

10   or during some other -- well you've rested, so, um, it's

11   either now or I'll allow you to defer the decision until

12   9:00 tomorrow morning, um, Wednesday morning, um, and

13   you'll eat 10 minutes.

14        What is it that you want to do?

15        MR. STRICKLAND:  I'll eat the 10 minutes.

16        THE COURT:  That's fine.

17        All right, then we will, um -- you may step down,

18   Ms. Strickland.  And, um, we will suspend for the

19   moment.

20        The government has made a motion for a judgment

21   based upon the evidence as it stood when the plaintiff

22   rested.  We will hear argument on that motion this

23   afternoon at 2:30.  I have a sentencing and another

24   short hearing -- or as soon thereafter as the sentencing

25   is concluded.  So I will see you back here this

afternoon for argument on that motion.  I don't think argument ought exceed 10 minutes per side.  That motion is limited to the evidence as it stood at the time the plaintiff rested.

All right, we'll recess until 2:30 this afternoon. The time --

MR. KOLSKY:  May I just ask one question, your Honor?

THE COURT:  Yes.

MR. KOLSKY:  I just wanted to confirm the trial schedule for this week.  Our understanding is that we're having trial today, Wednesday, Thursday, Friday, and Monday, is that correct?

THE COURT:  No, not Friday.  The schedule is as follows.  Today.  Wednesday.  Thursday.  Monday. Tuesday.  That's five days.

And the total elapsed time now, as of 2:00, is the plaintiff has used up 50 minutes, the defense has used up 2 hours and 40 minutes.  And we'll recess -- and the arguments don't count -- in the afternoon, don't count as time.  So we'll have argument this afternoon at 2:30. We'll recess.

THE CLERK:  All rise.

(Recess, 12:55 p.m.)

1              C E R T I F I C A T E

2

3

4          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

5     do hereby certify that the foregoing record is a true

6     and accurate transcription of my stenographic notes

7     before Judge William G. Young, on Monday, December 11,

8     2023, to the best of my skill and ability.

9

10

11

12

13     /s/ Richard H. Romanow 03-11-24
       _____
14     RICHARD H. ROMANOW    Date

15

16

17

18

19

20

21

22

23

24

25