1          UNITED STATES DISTRICT COURT

2        WESTERN DISTRICT OF NORTH CAROLINA (Asheville)

3                      No. 1:20-cv-00066-WGY

4

5  CARYN DEVINS STRICKLAND, formerly known as Jane Roe,
            Plaintiff

6

7  vs.

8

9  UNITED STATES OF AMERICA, et al,
            Defendants

10

11                    *********

12

13

          For Bench Trial via Courtroom Zoom Before:
14                 Judge William G. Young

15

16

                   United States District Court
17                 District of Massachusetts (Boston)
                   One Courthouse Way
18                 Boston, Massachusetts 02210
                   Wednesday, December 13, 2023

19

20                    ********

21

22        REPORTER: RICHARD H. ROMANOW, RPR
                 Official Court Reporter
23             United States District Court
       One Courthouse Way, Room 5510, Boston, MA 02210
24                 rhrbulldog@aol.com

25

```
 1              A P P E A R A N C E S

 2

 3   CARYN STRICKLAND, ESQ.
     COOPER J. STRICKLAND, ESQ.
 4       P.O. Box 92
         Lynn, NC 28750
 5       (802) 318-0926
         Email: Caryn.devins@hotmail.com
 6       Pro Se Plaintiff

 7

 8   JOSHUA MICHAEL KOLSKY, ESQ.
     DANIELLE YOUNG, ESQ.
 9   MADELINE McMAHON, ESQ.
         U.S. Department of Justice
10       1100 L Street NW
         Washington, DC 20005
11       (202) 305-7664
         Email: Joshua.kolsky@usdoj.gov
12       For Defendants

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    I N D E X

2

3

4  WITNESS              DIRECT  CROSS  REDIRECT  RECROSS

5  CARYN DEVINS STRICKLAND (Continued.)

6    By Mr. Kolsky:

7    By Mr. Strickland:

8

9  JAMES ISHIDA

10    By Mr. Kolsky:      20              104

11    By Ms. Strickland:        52              108

12

13  ANTHONY MARTINEZ

14    By Ms. Young:       112

15    By Ms. Strickland:

16

17

18

19

20

21

22

23

24

25
```

1                    E X H I B I T S

2

3
        EXHIBIT 18 ......................    26
4
        EXHIBIT 158 .....................    23
5
        EXHIBIT 159 .....................    28
6
        EXHIBIT 160 .....................    33
7
        EXHIBIT 161 .....................    42
8
        EXHIBIT 162 .....................    44
9
        EXHIBIT 163 .....................    80
10
        EXHIBIT 164 .....................   118
11
        EXHIBIT 165 .....................   128
12
        EXHIBIT 166 .....................   139
13
        EXHIBIT 167 .....................   140
14
        EXHIBIT 168 .....................   143
15
16

17

18

19

20

21

22

23

24

25

```
 1          P R O C E E D I N G S
 2          (Begins, 9:00 a.m.)
 3          THE COURT:  Good morning.  Ms. Gaudet informs me,
 4     Mr. Strickland, that you have no further questions for
 5     the witness, is that correct?
 6          MR. STRICKLAND:  Yes, your Honor.
 7          THE COURT:  I have some questions, so perhaps she
 8     might resume the witness stand for just a few minutes.
 9          (Pause.)
10          THE COURT:  And, ma'am --
11          Ms. Gaudet, would you remind the witness she's
12     still under oath.
13          THE CLERK:  I'd like to remind you that you are
14     still under oath, do you understand?
15          THE WITNESS:  Yes, thank you.
16          THE COURT:  Ms. Strickland, I just have a few
17     questions more to get the timeline of things in my mind,
18     and my questions may go to things that are already in
19     the record.  But it will help me just to get to know the
20     situation better.
21          Turn back, if you would, to your education in law
22     school.  Did you do any clinical, um, courses, courses
23     that took you out of the law school and into the
24     courtroom?
25          THE WITNESS:  Yes, your Honor.  It's a time ago,
```

```
 1    so I'll do my best to try to remember.
 2         I remember doing a clinic for North Carolina Legal
 3    Aid, that was a semester-long clinic.  I also remember
 4    doing internships in law school for --
 5         THE COURT:  Let me interrupt -- actually let's go
 6    to those internships.  Yes, you interned for who?
 7         THE WITNESS:  Yes, your Honor.  I interned for the
 8    Federal Public Defender's Office in Burlington, Vermont,
 9    which is actually when I really decided that it was my
10    dream job, that I really wanted to do public defense
11    work and in particular a Federal Public Defender office.
12         I also interned for a federal judge, William
13    Sessions, who served on the Sentencing Commission.  So
14    that was also part of my interest in how that developed
15    in federal sentencing law in particular.
16         I -- um, without looking at my resume, it's hard
17    for me to remember.  Those are the ones that come to
18    mind.
19         THE COURT:  All right.  And when you got out of
20    law school, did you sit for the bar right away?
21         THE WITNESS:  Yes, your Honor, I sat for the bar,
22    I believe it would have been -- I think people usually
23    take the bar in August, the summer after law school.  So
24    the first opportunity I took, I passed the Vermont bar.
25    Um, that was the before the uniform bar exam, so, um, it
```

1    was for the --

2         THE COURT:  All right.  And what was your first

3    job after law school?

4         THE WITNESS:  I clerked for the Chief Justice of

5    the Vermont State Supreme Court, Paul Rieber.

6         THE COURT:  Thank you.  And was that a year-long

7    clerkship?

8         THE WITNESS:  Yes, your Honor.

9         THE COURT:  And again, because I want to talk

10   about your clerkship on the Fourth Circuit -- and in

11   these questions naturally I'm not asking for anything of

12   substance, I recognize the confidentiality of a

13   clerkship, but just tell me the type of work you did as

14   law clerk for the Chief Justice, that was an appellate

15   position?

16        THE WITNESS:  Yes, your Honor, it was an appellate

17   position and I mean I would say I did basically

18   everything that judicial law clerks do, I drafted

19   opinions, I drafted bench memos before the oral

20   argument, I helped the justice prepare for oral

21   argument.

22        We also -- you know obviously on an appellate

23   court you have to work with other justices on the court.

24   There are five justices on the Vermont Supreme Court.

25   So I had to have a working relationship with all of

1    those justices.  So it was a very, um -- like any

2    appellate chambers, it was a very close-knit

3    environment.

4         So there were a lot of situations where, um, for

5    example, you might have to negotiate a position or

6    something like that, try to make sure that other people

7    are on board with an opinion.  So I helped research and

8    come up with ideas to try to help the Chief Justice just

9    ensure that what he wanted to do in the case was

10   accomplished.

11        THE COURT:  And after that year, what did you do?

12   What was your next job?

13        THE WITNESS:  Oh, yes, your Honor.  So my next job

14   was that I clerked for a federal district court judge,

15   James Jones, um, he also served on the FISA court at

16   that time.  But I didn't specifically help with that.

17   But he served in Abington, Virginia.  And, um --

18        THE COURT:  Forgive me, but is that the Eastern

19   District of Virginia?

20        THE WITNESS:  The Western District of Virginia.

21        THE COURT:  The Western District of Virginia.  All

22   right.

23        THE WITNESS:  Yes.

24        THE COURT:  And, um, what did you do in working

25   for him?

1    THE WITNESS:  Yes, your Honor.  So many of the

2  same tasks I just described, except because it's a trial

3  court, obviously the focus is more on trial work.  So,

4  um, I helped research and prepare opinions and bench

5  memos, just like an appellate judge, but I also helped

6  with jury trial situations, I drafted jury instructions

7  for the judge, helped the judge prepare for various

8  issues that came up at the trial.

9    The other major, um, thing that was going on the

10  year that I clerked there was that there was a

11  retroactive sentencing guidelines amendment by the US

12  Sentencing Commission called Amendment 782, and that

13  resulted in a retroactive change to sentencing law that

14  affected many many criminal defendants.  And in

15  particular in that district there was a -- I think it

16  was one of the top 5 or 10 districts in the country, so

17  I helped spearhead that project of making sure that

18  those sentencing guideline changes were implemented

19  properly.

20    THE COURT:  And after that job -- that lasted a

21  year, I'm assuming.  After that what did you do?

22    THE WITNESS:  Yes, your Honor.  So the year after

23  that I went back to Vermont and I clerked for Judge

24  Peter Hall, um -- and may he rest in peace, he's not

25  with us anymore, but he was a judge on the Second

Circuit Court of Appeals.  So I clerked for him for a
year.  And, um, again it was -- I mean obviously in some
ways different from the Vermont Supreme Court, but in
many ways similar.

We observed a lot of oral arguments.  There were
-- really I think what was special about that clerkship
is obviously, um, the Second Circuit is a special court
and there were a lot of really high-profile matters
going on at the time, as there always are, and so I got
to participate in all of the law clerk duties for those
matters, researching, drafting opinions, bench memos,
and assisting the judge in preparing for oral argument,
working with other chambers.

THE COURT:  And again I'm assuming that that
clerkship lasted for a year.  After that what did you
do?

THE WITNESS:  Um, so then, during my year at the
Second Circuit, I interviewed for a Supreme Court
fellowship and I was selected to serve as a Supreme
Court fellow in the Administrative Office of the US
courts.  So that's -- which was obviously a tremendous
honor.  So that's what I did next.

THE COURT:  Now I'm somewhat familiar with the
Supreme Court fellows program and, um, fellows do a
variety of things.  I'm assuming again that that was a

1  year, um, fellowship.  And what did you do?  Again I

2  don't mean to get into substance, but just what did you

3  do, what was the area of your research or work?  Give me

4  some idea.

5       THE WITNESS:  Yes, your Honor, I'm happy to answer

6  that.

7       So there were basically two parts of the

8  fellowship.  One part of the fellowship was that I

9  worked with other officials in the Administrative Office

10 of the US courts in their support of the Judicial

11 Conference meetings twice a year, and there are also

12 various subcommittees of the Judicial Conference.  And

13 so I worked in the Department of Program Services.

14 Laura Miner was my immediate supervisor.  She was the

15 Associate Director of AO at the time.  And so I worked

16 with her on streamlining the agenda items for the

17 Judicial Conference subcommittees that we were assigned

18 to in our office.  So that's kind of -- I mean I did a

19 lot of other things too, but that's kind of a big

20 summary of that side of it.

21      And then another component of the fellowship was

22 that we did a research project, and so I think I had

23 just mentioned that -- I mean I've had an interest in

24 federal sentencing law since law school from my

25 internships and those experiences.  And so when I

clerked for Judge Jones and we had the Amendment 782

project, that was when I realized that I was really

interested in how changes to sentencing law were

implemented administratively and how that would play out

and how it would affect the rights of individual people

who were affected, and how there could have been

disparities in the way that the guideline changes were

implemented in different courts, even though, you know,

you would think in the abstract there's an amendment and

it should be applied.  But in reality there were a lot

of differences between how courts would handle those

issues administratively.

So I was interested in exploring -- doing a

research project to explore how different courts

implemented retroactive changes to sentencing law.  And

part of the reason for that was that the Supreme Court

had just decided two cases, ***Johnson v. United States*** and

***Welch v. United States,*** which resulted in an

invalidation of the residual clause of the Armed Career

Criminal Act, and so that resulted in just a wave of

retroactive changes in sentencing law.  So what I did

for my research project was I compared how Amendment 782

was implemented through the guideline amendment process

versus a Supreme Court decision of constitutional law

that was made retroactive by the Supreme Court and how

1    those were implemented.

2         And so I, um, went to different courts, um,

3    throughout the country and I did interviews of judges

4    and court staff and the clerks's offices, I interviewed

5    people in the US Attorney's Office and the Federal

6    Public Defender's Office, and as well as the probation

7    services, because the probation services are such a

8    critical element of how making those changes work, when

9    people come out on supervised release.  And so I --

10        THE COURT:  All right, I'm interrupting only

11   because you've completely answered my question and I

12   thank you.

13        So we're four years into your legal career now, I

14   think.  And so after the fellowship, then what did you

15   do?

16        THE WITNESS:  So after the Supreme Court

17   fellowship, um, that was when I went to the Federal

18   Public Defender Office because that was what I really

19   wanted to do, and I got a lot of encouragement to do

20   that from all of my supervisors at the AO, Kate Clark,

21   Laura Miner, Jeffrey Maneri in the Supreme Court, the

22   counselor's office.  And so that's why I went then.

23        THE COURT:  Well let me ask a personal question,

24   but I simply want to get the timeline in mind.

25        And somewhere along here, either by now or after

1    you went to the Federal Defender's Office, you married

2    Mr. Strickland.  When was that?

3            THE WITNESS:  That was in April of 2018.

4            THE COURT:  While you were at the Federal Defender

5    Office?

6            THE WITNESS:  Um, yes, your Honor.

7            THE COURT:  Okay.  Now you've made various

8    statements about that and the government's attorney has,

9    um, interrogated you about that, and I'm not going to go

10   into those things except to ask this.

11           Somewhere along the line here, um, after your --

12   you had raised your complaint, it was arranged that you

13   would have a clerkship for a judge in the Fourth

14   Circuit, that's right, isn't it?

15           THE WITNESS:  Um, yes, that's right.

16           THE COURT:  And give me his name again?

17           THE WITNESS:  Henry Floyd.

18           THE COURT:  Henry Floyd.

19           Now, Judge Floyd, um, he, um, the Fourth Circuit,

20   as I understand it, sits in Richmond, but he had home

21   chambers.  Where were his home chambers?

22           THE WITNESS:  Um, Spartanburg, South Carolina.

23           THE COURT:  Okay.  And when you clerked for him,

24   where did you live?

25           THE WITNESS:  I lived in, um, just over the border

1    in Tryon, North Carolina.

2        THE COURT:  In other words that was the marital

3    home you were living in with your husband then?

4        THE WITNESS:  Right, yes.

5        THE COURT:  All right.  And when he would sit with

6    the court up in Richmond, would you go with him?

7        THE WITNESS:  With the judge?

8        THE COURT:  Yeah.

9        THE WITNESS:  Oh, yes.  Yes, I would.

10       THE COURT:  A circuit judge has four clerks.  Did

11   you go every time he sat in Richmond?

12       THE WITNESS:  Yes, and what I recall is we all

13   went every time.

14       THE WITNESS:  All right.  And that was a year

15   clerkship, is that right?

16       THE WITNESS:  Um, it was -- that was not a

17   full-year clerkship because by the time I got there I

18   was replacing someone who had to leave mid-clerkship, so

19   I think it was closer to five months.  It was --

20       THE COURT:  I see.  I see.  So --

21       THE WITNESS:  I'm sorry if I don't get the dates

22   exactly right, but --

23       THE COURT:  No, no, I can check these things, but

24   you're answering my questions.

25       And how did that go relative to your, um, the

1  other clerkships and work as a Supreme Court fellow, how

2  did it -- again nothing of a specific about what you

3  did, but how would you rate that clerkship?

4        THE WITNESS:  How would I rate that clerkship?  I

5  mean it was --

6        THE COURT:  Well I mean was it professionally

7  fulfilling?

8        THE WITNESS:  Yeah, I mean it was -- it was a

9  happy experience, it was, um, I had very good

10  relationships with the judge and the co-clerks and I

11  enjoyed, um, traveling to Richmond.  And, um, you know

12  one thing they do is they make a point of everybody

13  meeting each other and going out to dinner, so making

14  sure everybody gets to know each other.  So I

15  appreciated that.

16        THE COURT:  All right.

17        Now as that -- you knew that was only for the 5

18  months to succeed the clerk who had to leave, and as

19  that clerkship went along and you were looking ahead,

20  how did you view your career path after the conclusion

21  of that clerkship, what did you think was the way

22  forward from there?

23        THE WITNESS:  Well I mean to be completely honest

24  with you, I was very very concerned about my career path

25  going forward from there.  The main reason why I took

1   the clerkship was not because I needed another

2   clerkship, I mean I don't think I -- I was grateful for

3   the clerkship, but I didn't need the clerkship for my

4   resume necessarily, but I was very afraid of what I knew

5   about that office and the way that they treated people,

6   and I was very concerned about my reputation and what

7   would be -- what would be said about me.  I was very

8   concerned that despite having a positive experience in

9   the clerkship, that those, um, rumors and comments and

10  things that were made would -- would not go away.  And

11  so I was very concerned in particular, wanting to stay

12  in the criminal defense field, about how that would play

13  out given how much power that office would still have,

14  um, over my career and what I could do and what the

15  options were.

16        So what I decided to do was to focus on, um, kind

17  of re -- switch up, switch gears and focus on state

18  public defense work, because those worlds don't

19  really -- they don't really interact with each other and

20  they don't collide.  So -- and I'm oversimplifying a

21  little bit, but, you know, I'm just trying to cut to the

22  chase to answer your question.  But that was why I

23  needed to learn -- I mean obviously I knew a lot about

24  appellate practice, but criminal law is different in

25  every state and, um, appellate practice is different in

every state.  And so I took a fellowship at the North
Carolina Solicitor General's Office so I could learn how
to practice in state court.  And that was also a very
positive experience, I had great relationships with --
well a lot of respect for everybody that I worked with.

THE COURT:  How long did that last?

THE WITNESS:  Um, I'm trying to remember.  That
was -- I think that was about a year, like the other
jobs.  And what I decided was to, um, pursue -- you know
I had done research and spoken to people at the, um,
appellate Defender Office in Raleigh and that's when I
decided, you know -- I mean partly I was -- because of
what happened to me, I, um -- (Cries.)  I was afraid to
go work in an office again.  So I decided -- (Cries.)

THE COURT:  Well my question is -- my question --
and I guess I'm not -- and this is why it's helpful to
have you tell me, I'm a little unclear as to the
sequence of things.  That's my fault.  I've got to sort
that all out before I resolve anything here.

But do I understand that in fact you left the
Federal Defender's Office for the Fourth Circuit
clerkship and you never went back, or did you go back
for a period?

THE WITNESS:  I did not go back to the Federal
Defender Office after --

```
 1          THE COURT:  Of course.  All right.  That --
 2          THE WITNESS:  Right.
 3          THE COURT:  That answers my question.
 4          And when you left the Defender Office, it was to
 5     take this -- the remainder of the clerkship with Judge
 6     Floyd, have I got that right?
 7          THE WITNESS:  Yes, your Honor.
 8          THE COURT:  All right, those were my questions.
 9          Now since I've asked questions, I must ask counsel
10     if they have any questions about my questions.
11          So I'll ask Mr. Kolsky.  Any questions about my
12     questions or following up any of my questions?
13          MR. KOLSKY:  No questions, your Honor.
14          THE COURT:  None.
15          Mr. Strickland, any questions following up any of
16     my questions?
17          MR. STRICKLAND:  No, your Honor.
18          THE COURT:  Thank you.  You may step down.
19          And, um, Mr. Kolsky, the government may call the
20     next witness.
21          MR. KOLSKY:  Your Honor, the government calls
22     James Ishida.
23          THE COURT:  He may be called.
24          (JAMES ISHIDA, sworn.)
25
```

1          * * * * * * * * * * * *

2          JAMES ISHIDA

3          * * * * * * * * * * * *

4

5  DIRECT EXAMINATION BY MR. KOLSKY:

6  Q.    Good morning, Mr. Ishida.

7  A.    Good morning.

8  Q.    Where are you currently employed?

9  A.    I am the Circuit Executive for the Fourth Circuit

10  in Richmond, Virginia.

11  Q.    And how long have you been the Circuit Executive?

12  A.    A little over 6 years, since October 2017.

13  Q.    What are your duties as Circuit Executive?

14  A.    I think you can think of me as the Chief

15  Administrative Officer.  My office has a number of

16  administrative functions and we support the

17  administrative needs of the courts throughout the Fourth

18  Circuit.

19  Q.    Have you ever served as the Circuit's employment

20  Dispute Resolution Coordinator, or the EDR coordinator?

21  A.    I did.

22  Q.    And when were you the EDR coordinator?

23  A.    Well I -- when I started in October of 2017, and I

24  think I served the function until a couple of years,

25  2019.

```
1   Q.    What were your duties as the EDR coordinator?
2   A.    Well the EDR coordinator is an impartial
3   facilitator, my job encompassed, um, being an initial
4   point of contact for people interested in the EDR
5   process and their rights, and if a person initiates the
6   EDR process, then I help facilitate that process.  I try
7   to find out what happened, what the concerns are, the
8   issues are, and work as a facilitator and try to achieve
9   a resolution.
10  Q.    When you were the EDR coordinator, did you become
11  aware of an allegation of sexual harassment by Caryn
12  Strickland?
13  A.    Yes, I did.
14  Q.    How did you become aware of that allegation?
15  A.    I think it was around August 14th, 2018, and I
16  think I first, um, heard about it when I received a call
17  from a Federal Public Defender, Tony Martinez.
18        (Interruption.)
19        THE COURT:  We have lost the feed here.
20        MR. KOLSKY:  I'm sorry, your Honor, we're just
21  getting an exhibit to the witness.
22        THE COURT:  That's fine.  I haven't lost it.  Very
23  well.
24        (Pause.)
25        MR. KOLSKY:  Your Honor, may I approach the
```

1    witness?

