1            UNITED STATES DISTRICT COURT

2          WESTERN DISTRICT OF NORTH CAROLINA (Asheville)

3                         No. 1:20-cv-00066-WGY

4

5    CARYN DEVINS STRICKLAND, formerly known as Jane Roe,
              Plaintiff

6

7    vs.

8

9    UNITED STATES OF AMERICA, et al,
              Defendants

10

11                      * * * * * * * * *

12

13

           For Bench Trial via Courtroom Zoom Before:
14                 Judge William G. Young

15

16

                   United States District Court
17                 District of Massachusetts (Boston)
                   One Courthouse Way
18                 Boston, Massachusetts 02210
                   Thursday, December 14, 2023

19

20                      * * * * * * * *

21

22          REPORTER: RICHARD H. ROMANOW, RPR
                   Official Court Reporter
23               United States District Court
         One Courthouse Way, Room 5510, Boston, MA 02210
24                 rhrbulldog@aol.com

25

```
 1                    A P P E A R A N C E S

 2

 3   CARYN STRICKLAND, ESQ.
     COOPER J. STRICKLAND, ESQ.
 4       P.O. Box 92
         Lynn, NC 28750
 5       (802) 318-0926
         Email: Caryn.devins@hotmail.com
 6       Pro Se Plaintiff

 7

 8   JOSHUA MICHAEL KOLSKY, ESQ.
     DANIELLE YOUNG, ESQ.
 9   MADELINE McMAHON, ESQ.
         U.S. Department of Justice
10       1100 L Street NW
         Washington, DC 20005
11       (202) 305-7664
         Email: Joshua.kolsky@usdoj.gov
12       For Defendants

13

14

15

16

17

18

19

20

21

22

23

24

25
```

I N D E X

WITNESS                DIRECT  CROSS  REDIRECT  RECROSS

DR. PAUL F. WHITE
   By Ms. Young:           5                52
   By Ms. Strickland:           33              53

JOSHUA CARPENTER
   By Mr. Kolsky:          54                74
   By Ms. Strickland:           64

ANTHONY MARTINEZ (Resumed.)
   By Ms. Young:          75
   By Ms. Strickland:           115

1                   E X H I B I T S

2

3          EXHIBIT 169 ......................   47

           EXHIBIT 170 ......................   77
4
           EXHIBIT 171 ......................   90
5
           EXHIBIT 172 ......................   90
6
           EXHIBIT 173 ......................  150
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    P R O C E E D I N G S

2    (Begins, 9:00 a.m.)

3    THE COURT:  Good morning.  And the witness may

4    resume the stand.

5    MS. YOUNG:  The government was planning to start

6    with our expert, Dr. Paul White, who is only available

7    today to testify, if that's all right?

8    THE COURT:  It is all right.  I said it was.  So

9    we're going to interrupt, and I'll keep my mind

10   suspended.  And you may go to your new witness.

11   And, forgive me, but as we're at a distance, can

12   you identify yourself again?

13   MS. YOUNG:  Oh, of course, your Honor.  Danielle

14   Young for the defense.  And we call Dr. Paul White.

15   THE COURT:  He may be called.

16   MS. YOUNG:  Thank you, your Honor.

17   (Dr. White takes the stand.

18   (DR. PAUL F. WHITE, sworn.)

19

20   * * * * * * * * * * * * * * * * *

21   DR. PAUL F. WHITE

22   * * * * * * * * * * * * * * * * *

23

24   DIRECT EXAMINATION BY MS. YOUNG:

25   Q.    Good morning, Dr. White.

```
 1    A.     Good morning.

 2    Q.     Where do you work?

 3    A.     I work at a firm called Resolution Economics.

 4    Q.     And how long have you been with Resolution

 5    Economics?

 6    A.     I've been --

 7           THE COURT:  Let me interrupt simply because my

 8    practice is always to get the witness to start by the

 9    witness stating his full name.  So if you would permit

10    me.

11           Would you state your full name, sir?

12           THE WITNESS:  Yes, sir.  Paul F. White.

13           THE COURT:  Thank you.

14           And proceed, Ms. Young.

15           MS. YOUNG:  Thank you, your Honor.

16    Q.     What is your title at Resolution Economics,

17    Dr. White?

18    A.     My title is I'm a labor economist and I'm a

19    partner at Resolution Economics.

20           MS. YOUNG:  Your Honor, can you still see us?  It

21    appears we've lost connection.

22           THE COURT:  I can see everything.

23           MS. YOUNG:  Okay.

24           THE COURT:  Proceed.

25           MS. YOUNG:  Thank you, your Honor.
```

1    Q.    Do you do any other related work outside of

2    Resolution Economics, Dr. White?

3    A.    I do, yes.

4    Q.    And what is it?

5    A.    I serve as a faculty member on a nonprofit

6    organization called the Institute of Workplace Equality.

7    Q.    And how long have you been there for?

8    A.    I've been doing that, I think, about 6 to 8 years.

9    Q.    Okay.  And where did you attend college?

10   A.    I went to undergraduate school at James Madison

11   University.

12   Q.    And after college did you obtain a graduate

13   degree, Dr. White?

14   A.    I did, I obtained two graduate degrees, a Master's

15   in Economics with a minor in statistics at North

16   Carolina State University, and also a PhD in economics,

17   also with a minor in statistics, also from North

18   Carolina State.

19   Q.    And has your work since graduating graduate school

20   been in the field you received your Master's and PhD

21   degrees in?

22   A.    It has been, so I've been focused on labor

23   economics and statistics.

24   Q.    Thank you.  And can you tell me in more detail

25   some of the types of work you've done over the past 30

1  years?

2  A.    Sure, I'll break it down into categories.  One

3  category has to do with the statistical analysis of

4  alleged employment discrimination, so we looked at

5  employer data, we looked to see if there are trends, um,

6  that show, for examples, females are being paid less

7  than males who are similarly situated.  So that can be

8  in context of litigation, but it can also be in the

9  context of collective analyses where, excuse me, an

10  employer will ask to look at their data to see if there

11  are any pay gaps by gender or by race, for example, and

12  we'll look at the data, and we'll see if there are some,

13  and if there are, we will work with them to help close

14  those gaps by calculating adjustments to females or

15  minorities.  So there's that kind of work.

16        There's also work related to what I'll refer to

17  generally as "wage-and-hour cases" that involve claims

18  of people who are working off the clock or their pay

19  rate, for whatever reason, is incorrect.  And so we do

20  those type of cases.

21        And then the third major category are

22  single-plaintiff damages cases like what we have here.

23  Q.    And what's one of your common features of your

24  work as a labor economist?

25  A.    I think a general theme of all the work that we do

1    is that we have to build an economical or statistical

2    model that reflects the reality of the decision-making

3    process, and that way we feel like we're coming up with

4    the most sound conclusion.

5    Q.    Thank you.  And do you offer and analyze survey

6    data in your work as a labor economist?

7    A.    We do quite frequently, yes.

8    Q.    And are you familiar with analyzing labor market

9    data in your work?

10   A.    I am, yes.

11   Q.    And have you ever been involved in cases in

12   litigation before this one?

13   A.    Yes, many times.

14   Q.    About how many times would you say?

15   A.    Well I've been doing this work for 30 years, so

16   well over 500, probably closer to 1,000.

17   Q.    And have you ever provided deposition or trial

18   testimony before?

19   A.    I have, yes.

20   Q.    About how many times?

21   A.    At least probably 75 times.

22   Q.    And have you testified in federal court before,

23   Dr. White?

24   A.    Yes, I have.

25   Q.    And what subjects have you addressed in your prior

1    testimony?

2    A.    Well those are more of the subjects I've talked

3    about already, the statistical analysis of alleged

4    employment discrimination, single-plaintiff damage

5    cases, and the wage-and-hour cases I mentioned earlier.

6    Q.    Did any of those cases involve similar issues to

7    this case?

8    A.    Yes, the single-plaintiff damage cases are very

9    similar to what we're talking about here today.

10   Q.    And were you qualified as an expert by the Court

11   in those single-plaintiff cases?

12   A.    I was, yes.

13   Q.    In what areas were you qualified by the Court in

14   those cases?

15   A.    In those cases I was qualified as a labor

16   economist.

17   Q.    And are you a member of any professional

18   associations, Dr. White?

19   A.    I am, yes.

20   Q.    In which associations?

21   A.    In two of them, one is called the American

22   Economic Association, and the second one is called the

23   National Association of Forensic Economists.

24   Q.    And what documents or other materials did you use

25   for purposes of preparing your testimony today?

A.    Well generally speaking I reviewed my report, the
report of the plaintiff's economic expert, I reviewed
the deposition.  There was the complaint of course.
There are, um, earnings documents and personal documents
associated with Ms. Strickland's work history.

Q.    And which of plaintiff's expert reports did you
focus on?

A.    Which of the plaintiff's expert's reports?  Um, I
don't remember the dates, but it would have been the
two -- I think there were two that were, um, produced by
Dr. Albrecht.

Q.    Thank you.  And would you please summarize
generally the focus of Dr. Albrecht's reports?

A.    Yeah, the focus of his approach is to estimate the
earnings of Ms. Strickland had her employment with FDO
not ended when it did, and to project what her earnings
might have been had that employment not ended, and then
also to compare that to a measure of what her earnings
are now that her employment with FDO did end, and to
calculate the difference between the two.

Q.    Thank you.  And what was your assignment in this
case, Dr. White?

A.    My assignment was to review Dr. Albrecht's
analysis and methodology and his math, and see if I had
any concerns with his assumptions that go behind the

1  calculations.

2  Q.    And were you also assigned to calculate your own

3  estimate of economic damages in this case?

4  A.    Only if I had some concerns with his approach, I

5  calculated alternative estimates of the potential

6  economic losses.

7  Q.    Are you opining that the defendants are liable in

8  this matter?

9  A.    No, I have no --

10        THE COURT:  I didn't understand that question?

11  Put it again.

12        MS. YOUNG:  I just --

13  Q.    Are you opining that the defendants are liable in

14  this matter?

15  A.    No, I'm not, I have no opinion whatsoever about

16  the liability in this case.

17  Q.    And how would you describe the methodology that

18  you used in preparing your opinion?

19  A.    The methodology I used is structured similar to

20  Dr. Albrecht's, meaning I have, um, looked at potential

21  earnings of Ms. Strickland had her employment with FDO

22  not ended, and I've also looked at an alternative

23  measure of her earnings given that it did end, and I'd

24  calculate the difference between the two.

25  Q.    Is the methodology that you described widely used

1  by other economists in the field?

2  A.    It is, yes.

3  Q.    And did the application of this methodology allow

4  you to reach the opinion outlined in your report in this

5  case?

6  A.    It did.

7        MS. YOUNG:  Your Honor, at this time I move to

8  have Dr. Paul White qualified as an expert witness in

9  labor economics.

10       THE COURT:  I don't follow that practice.  You've

11 laid your foundation and I will simply rule on specific

12 questions as we go along.

13       MS. YOUNG:  Yes, your Honor.

14 Q.    Dr. White, can you briefly summarize the opinions

15 you're offering today?

16 A.    Certainly.  The opinions that I have today mostly

17 reflect the concerns that I have with Dr. Albrecht's

18 approach.  So, um, I -- in general I don't believe that

19 Dr. Albrecht's calculations are based on a realistic

20 model of potential economic losses.

21 Q.    Thank you.  And turning to your specific opinions,

22 would you briefly describe for the Court your first

23 opinion about Dr. Albrecht's assumption?

24 A.    Yes, the first opinion that I have about

25 Dr. Albrecht's assumption is that his calculations make

1    the assumption that had Ms. Strickland's employment with

2    FDO not ended in 2019 when it did, then her earnings and

3    her employment with FDO would have continued for the

4    rest of her career, for over 30 years, and until the

5    year 2055.  So with 100 percent certainty, she would

6    have remained at FDO for the rest of her career.

7    Q.    And why do you believe that assumption is not

8    valid?

9    A.    I believe that assumption is not valid because we

10   do see data that shows that people do leave the

11   employment of FDO, that people don't stay there their

12   entire careers, and, um, 30-plus years in the future is

13   a long way to assume something's going to happen with

14   100 percent probability.

15   Q.    Are you familiar with the "Privately-Appointed

16   Counsel of 2019 Fiscal Year Study" which was used by

17   plaintiff's expert?

18   A.    Yes, I am.  Yes.

19   Q.    Is it relevant to your opinion that the -- I'm

20   going to call it the "PAC Survey," the P-A-C Survey, it

21   states that one in two self-employed defense attorneys

22   have cut down their practice or taken less work?

23   A.    Yes, it is relevant.  Yes.

24   Q.    I mean how so?

25   A.    Um --

1          MS. STRICKLAND:  Your Honor, I'm going to object,

2     this is not what's in the report that I am aware of.

3          THE COURT:  Where is it in the report, Ms. Young?

4          MS. YOUNG:  It goes directly to --

5          THE COURT:  No, no, where is it in his report?

6     Identify it in his report.  Or is this some something

7     new?

8          MS. YOUNG:  It goes to the assumption that the

9     employment running through 2055 is not valid.

10          THE COURT:  And where does he say this in his

11     report?

12          MS. YOUNG:  On Page -- I believe it's on Pages 3

13     and 4 of the report, your Honor.

14          THE COURT:  He may testify consistent with the

15     report.

16          Go ahead.

17          MS. STRICKLAND:  Your Honor, may I be heard?

18          THE COURT:  You may.

19          MS. STRICKLAND:  Thank you, your Honor.

20          I don't see anything on Pages 3 or 4 of the report

21     that say anything about whether attorneys have left the

22     public defense profession.

23          THE COURT:  And your answer, Ms. Young?  It

24     doesn't, does it?

25          MS. YOUNG:  It just goes to the assumptions

1    discussed on Pages 3 and 4.

2         THE COURT:  Well then I'll sustain the objection.

3    We're getting into other matters.  And he's held to the

4    report.

5         Go ahead.

6         MS. YOUNG:  Yes, your Honor.

7    Q.    Dr. Albrecht, you mentioned a moment ago that

8    there's other data on tenure for Assistant Federal

9    Public Defenders, is that correct?

10   A.    That's correct, yes.

11   Q.    And what data are you referring to on Assistant

12   Federal Public Defenders?

13   A.    There's a document that I cited in my report that

14   shows the, um -- the hire dates and termination dates of

15   public defenders who have terminated in the last 2

16   years.

17   Q.    And what is the source of that data?

18   A.    My understanding is from the public defender's

19   office.

20   Q.    And that's cited on Page 4 of your report, is that

21   correct?

22   A.    I believe so, yes.

23   Q.    And how did that data inform your analysis?

24   A.    It just supported, um, the belief that people

25   don't stay at that office for their entire careers, and

1  when they do leave, they're not leaving after 30 years,

2  much earlier than that.

3  Q.    And turning to your second opinion in your report,

4  um, regarding plaintiff's expert's assumption that

5  plaintiff will not catch up to her earnings at the FDO

6  prior to 2055.  Would you explain the basis for that

7  opinion?

8  A.    Yes.

9         MS. STRICKLAND:  Your Honor, I'm going to object

10  to this and renew our motion in limine about the

11  mitigation defense.

12         THE COURT:  Overruled, he may testify.  Your

13  rights are saved.

14  A.    One of Dr. Albrecht's other assumptions was that,

15  um, Ms. Strickland's current earnings level would

16  essentially continue also throughout the rest of her

17  career, 30 plus years until the year 2055 or so, and

18  with 100 percent certainty.  And so what that means is

19  that her earnings are quite a bit lower now than they

20  were when she was with the FDO's office, and

21  Dr. Albrecht has assumed that there's no chance that she

22  would ever earn more than she's currently earning, and

23  therefore would never catch up or meet or exceed what

24  she had earned at the FDO office.

25  Q.    And you discussed in your report plaintiff's

1  overhead expenses, is that right?

2  A.    That's correct.

3  Q.    And why is Dr. Albrecht's assumption about

4  plaintiff's overhead expenses, in her current role as a

5  self-employed defense attorney, important?

6  A.    It's important because the -- I mentioned

7  Dr. Albrecht has compared the investment of

8  Ms. Strickland's earnings at FDO had she not -- had her

9  employment not ended at the FDO, versus what she is

10 earning now in net of expenses.  And so the expenses are

11 taking out -- are excluded from those offset earnings.

12 And therefore if his estimate of her expenses are

13 inflated, then so would her -- then so would his

14 estimate of her economic losses also be inflated.

15 Q.    And based on available information, what

16 deficiencies did you identify with respect to

17 Dr. Albrecht's assumptions regarding plaintiff's

18 expenses and income as a self-employed defense attorney,

19 as outlined in your report?

20 A.    As outlined in my report, Dr. Albrecht relied upon

21 a survey of indigent defense attorneys in the State of

22 North Carolina, and that survey, um, the number that he

23 cited in that survey, um, was based upon the overhead

24 expenses for 10, I think maybe 13 different categories.

25 Every category that's listed in that survey goes into

1    the number that Dr. Albrecht has relied upon.

2         Dr. Albrecht, in his report, did not attempt to

3    identify the ones that -- the components that

4    Ms. Strickland is actually incurring, and so

5    Dr. Albrecht has not based his estimate of overhead cost

6    on what Ms. Strickland is actually incurring, but rather

7    on the survey that includes some components that she may

8    not be incurring at all.

9    Q.    And are you referring to the PAC 2019 Fiscal Year

10   survey, is that correct?

11   A.    Yes, I am.

12   Q.    And how does that table regarding overhead costs,

13   how are those calculated in the table?

14   A.    The table that Dr. Albrecht relied upon?

15   Q.    Yes.

16   A.    All right.  If I recall correctly it had maybe 13

17   different categories of overhead and it was the median

18   monthly value for each of those categories.

19   Dr. Albrecht added up all of those categories to come up

20   with a total, and then he multiplied that total by 12, I

21   believe, and maybe increased it by inflation, because

22   the survey was a couple of years old, um, to come up

23   with his number of overhead cost.

24   Q.    And what was the response rate for that PAC 2019

25   survey?

1   A.    The response rate was only about 13 percent.

2   Q.    Is that number important?

3   A.    It is important.

4        MS. STRICKLAND:  Your Honor, I'm going to object.

5   I don't believe this is in the report.

6        THE COURT:  Where is it?

7        (Pause.)

8        MS. YOUNG:  I'll withdraw the question, your

9   Honor.

10       THE COURT:  Very well.

11  Q.    Dr. White, do you discuss the differences between

12  the table Dr. Albrecht relied on in the study and the

13  respondent's actual median cost identified in the study

14  in your report?

15  A.    I do, yes.

16  Q.    On what page?

17  A.    I don't recall the page number.

18  Q.    Have you prepared a demonstrative that visualizes

19  the differences between Dr. Albrecht's calculations

20  based on the hypothetical -- sorry, the table in the

21  study, and respondent's actual median cost identified in

22  the study and discussed in your report?

23  A.    I have, yes.

24       MS. YOUNG:  Your Honor, may I present just three

25  brief demonstratives from Dr. White's -- from Dr. White,

1  via the trial director, solely for demonstrative

2  purposes as an aid to the Court, not for admission as an

3  exhibit?

4          THE COURT:  I understand.  You may proceed.

5          MS. YOUNG:  Thank you.

6          Mr. Spear, can I have Slide 2, please.

7          (On screen.)

8  Q.    All right, Dr. White.  What was the median

9  overhead cost per hour reported by survey respondents?

10 A.    I'm sorry, could you repeat the question?

11 Q.    Of course.

12        Dr. White, what was the median overhead cost per

13 hour reported by survey respondents in that PAC 2019

14 survey?

15 A.    The median actual cost was $21.72 per hour.

16 Q.    And is that represented in your graph here?

17 A.    It is, yes, that is the -- that is the bar on the

18 right-hand side, the orange section, the bottom side,

19 $21.72.

20 Q.    And what data from the survey did Dr. Albrecht

21 rely on?

22 A.    As I mentioned before, he relied on the median

23 value for every potential component in that survey, and

24 that ended up being the orange box on the left side bar,

25 which was $48 an hour.  And so what this tells us is

1    that, um, the typical respondent to this survey didn't

2    actually incur all those 13 different categories of

3    cost, that the typical respondent didn't incur $48 an

4    hour of overhead, the typical respondent actually

5    incurred about $21.72 per hour.

6    Q.    And does the table Dr. Albrecht relied on, does it

7    account for respondents with low overhead costs?

8    A.    No, that survey, um, by definition excluded those

9    that had it, a relatively low or a very small overhead

10   cost.

11   Q.    And is that significant?

12   A.    It is significant because it makes the numbers for

13   all -- all the numbers reported in that survey higher

14   than what they otherwise would be if those lower amounts

15   were included.

16   Q.    And how did the table Dr. Albrecht relied on

17   calculate costs for paralegal support?

