1                    UNITED STATES DISTRICT COURT

2              WESTERN DISTRICT OF NORTH CAROLINA (Asheville)

3                              No. 1:20-cv-00066-WGY

4

5      CARYN DEVINS STRICKLAND, formerly known as Jane Roe,
                 Plaintiff

6

7      vs.

8

9      UNITED STATES OF AMERICA, et al,
                 Defendants

10

11                            * * * * * * * *

12

13

              For Bench Trial via Courtroom Zoom Before:
14                    Judge William G. Young

15

16

                          United States District Court
17                        District of Massachusetts (Boston)
                          One Courthouse Way
18                        Boston, Massachusetts 02210
                          Monday, December 18, 2023

19

20                            * * * * * * * *

21

22            REPORTER: RICHARD H. ROMANOW, RPR
                      Official Court Reporter
23                 United States District Court
          One Courthouse Way, Room 5510, Boston, MA 02210
24                    rhrbulldog@aol.com

25

1                    A P P E A R A N C E S

2

3   CARYN STRICKLAND, ESQ.
    COOPER J. STRICKLAND, ESQ.
4        P.O. Box 92
         Lynn, NC 28750
5        (802) 318-0926
         Email: Caryn.devins@hotmail.com
6        Pro Se Plaintiff

7

8   JOSHUA MICHAEL KOLSKY, ESQ.
    DANIELLE YOUNG, ESQ.
9   MADELINE McMAHON, ESQ.
         U.S. Department of Justice
10       1100 L Street NW
         Washington, DC 20005
11       (202) 305-7664
         Email: Joshua.kolsky@usdoj.gov
12       For Defendants

13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| ANTHONY MARTINEZ (Continued.) | | | | |
| By Ms. Young: | | | 38 | |
| By Ms. Strickland: | | 5 | | 41 |
| | | | | |
| JOHN PARKE DAVIS | | | | |
| By Ms. McMahon: | 43 | | | |
| By Ms. Strickland: | | 84 | | |
| | | | | |
| WILLIAM MOORMANN | | | | |
| By Ms. Young: | 119 | | | |
| By Ms. Strickland: | | 145 | | |

1                    E X H I B I T S

2

3

      EXHIBIT 174 ......................   23
4
      EXHIBIT 175 ......................   33
5
      EXHIBIT 176 ......................   46
6
      EXHIBIT 177 ......................   59
7
      EXHIBIT 178 ......................   82
8
      EXHIBIT 179 ......................  125
9
      EXHIBIT 180 ......................  130
10
      EXHIBIT 181 ......................  131
11
      EXHIBIT 182 ......................  132
12
      EXHIBIT 183 ......................  133
13
      EXHIBIT 184 ......................  137
14
      EXHIBIT 185 ......................  144
15

16

17

18

19

20

21

22

23

24

25

1        P R O C E E D I N G S

2        (Begins, 9:30 a.m.)

3        THE COURT:  Good morning.  I apologize for the

4    delay, it was my responsibility.  We're now ready to go.

5    And I'll ask Ms. Gaudet, the Clerk here, to remind

6    Mr. Martinez that he's still under oath.

7        THE CLERK:  I'd like to remind you, sir, that

8    you're still under oath.

9        Do you understand?

10        THE WITNESS:  Yes, ma'am.

11        THE COURT:  And, Ms. Strickland, do you wish to

12    inquire further?

13        MS. STRICKLAND:  Yes, your Honor.  Thank you.

14        THE COURT:  You may.

15

16    CROSS-EXAMINATION BY MS. STRICKLAND:  (Continued.)

17    Q.    Mr. Martinez, you testified earlier that you read

18    Judge Cogburn's testimony about this office, is that

19    correct?

20    A.    Yes, ma'am.

21    Q.    And you testified that you do not recall whether

22    he testified that this office was "a mess in need of a

23    change," is that correct?

24    A.    That's correct.

25    Q.    Okay.  And you testified that you do not recall

```
 1    whether he stated that the supervisors in the office
 2    were unqualified, is that correct?
 3    A.    There were a lot of details.  I do not recall.
 4    That was 7 years ago?  8 years ago?
 5    Q.    Would it refresh your recollection to review that
 6    testimony?
 7    A.    If you want to show me the testimony.
 8          MS. YOUNG:  Objection, relevance.
 9          THE COURT:  Yeah, I don't really see the
10    relevance, Ms. Strickland, this is before -- at least if
11    I've got the time correctly, this is before Mr. Martinez
12    became the Federal Defender.
13          MS. STRICKLAND:  Yes, your Honor.  It goes to the
14    qualifications of the supervisors who he tapped when he
15    came on as Federal Defender.
16          THE COURT:  Well what Judge Cogburn said, and I --
17    and no disrespect to him, he's not testifying here, so
18    it's hearsay what he may have thought, but I suppose you
19    are entitled to inquire and I've allowed it as to what,
20    um, Mr. Martinez knew and how he deployed his resources.
21    But that's the only relevance here, what Mr. Martinez
22    believed.
23          Mr. Martinez, thinking over the weekend, sir, can
24    you tell me -- a couple questions occur to me.
25          When did you retire, sir?
```

```
1            THE WITNESS:  March 25th of 2022.

2            THE COURT:  Thank you.

3            And do you mind giving me the, um, demographic

4    breakdown of your office in terms of attorneys, male and

5    female, at the time you retired?

6            THE WITNESS:  I -- I have it in my declaration,

7    the exact details.  I -- I don't recall the exact

8    details.  I know that in the last, I believe, 11 hires,

9    I hired, um, 10 were female, and it was a very diverse

10   group of staff members.  I don't have the breakdown, the

11   specific breakdown, your Honor, I'm sorry, off the top

12   of my head.

13           THE COURT:  Understood.

14           And what was the demographic breakdown when you

15   became the Public Defender?

16           THE WITNESS:  What -- the demographic in terms of

17   --

18           THE COURT:  Male and female.  I'm sorry.

19           THE WITNESS:  Oh, male and female.  Yeah, um, I'm

20   sure the majority of the employees were female.  And I

21   would say it was anywhere from 60 to 65 percent of the

22   staff, of the entire staff was female.

23           THE COURT:  Thank you.

24           Ms. Strickland, I interrupted.  You go right

25   ahead.
```

1          MS. STRICKLAND:  Thank you, your Honor.

2          And just to clarify, if you're going to exclude us

3     from refreshing recollection about what Mr. Martinez

4     knew at the time he became the Federal Defender, we

5     would like for the --

6          THE COURT:  Actually I'm not -- I'm not going to,

7     what he knew.

8          MS. STRICKLAND:  Oh, okay, I apologize.  I

9     misunderstood.  I won't belabor the point.

10         THE COURT:  All right.

11         MS. STRICKLAND:  But would you then go on to Page

12    33, please.

13         THE COURT:  Only I take issue with your saying

14    what he knew.  I am interested in what he thought about

15    his supervisors, he himself, Mr. Martinez.

16         Go ahead.

17         THE WITNESS:  I'm sorry, were you asking me a

18    question, Judge?

19         THE COURT:  I was not, I was explaining myself to

20    Ms. Strickland.

21         THE WITNESS:  Oh, okay.

22    Q.   Would you please read to yourself the last

23    paragraph where it says "Judge Cogburn," it starts on

24    Page 33 and it actually goes through to Page 34.

25         MS. STRICKLAND:  Yeah, there, that's perfect.

```
 1           (On screen.)
 2    A.     (Reads.)   I read it.
 3    Q.     Thank you.
 4           Does this refresh your recollection about whether
 5    you knew that Judge Cogburn had testified that the First
 6    Assistant could not be a panel attorney because he's
 7    only second-chaired one criminal case?
 8           MS. YOUNG:  Objection, relevance.
 9           THE COURT:  The objection is overruled.  I --
10    that's not substantive evidence.  But I wonder if he
11    knew of that testimony.
12    A.     Yes, I did know of his testimony.  I'm sorry.
13    Q.     No, just go ahead.  I apologize.
14    A.     Several years before I became a Defender is my
15    point.
16    Q.     Did you become the Defender in August of 2017?
17    A.     Yes, ma'am.
18    Q.     Thank you.
19           And just to be clear, this testimony is dated in
20    2016, is that right?
21    A.     I don't --
22    Q.     We'll come back to that in a second.
23           Does this refresh your recollection about whether
24    Judge Cogburn stated, "The office is a mess, we need a
25    change"?
```

1    A.    It does.

2    Q.    Thank you.

3         MS. STRICKLAND:  Go ahead and scroll back up to

4    Page 1.

5         (On screen.)

6    Q.    Is his testimony dated in 2016?

7    A.    Yes.

8    Q.    Okay.

9         MS. STRICKLAND:  Let's turn to Admitted Exhibit 7,

10    please.

11         (On screen.)

12    Q.    Are you familiar with this document?

13    A.    Yes, ma'am.

14    Q.    You testified earlier that this was a letter of

15    counseling that James Ishida delivered to you, is that

16    right?

17    A.    That's correct.

18    Q.    And this letter is dated May 28th, 2019, is that

19    correct?

20    A.    That's correct.

21         MS. STRICKLAND:  Let's turn to Page 2 of this

22    letter.  Scroll down to where it says "Marriage

23    Metaphor."

24         (On screen.)

25    Q.    Under the section entitled "Marriage Metaphor," in

the second paragraph, this letter states that you had

used an "ill-advised metaphor comparing the relationship

between Ms. Strickland and Mr. Davis as a 'marriage'

with 'the parties needing to compromise and meet in the

middle'."

     Do you deny this finding?

A.    Yes.

Q.    So you did not state -- you did not compare the

relationship between myself and Mr. Davis as a "marriage

with the parties needing to compromise and meet in the

middle"?

A.    That's correct.

Q.    Are you aware that the defendants admitted that

you used a marriage metaphor in their answer during this

litigation?

A.    Well I want to clarify -- I made a statement to

you indicating that "All relationships are like a

marriage, they require compromise and communication."

That was my statement.

Q.    So you did compare the relationship between myself

and Mr. Davis to a marriage?

A.    I compared all relationships to a marriage, not

just you and Mr. Davis.

Q.    But to be clear, the discussion that we were

having was about my relationship with Mr. Davis, is that

1    correct?

2    A.    To be clear, we were having a discussion about a

3    breakdown of communication which happens in all

4    relationships, such as marriages.

5    Q.    And the breakdown in communication in that

6    particular conversation was between myself and

7    Mr. Davis, is that right?

8    A.    That's correct.

9    Q.    Okay, thank you.

10         MS. STRICKLAND:    Let's turn to Section B, which is

11    entitled "No Physical Touching."

12         (On screen.)

13    Q.    This paragraph states that "Investigator Beam

14    found that you had said 'at least you weren't touched,'

15    or words to that effect."  Do you deny this finding?

16    A.    I deny saying that, yes.

17    Q.    Did you state, during this conversation, "Okay,

18    but there was no physical contact"?

19    A.    Okay, "There was no physical contact," um, where

20    are you finding that, ma'am.

21    Q.    I'm just asking you if that's what you said?

22    A.    Correct.

23    Q.    That is what you said?

24    A.    Correct.

25    Q.    Okay.

1    MS. STRICKLAND:  Let's turn to Page 3 of the

2   letter, a section entitled "Disapproval of Seeking

3   Outside Advice."

4       (On screen.)

5   Q.    This paragraph states, "The investigator found

6   that you had called out Ms. Strickland for seeking legal

7   advice from the Fair Employment Opportunity Office."

8       Do you deny this finding?

9   A.    I agree that I disapproved of you seeking advice

10  to the AO because in my opinion the AO was not going to

11  be able to resolve something that was occurring within a

12  Defender office.

13  Q.    And you testified earlier that you were frustrated

14  that I went to the AO, is that fair?

15  A.    I was frustrated because again I knew that there

16  was nothing that the AO could do and I just felt that it

17  was better for you to speak to me than to speak to the

18  AO.

19  Q.    Do you believe that there is something wrong with

20  a judiciary employee seeking guidance about their legal

21  rights from the Administrative Office?

22      MS. YOUNG:  Objection, calls for speculation.

23      THE COURT:  No, it really doesn't.  Overruled.

24  A.    Again, there is nothing wrong with a judicial

25  employee seeking advice from the AO, but when it comes

1   to issues that occur between employees and a Defender

2   Office, there is absolutely nothing that an AO -- a

3   member of an AO or an official from the AO is going to

4   be able to do to resolve that issue within a Defender

5   office.

6   Q.    So your testimony, just so I'm clear, is that

7   while you say there's nothing wrong with an employee

8   going to the AO, it was wrong for me to go to the AO, is

9   that right?

10  A.    I never said --

11        MS. YOUNG:  Objection, misstates prior testimony.

12        THE COURT:  Well it's cross-examination, she's

13  framing the question.

14        Did you think it was wrong for her to go to the

15  AO?

16        THE WITNESS:  There was nothing wrong with you

17  going to the AO, or any judicial employee or federal

18  employee to the AO.

19  Q.    But to be clear, you were frustrated?

20  A.    I was frustrated because there's nothing that the

21  AO can do to resolve an issue, an employee issue within

22  a Defender office.

23  Q.    Is it your understanding that your reaction of

24  being frustrated that I went to the AO is part of the

25  reason why you were counseled?

1  A.    It is.  Yes, it is part.  Yes.

2  Q.    Okay, thank you.

3        MS. STRICKLAND:  Let's turn to Section D,

4  "Shifting Responsibilities."

5        (On screen.)

6  Q.    This paragraph states, "Finally the investigator

7  noted that you had said you were being blamed for

8  matters that you had nothing to do with."

9        Do you deny this finding?

10 A.    (Pause.)  I felt -- I did feel like I was being

11 blamed.  I did feel like I was being blamed.  Yes.

12 Q.    Thank you.

13       Mr. Martinez, I'd like to return to your testimony

14 about the August 9th, 2018 meeting.  I just want to

15 clarify, um, did you testify earlier that you were

16 shocked by the August 10th, 2018 e-mail I sent you after

17 that meeting?

18 A.    I was shocked because that was the very first time

19 that you alleged that Mr. Davis was sexually harassing

20 you.

21 Q.    Was part of the reason why you were shocked was

22 that you did not believe we had come to an agreement on

23 these issues?

24 A.    No, I was shocked because this was the very first

25 time that you indicated that Mr. Davis was sexually

1    harassing you.
2    Q.    Did you believe that we had come to an agreement
3    based on the August 9th, 2018 meeting?
4    A.    I thought we had come to an agreement because I
5    was meeting basically almost all of your demands, yes.
6    Q.    Okay, thank you.
7          And you testified earlier that you responded to my
8    e-mail on August 10th, 2018, is that right?
9    A.    Can you clarify?  There was an e-mail you sent on
10   August 10th --
11   Q.    Yes.
12   A.    -- and I did respond to that e-mail, yes, ma'am.
13         MS. STRICKLAND:  Can you put up Admitted Exhibit
14   71.
15         (On screen.)
16   Q.    Do you recognize this document?
17   A.    Yes.
18   Q.    Is this the e-mail that you were testifying
19   earlier that you sent me in response?
20   A.    Can you scroll down?
21         MS. STRICKLAND:  Yeah, go ahead and scroll down.
22         (Scrolls.)
23   A.    (Looks.)  Yes.
24   Q.    And when I objected that this e-mail was not
25   authentic, did you continue to testify that you

1    responded to my e-mail on August 10th, 2018?

2          THE COURT:  Well, I -- look, we've been over this,

3    I know what his testimony was, it was the testimony in

4    this trial.  So ask another question.

5          MS. STRICKLAND:  Yes, your Honor, I -- may I be

6    heard?

7          THE COURT:  You may.

8          MS. STRICKLAND:  Thank you, your Honor.

9          He stated in his sworn declaration that he

10   responded to me on August 17th.  So I just wanted to

11   clarify that in fact this e-mail is not the e-mail that

12   he sent.

13         THE COURT:  Well then ask him that question.

14         MS. STRICKLAND:  Okay.

15   Q.    Mr. Martinez, did you submit a sworn declaration

16   in this proceeding?

17   A.    Yes.

18         THE COURT:  No, that's not the question -- that's

19   not the question I said you could ask him, but that

20   stands.  That stands.  We've been over this.

21         Go ahead.

22         MS. STRICKLAND:  I apologize, your Honor.  Okay,

23   thank you, your Honor, I'll move on.

24   Q.    Mr. Martinez, is it your understanding that I was

25   hired at a Grade 14, Step 1?

1    A.    Yes.

2    Q.    Thank you.

3          And is it your understanding that I began work in

4    August of 2017?

5    A.    Yes.

6    Q.    And I was hired as a Research and Writing attorney

7    as we discussed, correct?

8    A.    Yes.

9    Q.    Are Research and Writing attorneys paid on the GS

10   pay scale set by Congress for federal employees?

11   A.    Yes, ma'am.

12   Q.    Did I understand your testimony earlier to be that

13   when you reclassified my position, you had to use the

14   Red-Circle Rule to avoid decreasing my pay?

15   A.    That's correct.

16   Q.    And is it your testimony today that you

17   compensated me at the highest possible rate?

18   A.    Yes, that I could possibly give you.  Yes.

19   Q.    Is it your testimony that it was not within your

20   discretion to pay me a higher amount than I was making

21   on the GS pay scale?

22   A.    No, no, I was talking about the AD scale.

23   Q.    Was it within your discretion to pay me a higher

24   amount than I was making on the GS pay scale?

25   A.    I have no idea.  I have -- I was focused on the

```
1    version of you being an R&W to an AFPD.  You wound up
2    with a salary that was equivalent to what you were
3    making as an R&W and there was -- what I was saying was
4    I maxed you out into what I was able to and had
5    authority to give you.  I could not give you more money.
6    Q.    Did you have any awareness of whether I was
7    eligible for a promotion as a Research and Writing
8    attorney?
9    A.    I have no knowledge of that, ma'am.
10         MS. STRICKLAND:  Okay, let's turn to Admitted
11   Exhibit 188, please.  (Turns.)  Okay, scroll down to
12   Bates Number 4971, it's toward the end.  (Scrolls.)
13   There you go, that's perfect.  Actually go up one page
14   because -- go up to the top.  One more page so he can
15   see what it is.  (Scrolls.)  Perfect.  There you go.
16   Q.    Are you familiar with this document?
17   A.    Yes, ma'am.
18   Q.    Is this the job description from the DOCS manual
19   for a Research and Writing Specialist?
20   A.    Yes, ma'am.
21         MS. STRICKLAND:  Okay, let's turn this down.
22   Sure.
23         (On screen.)
24   Q.    Is this a chart labeled "Salary and Experience
25   Scale"?
```

1    A.    Yes, ma'am.

2    Q.    Does the chart state that a Grade 14 requires 9

3    years of total experience?

4    A.    Yes, ma'am.

5    Q.    Does the chart state that a Grade 15 requires 10

6    years of total experience?

7    A.    Yes, ma'am.

8    Q.    Does this chart indicate that an employee at Grade

9    14 would need one more year of experience to qualify for

10   Grade 15?

11   A.    I don't understand your question, ma'am.

12   Q.    Is 10 years one year more than 9 years?

13   A.    It is what it is.  It's written in black and

14   White, ma'am.

15   Q.    Okay, thank you.

16         Is it your testimony today that at the time of the

17   transition in August of 2018, you normally would have

18   set my salary between $66,254 and $101,036?

19   A.    Yes, that was based on your level of experience.

20   Q.    Okay.

21         MS. STRICKLAND:  Let go to Admitted Exhibit 5,

22   please.  It's going to be Bates Number 1311, so it's in

23   the exhibits.  So scroll down.  (Scrolls.)  There you

24   go, that's it.

25         (On screen.)

1    Q.    Are you familiar with this document?

2    A.    Yes, ma'am.

3    Q.    Is this the 2018 "Line AFD Salary Chart"?

4    A.    Yes, ma'am.

5    Q.    Turning to the starting salary chart.  You

6    testified earlier, we just confirmed that the salary

7    range that would have been applied, according to your

8    testimony, was the $66,254 to $101,036, is that right?

9    A.    That's my recollection, yes, ma'am.

10   Q.    And would you agree that based on this chart, that

11   salary range is an AD Level 23?

12   A.    Yes, ma'am.

13         MS. STRICKLAND:  Okay, let's go to 1309, which I

14   think is 2 pages up.  Yes, good.

15         (On screen.)

16   Q.    Are you familiar with this document?

17   A.    (Looks.)  Yeah, thank you for scrolling down.

18   Thank you.

19         I am familiar with it, but it's a document that is

20   created by Mr. William Altman.

21   Q.    Okay.  And does this appear to be a "Notification

22   of Personnel Action"?

