1                UNITED STATES DISTRICT COURT

2            WESTERN DISTRICT OF NORTH CAROLINA (Asheville)

3                             No. 1:20-cv-00066-WGY

4

5    CARYN DEVINS STRICKLAND, formerly known as Jane Roe,
               Plaintiff

6

7    vs.

8

9    UNITED STATES OF AMERICA, et al,
               Defendants

10

11                        * * * * * * * *

12

13

          For Bench Trial via Courtroom Zoom Before:
14                    Judge William G. Young

15

16

                       United States District Court
17                     District of Massachusetts (Boston)
                       One Courthouse Way
18                     Boston, Massachusetts 02210
                       Tuesday, December 19, 2023

19

20                        * * * * * * * *

21

22           REPORTER: RICHARD H. ROMANOW, RPR
                     Official Court Reporter
23               United States District Court
          One Courthouse Way, Room 5510, Boston, MA 02210
24                     rhrbulldog@aol.com

25

```
 1                    A P P E A R A N C E S

 2

 3   CARYN STRICKLAND, ESQ.
     COOPER J. STRICKLAND, ESQ.
 4       P.O. Box 92
         Lynn, NC 28750
 5       (802) 318-0926
         Email: Caryn.devins@hotmail.com
 6       Pro Se Plaintiff

 7

 8   JOSHUA MICHAEL KOLSKY, ESQ.
     DANIELLE YOUNG, ESQ.
 9   MADELINE McMAHON, ESQ.
         U.S. Department of Justice
10       1100 L Street NW
         Washington, DC 20005
11       (202) 305-7664
         Email: Joshua.kolsky@usdoj.gov
12       For Defendants

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    I N D E X

2

3

4  WITNESS                 DIRECT  CROSS  REDIRECT  RECROSS

5

6  WILLIAM MOORMANN (Continued.)

7     By Ms. Young:                      25

8     By Ms. Strickland:         4                     27

9

10  JILL LANGLEY

11     By Ms. Canevari:     28

12     By Ms. Strickland:        40

13

14

15                    E X H I B I T S

16

17

          EXHIBIT 186 ...................... 23
18
          EXHIBIT 187 ...................... 40
19

20

21

22

23

24

25

```
 1          P R O C E E D I N G S
 2          (Begins, 9:00 a.m.)
 3          THE COURT:  Good morning.  The witness is on the
 4     stand and I'll ask Ms. Gaudet to remind him that he's
 5     still under oath.
 6          THE CLERK:  I'd like to remind you, sir, that
 7     you're still under oath.
 8          Do you understand?
 9          THE WITNESS:  Yes.
10          THE COURT:  And, Ms. Strickland, you may continue.
11          MS. STRICKLAND:  Thank you, your Honor.
12
13     CROSS-EXAMINATION BY MS. STRICKLAND:  (Continued.)
14     Q.    Good morning, Mr. Moormann.
15          Mr. Moormann, did I understand your testimony
16     yesterday to be that Assistant Federal defenders can do
17     research and writing work?
18     A.    Yes.
19     Q.    Okay.
20          MS. STRICKLAND:  Let's turn to Admitted Exhibit
21     138, Page 7, Bates Number 4971.
22          (On screen.)
23     Q.    I believe we talked about this document yesterday,
24     but is this the job description for a Research and
25     Writing Specialist?
```

1 A.  It appears to be the listing for the DOCS manual.

2 Q.  Does it state in bold and italics, "The Research

3 and Writing Specialist does not ordinarily sign

4 pleadings or make court appearances.  The Research and

5 Writing position" -- excuse me.  "The Research and

6 Writing Specialist position is not intended to serve as

7 a proxy, substitute, or replacement for an AFD position

8 nor in the place of an additional AFD position."

9    Is that correct?

10 A.  Yes.

11    MS. STRICKLAND:  Okay, let's go to Page 4.

12    (On screen.)

13 Q.  Is this the job description for an Assistant

14 Federal Defender?

15 A.  Yes.

16 Q.  Does the first sentence under the subheading

17 "Definition" state, "The Assistant Federal Defender,

18 AFD, provides every aspect of legal representation to

19 individuals charged with federal criminal offenses, but

20 who are unable to retain an attorney"?

21 A.  Yes.

22 Q.  Would you agree that Research and Writing

23 attorneys and Assistant Federal Defenders have different

24 job descriptions?

25 A.  They certainly have two different job

1    descriptions.

2    Q.    Thank you.  And would you agree that one position

3    is not intended to serve as a proxy for the other?

4    A.    I would agree with that, yes.

5          MS. STRICKLAND:  All right.  Let's go to Admitted

6    Exhibit 181, please.

7          (On screen.)

8          MS. STRICKLAND:  Okay, go ahead and scroll through

9    that.

10          (Scrolls.)

11   Q.    I believe you testified about this document

12   earlier, is that correct?

13   A.    Yes.

14   Q.    Was this document submitted on August 16th, 2018?

15   A.    Yes.

16   Q.    Does this document state --

17          MS. STRICKLAND:  Oh, no, I'm sorry, it's right

18   there.

19          (On screen.)

20   Q.    Does this document state "Current promotion

21   potential one grade"?

22   A.    Yes.

23   Q.    Thank you.

24          MS. STRICKLAND:  Let's move to Admitted Exhibit

25   174.

1          (On screen.)

2          MS. STRICKLAND:  And go ahead and scroll through.

3          (Scrolls.)

4     Q.    And I'll ask you, are you familiar with this

5     document?  Once you've had a chance to review it.

6     A.    (Looks.)  Please go back up to the top.  (Looks.)

7     Yes, I'm familiar with it.

8     Q.    Is this a "Request for Personnel Action"?

9     A.    It was a Request for Personnel Action produced

10    that was inaccurate and never submitted.

11    Q.    So it's your testimony that this document was

12    never submitted to OPM?

13    A.    Not for final approval.  This was in the process,

14    as we discussed yesterday, of trying to properly have

15    everyone classified at the reclassification, the actual

16    functional step.

17    Q.    So just to be clear, there was a Request for

18    Personnel Action that you submitted on August 16th, is

19    that right?

20    A.    That's correct.

21    Q.    And this Request for Personnel Action --

22          MS. STRICKLAND:  If you'd scroll down to the

23    bottom.

24          (Scrolls.)

25    Q.    -- is it dated August 28th, 2018?

1    A.    Yes.

2    Q.    Is August 28th, 2018 after August 16th, 2018?

3          THE COURT:  Well obviously it is.  Let's not take

4    the time.  Go ahead.

5    Q.    Um, scrolling back to the top, is the effective

6    date for this request August 20th, 2018?

7    A.    Yes.

8    Q.    Mr. Moormann, you testified earlier that you are

9    familiar with the judiciary's highest previous rate

10   policy, is that right?

11   A.    That is correct.

12   Q.    And we discussed that the highest previous rate

13   policy allows an employee's prior salary in federal

14   employment, or a FDO, to carry over to a new position,

15   is that fair statement?

16   A.    Yes, and we did so in your case.

17   Q.    Is there anything in the DOCS manual that would

18   have prevented me from being considered for a promotion

19   to Grade 15 and then reclassified to an Assistant

20   Federal Defender position?

21   A.    I'm sure it is a possibility, but not within the

22   normal course of business.

23   Q.    Okay, but it is a possibility?

24   A.    Yes.

25   Q.    Okay.  Thank you.

1      Looking back at this form, does this form state,

2  under the Assistant Public Defender section, that basic

3  pay is $92,349.

4  A.    That is the, um, amount listed on this form, which

5  is why it was not correct and not the final submitted

6  item.

7  Q.    Does it also state that the total salary is

8  $92,349?

9  A.    It does on this form, yes.

10  Q.    Did you state --

11  A.    Though this is a process form, it is not the final

12  and final processed form.

13  Q.    Yeah, but it is the Request for Personnel Action,

14  is that right?

15  A.    It is one of a number that were submitted to try

16  to get the action to process correctly.

17  Q.    Mr. Moormann, did you state, in your sworn

18  declaration, that "Since plaintiff was teleworking from

19  a location outside of the Charlotte metropolitan area,

20  she technically was no longer eligible for a locality

21  adjustment"?

22  A.    That is correct.

23  Q.    In your sworn declaration did you also state the

24  following, "The closest cities to Tryon, North Carolina,

25  with federal courthouses, are Asheville, North Carolina,

1    approximately 35 miles away, and Greenville-Spartanburg,

2    South Carolina, each approximately 30 miles away.  None

3    of those geographic locations have locality

4    adjustments"?

5    A.    Other than the standard locality adjustment.

6    Q.    Did you say anything about the standard locality

7    adjustment in your declaration?

8    A.    It is calculated in all federal pay.

9    Q.    Did you say, in your sworn declaration, that none

10   of those geographic locations have locality adjustments?

11   A.    Beyond the standard listed one, they do not have

12   an increased, um -- I don't know the number of cities

13   off the top of my head, but there are a number of cities

14   that are adjusted beyond normal locality pay, and

15   Charlotte happens to be one of them.

16        MS. STRICKLAND:  Let's turn to Page 10, I believe

17   it's Paragraph 45.  No, I'm sorry, not Paragraph 45.

18   Go, up --

19        (Scrolls.)

20   Q.    Is this your sworn declaration?

21   A.    Yes.

22   Q.    Did you state at Paragraph 43, "Since plaintiff

23   was teleworking from a location outside of the Charlotte

24   metropolitan area, she technically was no longer

25   eligible for the locality adjustment"?

1    A.     That is correct.

2    Q.     Okay.

3    A.     And the rest of that is also correct.

4           MS. STRICKLAND:  So let's move to 44.

5           (On screen.)

6    Q.     Did you state, in Paragraph 44, "The closest

7    cities to Tryon, North Carolina, with federal

8    courthouse, are Asheville, North Carolina, approximately

9    35 miles away, and Greenville-Spartanburg, South

10   Carolina, each approximately 30 miles away.  None of

11   those geographic locations have locality adjustments"?

12   A.     Yes, that's what the document says.

13   Q.     Okay.  Um, just a moment.  (Pause.)

14          Are you aware that the DOCS manual states that

15   locality pay cannot be denied under any circumstances?

16   A.     And is not.

17   Q.     Are you aware that the DOCS manual states that

18   "Each AFD's salary consists of two components, which are

19   basic pay and a locality adjustment"?

20   A.     That is correct.

21   Q.     And do I understand your testimony earlier to be

22   that there was some sort of policy that basic pay and

23   locality pay were lumped together -- um, I'm not sure I

24   recall exactly the words you used, but that they were

25   put together in the Notification of Personnel Action?

1    A.    Yes.

2    Q.    Was this a written policy?

3    A.    This is the chart and mechanism by which the, um,

4    Human Resources action had to be taken.  It's not a

5    policy, it is a practical matter of just doing the math.

6    Q.    So do I understand your testimony to be that

7    there's nothing in writing confirming that locality pay

8    and basic pay are supposed to be lumped together on a

9    Notification of Personnel Action?

10    A.    As I stated before, the personnel action in the

11    case of those reclassifications was handled between two

12    different pay scales, therefore when it transferred to

13    cost, it was considered a lump number, a $107,000 and

14    some-odd dollars.

15    Q.    I'm just asking you whether there is or is not a

16    written policy regarding what you were talking about,

17    that they are supposed to be one number?

18    A.    I don't know if there's a policy or not, I do know

19    that that's the only way the transaction is processed.

20    Q.    So we're just supposed to take your word for it,

21    is that right?

22    A.    Well you can certainly speak with AOHR.

23    Q.    Okay.

24         MS. STRICKLAND:  Let's move on to Admitted Exhibit

25    5.

1          (On screen.)

2    Q.    Okay.  Did I understand you to testify earlier

3    that I was supposed to be placed in AD-23, Grade 23, is

4    that what you testified yesterday?

5          MS. YOUNG:  Objection, misstates prior testimony.

6          THE COURT:  It does.

7          Put another question.

8          MS. STRICKLAND:  Thank you, your Honor.

9    Q.    Did you state in your sworn declaration that, at

10   the time of the reclassification, I was supposed to be

11   put or put in Grade 23 on the AD pay scale?

12         MS. YOUNG:  Again misstates prior testimony.

13   Q.    Was I placed in Grade 23?

14   A.    Yes.

15   Q.    Okay, thank you.  And we also discussed the fact

16   that the Request for Personnel Action that you submitted

17   states, quote, "Should be set at AD level 28, to be set

18   at AD 28."  Is that correct?

19   A.    That was on the form, yes.

20   Q.    Okay.  Did you tell Heather Beam, during the EDR

21   investigation, that I was AD Grade 25?

22   A.    I don't recall.  I know we were trying to make

23   sure everything was calculated correctly.

24   Q.    Would it refresh your recollection to review a

25   document?

