**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

**ASHEVILLE DIVISION**

| | |
|---|---|
| **CARYN DEVINS STRICKLAND,** | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| **v.** | )    **Civil No. 1:20-cv-00066-WGY** |
| | ) |
| **UNITED STATES**, *et al.*, | ) |
| | ) |
| *Defendants*. | ) |

**PLAINTIFF'S MOTION TO REQUEST JUDICIAL NOTICE AND LEAVE TO SUBMIT
SUPPLEMENTAL BRIEFING REGARDING THE GOVERNMENT
ACCOUNTABILITY OFFICE'S REPORT, "FEDERAL JUDICIARY: ADDITIONAL
ACTIONS WOULD STRENGTHEN EFFORTS TO PREVENT AND ADDRESS
WORKPLACE CONDUCT."**

Plaintiff respectfully requests that this Court take judicial notice of the recently released

report by the United States Government Accountability Office, "Federal Judiciary: Additional

Actions Would Strengthen Efforts to Prevent and Address Workplace Misconduct" ("GAO

Report"). The GAO Report, which was requested by Members of Congress, was "delayed

significantly because of the challenges and delays in obtaining information from the judiciary,"

including the fact that "the Administrative Office of the U.S. Courts (AO) failed to fully

cooperate." Report, App'x I, at 53; Durbin, Hirono, House Leaders Release GAO Report

Constrained by AO Blocking Access to Federal Audit of Sexual Harassment in the Judiciary

System (July 30, 2024), *available at* https://tinyurl.com/bdh767wm ("Members Press Release").

The GAO Report found that the judiciary "does not have performance measures in place

for its workplace conduct efforts and has not evaluated the effectiveness of its efforts." Members

Press Release; Report 1. "Overall, GAO found that judicial systems aligned ***with only 65***

***percent of federal standards evaluated.***" Members Press Release (emphasis added). "Deficient

1

areas include methods to ensure written policy is implemented correctly and employee rights are substantive in practice; processes to prevent, identify, and end retaliation; training, where training materials met only 23.5% of the federal standards evaluated; and data collection, where the Judiciary does not collect adequate data on complaints." *Id.*

GAO is "the supreme audit institution for the United States." GAO, What GAO Does: Role as an Audit Institution," *available at* https://tinyurl.com/wkxxzv5p. GAO "provides Congress, the heads of executive agencies, and the public with timely, fact-based, non-partisan information that can be used to improve government." GAO, What GAO Does, *available at* https://tinyurl.com/yfkuumsz. The GAO Report is subject to judicial notice. *See Williams v. Lew*, 819 F.3d 466, 473 (D.C. Cir. 2016) ("The Court may take judicial notice of the GAO Report." (citing Fed. R. Evid. 201(b)). The GAO Report, as well as a Summary Report of its findings, are attached to this motion for the Court's review.

The GAO Report contains significant findings that are relevant to this case. For example, the report finds that "[t]he AO does not require Judges or employees to attend trainings," and "[t]here is no training for how investigations of misconduct should be run." Summary Report. Additionally, the report finds that, contrary to AO officials' insistence that the judiciary does not "need to fully align" with recommended EEOC practices, "alignment with the EEOC's recommended practices is important to help design effective programs and help create a culture in which workplace misconduct is not tolerated." Report 27. This finding undermines Defendants' misguided assertion that EEOC guidance does not provide "well-developed standards in the human resource field relating to practices in preventing and responding to workplace complaints," a key aspect of their defense and the basis for requesting that the testimony of Plaintiff's workplace investigations expert be excluded. ECF No. 323, at 6–7.

The GAO Report is a watershed report with many insights regarding the judiciary's handling of workplace misconduct that are relevant to this case. A two-page notice of supplemental authority is not sufficient to address these highly significant findings. *See* LCvR 7.1(j). Plaintiff therefore requests that, in addition to taking judicial notice of the GAO Report, this Court allow supplemental briefing on the significance of the GAO Report to this case.

Prior to filing this motion, Plaintiff requested Defendants' position as required by Local Rule 7.1. Defendants stated: "Defendants will review Plaintiff's motion when it is filed and will file a response in accordance with the local rules."

This the 31st day of July, 2024.

Respectfully Submitted,

*/s/ Cooper Strickland*

Cooper Strickland
P.O. Box 92
Lynn, NC 28750
Tel. (828) 817-3703
cooper.strickland@gmail.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of July, 2024, I will electronically file the foregoing with the

Clerk of Court using the CM/ECF system, which will then send a notification of such filing

(NEF) to the following:

Joshua M. Kolsky at Joshua.Kolsky@usdoj.gov

Madeline M. McMahon at madeline.m.mcmahon@usdoj.gov

Dorothy Canevari at Dorothy.m.canevari@usdoj.gov

/s/ Cooper Strickland
Cooper Strickland
N.C. Bar No. 43242
P.O. Box 92
Lynn, NC 28750
Tel. (828) 817-3703
cooper.strickland@gmail.com

4

# AUDIT OF FEDERAL JUDICIARY EFFORTS TO PREVENT, ADDRESS WORKPLACE MISCONDUCT



*The Judiciary "does not have performance measures in place for its workplace conduct efforts and has not evaluated the effectiveness of its efforts."*

**Government Accountability Office (GAO), Report 24-205638**

The protection of the Judiciary's 30,000 employees is limited to workplace policies **"that are entirely internal to the judiciary", not the laws that apply to other Americans.** In 2020, at the request of Representatives Norma Torres, Hank Johnson, and Jackie Speier, the Government Accountability Office (GAO) examined the Judiciary's systems to prevent and address workplace misconduct. **The Administrative Office of the Courts failed to fully cooperate with the GAO audit**, a process that relies heavily on transparency. Over 2 years, the Judiciary only permitted GAO to interview one current Judiciary employee and one former employee to gain an "employee perspective," severely limiting GAO's ability to assess the practical implementation of the Judiciary's policies.

**GAO found that the Judiciary has yet to develop performance measures to better evaluate its workplace misconduct efforts, primarily the Model Employment Dispute Resolution Plan (EDR).** Overall, GAO found that Judicial systems aligned with only 65% of federal standards evaluated. Deficient areas include methods to ensure written policy is implemented correctly and employee rights are substantive in practice; processes to prevent, identify, and end retaliation; training, where training materials met only 23.5% of the federal standards evaluated; and data collection, where the Judiciary does not collect adequate data on complaints including complaints involving judges and complaints using the most common form of dispute resolution, among other areas. GAO noted that the lack of data collection "may limit" the Judiciary's ability to understand and fully address workplace misconduct within its organization.

## MAIN ISSUES:

### Policy Development

**The Judiciary's policies are entirely internal.**

- The Judiciary has identified risk factors of workplace misconduct but has not assessed or identified steps to minimize.
- There is no process to determine retaliation.

### Policy Implementation

**There are no performance measures to assess the effectiveness of the Judiciary's procedures.**

- Alignment of policies and implementation of recommended reforms is varied by circuit.
- The Judiciary has not evaluated the effectiveness of its policies.

### Effective Training

**Only 23.5% of training materials meet federal standards.**

- There is no training for how investigations of misconduct should be run.
- The AO does not require Judges or employees to attend trainings, and there is no comprehensive data on who does attend.

### Data Collection

**The Judiciary does not collect adequate data on complaints.**

- No data is collected for the most common forms of employee complaint.
- There is not adequate data collected on the formal EDR Plan or JC&E processes.

## GAO RECOMMENDATIONS:

*The Administrative Office of the Courts should:*
- Update workplace conduct training materials and activities, in collaboration circuit-level officials;
- Evaluate the effectiveness of the Judiciary's Employee Dispute Resolution (EDR) policies and procedures;
- Evaluate the effectiveness of the Judicial Conduct and Disability Act (JC& D) policies and practices in the workplace.

*The Judicial Conference should:*
- Set performance measures to determine whether policies are achieving established strategic workplace conduct goals;

*Collaboratively, the AO and Judicial Conference should:*
- Update the Model EDR plan and related activities;
- Update the workplace conduct training materials and activities in the circuits;
- Develop a circuit-level mechanism to collect and analyze data on workplace misconduct complaints made outside of the EDR plan and JC&D processes.



July 2024

# FEDERAL JUDICIARY

## Additional Actions Would Strengthen Efforts to Prevent and Address Workplace Misconduct

This Report Is Temporarily Restricted 5 Days Pending Official Public Release.

Case 1:20-cv-00066-WGY   Document 427   Filed 07/31/24   Page 6 of 77



# Highlights

Highlights of GAO-24-105638, a report to congressional requesters

## Additional Actions Would Strengthen Efforts to Prevent and Address Workplace Misconduct

## Why GAO Did This Study

In recent years, various high-profile allegations of workplace misconduct at the federal judiciary drew national attention. More than 30,000 employees work across the judicial branch, and in 2017, the Chief Justice requested that the judiciary evaluate its workplace conduct efforts.

GAO was asked to review the judiciary's policies and practices to prevent and respond to workplace misconduct. This report examines (1) actions the judiciary has taken since 2017 to prevent and respond to workplace misconduct; (2) the extent to which the judiciary's Model Employment Dispute Resolution Plan and related practices align with EEOC recommended practices; (3) the judiciary's data on workplace misconduct and the extent to which opportunities exist to improve data collection; and (4) the judiciary's oversight of workplace conduct policies and the extent to which the judiciary evaluates the effectiveness of these policies. GAO reviewed the judiciary's workplace conduct policies, analyzed data on allegations of misconduct, and interviewed officials at the national and circuit levels.

## What GAO Recommends

GAO is making eight recommendations, including that the judiciary take steps to more fully align its workplace conduct efforts with EEOC recommended practices, collect and analyze additional data, and take actions to measure and evaluate its policies and practices. The judiciary neither agreed nor disagreed with our recommendations but noted planned actions and challenges related to addressing the recommendations.

View GAO-24-105638. For more information, contact Gretta L. Goodwin at (202) 512-8777 or goodwing@gao.gov.

## What GAO Found

The federal judiciary has taken several actions at the national and circuit levels to address workplace misconduct. For example, in 2019, the judiciary revised its Model Employment Dispute Resolution Plan and expanded options for reporting wrongful conduct under the employment dispute resolution process. In 2020, the judiciary updated its data collection system.

GAO found that the judiciary's efforts generally aligned with selected recommended practices of the Equal Employment Opportunity Commission (EEOC), although some efforts were partially aligned or not aligned, particularly with circuit-level trainings. For example, none of the training materials had an explanation of the range of possible consequences for engaging in prohibited conduct.

Judiciary data show that individuals filed 161 complaints of wrongful conduct from fiscal year 2020 through fiscal year 2022. Each complaint can contain one or more allegations. The most frequent allegation of wrongful conduct was discrimination (see figure). Data also show that judiciary employees filed 17 complaints of misconduct by judges during this timeframe. GAO found that the judiciary could collect additional data, including on issues described by individuals seeking informal advice and issues reported outside of the dispute resolution process. This additional data could help the judiciary better identify and address specific workplace misconduct issues.

Number of Wrongful Conduct Allegations Reported at the Judiciary, by Type, Fiscal Years 2020–2022



Source: GAO analysis of Administrative Office of the U.S. Courts data. | GAO-24-105638

Various judiciary entities provide oversight of workplace conduct policies and practices. However, the judiciary does not have performance measures in place for its workplace conduct efforts and has not evaluated the effectiveness of its efforts. In early 2023, the judiciary administered a survey of employees that, according to officials, included questions about workplace conduct policies. As of May 2024, the results of this survey are pending. Officials intend to use the survey results, once finalized, to develop performance measures. Establishing performance measures and evaluating the effectiveness of its policies and practices would help the judiciary better monitor the progress of its workplace conduct efforts and adjust to meet its goals.

Case 1:20-cv-00066-WGY   Document 427   Filed 07/11/24   Page 7 of 77

# Contents

Letter                                                                                           1

Background                                                                                        6
The Judiciary Implemented Various National- and Circuit-Level
    Actions to Help Prevent and Address Workplace Misconduct          19
The Judiciary's National-Level Efforts Generally Aligned with
    EEOC Practices While Trainings at the Circuits Generally Did
    Not                                                                                          25
Discrimination is the Most Frequent Allegation, but the Judiciary
    Does Not Collect Data on All Reported Workplace Misconduct        29
Various Judiciary Entities Provide Oversight, but the Judiciary Has
    Not Evaluated the Effectiveness of Policies                                     41
Conclusions                                                                                      44
Recommendations for Executive Action                                         45
Agency Comments and Our Evaluation                                          46

Appendix I          Objectives, Scope, and Methodology                               48

Appendix II         Summary Analysis of Whether Judiciary Actions and Policy Aligned with
                         Selected Recommended Practices Developed by the Equal Employment
                         Opportunity Commission                                                 54

Appendix III        Comments from the Federal Judiciary                          60

Appendix IV        GAO Contact and Staff Acknowledgments                 66

Tables

Table 1: Types of Wrongful Conduct Outlined in the Model
                Employment Dispute Resolution (EDR) Plan                          10
Table 2: Extent to Which the Judiciary's National Leadership
                Activities Align with Selected EEOC Recommended
                Practices for Leadership and Accountability in Preventing
                and Responding to Harassment                                              54

Case 1:20-cv-00066-WGY   Document 427   Filed 07/31/24   Page 8 of 77

Table 3: Extent to Which the Judiciary's Model EDR Plan Aligned with Selected EEOC Recommended Practices for Comprehensive and Effective Policy for Preventing and Responding to Harassment     55

Table 4: Extent to Which the Judiciary's EDR Complaint System Aligned with Selected EEOC Recommended Practices for an Effective and Accessible Complaint System     57

Table 5: Extent to Which Each Circuit's Workplace Conduct Training Aligned with Selected EEOC Recommended Practices for Regular and Effective Anti-Harassment Training     58

Figures

Figure 1: Simplified Organizational Structure for the Federal Judiciary     7

Figure 2: Selected Judiciary Actions Taken at the National Level to Help Prevent and Address Workplace Misconduct for Judiciary Employees, 1997 to 2023     20

Figure 3: Number of Allegations Made within 161 Employment Dispute Resolution (EDR) Claims Filed by Judiciary Employees, Fiscal Years 2020–2022     30

Figure 4: Number of Allegations by Type of Wrongful Conduct Reported in 161 EDR Claims, Fiscal Years 2020–2022     32

Figure 5: Occupational Codes of Employees Making Allegations at the Judiciary, in 161 EDR claims, Fiscal Years 2020–2022     34

Figure 6: Number of Times Subject of the Claim Categories Appeared in 161 EDR Claims, and Associated Allegation Types, Fiscal Years 2020–2022     36

**Abbreviations**

| | |
|---|---|
| AOUSC | Administrative Office of the U.S. Courts |
| DWR | Director of Workplace Relations |
| EDR | Employment Dispute Resolution |
| EEOC | Equal Employment Opportunity Commission |
| JC&D | Judicial Conduct and Disability Act |
| JC&D Rules | Rules for Judicial-Conduct and Judicial-Disability Proceedings |
| judiciary | federal judiciary |
| Working Group | Federal Judiciary Workplace Conduct Working Group |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

Case 1:20-cv-00066-WGY   Document 427   Filed 07/31/24   Page 10 of 77

# GAO

**U.S. GOVERNMENT ACCOUNTABILITY OFFICE**

**441 G St. N.W.**
**Washington, DC 20548**

July 25, 2024

The Honorable Richard J. Durbin
Chair
Committee on the Judiciary
United States Senate

The Honorable Henry C. "Hank" Johnson Jr.
Ranking Member
Subcommittee on Courts, Intellectual Property, and the Internet
Committee on the Judiciary
House of Representatives

The Honorable Mazie Hirono
United States Senate

The Honorable Norma Torres
House of Representatives

The mission of the federal judiciary is to ensure the fair administration of justice. The judiciary holds its judges and employees to codes of conduct, which serve as ethical guidance while performing official duties and participating in outside activities. In recent years, however, various high-profile allegations of workplace misconduct at the federal judiciary, such as sexual misconduct and discrimination, have surfaced in the press.

More than 30,000 employees work across the Judicial Branch, including the Supreme Court, circuit, district, bankruptcy, and specialty courts, such as the Court of International Trade. Court units such as probation and pretrial services offices; federal public defender organizations; and agencies such as the U.S. Sentencing Commission and the Administrative Office of the United States Courts (AOUSC) are also part of the Judicial Branch. Unlike most other federal employees, judiciary employees are not covered by various federal civil rights statutes that provide protections for federal employees from discrimination on the basis of race, color, sex, religion, national origin, age, disability, and genetic

information and from retaliation.[1] Instead, judiciary employees are protected by judiciary policy, and they can use only those processes developed and applied by the judiciary to address workplace misconduct.[2]

In 2017, the Chief Justice of the United States asked AOUSC to evaluate the judiciary's workplace conduct policies and procedures.[3] The Director of AOUSC established the Federal Judiciary Workplace Conduct Working Group (Working Group). The Working Group included in its review the judiciary, including judges, managers, supervisors, and others serving in supervisory roles, as well as law clerks, interns, externs, other employees, and volunteers. The Working Group's first report, published in June 2018, incorporated a 2016 Equal Employment Opportunity Commission (EEOC) study that provided recommendations on developing harassment prevention policies, training, and workplace

---

[1]See, e.g., Civil Rights Act of 1964, Pub. L. No. 88-352, tit. VII, § 717(a), as added by Equal Employment Opportunity Act of 1972, Pub. L. No. 92-261, § 11, 86 Stat. 103, 111 (codified as amended at 42 U.S.C. § 2000e-16(a)) (prohibiting discrimination based on race, color, religion, sex, or national origin); Age Discrimination in Employment Act of 1967, Pub. L. No. 90-202, § 15(a), as added by Fair Labor Standards Act of 1974, Pub. L. No. 93-259, § 28(b)(2), 88 Stat. 55, 74-75 (codified as amended at 29 U.S.C. § 633a(a)) (prohibiting discrimination based on age). Generally, federal civil rights statutes protecting federal employees do not apply to judiciary employees in the excepted service, which comprises nearly all judiciary employees, see, e.g., 42 U.S.C. § 2000e-16(a), 29 U.S.C. § 633a(a). Further, neither the protections from the Whistleblower Protection Act nor the reporting provisions of the No FEAR Act apply to the judicial branch. However, judiciary employees are protected by a whistleblower policy contained in the Guide to Judiciary Policy, vol. 12, ch. 2, § 220.10.20(c), and limited data must be made publicly available under the Judicial Conduct and Disability Act. See Pub. L. No. 96-458, § 3a, 94 Stat. 2035, 2039 (1980) (originally codified at 28 U.S.C. § 372(c) et seq.), recodified in 2002, Pub. L. No. 107-273, tit. I, subtit. C, § 11042, 116 Stat. 1758, 1854 (2000) (codified at 28 U.S.C. § 360(b).

