UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA

_____
                              )
CARYN DEVINS STRICKLAND,       )
                              )
              Plaintiff,       )
                              )
        v.                     )        CIVIL ACTION
                              )        No. 20-00066-WGY
UNITED STATES OF AMERICA[1],   )
                              )
              Defendants.      )
_____)

YOUNG, D.J.[2]                          August 9, 2024

**FINDINGS OF FACT, RULINGS OF LAW, AND ORDER FOR JUDGMENT**


I.   **INTRODUCTION**

     This case proceeds subject to the mandate of the United

States Court of Appeals for the Fourth Circuit in Strickland v.

United States, 32 F.4th 311, 377 (4th Cir. 2022).

     Its procedural history, however, begins two years earlier

and needs be recited briefly.

_____
     [1] As this case presently proceeds against federal judicial
officers and employees in their official capacities, the United
States government has provided the defense and is the
appropriate defendant.  See, e.g., Defs.' Answer Pl.'s Compl.
67, ECF No. 127.  The individuals are each named in the body of
the opinion.  When referring to the Defendants collectively, the
Court refers to them as the "Judicial Administrators."

     [2] Of the District of Massachusetts, sitting by designation.

1

## II. PROCEDURAL HISTORY

In 2018, the Plaintiff, Caryn Devins Strickland ("Strickland"), filed two employment dispute claims -- a Chapter IX report of wrongful conduct and a Chapter X request for counseling -- , alleging sexual harassment, discrimination, and retaliation, under the Fourth Circuit Court of Appeals' Employment Dispute Resolution Plan ("EDR Plan"). Compl. ¶ 274, ECF No. 1.

Nearly two years later, on March 3, 2020, Strickland brought this suit alleging four counts against individuals and entities who participated in the resolution of her claims under the EDR Plan. She alleged a violation of the Fifth Amendment Due Process Clause (Count I), a violation of the Fifth Amendment Equal Protection Clause (Count II), conspiracy to violate civil rights under 42 U.S.C. § 1985 (Count III), and neglect to prevent conspiracy to violate civil rights under 42 U.S.C. § 1986 (Count IV). Id. ¶¶ 494-505.

Strickland sued the following people in their individual capacities: Sheryl L. Walter as General Counsel for the Administrative Office of the United States Courts; the Honorable Roger L. Gregory, Chief Judge of the Fourth Circuit ("Chief Judge Gregory");[3] James N. Ishida, Circuit Executive of the

_____

[3] Chief Judge Gregory served as the Chief Judge of the Fourth Circuit Court of Appeals from 2016-2023. Fed. Jud. Ctr.,

2

Fourth Circuit and Secretary of the Judicial Council of the Fourth Circuit ("Ishida"); and Anthony Martinez, Federal Public Defender for the Western District of North Carolina ("Martinez") (collectively the "Individual Capacity Defendants"). Id. ¶¶ 23-35. Strickland also sued the following people and entities in their official capacities: the United States of America; the Judicial Conference of the United States; the Administrative Office of the United States Courts; the United States Court of Appeals for the Fourth Circuit; the Judicial Council of the Fourth Circuit; Chief Judge Gregory; Ishida; the Honorable Roslynn R. Mauskopf, Chair of the Judicial Conference Committee on Judicial Resources; James C. Duff, Director of the Administrative Office of the United States Courts; John Doe(s) c/o Office of the General Counsel for the Administrative Office of the United States Courts; and Martinez, (collectively, the "Official Capacity Defendants"). Id. Strickland did not sue her alleged harasser in this action. See id.

### A. In December 2020, This Court Dismissed Strickland's Claims.

On December 30, 2020, this Court dismissed all of Strickland's claims. Memorandum & Order 3-4, ECF No. 102. First, the Court granted the Official Capacity Defendants'

---

Gregory, Roger L., https://www.fjc.gov/history/judges/gregory-roger-l (last visited Aug. 5, 2024).

motion to dismiss because it ruled that "sovereign immunity shield[ed] them from suit." Id. at 3. Second, the Court granted the Individual Capacity Defendants' motion to dismiss because Strickland "fail[ed] to allege cognizable claims against them." Id. at 3-4.

Specifically, this Court dismissed Count I, alleging a Fifth Amendment Due Process violation, for failing to allege the deprivation of a constitutionally protected interest. Id. at 25. This Court held that the Fifth Amendment protects neither Strickland's asserted liberty interest in being free from unlawful discrimination nor her asserted property interest in the EDR Plan's terms. Id. at 26-27, 30. This Court dismissed Count II, in which Strickland alleged that the Individual Capacity Defendants violated the Fifth Amendment's Equal Protection Clause because they discriminated on the basis of sex in mishandling her sexual harassment complaints, on grounds that such a theory was not class-based discrimination but rather would require "graft[ing] Title VII standards onto the Fifth Amendment." Id. at 34-35. Finally, this Court dismissed Count III, alleging a conspiracy to violate her civil rights under 42 U.S.C. § 1985(3), and Count IV, alleging neglect in preventing a conspiracy to violate her civil rights under 42 U.S.C. § 1986, because the Court ruled Strickland had "fail[ed] to plead" that the Judicial Administrators were motivated by a "specific class-

4

based, invidiously discriminatory animus." Id. at 36-37

(quoting Simons v. Poe, 47 F.3d 1370, 1376 (4th Cir. 1995)).

Strickland promptly appealed this decision.

> **B.    In March 2022, the Fourth Circuit Affirmed in Part and Reversed in Part This Court's Motion to Dismiss Ruling, Holding That Strickland May Pursue Prospective Equitable Relief for Her Fifth Amendment Due Process and Equal Protection Claims.**

On March 2, 2022, the Court of Appeals for the Fourth

Circuit[4] heard oral argument on appeal, and the Court published

its opinion on April 26, 2022.  See Strickland, 32 F.4th at 311.

Regarding Strickland's first claim, under the Fifth

Amendment's Due Process clause, the Fourth Circuit ruled that

this Court "erred in failing to recognize that the Fourth

Circuit's EDR Plan afforded Strickland protected property

interests but did not err in concluding that Strickland failed

to adequately allege a protected liberty interest."  Id. at 347.

The Fourth Circuit went on to hold that "Strickland's facial

challenge to the EDR Plan fails, but that her as-applied

challenge is sufficient to state a claim upon which relief can

be granted."  Id. at 348.

---

[4] The members of the Fourth Circuit Court of Appeals recused themselves, and a panel of federal appellate judges sat by designation to hear the appeal, including Mary Beck Briscoe, Senior Circuit Judge of the United States Court of Appeals for the Tenth Circuit, Ronald Lee Gilman, Senior Circuit Judge of the United States Court of Appeals for the Sixth Circuit, and Michael Joseph Melloy, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit.

5

Next, in reviewing Strickland's Fifth Amendment Equal Protection claim, the Fourth Circuit concluded that "Strickland's complaint adequately alleged that defendants violated her equal protection rights under the Fifth Amendment." Id. at 360.

Regarding Strickland's statutory claims under sections 1985(3) and 1986, the Fourth Circuit determined that Strickland's complaint failed "to plausibly allege any conspiratorial plan of class-based discriminatory animus," and therefore affirmed this Court's dismissal of those counts. Id. at 362.

The Fourth Circuit went on to discuss whether the "Official Capacity Defendants [were] entitled to sovereign immunity from the claims asserted against them." Id. The Fourth Circuit ruled that Strickland's Fifth Amendment Equal Protection and Due Process claims are not barred by sovereign immunity to the extent that she is seeking prospective equitable relief; thus, while Strickland cannot recover back pay, she may recover reinstatement or front pay in lieu of reinstatement. Id. at 371.

Lastly, the Fourth Circuit assessed whether Bivens barred Strickland's claims against the Individual Capacity Defendants.[5]

---

[5] The Court also evaluated the Judicial Administrator's claims that Strickland lacked a cause of action under the Civil

<u>Id.</u> at 362-370; <u>see</u> <u>Bivens</u> v. <u>Six Unknown Named Agents of</u>
<u>Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971). The Court
held that "<u>Bivens</u> should not be extended to the Fifth Amendment
equal protection claim asserted by Strickland in her complaint"
and, thus, Strickland failed to state a claim against Individual
Capacity Defendants. <u>Strickland</u>, 32 F.4th at 374.

The Court summarized its ruling as follows:

> Strickland's Fifth Amendment due process claim, to the
> extent that it alleges a deprivation of Strickland's
> property rights, and to the extent that it is asserted
> against the Official Capacity Defendants, is
> sufficient to survive the motions to dismiss; to the
> extent the Fifth Amendment due process claim alleges
> the deprivation of a liberty interest, however, it was
> properly dismissed by the district court.

> Strickland's Fifth Amendment equal protection claim,
> to the extent that it is asserted against the Official
> Capacity Defendants, is sufficient to survive the
> motions to dismiss. The Official Capacity Defendants
> are entitled to sovereign immunity from the Fifth
> Amendment due process and equal protection claims only
> to the extent those claims seek back pay; in other
> words, Strickland's potential recovery on those claims
> against the Official Capacity Defendants is limited to
> prospective equitable relief.

> With respect to the Individual Capacity Defendants,
> Strickland's Fifth Amendment equal protection claim is
> subject to dismissal because Strickland cannot state a
> cause of action under <u>Bivens</u>. Strickland's §§ 1985
> and 1986 claims against the Individual Capacity
> Defendants are inadequately pled and were thus
> properly dismissed by the district court.

<u>Id.</u> at 377.

---

Service Reform Act, 5 U.S.C. § 1101 et seq., which the Court
rejected. <u>Id.</u> at 374.

**C. This Court Collapsed Strickland's Motion for Preliminary Injunction with a Trial on the Merits Pursuant to Rule 65(a), and the Fourth Circuit Denied Strickland's Interlocutory Appeal as to this Court's Rule 65(a) Ruling.**

Following the Fourth Circuit's mandate directing further proceedings in this Court, Strickland, on July 27, 2022, filed a motion for preliminary injunction, seeking compensation for lost earnings while litigation was pending. See Mot. Prelim. Inj., ECF No. 125. On September 8, 2022, this Court held oral argument on Strickland's motion and collapsed the motion for preliminary injunction with a trial on the merits, in accordance with Rule 65(a). See 9/8/2022 Minute Order, Electronic Clerk's Notes.

Following the Court's ruling, on September 9, 2022, Strickland filed an interlocutory appeal to the Fourth Circuit arising from this Court's alleged "refusal to grant and/or denial of her motion for a preliminary injunction." Not. Appeal, ECF No. 143. The Fourth Circuit dismissed Strickland's appeal for lack of jurisdiction. Order 4, ECF No. 156.

**D. This Court Denied Strickland's Motion for Summary Judgment Against Official Capacity Defendants, Granted and Denied in Part Strickland's Motion for Summary Judgment Against Individual Capacity Defendants, and Granted and Denied in Part Defendants' Motion for Summary Judgment.**

On June 21, 2022, Strickland filed an amended motion for partial summary judgment against the Official Capacity Defendants. See Pl.'s Mot. Leave File Supp. Mem. Supp. Mot.

8

Partial Summ. J., ECF No. 116.  On October 31, 2022, this Court heard oral argument on Strickland's motion for partial summary judgment against the Official Capacity Defendants.  After hearing arguments of counsel, the Court entered an order denying the motion.  See 10/31/22 Minute Order, Electronic Clerk's Note.

After further motion practice, both Strickland and the Judicial Administrators filed motions for summary judgment on June 1, 2023.  See Pl.'s Renewed Mot. Summ. J., ECF No. 243; Defs.' Mot. Summ. J., ECF No. 245.  This Court heard oral argument on the cross-motions for summary judgment on July 10, 2023.  After hearing the arguments of the parties, this Court granted in part and denied in part Strickland's motion for summary judgment, specifying that it was granted "only insofar that we will say that those facts that the defense has actually admitted are taken as established."  7/10/23 Mot. Hearing Tr. 25:20-22, ECF No. 268.  The Court denied, in part, the Judicial Administrators' motion for summary judgment, except for one matter that this Court took under advisement: viz. whether Strickland provided any plausible evidence of discriminatory intent on behalf of any supervisory defendant in their official capacity.  Id. at 26:2-18.  This Court entered an order on that issue on July 25, 2023, ruling that the Judicial Administrators were entitled to partial summary judgment on the equal protection claim as to all defendants except Martinez, in his

9

official capacity.  See Mem. and Order, ECF No. 258; see also
8/10/2023 Text Only Order, Electronic Clerk's Note.

Thus, the following claims, and defendants, remained for
trial, with prospective equitable relief as Strickland's only
potential remedy: her Fifth Amendment due process claim, to the
extent that it shows a deprivation of Strickland's property
rights, and to the extent that it is asserted against the
Official Capacity Defendants; and Strickland's Fifth Amendment
Equal Protection claim against Defendant Martinez in his
official capacity.

**E.   Trial Commenced in December 2023.**

Trial commenced on December 11, 2023, and lasted for six
days.  The parties made closing arguments on January 4, 2024.

During the first day of trial, directly after the parties'
opening statements, Strickland "rest[ed]" her case on the
exhibits and deposition transcripts she submitted prior to
trial.[6]  12/11/23 Tr. 32:23-36:20, ECF No. 399.  In response, the

---

[6] Based upon this submission, Strickland filed Proposed
Findings of Fact and Conclusions of Law, a document over 450
pages.  Pl.'s Proposed Findings Fact and Conclusions Law, ECF
No. 370 (submitting on December 11, 2023); see also Pl.'s Am.
Proposed Findings Fact and Conclusions Law ("Pl.'s PFOFCOL"),
ECF No. 387 (submitting a revised version on January 3, 2024).
The Judicial Administrators submitted their Proposed Findings of
Fact and Conclusions of Law on January 2, 2024.  Defs.' Post-
Trial Proposed Findings of Fact and Conclusions of Law ("Defs.'
PFOFCOL"), ECF No. 385.

Judicial Administrators moved for judgment on the merits
pursuant to Rule 52(c).  Id. at 36:23-37:2.  The Court took the
matter under advisement, id., and heard arguments on the motion
that afternoon.  12/11/23 Mot. Hearing Tr., ECF No. 406.[7]  The
Court made the following, narrow ruling as to Judicial
Administrators' motion for judgment on the merits:

> In part, the [Judicial Administrators'] motion is
> allowed, and that is that on all this evidence as I
> believe it to be at the close of the plaintiff's case,
> there is no basis for concluding that the plaintiff
> reasonably believed that the decision-maker in her
> employment discrimination dispute would be anyone
> other than an independent judicial officer.  There
> simply is no reason, no basis to draw that conclusion.
> In all other respects, the motion is denied.  It is
> within the Court's discretion to go on until the case
> is over, but more than that, it does seem to this
> Court that justice would be aided by hearing the case
> in full.

Id. at 13:18-14:5.

---

[7] During this motion hearing, Strickland argued, and the
Court agreed, that the Fourth Circuit's opinion, "identified one
route to establish a due process violation but, of course, would
not be exclusive of all other routes to establish a due process
claim."  12/11/23 Mot. Hearing Tr. 9:23-10:3.  During the
hearing, Strickland identified, as examples, other routes for
her due process claim, such as "when there is a severe deviation
in a way that the EDR plan is applied by the officials who are
responsible for administering the EDR process" and whether
"there would be remedies as a practical matter during a final
hearing."  Id. at 10:4-11:8.  She explained how the latter
example is different from the question of "whether a judge would
be the final presiding [officer] or whether that would be the
defender."  Id.

Trial then proceeded on both the equal protection claim, as well as the due process claim.[8]

This opinion follows.

## III. FINDINGS OF FACT — WHAT ACTUALLY HAPPENED[9]

### A. Background — Employee Dispute Resolution in the Federal Judiciary

Federal courts, and by extension, Federal Public Defenders Offices ("FDOs"), which are housed within district courts per

---

[8] When the government called Strickland as an adverse witness she refused to testify, citing her rights under the Fifth Amendment, but she soon abandoned that claim. 12/11/23 Strickland Tr. 38:7-40:25.

[9] Throughout this ordeal, Strickland surreptitiously recorded her interactions with those tasked with dealing with her case, including her supervisors, the investigator, the mediator, and the Fourth Circuit Executive, among others. The parties both rely on these recordings to aid in making their cases and the recordings are in evidence. As a litigation aid, transcripts were made of the recordings; however, the transcripts are not perfect, and the Court has noted multiple mistakes when comparing the written transcript to the audio recording. Throughout this opinion, the Court cites to the litigation aid transcripts for ease of citation. The Court, however, notes whenever that transcript diverges from the actual spoken words of the recorded audio.

The Court also notes that, at times, the facts are taken almost verbatim from the parties' submissions. The Court omits citations to these submissions and quotations for readability.

Finally, throughout trial, Strickland objected to the admission of certain exhibits (including five recordings and one email) on hearsay grounds; the Court sustained these objections and allowed the evidence not for the truth of the matter, but instead for the fact that they were said (and therefore for the effect on the listener). Strickland, however, relies on these exhibits throughout her proposed findings of fact for the truth, and does not limit her reliance simply on whether the statements made in the exhibits were in fact made. The Court therefore deems her hearsay objections with respect to these exhibits waived.

the Criminal Justice Act, are administered by the Administrative

Office of the Courts (the "AO"), as well as the Chief Justice

and the Judicial Conference of the United States.  Fed. Jud.

Ctr. and Nat'l Acad. of Pub. Admin., Enhancing Efforts to

Coordinate Best Workplace Practices Across the Federal Judiciary

8 (2024) ("Judicial Conference Report"); U.S. Courts, Defender

Services, https://www.uscourts.gov/services-forms/defender-

services (last visited July 29, 2024).  The AO promulgates

policies and processes for the federal courts, and by extension,

FDOs, including the Model Employee Dispute Resolution Plan ("EDR

Plan"), a set of policies and procedures that "prohibit[s]

discrimination, harassment, and retaliation, including conduct

that would violate Title VII [of the] Civil Rights Act of

1964[,] the Age Discrimination in Employment Act of 1967[,] and

the Americans with Disabilities Act of 1990 and the

Rehabilitation Act of 1973."[10]  U.S. Courts, Fact Sheet for

Workplace Protections in the Federal Judiciary,

https://www.uscourts.gov/about-federal-courts/workplace-

conduct/fact-sheet-workplace-protections-federal-judiciary (last

---

[10] Jill Langley served as the Judicial Integrity Officer
("JIO"), an employee of the AO, to "provide training and
education [regarding the Model EDR Plan] . . . nationally," from
December 2018 to March 2021.  Langley Dep. 27-28 (stating that
she is a "national resource" on the EDR Plan); 12/19/23 Langley
Tr. 29:6-9.  She has stated that the EDR Plan's definition of
sexual harassment purposefully mirrors private employment laws.
Langley Dep. 62:16-63:11.

13

visited July 29, 2024). Each circuit court in the United States has implemented its own EDR Plan based on the Model EDR Plan.

Per the Fourth Circuit EDR Plan,[11] an employee may make a "report of wrongful conduct" (a "Chapter IX report"), which will be "appropriately investigated." Tr. Ex. 136 at US4545. "[E]mployees are encouraged to report wrongful conduct to . . . their supervisor as soon as possible, before it becomes a [sic] severe or pervasive." Id. at US4545. "Employees found by the Chief Judge and/or unit executive to have engaged in wrongful conduct, as defined in this Plan, may be subject to disciplinary action." Id. A Chapter IX report, however, "is not the same as initiating or filing a claim," a process under Chapter X. Id. Chapter IX of the EDR Plan was intended to encourage employees to report instances of misconduct. Id. at US4545; 12/19/23 Langley Tr. 30:9-13. Chapter IX does not provide any employee with any rights or remedies. Tr. Ex. 136 at US4545; 12/19/23 Langley Tr. 30:19-31:4.

The EDR Plan also allows employees "who claim[] a denial of [] rights granted under. . . [the] Plan" to "seek resolution of

_____

[11] The Court, throughout this case, refers to the **2013** Fourth Circuit EDR Plan. The AO introduced a new Model EDR Plan in 2019; in response, the Fourth Circuit amended its EDR Plan in 2020, after the events of this case occurred. See In the Matter of the Review of the Employment Dispute Resolution Plan of the United States Court of Appeals for the Fourth Circuit, Order No. 414 (August 11, 2020).

14

such claims" through a Chapter X complaint.  Tr. Ex. 136 at

US4545.  Chapter X of the Plan is the formal dispute resolution

provision of the EDR Plan and consists of three stages:

counseling, mediation, and a hearing on the employee's formal

complaint.[12]  Id.; 12/19/23 Langley Tr. 31:5-32:15.  "The

respondent [in a Chapter X proceeding] shall be the employing

office which would be responsible for redressing, correcting or

abating the violation(s) alleged in the complaint."  Tr. Ex. 136

at US4551; see also id. at US4540 (defining "employing office"

to include an FDO).  After a formal complaint and a hearing

under Chapter X, a presiding judicial officer may order remedies

to successful complainants.[13]  Id. at US4555-56; 12/19/23 Langley

---

[12] Each of these stages is mandatory; a party cannot request
to skip one to move on to the next stage in the process.
12/19/23 Langley Tr. 31:5-32:15 (stating that the counseling and
mediation stage are "prerequisites" to filing a formal
complaint); see, e.g., Tr. Ex. 136 at US4550 (explaining that a
"[f]ailure to pursue mediation will preclude further processing
of the employee's claim under any other provisions of this
Chapter").  The EDR Plan states that the purpose of counseling
is to "discuss the employee's concerns and elicit information
regarding the matter which the employee believes constitutes a
violation; to advise the employee of his or her rights and
responsibilities and the procedures of the Court applicable to
the employment dispute resolution process; to evaluate the
matter; and to assist the employee in achieving an early
resolution of the matter, if possible."  Tr. Ex. 136 at US4549.
The EDR Plan further states that an employee is "encouraged to
bring his or her concerns to his or her supervisor or unit
executive, unless the supervisor or unit executive is the
alleged violator," prior to "invoking a request for counseling."
Id. at US4545-46.
[13] The Plan defines "judicial officer" as "a Circuit Judge
(including Senior Circuit Judge) of the United States Court of

15

Tr. 31:12-32:15.  Specifically, the EDR Plan states that "remedies may be provided in accordance with § 12 of this Chapter where the presiding judicial officer finds that the complainant has established by a preponderance of the evidence that a substantive right protected by this Plan has been violated[.]"  Tr. Ex. 136 at US4552-53; id. at US4555 ("Where judicial officers acting pursuant to § 10 or § 11 of this Plan find that a substantive right protected by this Plan has been violated, they may order a necessary and appropriate remedy."); see also id. at US4555-56 (listing certain available remedies).[14]

_____

Appeals for the Fourth Circuit appointed pursuant to Article III of the United States Constitution."  Tr. Ex. 136 at US4540.

[14] "Remedies which may be provided to successful complainants under this Plan include, but are not limited to:

> 1. placement of an employee in a position previously denied;
> 2. placement in a comparable alternative position;
> 3. reinstatement to a position from which previously removed;
> 4. prospective promotion to a position;
> 5. priority consideration for a future promotion or position;
> 6. back pay and associated benefits, including attorneys' fees, where the statutory criteria of the Back Pay Act, 5 U.S.C. § 5596, are satisfied;
> 7. records modification and/or expungement;
> 8. 'equitable' relief, such as temporary stays of adverse actions;
> 9. granting of family and medical leave; and
> 10. accommodation of disabilities through the purchase of specialized equipment or the

16

Chapter X of the EDR Plan directs the employing office to protect complaint "allegations filed under this Plan to the extent possible" but recognizes that allegations may need to "be shared on a need-to-know basis." Id. at US4546. "Claimants under [the] Plan [also] have the right to be free from retaliation because of filing a claim . . . ." Id.

The EDR Plan is administered within the Fourth Circuit by an Employment Dispute Resolution Coordinator ("EDR Coordinator") and the Chief Judge of the circuit; for the instant case, the role of EDR Coordinator was filled by James Ishida, the Circuit Executive for the Fourth Circuit, and the Chief Judge of the Fourth Circuit at that time was Judge Roger L. Gregory. 12/13/2023 Ishida Tr. 20:8-21:13, 23:17-19. As a Chapter IX report must be investigated, the appointed investigator for Strickland's claims was Heather Beam ("Beam"), an HR Specialist in a "dual function. . . for the probation office and the District Court." Id. at 25:2-4; Beam Dep. 43:14-24. Strickland eventually filed a request for mediation of her claims per the EDR Plan, and the Chief Circuit Mediator, Edward Smith ("Smith"), was appointed to mediate the dispute. Tr. Ex. 14 at US0519, US0521.

---

restructuring of duties and work hours, or other appropriate means."

Tr. Ex. 136 at US4555-56.

17

At the time Strickland reported her claims, there was no FDO manual on sexual harassment. Tr. Ex. 189 at US5950; Beam Dep. 157:9-12. The officials designated to investigate and mediate Strickland's claims received little training on how to handle a sexual harassment claim. Beam recalled reviewing an overview of the EDR process but does not recall whether she was provided guidance on how to conduct a workplace investigation.[15] See Beam Dep. 42:4-19. Smith had never worked on a sexual harassment case before and had never received training on handling a sexual harassment claim. Smith Dep. 94:12-22. The FDO did not receive any office-wide mandatory sexual harassment training until 2019. Tr. Ex. 137 at 14. Officials involved in the EDR process nationwide did not have mandatory training until 2019. Langley Dep. 64:5-13.

**B.   Caryn Devins Strickland**

In May 2010, Strickland graduated summa cum laude and Phi Beta Kappa from the University of Vermont with a Bachelor of Arts in Political Science and Spanish, earning a GPA of 3.98. Tr. Ex. 5 at US1302. In May 2013, Strickland graduated from

---

[15] Beam also did not have any experience conducting this type of investigation. Beam Dep. at 12:17-19 ("Q: Had you ever done an investigation like this before? A: No. This was my first one."). Aside from a "template" investigation report from the judiciary's intranet site, Beam did not "recall" using any other resources to guide her investigation of Strickland's allegations. Id. at 42:12-43:10.

18

Duke University School of Law with a 3.771, where she served on law review and was elected to Order of the Coif.  Id.  From August 2013 to August 2014, Strickland served as a law clerk for the Honorable Paul Reiber, Chief Justice of the Vermont Supreme Court, where she "[p]erformed legal research, drafted opinions, and assisted in judicial branch administration."  Id.  From September 2014 to August 2015, Strickland served as a law clerk for the Honorable James P. Jones, United States District Judge for the Western District of Virginia, where she "[p]erformed legal research and drafted opinions and jury instructions."  Id. From September 2015 to August 2016, Strickland served as a law clerk to the Honorable Peter W. Hall, Circuit Judge for the United States Court of Appeals for the Second Circuit, where she "[p]erformed legal research and drafted opinions [for] civil and criminal cases."  Id.  After clerking, Strickland was selected for a prestigious fellowship in the federal judiciary, where she served as a Supreme Court Fellow for the AO.  Id.; see also Tr. Ex. 135 at ¶ 21.  Strickland served in this role from August 2016 to July 2017 and worked on several projects to support the federal courts and the federal defender offices.  Tr. Ex. 5 at 1303; Tr. Ex. 135 at ¶ 21.

In April 2018, Strickland married her husband, Cooper Strickland, whom she met while clerking.  12/13/23 Strickland Tr. 13:23-14:6; Tr. Ex. 154 at 21:15-17.

**C.   At the Federal Defender Office – The Initial Phase**

In early March 2017, Strickland met with Ross Richardson, the interim Federal Defender for the Western District of North Carolina, to discuss working at the Federal Defender Office ("FDO") in Charlotte.  12/13/23 Martinez Tr. 116:20; 12/14/23 Martinez Tr. 121:1-7.  On March 21, 2017, Richardson sent Strickland an email, offering Strickland "the position of Research and Writing Attorney" ("R&W") with the following understanding: "[T]he idea would be for you to be in this role initially in order to get some experience.  We would look to move you to an Assistant Federal Defender position pretty soon thereafter."  Tr. Ex. 5 at US1259.  On March 24, 2017, Richardson sent a formal offer letter to Strickland, "confirming [their] conversation regarding [Strickland's] employment as a Research and Writing Specialist Attorney with the expectation that [Strickland] [would] transition to an Assistant Federal Defender position," "working at the Charlotte Headquarters Office," with a salary set at "Grade 14, Step 1, earning $101,929 per annum, including locality pay."  Id. at US1258. The offer letter does not detail when Strickland would be transitioned to an Assistant Federal Public Defender ("AFPD") position, nor does it mention any promised salary increases. See id.

Strickland accepted the role while she was still working as a Supreme Court Fellow. Tr. Ex. 135 at ¶ 38. Before joining the FDO, Strickland did not have any practice experience as a licensed attorney trying cases, arguing in court, or examining witnesses. 12/11/23 Strickland Tr. 41:9-42:13.

The AFPD position and the R&W position are distinct. An Assistant Federal Public Defender "can file a notice of appearance on a case, they have their own cases, file their own motions" -- they essentially act like full-time practicing attorneys with their own clients and cases. 12/14/23 Martinez Tr. 101:3-18, ECF No. 401. A Research and Writing Specialist, however, is not allowed to have her own cases, can only make supervised arguments in court, and cannot herself file an appearance and cannot sign motions. Id. The Federal Defender Manual, which has job descriptions for each role,[16] emphasizes

_____

[16] The FDO's employment manual contains a description of what an AFPD does. An Assistant Federal Public Defender:
   provides every aspect of legal representation to individuals charged with federal criminal offenses but who are unable to retain an attorney. Duties include trials and court hearings, direct appeals to the circuit court, habeas, post-conviction and witness representation, and representation in other matters such as supervised release hearings and probation and parole hearings.

Tr. Ex. 138 at US4968. In contrast, a R&W Specialist:
   provides advanced research and writing services to assistant federal defender (AFPD) staff on trial and appellate cases [and the] [g]eneral duties include examining, analyzing and researching records and issues; performing legal research and preparing legal

21

that the R&W role "does not ordinarily sign pleadings or make court appearances[,] [and] [t]he Research and Writing Specialist position is not intended to serve as a proxy, substitute, or replacement for an AFPD position, nor in the place of an addition [sic] AFPD position."  Tr. Ex. 138 at US4971.

Strickland began at the Federal Defender's Office for the Western District of North Carolina (Charlotte) as a Research & Writing Specialist on August 21, 2017.  Tr. Ex. 5 at US1302.

On December 5, 2017, Strickland emailed Martinez, the Federal Defender,[17] copying J.P. Davis ("Davis"), the First Assistant, asking if they could "meet sometime soon to discuss what the transition to an AFPD position will look like."  Tr. Ex. 164 at US4587.  Strickland asked about Martinez's expectations of her work and responsibilities and for a "rough timeline of how [her] duties may evolve."  Id.  Martinez believed Strickland, at this time, was "on track . . . to become

_____

documents; assisting AFPD staff with all aspects of
case preparation, training and continuing legal
education and supervision of other research staff as
appropriate.

Id. at US4971.

[17] Martinez joined the FDO in the Western District of North Caroline in 2017.  12/13/23 Martinez Tr. 113:2-21.  At the time of Strickland's hiring, Martinez had accepted the offer to be the Federal Defender, but had not yet begun his role, as he was awaiting a background clearance.  Id. at 116:14-117:6.  Martinez "skyped into" Strickland's hiring interview and was consulted on whether to hire her.  Id.

an AFPD." Martinez Dep. 102:18-103:4. Martinez did not give Strickland a timeline for when she would become an AFPD. 12/13/23 Martinez Tr. 118:2-119:3, ECF No. 400. Martinez explained he could not give a timeline because "there are too many factors that go into considering whether a person is prepared to be an AFPD[,]" including how the attorney handles clients, works on a team, relates to judges, handles oral arguments in court, and interacts with other entities or attorneys. Id. at 118:24-119:19.

Davis served as the First Assistant before and during Strickland's employment with the FDO. Tr. Ex. 135 at ¶ 51. The First Assistant worked as the Federal Defender's "principal deputy" and could "assist in the management of all phases of the FDO and take actions that affect the basic content and character of the FDO's administrative and legal operations." Tr. Ex. 137 at 3; Tr. Ex. 135 at ¶ 52. The First Assistant role is "a one-of-a-kind position within a defender organization and supervises a minimum of five (5) Assistant Federal Defenders (AFPDs)." Tr. Ex. 138 at US4956. The First Assistant's responsibilities also include "[i]nitiat[ing] personnel actions involving all staff members when required" and "hiring, performance appraisals, mediation and negotiation, disciplinary actions, and employee job termination." Id. at US4957. Martinez testified that Davis "supervise[d] the whole office" -- including the trial,

23

appellate, and administrative units in both Charlotte and Asheville. Martinez Dep. 90:4-21; Tr. Ex. 137 at 3 (demonstrating that Davis had some supervisory authority). While Martinez was the only person who could "promote, demote, fire, terminate[,]" Davis supervised all employees besides Martinez, Davis could refer an employee to Martinez for disciplinary action, and Martinez trusted Davis's judgment. Martinez Dep. 90, 92-95. Davis requested to be Strickland's mentor, and Martinez testified at trial that he asked Davis to serve as Strickland's mentor so that she could learn "the ropes" of practicing in federal court as a public defender. 12/11/23 Martinez Tr. 119:24-120:22; Tr. Ex. 189 at US6226; see also 12/18/23 Davis Tr. 87:25-88:6, ECF No. 402.

Davis had supervisory authority over Strickland from August to December 2017 and from July to August 2018. Tr. Ex. 137 at 3; see also Martinez Dep. 170:2-10 (testifying that Martinez told Strickland on July 5 that Davis "was a supervisor" and "was going to continue being a supervisor"). As part of his mentoring of Strickland, Davis created a document called the "New Attorney Shadowing Checklist" to prepare Strickland for the AFPD position, which listed nicknames and recorded their four mentoring lunches together. Tr. Ex. 135 at ¶ 63. Davis paid for all of these lunches. Id. After Strickland had to "take a raincheck" on a shadowing debrief in March, Davis clarified to

24

Strickland that she did not "have to do these shadowing things"
with him and told Strickland to let him know "if [she did]
something with someone else so [he] [could] check it off [her]
list." Tr. Ex. 3 at US0096.

Strickland and Davis attended mentoring lunches together in
December 2017, March 2018, April 2018, and May 2018. 12/11/23
Strickland Tr. 43:16-43:25; 12/18/23 Davis Tr. 46:4-8. During
these mentoring lunches, Strickland and Davis spoke about work,
her caseload, and her career. 12/11/23 Strickland Tr. 44:1-7.

Strickland felt obligated to attend because Davis was her
supervisor. Id. at 44:8-22. Strickland never told Davis that
she was uncomfortable attending these mentoring lunches. Id. at
44:12-46:6. In hindsight, Strickland considers the lunches to
be "red flags" as to Davis's behavior; however, she did not
perceive the mentoring lunches as sexual harassment at the time
they were happening. Id. at 50:4-12.

Davis claims that he set up these mentoring lunches because
his mentor from private practice had taken him to paid mentoring
lunches, and Davis thought "it was a very effective mentoring
technique" that his mentor had shown a personal interest in him.
12/18/23 Davis Tr. 46:9-24. Davis wanted to apply the same
mentoring techniques with Strickland. Id.

Before May 2018, Strickland and Davis had friendly
professional relationship. 12/11/23 Strickland Tr. 50:13-16;

25

12/18/23 Davis Tr. 45:4-9.  Strickland lived close to Davis, and Davis gave Strickland rides home when Strickland could not ride her bike due to the weather.  Tr. Ex. 135 at ¶ 69.  Davis and Strickland had a mutual interest in guitars, and after Strickland recommended a music store to Davis, Davis purchased a guitar from that store.  Id. ¶ 71.

After Strickland married her husband, Cooper Strickland, in April 2018, Strickland texted photos of the wedding to both Davis and Martinez.  Tr. Ex. 176 at US6319-20.

The FDO office culture included social drinking and both Davis and Strickland partook.  It was not unusual for FDO attorneys to get together for drinks after work.  12/11/23 Strickland Tr. 57:11-15; see also Martinez Dep. 95.  On various occasions, Davis and Strickland went for drinks together, at his invitation or hers.  12/11/23 Strickland Tr. 54:815-57:10. Drinking took place, as well, during the annual office retreat in December 2017.  Tr. Ex. 3 at US0069.

Months after this retreat, Strickland's co-workers told her that Davis was acting "lustful" towards Strickland; that "they had never seen him act so 'fixated' and sexually attracted to

anyone[,]" and that Davis was "smothering" Strickland.  Id.[18];
12/11/23 Strickland Tr. 63:7-20.

On May 15, Strickland asked Davis to get alcoholic drinks
alone after her first examination in court.  12/18/23 Davis Tr.
47:2-23.  During this time, Strickland did not directly tell
Davis that she was uncomfortable getting drinks with him.
12/11/23 Strickland Tr. 63:7-20; 12/18/23 Davis Tr. 77:10-12.
Strickland began politely to decline Davis's invitations soon
after May 2018.  12/11/23 Strickland Tr. 63:12-20.

While at the FDO, Martinez, Davis, and other FDO attorneys
praised Strickland for her excellent job performance.  Martinez
Dep. 100, 106:20-107:1.  Martinez stated she was "hardworking,"
"responsible," and produced "high-quality" work.  Martinez Dep.
106:20-107:1.

### D.    Things Go Awry
#### 1.    The "Mas Dinero" Email[19]

Strickland and Davis had their fourth and final mentoring
lunch on May 18, 2018.  Tr. Ex. 138 at ¶ 76.  During lunch, the
conversation was limited to Strickland's caseload and work-
related topics.  Tr. Ex. 156 at 0688.  Strickland told Davis

---

[18] The Court credits that these statements were made to
Strickland but gives no weight to the substance of the
statements by these unnamed hearsay declarants.

[19] Mas Dinero means "more money" in Spanish.  12/18/23 Davis
Tr. 93:18-23.

that, at her next performance review,[20] she planned to ask for a raise to the next grade on the GS pay scale. Tr. Ex. 1 at US0501; Tr. Ex. 3 at US0070. Strickland also stated that she planned to ask for a promotion to an AFPD position, as promised in her offer letter. Tr. Ex. 1 at US0501; Tr. Ex. 3 at US0070; Davis Decl. ¶¶ 20-21, ECF No. 245-3.

During this lunch, Strickland stated that she wanted to get trial experience that summer and was especially focused on the Dixon case. 12/18/23 Davis Tr. 48:20-49:6. The Dixon case was a child pornography case in which the client was facing a potential life penalty. 12/18/23 Davis Tr. 48:20-49:6. Davis observed that Strickland "was very focused on the Dixon case, . . . because she believed the other cases would get continued and she wanted to be on a case that summer." Id. at 49:3-6; Tr. Ex. 8 at US5890 (Davis's personal notes on June 6 observing that Strickland was "fixated" on Dixon because it was going to trial). Davis later noted that Strickland "admitted" that she wanted to be on a trial that summer "so she could point to it as part of her merit [to] demand [a transfer to the Asheville office]." Tr. Ex. 8 at US5890; Tr. Ex. 135 at ¶ 101 (stating that Davis told Strickland that he understood that she wanted to

---

[20] Although all grade-level promotions are allowed at the discretion of the Federal Defender, Strickland would have been eligible for a grade-level promotion (to a GS-15) on August 21, 2018. Tr. Ex. 137 at 9-10.

second chair Dixon so she could demonstrate her valuableness to the office and secure a transfer to Asheville). Davis told Strickland that it was not a good idea for Strickland to work on the Dixon case. 12/18/23 Davis Tr. 49:7-17; Tr. Ex. 8 at US5890. He explained that the FDO could not defend two of its most junior (and least experienced) attorneys –- the then-first chair and Strickland -- handling a case carrying a life penalty, due to ineffective assistance of counsel concerns. 12/18/23 Davis Tr. 49:7-17. Davis remarked that it would not be a good first case for anyone. Id.; Tr. Ex. 8 at US5890. Davis later wrote that Strickland seemed to understand Davis's concerns, though she wanted to work on Dixon. Tr. Ex. 8 at US5890. Davis also later wrote that Strickland said she would talk with Martinez about it. Id.

Davis then asked Strickland "what else [was] going on besides work." Tr. Ex. 156 at 0688. Strickland told Davis that she was not happy living in a different city from her husband.[21] 12/18/23 Davis Tr. 49:18-24; 12/11/23 Strickland Tr. 50:20-51:25; Tr. Ex. 5 at US1246. While she did not want to leave, Strickland said that eventually she would either need to be

_____

[21] At the time, Cooper Strickland, Strickland's husband, was living in Tryon, Polk County, North Carolina, which is closer to Asheville than Charlotte. 12/11/23 Strickland Tr. 51:9-17. Strickland explained that she could not ask Mr. Strickland to leave his job, which required him to live in Polk County. Tr. Ex. 156 at 000688.

29

transferred to the Asheville office or leave the FDO.  12/18/23
Davis Tr. 49:18-24; 12/11/23 Strickland Tr. 50:20-51:25; Tr. Ex.
156 at 000688; Tr. Ex. 5 at US1246.  Strickland stated that she
would at least like a pay raise.  12/11/23 Strickland Tr. 52:6-
53:3; Tr. Ex. 5 at US1246; Tr. Ex. 156 at 000689 (stating that
she planned on asking for a raise or promotion to GS-15 pay
scale).[22]

Davis told Strickland that there were no open positions in
Asheville, that there was no guarantee as to when a position
would be open, and that Asheville was a popular location.
12/18/23 Davis Tr. 50:1-8.  After lunch, Davis repeated that he
expected this to be her last mentoring lunch, except for one in
August closer to her review.  Id. at 51:16-52:2.  Strickland
responded, in substance: "anytime you want to buy me lunch or a
drink, I'll take it."  Id. at 51:22-52:2.  Once they returned to

---

[22] Davis later wrote that he interpreted this as Strickland
making "veiled threats" about quitting if she was not moved to
Asheville and "demand[ing]" more money.  Tr. Ex. 8 at US5890;
Martinez Dep. 114:21-115:2 (recounting that Davis told him that
Strickland was going to demand for a promotion and "wave that
offer letter to [Martinez]"); Davis Decl. ¶¶ 20-21 (stating that
he was "taken aback by [Strickland's] demands" for a promotion
and raise and claiming that Strickland would "wave [the offer
letter] around").  Davis also observed that Strickland did not
intend to have this conversation with him but "she felt like she
could air it with [him] because she thought [he] was
sufficiently wrapped around her little finger that [he] wouldn't
resist."  Tr. Ex. 8 at US5890.

the office, Davis said: "Don't worry, we're going to take care of you."  Tr. Ex. 5 at US1246; Tr. Ex. 3 at US0070.

A little later that afternoon, Davis sent Strickland the following email ("Mas Dinero email") with the subject line "Mas Dinero": "Dude, you are shooting high with a G15.  Not least of all since you'll need 5 more years of fed service to qualify for it.  But fret not, I have a plan . . . just remember I deal in pay-for-stay :)[.]"  Tr. Ex. 5 at US1260.[23]  The factual assertion in this email is false; Strickland would have been eligible for a G15 promotion in August 2018.  Tr. Ex. 137 at 9-10.

### 2.  The <u>Dixon</u> Case – Deterioration in the Davis-Strickland Professional Relationship

A few days later, Strickland volunteered for, and Martinez assigned her to serve as second chair to Jeff King on the <u>Dixon</u> case.  Tr. Ex. 135 at ¶ 89.  Martinez recalled that Strickland did a "bang up" job on the <u>Dixon</u> trial preparation, and that she showed an eagerness to learn from him.  Martinez Dep. 100:5-22; <u>id.</u> at 107:9-25 (Strickland was "open eyes, open ears").

The selection of Strickland to work on <u>Dixon</u> caused a kerfuffle within the FDO office.  On May 24, 2018, Erin Taylor ("Taylor"), a senior AFPD, and Davis exchanged text messages

---

[23] Strickland later interpreted this as a quid pro quo request: that Davis "had a 'plan' to raise her pay . . . if she complied with his [personal] requests."  Tr. Ex. 3 at US0070.

31

about the matter.  Tr. Ex. 9 at US5881-89.  Taylor complained
that Strickland (nor Jeff King, the first chair) had told Taylor
or Peter Adolf ("Adolf"), another senior AFPD, that Strickland
was serving as Dixon's second chair.  Id. at US5881-82.  Davis
explained to Taylor that he had told Strickland that he was
concerned and suggested that Taylor talk with Martinez.  Id. at
US5882-85.  Davis texted that "[he didn't] want to get in
[Strickland's] way and as much as [he didn't] think that's the
right case for her, [he'd] be fine if there was an experienced
[attorney] on it."  Id. at US5885.  Davis also acknowledged that
he "probably need[ed] to butt out since [he] really [didn't]
have a role here other than generic mentor/mgmt. stuff . . . ."
Id. at US5886.

On May 29, Davis ran into Strickland outside the office
while she was talking with Adolf.  12/18/23 Davis Tr. 53:19-25.
Strickland asked Davis if he would go for a walk with her.  Id.
at 54:14-22.  During the 45-minute walk, Strickland aired issues
she saw with the Dixon case and asked for Davis's advice on how
to handle them.  Id. at 54:21-22, 55:7-13.  Davis told
Strickland that he expected Martinez to remove her as a second
chair, explaining again that the FDO was going to be at risk of
an ineffective assistance of counsel claim if they kept their
two least experienced attorneys on the case.  Id. at 55:20-57:4.

32

On this same day, Martinez and Davis exchanged text messages about Strickland and the Dixon case. Tr. Ex. 36 at US6640. Martinez felt he had to explain that Strickland had asked him if she could second chair Dixon, and he had told her he "didn't see a problem with that" as he "would still be involved in the case." Id. Martinez admitted that this assignment rightfully "kicked off a firestorm with [Adolf] and [Taylor] since they were never consulted." Id.

A few days later, Davis and Strickland exchanged several emails about meeting with a client to inform him that he had lost a suppression hearing on which Strickland had worked. Tr. Ex. 177; 12/18/23 Davis Tr. 58:9-15. On May 31, 2018, Davis emailed Strickland to tell her that they needed to see the client tomorrow and to let him (Davis) know if she wanted to visit the client with him. Tr. Ex. 177 at US7553. Strickland replied that she had a meeting for Dixon and did not know how long it would go but said she would let Davis know if she could join him. Id.

The next day, on June 1, 2018, Davis replied that he was unable to see the client that morning and suggested alternative meeting times. Id. at US7552. Davis also told Strickland that she could see the client without him if she wanted. Id. Strickland apologized that she had "been completely absorbed in the Dixon matter . . . [and was therefore] completely mentally

33

and emotionally exhausted." Id. Strickland asked whether the
client meeting was about plea options and questioned whether
Davis "really need[ed] [her] to go with [him to speak with the
client.]" Id. Davis explained that the purpose of the meeting
was to "inform [the client] of the ruling and discuss the
case[.]" Id. He confirmed that he did not need Strickland to
go with him, but that he had just asked her if she wanted to go
and had interpreted her response as a "yes". Id. Davis stated
that it was "fine" for Strickland not to attend. Id. In the
same email, Davis also made the following comment:

> I did notice that you looked pretty unhappy earlier.
> I hope you feel better. I'm happy to offer a drink
> and an ear if you need one, though I get the feeling
> you are not comfortable talking to me about it. Might
> I suggest Mary Ellen?[24]. She's completely separate
> from all aspects of this and would give you some good
> perspective.

Id. Strickland replied that she was "totally fine," that she
had learned helpful information for the Dixon case, and she
remarked that "[i]t is just intense to read about child
molestation all day." Id. at US7551. Davis clarified that he
was referring both to the Dixon case and office drama. Id. He
stated: "it really is okay to talk about it if you need to."

---

[24] Davis also testified that he referred Strickland to Mary
Ellen Coleman, the Branch Manager of the FDO's Asheville office,
because it was his impression that Strickland did not want to
talk to Davis about Dixon after Davis told her that Martinez
would likely remove her from the case. 12/18/23 Davis Tr.
60:17-61:12.

34

Id.  Davis interpreted this interaction as indicating Strickland
was losing interest in the client that he had asked her to meet
with.  12/18/23 Davis Tr. 59:10-60:6; see also Tr. Ex. 8
(Davis's June 2018 Notes) at US5891 (noting that Strickland had
"complete disinterest" in matters outside of Dixon and "blew
[Davis] off completely" concerning "seeing [this client]").
Davis also wrote in his notes that Strickland "questioned" why
she needed to attend and showed a "[s]hocking lack of concern"
for the client.  Tr. Ex. 8 at US5891.

On June 5, 2018, Strickland and Davis had an email exchange
regarding a pre-sentence interview ("PSI") with a client.  Tr.
Ex. 5 at US1270.  Strickland emailed Davis, stating that she
needed to conduct a discovery review for Dixon on Thursday
morning -- the same time as the PSI meeting.  Id.  Strickland
explained that Thursday morning "was the only time everyone was
available" for the review of the Dixon FBI materials.  Id.
Davis responded: "[t]hat's really not okay with me."  Id.
Strickland asked whether Davis was being "sarcas[tic] or for
real?"  Id.  Davis said "real."  Id. at US1271.

Davis "had [previously] told [her] that these are shadowing
opportunities that are optional and [she] had cancelled or
rescheduled numerous other similar activities with him [with] no
problem."  Tr. Ex. 156 at 00690-91.

Davis later wrote, and testified, that "it appeared [to him] that she had not attempted to meet [both] obligations" and showed "no interest" in the client.  12/18/23 Davis Tr. 61:21-62:20, 67:23-68:11; see also Tr. Ex. 8 at US5891 (writing that that Strickland was "focused on Dixon to the exclusion of all else," had shown "complete disinterest" in other cases, and showed a "[s]hocking lack of concern" for one client); Tr. Ex. 9 at US5813, 6856 (Davis texting to Taylor that Strickland "[didn't] FEEL the clients" and she was working in her "self-interest" instead of the client's interest).  Davis believed that the PSI was an "important part of the sentencing process because it's basically the only time that you get to humanize your client to the person who is creating the presentence report."  12/18/23 Davis Tr. 62:6-14.  Davis, at the time Strickland cancelled the PSI, felt that Strickland "had been misleading" when stating that there was a conflict with the Dixon case; Davis later understood that Strickland was not being truthful about the scheduling conflict.  Id. at 66:3-7; Tr. Ex. 135 at ¶ 103 (Judicial Administrators admitting that Davis noted Strickland's inconsistent emails about her scheduling conflict).

On June 5, 2018, Davis and Taylor exchanged text messages about Strickland.  After Taylor told Davis to "check [his] email," Davis said that "[it was] starting to look like [Strickland was] way more manipulative than [he] expected."  Tr.

36

Ex. 9 at US5807. Davis said he "really wanted a lot for her" but that "her own self-interest [was] the real problem." Id. at US5808. Davis also stated that Strickland "want[ed] to use the case to prove that she's a star so she can threaten to quit if we don't move her to Ashville [sic]." Id. Davis went on to say that Strickland was "going to use this case to win [Martinez] over," and "she'll show him how valuable she is – because she legitimately IS very good." Id. at US5808-09. He further stated that "[t]he diff[erence] between her and the others [was] she ha[d] the actual goods to deliver and [was] very good at playing innocent." Id. at US5809. Lastly, Davis told Taylor that he had thought Strickland could be in management someday, but he did not think that anymore. Id. at US5814.

In late spring 2018, Jeff King left the FDO office to work elsewhere. 12/13/23 Martinez 128:21-129:10. Caught short, and needing a continuance, Martinez took over the Dixon case and removed Strickland from serving as second chair, telling Strickland that the removal "had nothing to do with her personally or her job performance." Id. at 123:5-124:24; Tr. Ex. 135 at ¶ 109. On June 6, 2018, however, Martinez instructed Strickland to keep doing what she was doing with respect to Dixon.[25] Tr. Ex. 197 at US7499.

---

[25] Martinez later told Beam that he did not remove Strickland from the case until June 12, 2018. Tr. Ex. 189 at

37

On June 6, 2018, Davis emailed Strickland asking for her offer letter stating that Strickland would transition to an AFPD within her first few months at the FDO. Tr. Ex. 135 at ¶ 93; Tr. Ex. 156 at US00691.

Later that morning, Strickland emailed Davis about meeting that morning to talk. Tr. Ex. 5 at US1273. Strickland intended to meet to "smooth things over." Tr. Ex. 156 at 00691. Davis and Strickland met in Davis's office that morning during business hours. Tr. Ex. 135 at ¶ 94. Davis explained to Strickland that this was an issue of "how we treat our clients," told Strickland that she should meet all of her obligations, and instructed Strickland to attend the PSI. 12/18/23 Davis Tr. 67:23-68:11. Strickland later wrote that she understood that Davis was accusing her of not caring about the clients. Tr. Ex. 156 at 00692. Strickland apologized, indicated that she understood, and confirmed that she would be attending the PSI. 12/18/23 Davis Tr. 68:9-11; see also Tr. Ex. 156 at 00692.

This interaction made Strickland uncomfortable. Beam Dep. 66:16-19. Strickland later wrote that Davis was so angry with her during this meeting that he was "pale and shaking." Tr. Ex. 156 at 00691 (stating Davis was "extremely angry" and "his voice was shaking" and "berated" her); Tr. Ex. 3 at US0072; Beam Dep.

---

US5949. Beam noted that the "normal procedure" is "not to remove [attorneys] from cases." Id. at US6229.

38

100:16-101:1 (testifying that, considering what Davis and Strickland told her during interviews, it is "likely" and "reasonable" that Davis reacted as angrily as Strickland described). Davis admitted to Beam during the investigative process that he was "very upset" and "controlling" during the meeting, and he did not recall if he raised his voice. Tr. Ex. 189 at US6230; see also Beam Dep. 66:3-15, 100:16-22 (testifying that Strickland told Beam during her interview that Davis was so angry he was shaking).

In the afternoon of June 6, Davis emailed Strickland about when they should leave the next morning to visit the client. Tr. Ex. 5 at US1274. Strickland emailed back, stating that "[she] [would] not be able to attend the PSI meeting tomorrow" because her other meeting was set in stone. Id. at US1275. Strickland also explained that she thought shadowing opportunities were optional. To justify this understanding, Strickland forwarded an email from Davis from March 2019 in which he had stated that Strickland did not have to do the shadowing opportunities with him specifically. Tr. Ex. 5 at US1276. Davis replied, copying Adolf and Martinez (Strickland's supervisors), and ordered Strickland's attendance:

> This is not the right way to handle this situation. You made the knowing and deliberate decision to disregard your commitment and schedule the FBI review without even raising the preexisting PSI or clearing

39

it with me ahead of time.  The fact that it is now scheduled is your own doing.

I did not give you an option this morning.  I am directing you to attend the PSI.  **If you choose to disobey a direct order, that is an action that I as a supervisor cannot ignore.**  I will have my phone if you would like to discuss this further.  Otherwise, I expect you to be ready to go at 8:15.

Tr. Ex. 5 at US1275 (emphasis added).  Strickland attended the PSI meeting on June 7.  12/18/23 Davis Tr. 69:17-19.

In the evening of June 6, 2018, Davis sent himself personal notes via email about Strickland.  Tr. Ex. 8 at US5890-91. Davis discussed the PSI meeting in the notes.  Id.  He wrote that Strickland was supposed to attend the PSI, failed to mention her conflict with Dixon, and then emailed Davis "TELLING [him] that she would be blowing off [the PSI client] due to the Dixon review."  Id.  Davis also wrote that Strickland was "self-centered and personal goal oriented" and has been "marshall[ing] her forces and plac[ing] herself in position to be indespensible [sic] in Dixon[.]"  Id.

Although Strickland was "open" with Davis initially, Davis observed that Strickland became "distant/disengaged very quickly," "displayed serious avoidance behaviors," "[had] been avoiding [Davis] and [has been] difficult to talk to ever since," and "clearly [did] not want to interact with [him]." Id.  Davis emphasized that this was only after he "questioned her place in Dixon."  Id.  Davis also found it odd that

40

Strickland did not acknowledge the Mas Dinero email, in which he "told her she couldn't get grade increase but offered that [he] had a plan to get her up toward where she wanted to be."  Id.

Davis testified that, starting in early to mid-June, the relationship between Strickland and Davis was "tense" for a few months but "in general it moved back to being friendly." 12/18/23 Davis Tr. 69:20-25.

On June 6, Davis and Taylor exchanged text messages about Strickland and FBI discovery review for the Dixon case.  Taylor noted that Strickland never mentioned rescheduling the Dixon FBI review or that she would not be attending.  Tr. Ex. 38 at US6384, US6387.  Davis and Taylor discussed how Strickland defended her attendance of the discovery review by forwarding Davis an email from three months ago.  Id. at US6385.  Davis said that he was "stunned" and that he was "fully expecting to not hear anything more and [that Strickland] [would] go to the disco[very] review."  Id.  Davis wrote that Strickland was being "colossally stupid," and that he would have let her off the hook if "she had reached out to [him] and done a bunch of mea culpas and begged . . . ."  Id. at US6386.  After mentioning other examples of her behavior, Davis said: "She needs to get slapped.

41

I thought this morning would have at least been something. It's clearly made her worse."[26] Id. at US6388.

In the early evening of June 19, 2018, Davis and Strickland exchanged emails about work topics. Tr. Ex. 5 at US1277. After Strickland sent Davis her edits on a brief, Davis said: "Thanks. I'm going to get this filed and get a celebratory drink. You're welcome to join me, but if I recall correctly, you have an appellate brief to write." Id. Strickland replied that she was busy but that she hoped he could enjoy his celebratory drink. Id. Davis testified during trial that he knew Strickland was unavailable for a drink that night and only asked her because he knew she couldn't go. 12/18/23 Davis Tr. 70:15-23 ("[T]he reason that I brought [the celebratory] drink up is because I frankly was annoyed with her, I knew that she couldn't go, . . . and I was being really passive aggressive.").

On June 21, 2018, Strickland asked to meet Davis around 5pm to discuss work. Tr. Ex. 135 at ¶ 111; 12/18/23 Davis Tr. 71:6-

---

[26] Davis testified that the phrase was "colloquial" and "was not intended to refer to physical violence." 12/18/23 Davis Tr. 96:1-97:8 ("[I]t was possible that the only way that she was going to learn . . . was if she actually continued to do this and it continued to have negative repercussions."). Davis's intent to use this phrase in a non-literal, colloquial manner is corroborated by a message from Taylor to Davis in a different context, in which she used similar language about Martinez: when talking about issues that arose with Dixon, Taylor texts Davis "I'm gonna slap Tony." Tr. Ex. 9 at US6856.

42

21.  They met for around an hour and a half.  Tr. Ex. 135 at ¶
111; 12/18/23 Davis Tr. 71:25-72:1.  At the end of the meeting,
Davis offered to give Strickland a ride home because there was
an impending storm and Strickland rode her bike to work.[27]  Tr.
Ex. 135 at ¶ 111; 12/18/23 Davis Tr. 72:3-10.  Strickland stated
that there was little chance of rain and joked that it was okay
because she was "tough."  Tr. Ex. 135 at ¶ 111; 12/18/23 Davis
Tr. 72:3-10; Tr. Ex. 5 at US1278 (Strickland's notes recounting
this conversation).  After this exchange, Strickland went to her
office, which was an interior office with no window, while Davis
prepared to leave.  Tr. Ex. 135 at ¶ 111; 12/18/23 Davis Tr.
72:11-18.

     As Davis was getting ready to leave, he noticed it started
raining.  12/18/23 Davis Tr. 72:11-18.  Davis texted Strickland
at 6:44pm to ask if she was sure about not wanting a ride.
12/18/23 Davis Tr. 72:11-18.  The text read: "It is currently
raining.  Last chance for a ride tough girl."  Tr. Ex. 3 at
US0092.  Davis then "went downstairs to the lobby and waited a
few minutes to see if [Strickland] would respond to [his] text."
12/18/23 Davis Tr. 72:11-18.  Davis stated that, at this time,

---

[27] Prior to June 2018, Davis had given Strickland a ride
home between five and ten occasions.  12/11/23 Strickland Tr.
65:15-20; 12/18/23 Davis Tr. 48:4-12.  Strickland requested at
least some of these rides.  12/11/23 Strickland Tr. 65:12-13;
12/18/23 Davis Tr. 48:4-12.

it was "still raining heavily."  Decl. Davis ¶ 30, ECF No. 245-3.  Without responding to his text, Strickland went down to the lobby.  12/18/23 Davis Tr. 72:21-24; Tr. Ex. 135 at ¶ 112.  Davis asked Strickland if she was sure about not wanting a ride home.  Tr. Ex. 135 at ¶ 112.  Strickland said that she was sure.  Id.  Davis testified that they were no closer than ten yards (or thirty feet) from each other during this interaction.  12/18/23 Davis Tr. 72:25-73:6; see also Tr. Ex. 5 at US1247 (Beam reporting that in her interview with Davis, he stated that he was about 100 feet from Strickland during this interaction).  Davis further testified that there was also a kickboxing class going on that looked into the lobby through glass.  12/18/23 Davis Tr. 73:7-12.

According to Beam's investigative report, Strickland told Beam that Davis "cornered" her and "creeper [sic] her out."  Tr. Ex. 5 at US1247.  This interaction made Strickland feel "physically intimidated and concerned about [Davis's] intentions . . . ."  Tr. Ex. 3 at US0074; Tr. Ex. 5 at US1278 (Strickland writing in contemporaneous notes that "[she] may be paranoid, but [she was] afraid to be alone" with Davis even though he "seem[ed] to be pushing for that," fearing that he "want[ed] to spend time [with] her," "would try something, or because . . . [he] wants to create the impression of something inappropriate to blackmail [her] later").  Strickland wrote that Davis "ha[d]

44

a habit of knowing exactly when [she was] leaving," and making
it "seem[] like it is a coincidence when he walk[ed] around the
corner at the same time" when it was "obvious[] he [was] waiting
for [her]." Tr. Ex. 5 at US1278. In her mediation supplement,
Strickland also wrote that she "no longer felt safe around"
Davis, thought his texts were inappropriate, and "was concerned
that [Davis] had a pattern of pushing for her to see him after
hours." Tr. Ex. 3 at US0074.[28] Strickland wrote that she
"decided to modify her work schedule to never leave the office
after 5p.m., in order to avoid being alone with [him]." Id.

On June 26, 2018, Davis and Taylor exchanged text messages
about Strickland. Tr. Ex. 9 at US6859. Taylor remarked that
Strickland was "harsh" and that she "got a bit of her wrath"
when she had to explain her "lack of" a role on Dixon. Id. at
US6859. Taylor wrote that Strickland had been told multiple
times to stop working on Dixon and still claimed to be confused.
Id. at US6861. Taylor also stated that Strickland asked how she
could stop working on Dixon if people kept asking her to do work
for Dixon. Id. at US6864. Davis replied: "in fairness, appears
to be accurate, but she has also independently been digging into
and presenting ideas." Id. Davis stated that Strickland blew

---

[28] Ishida testified that Strickland told him she was
"physically afraid" of Davis, and he believed Strickland
genuinely felt this way. Ishida Dep. 164:1-165:14.

him off on a meeting the previous week for <u>Dixon</u>, and that "she only want[ed] to work on what she want[ed] to work on." <u>Id.</u> at US6860. Davis also observed that Strickland "was clearly trying to avoid [him] before." <u>Id.</u> Taylor commented that Strickland "[didn't] handle adversity well" and that Strickland was "not in a happy place right now." <u>Id.</u> at US6860-61. Davis explained that he was "[g]oing to try and talk to her at some point" and that "[s]he may just need to get smacked a bunch, tho." <u>Id.</u> at US6861. When Taylor told Davis that Strickland gave her, Martinez, and Adolf attitude that day, Davis said that Strickland was "acting like a spoiled brat." <u>Id.</u> at US6866.

### 3. Martinez Believed that Strickland Was Not a Team Player Soon After Her Removal from Dixon.

On June 26, 2018, Strickland was assigned several low-level cases, which were newly assigned to Strickland because of the recent departure of an FDO attorney. 12/18/23 Davis Tr. 73:21-74:5; 12/13/23 Martinez Tr. 128:24-129:25. After being assigned these cases, Strickland emailed Martinez to update him on her workload. Tr. Ex. 165 at US6626. Strickland explained that she did not have the capacity to take on these new cases until later in the month, that she did "not want to be ineffective simply by being assigned more cases than [she] [could] handle," and that she was concerned that she had not "received any training in handling these types of cases." <u>Id.</u> Still, Strickland stated

46

that she would do "what needs to be done to help with the office[.]"  Id.

Martinez testified that he "was upset" about Strickland's email because "[he'd] never seen that happen quite frankly in thirty-five years of experience as a Defender," and that "it was a shock to [him]" that she was "too busy" -- especially considering how eager Strickland was to do a significant amount of work on Dixon, an extremely difficult case.  12/13/23 Martinez Tr. 130:2-16.  Martinez also testified that this made him doubt whether Strickland was a team player.  Id. at 130:2-131:2 ("[W]hen it's her best interest to handle something, like a big trial, then she will do it, but when it's not so much in her interest to help a fellow attorney handle four simple cases, she's not willing.  And so it showed me that she was not basically a team player at that point."); see also Tr. Ex. 5 at US1247-48 (Beam reporting that Martinez felt like Strickland was picking and choosing what cases to work on).

####    4.    Strickland and Davis's Relationship Worsened, and Strickland Expressed Concerns Regarding Davis to Martinez.

In June 2018 generally, Strickland would contact Davis to discuss cases they were both working on.  12/11/23 Strickland Tr. 67:3-8.

On June 27, 2018, Davis emailed Strickland asking for another mentoring session, offering to do so in the office, over

47

lunch, or a "celebratory. . . drink," noting that, he thought "it might be good to have some distance from work." Tr. Ex. 5 at US1289. Strickland indicated that she was busy, preferred to meet in the office, and suggested Friday morning. Id. at 1288. They agreed to meet Friday morning. Id.

On June 29, 2018, Strickland sent Davis a text message stating: "JP, I am feeling sick today. I will not be making it in but will try to finish my appeal brief from home." Tr. Ex. 135 at ¶ 120. Davis replied, stating: "OK. Can we reschedule our meeting for Monday?" Id. ¶ 121. He went on to state that he was "free all day, including early morning, lunch and evening," and that he "[hoped] this will be helpful for [her]," and that she should not be "over-anxious about it." Id.; see also Tr. Ex. 3 at US0094.

On July 2, 2018, Strickland met with Martinez. The conversation lasted 5-10 minutes. 12/13/23 Martinez Tr. 132:14-17. As Strickland wrote in contemporaneous notes, Strickland told Martinez that she was giving Martinez a "heads up," and she asked Martinez to keep her confidence. Tr. Ex. 143 at PLT00744. Strickland told Martinez that she needed to set "boundaries on [Davis's] way of talking to [her]." 12/13/23 Martinez Tr. 131:17-132:6; Tr. Ex. 135 at ¶ 124. Strickland explained that Davis "spoke to [her] inappropriately and berated [her] and got extremely angry" a few weeks ago. Tr. Ex. 143 at PLT00744; Tr.

48

Ex. 135 at ¶ 125.  Strickland further explained that she felt

"uncomfortable and that [she had] been leaving the office by 5

every night to avoid issues."  Tr. Ex. 143 at PLT00744.

Martinez asked Strickland if this was "sexual harassment."  Tr.

Ex. 135 at ¶ 125.  Strickland said that "[she did not] feel we

are there yet," and that she did not "want to use words like

that to trigger something," and that she was "self-managing" "to

try to resolve the issue."  Tr. Ex. 143 at PLT00744.  Martinez

stated that he understood this was a heads up, and Strickland

said she did not want Martinez to do anything except keep her

confidence.  Id.  Strickland told Martinez that she "wouldn't

involve him unless [she] thought it was absolutely necessary[,]"

that she wanted to "do this all by the book," and that she was

following "advice" she received by giving him a heads up.  Id.

at PLT0744-45.

Martinez understood that, by stating that she was going to

set "boundaries" with Davis, Strickland was informing Martinez

that she was going to tell Davis "that he shouldn't raise his

voice when he disagrees with her."  12/13/23 Martinez Tr.

132:10-13.  Martinez believed the conflict between Strickland

and Davis was a breakdown in workplace communication.  Id. at

132:2-24.  According to Martinez, the only facts Strickland

informed him of were the cancellation of the PSI interview and

Davis's anger towards her.  Id. at 133:3-6.[29]  Martinez later wrote in his "significant event log" that he "wanted to clarify with [Strickland] any issue about any harassment by [Davis]." Tr. Ex. 17.  During this deposition, Martinez testified that –– based on his conversation with Strickland on July 2 –– he was aware that Davis's conduct was making her uncomfortable. Martinez Dep. 112:18-23, 149:3-12; see also 12/13/23 Martinez Tr. 146:12-14.  This prompted Martinez's concern that Davis's behavior might be sexual harassment.  Martinez Dep. 112:18-23, 149:3-12.  Martinez observed that Strickland was being "almost cryptic" during their conversation because she "wasn't really explaining everything to [him]".  Id. at 149:3-12, 158:19-159:3.

On July 2, Strickland met with Davis in an interior conference room without windows.  Tr. Ex. 135 at ¶ 127.  Davis closed the doors to the conference room during the meeting.  Id. In advance of this meeting, Davis created a coping skills agenda to help Strickland deal with stress and anxiety, her workload, communication, and other obstacles.  Tr. Ex. 5 at US1248, US1293-95.  Strickland walked into the meeting intending to speak with Davis about setting boundaries.  Id. at US1248.

---

[29] During Strickland and Martinez's August 9 meeting, Strickland confirmed that August 9 was the first time she told Martinez about the Mas Dinero email.  Tr. Ex. 150 at 14:5-11.

Davis started by going through the coping skills agenda and explaining that it was intended to be helpful, not "critical." 12/18/23 Davis Tr. 78:10-17; Tr. Ex 5 at US1296.  During the conversation, Davis used the words "struggling," "frustrated," and "comfort zone."  Tr. Ex. 135 at ¶ 127; see also Tr. Ex 5 at US1296.  In the past, Davis had consistently praised Strickland's work.  Tr. Ex. 135 at ¶ 128.  Strickland redirected the conversation to how Davis had spoken to her about attending the PSI in early June.  12/18/23 Davis Tr. 78:18-79:5. Strickland told Davis that he had "crossed a boundary" when he directed her to attend the PSI meeting, and that he had spoken to her in an "unacceptable" tone.  Id.; Tr. Ex 5 at US1296; Tr. Ex. 135 at ¶ 129.

Davis stated that he did not want this meeting to be an "airing of the grievances."  Tr. Ex. 135 at ¶ 130.  Davis said that he would work on his tone, but that he had to respond to Strickland's actions.  Tr. Ex. 5 at US1248, US1296.  Davis felt Strickland "needed to honor her commitments and be honest with him."  Id. at US1248.  Davis told Strickland that it was unacceptable that she lied to him about whether June 7 was the only date the Dixon discovery review could happen.  12/18/23 Davis Tr. 79:9-22; Tr. Ex. 135 at ¶ 132 (stating: "Caryn, you lied to me repeatedly, That's not okay."); see also Tr. Ex 5 at US1296 (Davis's notes stating that he knew from others that

51

Strickland lied when she told him that the "discovery review was set at the only time when everyone could go").  In response, Strickland stood up and walked out, stating that they should go talk to Martinez.  Tr. Ex. 135 at ¶ 132; 12/18/23 Davis Tr. 79:6-22.  Davis left with Strickland to talk to Martinez.  Tr. Ex. 135 at ¶ 132.  Strickland instead walked back to her office. id., so that she could collect her thoughts, Tr. Ex. 5 at US1249.

On that same day, Strickland called Martinez to let him know that Davis might say something about her to Martinez.  Tr. Ex. 135 at ¶ 133.  Strickland asked Martinez to withhold judgment until she had a chance to speak with him.  Id.

Sometime after this meeting between Strickland and Davis, Davis and Taylor exchanged further text messages about Strickland.  Tr. Ex. 9 at US5777-92 (undated).  Davis stated that Strickland "didn't get the important points" from the meeting, like, "don't be a lying manipulative underhanded jackass."  Id. at US5782.  Taylor wrote to Davis: "[n]ow that her true colors have been exposed, see her for who she is and stop trying to save a lost cause."  Id. at US0577.  Davis responded: "No, you're right.  I'm legit done.  Just depressed at all the time and emotional energy I've spent trying to lift her up.  But she isn't the person I was trying to lift.  Jesus, that read like a break-up text."  Id. at US5777-78.  Davis said

52

that he tried to be "gentle and conciliatory," and that
Strickland herself told him to be gentler when there was an
"obvious confusion" in communication.  Id. at US5780-81.  Taylor
stated that Strickland's "whole be gentle with me is a low key
gender play" and that she was "playing the gender card,"
sentiments to which Davis agreed.  Id. at US5779-80.  Davis also
said that Strickland "def plays those tears for sympathy[.]"
Id. at US5780.

On July 5, Martinez decided to call a meeting between Davis
and Strickland.  Tr. Ex. 135 at ¶ 135.  Martinez called the
meeting to "resolve a breakdown in communication" and "clarify
with [Strickland] any issue about any harassment."  Tr. Ex. 17
(Martinez's contemporaneous notes); see also Martinez Dep.
149:3-12; 158:19-159:3 (stating that he wanted to "check [] out"
potential concerns from Strickland about Davis harassing her).
At the beginning of the meeting, Martinez asked Davis and
Strickland to put their notepads away so they could talk without
being defensive.  Tr. Ex. 135 at ¶ 136; 12/13/23 Martinez Tr.
133:9-134:2.

Strickland told Martinez that she wanted to speak to him
first, alone.  12/13/23 Martinez Tr. 134:3-9; Tr. Ex. 135 at ¶
136.  Martinez asked Davis to leave, and he did.  12/13/23
Martinez Tr. 134:3-9; Tr. Ex. 135 at ¶ 136.  After Davis left,
Strickland asked Martinez whether Davis questioned her

53

performance, and Martinez confirmed that he did not and that they had appreciated Strickland's hard work thus far.  12/13/23 Martinez Tr. 134:9-18; see also Tr. Ex. 17 (explaining that Davis never said Strickland's "performance was lacking"); Davis Decl. ¶ 21, ECF No. 245-3 ("I thought highly of her performance and considered her a valuable employee.").

Martinez explained to Strickland that Davis was upset that Strickland did not keep her commitment to him, calling this a "breakdown in communication."  Tr. Ex. 135 at ¶ 137.  Martinez stated that he could understand where Davis was coming from. Id. ¶ 137.  Strickland told Martinez that Davis had showed anger towards her.  Id. ¶ 138.  Martinez told Strickland that, as her supervisor, Davis had the right to meet with her.  Id. ¶ 139. Martinez used a marriage metaphor when discussing Davis and Strickland's employment relationship -- stating that they needed to "compromise" and "meet in the middle."  Id. ¶ 140.  During the same meeting, Martinez asked Strickland why she was "getting emotional."  Id. ¶ 142.

Strickland also told Martinez about the bike-lobby incident.  Specifically, Strickland told Martinez that she and Davis had stayed after hours working on a case, it was raining, and that Davis offered to give Strickland a ride home.  Id. ¶ 143; 12/13/23 Martinez Tr. 134:19-135:6.  Strickland further explained that she told Davis that she had her bike and

54

therefore did not need a ride, that Davis waited for her in the
lobby and asked again whether she needed a ride, that Strickland
declined, and that they then walked out through separate exits.
Id.  Strickland told Martinez that this interaction made her
feel uncomfortable and "creeped out."  Tr. Ex. 17; see also
12/13/23 Martinez Tr. 135:13-25.  Martinez asked whether
"uncomfortable" meant that Davis sexually harassed her.
12/13/23 Martinez Tr. 135:18-25.  Martinez also asked Strickland
if there was any "inappropriate touching," and Strickland said
there had not been.  Tr. Ex. 17.

    According to Martinez, Strickland only notified him of the
bike-lobby incident and that Davis had asked her to meet after
hours, which made her uncomfortable.[30]  Tr. Ex. 17 (Martinez's
contemporaneous notes); 12/13/23 Martinez Tr. 134:19-135:9.
Martinez also testified that Strickland confirmed that she was
not alleging sexual harassment and did not want him to
accelerate what she was telling Martinez about Davis into a

_____

    [30] According to the investigative report, Strickland also
reported the Mas Dinero email, and the "tone" Davis used when
they were walking to the PSI meeting.  Tr. Ex. 5 at US1248.  The
report also stated that Strickland told Martinez that she felt
unsafe in the Charlotte office and that the only reason Davis
"had not touched her [was] because she had not let him."  Tr.
Ex. 5 at US1249.  The Court observes that Beam may have confused
the July 5 meeting with the August 9 meeting.  During the August
9 meeting, Strickland admitted that she was telling Martinez
about the Mas Dinero email for the first time.  See infra
Section III.L.

55

formal complaint.  12/13/23 Martinez Tr. 135:13-25; see also Tr.
Ex. 17 (stating that Strickland did not want to submit a formal
complaint against Davis).

Martinez brought Davis back into the room, and Strickland
did not object.  Tr. Ex. 135 at ¶ 144; 12/13/23 Martinez Tr.
136:1-4.  At this time, Davis and Martinez praised Strickland
for her excellent work performance.  Tr. Ex. 135 at ¶ 144.
Davis explained that his New Attorney Shadowing Checklist was
intended to ensure that Strickland received the experience
necessary for becoming an Assistant Federal Defender.  Id. ¶
145.[31]  All three of them agreed that Davis ought step down as
Strickland's mentor.  12/13/23 Martinez Tr. 137:1-15.  They also
agreed Kelly Johnson ("Johnson") ought be Strickland's mentor
moving forward.  See Tr. Ex. 10 at US6088; 12/13/23 Martinez Tr.
137:1-15.

It was Martinez's impression that Strickland was
comfortable with this situation, that she did not need anything
else, and that she was primarily concerned about whether they
were questioning her performance.  12/13/23 Martinez Tr. 137:16-

---

[31] Davis later texted Taylor about this July 5 interaction
with Strickland: "I made a point of working in that I had
designed the shadowing stuff she blew off for the purpose of
justifying promoting her and that seemed to have an impact."
Tr. Ex. 9 at US5782.  Davis also told Taylor that he did not
think Strickland could make it in management.  Id. at US6855 ("I
thought she could be in mgmt. but I don't think so any more.").

138:3 (testifying that he asked Strickland whether she was okay with this situation and Strickland confirming that she was); Tr. Ex. 17 (significant event log confirming the same).  Martinez also testified that a "breakdown in communications" between a manager and employee at the FDO is "typical" given the nature of the job -- it is a high-stress environment, and attorneys have heavy caseloads and difficult clients.  12/13/23 Martinez Tr. 138:4-21.  Martinez perceived his role on July 5 as "mediat[ing] the breakdown in communications between a manager and an employee . . . ."  Id.  Martinez also testified that he told Strickland that Davis "was a supervisor at this time and he was going to continue being a supervisor."  Martinez Dep. 170:2-10.

Strickland and Davis did not meet alone at any point after July 5.  12/11/23 Strickland Tr. 71:17-72:20; 12/18/23 Davis Tr. 80:1-24 (stating that there were very little interactions between Davis and Strickland after July 5).

In the morning of July 6, 2018, Davis emailed Martinez "to convey [his] feelings about the situation" with Strickland.  Tr. Ex. 11 at US3974.  Davis stated: "[i]f this had been . . . any other employee, I would have insisted they receive a formal reprimand after deception and insubordination this severe . . . [--] they would get chewed out and be well on their way to a PIP . . . ."  Id.  Davis went on to state:

[W]hile I am not requesting any disciplinary action at all for [Strickland], I want to make sure that these incidents are not just written off as a mutual mistake or personality conflict, as I believe they need to be addressed during her annual performance review (alongside her many positive traits).  We are considering making her an AFD, for various reasons, and I think we need to be serious about whether she actually lives up to that title at the moment. . . .

Tr. Ex. 11 at US3974-75.

On July 8, 2018, Davis sent Johnson an email, copying Martinez, about Johnson taking over as Strickland's mentor.  Tr. Ex. 10 at US6088.  Davis stated: "[Strickland] is an amazingly gifted and talented young woman who has made some egregious errors in attitude and judgement recently . . . ."  Id.

On July 9, 2018, Strickland and Martinez exchanged follow up emails regarding next steps.  Tr. Ex. 167 at US3980. Strickland confirmed "[her] understanding . . . that there [was] no performance issue with [her] work, but that this [was] a matter of receiving the right mentoring," and requested a new mentor.  Id.  Martinez confirmed her "performance [was] not at issue," that Johnson would be her new mentor, and that her team leader was aware of this change.  Id.  Strickland did not mention allegations of sexual harassment in her July 9 email. Id.

58

### E. FDO Management Held a Meeting Regarding Promotions and Personnel Changes.

On July 20, FDO management (including Martinez and Davis, among others)[32] participated in an "extensive meeting" that "took literally hours" where they "reshuffled the office" to increase efficiency and account for the recent departure of a R&W attorney. 12/13/23 Martinez Tr. 144:2-13; 12/18/23 Davis Tr. 80:20-81:11.

Because one of the existing three R&Ws was leaving the FDO, FDO management assigned the remaining R&Ws, Strickland and Jared Martin ("Martin"), to two teams each. 12/18/23 Davis Tr. 80:13-81:11; see Tr. Ex. 173 at US7411, US7413. At the meeting, FDO management also discussed converting the R&Ws to AFPDs. See Tr. Ex. 173 at US7411, US7413. The meeting minutes state that Strickland was to be removed from "trial support cases" and "duty days," that the "R&Ws [would] be more [Martin's], essentially[,]" and that Martin and Strickland would be doing "pure R&W" tasks, including "[p]retrial motions, sentencing objections, trial research, appellate, etc." Tr. Ex. 173 at US7413. Martin was also removed from duty days. Id.

The notes state that the budget had "enough money and approval for two FTE's [i.e., full-time equivalents] at AF[P]D salary range . . . and one FTE at a lower range." Id. Although

---

[32] The FDO management team was predominantly male. Tr. Ex. 135 at ¶ 60.

the FDO had been surviving with 1.75 FTEs, the budget for appellate AFPDs was 2.75 full-time employees -- leaving a position for one-full time employee in the appellate unit. Id.; see also Tr. Ex. 189 at US6234 (Beam's investigative notes indicated that the office "needed more appellate support" around this time). The meeting minutes state that they were going to hire another R&W or AFPD for the appellate team and suggested having the new hire split time between the trial and appellate unit. Tr. Ex. 173 at US7411, US7413. The notes also say that Joshua Carpenter ("Carpenter")[33] "[was] 'pretty sure' [they] ha[d] full-time need for AVL R&W (will be CLT-based at least for the first year or so)." See id. at US7414.

It was Martinez's understanding that converting R&Ws to AFPDs was in the best interests of the office, because it would allow the office to get credit for the work of R&Ws (which was not the case previously). 12/14/23 Martinez Tr. 99:22-101:2; see also 12/14/23 Carpenter Tr. 57:6-24; Tr. Ex. 173 at US7411, US7414.[34] FDO management determined that it was in its best

---

[33] Carpenter is the Appellate Chief for the Federal Public Defender for the Western District of North Carolina. 12/14/23 Carpenter Tr. 54:20-55:5.

[34] Before 2016, FDOs were given a certain number of AFPD slots based on their case load, but they could "smuggle" more attorneys by classifying additional attorneys as R&Ws. 12/14/23 Carpenter Tr. 57:10-58:24. After 2016, AFPDs and R&Ws counted equally for budgetary purposes, so there no longer was any

interest to reclassify their R&Ws as AFPDs because the AD pay scale, used by all AFPDs, "tops out [at a] higher level than the pay scale for [R&Ws]." 12/14/23 Carpenter Tr. 57:10-24, 70:23-71:15; 12/14/23 Martinez Tr. 101:22-102:3 (testifying that converting to an AFPD is better for R&Ws over the long run because their pay increases would be much higher). Around this time, Carpenter emailed management stating that "it may well make sense to reward [Martin's] excellent performance by converting him to an AFPD position, given the higher top end salary range." Tr. Ex. 39 at US2810.

On July 20, 2018, Martinez emailed the FDO staff, stating that, to ensure all teams have full R&W support, Martin and Strickland, the two R&W Attorneys, would be assigned to cover two teams each: Strickland was assigned to Adolf and Davis's teams, and Martin was assigned to Taylor and Coleman's teams. Tr. Ex. 3 at US0099; Tr. Ex. 135 at ¶ 150. Martinez testified that assigning Strickland to work on Davis's team was inadvertent -- "there were so many things going on" during the July 20 meeting that Strickland's placement on Davis's team was "not purposeful." 12/13/23 Martinez Tr. 144:14-145:4; 12/14/23 Martinez Tr. 148:6-18 (stating the reshuffling of the office was

---

benefit to the individual office to classify attorneys as R&Ws. Id.

a joint decision made by FDO management but acknowledging that he was in charge as the unit executive).

On that same day, Carpenter spoke to Strickland about the proposed restructuring of the FDO's R&W attorneys, and Strickland expressed her interest in gaining more appellate experience. Tr. Ex. 135 at ¶ 152. Strickland also complained to Carpenter about specific case-related staffing decisions by FDO supervisors and Davis's micromanagement, stating that he was difficult to work with. Id. ¶ 154; 12/14/23 Carpenter Tr. 63:9-23. Carpenter testified that he was not surprised by Strickland's complaints because other FDO employees similarly complained about his tendency to micromanage. 12/14/23 Carpenter Tr. 63:9-23. According to Carpenter, Strickland never told him that she was being sexually harassed by Davis. Id. at 65:6-8.

**F.  Davis Spoke Poorly of Strickland to Carpenter, and Davis Contacted Strickland to Discuss a Case They Were Both Working On.**

On the evening of July 20, 2018, Davis and Carpenter exchanged several emails about Strickland. Tr. Ex. 16 at US2794-97. Davis emailed Carpenter "follow[ing] up," as he had "reacted a bit strongly on the phone." Id. at US2796. He wrote the following to Carpenter about Strickland's behavior and how he felt about her:

My primary concern is that I am the only one who has communicated to [Strickland] that her actions--which were fireable offenses-- were in fact problematic.  I feel a bit out in the wind here, and I am going to have trouble working with her so long as I think she thinks she can lie to me and disobey me and no one will back me up.

This is not really fair to dump on you as you are not in a great position to be chastizing [sic] her.  To be blunt, though, [Strickland] needs to get the message that she fucked up and she needs to make things better and apologize.  She may not ever do that -I suspect she won't- but she needs to at least know that lying to your superior and overt insubordination are not considered acceptable in our organization.  If she chooses to continue the "fuck off" attitude, then at least we know what we have.  Right now, it's not clear to me that she thinks anything other than that I'm an asshole and she is the only one willing to stand up to me.

Id. at US2796-97.  Carpenter responded:

I understand, and I want to get a bit more detail from you on some of what happened so I can tread carefully.  I have a game plan in mind for how to give her a chance – whether deserved or not – to redeem herself and return to being a productive employee.  If it works, great.  If not, we'll encourage [Martinez] to respond appropriately.

Id. at US2796.

In the evening of July 22, 2018, Davis emailed Strickland to meet up and discuss her role as a R&W on Davis's trial team.  Tr. Ex. 178 at US4586.  Beam reported that this email upset Strickland so much that she called out of work for the next two days.  Tr. Ex. 5 at US1253.  The next morning, Davis emailed Carpenter stating that he had emailed Strickland to meet and that she had then called in sick, remarking that this must be

63

"purely coincidental, as it was the last two times this happened." Tr. Ex. 16 at US2794-97. Davis knew that Strickland was intentionally avoiding him. Id.; see also Tr. Ex. 40 (Davis's notes stated that Strickland called in sick on 7/23 and Davis told Martinez that it was "probably because of this email"). Strickland took leave on July 23. Tr. Ex. 135 at ¶ 157.

**G.  Strickland Contacted Nancy Dunham from the Fair Employment Opportunity Office About Her Allegations.**

At the end of July, Strickland contacted Nancy Dunham at the Fair Employment Opportunity Office ("FEOO") with the AO because she felt that "[Martinez] had not followed through on what they agreed to resolve this situation." Tr. Ex. 5 at US1249; Pl.'s PFOFCOL ¶ 72a.[35]

Strickland connected with Dunham through her old supervisor at the AO, Laura Minor ("Minor"). Dunham Dep. 25:3-27:7; 12/13/23 Strickland Tr. 10:14-11:14. Dunham did not know Strickland prior to speaking to her about her sexual harassment allegations. Id. Strickland advised Dunham of her allegations against Davis. Id. at 32:3-34:10. Dunham encouraged Strickland

---

[35] Dunham was "the manager of the civil rights office for federal courts and for AO employees." Dunham Dep. 168:19-22. Dunham did not work at the FDO and had no supervisory authority over Strickland or the office. See Dunham Dep. 67:9-14.

to resolve this matter informally with Martinez, warning that the odds were "stacked against [Strickland]."[36]  Id. at 45-46, 48:9-49:9, 174:17-25.

## H. Martinez Realized that He Inadvertently Assigned Strickland to Work Under Davis and Instructed Davis to Stop Contacting Strickland.

A few days after the July 20 management meeting, Martinez realized that he had inadvertently put Strickland on Davis's team.  12/13/23 Martinez Tr. 144:2-146:25.  Martinez testified that, during the July 5 meeting, the priority was ending the mentee/mentor relationship between Davis and Strickland because of a "breakdown in communication".  Id. at 146:5.  At that time, Martinez "did not think of the later consequences about how the workload was going to be distributed" to R&Ws and "what effect that would have in relation to [Davis]."  Id. at 146:5-9.  After he sent the July 20th email about team assignments, it "dawned" on Martinez that Strickland was uncomfortable with Davis and that he needed to separate them.  Id. at 146:9-16.  Martinez contacted Strickland to explain his mistake, apologized for the inadvertence, and stated that he would correct it immediately.

---

[36] Dunham testified that she believed that "one of the first things . . . that the AO should do is look at whether the situation could be resolved informally."  Dunham Dep. 48:18-50:4.  It was Dunham's understanding that the AO believed Strickland's allegations were especially concerning given her high reputation, as well as fears that Strickland would go public with her claims.  Id. at 178:20-180:6.

Id. at 146:24-147:17; Tr. Ex. 135 at ¶ 163.  Strickland texted
Martinez, asking to review any email sent out to FDO employees
about this organizational change.  Tr. Ex. 135 at ¶ 164; Tr. Ex.
3 at US0101.  Strickland was concerned about others viewing her
as the reason for the change.  Tr. Ex. 3 at US0101.  Martinez
assured her: "I'll show it to you before I send it out."  Tr.
Ex. 135 at ¶ 164; Tr. Ex. 3 at US0101.

      On July 24, 2018, Martinez emailed Davis to not contact or
meet with Strickland until further notice and told Davis about
Strickland's concerns.[37]  Tr. Ex. 170 at US6636 (instructing
Davis on July 24); 12/14/23 Martinez Tr. 77:20-23, 148:19-24
(stating that he instructed Davis to not contact or meet with
Strickland so that Strickland could feel more comfortable in the
office); see also 12/18/23 Davis Tr. 82:12-83:1 (stating that
Martinez instructed him to "have no further contact with
[Strickland]").  Martinez also instructed Davis to not give
Strickland any work; it was Martinez's impression that Davis
agreed with him.  12/14/23 Martinez Tr. 78:14-79:3.

      Davis testified that, after July 24, he had no substantive
contact with Strickland, explaining that he passed her in the

---

[37] Martinez felt like he had to tell Davis about
Strickland's concerns with Davis "because that was the only way
that [he] could ensure, based on the reshuffling within the
office, that . . . [Strickland] wouldn't be doing any work for
[Davis]."  12/14/23 Martinez Tr. 148:20-149:11.

66

hallway once, they participated in appellate moots (of which
Strickland participated telephonically), and she was copied on
some emails he wrote.  12/18/23 Davis Tr. 82:12-83:9.  He also
testified that had no involvement in decisions about
Strickland's pay, nor did he have any involvement regarding
decisions about promoting Strickland.  Id. at 83:10-21.  Davis
further testified that he did not have authority to change
Strickland's pay or promote her, as this was left up to
Martinez.  Id.  Martinez testified that, as the Federal
Defender, he was the only person with "authority over personnel
decisions such as terminations, promotions, [and] pay
adjustments."  12/14/23 Martinez Tr. 114:10-14.

>   **I.   Martinez Announced the New Appellate AFPD Position and
>         Made Martin the Gatekeeper of Assignments.**

On July 25, 2018, FDO management discussed specifics for
the new Appellate AFPD position draft posting and how to
organize R&W assignment distribution and workload.  Tr. Ex. 33.
Carpenter explained that between Martin, Strickland, and the new
hire, the office needed "one FTE of appeals / post-conviction
work" and recognized that "there [were] a lot of ways to get
there."  Id. at US4156.  Carpenter stated that they may give the
new hire 70% appeals/30% trial time to "free up more time for
[Martin and Strickland] to work on trial-support issues" or

"have that person join [Martin and Strickland] with something like a 30/70 appeals split."  Id.

On July 26, 2018, Martinez emailed the FDO staff announcing the posting of Appellate AFPD position (stationed in Charlotte). Tr. Ex. 135 at ¶ 165; Tr. Ex. 168 at US2786.  The new position had the same duties as Martin and Strickland and thus divided time between the trial and appellate teams.  12/14/23 Carpenter Tr. 58:13-59:1; Tr. Ex. 168 at US2786.  Martinez also stated that to "facilitate the flow of work to the R&Ws[,]" "all requests for R&W support should be sent to [Martin], who will then distribute the work amongst himself and [Strickland] based on their current workload capacity and any particular interest or expertise that an R&W may have on the relevant issue."  Tr. Ex. 135 at ¶ 165; Tr. Ex. 168 at US2786.  Martinez indicated that this was a temporary fix until a new AFPD was on board. Tr. Ex. 168 at US2786.  Martinez testified that he made Martin, who had more experience than Strickland, the "gatekeeper" of assignments to protect Strickland from being inadvertently assigned work under Davis's command.  12/13/23 Martinez Tr. 148:6-10; 12/14/23 Martinez Tr. 82:20-83:25.  Despite Martinez previously indicating that he would, Martinez did not provide a draft email to Strickland to review in advance of his distribution to FDO staff.  Tr. Ex. 135 at ¶ 165.

68

In late July, Martinez distributed an employee manual with an organizational chart showing the R&W attorneys reporting to Davis.  Tr. Ex. 135 at ¶ 167; Tr. Ex. 3 at US0088.  In another, earlier iteration of the organizational chart, Davis only supervised his trial team (which did not include Strickland) – not the entire FDO.  Tr. Ex. 196 at US1059 (Strickland sending a chart to Dunham with the subject "Dec 2017 organizational chart"); Tr. Ex. 37 at US1074 (Strickland writing Dunham stating that she is going to send her the December 2017 organizational chart).

Around July 27, Carpenter and Strickland spoke about the new position.  Carpenter told Strickland not to apply for the new position,[38] that it "may be financially advantageous for [Strickland] to remain in her position",[39] and that she already

---

[38] An August email from William Moormann ("Moormann") casts some doubt on Carpenter's comment that Strickland need not apply for the role.  Moormann wrote DSO, stating: "We are currently advertising for an additional Appellate AF[P]D.  This means these Reclassifications [of the R&W positions] would not exclude anyone from the opportunity of being considered for an Appellate AFPD Position."  Tr. Ex. 186 at US2706 (emphasis added).  FDO management internal emails, however, as well as the AFPD job posting, do support Carpenter's statement that Strickland would essentially be applying to a job she already had.

[39] Contrary to Carpenter's statement to Strickland, it is more financially advantageous to be an AFPD rather than an R&W.  Tr. Ex. 39 at US2810 (July email in which Carpenter writes that converting Martin to an AFPD would be a "reward" "given the higher top end salary range"); Decl. Moormann ¶ 19, ECF No. 245-2, (stating that AFPDs have "greater maximum pay" and "accelerated movement to the maximum pay", and the AFPD is

69

had this position.  Tr. Ex. 135 at ¶ 170; 12/14/23 Carpenter Tr. 58:18-59:24; see also Tr. Ex. 37 at US1076.  During trial, Carpenter explained that the new AFPD position's duties were "exactly what [Strickland's] duties were going forward." 12/14/23 Carpenter Tr. 58:11-23.  Despite this admonishment, Strickland applied for the "Appellate Assistant Federal Public Defender position," attaching her resume on August 7, 2018.  Tr. Ex. 135 at ¶¶ 169, 171.

In August 2018, the hiring committee conducted interviews for the position, and Strickland was not invited to interview. Tr. Ex. 135 at ¶ 236.  Carpenter explained that Strickland was not interviewed because she already had the role.  12/14/23 Carpenter Tr. 59:13-16.  Id.  Carpenter, with a FDO team, engaged in the interview and selection process for the position,

_____

typically viewed as more prestigious given the broader range of duties).  Moreover, Strickland was eligible for a grade-level promotion in August 2018.  Tr. Ex. 137 at 9-10.  According to a declaration by Martinez, under the judiciary's "Highest Previous Rate" policy, an AFPD's "starting salary may be set higher than the maximum of the applicable starting salary range if necessary to match the salary . . . the AFPD previously earned as an employee of any federal government entity or any FDO."  Decl. Martinez 11, ECF No. 245-4.  Otherwise, a promotion from an R&W to AFPD would result in a pay decrease.  See Decl. Moormann ¶ 19, ECF No. 245-2 (stating that "at the beginning of the AFPD's career, the pay scale is lower than that of a GS employee with Plaintiff's level of experience at the time").  Thus, there was no financial disadvantage for Strickland to convert to an AFPD, as she could have retained the salary she had as an R&W if it was higher than the maximum starting salary she could have received as an AFPD under the "Highest Previous Rate" policy.

70

and Davis had no input in who was selected.  12/14/23 Carpenter

Tr. 59:2-10.  A female attorney was selected for the position.

Id. at 60:5-7.

Martinez and Davis made a "bet" about whether Strickland

would apply to the position.  Tr. Ex. 12 at US6035-36.  The

conversation included the following:

> DAVIS: I would like you to know that I respect the
> sanctity of a bet: [Strickland] asked me out of the
> blue if we were just "inundated with applications for
> the AFPD slot."  She was clearly fishing for whether
> she should apply (if she hasn't already).  I was
> sorely tempted to subtly encourage her, but I
> pretended like I didn't see where she was angling.

> MARTINEZ:  I appreciate you respecting the sanctity of
> a bet.  You could of [sic] played dirty but you played
> it clean.  Let see if she files.

> DAVIS: She's right on the edge.  I said something
> about transfers from other offices and her lip was
> practically quivering.  She said "Is that what you're
> looking for, a transfer from another office?"  It was
> like the thought was breaking her heart.

Id.

### J.   Strickland Had Safety Concerns with Working in the Same Office as Davis.

Strickland only worked certain days in early August 2018.

Tr. Ex. 135 at ¶ 173.  Strickland's officemate was leaving the

FDO soon.  Id. ¶ 175.  Strickland told Dunham that Davis made

her feel unsafe in the office, especially because Strickland

worked in a more isolated part of the building.  Tr. Ex. 37 at

US1075.

71

In her later supplement to her mediation request, Strickland further detailed her safety concerns with Davis. Strickland explained that she worked in an isolated part of the building and that she began to carry pepper spray to work because of her fear of Davis. Tr. Ex. 3 at US0081-86. Strickland also detailed that she believed Davis was asking other employees to spy on her:

> On August 3, 2018, Ms. Strickland confided in Mr. Newman[, Strickland's office mate,] that she was thinking about moving her workplace after he left the FDO, because she felt unsafe being in that space alone. Ms. Strickland told Mr. Newman that she had raised concerns with Mr. Martinez that Mr. Davis was sexually harassing her, and that Mr. Martinez had failed to address her concerns.

> A few hours later, Mr. Newman told Ms. Strickland that, following their conversation, Mr. Davis had made an inappropriate joke at their team meeting. Mr. Newman had joked that he wished he could come back to attend the annual office retreat. Mr. Davis responded by stating, in front of the whole trial team, that Mr. Newman should come back to give the sexual harassment training. . . . Given the timing of Mr. Davis's comments, they also wondered if he, or someone else, had eavesdropped on their conversations. . . .

> Mr. Davis continued engaging in harassing and obsessive behaviors even after he was aware of Ms. Strickland's complaints. For instance, another employee later told Ms. Strickland that, after Ms. Strickland had resumed coming into work in August 2018, Mr. Davis asked Lisa Ottens, a paralegal whose office was nearest the utility closet, to "keep tabs" on her. According to this employee, it was widely known within the office that Ms. Ottens had been spying on Ms. Strickland and reporting on her back to Mr. Davis.

> Ms. Strickland was mortified that her privacy was violated in this manner. She was shocked that Mr.

72

Davis made such an inappropriate request, that Ms. Ottens complied, and that other employees knew but did not report it.  She also believed, in light of this information, that it likely was no coincidence that Mr. Davis made a joke about sexual harassment training just after Ms. Strickland had confided in Mr. Newman that Mr. Davis was sexually harassing her, which made her feel demeaned and humiliated.  More than ever, she believed that Mr. Davis was obsessed with her and that she was not safe around him.

Tr. Ex. 3 at US0081-86.

## K.    Officials at the AO Contacted Martinez About Strickland's Requests.

On August 8, 2018, Martinez had a brief, two-minute conversation with Cait Clarke at the AO about Strickland.[40] 12/14/23 Martinez Tr. 79:11-80:25; Tr. Ex. 135 at ¶ 188.  Clarke told Martinez that Strickland was unhappy about the situation with Davis and suggested Martinez meet with Strickland again to talk.  12/14/23 Martinez Tr. 79:11-80:25.  Clarke did not explain why Strickland was unhappy, nor did she inform Martinez that Strickland was alleging sexual harassment.  Id. (testifying that Clarke gave "no details" as to the issues Strickland was having with Mr. Davis).  Clarke also suggested to Martinez that

---

[40] Dunham shared Strickland's allegations of sexual harassment with Cait Clarke, a senior official at the AO who "had responsibilities for and with the federal . . . defender's office."  Dunham Dep. 60:20-23, 61:10-22; Tr. Ex. 135 at ¶ 187. Lee Bennett, "second-in-command at the AO" with "responsibilities that related to that office and . . . all the offices in the courts[,]" authorized Clarke to contact Martinez about Strickland.  Dunham Dep. 62:12-20; Tr. Ex. 135 at ¶ 188.

73

he transfer Strickland to another office, among other options.
Tr. Ex. 135 at ¶ 193.

**L. Strickland Reported Her Sexual Harassment Claims to Martinez.**

On August 9, Martinez and Strickland met in Strickland's office.  12/14/23 Martinez Tr. 82:14-19; Tr. Ex. 150 (Strickland's recording of the meeting); Tr. Ex. 135 at ¶ 195.

Martinez expressed his frustration with Strickland going to the AO –- "some other party", Tr. Ex. 150 at 10:12-13, -- about her concerns with Davis, because "there was nothing really that the AO could possibly do . . . if there's . . . anything happening like that nature in our office."  12/14/23 Martinez Tr. 84:19-85:6.  Martinez was frustrated and "upset" that Strickland spoke to the AO about her concerns, instead of Martinez.  Id.; Martinez Dep. 189:1-5 (testifying that he was "upset" when Strickland "reported to the AO").  He told Strickland that he was being "blamed" and "attacked" for a situation that was not his fault –- a situation that he already took "control" of as soon as he was "put on notice."  Tr. Ex. 150 at 17:9-17.  He also told Strickland that he "thought she was going behind [his] back and [he] would have liked for her to come to [him] first."  Martinez Dep. 189:1-5.  Martinez explained that he asked Strickland why she did not talk to him first and that he "would have tried to resolve all these issues

74

before [she went] to the AO." Id. at 186:1-5.[41] Martinez did not tell Strickland that she could not talk to the AO about this situation. See generally id.

It was Martinez's understanding that all of Strickland's concerns were resolved on July 5, so he was "taken aback." Id. at 186:18. Martinez felt that he "took care" of this situation and "created a distance" between Strickland and Davis. Tr. Ex. 150 at 3:6-7. During his deposition, Martinez further testified about why he felt defensive during this meeting, explaining that he "felt she was pointing the finger at [him]," that "she was very forceful," and that she was "making demands." Martinez Dep. 190:1-191:8

At the meeting, Strickland and Martinez disagreed on whether Strickland had previously told Martinez that she was being sexually harassed. Tr. Ex. 150 at 10:16-18. Martinez stated that he previously asked Strickland whether she was being harassed, and she said no but that she was "uncomfortable." Id. at 10:16-11:5. Strickland disputed this, stating that she first came to Martinez and said that she was going to give Davis "the benefit of telling him personally that he cannot talk to me this

---

[41] Martinez stated at his deposition that Strickland did "nothing wrong" by going to the AO -- he "just thought it was unfair to [him] that she didn't speak to [him] first and articulate to [him] . . . all of the concerns so that [he] could try to resolve them." Martinez Dep. 186:6-20.

75

way" and told Martinez that she was "going to be drawing
boundaries" with Davis.  Id. at 11:6-15.  Strickland argued that
the fact that Martinez asked her whether this was sexual
harassment showed that he was "on notice that [he] understood
the significance of what [Strickland] was telling [him]."  Id.
Strickland further argued that she did not specifically say "no"
–- that it was not sexual harassment -- but instead said "I'm
not using those words yet . . . I'm trying to give everybody the
benefit of me trying to resolve this."  Id. at 11:16-20.  It was
her understanding that if she told Martinez that Davis was
sexually harassing her, it would "trigger" the obligation to
investigate.  Id. at 11:22.  She explained that she told him
earlier that she was "trying to [toe] a line" and not use those
direct words because she was "trying to self-manage the
situation."  Id. at 12:3-7.  Strickland stated that she never
said she "wasn't being sexually harassed."  Id.

     Strickland stated that she previously gave Martinez details
about Davis's concerning behavior.  Id. at 13:1-9.  Martinez
interrupted Strickland and asked, in a somewhat inquisitive
tone, "[b]ut there was no physical contact or anything like
that?"[42]  Id. at 13:10-11.

---

[42] Beam's report, and Strickland's allegations, stated that
Martinez said words to the effect of: "at least you weren't
touched[.]"  Tr. Ex. 7 at US4265-66.

Strickland began to detail Davis's behavior to Martinez, stating that after the discovery review issue, Davis seemed to have "reported [her]" to Martinez directly and "he got so angry that he was . . . frankly [] shaking and pale." Id. at 13:12-19. While Davis "played that off like that's just how he confronts people[,]" Strickland found Davis to be "extremely aggressive" and she felt "threatened by him." Id. Strickland stated that Davis made her cancel the FBI review, and when they were both walking to the jail, Davis "berat[ed]" and accused her of only wanting to be on the Dixon case so she "could get enough experience to make [herself] indispensable, so that [she] could demand to go to Asheville." Id. at 13:20-14:5.

Strickland then informed Martinez about the Mas Dinero email. She stated that she "probably should have" told Martinez this before but "before all this happened . . . when [she] told [Davis] that [she] wanted to be able to transfer to the Asheville office now that [she] was married, [Davis] sent [her] an email that day and he said that he would raise – that he had a plan to raise [her] pay . . . [stating] but 'remember I deal in pay for stay.'" Id. at 14:5-11. Strickland explained Davis wrote "I deal in pay for stay as if he would raise [her] pay if [she] stayed in Charlotte." Id. at 14:13-14. Strickland stated that she was "not trying to be difficult" but that she was "not safe here." Id. at 14:16-17. Martinez said that he understood,

77

and that he was "not disagreeing with [her]," but maintained that he took "control of the situation" as soon as he was "put on notice," with the exception of the one meeting (in which he had Strickland and Davis meet together), of which he took "ownership" of.  Id. at 14:22-15:5.

In terms of next steps, Strickland and Martinez discussed: (1) Strickland's conversion from an R&W to an AFPD; (2) Davis's removal from her chain of command; (3) whether Strickland could exclusively work in appeals; and (4) whether Strickland could telework or transfer to Asheville.

Strickland indicated that "she was under the impression that she would be an AFPD."  12/14/23 Martinez Tr. 85:7-17. Martinez told her that the FDO was already planning to convert both her and Martin from R&Ws to AFPDs for case weight measurement purposes, so she would become an AFPD "ASAP."  Id.; Tr. Ex. 150 at 35:19-21.

Strickland asserted that Davis should not be in her chain of command, Tr. Ex. 150 at 30:14-18, and that this situation could not be resolved if she was "supervised by the trial people", id. at 15:12-17.  Martinez stated that he needed to consult with Carpenter on whether Strickland could work exclusively in appeals "as a courtesy."  Id. at 36:1-3; 12/14/23 Martinez Tr. 85:18-86:7.  Martinez agreed to changing the

78

organizational chart so that Strickland was no longer in Davis's chain of command.  Tr. Ex. 150 at 20:3-4, 35:8-10.

Martinez stated that he had separated Strickland and Davis, and that he was "putting [Strickland] in opposite sides of the office so [Davis] has no direct supervisory responsibility." Id. at 15:5-9.  Strickland explained that she did not feel safe in the Charlotte office, could not work there, and had already cut her working hours so that she was not in the office alone. Id. at 15:20-16:5. Strickland instead indicated that she was okay with teleworking or transferring to Asheville.  Id. at 32:4-12.  Martinez asserted that he did not have office space in Asheville.  Id. at 33:7-8.  He also stated that he did not think she could telework -- the FDO did not have a policy allowing employees routinely to telework.  12/14/23 Martinez Tr. 86:2-87:6; Tr. Ex. 150 at 33:8-11.  Despite this, Martinez stated that he would look into these requests and see what he could do. Tr. Ex. 150 at 33:13-21; Tr. Ex. 41 at US6839.  After this discussion, Strickland resumed taking leave from work.  Tr. Ex. 135 at ¶ 210.

On August 10, Strickland emailed Martinez confirming the details of their conversation and what she understood as their agreed-to next steps.  Tr. Ex. 171 at US4262.  Strickland wrote that they agreed: (1) she would be an AFPD; (2) she would work exclusively in appeals; and (3) "[Davis] [would] not be in [her]

79

chain of command or have any supervisory authority [over her]."

Id. Strickland made the following statement in writing:

> As we discussed, these steps are necessary to protect
> myself from further sexual harassment by the First
> Assistant, and to allow me to do my job effectively
> going forward. In addition, as I told you, I am not
> safe working in the Charlotte office. The First
> Assistant has already crossed many lines with me by
> engaging in sexually harassing and threatening
> behaviors, such as cornering me in the lobby after
> hours when he knew I was alone. I have already
> curtailed my working hours to avoid being alone in the
> building and this situation is not tenable moving
> forward. The First Assistant is likely to be very
> angry when he finds out about these changes, which
> puts me at further risk.

Id. Martinez testified that this email was the first time

Strickland stated that Davis was sexually harassing her.

12/14/23 Martinez Tr. 90:10-22 (stating that August 10 was the

first time that Strickland alleged sexual harassment and that

she did not allege this on August 9). Strickland testified that

she sent the August 10 email to Martinez because Dunham advised

her to "tell [Martinez] what [she] was asking for and why."

12/11/23 Strickland Tr. 74:21-75:5.

Strickland also requested to telework to "prevent further

threats to [her] safety" until she could transfer to Asheville.

Tr. Ex. 171 at US4262. She also indicated that she was "fine"

with teleworking as a long-term resolution. Id. ("A long-term

80

resolution that allows me to work remotely and report to the Appellate Chief in Asheville is fine with me.").[43]

On August 10, Martinez replied to Strickland's email and summarized their agreement as follows: (1) the organizational chart would be changed such that Strickland reported to Carpenter and Carpenter reported to Martinez -- thus removing Davis from her chain of command; (2) Strickland would be converted to an AFPD "as soon as possible" -- after William Moormann ("Moormann")[44] was back in the office; (3) Strickland could not work full time in appeals -- he spoke to Carpenter and Carpenter envisioned Strickland, Martin, and the new AFPD all doing both trial and appeals work; and (4) there was no office space in Asheville, and he was not agreeable to telework but would report back in one week.  Tr. Ex. 172 at US4261.[45]

_____

[43] Strickland did not indicate to Martinez, after the EDR process started, that she was unhappy teleworking.  12/11/23 Strickland Tr. 79:20-80:21.

[44] Moormann is the "Administrative Officer with the Federal Public Defenders [for] the Western District of North Carolina." 12/18/23 Moormann Tr. 119:13-20.  In this role, he "handle[s] the functional side of the organization, processing paperwork, running the budgets, . . . allocating the funds, all of the backroom work that the FDO office runs."  Id. at 119:21-120:20. Martinez relied on Moormann for handling HR matters.  Id.

[45] Martinez testified that he removed Strickland from Davis's chain of command around August 9, although acknowledged that he was unsure as to the exact date.  12/14/23 Martinez Tr. 108:9-12.

**M.  Martinez and Ishida Initiated a Chapter IX Wrongful Conduct Investigation, and Martinez Worked on Addressing Strickland's Requests.**

On August 13 or 14, Martinez called James Ishida, the EDR Coordinator for the Fourth Circuit, to advise him that one of his female employees made allegations of sexual harassment against Davis.  12/14/23 Martinez Tr 90:25-91:14; 12/13/23 Ishida Tr. 21:10-17.  On August 14, Martinez forwarded Strickland's August 10 email to Ishida.  Tr. Ex. 188 at US2558-59.  Ishida replied to Martinez that day, copying Chief Judge Gregory, and stating that -- under Chapter IX of the EDR Plan -- Ishida was required to inform Chief Judge Gregory of Strickland's allegations.  Id.

Ishida further stated: "I understand that arrangements are currently being made for you to appoint someone outside your office to investigate the allegations contained in the below email.  At the conclusion of the investigation, under the Plan, any employee found to have engaged in wrongful conduct may be subject to appropriate disciplinary action." Id.  Under Chapter IX of the EDR Plan, Fourth Circuit officials "shall ensure that the allegations in the report are appropriately investigated, either by the human resources manager or other person."  Tr. Ex. 136 at US4545.

Martinez testified that his next step was to appoint an investigator.  Martinez Dep. 179:1-14.  Ishida reached out to

the Clerk of the Court in the Western District of North Carolina, who recommended Heather Beam, HR Specialist in the Western District of North Carolina, to investigate Strickland's allegations.  12/13/23 Ishida Tr. 23:20-24:18; Martinez Dep. 179:1-14 (testifying that Ishida told Martinez that he "should appoint Heather Beam as investigator" and Martinez confirming that he did appoint Beam).

On August 14, 2018, Ishida emailed Lisa Morris, Chief U.S. Probation Officer, asking whether Heather Beam could help investigate a "sensitive EDR Matter" "brewing in the Western District."  Tr. Ex. 18 at US0617.  Ishida stated that he was looking for someone "outside the particular office[.]"  Id. at US0617.  Morris confirmed Beam's availability to serve as investigator.  Id.

Ishida then informed Martinez that "we now have Heather Beam" and suggested Martinez set up a meeting with Beam to discuss the case and to inform her that Martinez was "appointing her to investigate" Strickland's allegations.  Id. at US0616. Ishida also advised Martinez to tell Beam when he appointed her that he was recusing himself from involvement in the investigation due to his early involvement.  Id.  Ishida testified during trial that Martinez "had no role" in selecting Beam as an investigator.  12/13/23 Ishida Tr. 25:5-7.  Martinez testified that both he and Ishida agreed that Beam "would be

83

best because she had no knowledge, personal knowledge of the facts, [and] was not involved in anything . . . ." 12/14/23 Martinez Tr. 94:2-22.

On August 14, Martinez emailed Beam the following: "I have just been advised by Circuit Executive James Ishida that you are willing and able to assist us in investigating allegations of misconduct by an employee in my office. Pursuant to our office's EDR plan I am appointing you as my designee to conduct the investigation into the allegations." Tr. Ex. 137 at 8.

Martinez also testified that he recused himself "from being involved in the process and investigation as a result of [his] involvement in the very beginning." 12/14/23 Martinez Tr. 94:19-22. Martinez did, however, still technically appoint Beam, as per the text of the EDR Plan. Tr. Ex. 136 at US4545 ("the Chief Judge or the unit executive shall ensure that the allegations in the report are appropriately investigated"). Martinez testified that Beam was not reporting to him during the investigation, but instead reported to Ishida. 12/14/23 Martinez Dep. 95:21-96:2.[46]

_____

[46] But see Beam Dep. 19:9-21. Beam read an email during her deposition in which Ishida stated to Martinez that Beam reports to Martinez. Id. Beam understood this to mean that she was reporting to Martinez. Id. This email is not in evidence. While this casts some doubt on whether Martinez exerted control over the investigation early on, and while this may have been Beam's understanding at the beginning of the investigatory process, the Court credits Martinez' trial testimony, and the

84

On August 14, Martinez emailed Ishida for advice on insulating Strickland from her contact with Davis. Tr. Ex. 18 at US0615. Martinez explained that he had been "attempt[ing] to insulate [Strickland] from [Davis] [by] creat[ing] a Research & Writing Unit (composed of [Strickland] and [Martin] the other R&W) that would become part of the Appellate Unit" and funneling all work to that unit through Martin. Id. This unit would report to Carpenter. See id.

Martinez asked Ishida how to instruct Martin to not give Strickland any of Davis's cases without "raising any eyebrows." Id. Martinez also asked how to let Carpenter and Martin know that Strickland was working remotely without breaking Strickland's confidences. Id. Ishida advised Martinez to "advise [Carpenter] and [Martin] that [Strickland] [would] be teleworking temporarily for the time being" and to "simply ask [Martin] not to assign any work from [Davis] to [Strickland]." Id. Ishida reassured Martinez that he was "doing a great job" and that his "organizational changes were brilliant." Id.

---

lack of evidence showing that Beam actually reported to Martinez or showing that Martinez exerted control over the investigation, in finding that Martinez did not have control over the investigation and that Martinez only participated as a witness. 12/14/23 Martinez Tr. 97:11-25.

### 1. Martinez Told Ishida that Dunham Tried to Obstruct an Ongoing EDR Investigation.

On August 15, Ishida emailed Chief Judge Gregory to inform him of an "disturbing incident" that happened in Strickland's EDR matter. Tr. Ex. 188 at US2558. Ishida wrote that Dunham tried to obstruct an investigation into Strickland's claims:

> Dear Chief,
>
> I wanted to alert you about a disturbing incident that happened today in this EDR matter.
>
> It's a long story, one that I'll fill you in on tomorrow, but the short version is it appears that the head of the AO's Fair Employment Practices Office, Nancy Dunham, tried to obstruct an ongoing Fourth Circuit EDR investigation. Ms. Dunham allegedly instructed one of her staff to tell Tony Martinez that he needed to give the complainant, Caryn Devins, whatever it is that she is asking for – telework, relocation, etc – before Ms. Devins hires an attorney or goes to the press. Ms. Dunham reportedly said that this is not a request but an order that comes from the highest levels of the AO.[47]
>
> After some checking, [Martinez] discovered that this "demand" did not come from the highest levels of the AO, but from Ms. Dunham, who coincidentally is a friend of the complainant, Caryn Devins.
>
> Needless to say, [Martinez] felt threatened, coerced, intimidated, and mystified by the extraordinary demand. He's also very upset and intends to write Jim Duff a letter tomorrow.
>
> I suggested to [Martinez] that we step back and think about this overnight before doing anything further. I also told him that I wanted to advise you of what had happened.

Id. at US2558.

_____

[47] Dunham testified that Clarke did not have the authority to order Martinez to take any action. Dunham Dep. 66:7-14.

Martinez stated that Beam told him that she spoke to Amal Scroggins ("Scroggins") at the FEOO who told Beam that "there is nothing . . . [Beam] can do about this situation", "Martinez needs to resolve this" and ordered Beam to "not contact any lawyers", stating that "this is a directive, this is an order." Martinez Dep. 179:10-180:15. Beam relayed to Martinez that she "can't be involved in investigation of this case" and she is "done." Id. During her deposition, while Beam confirmed that she was told to stop investigating Strickland's claims, she does not recall ever being threatened by an official at the AO. Beam Dep. 40:7-41:6.

During her deposition, Dunham denied the allegations relayed by Ishida to Chief Judge Gregory in his August 15 email and stated that they were "patently false." Dunham Dep. 123:13-124:3. Dunham explained that she had "very little interaction" with Beam except for a phone call early in the process. Id. at 190:24-191:7. After Scroggins spoke with Beam, Scroggins came to Dunham, told her that she received a call from Beam and that she "believe[d] this person may be involved" in Strickland's case. Id. at 192:2-21. Dunham did not think that Scroggins disclosed this during the first call with Beam because "she didn't know that that's what the situation was" -- i.e., that Dunham was already involved in this case. Id. Dunham thought Scroggins did not make the connection until after Dunham and

87

Scroggins spoke about it.  Id.  During the second call with
Beam, Scroggins and Dunham "informed [Beam] that the matter she
had talked about with [Scroggins] was also something that had
been brought to [Dunham's] attention by [Strickland] and that
[Dunham] was working with AO managers and others on how to
assist in the case."  Id. at 194:4-23.  Dunham testified that
she did not think the call was threatening and that they did not
give Beam any orders or directives.  Id.  Dunham further
elaborated on this second phone call with Beam that she and
other staff at the AO "were in the process of trying to
informally settle the case."  Id. at 97:24-99:5.

     Dunham stated that she was "shocked" to see this August 15
email.  Id. at 126:12-128:4, 133:4-21 (explaining that her
office regularly guides courts and judicial staff about cases
and it has never been considered "interference," and that
Strickland was right to reach out to the AO for advice on her
rights).  Dunham also denied any allegations that she was
Strickland's "friend" as communicated in the August 15 email.
Id. at 128:10-129:12.  Finally, Dunham also explained how the
August 15 email "might interfere with the EDR process," stating
that as Chief Judge Gregory and Ishida were to be neutral
adjudicators, "having falsehoods presented to them could
interfere with decisions they made in the future" and hurt
Strickland's credibility.  Id. at 129:19-130:15, 131:18-132:10.

88

During his deposition, Ishida testified that this alleged "interference" by the AO "irritated" him and that he was concerned about the AO's involvement and how that would impact the ongoing proceeding. Ishida Dep. 103:21-104:6. Ishida also confirmed that Martinez relayed these allegations, about Dunham's interference, to Ishida. Id. at 96:10-97:25. Ishida was concerned with the AO's involvement because "these are confidential matters," id. at 98:5-19, and he believed that "if the AO were involved, that would be prejudging the outcome before the investigation was complete," id. at 105:21-106:22; see also id. at 105:14-106:5, 109:7-24 (stating that it would be "inappropriate" to order an action in favor of the complainant "without the benefit of knowing the outcome of what the investigation report said"). He testified that the AO eventually agreed to letting the investigation play out. Id. at 107:12-16.

Ishida recognized that, at the time of the AO's alleged interference, there was not a report of wrongful conduct filed by Strickland, and the AO was not "recommending discipline" against either Davis or Martinez. Id. at 109:25-114:20. Instead, as Ishida testified, the AO was telling Martinez to allow Strickland to telework and promote her to an AFPD. Id. Ishida still maintained that implementing these changes would be "prejudging" the case because if the investigation found no

89

misconduct, "then any corrective or preventive action . . . may not [have been] necessary." Id. Ishida believed that because only Martinez could order those remedies, the AO was interfering by telling Martinez how to manage his office. Id.

### 2. Martinez Updated Strickland on the Steps He Had Taken with Respect to Her Requests and Asked Davis for a Timeline of Events.

Strickland took sick leave on August 10 and August 13-17. Martinez authorized the sick leave to be converted to administrative leave to avoid depleting Strickland's sick leave balance. Tr. Ex. 135 at ¶ 212; see also Tr. Ex. 159 at US2546-47. On August 17, 2018, Martinez emailed Strickland, copying Ishida and Beam, about progress on Strickland's outstanding requests. Tr. Ex. 159 at US2546-47.

First, Martinez confirmed that he had already instructed Moormann to begin the process of converting Strickland to an AFPD. Id. at US2546 (stating that he was "advised that it was to the office's advantage to reclassify [R&Ws] to AF[P]D positions for purposes of case weight measurement").[48]

Second, Martinez stated that he "never agreed to allow [Strickland] to work exclusively on appeals":

> At our meeting I never agreed to allow you to work
> exclusively on appeals. I advised you I personally
> had no problem with it but had to clear it through

---

[48] Beam's investigation concluded that this was a change in title, and Strickland's duties remained the same. Tr. Ex. 5 at US1245.

> Appellate Chief Josh Carpenter.  If I were to allow
> you to only work on appeals, it would leave me with
> only one Research & Writing Specialist to support nine
> trial attorneys.  After discussion with Josh about
> this request, we determined this is not doable and l
> will not agree to have you do appeals exclusively.

Id.

Third, Martinez confirmed that he altered the organizational chart, such that Strickland reported to Carpenter and Carpenter reported to Martinez.  Tr. Ex. 159 at US2546; see Tr. Ex. 5 at US1264 (modified organizational chart reflecting these adjustments).  At this time, however, Strickland still "provided support to attorneys in the office generally, which included attorneys in the trial unit headed by [Davis.]"  Tr. Ex. 135 at ¶ 244; see also Tr. Ex. 137 at 3 (admitting that Davis supervised the entire FDO trial unit).

Next, Martinez stated that he had reported Strickland's allegations of sexual harassment pursuant to his obligations under the EDR Plan.  Tr. Ex. 159 at US2547; Tr. Ex. 135 at ¶ 217.  Martinez cited Strickland's August 10 "email as the basis for making the report."  Tr. Ex. 135 at ¶ 217.  Martinez stated that Heather Beam has been approved by Ishida to investigate Strickland's claims.  Id.  Martinez also told Strickland that both he and Beam would meet with Strickland to "advise" her of her rights under the EDR Plan.  Tr. Ex. 159 at US2547; Tr. Ex. 135 at ¶ 218.

Lastly, Martinez wrote the following about telework:

91

> I will allow you to telework temporarily during the
> pendency of this investigation.  This is not a
> permanent solution.  I am reserving the right to
> request your return to your duty station in Charlotte
> subject to and upon completion of this investigation.

Tr. Ex. 159 at US2547; Tr. Ex. 135 at ¶ 219.

After Martinez authorized Strickland to telework on August 17, she began teleworking in Tryon, North Carolina.  12/14/23 Martinez 92:23-93:4.  Strickland teleworked until she left the FDO in March 2019.  See 12/11/23 Strickland Tr. 87:9-21.  After she began teleworking, Strickland did not see Davis or Martinez again.  See id. (Strickland admitting that she teleworked from August 2018 to March 2019, and that she did not have contact with Davis when she resigned in March 2019).

On August 20, 2018, as per Martinez's request, Davis prepared and emailed Martinez an extensive timeline of events called "Timeline of Caryn Events for You".  Tr. Ex. 40 at US2844-49.

### 3. Strickland and Martin Were Converted to AFPDs, and Strickland Started to Work Under Carpenter's Supervision.[49]

On August 15, 2018, Moormann reached out to the Defender Services Office ("DSO") to request approval to reclassify Strickland and Martin from R&W attorneys to AFPDs.  Tr. Ex. 180 at US3466-67; Tr. Ex. 181 (request to reclassify Strickland);

---

[49] The Court notes that Strickland continued working in a role in which she supported other attorneys after this conversion.  Tr. Ex. 135 at ¶ 244.

Tr. Ex. 182 (request to reclassify Martin).  He further stated:
"This action would be revenue neutral.  We are currently
advertising for an additional Appellate AFPD.  This means this
reclassification would not exclude anyone from the opportunity
of being considered for an Appellate AFPD position."  Id.  This
conversion (to an AFPD) meant that both Strickland and Martin
had a higher earnings potential over the long run, eligibility
for faster pay increases, and that they could potentially handle
their own cases once Martinez determined that they were ready.
12/14/23 Martinez Tr. 101:6-102:11; see 12/18/23 Moormann Tr.
143:6-10.

Moormann testified that Martinez instructed him to make the
reclassification as soon as possible.  12/18/23 Moormann Tr.
132:23-25, 138:15-19.  Martinez's only involvement in
Strickland's conversion was to ask Moormann to initiate the
process and to instruct Moormann to make sure that Strickland's
pay did not decrease.  Id. at 132:20-25, 138:15-23, 139:1-24,
141:2-4.  Martinez left the calculation of Strickland's AD level
up to Moormann.  Id. at 138:20-139:10, 140:22-141; see also id.
at 144:23-145:1 (testifying that he understood Martinez as
instructing Moormann to calculate Strickland's pay "by the
book").  No one instructed Moormann to reduce Strickland's pay.
Id. at 145:5-7.

R&W attorneys are paid on a scale comprised of grades and steps. 12/18/23 Moormann Tr. 125:14-22 (explaining that Strickland was not on the AD scale when hired because the R&W job is a different, grade-and-step position). Under the R&W scale (GS scale), grade increases are discretionary, and step increases are non-discretionary. Id. at 151:21-24; Tr. Ex. 137 at 9-10. AFPDs, in contrast, are paid according to a pay band system that is calculated based on years of experience as a practicing attorney. Tr. Ex. 5 at US1311. It was Moormann's responsibility to advise Martinez when an employee was eligible for a promotion. 12/14/23 Martinez Tr. 103:1-13; see also 12/18/23 Moormann Tr. 141:15-18.

The effective date of Strickland's conversion was August 20. Tr. Ex. 179 at US2889. This was one day before Strickland's one-year anniversary at the FDO -- which is when she became eligible for a grade-level promotion (at the discretion of Martinez). See Tr. Ex. 137 at 9-10.[50] Moormann

_____

[50] This Court notes that Davis's Mas Dinero email falsely claimed that Strickland was "shooting high" with a promotion to GS-15, as it stated that she needed "4 more years of fed service to qualify." Tr. Ex. 5 at US1260; see also Davis Decl. ¶ 21, ECF No. 245-3 (declaration stating Strickland was not eligible for GS-15 promotion); Tr. Ex. 137, at 9-10 (Judicial Administrators admitting that Strickland was eligible for a promotion to a GS-15 on August 21). Moreover, Moormann stated in a sworn declaration that "10 years of experience in the federal GS system is required to eligible for promotion to GS-15" and that Strickland had "slightly less than 4 years" of relevant employment experience. Decl. Moormann ¶ 16, ECF No.

testified that it would have been "extraordinary" to promote Strickland to a GS-15, considering she had not yet completed all of the steps for a GS-14.  12/18/23 Moormann Tr. 153:16-154:7.

Strickland was not considered for an increase in salary or job responsibilities at the time of the conversion.  Tr. Ex. 135 at ¶ 242.  In fact, Strickland did not receive a formal

---

245-2.  It is possible that Moormann and Davis were interpreting the following chart, found in the Defender Organization Classification System ("DOCS") manual:

| DOCS Grade Level | Years of General Experience | Years of Specialized Experience | Total Years of Experience |
|---|---|---|---|
| 9 | 3 | 2 | 5 |
| 11 | 3 | 3 | 6 |
| 12 | 3 | 4 | 7 |
| 13 | 3 | 5 | 8 |
| 14 | 3 | 6 | 9 |
| 15 | 3 | 7 | 10 |

Tr. Ex. 138 at US4973.
The DOCS manual further states that a GS-15 requires ten years of "total" experience, which includes general experience, specialized experience (working as a practicing attorney or judicial law clerk), and educational substitutes, which Strickland had due to her advanced education and honors, including election to membership in Phi Beta Kappa.  Id. at US4973-74; Tr. Ex. 5 at US 1302.  Strickland argues that, looking at the DOCS manual, it is obvious that she was eligible for a GS15.  Pl.'s PFOFCOL ¶ 129.  Looking at this chart and guidance on how to calculate years of experience, it is not as obvious to the Court, as the DOCS manual is poorly structured. Regardless, this Court agrees, as Strickland noted and as later admitted by the Judicial Administrators, that she only needed one year of experience in her role to be eligible for a grade promotion.  Id.  The DOCS manual stated: "One year of the required experience must have been at, or equivalent to, the next lower grade in federal service."  Tr. Ex. 138 at US4973.

performance evaluation or performance plan with benchmarks for advancement, nor did she receive any formal performance review during her time at the FDO.  Id.  If Martinez had authorized a grade-level promotion before Strickland's conversion to an AFPD, she would have had a pre-conversion salary of $122,163.[51]  Under the "Highest Previous Rate" policy, Strickland could have retained this salary after the conversion.  Decl. Martinez 24, 26, ECF No. 245-4.  At the time Martinez initiated the conversion, he did not know that Strickland was eligible for a salary increase on the GS scale.  12/14/23 Martinez Tr. 103:1-13.  Moormann never notified Martinez of Strickland's eligibility, and it was Moormann's responsibility and regular practice to do so.  12/18/23 Moormann Tr. 142:25-143:5.

Instead, at the time Strickland was converted to an AFPD, she was making $107,319.  12/11/23 Strickland Tr. 73:6-11; Tr. Ex. 179 at US2889.  Moormann calculated -- what he believed to be -- the pay for which Strickland was eligible at the time of her conversion and ran it by Martinez.  12/14/23 Martinez Tr. 102:21-25.  The conversions of Strickland and Martin to AFPD were intended to be "revenue neutral" for the FDO's budget.

---

[51] See U.S. Office of Pers. Mgmt., Salary Table 2018-CT, https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/salary-tables/pdf/2018/CT.pdf (last accessed April 23, 2024).  This Court takes judicial notice of the GS pay scale in 2018 as adjusted for federal employees in Charlotte, North Carolina.  See Fed. R. Evidence 201.

12/19/23 Moormann Tr. 26:18-27:1 (testifying that Strickland's pay would not have changed at the time of conversion even if she was properly set at the AD-level 25); Tr. Ex. 180 at US3466 (Moormann explaining that the reclassification actions "would be revenue neutral"); 12/18/23 Moormann Tr. 126:23-25; see also Decl. Martinez ¶¶ 31, 33, ECF No. 245-4 ("Without the Red Circle Rule,[52] [Strickland] would have had to take a pay cut to become an AFPD. It was not within my discretion to pay [Strickland] a higher amount than what she was making in the GS scale. In fact, the rule clearly states that I am not permitted to increase [Strickland's] pay until the amount of her pay was 'overtaken by the regularly prescribed pay for the current position.'").

When Strickland was converted to an AFPD, Moormann calculated her AD level to be an AD-23 based upon her level of experience. 12/18/23 Moormann Tr. 140:2-24; see id. at 143:11-16 (explaining that AD levels are a measure of time). The maximum salary for AD-23 was $101,038 -- less than the amount ($107,319) Strickland was making as an R&W attorney at the time. Tr. Ex. 5 at US1311. Martinez instructed Moormann to apply the Red Circle Rule. 12/14/23 Martinez Tr. 103:23-104:16; 12/18/23

_____

[52] The Red Circle Rule allowed Martinez to authorize reclassified employees to maintain the same salary, even if that salary was higher than the maximum amount prescribed for their AD level. 12/14/23 Martinez Tr. 103:19-104:16.

Moormann Tr. 141:2-5 (testifying that Martinez told Moormann to apply the rule, i.e., Strickland's pay should not decrease with the conversion).

While he was preparing for his testimony at this trial, Moormann realized that he inadvertently miscalculated Strickland's years of legal experience, and Strickland may have been eligible to be AD-25. 12/18/23 Moormann Tr. 140:2-12. But see Tr. Ex. 5 at US1252 (Beam explaining that she spoke to Moormann about Strickland's classification as an AD-25 in 2018). Because both Strickland and Martin's conversions were intended to be "revenue neutral," or maintained at the same level of pay, it would not have made a difference in her salary whether Strickland were classified as AD-23 or AD-25. 12/14/23 Martinez Tr. 104:8-16 (explaining that, under the Red Circle rule, he cannot give an employee who was converted into a new role "any more money than what they were making before the conversion"); 12/19/23 Moormann Tr. 26:18-27:1 (testifying that even if Strickland was set to an AD-25, her pay at the time of conversion would not have changed).

On August 16, Moormann received approval for these requests from the DSO. Tr. Ex. 180 at US3466. After receiving approval, Moormann submitted "Requests for Personnel Action" (AO 52s) to initiate the reclassifications for both Martin and Strickland. Tr. Ex. 183 (Strickland's AO 52); 12/18/23 Moormann Tr. 133:13-

98

17.  Even though Moormann submitted the request on August 16, it had an effective date of August 20 because that was the first day of the next pay period after August 16.  12/18/23 Moormann Tr. 133:13-134:8; Tr. Ex. 183.  Moormann testified that it is typical for an HR action to have an effective date that is later than the request date, because the action goes into effect at the beginning of the next pay period.  12/18/23 Moormann Tr. 137:3-14.

On August 28, Moormann was informed that he used the incorrect code when filling out both Strickland and Martin's reclassification paperwork.  Tr. Ex. 184 at US2714-15.  Moormann explained that there was confusion about which code to use because they were switching between pay scales.  12/18/23 Moormann Tr. 134:21-135:5; see also id. at 137:22-138:2 (explaining that changing pay scales is "complicated" and "requires some interaction beyond [his] level of approval").  Due to this error, the forms had to be processed manually.  Id.  As a result of this processing error, Moormann submitted a revised Request for Personnel Action form on August 28, and the effective date remained August 20.  Tr. Ex. 174 at US3411.[53]

_____

[53] This Request for Personnel Action (AO 52) form also stated that Strickland's previous adjusted basic pay was $107,319.00 (with $92,349 basic pay) and her new adjusted basic pay was $92,349.00.  Tr. Ex. 174 at US3411.  If this was the final form, then this would indicate a decrease in Strickland's pay.  Moormann testified, however, that the final processed form

99

This request form stated that "[t]his request is submitted with the approval of the court." Id. Moormann testified that it is "very common" "to have a form that's processed after the effective date . . . [because] [t]he system isn't particularly efficient." 12/18/23 Moormann Tr. 137:3-14.

Strickland's official conversion to an AFPD resulted in a "Notification of Personnel Action," or a Standard Form 50 ("SF-50"), with an effective date of August 20. Tr. Ex. 179 at US2889; 12/18/23 Moormann Tr. 134:10-135:16; see also Tr. Ex. 135 at ¶ 236 (stating that Strickland's position was reclassified to an AFPD). This version of the form was processed on August 28 and showed that Strickland's pay remained at $107,319. Id. In the "Remarks" section of this form, Moormann mistakenly listed Strickland as AD Level 28. Tr. Ex. 179 at US2889; 12/18/23 Moormann Tr. 21:10-22:23 (testifying that listing Strickland as an AD-28 is a typographical error); see also Tr. Ex. 183 (Request for Personnel Action stating in "Remarks": "Should be Set at AD level 28 To be set at AD 28 Salery [sic] should remain $107,319"). To qualify for AD Level 28, Strickland needed at least eight years of professional attorney experience. Tr. Ex. 5 at US1311; 12/18/23 Moormann Tr.

_____

(Notification of Personnel Action) was submitted to this Court as Tr. Ex. 179 at US2889. 12/18/23 Moormann Tr. 134:10-135:16. This form shows Strickland's total salary -- before and after the conversion -- as $107,319. Tr. Ex. 179 at US2889.

100

21:10-22:23.  At the time of the conversion, Strickland had approximately five years of such experience, Tr. Ex. 5 at US1302, which would have placed her at an AD-25, Tr. Ex. 5 at US1311.

Moormann testified that Strickland's locality pay was not present on her final form because, on the AD pay scale at the time, locality pay was combined with base salary as one lump sum.  12/18/23 Moormann Tr. 138:3-14.  Even though Strickland's SF-50 lists nothing in the "Locality Adj." box, since Strickland was now on the AD scale, her locality adjustment was included in the total amount of pay, as reflected in the "Basic Pay" box on the SF-50.  Tr. Ex. 179 at US2889; see also Tr. Ex. 5 at US1311 (explaining in the notes under the salary chart that, once a location was selected, the chart updates to include the applicable locality pay with the base pay).  Moormann testified that Strickland did not lose any "locality pay" during the conversion.  12/18/23 Moormann Tr. 138:12-14.  Strickland testified that her total salary, before and after conversion, did not change.  12/11/23 Strickland Tr. 74:7-12.

Martin, the other remaining R&W, was also "reclassified" around the same time.  Tr. Ex. 135 at ¶ 243.  After the R&Ws were converted to AFPDs, the former R&Ws' roles did not change – - the decision as to when a former R&W could work on her own

101

cases was at the discretion of Martinez.  12/14/23 Martinez Tr. 102:4-11.

Davis, Martinez, and Moormann all testified that Davis was not involved in decisions regarding Strickland's pay or promotion to an AFPD.  12/14/23 Martinez Tr. 107:24-108:5; 12/18/23 Moormann Tr. 143:17-22; 12/18/23 Davis Tr. 83:10-23 (testifying that he had no involvement in deciding Strickland's pay or promotion to an AFPD and he did not have the authority to make decisions with respect to Strickland's pay or promotion to an AFPD).

When Strickland was converted to an AFPD in August 2018, she began working under Carpenter's supervision until she left the FDO in March 2019.  12/14/23 Carpenter Tr. 60:8-25. Martinez did not influence the work that Carpenter assigned to Strickland, and Davis had no role in Strickland's job duties. 12/14/23 Carpenter Tr. 61:22-25, 62:1-5.  Strickland's duties remained the same after she was converted to an AFPD, and she performed the same work as the other attorneys in the appellate group supervised by Carpenter.  12/14/23 Carpenter Tr. 61:1-21; Tr. Ex. 1 at US505 (Strickland admitting in EDR grievance that she did not have any "change in job responsibilities" after conversion); see also Tr. Ex. 32 (emails showing Strickland's participation in appellate moots).

### 4. Davis Copied Strickland on an Email to a Client and Made Obscure, Nonsensical References to a Law Review Article Strickland Authored.

On August 31, Davis used the reply-all function and thereby copied Strickland on an email to a client. Tr. Ex. 135 at ¶ 253; Tr. Ex. 3 at US0108.

Strickland later contextualized Davis's email to Fourth Circuit officials, and the effect that it had on her:

> Mr. Davis copied Ms. Strickland on an email to a client in which he referenced numerous words and phrases from her law review article "Against Design." . . . These references were entirely nonsensical and inappropriate in the context of a client email, and Ms. Strickland believed Mr. Davis included them because he knew she was the only one who would understand them. Ms. Strickland found Mr. Davis's email disturbing and believed it showed his continued obsession with her.

Tr. Ex. 3 at US0086 (mediation supplement submitted in February 2019).

Specifically in response to a client's complaint about feeling "in the dark" after Davis failed to keep in contact before an upcoming court date, Davis sent the following email:

> Apologies for being out of pocket and unavailable; it was not by design. One begins to feel like the Red Queen from Lewis Carroll, running eternally just to stay in the same place. Not an excuse – just a sentiment I know you'll understand.

> Let's talk Tuesday at 10, you can call my cell. I've also asked Jim to be available to you. It's hard to prestate what the future will look like, so you should always feel free to reach out to Claudia – or Lisa, or anyone else on the team, for that matter. Everyone is still on board to help if asked, and that might be a lot easier than trying to pin me down.

103

Tr. Ex. 3 at US108.  Strickland wrote a law review article

called "Against Design" in 2015.  Tr. Ex. 5 at 1303.  "Against

Design" is about constitutional theory and is completely

unrelated to client representation in the FDO.  Caryn Devins et

al, Against Design, 47 Ariz. St. L.J. 609 (2015).  Her article

invokes the Red Queen metaphor, stating, by way of example:

"This behavior accords with the Red Queen phenomenon, 'an

unceasing evolutionary process in which all species continue to

change . . . faster and faster in order to maintain the same

relative fitness.'"  Id. at 669.  Strickland's article also

contends that "institutions are adaptive functional wholes that

change in unpredictable and unprestateable ways," id. 609,

explaining, by way of example: "The law constrains, but in doing

so it also enables. . . . The unprestatability of future

possibilities enables creative evolutionary change . . . ."  Id.

at 623.

    **N.**    **The EDR Process Continued: the Investigation, Chapter
IX Proceeding, and Chapter X Proceeding.**

        **1.**    **Beam Continued Her Investigation, and Strickland
Filed a Request for Counseling and Wrongful
Conduct.**

On September 5, 2018, Strickland spoke to Ishida by

telephone.[54]  Tr. Ex. 151 (Strickland's recording of the

---

[54] Throughout her EDR process, Ishida spoke to Strickland
too many times to count.  12/13/23 Ishida Tr. 34:25, 35:1-3.
Their conversations primarily involved Ishida responding to
Strickland's questions.  Id. at 35:4-11.

meeting). He explained that Beam would be investigating her complaints, and that although there were no hard or fast deadlines, the investigation would be done "promptly." Id. at 8:12, 16:4. Strickland asked Ishida to clarify the scope of the investigation he had opened. Id. at 10:17-20. He told Strickland that the investigation would cover her allegations of sexual harassment against Davis. Id. at 11:5-7. Strickland informed him that her allegations were not just sexual harassment by one person and included acts of retaliation as well. Id. at 11:12-20. She told him that she planned to name Martinez as a violator of the EDR Plan. Id. at 11:21-12:3. Strickland told Ishida that Martinez was not being truthful when he said that he only learned of her sexual harassment allegations from her August 10 email. Id. at 12:2-13:1. Strickland explained that she had been trying to work with Martinez to resolve her complaints informally, but he had escalated the situation and failed to protect her. Id. at 13:10-18. Strickland emphasized that she wanted an investigation, but she was very concerned about the Martinez's role in the investigatory process considering that she believed that he too had violated her rights. Id. at 14:6-15:7.

Ishida told Strickland that he had discussed her concerns about Martinez with the General Counsel ("OGC"). Id. at 39:4-11. The OGC had suggested that he, rather than Martinez,

"receive" the final investigation report.  Id. at 39:13-21.  He
further stated that, although that step was not in the process
or plan, Martinez had agreed to let him receive the report.  Id.
at 40:2-8.

Ishida also told Strickland that it was not "helpful" for
her to have reported her complaints to the AO.  Id. at 40:20. He
said that when that happens, "barriers go up," walls go up, and
people are "on guard."  Id. at 41:1-3.  Strickland explained
that she reached out to the FEOO because she had felt that
Martinez "did not resolve [her] concerns," and instead "put
[her] in a far worse position."  Id. at 42:20-43:4.

Ishida asked Strickland what she "want[ed]."  Id. at 38:12-
17.  He explained that he had been involved in another EDR
complaint against Martinez's office.  Id. at 47:21-48:1.  Based
on this experience, he said he believed that Martinez was
"earnest" and wanted the best for his employees.  Id. at 48:3-
10.  Strickland told Ishida that she "wanted" two things: (1) a
full, fair, and impartial investigation that included the full
scope of her allegations, and (2) the opportunities for
professional advancement that she believed she was promised when
she began her job at the FDO.  Id. at 50:5-17.

Ishida also asked Strickland whether it would make sense to
"have someone else work with [her and Martinez]" and stated that
they have "outstanding" circuit mediators.  Id. at 52:15-20.

106

Ishida emphasized that the "chief circuit mediator [Ed Smith] [was] outstanding" and that Ishida had "used him in other instances and [he had] done a fantastic job."  Id. at 52:19-20.

On September 10, 2018, Strickland filed a Request for Counseling and her own report of wrongful conduct (an "Official Grievance").  Tr. Ex. 1 at US500-07.  In this report, Strickland accused Davis of sexual harassment and Martinez of retaliation in violation of the EDR Plan.  Id.  Strickland requested the following corrective action: "to work in an environment free of harassment and retaliation. . . the opportunity for merit-based advancement, and any other appropriate relief."  Id.

On the same day, Strickland emailed Chief Judge Gregory, copying Ishida, informing him that she had requested counseling and made a report of wrongful conduct.  Tr. Ex. 30 at US0856-57. Strickland also attached her request for disqualification of Martinez and stay of the prior wrongful conduct investigation. Id.

In the accompanying letter, Strickland specified that she moved to disqualify Martinez under Ch. X, Section 7, and Ch. IX of the EDR plan.  Id.

Strickland moved to disqualify Martinez because he "[was] a subject of [her] wrongful conduct report" and was "named in [her] request for counseling."  Id. at US0857.  Strickland also moved to stay the wrongful conduct investigation initiated by

107

Martinez so that she may receive an "independent investigation into [her] allegations of wrongful conduct." Id.

Ishida and Strickland met on September 18 to discuss the EDR process. Tr. Ex. 135 at ¶ 284; Tr. Ex. 199 (Strickland's recording of the meeting).

Ishida began the meeting by emphasizing that the Chief Judge was "taken aback" by Strickland's request to disqualify Martinez, because he wasn't "expecting it." Tr. Ex. 199 at 9:1-3. Strickland asked if Martinez would be involved in administering the investigation, and whether he had already talked to Beam about Strickland's allegations. Id. at 10:12-13; 12:12-15. Ishida stated that Beam was not aware of Strickland's allegations about Martinez "because that was never part of the initial concern about [the] sexual harassment [allegations]." Id. at 11:10-13. He reiterated that Beam would deliver the investigation report to Ishida, instead of Martinez. Id. at 14:3-6. Ishida also indicated that, if the allegations against Martinez were substantiated, then the Chief Judge would need to "step in" as Martinez's "supervisor." Id. at 17:7-14. Strickland explained that this conflict of interest was why she had moved to disqualify Martinez. Id. at 23:2-24:10.

Ishida asked Strickland, again, what she wanted. Id. at 21:10. He said that he believed the parties were "close" to agreeing, with the exception of a transfer because Martinez

108

"physically [didn't] have space." Id. at 21:22, 22:4-5. Ishida

noted that Martinez had told him that he had already

"physically" separated Davis and Strickland by putting them "on

opposite sides of the office." Id. at 26:20-21. This shocked

and angered Strickland.[55] Strickland stressed to Ishida that

Martinez did not move her office. Id. at 27:1. Strickland

explained that, even if he had, this was not, in her view, an

adequate remedy to the complaints she had raised. Id. at 28:20-

29:3. Strickland told Ishida that Martinez had acted in bad

faith, and that his rejection of a transfer showed that Martinez

had already prejudged the investigation. Id. at 29:13-15, 51:4-

11. Ishida acknowledged that it would be "awkward" if

Strickland returned to Davis's duty station. Id. at 28:7. He

added that Strickland's complaint was very troubling in terms of

the sequence of events, "one thing after another," even after

her concerns were brought to light. Id. at 29:6-8.

Ishida then asked Strickland, yet again, what she

"want[ed]." Id. at 30:17-18. Strickland repeated what she had

already requested: a working environment free of harassment and

retaliation, the opportunity for merit-based advancement, and

any other appropriate relief. Id. at 33:6-10. Strickland told

---

[55] Although Strickland does not explicitly say she is
shocked and angered during the recorded meeting, it is obvious
from Strickland's tone that this upset her.

Ishida that her limited caseload had been taken away after she
reported her allegations of sexual harassment against Davis.
Id. at 38:14-20.  Ishida expressed empathy for Strickland.  Id.
at 51:12-16.  Ishida explained that, considering Strickland had
not being invited to interview for the new appellate position
and her being required to return to her duty station in
Charlotte, he could understand how she would not feel valued or
safe, and how she would not feel taken seriously career-wise and
in her personal safety.  Id. at 51:17-20.

Moving forward, Ishida said that he would send Strickland's
report of wrongful conduct and request for counseling to Beam,
and that she would conduct one, unified investigation for both
proceedings.  Id. at 54:2-9.

Following this meeting, Strickland agreed to delay her
interview with Beam, which was scheduled for that week.  Tr. Ex.
160 at US1403.

On September 27, 2018, Strickland emailed Ishida stating
that she was "comfortable sharing [her] grievance with [Beam]
and expanding the scope of the investigation to include [her]
allegations against [Martinez]."  Tr. Ex. 160 at US1402.
Strickland further stated that she was comfortable proceeding
with "one, unified wrongful conduct investigation" so long as
Martinez "[was] not involved with the administration of the
investigation and [did] not receive information except as

110

necessary to investigate [her] allegations . . . ." Id. at
1402. Ishida responded the next day, copying Beam, and
instructing her to proceed with "one, unified investigation"
under Chapter IX into Strickland's allegations of sexual
harassment by Davis and "alleged, subsequent, related conduct by
[Martinez]." Id.

On October 5, Strickland met with Beam. Tr. Ex. 200
(Strickland's recording of the meeting). At this meeting,
Strickland provided Beam copies of text messages and emails from
Davis and her own notes about Davis's behavior. Tr. Ex. 135 at
¶ 301.

At the beginning of the meeting, Beam told Strickland that
her only role was to "collect" the facts. Tr. Ex. 200 at 5:4-7.
During this meeting, Beam told Strickland that she did not think
there was anything wrong with Strickland going to the AO for
advice, even before speaking to anyone locally. Id. at 157:11-
15. Beam noted that she had been involved with the office
conversion to the FDO. Id. at 232:1-9. She expressed surprise
that no one from the AO provided training during the conversion
on policies and procedures for handling complaints. Id. at
232:10-14. Id. Beam opined that training would have helped in
Strickland's situation -- and maybe even "avoided" it. Id. at
232:16. Instead, in her view, the office was left on its own to
learn. Id. at 232:18-19. She said that she was not making

excuses for Martinez, though, and that it was "evident" that he handled things "very poorly." Id. at 233:8-12. Strickland told Beam that she believed the EDR process was being set up to "wash [her] out" and "throw [her] away." Id. at 244:16.

On October 8, 2018, Strickland emailed Beam several attachments related to the investigation, including the witness list and timeline, the FDO employee manual, and the underlying documentation for Strickland's EDR claim. Tr. Ex. 19 at PLT0590-0592.

Beam interviewed Davis on October 10 and Martinez on October 18. Tr. Ex. 5 at US1246. After her October 8 interview, Strickland did not hear from Beam for approximately three weeks. Tr. Ex. 135 at ¶ 306.

During this time, Davis contacted Beam several times, including with requests that she complete the investigation before the office's fall "retreat." Tr. Ex. 191 at US1353-54. In one of his emails dated October 4, Davis told Beam:

> As you are probably aware, the entire Appeal/Research and Writing Unit has been temporarily removed from my authority pending this investigation. Most of the office is currently unaware of that, but I expect the retreat will make them aware—it is pretty obvious once you see it, as this is the only part of the office that goes around me, and there is no real reason why that should be the case. Even trying to avoid conversations related to [Strickland], I have heard enough to know that many of the employees have figured out there is some kind of existing HR matter. Once folks see that my authority has been reduced, I strongly expect that at least a few of them will

112

connect the dots, and quite possibly reach the wrong
conclusion regarding the status and merits of
[Strickland's] claim.  If that happens, I am afraid it
will result in damage to my reputation and standing in
the office that I may never be able to repair.  It's
my hope that the Chapter IX investigation can be
completed in time for the restructuring to be
addressed and decisions made before it is highlighted.

Id. at US1354.  After initially telling Davis she could likely
"accommodate" his requested timeline, id. at US1353, Beam later
told him on October 22, that such a timeline had been "a little
too optimistic unfortunately," in part, because "[she] also
[had] to get ready to present at [Davis's] retreat on Thursday."
Tr. Ex. 192 at US1345.

Around October, Davis was also either shown a copy of the
investigation report or told of the investigation's findings.
On February 1, 2019, Davis sent an email to Moormann stating:
"As of this month, it will be six months since [Strickland]
falsely accused me of harassment" and "four months since I was
informally told that the investigation had found that no
harassment occurred."  Tr. Ex. 24 at US2944.  Thus, Davis was
informed of the investigation's initial findings in October
2018.  See id.[56]

_____

[56] This is further supported by an email from Davis to
Ishida in December.  Davis wrote:

Heather has produced a written recitation of facts
sufficient, to my understanding, for a decision-maker
to immediately conclude there was no sexual harassment
(which, from what Heather told me, is the only

113

In mid-November, Davis followed up again with Beam on the status of the report:

> Hey Heather, I hate to follow up so soon, but wanted to let you know that [Ishida] and [Martinez] are together at a conference today and half of tomorrow. I am hoping that if they get the report while they're there they can discuss it and we will have a chance of getting the whole thing wrapped up before Thanksgiving so it isn't hanging over our heads during the holidays.

Id. at US1343. Beam responded: "Hey JP! Haha! Ya know, with every email you send me it takes me away from working on this report. :)  Just Kidding . . . ." Id. Davis replied: "I guess the reality is that with Caryn's conspicuous absence, it feels less like a settling of past events and more like we're still being taking advantage of, every day. Of course, the fact that I could still lose my job for misconduct doesn't help either, so there's that :)." Id.

On November 1, Strickland asked Beam for a status update. Tr. Ex. 135 at ¶ 307. Beam responded that she had a few follow-up questions for Strickland. Id. Strickland and Beam met for a second time on November 9, 2018. Tr. Ex. 135 at ¶ 308; Tr. Ex. 201 (Strickland's recording).

---

allegations that fits into the Plan's definition of "wrongful conduct").
Tr. Ex. 13 at US3020.

114

Beam asked Strickland whether she had been "friendly" to
Davis and whether their relationship broke down over a case
assignment.  Tr. Ex. 201 at 6:18-22.  Beam also questioned
whether Davis's behavior was "sexual."  Id. at 30:16-22.
Strickland responded that she had not welcomed Davis's conduct,
that it was obvious that his harassment was sexually motivated,
and that her complaint was about the Davis's inappropriate
behavior, not about a case assignment.  Id. at 7:2-14:16.

Strickland then asked Beam whether she needed to start
making "contingency plans" because her employing office had not
shown any willingness to work with her and she did not know what
her professional future would look like.  Id. at 17:15-20.  Beam
stated it was "fair" for Strickland to feel that way.  Id. at
18:4-15.  Strickland said that it was "obvious" to her that "if
they could, they would fire [her] tomorrow."  Id. at 21:15-20.

Strickland repeatedly asked when she would hear some kind
of substantive update that would allow her to make an informed
decision about her career.  Id. at 22:1-5.  Beam replied that
there were no deadlines for the investigation.  Id. at 22:13-20.
Beam did not mention interviewing any other witnesses besides
Strickland, Davis, and Martinez.  See generally Tr. Ex. 201.

Strickland also asked Beam about her investigation into
Martinez's alleged retaliation.  Id. at 23:6-17.  Beam explained
that she had been focusing on the sexual harassment claims

115

regarding Davis, as well Martinez's "hand[ling]" of those claims. Id. at 24:14-18. She stated that if there was a "true feeling of retaliation," then that would have to be investigated "separately." Id. at 24:20-25:1. She said that she did not understand Strickland's claims to be within the scope of the investigation ordered by Ishida. Id. at 25:21-27:4. Strickland stated that she had understood that the investigation of her retaliation claims "would basically be based on the . . . same facts." Id. at 24:20-25:6.

Beam also stated that she would not be comfortable making, and did not think it was appropriate for her to make, recommendations on the complaint because she was not an "attorney" and not trained on the "legal" side. Id. at 27:19-28:9. Therefore, she told Strickland, her report would only contain "facts." Id. at 27:12-16. She said she expected Ishida to make the final decisions because he was "over" Martinez. Id. at 28:9-15. She said she assumed that Ishida would consult with Chief Judge Gregory in making the final decision. Id. at 28:22-29:3

On November 12, 2018, Strickland sent Beam an email detailing her allegations of quid pro quo harassment. Tr. Ex. 26 at US0431. She also stated that she was legally retaliated against by Martinez, Davis, and Carpenter. Id.

116

On the same day, Strickland emailed Ishida, copying Chief
Judge Gregory, to ask about the status of her EDR complaint.
Tr. Ex. 135 at ¶ 322.  At this point, her report of wrongful
conduct, request for counseling, and motion to disqualify
Martinez had been pending for over two months.  Id.

Strickland asked Ishida for a status update, expressed her
concern that the counseling period would expire before Beam
finished her report, and explained that it was difficult for her
to articulate specific remedies for her situation, especially
given her pending request for disqualification.  Tr. Ex. 205 at
US1638-39.

On November 12, Ishida replied, with Chief Judge Gregory
copied, and stated that, while "the Complaint for Wrongful
Conduct under Chapter IX and Request for Counseling under
Chapter X" were "separate proceedings," Ishida had "ordered a
joint investigation for both" because "both proceedings share
essentially the same set of facts."  Id. at US1638.  Ishida also
confirmed that "the counseling period end[ed] on November 29"
and that, "[s]ince [Ishida and Strickland] had agreed earlier to
an extension of the counseling period, this [was] the last
extension that [could] be granted."  Id.  Ishida also stated
that Martinez had already "taken numerous steps" to protect
Strickland's safety -- although he did not specify exactly which
steps were taken.  Id.

On November 13, Strickland asked Ishida what "steps" Martinez has taken and detailed her view of Martinez's retaliation against her:

> I am only familiar with his rejection of a transfer from the First Assistant's duty station and his asserted authority to require me to return to that work environment at the impending conclusion of the Chapter IX process. . . .

> I am familiar with the administrative reclassification of my job title with no consideration for a raise in total salary or formal progression of duties, the elimination of my locality adjustment, and the failure to interview me for a newly created 'Appellate' AFPD position that I was discouraged from applying for, among other events described in my official grievance. . . .

Id. at US1637. Strickland also asked Ishida about who would be receiving her investigative report:

> Can you also inform me of which individuals will receive the Chapter IX investigator's factual report, including who will receive the report for the purpose of making recommendations based on its content? Similarly, who will make final decisions based on that individual's recommendations and how will I be informed of those decisions?

Id.

On November 14, Ishida responded to Strickland's email, copying the Chief Judge. Ishida explained that Martinez had allowed Strickland to telework, removed Strickland from Davis's chain of command, and has taken "other steps to avoid contact with the accused." Id. at US1636. Ishida explained that Martinez had tried to accommodate her request to move to Asheville but that "there literally [was] no space in that

118

office."  Id.  Ishida asked Strickland again for specific requests as to what she needed to feel safe, remarking that Martinez felt as though he had done all he could.  Id. at US1635-36.

On November 19, 2018, Beam emailed Strickland, copying Ishida, asking for a "specific list of demands", and noted that Strickland's requests were too general to implement.  Tr. Ex. 26 at US0345-46.[57]  Beam stated that the following "steps" had already been taken based on Strickland's previous requests: (1) Strickland's "reclassification" from an R&W to AFPD; (2) Strickland's being taken out of Davis's chain of command and instead reporting to Carpenter; (3) Strickland's being allowed to work remotely (full-time) on a temporary basis until the conclusion of this investigation; and (4) "the return of any sick leave used between August 10 through August 17."  Id.  Beam acknowledged difficulty with returning back to the Charlotte office.  Id. at US0346.  Strickland did not immediately respond to this email.  Tr. Ex. 135 at ¶ 337.

---

[57] As of their last meeting, Beam understood Strickland's demands to be (1) "an environment free from harassment and intimidation;" and (2) "[a]dvancement based on merit."  Tr. Ex. 26 at US0345-46.  Beam called these demands "general in nature" and asked Strickland to make "specific, tangible requests so [Beam] can include them in [her] report as possible resolutions."  Id.

### 2. Strickland Called into a Meeting in Which Her Trial Team Was Ridiculing Her.[58]

On November 16, 2018, Strickland called into an all-staff meeting, even though she was not required to do so because she was on bereavement leave. After the staff meeting ended, Strickland remained on the call after she realized that her trial "team" was meeting and that she had become a topic of conversation. Tr. Ex. 135 at ¶ 348.

Strickland listened in while her "team" members complained about her not being in the office and mocked and belittled her. Id. ¶ 349. One attorney joked: "I mean, do I meet her at Starbucks?," resulting in rolling laughter. Id. ¶ 350. The Team Leader chimed in: "Should we meet her at Waffle House?" Id. ¶ at 351. Others added: "Where's Waldo?," to more chuckles and laughter. Id. ¶ 352.

Strickland's "team" members sarcastically referred to her as a "liaison" "research and writing attorney." They said they had "no idea" what her job was. The Team Leader joked that

---

[58] The statements made in this conversation were not explicitly admitted or denied by the Judicial Administrators. Instead, the Judicial Administrators direct the Court to refer to a recording of the conversation; however, no such recording is in evidence and thus the Court cannot cross-reference Strickland's allegations with respect to this meeting. As the Judicial Administrators did not deny the statements made, the Court accepts Strickland's allegations regarding the statements as evidence.

120

Strickland was not "ideal to the task" if "communication is what we're looking for."  Id. ¶ 353.

Once the laughter died down, the Team Leader added:

> I'll just say this as a caveat for the whole thing.  Not knowing anything about what's going on, which I don't, I was told that the fact that I do not know anything about what's going on is — I should feel lucky about the fact that I don't know. . . .  I don't know what's going on, but I know enough to not ask questions.  My guess is it only gets worse the more you find out.

Id. ¶ 354.

### 3. Strickland Asked Ishida and Chief Judge Gregory for Help Transitioning Out of the FDO.

On November 21, Strickland sent Ishida an email, copying the Chief Judge, stating:

> I have been reflecting on this situation and discussing potential next steps with my family.  This situation has irreparably damaged my relationships with the Federal Defender and my colleagues, and I believe I am no longer welcome in that environment.  I would appreciate the Fourth Circuit's assistance in transitioning me out of [Martinez's] office.

Tr. Ex. 205 at US1635.  Strickland later testified that she believed that she was constructively discharged because she no longer felt welcome at the FDO.  12/11/23 Strickland Tr. 91:10-25.  She felt this way because her "character and integrity were being questioned as a defense to the complaints" and there was not progress on her EDR claims.  Id.

On the same day, Strickland emailed Scroggins, copying Dunham, to update them on the status of her EDR claim.  Tr. Ex.

121

145 at PLFT2178.  She explained that she told the Fourth Circuit
that she no longer felt welcome at the FDO and wanted help
transitioning to a different role within the Circuit.  Id. at
PLFT2178-79.  She also indicated that she did not want to leave
her position, but that she had been constructively discharged.
Id.  Strickland stated that she did not intend on resigning
until she reached a "satisfactory resolution".  Id.

        Strickland also told Minor, her former supervisor at the
AO, see 12/13/23 Strickland Tr. 10:14-11:14, that, while she
"d[id] not want to seem like an opportunist," she was "thinking
about trying to get a [F]ourth [C]ircuit clerkship to protect
[her] reputation and open [her] career options further."  Tr.
Ex. 155 at 4450.  Strickland further elaborated that her "mantra
right now [was] 'transition up, not down' haha[.]"  Id.
Strickland also told Minor that she [was] "heartbroken because
it seems like the process failed [her]" as she would not be
comfortable working at the FDO again.  Id.

        On November 25, Ishida asked Strickland for a copy of her
resume, stating that he would make "inquiries" in FDOs around
the circuit.  Tr. Ex. 28 at US2050.  Strickland thanked Ishida
for the offer, sent her resume, and authorized him to distribute
her resume to other FPD offices and Article III judges within
the Fourth Circuit.  Id.

On November 26, Ishida stated that he was happy to circulate her resume to other federal public defender offices in the Fourth Circuit, but that he would leave it to Strickland to circulate her resume to other judges "as [she] [saw] fit." Id. at US2049. Ishida also said that, since Strickland was "now contemplating leaving" the FDO, he would like his Human Resources Administrator, Kim Llewellyn, to join an upcoming phone call they had scheduled in case any "HR questions or issues arise." Id. Strickland directed Ishida to hold off from distributing her resume until they talked. Id.

Ishida inquired about whether the Federal Defender's Office in the Western District of Virginia would be a potential option for Strickland and also whether there were any potential clerkship opportunities on the Fourth Circuit. 12/13/23 Ishida Tr. 43:7-20; Tr. Ex. 27 at US1958.

> **4. Ishida Instructed Beam to Revise Her Initial Report to Add "Findings and Recommendations", Reminded Beam to Include Strickland's Retaliation Claims, and Strickland Extended the Counseling Period.**

On November 27, Strickland spoke with Ishida by phone. Tr. Ex. 135 at ¶ 362; Tr. Ex. 202 (Strickland's recording of the meeting). Ishida informed her that he had received Beam's report, but that he was sending it back. Tr. Ex. 202 at 3:15-

4:12.  Ishida explained that the report set out a "chronology"[59] of the facts that "we all know."  Id. at 3:17.  He said that he had told Beam that it would be "helpful" if the report had "findings and recommendations."  Id. at 3:18-19.  Ishida stated that Beam had already written them up, but she had not wanted to make the report "overly long."  Id. at 4:2-3.  He asked her to supplement the report to include her findings, conclusions, and recommendations.  Id. at 4:7-12.  Strickland told Ishida that, from her perspective, "the facts speak for themselves" and she found it confusing that Beam would be making legal conclusions.  Id. at 5:12-17.

Strickland asked when the amended investigation report would be finished, noting that the investigation had consumed the entire counseling period and could now stretch into the mediation period.  Id. at 16:1-10.  Strickland found this circumstance "challenging," describing it as "a limbo where basic procedural matters remain outstanding."  Id. at 16:10, 18:4-13.

Strickland asked, again, who would be responsible for acting on the investigation report.  Id. at 9:2-4.  Ishida said that he would receive the report, and then a decision would be

_____

[59] Within the recording, it is clear that Ishida uses the word "chronology," thought the litigation aid transcript uses the word "credibility."  Tr. Ex. 202 at 3:17.

made about discipline.  Id. at 9:12-17.  He said that Martinez would be making any disciplinary decisions as Davis's supervisor, but if the report "raise[d] questions" about Martinez, then it may be referred to Chief Judge Gregory.  Id. at 9:18-20.

Strickland also asked about the status of her retaliation claims.  Id. at 10:20-22.  Strickland relayed Beam's comments that she was investigating Martinez's "mishandling" of the situation, but not retaliation.  Id. at 11:1-8.  Strickland asked whether there was a difference between "mishandling" and retaliation.  Id. at 11:9-12.  Ishida said that he could "not remember exactly when" Strickland had raised an allegation of retaliation, and so he was not sure whether retaliation was part of the investigation.  Id. at 11:17.  She reminded Ishida that she had filed a written claim of retaliation against Martinez on September 10.  Id. at 12:4.

Finally, Strickland and Ishida discussed her motion to disqualify Martinez and her future at the FDO.  Id. at 14:4-15:1, 30:3-5.

On November 28, Strickland wrote to Ishida that she was grateful for Ishida's clarification that "her retaliation claims are actively being considered as part of the investigation under Chapters IX and X of the EDR Plan."  Tr. Ex. 161 at US3121.

On the same day, Strickland requested a continuation of the counseling period.  Tr. Ex. 135 at ¶ 387.  Her request stated:

> [T]he findings in the report will help determine the next steps in the wrongful conduct investigation under Chapter IX, including whether it is appropriate for [Martinez] to make any decisions regarding the disciplinary action. . . .  An extension would allow the parties time to evaluate the report's findings and recommendations and to resolve any outstanding procedural issues.

Tr. Ex. 20 at US1536.

On November 29, Strickland emailed Beam to give her "an update regarding the retaliation [Strickland] [had] experienced since filing [her] complaint, particularly as it relate[d] to the steps [allegedly] taken" by Martinez as enumerated in Beam's November 19 email.  Tr. Ex. 26 at US0344-0346; see also Tr. Ex. 135 at ¶ 356.

On November 30, Chief Judge Gregory issued a written order granting Strickland's request for a continuation of the counseling period in part and denying it in part.  Tr. Ex. 135 at ¶ 388.  The Chief Judge extended the counseling period until January 14, 2019.  Tr. Ex. 140 at US2047.

On December 3, 2018, Davis emailed Ishida about the ongoing investigation of Strickland's claims.  Tr. Ex. 13 at US3020-04.  Specifically, Davis emailed Ishida the following:

> Hi James,
>
> Hope you're doing well.  Can we schedule a time to speak about the on-going investigation?  This would be mainly to help me get a better understanding of what

126

the procedure is at this point.  It's been 4 months
since [Strickland] made her false harassment claims,
and with the facts now reported, I believe everyone
now recognizes that no harassment or physical threats
ever occurred.  I don't want to rush anything, but as
the victim of [Strickland's] malicious conduct, the
harm to me is serious and on-going every day, not just
historical.  I am just hoping to get a better
understanding of what to expect going forward, and
what remedies I will have at the end of it.

Tr. Ex. 13 at US3023.  In response, Ishida stated:

I'd be happy to talk to you, but let me tell where
things stand at the moment.  I've asked [Beam] to
submit a supplemental report that contains her
findings and recommendations. . . . [U]ntil then the
proceedings are at a stand still.  So, as difficult as
this must be for you and everyone involved, I'm
counseling patience.  We need to let the process play
out and allow the investigator to complete her work.

Id. at US3023.  Ishida concluded, "if you still wish to talk,

pls let me know.  Otherwise, I will inform the appropriate

parties at the appropriate time."  Id.  In response, Davis asked

a series of questions including: "will I hear anything once the

supplement is completed," and "[a]m I one of the appropriate

parties you mentioned who will be notifies [sic] . . . ?"  Id.

at US3022-23.  He also asked "[w]ho is making the final

decision" and whether that decision could "sweep more broadly,"

including to what he characterized as "[Strickland's] conduct."

Id.  Ishida responded that "[it was] hard to say how things

[would] proceed because it all depend[ed] on [Beam's] findings

and recommendations."  Id. at US3022.  Ishida provided different

possible scenarios depending on the report's findings:

127

> For example, under the Chapter IX proceeding, let's
> say that [Beam] finds wrongful conduct and recommends
> some form of discipline.  That recommendation would
> most likely be shared with the unit executive for his
> consideration.
>
> However, let's suppose that [Beam's] recommendation
> also includes a finding questioning the unit
> executive's impartiality.  If that's the case, then I
> could envision a scenario where the recommendation
> would instead to submitted to the chief judge for his
> consideration.

Id.  Ishida explained, however, that "[he] would prefer not

getting into a discussion about possible scenarios because

that's just pure speculation, and it could open [him] and the

process up to accusations of prejudging the case."  Id.  Davis

indicated that he "would still like to speak."  Id.  Ishida

asked Davis to "tell me what you plan to ask" in order "to be

helpful and safeguard the process."  Id. at US3021.  The next

day, Davis responded with the following:

> I would simply request that you consider imposing a
> deadline for the Supplement.  After all this time, I
> don't see how doing so could lead anyone to a conclude
> [sic] that the investigation was rushed or prejudged,
> particularly as I know you would grant any reasonable
> request for extension.  I think you have shown as much
> sympathy for me—and for everyone involved, including
> [Strickland]—as someone in your position possibly
> could, and I am grateful for that.  Nevertheless, it
> is difficult to express or understand how difficult a
> situation like this really is, the toll it takes on
> person and family, or deeply it impacts one day to
> day.
>
> . . .
>
> Finally, returning to the question I had for you:
> fundamentally, it is now obvious there are procedures
> in place that I cannot find or figure out, and I would
> like to know what they are.  Currently, all I have to

go on is Chapter IX itself, and as you know, its requirements are minimal: that "the allegations in the report are appropriately investigated" and no elaboration.  Those facial requirements seem satisfied: the investigation is complete, and [Beam] has produced a written recitation of facts sufficient, to my understanding, for a decision-maker to immediately conclude there was no sexual harassment (which, from what [Beam] told me, is the only allegation that fits into the Plan's definition of "wrongful conduct").

Obviously, it's not that simple: as you told me, there needed to be Findings & Recommendations in the report, and [Martinez] told me a couple weeks back that you would have two weeks after receiving the report to take some action on it.  You've also given me some examples of different procedures in different scenarios.  All of this shows me that there **are** established procedures—whether formal or informal—that go beyond what's written in the Plan.  On the flipside, I know [Strickland] filed a Chapter X Request for Counseling some time back.  Section 8.C.2 of Chapter X requires a copy of that to be "promptly" provided to the unit executive, but [Martinez] does not have it, or at least did not as of last week.  I fully recognize that Chapter X is not my concern except insofar as [Martinez] deems me necessary as either witness or management team member, and I am not trying to interfere in that; I raise it only to point out that here, too, there is clearly an established procedure, and apparently it can **override** what is written in the Plan in certain circumstances.  My question is simply what those established procedures are, at least in regard to Chapter IX, and where they come from.

Id. at US3020-21 (emphasis in original).  Davis's email suggests

that someone may have apprised him of the initial findings of

Beam's report.[60]

---

[60] During his deposition, Ishida denied that he had disclosed Beam's findings to Davis, but he testified that it was possible that Davis "had been told about Heather Beam's recitation of findings or facts."  Ishida Dep. 185:10-19.  He

During his deposition, Ishida testified that he had "expressed concerns" to Martinez that Davis's behavior was "inappropriate" and that he was "worried that the investigation be conducted with integrity." Ishida Dep. 186:12-18, 201:14-17. Ishida did not remember, however, ever notifying the Chief Judge of his concerns about Davis's behavior. Id. at 203:5-16. Ishida also testified that he did not do anything to supervise the investigation because "once [Beam] was appointed, then,. . . it was her job to conduct the investigation as she saw fit, and [Ishida] didn't want to know, and [Ishida] didn't want to be involved in that process." Id. at 200:2-9. Ishida stated that he did not ask Beam whether Davis had contacted her because he "trust[ed]" that she "would handle it appropriately." Id. at 203:17-23. By "appropriately," Ishida explained that he expected that if Davis had asked "a procedural question," like when he was going to be interviewed, that would be permissible, but "if it was an attempt to frame the issues or . . . something

_____

stated that "[i]t could very well be that the investigator had drafted facts as she understood them and wanted to get confirmation," although he qualified that this was "pure speculation." Id. Ishida testified that he did not know because "[he] wanted, really, nothing to do with the investigation. . . [and therefore] let [Beam] dictate how that would go." Id. at 186:25-187:3. Ishida stated: "So, again, I don't know what [Beam] did. I don't know if she showed [Davis] a copy of the report or what happened, but I don't know what [Davis] means by 'the facts are now reported.'" Id. at 189:11-14.

where . . . Davis was trying to influence the outcome of the investigation,. . . [Ishida] ha[d] full confidence that [Beam] would have said, 'That's improper' and 'Please don't do that.'" Id. at 204:17-205:4.

On December 4, 2018, Martinez counseled Davis for "talk[ing] to James Ishida about something that [Martinez] and [Davis] talked about in a private conversation."[61] Tr. Ex. 175 at US4807. Martinez's notes state that Davis's "legal conclusions" about the investigation did not have any basis because "that was an informal conversation between [Ishida and Martinez]." Id.[62] Martinez's notes explain that he had

---

[61] Beam allowed Martinez and Davis to speak to each other throughout the investigative process. In an email to Davis, Beam told Davis that "if you need to talk keep it [Administrative Officer] Bill [Moormann] or [Defender] Tony [Martinez] and of course your wife only." Tr. Ex. 190 at US1359; see also Tr. Ex. 24 at US2944 (Davis contacting Moormann in February 2019 and stating that Strickland made false accusations against him). Beam testified during her deposition that she did not "recall" ever instructing the accused supervisors to not discuss the facts of the allegations. Beam Dep. 79:13–82:10. She further testified that she had never been concerned that two witnesses might come up with a story if they were to talk to one another. Id.

[62] The Court notes that this may suggest that the investigation's findings were shared in an "informal conversation between [Ishida] and [Martinez]," and then shared with Davis "in a private conversation" with Martinez. Tr. Ex. 175 at US4807; see also Tr. Ex. 24 at US2944 (Davis indicating that he was informally told in October 2018 that no harassment occurred). In Martinez's notes, he writes that Davis ought not feel like a victim because there was not yet a final report on the investigation. Id. Martinez also wrote that he told Davis to not go to the trier of fact and speak about legal conclusions

131

"received an email from James Ishida regarding 'a troubling email exchange with one of [Martinez's] attorneys.'"  Id.
Martinez then gave Davis an order "that if he contact[ed] Heather Beam or James Ishida again, then [he would] walk him out of the office."  Id.  Martinez's notes indicate that Davis and Martinez had been in contact about the investigation of Strickland's claims.  Id.

On December 14, Ishida asked Strickland to consider an "unconventional" step: involving a mediator during the counseling period.  Tr. Ex. 206 at US1613.  He stated, however, that "much depends on the findings and recommendations of the investigation report."  Id.  Strickland agreed to discuss the possibility of using a mediator after the holidays.  Id. at US1611.

On January 9, Ishida and Strickland had a phone call to discuss potential mediation.  See Tr. Ex. 203 (Strickland's recording of the meeting).  At that point, Ishida still did not know when the amended investigation report would be finished.  Id. at 5:1-2.  Ishida explained that he "thought a mediator

_____

when there was no basis to do so.  Id.  Lastly, Ishida denied disclosing the findings of Beam's draft report, see Ishida Dep. 186:9-22.  Martinez testified that Ishida only informed him about the "status" of the investigation, including that the report was sent back to Beam to add recommendations.  12/18/23 Martinez Tr. 35:20-36:15.  The record, therefore, is not clear regarding what was discussed in this "private conversation," and the Court will not speculate on the matter.

would be helpful" to facilitate a discussion . . . [and] settlement negotiations." Id. at 5:16-6:2. Thus, he explained, "[he] [thought] a mediator could help kind of bring into focus where the parties -- where both parties stand." Id. at 7:1-6.

Strickland expressed her concern with pausing the investigation to pursue mediation, noting that the investigation "was going to be what was used to determine whether [Martinez] was disqualified," and that if the report was not finished, "no determination [could] be made on the disqualification." Id. at 13:18-3. Strickland said, however, that if the EDR process were paused, and she would not "be waiving [her] right to have that request for disqualification decided in the future," she would agree to participate in mediation during the counseling period with Smith. Id. at 14:22-15:2.

Ishida stated that he felt Chief Judge Gregory was "concerned" with how long the investigation was taking, noting that the process was meant to move "expeditiously." Id. at 15:14, 34:7.

Strickland observed that mediation would be difficult without the investigation report, given that the process had "dragged on so long without the problems being addressed." Id. at 21:1-2. She noted that if mediation failed, the only stage left would be a final hearing. Id. at 10:4-7, 20:22-21:2.

133

On January 11, 2019, soon after Beam contacted Carpenter for an interview for Strickland's retaliation claims, Carpenter asked Strickland if she wanted to do an appellate argument. 12/11/23 Strickland Tr. 83:6-23. Strickland declined the opportunity. Tr. Ex. 144 at PLTF4357.

### 5. Beam Completed the Investigative Report.

On January 11, 2019, Beam emailed the final investigative report to Ishida. Tr. Ex. 5 at US2293.[63] On January 11, Ishida informed Strickland that he had received the amended investigation report and would "be in touch." Tr. Ex. 135 at ¶ 393. This was just over four months after Strickland filed her request for counseling. Id.

The report summarized Strickland's claims as the following: repeated lunch meetings premised as "mentoring"; "[w]aiting for [Strickland] in the lobby after working late into the evening on a case and offering a ride since she was on a bike and it had begun to rain after she had already declined the offer upstairs"; "[a]ttempt[ing] to restrict her job responsibilities and speaking to her in an unprofessional manner"; and the Mas Dinero email. Tr. Ex. 5 at US1244.

---

[63] The final report summarized Strickland's claims, listed her requested remedies and the progress of those requests, set forth a detailed timeline of events with accompanying exhibits, and suggested actions to be taken. See generally Tr. Ex. 5.

134

Beam's report ultimately recommended executive coaching for Martinez. Id. at US1254. Beam suggested that Martinez be trained on "future employee issues he will be tasked to handle" through "additional training on workplace conduct as well as basic managerial/leadership skills." Id. In determining that Martinez "mishandled [Strickland's claim] from the beginning," Beam observed the following:

> [W]hen [Strickland] initially brought her complaint to Mr. Martinez he compared her relationship with the First Assistant Defender as a marriage and asked her to compromise. He also made comments bade [sic] on [Strickland's] report such as "At least she was not touched" and called her out on contacting the AO to receive guidance on her civil rights as a federal employee. He also stated he was being blamed for something that was not his fault.

Id.[64] Beam's report also explained that Strickland's belief that her relationships were "irreparably damaged" and that she was "no longer welcome" in this office "may be the case for [Strickland] based on her own perception of how this case has been handled." Id. at US1255.[65]

Beam's report also discussed the Mas Dinero email. Id. at US1256. The report explained that after Strickland "expressed a desire to transfer to Asheville and also asked for a

_____

[64] These mishandlings by Martinez are further detailed in the Letter of Counseling, Tr. Ex. 7, see infra Section III.O.2.

[65] Beam also determined that, despite Strickland's belief to the contrary, her allegations were handled in a confidential manner. Tr. Ex. 5 at US1255.

promotion[,]" Davis sent a "questionable email" (the Mas Dinero email).  Id.  Beam observed that the Mas Dinero email can "clearly be inferred to be a quid pro quo request."[66]  Id.  Davis told Beam this email was a dumb joke and admitted it was a "stupid email to send."  Id.; Tr. Ex. 189 at US6235.  "Based on [Davis's] forthrightness with the email and his reaction when [Beam] brought it up," Beam "[did] not believe there was an intention of sexual harassment when he sent the email."  Tr. Ex. 5 at US1256.  Still, Beam observed, the Mas Dinero email "supports [Strickland's] claim of sexual harassment."  Id.

Concluding her report, Beam determined that both Davis and Martinez ought be counseled:

> JP Davis MUST be counseled and trained on workplace conduct issues and professional communications via email.  I have seen copies of other emails where he has used profanity and this is simply unprofessional in a court environment.  I must clarify the profanity used was not **at** anyone as it was simply used in a sentence.

> Mr. Martinez MUST also be counseled and trained on how to handle workplace conduct complaints.  He should also be counseled or training on judgement and decisiveness.  From my interview with him and these decisions he made he had commented most of these were made at the end of a day where he attended meetings all day and was tired.

> I would not recommend terminating employment for either individual, Mr. Davis or Mr. Martinez.  This situation should be documented and discussed.

Id. at US1257 (emphasis in original).

---

[66] Beam testified that it was "reasonable" for Strickland to be upset by this email.  Beam Dep. 58:1-9.

136

With respect to Strickland, Beam found that
"[Strickland] has experienced in her mind sexual harassment
although the facts discovered in this case find this claim
to be very flimsy.  This investigation has also found she
has also exploited poor judgement and decision-making
skills of upper management to attain her goal of a transfer
to Asheville."  Id.

Beam investigated and addressed Strickland's claims of
retaliation.  Tr. Ex. 5 at US1251 (adding an addendum on
November 19 to address Strickland's retaliation claims).[67]  Beam
dismissed Strickland's claim that she was not considered for the
appellate AFPD role because Strickland was already converted to
an AFPD during the investigation.  Id. at US1249; Beam Dep.
161:25-165:16.  Beam investigated and addressed Strickland's
retaliation claim that she experienced a regression in job
duties after reporting sexual harassment (although perhaps not
thoroughly).[68]  Tr. Ex. 5 at US1252.  While Strickland claimed

---

[67] Beam testified that she does not recall taking additional
steps to investigate Strickland's retaliation claims after
November 19, but then also clarified that she investigated both
of Strickland's clams when she made the report.  Beam Dep.
158:4-7, 159:23-160:1.  Strickland conceded during a phone call
that additional investigation was not necessary because her
retaliation claims are based on the same set of facts as her
sexual harassment claims.  Tr. Ex. 201 at 24:20-25:6.

[68] When asked about the investigation of Strickland's job
duties, Beam testified that she did not speak to anyone about
their job duties or look at any of the job duties outlined for

137

that she stopped receiving invitations to appellate moots, Beam investigated this claim by interviewing Carpenter and determined that it had no merit. Tr. Ex. 5 at US1252; see also Tr. Ex. 32 (emails corroborating Beam's findings).[69] Beam also found that Carpenter asked Strickland whether she wanted handle oral arguments for an appellate case in November, and Strickland declined the opportunity.[70] Tr. Ex. 5 at US1253.

Beam investigated Strickland's claims regarding the availability of office space in Asheville by speaking to Martinez and Carpenter. Beam Dep. 160:11-161:20; Tr. Ex. 5 at US1251.[71] While Strickland pointed to an advertisement for a

---

Strickland's role by the FDO, despite Strickland telling her that her job duties were different from others. Beam Dep. 161:22-165:16.

[69] Throughout the investigatory period, Davis and Strickland were invited to, and participated in, several appellate moots. Tr. Ex. 135 at ¶¶ 341-42 (stating that appellate attorneys requested Davis participate in the moots).

[70] The record shows that Carpenter was contacted by Beam about Strickland's retaliation as early as January 9, 2019. Tr. Ex. 32 at US2803-04. Carpenter asked Strickland if she wanted to handle the oral argument on January 11. 12/11/23 Strickland Tr. 883:6-23; Tr. Ex. 144 at 4357. Carpenter claimed that he originally emailed Strickland about this opportunity as early as November 2018. Beam Dep. 175-76. Beam did not independently verify whether Carpenter in fact asked Strickland in November whether she wanted to handle this oral argument in November. Id. This alleged November 2018 email is not in the record, nor is it included as an exhibit in Beam's report. See Tr. Ex. 7 at US1253.

[71] Beam did not notify Strickland that she was speaking to Carpenter about Strickland's claims. Beam Dep. 160:11-161:20.

138

summer intern and paralegal position based in the Asheville
office as evidence that there was in fact office space, Martinez
maintained that there was no office space for a full-time
attorney at the Asheville office.  Tr. Ex. 5 at US1251; Tr. Ex.
135 at ¶ 339.  Beam's investigative report rejected Strickland's
claim of office space availability:

> I have confirmed with Joshua Carpenter as well as Mr.
> Martinez there is not office space available in
> Asheville to accommodate [Strickland] working out of
> that office on a full-time basis.  Mr. Carpenter
> stated there is a visiting managers office in
> Asheville that is primarily used by the Federal
> Defender or First Assistant when they travel in from
> Charlotte.  It is also used by IT or other staff when
> traveling to the Asheville office.  There has also
> been an advertisement for a summer intern in the
> Asheville office as well as a Charlotte paralegal
> position that will require occasional travel to
> Asheville.  Mr. Carpenter stated he is not sure where
> the intern will sit and they may have to set up a
> temporary cubicle.  The paralegal can use the visiting
> manager's office when they come to the Asheville
> office.  [Strickland's] rebuttal of the fact there is
> office space in Asheville is unfounded as a result of
> my conversations with Mr. Carpenter and Mr. Martinez.

Tr. Ex. 7 at US1251.[72]

Beam's report also addressed Strickland's claim that she
was denied locality pay.  Tr. Ex. 5 at US1251; Beam Dep. 166:12-
15.  Beam explained how she came to this conclusion:

---

[72] The Court notes that Martinez's claim of no office space
is weakened, but not overcome, by the fact that FDO meeting
minutes from the July 20 meeting state that Carpenter believed
that there would be a need for a full-time R&W in the Asheville
office the next year, Tr. Ex. 173 at US7414, which would
presumably require office space.

139

> I asked Bill [Moormann] to see [Strickland's] SF-50.
> I also confirmed with -- I called somebody at the AO
> and asked about that, and locality pay is based off of
> the pay table that the person is put on, which is
> based on their duty station, and that's not something
> we have any control over at the local level.

Beam Dep. 166:2-21; id. at 167:14-170:25 (testifying that she did not think it was possible for locality pay to be removed).[73] Beam, however, also noted in her report, "Defender should always authorize both ECI and locality for all AFPDs," as stated in the DOCS Manual. Id. at 166:22-167:1.

Beam's investigation did not include whether Strickland was eligible for a raise at the time she was reclassified as an AFPD.[74] Beam Dep. 171:18-23. Beam also acknowledged that she did not look into what Strickland's AFPD salary ought have been based on her years of experience. Id. Beam does not remember whether she investigated Davis's assertion, in the Mas Dinero email, that Strickland needed five more years of federal service

---

[73] Beam reviewed Moormann's request for personnel action, which showed a reduction in locality pay, and the final form. Beam Dep. 166:2-21, 167:14-170:25; Tr. Ex. 174 at US3411 (AO-52 request form). The final form, however, did not evidence a reduction in locality pay. Tr. Ex. 179 at US2889. Beam acknowledged that she spoke to Moormann about these forms because she was having troubling understanding them. Beam Dep. 167:14-170:25. Beam remarked that Moormann "understood it about as well as [she] did." Id. Beam did not know why locality adjustment was not specifically separated out in the final form. Id.

[74] Beam's report did note, however, that Strickland's offer letter did not mention a pay raise accompanying her transition to an AFPD. Tr. Ex. 5 at US1246.

140

to qualify for a GS 15. Tr. Ex. 5 at US1260; Beam Dep. 107:4-111:8 (stating that she spoke with Moormann and looked at the DSO manual but does not recall specifically if she looked into this assertion); see also Tr. Ex. 137 at 9-10 (indicating that Davis's statement was false).

During her investigation, Beam did not contact the individuals listed on Strickland's exhibit list, nor anyone that "could substantiate [Strickland's] claims." Tr. Ex. 135 at ¶ 317; see also Beam Dep. 114:8-15.[75] Beam initially spoke to Strickland, Martinez, and Davis. See id. Beam also interviewed Carpenter and Moormann to further investigate Strickland's retaliation claims. Tr. Ex. 5 at US1251-52.

As part of her investigation, Beam received a list from Davis about his desired outcomes.[76] In her report, Beam also

---

[75] Beam explained that she "was only focused on the people that were involved directly in the situation." Beam Dep. 114:8-15.

[76] According to Beam's investigative notes on her interview of Davis, Tr. Ex. 189 at US6226-6235, Davis provided Beam a list of what outcomes he wanted as a result of the investigation:

Would like documented she was found to be making this up.

All units should report to him; this should not be one unit that goes around me.

No intention to have interaction. Would be comfortable w/ a level of insulation.

Explicit provision to address the things she has done that do not relate to the complaint (JP not involved in this)

141

detailed a "summary of informal resolution attempt[s]" with Strickland, in which she stated that Strickland had been accommodated in most of her requests (except for the transfer to Asheville) and that Strickland had failed to make any other specific requests as to what she wanted.[77]  Tr. Ex. 5 at US1250.

Martinez was not involved in the investigatory process. During the investigation, Ishida provided Martinez updates on the status of the investigation periodically, but they never discussed the contents of the investigation.[78]  12/14/23 Martinez Tr. 97:11-25.  Ishida also told Martinez when he received a

_____

1) Finding of fact

2) What can be considered and what should not be considered

3) Clearly explain no retaliation

4) One month cooling off once she returns to the office

5) Any communication is work related

6) No involvement during this time for JP to make any decisions regarding her

7) Eventual return to status quo + normal reporting process

8) No issue w/ Caryn staying w/ agency

Id. at US6236.

[77] Beam testified during her deposition that she did not give Strickland examples of the kind of requests she could make, although, as an HR professional, Beam could think of a few options that Strickland might have raised.  Beam Dep. 155:16-157:13.

[78] Martinez testified that he did not discuss these status updates with anyone else.  12/14/23 Martinez Tr. 97:7-12.

142

draft of the initial investigation report from Beam in November, but that he was sending it back to Beam to provide additional information.  Id.  Martinez only participated in the investigation as a witness.  Id.

### 6.  Strickland's Request to Disqualify Martinez

On January 13, Ishida asked for Beam's thoughts on whether Martinez should be disqualified from participating in the EDR case "[g]iven [Beam's] recommendation that [Martinez] be counseled and trained on handling workplace conduct complaints and decision making . . . ."  Tr. Ex. 163 at US1382.  In response, Beam shared the following thoughts and recommendation:

> I truly believe [Martinez] is biased in this case involving [Davis and Strickland] as far as the sexual harassment is concerned.  From my conversations with him I know he feels [Strickland] is attempting to exploit this situation to get the transfer to Asheville, however it has created a bias in him to look at this case from a neutral perspective.  I also believe he lacks the experience and understanding of exactly how this process works.[79]  I am concerned he could cause more damage if he were involved in the process at this point.

> [Strickland] had requested [Martinez] be disqualified as she felt she was retaliated against after she submitted her claim of Wrongful Conduct.  Although retaliation in my investigation was unfounded, I still think in a good faith effort to resolve this the circuit should consider disqualifying him based on the contentious nature of the current situation.  I would strongly recommend mediation at this point with

---

[79] During his deposition, Martinez remarked that he received "minimal" training on the EDR process and how to handle sexual harassment claims.  Martinez Dep. 40:13-41:10, 49:6-14.

143

perhaps one of the individuals we discussed the other
day.

Id.[80]  Despite this communication from Beam, Ishida testified

that, throughout the EDR process, he thought Martinez was

"conscientious", "diligent," and "acted in good faith."

12/13/23 Ishida Tr. 39:25-40:1, 45:9-14, 51:8.  Ishida thought

Martinez was "very concerned" about Strickland and "wanted to

make sure he did the right thing."  12/13/23 Ishida Tr. 45:9-14.

On January 16, 2019, Ishida told Strickland that he was

"preparing a notice to [her] announcing the end of the

counseling period and [her] right to file a request for

mediation," "[n]otwithstanding [her] pending request . . . for

an extension of the counseling period."[81]  Tr. Ex. 15 at US1533.

In the same email, Ishida informed Strickland that he had

spoken to Chief Judge Gregory and that he understood that the

---

[80] During his deposition, Chief Judge Gregory did not recall
whether this email, or its contents, were ever shared with him.
Gregory Dep. 32-34.  Regardless, Gregory testified that he would
not have considered Beam's opinion when deciding Strickland's
disqualification request because "it wasn't her job to make the
decision."  Id.  He confirmed that he did not "[seek] counsel
from [Beam] to help in that decision."  Id.

[81] Strickland never received a ruling on her second request
for an extension of time, which she made to evaluate the
investigative report.  Tr. Ex. 135 at ¶ 394.  During the
counseling phase, Strickland made at least three extension
requests, which were mostly granted.  12/13/23 Ishida Tr. 34:10-
15; see also, e.g., Tr. Ex. 20 (request for extension in mid-
January); see id. (stating that her extension request in late
November was granted); Tr. Ex. 140 (granting January extension
order).

144

Chief Judge "intend[ed] to deny [Strickland's] request to disqualify [Martinez]," and that he was "prepar[ing] an order to that effect."  Tr. Ex. 15 at US1533.  Strickland's request for disqualification of Martinez was thereafter denied.  Tr. Ex. 137 at 7-8.  During his deposition, Chief Judge Gregory explained that he chose to deny the request because "the purpose of an EDR" was "dispute resolution," and he needed "the right people there who [could] effect a settlement."  Gregory Dep. 35:8-9. He went on to explain that Martinez was not the person who committed the "alleged sexual harassment," and that for the remedies Strickland was requesting ("pay, job duties, who you'll report to, where you would work"), Martinez was "the fulcrum." Id. at 35:17-24.  Chief Judge Gregory also testified that, in short, "there were no facts submitted or proffered that would warrant disqualification of Tony Martinez."  Id. at 21:4-6. Chief Judge Gregory elaborated that "the only ground[] that was stated in [Strickland's] letter was the fact that" she had made an accusation against Martinez but, Chief Judge Gregory explained, that "party is never neutral because they're defending, obviously, the unit or the appointing authority in it, so that's not enough."  Id. at 21:12-21.  Chief Judge Gregory noted that "there was no allegation that [Martinez] was stonewalling, would not meet with her, would not negotiate. There was nothing that he would be a mediator, nothing that he

145

would have any fact-finding or be involved in the investigation or those things." Id. at 22:18-22.

Ishida also testified that he believed it would depend on the "context" whether an accused unit executive would need to be disqualified from an EDR proceeding, even if the unit executive himself was accused of sexual harassment or sex discrimination. Ishida Dep. 167:3. Ishida also testified that, given Martinez was not disqualified, Martinez's role as the unit executive at the time of disqualification (close of counseling and beginning of mediation) would be to "see what he could do to address [Strickland's] concerns about, you know, promotion, the work conditions, and so on and so forth." Id. at 162:9-16. Ishida testified during trial that, as the unit executive, Martinez was not required to be neutral -- in fact, if Martinez was neutral, Ishida would "question" whether Martinez was properly representing the employing office. 12/13/23 Ishida Tr. 40:10-41:1.

Smith similarly testified that he did not believe that "anyone else could have represented that office during the mediation," besides the unit executive -- even if the unit executive had engaged in wrongful conduct -- "[b]ecause the only person in that office that had the authority or the power to agree to things that would have to be agreed to was [the Defender]." Smith Dep. 70.

146

On January 17, Ishida, Strickland, and her husband had a phone call.  Tr. Ex. 147 (Strickland's recording of the meeting).

Ishida informed the Stricklands that, as advised by the OGC, the investigative report, which was considered an "internal document", would not be distributed to any of the parties during the informal counseling and mediation stages.[82]  Id. at 8:19. Ishida stated that the OGC's advice was different "if this . . . should proceed to the formal stage of a hearing and a judicial officer is appointed."  Id. at 8:14-16.  Ishida explained that the OGC had advised Ishida that distributing the report would make informal resolution more difficult because the parties would "fight" about the report instead of the issues involved in the case.  Id. at 14:18-22.  Mr. Strickland asked Ishida how disciplinary action could be taken without the investigative report, and also explained that he was concerned with neither party getting the investigative report through the Chapter X informal counseling and mediation process, but Martinez still getting access to the report through the linked Chapter IX proceeding.  Id. at 12:10-13:17.  In response, Ishida stated

---

[82] Langley, the JIO, stated that it was "very typical not to reveal the results of a wrongful conduct investigation to the parties, as it is an internal investigation."  Tr. Ex. 21 at US5446.  Langley later told Strickland that she could request the investigative report during the discovery stage of her Chapter X claim.  Id.

147

that they could hold the Chapter IX portion in "abeyance" until the Chapter X claim concluded. Id. at 13:18-11. Ishida stated that they had done this in other EDR claims in the past: "you hold the judicial conduct piece of this in advance [sic], and you let the EDR piece just go forward."[83] Id. at 19:22-20:3.

Strickland told Ishida that she did not understand the delay in disciplinary action. Id. at 21:3-15. Ishida agreed with the Stricklands that, unless they released the report, "nothing could happen" in terms of discipline under the Chapter IX action. Id. at 22:2-23:1.[84] Ishida assured Strickland, however, that Chief Judge Gregory would hold people accountable if necessary. Id. at 22:14-19. Mr. Strickland raised concerns that Strickland had been joked about in the office and forced to

---

[83] After listening to the recording, the Court determines that Ishida said "abeyance" not "advance." Tr. Ex. 147 at 19:22-20:3.

[84] Martinez did receive a copy of the investigation report sometime before April 2019. On April 5, 2019, Ishida and Shirley Sohrn, at the AO's office, exchanged emails about who Ishida must or should give the Chapter IX investigative report to. Tr. Ex. 23 at US2739_0001. Ishida explained that he was dealing with a report of wrongful conduct under Chapter IX, and that he gave the resulting investigative report to the unit executive "to decide whether disciplinary action should be taken against the employee accused of sexual harassment." Id. Ishida asked whether the "employee [was] entitled to see the investigation report." Id. The OGC explained that nothing mandates sharing the report with either the individual who made the accusation, or the individual accused of the wrongful conduct," and that they "generally advise NOT to share the report with either individual." Id.

148

telework.  Id. at 23:15-21, 25:21-26:6.  Ishida responded that

this had been a "living hell" for Davis, and he had heard that

Davis had been suffering physical symptoms from this situation.

Id. at 26:7-15.  Mr. Strickland asked Ishida how he knew this.

Id.  Ishida indicated that Davis contacted him asking why the

process was taking so long.  Id. at 26:16-27:15.  Ishida also

noted that he had told Davis not to contact him again.  Id. at

27:21-28:2.

Ishida told Strickland to "trust the process" and that they

would "hold people accountable."  Id. at 58:13-21.

### 7.  Strickland Requested a Transfer to Another FDO.

Strickland sent an email to Chief Judge Gregory and Ishida

on January 22, 2019, stating: "A transfer to another federal

defender office with flexible working conditions, specifically

in the Western District of Virginia, would resolve my Chapter X

claim."  Tr. Ex. 27 at US1958-60.  Strickland stated that

although "it was [her] dream since law school to be a federal

defender," she did not "believe it is possible to reach a

resolution with [her] current office that will protect [her]

from further harassment and allow [her] to advance in [her]

career."  Id. at US1959.

Strickland discussed some grievances she had with the EDR

process, as well as her concerns that a "successful negotiation"

of her EDR claim "[would be] unlikely," explaining that such a

149

negotiation "would require [Strickland] to negotiate directly with an alleged violator without knowing the report's findings and recommendations." Id. Strickland stated that she did "not see any path forward that would allow [her] to continue working in [her] office." Id. Strickland concluded by expressing her wish "to move on in a way that preserve[d] [her] professional reputation and career options." Id.

Ishida replied on January 24, stating: "I'm sorry to hear about your experiences, and your decision to leave your office. I have spoken to Chief Judge Gregory, and he has directed me to lend appropriate assistance in finding you another position. We can, of course, make no assurances, but we will do what we can to help." Id. at US1958.

### 8. Strickland Filed a Request for Mediation.

On January 31, 2019, Strickland filed a request for mediation under Chapter X. Tr. Ex. 14 at US0521; Tr. Ex. 141 at US3138. Strickland had not yet received any substantive update on her transfer request. Tr. Ex. 135 at ¶ 411.

Ishida replied that he was notifying Chief Judge Gregory and Martinez of her mediation request and designated Edward G. Smith, the Chief Circuit Mediator, as a mediator. Tr. Ex. 14 at US0521.

Strickland asked Ishida to clarify whether her confidentiality would be protected during mediation, and whether

150

any documents she submitted would be shared with Martinez
without her consent.  Tr. Ex. 14 at US0519-21.  Ishida confirmed
that he had not shared any documents with Martinez except for
her request for counseling and request for mediation.  Id.  He
had not shared her factual narrative or any of her supporting
documentation.  Id.

The Stricklands and Smith, the mediator, met on February 7,
2019, in the law library of a Fourth Circuit Judge.  Tr. Ex. 135
at ¶ 413; Tr. Ex. 148 (Strickland's recording of the meeting).
Smith understood his role as a mediator was to "figure out how
[he] was going to get [Strickland] back in the office in such a
way where she is given some concessions . . . where she's
happy."  Smith Dep. 28.

Smith acknowledged that it would be difficult for
Strickland to keep on working at the FDO in Charlotte if
everyone was "still there."  Tr. Ex. 148 at 3:11.  Strickland
indicated that she preferred teleworking and worked better on
her own.  Id. at 56:8-17.  Smith saw the Mas Dinero email and
commented that he felt that it was "inappropriate".  Id. at
23:3.

During the meeting, Smith acknowledged that Martinez was
the "decision maker" for the FDO in mediation.  Id. at 53:4-18.
Smith also told Strickland that she could go to a hearing in
front of a judge if mediation did not work out.  Id. at 35:16-

151

20.  Smith stated that he was not sure how the FDO worked or who "police[d]" Martinez.  Id. at 28:19-29:5.  In this conversation, Strickland also acknowledged that Martinez could be removed for cause and neglect of duty.  Id. at 29:6-13.

On February 12, 2019, Smith and Strickland spoke by phone. Tr. Ex. 135 at ¶ 418; Tr. Ex. 152 (Strickland's recording of the meeting).

Smith said Martinez offered his own office in Asheville for Strickland to use, but indicated that she may have to share the office with an intern if no conference rooms were available to work in.  Tr. Ex. 152 at 4:15-5:7; see also 12/13/23 Ishida Tr. 86:2-9; 12/18/23 Martinez Tr. 40:16-20; 12/14/23 Martinez Tr. 109:20-110:10.  Smith said that Martinez indicated that he could just use the library or conference room when he came to Asheville.  Id.

Strickland asked Smith why a transfer was possible now, but not six months ago.  Id. at 3:20-4:2, 9:11-20.  Smith said that Martinez changed his mind once Smith got "involved."[85]  Id. at 4:3-6.

Strickland told Smith that a transfer under these circumstances would "potentially stigmatize [her] and affect

_____

[85] Martinez testified during trial that he did not offer the space sooner because it was not private, and he wanted an office when he traveled to the FDO's Asheville office.  12/14/23 Martinez Tr. 110:11-15.

152

[her] relationships with other employees in the office." Id. at 5:8-18. She was also concerned about Davis traveling to the Asheville office. Id. Smith suggested that, in order to keep this job, Strickland ought put aside her trust issues with Martinez and "what happened[,]" so Smith could help "figure this thing out." Id. at 10:22-11:11. According to Smith, Martinez was also in agreement that Davis could no longer be "involved" with Strickland's work. Id. at 6:22-7:3. Smith suggested taking Martinez at his "word" on his promise for now. Id. at 7:17-20.

Strickland asked Smith whether an EDR settlement was binding on the next federal defender. Id. at 29:11-15. Smith stated that he had not thought about that, but that it was a "good question" that they "absolutely . . . need[ed] to think about . . . ." Id. at 30:5-7.

During the week of February 13, Langley, the JIO, met with the Stricklands at the AO in Washington, DC to talk about Strickland's EDR claim. Tr. Ex. 135 at ¶ 427; 12/19/23 Langley Tr. 41:2-14. Strickland told Langley about her experience with the EDR process, expressing her concern that her due process rights were being violated. Tr. Ex. 135 at ¶ 428; Tr. Ex. 21 at US5445-47 (Langley's notes stating that Strickland felt like the EDR process was being "bungled" to protect Martinez). Langley told Strickland that if Strickland proceeded to file a formal

153

complaint under Chapter X of the EDR Plan, a presiding judicial

officer could order equitable remedies to make her whole.

12/19/23 Langley Tr. 34:11-35:17.  Langley also told Strickland

that disqualifying Martinez at the mediation stage was unusual

because he was the head of the responding office.  Tr. Ex. 135

at ¶ 436.  Langley's notes state:

> I also said that it would not be expected that the EDR
> hearing officer would disqualify the head of the
> Responding Employing Office to act on behalf of the
> office, even when the UE is accused of wrongdoing.  I
> explained that almost all EDR complaints allege that
> the UE violated their employment rights and that it
> was still entirely contemplated that the UE would act
> as the head of the Responding Office, just as any
> defendant to a civil action is the party responsible
> for acting as the defendant.  If the court concluded
> there was a significant conflict of interest, it could
> act – such as hiring an outside law firm to represent
> the office – and her motion for disqualification could
> be a means to do that, but that it would not at all
> surprise me if her disqualification motion was denied.
> I explained disqualification motions were designed to
> ensure that the EDR Coordinator, Mediator, and Hearing
> Officer were impartial, not that the defending party
> was impartial.

Tr. Ex. 21 at US5446; see also Langley Dep. 179-80 (stating that

an updated version of the EDR contemplates situations in which

the respondent ought not be represented by the unit executive

during the complaint stage).[86]

---

[86] Langley similarly testified during her deposition that,
although not reflected in the language of the EDR Plan, she
understood that the defending party is going to be biased.
Langley Dep. 84-87; see also 12/19/23 Langley Dep. 58:17-60:18
(testifying that Martinez "has a right to defend" himself).

154

Regarding whether remedies could be ordered against Martinez in the EDR process, Langley testified that she "didn't understand what would happen" if "an appointed Defender refused" to comply with an order in an EDR proceeding. Langley Dep. 130-31; 12/19/23 Langley Tr. 35:18-25, 36:1-15. Langley had not considered that question before because she did not have reason to think that someone might refuse to comply with an order of a presiding judicial officer. 12/19/23 Langley Tr. 35:18-36:5. Langley neither informed Strickland that a presiding judicial officer would or could not order remedies against a Federal Defenders' Office, nor did she say that a presiding judicial officer would have no jurisdiction to enter remedies against a Federal Defenders' Office. 12/19/23 Langley Tr. 36:17-21. Langley testified that she expressed this uncertainty to Strickland:

> [Strickland asked] what would happen if the defender, like if the presiding judicial officer at the end of the complaint stage -- because that's when remedies happen, after there has been a decision on the merits -- what would happen if the defender refused to comply with the orders. . . . And I said I didn't remember what – I was not familiar with the -- how a defender could be unappointed.

> In contrast, if I'm a court employee and the presiding judicial officer orders the clerk of court to provide some remedy, the clerk of court, I understand, is in a very direct employment relationship with the chief judge and the judges on the court.

> And what I remember telling [Strickland] is I literally did not know enough about the relationship between a defender -- and I'm talking about the unit

155

executive defender -- and the judges on the Court of
Appeals.· And so I remember telling her that I didn't
know what would happen.

I certainly told her that they are obligated -- a
defender would be obligated under the plan to take
those remedies and to comply with the order, but I
didn't know what would happen if they refused to
follow that. . . .  I knew that [the presiding
judicial officer] had the power to enforce it.

But the mechanics of what does that enforcement mean,
what I didn't know was would they have the power to
fire the defender for failing to comply with a
presiding judicial officer decision.

And after our meeting, I did learn about a statute
that describes how a defender can be removed from
office for misconduct in office or neglect of duty;
and as a lawyer I would make the argument that failing
to comply with a presiding judicial officer's order
would be neglect of duty.

So, I didn't know that.

Langley Dep. 130-32.

Langley told Strickland that she could pursue "motions" and
"discovery" to prove her claims after filing a formal complaint
following the close of counseling and mediation.  Tr. Ex. 135 at
¶ 432.  Langley urged Strickland to use the EDR process as it
existed and to be clear about the remedies she was seeking.  Id.
¶ 437; see also Tr. Ex. 22 at US2208 (Langley later telling
Strickland that she was "still at the start of the EDR Process"
and had access to "[a]ll of the due process rights" associated
with this process).

After their meeting, Strickland and Langley exchanged
emails.  One email from Langley stated:

156

Every matter can be a "lesson learned."  For example,
your experience has taught me that I/we need to
provide EDR interpretive guidelines to courts, to
flesh out what I/we think should happen in EDR
proceedings. . . .  And I'd like to better understand
if FPDs are adequately protected by EDR remedies[87].

Tr. Ex. 22 at US2207.

Martinez testified that he "[didn't] think a Court – a
judge would order a defender that you've got to do this without
considering whatever needs that defender has or lacks or budget
lacks or space. . . There [are] so many factors."  Martinez Dep.
244–45.  During trial, Martinez further testified that, as a
unit executive, Martinez understood that he must obey an order
from a presiding judicial officer and would have complied with
his obligation to do so.  12/14/23 Martinez Tr. 114:15-22.

On February 15, 2019, Strickland exchanged text messages
with Valerie Nannery.  Tr. Ex. 157 at 4499.  Strickland stated:
"My reputation has already been ruined with the [F]ourth

---

[87] During her deposition, Langley explained this comment:

[Strickland] had asked me what would happen if the
defender didn't comply with the presiding judicial
officer's remedies at the end of the complaint stage;
and I did not at that time know enough about the
appointment, reappointment, and removal of defenders
to know what would happen.· They are different than
the unit executive in the court which is clearly
governed by, supervised by, and works at the pleasure
of the chief judge and the judges on that court.

Langley Dep. 175-76.  Langley testified that she never
followed up with Strickland with the answer her question.
Id.

[C]ircuit.  Things will never be the same again.  So I'm going to burn the place down on the way out[.]"  Id.  She also expressed that her experience was a "due process violation" and that "federal defenders are not accountable to anyone."  Id.

On February 22, 2019, Strickland's representative sent a letter to Ishida supplementing Strickland's request for mediation.  Tr. Ex. 135 at ¶ 449; Tr. Ex. 3 at US0064; Tr. Ex. 29 at US0754-55.  Ishida replied that he was obligated, pursuant to Ch. X, Section 9A of the EDR Plan, to "provide a copy of the supplemental request to Chief Judge Gregory and Anthony Martinez, the unit executive" and that he was also providing a copy to the mediator, Smith.  Tr. Ex. 29 at US075-55.  Ishida indicated that he had reached out to the OGC for guidance, who advised that the supplemental request "is not subject to redaction" but that Martinez was "prohibited from retaliating against any employees for their participation in, or opposition to, EDR matters."  Id.  Martinez shared portions of this mediation supplement with Davis, Davis Decl. ¶ 43, ECF No. 245-3, who was not a party to Strickland's Chapter X proceeding, see Tr. Ex. 136 at US4551-52.[88]

---

[88] Ch. X, Section 9(B)(4) of the EDR Plan states: "Any person or party involved in the mediation process shall not disclose, in whole or in part, any information or records obtained through, or prepared specifically for, the mediation process, except as necessary to consult with the parties or their representatives, and then only with notice to all

158

On February 24, 2019, Strickland's representative submitted a renewed request to disqualify Martinez, as Strickland had not yet received a written ruling on her request. Tr. Ex. 4 at US1498-1502; Tr. Ex. 135 at ¶ 453.

On February 26, 2019, Strickland and her husband, acting as her representative, met with Smith in a Fourth Circuit judge's law library. Tr. Ex. 135 at ¶ 454; Tr. Ex. 153 (Strickland's recording of this meeting).

During this conversation, Smith and the Stricklands discussed the remedies available to Strickland via the EDR Plan. Smith explained that as both he, as a mediator, and the presiding judicial officer, were constrained by the remedies available in the EDR Plan, the relief Strickland really wanted would not be available to her. Smith reminded Strickland that there was nothing she could receive as a remedy in a formal hearing "that [he] might not be able to get [her] through a settlement agreement[.]" Tr. Ex. 153 at 44:5-9. When the Stricklands asked for explanation on this point, Smith elaborated, explaining that Strickland would not be able to "get what [she] want[ed], [as] a lot of what [she] want[ed] [was] the

_____

parties." Tr. Ex. 136 at US4551. Martinez violated this provision by sharing the mediation request with Davis. Strickland, of course, also violated this provision repeatedly by secretly recording the mediation sessions and then filing the recordings publicly in connection with this litigation.

159

backtalk and the optics of the whole thing to go away and that [was] not going to happen." Id. at 46:12-14. She would also not, under the EDR Plan, be able to have "[Davis] or [Martinez] be terminated."[89] Id. at 47:18-20.

Due to these limitations, Smith explained that because the remedies available to Strickland were the same at both the mediation and hearing stages of the EDR process, "in drafting a settlement agreement. . . [Strickland would] have the better ability" to add specific details regarding her working situation (i.e., telecommuting, office space) than she would after a final hearing in front of a presiding judicial officer. Id. at 47:8-10. Smith noted that he did not "think the judge [was] going to micromanage this office and tell a federal defender how to do his job."[90] Id. at 47:10-12.

---

[89] Smith testified during his deposition about the lack of remedies as applied to this case. Smith testified that "there really wasn't a remedy" under the EDR Plan that "fit the situation," because "[n]one of these [were] going to do anything in this particular case." Smith Dep. 13, 28. Smith further explained: "I always viewed this as what [Strickland] was after was some kind of discipline to [Davis], whether it be termination or something, and that could never be addressed in mediation." Smith Dep. 19.

[90] Smith later elaborated on this quote in deposition, stating that he was also a unit executive who "serve[s] at the chief judge's pleasure." Smith Dep. 22. Smith explained how this personal experience led him to believe that a "judge can't micromanage him in [the workings of his office]." Smith Dep. 88. Smith explained that a presiding judicial officer would not know "the effect" of the remedies requested by a complainant and would not know how the "office operates." Id. A presiding

160

Smith also explained in this conversation, however, that Chief Judge Gregory had removal authority and explained that "if [Chief] Judge Gregory wanted something done, . . . he could fashion it in such a way." Id. at 81:20-22.

Smith also told Strickland that she could not transfer to the FDO in the adjacent district as she had requested because that office did not have an opening. Id. at 3:9-11. Strickland expressed concern and frustration that she would never be able to return to work normally at the FDO. Id. at 10:8-11:1, 14:3-19. Strickland asked Smith to help her secure a Fourth Circuit clerkship. Id. at 33:12-17.[91]

After this meeting, Smith went to Richmond, VA to discuss the possibility of a clerkship for Strickland. Tr. Ex. 135 at ¶ 457. Later that week, Smith called Strickland to relay that a Fourth Circuit judge had a term clerkship vacancy, which had been open for at least several weeks. Id. ¶ 458. The judge wanted to interview Strickland for the role. Id.

On March 7, 2019, Smith and Ishida exchanged emails regarding clerkship opportunities for Strickland. Tr. Ex. 25.

_____

judicial officer, therefore, would be reluctant to order specific remedies that are tailored directly to the needs of the complainant.

[91] During this meeting, Smith also remarked on the Mas Dinero email, stating that "[he] just can't believe anybody is going to say it wasn't an improper email." Tr. Ex. 153 at 58:8-13.

Smith reported to Ishida that Strickland was seeing Judge Floyd tomorrow and that she was "excited and extremely grateful for the potential opportunities we have arranged and are working on." Id. Ishida replied to Smith, telling him that "[t]here's a medal in this for you if this works" and that he was keeping his "[f]ingers and toes crossed" that this worked out. Id. at US1322.

On March 8, 2019, Strickland interviewed with Fourth Circuit Judge Henry Floyd. Tr. Ex. 135 at ¶ 459. Strickland was highly qualified for the clerkship, and she received an offer on the spot. Id. Smith accompanied Strickland to the interview. Tr. Ex. 154 (Strickland's recording of the meeting).

As they were wrapping up mediation, Strickland told Smith that the clerkship was a "very nicely packaged constructive discharge." Id. at 74:18. She said she was giving up her career because she was harassed and retaliated against without any accountability. Id. at 74:19-75:2. She called the situation the "collective fault of the institution." Id. at 75:15-16. During this conversation, Strickland further stated that the clerkship did not "make [her] whole" and that she had to give up her career because of Davis's harassment. Id. at 74:9-10. During the conversation, Strickland also explained that she "[didn't] think [the EDR Plan] gives [a presiding judicial officer] any statutory authority to actually order the

162

[Defender or First Assistant] be terminated." Id. at 76:21-77:2.  Smith agreed, stating that due to the limitations on what remedies were available under the EDR Plan, "the remedy part" was a "big problem."  Id. at 78:3-4.  Smith, however, reminded Strickland that "[Martinez] does have a boss.  It's a judge.  He can be removed."[92]  Id. at 80:2-3.

On March 8, Smith notified Ishida that Strickland planned to accept Judge Floyd's clerkship offer and wanted Smith to pass along "how grateful see [sic] is to all who helped reach this result."  Tr. Ex. 25 at US1322.  Smith stated that Strickland would be reaching out to Ishida to withdraw her EDR complaint. Id.  Smith also stated: "I have notified Tony Martinez that [Strickland] will be transferring effective March 18.  I refused to tell him where she was transferring.  He is thrilled and [said] 'You must be able to walk on water.'"  Id.  Ishida expressed this appreciation to Smith given the difficulty of Strickland's EDR claim:

> Having lived with this case for what seems like years,
> I can't tell you how relieved and delighted I am with

---

[92] The Court notes that Strickland never sought clarification regarding the difference between what the EDR Plan stated about remedies and what she now alleges she believed she had been told by Smith and Langley.  See, e.g., 12/11/23 Strickland Tr. 101:16-24 (testifying that she did not ask Ishida whether a judicial officer could order remedies against Martinez because "[Ishida] works directly for the Fourth Circuit and the Chief Judge, so I knew he wouldn't necessarily be a good person to ask" because he had an "inherent conflict of interest in that position"); see also 12/19/23 Langley Tr. 37:8-14.

163

the news.  This has been an extraordinarily difficult
case, compounded by the high-profile nature of it.
Yet, you managed to achieve a result that everyone is
thrilled with.  This is a monumental accomplishment.

Id.  Ishida further wrote: "You've certainly earned the

Circuit's thanks and appreciation for an outstanding job in

settling this difficult case."  Id.

On March 11, Strickland emailed Ishida to inform him that

she had accepted a clerkship with Judge Floyd and that she was

withdrawing her EDR claim before it reached the formal complaint

stage, stating that although she was "saddened to no longer be a

federal defender, [she was] honored for this opportunity" and

"very much appreciate[d] the Fourth Circuit's assistance in

helping [her] reach the best possible outcome under the

circumstances."  Tr. Ex. 162 at US3300.  Thus, Strickland ended

her EDR process before it reached the formal complaint stage.

See id.

On March 20, Ishida congratulated Smith for settling

Strickland's claim.  Tr. Ex. 25 at US201; see also Tr. Ex. 6 at

US7561-62 (Ishida stating that Smith "convinced" Strickland to

withdraw her EDR claim).

Martinez signed off on the paperwork to effectuate

Strickland's transfer from the FDO to the Fourth Circuit.

12/14/23, Martinez Tr. 110:23-25, 111:1.

164

O. **The Aftermath**

1. **Ishida Delivered the Investigation Report to Chief Judge Gregory.**

On March 25, 2019, Ishida sent an email to Chief Judge Gregory, attaching "the investigation report that was prepared in the EDR/Report of Wrongful Conduct matter filed by [Strickland]."  Tr. Ex. 6 at US7561-62.  The memorandum stated:

To: Chief Judge Gregory

From: James N. Ishida

RE: Investigation Report - Caryn Devins Strickland

Attached is the investigation report that was prepared in the EDR/Report of Wrongful Conduct matters filed by Caryn Devins Strickland.  You must decide what disciplinary action, if any, should be taken against Federal Public Defender Anthony Martinez (N.C. W.D.) under Chapter IX of the Fourth Circuit's EEO/EDR Plan (November 2018) ("the Plan").

I. Summary

On September 10, 2018, Assistant Federal Public Defender Caryn Devins Strickland filed both an EDR Complaint under Chapter X and a Report of Wrongful Conduct under Chapter IX of the Plan, alleging sexual harassment, retaliation, and other acts of wrongdoing. Because both matters arose under the same general facts, I had ordered a joint investigation and appointed HR Manager Heather Beam, from the North Carolina Western District Probation Office, to handle the investigation.

While the investigation was ongoing, I had attempted to find a resolution through the counseling phase of the Chapter X EDR proceeding.  In spite of extending the counseling period, I was unsuccessful in settling the matter.  The counseling period ended on January 14, 2019.

On January 31, 2019, Ms. Strickland filed a timely request for mediation under Chapter X of the Plan.  I thereafter appointed Edward G. Smith, Fourth Circuit Chief Mediator, to conduct the mediation.

165

The mediation period was extended once by mutual consent of Mr. Smith and Ms. Strickland. Eventually, Mr. Smith was able to persuade Circuit Judge Henry Floyd to offer Ms. Strickland a clerkship to the end of the term in June and convince Ms. Strickland to withdraw her EDR complaint in return for the clerkship.

On March 11, 2019, Ms. Strickland submitted her request, asking that her EDR complaint be withdrawn.

II. Next Steps – Chapter IX Report of Wrong Conduct

The last remaining matter is Ms. Strickland's Report of Wrong Conduct under Chapter IX of the Plan.

Chapter IX describes the process for resolving a Report of Wrongful Conduct:

(a) A Report of Wrongful Conduct is not the same thing as an EDR Complaint, and the two must be handled according to the procedures as set forth in their respective chapters,

(b) An investigation must be conducted into the allegations,

(c) All parties involved in the investigation must protect the confidentiality of the allegations, and

(d) "Employees found by the Chief Judge and/or unit executive to have engaged in wrongful conduct, as defined in this Plan, may be subject to disciplinary action."

The investigation report recommends that disciplinary action be taken against the accused employee – Federal Public Defender First Assistant J.P. Davis – as well as the unit executive, Anthony Martinez. You cannot decide any disciplinary action against Mr. Davis – that is within the authority of the unit executive. But you can and are tasked with deciding if disciplinary action is appropriate for Mr. Martinez.

III. Additional Information

I'll speak to you later about a conversation that I had with Cait Clarke, the chief of the AO's Defender Services Office, which may help with your decision regarding Mr. Martinez.

166

Tr. Ex. 6 at US7561-62.  Footnote 1 in the report includes the following definition of wrongful conduct:

> "Wrongful conduct" is defined to include "[d]iscrimination against employees based on race, color, religion, sex (including pregnancy and sexual harassment), national origin, age (at least 40 years of age at the time of the alleged discrimination), and disability is prohibited.  Harassment against an employee based upon any of these protected categories or retaliation for engaging in any protected activity is prohibited."  See Chapter II, section 1 of the Plan.

Id.

On May 1, Strickland requested an update on her Chapter IX report.  Tr. Ex. 198 at US476.  Ishida reported back that the Chapter IX proceeding was still "open and ongoing."  Id.

Martinez counseled Davis on May 8, 2019, based on facts uncovered during Beam's investigation of Strickland's allegations.[93]  Tr. Ex. 137 at 9.  Specifically, Martinez counseled Davis about his professional word choice with respect to four emails Davis sent to Strickland.  Martinez Dep. 275;

_____

[93] During his deposition, Ishida testified that the decision regarding disciplinary action against Davis for sexual harassment was not the "concern" of the Fourth Circuit.  Ishida Dep. 223-24; see also Tr. Ex. 6 at US7561 (stating that disciplinary action against Davis "is within the authority of the unit executive").  Ishida further testified that he did not "know what action Mr. Martinez took against Mr. Davis," and that the Fourth Circuit "had no authority to take any action. . . [as] [t]hat is the purview of the unit executive."  Ishida Dep. 223-25.  Unlike a subordinate of Martinez, however, both Ishida and Chief Judge Gregory did "feel that the Court of Appeals, as the appointing entity, had [the] ability" to discipline Martinez.  Id.

12/14/23 Martinez Tr. 113:10-22.  Martinez also counseled Davis on using profanity in emails and noted that the profanity was not directed at anyone in particular.  12/14/23 Martinez Tr. 114:1-9.

Martinez believed that Davis's conduct "did not require any disciplinary action[.]"  Martinez Dep. 273-75 (stating that there is a difference between counseling and discipline). During his deposition, Martinez testified he "always believed" Davis's account; that in his "opinion," the conduct Strickland reported "was not sexual harassment"; and that he made his decision to counsel Davis based on "the gravity of the conduct," which he believed was "just emails," and "wasn't as serious as any other action that [Davis] might have taken."  Id. at 117, 216, 273-276.  Martinez also testified that, when deciding whether the Mas Dinero email was a quid pro quo request, he considered the context provided to him by Davis; namely, that Strickland told Davis "If I don't get my demands, I'm going to quit."  Id. at 119:11-16, 125:1-24.[94]

On May 7, 2019, Strickland met with Ishida and Beam in Richmond, Virginia.  Tr. Ex. 135 at ¶ 474; Tr. Ex. 204 (Strickland's recording of the meeting).  Strickland asked for

_____

[94] Martinez testified that he could see how this email could be "misinterpreted" as referring to "sexual favors."  Martinez Dep. 127:2-14.

an update on the wrongful conduct proceeding.  Tr. Ex. 204 at

10:3-7.  Ishida said that, on the advice of OGC, he could not

tell Strickland anything about the proceeding or its outcome.

Id. at 10:8-11:3.  Strickland further explained that she had had

difficulty finding another job because, when asked, she did not

feel comfortable providing references from the FDO.  Id. at

11:11-13:7.  Strickland told them that everyone in her office

knew that she filed a complaint, and that the rumor was that she

"lost."  Id. at 23:2-7.  Strickland told Ishida that this was

not over for her.  She told him that she lived with this burden

every day and that it had tremendously affected her life and

career.  Id. at 21:11-14.

### 2. Martinez Received a Letter of Counseling from Ishida Based on His Conduct Managing Davis and Strickland.

On May 28, 2019, Ishida sent a Letter of Counseling, which

he drafted, to Martinez based on facts uncovered during Beam's

investigation.  12/13/23 Ishida Tr. 46:20-25; Tr. Ex. 137 at 9;

Tr. Ex. 7 at US4264-67.

According to Ishida, the Letter of Counseling was not a

letter of reprimand or disciplinary action.  12/13/23 Ishida Tr.

46:20-22.  But see Tr. Ex. 194 at US4714 (Ishida's email to

Strickland stating that "disciplinary action was taken . . . as

a result of [her] report of wrongful conduct").  Ishida

testified that a letter of reprimand would be equivalent to a

169

"harsh rebuke or censure," while this letter was meant to be "corrective" rather than "punitive". 12/13/23 Ishida Tr. 47:17-22, 48:6-18. Ishida further testified that the purpose of the Letter of Counseling was to "advise Martinez about the findings of the investigation and to inform him about a few well-intended mistakes he made when communicating with Strickland during her EDR process." Id. at 48:19-25, 49:1-18. Ishida stated that he referenced these "missteps" so that "Martinez could learn from them and not make similar mistakes in the future." Id. at 49:4-25.

Ishida began the letter by providing background on Strickland's allegations:

> On September 10, 2018, Ms. Strickland submitted a Report of Wrongful Conduct under Chapter IX and a Request for Counseling under Chapter X[] of the Plan, alleging sexual harassment, retaliation, and discrimination during her employment with your office. In her Report of Wrongful Conduct, styled Official Grievance, Ms. Strickland claimed that "[t]he First Assistant [JP Davis] has abused his power and offered employment preferences for his unwanted advances." Ms. Strickland explained that Mr. Davis subjected her to unwanted advances, unreasonably interfered with her work assignments, and even proposed an unsavory quid pro quo proposal on her request for a promotion and raise. Ms. Strickland also included you in her allegations.

Tr. Ex. 7 at US4264. Ishida then detailed the findings of Beam's report:

> Following a painstaking investigation, Ms. Beam issued her Counselor's Report on November 19, 2018, later supplemented on January 11, 2019. In her report, Ms. Beam suggested that you "be counseled and trained on

170

how to handle workplace conduct complaints. He should also be counseled or training [sic] on judgement and decisiveness." Ms. Beam explains:

For example, Caryn states when she initially brought her complaint to Mr. Martinez he compared her relationship with the First Assistant Defender as a marriage and asked her to compromise. He also made comments bade [sic] on Caryn's report such as "At least she was not touched" and called her out on contacting the AO to receive guidance on her civil rights as a federal employee.

He also stated he was being blamed for something that was not his fault. It is evident this claim was mishandled from the beginning by Mr. Martinez and he would benefit greatly with additional training on workplace conduct as well as basic managerial/leadership skills.

A. Marriage Metaphor

On or around July 5, 2018, you met with Ms. Strickland and Mr. Davis to resolve a "breakdown in communications." Though well-intended, you had not abided by Ms. Strickland's wishes that she meet with you privately to discuss Mr. Davis's conduct. This made Ms. Strickland feel "uncomfortable" and "intimidated," having to confront the person she accused of sexually harassing her. She was also troubled by your characterization that this was a simple misunderstanding, feeling that you had trivialized the incident.

After attempting to resolve several disagreements between Ms. Strickland and Mr. Davis, you had used an ill-advised metaphor, comparing the relationship between Ms. Strickland and Mr. Davis as a "marriage," with the parties needing to "compromise" and "meet in the middle." Ms. Strickland said that she was "shocked" and "offended" at the reference, believing that it was inappropriate to describe any professional relationship between a male supervisor and female subordinate as a "marriage." The metaphor was especially inappropriate given the context that Ms. Strickland had raised concerns with Mr. Davis's behavior towards her.

B. No Physical Touching

171

You had a subsequent discussion with Ms. Strickland in which you attempted to clarify whether Mr. Davis had touched Ms. Strickland or had engaged in other inappropriate behavior.

Ms. Strickland denied that Mr. Davis had touched her inappropriately, but she repeated that Mr. Davis made her feel uncomfortable and threatened. Investigator Beam found that you had said, "at least you weren't touched," or words to that effect. The investigator concluded that your remarks were callous, minimizing, insensitive, and contributed to the distress that Ms. Strickland felt.

C. Disapproval of Seeking Outside Advice

Ms. Strickland had also sought advice and guidance from the Fair Employment Opportunity Office at the Administrative Office of the U.S. Courts on her civil rights as a judiciary employee. The investigator found that you had "called out" Ms. Strickland for seeking legal advice from that office, which further eroded trust between you and Ms. Strickland and exacerbated the deteriorating situation in your office.

D. Shifting Responsibility

Finally, the investigator noted that you had said you were being blamed for matters that you had nothing to do with. Ms. Strickland reported that she felt "offended" by your protest, which she perceived as disapproving her right to seek outside advice and counsel from the AO Fair Employment Opportunity Office. This, the investigator concluded, contributed to your mishandling of the matter.

E. Mitigating Factors

In mitigation, Investigator Beam found that you had acted expeditiously to accommodate Ms. Strickland's requests, except her request to be transferred to your Asheville Office. You had noted, however, that there was no physical space in that office to accommodate Ms. Strickland.

The investigator also found that you had acted in good faith in accommodating Ms. Strickland's request to telework, and you were flexible in other work assignments.

172

Finally, Ms. Strickland alleged that you had retaliated against her by denying merit-based promotional opportunities and by-removing her locality pay.  The investigator found that these allegations are without support.

F. Conclusion

In conclusion, Investigator Beam reported that she did "not see a case for retaliation based on [her] investigation and the facts presented by both sides." The investigator also concluded that "Mrs. Devins has experienced in her mind sexual harassment although the facts discovered in this case find this claim to be very flimsy."

But the investigator did record the numerous missteps that you committed, which contributed to Ms. Strickland's perception of mistreatment and retaliation by you.  These missteps appeared to have exacerbated the underlying situation, and they broke trust between you and Ms. Strickland.  This was not helpful.  But the investigator observed that most of your "decisions ... were made at the end of a day where [you had] attended meetings all day and was tired."  She found that your actions were not motivated by malice or ill-will, but rather were the result of poor judgment caused by fatigue.

Taking all of this into account, the investigator concluded that harsher discipline was not appropriate; instead, she recommended that you should be "counseled or train[ed] on judgement and decisiveness," in addition to be "counseled and trained on how to handle workplace conduct complaints."

Id. at US4265-67.  The Letter of Counseling then states Chief

Judge Gregory's decision as to disciplinary action against

Martinez:

Under Chapter IX of the Plan, "[e]mployees found by the Chief Judge and/or unit executive to have engaged in wrongful conduct,[4] as defined in this Plan, may be subject to disciplinary action."  After careful consideration of the investigator's report, supporting attachments, and documents filed in this case - and noting the mitigating circumstances – Chief Judge

173

Gregory has decided to adopt the recommendations
contained in the report.

Id. at US4267.  The Letter of Counseling defines "wrongful

conduct" (footnote 4 in the counseling letter) as including:

> Discrimination against employees based on race, color,
> religion, sex (including pregnancy and sexual
> harassment), national origin, age (at least 40 years
> of age at the time of the alleged discrimination), and
> disability is prohibited.  Harassment against an
> employee based upon any of these protected categories
> or retaliation for engaging in any protected activity
> is prohibited.  All of the above constitute "wrongful
> conduct."

Id. at n.4 & US4267.  Ishida testified that he only included the

standard for "wrongful conduct" under Chapter IX in the letter

because the counseling was pursuant to Chapter IX of the EDR

Plan.  12/13/23 Ishida Tr. 50:14-25.  According to Ishida, the

letter contained no finding of wrongful conduct on the part of

Martinez.  Id.

Martinez testified that he never took any action against

Strickland because of her gender.  12/14/23 Martinez Tr. 115:2-

4.  Ishida testified that he was "concerned about a pattern of

complaints against JP Davis or Mr. Martinez" during Strickland's

EDR proceeding, noting that "[t]here were multiple [complaints]

coming within a relatively short period of time," which

concerned Ishida.  Ishida Dep. at 227-28.

On June 4, 2019, Ishida sent Strickland an email, with

Chief Judge Gregory copied.  Tr. Ex. 135 at ¶ 483; Tr. Ex. 194

at US4714.  Ishida disclosed to Strickland that "disciplinary

174

action was taken . . . on [her] report of wrongful conduct"
based on the findings of Beam's report.  Tr. Ex. 194 at US4714.[95]

### 3.    **Strickland and the FDO Move Forward.**

In March 2019, Beam sent an email to her supervisor, Frank
Johns, about Strickland.  Tr. Ex. 195 at US4025-26; Beam Dep.
41:12-24.  Beam forwarded an email to Johns, in which Strickland
withdrew her application for a pro se law clerk position.  Tr.
Ex. 195 at US4025-26.  Johns said to Beam: "YEA!  That one is
off the chess board."  Id.  Beam replied: "Yep – I think she
would have been a true pain in the you know what :)".  Id.

On March 19, 2019, during Strickland's clerkship with Judge
Floyd, the AO Director circulated an Exposure Draft of the
revised Model EDR Plan within the judiciary and called for
comments.  Tr. Ex. 135 at ¶ 465.

On April 19, 2019, Strickland submitted a comment on the
Exposure Draft to the Model EDR Working Group.  Id. ¶ 467.  The
comment read:

> [E]ven the remedies listed in the Plan may not
> actually be legally or practically available to
> claimants.  As an initial matter, the EDR Plan itself
> is a creature of Judicial Conference policy, rather
> than statute or other legally-binding authority.
> Judicial Conference policy states: "Judges' decisions
> in EDR matters must be in conformance with all
> statutes and regulations that apply to the judiciary,
> . . . [and] judges presiding in EDR matters may not

---

[95] Strickland was not informed about the content of the
investigation report, or the nature of the action taken under
Chapter IX of the EDR Plan.  Tr. Ex. 135 at ¶ 486.

175

compel the participation of or impose remedies upon
agencies or entities other than the employing office
which is the respondent in such matters."  Proceedings
of the Judicial Conference at 25 (Sept. 2010).  This
policy potentially undermines many of the remedies
purportedly available under the Plan.  For instance,
if an employee requests a transfer as an interim
measure or ultimate relief, the policy indicates that
a court may not direct any other office to absorb that
employee.  Similarly, a court can only request, but
not direct, another agency, such as GSA, to provide
building modifications necessary to accommodate an
employee with a disability.
        The problem is especially acute for employees of
federal defender offices, who functionally have no
remedies under the Plan at all.  Although federal
defender offices are "covered" by EDR Plans, the
Criminal Justice Act does not explicitly confer
statutory authority for the court of appeals to impose
remedies or disciplinary action, short of removing the
Federal Defender.  See 18 U.S.C. § 3006A(g)(2)(A)
(providing the court of appeals in the relevant
circuit authority to appoint, set compensation for,
and remove a Federal Defender for "incompetency,
misconduct in office, or neglect of duty").  Even if
the court has authority, institutionally speaking, the
court is also unlikely to want to be perceived as
interfering with the independence of a federal
defender office.

Tr. Ex. 135 at ¶ 468.  In her comment, Strickland also stated

that the Judicial Conference should "undertake a comprehensive

review of its policies in this area and consider making

recommendations to Congress in order to strengthen the remedies

available to judicial employees."  Id. at ¶ 469.

On March 25, 2019, Moormann requested the adjustment of

Martin's pay "less than the standard 52 weeks", explaining that

he was correcting for no pay changes occurring as a result of

Martin's reclassification from an R&W to AFPD:

176

> Jared Martin was converted from an R&W to An AFPD in
> August of last year.  There was no pay change at the
> time of the reclassification.  (see Attached) Due
> [sic] to the reclassification the usual Grade and Step
> pay changes did not occur.  An employee review has now
> occurred and we wish to perform a pay adjustment from
> $134,379.00 to 147[,]816.90 to correct this.

Tr. Ex. 186 at US2705.  This request was approved by the DSO.

Id.  Moormann testified that he was correcting Martin's pay
because other attorneys with similar levels of experience were
making much more than Martin.  12/19/23 Moormann Tr. 19:6-20;
see also 12/13/23 Martinez Tr.117:10-15 (testifying that Martin
had significant experience, including eight years in a community
defender office).

Strickland is now working as a private appointed counsel
for the State of North Carolina representing indigent criminal
defendants on appeal.  12/11/23 Strickland Tr. 101:25-102:4.

## IV.  CONCLUSIONS OF FACT — DRAWING THE REASONABLE INFERENCES
### A.  Federal Public Defenders

Together with their counterparts, Assistant United States
Attorneys, Federal Public Defenders are the closest thing we
have to barristers here in the United States.  They are the
attorneys who best know their way around our federal district
courtrooms.  They know the foibles of every judge and magistrate
judge in the districts where they serve and are on close
professional terms with the courtroom deputy clerks and court
reporters.  The choreography of empaneling a jury, receiving a

177

verdict, pleading a client, and participating in a sentencing
hearing all must be second nature to them, together with the not
insignificant variations that inevitably occur from session to
session.  Genuine civility, born out of mutual professional
respect, must come naturally.  It is the key to success.  In
short, federal defenders breathe actual life into the Sixth
Amendment's right to counsel in a criminal case.  Upon their
advocacy skills rest the equally important guarantees of the
Fourth and Fifth Amendments as well.

This is hard, demanding, and challenging professional work,
always performed under the pressures of time as the client's
liberty, and perhaps his life, are at stake.  Ethical dilemmas
abound.  As is true for all public service attorneys, the pay is
meagre compared to Big Law.

Federal Defender Offices are small compared to the
counterpart Offices of the United States Attorney, as it is
expected that the private bar will undertake a significant
portion of the defense load.  Accordingly, the work of an FDO is
fast paced, with counsel expected quickly to assume major
responsibilities.  Criminal cases today become ever more
complex.  See e.g., U.S. Courts, Case Closure Rates Get Longer
as E-Discovery Increases (Mar. 21, 2024),
https://www.uscourts.gov/news/2024/03/21/case-closure-rates-get-
longer-e-discovery-increases.  Negotiation skills play a major

178

role since at least 90% of indicted federal defendants eventually plead guilty, see Am. Bar Ass'n, Plea Bargain Task Force Report 36 (2023), https://www.americanbar.org/content/dam/aba/publications/criminaljustice/plea-bargain-tf-report.pdf, and the institutional pressure to plead, id. at 15, 20, must be resisted wherever appropriate.[96]  The finest federal defenders are superb at this.

In such a high stress environment, teamwork, mutual professional support, empathy, and esprit are essential.  When such an office is working well, the shared sense of deep constitutional purpose serves to create a strong sense of group identity and very real and lasting professional bonds -- not to mention attorneys who exemplify everything that is fine about our profession.

Conversely, cliques and back biting are especially corrosive to unit identity in such offices.

---

[96] Tom Marten (Hon. Thomas H. Marten, D. Kan. 1996-2021), one of America's foremost teachers of trial advocacy, uses the song "The Gambler," written by his friend Don Schlitz, to teach plea negotiation in the shadow of a trial:

You've got to know when to hold 'em,
Know when to fold 'em,
Know when to walk away,
And know when to run.

See, e.g., William J. Stuntz, Plea Bargaining and Criminal Law's Disappearing Shadow, 117 Harv. L. Rev. 2548 (2004).

179

## B.    Caryn Devins Strickland

Strickland sought to become one of this elite group, a federal public defender.  The transition from the stately pace of prestigious clerkships[97] and Administrative Office staff work to the hurly-burly of a client-centered criminal defense trial shop must have been quite a shock.  Still, Strickland appeared to have been making her way, eager to gain experience.

That was then.

Today, as plaintiff in this civil rights case, Strickland seeks front pay for what she claims were violations of her rights under the EDR plan.  Yet almost as important as the monetary recovery, Strickland wants vindication -- an authoritative judicial determination that she has been the victim of sexual harassment by Davis.

Yet this Court is not warranted to -- nor need it -- make any such determination.  While the underlying facts are all set forth in detail above, making an ultimate determination is unwarranted because Davis, for reasons unknown to the Court, is not a party and denies such misconduct.  For this Court to adjudicate sexual harassment vel non as to a non-party would be inappropriate.  See Fed. R. Civ. P. Rule 19(a)(1).  Nor need this Court make any such determination, as developed more fully

---

[97] As Justice Breyer wrote recently, "[Appellate] judge[s] may take weeks or months to write an opinion."  Stephen Breyer, Reading the Constitution 21 (2024).

infra at Section V.B.  A good faith claim of sexual harassment ought be all that is necessary to invoke the equal protection and due process rights afforded to her under the EDR plan.  A good faith, albeit ultimately unsuccessful, claimant ought be entitled to just as rigorous a review and hearing as one who ultimately prevails.

This Court finds emphatically that Strickland's claim of sexual harassment was made in complete good faith and for no ulterior motive.  On June 21, 2018, when Strickland passed Davis in the foyer of their office building, got her bicycle, and cycled off into the storm, she truly was -- as she stated -- "creeped out."  Tr. Ex. 5 at US1247; 12/13/23 Martinez Tr. 135:13-25; Tr. Ex. 17.  She believed absolutely that Davis was virtually stalking and harassing her.  For her, everything fell into place: the after-hour drinks, the comments from her co-workers about his interest in her, his exercise of authority over her work priorities, the "pay for stay" email -- all of it.

To Strickland, it all fits and she proceeds on the basis that her view of Davis's conduct is self-evident.  So passionately is she convinced of the rightness of her cause that she has come to believe that anyone who questions her position is, ipso facto, discriminating against her and denying her due process.  That's not reality.  As that great trial lawyer

181

Abraham Lincoln was fond of saying in another context, "Calling a tail a leg doesn't make it a leg."[98]

## C.   J.P. Davis

Davis was the First Assistant Federal Defender and Strickland's mentor.  Tr. Ex. 164 at US4587; 12/11/23 Martinez Tr. 119:24-120:22; Tr. Ex. 189 at US6226; see also 12/18/23 Davis Tr. 87:25-88:1-6.  At first glance, Davis comes across as a congenial guy around the office, taking coworkers out to lunch or going out for drinks after work.  See, e.g., 12/18/23 Davis Tr. 46:6-24; 12/11/23 Strickland Tr. 57:11-15, 63:7-20; see also Martinez Dep. 95.  After digging deeper, however, this Court has concluded that Davis was a controlling manager who did anything he could to exaggerate his importance.  He did take actions that reasonably made Strickland uncomfortable.

To begin, Davis "says more than his prayers"[99] -- he talks too much.  The "Mas Dinero" email, for instance, stated that Davis "deal[t] in pay-for-stay."  Tr. Ex. 5 at US1260.  Davis may have had some influence as the First Assistant, but he had no control over Strickland's salary or promotions; for Davis to

--------

[98] In re Nexium (Esomeprazole) Antitrust Litig., 309 F.R.D. 107, 148 (D. Mass. 2015), as amended (Aug. 7, 2015), aff'd, 842 F.3d 34 (1st Cir. 2016) (quoting United States v. Bowen, 527 F.3d 1065, 1077 n.9 (10th Cir. 2008)).

[99] My wise mother-in-law was fond of this phrase.  It suits Davis perfectly.

182

assert otherwise exhibits a clear desire to puff up both himself
and his status within the office.  Similarly, messages Davis
exchanged with other colleagues regarding Strickland suggest
that he viewed his role as her mentor to include putting her in
her place and exerting his power over her.  See, e.g., Tr. Ex. 9
at US6866 (stating that Strickland was "acting like a spoiled
brat"); Tr. Ex. 38 at US6386-88 ("If she had reached out to me
and done a bunch of mea culpas and begged, I probably would have
let her out of [attending the client PSI]"); see id. ("She needs
to get slapped.").

    Davis's actions as Strickland's manager and mentor also
demonstrate his inappropriate need to control her.  For example,
when Strickland met with Davis to "smooth things over" after
Strickland indicated that she could not attend a client meeting
with him, Tr. Ex. 5 at US1270, Tr. Ex. 156 at 00691, he became
so angry that "his voice was shaking."  Tr. Ex. 156 at 00691.
His further email on the subject to Strickland, Martinez, and
other coworkers exhibited further anger and was a
disproportionate response to her failure to join the meeting, as
were his later statements on the subject to Carpenter, the
Appellate Chief.  See Tr. Ex. 5 at US1275 ("If you choose to
disobey a direct order, that is an action that I as a supervisor
cannot ignore."); Tr. Ex. 16 at US2794-97 (describing
Strickland's behavior as "fireable" and referring to her "overt

183

insubordination"). Davis's decision to take notes on his interactions with Strickland, and the increasingly irrational tone of those notes, further suggests he was focused on her and his ability to control her. See, e.g., Tr. Ex. 8 at US5890-91 ("[S]he felt she could air it with me because she thought I was sufficiently wrapped around her little finger that I wouldn't resist."). He also tried to sabotage her relationship with her new mentor, Johnson. Tr. Ex. 10 at US6088 (telling Johnson that Strickland has "made some egregious errors in attitude and judgment").

Finally, Davis did specific, concrete acts that reasonably made Strickland uncomfortable. It appeared to Strickland that Davis "[knew][] exactly when [she was] leaving" and made it "seem[] like it [was] a coincidence when he walk[ed] around the corner at the same time." Tr. Ex. 5 at US1278. These actions, among others, allow the Court to conclude that Davis was, in some way, preoccupied with Strickland. See, e.g., Tr. Ex. 9 at US5777-78 ("No, you're right. I'm legit done. Just depressed at all the time and emotional energy I've spent trying to lift her up. But she isn't the person I was trying to lift. Jesus, that read like a break-up text."). His actions understandably made her uncomfortable, and it does not appear he was a manager one would want to work under. See 12/14/23 Carpenter Tr. 63:9-

184

23 (testifying that other FDO employees complained about Davis's micromanaging).

### D. Anthony Martinez

Martinez was the Federal Defender for the Western District of North Carolina and started this role around the same time Strickland joined the FDO.  12/13/23 Martinez Tr. 114:1-21, 120:2-6.

In the beginning, Martinez thought highly of Strickland's work: he described her work as "excellent," remarked that she was "talented" and "energetic," and observed that she did a "bang up" job on the Dixon case.  Martinez Dep. 100:5-22. Martinez also observed that Strickland showed an eagerness to learn from him.  Id. at 107:9-25.  He consistently praised her work performance.  12/13/23 Martinez Tr. 134:9-18; see also Tr. Ex. 17; Tr. Ex. 135 at ¶ 144.

Martinez's view of Strickland soured shortly after he removed her from the Dixon case.  Soon after Martinez removed Strickland from Dixon, a difficult and time-consuming case that she had expressed much interest in, 12/13/23 Martinez Tr. 130:2-16, Martinez assigned Strickland five relatively easy cases following the departure of an FDO attorney.  12/18/23 Davis Tr. 73:21-74:5; 12/13/23 Martinez Tr. 128:24-129:25.  Strickland pushed back on these assignments, citing workload concerns and a lack of preparedness or training in handling these types of

185

cases.  Tr. Ex. 165 at US6626.  Upon receiving this pushback and considering Strickland's eagerness to work on the Dixon case, Martinez began to doubt whether Strickland was a "team player." 12/13/23 Martinez Tr. 130:2-131:2.  He believed she was picking and choosing what cases she wanted to work on.  Id.

Once Strickland raised her concerns about Davis to Martinez, Martinez's perception of Strickland soured even more. From Martinez's perspective, Strickland's demeanor, and the relationship between them, changed: he felt like she was making demands and using her contacts at the AO to intimidate him into giving her what she wanted.  Martinez Dep. 190:1-191:8; 12/14/23 Martinez Tr. 79:11-80:25; Tr. Ex. 135 at ¶ 193; Tr. Ex. 188 at US2558.  With Davis's narrative in his ear, Tr. Ex. 40 at US2844-49, Martinez erroneously believed that Strickland was "exploiting this situation to get the transfer to Asheville." Tr. Ex. 163 at US1382; see supra Section IV.B.  As observed by Beam, Martinez was "biased" against Strickland.  Tr. Ex. 163 at US1382.

Put plainly, Martinez didn't like Strickland -- nor did he believe her claim of sexual harassment against Davis. Martinez's dislike of Strickland, however, had nothing to do with her gender.  While Martinez certainly did not believe that Strickland was experiencing sexual harassment, and Martinez did make mistakes in his early handling of Strickland's concerns

186

against Davis, Martinez did take several measures to make
Strickland more comfortable working at the FDO and appeared
sincere in his effort to address Strickland's concerns.
Martinez Dep. 117, 216, 273-276; Tr. Ex. 7 at US4266 (detailing
Martinez's missteps).

      **E.    Heather Beam**

      Beam, an HR Specialist in the Western District of North
Carolina, was appointed to investigate Strickland's claims.  Tr.
Ex. 137 at 8; Tr. Ex. 18 at US0617-18; Beam Dep. 155:16-157:13;
12/13/23 Ishida Tr. 23:20-24:18; Martinez Dep. 179:1-14.  While
Beam's investigation had its flaws, the Court finds that Beam
conducted the investigation in good faith.

      Ishida selected Beam upon a recommendation from the Clerk
of the Court in Charlotte.  12/13/23 Ishida Tr. 23:20-24:18;
Martinez Dep. 179:1-14; Tr. Ex. 18 at US0617-18.  Martinez
appointed Beam on August 14.  Tr. Ex. 137 at 8.  This was Beam's
first investigation, and she did not receive any training or
guidance on how to conduct a workplace investigation prior to
investigating Strickland's claims.  Beam Dep. 12:17-19, 42:4-19.

      This investigation took far too long.  Although Martinez
appointed Beam in mid-August, Beam did not interview Strickland,
Davis, and Martinez until October.  Tr. Ex. 137 at 8; Tr. Ex.
200; Tr. Ex. 5 at US1246.  After Beam finished her initial
report in late November, Ishida asked Beam to amend the report

187

to add "findings and recommendations."[100]  Tr. Ex. 202 at 3:18-
19.  Beam finished the amended report on January 11.  Tr. Ex. 5
at US2293.  Beam did not seem to be deliberately taking her time
with the report -- several people were pressuring her to get it
done promptly.  Tr. Ex. 201 at 22:1-5 (Strickland asking for an
update in November); Tr. Ex. 191 at US1354 (Davis asking Beam
whether she can complete the report before the office's fall
retreat).  Beam was faced with the pressures of getting the
report done quickly and getting it done right.  Although the EDR
Plan allows an HR professional to be appointed to investigate
EDR claims, Tr. Ex. 136 at US4545, Beam was not properly trained
to do so.

There were other issues with this investigation: Beam
expressly allowed Davis to speak with Martinez about
Strickland's EDR claims, which increased the risk of them
corroborating their interviews and later testimony.  Tr. Ex. 190
at US1359.  Beam did not interview any of Strickland's
witnesses, only opting to collect facts from the people directly
"involved."  Tr. Ex. 135 at ¶ 317; see also Beam Dep. 114:8-15.
There is some suspicion that Beam shared the initial results of
her report with Davis prematurely, as speculated by Ishida,

_____

[100] Beam felt uncomfortable doing this because she did not
have any legal training.  Tr. Ex. 201 at 27:19-28:9.

188

although there is no other confirmation of this in the record aside from Ishida's speculation.  See Ishida Dep. 185.

Beam was also a little too friendly with Davis during the investigation.  Tr. Ex. 191 at US1343("Hey JP! Haha! Ya know, with every email you send me it takes me away from working on this report :)").  She also emailed her colleague, after the investigation, about how much of a "pain" Strickland was.  Tr. Ex. 195 at US4025-26 (describing Strickland as a "true pain in the you know what :)").  These communications were unprofessional considering the context of Beam's role.  Still, there is no indication that Beam conducted the investigation in bad faith, and the investigation was adequate enough -- investigations do not need to be perfect.

**F.  Ed Smith**

After Strickland agreed to mediation in January 2019, Smith, the Chief Circuit Mediator, was designated as the mediator for this case.  Tr. Ex. 14 at US0519, US0521.  Smith, an experienced mediator, worked hard to gain the trust and confidences of Strickland, her husband (who, as a lawyer, acted as her representative), and separately, of Martinez.  Smith, with knowledge of the Fourth Circuit and the remedies available to Strickland under the EDR Plan, used his empathetic understanding of the difficult situation Strickland was in to find an innovative, tailored solution.  He spent hours with

189

Strickland listening to her grievances and searching for a
resolution that would provide her with some relief.  He was also
candid about the limitations inherent in the EDR Plan.  This
Court applauds his work; Smith was everything a mediator should
be.

Smith was, however, an employee of the Fourth Circuit.
Rightly or wrongly, Smith's position within the hierarchy of the
judiciary made him, in Strickland's eyes, at least a tangential
member of the opposing team.  Under the EDR Plan, "[t]he EDR
Coordinator has discretion to nominate a Circuit Mediator,
another employee of the Court, or someone from outside the Court
as mediator."  Tr. Ex. 136 at US4550.  In this instance, Ishida,
as the EDR Coordinator, likely felt that Smith's experience and
expertise within the Circuit was necessary to successfully
mediate Strickland's complaint.  The Court, however, suggests
that an independent mediator, whose neutral position could never
be questioned, may have been a prudent choice.

### G.   James Ishida

Ishida was the Circuit Executive for the Fourth Circuit and
served as the EDR Coordinator for Strickland's claims.
12/13/2023 Ishida Tr. 20:8-21.  In this role, Ishida facilitated
the EDR process and was the point person for anyone interested
in bringing an EDR claim.  Id. at 21:1-9.  Ishida also acted as
a middleman between Chief Judge Gregory and the parties to

190

Strickland's EDR claim, keeping Chief Judge Gregory apprised on the status of Strickland's claims and the investigation thereof. Tr. Ex. 188 (informing Chief Judge Gregory of Strickland's initial allegations and the alleged interference by the FEOO); Tr. Ex. 15 at 1533-35 (informing Strickland that Chief Judge Gregory intended on denying her disqualification request); Tr. Ex. 27 at US1958-60 (stating that Chief Judge Gregory directed Ishida to help Strickland transition out of the Charlotte division of the FDO); 12/13/23 Ishida Tr. 46:22-25 (stating that he drafted the Letter of Counseling at the direction of Chief Judge Gregory).

Ishida secured Beam as an investigator for Strickland's claims, guided Martinez through the EDR process, fielded persistent and inappropriate emails from Davis requesting updates on the case, and spent countless hours speaking to Strickland about her claims.[101]  When asked how many times he spoke with Strickland about her EDR claims in person or over the phone, Ishida testified that their exchanges were "too numerous

---

[101] Tr. Ex. 18 at US0617-18 (securing Beam as an investigator); Tr. Ex. 13 at US3020-04 (refusing to engage in discussions with Davis about the merits of Strickland's claims to not "open [himself] and the process up to accusations of prejudging the case" so he could "safeguard the process"); Ishida Dep. 186:12-18, 200-01 (recalling that he told Martinez that he thought Davis's behavior was inappropriate and that he was "worried that the investigation be conducted with integrity"); 12/13/23 Ishida Tr. 34:20-35:3 (discussing his frequent communications with Strickland).

191

to count." 12/13/23 Ishida Tr. 34:20-24. Ishida similarly testified that he exchanged a "voluminous" number of emails with Strickland -- again, "too many to count." Id. at 34:20-30.

At the end of Beam's initial investigation report, Ishida, perhaps at the direction of Chief Judge Gregory, sent the report back, asking Beam to make "findings and recommendations" after she finished compiling the facts of Strickland's claim. Tr. Ex. 202 at 3:18-19. Beam herself did not feel comfortable making legal conclusions, considering she was not an attorney. Tr. Ex. 201 at 27:19-28:9.

Although this Court finds that Beam's role ought have been limited to fact collecting, it observes that Ishida showed effort and patience in resolving Strickland's claims and appeared genuinely to care about safeguarding the integrity of the EDR process.

## H. Chief Judge Gregory

Chief Judge Gregory, as the then-Chief Judge of the Fourth Circuit, was responsible for administering the EDR Plan and monitoring the status of EDR claims.[102]

---

[102] See Tr. Ex. 136 at US4545 (stating that the EDR Coordinator must notify the Chief Judge of wrongful conduct reports and that the Chief Judge is in part responsible for ensuring that the allegations are appropriately investigated); id. at US4547 (allowing the Chief Judge or presiding judicial officer to extend Chapter X deadlines for good cause); id. at US4548 (explaining that the Chief Judge is responsible for ruling on disqualification requests); id. at US4550 (calling for

192

The parties had little or no interaction with Chief Judge Gregory directly -- Ishida acted as the middleman. See supra Section IV.G.

This Court observes that it would have been better for a presiding judicial officer to be appointed earlier on -- as the Chief Judge, Chief Judge Gregory's attention was likely spread thin with multiple matters and the process would have benefitted from having a judge involved more actively, more directly, and earlier on in the EDR process. See infra Section VI.

V.   **RULINGS OF LAW**

   A.   **The Mandate Rule.**

A subtle issue requires explanation since -- potentially -- it could make a material difference. In Strickland, the Fourth Circuit, recognizing that judicial employees were not covered by the major civil rights statutes, courageously went on to recognize equal rights and due process constitutional protections stemming from such employees' property rights in their court's employee dispute resolution plan. Strickland, 32 F.4th at 321, 377. It gave substance to these protections by citing Fourth Circuit precedent interpreting the civil statutes implementing them, while recognizing that such statutes

---

the EDR Coordinator to keep the Chief Judge apprised of requests for mediation); id. at US4551 (stating that a Chapter X complaint must be transmitted to the Chief Judge).

themselves do not provide Strickland, a federal employee, with any protections or rights.  Id. at 354, 359.

Are these references part of the holding in Strickland or mere dicta explaining that holding?

Were I again to handle the case of a judicial employee within the Fourth Circuit who alleged a right to recover under Strickland, I could reason that it provides relief beyond the jurisprudence of those implementing statutes (i.e., the citations to such case law are dicta) and use my opinion to correct lacunae in the implementing civil rights statutes.  See generally Nancy Gertner (Hon. Nancy Gertner, D. Mass 1994 – 2011), Losers' Rules, 122 Yale L.J. F. 109 (2012).

A single illustration will suffice.  In the Fourth Circuit, one who complains of deliberate indifference in the investigation of a sexual harassment claim must first prove the sexual harassment.  Strickland, 32 F.4th at 359 (citing Feminist Majority Found. v. Hurley, 911 F.3d 674, 686 (4th Cir. 2018) (applying Title IX principles)).  This is illogical.  Certainly, if we are serious about sexual harassment in the workplace, a good faith claim of such harassment merits a rigorous investigation, whatever the underlying merits.  Moreover, this requirement naturally aligns the employer with the alleged harasser.  Defeating the underlying claim concludes any inquiry into the alleged indifference.

194

It is important to note that this Court is not free to advance any such argument, and I do not.  After the appeal and the Fourth Circuit's decision in Strickland, this Court's duty is simply to conduct the "further proceedings" ordered pursuant to the Circuit's mandate, neither more nor less.  But see the respectful suggestions offered in Section VI, infra.  Accordingly, this Court has been careful to confine itself to the issues left for determination under that mandate and, where it has cited as persuasive circuit and district court decisions other than those of the Fourth Circuit itself, this Court has satisfied itself that those decisions accord with Fourth Circuit jurisprudence.  That's what a circuit mandate requires.

**B.  Strickland's Equal Protection Rights.**

Strickland claims that Martinez violated her equal protection rights under two theories.  First, that Martinez was deliberately indifferent to Strickland's complaints of sexual harassment.  Second, that Strickland was subjected to continued sex discrimination and retaliation by Martinez after reporting her sexual harassment (i.e., she suffered from a "mixture" of retaliation and continued sexual harassment).[103]  After a

---

[103] The Court does not conduct a separate analysis for Strickland's second theory of mixed retaliation, as Strickland's allegations with respect to Martinez's retaliation and ratification of Davis's sexual harassment are thoroughly analyzed in this Court's deliberate indifference analysis infra.

195

thorough review of the evidentiary record and hearing witness
testimony at trial, this Court rules that Martinez did not
violate Strickland's equal protection rights.

The Fifth Amendment provides that "[n]o person shall . . .
be deprived of life, liberty, or property, without due process
of law." U.S. Const. Amend. V. The Supreme Court has held that
"the Due Process Clause of the Fifth Amendment forbids the
Federal Government to deny equal protection of the laws." <u>Davis</u>
v. <u>Passman</u>, 442 U.S. 228, 234 (1979). "To withstand scrutiny
under the equal protection component of the Fifth Amendment's
Due Process Clause, classifications by gender must serve
important governmental objectives and must be substantially
related to achievement of those objectives." <u>Id.</u> at 234-35
(internal quotation marks omitted). "The equal protection
component of the Due Process Clause thus confers . . . a federal
right to be free from gender discrimination which cannot meet
these requirements." <u>Id.</u> at 235.

The Fourth Circuit in <u>Strickland</u> held that "federal
judiciary employees who occupy supervisory roles and/or who are
charged with enforcing an EDR plan can . . . be held liable
under the Fifth Amendment for their deliberate indifference to
sexual harassment committed by a federal judiciary employee or

_____

To be clear, this Court holds that Strickland failed to prove an
equal protection violation under either theory of liability.

supervisor against another federal judiciary employee."

Strickland, 32 F.4th at 359.[104]  According to the Fourth

Circuit's decision in Strickland, id., the elements of a claim

of deliberate indifference to sexual harassment are derived from

Feminist Majority Found. v. Hurley, 911 F.3d 674, 703 (4th Cir.

2018).  Thus, to succeed on her Fifth Amendment equal protection

claim for deliberate indifference, Strickland must prove the

following elements:

> (1) the plaintiff was subjected to sexual harassment
> by another employee or supervisor; (2) the plaintiff
> alerted supervisory officials and/or officials
> responsible for overseeing the court's EDR plan about
> the sexual harassment; (3) the supervisory officials
> and/or officials responsible for overseeing the
> court's EDR plan responded to the allegations with
> deliberate indifference; and (4) the deliberate
> indifference was motivated by a discriminatory intent.

Strickland, 32 F.4th at 359.

This Court rules that Strickland has failed to prove her

equal protection claim, as there is insufficient evidence that

Martinez responded with deliberate indifference, that Martinez

retaliated against Strickland, and that Martinez was motivated

by discriminatory intent.  Accordingly, the Court does not, and

needs not, reach the first element of her deliberate

---

[104] The Equal Protection Clause "both guards against sexual
harassment perpetrated by other federal judiciary employees and
protects federal judiciary employees from deliberate
indifference on the part of federal judicial employees charged
with preventing sexual harassment and investigating complaints
of sexual harassment."  Strickland, 32 F.4th at 359.

197

indifference claim: whether Strickland was subjected to sexual harassment.

With respect to this first element of the test adopted by the Fourth Circuit, the Court does note that whether Strickland was actually sexually harassed ought not matter. The law ought do better to protect good faith claims of sexual harassment and ensure that supervisory officials are not deliberately indifferent to those claims, regardless whether, from a legal standpoint, the claimant actually suffered sexual harassment. Although the Court does not reach whether Strickland was sexually harassed, it does conclude that Strickland had a good-faith claim of sexual harassment -- she sincerely believed that Davis was sexually harassing her and Davis's behavior genuinely made Strickland uncomfortable, see supra Section IV.B.

The Court now addresses the elements of its analysis.

### 1. Strickland Reports Her Claim of Sexual Harassment to Martinez.

The parties dispute when Strickland first claimed harassment. This is material to the Court's analysis of whether Martinez acted deliberately indifferent in his response to Strickland's complaint. See Madray v. Publix Supermarkets, Inc., 208 F.3d 1290, 1299 (11th Cir. 2000) (stating that a court must "determine when [the employer] had notice of [the alleged harasser's] behavior in order to evaluate the alacrity of its

198

response").  Strickland states that Martinez "was on notice of potential 'harassment' by [Davis] by July 2, 2018."  Pl.'s PFOFCOL 428.  She also states that she reported her allegations to "various judiciary employees, some of whom alerted [Martinez] to the harassment."  Id.  The Judicial Administrators argue that Strickland reported her claim of sexual harassment on August 10, 2018.  Defs.' PFOFCOL 38, 45.  This Court finds that Strickland reported her harassment claim to Martinez on August 9, 2018.

### a.  Applicable Case Law

Vague complaints are not enough to put an employer on notice of sexual harassment -- a plaintiff must give sufficient details and specifics about the alleged conduct.[105]  Cramer v. Bojangles' Rest., Inc., No. 2:10-CV-0159-RWS-SSC, 2012 WL 716176, at *12 (N.D. Ga. Feb. 8, 2012), report and recommendation adopted, No. 2:10-CV-0159-RWS, 2012 WL 716028 (N.D. Ga. Mar. 6, 2012), aff'd, 498 F. App'x 885 (11th Cir. 2012) (collecting cases showing examples of "vague" complaints); see also Madray, 208 F.3d at 1300 (stating that a plaintiff must "disclose[] the extent or precise nature of" the alleged

---

[105] For example, the Fourth Circuit has held that a plaintiff provided actual notice when she reported that the alleged perpetrator rubbed her legs, moved her hands close to his genitals, pulled down his pants, and the plaintiff tried to move her hand away and block him, and the alleged perpetrator put his hands under the plaintiff's shirt and down her pants. Doe v. Fairfax Cnty. Sch. Bd., 1 F.4th 257, 269 (4th Cir. 2021).

199

harasser's conduct towards the plaintiff to give sufficient notice of sexual harassment).

For example, in Cramer, the court stated that the plaintiff's complaint that the alleged harasser made "nasty" comments to her was insufficient to put the employer on notice of her report because the plaintiff failed to give enough details about the alleged misconduct. Cramer, 2012 WL716176, at *12. Calling the comments "nasty" does not indicate that these remarks were "comments of a sexual nature." See id. In Nurse "BE", the plaintiff told her employer that the alleged harasser called the plaintiff on five occasions, all late at night, and asking the plaintiff if she wanted to meet him for dinner or drinks. Nurse "BE" v. Columbia Palms W. Hosp., 490 F.3d 1302, 1309-11 (11th Cir. 2007). The court held that this was not a report of sexual harassment because "[t]here is no indication that [the plaintiff] suggested that any sexually explicit remarks or even sexual innuendos were made during these phone calls" -- only that the alleged harasser called five times to ask the plaintiff out on dates. Id. at 1309-10.

An employer's notice of allegations suggesting "possible" sexual harassment is not enough to constitute notice. In DeCecco, the plaintiff, a professional soccer player, alleged that she was sexually harassed by her coaches. DeCecco v. University of S.C., 918 F. Supp. 2d 471, 477 (D.S.C. 2013).

During a meeting with a supervisor, the plaintiff's father
stated that the plaintiff was experiencing a "toxic
environment[,]" "neglect" by one of her coaches, "too much
domination" by another coach, and indicated that a male coach
had a "closed, locked door meeting with [plaintiff,] a female
athlete[.]"  Id. at 486-87.  The court explained how the
plaintiff's father made "vague comments suggest[ing] possible
sexual discrimination or harassment (or at least circumstances
presenting a heightened possibility of improper actions)" and
did not lodge a formal complaint despite being invited to do so
during the meeting.  Id. at 493.  Considering these comments and
the failure to lodge a formal complaint, the court held that the
plaintiff did not provide sufficient notice of her claim.  Id.
Thus, general claims, failing to detail the precise nature of
the plaintiff's claim, will not suffice to put an employer on
notice of sexual harassment.

    If a plaintiff indicates that she "did not want [the
harassing behavior] reported or acted upon, then [the employer]
would not have been placed on proper notice of the harassment .
. . ."  Nurse "BE", 490 F.3d at 1310 (quoting Olson v. Lowe's
Home Ctrs., Inc., 130 Fed. Appx. 380, 391 n.21 (11th Cir.
2005)); see also Madray, 208 F.3d at 1293, 1300 (determining
that the plaintiff did not put the employer on sufficient notice

of the harassment, in part, because the plaintiff did not
request the employer to take any action).

### b.    Analysis

This Court holds that Strickland did not report her sexual
harassment claims to Martinez on July 2, 2018.  The information
that Strickland communicated to Martinez was too vague to
constitute notice, as she did not detail "the extent or precise
nature" of Davis's improper conduct.  Madray, 208 F.3d at 1293,
1300.  Strickland told Martinez she was going to be setting
boundaries with Davis because he "berated" her and spoke to her
inappropriately, that she felt uncomfortable, and that she was
leaving the office early.  See Cramer, 2012 WL 716176, at *12
(vague complaint of "nasty" comments is insufficient to
constitute notice).  Strickland was purposely being vague, or
"cryptic" as stated by Martinez, because she did not want to
trigger any formal reporting.[106]  See Wilson v. Gaston Cnty., NC,
685 F. App'x 193, 199 (4th Cir. 2017) (determining there was
insufficient notice when the plaintiff "generally refused to
report what was happening"); Martinez Dep. 149:3-12; Tr. Ex. 143

---

[106] The Court acknowledges that Strickland was just doing
what she was advised to do by Dunham and Minor at the AO:
attempting to resolve this situation informally with Martinez.
Dunham Dep. 97:24-99:5, 187:18-20; 12/11/23 Strickland Tr. 71:1-
9 (stating that Minor told her to try to resolve this
"informally and at the lowest level possible" and to not make a
formal report).

202

at 00744.  When Martinez asked whether this was sexual harassment, Strickland told Martinez that "we are [not] there yet."  Tr. Ex. 135 at ¶ 125; Tr. Ex. 143 at 00744.

It was reasonable for Martinez to interpret this as Strickland not alleging sexual harassment, particularly considering the vagueness of her allegations and her suggestion that she did not want to "trigger" anything by speaking to Martinez.  It is true that Martinez had suspicions about whether Strickland was alleging sexual harassment after this meeting (which prompted him to schedule the July 5 meeting), Martinez Dep. 112:18-23, 149:3-12; however, a plaintiff indicating a "possible" claim of harassment is not enough to be considered a report, especially when it is not (yet) followed up by a formal complaint.  See DeCecco, 918 F. Supp. 2d at 477.  Lastly, Strickland specifically told Martinez not to do anything with her concerns, which further supports the Judicial Administrators' arguments that Strickland's communications did not constitute proper notice.  See Nurse "BE", 490 F.3d at 1309-11; Madray, 208 F.3d at 1293, 1300.  Given the nature of Strickland's allegations at this time, this Court agrees with the Judicial Administrators that it was reasonable for Martinez to believe that the conflict between Davis and Strickland was a "breakdown in communication".  12/13/23 Martinez Tr. 132:18-24.

Thus, Strickland failed to provide sufficient notice of her claim on July 2, 2018.

This Court also holds that Strickland did not report her sexual harassment claims to Martinez on July 5, 2018. Much of the July 5 meeting focused on Davis's questioning of Strickland's performance (if any), Strickland not keeping a work commitment to Davis, and Davis berating Strickland. Id. at 134:9-18; Tr. Ex. 135 at ¶¶ 137-38. During the July 5 meeting itself, Strickland did tell Martinez her account of the bike-lobby incident: that this incident made her uncomfortable and creeped her out, that Davis had asked her to meet outside of working hours, and that there was no physical contact between Davis and Strickland. Tr. Ex. 135 at ¶ 143; 12/13/23 Martinez Tr. 134:19-135:25; Tr. Ex. 17. Again, these allegations are too vague to constitute a report of sexual harassment. See Cramer, 2012 WL716176, at *12; Johnson v. Becerra, No. 19-CV-1859, 2022 WL 2528430, at *11 (D. Md. July 7, 2022) (finding no actual notice after the alleged harasser attempted the kiss the plaintiff, described by the court as a "failed romantic overture," when plaintiff "was uninterested in pursuing a complaint"). Based on what Strickland recounted to Martinez on July 5, there was insufficient indication that Davis made any sexual innuendos, sexually explicit remarks, or made any

204

physical sexual advances towards Strickland during the bike-lobby incident.  See Nurse "BE", 490 F.3d at 1309-11.

Strickland also did not submit to Martinez any specifics (or documentation) of the other communications received from Davis that she now uses in support of her sexual harassment claim: the Mas Dinero email and the June emails asking Strickland for dinner or drinks.  Tr. Ex. 17; see Wilson, 685 F. App'x at 199 (determining there was insufficient notice when the plaintiff "generally refused to report what was happening," failed to mention specific illicit text messages supporting her claim, and did not tell the employer that the alleged perpetrator groped her); see also 12/13/23 Martinez Tr. 134:19-135:9.  Strickland here explicitly told Martinez to not take any action and that she did not want to make a formal complaint. 12/13/23 Martinez Tr. 135:13-25; Tr. Ex. 17; see Nurse "BE", 490 F.3d at 1310 (holding that it was improper notice if the plaintiff did not want behavior reported or acted upon); DeCecco, 918 F. Supp. 2d at 477 (holding that it was insufficient notice when the plaintiff did not follow up with formal complaint after being invited to do so, even if the plaintiff's allegations indicated potential harassment).  Once Davis, Strickland, and Martinez all agreed that Strickland would be getting a new mentor, Martinez believed, and reasonably so, that Strickland was comfortable and that the situation was

205

resolved.  12/13/23 Martinez Tr. 137:16-138:3; Tr. Ex. 17.  In
fact, Strickland's follow up email from the meeting centered on
whether her performance was at issue, indicated that this was an
issue of mentoring, and did not raise any allegations of sexual
harassment.  Tr. Ex. 167 at US3980.  This Court thus determines
that Strickland did not report sexual harassment on July 5,
2018.

    Strickland's report in late July 2018 to Dunham also does
not count as a "report" of sexual harassment for the purposes of
Strickland's deliberate indifference claim.  Dunham did not work
at the FDO, she had no supervisory authority over Strickland,
and there is no indication that she was responsible for
overseeing the EDR Plan.  Dunham Dep. 67:9-14; Strickland, 32
F.4th at 359 (stating that to meet the second element of the
deliberate indifference claim, Strickland must have "alerted
supervisory officials and/or officials responsible for
overseeing the court's EDR plan about the sexual harassment");
see also DeCecco, 918 F. Supp. 2d at 492 (holding that the
plaintiff did not provide sufficient notice when she reported
the alleged misconduct to a coach without supervisory
authority).  Nor did Clarke's call to Martinez on August 8
constitute notice of Strickland's sexual harassment claim, as
the conversation between Martinez and Clarke was very brief,
Clarke only indicated that Strickland was unhappy without saying

why, and Clarke did not specifically state that Strickland was alleging sexual harassment. 12/14/23 Martinez Tr. 79:11-80:25; Tr. Ex. 135 at ¶ 188.

This Court determines that Strickland reported the sexual harassment to Martinez during their meeting on August 9, 2018. At this meeting, Strickland explained to Martinez how she was, in previous meetings with him, toeing the line with her words so as not to trigger a formal response. Tr. Ex. 150 at 10:12-12:11. During this meeting, Strickland also directly told Martinez that she did not say that she was not being harassed earlier, and argued that the fact that he asked her whether this was sexual harassment meant that he was "on notice that [he] understood the significance" of what Strickland was telling him. Id. With this record in mind, this Court determines that Strickland reported her claim of sexual harassment to Martinez on August 9, 2018.[107]

### 2. Martinez Did Not Respond to Strickland's Complaint with Deliberate Indifference.

_____

[107] The Court notes that Strickland testified that she sent the August 10 email to Martinez informing him of her sexual harassment in writing, Tr. Ex. 171 at US4262, because Dunham advised her to "tell [Martinez] what [she] was asking for and why[,]" which may suggest a reporting date of August 10, 2018. 12/11/23 Strickland Tr. 74:21-75:5. The Court will not linger on whether the reporting date is August 9 or August 10; it does not make any difference to the Court's analysis.

Strickland argues that, after making her allegations, Martinez "failed 'to take immediate and effective action' and failed to provide 'meaningful review or remedies.'" Pl.'s PFOFCOL 430 (quoting Strickland, 32 F.4th at 360). Strickland further argues that the Letter of Counseling serves as a "roadmap" for her deliberate indifference claim. Id.

### a. Applicable Law

A defendant acts with deliberate indifference when he responds to the sexual harassment "in a manner clearly unreasonable in light of known circumstances." Strickland, 32 F.4th at 311, 359; Feminist Majority Found., 911 F.3d at 703 (holding that plaintiff sufficiently stated that the defendant responded with deliberate indifference when defendant "had the authority to address and curtail the harassment but failed to do so over a period of months"). "A clearly unreasonable response causes [victims] to undergo harassment or makes them more vulnerable to it." Hill v. Cundiff, 797 F.3d 948, 973 (11th Cir. 2015).

Deliberate indifference is "a very high standard – a showing of mere negligence will not meet it." Baynard v. Malone, 268 F.3d 228, 236 (4th Cir. 2001) (quoting Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999), abrogated on other grounds; Hill, 797 F.3d at 975 ("The deliberate indifference standard is rigorous and hard to meet."); S.B. ex rel. A.L. v.

208

<u>Bd. of Educ. of Harford Cnty.</u>, 819 F.3d 69, 76-77 (4th Cir. 2016) ("<u>Davis</u> sets the bar high for deliberate indifference."); <u>Koon</u> v. <u>North Carolina</u>, 50 F.4th 398 (4th Cir. 2022) ("It is not enough simply to point to what could or should have been done. That is the language of negligence. Deliberate indifference requires a 'deliberate or conscious choice' to ignore something.") (citing <u>City of Canton</u> v. <u>Harris</u>, 489 U.S. 378, 389 (1989)).

"Actions that [are] in hindsight . . . 'unfortunate' or even 'imprudent' will not suffice." <u>Baynard</u>, 268 F.3d at 236; <u>see also</u> <u>Grayson</u>, 195 F.3d at 695 ("[T]he Constitution is designed to deal with deprivations of rights, **not errors in judgment,** even though such errors may have unfortunate consequences.") (emphasis added). The fact that a plaintiff requested stronger remedial measures that were available for a defendant to take does not itself render the defendant's actions "clearly unreasonable." <u>S.B. ex rel. A.L</u>, 819 F.3d at 77.

> **b.  Martinez Took Several Steps to Prevent Any Further Contact Between Strickland and Davis, Acted Consistently with the EDR Plan, and Promptly Initiated the Investigation.**

The Court determines that Martinez's response to Strickland's claims was not clearly unreasonable. Martinez's actions do not evince a deliberate indifference to Strickland's claims. Courts have observed no deliberate indifference when

209

the defendants promptly investigated the plaintiff's claims and separated the harasser from the plaintiff.  See, e.g., Stiles ex rel. D.S. v. Grainger Cnty., Tenn., 819 F.3d 834, 849 (6th Cir. 2016) (holding there was no "triable issue as to whether Defendants exhibited deliberate indifference" when the school "investigated promptly[,]" "disciplined students found guilty of wrongdoing[,]" and separated the alleged harasser from the purported victim); Greene v. Friendship Pub. Charter Sch., Inc., 2019 WL 918307, at *9-12 (D.D.C. Feb. 25, 2019) (similar).

Indeed, suspecting Strickland was claiming sexual harassment, Martinez took several steps to separate Davis and Strickland after Strickland told Martinez that Davis was making her feel uncomfortable but before she reported the sexual harassment.  Soon after the July 5 meeting, Martinez removed Davis as Strickland's mentor.  12/13/23 Martinez Tr. 137:1-15. See generally Tr. Ex. 10.  On July 24, 2018, Martinez instructed Davis to not contact Strickland until further notice.  Tr. Ex. 170 at US6636; 12/13/23 Martinez Tr. 147:9-11.  On July 26, 2018, Martinez temporarily made Martin the "gatekeeper" for research and writing assignments to ensure that Strickland would not be assigned any work from Davis.  Tr. Ex. 18 at US0615-18; Tr. Ex. 135 at ¶ 165; Tr. Ex. 168 at US2786.  After Strickland reported the harassment on August 9, 2018, Martinez took Strickland out of Davis's chain of command and placed her under

210

the supervision of Carpenter, who then would report directly to Martinez.  Tr. Ex. 172 at US4261; 12/14/23 Martinez Tr. 108:9-12.  Martinez also granted Strickland's request to telework during the pendency of the investigation, which established a physical separation between Strickland and Davis while her allegations were investigated.  Tr. Ex. 159 at US2547.  These actions were effective in ensuring that Strickland and Davis had no further meaningful contact.  12/18/23 Davis Tr. 82:12-83:9.  But see infra Section V.B.2.c (discussing the August 31 email).  After Strickland began teleworking in August 2018, she did not see Davis again.  See 12/11/23 Strickland Tr. 87:12-88:3.  While both participated in two appellate moots in fall of 2018, these moots had other participants and Strickland participated by phone.[108]  12/18/23 Davis Tr. 82:12-83:6.

Although the investigation took far too long and had its flaws, infra Section V.B.4, Martinez acted consistently with the EDR Plan by promptly notifying Ishida of Strickland's claims and promptly initiating the investigatory process (over which, the record shows, he exerted no control).  Days after Strickland informed Martinez that she was alleging sexual harassment on August 9, 2018, Martinez reported the conduct to Ishida by phone.  12/14/23 Martinez Tr. 90:25-14; 12/13/23 Ishida Tr.

---

[108] Strickland does not argue that Davis harassed her during these appellate moots.

211

21:10-17.  On August 14, 2018, Martinez forwarded Strickland's August 10 email memorializing her allegations in writing to Ishida.  Tr. Ex. 188 at US2559-60.  Chapter IX of the EDR Plan states that employees "are encouraged to report wrongful conduct to the Court's EDR Coordinator, the Chief Judge, unit executive, human resources manager, or their supervisor as soon as possible[.]"  Tr. Ex. 136 at US4545.  Pursuant to Chapter IX, Ishida then immediately reported the conduct to then-Chief Judge Gregory and began the process to select an investigator.  Tr. Ex. 188 at US2558.  Chapter IX states that the "EDR Coordinator shall promptly inform the Chief Judge and unit executive of any report" and that "[t]he Chief Judge and/or unit executive shall ensure that the allegations in the report are appropriately investigated, either by the human resources manager or other person."  Tr. Ex. 136 at US4545.  On August 14, 2018, Ishida identified an investigator -- Heather Beam -- based on a recommendation from the Clerk of Court.  Tr. Ex. 18.  While not having any involvement in the selection of Beam, Martinez formally appointed Beam on August 14, 2018.  Tr. Ex. 137 at 8.  Thus, Martinez promptly initiated an investigation only a few days after Strickland made her allegations.

Given that Martinez promptly separated Strickland from Davis and initiated an investigation, this Court holds that Martinez did not act with deliberate indifference.

212

> **c.** **While Strickland Does Reference an August 31 Instance of Sexual Harassment, There Is No Evidence that She Reported This Harassment to Martinez or Relayed This Allegation to Beam. The Fact that Strickland and Davis Had Minimal Contact After July 24, 2018, Militates Against a Holding of Deliberate Indifference.**

Strickland alleges that Martinez "had the authority to address and curtail the harassment but failed to do so over a period of months." Pl.'s PFOFCOL 435. The Judicial Administrators state that Strickland "does not allege a single instance of supposed sexual harassment that occurred after June 27." Defs.' PFOFCOL 50. They argue that Strickland's claim of deliberate indifference must fail, therefore, because there were no allegations of sexual harassment after she reported her claim to Martinez, even were the Court to assume that Strickland reported on July 2, 2018, instead of August 9, 2018. Id.

Courts typically decline to find deliberate indifference when the allegedly harassing conduct stops after the sexual harassment is reported.[109] Similarly, when courts make a ruling

---

[109] See Williams v. Board of Regents of Univ. Sys. of Ga., 477 F.3d 1282, 1295-96 (11th Cir. 2007) (holding that a plaintiff must allege that the "deliberate indifference to the initial discrimination subjected the plaintiff to further discrimination" to state a deliberate indifference claim) (citing Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 645 (1999)); DeCecco, 918 F. Supp. 2d at 494-95 (holding that the defendant was not deliberately indifferent, in part, because there was "no evidence that [the plaintiff] was subjected to sexual harassment, a sexually abusive environment, or any other form of adverse treatment after" informing the defendant of her allegations); Borkowski v. Baltimore Cnty., Maryland, 492 F.

213

of deliberate indifference in the sexual harassment context or allow a claim to survive past the summary judgment phase, it is typically[110] only when the sexually harassing conduct has continued after it was reported.[111]

_____

Supp. 3d 454, 491 (D. Md. 2020) (holding that the school had not been deliberately indifferent after a student reported a sexual assault because "there [was] no allegation that harassment continued, let alone that [the school's] alleged failure to respond properly to her complaint caused further discrimination").

[110] The Court qualifies this with "typically" because, in the Title IX context, liability can sometimes be found when there is only "a single incident of pre-notice harassment," but this harassment must be "vile enough and the institution's response, after learning of it, unreasonable enough to have the combined systemic effect of denying access to a scholastic program or activity." Doe, 1 F.4th at 273-74. As stated in Fairfax Cnty. Sch. Bd., this comes directly from the language of Title IX. Id. ("This reading of Title IX is consistent with the plain language of the statute, which reads: 'No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.'") (quoting 20 U.S.C. § 1681(a)). While this Court, and the parties alike, have been relying on Title IX cases generally in guiding their deliberate indifferent analyses, the language of Title IX allowing for liability based on a single pre-notice instance of harassment is not applicable here, in addressing an equal protection claim made by a government employee arising under the Constitution.

[111] See, e.g., Jennings v. University of N.C., 482 F.3d 686, 700 (4th Cir. 2007) (denying summary judgment because the university official "took no action on the complaint, and [the plaintiff's] harassment continued"); Baynard, 268 F.3d at 233-36 (denying judgment as matter of law when the sexual abuse continued after the defendant was aware of the abuse); Feminist Majority Found., 911 F.3d at 689-90 (holding that plaintiffs stated a claim for deliberate indifference because the university "did not engage in efforts that were reasonably

The Judicial Administrators' claim that Strickland alleged no sexual harassment after June 27, 2018 is not exactly true -- Strickland stated that Davis continued to harass her on August 31, 2018 with his strange email (to a client, Strickland was copied) in which he obscurely references her law review article written in 2015.[112] Tr. Ex. 135 at ¶ 253; Tr. Ex. 3 at US0108; Pl.'s PFOFCOL 142 (stating that Davis "continue[d] to harass[] [her]" at the end of August 2018). The Court does not take a stance on whether this is a further instance of sexual harassment. The Court does note, however, that Strickland did not raise this alleged instance of sexual harassment until her mediation supplement -- it is notably absent from Beam's report. See generally Tr. Ex. 5.[113]

---

calculated to end [the] harassment," which **continued after** the plaintiffs alerted administrators).

[112] The Court notes that because Strickland argues that Martinez "ratified" Davis's quid pro quo request, her sexual harassment allegations would technically reach conduct that goes beyond this June 27 email (as Martinez, or Davis, "making good" on his quid pro quo request would be a continuation of the harassment). Pl.'s PFOFCOL 412, 415. Whether Strickland was subjected to quid pro quo sexual harassment (in terms of whether she was subjected to adverse employment actions) is interrelated to her claims of retaliation, addressed infra Section V.B.2.g. As this Court rejects Strickland's arguments that Martinez retaliated against her and does not decide the merits of the rest of Strickland's sexual harassment claims, the last possible allegation of sexual harassment for the purposes of the Court's analysis here is the August 31 email.

[113] Beam's summary of Strickland's claims includes the mentoring lunches, the bike-lobby incident, Davis's "attempts to

There is no evidence here in the record that Strickland ever told Martinez or anyone else about this August 31 email until her February 2019 mediation supplement. Tr. Ex. 3 at US0108. Moreover, the record shows that, aside from this August 31 email, Strickland and Davis had minimal contact after Martinez instructed Davis to stop contacting Strickland on July 24, 2018. 12/18/23 Davis Tr. 82:12-83:9. Despite the August 31 email, the minimal contact after July 24, 2018, further cautions the Court against a ruling of deliberate indifference.[114]

### d. Martinez's Missteps, While Certainly Errors in Judgment, Do Not Rise to the Level of Deliberate Indifference.

In arguing that the Letter of Counseling reads as a roadmap for her deliberate indifference claim,[115] Strickland focuses on Martinez's use of a marriage metaphor during the July 5 meeting,

---

restrict her job responsibilities and speaking to her in an unprofessional manner[,]" and the Mas Dinero email. Tr. Ex. 5 at US1244-45.

[114] Even were this a further instance of sexual harassment, Martinez's failure to stop the harassment does not mean that his response is clearly unreasonable. See S.B. ex. rel. A.L., 819 F.3d at 77.

[115] While Strickland analyzes these observations from the Letter of Counseling as part of whether Martinez responded with deliberate indifference to Strickland's claims, Pl.'s PFOFCOL 430-31, the Judicial Administrators analyze these observations under the discriminatory intent analysis. Defs.' PFOFCOL 58-59. While the Court analyzes this evidence as part of its deliberate indifference inquiry, it notes that none of these comments made by Martinez show discrimination on the basis of gender.

216

Martinez's comment on August 9, 2018 stating "but you were not touched", Martinez "calling out" Strickland for seeking advice from the AO, and Martinez stating that "he was being blamed for matters that [he] had nothing to do with." Pl.'s PFOFCOL 430-31. Martinez was ultimately counseled for these comments. See generally Tr. Ex. 7. The Court holds that while these comments may well be inappropriate, they reflect errors in judgment rather deliberate indifference to Strickland's allegations. Grayson, 195 F.3d at 695 (stating that the Constitution does not protect the plaintiff from "errors in judgment"); Stiles ex rel. D.S., 819 F.3d at 849 (stating that the defendants' "rude or critical comments," "unhelpful suggestions," and "disrespectful[]" behavior "do not undercut the reasonableness of [d]efendants' concrete actions taken in response to [p]laintiff's complaints") (citing Williams v. Port Huron Sch. Dist., 455 Fed. Appx. 612, 620 (6th Cir. 2012)).

The Court deals with these matters seriatim.

**Marriage metaphor.** Strickland states that Martinez's use of a marriage metaphor during the July 5 meeting is evidence of Martinez's deliberate indifference towards Strickland's claims. Pl.'s PFOFCOL 430. Using a "marriage metaphor" to describe a professional relationship between a male supervisor and female subordinate is not appropriate in any situation, let alone here, where Martinez admittedly had suspicions of potential

harassment.  See Tr. Ex. 7 at US4265.  Still, as of July 5,
2018, Strickland had not yet reported her claim of sexual
harassment.  Martinez cannot be deliberately indifferent to a
report of sexual harassment that, despite Martinez's suspicions,
had not occurred.  See DeCecco, 918 F. Supp. 2d at 494 (a
defendant "cannot [be] deliberately indifferent in failing to
respond to an environment of which it was unaware").

**"But There Was No Physical Contact or Anything Like That?"**
Strickland argues that Martinez's comment during the August 9
meeting about whether there was physical touching is evidence of
Martinez's deliberate indifference to Strickland's claims.
Pl.'s PFOFCOL 430.  Beam characterized the comment as "at least
you weren't touched" and observed that it was "callous,
minimizing, insensitive, and contributed to [Strickland's
distress]".  Tr. Ex. 7 at US4265.  Martinez did not say "at
least you weren't touched", but instead said, in a somewhat
inquisitive tone, "[b]ut there was no physical contact or
anything like that?"  Tr. Ex. 150 at 13:10-11.  Based on the
Court's actual review of the recording, it appears Martinez was
simply confirming that there was no physical contact better to
understand Strickland's allegations.  See id.  While Martinez's
tone and word choice is not as dismissive as "at least you
weren't touched", Martinez's interruption of Strickland to
confirm that there was no actual touching, as she was describing

218

why and how she felt sexually harassed by Davis, was certainly
not helpful and understandably made Strickland feel like
Martinez was minimizing her claims.  Still, this comment does
not "undercut" all of the actions Martinez did take in response
to Strickland's claims and thus does not render Martinez's
response deliberate indifferent.  Stiles ex rel. D.S., 819 F.3d
at 849.

**"Calling Out" Strickland for Seeking Outside Advice and
Stating that He Was "Being Blamed for Matter that [He] Had
Nothing to Do With."**  Strickland argues that Martinez's "calling
out" Strickland for seeking advice from the AO and stating that
he was "being blamed for matters that [he] had nothing to do
with" are evidence of Martinez's deliberate indifference.  Pl.'s
PFOFCOL 430.  Martinez was upset when Clarke from the AO reached
out to him because he subjectively believed that he already had
handled Strickland's concerns, and he did not understand why
Strickland went to an outside party with her concerns instead of
him.  Tr. Ex. 150 at 2:16-3:7, 10:12-14; 12/14/23 Martinez Tr.
84:19-85:6.  There is no indication in the record that Martinez
told Strickland that she could not go to an outside party for
advice on her rights; he just did not understand why Strickland
was not more transparent with him about her concerns and why he
was getting calls from the FEOO about something he already
thought was resolved.  Id.  The record show that Strickland was

219

being purposely cryptic when describing her concerns to Martinez

so she could resolve her concerns informally without triggering

a formal response.  While it would have been better, and more

professional, had Martinez not acted emotionally towards

Strickland after receiving Clarke's call, Martinez's emotional

response does not rise to the level of deliberate indifference

and does not undercut the measures he did take to protect

Strickland.  Stiles ex rel. D.S., 819 F.3d at 849.

Strickland argues that the fact that Chief Judge Gregory

issued a Letter of Counseling to Martinez shows that Martinez

acted with deliberate indifference.  Pl.'s PFOFCOL 430.  The

Letter of Counseling stated that Chief Judge Gregory adopted

Beam's recommendation that Martinez be "counseled or train[ed]

on judgement and decisiveness" as well as "counseled and trained

on how to handle workplace conduct complaints."  Tr. Ex. 7 at

US4267.  In explaining Chief Judge Gregory's decision for

counseling, the Letter cites the wrongful conduct standard

(which is defined to include sexual harassment and retaliation).

Id.  Ishida (who drafted the letter) testified that, despite

citing this wrongful conduct standard, the Letter found no

wrongful conduct on the part of Martinez and that Martinez was

only guilty of making well-intended mistakes.  12/13/23 Ishida

Tr. 46:20-25, 48:19-49:3, 49:1-50:25.  It is true that the

content of the Letter finds that Martinez mishandled

Strickland's complaint, not that he acted deliberately indifferent to her claims.  See Tr. Ex. 7 at US4266 (stating that Beam found Martinez's actions were a result of fatigue and poor judgment and that Martinez still acted "expeditiously" and in "good faith").  Martinez's errors in judgment do not rise to the level of deliberate indifference.  Grayson, 195 F.3d at 695.

> ### e.  The Court Rejects Strickland's Arguments that Martinez's Deliberate Indifference Is Shown by a Pattern of Similar Complaints.

Strickland argues that the Judicial Administrators' failure to act on Strickland's complaint "was part of a pattern of failing to take sexual harassment complaints seriously."  Pl.'s PFOFCOL 433 (citing Basta v. Novant Health Inc., 56 F.4th 307, 317 (4th Cir. 2022)).[116]  This Court rejects those arguments.

Strickland does not offer any admissible evidence of a pattern of similar violations.  While Strickland offered the

---

[116] Applying the deliberate indifference standard in a Rehabilitation Act case, the Fourth Circuit in Basta recognized that while "a history [or pattern] of [similar] violations . . . is relevant [circumstantial evidence] to proving deliberate indifference, it cannot be equated with the standard itself[,]" which is an "actual-notice" standard.  Basta, 56 F.4th at 317.  Instead, the violations must be "longstanding, pervasive, [and] well-documented" to serve as circumstantial evidence that the defendants "had been exposed to information concerning the risk and thus must have known about it."  See id. (quoting Farmer v. Brennan, 511 U.S. 825, 842 (1994)).  Thus, even if Strickland had established a pattern of similar complaints, this would only be circumstantial evidence of Martinez's deliberate indifference.

admission of other EDR complaints at trial, the Court ruled them inadmissible.[117]  There is evidence in the record that Ishida was concerned about a pattern of complaints against Davis or Martinez; however, there is no indication that these complaints were meritorious (they were allegations) or sufficiently similar to Strickland's claims to show a pattern of Martinez acting with deliberate indifference towards claims of sexual harassment.

Thus, this Court rejects those arguments.[118]

> **f.    This Court Rejects Strickland's Arguments that a Failure to Provide Training to Those Involved in Handling Strickland's Claim or the Failure to Provide Notice of Sexual Harassment Procedures Serve as Evidence that the Judicial Administrators Acted with Deliberate Indifference.**

Strickland argues that the Judicial Administrators' failure to provide training to those involved in handling her claim and

----

[117] In arguing against the admissibility of these complaints, the Judicial Administrators argued that these complaints, in Exhibit BB, are not relevant because "[Strickland] hasn't shown that these individuals are similarly situated and none of these claims involve deliberate indifference to alleged sexual advances."  12/18/23 Martinez Tr. 27:8-28:9; 12/19/23 Tr. 68:11-23.  The Judicial Administrators also argued that these complaints ought be excluded because they are inadmissible hearsay.  12/18/23 Martinez Tr. 27:8-28:9; 12/19/23 Tr. 68:11-23.  The Court agreed with the Judicial Administrators and excluded Exhibit BB from the record. 12/19/23 Tr. 68:11-23.

[118] Strickland also argues that this pattern of complaints shows Martinez's discriminatory intent.  Pl.'s PFOFCOL 439-41. The Court rejects those arguments for the same reasons it gives in its deliberate indifference analysis.

the lack of notice of the FDO's sexual harassment procedures
show that their response to her complaint was "clearly
unreasonable." Pl.'s PFOFCOL 434. In making this argument,
Strickland cites to Hill, 797 F.3d at 975. The Judicial
Administrators argue, however, that the lack of a policy or
training on sexual harassment can only be evidence of a clearly
unreasonable response to a sexual harassment claim when the lack
of training or policies causes, or makes the plaintiff
vulnerable to, more sexual harassment. Defs.' PFOFCOL 52
(arguing that plaintiff "must present evidence" that it was
"clearly unreasonable . . . not to improve [] sexual harassment
training" after receiving notice of the "initial discrimination"
such that she was subject to "further discrimination"). The
Court agrees with the Judicial Administrators.

Hill supports the Judicial Administrators' arguments. The
factual circumstances in Hill are starkly different from the
facts of this case. Hill involved student-on-student
harassment, and the defendants used an eight-grade student, who
accused another eight-grade student of sexual harassment, in a
sting operation to catch that student in the act. See Hill, 797
F.3d at 955-56, 961-63. During the sting operation, the
student-perpetrator raped the student-victim in the bathroom.
Id. Determining that the defendants' response was clearly
unreasonable in the deliberate indifference context for a Title

223

IX claim, the court considered the defendants' "decision to use [the student-victim] as bait in a sting operation with [the alleged harasser], a known and already disciplined sexual harasser, **combined with** the [the defendants'] failure to change any sexual harassment policies after [the harasser's] rape of [the student-victim]." Id. at 973 (emphasis added). The court did determine that it was clearly unreasonable for the defendants not to improve their sexual harassment policy (which required they catch the perpetrator in the act to act upon a victim's allegations). Id. at 975. The defendants' failure to change its training or policy, however, was one of many reasons why the court held that the defendant acted with deliberate indifference. Id. at 973-75. Accordingly, Hill does not stand for the proposition that a lack of training or policy alone could meet the standard for deliberate indifference. See id.[119] Still, a failure to change its training or policy could still be evidence of a clearly unreasonable response. The defendants in Hill very clearly created the circumstances that led to the

---

[119] "Given all these events and circumstances considered **cumulatively**, there is a genuine issue of fact as to whether both the [defendants'] action and inaction were deliberately indifferent. We do not say that any one action or inaction suffices. The deliberate indifference standard is rigorous and hard to meet. But the **cumulative** events and circumstances here, viewed in the light most favorable to [the student-victim], are enough to establish deliberate indifference under Title IX." Hill, 797 F.3d at 975 (emphasis added).

224

plaintiff's rape, in stark contrast to any action, or inaction, by Martinez in the case at bar.

The Court agrees with the Judicial Administrators' interpretation of Hill and holds that a lack of policy or training on sexual harassment can only be evidence of a clearly unreasonable response if this failure causes, or makes the plaintiff vulnerable to, more harassment. Id. ("A clearly unreasonable response causes students to undergo harassment or makes them more vulnerable to it."). Here, the record does not support that this lack of training or policies caused Strickland harassment -- Strickland does not allege that Davis harassed her after July 2, 2018 (which is the date Strickland argues that she reported her sexual harassment claim to Martinez), with the exception of the August 31 email, see supra Section V.B.2.c.

To the extent Strickland argues that this lack of training or policy made a violation of her rights more likely, the Court rejects those arguments. See Hill, 797 F.3d at 977-78 (stating that while the defendant's policy requiring a perpetrator to be caught in the act to be disciplined for sexual harassment may have made a violation of the plaintiff's rights "more likely" by motivating a teacher to "engineer the rape-bait operation, that alone does not give rise to an inference that the policies 'produced a specific constitutional allegation'"). Martinez would have had to "disregard[] a known or obvious consequence of

225

his action [or inaction]" to be liable under the deliberate
indifference inquiry's "stringent standard of fault."  See id.
(describing the deliberate indifference inquiry for a section
1983 equal protection claim).  The evidence does not show that
the lack of training or policies is a "known or obvious
consequence" of the failure to improve training or the sexual
harassment policy.  See id.

> ### g. Strickland's Claims of Retaliation Are
> ### Unsupported by the Evidence.[120]

Strickland argues that she was subject to "continued sex
discrimination and retaliation[]" by Martinez because he
retaliated against her for reporting sexual harassment and, in
doing so, essentially "ratified" and continued Davis's sexual
harassment.  Pl.'s PFOFCOL 444.  Specifically, Strickland
alleges that Martinez retaliated against her by denying her a
promotion, attempting to remove her locality pay, diminishing

---

[120] As discussed supra note 103, Strickland analyzes her
retaliation claim as a standalone violation of the equal
protection clause.  Pl.'s PFOFCOL 444-45.  The Judicial
Administrators analyze Martinez's alleged retaliation as part of
their deliberate indifference analysis.  Defs.' PFOFCOL 52-56.
Because Martinez's alleged retaliation in part relates to
whether his response to her report of sexual harassment was
clearly unreasonable (i.e., his response would certainly be
clearly unreasonable if he retaliated against Strickland for
reporting sexual harassment), this Court analyzes the
retaliation claims under the deliberate indifference framework;
however, even if Strickland's retaliation claims ought be
analyzed as a standalone equal protection violation, her claims
would still fail, as this Court determines that Martinez did not
retaliate against Strickland.

226

her job duties, demoting her to a "pure R&W" beneath Martin (another R&W), and subjecting Strickland to an "indefinite telework[ing]" arrangement despite the alleged availability of office space. Id. at 444-45. As further evidence of Martinez's alleged retaliation against her, Strickland submits evidence that Martin, a male attorney who was similarly providing research support to other FDO attorneys, received a raise soon after Strickland left the FDO. Id. Strickland argues that Martin's delayed raise in March 2019, which Moormann purportedly initiated to correct for Martin not receiving a raise during the conversion process in August 2018, Tr. Ex. 186, further supports her retaliation claim. Pl.'s PFOFCOL 444-45. It shows, as Strickland argues, that Martinez treated Strickland differently based on her sex. Id.

The Judicial Administrators argue that Strickland's arguments that Martinez retaliated against her are meritless. Defs.' PFOFCOL 52. While the Court regrettably observes that Strickland, after reporting her good-faith harassment claim, faced consequences that negatively affected her career, this Court holds that Martinez did not retaliate against Strickland in violation of the equal protection clause.

The Fourth Circuit in Strickland stated that while pure retaliation claims are not cognizable under the equal protection clause, "continued sexual harassment and adverse treatment of a

227

female employee unlike the treatment accorded male employees remains actionable as a violation of the Equal Protection Clause even when the sex discrimination and harassment continue after, and partially in response to, the female employee's report of prior discrimination and harassment." Strickland, 32 F.4th at 357 (citing Wilcox v. Lyons, 970 F.3d 452, 461 (4th Cir. 2020)). Thus, when an employee is subjected to "a mixture of retaliation and continued sexual harassment," such conduct violates equal protection by "maintain[ing] and reinforc[ing] the hostile work environment that [the harassing supervisor] had created." Beardsley v. Webb, 30 F.3d 524, 530 (4th Cir. 1994).

### i. Denial of a Promotion and Raise

Martinez did not remove Strickland off of the path of becoming an AFPD, nor did he retaliate against her by not giving her a raise before conversion.

Strickland indicated to Davis in May 2018 that she planned on asking for a promotion and raise at her next performance review. Tr. Ex. 1 at US0501; Tr. Ex. 3 at US0070. The subject of Davis's alleged quid pro quo email was Strickland's request for a raise. Tr. Ex. 5 at US1260. Strickland alleges that Martinez "ratified [Davis's] harassing conduct, most significantly by refusing to consider [Strickland] for the promotion for which she was qualified." Strickland, 32 F.4th at 337, 358. Relatedly, discussed infra, Strickland alleges that

228

Martinez went "to lengths to backdate his reclassification of her title to the day before she became eligible for a promotion" and "sought to remove her locality pay." Pl.'s PFOFCOL 129, 399, 415. Strickland also alleges that Martinez retaliated against her for not considering her application for a new appellate AFPD position. See Tr. Ex. 5 at US1252 (Beam's report addressing Strickland's complaints of not being interviewed for appellate AFPD position).

There is insufficient support for Strickland's claim that Martinez retaliated against her by taking her off the path of becoming an AFPD. Neither Martinez, nor Strickland's offer letter, promised Strickland that she would be an AFPD by a certain time. Id. at US1258; 12/13/23 Martinez Tr. 118:6-119:19. Moormann, upon Martinez's direction, converted Strickland and Martin to AFPDs in late August 2018. Tr. Ex. 179 at US2889; Tr. Ex. 159 at US2546. Thus, Strickland did receive a promotion, at least in title, to AFPD, very soon after she requested a promotion from Martinez. Martinez explained to Strickland that management decided to convert its R&Ws to AFPDs for case weight measurement purposes. Tr. Ex. 159 at US2546. Strickland did not, however, receive an increase in job responsibilities consistent with her promotion to an AFPD. Martinez's failure to increase Strickland's job responsibilities with conversion does not mean that Martinez removed Strickland

229

from the path of becoming an AFPD.  Martinez testified that whether a new AFPD can handle her own cases is up to him, and there are many factors that go into whether an attorney is ready to do so.  12/14/23 Martinez Tr. 101:6-102:11.  At that point, Strickland had only been at the FDO for a year.  Thus, there is insufficient evidence to conclude that Strickland was taken off of the path of an AFPD -- Martinez just did not think that Strickland was ready to handle her own cases yet.[121]

It is undisputed that Strickland was eligible for a grade-level promotion to a GS15 on or around August 21, 2018.  Tr. Ex. 137 at 9-10.  There is no evidence in the record that Martinez or Davis ever had issues with Strickland's work performance. Martinez could have, in his discretion, promoted Strickland to a GS15 on August 21, 2018, before he converted her to an AFPD, which would have resulted in a higher salary for Strickland in her new role.  Martinez (and Moormann) initiated the conversion soon before her work anniversary, and the effective date of the

---

[121] Soon after the July 5 meeting, Davis told Martinez that they needed to consider whether Strickland lived up to the title of AFPD considering her recent behavior.  Tr. Ex. 11 at US3974-75.  There is also evidence in the record that Martinez generally trusted Davis's judgment.  Martinez Dep. 92-95.  While it is certainly possible that Davis influenced Martinez's perception of Strickland's fitness as an AFPD, this is not enough evidence for the Court to conclude that Strickland was taken off of the AFPD path.  In fact, Davis specifically testified that he had no involvement in decisions about Strickland's promotion.  12/18/23 Davis Tr. 83:10-21.

230

conversion was one day before she would have become eligible.
Tr. Ex. 179 at US2889; Tr. Ex. 159 at US2546-27.  Thus,
technically, at the time her conversion was both initiated and
effective, she was not eligible for a promotion; however, if the
Court is wading into technicalities, Strickland was technically
eligible for a promotion before the conversion was finalized on
August 28, 2018 (although this was after the effective date on
August 20, 2018).

While the timing of these events certainly gives the Court
pause, it is too much of a stretch, on these facts, reasonably
to infer that Martinez retaliated against Strickland by
depriving her of a promotion to a GS15.  See S.B. ex rel. A.L.,
819 F.3d at 79 ("[T]iming alone generally cannot defeat summary
judgment once an employer has offered a convincing,
nonretaliatory explanation.").  First, Martinez had to have been
aware of Strickland's eligibility for a promotion to deprive her
of it as a form of retaliation.  Martinez testified that he was
not aware of Strickland's eligibility because Moormann, who was
responsible for notifying Martinez of such events, never
communicated Strickland's eligibility to Martinez.  12/14/23
Martinez Tr. 103:1-13; see also 12/18/23 Moormann Tr. 141:15-18.
Moormann testified consistent with Martinez.  12/18/23 Moormann
Tr. 141:15-18.  Second, Moormann testified that promoting
Strickland -- who was at that time a GS14, step 2, Tr. Ex. 179

231

at US2889 -- to a GS15 would have been "extraordinary" because she had not yet completed the remaining "steps" in GS14. 12/18/23 Moormann Tr. 153:16-154:7. Thus, while Martinez could have, in his discretion, promoted Strickland to a GS15, Moormann's testimony indicates that this would have been unlikely.

Lastly, and importantly, Martin also did not receive a raise at the time of conversion. Tr. Ex. 186 at US2705. Martin's pay was adjusted to correct for this a mere week after Strickland resigned. Id.; Tr. Ex. 162 at US3300. Strickland cites this as evidence that Martinez retaliated against her. Pl.'s PFOFCOL 444-45. The record shows that, while Martin and Strickland may have benefitted long-term from the conversion, at the time of conversion, they both were soon eligible for pay increases that did not occur. While the timing of this, again, gives the Court pause, see S.B. ex rel. A.L., 819 F.3d at 79, it would be unreasonable to infer that Martinez delayed giving Martin a promotion until after Strickland resigned solely to stick it to Strickland for reporting her claims. While this Court agrees with Strickland that it would have been better, and fairer, to consider Strickland for a promotion before conversion given the proximity of her anniversary date, Martinez did not retaliate against Strickland by failing to do so. This appears to be an administrative oversight -- these mistakes cannot be

232

seen as retaliatory nor evidence of deliberate indifference.
Baynard, 268 F.3d at 236 (stating that deliberate indifference
standard is higher than negligence).

### ii. Not Considering Strickland for the Appellate AFPD Position

Martinez did not retaliate against Strickland by not
considering her for the open AFPD position. It is undisputed
that Strickland applied for and was not considered for the new
AFPD role. Tr. Ex. 135 at ¶¶ 169, 171, 236. Strickland was not
considered for role because it was identical to the position
that she already had. 12/14/23 Carpenter Tr. 58:11-23. This is
further confirmed by contemporaneous emails about the new AFPD
position -- FDO management contemplated and advertised the
position as providing support for both the appellate and trial
teams. Tr. Ex. 33 at US4156; Tr. Ex. 168 at US2786. Thus,
Martinez did not retaliate against Strickland for not
considering her for this position.

The Court does note, however, that it would have been wise
to let Strickland work exclusively in appeals, given her
allegations against Davis (who ran the trial unit) and her
expressed interest in appellate work. While the Court is not
convinced that Martinez's failure to consider Strickland for the
appellate AFPD position was retaliation, allowing Strickland to
work full-time in appeals appears a feasible solution (at least

233

after the hiring of the new AFPD providing research support).
The record shows that, while FDO management did not specifically
contemplate one research support specialist working full-time in
appeals, they had the budget to hire one person for such a
position.  Tr. Ex. 173 at US7413.  Of course, just because
something is feasible from a budgetary perspective does not
necessarily mean that it is feasible practically.  Moving
Strickland to appeals full-time, however, would have solved
other problems, and likely would have been prudent given the
circumstances.

    This begs the question of whether Martinez not shifting
Strickland full-time to the appeals unit was a "clearly
unreasonable" response to her claims of sexual harassment.  The
record reflects that Martinez's response was not clearly
unreasonable.  Martinez could not shift Strickland full-time to
appeals before a new person was hired because, as Martinez told
Strickland on August 9, 2018, that "would leave [Martinez] with
only one Research & Writing Specialist to support nine trial
attorneys."  Tr. Ex. 159 at US2546.  The record is unclear as to
when the new person was hired.  It is possible that Strickland
working full-time in appeals was more feasible after the new
hire joined the FDO because there would be more research support
all around.  The advertisement for the new position, however,
went out before Strickland reported her claims, before

234

Strickland requested to work exclusively in appeals, and was called an "appellate" AFPD position. Tr. Ex. 171 at US4262; Tr. Ex. 135 at ¶ 165; Tr. Ex. 33 at US4155; Tr. Ex. 168 at US2786. At the time Strickland made her report, the ball was already rolling on hiring a person who would be doing at least some appellate work. The record is unclear as to why the FDO did not want one full-time person in appeals, and the Court is not going to speculate as to why. Although Strickland working full-time in appeals seems like a workable solution, Martinez's response (removing Strickland from Davis's chain of command, insulating her with Martin as gatekeeper of assignments, and allowing telework), was not clearly unreasonable simply because Martinez failed to choose the remedial measure sought by Strickland (working exclusively in appeals). See S.B. ex rel. A.L., 819 F.3d at 77. Nor does Martinez's failure to move Strickland exclusively to appeals support Strickland's retaliation claim.

### iii. Diminishing of Job Duties

Strickland argues that, soon after she reported her harassment, her job responsibilities "were diminished, as she was taken off of new trial cases and demoted to 'pure R&W,' decisions on which [Davis] had direct input." Pl.'s PFOFCOL 413, 444. The Judicial Administrators state that Martinez did not diminish her job duties after her report of sexual harassment. Defs.' PFOFCOL 55. The Court holds that Martinez

235

did not retaliate against her by adjusting her job responsibilities -- the FDO management team was instead adjusting its workload after the departure of another R&W.

In asserting that her job responsibilities were diminished,[122] Strickland refers to the July management meeting.[123]  During this meeting, the office was reshuffled to account for the recent departure of an R&W attorney and to increase efficiency.  12/13/23 Martinez Tr. 144:2-13; 12/18/23 Davis Tr. 80:13-81:11.  The meeting minutes state that Strickland was to be removed from "trial support cases" and "duty days", the "R&Ws [would] be more Jared's, essentially[,]" and Martin and Strickland would be doing "pure R&W" tasks, including "[p]retrial motions, sentencing objections, trial research, appellate, etc." Tr. Ex. 173 at US7413.  Martin was also removed from duty days.  <u>Id.</u>  These arrangements were meant to be short term -- until they hired another person to help with R&W support for both the trial and appellate team.  <u>Id.</u> at US7411, US7413 (stating that the R&Ws would both be "'unlocked'

---

[122] Strickland stated in her grievance -- albeit in the context of her stating that her conversion to an AFPD was a "phantom promotion" without an **increase** in job responsibilities -- that there was **no change** in job responsibilities" after conversion.  Tr. Ex. 1 at US0505 (emphasis added).

[123] At the outset, the Court notes this meeting occurred before Strickland reported her sexual harassment claim on August 9, 2018, which further supports the Judicial Administrators' arguments that this was not retaliation.

236

from the teams [for a month] and [would] no longer take duty days (unless needed as back-up) nor take new criminal cases"); see also Tr. Ex. 168 (stating the staffing arrangement was a "temporary fix").  There is evidence here that some of Strickland's job duties changed after this meeting, but these changes appear minor.  Potash v. Fla. Union Free Sch. Dist., 972 F. Supp. 2d 557, 583 (S.D.N.Y. 2013) ("Changes in assignments or responsibilities that do not 'radical[ly] change' the nature of work are not typically adverse employment actions.").  Some of Martin's duties also changed.  This Court determines that any change in Strickland's job responsibilities was minor and, in any event, was due to FDO management balancing the FDO's caseload after an employee departure, not because Martinez was retaliating against Strickland for her allegations.

Other evidence in the record also supports this Court's conclusion that Martinez did not retaliate against Strickland by diminishing her job responsibilities.  After conversion, Strickland worked under Carpenter's supervision.  Carpenter testified that Martinez did not influence what work Strickland was assigned, Strickland's job duties remained the same after conversion, and that Strickland performed similar work to that performed by other attorneys in the group supervised by Carpenter.  12/14/23 Carpenter Tr. 61:16-62:1.  Strickland was also consistently invited to participate in appellate moots.

Id. at 62:6-9.  Lastly, in January 2019, Carpenter asked
Strickland if she wanted to handle oral argument for a case she
worked on.[124]  For these reasons, the Court does not rule that
Martinez retaliated against Strickland by diminishing her job
responsibilities.

### iv.  Assigning Martin as the Gatekeeper

Strickland further alleges that she "was demoted to a
support role underneath a male research and writing attorney,
who would serve as the 'gatekeeper' of assignments and [her]
'supervisor.'"  Pl.'s PFOFCOL 413-14, 444.  This Court rules
that Martinez did not retaliate against Strickland when he made
Martin the "gatekeeper" of assignments -- to the contrary, this
was done to protect Strickland from further contact with Davis.

Martinez testified, and communicated to Ishida via email,
that he made Martin the gatekeeper to insulate Strickland from

---

[124] The Court notes that Carpenter made this offer two days
after Beam informed him of Strickland's retaliation claims,
which casts some doubt that Carpenter's offer was made in good
faith.  See Tr. Ex. 32 at US2803-04 (indicating that Beam and
Carpenter spoke about Strickland's claims on January 9);
12/11/23 Strickland Tr. 81:6-21; Tr. Ex. 144 at 4356 (showing
that Carpenter emailed Strickland about the appellate argument
on January 11).  Still, Carpenter did offer Strickland an
opportunity to do an oral argument.  12/11/23 Strickland Tr.
81:6-21; see also 12/14/23 Carpenter Tr. 62:6-9 (testifying that
Strickland was invited to participate in oral arguments).
Strickland testified that she declined the opportunity because
she was "afraid that [she] was being set up for failure and
[she] didn't want to do that to the client."  12/11/23
Strickland Tr. 81:6-21.

238

inadvertently being assigned work under Davis's command.  Tr. Ex. 18 at US0615.  The record also shows that, in late July 2018 (before Strickland reported the harassment), management contemplated having Martin as the "gatekeeper" to facilitate the flow of work to the R&Ws.  Tr. Ex. 33 at US4158.  On August 9, 2018, Strickland expressed to Martinez that she felt "subordinate" to Martin because he had the authority to assign and distribute work to her.  Tr. Ex. 150 at 3, 5.  Martinez agreed that Martin could assign and distribute work, but clarified that Martin was "not a supervisor",[125] they were

---

[125] In an attempt to show that Martinez promoted Martin as Strickland's "supervisor", Strickland refers to emails between FDO management in which they brainstorm how to best assign work to R&Ws.  Pl.'s PFOFCOL 89.  Carpenter proposes two models: the single-unit and the separate-unit model.  Tr. Ex. 33 at US4161. In the single-unit model, the appellate unit "serves the rest of the office by providing support to the trial teams and by handling appeals and post-conviction issues," with the R&W unit incorporated in the appellate unit.  Id. at US4161, US4157.  In the separate unit model, the "Appellate and RW (trial-support) units [are] separate and distinct."  Id. at US4161.  Carpenter explained that both he and Martin preferred the single unit model.  Id. (explaining that this is what Martin has been doing to handle requests from Asheville).  Carpenter explained to FDO management that in the "appellate-unit structure" (which is presumably the single unit structure), Carpenter would be supervising the unit, although Martin would be the "gatekeeper" of assignments.  Id. at US4158.  In the separate-unit structure, "the supervisor would be [Martin]" – although Carpenter notes that he is "not sure [whether Martin] wants that responsibility."  Id.  Strickland cites to this hypothetical reference to Martin as a "supervisor" as evidence that Martin was made her supervisor.  Pl.'s PFOFCOL 89.  This is misleading. Carpenter said Martin would technically be a supervisor under the separate-unit structure.  Martinez, however, appeared to adopt the single-unit structure, in which Martin would be

"equals", and Martin "ha[d] more seniority. . . [and] time in the office."[126]  Id. at 5.  Considering the evidence, this Court determines that Martinez made Martin the gatekeeper, not as a form of retaliation against Strickland, but to insulate her from Davis and facilitate R&W work given recent staffing changes.

### v.    Reduction in Locality Pay

Strickland alleges that Martinez attempted to remove her locality pay.  Pl.'s PFOFCOL 130, 141, 415.  The Judicial Administrators maintain that Strickland's locality pay was not removed.  Defs.' PFOFCOL 53.  The Court agrees -- Strickland's locality pay was not removed and neither Martinez (nor Moormann) attempted to remove it.

It is true that the form submitted by Moormann on August 28, 2018, in connection with the conversion, did not include Strickland's locality pay and showed a reduction in her salary.

---

gatekeeping assignments and the R&W unit reported to Carpenter.  Tr. Ex. 135 at ¶ 165; Tr. Ex. 168 at US2786 (stating that all R&W work went to Martin, who would distribute it among him and Strickland, and commenting that Martin used this system in Asheville).  Thus, this evidence fails to show that Martin was made to be Strickland's supervisor.

[126] Strickland also points out that, during the July management meeting, FDO management contemplated promoting Martin but not Strickland.  Pl.'s PFOFCOL 414.  The Court does not find this relevant to Strickland's retaliation claims.  First, Strickland and Martin both ended up being promoted to AFPDs.  Second, it would not be retaliatory against Strickland for FDO management to recognize Martin's hard work, particularly considering Martin was more senior than Strickland.  12/13/23 Martinez Tr. 148:6-10; 12/14/23 Martinez Tr. 82:20-83:25.

240

Tr. Ex. 174.  The initial form submitted by Moormann on August
16, 2018, however, expressly included locality pay and showed
Strickland having the same total salary after the conversion.
Tr. Ex. 183.  Similarly, the final processed form also showed
that Strickland retained the same total lump salary after
conversion, even though the locality adjustment was not
reflected as a separate value in the form.  Tr. Ex. 179 at
US2889.  Because Strickland's salary stayed the same before and
after conversion, Strickland's locality pay was not actually
denied.

Still, Strickland alleges that Martinez sought or attempted
to reduce her salary.  Pl.'s PFOFCOL 130.  This Court holds that
there is insufficient evidence to show that Martinez attempted
to reduce Strickland's pay.  While the August 28 form did not
include locality pay, the record shows that there was some
confusion, and errors made, when converting between the R&W pay
scale and the AFPD pay scale.  It is more reasonable to view the
omission of locality pay on the August 28 form as a mistake
(i.e., a non-retaliatory reason for the action) rather than an
attempt to reduce Strickland's locality pay, particularly
considering the other forms submitted during the conversion
process.  12/18/23 Moormann Tr. 134:21-135:5, 137:22-138:2.
Moreover, Moormann testified that Martinez specifically
instructed him to ensure that Strickland's pay did not decrease

during conversion.  12/18/23 Moormann Tr. 132:20-25, 138:15-23, 139:1-24, 141:2-4.  Thus, this Court rules that Martinez did not actually or attempt to reduce Strickland's locality pay.

### vi. Backdating of Strickland's Conversion

Strickland alleges that Martinez went "to lengths to backdate his reclassification of her title to the day before she became eligible for a promotion[.]"  Pl.'s PFOFCOL 399.  The Judicial Administrators deny that Martinez backdated Strickland's conversion intentionally to rob her of a promotion. Defs.' PFOFCOL 53.  The Court agrees with the Judicial Administrators -- the timing of Strickland's conversion is simply a coincidence.

The effective date of Strickland's conversion was August 20, 2018, one day before she would have become eligible for a promotion.  Tr. Ex. 179 at US2888.  Although Moormann submitted the initial request form for conversion on August 16, 2018, Strickland's final conversion form was not actually finalized until August 28, 2018, after the August 20, 2018, effective date.  Tr. Ex. 174 at US3411; Tr. Ex. 181 at US2784; Tr. Ex. 183 at US3454.  The Court recognizes that, at a glance, the timing of these events does raise suspicions about backdating, especially given the proximity of Strickland's work anniversary. The Court's concerns are assuaged, however, after looking more closely at the record, specifically the management team's

242

decision to convert the R&Ws in late July 2018, Martinez's instruction to Moormann to convert both Strickland and Martin as soon as possible, Strickland's August 9 request to be converted, and Moormann's testimony about the conversion process.

At the end of July 2018, the FDO management team was looking into whether it was advantageous to convert its R&Ws to AFPDs for case measurement purposes. Tr. Ex. 173 at US7411, US7414. On August 9, 2018, Strickland told Martinez that she was under the impression that she would become an AFPD. Tr. Ex. 150 at 7:12-20, 22:3-7; 12/14/23 Martinez Tr. 85:7-17. During the same conversation, Martinez told her that the office planned to convert both Strickland and Martin to AFPDs as soon as possible. Tr. Ex. 150 at 18:6-14. The record shows that Moormann promptly handled the conversion. Thus, the fact that Strickland asked for, and Martinez authorized, conversion soon before Strickland's August 21 anniversary date is simply a coincidence. Moormann began conversion on August 15, 2018, and submitted the paperwork on August 16, 2018. Tr. Ex. 180 at US3466-67; Tr. Ex. 181; Tr. Ex. 183. The effective date on the form was August 20, 2018, simply because that was the first date of the next pay period. 12/18/23 Moormann Tr. 133:13-134:8, 137:3-14. Moormann testified that having an effective date later than the request date is a normal HR occurrence, as is finalizing a form after the effective date. Id. The final form

243

was not processed until August 28, 2018 (due to a coding error),
and the final form retained the original effective date of
August 20, 2018.  Tr. Ex. 184; Tr. Ex. 179 at US2889.

Given this detailed explanation why the August 28 form was
processed with an August 20 effective date, why the conversion
took place so close to Strickland's anniversary date, and
Moormann's testimony that this is not an abnormal HR occurrence,
this Court finds insufficient support for Strickland's
allegations that Martinez retaliated by backdating the forms.
See S.B. ex rel. A.L., 819 F.3d at 79 ("[T]iming alone generally
cannot defeat summary judgment once an employer has offered a
convincing, nonretaliatory explanation.").

### vii. Teleworking & Office Space Availability

Strickland alleges that she "was forced to telework for
nearly seven months while her complaint went unaddressed, while
office space that was available in another division office was
used for an intern."  Pl.'s PFOFCOL 414; see also 7/10/23
Hearing Tr. 18–19, ECF No. 268 (this Court describing remote
work as "career-ending step").  The Judicial Administrators
point out that Strickland asked Martinez to telework and never
indicated that she was unhappy with this arrangement.  Defs.'
PFOFCOL 54-55.

**Teleworking.**  On August 9-10, 2018, Strickland requested to
telework and indicated that she was fine with long-term telework

244

as a resolution.  Tr. Ex. 171.  Martinez approved Strickland's request temporarily to telework during the investigation of her claims.  Tr. Ex. 159 at US2547.  Strickland later indicated during mediation that she preferred teleworking.  Tr. Ex. 148 at 56.  At no point did Strickland indicate to Martinez that she was unhappy with teleworking.  12/11/23 Strickland Tr. 79:20-80:21.  Thus, Martinez could not have retaliated, or acted with deliberate indifference, by granting Strickland's teleworking requests, as he reasonably believed that he was complying with her requests to alleviate her discomfort with being physically present in the same office as Davis.

**Office Space.**  In August 2018, Martinez told Strickland that there was no office space in Asheville.  Tr. Ex. 150 at 31; Tr. Ex. 172.  Beam wrote in her report that she confirmed with Carpenter that there was no office space.  Tr. Ex. 5 at US1251.  According to Beam's report, there was, however, a visiting manager's office that was used by Martinez or Davis when they traveled to Asheville and was also used by IT or other staff when traveling to the Asheville office.  Id.  Strickland doubts this lack of office space, pointing to FDO job listings for paralegal and intern positions in Asheville.  Tr. Ex. 135 at ¶ 339.  Martinez testified that the interns use his shared office in Asheville.  12/18/23 Martinez Tr. 40:16-20; 12/14/23 Martinez Tr. 110:3-10.  The fact that the Federal Defender had to share

245

an office with IT and an intern supports the Judicial Administrators' claims that office space in Asheville was limited.

Martinez did later offer Strickland his office in Asheville. Martinez testified as to why he did not offer this office space sooner. He explained that he needed an office for when he traveled to Asheville, especially because the office was growing. 12/14/23 Martinez Tr. 109:22-110:15. Martinez also did not offer the space sooner because it was a shared office without any privacy. Id. Strickland ultimately did not take Martinez up on his offer for an office in Asheville. Strickland told Smith that she was willing to consider this offer but that accepting it may "potentially stigmatize [her] and affect [her] relationships with other employees in the office." Tr. Ex. 202 at 4:15-5:18. Strickland was also concerned about Davis traveling to Asheville while she was stationed there. Id. Strickland had previously expressed that she wanted a transfer to Asheville and, during mediation, Martinez found an imperfect but suitable way to accommodate that request. The Court holds that Martinez did not retaliate, or act deliberately indifferent, in not transferring Strickland to Asheville sooner. There seemed to be a genuine lack of office space in Asheville, Martinez eventually offered his office to Strickland, which she

declined, and Martinez took several other steps to protect
Strickland from Davis.

>          3.    **Martinez's Response to Strickland's Allegations**
>                **Was Not Motivated by Discriminatory Intent.**

"[D]iscriminatory intent 'implies more than intent as
volition or intent as awareness of consequences. It implies
that the decisionmaker . . . selected or reaffirmed a particular
course of action at least in part **because of**, not merely in
spite of, its adverse effects upon an identifiable group.'"
<u>Sylvia Dev. Corp.</u> v. <u>Calvert Cnty., Md.</u>, 48 F.3d 810, 819 n.2
(4th Cir. 1995) (emphasis added) (citing <u>Personnel Adm'r of
Mass.</u> v. <u>Feeney</u>, 442 U.S. 256, 279 (1979) (internal quotation
marks omitted)). "To succeed on an equal protection claim, a
plaintiff must . . . demonstrate that [s]he has been treated
differently from others with whom [s]he is similarly situated
and that the unequal treatment was the result of intentional or
purposeful discrimination" based on a protected characteristic.
<u>Morrison</u> v. <u>Garraghty</u>, 239 F.3d 648, 654 (4th Cir. 2001). A
plaintiff need not show that the defendant was "maliciously
motivated" by discriminatory intent. <u>Bray</u> v. <u>Alexandria Women's
Health Clinic</u>, 506 U.S. 263, 270 (1993). She must show,
however, that the defendant acted "because of" sex. <u>Personnel
Adm'r of Mass.</u>, 442 U.S. at 279. In <u>Feminist Majority Found.</u>,
the court held that the plaintiff stated a claim for

247

discriminatory intent under a deliberate indifference framework when the defendant "ratified the 'right' of [the harassers] to target [the plaintiff] with . . . harassment, free from any disciplinary consequences[,]" "downplayed the harassment", and "made no effort to stop them." Feminist Majority Found., 911 F.3d at 703.

Strickland argues that Martinez acted with discriminatory intent because he "ratified the right" of Davis to harass Strickland, "downplayed the harassment", and "made no effort to stop" the harassment. Pl.'s PFOFCOL 435 (citing Feminist Majority Found., 911 F.3d at 703). As the record demonstrates, this simply is not true -- Martinez did not retaliate against Strickland (and thus did not "ratify" Davis's alleged quid pro quo request), harassment did not occur after Strickland's report to Martinez (with the exception of the August 31 email), and Martinez took several steps to separate Davis and Strickland.[127]

_____

[127] The Court recognizes that Beam's report found that Strickland felt like Martinez "trivialized" the incident through the use of the marriage metaphor. Tr. Ex. 7 at US4265. Again, this comment, while inappropriate, was made before Strickland's report of sexual harassment. See supra Section V.B.1. The report also deemed Martinez's comment about physical touching "callous, minimizing, [and] insensitive," and found that the comment "contributed to the distress that Ms. Strickland felt." Tr. Ex. 7 at US4265. Beam, however, understood Martinez's comment as "at least you were not touched," which is not what he said. While the Court certainly understands why Martinez's clarification of physical contact would make Strickland feel like Martinez was downplaying her claim, see supra Section V.B.2.d, Martinez did not downplay her claim to the level

248

Strickland next points to the Letter of Counseling, arguing that these comments are "direct evidence of [Martinez's] discriminatory intent."  Pl.'s PFOFCOL 436 (citing <u>Cole</u> v. <u>Family Dollar Stores of Md., Inc.</u>, 811 F. App'x 168, 175 (4th Cir. 2020) (stating that "derogatory comments" based on an employees' gender "may be direct evidence" of discrimination provided that the comments "concern" the employee's gender and sufficiently demonstrate that the employer's gender-related animus "affected the employment decision at issue").  The Court rejects these arguments for the same reason discussed in <u>supra</u> Section V.B.2.d (addressing Martinez's comments under the element of deliberate indifference) -- although the marriage metaphor presents a close call,[128] none of the other comments demonstrate that Martinez intentionally discriminated against Strickland on the basis of sex.

It is true that the Letter of Counseling called for Martinez to be counseled on "judgement and decisiveness" and "how to handle a workplace conduct complaint."  Tr. Ex. 7 at

---

experienced by the plaintiffs in <u>Feminist Majority Foundation</u> -- he did not ratify Davis's conduct and he took many steps to separate Strickland from her alleged harasser.  Moreover, while the evidence is clear that Martinez himself did not believe Strickland's sexual harassment claim, Martinez Dep. 117, 216, 273-76, that does not necessarily mean that Martinez discriminated against her on the basis of sex.

[128] Martinez testified that he compared all relationships to a marriage.  12/18/23 Martinez Tr. 11:13-23.

US4267.  The Letter did observe, however, as "mitigating factors," that Martinez "acted expeditiously to accommodate [Strickland's requests]" (except for her transfer request, because there was no office space to accommodate), "had acted in good faith in accommodating [Strickland's] request to telework," and was "flexible in other work assignments."  Id. at US4266. Lastly, the Letter stated that Beam did "not see a case for retaliation" and found that Martinez's "actions were not motivated by malice or ill-will" but a result of "poor judgment caused by fatigue."  Id.  These facts do not lend themselves to a determination that Martinez acted with discriminatory intent. See Sylvia Dev. Corp., 48 F.3d at 819 n.2 (discriminatory intent requires the decisionmaker to select an action "because of, not merely in spite of, its adverse effects upon an identifiable group") (internal quotation marks omitted); Roe v. Charlotte-Mecklenburg Bd. of Educ., No. 319CV00694FDWDSC, 2020 WL 5646105, at *6 (W.D.N.C. Sept. 22, 2020) (stating that negligence is insufficient to support an equal protection violation).

Strickland fails to show that she was treated differently than similarly situated employes, let alone that she was treated differently on the basis of sex.  Martinez testified that he never took any action against Strickland because of her gender. 12/14/23 Martinez Tr. 115:2-4.  As the record shows, the conversion process for Strickland and Martin, her male R&W

250

counterpart, was the same.  To the extent that Strickland complains that Martin was paid more, the Court notes that this is not evidence of discriminatory intent: Martin had more experience than Strickland, Tr. Ex. 150 at 5, and thus they are not "similarly situated."  See Morrison, 239 F.3d at 654.

While this Court acknowledges that Martinez was certainly biased against Strickland, see supra Section IV.D, as observed by Beam, Tr. Ex. 163 at US1382, there is no evidence that this bias was based on any discriminatory animus.  Martinez did not think Strickland was a team player and believed that Strickland was exploiting this situation to secure a transfer to Asheville to be closer to her husband.[129]  See supra Section IV.D.

_____

[129] In her closing argument, Strickland referred to Martinez's conclusion that she was not a team player as a "gender-based euphemism." 1/4/24 Tr. 28.  To the extent that Strickland is arguing that Martinez had discriminatory intent based on gender stereotypes, the Court rejects those arguments. See Willey v. Board of Educ. of St. Mary's Cnty., No. CV DLB-20-161, 2023 WL 3819294 (D. Md. June 5, 2023).  In Willey, the defendants dismissed sexual harassment allegations because they believed the alleged victim was "unreasonable, hysterical, hypersensitive, paranoid, overreacting to the situation, and not being truthful" "like most female high school students." Id. at *9.  The court held that "those generic allegations do not give rise to a reasonable inference that the defendants acted with discriminatory animus towards [the alleged victim]." Id.  But see Stegall v. Citadel Broad. Co., 350 F.3d 1061, 1062, 1070, 1072 (9th Cir. 2003) (stating that its decision, holding that the plaintiff showed sufficient evidence of pretext and "illegitimate motives" for her Title VII retaliation claim on summary judgment to rebut the defendants' showing that the plaintiff was fired for nondiscriminatory reasons, was made in "due regard of the history of discrimination against women in the workplace[,]" as the defendants' reasons for firing

251

Strickland's gender had nothing to do with it.  It also does not matter that Martinez was biased against Strickland as (1) he was not serving in a neutral role during the EDR process (he was an adversarial party), and (2) despite his bias, Martinez did take steps to protect Strickland from further harassment and appeared to address Strickland's concerns in good faith, as Ishida testified.  12/13/23 Ishida Tr. 39:25-40:4, 45:9-14.

### 4.    While the Investigation Was Flawed, It Was Not "Clearly Unreasonable" and Certainly Was Not a Sham Investigation Showing Discriminatory Intent.

In the context of deliberate indifference, the law does not require a perfect investigation; only one that is not "'clearly unreasonable.'"  Doe v. Emerson Coll., 271 F. Supp. 3d 337, 355 (D. Mass. 2017) (Saylor, J.) (citing Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 649 (1999)).  "If a [fact-finder] were to conclude that the [employer's] investigation fell below uniformly adopted minimum standard practices[130] for such an

_____

plaintiff were based on "sexual stereotypes[,]" including defendants' claims that the plaintiff was "difficult[,]" having a "negative attitude[,]" "**not a team player**[,]" and "problematic") (emphasis added).

Here too, assuming that saying Strickland is not a "team player" amounts to a gender-based euphemism, these generic allegations do not show Martinez's discriminatory animus towards Strickland.  Willey, 2023 WL 3819294, at *9.  In any event, the Court does not consider calling Strickland not a "team player" a gender-based euphemism after considering the context which led Martinez to formulate this belief about Strickland.

[130] Strickland's workplace expert, Vida Thomas, opined that the investigation "fell below well-accepted HR practices" because the Judicial Administrators "did not respond to or

252

investigation, the [fact-finder] could conclude [that] it was a 'sham' investigation put on by the [d]efendant to justify its decision not to [remedy the plaintiff's harm] and to conceal its previous discrimination." Mueller v. Daugherty Sys., No. 1:18-cv-3358-MLB, 2021 U.S. Dist. LEXIS 163044, at *19 (N.D. Ga. June 14, 2021) (stating a "sham" investigation could be evidence of discriminatory purpose).  Moreover, a court can infer gender bias when "[a] departure from typical adjudicatory or procedural norms might be so perplexing that it supports an inference of gender bias." Doe v. Coastal Carolina Univ., No. 4:18-cv-268-SAL, 2021 U.S. Dist. LEXIS 82292, at *7 (D.S.C. Mar. 8, 2021) (citing Doe v. University of Purdue, 928 F.3d 652, 669 (7th Cir. 2019)); Menaker v. Hofstra Univ., 935 F.3d 20 (2d Cir. 2019)).

---

investigate Strickland's complaint promptly," Martinez "control[led] aspects of the investigation," the Judicial Administrators "took no action to remedy the harm Strickland suffered[,]" the investigation was not "timely, fair, and thorough" and was conducted "in a manner that raises questions about [Beam's] impartiality[,]" and because the Judicial Administrators "failed to protect Strickland from retaliation." Pl.'s PFOFCOL 431.

While the investigation was certainly flawed and took far too long, see supra Section IV.E, the actual facts are that Strickland appeared to resolve the EDR process at the mediation stage before the question of remedy was formally determined (and thus before the Judicial Administrators could remedy her harm), there is no indication that Beam thinking Strickland was a "pain" affected the quality of her investigation, Martinez did not have control over the investigation, and Martinez did not retaliate against Strickland.  Thus, the Court does not rely on Thomas's opinion as it bears only a peripheral relationship to the actual facts.

At the outset, the Court notes, despite Strickland's claims to the contrary, that Martinez did not have any control over the investigation. While Martinez formally appointed Beam, Tr. Ex. 137 at 8, see Tr. Ex. 136 at US4545 (EDR Plan), Ishida chose Beam, Tr. Ex. 18, and Beam did not report to Martinez. 12/14/23 Martinez Tr. 95:21-96:2. Ishida gave Martinez only non-substantive "status" updates, and Martinez testified that he was only involved in the investigation as a witness. Id. at 97:11-98:1. There was nothing wrong with Martinez, in his role as the unit executive, appointing Beam in August 2018, especially as, at that point, Martinez was not an accused party. See Tr. Ex. 1 at US500-07 (Strickland raising retaliation claims against Martinez in September 2018). Thus, any imperfections with the investigation would not have any bearing on Martinez's discriminatory intent.[131]

---

[131] Strickland claims that Beam's investigation of Martinez was a "sham." Pl.'s PFOFCOL 442. In September 2018, Ishida did instruct Beam to investigate the claims jointly with Strickland's sexual harassment claims. Tr. Ex. 160 at US1402. During a conversation between Beam and Strickland on November 9, 2018, Beam said that she was focusing on Strickland's sexual harassment claims and Martinez's "hand[ling]" of those claims. Tr. Ex. 201 at 24. She noted that any claims of retaliation would have to be investigated separately. Id. at 24-25. Strickland stated that her retaliation claim was based on the same facts as her sexual harassment claim. Id. at 25. Even though the record is unclear as to whether Beam conducted additional factfinding for Martinez's retaliation claims, the Court determines that the investigation ultimately covered both claims: Strickland conceded that fact-finding for her sexual harassment claim relies on the same facts as her retaliation

254

Strickland argues that Martinez interfered with the investigation by fabricating an allegation about Strickland, that Martinez communicated this fabrication to Ishida (who then communicated this to Chief Judge Gregory), and that Martinez's "interference" through this fabrication is evidence of his discriminatory intent.  Pl.'s PFOFCOL 442.  Martinez alleged that Dunham tried to obstruct Beam's investigation by telling her staff to tell Martinez that he needed to give Strickland whatever she wanted before Strickland sued or went to the press, and that Dunham did so because she was a friend of Strickland. Tr. Ex. 188 at US2558.  Ishida reported this allegation to Chief Judge Gregory, indicating that this "interference" occurred on August 15, 2018.  Id.  Beam testified that she was instructed to stop her investigation from someone at the AO.  Beam Dep. 40. Before this alleged interference on August 15, 2018, Martinez already felt like the AO was interfering with his office after the call he received from Clarke in early August 2018.  See Martinez Dep. 189:1-5; 12/14/23 Martinez Tr. 79:11-80:25; Tr. Ex. 135 at ¶ 188.  There is no support, however, for Martinez's statement that Dunham was a "friend" of Strickland's, Dunham

_____

claim, Tr. Ex. 201 at 24:20-25:6, and Beam's amended report
included a thorough discussion of the retaliation claims, Tr.
Ex. 5 at US1251-53.  Regardless, because Martinez did not have
control over the investigation, Beam's alleged failure to
investigate the claims against him says nothing about Martinez's
discriminatory intent.

255

Dep. 128:10-129:12, although Strickland was connected to Dunham through her contacts at the AO, specifically Minor, Strickland's former supervisor, 12/13/23 Strickland Tr. 10:14-11:14.  While Martinez's communication to Ishida may have been exaggerated, it does not appear to be fabricated.  Even so, it does not appear to the Court that this was motivated by any discriminatory intent on the part of Martinez.

Strickland points out other deficiencies with the investigatory process, namely that Martinez "coordinated" his testimony with Davis by asking for a timeline of events after the investigatory process began (it is true that Davis sent him a timeline on August 20, 2018, Tr. Ex. 40), and that Davis was prematurely told the results of investigation before it was finalized (this is true, Davis spoke as if he knew the findings of the report in a December 2018 email, Tr. Ex. 13) perhaps by Beam (Ishida's speculation, Ishida Dep. 185:10-19) or Martinez.[132]  These deficiencies, along with how long the

---

[132] In a significant event log, Martinez wrote that he counseled Davis for talking to Ishida about something that Martinez mentioned to Davis in a private conversation (perhaps the facts of the investigative report), told Davis that he could not go to the trier-of-fact and talk about "legal conclusions[,]" and noted that there was "no legal conclusion to the ongoing investigation."  Tr. Ex. 175.

256

investigation took (over 4 months[133]), certainly undermined its
integrity and reliability –- this investigation certainly had
its imperfections.  Although the Court did not have the benefit
of Beam's live testimony at trial, the record does not indicate
that Beam was in any way conducting a "sham" investigation.  See
supra Section IV.E.  Moreover, the Court does not see how this
has any bearing on Martinez's **discriminatory** intent.

Lastly, Strickland states that the fact that Martinez was
deciding disciplinary action against Davis, and that Martinez
did not think Davis's conduct amounted to sexual harassment, is
also evidence that the investigation was a sham and that
Martinez discriminated against her on the basis of gender.
Pl.'s PFOFCOL 443.  The Court rejects this argument.  Martinez's
counseling of Davis after the investigation had nothing to do
with the quality of the investigation (and is within his role as
the unit executive, though it likely occurred due to the
recommendations within Beam's report).  Martinez's views on the
sincerity or merit of Strickland's claims does not mean that he
discriminated against her on the basis of gender.

Because Strickland fails to meet her burden in proving
Martinez's deliberate indifference, Martinez's retaliation, and

---

[133] Martinez appointed Beam on August 14, 2018, Tr. Ex. 137
at 8, and Beam's final report was completed on January 11, 2019,
Tr. Ex. 5 at US2293.

Martinez's discriminatory intent, this Court rejects her equal protection claim.

### C.   Strickland's Due Process Claim

Strickland claims that the Judicial Administrators violated her due process rights because she was "coerced to end the investigation and led to believe [Martinez] was a final decisionmaker" in her EDR complaint.  Pl.'s PFOFCOL 449.  The Fourth Circuit has held that judiciary employees have a property interest in the protections granted by the EDR Plan. Strickland, 32 F.4th at 348-52.  In its opinion in this case, the Fourth Circuit stated that Strickland's "due process rights were violated if she can prove that the [Martinez], an accused party, was not disqualified from the EDR process, and if Strickland was led to believe that [Martinez] would be the final decisionmaker in her case."  Id. at 356.  As Strickland has not demonstrated that she reasonably was led to believe that Martinez would be the final decisionmaker in her case, she has not met her burden on her due process claim.

### 1.   The Judicial Administrators' Claims Regarding This Court's Earlier Ruling Are Incorrect.

At the outset, this Court must address the Judicial Administrators' argument that as this Court granted in part their Motion for Judgment on Partial Findings on December 11, 2023, no assessment of Strickland's due process claim is

258

necessary.  See Defs.' PFOFCOL 30.  They argue that because this
Court held "that there was no basis to conclude that
[Strickland] reasonably believed the final decisionmaker on her
EDR claims would be anyone other than an independent judicial
officer," Strickland's due process claim is "foreclose[d]."  Id.
This argument, at best, mistakenly misconstrues the Court's
ruling, and at worst, purposefully attempts to manipulate the
Court's ruling without regard for the Court's intent.  The Court
assumes the former.

    As explained above, see supra Section II.E., this Court
ruled on the Judicial Administrators' motion regarding the
narrow issue of whether Strickland reasonably believed that
Martinez would be the "decision-maker in the dispute resolution
process."  12/11/23 Mot. Hearing Tr. 9:1-3.  This Court,
however, also stated that the contentions at the hearing by the
Judicial Administrators that such a ruling "sweeps the board
clear" of a due process claim were "question[able]."  Id. at
9:9-12.  In making its ruling on this motion, the Court ruled
that it would have been unreasonable for Strickland to believe
that Martinez was the decisionmaker on whether she had, in fact,
been sexually harassed.  The Court left open, however, the
possibility that Strickland reasonably may have believed that
Martinez would be the final decisionmaker on any remedies
available to Strickland at the close of the presiding judicial

259

officer's findings and determinations.  See id. at 10:4-11:8

(detailing possible due process violations that may have

occurred outside the issue of whether Martinez would be the

final decisionmaker on Strickland's claims).

Having clarified this confusion, the Court goes on to

address Strickland's due process claim.

### 2.    Martinez Was Not Disqualified from the EDR Process.

The parties agree that Martinez was not disqualified from

the EDR process; therefore, the Court need not dwell on this

issue.[134]  See Defs.' PFOFCOL 33-34; Pl.'s PFOFCOL 450-51.  As

---

[134] Whether Martinez should or should not have been
disqualified from the EDR process is not a question the Court
need decide here.  The Court notes, however, that when Ishida
asked Beam for her opinion on Strickland's disqualification
request, Beam told Ishida that she "truly believe[d] [Martinez]
[was] biased in this case," and that she was "concerned he could
cause more damage if he were involved in the process at this
point."  Tr. Ex. 163 at US1382.  Further, Jill Langley, the
national Judicial Integrity Officer, testified that it would be
appropriate to disqualify a unit executive when that executive's
personal interests conflict with the best interest of the
office.  12/19/23 Langley Dep. 58:17-60:18; see also Langley
Dep. 141:3-142:21.  Finally, it is obvious to the Court that
Martinez's actions as the unit executive were inappropriate,
including his reaction to Strickland's contact with the AO and
his use of a marriage metaphor, and his sharing of Strickland's
mediation supplement with Davis, among others.  See, e.g., Tr.
Ex. 150 at 10:12-13; Martinez Dep. 189:1-5; Tr. Ex. 135 at ¶
140; Davis Decl. ¶ 43, ECF No. 245-3.  The Fourth Circuit, in
its opinion in this case, also stated unequivocally that "[t]he
refusal to disqualify [Martinez] created a conflict of interest
that infected the entire investigation."  Strickland, 32 F.4th
at 355.

Martinez was not disqualified from the EDR process, this element of the test laid out by the Fourth Circuit is satisfied.[135]  See Strickland, 32 F.4th at 356.

### 3. Strickland May Have Believed That Martinez Would Be the Final Decisionmaker on Remedies in Her Case, But That Belief Was Not Reasonable Under the Circumstances.

The crux of Strickland's due process claim is therefore whether she reasonably was led to believe that Martinez would be the final decisionmaker on any remedies that may occur at the conclusion of the EDR process.  Were Martinez the final decisionmaker on those remedies, even if Chief Judge Gregory or another presiding judicial officer was the one issuing the final decision on whether Strickland was sexually harassed, Martinez's ability to control the consequences of that decision would have tainted any relief available to Strickland, and therefore would make continuing in the EDR process superfluous.  Such a circumstance would offer Strickland no unbiased, objective remedy, denying her the fair and equal treatment she sought.  If

_____

[135] Strickland argues separately that Martinez's "severe conflicts of interest are sufficient, standing alone, to conclude that [her] due process rights were violated."  Pl.'s PFOFCOL 459.  This argument, however, is an attempt to collapse the two-part test established by the Fourth Circuit into just one step -- essentially, she asks this Court to hold that simply because Martinez was not disqualified, her due process rights were violated.  The failure to disqualify Martinez, standing alone, is not a violation of Strickland's due process rights under the EDR Plan.  The Court, therefore, rejects this argument.

Strickland reasonably believed that the outcome of the final judicial hearing did not matter because Martinez had the final say on any resolution, she was deprived of due process.

This Court has determined that Strickland did believe that Martinez was the final decisionmaker; the evidence and her statements at the time suggest as much, particularly her decision to withdraw her EDR complaint and the comment she submitted on the Exposure Draft to the Model EDR Working Group. <u>See</u> Tr. Ex. 135 at ¶ 467. What is important in this analysis, however, is only whether that conclusion was reasonable under the circumstances with the information available to Strickland at the time.

> **a. Strickland's Reliance on the Out-of-Context Statements of the Mediator in Her Case Could Not Reasonably Have Led to Her Belief That the Chief Judge Had No Authority to Order Remedies.**

Under the Fourth Circuit EDR Plan, "[t]he purpose of . . . mediation is to afford the mediator the opportunity to 'consult separately and/or jointly with the employee and his or her representative, if any, and the employing office to discuss alternatives for resolving a dispute, including any and all possibilities of reaching a voluntary, mutually satisfactory mediation.'" <u>Strickland</u>, 32 F.4th at 323. The purpose of mediation is that the parties "cooperate and compromise." <u>Willis</u> v. <u>Trenton Mem'l Ass'n</u>, 166 F.3d 337 (4th Cir. 1998).

Going into mediation, parties are asked to appear "with an open mind as to a possible mutually acceptable resolution of" the case, knowing that they may not receive everything they want, but also knowing that they may receive a more favorable outcome than they would at trial. Karagiannopoulos v. City of Lowell, No. 3:05CV401-FDW-DCK, 2008 WL 934391, at *1 (W.D.N.C. Mar. 31, 2008) (Keesler, M.J.).

In order to be effective, a mediator must be impartial and gain the trust of both parties; however, the mediator must also provide both parties with incentives to cooperate, incentives that can be both positive (a carrot, if you will) and negative (a stick). Smith explained that he understood his role as mediator to be to "figure out how [he] was going to get [Strickland] back in the office in such a way where she is given some concessions. . . where she's happy."[136] Smith Dep. 28:7-22.

The carrot here, of course, would be those concessions Strickland had requested; for instance, a transfer to an office in an adjacent district, as Strickland was asking. The stick, in contrast, was everything Smith did and said to move the

---

[136] The Court notes here that Strickland and her husband, who acted as her representative in all interactions with Smith, are trained lawyers, and ought have understood the motivations and incentives of a mediator. Smith's job was to see if it was possible for the case to settle prior to the formal hearing; his actions were eminently reasonable given that goal and Strickland ought have recognized that his statements were made in furtherance of that goal.

263

mediation forward by suggesting to Strickland that a resolution via mediation would be in her best interest. As Smith explained to Strickland: "[Y]our best opportunity, if you want to stay in that office and try to figure this thing out is to formulate a settlement agreement . . . ." Tr. Ex. 153 at 51:1-5. Such a statement, made by a mediator in the run-up to the adversary hearing, is meant to incentivize settlement.

Strickland argues that the statements Smith made to her in mediation conversations reasonably led her to believe that Martinez would be the final decisionmaker in her case because Smith stated that he didn't "think a judge [was] going to micromanage. . . and tell a federal defender how to do his job." Id. at 47:8-13. Taken in the context of the entire conversation Smith, Strickland, and her husband were having, however, this statement was not in reference to whether the presiding judicial officer would be able to order remedies, but instead whether he would order remedies as tailored and specific as Strickland could achieve through mediation.

In the conversation, Smith explained to Strickland and her husband that the remedies she would have preferred (for instance, Davis being fired, or people to stop gossiping about her in the office) were not available under the EDR Plan, and that therefore neither Smith, through mediation, nor a presiding judicial officer, through hearing and judicial order, could

264

provide them.[137]  See id. at 43:4-47:21 (Smith explaining that

"what I'm mainly talking about is you're not going to go get

what you want. . . the backtalk and the optics of the whole

thing to go away and that's not going to happen"; Smith

explaining that "the way [he] read[s] the EDR [Plan]," it would

not "allow [Strickland] to put in a [request] for relief that

[Davis] or [Martinez] be terminated.").  Read in the context of

the conversation, Smith's statements do demonstrate frustration

with the EDR Plan, but that frustration stems from the remedies

available to any and all complainants, and not with who would be

administering those remedies.  Instead, Smith is trying to

convey to Strickland that to resolve the case through mediation

was in her best interest; a binding settlement agreement could

include specific details that she personally advocated for and

was guaranteed relief, a guarantee she would not have were she

to go to a formal hearing.  Taken in context, Smith's statements

could not reasonably have led Strickland to believe that a

presiding judicial officer would not be the final decisionmaker

on remedies in her case were she to go to a formal hearing.

Other conversations Strickland had with Smith bear this

out.  For instance, when Strickland interviewed for her

_____

[137] The EDR Plan mostly provides what the Court refers to as
"positive remedies," that is, things granted **to** the complainant,
not adverse actions taken against others.  See Tr. Ex. 136 at
US4555 (listing remedies available to successful complainants).

265

clerkship with Judge Floyd, she spoke with Smith about her concern that no remedies could be afforded to her through a formal hearing in the EDR process.  See Tr. Ex. 154 at 76:21-77:2.  After she raised her concerns, Smith reminded Strickland that "[Martinez] does have a boss.  It's the chief judge.  He can be removed."  Id. at 80:1-8.  This statement unequivocally refuted any concern from Strickland that a presiding judicial officer could not order remedies within the Federal Defenders' Office.

Strickland also argues that as a variety of judiciary officials celebrated, and commended Smith on his success, when Strickland accepted a settlement and withdrew her complaint, "the goal of [Smith's] statements was to convince [Strickland] to withdraw her EDR complaint instead of continuing to a final hearing."  Pl.'s PFOFCOL 453 (internal quotations omitted). This argument, however, fundamentally misunderstands the goal of mediation (or, at least, misunderstands the reason for that goal).  The goal of mediation is settlement; celebration of settlement is generally normal (though the text messages and emails to which Strickland cites are clear and shameful examples of judiciary officials' failure to lead with empathy and respect).  The reason settlement generally is celebrated, however, is not because parties want to be rid of each other; instead, successful mediation should generally lead to

satisfactory relief for all parties involved.  Smith's goal was
for Strickland and her case to avoid a formal hearing, but
nothing untoward existed in his actions or motivations for that
goal.  As a mediator, he attempted to find a settlement which
would leave Strickland "happy."  Smith Dep. 28:7-22.  Although
Smith recognized that the resolution of her case did not provide
Strickland with satisfactory relief, the Court has determined
that Smith thought he had provided Strickland with the best
possible outcome to her complaint given the restraints on
remedies available under the EDR Plan.  Smith did not mislead
Strickland in reaching settlement, and any belief formed in
reliance on Smith's statements that Strickland had regarding the
Chief Judge's, or another presiding judicial officer's, capacity
as final decisionmaker was unreasonable.

> **b.  Strickland's Reliance on Inconclusive
> Statements by Jill Langley, the Judicial
> Integrity Officer, Could Not Have Reasonably
> Led to Her Belief That the Chief Judge Had
> No Authority to Order Remedies.**

Strickland also argues that statements made to her by Jill
Langley, the Judicial Integrity Officer and a "national
resource" for judiciary employees on the Model EDR Plan,
reasonably led her to believe that Martinez would be the final
decisionmaker in her case as "remedies under the Plan could not,
or would not, be ordered in practice."  Langley Dep. 27:6; Pl.'s
PFOFCOL 456.  Strickland points to statements Langley made

267

during depositions in this case, as well as statements made to Strickland in person and via email while Strickland was still in the middle of the EDR process. Pl.'s PFOFCOL 456. Statements Langley made during depositions in this case occurred well after Strickland withdrew her EDR complaint, and therefore, could not have been relied upon by Strickland as a basis for her belief that Martinez would be the final decisionmaker in her case.

When Strickland and her husband met with Langley in February 2019, they discussed her EDR complaint and issues Strickland had had with the EDR process as a whole. Tr. Ex. 135 at ¶ 428; Tr. Ex. 21 at US5445-47. Langley testified that, during this February meeting, Strickland asked:

> [W]hat would happen if the defender, like if the presiding judicial officer at the end of the complaint stage -- because that's when remedies happen, after there has been a decision on the merits -- what would happen if the defender refused to comply with the orders.

Langley Dep. 130:12-22. In response to the question, Langley testified that she told Strickland that she "literally did not know enough about the relationship between the defender. . . and the judges on the Court of Appeals," but that "a defender would be obligated under the plan to take those remedies and to comply with the order." Id. at 131:11-21. Langley went on to say that what she was unclear on, simply, was "what would happen if [the Federal Defender] refused to follow" the presiding judicial

268

officer's orders.[138]  Id. at 131:17-21.  Langley's uncertainty,
as conveyed to Strickland, did not rise to telling Strickland
unequivocally that Martinez would be the final decisionmaker on
Strickland's remedies following her Chapter X hearing, and any
belief otherwise based on these statements was unreasonable.
The issues Strickland raised to Langley demonstrate a failure of
the EDR Plan clearly to articulate the roles, responsibilities,
and authorities of the presiding judicial officer and a unit
executive like the Federal Defender; however, uncertainty on the
outcome does not dictate the outcome, and Strickland's
assumptions otherwise were unreasonable.

As for the email Langley sent, the email simply stated that
she would "like to better understand if [Federal Public
Defenders] are adequately protected by EDR remedies."  Tr. Ex.
22 at US2207.  Again, Langley, in doing her job as a resource
and, more importantly, a trainer and educator on the Model EDR
Plan, as well as someone with the power to suggest changes to
the EDR Plan, was not suggesting, specifically, that Strickland
and other federal public defenders were in fact not "adequately

---

[138] Strickland further claims that she was told by Langley
that "Article III judges do not have authority to 'manage' a
federal defender office," and that Langley "called this issue
'jurisdictional.'"  Compl. ¶ 439; see also Pl.'s PFOFCOL 456.
Strickland cites to no evidence for this assertion, and Langley
directly disputed the claim at trial.  12/19/23 Langley Tr.
36:17-21, 38:2-6.

269

protected by EDR remedies." Instead, Langley appears to have been attempting to learn from Strickland's experiences in order to improve the EDR Plan and her training of judiciary employees. Langley's statements, both over email and in person, articulated what could be reasonably inferred as an uncertainty on the issue of whether Martinez would have to follow remedies ordered by a presiding judicial officer. Reasonable uncertainty, however, and even reasonable concern, does not rise to the level of conviction; the fact that Langley was unsure disputes Strickland's claim that she told her "a hearing officer could not, or would not," be able to tell Martinez what to do at the remedies stage. Pl.'s PFOFCOL 456. Strickland was therefore not reasonably led to believe by Langley that Martinez would be the final decisionmaker in her case. How could she have, when Langley did not know herself?

   c.   **The Information Available from Other Sources to Strickland Directly Disputed Any Uncertainty Raised by Smith and Langley's Statements, and Therefore, Strickland's Belief That Martinez Would Be The Final Decisionmaker in Her Case Was Unreasonable.**

Strickland points to only Langley and Smith's statements as those she relied on to formulate the belief that Martinez would be the final decisionmaker on remedies in her case. It does not appear that Strickland sought clarification on the issue from Ishida or any other EDR coordinator, people who may have further

270

assisted in clearing up any confusion due to their experience in administering the EDR Plan.[139]  See 12/11/23 Strickland Tr. 101:10-24; 12/19/23 Langley Tr. 37:8-14.  Strickland also appears to have disregarded the plain language of the EDR Plan itself, which states that: "Where judicial officers acting pursuant to § 10 or § 11 of this Plan find that a substantive right protected by this Plan has been violated, they may order a necessary and appropriate remedy."  Tr. Ex. 136 at US4555.  The Court is surprised that as an attorney, Strickland would choose to ignore the plain text of the Plan in favor of out-of-context and inconclusive statements.  As the Supreme Court has repeatedly explained, "[w]hen the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest.  Only the written word is the law, and all persons are entitled to its benefit."  Bostock v. Clayton Cnty., Georgia, 590 U.S. 644, 653 (2020).  In this case, at the close of a formal hearing, the EDR Plan would be the "statute" by which the presiding judicial officer could order remedies.  For Strickland to believe, on the basis of not only "extratextual," but also uncertain and out-of-context

_____

[139] See, e.g., 12/11/23 Strickland Tr. 101:16-24 (Strickland testifying that she did not ask Ishida whether a judicial officer could order remedies against Martinez because "he works directly for the Fourth Circuit and the Chief Judge, so [she] knew he wouldn't necessarily be a good person to ask" because he had an "inherent conflict of interest in that position").

271

statements, that the presiding judicial officer would not be able to order remedies as stated in the EDR Plan was unreasonable.  Although Martinez was not disqualified, Strickland's due process rights were not violated, and thus the Court rejects her due process claim.

> **4.    Strickland Attempts to Broaden the Fourth Circuit's Holding in Order to Establish More Paths for a Due Process Claim, But This Court is Constrained by the Fourth Circuit's Holding.**

Strickland also argues that she was "coerced to resign," and that that coercion was a "violation of her due process rights."  Pl.'s PFOFCOL 458 (internal quotations omitted).  Strickland interprets the Fourth Circuit's earlier opinion to hold that, on its own, "the alleged coercing of Strickland to end the investigation stated a plausible violation of her due process rights."  Id. (quoting Strickland, 32 F.4th at 355).  She goes on to argue that because the investigation into her original claim and post-disciplinary action were delayed, and because such disciplinary action was, she alleges, "conditioned on the withdrawal of [Strickland's] EDR complaint," she was coerced into ending the investigation and that, therefore, her due process rights were violated.  Id. at 458-59.  Strickland, however, fundamentally misreads the Fourth Circuit's holding.[140]

---

[140] Separately, the evidence does not support Strickland's allegations that her wrongful conduct report was deliberately, and she insinuates, maliciously, withheld in "abeyance".  Pl.'s

Though the Fourth Circuit does state that "the alleged coercing of Strickland to end the investigation stated a plausible violation of her due process rights," this statement, on its own, is out of context. <u>Strickland</u>, 32 F.4th 311 at 355. The full analysis of the Fourth Circuit reads:

> [T]he refusal to disqualify [Martinez] from the investigation and the alleged coercing of Strickland to end the investigation

---

PFOFCOL 458. During a January 17 meeting between Ms. Strickland, Mr. Strickland, and Ishida, Ishida suggested that they hold the wrongful conduct proceeding in "abeyance" to address Strickland's concerns about Ishida unfairly disclosing the contents of the investigative report to Martinez, but not Strickland. Tr. Ex. 147 at 13:18-11. In making this suggestion, Ishida told the Stricklands that the OGC advised Ishida to not disclose the findings of the report to either party during the mediation and counseling stages of the Chapter X process (although he also stated that "it is a different story" if Strickland's claim reached the "formal stage of hearing"). <u>Id.</u> at 8:2-21. Mr. Strickland expressed concern about Martinez obtaining the investigative report during the Chapter IX wrongful conduct process, even though Ishida relayed that all parties, including Martinez, were foreclosed from obtaining the investigative report through the Chapter X process (at least until the formal complaint stage). <u>Id.</u> at 10:18-13:11. With this context in mind, it is clear that, in suggesting to delay the Chapter IX proceeding, Ishida was attempting to address Strickland and her counsel's valid concerns. Thus, the evidence does not support Strickland's allegation that disciplinary action was conditioned on her withdrawal of her EDR complaint.

The Court finds that the counseling action only occurred after the withdrawal of Strickland's EDR complaint because the action for the reported wrongful conduct (a process separate from the EDR process) could not practically occur until a resolution of the EDR complaint (whether that be settlement, withdrawal, or adjudication at a formal hearing). Because the two dealt with the same facts and involved the resolution of the same issues, the decision to deal with both in this fashion was pragmatic and does not evince a desire to coerce Strickland to resign.

273

> stated a plausible violation of her due
> process rights. . . . Leading Strickland to
> believe that her only way forward was to
> obtain a favorable decision from one of the
> key subjects of the investigation could be
> found to have deprived Strickland of her
> property interest in the right to a remedy
> from injuries incurred because of harassment
> and discrimination.

Id. When read in context, the Fourth Circuit's intent becomes

clear; its reference to Strickland's allegations that she was

"coerced" to resign refers specifically to Strickland's belief

that Martinez "would be the final decisionmaker in the case."

Id. Again, Strickland attempts to collapse the two-step test

put forth by the Fourth Circuit into a one-step test -- here, to

have the Court find a due process violation simply from the

second step the Fourth Circuit directed, without regard to the

first. See note 135, supra. The Court is constrained by the

law as construed by the Fourth Circuit. Under that

interpretation, the due process violation Strickland alleges

here is not actionable. The Court, therefore, rejects the

argument.

### D. Strickland's Claim of Constructive Discharge

Strickland argues that she "was constructively discharged

because of the violations of her equal protection and due

process rights." Pl.'s PFOFCOL 464. As this Court has

determined that there was no violation of Strickland's due

process or equal protection rights, this Court further

274

determines that Strickland was not constructively discharged.
For the Court to hold that Strickland was constructively
discharged, the Court would need to find that the conditions
were "so intolerable that a reasonable person" would feel
"compelled to resign."  Pennsylvania State Police v. Suders, 542
U.S. 129, 141 (2004).  This Court has no doubt that the
situation in which Strickland found herself was not only
disappointing and frustrating, but in fact likely excruciating.
As Strickland stated at the time, the "situation . . .
irreparably damaged [her] relationships with [Martinez] and
[her] colleagues, and [she] believe[d] [she was] no longer
welcome in that environment."  Tr. Ex. 205 at US1635; 12/11/23
Strickland Tr. 91:10-25.  In rejecting Strickland's constructive
discharge claim, this Court in no way means to make light of
what Strickland experienced.

The law, however, only recognizes constructive discharge
claims where an employee "would have had **no choice** but to
resign."  Lee v. Belvac Prod. Mach., Inc., No. 20-1805, 2022 WL
4996507, at *3 (4th Cir. Oct. 4, 2022) (quoting Perkins v. Int'l
Paper Co., 936 F.3d 196, 212 (4th Cir. 2019)) (emphasis in
original).  "Intolerability is not established by showing merely
that a reasonable person, confronted with the same choices as
the employee, would have viewed resignation as the wisest or
best decision, or even that the employee subjectively felt

compelled to resign." Id. "[D]ifficult or unpleasant working conditions and denial of management positions, without more, are not so intolerable as to compel a reasonable person to resign." Id. Strickland's damaged relationships with her colleagues do not rise to the level of intolerableness necessary for this Court to accept her claim of constructive discharge. Further, as this Court has already rejected her due process and equal protection claims, the Court rejects her assertion that she was "coerced" into resigning. The Court, therefore, rejects Strickland's claim of constructive discharge.

## VI.  SUMMING UP; SUGGESTIONS FOR REFORM

And so Strickland's proof falls short of convincing this Court that she is entitled to relief.

None of the Judicial Administrators she has sued took any action or failed to take any action based either in whole or in part on her gender. Nor did any Judicial Administrator retaliate in any way against Strickland because she made a good faith claim of sexual harassment. Yes, Martinez mistrusted Strickland as a "team player" after he removed her from working on the Dixon case and she soon after pushed back on taking on a few easier cases. And yes, that mistrust deepened into active dislike when he mistakenly jumped to the conclusion that Strickland's good faith claim of sexual harassment by Davis was actually a manipulative attempt to be reassigned to Asheville, a

276

duty station closer to her husband.  This hostility, however, was not gender based.  Martinez's reaction would have been identical had Strickland's husband Cooper been the Assistant Federal Defender rather than her.

Nor was Strickland denied constitutional due process. Remember, Strickland's due process rights depend on the provisions of the 2013 EDR plan.  <u>Strickland</u>, 32 F.4th at 352 (holding that "the EDR Plan afforded Strickland with substantive rights that are protected property interests under the Fifth Amendment").  Under the EDR Plan, Strickland has received the process to which she was due.  True, the process was flawed in various respects, but none of those flaws rises to the level of a constitutional violation.  They stem, rather, from well-meaning people trying fairly to implement the EDR plan while "walking wide"[141] of Strickland.  As this Court has already ruled, 12/11/23 Tr. 13:18-14:1, ECF No. 406, Strickland could never reasonably have believed that Martinez would be the

---

[141] The reference is to Kipling:
    Walk wide o'the Widow at Windsor
    For 'alf o' Creation she owns
    We 'ave bought 'er the same with the sword an'
    the flame,
    An' we've salted it down with our bones.

Rudyard Kipling, Barrack-Room Ballard and Other Verses 46 (Heinemann & Balestier Ltd. ed., 1892); <u>see also</u> The Kipling Society, https://www.kiplingsociety.co.uk/poem/poems_ widowatwindsor.htm.

decision-maker on the issue of whether she had suffered sexual
harassment. This Court now also holds that it was unreasonable
for Strickland to believe that Martinez would be the final
decisionmaker on any remedies available to Strickland at the
close of the Chapter X hearing. This Court infers that
Martinez's involvement would be limited to the extent that his
views would be sought as the Unit Executive.

Finally, Strickland resigned because she believed her
career was going nowhere, not because of a hostile work
environment as the Fourth Circuit decisional law construes that
requirement.

For all these reasons, as more fully articulated in the
body of this opinion, judgment shall enter for the defendant
United States as it represents the various judicial officers and
administrators in their official capacities.

Yet, one obdurate and inconvenient truth remains -- in this
case, a young woman with significant professional qualifications
made a good faith claim of sexual harassment. As a result, she
saw her desired career in public service stunted and ultimately
withered such that her services have been lost to federal public
service. That she is without redress under the present legal
framework cannot be a cause for congratulation on the part of
federal judges or administrators.

What can be done?

This Court is fully sensitive that it has tried this case under the mandate of an important, indeed seminal, decision of the Fourth Circuit.  Strickland, 32 F.4th at 377.  Under that decision this Court must construe the EDR plan as it stands, not restructure it.  As the Fourth Circuit said, "The EDR Plan is . . . not facially invalid."  Id. at 355.

Nevertheless, it is the duty of this Court respectfully to recommend those structural reforms that, in its view, could have ameliorated the problems revealed in this case.[142]

**1. The judicial officer ought be appointed once an apparent good faith claim of sexual harassment is made.**  Under the EDR plan, direct involvement of a judicial officer comes only at the end of the process, once mediation fails and it is clear that a hearing upon disputed evidence must take place.  If we judges are serious about sexual harassment, we must own the process

---

[142] As this decision was in its final drafts, the Federal Judicial Center, on September 17, 2019, issued a comprehensive report on judiciary workplace issues.  Judicial Conference Report 4.  The Report is thorough and balanced, albeit a bit self-congratulatory and protective of the judiciary's internal hierarchies.  As far as it goes, its recommendations are eminently sensible.  The Report appears to adopt my recommendation that mediation may be voluntary not mandatory where there are claims of sexual harassment.

Since it does not go far enough, however, it continues to be my duty respectfully to express my views drawn from this particular case against a background of over forty years of service as a district judge, seven as a Chief district judge.

My views, of course, have nothing to do with judicial discipline, an issue not presented in this case.

279

from the beginning. We must be directly responsible (and be seen directly responsible) from start to finish.

The proper analog is a lawyer disciplinary proceeding where an ethical lapse is alleged. Judges are familiar with such proceedings, know how to initiate the proper investigations, and can maintain appropriate confidentiality to safeguard client confidences and professional reputations. Here, it appears that Chief Judge Gregory informally assumed that role, acting through Circuit Executive Ishida. Respectfully, it would have been better had another circuit or out-of-district judge been delegated the responsibility and appointed at the outset. As the point person, that judge would set a reasonable schedule and authoritatively handle the plethora of questions that can be expected to arise. I infer, though the point is regrettably obscure, that the EDR plan as written vests in that judge the authority to make employment decisions.[143] In any event, if we're serious, the judge must have that authority unless a statute or court rule requires a group decision, i.e., the selection or termination of a federal defender or clerk of court. In such case, the appointed judge makes a written report

---

[143] The issue never arose in this case as the process ended with Strickland accepting the short-term clerkship position. Martinez testified that he would, of course, have done whatever Chief Judge Gregory had recommended. 12/14/23 Martinez Tr. 114:15-22.

to the body that makes the decision -- again just as is the case in many courts with attorney discipline. As stated above, we judges own this issue. Where sexual harassment is claimed, no accused judicial employee ought find solace in long years of exemplary service and an understanding boss. The issue is that important.

**2. The process took far too long.** Here again, while there is no due process violation -- consider how long it takes to get to trial in a federal district court[144] -- the approximately four months it took for investigation and to commence mediation[145] evidences a ho-hum attitude toward a claim of this magnitude. Strickland rightly complains of the process here as compared to the Ninth Circuit's investigation of a similar complaint involving a judicial officer. <u>See</u> Pl.'s Notice Suppl. Auth. 2, ECF No. 417.

We must remember that the appropriate steps taken here -- removing Davis from any direct supervision of Strickland's work, allowing Strickland to work remotely (all steps in which Strickland concurred) -- had the inevitable effect of cutting

---

[144] Strickland reported sexual harassment in early August 2018 and filed her complaint in this Court on March 3, 2020. It has taken over four years to try this case and render this decision. <u>See generally</u> Compl, ECF No. 1.

[145] Martinez appointed Beam on August 14, 2018, Tr. Ex. 137 at 8, and Beam's final report was completed in January 11, 2019, Tr. Ex. 5 at US2293. Strickland commenced mediation in January 2019. Tr. Ex. 14 at US0519; Tr. Ex. 141 at US3138.

Strickland off from the day-to-day interaction with her colleagues and the benefits and burdens of a joint team effort. The longer it lasted, the more truly remote she became in the eyes of everyone who needed to depend on her work.

**3. We need to rethink mandatory mediation.** Here, everyone, including this Court but perhaps not Strickland (though he won her confidence, and she did not sue him), thinks that the mediator, Ed Smith, did a superb job. Indeed, it appeared he had resolved the matter to Strickland's satisfaction.

Now, of course, we know that she was being somewhat disingenuous, dreading returning to work for Martinez but believing her securing of a Fourth Circuit clerkship to be the most face-saving arrangement she could secure.

At the risk of falling into the trap of thinking that judicial processes are the "best" processes, see Dennis Jacobs's brilliant article, The Secret Life of Judges, 75 Fordham L. Rev. 2855 (2007), I wonder whether requiring mandatory mediation is the best way to go. Perhaps voluntary mediation might work better. True, the EDR plan here parallels many such plans in private industry. Moreover, Smith was everything one wants a mediator to be –- he was both appropriately candid while at the same time assiduous and innovative in seeking out alternatives to a zero-sum disputed hearing.

Had Strickland truly wanted mediation, of course it should be afforded -- and with a mediator as skilled as Smith. But here she had no choice. Under the EDR plan that established her rights, she had to mediate before she could obtain a judicial hearing. Tr. Ex. 136 at US4551. Viewed from afar, this looks like a measured and thoughtful process. From Strickland's point of view (and apparently that of others similarly situated), where the mediator himself is an employee of the judiciary, mandatory mediation is viewed as what the great Tom Eisele[146] called an "IIE," an Intermediate Irritating Event, designed to maximize resolution with the least damage to the judiciary's reputation.[147] Voluntary mediation would obviate these concerns.

The entry of judgment terminates my involvement in this case. Perhaps there will be an appeal. Should there be an appeal and I am affirmed, so be it. Should I be reversed in whole or in part, another district judge necessarily will pick up the stroke. It will not be amiss, therefore, if I drop a

---

[146] Hon. G. Thomas Eisele, United States District Judge, Eastern District of Arkansas, 1970-2011.

[147] The fact that Smith appeared at the time to achieve resolution, while a tribute to him, does not diminish the force of this analysis.

283

footnote here by way of "thank you" to the trial lawyers

involved.[148]

## VII. ORDER FOR JUDGMENT

In light of the findings and rulings made above, judgment

shall enter for the United States.

**SO ORDERED.**

---

[148] What follows is a brief commentary on trial advocacy.
It has nothing whatsoever to do with the merits.

Before trial Ms. Strickland and her husband told the Court
that neither one had ever tried a case.  Now you have.  Quite an
experience, isn't it?  I have been a trial judge longer than
most of you have been alive and have taught trial advocacy and
evidence for over forty years.  Each one of you did a fine
professional job.

You government attorneys were thorough, fair, ethical
without overreach (though I don't buy the argument she ought be
earning in what the average Duke Law School graduate at Big Law
is taking home.  That's just wrong).  Fine advocates, each one.

Ms. Strickland, after the silliness at the beginning about
the Fifth Amendment, you held your own against their entire
team.  Your cross examination of Martinez showed flashes of
excellence and left the Court in no doubt about his antipathy.
A fine job as well.

Thank you all.

I urge each of you to continue in trial work.  In Ms.
Strickland's case, I urge you to nurture your evident trial
skills in some public service position where they can be put to
use.

We appear to be at a hinge moment where we need every trial
attorney we can get.  The Supreme Court has just affirmed
America's long-standing reliance on our jury system in both
criminal, Erlinger v. United States, 144 S. Ct. 1840, 1852
(2024) and civil cases, S.E.C. v. Jarkesy, 144 S. Ct. 2117, 2128
(2024); see id. at 2140 (Gorsuch, J. concurring), opinions which
will stand for decades.  But see Trump v. United States, 144 S.
Ct. 2312 (2024) (a six-member majority, eschewing historical
analysis sought fundamentally to redesign the relationship
between the sovereign people and the first citizen of the
Republic).

284

```
                                    /s/ William G. Young
                                  WILLIAM G. YOUNG
                                       JUDGE
                                      of the
                                  UNITED STATES[149]
```

---

[149] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents.  Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 46 years.