2           THE COURT:  You may.

3    Q.    Mr. Ishida, I've handed you what's currently

4    marked as Defendant's Exhibit EP.  Do you recognize this

5    document?

6    A.    Yes, I do.

7    Q.    And what is it?

8    A.    This is an e-mail from -- it's an e-mail string,

9    the top part of it is from me to, um, Mr. Martinez, with

10   a copy to then Chief Judge Roger Gregory, it's dated

11   August 14th, 2018.  And we talk about the plaintiff's

12   allegations.

13          MR. KOLSKY:  Your Honor, defendants move to admit

14   Exhibit EP into evidence.

15          THE COURT:  Any objection?

16          MS. STRICKLAND:  Your Honor, we object.

17          THE COURT:  It's hearsay, so that's for starters,

18   so I can't admit it substantively.

19          What's the basis?  Why is it relevant?

20          MR. KOLSKY:  It shows the date that, um,

21   Mr. Martinez forwarded plaintiff's allegations of sexual

22   harassment to Mr. Ishida.  It shows that that occurred

23   on August 14th.  And it shows that Mr. Ishida responded

24   on that -- on that same day.

25          THE COURT:  If it's --

1          MR. KOLSKY:  We're not offering it for the truth.

2          THE COURT:  Not for the truth, but simply for the

3    date.

4          Any objection, Ms. Strickland, as limited?

5          MS. STRICKLAND:  No, your Honor, as limited.

6          THE COURT:  As limited.

7          EP is admitted Exhibit 158 in evidence.

8          (Exhibit 158, marked.)

9          THE COURT:  Proceed.

10   Q.    Mr. Ishida, what actions did you take after

11   learning about Ms. Strickland's allegations of sexual

12   harassment?

13   A.    After I had received this and had discussions with

14   Mr. Martinez about plaintiff's allegations of sexual

15   harassment, I had talked to him about arranging for an

16   investigation to look into the plaintiff's allegations.

17   Q.    And did you notify anyone else of the allegation

18   of sexual harassment?

19   A.    On the e-mail I had copied Chief Judge Gregory.

20   Q.    And you mentioned an investigation.  What did you

21   do to search for someone to conduct that investigation?

22   A.    Well this would have been, um -- I construed this

23   as a report of wrongful conduct under Chapter 9 of the

24   Fourth Circuit's EDR plan, and under Chapter 9 of the

25   plan it requires that an investigation be the Chief

1  Judge or the Unit Executive to ensure that an

2  investigation would take place.  Um, Chapter 9 also

3  talked about, um, the human resources manager being one

4  person who could fulfill that role.

5       So what I had done was I told Mr. Martinez that I

6  would help get the investigator, so I reached out to the

7  Clerk of Court in the District -- in the Western

8  District of North Carolina for his recommendation and he

9  had recommended, um, Heather Beam.

10       MS. STRICKLAND:  Objection, hearsay.

11       THE COURT:  Again you want that for the fact that

12  that was said, not for the -- well the two are, um,

13  inextricable.  But the recommendation is a statement of,

14  um -- it is it -- it is a assertive conduct, but it does

15  stand for, um, what was said, and I'm going to admit it.

16       All right.  He had recommended who?

17       THE WITNESS:  He had recommend Heather Beam, your

18  Honor.

19       THE COURT:  Fine, that may stand.

20  Q.   Did you take any further steps to, um, vet the

21  recommendation of Heather Beam after that?

22  A.   I did.  I had, um, also checked with my head of

23  HR, Kim LLewelyn, who was familiar with Ms. Beam and

24  Ms. LLewelyn said --

25       MS. STRICKLAND:  Objection, hearsay.

```
 1           THE COURT:  Sustained.
 2    Q.    Was Ms. Beam actually selected as the
 3    investigator?
 4    A.    She was.
 5    Q.    To what extent did Tony Martinez have a role in
 6    deciding who would be the investigator?
 7    A.    He had no role in deciding that.
 8           MR. KOLSKY:  Your Honor, may I approach the
 9    witness?
10           THE COURT:  You may.
11    Q.    Mr. Ishida, I've handed you what's currently
12    marked as Defendants's Exhibit DG.  Do you recognize
13    this document?
14    A.    Yes, I do.
15    Q.    What is it?
16    A.    Again it's an e-mail string from me to
17    Mr. Martinez with a copy to Kim Llewelyn, it's dated
18    August 14th, 2018, and it talks about the appointment of
19    Heather Beam and a few other things.
20           MR. KOLSKY:  Your Honor, defendants move to admit
21    Exhibit DG into evidence.
22           THE COURT:  Any objection?
23           MS. STRICKLAND:  Your Honor, yes, on the same
24    grounds of hearsay.
25           THE COURT:  Well it is hearsay.
```

1        Mr. Kolsky?

2        MR. KOLSKY:  Yes, so, your Honor, it reflects the

3    process of selecting the investigator, it shows who was

4    involved.  I'm not offering it for, um, the truth of

5    the --

6        THE COURT:  You are offering it for the truth,

7    just as you say it reflects the process.  No, the

8    objection is sustained.

9        MR. KOLSKY:  Actually, your Honor, I'm informed

10   that this is already admitted as Numbered Exhibit 18,

11   according to the exhibit list we filed yesterday.

12       THE COURT:  Well if it's admitted by agreement, it

13   may be admitted.  DG is by agreement, and before the

14   Court, it doesn't mean anything more than that, as

15   Exhibit 18, yes.

16       All right.  Proceed.

17       (Exhibit 18, marked.)

18       MR. KOLSKY:  Your Honor, may I approach the

19   witness?

20       THE COURT:  You may.

21   Q.   Mr. Ishida, I've handed you what I've marked as

22   Defendants's Exhibit GL.  Do you recognize this

23   document?

24   A.   Yes, I do.

25   Q.   And what is it?

A.   It is an e-mail string from me to Mr. Martinez
with a copy to Kim LLewelyn.  It talks about a number of
steps Mr. Martinez took in response to the plaintiff's
allegations of sexual harassment.

     MR. KOLSKY:  Your Honor, defendants move to admit
Exhibit GL, and we're not offering it for the truth of
the statements.  This is an a mail to Mr. Martinez.
Mr. Martinez's state of mind is an issue in this case
and these are statements made to him by the Circuit
Executive specifically without his response to
Ms. Strickland.  It goes to his understanding and his
state of mind.

     THE COURT:  What you're saying is you want it in
for the fact of notice to him of the matters contained
therein?

     MR. KOLSKY:  Yes.  So, for instance it says
"Fantastic e-mail, Tony, I think you've done all you can
to protect Ms. Devins."  That's relevant to
Mr. Martinez's state of mind at the time.

     THE COURT:  Limited to that, any objection,
Ms. Strickland, so limited?

     MS. STRICKLAND:  Your Honor, we'd only object on
the basis of -- I don't know how James Ishida would have
personal knowledge that Tony has done all he can to
protect Ms. Devens, he wouldn't have personal knowledge

```
1    of --
2         THE COURT:  Well that's -- yes, that goes to the
3    weight though, not to the admissibility as limited.  I
4    mean if he fired that off as comfort to Martinez and
5    Martinez took it as comforting, that may be relevant
6    here, and it's open to you folks to argue that he had no
7    basis -- he, Mr. Ishida, had no basis or an inadequate
8    basis for sending such a comforting e-mail.
9         As limited I'm going to admit it and it will be
10   Exhibit 159 in evidence, as limited.
11        (Exhibit 159, marked.)
12        MR. KOLSKY:  Mr. Spears, please display Exhibit
13   GO, which is now Exhibit 159.
14        (On screen.)
15   Q.   Mr. Ishida, when you wrote "I think you've done
16   all you can to protect Ms. Devins," what did you mean by
17   that?
18   A.   Well from what was communicated to me about
19   plaintiff's concerns and, um, you know the concerns
20   about her safety, the concerns about contact with her
21   then supervisor, JP Davis, and the express concerns that
22   I understood that she had expressed to Mr. Martinez, um,
23   when I looked at what Mr. Martinez had done, I thought
24   that what he did was he addressed, to the best of his
25   ability, the plaintiff's concerns, and that's why I
```

```
 1    thought that he's done, you know, all he could to
 2    address the concerns at that time.
 3    Q.    And at that time were you aware of the actions
 4    that Tony Martinez took to protect Ms. Strickland from
 5    the alleged harassment?
 6    A.    Yes, I was.
 7    Q.    And what were those actions?
 8    A.    Well, one, he, um, had taken -- he had changed his
 9    organizational chart to take Ms. Devins out of the chain
10    of command, he --
11          MS. STRICKLAND:  Your Honor, objection, personal
12    knowledge.  He doesn't know what Tony --
13          THE COURT:  Wait.  Wait.  Wait.  I follow every
14    question, Ms. Strickland, it's not necessary to argue.
15    If you think I've made a ruling that's ill-informed, you
16    may ask to argue.
17          The objection's sustained on precisely those
18    grounds.  He says, um -- this is substantive for what
19    Martinez says he has done.  He doesn't know what
20    Martinez has done except for what he's been told.  So
21    substantively that can't come in.  Sustained.  I mean I
22    haven't heard that he went down to Richmond to check
23    this all out.  It's not in evidence.
24          Put another question.
25          MR. KOLSKY:  You can take that down now.
```

1      (Off screen.)

2  Q.    Mr. Ishida, can you explain the difference between

3  Chapter 9 and Chapter 10 of the EDR plan?

4  A.    Of course.  So under the Fourth Circuit's EDR

5  plan, under Chapter 9, someone that, um, has, say, heard

6  or witnessed a perceived, um, an act of wrongful conduct

7  -- and Chapter 9 provides a vehicle or a mechanism to

8  report that to a number of officials, and then once the

9  officials receive it, namely the EDR coordinator, I am

10 in turn then responsible for communicating that to the

11 Chief Judge and the Unit Executive, who then must ensure

12 that an investigation is conducted to look into the

13 report, and then upon the conclusion of the

14 investigation, appropriate action taken.  And so if you

15 think of a process akin to if you see -- "If you see

16 something, say something," Chapter 9 is assigned to

17 provide that vehicle to process that, um, what was seen

18 and what was reported.

19      Chapter 10, on the other hand, is when someone

20 experiences an alleged act of wrongful conduct and they

21 are seeking redress or personal relief, they can

22 initiate Chapter 10 of the EDR process, and then we go

23 through the process of resolving it and, um, you know

24 seeking resolution and relief of the person's, you know,

25 concerns and issues and allegations.

Q.    To what extent does Chapter 9 confer rights on a
person making a report of wrongful conduct?

A.    It doesn't confer any rights.

Q.    Did Ms. Strickland ever pursue her rights under
Chapter 10?

A.    She did.

Q.    And when did that occur?

A.    On September 10th, 2018, the plaintiff had filed
both a report -- she made a report of wrongful conduct
under Chapter 9 as well as a request for counseling
under Chapter 10.

       MR. KOLSKY:  Your Honor, may I approach the
witness?

       THE COURT:  You may.

Q.    Mr. Ishida, I've handed you what's currently
marked as Defendants's Exhibit DS.  Do you recognize
this document?

A.    Yes, I do.

Q.    And what is it?

A.    It is an e-mail string, um, between me and the
plaintiff, with a copy to Heather Beam, the last entry
of this is dated September 28th, 2018, and it talks
about the counseling process and the investigation and
then the end of the procedures going forward.

       MR. KOLSKY:  Your Honor, the government moves to

1    admit Exhibit DS into evidence.

2         THE COURT:  Any objection?

3         MS. STRICKLAND:  Objection, yes, on hearsay

4    grounds.  I'd also note we have a 106 objection and we,

5    um, would like the opportunity to, um, submit further

6    proof pursuant to the parties's joint agreement.

7         THE COURT:  Well it's not in yet.  But if you get

8    the opportunity to submit further proof, are you okay

9    with it?

10        MS. STRICKLAND:  Um, we would maintain our hearsay

11   objection.

12        THE COURT:  All right.

13        MR. KOLSKY:  Your Honor --

14        THE COURT:  What do you say to that, why is this

15   e-mail string relevant for the facts of --

16        MR. KOLSKY:  So Ms. Strickland has alleged that --

17        THE COURT:  Go ahead.

18        MR. KOLSKY:  So Ms. Strickland has alleged that

19   the investigator did not investigate the allegations of

20   retaliation, um, this is -- this e-mail shows that, um,

21   Mr. Ishida in fact did instruct the investigator to

22   investigate those allegations.

23        THE COURT:  For the fact of the --

24        MS. STRICKLAND:  It sounds like it's --

25        THE COURT:  For the fact of the instructions,

1    limited to that, it's relevant.

2         MR. KOLSKY:  Right.

3         THE COURT:  So limited to that, it's admitted.

4         What do you, um, want in the way of further

5    evidence that might be tied to this Exhibit 160,

6    Ms. Strickland?

7         MS. STRICKLAND:  Oh, I'm sorry, we would need to

8    review that.  We just -- I think the parties -- if I

9    understand correctly, we agreed that we would have an

10   opportunity to submit 106 evidence, so we would just

11   preserve that, um, that potential objection.

12        THE COURT:  I understand that.

13        All right, so as limited it's in evidence, Exhibit

14   160, as to the nature of his instructions.

15        (Exhibit 160, marked.)

16   Q.   Mr. Ishida, what are the different phases of a

17   Chapter 10 EDR proceeding?

18   A.   There are three distinct phases in a Chapter 10

19   EDR proceeding.  It starts with a counseling phase, and

20   if that's not successful and it's, you know, being

21   pursued, then there could be a mediation phase after

22   that, and if that's not successful and the individual

23   wants to pursue it, then there's a formal complaint

24   stage.

25   Q.   Did Ms. Strickland complete the counseling phase

1    in her Chapter 10 proceeding?

2    A.    She did.

3    Q.    Did Ms. Strickland complete the mediation phase in

4    her Chapter 10 proceeding?

5    A.    Um, partially.  We were in mediation when

6    Ms. Strickland withdrew her EDR claim.

7    Q.    Did Ms. Strickland ever proceed to the formal

8    complaint stage under Chapter 10?

9    A.    She did not.

10   Q.    Did Ms. Strickland request any extensions of time

11   during the EDR process?

12   A.    She did.

13   Q.    Do you recall if it was more than one?

14   A.    It was at least three, in the counseling phase.

15   Q.    And were those granted?

16   A.    Um, yes.  The last one Chief Judge Gregory granted

17   in part and he didn't extend completely.  So under his

18   order, the counseling phase would have ended on January

19   14th, 2019.

20   Q.    To what extent did you -- did you speak to

21   Ms. Strickland, by phone or in person, during her EDR

22   process?

23   A.    I couldn't give you a count, it was -- you know it

24   was too numerous to count.

25   Q.    To what extent did you communicate with

1   Ms. Strickland through e-mail during her EDR process?

2   A.   Oh, it was voluminous.  Again it was too many to

3   count.

4   Q.   What was the purpose of your conversations and

5   e-mails with Ms. Strickland during the EDR process?

6   A.   Well sometimes I would, um, let her know what

7   developments had happened or what phases we were in.

8   Most of it was answering questions and her inquiries

9   about the process, about what certain things mean, and I

10  -- you know it was basically responding to a variety of

11  questions she had.

12  Q.   To what extent did Ms. Strickland's EDR process

13  follow the requirements of the EDR plan?

14  A.   We followed it scrupulously.

15       MS. STRICKLAND:  Your Honor, objection, that's

16  opinion testimony, that's a legal issue in this case.

17       THE COURT:  Well he's entitled to give his view

18  and it goes to the weight.  I'll evaluate it.  It may

19  stand.

20  Q.   Mr. Ishida, do you recall Ms. Strickland

21  requesting that Tony Martinez be disqualified from

22  participating in her EDR process?

23  A.   Yes, I do.

24  Q.   Did you ever ask Heather Beam for her thoughts on

25  whether Mr. Martinez should be disqualified?

1   A.    Yes, I did.

2   Q.    When was that?

3   A.    That was, um -- it was on January 13th, 2019.

4   Q.    And why did you ask Ms. Beam for her thoughts on

5   the disqualification question?

6   A.    Well the plaintiff had filed a request to

7   disqualify Mr. Martinez on the same day that she filed

8   her Chapter 9 and Chapter 10 requests, and so one of the

9   things -- and I talked to Chief Judge Gregory about

10  this.  One of the things that Judge Gregory wanted to do

11  was he --

12        MS. STRICKLAND:  Objection, hearsay.

13        THE COURT:  Yeah, sustained.  But you may answer

14  the question.

15        His question was --

16  Q.    Chief Judge Gregory wanted to --

17        THE COURT:  No, you may answer the question about

18  why you asked Ms. Beam for her views, you may tell us

19  that.  But if it's based on something that Judge Gregory

20  told you, you're going to have to say "based upon my

21  discussions with Judge Gregory," et cetera.  Do you

22  follow, Mr. Ishida?  Her objection is timely and

23  appropriate.  You can't tell me what other people told

24  you, but you can -- it's a "why" question, so you can

25  tell me why you asked Ms. Beam for her views about the

1    status of Mr. Martinez.

2          THE WITNESS:  Of course, Judge.  Thank you.

3    A.    Well she had conducted the investigation and one

4    of the things that I was interested in is she was -- she

5    had met with everyone, she had seen, you know talked to

6    people, and so I just wanted her views on -- on you know

7    what she thought of, you know -- did she see any reason

8    that Mr. Martinez should be disqualified.

9    Q.    And what was Ms. Beam's response?

10   A.    She -- she said that, um -- well she had thought

11   that Mr. Martinez should be disqualified and she said

12   that, um -- in talking to Mr. Martinez, she felt that,

13   um, you know Mr. Martinez was biased, particularly with

14   the allegation of sexual harassment.

15   Q.    And what did you do after you received Ms. Beam's

16   response?

17   A.    So I thanked her for that.  What I did was I had

18   raised that issue with the AO's Office of Chief Counsel,

19   I wanted them to weigh in on that, um --

20   Q.    And just to be clear, I'm not asking for you to

21   disclose the advice that you received.

22   A.    Right, but I -- but this is what I did in response

23   to -- that I wanted to get the General Counsel's view on

24   that.  And, um -- and, um, I had further discussions.

25   Q.    Did you agree with the --

```
 1          THE COURT:  As best you can --

 2          Excuse me, Mr. Kolsky, let me just probe the

 3     witness a moment.

 4          As best you can recall, sir, could you tell me

 5     what Ms. Beam said?  No one expects you to have a

 6     photographic memory or a transcript, but what did she

 7     say?

 8          THE WITNESS:  Judge, as best as I can recall from

 9     that e-mail exchange, um, Ms. Beam said that she was

10     concerned because she felt that Mr. Martinez --

11          MS. STRICKLAND:  Your Honor, I'm going to object

12     on grounds of -- oh, I'm sorry.

13          THE COURT:  No, I think I -- I think I misspoke

14     and that's because I thought you were talking to her.

15          You didn't talk to her, you e-mailed her and she

16     responded, is that the way it worked?

17          THE WITNESS:  It did, but I think I had --

18          THE COURT:  You had a discussion with her?

19          THE WITNESS:  I was trying to arrange a follow-up

20     discussion, your Honor, but I don't recall if I did or

21     not.

22          THE COURT:  I see.  So what she said I'm going to

23     see in the e-mail string and that's in evidence, so I --

24     I should not have interrupted.

25          Go ahead, Mr. Kolsky.
```

Q.    Mr. Ishida, did you agree with Ms. Beam's concerns
about Mr. Martinez participating in the EDR case?

A.    I did not.

Q.    And why not?

A.    So we have to remember when this happened.  So on
January 11th, 2019, Ms. Beam filed her amended
investigation report, which I read, and then two days
later I reached out to Ms. Beam to ask her for her views
on the disqualification issue.

      So Ms. Beam was concerned that Mr. Martinez was
biased.  I didn't agree with that for the simple reason
that I didn't see bias.  And so, um, what I saw was
Mr. Martinez, you know -- well let me take a step back.

      Ms. Beam was concerned about bias because she felt
that Mr. Martinez, um, maybe no longer believed or the
plaintiff had inflated her claims of sexual harassment
as a ploy to get reassigned to the Asheville office, and
so that's why -- from my reading of the e-mail, that's
why Ms. Beam felt that Mr. Martinez was biased.  That he
was no longer a neutral party, no longer looking at
this, but he was somehow convinced in his mind that the
plaintiff was just scheming to get to the Asheville
office.  But again that was not my experience with
Mr. Martinez.