18   A.    It's interesting that the survey did not include

19   paralegal support, um, or did not include the numbers

20   that they reported for paralegal support, because the

21   vast majority of the respondents did not have

22   paralegals.  So instead, that survey relied upon other

23   publicly-available data from, I believe, the Bureau of

24   Labor Statistics for the overhead part of that table.

25   Q.    Is using industry-wide median paralegal costs, as

1    opposed to respondent's median paralegal costs,
2    significant?
3    A.    It is significant.  We would have rather had the
4    actual respondent's overhead costs.  As I mentioned,
5    very few respondents -- excuse me.  We would have much
6    rather had the respondent's paralegal costs, which was
7    salary and benefits, um, then some industry-wide
8    average, because the industry-wide average is going to
9    include the whole state of North Carolina, and it's
10   going to include also, um, lots of different practices,
11   lots of different law firm situations.  The fact that
12   the vast majority of the respondents did not have
13   paralegals is very important to understand for this
14   particular survey because the paralegal costs of -- of
15   the number that Dr. Albrecht relied upon, I think is
16   roughly, um, $5,000 per month.  Well let's just use
17   round numbers.  Roughly $5,000 per month.  I believe
18   it's the case that about $4,000 of that $5,000 is
19   directly related to paralegal costs.  So the vast
20   majority of those paralegal costs -- the vast majority
21   of the total overhead costs were for paralegals.
22   Q.    Is Dr. Albrecht's use of that table valid in this
23   field?
24   A.    No, I don't believe it's valid in this field as it
25   applies to this particular case.

Q.    Have you been provided documentation of
plaintiff's reimbursements, expenses, and income, as a
self-employed defense attorney?

A.    I have seen some of that, yes.

Q.    Turning to plaintiff's likely future earnings, is
it your opinion that plaintiff will obtain more
lucrative employment in the future than her current
employment?

     MS. STRICKLAND:  Objection, your Honor.

     THE COURT:  Sustained.  Sustained.  Sustained.
You're leading the witness.  There's no need.  Proceed.

Q.    Dr. Albrecht, on Page 5 on your report you discuss
plaintiff's potential future earnings, is that right?

A.    That's correct, yes.

Q.    And how did you determine plaintiff had the
capacity to earn more lucrative employment in the
future?

A.    I looked at sources of attorney earnings data from
the labor statistics, I could see that, um --

     MS. STRICKLAND:  I would object, your Honor.  I
believe that this actually comes from Dr. Jackson's
report, and in that sense it's hearsay.

     MS. YOUNG:  It's on Page 5 of the report.

     THE COURT:  Yes, but it's in the report.  He may
testify to his views.  But your point is well taken.

1    But he may testify to his views.

2          MS. STRICKLAND:  Thank you, your Honor.

3          THE COURT:  Well the question may be answered.

4    You may answer it, testifying to your own opinion, sir.

5          (Silence.)

6          MS. YOUNG:  Um, I'll reask the question just to

7    get us reoriented.

8    Q.    How did you determine the plaintiff had the

9    capacity to earn more lucrative employment in the

10   future?

11   A.    So I observed the plaintiff's actual earnings, um,

12   which were in the $40,000 to $50,000 range, and I

13   compared that to the earnings of attorneys, um, in

14   different measures, one of them being in the Charlotte

15   area, another measure being, um -- plaintiff went to

16   Duke University, so I was able to find data on recent

17   graduates from Duke University, and I compared those

18   earnings levels and I saw that they are much higher than

19   what the plaintiff is currently earning.

20   Q.    And that's on Page 5 of your report, is that

21   correct?

22   A.    I believe so, yes.

23   Q.    And have you prepared a video aid demonstrating

24   your opinion regarding the differences in Dr. Albrecht's

25   calculations with respect to plaintiff's future earnings

1  in the market data?

2  A.     I have, yes.

3         MS. YOUNG:  Mr. Spears, can I please have Slide 3.

4         (On screen.)

5         MS. YOUNG:  Thank you.

6  Q.     Dr. White, can you please explain this bar graph.

7  A.     Sure.  Let's start at the far right.  And these

8  are all pre-tax numbers.  So let's start at the far

9  right.

10        The brown bar on the right-hand side is pre-tax

11 Dr. Albrecht's projection of the plaintiff's earnings

12 going forward, again for the rest of her career,

13 $54,000.  The orange bar just to the left of that,

14 $179,000, is what she was earning at the time that her

15 employment with FDO ended projected up until 2024.  So

16 Dr. Albrecht has essentially modeled and calculated the

17 difference between the orange bar and the brown bar, and

18 that's the basis of his economic losses.

19        However, if you compare the brown bar, the $54,000

20 that she's currently earning, to other measures of what

21 attorneys are making, you can see, for example, on the

22 far left-hand side, recent Duke Law School graduates,

23 $215,000, the average lawyer in Charlotte, North

24 Carolina, $162,000.  And so it just shows that, um, the

25 plaintiff, um, if she were to work somewhere else, could

1   very easily make more than what she's earning.

2   Q.     Thank you.

3          Turning back to your opinion that Dr. Albrecht's

4   assumption that plaintiff will remain at the FDO through

5   2055 and will never recapture her earnings is invalid,

6   do you have a visual aid showing Dr. Albrecht's

7   calculations with respect to plaintiff's future earnings

8   outlined in your report?

9   A.     I do, yes.

10         MS. YOUNG:  Mr. Spears, can I please have Slide 4.

11         (On screen.)

12         MS. YOUNG:  Thank you.

13  Q.     Can you explain these line graphs, Dr. White.

14  A.     Certainly.  Let's start by explaining the chart.

15  So on the top axis you can see the years, the first year

16  is 2024 and it goes all the way out to 2067, that is --

17  the first, 2024, is the beginning of the front pay

18  period, and 2067 is the plaintiff's life expectancy.

19  The vertical axis is dollars.  And let's start with the

20  blue line at the top.

21         The blue line starts just under $150,000, that is

22  after tax what Dr. Albrecht has assumed that, um,

23  Ms. Strickland would have earned at the FDO had her

24  employment not ended in 2019, um, in 2024 dollars, and

25  as I said before, he assumes that she will stay there

the rest of her career, that's why this blue line starts
in 2024 and goes all the way up to 2055 before it takes
a dip.  So that 2055 is Dr. Albrecht's assumption of the
plaintiff's retirement date.  And once that blue line
dips, then she still earns her pension from the federal
government.  That's why you see the horizontal line
starting in 2056 going off to the right.

So this is a graphical representation of his
projection of what she would have been earning at FDO
had her employment not ended in 2019.  And again the big
assumption here is that she would have stayed there the
rest of her career.

Now compare that to the orange line that's
somewhere in the $40,000 range.  Again it also starts in
2024.  And this represents his projection of her
earnings going forward.  So he says that she would start
earning roughly $40-some-thousand dollars and that would
continue.  So it would never change, it would never go
up for the rest of her career.  And then it would stay
that way until 2055, and then she would retire, but with
no pension.

So as I mentioned earlier, a couple of the
concerns I have with Dr. Albrecht's methodology, (A) the
blue line, it never stops, meaning that she would have
stayed with FDO the rest of her career, and the orange

line, it never gets closer to the blue line.  So no
matter what, for the rest of her career, he has her
never earning more than she's currently earning despite
the market data to suggest otherwise.

Q.    Thank you.

Is Dr. Albrecht's assumption that plaintiff will
never recapture her prior earnings amount at the FDO
supported by evidence in your opinion?

A.    I don't think so.  For the reasons I mentioned
earlier the market data would suggest that if she chose
to do so, she could earn a lot more than she's earning
right now.

Q.    Is that assumption significant?

A.    It is, yes.  Dr. Albrecht, getting back to this
exhibit, essentially has defined the losses as the area
between the two lines, and if she were to earn more in
another job, then that orange line would get closer to
the blue line, maybe even exceed the blue line, which
would cut off the damages if she chose to earn at a
different level.

Q.    Are there any issues with Dr. Albrecht's
methodology?

A.    Yes, the three main issues.  One is the continued,
um -- the assumption of continued employment with the
FDO, the assumption of her earnings capacity being as

1    low as it is, in the $40,000 range, and then also the
2    assumption that her earnings would never catch up to her
3    federal government earnings in time for the next 30-plus
4    years.
5    Q.    Thank you.
6          Turning to your own calculations, Dr. White, what
7    are the two main scenarios you discuss in your report?
8    A.    The two main scenarios have to do with different
9    assumptions on when she could catch up to her FDO
10   earnings.
11         So the first assumption is based on the premise
12   that if she loses her, um -- if her employment at FDO
13   ends, then we look at a data source called the
14   "Displaced Worker Survey," and we look to see how long
15   it takes people to find another job that gets them
16   closer to their previous earnings, and we found that
17   that amount was about 5 months, about 20 weeks.  So the
18   first scenario assumed that it takes her 20 weeks to
19   find another job that earned as much as she would have
20   been earning at FDO.  And at that point the economic
21   losses stop.
22   Q.    And so what estimate of potential economic losses
23   did you calculate based on that first scenario, 1A, you
24   just mentioned in your report?
25   A.    That estimate is about -- as I said, about 20

1  weeks worth of economic losses, so that ended up being,

2  I believe, $42,000, something in that range.  It's in

3  the report.

4  Q.    And turning to the second scenario addressed in

5  your report.  What estimates of potential economic

6  losses did you calculate based on your method as

7  outlined in the second scenario, 2A, in your report?

8  A.    The second scenario, um, recognizes that the

9  plaintiff graduated from law school in 20 -- um, let's

10  see, 2013, and it took her 6 years to get up to that

11  level of FDO earnings that she had at the time she left,

12  so 2013 to 2016.  And so we took the second scenario

13  where we said, okay, she loses her job at FDO and we

14  give her not 20 weeks to catch up to her FDO earnings,

15  but we give her 6 years to catch up to her FDO earnings.

16  And so she gets a job, she's working at her current

17  level of earnings, but then we give her 6 years to get

18  back up to where she was.

19  Q.    And do you remember about the total economic loss

20  calculated in Scenario 2A in your report, approximately?

21  A.    Approximately I want to say $462,000, if I have

22  that correct?

23  Q.    Would it refresh your recollection if I provided

24  you a copy of your report to provide the exact numbers?

25  A.    It would, yes.

1          MS. YOUNG:  Your Honor, may I approach the

2    witness?

3          THE COURT:  You may.

4    Q.    Dr. White, can we go back to Scenario 1A and get

5    the exact number as outlined in your report.

6    A.    Yes, the number for Scenario 1A is $46,675.

7    Q.    And can we also please -- can you please state the

8    economic losses calculated in Scenario 2A in your

9    report?

10   A.    Yes, $425,916.

11   Q.    Thank you.

12         And, Doctor, why should the Court adopt your

13   opinions rather than those of plaintiff's expert,

14   Dr. Albrecht?

15   A.    I believe my methodology is more realistic than

16   Dr. Albrecht's methodology, I account for the

17   possibility that she wouldn't have stayed there the rest

18   of her career.  I account for the possibility that if

19   she chose to, she could earn more as a lawyer than she

20   is right now.

21   Q.    (Pause.)  Does your compensation depend on the

22   outcome of this case, Dr. White?

23   A.    No, not at all.

24         MS. YOUNG:  That's it.  Thank you very much.

25         Your Honor, the defendant passes the witness.

```
 1        THE COURT:  Thank you.

 2        Ms. Strickland, do you wish to examine this

 3   witness?

 4        MS. STRICKLAND:  Yes, your Honor, thank you.

 5        THE COURT:  You may.

 6

 7   CROSS-EXAMINATION BY MS. STRICKLAND:

 8   Q.    Good morning, Dr. White.

 9   A.    Good morning.

10   Q.    Dr. White, you were hired by the defendants for

11   your expert report and your trial testimony today, is

12   that right?

13   A.    That is correct, yes.

14   Q.    How much have you been paid in total by the

15   defendants?

16   A.    I don't know.

17   Q.    Does somewhere in the range of $72,000 sound right

18   to you?

19   A.    I don't know.

20   Q.    (Pause.)  And you testified that part of what you

21   were asked to -- I'm sorry.  I apologize.

22        Would it refresh your recollection if you were to

23   review a document regarding your payment in this case?

24   A.    Sure, yeah.

25   Q.    Okay.  (On screen.)  Are you familiar with this
```

```
 1  document?
 2  A.     This looks to be a contract.  I don't know which
 3  contract this is, but, yes, this looks to be a contract.
 4  Q.     Does that say, in the word amount, of $57,900?
 5  A.     It does, yes.
 6  Q.     And is it dated April 17th, 2023?  Oh, just a
 7  second.
 8  A.     It is.  Now one thing to keep in mind about these
 9  contracts, this is the amount that's been allocated for
10  our work, it's not necessarily what we're paid.  If we
11  come in well below this amount, then that's what we're
12  going to be paid.  So I suggest this is just a budget
13  allocation, not the actual payment.
14  A.     Okay, well thank you for clarifying that.
15         So you testified today that, um -- okay, thank
16  you.
17         So you've reviewed Dr. Albrecht's report, is that
18  right --
19  A.     That's correct, yes.
20  Q.     -- for this case and, um, did you mention that he
21  had also created a revised report that you may have
22  reviewed.  Do you recall that?
23  A.     I do recall he had a revised report, yes.
24  Q.     Okay, thank you.  And you were asked to provide
25  calculations of the plaintiff's alleged economic losses
```

1   in the event the finder of fact determines the plaintiff
2   is entitled to damages, is that right?
3   A.   That's correct, yes.
4   Q.   Okay.  So I want to turn first to your testimony
5   at the end about the alternative losses scenarios.
6        So under your first scenario, you state your
7   conclusions based on the assumption that plaintiff finds
8   replacement employment as of January 1st, 2024, is that
9   right?
10  A.   Um, yes.  Right.
11  Q.   Is January 2024 a month from now?
12  A.   Um, it is.
13  Q.   And by "replacement employment," do you mean by
14  that that the plaintiff's earnings were the same as they
15  were at the FDO?
16  A.   Um, yes, the plaintiff would have found earnings,
17  um, that meets or exceeds what she would have earned at
18  the FDO.
19  Q.   Okay.  And so your testimony today is that if
20  plaintiff finds replacement employment with the federal
21  government by January 1st, 2024, her potential losses
22  are $46,610 -- sorry, $46,675.  Does that sound right?
23  A.   Yes.
24  Q.   Okay.  And if you find that plaintiff does not
25  find replacement employment with the federal government

1  but her earnings are the same as the FDO, her total

2  potential loss is $375,004, is that right?

3  A.   That's the amount that would include pension

4  losses, yes, if she finds alternative employment, but

5  not an alternative pension.

6  Q.   Right, okay, so that includes the value of the

7  projected for pension?

8  A.   That's correct, yes.

9  Q.   Okay, great.  So then turning to your Scenario 2,

10  your testimony about Scenario 2 is based on the

11  assumption that it will take 6 years to recover lost

12  earnings, is that right?

13  A.   That's correct.

14  Q.   Okay.  And you chose that assumption of 6 years

15  based on the fact that it took 6 years from graduation

16  from law school to reach those earnings at the FDO, is

17  that right?

18  A.   That's right.

19  Q.   Did you select 6 years for this assumption because

20  6 years is a reasonable assumption to make based on

21  those facts?

22  A.   No, I think the reasonable assumption to make is

23  the first scenario.  We want to be conservative as well

24  and show what we thought would be the most upperbound

25  amount.  So given that the plaintiff took 6 years to get

1    to that level, we thought, "Okay, let's put in the
2    scenario that says 'Let's just start from scratch,' um,
3    and give her the opportunity to rebuild her career.  And
4    if she was able to do it in 6 years the first time,
5    let's do another assumption that says, "Let's give her 6
6    years to do it a second time."
7    Q.    Okay, and that's because that's a potentially
8    realistic scenario, even if you don't think it's the
9    most likely one, is that right?
10   A.    I don't think it's -- I think it's
11   ultraconservative, to be honest with you, because I
12   think that -- well given the level of earnings the
13   plaintiff currently has versus the market, I think it
14   wouldn't take 6 years at all.
15   Q.    Well we'll get to the market assumptions in a
16   little bit.
17         But, um, during the 6-year period, did you assume
18   that the plaintiff's earnings increased each year until
19   essentially the gap was 0?
20   A.    That's correct, yes.
21   Q.    Okay.  And, um, under this scenario you calculated
22   that if the pension losses are not mitigated, the total
23   losses are $692,881, is that right?
24   A.    That is correct, yes.
25   Q.    Okay.  And, um, to be clear, this scenario is

based on the assumption of full mitigation after 6
years, is that right?

A.    Yes.

Q.    So is it fair to say that you were assuming that
an alleged failure to mitigate is a relevant issue in
this case?

        MS. YOUNG:  Objection, that misstates prior
testimony.

        THE COURT:  I will really don't understand that
question, so I'll ask that another question be put.  I
don't understand the question.

        MS. STRICKLAND:  Well, your Honor, we're just
asking whether, um, mitigation efforts are a relevant
issue -- whether his assumption is based on mitigation
after it's being relevant to his calculation?

        THE COURT:  Well I've ruled that you have to prove
the damages.  Now his various assumptions seem to me to
directly go to that issue and, um, as do the assumptions
made by your expert, Mr. Albrecht.  So I continue not to
understand what you're asking there?

        MS. STRICKLAND:  Okay, yes, your Honor, I'll ask
it one more way and if it doesn't work, I'll move on.

Q.    If plaintiff did in fact adequately mitigate her
damages with the employment issues she's chosen now, is
it fair to say that your loss-earnings calculation would

1   increase?

2   A.    Um, I -- as a labor economist I'm not going to

3   opine on the legal question of whether or not plaintiff

4   has adequately attempted to mitigate her earnings.  So

5   I'm just looking at the market levels, um, in the

6   economic survey data, I'm looking at the earnings

7   streams that we have and the data that I cited.  So I'm

8   not making any opinion on anybody's mitigation efforts

9   and whether they are sufficient.

10  Q.    Okay, thank you for clarifying that.

11        So you testified that one of your, um -- one of

12  your criticisms of Dr. Albrecht's report is that it

13  assumes that plaintiff never would have ended employment

14  at the FDO prior to retirement.  Is that, um -- is that

15  right?

16  A.    That is right, yes.

17  Q.    Wouldn't you agree that estimating front pay

18  always involved some degree of speculation?

19  A.    It, um -- yeah, it involves some degree of

20  estimation into the future, but that estimation can be

21  refined to be more realistic.

22  Q.    And when you're looking at the -- a labor

23  economist at what somebody is likely to do in the

24  future, is it fair to say that part of that

25  determination is looking at what that individual has

1  done in the past?

2  A.    Or if it did involve what's happened in the past,

3  yes.

4  Q.    Okay.  If the individual has a track record of

5  doing the same type of work, is it fair to assume that

6  they might continue doing the same type of work?

7  A.    They may do the same type of work, but maybe not

8  at the same employer.  If there's turnover in a

9  particular employer, then that employment would not have

10  lasted for the rest of the career.

11  Q.    And is it -- if a -- if an individual has been

12  doing the same type of work for a period of time, is it

13  speculative to assume that they will switch to a

14  different type of work?

15  A.    I'm sorry, what do you mean by a "different type

16  of work"?

17  Q.    To a different -- a different career path, a

18  different field.

19  A.    A different field?  That's different.  Um, I don't

20  want to use the word "different," but a different type

21  of -- a "practice area," can we say that?

22  Q.    Yeah, that's a good -- thank you.

23  A.    It's a totally different concept than a different

24  employer.

25  Q.    Right.

```
 1    A.    I'm not making any assumptions, nor do I think
 2    that Dr. Albrecht is about whether or not the plaintiff
 3    would have changed practice areas.
 4    Q.    Right.  Right.  Okay.  Okay, thank you.
 5          So, um, I just want to ask a couple of questions
 6    about this "Demonstrative Market Salary Level, Lawyers
 7    versus Plaintiff's Experts' projected future earnings.
 8          Is it fair to say that this chart is based on
 9    projected earnings for lawyers in the legal profession
10    as a whole?
11    A.    Um, yes, the two market values?
12    Q.    Um, yes.
13    A.    Yes, the Duke University as well as the Charlotte
14    area, yes.
15    Q.    Did you look at earnings for public defenders in
16    North Carolina for this chart?
17    A.    It's not on the chart.  But, no, I've not looked
18    at earnings for public defenders.
19    Q.    Did you look at earnings for private-appointed
20    counsel in the State of North Carolina for this chart?
21    A.    Not for this chart, no.
22    Q.    So by "Earnings Capacity," you are looking at just
23    earnings potential in the legal profession, not public
24    defense work?
25    A.    Not public defense work.  But I note, for example,
```

1    that public defense work would still pay more than what

2    plaintiff is currently earning.  If I understand -- if I

3    remember correctly, shortly after plaintiff's employment

4    with FDO ended, she obtained a clerk job that paid

5    exactly the same amount as what she was earning at FDO.

6    So there's a data point that shows that even in the same

7    type of work, just a different employer, plaintiff could

8    still be earning much more than she's currently earning.

9    Q.    Sure.  But just to be clear, there's nothing about

10   public defender salaries in this chart?

11   A.    Not in this chart, but that is in the record.

12   Q.    Okay, thank you.

13         Now, and, um, I'm sorry, just to be clear, serving

14   as a judicial law clerk is not the same thing as being a

15   public defender, is that right?

16   A.    Um, I'm -- I don't know.

17   Q.    Okay, I won't ask you something you don't know.

18         So I also would like to ask you -- my apologies

19   for just skipping through my notes, um -- okay.