23   A.    Yes, ma'am.

24   Q.    And in the bottom box, in the remarks, does it

25   state, "Assistant Federal Public Defender is placed in

```
 1   AD Level 28"?
 2   A.     Yes, ma'am.
 3          MS. STRICKLAND:  Okay, let's go back to the chart.
 4          (On screen.)
 5   Q.     So looking again at this chart, is the starting
 6   salary range for an AD 28 go from $88,301 to $134,659?
 7   A.     Yes, ma'am.
 8   Q.     Thank you.
 9   A.     Can I explain something?  There's a typographical
10   error on that form.
11   Q.     So it's your testimony today that AD 28 has a
12   typographical error?
13   A.     Yes, ma'am, because you don't have the experience
14   for an AD 28.
15   Q.     Okay.
16   A.     Which requires 8 to 9 years experience as an
17   attorney, and you don't have that.  So you're not an AD
18   28.
19   Q.     Would it surprise you to learn that it says "AD
20   28" in multiple places, not just on that form?
21   A.     People make mistakes, make errors.  That's a
22   typographical error.
23   Q.     Okay.
24          MS. STRICKLAND:  Let's pull up Lettered Exhibit
25   AX.  (On screen.)  Go ahead and scroll through it.
```

```
 1           (On screen.)
 2    Q.    Are you familiar with this document?
 3    A.    Can you go back, scroll back up?  (Scrolls.)  Yes.
 4    Q.    Is this a request for personnel action?
 5    A.    Yes.
 6    Q.    Does it state that the action is authorized by
 7    Anthony Martinez?
 8    A.    Yes.
 9           MS. STRICKLAND:  Your Honor, I move to admit this
10    document into evidence.
11           THE COURT:  Any objection?
12           MS. YOUNG:  One moment, your Honor, I'm just
13    consulting my notes.  (Pause.)  Your Honor, we object on
14    relevance grounds because this is not the original
15    request or the final form.
16           THE COURT:  No, overruled.  It may be admitted.
17           It's AX for identification?
18           MS. STRICKLAND:  Yes, your Honor.
19           THE COURT:  All right, it's admitted in evidence,
20    Exhibit 173.
21           THE CLERK:  174.
22           THE COURT:  174.  I'm sorry.
23           (Exhibit 174, marked.)
24           MS. STRICKLAND:  Thank you, your Honor.
25    Q.    Is the date that this request was made August
```

1    28th, 2018?

2    A.    Yes, ma'am.

3    Q.    Okay.

4          MS. STRICKLAND:  Go ahead and scroll up to the

5    top.

6          (On screen.)

7    Q.    Is the effective date for this request August

8    20th, 2018?

9    A.    Yes, ma'am.

10   Q.    Is August 20th, 2018 the day before August 21st,

11   2018?

12         THE COURT:  Well of course it is.

13   A.    Yes, ma'am.

14   Q.    (Laughs.)  Let's look at the section that states,

15   "From, Position Title, and Number."

16         Does this section say that the grade and step are

17   Grade 14 and Step 2?

18   A.    If you're reading from the form, I'm not

19   disagreeing, the form is what it is and it says what it

20   says.

21   Q.    Okay, so just as a clarifying question.  Under the

22   Assistant Federal Public Defender section, does it say

23   that the total salary being requested is $92,349?

24   A.    Yes, it does.

25   Q.    Okay, thank you.

1        MS. STRICKLAND:  I'm done with that exhibit.

2        (Takes down.)

3   Q.    Mr. Martinez, before I raised my complaint of

4   sexual harassment, had I ever put any formal request to

5   transfer to the Asheville office?

6   A.    You had indicated a desire to go to the Asheville

7   office.

8   Q.    Did I ever put in any formal request to transfer

9   to the Asheville office?

10  A.    A formal request?  What do you mean by "formal"?

11  Q.    Did I ever state anything in writing, did I ever

12  tell you -- did I ever e-mail you and say,

13  "Mr. Martinez, I am putting in a formal request to

14  transfer to the Asheville office"?

15  A.    You never e-mailed me indicating you were putting

16  in a formal request.

17  Q.    Okay, thank you.

18        You testified earlier that you had an intern in

19  the Asheville office, is that correct?

20  A.    A summer intern.  It would be a summer intern,

21  yes.

22  Q.    You hired an intern and you -- did you start that

23  hiring process during the year of 2018?

24  A.    I don't recall the dates that we had interns there

25  and it was not a hire, interns worked voluntarily.  And

1   I can't recall the dates when each internship started.

2   Q.    Okay, but just to be clear, whether hired,

3   selected, you had an intern in the Asheville office, is

4   that correct?

5   A.    We've had interns in the Asheville -- summer

6   interns in the Asheville office, yes, ma'am.

7   Q.    Did you ever consider the possibility that putting

8   an intern in the Asheville office would signal that you

9   prioritized hiring an intern over resolving my sexual

10  harassment complaint?

11  A.    First of all, I don't recall the dates.  Um, I was

12  not -- interns are volunteers.  Interns are not

13  attorneys.  I'm not understanding your question?

14  Q.    My question is whether you ever considered the

15  possibility that having an intern in the Asheville

16  office would signal that you prioritized having a summer

17  intern over resolving my sexual harassment claim?

18  A.    No, ma'am, no.  Not at all.

19  Q.    Did you ever consider the possibility that having

20  an intern in the Asheville office would signal to my

21  co-workers that I was less important to you than an

22  intern?

23  A.    No, ma'am.

24  Q.    You never considered that?

25  A.    No.

1    Q.    Did you ever consider the possibility that putting

2    an intern in the Asheville office would be ostracizing

3    or humiliating for me?

4    A.    No, ma'am.

5    Q.    Did you ever consider whether putting an intern in

6    the Asheville office could be perceived as retaliation?

7    A.    No, ma'am.

8          MS. STRICKLAND:  Your Honor, I would like to ask

9    him about an EDR matter.  I understand that there is a

10   request, um, from defendants to seal this information.

11   I just wanted to clarify that before proceeding to make

12   sure that -- to have guidance from the Court.

13         MS. YOUNG:  Your Honor, I would like to make an

14   standing objection.

15         THE COURT:  Now I'm not clear what this involves,

16   this so-called EDR matter.  So can we talk about it

17   without the necessity of sealing?

18         MS. STRICKLAND:  Your Honor, I believe so.  We

19   just understood that the defendants had made a sealing

20   request.  I'm not going to identify the employee.  Your

21   Honor, I understand that --

22         MS. YOUNG:  I mean we would just like to make a

23   standing objection for the record.  As we've indicated

24   previously, EDR-related information, you know, was

25   sealed by this Court, I believe, on June 21st, and we

```
 1    agree it continues to be necessary to seal some of this
 2    information.  These individuals are promised
 3    confidentiality pursuant to Chapter 10, Section 4 of the
 4    plan.  And we believe it's not relevant because
 5    plaintiff hasn't shown that these individuals are
 6    similarly situated and none of these claims involve
 7    deliberate indifference to alleged sexual advances.  The
 8    plaintiff could have called these witnesses for live
 9    testimony and their EDR complaints are hearsay.
10         THE COURT:  Now the complaints themselves are --
11    how are they marked?
12         MS. STRICKLAND:  I apologize, I didn't hear the
13    last part of what you said?
14         THE COURT:  The complaints themselves, what are
15    their markings for identification?
16         MS. STRICKLAND:  Oh, they're letters.  I'm sorry.
17    It's all included in one exhibit, lettered BB.
18         THE COURT:  DB.
19         MS. STRICKLAND:  "BB" as in "boy."
20         THE COURT:  Two Bs.
21         MS. STRICKLAND:  Yes, your Honor.
22         THE COURT:  All right, I propose to proceed as
23    follows.  I'm going to review those documents as sealed.
24    Whether they are hearsay, and therefore inadmissible, or
25    whether they are, um, admissible under any exception, I
```

will consider.  If they, or any of them are admissible,
I will rule.  But I don't see any reason for
interrogating this witness about them.  What's the
reason for interrogating this witness?

I also have in mind, Ms. Strickland, the last time
that I asked you you said you had about a half an hour
left and we've been going a half an hour.  Do you have
much more for this witness?

MS. STRICKLAND:  Um, no, I don't have much more.
I would just like to clarify that we have discussed
these complaints in our proposed findings of fact.  To
the extent that your Honor rules that we are not
permitted to ask these questions or that they should be
excluded, we would request that our proposed findings
serve as a written offer of proof for purposes of
appeal.

THE COURT:  I accept that, and I'll proceed in
that fashion.

MS. STRICKLAND:  Thank you, your Honor.  I will
move on.

THE COURT:  Go ahead.

MS. STRICKLAND:  Yes, your Honor.

Q.   Mr. Martinez, you testified earlier that you
recused yourself once the EDR investigation began, is
that correct?

```
 1   A.    Yes, ma'am.

 2   Q.    And you had no involvement in the investigation

 3   except to be interviewed as a witness?

 4   A.    Yes, ma'am.

 5   Q.    Okay.

 6         MS. STRICKLAND:  Let's look at Admitted Exhibit

 7   40.  Go ahead and scroll through it so he can see.

 8         (Scrolls.)

 9   Q.    I'm just going to ask you if you're familiar with

10   this document, but I'll allow you to review it.

11   A.    (Looks.)  Yes, I am familiar.

12   Q.    You're familiar, okay.

13         MS. STRICKLAND:  Now go ahead and scroll to the

14   top.

15         (On screen.)

16   Q.    Is this an e-mail from JP Davis to you?

17   A.    Yes, ma'am.

18   Q.    Is this dated August 20th of 2018?

19   A.    Yes, ma'am.

20   Q.    Did JP Davis e-mail you a document called

21   "Timeline of Current Events for You"?

22   A.    Yes, ma'am.

23   Q.    Did you ask JP Davis to prepare a timeline of

24   events for you regarding my sexual harassment complaint?

25   A.    Yes, ma'am.
```

```
 1          MS. STRICKLAND:  Okay, let's look at Exhibit 44,
 2     an admitted exhibit.
 3          (On screen.)
 4     Q.   Okay, are you familiar with this document?  I'm
 5     happy to scroll through it if you would like to review
 6     it.
 7     A.   Yes, please scroll it because I don't recall that.
 8     Q.   (Scrolls.)
 9     A.   Yes, I'm familiar with that.
10     Q.   Is this an e-mail from JP Davis to you dated
11     September 18th, 2018?
12     A.   Could you scroll back up please, ma'am?  (Looks.)
13     Yes.
14     Q.   Did JP Davis forward you the timeline again per
15     request?
16     A.   I don't -- when you use the term "again," it
17     appears that this timeline is more specific, more of an
18     explanation on the dates, and the prior one was more
19     like a summary.  But, yes, yes, it was September 18th.
20     Q.   Did you have any concerns about violating my
21     confidentiality rights by discussing my complaint with
22     the accused harasser?
23     A.   (Pause.) Um, no.
24     Q.   Did you have any concern that discussing my
25     complaint with Mr. Davis could undermine the fairness of
```

1    the investigation?

2    A.    No.

3    Q.    Did you rely on Mr. Davis's prepared timeline when

4    you were interviewed by Heather Beam?

5    A.    No.

6    Q.    But to be clear, you asked him to prepare this for

7    you, is that right?

8    A.    Yes, ma'am.

9    Q.    Okay.

10        MS. STRICKLAND:  Let's move on to Lettered Exhibit

11   AI.  Okay, go ahead and scroll through it.

12        (On screen.)

13   Q.    And I'm going to ask you if you're familiar with

14   this document?

15   A.    Yes, ma'am.

16   Q.    Is this your Significant Event Log dated December

17   4th, 2018?

18   A.    Yes, ma'am.

19        MS. STRICKLAND:  Your Honor, I move to admit this

20   as a trial exhibit.

21        THE COURT:  Any objection?

22        (Pause.)

23        MS. YOUNG:  Okay, there's lack of a foundation,

24   it's not clear who wrote this and submitted this log.

25        THE COURT:  Well I'll sustain it on that ground.

1   She may further inquire.

2   Q.    Did you or did someone on your behalf prepare this

3   document?

4   A.    Someone on my behalf.

5   Q.    And you are familiar with this document, correct?

6   A.    Yes, ma'am.

7         (Pause.)

8         MS. STRICKLAND:  We believe that there is an

9   adequate foundation.

10        THE COURT:  Well you're familiar with it, sir.

11  Who prepared it?

12        THE WITNESS:  My legal assistant, Holly Dixon.

13        THE COURT:  All right.  It's overruled.  It may be

14  admitted, Exhibit 174 in evidence.

15        THE CLERK:  175, Judge.

16        THE COURT:  175.  I'm sorry.

17        (Exhibit 175, marked.)

18        MS. STRICKLAND:  Oh, I apologize.

19        THE COURT:  Go ahead.

20  Q.    Does this log state that you received an e-mail

21  from James Ishida regarding a troubling e-mail exchange

22  with one of your attorneys?

23  A.    Yes, ma'am.

24  Q.    Did you give JP Davis an order that if he contacts

25  Heather Beam or James Ishida again, then you will "walk

1    him out of the office"?

2    A.    Yes, ma'am.

3    Q.    Does that mean fire Mr. Davis?

4    A.    Yes, ma'am.

5          MS. STRICKLAND:  Let's turn to the last paragraph.

6          (On screen.)

7    Q.    Does this paragraph state in part the following:

8    "Tony expressed several times that you cannot go to the

9    trier of fact and speak about legal conclusions when

10   there is no basis, that was an informal conversation

11   between James and Tony.  There is currently no legal

12   conclusion to the ongoing investigation."

13         Is that an accurate statement?

14   A.    Yes.

15   Q.    Did you and James Ishida have an informal

16   conversation about the EDR investigation while it was

17   ongoing?

18   A.    The conversations were updates.  I would

19   periodically speak to Mr. Ishida, getting updates as to

20   the status of the investigation.  And that was the

21   extent of the conversation.

22   Q.    Did this informal conversation at all relate to

23   the legal conclusions of the EDR investigation?

24   A.    (Pause.)  Around this time, um, Mr. Davis was

25   contacting Mr. Ishida trying to find out the status of

1    the investigation and inquiring -- he had a lot of

2    questions about who would the decision-maker be, to whom

3    does the report go to?  He had a lot of questions about

4    -- about the process.

5    Q.    Thank you, Mr. Martinez.  I'm asking you about

6    whether you and James Ishida discussed any matter

7    related to the conclusions of the investigation?

8    A.    If you'd let me finish, I'm about to explain and

9    answer your question.

10            And so we would go back and forth.  I was talking

11    to Mr. Ishida about the status of the investigation.  JP

12    had questions about legal matters, legal conclusions

13    about the process, which I had -- I was not clear on.

14    He then contacts, unbeknownst to me, Mr. Ishida, and

15    asked him questions about the legal conclusions and

16    legal processes of the investigation.  And that's when I

17    gave Mr. Davis a warning about trying to contact

18    Mr. Ishida about these type of questions, legal

19    questions, legal conclusions.

20    Q.    Do these notes convey that you were concerned that

21    JP Davis contacted James Ishida about something that you

22    and James Ishida had discussed?

23    A.    James Ishida and I had talked about the status of

24    the investigation, that was what he and I had talked

25    about.  He periodically, as the Unit Executive, would

1    give me an update as to the status.

2    Q.    And did that status include any informal

3    conversation about the findings of the EDR

4    investigation?

5    A.    There was one conversation that we had, um -- well

6    there were two phases.  Ms. Beam, um, had finished up

7    the report, um, the report was submitted to both Judge

8    Gregory -- Chief Judge Gregory, and James Ishida.  Both

9    James Ishida and Chief Judge Gregory felt that the

10   report was not complete.  So we had an update -- he gave

11   me an update advising me that their plan was to then

12   return the report to Ms. Beam, so she can complete it,

13   and complete it by having specific recommendations put

14   in there.  So that was the discussion that we talked

15   about.

16   Q.    Isn't your testimony today that you threatened to

17   fire JP Davis because he contacted James Ishida about a

18   conversation about an update on the EDR investigation?

19   A.    That's correct.

20   Q.    You testified that you participated in the

21   mediation, is that right?

22   A.    Yes, ma'am.

23   Q.    And you spoke to the mediator as part of that?

24   A.    Yes, ma'am.

25   Q.    Did you also share portions of my mediation

1  supplement with JP Davis?

2  A.    No, ma'am.

3  Q.    If JP Davis stated in his declaration that you

4  shared portions of my mediation supplement with him, do

5  you have any reason to believe that Mr. Davis is being

6  untruthful?

7  A.    I don't believe he's being untruthful, um, I just

8  have no recollection of me providing that to him.

9  Q.    Do you believe that asking for a timeline of

10  events from JP Davis and sharing details with my

11  complaint with him is consistent with the EDR plan?

12  A.    Whether consistent or not, he's being accused of

13  basically sexually harassing an employee, and as far as

14  I'm concerned, he needed to know that.  He needed to be

15  given notice that he has been accused of wrongful

16  conduct under Chapter 9 of the EDR plan for the Fourth

17  Circuit Court of Appeals.

18  Q.    Do you believe that asking for a timeline of

19  events from JP Davis and sharing details of my complaint

20  with him is consistent with participating only as a

21  witness in the investigation?

22  A.    Yes.

23      MS. STRICKLAND:  Your Honor, subject to my

24  preservation of -- we would like to ask him about the

25  EDR complaints, but we understand that's subject to a

```
 1    pending motion before the Court.  Subject to us
 2    reserving any offer of proof on that point, I have
 3    nothing further.
 4          THE COURT:  Your rights are saved in the manner
 5    that you've just stated.
 6          Ms. Young, nothing further for this witness, is
 7    there?
 8          MS. YOUNG:  Less than 5 minutes, I think, your
 9    Honor.
10          THE COURT:  You may.  You go right ahead.
11          MS. YOUNG:  Thank you, your Honor.
12
13    REDIRECT EXAMINATION BY MS. YOUNG:
14    Q.    Mr. Martinez, you testified that Ms. Strickland
15    raised concerns about being mentored by Mr. Davis on
16    July 5th.  When did Ms. Strickland first raise concerns
17    about being supervised by Mr. Davis?
18    A.    About being supervised?
19    Q.    Correct.  When did Ms. Strickland first raise
20    concerns about being supervised by Mr. Davis?
21    Approximately.
22    A.    Well June 6th there was a meeting about the
23    argument or the disagreement that they had, um, and
24    Mr. Davis's reaction.  I don't recall her specifically
25    directing an issue.  Um, it would have to be August 9th.
```

1    August 9th is the day when she specifically, um, asked

2    that the organizational chart, um, be modified and show

3    that she's not reporting to Mr. Davis, but she should be

4    reporting to Mr. Josh Carpenter, who is the Chief of

5    Appellate, and then Mr. Carpenter would be reporting to

6    me, and therefore JP -- Mr. Davis would not be in the

7    chain of command.  And that was the first line, August

8    9th.

9    Q.    Thank you.  And when approximately did you modify

10   the supervisory chain so that Mr. Davis would not have

11   supervisory authority over Ms. Strickland?

12   A.    Um, the dates are a little confusing to me, but I

13   think I had already -- when I met with her on August

14   9th, I had already changed it.  But if I didn't change

15   it, I changed it soon after August 9th, um, in response

16   to her request.

17   Q.    Understood.  Thank you.

18         You testified earlier that after you called

19   Ms. Strickland to apologize about the team assignments,

20   you spoke to Mr. Davis a few days later on July 24th, is

21   that correct?

22   A.    That's correct.

23   Q.    And when you spoke to Mr. Davis on July 24th about

24   any interaction with Ms. Strickland, what was your

25   understanding at that time about whether Ms. Strickland

1   was alleging sexual harassment?

2   A.   At that time I indicated to Mr. Davis that she was

3   not alleging sexual harassment because I specifically

4   asked her and she said she was not alleging it.

5   Q.   You testified that Ms. Strickland was removed from

6   *Dixon*.  What role, if any, did she have on the case

7   after she was no longer serving a second chair?

8   A.   She continued supporting the *Dixon* case in her

9   capacity as a Research and Writing Specialist.

10  Q.   And you testified earlier that the first chair in

11  *Dixon* left the office.  By giving that testimony, did

12  you indicate whether the first chair voluntarily or

13  involuntarily left the office?

14  A.   I did not indicate that, correct.

15  Q.   Thank you.

16       And last question.  Where did the interns sit in

17  the Asheville office?

18  A.   Again there's only summer interns, um, for 2

19  months, and they would sit in the same office that I was

20  using, um, sharing.

21  Q.   Thank you.

22       MS. YOUNG:  That's it for the government, your

23  Honor.

24       THE COURT:  Thank you.

25       Nothing further, Ms. Strickland?

1          MS. STRICKLAND:  Just one question, your Honor.

2

3     RECROSS-EXAMINATION BY MS. STRICKLAND:

4     Q.     Do you believe there's a meaningful difference

5     between "mentoring" and "supervising"?