```
 1   A.     I would believe so.
 2         MS. STRICKLAND:  I'm happy to have him scroll
 3   through.
 4         (Scrolls.)
 5   Q.     But are you familiar with this document?
 6   A.     (Silence.)
 7         MS. STRICKLAND:  Why don't you go ahead and scroll
 8   through it.
 9         (Scrolls further.)
10   A.     Okay.
11   Q.     Are you familiar with this document?
12   A.     Yes.
13   Q.     Is this an e-mail from yourself to Heather Beam?
14   A.     Yes.
15   Q.     Did you state that I was an AD-25?
16   A.     Um, it's certainly in the e-mail.
17   Q.     Okay.
18         MS. YOUNG:  Your Honor, I want to note that this
19   exhibit hasn't been marked for identification.
20         THE COURT:  Shouldn't we do that?
21         MS. STRICKLAND:  Um, your Honor, this is just for
22   purposes of refreshing recollection, but we're happy to
23   mark it, if that would be helpful.
24         THE COURT:  Okay, let's mark it.  What are the
25   next letters?
```

1          (Pause.)

2          THE COURT:  Right.  Wait a minute, the Clerk

3    reminds me and advises me wisely that there's already

4    confusion here when we're marking with letters documents

5    that have not been shown before.  So we're going to

6    start at the letter M and we'll call this M-A.

7          There's nothing close to that, is there?

8          (Silence.)

9          THE COURT:  I hear nothing.  So we'll mark this MA

10   for identification.

11         MS. STRICKLAND:  Thank you, your Honor.

12   Q.    Mr. Moormann, did you testify earlier that there

13   was a Continuing Resolution in effect during -- excuse

14   me, in August of 2018?

15   A.    There was a Continuing Resolution coming and it

16   was being planned for, um, at that time.  We knew that

17   there was not going to be a budget passed.

18   Q.    Are you aware that Continuing Resolutions were

19   used to fund the federal government for 20 consecutive

20   years between 1997 and 2017?

21   A.    I'm sorry, say that again?

22   Q.    Are you aware that Continuing Resolutions were

23   used to fund the federal government for 20 consecutive

24   years between 1997 and 2017?

25   A.    I was not aware of that.

1      MS. STRICKLAND:  Thank you, your Honor, that helps

2   me.  I would like to be heard on this at the appropriate

3   time, but we're going to move to strike this testimony

4   about the Continuing Resolution.  We went back and

5   reviewed our discovery requests last night and we

6   clearly requested the factual basis for any denial of an

7   allegation in the complaint, or any factual defenses,

8   and something about a Continuing Resolution was never

9   disclosed to us at any time.  And it's severely

10  prejudicial to us because we would have wanted to

11  conduct discovery on the issue.  And so, um, we're just

12  preserving the issue that we would move to strike this

13  testimony.

14      THE COURT:  Well are you done?  Are you done with

15  your examination?

16      MS. STRICKLAND:  Um, no, your Honor.

17      THE COURT:  Well, all right, you've raised it, and

18  I'll hear you once you're done with his examination.

19      How much more have you got for this witness?

20      MS. STRICKLAND:  Um, I have not very much more.  I

21  have three pages.  So it should not be very long.

22      THE COURT:  Go ahead.

23  Q.   Are you aware of whether there was a Continuing

24  Resolution during the year of 2017?

25  A.   Um, are you -- you just quoted it.  There have

1    been Continuing Resolutions at the beginning of certain

2    budget years, um, so it would -- but I don't know off

3    the top of my head.

4    Q.    Okay.  Does your sworn declaration state anything

5    about a Continuing Resolution being the reason why I was

6    not given a pay raise?

7    A.    It wasn't relevant at the time, it was a

8    conversion.

9    Q.    Didn't you state, in your sworn declaration, that

10   the maximum I could have been paid was $101,036, and the

11   Defender had to use the Red-Circle rule to avoid

12   reducing my pay?

13   A.    Yes, I did.

14   Q.    Okay.  Um --

15        MS. STRICKLAND:  okay, let's go to Admitted

16   Exhibit 182.

17        (On screen.)

18   Q.    Okay.

19        MS. STRICKLAND:  Let's go ahead and scroll

20   through.

21        (Scrolls.)

22   Q.    And I believe you testified about this document

23   yesterday, is that correct?

24   A.    Yes.

25   Q.    So you submitted a request to reclassify Jared

1    Martinez to an Assistant Federal Defender, right?

2    A.    Correct.

3    Q.    And that was on August 16th, 2018?

4    A.    Correct.

5    Q.    Does this document state "Research and Writing

6    Specialist, Grade 15, Step 4"?

7    A.    Yes.

8    Q.    And does this document state "Current promotion

9    potential step only"?

10   A.    Correct.

11        MS. STRICKLAND:  Okay, let's go to Lettered

12   Exhibit AQ.  And we'll scroll through the document.

13        (Scrolls.)

14   Q.    And I will ask you whether you are familiar with

15   this document?

16   A.    Yes, I am.

17   Q.    You are.  Okay.

18        Is this an e-mail from you to Tim Lavan -- Lavan,

19   I'm not sure how to pronounce it, in Defender Services

20   at the AO?

21   A.    Yes, it is.

22   Q.    Is this an e-mail dated March 25th, 2018?

23   A.    Correct, it is.

24        MS. STRICKLAND:  Okay, go ahead and scroll down.

25   (Scrolls.)  Okay, yeah, stop right there.

1        (On screen.)

2   Q.    Did you state, in this e-mail, "This is a request

3   to adjust the pay of Jared Martin in less than the

4   standard 52 weeks"?

5   A.    Yes, it is.

6   Q.    Did you state, "Jared Martin was converted from an

7   R&W to and AFD in August of last year.  There was no pay

8   change at the time of the reclassification.  Due to the

9   reclassification, the usual grade and step pay changes

10  did not occur.  An employee review has now occurred and

11  we wish to perform a pay adjustment from $134,379 to

12  $147,815 to correct this"?

13  A.    Yes.

14  Q.    Did you testify earlier that a grade increase

15  would be extraordinary?

16  A.    A grade increase is extraordinary.  This is an AFD

17  motion.

18  Q.    Does your e-mail --

19  A.    An AFD pay increase.  Excuse me.

20  Q.    I apologize.

21        Does your e-mail refer to the usual grade and step

22  pay changes?

23  A.    Yes, it does.

24  Q.    Does your e-mail state that you wish to correct

25  the fact that the usual grade and step pay changes did

1  not occur?

2  A.   Ultimately it -- because of that his salary or

3  people with a certain amount of time in the office were

4  significantly higher than his pay.  We were trying to

5  correct that.

6  Q.   And you used the word "correct"?

7  A.   Leaving Mr. Martin in this grade and step position

8  was penalizing his pay.  As I testified earlier, it is

9  to an employee's benefit to be reclassified as an AFD.

10 Q.   Does your sworn declaration state that on March

11 22nd, 2019, you received an automatically-generated

12 e-mail from the AO indicating that I had transferred

13 within the judiciary effective March 18th, 2019?

14 A.   I'm sure -- I'm sure I have received that

15 document.

16 Q.   Okay.  You don't have any reason to deny that it

17 was on March 22nd, 2019?

18 A.   Um, it was the date that it occurred.

19      MS. STRICKLAND:  Let's go ahead and pull up his

20 declaration, um, Paragraph 49.  (On screen.)  Okay.

21 Q.   Does this refresh your recollection about whether

22 it was March 22nd, 2019 when you received this

23 automatically-generated e-mail?

24 A.   Yes, and it looks like, um, you were transferred

25 March 8th.

1    Q.    Is it your recollection that March 22nd, 2019 was

2    a Friday?

3    A.    I do not have a calendar, so I do not remember

4    that one way or the other.

5    Q.    Do you have any reason to deny that it was a

6    Friday?

7    A.    Again I don't know what day of the week that would

8    have been.

9    Q.    Okay.  So the, um -- the request for a pay raise

10    for Jared Martin --

11          MS. STRICKLAND:  And let's go back to that

12    exhibit.

13          (On screen.)

14          MS. STRICKLAND:  Oh, and I apologize, I forgot.  I

15    would like to admit this exhibit.

16          THE COURT:  And the exhibit is what?  How marked?

17          MS. STRICKLAND:  It is Lettered CQ.

18          THE COURT:  CQ.

19          Any objection?

20          MS. YOUNG:  Yes, your Honor, we object on

21    relevance grounds.

22          THE COURT:  I don't --

23          MS. YOUNG:  These documents were created --

24          THE COURT:  Wait.  Wait.  I asked you.  You told

25    me.  I don't see the relevance.

1          What's the relevance, Ms. Strickland?

2          MS. STRICKLAND:  Yes, your Honor, it's relevant

3    for two reasons.

4          First, he testified in his direct examination that

5    a grade increase would be an extraordinary thing and --

6          THE COURT:  This isn't a grade increase, as I

7    understand it?

8          MS. STRICKLAND:  What he says in the e-mail is

9    that the usual grade and step pay changes for Jared and

10   I, as Research and Writing attorneys, did not occur, and

11   that he wishes to correct it.

12         The other reason, and what I was about to ask him,

13   is that he put in this request for a pay increase in

14   less than the standard 52 weeks, one business day after

15   he was notified that I left the office.  So it is

16   evidence that withholding the promotion from me was

17   retaliatory and discriminatory.

18         THE COURT:  What do you say to that?  The

19   government.

20         MS. YOUNG:  Yes, your Honor.

21         As Mr. Moormann just testified, Mr. Martin had

22   substantially more experience and was being underpaid,

23   compared to other AFPDs in the office, and when the

24   Continuing Resolution ended, the Office sought to fix

25   those differences.  The plaintiff, at that time, had

1    already, you know, already essentially left, had already

2    put in for a transfer, and the transfer was, you know,

3    finalized with an effective date of March 18th, 2023.

4    If she had stayed -- she was leaving so there was no

5    opportunity to review her pay at that time.

6         MS. STRICKLAND:  May I be heard, your Honor?

7         THE COURT:  Well you just had been heard, and I'm

8    going to allow the document to be admitted.  And it will

9    have the next exhibit number, which will be Exhibit 186

10   in evidence.

11        (Exhibit 186, marked.)

12        MS. STRICKLAND:  Thank you, your Honor.

13   Q.   So just to review.

14        On March 25th, 2019, you requested a pay raise for

15   Jared Martin in less than the standard 52 weeks, is that

16   right?

17   A.   As part of trying to adjust pay, um, to a fair

18   level, yes.

19   Q.   But my question is whether you did that in less

20   than the standard 52 weeks?

21   A.   I did that at the end of the Continuing

22   Resolution.

23   Q.   And that was in less than the standard 52 weeks?

24   A.   Yes.

25   Q.   Okay.  And March 25th, 2019 was 3 days after you

1  were notified that I had left the office by the
2  automatically-generated e-mail from the AO, is that
3  correct?
4  A.    It's correct, but irrelevant.
5       MS. STRICKLAND:  Okay, I move to strike the last
6  portion of his statement.
7       THE COURT:  Well we'll strike it because he's not
8  determining it.  No, I won't strike it, that's his
9  position, and, um, we'll have his position on the
10 record.
11      All right.  Anything else for this witness?
12      MS. STRICKLAND:  No, your Honor, just that we
13 would preserve our motion to strike on the Continuing
14 Resolution issue and also an apparent policy about
15 locality pay that was never disclosed to us in discovery
16 and that we didn't hear anything about until he was on
17 the stand yesterday.
18      THE COURT:  Ms. Young, what do you say to that,
19 the motion to strike?
20      MS. YOUNG:  Your Honor, we believe the plaintiff
21 should have taken this witness's deposition, he's been
22 disclosed as a witness for many months.  We're not
23 denying any specific allegations, he's just explaining
24 the process of the conversions.  We never denied that
25 those conversions to AFD occurred.

1          She claimed that it was backdated.  He's explained

2     the reasons, the underlying reasons of what happened.

3     I'm not aware of any -- you know any specific discovery

4     requests that this information should have disclosed in

5     response to at this time.

6          THE COURT:  Well she claims there's a, um, you

7     know a request that you're to disclose all the factual

8     bases for your position and this wasn't done.

9          Is she in error on that?

10          MS. YOUNG:  (Pause.)  Your Honor, we would have to

11     go back and review those specific discovery requests.

12     We only learned of this information preparing for

13     Mr. Moormann's testimony for trial.

14          THE COURT:  Well both sides should go back and do

15     that.  I'll take this under advisement.

16          All right, you have no further questions for him,

17     do you, Ms. Young?

18          MS. YOUNG:  Just a few, your Honor.  I have just a

19     few, your Honor.

20          THE COURT:  You may.

21          MS. YOUNG:  Thank you.

22

23     REDIRECT EXAMINATION BY MS. YOUNG:

24     Q.    Mr. Moormann, did Ms. Strickland ever lose

25     locality pay?

A.      No.

        MS. YOUNG:  Mr. Spears, can we please have Exhibit
ER, which I believe was admitted yesterday, although I
don't have the number.

        THE COURT: ER?

        MS. YOUNG:  Yeah, Bates 2887, which is now -- yes,
perfect.  Thank you.

        (On screen.)

Q.      Mr. Moormann, what does it say in the remarks
section of this document?

A.      The salary includes a general increase of 1.4
percent in a locality payment, other geographic
adjustments at --

Q.      Why does this SF-50 indicate a locality adjustment
that does not appear in the locality box?

A.      The way the AD scale is recorded or was recorded
at that time, it was a lump sum.

Q.      Mr. Moormann, for both Ms. Strickland and
Mr. Martin, were the conversions to AFPD intended to be
revenue-neutral?

A.      Yes.

Q.      How, if at all, would it have changed
Ms. Strickland's pay at the time of conversion if she
had been set at AD-level 25?

A.      It wouldn't have changed either way.  AD is a