[2]Judiciary employees are primarily protected under the applicable Employment Dispute Resolution (EDR) plans, which apply as a matter of policy certain employment laws. See Model EDR Plan, Pt II.A., https://www.uscourts.gov/sites/default/files/guide-vol12-ch02-appx2a_oji-2019-09-17-post-model-edr-plan.pdf. Judiciary employees can also file a complaint alleging judicial misconduct under the Judicial Conduct and Disability Act (JC&D), a mechanism through which anyone may file a complaint of judicial misconduct. We discuss both of these processes later in the report.

[3]Federal Judiciary, Supreme Court of the United States, *2017 Year-End Report on the Federal Judiciary* (Washington, D.C.: 2017).

civility. As of October 2023, the judiciary's evaluation has resulted in three reports and over 40 recommendations.[4]

You asked us to review the judiciary's workplace conduct policies and practices. This report examines (1) actions the judiciary has taken since 2017 to prevent and respond to workplace misconduct; (2) the extent to which the judiciary's Model Employment Dispute Resolution Plan (EDR)[5] and related practices align with EEOC recommended practices; (3) judiciary data on workplace misconduct and the extent to which opportunities exist to improve data collection; and (4) the judiciary's oversight of workplace conduct policies and the extent to which the judiciary evaluates the effectiveness of these policies.

To address our first objective, we reviewed documentation of actions taken by the judiciary since 2017 when the Chief Justice instructed AOUSC to assess the sufficiency of the judiciary's policies and practices to prevent and respond to workplace misconduct. We reviewed documents such as the Working Group's reports and the Model EDR Plan. We also interviewed judiciary officials at the national and circuit levels. At the national level, we interviewed officials from the AOUSC and representatives from the Working Group on actions taken by the judiciary to address workplace misconduct. At the circuit level, we received written responses from or interviewed officials representing all 13 circuits on

---

[4]For the findings and recommendations of the Federal Judiciary Workplace Conduct Working Group, see *Report of the Federal Judiciary Workplace Conduct Working Group to the Judicial Conference of the United States* (Jun. 2018); *Status Report from the Federal Judiciary Workplace Conduct Working Group to the Judicial Conference of the United States* (Sept. 2019); *Report of the Federal Judiciary Workplace Conduct Working Group to the Judicial Conference of the United States* (Mar. 2022).

[5]This report focuses on the Model EDR Plan because the majority of judiciary employees are subject to this plan. The Model EDR Plan applies to all judges, current and former employees, including all law clerks, chambers employees, paid and unpaid interns, externs, and other volunteers, and probation and pretrial employees. The Model EDR Plan also applies to applicants for employment who have been interviewed. The following persons cannot seek relief under the Model EDR Plan: judges, applicants for judicial appointment, Criminal Justice Act panel attorneys and applicants, investigators and service providers, community defender employees, volunteer mediators, and other non-employees. Federal public defender organization employees are covered under either their circuit's Court of Appeals EDR Plan, or an EDR Plan adopted by the federal public defender organization pursuant to a new Model Federal Defender EDR Plan, which was approved by the Judicial Conference in 2021 to address issues unique to federal public defender organization employees. Previously, federal public defender organization employees were covered under the Model EDR Plan. Other entities within the judiciary—for example, the AOUSC and the Federal Judicial Center—have separate workplace conduct policies and procedures.

Case 1:20-cv-00066-WGY   Document 427   Filed 07/31/24   Page 13 of 77

circuit-level activities and processes to implement the workplace conduct policies.

To address our second objective, we assessed information provided by the judiciary against selected EEOC practices aimed at assisting private and public sector employers in creating effective programs for preventing and addressing harassment in the workplace.[6] We selected 37 of 74 EEOC practices for our review generally based on whether a given practice was explicit and practical enough for us to evaluate.[7] We compared information from the judiciary policies, procedures, and training as well as interviews and written responses from national - and circuit - level officials against relevant selected EEOC practices. We determined the extent to which the judiciary's policies and practices aligned with each EEOC practice.

To address our third objective, we analyzed summary-level data from the judiciary's InfoWeb data system—the central database for collecting EDR claims data—from fiscal year 2020 through fiscal year 2022. We selected this period because 2020 was the first full fiscal year that the Model EDR Plan was in effect, and 2022 was the last fiscal year for which data were available at the time of our audit work. We requested that the judiciary run specified analyses of its record-level data and provide GAO with the outputs, including the number of EDR claims filed per year and EDR

---

[6]EEOC, *Promising Practices for Preventing Harassment*, EEOC-NVTA-2017-2 (Washington, D.C.: Nov. 21, 2017). We refer to these practices as "EEOC practices." Although the EEOC practices are not legal requirements, and the anti-discrimination laws to which the EEOC practices relate do not apply directly to the judiciary, the EEOC practices can be adapted for a variety of workplaces and may aid in compliance with federal equal employment opportunity laws, many of which the Model EDR Plan applies to the judiciary as a matter of policy. We discuss this in more depth later in this report. In April 2023, the EEOC issued *Promising Practices for Preventing Harassment in the Federal Sector*, a technical assistance document that builds upon the 2017 document with a focus on promising practices for preventing and addressing harassment within the federal civilian workforce. Because our collection and analysis of information pre-dated EEOC's update, and because the Working Group noted in its 2018 report the importance of EEOC's 2017 recommended practices, we use the 2017 EEOC report for the purposes of this report. In total, there are 74 EEOC practices across four categories—(1) leadership and accountability, (2) comprehensive and effective anti-harassment policy, (3) effective and accessible harassment complaint system, and (4) effective anti-harassment training.

[7]We determined that a practice was explicit if the practice used concrete or measurable terms that GAO could use to assess the judiciary's policies and practices. For example, we excluded EEOC practices that required us to make a judgment on whether the judiciary's workplace conduct system was fully resourced. We determined that a practice was practical if the practice was feasible for GAO to make the assessment. For example, we excluded an EEOC practice that would require us to assess whether the policy is posted in a central location in each federal court building.

Case 1:20-cv-00066-WGY   Document 427   Filed 07/31/24   Page 14 of 77

claims filed by employment status of the claimant. We reviewed these outputs and reviewed documentation related to InfoWeb to assess the reliability of the judiciary's underlying data. We also interviewed national- and circuit-level officials who work with inputting EDR claims data into InfoWeb and extracting and aggregating data from InfoWeb. We determined these data were sufficiently reliable for the purposes of describing the types and amount of workplace misconduct allegations reported in EDR claims at the judiciary.

We also analyzed summary-level data from Judicial Conduct and Disability Act (JC&D) complaints from fiscal year 2020 through fiscal year 2022 as well as documentation related to judicial complaint reporting. We conducted interviews with AOUSC officials that manage the JC&D data collection and processes. We determined the JC&D data were sufficiently reliable for the purposes of identifying the number of complaints filed by judiciary employees during the period. In addition, we reviewed public orders related to closed JC&D complaints filed by judiciary employees from fiscal year 2020 through fiscal year 2022.

To identify opportunities to improve data collection, we reviewed documentation provided by the judiciary such as Working Group reports and the Model EDR Plan and evaluated its EDR and JC&D data collection efforts against *Standards for Internal Control in the Federal Government*, including the standards related to data processing for quality information. In addition, we interviewed national level and circuit level officials about how they use EDR and JC&D data and identify potential improvements.

For our fourth objective on oversight efforts, effectiveness, and performance measures, we reviewed judiciary documentation, such as its Strategic Plan and other documents, to identify any goals or performance measures related to workplace conduct. We also interviewed officials responsible for implementing EDR and JC&D policies and practices.

We compared the information collected from documents and interviews against *Standards for Internal Control in the Federal Government* to assess the extent to which the judiciary has evaluated the effectiveness

of its EDR and JC&D policies and practices, including the standards related to establishing performance measures.[8]

We conducted this performance audit from January 2022 to June 2024 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

# Background

## Structure of Federal Judiciary

The judiciary primarily consists of a system of courts that is responsible for ensuring the fair administration of justice. Specifically, the judiciary includes the Supreme Court and a network of courts organized into 12 geographic circuits and 1 federal circuit, for a total of 13 circuits. The circuits include 13 appellate courts, 94 district courts, 90 bankruptcy courts, and two special trial courts (the U.S. Court of Federal Claims and the U.S. Court of International Trade). The judiciary also includes probation and pretrial services offices as well as federal public defender organizations. Independent national offices within the judiciary include the AOUSC, the Federal Judicial Center, the U.S. Sentencing Commission, and the Judicial Panel on Multidistrict Litigation.

The Judicial Conference of the United States, a body over which the Chief Justice of the United States presides, is the judiciary's national policymaking body that considers administrative and policy issues affecting the federal court system as a whole.[9] In 1939, AOUSC was created by statute as the central support entity for the judicial branch.[10] AOUSC helps the Judicial Conference carry out its statutory responsibilities and provides a broad range of legislative, legal, financial,

---

[8]For more information about our scope and methodology, including challenges encountered when obtaining information, see appendix I.

[9]The name "Judicial Conference of the United States" took effect in 1948 pursuant to the enactment of the Act of June 25, 1948, ch. 646, Pub. L. No. 80-773, 62 Stat. 869, 902 (codified as amended at 28 U.S.C. § 331). Before that, the body was known as the "Conference of Senior Circuit Judges" from its creation in 1922.

[10]See Act of Aug. 7, 1939, ch. 501, Pub. L. No. 76-299, § 1, 53 Stat. 1223 (codified as amended at 28 U.S.C. § 601).

Case 1:20-cv-00066-WGY   Document 427   Filed 07/31/24   Page 16 of 77

technical, management, administrative, and program support services to federal courts.

At the regional level, the circuit judicial council in each geographic circuit oversees the administration of courts located in that circuit. Each circuit's chief judge serves as chair of the judicial council in their circuit. An equal number of additional circuit and district judges comprise each judicial council.[11]

Otherwise, governance is largely decentralized and does not have one distinct body or office that directs actions for all parts of the branch. The chief judge of each court oversees day-to-day court administration, while important policy decisions are to be made by judges of a court working together. The clerk of court is the executive hired by the judges to carry out the court's administrative functions. For example, each court unit and judge's chambers operate as an employing office with hiring and policy-setting authority if they are not in conflict with judiciary policy. Figure 1 provides a depiction of the judiciary's organizational structure.

**Figure 1: Simplified Organizational Structure for the Federal Judiciary**



Source: GAO analysis of federal judiciary information; jpldesigns/stock.adobe.com (Supreme Court illustration); GAO (map); Icons-Studio/stock.adobe.com (District Court illustration). | GAO-24-105638

---

[11]The Federal Circuit's Judicial Council is comprised of all active judges of the court.

Case 1:20-cv-00066-WGY   Document 427   Filed 07/31/24   Page 17 of 77

## The Judiciary's Policies and Procedures to Address Workplace Misconduct

The judiciary's Strategic Plan, updated in 2020, states that a key strategy is to "ensure an exemplary workplace free from discrimination, harassment, retaliation, and abusive conduct."[12] To that end, the judiciary has policies addressing workplace misconduct and procedures for addressing alleged violations of those policies. The policies and procedures that apply vary depending on the types of workplace misconduct, the individual alleged to have engaged in misconduct, and the resolutions sought.

### Codes of Conduct

The judiciary holds its judges and employees to codes of conduct, which serve as ethical guidance for judges and judiciary employees while performing official duties and participating in certain outside activities. The codes of conduct—the Code of Conduct for United States Judges and the Code of Conduct for Judicial Employees—are approved by the Judicial Conference of the United States.[13] The Code of Conduct for United States Judges applies to circuit judges, district judges, bankruptcy judges, magistrate judges, as well as judges from the Court of International Trade and Court of Federal Claims.[14] The Code of Conduct for Judicial Employees applies to court employees, including clerk's office staff, chambers staff, and probation and pretrial services staff, including interns, externs, and other volunteer court employees.[15]

The Code of Conduct for United States Judges says that judges have the responsibility to avoid comment or behavior that could reasonably be interpreted as harassment, prejudice, or bias and that judges should not retaliate against those who report such conduct.[16] Judges should also

---

[12]Judicial Conference of the United States. *Strategic Plan for the Federal Judiciary.* (Washington, D.C.: Sept. 2020).

[13]There is a separate code of conduct for federal public defender organization employees that is likewise approved by the Judicial Conference of the United States. It prohibits sexual or other forms of harassment and retaliation against those who report misconduct. Federal public defender organization employees subject to the code should take appropriate action upon receipt of reliable information indicating a likelihood of conduct inconsistent with the code.

[14]See Code of Conduct for United States Judges, Introduction. The Tax Court, Court of Appeals for Veterans Claims, and Court of Appeals for the Armed Forces have adopted the Code of Conduct for United States Judges.

[15]There are separate codes of conduct for Supreme Court Justices and employees, federal public defender employees, the AOUSC, the Federal Judicial Center, the U.S. Sentencing Commission, and the Judicial Panel on Multidistrict Litigation. See Guide to Judiciary Policy, vol. 2, pt. A, § 310.10(a), (b).

[16]See Guide to Judiciary Policy, vol. 2, pt. A, ch. 2, Canon 3A(3) cmt.; Canon 3B(4).

Case 1:20-cv-00066-WGY   Document 427   Filed 07/31/24   Page 18 of 77

take appropriate action upon receipt of reliable information that the conduct of a judge or employee is inconsistent with the applicable code of conduct.[17] While appropriate action depends on the unique circumstances, it should aim to prevent harm and recurrence.[18]

The Code of Conduct for Judicial Employees prohibits sexual or other forms of harassment and retaliation against those who report misconduct.[19] Employees should also take appropriate action upon receipt of reliable information indicating a likelihood of conduct inconsistent with the Code of Conduct for Judicial Employees.[20]

The codes of conduct do not contain processes for remedying violations but encourage reporting of workplace misconduct. Further, the Code of Conduct for Judicial Employees is referenced in the Model EDR Plan, as described below.

## Model Employment Dispute Resolution (EDR) Plan

The Model EDR Plan was first established in 1997 and most recently updated in 2019. It provides both protections against and processes to address certain conduct called "wrongful conduct."[21] The Model EDR Plan applies to all judges, current and former employees (e.g., law clerks, chambers employees, paid and unpaid interns, externs, and other volunteers), as well as applicants for employment at the judiciary who have been interviewed.[22] Judges, applicants for judicial appointment, and

---

[17]See Guide to Judiciary Policy, vol. 2, pt. A, ch. 2, Canon 3B(6); pt. E, § 320, Art. II, Rule 4(a)(6). See also Model EDR Plan, pt. IV.B.1, discussed at length in the next section.

[18]See Guide to Judiciary Policy, vol. 2, pt. A, ch. 2, Canon 3B(6) cmt.

[19]See Guide to Judiciary Policy, vol. 2, pt. A, § 320, Canon 3C(1). There is a separate code of conduct for federal public defender organization employees.

[20]See Guide to Judiciary Policy, vol. 2, pt. A, § 320, Canon 3C(1).

[21]We use the term "wrongful conduct" for violations or alleged violations brought under the Model EDR Plan. We use the term "judicial misconduct" for violations or alleged violations brought under JC&D by judiciary employees that are equivalent to wrongful conduct under the Model EDR Plan—e.g., allegations of discrimination. Collectively, we refer to both wrongful conduct and judicial misconduct of this type as "workplace misconduct."

[22]See Model EDR Plan, pt. I. Federal public defender organization employees are covered under either their circuit's Court of Appeals EDR Plan, or an EDR Plan adopted by the federal public defender organization pursuant to a new Model Federal Defender EDR Plan, which was approved by the Judicial Conference in 2021 to address issues unique to federal public defender organization employees. Other entities within the judiciary—for example, the AOUSC and the Federal Judicial Center—have separate workplace conduct policies and procedures. This report focuses on the Model EDR Plan because the majority of judiciary employees are subject to this plan.

certain other individuals may not seek relief under the Model EDR Plan.[23] This means that the prohibitions contained in the Model EDR Plan apply broadly, but not all individuals to whom the Model EDR Plan applies may use it to seek relief (e.g., judges).

Each court unit must adopt and implement an EDR plan based on the Model EDR Plan. Court-specific modifications can expand on rights and remedies but should not curtail those afforded by the Model EDR Plan.[24] Of the more than 30,000 judiciary employees, approximately 25,000 are employees covered by EDR policies based on the Model EDR Plan.[25]

Under the Model EDR Plan, wrongful conduct can be verbal, nonverbal, physical, or non-physical.[26] Table 1 depicts the types of wrongful conduct outlined in the Model EDR Plan.

**Table 1: Types of Wrongful Conduct Outlined in the Model Employment Dispute Resolution (EDR) Plan**

| Type of Wrongful Conduct | Definition Provided in Model EDR Plan |
| --- | --- |
| Discrimination | An adverse employment action that materially affects the terms, conditions, or privileges of employment (such as hiring, firing, failing to promote, or a significant change in benefits) based on the following protected categories: race, color, sex, gender, gender identity, pregnancy, sexual orientation, religion, national origin, age (40 years and over), or disability. |
| Discriminatory harassment | Discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the employment and create an abusive working environment. Discriminatory harassment includes sexual harassment. |
| Abusive conduct | A pattern of demonstrably egregious and hostile conduct not based on a protected category that unreasonably interferes with an employee's work and creates an abusive working environment. Under the Model EDR Plan, abusive conduct is conduct that is threatening, oppressive, or intimidating. |

[23]Nonemployees not otherwise specified may not seek relief under the Model EDR Plan. For example, Criminal Justice Act panel attorneys and applicants, investigators and service providers, community defender organization employees, volunteer mediators, and applicants who have not been interviewed may not seek relief. See Model EDR Plan, pt. I.

[24]See Model EDR Plan, pt. V.A.