      Mr. Martinez had always, um, you know acted in

good faith, he was diligent, he was very responsive to

the plaintiff's concerns, he treated them as such, and

if Mr. Martinez had harbored that view, he never

communicated that to me.  And in fact everything I saw

and everything I dealt with him, he was very responsive,

very concerned about the plaintiff's allegations, and

was working towards, you know, addressing them and

resolving them.  So that's why I did not personally see

this bias in Mr. Martinez.

Q.    Was Mr. Martinez required to be neutral, um, given

his role in the EDR proceeding?

A.    No.  No, in fact if Mr. Martinez --

      MS. STRICKLAND:  Objection, lacks foundation.

      THE COURT:  No, no, he's not -- overruled.  He's

now asked for his interpretation of the EDR plan and I

want to hear him.  He may answer.

      And you're answering the question was he required

to be biased?  You started out saying no, and then you

were giving a more nuanced interpretation.  And I'm

interested in your interpretation, sir.

      Go ahead.

      THE WITNESS:  Yes, your Honor.

A.    So Mr. Martinez, as the Unit Executive, would have

represented the employing office, and so if he didn't

act in that fashion, I would question whether or not

```
 1   he's doing a good job representing his employing office.
 2         MR. KOLSKY:  Your Honor, may I approach the
 3   witness?
 4         THE COURT:  You may.
 5   Q.    Mr. Ishida, I've handed you what's currently
 6   marked as Defendants's Exhibit EF.
 7   A.    (Looks.)
 8   Q.    Do you recognize this document?
 9   A.    Yes, I do.
10   Q.    And what is it?
11   A.    It's an e-mail string between me, the plaintiff,
12   and the top portion is dated November 28th, 2018, and
13   we're just talking about questions that the plaintiff
14   had about the EDR process.
15         MR. KOLSKY:  Your Honor, defendants move to admit
16   Exhibit EF.
17         THE COURT:  The parties to this e-mail string are?
18         MR. KOLSKY:  Ms. Devins and Mr. Ishida.  There's
19   another person copied and that is redacted.  I'm not
20   sure -- I believe that may be Chief Judge Gregory, but
21   I'm not certain.
22         THE COURT:  All right.
23         Any objection?
24         MS. STRICKLAND:  Oh, just the same hearsay
25   objection.  There are other e-mails.
```

1      THE COURT:  Why are these communications relevant

2  as communications?

3      MR. KOLSKY:  All right.  So for one thing it shows

4  that Mr. Ishida was communicating and answering

5  questions that Ms. Strickland raised.  Also on the

6  second page there is a request by Ms. Devins for

7  assistance transitioning out of the, um, the Federal

8  Defender's Office.  And these are -- Ms. Strickland's

9  statements are admissions by a party opponent, so those

10  would not be hearsay.

11      THE COURT:  Well, that's correct.  That's correct.

12  And therefore it is admitted, her statements are

13  admitted as admissions.  And we will admit this as

14  Exhibit 161.

15      (Exhibit 161, marked.)

16  Q.    Mr. Ishida, if you would please turn to Page 2 of

17  this document.

18  A.    (Turns.)

19  Q.    There's a statement by Ms. Strickland in the

20  center of the page that says "I would appreciate the

21  courts assistance in transitioning me out of

22  Mr. Martinez's office," and that's dated November 21st,

23  2018.  Do you see that?

24  A.    Yes, I do.

25  Q.    What did you do after receiving that request from

1    Ms. Strickland?

2    A.    I had a conversation with Chief Judge Gregory and

3    after that, um, I had further discussions with plaintiff

4    about the type of position she was interested in, but I

5    began inquiry into looking into possible other offices.

6    Q.    And what sorts of inquiries did you make?

7    A.    The plaintiff was particularly interested in

8    another Federal Public Defender office in the Fourth

9    Circuit, particularity the, um, you know the FPD office

10    in the Western District of Virginia, so I reached out to

11    the Defender and asked if she was, um -- if she had an

12    opening and would be interested in plaintiff coming to

13    her office.

14    Q.    And did you reach out to any other potential

15    employers on behalf of Ms. Strickland?

16    A.    As for the Federal Public Defender offices, no,

17    because I did not get permission from the plaintiff to

18    pursue other offices.  With respect to other judges,

19    yes, I did, I checked with other Circuit Judges on the

20    Fourth Circuit.

21        MR. KOLSKY:  Your Honor, may I approach the

22    witness?

23        THE COURT:  You may.

24    Q.    I've handed you what's currently been marked as

25    Defendants's DK.  Do you recognize this document?

A.    Yes, I do.

Q.    And what is it?

A.    This is an e-mail from the plaintiff to me, which
is dated March 11th, 2019, in which the plaintiff says
that she is accepting the clerkship with Judge Floyd,
she expresses great appreciation for our help in
securing the clerkship, and as a result she is, um --
she says that she is no longer interested in pursuing
her charge and EDR claim.

        MR. KOLSKY:  Your Honor, defendants move to admit
Exhibit DK.

        THE COURT:  No objection?

        MS. STRICKLAND:  No objection, your Honor.

        THE COURT:  It's admitted Exhibit 162 in evidence.

        (Exhibit 162, marked.)

        MR. KOLSKY:  Mr. Spears, would you please display
Exhibit DK now, Exhibit 162.

        (On screen.)

Q.    Mr. Ishida, what was your reaction when you
received this e-mail?

A.    Well I was -- I was, um -- I was happy for the
plaintiff and I was -- I was elated that we had, um,
gotten a resolution that the plaintiff was excited about
and happy and looking forward to.

        MS. STRICKLAND:  Objection, your Honor, this lacks

```
 1   foundation, it lacks personal knowledge.
 2          THE COURT:  Well he's telling me his reaction to
 3   your e-mail and it may stand.  That was his reaction.  I
 4   know he can't speak for what's in your mind, he's
 5   telling you what he thought was in your mind.
 6   Q.    Mr. Ishida, what were your overall impressions of
 7   how Mr. Martinez responded to Ms. Strickland's claim of
 8   sexual harassment?
 9   A.    Well I thought Mr. Martinez was very
10   conscientious, very diligent, um, he acted in good
11   faith, he was very responsive.  He was overall very
12   concerned for the plaintiff and in protecting the
13   plaintiff and he wanted to make sure he did the right
14   thing.
15   Q.    Did you receive a final investigation report from
16   Heather Beam?
17   A.    Yes, I did.
18   Q.    What were the report's findings regarding the
19   allegations of sexual harassment by JP Davis?
20          THE COURT:  Well the document's in --
21   A.    So the, um --
22          THE COURT:  Wait.  Wait.  The document's is
23   evidence, isn't it, the final report?
24          MR. KOLSKY:  Yes, your Honor.
25          THE COURT:  Well you can expect I've read it and
```

```
 1    will read it again.  The document speaks for itself.
 2            MR. KOLSKY:  Thank you.  I'll move on, your Honor.
 3            THE COURT:  All right.
 4            (Pause.)
 5            MR. KOLSKY:  Your Honor, may I approach the
 6    witness?
 7            THE COURT:  You may.
 8    Q.    Mr. Ishida, I've handed you Exhibit 7, which is
 9    already in evidence.
10            MR. KOLSKY:  Mr. Spears, please display EX 007.
11            (On screen.)
12            MR. KOLSKY:  We appear to have lost the video
13    feed, your Honor.
14            THE COURT:  Well I have it.
15            MS. STRICKLAND:  It's back up, your Honor.
16            MR. KOLSKY:  All right.
17    Q.    Mr. Ishida, do you recognize this document?
18    A.    Yes, I do.
19    Q.    And what is it?
20    A.    This is a letter of counseling to Mr. Martinez
21    which is dated May 28th, 2019.
22    Q.    And what was your role, if any, in preparing this
23    letter?
24    A.    I drafted the letter at the direction of Chief
25    Judge Gregory.
```

```
 1   Q.     And what was your role in delivering the letter to
 2   Mr. Martinez?
 3   A.     I had, um, sent him this letter, but the week
 4   before I had also had the chance to, um, meet with
 5   Mr. Martinez at a conference.  The interesting footnote
 6   to that was this was a Fourth Circuit workplace conduct
 7   conference.
 8   Q.     What do you recall about your conversation with --
 9          MS. STRICKLAND:  Objection, hearsay.
10          THE COURT:  It looks like it's --
11          MR. KOLSKY:  Again it goes to --
12          THE COURT:  Yes, I'll hear you.  Why?  Because
13   it's hearsay.
14          MR. KOLSKY:  Well this -- I'll withdraw the
15   question, your Honor.
16          THE COURT:  Withdrawn.
17   Q.     All right.  Now I'm sure you heard Ms. Strickland
18   and her counsel refer to this as a "letter of reprimand"
19   during this trial.  So to be clear, is this a letter of
20   reprimand or a letter of counseling?
21   A.     This is not a letter of reprimand, this is a
22   letter of counseling.
23   Q.     What is the difference between --
24          MS. STRICKLAND:  Objection, your Honor.
25          THE COURT:  Wait.  Wait a minute.
```

1      MS. STRICKLAND:  It lacks foundation.

2      THE COURT:  No, he gave -- this is testimony,

3  you'll have a chance to cross-examine.

4      You're asking him the difference between the two.

5  You may do it.

6  Q.    What is the difference between a letter of

7  counseling and a letter of reprimand?

8  A.    Well, um, a letter of reprimand would be a harsh

9  rebuke or a censure.

10     MS. STRICKLAND:  Objection, lacks foundation.

11     THE COURT:  Well he's the Circuit Executive,

12  overruled.

13     You may finish your answer.

14  Q.    You may continue.

15  A.    So a letter of reprimand would be a harsh rebuke

16  or censure, whereas a letter of counseling would be, you

17  know, it's not punitive, it's corrective.  And, um, I

18  had styled it accordingly.

19  Q.    And what was the purpose of this letter?

20  A.    It was to advise Mr. Martinez of the findings of

21  the investigation.  It was to also identify a number of

22  missteps that Mr. Martinez had made.  And the idea was

23  to, um, bring those to Mr. Martinez's attention for

24  reflection and hopefully that he would, you know,

25  understand the missteps that he made, work on it, and

1   not repeat them in the future.  So it was -- we wanted

2   to make sure that Mr. Martinez knew or understood the

3   mistakes he had made in this case.

4   Q.    And you referred to "missteps."  Can you briefly

5   summarize the missteps that were addressed in your

6   letter?

7   A.    So, um, there were a number of things that

8   Mr. Martinez had said, he was well-meaning,

9   well-intended, but the effect wasn't, you know, very

10  helpful.  For example, he used a marriage metaphor to

11  describe the relationship between the plaintiff and her

12  then supervisor JP Davis.  Mr. Martinez, his intention

13  was good, he wanted to, um, suggest to the plaintiff and

14  her -- and to Mr. Davis that, you know, like a marriage

15  it's --

16        MS. STRICKLAND:  Objection, lacks foundation.

17        THE COURT:  This is the man who drafted the

18  letter.  No, overruled.  He drafted the letter.  He's

19  simply telling us what's in his mind.  He himself

20  identified this use of the marriage metaphor as a

21  "misstep."  He's now being asked by defense counsel to

22  expand on that.  I'll permit it.

23        Go ahead, sir.

24  A.    So Mr. Martinez was well-intended.  His point was,

25  um, he was trying to encourage the plaintiff to work

1    with her supervisor to keep lines of communication open,

2    compromise where necessary.  And so that was -- that was

3    his intention.  It was well-meaning.  But in the context

4    of this case, using the marriage metaphor was probably

5    not the wisest thing and had caused plaintiff some

6    distress.

7    Q.    Did your letter conclude that Mr. Martinez had

8    failed to take appropriate actions to protect

9    Ms. Strickland from the alleged sexual harassment?

10   A.    No, it did not.

11   Q.    Did you letter contain any finding of wrongful

12   conduct under the EDR plan?

13   A.    No, it does not.

14   Q.    Why did you reference the wrongful conduct

15   standard in the letter?

16   A.    So at the time I drafted the letter, other than

17   Chapter 9, this was the only provision that talked about

18   what happened after the investigation, and you know I

19   just wanted to -- to provide a reason to Mr. Martinez

20   why he was being counseled.  Now if I could go back in

21   time and, you know, look at the letter again, I probably

22   would not have used those choice of words.  But that was

23   the reason why I did it.  I just wanted to provide a

24   justification why this letter of counseling was being

25   sent to Mr. Martinez.

Q.    Why did Mr. Martinez's missteps that were
addressed in the letter not amount to wrongful conduct
under the EDR plan?
A.    Well in the investigation report the -- the more
serious allegations of retaliation and sexual harassment
were just not founded.  In addition, there were
mitigating factors that went to Mr. Martinez's -- he
was -- he acted in good faith, he was, you know,
responsive, he was -- you know he acted with -- I mean
he tried to do the right thing.  So in a sense, um,
Mr. Martinez was exonerated on the serious allegations.
But some of the statements that he made were not helpful
and had caused some distress to the plaintiff.

      And so what we were interested in is, um, okay
even though Mr. Martinez was not -- there was no
evidence of retaliation and there was no objective
evidence to support the allegation of sexual harassment,
we wanted to make sure that Mr. Martinez understood that
what he did was not helpful and caused plaintiff
distress.  And again, looking at the broader picture,
Chief Judge Gregory was very concerned about workplace
conduct and --
      MS. STRICKLAND:  Objection, hearsay.
      THE COURT:  Well I won't accept that as a -- it's
a conclusory statement about what's in the mind of

1  another person and I'll strike it.

2        Put another question, Mr. Kolsky.

3        THE WITNESS:  Well, Judge, may I just finish my

4  impression?

5        THE COURT:  You may.  I interrupted.

6  A.    This was a -- please forgive me, I misspoke.

7        It was certainly important to me that we create

8  exemplary workplaces throughout the Fourth Circuit, and

9  so here was an opportunity, a teaching opportunity to

10  talk to Mr. Martinez about his missteps, have him

11  reflect on it, and hopefully learn from it, and not make

12  the same mistakes going forward.

13        (Pause.)

14        MR. KOLSKY:  No further questions.

15        THE COURT:  Ms. Strickland, do you wish to examine

16  this witness?

17        MS. STRICKLAND:  Yes, your Honor, thank you.

18        I'd like to keep Exhibit 7 on the screen and start

19  with that, please.

20

21  CROSS-EXAMINATION BY MS. STRICKLAND:

22  Q.    Does this letter state "Ms. Strickland explains

23  that Mr. Davis subjected her to unwanted advances,

24  unreasonably interfered with her work assignments, and

25  even proposed an unsavory quid-pro-quo proposal on her

1    request for a promotion and raise."  Is that an accurate

2    statement from that letter?  And I apologize, I'm on

3    Page 1 under the background section, the first

4    paragraph.

5    A.    I'm sorry, the page?

6    Q.    The first page of the document.

7    A.    Okay.

8    Q.    Under "Section Background"?

9    A.    Okay.

10   Q.    Where it says "September 10th."  Go down that

11   paragraph and it says "Ms. Strickland explains that

12   Mr. Davis subjected her to unwanted advances,

13   unreasonably interfered with her work assignments, and

14   even proposed an unsavory quid-pro-quo proposal on her

15   request for a promotion and raise."

16         I that an accurate statement from that letter?

17   A.    That was a summary of what I believed your

18   allegations were.

19   Q.    Did you use the words "unsavory quid-pro-quo

20   proposal on her request for a promotion and a raise"?

21   A.    I'm sorry, I don't understand the question?

22   Q.    Did you testify that you drafted this letter?

23   A.    Yes, I did.

24   Q.    Did you use the words "That he proposed an

25   unsavory quid-pro-quo proposal on her request for a

1  promotion and raise"?

2  A.    Well again this is a summary --

3  Q.    I'm just asking for a "yes" or "no" answer,

4  please.

5  A.    Again this is a summary of your allegations.

6  Q.    Is that what your letter states?

7  A.    The --

8      THE COURT:  Well the letter is before the Court

9  and it says what it says, he -- in answer to your

10  question, he explains that that's a recitation of your

11  allegations, and that's how I'm taking it.

12      Go ahead.

13      MS. STRICKLAND:  Yes, your Honor.

14  Q.    But the word "unsavory," was that included

15  specifically in the allegations to your recollection?

16  A.    Again I was trying to summarize the allegations.

17      THE COURT:  Well she's asked a different question

18  now.  Do you recall her using that word in any of her

19  recitations -- any of her allegations?  Excuse me.

20  A.    Um, at the moment I don't recall if you used that

21  word or not.

22  Q.    Didn't you put the words "unsavory quid-pro-quo

23  proposal" in this letter?

24  A.    It's in the letter.

25  Q.    Yes.  Thank you.  Turn to page -- to the second

1    page, it's marked Page 3 on the ECF stamp.

2    A.    (Turns.)

3    Q.    So in the italicized block where it says "Ms. Beam

4    explains," "For example, Karen states when she initially

5    brought her complaint to Mr. Martinez, he compared her

6    relationship with the First Assistant Defender as a

7    'marriage' and asked her to compromise.  He also made

8    comments on Karen's report such as 'at least she was not

9    touched' and called her out on contacting the AO to

10   receive guidance on her civil rights as a federal

11   employee.  He also stated he was being blamed for

12   something that was not his fault.

13         It is evident this claim was mishandled from the

14   beginning by Mr. Martinez and he would benefit greatly

15   with additional training on workplace conduct as well as

16   basic managerial/leadership skills."

17         Is that an accurate statement from that letter?

18   A.    This is -- this is a quote from the investigation

19   report.

20   Q.    Right.  Is it your position today that none of

21   that is discriminatory conduct?

22   A.    Um, sorry, I'm not sure what you're asking me?

23         THE COURT:  As I understand your question --

24   Q.    Is your position to --

25         THE COURT:  Wait.  Wait.  Wait.

```
 1        As I understand your question, it is if that were
 2   so, these allegations -- is it your position that that
 3   is not -- well you called it "discriminatory conduct" --
 4   well, yes, discriminatory conduct on the basis of her
 5   gender?  I think that's the question.  And I'll ask it.
 6   Is that your position?
 7        MS. STRICKLAND:  Yes, your Honor.
 8        THE COURT:  Is that your position?  If proved.
 9   A.    (Silence.)
10        MR. KOLSKY:  Your Honor, we object, that that
11   calls for a legal conclusion.
12        THE COURT:  Overruled.
13        MS. STRICKLAND:  Your Honor, he testified --
14        THE COURT:  Wait a minute, you just won that one.
15        MS. STRICKLAND:  Oh, I apologize.
16        THE COURT:  Okay, now I'm going to let him answer
17   it, I think.
18        As I have allowed him to explain the Fourth
19   Circuit's EDR plan -- and now that question is both
20   appropriate and he can explain it, if proved -- and it's
21   the Court's question.
22        If proved, is that conduct, as you summarize it
23   there, sir, um, discriminatory conduct on the basis of
24   gender?
25        THE WITNESS:  (Pause.)  Well if these allegations
```

are true, um, you know what I read from the
investigation report was that like, for example, that I
know one of the -- one of the, um, missteps that
Mr. Martinez was -- had made was he shifted blame, and I
didn't really see that as being discriminatory, more a
thought that Mr. Martinez was, you know, not being
accountable or not responsible.  So I didn't see that as
discriminatory.

          THE COURT:  Wait, now that --

          MS. STRICKLAND:  How about a comment that --

          THE COURT:  Wait.  Wait.  You may ask questions,
but now I've asked one and I'm going to get to follow up
my question.  Excuse me.

          Mr. Ishida, she listed for you various conduct in
her question.  That's all I'm limited to.  And I'm
asking the question now.

          Assume that conduct, which is included in your
summary in this counseling letter, was proven to be
true, is that not discriminatory conduct on the basis of
gender?  That's all.  But I'm asking it.  Don't you
think it is?  If proved.