20         Is it fair to say that experts in your field often

21   rely on government data for making assumptions about

22   lost earnings?

23   A.    Yes, when individual-level data is not available.

24   Q.    Okay.  Is it reasonable to rely on government data

25   about pay scales for federal employees?

```
1    A.    Yes.

2    Q.    Um, is it reasonable to rely on data from the

3    Office of Personnel Management in determining, um, data

4    such as annual leave, sick leave, and holidays?

5    A.    For government employees?

6    Q.    Yes.

7    A.    Yes, it is.

8    Q.    Is it reasonable to rely on government data to

9    determine the value of pension benefits?

10   A.    For government employees?

11   Q.    Yes.

12   A.    Yes.

13   Q.    Okay.  And so you just testified that experts in

14   your field often rely on government data and studies, is

15   that right?

16   A.    Yes.

17         MS. STRICKLAND:  Let's go ahead and pull up Trial

18   Exhibit -- this is Lettered-Exhibit AW.  (On screen.)

19   Okay.

20   Q.    Are you familiar with this document?

21   A.    I am, yes.  This is the document we were referring

22   to earlier about the overhead costs.

23   Q.    Okay.  Does this document state, "North Carolina

24   Office of Indigent Defense Services"?

25   A.    It does, yes.
```

 1          MS. STRICKLAND:  Okay, scroll down to the bottom
 2     of this page.  (Scrolls.)  Sorry, go up a little bit.
 3          Is this titled "Fiscal Year '19 Private-Appointed
 4     Counsel Affected Pay Rate Study"?
 5     A.    It is, yes.
 6     Q.    Is it subtitled "Public Defense Attorney Overhead
 7     Rates and Access to Benefits"?
 8     A.    It is, yes.
 9          MS. STRICKLAND:  Okay, now scroll down to the
10     bottom.
11          (On screen.)
12     Q.    And in the bottom corner, is that the Great Seal
13     of the State of North Carolina?
14     A.    It is.
15     Q.    Is this a North Carolina state government study?
16     A.    I believe it is, yes.
17     Q.    Okay.  And I believe you testified earlier that
18     you did review this document when assessing
19     Dr. Albrecht's report?
20     A.    I did.
21     Q.    Okay.
22          MS. STRICKLAND:  Let's turn to Page 1.  (On
23     screen.)  Yeah.
24     Q.    If you look in the top right corner, where it has
25     the box, the headings state "Gross Pay versus Earnings"?

A.    It does.

Q.    And under that heading does the report state "Private-appointed public defense attorneys or contractors' gains does not equal earnings"?

A.    It does.

Q.    So is it fair to say that the purpose of this study was to measure the effective pay rate of private-appointed counsel in North Carolina?

A.    That is one of the objectives of the study, yes.

Q.    Okay, thank you.

So you testified earlier that you believed that Dr. Albrecht didn't provide a reasonable basis for his assumption about the overhead rates, is that right?

A.    That's correct.

Q.    Okay.

MS. STRICKLAND:  Let's turn to Page 2 of the report.  (Turns.)  Go up a little bit.  Okay.

Q.    So is the heading for this "Private-Appointed Counsel Overhead Costs"?

A.    It is, yes.

Q.    So in the second paragraph, does it state "In 2018, attorneys report their average per attorney per hour overhead costs was $38.10 per hour and the median was $21.72 per hour.  The average affected hourly rate before benefits was $15.62 and the median was $30.75.

However, these low overhead rates were achieved by
eliminating critical resources such as legal research
pools that enable attorneys to provide competent
representation."

      Is that what the -- is that a fair statement of
what it says?

      MS. YOUNG:  Objection, the document speaks for
itself.

      THE COURT:  The document does speak for itself.
At present it's not in evidence.

      (Pause.)

      MS. STRICKLAND:  Well I would move to admit this
into evidence.

      THE COURT:  No objection, is there?  Ms. Young?

      (Pause.)

      MS. YOUNG:  I mean I object, that the document is
hearsay.

      MS. STRICKLAND:  This document I believe was --

      THE COURT:  Wait.  Wait.  Wait.  Please.

      MS. STRICKLAND:  I apologize.

      THE COURT:  You know it's not necessary to argue
every point, if I need argument, I've allowed argument
and I will accept it.

      This is a government document, it's admitted for
all the facts that it contains, not necessarily the

conclusions, but the facts.  It's admitted, um, under

8038, I believe.  It's admitted and it will be Exhibit

169.

        (Exhibit 169, marked.)

        THE COURT:  Proceed.

        MS. STRICKLAND:  Thank you, your Honor.  But --

        MS. YOUNG:  Your Honor, just one question about

the admission?  What is the full scope of the exhibit?

Because we can't see -- is it just the PAC survey that's

been admitted as Exhibit 169?

        THE COURT:  The document.  The document is

admitted.

        MS. YOUNG:  Well, your Honor, the document also

contains the plaintiff's, um, her own questionnaire that

she submitted to Dr. Albrecht and, you know, that

document contains hearsay and we don't believe it should

be admitted.

        THE COURT:  Well I understand that.  It's only the

government's document that is admitted.  She's laid a

foundation for the government document from the State of

North Carolina, that study, that's what's admitted.

        Does that make it clear?

        (Silence.)

        MS. STRICKLAND:  Okay, thank you, your Honor, but

just to clarify, um, I think this was an exhibit that

```
 1   was admitted at Dr. Albrecht's deposition, but we're
 2   happy to rely just on the report for now.  So, um, okay,
 3   great.
 4   Q.   So is it fair to say, based on that paragraph I
 5   just read you, that the report finds that these are low
 6   overhead rates that are achieved by eliminating critical
 7   resources such as legal research tools?
 8   A.   That's what the paragraph states.  But it's a
 9   reflection of what their actual overhead rates are.
10   Q.   Okay.
11   A.   And that's what we're trying to model, what's
12   actually being incurred.
13        MS. STRICKLAND:  So let's turn to Page 5 of the
14   report.  (Turns.)  So keep going, I think it's -- no.
15   No.  (On screen.)  Yes, there you go.
16        Does this have the heading "Appropriate Overhead
17   Costs"?
18   A.   It does.
19   Q.   Does the second paragraph of this report state the
20   following:  "IDS reviewed all the itemized overhead
21   costs and identified 13 nonoptional overhead IMs at the
22   hourly rate that public defense attorneys should cover,
23   rents, malpractice insurance, office equipment, office
24   expenses, telephone/internet, required annual programs,
25   legal research tools such as Lexus or Westlaw, access to
```

1    one full-time support staff, and debt service or the

2    interest on the fair employment credit.  The average

3    overhead costs for nonoptional items average $46.72 an

4    hour and the median was $38.20 an hour."

5         Is it fair to say that this report is reflecting

6    that this overhead rate is considered for nonoptional

7    items?

8    A.    That's the header on the table, but again our goal

9    is to measure actual costs that have been incurred, and

10   the first question that comes to mind is why are we not

11   looking at your actual overhead costs, why are we

12   relying on a survey to begin with?  But given that we

13   are relying on a survey, this is the table I was

14   referring to earlier that listed, I believe, it's 13

15   blue columns here.

16        And you say the largest ones, um, are the -- the 1

17   FTE support staff and the staff benefits.  An FTE

18   support staff of $3,479 a month, staff benefits of $600

19   a month, that's over $4,000 a month for support staff.

20   Whereas Dr. Albrecht used that number that's just off to

21   the right, $5,729 a month.

22        So $4,000 a month -- even using this survey,

23   $4,000 a month plus, um, goes to the support staff, and

24   the question is if you have support staff, then maybe

25   that should be included, but if you don't, then I think

1   that's overstating overhead costs that you actually

2   incurred and therefore overstating economic losses.

3   Q.   If the State of North Carolina identifies these

4   overhead costs as appropriate overhead costs, do you

5   have any reason to doubt that?

6   A.   I understand that they are calling these

7   "nonoptional," but also it's very clear in this document

8   that these are not the costs that people are actually

9   incurring, this it what the State of North Carolina

10   would like all the, um, public defense attorneys --

11   excuse me, private public defense attorneys to incur.

12   But that's not what's actually happening.

13      (Pause.)

14      MS. STRICKLAND:  I just need a moment.  I think

15   I'm about done.

16      (Pause.)

17   Q.   And again, just to be clear, the overhead rate

18   that you relied on was achieved by what the Office of

19   Indigent Defense Services says is necessary to eliminate

20   critical resources such as legal research tools that

21   enable attorneys to provide competent representation, is

22   that right?

23   A.   It was the right that -- it's the closest thing

24   that this survey comes to what has actually been

25   incurred, and that's what I'm trying to model.  I would

1    prefer to have your actual costs that you've incurred,

2    and I would use that, but since we don't have that, I'm

3    using what I think is the best measure in this survey of

4    what's actually been incurred.

5    Q.    Yeah, and, um, just to clarify, you testified

6    material that it is appropriate to rely on government

7    data when nonspeculative individualized data is not

8    available, is that right?

9         MS. YOUNG:  Objection, asked and answered.

10        THE COURT:  You have asked that, Ms. Strickland,

11   I'm going to sustain that objection.

12        (Pause.)

13        MS. STRICKLAND:  Just one more question, your

14   Honor.

15   Q.    All right.  You testified earlier about FDO

16   employees leaving the office.  Were you given any data

17   with reasons about why that was?

18   A.    I don't recall seeing the reasons why they left.

19   Q.    Okay.

20   A.    In these calculations it doesn't really matter the

21   reasons why somebody could leave in the future, it could

22   be voluntary, it could be involuntary.  For purposes of

23   the calculations, we would just care whether they left

24   or not.

25        MS. STRICKLAND:  Okay, nothing further.  Thank

1    you.

2          THE COURT:  Nothing further for this witness,

3    Ms. Young?

4          MS. YOUNG:  I just have two quick questions, your

5    Honor, with the Court's permission?

6          THE COURT:  Well of course.

7

8    REDIRECT EXAMINATION BY MS. YOUNG:

9    Q.    Dr. White, do you think using total hours worked

10   by plaintiff or OPM hours data is more precise in terms

11   of economic loss calculations?

12         MS. STRICKLAND:  Objection, that's not within the

13   scope of the report.

14         MS. YOUNG:  It was addressed on cross.

15         THE COURT:  He may answer.

16         MS. STRICKLAND:  I don't recall that ever being

17   addressed.

18         THE COURT:  Well, she may have the answer to that

19   question.

20   A.    I'm sorry, could you repeat the question?

21   Q.    Absolutely.

22         Do you think using total hours worked by plaintiff

23   or OPM hours data is more precise for calculating

24   economic loss?

25   A.    The total hours worked by plaintiff.  We like to

1    get numbers as specific to the plaintiff as possible.

2    Q.    And what if anything are you aware of in terms of

3    reimbursements for overhead costs for

4    privately-appointed counsel?

5    A.    I've seen some documents that show that some of

6    the overhead costs are indeed reimbursed, I don't recall

7    which ones they are, but some of them are.

8    Q.    Thank you very much, Dr. White.

9         THE COURT:  Nothing further, Ms. Strickland?

10         MS. STRICKLAND:  I just have one follow-up

11   question.

12         THE COURT:  You may.

13

14   RECROSS-EXAMINATION BY MS. STRICKLAND:

15   Q.    Does the indigent defense study rely on overhead

16   costs that are reimbursed or overhead costs that come

17   out of pocket?

18   A.    I would have to look at the list of those that are

19   reimbursed and whether that overlaps with the ones that

20   are listed here in this exhibit.

21         THE COURT:  And we have the study in evidence, so

22   the Court can look at it.  I think that's about it for

23   this witness.

24         All right, you may step down.  And, Mr. Martinez,

25   you may resume the stand.

1          And, Ms. Gaudet, would you -- once he does, would

2     you remind him he's still under oath.

3          MR. KOLSKY:  Your Honor, we actually have, I

4     think, one other quick witness that we'd like to call

5     out of order, because he's not going to be available

6     next week.  His direct testimony should be less than 20

7     minutes.

8          THE COURT:  I think that's fine, I said you could

9     call witnesses out of order.  A new witness may be

10    called.  And the Clerk will swear the witness.

11         MR. KOLSKY:  Thank you, your Honor.  The

12    government calls Joshua Carpenter.

13         (JOSHUA CARPENTER, sworn.)

14

15         * * * * * * * * * * * * * * * *

16         JOSHUA CARPENTER

17         * * * * * * * * * * * * * * * *

18

19    DIRECT EXAMINATION BY MR. KOLSKY:

20    Q.    Can you please state your full name for the

21    record.

22    A.    My name is Joshua Brown Carpenter.

23    Q.    Where are you employed, sir?

24    A.    I work for the Federal Public Defender for the

25    Western District of North Carolina.

1    Q.    And what is your position there?

2    A.    I'm the Appellate Chief.

3    Q.    How long have you worked in that office?

4    A.    So I've worked for the office since the summer of

5    2012 and I've been the Appellate Chief since 2015.

6    Q.    What was your title when you started at the

7    Federal Defender's Office?

8    A.    My title was "Assistant Appellate Attorney," and

9    that technically is a Research and Writing Specialist

10   for purposes of pay scales and what-not.

11   Q.    So what did you do before starting at the Federal

12   Defender's Office?

13   A.    So after law school I spent a year at Covington

14   Burling in D.C., spent a year after that clerking for

15   Judge Wayne Michael on the Fourth Circuit, and then

16   spent 3 1/2 years working in the Washington D.C. office

17   of Gibson, Dunn & Crutcher.

18   Q.    Why did you decide to join the Federal Defender's

19   Office?

20   A.    My plan after law school had always been to spend

21   a few years at the firm to pay down the debt from school

22   and then pursue a job that I was passionate about, and

23   for me this job did that perfectly.  I loved appellate

24   practice and I loved the idea of representing indigent

25   defendants, and the opportunity to do those two things,

1    while also practicing before the Fourth Circuit in which

2    I clerked, was a perfect combination for me.

3    Q.    Are you familiar with the Office's conversion of

4    Research and Writing Attorneys to Assistant Federal

5    Defenders in August 2018?

6    A.    I am, yes.

7    Q.    What if any was your involvement in that

8    conversion?

9    A.    So I was involved in some of the conversations

10   about whether we should do it, including speaking with,

11   um, Todd Watson of the Defender Services Office about

12   the idea of conversion.

13   Q.    Who is Todd Watson?

14   A.    Todd Watson is an employee, I think with the

15   Defender Services Office, he provides advice to Defender

16   Offices on budgetary matters, case-related matters, and

17   the like.

18   Q.    Which attorneys were converted from Research and

19   Writing positions to Assistant Federal Defenders?

20   A.    My understanding is that ultimately both Jared

21   Martinez and Caryn Strickland were converted at some

22   point from Research and Writing to an Appellate -- an

23   Assistant Federal Defender position.

24   Q.    And what is your understanding of why they were

25   converted?

A.    So the conversation we had with Todd Watson about whether to do this, um, sort of led us to the conclusion that he -- let me explain, that before --

       MS. STRICKLAND:  Objection, hearsay.

       THE COURT:  Yeah, it is hearsay.  Sustained.

Q.    Mr. Carpenter, I'm not going to ask about any, um, conversations that were made to you, but, um, can you describe your understanding of the reasons for the conversions to Assistant Federal Defenders?

A.    Yes.  My understanding is that before 2016 there has been an incentive for Defender Offices to limit the number of Assistant Federal Defenders based on the way the case-budgeting systems worked and to instead "smuggle," so to speak, lawyers into the Offices using the Research and Writing classification.  The budgetary system changed in 2016, which eliminated that incentive, and as a result it became up to the individual office whether to classify attorneys in which of those classifications.  My understanding is that we decided to make a conversion because it was in the financial best interests of the employees affected because the pay scale for the Assistant Federal Defenders literally tops out at a higher level than the pay scale for Research and Writing Specialists.

Q.    Are you familiar with an Appellate Assistant

1   Federal Defender position, um, a position announcement

2   that was posted around August 2018?

3   A.    Yes, I am.

4   Q.    Who wrote the position announcement for that

5   position?

6   A.    So I wrote the substantive portion of it, um, I

7   think our Administrative Officer, Bill Moormann, had

8   provided some of the language for the technical

9   requirements.  But in terms of what the job functions

10  would be, I drafted that component of it.

11  Q.    And what were the duties or the job functions of

12  that position?

13  A.    So based on the way we were researching, um, the

14  way the work flowed in the office, our appellate team

15  was going to handle three, and continues to this day to

16  handle three work streams, um, one was direct appeals,

17  another is post-conviction work, and third is trial

18  support and motions practice.

19  Q.    How did those duties compare to Ms. Strickland's

20  job duties at that time?

21  A.    So based on the way things shifted that summer,

22  those duties were exactly what her duties were going

23  forward.  So she was, um, shifted over to the Appellate

24  Team under my supervision, along with Ann Hester and

25  Jared Martin, um, and then the fifth person on the team

1  was what we were advertising for.

2  Q.    What if any role did you have in the selection

3  process for that Appellate AFD position?

4  A.    So I reviewed all of the resumes, made

5  recommendations on who to interview, um, and worked with

6  the team committee to interview and to ultimately reach

7  a consensus on who to offer the position to.

8  Q.    Did JP Davis have a role in that selection

9  process?

10  A.    He did not.

11  Q.    Did Ms. Strickland apply for that position?

12  A.    She did submit an application, yes.

13  Q.    Was she interviewed?

14  A.    She was not.  The reason was that she already had

15  one of the positions, so there was no need to conduct a

16  further interview, she was "already hired," so to speak.

17  Q.    What if anything did you tell Tony Martinez about

18  Ms. Strickland's interest in that position?

19  A.    My recollection is that I told Tony that, um, I

20  talked to Caryn at some point and explained that there

21  was no need for her to apply for it, um, because she

22  already had the position, um, and then so I told him I

23  conveyed the information to her and that I didn't think

24  we needed to interview her.

25  Q.    At the time that Ms. Strickland was not selected

1  for an interview, did you know of any allegation of

2  sexual harassment or discrimination or retaliation by

3  Ms. Strickland?

4  A.    I did not.

5  Q.    Who was ultimately selected for the Appellate AFD

6  position?

7  A.    A woman named Melissa Baldwin.

8  Q.    Mr. Carpenter, were you ever Ms. Strickland's

9  supervisor?

10  A.    I was.

11  Q.    Approximately when was that?

12  A.    I don't remember the exact date, but at some point

13  in that summer, um, we transitioned the structure and I

14  believe I became technically the supervisor for both her

15  and Jared Martinez sometime in the late summer or fall.

16  Q.    And how long did you --

17        THE COURT:  Wait a second.  Wait a second.  I'm

18  sorry.  I just want to follow.

19        And the year?  The summer of what year?

20        THE WITNESS:  Oh, of 2018.

21        THE COURT:  Thank you.

22  Q.    And how long did your supervision of

23  Ms. Strickland continue?

24  A.    Until she left the office, which I think was

25  March-ish of 2019.

Q.   What type of work was Ms. Strickland doing while she was under your supervision?

A.   She was doing the same things as the other members of the Appellate Team, so she handled some direct appeals.  I remember her working on, um, *Jarvis Lopes* is one case, *Rangel Cornet* was another, *Bonn Stroop* was another, where she handled direct appeals matters.  I know she did some trial support work in particular.  I remember a case up here in Asheville had a really interesting question about American jurisdiction, where she worked for Mary Ellen Coleman or with Mary Ellen Coleman.  And she also did a lot of work, when the First Step Act was passed, in December of 2018, identifying eventually eligible individuals and preparing some of those motions that were filed in early 2019.

Q.   How did Ms. Strickland's job duties at that time, um, when she was working under your supervision, how did her job duties compare to the other attorneys that you supervised in the Appellate Group?

A.   So her job duties, as far as I saw, were identical to the others.

Q.   To what extent did Tony Martinez influence the work that was assigned to Ms. Strickland while she was working under your supervision?

A.   He really didn't.  He didn't sort of bother me on

1    the assigning basis.

2    Q.    To what extent did JP Davis influence the work

3    that was assigned to Ms. Strickland while she was

4    working under your supervision?

5    A.    He didn't at all.

6    Q.    While Ms. Strickland was working under your

7    supervision, was she invited to participate in moots or

8    appellate arguments?

9    A.    Yes, just like all of our team members.

10    Q.    And did she participate in moots?

11    A.    She did participate in some, yes.

12    Q.    Particularly how many people participated?

13    A.    So when I schedule moots I like to have at least

14    four people, um, serving in the role of moot judge,

15    sometimes five, because it's also the case that

16    something happens in the last minute and one or two

17    people have to drop off.  So I like to have 4 or 5 on

18    the panel signed up for the view.

19    Q.    Did JP Davis ever participate in Appellate moots?

20    A.    Yes.

21    Q.    For how long has he been participating in

22    Appellate moots?

23    A.    He participated in Appellate moots from the time

24    that we began.  So I began in 2012, JP began a few

25    months after me.  He, along with a number of the other

1  trial lawyers, participated in moots simply because we

2  didn't have enough people on our Appeals team to staff

3  them, um, without helping the trial units, and JP was a

4  person who had been willing from the beginning to assist

5  in that capacity.

6  Q.   Did Ms. Strickland ever tell you that she believed

7  she was being sexually harassed by anyone in the office?