6     A.     Yes.

7          THE COURT:  All right.

8     Q.     If somebody, just hypothetically, had reported a

9     sexual harassment complaint to you, do you think that

10    there's a relevant difference between "mentoring" and

11    "supervising" by the accused harasser?

12    A.     I don't understand your question, ma'am?

13    Q.     If you had received a complaint of sexual

14    harassment about a supervisor, do you believe that it's

15    appropriate to remove the supervisor from mentoring, but

16    not supervising?

17         MS. YOUNG:  Objection, calls for speculation.

18         THE COURT:  Well, sustained, this is, um, really

19    it's beyond the scope.  And so we're done with

20    Mr. Martinez.

21         Let me, um --

22         THE WITNESS:  Your Honor, I'm sorry.  May I be

23    excused?

24         THE COURT:  You are excused and thank you.

25         THE WITNESS:  Okay.  Thank you, your Honor.

```
 1          THE COURT:  Let me say one thing that's arisen and
 2     I turn to the government for this.
 3          I want the docket number of the *Dixon* case so that
 4     I can review the, um, the docket in that case.  It's a
 5     matter of which I can take judicial notice.  And, um, I
 6     may take judicial notice of the proceedings in the *Dixon*
 7     case.
 8          Second, before we get on to the next witness,
 9     because it may be helpful, um, I have the government's
10     motion for additional time for evidence.  Denied.
11     However, we'll treat the time for closing as, um, not
12     chargeable to either party.  And if we don't get to it
13     tomorrow, we'll have to set a time for closing in the
14     new year.  So the motion is allowed in part and denied
15     in part.  We will be done with the evidence, if not
16     today, we'll be done with the evidence tomorrow.
17          All right.  I also acknowledge for the Stricklands
18     a motion that they filed, which I have not had a chance
19     to review.
20          Call your next witness.
21          MS. McMAHON:  Your Honor, this is Madeline McMahon
22     for the government.
23          THE COURT:  Yes, Ms. McMahon.
24          MS. McMAHON:  And we're calling JP Davis.
25          THE COURT:  He may be called.
```

```
 1          MS. McMAHON:  We're just going to fetch him now.
 2          THE COURT:  That's fine.
 3          (Pause.)
 4          (JOHN PARKE DAVIS, sworn.)
 5
 6          * * * * * * * * * * * * * * *
 7          JOHN PARKE DAVIS
 8          * * * * * * * * * * * * * * *
 9
10   DIRECT EXAMINATION BY MS. McMAHAON:
11   Q.    Good morning, Mr. Davis.
12   A.    Good morning.
13   Q.    Can you please state your name for the record.
14   A.    I am JP Davis.
15   Q.    And how long have you worked at the Western
16   District of North Carolina as the FDO?
17   Q.    I was hired into the predecessor, the Community
18   Defender Organization, in 2012.  I was appointed the
19   First Assistant there in 2015.  And then I was
20   transitioned over and Ms. Richardson appointed me the
21   First Assistant of the FDO, um, when that was created,
22   in I believe January of 2017.
23   Q.    Are you still the First Assistant?
24   A.    I am not.
25   Q.    When did you first meet Ms. Strickland?
```

```
1   A.    At her interview in March of 2017.
2         THE COURT:  I know I'm interrupting, but just to
3   get this timeline set.
4         And when did you leave the office, sir?  Or if
5   you're in some different capacity, tell me.
6         THE WITNESS:  I am still an Assistant Federal
7   Defender in the Western District of North Carolina.
8         THE COURT:  I see.  But you're not the First
9   Assistant?
10        THE WITNESS:  Correct.
11        THE COURT:  Thank you.
12        Go ahead.
13  Q.    Were you Ms. Strickland's mentor?
14        MS. McMAHON:  Oh, excuse me, your Honor, what did
15  you say?
16        THE COURT:  I just said, "Go ahead."  I'm sorry.
17        MS. McMAHON:  Oh, yes, your Honor.
18  Q.    Were you Ms. Strickland's mentor at the FDO?
19  A.    I was, up until July of 2018.
20  Q.    What did that mentorship involve?
21  A.    Essentially I created a training program for
22  Ms. Strickland, when she came into the office, um, and
23  administered that.  When the team structure was created
24  by Mr. Martinez in, I believe, December of 2017, um, it
25  became more of a -- basically a resource role, someone
```

1    to be there for her, if she had any questions.  And then
2    it was to give her, you know, basically informal
3    guidance.
4    Q.    When Ms. Strickland first started at the FDO in
5    2017, what was your relationship with her like?
6    A.    I thought it was very positive, um, it was a good
7    working relationship.  We were friendly.  She came to me
8    for advice often.  I thought it was a very good
9    relationship.
10        MS. McMAHON:  Mr. Spears, can you please show the
11   witness what's been identified as Exhibit FU.
12        (On screen.)
13   Q.    Mr. Davis, you should see before you what's been
14   identified as FU?
15   A.    I do.
16   Q.    Do you recognize this document?
17   A.    Yes, I do.
18   Q.    What is it?
19   A.    Well these are texts from Ms. Strickland to me and
20   Mr. Martinez sending us her wedding pictures, dated
21   April 30th of 2018.
22        MS. McMAHON:  Your Honor, I'd like to move Exhibit
23   FU into evidence.
24        THE COURT:  No objection?
25        MS. STRICKLAND:  Um, no, your Honor.

1    THE COURT:  It's admitted Exhibit 176.

2    (Exhibit 176, marked.)

3    MS. McMAHON:  Thank you, your Honor.

4  Q.    Mr. Davis, as part of your mentoring relationship,

5  did you go to lunch with Ms. Strickland?

6  A.    Um, yes, we had, I believe, four mentoring

7  lunches, um, in December, I believe in March, and in

8  April, and finally on May 18th of 2018.

9  Q.    Why did you schedule mentoring lunches with

10  Ms. Strickland?

11  A.    That was something that my mentor had done for me

12  when I was in private practice, he would basically take

13  me to a restaurant, away from the office, um, give me an

14  opportunity to discuss any issues that I was having in

15  the office.  You know he showed an interest in me

16  personally.  And I thought it was a very effective

17  mentoring technique, so I wanted to do the same for

18  Ms. Strickland.

19  Q.    And who paid at these lunches?

20  A.    I did.

21  Q.    Why did you pay?

22  A.    That was also what my mentor did for me and

23  basically showed me that the firm was investing in me.

24  And so I thought that was a significant portion of it.

25  Q.    Did you ever drink alcohol with Ms. Strickland?

A.      Yes.

Q.      When did you drink alcohol with Ms. Strickland?

A.      Um, I believe there were at least a couple office happy hours.  We took a trip to Little Rock with an investigator, um, for work purposes, and I believe we drank on both nights of that trip, and that would have been in November of 2017.  We drank at the office retreat together, um, I believe in December of 2017.  We had drinks with, um, a trial team after a client pled guilty in a large sophisticated fraud case.  Um, we also had drinks at the courthouse's annex groundbreaking ceremony.  And then I believe also on May 15th following Ms. Strickland's first examinations in a suppression hearing.

Q.      And what happened on May 15th?

A.      Ms. Strickland, um, we had a suppression hearing when Ms. Strickland examined witnesses for the first time, um, after that we went to lunch to celebrate.  We had talked about just, you know, joking, having drinks at lunch.  At the end of the lunch, Ms. Strickland asked if we could actually go have drinks?  And so we did.  The investigator could not join us, so it was just me and Ms. Strickland.

Q.      So Ms. Strickland asked you to get drinks on May 15th?

1    A.    That's correct.

2    Q.    And who attended those drinks?

3    A.    Just me and her.

4    Q.    When Ms. Strickland was employed at the FDO, did

5    you ever give her rides home?

6    A.    Yes, I did.

7    Q.    How often?

8    A.    1 to 5 -- well probably closer to 10, somewhere

9    around that, um, occasions.

10   Q.    Who initiated those rides?

11   A.    Typically her, although I offered her rides, from

12   time to time, as well.

13   Q.    Why did you give her rides home?

14   A.    Well she lived a mile away from me and she often

15   road, um, her bike to work, so it was pretty easy for me

16   to do.  I think that it started when we went to the trip

17   in Little Rock and she asked for a ride to the airport.

18   Q.    Back to the mentoring lunches.  What do you recall

19   about the last mentoring lunch on May 18th, 2018?

20   A.    We had lunch out at a restaurant, away from the

21   office, um, where most of that lunch we discussed work

22   issues.  Ms. Strickland talked about her desire to be on

23   a trial case that summer and she was particularly

24   focused on a difficult child pornography, child

25   molestation case, the *Dixon* case, um, that carried a

```
1    life penalty.  I encouraged her to get trial experience,
2    but on one of the other two cases that we expected that
3    we'd be going to trial.  But Ms. Strickland was very
4    focused on the *Dixon* case, um, because she believed the
5    other cases would get continued and she wanted to be on
6    a case that summer.
7    Q.    What else do you remember about that lunch?
8    A.    I told Ms. Strickland, um, that I did not think
9    that it would be a good idea for her to be on the *Dixon*
10   case because the First Chair on that case was our
11   least-experienced AFD.  I also didn't think it was a
12   great case for anybody's first case.  But that there was
13   a problem because we couldn't basically put our
14   least-experienced attorneys on a case carrying a life
15   penalty, that would certainly end at some point with an
16   ineffective assistance of counsel claim.  The Office
17   couldn't defend that.  And she acknowledged that.
18         Then after lunch I asked her how things were going
19   -- as we were headed back towards the office, I asked
20   her how things were going in general?  And she said she
21   was tired of living like a single person, now that she
22   was married.  I asked her if she and her husband had
23   discussed what they would do about that?  And she said,
24   "If I don't get moved to Asheville, I'm going to quit."
25   Q.    How did you respond to that?
```

A.    I told her I was very sorry to hear that because
there were no positions available in the Asheville
office at that time, um, and I could not guarantee when
one might become open.  This was a desirable office.
And I said, you know, I hoped that her husband might be
amenable to move to Charlotte.  And she said, "I cannot
ask him to do so, because he had his dream job in
Tryon."

Q.    And what did Ms. Strickland say in response?

A.    She was upset, um, she said that she had not meant
to bring up the topic at that time, that she had meant
to save it until her annual review in August.  She said
that she would be open to teleworking, doing only
appeals, but she didn't really want to do that because
Mr. Martinez wouldn't be the Defender forever and the
next Defender might not allow that.  I told her, you
know, that the Office just could not guarantee that
there would be a position in Asheville in any given
timeframe.  She thanked me for being honest with her.

Q.    Do you recall if Ms. Strickland said anything else
about staying in the office?

A.    Um, yes, she said -- well, first of all, she said,
"Why do you think I've been working my butt off all
year?" and she said, "Why do you think I wanted a trial
this summer so badly?"  Which I understood in context

means that she believed having a trial this summer would increase basically her leverage when she brought this up at her annual review. She then said, um, that if she couldn't get a transfer to Asheville, she at least wanted to be promoted or raised to a G-15 and to be promoted to an Assistant Federal Defender. She stated that she had an offer letter from our office that would, um, that promised that she would be transitioned to an AFD slot within a few months of starting, which I knew to be inaccurate, and she said that she had discussed it with her husband and she would, quote, "waive it around" if she was not promoted to an Assistant Federal Defender.

Q.     And what happened, um, at the end of this conversation?

A.     Um, as we got back to the office and at that point it had become a much -- it was back to being a pretty friendly conversation. I had told Ms. Strickland at the beginning of the lunch that I expected that this would be the last one that we would need to have, except for one close to her annual review. I repeated that.

        At the end of the lunches, we got back to the office and Ms. Strickland stated that it didn't have to be the last time, that she would be open to me buying her lunch any time or to cutting out early to get

1  drinks, like we had a few days earlier with a
2  suppression hearing, at any time.
3  Q.    Did you follow up with Ms. Strickland about your
4  conversation at lunch that day?
5  A.    I did.  When I got back to the office, I looked at
6  the GS pay scales, I wasn't very familiar with it and I
7  did not know how much of a raise Ms. Strickland was
8  asking for.  When I pulled it up, it showed that she
9  needed 10 years of experience, federal experience to be
10  a G15.  So I e-mailed her to let her know basically that
11  she didn't meet that qualification, but also let her
12  know that I had an idea for how she basically could get
13  to the same -- to roughly the same point.
14      MS. McMAHON:  Mr. Spears, will you please display
15  Page 18 of what's been admitted into evidence as Exhibit
16  5, EX 005.
17      (On screen.)
18  Q.    Mr. Davis, is this the e-mail you were just
19  referring to a moment ago?
20  A.    Yes, it is.
21  Q.    And why did you use the phrase "mas dinero" in the
22  subject line?
23  A.    Um, Ms. Strickland spoke Spanish and basically it
24  was just keeping the tone, the lighthearted tone that we
25  had left the conversation on, basically conveying that

1    this was not a very serious e-mail.

2    Q.    And why did you address her with the word "Dude"?

3    A.    The same reason, it was lighthearted and keeping

4    with the tone that the end of our conversation was.

5    Q.    What did you mean when you used the phrase "Pay

6    for stay"?

7    A.    That was a reference to her statement that if she

8    couldn't get transferred to Asheville, she wanted an

9    increase in pay in order to stay employed with the

10   Federal Defender's Office.

11   Q.    Do you know if your interpretation of the GS scale

12   in this e-mail is accurate?

13   A.    I do not.

14        MS. McMAHON:    Mr. Spears, please take down the

15   exhibit.

16        (Off screen.)

17   Q.    Mr. Davis, when was your next conversation with

18   Ms. Strickland?

19   A.    I was on vacation the next week and Ms. Strickland

20   e-mailed me a couple of times about a few different

21   subjects.  I arranged to meet with her when I got back

22   to the office on May 29th.  On the 29th, um, I was with

23   a witness who's testifying in court.  On my way back

24   from court I ran into Ms. Strickland and Peter Adolph

25   talking on the street corner and --

1          MS. STRICKLAND:  Objection, hearsay.

2          THE COURT:  Well we'll stop it there.

3          MS. McMAHON:  Your Honor, may I respond?

4          THE COURT:  You may.

5          MS. McMAHON:  He's not testifying to the substance

6     of any conversations, he's just describing what

7     happened.

8          THE COURT:  Well isn't it a conversation?  What

9     happened is a conversation.

10          MS. McMAHON:  Um, the witness isn't describing the

11    contents of any conversation, he's just saying that he

12    ran into Ms. Strickland who was with another employee.

13          THE COURT:  Well he may so testify.

14    A.    I ran into Ms. Strickland talking to Peter Adolph

15    on the street corner, um, and I let her know that

16    basically I was available to meet, as we had planned,

17    whenever she wanted to.  And she told me that she was

18    going for a walk, but she invited me to go with her.

19    And then we walked around the Fourth Ward, which is a

20    quiet residential neighborhood of Charlotte, together.

21    Q.    Approximately how long was the walk?

22    A.    About 45 minutes.

23    Q.    And what did you discuss on this walk?

24    A.    Well we primarily discussed the *Dixon* case.

25    Ms. Strickland had talked to Mr. Martinez and been

```
 1   assigned a second chair to --
 2         MS. STRICKLAND:  Objection, hearsay.
 3         THE COURT:  Well that's undisputed, so I won't
 4   take it for the substance.  But you may say what you
 5   said and what she said.
 6         Go ahead.
 7   A.    She principally talked to me about the *Dixon* case
 8   and issues that she had seen on it, um, problems that
 9   she identified with, you know the work that had been
10   done or the lack of the work that had been done, and she
11   was basically asking for my advice about it, um, and
12   venting a lot about it and, you know, how she was
13   dealing with it.
14   Q.    And who was on this walk?
15   A.    Just me and her.
16   Q.    Who initiated this walk?
17   A.    Ms. Strickland.
18   Q.    After May 29th, when did you next communicate with
19   Ms. Strickland?
20   A.    Um, well at the end of that walk, um, I had told
21   Ms. Strickland, um, that, um, I thought she was doing
22   well, um, doing the best she could with it, but that I
23   believed that Mr. Martinez was likely to take her off
24   the second chair counsel at the end, um, when he came
25   back.  He was out that week.
```

1        After that I, um, exchanged some e-mails with her

2    over the course of the next few days, um, and some of

3    those she did not respond to.  In particular, um, I was

4    concerned about one where she didn't seem, um,

5    interested in a case that we had worked on together, the

6    suppression hearing, a case that we needed to meet with

7    the client to let him know that we had lost the

8    suppression hearing and needed to talk to him about what

9    was going to happen with his case, which was at a pretty

10   significant point in his case.  And she seemed to have

11   lost interest in that case, which concerned me.

12   Q.    Um, what happened on the --

13        THE COURT:  Wait a minute.  Wait a minute.  Let me

14   interrupt.

15        When you said that when Mr. Martinez returned, he

16   was likely to take her off the *Dixon* case, did you --

17   what did you say?  Did you give reasons for that?  What

18   did you say to her?

19        THE WITNESS:  Um, to Ms. Strickland?  I don't

20   remember the exact words that I used, but I basically

21   conveyed to her what I had conveyed to her in the past,

22   that I thought it was a problem to have our two least

23   experienced attorneys on the case because it would

24   almost certainly end in an ineffective assistance of

25   counsel claim, that we would have difficulty defending

1    that decision, and also because of the issues that she

2    had identified with the first chair's performance which

3    basically indicated it needed a more experienced

4    attorney on it as well.

5              THE COURT:  Thank you.

6              Ms. McMahon, you go ahead.

7              MS. McMAHON:  Thank you, your Honor.

8    Q.    Mr. Davis, um, do you recall what happened on June

9    1st?

10   A.    Yes, I do.  I had sent Ms. Strickland an e-mail

11   the night before about meeting with the client I had

12   just referenced, and she said, you know, that she had a

13   discovery review or some meeting for *Dixon*, um, but to

14   let her know when I was going to meet the client, she'd

15   let me know if she could go.

16             I saw her then that morning.  My trial team had

17   reserved the large conference room for our team meeting,

18   and she was in this meeting, and basically she looked

19   extremely unhappy that we were, you know, taking the

20   conference room even though we had reserved it in

21   advance.

22             MS. McMAHON:  Mr. Spears, can you please display

23   Exhibit DB.

24             (On screen.)

25   Q.    Mr. Davis, do you recognize this document?

```
 1   A.     I do.

 2   Q.     What is it?

 3   A.     This is an e-mail chain between Ms. Strickland and

 4   myself dated June 1st, 2018.

 5   Q.     Is this the e-mail you were just referring to

 6   where you asked Ms. Strickland if she wanted to attend

 7   the client meeting?

 8   A.     Yes.

 9   Q.     And what was that client meeting for?

10   A.     That was to tell the client, who we had just done

11   the suppression hearing for, that he had lost the

12   hearing and to discuss with him his case going forward.

13   Q.     And who argued the suppression hearing?

14   A.     Myself and Ms. Strickland jointly.  Ms. Strickland

15   examined witnesses in that hearing.

16          MS. McMAHON:  Your Honor, I'd like to move Exhibit

17   DB into evidence.

18          THE COURT:  Any objection?

19          MS. STRICKLAND:  We object on 106 grounds because

20   this doesn't -- unless there's more that's not on the

21   screen, it doesn't include the full e-mail chain.

22          MS. McMAHON:  This is the full e-mail chain.

23   There are multiple pages.

24          THE COURT:  On that representation --

25          MS. McMAHON:  Excuse me, your Honor?
```

1          THE COURT:  No, go ahead and scroll through.  The

2     whole thing will be admitted, Exhibit 177.

3          (Exhibit 177, marked.)

4          THE COURT:  Proceed, Ms. McMahon.

5          MS. McMAHON:  Thank you, your Honor.

6          Mr. Spears, can you go to Page 2 of this document.

7          (On screen.)

8     Q.   Mr. Davis, what did Ms. Strickland e-mail you

9     about whether she could attend the client meeting?

10    A.   Um, she e-mailed that she had been completely

11    absorbed in the *Dixon* matter, um, and was completely

12    mentally and emotionally exhausted, and then asked what

13    the meeting with the client was for?  And said that she

14    wasn't really sure that I needed her to go, but if I

15    did, then Monday would work best.

16    Q.   And what did you respond to Ms. Strickland?

17    A.   I responded to her explaining what the meeting was

18    for, um, and that I did not need her to go, I just asked

19    if she wanted to and took her response.  It was a "Yes."

20    I then stated to her that -- noted that she had been

21    unhappy earlier, um, that I was happy to offer a drink

22    and ear if she needed it, but that I recommended that

23    she talk to Mary Ellen Coleman, if not.