```
 1    measure of time, promotions are a separate item.
 2            (Pause.)
 3            MS. YOUNG:  Your Honor, that's it for this
 4    witness.  And I'll just note my apologies, this exhibit
 5    was admitted as 179 yesterday.
 6            THE COURT:  ER is 179?
 7            MS. YOUNG:  Yes, your Honor.
 8            THE COURT:  Thank you.
 9            Nothing further, Ms. Strickland?
10            MS. STRICKLAND:  Um, just very briefly.
11
12    RECROSS-EXAMINATION BY MS. STRICKLAND:
13    Q.    Was this form while I was still employed at the
14    FDO?
15    A.    It was effective, um, 1-7-2019.
16    Q.    Was I still employed at the FDO in January 2019?
17    A.    Yes.
18    Q.    Thank you.
19            MS. STRICKLAND:  And just for the Court's
20    information, I believe the discovery request was
21    Interrogatory Number 3, we requested all factual
22    defenses that they anticipated raising, and they didn't
23    disclose either of those.
24            THE COURT:  Thank you.
25            All right, that's it for this witness?
```

1          (Silence.)

2          THE COURT:  Does the government intend to call any

3     other witnesses?

4          You may step down, Mr. Moormann.  Thank you.

5          MS. CANEVARI:  Yes, your Honor.

6          (Witness leaves.)

7          THE COURT:  Then you may call your last witness.

8          MS. CANEVARI:  Your Honor, this is Dorothy

9     Canaveri, and the government will call Jill Langley.

10          THE COURT:  Yes, thank you, Ms. Canevari.  And she

11     may be called.

12          (JILL LANGLEY, sworn.)

13

14          * * * * * * * * * * * *

15          JILL LANGLEY

16          * * * * * * * * * * * *

17

18     DIRECT EXAMINATION BY MS. CANEVARI:

19     Q.    Good morning, Ms. Langley.  Would you please state

20     your full name for the record.

21     A.    Jill Elizabeth Baker Langley.

22     Q.    And where are you employed?

23     A.    I'm employed at the Tenth Circuit Court of Appeals

24     in Denver as the Circuit Director of Workplace

25     Relations, and I am also the Eighth Circuit Director of

1    Workplace Relations.

2    Q.    And how long have you been in that position?

3    A.    I've served as the Eighth Circuit Director of

4    Workplace Relations since March of '21 and as the Tenth

5    Circuit Director of Workplace Relations since August of

6    2018.  I was also the Judicial Integrity Officer, the

7    first Judicial Integrity Officer at the Administrative

8    Office of the United States courts from December of 2018

9    through March of 2021.

10   Q.    And before becoming the Judicial Integrity

11   Officer, what did you do before that?

12   A.    So I was a staff attorney with the Tenth Circuit

13   Court of Appeals since 1995, and in that role I also

14   served as the primary EDR coordinator for the Tenth

15   Circuit Court of Appeals.

16   Q.    And what does "EDR" stand for?

17   A.    "Employment Dispute Resolution," it's the

18   administrative procedure we have in the judiciary for

19   employment protections.

20   Q.    And what familiarity, if any, do you have with the

21   EDR process?

22   A.    So I actually have quite a lot a lot of experience

23   with the -- and I do call it the "EDR process," the

24   "Employment Dispute Resolution" process, both as an EDR

25   coordinator, um, but also because I was involved in all

1  of the amendments to the model EDR plan throughout its

2  history.  So, um, in the Judicial Conference of the

3  United States, the judges adopt a model EDR plan and

4  then each court adopts its own based on that.  And so I

5  was part of the working group in 2008 that amended it.

6  I drafted the 2013 Amendment on behalf of the Committee

7  For Judicial Resources and was also on the work group to

8  amend it most recently in 2019.

9  Q.    What is your understanding of Chapter 9 of the EDR

10 plan?

11 A.    Chapter 9 was added in a 2010 amendment and it was

12 designed to encourage employees to report wrongful

13 conduct.  We had become aware that there were some

14 people who thought the only way they could report

15 wrongful conduct was by filing an EDR complaint, and we

16 wanted to say "We always encourage you to come forward

17 and report wrongful conduct."  So it's a reporting

18 provision and it says, right there, that it's not a

19 complaint, it's just an encouragement to report

20 harassment, or any other wrongful conduct.

21 Q.    Are there any rights guaranteed under Chapter 9?

22 A.    No, Chapter 9 says that the "Chief Judge will take

23 appropriate action," but there's not a process to it,

24 it's just a reporting encouragement.

25 Q.    And are there any remedies guaranteed under

Chapter 9?

A.     No, and in fact it explicitly says that if you want any remedies under the EDR plan, you have to use the Chapter 10 complaint process.

Q.     And can you give us your understanding of Chapter 10 of the EDR process?

A.     Chapter 10 is the complaint process for any employees who believe that the employment protections set forth in the EDR plan have been violated.  There are two prerequisites that an employee has to go through in order to file the actual complaint.

You first have to request counseling with an EDR coordinator.  That stage is designed to make sure the employee understands the process, their rights, has the form, has a copy of the plan, and gets all their questions answered.  That's a 30-day period.  It can be shorter.  If the employee agrees, it can be extended.

And when that stage is over, you then have to request -- the employee then has to request mediation.  And that stage is between the employee, the employing office, and a mediator, and it's designed to try and see if we can resolve this informally before a complaint is filed.  And that also is a 30-day period.  It can be shorter.  It can be extended if the mediator and the employee agree.  And it says that the employee and the

1    employing office only have to meet once with a mediator,

2    they could meet together, they could meet separately,

3    um, and that's all you do.  So you get to the mediation,

4    it either resolves it or it doesn't, and if it doesn't,

5    you then can file a complaint.

6        At the complaint stage, a federal judge is

7    designated by the Chief Judge to be the Presiding

8    Judicial Officer -- sometimes I'll say "PJO," but I'll

9    try to say "Presiding Judicial Officer," and so as the

10   federal judge, they oversee the complaint process, they

11   hear and decide the allegations, and they have

12   authority, if they find that the rights were violated,

13   to order remedies.  And that decision has to be a

14   written decision and it can be appealed to the Judicial

15   Council.

16   Q.    All right.  Did you ever meet with Ms. Strickland?

17   A.    I did, I met with her and her husband in February

18   of 2019.

19   Q.    And at what point in the EDR process was

20   Ms. Strickland when you met with her?

21   A.    It was my understanding she was at the mediation

22   stage of the complaint process.

23   Q.    What were the topics that you and Ms. Strickland

24   discussed?

25   A.    So Ms. Strickland told me that she had reported to

her Defender that she thought she was being sexually
harassed by the First Assistant and that that
information had been reported to James Ishida, the
Fourth Circuit Executive who was also an EDR
coordinator, and that Mr. Ishida had requested the HR
specialist at the Court of Appeals to investigate.
Ms. Strickland told me she had met with that
investigator for about 5 hours and that it had taken
several months and she had not gotten word about the
investigation report, and then heard that the report was
incomplete and hadn't covered her also claim that the
Defender had retaliated against her for reporting the
alleged harassment.

And so that somewhere in the process she had filed
the first -- that request for counseling, that first
precomplaint prerequisite, and, um, she said that her --
that her reporting was described to her as a "wrongful
conduct complaint" under Chapter 9.  And so one of the
things I explained is that it's not a complaint, it's
not a process at all, it's just a report.  And the other
thing she told me is that she had been told that the EDR
complaint, the Chapter 10 process, had to be abated
while they waited for the investigation to be complete.

So what she wanted was a copy of that
investigation report, and what she also wanted at the

mediation stage was for Chief Circuit Judge Gregory to
disqualify the Defender from acting on behalf of the
office, she wanted the First Assistant to be terminated,
and/or she wanted to have her duty station changed to a
different office of the Federal Public Defender's office
and/or to work from home remotely.  Those were things
that she was looking to have happen then.

Q.    What if anything did you discuss about the
remedies that would be available after a formal
complaint?

A.    So I first made sure she understood that a report
under Chapter 9 is not a complaint, I don't know why it
had gotten called a "complaint," but it's not a
complaint, and that it expressly says in that provision
that if you want EDR remedies -- and it also says it in
Chapter 10, that you have to file a complaint, you have
to use the Chapter 10 process, filing a request for
counseling, a request for mediation, and a complaint.
And that the only person with power to order remedies is
the Presiding Judicial Officer who's designated at that
complaint stage, and only if the Presiding Judicial
Officer, at the end of the complaint stage, determines
that the employee's rights were violated.  And that
there was no basis in the EDR plan for the Court of
Appeals judge, the Chief Circuit Judge, to order

remedies, that that's only the role of the Presiding

Judicial Officer.  But I did explain to her that the

Presiding Judicial Officer would have authority to order

remedies in her favor.

Q.    What if anything did you discuss about remedies

that would be available during mediation?

A.    Again there's no remedies -- you're not at the

complaint stage.  The PJO is only appointed once you

file a request -- I'm sorry, a complaint.  There's no

PJO at the counseling stage, there's no Presiding

Judicial Officer at the mediation stage.  That happens

once you file your complaint, the Chief Judge appoints a

a Presiding Judicial Officer, who hears and decides the

allegations, makes a finding, and if that finding is in

favor of the employee, they are then empowered by the

EDR plan to order equitable remedies in favor of the

employee.

Q.    Thank you.  What if anything did you discuss about

the enforceability of remedies ordered by a Presiding

Judicial Officer?

A.    So I did say that the Presiding Judicial Officer

has power to enforce remedies, including remedies

against the Federal Public Defender's office, and that's

clear from the EDR plan.  And at one point at the very

end Ms. Strickland asked me, "What would happen if the

1    Defender refused to comply with those ordered remedies?"
2    And that question concerned me because I had never heard
3    the concept of refusing to comply with a CJO's ordered
4    remedies, that was kind of a -- it never even occurred
5    to me that anyone would do that.
6          So it kind of dawned on me that I understand -- if
7    I'm an employee of the court, that I understand that all
8    the employees of that court work for the judges and so
9    there's a direct chain of command.  And I didn't
10   understand what would happen, when I was meeting with
11   Ms. Strickland that day, if a Defender, who had been
12   appointed, flat-out refused to comply with the PJO's
13   order, would they be fired?  I didn't know what the
14   statute was, what the rules were, and what would happen
15   if an appointed Defender refused to comply.
16   Q.    So how did you respond?
17   A.    I said that really I had never thought about it, I
18   didn't know what would happen in that scenario, I didn't
19   know, you know, if they were unaccountable for the four
20   years of their term, that I just literally didn't know
21   what would happen.
22   Q.    Did you ever follow up or did you ever look into
23   that question?
24   A.    Later, but not right away.  But, yeah, at some
25   point in time I did later learn that the very same

statute that appoints Defenders, um, has a provision
that says that they can be removed from office, prior to
the end of their term, for misconduct or neglect of
duties, and certainly I would think that failing to
comply with a federal judge's EDR-ordered remedy would
be a neglect of duty. But I did not know that when I
met with her.

Q.   Did you ever follow up regarding that answer with
Ms. Strickland?

A.   I don't remember if I did. I don't have a memory
of doing that.

Q.   Did Ms. Strickland ever follow up with you to get
that answer?

A.   No.

Q.   Okay. What if anything did you tell
Ms. Strickland about whether a Presiding Judicial
Officer would not or could not order remedies against
the Federal Defender's Office?

A.   So I never said that the Presiding Judicial
Officer doesn't have the power to order remedies against
the Federal Defender's Office, the plan explicitly says
they do, and it would be illogical for me to say
something different than that. I did say that the Chief
Circuit Judge couldn't order remedies in the mediation
stage, because they're not the Presiding Judicial

1    Officer.  But that's apples and oranges.

2    Q.    And just to clarify, did you ever tell

3    Ms. Strickland that the Presiding Judicial Officer would

4    have no jurisdiction to order a remedy against the

5    Federal Defender's Office?

6    A.    Yeah, I didn't say that and the plan doesn't say

7    that.

8    Q.    How would you characterize Mr. and

9    Mrs. Strickland's demeanor during that meeting?

10    A.    They were very agitated from the start, they

11    believed that like everything seemed to be nefarious.

12        MS. STRICKLAND:  Objection, speculation, lacks

13    foundation.

14        THE COURT:  Well she can't testify to what's going

15    on in either of the Stricklands's minds, but the

16    question, "How did they appear?" is an appropriate

17    question.  And so we'll leave the part about, um, the

18    two being agitated, and, um, we'll strike the part about

19    "They believe."  However, if things were said along

20    those lines, then that may be testified to.

21        Go ahead with your question.

22    Q.    Ms. Langley, what made you think that Mr. and

23    Mrs. Strickland were agitated?

24    A.    Because they did appear angry and agitated from

25    the very start throughout the entire 3-hour time.  They

said that they thought that Mr. Ishida was trying to

protect the Defender.  They seemed -- whenever I would

try to explain the EDR process, they didn't like my

answers, they would challenge how it worked.  At one

point in time I felt like I was explaining something

very straightforward and Mr. Strickland banged his fists

on the table and threw papers down, and just the entire

3 hours there was just a lot of -- they were just --

they were very agitated and angry and often seemed to

describe nefarious motives in everything.

          MS. CANEVARI:  Mr. Spears, can you please display

Trial Letter FQ.

          (On screen.)

Q.     Ms. Langley, do you recognize this document?

A.     Yes, I do.

Q.     What is it?

A.     This is the e-mail that Ms. Strickland sent to me

to let me know that she had settled her EDR matter in

mediation by accepting a clerkship.

          MS. CANEVARI:  Your Honor, defendants move to

admit Exhibit FQ into evidence.

          THE COURT:  No objection?

          MS. STRICKLAND:  No objection, your Honor.

          THE COURT:  It may be admitted, Exhibit 187 in

evidence.

1          (Exhibit 187, marked.)

2          THE COURT:  10 more minutes, counsel.

3          (Pause.)

4          MS. CANEVARI:  No further questions from the

5      government.

6          THE COURT:  All right.

7          Any questions for this witness, Ms. Strickland?

8          MS. STRICKLAND:  Yes, your Honor.  Thank you.

9

10     CROSS-EXAMINATION BY MS. STRICKLAND:

11     Q.    I'll start with one of the last things you said,

12     Ms. Langley.

13          Did I hear you testify that Mr. Strickland "banged

14     his fists on the table and was throwing papers" during

15     this meeting?

16     A.    He was picking up papers and, I don't know,

17     putting them down hard on the table.  And, yes, there

18     was some point in time I remember him banging on the

19     table.

20     Q.    Did you give a -- I'm sorry, were you deposed in

21     this matter?

22     A.    Yes.

23     Q.    Did you ever mention anything in your deposition

24     about Mr. Strickland "banging his fists on the table and

25     throwing papers"?

1    A.    I can't remember.

2    Q.    Thank you.

3          So you testified that you met with me on February

4    12th, 2019, is that right?

5    A.    I don't remember if the date is the 12th.  It was

6    a Friday in February and I would have thought it was the

7    15th.

8    Q.    Okay, I might have the date wrong, but it was in

9    February of 2019?

10   A.    That's correct.

11   Q.    Okay, thank you.  And at that time you were the

12   first-appointed Judicial Integrity Officer, is that

13   right?

14   A.    That's correct, it was a newly-created position.

15   Q.    Okay.  And, um, was the role of Judicial Integrity