[25]Of the 30,000 judiciary employees, 3,000 are federal public defender organization employees (separate from the 25,000 judiciary employees covered by EDR policies based on the Model EDR Plan). Federal public defender organization employees are covered under either their circuit's Court of Appeals EDR Plan, or an EDR Plan adopted by the federal public defender organization pursuant to a new Model Federal Defender EDR Plan, which was approved by the Judicial Conference in 2021 to address issues unique to federal public defender organization employees.

[26]See Model EDR Plan, pt. II.A.

Case 1:20-cv-00066-WGY   Document 427   Filed 07/31/24   Page 20 of 77

| Retaliation | A materially adverse action taken against an employee for reporting wrongful conduct, for assisting in the defense of rights protected by the Model EDR Plan, or for opposing wrongful conduct. Under the Model EDR Plan, retaliation against a person who reveals or reports wrongful conduct is itself wrongful conduct. |
|---|---|
| Other conduct | Conduct that would violate specified employment laws and policy, including Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967, Family and Medical Leave Act of 1993, and the Occupational Safety and Health Act[a] These laws do not apply directly to the judiciary; instead, the Judicial Conference adopted the laws' substantive protections as a matter of policy for the judiciary.[b] |

Source: GAO presentation of Model EDR Plan information. | GAO-24-105638

Note: This figure focuses on the Model EDR Plan because the majority of judiciary employees are subject to this plan. Other entities within the judiciary—for example, the Administrative Office of the U.S. Courts and the Federal Judicial Center—have separate workplace conduct policies and procedures.

[a]See Model EDR Plan, pt. II. Other employment laws and policies include the Americans with Disabilities Act of 1990 and the Rehabilitation Act of 1973; Uniformed Services Employment and Reemployment Rights Act of 1994; Whistleblower Protection Provision (Guide to Judiciary Policy, Vol. 12, § 220.10.10(c)); Worker Adjustment and Retraining Notification Act; and the Employee Polygraph Protection Act of 1988.

[b]See Model EDR Plan, pt. II.

Under the Model EDR Plan, all judges, offices, and employees have a responsibility to promote workplace civility and prevent harassment or abusive conduct.[27] Further, and by reference to the Code of Conduct for Judicial Employees, employees are strongly encouraged to report if they experience, observe, or learn of reliable evidence of wrongful conduct.[28] Judges, supervisors, and unit executives must take appropriate action if they learn of reliable information of wrongful conduct under the Model EDR Plan.[29]

According to AOUSC officials, because the EDR process involves an individual filing a complaint against an employing office, not an individual, the EDR process is not used to discipline the individual who is the

---

[27]See Model EDR Plan, pt. I.

[28]See Model EDR Plan, pt. III.

[29]See Model EDR Plan, pt. IV.B.1.

wrongdoer.[30] Instead, the official with supervising authority separately assesses whether further action—which could include a disciplinary action—is necessary to correct or prevent wrongful conduct and promote appropriate workplace behavior.[31]

Several entities at the national, circuit, and court unit levels play a role in the EDR process. For example, the AOUSC's Office of Judicial Integrity is an independent resource outside of the courts that provides confidential help, information, referrals, and guidance on options for addressing wrongful conduct. Each of the 13 circuits has a circuit Director of Workplace Relations (DWR) who serves as an additional point of contact outside the court units. DWRs can provide confidential advice and information regarding options for addressing workplace conduct concerns, facilitate parts of the EDR process, and help employees informally address workplace conduct issues.

In addition to the national and circuit levels, individual courts have EDR coordinators who provide resources on aspects of workplace conduct. As of October 2023, there are 518 EDR coordinators throughout the judiciary. EDR coordinators serve in this role in addition to their other duties. According to AOUSC officials, chief judges, unit executives, and federal public defenders also play a role, for example, by assessing certain allegations in requests for assisted resolution (and denying requests if the allegations are deemed frivolous), or by appointing a Presiding Judicial Officer to serve as a judge in formal complaints.[32]

The EDR process provides three options for addressing allegations of wrongful conduct:

---

[30]This process is similar to the equal employment opportunity (EEO) process used to address complaints of discrimination at executive agencies and military departments, defined at 5 U.S.C. §§ 101-102, respectively, among others. Under the EEO regulations, an EEO complaint must contain a signed statement from the aggrieved person or their attorney that (1) specifies the aggrieved individual, (2) specifies the agency, and (3) generally describes the action(s) or practice(s) that form the basis of the complaint. See 29 C.F.R. § 1614.106(c). Accordingly, the complaint is filed against the agency and not an individual. See also 29 C.F.R. § 1614.109 (repeatedly describing the parties in an EEOC hearing process as the complainant and the agency). To be sure, agencies must still take appropriate disciplinary action against employees who engage in discriminatory practices, 29 C.F.R. § 1614.102(a)(6), but the complaint process itself does not involve such action.

[31]See Model EDR Plan, pt. IV.C.3.h.i, note 3.

[32]See Model EDR Plan, pt. IV.C.2, 3.e.i.

Case 1:20-cv-00066-WGY   Document 427   Filed 07/31/24   Page 22 of 77

- **Informal advice.** An employee may contact an EDR coordinator, circuit DWR, or the national Office of Judicial Integrity for confidential advice and guidance about a range of topics including, for example, the rights and protections afforded under the Model EDR Plan and options for addressing the conduct.[33] According to AOUSC officials, individuals who witness wrongful conduct may also seek the informal advice option.

- **Assisted resolution.** This option is an interactive, flexible process that may use various approaches based on the circumstances, including a facilitated discussion between the employee and the person whose behavior is of concern; engaging in voluntary mediation between the persons involved; or resolving the matter by agreement. To pursue this option, an employee must contact and file a written request with the EDR coordinator or circuit DWR.[34] Under the Model EDR Plan, an employee asserting a claim of abusive conduct must first use assisted resolution before filing a formal complaint.[35]

- **Formal complaint.** An employee may file a formal complaint with an EDR coordinator within 180 days of the alleged wrongful conduct or within 180 days of the time the employee becomes aware or reasonably should have become aware of such wrongful conduct.[36]

To file an EDR claim, which is either a request for assisted resolution or a formal complaint, an employee completes the requisite form available in each court EDR plan.[37] The forms contain fields such as employee contact information, space to provide a summary of the actions or occurrences leading to the claim(s), dates that the alleged incident(s) occurred, the wrongful conduct alleged, and the names and contact information for persons involved in the matter, including witnesses. The

---

[33]See Model EDR Plan, pt. IV.C.1.

[34]See Model EDR Plan, pt. IV.C.2.

[35]See Model EDR Plan, pt. IV.C.2.a.

[36]See Model EDR Plan, pt. IV. C.3.a.

[37]See Model EDR Plan, Appendix 2 (Assisted Resolution) and Appendix 3 (Formal Complaint).

employee then submits the completed form to the court's EDR coordinator.

Each court designates a person or persons to enter data from EDR claim forms into InfoWeb, a data system used by the judiciary for a range of functions, including collecting data on EDR claims since 2020. Information entered in InfoWeb for each EDR claim includes, for example, the alleged wrongful conduct and the date the claim was filed. Other details about the employee are also entered in InfoWeb for each EDR claim, including, for example, the complainant's employment status, occupational code,[38] and the job role of the individual(s) alleged to have engaged in wrongful conduct—the subject of the claim.

## Judicial Conduct and Disability Act

The Judicial Conduct and Disability Act (JC&D) of 1980 set forth the JC&D process through which allegations against a judge may be reported.[39] Supplementing the JC&D Act are the Rules for Judicial-Conduct and Judicial-Disability Proceedings (JC&D Rules), which establish standards and include procedures for addressing complaints filed under the Act.[40] Taken together, the JC&D Act and the JC&D Rules provide both protections and a process for addressing judicial misconduct. The JC&D process is designed to address allegations of judicial misconduct, in which a judge's conduct harms the effective and expeditious administration of the business of the courts. Allegations that a judge is unable to discharge all the duties of office due to mental or physical disability also fall under the JC&D Act.[41] Under the JC&D Rules, judicial misconduct includes, in part, abusive or harassing behavior, discrimination, and retaliation.[42] Additionally, under the JC&D Rules, which reference the Code of Conduct for United States Judges, judges must disclose to the chief district judge or chief circuit judge any reliable information reasonably likely to constitute judicial misconduct or disability.[43]

---

[38]The occupational code within an EDR claim refers to the category of the complainant's position or title (e.g., legal secretary). In December 2023, judiciary officials informed us that these occupational code fields are no longer used in InfoWeb.

[39]28 U.S.C. §§ 351–364.

[40]See Guide to Judiciary Policy, vol. 2, pt. E, § 320, Preface; see also 28 U.S.C. § 358.

[41]See 28 U.S.C. § 351(a).

[42]See Guide to Judiciary Policy, vol. 2, pt. E, § 320, Art. II, Rule 4(a)(2), (3), and (4).

[43]See Guide to Judiciary Policy, vol. 2, pt. E, § 320, Art. II, Rule 4(a)(6) cmt.

Case 1:20-cv-00066-WGY   Document 427   Filed 07/31/24   Page 24 of 77

A judiciary employee may file a JC&D complaint against a judge in the appropriate court office.[44] The chief circuit judge where the complaint was filed will consider the complaint and determine what action to take (e.g., begin an investigation, dismiss the complaint).[45] According to AOUSC officials, when a complaint is filed with a court, the clerk of the court or the circuit executive enters the data—such as type of judge, the type of allegation, etc.—in a data system called the Statistics Electronic Form and submits the information to the judiciary's Data and Analysis Office, within the Administrative Office of the U.S. Courts. The dispositions of each complaint are also entered in the Statistics Electronic Form, such as whether the complaint was dismissed, or a special committee was created to investigate the allegation.

## Reporting Workplace Misconduct to a Supervisor or Other Trusted Person

Separate from the EDR or JC&D processes, employees may report workplace misconduct to a supervisor, unit executive, or a judge in their court or office.[46] Subsequently, under the Model EDR Plan, all judges, court unit executives, and federal public defenders must take appropriate action to address the wrongful conduct in the workplace. Nonsupervisory employees are strongly encouraged to take appropriate action. If a court employee feels that they experienced wrongful conduct that was not appropriately addressed or remedied when using this option, they can either request assisted resolution or file a formal complaint under the Model EDR Plan.[47]

The policies and procedures outlined above may overlap, particularly when allegations involve judges' conduct. In cases where an employee alleges that a judge has engaged in wrongful conduct, the employee may file a formal complaint or request assisted resolution through the EDR process. Filing a formal complaint triggers the obligation to inform the chief circuit judge of the allegations, which could cause the chief circuit

---

[44]See Guide to Judiciary Policy, vol. 2, pt. E, § 320, Art. III, Rule 7. For purposes of this report, we focused on JC&D complaints filed by judiciary employees; however, a JC&D complaint may be filed by, or on behalf of, any person or organization. See Guide to Judiciary Policy, vol. 2, pt. E, § 320, Art. I, Rule 3(c)(1); see also 28 U.S.C. § 351(a).

[45]Alternatively, if the conduct complained of is that of the chief judge, then the most-senior active circuit judge not disqualified will review the complaint. See Guide to Judiciary Policy, vol. 2, pt. E, § 320, Art. IV, Rule 11; see also 28 U.S.C. § 352.

[46]See Model EDR Plan, pt. III.

[47]See Model EDR Plan, pt. IV.C.

Case 1:20-cv-00066-WGY   Document 427   Filed 07/31/24   Page 25 of 77

judge to take some action under the JC&D Act and the JC&D Rules.[48] In an assisted resolution, if the allegations concern the conduct of a judge, the chief judge of the appropriate district or circuit court must be notified and will be responsible for coordinating any assisted resolution or taking any other action required or appropriate under the circumstances.[49] In addition, or as an alternative to the EDR process, the employee may file a JC&D complaint alleging judicial misconduct.[50]

If a judge becomes the subject of both a JC&D complaint and an EDR complaint, the chief circuit judge will determine the appropriate procedure for addressing both. This may include suspending the EDR claim and determining how best to find any common issues of fact, subject to all requirements of the JC&D Act, the JC&D Rules, and, as practicable, the court's EDR Plan.[51]

The protections that apply to judiciary employees are similar to the statutory protections that apply to most federal employees. In some ways, certain protections exceed those that apply by statute to most federal employees. For example, the Model EDR Plan provides express protections against "abusive conduct." This is defined in the Model EDR Plan as a "pattern of demonstrably egregious and hostile conduct not based on a Protected Category that unreasonably interferes with an employee's work and creates an abusive working environment."[52] This protection extends beyond those provided under federal employment laws, as it defines and prohibits workplace harassment even when it is

---

[48]In the case of a formal complaint, the EDR coordinator must immediately provide a copy of the complaint to the chief circuit judge (or the next most-senior active circuit judge, if the allegation is against the chief circuit judge), who will oversee the EDR complaint process. See Model EDR Plan, pt. IV.C.3.d. In the case of assisted resolution, the chief judge of the relevant court would be notified. See Model EDR Plan, pt. IV.C.2.b. The chief circuit judge's receipt of the EDR formal complaint or notification of the request for assisted resolution may trigger obligations under the JC&D Act and the JC&D Rules. Under the JC&D Act and the JC&D Rules, a chief judge with information constituting reasonable grounds for inquiry into whether the judge has engaged in misconduct may conduct an inquiry into the accuracy of the information and, as necessary, to seek informal resolution or identify a JC&D complaint. See Guide to Judiciary Policy, vol. 2, pt. E, § 320, Art. III, Rule 5(a); see also 28 U.S.C. § 351(b).

[49]Model EDR Plan, pt. IV.C.2.b.

[50]See Model EDR, pt. IV.B.5.

[51]See Model EDR, pt. IV.C.3.d.

[52]See Model EDR Plan, pt. II.D.

Case 1:20-cv-00066-WGY   Document 427   Filed 07/31/24   Page 26 of 77

not discriminatory or otherwise based on the recipient's membership in a protected class.

Conversely, some protections are more limited than those that apply to most federal employees.[53] For example, judiciary employees are limited to workplace conduct policies and procedures that are entirely internal to the judiciary—generally developed and solely implemented by the judiciary.[54] In contrast, most federal employees are subject to policies and procedures that are reviewed by the EEOC and required to be in compliance with EEOC regulations and policies.[55] In addition, most federal employees have options for redress provided by their agencies as well as the EEOC and can file a civil action in federal district court after exhausting the EEOC administrative process.[56]

## EEOC Recommended Practices

The mission of the EEOC is to prevent and remedy unlawful employment discrimination and advance equal opportunity in the workplace through law enforcement, outreach, education, and technical assistance programs. The EEOC provides leadership and guidance to federal agencies and the private sector on all aspects of the federal government's Equal Employment Opportunity efforts, including preventing and addressing discrimination in the workplace.

---

[53]While federal employee protections most often apply to executive branch employees, some protections may also extend to certain legislative branch employees. See, e.g., 42 U.S.C. § 2000e-16(a) (prohibiting discrimination based on race, color, religion, sex, or national origin for employees of executive agencies as defined by 5 U.S.C. § 105, as well as legislative agencies such as the Government Publishing Office, the Government Accountability Office, and the Library of Congress, among others).

[54]But see Strickland v. United States, 32 F.4th 311 (4th Cir. 2022) (holding that, in the Fourth Circuit, an employee could bring a claim in federal court under the Fifth Amendment because the EDR plan afforded substantive rights that are protected property interests under the Fifth Amendment and, under the equal protection component of the Fifth Amendment's Due Process Clause, for deliberate indifference to sexual harassment committed by a federal judiciary employee or supervisor against another federal judiciary employee).

[55]See 29 C.F.R. § 1614.102(e) (providing for EEOC review of agency equal employment opportunity programs and requiring their compliance with EEOC regulations, Management Directives, and Bulletins).

[56]See 29 C.F.R. §§ 1614.108(h), 1614.109 (providing that employees may request a hearing with an EEOC Administrative Judge and establishing procedures for such hearing), 1614.401 (providing for appeals process for complainants of an EEOC Administrative Judge's decision), 1614.407, 1614.408, 1614.409 (providing for civil action).

Case 1:20-cv-00066-WGY   Document 427   Filed 07/31/24   Page 27 of 77

In November 2017, EEOC issued a technical assistance document that outlines recommended practices for preventing harassment.[57] The practices are organized into four core principles that have generally proven effective in preventing and addressing harassment. They are (1) committed and engaged leadership and consistent and demonstrated accountability; (2) strong and comprehensive anti-harassment policies; (3) trusted and accessible complaint procedures; and (4) regular interactive training tailored to the audience and the organization.[58]

The practices are not legal requirements but identify practices employers can implement to help prevent and address harassment,[59] which is a form of wrongful conduct under the EDR and could be a form of judicial misconduct under the JC&D. The practices and principles may aid workplace compliance with federal equal employment opportunity laws, many of which apply as a matter of policy under the Model EDR Plan and can be adapted for a variety of workplaces.

---

[57]EEOC, *Promising Practices for Preventing Harassment*, EEOC-NVTA-2017-2 (Washington, D.C.: Nov. 21, 2017). For the purposes of this report, we refer to these practices as "recommended practices." The 2017 technical assistance document was based on a 2016 EEOC study (EEOC, Select Task Force on the Study of Harassment in the Workplace: Report of Co-Chairs Chai R. Feldblum & Victoria A. Lipnic, (Washington, D.C.: Jun. 2016). In April 2023, the EEOC issued *Promising Practices for Preventing Harassment in the Federal Sector*, a new technical assistance document that builds upon the 2017 document with a focus on promising practices for preventing and addressing harassment within the federal civilian workforce. Because our collection and analysis of information pre-dated EEOC's update, and because the Working Group noted in its 2018 report the importance of EEOC's 2017 recommended practices, we use the 2017 EEOC report for the purposes of this report.

[58]Of the 18 EEOC recommended practices related to leadership and accountability, we selected four for our assessment. Of the 16 EEOC recommended practices related to policy, we selected 11 for our assessment. Of the 17 EEOC recommended practices related to complaint procedures, we selected five for our assessment. Of the 23 EEOC recommended practices related to training, we selected 17 for our assessment.

[59]EEOC, *Promising Practices for Preventing Harassment*, EEOC-NVTA-2017-2 (Washington, DC.: Nov. 21, 2017).