          THE WITNESS:  (Pause.)  Yes, your Honor.  I guess,
you know, it doesn't necessarily go to any kind of
discrimination, I think it goes to his conduct, which
when you view it, it's -- it's not gender-based, there

```
 1    is some alternate explanation and concern.
 2            THE COURT:  That's your answer.
 3            Go ahead, Ms. Strickland.
 4            MS. STRICKLAND:  Thank you, your Honor.
 5    Q.    Under Subparagraph A where it says "Marriage
 6    Metaphor," this letter says, you say, "Though
 7    well-intended," you had not abided by Ms. Strickland's
 8    wishes that she meet with you privately to discuss
 9    Mr. Davis's conduct?  In this letter are you referring
10    to the fact that I, Ms. Strickland, the plaintiff, had
11    raised concerns with Mr. Martinez about Mr. Davis's
12    conduct?
13    A.    Again I'm not sure what you're asking me?
14    Q.    Is this letter acknowledging the fact that
15    concerns were raised with Mr. Martinez about Mr. Davis's
16    conduct?
17    A.    By this sentence?
18    Q.    In this paragraph, "Marriage Metaphor," it says
19    "She was troubled" -- I'm sorry.  If you go to the last
20    paragraph of "Marriage Metaphor," the last sentence,
21    "The marriage metaphor was especially inappropriate
22    given the context that Ms. Strickland had raised
23    concerns with Mr. Davis's behavior towards her."
24            Is that an accurate statement of what is in this
25    letter?
```

1    A.    Well again, as I said, with Mr. Martinez, his

2    point was about working together and compromising and,

3    um, it was inappropriate, because using the -- I mean

4    the point was well-meaning, the point was well-intended,

5    but using the marriage metaphor to describe your

6    relationship with JP Davis was not helpful.

7    Q.    Thank you, I'm just asking whether that statement

8    is inaccurate, whether that's what the letter says?

9    A.    As you've read it, that's what is in the letter.

10   Q.    Thank you.  So if you go up to the first paragraph

11   of that section under "Marriage Metaphor" and we talk

12   about the marriage metaphor that he used, does this

13   letter state "This made Ms. Strickland feel

14   uncomfortable and intimidated having to confront the

15   person she accused of sexually harassing her"?

16        MR. KOLSKY:  Objection, I think it speaks for

17   itself.

18        THE COURT:  No, she may be asking to interpret it.

19   Overruled.  You may answer.

20   Q.    Is that an accurate statement -- I apologize.

21   A.    So why don't you ask me that again.

22   Q.    Okay.

23        So the question is, where it says "The marriage

24   metaphor that Mr. Martinez used made Ms. Strickland feel

25   uncomfortable and intimidated having to confront the

1    person she accused of sexually harassing her."  Is that
2    an accurate statement from this letter?
3    A.    That is taken from the investigation report.
4    Q.    Yes, thank you.  So -- and this letter states that
5    this conversation happened around July 5th, 2018, is
6    that right?
7    A.    That is in the letter.
8    Q.    So does this letter indicate that Ms. Strickland,
9    me, the plaintiff, had accused Mr. Davis of sexually
10   harassing her on or about July 5th, 2018?
11   A.    Well again I got this from the investigation
12   report.
13   Q.    Right, I understand, but this is what's in the
14   letter?  Is that a correct statement of what is in the
15   letter?
16   A.    Yes, it's in the letter.
17   Q.    Okay, thank you.  And the letter specifically
18   states that because she had accused Mr. Davis of
19   sexually harassing her, it was especially inappropriate
20   for Mr. Martinez to use a marriage metaphor to describe
21   this situation, is that accurate?
22        MR. KOLSKY:  Objection, asked and answered.
23        THE COURT:  It has been, but I'll allow it.
24   A.    It was ill-advised.
25   Q.    Okay, thank you.  Let's move down to the next

1    Subparagraph E that's entitled "No Physical Touching."

2          So this section says that, um -- this is a finding

3    about Mr. Martinez, by you, and the letter refers to

4    Mr. Martinez, that you "had a subsequent discussion with

5    Ms. Strickland in which you attempted to clarify whether

6    Mr. Davis had touched Ms. Strickland or engaged in other

7    inappropriate behavior.  Ms. Strickland denied that

8    Mr. Davis had touched her inappropriately, but she

9    repeated that Mr. Davis made her feel uncomfortable and

10   threatened.  The investigator, being found that you had

11   said" -- by you I mean Mr. Martinez, "'at least you

12   weren't touched,' or words to that effect, the

13   investigator concluded that your remarks were callous,

14   minimizing, insensitive, and contributed to the distress

15   that Ms. Strickland felt."

16         Is that an accurate statement from this letter?

17   A.    It is, as it came from the investigation report.

18   And again may I add that Mr. Martinez was worried that

19   you were -- for your physical safety.

20   Q.    Yes, he was.  Um, thank you.

21         THE COURT:  Well I've got to strike your comment,

22   you're not testifying now.  I'll strike your comment.

23   Go ahead.

24         MS. STRICKLAND:  Thank you, your Honor.

25   Q.    The words "callous, minimizing, insensitive, and

1    contributed to the distress that Ms. Strickland felt,"

2    did those words come from the investigation report?

3    A.    It's my recollection it did.

4    Q.    So that you drafted this letter, is that correct?

5    A.    I did.

6    Q.    And you used the words, "callous, minimizing,

7    insensitive, and contributed to the distress that

8    Ms. Strickland felt"?

9    A.    I would have gotten that from the investigation

10   report.

11   Q.    Do you agree with that finding in the

12   investigation report?

13   A.    I wasn't here to agree or disagree.

14   Q.    Do you agree that using words such as "at least

15   you weren't touched," or words to that effect, are

16   "callous, minimizing, insensitive, and contributed to

17   the distress that Ms. Strickland felt"?

18   A.    Again this came from the investigation report.

19   Q.    I'm just asking you your personal opinion now, is

20   that what you believe?

21         MR. KOLSKY:  Objection, relevance.

22         THE COURT:  No, overruled.  You may have it.

23         MS. STRICKLAND:  Your Honor, I --

24         THE COURT:  You just won.  He'll answer.

25   A.    I think it wasn't the context in which this

1   statement was made.  Like I said, Mr. Martinez was

2   concerned about your physical safety.

3   Q.    So it's your testimony today that when a

4   supervisor tells an employee, who has complained about

5   sexual harassment, "at least you weren't touched or

6   words to that effect," whether that is discriminatory or

7   not depends on the context?

8   A.    I -- um, yes, I think it -- context is everything.

9   Q.    So you think that there is a context where a

10  supervisor telling a subordinate who reports sexual

11  harassment, "at least you weren't touched," you believe

12  that there's a context where that would be appropriate?

13       MR. KOLSKY:  Your Honor, objection, this misstates

14  the testimony.

15       THE COURT:  I am going to sustain that.

16  Sustained.

17  Q.    Okay, let's move on to the next page of the

18  letter, it is page -- it's marked as Page 4, I think

19  it's on the bottom of Page 3 and on the top, this

20  "approval of seeking outside advice."

21       This section says, "Ms. Strickland had also sought

22  advice and guidance from the Fair Employment Opportunity

23  Office at the Administrative Office of the US courts on

24  her civil rights as an judiciary employee.  The

25  investigator found that you had called out

1   Ms. Strickland seeking legal advice from that office,

2   which further eroded trust between you and

3   Ms. Strickland and exacerbated the deteriorating

4   situation in your office."

5       Is this an accurate statement from this letter?

6   A.   Again that was from the investigation report.

7   Q.   Do you have any reason to doubt that those

8   statements were made?

9   A.   Um, no.  I mean that was what the investigator had

10   concluded.

11   Q.   Is it your position today, your testimony today,

12   that a supervisor, a head of an office calling out a

13   subordinate who sought guidance on her legal rights from

14   the Fair Employment Opportunity Office, is it your

15   testimony that that conduct is not discriminatory?

16   A.   Well again I don't know -- I don't know why -- I

17   don't know what Mr. Martinez did, I don't know what

18   "calling out" means, so I don't know the context of what

19   had happened.  All I did was cited what the investigator

20   had reported in her report.

21   Q.   Do you think as a general matter that judiciary

22   employees have a right to seek legal guidance and advice

23   from the Fair Employment Opportunity Office at the

24   Administrative Office of the US Courts?

25       THE COURT:  Well isn't that settled?

1    A.    So I --

2          THE COURT:  Wait.  Wait.  Isn't that settled?  I

3    think that's going rather far afield.  On my own motion,

4    I'll sustain it.

5          MS. STRICKLAND:  Thank you, your Honor.

6    Q.    Moving on to Subsection D, "Shifting

7    responsibility."  "Finally the investigator noted that

8    you," Mr. Martinez, "had said you were being blamed for

9    matters that you had nothing to do with."

10          Do you think that it is appropriate for a

11   supervisor of an office to react to a sexual harassment

12   complaint by saying that he was blamed for matters which

13   he had nothing to do with?

14   A.    So -- I'm sorry, I don't quite understand your

15   question?

16   Q.    My question is, that do you think that it is

17   appropriate for a supervisor, who is informed of a

18   complaint of sexual harassment, to tell that employee --

19   excuse me, that employee that the supervisor is being

20   blamed for matters that he had nothing to do with, is

21   that an appropriate reaction to a sexual harassment

22   complaint?  That's my question.

23   A.    Yeah, I mean I can't answer that because again I'm

24   not sure what that means, and the other reason is I've

25   never seen -- in my experience dealing with Mr. Martinez

1    and this episode, he ever shift blame.  It's quite the

2    opposite.  He was always ready to assume responsibility.

3    Q.    Well isn't this an accurate statement from your

4    letter that you delivered to Mr. Martinez?

5    A.    This is taken from the investigation report and I

6    don't -- and that's all it is.  I don't -- I'm not

7    familiar with the underlying facts behind this.  And

8    like I said, it flies in the face of my experience with

9    Mr. Martinez.

10   Q.    So you doubt findings by the investigator that --

11   in this matter?

12   A.    I didn't say that, I just said it was a -- I

13   was -- I took this from the investigation report.

14   Q.    You are a supervisor, is that right?

15   A.    I am.

16   Q.    If an employee came to you with a report of sexual

17   harassment, do you think it would be appropriate to

18   respond to that employee by saying that you felt you

19   were being blamed for matters you had nothing to do

20   with?

21          MR. KOLSKY:  Objection, calls for speculation,

22   relevance.

23          THE COURT:  It does, we're somewhat far afield

24   here.  Sustained.

25          MS. STRICKLAND:  Okay.

1    Q.    Earlier you testified about, um, the wrongful

2    conduct provision of the EDR plan and that being cited

3    as a basis for this letter, is that correct?

4    A.    That's right.

5    Q.    You're not disputing that the letter cites

6    "wrongful conduct" as the basis for the action taken

7    here?

8    A.    What I had testified to was that I had used that

9    because that was the closest provision in Chapter 9 that

10   talked about what would happen at the end of the

11   investigation that there was action taken, and I also

12   conceded that if I could go back in time I probably

13   would have rewritten that paragraph.

14   Q.    So if you go to Section 3, and this is on the last

15   page, Chief Judge Gregory's decision.

16   A.    (Turns.)

17   Q.    It states, under Chapter 9 of the plan, "Employees

18   found by the Chief Judge and/or Unit Executive to have

19   engaged in wrongful conduct, as defined in this plan,

20   may be subject to disciplinary action."

21         Are you disputing that the report says that?

22   A.    No, I'm not disputing the report says that.  But

23   again, my explanation as the drafter of this, I'm trying

24   to tell you why I put that in.

25   Q.    Is it because there's no basis to take

1    disciplinary action if there is not a finding of

2    wrongful conduct under the EDR plan?

3    A.    Well again, this is the closest provision in

4    Chapter 9 that I could find that would explain to

5    Mr. Martinez why he's being counseled.  And again I

6    concede that if I could go back and do it again, I would

7    not have fashioned it the way I did.

8    Q.    Okay, let's move on.  Let's see here.  Okay, let's

9    go to, um, Exhibit 18, I believe -- I believe that's the

10   latest number where we are.

11   A.    (Turns.)

12         MR. STRICKLAND:  I might be having technical

13   difficulties here.

14         (Pause.)

15         MR. STRICKLAND:  I apologize.  You said 18?

16         MS. STRICKLAND:  18, yeah.

17         MR. STRICKLAND:  Oh, okay.

18         (On screen.)

19         MS. STRICKLAND:  Okay, let's go down to Bates

20   Number 16, I believe that's the next page.

21         (On screen.)

22         MS. STRICKLAND:  Okay.

23   Q.    Are you familiar with this document?

24   A.    Yes.

25   Q.    Is this an e-mail from you to Tony Martinez?

A.    Yes, it looks like it.

Q.    Is this e-mail about the investigation of me,
plaintiff's report of wrongful conduct?

A.    Um, it looks like the early stages, yes.

Q.    Did you state in this e-mail to Tony Martinez,
"Heather will need to know that you're appointing her to
investigate the allegations contained in Karen's
e-mail."  Is that what it states?

A.    Yeah, you're referring to the second sentence?

Q.    Yes.

A.    Yes.

Q.    Did you also state, in the next sentence, "I might
say that because of your earlier involvement in the
matter, that you are recusing and appointing Heather as
your designee to investigate the allegations"?

A.    Yes, I said that as well.

Q.    Did Heather Beam have any experience conducting
workplace investigations before this matter?

A.    I don't know.

Q.    You didn't -- you didn't try to verify that before
she was appointed?

A.    So like I said, um, when this came up and this was
being construed as a report of wrongful conduct under
Chapter 9 -- Chapter 9 requires that an investigator be
appointed and it mentions a Human Resources manager.  So

1    I called the Clerk and said, "I have a task, I need an
2    investigator who is somebody who's a Human Resources
3    manager, preferably someone outside Mr. Martinez's
4    office, do you have any recommendations?"  And the Clerk
5    had recommended Heather Beam.
6    Q.    And my question was to verify whether Heather Beam
7    had any experience conducting workplace investigations
8    before this matter?
9    A.    I relied on the Clerk's recommendation to me given
10   what I told him I needed to have done.
11   Q.    Once Heather Beam began the investigation, did you
12   do anything to oversee the investigation to ensure that
13   it was appropriately conducted?
14   A.    Once Heather Beam was appointed as the
15   investigator, I let Heather Beam conduct that
16   investigation.
17   Q.    Did you do anything to make sure that the accused
18   parties didn't speak to each other and coordinate their
19   testimony before the investigation?
20   A.    Again I let Ms. Beam handle the investigation.
21   Q.    But just to be clear, in your role as EDR
22   coordinator, that's part of your position is to ensure
23   that the allegations are investigated appropriately, is
24   that right?
25   A.    That's correct, which includes letting Heather

1    Beam conduct the investigation without my
2    interference -- with my -- you know without my
3    micromanaging her.
4    Q.    Right, but you didn't ask her whether the accused
5    parties were allowed to speak to each other, for
6    example?
7    A.    Again I let Ms. Beam handle that.
8    Q.    Okay, thank you.
9          MS. STRICKLAND:  Let's move up to Page 615.
10         (On screen.)
11         MS. STRICKLAND:  Keep going up.
12         (On screen.)
13   Q.    I think this was something that was discussed
14   earlier.  Is this part of the e-mail chain to Tony
15   Martinez?
16   A.    Um, yes, it is.  The date's not correct, but it
17   looks like it is.
18   Q.    Right.  Did you state in this e-mail, "I think
19   you're doing a great job, Tony, your organizational
20   changes are brilliant"?
21   A.    Yeah, you're referring to the last line of the
22   sentence?
23   Q.    Um, yes.
24   A.    Yes.
25   Q.    Did you testify today that we also saw e-mails to

```
1    the fact of you said, "Fantastic e-mail, Tony, you're
2    doing all you can to protect Ms. Devins"?
3    A.    Yes, I said that.
4    Q.    And you testified earlier that your role is
5    supposed to be an impartial facilitator of the EDR
6    process, is that right?
7    A.    I did.
8    Q.    So did you have any concern when you made these
9    statements -- after acknowledging that Mr. Martinez was
10   involved in the matter, did you have any concern about
11   showing bias in favor of Mr. Martinez?
12         MR. KOLSKY:  Objection, misstates the evidence
13   after he was involved in the matter.
14         THE COURT:  It does.  Sustained.
15   Q.    Did you --
16         MS. STRICKLAND:  I apologize.  May I be heard on
17   that?
18         THE COURT:  You may.
19         MS. STRICKLAND:  Thank you, your Honor.
20         He stated -- we just went over that he stated that
21   because of his earlier involvement in the matter,
22   Mr. Ishida had suggested that he recused himself.  We're
23   in the same e-mail chain and I'm just following up on
24   that statement.
25         THE COURT:  I understand, but I adhere to my
```

ruling.  The document -- the e-mail chain is before me
and I will evaluate it.

You're about done with this witness, aren't you?

MS. STRICKLAND:  I just have a few other things, I
will move as quickly as I can.

THE COURT:  How long do you think you're going to
take?  I'm not crowding you, I just am thinking about
the morning recess.

MS. STRICKLAND:  Yeah, I mean I still have a few
more matters, um, probably within the next 30 minutes.

THE COURT:  Well, all right, if it's going to go
possibly 30 minutes, we'll take the morning recess at
this time and we'll resume at 11:15.  We'll recess.

THE CLERK:  All rise.

THE COURT:  Well actually I said we'd recess and
the Clerk properly spoke, but before we do that, now
we're off the clock here, we're into the recess time.

I have this issue about the plaintiff's expert
witness as to whom a deposition has been taken, and I've
said that I was not inclined to allow a witness, an
expert witness to testify without actually appearing and
being cross-examined.  I wonder if we might -- and the
matter has been fully briefed and I've been reviewing
those briefs and considering them.

So I wonder if we might avoid difficulty here.

The defense wants to call two witnesses, one of them,
um, remotely, and I've said "Well if there's agreement
on that, I guess that's fine."  Well that ought apply to
the plaintiff as well.

So let me turn to the defense.  You have no
objection to them calling this witness remotely as
you're going to call one of your witnesses, isn't that
right?

MR. KOLSKY:  Well, your Honor, I'm not sure we are
going to call one of our witnesses remotely, I think
there's still a scheduling issue that he's only
available in the afternoon.

THE COURT:  Then you have a problem putting him
on, um, at all in the case.  But put that aside.

Suppose they call this witness remotely?  The
witness has something relevant to say.  No problem with
--

MR. KOLSKY:  My understanding is that the
plaintiff had previously disagreed with remote
testimony.

THE COURT:  Well now the plaintiff's in a bind, so
it's different.  My question to you is, you don't
object to that, do you?

MR. KOLSKY:  Yes, your Honor, we do object.  And
we had -- we had made a proposal to plaintiff weeks ago

1    in which we would agree to, um, the submission of expert
2    reports if it was -- if both sides could present their
3    experts that way, and they immediately rejected that
4    offer.  And that was their chance to get their expert
5    deposition in front of the Court --
6         THE COURT:  Well just as I've said that I've
7    allowed you to maintain your objections, maybe now that
8    they've heard what I think, we will revisit that.  And
9    I'll turn to the plaintiffs.
10        If you can submit your expert report and they can
11   submit their expert report, thus saving us time, um, I'm
12   willing to do that.
13        How does that suit the plaintiff?
14        MR. STRICKLAND:  Thank you, your Honor.  That's
15   actually an offer we made yesterday and the defendants
16   rejected it.
17        THE COURT:  Well now I'm supervising it.  So now
18   I'm putting it to you in open court.
19        Since you're willing, um, you're willing to submit
20   your expert report if they're willing to submit their
21   expert report, right?
22        MR. STRICKLAND:  Your Honor, the offer that was
23   made before by the defendants was their two expert
24   reports for our loss-earnings's expert's deposition
25   testimony and reports, and we're fine with that.  That

1    offer still stands.

2         THE COURT:  All right, wait a second, that's a

3    little different, that's deposition and expert report

4    for their two expert reports.

5         What does the defense say to that, that will save

6    us all time?

7         MR. KOLSKY:  We had made that proposal and the

8    plaintiff immediately rejected it --

9         THE COURT:  We're talking about today, as I said

10   I'm presiding now.  Now here's the offer.  The

11   plaintiff's deposition and expert report in return for

12   your submitting your two expert reports.  Do you go for

13   that?

14        MR. KOLSKY:  Your Honor, we do not.  We think that

15   it's important that we have an opportunity to cross-

16   examine their expert in court, and we've spent a lot of

17   time preparing our own expert to testify, um, and so we

18   think we should be able to present him in court.  And if

19   plaintiff wants to present expert testimony, their

20   expert should testify in court as well.