8  A.   She did not.

9  Q.   Did she base any, um, complaints with regard to

10 Mr. Davis?

11 A.   Yes, we had a conversation, I think it was in July

12 of 2018, where she did complain about his supervision of

13 her.  It was kind of -- it was very reminiscent for me

14 from my law firm days where I heard someone complaining

15 about a, you know a partner who was hard to work with,

16 um, get along well with, um, some complaints about

17 micromanaging or scheduling or things like that.  So,

18 yes, she did voice those complaints to me.

19 Q.   Were you surprised that someone would think

20 Mr. Davis was a micromanager?

21 A.   Well not especially, I've heard other people

22 occasionally make that kind of complaint about him, so

23 it didn't shock me.

24 Q.   Did Ms. Strickland ever express to you an interest

25 in transferring to the Asheville office?

A.    Um, I do recall, long before all of this happened,
that she had mentioned that her, um, I think it was her
fiance at the time, lived up in this area and she was
interested in potentially, you know, maybe one day
transferring, and I remember conveying to her that that
could happen if she stuck around long enough.  One of
our trial attorneys had expressed interest in 2014, to
the boss, in moving to Asheville and a few years later a
spot finally opened up.  So, yeah, I think I remember
kind of saying "Yeah, if a spot comes open, maybe you'd
be in a position to do that one day."

        (Pause.)

        MR. KOLSKY:  No further questions.

        THE COURT:  And, um, whichever one of you is going
to examine, any questions for this witness?

        MS. STRICKLAND:  Um, yes, your Honor, just a few.

        THE COURT:  You may.


CROSS-EXAMINATION BY MS. STRICKLAND:

Q.    Did you just testify that Mr. Davis did not have
any role in influencing the plaintiff's, my job duties
during the conversion from RFW -- I'm sorry, R&W to AFD?

A.    So what I testified to was that after you were on
the Appellate Team, he didn't have any influence on what
I would assign.

1   Q.   How about before then, did he have any influence?

2   A.   Before that, yeah, I think he was one of your

3   supervisors before that, yes.

4       MS. STRICKLAND:  Okay, let's pull up exhibits --

5   This is a -- this exhibit is admitted already as Exhibit

6   16.  Go ahead and scroll down so he can look at the

7   e-mail chain.  (Scrolls.)  Let him just scroll through

8   the whole thing.  (Scrolls.)

9   Q.   Are you familiar with this document?

10   A.   Yes.

11   Q.   Is this a chain of e-mails between you and JP

12   Davis dated July 20th, 2018?

13   A.   It is, yes.

14   Q.   And does this e-mail state, "A quick follow-up

15   since I realize I reacted a bit strongly on the phone"?

16       MR. KOLSKY:  Objection, your Honor, this is

17   outside the scope of direct.

18       MS. STRICKLAND:  He testified that --

19       THE COURT:  Wait.  Wait.  Wait a minute.

20       Now, um, it is, um -- we're going into the

21   supervision.  She may have it.

22       You may answer, Mr. Carpenter.

23   A.   Yes, that is what the e-mail says.

24   Q.   Is it fair to say that you had had a conversation

25   with Mr. Davis on the phone prior to this e-mail?

A.    Yes, it is.

Q.    And Does JP Davis state, "My primary concern is
that I am the only one who has communicated to Caryn
that her actions, which were filable offenses, were in
fact problematic"?

A.    That is what the e-mail says.

Q.    Does the e-mail state, "I feel a bit out in the
wind here and I am going to have trouble working with
her so long as I think she thinks she can lie to me and
disobey me and no one will back me up"?

A.    Yes, that is what it says.

Q.    Does this e-mail state, "This is not really fair
to jump on you as you are not in a great position to be
chastising her"?

A.    Yes, except it says "dump" rather than "jump."
But, yes.

Q.    Is it fair to say that Mr. Davis wished that
someone besides himself would back him up and chastise
me?

      MR. KOLSKY:  Objection, calls for speculation, it
lacks foundation about what Mr. Davis was thinking.

      THE COURT:  Yeah, he can't testify to what
Mr. Davis is thinking.  The document is in evidence.

Q.    Does this e-mail state, by Mr. Davis, "If she
chooses to continue the fuck-off attitude, then at least

```
 1   we know what we have"?
 2   A.    Um, I think, um, I'm not --
 3         MS. STRICKLAND:  Yeah, I think we need to scroll
 4   down to the next page.
 5         (Scrolls.)
 6   A.    Oh, yes, I see that sentence.  Yes.
 7   Q.    Do you think that it's appropriate for a
 8   supervisor to use words like "fuck-off attitude" in a
 9   work setting?
10   A.    I mean I'm not a huge fan of it, no.
11   Q.    I'm sorry, I didn't hear that?
12         THE COURT:  "I'm not a huge fan of it, no."
13   A.    Yes, that's what I said.
14   Q.    Okay, thank you.
15         MS. STRICKLAND:  Let's go up.
16         (On screen.)
17   Q.    Did you respond to this e-mail on the evening of
18   July 20th, 2018?
19   A.    Yes.
20   Q.    Did you state, "I have a game plan in mind for how
21   to give her a chance, whether deserved or not, to redeem
22   herself and return to being a productive employee.  If
23   it works, great.  If not, we'll encourage Tony to
24   respond appropriately."
25   A.    Yes, that is what I said.
```

1    Q.    By "encouraging Tony to respond appropriately,"
2    did you mean to suggest some sort of adverse action
3    being taken against me in the future?
4    A.    Yeah, my "game plan" that I referred to in this
5    would be you working under my supervision and being able
6    to do the type of appellate work that you had expressed
7    to me in earlier conversations that you were interested
8    in doing.  I thought that would give you a fresh start
9    in the office, because I knew from our conversations
10   that you weren't happy with your situation.  But I also
11   believed you had the potential to be a productive
12   employee.  So my game plan was to bring you over to the
13   appellate team, give you an opportunity to do the work
14   that you had expressed an interest in doing, and hope
15   that allows you to reset and to flourish.
16   Q.    So when you say the words "return to being a
17   productive employee," do you mean to say you did not
18   think I was a productive employee?
19   A.    That wasn't my opinion, it was the opinion that JP
20   was expressing, so I was sort of taking -- I mean I took
21   everything that both of you told me in those
22   conversations with a bit of a grain of salt knowing that
23   I was only getting one side of the story from each of
24   you.  So, you know, I knew that there were concerns that
25   there were problems and, you know, my view was maybe in

1   a fresh setting in the appeals scene, um, that you'd get

2   past those and do good work.

3   Q.   (Pause.)  You testified earlier about the, um, the

4   appellate AFD position, is that right?  When that

5   position was posted, was there an open full-time

6   position in appeals at that time?

7   A.   Yes, there was.  Yes, we were restructuring to

8   create one because what was happening at the time, as

9   you probably remember, is that Caleb Newman had been

10  doing -- had been hired on a contract position to do

11  post-conviction work under Amendment 782, and then that

12  contract is renewed to do post-conviction work under the

13  *Johnson* decision, and so his contract was ending.  And

14  at the same time Ros Richardson, who had been diagnosed

15  with cancer a few years before and had been doing

16  appellate work, was about to transition out of the

17  office because of her illness.  And so the decision was

18  made that we needed and had the capacity to add, um,

19  that position to kind of -- merging essentially what had

20  been the work Caleb had been doing and the work that Ros

21  had been doing.

22  Q.   Sir, I understand your testimony, but my question

23  was did you have one FTE in appeals at the time, at

24  least one?

25  A.   Our FTEs were never divided, like trial and

1    appeals, in any formal way.

2    Q.    So if there are staff meeting notes that say

3    "Appeal FTE is 2.75 for having surviving with 1.75 FTE,"

4    are you saying that's inaccurate?

5    A.    Well that refers to the fact that we had 2 3/4s

6    appeals employees, which would be me, Ros, and Ann, and

7    when we're saying "surviving with 1.75," we're referring

8    to the fact that because of Ros's cancer, she hadn't

9    been able to work, and so her work was being covered in

10   other ways.  What was changing going forward is that we

11   were formally moving the Research and Writing positions,

12   which had kind of been under the trial-level like sort

13   of floating positions into the fold of appeals to make

14   the unit more structured.

15   Q.    And those decisions were made in July and August

16   of 2018, is that right?

17   A.    Yes, that sounds right.  I can't remember if the

18   conversation -- when the conversations started.  I know

19   the initial conversation with Todd Watson had been, I

20   think, several months before that, which had sort of

21   planted the seed, and, yeah, I think the final decisions

22   were made in July and August of 2018.

23   Q.    So you testified earlier that it was in the best

24   interest of the R&Ws to convert them to AFDs, is that

25   right?

A.    So I think that was ultimately the decision that
was made.  I remember you and I had a conversation at
one point where I suggested that you talk to our
administrative officer, Bill Moormann, because he had
informed me that it might be in your interest, as a more
junior employee at a lower point in the pay scale, to
stay in the R&W position, because at least he understood
it to be the case that there could be a financial
benefit to that, because the AFD pay scale tops out
higher, um, and as he explained it to me is somewhat
more structured.  And so that at the lower level there
could be a financial benefit to someone sticking as an
R&W position until they gain some seniority.  And so I
remember suggesting you might want to consult with him
about what would be in your own financial best interest.
Q.    Did you base that on any provision of the Docs
manual?
A.    I based that on the advice of our administrative
officer who handles budgetary and salary issues, that
was well-outside of my purview.
Q.    Did you state in an e-mail, dated July 23rd, 2018,
"It may well make sense to reward Jared's excellent
performance by converting him to an AFD position given
the higher top-end salary range"?
A.    Um, that sounds familiar, although if you had the

1    e-mail it might help to refresh my recollection a bit.

2    Q.    Sure.  All right.  (Pause.)  This is admitted

3    Exhibit 39.

4         MS. STRICKLAND:  Um, let's see here.  I think we

5    want to scroll down.  (Scrolls.)  Yes, all right.  Yes.

6    Q.    Are you familiar with this document?

7    A.    Yes, this looks like the --

8         MS. STRICKLAND:  Well just go to the top of the

9    page.  (Scrolls up.)  And you can scroll all the way

10   down to the bottom, if that would help.  (Scrolls.)

11   Yeah.  Now go back up.

12        (On screen.)

13   Q.    Are you familiar with this document?

14   A.    Yes.

15   Q.    Is this an e-mail from you to the management team?

16   A.    Um, yes, it is.

17   Q.    And is this e-mail dated July 23rd, 2018?

18   A.    It is, yes.

19   Q.    So does this e-mail state, "It may well make sense

20   to reward Jared's excellent performance by converting

21   him to an AFD position given the higher top-end of the

22   salary range"?

23   A.    Yes, and that reflects what I suggested a second

24   ago, my understanding being that at the high end -- and

25   Jared had 10-plus years of experience at that point, so

1    that at the higher end of the scale it would make sense

2    that that was reflecting that advice that I had

3    understood from Mr. Moormann.

4    Q.    Does it make a difference, um -- is the high end

5    of the AFD pay scale different depending on how many

6    years of experience you have?

7    A.    No, what Bill explained to me -- and again I

8    didn't go to the document to let me verify this, but the

9    explanation I was given was that the AFD scale is more

10   rigid, um, and so that you take smaller jumps, whereas

11   the R&W scale had bigger gaps and more ability to push

12   someone up based on comparable experience.  Um, again

13   this is my understanding, so this is what the e-mail

14   reflected.

15   Q.    And that's based on what Bill Moormann said,

16   right?

17   A.    Correct.

18   Q.    Okay.  Would it affect that if there was actually

19   -- I was eligible for a promotion onto the next grade on

20   an R&W scale before being converted?

21        MR. KOLSKY:  Objection, lacks foundation.

22        THE COURT:  Yeah, I don't know the foundation.

23   Sustained.

24   Q.    Does this e-mail state, "JP and Bill, please add

25   in anything I missed or any additional thoughts."

A.    It does, yes.

Q.    Is it fair to say that JP was part of these
conversations about the conversion from R&Ws to AFDs?

A.    He was at this point, yes.  I believe he was on
the phone call with Todd Watson, which is what this
e-mail is making me think.

      MS. STRICKLAND:  Give me just a moment, please.

      THE COURT:  Of course.

      (Pause.)

      MS. STRICKLAND:  That's all I have.  Thank you.

      THE COURT:  No redirect, Mr. Kolsky?

      MR. KOLSKY:  One question, your Honor.

      THE COURT:  Go ahead.


REDIRECT EXAMINATION BY MR. KOLSKY:

Q.    Mr. Carpenter, you were asked about Exhibit 16, a
statement in your e-mail, um, to the effect of "If it
works great, if not, we'll encourage Tony to respond
appropriately."

      My question is, did you ever encourage Tony to
"respond appropriately," as you put it?

A.    No.

      MR. KOLSKY:  No further questions.

      THE COURT:  All right.

      Nothing further then for this witness?

1          (Silence.)

2          THE COURT:  Are we going back to Mr. Martinez now?

3          MR. KOLSKY:  Yes, your Honor.

4          THE COURT:  All right, he may resume the stand and

5     Ms. Gaudet will caution him -- remind him.

6          MS. STRICKLAND:  Just one moment, your Honor,

7     while we go and get the documents?

8          THE COURT:  Yes, I understand.

9          (Pause.)

10          (Mr. Martinez resumes stand.)

11          THE CLERK:  I'd like to remind you, sir, that you

12     are still under oath.

13          Do you understand?

14          THE WITNESS:  Yes.

15          THE COURT:  Thank you.

16

17     DIRECT EXAMINATION BY MS. YOUNG:  (Resumed.)

18     Q.    Will you please state your name.

19     A.    Anthony Martinez.

20     Q.    Thank you, Mr. Martinez.  Good morning.

21     A.    Good morning.

22     Q.    Mr. Martinez, you testified yesterday that after

23     you inadvertently assigned Ms. Strickland to Mr. Davis's

24     team, you called Ms. Strickland to apologize, is that

25     correct?

A.    Yes.

Q.    And when did that phone call occur, approximately?

A.    I believe the action was taken like on a Friday and I might have -- and I thought about it over the weekend and realized there was, you know, my inadvertence during the meeting, and so I wanted to say I called her like on a Monday or Tuesday.  To my recollection.

Q.    Thank you.

      MS. YOUNG:  Mr. Spears, can we please have Defendants' DF.

      (On screen.)

Q.    Mr. Martinez, are you familiar with this?  Oh, we just lost the document.  (Adjusts on screen.)  Yes, there we go.  Good.

      Mr. Martinez, are you familiar with this document?

A.    Yes, ma'am.

Q.    And what is it?

A.    This is a text from me on July 24th, 2018 at 8:48 a.m. in the morning.

      MS. YOUNG:  Your Honor, defendants move to admit DF into evidence.

      THE COURT:  No objection?

      MS. STRICKLAND:  I object to the extent it contains hearsay.

1      THE COURT:  Well what extent is that?

2      MS. STRICKLAND:  I'm sorry?

3      THE COURT:  What extent is that?  It's all hearsay

4  in the sense that there's a -- this is not the, um --

5  this is an e-mail, I assume it's relevant, for the fact

6  of the communication.  So what within it would I

7  exclude?

8      MS. STRICKLAND:  Um, yes, your Honor.  It just

9  looks like there are follow-up text messages from JP

10  Davis and we would contend those are hearsay.

11      THE COURT:  Do you want the whole string,

12  Ms. Young?

13      MS. YOUNG:  No, your Honor, we just need the

14  instruction on July 24th.  Oh, sorry -- yes, July 24th,

15  2018.

16      THE COURT:  The instruction on that date is

17  admitted as Exhibit 170.

18      MS. YOUNG:  Thank you, your Honor.

19      (Exhibit 170, marked.)

20  Q.    Mr. Martinez, why did you send Mr. Davis this text

21  message?

22  A.    Um, as I indicated, I thought about the

23  inadvertence over the weekend and, um, I decided that,

24  um, I needed to change the assignments and to make Jared

25  the gatekeeper.  And so I decided that the best way to

1    resolve this, um, in order to make and have

2    Ms. Strickland feel comfortable and not have any work

3    from Mr. Davis go to Ms. Strickland, I decided that the

4    only way to do this, um, and not have anyone else in the

5    office have any information about this and raise any

6    eyebrows about Ms. Strickland's concerns, I then decided

7    that I'm going to let Mr. Davis know -- well first of

8    all, um, my instruction to him was, um, as I'm reading

9    this text, "Please do not e-mail, text, or meet with him

10   at all until further notice from me, I'm at the Calderon

11   County Jail, we'll talk later."

12   Q.     Thank you.  What if anything did you speak to

13   Mr. Davis about on this day?

14   A.     And after he saw this text I spoke to him that

15   evening and I advised him that, um, back on July the

16   5th, when he had that meeting between myself,

17   Ms. Strickland, and him, that when we had that private

18   session between Ms. Strickland and myself, she indicated

19   she felt uncomfortable with him as a result of the --

20   what I called the "bike incident in the lobby," and

21   that's why I instructed him not to e-mail, text, or meet

22   with Caryn, um, or -- or not even to work -- not even

23   to, um, have her provide any work for him.

24          And he then responded and he completely agreed, he

25   said --

1          MS. STRICKLAND:  Objection, hearsay.

2     Q.    What was your impression of Mr. Davis's reaction?

3     A.    He agreed.

4     Q.    (Pause.)  Did you and Mr. Davis have any

5     conversations about Ms. Strickland's team assignment

6     after this text message?

7          MS. STRICKLAND:  Objection, hearsay.

8          THE COURT:  Um --

9          MS. STRICKLAND:  I'll withdraw it.

10         THE COURT:  Very well.

11    Q.    Um, Mr. Martinez, who is Kate Clark?

12    A.    Ms. Clark is the -- was a former Director for the

13    Defender Services office in the Administrative Office of

14    the Courts.

15    Q.    And did you speak with Ms. Clark regarding

16    Ms. Strickland?

17    A.    I did, yes, ma'am.

18    Q.    And how many conversations did you have with

19    Ms. Clark?

20    A.    I had two conversations with Ms. Clark.

21    Q.    When did those conversations occur?

22    A.    The first one was on August 8th, 2018, and in that

23    conversation, um, Ms. Clark called me and she indicated

24    to me, um, that there were some concerns from an

25    individual by the name of Nancy Dunham, who was the

1    Director of the Fair Employment Practice Office, about

2    the interactions between JP -- Mr. Davis, I'm sorry, and

3    Ms. Strickland, um, and I responded, because I was

4    surprised with the phone call and shocked -- um, this is

5    now August 8th, and I said, "Well I thought this whole

6    issue and the interactions between Mr. Davis and

7    Ms. Strickland were resolved back on July 5th." You

8    know we resolved this as far as I was concerned. And,

9    um, she said, "Well there's still concerns, and what I

10   suggest to you is that you meet with her as soon as you

11   can and, um, let her telework." And that was the extent

12   of the conversation, there were no other details.

13   Q.    Who else was on this call with Ms. Clark?

14   A.    No one else was on that call.

15   Q.    And how long was the call with Ms. Clark?

16   A.    2 minutes.

17   Q.    Um, what details, if any, did Ms. Clark give you

18   about the issues Ms. Strickland was having with

19   Mr. Davis?

20   A.    No details.

21   Q.    What did you tell Ms. Clark about how you were

22   handling this situation?

23   A.    I told her that I thought it was handled overtly

24   on July 5th and I expressed my surprise that this was

25   resurrecting itself, um, and that was it.

```
 1    Q.    What if anything was discussed about the open
 2    appellate AFPD position with Ms. Clark?
 3    A.    I don't recall -- I don't recall any conversation
 4    about the open appellate position with Ms. Clark.
 5    Q.    And you said you --
 6          (Pause.)
 7          THE COURT:  Wait.  Wait.  Hold on a second.  I
 8    have an issue with the Court Reporter.
 9          (Pause.)
10          THE COURT:  We'll take the morning recess at this
11    time for one half hour, it's time for the recess.  We'll
12    take the recess until quarter after 11:00.  We'll stand
13    in recess.
14          THE COURT:  All rise.
15          (Recess, 10:45 a.m.)
16          (Resumed, 11:15 a.m.)
17          THE COURT:  And, Ms. Young, you may continue.
18          MS. YOUNG:  Thank you, your Honor.
19    Q.    Mr. Martinez, you testified before the break that
20    you were surprised that Ms. Clark had called you, is
21    that correct?
22    A.    That's correct.
23    Q.    And can you please explain why you were surprised?
24    A.    Again, um, I believed I testified to this, um, I
25    thought that the matter, in reference to the
```

1    interactions between Ms. Strickland and Mr. Davis, was

2    resolved already on July 5th, so I was surprised to

3    receive a call that someone from the AO, Nancy Dunham,

4    from the Fair Employment Practices Office, who was

5    concerned about the interactions as well, of what

6    Ms. Clark indicated.

7    Q.    And what did you do next after that call with

8    Ms. Clerk?

9    A.    I couldn't meet with her on that day, on August

10   8th, because I had a schedule, I had scheduled some

11   meetings, so I arranged to meet with her on August 9th,

12   the next day.