24    Q.   Why did you offer to give Ms. Strickland a, quote,

25    "drink and an ear"?

```
1   A.    I was a bit annoyed actually by Ms. Strickland's
2   response to me, um, both because of what I described
3   earlier with the issues with her lacking interest in the
4   client, um, and because, you know, she seemed to be
5   unhappy about the fact that I was contacting her, even
6   though I thought that's what she had asked me to do.
7   But in light of what she had said about being completely
8   mentally and emotionally exhausted, I decided that I
9   would take this sort of tact.
10       So basically I was trying to let her know that I
11  was available if she wanted to talk about anything.  I
12  included a reference to a drink as basically the
13  reference to what she told me on May 18th, that she
14  would always be up to cut out early for a drink, um, to
15  basically make a more friendly offer to make sure she
16  knew that that was a friendly offer.
17  Q.    And why --
18       THE COURT:  Wait.  Wait.  You referred her to some
19  other person.  Who is that person and what's their
20  connection?
21       THE WITNESS:  Um, that person, Mary Ellen Coleman,
22  is the Branch Manager in Asheville.  I referred her, um,
23  to Ms. Coleman because it was clear to me, following
24  what happened earlier that week, that Ms. Strickland did
25  not want to talk to me about the *Dixon* matter,
```

1    specifically after I had said that I believed that

2    Mr. Martinez would take it off of her.  So I recommended

3    that she talk to Ms. Coleman for two reasons.

4         First, because Ms. Coleman is in the Asheville

5    office and so it had nothing to do with the *Dixon* matter

6    and she can be objective about that.  And second,

7    because Ms. Coleman has significant experience with

8    difficult sexual abuse and child sex-type of cases and I

9    thought that she would be a good resource for

10   Ms. Strickland in dealing with that, which is often an

11   extremely difficult subject matter in the cases that we

12   deal with.

13        THE COURT:  Thank you.

14        MS. McMAHON:  Thank you, Mr. Davis.

15   Q.   And when you sent this e-mail, were you making a

16   sexual advance towards Ms. Strickland?

17   A.   No, I was not.

18        MS. McMAHON:  Mr. Spears, please take down that

19   exhibit.

20        (Off screen.)

21   Q.   Mr. Davis, do you recall what happened on June

22   5th?

23   A.   I do.  There was a meeting, a large meeting about

24   the *Dixon* trial that I was not a part of.  Following

25   that meeting, Ms. Strickland sent me an e-mail saying

1   that she could not attend a presentence interview that

2   had been previously scheduled around her schedule, um,

3   because there was a discovery review in *Dixon* and she

4   stated that, um, that was the only time that everyone

5   could do it.

6   Q.    What was the presentence interview?

7   A.    That was a -- it's basically a portion, um, of the

8   sentencing process where the -- where the defendant

9   meets the probation officer.  It's an important part of

10  the process because it's basically the only time that

11  you get to humanize your client to the person who is

12  creating the presentence report, and there's also a lot

13  of good information that can come out of it.  So it's

14  very important to have an attorney present for that.

15  Q.    And how did you respond to Ms. Strickland's saying

16  that she couldn't attend the meeting for your mutual

17  client?

18  A.    I was frustrated by that because this was the

19  second time in about a week that she seemed to be, um,

20  basically showing no interest in one of her clients.

21  That's a significant portion of being a Federal Defender

22  is basically humanizing your client, seeing them as a

23  person and treating them that way.  You know the federal

24  system tends to try to reduce people to numbers on a

25  grid, and our job, as defense attorneys, is to put their

1    humanity back into it.  And we get very attached to the

2    clients and --

3          MS. STRICKLAND:  Objection, your Honor, this lacks

4    foundation.

5          THE COURT:  Well part of this lacks foundation, so

6    we'll stop it at this point.  And Ms. McMahon will put

7    another question.

8    Q.    Mr. Davis, after Ms. Strickland told you she could

9    not attend her client's meeting, what happened next?

10   A.    At that point I contacted Erin Taylor, who was a

11   good friend of mine, and who is also a trial team

12   leader, another supervisor, um, and I texted her

13   basically just to vent about my frustration.

14   Q.    So can you describe who Erin Taylor is?

15   A.    Erin Taylor?  She was another supervisor in the

16   FDO, um, she was a close friend of mine, she had been my

17   trial partner for a while, um, and she was also the team

18   leader who was the supervisor of the trial attorneys

19   that were doing the *Dixon* case, um, in general.

20   Q.    And what happened when you texted Ms. Taylor?

21   A.    Um, I texted her, you know, that Ms. Strickland

22   had not asked me, and just to vent basically my

23   frustration, um, and from I learned that Ms. Strickland

24   --

25         MS. STRICKLAND:  Objection, hearsay.

```
 1          THE COURT:  Well, um, we'll stop it there.
 2          MS. McMAHON:  Your Honor, may I respond?
 3          THE COURT:  Well he's gone beyond your question.
 4     What happened next is he texted this Ms. Taylor.  Now go
 5     from there.
 6          MS. McMAHON:  Your Honor, I would like to ask the
 7     question of "Why did Ms. Taylor respond?" and I just
 8     want to be clear about why that is not hearsay.
 9          THE COURT:  I'll hear you.  (Pause.)  Go ahead.
10          MS. McMAHON:  Your Honor, we are not introducing
11     Ms. Taylor's statement for the truth of the matter
12     asserted.  It doesn't matter whether or not what
13     Ms. Taylor texted Mr. Davis is true, it goes towards
14     Mr. Davis's knowledge and how he -- which informs how he
15     responded to, um, to, um -- to how he took the next
16     steps in the case.
17          THE COURT:  What's the response?
18          MS. STRICKLAND:  Without knowing exactly what it
19     is, we would submit that out-of-court statements by
20     another employer is clearly hearsay, they're being used
21     for the truth of the matter asserted.  This witness is
22     not here testifying --
23          THE COURT:  I'm sorry, Ms. Strickland, and it's
24     difficult when I'm at a distance.  Really that question
25     was for Ms. McMahon.
```

1          What was Ms. Taylor's response?

2          MS. McMAHON:  Um, I'm happy, you know, to -- may

3    we -- may we ask the witness to testify about their

4    response?

5          THE COURT:  No, I'm asking you.

6          MS. McMAHON:  Or I can explain that.

7          THE COURT:  Not explain it, what do you think she

8    said?

9          MS. McMAHON:  Sure.

10         Ms. Taylor told Mr. Davis that Ms. Strickland had

11   not raised a scheduling conflict when she scheduled the

12   *Dixon* meeting.

13         THE COURT:  All right.  I'll sustain the

14   objection.  And you now ask Mr. Davis, as a result of

15   Ms. Taylor's response, because I guess that's where you

16   want to go, what did you next do or the like?

17         Go ahead.

18   Q.   Um, based on your understanding of whether -- of

19   what Ms. Taylor's response was, um, how did you react to

20   the fact that Ms. Strickland said she couldn't attend

21   the presentence investigation?

22   A.   Um, I was very frustrated because it appeared that

23   she had not attempted to meet those obligations, um, so

24   I was determined to tell her that she had to go to the

25   presentence interview.  And I contacted Mr. Martinez to

1   make sure that this response was alright by him, before
2   I took that action.
3   Q.    And what was your understanding about whether
4   Ms. Strickland was being truthful about her scheduling
5   conflicts?
6   A.    At that time it appeared to me that she had been
7   misleading.  I later learned that it was actually false.
8           MS. McMAHON:  Mr. Spears, could you please pull up
9   EX 009, Page 7, this is what's been admitted into
10  evidence as Exhibits 9.
11          (On screen.)
12  Q.    Mr. Davis, do you recognize this document?
13  A.    I do, these are texts between Erin Taylor and
14  myself dated June 5th, 2018.
15  Q.    What are you texting Ms. Taylor about?
16  A.    Ms. Taylor was texting me about e-mails from, um,
17  that Ms. Strickland had sent, um, where basically she
18  had rearranged a different discovery review without
19  clearing it, the time workings with the first, um --
20  with the first chair of the *Dixon* case, um, and it
21  appeared essentially that she was running that case.
22  Q.    And why did you text Ms. Taylor that
23  Ms. Strickland is more manipulative than you expected?
24  A.    Um, up until this point I had given Ms. Strickland
25  the benefit of the doubt on several things, most

1    particularly my suspicion that she had not raised the

2    ineffective assistance of counsel claim with

3    Mr. Martinez, but some other issues as well.  And based

4    upon her statements to me and also her other conduct

5    regarding the *Dixon* case at this point, um, I believe I

6    should not be giving her the benefit of the doubt.

7    Q.    Who else did you intend to see these texts besides

8    Ms. Taylor?

9    A.    No one.

10   Q.    What happened on June 6th?

11   A.    On June 6th, um, in the morning I met with

12   Mr. Martinez regarding what was going on, um, and

13   confirmed my suspicion that --

14         MS. STRICKLAND:  Objection, hearsay.

15         THE COURT:  I'll sustain it at that point.  Yes,

16   you met with him, and then what happened?

17   A.    I met with Mr. Martinez, um, and obtained his

18   approval to go forward, um, with telling Ms. Strickland

19   that she needed to go to the PSI, the presentence

20   interview, excuse me, and then Ms. Strickland e-mailed

21   me asking to meet and I met with Ms. Strickland that

22   morning about it.

23   Q.    What happened at that meeting?

24   A.    At that meeting, Ms. Strickland, um, again

25   repeated what she had said the night before, about this

being the only time that everyone could do it, remove
the conflict.  I asked her if she had raised that she
had a conflict, and she responded to that.  Then I asked
her again and she stated that she thought she had to
prioritize.  I told her -- I mean I explained to her
that I felt there was an issue of how -- because
basically this is how we treat our clients, that she
needed to try to meet all her obligations, and directed
her to go to the presentence interview.  And at the end
of that, she confirmed that she understood and that she
would be going.

Q.    What happened later that day on June 6th?

A.    Ms. Strickland e-mailed me, a little after 5:00,
and stated that the discovery in the *Dixon* case was set,
um, and that she would not -- and that she would not be
going to the presentence interview.  She forwarded a
chain, an e-mail chain from March of that year in
another situation where I had told her that she didn't
have to do shadowing activities with me specifically,
that she could do them for other people, and she
basically characterized that as shadowing activities
being optional, and that is why she did not have to go
to this meeting.

Q.    And why didn't you view this as an optional
exercise?

A.    Shadowing in general wasn't optional, the whole
purpose of the shadowing program was to give her the
experience that she needed to have in order to actually
represent clients effectively.  The specific individual
instances reflects both.  So in this case it was not the
specific presentence interview that was the issue, it
was in part it had been set up around her schedule to
begin with, but in larger part, um, the biggest issue I
had at that point was that I told her I expected her to
go, and rather than addressing it with me directly, you
know showing any kind of acknowledgement of the issue,
explaining why she, you know, needed to go or anything
like that, she just told me she just wasn't going to do
what I had told her to do.  And I felt at that point I
didn't really have a choice but to enforce that she had
to go.

Q.    And what ended up happening on June 7th with the
PSI?

A.    Um, Ms. Strickland did go.

Q.    In the next few weeks after June 7th, 2018, what
was your relationship with Ms. Strickland like?

A.    It was tense, um, particularly to begin with, but
over the weeks it got better and more friendlier.  There
still were a couple of months that were tense, but in
general it moved back to being friendly.

1        MS. McMAHON:  Mr. Spears, can you please pull up

2   Page 35 of the X 005.

3        (On screen.)

4   Q.    Mr. Davis, what is this document?

5   A.    This is an e-mail chain between myself and

6   Ms. Strickland dated June 19th of 2018.

7   Q.    Why did Ms. Strickland e-mail you on June 19th?

8   A.    We had been working on a sentencing memorandum, a

9   large sentencing memorandum, a more complicated fraud

10  case that she, um, had been working on with me since she

11  started in the office.  I believe this was the -- I had

12  sent her the final product, the first and final edits,

13  and she was -- you know she got them to me a bit later

14  than expected, um, and so she was sending that to me.

15  Q.    What did you mean by offering to get a

16  "celebratory drink" with Ms. Strickland?

17  A.    I referred to a "celebratory drink" because, you

18  know, it was a big -- you know it was a large sentencing

19  memo so it wouldn't have been unusual at all to go

20  celebrate something like that, but mainly the reason

21  that I brought it up is because I frankly was annoyed

22  with her, I knew that she couldn't go, um, and I was

23  being really passive aggressive.

24  Q.    When you sent this e-mail, were you making a

25  sexual advance towards Ms. Strickland?

A.    No, I was not.

      MS. McMAHON:  Mr. Spears, please take down the
exhibit.

      (Takes down.)

Q.    What happened with Ms. Strickland on June 21st?

A.    On June 21st?  Well the day before, on June 20th,
she had come to my office to give me a High-5 for
completing the sentencing memo, and we had, um, were
scheduled to meet the next morning, on the 21st, to talk
about some other legal issues with the case that was
going to be sentenced on the 25th, I believe.

      On the morning of the 21st, Ms. Strickland did not
come to meet with me and when I went to find her, I
couldn't find her, so we didn't meet that morning.  She
then e-mailed me that afternoon apologizing for having
missed the meeting and asking me if I still needed help,
and telling me that she was going to be out that day,
which was the last business day before that hearing was
scheduled, and I responded that I did and sent her a
topic that I wanted researched.  And then she asked if
she could meet with me at 5:00 that day?

Q.    Did you end up meeting with Ms. Strickland at
5:00?

A.    I did, yes.

Q.    How long did that meeting last?

1    A.    About an hour and 45 minutes.

2    Q.    What happened after that meeting?

3    A.    At the end of that meeting -- that meeting was

4    very friendly, I thought it was a positive meeting, but

5    at the end of it a thunderstorm was blowing in and I

6    asked Ms. Strickland if she had ridden her bike to work?

7    And because of the light rain, I offered to give her a

8    ride, if she had.  She told me she did not believe it

9    was going to rain, but if it did, it was okay, because

10   she was tough.

11   Q.    What happened next?

12   A.    Ms. Strickland went back to her office, which is

13   an interior office with no window, I finished what I was

14   doing, and as I started to leave it started raining

15   heavily.  So I texted Ms. Strickland to, you know, give

16   her a last chance to get a ride.  I then went downstairs

17   and waited a few minutes to see if she would respond to

18   my text.

19   Q.    How long were you waiting downstairs in the lobby?

20   A.    No more than a couple of minutes.

21   Q.    How close did you get to -- or what happened after

22   that?

23   A.    At that point Ms. Strickland did not respond to my

24   text, but she came down the elevator into the lobby.

25   Q.    And how close did you get physically to

1    Ms. Strickland in the lobby?

2    A.    No more than 10 yards.  She was basically in the

3    elevator in the middle of the lobby, I was on one side

4    where there's a hallway to the back exit, and the wall

5    of doors to the front exit were on the other side, and

6    she left by those doors.

7    Q.    Who could see you and Ms. Strickland when you were

8    in the lobby?

9    A.    Um, by me, on the other side of the hallway I was

10   at, there was a kickboxing studio at the time, where the

11   wall was glass, and there was a kickboxing class going

12   on and about 20 or 30 people in it who could see us.

13   Q.    Mr. Davis, do you recall what happened on June

14   26th?

15   A.    Um, yes, I do.  On the 26th, um, Mr. Martinez, um,

16   forwarded me an e-mail --

17          MS. STRICKLAND:  Objection, hearsay.

18          THE COURT:  No, forwarding is --

19          MS. McMAHON:  Your Honor, may I respond?

20          THE COURT:  It's not necessary.  He may testify.

21   A.    Um, Mr. Martinez forwarded me, and I believe Josh

22   Carpenter, an e-mail from Ms. Strickland.  Um, I believe

23   a few days earlier than that, one of the attorneys in

24   the office had left unexpectedly and we had -- and "we,"

25   being the management team, had decided that some of his

```
 1    cases, low-level cases, could be reassigned to
 2    Ms. Strickland.  Ms. Strickland, um -- the e-mail that
 3    Mr. Martinez forwarded was from Ms. Strickland, you
 4    know, eventually complaining about being assigned those
 5    cases.
 6    Q.    And how did you respond to receiving that e-mail?
 7    A.    Um, I had given some thought at that point, um,
 8    about Ms. Strickland's conduct, and there, and under the
 9    previous month, um, it had occurred to me that, um, part
10    of the issues might have been that, you know, she didn't
11    really have any practice experience before she came to
12    us, and it's a very high-pressure job, and she didn't,
13    you know -- she might need help developing coping skills
14    for dealing with the high stress of the job.  So
15    basically I determined that it would be a good idea to
16    try and meet with her, um, to basically help her deal
17    with that.
18    Q.    And after you discussed meeting with
19    Ms. Strickland with Mr. Martinez, what did you do?
20    A.    Um, Mr. Martinez, you know, approved to that which
21    I --
22          MS. STRICKLAND:  Objection, hearsay.
23          THE COURT:  No, approval is a then-present
24    statement of intent, "I approve."  It is hearsay, but
25    it's admissible under 8033.  It may stand.
```

1          MS. McMAHON:  Thank you, your Honor.

2          THE COURT:  It's time for the recess, and I know

3    you're in the midst, Ms. McMahon, and we started late,

4    so we'll take only a 15-minute recess and we'll start at

5    11:15.  We'll stand in recess until 11:15.

6          We'll recess.

7          (Recess, 11:00 a.m.)

8          (Resumed, 11:15 a.m.)

9          THE COURT:  You may proceed.

10         MS. McMAHON:  Thank you, your Honor.

11   Q.    Mr. Davis, I believe you were discussing June

12   26th, 2018.

13         After you talked to Mr. Martinez about meeting

14   with Ms. Strickland on June 26th, what did you do?

15   A.    At that point I prepared an agenda for the

16   coping-skills meeting that I wanted to have, um, with

17   Ms. Strickland, and then I e-mailed Ms. Strickland to

18   arrange that meeting.

19         MS. McMAHON:  Mr. Spears, can you please pull up

20   EX 005 at Page 46 and 47, and that's already been

21   admitted into evidence as Exhibit 5.

22         (On screen.)

23   Q.    Mr. Davis, do you recognize this document?

24   A.    I do.

25   Q.    What is it?

A.    These are e-mails between myself and
Ms. Strickland, um, dated June 27th and 28th, 2018.

Q.    Is this the, um, setting up the meeting that you
were just referring to?

A.    That's correct.

Q.    And why were you e-mailing Ms. Strickland?

A.    Well I was e-mailing Ms. Strickland to basically
set up a time to have the meeting that I had explained
to Mr. Martinez about to basically help her, um, with,
you know, stress-coping skills.

Q.    In this e-mail, why did you suggest setting a
post-***Davis*** drink.

A.    Um, ***Davis*** was the big fraud case that
Ms. Strickland had been working on with me since, um,
since she came to the office, and the sentencing had
been, I believe, two days before this.  But the larger
context of this is I basically was, you know, suggesting
that we should have the meeting, um, basically wherever
she felt most comfortable.

      Specifically my reference to a drink was going
back to her May 18th statement that she would always be
good for cutting out for a drink.  And I still think
that being away from the office would be good, because I
expected us to talk about, you know, potential stressors
within the office, like, you know, working with support

staff or things like that.  I thought that she might be
more willing to be open about that if she didn't have to
worry about, you know, "Is this person right around the
corner?" or something to that effect.  But the general
effort was to make it in whatever environment made her
most comfortable.

Q.    Were you making a sexual advance towards
Ms. Strickland when you sent this e-mail?

A.    No, I was not.

Q.    Did Ms. Strickland ever indicate to you that she
was uncomfortable getting a drink?

A.    No, she did not.

Q.    And besides for these three e-mails we've been
discussing today from June 1st, 2019 and this e-mail
here from June 26th, what if any -- on what if any other
occasions in June did you ask Ms. Strickland to get a
drink?

A.    None.

        MS. McMAHON:  Mr. Spears, please take town the
exhibit.

        (Takes down.)

Q.    What happened after you sent this e-mail to
Ms. Strickland?

A.    Ms. Strickland arranged for us to meet at
9:00 a.m. in the office on that Friday.  On that Friday

morning she texted me that she was sick and could not

come in, um, so I asked to reschedule the meeting for

Monday, which we did.

Q.     And what was the date on that Monday?

A.     That would have been July 2nd.  I believe the

meeting was at 3:00 or 3:30, something like that.

Q.     Did you end up meeting with Ms. Strickland on July

2nd?

A.     Yes, I did.

Q.     And what happened during that meeting?

A.     I started, um, the meeting going down the agenda I

had created, um, which was basically explaining to her

why I was having the meeting, that it was intended to be

supportive and productive for her, not critical in any

way, and, um, you know asked her to identify her

short-term and long-term goals, I was basically going

down the agenda that I had prepared.