16   Officer created as a result of the Workplace Conduct

17   Working Group report in 2018?

18   A.    It was, quote, "The Federal Judicial Workplace

19   Conduct Working Group had recommended the establishment

20   of someone at the Administrative Office to help

21   employees and managers and judges with the EDR process

22   and employment rights."

23   Q.    Is it your understanding that the role of the

24   Judicial Integrity Officer is to be "A national resource

25   that would be easy for any judiciary employee to locate

1    and find and that it would be a resource outside of
2    someone's court or employing office if that's where they
3    felt more comfortable"?
4    A.    Yes.
5    Q.    Was the Judicial Integrity Office envisioned as an
6    office that could provide advice and guidance about the
7    employment protections in the EDR plan and the process
8    for seeking remedies and resolutions under the EDR plan?
9    A.    Yes.
10   Q.    Is it fair to say that a judiciary employee
11   seeking advice from the Judicial Integrity Office could
12   reasonably rely on advice and guidance provided by that
13   office?
14   A.    (Pause.)  Yes.
15   Q.    Okay, thank you.  And I believe you also testified
16   that you served as the EDR coordinator?
17   A.    Can I qualify that just briefly?
18         THE COURT:  Yes, you may.  Go ahead.
19         THE WITNESS:  Thank you.  It's weird having words
20   coming in.
21   A.    The plan always dictates, you have to rely on what
22   the language of the plan is.  An EDR coordinator's job,
23   a Judicial Integrity Officer's job, is to describe the
24   plan accurately.  So my qualification would be that if
25   someone described it inaccurately, that their job is to

1    describe the plan accurately, and that's something that
2    one should be able to rely on, an accurate description
3    of the plan and process.
4    Q.    Yeah, so it would be reasonable, as a general
5    matter, to rely on advice and guidance provided by the
6    Judicial Integrity Officer?
7    A.    So long as it was accurate.
8    Q.    Is it the judiciary employee's responsibility or
9    the Judicial Integrity Officer's responsibility to
10   ensure an accurate understanding of the plan?
11   A.    It's always the employee's responsibility to read
12   the plan and understand it.  The EDR coordinator, the
13   Judicial Integrity Officer, gives their experience,
14   gives their guidance, but it is always the employee's
15   responsibility to read the plan.  We give them a copy of
16   it, we tell them to "Make sure you read it, ask any
17   questions about it," but it's your responsibility as an
18   employee to read it and understand it.
19   Q.    So is it your testimony today then that if a
20   Judicial Integrity Officer says something that's wrong,
21   or an inaccurate description of the plan, the judiciary
22   employee cannot rely on that because they are
23   responsible for reading the plan themselves?
24   A.    The plan is what governs, the language of the plan
25   is what dictates the process.  If an EDR coordinator

1    says something wrong, that would be unfortunate, but the
2    plan is what would control.  The language of the plan is
3    what controls.
4    Q.    And, um, just to be clear, that somebody in the
5    role of a Judicial Integrity Officer, or an EDR
6    coordinator, would have more knowledge than an average
7    judiciary employee about the EDR plan, is that right?
8    A.    They would have -- it depends.  Some EDR
9    coordinators have never had an EDR complaint happen, so
10   some have had no more experience than the employee.
11   Some have had some experience.  But at the end, it's
12   still -- the plan is what dictates how the process will
13   work.
14   Q.    Okay, thank you.
15         In addition to serving as a Judicial Integrity
16   Officer, you served as the EDR coordinator for the Tenth
17   Circuit, isn't that correct?
18   A.    That's correct.
19   Q.    Okay.  And in that role you have provided
20   trainings on the EDR plan, is that right?
21   A.    That's true.
22   Q.    Does the EDR plan have definitions of workplace
23   harassment?
24   A.    Yes, both the 2013 EDR plan, in the Fourth
25   Circuit, yes, they all describe discrimination and

harassment.

Q.    Does the EDR plan have definitions of workplace

discrimination?

A.    Yes.  Can I just make sure we're talking about

which EDR plan, since there are several?

Q.    Is there --

A.    Are you talking about the one that applied to you

or are you talking about the current model EDR plan?

Q.    Are you saying that there's a relevant

distinction?

A.    There really is not, but I still want to be clear

what plan we're talking about.  In the 2019 plan, we,

um, put some plain English definitions in.  We also have

similar definition language in the 2013 plan.  Yes, they

both defined it, they're both based on Title VII, so

there's not differences, but I would just like to know

which plan we're talking about rather than generically.

Q.    Yeah, I think you answered my question, the

definitions are based on Title VII as a general matter,

isn't that correct?

A.    That's correct, they're based on Title VII of the

Civil Rights Act of 1964.

Q.    Okay.  And, um, is it your understanding that

since 1985, it has been binding Judicial Conference

policy to voluntarily comply with the substance of these

1  federal employment laws?

2  A.    I think the way it's stated in the discrimination

3  as defined in Title VII -- I'm sorry, the harassment as

4  it's defined in Title VII, violate, yes, binding

5  Judicial Conference policy.  The way harassment and

6  discrimination are defined in Title VII is how the

7  judiciary defines discrimination and harassment in the

8  EDR plans.

9  Q.    Okay.  And are you familiar with trainings

10  provided by the Federal Judicial Center?

11  A.    Very limited knowledge of what they provide, um,

12  some of them.

13        (Pause.)

14        MS. STRICKLAND:  Just one moment, please.

15        (Pause.)

16        MS. STRICKLAND:  This is Lettered Exhibit AY.  Um,

17  I don't think you're on the screen.  (Scrolls.)  Okay.

18  Why don't you scroll through and allow her to review the

19  document.

20        (Scrolls.)

21  Q.    All right.  Does this appear to be a "Federal

22  Judicial Center Training on Preventing Workplace

23  Harassment for Court Staff"?

24  A.    I'll say "Yes" based on the fact that it has the

25  words "Federal Judicial Center Preventing Workplace

1    Harassment for Court Staff" on this document.

2    Q.    Okay, thank you.

3    A.    But I haven't seen this document.

4    Q.    So you don't have any reason to doubt that this

5    would be a training from the Federal Judicial Center?

6    A.    I don't.

7    Q.    Okay.

8         MS. STRICKLAND:  I move to admit this exhibit.

9         THE COURT:  Any objection?

10        MS. CANEVARI:  Yes, your Honor, um, we have a

11   relevance objection --

12        THE COURT:  Yes.

13        MS. CANEVARI:  -- and a foundation objection.

14        THE COURT:  I'm going to sustain the objection on

15   that foundation.  She's never seen it.  I'm not clear as

16   to its timing, um, relative to what's material here.

17   Sustained.  We'll leave it marked for identification.

18        Anything more for this witness?

19        MS. STRICKLAND:  Yes, your Honor.

20        And just on that point, this is subject to our

21   motion to admit exhibits, we're not aware that there's

22   any foundational or authenticity objection, so.  But I'm

23   happy to move on subject to our motion.

24        THE COURT:  Well I mean the case will soon be

25   over.  I'm not entertaining additional motions.  I've

1 just excluded it on this foundation, so there's nothing

2 further to be heard.  They're entitled, in this Court's

3 view, to raise the foundation objection.

4      Anything further for the witness?

5      MS. STRICKLAND:  Um, yes, your Honor.  I'd like to

6 reserve the right to be heard on that issue at an

7 appropriate time, but I'll move on for now.

8      THE COURT:  Well I'm not clear when that time will

9 be, I'm trying to make clear that the evidentiary

10 portion of this case is about to be over, and we will

11 then promptly, in the new year, go on to final argument.

12      But ask questions of the witness.

13      MS. STRICKLAND:  Yes, your Honor.  Yes, I'll

14 reserve it to a different time.

15 Q.    Ms. Langley, do you think that, um, employees have

16 rights under the EDR plan to be free from harassment,

17 discrimination, and retaliation, in their employment?

18 A.    Sounds to me like you're reading from the EDR

19 plan, I think that's what it says.

20 Q.    Do you think that the employer has a duty to solve

21 this problem when there is sexual harassment?

22 A.    I think they have an obligation to take

23 appropriate action, depending on the facts and the

24 allegations.

25 Q.    Okay.  Do you believe that whoever has the power

1  to make personnel decisions for the organization has the

2  duty to solve the problem?

3  A.    I think they have an obligation to take

4  appropriate action depending on the facts and the

5  allegations and the nature of the situation.

6  Q.    Is it true that under Title VII an employer is

7  liable when they know or should have known of harassment

8  and don't take action reasonably calculated to stop the

9  harassment from continuing?

10      MS. CANEVARI:  Objection, your Honor, that's

11  outside the scope of the direct.

12      MS. STRICKLAND:  Your Honor, I'm laying the

13  foundation for, um -- she testified about the difference

14  between Chapter 9 and Chapter 10 and the fact that

15  under --

16      THE COURT:  No, the problem I have is not that

17  it's outside the scope of the direct, although it

18  clearly is, my problem is -- it's because the rules of

19  evidence deal with that.  And when she raises that

20  objection, you must take the witness as though on

21  direct.  Now the witness has not shown any hostility to

22  you, so ask a nonleading question.

23      Go ahead.

24  Q.    What is the standard that applies to managers in

25  the judiciary under the EDR plan?

1    A.    I'm sorry, I missed the first part of what you

2    said?

3    Q.    What is the standard that applies to managers in

4    the judiciary, under the EDR plan, when it comes to

5    taking action on sexual harassment?

6    A.    The EDR plan doesn't have provisions that directly

7    tell the manager something other than Chapter 9 does say

8    that the Chief Judge will take appropriate action, and

9    obviously that's a broad term.  It also says that in

10   ruling on an EDR complaint, the Presiding Judicial

11   Officer will be guided by court decisions interpreting

12   the different laws that are in the EDR plan, that are

13   copied in the EDR plan, um, such as, um, in Title VII.

14   Q.    Ms. Langley, you testified in a deposition in this

15   matter, is that correct?

16   A.    Yes.

17         MS. STRICKLAND:  Okay, let's go to, um, Page 138.

18   (On screen.)  Okay.

19   Q.    Did you state in your deposition, um, that when

20   you look at harassment under the EDR plan, it says "We

21   will look to the laws that we are mirroring"?

22   A.    Right.

23   Q.    Did you state, "If you look at Title VII, an

24   employer is liable in several situations, but one where

25   they are liable is if they know or should have known of

1    harassment and don't take action reasonably calculated

2    to stop the harassment from continuing."  So that's

3    another responsibility of a manager or of a Unit

4    Executive, am I right?

5    A.    And your question is did I say that?

6    Q.    Yes.

7    A.    Yes.

8         MS. STRICKLAND:  All right, keep scrolling down.

9         (Scrolls.)

10   Q.  And did you also say, on the next page, "The

11   protections in the EDR plan are employment protections

12   that a Unit Executive is responsible for complying

13   with"?

14   A.    I did say that.

15   Q.    Okay.  So just to be clear, um, do you believe

16   that under the EDR plan, "It is the responsibility of a

17   manager, or a Unit Executive, to take action reasonably

18   calculated to stop harassment from continuing"?

19   A.    I'm not trying to be difficult, but the EDR plan

20   itself, I don't recall any provisions that say "A

21   manager should do X or Y," it talks about other parties.

22   My deposition is describing my general knowledge of

23   employment law.  But you're asking what does the EDR

24   plan say?

25   A.    Well I guess as a more general matter you

1  testified earlier that the EDR plan is intended to

2  implement the judiciary's policy of complying with

3  employment laws, is that fair to say?

4  A.    Yes.

5  Q.    Okay, thank you.

6        MS. STRICKLAND:  Let's turn to Admitted Exhibit

7  21.

8        (On screen.)

9  Q.    I believe you testified earlier that we met in

10 February of 2019.  Does this appear to be a copy of your

11 notes from this meeting?

12 A.    Yes.

13 Q.    Okay.  And, um, do these notes say that "She

14 alleges that shortly after beginning that job, the First

15 Assistant, who supervised her, began making

16 inappropriate sexual-type comments and remarks.  She

17 characterized his actions toward her as 'stalking.'  She

18 reported the First Assistant's conduct to the Defender.

19 She alleges he did not take her allegations seriously

20 enough, telling her that 'at least the First Assistant

21 never touched her.'  She also believed the Defender has

22 been retaliating against her by not hiring her for an

23 AFPD position for which she was well-qualified."

24        Is this an accurate summary of the concerns that I

25 reported to you?

1    A.    It's the notes that I took contemporaneous with

2    the meeting.

3          MS. STRICKLAND:  Okay, scroll down.

4          (Scrolls.)

5    Q.    Okay, the paragraph that starts "When she reported

6    the harassment to the Defender," that paragraph states,

7    and I believe you testified about this as well, "Caryn

8    was told the EDR-complaint process would need to be

9    abated during the wrongful conduct investigation."

10         Is that a fair and accurate summary of the

11   concerns that I reported to you?

12   A.    It's what I wrote down and what I do remember you

13   telling me.

14   Q.    Okay.  Is it your understanding that "abating an

15   EDR-complaint process" is not something you have ever

16   heard of or understood as part of the EDR process?

17   A.    What you characterized to me is not what the EDR

18   plan says.  The way you characterized it to me is you

19   were told you had to, you needed to abate the EDR

20   process, but the EDR plan says that the employee has to

21   agree to any extensions of time.  Now the one exception

22   to that is that the EDR plan also says that the Chief

23   Judge, or the Presiding Judicial Officer, could extend

24   deadlines, but that's not what you had described

25   happening, what you described to me as happening was

1    that you were told you had to, um, abate the, um --

2    processing the counseling mediation stages of your

3    complaint, and that it's not connected -- and that

4    description of what you said was happening is not

5    consistent with the EDR plan.

6    Q.    Okay, thank you.

7          So during your meeting with me, did you testify

8    that you told me that you did not know what would happen

9    if a Federal Defender refused to comply with a Presiding

10   Officer's order?

11   A.    Yes, I had never given any thought to that

12   scenario.

13   Q.    And the reason why, if I'm understanding

14   correctly, um, is because you weren't sure whether the

15   Defender was in the chain of command for the Court?

16   A.    No -- well I didn't -- so I know that the Court of

17   Appeals, or some judges on the Court of Appeals, and I'm

18   not even sure of that, appoints a Defender for a 4-year

19   term.  What I didn't know is if a Defender refused to

20   comply with a PJO-ordered remedy and you were -- and

21   push comes to shove on how do you take action, could he

22   be fired, he or she fired?  And I just didn't know what

23   the rules were about that.

24   Q.    Did you tell me that Federal Defenders are, quote,

25   "Different than the Unit Executive in the court, which

1    is clearly governed by, supervised by, and works at the

2    pleasure of the Chief Judge and the judges of the

3    court"?

4    A.    So I think I'm saying the same thing.  That in

5    other words, if you're a court employee, you're in the

6    chain of command with the judges, but if you're a

7    Defender, I don't know what the mechanics are of firing

8    a defender.

9    Q.    Okay.  And did you also say, quote, "In contrast,

10   if I'm a court employee and the Presiding Judicial

11   Officer orders the Clerk of Court to provide some

12   remedy, the Clerk of Court, I understand, is in a very

13   direct relationship with the Chief Judge and the judges

14   on the court"?

15   A.    Yes.

16   Q.    Okay, thank you.

17        MS. STRICKLAND:  Let's move on to Admitted Exhibit

18   22.  (On screen.)  Okay, go ahead and scroll down.

19        (Scrolls.)

20   Q.    Now this has been admitted, but --

21        MS. STRICKLAND:  No, keep going.

22        (Scrolls.)

23   Q.    And I'll ask you if you're familiar with this

24   document?

25   A.    Yes, I am.