Case 1:20-cv-00066-WGY   Document 427   Filed 07/31/24   Page 28 of 77

# The Judiciary Implemented Various National- and Circuit- Level Actions to Help Prevent and Address Workplace Misconduct

## National-Level Activities

Since 2017, the judiciary has implemented several changes to expand efforts at the national level to prevent and respond to workplace misconduct. These changes include creating the Federal Judiciary Workplace Conduct Working Group (Working Group), revising workplace conduct policies, conducting a national climate survey, and other actions, as figure 2 shows.

**Figure 2: Selected Judiciary Actions Taken at the National Level to Help Prevent and Address Workplace Misconduct for Judiciary Employees, 1997 to 2023**



Source: GAO analysis of federal judiciary documents and interviews with officials from the Administrative Office of the U.S. Courts (AOUSC) and Federal Judicial Center. | GAO-24-105638

**Created the Working Group.** At the direction of the Chief Justice's 2017 *End of Year Report*, AOUSC's Director created the Working Group to examine the sufficiency of the judiciary's policies and practices to protect employees from inappropriate workplace conduct.[60] For the initial report published in June 2018, the Working Group sought the views of current and former employees, interest groups, and industry experts through interviews and anonymous comments received through an electronic mailbox.[61] In March 2022, the Working Group published its third report.

---

[60]United States Supreme Court, *2017 Year-End Report on the Federal Judiciary*. (Washington, D.C.: 2017).

[61]The Working Group's assessment focused on the policies and procedures that apply to court and court unit employees and judges. According to representatives from the Working Group, the Working Group did not focus on the policies, procedures, and employees of the independent agencies because they are outside the scope of the Judicial Conference's jurisdiction.

Case 1:20-cv-00066-WGY   Document 427   Filed 07/31/24   Page 30 of 77

Through these reports, the Working Group has made over 40 recommendations calling for various actions, some of which we discuss in more detail below.[62] According to AOUSC officials, the judiciary has implemented over 30 recommendations made from the Working Group's 2018 report and are taking actions to address recommendations made in the 2022 report.[63]

**Revised workplace conduct policies and guidance.** In response to the Working Group's recommendations, the judiciary revised its workplace conduct policies that set standards for employee conduct and provide options for reporting workplace misconduct. Specifically:

- In March 2019, the Judicial Conference approved revisions to the Rules for Judicial-Conduct and Judicial-Disability Proceedings (JC&D Rules), the Code of Conduct for U.S. Judges, and the Code of Conduct for Judicial Employees. Some revisions to these policies include (1) expressly stating that a judge failing to report reliable information that is reasonably likely to constitute misconduct or disability to the relevant chief judge is cognizable misconduct; (2) stating that judges and judiciary employees should neither engage in nor tolerate workplace misconduct; (3) clarifying that confidentiality obligations do not prevent reporting or disclosing workplace misconduct; (4) clarifying that misconduct by judges includes workplace harassment and retaliation against employees for reporting or disclosing misconduct; and (5) clarifying that appropriate action should be taken when they receive reliable information of likely workplace misconduct.

- In September 2019, the Judicial Conference approved revisions to the judiciary's main workplace conduct policy—the Model EDR

---

[62]The Working Group's first and third reports contained the recommendations, while the second report was a status update on the judiciary's progress on implementing the recommendations from the first report. For all three reports of the Working Group, see *Report of the Federal Judiciary Workplace Conduct Working Group to the Judicial Conference of the United States* (Jun. 2018); Status *Report from the Federal Judiciary Workplace Conduct Working Group to the Judicial Conference of the United States* (Sept. 2019); *Report of the Federal Judiciary Workplace Conduct Working Group to the Judicial Conference of the United States* (Mar. 2022).

[63]The Working Group's 2022 report made nine recommendations, including developing policy on romantic relationships between employees, assessing additional monetary remedies for complainants, and requiring courts and employing offices to ensure employees complete annual workplace conduct trainings.

Case 1:20-cv-00066-WGY   Document 427   Filed 07/31/24   Page 31 of 77

Plan.[64] Revisions to the Model EDR Plan include expanding employee protections, such as prohibiting abusive conduct; expanding the options for reporting workplace misconduct; and clarifying that court and chambers' confidentiality requirements do not prevent an employee from reporting wrongful conduct.[65] The revised Model EDR Plan also requires each court to adopt its own EDR plan based on the Model EDR Plan and offer annual workplace conduct training for employees, among other things.[66] All federal circuit, district, and bankruptcy courts have adopted either a single or consolidated court EDR plan (where multiple courts in a district share an EDR plan).

- In January 2020, the judiciary published the EDR Interpretive Guide and Handbook to provide guidance to employees, managers, and judges on the EDR process.[67] The Handbook provides guidance about the Model EDR Plan and its options for resolution.

**Expanded options for reporting workplace misconduct.** In the revised Model EDR Plan, the judiciary created additional options for employees to report workplace misconduct, including conduct of nonemployees occurring in the workplace. The revisions permit employees to seek informal advice, request an assisted resolution, or file a formal complaint when the incident involves another employee, manager, or a judge.[68] In addition, the revisions encourage employees to take appropriate action and require supervisors, unit executives, and judges to take appropriate action if they become aware of or witness workplace misconduct,

---

[64]The 2019 Model EDR Plan covered federal public defender organization employees. Then in October 2021, the Judicial Conference approved a new Model Federal Public Defender EDR Plan to address issues that are unique to the federal public defender community. According to AOUSC officials, some federal public defender organization employees are covered by the Court of Appeals' EDR Plan in their circuit.

[65]Under the Code of Conduct for Judiciary Employees, judiciary employees are bound by a duty of confidentiality that prevents them from disclosing confidential information received in the course of official duties except as required in the performance of such duties. See Guide to Judiciary Policy, vol. 2, pt. A, § 320, Canon 3D(3). Revisions to the Model EDR Plan sought to clarify that these confidentiality obligations do not prevent or discourage employees from reporting or disclosing wrongful conduct. See Model EDR Plan, pt. IV.B.1.

[66]See Model EDR Plan, pt. V.A, D.4.

[67]Judiciary Employment Dispute Resolution Working Group and the Office of Judicial Integrity, *Employee Dispute Resolution Interpretative Guide & Handbook: A Guide to the 2019 Model EDR Plan,* (Washington, D.C.: Jan. 1, 2020).

[68]See Model EDR Plan, pt. IV.A.

including incidents involving nonemployees.[69] Examples of appropriate actions include addressing it directly, reporting the incident to a manager or chief judge, or filing a formal complaint.[70] Furthermore, the 2019 revisions to the JC&D Rules expanded the definition of misconduct to situations in which a judge fails to report reliable information to the relevant chief district judge or chief circuit judge that is reasonably likely to constitute judicial misconduct.[71]

**Established the Office of Judicial Integrity.** Within the AOUSC, the Office of Judicial Integrity tracks the adoption of court EDR Plans and collects and analyzes workplace conduct data, according to judiciary officials. Within the Office of Judicial Integrity, officials serve as independent national-level workplace conduct experts, offering confidential guidance to judges, managers, and employees about workplace conduct matters in the federal courts. Judiciary employees may contact the Office of Judicial Integrity, which operates outside of their court or circuit leadership structure, for confidential advice and guidance on the options for resolving workplace conduct issues.

**Required courts to offer annual workplace conduct training.** Revisions to the Model EDR Plan required courts to provide training to employees on an annual basis to raise awareness of their rights under the Plan and options for reporting workplace misconduct.[72] Court leaders may direct employees to take workplace conduct trainings offered by the circuit's DWR, Office of Judicial Integrity, or Federal Judicial Center. In some courts, a circuit judge or EDR coordinator may provide the training, according to judiciary officials.

**Updated system for central collection of EDR data.** In January 2020, AOUSC updated its reporting application in the judiciary's central database—InfoWeb—to collect EDR data consistent with the updated requirements and provisions of the revised 2019 Model EDR Plan. According to these requirements, courts and employing offices must provide data on EDR claims—requests for assisted resolution or formal

---

[69]See Model EDR Plan, pt. IV.B.1.

[70]See, e.g., Model EDR Plan, pt. IV.A.

[71]See Guide to Judiciary Policy, vol. 2, pt. E, § 320, Art. II, Rule 4(a)(6).

[72]See Model EDR Plan, pt. V.D.4.

Case 1:20-cv-00066-WGY   Document 427   Filed 07/31/24   Page 33 of 77

complaints—to AOUSC on an annual basis.[73] AOUSC officials reported that courts and employing offices may appoint individuals with access to InfoWeb to enter the EDR data for their office. InfoWeb contains data on EDR claims made by current and former judiciary employees and applicants for employment at the judiciary who have been interviewed. EDR claims can be filed by court employees, probation and pretrial services office employees, and federal public defender organization employees.

**Completed a climate survey of judiciary employees.** In early 2023, the Federal Judicial Center administered a survey to employees covered by an EDR Plan to gather perspectives on the prevalence of workplace misconduct and the impact of the judiciary's efforts to improve its policies and processes.[74] We discuss the survey later in this report.

## Circuit-Level Activities

The judiciary also implemented changes at the circuit level to prevent and respond to workplace misconduct. These efforts varied by circuit.

**Created Director of Workplace Relations positions.** As of December 2023, all 13 circuits created the position of DWR to serve as dedicated circuit-level workplace conduct experts. The responsibilities of each DWR vary across the circuits. In general, they offer confidential guidance on workplace conduct issues to employees, supervisors, and judges within their circuits. DWRs in some circuits said they collect and analyze data related to workplace conduct issues; others said they do not currently collect and analyze data but may do so in the future.

**Created circuit workplace conduct committees.** Of the 13 circuits, DWRs reported that 10 circuits created standing or ad hoc committees to focus on efforts to prevent and address wrongful conduct issues. According to some DWRs, these committees may review individual court EDR plans to recommend them for final approval by the circuit judicial

---

[73]The Model EDR Plan requires courts and employing offices to submit information such as the number and types of alleged violations for which assisted resolution was requested; the resolution of each EDR complaint, whether they were dismissed, settled prior to a decision, or decided with or without a hearing; and the employee rights that were violated. See Model EDR Plan, pt. V.E.

[74]The survey excluded Supreme Court employees; judges; and employees of the independent agencies—AOUSC, Federal Judicial Center, U.S. Sentencing Commission, and Judicial Panel on Multidistrict Litigation—because individuals in these groups are covered by different workplace conduct policies. The survey also excluded court contractors because they are not judiciary employees, and unpaid interns, whose experiences as court employees are so brief that it may skew the responses.

councils or make recommendations for procedural changes to the workplace conduct processes within the circuit. In all circuits that have committees, DWRs told us that judges from across the circuit serve on the committee. In some circuits, membership may include circuit executives, and only a few circuits include non-judge voting members, such as law clerks or employees from the clerk of court's office or the probation and pretrial services organization, according to the DWRs.

**Implemented other circuit-level activities.** Other types of circuit-level activities to prevent and respond to workplace misconduct include circuit-wide employee climate surveys to get feedback on the circuit's workplace conduct policies and procedures. Circuits also created employee advisory committees, such as law clerk advisory committees, to ensure that these employee groups have direct input into workplace conduct processes. The majority of circuits published anti-harassment statements, which note that employment discrimination and harassment based on the protected categories, including race, color, sex, and gender are prohibited.

# The Judiciary's National-Level Efforts Generally Aligned with EEOC Practices While Trainings at the Circuits Generally Did Not

## Judiciary's National-Level Activities Generally Aligned with EEOC Practices, but Updates Could Further Improve Alignment

Overall, the judiciary's national activities to prevent and address workplace misconduct aligned with 13 of 20 selected EEOC practices and partially aligned with the remaining seven practices.[75] For example, the judiciary's national leadership activities aligned with EEOC's practice that senior leaders seek feedback about their organization's anti-harassment efforts. Specifically, leaders at the judiciary sought feedback on workplace conduct policies and practices from various types of employees, such as law clerks and judges, during the Working Group's initial assessment of the judiciary's workplace conduct efforts. In addition, the Model EDR Plan

---

[75]Appendix II contains our full analysis of the extent to which the judiciary's efforts aligned with selected EEOC practices.

aligned with EEOC's practice to describe processes for employees to informally share or obtain information about harassment without filing a formal complaint. According to the Model EDR Plan, court employees may contact DWRs, EDR coordinators, or the Judicial Integrity Officer to seek advice or guidance on a range of topics related to workplace conduct.

While most of the national-level activities we reviewed aligned, some of the activities did not fully align with the selected EEOC practices. For example, the judiciary's actions partially aligned with EEOC's practice that leaders assess and address harassment risk factors and take steps to at least minimize those risks. While the judiciary identified factors that could increase the risk for employee harassment, the judiciary did not explicitly assess these risks or identify specific steps to minimize each risk identified. In its 2018 study, the Working Group acknowledged that the judiciary has certain unique characteristics that could discourage or deter employees from reporting inappropriate conduct. The Working Group identified four specific risks: (1) significant power disparities between judges and their employees, (2) life tenures for judges, (3) discipline for judges only through a formal process, and (4) law clerks and chamber employees' misinterpretation of the confidentiality clause.

In response to the study's findings, the judiciary identified specific steps to minimize the last risk by clarifying the confidentiality clause for law clerks and chamber employees in the Model EDR Plan and the Codes of Conduct for Judiciary Employees. However, while the judiciary has completed several studies of its workplace conduct policies and activities, the judiciary has not formally assessed or documented any steps taken to address the three other identified risk factors.

Additionally, the judiciary's complaint system partially aligned with EEOC's practice that complaint systems have processes to determine whether alleged victims, individuals who report harassment, witnesses, and other relevant individuals are subjected to retaliation. EEOC suggests that employers should consider processes outside of self-reporting to help identify retaliation, such as checking in with employees or managers and inquiring whether the individual has any concerns about potential retaliation. While the Model EDR Plan lists retaliation as prohibited conduct that employees are encouraged to report, there is no process outside of self-reporting under the Model EDR Plan to determine whether retaliation has occurred against an employee who reports or participates in the EDR process.

Case 1:20-cv-00066-WGY   Document 427   Filed 07/31/24   Page 36 of 77

While the Working Group identified in its 2018 report that the EEOC's recommended practices can help design effective strategies to prevent and address workplace misconduct, AOUSC officials told us that the recommended practices are not requirements for the judiciary. Thus, according to the officials, the judiciary's actions do not need to fully align with all selected EEOC recommended practices. Judiciary officials told us that while evidence of alignment with some EEOC practices may not be explicitly stated, evidence of the recommended practice in their recent efforts is implicit.

While we recognize that the EEOC's practices are recommended and not required, alignment with EEOC's recommended practices is important to help design effective programs and help create a culture in which workplace misconduct is not tolerated. Additionally, according to the EEOC, one of the most important lessons from its study is that employers must use a holistic approach to prevent inappropriate behaviors.[76] Therefore, each aspect of the recommended practices helps organizations to better prevent and address workplace misconduct. As the judiciary contemplates additional steps to better protect its employees and maintain its reputation, updating its Model EDR Plan and related activities to more fully align with the selected EEOC recommended practices could improve the prevention and handling of workplace misconduct.

## Training Materials Used by Circuits Do Not Align With Most EEOC Practices

We reviewed materials that were used in trainings offered to the majority of employees in each circuit as well as related training activities within each circuit and found that most did not align with the EEOC practices. While a small number of training materials and activities aligned with all the selected EEOC practices, for most of the EEOC practices, the extent to which these materials and activities aligned varied across the circuits.

[76]EEOC, Select Task Force on the Study of Harassment in the Workplace: Report of Co-Chairs Chai R. Feldblum & Victoria A. Lipnic (Washington, D.C.: June 2016).

Case 1:20-cv-00066-WGY   Document 427   Filed 07/31/24   Page 37 of 77

Specifically, we found that the training materials all aligned with four of the 17 selected EEOC practices.[77] For example, the training materials all aligned with EEOC's practice to tailor the training to the specific workplace and to include explanations of the complaint process, including any voluntary alternative dispute resolution processes.[78]

None of the training materials we reviewed aligned with two of the selected EEOC practices for regular and effective training. In one EEOC practice, it states that effective training should explain the consequences of engaging in conduct that is unacceptable in the workplace. None of the training materials for judiciary staff that we reviewed included an explanation of the range of possible consequences for engaging in prohibited conduct. The second EEOC practice calls for effective training to explain the information that may be requested during an investigation, such as the name or a description of the alleged harasser(s), alleged victim(s), and any witnesses; the date(s) of the alleged harassment; the location(s) of the alleged harassment; and a description of the alleged harassment. In our assessment, none of the training materials we reviewed included this information.

For the remaining 11 selected EEOC practices, the extent to which training materials and activities in the circuits aligned varied across the circuits. For example, training materials in six circuits that we reviewed aligned with the EEOC's practice that training for supervisors and managers include consequences of failing to fulfill their responsibilities related to workplace conduct. Training materials in four circuits partially aligned with this practice and two did not align with this practice.

According to AOUSC officials, training materials and activities at the circuits may vary because circuits and courts have discretion to design

---

[77]While we focused our assessment on circuit-level workplace conduct training that was offered to the majority of employees within each circuit, one circuit did not have a specific circuit-level training. The circuit's leadership encouraged their managers, supervisors, and employees to attend the workplace conduct training offered by the national Office of Judicial Integrity, which offers training for all court employees. As a result, we assessed the national workplace conduct training material for our review of this circuit. We also partially excluded another circuit whose training material did not meet our criterion at the time of our review—that the training material be used to train the majority of employees across the circuit. We understand that this training material was only used to train employees in one court in the circuit at the time of our analysis. As a result, we excluded the circuit for the EEOC practices on training materials and included the circuit for the other relevant EEOC practices.

[78]Appendix II contains our full analysis of the extent to which the judiciary's training efforts aligned with selected EEOC practices.

their own EDR training program, such as deciding what is included in their workplace conduct training materials. In addition, DWRs, who mainly offer these trainings, may discuss additional points that are not written in the training materials and advise employees on relevant points of contact for more information. EEOC recommends that employers provide comprehensive anti-harassment training at every level of an organization to ensure that the workforce understands the organization's rules, policies, procedures, and expectations, as well as the consequences of misconduct. By working to more fully align workplace conduct training materials and activities used by the circuits with selected EEOC recommended practices, the judiciary will be able to more consistently and comprehensively educate judges, managers, and staff on how to prevent and address workplace misconduct.