21        THE COURT:  Well you think about it, because I'm

22   going to ask that again at 11:15.  There is sufficient

23   grounds in the exercise of my discretion, because you've

24   had a chance to cross-examine this expert on deposition,

25   that, um, I see this as a way of saving time and at

```
 1   least getting the data all before the Court.  I'll ask
 2   you again at 11:15.  Otherwise I'll make an order with
 3   respect to the matter.
 4        All right, we'll recess until 11:15.  We'll
 5   recess.
 6            THE CLERK:  All rise.
 7            (Recess, 10:50 a.m.)
 8            (Resumed, 11:20 a.m.)
 9            THE COURT:  And, Ms. Strickland, you may continue.
10            MS. STRICKLAND:  Thank you, your Honor.  Thank
11   you, Mr. Ishida.
12        Let's pull up the lettered AJ Exhibit, please.
13   Thank you.
14        (On screen.)
15   Q.    Mr. Ishida, is it your understanding that
16   plaintiff, myself, filed a report of wrongful conduct
17   and request for counseling on September 10th, 2018?
18   A.    Yes, that's correct.
19   Q.    All right.  And Heather Beam conducted an
20   investigation of that complaint as we discussed,
21   correct?
22   A.    Yes, she conducted a unified investigation into
23   both of your requests.
24   Q.    Okay.  And Heather Beam sent you a copy of her
25   report on January 11th, 2019?
```

```
 1    A.    That's right.

 2    Q.    Thank you.

 3          So looking at the exhibit in front of you on the

 4    screen, are you familiar with this document?

 5          MS. STRICKLAND:  We can scroll down, if that would

 6    help.

 7          (On screen.)

 8    A.    I think I recognize it, but if you could scroll

 9    down more, that would be helpful.  (Scrolls.)  Yes.

10    Q.    You are familiar?

11    A.    Yes.  Yes.

12          MR. KOLSKY:  Objection, this is beyond the scope

13    of direct.

14          THE COURT:  Well I don't know, let's see.

15    Q.    This is an e-mail that --

16          THE COURT:  Just a moment.  AJ?  Just a moment.

17          MS. STRICKLAND:  AJ.  This is an e-mail he was

18    asked about on direct examination.

19          MR. KOLSKY:  This e-mail was not introduced during

20    the direct examination.

21          THE COURT:  Well it may have been.  But if it was,

22    it was not beyond the scope.

23          She may have a few questions.  Go ahead.

24          MS. STRICKLAND:  Thank you.

25    Q.    So this is an e-mail exchange between you and
```

1    Heather Beam?

2    A.    Yes.

3    Q.    And it's dated January 13th, 2019, is that right?

4    A.    That's correct.

5    Q.    And, um, you asked her, "Given your recommendation

6    that Tony be counseled and trained on handling workplace

7    conduct complaints and decision-making, I'd like your

8    thoughts on whether you think Tony should be

9    disqualified from participating in the EDR case," is

10    that right?

11    A.    That's correct.

12    Q.    And Ms. Beam responded, "I truly believe that Tony

13    is biased in this case involving JP and Karen as far as

14    the sexual harassment is concerned."  Is that correct?

15    A.    That's correct.

16    Q.    And did Ms. Beam state, "From my conversations

17    with him, I know he feels Karen is attempting to exploit

18    this situation to get the transfer to Asheville, however

19    it has created a bias in him to look at this case from a

20    neutral perspective."  Is that what she told you?

21    A.    Yes.

22    Q.    Did she also state, "I also believe he lacks the

23    experience and understanding of exactly how this process

24    works."  Is that right?

25    A.    That's what she said.

```
1   Q.    And did she also state, "Although retaliation in
2   my investigation was unfounded, I still think, in a
3   good-faith effort to resolve this, the Circuit should
4   consider disqualifying Tony based on the contentious
5   nature of the situation," is that right?
6   A.    That's what's there.
7   Q.    Did you state, um --
8         THE COURT:  Let me interrupt.  I guess I'm
9   confused.  I thought this was a matter of evidence.  If
10  not, you're offering it, are you?
11        MS. STRICKLAND:  Yes, your Honor, we would move to
12  admit this as an exhibit.
13        THE COURT:  I thought it was in evidence.  I
14  thought it was in evidence.
15        No objection to it, is there, Mr. Kolsky?
16        MR. KOLSKY:  Um --
17        THE COURT:  AJ?
18        MR. KOLSKY:  No objection.
19        THE COURT:  It may be received, Exhibit 163 in
20  evidence.
21        (Exhibit 163, marked.)
22        THE COURT:  Go ahead, Ms. Strickland.
23        MS. STRICKLAND:  Okay, thank you, your Honor.
24  Q.    Did your response state in part, "I have a meeting
25  tomorrow with Chief Judge Gregory at 2:00 p.m."?
```

A.    Yes.

      THE COURT:  Well, you know, it's in evidence now.
This isn't an e-mail chain I have seen before, given the
motion practice here.  So it's in evidence.  It speaks
for itself.  It says what it says.

      MS. STRICKLAND:  I'll move on.  Yes, your Honor.

Q.    Did you provide Ms. Beam's January 13th, 2019
e-mail to Chief Judge Gregory?

A.    I can't remember if I provided the e-mail to him,
no.

Q.    Did you tell Chief Judge Gregory that Ms. Beam had
recommended that Defendant Martinez be disqualified from
the EDR proceeding?

A.    So as I testified in my deposition, I don't
recall -- I didn't recall the conversation or the
meeting I had with Judge Gregory, but, um, I am -- I'm
sure that I raised Ms. Beam's concerns with Chief Judge
Gregory, because after I got on this e-mail, as I've
testified, I raised this issue with General Counsel and
got their views and guidance, which I conveyed to Chief
Judge Gregory.  And the reason why I'm sure I raised
Heather Beam's concern is because the only time bias was
mentioned was by Heather Beam.  So that's why I'm sure
that I raised Heather's concern with Chief Judge
Gregory.

1    Q.    Would you be surprised to learn that Chief Judge

2    Gregory testified in his deposition that no one ever

3    gave this e-mail or commuted its contents -- excuse me,

4    communicated its contents to him that he was aware of?

5         MR. KOLSKY:  Objection, relevance.

6         THE COURT:  Sustained.  That's just not relevant.

7    His deposition stands for what it does.  You proceed.

8         MS. STRICKLAND:  Yes, your Honor.  Yes, your

9    Honor, I understand.  Yes.

10   Q.    So just to be clear, it's your testimony today

11   that you do not recall whether you specifically shared

12   this e-mail or what it stated to Chief Judge Gregory?

13        MR. KOLSKY:  Objection, asked and answered.

14        THE COURT:  It has been, that is his testimony,

15   that's what I understand.

16        MS. STRICKLAND:  Okay.

17   Q.    Is it generally part of your duties as EDR

18   coordinator to provide relevant information to the

19   decision-maker in an EDR proceeding?

20   A.    Yes, it is.

21   Q.    Was there a pending disqualification request in

22   front of Judge Gregory when Ms. Beam sent you this

23   e-mail?

24   A.    Yes, there was.

25   Q.    Do you think it would have been important to

1    communicate this information to Chief Judge Gregory

2    given the pending disqualification request?

3    A.    I do, and that's why I had raised the issue with

4    General Counsel.  And my recollection of the

5    conversation was I did have a conversation with Chief

6    Judge Gregory about the bias issue and the

7    disqualification decision he was making.

8    Q.    So are you denying -- you were not instructed by

9    any officials at the Administrative Office to not share

10   this information with Chief Judge Gregory?

11   A.    I'm sorry, I don't understand what you're asking?

12   Q.    Did any officials at the Administrative Office

13   advise or instruct you not to share this information

14   with Chief Judge Gregory?

15   A.    So you're asking me a negative?

16   Q.    Yes, I'm asking you to -- did you receive any

17   advice or instruction from the Administrative Office to

18   not share this information with Chief Judge Gregory?

19   A.    No, I received no such instruction.

20   Q.    Is it your position that a Unit Executive who is

21   accused of wrongful conduct who is found to be biased,

22   um, can represent an employing office in an EDR

23   proceeding, that that is an appropriate interpretation

24   of the EDR plan?

25   A.    This goes to the advice and guidance that I

1  received from the Office of General Counsel.

2  Q.   And did the Office of General Counsel advise you

3  that a Unit Executive cannot be disqualified from the

4  EDR matter?

5       MR. KOLSKY:  Objection, privileged.

6       THE COURT:  Yeah, I have to sustain the --

7       MS. STRICKLAND:  Your Honor, may I be heard?

8       THE COURT:  You may be heard.  Yeah, you may be

9  heard.

10       MS. STRICKLAND:  Your Honor, the general -- I'm

11  sorry, there's just a little feedback.

12       The General Counsel, Cheryl Walter, submitted a

13  declaration in this case, it's on the public docket, in

14  which she stated, "The defending respondent employing

15  office, acting through its Unit Executive, is the

16  opposing or differing party to an EDR-disputed matter.

17  In fact to disqualify a respondent employing office from

18  being able to respond to and defend an employment action

19  filed under EDR would be unfair to the respondent

20  employment office."  So I just want to know whether

21  that's what he was told?

22       THE COURT:  Well I know you to do, and, um -- but

23  she's an attorney and they've objected on the basis of

24  attorney-client privilege.  Her general statement of the

25  law is not a waiver of the attorney-client privilege.

1    Now I will say that this is going to have to, um,

2    take some further briefing on your part because the

3    assertion of the attorney-client privilege is a very

4    interesting thing.

5    Here in the District of Massachusetts, um, where

6    assertions of that privilege are, as they are in the

7    Western District of North Carolina, affected by the

8    local law, the local law here in Massachusetts is that

9    of course the courts of the Commonwealth of

10   Massachusetts recognize the attorney-client privilege

11   and uphold it assiduously, however they also empower a

12   Court to draw a negative inference from it.  I'm not

13   sure what the standard is in the State of North

14   Carolina, but I'm going to have to figure that out.  But

15   I sustain the privilege.  And move on.

16   Q.    Are you aware of the Fourth Circuit's decision in

17   this case stating that not disqualifying an accused Unit

18   Executive created a conflict of interest?

19   A.    Am I aware of the decision?

20   Q.    Yes, are you aware of the decision?

21   A.    (Pause.)  I'm not sure I am.

22   Q.    Okay.  So there was some discussion about, um, in

23   this e-mail about how Tony believed that I fabricated or

24   exploited this complaint to get a transfer to the

25   Asheville office.  Are you aware of whether I ever

1   transferred to the Asheville office?

2   A.    No, I think the last thing I recall is that, um,

3   among your many initial demands, you had asked to be

4   transferred to the Asheville office, and that was the

5   only thing Mr. Martinez did not grant, because my

6   understanding was that there was no space there.  But at

7   some point during mediation I, um, I understood that

8   Mr. Martinez was offering his office.  But whether or

9   not you actually moved?  I don't know that.

10  Q.    So you're not aware of whether that transfer offer

11  was accepted?

12  A.    Um, no, all I know is the offer was made.  I don't

13  know if you had actually accepted it.

14  Q.    Okay.  Thank you.  I believe it was your earlier

15  testimony that plaintiff, me, was asking you for help,

16  and the Circuit for help, seeking employment outside of

17  the FDO during this time, isn't that right?

18  A.    My recollection is you asked twice, the middle of

19  November and the middle of January.

20  Q.    Yes.  So, um, I was seeking to leave the office

21  entirely and go to a different employer, is that right?

22  A.    Well you were asking for another -- a transition

23  to another office.

24  Q.    Okay, right.  Thank you.  And is it your

25  understanding that me, plaintiff, resigned from the FDO

1    in March of 2019?

2    A.    I wasn't aware of when you actually resigned.

3    Q.    Okay, does that sound plausible to you, that it

4    would have been in March of 2019?

5    A.    I don't disagree, but I wasn't aware of it.

6    Q.    Okay.  And did you think that, um -- did you

7    believe that resigning was a good outcome?

8    A.    That's for you to say.

9    Q.    Well you testified earlier that that's what you --

10   what you believed.  Is that your testimony?

11        MR. KOLSKY:  Objection, misstates testimony.

12        THE COURT:  Um, it does.  On those grounds.

13        So put another question, Ms. Strickland.

14   Q.    Do you believe in -- in your experience as EDR

15   coordinator, if a complainant ultimately resigns from

16   the employer during the EDR proceeding, do you believe

17   that's an acceptable outcome?

18        MR. KOLSKY:  Objection, calls for speculation.

19        THE COURT:  I think not.  Overruled.

20   A.    (Pause.)  Do you mind repeating the question

21   again?

22   Q.    So in your experience as EDR coordinator, do you

23   believe that if a complainant resigns as a result of the

24   EDR proceeding, do you believe that's an acceptable

25   outcome?

1    A.    Well I think it depends on whatever the

2    circumstances were.   The reason why I had thought that

3    you -- that this was an outcome that you wanted, was I

4    had several communications with the mediator, Ed Smith,

5    and he sent me two e-mails before your March 11th e-mail

6    withdrawing your EDR, you know, request, I think it was

7    March 7th and March 8th, in which he told me that --

8    that you were excited about the clerkship opportunity

9    with Judge Floyd and you were greatly appreciative of

10   the Fourth Circuit's help.   And so from those e-mails

11   and reports from Mr. Smith, I deduced that this was

12   something you were excited about, looking forward to,

13   and that it was a good move for you.

14   Q.    At the time of those e-mail communications, had

15   any corrective or disciplinary action been taken based

16   on the report of wrongful conduct?

17   A.    At the time of what e-mails?

18   Q.    What you were just describing, the communications

19   in March of 2019.

20   A.    No, no, nothing had happened by that point.

21   Q.    And just to be clear, this complaint was formally

22   filed in September of 2018?

23         MR. KOLSKY:   Objection, I guess to the term

24   "complaint."

25   Q.    The EDR request for counseling and report of

wrongful conduct.

A.    Yeah, your two requests were filed on September
2018.

Q.    Okay, thank you.  Um, so just a moment please.
(Pause.)  Okay.

      Did you have a conversation with plaintiff, me, on
January 17th, 2019 about this EDR proceeding that you
recall?

A.    Can you tell me the date again?

Q.    January 17th, 2019.

A.    Yeah, I mean I'm not -- as I'm sitting here, I'm
not sure of the date.

Q.    Do you have any reason to doubt that there was a
conversation on January 17th?

A.    No, I have no reason to doubt it.

Q.    And this was after the investigation report came
about?

A.    January 17th?

Q.    Right.

A.    That's correct.  Okay.

Q.    Did you tell plaintiff, me, that no decisions
about disciplinary action would be made until after the
Chapter 10 EDR proceeding was over?

A.    Again I don't recall, but I don't dispute that
either.

Q.    Okay.  Did you say, "So what we could do is hold
the Chapter 9 proceeding in abeyance until the Chapter
10 proceeding was finished," does that sound like
something you would have said?

A.    Again I don't recall.

Q.    Well are you disputing it, do you have a reason to
deny that that was said?

A.    I don't have a reason to affirm or deny it.

Q.    Are you aware that this conversation was
audio-recorded?

A.    I -- I didn't -- I didn't know any of our
conversations were being recorded.

Q.    Did you become aware of that during this
litigation?

A.    I think at some point during discovery I found out
about transcripts of audio recordings.

Q.    So you are aware that defendants created a
transcript of these recordings during this litigation?

A.    I'm aware that you had audio-taped and there were
transcripts made.

Q.    Okay.  Do you have any reason to doubt the
accuracy of the transcripts that the defendants would
have created?

A.    Um, I have no reason to doubt that.

Q.    Okay.

```
 1        MS. STRICKLAND:  This is Exhibit BO.  Is that out?
 2   Okay.
 3        (On screen.)
 4   Q.   Have you seen this document?
 5        THE COURT:  To what document --
 6        MR. KOLSKY:  Objection, your Honor.
 7        THE COURT:  Yes, to what document are you
 8   referring?
 9        MS. STRICKLAND:  I'm sorry, the document that's on
10   the screen, this is Plaintiff's Lettered-Exhibit BO.
11        THE COURT:  All right.
12        And, Mr. Kolsky, you object to her examining about
13   it?
14        MR. KOLSKY:  Yes, this is beyond the scope of
15   direct.  This document was not shown to the witness
16   during his direct testimony.
17        THE COURT:  It was not --
18        MS. STRICKLAND:  Your Honor, the only -- I
19   apologize.  All I'm going to do --
20        THE COURT:  Go ahead.
21        MS. STRICKLAND:  I'm not going to ask him any
22   questions about it, I'm just, um, asking him if he has
23   any reason to doubt the accuracy of these transcripts.
24        THE COURT:  Well it's clearly beyond the scope.
25   The transcript is what it is.  I'll sustain the
```

```
 1    objection.  Move on.

 2         (Pause.)

 3         MS. STRICKLAND:  Your Honor, we'd just like to

 4    clarify whether these exhibits are admitted or not?

 5    It's our understanding that these transcripts were also

 6    sent by the defendants to the Court to aid with

 7    reviewing the recording.  So maybe this can be addressed

 8    at a different time.  But we'd just like to note for the

 9    record our confusion about this issue.

10         THE COURT:  Well there's no confusion in the

11    Court's mind.  Something that is denominated EO is not

12    in evidence.  My understanding is that the actual

13    recording is in evidence and I can review it.  If I'm

14    mistaken, the parties can correct me.  But the

15    transcript is not.  At most the transcript is an aid,

16    like a demonstrative aid, an aid to understanding what

17    the actual recording says.  And that's how I'm treating

18    it.

19         Go ahead.  Anything else?

20         MS. STRICKLAND:  Thank you, your Honor.  I'm

21    sorry, I didn't catch that?

22         THE COURT:  Anything else for this witness?

23         MS. STRICKLAND:  Oh, um, yeah, but not on that

24    issue.  I will -- I will move on.

25         Let's go to, um, Exhibit 6, Admitted Exhibit 6.
```

```
 1          (On screen.)

 2          MS. STRICKLAND:  Thank you.

 3     Q.   Are you familiar with this document?

 4     A.   (Silence.)

 5          MS. STRICKLAND:  We can scroll down, if that would

 6     help.

 7          MR. KOLSKY:  Objection, beyond the scope of the

 8     direct.  This witness was not asked about this document

 9     during his direct testimony.

10          MS. STRICKLAND:  This document is relevant to his

11     testimony about whether disciplinary action was taken or

12     not or the, um, definitions that were used.

13          THE COURT:  And how is it relevant?

14          MR. KOLSKY:  Your Honor --

15          THE COURT:  Wait a minute, I'm asking this

16     question of --

17          Go ahead, Ms. Strickland.

18          MS. STRICKLAND:  Oh, thank you, your Honor.

19          It's relevant because it says, um, "The

20     investigation report recommends that disciplinary action

21     be taken against the accused employee as well as the

22     Unit Executive."  So it's relevant to his credibility.

23     It's also relevant to the constructive discharge issue

24     because it contains discussion of the circumstances of

25     the resignation.
```

1          THE COURT:  Mr. Kolsky?

2          MR. KOLSKY:  Your Honor, may I respond?

3          THE COURT:  You may.

4          MR. KOLSKY:  Ms. Strickland had an opportunity to

5     call witnesses in this case.  She chose not to.  She

6     could have called Mr. Ishida and asked him about this

7     document.  She chose not to.  She shouldn't be permitted

8     to examine him about a new document during cross-

9     examination.

10         THE COURT:  I think this is in -- within, as she

11    explains it, within the scope of your examination,

12    however, and in my discretion I'm going to allow it and

13    she may examine concerning it.

14         MS. STRICKLAND:  Your Honor, I won't belabor the

15    point, but let's go back to the summary section on the

16    first page.

17         THE COURT:  This document is not --

18         MS. STRICKLAND:  All right.

19         THE COURT:  Is this in evidence?  Correct me.

20         MS. STRICKLAND:  I believe so.  This is admitted

21    as Exhibit 6.

22         THE COURT:  Thank you.  Go ahead.  You may examine

23    concerning this.

24    Q.    Does it state in the fourth paragraph, the second

25    sentence, "Eventually Mr. Smith was able to persuade

1    Circuit Judge Henry Floyd to offer Ms. Strickland a

2    clerkship, till the end of the term in June, and

3    convince Ms. Strickland to withdraw her EDR complaint in

4    return for the clerkship."

5          Is that what it states?

6    A.    I think it does state that, yes.

7    Q.    Okay.

8          (Pause.)

9          MS. STRICKLAND:  I'm sorry, may I proceed?

10         THE COURT:  You may.

11         MS. STRICKLAND:  Okay, thank you.

12         Now let's go to Section 2.

13         (On screen.)

14   Q.    Does this document state, "The last remaining

15   matter is Ms. Strickland's report of wrong" -- I assume

16   that means "wrongful conduct under Chapter 9 of the EDR

17   plan."  Is that what it states?

18   A.    (Reads.)  That's what it states, yes.

19   Q.    Does this document confirm that you waited to

20   address the disciplinary proceeding until after I

21   resigned and accepted a clerkship?

22   A.    (Pause.)  Say that again?

23   Q.    Does this document confirm that you waited to

24   address the disciplinary proceeding until after I

25   resigned and accepted a clerkship?