13   Q.    Arranged to meet with who?

14   A.    With Ms. Strickland, I'm sorry, on August 9th.

15   Q.    Thank you.  And what was the purpose of the

16   meeting with Ms. Strickland on August 9th?

17   A.    To follow up with the phone call from Ms. Clark

18   and find out what exactly was happening and what are the

19   concerns.

20   Q.    What do you recall about that meeting on August

21   9th?

22   A.    The first thing I recall, um, is that she was, um,

23   concerned that she felt she was demoted by me having

24   Jared Martin be the gatekeeper.  I advised her that, um,

25   and I was trying to explain to her my managerial

1    situation, and that is basically I had four trial teams

2    with three attorneys in each team, I had 12 attorneys.

3    Recently I had three R&Ws supporting 12 attorneys, but

4    one of them left, one lawyer left around that time. So

5    now it was 2 R&Ws, Research and Writing Specialists, um,

6    supporting 12 attorneys.

7         Then her issue, um, and her expression to me that

8    she was uncomfortable with Mr. Davis, um, I then, you

9    know, assigned -- because I had four trial teams with

10   two R&Ws, I assigned one R&W to two teams and one R&W to

11   another two teams inadvertently, um, in the middle of a

12   long meeting, and I inadvertently appointed her on

13   Mr. Davis's team.

14   Q.    And that -- and just to be clear, was that back in

15   July?

16   A.    That's correct. Um, and so I corrected that and

17   made the two R&Ws just one unit basically and had

18   Mr. Martin, Jared Martin, be the gatekeeper so as to

19   ensure, um, that Ms. Strickland was protected. And on

20   July 24th I told Mr. Davis not to basically do any work,

21   give any work to, um, Ms. Strickland -- for her not to

22   do any work for him rather. And so I was trying to do,

23   from a managerial perspective, everything I could

24   possibly do to make her feel comfortable. That's what

25   we discussed on August 9th.

1    Another thing we discussed is I told her, during

2    that meeting, she started saying that she felt

3    threatened, she felt harassed, she mentioned.  I then

4    responded, I said, "Well at the last meeting we had on

5    July 5th, I specifically asked you whether you were

6    being sexually harassed and you said no," and she said,

7    "Well I wasn't really using that language, I was trying

8    to 'self-manage,' that's what I told you, and I didn't

9    use that language, I didn't want to use that language

10   yet," she says basically.

11   Now at this meeting they were talking about on

12   August 9th, she surreptitiously recorded this

13   conversation unbeknownst to me.  And so that point that

14   she made that she used the language of "self-managing,"

15   she never did before, this is the first time I'm hearing

16   this from her, she never mentioned it in previous

17   conversations.  And so, um -- so I was a little

18   surprised with that.

19   Then she, um -- I expressed my concern with her

20   going to the AO, the Administrative Office of the

21   Courts, and, um, I wasn't trying to, um, deny her her

22   ability to speak to people, but I was frustrated in that

23   she was talking to people in the AO about a situation in

24   our office where there was nothing really that the AO

25   could possibly do, um, if there's any -- anything

happening like that nature in our office. And so I just
felt frustration, I expressed my frustration that she
went to the AO and not talked to me when I gave her the
opportunity on July 5th to talk to me, to express to me
specifically what exactly Mr. Davis was doing, um,
previously to make her feel uncomfortable.

I then -- we talked about the organizational
chart, um, I agreed that it had already been modified,
that she would then report to Josh Carpenter, the
Appellate Chief, and the Appellate Chief would report to
me directly. She then expressed to me that she was
under the impression that she would be an AFPD, that she
was expecting and she was advised by the Defender, the
previous Defender, that she had an expectation of being
an FPD by now. And I said, "Well I'm going to convert
you, um, like within days, that's already in the works
to make you an AFPD."

She then expressed to me that she wanted to do
exclusively appeals. I then told her "Well I can't
commit to that yet, I need to speak to Mr. Carpenter to
find out whether that's feasible institutionally or what
the needs are within the organization, and I'll get back
to you on that." And then she expressed a concern that
again she wanted to feel safe and the only way she felt
she could be safe is if she worked in Asheville, if

1    there was a change in her duty station, or telework.

2    But I advised her, "Well I have no space, I'm giving you

3    the answer on Asheville right now, that I have no space

4    in Asheville," and "I do not have a telework policy,

5    because it's inconsistent" -- and this is pre-covid,

6    "inconsistent with our function, our defense function,

7    we have to be" -- oh, I'm sorry.

8    Q.    Very good.

9          Is it inconsistent with the function of all AFPDs,

10   does that include Research and Writing attorneys?

11   A.    Generally I'm talking about pre-covid.

12   Q.    Um-hum.

13   A.    Yes, that was the perception that we should be --

14   our job is to be available to the District Court judges

15   on short notice, and so that's the way, you know, all

16   Defenders were working and everybody was coming in --

17   and I'm not saying never, never, never, okay, I mean

18   there were exceptions.  If there was a health issue, an

19   emergency, of course they were permitted to telework

20   during it.  But generally as a function, um, that was

21   discouraged, to telework, because of our need to be, at

22   a moment's call, in the District Court.

23   Q.    Did you tell Ms. Strickland you would look into

24   the telework issue?

25   A.    I'm sorry, could you repeat that question?

Q.    Did you tell Ms. Strickland you would consider the
telework issue?

A.    I was -- my recollection is that I said, "I'll
look into it, I'll see what I can do."  I didn't deny it
at that moment.  I just told her, "Look, I don't have a
telework policy right now, but let me look into it."

        MS. YOUNG:  Mr. Spears, may we please have
Defendants's Exhibit FE.  (On screen.)  Can I have FE-01
and FE-02 side by side.

        (Joint screen.)

        MS. YOUNG:  The document appears to be blurry, you
might want to try -- could you try refreshing please?

        (Pause.)

        MS. YOUNG:  Sorry, your Honor, we're just having
some technical difficulties in the courthouse.

        THE COURT:  No, it's quite all right.

        (Pause.)

        MS. YOUNG:  Perfect.  Thank you, Mr. Spears.

Q.    Mr. Martinez, are you familiar with this document?

A.    I have two documents in front of me.  I'm familiar
with both of them.

Q.    And what is this document?

A.    It's, um -- well I'll go in order.  The document
to my right is an e-mail from Ms. Caryn Devens to me,
dated August 10th, 2018, and the subject matter is

"Agreement from yesterday's meeting."  The other
document, to my left, is an e-mail from me, on August
10th, "Soon after 11:40," um, and the subject matter is
"Agreement from yesterday's meeting."

Q.    And are these pages part of the same e-mail chain?

A.    Yes.

MS. YOUNG:  Defendants move to admit Exhibit FE
into evidence.

THE COURT:  No objection?

MS. STRICKLAND:  Your Honor, I'm going to object
and, um -- yes, your Honor.  This is one that maybe
requires a little bit of an explanation, if I may be
heard?

THE COURT:  Well it appears that the first page is
your admission, so why shouldn't I admit that?

MS. STRICKLAND:  Your Honor, it's our
understanding that this is not an authentic document,
this e-mail was not sent on August 10th, 2018.  The only
e-mail that's in the record, for example in our
mediation supplement that we filed, is from August 17th,
2018 where she sent -- it looks like a version of this
e-mail.  But this is not an authentic document.

THE COURT:  Well I know you're not under oath, but
what do you have to say about this?  You didn't --
you're saying --

```
 1          MS. STRICKLAND:  I never received this e-mail.
 2          THE COURT:  Well as I understand it, one of them
 3     is an e-mail you sent.  You're saying you didn't send
 4     it?
 5          MS. STRICKLAND:  Yes, I -- no, your Honor, to
 6     clarify, I sent that e-mail.  I never received an e-mail
 7     on August 10th, I did not hear anything back or receive
 8     any e-mail until August 17th, a week later, and those
 9     communications --
10          THE COURT:  All right, no, wait a minute --
11          MS. STRICKLAND:  Your Honor, I don't know if this
12     is a draft, but it's not authentic.
13          THE COURT:  Well so you say.  At least I can admit
14     your e-mail of August 10th, all right, because you admit
15     you sent it and it's an admission.  So I will admit
16     that.
17          Then, um, doesn't his testimony authenticate it?
18     I have a live witness who you can cross-examine who has
19     just testified that later that same day, in response to
20     -- I hear you say it, but it's not under oath, so it
21     can't be part of the record, but that you didn't receive
22     it.  Now that's a little different.  I have a witness
23     say that he sent it.  And so that satisfies the
24     authenticity prong, that you have a witness who says he
25     sent it and he sent it on August 10th.
```

```
 1        Now your position is you didn't receive it, but I
 2   see no reason not to admit it against that challenge and
 3   I will admit the two documents -- no, we best keep them
 4   separate because you're only challenging the one on
 5   authenticity.  Your e-mail to Mr. Martinez is 171.  His
 6   e-mail back, which you challenge, is 172.
 7        Go ahead, Ms. Young.
 8        (Exhibits 171 and 172, marked.)
 9        MS. YOUNG:  Thank you, your Honor.
10   Q.    Mr. Martinez, what was your reaction upon seeing
11   Ms. Strickland's e-mail dated August 10th?
12   A.    I was in shock and that's basically because of the
13   third paragraph, um, when she says "This states here,"
14   and I'm going to read it word for word, "As we
15   discussed, these steps are necessary to protect myself
16   from further sexual harassment by the First Assistant."
17   That was the first time that she ever alleged that she
18   was experiencing sexual harassment by the First
19   Assistant.
20   Q.    Did she tell you, on August 9th, that Mr. Davis
21   was sexually harassing her?
22   A.    No, she did not.
23   Q.    How did you respond to Ms. Strickland's e-mail on
24   August 10th?
25   A.    I, um, I believe I received this on a Friday
```

1    afternoon?  Sorry, Friday morning at 11:12.  I -- I was
2    working the whole day, I mean I had meetings, I reviewed
3    it later on in the evening.  And I believe it was a
4    weekend, Monday, um, when I called Mr. Ishida, who was
5    the Circuit Executive for the Fourth Circuit Court of
6    Appeals, and I advised him that, "I have a concern here
7    that we have an employee, a female employee that is
8    making allegations of sexual harassment by the First
9    Assistant -- my First Assistant, you know, what should I
10   do?"  You know, basically seeking direction.  And I
11   believe on the following day, Tuesday -- and I'm sorry
12   that I don't have the dates in my head, I forwarded the
13   e-mail from Ms. Strickland referencing sexual harassment
14   to Mr. Ishida.
15   Q.    Thank you.  And in this e-mail we have up here,
16   why did you tell Ms. Strickland in response that she
17   couldn't do exclusively appeals?
18   A.    Um, because I had discussed, on August 9th, I
19   mentioned to her I have to -- when she expressed to me
20   her interest and request to do only appeals, I advised
21   her, "Well I have to double-check with the Chief of
22   Appellate, Mr. Josh Carpenter, and make sure that he's
23   okay with it."  And so when I write to her, I confirm in
24   there, um, that I had just talked to Josh, the Chief,
25   and he wrote to me that he indicated to you -- so I make

1  reference to Josh Carpenter and just following up on the

2  conversation I had with her on August 9th.

3  Q.    And when did you get back to Ms. Strickland about

4  her telework request?

5  A.    I want to say August 17th, um, when I drafted, um

6  -- I had gone back and forth with Mr. Ishida about going

7  forward.  Mr. Ishida, myself, reviewed the EDR plan, the

8  Fourth Circuit EDR plan, and when we had firmed up what

9  steps were going forward in the EDR process that we

10  should take, um, my recollection is that I then included

11  it in that letter to her that I was approving telework

12  until the investigation process would be completed and

13  that she was expected to come back to the office once

14  that investigation was completed.

15  Q.    Did the granting of the telework request, what if

16  any effect did that have on Ms. Strickland's duty

17  station?

18  A.    It had no effect on her duty station.  She was

19  always welcome, if she needed to come back to Charlotte,

20  that there was an office available in Charlotte, which

21  she never took advantage of.  And so it had no effect on

22  her duty station.

23  Q.    What if any personal knowledge do you have about

24  where Ms. Strickland was working after you authorized

25  her telework request?  Or what was your understanding of

1    where Ms. Strickland was working after you authorized
2    the telework request?
3    A.    My recollection is that she was working in Tryon,
4    North Carolina.
5    Q.    Thank you.  And what actions did you take to
6    modify Ms. Strickland's supervisory change after this
7    e-mail exchange?
8    A.    It was modified to show, as per her request, that
9    she would be working in the Appellate Unit, answering to
10   the Appellate Chief, Josh Carpenter, and the Appellate
11   Chief would be answering to me directly and not to
12   Mr. Davis.
13        MS. YOUNG:  Thank you.
14        Mr. Spears, can you please take down this exhibit.
15   Can we please have Trial Exhibit 149.  Thank you,
16   Mr. Spears.
17        (On screen.)
18   Q.    Mr. Martinez, is this the e-mail exchange you were
19   mentioning earlier with Mr. Ishida?
20   A.    Yes.
21   Q.    So what actions did you take in response to the
22   August 10th e-mail from Ms. Strickland, can you just --
23   well strike that.
24        Can you explain a little more about your
25   interactions with Mr. Ishida after the August 10th

1    e-mail?

2    A.    After the August 10th e-mail, again we were going

3    back and forth and we decided that we needed to proceed

4    pursuant to Chapter 9 of the EDR plan for the Fourth

5    Circuit and, um, it would be a claim of misconduct on

6    the part of Mr. Davis, and then we went back and forth

7    about responsibilities, that we would be appointing

8    Heather Beam as the investigator.  And Mr. Ishida was

9    able to get Ms. Beam on board because he had contacted

10   the District Court as to who they believed would be a

11   good person to do the investigation and they suggested

12   -- we have an HR specialist and her name is Heather

13   Beam, and that's what she does.  And both him and I just

14   agreed that she would be best because she had no

15   knowledge, personal knowledge of the facts, was not

16   involved in anything, that I was involved early on and

17   so it was important that I not be involved in the

18   investigation.  And as a matter of fact, around August

19   14th, I recused myself from being involved in the

20   process and investigation as a result of my involvement

21   in the very beginning.  And so those were the kinds of

22   things that Mr. Ishida and myself were talking about.

23   Q.    And who did you rely on to help you navigate the

24   EDR process?

25   A.    James Ishida.

1    Q.    And why did you rely on Mr. Ishida?

2    A.    Mr. Ishida is -- as the Circuit Executive at that

3    time was the EDR coordinator under the EDR plan for the

4    Fourth Circuit Court of Appeals, and so he would be the

5    person who -- as a Unit Executive in the Fourth Circuit,

6    I would depend on him as the EDR coordinator.

7    Q.    Thank you.  And turning to the investigation.

8    What was your role in the investigation?

9    A.    Again I had no role, I was, um -- I recused myself

10   from involvement.  The only role I had was to be

11   interviewed by the investigator, Ms. Heather Beam.

12   Q.    Why did you recuse yourself from the

13   investigation?

14   A.    As I've just testified, because of my prior

15   involvement in the case and having met with

16   Ms. Strickland and Mr. Davis, both Mr. Ishida and myself

17   thought it would be prudent for me to recuse myself from

18   being involved in any investigation, and have someone

19   who was separated, so we can be sure there was a fair

20   and impartial investigation in this case.

21   Q.    And who was Ms. Beam reporting to during the

22   pendency of the investigation?

23   A.    She was not reporting to me, my understanding was

24   she was reporting to Mr. Ishida.

25   Q.    And to your knowledge did that reporting process

1  ever change during the investigation?

2  A.     It never changed, ma'am, no.

3  Q.     What were the nature of your discussions with

4  Ms. Beam throughout the investigation?

5  A.     The nature of my discussions with her, um, I know

6  it took a little bit longer than anticipated and so at

7  various times I would see her in the courthouse, and

8  I never asked her, but she would give me an update,

9  "Hey, Mr. Martinez, I'm still working on that report of

10  the investigation."  And so that was one aspect of it,

11  and maybe I did that two or three times.

12         At the beginning of the investigation, I assured

13  her that my office was open, that she could interview

14  anyone in the office, if she needed to, um, either in

15  the office or in her office.  And if there's anything I

16  could do to facilitate the investigation of our office,

17  that she should please advise me and I would facilitate

18  it.

19  Q.     Did Ms. Beam interview you?

20  A.     Yes, ma'am.

21  Q.     And approximately when that did interview occur?

22  A.     I don't recall the exact date, but I know it was

23  early on in the investigation, um, after the

24  investigation commenced.

25  Q.     How many times did she interview you?

A.    My recollection is I recall clearly once, but
there might have been a second time.

Q.    What if any discussions did you have about
Ms. Beam's report before it was finalized?

A.    What if -- can you repeat the question?

Q.    Of course.

      What if any discussions did you have about
Ms. Beam's report before it was finalized?

A.    Any discussions with anyone or with --

Q.    Yeah.

A.    The only discussion I can recall is that when
Mr. Ishida, um, was giving the updates on the status of
it, as the Unit Executive in this case, and the
employer, um, and we did discuss that, um, he,
Mr. Ishida, and Judge Gregory had received, um, one
final draft or one final report, and he advised me that
both he and Judge Gregory had decided that they needed
more information in order to resolve it pursuant to, I
think it was with Chapter 9, um, and wrongful conduct,
that they needed to -- that the report needed to have
recommendations, specific recommendations, and it
didn't.  And so they gave it back to Ms. Beam and
Ms. Beam then provided them with that.  And then there
was a final final report and Mr. Ishida then advised me,
"Okay, I have it."  So that was the extent of the

1  conversation.

2  Q.    Thank you.  And why do you think you were made

3  aware of the fact that the report needed to be

4  supplemented?

5  A.    As Unit Executive.

6  Q.    And as Unit Executive, were you the one who

7  forwarded the e-mails that started the investigation

8  process?

9  A.    Yes, I'm the first -- yes.  My understanding, as

10  far as I'm concerned, is the EDR commenced -- once I

11  reported the allegations of sexual harassment made by

12  Ms. Strickland, I reported it immediately to the Fourth

13  Circuit Court of Appeals.

14  Q.    And who else did you speak to about the

15  supplementation of the report?

16  A.    I don't recall speaking to anyone else.

17  Q.    (Pause.)  What discussions, if any, did you have

18  with Mr. Davis about the report?

19  A.    With Mr. Davis -- well, first of all, I had no

20  knowledge of what was going on with the report, I mean

21  the substance of it, that was strictly Ms. Beam, but I

22  know Mr. Davis was anxiously awaiting the results of the

23  report, um, and I understand where he was coming from.

24  He felt that, um --

25       MS. STRICKLAND:  Objection to the extent that this

```
 1   is hearsay, the witness is testifying to his impression.
 2        THE COURT:  Well he can't testify to what
 3   Mr. Davis was thinking.  I'll sustain it.  I'll leave
 4   the business about him being anxious.
 5        (Pause.)
 6   Q.   Now turning back to mid August of 2018.  Why did
 7   you reclassify Ms. Strickland as an AFPD?
 8   A.   That reclassification was in the works, um, prior
 9   to her even requesting it because we were advised by
10   members of the Defender Services --
11        MS. STRICKLAND:  Objection, hearsay.
12        THE COURT:  Yes, as to what the substance of the
13   advice was.  Sustained.
14   Q.   Mr. Martinez, can you please explain your
15   understanding of the benefits of reclassifying Research
16   and Writing attorneys at the AFPD?
17        MS. STRICKLAND:  Objection, hearsay.
18        MS. YOUNG:  It's his understanding as the
19   decision-maker.
20        THE COURT:  It is.  He may give us his own
21   understanding.
22   A.   My understanding is, um, there was a time when,
23   um, prior to this conversion of Ms. Strickland to become
24   an AFPD, that all -- and this is nationally, in all
25   Defender offices around the country, that defenders were
```

1  not getting any credit for the work that the R&Ws were

2  doing on cases, and they were attorneys, but they were

3  not AFPDs.  And so we received approval to then convert

4  the R&Ws to become AFPDs so that now we can get credit

5  for the work that they're doing on these cases.  And

6  getting credit for the work they were doing on these

7  cases is important because the more credit we can get

8  and the more work we can get, then we -- it results in

9  the increase of FTEs as full-time employees.  So we get

10  more positions, more money in our budget.  Our budget is

11  driven by the amount of work that we receive.

12       So it is important for defenders, for all

13  defenders to then convert the R&Ws, that are working

14  hard but getting 0 credit for their work, to become

15  AFPDs, so now they can get credit and we can increase

16  our budgets.

17  Q.    Thank you.  And who else was reclassified, if

18  anyone, at that time?

19  A.    The other Research & Writing Specialist, Jared

20  Martin.

21  Q.    And I believe you mentioned Todd Watson a moment

22  ago.  Who is Todd Watson?