       At that point Ms. Strickland thanked me for

mentoring, but turned the conversation to June 6th and

June 7th regarding the *Dixon* discovery review, the

presentence-interview issue, and stated that, um, the

way I had talked to her on those days was unacceptable.

At that point I tried to, um, redirect the conversation

back to what it was supposed to be about, but

Ms. Strickland was very strident on that, she wanted to

talk about what happened on June 6th and June 7th. She
said that -- she acknowledged that I had -- you know as
her supervisor I had the ability to disapprove of her
actions, but she specifically notes that -- stated that
my tone on those dates was unacceptable.

Q.    And what if anything did Ms. Strickland say to
you, at the end of the July 2nd meeting, about meeting
again?

A.    At the end of that meeting, um, I stated, you
know, that, um, that she had lied to me, which was
unacceptable, at which point she stood up and said, um,
"We should have this conversation with Tony," um, and
walked out, and I walked out with her to go to
Mr. Martinez. Then she stated -- she said "Now?" And I
said "Yes, or else we can come down and try to meet
together." And she stated -- she said something that
basically sounded like she agreed with that, but it was
unclear to me whether she was saying she wanted to meet
with me and her or whether she wanted to meet with me
and Tony and her. So I asked her what he meant, and she
said, "Let me go deal with this and I'll get back to you
real soon," and walked away.

Q.    And did you end up meeting again with
Ms. Strickland on July 5th?

A.    Yes.

1    Q.    What interaction did you have with Ms. Strickland

2    after July 5th?

3    A.    Very little.  The next week I was at a training

4    all week, um, so we exchanged e-mails about a plea

5    hearing for a mutual client that she needed to cover,

6    since I was out of the office.  After that I think she

7    may have ridden past me in the park one morning.  I

8    believe on one occasion I walked into someone's office

9    and she was behind the door, and I didn't see her, and

10    we exchanged pleasantries.  And then I did not, um -- I

11    didn't have any substantive interaction with her, um,

12    until after our management meeting on July 20th.

13    Q.    What happened at the management meeting on July

14    20th?

15    A.    That meeting was basically, you know, we were

16    trying to figure out what to do, "we" meaning the

17    management team, we were discussing what to do about

18    some open spots, um, because the Research and Writing

19    attorney who had been working on my team, um, was

20    leaving the office.

21          It was determined that we --

22          MS. STRICKLAND:  Objection, hearsay.

23          THE COURT:  Well we'll stop it at that point and

24    Ms. McMahon can question him.

25    Q.    What was decided about which Research and Writing

```
 1   attorneys were assigned to which teams, um, at the
 2   management meeting?
 3   A.    It was determined for the short term, um, while we
 4   were hiring another person, that the two remaining
 5   Research and Writing attorneys would each have to cover
 6   two teams.  One of them, Jared Martin, was already
 7   effectively doing that, um, because he was covering
 8   research and writing for the Asheville trial team as
 9   well as on his own.  And so it was determined that
10   Ms. Strickland would cover the Adolph team that she was
11   already assigned to as well as mine for now.
12   Q.    And what happened after the management meeting?
13   A.    Um, I e-mailed Ms. Strickland on July 22nd, asking
14   to meet with her to discuss her role on my team and her
15   workflow and basically, you know, how best to structure,
16   um, her working on my team.
17         MS. McMAHON:  Mr. Spears, can you please display
18   Exhibit FH.
19         (On screen.)
20   Q.    Mr. Davis, do you recognize this document?
21   A.    I do.
22   Q.    What is it?
23   A.    It's my July 22nd, 2018 e-mail to Ms. Strickland
24   that I was just discussing.
25         MS. McMAHON:  Your Honor, I'd like to move this
```

1   exhibit into evidence.

2        THE COURT:  No objection?

3        MS. STRICKLAND:  No objection.  Thank you.

4        THE COURT:  It may be admitted.  It will be

5   Exhibit 178.

6        (Exhibit 178, marked.)

7   Q.    Mr. Davis, what happened after you sent

8   Ms. Strickland this e-mail?

9   A.    I believe the next day Ms. Strickland called in

10   sick.

11   Q.    And what happened after that?

12   A.    On the following day, on July 24th, Mr. Martinez,

13   um, texted me telling me not to --

14        MS. STRICKLAND:  Objection, hearsay.

15        THE COURT:  No, he gave instructions.  He may tell

16   us what instructions he was given.

17   A.    He contacted me, telling me to have no further

18   contact with Ms. Strickland, um, until further notice

19   from him.

20   Q.    What contact did you have with Ms. Strickland

21   after Mr. Martinez reached out to you on July 24th?

22   A.    Um, nothing substantive.  I believe, um, we might

23   have passed in the hall once, I believe.  She was cc'd

24   on some reply-alls and the person who sent it to me had

25   cc'd her.  And I believe we were on one, or possibly

```
 1    two, appellate moots together.  And that was it.
 2    Q.    Did Ms. Strickland call into those moots?
 3    A.    Yes, she did.
 4    Q.    When did they take place?
 5    A.    Um, I believe the late fall and possibly November,
 6    December, somewhere in there.
 7    Q.    Did you have any conversations with Ms. Strickland
 8    after July 24th?
 9    A.    No.
10    Q.    What was your involvement in decisions about
11    Ms. Strickland's pay after July 24th, 2018?
12    A.    None.
13    Q.    What was your involvement in decisions about
14    promoting Ms. Strickland after July 24th?
15    A.    None.
16    Q.    What authority did you have at any point to change
17    Ms. Strickland's pay?
18    A.    None, that was up to the Defender.
19    Q.    What authority did you have at any point to
20    promote Ms. Strickland?
21    A.    None, that was also up to the Defender.
22          (Pause.)
23          MS. McMAHON:  Thank you, that's it for the
24    government.
25          THE COURT:  Thank you.
```

```
1          Do you wish to examine this witness,
2     Ms. Strickland, or Mr. Strickland?
3          MS. STRICKLAND:  Yes, your Honor, I do.
4          THE COURT:  And you may -- you may inquire.
5          MS. STRICKLAND:  Thank you, your Honor.
6
7     CROSS-EXAMINATION BY MS. STRICKLAND:
8     Q.    Mr. Davis, you testified on direct about being
9     selected as First Assistant in 2015, do I have that
10    right?
11    A.    That's correct.
12    Q.    When you were selected to be First Assistant, had
13    you ever served as First Chair on a criminal jury trial?
14    A.    Yes, I had First-Chaired two criminal jury trials
15    at that point and then tried with trial counsel on, I
16    believe, 5 or 6.
17    Q.    As of August 2017, had you served as First Chair
18    on those two criminal jury trials?
19    A.    I'm sorry, as of what date?
20    Q.    August 2017.
21    A.    Yes.
22    Q.    Can you please identify those cases?
23    A.    Yes, I was First-Chair on -- do you want all the
24    cases or just the ones I was First Chair on?
25    Q.    The cases you were First Chair on.
```

A.    It was **United States vs. Mario Taylor**, which I

believe would have been January of 2014.  And **United**

**States vs. Darius Freeman**, which might have been, um --

I don't actually remember the date, but maybe May of

2014.

Q.    Thank you, Mr. Davis.

I believe you testified earlier that one of the

first projects I was assigned to work on was a large

sophisticated white-collar case, is that right?

A.    That's correct.

Q.    Would you agree that large white-collar cases can

be some of the most difficult and complex cases that an

FDO handles?

A.    Yes, absolutely.

Q.    And you testified earlier that I assisted you in

drafting the sentencing memorandum in that case, is that

correct?

A.    That's correct.

Q.    And I traveled with you to conduct witness

interviews in that case, correct?

A.    That's correct.

Q.    Did I assist you in preparing for the witness

interviews in that case?

A.    Um, I believe so.  I don't have a very clear

memory of that.  But probably.

Q.    Did I meet with the client in that case, to your
recollection?

A.    Yes.

Q.    (Pause.)  Did you state in an e-mail to me, dated
June 12th, 2018, "Great, thanks for diving in, I'm sorry
this is happening very last-minute.  You were right
earlier that it is a lot.  I'm feeling a touch
overwhelmed myself"?

Q.    I don't know.  You'd have to show me to refresh my
recollection.

A.    Would it refresh your recollection to review a
document?

A.    It would.

Q.    (Shows.)

      MS. STRICKLAND:  All right, let's scroll down so
we can review the entire document.  (Scrolls.)  All
right, stop right there.

Q.    Are you familiar with this document?

      MS. McMAHON:  Objection, your Honor, this has not
been identified as an exhibit by either party.

      MS. STRICKLAND:  May I be heard?

      THE COURT:  Well you may use it to refresh his
recollection, but that's all.  And we probably should
mark it for identification.

      MS. STRICKLAND:  Yes, your Honor.

1      THE COURT:  What will the next letters be?

2      MS. STRICKLAND:  HA.

3      THE COURT:  All right, we'll mark it HA for

4  identification.  You may use it to refresh his

5  recollection, if it does.

6      MS. McMAHON:  Thank you, your Honor.

7  Q.   Does this refresh your recollection about whether

8  you stated, in an e-mail to me dated June 12th, 2018,

9  "Great, thanks for diving in, I'm sorry this is

10  happening very last-minute.  You were right earlier that

11  it is a lot.  I'm feeling more than a touch overwhelmed

12  myself"?

13  A.   Yes.

14  Q.   And does this appear to be about the large white-

15  collar case?

16  A.   I believe that it is, but I'm not certain.

17  Q.   I understand it's redacted, but --

18      MS. STRICKLAND:  And can you scroll up to -- okay.

19      (Scrolls.)

20  Q.   And did you also say to me, in an e-mail dated

21  June 13th, 2018, "You're not really selling the whole 'I

22  can't handle things at the last minute' line," you know?

23  A.   Um, yes.

24  Q.   Okay.  Thank you.

25      Mr. Davis, did you request to be my mentor?

1  A.    Um, I believe that I probably did.  Um,

2  Mr. Martinez assigned me, um, to handle your training

3  from the beginning, um, but I believe that became a

4  mentorship around December in that area.  I believe that

5  I probably did, because I thought we already had that

6  relationship, um, and if you agreed to it.

7  Q.    Okay, thank you.

8        And you testified that part of the mentoring

9  relationship was shadowing activities, is that correct?

10  A.    Um, I think that was larger than the mentoring

11  relationship, um, but certainly that was a component of

12  it.  I think the shadowing was not just a mentoring

13  thing, that was about you being experienced enough to

14  handle the cases.

15  Q.    Mr. Davis, did you tell me, in an e-mail dated

16  November 22nd, 2017, that "Substantive work always takes

17  priority over shadowing activities"?

18  A.    Um, I would have to see the e-mail, but that

19  sounds -- that sounds quite likely.

20  Q.    Would you like to have -- would it refresh your

21  recollection to review a document?

22  A.    It might.

23  Q.    Okay.

24        (Pause.)

25        MS. McMAHON:  Objection, your Honor, this is

1   another e-mail that hasn't been marked for
2   identification.
3          THE COURT:  We'll mark it HB for identification.
4   She may use it only to refresh his recollection.
5          (Shows to witness.)
6   Q.    Does this refresh your recollection as to whether
7   you stated that "Substantive work always takes priority
8   over a shadowing or training activity"?
9   A.    Um, if I used those words?  I would have to see
10  the remainder of the document.
11  Q.    Sure, I'm happy to scroll through it.  (Scrolls.)
12  A.    (Looks.)  Can you scroll back, um, again?
13  Q.    (Scrolls.)
14  A.    (Reads.)  I stated in this that "I would like for
15  you to come with me for shadowing training purposes, but
16  substantive work always takes priority," yes.
17  Q.    Thank you.
18         MS. STRICKLAND:  Let's turn to Admitted Exhibit 5.
19  I'm on Page 44, I believe.  It's Bates number 1276 --
20  no, that's not right.  It might be in the, um -- take a
21  look at -- oh, yes.  Yes, that's right.
22         (On screen.)
23  Q.    And we're happy to scroll through this page, but
24  are you familiar with this document?
25  A.    Um, yes, I am.

1   Q.    Is this an e-mail from you to me?

2   A.    Um, this -- this is part of an e-mail chain -- and

3   you're referring specifically to the one that's on the

4   screen?

5   Q.    Um, yes.

6   A.    Yes.

7   Q.    Okay.  And is this e-mail dated March 13th, 2018?

8   A.    Yes, it is.

9   Q.    Did you state in this e-mail, "No worries, we'll

10  find another one.  Also, I'm sure you know this, you

11  don't have to do these shadowing things with me, just

12  let me know if you do something with someone else so I

13  can check it off your list"?

14  A.    Yes, this is the e-mail I referred to earlier that

15  you forwarded to me, um, where I discussed that you

16  didn't have to do the activities with me, you could do

17  them with other people.

18  Q.    Did you e-mail me, on May 29th, 2018, about

19  shadowing a presentence interview?

20  A.    Um, I'm sorry, what was the date again?

21  Q.    May 29th, 2018.

22  A.    Um, one of the -- that seems around the time that

23  I would have, but again I would have to see it to be

24  sure.

25  Q.    Would it refresh your recollection to review a

1    document?

2    A.    It might.

3    Q.    Okay.

4         MS. STRICKLAND:  Okay, go ahead and scroll through

5    it.  Oh, I'm sorry, I guess we'll have to mark this.

6    This is also for refreshing recollection.

7         THE COURT:  We'll mark it as HC.

8         MS. STRICKLAND:  Thank you, your Honor.

9    Q.    (Shows.)  Are you familiar with this document?

10   A.    Yes, this is the document that -- this is the

11   e-mail where I, um, basically arranged the presentence

12   interview I had referred to earlier around your

13   schedule.

14   Q.    Did you state in this e-mail, "It might be good

15   for you to sit through another of these, if you can.  I

16   know it's not exciting, but it will show you what the

17   dynamic is like doing them at the jail"?

18   A.    Yes, in addition to asking you if the dates worked

19   for you.

20   Q.    Is it fair to say that this e-mail reflects that I

21   had already shadowed a presentence interview in the

22   past?

23   A.    My recollection is that you had shadowed one that

24   was done with the client on bond, which is, you know, a

25   substantively different experience than doing it in the

1    jail where the prisoners are.

2    Q.    Do the words "might," and "if you can" indicate

3    that this shadowing activity was optional?

4    A.    No.

5    Q.    No, the words "might" and "if you can," your

6    testimony is that those words do not indicate that this

7    shadowing activity was optional?

8         MS. McMAHON:  Objection, asked and answered.

9         THE COURT:  No, she may press the point.  He may

10   answer.  (Silence.)  He may answer.

11        And your answer, sir?

12   A.    It was "No."  The -- when I sent the e-mail, um, I

13   was asking, once I've already set the activity, that it

14   was not optional at that point.  But like I said

15   earlier, um, I tended to be flexible about these things.

16   The issue is not that this specific presentence

17   interview was one that you needed -- desperately needed

18   to go to, the issue, at the time that I told you to go

19   to it, is that I already had it and you had already said

20   that you would, and then you returned and said that you

21   would not, um, without attempting to discuss that with

22   me.

23   Q.    But just to be clear, when similar, um,

24   occurrences had happened in the past, you had said

25   things like "Don't worry, we'll find you another one" or

1    allowed a rain-check, correct?

2    A.    I don't believe that those occurrences were

3    similar.

4    Q.    I'm sorry, I didn't hear your answer?

5    A.    I don't believe that those occurrences were

6    similar.

7    Q.    Just to be clear, you did not say, in an e-mail

8    dated March 13th, 2018, "No worries, we'll find another

9    one?"

10   A.    I did in that e-mail, yes.

11   Q.    Okay, thank you.

12   A.    I do not think that was similar to this.

13        MS. STRICKLAND:  Let's move on to Admitted Exhibit

14   5, please, page -- the page numbers aren't going to be

15   right, but this should be 27.  Yes, that's okay.  I just

16   want to -- we've talked about this at an earlier time.

17        (On screen.)

18   Q.    I believe you testified earlier that you sent me

19   an e-mail on May 23rd -- I'm sorry, May 18th, 2018,

20   entitled "Mas dinero," is that right?

21   A.    Yes.

22   Q.    And does that mean more money?

23   A.    Yes.

24   Q.    And does that e-mail state, to your recollection,

25   "Dude, you're shooting high with a G-15, not least of

1    all since you'll need 5 more years of fed service to

2    qualify for it.  So fret not, I have a plan.  Just

3    remember I deal in pay for stay"?

4    A.    Oh, yeah, that's my recollection.  Again, I

5    testified that I -- well that's certainly pretty close.

6    Q.    Mr. Davis, when you referred to "GS 15," are you

7    referring to Grade 15 on the General Service schedule

8    for federal employees?

9    A.    I believe so.

10   Q.    Mr. Davis, did you admit to the EDR investigator

11   that the "mas dinero" e-mail was "a stupid e-mail to

12   send"?

13   A.    No, I did not.

14   Q.    If the investigation report states that you

15   admitted to the EDR investigator that the "mas dinero"

16   e-mail was "a stupid e-mail to send," do you have any

17   reason to doubt the accuracy of that?

18   A.    Yeah, I believe I said it was a "stupid joke,"

19   that it wasn't a very good joke.

20   Q.    But you did say it was "stupid"?

21   A.    Um, I don't remember the word that I used.  But it

22   is possible.  It certainly was not a good joke.

23        MS. STRICKLAND:  Let's turn to admitted Exhibit 9,

24   Page 33.

25        (On screen.)

```
 1    Q.    Are you familiar with this document?

 2    A.    Yes, I am.

 3    Q.    And is this a chain of text messages between you

 4    and Erin Taylor?

 5    A.    Yes, it appears to be.

 6    Q.    And you testified earlier that Erin Taylor was

 7    also a trial team leader at the FDO, is that correct?

 8    A.    That's correct.

 9    Q.    Did you tell Erin Taylor that I "may just need to

10    get smacked a bunch"?

11    A.    Um, are you asking me what the words say or are

12    you asking me what I was stating?

13    Q.    I didn't hear what you just said, but I'm asking

14    you did you tell Erin Taylor that I "may just need to

15    get smacked a bunch"?

16    A.    Um, I told Erin Taylor that I was going to try and

17    talk to you, um, based on your issues, and give you a

18    chance to turn around, um, but you may need to be --

19    just need to get "smacked a bunch," though meaning in

20    that context that, um, you may -- because of the issues

21    that you were having, it may be the only way, um, that

22    you would learn that you were having problems, um, for

23    those to play out.

24          THE COURT:  Well I'm not sure what --

25    Q.    But you were --
```

1        THE COURT:  No, wait.  Wait.  Wait.  Let me ask

2    him.

3        Sir, what did you mean by that when you said it?

4        THE WITNESS:  What I meant, um, is that in the

5    context of that Ms. Strickland had been having issues,

6    um, with supervisors and with others, um, and this

7    particularly I believe was right after she sent, um,

8    that e-mail to Mr. Martinez, um, and he had indicated,

9    um, basically a desire to meet with her, um, to

10   essentially -- I think his words were "nip the whining

11   in the bud," um, so what I meant by this was I would

12   have wanted to meet with her -- as referring to the

13   coping skills meeting there, to basically give her an

14   opportunity to get through this.  But that it was

15   possible that the only way that she was going to learn,

16   you know, was if she actually continued to do this and

17   it continued to have the negative repercussions.

18       THE COURT:  I see.

19       THE WITNESS:  Basically this was a private

20   conversation with Ms. Erin Taylor and myself and it was

21   colloquial.

22       THE COURT:  Go ahead, Ms. Strickland.

23       MS. STRICKLAND:  Thank you, your Honor.

24   Q.    Mr. Davis, do you believe that it's appropriate to

25   talk about hitting a female subordinate with another FDO

1  supervisor?

2  A.    I was not discussing hitting you, or anyone.

3  Q.    But to be clear, you did say that I may just need

4  to get "smacked a bunch"?

5  A.    That is a colloquial.  This is in a private

6  conversation with a friend of mine and another

7  supervisor, it was not intended to refer to physical

8  violence.

9        MS. STRICKLAND:  Let's turn to Admitted Exhibit

10  38, please.  (On screen.)  On Page 9.

11        (On screen.)

12  Q.    Are you familiar with this document?

13  A.    Um, yes.

14  Q.    Is this a chain of text messages between you and

15  Erin Taylor?

16  A.    Yes, and that appears to be dated June 6th of

17  2018.

18  Q.    Did you tell Erin that I need "to get slapped"?

19  A.    I believe this was -- can you scroll over?

20  (Scrolls.)  Yes, this was in reference to the, um -- to

21  your -- both your e-mail to me and the fact of -- and

22  your conduct on the *Dixon* case, um, and basically I was

23  telling Ms. Taylor that you needed a wake-up call.