```
 1        MS. STRICKLAND:  Just scroll down to the first
 2   part.  (Scrolls.)  Okay, thank you.
 3   Q.    So did you state that "I hope Friday wasn't
 4   completely overwhelming and that you felt a little
 5   overwhelmed, so I suspect you did as well."  I'm sorry,
 6   I got the "I" and "You" reversed.  But, I mean, you can
 7   read the document.
 8   A.    Yes, that's what I wrote.
 9   Q.    Okay.  So is it fair to say that the meeting was a
10   little overwhelming for all of us?
11   A.    Well as I've said earlier, um --
12        MS. CANEVARI:  Your Honor, it calls for
13   speculation.
14        THE COURT:  I don't think it calls for
15   speculation.
16        MS. STRICKLAND:  I can rephrase it.
17        THE COURT:  All right, the matter is withdrawn.
18   Put another question.
19   Q.    Did you use the word "overwhelmed" in your e-mail?
20   A.    I did.
21   Q.    Okay, thank you.  In your e-mail did you state, "I
22   can't address the why of what has transpired in your" --
23   I think that should be "case to date, and I know this
24   has been an arduous task for you"?
25   A.    Yes, I wrote that.
```

Q.   Did you offer yourself as a guide to James Ishida
for "How I train and expect EDR to work"?

A.   I did.

     MS. STRICKLAND:  Okay, go right up to the next
block, it says "From her."

     (On screen.)

Q.   Did you state that my matter could be "a lesson
learned"?

A.   Yes.

Q.   Did you state that "My experience has taught you
that I" -- we "need to provide EDR-interpretive
guidelines to court to flesh out what I think should
happen in EDR proceedings"?

A.   Yes, I did.

Q.   And did you also say, "I'd like to better
understand if FPDs are adequately protected by EDR
remedies"?

A.   I did.

Q.   And you testified on direct that you did not
follow up with me about your understanding of whether
FPDs are adequately protected by FDRs?

A.   I don't remember one way or the other.  I just
don't have a memory of it.

Q.   But there's no e-mail in this chain that describes
that, correct?

A.     That's true.

Q.     Okay.

       MS. STRICKLAND:  That's all I have.  Thank you.

       THE COURT:  And, counsel, I didn't catch the name
of counsel for the government.  Forgive me.

       MS. CANEVARI:  This is Dorothy Canevari, your
Honor.

       THE COURT:  Ms. Canevari.  Forgive me,
Ms. Canevari.

       Any further questions?

       (Pause.)

       MS. CANEVARI:  No questions for the government,
your Honor.

       THE COURT:  Actually I have a couple, while the
witness is on the stand.

       THE WITNESS:  Okay.

       THE COURT:  I've received evidence in this case,
um, both direct evidence and other people commenting, on
the attitude of the Defender himself, Mr. Martinez, and
the role that he played in these proceedings.  The
testimony I want to focus on, if I've recalled it
correctly, is testimony from Mr. Ishida which says that
it was not unexpected that Mr. Martinez would himself,
as the Unit Manager, have beliefs about the situation
and that excluding him entirely was inappropriate,

1    because there was some suggestion that he, Mr. Martinez,

2    was biased.

3          Is that how it's supposed to work?  What -- what

4    -- how do you view the role of the Unit Supervisor?  In

5    a relatively small unit, the Unit Supervisor would know

6    the people with whom he works and not surprisingly might

7    have views.

8          Does my question make sense?

9          THE WITNESS:  So, Judge, yes, thank you.  Just

10   there's a lot of moving parts to it.

11         So a Unit Executive's role is obviously to, um --

12   I think to, um, protect the safety of all employees that

13   they work for.  Yes, they might have opinions on any

14   matter about personalities, staffing, operational needs,

15   um, that would come into account in any situation.  And

16   I think what I'm hearing in your question -- and please

17   if I'm not, you're asking about the disqualification

18   aspect of whether the Defender should be disqualified

19   from a role in acting on behalf of the office in an EDR

20   process?

21         THE COURT:  I am, um, precisely.

22         THE WITNESS:  Okay.

23         So generally speaking, and there's exceptions to

24   everything, but generally speaking to me, the Defender

25   in an EDR-complaint proceeding has the right to defend

themselves, they've been accused of not acting appropriately, they've been accused of some EDR violation, and in a typical EDR matter, um, they have a right to defend themselves.  And the disqualification provisions in the EDR plan are about people like the EDR coordinator, who's in charge of him helping process it, or the mediator, who's in charge of trying to resolve it, or the investigator, or of course the Presiding Judicial Officer, who should be neutral, but that the Defender is their party.  And that just because they've been accused of violating an EDR protection, they should not be disqualified from defending themselves.

Now that's not 100 percent of the time, there could be situations in which their personal interests conflict with the Office, the best interests of the employing office.  But as a general rule, I see no reason for them to be disqualified from acting on behalf of the employing office.

THE COURT:  Thank you.  And I have one other question.

Ever since I was named to be the judge to handle this federal case, I've thought it appropriate to stay away, um, from the specifics of the training of judicial officers simply so that I would adjudicate this case, at the time it arose, with a completely open mind based

1    upon the evidence as presented.

2         In one respect, um, a matter has come up that, um,

3    touches on training that was provided in the First

4    Circuit for judicial officers at which I was expected to

5    attend, and which I did, and one of the things we were

6    taught by a counterpart of yours in the First Circuit

7    was that frequently in these situations the complainant

8    will ask that the matters that they share be held in

9    confidence, and we were taught also that while that's

10   both understandable, and you can respond as you wish,

11   you really ought, um, say to the complainant, "I cannot

12   promise to hold these things in confidence because I may

13   have a duty to report them to others."  And, um, the

14   training about which I speak took place at a First

15   Circuit Judicial Conference in the spring of 2023 after

16   the events of this case.

17        But I did want to ask you.  Is that standard

18   training and was that in place at the time you met with

19   the Stricklands?

20        THE WITNESS:  So, Judge in March of 2019, the Code

21   of Conduct for U.S. judges was modified, and I'm going

22   to be -- I'm not totally sure if this is one of the

23   amendments, but I think it was, and what you're

24   referring to is a confidentiality provision that's in

25   the Code of Conduct for U.S. judges.  And it says that