# Discrimination is the Most Frequent Allegation, but the Judiciary Does Not Collect Data on All Reported Workplace Misconduct

## EDR Data

The judiciary's data from InfoWeb show that from fiscal year 2020 through fiscal year 2022, individuals filed 161 EDR claims,[79] including both assisted resolutions and formal complaints.[80] Each EDR claim can contain one or more allegations. Within the 161 EDR claims, there were 566 allegations of wrongful conduct. These included 124 allegations in

[79]The judiciary reported that during fiscal year 2023 individuals filed 58 EDR claims. We did not include these data in our analyses or figures below because these data were not available for us to analyze during the course of our audit.

[80]An EDR claim constitutes a request for assisted resolution or a formal complaint; it does not include requests for informal advice. Current and former judiciary employees and applicants for employment at the judiciary who have been interviewed may file EDR claims. See Model EDR Plan, pt. I. From fiscal year 2020 through fiscal year 2022, current employees filed 101 EDR claims, former employees filed 55 EDR claims, and applicants filed five EDR claims. Of the 161 total EDR claims filed from fiscal year 2020 through fiscal year 2022, 60 were filed by court employees, 58 were filed by probation and pretrial services office employees, and 43 were filed by federal public defender organization employees.

Case 1:20-cv-00066-WGY    Document 427    Filed 07/31/24    Page 39 of 77

fiscal year 2020, 106 allegations in fiscal year 2021, and 336 allegations in fiscal year 2022, as shown in figure 3.[81]

**Figure 3: Number of Allegations Made within 161 Employment Dispute Resolution (EDR) Claims Filed by Judiciary Employees, Fiscal Years 2020–2022**



Source: Administrative Office of the U.S. Courts data. | GAO-24-105638

Note: A single employment dispute resolution (EDR) claim alleging wrongful conduct is filed by a single judiciary employee covered by an EDR Plan, former employee, or applicant for employment at the judiciary who has been interviewed; however, multiple data elements may be included as part of a single EDR claim. For example, an EDR claim can raise just one allegation of wrongful conduct (e.g., a single claim of retaliation) or multiple allegations (e.g., abusive conduct, discrimination, and harassment) as part of the same claim. That same EDR claim can also allege wrongful conduct on the part of one or more subjects (e.g., a singular claim against a coworker, or allegations against both their immediate supervisor and the court unit executive).

AOUSC acknowledged an increase in EDR claims in fiscal year 2022 compared to prior fiscal years, but officials could not identify a specific cause for the increase. Officials theorized that the increase could be indicative of employees' knowledge of their options due in part to workplace conduct training or, similarly, improved trust and familiarity with the reporting options. Additionally, AOUSC officials suggested that the increase in claims could be related to more in-person work in 2022, compared to the more prevalent teleworking environment during the COVID-19 pandemic in 2020 and 2021.

Based on our review of EDR data we found that the most frequent allegation category reported in EDR claims was discrimination, followed by discriminatory harassment and abusive conduct. For allegations of discrimination or discriminatory harassment, complainants also select the specific type of discrimination or harassment, for example based on

---

[81]Under the Notification and Federal Employee Antidiscrimination and Retaliation ("No FEAR") Act, executive branch agencies are required to provide specified information on equal employment opportunity complaints filed with the agency in an annual report to Congress, as well as on their public internet sites. See Pub. L. No. 107-174, tit. II, § 203, tit. III, § 301, 116 Stat. 566, 569-70, 573-74 (2002) (codified as amended at 5 U.S.C. § 2301 note). The judiciary is not subject to these No FEAR Act requirements.

Case 1:20-cv-00066-WGY   Document 427   Filed 07/31/24   Page 40 of 77

legally protected categories, such as race or gender.[82] Figure 4 shows the number of allegations by type and breakouts of the subcategories of discrimination and harassment.

---

[82]The Model EDR Plan defines a "protected category" as race, color, sex, gender, gender identity, pregnancy, sexual orientation, religion, national origin, age (40 years and over), or disability. See Model EDR Plan, pt. II.B. Some individual court EDR plans contain additional protected categories. See, e.g., Ninth Circuit Employment Dispute Resolution Policy, pt. II.B (including, in addition to the categories provided in the Model EDR Plan, the following categories: gender expression, marital status, parenthood, creed, ancestry, citizenship, genetic information, and service in the uniformed forces).

Case 1:20-cv-00066-WGY   Document 427   Filed 07/31/24   Page 41 of 77

**Figure 4: Number of Allegations by Type of Wrongful Conduct Reported in 161 EDR Claims, Fiscal Years 2020–2022**



Source: GAO analysis of Administrative Office of the U.S. Courts data. | GAO-24-105638

Notes: For the purposes of this report, we grouped multiple allegation types into a single category entitled "All Other Allegations Combined." For fiscal year 2020 through fiscal year 2022, this category includes 25 allegations related to whistleblower protections, 16 allegations related to the Family and Medical Leave Act, three allegations related to the Occupational Safety and Health Act, three allegations related to the Worker Adjustment and Retraining Notification Act, one allegation related to

the Uniformed Services Employment and Reemployment Rights Act of 1994, and one allegation related to the Employee Polygraph Protection Act of 1988. In addition, this category includes 26 allegations categorized as "Other" in InfoWeb. According to Administrative Office of the U. S. Courts officials, the "Other" category includes allegations of general unfair treatment that did not involve a protected class, among other things.

A single employment dispute resolution (EDR) claim alleging wrongful conduct is filed by a single judiciary employee covered by an EDR Plan, former employee, or applicant for employment at the judiciary who has been interviewed; however multiple data elements may be included as part of a single EDR claim. For example, an EDR claim can raise just one allegation of wrongful conduct (e.g., a single claim of retaliation) or multiple allegations (e.g., abusive conduct, discrimination, and harassment) as part of the same claim. That same EDR claim can also allege wrongful conduct on the part of one or more subjects (e.g., a singular claim against a coworker, or allegations against both their immediate supervisor and the court unit executive).

From fiscal year 2020 through fiscal year 2023, the judiciary tracked the occupational code of each complainant filing an EDR claim in InfoWeb. The occupational code is a category that aligns with the complainant's job title. Based on our review of EDR data from fiscal year 2020 through fiscal year 2022, the occupational code of employees that filed the most EDR claims was general professional (72 of 161 EDR claims, accounting for 265 of the 566 total allegations of wrongful conduct), followed by legal professional (31 of the 161 EDR claims, accounting for 111 of the 566 total allegations of wrongful conduct).[83] Figure 5 shows the number of EDR claims filed by employees in each occupational code category, as well as the total number of allegations made by each occupational code and the distribution of allegation type by occupational code.

[83]Judiciary officials told us that they developed the occupational codes by drawing upon the Office of Management and Budget's occupational classification standards, which officials described as standards that are applicable to occupations at federal agencies and which correlate to job titles at the judiciary. For example, AOUSC officials said that they aligned the general professional occupational code to include budget analysts, administrative managers/officers, paralegals, and financial administrators, among others. Officials also described the legal professional occupational code as including positions requiring a law degree, such as staff attorneys and law clerks, among others. In December 2023, judiciary officials told us that they no longer use occupational code fields in InfoWeb; instead, job categories of complainants are tracked.

Case 1:20-cv-00066-WGY   Document 427   Filed 07/31/24   Page 43 of 77

**Figure 5: Occupational Codes of Employees Making Allegations at the Judiciary, in 161 EDR claims, Fiscal Years 2020–2022**

**Total number of times that occupational code categories filed EDR claims, fiscal years 2020–2022**

| General professional | Legal professional | Technical | Office clerical | Legal secretary | Executive |
|---|---|---|---|---|---|
| 72 | 31 | 20 | 20 | 14 | 4 |

**Distribution of allegation type filed in EDR claims by occupational code, fiscal years 2020–2022**



| General professional | Legal professional | Technical | Office clerical | Legal secretary | Executive |
|---|---|---|---|---|---|

General professional (265): 17% / 35% / 24% / 13% / 11%
Legal professional (111): 14% / 30% / 21% / 19% / 16%
Technical (64): 23% / 28% / 16% / 13% / 20%
Office clerical (59): 14% / 44% / 14% / 12% / 17%
Legal secretary (34): 35% / 18% / 35% / 9% / 3%
Executive (33): 12% / 61% / 12% / 9% / 6%

Legend:
- Abusive conduct
- Discrimination
- Harassment
- Retaliation
- All other allegations combined

Source: GAO analysis of Administrative Office of the U.S. Courts Data.  |  GAO-24-105638

Notes: For the purposes of this report, we grouped multiple allegation types into a single category entitled "All Other Allegations Combined." For fiscal year 2020 through fiscal year 2022, this category includes 25 total allegations related to whistleblower protections, 16 allegations related to the Family and Medical Leave Act of 1993, three allegations related to the Occupational Safety and Health Act, three allegations related to the Worker Adjustment and Retraining Notification Act, one allegation related to Uniformed Services Employment and Reemployment Rights Act of 1994, and one allegation related to the Employee Polygraph Protection Act of 1988. In addition, this category includes 26 allegations categorized as "Other" in InfoWeb. According to Administrative Office of the U.S. Courts officials, the "Other" category includes allegations of general unfair treatment that did not involve a protected class, among other things.

A single employment dispute resolution (EDR) claim alleging wrongful conduct is filed by a single judiciary employee covered by an EDR Plan, former employee, or applicant for employment at the judiciary who has been interviewed; however multiple data elements may be included as part of a single EDR claim. For example, an EDR claim can raise just one allegation of wrongful conduct (e.g., a single claim of retaliation) or multiple allegations (e.g., abusive conduct, discrimination, and harassment) as part of the same claim. That same EDR claim can also allege wrongful conduct on the part of one or more subjects (e.g., a singular claim against a coworker, or allegations against both their immediate supervisor and the court unit executive).

The judiciary also tracks the subject of the claim in InfoWeb. The subject of the claim is the identified job role(s) of the individuals(s) alleged to have engaged in wrongful conduct. According to AOUSC officials, for

most EDR claims, there is one subject of the claim. However, some EDR claims may include multiple subjects of the claim. For example, this could occur either when multiple individuals are involved in the allegations or when one individual serves in several roles, such as a unit executive who is also a manager or supervisor.[84]

Based on our analysis of EDR data in InfoWeb, we found that, from fiscal year 2020 through fiscal year 2022, unit executives[85] were the most frequently named subject of the claim. Specifically, unit executives were identified as subjects of the claim 91 times within the 161 EDR claims, involving 382 of the 566 allegations of wrongful conduct. Managers or supervisors were the next most frequently named subject of the claim from fiscal year 2020 through fiscal year 2022. Managers and supervisors were identified as subjects of the claim 56 times within the 161 EDR claims, involving 207 of the 566 allegations of wrongful conduct. Figure 6 shows the number of times each employee category was identified as a subject of an EDR claim from fiscal year 2020 through fiscal year 2022. The figure also shows the total number of allegations that involved each subject of the claim category and the distribution of allegation type by subject of the claim category.

[84]A single alleged wrongdoer may fit multiple subject of the claim categories (e.g., a unit executive may also be a manager/supervisor). In these cases, both categories may be selected in InfoWeb. Thus, the number of allegations presented in figure 6 does not match the total number of allegations presented in prior figures.

[85]A unit executive is a circuit executive, district court executive, clerk of court, chief probation officer, chief pretrial services officer, federal public defender, bankruptcy administrator, bankruptcy appellate panel clerk, senior staff attorney, chief pre-argument/conference attorney/circuit mediator, or circuit librarian.

GAO-24-105638 Federal Judiciary

Case 1:20-cv-00066-WGY   Document 427   Filed 07/31/24   Page 45 of 77

**Figure 6: Number of Times Subject of the Claim Categories Appeared in 161 EDR Claims, and Associated Allegation Types, Fiscal Years 2020–2022**

Total number of times subject of the claim categories appeared in EDR claims, fiscal years 2020–2022

| Unit executive | Manager/supervisor | Employee/coworker | Judge |
|---|---|---|---|
| 91 | 56 | 32 | 24 |

Distribution of allegations appearing in EDR claims, by subject of the claim, fiscal years 2020–2022



Source: GAO analysis of Administrative Office of the U.S. Courts Data. | GAO-24-105638

Note: A person filing an employment dispute resolution (EDR) claim alleging wrongful conduct may select more than one subject title even if there is only one person who is the alleged wrongdoer (e.g., a unit executive who is also a manager/supervisor). Judiciary officials described this field in InfoWeb as a "multi-value picklist." For example, certain subjects through their role have supervisory authority, including judges, unit executives, and manager/supervisors. The other remaining "subject" positions (i.e., chambers staff, employee/coworker) are not considered supervisory. Additionally, the subject of the claim is not mutually exclusive (e.g., the same individual could be identified as a supervisor and a unit executive).

For the purposes of this report, we grouped multiple allegation types into a single category entitled "All Other Allegations Combined." For fiscal year 2020 through fiscal year 2022, this category includes 25 total allegations related to whistleblower protections, 16 allegations related to the Family and Medical Leave Act of 1993, three allegations related to the Occupational Safety and Health Act, three allegations related to the Worker Adjustment and Retraining Notification Act, one allegation related to the Uniformed Services Employment and Reemployment Rights Act of 1994, and one allegation related to the Employee Polygraph Protection Act of 1988. In addition, this category includes 26 allegations categorized as "Other" in InfoWeb. According to Administrative Office of the U.S. Courts officials, the "Other" category includes allegations of general unfair treatment that did not involve a protected class, among other things.

Case 1:20-cv-00066-WGY   Document 427   Filed 07/31/24   Page 46 of 77

A single EDR claim alleging wrongful conduct is filed by a single judiciary employee covered by an EDR Plan, former employee, or applicant for employment at the judiciary who has been interviewed; however, multiple data elements may be included as part of a single EDR claim. For example, an EDR claim can raise just one allegation of wrongful conduct (e.g., a single claim of retaliation) or multiple allegations (e.g., abusive conduct, discrimination, and harassment) as part of the same claim. That same EDR claim can also allege wrongful conduct on the part of one or more subjects of the claim (e.g., a singular claim against a coworker, or allegations against both their immediate supervisor and the court unit executive).

## Judicial Conduct and Disability Act Complaint Data

Of the 4,053 JC&D complaints filed from fiscal year 2020 through fiscal year 2022, 17 were filed by judiciary employees.[86] Of those 17 complaints, we reviewed those that were closed[87] and found that allegations included abusive conduct by a judge, religious discrimination, and discrimination and harassment based on the employee's pregnancy, among others. According to AOUSC officials, outcomes of these closed JC&D complaints varied, including the dismissal of some complaints for lack of evidence. AOUSC officials stated that some JC&D complaints resulted in investigations by special committees. In one of the JC&D complaints that resulted in an investigation, a judge was privately reprimanded, and in another investigation, a judge had been found to have, among other things, created a hostile work environment.

## The Judiciary Does Not Collect and Analyze Additional Data on Informal Advice and Certain Reported Workplace Misconduct

### Data Related to the Informal Advice Option of the Model EDR Plan

The judiciary does not currently collect data related to the informal advice option available in the Model EDR Plan.

All DWRs reported that they have received calls from employees seeking the informal advice option under the Model EDR Plan, and Office of Judicial Integrity officials told us that informal advice is a popular way for

---

[86]According to AOUSC officials, the 17 JC&D complaints were filed by a total of nine judiciary employees. AOUSC officials elaborated on these figures, stating that a complaint filed by a single complainant against multiple judges is counted as more than one complaint because each judge named is assigned their own complaint number. In addition to judiciary employees, any member of the public—such as incarcerated individuals, lawyers, litigants, and public officials—can file complaints. See 28 U.S.C. § 351(a).

[87]Generally, orders are made publicly available only when final action has been taken on the complaint and no options for review are available. See Guide to Judiciary Policy, vol. 2, pt. E, § 320, Art. VIII, Rule 24 cmt.; see also 28 U.S.C. § 360(b).

Case 1:20-cv-00066-WGY   Document 427   Filed 07/31/24   Page 47 of 77

employees to resolve workplace conduct issues. The Federal Judiciary Workplace Conduct Working Group (Working Group) in its March 2022 report emphasized the importance of the informal advice option as well, stating that DWRs spent more of their time providing informal advice than anything else. One judiciary official noted that, based on his observations, use of the informal advice option has been increasing since it was implemented.

Judiciary officials told us that they do not currently collect data on informal advice, even though it is a popular option, because it is considered confidential advice and guidance. They said that collecting detailed data on these calls may affect employees' willingness to seek informal advice. However, according to the EDR Handbook and the Model EDR Plan, certain aspects of confidentiality are ensured for all three EDR options, including the assisted resolution and formal complaint options for which the judiciary collects detailed information regarding individual workplace misconduct.[88] Thus, data related to the informal advice option could be collected and kept confidential to ensure that specific trends related to workplace conduct issues are identified.

In its March 2022 report, the Working Group recommended that the judiciary augment the annual EDR-related data that it collects to include certain data related to informal advice. An AOUSC official also told us that they are planning to implement the Working Group's recommendation. However, because AOUSC considers the informal advice option of the EDR Plan different from the assisted resolution and formal complaint options, the official told us that the data collected should be different as well. For example, the official told us that AOUSC is considering collecting more limited data to include the number of individuals who use the informal advice option. Maintaining a count of these individuals who use informal advice would be different than the more detailed data the judiciary collects regarding assisted resolution and formal complaints, which includes allegation type and complainant's occupational code among other things, as described earlier in this report. In August 2023, AOUSC officials stated that they are considering making a change to the

---

[88]The EDR Handbook states that all EDR options, including informal advice meetings and discussions are confidential, unless there are certain safety or security concerns, as described in the Model EDR Plan. Federal Judiciary, *EDR Interpretive Guide & Handbook*. In particular, the Model EDR Plan states that all EDR options are confidential except when reliable information shared during these meetings is "serious or egregious such that it threatens the integrity of the judiciary" or "threatens the safety or security of any person." See Model EDR Plan, pt. IV.B.1.

Model EDR Plan to require collecting this more limited data on informal advice, but that a proposal had not yet been developed.

**Data On Workplace Misconduct Reported Outside the EDR and JC&D Processes**

We found that the judiciary does not currently collect data related to workplace misconduct reported outside of the EDR and JC&D processes. For example, the Model EDR Plan states that an employee may address a workplace conduct issue *outside* of the formal processes, for example, either directly with the person who allegedly committed the wrongful conduct or by contacting a colleague or supervisor. DWRs that we spoke with provided additional context, stating that an employee may report potentially wrongful conduct to a manager, supervisor, unit executive, or judge in the employee's individual employing office or court.