A.    I don't know if it reflects an intention to wait,
but the timing looks like it happened afterwards, yes.

Q.    Okay.  Turning to next page, does this document
state, "The investigation report recommends that
disciplinary action be taken against the accused
employee, Federal Public Defender First Assistant JP
Davis, as well as the Unit Executive, Anthony Martinez.
We cannot decide any disciplinary action against
Mr. Davis, that is within the authority of the Unit
Executive.  But we can and have in deciding if
disciplinary action is appropriate for Mr. Martinez."

        Is that what it states?

A.    That's what it states, yes.

Q.    Did you state in this letter that pursuant to
Chapter 9 of the EDR plan, "Employees found that a Chief
Judge and/or a Unit Executive to have engaged in
wrongful conduct, as defined in this plan, may be
subject to disciplinary action"?

A.    I'm sorry, say that again?

Q.    The statement that I just read, is that in this
memorandum?

A.    Yes, the statement you read is there.

Q.    Okay.  So going to Footnote 1, it states,
"Wrongful conduct is defined to include discrimination
against employees based on race, color, religion, sex,

1    including pregnancy and sexual harassment, national

2    origin, age" -- and skip ahead, "Harassment against an

3    employee based on any of these protected categories, or

4    retaliation for engaging in any protected activity, is

5    prohibited."

6         Is that what it states?

7    A.    That's what it states, yes.

8    Q.    Okay.  So does this letter confirm that

9    Mr. Martinez was allowed to make the decision about

10   whether to discipline JP Davis?

11   A.    This memorandum says that I don't know if the

12   Circuit has the authority to discipline JP Davis.

13   Q.    So Mr. Martinez was allowed to make the decision

14   about whether to discipline JP Davis?

15   A.    It was in his, um, within his authority and

16   purview as the Unit Executive, to do that, yes.

17   Q.    Even though he also received a -- whether you call

18   it a "reprimand" or a "letter of counseling," there was

19   action taken against him based on the same

20   investigation?

21   A.    I don't understand your question?

22   Q.    So the letter of counseling that we discussed

23   earlier, that arose from the same investigation, is that

24   right?

25   A.    Yes, the letter of counseling was based on the

1   investigation report.

2   Q.    And Mr. Martinez, even though he was counseled,

3   disciplined, whatever you want to call it, he also made

4   the decision about whether to discipline JP Davis, is

5   that right?

6   A.    Because the Circuit did not have the authority to

7   discipline a subordinate in that office.

8   Q.    Do you have a source of authority for that?

9   A.    Well I -- that is -- that is something that was

10  discussed, you know, frequently, and our view is I don't

11  know of an authority that gives the Circuit the

12  authority to discipline a subordinate in a Unit

13  Executive's office.

14  Q.    Does Chapter 9 of the plan say that?

15  A.    You're talking about something -- you're talking

16  about a disciplinary action outside of Chapter 9.

17  You're talking about the authority of the Court of

18  Appeals to discipline a subordinate in an office.

19  Q.    Does Chapter 9 of the plan state "Employees found

20  by the Chief Judge and/or Unit Executive to have engaged

21  in wrongful conduct, as defined in this plan, may be

22  subject to disciplinary action"?

23  A.    Well I think you read the operative language, "the

24  judge and/or the Unit Executive."

25  Q.    Does Chapter 9 in the plan state that the Chief

1   Judge and/or the Unit Executive, that one or the other,

2   has particular authority?

3   A.    Well I think -- I think the authority to

4   discipline a subordinate in an office rests with the

5   Unit Executive, which is what Chapter 9 says.  So I

6   think the two are consistent.

7   Q.    Do you think that it's an conflict of interest for

8   somebody who was disciplined in a matter to make a

9   decision about disciplinary action regarding another

10  employee?

11        MR. KOLSKY:  Objection, relevance.

12        THE COURT:  Sustained.

13        MR. KOLSKY:  This is not relevant as applied.

14        THE COURT:  It is not relevant as applied.  She'll

15  move on.

16        MS. STRICKLAND:  Yes, your Honor, I'll move on.

17  Q.    Are you aware that Mr. Davis told another

18  supervisor that plaintiff, me, may just "need to get

19  smacked a bunch"?

20  A.    I'm sorry, I didn't understand the last part.

21  Q.    Are you aware that Mr. Davis told another

22  supervisor that plaintiff, me, "may just need to get

23  smacked a bunch"?

24        MR. KOLSKY:  Objection, relevance.

25        THE COURT:  Sustained.  Well not on that ground,

1  that's clearly beyond --

2        MS. STRICKLAND:  Your Honor --

3        THE COURT:  Wait a minute.  I think that's beyond

4  the scope.  I mean you did have a chance to put on this

5  witness and other witnesses.  Sustained.

6        Move on.

7        MS. STRICKLAND:  Thank you, your Honor.

8  Q.    You testified earlier that you believed that Tony

9  acted in good faith, um, throughout the investigation,

10 is that right?

11 A.    Yes.

12 Q.    Do you, sitting here today, do you believe that

13 Tony acted in good faith as a Federal Public Defender?

14 A.    In my dealings with him and in my interactions, he

15 acted in good faith.  And it's also, may I add,

16 something the investigator found as well.

17 Q.    Are you aware of other EDR complaints filed

18 against Tony in his office?

19       MR. KOLSKY:  Objection, relevance, and outside the

20 scope of direct.

21       THE COURT:  It is outside the scope.  Sustained.

22       MS. STRICKLAND:  Your Honor, may I be heard?

23       THE COURT:  You may.

24       MS. STRICKLAND:  Thank you, your Honor.

25       We'd just like to at least put it on the record

1    that we believe it's relevant, if he's saying he

2    believes that Tony acted in good faith and in a

3    nondiscriminatory matter, the fact that he was aware of

4    other EDR complaints, a pattern of complaints from that

5    office.

6         THE COURT:  I understand that's your proffer.  I

7    didn't rule as to whether it was relevant or not, I

8    ruled that it's beyond the scope of the examination of

9    this witness.

10        Now what Mr. Kolsky said is correct, you rested on

11   a documents-only case.  They called a live witness, um,

12   and I grant you the witness is one of the defendants,

13   and they examined him.  You have the right to examine

14   him on all those matters as to which they examined plus

15   you have the right to examine him on the question of any

16   issues of bias or motive related to his testimony.  But

17   beyond that, um -- and his credibility.  But beyond

18   that, um, you don't.  And this is beyond the scope.

19   Sustained.

20        (Pause.)

21        MS. STRICKLAND:  I apologize, your Honor, we're

22   just -- because there have been so many changes in the

23   exhibit list, we just want to make sure that things get

24   admitted.

25   Q.   Okay.  Did you testify in a deposition in this

1   matter?

2   A.      I did, yes.

3   Q.      Okay.  Did you review and sign the transcript for

4   your deposition?

5   A.      Yes, I did.

6   Q.      So let's take a look at -- this is Lettered

7   Exhibit S.

8           Does this appear to be a true and accurate copy of

9   your deposition transcript?

10          MR. KOLSKY:  Objection, this is outside the scope

11  of direct.

12          THE COURT:  It appears to be.  sustained on the

13  same ground.

14          MS. STRICKLAND:  Okay, thank you, your Honor.  I

15  think we're just a little confused.  They have objected

16  to -- we have moved to admit our trial exhibits.  They

17  have objected to some of our exhibits on various

18  grounds.  This deposition transcript, for example, it's

19  our understanding that they don't actually object to us

20  using the deposition, so we're a little confused as to

21  why, um, some of our exhibits are not admitted into

22  evidence, and we would appreciate a chance to make

23  arguments as to other exhibits, why we believe their

24  objections are invalid.  But I understand if your

25  Honor's ruling is that that's outside the scope of this

1  matter.

2        THE COURT:  Well that is my ruling and we'll

3  address that at an appropriate time.

4        All right.  Is that it for this witness?

5        (Pause.)

6        MS. STRICKLAND:  Um, I believe so.  If I could

7  just have one moment please to review my notes?

8        THE COURT:  Of course, you may.

9        MS. STRICKLAND:  Thank you.

10        (Pause.)

11        MS. STRICKLAND:  That's all I have.  Thank you,

12  your Honor.

13        THE COURT:  Any redirect, Mr. Kolsky?

14        MR. KOLSKY:  Just a few questions, your Honor.

15  Thank you.

16        THE COURT:  Very well.  Thank you.

17        I neglected, when I came back on the bench, to see

18  whether we've reached agreement as to the, um,

19  deposition and expert report of the plaintiff's expert

20  and the expert reports of the defendants's experts.

21  Have we, Mr. Kolsky?

22        MR. KOLSKY:  Your Honor, I'm sorry, I did say I

23  had a few questions for redirect.

24        THE COURT:  Oh, I misheard you.  We'll take those

25  questions and then I'll put my question to you.  You go

```
1   right ahead.

2

3   REDIRECT EXAMINATION BY MR. KOLSKY:

4   Q.    Mr. Ishida, would you please take out Exhibit 7,

5   which is the letter of counseling.

6   A.    (Turns.)  Yes.

7   Q.    So this letter on Page 2 refers to, um,

8   Mr. Martinez's use of the marriage metaphor, correct?

9   A.    That's correct, yes.

10  Q.    Okay.  Do you consider that to have been an act of

11  discrimination by Mr. Martinez?

12  A.    No.

13  Q.    And then below that it refers to -- there's a

14  section titled "No Physical Touching," um, and it refers

15  to a remark by Mr. Martinez.  Do you consider that to

16  have been an act of discrimination?

17  A.    No.

18  Q.    And, um, in that section it says "At least you

19  weren't touched," or words to that effect.  Why does the

20  letter say "or words to that effect"?

21  A.    Well I think it, um -- again I took this from the

22  investigator's report and I think the investigator used

23  that, because I don't know if these were the exact words

24  that were used.

25  Q.    You don't know the exact words Mr. Martinez used,
```

1    is that right?

2    A.    Right, which is why I used "words to that effect."

3    Q.    Moving on to the next page in the section entitled

4    "Disapproval of Seeking Outside Advice."

5    A.    Yes.

6    Q.    Do you consider that to have been an act of

7    discrimination by Mr. Martinez?

8    A.    No.

9    Q.    And then below that there's a section titled

10   "Shifting Responsibility."  Do you consider that to have

11   been an act of discrimination by Mr. Martinez?

12   A.    No.

13   Q.    Moving on to the next page, the last page in the

14   document, um, your letter cites the wrongful conduct

15   standard under Chapter 9 of the plan, correct?

16   A.    That's correct.

17   Q.    Does Ms. Strickland have any rights under Chapter

18   9?

19   A.    No.

20   Q.    You were asked about Exhibit 18, which is the

21   e-mails where you say "You're doing a great job," or

22   similar words.  Do you recall those e-mails?

23   A.    Yes, the, um -- what was the date again?

24   Q.    That was going to be my question for you.  Could

25   you, um -- could you see if you can pull that document

1   up in front of you.

2   A.   (Turns.)

3       MR. KOLSKY: Mr. Spears, could you bring up

4   Defendants's DG, which is now Trial Exhibit 18.

5       (On screen.)

6   Q.   Mr. Ishida, the document is now displayed on the

7   screen, um, and it says, "I think you're doing a great

8   job, Tony," is that right?

9   A.   Um, yes.

10   Q.   So what was the -- what is the date that appears

11   on this, um, on this e-mail?

12   A.   This is -- well the top of the e-mail is dated

13   June 12th, 2019, but I don't think that's correct.

14   Q.   Do you know why it has the June 12th, 2019 date?

15   A.   Well I think -- my understanding was that when we

16   -- we, the Court, turned over these documents, there was

17   some tracking error because at the time we were moving

18   e-mail servers, and so I think some of the e-mails that

19   we turned over had been misdated. And so that's why --

20   I don't think this is the correct date because if you

21   look down at the previous message in that e-mail string,

22   it's dated August 14th, 2018. So I don't think the June

23   12th, 2019 date is correct.

24   Q.   Do you recall approximately when you sent that

25   e-mail to Mr. Martinez?

A.    It would have been around August 14th, 2018.

Q.    At that time had Ms. Strickland made any allegations of retaliation, discrimination, or any other wrongful conduct against Tony Martinez, as far as you're aware?

A.    No, the first time I became aware of the plaintiff's allegations against Mr. Martinez was on September 10th, 2018 when she filed her Chapter 9 and 10 requests.

Q.    You were also asked about Exhibit 6, your memorandum to the Chief Judge.

       Why did that memorandum include the wrongful conduct standard from Chapter 9?

A.    Well again this was -- this was -- I wasn't intending to imply that there was wrongful conduct, I wasn't intending to imply that discipline was necessary, I just tried to give Chief Judge Gregory kind of the overall scope, "This is what the universe looked like" and "This is how Chapter 9 functions," and "These are decisions that he needed to maintain in the Chapter 9," um -- "the Chapter 9" -- excuse me, "the Chapter 9 matter."

       THE COURT:  I'm sorry, I didn't hear you clearly?

       THE WITNESS:  My apologies, Judge.

       What I was saying was that, um -- what I was

1    trying to lay out for Judge Gregory was how the whole

2    process worked, decisions that he needed to make, and

3    the Chapter 9 matter.

4             THE COURT:  Thank you.

5             MR. KOLSKY:  No further questions.

6             THE COURT:  Ms. Strickland, anything further for

7    this witness?

8             MS. STRICKLAND:  Yeah, just very briefly, your

9    Honor.

10

11   RECROSS-EXAMINATION BY MS. STRICKLAND:

12   Q.    When you say -- Mr. Kolsky asked you about various

13   findings in the letter and you said that you believed

14   they are not examples of discriminatory conduct.  Are

15   you basing that on Title VII standards or any sort of

16   objective standard for evaluating misconduct?

17   A.    No, I'm saying that they were not, um, you know

18   protected -- they did not implicate a protected class.

19   I think there were -- if you look at the context, there

20   were other reasons why, um, Mr. Martinez had said those

21   things.

22   Q.    Is that your personal opinion or is that based on

23   an objective legal standard?

24   A.    Well this is -- this is what's based on my

25   understanding as is borne by the investigation report.

```
 1          MS. STRICKLAND:  Let's pull up Trial Exhibit 18.
 2          (On screen.)
 3   Q.    Okay.  So Mr. Kolsky asked you, when you sent this
 4   e-mail on August 14th, regarding -- requesting Heather
 5   Beam, whether you were aware of allegations of
 6   Mr. Martinez's involvement in the situation at the time
 7   you sent the e-mail, is that correct?
 8          MR. KOLSKY:  Objection, misstates the question.
 9          THE COURT:  It does.
10          Put another question.
11          MS. STRICKLAND:  Okay.
12          Let's scroll down to Bates 2861, it's the second
13   page.
14   A.    I'm not seeing anything on my screen.
15   Q.    Oh, sorry.  (Pause.)  So -- yeah, it is right
16   here.
17          MS. STRICKLAND:  Yeah, so just go ahead and scroll
18   it.
19          (Scrolls.)
20   Q.    Okay.  So is this the e-mail where you talk about
21   Mr. Martinez's earlier involvement in the matter?
22   A.    Um --
23   Q.    In that first paragraph did you say --
24   A.    If you can scroll up and let me look at the date
25   so I can kind of orient myself.  (Looks.)  Okay.
```

```
 1   Q.    So did you say in this e-mail "I might say that
 2   because of your earlier involvement in the matter, that
 3   you are recusing and appointing Heather as your designee
 4   to investigate the allegations"?
 5   A.    Okay, yes.
 6   Q.    And then your -- your e-mail --
 7         MS. STRICKLAND:  If you could just scroll up to
 8   the top.
 9         (Scrolls.)
10   Q.    When you said, "I think you're doing a great job,
11   Tony, your organizational changes are brilliant," was
12   that after you sent the prior e-mail I just read?
13   A.    (Looks.)  Um, yeah, I think the way it's sequenced
14   in this document, I would say it was after.
15   Q.    Thank you.
16         MS. STRICKLAND:  That's all I have.
17         THE COURT:  Nothing more for this witness?
18         (Pause.)
19         MR. KOLSKY:  No further questions from the
20   government.
21         THE COURT:  All right, you may step down,
22   Mr. Ishida.  Thank you.
23         (Steps down.)
24         THE COURT:  And, Mr. Kolsky, what about this
25   admitting expert reports?
```

1        MR. KOLSKY:  With your Honor's permission,

2    Ms. Young will address that.

3        THE COURT:  I'll hear you, Ms. Young.

4        MS. YOUNG:  Your Honor, we think the Court will

5    benefit from the live testimony of our expert, who's

6    already on his way here and traveling here today.  The

7    deposition testimony and declarations of plaintiff's

8    expert is hearsay, and we object, but we'd be okay with

9    him appearing by video.

10        THE COURT:  Your rights are saved.  Well, no,

11   that's a good point.

12        What do you say, um, they now are amenable to your

13   expert appearing by video?  Um, either one of you, who

14   is going to address that?  Is that all right?

15        MR. STRICKLAND:  We wouldn't have the time to

16   schedule it now, and as we've stated by our filing, we

17   have lost our litigation grant because of the withdrawal

18   of counsel.  So we don't have the funds to pay for him

19   even to appear by video.

20        THE COURT:  The Court is admitting the deposition,

21   in view of the absence of the witness, um, but no ruling

22   by this Court prevents you from putting on -- the

23   defense I'm speaking to now, putting on your experts

24   live.  Indeed not.  Of course you may do that.

25        All right.  Call your next witness.

1          MS. YOUNG:  Thank you, your Honor, just one moment

2     while we search for the witness.

3          (Pause.)

4          MS. YOUNG:  Your Honor, we call Anthony Martinez.

5          THE COURT:  He may be called.

6          (ANTHONY MARTINEZ, sworn.)

7          (Interruption by Court Reporter.)

8          THE COURT:  Yes, I was going to ask the same

9     question.

10         It's hard to identify voices.  Who is going to

11    examine this witness?

12         MS. YOUNG:  I will be, your Honor, Danielle Young

13    for the defense.

14         THE COURT:  Thank you, Ms. Young.

15

16    * * * * * * * * * * * * * * * *

17    ANTHONY MARTINEZ

18    * * * * * * * * * * * * * * * *

19

20    DIRECT EXAMINATION BY MS. YOUNG:

21    Q.   Mr. Martinez, let's begin by having you introduce

22    yourself and telling us about your educational

23    background.

24    A.   My name is Anthony Martinez.  I graduated from

25    Rutgers University with a Bachelor's degree in 1976 and

1   I graduated from Siena Law School in 1981.

2   Q.    And can you tell us about your work experience

3   after law school?

4   A.    After law school I clerked for a, um, a criminal

5   judge, a Superior Court judge In New Jersey for a year.

6   After I left that position, I was an Assistant

7   Prosecutor in a county prosecutor's office for two

8   years.  After that I was in a solo practice where I did

9   exclusive criminal defense in Jersey City, New Jersey,

10  for three years.  Then in March of 1987, I was hired as

11  an Assistant Federal Public Defender in the Middle

12  District of Florida out of the Tampa division, I worked

13  there from 1987 to 2000.  In 2000, I was hired as an

14  Assistant Federal Public Defender in the Eastern

15  District of Tennessee, and then within a year I became a

16  First Assistant.  And so I was a First Assistant in the

17  Eastern District of Tennessee for approximately 15

18  years.  And after that I then joined the Federal Public

19  Defender's Office in the Western District of North

20  Carolina in 2017, and I was there for approximately 4

21  1/2 years, 5 years.

22  Q.    And what are you doing now, Mr. Martinez?

23  A.    I'm retired and spending some good time, quality

24  time with my grandchildren.

25  Q.    Let's turn now to what you did before you retired.

What led to you being hired as the Federal Defender for
the Western District of North Carolina?

A.    I was working as the First Assistant in the
Eastern District of Tennessee, in Chattanooga, um, and a
co-worker, my former co-worker, um, then working in the
Chattanooga office with me, her name is Mary Ann
Lacogan, she was working in the Asheville division here,
and she advised me that there was an opening in the
Federal Defender's Office here in the Western District
of North Carolina, and that she thought I would be a
good fit, um, only because I had worked in an FDO when I
was in Tampa.  I worked at an FDO, a Federal Defender
organization, for 14 years, and then I worked in a
community-defender organization for 16 years in
Tennessee.  And this is --

Q.    What changes did you make to the office when you
came on-board?

A.    When I came on-board I looked at the
organizational structure, that was the first thing we
did, and what I observed is that there was no structure
basically.  And I always came from -- when I worked in
Tampa and I worked in Tennessee I came from, you know, a
heavy-litigation-type office for sure and a quasi-
team-related or oriented structure, a trial-team
structure.  So the first thing I did was effectuate a

trial-team structure.  So I split the office up into
trial teams, an appellate unit, and a trip team, and an
administrative unit team.

Q.    What was your leadership --

THE COURT:  How many -- excuse me.  How many
attorneys, including yourself, were in that office
during your tenure, sir?