23  A.    Todd Watson is, um, I call him the "Data Guru" in

24  Defender Services, and he was the one that kind of was

25  in charge of advising us as to the best way our offices

```
 1    could take advantage of what they called a "weight
 2    measurement of study" of the work that we do.
 3    Q.    Pre the conversion, before the conversion process,
 4    um, what were the differences between an AFPD's work and
 5    an R&W's work?
 6    A.    The differences were basically an AFPD, um, is an
 7    Assistant Public Defender, meaning they can file a
 8    notice of appearance on a case, they can have their own
 9    cases, file their own motions.  They represent the
10    office, um, in relation to the DEA, the FBI.  I mean
11    they're just basically full-time, um, practicing and
12    representing clients.  Research and Writing Specialists
13    are not permitted to have their own cases, they can make
14    arguments in court, but under the supervision of an
15    AFPD.  They can't sign off on motions, AFPDs sign off on
16    motions.  They can't file a motion of appearance on
17    behalf of a case, because they're not AFPDs.  So that's
18    the basic difference.
19    Q.    How did the conversion change the role for the two
20    attorneys who were previously Research and Writing
21    Specialists?
22    A.    It didn't change their roles because again the
23    rationale behind it all is so we can get more credit for
24    the work that they were doing, and of course it is a
25    promotion in terms of financial for them because then,
```

1   over the long term, their increases that they receive

2   would be much higher than they would have received as a

3   Research and Writing Specialist.

4   Q.   And once that change in title, could they have

5   handled their own cases at that point if they were ready

6   to do so?

7   A.   If the Defender -- if I decided that, yes, they

8   were ready, then they can become an FPD -- well not an

9   FPD -- I mean an Assistant FPD, but they can hold their

10  own cases.  But that determination is up to the

11  Defender.

12  Q.   Thank you.  Who else was involved in effectuating

13  Ms. Strickland's conversion to an AFPD?

14  A.   Bill Moormann is the only other person.

15  Q.   And what role did Mr. Moormann play in processing

16  AFPD conversion for both Ms. Strickland and Mr. Martin?

17  A.   Will Moormann, um, Mr. Moormann is the

18  Administrative Officer of the organization, and so, as

19  the Administrative Officer, he would do all the

20  paperwork basically.

21  Q.   Who calculated what pay Ms. Strickland was

22  eligible for on the AD scale at the time of her

23  conversion?

24  A.   Mr. Moormann did the initial calculation and then

25  ran it by me.

1   Q.    And how did Ms. Strickland's pay change, when she
2   was converted to an AFPD role, if at all?
3   A.    Her pay range did not change at all.
4   Q.    At the time of the conversion, what did you think
5   about Ms. Strickland's eligibility for a potential
6   salary increase on the GS scale?
7   A.    I had no knowledge of her potential salary
8   increase on the GS scale.  I had no knowledge of that.
9   Q.    Then how did you become aware when an employee was
10  eligible for a promotion on the GS scale?
11  A.    Mr. Moormann would advise me.
12  Q.    And on the AD scale?
13  A.    Mr. Moormann would advise me.
14  Q.    At the time of the conversion, what did you think
15  about Ms. Strickland's eligibility for a potential
16  salary increase on the AD scale?
17  A.    I'm sorry, could you repeat that question again?
18  Q.    Sure.
19        At the time of the conversion, what did you think
20  about Ms. Strickland's eligibility for a potential
21  salary increase as part of the conversion process and
22  moving over to the AD scale?
23  A.    My understanding is that we capped her out, we
24  could not give her any more money than what we gave her.
25  As a matter of fact, really based on her level of

1    experience, she should have been making less money,

2    $6,000 less, but because of the Red-Circle Rule in the

3    Docs manual, we were able to give her the salary she was

4    making before, as an R&W, and keep her at the same

5    salary and not decrease it.  But I was maxed out, I

6    could not give her any more money.

7    Q.    And what is this "Red-Circle Rule"?

8    A.    The "Red-Circle Rule" is when you convert someone

9    to a different position, a federal employee within the

10   same agency, if when they're converted the conversion

11   causes them to make less money, than the Red-Circle Rule

12   allows me, as a Unit Executive, to allow them to make

13   the same money they were making prior to the conversion.

14   But now you're limited, I cannot give that individual

15   any more money than what they were making before the

16   conversion.

17   Q.    Thank you.  At this time in mid August 2018, how

18   were you handling performance reviews for employees?

19   A.    I wasn't generally giving them any performance

20   reviews for employees.

21   Q.    Did you have any policy that you were following

22   with respect to --

23   A.    Generally I would max people -- I would max all my

24   staff to the largest maximum I could possibly give them

25   going forward, and there were some people I would give

1    feedback to, particularly the younger attorneys who

2    would be looking for feedback.  But other than that,

3    that was it.

4    Q.    At the time of the conversion, what was your

5    understanding of whether Ms. Strickland was ready to

6    handle her own caseload?

7    A.    We had now reached a point -- she had just been

8    converted, so we didn't have a meeting yet, um, but to

9    discuss whether she could take on her own cases, but

10   honestly, um, based upon that e-mail that she sent after

11   we, um, divvied up Mr. King's cases on the *Dixon* trial,

12   um, and we asked her -- and I gave her -- we gave her,

13   um, the team leaders all agreed that she should get four

14   or five cases -- and I don't recall the exact number,

15   but they were the least difficult cases, they were

16   several supervised release and reentry cases that had

17   already been resolved, and she e-mailed me back and said

18   she could not handle those, that she was too busy.  And

19   that weeks before that, she had volunteered to second

20   chair the *Dixon* trial, who -- Mr. Dixon was facing very

21   serious federal penalties with the possibility of being

22   sent to prison for the rest of his life, that she was

23   energetically volunteering to do that.

24         So then I removed her from that case and after the

25   removal, now that Mr. King is leaving, I have to divvy

1   out his cases, and I was asking her to help with that,

2   um, and she said she was too busy.  So I felt that that

3   really indicated that she was not much of a team player,

4   because culturally, and in the 35 years that I had been

5   in the office as a Defender, it was within our culture

6   that when one person is down, the other people would

7   pick them up.

8       MS. STRICKLAND:  Your Honor, this repeats prior

9   testimony, asked and answered.

10      THE COURT:  Actually the objection is appropriate

11  at this time, it does.

12      Now I'm a little unclear, sir, as to the

13  chronology, and that may make a difference here.

14      So looking at my notes, um, you, um, get this

15  e-mail from her as to what was agreed at the prior

16  meeting on August 10th, and that's -- that's, as you've

17  testified, the first reference you have to sexual

18  harassment and you do various things.

19      Now immediately prior to that e-mail, in the days

20  immediately prior to August 10th, did you feel she was

21  ready to handle her own caseload?  Now you've averted to

22  it, but Ms. Young asked you a question and I'm simply

23  tagging onto it a specific time period, the days just

24  before August 10th.

25      THE WITNESS:  Well what I testified to is, um,

1    Number 1, I had not consulted -- my procedure, um, what

2    I would do is consult with other supervisors that have

3    dealt with her, and other employees, to see if she's

4    ready to handle cases.  I had not done that.

5            THE COURT:  All right.  So that's your answer.

6            THE WITNESS:  I'm sorry?

7            THE COURT:  Go ahead, finish your answer.

8            THE WITNESS:  But as far as -- well I'm concerned,

9    I don't believe she was ready.

10           THE COURT:  Thank you.

11           But then, after the e-mail and as you've

12   testified, you permitted her, um, on August 17th, to

13   telework.  Now she couldn't handle her own cases if she

14   was teleworking, could she?

15           THE WITNESS:  Yes, if, you know, like, for

16   example, even during covid there were many FPDs who had

17   their own cases and they were teleworking, they would

18   have to come into the duty station and work, um, and go

19   to court, um, but they could telework.  So there was

20   nothing preventing her from teleworking here and having

21   her own cases.

22           THE COURT:  Thank you.

23           Go ahead, Ms. Young.

24           MS. YOUNG:  Thank you, your Honor.

25   Q.    Mr. Martinez, what role, if any, did Mr. Davis

1    have in Ms. Strickland's conversion to an AFPD role?

2    A.    No role.

3    Q.    And what role, if any, did Mr. Davis have in any

4    decision regarding Ms. Strickland's pay?

5    A.    No role.

6    Q.    And at the time of the conversion, who was

7    Ms. Strickland's direct supervisor?

8    A.    Josh Carpenter.

9    Q.    And just to be clear, when did Mr. Davis get

10    removed from Ms. Strickland's chain of command?

11    A.    It was around August 9th. But I'm not sure of the

12    exact date.

13    Q.    Thank you.

14    And then how much information did you have at this

15    time about Ms. Strickland's allegations of quid-pro-quo

16    harassment regarding the e-mail --

17    A.    Are you talking about August 9th?

18    Q.    At the time of the conversion. Sorry. Actually,

19    strike that question.

20    (Pause.)

21    Q.    Mr. Martinez, what was your role in mediation?

22    A.    My role basically was as the employer and, um, on

23    occasion the mediator, Mr. Edward Smith -- Ed Smith

24    would contact me. I know early on there was a

25    conversation I had with him about, um, whether -- and I

don't know, I don't recall the specific details, but it
was something about possibly if she could come -- if
Ms. Strickland could come back to the office and do
exclusively appeals, was that possible?  And things of
that nature.  So it was as an employer, um, that was my
role, um, throughout the mediation process.

Q.    And how many conversations did you have with
Mr. Smith during the mediation process?

A.    Well my recollection might have been anywhere from
3 to 5 conversations.

Q.    And what impact, if any, did your conversations
with Mr. Smith have on what you were willing to offer
Ms. Strickland to keep her at the Federal Defender's
Office?

A.    He was a very good mediator, very professional, he
really went out of his way to try to resolve this
matter, um, and so much so that, um, towards the end of
the mediation I then, um, advised Mr. Smith, you know,
"What do I need to do to" -- "What can I do to resolve
this?"  And, um, I guess in that conversation I felt
that this was -- this was all the way towards the end of
the mediation, and I said, "Then you know what I'll do?
If this will resolve this, um, this EDR, I will give her
my office," which is not really my office, "in
Nashville."  And so I offered that and agreed to that in

1    an attempt, a last-ditch effort to try to resolve the
2    EDR.
3    Q.    And you testified it wasn't really your office,
4    what did you mean by that?
5    A.    Well it was shared.  It was an office that I
6    didn't have really any privacy.  I had to share it.  If
7    there was an intern in the office, I had to share with
8    the intern.  If an IT person came in, they would come in
9    through the EDR office.  Um -- but I had a computer
10   there.  And if, um --
11   Q.    And why didn't you offer Ms. Strickland your
12   office space sooner in Nashville?
13   A.    I'm the Defender and I needed to manage and
14   supervise that office, and it was growing.  I needed an
15   office.
16   Q.    How did the mediation conclude?
17   A.    I found out, um, that, um -- and I forget who
18   advised me, to be honest, that Ms. Strickland had agreed
19   to, um -- first there was a letter that she was ending
20   the EDR process and that she -- and then there was some
21   other indication that she was being transferred to
22   another agency within the Fourth Circuit.
23   Q.    Thank you.  And what if any action did you take to
24   effectuate that transfer?
25   A.    I think I signed a document, a cross-agency

1    document that I needed to file as the Unit Executive.

2    Q.    Thank you.  And when did you first receive a copy

3    of the final investigation report?

4    A.    I don't really recall the date, but April, March

5    or April of 2019 comes to mind.

6    Q.    And who did you speak to about the final report

7    once you received it?

8    A.    Mr. Ishida.

9    Q.    And what do you recall about those conversations?

10   A.    My recollection is basically what the findings

11   were.

12         MS. YOUNG:  Mr. Spears, can we please have Trial

13   Exhibit 7.

14         (On screen.)

15   Q.    Mr. Martinez, are you familiar with this document?

16   A.    Yes, ma'am.

17   Q.    When did you first speak to Mr. Ishida about this

18   letter of counseling, if at all?

19   A.    Well as, um, the letter indicates, um, in the

20   first paragraph, "I attended the Fourth Circuit's

21   Workplace Conduct Conference in Richmond, Virginia," I

22   want to say several weeks before the date on this -- on

23   this letter.

24   Q.    And what was your impression of the conversation?

25         MS. STRICKLAND:  Objection, hearsay.

1          MS. YOUNG:  It says "understanding."

2          THE COURT:  Impression of the conversation with

3     Mr. Ishida, is that your question, Ms. Young?

4          MS. YOUNG:  That's correct.  Yes, your Honor.

5          THE COURT:  Well it is hearsay.  So I will sustain

6     it.

7     Q.   What was your reaction to the conversation with

8     Mr. Ishida?

9     A.   My reaction was, um, he was giving me --

10         MS. STRICKLAND:  Objection, hearsay.

11         THE COURT:  No, no, he can tell his reaction.

12         What was your reaction to what he had to say?

13         THE WITNESS:  My reaction was I appreciated him

14    giving me a heads-up basically that this letter was

15    forthcoming.

16    Q.   And what was your reaction to this letter?

17    A.   Um --

18    Q.   Actually we can strike that.

19         All right.  What was your understanding, at the

20    time you received this letter, about whether there was a

21    finding of wrongful conduct against you?

22    A.   Based upon -- I mean the letter itself makes a

23    finding that there's no misconduct on my part.

24         MS. STRICKLAND:  Objection, your Honor, misstates

25    the question.

1      THE COURT:  The question clearly called for a
2  hearsay answer and that's what his view is.  The
3  letter's in evidence.  It speaks for itself.  That may
4  stand.
5  Q.    Um, what if anything -- actually strike that.
6      MS. YOUNG:  Mr. Spears, can you please take down
7  this exhibit.  (Removes.)  Thank you.
8  Q.    Mr. Martinez, what actions did you take after
9  receiving this letter of counseling?
10 A.    As a result of this letter, then I did an oral
11 verbal counseling with Mr. Davis.
12 Q.    And what did that counseling entail?
13 A.    It entailed his, um, electronic communications in
14 this situation with Ms. Strickland and other members of
15 his staff and, um, I advised them that some of the
16 electronic communications were, um, the wording was a
17 little unprofessional and that it could be more
18 professional.  And so that was basically -- you know how
19 to address other employees in the office, especially as
20 a First Assistant, and what language you use, um, in an
21 e-mail is important, and that that language should be
22 professional.  That's basically what we reviewed.
23 Q.    And why was some of the language unprofessional in
24 your view?
25 A.    Well there was some, um, profanity that was not

addressed to any particular individual, but I just made
reference to some profanity that was not professional in
an e-mail in an office.

Q.    And what did you say to Mr. Davis about
Ms. Strickland during the counseling meeting, if
anything?

A.    The focus of the counseling was strictly on his
communications within the office and how they should be
a little bit more professional.

Q.    While you were serving as a federal defender, did
anyone else have authority over personnel decisions such
as terminations, promotions, pay adjustments, um,
besides you?

A.    No.

Q.    And what was your understanding of your role as
Unit Executive in terms of complying with the presiding
judicial officer's order resulting from any final EDR
hearing?

A.    My understanding is that if a judicial officer,
pursuant to the EDR plan orders, or whatever they order,
then I should be -- make myself in compliance with that
request or order from the judicial officer.

Q.    Um, to wrap up, Mr. Martinez, did you ever take
any action against Ms. Strickland because you wanted to
punish her for reporting alleged sexual harassment?

```
 1    A.     No, ma'am.

 2    Q.     Did you ever take any action against

 3    Ms. Strickland because of her gender?

 4    A.     No, ma'am.

 5    Q.     And did you ever treat Ms. Strickland less

 6    favorably than any other employees who raised complaints

 7    against the office?

 8    A.     No, ma'am.

 9    Q.     And did you ever reduce Ms. Strickland's pay?

10    A.     No, ma'am.

11           (Pause.)

12           MS. YOUNG:  Your Honor, the government passes the

13    witness.

14           THE COURT:  Ms. Strickland, do you wish to examine

15    this witness?

16           MS. STRICKLAND:  Yes, your Honor.  Thank you.

17           THE COURT:  You may.

18

19    CROSS-EXAMINATION BY MS. STRICKLAND:

20    Q.     Mr. Martinez, you previously served as the Federal

21    Defender for the Western District of North Carolina, is

22    that right?

23    A.     Yes, ma'am.

24    Q.     How many terms did you serve as Federal Defender?

25    A.     One term.
```

1   Q.    Did you apply for reappointment for a second term

2   as Federal Defender?

3         MS. YOUNG:   Objection, outside the scope.

4         THE COURT:   Well it's not that it's outside the

5   scope, it's that it is irrelevant.   Sustained.

6   Q.    Did you participate in plaintiff's, my job

7   interview for a position at the Federal Defender's

8   Office?

9   A.    As I testified, I participated from Chattanooga,

10  Tennessee via skype.

11  Q.    Was it your view that I was the best candidate for

12  the position?

13  A.    Yes.

14  Q.    Did plaintiff, my offer letter state that I was

15  being hired as a Research and Writing Attorney with the

16  expectation of transitioning to an Assistant Defender

17  position?

18  A.    That letter was signed by Ros Richardson, who was

19  the Defender at that time.   I was not the Defender.

20  Q.    That's not my question.   My question is did the

21  offer letter state that I was being hired as a Research

22  and Writing attorney with the expectation of

23  transitioning to an Assistant Defender position?   That

24  is my question.

25  A.    Yes, the letter states that, yes, ma'am.

1    Q.    Okay, thank you.  Did you review my resume when I

2    was hired?

3    A.    Yes, ma'am.

4    Q.    To your recollection did I have prior experience

5    as a law clerk for a state Supreme Court Chief Justice?

6    A.    Yes, ma'am.

7    Q.    Did I have prior experience as a law clerk for a

8    federal District Court judge?

9    A.    Yes, ma'am.

10   Q.    Did I have prior experience as a law clerk for a

11   judge on the Second Circuit Court of Appeals?

12   A.    Yes, ma'am.

13   Q.    Did I have prior experience as a Supreme Court

14   Fellow?

15   A.    Yes, ma'am.

16   Q.    Was I recommended to you by Kate Clark?

17   A.    Yes, ma'am.

18   Q.    And you testified on direct that Kate Clark was

19   the head of the Defender Services Office and the

20   Administrative Office of the U.S. Courts, is that right?

21   A.    Yes, ma'am.

22   Q.    Is the Defender Services Office involved in the

23   work of Federal Defender Offices nationwide?

24   A.    Can you repeat that question, ma'am?

25   Q.    Is the Defender Services Office involved in the

1  work of Federal Defender Offices nationwide?

2  A.    They conduct training, but not involved in the

3  work.

4  Q.    But they're part of the Administrative Office of

5  the U.S. Courts, isn't that correct?

6  A.    Yes, ma'am.

7  Q.    Is it fair to say that Kate Clark would be a good

8  source of a recommendation for this type of work?

9  A.    Many Defenders would not agree to that.  I

10  wouldn't agree with that.

11  Q.    Was Kate Clark the head of DSL?

12  A.    Yes.

13  Q.    Okay.  You specified earlier that when you were

14  hired as Federal Defender, you wanted to make changes to

15  the organizational structure of the office, is that

16  right?

17  A.    Yes, ma'am.

18  Q.    Did you do any due diligence about understanding

19  what was going on in the office when you were hired

20  there?

21  A.    Yes, ma'am.

22  Q.    Were you aware that the office was in transition

23  from a Community Defender to a Federal Defender office

24  at that time?

25  A.    At which time?

1    Q.    When you were hired.

2    A.    Yes, ma'am.

3    Q.    Are you aware of --

4          THE COURT:  Wait a minute.  Let me interrupt

5    because I don't know what a "Community Defender" is,

6    sir, tell me what it is?

7          (Silence.)

8    Q.    Would you like to explain that, Mr. Martinez?

9          THE WITNESS:  Yes, your Honor.

10         A "Community Defender" is, I believe out of the 91

11   districts there might be 15 that are Community

12   Defenders.  A "Community Defender" is not a federal

13   agency, it's a nonprofit organization, they have a

14   board.  So the CDO, "Community Defender Organization,"

15   is run by a board.  The employees don't have federal

16   benefits, they're not federal employees.  As opposed to

17   an FDO, a "Federal Defender Organization," um, which is

18   a federal agency with federal benefits.  So that's

19   basically, um, the difference between the CDO and an

20   FDO.  And the FDO works under the Circuit Court of

21   Appeals.  CDOs again are strictly nonprofit

22   organizations.

23         THE COURT:  Thank you.

24         Go ahead, Ms. Strickland.

25         MS. STRICKLAND:  Thank you, your Honor.

```
1   Q.    You worked in a -- I apologize.  You worked in a
2   CDO previously, did you not?
3   A.    Yes, ma'am.
4   Q.    Are CDOs covered by Title VII to your knowledge?
5   A.    I have no knowledge.
6   Q.    You have no knowledge.
7         Is it your understanding that the District Court
8   judges in the District vote on whether an office should
9   be a Community Defender or a Federal Defender Office?
10  A.    I have no knowledge of that.
11        MS. YOUNG:  Objection, relevance.
12        MS. STRICKLAND:  This goes to, um --
13        THE COURT:  Well wait a minute.  Wait a minute.
14  He has no knowledge, so it's moot.  Let's move on.
15  Q.    Are you aware of public testimony from Judge Max
16  Cogburn stating that this office was "a mess in need of
17  a change"?
18        MS. YOUNG:  Objection, relevance.
19        MS. STRICKLAND:  May I be heard?
20        THE COURT:  Not yet.  The --
21        Had the transition completed before you became the
22  Federal Defender, sir?  You mentioned a Mr. Richardson,
23  and I understood him to be a Federal Defender -- the
24  Federal Defender.  So had the transition completed at
25  least in form?
```

1          THE WITNESS:  Yes, your Honor.  And to be

2    specific, so when Ms. Ros Richardson was the Interim

3    Defender, she was previously the CDO Defender, and when

4    the conversion occurred to an FDO, a federal agency, she

5    stayed as the Interim Defender when Ms. Strickland was

6    interviewed.  And then I was appointed after that, um,

7    by the Circuit Court of Appeals.