24  Q.    But to be clear, what you told her is that I

25  "needed to get slapped"?

A.     Those were the words that I used in the private
conversation, but the meaning of them was that you
needed a wake-up call.

Q.     Thank you.

       Mr. Davis, did you have a meeting with me on June
6th, 2018 about the *Dixon* case?

A.     On June 6th of 2018?  I'm not sure.  About the
*Dixon* case?

Q.     Around June 6th, about that time range.

A.     About the *Dixon* case?  I'm not sure that I did.

Q.     If you told the EDR investigator that you had a
meeting with me in which you were very upset and
controlling, do you have any reason to doubt the
accuracy of those notes?

       MS. McMAHON:  Objection, misstates evidence in the
record.

       THE COURT:  Yes, I'm not so sure that is accurate.
Let's ask the question again.

       MS. STRICKLAND:  I'm sorry, your Honor, I didn't
hear that?

       THE COURT:  Ask the question again, counsel.
Ms. McMahon states that it misstates the record, and I
think it does.  So ask the question again.

Q.     So if the EDR investigator's note states,
"Admitted to being very upset and controlling with

```
 1   regard to the *Dixon* case," do you have any reason to
 2   doubt the accuracy of those notes?
 3           MS. McMAHON:  The same objection.
 4           THE COURT:  No, overruled.
 5           MS. STRICKLAND:  May I be heard?
 6           Oh, okay.  Thank you.
 7   A.    Oh, yes, I do.  Um, I believe I told the
 8   investigator that I was very upset, that I was
 9   controlling myself.
10   Q.    I'm sorry, can you repeat that?
11           THE COURT:  He said he --
12   A.    What I told the investigator was that I was very
13   --
14           THE COURT:  He said that he was very upset, but he
15   was controlling himself, that's his testimony here
16   today.
17           MS. STRICKLAND:  Okay, sure, sure, that's his
18   testimony here today.
19   Q.    Mr. Davis, is it your understanding that you were
20   counseled on workplace conduct issues and professional
21   communications via e-mail?
22   A.    I was counseled on, um, a series of e-mails.
23   Q.    Is it your understanding that the investigator
24   said your profanity was not directed at anyone as it was
25   simply used in a sentence?
```

```
 1    A.    That sounds -- again I can't say that that's the
 2   exact wording, um, unless I see a document.  But that
 3   sounds right.
 4    Q.    You don't have any reason to doubt that, is that
 5   right?
 6    A.    I mean if you want me to say that's what it said,
 7   you can show me the document.  But that sounds right.
 8    Q.    Okay, thank you.
 9          MS. STRICKLAND:  Let's look at Admitted Exhibit 9,
10   on Page 6.
11          (On screen.)
12    Q.    Are you familiar with this document?
13    A.    Yes, I am.
14    Q.    Is this a text message from you to Erin Taylor?
15    A.    Um, yes, I believe this is following the July 5th
16   meeting.
17    Q.    Did you say that I was a "lying, manipulative,
18   underhanded jackass"?
19    A.    I said that you did not get to the important point
20   of the meeting, um, which is that you should not be a
21   "lying, manipulative, underhanded jackass."
22    Q.    So you said that I was a "lying, manipulative,
23   underhanded jackass"?
24          MS. McMAHON:  Objection, the document speaks for
25   itself.
```

1    THE COURT:  The document does speak for itself.

2    (Pause.)

3    MS. STRICKLAND:  Okay, um, let's turn to Page 39.

4    (On screen.)

5    Q.    Are you familiar with this document?

6    A.    Yes, again, these are more private texts between

7    me and Ms. Taylor.

8    Q.    And did you say that I was "acting like a spoiled

9    brat"?

10   A.    In this text?  Yes.

11   Q.    Okay.

12         MS. STRICKLAND:  Let's go to Page 2.

13         (On screen.)

14   Q.    Did you tell Erin Taylor, "No, you're right, I'm

15   legit done, just depressed at all the time and emotional

16   energy I've spent trying to lift her up.  But she isn't

17   the person I was trying to lift.  Jesus, that read like

18   a break-up text"?

19   A.    Um, I -- those are the words written in my, um,

20   reference to "reading like a break-up text," is that the

21   first text sounded more serious than I admitted.

22   Q.    So you did say "Jesus, that read like a break-up

23   text"?

24   A.    Yes, that I wrote that.  Yeah.

25   Q.    Okay.

```
 1          MS. STRICKLAND:  Let's go to Admitted Exhibit 8.
 2          (On screen.)
 3     Q.    And I'm happy to scroll through it, but I will ask
 4     you, are you familiar with this document?
 5     A.    Yes, I am.
 6     Q.    Is this an e-mail to yourself dated June 6th,
 7     2018?
 8     A.    Yes, it is.
 9     Q.    Is the subject line, "CD Events"?
10     A.    Yes.
11     Q.    And by "CD" you're referring to me?
12     A.    Um, that's correct.
13     Q.    Okay.  Do these notes state that "Caryn is self-
14     centered and personal-goal Oriented"?
15     A.    Um, yeah, that is one of the things that's on
16     here.  Yes.
17     Q.    Okay.
18          MS. STRICKLAND:  And go ahead and scroll down.
19     (Scrolls.)  Okay.
20     Q.    Do these notes state, "She thought I was
21     sufficiently wrapped around her little finger, that I
22     wouldn't resist."
23     A.    Um, the full bullet point is you'd "seemed
24     surprised at my reaction.  I now believe that you were
25     telling the truth, that you didn't mean for it to come
```

1  up.  You felt you could air it with me because you

2  thought I was sufficiently wrapped around your little

3  finger that I would not resist."

4  Q.    Do these notes state, "Also demanded more money"?

5  A.    Yes.

6  Q.    Do these notes state "veiled threats about moving

7  up to an AFD"?

8  A.    "With a supposed offer letter stating that she

9  would move up to an AFD in a few months after starting,"

10 which was not accurate.

11 Q.    Mr. Davis, are you aware that there is a

12 derogatory gender stereotype about high-achieving

13 professional women being demanding and too overly

14 aggressive and assertive?

15       MS. McMAHON:  Objection, your Honor, relevance and

16 outside the scope of the direct testimony.

17 A.    Well I'm not troubled with it being outside the

18 scope of the direct testimony.  But, um --

19       Why is that relevant, Ms. Strickland?

20       MS. STRICKLAND:  Yes, your Honor.

21       My understanding of Mr. Davis's testimony is that

22 he is testifying that these are just legitimate

23 management decisions and that I was the one that my

24 conduct was a problem.  I believe that I'm entitled to

25 explore whether it was really my conduct that was the

1  problem or whether it was gender-based discrimination

2  and sexual harassment that was the problem.  So I

3  believe that it's directly relevant to the questions

4  that he was asked on direct examination.

5       THE COURT:  So your point -- No, I get your point.

6  So you're asking him if he's aware of that stereotype?

7       MS. STRICKLAND:  Yes.

8       THE COURT:  And you may.

9       MS. STRICKLAND:  Thank you.

10      THE COURT:  Are you aware of that stereotype, sir?

11      THE WITNESS:  I'm sorry, could you repeat the

12  question?

13      MS. STRICKLAND:  Yes, of course.

14  Q.   Mr. Davis, are you aware that there is a

15  derogatory gender stereotype about high-achieving women

16  being demanding and overly assertive?

17  A.   Um, I am aware that that is an issue that's been

18  said before, yes.

19  Q.   Okay.  Are you aware that there is a derogatory

20  gender stereotype about high-achieving women being self-

21  sufficient, self-centered?

22  A.   No, I'm not.

23  Q.   Are you aware that there is a derogatory gender

24  stereotype of high-achieving professional women being

25  conniving and not deserving what they've achieved?

 1        MS. McMAHON:  Objection, your Honor, relevance.

 2        THE COURT:  No, she may press these things to see

 3   if he agrees with those stereotypes, agrees that those

 4   stereotypes exist in the workplace.  Overruled.  You may

 5   answer.

 6   A.    Um, conniving and what was the latter part?

 7   Q.    Well just use the word "manipulative"?

 8   A.    No, I'm not.

 9        MS. STRICKLAND:  Scroll down a little bit.

10   (Scrolls.)  Okay.

11   Q.    Do your notes say that I -- or "has been avoiding

12   me and difficult to talk to," in that first bullet point

13   on the page?

14   A.       Um, I noted that you "raised numerous complaints,"

15   and this was when we were walking -- on the 29th when

16   you invited me to go for a walk, "raised numerous

17   complaints and issues with the First Chair's work after

18   approximately 2 days on the case, and in fairness they

19   appear warranted, that you were very open with me about

20   it until I told you that you should be prepared to get

21   off the case.  You seemed to acknowledge and believe

22   that, but got very distant and disengaged very quickly.

23   And has been avoiding me and difficult to talk to ever

24   since -- ever since I made that comment about you."

25   Q.    Regardless of --

1          THE COURT:  Excuse me, Ms. Strickland.  Excuse me.

2          Mr. Davis, what was the occasion of your preparing

3     these notes?

4          THE WITNESS:  These were notes that I prepared to

5     myself the morning after Ms. Strickland had e-mailed me,

6     um, stating that, um -- about the discovery review where

7     she stated, um, that it had been set, that it's the only

8     other time -- it's the only time other people could do

9     it.  And, um, that morning, um, basically that, um, as I

10    think I've testified earlier, I had been giving her a

11    lot of the benefit of the doubt before that and that

12    changed my opinion about whether I should be giving her

13    the benefit of the doubt.

14         THE COURT:  Thank you.

15         THE WITNESS:  So I prepared these for myself to

16    document things that had happened up to that date.

17         THE COURT:  Thank you.

18         Go ahead, Ms. Strickland.

19    Q.    Regardless of the reason why, um, these notes

20    state that you were aware that I have been avoiding you

21    and was difficult to talk to, is that correct?

22    A.    Um, based on the fact that I told you that you

23    should be prepared to get off the case after the --

24    after I made that comment, for that "You had been

25    avoiding me and difficult to talk to," but not before

1    that.

2    Q.    So going down to, I believe it's the 5th bullet

3    point, does it say "Clearly does not want to interact

4    with me"?

5    A.    (Pause.)  I'm sorry, I believe that's true, but

6    I'm having trouble finding it.

7    Q.    It's at the very bottom.

8    A.    Oh, okay, yes.  But this only started after I

9    questioned your place in the *Dixon* case.

10   Q.    Was this after the May 18th, 2018 "mas dinero"

11   e-mail as well?

12   A.    Um, no, you did not start avoiding me until, um --

13   after the "mas dinero" e-mail, we went on that walk

14   where you were very open and, um, you were very

15   friendly, after the "mas dinero" e-mail, but before --

16   it only happened, um -- and it may have only changed

17   when, um, the time when I believed Tony would take you

18   off the case.

19   Q.    Yeah, I understand.  I'm just asking, that these

20   notes are dated June 6th, is that correct?

21         MS. STRICKLAND:  And you can go to the top if he

22   needs to review it.

23   A.    (Looks.)  Yes.

24   Q.    Okay.  And the e-mail dated May 18th, 2018, was

25   before June 6th, is that right?

1    A.    No, that's correct.

2    Q.    Okay.  And I believe you testified earlier that

3    May 18th, 2018 was the last mentoring lunch, is that

4    accurate?

5    A.    That's the last -- do you mean it was the last one

6    that we had or it was going to be the last one?

7    Q.    I believe you testified that "It was the last one

8    that we had," is that accurate?

9    A.    Yeah, that's right, that's the last meeting we

10   had.

11   Q.    Okay.  And you testified earlier that you sent me

12   an e-mail on June 1st, 2018 and offered me a drink, is

13   that correct?

14   A.    No, I did not, I testified I sent you an e-mail,

15   um, where I offered you "a drink and an ear," if you

16   don't think it's set, "if you need one," um, and then

17   referred you to Mary Ellen.

18   Q.    So you offered "a drink and an ear"?

19   A.    "If you need one."

20   Q.    Okay.  Did I agree to go for a drink with you?

21   A.    Um, I wasn't asking you to, so you didn't respond

22   to that.

23   Q.    I didn't respond to that, is that correct?

24   A.    Well I mean you responded to that e-mail.

25   Q.    Did I respond and say I wanted to go for a drink

1    with you?

2    A.    You didn't.  No, you did not.

3    Q.    Okay, thank you.

4          And you asked me for a "celebratory drink" on June

5    19th, 2018, is that correct?

6    A.    No, that is not correct.

7          MS. STRICKLAND:  Um, let's bring up Admitted

8    Exhibit 3.  (On screen.)  No, wait, I'm sorry, Page 39.

9    I'm sorry.  No, wait, Bates Number 91.  Okay.  Now go

10   back a few pages.  (On screen.)  Okay, and scroll down.

11   (Scrolls.)

12   Q.    Did you say, "I'm going to get this filed and get

13   a celebratory drink, you're welcome to join me"?

14   A.    But if I recall correctly, yeah, it's --

15   Q.    Right, is that what you said?

16   A.    Yeah.

17   Q.    Did I agree to go for a drink with you?

18   A.    Again I was not asking you to go, but you, um, as

19   you just stated, did not.

20   Q.    But you said you were "getting a celebratory drink

21   and you're welcome to join me"?

22   A.    Correct.

23   Q.    Okay.  And did you offer to give me a ride home on

24   June 21st, 2018?

25   A.    Yes.

Q.    Did I agree to take a ride home from you?

A.    You did not.

Q.    Did you wait for me in the lobby?

A.    I did not.  I waited to see if you would respond to my text message, but I was not waiting for you.

Q.    Were you in the lobby when I came down from the elevator?

A.    Yes, but I was not expecting you to come down at that time.

Q.    But did you send me a text message stating "Last chance for a ride, tough girl"?

A.    Um, yes, um, mirroring your language, um, from about 5 minutes before I sent it, I did.  But that was before you came down into the lobby.

Q.    Did I call myself a "girl" when I was talking to you?

A.    No, you said "I'm tough."

Q.    Do you think It's appropriate to refer to your female colleague as a "girl"?

A.    I think "tough girl" is like "tough guy," I think it's a colloquialism and I don't think there's anything wrong with it.

Q.    So you don't think that's inappropriate?

A.    No.

Q.    Did you e-mail me on June 19th, 2018 and ask for

```
1   another "mentoring session"?

2   A.    Um, I'm not -- yeah, I think I -- I'm sorry, give

3   me the date again?

4   Q.    Judge 29th, 2018.

5   A.    I'm not sure that that date is correct.

6         MS. STRICKLAND:  Um, we can look at the -- I can't

7   -- yeah, go ahead and scroll up.  (Scrolls.)  No, that's

8   the wrong one.  Let's go to the next page.  (Scrolls.)

9   Yes, okay.

10  Q.    Did you say, "I think it would be good for us to

11  have another mentoring session"?

12  A.    Oh, yes, on June 27th, 2018.

13  Q.    Oh, I apologize, I have the date wrong.  June

14  27th.

15  A.    Right.

16  Q.    Did you suggest that "It might good to have some

17  distance from work"?

18  A.    Yes, I did.

19  Q.    Did I respond to your e-mail and state that I

20  would prefer to meet in the office?

21  A.    You did.

22  Q.    Did we reschedule this meeting for the following

23  Monday?

24  A.    Yes.

25  Q.    Did you state, "I am free all day including early
```

```
 1    morning, lunch, and evening"?
 2    A.    Um, well can you show me the -- so I can see the
 3    context of it.  I believe that's right, but I would like
 4    to see the context.
 5            MS. STRICKLAND:  Up one, please.
 6            (On screen.)
 7    Q.    Did you say "I am free all day including early
 8    morning, lunch, and evening"?
 9    A.    I believe I was responding to your text stating
10    that you had, um, some fun things that you had to do
11    that day and asking me, you know, what times I was
12    available or what times I was thinking about, and I was
13    telling you basically "I'm free any time you want."
14    Q.    Did you state "I am free all day including early
15    morning, lunch, and evening"?
16    A.    Yes, those were the words I wrote.
17    Q.    Were you at all concerned that you were not
18    respecting my stated preference to meet in the office?
19    A.    No, not even a little bit, I was basically telling
20    you that we can meet at any time you want.
21    Q.    So you were not concerned?
22    A.    No.
23            MS. STRICKLAND:  Okay, let's turn to Admitted
24    Exhibit 11.
25            (On screen.)
```

```
1   Q.     Um, and feel free to scroll through it and I'll
2   ask you if you're familiar with this document?
3   A.     (Looks.)  Yes, I am.
4   Q.     Is this an e-mail that you sent Tony Martinez on
5   July 6th, 2018?
6   A.     Yes, it is.
7   Q.     Was this e-mail sent after a meeting you had with
8   Tony and me on July 5th, 2018?
9   A.     Yes, it is.
10  Q.     Did you tell Tony Martinez --
11         MS. STRICKLAND:  And we'll probably need to scroll
12  down, yeah, it's a long e-mail, but, um, we'll find it.
13         (Scrolls.)
14  Q.     Did you tell Tony Martinez that "If this had been
15  any other employee, I would have insisted they receive a
16  formal reprimand after deception and insubordination
17  this severe"?
18  A.     I believe that I did.  Yes, I'd go along with --
19  Q.     Did you say that any other employees would --
20  A.     Yes.
21  Q.     I apologize, I didn't mean to interrupt you.
22  A.     I was just reading it.  Yes.
23  Q.     Okay.  Did you say that "Any other employee would
24  get chewed out and be well on their way to a PIP at the
25  meeting last night"?
```

1   A.    (Pause.)  Um, "If this had been Caleb or Jeff King

2   or most any other employee, I would never have permitted

3   multiple instances of being out without leave.  And then

4   for teleworking, I would have expected to have to --

5   (Inaudible.) audacity, lack of accountability, for them

6   to get chewed out, and be well on their way to assess at

7   the meeting last night," yeah.

8   Q.    Does a "PIP" mean a "Performance Improvement

9   Plan"?

10   A.    It does.

11   Q.    Did you say, "I want to make sure that these

12   incidents are not just written off as a mutual mistake

13   or a personality conflict as I believe they need to be

14   addressed during her annual performance review"?

15   A.    I believe that I did, um -- yes.

16   Q.    Did you say "We are considering making her an AFD

17   for various reasons and I think we need to be serious

18   about whether she actually lives up to that title at the

19   moment"?

20   A.    I wrote those words, yes.

21   Q.    Just to be clear, at this time you reported to

22   Tony Martinez, is that correct?

23   A.    Correct.

24   Q.    He was above you in the chain of command?

25   A.    He was above everyone, yes.

1    Q.    So if he gave an order, um, were you required to

2    respect that?

3    A.    Yes.

4    Q.    Okay, thank you.

5          MS. STRICKLAND:  Well let's turn to Trial Exhibit

6    16.

7          (On screen.)

8    Q.    Go ahead and scroll through and I'll ask you if

9    you are familiar with this document?

10   A.    Um, yes, I am.

11   Q.    Is this a chain of e-mails between you and Josh

12   Carpenter dated July 20th, 2018?

13   A.    I --

14   Q.    I'm sorry, I guess there's some on July 23rd, but

15   go ahead to the bottom.

16   A.    Oh, yes.  Yes.

17         MS. STRICKLAND:  No, wait, go ahead to the bottom.

18         (On screen.)

19   A.    Yes, it is.

20   Q.    Okay.  So, yeah, let's start there.

21         And Joshua Carpenter, just for the Court's

22   benefit, was the Appellate Chief, correct?

23   A.    That's correct.

24   Q.    Did you tell Josh Carpenter, "My primary concern

25   is that I am the only -- I am the only one who has

1   communicated to Caryn that her actions, which were

2   firable offenses, were in fact problematic"?

3   A.   Yes.

4   Q.   Did you tell Josh carpenter, "I feel a bit out in

5   the wind here and I am going to have trouble working

6   with her so long as I think she thinks she can lie to me

7   and disobey me and no one will back me up"?

8   A.   Yes.

9   Q.   Did you tell Josh Carpenter, "If she chooses to

10  continue the fuck-off attitude, then at least we know

11  what we have"?

12  A.   Um, yeah, I think that's in here somewhere.  Um,

13  that's sounds accurate.

14  Q.   Do you think that it's appropriate to use the

15  words "fuck-off attitude" in a work setting?

16  A.   Um, this is a communication between myself and

17  Mr. Carpenter.  We had been friends for quite a long

18  time and knew each other very well.  I don't believe

19  that informal language generally is a problem as long as

20  the person that you're communicating to understands it.