```
1    when information is provided to a judge -- and this is
2    unique to judges, you have certain responsibilities to
3    report potential judicial misconduct to a Chief Circuit
4    Judge, and maybe you have a responsibility to tell the
5    Chief District Judge or the Chief Bankruptcy Judge of
6    whatever court you're on, so the judicial misconduct
7    could be assessed.  And it has a broader language --
8            THE COURT:  I'm going to interrupt.
9            THE WITNESS:  You know what I'm talking about?
10           THE COURT:  Right, but because I'm not talking
11   about judicial officers here.  Though my question comes
12   from training of judicial officers, I'm talking about
13   general training, training of Unit Managers, training of
14   federal employees, that we have rather extensive
15   training now in EDR matters.  So don't focus on judges
16   and their particular responsibilities, though I'm
17   certainly sensitive to them, but focus on other than
18   judges.
19           Was this confidentiality, and the duty to inform
20   someone that perhaps they couldn't keep a matter
21   confidential, was that, um, part of the standard
22   training back in 2019?
23           THE WITNESS:  So --
24           THE COURT:  If you know.
25           THE WITNESS:  First there wasn't really standard
```

1  national training that early, at that point in time
2  training was just done in each court.  The reason I
3  brought up judicial officers is because I feel that what
4  you were taught is a judicial officer provision.  But
5  generally speaking what you want to focus on is what
6  managers are taught, and what would have been in place
7  in 2019 is the EDR confidentiality which just says you
8  don't share things, um, outside of an EDR complaint or
9  allegations with anyone who doesn't need to know the
10  information in order to resolve it.  That would have
11  been what the EDR plan said in 2019.  And it says
12  something pretty similar now, it now incorporates the
13  Code of Conduct provisions.

14      THE COURT:  And did you expect that within a, um,
15  particular court unit, that managers were taught to say
16  that perhaps they could not respect the confidentiality
17  that was requested because they might have a duty to
18  report to others, was that what was being taught in
19  2019?

20      THE WITNESS:  What should have been taught in
21  2019 -- and again there wasn't like a national training
22  program, so it's going to be what each court's EDR
23  coordinators and trainers did, but what the EDR plans
24  that I've seen, the closest I've got would be that
25  Chapter 9, that says when anyone reports wrongful

conduct under the EDR plan to a judge, to a supervisor, to a Unit Executive, to HR, they (1) needed to tell the EDR coordinator, and then the Chief Judge needed to take appropriate action.  And that's what I would have said the training should have said, is that if I learn about something, I have to tell the EDR coordinator, I have to tell the Chief Judge.

THE COURT:  Thank you.

Any questions based upon my questions?

Ms. Canevari?

MS. CANEVARI:  (Pause.)  Just a moment, your Honor.  (Pause.)  Nothing from the government, your Honor.

THE COURT:  Ms. Strickland, any questions based on my questions?

MS. STRICKLAND:  Um, yes, your Honor, just one, um, the policy of confidentiality that your Honor was discussing.

Ms. Langley, do you know whether that policy was taught in the Fourth Circuit?

THE WITNESS:  I have no knowledge if it was taught in the Fourth Circuit.

THE COURT:  Thank you.

You may step down.  Thank you.

(Witness leaves.)