Judiciary officials explained that using options outside of the EDR process gives employing offices an opportunity to address workplace conduct issues informally and at the "lowest possible level." The DWRs stated that, in these cases, the person receiving the report of potentially wrongful conduct may even contact circuit DWRs to obtain advice and guidance about the report. However, any data related to these types of workplace misconduct are not collected and analyzed at a national level, unlike how EDR claims are reported annually by circuit to the Office of Judicial Integrity.

Officials told us that the data are not collected and analyzed because there is no circuit-level mechanism in place to collect information on workplace misconduct that is reported directly to the individual employing offices. Officials stated that there is no data collection mechanism due to the "inherently flexible and ad-hoc nature of employee communications with many of [the] officials" taking reports of workplace misconduct at the employing office level. However, the judiciary currently has a mechanism to collect data on reported workplace misconduct through InfoWeb, and the judiciary could use a similar mechanism to collect data on workplace misconduct reported directly to individual employing offices.

*Standards for Internal Control in the Federal Government* states that agency management should obtain quality information to achieve the organization's objectives, and that the identification of data to collect and the design of methods to collect that data should be based on an organization's objectives.[89] It states that quality information is appropriate,

---

[89]GAO, *Standards for Internal Control in the Federal Government*, GAO-14-704G (Washington, D.C.: Sept. 10, 2014).

current, complete, accurate, accessible, and provided on a timely basis. The data should be used to make informed decisions and evaluate the organization's performance in achieving key objectives, including the judiciary's strategic goal of ensuring an exemplary workplace.

Because the judiciary does not collect data on issues raised through the EDR informal advice option or reported to individuals outside of the EDR and JC&D processes, it may be undercounting the number of reported workplace misconduct incidents, or not fully understanding the scope of the problem. A plan for collecting and analyzing data regarding the types of workplace misconduct described during informal advice sessions or reported outside of the EDR and JC&D processes could help the judiciary better address specific workplace conduct issues and help ensure a workplace that is free from discrimination, harassment, retaliation, and abusive conduct.

Various Judiciary
Entities Provide
Oversight, but the
Judiciary Has Not
Evaluated the
Effectiveness of
Policies

## The Judicial Conference Is the Primary Oversight Entity for Workplace Conduct Policies and Practices, but Some Oversight Also Occurs at the Circuit Level

### Oversight for EDR Policies and Practices

The entities tasked with overseeing the judiciary's EDR policies and practices include the following:[90]

- **The Judicial Conference of the U.S.** The Judicial Conference is the policymaking body for the federal courts and convenes twice per year to consider administrative and policy issues affecting the judiciary. The Judicial Conference approved the Model EDR Plan in September 2019 and will approve or decline future changes.

- **Circuit judicial councils.** According to the Model EDR Plan, judicial councils approve or deny proposed changes to individual courts' EDR plans and ensure that the court EDR plans align with the Model EDR Plan. A circuit's chief judge serves as chairperson of the circuit judicial council.

- **Circuit executives.** Each circuit has a circuit executive who is appointed by the circuit judicial council and responsible for the

---

[90]According to judiciary documentation and interviews with officials, DWRs and EDR coordinators do not have a role in oversight of EDR policies and practices. Rather, these individuals are involved in the implementation of these policies and practices. Additionally, DWRs have an advisory role to the AOUSC Director through their membership on the Directors of Workplace Relations Advisory Group.

administrative function of all nonjudicial activities of that circuit's court of appeals. The circuit executive supervises the DWR in most circuits.[91]

- **Circuit-level workplace conduct committees.** Five DWRs that we spoke with stated that their circuit has a workplace conduct committee that has a role in EDR policy oversight. According to AOUSC officials, these committees ensure compliance with courts' EDR Plans and make recommendations on workplace conduct policies, initiatives, and training programs that support the EDR Plans.

## Oversight for JC&D Policies and Practices

The Judicial Conference and its Committee on Judicial Conduct and Disability oversee JC&D policies and practices at the national level. For example, changes to JC&D complaint process rules and procedures go through a review process involving both the Judicial Conference and the JC&D Committee, and subsequently undergo a notice and public commenting period, before being implemented.[92]

In addition, circuit judicial councils also oversee JC&D policies and practices. For example, the Judicial Conference and circuit judicial councils have the authority to analyze conditions that may have enabled misconduct or prevented discovery of misconduct. Additionally, according to AOUSC officials, judicial councils consider and decide requests for review of decision filed by either party in a formal complaint proceeding.

## The Judiciary Does Not Have Performance Measures and Has Not Evaluated the Effectiveness of its EDR and JC&D Policies and Practices

In August 2023, judiciary officials told us that they do not have performance measures in place for either the EDR or the JC&D policies and practices. Officials noted that they intend to use the results of the judiciary's nationwide climate survey of employees covered by an EDR Plan, which was administered in early 2023, to develop performance measures for EDR policies but could not provide additional details

---

[91]The Federal Circuit DWR reports to the circuit's General Counsel, according to AOUSC officials.

[92]See 28 U.S.C. § 358.

Case 1:20-cv-00066-WGY   Document 427   Filed 07/31/24   Page 52 of 77

regarding plans for analyzing and finalizing survey results.[93] Additionally, officials who oversee the JC&D process told us that they do not have any specific JC&D performance measures in place.

In addition, the judiciary has also not evaluated the effectiveness of its EDR or JC&D policies.[94] However, more recent efforts, including the nationwide climate survey administered in early 2023, may position the judiciary to assess effectiveness. According to judiciary officials, the nationwide climate survey included questions about employees' familiarity with and confidence in using EDR and JC&D policies and resources in their office, as well as requests for suggestions on how to improve those policies and procedures. We requested from AOUSC but did not receive copies of the nationwide climate survey questionnaire and subsequent results; AOUSC officials informed us that, as of May 2024, the results are still pending.[95] Therefore, we were unable to determine whether, or to what extent, its survey effort would position the judiciary to assess the effectiveness of its EDR or JC&D policies.

Performance measures are critical to evaluating the effectiveness of policies and practices. As described in *Standards for Internal Control in the Federal Government*, establishing performance measures involves identifying how the governmental entity will measure or determine the effectiveness of a policy or process.[96] It also involves establishing a baseline, for example the current state or the state before any changes were made to certain policies.

Establishing these measures also involves identifying the level of improvement the governmental entity would desire, which would equate to effectiveness. Once performance measures are established, the government entity must conduct evaluations to determine the

---

[93]In its March 2022 report, the Working Group recommended and the Judicial Conference approved periodic nationwide climate surveys of all judiciary employees, to be administered by the Federal Judicial Center. The Federal Judicial Center administered the survey in early 2023 to approximately 28,000 employees. Judges, contractors, unpaid interns, employees of the Supreme Court, and AOUSC, among others, were not included in the survey distribution.

[94]Officials told us that the JC&D Committee reviews the JC&D Rules whenever they are revised. However, this kind of review is not the same as performance measures to assess effectiveness.

[95]For additional information on our objectives, scope, and methodology, see appendix I.

[96]GAO, *Standards for Internal Control in the Federal Government*, GAO-14-704G (Washington, D.C.: Sept. 10, 2014).

effectiveness of policies and practices. Based on these results, government entities make modifications to increase effectiveness and continue to evaluate and make modifications at regular intervals.

In addition, a key goal in the updated Strategic Plan for the Federal Judiciary is that the judiciary "ensure an exemplary workplace free from discrimination, harassment, retaliation, and abusive conduct." According to the Strategic Plan, to achieve this strategic goal, the judiciary is to "systematically evaluate whether guidance and procedures designed to foster an exemplary workplace are effective and whether additional action may be needed."[97] As noted by the Working Group, the primary purpose of the nationwide climate survey will be to use the results to determine the effectiveness of improvements the judiciary has made in its policies in recent years. By establishing performance measures and subsequently using those measures to determine the effectiveness of the judiciary's EDR and JC&D policies and practices, the judiciary will be better able to track the progress of its workplace conduct efforts and make adjustments to achieve the judiciary's strategic goals.

# Conclusions

The judiciary has committed to providing a workplace of respect, civility, fairness, and dignity, free of discrimination and harassment. The judiciary has taken actions—beginning with the establishment of the Federal Judiciary Workplace Conduct Working Group—to help prevent and address workplace misconduct for over 30,000 employees. While these actions generally aligned with EEOC's recommended practices to prevent harassment, the judiciary's actions only partially aligned with some recommended practices, for example, related to assessing and addressing risks and establishing a comprehensive system for identifying retaliation. In addition, circuit-level training varied by circuit in the extent to which it aligned with EEOC recommended practices. The judiciary could further enhance its efforts to address and prevent workplace misconduct by taking additional actions to further align with EEOC recommended practices.

Judiciary employees are not covered by various federal civil rights statutes that provide protections for federal employees from discrimination. Instead, they are protected by the judiciary's policies and can use only those processes developed and applied by the judiciary to address workplace misconduct. Moreover, given its decentralized

---

[97]Judicial Conference of the United States. *Strategic Plan for the Federal Judiciary.* (Washington, D.C.: Sept. 2020).

Case 1:20-cv-00066-WGY   Document 427   Filed 07/31/24   Page 54 of 77

organization and the workplace conduct efforts occurring at both the national and circuit levels, it is imperative for the judiciary to ensure that its workplace conduct policies and practices are effectively achieving its goal of creating an exemplary workplace. Collecting additional data on workplace misconduct and evaluating the effectiveness of its ongoing efforts, including setting performance measures, could better position the judiciary to achieve its goals. Doing so could also assist the judiciary in better understanding the scope of workplace misconduct at the judiciary as well as ensure that its current policies and practices are addressing those issues.

## Recommendations for Executive Action

We are making the following eight recommendations to the judiciary:

The Director of the Administrative Office of the U.S. Courts should, in coordination with the Judicial Conference, update the Model EDR Plan and related activities, as appropriate, to more fully align with selected EEOC recommended practices. (Recommendation 1)

The Director of the Administrative Office of the U.S. Courts should, in coordination with circuit-level officials, update workplace conduct training materials and activities in the circuits to more fully align with selected EEOC recommended practices. (Recommendation 2)

The Director of the Administrative Office of the U.S. Courts should, in coordination with the Judicial Conference, develop a plan for collecting and analyzing data on issues raised through the informal advice option of the Model EDR Plan. (Recommendation 3)

The Director of the Administrative Office of the U.S. Courts should, in coordination with the Judicial Conference, develop a circuit-level mechanism to collect and analyze data on workplace misconduct complaints made outside of the EDR and JC&D processes. (Recommendation 4)

The Judicial Conference should set performance measures to determine whether its EDR policies are achieving established strategic workplace conduct goals. (Recommendation 5)

The Director of the Administrative Office of the U.S. Courts should evaluate the effectiveness of the judiciary's EDR policies and practices. (Recommendation 6)

The Judicial Conference should set performance measures to determine whether its JC&D policies are achieving established strategic workplace conduct goals. (Recommendation 7)

The Director of the Administrative Office of the U.S. Courts should evaluate the effectiveness of the judiciary's JC&D policies and practices on workplace conduct. (Recommendation 8)

## Agency Comments and Our Evaluation

We provided a draft of this report to the judiciary and the EEOC for review and comment. In its comments, the judiciary neither agreed nor disagreed with our eight recommendations but noted its planned actions and challenges it would encounter addressing some of the recommendations. The judiciary's comments are reproduced in appendix III. Both the judiciary and EEOC also provided technical comments, which we incorporated as appropriate.

Regarding our recommendations related to the judiciary's alignment with selected EEOC recommended practices, the judiciary noted that EEOC recommended practices have informed many of the improvements that the judiciary has implemented. The judiciary noted that it will continue to seek alignment with these practices as it looks for ways to improve its Model EDR Plan and related activities, including coordinating with circuit executives and others to communicate the need to review and update training materials.

The judiciary noted several concerns regarding our recommendation to develop a circuit-level mechanism to collect and analyze data on workplace misconduct complaints made outside of the EDR and JC&D processes. For example, it noted concerns about the feasibility of doing so, given the volume of these reports and the possibility of dampening local-level efforts to address concerns early. However, as stated earlier, because the judiciary does not collect data on issues raised through the EDR informal advice option or reported to individuals outside of the EDR and JC&D processes, it may be undercounting the number of reported workplace misconduct incidents or not fully understanding the scope of the problem. A plan for collecting and analyzing this type of information could help the judiciary better address specific workplace conduct issues and help ensure a workplace that is free from discrimination, harassment, retaliation, and abusive conduct.

Regarding our recommendations to set performance measures and evaluate the effectiveness of EDR and JC&D policies, the judiciary noted that the evaluation of its workplace conduct programs is underway. It

stated that the nationwide climate survey will assess the workplace environment and provide insight into the effectiveness of the judiciary's policies and practices. The Working Group plans to use the results to help inform future recommendations to the Judicial Conference, including any further changes or improvements to the judiciary's EDR and JC&D policies and practices.

These efforts could better assist the judiciary in determining the effectiveness of its ongoing actions and practices.

As agreed with your offices, unless you publicly announce the contents of this report earlier, we plan no further distribution until 5 days from the report date. At that time, we will send copies to the appropriate congressional committees, the Director of the AOUSC, the Chair of the EEOC, and other interested parties. In addition, the report will be available at no charge on the GAO website at https://www.gao.gov.

If you or your staff have any questions about this report, please contact Gretta Goodwin at (202) 512-8777 or goodwing@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made major contributions to this report are listed in appendix IV.

Gretta L. Goodwin
Director, Homeland Security and Justice

# Appendix I: Objectives, Scope, and Methodology

This report examines (1) actions the judiciary has taken since 2017 to prevent and respond to workplace misconduct; (2) the extent to which the judiciary's Model Employment Dispute Resolution (EDR) Plan and related practices align with the Equal Employment Opportunity Commission's (EEOC) recommended practices; (3) judiciary data on workplace misconduct and the extent to which opportunities exist to improve data collection; and (4) the judiciary's oversight of workplace conduct policies and the extent to which the judiciary evaluates the effectiveness of these policies.

To address our first objective, we reviewed the judiciary's documents and actions since 2017 when the Chief Justice instructed the Administrative Office of the U.S. Courts (AOUSC) to assess the sufficiency of the judiciary's policies and practices to prevent and respond to workplace misconduct. We reviewed documents such as the Federal Judiciary Workplace Conduct Working Group (Working Group) reports and the Model EDR Plan.[1]

We also interviewed judiciary officials at the national and circuit levels. At the national level, we interviewed officials from the AOUSC and representatives from the Working Group on actions taken by the judiciary to address workplace misconduct. At the circuit level, we requested interviews with each of the 13 circuit Directors of Workplace Relations (DWR), who serve as workplace conduct experts within the circuits, to understand workplace conduct policies and practices at the court and court units. We conducted interviews with 10 DWRs, received written responses from two DWRs, and written responses from a representative of the remaining circuit because the circuit was in the process of hiring a DWR.[2]

To address our second objective, we assessed the judiciary's information against selected EEOC practices aimed at assisting private and public sector employers in creating effective programs for preventing and

---

[1]*Report of the Federal Judiciary Workplace Conduct Working Group to the Judicial Conference of the United States* (Jun. 2018); *Status Report from the Federal Judiciary Workplace Conduct Working Group to the Judicial Conference of the United States* (Sept. 2019); *Report of the Federal Judiciary Workplace Conduct Working Group to the Judicial Conference of the United States* (Mar. 2022). *Model Employment Dispute Resolution Plan,* Guide to Judiciary Policy, Vol. 12, 2A (Sept. 17, 2019).

[2]AOUSC officials told us that, as of December 2023, this position was filled.

Case 1:20-cv-00066-WGY   Document 427   Filed 07/31/24   Page 58 of 77

addressing harassment in the workplace.[3] This list of recommended
practices is based on a 2016 study from the co-chairs of EEOC's Select
Task Force on the Study of Harassment in the Workplace that identifies
approaches employers can take to prevent and correct harassment and
may enhance employers' compliance efforts on harassment matters.[4] In
total, there are 74 EEOC practices across four categories—(1) leadership
and accountability, (2) comprehensive and effective anti-harassment
policy, (3) effective and accessible harassment complaint system, and (4)
effective anti-harassment training.[5] We selected 37 out of 74 EEOC
practices for our review generally based on whether a given practice was
explicit and practical enough for us to evaluate.

We determined that a practice was explicit if the practice used concrete or
measurable terms against which we could compare the judiciary's policies
and practices. For example, we excluded EEOC practices that required
us to make evaluative judgments whether resources are sufficient. We
determined that a practice was practical if it was feasible for us to make
the assessment. For example, we excluded practices that would require
understanding individual court's hiring practices to assess whether the
Model EDR Plan is provided to employees upon hire or posted centrally,
such as on the court's website or in employee break rooms, or other
commonly used areas.

We reviewed documents provided by the judiciary, including the 2019
Model EDR Plan, Codes of Conduct for Judges and Employees, Rules for
Judicial-Conduct and Judicial-Disability Proceedings, and the judiciary's
2020 Strategic Plan. We assessed the information contained in the
documents, as well as information provided by judiciary officials in
interviews and in written responses, against each selected EEOC practice
under the categories (1) leadership and accountability, (2) comprehensive

---

[3]EEOC, *Promising Practices for Preventing Harassment*, EEOC-NVTA-2017-2
(Washington, D.C.: Nov. 21, 2017). We refer to these practices as "EEOC practices." In
April 2023, the EEOC issued *Promising Practices for Preventing Harassment in the
Federal Sector*, a technical assistance document that builds upon the 2017 document with
a focus on promising practices for preventing and addressing harassment within the
federal civilian workforce. Because our collection and analysis of information pre-dated
EEOC's update, and because the Working Group noted in its 2018 report the importance
of EEOC's 2017 recommended practices, we use the 2017 EEOC report for the purposes
of this report.

[4]EEOC, Select Task Force on the Study of Harassment in the Workplace: Report of Co-
Chairs Chai R. Feldblum & Victoria A. Lipnic, (Washington, D.C.: Jun. 2016).

[5]According to the EEOC, its promising practices are recommended rather than required,
but these practices may help employers prevent and respond to harassment.