THE WITNESS:  In the Charlotte office or in the
entire office, sir?

THE COURT:  The entire office, and where they were
located.

THE WITNESS:  Okay, I'm trying to recollect now,
it's been 5 years.

At that time I had 40 FTEs, 40 full-time
employees, I want to say approximately half of them were
attorneys, um, approximately.  And if the math works
out, there were about 9 trial-team attorneys in
Charlotte.  There were two R&Ws, and that's 11 in
Charlotte.  Then we had an appellate unit that had 3 or
4, um, in Charlotte.  So that's 14, 15.  And then I had
about 4 attorneys in Asheville.  So that's approximately
what the split-up was.

THE COURT:  Thank you.

Go ahead, Ms. Young.

MS. YOUNG:  Thank you, your Honor.

1    Q.    What was your leadership style as the Federal

2    Defender, Mr. Martinez?

3    A.    My leadership style, I call it "servant

4    leadership," and what I mean by "servant leadership" is

5    I always want to lead by example.  And so, um, if

6    there's any issue that came up that people could not

7    handle, any -- because I thought in my career, having

8    done this -- by this time I had 32 years experience, I

9    had experience defending all kinds of different

10   defendants, criminal defendants in federal court, and so

11   I would take on the task and take the responsibility and

12   do what I expected other attorneys and other people

13   would do in the case.  And so that was my style.

14   Q.    And were you involved in Ms. Strickland's hiring?

15   A.    I was not directly involved.  I was still in the

16   Chattanooga division in the Eastern District of

17   Tennessee, I had already accepted an offer to be the

18   Defender, um, with the Fourth Circuit, but I was

19   awaiting my background clearance, and so what I did was

20   -- Ros Richardson, who was the Defender at that time,

21   um, wanted me to participate, listen to the interview,

22   and so I skyped into Ms. Strickland's interview from

23   Chattanooga.  So that was my participation and role.

24   Q.    And were you involved in the decision of whether

25   or not to hire Ms. Strickland?

A.    I was involved to the extent that Ros Richardson

spoke to me and said, "Mr. Martinez, I'm inclined to

hire Ms. Strickland, do you have any objection?"  And I

said "No, I have no objection, she appears to be

well-qualified for the position."  And she said, "Okay,

fine.  Thank you."  And that was the extent of it.

Q.    How did Ms. Strickland's qualifications compare to

other Research and Writing attorneys at the Federal

Defender's Office?

A.    Well there were only two in Charlotte, two

Research and Writing Specialists.  Um, Caleb Newman, he

had limited experience, I would say somewhat similar to

Ms. Strickland.  And then Jared Martin had much more

extensive experience, I think he worked for the Indiana

Community Defender for about 8 or 9 years.

Q.    And when Ms. Strickland was hired, what did you

know about her expectation that she would transition to

a AFPD role from a Research and Writing role?

A.    When she was hired, I had no knowledge of her

expectations, I did not participate in that discussion

that she had with Ms. Richardson.  Ms. Richardson did

not consult with me about any expectations.  I had

absolutely no knowledge of her -- of Ms. Strickland's

expectations.

        MS. YOUNG:  Mr. Spears, can you please show

1    Exhibit FI to the witness.

2          (On screen.)

3    Q.    Do you recognize this document, Mr. Martinez?

4    A.    (Looks.)  Yes, ma'am.

5    Q.    And what is it?

6    A.    It's an e-mail that I received from Caryn Devens

7    to myself, um, copied "JP Davis," and the subject matter

8    was "Job Transition," dated December 5th, 2017.

9          MS. YOUNG:  Your Honor, the defendants move to

10   introduce FI into evidence.

11         THE COURT:  Any objection?

12         MS. STRICKLAND:  No, your Honor.

13         THE COURT:  FI is admitted, Exhibit 164.

14         (Exhibit 164, marked.)

15   Q.    Mr. Martinez, do you recall meeting with

16   Ms. Strickland, after she sent you this e-mail, to

17   discuss her transition to the Assistant Federal Defender

18   role?

19   A.    I don't recall any -- this specific meeting.  My

20   only recollection is that I did meet with her on at

21   least two or three different occasions, and we discussed

22   -- in particular I was interested in finding out which

23   track she would take within our office.  And when I --

24   Q.    All right.  And at those meetings, Mr. Martinez,

25   what did you discuss about a timeline for promoting

1    Ms. Strickland to an AFPD role?

2    A.    I didn't discuss any timeline with her in terms of

3    when she would become an AFPD.

4    Q.    And why not?

5    A.    Because my philosophy is I would never give an R &

6    W a timeline to an AFPD, because there are too many

7    factors that go into considering whether a person is

8    prepared to be an AFPD, um, at that time.  Because first

9    I would want to find out, you know, how does she handle

10   -- or anyone handle clients?  How do they relate to

11   clients?  How do they relate to other members of the

12   team?  How do they relate to judges?  What are their

13   research skills?  What are their writing skills?  What

14   are their oral skills?  Going to visit clients?  Going

15   to FBI?  DEA?  So there's many factors that go into --

16   and around this time, um, that would go into considering

17   whether I would promote somebody to an APD.  I would not

18   give a 2-month or 3-month timeline because I would not

19   know whether this person is ready to be an APD.

20   Q.    Thank you.

21         MS. YOUNG:  Mr. Spears, can you please take down

22   what has now been identified as Exhibit 163.

23         (Off screen.)

24   Q.    Who decided that Mr. Davis would be

25   Ms. Strickland's mentor?

A.    I did.

Q.    And how did you decide that Mr. Davis would be
Ms. Strickland's mentor?

A.    Well, both Ms. Strickland and myself started
around the same time and so when I came on board I
realized she lacked a lot of experience.  I mean she had
no experience whatsoever in practicing in a Federal
Public Defender's office where she'd been handling cases
in federal court.  And so I wanted to make sure that
there was somebody that could just walk her through the
ropes, from A through Z, on how to file a motion, when
to file a motion, how to go to a jail to speak to her
client, guideline sentencing, um, and all the statutes.
And so I thought that Mr. Davis would be the perfect
person basically because Mr. Davis -- we were talking on
a regular basis, every single day, and his office was
physically right next to mine.  And based on his level
of experience, I thought he would be a good person.  I
didn't need anyone -- necessarily anyone that had a lot
of experience, I just needed someone who would be able
to explain the basics of federal practice in federal
court, and in my eyes Mr. Davis was the perfect person.

Q.    Mr. Martinez, what do you recall about meeting
with Ms. Strickland on June 6th, 2018?

A.    I met with Ms. Strickland, the purpose of the

1    meeting was to discuss what was happening on the *Dixon*

2    trial, which was a case that we had in our office, um,

3    that we inherited when I came in, um, and it involved a

4    very serious offense, the client was very difficult to

5    deal with, and it involved him facing, if he was

6    convicted, life mandatory without any possibility of

7    parole in federal prison.  We had a meeting and I asked

8    -- there were concerns about what the first, um, chair

9    was doing or not doing on the case, so I asked Ms. Holly

10   Dixon, our legal Assistant, to take notes, um, and then

11   we sat down -- and because Ms. Strickland at that time

12   was working very hard, was working -- and I really

13   appreciated all the work she was doing, she was the

14   Research and Writing Specialist on the case, she was

15   researching a lot of issues, there were a lot of motions

16   that needed to be filed.  And so I was just asking, um

17   -- the purpose the meeting was "Hey, what's going on

18   with this case?"

19   Q.    What if anything did Ms. Strickland mention to you

20   about how that case was affecting her other work?

21   A.    One of the first words she started talking, saying

22   was that this case is causing -- "My working on this

23   case is causing tension with other cases that I have,

24   because I just now had to cancel a meeting that

25   Mr. Davis has scheduled for me to shadow to meet with a

1    client and review a PSR," a Presentence Investigation

2    Report, um, "but I had a conflict because I scheduled a

3    discovery review meeting with the FBI on this case.  And

4    so, um, I was surprised on how disturbed Mr. Davis was,

5    on his reaction -- I was shocked by his reaction, and I

6    thought that the shadowing events were optional and not

7    mandatory."

8    Q.    Mr. Martinez, you just testified "I was shocked

9    and disturbed."  Are you referring to yourself?

10   A.    No, no, this is what Ms. Strickland -- I'm sorry,

11   I was -- this is what Ms. Strickland was conveying to me

12   on how she was shocked at Mr. Davis's reaction on being

13   disturbed, that she assumed that these meetings, these

14   shadow meeting were optional and not mandatory.  Thank

15   you.

16   Q.    Thank you.  And what was your impression of the

17   nature of the disagreement between Ms. Strickland and

18   Mr. Davis at that time?

19   A.    The nature of it was basically, in my mind, a

20   breakdown in communication.

21   Q.    And what if anything did Ms. Strickland say to you

22   about that meeting, about how Mr. Davis was

23   communicating to her?

24   A.    She just -- the words she used was "He was

25   disturbed."

1  Q.    And how did things resolve after that meeting

2  during the month of June, are you aware of any other

3  issues between Mr. Davis and Ms. Strickland?

4  A.    I don't recall any other issues, No, ma'am.

5  Q.    Did Ms. Strickland ever serve as second chair on

6  the *Dixon* case?

7  A.    Yes, she did.

8  Q.    And how did Ms. Strickland come to be assigned

9  second chair on the *Dixon* case?

10 A.    I don't recall the date, off the top of my head,

11 but I know I was on my way to a training out of the

12 office, I was on my way to Kansas City, I had to grab a

13 flight that evening from Charlotte, and I think it was

14 like 5:00 or 5:30 when she approached me and advised me

15 -- and asked to volunteer.  She said, "Hey, Tony, I'm

16 interested in second-chairing the trial, the *Dixon*

17 trial, do you have any objection to me being second

18 chair?"  And I said "No."  And I literally walked out

19 and took my flight.

20 Q.    Why did you later get involved in rearranging who

21 was handling the *Dixon* matter?

22 A.    Well eventually, um, the trial of that matter was

23 scheduled for a date-certain within a two- or three-week

24 period of time.  The trial had already been continued on

25 at least 2 or 3 occasions, so there were three

1    continuances.  The lead counsel in that case was leaving

2    the office.  The client -- again there were very serious

3    charges, facing mandatory life without parole in federal

4    prison.  And so I had to do something, I had to step in,

5    and so I stepped in and I took over the case.

6    Q.    And why did you decide to adjust Ms. Strickland's

7    role on the *Dixon* case and no longer have her serve as

8    second chair instead of only assigning a new first

9    chair?

10   A.    It was a tactical strategic decision because I

11   felt that the only way I could get a continuance from

12   the judge -- I needed a continuance, I needed more time,

13   I was going to take the case over and I did.  I needed

14   more time to prepare for that trial.  And the only way I

15   was going to be able to get -- there was only three

16   continuances and the only way I could get another

17   continuance was to tell the Court that the first chair

18   had been removed, the first chair attorney was leaving

19   the office, and the second chair -- they both have been

20   removed, and I'm taking over the case.  That I needed to

21   prepare for this trial.  The client is facing very

22   serious charges, a very serious sentence, and I needed

23   more time to prepare.  And this was a strategic decision

24   on my part and the Court granted my request.

25   Q.    Who else did you speak to about Ms. Strickland's

1   assignment on the *Dixon* case?

2   A.   I talked to -- Ann Taylor was a trial team leader,

3   Peter Adolph was a trial team leader, and JP Davis had

4   also talked to me about Ms. Strickland second-chairing

5   the case.

6   Q.   And what concerns did they raise?

7        MS. STRICKLAND:  Objection, hearsay.

8        THE COURT:  Yeah, sustained.

9   Q.   Were you aware of any concerns or did you have

10  any -- sorry, did you have any --

11       MS. STRICKLAND:  Objection, hearsay.

12  Q.   Did you have any concerns about Ms. Strickland's

13  assignment as second chair on the *Dixon* case?

14  A.   I did not have any concerns, but there were

15  concerns -- initially I did not have any concerns, um,

16  but based on the conversations --

17       MS. STRICKLAND:  Objection, hearsay.

18       THE COURT:  Yeah, it is, Ms. Young, and you want

19  it for the substance of the matter, not for just the

20  communication.  Sustained.  He's told us why she was

21  removed on that case.

22       MS. YOUNG:  Your Honor, it goes to his state of

23  mind and his understanding of -- what his state of mind

24  was when he made the decision to reassign Ms. Strickland

25  on that case.

```
 1          THE COURT:  It may be, but it's the substance that
 2    you want.  We're not here trying out how he deploys his
 3    resources.  He's told us he made a strategic decision
 4    because he needed a continuance from the trial judge.
 5    He got it.
 6    Q.    Any other reasons you decided Ms. Strickland
 7    should be reassigned on the *Dixon* case?
 8          MS. STRICKLAND:  Objection, that relies on
 9    hearsay.
10          THE COURT:  It does.  Sustained.
11          MS. YOUNG:  Well it --
12          THE COURT:  Well you may say so, but I've made my
13    ruling, you want it for the substance in this case.
14    It's hearsay.  Now move on.
15          (Pause.)
16    Q.    Did you personally have any ineffective assistance
17    of counsel concerns at the time?
18    A.    Clearly, and I think in capital letters, that was
19    what, um -- that was exactly what was driving this whole
20    thing.  I knew going forward, um, that -- first of all,
21    if the first chair even was on the case, it was going to
22    be a possible ineffective assistance, and if I allowed
23    Ms. Strickland, who has the least amount of experience
24    in the office to continue, there was a possibility of
25    ineffective assistance of counsel.  And so that was
```

1    another reason why I just basically, um -- the strategic

2    reason was for a continuance, but why I took it over was

3    more senior experience, and I handled it.

4    Q.    What if any role did Ms. Strickland have on the

5    *Dixon* case after she was no longer serving as second

6    chair?

7    A.    My recollection is that she continued the Research

8    and Writing support after that.

9    Q.    Thank you.

10         MS. YOUNG:  Mr. Spears, can we please have

11   Defendants's Exhibit FY for the witness.

12         (On screen.)

13   Q.    Mr. Martinez, do you recognize this document?

14   A.    Yes, ma'am.

15   Q.    And what is it?

16   A.    This is an e-mail from myself, um, to JP Davis,

17   the subject matter is "Jeff King cases to Caryn," dated

18   June 26th, 2018.

19         MS. STRICKLAND:  Objection, hearsay, to the extent

20   it has statements from others.

21         THE COURT:  He hasn't offered it yet.  She hasn't

22   offered it yet.

23         MS. YOUNG:  Your Honor, defendants move to admit

24   FY into evidence, it goes to Mr. Martinez's

25   understanding of Ms. Strickland's workload.  We're not

1    using it for the truth of the matter asserted.

2         MS. STRICKLAND:  Objection, hearsay.

3         THE COURT:  His understanding of her workload.  So

4    -- but that depends upon the accuracy of the matters

5    conveyed.  I don't understand?

6         MS. YOUNG:  Your Honor, it's just the fact that

7    the information was conveyed to Mr. Martinez.

8         THE COURT:  And what difference does that make?

9         MS. YOUNG:  It also contains an admission of a

10   party opponent because part of the e-mail contains --

11   part of the chain contains Ms. Strickland's e-mail to

12   Mr. Martinez.

13        THE COURT:  Well I suppose I could admit that, um,

14   but only that.

15        Are you satisfied with that?

16        MS. YOUNG:  I am, your Honor.

17        THE COURT:  All right.  Only the admission, the

18   e-mail from Ms. Strickland to Mr. Martinez, that's

19   admitted Exhibit 165.

20        (Exhibit 165, marked.)

21   Q.   Mr. Martinez, can you tell us about what happened

22   in the lead-up to receiving the e-mail from

23   Ms. Strickland?

24   A.   Yes.  Um, Mr. King, like I indicated, he was first

25   chair in this case, um, Mr. Jeff King was leaving the

office, and, um, whenever anyone leaves the office --
anyone leaves the office, we have to divvy the cases and
spread them out to the other attorneys.  I want to say
Mr. King had approximately 30 or 40 cases.  And so I met
with the team leaders to figure out which cases would go
to which attorneys.  And so obviously a consideration of
the most difficult cases will go to the most experienced
attorneys and the least difficult cases will go to the
least experienced attorneys generally, and that's what
we did in this case.

Q.    And what happened after you divvied up the
leaving-attorney's cases?

A.    We decided that Ms. Strickland would have, to my
recollection, five cases that were the least
complicated, they were mostly all resolved already and
all that required was for her to go to court and, um,
have the client sentenced on either a violation of
supervised release or an illegal reentry.  I then
received an e-mail from her -- we sent an e-mail out to
all the attorneys and we advised Ms. Strickland what
cases we decided, and then she sent an e-mail back
indicating that she was too busy, she was working on
other cases for Josh Carpenter in appellate, um,
Mr. Kaite in the trial unit, and that she was just too
busy and she would not be able to handle those cases.

Q.    And how did you react to that e-mail?

A.    I was -- I was upset.  I'd never seen that happen
quite frankly in 35 years of experience as a Defender.
Within our culture we back each other up, when someone's
down, we take their cases, when someone's up, we bolster
them, and it was a shock to me that she had made herself
available, just weeks before this, to be second chair on
a trial where the client was facing mandatory life
imprisonment, it was an extremely difficult client to
handle, she was willing to second chair and work on that
case, she wasn't that busy, and I take her off that
case, and now just a week later we're asking her to
handle really the most simple cases in federal practice
and she was too busy.  And so that clearly I felt that
it was in her interest -- this is my observation of
that, it is to her interest --

        MS. STRICKLAND:  Judge, it lacks foundation,
speculation.

        THE COURT:  No, he's telling us his reaction.  He
may tell us his reaction.

        Go ahead, sir.

A.    When -- my reaction is that when it's her best
interest to handle something, like a big trial, then she
will do it, but when it's not so much in her interest to
help a fellow attorney handle four simple cases, she's

1   not willing.  And so it showed me she was not basically
2   a team player at that point.
3   Q.    Thank you.  And you testified a moment ago you
4   felt upset.  What if anything made you calm down after
5   feeling upset upon receiving this e-mail?
6   A.    When I say "upset," I mean I -- I wasn't yelling
7   at anybody, that was just my reaction.  I generally, you
8   know, stay calm when I'm talking to employees, I don't
9   yell.  What I did was I just took a walk around the
10  building -- generally whenever I feel like I'm getting a
11  really negative reaction, I take a walk.  And by the
12  time I got back to the office I had calmed down and I
13  indicated that I had calmed down.
14  Q.    Okay, thank you.
15        Turning now to July, what happened on July 2nd
16  with Ms. Strickland?
17  A.    On July 2nd, um, we went, I think back and forth,
18  about -- she wanted to meet with me and we agreed to
19  meet that day and she came to my office.  And she
20  immediately started telling me, um, "I just want to know
21  if I have your support, if you have my back?  If
22  you're -- and I want to put you in the loop.  And I just
23  want to let you know that I want to put boundaries on
24  Mr. Davis's way of talking to me.  Because when I
25  canceled that PSI interview with him, he became angry

1    and raised his voice.  And I want to let him know he is

2    not to talk to me that way going forward."  I then said,

3    "Good."  You know I mean -- to me that was good that she

4    was going to try to communicate with Mr. Davis and let

5    him know what the boundaries were with her.  And so I

6    encouraged it.

7    Q.    At this time what did you think she was keeping

8    you in the loop about?

9    A.    I had no idea.

10   Q.    And what do you think she meant by "setting

11   boundaries"?

12   A.    That he shouldn't raise his voice when he

13   disagrees with her.

14   Q.    And how long was the meeting on July 2nd with

15   Ms. Strickland?

16   A.    It was short, it wasn't -- I don't recall it being

17   more than 5 minutes, 10 minutes.

18   Q.    And what was your understanding of what

19   Ms. Strickland was informing you about?

20   A.    She was informing me about a disagreement or

21   her -- about Mr. Davis's reaction to her.  And I thought

22   again this was a breakdown of communication between a

23   manager and an employee and the employee was going to

24   talk to the manager and say, "I'm setting boundaries."