8          THE COURT:  Thank you.  Thank you.  And it's a

9    "she," Ms. Richardson?

10          THE WITNESS:  Yes, your Honor.

11          THE COURT:  Now, um, Ms. Strickland has just

12   referenced some statement by a judge.  Just "Yes" or

13   "No," are you familiar with that statement?

14          THE WITNESS:  Can counsel repeat the question?

15          THE COURT:  Yes.

16   Q.    Are you aware of public testimony from Judge Max

17   Cogburn stating this office was "a mess in need of a

18   change"?

19   A.    I have no knowledge of him stating -- using the

20   word that it was a "mess."  I have no knowledge of that.

21   Q.    So reading that testimony was not part of your due

22   diligence when you came to this office?

23   A.    I read the testimony, but my recollection is that

24   I never saw a word about the office being a "mess."

25   Q.    Are you aware that Judge Cogburn testified that

1  the supervisors in the office were not qualified for

2  their positions?

3  A.    I don't recall that in his testimony.

4  Q.    Do you recall that Judge Cogburn testified that JP

5  Davis would not have even qualified for the CJA panel

6  because he had only served as second chair on one

7  criminal case?

8  A.    I don't recall that testimony.

9  Q.    But you did read the testimony, right?

10 A.    Correct.

11 Q.    To your knowledge had JP Davis ever served as

12 first chair on a criminal jury trial when he became the

13 First Assistant of the FDO?

14       MS. YOUNG:  Objection, relevance.

15       THE COURT:  Well let me be clear on this.  Who

16 appointed him First Assistant, if we know, Mr. Martinez?

17       THE WITNESS:  He was the First Assistant under the

18 CDO and I appointed him under the FDO.

19       THE COURT:  Thank you.

20       THE WITNESS:  I believe Ros Richardson appointed

21 him under the CDO, I believe.

22       THE COURT:  All right.

23       And you may have your question, Ms. Strickland,

24 you may ask this witness about what he knew about

25 Mr. Davis's qualifications.

1    MS. STRICKLAND:  Thank you, your Honor.

2  Q.    To your knowledge had JP Davis ever served as

3  first chair in a criminal jury trial when he became

4  First Assistant?

5    THE COURT:  Well, wait a minute, I'm going to

6  sustain that.  The time reference has got to be when

7  Mr. Martinez confirmed him and continued him as First

8  Assistant, at that time.

9    MS. STRICKLAND:  Yes, your Honor, I understand.

10    THE COURT:  All right.

11    So at that time, sir, what did you do know about

12  his, um, actual trial experience?

13    THE WITNESS:  I -- I wasn't -- I had no knowledge

14  as to whether he first-chaired, I know he second-chaired

15  a trial in federal court.  I don't know whether he

16  first-chaired a trial in federal court.

17    THE COURT:  Thank you.

18  Q.    So you didn't ask him about his qualifications?

19  A.    I already knew his qualifications.

20  Q.    But you don't know whether he actually

21  first-chaired a criminal jury trial in federal court?

22  A.    That's not -- it has no relevance to me in

23  appointing a first assistant, ma'am.

24  Q.    I'm just asking whether you knew whether he had

25  first-chaired a criminal --

1          MS. YOUNG:  Objection, asked and answered.

2          THE COURT:  Sustained, on that ground.

3    Q.    When you became the Defender, did you organize the

4    attorney structure to include team leaders?

5    A.    Yes, ma'am.

6    Q.    Did you also make decisions about who to select

7    for other supervisory positions like First Assistant?

8    A.    Yes, ma'am.

9    Q.    Before you made these promotion decisions, did you

10   post any announcements, internally or externally, for

11   any of these positions?

12   A.    No, ma'am.

13   Q.    Did you invite qualified attorneys to apply for

14   these positions?

15   A.    No, ma'am.

16   Q.    Did you conduct interviews for these positions?

17   A.    When I became the Defender, I met with every

18   single employee in that organization.

19   Q.    Did you conduct formal interviews for the

20   promotions?

21   A.    I conducted informal interviews when people did --

22   when people were not aware of what I was looking for, I

23   interviewed every single employee in that organization.

24   Q.    All right, and we'll get to that.

25          But after you announced these promotions, isn't it

```
1    true that a female Assistant Federal Public Defender
2    filed an EDR complaint against you?
3              MS. YOUNG:  Objection, relevance.
4              THE COURT:  Sustained.
5              MS. STRICKLAND:  Your Honor, may I be heard?
6              THE COURT:  You may.
7              MS. STRICKLAND:  He testified about his leadership
8    style and organizational structure and an issue in this
9    case is his discriminatory intent.  So, um, we think it
10   is relevant.  And we would also appreciate the
11   opportunity to make a proffer.
12             THE COURT:  You may make a proffer, but not now.
13   And I adhere to my ruling.  Move on.
14             MS. STRICKLAND:  Thank you, your Honor.
15   Q.   So you testified that you did ask employees at the
16   FDO for their feedback about who would be good
17   candidates for these positions, is that right?
18   A.   I don't recall me asking them their opinion on who
19   would be good for those positions.  I don't recall that,
20   ma'am.
21   Q.   You just testified though that you spoke to
22   everybody in the office?
23   A.   Yes, ma'am.
24   Q.   And is one of the things that you spoke about with
25   people in the office is their recommendations for who
```

```
 1   might be a good candidate for these positions?
 2        MS. YOUNG:  Objection, asked and answered.
 3        THE COURT:  It is, and I recall it.  It's
 4   sustained.  Move on.
 5   Q.   So you don't recall then that one Assistant
 6   Federal Public Defender warned you that JP Davis was not
 7   suited to have supervisory authority over other people?
 8        MS. YOUNG:  Objection, hearsay.
 9        THE COURT:  No, no, this is -- she's challenging
10   him as to the fact of a communication.  I assume she's
11   doing it in good faith.  She may have the question.
12        Did you ever receive any such communication?
13        THE WITNESS:  No.
14        THE COURT:  All right, that's your answer.
15   Q.   So if an Assistant Federal Public --
16        MS. STRICKLAND:  I apologize.  What?
17        THE COURT:  I said that was his answer.  Go ahead.
18        MS. STRICKLAND:  All right.
19   Q.   So if an attorney alleged that, in an EDR
20   complaint, that she -- that that conversation --
21        MS. YOUNG:  Objection, relevance, and also
22   confidential information of other nonparties's EDR
23   claims, which is akin to privacy act information.
24        THE COURT:  I'll let her have the question.
25        MS. YOUNG:  And that is protected under chapter --
```

```
 1          THE COURT:  The question is not evidence of a
 2   single thing.  I'll let her have the question.  You may
 3   object to it.
 4   Q.    So if an employee alleged that the conversation
 5   did in fact occur, is it your testimony today that that
 6   employee was not being truthful?
 7   A.    No.
 8   Q.    That is not your testimony or you believe this
 9   employee was --
10   A.    I'm not saying that that employee was not
11   truthful.
12   Q.    Okay.  Thank you.
13          So you chose to retain JP Davis as First
14   Assistant, is that right?
15   A.    Yes, ma'am.
16   Q.    And you did so even though he had very limited
17   practice experience, is that right?
18          MS. YOUNG:  Objection, misstates prior testimony.
19          THE COURT:  It does, sustained.
20          MS. STRICKLAND:  I'll rephrase.
21   Q.    You chose to retain him as First Assistant even
22   though he had no experience as first chair in a criminal
23   jury trial?
24          MS. YOUNG:  Objection, asked and answered.
25          THE COURT:  No, she may have it, if that's the
```

1    objection.

2          You may answer.

3    A.    Yes, I appointed him, yes, ma'am.

4    Q.    So your testimony today was that I was not

5    qualified to become a line Assistant Public defender?

6          MS. YOUNG:  Objection, misstates prior testimony.

7          THE COURT:  It does, that wasn't his testimony.

8    Q.    Your testimony was that -- I'm happy to allow you

9    to clarify, but that's all I heard, that you repeatedly

10   testified that you believed that I was not capable of

11   handling my own caseload?

12   A.    That's correct.

13   Q.    So that is your testimony today?

14   A.    That's correct.

15   Q.    But you believe JP was qualified to be the First

16   Assistant of the FDO?

17   A.    That's correct.

18   Q.    So as the First Assistant, does JP Davis have a

19   supervisory role in the organization?

20   A.    Yes, ma'am.

21   Q.    Did he have supervisory authority over me?

22   A.    Yes, ma'am.

23   Q.    Did he have authority to refer me for disciplinary

24   action?

25   A.    Yes, ma'am.

```
 1   Q.    Did he oversee the whole office?

 2   A.    Yes, ma'am.

 3   Q.    And does that include the trial and the Appellate

 4   Unit?

 5   A.    Yes, ma'am.

 6   Q.    Did he supervise all employees at the FDO except

 7   for you?

 8   A.    Yes, ma'am.

 9   Q.    Thank you.

10         You testified earlier about your observations of

11   my work performance, is that right?

12   A.    Can you repeat the question?

13   Q.    Sure.

14         You testified earlier that you had a chance to

15   observe my work performance at the FDO, is that correct?

16   A.    Yes.  Yes, I observed it.  Yes.

17   Q.    Isn't it true that I was hardworking, responsible,

18   and my work was of high quality?

19   A.    Yes.

20   Q.    Isn't it true that I was praised by attorneys in

21   the office for my performance?

22   A.    Yes.

23   Q.    Did you think highly of my performance?

24   A.    I thought highly of your performance on the *Dixon*

25   trial and my observation of your performance was
```

1   strictly in reference to what you did on the *Dixon*

2   trial.  I have no opinion about what you did on other

3   cases.

4           THE COURT:  I understood you --

5   Q.    But I'm saying --

6           THE COURT:  Wait.  Wait.  Wait a minute.

7           Because I understood you earlier to testify that

8   she called you at one time when your obligation was to

9   cross-examine a police officer, she was in a panic, you

10  testified about it, and then, if my notes are correct,

11  you said she went ahead and cross-examined and she did

12  it very well.

13          Have I recalled that correctly.

14          THE WITNESS:  Yes, your Honor, you have.

15          THE COURT:  All right.

16          Go ahead, Ms. Strickland.

17          MS. STRICKLAND:  Thank you.

18  Q.    And you testified about the *Dixon* case.  Just to

19  be clear, did you assign me to work on the *Dixon* case?

20  A.    You requested it.  You volunteered.  And I

21  approved it.  Yes, ma'am.

22          MS. STRICKLAND:  Okay, let's look at Admitted

23  Exhibit 36.  (On screen.)  Okay, scroll down.

24          (Scrolls.)

25  Q.    Are you familiar with this document?

1    A.    Yes, ma'am.

2    Q.    Are these text messages between you and JP Davis?

3    A.    Yes, ma'am.

4    Q.    Did you send a text message to JP Davis on May

5    29th, 2018 where you stated that you didn't see a

6    problem with me second-chairing the trial, but you would

7    still be involved in the case?

8    A.    Yes, ma'am.

9    Q.    Did you communicate to me that you would still be

10    involved in supervising the case?

11    A.    Yes, ma'am.

12    Q.    Okay, thank you.

13          Did you use the case -- the *Dixon* case, excuse me,

14    to teach me about client management?

15    A.    Yes, ma'am.

16    Q.    Was I open eyes, open ears, listening to every

17    aspect and really appreciated everything?

18    A.    Yes, ma'am.

19    Q.    Is it fair to say that I was very interested in

20    learning from you and taking training opportunities?

21    A.    Yes, ma'am.

22    Q.    Before June 12th, 2018, did you ever tell me that

23    I was no longer assigned to work on the *Dixon* case?

24    A.    Before June 12th?

25    Q.    Before.

1    A.    (Pause.)  I don't recall -- I'm sorry, I don't

2    recall the date that I removed you from the *Dixon* case,

3    to be honest.

4    Q.    Um, I just want to --

5          MS. STRICKLAND:  Oh, we've lost the video

6    connection.  (Pause.)  Okay, there it is.  Thank you.

7    Q.    If you told Heather Beam that the removal happened

8    on June 12th, 2018, do you have any reason to doubt

9    that, the accuracy of that?

10   A.    No.  No.

11   Q.    Okay.  Was it reasonable for me to follow your

12   order?

13   A.    Yes.

14   Q.    Okay.  Did you fire the attorney who was serving

15   as first chair on the life-sentence case?

16         MS. YOUNG:  Objection, that relates to

17   confidential information pursuant to the EDR plan, which

18   the parties have protected.

19         THE COURT:  I don't see its relevance and I'm

20   excluding it on the ground of relevance.

21         MS. STRICKLAND:  May I be heard, your Honor?

22         THE COURT:  You may be.

23         MS. STRICKLAND:  He testified on direct that he

24   removed -- he fired the first-chair attorney because he

25   was concerned about potential ineffective assistance.

1    So I just wanted to ask him about his stated reasons.

2         MS. YOUNG:  It misstates prior testimony.

3         THE COURT:  It does.  My notes show that the -- on

4    *Dixon*, that the fellow who was on first chair left the

5    office, and that put the situation in a difficult light

6    because the case was coming on for trial and it was

7    necessary to secure a continuance.  That's what my notes

8    show.  I sustain the objection.

9         MS. STRICKLAND:  May I have an opportunity to make

10   a proffer?

11        THE COURT:  Not now, but at some time, yes.

12   Q.   So you testified that you were concerned with a

13   potential ineffective assistance claim regarding the

14   *Dixon* case, is that right?

15   A.   Yes, ma'am.

16   Q.   Do you believe that I provided ineffective

17   assistance of counsel on the *Dixon* case?

18   A.   You were only on the case as a second chair.

19   Q.   So was ineffective assistance even relevant to me,

20   to my performance on the case?

21   A.   Yes, with your lack of experience on a case where

22   the defendant was looking at life mandatory without

23   parole and you had never handled a case of that nature.

24   Q.   Didn't you just testify that you were supervising

25   the case?

```
1    A.    Yes, I was supervising the case.

2    Q.    Okay.  Did you replace the attorney, who was the

3    first chair, with another Assistant Federal Public

4    Defender?

5    A.    I took over the case.

6    Q.    Did you have a second chair on that case?

7    A.    No, ma'am.

8    Q.    You did not have a second chair on that case?

9    A.    No, ma'am.

10   Q.    So if an attorney stated that she served as second

11   chair with you and that you failed to follow any of the

12   basic chores preparing the case, is it your testimony

13   today that that attorney is being untruthful?

14         MS. YOUNG:  Objection, relevance.

15         THE COURT:  Yeah, it is.  You've rested the case,

16   your case.  Sustained.

17         MS. STRICKLAND:  Your Honor, we'd like to make a

18   proffer and I -- he testified that his reasons for

19   taking these actions with regard to --

20         THE COURT:  No, wait a minute.  Look, you can make

21   these proffers, but you will make them out of the time

22   that we're counting, because that's not fair, just to

23   use up time while you make proffers.  But of course you

24   may make a proffer.  Now that's ultimately contrary --

25   what you're suggesting is utterly contrary to what he
```

1    has testified.

2         Now it's so contrary that maybe you want to put on

3    some rebuttal evidence, because we've gotten into this,

4    and if there's someone who knows, um, maybe you would

5    like to call such a witness.  But I'm not simply -- I

6    normally, on cross-examination, assume the good faith of

7    the examiner, but this is entirely different than the

8    story that I've been given.  Now if there's evidence to

9    that effect, well I would be interested to see it.  But

10   you can't just assert it.

11        Go ahead.

12        MS. STRICKLAND:  Thank you, your Honor.

13   Q.    Mr. Martinez, you testified that you were upset

14   with plaintiff, me, for not being a team player, is that

15   right?

16   A.    That's correct.

17   Q.    And that was because of expressed hesitancy to

18   accept a number of cases from an attorney who left the

19   FDO, is that right?

20   A.    That's correct.

21   Q.    And your testimony, I believe repeatedly on

22   direct, was that I had said I was just too busy to work

23   on these cases, is that right?

24   A.    In summary, yes, ma'am.

25        MS. STRICKLAND:  Okay, let's pull up Admitted 165

1    from yesterday.  (On screen.)  That's okay.  I think
2    it's -- is it FY?  Okay, go ahead and scroll down to the
3    bottom of the chain.  (Scrolls.)  Okay, right here.
4    Right here.  Yes, that's good.
5    Q.    Is this an e-mail from Yvette Arroyo Becker to me?
6    A.    Yes, ma'am.
7    Q.    Who is Ms. Arroyo Becker?
8    A.    She's a legal assistant.
9    Q.    Did you ever discuss this list of cases with me?
10   A.    No, ma'am.
11         MS. STRICKLAND:  Okay, let's scroll up.  (On
12   screen.)  Okay, that's good.  Go down a little bit.
13   Yes, thank you.
14   Q.    Is this an e-mail from me to you about this list
15   of cases?
16   A.    If you'd scroll up?  I just want to see it.
17   (Scrolls screen.)
18         I believe so, yes.  Yes, ma'am.
19   Q.    Okay, and it's dated June 26th?
20   A.    Yes, ma'am.
21   Q.    Did I state in this e-mail, "I wanted to be
22   upfront with you about his scheduled commitments.  I
23   don't want to be ineffective simply by being assigned
24   more cases than I can handle."
25         Is that what it states?

```
1    A.    Yes, ma'am.

2    Q.    Does it also state, "In addition, I am concerned

3    that I have not received any training in handling these

4    types of cases.  For example, I have never worked on an

5    illegal reentry case.  I was assured that these

6    particular cases are straightforward, but in similar

7    situations in the past I have sometimes found that not

8    to be the case."

9          Is that what it says?

10   A.    Yes, ma'am.

11   Q.    And does it also state, "I am happy to talk with

12   you in person about this further and I am of course

13   happy to do what needs to be done to help with the

14   office, but I have concerns about this situation and I

15   felt I needed to express them to you directly."

16         Is that what it states?

17   A.    Yes, ma'am.

18   Q.    Does the statement that "She is of course happy to

19   do what needs to be done to help with the office," sound

20   like someone who is not a team player?

21   A.    That statement does not sound like someone who

22   does not want to be a team player, correct.

23   Q.    Is the fact that I was busy the only reason why I

24   stated I was concerned about handling these cases?

25   A.    Can you repeat that question?
```

Q.    Is the fact that I was quote, unquote "busy" the
only reason why I stated I was concerned about handling
these cases?

A.    Yes, ma'am.  Yes.

Q.    Does the e-mail not state that I was also
concerned about a lack of training?

A.    Yes, it does.

Q.    So it's not just busyness?

A.    As far as you're concerned, yes, ma'am, that's
right.

Q.    There was also an expressed lack of training, is
that not right?

A.    Yes, ma'am.

Q.    And the e-mail also explains that while I
understood these cases can be straightforward, my
experience was that that was not always the case?

A.    Yes, ma'am.

Q.    Did it ever occur to you that these concerns might
have had something to do with the fact that you had just
removed me from the *Dixon* case?

A.    I don't understand your question, ma'am?

Q.    Did you ever occur to you that this e-mail might
have been directly related to the fact that you had just
removed me from the *Dixon* case?

A.    I don't see any relation between this e-mail and

1    the *Dixon* case.

2    Q.    Okay.  So it never occurred to you that there

3    might have been a concern that because you had told me,

4    less than two weeks earlier, that I couldn't even

5    provide research and reading support due to the risk of

6    ineffective assistance, you didn't think that had

7    anything to do with this e-mail that I sent?

8    A.    I'm not understanding your question, ma'am.  I'm

9    sorry.

10   Q.    So on June 12th, you took me off the *Dixon* case,

11   correct?

12   A.    Correct.

13   Q.    And you expressed, you testified on direct that

14   you were concerned about ineffective assistance with me

15   being second chair?

16   A.    (Pause.)  You asked me if I was concerned about

17   ineffective assistance on the case, yes, I was concerned

18   about that, but not just solely because you

19   second-chaired *Dixon*.

20   Q.    Right, and you removed me from the case

21   ultimately?

22   A.    I removed you for strategic reasons because I

23   needed to prepare quickly for the trial.

24   Q.    Does this e-mail discuss the concerns about

25   ineffective assistance?

1      THE COURT:  Well the e-mail speaks for itself.

2  A.      This has nothing to do with --

3  Q.      Did you ever consider the possibility that I was

4  afraid that I was being set up to fail by being provided

5  cases with no training?

6  A.      Ma'am, how -- I cannot get into your head about

7  what you were feeling around the time.

8  Q.      I was just asking about your interpretation of the

9  e-mail.

10 A.      My interpretation is you originally volunteered to

11 handle a life mandatory without the possibility of any

12 parole, a serious case, you were willing to do that just

13 weeks before this, and now, when we're asking you for

14 some help, you advise us that you're too busy to handle

15 four or five very easy cases.  You weren't busy for the

16 *Dixon* trial, but now all of a sudden you are busy.  To

17 me, based upon my 35 years experience in dealing -- in

18 being in the defender culture, this shows me that you're

19 not a team player -- it's an indication that you're not

20 a team player.