21  Q.   But to be clear, this is a work e-mail, correct?

22  A.   Correct.

23  Q.   Did you participate in a management meeting on

24  July 20th, 2018?

25  A.   Yes.

1  Q.    And was I assigned to your trial team as a result
2  of that meeting?
3  A.    Yes, and in addition to Peter Adolph.
4  Q.    Did you e-mail me on July 22nd, 2018 and request
5  to meet with me alone about your trial team?
6  A.    Um, I don't believe I mentioned anything about
7  being alone, but I did request to meet with you.
8  Q.    Was anyone else invited to the meeting?
9  A.    Um, I didn't send it to anyone else, but I
10 certainly didn't have an issue with anyone else
11 participating.
12 Q.    Did I call in sick the next day?
13 A.    You did.
14 Q.    Did you tell Josh Carpenter in an e-mail that my
15 calling in sick was not coincidental?
16 A.    Um, yeah, I believe it's in this chain -- if you
17 want to scroll up you can see what I said.
18 Q.    Yes.
19        MS. STRICKLAND:  Keep going.  (Scrolls.)  Yeah,
20 there it is.
21        (On screen.)
22 A.    Yes.  I mean that was the implication.  Those are
23 not the words I used, but that was the implication.
24 Q.    Okay.  Did you tell Tony Martinez that you
25 believed I was calling in sick because of your e-mail to

1    me?

2    A.    Um, that you called in sick on the 23rd because of

3    my e-mail to you?  Yes.

4          (Pause.)

5          MS. STRICKLAND:  That's all I have.  Thank you.

6          THE COURT:  Any redirect?

7          Have in mind now, even with the extension of time,

8    that the government has an hour left.

9          Go ahead, Ms. McMahon.

10         MS. McMAHON:  Um, just one minute to discuss it

11   with my colleagues?

12         THE COURT:  Of course.

13         (Pause.)

14         MS. McMAHON:  No further questions from the

15   government.

16         THE COURT:  Thank you.

17         You may step down.  Thank you.

18         (Witness leaves.)

19         THE COURT:  Call your next witness.

20         MS. YOUNG:  Your Honor, the government calls

21   William Moormann, and we're just going to fetch the

22   witness.  So just one moment, please.

23         (Interruption.)

24         MS. YOUNG:  Yes, I'm sorry, it's Danielle Young.

25         THE COURT:  And thank you.  I do apologize that

1    we're at such a distance that I have to ask.  Thank you,
2    Ms. Young.
3            (Pause.)
4            (WILLIAM MOORMANN, sworn.)
5
6            * * * * * * * * * * * * * * *
7            WILLIAM MOORMANN
8            * * * * * * * * * * * * * * *
9
10   DIRECT EXAMINATION BY MS. YOUNG:
11   Q.    Good morning.  State your name on the record.
12   A.    William Moormann.
13   Q.    Thank you.  Let's begin by having you tell us
14   about where you currently work, Mr. Moormann?
15   A.    I am the Administrative Officer with the Federal
16   Public Defenders, the Western District of North
17   Carolina.  And I have been with the organization since
18   2006 when it was a -- I was a Computer Systems
19   Administrator at that time and I was converted to an
20   Administrative Officer in 2013.
21   Q.    Thank you.  Generally what are your
22   responsibilities as an administrator -- sorry, the
23   Administrative Officer at the FDO?
24   A.    I handle the functional side of the organization,
25   processing paperwork, running the budgets, um,

```
1   allocating the funds, all of the backroom work that the
2   FDO office runs.
3   Q.    And what HR matters does the Defender rely on you
4   for?
5   A.    The Defender relies on me for addressing actual
6   actions, um, for reminders on times and dates to perform
7   the, um, again the functional side of processing the HR
8   work.
9   Q.    When you work on processing HR actions for the
10  FDO, what other offices do you have to work with?
11  A.    I work with predominantly the Defender Services
12  Office and the Administrative Office of the US Courts.
13  The HR actions actually go through the Administrative
14  Office of the US Courts.
15  Q.    Thank you.  Mr. Moormann, what role do you play
16  for off-boarding, um, employees who are separating from
17  the office?
18  A.    I am the person who collects physical items, keys,
19  cards, um, handles the last items of when someone leaves
20  employment.
21  Q.    And are you familiar with the FDO operating
22  manuals?
23  A.    Yes, I am.
24  Q.    And what was your role, if any, in drafting it?
25  A.    I was one of the team of people who drafted the,
```

1    um, Employee Manual.

2    Q.    What is your understanding of what the Employee

3    Manual says about an employee's removal of confidential

4    client information with them after they separate from

5    the FDO?

6        MS. STRICKLAND:  Objection, your Honor, relevance.

7    We renew our motion in limine regarding after-acquired

8    evidence.

9        THE COURT:  The objection -- the manual is a

10   document and the manual speaks for itself.

11       Is the manual in evidence?

12       MS. YOUNG:  The manual is not in evidence, your

13   Honor.  No, it's not.

14       THE COURT:  Well --

15       MS. YOUNG:  I'm just asking about his

16   understanding of office policy.

17       THE COURT:  Well why is that relevant?  I mean

18   what it suggests is that some confidential material was

19   removed and you're going to try to prove it through this

20   officer.  Now that may be, but we need a manual here.

21   So I'm not clear how you're going to do it?  But go

22   ahead.

23       MS. YOUNG:  I can revise the question.  But I

24   think the issue of confidential information being

25   removed has already been addressed.

1   Q.    Mr. Moormann, are employees -- is it your

2   understanding that employees are permitted to remove

3   confidential client information --

4       MS. STRICKLAND:  Objection, your Honor.  I

5   apologize, I object again, this is an affirmative

6   defense that was not raised in their answer, um, and

7   it's not relevant.

8       THE COURT:  Overruled.  The objection -- well just

9   a moment.  Actually the objection is sustained, but not

10   on those grounds, um, because he only knows this from

11   reading a document.

12       Now does he know of anything that was removed that

13   might be germane as to which argument can be made?

14       (Silence.)

15       THE COURT:  Ms. Young, here's the line.  The line

16   is I'm not going into this business about the, um, they

17   didn't raise it or you, the judiciary, didn't raise it

18   as an affirmative defense, she has to prove her case

19   both as to liability and as to damages.  And so her

20   conduct is very much at issue.

21       On the other hand, you've been assiduous in

22   objecting when she has tried, Ms. Strickland, the

23   plaintiff, has tried to, um, introduce documents, um,

24   the three of them that I've allowed, um, for use in

25   refreshing someone's recollection.  You objected to

that.  Now you come up with a document, apparently of
some significance, that's nowhere referred to in the
pretrial order and he knows -- he's the person who
helped write that document, he knows what it says.  But
it's the document that sets the policy.  It seems to me
that without the document we're not going very far with
this witness.

     MS. YOUNG:  Well I believe the policy existing is
more than just the document, which is why I was trying
to rephrase this to his understanding of the office
policy on this issue.

     THE COURT:  Well it exists how?  Where?  The best
evidence is the policy.  I'm just following the rules of
evidence when she objects, albeit not on the ground that
she suggested.

     MS. YOUNG:  Your Honor, I believe it's also
covered in the FDO manual in the code of conduct.

     THE COURT:  Well I can take judicial notice of
those things.  If you have them, let's see it.

     MS. YOUNG:  I'll move on, your Honor.

     THE COURT:  Go ahead.

     MS. YOUNG:  Mr. Spears, can we please have, um,
Defendants's Exhibit ER.

     (On screen.)

     MS. YOUNG:  And can you please scroll down.

1          (Scrolls.)

2     Q.    Mr. Moormann, what is this set of documents?

3     A.    These are SF-15s, "Notification of Personnel

4     Actions."

5     Q.    And how are those entries generated?

6     A.    They are generated, um, through the Administrative

7     Office of the US Courts.  This is a record of an action.

8     Q.    And are they made and kept in the course of

9     regular business?

10    A.    Yes.

11    Q.    Are they routinely made?

12    A.    Yes.

13    Q.    Are they made at or near the time of the event

14    indicated in the document?

15    A.    Yes, they are.

16    Q.    And who enters the information into HRMS?

17    A.    I enter the information into the HRMS management

18    system, um, as entering in as a request, and when it is

19    acted upon by the AO, we get back the action, um, the

20    Notification of Action.

21         MS. YOUNG:  Thank you, your Honor.  Defendants

22    move to admit Exhibit ER into evidence.

23         THE COURT:  No objection?

24         MS. STRICKLAND:  Um, no objection, your Honor.

25         THE COURT:  It's received in evidence, Exhibit 179

125 of 157

1    in evidence.

2           You may proceed.

3           (Exhibit 179, marked.)

4           MS. YOUNG:  Mr. Spears, can you please turn to

5    ER-15 of this document.

6           (On screen.)

7    A.     (Turns.)  Mr. Moormann, what was Ms. Strickland's

8    starting salary at the FDO?

9    A.     Um, her starting salary was $94,000, um -- excuse

10   me, her starting salary was $101,949 per annum.

11   Q.     Thank you.  And how is that set, I mean like what

12   grade and step?

13   A.     Um, so it's a Grade 14, Step 1.

14   Q.     And how was it determined that she was a Grade 14,

15   Step 1?

16   A.     Um, that was set as a level of experience in the

17   Research and Writing role.

18   Q.     Thank you.  And why was Ms. Strickland not on the

19   AD scale at the time she joined the office?

20   A.     She was a Research and Writing Specialist, that is

21   a grade-and-step position as opposed to the professional

22   position of Assistant Federal Defender.

23          MS. YOUNG:  And, Mr. Spears, you would take down

24   the exhibit.  Thank you.

25          (Takes down.)

1  Q.    Mr. Moormann, what was your involvement, if any,

2  in reclassifying the Research and Writing position of

3  AFPDs in office of 2018?

4  A.    So I was the person who drafted the request that

5  went to the Defender Services office to request the

6  action of a reclassification.  I was also the person,

7  slightly before me, doing the work to make sure that we

8  would be allowed to reclassify employees into the AFD

9  position from the Research and Writing position.

10 Q.    Was it to the Office's advantage to reclassify

11 Research and Writing Specialists as AFPDs?

12 A.    Not particularly, but it was no longer to our

13 disadvantage.  At one time we were very limited on how

14 many AFDs we could have.  That restriction was removed.

15 And it's to the employee's advantage to be an AFD as

16 opposed to a Research and Writing attorney.

17 Q.    Who also was involved in the reclassification

18 decision?

19 A.    Um, Mr. Martinez.

20 Q.    Anyone else in the Federal Defender's Office for

21 the Western District of North Carolina?

22 A.    No.

23 Q.    At the time what impact was the reclassification

24 expected to have on the FDO's budget?

25 A.    It was a revenue-neutral reclassification.

1   Q.    And why was it revenue-neutral?

2   A.    We knew that we were in the CR and that any

3   changes that would be a change in pay would be refused,

4   so we would, um -- to do this action, we would have to

5   make it revenue-neutral, um, because of the CR.

6   Q.    And what is a "CR"?

7   A.    A "Continuing Resolution," um, like what we're

8   going through right now, um, where Congress has not

9   approved the budget yet and we have to operate in a

10  limited fashion.

11  Q.    And what was the -- I'm sorry, how long does the

12  CR last for?

13  A.    Um, it lasted until, um, March 23rd, I believe.

14  Q.    Of what year?

15  A.    That would have been in 2019.

16  Q.    Thank you.  What effect did the Continuing

17  Resolution have on the Office's finances and budgets

18  during that time?

19  A.    Everything basically is frozen, um, you don't

20  really do anything until the CR is resolved.

21  Q.    At the time of the conversion, what was your

22  understanding of whether Ms. Strickland had requested to

23  be converted to an AFPD?

24  A.    It was my understanding that that was a request,

25  um, and was to be acted on quickly.

1   Q.    Who else was reclassified, if anyone, at that

2   time?

3   A.    Um, another Research and Writing attorney, Jared

4   Martin.

5   Q.    Can you please walk me through what steps you took

6   to reclassify both Ms. Strickland and Mr. Martin as

7   AFPDs?

8   A.    A reclassification request document is put

9   together, sent to the Defender Services Office, where it

10  is reviewed, and they determine whether or not we would

11  be allowed to reclassify an employee.

12  Q.    And then what happens after they review and

13  approve the reclassification request?

14  A.    Once they're approved, we then go and enter an

15  action into HRMS to, um, make the reclassification

16  occur.

17  Q.    And what is the resulting end of that process,

18  what document results once it's completed?

19  A.    Um, eventually the SF-50.

20  Q.    Thank you.

21        MS. YOUNG:  Mr. Spears, can we please have

22  Defendants's Exhibit HD.

23        (On screen.)

24  Q.    Are you familiar with this document, Mr. Moormann?

25  A.    Yes, this is an e-mail chain regarding the

```
 1    reclassification.
 2    Q.    And what is the date on the first e-mail?
 3    A.    Um --
 4          MS. YOUNG:  Well go to the bottom.  (Scrolls.)
 5    All right.  Now scroll up a bit to the date.  (On
 6    screen.)  Thank you.
 7    Q.    Now what is the date on the first e-mail on this
 8    chain?
 9    A.    August 15th, 2018.
10          MS. YOUNG:  Your Honor, the defendants move to
11    admit Exhibit HD into evidence.
12          THE COURT:  No objection?
13          MS. STRICKLAND:  Your Honor, just for
14    clarification, I'm not sure that this is on the exhibit
15    list.
16          MS. YOUNG:  It is indeed on the list.
17          MS. STRICKLAND:  I'm sorry, which one?
18          MS. YOUNG:  HD.
19          MS. STRICKLAND:  HD?  Just one moment.  I'm sorry.
20    We're trying to find it.
21          (Pause.)
22          MS. STRICKLAND:  You said this was HB?  If you
23    would just point out the page number?  We're just trying
24    to find it.
25          (Pause.)
```

THE COURT: Now really I think it's somehow peripheral, but I'm going to admit it subject to -- if it's not on that list, I'll strike it.

Exhibit 180 in evidence.

Go ahead.

(Exhibit 180, marked.)

MS. YOUNG: This was previously, I believe, Plaintiff's CU on her numbering system.

THE COURT: I simply state parenthetically that you would have been well-advised to have followed my order in this respect. It's unfortunate you did not.

Go ahead.

MS. YOUNG: Mr. Spears, can we please have Defendants's Exhibit HB.

(On screen.)

Q. Are you familiar with this document, Mr. Moormann?
A. Yes, I am.
Q. What is it?
A. It is the request to reclassify that we submitted for Ms. Strickland.
Q. And did you fill out this document?
A. Yes, I did.
Q. What was Ms. Strickland's grade and step at the time of this conversion?
A. Um, she was a 14-2.

```
 1          MS. YOUNG:  Your Honor, defendants move to admit
 2     Exhibit HB into evidence.
 3          THE COURT:  I've just admitted it, Exhibit 180.
 4          MS. YOUNG:  This is a different document, your
 5     Honor.
 6          THE COURT:  That was HD and now we're talking
 7     about HB, correct?
 8          MS. YOUNG:  Correct.
 9          THE COURT:  It's admitted --
10          No objection, Ms. Strickland?
11          MS. STRICKLAND:  Um, I -- sorry, we're still
12     trying to find it on the list.
13          THE COURT:  Well subject to your objection --
14          MS. STRICKLAND:  I don't think we have -- I'm
15     sorry?  Yeah, I don't think we have an objection to this
16     one.  Thank you.
17          THE COURT:  Very well, it's admitted 181.
18          (Exhibit 181, marked.)
19          THE COURT:  And at that time she was Grade 14,
20     Step 2, correct?  Mr. Moormann?
21          THE WITNESS:  Yes.
22          THE COURT:  Thank you.
23          Go ahead.
24          MS. YOUNG:  And, Mr. Spears, may we please have
25     Defendants's HC.
```

1          (On screen.)

2     Q.     Are you familiar with this document, Mr. Moormann?

3     A.     Yes.

4     Q.     And what is it?

5     A.     It is a request to reclassify Jared Martin.

6     Q.     And just to be clear, this is an attachment to the

7     e-mail we were looking at a minute ago?

8     A.     Yes.

9          MS. YOUNG:  Your Honor, we move to admit HC into

10    evidence.

11         THE COURT:  No objection to that?

12         MS. STRICKLAND:  (Pause.)  Um, again it doesn't

13    appear to be in the exhibit list.  But subject to that,

14    um, we don't have any other objection.

15         THE COURT:  Fine, it's admitted subject to that.

16    That's 182.

17         (Exhibit 182, marked.)

18    Q.     Mr. Moormann, when did you reach out to the DFO

19    about these conversion requests?

20    A.     Um, the process started on the, um, on the 15th

21    with a couple of phone calls and then an e-mail to our

22    budget analyst to clarify the process.

23    Q.     And who instructed you to take action to process

24    the conversions?

25    A.     Um, that was Mr. Martinez.

```
 1          MS. YOUNG:  And may we please have Defendants's
 2    EU, Mr. Spears.  Yes, thank you.
 3          (On screen.)
 4    Q.    Are you familiar with this document?
 5    A.    Yes, I am.
 6    Q.    And what is it?
 7    A.    It was my initial request for a personnel action
 8    for the reclassification, um, to AFD, from Research and
 9    Writing, for Ms. Strickland.
10    Q.    And did you fill out the form personally?
11    A.    I entered the form into the system, the engine
12    writes the form, but, yes.
13    Q.    And what is the request date on this form, um, in
14    Part C?
15    A.    The request date was 8-16-2018.
16    Q.    And what was the effective date?
17    A.    8-20-2018.
18    Q.    Thank you.
19          MS. YOUNG:  Your Honor, defendants move to admit
20    Exhibit EU into evidence.
21          THE COURT:  No objection?
22          MS. STRICKLAND:  No objection.
23          THE COURT:  EU is admitted, Exhibit 183.
24          (Exhibit 183, marked.)
25    Q.    Mr. Moormann, what type of form is this?
```

1    A.    This is an AO-52, this is the form generated when
2    a request is created.
3    Q.    And how that different from an SF-50?
4    A.    The first one, the AO-52 is a request.  The SF-50
5    is the document created when everything is completed.
6    Q.    Why is August 20th the requested effective date?
7    A.    That was the first beginning of a pay period after
8    this date.
9    Q.    Thank you.
10         MS. YOUNG:  Mr. Spears, can you please pull up ER
11   19.
12         (On screen.)
13   Q.    Mr. Moormann, what is the document located at
14   Bates US 2889?
15   A.    This is the SF-50, um, the Final Notification of
16   Personnel Action, processed by Heather Tindle Best, um,
17   performing the reclassification, but using the job code
18   pay adjustment.
19   Q.    Who is Heather?
20   A.    She is Chief of the Court, the HR Division.
21   Q.    And why did she submit the request or submit the
22   form for you?
23   A.    Um, there was -- in the process of merging there
24   was some confusion about how to -- which code to use
25   within the HRMS system.  The code that I used was a

1    reclassification code.  However, the system, because we

2    were switching between a grade and step and an AD scale,

3    did not process correctly, because they're two separate

4    pay systems.  So it had to be processed manually by the

5    AO as a pay adjustment.

6    Q.    Thank you.  And who processed the form manually?

7    A.    Um, there was a discussion between myself and our

8    HR rep.  The process was submitted by Valerie Farr.

9    Q.    Thank you.  And just to be clear, is this the

10   final SF-50 form for Ms. Strickland's conversion?

11   A.    Yes.

12   Q.    And what is the effective date?

13   A.    The effective date, again, is 8-20-2018.

14   Q.    And what date was the SF-50 processed on?

15   A.    The SF-50 was processed on the 28th.

16   Q.    Thank you.

17         MS. YOUNG:  Mr. Spears, can I please have

18   defendants's EJ.

19         (On screen.)

20   Q.    Are you familiar with this document, Mr. Moormann?

21   A.    Yes, I am.

22   Q.    And what is it?

23   A.    It is the, um, e-mail chain between myself and

24   Valerie Farr discussing the challenge of doing a

25   reclassification within the HRMS system.  And she was

letting me know that she would have to manually perform
it as it was a command that was not enabled down to my
level.

Q.    And who is Ms. Farr?

A.    She was our Human Service Specialist, our Human
Resource Specialist for our office.

MS. YOUNG:  Your Honor, defendants move to admit
Exhibit EJ into evidence.

THE COURT:  No objection to EJ?

MS. STRICKLAND:  It's hearsay.

THE COURT:  Well it is, but I don't know that this
is disputed.  I guess my major problem is, um, what's
the relevance of this?  I can see some peripheral
relevance as to the timing of it, but why -- the e-mails
back and forth between these two technicians, why is
that -- and I mean no disrespect, but why is that
relevant?