```
 1          THE COURT:  Does the government wish to call
 2    another witness in the remaining 10 minutes?
 3          MR. KOLSKY:  Um, we have no further witnesses,
 4    your Honor, but before we rest I did just want to read a
 5    stipulation into the record, if I may?
 6          THE COURT:  You certainly may.
 7          MR. KOLSKY:  Thank you.
 8          The stipulation reads:  "The parties note that
 9    some e-mails contained in the exhibit list may
10    incorrectly list June 12th, 2019 as the date the e-mail
11    was sent.  The parties jointly stipulate that the June
12    12th, 2019 date is a result of defendants's transition
13    to a new e-mail system and does not reflect the date the
14    e-mail was sent."
15          THE COURT:  Thank you.
16          So stipulated, Ms. Strickland?
17          MS. STRICKLAND:  Yes, your Honor.
18          THE COURT:  Very well.
19          All right.  Um, any rebuttal evidence,
20    Ms. Strickland?
21          MS. STRICKLAND:  Yes, your Honor, I just have two
22    brief points to make on that.
23          The first is --
24          THE COURT:  Wait.  Wait.  Wait.  Any rebuttal
25    evidence?  That is do you have any genuine rebuttal
```

witness to call, um, with respect?  It's not a time for
argument.

Any other witnesses?

MS. STRICKLAND:  Yes, your Honor, we, um -- it's
not a witness, but we would just reiterate that Exhibit
Lettered BB, which is before the Court, we understand,
should be submitted under seal.  That will serve as our
rebuttal case.  It shows that the testimony -- the
self-serving testimony of these officials in court, more
than 5 years after the event, is contradicted by the
contemporaneous statements of witnesses at the time,
that these officials are not credible.  We have argued
as to why the, um, these complaints are either not
hearsay or fall within the hearsay exceptions to the
rule.

I also want to add, as the basis for that motion,
that one of the complaints, um, and without revealing
the details, alleges protected activities that the
employee took and actions that Defender Martinez took in
response, and we would argue that those actions are not
hearsay, um, in addition to the other bases in our
motion.

And so based on this we would request, um,
permission from the Court to file our response to
defendants's motion in limine under seal, and we would

1    also request permission to file our findings of fact

2    under seal, so that the Court can review this evidence.

3         And we did file a motion to admit exhibits on

4    December 7th.  Our understanding was that we would be

5    allowed to argue that motion before closing arguments.

6    Yesterday we submitted an updated list that is

7    substantially narrower, it's really only a small handful

8    of exhibits left, and our understanding is that there

9    are no foundational or authenticity objections to any of

10   those exhibits, so we do not need witness testimony.

11        And with that I would also just, for the record,

12   renew our motion to strike testimony by William Moormann

13   regarding matters that were not disclosed to us in

14   discovery.

15        Thank you.

16        THE COURT:  I will take under advisement the

17   motion to strike the testimony of William Moormann.

18        Does the government want to respond to BB?

19        MR. KOLSKY:  Yes, your Honor.

20        We filed a motion in limine with respect to that

21   exhibit, um, I believe it's EDR Number 330.  If

22   Ms. Strickland is permitted to file anything related to

23   that exhibit under seal, we would ask for an opportunity

24   to file an unredacted version of our motion under seal

25   as well.

1        And I would say that if that exhibit is, um,

2   admitted into evidence, we would ask that it be kept

3   under seal, it does contain very sensitive information

4   about EDR complainants who are not a part of this case.

5        THE COURT:  Yes, but that's what I expected you to

6   speak to.  Why shouldn't I admit this?  You think I

7   shouldn't.  Why not?  We don't have to reveal anything

8   that's under seal to make that argument.  She hasn't

9   done that in arguing to the contrary.  So I'm -- I'd

10  like to hear you on the record.

11       Why don't I admit BB?

12       MR. KOLSKY:  So the documents themselves are

13  hearsay.  The witnesses, or the individuals whom they

14  pertain, did not testify in this case.  These are

15  unproven allegations made in documents, that they're

16  hearsay.

17       Also the, um, allegations made in these other EDR

18  claims are dissimilar to Ms. Strickland's claims.  There

19  is no claim of deliberate indifference in response to

20  sexual harassment.  So they're not relevant.

21       THE COURT:  I have reviewed the matter and I

22  accept that argument.  BB is not admitted.  And the

23  evidence is now closed.

24       I propose final argument at 10:00 on Thursday, the

25  4th of January.  Here, um, assuming that I, um, as the

1    District Court has so graciously permitted me, we can

2    have access to this courtroom at that time.

3          (Off the record discussion.)

4          THE COURT:  Oh, Ms. Gaudet properly -- who is

5    arranging everything, corrects me, says that on Thursday

6    the 4th of January, we will have Courtroom 2 in

7    Asheville.

8          And at that time we'll entertain final argument.

9    Final argument will not exceed one-half hour on either

10   side.  I follow the policy that the party with the

11   burden of proof, that is Ms. Strickland, gets to argue

12   last.  So we will hear first from the judiciary.

13         I hope you will all have a very fine holiday, um,

14   and I look forward to the final argument.

15         One question I will ask you --

16         Yes, Mr. Kolsky?

17         MR. KOLSKY:  Sorry, your Honor, just a couple, um,

18   topics I wanted to raise.

19         First, we think it would be helpful if we could

20   have the trial transcripts before the closing argument.

21   Do you know if that would be possible?

22         THE COURT:  I don't know, that's something you

23   take up with the Court Reporter.

24         Go ahead.

25         MR. KOLSKY:  Very well.

1    We also wanted to note for the record that we

2 renew our Rule 52C motion that we made earlier in the

3 trial.  And Ms. Strickland has filed a motion to admit

4 her trial exhibits, that's ECF Number 364, and then

5 yesterday filed a notice relating to that motion.  We

6 would ask for a one-day extension to file our response

7 to that, which would take us to, um, this Friday,

8 instead of this Thursday.

9         THE COURT:  That's allowed.

10        The first thing, your 56C motion is what?

11        MR. KOLSKY:  Rule 52C for judgment.

12        THE COURT:  Oh -- oh, I'm sorry, I miscited both

13 the rule and I misheard you.  Your -- you renew that

14 motion.  I will hear final argument as scheduled.

15        Anything else?

16        MR. KOLSKY:  Yes, thank you, your Honor.

17        And the only other thing is yesterday your Honor

18 asked for the case number of the *Dixon* case.

19        THE COURT:  I did.

20        MR. KOLSKY:  I just wanted to provide that to the

21 Court.

22        THE COURT:  Yes.

23        MR. KOLSKY:  It is 5:17-cr-55.  And my

24 understanding is there is a related preindictment case

25 at 3:13-mj-98.

1          THE COURT:  Thank you very much.

2          All right.

3          MR. KOLSKY:  And one last question.  Sorry, your

4     Honor, if I may, just one other question?

5          THE COURT:  Yes.

6          MR. KOLSKY:  Will counsel be permitted to

7     participate in the closing argument by zoom or will we

8     be expected to appear in Asheville?

9          THE COURT:  Respectfully I really do want you to

10    appear in Asheville.  This is an important judicial

11    proceeding and, um, I think we ought, all of us, hold it

12    in open court.

13         Now my question once, you've heard my interaction

14    with you, on final argument, is going to be the

15    following.

16         Once I've held the final arguments, I'm going to

17    ask you, um, whether -- and each side can make its own

18    determination, and I am not sanguine of any further

19    discussions regarding settlement, but I always should

20    ask, and so I'll be asking, that once final arguments

21    have been held and you've heard me ask the questions I

22    want to ask, whether you want me to stay my hand in

23    preparing my findings and rulings for any period of time

24    so that you can discuss settlement?  And if you do, I

25    will honor that.  But you both have to agree.  And if