Case 1:20-cv-00066-WGY   Document 427   Filed 07/31/24   Page 59 of 77

and effective anti-harassment policy, and (3) effective and accessible harassment complaint system.[6]

For the final category on effective anti-harassment training, we reviewed workplace conduct training materials used by 12 of the 13 circuits and reviewed information on workplace conduct training activities from all 13 circuits.[7] For each circuit, we reviewed training materials that the circuit's DWR told us were used in trainings offered to the majority of employees in the circuit.[8] Specifically, we reviewed (1) training material for judges, managers, and supervisors against the EEOC practices related to manager and supervisor training; (2) training material for staff against the general EEOC training practices; and (3) testimonial evidence provided by DWRs. We compared this information against EEOC practices related to leadership activities to promote training.[9]

[6]Judicial Conference of the United States, *Model Employment Dispute Resolution Plan,* Guide to Judiciary Policy, Vol. 12, 2A (Sept. 17, 2019); Judicial Conference of the United States, *Code of Conduct for United States Judges*, Guide to Judiciary Policy, Vol.2, 2A (Mar. 12, 2019); Judicial Conference of the United States, *Code of Conduct for Judicial Employees,* Guide to Judiciary Policy, Vol.2, 3A (Mar. 12, 2019; Judicial Conference of the United States, *Rules for Judicial-Conduct and Judicial-Disability Proceedings*, Guide to Judiciary Policy, Vol.2, 3E (Mar. 12, 2019; Judicial Conference of the United States. According to AOUSC officials, the Code of Conduct for Judicial Employees was amended by the Judicial Conference in March 2022, but those changes were unrelated to workplace conduct issues. Also, see *Strategic Plan for the Federal Judiciary.* (Washington, D.C.: Sept. 2020).

[7]While we received workplace conduct training materials from all 13 circuits, we did not assess one circuit's training materials that we determined were out of the scope of our review because the materials were not used to train the majority of court employees within the circuit at the time of our review. In that circuit, the DWR had recently developed the training material and it was used to train employees in two courts in that circuit at the time of our review. However, we did assess this circuit for three EEOC practices related to workplace conduct training activities.

[8]Some circuits provided us with multiple workplace conduct training materials. For these circuits, we worked with the DWRs to determine the most appropriate training material(s) for our assessment. For instance, in one circuit, we received two mandatory training materials—one that focused on the EDR process and another supplemental training material that focused on principles for creating an exemplary workplace. We determined that the training on the EDR process was most appropriate for our review because (1) it was used to train the majority of employees across the circuit, including judges, (2) it focused on the processes for employees to identify and report wrongful conduct, and (3) the DWR was uncertain whether the training on preventative principles would be repeated on an annual basis, per EEOC recommendation.

[9]The EEOC recommends that anti-harassment training for supervisors and managers should be separate from the training for staff so there are recommended practices specifically related to the training for supervisors and managers.

Case 1:20-cv-00066-WGY   Document 427   Filed 07/31/24   Page 60 of 77

To assess training activities within the circuits against relevant selected EEOC practices, we compared information from interviews or written responses from DWRs against relevant EEOC practices. We determined the extent to which judiciary policies and practices aligned with each EEOC practice by first having one analyst assess the information collected against each EEOC practice. Next, a second analyst reviewed this assessment and flagged areas of disagreement, if any. Finally, both analysts reached consensus on the judiciary's actions compared to each EEOC practice to finalize the assessment.

To address our third objective, we reviewed summary data from the judiciary's InfoWeb data system—the central database for collecting EDR claims—for fiscal year 2020 through fiscal year 2022. We selected this period because 2020 was the first full fiscal year that the Model EDR Plan was in effect, and 2022 was the last fiscal year for which data were available at the time of our audit work. We asked the judiciary to run certain analyses on our behalf and provide us with specific outputs we needed to address our researchable objectives. This included, for example, the number of EDR claims filed per year and additional breakouts such as EDR claims filed by employment status of the claimant.

We assessed the reliability of the data by reviewing outputs for obvious errors or omissions, interviewing knowledgeable agency officials, and reviewing relevant documentation (such as the InfoWeb data dictionary, user manual, screenshots of the system, and instruction for recording EDR claim data within the EDR Handbook). We determined these data were sufficiently reliable for the purposes of describing the types and amount of workplace misconduct allegations reported in EDR claims filed at the judiciary from fiscal year 2020 through fiscal year 2022.

To analyze Judicial Conduct and Disability Act (JC&D) data, we examined summary-level data from the judiciary's Form S-22s, the judiciary's annual publication of JC&D complaint data, for fiscal year 2020 through fiscal year 2022. We selected this period to align with the InfoWeb data we reviewed. JC&D complaint information is entered into the judiciary's Statistics Electronic Forms database. We assessed the reliability of this data by reviewing relevant documentation (such as the database's data dictionary and the Judicial Complaints Reporting Guide) and determined this JC&D data to be sufficiently reliable for the purposes of identifying the number of JC&D complaints filed by judiciary employees during the period.

Case 1:20-cv-00066-WGY   Document 427   Filed 07/31/24   Page 61 of 77

We also reviewed public orders issued from fiscal year 2020 through
fiscal year 2022. These public orders were from closed JC&D complaints
that involved judiciary employees. We reviewed these public orders to
determine information about the allegations specified in the complaint and
other details. We did not gather details about the still-open JC&D
complaints filed by judiciary employees, as that information is not publicly
available until the JC&D complaint is closed.[10] We also conducted
interviews with AOUSC officials that manage the JC&D data collection
and processes to obtain additional information about other JC&D data,
such as how to identify JC&D complaint outcomes and how the annual
JC&D data is aggregated, among other things.

To identify opportunities to improve data collection, we reviewed the
Model EDR Plan and reports and recommendations by the Federal
Judiciary Workplace Conduct Working Group. We also interviewed an
official from the Office of Judicial Integrity and circuit DWRs to learn more
about how they use EDR and JC&D data and identify potential
improvements. We also compared the judiciary's EDR and JC&D data
collection efforts against the principles related to data processing for
quality information in *Standards for Internal Control in the Federal
Government*.[11]

For our fourth objective, to understand how the judiciary provides
oversight of its workplace conduct policies and practices, we reviewed
documentation and spoke to officials. For example, we reviewed the
Federal Judiciary Workplace Conduct Working Group reports and
recommendations, the Model EDR Plan (which identifies key roles and
responsibilities for EDR policies and practices), the JC&D Act (which
established the process by which any person can file a complaint against
a federal judge), and the Rules for Judicial-Conduct and Judicial-Disability
Proceedings. We also interviewed officials with responsibilities related to
EDR policies and practices, such as DWRs and an official from the Office
of Judicial Integrity, and officials with responsibilities related to JC&D
policies and practices.

---

[10]Generally, orders are made publicly available only when final action has been taken on
the complaint and no options for review are available. See Guide to Judiciary Policy, vol.
2, pt. E, § 320, Art. VIII, Rule 24 cmt.; see also 28 U.S.C. § 360(b).

[11]GAO, *Standards for Internal Control in the Federal Government*, GAO-14-704G
(Washington, D.C.: Sept. 10, 2014).

We originally planned to assess the effectiveness of judiciary's workplace
conduct policies and practices by conducting an independent survey of
judiciary employees. However, AOUSC officials told us the judiciary was
planning to conduct its own survey around the same time period and
raised concerns about competing survey efforts leading to confusion or
low response rates. Later we requested a copy of the survey questions,
and judiciary officials stated that the judiciary was not in a position to
release this document.[12] We also requested interviews with employee
advisory groups. After significant delays, the judiciary made one current
employee and one former employee available for interviews.[13] Based on
the information we obtained for this audit, we focused on the extent to
which the judiciary currently has performance measures or other efforts to
evaluate its policies and practices.

To understand the extent to which the judiciary has evaluated the
effectiveness of these policies and practices, we reviewed the judiciary's
Strategic Plan and other documents to identify any goals or performance
measures related to workplace conduct. We also interviewed officials with
responsibilities related to EDR policies and practices, such as DWRs and
an official from the Office of Judicial Integrity, as well as officials
cognizant of JC&D policies and practices. To assess the extent to which
the judiciary has evaluated the effectiveness of its EDR and JC&D
policies and practices, we compared the information collected from
documents and interviews against the principle related to establishing
performance measures in *Standards for Internal Control in the Federal
Government*.

---

[12]According to judiciary officials, the survey was administered from January 12 through
February 17, 2023, and they received responses from roughly 14,000 of approximately
28,000 employees surveyed.

[13]Completion of our audit was delayed significantly because of the challenges and delays
in obtaining information from the judiciary.

# Appendix II: Summary Analysis of Whether Judiciary Actions and Policy Aligned with Selected Recommended Practices Developed by the Equal Employment Opportunity Commission

This appendix provides further information on our determination of the extent to which the judiciary's national and circuit-level actions and policy aligned with selected practices described in each of the four categories described by the Equal Employment Opportunity Commission's (EEOC) Promising Practices for Preventing Harassment. These four categories are: (1) leadership and accountability, (2) comprehensive and effective anti-harassment policy, (3) effective and accessible harassment complaint system, and (4) effective anti-harassment training.[1]

The EEOC recommended practices are not legal requirements under federal employment discrimination laws but may enhance employers' compliance efforts when addressing matters of harassment. The EEOC recommended practices are also not legal requirements for the judiciary. However, we determined they were appropriate criteria for assessing the judiciary's activities. The Federal Judiciary Workplace Conduct Working Group acknowledged the EEOC findings as an empirical baseline for its own evaluation of the sufficiency of the workplace conduct policies and practices within the judiciary.

**Leadership and Accountability.** The judiciary's national-level leadership activities aligned with three of four selected EEOC recommended practices related to engaged leadership and accountability and partially aligned with one recommended practice (see table 2).

**Table 2: Extent to Which the Judiciary's National Leadership Activities Align with Selected EEOC Recommended Practices for Leadership and Accountability in Preventing and Responding to Harassment**

| Selected EEOC Recommended Practices | Alignment |
|---|---|
| Incorporate enforcement of, and compliance with, the organization's harassment and other discrimination policies and procedures in the organization's operational framework. | ● |
| Assess harassment risk factors and take steps to minimize or eliminate those risks. | ◐ |

[1]We assessed national-level activities for the first three categories—leadership and accountability, comprehensive and effective anti-harassment policy, and effective and accessible harassment complaint system. For the training category, we assessed training material used by circuits to train staff, managers, and judges, where relevant.

Case 1:20-cv-00066-WGY   Document 427   Filed 07/31/24   Page 64 of 77

Appendix II: Summary Analysis of Whether
Judiciary Actions and Policy Aligned with
Selected Recommended Practices Developed
by the Equal Employment Opportunity
Commission

| | |
|---|---|
| Engage organizational leadership in harassment prevention and correction efforts. | ● |
| Senior leaders could seek feedback about their anti-harassment efforts. For example, senior leaders could consider conducting anonymous employee surveys on a regular basis to assess whether harassment is occurring or is perceived to be tolerated; partnering with researchers to evaluate the organization's harassment prevention strategies. | ● |

Legend: ● Aligned, ◕ Partially aligned, ○ Did not align

Source: GAO analysis of information from the judiciary compared with selected Equal Employment Opportunity Commission's (EEOC) November 2017 Promising Practices for Preventing Harassment. | GAO-24-105638

Notes: "Aligned" means that the judiciary's national leadership activities were consistent with a selected EEOC recommended practice. "Partially aligned" means that the judiciary's national leadership activities are consistent with part, but not all, of a selected EEOC recommended practice. "Did not align" means that the judiciary's national leadership activities are not consistent with a selected EEOC recommended practice. We selected four out of 18 EEOC recommended practices for leadership and accountability. Our selections were based on whether each practice was explicit or practical enough for us to evaluate the documentary and testimonial evidence we received.

**Comprehensive and Effective Policy.** The judiciary's Model Employment Dispute Resolution (EDR) Plan aligned with seven of 11 selected EEOC recommended practices for having a comprehensive and effective anti-harassment policy and partially aligned with the remaining four recommended practices (see table 3).

**Table 3: Extent to Which the Judiciary's Model EDR Plan Aligned with Selected EEOC Recommended Practices for Comprehensive and Effective Policy for Preventing and Responding to Harassment**

| Selected EEOC Recommended Practices | Alignment[a] |
|---|---|
| A statement that the policy applies to employees at every level of the organization, as well as to applicants, clients, customers, and other relevant individuals | ◕ |
| An unequivocal statement that harassment based on, at a minimum, any legally protected characteristic is prohibited | ◕ |
| A description of any processes for employees to informally share or obtain information about harassment without filing a complaint | ● |
| A description of the organization's harassment complaint system, including multiple (if possible), easily accessible reporting avenues | ● |
| A statement that employees are encouraged to report conduct that they believe may be prohibited harassment (or that, if left unchecked, may rise to the level of prohibited harassment), even if they are not sure that the conduct violates the policy | ● |
| A statement that the employer will provide a prompt, impartial, and thorough investigation | ● |

Case 1:20-cv-00066-WGY   Document 427   Filed 07/31/24   Page 65 of 77

Appendix II: Summary Analysis of Whether
Judiciary Actions and Policy Aligned with
Selected Recommended Practices Developed
by the Equal Employment Opportunity
Commission

| | |
|---|---|
| A statement that the identity of individuals who report harassment, alleged victims, witnesses, and alleged harassers will be kept confidential to the extent possible and permitted by law, consistent with a thorough and impartial investigation | ● |
| A statement that employees are encouraged to respond to questions or to otherwise participate in investigations regarding alleged harassment | ◑ |
| A statement that information obtained during an investigation will be kept confidential to the extent consistent with a thorough and impartial investigation and permitted by law | ● |
| An assurance that the organization will take immediate and proportionate corrective action if it determines that harassment has occurred | ◑ |
| An unequivocal statement that retaliation is prohibited, and that individuals who report harassing conduct, participate in investigations, or take any other actions protected under federal employment discrimination laws will not be subjected to retaliation | ● |

Legend: ● Aligned, ◑ Partially aligned, ○ Did not align

Source: GAO analysis of information from the judiciary compared with selected Equal Employment Opportunity Commission's (EEOC) November 2017 Promising Practices for Preventing Harassment. | GAO-24-105638

Notes: "Aligned" means that the judiciary's Model Employment Dispute Resolution (EDR) Plan was consistent with a selected EEOC recommended practice identified by EEOC. "Partially aligned" means that the judiciary's Model EDR Plan was consistent with part, but not all, of a selected EEOC recommended practice. "Did not align" means that the judiciary's Model EDR Plan was not consistent with a selected EEOC recommended practice. We selected 11 out of 16 EEOC recommended practices for comprehensive and effective policy. Our selections were based on whether each practice was explicit or practical enough for us to evaluate the documentary and testimonial evidence we received.

[a]To evaluate the extent to which the judiciary's policy aligned with the selected EEOC recommended practices for effective anti-harassment policy, we focused our review on the judiciary's Model EDR Plan, the judiciary's main anti-harassment policy. All courts must adopt and implement an EDR Plan based on the Model EDR Plan. While court may make modifications to the Model EDR Plan, no modification should diminish or curtail any of the rights or remedies laid out in the Model EDR Plan.

**Effective and Accessible Complaint System.** The judiciary's complaint system aligned with four of five selected EEOC recommended practices for having a trusted and accessible complaint system and partially aligned with the one remaining recommended practice (see table 4).

Case 1:20-cv-00066-WGY   Document 427   Filed 07/31/24   Page 66 of 77

Appendix II: Summary Analysis of Whether
Judiciary Actions and Policy Aligned with
Selected Recommended Practices Developed
by the Equal Employment Opportunity
Commission

**Table 4: Extent to Which the Judiciary's EDR Complaint System Aligned with Selected EEOC Recommended Practices for an Effective and Accessible Complaint System**

| Selected EEOC Recommended Practices | Alignment |
|---|:---:|
| Provides multiple avenues of complaint, if possible, including an avenue to report complaints regarding senior leaders | ● |
| May describe the information the organization requests from complainants, even if complainants cannot provide it all, including: the alleged harasser(s), alleged victim(s), and any witnesses; the date(s) of the alleged harassment; the location(s) of the alleged harassment; and a description of the alleged harassment | ● |
| May include voluntary alternative dispute resolution processes to facilitate communication and assist in preventing and addressing prohibited conduct, or conduct that could eventually rise to the level of prohibited conduct | ● |
| Includes processes to determine whether alleged victims, individuals who report harassment, witnesses, and other relevant individuals are subjected to retaliation, and imposes sanctions on individuals responsible for retaliation | ◑ |
| Includes processes to convey the resolution of the complaint to the complainant and the alleged harasser and, where appropriate and consistent with relevant legal requirements, the preventative and corrective action take | ● |

Legend: ● Aligned, ◑ Partially aligned, ○ Did not align

Source: GAO analysis of information from the judiciary compared with selected Equal Employment Opportunity Commission's (EEOC) November 2017 Promising Practices for Preventing Harassment. | GAO-24-105638

Notes: "Aligned" means that the judiciary's Employment Dispute Resolution (EDR) complaint system is consistent with a selected EEOC practice. "Partially aligned" means that the judiciary's EDR complaint system is consistent with part, but not all, of a selected practice. "Did not align" means that the judiciary's EDR complaint system is not consistent with a selected practice. We selected five out of 17 EEOC recommended practices for accessible complaint system. Our selections were based on whether each practice was explicit or practical enough for us to evaluate the documentary and testimonial evidence we received.

**Effective Anti-Harassment Training.** Circuits varied in the extent their training materials and activities aligned with selected EEOC recommended practices for regular and effective anti-harassment training (see table 5).