25   Q.    At that time to what extent did you think

1    Ms. Strickland may have been informing you about sexual
2    harassment?
3    A.    I had no indication she was informing me of that
4    whatsoever, I had no facts, all I had was a cancellation
5    of a PSI interview and Mr. Davis being angry.  I had no
6    other facts before me.
7    Q.    Thank you.  And what did you decide to do after
8    the July 2nd meeting with Ms. Strickland?
9    A.    I decided to bring them together.  So that
10   occurred July 2nd.  On July 5th, three days later, I
11   decided to bring Mr. Davis and Ms. Strickland together
12   and meet.  And then, um, I caught them off-guard,
13   meaning it wasn't a scheduled meeting.  Mr. Davis was in
14   the office and I told him, "I'm going to meet with you
15   and meet with Ms. Strickland also, both of you
16   together."  I went to Ms. Strickland's office and I said
17   "Come to my office, I'm going to meet with you and JP."
18   She came way with a notepad.  He came with a notepad.  I
19   said "Please, guys, put the notepads down."
20   Q.    And why did you tell them to put the notepads
21   away?
22   A.    Because I felt like they were both very defensive
23   with one another and I just wanted to bring a barrier
24   down, and I think it's difficult for people to talk when
25   one person's talking and the other one is taking notes

1    of what they're saying.  And so I just wanted no one to

2    take notes and just talk.

3    Q.    And what did you discuss at the beginning of that

4    meeting?

5    A.    And so the first thing, after I said that,

6    Ms. Strickland made it really clear, "I do not want to

7    talk to you in the presence of Mr. Davis," and I said

8    "Fine," "Mr. Davis, you're excused," and he left the

9    room and we closed the door.  Then the first thing out

10   of Ms. Strickland, what she mentioned to me, was the

11   fact that -- she asked "Is Mr. Davis questioning my

12   performance?"  And I said, "No, I think you're

13   misunderstanding, he's not questioning your performance.

14   He never has.  We're both very appreciative of all the

15   hard work that you've done on the *Dixon* case and there's

16   no issue about performance."  And she then said, "Well,

17   okay, but I do want to tell you about an incident I had

18   with Mr. Davis."  And I said "Fine."

19        "There was one day that we stayed after, late

20   hours to work in the office, it was raining, I had

21   commuted to the office with my bicycle, I had --

22   Mr. Davis had asked me if I needed a ride?  I told him

23   no.  I got on my bike, I went to the elevator, went

24   downstairs to the lobby, and Mr. Davis is standing

25   there.  I then, um, walked, um" -- she indicated -- when

1    I say "I," I'm sorry that's her speaking.  She indicated

2    that she, um, saw Mr. Davis and then he asked her, "Are

3    you sure you don't need a ride?"  And she said, "No, I

4    don't need a ride."  Then she walked out one exit and he

5    walked out another exit.

6    Q.    What did she tell you, if anything, about

7    out-of-office drinks or lunches between her and

8    Mr. Davis?

9    A.    She didn't say anything at that meeting.

10    Q.    And what else, if anything, did she tell you about

11    her interactions with Mr. Davis at that meeting?

12    A.    There was nothing else at that meeting.

13        THE COURT:  Well wait a minute.  You've told us,

14    after she recounted this incident that you have now

15    relayed to us, what happened next in that meeting?  Who

16    spoke?

17        THE WITNESS:  Okay.

18    A.    Okay, what happened next was, um, she indicated

19    she was -- that made -- that situation made her feel

20    very uncomfortable.  I then asked her specifically,

21    "When you say 'uncomfortable,' are you suggesting that

22    he sexually harassed you?"  She said clearly, "No, I am

23    not alleging that he was sexually harassing me, and

24    please don't accelerate what I'm telling you about

25    Mr. Davis."

1          And, um, we talked a little bit about other

2     things.  I felt she felt comfortable and I said at that

3     point, "Do you mind if I bring in Mr. Davis back into

4     the office?"  And she said "No."  I was convinced there

5     was no sexual harassment at that time, no allegation of

6     sexual harassment at that time.  I brought him in and I

7     advised Mr. Davis that -- I made no mention to

8     Mr. Davis, to maintain her confidence -- she also asked

9     me to please keep it confident, "I don't want to share

10     this with anyone else in the office or with Mr. Davis."

11     I then shared with Mr. Davis her concern that she

12     thought that he was questioning her performance.  He

13     then basically corroborated what I said, he said, "No, I

14     think there's a misunderstanding, I am not questioning

15     your performance, the only issue I do have is that you

16     blew me off when we had scheduled the PSI interview."

17     Q.     Thank you.  And what --

18          MS. STRICKLAND:  Objection, hearsay.

19          THE COURT:  I -- in the exercise of discretion,

20     I'm going to let that stand.  I'm going to take that as

21     a motion to strike, he had testified -- I treat it as a

22     motion to strike, but I let it stand.

23     Q.     Mr. Martinez, before Mr. Davis returned to the

24     room, what if anything did Ms. Strickland ask about her

25     assignments with Mr. Davis?

1    A.   There was nothing about her assignment to

2    Mr. Davis.  I -- when Mr. Davis reentered into the

3    office, I then -- it was clear that they were both

4    defensive with one another and I suggested that maybe we

5    could change this mentor/mentee relationship.  And I

6    asked Ms. Strickland and she said she agreed, and

7    Mr. Davis agreed, and I suggested another attorney to be

8    her mentor, Aaron Johnson, who had approximately 20, 25

9    years experience, and had a good relationship with

10   Ms. Strickland.  And so I said "How about Aaron

11   Johnson?"  She said, "That's a good idea, no objection."

12   "Mr. Davis, do you have a problem with that?"  "No."  I

13   then instructed Mr. Davis to advise Mr. Johnson that

14   he -- if he's willing, he would be the mentor for

15   Ms. Strickland going forward.

16   Q.   And what were your impressions of how

17   Ms. Strickland reacted to the meeting's conclusion?

18   A.   She was amenable to everything.  I then asked her

19   several times, "Are you comfortable with that?  Are you

20   okay with this?  Is there anything else?"  And she said

21   "No, I am comfortable.  I'm okay with this."  And she

22   left.  And, um, there was another e-mail, I think a

23   follow-up that she sends, and she summarizes the meeting

24   in basically saying, "I just want to make sure that

25   there was no issue about my performance?"  And I said,

1    "No, you've got it right, there was no issue of your

2    performance."  And so I left thinking that was really

3    the primary issue during that meeting.

4    Q.    After the July 5th, meeting, Mr. Martinez, how did

5    you view the breakdown in communications between

6    Mr. Davis and Ms. Strickland with respect to your role

7    as the senior manager of the FDO?

8    A.    I viewed it as it's fairly typical, it happens

9    in -- I can only speak for defender offices, in defender

10   offices a lot of attorneys are under a lot of stress, we

11   are always under a lot of very adverse adversarial

12   situations, we have situations with judges, adversarial

13   situations with U.S. Attorneys, with our clients going

14   to jail in really rough environments.  It's speedy

15   trial, heavy case loads.  So it's a lot of stress.  And

16   it's not unusual for there to be a disagreement between

17   a manager and an employee.  And I feel that my job is to

18   try to mediate the breakdown of communications between a

19   manager and an employee and that's what I was doing on

20   this day.

21   Q.    Thank you.

22          MS. YOUNG:  Mr. Spears, can you please show the

23   witness Defendants's Exhibit EY.

24          (On screen.)

25   Q.    Mr. Martinez, do you recognize this document?

A.    Yes, ma'am.

Q.    And what is it?

A.    It's a legal significant event log and it's July
5th, 2018.

Q.    And did you author these notes?

A.    Yes, ma'am.

Q.    And what are they about?

A.    It summarizes -- I took notes right after the
meeting and it summarizes, um, what occurred in the
meeting.

Q.    Thank you.

       MS. YOUNG:  Defendants move to admit Exhibit EY
into evidence.

       THE COURT:  No objection?

       MS. STRICKLAND:  No, thank you.

       THE COURT:  I didn't hear?  I'm sorry.  No
objection?

       MS. STRICKLAND:  No objection.  I apologize.

       THE COURT:  No, that's fine.

       Exhibit 166 in evidence.

       (Exhibit 166, marked.)

       MS. YOUNG:  Mr. Spears, you can take down that
document.  Thank you.  (Takes down.)  Mr. Spears, please
pull up Defendants's Exhibit EW.

A.    (Looks.)

Q.    Thank you.  Are you familiar with this document,
Mr. Martinez?

A.    Yes, ma'am.

Q.    And what is it?

A.    It's an e-mail from me to Ms. Caryn Devens, dated
July 9th, and the subject matter is "Next steps after
meeting last week."

Q.    And were you responding to an e-mail from
Ms. Strickland?

A.    That's correct.

     MS. YOUNG:  Your Honor, defendants move to admit
Exhibit EW into evidence.

     THE COURT:  No objection to EW?

     MS. STRICKLAND:  No objection.

     THE COURT:  It's admitted, Exhibit 167.

     (Exhibit 167, marked.)

Q.    Mr. Martinez, at the time you received this
e-mail, what was your impression of Ms. Strickland's
performance?

A.    Well like I indicated, she worked hard on the
*Dixon* trial, it was top performance, but there's another
aspect of performance.  There was no issue in terms of
work, hard work, she was a hard worker for the trial,
however overall I had questions about whether she was a
team player because of her initially volunteering to

take the very serious trial and then not being willing
to take very simple cases when we really needed her to
take those cases.

    And there was also a phone call that she made
that, um -- and this is early in May, she had called me
and, um -- because Mr. Davis had asked her to do a
cross-examination of a police officer and she called me
in a panic saying she didn't think she was able to do
it, or do a cross-examination.  I encouraged her, I
said, "You have the ability, you are able to do it, so
do it."  And she did it and she did a great job.  And so
the fact that she was calling me at night concerned that
she would not be able to do it, was not wanting to do
it, sort of questioned to me whether she was made out to
be a defender, because all defenders that I'm aware of,
when coming to the office and lack experience, they're
biting at the bit, they really want to get into court
and they really want to make the oral arguments, they
really want to get involved, and she was sort of in a
panic when she called me.  And so there was this issue
overall.

    So, yes, she was a hard worker, but there was an
issue overall about being a team player, um, and her
willingness, um, to take on those challenges of cross-
examining a police officer in court.

Q.    Thank you.

MS. YOUNG:  Mr. Spears, can you please take down
this exhibit and put up please Defendants's Exhibit EL.

(On screen.)

Q.    Mr. Martinez, are you familiar with this document?

A.    Yes, ma'am.

Q.    And what is it?

A.    It's an e-mail from me, um, it was sent on July
26th to the entire staff, and, um, the subject matter is
"Research and Writing support follow-up," and there's an
attachment of an AFD position.

Q.    And when did you send this e-mail?

A.    This was dated July 26th.

Q.    Okay.

MS. YOUNG:  Defendants move to admit Exhibit EL
into evidence.

THE COURT:  No objection to EL?

(Pause.)

MS. STRICKLAND:  We're going to object on hearsay
grounds.

THE COURT:  What do you say to that?

MS. YOUNG:  It's not hearsay because we're just
using it for the timeline of when the assignment issue
was resolved, so just to show the dates of the fact that
the statements were made, not to show the truth of the

1   matter asserted.

2       THE COURT:  As limited I'll admit it in evidence,

3   168 as limited.

4       MS. YOUNG:  Thank you, your Honor.

5       (Exhibit 168, marked.)

6   Q.   What was the purpose of the July 20th meeting

7   mentioned in this e-mail, Mr. Martinez?

8   A.   In essence it was about the, um, the R&Ws and the

9   R&Ws would be supporting the trial teams, and, um, that

10  basically, um, Jared, um, the -- the requests for work

11  from the attorneys would be funneled through Jared

12  Martin, who was the other R & W, and he would distribute

13  the work to the different attorneys on the different

14  teams.

15  Q.   And why did you decide to have Mr. Martin, um,

16  funnel the work for the different Research and Writing

17  attorneys?

18  A.   He had, I want to say, at least 8 years, um,

19  experience as a Indiana Community Defender before he

20  came to our office, and he had been in our office for

21  several years, he had the most experience as an R and W.

22  He had already done this kind of thing off in Asheville,

23  um, which I say in this e-mail, well that he had already

24  handled the requests from the Asheville office.  And so

25  I thought he was the most logical person to do it.

1    That's why he was selected.

2    Q.    And why was it necessary to make that selection,

3    did something happen beforehand?

4    A.    Yes, I had -- I believe it was on July 20th, there

5    was an extensive meeting that we had with the team

6    leaders, I want to say it took literally hours, and we

7    reshuffled the office.  There were like 35 different

8    moves, and we were trying to just be more efficient in

9    what we're doing as an office.  And, um, inadvertently,

10    um, Caryn would be supporting JP's team.  It was decided

11    that -- I'm sorry, Ms. Strickland would be supporting or

12    doing R & W work for JP Davis's time.  And so that was

13    on July 20th.

14          Soon thereafter, um, I realized that that was

15    inadvertent, it was not intentional, it was just an

16    oversight, that there were so many other matters going

17    on.  And so I contacted Ms. Strickland, I apologized to

18    her for the inadvertence, it was not intentional.  I

19    indicated to her that I would be changing the structure

20    and this was my solution by, um, having Jared then do

21    all of the dishing out of the work or assigning the work

22    that came to him.

23    Q.    Why was the assignment inadvertent?

24    A.    It was not -- it was not purposeful.  Again there

25    were so many things going on.  It wasn't like I am

1    thinking, "Oh, let me put Ms. Strickland on to do

2    Research and Writing work for Mr. Davis."  It wasn't an

3    intentional thing.  It was just inadvertent in that

4    respect.

5    Q.    What if anything had you --

6          THE COURT:  Excuse me, I am going to interrupt.

7          Go back to your meeting on July 5th, Mr. Martinez,

8    when you suggested that Mr. Johnson be Ms. Strickland's

9    mentor and she agreed with that.  I get the sense from

10   your testimony that after July 5th -- well let me ask

11   the question without stating anything.

12         As the office was then organized on July 5th, was

13   she the Research and Writing Specialist for any

14   particular team and if so, whose team?

15         THE WITNESS:  On July 5th?

16         THE COURT:  Yes.

17         THE WITNESS:  Your Honor?

18         THE COURT:  Yes.

19         THE WITNESS:  Off the top of my head, I don't

20   recall if she was assigned to a team.

21         THE COURT:  Well then I get the sense that after

22   that July 5th meeting, you believed that it was best

23   that Mr. Davis and Ms. Strickland work separately or

24   apart from each other, is that what I understand your

25   testimony to be?

```
1              THE WITNESS:  Well, your Honor, I want to clarify.
2    The priority on July 5th was to separate the
3    mentor/mentee relationship that Ms. Strickland and
4    Mr. Davis had, that was the priority, because there was
5    a breakdown of communication.  I did not think of the
6    later consequences about how the workload was going to
7    be distributed by the Research and Writing Specialists,
8    in particular Ms. Strickland, and what effect that would
9    have in relation to Mr. Davis.  And so I became aware of
10   that, that Ms. Strickland was assigned to support
11   Mr. Davis soon after my July 20th e-mail, putting her on
12   the team, and that's when it dawned on me, "Wait, I need
13   to separate them, she's uncomfortable with Mr. Davis."
14   And so that's when it occurred.  But before that, July
15   5th, in my mind the priority was to separate them in
16   terms of the mentor/mentee relationship.  I was not yet
17   considering what effect that would have in terms of the
18   workload and then coming together with the workload.
19             THE COURT:  Thank you.  You've answered my
20   question.
21             Go ahead, Ms. Young.
22   Q.   After you made the July 20th assignment, what
23   happened next, Mr. Martinez?
24   A.   I indicated I contacted Ms. Strickland, I told her
25   about accepting responsibility for the inadvertence, I
```

1    also texted Mr. Davis and I told him at that point "I

2    made a decision, Ms. Strickland advised me to hold in

3    confidence what she told me on July 5th about the

4    bicycle incident involving Mr. Davis and I did, I hadn't

5    shared it, but now I'm in a pickle because

6    Ms. Strickland is going to wind up doing some type of

7    work for Mr. Davis if I don't come in and intervene,"

8    that the only way that I found to intervene is by

9    telling Mr. Davis and texting him.  I said "JP, please

10   do not text, e-mail, or call Ms. Strickland and I will

11   talk to you tonight and let you know why."  And he said

12   "Fine."  I then spoke to him that evening and I advised

13   him, "I am putting you on notice to not talk to her, not

14   to e-mail her, because on the July 5th meeting she told

15   me she felt uncomfortable with you in reference to an

16   incident in the lobby with her bicycle."  And he said,

17   "Okay, got it.  Fine."  And he was fine with it.

18   Q.    Okay, I just want to go back for a minute.

19         What effect, if any, did funneling work through

20   Mr. Martin have on Ms. Strickland's job

21   responsibilities?

22   A.    I'm sorry, can you repeat that question?

23   Q.    Sure.

24         What effect did funneling work through Mr. Martin

25   have on Ms. Strickland's job responsibilities, if any?

A.     There was no effect.  She's indicated -- she
indicated at the August 9th -- I had a meeting after
this with her, and she felt she was demoted, and I made
it very -- she felt she was demoted as a result of me
making Jared Martin the gatekeeper on assignments.  And
I told her, "There's no way it's a demotion.  Jared
Martin is not your supervisor, he is only the most
experienced in that unit, and I just gave him the
responsibility for divvying up the work.  There is no
change whatever in responsibilities."
Q.     And to your knowledge how much, if anything, did
Mr. Martin know about the situation between
Ms. Strickland and Mr. Davis at that time?
A.     He knew nothing at that time.
Q.     And were Mr. Martin and Ms. Strickland equals?
A.     They were equals, yes, ma'am.
       MS. YOUNG:  Mr. Spears, can I please have
Defendants's Exhibit E9.  I'm sorry, EN.
       (On screen.)
       THE COURT:  Well maybe this is a good place to
stop because it's about 1:00, and I think we'll pick up
here tomorrow.  You say, or your co-counsel, Mr. Kolsky,
says that there's an expert, or you said that an expert
is on his way here.  I said experts can be taken out of
order and you may.  Whenever it's convenient for you to

```
 1    call the expert, we can suspend with whatever witness is
 2    on the stand.
 3            As of now, each side having 2 1/2 days, the
 4    defendant has used -- the plaintiff has used up 2 hours,
 5    15 minutes, the defense has used up 1 day, 1 hour, 15
 6    minutes.
 7            We will deal with any questions about exhibits as,
 8    um, Ms. Strickland has forecast, we'll deal with that at
 9    the close of all the live evidence before final argument
10    so that we know what's in evidence for final argument.
11            Very well, we'll recess until 9:00 a.m. tomorrow
12    morning.  We'll recess.
13            THE CLERK:  All rise.
14            MR. KOLSKY:  Your Honor, if we could just ask one
15    clarifying question?
16            THE COURT:  Yes.
17            MR. KOLSKY:  Well actually I guess two clarifying
18    questions.
19            How many hours a day, your Honor, mentioned --
20            THE COURT:  3 1/2 hours.
21            MR. KOLSKY:  Thank you.
22            And then the other question.  With regard to your
23    Honor's ruling, um, regarding the plaintiff, I
24    understand that the plaintiff's expert's deposition
25    transcript is coming in.  Is plaintiff also, um,
```

1     permitted to introduce the expert report?

2          THE COURT:  No.  No, the expert reports are

3     usually not evidence.  The deposition, where you had an

4     opportunity to cross-examine and having looked at it

5     you've taken extensive use of that opportunity, that's

6     it.  Nor are your expert reports in.  I would accept

7     them by agreement, but there is no agreement.

8          All right, we'll recess.

9          MR. KOLSKY:  Thank you, your Honor.

10         MR. STRICKLAND:  Your Honor, may the plaintiff be

11    heard on that?

12         THE COURT:  On what?  I've just made a ruling on

13    evidence.  If you want to agree to things --

14         MR. STRICKLAND:  No, just for a point of

15    clarification.  The defendants admitted the expert's

16    report at the deposition, it's attached to the

17    deposition designation.

18         THE COURT:  Well if they did, they did.  We'll

19    recess.

20         MR. STRICKLAND:  Yes, thank you.

21         THE CLERK:  All rise.

22         MS. YOUNG:  Your Honor, the report from the

23    deposition testimony is the March report, which is not

24    Dr. Albert's current report, which was only issued after

25    the deposition was taken.  And so we object to the

1   admission of the March report into evidence.  And the

2   July report was not part of the deposition transcript or

3   an exhibit to the deposition.

4        THE COURT:  Look, this is all my fault.  In the

5   future I will not say we're in recess until I'm done and

6   I'm not entertaining anyone's comments or arguments

7   after that.  I've made a ruling.  The ruling stands.  If

8   you need to sort it out, we'll have to sort it out at

9   some other time.  Now we are in recess.  We'll recess.

10       (Adjourned, 1:05 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

5     do hereby certify that the foregoing record is a true

6     and accurate transcription of my stenographic notes

7     before Judge William G. Young, on Wednesday, December

8     13, 2023, to the best of my skill and ability.

9

10

11

12

       /s/ Richard H. Romanow 03-11-24
13     _____
       RICHARD H. ROMANOW   Date
14

15

16

17

18

19

20

21

22

23

24

25