21 Q.      So you were upset about this, is that fair?

22 A.      Yes.

23 Q.      Did you ever discuss your concerns with me?

24 A.      No, ma'am.

25 Q.      Did you ever give me an opportunity to show you

1    that I was a team player and willing to help?

2    A.    I gave you the opportunity when we gave you the

3    four or five cases to handle.

4    Q.    But you never discussed the fact that you were

5    upset or that you perceived -- you had this perception

6    of your -- you never discussed that with me?

7    A.    I didn't need to discuss anything further, this

8    was clearly a reflection of character.

9    Q.    Did you make an assumption that I wanted to pick

10   and choose the cases I wanted to work on without even

11   talking to me about it?

12   A.    Yes, because this is a reflection of your

13   character.

14   Q.    And it's an assumption?

15   A.    It's a reflection of your character, ma'am, that's

16   my observation.

17   Q.    But you never followed up and had a conversation

18   about this?

19         MS. YOUNG:  Objection, asked and answered.

20         THE COURT:  It is.  Sustained.

21         MS. STRICKLAND:  I'll move on.

22   Q.    You testified earlier that you thought it was a

23   bad thing that I called you personally before my first

24   cross-examination, is that right?

25   A.    It's not a bad thing.

 1         MS. YOUNG:  That misstates prior testimony.

 2    Q.    You viewed it as a --

 3         THE COURT:  Wait.  Wait.  Wait, there's been an

 4    objection.

 5         I didn't understand from his prior testimony that

 6    it was her first cross-examination.  She's asserted that

 7    now in her question.  But I'll assume that that's in

 8    good faith.  And, um --

 9         Did you think it strange that she called you in

10    that other circumstance about the policeman?

11         THE WITNESS:  Yes, I found it strange.  Yes, your

12    Honor.

13         THE COURT:  All right.

14    Q.    Mr. Martinez, have you ever heard of "imposter

15    syndrome"?

16    A.    I never heard of that, ma'am.

17    Q.    Have you ever heard of the phenomenon where

18    high-achieving individuals experience self-doubt?

19         MS. YOUNG:  Objection, relevance.

20    A.    I don't think what you're talking about, ma'am.

21    Q.    I'm not talking about --

22         THE COURT:  Wait.  Wait.  Wait.  Wait a minute.

23    He answered the question, so the objection is moot.  He

24    says he doesn't know what you're talking about.  The

25    inquiry into this syndrome is irrelevant here.

1    Sustained.

2    Q.    And you did testify that I did do the cross-

3    examination, isn't that right?

4    A.    You did do the cross-examination, yes, ma'am.

5    Q.    And it was excellent?

6    A.    I didn't say "excellent."  But you did a good job.

7    Yes, you did a good job.

8    Q.    Are you aware of the possibility that women, more

9    than men, can experience self-doubt particularly in the

10   legal profession?

11        MS. YOUNG:  Objection, relevance.

12        THE COURT:  No, she may have that question.  Only,

13   um -- she may have that question, framed in that

14   fashion.

15        You may answer, sir.

16   A.    In my experience in over 35 years of dealing with

17   many female defenders and many male defenders equally is

18   that they've never had self-doubt when it comes to

19   representing an indigent defendant and having to cross-

20   examine a police officer or take on four or five simple

21   cases to help a Federal Defender.

22   Q.    So you are completely unaware of the phenomenon

23   that affects the legal profession where women have more

24   self-doubt than men because of the history of sexism in

25   the legal profession, you've never heard of that?

```
 1          MS. YOUNG:  Objection, asked and answered.
 2          THE COURT:  Well I don't know that that's been
 3     asked and answered, but it's quite conclusory and I
 4     don't think it has a foundation.  So I'm going to
 5     sustain it.
 6          MS. STRICKLAND:  Thank you, your Honor.
 7     Q.    You testified earlier that you met with me on July
 8     2nd, 2018, is that right?
 9     A.    Yes, ma'am.
10     Q.    And you testified, I believe the words you used
11     were, that you "had no indication whatsoever that there
12     was any allegation of sexual harassment in this
13     meeting," is that right?
14     A.    That's correct, ma'am.
15          MS. STRICKLAND:  I would like to turn to Admitted
16     Exhibit 17.
17          (On screen.)
18     Q.    Mr. Martinez, are you familiar with this document?
19     A.    Yes, ma'am.
20     Q.    Is this a Significant Event Log from July 5th,
21     2018?
22     A.    Yes, ma'am.
23     Q.    Does it have that title because a significant
24     event happened on July 5th, 2018?
25     A.    Yes, ma'am.
```

 1    Q.    Does this Significant Event Log say, "I wanted to
 2    clarify with Caryn any issue about any harassment with
 3    JP"?
 4    A.    Yes, ma'am.
 5    Q.    Does this Significant Event Log say, "I then
 6    specifically asked her about any possibility harassment
 7    by JP"?
 8    A.    Yes, ma'am.
 9    Q.    Does this Significant Event Log say that "Caryn
10    said she felt creeped out by JP Davis's behavior"?
11          MS. YOUNG:  Objection, the document's in evidence
12    and it speaks for itself.
13          THE COURT:  It does, but she may follow up and
14    press it.  Well you don't need to press that question,
15    it's in evidence and it says that.  Now ask him a
16    question.
17    Q.    Did you understand, based on this situation, that
18    it was important to separate me from JP's supervision
19    based on feeling "creeped out"?
20    A.    In terms of supervision I was focused on -- as I
21    indicated in my prior testimony in response to your
22    Honor's question, I was focused on the mentor/mentee
23    relationship, not on the supervisory relationship, to be
24    honest, and I was under the impression that the only
25    issue I was dealing with is a misunderstanding or a

1    breakdown of communication between you and Mr. Davis

2    about him demanding that you appear at an interview or

3    on a PSI for a client.  That was the only issue that I

4    was dealing with at that time.

5    Q.    But you wanted to clarify whether there was an

6    issue about sexual harassment, is that not right?

7    A.    Yes, ma'am.

8    Q.    Because you were concerned about that possibility,

9    is that not right?

10   A.    I wasn't concerned -- you were using language

11   about putting boundaries on Mr. Davis -- in the certain

12   language you were using, I just wanted to clarify and

13   make sure that there was not a sexual harassment issue.

14   Q.    Because it sounded like maybe there was, is that

15   not right?

16   A.    It sounded like there was.  And you didn't give me

17   any information indicating that there was.

18   Q.    But just to be clear, that's what you talked

19   about, right?

20   A.    Yes, ma'am.

21   Q.    Is there some difference between a mentorship and

22   supervision in this context of deciding whether it's

23   appropriate to separate employees?

24   A.    There is a difference, but I was not focused on

25   the supervisory aspect, ma'am, I was focused on the

1   mentor/mentee relationship, because I thought the only

2   issue was Mr. Davis being angry with you when you

3   canceled the PSI interview.

4   Q.   So you believe that it was appropriate for JP

5   Davis to continue acting as a supervisor at this time?

6   A.   I didn't say I didn't think it was appropriate, I

7   was only focused on the mentor/mentee relationship,

8   because I thought the only issue I was dealing with was

9   the cancellation of the PSI interview and Mr. Davis's

10  reaction to that.

11  Q.   Sir, is it your testimony that you just didn't

12  think about the supervisory relationship at all then?

13  A.   I did not think about the supervisory relationship

14  at all because I was focused on making sure that you

15  were comfortable, and if you were not, then breaking up

16  the mentor/mentee relationship.

17  Q.   Is it your normal practice to make Significant

18  Event Logs of conversations about ordinary work

19  disagreements?

20  A.   This -- this document speaks for itself.

21  "Significant Event Log"?  If it was just a disagreement

22  between two individuals, I am not going to write down

23  "Significant Event Log."  But this was a significant

24  event.

25  Q.   I apologize, I didn't quite understand your answer

1    to my question.

2         Is it your normal practice to make Significant

3    Event Logs of conversations about ordinary work

4    disagreements?

5    A.    No.

6    Q.    Thank you.

7         You testified earlier that a few weeks later you

8    inadvertently assigned me back under JP Davis's

9    supervision on his trial team, is that right?

10   A.    I did not solely do that, there was -- during a

11   meeting with all the team leaders and management, there

12   were 7 or 8 people present at that meeting, and it was a

13   long meeting, and as a team they were trying to

14   reshuffle our resources, and we inadvertently, yes, put

15   you to work on JP's team.

16   Q.    Well I mean to be clear, you're the one who's in

17   charge, you're the Unit Executive, is that not right?

18   A.    Yes, but your --

19   Q.    Thank you.  That's enough.  Thank you.

20        And you testified that after you did that, you

21   told JP Davis about my allegations against him, is that

22   right?

23   A.    On July 24th, I told him the allegations of you

24   feeling uncomfortable and the bike incident, yes, ma'am.

25   Q.    Were you concerned about violating my confidences

1    by telling JP Davis about my allegations?

2    A.    Yes, I was concerned.

3    Q.    So -- but you did it anyway, is that right?

4    A.    Yes, because that was the only way that I could

5    ensure, based upon the reshuffling within the office,

6    that he would not be -- that you wouldn't be doing any

7    work for him.

8    Q.    But the only way that you could ensure that I

9    wouldn't be doing any work for him would be to tell him

10   about my allegations of sexual harassment?

11   A.    Yes, ma'am, because -- yes, ma'am.

12   Q.    Were you concerned about the possibility that I

13   would be retaliated against because you told JP Davis

14   about my allegations?

15   A.    I was not concerned about that, about retaliation,

16   no.

17   Q.    Okay.

18         MS. STRICKLAND:  Let's pull up Lettered Exhibit Z.

19         (On screen.)

20   Q.    You testified on direct examination about a

21   management meeting on July 20th, 2018, is that right?

22   A.    Yes, ma'am.

23   Q.    And you testified that my job duties did not

24   change as a result of the changes to the Research and

25   Writing position, is that right?

1   A.      That's my understanding, yes, ma'am.

2   Q.      Okay.  Please take a look at the document in front

3   of you.

4           MS. STRICKLAND:  If we can just scroll through it.

5   (Scrolls.)  Yes, keep going up to the top, please.

6           (On screen.)

7   Q.      Are you familiar with this document?

8   A.      I'm familiar with it, yes, ma'am.

9   Q.      Is this the, um, the team leader meeting agenda

10  from July 20th, 2018?

11  A.      Yes, ma'am.

12          MS. STRICKLAND:  Go ahead and scroll down too, I

13  think it's where the video attachment is.

14          (Scrolls.)

15          THE COURT:  What's the identification on this?

16          MS. STRICKLAND:  This is Lettered Exhibit Z and I

17  move to -- I move to admit this exhibit.

18          THE COURT:  No objection to that, is there?

19          MS. YOUNG:  No objection, your Honor.

20          THE COURT:  It is admitted, Exhibit, um, 173.

21          (Exhibit 173, marked.)

22          MS. STRICKLAND:  Thank you.

23  Q.      Does this document state:  "Present, Tony, Bill,

24  JP, Josh, Erin, Mary Ellen, Peter, Holly"?

25  A.      Yes, ma'am.

```
1    Q.    Is that because those employees were members of

2    management present at that meeting?

3    A.    Yes, ma'am.

4    Q.    Is this document the meeting notes from the

5    meeting you testified about earlier in your testimony?

6    A.    Yes, ma'am.

7    Q.    Does this document accurately reflect the

8    management decisions that were made at that meeting, to

9    your knowledge?

10   A.    To my knowledge?  I didn't create the document,

11   this document was created by Holly Dixon, and to my

12   knowledge it's accurate.

13   Q.    Okay, thank you.

14         MS. STRICKLAND:  Now let's see.  Yeah, okay.

15         (On screen.)

16   Q.    So does this document state -- and I'm looking at

17   the second star, "Bill, we have enough money and

18   approval for 2 FTEs at the AFD salary range.  This is

19   counting Josh's position on 1 FTD at a lower range."

20         Do you see that?

21   A.    If you're reading from the notes --

22   Q.    I'm reading from --

23   A.    I'm agreeing that the document says what it says.

24   I'm not disagreeing with you.

25   Q.    Okay.  So does this document indicate that there
```

1   was at least one open Assistant Federal Defender

2   position at the time of this meeting?

3   A.   Ma'am, again I'm not arguing with you about what

4   the document says, this document has a lot of

5   information in it, as I indicated in my testimony, it

6   was a long day, there were a lot of moving parts within

7   the organization.  I cannot recall 98 -- 97 percent of

8   what happened on this day, because this happened 5 1/2

9   years ago.  So I'm not disagreeing -- if you're going to

10  read these notes, I'm not disagreeing that the notes are

11  there and it says what it says.

12  Q.   Okay, thank you.  So this document does in fact

13  indicate that there was at least one open Assistant

14  Federal Defender position at the time of the meeting, is

15  that correct?

16          MS. YOUNG:  Objection, asked and answered.

17          THE COURT:  It is, and his answer that he just

18  gave says that's the extent of his agreement.  You're

19  putting a spin on it.  It says what it says.  You may

20  argue it, I mean if there's some evidence of that,

21  that's true, but he says he doesn't have a specific

22  memory.

23          Mr. Martinez, I don't want to misstate anything

24  that you've said.  Did I capture your answer to the

25  preceding question accurately?

1          THE WITNESS:  Yes, your Honor.  Thank you.

2          THE COURT:  Go ahead.

3          MS. STRICKLAND:  Your Honor, I'll move on.

4          THE COURT:  Go ahead.

5          MS. STRICKLAND:  Thank you.

6    Q.    So you wouldn't dispute then, based on what this

7    document says, that, um, the Appeal full-time equivalent

8    at that time was 2.75, but they had been surviving with

9    1.75 FTEs, is that right?

10   A.    Ma'am, I just said to you -- indicated to you that

11   if you're going to read what this document says, that

12   I'm not disagreeing with what this document says.  I

13   have no recollection of 98 percent of what this document

14   says because this happened 5 1/2 years ago and many

15   things occurred on this day.  As you can see, the notes

16   are lengthy and there are many moving parts.

17   Q.    Okay, I'm just trying to understand.  You

18   testified earlier, um, that moving to exclusive appeals

19   was not possible because there wasn't an open position,

20   is that right?

21   A.    I didn't say there was not an open position.

22   Q.    You testified that there was so much work for the

23   trial attorneys that you couldn't put me exclusively in

24   Appeals, is that not right?

25   A.    Ma'am, what I said was we have four trial teams,

1   each trial team has three attorneys on each team, that's

2   12 attorneys.  When Caleb Newman left, the one R&W, I

3   was down to two R&Ws, you and Jared Martin.  If I were

4   to have you work on appeals exclusively, that would

5   leave Jared Martin supporting 12 trial attorneys.  We

6   could not do that in order to function and provide

7   effective assistance of counsel to our clients.

8   Q.    Mr. Martinez, were you not advertising a new

9   appellate attorney position at that very time?

10  A.    It was -- it was a position for an APD that would

11  be doing Research and Writing work and supporting trials

12  and the appeals, yes, ma'am.

13  Q.    Okay, thank you.  So you still testified that --

14        THE COURT:  Excuse me, Ms. Strickland, but we're

15  going to stop now because I -- I will allow Mr. Martinez

16  to step down.

17        (Witness steps down.)

18        THE COURT:  About how much more have you for him?

19        MS. STRICKLAND:  Um, probably about 30 minutes,

20  maybe a little more.

21        THE COURT:  All right, well you can continue on

22  Monday.

23        As we stand now, you've taken up a day and 15

24  minutes, the defense has taken up a day, 3 hours, and 15

25  minutes.

1      Mr. Kolsky, it looks to me like you're going to

2  finish your testimony anyway on Monday, that's correct,

3  isn't it?

4      MR. KOLSKY:  It may go into Tuesday, your Honor,

5  just depending on how much cross there is, which we

6  can't anticipate.

7      THE COURT:  Well in another 15 minutes you'll have

8  an hour and 45 minutes left and you get half an hour for

9  closing, so it looks to me like you'll be shutting down

10  on Monday.  But I will give you the time that I have

11  stated.  And I appreciate everyone being prompt.

12      All right, I was thinking that if we finish the,

13  um, testimony on Monday, perhaps even if we stop before

14  1:00, we might give you -- or my intention is to give

15  you, if we finish, until Tuesday morning and have final

16  arguments on Tuesday morning.  But we can discuss that

17  further on Monday.

18      Now, Ms. Strickland, you want to make various

19  offers of proof.  You may do so.  I'm going to recess.

20  You may recite your offers of proof, they'll be on the

21  record, the Court Reporter will take it down.

22      Very well, we'll stand in recess.  I wish you a

23  good weekend.  We'll stand in recess until 9:00 a.m. on

24  Monday morning the 18th of December.  We'll recess.

25      THE CLERK:  All rise.

1          (Recess, 1:00 p.m.)

2          MS. STRICKLAND:  So the offer of proof is exhibits

3    -- um, okay.

4          So we do understand that this document has been,

5    um, marked as confidential and that the defendants want

6    to seek to potentially seal it and have the courtroom

7    closed.  My understanding of the Judge's ruling is that

8    he was not going to do that.  But we wanted to put that

9    on the record.

10          THE CLERK:  Okay, the Court Reporter is taking it

11    down right now.

12          (Pause.)

13          MS. STRICKLAND:  Okay, I'm sorry, can I -- okay,

14    so, um, we are making an offer of proof, this is for

15    Lettered Exhibit BB, it is redacted for personally-

16    identifying information, and, um, this -- it begins with

17    a, um, "Defendants's responses regarding other EDR

18    complaints against the FDO," and, um, there are various

19    things in here that we would like to offer to refute

20    Mr. Martinez's testimony, um, if appropriate to a

21    rebuttal piece.

22          But one of the things is that when Mr. Martinez

23    testified that he was reorganizing the attorney

24    structure, after he announced the promotions, a female

25    Assistant Federal Public Defender filed an EDR complaint

against him and alleged that she was discriminated

against because she was demoted from a supervisory

position to a line attorney and replaced by a man.

The second offer of proof is that another

Assistant Federal Public Defender warned Mr. Martinez

that JP Davis was not suited to have supervisory

authority over other people, and she told him that he

should not rely on Mr. Davis.  As part of her

allegations in her EDR complaint, she alleged that she

was later retaliated against in part for making those

remarks.

Another offer of proof is --

MR. KOLSKY:  I want to say that this document

should not be displayed publicly.

MS. McMAHON:  Yeah, it's not sufficiently

redacted.

(Pause.)

MR. STRICKLAND:  Defense counsel has provided this

document before trial.

THE CLERK:  Listen, the Judge is not here and --

MS. McMAHON:  Right, the EDR information has all

been sealed throughout the proceeding, because these --

MR. STRICKLAND:  That is incorrect, they have not

been sealed for several --

THE CLERK:  Excuse me.  Excuse me.  Excuse me.  We

1  are not in court right now, there's no need to display

2  any evidence, we are simply making an offer of proof, as

3  requested, with the Court Reporter.

4       MS. STRICKLAND:  Thank you.

5       So, um, in response to Mr. Martinez's statements

6  that he took personnel actions regarding the *Dixon* case,

7  including removing the first chair based on his concerns

8  about ineffective assistance of counsel, this employee,

9  um, or this attorney who was removed, in fact filed an

10  EDR complaint against Mr. Martinez alleging that he was

11  retaliated against for reporting wrongful conduct, and

12  then he testified that he took over the case and that

13  the case was handled better because he took it over.

14       Our offer of proof on that is that he testified

15  that he did not have a second chair on that case.

16  There's a female Assistant Federal Public Defender who

17  filed an EDR complaint against Mr. Martinez and in part

18  of her allegations she alleged that she was assigned as

19  the second chair of that case, that Mr. Martinez failed

20  to follow any of the basic steps towards properly

21  preparing the case, that the motions that Mr. Martinez

22  eventually filed in the case were motions that the

23  Research and Writing attorneys, including myself and

24  Jared Martin, had proposed months earlier.  And this

25  attorney alleged that Mr. Martinez made other

1    questionable decisions, like replacing an experienced

2    litigation paralegal with a new paralegal who had very

3    limited criminal defense background and had never

4    handled a case of this type.  This attorney also alleged

5    that Mr. Martinez had mismanaged the plea negotiations

6    with the government.  And she also alleged that when

7    Mr. Martinez lost the plea offer, um, as a result of

8    mismanaging the plea negotiations, he referred to the

9    female Assistant United States Attorney as being a

10    "fucking bitch."

11        I believe that's all we have for right now.

12        THE CLERK:  Thank you.  See you all on Monday

13    morning.

14        (Adjourned, 1:00 p.m.)

15

16

17

18

19

20

21

22

23

24

25

```
1                C E R T I F I C A T E

2

3

4        I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

5   do hereby certify that the foregoing record is a true

6   and accurate transcription of my stenographic notes

7   before Judge William G. Young, on Thursday, December 14,

8   2023, to the best of my skill and ability.

9

10

11

12

13  /s/ Richard H. Romanow 03-11-24
    _____
14  RICHARD H. ROMANOW    Date

15

16

17

18

19

20

21

22

23

24

25
```