MS. YOUNG:  Well, your Honor, Ms. Strickland has
claimed that some of the paperwork was backdated, but
this was just the result of our team HR practice.  And
Mr. Moormann is explaining the timeline for the HR
transactions that occurred and why they occurred and
when they occurred.

THE COURT:  Yeah, overruled.  It's admitted.
These are internal business records.  So EJ is admitted,

Exhibit 184.

2          (Exhibit 184, marked.)

Q.    Okay.  Mr. Moormann, is it unusual to have an
effective date before the request date?

A.    An effective date before the request date is very
unusual.  Typically the effective date is the next
beginning of a payroll, when you begin an action.

Q.    Is it unusual to have a form that's processed
after the effective date?

A.    It is very common.

Q.    And why is it common?

A.    The system isn't particularly efficient.  When we
submit a request, it goes into the system and is
reviewed and then processed when HR gets to it.

Q.    Can you explain why the paperwork had to be
processed manually?  Like why did the paperwork have to
be processed manually?

          MS. STRICKLAND:  Objection, your Honor, asked and
answered.

          MS. YOUNG:  That's fine.  I'll move on.

          THE COURT:  All right.

Q.    Can you explain why there was a delay in the
finalized processed form?

A.    The changing of grade and step to an AFD is not
the most common process and it is a different more

1 complicated, um, process within the HRMS system, and

2 requires some interaction beyond my level of approval.

3 Q.    Turning back to Ms. Strickland's final SF-50.  Why

4 does her locality pay not appear in the locality pay box

5 on her final SF-50 form?

6 A.    In the AD scale the pay is combined on the chart

7 itself, or the pay chart, where it is still a base pay

8 and a locality pay and also have a different pay rate

9 based on the location.  But it is considered one lump

10 sum at that time.  They have since changed that process,

11 but up until 2021 it was always one lump sum.

12 Q.    Did Ms. Strickland lose locality pay during the

13 conversion?

14 A.    No, she did not.

15 Q.    What correspondence did you have with Mr. Martinez

16 after he told you he'd like to initiate the process of

17 converting both R&Ws to AFPDs?

18 A.    Well there was a lot of conversation, it was, you

19 know, to get it done as quickly as possible.

20 Q.    Did he give you any instructions about how to set

21 Ms. Strickland's pay?

22 A.    Yes, he did want to make sure that there was no

23 lowering of her pay.

24        MS. STRICKLAND:  Objection, hearsay.

25        THE COURT:  No, that's --

1    Q.    What was the --

2          THE COURT:  Did he give you instructions?  An

3    "instruction" is not asserted conduct, it is a verbal

4    act.

5          Go ahead, Ms. Young.

6    Q.    Um, you can go ahead and answer the question,

7    Mr. Moormann.

8    A.    Mr. Martinez wanted to make sure that there was

9    no, um, negative harm done to anyone and to make the

10   transfer across even though the AD level that

11   Ms. Strickland was set at was below the pay she was

12   currently getting, and to make sure that she retained

13   that pay, um, we do what's referred to as a "Red-Circle

14   rate," which means you can keep your pay even though the

15   scale had not been set up to it yet, the next action

16   would catch that rate up and it would not affect it

17   negatively going forward.

18   Q.    What pay did Ms. Strickland receive after the

19   conversion?

20   A.    The exact same pay as she was receiving before the

21   conversion.  Again it was a revenue-neutral change.

22   Q.    And what did Mr. Martinez say, if anything, about

23   backdating the conversions?

24   A.    Absolutely nothing.

25   Q.    What was the final SF-50 AD pay level supposed to

1    be for Ms. Strickland when she was converted to AFPD?

2    A.    Upon the review of the documents, we found that --

3    or I found that her AD level should have been an AD-25,

4    but I set it at the A-23 rate.  That was my error.

5    Q.    When you say "upon review of the documents," are

6    you talking about at the time or at the time of the

7    events or in preparation for your testimony today?

8    A.    In preparation for my testimony.

9    Q.    So at the time Ms. Strickland was converted to an

10   AFPD, was it your understanding she was an AD-23, is

11   that correct?

12   A.    That is correct.

13   Q.    Why does her SF-50 say "AD-28"?

14   A.    I do not have that notes field and I do not have

15   an answer for that.  It may well have carried across as

16   we were processing two actions at the same time.

17          MS. STRICKLAND:  Objection, speculation.

18          THE COURT:  I'm going to let that stand.

19          Anything else, Ms. Young?

20          MS. YOUNG:  Oh, I do apologize, your Honor.

21          THE COURT:  Proceed.

22   Q.    Well what did you tell Mr. Martinez about what AD

23   level Ms. Strickland should receive upon conversion?

24   A.    I calculated it as an AD-23.

25   Q.    And what did he say in response?

1    A.    He left that calculation up to me.

2    Q.    And what did Mr. Martinez say about applying the

3    Red-Circle rate to keep Ms. Strickland's pay the same?

4    A.    He wanted to make certain that there was no

5    lowering in pay.

6    Q.    How if at all did Mr. Martin's pay change when he

7    was converted to an AFPD?

8    A.    It did not change either.

9    Q.    Were both R&Ws paid the same because of that

10   continuing resolution?

11   A.    They had different pays, but they kept the same

12   pay through the conversion process.

13   Q.    And is that because of the Continuing Resolution?

14   A.    Yes, it was.

15   Q.    And going back to that time, who was responsible

16   for notifying Mr. Martinez of when someone was eligible

17   for promotion?

18   A.    That was my responsibility.

19   Q.    And what did you tell Mr. Martinez, if anything,

20   about Ms. Strickland's eligibility for promotion at the

21   end of August 2018?

22   A.    Well once a conversion is created, there is a

23   12-month period before we can do a pay change.

24   Q.    Are you referring to the time it takes to move

25   between AD levels potentially?

A.    Well the AD level is really irrelevant to the pay
setting, those are two separate acts.  An AD level is a
measure of time.  Promotion and change in pay can occur
once every 12 months.

Q.    Understood.  And when would you normally look at
the AD level again after, um, a promotion on the AD
scale?

A.    After the 12-month period, when someone was
eligible for a pay change, we would go back through it
and rereview everything.

Q.    How would the 12-month rule apply here?

A.    As of 8-20-2018, or 12 months, she would remain at
that location or that pay grade short of COLA changes.
There was, subsequent to that, a COLA change.

Q.    So when would Ms. Strickland have been eligible
for a potential AD promotion after her conversion to
AFPD?

A.    It would be late August of 2018.

Q.    Thank you.  At the time of the conversion, why
didn't Ms. Strickland's anniversary date or potential
promotion to GS-15 come up?

A.    It wasn't relevant to make a conversion and, um,
it was my understanding that the conversion took
precedence on everything.

Q.    Did you inform Mr. Martinez that Ms. Strickland's

1    anniversary date was coming up or that she was eligible
2    for GS-15 at that time?
3    A.    Um, no, and there is -- while eligible for GS-15,
4    um, the most likely process would be a 14, Step 3, not a
5    15.
6    Q.    Thank you.  Turning back to the AFPD conversions,
7    what are the salary benefits to being an AFPD?
8    A.    Your pay can be increased much more quickly as an
9    AFD than it can, through the grading step process, and
10   it also is a significantly higher maximum pay.
11   Q.    Are there any grade or step increases on the AFPD
12   salary charts?
13   A.    They're not grade and step, they are AD levels,
14   which is a measure of time, and then there is a pay
15   chart that determines what an AD level could earn as a,
16   um, pay band.  So a low number and then a high number.
17   Q.    What role, if any, did Mr. Davis have on
18   Ms. Strickland's AFPD's conversion?
19   A.    None.
20   Q.    And what role, if any, did Mr. Davis have in any
21   decision regarding her front pay?
22   A.    None.
23          MS. YOUNG:  Mr. Spears, can I please have FC.
24          (On screen.)
25   Q.    Are you familiar with this document?

```
1    A.    Yes, I am.

2    Q.    What is it?

3    A.    It is a compilation of a timeline that I put

4    together for Mr. Martinez because he wanted

5    clarification of all actions affecting Ms. Strickland.

6    Q.    And what are the dates?

7    A.    The request was February 11th, 2019.

8          MS. YOUNG:  Your Honor, the defendants move to

9    admit FC into evidence.

10         THE COURT:  No objection?

11         MS. STRICKLAND:  No objection.

12         THE COURT:  It may be admitted, 184.

13         Go ahead.

14         THE CLERK:  Judge, 185.

15         THE COURT:  185.

16         (Exhibit 185, marked.)

17   Q.    What did you tell Mr. Martinez in this e-mail?

18   A.    I went through the timeline of events and what

19   changes in pay and changes in reclassifications had

20   occurred, um, with Ms. Strickland.

21   Q.    Thank you.  And what was your understanding of how

22   Mr. -- sorry.

23         What was your understanding of Mr. Martinez's

24   concerns, if any, about Ms. Strickland's pay?

25   A.    He wanted to make sure that it had been done by
```

1   the book.

2   Q.    To wrap up, did you ever take any action against

3   Ms. Strickland because of her gender?

4   A.    No.

5   Q.    Did anyone ever instruct you to reduce

6   Ms. Strickland's pay?

7   A.    No.

8   Q.    What was your understanding of how Mr. Martinez

9   wanted Ms. Strickland's pay handled?

10  A.    By the book.  He wanted to make sure that there

11  were no questions or concerns about her pay.

12  Q.    Okay.

13        MS. YOUNG:  Your Honor, defendants pass the

14  witness.

15        THE COURT:  Do you have any questions for this

16  witness, Ms. Strickland?

17        MS. STRICKLAND:  Yes, your Honor.

18

19  CROSS-EXAMINATION BY MS. STRICKLAND:

20  Q.    Mr. Moormann, you were the Administrative Officer

21  at the FDO at the time of the events alleged in my

22  complaint, is that correct?

23  A.    Yes.

24  Q.    And as Administrative Officer, was it part of your

25  duties to serve as a contact for Human Resources and

1   personnel issues?

2   A.    Yes.

3   Q.    Did you maintain all personnel documents and

4   documents relating to employment as part of your duties?

5   A.    Yes, I did.

6   Q.    As part of your duties, are you required to be

7   familiar with the policies in the Defender Organization

8   Classification System manual, otherwise known as the

9   "DOCS manual"?

10  A.    Yes.

11  Q.    Is it your understanding that the policies in the

12  DOCS manual govern Federal Defender Organizations

13  nationwide?

14  A.    Yes.

15  Q.    Is it your understanding that I was hired in March

16  of 2017?

17  A.    Yes.

18  Q.    And I believe you testified earlier that I was

19  hired at a grade level 14, step 1, is that correct?

20  A.    That is correct.

21  Q.    And was I hired with the expectation that I would

22  transition to an Assistant Federal Defender position?

23  A.    I have no directions for that one way or the

24  other.

25  Q.    If that's what the offer letter states, do you

1 have any reason to doubt that?

2 A.    No.

3 Q.    Is it your understanding that Research and Writing

4 attorneys do not sign pleadings or have court

5 appearances?

6 A.    That depends on the court.

7 Q.    Is it your understanding that a Research and

8 Writing position is not intended to serve as a proxy for

9 an Assistant Federal Defender position?

10       MS. YOUNG:  Objection, outside the scope.

11       THE COURT:  No, overruled, if he's competent to

12 answer.

13 A.    Could you repeat the question?

14 Q.    Yes.

15       Is it your understanding that a Research and

16 Writing position is not intended to serve as a proxy for

17 an Assistant Federal Defender position?

18 A.    They are in support of AFD positions and do much

19 of the same work, but are not the same job.

20 Q.    Is it your understanding that a Research and

21 Writing attorney is not supposed to be working under an

22 Assistant Federal Defender title?

23 A.    I'm sorry, say that again?

24 Q.    Is it your understanding that -- well let me put

25 it a different way.

1        Is it your understanding that an Assistant Federal

2   Defender should be doing Assistant Federal Defender

3   duties and should not be doing research and writing

4   duties?

5   A.     The Research and Writing, which typically was

6   appellate-oriented work, can be done by an AFD or a

7   Research and Writing attorney.

8   Q.     Do you believe that that understanding is

9   consistent with the DOCS manual?

10  A.     Yes.

11  Q.     So -- okay.  Are Research and Writing attorneys

12  paid on the GS pay scale set by Congress for federal

13  employees?

14  A.     Yes, they are, rate and step.

15  Q.     And that pay scale is standardized, right?

16  A.     Yes.

17  Q.     You testified today about a Continuing Resolution,

18  is that right?

19  A.     Yes.

20  Q.     Did you file a sworn declaration in this

21  proceeding?

22  A.     Yes.

23  Q.     Did you state, in your sworn declaration, that a

24  promotion to a Grade 15 on the GS pay scale requires 10

25  years of federal government service?

```
 1   A.    It certainly can.
 2   Q.    I'm asking you.  Did you state, in your sworn
 3   declaration, that a promotion to Grade 15 requires 10
 4   years of federal government service?
 5   A.    I don't have my declaration in front of me, but
 6   that is --
 7   Q.    Would it refresh your recollection to review that?
 8   A.    Yes, please.
 9         MS. STRICKLAND:  Let's bring up the declaration.
10         (On screen.)
11   Q.    But let me ask you first.  Are you familiar with
12   this document?
13   A.    Yes.
14   Q.    Is this your sworn declaration?
15   A.    Yes.
16   Q.    And you filed this -- or you signed this for the
17   purpose of this proceeding, correct?
18   A.    Yes.
19   Q.    All right.
20         MS. STRICKLAND:  So go to paragraph --
21         (Pause.)
22   Q.    Would you please read to yourself Paragraph 16.
23   A.    (Reads.)
24   Q.    Does that refresh your recollection on where you
25   stated that a promotion to Grade 15 requires 10 years of
```

1  federal government service?

2  A.    Yes.

3  Q.    Is this statement accurate?

4  A.    (Pause.)  There are ways to do that otherwise, but

5  that is the normal course of business.

6  Q.    So it is your testimony today that you believe

7  that 10 years of experience in the federal GS system is

8  required to be eligible for a promotion to Grade 15?

9        MS. YOUNG:  Objection, misstates prior testimony.

10       THE COURT:  It does, that's not what he just said.

11       MS. STRICKLAND:  I'm sorry, your Honor, I'm just

12  trying to clarify.

13  Q.    You stated in your declaration --

14       THE COURT:  You can't clarify by misstating what

15  he said.  The question is improper.

16       MS. STRICKLAND:  Fair enough, your Honor.

17  Q.    So your declaration states that 10 years of

18  experience in the federal GS system is required to be

19  eligible for promotion to GS 15, is that right?

20  A.    That is the -- that is in the document.

21  Q.    Is that your testimony today?

22  A.    It is the normal course of business.

23  Q.    Okay.  And did you state, um -- did you also state

24  that I was not eligible for a promotion to Grade 15

25  because I had slightly less than 4 years federal

1   government employment, about 9 months of which was with

2   the FDO WDNC?

3   A.    Yes.

4   Q.    Is that your testimony today?

5   A.    (Pause.)  I have no reason to change it.

6   Q.    I'm sorry, I didn't hear, can you please repeat

7   that?

8         THE COURT:  "I have to reason to change it," he

9   said.

10  Q.    Okay, thank you.  Thank you.

11        Mr. Moormann, have you heard of the -- are you

12  aware of the judiciary's highest previous rate policy?

13  A.    Yes.

14  Q.    Does that policy state that "A Line AFD's starting

15  salary may be set higher than the maximum of the

16  applicable starting salary range if necessary to match

17  the salary the AFD previously earned as an employee of

18  any federal government entity or any FDO"?

19  A.    Yes, that occurred in your case.

20  Q.    Okay, thank you.

21        Is your statement that I was not eligible for a

22  promotion to Grade 15 accurate?

23  A.    A promotion to Grade 15 is not an automatic, it is

24  not like a step increase.

25  Q.    I'm asking whether your statement that I was not

1    eligible for a promotion, whether that statement is

2    accurate?

3    A.    (Pause.)  You may actually be eligible, but it

4    would not be within the standard course of business.

5    Q.    Is there a difference between being eligible and

6    the standard course of business?

7    A.    There are various ways a Defender can determine

8    workforce and workforce management, um, that is -- and

9    in our offices too, um, so we didn't perform, um, jumps

10   of that nature.

11   Q.    I'm just trying to understand.  Is your statement

12   that I was not eligible for a promotion pursuant to the

13   policies of the DOCS manual, is that statement accurate?

14        MS. YOUNG:  Objection, asked and answered.

15        THE COURT:  That has been asked and answered,

16   Ms. Strickland.  Sustained.

17        MS. STRICKLAND:  I'll move on.

18        Let's pull up Trial Exhibit, I believe it's 138.

19   (On screen.)  And go down to the Research and Writing.

20        (Scrolls.)

21   Q.    Are you familiar with this document?

22   A.    It appears to be a job description from the DOCS

23   manual.

24   Q.    Okay.

25        MS. STRICKLAND:  Let's go down to the -- yes,

1    okay.

2           (Scrolls.)

3    Q.    Okay.  Is this chart labeled "Salary and

4    Experience Scale"?

5    A.    Yes.

6    Q.    Does this chart state that Grade 14 requires 9

7    years of total experience?

8    A.    Yes.

9    Q.    Does the chart state that Grade 15 requires 10

10   years of total experience?

11   A.    Yes.

12   Q.    Is it your position that an attorney at Grade 14

13   must max out all steps at Grade 14 before advancing to

14   Grade 15?

15   A.    They are not required to.

16   Q.    Did you state, in your sworn declaration, that it

17   takes an attorney, starting as a GS-14, Step 1, 20 years

18   to reach the maximum pay level under the GS pay scale?

19   A.    It certainly can.

20   Q.    I'm asking does it take -- actually -- no, I'm

21   sorry.

22          I'm asking you whether it takes -- did you state

23   in your sworn declaration that it takes an attorney,

24   starting as a GS-14, Step 1, 20 years to reach the

25   maximum pay amount under the GS pay scale, did you state

1    that?

2    A.    Without an extraordinary act, yes.

3    Q.    Do you believe that that statement is accurate?

4    A.    Again without an extraordinary act, yes.

5    Q.    Do you believe that a grade level promotion is an

6    extraordinary act?

7    A.    From a 14-1 to a 15-1 is an extraordinary act.

8          (Pause.)

9          MS. STRICKLAND:  Give me just a moment, please,

10   I'm trying to skip over material that we already

11   covered.

12         (Pause.)

13   Q.    Mr. Moormann, did you testify that you meant to

14   set my pay at an AD-23?

15   A.    I set your system as an AD-23, which I've since

16   then corrected.

17   Q.    I'm sorry, the AD-23 was an error?

18   A.    Yes.

19   Q.    And your testimony was that it should have been --

20   what grade should it have been?

21   A.    The next step is AD-25.

22   Q.    Okay.  Did you state, in a Request for Personnel

23   Action, on August 16th, 2018, quote, "It should be set

24   at AD Level 28."  "To be set at set at AD-28"?

25   A.    If you're referring to the note section on the

1    request action, that was in the note section.

2    Q.    Okay, thank you.

3          MS. STRICKLAND:  And let's pull up, I believe it

4    was --

5          THE COURT:  Well let's stop there, it's 1:00.

6          The government, with this extension of time, has

7    another 25 minutes to call whatever witnesses they want

8    to call.  The plaintiff has used up 1 day, 1 hour, and

9    55 minutes.  So as ample time, the defense has used up 2

10   days, 1 hour, and 20 minutes.  So has another 25

11   minutes.

12         Since I expect that if the government calls

13   another witness, Ms. Strickland will wish to cross-

14   examine that witness, we're not, in fairness, going to

15   have time for final argument tomorrow without, I think,

16   unduly pressing counsel, who have been right up to the

17   mark, each day you've been prompt.  I apologize for the

18   delay today, that was entirely my responsibility.

19         So what I propose is that we will finish testimony

20   tomorrow, we will agree upon a day for final argument

21   early in the new year, and that will give me the

22   opportunity, which I have not completed, of reading all

23   -- going through all the exhibits and reading all the

24   depositions and making determinations as to the

25   designations which are in dispute.

1          So we'll recess now and tomorrow we'll agree upon

2     the day for final argument and we'll wind up the

3     testimony in this case tomorrow.  We'll stand adjourned

4     until 9:00 a.m. tomorrow morning.

5          We'll recess.

6          (Adjourned, 1:00 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           C E R T I F I C A T E

2

3

4           I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

5     do hereby certify that the foregoing record is a true

6     and accurate transcription of my stenographic notes

7     before Judge William G. Young, on Monday, December 18,

8     2023, to the best of my skill and ability.

9

10

11

12

13     /s/ Richard H. Romanow 03-11-24
      _____
14     RICHARD H. ROMANOW   Date

15

16

17

18

19

20

21

22

23

24

25