```
 1    you don't, I'll get to work on preparing them just as
 2    soon as the final arguments are over.
 3           I do wish you a very fine holiday, um, and we will
 4    see you in the new year on Thursday, the 4th of January.
 5           We'll stand in recess.
 6           MS. STRICKLAND:  Your Honor, I apologize, just two
 7    quick things?
 8           THE COURT:  Yes.
 9           MS. STRICKLAND:  We also, we renew our motion for
10    summary judgment, for purposes of the record, and we
11    also renew our request for our proposed findings and the
12    exhibit to serve as a written proffer.
13           THE COURT:  The -- well let me see if I
14    understand.
15           Saying at this stage you renew a motion for
16    summary judgment is like asking for a reconsideration,
17    which you already have done, um, in effect, on my
18    earlier ruling on summary judgment.
19           Summary judgment is an entirely different
20    procedural vehicle.  Now you've had a trial, a real
21    trial on evidence, and respectfully now you both can say
22    that you have tried a case, because you have.  So it's
23    just -- it's immaterial, we're way beyond summary
24    judgment, now we're on evidence.
25           I didn't understand the second thing you said?
```

 1          MS. STRICKLAND:  Yes, your Honor.

 2          And just to be clear, I think there's some quirky

 3     law in the Fourth Circuit, I think it's been changed,

 4     but it's about preserving a denial of summary judgment.

 5     So that's the only reason I say that.  I completely

 6     understand your point.

 7          THE COURT:  Okay.

 8          MS. STRICKLAND:  The other point is to, um, renew

 9     our request to have our proposed findings and

10     conclusions, and our proffer of Exhibit BB, to serve as

11     a written offer of proof for purposes of appeal.

12          THE COURT:  Oh, I will take BB as an offer of

13     proof, but my ruling on that stands.

14          Does that make the record clear?

15          MS. STRICKLAND:  Yes, your Honor.  Thank you very

16     much.

17          THE COURT:  And since this has been mentioned,

18     while I of course look forward to both sides, um,

19     requests for findings of fact and rulings of law, um,

20     none of that is going to be under seal.  This is a

21     public proceeding, which will be publicly decided based

22     upon the evidence received in this public -- in both of

23     these public courtrooms.

24          All right, thank you all very much.  We'll recess.

25          (Adjourned, 10:40 a.m.)

```
1              C E R T I F I C A T E

2

3

4         I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

5    do hereby certify that the foregoing record is a true

6    and accurate transcription of my stenographic notes

7    before Judge William G. Young, on Tuesday, December 19,

8    2023, to the best of my skill and ability.

9

10

11

12

     /s/ Richard H. Romanow 03-11-24
13   _____
     RICHARD H. ROMANOW    Date
14

15

16

17

18

19

20

21

22

23

24

25
```