Appendix II: Summary Analysis of Whether
Judiciary Actions and Policy Aligned with
Selected Recommended Practices Developed
by the Equal Employment Opportunity
Commission

**Table 5: Extent to Which Each Circuit's Workplace Conduct Training Aligned with Selected EEOC Recommended Practices for Regular and Effective Anti-Harassment Training**

| Selected EEOC Recommended Practices | Number of circuits in alignment[a] | | |
|---|---|---|---|
| | Aligned | Partially Aligned | Did not align |
| Championed by senior leaders[a] | 9 | 3 | 1 |
| Repeated and reinforced regularly[a] | 4 | 9 | 0 |
| Provided to employees at every level and location of the organization[a] | 12 | 1 | 0 |
| Tailored to the specific workplace and workforce | 12 | 0 | 0 |
| Descriptions of prohibited harassment, as well as conduct that if left unchecked, might rise to the level of prohibited harassment | 12 | 0 | 0 |
| Examples that are tailored to the specific workplace and workforce | 5 | 3 | 4 |
| Information about employees' rights and responsibilities if they experience, observe, or become aware of conduct that they believe may be prohibited | 11 | 1 | 0 |
| Encouragement for employees to report harassing conduct | 10 | 1 | 1 |
| Explanations of the complaint process, as well as any voluntary alternative dispute resolution processes | 12 | 0 | 0 |
| Explanations of the information that may be requested during an investigation, including: the name or a description of the alleged harasser(s), alleged victim(s), and any witnesses; the date(s) of the alleged harassment; the location(s) of the alleged harassment; and a description of the alleged harassment | 0 | 0 | 12 |
| Assurance that employees who report harassing conduct, participate in investigations, or take any other actions protected under federal employment discrimination laws will not be subjected to retaliation | 12 | 0 | 0 |
| Explanations of the range of possible consequences for engaging in prohibited conduct | 0 | 0 | 12 |
| Opportunities to ask questions about the training, harassment policy, complaint system, and related rules and expectations | 4 | 8 | 0 |
| Identification and provision of contact information for the individual(s) and/or office(s) responsible for addressing harassment questions, concerns, and complaints. | 10 | 2 | 0 |
| Effective training for supervisors and managers includes information about how to prevent, identify, stop, report, and correct harassment, such as: Identification of potential risk factors for harassment and specific actions that may minimize or eliminate the risk of harassment; Easy to understand, realistic methods for addressing harassment that they observe, that is reported to them, or that they otherwise learn of; Clear instructions about how to report harassment up the chain of command; and Explanations of the confidentiality rules associated with harassment complaints | 6 | 6 | 0 |

Appendix II: Summary Analysis of Whether
Judiciary Actions and Policy Aligned with
Selected Recommended Practices Developed
by the Equal Employment Opportunity
Commission

| | | | |
|---|---|---|---|
| Effective training for supervisors and managers includes an unequivocal statement that retaliation is prohibited, along with an explanation of the types of conduct that are protected from retaliation under federal employment discrimination laws, such as: complaining or expressing an intent to complain about harassing conduct; Resisting sexual advances or intervening to protect others from such conduct; and Participating in an investigation about harassing conduct or other alleged discrimination | 4 | 8 | 0 |
| Effective training for supervisors and managers includes explanations of the consequences of failing to fulfill their responsibilities related to harassment, retaliation, and other prohibited conduct | 6 | 4 | 2 |

Source: GAO analysis of information from the judiciary compared with selected Equal Employment Opportunity Commission's (EEOC) November 2017 Promising Practices for Preventing Harassment. | GAO-24-105638

Notes: We focused our assessment on circuit-level workplace conduct training that was offered to the majority of employees within each circuit. We reviewed training materials we received from each of the 13 circuits and omitted one circuit's training material because it was not offered to a majority of the circuit's employees. We understand that some circuits may offer additional trainings related to workplace conduct policies and practices, but we did not include them in our assessment to provide a consistent analysis of similar types of training across the circuits. We also reviewed statements made by each circuit's Director of Workplace Relations (DWR) to assess the extent to which each circuit's training material and related activities align with the selected EEOC recommended practices. While Administrative Office of the U.S. Courts officials told us that the workplace conduct training from the national Office of Judicial Integrity is open to all court employees, court leaders from one circuit specially encourage their employees, supervisors, and managers to take the workplace conduct training conducted by the judiciary's national Office of Judicial Integrity in lieu of taking circuit-level training. As a result, we assessed the national workplace conduct training material for our review of this circuit.

"Aligned" means that the circuit's training document(s) or activity was consistent with a selected EEOC recommended practice. "Partially aligned" means that the circuit's training document(s) or activity was consistent with part, but not all, of a selected EEOC recommended practice. "Did not align" means that the circuit's training document(s) or activity is not consistent with a selected EEOC recommended practice. We selected 17 out of 23 EEOC recommended practices for regular and effective anti-harassment training. Our selections were based on whether each practice was explicit and practical enough for us to evaluate the documentary and testimonial evidence we received.

[a]We partially excluded one circuit from our review of selected EEOC recommended practices. For the first three EEOC practices on training related activities, we included this circuit in our review. We compared statements made by the circuit's DWR to assess the extent that this circuit's training activities aligned with these first three EEOC practices. This circuit was excluded from the remaining selected EEOC recommended practices for training materials because the training material we received from the circuit's DWR did not meet our criterion at the time of our review—that the training material be used to train the majority of employees across the circuit. We understand that this training material was only used to train employees in one court in the circuit at the time of our analysis. As a result, the first three EEOC practices will add up to 13 circuits while the remaining EEOC practices will add up to 12 circuits.

Case 1:20-cv-00066-WGY   Document 427   Filed 07/31/24   Page 69 of 77

# Appendix III: Comments from the Federal Judiciary



ADMINISTRATIVE OFFICE OF THE
UNITED STATES COURTS

HONORABLE ROBERT J. CONRAD, JR.
Director

WASHINGTON, D.C. 20544

May 23, 2024

Dr. Gretta Goodwin, Ph.D.
Director, Homeland Security and Justice
U.S. Government Accountability Office
441 G Street NW
Washington, DC 20548

Dear Director Goodwin:

The Administrative Office of the United States Courts (AO) acknowledges receipt of the Government Accountability Office's (GAO) draft report *Federal Judiciary: Additional Actions Would Strengthen Efforts to Prevent and Address Workplace Misconduct* (GAO-24-105638). Technical corrections have been provided to GAO in a separate communication.

Based on an in-depth review of Judiciary policies and practices, the draft report finds that "[t]he protections that apply to Judiciary employees are similar to the statutory protections that apply to most federal employees." In addition, GAO notes that "certain protections exceed those that apply to most other federal employees," including protections against abusive conduct that provide Judiciary employees with enforceable recourse for instances of harassment, even when the conduct is not discriminatory or based on a protected class. While Judiciary employees are not statutorily included under the same civil rights laws that create protections for other federal employees, Judiciary employees are afforded the substantive protections of those statutes through Judiciary policy. These policies include codes of conduct, Employee Dispute Resolution (EDR) plans, and human resources policies.

The draft report also documents the Judiciary's numerous efforts to promote an exemplary workplace and protect employees from harassment and other workplace misconduct. The Judiciary's national policymaking body, the Judicial Conference of the United States (Judicial Conference), adopted a national equal employment opportunity policy in 1966. Significant policy advances have expanded and clarified the scope of employee protections over the years. The first EDR Plan was approved by the Judicial Conference in 1997, and modifications to the Plan have provided whistleblower protections and clarified the obligations of judges and employees to report workplace misconduct. Other updates have expanded the avenues for addressing reports of workplace misconduct. As in any workplace, continual review and thoughtful revision of workforce protections are needed, and the Judiciary is committed to supporting its more than 30,000 employees by addressing workplace conduct issues promptly and effectively.

A TRADITION OF SERVICE TO THE FEDERAL JUDICIARY

Dr. Gretta Goodwin, Ph.D.
Page 2

**Improvements Based on Recommendations from the
Workplace Conduct Working Group**

The draft report documents Judiciary actions taken to prevent and address workplace
misconduct, with a focus on actions taken since 2017. In 2017, Chief Justice John G.
Roberts, Jr. called for the creation of a working group to evaluate the Judiciary's workplace
conduct policies and procedures. The Chief Justice charged this group with considering
whether any changes were needed in codes of conduct, guidance to employees on issues of
confidentiality and reporting instances of workplace misconduct, educational programs, and
rules for investigating and processing workplace misconduct complaints. The Federal
Judiciary Workplace Conduct Working Group (Working Group) first convened in January
2018, and the Judiciary continues to engage in a substantive and deliberate effort to foster
respectful, professional, and safe workplaces.

Based on recommendations made by the Working Group in 2018, 2019, and 2022, the
Judiciary has improved the environment for its employees in numerous ways:

- Significantly streamlined and improved its EDR processes, including effective formal
  and informal avenues to address concerns;

- Expanded workplace protections to include an express prohibition against abusive
  conduct, addressing harassing behavior even when it is not discriminatory;

- Established the national Office of Judicial Integrity and hired Directors of Workplace
  Relations in every circuit, creating an interlaced network of circuit and national
  workplace specialists who are outside the supervisory chain of command and
  positioned to provide confidential guidance and assistance to all Judiciary employees;

- Updated codes of conduct to clarify confidentiality obligations, remove barriers to
  reporting, and emphasize the responsibility of all judges and employees to take
  appropriate action upon learning of potential workplace misconduct;

- Amended the Rules for Judicial-Conduct and Judicial-Disability Proceedings (JC&D)
  Rules to, among other changes, clarify confidentiality obligations and that judicial
  misconduct includes: (1) failing to report reliable information reasonably likely to
  constitute judicial misconduct or disability; (2) abusive or harassing behavior,
  including sexual harassment and creating a hostile work environment for judicial
  employees; and (3) intentional discrimination;

- Developed a new Model Federal Public Defender Organization (FPDO) EDR Plan[1] to
  address the issues unique to the federal public defender community while providing
  the same protections and process options;

---

[1]Prior to the adoption of the Model FPDO EDR Plan in September 2021, the 2019 Model EDR Plan applied to all
judges, court employees, and federal public defender organization employees.

Case 1:20-cv-00066-WGY    Document 427    Filed 07/31/24    Page 71 of 77

Dr. Gretta Goodwin, Ph.D.
Page 3

- Created and made available a Judiciary-wide EDR Interpretive Guide and Handbook
  to provide detailed explanations and step-by-step directions for each of the EDR
  options for resolution; and

- Expanded nationwide, circuit, and local workplace conduct training programs tailored
  for judges and Judiciary employees, as well as additional programs on promoting
  civility and respect, and other initiatives designed to prevent workplace misconduct
  from occurring and foster an exemplary workplace.

**Recommendations**

The draft report makes eight recommendations for further improvement, including
recommendations that the Judiciary more fully align with selected Equal Employment
Opportunity Commission (EEOC) recommended practices. The AO will work with the
Working Group, the Judicial Conference, and other advisory bodies to assess and respond to
GAO's recommendations as the Judiciary continues to consider and implement
improvements in workplace conduct policies and procedures.

*Updates to Model EDR Plan*

Recommendation 1 states that the Model EDR Plan and related activities should be
updated to more fully align with selected EEOC recommended practices. EEOC
recommended practices have informed many of the improvements that the Judiciary has
implemented. The Judiciary will continue to seek alignment with these practices as it looks
for ways to improve its Model EDR Plan and related activities. In its 2022 report, the
Working Group built upon its earlier recommendations to improve Judiciary policies by
recommending additional updates to the Model EDR Plan, including procedural safeguards
to ensure that the informal and formal EDR options for addressing workplace conduct
concerns are consistent, unbiased, and effective. The Working Group also recommended
that the Judiciary assess incorporation of additional monetary remedies as part of the EDR
complaint process. These changes are under consideration by the Judicial Conference.

*Updates to Training Materials in the Circuits*

Recommendation 2 states that workplace conduct training materials and activities in
the circuits should be updated to more fully align with selected EEOC recommended
practices.

While the Judiciary has made great strides in expanding training throughout the
circuits, the EEOC recommended practices provide additional areas where improvements can
be made, such as including explanations of the range of possible consequences for engaging
in prohibited conduct. These explanations can be included in future training, highlighting the
statement in the Model EDR Plan that appointing officials should assess whether action,
including disciplinary or other personnel action against an employee who engaged in

Dr. Gretta Goodwin, Ph.D.
Page 4

wrongful conduct, is necessary. As in most organizations, personnel actions to address
wrongful conduct are addressed through an employee's management chain rather than
through a remedial process such as EDR. In the Judiciary, these personnel actions are
handled at each court and/or employing office.

One of the Working Group's recommendations in its 2022 report was to strengthen
existing policies regarding annual EDR training. The AO will continue to coordinate with
circuit executives and others to communicate the need to review and update training
materials.

*Collecting and Analyzing Data on Issues Raised Through Informal Advice Option*

Recommendation 3 states that data on issues raised through the Informal Advice
option in the Model EDR Plan should be collected and analyzed. By its nature, the Informal
Advice option is a confidential and informal avenue for employees to seek guidance on a
range of topics. Employees can ask questions anonymously to better understand their rights
and protections, reporting avenues and processes, and options for resolution and remedies
available. No formal action is taken by the person providing Informal Advice unless the
employee requests it (or if there is a safety risk or threat).

In its 2022 report, the Working Group recommended that data regarding Informal
Advice be collected at a high level (i.e., on the number of contacts). While this data would
provide insights on the usage rate of Informal Advice at the national and circuit level, the
Working Group's recommendation emphasized that any such data collection must be
carefully considered to avoid diminishing the confidentiality protections necessary for the
effectiveness of Informal Advice. Implementation of Informal Advice data collection is
currently being evaluated as part of the Judiciary's normal policymaking process, which
involves input from court and defender services representative advisory groups for
consideration by the relevant Judicial Conference committees and the Conference itself.

*Collecting and Analyzing Data on Workplace Misconduct Complaints Made Outside EDR
and JC&D Processes*

Recommendation 4 states that a circuit-level mechanism should be developed to
collect and analyze data on workplace misconduct complaints made outside of the EDR and
JC&D processes. The Judiciary has several initial concerns with this recommendation.
Implementation of such a data collection system may not be feasible and presents issues with
reliability and usefulness of the data collected. Such a system may also negatively impact
otherwise effective efforts at the local level to address inappropriate conduct early and
without unnecessary formality.

The Model EDR Plan details the numerous avenues available for reporting workplace
concerns. The Judiciary's multiple reporting avenues are specifically designed to encourage
early reporting of conduct concerns *before* they escalate to potential policy violations, for

Dr. Gretta Goodwin, Ph.D.
Page 5

which EDR processes were designed to address and remediate. Indeed, employees often raise workplace concerns outside of EDR processes precisely because they know the problematic behavior does not rise to the level of policy-violating forms of wrongful conduct. The Judiciary encourages employees to report *any* concern that might negatively impact the Judiciary workplace. Reporting concerns to the human resources department, or to a manager or supervisor, are some ways that Judiciary employees can raise issues early and may prevent escalation into cognizable wrongful conduct. Given the sheer number of individuals who might field some type of concern, the recommended data collection efforts may create significant systemic challenges.

Formalizing a system to categorize and track these types of informal circumstances could chill reporting, as employees may be reluctant to confide in their supervisors or managers if every conversation has the potential to be documented and reported. Further, the burden of requiring this assessment and reporting of routine managerial discussions could thwart the genuine efforts of those managers to address employee concerns brought to their attention. In any organization, it would be difficult for human resource professionals, supervisors, and managers to determine which conversations with employees should be documented through an official reporting mechanism. Additionally, it is plausible that if an employee raises concerns with a supervisor or colleague who has engaged in wrongful conduct, that supervisor or colleague would be required to self-report their own conduct.

Despite these initial concerns, the Judiciary will bring GAO's recommendation to the Working Group and advisory groups for further consideration.

*Evaluating the Effectiveness of the Judiciary's EDR and JC&D Policies and Practices and Setting Performance Measures*

Recommendations 5 through 8 are related to evaluating the effectiveness of the Judiciary's EDR and JC&D policies and practices and setting performance measures to determine whether they are achieving strategic workplace conduct goals. The Judiciary's evaluation of workplace conduct programs is underway. In its 2022 report, the Working Group's first recommendation was to conduct a nationwide climate survey at regular intervals of all Judiciary employees "[…] to assess the workplace environment and to provide insight into the prevalence of workplace conduct issues and the impact and effectiveness of the improvement the Judiciary has made to its policies and processes."

The Working Group partnered with the Federal Judicial Center to administer and disseminate a national workplace survey to all current court and federal public defender organization employees. The survey was administered in January and February 2023 to approximately 28,000 employees and the Working Group recently received a report of the survey results. The Working Group will use the results to help inform future recommendations to the Judicial Conference, including any further changes or improvements to the Judiciary's EDR and JC&D policies and practices.

Dr. Gretta Goodwin, Ph.D.
Page 6

## Conclusion

As noted by GAO in its report, the Judiciary "has committed to providing a workplace of respect, civility, fairness, and dignity, free of discrimination and harassment." The Judiciary takes this commitment seriously and will continually take steps to maintain and improve such a workplace.

Sincerely,

Robert J. Conrad, Jr.
Director

# Appendix IV: GAO Contact and Staff Acknowledgments

| | |
|---|---|
| **GAO Contact** | Gretta L. Goodwin, (202) 512-8777 or goodwing@gao.gov |
| **Staff Acknowledgments** | In addition to the individual named above, Tonnyé Conner-White (Assistant Director), Meghan Squires (Analyst-In-Charge), Dominick Dale, Elizabeth Dretsch, Melissa Hargy, Eric Hauswirth, Dainia Lawes, Sami Lyew, Janet Temko-Blinder, and Sonja Ware made key contributions to this report. |

| | |
|---|---|
| GAO's Mission | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| Obtaining Copies of GAO Reports and Testimony | The fastest and easiest way to obtain copies of GAO documents at no cost is through our website. Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. You can also subscribe to GAO's email updates to receive notification of newly posted products. |
| Order by Phone | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, https://www.gao.gov/ordering.htm. |
| | Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. |
| | Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| Connect with GAO | Connect with GAO on Facebook, Flickr, Twitter, and YouTube.<br>Subscribe to our RSS Feeds or Email Updates. Listen to our Podcasts.<br>Visit GAO on the web at https://www.gao.gov. |
| To Report Fraud, Waste, and Abuse in Federal Programs | Contact FraudNet:<br><br>Website: https://www.gao.gov/about/what-gao-does/fraudnet<br><br>Automated answering system: (800) 424-5454 or (202) 512-7700 |
| Congressional Relations | A. Nicole Clowers, Managing Director, ClowersA@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| Public Affairs | Sarah Kaczmarek, Acting Managing Director, KaczmarekS@gao.gov, (202) 512-4800, U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |
| Strategic Planning and External Liaison | Stephen J. Sanford, Managing Director, spel@gao.gov, (202) 512-4707 U.S. Government Accountability Office, 441 G Street NW, Room 7814, Washington, DC 20548 |